# CABRASER DECLARATION

# EXHIBIT  A

# SETTLEMENT AGREEMENT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | : | MDL NO. 2741 |
|  | : | Case No. 3:16-md-02741-VC |
| THIS DOCUMENT RELATES TO: | : |  |
| *Ramirez, et al. v. Monsanto Co.*, Case No. 3:19-cv-02224 | : |  |

**CLASS ACTION SETTLEMENT AGREEMENT**

Dated:          February 3, 2021

# TABLE OF CONTENTS

**Page**

ARTICLE I Definition of Settlement Class and Subclasses.................................................2

ARTICLE II Definitions ...............................................................................................................3

ARTICLE III Defendant's Payment Obligations .......................................................................14

ARTICLE IV Opt-Out Rights.......................................................................................................18

ARTICLE V Information and Registration Process ..................................................................20

ARTICLE VI Compensation Awards ...........................................................................................23

ARTICLE VII Compensation Award Determinations, Payments, and Appeals ..........................28

ARTICLE VIII Diagnostic Accessibility Grant Program..............................................................44

ARTICLE IX Labeling Addition ..................................................................................................54

ARTICLE X Research Funding Program ...................................................................................54

ARTICLE XI Legal Services Program ........................................................................................55

ARTICLE XII Advisory Science Panel .........................................................................................57

ARTICLE XIII Terms Following Conclusion of Initial Settlement Period .................................70

ARTICLE XIV Administration of the Settlement Agreement ......................................................74

ARTICLE XV Settlement Fund Administration ...........................................................................87

ARTICLE XVI Governmental Payors ...........................................................................................89

ARTICLE XVII Releases and Covenants Not to Sue ...................................................................93

ARTICLE XVIII Preliminary Approval ..........................................................................................96

ARTICLE XIX Objections ..............................................................................................................98

ARTICLE XX Final Order and Judgment and Dismissal With Prejudice ...................................99

ARTICLE XXI Enforceability of Settlement Agreement and Dismissal of Claims ....................99

ARTICLE XXII Communications to the Public............................................................................101

ARTICLE XXIII Termination .........................................................................................................102

ARTICLE XXIV Treatment of Confidential Information ........................................................103

ARTICLE XXV Attorneys' Fees................................................................................................104

ARTICLE XXVI Denial of Wrongdoing, No Admission of Liability ......................................105

ARTICLE XXVII Representations and Warranties ...................................................................106

ARTICLE XXVIII Cooperation .................................................................................................107

ARTICLE XXIX Continuing Jurisdiction .................................................................................107

ARTICLE XXX Additional Provisions .....................................................................................108

***ROBERT RAMIREZ, ET AL. v. MONSANTO COMPANY,***
**CASE NO. 3:16-MD-02741-VC & 3:19-CV-02224-VC;**
<u>**CLASS ACTION SETTLEMENT AGREEMENT AS OF FEBRUARY 3, 2021**</u>
**(subject to Court approval)**

       This SETTLEMENT AGREEMENT, dated as of February 3, 2021 (the "Settlement Date"), is made and entered into by and among defendant Monsanto Company ("Defendant"), by and through its attorneys, and the Class Representatives and Subclass Representatives, individually and on behalf of the Settlement Class and Subclasses, by and through Class Counsel and Subclass Counsel.  The Settlement Agreement is intended by the Parties to fully, finally, and forever resolve, discharge, and settle the differences among them with respect to the Lawsuit, as set forth below, subject to Court approval.

<u>**RECITALS**</u>

       WHEREAS, on April 24, 2019, the original complaint in *Robert Ramirez, et al. v. Monsanto Co.* was filed in the Court on behalf of a purported class of persons allegedly exposed to Roundup Products;

       WHEREAS, the Defendant answered the *Ramirez* complaint on July 24, 2019;

       WHEREAS, on February 3, 2021, an amended complaint was filed in the Lawsuit on behalf of Class Representatives and Subclass Representatives seeking to represent a class of persons allegedly exposed to Roundup Products, including two subclasses of such persons (as defined specifically below, the "Class Action Complaint");

       WHEREAS, the original complaint and amended complaint alleged that exposure to Roundup Products can cause Non-Hodgkin's Lymphoma in humans, and the amended complaint seeks compensation, programmatic relief, and punitive damages, among other relief, on behalf of the Class Representatives, the Subclass Representatives, and/or the class;

       WHEREAS, the Defendant denies the allegations in the original complaint, the Class Action Complaint, the Lawsuit and the Roundup Lawsuits, the allegations that exposure to Roundup Products can cause Non-Hodgkin's Lymphoma in humans (the "general causation dispute"), and any liability to the Class Representatives and Subclass Representatives, the Settlement Class, or any Settlement Class Member for any claims, causes of action, costs, expenses, attorneys' fees, or damages of any kind, and would assert a number of legal and factual defenses against plaintiffs' claims if they were litigated to conclusion (including against certification of the purported class for litigation purposes);

       WHEREAS, on June 24, 2020, the Parties entered the June Settlement Proposal to settle the Lawsuit on a classwide basis on the terms and conditions set forth therein, and filed that agreement and a motion for preliminary approval in the Court;

       WHEREAS, on July 8, 2020, the Parties withdrew the June Settlement Proposal following an order of the Court dated July 6, 2020 (MDL Doc. 11182), raising certain questions

regarding the settlement and suggesting that it was tentatively disinclined to grant preliminary approval;

WHEREAS, following extensive, arm's-length, good faith negotiations and consideration of the questions raised by the Court, the Parties have agreed to a settlement of the Lawsuit on the terms and conditions set forth below;

WHEREAS, after careful consideration, the Class Representatives and Subclass Representatives, and their respective counsel, have concluded that it is in the best interests of the Class Representatives and Subclass Representatives and the Settlement Class and Subclasses to enter into the Settlement Agreement. After arm's-length negotiations with Counsel for the Defendant, including through the efforts of the court-appointed mediator, the Class Representatives and Subclass Representatives have considered, among other things: (1) the complexity, expense, and likely duration of the litigation; (2) the stage of the litigation and amount of fact gathering completed; (3) the potential for the Defendant to prevail on threshold issues and on the merits; (4) the range of possible recovery, and (5) the order of the Court regarding the June Settlement Proposal, and have determined that the Settlement Agreement is fair, reasonable, adequate, and in the best interests of the Class Representatives and Subclass Representatives and the Settlement Class and Subclasses;

WHEREAS, the Defendant has determined to enter into the Settlement Agreement solely to avoid the costs, risks, and burden of litigation;

WHEREAS, the Settlement Agreement is subject to and conditioned upon approval of the Court as provided by Rule 23 of the Federal Rules of Civil Procedure, and the Parties intend promptly to seek such approval and entry by the Court of the Preliminary Approval Order and, thereafter, the Final Order and Judgment as provided below;

WHEREAS, the Settlement Agreement will not be construed (1) as evidence of, or as an admission by, the Defendant of any liability or wrongdoing whatsoever or as an admission regarding the general causation dispute, or (2) as an admission by the Class Representatives or Subclass Representatives, or Settlement Class Members, of any lack of merit in their claims;

NOW, THEREFORE, it is agreed that for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, this action shall be settled and compromised under the following terms and conditions:

## ARTICLE I
## Definition of Settlement Class and Subclasses

Section 1.1    Definition of Settlement Class.

(a)    "Settlement Class" means (i) those individuals who are either citizens or Residents of the United States as of February 3, 2021 or who claim exposure to Roundup Products through the application of Roundup Products in the United States and who as of February 3, 2021 both (1) have been exposed to Roundup Products through the application of Roundup Products and (2) have not commenced an individual, non-class lawsuit or retained counsel for the pursuit of any individual, non-class personal injury or false advertising claims arising from,

resulting from, in any way relating to or in connection with such exposure; and (ii) all Derivative Claimants. "Exposure to Roundup Products through the application of Roundup Products" includes exposure through mixing and any other steps associated with application, whether or not the individual performed the application, mixing, or other steps associated with application himself or herself.

(b)     The following Persons are excluded from the Settlement Class:

(i)     Judicial officers and associated court staff assigned to this case, and their immediate family members;

(ii)     Past and present (as of the Settlement Date) officers, directors, and employees of the Defendant or any of its direct or indirect subsidiaries; and

(iii)     All those otherwise in the Settlement Class who timely and properly exclude themselves from the Settlement Class pursuant to Section 4.2 in the manner approved by the Court and set forth in the Settlement Class Notice.

Section 1.2     Definition of Subclasses.

(a)     "Subclass 1" means Settlement Class Members who have been diagnosed with NHL as of February 3, 2021, and their Derivative Claimants.

(b)     "Subclass 2" means Settlement Class Members who have not been diagnosed with NHL as of February 3, 2021, and their Derivative Claimants.

## ARTICLE II
## Definitions

Section 2.1     Definitions.

For the purposes of the Settlement Agreement, the following terms (designated by initial capitalization throughout the Settlement Agreement) will have the meanings set forth in this Section 2.1.   Additional terms are defined in specific sections of the Settlement Agreement (including the Exhibits) and, along with the terms in this Section 2.1, are listed in the index of defined terms that follows the signature pages of the Settlement Agreement.  Exhibit 2 and Exhibit 6 contain certain additional defined terms that are for use solely with respect to those Exhibits and the definitions of which do not apply outside of them.

Unless the context requires otherwise, (a) words expressed in the masculine will include the feminine and neuter gender and vice versa; (b) the word "will" shall be construed to have the same meaning and effect as the word "shall"; (c) the word "or" will not be exclusive; (d) the word "extent" in the phrase "to the extent" will mean the degree to which a subject or other thing extends, and such phrase will not simply mean "if"; (e) references to "day" or "days" in the lower case are to calendar days, but if the last day of a period is a Saturday, Sunday, or legal holiday (as defined in Rule 6(a)(6) of the Federal Rules of Civil Procedure), the period will continue to run until the end of the next day that is not a Saturday, Sunday, or legal holiday; (f) references to the Settlement Agreement will include all exhibits hereto (the "Exhibits"); (g)

references to any law will include all rules, regulations, and sub-regulatory guidance promulgated thereunder; (h) the terms "include," "includes," and "including" will be deemed to be followed by "without limitation," whether or not they are in fact followed by such words or words of similar import; and (i) references to dollars or "$" are to United States dollars.

(1)     "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies, whether through the ownership of voting shares, by contract, or otherwise.

(2)     "Appeals Form" means that document that Settlement Class Members or Class Counsel will submit when appealing a Claims Program Award, as set forth in Section 7.10.

(3)     "Bradford Hill Guidelines" means the criteria proposed by Sir Austin Bradford Hill in *The Environment and Disease: Association or Causation?*, 58 Proc. Royal Soc'y Med. 295 (1965).

(4)     "Claim Form" means that document to be submitted to the Claims Administrator by a Settlement Class Member requesting a Compensation Award, as set forth in Section 7.1.  References to Claim Form refer to both the Accelerated Payment Claim Form and the Claims Program Claim Form.

(5)     "Claim Package" means the documentation and information that Section 7.2 requires a Settlement Class Member requesting a Compensation Award to submit to the Claims Administrator.  A Claim Package can be submitted as either an Accelerated Payment Claim Package or a Claims Program Claim Package.

(6)     "Claims" means past, present and future claims, counterclaims, actions, rights, remedies, causes of action, liabilities, suits, demands, damages, losses, payments, judgments, verdicts, debts, dues, sums of money, Liens, costs and expenses (including, without limitation, attorneys' fees and costs), accounts, reckonings, bills, covenants, contracts, controversies, agreements, obligations, or promises, including any of the foregoing for direct damages, indirect damages, consequential damages, incidental damages, punitive or exemplary damages, statutory and other multiple damages or penalties of any kind, or any other form of damages whatsoever, and whether based upon breach of contract, warranty or covenant, tort, negligence, strict liability, gross negligence, recklessness, willful or wanton conduct, malice, oppression, conscious disregard, joint and several liability, guarantee, contribution, reimbursement, subrogation, indemnity, defect, failure to warn, fault, misrepresentation, common law fraud, statutory consumer fraud, quantum meruit, breach of fiduciary duty, violation of statutes or administrative regulations and/or any other legal (including common law), foreign, statutory, equitable or other theory or right of action, whether in law or in equity, fixed, contingent, or non-contingent, known or unknown, discovered or undiscovered, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, ripened or unripened, perfected or unperfected, choate or inchoate, developed or undeveloped, liquidated or unliquidated, now recognized by law or that may be created or recognized in the future by

4

statute, regulation, judicial decision or in any other manner, and whether direct, representative, derivative, class or individual in nature, in any forum that any Person had, has, or may have in the future.

(7)     "Claims Administrator" means that Person(s), agreed to and jointly recommended by Class Counsel and Counsel for the Defendant, and appointed by the Court, to perform the responsibilities assigned to the Claims Administrator under the Settlement Agreement, including, without limitation, as set forth in Section 14.2.

(8)     "Claims Program" means the program set forth in Article VI and Article VII for the purpose of awarding Claims Program Awards, including any extension of that program pursuant to Article XIII.  The Claims Program will be implemented by the Settlement Administrator and Claims Administrator as provided in Section 14.5.

(9)     "Class Action Complaint" means the complaint captioned Plaintiffs' Second Amended Class Action Complaint filed in the Lawsuit by consent on February 3, 2021.

(10)    "Class Counsel" means, pending Court appointment, Elizabeth J. Cabraser, Robert L. Lieff, and Steven E. Fineman of Lieff Cabraser Heimann & Bernstein, LLP; Samuel Issacharoff; James R. Dugan, II and TerriAnne Benedetto of the Dugan Law Firm, APLC; William M. Audet of Audet & Partners, LLP; Elizabeth Fegan of FeganScott LLC; and such other counsel as the Court may appoint to represent the Settlement Class.  Any reference in the Settlement Agreement to the duties or actions of Class Counsel refers also to Subclass Counsel.

(11)    "Class Representatives" means Robert Ramirez; Jerry Agtarap; Dexter Owens; John Elko; Aaron Sheller; and Kabe Cain or such other or different persons as may be appointed by the Court as the representatives of the Settlement Class.

(12)    "CMS" means the Centers for Medicare & Medicaid Services.

(13)    "Compensation Award" means an Accelerated Payment Award or a Claims Program Award.

(14)    "Compensation Fund" means the program set forth in Article VI and Article VII for the awarding of Compensation Awards, including any extension of such program pursuant to Article XIII.

(15)    "Compensation Award Guidelines" are attached as Exhibit 5.

(16)    "Compensatory Damages" means any tort-based damages to compensate an individual for the loss, harm, or injury he or she has suffered.  Compensatory Damages do not include damages for medical monitoring for undiagnosed injuries, or any damages that were increased because of the absence of medical monitoring for any injuries. Compensatory Damages further do not include punitive, exemplary, vindictive, punitory, presumptive, added, aggravated, speculative, or imaginary damages.

(17)    "Counsel for the Defendant" means Wachtell, Lipton, Rosen & Katz and Arnold & Porter Kaye Scholer LLP, or any law firm or attorney so designated in writing by the Defendant.

(18)    "Court" means the United States District Court for the Northern District of California, Judge Vince Chhabria (or any successor judge designated by the United States District Court for the Northern District of California or Judicial Panel on Multidistrict Litigation, or a magistrate judge designated by Judge Chhabria or such designated successor judge), presiding in *Robert Ramirez, et al. v. Monsanto Company*, Case No. 3:16-md-02741-VC & 3:19-cv-02224-VC.

(19)    "Covenants Not to Sue" means the covenants not to sue set forth in Section 17.4.

(20)    "DAGP Administrator" means that Person, agreed to and jointly recommended by Class Counsel and Counsel for the Defendant, and appointed by the Court, to perform the responsibilities assigned to the DAGP Administrator under the Settlement Agreement, including, without limitation, as set forth in Section 14.3.

(21)    "Defendant" means Monsanto Company.

(22)    "Deficiency" means any failure of a Settlement Class Member to provide required information or documentation to the Claims Administrator, as set forth in Section 7.5.

(23)    "Derivative Claims" means Claims that arise from, result from, in any way relate to or are in connection with the claimant's relationship with a Settlement Class Member, including a deceased Settlement Class Member, including any Claims arising from, resulting from, in any way relating to or in connection with loss of support, services, consortium, companionship, society, or affection, or damage to familial relations (including disease, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life).

(24)    "Derivative Claimants" means spouses, parents, children who are dependents, or any other Persons who have or assert a right to maintain a Roundup Claim against the Monsanto Parties or the Related Parties by reason of their relationship with a Settlement Class Member, including a deceased Settlement Class Member.

(25)    "Diagnostic Accessibility Grant Program" means the program described in Article VIII.

(26)    "ECHA" means the European Chemicals Agency.

(27)    "Effective Date" means (a) the day following the expiration of the deadline for appealing the entry by the Court of the Final Order and Judgment (or for appealing any ruling on a timely motion for reconsideration of such Final Order and Judgment, whichever is later), if no such appeal is filed; or (b) if an appeal of the Final Order and Judgment is filed (i) the date upon which all appellate courts with jurisdiction (including the United States Supreme Court by petition for certiorari) affirm such Final Order and Judgment, or deny any such appeal

or petition for certiorari, such that no further appeal is possible, or (ii) if no appeal is filed from the appellate court decision obtained pursuant to clause (i), the day following the expiration of the deadline for filing a petition for certiorari to the United States Supreme Court.

(28)     "EFSA" means the European Food Safety Authority.

(29)     "EPA" means the United States Environmental Protection Agency.

(30)     "Escrow Agent" means the agreed upon entity to address and hold for distribution the funds identified in the Settlement Agreement pursuant to the terms of the Escrow Agreement.  That agreed upon entity is Citibank, N.A. acting through its Citi Private Bank business unit.

(31)     "Escrow Agreement" means the agreement by and among Class Counsel and Counsel for the Defendant with respect to the escrow of the funds to be deposited into the Settlement Fund escrow account.

(32)     "Fairness Hearing" means the hearing scheduled by the Court to consider the fairness, reasonableness, and adequacy of the Settlement Agreement under Rule 23(e)(2) of the Federal Rules of Civil Procedure and to determine whether the Final Order and Judgment should be entered.

(33)     "Final Order and Judgment" means the final order and judgment entered by the Court, in the form of Exhibit 11 together with any modifications acceptable to the Parties.

(34)     "Form of Release" means the full release attached as Exhibit 6.

(35)     "General Causation" means whether exposure to Roundup Products can cause NHL in humans to the level of causation (and proof thereof) necessary to maintain a Claim under applicable law.

(36)     "Governmental Authority" means any government or political subdivision, department, commission, board, bureau, agency, or other governmental authority, whether United States federal, state, District of Columbia, city, county, municipal, territorial, or otherwise domestic, or foreign or supranational, or any instrumentality whether domestic, foreign, or supranational.

(37)     "Governmental Payor" means (a) any federal, state, or other governmental body, agency, department, plan, program, or entity that administers, funds, pays, contracts for, or provides medical items, services, and/or prescription drugs, including, but not limited to, the Medicare Program, the Medicaid Program, Tricare, the Department of Veterans Affairs, and the Indian Health Service and (b) any entity paid by such a plan, program, or entity to provide benefits under contract on a prepaid or capitated basis.

(38)     "HIPAA" means the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996) (codified as amended

in scattered sections of 42 U.S.C.) and its implementing regulations, as well as any other applicable federal, state, or local statutes and/or regulations governing Protected Health Information.

(39)    "IARC" means the International Agency for Research on Cancer, a cancer agency within the World Health Organization of the United Nations.

(40)    "IARC Monograph 112" refers to IARC, Monographs on the Evaluation of Carcinogenic Risks to Humans, Volume 112, *Some Organophosphate Insecticides and Herbicides* (2017).

(41)    "Initial Settlement Period" means the period commencing 90 days after entry of the Final Order and Judgment and concluding either (a) four years after commencement or (b) on the first anniversary of the Effective Date, whichever is later.

(42)    "IRC" means the Internal Revenue Code of 1986, as amended.

(43)    "JMPR" means the Joint Meeting on Pesticide Residues, an international expert group administered jointly by the Food and Agriculture Organization of the United Nations and the World Health Organization.

(44)    "June Settlement Proposal" means the settlement agreement filed on the docket of *In Re Roundup Products Liability Litigation*, Case No. 3:16-md-02741-VC, in the Northern District of California, as Exhibit A to Document No. 11042, on June 24, 2020.

(45)    "Lawsuit" means *Robert Ramirez, et al. v. Monsanto Company*, Case No. 3:16-md-02741-VC & 3:19-cv-02224-VC (N.D. Cal.).

(46)    "Lien" means any statutory lien of a Governmental Payor or any mortgage, lien, pledge, charge, security interest, hypothecation, assignment, encumbrance, subrogation right, reimbursement claim, right of indemnity, right to payment, third-party interest or adverse claim, of any nature whatsoever, in each case whether statutory or otherwise, held or asserted by any Person.

(47)    "Lien Administrator" means that Person(s), agreed to and jointly recommended by Class Counsel and Counsel for the Defendant, and appointed by the Court, to perform the responsibilities assigned to the Lien Administrator under the Settlement Agreement, including, without limitation, as set forth in Section 14.4.

(48)    "Medicaid Program" means the federal program administered by the states under which certain medical items, services, and/or prescription drugs are furnished to Medicaid beneficiaries under Title XIX of the Social Security Act, 42 U.S.C. § 1396–1, *et seq.*

(49)    "Medicare Program" means the federal program administered by CMS under which certain medical items, services, and/or prescription drugs furnished to Medicare beneficiaries are reimbursed under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*  This program includes Part A and Part B, directly administered by CMS, and two parts administered by private entities that contract with CMS to serve Medicare beneficiaries

on a capitated basis: Medicare Part C, which includes Medicare Advantage, Medicare cost, and Medicare health prepayment plans, and Medicare Part D, under which CMS contracts for coverage of certain outpatient prescription drugs.

(50)     "Monsanto Parties" means the Defendant and Bayer AG, and each and all of their respective past, present, or future, direct or indirect, predecessors, successors, parents, subsidiaries, Affiliates, and divisions; and any past, present or future officer, director, shareholder, owner, employee, partner, trustee, representative, agent, servant, insurer, attorney, predecessor, successor, or assignee of any of the above.

(51)     "MSP Laws" means the Medicare Secondary Payer Act set forth at 42 U.S.C. § 1395y(b), as amended from time to time, and implementing regulations, and other applicable written CMS guidance.

(52)     "NHL" means a cancer that starts in white blood cells called lymphocytes and qualifies as a "lymphoma" other than Hodgkin's lymphoma.  See the American Cancer Society website, available at http://www.cancer.org/cancer/non-hodgkin-lymphoma/about/what-is-non-hodgkin-lymphoma.html.  The term does not include multiple myeloma or any leukaemia that does not also contain "lymphoma," "lymphocytic," or "prolymphocytic" in its name under S.H. Swerdlow et al., *World Health Organization Classification of Tumours of Haematopoietic and Lymphoid Tissues*, Revised 4th Edition (2017), with the exception that the term does include hairy cell leukaemia and aggressive NK-cell leukaemia.  The term includes the subtypes listed in Exhibit 3.

(53)     "Notice of Deficiency" means that document that the Claims Administrator sends to any Settlement Class Member whose Claim Package contains a Deficiency, as set forth in Section 7.5.

(54)     "Opt Out," when used as a verb, means the process by which any individual otherwise included in the Settlement Class exercises the right to exclude himself or herself from the Settlement Class pursuant to Section 4.2.  "Opt Out," when used as a noun, means those individuals who would otherwise have been included in the Settlement Class and who have timely and properly exercised their rights to Opt Out pursuant to Section 4.2 and therefore are not Settlement Class Members.

(55)     "Other Insurer" means any Person other than a Governmental Payor, a provider, a patient, or a relative or guardian of a patient that is obligated, under contract, agreement or otherwise, to pay health care costs of a Settlement Class Member, including, without limitation, a self-insured plan operated by an employer or a corporate or association health insurer or liability insurer.

(56)     "Parties" means the Class Representatives and Subclass Representatives, individually and on behalf of the Settlement Class and Subclasses, and the Defendant.

(57)     "Person" means a natural person, partnership (whether general or limited), limited liability company, trust, estate, association (including any group, organization, co-tenancy, plan, board, council or committee), corporation, Governmental Authority, custodian,

nominee, or any other individual or entity (or series thereof) in its own or any representative capacity, in each case, whether domestic or foreign.

(58)　"Personal Signature" means the actual signature by the individual whose signature is required on the document.  Unless otherwise specified in the Settlement Agreement, a document requiring a Personal Signature may be submitted by an actual original "wet ink" signature on hard copy, a PDF or other electronic image of an actual signature, or DocuSign or similar verifiable mechanism.

(59)　"Preliminary Approval Motion" means the motion for preliminary approval of the Settlement Agreement, approval of the Settlement Class Notice Plan, and entry of the Preliminary Approval Order.

(60)　"Preliminary Approval Order" means the order approving dissemination of notice to the Settlement Class and finding that the Court will likely be able to approve the Settlement Agreement and certify the proposed Settlement Class and Subclasses, in the form of Exhibit 10 together with any modifications acceptable to the Parties.

(61)　"Protected Health Information" means individually identifiable health information, as defined in 45 C.F.R. § 160.103.

(62)　"Qualified Physician Certification" refers to a form that certifies that a physician is a Qualified Physician as defined in Exhibit 4.

(63)　"Registration Applicant" means a purported Settlement Class Member or Representative Claimant who submits a registration application pursuant to Article V.

(64)　"Related Parties" means the past, present, and future manufacturers, formulators, distributors, marketing agents, commissionaires, resellers, retailers (including, without limitation, wholesale distributors, private label distributors, and all retailers and retail distributors), clinical researchers, agents, licensees, contractors, joint ventures, joint venturers, and consultants of or with respect to Roundup Products, and any and all past, present, or future suppliers of materials, components, and services used in the development, registration, formulation, manufacture, distribution, handling, sale or marketing of Roundup Products, including the labeling and packaging thereof, in all cases who are not Monsanto Parties, and each and all of their respective past, present, or future, direct or indirect, predecessors, successors, parents, subsidiaries, Affiliates, divisions, joint ventures, and joint venturers; and any past, present or future officer, director, shareholder, owner, employee, partner, trustee, representative, agent, servant, insurer, attorney, predecessor, successor, or assignee of any of the above.

(65)　"Related Party Lawsuits" means all past, present, and future actions or proceedings between one or more Settlement Class Member Parties and any of the Related Parties, in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum that assert or allege Roundup Claims.

(66)　"Releases" means the releases set forth in Section 17.1.

(67)    "Representative Claimants" means authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased Settlement Class Members (and/or their estates), or minor or legally incapacitated or incompetent Settlement Class Members.

(68)    "Research Funding Program" means the program set forth in Article X.

(69)    "Resident" means any natural person who (a) is a lawful permanent resident of the United States at any time during a given calendar year, or (b) was present in the United States for at least 31 days during a given calendar year.

(70)    "Roundup Claims" means Claims arising from, resulting from, in any way relating to or in connection with the allegations, transactions, facts, matters, occurrences, representations or omissions involved, set forth, alleged, or referred to in the Class Action Complaint or that otherwise arise from, result from, in any way relate to or are in connection with Roundup Products and NHL, including Derivative Claims, personal injury claims, medical monitoring claims, other tort claims (including claims for fraud, misrepresentation, fraudulent concealment, negligent misrepresentation, and failure to warn), warranty claims, false advertising claims, and claims for violations of any consumer protection or unfair and deceptive acts or practices statute.

(71)    "Roundup Lawsuits" means all past, present, and future actions or proceedings between one or more Settlement Class Member Parties and any of the Monsanto Parties in the Court, other than the Lawsuit, or in any other federal court, state court, arbitration, regulatory agency, or other tribunal or forum, that assert or allege Roundup Claims.

(72)    "Roundup Products" means any glyphosate-containing product developed, manufactured, distributed, sold, and/or marketed by the Defendant (or any of its direct or indirect subsidiaries), or by any Person to the extent such product contains glyphosate exclusively supplied by the Defendant (or any of its direct or indirect subsidiaries), under any name or brand: (a) prior to or as of the Settlement Date; or (b) after the Settlement Date if the product has a chemical formulation identical to a Roundup Product developed, manufactured, distributed, sold, and/or marketed prior to or as of the Settlement Date.  Exhibit 1 contains a list of names and brands of Roundup Products of which the Defendant is currently aware following reasonable inquiry.  A product not on the list but meeting the foregoing definition shall be a Roundup Product under the Settlement Agreement.

(73)    "Science Panel Chairperson" means the member of the Science Panel serving as its presiding member, selected as set forth in Section 12.1(b).

(74)    "Science Panel Commencement Date" means the day following the date the Settlement Administrator receives fully executed copies of the Science Panel Contracts from all Science Panel members.

(75)    "Science Panel Determination Form" is attached as Exhibit 8.

(76)   "Settlement Administration Costs" refers to the DAGP Administrator Costs, the Lien Administrator Costs, the Settlement Administrator Costs, and the Claims Administrator Costs.

(77)   "Settlement Administrator" means that Person appointed by the Court to oversee the administration of the Settlement Agreement, as set forth in Section 14.1.

(78)   "Settlement Agreement" means this Settlement Agreement and all accompanying Exhibits, including any subsequent amendments thereto and any exhibits to such amendments.

(79)   "Settlement Class Member" means an individual who is a member in the Settlement Class; provided, however, that the term Settlement Class Member does not include any Opt Outs.

(80)   "Settlement Class Member Parties" means the Settlement Class, the Class Representatives and Subclass Representatives, and each Settlement Class Member, on his or her own behalf and on behalf of his or her respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical Person or entity to the extent he, she, or it is entitled to assert any Claim on behalf of any Settlement Class Member. For the avoidance of doubt, Settlement Class Member Parties includes Representative Claimants.

(81)   "Settlement Class Notice" means the notice described in Section 4.1, in the form of Exhibit 2 together with any modifications acceptable to the Parties.

(82)   "Settlement Class Notice Agent" means the Person(s) who will implement the Settlement Class Notice Plan and who will be responsible for the dissemination of the Settlement Class Notice and any supplemental notice to the Settlement Class at any stage of the Settlement Agreement approval and administration periods as approved and directed by the Court.

(83)   "Settlement Class Notice Amount" means the amount of Settlement Class Notice Costs related to the Settlement Class Notice, as opposed to any supplemental notice.

(84)   "Settlement Class Notice Costs" means the reasonable costs and expenses of Settlement Class Notice, any supplemental notice required, and compensation of the Settlement Class Notice Agent and the Claims Administrator to the extent the Claims Administrator performs notice-related duties that have been agreed to by the Defendant.

(85)   "Settlement Class Notice Plan" means that document which sets forth the methods, timetable, and responsibilities for providing Settlement Class Notice to Settlement Class Members, as set forth in Section 4.1.

(86)   "Settlement Date" means the date by which Class Counsel, Subclass Counsel, and Counsel for the Defendant have all signed the Settlement Agreement on

behalf of the Class Representatives and Subclass Representatives, Settlement Class and Subclasses, and the Defendant, respectively.

(87)     "Settlement Fund" means the escrow account described in Article XV, into which the Defendant will make payments pursuant to Article III, and from which Funded Class Benefits, Additional Permitted Fund Uses, and Class Counsel Attorneys' Fees are paid under the Settlement Agreement to the extent and as set forth in Article III.

(88)     "Specific Causation" means whether exposure to Roundup Products caused NHL in the specific individual at issue to the level of causation (and proof thereof) necessary to maintain a Claim under applicable law, including consideration of any potential alternate cause of the individual's NHL.

(89)     "Subclass Counsel" means, pending Court appointment, William M. Audet of Audet & Partners, LLP for Subclass 1, and TerriAnne Benedetto of the Dugan Law Firm, APLC and Elizabeth Fegan of FeganScott LLC for Subclass 2, and such other counsel as the Court may appoint to represent Subclasses 1 and 2.

(90)     "Subclasses" means Subclass 1 and Subclass 2.

(91)     "Subclass Representatives" means Robert Ramirez for Subclass 1; and Jerry Agtarap; Dexter Owens; John Elko; Aaron Sheller; and Kabe Cain, for Subclass 2, or such other and different persons as may be designated by the Court as the representatives of the Subclasses.

(92)     "Tricare" means the federal program managed and administered by the United States Department of Defense through the Tricare Management Activity under which certain medical items, services, and/or prescription drugs are furnished to eligible members of the military services, military retirees, and military dependents under 10 U.S.C. § 1071, *et seq.*

(93)     "United States" means the fifty States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the Virgin Islands of the United States, the Commonwealth of the Northern Mariana Islands, any other territory or possession of the United States, and any United States military or diplomatic establishment wherever located.

Section 2.2     All references in the Settlement Agreement to "exposure to Roundup Products" mean exposure to Roundup Products through the application of Roundup Products.  Exposure "through the application of Roundup Products" includes exposure through mixing and any other steps associated with application, whether or not the individual performed the application, mixing, or other steps associated with application himself or herself.

## ARTICLE III
### Defendant's Payment Obligations

Section 3.1     <u>Funding Amount</u>.  This Article III sets out in full the Defendant's payment obligations in connection with the Settlement Agreement.  The Defendant shall pay the following in accordance with the funding terms set forth herein:

(a)     <u>Settlement Fund Amount</u>.  The sum of U.S. $1,630,000,000 to be used for the Funded Class Benefits and the Additional Permitted Fund Uses as described in this Article III (such amount being the "Settlement Fund Amount").  In no event shall Defendant be required to fund any payments for Funded Class Benefits or Additional Permitted Fund Uses in excess of the Settlement Fund Amount, except to the extent the Defendant is required to pay the End Payment pursuant to Section 13.3(b)(i).  If the Court approves an amount of Class Counsel Attorneys' Fees that is less than U.S. $170,000,000, the difference between $170,000,000 and the amount of Class Counsel Attorneys' Fees approved by the Court shall be added to the Settlement Fund Amount payable by the Defendant pursuant to Section 3.6(a)(ix).

(b)     <u>Class Counsel Attorneys' Fees</u>.  Class Counsel Attorneys' Fees pursuant to Article XXV, including funding for the Legal Services Program, as set forth in Section 3.6(b) and ordered by the Court.

(c)     <u>End Payment</u>.  The potential End Payment of U.S. $200,000,000 under Section 13.3(b)(i), which shall be owed only under the terms and conditions described in Article XIII.

(d)     <u>Compensation Fund Continuation Terms</u>.  The amounts due under the Compensation Fund Continuation Terms, which shall be owed only if the Compensation Fund continues as provided in Section 13.4(c).

(e)     Notwithstanding any provision of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029, or any subsequent legislation mandating or subsidizing health insurance coverage, the Defendant shall pay in full the amounts set forth in this Section 3.1, and will not bill any Governmental Payor for any such costs.

Section 3.2     <u>Allocation of Settlement Fund Amount to Funded Class Benefits</u>.

(a)     The Settlement Fund Amount shall be used for Funded Class Benefits and Additional Permitted Fund Uses (defined in Section 3.3(a)).  The following shall constitute "Funded Class Benefits":  (i) the Compensation Fund, (ii) the Diagnostic Accessibility Grant Program, and (iii) the Research Funding Program, in each case including any directly associated Tax Expenses.

(b)     The Settlement Fund Amount shall be allocated among the Funded Class Benefits as follows:

(i)     U.S. $1,325,000,000 of the Settlement Fund Amount will be allocated to the Compensation Fund, subject to Section 3.3(b).

(ii)     U.S. $210,000,000 of the Settlement Fund Amount will be allocated to the Diagnostic Accessibility Grant Program.

(iii)     U.S. $40,000,000 of the Settlement Fund Amount will be allocated to the Research Funding Program.

(iv)     Any of the Settlement Fund Amount not expended pursuant to the purpose for which it was initially allocated under the Settlement Agreement and any additional amount paid into the Settlement Fund will be allocated to or among the Compensation Fund, Diagnostic Accessibility Grant Program, or Research Funding Program as the Settlement Administrator determines in his or her discretion, after consultation with the Parties.   This provision shall not apply to payments made into the Settlement Fund from the End Payment or the Compensation Fund Continuation Terms, whose allocations are separately provided for under the Settlement Agreement.

(c)     The Settlement Administrator shall be responsible for ensuring that the Defendant's payments in a given period are allocated among the Funded Class Benefits in a manner consistent with the timing and administration of the Funded Class Benefits under the Settlement Agreement.

Section 3.3     Allocation of Settlement Fund Amount to Additional Permitted Fund Uses.

(a)     The following shall constitute "Additional Permitted Fund Uses": (i) Settlement Administration Costs, (ii) Science Panel Costs, (iii) Settlement Class Notice Costs, including the Settlement Class Notice Amount and the cost of any supplemental Settlement Class notice plan pursuant to Section 13.4(g), (iv) Tax Expenses other than those directly associated with Funded Class Benefits, and (v) the fees and expenses of the Escrow Agent, to the extent set forth in the Escrow Agreement.

(b)     The Settlement Administrator shall allocate up to $55,000,000 of the Settlement Fund Amount, including the $40,000,000 paid and allocated as set forth in Section 3.6(a)(i) and Section 3.6(a)(ii), among the Additional Permitted Fund Uses, with the remainder of the Settlement Fund Amount allocated among the Funded Class Benefits as provided in Section 3.2(b).   The total amount of the Settlement Fund Amount allocated to Additional Permitted Fund Uses may not exceed U.S. $55,000,000, absent Court approval.   If the Court approves allocation of an additional amount to Additional Permitted Fund Uses, the amount allocated to the Compensation Fund shall be reduced equivalently.

(c)     The Settlement Fund Amount will be allocated to and among the Additional Permitted Fund Uses by the Settlement Administrator in its sole discretion so long as consistent with the Settlement Agreement (taking into account, among other things, potential costs and expenses of indemnification pursuant to Section 12.7(b)(vi)); provided, however, that Court approval is required for allocation to Additional Permitted Fund Uses above the cap set forth in this Section 3.3 or for allocation to Settlement Administrator Costs.

Section 3.4     No Interest or Inflation Adjustment.   The payments set forth in this Article III will not be subject to any interest obligation or inflation adjustment.

Section 3.5    No Further Financial Obligations.   If the Preliminary Approval Order or the Final Order and Judgment is not entered by the Court or is reversed by an appellate court, the Defendant will cease to have any payment obligations under this Article III or otherwise under the Settlement Agreement and any unexpended funds in the Settlement Fund, and unexpended payments made to Class Counsel for Settlement Class Notice, will be returned to the Defendant promptly.

Section 3.6    Funding Schedule and Terms.    The Defendant's payment obligations shall be funded as follows:

(a)    Settlement Fund Amount.  The Defendant shall pay the Settlement Fund Amount on the following schedule:

(i)    No later than 10 days after the Settlement Date, the Defendant shall pay U.S. $1,000,000 of the Settlement Class Notice Amount to Class Counsel to fund the development of the Settlement Class Notice Plan.  The Defendant shall receive a credit for this payment against the Settlement Fund Amount, as described in Section 3.6(a)(ii).

(ii)    No later than 20 days after entry of the Preliminary Approval Order (including approval of the Escrow Agreement), the Defendant shall pay a total of U.S. $39,000,000 into the Settlement Fund (i.e., U.S. $40,000,000 with a credit for the U.S. $1,000,000 previously paid pursuant to Section 3.6(a)(i)).  Such amount shall be used first to satisfy the Settlement Class Notice Amount.  The excess of such amount over the Settlement Class Notice Amount may be used prior to the commencement of the Initial Settlement Period to the extent necessary to fund Settlement Administration Costs associated with preparing the administration of the Funded Class Benefits, and any remainder shall go towards Additional Permitted Fund Uses following the commencement of the Initial Settlement Period (and if not exhausted for that purpose, shall then be allocated to Funded Class Benefits pursuant to Section 3.2(b)(iv)).  The Parties shall inform the Settlement Administrator of the dollar amount of the Settlement Class Notice Amount once such final dollar amount is known, as set forth in Section 4.1(b).

(iii)    Beginning no later than 30 days after entry of the Preliminary Approval Order (including approval of the Escrow Agreement) and ending on the date the Initial Settlement Period commences, the Defendant shall pay into the Settlement Fund such amounts as are necessary to fund Accelerated Payment Awards that become payable during that period, subject to the $250,000,000 limitation set forth in Section 6.3(a).  With regard to such payments:

(1)    The Defendant shall pay into the Settlement Fund amounts to fund Accelerated Payment Awards awarded during a month no later than the end of the following month.  An Accelerated Payment Award shall be considered awarded for purposes of this Section 3.6(a)(iii)(1) during the month as of which it is required to be paid under Section 7.9(a).

(2)    The Settlement Administrator shall provide monthly statements to the Defendant, no later than the tenth day of the month, notifying the Defendant of the payments due at the end of that month (each, an "Accelerated Payment Monthly Statement").

16

The Accelerated Payment Monthly Statements shall be in writing and shall itemize the amounts due, including the amount and recipient of each Accelerated Payment Award. The Defendant shall be entitled to rely on the Accelerated Payment Monthly Statement as stating the amount payable.

(iv)    No later than 30 days after the commencement of the Initial Settlement Period, the Defendant shall pay into the Settlement Fund an amount equal to U.S. $250,000,000 less the total amount (if any) that the Defendant paid pursuant to Section 3.6(a)(iii).

(v)    No later than 30 days after the commencement of the Initial Settlement Period or 30 days after the Effective Date, whichever is later, the Defendant shall pay into the Settlement Fund an amount equal to U.S. $430,000,000.

(vi)    No later than on each of the first three anniversaries of the date of the payment set forth in Section 3.6(a)(iv) or, in each case, 30 days after the Effective Date, whichever is later, the Defendant shall pay into the Settlement Fund an amount equal to U.S. $215,000,000.

(vii)    No later than 30 days after the Effective Date, the Defendant shall pay into the Settlement Fund an amount equal to U.S. $145,000,000.

(viii)    No later than on each of the first three anniversaries of the date of the payment set forth in Section 3.6(a)(vii), the Defendant shall pay into the Settlement Fund an amount equal U.S. $40,000,000.

(ix)    If the Court approves an amount of Class Counsel Attorneys' Fees that is less than U.S. $170,000,000, the difference between $170,000,000 and the amount of Class Counsel Attorneys' Fees approved by the Court, which shall be added to the Settlement Fund Amount pursuant to Section 3.1(a), shall be considered paid by the Defendant by virtue of the Defendant's payment set forth in Section 3.6(b) and shall be made available for use following the Effective Date.

(b)    Payment of Class Counsel Attorneys' Fees.  The Defendant shall pay $170,000,000 into the Settlement Fund no later than 30 days after entry of the Final Order and Judgment.  That amount shall be used to pay Class Counsel Attorneys' Fees (including Class Counsel and Subclass Counsel attorneys' fees and costs, funding for the Legal Services Program, and Class Representative service awards pursuant to Article XXV) at the time(s) and in such amount(s) as the Court orders.  The amount and timing of the disbursement of Class Counsel Attorneys' Fees will be set by the Court on application by Class Counsel as set forth in Article XXV.  If the Court approves an amount of Class Counsel Attorneys' Fees that is less than U.S. $170,000,000, the difference between $170,000,000 and the amount of Class Counsel Attorneys' Fees approved by the Court shall be added to the Settlement Fund Amount as set forth in Section 3.6(a)(ix).

(c)    Prepayment Right.  The Defendant will have the right (but not the obligation) to prepay any of its anticipated payment obligations under the Settlement Agreement. In connection with any such prepayment, the Defendant will designate in writing the payment obligation that is being prepaid and how such prepayment should affect the Defendant's remaining

payment obligations (*i.e.*, whether the amount prepaid should be credited against the next payment obligation or to one or more subsequent payment obligations or a combination thereof).

# ARTICLE IV
## Opt-Out Rights

Section 4.1     Notice.

(a)     As part of the Preliminary Approval Motion, Class Representatives and Subclass Representatives will submit to the Court a Settlement Class Notice Plan agreed upon by Class Counsel and Counsel for the Defendant and consistent with due process and Rule 23 of the Federal Rules of Civil Procedure.

(b)     The Settlement Class Notice Plan will be designed to meet the requirements of Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure and due process, and will include the best notice practicable for the Settlement Class and each of the Subclasses.  The Settlement Class Notice Agent will implement the Settlement Class Notice Plan following the Court's entry of the Preliminary Approval Order, approval of the Settlement Class Notice (in the form of Exhibit 2 together with any modifications acceptable to the Parties), and approval of the Settlement Class Notice Plan as consistent with Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure and due process.  The Settlement Class Notice Plan will be paid for by the Defendant pursuant to Section 3.6(a)(i)-(ii).  The Parties shall inform the Settlement Administrator of the dollar amount of the Settlement Class Notice Amount once such final dollar amount is known.

(c)     Monsanto shall be responsible for compliance with the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), 1453, 1711-1715, and its notice requirements by providing appropriate federal and state officials with information about the Settlement Agreement.

Section 4.2     Opt-Out Rights.

(a)     All Settlement Class Members will have a right to Opt Out commencing on the entry of the Preliminary Approval Order and ending 150 days following the commencement of the Settlement Class Notice Plan, as provided in Section 4.2(b)-(d).

(b)     The Settlement Class Notice will provide instructions regarding the procedures that must be followed to Opt Out of the Settlement Class pursuant to Rule 23(c)(2)(B)(v) of the Federal Rules of Civil Procedure.  The Parties agree that, to Opt Out validly from the Settlement Class, a Settlement Class Member must submit a written request to Opt Out stating "I wish to exclude myself from the Settlement Class in *Robert Ramirez, et al. v. Monsanto Company*, Case No. 3:16-md-02741-VC & 3:19-cv-02224-VC" (or substantially similar clear and unambiguous language) and containing the information and materials set forth in Section 4.2(c) and Section 4.2(d) to the Claims Administrator on or before the date 150 days following the commencement of the Settlement Class Notice Plan (postmarked, emailed, or submitted through the Settlement Website no later than such date).

(c)     The written request to Opt Out also must contain the Settlement Class Member's printed name, address, telephone number, date of birth, and enclose a copy of his or her identification issued by any Governmental Authority or other bona fide identification.  A

written request to Opt Out must contain the dated Personal Signature of the Settlement Class Member seeking to exclude himself or herself from the Settlement Class.  No Opt Out request will be denied on the grounds that the Settlement Class Member is an undocumented alien.

(d)      The Settlement Class Member must either (i) mail the signed written request to Opt Out to a physical address to be identified in the Settlement Class Notice; (ii) email a complete and legible scanned copy or photograph of the signed written request to an email address to be identified in the Settlement Class Notice; or (iii) submit a complete and legible scanned copy or photograph of the signed written request through the Settlement Website. Attorneys for Settlement Class Members may submit a written request to Opt Out on behalf of a Settlement Class Member, but such request must contain the Personal Signature of the Settlement Class Member.  The Claims Administrator will provide copies of all requests to Opt Out to Class Counsel and Counsel for the Defendant within seven days of receipt of each such request.  A valid request to Opt Out from the Settlement Class will become effective as of the later of 21 days of receipt by the Claims Administrator or the resolution of any challenge to the validity of the request brought by Class Counsel or the Defendant.

Section 4.3      Revocation of Opt Out.  Prior to entry of the Final Order and Judgment, any Settlement Class Member may seek to revoke his or her Opt Out from the Settlement Class and thereby receive the benefits of the Settlement Agreement by submitting a request to the Claims Administrator by email, mail, or through the Settlement Website (who will forward these to Class Counsel and Counsel for the Defendant) stating "I wish to revoke my request to be excluded from the Settlement Class" (or substantially similar clear and unambiguous language), and also containing the Settlement Class Member's printed name, address, phone number, and date of birth.  The written request to revoke an Opt Out must contain the Personal Signature of the Settlement Class Member seeking to revoke his or her Opt Out.  Such revocation shall only be effective with the express written consent of the Defendant (in its sole discretion).

Section 4.4      Rights of Settlement Class Members Who Do Not Opt Out to Sue for Compensatory Damages.  All Settlement Class Members who do not timely and properly Opt Out (or who revoke an Opt Out) from the Settlement Class will in all respects be bound by all terms of the Settlement Agreement and the Final Order and Judgment.  Following the conclusion of the Initial Settlement Period, Settlement Class Members can sue for Compensatory Damages in the tort system for any Roundup Claim against the Monsanto Parties or the Related Parties under, at the time, and subject to the terms and conditions set forth in Section 7.13, Section 7.16, and Article XIII.

Section 4.5      Termination Rights.  The Defendant shall have the right, in its discretion, to terminate and render null and void the Settlement Agreement following notice of Opt Outs and prior to the Fairness Hearing if the Defendant determines, in its sole discretion, that the number or nature of the qualified Opt Outs frustrates the purpose of the Settlement Agreement. The Defendant must provide written election to terminate the Settlement Agreement under this provision to Class Counsel and the Court prior to the Fairness Hearing.

# ARTICLE V
## Information and Registration Process

Section 5.1    Information.

(a)    Within 20 days after entry of the Preliminary Approval Order, Class Counsel and the Settlement Class Notice Agent will establish a public website containing information about the Settlement Agreement (the "Settlement Website"), including the Settlement Class Notice, frequently asked questions, and other relevant documents.  The Settlement Website also will be the launching site for a secure web-based portal that shall be used for online registration of Settlement Class Members to facilitate their participation in the Funded Class Benefits and for other settlement administration purposes including submitting claims and Opt Out requests.  The Settlement Website shall contain the schedule of deadlines set forth in Exhibit 12. All content posted on the Settlement Website will be subject to advance approval by Class Counsel and Counsel for the Defendant.  The Settlement Website and relevant related documents shall be maintained in English, Spanish, and any other language deemed necessary by Class Counsel and the Settlement Class Notice Agent.  The Settlement Website will be kept current for the duration of the programs under the Settlement Agreement.

(b)    Within 20 days after entry of the Preliminary Approval Order, Class Counsel and the Settlement Class Notice Agent will establish an automated telephone system that uses a toll-free number or numbers to provide information about the Settlement Agreement.  All information on the automated telephone system will be in English, Spanish, and any other language deemed necessary by Class Counsel and the Settlement Class Notice Agent.  Through this system, Settlement Class Members may request and obtain copies of the Settlement Class Notice, Settlement Agreement, Claim Form, and Appeals Form, and they may leave messages for further information.  Class Counsel and the Settlement Class Notice Agent may also establish and maintain a process whereby live telephone operators answer questions about the Settlement Agreement, provided that such live telephone conversations are conducted by the operators pursuant to training materials approved in advance by Class Counsel and Counsel for the Defendant.

Section 5.2    Registration Methods and Requirements.

(a)    Within 40 days after entry of the Preliminary Approval Order, the Claims Administrator will establish both online and hard copy registration methods for Settlement Class Member participation in the Funded Class Benefits.  The registration process is solely for the purpose of facilitating and administering Settlement Class Member participation in the Funded Class Benefits.  Settlement Class Members who do not register, or whose registration is denied, remain bound by the Settlement Agreement and the Final Order and Judgment.

(b)    The registration requirements will include information concerning whether a Person is a potential Settlement Class Member for purposes of applying for Funded Class Benefits, including:  (i) name; (ii) address; (iii) date of birth; (iv) Social Security number (if any) or otherwise a copy of his or her identification issued by any Governmental Authority or other bona fide identification; (v) email address (if any); (vi) whether email, the web-based portal on the Settlement Website, or U.S. mail is the preferred method of communication; (vii) a description of

the circumstances and extent of claimed exposure to Roundup Products; (viii) whether a Qualifying Diagnosis has been received, and, if so, when the Qualifying Diagnosis was made; and (ix) the Personal Signature of the Registration Applicant.

(c)     Representative Claimants.

(i)     Where a Settlement Class Member is (1) a minor, (2) lacking capacity or incompetent, or (3) deceased, his or her Representative Claimant may act on his or her behalf, and in so doing shall be bound by all the same terms and conditions of the Settlement Agreement that the Settlement Class Member would be if he or she were acting on his or her own behalf.  A Representative Claimant may take all actions permitted or required under the terms of the Settlement Agreement on behalf of a Settlement Class Member.  As a condition of acting on behalf of a Settlement Class Member, a Representative Claimant must agree, in writing, to all matters to which Settlement Class Members agree under the Settlement Agreement.

(ii)     Representative Claimants may register on behalf of deceased, minor, or legally incapacitated or incompetent Settlement Class Members by providing the information necessary to satisfy the registration requirements for the Settlement Class Member set forth in Section 5.2(b) and a copy of the court order, or other document issued by an official of competent jurisdiction, providing the Representative Claimant's authority to act on behalf of that deceased, minor, or legally incapacitated or incompetent Settlement Class Member.  If a Settlement Class Member on whose behalf the Representative Claimant is authorized to act has previously received an Approved Registration Number, the Representative Claimant shall provide the Claims Administrator with the Approved Registration Number in lieu of the information otherwise necessary to satisfy the registration requirements for the subject Settlement Class Member.

(iii)     Only one Representative Claimant may be authorized to act on behalf of a given Settlement Class Member.  In the event multiple Persons purport to act on behalf of a given Settlement Class Member, the Claims Administrator, after conducting an appropriate investigation including the review of any necessary documentation, shall determine which Person is authorized to act on behalf of a given Settlement Class Member.  Any Person the Claims Administrator determines is not authorized to act on behalf of a given Settlement Class Member may appeal that decision to the Settlement Administrator by submitting a written challenge to the Settlement Administrator within 30 days after receiving the Claims Administrator's determination.  A copy of such submission shall be provided to the Claims Administrator, and the Claims Administrator shall have 30 days to provide the Settlement Administrator with written support for its determination.  The Settlement Administrator will be provided access to all documents and information available to the Claims Administrator to aid in determining the appeal.  Appeals may only be taken to the Settlement Administrator, not the Court. The decision of the Settlement Administrator shall be final and binding.  There shall be no appeal from the Settlement Administrator's decision.

(d)     Registration Deadline.  Settlement Class Members may register until 45 days prior to the conclusion of the Initial Settlement Period.  If the Compensation Fund continues following that period as provided in Section 13.4(c), the registration deadline with respect to the Compensation Fund will be extended accordingly.  Failure to comply with the

deadline will preclude registration, unless, in the determination of the Claims Administrator, the Settlement Class Member can show good cause or excusable neglect.

Section 5.3    Registration Review.

(a)    Upon receipt of a registration from a Registration Applicant, the Claims Administrator will assign a unique identifying number and promptly notify the Registration Applicant of such number by the Registration Applicant's preferred method of communication identified in the registration.

(b)    Upon receipt of a Registration Applicant's registration, the Claims Administrator will review the information to determine whether the registration is timely pursuant to Section 5.2(d), whether the Registration Applicant has submitted the information required under Section 5.2(b) concerning whether that Person is a potential Settlement Class Member for purposes of applying for Funded Class Benefits, and, if applicable, whether the purported Representative Claimant has the actual authority to act on behalf of a deceased, minor, or legally incapacitated or incompetent Settlement Class Member.  The Claims Administrator will then issue a written notice containing a favorable or adverse registration determination informing the Registration Applicant, by his or her preferred method of communication, whether he or she has properly registered as a Settlement Class Member or Representative Claimant for purposes of applying for Funded Class Benefits (a "Notice of Registration Determination").  The Claims Administrator shall send a copy of the Notice of Registration Determination to Class Counsel and the Defendant.

(c)    An adverse Notice of Registration Determination will include information regarding each deficiency in the registration and how the Registration Applicant can cure any deficiency, to the extent cure is possible, except that the failure to timely register in accordance with the terms of the Settlement Agreement cannot be cured other than upon a showing of good cause or excusable neglect as set forth in Section 5.2(d).  The Registration Applicant or Class Counsel acting on the purported Settlement Class Member's behalf may attempt to cure any curable deficiencies by submitting additional information and documentation within 90 days of receipt of the adverse Notice of Registration Determination.  The Claims Administrator will promptly review such additional information and documentation in accordance with Section 5.2(b) and determine whether deficiencies have been cured and whether the Registration Applicant has properly registered as a Settlement Class Member or Representative Claimant for purposes of applying for Funded Class Benefits.  Curing of any deficiencies to the Claims Administrator's satisfaction is a prerequisite to registering and consideration of an application for Funded Class Benefits.  If the Claims Administrator determines that the Registration Applicant has properly registered as a Settlement Class Member or Representative Claimant for purposes of applying for Funded Class Benefits, the Claims Administrator shall withdraw the adverse Notice of Registration Determination and issue a favorable Notice of Registration Determination.

(d)    Following a favorable Notice of Registration Determination, the Claims Administrator shall assign a unique identifying number to the Registration Applicant signifying that their registration has been approved (the "Approved Registration Number").  The Approved Registration Number shall be generated by modifying the unique identifying number assigned to the Registration Applicant upon their registration application by adding a "—A," or other similar distinguishing modification deemed appropriate by the Claims Administrator, to the

end of that number.  The Claims Administrator will promptly notify the Registration Applicant of his or her Approved Registration Number for future use, including on a Claim Form, by the preferred method of communication identified in the registration.  Receipt of an Approved Registration Number is not a determination that a Person is a Settlement Class Member under the Settlement Agreement, and does not entitle the Registration Applicant to any Funded Class Benefits.  All Funded Class Benefits must be applied for and will be reviewed pursuant to the procedures set forth in the Settlement Agreement, and a registration determination shall have no weight in the determination whether a Person has met any of the eligibility requirements for any Funded Class Benefit.

Section 5.4    In the event a Registration Applicant receives an adverse Notice of Registration Determination, the time between a Registration Applicant's application for registration and 45 days after receipt of the adverse Notice of Registration Determination shall not be used in the calculation of any statute of limitations period; in other words, all statutes of limitations shall be considered tolled during that period.

## ARTICLE VI
## Compensation Awards

Section 6.1    Eligibility Criteria.

(a)    A Settlement Class Member is eligible to apply for a Compensation Award from the Settlement Fund if the following criteria (the "Eligibility Criteria") are met:

(i)    The Settlement Class Member timely submits a complete Claim Package meeting the applicable terms and conditions described in Section 7.2 either by U.S. mail, email, or through the Settlement Website;

(ii)    For Accelerated Payment Awards, the Settlement Class Member (1) provided proof of exposure to Roundup Products, in accordance with the requirements of the Accelerated Payment Claim Form set forth in Section 7.1(b)(iv), that is verified under penalty of perjury pursuant to Section 7.2(a)(i), in the United States as of February 3, 2021, with the first exposure more than 12 months prior to receiving a Qualifying Diagnosis; and (2) first received or receives a Qualifying Diagnosis prior to 2026 or four years after entry of the Final Order and Judgment, whichever is earlier;

(iii)    For Claims Program Awards, the Settlement Class Member (1) provided proof of exposure to Roundup Products, in accordance with the requirements set forth in Section 7.2(b)(vii), in the United States as of February 3, 2021, with the first exposure more than 12 months prior to receiving a Qualifying Diagnosis; (2) first received or receives a Qualifying Diagnosis prior to 2026 or four years after entry of the Final Order and Judgment, whichever is earlier, according to the Qualified Physician Certification, including consideration of, without limitation, the qualifications of the Qualified Physician and the Diagnosing Physician;

(iv)    Roundup Claims brought by Settlement Class Members who received a Qualifying Diagnosis prior to January 1, 2015 are presumed to be barred by statutes of limitations and statutes of repose.  Therefore, Settlement Class Members who received a Qualifying Diagnosis prior to January 1, 2015 will only be eligible for a Compensation Award if

the Settlement Class Member can rebut this presumption by proving that their Roundup Claims against the Defendant are not barred by the applicable statutes of limitations and statutes of repose. All other Settlement Class Members who received a Qualifying Diagnosis prior to January 1, 2015 will not be eligible for, and cannot receive, any Compensation Award; and

(v)     If the end of the Initial Settlement Period is extended by virtue of Section 2.1(41)(b), references to 2026 in Section 6.1(a)(ii) and Section 6.1(a)(iii) shall be to the last full calendar year prior to the end of the Initial Settlement Period, and the separate deadline of four years after entry of the Final Order and Judgment in Section 6.1(a)(ii) and Section 6.1(a)(iii) shall not apply.

(b)     One Award Per Settlement Class Member.  A Settlement Class Member is not eligible to apply for a Compensation Award if that Settlement Class Member previously received a Compensation Award.

(c)     Derivative Claimants.  Derivative Claimants are not eligible for Compensation Awards.

Section 6.2     Two Types of Compensation Awards.

(a)     The Settlement Agreement provides for two types of Compensation Awards:

(i)     Accelerated Payment Awards.  Within 30 days after entry of the Preliminary Approval Order (subject to the limitation in Section 6.3(a)), Settlement Class Members meeting the Eligibility Criteria set forth in Section 6.1 shall be eligible for a prompt payment of U.S. $5,000 from the Compensation Fund in exchange for executing the Form of Release attached as Exhibit 6 (an "Accelerated Payment Award").

(1)     Eligibility.  To determine whether a Settlement Class Member is eligible for an Accelerated Payment Award, the Claims Administrator shall review the Accelerated Payment Claim Package and the results of any investigations of the Settlement Class Member's claim.  Based on that review, the Claims Administrator will determine:  (a) whether the Settlement Class Member duly received a favorable Notice of Registration Determination; and (b) whether the Settlement Class Member meets the Eligibility Criteria set forth in Section 6.1, including the timeliness and sufficiency of the Accelerated Payment Claim Package, and the applicable criteria set forth in the Compensation Award Guidelines.

(2)     Accelerated Payment Determination.  The determination as to eligibility for an Accelerated Payment Award shall be referred to as the "Accelerated Payment Determination."

(3)     Release of Claims.  Settlement Class Members who are eligible to receive an Accelerated Payment Award must execute and submit to the Claims Administrator the Form of Release as set forth in Exhibit 6 as a precondition to issuance of the Accelerated Payment Award.

(ii)    Claims Program Awards.  Settlement Class Members who submit a Claims Program Claim Package and meet the Eligibility Criteria set forth in Section 6.1 shall be eligible for a payment pursuant to this Section 6.2(a)(ii) from the Compensation Fund, at an amount determined by the Claims Program, in exchange for executing the Form of Release attached as Exhibit 6 (a "Claims Program Award").  The Claims Program shall offer a Claims Program Award to each qualifying Settlement Class Member, pursuant to the Compensation Award Guidelines in Exhibit 5.  The Parties understand and agree that the amount of any Claims Program Award within the Compensation Ranges set forth in the Compensation Award Guidelines is subject to the discretion of the Claims Program, with the possibility of mediation and appeal to the Settlement Administrator as set forth in Section 7.10.

(1)    Amounts.  Claims Program Awards will be between the amounts U.S. $10,000 and U.S. $200,000 pursuant to the Compensation Award Guidelines in Exhibit 5.  If a Settlement Class Member's Tier Determination is Tier 4, then the Claims Program has discretion to issue a Claims Program Award exceeding U.S. $200,000, but only upon the Settlement Class Member's showing of circumstances unique to the Settlement Class Member—above and beyond the factors required for the Settlement Class Member's inclusion in Tier 4—that, in the Claims Program's sole judgment, merits an award that exceeds U.S. $200,000 ("Extraordinary Circumstances").  If the Claims Program determines that a Settlement Class Member has not demonstrated Extraordinary Circumstances, that finding shall be final and not subject to review in any subsequent mediation or appeal.  The total combined dollar amount of the portion of all payments made to all Settlement Class Members above U.S. $200,000 shall not exceed U.S. $50,000,000 during the Initial Settlement Period:  *e.g.*, if a Settlement Class Member is awarded a Claims Program Award of U.S. $250,000, U.S. $50,000 of that Claims Program Award will count toward this U.S. $50,000,000 cap.

(2)    Commencement.    Subject to the limitation in Section 6.3(a), the Claims Program can begin to receive Claims Program Claim Packages and make Claims Program Awards beginning 60 days after entry of the Final Order and Judgment, provided that only Settlement Class Members with a Qualifying Diagnosis as of the date of the entry of the Final Order and Judgment can submit claims to the Claims Program prior to the Effective Date.

(3)    Eligibility.  To determine whether a Settlement Class Member is eligible for a Claims Program Award, the Claims Administrator shall review the Claims Program Claim Package and the results of any investigations of the Settlement Class Member's claim.  Based on that review, the Claims Administrator will determine: (a) whether the Settlement Class Member duly received a favorable Notice of Registration Determination;  (b) whether the Settlement Class Member meets the Eligibility Criteria set forth in Section 6.1, including the timeliness and sufficiency of the Claims Program Claim Package, and the applicable criteria set forth in the Compensation Award Guidelines.

(4)    Claims Program Determination.  To determine the amount of any such Claims Program Award, the Claims Program shall apply the Compensation Award Guidelines set forth in Exhibit 5.  The determination as to eligibility for and amount of a Claims Program Award shall be referred to as the "Claims Program Determination."

(5)    <u>Release of Claims</u>.  Settlement Class Members who are eligible to receive a Claims Program Award must execute and submit to the Claims Administrator the Form of Release as set forth in Exhibit 6 as a precondition to issuance of the Claims Program Award.

(b)    <u>Assistance by Class Counsel</u>.  To assist Settlement Class Members in deciding whether to apply for an Accelerated Payment Award or a Claims Program Award, Class Counsel may advise Settlement Class Members regarding the two types of Compensation Awards.

(c)    <u>Next of Kin</u>.  For purposes of Article VI, Article VII, and the Compensation Award Guidelines, the next of kin of a deceased Settlement Class Member shall be the individual that benefits under an enforceable will of a deceased Settlement Class Member or, barring that, shall be determined by the law of the domicile of the deceased Settlement Class Member at the time of his or her death.

(d)    <u>Attorneys' Fees</u>.  Attorneys' fees and costs for or associated with Compensation Awards will be limited to 7.5% of the amount awarded (subject to Court approval, or to such other percentage as the Court may set in the exercise of its discretion in supervision over fees and costs).  For the avoidance of doubt, the attorneys' fees referenced in this Section 6.2(d) are separate from the attorneys' fees or other compensation provided under the Legal Services Program in Article XI.

Section 6.3    <u>Limitations</u>.  All Compensation Awards are subject to the following limitations:

(a)    The Claims Program, the Claims Administrator, and the Settlement Administrator will not make any Compensation Awards prior to the Effective Date that cause the aggregate total of all Compensation Awards issued prior to the Effective Date to exceed U.S. $250,000,000.  If U.S. $250,000,000 is awarded prior to the Effective Date, no more claims for Compensation Awards can be submitted to, or received by, the Claims Program, the Claims Administrator, or the Settlement Administrator until the Effective Date.  Any Compensation Awards made prior to the Effective Date will be a credit against the total payments allocated to the Compensation Fund.  Following the Effective Date, further claims may be received and paid, subject to the remaining limitations in this Section 6.3.

(b)    The Claims Program, the Claims Administrator, and the Settlement Administrator will not make any Compensation Awards during the Initial Settlement Period that cause the aggregate total amount of all Compensation Awards issued to exceed the total amount of funds allocated to the Compensation Fund for the Initial Settlement Period (the U.S. $1,325,000,000 referenced in Section 3.2(b)(i) plus any additional amounts allocated to the Compensation Fund pursuant to Section 3.2(b)(iv), less amounts expended on Accelerated Payment Awards approved prior to the commencement of the Initial Settlement Period), and shall not consider further claims if Compensation Awards totaling that total amount have been made prior to the end of the Initial Settlement Period.

(c)     The Claims Program, the Claims Administrator, and the Settlement Administrator shall not award a Compensation Award after the Initial Settlement Period has concluded, other than as provided in the next two sentences and administration of any Remaining Funds as set forth in Section 7.16.  If the Compensation Fund continues pursuant to Section 13.4(c) following the Initial Settlement Period, the provisions of Section 7.14 shall apply.   If the Compensation Fund does not continue pursuant to Section 13.4(c) following the Initial Settlement Period, the provisions of Section 7.15 shall apply.

(d)     The Claims Program, the Claims Administrator, and the Settlement Administrator may not base the amount of any Compensation Award on the health insurance status of the Settlement Class Member.

Section 6.4     <u>Subsequent Claims</u>.  Settlement Class Members (if any) who were eligible to submit claims to the Compensation Fund but were unable to receive payment from the Compensation Fund for the reasons described in Section 6.3(b) shall have the following rights: (a) if the Compensation Fund continues pursuant to Section 13.4(c), such Settlement Class Members may either (i) submit their claims to the Compensation Fund following the Initial Settlement Period as provided in Section 13.4, or (ii) exercise tort-system rights following the Initial Settlement Period under, at the time, and subject to the terms and conditions set forth in Section 7.13 and Article XIII; or (b) if the Compensation Fund does not continue pursuant to Section 13.4(c) following the Initial Settlement Period, either (i) submit their claims to the Compensation Fund for payment out of any Remaining Funds as set forth in Section 7.16 or (ii) exercise tort-system rights following the Initial Settlement Period under, at the time, and subject to the terms and conditions set forth in Section 7.13, Section 7.16 and Article XIII.  A Settlement Class Member referenced in this Section 6.4 who actually submitted his or her claim to the Compensation Fund during the Initial Settlement Period and opts to submit the claim after that period under Section 6.4(a)(i) and Section 6.4(b)(i) may either have the previously submitted claim automatically considered or supplement the claim within 60 days of the beginning of the period for submission.

Section 6.5     <u>Non-Exhaustion of Compensation Fund</u>.  If the Compensation Fund does not continue pursuant to Section 13.4(c) following the Initial Settlement Period but there are any Remaining Funds, Settlement Class Members may continue to submit claims to the Compensation Fund until such funds are exhausted.

Section 6.6     <u>Payment Priority</u>.  The Compensation Fund will be funded through the payments set forth in Section 3.6(a).  Compensation Awards that cannot be paid due to the insufficiency of funds in the Compensation Fund will roll to the period following the next deposit of funds into the Compensation Fund pursuant to Section 3.6(a) until the end of the Initial Settlement Period.  Rolled-over Compensation Awards have priority over Compensation Awards that become subsequently payable.  The order of payment priority will be Accelerated Payment Awards followed by Claims Program Awards.  Within each such category, payments will be made on a first-in, first out basis based upon the date the Settlement Class Member delivered his or her executed Form of Release to the Claims Administrator, who shall promptly provide it to the Defendant.

Section 6.7     No Additional Funding.  The Defendant has no funding obligations with respect to Compensation Awards beyond the amount of the Settlement Fund Amount allocated to the Compensation Fund and the amount of the End Payment (if any) allocated to the Compensation Fund under Section 13.3(b) (if applicable), even if such amount is not sufficient to pay all Settlement Class Members who satisfy the Eligibility Criteria or to provide eligible Settlement Class Members with Compensation Awards.  The Claims Administrator shall annually review the sufficiency of the allocated funds to pay future Compensation Awards anticipated during the Initial Settlement Period in light of filing, eligibility, and payment rates during the preceding year(s), and expected future filings.

## ARTICLE VII
## Compensation Award Determinations, Payments, and Appeals

Section 7.1     Claim Forms and Claim Packages.

(a)     Each Settlement Class Member applying for a Compensation Award must complete a Claim Form and submit the Claim Form along with a complete Claim Package to the Claims Administrator.

(b)     Claim Forms.  There will be two separate Claim Forms, one for an application for an Accelerated Payment Award (an "Accelerated Payment Claim Form") and another for an application for a Claims Program Award (a "Claims Program Claim Form").  The content of the Claims Program Claim Form and the Accelerated Payment Claim Form will be agreed to by Class Counsel and Counsel for the Defendant, and will both include, without limitation, (i) the Approved Registration Number from the Notice of Registration Determination, which the Settlement Class Member shall have obtained pursuant to Article V; (ii) an affirmation stating under penalty of perjury that no previous application for a Compensation Award has been made by the Settlement Class Member; (iii) authorization for the Claims Administrator to conduct any verifications necessary to process or verify the information in the Claim Form or Claim Package; (iv) information regarding timing, frequency, duration and extent of the Settlement Class Member's exposure to Roundup Products, including whether exposure was occupational or non-occupational, and (if known) the name(s) of the Roundup Products the Settlement Class Member was exposed to; and (v) the date the Settlement Class Member was first diagnosed with NHL and the subtype of NHL they were diagnosed with.  Settlement Class Members who do not have an Approved Registration Number, either because they have timely applied for but not yet received a Notice of Registration Determination or because there is an attempted cure pending with respect to their Notice of Registration Determination, may submit a Claim Form without an Approved Registration Number, but must supply that number promptly upon obtaining it and before their Claim Package can be considered.  A Claim Form shall not be considered complete until the Approved Registration Number is supplied, though will be considered to have been filed as of the original filing date for purposes of Section 7.3(a).

Section 7.2     Content of Claim Packages.  A Claim Package can be submitted either in connection with an application for an Accelerated Payment Award (an "Accelerated Payment Claim Package") or in connection with an application for a Claims Program Award (a "Claims Program Claim Package").  The content of Claim Packages will be agreed to by Class Counsel and Counsel for the Defendant, subject to the requirements below.

(a)      Accelerated Payment Claim Package.   An Accelerated Payment Claim Package will be designed to be as streamlined as possible, but must include:

(i)      An Accelerated Payment Claim Form with the Personal Signature of the Settlement Class Member or the Representative Claimant, either on the Accelerated Payment Claim Form or on an acknowledgement form, verifying the contents of the Accelerated Payment Claim Form under penalty of perjury;

(ii)      If the Settlement Class Member is deceased, a copy of the death certificate of such Settlement Class Member, identification of the next of kin of such Settlement Class Member, identification of the executor of the estate of such Settlement Class Member (if applicable), and the domicile of the Settlement Class Member at the time of his or her death;

(iii)      The documentation and information specified in Section 16.1(a) and Section 16.1(b);

(iv)      An affirmation stating under penalty of perjury that the information in the Claim Package is true and correct to the best of the Settlement Class Member's knowledge.

(v)      Medical records establishing a diagnosis of NHL through a signed medical report from a Diagnosing Physician or an anatomic pathology report signed by a Diagnosing Physician.   Pertinent medical records reflecting treatment for the Settlement Class Member's NHL may also be submitted.

(vi)      A certification that the Settlement Class Member has not had a prior Qualifying Diagnosis; and

(vii)      Proof the Settlement Class Member was a United States citizen or Resident of the United States as of February 3, 2021, or had been exposed to Roundup Products through the application of Roundup Products in the United States as of February 3, 2021.

(b)      Claims Program Claim Package.   A Claims Program Claim Package will include, without limitation:

(i)      A Claims Program Claim Form with the Personal Signature of the Settlement Class Member or the Representative Claimant, either on the Claims Program Claim Form or on an acknowledgement form, verifying the contents of the Claims Program Claim Form under penalty of perjury;

(ii)      If the Settlement Class Member is deceased, a copy of the death certificate of such Settlement Class Member, identification of the next of kin of such Settlement Class Member, identification of the executor of the estate of such Settlement Class Member (if applicable), and the domicile of the Settlement Class Member at the time of his or her death;

(iii)    The documentation and information specified in Section 16.1(a) and Section 16.1(b);

(iv)    An affirmation stating under penalty of perjury that the information in the Claim Package is true and correct to the best of the Settlement Class Member's knowledge;

(v)    For living Settlement Class Members, a diagnosis of NHL, documented in an anatomic pathology report signed by the Diagnosing Physician in accordance with Exhibit 4 or, for Settlement Class Members deceased prior to the Effective Date, a diagnosis of NHL, documented in an anatomic pathology report, which was produced while the Settlement Class Member was living, and which was signed by the Diagnosing Physician in accordance with Exhibit 4;

(vi)    A certification that the Settlement Class Member has not had a prior Qualifying Diagnosis;

(vii)    Proof of exposure to Roundup Products, in accordance with Part 4 of Exhibit 5;

(viii)    Proof that the Settlement Class Member was a United States citizen or Resident of the United States as of February 3, 2021, or had been exposed to Roundup Products through the application of Roundup Products in the United States as of February 3, 2021;

(ix)    A Qualified Physician Certification (other than as set forth in Section 7.2(c) and Section 7.2(d));

(x)    All available medical records reflecting the Qualifying Diagnosis, the date such diagnosis was made, and subsequent treatment;

(xi)    A HIPAA-compliant authorization form;

(xii)    The number and age of the dependents of the Settlement Class Member; and

(xiii)    Information sufficient to identify the Settlement Class Member's occupation during the 10 years prior to receiving a Qualifying Diagnosis.

(c)    Settlement Class Members in Subclass 1 applying for a Claims Program Award are not required to include in their Claims Program Claim Package the Qualified Physician Certification in Section 7.2(b)(ix), but must include all other content of the Claims Program Claim Package, including a signed copy of the anatomic pathology report described in Exhibit 4 and referenced in Section 7.2(b)(v), as well as information sufficient to identify the Diagnosing Physician and establish that such physician meets the requirements of a Diagnosing Physician as set forth in Exhibit 4.  Representative Claimants of Settlement Class Members who died prior to the Effective Date do not need to include a Qualified Physician Certification in the Claims Program Claim Package if the physician who would provide such certification also died prior to the Effective Date or was deemed by a court of competent jurisdiction legally incapacitated

or incompetent prior to the Effective Date, or is otherwise unavailable to provide the certification. Instead, the Representative Claimant must provide an affirmation under penalty of perjury stating that the physician has died, is incapacitated, incompetent, or is otherwise unavailable to provide the certification, and the identity and qualifications of that physician.   In addition, the Representative Claimant must provide a signed copy of the anatomic pathology report described in Exhibit 4, and information sufficient to identify the Diagnosing Physician and establish that such physician meets the requirements of a Diagnosing Physician as set forth in Exhibit 4.  For the avoidance of doubt, all other content of Claims Program Claim Packages must be submitted, including medical records reflecting the Qualifying Diagnosis, the date such diagnosis was made, and subsequent treatment.

(d)     If a Settlement Class Member applying for a Claims Program Award is not able to obtain a Qualified Physician Certification due to the unavailability of all physicians who could otherwise provide such certification, the Settlement Class Member does not need to include a Qualified Physician Certification in the Claims Program Claim Package.  Instead of obtaining the Qualified Physician Certification, the Settlement Class Member must provide an affirmation under penalty of perjury that (i) details all attempts that the Settlement Class Member made to obtain a Qualified Physician Certification, (ii) verifies that no physician is available to provide a Qualified Physician Certification, (iii) verifies that all possibilities to obtain a Qualified Physician Certification have been exhausted, (iv) provides a signed copy of the anatomic pathology report described in Exhibit 4, and (v) provides information sufficient to identify the Diagnosing Physician and establish that such physician meets the requirements of a Diagnosing Physician as set forth in Exhibit 4.  For the avoidance of doubt, all other content of Claims Program Claim Packages must be submitted, including medical records reflecting the Qualifying Diagnosis, the date such diagnosis was made, and subsequent treatment.  For purposes of Section 7.2(c) and this Section 7.2(d) a physician shall be considered "unavailable" only if he or she is deceased or deemed by a court of competent jurisdiction legally incapacitated or incompetent, is not able to be contacted after reasonable and repeated attempts by the Settlement Class Member, or unequivocally refuses to provide a Qualified Physician Certification.

(e)     The contents of Claim Packages will not include documents or information whose primary purpose is to show the medical costs for any medical services that a Settlement Class Member has incurred or may incur.  For the avoidance of doubt, to the extent a Settlement Class Member's medical records are provided in a Claim Package or otherwise to the Claims Administrator or Settlement Administrator, such medical records are not being provided to show and shall not be used to evaluate the medical costs for any medical services that a Settlement Class Member has incurred or may incur.

Section 7.3     Submission Timing.

(a)     Settlement Class Members must submit Claim Packages to the Claims Administrator in accordance with Section 30.19.  Claim Packages must be submitted to the Claims Administrator no later than 180 days after the Effective Date or receipt of a Qualifying Diagnosis, whichever is later, but no later than the conclusion of the Initial Settlement Period, provided, however, that to the extent Settlement Class Members are permitted to submit claims for Compensation Awards from either the Remaining Funds pursuant to Section 7.16(c) or the Compensation Fund if the Compensation Fund continues pursuant to Section 13.4(c), the 180-day

31

time limitation in the prior sentence shall be tolled from the date the Initial Settlement Period concludes to the date that is the beginning of the period for submission of claims for Compensation Awards from, as applicable, the Remaining Funds pursuant to Section 7.16(c) or the Compensation Fund if the Compensation Fund continues pursuant to Section 13.4(c).  For Settlement Class Members described in Section 6.4(a)(i) and Section 6.4(b)(i), such tolling shall commence on the date Settlement Class Members became unable to receive payment from the Compensation Fund for the reasons described in Section 6.3(b).  Failure to comply with the applicable limitation will preclude a Compensation Award for that Qualifying Diagnosis, unless in the determination of the Claims Administrator the Settlement Class Member can show good cause or excusable neglect.

(b)  Each Settlement Class Member will promptly notify the Claims Administrator of any changes or updates to the information the Settlement Class Member has provided in the Claim Package, including any change in mailing address.

(c)  All information submitted by Settlement Class Members to the Claims Administrator will be recorded in a computerized database that will be maintained and secured in accordance with all applicable federal, state, and local laws, regulations and guidelines, including, without limitation, privacy and data security laws.  The Claims Administrator must ensure that information is recorded and used properly, that an orderly system of data management and maintenance is adopted, and that the information is retained under responsible custody.  The Claims Administrator will keep the database in a form that grants access for claims administration use and for limited access to the Settlement Class Member, but otherwise restricts access rights, including to employees of the Claims Administrator who are not working on claims administration for the Settlement Agreement.

(d)  All information submitted by Settlement Class Members to the Claims Administrator will be treated as confidential, as set forth in Section 24.2.

Section 7.4    <u>Preliminary Review</u>.

(a)  The Claims Administrator will develop procedures for the expeditious review of Accelerated Payment Claim Packages.

(b)  Within 90 days of the date on which the Claims Administrator receives a Claims Program Claim Package from a Settlement Class Member, the Claims Administrator will determine the sufficiency and completeness of the required contents, as set forth in Section 7.2.  To the extent the volume of claims warrants, this deadline may be extended upon application by the Claims Administrator to the Settlement Administrator, in the Settlement Administrator's sole discretion.  If the Claim Package as originally filed does not contain the Settlement Class Member's Approved Registration Number for the reasons given in the penultimate sentence of Section 7.1(b), the 90-day period under this Section 7.4(b) will begin as of the date on which that number is provided to the Claims Administrator.

(c)  The Claims Administrator will reject a Claim Package submitted by a Settlement Class Member, subject to the cure provisions of Section 7.5, if the Claims Administrator has not received all required content.

32

Section 7.5    <u>Deficiencies and Cure</u>.  For rejected Claim Packages, the Claims Administrator will send a Notice of Deficiency to the Settlement Class Member, which will contain a brief explanation of the Deficiency(ies) giving rise to rejection of the Claim Package, and will, where necessary, request additional information and/or documentation.  The Claims Administrator will make available to the Settlement Class Member through a secure online web interface any document(s) with a Deficiency needing correction or, upon request from the Settlement Class Member, will send the Settlement Class Member a copy of such document(s) via mail or encrypted text message, or other means of electronic delivery.

(a)     The Notice of Deficiency will be sent no later than 30 days from the date on which the Claims Administrator receives an Accelerated Payment Claim Package or 90 days from the date on which the Claims Administrator receives a Claims Program Claim Package. To the extent the volume of claims warrants, these deadlines may be extended upon application by the Claims Administrator to the Settlement Administrator, in the Settlement Administrator's sole discretion.

(b)     The Notice of Deficiency will contain a recommendation for how, if possible, the Settlement Class Member can cure the Deficiency, and will provide a reasonable deadline not less than 120 days (from the date the Notice of Deficiency is sent to the Settlement Class Member) for the Settlement Class Member to submit Deficiency cure materials.  Within that time period, the Settlement Class Member will have the opportunity to cure all Deficiencies and provide any requested additional information or documentation, except that the failure to submit timely a Claim Package in accordance with the terms of the Settlement Agreement cannot be cured other than upon a showing of good cause or excusable neglect as set forth in Section 7.3(a).  The Claims Administrator will send the Settlement Class Member a reminder notification 30 days prior to the expiration of the deadline to cure any Deficiency, provided, however, that the Claims Administrator's failure to provide such reminder will not excuse the underlying Deficiency.

(c)     Any Claim Package that continues to suffer from a Deficiency identified on the Notice of Deficiency that impacts the ability to process a claim following the submission of documentation intended to cure the Deficiency will be denied by the Claims Administrator following expiration of the cure deadline.  A Deficiency that is not material to the claim may be excused upon application by the Claims Administrator to the Settlement Administrator, in the Settlement Administrator's sole discretion.  The Settlement Administrator may not excuse a failure to provide the information and documentation set forth in Section 7.2(a) and Section 7.2(b).

(d)     Any claim that has a Deficiency or is otherwise rejected by the Claims Administrator that has not been completely cured before (i) the end of the Initial Settlement Period (unless the Compensation Fund continues after that period as provided in Section 6.3(c) or Section 13.4(c)), (ii) the Compensation Fund has been otherwise terminated, or (iii) the amount of the Settlement Fund Amount allocated to Compensation Awards has been fully exhausted, will not be considered by the Claims Administrator, Claims Program, or Settlement Administrator and no Compensation Award will be granted, regardless of when the Claim Package was first submitted, the status or nature of the Deficiency, or reason for rejection.  A Settlement Class Member whose claim is rejected due to a Deficiency and does not cure the Deficiency by the end

of the Initial Settlement Period will be treated as having been determined to be ineligible for a Compensation Award for purposes of the tort-system rights set forth in Section 7.13.

Section 7.6    Verification and Investigation.

(a)    Each Settlement Class Member claiming a Compensation Award will authorize the Claims Administrator, consistent with HIPAA and other applicable privacy laws, to verify facts and details of any aspect of the Claim Package and/or the existence and amounts, if any, of any Liens.  The Claims Administrator, at its sole discretion, may request additional documentation or authorizations, which each Settlement Class Member agrees to provide in order to claim a Compensation Award.  No Claim Package will be considered complete and eligible for payment of any Compensation Award, and the applicable deadlines in Section 7.7 and Section 7.8 will not be triggered, until such time that any additional documentation requested by the Claims Administrator is provided and/or Deficiencies are cured.

(b)    The Claims Administrator will have the discretion to undertake or cause to be undertaken further verification and investigation, including into the nature and sufficiency of any Claim Package documentation.

Section 7.7    Timing and Content of Accelerated Payment Determination.

(a)    The Claims Administrator will make an Accelerated Payment Determination and will send a corresponding written notice of the Accelerated Payment Determination (a "Notice of Accelerated Payment Determination") to the Settlement Class Member, the Defendant, and Class Counsel no later than 30 days after a complete Accelerated Payment Claim Package, that is not deficient and meets the applicable requirements set forth in Section 7.2(a), is received by the Claims Administrator; provided, however, that to the extent the volume of claims warrants, this deadline may be extended upon application by the Claims Administrator to the Settlement Administrator, in the Settlement Administrator's sole discretion. The Claims Administrator will not consider or make an Accelerated Payment Determination as to any application that is not complete as of the date the Science Panel announces the Science Panel Determination (unless the Compensation Fund continues after that period as provided in Section 6.3(c) or Section 13.4(c)).

(b)    An Accelerated Payment Determination that provides an adverse determination will notify applicants that no appeal is possible from an Accelerated Payment Determination.  An adverse Accelerated Payment Determination does not preclude a Settlement Class Member from submitting a Claim Package in the future for a Compensation Award should the Settlement Class Member's circumstances or knowledge of exposure to Roundup Products materially change.  The Claims Administrator shall develop reasonable procedures and rules to ensure the right of Settlement Class Members who receive an adverse Accelerated Payment Determination to submit a Claim Package in the future, while preventing repetitive claims that do not disclose materially changed circumstances from prior claims made by the Settlement Class Member.

(c)     An Accelerated Payment Determination that provides a determination that the Settlement Class Member is entitled to an Accelerated Payment Award will provide information regarding the timing of payment, as set forth in Section 7.9.

Section 7.8     Timing and Content of Claims Program Determination.

(a)     The Claims Program will make a Claims Program Determination and will send a corresponding written notice of the Claims Program Determination (a "Notice of Claims Program Determination") to the Settlement Class Member, the Defendant, and Class Counsel no later than 90 days after a complete Claims Program Claim Package, that is not deficient and meets the applicable requirements set forth in Section 7.2(b), is received by the Claims Administrator; provided, however, that to the extent the volume of claims warrants, this deadline may be extended in the Settlement Administrator's sole discretion.  The Claims Program will not consider or make a Claims Program Determination as to any application that is not complete as of the date on which the Science Panel announces the Science Panel Determination (unless the Compensation Fund continues after that period as provided in Section 6.3(c) or Section 13.4(c)).

(b)     A Claims Program Determination that provides an adverse eligibility determination will include information regarding how the Settlement Class Member can appeal the determination, as set forth in Section 7.10, as well as information regarding seeking assistance with the appeal from Class Counsel.  An adverse Claims Program Determination does not preclude a Settlement Class Member from submitting a Claim Package in the future for a Compensation Award should the Settlement Class Member's circumstances or knowledge of exposure to Roundup Products materially change.  The Claims Program shall develop reasonable procedures and rules to ensure the right of Settlement Class Members who receive an adverse Claims Program Determination to submit a Claim Package in the future, while preventing repetitive claims that do not disclose materially changed circumstances from prior claims made by the Settlement Class Member.

(c)     A Claims Program Determination that provides a determination that the Settlement Class Member is entitled to a Claims Program Award will provide:  (i) the amount of that Claims Program Award; (ii) the Claims Administrator's determination of any amount to be deducted from the Claims Program Award in connection with identified Liens, as set forth in Article XVI; (iii) information regarding how the Settlement Class Member can appeal or mediate the Claims Program Determination, as applicable, and as set forth in Section 7.10; and (iv) information regarding the timing of payment, as set forth in Section 7.9.

Section 7.9     Remuneration and Payment of Compensation Awards.

(a)     An Accelerated Payment Award is required to be paid by the Claims Administrator following (i) the sending of a Notice of Accelerated Payment Determination; (ii) the receipt of an acceptance of the Accelerated Payment Award from the Settlement Class Member along with a fully executed Form of Release as set forth in Exhibit 6, and (iii) the completion of the processes for (1) if applicable, auditing claims and investigating claims for fraud, and (2) entering or satisfying any agreement with a Governmental Payor (or establishment of a mechanism in lieu of an agreement) under Section 16.2.

(b)      A Claims Program Award is required to be paid by the Claims Administrator following (i) the sending of a Notice of Claims Program Determination, (ii) receipt of an acceptance of the Claims Program Award from the Settlement Class Member along with a fully executed Form of Release as set forth in Exhibit 6; and (iii) the completion of the processes for (1) appealing Claims Program Determinations, as set forth in Section 7.10, (2) if applicable, auditing claims and investigating claims for fraud, and (3) entering or satisfying any agreement with a Governmental Payor (or establishment of a mechanism in lieu of an agreement) under Section 16.2.

(c)      The Claims Administrator shall notify the Settlement Administrator of the dates, amounts, and recipients of all Compensation Awards that are required to be paid as of each month.

(d)      Settlement Class Members who are unrepresented by counsel may elect to receive payment of their Compensation Award by physical check, electronic funds, transfer, or pre-paid debit card.  Settlement Class Members who are represented by counsel shall receive payment of their Compensation Award by electronic fund transfer directly to the trust account of the attorney.

(e)      In connection with a Compensation Award issued to a Representative Claimant, the Claims Administrator will abide by all substantive laws of the domicile of such Representative Claimant concerning distribution and will not issue payment until the Claims Administrator has received from the Settlement Class Member or Representative Claimant proof of such court approvals or other documents necessary to authorize payment. Where short form procedures exist concerning such distribution that do not require domiciliary court approval or supervision, the Claims Administrator is authorized to adopt those procedures as part of the claims administration process applicable to such Representative Claimant.  The Claims Administrator also is authorized to adopt procedures as are approved by the Court to aid or facilitate in the payment of claims to minor, incapacitated, or incompetent Settlement Class Members or their guardians.

Section 7.10   <u>Appeals Process for Claims Program</u>.

(a)      <u>Settlement Class Member and Class Counsel Appeals</u>.

(i)      <u>Eligibility Determinations</u>.

(1)      Settlement Class Members who have applied for a Claims Program Award or Class Counsel can appeal the Claims Administrator's eligibility determination under Section 6.1 and Section 6.2 to the Settlement Administrator by submitting a written challenge to the Settlement Administrator within 60 days after receiving the Notice of Claims Program Determination.  The Settlement Website's web-based portal will include an online process for submitting an appeal.  Appeals may only be taken to the Settlement Administrator, not the Court.  In order for Class Counsel to submit such an appeal, Class Counsel must include in their appeal a certification that Class Counsel is authorized by the Settlement Class Member to bring the appeal and that the Settlement Class Member is not bringing an appeal of his or her own.

(2)    The appellant must submit to the Settlement Administrator his or her notice of appeal, using an Appeals Form provided by the Claims Administrator.  The content of the Appeals Form will be agreed to by Class Counsel and Counsel for the Defendant.  Once the Appeals Form is submitted by the appellant, the Settlement Administrator shall provide a written copy to the Claims Administrator, the Defendant, Class Counsel (if the appeal is taken by a Settlement Class Member), and the applicable Settlement Class Member (if the appeal is taken by Class Counsel).  The appellant must have a good faith belief that the determination by the Claims Administrator was incorrect.  The appellant also must specifically identify evidence in support of the written challenge that was presented to the Claims Administrator and which the appellant contends was not properly considered.  Any written statement in support of an appeal may not exceed five single-spaced pages in length absent advance approval from the Claims Administrator.

(3)    No later than 30 days after receipt of the Appeals Form, the Claims Administrator may submit a written statement in opposition to the appeal, and the applicable Settlement Class Member (if the appeal is taken by Class Counsel) may submit a written statement in support of or opposition to the appeal.  Any written statement pursuant to this Section 7.10(a)(i)(3) must not exceed five single-spaced pages in length.  The Settlement Administrator will not deem the lack of a statement to be an admission regarding the merits of the appeal.  The Settlement Administrator will also be provided access to all documents and information available to the Claims Administrator to aid in determining the appeal of the Claims Administrator's eligibility determination.  The appellant may not submit a reply.

(4)    If the appeal is taken by a Settlement Class Member, Class Counsel may submit a written statement in support of or opposition to the appeal no later than 15 days after the latter of (a) receipt of the Appeals Form or (b) the Claims Administrator's written opposition.  If the appeal is taken by a Settlement Class Member or Class Counsel, the Defendant may submit a written statement in support of or opposition to the appeal no later than 15 days after the latter of (a) receipt of the Appeals Form or (b) the Claims Administrator's written opposition.  These written statements must not exceed five single-spaced pages in length.  The Settlement Administrator will not deem the lack of a statement to be an admission regarding the merits of the appeal.  The appellant and the Claims Administrator may each submit a reply to the submission of Class Counsel or the Defendant no later than 15 days after receipt of Class Counsel's or the Defendant's written statement.

(5)    The Settlement Administrator will make a determination on the written challenge to the Claims Administrator's eligibility determination and inform the Settlement Class Member, the Claims Administrator, Class Counsel, and the Defendant of the decision.  The Settlement Administrator will require clear and convincing evidence in order to set aside the Claims Administrator's determination of the Settlement Class Member's eligibility to apply for a Claims Program Award for appeals under this Section 7.10(a)(i).  The decision of the Settlement Administrator shall be final and binding.  There shall be no appeal from the Settlement Administrator's decision.

(ii)    <u>Amount of Claims Program Award</u>.

(1)     Settlement Class Members who have applied for a Claims Program Award who are dissatisfied with the designated amount of the Claims Program Award may challenge the Claims Program Award in mediation.  Such Settlement Class Members must submit a written mediation request to the Settlement Administrator within 60 days after receiving the Notice of Claims Program Determination.  No Claims Program Award may exceed the amount of U.S. $200,000, notwithstanding any mediation or appeal, unless there was a finding of Extraordinary Circumstances by the Claims Program pursuant to Section 6.2(a)(ii)(1).  The Settlement Administrator shall develop guidelines for an efficient mediation system no later than 90 days after entry of the Final Order and Judgment.  These guidelines will require that the mediators follow the same criteria, limitations, and guidelines for Claims Program Awards set forth in the Settlement Agreement and the Compensation Award Guidelines in Exhibit 5, and may permit, but not require, mediators to take into account the reasons given for the Claims Program Determination by the Claims Program.  The mediators who will preside over the mediations regarding the designated amount of the Claims Program Award shall be agreed upon by Class Counsel and Counsel for the Defendant.

(2)     After pursuing mediation pursuant to Section 7.10(a)(ii)(1), Settlement Class Members who are dissatisfied with the results of the mediation process may appeal their mediation offer to the Settlement Administrator within 60 days after receiving the mediation offer.  Appeals may only be taken to the Settlement Administrator, not the Court.  The Settlement Administrator shall develop a process for appealing a mediation offer substantially resembling the process as set forth in Section 7.10(a)(i) for appeals of eligibility determinations.  The Settlement Administrator shall make its appellate determination based on the exercise of its sole discretion applying the same criteria, limitations, and guidelines for Claims Program Awards set forth in the Settlement Agreement and the Compensation Award Guidelines set forth in Exhibit 5, and may, but is not required to, take into account the reasons given for the Claims Program Determination by the Claims Program.  The decision of the Settlement Administrator shall be final and binding.  There shall be no appeal from the Settlement Administrator's decision.  For the avoidance of doubt, no Claims Program Award may exceed the amount of U.S. $200,000, notwithstanding any mediation or appeal, unless there was a finding of Extraordinary Circumstances by the Claims Program pursuant to Section 6.2(a)(ii)(1).

(3)     After pursuing an appeal pursuant to Section 7.10(a)(ii)(2), Settlement Class Members will have 60 days after receipt of the offer that results from the appeal to either accept or reject that offer.  Settlement Class Members who reject the offer will have the tort-system rights set forth in Section 7.13.

(b)     <u>Defendant Appeals</u>.  All Claims Program Awards, including eligibility determinations and the amount of the award, can be appealed by the Defendant directly to the Settlement Administrator by submitting a written challenge to the Settlement Administrator within 60 days after receiving the Notice of Claims Program Determination.  The Settlement Administrator shall develop a process for appeals under this Section 7.10(b) substantially resembling the processes set forth in Section 7.10(a)(i) and Section 7.10(a)(ii)(2).  The Defendant may submit a written statement in support of the appeal.  In reviewing eligibility determinations and the amount of a Claims Program Award, the Settlement Administrator shall make its appellate determination based on the exercise of its sole discretion applying the same criteria, limitations, and guidelines for Claims Program Awards set forth in the Settlement Agreement and the

Compensation Award Guidelines set forth in Exhibit 5, and may, but is not required to, take into account the reasons given for the Claims Program Determination by the Claims Program. The Defendant may appeal no more than 17.5% of Claims Program Awards in any given year. After an appeal by the Defendant, the Settlement Class Member will have 60 days to either accept the offer that results from the appeal or reject that offer. Settlement Class Members who reject the offer will have the tort-system rights set forth in Section 7.13.

Section 7.11    <u>Audit Rights and Detection and Prevention of Fraud.</u>

(a)    Class Counsel and the Defendant each will have the absolute right and discretion, at any time, but at their sole expense, in good faith to conduct, or have conducted by an independent auditor, audits to verify Compensation Award claims submitted by Settlement Class Members.

(b)    A Settlement Class Member whose claim for a Compensation Award has been selected for audit by the Claims Administrator, the Settlement Administrator, Class Counsel, or Counsel for the Defendant may be required to submit additional records, including medical records, employment records, proof of exposure to Roundup Products, additional information regarding the list of Governmental Payors and Other Insurers provided under Section 16.1(b), and any other information/documents as requested by the auditing party.

(c)    A Settlement Class Member who refuses to cooperate with any audit, including by unreasonably failing or refusing to provide the auditing party with all records and information sought within the time frame specified, will have the claim denied without right to an appeal and no Compensation Award will be provided to that Settlement Class Member.

(d)    <u>Registration Audits.</u>  The Claims Administrator will establish and implement any procedures to detect and prevent fraudulent registrations under Article V it deems necessary. The Defendant may request an audit of favorable registration determinations if the Defendant reasonably believes, based on information received pursuant to Section 14.2(a)(v), that fraudulent registrations may have occurred. Such requests shall be made to the Settlement Administrator who may, in his sole discretion, require the Claims Administrator to audit favorable registration determinations.

(e)    <u>Accelerated Payment Award Audits.</u>

(i)    On a quarterly basis, the Claims Administrator will audit at least four Accelerated Payment Claim Packages that the Claims Administrator has found to qualify for Accelerated Payment Awards during the preceding quarter, if any qualify. The Claims Administrator will select such Accelerated Payment Claim Packages for auditing on a random basis or to address a specific concern raised by an Accelerated Payment Claim Package.

(ii)    The Claims Administrator will establish and implement any additional procedures the Claims Administrator determines are necessary to detect and prevent fraudulent submissions to, and payments of fraudulent claims for, Accelerated Payment Awards.

(f)    <u>Claims Program Award Audits.</u>  Class Counsel, Counsel for the Defendant, the Settlement Administrator, and the Claims Administrator will establish and

implement procedures to detect and prevent fraudulent submissions to, and payments of fraudulent claims for Claims Program Awards.  Among other fraud detection and prevention procedures, the following procedures relating to claim audits will be instituted:

(i)     On a quarterly basis, the Claims Administrator will audit at least ten Claims Program Claim Packages that the Claims Administrator has found to qualify for Claims Program Awards during the preceding quarter, if any qualify.  The Claims Administrator will select such Claims Program Claim Packages for auditing on a random basis or to address a specific concern raised by a Claims Program Claim Package.

(ii)     In addition, the Claims Administrator will audit Claims Program Claim Packages that:  (1) seek a Claims Program Award when the Settlement Class Member took part in the Diagnostic Accessibility Grant Program within the prior 365 days and was not diagnosed with NHL during the Diagnostic Accessibility Grant Program examination; (2) seek a Claims Program Award when the Settlement Class Member submitted a different Claim Package within the prior 365 days based upon a diagnosis of NHL by a different physician, and that Claim Package was found not to qualify for a Compensation Award; and (3) reflect a Qualifying Diagnosis made through a medical examination conducted at a location other than a standard treatment or diagnosis setting (*e.g.*, hotel rooms).

(iii)     Upon the request of Counsel for the Defendant, the Claims Administrator will also audit Claims Program Claim Packages that result in Claims Program Awards that exceed U.S. $200,000.  Counsel for the Defendant may request audits for up to 50% of the total Claims Program Claim Packages filed in any calendar year that result in Claims Program Awards that exceed U.S. $200,000.

(g)     Upon selection of a Settlement Class Member's Claim Package for any audit, the Claims Administrator will notify Class Counsel, the Settlement Class Member (and his/her individual counsel, if applicable), Counsel for the Defendant, and the Settlement Administrator of the selection and will require that, within 90 days, or such other time as is necessary and reasonable under the circumstances, the audited Settlement Class Member submit to the Claims Administrator, to the extent not already provided, such information as may be necessary and appropriate to audit the Claim Package.

(h)     When auditing any Settlement Class Member's claim for a Compensation Award, the Claims Administrator will review the records and information relating to that claim and determine whether the Claim Package misrepresents, omits, and/or conceals material facts that affect the claim and whether it sufficiently demonstrates the Settlement Class Member's exposure to Roundup Products.

(i)     If, upon completion of any audit, the Claims Administrator determines that there has not been a misrepresentation, omission, or concealment of a material fact made in connection with the claim, the process of issuing a Compensation Award, with Claims Program Awards subject to mediation and appeal, will proceed.

(j)     If, upon completion of any audit, the Claims Administrator determines that there has been a misrepresentation, omission, or concealment of a material fact

made in connection with the claim, the Claims Administrator will notify the Settlement Class Member and will refer the claim to the Settlement Administrator for review and findings. The Settlement Administrator's review and findings shall take into account whether the misrepresentation, omission or concealment was intentional, and may include the following relief, without limitation: (i) denial of the claim; (ii) additional audits of claims involving the same attorney, law firm, or physician (if applicable), including those already paid; (iii) referral of the attorney, law firm, or physician (if applicable) to the appropriate disciplinary boards; (iv) referral to federal authorities; (v) disqualification of the Settlement Class Member from further participation in the Funded Class Benefits; (vi) disqualification of the attorney, law firm, or physician from further participation in the Settlement Agreement; and/or (vii) if a law firm is found by the Claims Administrator to have submitted more than one fraudulent submission on behalf of Settlement Class Members, claim submissions by that law firm will no longer be accepted, and attorneys' fees paid to the firm by the Settlement Class Member, or by the Legal Services Program if the firm is a Legal Services Program Counsel, will be forfeited and paid to the Settlement Fund.

(k)     If the Claims Administrator at any time makes a finding (based on its own detection processes or from information received from Class Counsel or Counsel for the Defendant) of fraud, misrepresentation, omission, or concealment of facts by a Settlement Class Member submitting a claim for a Compensation Award, and/or by the physician providing the Qualifying Diagnosis, the Claims Administrator will notify the Settlement Class Member, Class Counsel and Counsel for the Defendant, and will refer the claim to the Settlement Administrator for review and findings that may include, without limitation, the relief set forth in Section 7.11(j).

(l)     Subject to the discretion of the Claims Administrator and Settlement Administrator, the applicable deadlines relating to the Claims Administrator's, Settlement Administrator's, or Claims Program's review, investigation, timing of payment, and appeals of Claim Packages or Compensation Awards may be temporarily suspended for any claim being subject to an audit under this Section 7.11.

Section 7.12   The Claims Administrator, in consultation with Class Counsel, Counsel for the Defendant and the Settlement Administrator, will also establish system-wide processes to detect and prevent fraud, including, without limitation, claims processing quality training and review and data analytics to spot "red flags" of fraud, including, without limitation, alteration of documents, questionable signatures, duplicative documents submitted on claims, the number of claims from similar addresses or supported by the same physician or office of physicians, data metrics indicating patterns of fraudulent submissions, and such other attributes of claim submissions that create a reasonable suspicion of fraud.

Section 7.13   <u>Tort-System Rights</u>.   Following the conclusion of the Initial Settlement Period, a Settlement Class Member who has not previously accepted and received a Compensation Award (and who does not subsequently accept and receive a Compensation Award) will have the right to sue for Compensatory Damages in the tort system for any Roundup Claim against the Monsanto Parties or the Related Parties at the time the stay expires under Section 18.2(b)(i), subject to the following terms and conditions.

(a)     A Settlement Class Member who submits a claim for a Compensation Award may not sue for Compensatory Damages in the tort system following

41

expiration of such stay until he or she receives and rejects a final Claims Program Award as provided in Section 7.10(a)(ii)(3), is determined to be ineligible for a Compensation Award, or the funds in the Compensation Fund are exhausted.

(b)     A Settlement Class Member who applied for an Accelerated Payment Award and received a favorable Accelerated Payment Determination may not reject the award and sue in the tort system.

(c)     If the Compensation Fund continues pursuant to Section 13.4(c) following the Initial Settlement Period, Section 13.4(d) and Section 13.4(e) sets forth additional terms and conditions on which a Settlement Class Member who submits a Claim Package during the period in which the Compensation Fund continues may sue in the tort system.

(d)     Section 7.16 sets forth additional terms and conditions on which a Settlement Class Member whose claim for a Compensation Award is being considered for payment from the Remaining Funds may sue in the tort system.

(e)     If a Settlement Class Member who was offered but did not accept a Claims Program Award sues for Compensatory Damages in the tort system for any Roundup Claim against the Monsanto Parties or the Related Parties, the amount of last offer by the Claims Program will be treated as an offer of judgment for purposes of obligation to pay costs in the event of a tort-system judgment below that amount.

(f)     In any suit in the tort system for any Roundup Claim against the Monsanto Parties or the Related Parties, the Settlement Class Member may seek Compensatory Damages only and remains bound by all provisions of the Settlement Agreement other than the bar on bringing Roundup Claims for Compensatory Damages in the tort system, including Section 4.4, Section 5.4, Section 6.4, this Section 7.13, Section 7.14, Section 7.15, Section 7.16, Section 7.17,   Section 11.3(c),   Section 11.6,   Article XII,   Article XIII,   Section 14.1(d), Section 14.2(d),  Section 14.3(d),  Section 14.4(e),  Section 14.5(c),  Section 14.8,  Article XVI, Article XVII, Section 18.2(b)(ii)-(v), Section 21.4–Section 21.10, Section 23.2(a), Section 23.3, Article XXIV, Article XXVI, Article XXIX, Article XXX, and Part 4(c) of Exhibit 5.

Section 7.14   Continuation of Compensation Fund.  This Section 7.14, along with Section 7.15 and Section 7.16, address the operation of the Compensation Fund following the end of the Initial Settlement Period.   This Section 7.14 addresses operations in the event the Compensation Fund continues as described in Article XIII.  Section 7.15 addresses operations in the event the Compensation Fund does not so continue.  Section 7.16 addresses administration of Remaining Funds (as defined therein) in the period between the end of the Initial Settlement Period and confirmation of Compensation Fund Continuation Terms (if the Compensation Fund continues as described in Article XIII) or after the end of the Initial Settlement Period (if the Compensation Fund does not so continue).  If the Compensation Fund continues pursuant to Section 13.4(c) following the Initial Settlement Period, the following will apply:

(a)     Supersession by Compensation Fund Continuation Terms.  The Compensation Fund will follow the Compensation Fund Continuation Terms to the extent they expressly supersede anything in Article VI, Article VII, and the Compensation Award Guidelines.

The Claims Program will use the new payment ranges, payment criteria, and guidelines set forth in the Compensation Fund Continuation Terms, as well as any procedural changes set forth therein. Notwithstanding the foregoing, any claims being considered for payment from the Remaining Funds shall continue to be administered and processed pursuant to Section 7.16. If the Compensation Fund continues pursuant to Section 13.4(c), to the extent any Remaining Funds are not exhausted following the administration and processing of all claims that were being considered for payment from the Remaining Funds, such Remaining Funds shall thereafter be administered from the Compensation Fund under the Compensation Fund Continuation Terms.

(b)     Payment Priority. The order of payment priority in a given year will be (i) any Compensation Awards which would have become payable during the Initial Settlement Period but for insufficiency of funds or any Compensation Awards for Settlement Class Members provided for in Section 7.16(b), followed by (ii) Accelerated Payment Awards, followed by (iii) Claims Program Awards, followed by (iv) any amounts referenced in Section 13.4(d)(ii). Amounts unpaid in a year shall roll to the next year and have priority over amounts that become payable during the next year.

Section 7.15     Non-Continuation of Compensation Fund. If the Compensation Fund does not continue pursuant to Section 13.4(c) following the Initial Settlement Period, the payment of Compensation Awards and the operation of the Compensation Fund will end, other than administration of Remaining Funds.

Section 7.16     Administration of Remaining Funds.

(a)     As used in the Settlement Agreement, "Remaining Funds" shall mean: (i) any funds remaining in the Compensation Fund at the end of the Initial Settlement Period and (ii) in the event the End Payment is owed, the portion of the End Payment (if any) that is allocated to the Compensation Fund, in each case until the funds are exhausted.

(b)     Settlement Class Members (if any) who submitted claims to the Compensation Fund during the Initial Settlement Period but (other than for the reasons described in Section 6.3(b)) did not receive an Accelerated Payment Determination or Claims Program Determination prior to the conclusion of the Initial Settlement Period shall have their claims administered and processed by the Compensation Fund out of any Remaining Funds until such funds are exhausted. Notwithstanding anything to the contrary in Section 7.13, such a Settlement Class Member may not sue for Compensatory Damages in the tort system following expiration of the stay under Section 18.2(b)(i) until he or she receives and rejects a final Claims Program Award as provided in Section 7.10(a)(ii)(3), is determined to be ineligible for a Compensation Award, or the Remaining Funds are exhausted.

(c)     Settlement Class Members referenced in Section 6.4 and Section 6.5 may submit claims for Compensation Awards out of any Remaining Funds in the manner set forth in those Sections until such funds are exhausted. A Settlement Class Member who may submit such a claim under this Section 7.16(c), but instead opts to sue for Compensatory Damages without first applying for a Compensation Award from Remaining Funds waives any right to apply for a Compensation Award. A Settlement Class Member who opts to submit a claim under this Section 7.16(c) may not sue for Compensatory Damages in the tort system following expiration of

43

the stay under Section 18.2(b)(i) until he or she receives and rejects a final Claims Program Award as provided in Section 7.10(a)(ii)(3), is determined to be ineligible for a Compensation Award, or the Remaining Funds are exhausted.

(d)     All provisions of Article VI, Article VII, and the Compensation Award Guidelines shall apply to the administration and processing of all claims for Compensation Awards from Remaining Funds without regard to any Compensation Fund Continuation Terms.

(e)     If a Settlement Class Member referenced in Section 7.16(b) does not receive an Accelerated Payment Determination or Claims Program Determination prior to the exhaustion of the Remaining Funds and the Compensation Fund continues pursuant to Section 13.4(c), he or she may either (i) submit his or her claim to the Compensation Fund as provided in Section 13.4 for consideration under the Compensation Fund Continuation Terms, or (ii) exercise tort-system rights following the exhaustion of the Remaining Funds under, at the time, and subject to the terms and conditions set forth in Section 7.13, this Section 7.16, and Article XIII. A Settlement Class Member referenced in the prior sentence who opts to submit his or her claim to the Compensation Fund as provided in Section 7.16(e)(i) may either have the previously submitted claim automatically considered or supplement the claim within 60 days of the beginning of the period for submission.

(f)     In any suit in the tort system permitted under this Section 7.16, the terms and conditions for tort-system suits set forth in Section 7.13, this Section 7.16, and Article XIII shall apply, including the limitations set forth in Section 7.13(e)-(f).

Section 7.17   No Prejudice.  The provisions of the Settlement Agreement that permit Settlement Class Members to sue for Compensatory Damages in the tort system for Roundup Claims against the Monsanto Parties or the Related Parties set forth solely the time, circumstances and terms and conditions under which Settlement Class Members may bring such lawsuits consistent with the Settlement Agreement.  Such provisions shall not be construed as suggesting that any Settlement Class Member would have a valid Roundup Claim or that any such lawsuit or Roundup Claim has or would have merit, and are without prejudice to the rights of the Monsanto Parties and the Related Parties to defend against any such lawsuits or Roundup Claims.

Section 7.18   Equitable Adjustment of Compensation Program.  For good cause shown, and with the consent of Class Counsel and the Defendant, the Settlement Administrator may equitably adjust or modify the required content of Claim Forms or Claim Packages (including the criteria in Exhibit 5), or the process of applying for Compensation Awards.  Any such equitable adjustment or modification shall be in furtherance of the objectives of the Settlement Agreement.

## ARTICLE VIII
## Diagnostic Accessibility Grant Program

Section 8.1   Scope of Program.  The Diagnostic Accessibility Grant Program is intended to increase access to NHL Diagnostic Evaluation among Settlement Class Members, including to address regional disparity to such access through the distribution of grants to medical providers in specified service areas.  As used in the Settlement Agreement, "NHL Diagnostic Evaluation" means evaluation of an individual for NHL using methodologies that are generally

44

accepted as appropriate among the medical community for the individual in question in view of that individual's profile and characteristics. Within 90 days following entry of the Preliminary Approval Order, the DAGP Administrator will publish on the Settlement Website a list of service areas identified pursuant to Exhibit 7 (the "List of Service Areas"). Class Counsel or Counsel for the Defendant may appeal the List of Service Areas to the Settlement Administrator. Any such appeal must be made in writing to the Settlement Administrator within 30 days of the publication of the List of Service Areas on the Settlement Website. The Settlement Administrator shall dictate the format and length of any such written appeal, and may give the DAGP Administrator an opportunity to respond. The decision of the Settlement Administrator regarding an appeal shall be final and binding. There shall be no appeal from the Settlement Administrator's determination. The List of Service Areas may be modified with 30 days' notice to Class Counsel and Counsel for the Defendant (which shall trigger the appeal rights set forth immediately above). Grants provided to medical providers under the Diagnostic Accessibility Grant Program shall be used only to increase the availability of NHL Diagnostic Evaluation to eligible Settlement Class Members, and may not be used to provide or pay for treatment for any Settlement Class Member.

Section 8.2    Outreach Campaign.

(a)    Beginning within the later of 30 days following the Effective Date or 90 days following entry of the Final Order and Judgment, and continuing until the conclusion of the final budget period as set forth in Section 8.3(b)(i), the DAGP Administrator shall conduct an outreach campaign (the "Outreach Campaign") to inform DAGP Eligible Settlement Class Members about the objectives of the Diagnostic Accessibility Grant Program described in this Article VIII and Exhibit 7.

(b)    The DAGP Administrator shall design the Outreach Campaign (i) with a significant focus on the affected populations in the List of Service Areas and medically underserved populations; (ii) to leverage the communication channels that best reflect how various cohorts of DAGP Eligible Settlement Class Members receive and share information; and (iii) to otherwise inform DAGP Eligible Settlement Class Members about the objectives of the Diagnostic Accessibility Grant Program described in this Article VIII and Exhibit 7.

(c)    The funding for the Outreach Campaign shall come from the funds allocated to the Diagnostic Accessibility Grant Program. The DAGP Administrator shall design and direct the Outreach Campaign on a cost-effective basis to ensure that as much of the Diagnostic Accessibility Grant Program funds as practicable are preserved for grants to medical providers. Absent approval of the Settlement Administrator, no more than 5% of the funds allocated to the Diagnostic Accessibility Grant Program may be used for the Outreach Campaign. The Outreach Campaign is not required to last for the entire period set forth in Section 8.2(a) if that would require funding exceeding 5% of the funds allocated to the Diagnostic Accessibility Grant Program.

(d)    Within 45 days following entry of the Final Order and Judgment, the DAGP Administrator will provide to the Settlement Administrator, Class Counsel, and the Defendant a preliminary plan for the Outreach Campaign meeting the conditions set forth in Section 8.2(b) and Section 8.2(c). The Outreach Campaign shall commence following the Effective Date in accordance with that plan, together with any modifications requested by the Settlement Administrator after consultation with the DAGP Administrator.

Section 8.3    <u>DAGP Grants</u>.

(a)    <u>Grant Criteria</u>.  Within 45 days following entry of the Final Order and Judgment, the DAGP Administrator will develop procedures for the award of grants ("DAGP Grants") to medical providers (such providers being "DAGP Grantees"), and for the monitoring of the use of DAGP Grant funds by such DAGP Grantees.  These procedures shall include grant application contents and contracting protocols meeting the requirements set forth in this Section 8.3.  The procedures shall also include guidelines for the selection of DAGP Grantees and the determination of the amount of individual DAGP Grants.  The guidelines shall provide for the selection of DAGP Grantees and determination of DAGP Grant amounts consistent with the requirements of this Section 8.3 and in a manner that the DAGP Administrator determines will increase the availability of NHL Diagnostic Evaluation to the greatest number of DAGP Eligible Settlement Class Members in the service areas identified in the List of Service Areas (and elsewhere as consistent with Section 8.3(b)(iii)), taking into account the following criteria, as well as the limitations imposed in Section 8.3(b):

(i)    The provider's capabilities and capacity to arrange for or perform NHL Diagnostic Evaluation;

(ii)    The estimated number of Settlement Class Members within the provider's service area who are DAGP Eligible Settlement Class Members, and who would not otherwise have access to NHL Diagnostic Evaluation services;

(iii)    The extent of usage of Roundup Products in the provider's service area;

(iv)    The provider's number and types of staff and full-time equivalents that can serve DAGP Eligible Settlement Class Members, including their qualification levels;

(v)    The provider's ability to collect patient-level data, including considerations for HIPAA compliance, and performance measures as prescribed by the DAGP Administrator to assist the DAGP Administrator in assessing and reporting upon the Diagnostic Accessibility Grant Program's outcome and performance measures;

(vi)    The provider's fraud, waste, and abuse policies;

(vii)    Whether the provider is capable of satisfying the requirements for a Qualified Physician;

(viii)    The provider's effectiveness in applying funds from any prior DAGP Grant to the NHL Diagnostic Evaluation of DAGP Eligible Settlement Class Members;

(ix)    The provider's compliance with the Diagnostic Accessibility Grant Program's requirements in connection with any prior DAGP Grant, including any such requirements contained in any Grantee Contract entered into by the provider; and

46

(x)     In the case of a Telehealth-Only Provider, the provider's ability to provide the services set forth in Section 8.3(b)(iv) rather than NHL Diagnostic Evaluation.

(b)     <u>Additional Limitations on Grant Amounts</u>.

(i)     The DAGP Administrator shall award DAGP Grants based on a fixed-length budget period, the length of which shall remain the same from period to period once set by the DAGP Administrator.  The DAGP Administrator shall determine the length of the budget period, which shall not be longer than 12 months, based on what length best accommodates the objectives of the Diagnostic Accessibility Grant Program while also taking into account the DAGP Grantees' fiscal planning process.  At the conclusion of a budget period a DAGP Grantee may reapply for a new DAGP Grant.  The first budget period shall begin 30 days following the Effective Date.  The last budget period shall end on the date that is four years from the date the first budget period began.

(ii)     In awarding DAGP Grants, the DAGP Administrator shall seek to conserve funds such that funds will remain available through the conclusion of the final budget period as set forth in Section 8.3(b)(i), taking into account that start-up processes may require more funds early on.  The DAGP Administrator may not award DAGP Grants in a total amount that exceeds the total funds allocated to the Diagnostic Accessibility Grant Program (less funds devoted to the Outreach Campaign and to the payment of any vendors, professionals, and consultants as provided in Section 8.5).

(iii)     No more than 17.5% of the total DAGP Grant funds may be used for any NHL Diagnostic Evaluation outside of the List of Service Areas. The DAGP Administrator shall maintain sufficient records to ensure that such percentage is not exceeded.

(iv)     The DAGP Grants may include amounts to be used for telehealth services subject to the following conditions:

(1)     No more than 10% of the total DAGP Grant funds in each budget period may be used to provide telehealth services.  The DAGP Administrator shall include provisions in each DAGP Grant and Grantee Contract limiting the dollar amount the DAGP Grantee may use for such services such that the total of such amounts for the budget period is consistent with this percentage, and shall maintain sufficient records to ensure that this percentage is not exceeded.

(2)     Subject to Section 8.3(b)(iv)(1), the DAGP Administrator may determine to include amounts to be used for telehealth services in either or both (A) DAGP Grants to providers who also provide in-person NHL Diagnostic Evaluation and/or (B) a DAGP Grant to a single DAGP Grantee who is solely to provide telehealth services and not any in-person NHL Diagnostic Evaluation ("Telehealth-Only Provider") for DAGP Eligible Settlement Class Members residing in or outside of the List of Service Areas.

(3)     DAGP Grantees who provide telehealth services are subject to the following conditions:

(A)     Telehealth services shall consist only of intake processing (*i.e.*, getting the Settlement Class Member's basic medical and background information) and an initial screening to determine whether or not, based on that information, the telehealth provider recommends that the Settlement Class Member seek in-person NHL Diagnostic Evaluation.  No tests shall be conducted, no diagnosis shall be made, and no other course of action shall be discussed during a telehealth session.  A provider may not discuss or assess medical conditions other than NHL (including other cancers) during a telehealth session.

(B)     A DAGP Grantee that is not a Telehealth-Only Provider may provide telehealth services using its DAGP Grant funds only for DAGP Eligible Settlement Class Members who are located in its service area.

(C)     A DAGP Grantee that provides telehealth services may not suggest or recommend a particular provider of in-person NHL Diagnostic Evaluation (or other medical evaluation) other than a DAGP Grantee that provides in-person NHL Diagnostic Evaluation under its DAGP Grant or the Settlement Class Member's local hospital.

(c)     <u>Report to the Settlement Administrator</u>.  The DAGP Administrator shall provide the grant procedures to the Settlement Administrator promptly after developing them.  Following the Effective Date, the DAGP Administrator shall conduct the selection of DAGP Grantees and determination of DAGP Grant amounts as provided below in accordance with those procedures, together with any modifications to the procedures requested by the Settlement Administrator after consultation with the DAGP Administrator.  The DAGP Administrator shall promptly notify the Settlement Administrator of all DAGP Grant amounts and the respective DAGP Grantees for each budget period.

(d)     <u>Selection of DAGP Grantees</u>.

(i)     Within the later of 30 days following the Effective Date or 120 days following entry of the Final Order and Judgment, the DAGP Administrator will select a network of medical providers as initial DAGP Grantees for the first budget period, which shall begin as provided in Section 8.3(b)(i).  In addition to the criteria provided in Section 8.3(a), priority in the selection of initial DAGP Grant recipients shall be given to federally funded healthcare centers, including Federally Qualified Health Centers ("FQHCs") and FQHC "look-alikes" under Section 330 of the Public Health Service Act, 42 U.S.C. § 254b, in the service areas identified in the List of Service Areas.  Thereafter, for each subsequent budget period, the DAGP Administrator shall award DAGP Grants to DAGP Grantees for that budget period.

(ii)     Upon selection of a DAGP Grantee, the DAGP Administrator shall determine whether the DAGP Grantee is capable of satisfying the requirements of a Qualified Physician as set forth in Exhibit 4.  If the DAGP Grantee is deemed so capable, following the DAGP Grantee's provision of NHL Diagnostic Evaluation to a Settlement Class Member, the receipt by the Settlement Class Member of a Qualifying Diagnosis, and the submission of any additional information to the DAGP Administrator necessary to establish that the DAGP Grantee meets the requirements of a Qualified Physician for such Settlement Class Member, the DAGP Administrator shall determine whether the DAGP Grantee is a Qualified Physician for such Settlement Class Member.  The purpose of the DAGP Grant is not to provide

48

individual medical treatment and any treatment provided by a DAGP Grantee to a Settlement Class Member, including in order to satisfy the requirements of a Qualified Physician, shall not be provided or paid for using funds from a DAGP Grant. Class Counsel and the Defendant may appeal a DAGP Administrator determination that a DAGP Grantee is capable of satisfying the requirements of a Qualified Physician, and a DAGP Administrator determination that a DAGP Grantee is a Qualified Physician for a particular Settlement Class Member. Any appeal must be made to the Settlement Administrator within 30 days of the appellant receiving notification of the DAGP Administrator determination that is the subject of the appeal, and such determination shall be reviewed by the Settlement Administrator for abuse of discretion. The decision of the Settlement Administrator regarding an appeal shall be final and binding. There shall be no appeal from the Settlement Administrator's determination.

(iii)    The DAGP Administrator shall provide the list of DAGP Grantees, DAGP Grant amounts, and the DAGP Administrator's determinations as to whether a DAGP Grantee is capable of satisfying the requirements of a Qualified Physician to the Settlement Administrator and shall give the Settlement Administrator a reasonable opportunity for review and comment. Absent any objection from the Settlement Administrator, the DAGP Administrator shall disburse a DAGP Grant following the execution by the DAGP Grantee of a Grantee Contract as set forth in Section 8.3(e).

(iv)    The DAGP Administrator shall provide a list identifying each DAGP Grantee that the DAGP Administrator determines is a Qualified Physician for a Settlement Class Member. For each such DAGP Grantee, the list shall identify each Settlement Class Member for which the DAGP Administrator has determined that the DAGP Grantee is a Qualified Physician.

(e)    <u>DAGP Grantee Contracts</u>.

(i)    The DAGP Administrator will enter into a written contract with each DAGP Grantee (the "Grantee Contract") to increase the availability of NHL Diagnostic Evaluation to DAGP Eligible Settlement Class Members. The Grantee Contract will include, among other things, a description of the services that will be provided under the Diagnostic Accessibility Grant Program, which shall include only NHL Diagnostic Evaluation and/or telehealth services consistent with Section 8.3(b)(iv); rate benchmarks and any inflation indices related to the NHL Diagnostic Evaluation services; terms relating to licensing, credentials, board certification, and other qualifications; the amount and type of insurance to be maintained by the DAGP Grantee; procedures for scheduling, rescheduling, and cancelling appointments for DAGP Eligible Settlement Class Members; pursuant to Section 8.3(b)(iv)(1), a cap on the amount of DAGP Grant funds that the DAGP Grantee may use for telehealth services; document retention policies and procedures; and fraud policies. The Grantee Contract will further provide that:

(1)    DAGP Grant funds may only be applied to increase the availability of NHL Diagnostic Evaluation to DAGP Eligible Settlement Class Members or for telehealth services consistent with Section 8.3(b)(iv);

(2)     The DAGP Grantee will not bill or otherwise seek reimbursement from any Governmental Payor for any NHL Diagnostic Evaluation services or telehealth services that it provides or pays for using DAGP Grants;

(3)     The DAGP Grantee will complete Qualified Physician Certifications for Settlement Class Members, upon request, if the DAGP Administrator determines that the DAGP Grantee is a Qualified Physician for such Settlement Class Members;

(4)     The DAGP Grantee will release, discharge, and hold harmless the Parties, the Monsanto Parties, Class Counsel, Counsel for the Defendant, the DAGP Administrator, and the Settlement Administrator from any and all Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, arising from, resulting from, in any way relating to or in connection with the services provided by that DAGP Grantee as part of the Diagnostic Accessibility Grant Program; and

(5)     The DAGP Administrator may terminate the Grantee Contract and require the return of any remaining DAGP Grant funds from the DAGP Grantee if the DAGP Grantee is not in compliance with the Grantee Contract terms, or for other cause.

(ii)     The Grantee Contract's fraud policies will contain the following provision regarding fraudulent conduct:  "As a DAGP Grantee you have agreed to provide your services and make any evaluation in good faith in accordance with best medical practices.  Your evaluations and billings will be audited on a periodic and random basis subject to the discretion of the DAGP Administrator and Settlement Administrator.  Fraud will not be tolerated and will be reported forthwith" (or substantially similar language approved in advance by the Settlement Administrator).

(iii)     The DAGP Administrator shall establish procedures to audit DAGP Grantees' compliance with Grantee Contracts.

(iv)     Nothing in the Grantee Contracts will limit or otherwise restrict a DAGP Grantee or its personnel from providing treatment or from using its facilities, equipment, or resources to provide treatment, on the condition that funds from a DAGP Grant may not be used to provide or pay for that treatment.

Section 8.4     DAGP Applications.     Following the Effective Date, eligible Settlement Class Members will be entitled to submit an application for participation in the Diagnostic Accessibility Grant Program ("DAGP Application").

(a)     A living Settlement Class Member, other than a Derivative Claimant, is eligible for participation in the Diagnostic Accessibility Grant Program (and accordingly a "DAGP Eligible Settlement Class Member") if he or she meets the following criteria:

(i)     The Settlement Class Member has not received a Qualifying Diagnosis; and

(ii)     The Settlement Class Member timely submits an application for participation in the Diagnostic Accessibility Grant Program meeting the terms and conditions described in Section 8.4(c), including proof of the Settlement Class Member's exposure to Roundup Products as set forth in Section 8.4(c)(iii) and Section 8.4(c)(iv).

(b)     To be considered timely, a DAGP Application must be submitted by 45 days prior to the conclusion of the final budget period as set forth in Section 8.3(b)(i), unless the DAGP Administrator determines upon application that the individual Settlement Class Member has shown good cause or excusable neglect.

(c)     The contents of the DAGP Application will include, in addition to any other information the DAGP Administrator or Settlement Administrator believe warranted to fulfill the objective of the Diagnostic Accessibility Grant Program:

(i)     The Approved Registration Number that the Settlement Class Member shall have obtained pursuant to Article V;

(ii)     An affirmation bearing the Settlement Class Member's or Representative Claimant's Personal Signature and stating under penalty of perjury that the Settlement Class Member has not previously received a Qualifying Diagnosis; and

(iii)     A written description, under penalty of perjury, establishing the Settlement Class Member's exposure to Roundup Products, including the timing, frequency, duration and extent of the Settlement Class Member's exposure to Roundup Products, whether exposure was occupational or non-occupational, and (if known) the name(s) of the Roundup Products the Settlement Class Member was exposed to; and

(iv)     Some documentary evidence of the exposure, such as employment or purchase records, or an explanation of why no documentary evidence is available.

(d)     Settlement Class Members who have applied for registration but have not yet received an Approved Registration Number may submit a DAGP Application without the Approved Registration Number, but must supply that number promptly upon obtaining it. A DAGP Application shall not be considered complete until the Approved Registration Number is supplied, though will be considered to have been filed as of the original filing date for purposes of Section 8.4(b).

(e)     Each Settlement Class Member will promptly notify the DAGP Administrator of any relevant changes or updates to the information the Settlement Class Member has provided in his or her DAGP Application.

(f)     All information received by the DAGP Administrator in connection with any DAGP Application will be recorded in a computerized database that will be maintained and secured in accordance with all applicable federal, state, and local laws, regulations, and guidelines, including, without limitation, privacy and data security laws. The DAGP Administrator must ensure that information is recorded and used properly, that an orderly system of data management and maintenance is adopted, and that the information is retained under responsible custody. The DAGP Administrator will keep the database in a form that grants access

for Diagnostic Accessibility Grant Program use and for limited access to the Settlement Class Member, but otherwise restricts access rights, including to employees of the DAGP Administrator who are not working on the Diagnostic Accessibility Grant Program.

(i)     The DAGP Administrator and his or her respective agents, representatives, and professionals who are administering the Settlement Agreement, will have access to all information received by the DAGP Administrator in connection with DAGP Applications necessary to perform his or her responsibilities under the Settlement Agreement.

(ii)     All information received by the DAGP Administrator in connection with any DAGP Application will be treated as confidential, as set forth in Section 24.2.

(g)     A DAGP Grantee shall not use funds from a DAGP Grant to provide NHL Diagnostic Evaluation to a Settlement Class Member in the absence of a complete DAGP Application that complies with the requirements set forth above.  Any NHL Diagnostic Evaluation provided by the DAGP Grantee in the absence of a complete DAGP Application that complies with the requirements set forth above shall not be considered when reviewing the DAGP Grantee's effectiveness in applying funds from any prior DAGP Grant to the NHL Diagnostic Evaluation of DAGP Eligible Settlement Class Members, but may be considered when reviewing the DAGP Grantee's compliance with the Diagnostic Accessibility Grant Program's requirements in connection with any prior DAGP Grant.  The DAGP Administrator shall develop procedures for prompt review of DAGP Applications to determine their timeliness and compliance with the requirements set forth above, and will send a written notice to the Settlement Class Member, Class Counsel, the Defendant, and the Settlement Administrator informing them of its determination. The DAGP Administrator shall also develop procedures for when, in exigent circumstances, a DAGP Grantee may provide NHL Diagnostic Evaluation without the DAGP Administrator's advance review of a Settlement Class Member's DAGP Application.  In developing these procedures, the DAGP Administrator shall balance the goal of expediting the availability of NHL Diagnostic Evaluation against the goal of preventing the misuse of Diagnostic Accessibility Grant Program funds through the provision of NHL Diagnostic Evaluation to ineligible Persons.

(h)     If, based on information received pursuant to Section 14.3(a)(v)-(vii), the Defendant reasonably believes that the DAGP Administrator may have made a material number of inaccurate determinations that Settlement Class Members are DAGP Eligible Settlement Class Members, the Defendant may request that the Settlement Administrator review the DAGP Administrator's eligibility determinations.  The Settlement Administrator, in its sole discretion, may establish and implement procedures for such review and, if so, will inform the DAGP Administrator, Class Counsel, and the Defendant of its determination as to whether the DAGP Administrator made a material number of inaccurate determinations.  If the Settlement Administrator determines that there have been a material number of inaccurate determinations, he or she shall direct the DAGP Administrator to promptly submit and implement procedures to improve its decision-making processes.  If during the course of its review, the Settlement Administrator determines that a Settlement Class Member was incorrectly determined to be a DAGP Eligible Settlement Class Member, it shall inform the Settlement Class Member, the DAGP Administrator, Class Counsel, and the Defendant of that determination.   The Settlement Administrator will make its determinations based on the exercise of its sole discretion applying the same criteria, limitations, and guidelines for DAGP Applications set forth in the Settlement

Agreement, and may, but is not required to, take into account the determinations made by the DAGP Administrator.  The decision of the Settlement Administrator shall be final and binding. There shall be no appeal from the Settlement Administrator's decisions.

           (i)    <u>DAGP Application Audits</u>.

           (i)    On a quarterly basis, the DAGP Administrator will audit a sample of the total DAGP Applications that the DAGP Administrator has found to qualify for participation in the Diagnostic Accessibility Grant Program during the preceding quarter such that the estimated percentage of total DAGP Applications presenting no indication of fraud based on the aggregate number of audited DAGP Applications over any rolling 12-month period shall provide a confidence level of 95% with a margin of error of +/- 3%.  The DAGP Administrator will select such DAGP Applications for auditing on a random basis or to address a specific concern raised by a DAGP Application, but will audit at least four DAGP Applications, if any qualify, each quarter.

           (ii)    The DAGP Administrator will establish and implement any additional procedures that the DAGP Administrator determines are necessary to detect and prevent fraudulent submissions for participation in the Diagnostic Accessibility Grant Program.

           Section 8.5    <u>Retention of Vendors, Professionals, and Consultants</u>.  With the written approval of the Settlement Administrator, the DAGP Administrator may hire administrative vendors, professionals, and consultants, such as legal counsel, actuaries, and economists, whom the DAGP Administrator deems necessary to faithfully implement the above provisions of this Article VIII.  Payment to such vendors, professionals, and consultants shall come from the funds allocated to the Diagnostic Accessibility Grant Program.  In the case of administrative vendors, the DAGP Administrator will provide to the Settlement Administrator in advance the criteria by which such vendors would be selected, including draft requests for proposal to be used in soliciting such vendors.  Any such draft request for proposal shall include provisions for (a) the credentialing and other certifications of the vendor; (b) the specific administrative functions to be provided by the vendor; (c) proposed payment rate structure and terms; (d) required fraud policies; (e) the type of clinical and program data to be recorded and collected by the vendor, including considerations for the privacy and security of personal information and other data security; and (f) proposed written contracts to be entered into between the DAGP Administrator and any vendor.  The proposed contracts shall include effective procedures for the DAGP Administrator to audit the vendor's processes for billing and providing services to the Diagnostic Accessibility Grant Program and shall provide that the DAGP Administrator may terminate the contract if the vendor is not in compliance with such contract's terms.  The DAGP Administrator shall promptly notify the Settlement Administrator of all payments incurred under this Section 8.5.

           Section 8.6    <u>No Guarantee of Benefits and No Additional Funding</u>.  For the avoidance of doubt, a Settlement Class Member's eligibility for participation in the Diagnostic Accessibility Grant Program shall not guarantee that the Settlement Class Member will receive NHL Diagnostic Evaluation or any particular type of medical test in connection with the Diagnostic Accessibility Grant Program.  In no event shall the Defendant have any funding obligations with respect to the Diagnostic Accessibility Grant Program other than as set forth in Article III.

**ARTICLE IX**
**Labeling Addition**

Section 9.1    Within 180 days of entry of the Final Order and Judgment, the Defendant will seek permission from the EPA to include in the labeling of Roundup Products a reference to information regarding whether exposure to Roundup Products causes NHL in humans, consisting of links to the scientific evidence specified in Section 12.2(d) and existing at the commencement of the Initial Settlement Period, to the extent the Defendant has permission to disclose such documents or such documents are otherwise available in the public domain (the "Reference Link").  The Defendant shall provide Class Counsel with a copy of its submission to the EPA.

Section 9.2    If the EPA grants Defendant permission to include the Reference Link in the labeling of Roundup Products, the Defendant will, as soon thereafter as reasonably practicable:

(a)    Include the Reference Link on all Roundup Products it manufactures or sells;

(b)    Request that all other manufacturers and sellers of Roundup Products known to the Defendant include the Reference Link on future Roundup Products (i.e., excluding Roundup Products already manufactured or placed in the commercial process at the time of such request); and

(c)    Cease selling glyphosate or Roundup Products to any manufacturer or seller who the Defendant knows has declined the request set forth in Section 9.2(b), subject to any contractual obligations that already exist at such time.

Section 9.3    Notwithstanding anything to the contrary, the Defendant may continue to sell Roundup Products already manufactured or placed in the commercial process at the time the EPA grants the Defendant permission to include the Reference Link.  Nothing in this Article IX will require the Defendant or any other manufacturer or seller of Roundup Products to withdraw, recall, or otherwise collect or modify the label of any Roundup Products already placed in the commercial process or the market.

**ARTICLE X**
**Research Funding Program**

Section 10.1    <u>Scope of Program</u>.  A program will be established to fund medical and/or scientific research into the diagnosis and treatment of NHL (the "Research Funding Program").  Class Counsel and Counsel for the Defendant will agree to a protocol through which Settlement Class Members can actively participate in the research conducted in the Research Funding Program, to the extent applicable.

Section 10.2    <u>Selection for Research Funding Program.</u>

(a)    Following entry of the Final Order and Judgment, Class Counsel and Counsel for the Defendant shall solicit proposals for funding relating to medical and/or scientific

research into the diagnosis and treatment of NHL from medical and scientific professionals and entities. In addition, medical and scientific professionals and entities may make unsolicited proposals to Class Counsel and Counsel for the Defendant for funding relating to medical and/or scientific research into the diagnosis and treatment of NHL. All proposals received by Class Counsel and Counsel for the Defendant for funding relating to the diagnosis and treatment of NHL shall be referred to as "Research Funding Proposals." All Research Funding Proposals must specify the amount of funding that is being requested. The Research Funding Program and the Research Funding Proposals shall be limited to research into tests for early diagnosis of NHL and treatment of NHL, and shall not include research into causation of NHL.

(b)     Following the Effective Date and no later than 30 days after the first anniversary of the Effective Date, Class Counsel and Counsel for the Defendant shall submit to the Settlement Administrator joint or separate recommendations regarding which Research Funding Proposals shall be approved for the Research Funding Program. In approving a Research Funding Proposal for inclusion in the Research Funding Program, among other things, the Settlement Administrator shall take into consideration the credentials of the medical and scientific professionals and entities sponsoring such a proposal, the effectiveness of such professionals and entities in prior research initiatives, and the potential number of Settlement Class Members that may benefit from the Research Funding Proposal. The Settlement Administrator may approve a Research Funding Proposal for less than the amount requested. The decision of the Settlement Administrator shall be final and binding. There shall be no appeal from the Settlement Administrator's determination.

(c)     Class Counsel and Counsel for the Defendant may continue to make recommendations to the Settlement Administrator for Research Funding Proposals to be included in the Research Funding Program until the amount allocated to the Research Funding Program has been reached.

Section 10.3   The Settlement Administrator will take all necessary steps to administer the Research Funding Program and establish procedures and controls to manage and account for the disbursement of funds to the research programs and all other costs associated with the Research Funding Program. The costs and expenses to administer the Research Funding Program shall be treated as Settlement Administrator Costs, pursuant to Section 14.1(c).

## ARTICLE XI
## Legal Services Program

Section 11.1   <u>Description</u>. The Court-awarded payment by the Defendant of Class Counsel Attorneys' Fees under Article XXV will include a legal services program to provide free legal advice to Settlement Class Members and Representative Claimants regarding the Settlement Agreement (the "Legal Services Program"). Class Counsel will administer the Legal Services Program and will supervise the law firms who provide the Legal Services Program services ("Legal Services Program Counsel").

Section 11.2   <u>Duration</u>. The Legal Services Program will begin upon entry of the Final Order and Judgment and continue until the conclusion of the Initial Settlement Period (subject to continuation as provided in Article XIII).

Section 11.3    <u>Purpose and Operation</u>.

(a)     The Legal Services Program will be designed to afford free legal advice to Settlement Class Member Parties regarding their options and rights under the Settlement Agreement and to assist them in registering and applying for benefits under the Settlement Agreement. Such legal advice will include, at a minimum, explaining provisions of the Settlement Agreement, assisting with the preparation of documentation required under the Settlement Agreement (*e.g.*, Accelerated Payment Claim Packages and Claims Program Claim Packages), and responding to questions Settlement Class Members might have regarding the Settlement Agreement. Settlement Class Members do not have to avail themselves of the Legal Services Program under the Settlement Agreement and are free to secure their own counsel. The Legal Services Program is an alternative that will be provided by the Settlement Agreement and will have an attorney-client relation with any Settlement Class Member who elects such alternative. The Legal Services Program shall have the capacity to provide legal advice in Spanish and any other language needed to effectuate the aims of the Settlement Agreement. Communications between Settlement Class Member Parties and the Legal Services Program within the scope of the Program shall be treated as attorney-client communications, and the Monsanto Parties will not assert that the Defendant's funding of the Legal Services Program constitutes any form of waiver of the attorney-client privilege that would otherwise apply. Within 90 days following entry of the Preliminary Approval Order, Class Counsel will submit to the Court, after conferring with Defendant and the Settlement Administrator, a preliminary plan for operation of the Legal Services Program and thereafter coordinate with the Settlement Administrator regarding the plan. The plan is subject to approval by the Court in connection with the Court's consideration of final approval of the Settlement Agreement.

(b)     The Legal Services Program Counsel will make themselves available to provide Settlement Class Members with the services described in Section 11.3(a). The Legal Services Program Counsel will consist of Class Counsel's law firms and such other law firms with substantial mass tort experience as Class Counsel (in consultation with the Settlement Administrator) may deem appropriate to fulfill the Legal Service Program's purposes, with a priority given to law firms with experience representing individuals who brought Roundup Claims. The Legal Services Program Counsel (and their respective proposed compensation as negotiated with the Settlement Administrator under Section 11.4) will be identified prior to the Fairness Hearing as part of the preliminary plan for operation of the Legal Services Program.

(c)     As part of and a condition to its retention, any Legal Services Program Counsel must agree that: (i) it will not represent any Settlement Class Member Parties or any persons who submit Opt Out requests pursuant to Section 4.2 in any Roundup Lawsuits, Related Party Lawsuits, or otherwise with respect to any Roundup Claims against any Monsanto Party or Related Party; and (ii) it does not represent any Settlement Class Members who have filed objections to the Settlement Agreement.

Section 11.4    <u>Compensation of the Legal Services Program Counsel</u>. Class Counsel, in consultation with the Settlement Administrator, will negotiate the compensation of the Legal Services Program Counsel, accounting for any pre-set fee schedule and multiplier, with each law firm directly. Such compensation will include reasonable compensation for services provided under the Legal Services Program and reimbursement of out of pocket costs and expenses incurred

in connection with such services.  Neither Class Counsel nor any Legal Services Program Counsel shall have any entitlement to any portion of a Settlement Class Member's Compensation Award, including attorneys' fees under Section 6.2(d).

Section 11.5   <u>Funding of the Legal Services Program</u>.  Class Counsel will make up to 40% of Class Counsel Attorneys' Fees available to fund the Legal Services Program.  The compensation of the Legal Services Program Counsel and all other costs of the Legal Services Program will be included as a distinct program in Class Counsel's attorneys' fee application at a level appropriate to fulfill the Legal Services Program's purpose and operation under Section 11.3, and will be funded exclusively from such portion of Class Counsel Attorneys' Fees as awarded by the Court.

Section 11.6   <u>Liability</u>.   The Parties, Counsel for the Defendant, and the Settlement Administrator, and their respective Affiliates, and the Monsanto Parties will not be liable for any act, or failure to act, of any Legal Services Program Counsel.  Notwithstanding Defendant's funding of the Legal Services Program through Class Counsel Attorneys' Fees, neither the Defendant nor the Monsanto Parties shall be deemed responsible for any legal advice provided (or not provided) in connection with the Legal Services Program.

## ARTICLE XII
## Advisory Science Panel

Section 12.1   <u>Science Panel Description, Selection, and Composition</u>.

(a)   The Parties covenant and agree that an independent five-member scientific panel (the "Science Panel") will be established and will exercise authority and perform duties in accordance with the terms of this Article XII.

(b)   The Science Panel will be comprised of five individuals that are independent of the Parties.  The Science Panel members will be selected as follows:

(i)   Initially, the Parties will attempt to reach agreement on the individuals that will serve on the Science Panel.  If the Parties are able to reach complete agreement, those individuals will be identified as the Science Panel members.  In that case, the agreed-to Science Panel members will appoint one of their members to serve as the Science Panel Chairperson.

(ii)   The Parties will also consider in good faith designating a third-party entity to identify the individuals that will serve on the Science Panel.  The identity of any such third-party entity must be mutually agreed to by the Parties.  If a third-party entity is selected to identify the individuals who will serve on the Science Panel, the third party will choose the five members of the Science Panel, subject to strikes for cause by a Party if a potential Science Panel member does not meet the requirements set forth in Section 12.1(c).  In the event a Party contests the other Party's exercise of a strike for cause, the Settlement Administrator will adjudicate the validity of the strike.  The Science Panel members selected by the third-party entity will appoint one of their members to serve as the Science Panel Chairperson.

(iii)   The Parties will use reasonable efforts to identify and engage the members of the Science Panel as soon as practicable following entry of the Preliminary Approval Order.  If by 30 days following entry of the Final Order and Judgment the Parties are not able to reach complete agreement on Science Panel membership or on a third-party entity designated to identify the Science Panel membership, the Parties will use an alternate procedure.  In that case, each of the Parties shall choose two members of the Science Panel, subject to three peremptory strikes by the other Party, and any strikes for cause if a potential Science Panel member does not meet the requirements set forth in Section 12.1(c).  In the event a Party contests the other Party's exercise of a strike for cause, the Settlement Administrator will adjudicate the validity of the strike.  For the avoidance of doubt, any strike for cause shall not count against a Party's peremptory strikes.  Once each Party has chosen two members of the Science Panel, these four members of the Science Panel shall mutually agree upon the selection of a fifth member of the Science Panel, who shall also serve as the Science Panel Chairperson.  Selection of the Science Panel members pursuant to this alternate procedure shall be completed no later than 60 days following entry of the Final Order and Judgment.

(c)   Appropriate candidates for appointment to the Science Panel:  (i) shall be recognized, independent, appropriately credentialed epidemiologists, biostatisticians, toxicologists, or hematologists/oncologists, amongst others, and/or scientific or medical professionals with similar backgrounds and qualifications; (ii) shall not have been retained as testifying or consulting experts in any action or proceeding associated with the Lawsuit, MDL No. 2471, Roundup Products, or any lawsuit brought against the Monsanto Parties or the Related Parties in any forum that arises from, results from, in any way relates to or is in connection with exposure to glyphosate or a similar factual predicate raised in the Lawsuit; and (iii) shall not have expressed a view regarding any question the Science Panel is to address.  Individuals that are candidates for appointment to the Science Panel must submit sworn affidavits to the Settlement Administrator (who shall promptly provide copies of such affidavits to Class Counsel and Counsel for the Defendant) attesting to their satisfaction of the requirements of this Section 12.1(c).

(d)   If any member of the Science Panel withdraws, resigns, or otherwise stops serving on the Science Panel, a replacement Science Panel member shall be selected pursuant to the process used to select the departing member (*e.g.*, if the departing member had been appointed by a particular Party, that Party shall appoint a replacement pursuant to the process described above, including challenge for cause and any remaining peremptory strike by the other Party).  If the Parties mutually agreed upon the departing member and cannot mutually agree upon a replacement Science Panel member, the remaining Science Panel members may select the replacement, subject to the criteria set forth in Section 12.1(c), and the strikes for cause and any remaining peremptory strikes set forth in Section 12.1(b)(iii).

(e)   The Science Panel shall have the discretion to request that the Settlement Administrator retain, on behalf of the Science Panel, professionals from scientific disciplines or individuals performing administrative tasks, if the Science Panel has determined the retention of such Person will assist the Science Panel in performing its work.  Anyone retained by the Settlement Administrator on behalf of the Science Panel shall satisfy the same requirements for freedom from conflicts as the Science Panel members, as set forth in Section 12.1(c), and shall submit a sworn affidavit attesting to their satisfaction of those requirements.  The Parties shall be notified by the Settlement Administrator of any requests by the Science Panel pursuant to this

Section 12.1(e), including the identity of any individual proposed to be retained, within 5 days of such a request, and may block the retention of any individual who does not meet the requirements for freedom from conflicts set forth in Section 12.1(c).

(f)     For the avoidance of doubt, the Science Panel is not an arbitration panel and the Science Panel Determination is final and not subject to judicial review, including under the Federal Arbitration Act or other similar statute, rule, or regulation.

Section 12.2     Scientific Analysis.

(a)     Beginning on the Science Panel Commencement Date, the Science Panel shall examine the body of scientific evidence described in Section 12.2(d) and existing on the Science Panel Commencement Date to determine whether exposure to Roundup Products causes NHL in humans (the "Scientific Analysis").  If a majority of the Science Panel finds that such causation has not been established, the Science Panel shall undertake no further inquiry.  If a majority of the Science Panel finds that such causation has been established, the Science Panel shall then proceed to determine, by majority vote, at what threshold internal dose level (dose greater than xx micrograms/day) such causation has been established.  The conclusion(s) of the Science Panel with regard to the Scientific Analysis shall be referred to as the "Science Panel Determination."  As set forth in Section 12.3, the Science Panel's conclusion(s) shall constitute either a Causation Not Shown Finding (that causation has not been established for NHL) or a Causation Shown Finding (that causation has been established for NHL at or above the specified threshold internal dose level), and the Science Panel Determination shall have the evidentiary use described in Section 12.3.

(b)     To find that causation has been established as to NHL, the Science Panel must conclude:  (i) based on the body of scientific evidence described below, that there is reliable evidence overall (1) of a positive association between exposure to Roundup Products and NHL in humans, (2) that such positive association is not due to chance, confounding, or bias, and (3) that based on an application of the Bradford Hill Guidelines, "we can pass from [the] observed association to a verdict of causation;" and (ii) that such reliable evidence makes it more likely than not that exposure to Roundup Products can cause NHL.

(c)     If the Science Panel finds that causation has been established as to NHL, it shall determine the threshold internal dose level at which such causation has been established.  In so doing, the Science Panel shall presume that such threshold internal dose level is 1100 micrograms per day over a lifetime of 70 years, the NSRL adopted by the State of California, unless the Science Panel determines otherwise by calculating a threshold internal dose level for added risk using the methodology used by California OEHHA in their Initial Statement of Reasons regarding setting a Benchmark Dose, Cancer Slope Factor, and NSRL for glyphosate (as described in Title 27, Article 7, Section 25721 of the California Code of Regulations, and Fred Parham & Christopher Portier, *Benchmark Dose Approach*, *in* RECENT ADVANCES IN QUANTITATIVE METHODS IN CANCER AND HUMAN HEALTH RISK ASSESSMENT 239 (L. Edler & C. P. Kitsos eds., 2005)).  In applying that methodology, the threshold internal dose level shall be derived based on findings of malignant lymphomas from a lifetime animal carcinogenicity bioassay of sufficient quality using the model with the best fit according to EPA BMDS 3.1.2 software.  If the Science Panel determines that approach to be inadequate, it may employ another

established methodology for calculating a threshold internal dose in micrograms per day over a lifetime that has been explained and validated in the scientific literature.

(d)     The body of scientific evidence that the Science Panel shall consider consists of the following:

(i)     Published EPA, Health Canada, JMPR, ECHA, EFSA, New Zealand, Japanese, and Australian carcinogenicity assessments of glyphosate, glyphosate-based herbicides, and/or surfactants.

(ii)     IARC Monograph 112 regarding glyphosate.

(iii)     All published studies and reviews regarding glyphosate, glyphosate-based herbicides and/or surfactant epidemiology, exposure/dose, animal toxicology, genotoxicity, and chemical structure and activity.

(iv)     All registrant-supplied studies and data submitted to EPA, Health Canada, JMPR, ECHA, EFSA, New Zealand, Japanese, and Australian pesticide regulatory authorities concerning glyphosate, glyphosate-based herbicides, and/or surfactants regarding epidemiology, exposure/dose, animal toxicology, genotoxicity, and chemical structure and activity, provided that if the Science Panel believes that the underlying data for a particular study is necessary for a complete review of that study, the Science Panel shall not consider that study unless such underlying data are contained within the document productions made as of the Settlement Date by any Person in prior litigation involving Roundup Claims or are otherwise publicly available.

(e)     Prior to the termination of the Science Panel's work, should new scientific evidence falling within the terms of Section 12.2(d) become available that the Science Panel considers material, the Science Panel may petition the Settlement Administrator for permission to consider this new evidence.  The Settlement Administrator shall promptly notify the Parties of any such request, pursuant to Section 12.7(g)(i), and the Parties shall be permitted the opportunity to state their views regarding the request and the new scientific evidence that is the subject of the request, pursuant to Section 12.7(g)(ii), within 14 days of receiving the notification from the Settlement Administrator of the Science Panel's request.  The Settlement Administrator will take account of the Parties' views in deciding whether good cause exists to grant the Science Panel permission to consider the new evidence in question.

(f)     The Science Panel will have complete discretion to weigh the body of evidence as set forth in this Section 12.2, as it deems appropriate, and to conduct further analyses as it believes necessary to assess whether exposure to Roundup Products causes NHL in humans.  However, the Science Panel will not conduct any independent scientific research (*e.g.*, genotoxicity testing, animal studies, human epidemiological studies, dermal absorption studies, biomonitoring studies) to generate new scientific data.

Section 12.3     Science Panel Determination and Effect.

(a)     The Science Panel shall conclude the Scientific Analysis and reach the Science Panel Determination at the end of a four-year period following the Science Panel

60

Commencement Date.  The Science Panel shall provide a written report documenting its findings to the Settlement Administrator within 30 days of completing its work, but no sooner than the end of the four-year period following the Science Panel Commencement Date.  The Science Panel may exercise its discretion concerning the appropriate content and format of the written report, but the report must include a completed copy of the Science Panel Determination Form attached as Exhibit 8.  The Science Panel Determination Form shall be the operative document for determining whether the Science Panel has made a Causation Not Shown Finding or a Causation Shown Finding as described below for purposes of the Settlement Agreement and the evidentiary use of the Science Panel Determination under it, notwithstanding any additional content contained in the Science Panel's written report.  The Parties will inform prospective members of the Science Panel in advance of their selection of the requirement that they will complete the Science Panel Determination Form and obtain their agreement to do so in the Science Panel Contracts.  The Science Panel Determination shall be final and not appealable.

(b)     The Science Panel Determination shall include and consist of either a Causation Not Shown Finding or a Causation Shown Finding.  A "Causation Not Shown Finding" means the Science Panel Determination has concluded that causation has not been shown for NHL in humans pursuant to the standard set forth above.  A "Causation Shown Finding" means the Science Panel Determination has concluded that causation has been shown for NHL in humans pursuant to the standard set forth above, but only at or above the threshold internal dose level (dose greater than xx micrograms/day) set forth in the Science Panel Determination as provided in Section 12.2(c).  The Science Panel Determination must include a threshold internal dose level in a Causation Shown Finding, unless the Science Panel determines under the standard set forth in Section 12.2(b) and Section 12.2(c) that causation has been established for NHL at any internal dose level, no matter how small, and includes that determination in the Science Panel Determination (such a determination shall be considered a Causation Shown Finding of any internal dose level above zero.)  If the Science Panel Determination does not include a threshold internal dose level for NHL, that shall be considered under the Settlement Agreement as a Causation Not Shown Finding for NHL unless and until the Science Panel issues the missing threshold internal dose level as provided in the next sentence.  If the Science Panel Determination does not include a threshold internal dose level where it has determined that causation has been established for NHL, the Settlement Administrator shall so inform the Science Panel and request that the Science Panel issue the missing threshold internal dose level within 30 days of receipt of the Science Panel Determination Form.  If the Science Panel does not do so, the Science Panel shall be considered under the Settlement Agreement to have made a Causation Not Shown Finding for NHL.

(c)     No Issue Preclusive Effect.  The Science Panel Determination will not have the issue-preclusive effect set forth in the June Settlement Proposal.

(d)     Evidentiary Use of the Science Panel Determination.  The Defendant (on behalf of the Monsanto Parties), the Class Representatives and Subclass Representatives, each Settlement Class Member, and the Settlement Class, on behalf of the Settlement Class Member Parties, covenant, promise, and agree, as follows:

(i)     Any Monsanto Party or Settlement Class Member Party may introduce the Science Panel Determination as evidence in support of arguments to a court, jury, or

other tribunal in connection with the litigation of any and all Roundup Lawsuits and with respect to any and all Roundup Claims between one or more Settlement Class Member Parties and any of the Monsanto Parties, and no Monsanto Party or Settlement Class Member Party will object to the use or introduction of the Science Panel Determination in any such proceedings. Without limiting the foregoing, the evidentiary use is applicable in any and all Roundup Lawsuits and with respect to any and all Roundup Claims that require proof of any causal connection between exposure to Roundup Products and NHL, and to any Claims seeking a determination of the issue of General Causation. The evidentiary use is also applicable to any and all Roundup Claims (including false advertising claims) whose factual predicates include that Roundup Products can cause NHL. No Monsanto Party or Settlement Class Member Party may introduce a Causation Shown Finding without also introducing the threshold internal dose level set forth in that Causation Shown Finding, and the Science Panel Determination will be described as concluding that causation is not shown for doses lower than such threshold internal dose level.

(ii)   A stipulation of admitted facts in the form of Exhibit 9 together with any modifications agreed to by the Parties (the "Science Panel Stipulation") shall be applicable to the Monsanto Parties and the Settlement Class Member Parties in any and all Roundup Lawsuits and with respect to any and all Roundup Claims between one or more Settlement Class Member Parties and any of the Monsanto Parties. In any such proceeding, the Science Panel Stipulation will constitute stipulated facts by the Monsanto Parties and the Settlement Class Member Parties, the Monsanto Parties and the Settlement Class Member Parties may introduce the Science Panel Stipulation into evidence, and the Monsanto Parties and the Settlement Class Member Parties will not contradict any of the stipulated facts contained in the Science Panel Stipulation or assert that the Science Panel reached a conclusion inconsistent with the Science Panel Determination.

(iii)   In any and all Roundup Lawsuits and with respect to any and all Roundup Claims between one or more Settlement Class Member Parties and any of the Monsanto Parties, the Parties agree that the court or other tribunal shall (1) permit the full and fair introduction of the Science Panel Determination as evidence, (2) permit full and fair admission of the Science Panel Stipulation, including by permitting references to it and reading it or submitting it in writing to the jury (as the court or tribunal deems appropriate), and (3) not instruct or otherwise tell the jury it is not bound by any of the stipulated facts in the Science Panel Stipulation. The Parties agree that the Court shall have jurisdiction to oversee the requirements contained in this Section 12.3(d)(iii) and to issue binding orders as necessary to implement or enforce them, and consent to personal jurisdiction in the Court with respect to such matters.

(iv)   Nothing in this Section 12.3(d) or the Science Panel Stipulation will preclude or limit any Monsanto Party's or Settlement Class Member Party's right in any litigation or other proceeding to contest the result of the Science Panel Determination or to use or introduce evidence contrary to or in addition to the result of the Science Panel Determination, or bind a court, jury, or other tribunal to render a decision in accord with the result of the Science Panel Determination.

(v)   The evidentiary use provided for in this Section 12.3(d) shall not alter the burden, nature, or level of proof required under applicable law to demonstrate Specific Causation as to any individual Settlement Class Member Party. The Monsanto Parties retain all

rights to contend that a Settlement Class Member Party must satisfy the threshold internal dose level set forth in a Causation Shown Finding to demonstrate General Causation and Specific Causation under applicable law, and Settlement Class Member Parties retain all rights to contend otherwise.

       (e)    <u>Related Parties</u>.   The Class Representatives and Subclass Representatives, each Settlement Class Member, and the Settlement Class, on behalf of the Settlement Class Member Parties, covenant, promise, and agree, as follows:

       (i)    Any Related Party may introduce the Science Panel Determination as evidence in support of arguments to a court, jury, or other tribunal in connection with the litigation of any and all Related Party Lawsuits and with respect to any and all Roundup Claims between one or more Settlement Class Member Parties and any of the Related Parties on the same terms and conditions as the Monsanto Parties may introduce the Science Panel Determination, and no Settlement Class Member Party will object to such use or introduction of the Science Panel Determination in any such proceedings.

       (ii)    In any proceeding in which a Related Party introduces the Science Panel Determination as evidence pursuant to Section 12.3(e)(i), the Science Panel Stipulation shall be applicable to such Related Party and any and all Settlement Class Member Parties in that proceeding.   In such proceeding, the Science Panel Stipulation will constitute stipulated facts by the Related Parties and Settlement Class Member Parties, the Related Parties and the Settlement Class Member Parties may introduce the Science Panel Stipulation into evidence, and the Related Parties and the Settlement Class Member Parties will not contradict any of the stipulated facts contained in the Science Panel Stipulation or assert that the Science Panel reached a conclusion inconsistent with the Science Panel Determination.

       (iii)    In any proceeding in which a Related Party introduces the Science Panel Determination as evidence pursuant to Section 12.3(e)(i), the provisions of Section 12.3(d)(iii), Section 12.3(d)(iv), and Section 12.3(d)(v) shall apply *mutatis mutandis* with references to the Monsanto Parties being deemed to refer to the Related Parties and references to Roundup Lawsuits being deemed to refer to Related Party Lawsuits.

       (iv)    Nothing in the Settlement Agreement binds the Related Parties, and the Related Parties are entitled to take advantage of the evidentiary use of the Science Panel Determination and the agreement on the Science Panel Stipulation, while still contesting all issues, whether in law, fact, equity, or otherwise, including causation and damages, and asserting any defenses regardless of whether they use the Science Panel Determination against a Settlement Class Member Party.

       (f)    <u>Opt Outs</u>.   The agreement and stipulation regarding evidentiary use of the Science Panel Determination shall not apply in any legal, legislative, administrative, or regulatory action, proceeding, or matter between an Opt Out and any Monsanto Party or Related Party, but nothing in the Settlement Agreement precludes a Monsanto Party or Related Party from seeking to introduce or otherwise use the Science Panel Determination in such a lawsuit or other proceeding or matter in any way.

Section 12.4    Termination of the Science Panel's Work.  The Science Panel's work shall terminate upon delivering the Science Panel Determination to the Settlement Administrator, except as provided in Section 12.3(b).  The Parties shall jointly notify the Court of the termination of the Science Panel's work.

Section 12.5    New Scientific Evidence After Science Panel Determination.

(a)    Except as specifically provided in this Section 12.5, the evidentiary use of the Science Panel Determination and the agreement on the Science Panel Stipulation as set forth in Section 12.3 shall continue in full force and effect notwithstanding any subsequent changes in facts, law, or scientific opinion regarding Roundup Products, Roundup Claims, or the issues determined by the Science Panel.

(b)    Beginning three years after the Science Panel announces the Science Panel Determination, the Defendant and Settlement Class Members may challenge the admissibility of the Science Panel Determination solely on the basis that new scientific evidence as defined in this Section 12.5 has rendered the Science Panel Determination inadmissible under the standards of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) or *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), as applicable in the forum at issue and as such standards may be modified in the future (a "Daubert/Frye Challenge").

(c)    A Daubert/Frye Challenge must identify with specificity the new scientific evidence on which the challenge is based, and must demonstrate that such evidence relates to Roundup Products and NHL, falls within the terms of Section 12.2(d), and did not exist during the Scientific Analysis.  As used in this Section 12.5, "new scientific evidence" shall not include (i) a new discussion or evaluation of scientific evidence that existed during the Scientific Analysis, or (ii) new evidence that does not meet the publication requirements of Section 12.2(d). A Daubert/Frye Challenge must be made by means of an application to the Court by a Settlement Class Member with an NHL diagnosis or the Defendant.

(d)    If a Daubert/Frye Challenge is made, the party opposing the challenge may seek to depose or otherwise obtain testimony from the Science Panel members to rebut the claim that the new scientific evidence affects the validity of the Science Panel Determination or renders it unreliable, and such deposition or other testimony may be used in connection with that or subsequent Daubert/Frye Challenge(s).

Section 12.6    Science Panel Confidentiality.

(a)    Strict Confidentiality of Science Panel.  The Science Panel and its authorized contractors shall conduct their work in private.  All documents and information of the Science Panel arising from, resulting from, in any way relating to or in connection with the Scientific Analysis, including without limitation any and all work product of the Science Panel, drafts, conversations, correspondence, and analyses, whether oral or written, of any kind or nature, shall be held in conformity with strict confidence and not disclosed to any Person at any time, during or after the Scientific Analysis, except (i) a Science Panel member or an authorized contractor shall be entitled to disclose such documents and information to another Science Panel member or an authorized contractor during the course of the Scientific Analysis to the extent

necessary to conduct the Scientific Analysis, (ii) the Science Panel Determination and the report referenced in Section 12.3(a) may be disclosed as set forth in Section 12.3(a) and Section 12.7(f); (iii) as required by applicable law, regulation, or by order or request of a court of competent jurisdiction, regulator, or self-regulatory organization (including subpoena or document request), provided that the Parties are given prompt written notice thereof and, to the extent practicable, an opportunity to seek a protective order or other confidential treatment thereof, provided further that the Science Panel member or authorized contractor subject to such requirement or request cooperates fully with the Parties in connection therewith, and only such confidential information is disclosed as is legally required to be disclosed in the opinion of legal counsel for the disclosing Science Panel member or authorized contractor; (iv) under legal (including contractual) or ethical obligations of confidentiality no less stringent than those applicable to Science Panel members and authorized contractors, on an as-needed and confidential basis to such Science Panel member's or authorized contractor's present and future accountants and counsel, provided such confidentiality obligations include an agreement that such Persons will be bound by the restrictions applicable to Science Panel members and authorized contractors set forth in Section 12.7(b)(iv); (v) to the extent any such information is already publicly known through no fault of such Science Panel member or authorized contractor, provided, however, that Science Panel members and authorized contractors may not disclose such publicly known information until the Science Panel's work has terminated; or (vi) to the extent permitted by Section 12.5(d). The Science Panel, its members, and its authorized contractors shall make no public statements about the work of the Science Panel or status of the Scientific Analysis (including the expected date of completion), including after the Science Panel Determination, except to the extent permitted by Section 12.5(d). For the avoidance of doubt, this provision applies to the individual members of the Science Panel and their documents and information as well as to documents and information of the Science Panel as a whole.

(b)      No Discovery. The Defendant (on behalf of the Monsanto Parties), the Class Representatives and Subclass Representatives, each Settlement Class Member, and the Settlement Class, on behalf of the Settlement Class Member Parties, covenant, promise, and agree that, except to the extent permitted by Section 12.5(d), they will not, at any time, in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, seek discovery or disclosure from the Science Panel, any Science Panel member, any of the Science Panel's authorized contractors, or any Person to whom disclosure is made pursuant to Section 12.6(a)(iv), including any written discovery, requests for documents, subpoenas of any kind, or notices of deposition, and that they will not make use in any legal, legislative, administrative, or regulatory action, proceeding, or matter of any discovery or disclosure from the Science Panel, any Science Panel member, any of the Science Panel's authorized contractors, or any Person to whom disclosure is made pursuant to Section 12.6(a)(iv) that becomes available through any other means.

(c)      No Testimony. The Defendant (on behalf of the Monsanto Parties), the Class Representatives and Subclass Representatives, each Settlement Class Member, and the Settlement Class, on behalf of the Settlement Class Member Parties, covenant, promise, and agree that, except to the extent permitted by Section 12.5(d), they will not, at any time, in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, call any Science Panel member, any of the Science Panel's authorized contractors, or any Person to whom disclosure is made pursuant to Section 12.6(a)(iv), to provide testimony, whether as a fact witness, an expert witness, or in any other capacity, and that they will not make use in any legal, legislative, administrative, or regulatory action, proceeding, or matter of any testimony from any Science

Panel member, any of the Science Panel's authorized contractors, or any Person to whom disclosure is made pursuant to Section 12.6(a)(iv) that becomes available through any other means.

Section 12.7    Science Panel Administration.

(a)    Compensation and Expenses.    Reasonable compensation of the Science Panel members through the termination of the Science Panel's work will be agreed to by the Settlement Administrator, Class Counsel, and Counsel for the Defendant.  Compensation of the Science Panel members, and reimbursement of reasonable out-of-pocket costs and expenses incurred as a result of the Scientific Analysis (including the compensation and reimbursement of reasonable out-of-pocket costs and expenses for any Persons retained pursuant to Section 12.1(e), compensation for preparation and testimony provided pursuant to Section 12.5(d), and any costs and expenses of indemnification pursuant to Section 12.7(b)(vi)) ("Science Panel Costs") will be paid out of the Settlement Fund, subject to the limitation set forth in Section 3.3.  The Science Panel shall submit an annual budget to the Settlement Administrator for review and approval. Either Class Counsel or Counsel for the Defendant may challenge the reasonableness of the Science Panel's out-of-pocket costs and expenses, in which case the Settlement Administrator will determine the reasonableness of such costs and expenses.  If the Settlement Administrator determines that any costs and expenses are unreasonable, the Science Panel will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the Science Panel will refund that amount to the Settlement Fund.  The Science Panel may appeal the Settlement Administrator's determination that costs and expenses are unreasonable to the Court, which shall review the Settlement Administrator's determination for an abuse of discretion.

(b)    Science Panel Contracts.    No later than 30 days after the date the Science Panel members have been selected pursuant to Section 12.1(b), the Settlement Administrator shall execute contracts (in the form approved by Class Counsel and Counsel for the Defendant) with the members of the Science Panel (the "Science Panel Contracts").  The Science Panel Contracts shall:

(i)    Provide a fully-executed copy of the Settlement Agreement (with all Exhibits) and instructions to carefully review:  (1) Article XII, including the provisions describing the nature and extent of communications between the Science Panel, the Settlement Administrator, and the Parties; describing the duties of the Science Panel; and describing the confidentiality requirements; (2) Section 14.8 reflecting that the Settlement Administrator, the Science Panel, and any qualified entities retained by the Settlement Administrator in connection with the Settlement Agreement are not agents of any Party; and (3) Exhibit 8;

(ii)    Set forth the timeline for the completion of the Science Panel's duties as set forth in Section 12.3(a) and the compensation for Science Panel members pursuant to Section 12.7(a), as well as provide that the Science Panel members will provide testimony by deposition or otherwise to the extent requested pursuant to Section 12.5(d), if necessary;

(iii)    Provide that no work on the Scientific Analysis shall commence until the Science Panel Commencement Date and that the Science Panel Contracts will terminate upon the termination of the Settlement Agreement if the Settlement Agreement

terminates prior to the Effective Date, or upon the date that the Science Panel's work is terminated pursuant to Section 12.4, except in all cases any provisions of the Science Panel Contracts that require continuation after that date to satisfy the provisions of the Settlement Agreement that survive termination, as set forth in Section 23.3, such as provisions relating to the Science Panel's confidentiality obligations;

(iv)    Provide that, except to the extent permitted by Section 12.5(d), no Science Panel member or any of the Science Panel's authorized contractors may serve as an expert witness or consultant, or provide any voluntary testimony including by affidavit, in any Roundup Lawsuit, Related Party Lawsuit, or in any legal, legislative, administrative, or regulatory action, proceeding, or matter asserting or alleging Roundup Claims, otherwise arising from, resulting from, in any way relating to or in connection with Roundup Products, or against the Monsanto Parties or the Related Parties arising from, resulting from, in any way relating to or in connection with exposure to glyphosate or a similar factual predicate raised in the Lawsuit, in all such cases whether brought by a Settlement Class Member Party, an Opt Out, or any other Person, at any time, and further provide that no disclosure shall be made to any Person pursuant to Section 12.6(a)(iv) unless such Person(s) agree to the same;

(v)    Provide that Science Panel members will be compensated out of the Settlement Fund for their work from the Science Panel Commencement Date through the termination of the Science Panel's work at a specified hourly rate and/or guaranteed annual compensation during the Science Panel's work, pro-rated for any partial year, and that their reasonable out-of-pocket costs and expenses for such period will be reimbursed out of the Settlement Fund, and further provide that they will be compensated out of the Settlement Fund (but only to the extent funds remain in the Settlement Fund) at the same hourly rate for any preparation and testimony provided pursuant to Section 12.5(d);

(vi)    Provide that Science Panel members and their authorized contractors will be indemnified out of the Settlement Fund, to the extent available, for reasonable legal fees, expenses, and liabilities (except in the event such legal fees, expenses, and liabilities arise from, result from, in any way relate to or are in connection with the gross negligence, willful misconduct, or bad faith of the Person seeking indemnification), in any litigation arising from, resulting from, in any way relating to or in connection with the Scientific Analysis, with sole discretion provided to the Settlement Administrator to determine whether any legal fees and expenses are covered by the indemnification and are reasonable and whether any legal fees, expenses, and liabilities arise from, result from, in any way relate to or are in connection with the gross negligence, willful misconduct, or bad faith of the Person seeking indemnification, and further provide that no indemnification will be provided other than from the Settlement Fund and if the Settlement Fund is exhausted, no further indemnification will be provided; and

(vii)    Not contain any terms or conditions that conflict or are inconsistent with the terms of the Settlement Agreement.

(c)    The Settlement Administrator shall deliver a copy of each fully executed Science Panel Contract to the Parties within three days of execution of each of the Science Panel Contracts.  The Settlement Administrator shall monitor the execution of the terms of the Science Panel Contracts and shall compensate the Science Panel pursuant to the terms of the

Science Panel Contracts.  If any member of the Science Panel resigns, withdraws, or otherwise stops serving on the Science Panel, the Settlement Administrator shall notify the Parties within three days of such event, and shall contract with any such new member of the Science Panel selected by the Parties, as provided in Section 12.1 hereof.  The Settlement Administrator shall contract with any such new member pursuant to the provisions of Section 12.7(b).

(d)    At the request of the Science Panel, and by the deadlines requested by the Science Panel, the Settlement Administrator shall solicit proposals for services to assist the Science Panel in performing its duties as set forth in Section 12.1(e).  Any such authorized contractors retained by the Settlement Administrator on behalf of the Science Panel shall satisfy the same requirements for freedom from conflicts as the Science Panel members, as set forth in Section 12.1(c).  The Settlement Administrator shall maintain copies of all contracts with and certifications of such authorized contractors, shall monitor execution of the terms of each contract, and shall provide compensation according to the terms of each contract.  All compensation, costs, and expenses associated with such services to assist to the Science Panel shall be considered Science Panel Costs.

(e)    Beginning three months after execution of the last Science Panel Contract with the initial five Science Panel members, the Settlement Administrator shall provide quarterly administrative reports to the Parties, either orally or in writing, which shall contain copies of all contracts and certifications executed pursuant to Section 12.7(d) and a summary accounting of the quarterly Science Panel Costs incurred.  These quarterly reports will not discuss the substance of the Science Panel's work.

(f)    The Settlement Administrator shall notify the Parties the same day the Settlement Administrator receives the report from the Science Panel at the conclusion of the Science Panel's work as set forth in Section 12.3(a), and shall promptly transmit that report to the Parties and the Court.  The Final Order and Judgment shall provide that the Court will enter the Science Panel's report on its public docket upon receipt.

(g)    There shall be no *ex parte* contact with the Science Panel, any of its members, or authorized contractors, except as authorized by an express written waiver by the Parties and the Settlement Administrator.  All communications between the Science Panel and the Parties or their agents arising from, resulting from, in any way relating to or in connection with the Settlement Agreement shall be conducted through the Settlement Administrator as follows:

(i)    Communication by the Science Panel.  The Science Panel shall provide to the Settlement Administrator one copy of any written communication it wants to make to the Parties, which the Settlement Administrator shall transmit to each of the Parties within three days of receipt from the Science Panel.  The Settlement Administrator shall take appropriate steps to make certain each Party receives its copy as close to the same time as practicable.  If the Science Panel has questions for the Parties, in addition to providing the Parties with copies of the questions, the Settlement Administrator shall decide, in its sole discretion, whether the Parties may submit written responses to the Science Panel's questions, and shall dictate the schedule, format, and length of any responses submitted by the Parties to the Science Panel, subject to Section 12.7(g)(ii).

(ii)    Communication by the Parties.  Where permitted pursuant to the Settlement Agreement, including pursuant to Section 12.2(e) and Section 12.7(g)(i), if a Party (Party A) seeks to communicate with the Science Panel, Party A shall send a copy of the proposed communication to the other Party (Party B) and a copy to the Settlement Administrator.  Within three days of receipt of such communication, the Settlement Administrator shall forward copies of the communication provided by Party A to each member of the Science Panel and send a copy of the Settlement Administrator's correspondence to each of the Parties.

(iii)    For the avoidance of doubt, these communications are subject to Section 12.6, and considered as Confidential Information subject to the protections of Article XXIV.

(h)    Recordkeeping Duties of Settlement Administrator.  The Settlement Administrator shall maintain appropriate books, records, and documents pertaining to the Science Panel such as contracts, invoices, and receipts as reasonably required by the Defendant.  The Defendant shall have the right to obtain, and the Settlement Administrator shall be required to provide, an accounting related to costs and expenses as well as access to books and records pertaining to the Science Panel which the Defendant may reasonably require.

(i)    No Effect.  The Monsanto Parties' agreement and stipulation regarding evidentiary use of the Science Panel Determination shall not apply in any legal, legislative, administrative, or regulatory action, proceeding, or matter except Roundup Lawsuits between a Monsanto Party and a Settlement Class Member Party as set forth above. Nothing in the Settlement Agreement or the Science Panel Determination shall affect or limit the Monsanto Parties' right to rely upon determinations by the EPA or other regulators with respect to whether Roundup Products or glyphosate can cause NHL in connection with any issue or defense (including preemption).  The Defendant (which agrees with the conclusions reached by the EPA) reserves the right to assert the correctness of any findings that have been made by regulatory authorities (or any similar findings based on additional scientific developments) in any litigation, legislative, administrative, or regulatory setting in the United States or abroad.  The methodology set forth in Section 12.2 for the Scientific Analysis is the product of a negotiated settlement of Roundup Lawsuits, and nothing in the Settlement Agreement or the Science Panel Determination shall affect the Monsanto Parties' rights to contest causation in any litigation, legislative, administrative, or regulatory setting, including in litigation challenging any legislation, regulation, or legislative, administrative, or regulatory requirements or determinations.

Section 12.8    Settlement Class Members' Subsequent Exposures.    For the avoidance of doubt, if a Settlement Class Member is further exposed to Roundup Products on or after February 3, 2021, the evidentiary use under Section 12.3, the Releases under Article XVII, and the stay described in Section 18.2(b)(i) shall apply to Claims arising from, resulting from, in any way relating to or in connection with such exposure to the same extent as Claims arising from, resulting from, in any way relating to or in connection with exposure prior to February 3, 2021.

**ARTICLE XIII**
**Terms Following Conclusion of Initial Settlement Period**

Section 13.1   Diagnostic Accessibility Grant Program and Research Funding Program.  The Diagnostic Accessibility Grant Program will terminate on the conclusion of the final budget period as set forth in Section 8.3(b)(i), unless otherwise agreed to by the Parties.  The Research Funding Program will not receive further funding following the conclusion of the Initial Settlement Period (unless additional funds are allocated to it as provided in Section 13.3(b)(i)), but research using previously funded amounts may continue as appropriate.

Section 13.2   Compensation Fund Continuation Terms.

(a)   Following the conclusion of the Initial Settlement Period, the Parties will negotiate, under the supervision of the Settlement Administrator (or such other mediator as the Court designates), a continuation of the Compensation Fund, including a revised level of annual funding, a revised level of Accelerated Payment Awards, and revised ranges of Claims Program Awards, that are appropriate in light of the Science Panel Determination and other intervening developments during the Initial Settlement Period (the "Compensation Fund Continuation Terms").  The Compensation Fund Continuation Terms will also include funding for a continuation of the Legal Services Program.

(b)   The Parties will attempt to reach agreement on Compensation Fund Continuation Terms within 90 days following the conclusion of the Initial Settlement Period.  The Settlement Administrator may extend such period for 30 days.  Any further extension requires approval by the Court.  If the Parties do not reach agreement within such period (including as extended), the default Compensation Fund Continuation Terms shall be as follows:

(i)   There will be a six-year continuation of annual funding and operation of the Compensation Fund.

(ii)   In the event the Science Panel Determination is a Causation Shown Finding, (1) the revised level of annual funding will be two times the average annual funding of the Compensation Fund for the four years of the Initial Settlement Period, and (2) the revised level of Accelerated Payment Awards, and revised low, high, and average Claims Program Awards, will be up to two times those applicable during the Initial Settlement Period, and the Claims Administrator, Claims Program, and Settlement Administrator may take all aspects of the Science Panel Determination into account in making Accelerated Payment Determinations and Claims Program Determinations.

(iii)   In the event the Science Panel Determination is a Causation Not Shown Finding, (1) the revised level of annual funding will be 50% of the average annual funding of the Compensation Fund for the four years of the Initial Settlement Period, and (2) the revised level of Accelerated Payment Awards, and revised low, high, and average Claims Program Awards, will be 50% of those applicable during the Initial Settlement Period.

(iv)   The Defendant shall make the first annual payment within 30 days following confirmation by the Court as provided in Section 13.4(c) and the remaining annual payments by the first through fifth anniversaries of the due date of the first annual payment;

provided, however, that if, as of 30 days prior to the date on which an annual payment is due under the Compensation Fund Continuation Terms, the Compensation Fund contains uncommitted amounts equal to 50% or more of the upcoming annual payment amount, that annual payment amount will be reduced by the same percentage (up to a maximum reduction of 100%).

(v)     The Defendant will not be required to pay more than the revised annual funding regardless of the solvency of the Compensation Fund.

(vi)     Except as provided above, the Compensation Fund Continuation Terms will include the provisions of Article VI, Article VII, the Compensation Award Guidelines, and the provisions of Section 13.4(c)-(f).

(c)     At the time of the negotiation of the Compensation Fund Continuation Terms, and subject to Court approval, the Parties will also negotiate any additional costs and expenses associated with the potential continuation of the Compensation Fund, including fees and expenses to Class Counsel for ongoing services.

Section 13.3     Parties' Determination.

(a)     If the Parties agree on Compensation Fund Continuation Terms as described in Section 13.2(a), they shall proceed as set forth in Section 13.4.

(b)     If the Compensation Fund Continuation Terms are the default provisions set forth in Section 13.2(b), each Party will have the right, in its sole discretion, to reject such terms and discontinue the Compensation Fund. The Parties will submit their decisions to the Settlement Administrator within 30 days of the end of the period described in Section 13.2(b). The Settlement Administrator will hold a Party's decision in confidence until both Parties' decisions have been submitted, and then announce them to the Parties simultaneously. If no Party rejects such terms, the Parties shall proceed as set forth in Section 13.4. If any Party rejects such terms, the Parties will not proceed as set forth in Section 13.4 and the following will apply instead:

(i)     If the Defendant rejected such terms, the Defendant will be obligated to pay $200,000,000 into the Settlement Fund (the "End Payment") within 30 days of the Settlement Administrator's announcement of the Parties' decisions on such terms. The End Payment will be allocated first to the Compensation Fund to fund potential Compensation Awards for any Settlement Class Members (if any) who were eligible to submit claims during the Initial Settlement Period, but were unable to receive payment from the Compensation Fund for the reasons described in Section 6.3(b), with the amount of such Compensation Awards to be determined pursuant to the provisions applicable during the Initial Settlement Period. Remaining amounts shall be allocated 10% or $10,000,000 (whichever is less) to the Research Funding Program and the remainder to pay Compensation Awards to Settlement Class Members referenced in Section 7.16 (including any who receive a Qualifying Diagnosis following the Initial Settlement Period), with the amount of such Compensation Awards to be determined pursuant to the provisions applicable during the Initial Settlement Period. If the Defendant did not reject such terms, the Defendant will not owe the End Payment.

(ii)     The payment of Compensation Awards and the operation of the Compensation Fund will end, other than administration of any Remaining Funds (until such funds are exhausted).

(iii)     All Settlement Class Members other than those who previously accepted and received a Compensation Award (or who subsequently accept and receive a Compensation Award) can sue for Compensatory Damages in the tort system for any Roundup Claim against the Monsanto Parties or the Related Parties, under, at the time, and subject to the terms and conditions set forth in Section 7.13, Section 7.16, and Article XIII.

Section 13.4     Court Confirmation and Continuation of Compensation Fund.

(a)     Request for Court Confirmation.  Class Counsel will petition the Court to confirm that the Compensation Fund Continuation Terms are appropriate, taking into account the Science Panel Determination.  As to all other terms of the Settlement Agreement, the Court's initial approval of the Settlement Agreement will remain in place.  The petition shall include a proposed supplemental Settlement Class notice plan agreed upon by Class Counsel and Counsel for the Defendant designed to notify Settlement Class Members of the continuation of the Compensation Fund past the conclusion of the Initial Settlement Period and the Compensation Fund Continuation Terms.

(b)     Court Confirmation Not Obtained.  If the Court determines the Compensation Fund Continuation Terms are not fair to the Settlement Class:

(i)     The operation of the Compensation Fund will end, other than administration of any Remaining Funds (until such funds are exhausted).

(ii)     The Defendant will not make further payments, including that it will not owe the End Payment.

(iii)     All Settlement Class Members other than those who previously accepted and received a Compensation Award (or who subsequently accept and receive a Compensation Award) can sue for Compensatory Damages in the tort system for any Roundup Claim against the Monsanto Parties or the Related Parties, under, at the time, and subject to the terms and conditions set forth in Section 7.13, Section 7.16, and Article XIII.

(c)     Court Confirmation Obtained.  If the Court confirms the Compensation Fund Continuation Terms are appropriate, the following shall apply:

(i)     The Compensation Fund will continue as provided in Article VI, Article VII, and the Compensation Award Guidelines, as modified by the revised amounts, ranges, and any other modifications set forth in the Compensation Fund Continuation Terms.

(ii)     In addition to paying accepted Compensation Awards upon provision of the executed Form of Release as set forth in Exhibit 6, the Compensation Fund shall pay amounts referenced in Section 13.4(d)(ii), provided that the Compensation Fund shall have no

obligation to withhold funds otherwise payable on accepted Compensation Awards to reserve funds to pay such amounts.

(d)      Settlement Class Member Rights to Sue for Compensatory Damages During the Continuation of the Compensation Fund.  If the Compensation Fund continues as provided in Section 13.4(c), all Settlement Class Members who have not previously accepted and received a Compensation Award (or who do not subsequently accept and receive a Compensation Award) can sue for Compensatory Damages in the tort system for any Roundup Claim against the Monsanto Parties or the Related Parties during the period when the Compensation Fund is in operation under the Compensation Fund Continuation Terms on the following terms and conditions and under, at the time, and subject to the terms and conditions set forth in Section 7.13, Section 7.16, and Article XIII:

(i)      A Settlement Class Member who sues for Compensatory Damages without first applying for a Compensation Award during the period when the Compensation Fund is in operation under the Compensation Fund Continuation Terms waives any right to apply for a Compensation Award.  A Settlement Class Member who applies for a Compensation Award during the period when the Compensation Fund is in operation under the Compensation Fund Continuation Terms may not sue for Compensatory Damages in the tort system until he or she receives and rejects a final Claims Program Award as provided in Section 7.10(a)(ii)(3), is determined to be ineligible for a Compensation Award, or the Compensation Fund is exhausted.

(ii)      The provisions of Section 7.13(e) with respect to offers of Claims Program Awards shall apply.  In addition, a Settlement Class Member who received such an offer and sues for Compensatory Damages in the tort system will satisfy any judgment or settlement from the Compensation Fund up to the last amount offered by the Claims Program (except to the extent the Compensation Fund does not contain assets equal to or exceeding such amount at the time such judgment or settlement becomes payable).

(e)      Settlement Class Member Rights to Sue for Compensatory Damages After the Continuation of the Compensation Fund Ends.  If the Compensation Fund continues as provided in Section 13.4(c), but thereafter ceases operations because it has exhausted its funding under the Compensation Fund Continuation Terms, all Settlement Class Members who have not previously accepted and received a Compensation Award can sue for Compensatory Damages in the tort system for any Roundup Claim against the Monsanto Parties or the Related Parties subject to the terms and conditions set forth in Section 7.13 and Article XIII, and provided further that in the case of Settlement Class Members who were offered but did not accept a Claims Program Award, the amount last offered by the Claims Program will be treated as an offer of judgment for purposes of obligation to pay costs in the event of a judgment below that amount.

(f)      Right to Terminate Funding.  If the Compensation Fund continues as provided in Section 13.4(c), and notwithstanding anything to the contrary in the Compensation Fund Continuation Terms, the Defendant will have the right to terminate the funding of the Compensation Fund at any time thereafter upon six months' notice to Class Counsel, the Court (which may order appropriate supplemental notice to the Settlement Class), and the Settlement Administrator.  The Defendant will be obligated to pay the End Payment within 30 days of the

effective date of the termination of funding, and the provisions of Section 13.3(b) will apply as of the time the funding ends.

(g)      Costs of Supplemental Notice.  If the Court approves and the Parties proceed with a supplemental Settlement Class notice plan as described in Section 13.4(a), the cost will be a Settlement Class Notice Cost payable out of the Settlement Fund Amount, pursuant to Section 3.3(b) and not an additional cost to the Defendant.

Section 13.5    Labeling.  The provisions of Article IX shall continue to apply to the Defendant whether or not the Compensation Fund continues beyond the end of the Initial Settlement Period.

Section 13.6    Continued Application.  In any suit in the tort system for any Roundup Claim against the Monsanto Parties or the Related Parties, the Settlement Class Member may seek Compensatory Damages only and remains bound by all provisions of the Settlement Agreement other than the bar on bringing Roundup Claims for Compensatory Damages in the tort system, including Section 4.4, Section 5.4, Section 6.4, Section 7.13, Section 7.14, Section 7.15, Section 7.16,  Section 7.17,  Section 11.3(c),  Section 11.6,  Article XII,  this  Article XIII, Section 14.1(d), Section 14.2(d), Section 14.3(d), Section 14.4(e), Section 14.5(c), Section 14.8, Article XVI,  Article XVII,  Section 18.2(b)(ii)-(v),  Section 21.4–Section 21.10,  Section 23.2(a), Section 23.3, Article XXIV, Article XXVI, Article XXIX, Article XXX, and Part 4(c) of Exhibit 5.

Section 13.7    No Prejudice.  The provisions of this Article XIII permitting Settlement Class Members to sue for Compensatory Damages in the tort system for Roundup Claims against the Monsanto Parties or the Related Parties set forth solely the time, circumstances and terms and conditions under which Settlement Class Members may bring such lawsuits consistent with the Settlement Agreement.  Such provisions shall not be construed as suggesting that any Settlement Class Member would have a valid Roundup Claim or that any such lawsuit or Roundup Claim has or would have merit, and are without prejudice to the rights of the Monsanto Parties and the Related Parties to defend against any such lawsuits or Roundup Claims.

## ARTICLE XIV
## Administration of the Settlement Agreement

Section 14.1    Settlement Administrator.

(a)      Appointment and Oversight.

(i)      Class Counsel will request that the Court appoint Kenneth R. Feinberg, Law Offices of Kenneth R. Feinberg, PC, as the Settlement Administrator.  Within 10 days after entry of the Preliminary Approval Order, Class Counsel will retain the Settlement Administrator appointed by the Court.

(ii)      The Settlement Administrator shall be appointed for the duration of the Settlement Administrator's duties in connection with the Settlement Agreement, unless the Parties agree that the Settlement Administrator's role is no longer necessary, in which case oversight of the administration of the Settlement Agreement will revert to the Court.

(iii)   The Settlement Administrator will maintain at all times appropriate and sufficient bonding insurance in connection with his or her performance of responsibilities under the Settlement Agreement.  The cost for this insurance will be considered Settlement Administrator Costs.

(iv)   The Settlement Administrator has the discretion to retain administrative assistance.  Non-routine costs of administration are subject to prior Court approval and the approval of the Parties.  The cost for this assistance will be considered Settlement Administrator Costs.

(v)   The Settlement Administrator will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs.  The Claims Administrator may assist with such reports if requested by the Settlement Administrator.

(vi)   By the end of the first January after entry of the Preliminary Approval Order, and every January thereafter, the Settlement Administrator will provide annual financial reports to Class Counsel and Counsel for the Defendant, based on information from the preceding year, regarding:  (1) expenses/administrative costs;  (2) projected expenses/administrative costs; (3) the monies remaining in the Settlement Fund and any limitations applicable to allocation of such monies; and (4) any other information requested by Class Counsel or Counsel for the Defendant.

(vii)   At any time during the term of the Settlement Fund, either Class Counsel or the Defendant may elect, at its own expense, to cause an audit to be performed by a certified public accountant of the records of the Settlement Administrator to ensure Claim Packages, DAGP Applications, and Research Funding Proposals are being processed and paid in compliance with the terms and conditions of the Settlement Agreement, and to investigate potential fraud, negligence, and misconduct.  The Settlement Administrator shall cooperate in good faith with the audit.  The audit findings report will be provided to the Court, Class Counsel, and Counsel for the Defendant.

(b)   <u>Roles and Responsibilities</u>.  The Settlement Administrator will, among other responsibilities set forth in the Settlement Agreement:

(i)   Provide reports or information that the Court may, at its sole discretion, request from the Settlement Administrator;

(ii)   Oversee complaints raised by Class Counsel, Counsel for the Defendant, the DAGP Administrator, the Lien Administrator, and/or the Claims Administrator regarding aspects of the Settlement Agreement;

(iii)   Oversee the operation of the Compensation Fund, and participate in the Claims Program as set forth in Article VI, Article VII, and Section 14.5;

(iv)   Oversee the Claims Administrator and the DAGP Administrator as set forth in Section 14.2(a)(iv) and Section 14.3(a)(iv), and receive monthly (or quarterly) and annual reports from those administrators;

(v)     Oversee the Lien Administrator as set forth in Section 14.4(a)(iv), and receive annual reports from the Lien Administrator;

(vi)     Assist with any administrative oversight of or coordination with the Science Panel, as set forth in Article XII;

(vii)     Issue Accelerated Payment Monthly Statements to the Defendant as provided by Section 3.6(a)(iii)(2);

(viii)     Oversee the allocation of the Settlement Fund Amount as consistent with Article III;

(ix)     Oversee fraud detection and prevention procedures, and review and decide the appropriate disposition of potentially fraudulent claims as further specified in Section 7.11 and Section 14.7; and

(x)     Perform such other tasks reasonably necessary to accomplish the goals contemplated by the Settlement Agreement, as agreed to by Class Counsel and Counsel for the Defendant.

(c)     <u>Compensation and Expenses</u>.  Reasonable compensation of the Settlement Administrator, as approved by the Court, and reimbursement of reasonable out-of-pocket costs and expenses of the Settlement Administrator directly incurred as a result of the performance of his or her responsibilities ("Settlement Administrator Costs") will be paid out of the Settlement Fund, subject to the limitation set forth in Section 3.3 and approval of the Court in advance of payment.  Either Class Counsel or Counsel for the Defendant may challenge the reasonableness of the Settlement Administrator's compensation or out-of-pocket costs and expenses, in which case the Court will determine the reasonableness of such compensation or costs and expenses.  If the Court determines that the Settlement Administrator's compensation or any of its costs and expenses are unreasonable, the Settlement Administrator will not be paid such compensation or for such costs and expenses or, if such compensation or costs and expenses have already been paid, the Settlement Administrator will refund that amount to the Settlement Fund.

(d)     <u>Liability</u>.  The Parties, Class Counsel, and Counsel for the Defendant, and their respective Affiliates, and the Monsanto Parties will not be liable for any act, or failure to act, of the Settlement Administrator and its Affiliates, officers, directors, and employees.

(e)     <u>Replacement</u>.  The Court, in its discretion, can replace the Settlement Administrator for good cause.  If the Settlement Administrator resigns, or is otherwise unable to continue employment in this position, Class Counsel and Counsel for the Defendant shall agree on a successor after consultation with the Settlement Administrator (if practicable) and shall then file a joint motion with the Court for the appointment of the agreed successor as the new Settlement Administrator.

(f)     <u>Conflicts of Interest</u>.  Within 90 days after entry of the Preliminary Approval Order, Class Counsel, Counsel for the Defendant, and the Settlement Administrator will establish and implement procedures to promptly detect and resolve possible conflicts of interest

between the Settlement Administrator, on the one hand, and Settlement Class Members (and counsel individually representing them, if any), Class Counsel, the Defendant, Counsel for the Defendant, the DAGP Administrator, the Claims Administrator, or the Lien Administrator, on the other hand.  Class Counsel and Counsel for the Defendant, subject to approval of the Court, may modify such procedures in the future, if appropriate.  Employment of the Settlement Administrator as an expert by any Party or its agents or Affiliates in unrelated matters will not constitute a conflict of interest.

Section 14.2   <u>Claims Administrator</u>.

(a)   <u>Appointment and Oversight</u>.

(i)   Class Counsel will request that the Court appoint Verus, LLC as Claims Administrator.  Within 10 days after entry of the Preliminary Approval Order, Class Counsel will retain the Claims Administrator appointed by the Court.

(ii)   The Claims Administrator will maintain at all times appropriate and sufficient bonding insurance in connection with its performance of its responsibilities under the Settlement Agreement.  The Claims Administrator shall be responsible for the cost of this insurance and it shall not be charged to the Settlement Fund.

(iii)   The Claims Administrator will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs.

(iv)   The Settlement Administrator will oversee the Claims Administrator.

(v)   Beginning one month after entry of the Preliminary Approval Order, the Claims Administrator will issue a regular monthly report to the Settlement Administrator, Class Counsel, and Counsel for the Defendant through the first two years thereafter, and following the expiration of that two-year period on a quarterly basis or as reasonably agreed upon by the Settlement Administrator, Class Counsel, and Counsel for the Defendant, regarding the status and progress of registration.  The monthly (or quarterly) report will include:  (1) the monthly and total number of Settlement Class Members and Representative Claimants who registered, and the biographical and geographical information for each Settlement Class Member and Representative Claimant who registered in the preceding month (or quarter) (in the case of a Representative Claimant, including the biographical and geographical information for the Settlement Class Member on whose behalf the Representative Claimant is acting); and (2) any other information requested by the Settlement Administrator or reasonably requested by Class Counsel or Counsel for the Defendant.

(vi)   Beginning one month after entry of the Preliminary Approval Order, the Claims Administrator will issue a regular monthly report to the Settlement Administrator, Class Counsel, and Counsel for the Defendant, regarding the status and progress of the Compensation Fund process.  The monthly report will include, without limitation:  (1) the identity (which shall be redacted if the report is to be publicly filed) of each Settlement Class Member or Representative Claimant who submitted an Accelerated Payment Claim Package or Claims Program Claim Package in the preceding month (or quarter), including the identity (which

shall be redacted if the report is to be publicly filed) of the Settlement Class Member whom a Representative Claimant that has submitted an Accelerated Payment Claim Package or Claims Program Claim Package alleges they are authorized to represent; (2) the review status of such Accelerated Payment Claim Package or Claims Program Claim Package (*e.g.*, under preliminary review, subject to a Notice of Deficiency, subject to verification and investigation, received a Notice of Accelerated Payment Determination or Notice of Claims Program Determination); (3) the review status of any Accelerated Payment Claim Packages or Claims Program Claim Packages that are pending from a prior month (quarter) and the monthly and total number of claims for Compensation Awards; (4) the monthly and total number of Compensation Awards approved and paid; (5) the monthly and total number of Settlement Class Members or Representative Claimants for whom appeals are pending regarding Claims Program Awards; (6) the monthly identification/breakdown of physicians diagnosing Qualifying Diagnoses and/or law firms representing Settlement Class Members or Representative Claimants who submitted claims for Compensation Awards; (7) the monthly expenses/administrative costs, including a summary accounting of the administrative expenses incurred by the Claims Administrator; and (8) any other information requested by the Settlement Administrator, Class Counsel, or Counsel for the Defendant.  The monthly reports described in this Section 14.2(a)(vi) shall separately account for Accelerated Payment Awards and Claims Program Awards when providing information, including with respect to the information described in Section 14.2(a)(vi)(1)-(6).

           (vii)     By the end of the first January after entry of the Preliminary Approval Order, and every January thereafter, the Claims Administrator will provide annual reports to the Settlement Administrator, Class Counsel, and Counsel for the Defendant based on information from the preceding year, regarding:  (1) the number of Settlement Class Members or Representative Claimants who applied for Compensation Awards, and the number that did not meet the Eligibility Criteria in Section 6.1; (2) the number of Settlement Class Members or Representative Claimants who met the Eligibility Criteria in Section 6.1 and received Compensation Awards, and the amount of such Compensation Awards; (3) the number of Settlement Class Members or Representative Claimants for whom appeals are pending regarding Claims Program Awards; (4) the identification/breakdown of physicians diagnosing Qualifying Diagnoses and/or law firms representing Settlement Class Members or Representative Claimants who submitted claims for Compensation Awards; (5) the monies remaining in the Settlement Fund that can be allocated to Compensation Awards; (6) expenses/administrative costs, including a summary accounting of the administrative expenses incurred by the Claims Administrator; (7) the projected expenses/administrative costs for the remainder of the Settlement Fund term; and (8) any other information requested by the Settlement Administrator, Class Counsel, or Counsel for the Defendant.  The annual reports described in this Section 14.2(a)(vii) shall separately account for Accelerated Payment Awards and Claims Program Awards when providing information.

           (viii)    At any time during the term of the Settlement Fund, either Class Counsel or the Defendant may elect, at its own expense, to cause an audit to be performed by a certified public accountant of the financial records of the Claims Administrator, and the Claims Administrator shall cooperate in good faith with the audit.  The audit findings report will be provided to the Settlement Administrator (or the Court after expiration of the term of the Settlement Administrator), Class Counsel, and Counsel for the Defendant.

    (b) <u>Roles and Responsibilities</u>.  The Claims Administrator will, among other responsibilities set forth in the Settlement Agreement:

    (i) Maintain (along with the Settlement Class Notice Agent) the Settlement Website as set forth in Section 5.1(a);

    (ii) Maintain (along with the Settlement Class Notice Agent) an automated telephone system, as set forth in Section 5.1(b);

    (iii) Establish and administer both online and hard copy registration methods, as set forth in Section 5.2(a);

    (iv) Review a Registration Applicant's registration and determine its validity, as set forth in Section 5.3;

    (v) Process and review Accelerated Payment Claim Packages and Claims Program Claim Packages, as set forth in Article VII;

    (vi) Determine whether Settlement Class Members who submit Accelerated Payment Claim Packages or Claims Program Claim Packages are eligible for Compensation Awards and participate in the Claims Program as set forth in Article VI, Article VII, and Section 14.5;

    (vii) Perform any tasks set forth in Article XVI;

    (viii) Serve as the administrator of the Settlement Fund, as set forth in Article XV;

    (ix) Audit Accelerated Payment Claim Packages and Claims Program Claim Packages, and establish and implement procedures to detect and prevent fraudulent submissions to, and payments of fraudulent claims from, the Settlement Fund; and

    (x) Perform such other tasks reasonably necessary to accomplish the goals contemplated by the Settlement Agreement, as agreed to by Class Counsel and Counsel for the Defendant.

    (c) <u>Compensation and Expenses</u>.  Reasonable compensation of the Claims Administrator, as agreed to by Class Counsel and Counsel for the Defendant, and reimbursement of reasonable out-of-pocket costs and expenses directly incurred as a result of the Claims Administrator's responsibilities set forth in the Settlement Agreement ("Claims Administrator Costs") will be paid out of the Settlement Fund, subject to the limitation set forth in Section 3.3.  The Claims Administrator shall submit an annual budget to the Settlement Administrator for review and approval.  Either Class Counsel or Counsel for the Defendant may challenge the reasonableness of the Claims Administrator's out-of-pocket costs and expenses, in which case the Settlement Administrator will determine the reasonableness of such costs and expenses.  If the Settlement Administrator determines that any costs and expenses are unreasonable, the Claims Administrator will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the Claims Administrator will refund that amount to

the Settlement Fund.  The Claims Administrator may appeal the Settlement Administrator's determination that costs and expenses are unreasonable to the Court, which shall review the Settlement Administrator's determination for an abuse of discretion.

(d)     Liability.  The Parties, Class Counsel, Counsel for the Defendant, and the Settlement Administrator, and their respective Affiliates, and the Monsanto Parties will not be liable for any act, or failure to act, of the Claims Administrator and its Affiliates, officers, directors, and employees.

(e)     Replacement.  The Claims Administrator may be replaced by joint motion made by Class Counsel and Counsel for the Defendant, or for cause by motion of either Class Counsel or Counsel for the Defendant, upon order of the Court.  If the Claims Administrator resigns, or is otherwise unable to continue employment in this position, Class Counsel and Counsel for the Defendant will jointly recommend a new proposed Claims Administrator for appointment by the Court.  If the Parties cannot agree on a new proposed Claims Administrator for recommendation to the Court, the Settlement Administrator shall make such a recommendation to the Court.  The Settlement Administrator may, but is not required to, take into account the respective positions of the Parties in making its recommendation where the Parties could not agree on a new proposed Claims Administrator.

(f)     Conflicts of Interest.  Within 90 days after entry of the Preliminary Approval Order, Class Counsel, Counsel for the Defendant, the Settlement Administrator and the Claims Administrator will establish and implement procedures to promptly detect and resolve possible conflicts of interest between the Claims Administrator, including, without limitation, its executive leadership team and all employees working on the Settlement Agreement, on the one hand, and Settlement Class Members (and counsel individually representing them, if any), Class Counsel, the Defendant, Counsel for the Defendant, or the Settlement Administrator, on the other hand.  Class Counsel, Counsel for the Defendant, and the Claims Administrator, subject to approval of the Settlement Administrator, may modify such procedures in the future, if appropriate.  Notwithstanding anything herein to the contrary, Class Counsel, Counsel for the Defendant, and the Settlement Administrator understand that the Claims Administrator regularly provides settlement claims administration and other related services to settling parties and their attorneys, and the Settlement Administrator, Class Counsel, and Counsel for the Defendant acknowledge and agree that it shall not be a conflict of interest for the Claims Administrator to provide such services to such parties and individuals or to receive compensation for such work.

Section 14.3   DAGP Administrator.

(a)     Appointment and Oversight.

(i)     Class Counsel will request that the Court appoint Wolf Garretson, LLC as DAGP Administrator.  Within 30 days after entry of the Preliminary Approval Order, Class Counsel will retain the DAGP Administrator appointed by the Court.

(ii)     The DAGP Administrator will maintain at all times appropriate and sufficient bonding insurance in connection with its performance of its

responsibilities under the Settlement Agreement.  The cost for this insurance will be considered DAGP Administrator Costs.

(iii)    The DAGP Administrator will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs.

(iv)    The Settlement Administrator will oversee the DAGP Administrator.

(v)    Beginning one month after entry of the Preliminary Approval Order, the DAGP Administrator will issue a regular monthly report to the Settlement Administrator, Class Counsel, and Counsel for the Defendant until such time as the funds allocated to the Diagnostic Accessibility Grant Program are exhausted regarding the status and progress of the Diagnostic Accessibility Grant Program.  The monthly report will include, without limitation: (1) the monthly and total number of Settlement Class Members who have been found to be DAGP Eligible Settlement Class Members, and the biographical and geographical information for each such Settlement Class Member; (2) the identity (which shall be redacted if the report is to be publicly filed) of each Settlement Class Member or Representative Claimant who submitted a DAGP Application in the preceding month, including the identity (which shall be redacted if the report is to be publicly filed) of the Settlement Class Member whom a Representative Claimant that has submitted a DAGP Application alleges they are authorized to represent; (3) the review status of such DAGP Application; (4) the review status of any DAGP Applications that are pending from a prior month; (5) the identity of each DAGP Grantee, the monthly and total amount of DAGP Grants paid to each DAGP Grantee, the DAGP Administrator's determination as to whether each DAGP Grantee is capable of satisfying the requirements of a Qualified Physician, the Settlement Class Members (whose names shall be redacted if the report is to be publicly filed) for whom each DAGP Grantee has been determined to be a Qualified Physician, and any changes with regard to determinations relating to Qualified Physician status; (6) the number of Settlement Class Members who have received NHL Diagnostic Evaluation from each DAGP Grantee in the preceding month; (7) the monthly and total amount expended on the Outreach Campaign; (8) the monthly expenses/administrative costs, including a summary accounting of the administrative expenses incurred by the DAGP Administrator; and (9) any other information requested by the Settlement Administrator, Class Counsel, or Counsel for the Defendant.

(vi)    By the end of the first January after entry of the Preliminary Approval Order, and every January thereafter, the DAGP Administrator will provide annual reports to the Settlement Administrator, Class Counsel, and Counsel for the Defendant, based on information from the preceding year, regarding:  (1) the number of Settlement Class Members who were found to be DAGP Eligible Settlement Class Members and the number of Settlement Class Members who were determined not to be eligible for the Diagnostic Accessibility Grant Program; (2) the identity of each DAGP Grantee, the total amount of DAGP Grants paid to each DAGP Grantee, the DAGP Administrator's determination as to whether each DAGP Grantee is capable of satisfying the requirements of a Qualified Physician, the Settlement Class Members for whom each DAGP Grantee has been determined to be a Qualified Physician, and any changes with regard to determinations relating to Qualified Physician status; (3) the number of Settlement Class Members who have received NHL Diagnostic Evaluation from each DAGP Grantee; (4) the amount expended on the Outreach Campaign; (5) the expenses/administrative costs, including a

summary accounting of the administrative expenses incurred by the DAGP Administrator; (6) the projected expenses/administrative costs for the remainder of the Settlement Fund term; (7) the monies remaining in the Settlement Fund that can be allocated to DAGP Grants; and (8) any other information requested by the Settlement Administrator or Class Counsel.

(vii)    At any time during the term of the Settlement Fund, the Defendant may elect, at its own expense, to cause an audit to be performed by a certified public accountant of the financial records of the DAGP Administrator, and the DAGP Administrator shall cooperate in good faith with the audit.  The audit findings report will be provided to the Settlement Administrator (or the Court after expiration of the term of the Settlement Administrator and any extension(s) thereof), Class Counsel, and Counsel for the Defendant.

(b)    <u>Roles and Responsibilities</u>.  The DAGP Administrator will, among other responsibilities set forth in the Settlement Agreement:

(i)    Administer and oversee the Outreach Campaign, as set forth in Article VIII;

(ii)    Determine whether Settlement Class Members are eligible for participation in the Diagnostic Accessibility Grant Program, as set forth in Article VIII;

(iii)    Administer and oversee the distribution of DAGP Grants, as set forth in Article VIII;

(iv)    Audit the performance of DAGP Grantees, as set forth in Article VIII;

(v)    Audit DAGP Applications, as set forth in Section 8.4(i); and

(vi)    Perform such other tasks reasonably necessary to accomplish the goals contemplated by the Settlement Agreement, as agreed to by Class Counsel and Counsel for the Defendant.

(c)    <u>Compensation and Expenses</u>.  Reasonable compensation of the DAGP Administrator, as agreed to by Class Counsel and Counsel for the Defendant, and reimbursement of reasonable out-of-pocket costs and expenses directly incurred as a result of the DAGP Administrator's responsibilities set forth in the Settlement Agreement ("DAGP Administrator Costs") will be paid out of the Settlement Fund, subject to the limitation set forth in Section 3.3.  The DAGP Administrator shall submit an annual budget to the Settlement Administrator for review and approval.  Either Class Counsel or Counsel for the Defendant may challenge the reasonableness of the DAGP Administrator's out-of-pocket costs and expenses, in which case the Settlement Administrator will determine the reasonableness of such costs and expenses.  If the Settlement Administrator determines that any costs and expenses are unreasonable, the DAGP Administrator will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the DAGP Administrator will refund that amount to the Settlement Fund.  The DAGP Administrator may appeal the Settlement Administrator's determination that costs and expenses are unreasonable to the Court, which shall review the Settlement Administrator's determination for an abuse of discretion.

(d)     Liability.  The Parties, Class Counsel, Counsel for the Defendant, and the Settlement Administrator, and their respective Affiliates, and the Monsanto Parties will not be liable for any act, or failure to act, of the DAGP Administrator and its Affiliates, officers, directors, and employees.

(e)     Replacement.  The DAGP Administrator may be replaced by joint motion made by Class Counsel and Counsel for the Defendant, or for cause by motion of either Class Counsel or Counsel for the Defendant, upon order of the Court.  If the DAGP Administrator resigns, or is otherwise unable to continue employment in this position, Class Counsel and Counsel for the Defendant will jointly recommend a new proposed DAGP Administrator for appointment by the Court.  If the Parties cannot agree on a new proposed DAGP Administrator for recommendation to the Court, the Settlement Administrator shall make such a recommendation to the Court.  The Settlement Administrator may, but is not required to, take into account the respective positions of the Parties in making its recommendation where the Parties could not agree on a new proposed DAGP Administrator.

(f)     Conflicts of Interest.  Within 90 days after entry of the Preliminary Approval Order, Class Counsel, Counsel for the Defendant, the Settlement Administrator and the DAGP Administrator will establish and implement procedures to promptly detect and resolve possible conflicts of interest between the DAGP Administrator, including, without limitation, its executive leadership team and all employees working on the Settlement Agreement, on the one hand, and Settlement Class Members (and counsel individually representing them, if any), Class Counsel, the Defendant, Counsel for the Defendant, or the Settlement Administrator, on the other hand.  Class Counsel, Counsel for the Defendant, and the DAGP Administrator, subject to approval of the Settlement Administrator, may modify such procedures in the future, if appropriate.  Notwithstanding anything herein to the contrary, Class Counsel, Counsel for the Defendant, and the Settlement Administrator understand that the DAGP Administrator regularly provides settlement administration and other related services to settling parties and their attorneys, and the Settlement Administrator, Class Counsel, and Counsel for the Defendant acknowledge and agree that it shall not be a conflict of interest for the DAGP Administrator to provide such services to such parties and individuals or to receive compensation for such work.

Section 14.4   Lien Administrator.

(a)     Appointment and Oversight.

(i)     Class Counsel will request that the Court appoint Wolf Garretson, LLC as Lien Administrator.  Class Counsel will retain the Lien Administrator appointed by the Court promptly following entry of the Preliminary Approval Order.

(ii)     The Lien Administrator will maintain at all times appropriate and sufficient bonding insurance in connection with its performance of its responsibilities under the Settlement Agreement.  The cost for this insurance will be considered Lien Administrator Costs.

(iii)     The Lien Administrator will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs.

(iv)    The Settlement Administrator will oversee the Lien Administrator.

(b)    <u>Roles and Responsibilities</u>.  The Lien Administrator will, among other responsibilities set forth in the Settlement Agreement, perform any tasks set forth in Article XVI; address any interest, including Liens, asserted by Other Insurers; and perform such other tasks reasonably necessary to accomplish the goals contemplated by the Settlement Agreement, as agreed to by Class Counsel and Counsel for the Defendant.

(c)    <u>Reports</u>.  By the end of the first January after entry of the Preliminary Approval Order, and every January thereafter, the Lien Administrator will provide annual reports to the Settlement Administrator, Class Counsel, and Counsel for the Defendant, based on information from the preceding year, regarding the resolution of Claims by Government Payors and Other Insurers under Article XVI.

(d)    <u>Compensation and Expenses</u>.  Reasonable compensation of the Lien Administrator, as agreed to by Class Counsel and Counsel for the Defendant, and reimbursement of reasonable out-of-pocket costs and expenses directly incurred as a result of the Lien Administrator's responsibilities set forth in the Settlement Agreement ("Lien Administrator Costs") will be paid out of the Settlement Fund, subject to the limitation set forth in Section 3.3. The Lien Administrator shall submit an annual budget to the Settlement Administrator for review and approval.  Either Class Counsel or Counsel for the Defendant may challenge the reasonableness of the Lien Administrator's out-of-pocket costs and expenses, in which case the Settlement Administrator will determine the reasonableness of such costs and expenses.  If the Settlement Administrator determines that any costs and expenses are unreasonable, the Lien Administrator will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the Lien Administrator will refund that amount to the Settlement Fund.  The Lien Administrator may appeal the Settlement Administrator's determination that costs and expenses are unreasonable to the Court, which shall review the Settlement Administrator's determination for an abuse of discretion.

(e)    <u>Liability</u>.  The Parties, Class Counsel, Counsel for the Defendant, and the Settlement Administrator, and their respective Affiliates, and the Monsanto Parties will not be liable for any act, or failure to act, of the Lien Administrator and its Affiliates, officers, directors, and employees.

(f)    <u>Replacement</u>.  The Lien Administrator may be replaced by joint motion made by Class Counsel and Counsel for the Defendant, or for cause by motion of either Class Counsel or Counsel for the Defendant, upon order of the Court.  If the Lien Administrator resigns, or is otherwise unable to continue employment in this position, Class Counsel and Counsel for the Defendant will jointly recommend a new proposed Lien Administrator for appointment by the Court.  If the Parties cannot agree on a new proposed Lien Administrator for recommendation to the Court, the Settlement Administrator shall make such a recommendation to the Court.  The Settlement Administrator may, but is not required to, take into account the respective positions of the Parties in making its recommendation where the Parties could not agree on a new proposed Lien Administrator.

(g)     Conflicts of Interest.  Within 90 days after entry of the Preliminary Approval Order, Class Counsel, Counsel for the Defendant, the Settlement Administrator and the Lien Administrator will establish and implement procedures to promptly detect and resolve possible conflicts of interest between the Lien Administrator, including, without limitation, its executive leadership team and all employees working on the Settlement Agreement, on the one hand, and Settlement Class Members (and counsel individually representing them, if any), Class Counsel, the Defendant, Counsel for the Defendant, or the Settlement Administrator, on the other hand.  Class Counsel, Counsel for the Defendant, and the Lien Administrator, subject to approval of the Settlement Administrator, may modify such procedures in the future, if appropriate.  Notwithstanding anything herein to the contrary, Class Counsel, Counsel for the Defendant, and the Settlement Administrator understand that the Lien Administrator regularly provides settlement administration and other related services to settling parties and their attorneys, and the Settlement Administrator, Class Counsel, and Counsel for the Defendant acknowledge and agree that it shall not be a conflict of interest for the Lien Administrator to provide such services to such parties and individuals or to receive compensation for such work.

Section 14.5   Claims Program.

(a)     Operation and Oversight.

(i)     References in the Settlement Agreement to actions or determinations of the Claims Program are to actions or determinations by the Settlement Administrator and Claims Administrator in implementing the Claims Program.  In the event of a disagreement between the Settlement Administrator and the Claims Administrator as to such an action or determination, the Settlement Administrator's view shall govern.  The Settlement Administrator may, in his or her discretion, delegate individual duties assigned to the Claims Program to the Claims Administrator, provided that the Settlement Administrator retains overall authority as provided herein.

(ii)     The Claims Program may hire administrative vendors, professionals, and consultants, such as legal counsel, actuaries, and economists, whom the Claims Program deems necessary to faithfully implement the provisions of Article VI, Article VII, Article XIII, and Exhibit 5.  Payment to such vendors, professionals, and consultants shall come from the funds allocated to the Compensation Fund.  In the case of administrative vendors, the Claims Program will provide to the Settlement Administrator in advance the criteria by which such vendors would be selected, including draft requests for proposal to be used in soliciting such vendors.  Any such draft request for proposal shall include provisions for (1) the credentialing and other certifications of the vendor; (2) the specific administrative functions to be provided by the vendor; (3) proposed payment rate structure and terms; (4) required fraud policies; (5) the type of clinical and program data to be recorded and collected by the vendor, including considerations for the privacy and security of personal information and other data security; and (6) proposed written contracts to be entered into between the Claims Program and any vendor.  The proposed contracts shall include effective procedures for the Claims Program to audit the vendor's processes for billing and providing services to the Claims Program and shall provide that the Claims Program may terminate the contract if the vendor is not in compliance with such contract's terms.  The Claims Program shall promptly notify the Settlement Administrator of all payments incurred under this Section 14.5(a)(ii).

(iii)     Within 30 days after entry of the Preliminary Approval Order, the Claims Program shall select a limited number of plaintiffs' counsel and counsel for the Defendant, all with experience litigating Roundup Claims, to form a consulting group (the "Litigation Consulting Group") to advise the Claims Program as requested by the Claims Program.

(iv)     The Claims Program will be responsible for reporting and providing information to the Court at such frequency and in such a manner as the Court directs.

(b)     <u>Roles and Responsibilities</u>.  The Claims Program will, among other responsibilities set forth in the Settlement Agreement, perform any tasks set forth in Article VI, Article VII, Article XIII, and Exhibit 5; and perform such other tasks reasonably necessary to accomplish the goals contemplated by the Settlement Agreement, as agreed to by Class Counsel and Counsel for the Defendant.

(c)     <u>Liability</u>.   The Parties, Class Counsel, and Counsel for the Defendant, and their respective Affiliates, and the Monsanto Parties will not be liable for any act, or failure to act, of the Claims Program and its Affiliates, officers, directors, and employees.

Section 14.6     <u>Review of Settlement Administration Costs.</u>  If the Court determines that any Settlement Administration Costs are unreasonable, the Court will identify whether those costs and expenses are Settlement Administrator Costs, Claims Administrator Costs, DAGP Administrator Costs, or Lien Administrator Costs.  The Person associated with the unreasonable costs and expenses will not be paid for such costs and expenses or, if such costs and expenses have already been paid, the Person associated with the unreasonable costs and expenses will refund that amount to the Settlement Fund.

Section 14.7     <u>Fraud Prevention Processes</u>.   The Claims Administrator, in consultation with Class Counsel, Counsel for the Defendant and the Settlement Administrator, will also establish system-wide processes to detect and prevent fraud, including, without limitation, claims processing quality training and review and data analytics to spot attributes of claim submissions that create a reasonable suspicion of fraud.

Section 14.8     <u>Absence of Agency</u>.   The Parties acknowledge and agree that the Settlement Administrator, the Claims Administrator, the DAGP Administrator, the Lien Administrator, the Legal Services Program Counsel, the Settlement Class Notice Agent, the Science Panel members, any qualified entities retained by any of the foregoing entities in connection with the Settlement Agreement, and their respective Affiliates, officers, directors, and employees, are intended to be independent and are not agents of any of the Parties or any Monsanto Party.  As a result, any data or information obtained, generated, collected or otherwise possessed by the Settlement Administrator, the Claims Administrator, the DAGP Administrator, the Lien Administrator, the Legal Services Program Counsel, the Settlement Class Notice Agent, the Science Panel members, any qualified entities retained by any of the foregoing entities, and their respective Affiliates, officers, directors, and employees, should not be deemed to be known by any Party (prior to dissemination to the specific Party) or attributed to any Party, for any purpose whatsoever including, but not limited to, any reporting or other compliance obligation imposed by law.

**ARTICLE XV**
**Settlement Fund Administration**

Section 15.1 <u>Settlement Fund Administration</u>.

(a) Within 10 days of the date the Preliminary Approval Motion is filed, Class Counsel and Counsel for the Defendant will file a motion with the Court seeking (1) the approval of the proposed Escrow Agreement, (2) the authorization that the Settlement Fund escrow account established pursuant to the Escrow Agreement be established as a qualified settlement fund within the meaning of § 1.468B-1 of the Treasury Regulations promulgated under Section 468B of the IRC, and (3) the appointment of the Claims Administrator as the administrator of the Settlement Fund within the meaning of § 1.468B-2(k)(3) of the Treasury Regulations.

(b) Class Counsel and Counsel for the Defendant will jointly recommend Citibank, N.A. acting through its Citi Private Bank business unit, as the Escrow Agent, subject to the approval of the Court. The Escrow Agent may be replaced by joint motion made by Class Counsel and Counsel for the Defendant, and granted by the Court. If the Escrow Agent resigns, or is otherwise unable to continue employment in that position, Class Counsel and Counsel for the Defendant will agree to and jointly recommend a new proposed Escrow Agent for appointment by the Court. If the Parties cannot agree on a new proposed Escrow Agent for recommendation to the Court, the Settlement Administrator shall make such a recommendation to the Court. The Settlement Administrator may, but is not required to, take into account the respective positions of the Parties in making its recommendation where the Parties could not agree on a new proposed Escrow Agent.

(c) Upon Court approval of the proposed Escrow Agreement and authorization that the Settlement Fund established pursuant to the Escrow Agreement be established as a qualified settlement fund under § 1.468B-1 of the Treasury Regulations promulgated under IRC Section 468B, Class Counsel, the Defendant, the Escrow Agent, and the Settlement Administrator will execute the Escrow Agreement approved by the Court, thereby creating the Settlement Fund. The Settlement Fund will be structured and operated in a manner such that it qualifies as a "qualified settlement fund" under § 1.468B-1 of the Treasury Regulations promulgated under IRC Section 468B from the earliest date possible, and the Claims Administrator, the Defendant, and all other relevant parties shall file any relation-back election required to treat the Settlement Fund as a qualified settlement fund from the earliest date possible. The "taxable year" of the Settlement Fund shall be the "calendar year" as such terms are defined in IRC Section 441. The Settlement Fund shall use the accrual method of accounting as defined in IRC Section 446(c).

(d) The Defendant will make payments as required by the Settlement Agreement into the Settlement Fund. Subject to Section 3.5 and Section 23.2(d), the Settlement Fund shall be used solely to fund the Funded Class Benefits, Additional Permitted Fund Uses, and Class Counsel Attorneys' Fees as set forth in Article III.

(e) The Settlement Fund will be managed by the Escrow Agent as provided in the Escrow Agreement (except to the extent as otherwise provided in Section 15.1(f)), and both the Settlement Fund and the Escrow Agent will be subject to the continuing jurisdiction

and supervision of the Court.  The Settlement Fund will be maintained in a bank account at a federally insured depository institution approved by Class Counsel and Counsel for the Defendant. The Escrow Agent will have the authority to make disbursements from the Settlement Fund at the direction of authorized representatives of the Settlement Administrator, authorized representatives of Class Counsel and/or authorized representatives of the Defendant, consistent with the terms of the Settlement Agreement and the Escrow Agreement.

(f)     The Claims Administrator shall be authorized to take any action that it determines necessary to maintain status of the Settlement Fund as a "qualified settlement fund" within the meaning of § 1.468B-1 of the Treasury Regulations promulgated under IRC Section 468B.  The Claims Administrator shall (i) obtain a taxpayer identification number for the Settlement Fund, which shall be titled "Monsanto Class Action Settlement Fund," (ii) prepare and file, or cause to be prepared and filed, U.S. federal, state, local, and foreign tax returns (as applicable) for the Settlement Fund, consistent with Treasury Regulations § 1.468B-2(k) and corresponding or similar provisions of state and local law, and in accordance with the Settlement Agreement and the Escrow Agreement, (iii) prepare and file, or cause to be prepared and filed, any other statement, return, or disclosure relating to the Settlement Fund that is required by any governmental unit, including but not limited to information reporting as described in Treasury Regulations § 1.468B-2(l) (or corresponding or similar provision of state, local, or foreign law), (iv) obtain from the Defendant a statement required pursuant to Treasury Regulations § 1.468B-3(e) no later than February 15th of the year following each calendar year in which the Defendant makes a transfer to the Settlement Fund, and (v) be responsible for responding to any questions from, or audits regarding such taxes by, the Internal Revenue Service or any state or local tax authority.  The Claims Administrator also will be responsible for ensuring the Settlement Fund complies with all withholding requirements (including by instructing the Escrow Agent to withhold any required amounts) with respect to payments made by the Settlement Fund, as well as paying any associated interest and penalties.  Any amounts required to be withheld by the Escrow Agent (or any other withholding agent) shall be treated for all purposes as though such amounts had been distributed to such Person in respect of which such withholding was required. The Claims Administrator shall direct the Settlement Administrator and Escrow Agent to timely pay from the Settlement Fund any taxes (including but not limited to withholding taxes with respect to distributions from the Settlement Fund), interest, and penalty payments to the appropriate Governmental Authority and any reasonable out-of-pocket expenses from (x) causing any tax returns and information reports to be prepared and filed, (y) responding to any questions from, or representing the Settlement Fund in any audit or similar proceeding regarding taxes by, the Internal Revenue Service (or any state or local Governmental Authority) or (z) otherwise satisfying any tax compliance obligation of the Settlement Fund (all taxes, interest, penalties, and other expenses described in this sentence collectively referred to as the "Tax Expenses").  The Defendant shall provide the Claims Administrator with the statement required pursuant to Treasury Regulations § 1.468B-3(e) no later than February 15th of the year following each calendar year in which the Defendant makes a transfer to the Settlement Fund.

(g)     The Claims Administrator, the Escrow Agent, the Settlement Administrator, the DAGP Administrator, and the Lien Administrator shall be authorized to collect any tax information as necessary to effectuate the Settlement Agreement or the Escrow Agreement. In order to receive distributions under the Escrow Agreement, the Claims Administrator, the Escrow Agent, the Settlement Administrator, the DAGP Administrator, and the Lien

Administrator shall require any recipient to identify himself, herself, or itself and provide tax information, to the extent the Claims Administrator deems appropriate, including a taxpayer identification number as assigned by the Internal Revenue Service or, in the case of any recipient that is not a United States person for U.S. federal income tax purposes, a properly completed applicable Internal Revenue Service Form W-8 (with required attachments, if any).

Section 15.2    Funds Investment.

(a)    To the extent funds are made available for investment, amounts deposited in the Settlement Fund will be invested conservatively in a manner designed to assure timely availability of funds, protection of principal, and avoidance of concentration risk, and shall be invested only in short-term direct obligations of the United States of America and/or short-term obligations for which the full faith and credit of the United States of America is pledged to provide for the payment of principal and interest unless otherwise agreed in writing by the Defendant, Class Counsel, and the Settlement Administrator; provided, however, the scope of any such permissible investments shall be further limited to include only those investments that a "qualified settlement fund," within the meaning of Treasury Regulations section 1.468B-1 *et seq.*, may be permitted to invest in, pursuant to the Treasury Regulations, or any modification in Internal Revenue Service guidelines, whether set forth in Internal Revenue Service rulings, other Internal Revenue Service pronouncements or otherwise.

(b)    Any earnings attributable to the Settlement Fund will be retained in the Settlement Fund and shall become part of the Settlement Fund; and shall be disbursed as part of the Settlement Fund in accordance with the terms and conditions of the Settlement Agreement.

Section 15.3    Escrow Agent Satisfaction of Monetary Obligations.   Wherever in the Settlement Agreement the Settlement Administrator, the DAGP Administrator, the Lien Administrator, or the Claims Administrator is authorized or directed, as the context may reflect, to pay, disburse, reimburse, hold, waive, or satisfy any monetary obligation provided for or recognized under any of the terms of the Settlement Agreement, the Settlement Administrator, the DAGP Administrator, the Lien Administrator, or the Claims Administrator may comply with such authorization or direction by directing the Escrow Agent to, as appropriate, pay, disburse, reimburse, hold, waive, or satisfy any such monetary obligation, provided that such direction shall be accompanied by written authorization to the Escrow Agent from an authorized representative of Class Counsel and an authorized representative of the Defendant as provided for in the Escrow Agreement and, if such direction is made by the DAGP Administrator, the Lien Administrator, or the Claims Administrator, it shall also be accompanied by written authorization to the Escrow Agent from an authorized representative of the Settlement Administrator as provided for in the Escrow Agreement.

**ARTICLE XVI**
**Governmental Payors**

Section 16.1    Conditions for Applications for Compensation Awards.

(a)    As a condition of applying for and receiving a Compensation Award, a Settlement Class Member Party must agree in writing that:

89

(i)       The Monsanto Parties shall have no obligations to any Governmental Payor, nor for any other past and present Claims arising from, resulting from, in any way relating to or in connection with the Settlement Class Member Party's application for or receipt of a Compensation Award, including any costs and expenses incurred in resolving any such Claims (other than as provided under the Legal Services Program specified in Article XI); and

(ii)      It is a Settlement Class Member Party's sole responsibility to pay, have paid, or otherwise discharge and satisfy all past and present Claims asserted by any Governmental Payor or any other Person, including any provider, that are not discharged or satisfied pursuant to Section 16.2 and that arise from, result from, in any way relate to or are in connection with his or her application for or receipt of a Compensation Award, including any right against any Monsanto Party or Related Party due to the fact that the Settlement Class Member Party is a party to bankruptcy proceedings.

(b)      As a condition of applying for and receiving a Compensation Award, a Settlement Class Member Party must:  (i) identify in writing every Governmental Payor or Other Insurer that may have made any payments on behalf of the Settlement Class Member Party (or the Person whose NHL is the basis for the Settlement Class Member Party's application for a Compensation Award) arising from, resulting from, in any way relating to or in connection with such Settlement Class Member Party's NHL or such Person's NHL; and (ii) represent and warrant in writing he or she has used best efforts to identify such Governmental Payors or Other Insurers.  The Lien Administrator may verify information with any Governmental Payor or Other Insurer from which Settlement Class Member Parties are or were entitled to benefits pursuant to those programs.  In the event that a Settlement Class Member Party is determined to have provided false or misleading information with respect to any payments made by any Governmental Payor or Other Insurer for medical diagnosis or treatment, and any Claim is made against any Monsanto Party arising from, resulting from, in any way relating to or in connection with a Settlement Class Member Party's false or misleading statement, the Settlement Class Member Party shall indemnify such Monsanto Party and hold it harmless with respect to such Claim in accordance with Section 16.3.

(c)      The documentation and information required by Section 16.1(a) and Section 16.1(b) shall be included in an Accelerated Payment Claim Package under Section 7.2(a)(iii) and a Claims Program Claim Package under Section 7.2(b)(iii), and the Monsanto Parties shall be beneficiaries of the agreements and representations set forth in Section 16.1(a) and Section 16.1(b).  Upon reasonable request from the Defendant, the Lien Administrator shall provide the Defendant with the documentation and information submitted by a Settlement Class Member Party under Section 16.1(a) and Section 16.1(b), including the identified Governmental Payors and Other Insurers.

Section 16.2    <u>Procedures for Addressing Governmental Payors</u>.

(a)      Following the entry of the Preliminary Approval Order, the Lien Administrator shall seek written agreements meeting the following conditions from each Governmental Payor (with the exception for the purpose of this Section 16.2(a) of a Governmental Payor that is a Medicare Part C or Medicare Part D plan sponsor):

(i)     That the Governmental Payor:

(1)     holds no interest, and will not assert any interest in the future, including any Liens, in any Compensation Award; or

(2)     agrees to a maximum amount for which it will seek to resolve any interest, including any Liens, in any Compensation Award, where such maximum amount is either a specific percentage of the Compensation Award or a dollar amount that is less than the full amount of the Compensation Award; or

(3)     agrees to procedures for resolving any interest on an individual case basis; or

(4)     expressly releases any and all Persons from any Claims whatsoever for any interest, including any Liens, in any and all Compensation Awards; and

(ii)     That the Governmental Payor agrees either that the Monsanto Parties have no obligations to it arising from, resulting from, in any way relating to or in connection with any Settlement Class Member Party's application for or receipt of a Compensation Award, or that any such obligation that the Governmental Payor might otherwise claim is fully resolved and discharged by the terms agreed to with the Lien Administrator under Section 16.2(a)(i); and

(iii)     In the case of an agreement with CMS, that CMS acknowledges either that (1) the Defendant has no reporting obligations to CMS under Section 111 of the Medicare, Medicaid, and SCHIP Extensions Act of 2007, or its applicable regulations, that are arising from, resulting from, or in any way relating to or in connection with any Compensation Award;  (2) that the Defendant has satisfied any such reporting obligations; or (3) that the Defendant can satisfy any such reporting obligations by complying with a reporting process recognized by CMS.  To the extent necessary to secure such agreement, the Lien Administrator shall establish reporting processes recognized by CMS as satisfying any such reporting obligations.

(b)     Settlement Class Member Parties who receive a Compensation Award acknowledge that the Defendant may have a legal obligation under MSP Laws to report the amount of payments made under the Settlement Agreement and other information to the Secretary of Health and Human Services, unless it is released from so doing, and agree to cooperate fully with Defendant by executing any documents and providing such additional information as may be required by or on behalf of Defendant to comply with Defendant's reporting obligations.

(c)     The Lien Administrator shall provide copies of any written agreement reached with a Governmental Payor pursuant to Section 16.2(a) to the Settlement Administrator, Claims Administrator, Class Counsel, and Counsel for the Defendant.  Within 30 days of receipt of any such agreement, Class Counsel or the Defendant may challenge before the Settlement Administrator whether the agreement is consistent with Section 16.2(a).

(d)     The Claims Administrator may process, but shall not pay, any Compensation Award for a Settlement Class Member Party who identifies a Governmental Payor

pursuant to Section 16.1(b) until the Lien Administrator has entered a written agreement with that Governmental Payor that is consistent with Section 16.2(a) or put in place a mechanism as to that Governmental Payor, including Medicare Part C and Medicare Part D plan sponsors, consistent with Section 16.2(f).

(e)    If the Lien Administrator enters an agreement with a Governmental Payor that is consistent with Section 16.2(a) and calls for payment to the Governmental Payor of some portion of a Compensation Award, then the Claims Administrator shall retain and pay to the Governmental Payor that portion of the Compensation Award required to fulfill the terms of the agreement with the Governmental Payor. The Lien Administrator and Claims Administrator shall collaborate as they deem necessary to efficiently carry out the obligations under this Section 16.2(e), Section 16.2(a), or Section 16.2(f).

(f)    This Section 16.2(f) shall apply (i) to Governmental Payors that are Medicare Part C or Medicare Part D plan sponsors (to which Section 16.2(a) does not apply), and (ii) to Governmental Payors to which Section 16.2(a) applies, other than CMS with respect to Medicare Part A and Medicare Part B, with which the Lien Administrator is unable to obtain a written agreement consistent with Section 16.2(a) after reasonable efforts. This Section 16.2(f) shall not apply to CMS with respect to Medicare Part A and Part B. As to any Governmental Payor to which this Section 16.2(f) applies, the Lien Administrator will seek to put in place a mechanism consistent with the substance of Section 16.2(a) for addressing any interest, including any Liens, such Governmental Payor may have on an individual basis, subject to the approval of the Defendant (which shall not be unreasonably withheld). Said mechanism may facilitate the resolution of interests, including any Liens, from a Compensation Award made to an individual Settlement Class Member Party, but Settlement Class Member Parties agree and acknowledge that they are solely responsible for resolution of any interests, including Liens, and that the Monsanto Parties and the Related Parties shall have no responsibility for or obligation to provide for resolution of such interests or Liens.

Section 16.3    Indemnification.

(a)    Indemnification by Settlement Class Member Parties. If, notwithstanding the provisions of this Article XVI, any Claim is made against any Monsanto Party or Related Party by any Governmental Payor or other Person arising from, resulting from, or in any way relating to or in connection with a Settlement Class Member Party's application for or receipt of a Compensation Award (including because the Settlement Class Member Party did not identify that Governmental Payor pursuant to Section 16.1(b)), the Settlement Class Member Party shall indemnify such Monsanto Party or Related Party, up to the amount of the Compensation Award the Settlement Class Member Party receives, and hold it harmless with respect to such Claim.

(b)    Notice of Indemnification. **SETTLEMENT CLASS MEMBER PARTIES ACKNOWLEDGE THAT THIS SECTION 16.3 COMPLIES WITH ANY REQUIREMENT TO EXPRESSLY STATE THAT LIABILITY FOR SUCH CLAIMS IS INDEMNIFIED AND THAT THIS SECTION IS CONSPICUOUS AND AFFORDS FAIR AND ADEQUATE NOTICE.**

**ARTICLE XVII**
**Releases and Covenants Not to Sue**

Section 17.1   Releases.  This Section 17.1 sets forth the Claims that are released by all Settlement Class Members (the "Released Claims").  In addition to the Released Claims, Settlement Class Members who accept a Compensation Award execute a Form of Release, attached as Exhibit 6, that releases additional Claims as to them.

(a)   Release of Punitive Claims.  In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, the Settlement Class Member Parties hereby waive and release, forever discharge and hold harmless the Monsanto Parties and the Related Parties, of and from any and all Claims, including unknown Claims, for punitive, exemplary, vindictive, punitory, presumptive, added, aggravated, speculative, or imaginary damages arising from, resulting from, in any way relating to or in connection with Roundup Claims, Roundup Lawsuits and/or Related Party Lawsuits.

(b)   Release of Medical Monitoring Claims.  In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, the Settlement Class Member Parties hereby waive and release, forever discharge and hold harmless the Monsanto Parties and the Related Parties, of and from: (i) any and all Claims, including unknown Claims, for medical monitoring arising from, resulting from, in any way related to or in connection with Roundup Products and undeveloped, unmanifested, and/or undiagnosed NHL (including prevention and diagnosis thereof) and (ii) any and all Claims, including unknown Claims, that their injuries or damages arising from, resulting from, in any way related to or in connection with Roundup Products and NHL were increased because of the absence of a medical monitoring program.

(c)   Release of Claims Related to the Diagnostic Accessibility Grant Program.  In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, the Settlement Class Member Parties do hereby release, forever discharge and hold harmless the Monsanto Parties, the Related Parties, the Settlement Administrator, DAGP Administrator, Claims Administrator, and their respective Affiliates, officers, directors, and employees from any and all Claims, including unknown Claims, arising from, resulting from, in any way relating to or in connection with their participation, if any, in the Diagnostic Accessibility Grant Program, including, but not limited to, Claims for negligence, medical malpractice, wrongful or delayed diagnosis, personal injury, bodily injury (including disease, trauma, mental or physical pain or suffering, emotional or mental harm, or anguish or loss of enjoyment of life), or death arising from, resulting from, in any way relating to or in connection with such participation.

(d)   Release of Claims Related to Liens.  In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, the Settlement Class Member Parties do hereby release, forever discharge and hold harmless the Monsanto Parties and the Related Parties, from any and all Claims, including unknown Claims, arising from, resulting from, in any way relating to or in connection with (i) any claim for benefits under the Settlement Agreement, including any

consequences in the event that the Settlement Agreement impacts, limits, or precludes any Settlement Class Member's right to benefits under Social Security, Medicare, or Medicaid, or from any Governmental Payor or Other Insurer; or (ii) the reporting, transmittal of information, or communications between or among the Monsanto Parties, Counsel for the Defendant, the Settlement Administrator, the Claims Administrator, the Lien Administrator, their respective Affiliates, officers, directors, and employees, and any Governmental Payor.

(e)     Release of Claims Related to Government Reimbursements.  In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, the Settlement Class Member Parties do hereby release, forever discharge and hold harmless the Monsanto Parties and the Related Parties, from any and all Claims, including unknown Claims, pursuant to the MSP Laws or other similar causes of action, including Claims relating to the availability of future Medicare-covered expenses, and any private cause of action that Settlement Class Member Parties may have under 42 U.S.C. § 1395y(b)(3)(A), arising from, resulting from, in any way relating to or in connection with (i) the Settlement Agreement and/or (ii) the failure or alleged failure of any of the Monsanto Parties to provide for a primary payment or appropriate reimbursement to a Governmental Payor with a Lien in connection with claims for medical items, services, and/or prescription drugs provided in connection with compensation or benefits claimed or received by a Settlement Class Member Party pursuant to the Settlement Agreement.

(f)     Release of Claims Against Science Panel.  In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, the Settlement Class Member Parties do hereby release, forever discharge and hold harmless the Science Panel, and all of the Science Panel members and their authorized contractors, from any and all Claims, including unknown Claims, arising from, resulting from, in any way relating to or in connection with the Scientific Analysis or the Science Panel Determination.

(g)     Release of Claims Arising from the Settlement Agreement.  In consideration of the benefits described and the agreement and covenants contained in the Settlement Agreement, and by operation of the Final Order and Judgment, the Settlement Class Member Parties do hereby release, forever discharge and hold harmless the Monsanto Parties and the Related Parties, from any and all Claims, including unknown Claims, arising from, resulting from, in any way relating to or in connection with the administration of the Settlement Agreement, including the Diagnostic Accessibility Grant Program, the Research Funding Program, the Compensation Fund, the Legal Services Program, and any act or failure to act of the Claims Administrator, the DAGP Administrator, the Lien Administrator, the Settlement Administrator, the Escrow Agent, the Settlement Class Notice Agent, the Legal Services Program Counsel, and their respective Affiliates, officers, directors, and employees.

Section 17.2   Release of Unknown Claims.  In connection with the releases in Section 17.1, the Class Representatives and Subclass Representatives, all Settlement Class Members (on behalf of themselves and the associated Settlement Class Member Parties), and the Settlement Class acknowledge that they are aware that they may hereafter discover Claims now unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true, with respect to actions or matters released herein, whether such Claims or facts

now exist, hereafter may exist, or might have existed.  Class Representatives and Subclass Representatives, all Settlement Class Members, and the Settlement Class explicitly took unknown or unsuspected Claims into account in entering into the Settlement Agreement and it is the intention of the Parties fully, finally and forever to settle and release all Claims as provided in Section 17.1 with respect to all such matters.

Section 17.3    Scope of Releases.

(a)    The Class Representatives and Subclass Representatives (on behalf of themselves, the Settlement Class Members, and the associated Settlement Class Member Parties) acknowledge that they have been informed of Section 1542 of the Civil Code of the State of California (and similar statutes) by counsel and that they do hereby expressly waive and relinquish all rights and benefits, if any, which they have or may have under said section (and similar statutes) which reads as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

(b)    The Parties acknowledge that the foregoing waiver of the provisions of Section 1542 of the California Civil Code and all similar provisions of the statutory or common law of any other state, territory, or other jurisdiction was separately bargained for and that the Parties would not have entered into the Settlement Agreement unless it included a broad release of unknown Claims arising from, resulting from, in any way relating to or in connection with the matters released herein.

(c)    The Settlement Class Member Parties intend to be legally bound by the Releases.

(d)    The Releases are not intended to prevent the Defendant or any Monsanto Parties from exercising its rights of contribution, subrogation, or indemnity under any law.

(e)    Nothing in the Releases will preclude any action to enforce the terms of the Settlement Agreement.

(f)    The Parties represent and warrant that no promise or inducement has been offered or made for the Releases contained in this Article XVII except as set forth in the Settlement Agreement and that the Releases are executed without reliance on any statements or any representations not contained in the Settlement Agreement.

Section 17.4    Covenants Not to Sue.

(a)    Released Claims.  From and after the Effective Date, for the consideration provided for herein and by operation of the Final Order and Judgment, the Class

Representatives and Subclass Representatives, the Settlement Class Members (on behalf of themselves and the associated Settlement Class Member Parties), and the Settlement Class covenant, promise, and agree that they will not, at any time, in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum continue to prosecute, commence, file, initiate, institute, cause to be instituted, assist in instituting, or permit to be instituted on their, his, her, or its behalf, or on behalf of any other Person, any Claim, action, or proceeding alleging or asserting any Released Claims or challenging the validity of the Releases.  If any such Claim, action, or proceeding exists in any court, tribunal or other forum as of the Effective Date, the Settlement Class Member Parties covenant, promise and agree to withdraw, and seek a dismissal with prejudice of, such proceeding forthwith.

(b)     Roundup Claims.  For the consideration provided for herein, the Class Representatives and Subclass Representatives, the Settlement Class Members (on behalf of themselves and the associated Settlement Class Member Parties), and the Settlement Class covenant, promise, and agree that they will not continue to prosecute, commence, file, initiate, institute, cause to be instituted, assist in instituting, or permit to be instituted on their, his, her, or its behalf, or on behalf of any other Person, any Claim, action or proceeding alleging or asserting any of his or her respective Roundup Claims against the Monsanto Parties or the Related Parties in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, except at the time and to the extent following the conclusion of the Initial Settlement Period such actions are permitted pursuant to the terms and conditions set forth in Section 7.13, Section 7.16, and Article XIII.  The Class Representatives and Subclass Representatives, each Settlement Class Member, and the Settlement Class, on behalf of the Settlement Class Member Parties, covenant, promise, and agree that they will not act in any way contrary to or inconsistent with the agreement set forth in Section 12.3 regarding the evidentiary use of the Science Panel Determination or the Science Panel Stipulation, in any Roundup Lawsuit or Related Party Lawsuit or with respect to any Roundup Claims.

Section 17.5   No Release for Insurance Coverage.

(a)     Notwithstanding anything herein to the contrary, the Settlement Agreement is not intended to and does not release any Governmental Payor from its or their obligation to provide any health insurance coverage, major medical insurance coverage, or disability insurance coverage to a Settlement Class Member, or from any Claims, demands, rights, or causes of action of any kind that a Settlement Class Member has or hereafter may have with respect to such individuals or entities.

(b)     Notwithstanding anything herein to the contrary, the Settlement Agreement is not intended to and does not effect a release of any rights or obligations that any insurer has under or in relation to any contract or policy of insurance to any named insured, insured, additional insured, or other insured Person thereunder, including the Monsanto Parties.

**ARTICLE XVIII**
**Preliminary Approval**

Section 18.1   Promptly after execution, Class Counsel will file simultaneously: (a) the Preliminary Approval Motion, attaching the Settlement Agreement as an exhibit thereto;

(b) the proposed Preliminary Approval Order, which is attached as Exhibit 10; (c) a supporting brief requesting and providing authority for the Court to make the required findings under Rule 23(e)(1)(B)(i)-(ii) of the Federal Rules of Civil Procedure with respect to the likelihood of approval of the Settlement Agreement and certification of the proposed Settlement Class and Subclasses as Rule 23(b)(3) class and subclasses for purposes of settlement, and for the Court to approve the Settlement Class Notice and the Settlement Class Notice Plan; and (d) a request that the Court set a hearing to consider the Preliminary Approval Order within 30 days after the Preliminary Approval Motion is filed.

Section 18.2   The Parties agree to take all actions necessary to obtain the Preliminary Approval Order from the Court.  The Parties agree as follows with respect to the Preliminary Approval Order:

(a)      It is a condition to the Settlement Agreement that the Preliminary Approval Order be entered within a reasonable period of time following the Settlement Date and remain in full force and effect until entry of the Final Order and Judgment.

(b)      Stay and Tolling.   The Settlement Agreement provides for a standstill period to facilitate the operation of the Funded Class Benefits, and so that the Science Panel may conduct the Scientific Analysis and issue the Science Panel Determination. Accordingly, litigation of Roundup Claims will be stayed and statutes of limitations will be tolled as follows:

(i)      The Preliminary Approval Order shall contain, in addition to the provisions necessary and appropriate to direct, authorize and commence the Settlement Class Notice, provisions setting forth the process for the Court to consider final approval of the Settlement Agreement, provisions authorizing all actions under the Settlement Agreement that are permitted or required to be taken following entry of the Preliminary Approval Order and prior to entry of the Final Order and Judgment, and provisions staying the prosecution and preventing the further filing of any and all Roundup Claims, Roundup Lawsuits, and Related Party Lawsuits by any Settlement Class Member Party in any forum or jurisdiction (whether federal, state, or otherwise), against any of the Monsanto Parties or the Related Parties.  The stay and prohibition shall remain in effect until 90 days following the conclusion of the Initial Settlement Period.  The foregoing stay and prohibition provisions of the Preliminary Approval Order will be superseded by the provisions of the Final Order and Judgment providing for a stay and prohibition of equivalent duration, in the event the Court issues it.  For the avoidance of doubt, the stay and prohibition order shall not apply to any Opt Outs, effective as of the date their Opt Out becomes effective under Section 4.2(d).

(ii)      Beginning as of entry of the Preliminary Approval Order, the statutes of limitation applicable to any and all Roundup Claims that have been or could be asserted by or on behalf of any Settlement Class Members against any Monsanto Party, and any and all Claims, counterclaims, and defenses of the Monsanto Parties with respect to the Roundup Claims between any Settlement Class Member Party and any Monsanto Party, will be tolled and stayed to the extent not already tolled by the initiation of an action in the Lawsuit or a Roundup Lawsuit. The tolling shall remain in effect until 90 days following the conclusion of the Initial Settlement

Period.  For the avoidance of doubt, the tolling shall not apply to any Opt Outs, effective as of the date their Opt Out becomes effective under Section 4.2(d).

(iii)    Notwithstanding the foregoing, both the stay under Section 18.2(b)(i) and tolling under Section 18.2(b)(ii) shall expire:  (1) if entry of the Final Order and Judgment is denied (or its entry is reversed), effective on the date on which all appellate courts with jurisdiction (including the United States Supreme Court by petition for writ of certiorari) affirm such denial or reversal or deny such petition for writ of certiorari, such that no further appeal or review is possible (or the time for filing such an appeal or petition for writ of certiorari has expired); or (2) if the Settlement Agreement is otherwise terminated, effective as of the date 30 days after the termination.

(iv)    For the avoidance of doubt, any time already elapsed as to any Settlement Class Member Parties on any applicable statutes of limitations prior to entry of the Preliminary Approval Order will not be reset, and no expired Claims will be revived, by virtue of the Settlement Agreement or the Preliminary Approval Order.

(v)    Settlement Class Members do not admit that, by entering into the Settlement Agreement, they have waived any applicable tolling protections available as a matter of law or equity.  Nothing in the Settlement Agreement will constitute an admission in any manner that the statute of limitations has been tolled for anyone outside the Settlement Class, nor does it constitute a waiver of legal positions regarding tolling.

## ARTICLE XIX
### Objections

Section 19.1   Objections.

(a)    Provided a Settlement Class Member has not submitted a written request to Opt Out, as set forth in Section 4.2, the Settlement Class Member may present written objections, if any, explaining why he or she believes the Settlement Agreement should not be approved by the Court as fair, reasonable, and adequate.  No later than such date as is ordered by the Court, a Settlement Class Member who wishes to object to any aspect of the Settlement Agreement must file with the Court, or as the Court otherwise may direct, a written statement of the objection(s).  The written statement of objection(s) must include a detailed statement of the Settlement Class Member's objection(s), as well as the specific reasons, if any, for each such objection, including any evidence and legal authority the Settlement Class Member wishes to bring to the Court's attention.  That written statement also will contain the Settlement Class Member's printed name, address, telephone number, written evidence establishing that the objector is a Settlement Class Member, and any other supporting papers, materials, or briefs the Settlement Class Member wishes the Court to consider when reviewing the objection.  A written objection must contain the dated Personal Signature of the Settlement Class Member making the objection, in addition to any filing requirements of the Court regarding signatures.  The Court shall determine whether any Settlement Class Members who do not follow the procedures will have waived any objections they may have.

(b)      A Settlement Class Member may object on his or her own behalf or through an attorney hired at that Settlement Class Member's own expense, provided the Settlement Class Member has not submitted a written request to Opt Out, as set forth in Section 4.2.  Attorneys asserting objections on behalf of Settlement Class Members must:  (i) file a notice of appearance with the Court by the date set forth in the Preliminary Approval Order, or as the Court otherwise may direct; (ii) file a sworn declaration attesting to his or her representation of each Settlement Class Member on whose behalf the objection is being filed or a copy of the contract (to be filed *in camera*) between that attorney and each such Settlement Class Member; and (iii) comply with the procedures described in this Section 19.1.

(c)      A Settlement Class Member (or counsel individually representing him or her, if any) seeking to make an appearance at the Fairness Hearing must file with the Court, by the date set forth in the Preliminary Approval Order, or as the Court otherwise may direct, a written notice of his or her intention to appear at the Fairness Hearing, in accordance with the requirements set forth in the Preliminary Approval Order.

(d)      Class Counsel or Counsel for the Defendant may seek reasonable discovery from any objectors.

(e)      Any Settlement Class Member who fails to comply with the provisions of this Section 19.1 will waive and forfeit any and all rights he or she may have to object to the Settlement Agreement.

## ARTICLE XX
### Final Order and Judgment and Dismissal With Prejudice

Section 20.1    The Parties will jointly seek the Final Order and Judgment from the Court, in the form of Exhibit 11.  Approval and entry of the Final Order and Judgment in the form of Exhibit 11, together with any modifications acceptable to the Parties, shall be a condition of the Settlement Agreement.

## ARTICLE XXI
### Enforceability of Settlement Agreement and Dismissal of Claims

Section 21.1    It is a condition of the Settlement Agreement that the Court approve and enter the Preliminary Approval Order and the Final Order and Judgment, in the forms of Exhibit 10 and Exhibit 11, respectively, together with any modifications acceptable to the Parties.

Section 21.2    The Parties agree that the Settlement Agreement is not final and enforceable until the Effective Date, except as to any provisions that the Settlement Agreement provides shall occur prior to the Effective Date.

Section 21.3    From and after the Effective Date, for the consideration provided for herein and by operation of the Final Order and Judgment, the Court will dismiss with prejudice all Released Claims pending in the Court, and any and all Settlement Class Member Parties with Released Claims pending in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, other than the Court, will dismiss with prejudice the Released Claims, including any related appeals.

Section 21.4    From and after the Effective Date, for the consideration provided for herein and by operation of the Final Order and Judgment, the Parties agree that each and every Settlement Class Member Party will be permanently barred and enjoined from commencing, filing, initiating, instituting, prosecuting, and/or maintaining any judicial, arbitral, or regulatory action with respect to any and all Released Claims.

Section 21.5    From and after the Effective Date, for the consideration provided for herein and by operation of the Final Order and Judgment, the Settlement Agreement will be the exclusive remedy for any and all Released Claims by or on behalf of any and all Settlement Class Member Parties, and no Settlement Class Member Parties will recover, directly or indirectly, any sums for Released Claims other than those received under the terms of the Settlement Agreement, if any.

Section 21.6    From and after entry of the Preliminary Approval Order, for the consideration provided for herein and by operation of the Preliminary Approval Order, the Parties agree that no Settlement Class Member Party may file or prosecute any Roundup Claims, Roundup Lawsuits, and Related Party Lawsuits in any forum or jurisdiction (whether federal, state, or otherwise) against any of the Monsanto Parties or the Related Parties, and any such filings will be stayed, except to the extent and at the time following the conclusion of the Initial Settlement Period such filing or prosecution is permitted pursuant to the terms and conditions set forth in Section 7.13, Section 7.16, Article XIII, and Section 18.2(b)(i), or until the Settlement Agreement is terminated, as described in Section 18.2(b)(iii).   The provisions of this Section 21.6 shall be superseded in connection with the Court's decision regarding final approval of the Settlement Agreement and final certification of the proposed Settlement Class and Subclasses.

Section 21.7    From and after entry of the Final Order and Judgment, for the consideration provided for herein and by operation of the Final Order and Judgment, the Parties agree that each and every Settlement Class Member Party will be permanently barred and enjoined from commencing, filing, initiating, instituting, prosecuting, and/or maintaining any judicial, arbitral, or regulatory action against any Monsanto Party or Related Party with respect to any and all Roundup Claims, including any Roundup Lawsuit or Related Party Lawsuit, except at the time and to the extent following the conclusion of the Initial Settlement Period such actions are permitted pursuant to the terms and conditions set forth in Section 7.13, Section 7.16, Article XIII, and Section 18.2(b)(i).

Section 21.8    The Parties agree that each and every Settlement Class Member Party will be permanently barred and enjoined from acting in any way contrary to or inconsistent with the agreement set forth in Section 12.3 regarding the evidentiary use of the Science Panel Determination or the agreement on the Science Panel Stipulation, or otherwise precluded by the Settlement Agreement, in any Roundup Lawsuit or Related Party Lawsuit or with respect to any Roundup Claims.

Section 21.9    From and after the Effective Date, if any Settlement Class Member Party, in violation of Section 17.4, commences, files, initiates, or institutes any new action or other proceeding for any Released Claims, or continues to prosecute any pending Released Claims, or challenges the validity of the Releases, in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, such action or other proceeding will be dismissed with prejudice

and at such Settlement Class Member Party's cost; provided, however, before any costs may be assessed, counsel for such Settlement Class Member Party or, if not represented, such Settlement Class Member Party, will be given reasonable notice and an opportunity voluntarily to dismiss such new action or proceeding with prejudice.  Furthermore, if the Defendant, any other Monsanto Party, or any Related Party brings any legal action before the Court to enforce its rights under the Settlement Agreement against a Settlement Class Member Party and prevails in such action, that Monsanto Party or Related Party will be entitled to recover any and all related costs and expenses (including attorneys' fees) from any Settlement Class Member Party found to be in violation or breach of his or her obligations under this Article XXI.

Section 21.10  From and after entry of the Preliminary Approval Order, until the Settlement Agreement is terminated, if any Settlement Class Member Party, in violation of Section 17.4, commences, files, initiates, institutes, prosecutes, and/or maintains any judicial, arbitral, or regulatory action against any Monsanto Party or Related Party with respect to any and all Roundup Claims, including any Roundup Lawsuit or Related Party Lawsuit, in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum, except at the time and to the extent following the conclusion of the Initial Settlement Period such actions are permitted pursuant to the terms and conditions set forth in Section 7.13, Section 7.16, Article XIII, and Section 18.2(b)(i), such action or other proceeding will be dismissed at such Settlement Class Member Party's cost; provided, however, before any costs may be assessed, counsel for such Settlement Class Member Party or, if not represented, such Settlement Class Member Party, will be given reasonable notice and an opportunity voluntarily to dismiss such new action or proceeding with prejudice.  Furthermore, if the Defendant, any other Monsanto Party, or any Related Party brings any legal action before the Court to enforce its rights under the Settlement Agreement against a Settlement Class Member Party and prevails in such action, that Monsanto Party or Related Party will be entitled to recover any and all related costs and expenses (including attorneys' fees) from any Settlement Class Member Party found to be in violation or breach of his or her obligations under this Article XXI.

## ARTICLE XXII
## Communications to the Public

Section 22.1   The form, content, and timing of any public statement announcing the filing of the Settlement Agreement will be subject to mutual agreement by Class Counsel and Counsel for the Defendant.  The Parties and their counsel agree not to make any public statements, including statements to the media, that are inconsistent with the Settlement Agreement.  Any communications to the public or the media made by or on behalf of the Parties and their respective counsel regarding the Settlement Agreement will be made in good faith and will be consistent with the Parties' agreement to take all actions reasonably necessary for preliminary and final approval of the Settlement Agreement.  Any information contained in such communications will be balanced, fair, accurate, and consistent with the content of the Settlement Class Notice.  Any communications made by the Settlement Administrator, the Claims Administrator, the DAGP Administrator, the Lien Administrator, the Settlement Class Notice Agent, and their respective Affiliates, officers, directors, and employees, will be made in good faith and limited to those necessary to perform their responsibilities under the Settlement Agreement, and any information contained in such communications will be balanced, fair, accurate, and consistent with the content of the Settlement Class Notice.  Nothing herein is intended or will be interpreted to inhibit or

interfere with the ability of the Monsanto Parties to comply with their obligations under the securities laws of any jurisdiction or the rules of any stock exchange on which their securities are listed or traded.

(a)     Nothing herein is intended or will be interpreted to inhibit or interfere with the ability of Class Counsel or Counsel for the Defendant to communicate with the Court, their clients, or Settlement Class Members and/or their counsel.

(b)     Class Counsel acknowledge and agree, and the Preliminary Approval Order will provide, that the Defendant has the right to communicate orally and in writing with, and to respond to inquiries from, Settlement Class Member Parties on matters unrelated to the Settlement Agreement in connection with the Defendant's normal business.

## ARTICLE XXIII
## Termination

Section 23.1     Party Termination Rights.

(a)     Class Counsel and Counsel for the Defendant each have the absolute and unconditional right, in their sole discretion, which discretion will be exercised in good faith, to terminate and render null and void the Settlement Agreement if (i) the Court, or any appellate court(s), rejects, modifies, or denies approval of any portion of the Settlement Agreement that Class Counsel or Counsel for the Defendant reasonably and in good faith determines is material to the Party such counsel represents, including, without limitation, the agreement regarding evidentiary use of the Science Panel Determination and the agreement on the Science Panel Stipulation, the Releases or the definition of the Settlement Class, or (ii) the Court, or any appellate court(s), does not enter or completely affirm, or alters or expands, any portion of the proposed Preliminary Approval Order (Exhibit 10), or the proposed Final Order and Judgment (Exhibit 11) unless such modifications are acceptable to the Parties in their respective sole discretion, which discretion will be exercised in good faith.   Such written election to terminate the Settlement Agreement must be made to the Court within 30 days of such court order.

(b)     The Defendant shall have the right, in its discretion, to terminate and render null and void the Settlement Agreement as set forth in Section 4.5, in accordance with the terms of Section 4.5.

(c)     Class Counsel may not terminate and render null and void the Settlement Agreement on the basis of the attorneys' fees award ordered, or modified, by the Court or any appellate court(s), as set forth in Article XXV.

Section 23.2     Post-Termination Actions.

(a)     In the event the Settlement Agreement is terminated or becomes null and void, the Settlement Agreement will not be offered into evidence or used in this or in any other action in the Court, or in any other federal court, state court, arbitration, regulatory agency, or other tribunal or forum for any purpose, including, but not limited to, the existence, certification, or maintenance of any purported class.   In addition, in such event, the Settlement Agreement and all negotiations, proceedings, documents prepared and statements made in connection with the

Settlement Agreement will be without prejudice to all Parties and will not be admissible into evidence and will not be deemed or construed to be an admission or concession by any of the Parties of any fact, matter, or proposition of law and will not be used in any manner for any purpose, and all Parties will stand in the same position as if the Settlement Agreement had not been negotiated, made, or filed with the Court.

(b)     In the event the Settlement Agreement is terminated or becomes null and void, the Parties will jointly move the Court to vacate the Preliminary Approval Order and any orders approving the Settlement Agreement or certifying the Settlement Class or, if the Settlement Agreement is terminated before notice has been given, any other orders directing that notice be given to the Settlement Class.

(c)     If the Settlement Agreement is terminated or becomes null and void after notice has been given, the Parties will provide Court-approved notice of termination to the Settlement Class.  If a Party terminates the Settlement Agreement in accordance with Section 4.5 or Section 23.1, that Party will pay the cost of notice of termination.

(d)     In the event the Settlement Agreement is terminated or becomes null and void, any unexpended funds in the Settlement Fund will revert to the Defendant within 10 days, Defendant will cease to have any financial obligations under the Settlement Agreement, all data provided by the Defendant, Class Counsel and/or Settlement Class Members shall be returned or destroyed, and unexpended payments made to Class Counsel for Settlement Class Notice will be returned to the Defendant.

Section 23.3     Effect of Termination.   In the event the Settlement Agreement is terminated or becomes null and void, there shall be no liability or obligation on the part of any of the Parties, except the provisions of Section 3.5, Section 7.3(d), Section 8.4(f)(ii), Section 11.6, Section 12.6, Section 12.7(a) (but only with respect to the indemnification of the Science Panel members and their authorized contractors), Section 14.1(d), Section 14.2(d), Section 14.3(d), Section 14.4(e), Section 14.5(c), Section 14.8, Section 16.1, Section 16.3, Section 23.2, this Section 23.3, Article XXIV, Article XXVI, Section 30.1–Section 30.2, Section 30.5–Section 30.10, Section 30.14–Section 30.21, and Part 4(c) of Exhibit 5 shall survive any such termination of the Settlement Agreement or it becoming null and void and no such termination of the Settlement Agreement or it becoming null and void shall relieve any Person from any obligation under such provisions.

## ARTICLE XXIV
## Treatment of Confidential Information

Section 24.1     Confidentiality of Information Related to the Settlement Agreement. The Parties will treat all confidential or proprietary information shared hereunder, or in connection herewith, either prior to, on or after the Settlement Date, and any and all prior or subsequent drafts, representations, negotiations, conversations, correspondence, understandings, analyses, proposals, term sheets, and letters, whether oral or written, of any kind or nature, with respect to the subject matter hereof ("Confidential Information") in conformity with strict confidence and will not disclose Confidential Information to any non-Party without the prior written consent of the Party that shared the Confidential Information, except:  (a) as required by applicable law, regulation, or

by order or request of a court of competent jurisdiction, regulator, or self-regulatory organization (including subpoena or document request), provided that the Party that shared the Confidential Information is given prompt written notice thereof and, to the extent practicable, an opportunity to seek a protective order or other confidential treatment thereof, provided further that the Party subject to such requirement or request cooperates fully with the Party that shared the Confidential Information in connection therewith, and only such Confidential Information is disclosed as is legally required to be disclosed in the opinion of legal counsel for the disclosing Party; (b) under legal (including contractual) or ethical obligations of confidentiality, on an as-needed and confidential basis to such Party's present and future accountants, counsel, insurers, or reinsurers; or (c) with regard to any information that is already publicly known through no fault of such Party or its Affiliates.  The Settlement Agreement (including all Exhibits), any other documents filed in connection with the Settlement Agreement, and any information disclosed through a public court proceeding shall not be deemed Confidential Information.

Section 24.2   <u>Confidentiality of Settlement Class Member Information</u>.   All information relating to a Settlement Class Member that is disclosed to or obtained by the Settlement Administrator, the DAGP Administrator, the Lien Administrator, the Claims Administrator, DAGP Grantees, the Defendant, or the Court, may be used only by the Settlement Administrator, the DAGP Administrator, the Lien Administrator, the Claims Administrator, DAGP Grantees, the Defendant, or the Court for the administration of the Settlement Agreement according to the Settlement Agreement terms and conditions.  All such information relating to a Settlement Class Member will be treated as Confidential Information hereunder, will be subject to the terms of Section 24.1 hereof, and, where applicable, will be treated as Protected Health Information subject to HIPAA and other applicable privacy laws.

## ARTICLE XXV
### Attorneys' Fees

Section 25.1   <u>Award</u>.   The Parties have negotiated in good faith an amount of attorneys' fees and costs to be paid by the Defendant.  That negotiated award, which is $170,000,000, shall cover all Class Counsel and Subclass Counsel attorneys' fees and costs in connection with the Settlement Agreement; shall cover any Class Representative service awards; shall cover all fees and costs attributable to the Legal Services Program as set forth in Section 11.5; and is subject to Court approval.  Upon Court approval of that amount or such other lesser amount, the total amount approved by the Court shall be referred to as the "Class Counsel Attorneys' Fees." The Defendant shall not be obligated to pay Class Counsel Attorneys' Fees in excess of either $170,000,000 or the total amount approved by the Court, whichever amount is less.  The Monsanto Parties shall not be responsible for the payment of any attorneys' fees, including in the form of a common benefit assessment (if any), in connection with the Settlement Agreement other than Class Counsel Attorneys' Fees as set forth in this Article XXV.

Section 25.2   <u>Timing</u>.   The Defendant shall pay $170,000,000 into the Settlement Fund no later than 30 days after entry of the Final Order and Judgment.  Class Counsel Attorneys' Fees shall be disbursed from the Settlement Fund, including funds for Class Counsel and Subclass Counsel attorneys' fees and costs, funds for the Legal Services Program, and Class Representative services awards, in such amount(s) and at such time(s) as the Court orders.  The funds accounting

for any difference between $170,000,000 and the amount of Class Counsel Attorneys' Fees will be treated in accordance with Section 3.6(a)(ix) and Section 3.6(b).

## ARTICLE XXVI
## Denial of Wrongdoing, No Admission of Liability

Section 26.1   The Settlement Agreement, whether or not it becomes effective, is for settlement purposes only and is to be construed solely as a reflection of the Parties' desire to facilitate a resolution of the Class Action Complaint and Roundup Claims.   The Defendant expressly denies that it, or any of the other Monsanto Parties, has violated any duty to, breached any obligation to, committed any fraud on, or otherwise engaged in any wrongdoing with respect to, the Class Representatives and Subclass Representatives, the Settlement Class, any Settlement Class Member, any Settlement Class Member Party, or any Opt Out, and expressly denies the allegations asserted in the Class Action Complaint, and denies any and all liability related thereto. Neither the Settlement Agreement nor any actions undertaken by the Defendant or any of the Monsanto Parties in the negotiation, execution, or satisfaction of the Settlement Agreement will constitute, or be construed as, an admission of any liability or wrongdoing, or of any fact or legal position, or recognition of the validity of any Claim made by the Class Representatives and Subclass Representatives, the Settlement Class, any Settlement Class Member, any Settlement Class Member Party, or any Opt Out, in this or any other action or proceeding.

Section 26.2   In no event will the Settlement Agreement, whether or not it becomes effective, or any of its provisions, or any negotiations, statements, or court proceedings arising from, resulting from, in any way relating to or in connection with its provisions, or any actions undertaken in the Settlement Agreement, in any way be construed as, offered as, received as, used as, or deemed to be evidence, admissible or otherwise, of any kind, or used in any other fashion, by the Class Representatives and Subclass Representatives, the Settlement Class, any Settlement Class Member, any Settlement Class Member Party, Class Counsel, or any of the Monsanto Parties in any legal, legislative, administrative, or regulatory action, proceeding, or matter for any purpose, except a proceeding to resolve a dispute arising under, or to enforce, the Settlement Agreement.   Without limiting the foregoing, neither the Settlement Agreement nor any of its provisions, negotiations, statements, or court proceedings arising from, resulting from, in any way relating to or in connection with its provisions, nor any actions undertaken in the Settlement Agreement, will be construed as, offered as, received as, used as, or deemed to be evidence, admissible or otherwise, or an admission or concession of any liability or wrongdoing whatsoever on the part of any Person, including, but not limited to, the Monsanto Parties or the Related Parties.   This Section 26.2 shall not apply to disputes between the Defendant and their insurers, as to which the Defendant reserves all rights.   This Section 26.2 does not apply to the Parties' agreement regarding the evidentiary use of the Science Panel Determination or the Science Panel Stipulation as set forth in Section 12.3.   In the event this Section 26.2 conflicts with Section 12.3, Section 12.3 shall control.

## ARTICLE XXVII
### Representations and Warranties

Section 27.1    Authority.  Class Counsel represent and warrant as of the Settlement Date that they have authority to enter into the Settlement Agreement on behalf of the Class Representatives and Subclass Representatives.

Section 27.2    Class Representatives and Subclass Representatives.  Each of the Class Representatives and Subclass Representatives, through a duly authorized representative, represents and warrants that he or she:  (a) has agreed to serve as a representative of the Settlement Class proposed to be certified herein; (b) is willing, able, and ready to perform all of the duties and obligations as a representative of the Settlement Class; (c) is familiar with the pleadings in *Robert Ramirez, et al. v. Monsanto Company*, Case No. 3:16-md-02741-VC & 3:19-cv-02224-VC, or has had the contents of such pleadings described to him or her; (d) is familiar with the terms of the Settlement Agreement, including the Exhibits, or has received a description of the Settlement Agreement, including the Exhibits, from Class Counsel, and has agreed to its terms; (e) has consulted with, and received legal advice from, Class Counsel about the litigation, the Settlement Agreement (including the advisability of entering into the Settlement Agreement, its Releases, its agreement on the evidentiary use of the Science Panel Determination and the legal effects of the Settlement Agreement, its Releases and its agreement on the evidentiary use of the Science Panel Determination), and the obligations of a representative of the Settlement Class; (f) has authorized Class Counsel to execute the Settlement Agreement on his or her behalf; and (g) will remain in and not request exclusion from the Settlement Class and will serve as a representative of the Settlement Class until the terms of the Settlement Agreement are effectuated, the Settlement Agreement is terminated in accordance with its terms, or the Court at any time determines that such Class Representatives or Subclass Representative cannot represent the Settlement Class.

Section 27.3    Defendant.    The Defendant represents and warrants as of the Settlement Date that:  (a) it has all requisite corporate power and authority to execute, deliver, and perform the Settlement Agreement; (b) the execution, delivery, and performance by the Defendant of the Settlement Agreement has been duly authorized by all necessary corporate action; (c) it has authorized Counsel for the Defendant to execute the Settlement Agreement on its behalf; (d) the Settlement Agreement has been duly and validly executed and delivered by the Defendant; and (e) the Settlement Agreement constitutes its legal, valid, and binding obligation in accordance with its terms.

Section 27.4    Investigation and Future Events.    The Parties and their counsel represent and warrant that they have each performed an independent investigation of the allegations of fact and law made in connection with the Class Action Complaint in *Robert Ramirez, et al. v. Monsanto Company*, Case No. 3:16-md-02741-VC & 3:19-cv-02224-VC, and may hereafter discover facts in addition to, or different from, those that they now know or believe to be true with respect to the subject matter of the Settlement Agreement.  Nevertheless, the Parties intend to resolve certain of their disputes pursuant to the terms of the Settlement Agreement and thus, in furtherance of their intentions, the Settlement Agreement will remain in full force and effect notwithstanding the discovery of any additional facts or law, or changes in law, and the Settlement Agreement will not be subject to rescission or modification by reason of any change or difference in facts or law, except as permitted by its terms.

## ARTICLE XXVIII
## Cooperation

Section 28.1   The Parties will cooperate, assist, and undertake all reasonable actions to accomplish the steps contemplated by the Settlement Agreement and to implement the Settlement Agreement on the terms and conditions provided herein.

Section 28.2   The Parties agree to take all actions necessary to obtain final approval of the Settlement Agreement and entry of the Final Order and Judgment, including the terms and provisions described in the Settlement Agreement, and, upon final approval and entry of such order, an order dismissing the Class Action Complaint with prejudice as to the Class and Subclass Representatives, the Settlement Class, and each Settlement Class Member.

Section 28.3   The Parties and their counsel agree to support the final approval and implementation of the Settlement Agreement and defend it against objections, appeal, collateral attack or any efforts to hinder or delay its approval and implementation.  Neither the Parties nor their counsel, directly or indirectly, will encourage any Person to object to the Settlement Agreement or assist them in doing so.

## ARTICLE XXIX
## Continuing Jurisdiction

Section 29.1   Pursuant to the Final Order and Judgment, the Court will retain continuing and exclusive jurisdiction over the Parties and their counsel, all Settlement Class Members and Settlement Class Member Parties, the Settlement Administrator, the DAGP Administrator, the Lien Administrator, the Claims Administrator, the Settlement Class Notice Agent, the Legal Services Program Counsel, the Escrow Agent, and the Settlement Agreement, to interpret, implement, administer, and enforce the Settlement Agreement and the Final Order and Judgment, including as set forth in Section 12.3(d)(iii) and Section 12.3(e)(iii).  Any disputes or controversies arising from, resulting from, in any way relating to or in connection with the interpretation, implementation, administration, and enforcement of the Settlement Agreement will be made by motion to the Court, except as otherwise provided in the Settlement Agreement.  In addition, the Parties, each Settlement Class Member, and the Settlement Class Member Parties are hereby deemed to have submitted to the exclusive jurisdiction of the Court for any suit, action, proceeding, or dispute arising from, resulting from, in any way relating to or in connection with the Settlement Agreement, including any dispute arising from, resulting from, in any way relating to or in connection with the agreement regarding the evidentiary use of the Science Panel Determination, the agreement on the Science Panel Stipulation, and compliance with the requirements contained in Section 12.3(d)(iii) and Section 12.3(e)(iii).  The terms of the Settlement Agreement will be incorporated into the Final Order and Judgment of the Court, which will allow that Final Order and Judgment to serve as an enforceable injunction by the Court for purposes of the Court's continuing jurisdiction related to the Settlement Agreement.

Section 29.2   Notwithstanding any contrary law applicable to the underlying Claims, the Settlement Agreement and the Releases hereunder will be interpreted and enforced in accordance with the laws of the State of Missouri, without regard to conflict of law principles.

**ARTICLE XXX**
**Additional Provisions**

Section 30.1   <u>Class Certification for Settlement Purposes Only</u>.  The Parties agree that any certification of the Settlement Class and Subclasses will be for settlement purposes only. The Parties do not waive or concede any position or arguments they have for or against certification of any class for any other purpose in any action or proceeding, and the Monsanto Parties retain full right and ability to contest any such class certification.  Any class certification order entered in connection with the Settlement Agreement will not constitute an admission by the Defendant, or finding or evidence, that the Class and Subclass Representatives' Claims, or the Claims of any other Settlement Class Member, or the Claims of the Settlement Class, are appropriate for class treatment if the Claims were contested in this or any other federal, state, arbitral, or foreign forum. If the Court enters the proposed form of Preliminary Approval Order, the Final Order and Judgment will provide for vacation of the Preliminary Approval Order and the Final Order and Judgment in the event that the Settlement Agreement does not become effective.

Section 30.2   <u>No Effect</u>.  A favorable Notice of Registration Determination, Accelerated Payment Determination, or Claims Program Determination, a finding that a Settlement Class Member is a DAGP Eligible Settlement Class Member, participation by a Settlement Class Member in any research funded by the Research Funding Program, or any successful challenge, mediation, or appeal by a Settlement Class Member or Class Counsel to any of these decisions, shall not bind the Monsanto Parties or Related Parties regarding a Settlement Class Member's exposure to Roundup Products or whether an individual is a Settlement Class Member in any action or proceeding, and shall not be used as evidence against the Monsanto Parties or the Related Parties in any action or proceeding, regardless of whether the Monsanto Parties have participated in any of the foregoing determinations or any challenge, mediation, or appeal of those determinations.  The Monsanto Parties do not waive or concede any position or arguments they have for or against, and retain full right and ability to contest, a Settlement Class Member's claim of exposure to Roundup Products or whether an individual is a Settlement Class Member in any action or proceeding, including any Roundup Lawsuit, Related Party Lawsuit, and/or with respect to any and all Roundup Claims.  The Monsanto Parties and the Related Parties will not be precluded in any action or proceeding from contesting a Settlement Class Member's claim of exposure to Roundup Products or whether an individual is a Settlement Class Member, even if the Settlement Class Member receives a favorable Notice of Registration Determination, Accelerated Payment Determination, or Claims Program Determination, a finding that the Settlement Class Member is a DAGP Eligible Settlement Class Member, the Settlement Class Member participates in any research funded by the Research Funding Program, or the Settlement Class Member or Class Counsel successfully challenges, mediates, or appeals any of these decisions.  The Monsanto Parties are not obligated to participate in any of these determinations, or any appeal, mediation, or challenge of these determinations, in order to preserve the rights set forth in this Section 30.2.

Section 30.3   <u>No Assignment of Claims</u>.  Neither the Settlement Class nor any Class Representative or Subclass Representative or Settlement Class Member has assigned, will assign, or will attempt to assign, to any Person other than the Defendant any rights or Claims arising from, resulting from, in any way relating to or in connection with the Settlement Agreement, the subject matter of the Class Action Complaint, or Roundup Claims.  Any such

assignment, or attempt to assign, to any Person other than the Defendant any rights or Claims arising from, resulting from, in any way relating to or in connection with the Settlement Agreement, the subject matter of the Class Action Complaint, or Roundup Claims will be void, invalid, and of no force and effect and the Claims Administrator shall not recognize any such action.

Section 30.4   Individual Counsel.

(a)   A Settlement Class Member may retain counsel to assist with his or her applications for the Diagnostic Accessibility Grant Program and for Compensation Awards. Counsel acting on his or her client's behalf may submit all Claim Forms, proof, correspondence, or other documents to the Settlement Administrator, the DAGP Administrator, the Lien Administrator, or the Claims Administrator on behalf of that Settlement Class Member; provided, however, that counsel individually representing a Settlement Class Member may not sign on behalf of that Settlement Class Member:  (i) registration; (ii) an Opt Out request; (iii) a revocation of an Opt Out; (iv) an objection, as set forth in Section 19.1; (v) a DAGP Application; (vi) a Claim Form; or (vii) an Appeals Form.

(b)   Where a Settlement Class Member indicates in writing to the Settlement Administrator, the DAGP Administrator, the Lien Administrator, or the Claims Administrator, that he or she is individually represented by counsel, the Settlement Administrator, the DAGP Administrator, the Lien Administrator, or the Claims Administrator, will copy the counsel individually representing a Settlement Class Member on any written communications with the Settlement Class Member.  Any communications, whether written or oral, by the Settlement Administrator, the DAGP Administrator, the Lien Administrator, or the Claims Administrator, with counsel individually representing a Settlement Class Member will be deemed to be a communication directly with such individually represented Settlement Class Member.

Section 30.5   Integration.  The Settlement Agreement including its Exhibits will constitute the entire agreement and understanding among the Parties and supersedes all prior proposals, negotiations, letters, conversations, agreements, term sheets, and understandings, whether written or oral, arising from, resulting from, in any way relating to or in connection with the subject matter of the Settlement Agreement, including the June Settlement Proposal and the Memorandum of Understanding dated September 10, 2020 between Class Counsel, Subclass Counsel, and Counsel for the Defendant.  The Parties acknowledge, stipulate, and agree that no covenant, obligation, condition, representation, warranty, inducement, negotiation, agreement, arrangement, or understanding, whether written or oral, concerning any part or all of the subject matter of the Settlement Agreement has been made or relied on except as expressly set forth in the Settlement Agreement.

Section 30.6   Headings.  The headings used in the Settlement Agreement are intended for the convenience of the reader only and will not affect the meaning or interpretation of the Settlement Agreement in any manner.  Any inconsistency between the headings used in the Settlement Agreement and the text of the Articles, Sections, and Exhibits of the Settlement Agreement will be resolved in favor of the text.

Section 30.7    Incorporation of Exhibits.  All of the Exhibits attached hereto are hereby incorporated by reference as though fully set forth herein.  Notwithstanding the foregoing, any inconsistency between the text of Article I–Article XXX of the Settlement Agreement and any Exhibits hereto will be resolved in favor of the text of Article I–Article XXX of the Settlement Agreement.

Section 30.8    Amendment.  The Settlement Agreement will not be subject to any change, modification, amendment, or addition without the express written consent of Class Counsel and Counsel for the Defendant, on behalf of all Parties to the Settlement Agreement, and upon Court approval where required.

Section 30.9    Mutual Preparation.  The Parties have negotiated all of the terms and conditions of the Settlement Agreement at arm's length.  Neither the Settlement Class Members nor the Defendant, nor any one of them, nor any of their counsel will be considered to be the sole drafter of the Settlement Agreement or any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of the Settlement Agreement.  The Settlement Agreement will be deemed to have been mutually prepared by the Parties and will not be construed against any of them by reason of authorship.

Section 30.10   Beneficiaries.  The Settlement Agreement will be binding upon the Parties and will inure to the benefit of the Settlement Class Members, the Monsanto Parties, and the Related Parties; as well as the Settlement Class Member Parties who are not Settlement Class Members (but only to the extent necessary to enforce the evidentiary use of the Science Panel Determination and the agreement on the Science Panel Stipulation as set forth in Article XII).  All Monsanto Parties and Related Parties who are not the Defendant are intended third-party beneficiaries entitled to enforce the terms of the Releases and Covenants Not to Sue set forth in Article XVII and the evidentiary use of the Science Panel Determination and the agreement on the Science Panel Stipulation set forth in Article XII.  All Settlement Class Member Parties who are not Settlement Class Members are intended third-party beneficiaries to the extent necessary to enforce the evidentiary use of the Science Panel Determination and the agreement on the Science Panel Stipulation as set forth in Article XII.  The Settlement Administrator, DAGP Administrator, Claims Administrator, and their respective Affiliates, officers, directors, and employees are intended third-party beneficiaries to the extent necessary to enforce the Releases set forth in Section 17.1(c).  The Science Panel members and their authorized contractors are intended third-party beneficiaries to the extent necessary to enforce the Releases set forth in Section 17.1(f).  No provision in the Settlement Agreement is intended to create any third-party beneficiary to the Settlement Agreement other than the Monsanto Parties and the Related Parties; the Settlement Class Member Parties to the extent necessary to enforce evidentiary use of the Science Panel Determination and the agreement on the Science Panel Stipulation as set forth in Article XII; the Settlement Administrator, DAGP Administrator, Claims Administrator, and their respective Affiliates, officers, directors, and employees to the extent necessary to enforce the Releases set forth in Section 17.1(c); and the Science Panel members and their authorized contractors to the extent necessary to enforce the Releases set forth in Section 17.1(f).  Nothing expressed or implied in the Settlement Agreement is intended to or will be construed to confer any right or remedy under or by reason of the Settlement Agreement upon any Person other than Class and Subclass Representatives; the Settlement Class Members; Class Counsel; the Defendant; the Monsanto

Parties; the Related Parties; the Settlement Class Member Parties (but only to the extent necessary to enforce the evidentiary use of the Science Panel Determination and the agreement on the Science Panel Stipulation as set forth in Article XII); the Settlement Administrator, DAGP Administrator, Claims Administrator, and their respective Affiliates, officers, directors, and employees (but only to the extent necessary to enforce the Releases set forth in Section 17.1(c)); the Science Panel members and their authorized contractors (but only to the extent necessary to enforce the Releases set forth in Section 17.1(f)); and Counsel for the Defendant.

Section 30.11 <u>Certain Actions Not Subject to Particular Provisions</u>. Notwithstanding anything else to the contrary in the Settlement Agreement, the stay under Section 18.2(b)(i) and the associated provisions of Section 17.4(b), Section 21.6, Section 21.7 and Section 21.10 regarding compliance with that stay shall not apply to the continued prosecution of the following actions (and only such specific actions), but only so long as there is no expansion of the type of relief currently sought: *Gilmore v. Monsanto Company*, No. 1:20-cv-01085-UNA (D. Del.); *Ezcurra v. Monsanto Company*, No. 20-13341 (11th Cir.); *Tomlinson v. Monsanto Co.*, No. 1916-CV22788 (Jackson County, MO Sup. Ct.); *Weeks v. Home Depot USA, Inc.*, No. 21-55027 (9th Cir.); *Taylor v. Costco Wholesale Corp.*, No. 2:20-cv-00655-KJM-DMC (E.D. Cal.); *Williams v. Lowe's Home Centers, LLC*, No. 5:20-cv-01356-JGB-KK (C.D. Cal.); *Lamerson v. Walmart Stores, Inc.*, No. 50-2019-CC-009139-XXXX-MB (Palm Beach Cty. Fla. Cir. Ct.); *Shelly v. Target Corp.*, 50-2019-CC-010718-XXXX-MB (Palm Beach Cty. Fla. Cir. Ct.); *Biddle v. Lowe's Home Centers LLC*, No. 50-2019-CC-011405-XXXX-MB (Palm Beach Cty. Fla. Cir. Ct.); *Morley v. Ace Hardware Corp.*, No. CONO19010648 (Broward Cty. Fla. Cir. Ct); and *Jones v. Monsanto Company*, No. 4:19-cv-00102-BP (W.D. Mo.), including any amendments to these actions to which Monsanto consents.

Section 30.12 <u>Extensions of Time</u>.  Class Counsel and Counsel for the Defendant may agree in writing, subject to approval of the Court where required, to reasonable extensions of time to implement the provisions of the Settlement Agreement.

Section 30.13 <u>Extensions to Commencement of Funded Class Benefits</u>.  The Settlement Administrator shall have the authority to delay the date on which any of the Funded Class Benefits are to commence if it determines in its sole discretion that a delay is reasonable and appropriate for the orderly implementation of the Funded Class Benefit at issue, provided that any delay in excess of 30 days will be subject to Court approval.  The Settlement Administrator has no authority under the Settlement Agreement to extend the dates for the conclusion of any of the Funded Class Benefits.

Section 30.14 <u>Execution in Counterparts</u>.  The Settlement Agreement may be executed in counterparts, and a PDF or other electronic image of an actual signature will be deemed an original signature for purposes of the Settlement Agreement.

Section 30.15 <u>Good Faith Implementation</u>.  Class Counsel and Counsel for the Defendant will undertake to implement the terms of the Settlement Agreement in good faith. Before filing any motion or petition in the Court raising a dispute arising from, resulting from, in any way relating to or in connection with the Settlement Agreement, Class Counsel and Counsel for the Defendant will consult with each other in good faith and certify to the Court that they have conferred in good faith.

Section 30.16 <u>Force Majeure</u>.  The Parties will be excused from any failure to perform timely any obligation hereunder to the extent such failure is caused by war, acts of public enemies or terrorists, strikes or other labor disturbances, fires, floods, acts of God, or any causes of the like or different kind beyond the reasonable control of the Parties.

Section 30.17 <u>Waiver</u>.  The waiver by any Party of any breach of the Settlement Agreement by another Party will not be deemed or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, of the Settlement Agreement.

Section 30.18 <u>Tax Consequences</u>.  No opinion regarding the tax consequences of the Settlement Agreement to any individual Settlement Class Member Party is being given or will be given by the Defendant, the Monsanto Parties, the Related Parties, Counsel for the Defendant, Class and Subclass Representatives, or Class Counsel, nor is any representation or warranty in this regard made by virtue of the Settlement Agreement.  Settlement Class Member Parties must consult their own tax advisors regarding the tax consequences of the Settlement Agreement, including any payments provided hereunder and any tax reporting obligations they may have with respect thereto.  Each Settlement Class Member Party's tax obligations, and the determination thereof, are his or her sole responsibility, and it is understood that the tax consequences may vary depending on the particular circumstances of each individual Settlement Class Member Party.  The Defendant, the Monsanto Parties, the Related Parties, Counsel for the Defendant, and Class Counsel will have no liability or responsibility whatsoever for any such tax consequences resulting from payments under the Settlement Agreement.  The Defendant, the Monsanto Parties, the Related Parties, and Counsel for the Defendant will have no liability or responsibility for any reporting or withholding requirements with respect to any payments made under the Settlement Agreement.  The Settlement Administrator, the Escrow Agent, the DAGP Administrator, and the Lien Administrator shall cooperate with the Claims Administrator regarding any tax information reporting and withholding requirements with respect to payments made under the Settlement Agreement, as well as any associated interest and penalties, and take all actions necessary to enable the Claims Administrator to fulfill its responsibilities under Section 15.1(f).  Any amounts required to be withheld shall be treated for all purposes as though such amounts had been paid to such Person in respect of which such withholding was required.

Section 30.19 <u>Issuance of Notices and Submission of Materials</u>.  In any instance in which the Settlement Agreement requires the issuance of any notice regarding registration, a claim or a grant, unless specified otherwise in the Settlement Agreement, such notice must be issued by:  (a) online submission through any secure web-based portal established by the Claims Administrator for this purpose to the Settlement Class Member or Defendant, which shall be accompanied by an email certifying receipt; or (b) U.S. mail (or its foreign equivalent).  In any instance in which the Settlement Agreement requires submission of materials by or on behalf of a Settlement Class Member or the Defendant, unless specified otherwise in the Settlement Agreement, such submission must be made by:  (x) online submission through any secure web-based portal established by the Claims Administrator for this purpose; or (y) U.S. mail (or its foreign equivalent); or (z) delivery.  Written notice must be given to the following addresses, or such other Person or Persons as shall be designated by the Parties:

(a)     If to the Class Representatives, Class Counsel, or Subclass Counsel, to all of:

Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, California  94111
Attention:      Elizabeth J. Cabraser
Email:           ECabraser@lchb.com

Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Attention:      Steven E. Fineman
Email:           SFineman@lchb.com

Dugan Law Firm, APLC
One Canal Place
365 Canal Street, Suite 1000
New Orleans, LA 70130
Attention:      James R. Dugan, II
Email:           JDugan@dugan-lawfirm.com

FeganScott LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Attention:      Elizabeth Fegan
Email:           beth@feganscott.com

Audet & Partners LLP
711 Van Ness Ave., Suite 500
San Francisco, CA 94102
Attention:      William M. Audet
Email:           waudet@audetlaw.com

(b)      If to the Defendant or Counsel for the Defendant, to all of:

Bayer U.S. LLC
100 Bayer Boulevard
Whippany, NJ 07981
Attention:      General Counsel

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Attention:      Carrie M. Reilly
Email:           CMReilly@WLRK.com

Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave, NW
Washington, DC 20001

|              |                                  |
|--------------|----------------------------------|
| Attention:   | William Hoffman                  |
|              | David J. Weiner                  |
|              | Ashley Burkett                   |
| Email:       | william.hoffman@arnoldporter.com |
|              | david.weiner@arnoldporter.com    |
|              | ashley.burkett@arnoldporter.com  |

Section 30.20 <u>Waiver of Requirements.</u> The Parties recognize that there may be further pleadings, discovery responses, documents, testimony, or other matters or materials owed by the Parties to each other pursuant to existing pleading requirements, discovery requests, pretrial rules, procedures, orders, decisions, or otherwise. As of the Settlement Date, each Party expressly waives any right to receive, inspect, or hear such pleadings, discovery, testimony, or other matters or materials during the pendency of the settlement proceedings contemplated by the Settlement Agreement and subject to further order of the Court.

Section 30.21 <u>Party Burden</u>. Unless explicitly provided otherwise, whenever a showing is required to be made in the Settlement Agreement, the party seeking the relief shall bear the burden of substantiation.

*[Remainder of page intentionally left blank.]*

Agreed to as of this 3rd day of February, 2021.

**COUNSEL FOR THE DEFENDANT:**

By: _____
   Jeffrey M. Wintner
   Carrie M. Reilly
   WACHTELL, LIPTON, ROSEN &
   KATZ

By: _____
   William Hoffman
   David J. Weiner
   ARNOLD & PORTER KAYE
   SCHOLER LLP

**CLASS COUNSEL:**

By: _____
   Elizabeth J. Cabraser
   Robert L. Lieff
   Steven E. Fineman
   LIEFF CABRASER HEIMANN &
   BERNSTEIN, LLP

By: _____
   Samuel Issacharoff

By: _____
   James R. Dugan, II
   DUGAN LAW FIRM, APLC

**CLASS/SUBCLASS 1 COUNSEL:**

**CLASS/SUBCLASS 2 COUNSEL:**

By: _____
   William M. Audet
   AUDET & PARTNERS, LLP

By: _____
   TerriAnne Benedetto
   DUGAN LAW FIRM, APLC

[*Signature Page to Settlement Agreement*]

Agreed to as of this 3rd day of February, 2021.

**COUNSEL FOR THE DEFENDANT:**

By: _____

    Jeffrey M. Wintner
    Carrie M. Reilly
    WACHTELL, LIPTON, ROSEN &
    KATZ

By: _____

    William Hoffman
    David J. Weiner
    ARNOLD & PORTER KAYE
    SCHOLER LLP

**CLASS COUNSEL:**

By: _____

    Elizabeth J. Cabraser
    Robert L. Lieff
    Steven E. Fineman
    LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP

By: _____

    Samuel Issacharoff

By: _____

    James R. Dugan, II
    DUGAN LAW FIRM, APLC

**CLASS/SUBCLASS 1 COUNSEL:**

**CLASS/SUBCLASS 2 COUNSEL:**

By: _____

    William M. Audet
    AUDET & PARTNERS, LLP

By: _____

    TerriAnne Benedetto
    DUGAN LAW FIRM, APLC

*[Signature Page to Settlement Agreement]*

Agreed to as of this 3ʳᵈ day of February, 2021.

**COUNSEL FOR THE DEFENDANT:**

By: _____

Jeffrey M. Wintner
Carrie M. Reilly
WACHTELL, LIPTON, ROSEN &
KATZ

By: _____

William Hoffman
David J. Weiner
ARNOLD & PORTER KAYE
SCHOLER LLP

**CLASS COUNSEL:**

By: _____

Elizabeth J. Cabraser
Robert L. Lieff
Steven E. Fineman
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

By: _____

Samuel Issacharoff

By: _____

James R. Dugan, II
DUGAN LAW FIRM, APLC

**CLASS/SUBCLASS 1 COUNSEL:**

**CLASS/SUBCLASS 2 COUNSEL:**

By: _____

William M. Audet
AUDET & PARTNERS, LLP

By: _____

TerriAnne Benedetto
DUGAN LAW FIRM, APLC

*[Signature Page to Settlement Agreement]*

Agreed to as of this 3rd day of February, 2021.

**COUNSEL FOR THE DEFENDANT:**

By: _____

Jeffrey M. Wintner
Carrie M. Reilly
WACHTELL, LIPTON, ROSEN &
KATZ

By: _____

William Hoffman
David J. Weiner
ARNOLD & PORTER KAYE
SCHOLER LLP

**CLASS COUNSEL:**

By: _____

Elizabeth J. Cabraser
Robert L. Lieff
Steven E. Fineman
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

By: _____

Samuel Issacharoff

By: _____

James R. Dugan, II
DUGAN LAW FIRM, APLC

**CLASS/SUBCLASS 1 COUNSEL:**

By: _____

William M. Audet
AUDET & PARTNERS, LLP

**CLASS/SUBCLASS 2 COUNSEL:**

By: _____

TerriAnne Benedetto
DUGAN LAW FIRM, APLC

[*Signature Page to Settlement Agreement*]

Agreed to as of this 3rd day of February, 2021.

**COUNSEL FOR THE DEFENDANT:**

By: _____

    Jeffrey M. Wintner
    Carrie M. Reilly
    WACHTELL, LIPTON, ROSEN &
    KATZ

By: _____

    William Hoffman
    David J. Weiner
    ARNOLD & PORTER KAYE
    SCHOLER LLP

**CLASS COUNSEL:**

By: _____

    Elizabeth J. Cabraser
    Robert L. Lieff
    Steven E. Fineman
    LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP

By: _____

    Samuel Issacharoff

By: _____

    James R. Dugan, II
    DUGAN LAW FIRM, APLC

**CLASS/SUBCLASS 1 COUNSEL:**

By: _____

    William M. Audet
    AUDET & PARTNERS, LLP

**CLASS/SUBCLASS 2 COUNSEL:**

By: _____

    TerriAnne Benedetto
    DUGAN LAW FIRM, APLC

*[Signature Page to Settlement Agreement]*

By: _____
    Elizabeth Fegan
    FEGANSCOTT LLC

## INDEX OF DEFINED TERMS

Accelerated Payment Award.................................................................. Section 6.2(a)(i)
Accelerated Payment Claim Form ........................................................Section 7.1(b)
Accelerated Payment Claim Package ...................................................... Section 7.2
Accelerated Payment Determination ......................................... Section 6.2(a)(i)(2)
Accelerated Payment Monthly Statement.......................................Section 3.6(a)(iii)(2)
Additional Permitted Fund Uses ........................................................Section 3.3(a)
Affiliate ............................................................................................... Section 2.1
Appeals Form .................................................................................... Section 2.1
Approved Registration Number............................................................Section 5.3(d)
Bradford Hill Guidelines................................................................... Section 2.1
Causation Not Shown Finding ..............................................................Section 12.3(b)
Causation Shown Finding ....................................................................Section 12.3(b)
Claim Form ........................................................................................ Section 2.1
Claim Package ................................................................................... Section 2.1
Claims ................................................................................................ Section 2.1
Claims Administrator.......................................................................... Section 2.1
Claims Administrator Costs ................................................................Section 14.2(c)
Claims Program .................................................................................. Section 2.1
Claims Program Award........................................................................Section 6.2(a)(ii)
Claims Program Claim Form................................................................Section 7.1(b)
Claims Program Claim Package ............................................................ Section 7.2
Claims Program Determination .............................................. Section 6.2(a)(ii)(4)
Class Action Complaint ...................................................................... Section 2.1
Class Counsel...................................................................................... Section 2.1
Class Counsel Attorneys' Fees ............................................................ Section 25.1
Class Representatives.......................................................................... Section 2.1
CMS ................................................................................................... Section 2.1
Compensation Award.......................................................................... Section 2.1
Compensation Award Guidelines ........................................................ Section 2.1
Compensation Fund ........................................................................... Section 2.1
Compensation Fund Continuation Terms ...........................................Section 13.2(a)
Compensation Range ..........................................................................Exhibit 5
Compensatory Damages ..................................................................... Section 2.1
Confidential Information ..................................................................... Section 24.1
Counsel for the Defendant .................................................................. Section 2.1
Court ................................................................................................... Section 2.1
Covenants Not to Sue.......................................................................... Section 2.1
DAGP Administrator .......................................................................... Section 2.1
DAGP Administrator Costs ................................................................Section 14.3(c)
DAGP Application .............................................................................. Section 8.4
DAGP Eligible Settlement Class Member............................................Section 8.4(a)
DAGP Grant........................................................................................Section 8.3(a)
DAGP Grantee....................................................................................Section 8.3(a)
Daubert/Frye Challenge ......................................................................Section 12.5(b)

Defendant ............................................................................ Section 2.1
Deficiency ........................................................................... Section 2.1
Derivative Claimants ............................................................ Section 2.1
Derivative Claims ................................................................ Section 2.1
Diagnosing Physician ........................................................... Exhibit 4
Diagnostic Accessibility Grant Program .............................. Section 2.1
ECHA .................................................................................. Section 2.1
Effective Date ...................................................................... Section 2.1
EFSA ................................................................................... Section 2.1
Eligibility Criteria .............................................................. Section 6.1(a)
End Payment ....................................................................... Section 13.3(b)(i)
EPA ..................................................................................... Section 2.1
Escrow Agent ...................................................................... Section 2.1
Escrow Agreement ............................................................... Section 2.1
Exhibit ................................................................................ Section 2.1
Extraordinary Circumstances .............................................. Section 6.2(a)(ii)(1)
Fairness Hearing ................................................................. Section 2.1
Final Order and Judgment ................................................... Section 2.1
Form of Release .................................................................. Section 2.1
FQHC .................................................................................. Section 8.4(d)(i)
Funded Class Benefits ......................................................... Section 3.2(a)
General Causation ............................................................... Section 2.1
Governmental Authority ...................................................... Section 2.1
Governmental Payor ............................................................ Section 2.1
Grantee Contract ................................................................. Section 8.3(e)(i)
Group A Medical Conditions .............................................. Exhibit 5
Group B Medical Conditions .............................................. Exhibit 5
HIPAA ................................................................................ Section 2.1
IARC ................................................................................... Section 2.1
IARC Monograph 112 ......................................................... Section 2.1
Initial Settlement Period ..................................................... Section 2.1
IRC ..................................................................................... Section 2.1
JMPR .................................................................................. Section 2.1
June Settlement Proposal ..................................................... Section 2.1
Lawsuit ............................................................................... Section 2.1
Legal Services Program ....................................................... Section 11.1
Legal Services Program Counsel ......................................... Section 11.1
Lien ..................................................................................... Section 2.1
Lien Administrator .............................................................. Section 2.1
Lien Administrator Costs ..................................................... Section 14.4(c)
List of Service Areas ........................................................... Section 8.1
Litigation Consulting Group ................................................ Section 14.5(a)(iii)
Medicaid Program ............................................................... Section 2.1
Medicare Program ............................................................... Section 2.1
Monsanto Parties ................................................................. Section 2.1
MSP Laws ........................................................................... Section 2.1

NHL ........................................................................................................ Section 2.1
NHL Diagnostic Evaluation.......................................................................... Section 8.1
Notice of Accelerated Payment Determination ....................................... Section 7.7(a)
Notice of Claims Program Determination ............................................... Section 7.8(a)
Notice of Deficiency ................................................................................... Section 2.1
Notice of Registration Determination........................................................Section 5.3(b)
Opt Out....................................................................................................... Section 2.1
Other Insurer ............................................................................................. Section 2.1
Outreach Campaign ................................................................................ Section 8.2(a)
Parties........................................................................................................ Section 2.1
Person ........................................................................................................ Section 2.1
Personal Signature ..................................................................................... Section 2.1
Preliminary Approval Motion..................................................................... Section 2.1
Preliminary Approval Order ....................................................................... Section 2.1
Protected Health Information...................................................................... Section 2.1
Qualified Physician .......................................................................................Exhibit 4
Qualified Physician Certification ............................................................... Section 2.1
Qualifying Diagnosis ....................................................................................Exhibit 4
Reference Link ........................................................................................... Section 9.1
Registration Applicant ............................................................................... Section 2.1
Related Parties ........................................................................................... Section 2.1
Related Party Lawsuits ............................................................................... Section 2.1
Released Claims ........................................................................................ Section 17.1
Releases...................................................................................................... Section 2.1
Remaining Funds .................................................................................... Section 7.18(a)
Representative Claimants............................................................................ Section 2.1
Research Funding Program ........................................................................ Section 2.1
Research Funding Proposals ...................................................................Section 10.2(a)
Resident...................................................................................................... Section 2.1
Roundup Claims......................................................................................... Section 2.1
Roundup Lawsuits ..................................................................................... Section 2.1
Roundup Products ...................................................................................... Section 2.1
Science Panel .........................................................................................Section 12.1(a)
Science Panel Chairperson......................................................................... Section 2.1
Science Panel Commencement Date .......................................................... Section 2.1
Science Panel Contracts............................................................................Section 12.7(b)
Science Panel Costs ...............................................................................Section 12.7(a)
Science Panel Determination ..................................................................Section 12.2(a)
Science Panel Determination Form ............................................................ Section 2.1
Science Panel Stipulation.......................................................................Section 12.3(d)(ii)
Scientific Analysis ...................................................................................Section 12.2(a)
Settlement Administration Costs ................................................................ Section 2.1
Settlement Administrator ............................................................................ Section 2.1
Settlement Administrator Costs ...............................................................Section 14.1(c)
Settlement Agreement................................................................................. Section 2.1
Settlement Class........................................................................................Section 1.1(a)

Settlement Class Member ............................................................................ Section 2.1
Settlement Class Member Parties ............................................................... Section 2.1
Settlement Class Notice ............................................................................. Section 2.1
Settlement Class Notice Agent ................................................................... Section 2.1
Settlement Class Notice Amount ................................................................ Section 2.1
Settlement Class Notice Costs .................................................................... Section 2.1
Settlement Class Notice Plan ...................................................................... Section 2.1
Settlement Date .......................................................................................... Section 2.1
Settlement Fund ......................................................................................... Section 2.1
Settlement Fund Amount ........................................................................... Section 3.1(a)
Settlement Website .................................................................................... Section 5.1(a)
Specific Causation ..................................................................................... Section 2.1
Subclass 1 ................................................................................................ Section 1.2(a)
Subclass 2 ................................................................................................ Section 1.2(b)
Subclass Counsel ...................................................................................... Section 2.1
Subclass Representatives ........................................................................... Section 2.1
Subclasses ................................................................................................. Section 2.1
Tax Expenses ........................................................................................... Section 15.1(f)
Telehealth-Only Provider ......................................................... Section 8.3(b)(iv)(2)
Tier ........................................................................................................... Exhibit 5
Tier Criteria .............................................................................................. Exhibit 5
Tier Determination .................................................................................... Exhibit 5
Tier Guidelines ......................................................................................... Exhibit 5
Tricare ...................................................................................................... Section 2.1
United States ............................................................................................ Section 2.1

EXHIBIT 1

## EXHIBIT 1: NAMES AND BRANDS OF ROUNDUP PRODUCTS

KLEENUP SUPER EDGER
BONIDE KLEENUP GRASS & WEED KILLER, READY TO USE
> *FRANKS KLEEN UP GRASS & WEED KILLER READY TO USE*
> *FRANKS KLEEN UP READY TO USE*
> *MEIJER KLEENUP GRASS AND WEED KILLER RTU*
> *MORGRO WEED & GRASS KILLER R.T.U.*

KLEENUP SPOT WEED & GRASS KILLER
BONIDE KLEENUP GRASS & WEED KILLER, CONCENTRATE
RIGO NEAT'N CLEAN EXTRA STRENGTH SYSTEMIC WEED + GRASS KILLER
RIGO NEAT'N CLEAN CONCENTRATE SYSTEMIC WEED AND GRASS KILLER
A-11976E HERBICIDE
EXPERT NT HERBICIDE
TOUCHDOWN CONCENTRATE HERBICIDE
TOUCHDOWN 4-LC
TOUCHDOWN TECHNICAL
TOUCHDOWN (R) 6 HERBICIDE
DYNASTY HERBICIDE
TOUCHDOWN 5 HERBICIDE
GLYPHOSATE ACID TECHNICAL
TOUCHDOWN HERBICIDE
> *TOUCHDOWN*

TOUCHDOWN PRO HERBICIDE
TOUCHDOWN LIQUID CONCENTRATE
RIVERDALE CREDIT HERBICIDE
AQUANEAT AQUATIC HERBICIDE
> *AQUANEAT AQUATIC HERBICIDE*
> *SHORE-KLEAR AQUATIC HERBICIDE*

RAZOR HERBICIDE
> *REMUDA FULL STRENGTH*
> *LESCO PROSECUTOR*
> *LESCO PROSECUTOR PLUS TRACKER*
> *SQUARE DON*
> *SQUARE DOWN*
> *QUICK KILL*
> *UNITED HORTICULTURAL SUPPLY KLEEN U*
> *VERDICON KLEENUP PRO HERBCIDE*
> *COMPARE-N-SAVE GRASS & WEED KILLER 41% GLYPHOSATE*
> *VERDICON KLEENUP PRO HERBICIDE*

GRASS, WEED AND VEGETATION HERBICIDE (KILLER)
> *DO IT BEST GRASS & WEED KILLER CONCENTRATE*
> *SHOREKLEAR-PLUS AQUATIC HERBICIDE*
> *GREEN THUMB GRASS & WEED KILLER CONCENTRATE*
> *GRASS & WEED KILLER CONCENTRATE*
> *ORCHARD EST 1931 GRASS & WEED KILLER CONCENTRATE*
> *MEIJER WEED & GRASS KILLER CONCENTRATE*

Exhibit 1                                                                    Page 1

*GARDENER'S CHOICE WEED & GRASS KILLER CONCENTRATE II*
*ULTRASTOP WEED & GRASS KILLER CONCENTRATE II*
*POND OASIS SHORELINE PLANT CONTROL*
*POND OASIS SHORELINE PLANT CONTROL*
*TERMINATOR GRASS AND WEED KILLER*
GRASS, WEED AND VEGETATION HERBICIDE (KILLER) READY-TO-USE
GRASS, WEED AND VEGETATION HERBICIDE (KILLER) 5% CONCENTRATE
FORESTERS' NON-SELECTIVE HERBICIDE
RAZOR BURN
*REMUDA PLUS*
*REMUDA PLUS CONCENTRATE*
*TRIPLE SHOT*
PRODEUCE
*WEED IMPEDE 2 IN CONCENTRATE*
*ELIMINATOR EXTREME WEED & GRASS KILLER CONCENTRATE PLUS*
*PREVENTER*
*FERTI-LOME DOUBLE PLAY WEEDS'EM OUT KEEP 'EM OUT*
*MONTEREY REMUDA EXTENDED CONTROL*
PRODEUCE RTU GRASS & WEED KILLER
*FERTI-LOME DOUBLE PLAY READY-TO-USE*
*WEED IMPEDE 2 IN RTU*
*MONTEREY REMUDA EXTENDED CONTROL RTU*
RAZOR BURN READY-TO-USE
*REMIDA PLUS RTU*
RAZOR BURN RESIDENTIAL
*REMUDA PLUS*
RAZOR RTU HERBICIDE
*HEAVY WEIGHT GRASS & WEED KILLER*
*GARDENER'S CHOICE WEED & GRASS KILLER II*
*ULTRASTOP WEED & GRASS KILLER II*
*DO IT BEST GRASS & WEED KILLER2 READY-TO-USE*
TVC - CONSUMER CONCENTRATE
*GROUND FORCE VEGETATION KILLER CONCENTRATE*
*ORCHARD EST. 1931 VEGEATATION CONTROL CONCENTRATE*
*SPECTRACIDE VEGETATION KILLER CONCENTRATE3*
*HOMEFRONT VEGETATION KILLER CONCENTRATE*
*ELIMINATOR TOTAL VEGETATION KILLER CONCENTRATE*
*HY-END TVC*
TVC CONSUMER RTU
*SPECTRACIDE VEGETATION KILLER READY TO USE2*
*BONIDE KLEENUP WEED AND GRASS KILLER 365 READY TO USE*
*KLEENUP WEED & GRASS KILLER 365 READY TO USE*
NUP-17001
ORTHO SYSTEMIC SPOT WEED & GRASS KILLER
ORTHO READY-TO-USE SPOT WEED & GRASS KILLER
*GROWER'S CHOICE KLEENUP WEED & GRASS KILLER*

Exhibit 1                                                                                         Page 2

  *WEED & GRASS KILLER KLEENUP (GROWER'S CHOICE)*
ORTHO SYSTEMIC WEED & GRASS KILLER
  *PENNINGTON'S PRIDE ELIMINATOR CONCENTRATE SYSTEMIC WEED & GRASS KILLER*
  *GREEN CHARM ELIMINATOR CONCENTRATE SYSTEMIC WEED & GRASS KILLER*
  *PENNINGTON'S PRIDE SYSTEMIC WEED & GRASS KILLER*
  *GREEN CHARM KNOCK OUT SYSTEMIC WEED & GRASS KILLER*
  *GREEN CHARM KNOCK OUT CONCENTRATE SYSTEMIC WEED & GRASS KILLER*
  *PENNINGTON'S PRIDE, KNOCK OUT CONCENTRATE SYSTEMIC WEED & GRASS KILLER*
  *GROWER'S CHOICE KLEENUP SYSTEMIC WEED AND GRASS KILLER*
  *BULLSEYE*
  *GREEN DEATH CONCENTRATE*
  *CONTACT HERBICIDE #2*
  *ZAP-IT CONCENTRATE*
KLEENUP GRASS AND WEED KILLER
  *GROWER'S CHOICE TM KLEENUP R GRASS AND WEED KILLER*
ORTHO FENCE & GRASS EDGER FORMULA II
  *GROWER'S CHOICE KLEENUP SUPER EDGER*
KLEENUP SPOT WEED & GRASS KILLER
  *GROWER'S CHOICE KLEENUP SPOT WEED AND GRASS KILLER*
KLEERAWAY CONCENTRATE WEED & GRASS KILLER
ROUNDUP CONCENTRAATE WEED & GRASS KILLER
ROUNDUP SUPER CONCENTRATE WEED & GRASS KILLER
ROUNDUP L & G READY-TO-USE FAST ACTING FORMULA GRASS & WEED KILLER
ROUNDUP QUIK STIK GRASS AND WEED KILLER
ROUNDUP GRASS AND WEED KILLER
  *ELIMINATOR WEED & GRASS KILLER READY-TO-USE*
  *STRIKE WEED & GRASS KILLER READY-TO-USE*
ROUNDUP FENCE & YARD EDGER 1
ROUNDUP READY-TO-USE WEED & GRASS KILLER 1
ROUNDUP READY-TO-USE WEED AND GRASS KILLER 2
ROUNDUP CLUB CONCENTRATE WEED & GRASS KILLER
ROUNDUP CLUB SUPER CONCENTRATE WEED & GRASS KILLER
ROUNDUP CLUB SUPER CONCENTRATE WEED & GRASS KILLER
ROUNDUP GARDEN FOAM GRASS & WEED KILLER
ROUNDUP RAINFAST CONCENTRATE WEED & GRSS KILLER
ROUNDUP RAINFAST CONCENTRATE WEED & GRASS KILLER
ROUNDUP RAINFAST SUPER CONCENTRATE WEED & GRASS KILLER
ROUNDUP RAINFAST SUPER CONCENTRATE WEED & GRASS KILLER
KLEERAWAY CONCENTRATE WEED & GRASS KILLER1
KLEERAWAY CONCENTRATE WEED & GRASS KILLER 1
ROUNDUP RAINFAST TOUGH WEED
ORTHO GROUNDCLEAR TOTAL VEGETATION KILLER
GROUNDCLEAR SUPEREDGER GRASS & WED CONTROL I
ROUNDUP DRY CONCENTRATE

---

Exhibit 1      Page 3

ROUNDUP READY TO USE WEED & GRASS KILLER PLUS
ROUNDUP LOCK'N SPRAY
GROUND CLEAR RTU
ORTHO SEASON-LONG GRASS & WEED KILLER
ORTHO SEASON LONG WEED & GRASS KILLER PLUS PREVENTER READY-SPRAY II
ORTHO GROUNDCLEAR VEGETATION KILLER RTU
NS 515
NS 516
NSR 001
GROUNDCLEAR CONCENTRATE
GROUNDCLEAR W RTU
GROUNDCLEAR S RTU
GLYFOS HERBICIDE
GLYFOS READY-TO-USE 0.96% WEED & GRASS KILLER
GLYFOS MUC 62%
GLYFOS CONCENTRATE 27% WEED & GRASS KILLER
GLYFOS PRO HERBICIDE
GLYFOS CUSTOM HERBICIDE
GLYFOS CONCENTRATE 18% WEED & GRASS KILLER
GLYFOS READY-TO-USE 1.92% WEED & GRASS KILLER
GLYFOS CONCENTRATE 41% WEED & GRASS KILLER
GLYFOS CONCENTRATE 25% WEED AND GRASS KILLER
DUPONT STAPLE PLUS HERBICIDE
DUPONT GLYPHOSATE HERBICIDE
    *GLYPHOSATE ORIGINAL*
DUPONT GLYPHOSATE VMF HERBICIDE
    *EAGRE*
ETK-2301 HERBICIDE
DUPONT DPX-B2856 4.5 HERBICIDE
DUPONT DPX-B2856 3.0 HERBICIDE
DUPONT ABUNDIT EDGE HERBICIDE
ESPLANADE MUNI
SPECTICLE TOTAL
ROUNDUP HERBICIDE
    *RULER HERBICIDE*
    *JURY*
    *SILHOUETTE*
    *MIRAGE*
    *RATTER*
    *WEED WRANGLER 41*
    *TURFGO WEED WRANGLER 41*
    *TURFGO WEED WRANGLER 41*
MON 0139 TECHNICAL SOLUTION
ACCORD HERBICIDE
    *TURFGO WEED WRANGLER*
    *TURFGO WEED WRANGLER*

Exhibit 1                                                                 Page 4

SHACKLE HERBICIDE
     *HOEDOWN RTU*
     *TRAIL BLAZER RTU*
     *QUICK-CLAIM RTU*
     *BAREBACK RTU*
     *KEM-TIL RTU*
     *STRIKER RTU*
     *GREEN DEATH*
     *T-39*
     *LIQUIDATOR*
     *LIQUIDATOR*
     *T-39*
     *JAN/SAN II HERBICIDE*
     *TRAMPLE*
     *BURNOUT*
     *HNS-200*
     *PENNINGTON'S PRIDE SYSTEMIC WEED & GRASS KILLER READY-TO-USE*
     *GREEN CHARM KNOCK OUT READY-TO-USE*
     *GREEN CHARM KNOCK OUT READY-TO-USE SYSTEMIC WEED & GRASS KILLER*
     *PENNINGTON'S PRIDE KNOCK OUT SYSTEMIC WEED & GRASS KILLER READY-TO-USE*
     *GREEN CHARM ELIMINATOR READY-TO-USE SYSTEMIC WEED & GRASS KILLER*
     *PENNINGTON'S PRIDE ELIMINATOR SYSTEMIC WEED & GRASS KILLER READY-TO-US*
     *GONE-2*
     *BLITZ*
     *MEIJER NEAT 'N CLEAN READY TO USE GRASS & WEED KILLER*
     *ENVIRON*
     *MISTY GLYPHO KILL RTU*
     *TRUE VALUE GREEN THUMB SYSTEMIC WEED & GRASS KILLER*
     *TRUE VALUE GREEN THUMB SYSTEMIC WEED & GRASS KILLER*
     *CONTACT HERBICIDE #3*
     *ZAP-IT*
     *GREEN THUMB SYSTEMIC WEED & GRASS KILLER*
     *WEED-OUT*
     *REMUDA*
     *QUICKDRAW READY-TO-USE HERBICIDE*
     *OPTI-GRO TRAIL BLAZER RTU*
     *OPTI-GRO TRALL BLAZER RTU*
     *OPTI-GRO TRAILBLAZER RTU*
POLADO PLANT GROWTH REGULATOR
MON 0139 62% TECHNICAL SOLUTION
SHACKLE C / EXCHANGE HERBICIDE
BRONCO HERBICIDE
ROUNDUP CUSTOM HERBICIDE
RODEO HERBICIDE

Exhibit 1                                                                                                    Page 5

CUSTOM HERBICIDE
AQUAMASTER HERBICIDE
ROUNDUP AQUAMASTER HERBICIDE
ROUNDUP CUSTOM FOR AQUATIC & TERRESTRIAL USE
 *NUFARM AQUANEAT AQUATIC HERBICIDE*
POLADO L PLANT GROWTH REGULATOR
LANDMASTER BW HERBICIDE
ROUNDUP L & G CONCENTRATE GRASS & WEED KILLER
 *ZEP WEED DEFEAT*
 *HOEDOWN*
 *QUICK-CLAIM*
 *BAREBACK*
 *TRAIL BLAZER*
 *KEM-TIL*
 *STRIKER*
 *LESCO AVAIL NON-SELECTIVE HERBICIDE*
 *HNS-220*
 *JAN/SAN HERBICIDE*
 *3228 FADE-OUT*
 *UNITED 345 WEED BLITZ*
 *WK-95*
 *FORMULA 721 STOCK NO. 4030*
 *GREEN DEATH*
 *BURNOUT*
 *BURNOUT*
 *MISTY GLYPHO KILL CONCENTRATE*
 *TURFINATOR*
 *TRAIL BLAZER*
 *ZAP-IT ULTIMATE GRASS AND WEED HERBICIDE*
 *GREEN DEATH ULTIMATE GRASS AND WEED HERBICIDE*
 *GREEN DEATH ULTIMATE GRASS AND WEED HERBICIDE*
 *ZP-IT ULTIMATE GRASS AND WEED HERBICIDE*
 *CRC-500*
 *CONTACT HERBICIDE #4*
 *CRC-500 BURNDOWN*
 *REMUDA PLUS*
 *OPTI-GRO TRAIL BLAZER*
LANDMASTER II HERBICIDE
RANGER HERBICIDE
FALLOW MASTER HERBICIDE
ROUNDUP NM
NOMIX GRASS & WEED HERBICIDE
NOMIX GRASS-WEED HERBICIDE II
GLYPHOSATE
GLYPHOSATE TECHNICAL
MON-14420 HERBICIDE

MON 8750 HERBICIDE
EXPEDITE GRASS & WEED HERBICIDE
> *EXPEDITE GRASS AND WEED I HERBICIDE*
> *NOMIX MAJOR HERBICIDE*

MILITIA HERBICIDE
EZJECT SELECTIVE INJECTION HERBICIDE CAPSULES
ROUNDUP DRY PAK HERBICIDE WATER SOLUBLE GRANULE
MON-8750 WSB
EXPEDITE ONESTEP GRASS AND WEED HERBICIDE
ROUNDUP RAINFAST HERBICIDE
MON 14420 WSB HERBICIDE
MON 14420-G HERBICIDE
ROUNDUP HERBICIDE
HONCHO HERBICIDE
> *GLYFOS TM*
> *MIRAGE HERBICIDE*
> *SILHOUETTE HERBICIDE*
> *'BUCCANEER HERBICIDE'*
> *NUFARM CREDIT HERBICIDE*
> *GLY-FLO HERBICIDE*
> *GLY STAR ORIGINAL CA*
> *KLEEN UP PRO*
> *KLEENUP PRO GRASS AND WEED KILLER*
> *SUPERSATE HERBICIDE*
> *AGRISOLUTIONS CORNERSTONE HERBICIDE*
> *AGRISOLUTIONS CORNERSTONE HERBICIDE*
> *RASCAL*
> *MIRAGE*
> *SUPERSAFE*
> *SUPERSAFE HERBICIDE*
> *BUCCANEER GLYPHOSAE HERBICIDE*
> *CORNERSTONE*

EXPEDITE GRASS & WEED PLUS HERBICIDE
> *EXPEDITE GRASS AND WEED PLUS HERBICIDE*
> *NOMIX DELETE HERBICIDE*
> *EXPEDITE GRASS AND WEED PLUS RESIDUAL HERBICIDE*

EXPEDITE GRASS AND WEED II HERBICIDE
> *EXPEDITE GRASS AND WEED II HERBICIDE*
> *NOMIX SWEEP HERBICIDE*

ROUNDUP L & G READY TO USE FAST ACTING FORMULA GRASS & WEED KILLER
ROUNDUP QUIK STIK GRASS AND WEED KILLER
ROUNDUP ORIGINAL II HERBICIDE
HONCHO PLUS HERBICIDE
> *TENKOZ BUCCANEER PLUS HERBICIDE*
> *RATTLER PLUS HERBICIDE*
> *MIRAGE PLUS HERBICIDE*

Exhibit 1                                                                                                    Page 7

     *AGRISOLUTIONS CORNERSTONE PLUS HERBICIDE*
     *FS GLYPHOSATE PLUS HERBICIDE*
     *GLY-4 PLUS HERBICIDE*
     *BIOLOGIC BIOMAXX HERBICIDE*
     *RASCAL PLUS*
     *MIRAGE PLUS*
     *BUCCANEER PLUS GLYPHOSATE HERBICIDE*
     *CORNERSTONE PLUS*
     *BULLZEYE HERBICIDE*
     *CROP-SURE GLYPHOSATE PLUS HERBICIDE*
HONCHO K6
     *MAD DOG K6*
ROUNDUP GRASS AND WEED KILLER
ROUNDUP ULTRA HERBICIDE
     *ROUNDUP ULTRA*
     *ROUNDUP ULTRA*
ROUNDUP E Z DRY HERBICIDE
MON 58420 HERBICIDE
ROUNDUP D-PAK HERBICIDE
MON 58442 HERBICIDE
ROUNDUP WSD WATER SOLUBLE DRY HERBICIDE DEPLOY DRY HERBICIDE
ROUNDUP ULTRA DRY
ROUNDUP PRODRY HERBICIDE
MON 76369 63.9% TECHNICAL SOLUTION
FALLOW MASTER BROADSPECTRUM HERBICIDE
MON 77859 HERBICIDE
MON 78088 HERBICIDE
MON 78102 HERBICIDE
ROUNDUP ULTRAMAX
     *ROUNDUP ULTRA MAX HERBICIDE*
MON 78103 HERBICIDE
MON 78063
ACCORD XL HERBICIDE
     *PROKOZ GLYPHOSATE PRO II*
     *TOTALKILL(BRAND) PRO WEED & GRASS KILLER HERBICIDE*
     *TOTALKILL BRAND PRO WEED & GRASS KILLER HERBICIDE II*
ROUNDUP PROBLEND HERBICIDE
MON 78095 HERBICIDE
MON 78128 HERBICIDE
MON 78746 HERBICIDE
ROUNDUP PRO CONCENTRATE
54% GLYPHOSATE IPA SALT PREMIX
RT MASTER
MON 78623 58% TECHNICAL SOLUTION
ROUNDUP QUIKPRO HERBICIDE
     *LESCO PROSECUTOR SWIFT ACTION NON-SELECTIVE HERBICIDE*

MON 78473 HERBICIDE
  *LESCO PROSECUTOR PRO, NON-SELECTIVE HERBICIDE*
ROUNDUP WEATHERMAX HERBICIDE
ROUNDUP POWERMAX II HERBICIDE
MON 78271 HERBICIDE
ROUNDUP ORIGINAL MAX HERBICIDE
  *BULLZEYE HL-K*
MON 78404 HERBICIDE
MON 78736 HERBICIDE
MON 78783 HERBICIDE
MON 78481 HERBICIDE
RT3 HERBICIDE
RT3 POWERED BY ROUNDUP TECHNOLOGY HERBICIDE
MON 79158 HERBICIDE
MON 78868 HERBICIDE
MON 78460A HERBICIDE
ROUNDUP POWERMAX HERBICIDE
  *DUPONT ABUNDIT EDGE HERBICIDE*
RD1619 HERBICIDE
RD 1626 HERBICIDE
RD 1629 HERBICIDE
MON 008 HERBICIDE
GLYPHOSATE TECHNICAL (WETCAKE)
IPA GLYPHOSATE 62% G2
POTASSIUM GLYPHOSATE 58% G2
RD 1685
ROUNDUP PROMAX
M1693 HERBICIDE
M1724 HERBICIDE
M1727 HERBICIDE
M1728 HERBICIDE
K487 HERBICIDE
IP410 HERBICIDE
IP410FC HERBICIDE
R14697 HERBICIDE
R14701 HERBICIDE
R14640 HERBICIDE
RT4790 HERBICIDE
M1750 HERBICIDE
GLY 135EA TECHNICAL SOLUTION
GLY 200EA TECHNICAL SOLUTION
ROUNDUP XTEND WITH VAPORGRIP TECHNOLOGY
ROUNDUP POWERMAX 3 HERBICIDE
LILLY/MILLER KNOCK-OUT WEED & GRASS KILLER
LILLY/MILLER READY-TO-USE KNOCK-OUT WEED & GRASS KILLER
LILLY/MILLER READY-TO-USE KNOCK-OUT WEED & GRASS KILLER

Exhibit 1                                                                                            Page 9

GREEN LIGHT WEED AWAY
GREEN LIGHT READY-TO-USE WEED AWAY
GREEN LIGHT COM-PLEET 41% SYSTEMIC GRASS & WEED KILLER
GREEN LIGHT COM-PLEET 18% SYSTEMIC GRASS & WEED KILLER
GREEN LIGHT COM-PLEET 1.92% SYSTEMIC GRASS & WEED KILLER
GREEN LIGHT COM-PLEET SYSTEMIC GRASS & WEED KILLER
CORNERSTONE
CORNERSTONE PLUS
    *GLY-4 PLUS HERBICIDE*
CORNERSTONE PLUS GLYPHOSATE 41%
CORNERSTONE HERBICIDE
CORNERSTONE PLUS 5
62% GLYPHOSATE IPA
GLYPHOSATE IPA MUP CONCENTRATE
KORNERSTONE K
GLYPHOSATE ORIGINAL HERBICIDE
EAGRE EMERGED AQUATIC WEED AND BRUSH HERBICIDE
GLYFOS X-TRA
    *GLY-4 PLUS*
    *GORDON'S PRONTO BIG N' TUF NONSELECTIVE AGRICULTURAL HERBICIDE*
    *CROP-SURE GLYPHOSATE PLUS HEBICIDE*
    *BULLZEYE*
    *CROP-SURE GLYPHOSATE PLUS HERBICIDE*
GLYPHOSPHATE TECHNICAL
GLYFOS HERBICIDE
    *GLY-4*
GLYFOS AQ AQUATIC HERBICIDE
GLYPHOSATE CONCENTRATE MANUFACTURING USE PRODUCT
GLYFOS AU HERBICIDE
BACKDRAFT HERBICIDE
BACKDRAFT SL HERBICIDE
HM-2028 HERBICIDE
HM-0548 HERBICIDE
HM-0705-A HERBICIDE
GLYPHOSATE TECHNICAL
GLYPHOSATE 62% MUP
GLYPHOSATE 41%
GLYPHOSATE 53.8%
EXCHANGE RTU HERBICIDE
EXCHANGE SEMI CONCENTRATE HERBICIDE
EXCHANGE CONCENTRATE HERBICIDE
HI-YIELD SYSTEMIC VEGETATION KILLER
    *SCIENCE VEGETATION KILLER*
HI-YIELD SYSTEMIC WEED AND GRASS KILLER
HI-YIELD READY TO USE SYSTEMIC WEED AND GRASS KILLER
    *AMERICAN BRAND SYSTEMIC SPOT WEED & GRASS KILLER*

*FERTI-LOME READY TO USE SYSTEMIC POISON IVY KILLER*
FERTI-LOME SYSTEMIC VINE KILLER
FERTI-LOME READY-TO-USE VINE KILLER
HI-YIELD READY-TO-USE WEED AND GRASS KILLER
*AMERICAN BRAND SYSTEMIC SPOT WEED AND GRASS KILLER*
*HI-YIELD KILLZALL(R) SYSTEMIC WEED AND GRASS KILLER*
FERTI-LOME READY-TO-USE SYSTEMIC NUTGRASS KILLER
HI-YIELD READY-TO-USE VEGETATION KILLER
HI-YIELD SYSTEMIC WEED AND GRASS KILLER CONC.
HI-YIELD SYSTEMIC ROPE & WICK APPLICATOR MIX
HI-YIELD KILLZALL CONCENTRATE SYSTEMIC WEED & GRASS KILLER
TAKEOUT SYSTEMIC WEED & GRASS KILLER READY TO USE
*DRAGON EASY TRIM*
*RTU KLEER-OUT*
*ACME(R) SYSTEMIC WEED & GRASS KILLER, READY-TO-USE*
CHEMSICO RTU HERBICIDE G II
*REAL-KILL WEED & GRASS KILLER*
CHEMSICO RTU HERBICIDE G 1
CHEMSICO CONCENTRATE HERBICIDE G 1
CHEMSICO CONCENTRATE HERBICIDE G II
*SPECTRACIDE WEED & GRASS KILLER PRE-MEASURED CONCENTRATES*
JURY HERBICIDE
TOUCHDOWN CONCENTRATE HERBICIDE
TOUCHDOWN 4-LC
TOUCHDOWN TECHNICAL
TOUCHDOWN (R) 6 HERBICIDE
DYNASTY HERBICIDE
TOUCHDOWN 5 HERBICIDE
*TOUCHDOWN*
GLYPHOSATE TECHNICAL
ZPP 1560 HERBICIDE
ZPP 1560 PRO HERBICIDE, 28.3% GLYPHOSATE
ZPP 1560 LIQUID CONCENTRATE 28.3% GLYPHOSATE
CORRAL SPOT WEEDER
CORRAL SPOT WEEDER
*DECIMATE SPOT WEEDER*
*HERBI-DEAD SYSTEMIC WEED & GRASS KILLER*
*PEST SCRIPTION HERBI-DEAD SYSTEMIC WEED & GRASS KILLER*
*PEST SCRIPTION HERBI-DEAD SYSTEMIC WEED & GRASS KILLER*
CLEAN CROP WEED WRANGLER READY-TO-USE
CLEAN CROP WEED WRANGLER 10%
DOOMSDAY READY TO USE
DOOMSDAY CONCENTRATE
DREXEL DREXAR WEED-AWAY READY-TO-USE
DREXEL GLYPHOSATE IPA 53.8%
DREXEL IMITATOR PLUS

Exhibit 1                                                                                                    Page 11

  *IDA GLYPHOSATE 480 HERBICIDE*
  *AGSCO MAD DOG EXTRA 1*
  *HI-YIELD SUPER CONCENTRATE KILL-ZALL II*
  *REMUDA II*
  *REMUDA WEED & GRASS KILLER*
TOMAHAWK 5
TOMAHAWK
TOMAHAWK 4
TOMAHAWK K
AGENT GT
GLYPHOSATE TECHNICAL
  *GLYPHOSATE TECHNICAL*
GLYGRAN WDG
  *GLYGRAN WDG*
CLEAN CROP WEED WRANGLER READY-TO-USE
SYSTEMIC WEED & GRASS KILLER - .96
CLEAN CROP WEED WRANGLER 10%
  *SYSTEMIC WEED & GRASS KILLER - 10*
  *SYSTEMIC WEED & GRASS KILLER - 10*
KLEENUP SYSTEMIC WEED & GRASS KILLER
  *DEAD-N-GONE GRASS & WEED KILLER, CONCENTRATE*
  *GROWER'S CHOICE KLEENUP SYSTEMIC WEED & GRASS KILLER*
KLEENUP SPOT WEED & GRASS KILLER
KLEENUP GRASS & WEED KILLER READY TO USE
  *GROWER'S CHOICE KLEENUP GRASS & WEED KILLER READY TO USE*
  *DEAD-N-GONE GRASS & WEED KILLER, READY TO USE*
KLEENUP SUPER EDGER
GLYPHOSATE ISOPROPYLAMINE SALT TECHNICAL 62% SOLUTION
GLYPHOSATE
MIRAGE PLUS
AFG ORIGINAL
AFG PLUS
GLYPHO 648
PREP IT HERBICIDE
MAKAZE YIELD-PRO
LPI 6310-20 HERBICIDE
DOG FIGHT
GLYPHO K6
HI-YIELD SYSTEMIC ROPE & WICK APPLICATOR MIX
GLYPHOSATE TECHNICAL
GLYPHOSATE TECHNICAL
GLYPHOSATE TECHNICAL (NUP-05068)
GLYPHOSATE ACID TECHNICAL
GLYPHOSATE TECHNICAL
GLYPHOSATE TECHNICAL NUP 07169
GLYPHOSATE TECHNICAL NUP-07167

Exhibit 1    Page 12

TVC -SUPER CONCENTRATE
>    *RM43 43% GLYPHOSATE PLUS WEED PREVENTER*
>    *MARTIN'S ERASER MAX SUPER CONCENTRATE*
>    *JUDGEMENT DAY NON-SELECTIVE WEED KILLER SUPER CONCENTRATE*

ALBAUGH TECHNICAL GLYPHOSATE ACID
GLYPHOSATE 62%
GLYPHOSATE 53.8%
>    *SURRENDER BRAND ERASER-AQ AQUATIC HERBICIDE*
>    *TRAILBLAZER MAX*
>    *CATTPLEX CATTAIL CONTROL*
>    *CORNERSTONE 5*
>    *ERASER - AQ*
>    *SHORELINE DEFENSE*
>    *AQUA VET SHORELINE WEEDS*
>    *POND 2.0 SHORELINE WEEDS*
>    *ATO GLYCIDE*
>    *POND20 SHORELINE WEEDS*

GLYPHOSATE 41%
>    *GLY-4 HERBICIDE*
>    *CROP-SURE GLYPHOSATE HERBICIDE*
>    *CORNERSTONE*
>    *T.A.H. CONCENTRATED GRASS AND WEED KILLER*
>    *RASCAL*
>    *REMUDA III*

GLYPHOSATE 41% PLUS
>    *GLY-4 PLLUS HERBICIDE*
>    *GLY-4 PLUS HERBICIDE*
>    *TIGER BRAND GRASS AND WEED KILLER PRO*
>    *CROP-SURE GLYPHOSATE PLUS*
>    *AGRISOLUTIONS CORNERSTONE PLUS*
>    *RASCAL PLUS*
>    *CROPSMART GLYPHOSATE 41 PLUS*
>    *TKO*
>    *HI-YIELD SUPER CONCENTRATE KILL-ZALL II*
>    *HM-0705*
>    *HOSS ULTRA*
>    *BULLZEYE HERBICIDE*
>    *PRONTO BIG N' TUF*
>    *PRONTO BIG N' TUF 41% GLYPHOSATE WEEDS & GRASS KILLER*
>    *CROP$MART GLYPHOSATE 41 PLUS*
>    *BIG N'TUF WEED & GRASS KILLER*
>    *GORDON'S BIG N'TUF WEED & GRASS KILLER*

ALBAUGH LAND STAR
FALLOW STAR
GLYPHOSATE ACID TGAI
GLY STAR READY-TO-USE GRASS AND WEED KILLER

Exhibit 1                                                                                                    Page 13

    *GLY-4 PLUS READY-TO-USE WEED AND GRASS KILLER*
    *GLY-PLUS NONSELECTIVE READY-TO-USE WEED AND GRASS KILLER*
    *FERTI-LOME NUTGRASS, POISON IVY, & VINE KILLER RTU*
    *HI-YIELD KILLZALL II WEED AND GRASS KILLER RTU*
GLY STAR GRASS AND WEED KILLER CONCENTRATE
    *GLY-4 PLUS WEED AND GRASS KILLER CONCENTRATE*
    *GLY-PLUS NONSELECTIVE WEED AND GRASS KILLER CONCENTRATE*
    *AMDRO POWERFLEX WEED & GRASS KILLER CONCENTRATE*
THUNDERMASTER
GLYPHOSATE IPA MUP
GLYPHOSATE 48% K-SALT
    *BUCCANEER HL*
    *BUCCANEER HL GLYPHOSATE HERBICIDE*
IMAZETHAPYR 1.8% + GLYPHOSATE 22%
GLYPHOSATE ACID TGAI
CLEAROUT 41
CLEAROUT 41 PLUS
CLEAROUT 62 FORMULATION CONCENTRATE
GLYPHOSATE TECHNICAL
CLEAROUT TEC
CLEAROUT PROMPT
CLEAROUT JAVLIN
CLEAROUT SPARTAN HERBICIDE
GLYPHOSATE IPA + FOMESAFEN NA
GLYPHOSATE + DIQUAT
    *KLEENUP FAST WEED & GRASS KILLER CONCENTRATE*
    *ELIMINATOR WEED & GRASS KILLER FAST ACTING CONCENTRATE*
    *ELIMINATOR WEED AND GRASS KILLER PLUS CONCENTRATE*
    *ELIMINATOR WEED & GRASS KILLER PLUS CONCENTRATE*
    *KNOCKOUT WEED & GRASS KILLER FAST ACTING CONCENTRATE*
GLYPHOSATE WETCAKE
GLYPHOSATE AM + FOMESAFEN NA
GLYPHOSATE 50.2%
    *ELIMINATOR WEED AND GRASS KILLER II SUPER CONCENTRATE*
    *ELIMINATOR WEED & GRASS KILLER II SUPER CONCENTRATE*
GLYPHOSATE 58% K-SALT MUP
GLYPHOSATE 2 + 2
READY-TO-USE WEED AWAY
GLYPHOSATE ACID TGAI
SUPER K-GRO SYSTEMIC GRASS AND WEED KILLER CONCENTRATE.
READY TO USE SYSTEMIC GRASS AND WEED KILLER
SUPER K-GRO SHOOT OUT SPOT WEED & GRASS KILLER
EDGER II
MARMAN ATILA, GLYPHOSATE
MARMAN ATILA, GLYPHOSATE MP
GLYPHOSATE 4 HERBICIDE

Exhibit 1      Page 14

*ACQUIRE HERBICIDE*
*MAD DOG I GLYPHOSATE (ORIGINAL)*
GLY-FLO PLUS
GLY-FLO AQUATIC
GLY-FLO REDUCED TILLAGE
GLY-FLO SUGARCANE
GLY-FLO MUP
GLY-FLO FORESTRY
GLY-FLO 96% ACID TECHNICAL
GLY-FLO 76% ACID MUP
GLY-FLO 62% SC AG
MARTIN'S ERASER GLYPHOSATE CONCENTRATE HERBICIDE
MARTIN'S ERASER
MARTIN'S ERASER SYSTEMIC WEED & GRASS CONCENTRATE
SURRENDER BRAND ERASER 18% SYSTEMIC WEED & GRASS KILLER
MARTIN'S ERASER RTU SYSTEMIC WEED & GRASS KILLER
*OPTI-GRO TRAIL BLAZER MAXX RTU*
CORRAL SUPER SPOT WEEDER
BUCCANEER PLUS GLYPHOSATE HERBICIDE
BUCCANEER GLYPHOSATE HERBICIDE
BUCCANEER 5 EXTRA HERBICIDE
FOZZATE
*GLIFONOX 800*
SECURITY BLOT-OUT SYSTEMIC WEED & GRASS KILLER
SECURITY BLOT-OUT READY-TO-USE WEED & GRASS KILLER
SECURITY BLOT-OUT 2
SECURITY BRAND BLOT-OUT 10
GLYPHOSATE TECHNICAL HERBICIDE
GLYPHOSATE 62% TECHNICAL SOLUTION
NAF-545
*PROKOZ GLYPHOSATE PRO*
GLYPHOMAX
GLYPRO
*AQUAPRO*
*AQUAPRO OR SEPRO TOTAL POND - EMERGE*
ERASE BLUE
GLYPHOSATE 545 MUP
GLYPHOSATE 18% CONCENTRATE GRASS AND WEED KILLER
*GLYPHOSATE PLUS LAWN AND GARDEN CONCENTRATE*
GLYPHOSATE 0.96% RTU
*WEED GUN GLYPHOSATE PLUS READY TO USE*
GLYMIX MT
FOZZATE
AGRIVALU ONE-UP READY TO USE
NOMIX GRASS AND WEED I HERBICIDE
GLYFOS HERBICIDE

Exhibit 1                                                                                               Page 15

GLYFOS CONCENTRATE 18% WEED & GRASS KILLER
*NO-PEST WEED & GRASS KILLER CONCENTRATE*
GLYFOS READY-TO-USE 1.92% WEED & GRASS KILLER
*REAL-KILL WEED & GRASS KILLER 2*
*ACE READY-TO-USE WEED & GRASS KILLER 2*
*GREEN THUMB READY-TO-USE WEED & GRASS KILLER 2*
*ENFORCER ROOTS & ALL ULTIMATE GRASS & WEED KILLER READY-TO-USE WITH 1.*
*EASYGONE READY-TO-USE WEED & GRASS KILLER II*
*GREEN LIGHT COM-PLEET*
*GREEN LIGHT COM-PLEET SYTEMIC GRASS & WEED KILLER READY-TO-USE*
*GREEN LIGHT COM-PLEET SYSTEMIC GRASS & WEED KILLER READY-TO-USE*
*HDX WEED & GRASS KILLER READY-TO-USE*
GLYFOS READY-TO-USE 0.96% WEED & GRASS KILLER
*GREEN LIGHT COM-PLEET SYSTEMIC GRASS & WEED KILLER*
*NO-PEST WEED & GRASS KILLER 2*
GLYFOS CONCENTRATE 41% WEED & GRASS KILLER
*HI-YIELD KILLZALL CONCENTRATE SYSTEMIC WEED & GRASS KILLER*
*HI-YIELD KILLZALL CONCENTRATE SYSTEMIC WEED & GRASS KILLER*
*HI-YIELD SUPER CONCENTRATE KILLZALL WEED & GRASS KILLER*
*GREEN LIGHT COM-PLEET 41% SYSTEMIC GRASS & WEED KILLER*
*ENFORCER ROOTS & ALL ULTIMATE GRASS & WEED KILLER SUPER CONCENTRATE WI*
*EASYGONE SUPER CONCENTRATE 41% WEED & GRASS KILLER*
*AMERICA'S GROUNDSKEEPER 41% GLYPHOSATE CONCENTRATE GRASS & WEED KILLER*
*OSH COMPLETE HOME & GARDEN SUPER CONCENTRATE 41% WEED & GRASS KILLER*
*HDX WEED & GRASS KILLER CONCENTRATE*
GLYFOS MUC 62%
GLYFOS READY-TO-USE 0.75% WEED & GRASS KILLER
GLYFOS CONCENTRATE 5% WEED & GRASS KILLER
GLYFOS CONCENTRATE 16.5% WEED & GRASS KILLER
GLYFOS CONCENTRATE 7.5% WEED & GRASS KILLER
GLYFOS CONCENTRATE 27% WEED & GRASS KILLER
*ENFORCER ROOTS & ALL ULTIMATE GRASS & WEED KILLER CONCENTRATE WITH 27%*
*EASYGONE CONCENTRATE WEED & GRASS KILLER II*
*MAGNUM 27*
*ZEP WEED DEFEAT II*
*ZEP NON-SELECTIVE WEED KILLER CONCENTRATE*
GLYFOS PRO HERBICIDE
GLYFOS CUSTOM HERBICIDE
GLYFOS CONCENTRATE 25% WEED AND GRASS KILLER
*DO-IT-BEST CONCENTRATE WEED AND GRASS KILLER*
*ACE CONCENTRATE WEED AND GRASS KILLER*

Exhibit 1                                                                                   Page 16

*GREEN THUMB CONCENTRATE WEED AND GRASS KILLER*
*SCHULTZ WEED & GRASS KILLER CONCENTRATE*

*ULTRA-KILL WEED & GRASS KILLER CONCENTRATE 2*
*GLYFOS READY-TO-USE 2% WEED AND GRASS KILLER*
*BAYER ADVANCED GARDEN POWERFORCE KILLS WEEDS FAST GRASS & WEED KILLER*
ECOPLUG IMPLANT, CONTAINING RODEO HERBICIDE
ETK-2301 HERBICIDE
CLEAROUT 41
*GLY STAR PLUS*
CLEAROUT 41 PLUS
*DREXEL GLYPHOSATE PLUS*
*SHARPSHOOTER HERBICIDE*
*AGRISEL CLEAROUT 41 PRO-PLUS*
*HI-YIELD SUPER CONCENTRATE KILLZALL*
NUFARM CREDIT HERBICIDE
*AGRISOLUTIONS CORNERSTONE*
*AGS GLYPHOSATE (ORGINAL)*
*MAD DOG GLYPHOSATE (ORIGINAL)*
*AGRISOLUTIONS CORNERSTONE*
*AGRISOLUTIONS CORNERSTONE*
*DUPONT ABUNDIT XS HERBICIDE*
*AGS GLYPHOSATE (ORIGINAL)*
NUFARM AQUANEAT HERBICIDE
GLYPHOSATE IPA MANUFACTURING CONCENTRATE
NUFARM CREDIT DUO HERBICIDE
*IAP GLYPHOSATE 4DS DUAL SALT HERBICIDE*
*MH-0732*
*SHOWDOWN*
*SHOWDOWN HERBICIDE*
GLYKAMBA BROADSPECTRUM HERBICIDE
CREDIT MASTER HERBICIDE
RECOIL BROAD SPECTRUM HERBICIDE
NUFARM CREDIT DUO XL HERBICIDE
NUFARM CREDIT SYSTEMIC EXTRA HERBICIDE
NUFARM EXTRA CREDIT 5 HERBICIDE
*AGSCO MAD DOG MAX*
*BUCCANEER 5 GLYPHOSATE HERBICIDE*
NUFARM CREDIT
*RASCAL PLUS HERBICIDE EX*
CREDIT XTREME HERBICIDE
*DUPONT ABUNDIT X-HD HERBICIDE*
*BARBARIAN MAX*
NUFARM EXTRA CREDIT 5
KREDIT HERBICIDE

Exhibit 1                                                                Page 17

CREDIT X 4 HERBICIDE
NUFARM CREDIT 5.4 HERBICIDE
ROUNDUP ULTRA
KLEERAWAY READY-TO-USE SPOT WEED AND GRASS KILLER
KLEERAWAY SYSTEMIC WEED & GRASS KILLER2
>  *PROLINE RENEGADE*
>  *BULLSEYE SYSTEMIC WEED AND GRASS KILLER*
>  *CONTACT HERBICIDE #2*
>  *GREEN DEATH CONCENTRATE*
>  *ZAP-IT CONCENTRATE*
>  *ORNERY SYSTEMIC WEED AND GRASS KILLER*

KLEERAWAY GRASS & WEED KILLER2
KLEERAWAY SPOT WEED & GRASS KILLER2
KLEERAWAY CONCENTRATE WEED & GRASS KILLER
GLYPHOSATE 18% CONCENTRATE
>  *GARDENER'S CHOICE WEED & GRASS KILLER CONCENTRATE*
>  *ENFORCER ROOTS & ALL ULTIMATE GRASS & WEED KILLER CONCENTRATE*
>  *ALBERTSON'S WEED & GRASS VEGETATION KILLER CONCENTRATE*
>  *DEXOL WILDFIRE GRASS & WEED KILLER CONCENTRATE*
>  *ULTRASTOP WEED & GRASS KILLER CONCENTRATE*
>  *BASIC SOLUTIONS WEED & GRASS KILL CO*
>  *HOMELIFE WEED & GRASS VEGETATION KILLER CONCENTRATE*
>  *ELIMINATOR WEED & GRASS KILLER CONCENTRATE*

GLYPHOSATE 41% SUPER CONCENTRATE
>  *MASTE NURSERY KLEEN UP GRASS & WEED KILLER SUPER CONCENTRATE*
>  *ENFORCER ROOTS & ALL ULTIMATE GRASS & WEED KILLER SUPER CONCENTRATE*
>  *BONIDE KLEENUP GRASS & WEED KILLER SUPER CONCENTRATE*
>  *ELIMINATOR WEED & GRASS KILLER SUPER CONCENTRATE*
>  *AGWAY KLEENUP GRASS & WEED KILLER CONCENTRATE*
>  *MAXIDE SUPER CONCENTRATE 41% WEED & GRASS KILLER*
>  *TOTALKILL (BRAND WEED & GRASS KILLER SUPER CONCENTRATE*
>  *SOUTHERN STATES GRASS & WEED KILLER CONCENTRATE*
>  *MASTER NURSERY KLEEN UP GRASS & WEED KILLER SUPER CONCENTRATE*
>  *KLEENUP GRASS & WEED KILLER 41% SUPER CONCENTRATE*
>  *HDX WEED & GRASS KILLER CONCENTRATE*
>  *ACE WEED & GRASS KILLER CONCENTRATE*
>  *KNOCK OUT WEED & GRASS KILLER SUPER CONCENTRATE*

ROUNDUP READY-TO-USE WEED & GRASS KILLER
>  *KGRO FENCE & WALK EDGER READY-TO-USE*
>  *ENFORCER ROOTS & ALL ULTIMATE READY-TO-USE*
>  *TOTALKILL (BRAND) WEED & GRASS KILLER READY-TO-USE*
>  *HDX WEED & GRASS KILLER READY-TO-USE*

ROUNDUP QUIK STIK GRASS AND WEED KILLER
ROUNDUP GRASS AND WEED KILLER
>  *ELIMINATOR WEED & GRASS KILLER READY-TO-USE*

---

Exhibit 1                                                                 Page 18

*ENFORCER ROOTS & ALL ULTIMATE GRASS & WEED KILLER*
*MAXIDE READY-TO-USE WEED & GRASS KILLER*
*EASY GONE READY-TO-USE WEED & GRASS KILLER*
*EASYGONE READY-TO-USE WEED & GRASS KILLER*
*KGRO GRASS & WEED KILLER READY-TO-USE*
*BASIC SOLUTIONS LIQUID EDGER READY-T*
*ELIMINATOR LIQUID EDGER GRASS & WEED KILLER READY-TO-USE*
*ELIMINATOR LIQUID EDGER II GRASS & WEED KILLER READY TO USE*
ROUNDUP FENCE & YARD EDGER 1
ROUNDUP READY-TO-USE WEED & GRASS KILLER 1
ROUNDUP READY-TO-USE WEED AND GRASS KILLER 2
GLYPHOSATE CONCENTRATE HERBICIDE
*EARL MAY KLEENUP GRASS & WEED KILLER CONC.*
*MAXIDE CONCENTRATE WEED & GRASS KILLER*
*ENFORCER ROOTS & ALL ULTIMATE GRASS & WEED KILLER CONCENTRATE*
*BONIDE KLEENUP GRASS & WEED KILLER CONC.*
*EASYGONE CONCENTRATE WEED & GRASS KILLER*
*EASY GONE CONCENTRATE WEED & GRASS KILLER*
*KGRO GRASS & WEED KILLER CONCENTRATE*
*MEIJER KLEEN UP CONCENTRATE*
GLYPHOSATE 27% CONCENTRATE
ROUNDUP GARDEN FOAM WEED & GRASS KILLER
ROUNDUP RAINFAST CONCENTRATE WEED & GRASS KILLER
ROUNDUP RAINFAST SUPER CONCENTRATE WEED & GRASS KILLER
KLEERAWAY CONCENTRATE WEED & GRASS KILLER 1
ROUNDUP CONCENTRATE POISON IVY AND TOUGH BRUSH KILLER 1
ROUNDUP READY-TO-USE EXTENDED CONTROL WEED & GRASS KILLER 1 PLUS
WEED
ROUNDUP DRY CONCENTRATE
ROUNDUP WEED & GRASS KILLER1 READY-TO-USE
GLYPHOSATE 27% CONCENTRATE
ROUNDUP WEED & GRASS KILLER SUPER CONCENTRATE
ROUNDUP WEED & GRASS KILLER CONCENTRATE
GLYPHOSATE READY-TO-USE HERBICIDE 2
*MASTER NURSERY KLEEN UP GRASS & WEED KILLER READY-TO-USE*
*BONIDE KLEEN UP GRASS & WEED KILLER READY-TO-USE*
*ULTRASTOP WEED & GRASS KILLER*
*ALBERTSON'S WEED & GRASS VEGETATION KILLER*
*DEXOL WILDFIRE GRASS & WEED KILLER READY TO USE*
*GARDENER'S CHOICE WEED & GRASS KILLER*
*ELIMINATOR WEED & GRASS KILLER II READY-TO-USE*
*AGWAY KLEENUP GRASS & WEED KILLER RTU*
*BASIC SOLUTIONS WEED & GRASS KILLER READY-TO-USE*
*GARDEN RITE GRASS & WEED KILLER*
*ACO GRASS & WEED KILLER READY TO USE*
*MAXIDE READY TO USE WEED & GRASS KILLER II*

Exhibit 1                                                                                              Page 19

*HOMELIFE WEED & GRASS VEGETATION KILLER*
*SOUTHERN STATES GRASS & WEED KILLER READY TO USE*
*KGRO GRASS & WEED KILLER 1 READY-TO-USE*
*KLEENUP GRASS & WEED KILLER READY TO USE*
*ORCHARD EST. 1931 GRASS & WEED KILLER READY TO USE*
*ACE READY-TO-USE WEED & GRASS KILLER4*
*KNOCK OUT WEED & GRASS KILLER READY TO USE*
MON 78567 HERBICIDE
ROUNDUP WEED & GRASS KILLER CONCENTRATE PLUS
MON 78365 HERBICIDE
MON 78998 HERBICIDE
ROUNDUP WEED & GRASS KILLER READY-TO-USE PLUS
MON 78906 HERBICIDE
MON 78783 HERBICIDE
MON 78736 HERBICIDE
MON 78868 HERBICIDE
RD 1624 HERBICIDE
GLYPHOSATE RESIDUAL CONCENTRATE
RD 1653 HERBICIDE
RD 1662 HERBICIDE
RD 1686 HERBICIDE
RD 1689 HERBICIDE
RD 1687 HERBICIDE
M1732 HERBICIDE
RD 1734 HERBICIDE
M1739 HERBICIDE
LG737 READY-TO-USE HERBICIDE
LG712 CONCENTRATE HERBICIDE
LG 99 CONCENTRATE HERBICIDE
WEED & GRASS KILLER G1PA2
RD 1870 HERBICIDE
GLYPHOSATE 2% RTU HERBICIDE
NS HERBICIDE CONCENTRATE A
NS HERBICIDE CONCENTRATE B
NS HERBICIDE CONCENTRATE C
NS HERBICIDE READY-TO-USE A
NS HERBICIDE READY-TO-USE B
NS HERBICIDE READY-TO-USE C
*FARMSAVER.COM GLYPHOSATE 4*
*GLYPHOSATE 4*
*QUALI-PRO GLYPHOSATE T&O*
TOMAHAWK 5
TOMAHAWK
GREEN LIGHT COM-PLEET 41% SYSTEMIC GRASS & WEED KILLER
HELOSATE PRO
*GENESIS*

Exhibit 1                                                                                      Page 20

*GENESIS EXTRA*
*CORNERSTONE*
*CORNERSTONE PLUS*
*CROP-SURE GLYPHOSATE PLUS HERBICIDE*
*CROPSMART GLYPHOSATE 41 PLUS*
*GLY-4 PLUS HERBICIDE*
GLYPHOSATE PRO HERBICIDE
GLYPHOSATE TECHNICAL
GLYPHOSATE 97% TGAI
HELOSATE AQ
HELOSATE EX HERBICIDE
HELOSATE 62% MUP
HELOSATE 70 HERBICIDE
HELOSATE PLUS ADVANCED
*DREXEL IMITATOR X*
*GLY SUPREME PLUS*
*WISE UP PLUS*
*CORNERSTONE PLUS*
HELOSATE AQUATIC AND VM HERBICIDE
HELOSATE 75SG HERBICIDE
*GLYPHOSEL PRO DRY 75 SG TOTAL VEGETATION KILLER*
HELOSATE 5 HERBICIDE
HELOSATE 75 SG PRO HERBICIDE
EXTREME PACKAGED BY HELM
EXTREME HERBICIDE
GLYPHOSATE TECHNICAL
GLYGRAN WDG
EZ-JECT DIAMONDBACK HERBICIDE SHELLS
GLYPHOSATE 41%
TOMAHAWK K
GREEN LIGHT COM-PLEET 41% SYSTEMIC GRASS & WEED KILLER
GREEN LIGHT COM-PLEET 18% SYSTEMIC GRASS & WEED KILLER
GREEN LIGHT COM-PLEET 1.92% SYSTEMIC GRASS & WEED KILLER
GREEN LIGHT COM-PLEET SYSTEMIC GRASS & WEED KILLER
ROUNDUP PRO HERBICIDE
ROUNDUP CUSTOM FOR AQUATIC & TERRESTRIAL USE
ROUNDUP PROMAX HERBICIDE
ROUNDUP QUIKPRO HERBICIDE
RANGER PRO HERBICIDE
ROUNDUP PRO CONCENTRATE HERBICIDE
SC 78536 HERBICIDE

Exhibit 1                                                                                                  Page 21

EXHIBIT 2

**OFFICIAL COURT APPROVED LEGAL NOTICE**

# Used Roundup or Other Weed Killer Products?
## You Could Benefit from a $2 Billion Settlement

**People diagnosed with Non-Hodgkin's Lymphoma could receive up to $200,000. Others could receive monitoring to diagnose disease early.**

**Immigration Status Does Not Affect Eligibility**

The settlement includes anyone who applied/mixed Roundup and certain weed killer products in the United States, including those now living abroad ("Roundup users"). Included weed killer products were sold under Roundup and other brand names. Lawsuits claim that an ingredient in these products causes Non-Hodgkin's Lymphoma ("NHL"), a blood cancer. Monsanto, the manufacturer of Roundup, denies that it did anything wrong.

**Benefits Include:**

- **Money:** $5,000 to $200,000 for eligible Roundup users diagnosed with NHL. The next of kin of deceased Roundup users who qualify for benefits may apply for a payment.
- **Medical Evaluations:** Roundup users in the United States may be eligible for free NHL diagnostic evaluations.
- **Research:** Funds research into diagnosis and treatment of NHL.
- **Product Labeling**: Monsanto will request permission from the Environmental Protection Agency to change its weed killer labels to refer to information about whether Roundup exposure causes NHL.

An independent science panel will work to determine whether exposure to Roundup and other included weed killers cause NHL. Any science panel determination will not affect Roundup users' rights.

**Register for Benefits:** You must register to be eligible for money or a medical evaluation. Register online or by phone. Free legal assistance and help is available if needed. You will have at least four years to claim benefits.

**Rights Under the Settlement:** If you do nothing and later develop NHL, or reject your compensation award, you will keep your right to sue Monsanto about any compensatory damage claims (such as costs to treat NHL and pain and suffering) but you will not be able to sue for punitive and other damages. If you do not want to stay in the class for any reason, including because you want to pursue your own lawsuit now, you must exclude yourself by **Month XX, 2021**. You can also object to the settlement by **Month XX, 2021**. The Court will hold a hearing on **Month XX, 2021** to consider whether to approve the settlement.

More details, including a list of specific weed killer products and claims being released by the settlement, are available at the website or by calling the toll-free number.

# Need Free Help Registering for Benefits?

# 1-8XX-XXX-XXXX

# www.RoundupClass.com

**(Spanish available)**

# If You Used Roundup or Other Weed Killer Products

## *You Could Be Affected by a Class Action Settlement*

*A federal court authorized this notice.  This is not a solicitation from a lawyer.*

- The Monsanto Company ("Monsanto"), manufacturer of Roundup weed killer, has agreed to an up to $2 billion settlement of a class action lawsuit claiming Roundup Products (see Question 9) cause Non-Hodgkin's Lymphoma ("NHL").  Monsanto denies these claims and denies it did anything wrong.

- The settlement class generally includes anyone who was exposed through the mixing and/or application of Roundup and certain weed killer products in the United States, including individuals now living abroad.  The settlement class also includes any immediate family members (spouses, parents, or dependent children) or anyone else with a right to file a claim based on their relationship to a settlement class member.  (**Immigration status does not affect your ability to be in the settlement class**.)

- The settlement will provide benefits to the class, including funding for: (a) payments between $5,000 and $200,000 to certain settlement class members with NHL, (b) grants to medical providers to provide free NHL diagnostic services for settlement class members, (c) support for research into diagnosis and treatment of NHL, and (d) free legal services related to settlement class members' rights under this settlement.

- Monsanto will request permission from the Environmental Protection Agency ("EPA") to include a link to information concerning whether Roundup Products cause NHL on all Roundup labels.

- An advisory science panel of experts may determine, based on a scientific review of existing studies and data, whether Roundup Products cause NHL.  The advisory science panel's determination will not be legally binding or otherwise affect your legal rights, but it may be used as evidence by you or Monsanto in a lawsuit you file related to your use of Roundup Products.

| SUMMARY OF YOUR LEGAL RIGHTS AND OPTIONS | |
|---|---|
| **REGISTER FOR BENEFITS** | To receive certain settlement benefits, including money or access to the diagnostic accessibility grant program, you must first register to participate in the settlement.  Registration will remain open for at least the next four years. See Questions 1 to 4. |
| **FILE A CLAIM/ APPLICATION** | In addition to registering, you need to file a claim to be eligible to receive money or file an application to participate in the diagnostic accessibility grant program.  See Questions 12 to 33 for information on deadlines to file a claim and an application. |
| **EXCLUDE YOURSELF** | If you exclude yourself, you will not receive settlement benefits.  You will be able to file a lawsuit against Monsanto for all claims related to your exposure to Roundup Products.  See Questions 52 to 55. |
| **OBJECT** | Write to the Court about why you do not like the settlement.  See Question 59. |
| **ATTEND HEARING** | Ask to speak in Court about the fairness of the settlement.  See Questions 61-63. |
| **DO NOTHING** | If you do nothing, the settlement is approved, and you later develop NHL, you will keep your right to sue Monsanto for compensatory damage claims (such as costs to treat NHL and pain and suffering) after the science panel completes its work.  However, you will release your right to seek punitive and certain other damages.  See Question 64. |

- These rights and options—**and the deadlines to exercise them**—are explained in this notice.

**VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, 1-8XX-XXX-XXXX**
**PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA O VISITA NUESTRO SITIO WEB**

- The Court in charge of this case still has to decide whether to approve the settlement.  Please be patient.

## SUMMARY OF ROUNDUP SETTLEMENT

### SETTLEMENT BENEFITS

The settlement provides substantial benefits to class members.  To receive a compensation award or participate in the diagnostic accessibility grant program (described below), you must first register to participate in the settlement (see Question 1).  Settlement benefits include:

### Payments to Settlement Class Members with NHL Diagnosis

A Compensation Fund provides payments for eligible settlement class members diagnosed with NHL. Family members of deceased individuals who qualify for benefits may apply for a payment (see Question 14).

#### Claims Program

The Claims Program will provide payments of up to $200,000 to eligible settlement class members (see Question 14).  The Claims Program payments will begin 60 days after the district court grants final approval of the settlement.

#### Accelerated Payment

The settlement also provides an Accelerated Payment option which has a more streamlined application process (see Question 14).  Eligible class members will receive a guaranteed, expedited payment of $5,000.  Accelerated Payments will begin no later than Month XX, 2021 [30 days after the Court grants preliminary approval of the Settlement].

If you accept a Claims Program Award or Accelerated Payment Award, you will give up your right to individually sue Monsanto for any damage claims (such as costs to treat NHL and pain and suffering) related to your exposure to Roundup Products or participate in any other class action related to such claims.

### Benefits for Settlement Class Members without NHL Diagnosis

A diagnostic accessibility grant program will allow settlement class members the opportunity to be evaluated for NHL at no cost, by providing grants to existing medical clinics and healthcare providers (see Question 26).  Telehealth options will be available for settlement class members to make preliminary contact with and provide background medical information to medical providers.  The program will also provide for in-person exams with healthcare providers and medical clinics, including those in areas where high-quality healthcare is not readily available.  This program will expand access to NHL diagnostic evaluations for the most medically-underserved populations.

One of the main features of the program is an education campaign using various communication channels (including technology, social media, existing community-based and/or advocacy groups, etc.). This program will educate settlement class members about how to self-diagnose and/or contact a front line telemedical service to further facilitate the initial self-evaluation and decision-making prior to scheduling an in-person medical evaluation.

This program will partner with organizations that routinely communicate with and interact with migrant and non-migrant farmworker communities and certain non-farmworker communities with frequent exposure to Roundup Products (such as landscaping and groundskeeping workers) to build awareness and trust in the program.

VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, 1-8XX-XXX-XXXX
PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA AL O VISITA NUESTRO SITIO WEB

3

The diagnostic accessibility grant program will begin after the settlement is granted final approval by the district court and any appeals are resolved.  This program will be available for at least four years.

### Research Funding Program

The research funding program will fund medical and/or scientific research into diagnosis and treatment of NHL (see Question 34). The research funding program will begin after the district court grants final approval of the settlement and any appeals are resolved.

### Other Settlement Benefits

The settlement also includes the following:

- **Product Label Change:** Within 180 days after the district court grants final approval of the settlement, Monsanto will request permission from the EPA to add a reference link to Roundup Products' labels.  If approved, the labels will refer to more information about whether the exposure to the product is associated with NHL and provide links to relevant scientific evidence and materials (see Question 37).

- **Free Legal Services Program:** Provides settlement class members with free legal advice related to this settlement, including assistance with filing a claim and understanding all of their rights and options (see Question 38).  This benefit will be available after final approval by the district court.

The settlement fund will also pay the cost for notice and to administer the settlement and establish an advisory science panel.  Monsanto will separately pay attorneys' fees and costs.

### Benefits Funding

The distribution of the settlement fund will be:

| BENEFIT | AMOUNT |
| --- | --- |
| Compensation Fund | At least $1.325 billion |
| Diagnostic Accessibility Grant Program | $210 million |
| Research Funding Program | $40 million |
| Settlement Administration Costs, Advisory Science Panel Costs, Settlement Class Notice Costs, Taxes, and Escrow Agent Fees and Expenses | Up to $55 million |

Any unused amounts listed above will be used to fund class benefits.  None of the money will be returned to Monsanto.

The free legal services program will be funded by Monsanto in addition to the settlement fund.  Up to 40% of the Court-awarded attorneys' fees may be made available to fund the legal services program.

Additionally, the parties may agree to continue to provide additional funding to the Compensation Fund program after the initial settlement period, with Court approval.   If they do not, under certain

VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, 1-8XX-XXX-XXXX
PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA AL O VISITAR NUESTRO SITIO WEB

4

circumstances, Monsanto will be obligated to make a $200 million "End Payment" in addition to the payments listed above.

## What Class Members Give Up

If the settlement is approved, settlement class members who remain in the settlement will:

- Not be able to claim punitive damages or seek medical monitoring in Roundup Lawsuits against Monsanto (or certain other parties).  Generally, punitive damages do not pay people for their losses; it is a monetary award that is used to discourage a defendant and others from committing similar acts in the future.
- Not be able to begin or continue to sue Monsanto (or certain other parties) about claims related to being exposed to Roundup Products for compensatory damages (such as costs to treat NHL and pain and suffering) until after the advisory science panel completes its work.
- Not be able to bring claims against Monsanto (or certain other parties) related to your participation, if any, in the diagnostic accessibility grant program, and the administration of certain liens, certain government reimbursements, and administration of the settlement agreement.
- Not be able to bring any claims against the advisory science panel.

Settlement class members who accept a compensation award agree not to sue Monsanto for any claim related to exposure to Roundup Products.  If you do not receive a compensation award, you will keep your right to sue Monsanto about any compensatory damage claims you have for personal injuries related to exposure to Roundup Products.

If you are a settlement class member and do not exclude yourself from the settlement, your rights in future lawsuits against Monsanto will not be affected by the science panel's determination.  However, you or Monsanto may introduce the determination of the science panel as evidence in litigation involving Roundup Products in any future lawsuit you might bring should you not receive a compensation award under the settlement.

You cannot use your participation in this settlement as evidence against Monsanto in future lawsuits to claim you were exposed to Roundup Products.

Section XVII of the settlement agreement, available at www.RoundupClass.com, contains the complete text and details of what settlement class members give up if they do not exclude themselves from the settlement, so please read it carefully.

## Attorneys' Fees

In addition to the settlement benefits described above, Monsanto will separately pay Class Counsel's attorneys' fees and costs.  Class Counsel will request that the Court approve a total of $170 million in fees and costs, which include funding for the free legal services program to assist class members with their claims (see Questions 38 and 56 through 58).  The settlement class member benefits will not be reduced by Class Counsel's attorneys' fees or costs.  If the Court awards less than the requested amount, the remaining amount will be added to the settlement fund.

VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, 1-8XX-XXX-XXXX
PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA AL O VISITAR NUESTRO SITIO WEB

5

| WHAT THIS NOTICE CONTAINS |
|---|

**REGISTER FOR BENEFITS**.....................................……..........................................…………8
1.   How can I get benefits?
2.   How will I know if I am registered?
3.   Can I appeal if my registration is denied?
4.   What if the claims administrator denies my registration after I submit additional information?
5.   What is the initial settlement period?

**WHO IS PART OF THE SETTLEMENT?**………………………………………………..…………8
6.   How do I know if I am included in the settlement?
7.   Does my immigration status in the United States affect my ability to be in the settlement class?
8.   What does exposure mean?
9.   Which Roundup Products are included?
10.  What is Non-Hodgkin's Lymphoma?
11.  What should I do if I am not sure I am included in the settlement?

**COMPENSATION FUND**………………..…………………·………………………………..………10
12.  Who is able to apply for a compensation award?
13.  If I was diagnosed with NHL before January 1, 2015 can I apply for a compensation award?
14.  What types of compensation awards are available?
15.  How do I know which award I should apply for?
16.  How will the amount of my Claims Program Award be determined?
17.  Can Derivative or Representative Claimants receive a compensation award?
18.  How do I submit an application for a compensation award?
19   When will I know if I am eligible for a compensation Award?
20.  Is there a deadline to apply for a compensation award?
21.  Can I appeal a decision to deny or limit the amount of my compensation award?
22.  Can I reject my Claims Program Award?
23.  Do I have to pay a fee to appeal the results of my Claims Program Award?
24.  If my application for a compensation award is denied, can I submit another application?
25.  Will Monsanto continue the Compensation Fund after the settlement period expires?

**DIAGNOSTIC ACCESSIBILITY GRANT PROGRAM**…………………………·……………..………13
26.  What is the diagnostic accessibility grant program?
27.  Why is the diagnostic accessibility grant program included?
28.  Can I participate in the diagnostic accessibility grant program?
29.  What do I receive if I participate in the diagnostic accessibility grant program?
30.  How do I apply to participate in the diagnostic accessibility grant program?
31.  Is there a deadline to participate in the diagnostic accessibility grant program?
32.  What medical providers can receive grants to participate in the diagnostic accessibility grant program?
33.  How will I find medical providers in my area that participate in the diagnostic accessibility grant program?

**RESEARCH FUNDING PROGRAM**…………………………·…………………………………....………14
34.  What is the research funding program?
35.  Can I participate in the research funding program?
36.  When will the research funding program begin?

**VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, 1-8XX-XXX-XXXX**
**PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA O VISITA NUESTRO SITIO WEB**

6

**OTHER SETTLEMENT BENEFITS**…….……….…..……………………………….….………………...**15**
    37.     How will product labels change?
    38.     What is the free legal services program?

**SCIENCE PANEL** …………………………………...……………………………………………**16**
    39.     What is the science panel?
    40.     How can the science panel determination be used?
    41.     Who will be on the science panel, and who determines this?
    42.     What evidence will the science panel consider?
    43.     What if new evidence is available after the science panel completes its work?

**THE CLASS ACTION PROCESS** ……………………………………………………………………**17**
    44.     What is this notice about?
    45.     Why is this a class action?
    46.     Why is there a settlement?
    47.     What is the lawsuit about?
    48.     If I stay in the Class, but I do not apply for a compensation award (Claims Program Award or Accelerated Payment Award), will I keep my rights to sue Monsanto for compensatory damages?
    49.     Will I keep my rights to sue Monsanto for compensatory damages if I apply for, but do not receive, a Claims Program Award?
    50.     Will I keep my rights to sue Monsanto for compensatory damages if I apply for an Accelerated Payment Award?
    51.     If I sue Monsanto before applying for a Claims Program Award or Accelerated Payment Award, can I still participate in the Settlement?
    52.     How do I get out of the settlement class?
    53.     If I do not exclude myself, can I sue Monsanto for the same thing later?
    54.     If I exclude myself, can I still get benefits?
    55.     How do I cancel my exclusion request?
    56.     Do I have a lawyer in this case?
    57.     What if I have already hired an attorney or filed a lawsuit against Monsanto about exposure to Roundup Products?
    58.     How will the lawyers be paid?
    59.     How can I tell the Court if I do not like the settlement?
    60.     Can I both object to and exclude myself from the settlement?
    61.     When and where will the Court decide whether to approve the settlement?
    62.     Do I have to attend the hearing?
    63.     May I speak at the hearing?
    64.     What if I do nothing?

**GETTING MORE INFORMATION**…………………………………….……………………………….………**23**
    65.     Where can I get more information?

VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, 1-8XX-XXX-XXXX
PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA AL O VISITAR NUESTRO SITIO WEB

## REGISTER FOR BENEFITS

### 1.  How can I get benefits?

You have to register and provide information about your exposure to Roundup Products to get certain benefits.  To receive a compensation award or participate in the diagnostic accessibility grant program, you must first register to participate in the settlement.  You can register online at www.RoundupClass.com or call 1-8XX-XXX-XXXX and ask to register by phone or mail.

The deadline to register will be 45 days before the conclusion of the initial settlement period (at least four years).The deadline to register for a compensation award could be extended if the Compensation Fund continues (see Question 25).  The exact date of the registration deadline will be posted on the website.

### 2.  How will I know if I am registered?

You will receive a letter from the claims administrator stating whether your registration was approved or if they need more information.  If your registration is approved, you will receive your registration number.

### 3.  Can I appeal if my registration is denied?

You will have an opportunity to cure any deficiencies in your registration by submitting additional information.  More information about the deficiencies in your registration will be included in the letter you receive about your registration results.

### 4.  What if the claims administrator denies my registration after I submit additional information?

The claims administrator's decision about your registration will be final, and you cannot appeal it.

### 5.  What is the initial settlement period?

It is a period of time where the settlement will first begin and initially end.  Some of the settlement benefits may change or be extended after the initial settlement period ends (see Question 25).

The initial settlement period will begin 90 days after the district court grants final approval of the settlement and conclude either (a) four years after commencement or (b) on the first anniversary of the Effective Date, whichever is later.  The Effective Date will occur after the Court grants final approval to the settlement and any appeals are resolved.  The exact dates the initial settlement period begins and ends will be posted on the website.

## WHO IS PART OF THE SETTLEMENT?

### 6.  How do I know if I am included in the settlement?

You are included in the settlement if you:

- You were exposed to Roundup Products through the mixing or application of those products as of February 3, 2021 and you meet one of the following additional requirements: (1) you were a citizen or resident of the United States as of February 3, 2021, or (2) you claim the exposure occurred in the United States as of February 3, 2021, or

**VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, 1-8XX-XXX-XXXX**
**PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA AL O VISITAR NUESTRO SITIO WEB**

- You are a spouse, parent, or dependent child of a settlement class member, or have a relationship with a settlement class member that would enable you to bring a lawsuit against Monsanto because of that relationship ("Derivative Claimant").

- You are an authorized representative, ordered by a court or other official of competent jurisdiction under applicable state law, of deceased settlement class members (and/or their estates), or minor or legally incapacitated or incompetent settlement class members ("Representative Claimant").

The United States includes all 50 states and all United States' territories, possessions, and military or diplomatic establishments.

You are not part of the settlement class if you already started an individual (non-class action) lawsuit or hired a lawyer about any personal injury claim from your exposure to Roundup Products.

### 7.  Does my immigration status in the United States affect my ability to be in the settlement class?

No.  Your immigration status does not affect your ability to be a settlement class member.

### 8.  What does exposure mean?

Exposure means that you were exposed when Roundup Products were mixed or applied, whether or not you were the person doing the mixing or application.

### 9.  Which Roundup Products are included?

Roundup Products include any glyphosate-containing product developed, manufactured, distributed, sold, and/or marketed by Monsanto (or any of its direct or indirect subsidiaries) or by any company, individual, or entity to the extent such product contains glyphosate exclusively supplied by Monsanto (or any of its direct or indirect subsidiaries) under any brand name:

- On or before February 3, 2021, or
- After February 3, 2021 if the product has a chemical formulation identical to a Roundup Product.

(Examples of brand names include, but are not limited to: Roundup; Accord; AFG; Agent; Agrivalu; Albaugh; Aquamaster; Aquaneat; Backdraft; Bronco; Buccaneer; Chemsico; Clean Clearout; Cornerstone; Corral; Credit; Custom; Dog Fight; Doomsday; Drexel; DuPont; Dynasty; Eagre; Ecoplug Implant; Edger II; Erase Blue; Esplanade; ETK-2301; Exchange; Expedite; Expert; Extreme; EZ-Ject; Fallow; Ferti-Lome; Foresters; Fozzate; GLY; GlyStar; Glyfos; Gly-Flo; Glygran; Glykamba; Glymix; Glyphosate; Glypho; Glyphomax; Glypro; Grass, Weed and Vegetation Herbicide; Green Light Com-Pleet; Green Light; GroundClear; Helosate; Honcho;Jury; Kleenup; Kleeraway; Kornerstone K; Kredit; Landmaster; LG; Lilly/Miller; LPI; Makaze Yield-Pro; Marman Atila; Martin's Eraser; Militia; Mirage; Mon; NAF; Nomix; NS; NSR; NuFarm; NUP; Ortho; Polado; Prep It; Prodeuce; Razor; Ranger; RD; Ready-to-Use; Recoil Broad Spectrum; Rigo; Riverdale Credit; Rodeo; RT; RT3; SC; Security Blot-Out; Shackle; Specticle; Super K-Gro; Surrender; Systemic; Takeout; Thundermaster; Tomahawk; Touchdown; TVC; Weed & Grass Killer; and ZPP.)

A list of known Roundup Products is available at the website or by calling the toll-free number.

VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, 1-8XX-XXX-XXXX
PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA AL O VISITAR NUESTRO SITIO WEB

9

Glyphosate is an herbicide used to kill certain plants and grasses and is an active ingredient in Roundup Products.

### 10. What is Non-Hodgkin's Lymphoma?

Non-Hodgkin's Lymphoma, also known as NHL, is a type of cancer that starts in white blood cells, called lymphocytes. Lymphocytes are part of the body's immune system and helps it fight infections and other diseases. It does not include Hodgkin's Lymphoma, multiple myeloma, or generally any leukemia that does not contain "lymphoma," "lymphocytic," or "prolymphocytic" in its name. However, it does include hairy cell leukemia and aggressive NK-cell leukemia. A complete list of covered conditions is available at the website or by calling the toll-free number.

### 11. What should I do if I am not sure whether I am included in the settlement?

If you are not sure whether you are included in the settlement, or have any other questions, call the toll-free number, 1-8XX-XXX-XXXX. You may also send questions to the claims administrator at info@roundupclass.com or Roundup Settlement, P.O. Box 0000, City, ST 00000-0000.

## COMPENSATION FUND

### 12. Who is able to apply for a compensation award?

You are able to apply for a compensation award if you can show you were:
- Exposed to Roundup Products in the United States before February 3, 2021
- First exposed to Roundup Products more than 12 months before your NHL diagnosis, and
- Diagnosed with NHL before 2026 or four years after the settlement is granted final approval, whichever is earlier.

### 13. If I was diagnosed with NHL before January 1, 2015 can I apply for a compensation award?

Yes, you are able to apply for a compensation award. However, if you were diagnosed with NHL before January 1, 2015, you will only receive a compensation award (up to $10,000) if you can show that your state's laws (applicable statutes of limitations and repose) will allow you to pursue an individual lawsuit related to the claims in this case. You will remain part of the class even if you cannot show that your state's laws will allow you to pursue an individual lawsuit. Statutes of limitations and repose vary by state.

- **Statutes of limitations** are laws passed by a legislative body in each state that sets the maximum time after an event or the discovery of an event when a lawsuit may be filed.

- **Statutes of repose** (sometimes called a non-claim statute) cuts off certain legal rights if they are not acted on by a specified deadline.

### 14. What types of compensation awards are available?

There are two types of compensation awards available to settlement class members who have been diagnosed with NHL and were exposed to a Roundup Product.

- <u>Claims Program Award</u>: Payments will ordinarily range from $10,000 to $200,000. The Claims Administrator may award more than $200,000 for extraordinary circumstances and no more than $10,000 to qualified individuals who were diagnosed with NHL before January 1, 2015. Claims

VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, 1-8XX-XXX-XXXX
PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA AL O VISITAR NUESTRO SITIO WEB

10

Program Award payments will begin 60 days after the district court grants final approval of the settlement.

OR

- Accelerated Payment Award: Payment of $5,000.  You will receive payment after you receive a letter stating your application for the Accelerated Payment Award was approved.  Accelerated Payment Awards may begin no later than Month XX, 202X [30 days after the Court grants preliminary approval of the settlement.]

Settlement class members are only eligible to receive one compensation award.

If you hire your own attorney to represent you, the attorneys' fees and costs that your attorney may be paid from the Compensation Fund can be no more than 7.5% of any award you receive from the Compensation Fund.

Accepting a compensation award will fully release all claims you have against Monsanto involving Roundup Products.  That means you will not be permitted to sue Monsanto for any claims you have related to Roundup Products.  Your compensation award will not be paid until you first sign and return a release that will be provided to you by the claims program.

Prior to the date the settlement is granted final approval and any appeals are resolved, the Claims Administrator will have $250 million to pay compensation awards.  Monsanto will pay an additional $1.075 billion after any appeals to the settlement have been resolved.  This amount will be increased if Monsanto decides to continue the Compensation Fund (see Question 25).

## 15.  How do I know which award I should apply for?

Class Counsel (see Question 56) is available to help you decide whether you should apply for an Accelerated Payment Award or Claims Program Award.

## 16.  How will the amount of my Claims Program Award be determined?

Awards will be based on the factors including age, medical history, date of NHL diagnosis, exposure history and extent, circumstances of exposure (*e.g.*, occupational, consumer or other exposure; type of occupation), family circumstances/dependents, and disease status and progression.  Compensation ranges are detailed in the Claims Program Guidelines which is available at www.RoundupClass.com or by calling 1-8XX-XXX-XXXX.

If any other entity (such as Medicare, Medicaid, or TRICARE) paid any medical expenses resulting from your NHL diagnosis, they may have a medical claim or lien against you.  If this is the case, your payment for medical expenses may be delayed and the amount may be reduced to resolve the claim or lien.  Monsanto will not be responsible to pay any medical claim or lien against you.

## 17.  Can Derivative or Representative Claimants receive a compensation award?

Derivative Claimants (spouse, parent, or dependent child of a settlement class member, or people who have a relationship with a settlement class member that would enable them to bring a lawsuit against Monsanto because of the relationship) do not qualify to receive compensation awards.  However, the next of kin of a deceased settlement class member, who is a Representative Claimant, may qualify for a compensation award, if other criteria are met.

VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, 1-8XX-XXX-XXXX
PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA AL O VISITAR NUESTRO SITIO WEB

11

## 18.  How do I submit an application for a compensation award?

To apply for a compensation award, you must register and then submit the required information to the claims administrator online at www.RoundupClass.com, by email at xxxxx@RoundupClass.com, or by mail.  More information about how to apply is available at www.RoundupClass.com or by calling 1-8XX-XXX-XXXX.

Your application will not be complete until the claims administrator receives all of the required information.

## 19.  When will I know if I am eligible for a compensation award?

The claims administrator will review your application and decide if you will get a compensation award, no later than 30 days (for an Accelerated Payment Award) or 90 days (for a Claims Program Award) from the date they received your complete application that includes all the required information and proof of exposure to Roundup Products.

The different types of proof that can be submitted are listed in the application and available online or by calling the toll-free number.

## 20.  Is there a deadline to apply for a compensation award?

Yes.  To apply for a compensation award, you must submit the required information to the claims administrator within 180 days after: (a) the date that you are diagnosed with NHL or (b) the date the settlement becomes final and all appeals have been resolved, whichever is later.

Additionally, the deadline to file your application will be the conclusion of the initial settlement period (at least four years).  The exact date of the application deadline will be posted on the website.  This date may be extended if the Compensation Fund is continued (see Question 25).

In addition, to qualify for a compensation award, you must also have registered to be a settlement class member (see Question 1).  The deadline to register to be a settlement class member will be 45 days before the conclusion of the initial settlement period.

## 21.  Can I appeal a decision to deny or limit the amount of my compensation award?

That depends on the type of award:

- Accelerated Payment Award: You cannot appeal a decision to deny an Accelerated Payment award.
- Claims Program Award: The settlement establishes a process to appeal the results of your Claims Program Award.  More information will be included in the letter you receive about the decision on your application.

You can choose to file a new compensation award application in the future if your circumstances change.

## 22.  Can I reject my Claims Program Award?

Yes.  If you are not satisfied with your award, you can choose to mediate your claim.  Mediation is a process for parties (you and Monsanto) to resolve a dispute outside of court.  A mediator, or neutral third party, will hear the dispute and make a decision.  If you are dissatisfied with the results of the mediation

VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, 1-8XX-XXX-XXXX
PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA AL O VISITAR NUESTRO SITIO WEB

12

process, you may appeal your mediation offer to the Settlement Administrator.  Appeals may only be taken to the Settlement Administrator, not the Court.

**23.  Do I have to pay a fee to appeal the results of my Claims Program Award?**

No.  You do not need to pay a fee to appeal either the determination of whether you are eligible for an award or the amount of your award.

**24.  If my application for a compensation award is denied, can I submit another application?**

Yes.  Even if you are not awarded a compensation award, you may submit additional applications in the future.  However, the claims administrator may stop you from submitting applications that do not contain new information (or information that is significantly different than what you already submitted).

**25.  Will Monsanto continue the Compensation Fund after the initial settlement period ends?**

Maybe.  Class Counsel will negotiate with Monsanto to continue the Compensation Fund after the initial settlement period ends, in at least four years (see Question 39).

The Court will need to approve any extension of the Compensation Fund.  If the Court does not approve the extension of the Compensation Fund or if Monsanto wants to end the program, any settlement class members who did not (1) accept and receive a compensation award and (2) sign a full release will be able to individually sue Monsanto for compensatory damages involving their exposure to Roundup Products.  Additionally, under certain circumstances if the parties do not agree to extend the Compensation Fund, Monsanto will be obligated to make a $200 million "End Payment" to go toward compensation awards in addition to the payments listed above.

### DIAGNOSTIC ACCESSIBILITY GRANT PROGRAM

**26.  What is the diagnostic accessibility grant program?**

The diagnostic accessibility grant program distributes grants to medical providers in certain geographic regions, as well as telehealth providers, across the United States.  It will fund and facilitate diagnostic evaluations of settlement class members for NHL.

**27.  Why is the diagnostic accessibility grant program included?**

The diagnostic accessibility grant program is intended to increase access to NHL diagnostic evaluation among settlement class members.  It will include distributing grants to medical providers and telehealth providers in specified service areas to address regional disparities to such access.

**28.  Can I participate in the diagnostic accessibility grant program?**

You can participate in the diagnostic accessibility grant program if you have successfully registered to participate in the settlement, have not been diagnosed with NHL, have been exposed to Roundup Products through the application of those products, and submit an application that is approved.  The application is available at the website or by calling the toll-free number.

If you are a spouse, parent, or dependent child of a settlement class member, or have a relationship with a settlement class member that would enable you to bring a lawsuit against Monsanto because of that relationship, you cannot participate in the diagnostic accessibility grant program unless you independently

VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, 1-8XX-XXX-XXXX
PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA AL O VISITAR NUESTRO SITIO WEB

13

satisfy all the criteria for participation in the program as noted above.

**29.  What do I receive if I participate in the diagnostic accessibility grant program?**

If you participate in the diagnostic accessibility grant program, you may be able to receive a free diagnostic evaluation for NHL.

If you qualify to participate and your application to participate in the diagnostic accessibility grant program is approved, it does not guarantee that you will receive any particular type of medical test or that you will be able to obtain a diagnostic evaluation from the medical provider of your choosing.  A list of available medical providers, or opportunities for telehealth appointments, will be available at www.RoundupClass.com or by calling the toll-free number.

**30.  How do I apply to participate in the diagnostic accessibility grant program?**

You can submit an application online at www.RoundupClass.com or by mail.  Your application must include the registration number you received when you registered to participate in the settlement, confirmation that you have not previously been diagnosed with NHL, and proof that you have been exposed to Roundup Products.  The different types of proof that can be submitted are listed in the application and available online or by calling the toll-free number.

**31.  Is there a deadline to participate in the diagnostic accessibility grant program?**

Yes, but at the time of this notice the deadline to participate in this program is not set but will not be before 2025.  You must also have registered to be a settlement class member (see Question 1).  The exact date of the deadline to participate in the diagnostic accessibility grant program will be posted on the website.

**32.  What medical providers can receive grants to participate in the diagnostic accessibility grant program?**

Medical providers, including telehealth service providers, who qualify under the terms of the settlement agreement and the diagnostic accessibility grant program will be able to apply to receive grants under the diagnostic accessibility grant program.

**33.  How will I find medical providers in my area that participate in the diagnostic accessibility grant program?**

After the settlement is granted final approval and any appeals are resolved, an outreach program will inform settlement class members of the medical providers (in-person and/or telehealth) that are available to provide NHL diagnostic evaluations to qualifying settlement class members.

## RESEARCH FUNDING PROGRAM

**34.  What is the research funding program?**

The research funding program will be established to fund medical and/or scientific research into diagnosis and treatment of NHL.

VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, 1-8XX-XXX-XXXX
PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA AL O VISITAR NUESTRO SITIO WEB

14

### 35. Can I participate in the research funding program?

Settlement class members may have the opportunity to actively participate in the research conducted in the research funding program. The lawyers for the class (known as "Class Counsel") and Monsanto's counsel will create a process for you to participate if you qualify. There is no guarantee that settlement class members will be able to participate in the research conducted through the program. More information will be available at the website, www.RoundupClass.com.

### 36. When will the research funding program begin?

The research funding program will begin after the district court grants final approval of the settlement. Class Counsel and Monsanto's counsel will then request and accept proposals for medical and/or scientific research into the diagnosis and treatment of NHL from medical and scientific professionals and entities.

## OTHER SETTLEMENT BENEFITS

### 37. How will product labels change?

Within 180 days after district court grants final approval of the settlement, Monsanto will request permission from the EPA to add information to Roundup Products' labels. They will ask if the labels can provide links to relevant scientific evidence and materials related to whether exposure to Roundup Products causes NHL.

If the EPA approves the label change, Monsanto will (a) include this label information on all Roundup Products it manufactures or sells, (b) request that all other manufacturers and sellers of Roundup Products include this label information, and (c) stop selling glyphosate or Roundup Products to any such manufacturer or seller who declines such request, subject to any contractual limitations.

Any Roundup Products already manufactured or in the commercial process or market will be allowed to be sold for a period of time. Monsanto or any other manufacturer or seller or Roundup Products will not have to recall, collect, or change the label of any Roundup Products already in the commercial process or the market.

### 38. What is the free legal services program?

The legal services program will provide free legal advice to settlement class members related to this settlement, including assisting them in applying for settlement benefits and understanding all of their rights and options. Class Counsel will administer the legal services program and will supervise the law firm(s) who provide these services (see Question 38).

This program will begin after the district court grants final approval of the settlement. If you would like to participate in this program, you can call 1-8XX-XXX-XXXX or email info@RoundupClass.com.

Class Counsel may hire additional law firms to assist with this program.

VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, 1-8XX-XXX-XXXX
PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA AL O VISITAR NUESTRO SITIO WEB

15

## SCIENCE PANEL

**39.  What is the science panel?**

The science panel is an advisory panel of independent experts, funded by the settlement, that will examine specified existing scientific evidence in an attempt to determine whether being exposed to Roundup Products through mixing/applying those products can cause NHL in humans, and, if so, at what minimum dosage level (micrograms per day above which a person exposed to Roundup Products will develop NHL). Within four years after it begins, the science panel will finish its work. More details are provided in the settlement agreement, which is available at the website, www.RoundupClass.com, or by calling 1-8XX-XXX-XXXX.

**40.  How can the science panel determination be used?**

You or Monsanto can use any science panel determination as evidence in any lawsuit involving Roundup Products.   Neither side can object to the use of this evidence but can contest the science panel determination or introduce additional evidence to support their case.   The determination is not legally binding on any party, judge, or jury.  Please note, if you stay in the class, you can only bring an individual lawsuit against Monsanto for your exposure to Roundup Products after the Science Panel completes its work, and then only if you were offered a compensation award and did not accept it, or you did not apply for a compensation award.

**41.  What if new evidence is available after the science panel completes its work?**

Beginning three years after the science panel reports its determination, either Monsanto or a settlement class member diagnosed with NHL may challenge whether the science panel determination is admissible as evidence in lawsuits involving Roundup Products.  The challenge would need to be based upon new scientific evidence that makes the determination invalid or unreliable.

More details are provided in the settlement agreement, available at the website or by calling 1-8XX-XXX-XXXX.

**42.  Who will be on the science panel, and who determines this?**

The science panel will be made up of five recognized experts who are independent and appropriately credentialed epidemiologists, biostatisticians, hematologists/oncologists, and/or toxicologists, or scientific or medical professionals with similar backgrounds and qualifications.  The parties (or a third-party agreed-upon by the parties) will select the panel members.

VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, 1-8XX-XXX-XXXX
PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA AL O VISITAR NUESTRO SITIO WEB

16

**43.  What evidence will the science panel consider?**

The science panel will consider the following evidence:

- Published United States Environmental Protection Agency ("EPA"), Health Canada, Joint FAO/WHO Meeting on Pesticide Residues ("JMPR"), European Chemicals Agency ("ECHA"), European Food Safety Authority ("EFSA"), New Zealand, Japanese, and Australian carcinogenicity assessments of glyphosate, glyphosate-based herbicides, and/or surfactants;
- IARC Monograph 112 regarding glyphosate;
- All published studies and reviews regarding glyphosate, glyphosate-based herbicides, and/or surfactant epidemiology, exposure/dose, animal toxicology, genotoxicity, and chemical structure and activity;
- All registrant-supplied studies and data submitted to EPA, Health Canada, JMPR, ECHA, EFSA, New Zealand, Japanese, and Australian pesticide regulatory authorities concerning glyphosate, glyphosate-based herbicides, and/or surfactants regarding epidemiology, exposure/dose, animal toxicology, genotoxicity, and chemical structure and activity, provided that if the science panel believes that the underlying data for a particular study is necessary for a complete review of that study, the Science Panel will not consider that study unless such underlying data are contained within the document productions made as of February 3, 2021 by anyone in prior litigation involving Roundup Claims or are otherwise publicly available.

If new evidence (that falls within the terms of what the science panel is allowed to consider) becomes available before it completes its work, the science panel may ask the settlement administrator if it can consider that new evidence if the science panel believes the new evidence is material.

## THE CLASS ACTION PROCESS

**44.  What is this notice about?**

The Court overseeing this proposed class action settlement authorized this notice to inform you how you may be affected by the settlement.  This notice describes the lawsuit, the general terms of the proposed settlement, and what it may mean to you.  It also explains how to participate in, or exclude yourself from, the settlement.

Judge Vince Chhabria of the United States District Court for the Northern District of California is in charge of this case.  The case name is *Ramirez v. Monsanto Company*, No. 3:16-md-02741-VC & 3:19-cv-02224-VC (N.D. Cal.).  The people who sued are called the "Plaintiffs."  Monsanto is the "Defendant."

**45.  Why is this a class action?**

In a class action, the plaintiffs who file the lawsuit act as "class representatives" and sue on behalf of themselves as well as other people who have similar claims.  This group of people is called the "class," and the people in the class are called "class members."  One court resolves the issues for all class members, except for people who exclude themselves from the class.

**46.  Why is there a settlement?**

Plaintiffs and Monsanto agreed to a settlement.  It avoids the cost to both sides and risk associated with a trial and ensures that class members receive benefits.  The Court has not ruled in favor of Plaintiffs or

VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, 1-8XX-XXX-XXXX
PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA AL O VISITAR NUESTRO SITIO WEB

17

Monsanto.  Class Counsel and the Class Representatives believe the settlement is in the best interest of the class.

## 47.  What is this lawsuit about?

Roundup weed killer is one of the leading and most widely used herbicide products in the United States. Roundup weed killer contains glyphosate, which is also an ingredient in other similar products, (see Question 9).  The lawsuits claim that exposure to Roundup Products can cause a type of cancer called NHL (see Question 10).  Monsanto denies this claim and denies any wrongdoing.

## 48.  If I stay in the Class, but I do not apply for a compensation award (Claims Program Award or Accelerated Payment Award), will I keep my rights to sue Monsanto for compensatory damages?

Yes.  If you stay in the class but do not apply for a compensation award, you will keep your right to sue Monsanto for compensatory damages.

## 49.  Will I keep my rights to sue Monsanto for compensatory damages if I apply for, but do not receive, a Claims Program Award?

If the Compensation Fund is operating and you apply for a compensation award, you can sue Monsanto for compensatory damages if one of the following applies:

| | |
|---|---|
| **You are awarded but reject a Claims Program Award:** | You keep your rights to sue Monsanto for compensatory damages.<br><br>The offer made to you may be treated as a settlement offer or an offer of judgment if you later sue Monsanto for compensatory damage claims. |
| **You are determined to be ineligible for a Claims Program Award:** | You keep your rights to sue Monsanto for compensatory damages. |
| **If the Compensation Fund runs out of money before you receive an award:** | You keep your rights to sue Monsanto for compensatory damages. |

Statutes of limitations (the deadlines for filing individual lawsuits) will be tolled (stopped) for settlement class members during the operation of the settlement compensation programs (at least four years).

## 50.  Will I keep my rights to sue Monsanto for compensatory damages if I apply for an Accelerated Payment Award?

If the Compensation Fund is operating and you apply for an Accelerated Payment Award, your right to sue for compensatory damages will be affected as follows:

| | |
|---|---|
| **You are determined to be eligible for an Accelerated Payment Award:** | You are guaranteed the $5,000 payment and give up your right to sue Monsanto.  You are not permitted to reject an award through the Accelerated Payment Program. |
| **You are determined to be ineligible for an** | You keep your rights to sue Monsanto for |

VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, 1-8XX-XXX-XXXX
PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA AL O VISITAR NUESTRO SITIO WEB

18

| Accelerated Payment Award: | compensatory damages. |

### 51. If I sue Monsanto before applying for a Claims Program Award or Accelerated Payment Award, can I still apply for a compensation award?

No.  If you sue Monsanto for compensatory damage claims before applying for a compensation award, you will give up your right to apply for a compensation award.  However, if you did not exclude yourself from the Settlement and you sue Monsanto during the initial settlement period, your claims will be stayed and the statutes of limitations (the deadlines for filing individual lawsuits) will be tolled (stopped) for the duration of the settlement compensation programs (at least four years).

### 52. How do I get out of the settlement class?

If you don't want benefits from this settlement, but you want to keep the right to sue Monsanto on your own about all the legal issues in this case, then you must take steps to get out of the settlement.  This is called excluding yourself – or it is sometimes referred to as "opting out" of the settlement.

To exclude yourself (or "opt-out") from the settlement class, you must mail or electronically submit a letter or written request on or before **Month XX, 2021**.   You can also exclude yourself online at www.RoundupClass.com. Your request must include:

- Your name, address, telephone number; and date of birth;
- A copy of your government-issued or other genuine identification (social security card, driver's license, etc.);
- A statement saying, "I wish to exclude myself from the settlement class in *Robert Ramirez* v. *Monsanto Company*, No. 3:16-md-02741-VC & 3:19-cv-02224-VC;" and
- Your signature (you must personally sign the letter).

Your exclusion request must be postmarked or electronically submitted no later than **Month XX, 2021**:
- Submit your request online at www.RoundupClass.com,
- Email your request to XXXX, or
- Mail your request to:

Roundup Settlement
P.O. Box XXXX
City, ST XXXXX-XXXX

### 53. If I do not exclude myself, can I sue Monsanto for the same thing later?

Yes.  However, if you do not exclude yourself (leave the class), you will lose your right to seek to recover punitive damages or medical monitoring from Monsanto in any future lawsuit.

### 54. If I exclude myself, can I still get benefits?

No.  If you exclude yourself, you will not get any benefits from the settlement.  However, you can choose to cancel your exclusion (or opt-out) request so you can receive benefits (*see* Question 55).

VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, 1-8XX-XXX-XXXX
PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA AL O VISITAR NUESTRO SITIO WEB

19

**55. How do I cancel my exclusion request?**

If you exclude yourself from the settlement class, you can cancel your previous exclusion (or opt-out) request by submitting a written request online at www.RoundupClass.com, emailing your request to xxx@RoundupClass.com, or mailing your request to: Roundup Settlement, P.O. Box XXXX, City, ST XXXXX-XXXX.  Your request must state, "I wish to revoke my request to be excluded from the settlement class."  Your request must include your name, address, telephone number, date of birth, and signature.  Your request to cancel your exclusion request must be received before the district court grants final approval of the settlement.

**56.  Do I have a lawyer in this case?**

Yes.  The Court has appointed a number of lawyers to represent all settlement class members as "Class Counsel" and "Subclass Counsel" without charge to you. They are:

| | |
|---|---|
| Elizabeth J. Cabraser<br>Robert L. Lieff<br>Steven E. Fineman<br>LIEFF CABRASER HEIMANN &<br>BERNSTEIN, LLP<br>275 Battery Street, 29th Floor<br>San Francisco, California 94111<br>Telephone: 415.956.1000 | James R. Dugan, II<br>TerriAnne Benedetto<br>THE DUGAN LAW FIRM, APLC<br>One Canal Place<br>365 Canal Street, Suite 1000<br>New Orleans, LA 70130<br>Telephone: 504.648.0180 |
| William M. Audet<br>AUDET & PARTNERS, LLP<br>711 Van Ness, Suite 500<br>San Francisco, CA 94102<br>Telephone: 415.568.2555 | Samuel Issacharoff<br>40 Washington Square South<br>Suite 411J<br>New York, NY 10012<br>Telephone: 212.998.6580 |
| Elizabeth Fegan<br>FeganScott LLC<br>150 S. Wacker Dr., 24th Floor<br>Chicago, IL 60606<br>Telephone: 312.741.1019 | |

You will not be charged for contacting these lawyers.  If you have any questions about the settlement, you can talk to the attorneys from Lieff Cabraser Heimann & Bernstein, LLP, The Dugan Law Firm, APLC, and FeganScott LLC or you can hire your own lawyer at your own expense.

- If you have been diagnosed with NHL, you are a part of Subclass 1.  Subclass Counsel for Subclass 1 is William Audet of Audet & Partners, LLP.

- If you have not been diagnosed with NHL, you are a part of Subclass 2.  Subclass Counsel for Subclass 2 is TerriAnne Benedetto of the Dugan Law Firm, APLC, and Elizabeth Fegan of FeganScott LLC.

You can hire your own attorney to represent you, but the attorneys' fees and costs that your attorney may be paid can be no more than 7.5% of any award you receive from the Compensation Fund.  You must pay any additional fees and costs in excess of 7.5% of the award.

VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, 1-8XX-XXX-XXXX
PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA AL O VISITAR NUESTRO SITIO WEB

20

### 57.  What if I have already hired an attorney or filed a lawsuit against Monsanto about exposure to Roundup Products?

If, before February 3, 2021, you began an individual (or non-class action) lawsuit or hired a lawyer about any personal injury claims about exposure to Roundup Products in the United States, you are not a member of the settlement class, and you are not affected by this notice.

### 58.  How will the lawyers be paid?

You do not need to separately pay the lawyers representing the settlement class.  Monsanto will pay attorneys' fees and costs in addition to the benefits it is providing to the settlement class members in this settlement.  Class Counsel will make up to 40% of Class Counsel attorneys' fees available to fund the legal services program.  If you hire your own lawyer you will have to pay them yourself (or arrange for them to be paid) but Monsanto will not be responsible for paying their fees.

At a later date to be determined by the Court, Class Counsel and Subclass Counsel will ask the Court to award attorneys' fees and reasonable costs.  Class Counsel will also request that the Court award payments to the class and subclass representatives.  At that time, the motion will be posted on the settlement website, www.RoundupClass.com, and settlement class members will have an opportunity to comment on and/or object to this request.

Monsanto has agreed to pay up to $170 million for attorneys' fees and costs.  The Court will decide whether to  approve and award the request for the award of attorneys' fees and costs.  If the Court awards less than $170 million, the remaining amount will be added to the settlement fund.

**Any attorneys' fees and costs awarded by the Court to Class Counsel and Subclass Counsel will be paid separately by Monsanto and will not reduce the amount of money available to fund benefits to the settlement class.**

### 59.  How can I tell the Court if I do not like the settlement?

As a settlement class member, you have a right to object to or comment on any part of the proposed settlement.  The Court will consider your views when deciding to approve the settlement.  You can't ask the Court to order a different settlement; the Court can only approve or reject the settlement.  If the Court does not approve the settlement, no settlement benefits will be paid, and the lawsuit will continue.  If that is what you want to happen, you must object.

Any objection to the proposed settlement must be in writing.  However, this requirement may be excused if you provide a valid reason for why you were unable to submit your objection in writing.  To object, you must send a letter stating that you object to *Robert Ramirez* v. *Monsanto Company*, No. 3:16-md-02741-VC & 3:19-cv-02224-VC.  Your written objection must also include:

- Your name, address, and telephone number;
- Written evidence that shows you are a settlement class member;
- A written statement of your objection(s), including any specific reasons, legal support, and/or any supporting evidence you wish to bring to the Court's attention;
- Any other supporting papers, materials, or briefs that you want the Court to consider;
- A statement of whether you intend to appear or speak at the Fairness Hearing; and
- Your signature (you must personally sign the letter).

VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, 1-8XX-XXX-XXXX
PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA AL O VISITAR NUESTRO SITIO WEB

21

You must mail your objection or deliver it in-person to the Court at the address below:

| COURT |
|---|
| Class Action Clerk<br>United States District Court<br>Northern District of California<br>Phillip Burton Federal Building & United States Courthouse<br>450 Golden Gate Avenue<br>San Francisco, CA 94102 |

Objections must be filed or postmarked on or before **Month XX, 2021**.

If you hired a lawyer to represent you and file your objection, your attorney must:

- Follow the steps to object to the settlement as listed above;
- File a notice of appearance with the Court by **Month XX, 2021**; and
- File a declaration stating every settlement class member that he/she is representing/filing an objection or a copy of the contract between them and each settlement class member.

If you make a good-faith attempt to follow the above procedures, but do not comply with one or more of the specific requirements, your objection may still be considered by the Court.

## 60. Can I both object to and exclude myself from the settlement?

No.  If you exclude yourself you will no longer be part of the settlement.  In order to object to the settlement, you must be a member of the settlement class.

## 61. When and where will the Court decide whether to approve the settlement?

The Court will hold a Fairness Hearing at **X x.m.** on **Month XX, 2021**, at the United States District Court for the Northern District of California, in Courtroom X, Phillip Burton Federal Building & United States Courthouse, 17th Floor, 450 Golden Gate Avenue, San Francisco, California 94102.

The hearing may be moved to a different date or time without additional notice, so check www.RoundupClass.com or the Court's Public Access to Court Electronic Records (PACER) system for updates.  At the Fairness Hearing, the Court will consider whether the settlement is fair, reasonable, and adequate.  If there are objections or comments, the Court will consider them at that time.  After the hearing, the Court will decide whether to approve the settlement.  We do not know how long these decisions will take.

The Court will consider the request for attorneys' fees and reasonable costs by Class Counsel (see Question 58) after the Fairness Hearing, at a time that will be set at a later date by the Court.

## 62. Do I have to attend the hearing?

No.  Class Counsel and Subclass Counsel will attend the hearing and answer the Court's questions.  If you sent or filed an objection, the Court will consider it even if you do not attend, as long as it was sent on time.  You may, however, attend the Final Approval Hearing at your own expense, or pay your own lawyer to attend.

VISIT WWW.ROUNDUPCLASS.COM OR CALL TOLL-FREE, **1-8XX-XXX-XXXX**
PARA RECIBIR UNA NOTIFICACIÓN EN ESPAÑOL, LLAMA AL O VISITAR NUESTRO SITIO WEB

**63.  May I speak at the hearing?**

You may ask the Court for permission to speak at the Final Approval Hearing. To do so, you must include a statement in your written objection that you intend to appear at the hearing.  You cannot speak at the hearing if you exclude yourself from the class.

**64.  What if I do nothing?**

If you do nothing, you will be a member of the settlement class and you will be bound by the Court's decisions.  You will not get a compensation award or accelerated payment without registering for the settlement and filing a claim (see Questions 12 through 25).  Additionally, to be eligible for evaluation through the diagnostic accessibility grant program (see Questions 26 through 33), you must first register to participate in the settlement and file an application to participate in that program.

However, you will keep your right to sue Monsanto for compensatory damage claims (such as costs to treat NHL and pain and suffering) after the science panel completes its work.

### Getting More Information

**65.  Where can I get more information?**

This Notice summarizes the proposed settlement.  More details are provided in the settlement agreement, available at the website or by calling 1-8XX-XXX-XXXX.

You can get more information, including answers to questions about the settlement and important documents about the case, including a full copy of the settlement agreement, any motions for approval and attorney's fees, and the Court's order approving the settlement, by visiting www.RoundupClass.com, emailing info@RoundupClass.com, calling 1-8XX-XXX-XXXX, or writing to Roundup Settlement, P.O. Box 0000, City, ST 00000-0000.

You may also be able to access the settlement agreement and other Court documents by (a) accessing the Court docket in this case, for a fee, through the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.cand.uscourts.gov, or (b) by visiting the office of the Clerk of the Court for the United States District Court for the Northern District of California, Phillip Burton Federal Building & United States Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, between 9:00 a.m. and 4:00 p.m., Monday through Friday, excluding Court holidays.

Visit www.RoundupClass.com or Call Toll-Free, 1-8XX-XXX-XXXX
Para Recibir una notificación en Español, llama al o visitar nuestro sitio web

23

EXHIBIT 3

## EXHIBIT 3: NHL SUBTYPES

This list is based on the World Health Organization's Classification of Tumors of Hematopoietic and Lymphoid Tissues, Revised 4th Edition (2017) and/or prior editions (WHO Classification of Tumours of Haematopoietic and Lymphoid Tissues, 4th Edition (2008); WHO Classification of Tumours of Haematopoietic and Lymphoid Tissues, 3rd Edition (2001)).

- **Chronic lymphocytic leukaemia/small lymphocytic lymphoma**
  (Synonyms include: Chronic lymphocytic leukaemia, B-cell type; chronic lymphoid leukaemia; chronic lymphatic leukaemia)

- **Extranodal marginal zone lymphoma of mucosa-associated lymphoid tissue (MALT lymphoma)**
  (Synonyms include: Extranodal marginal zone B-cell lymphoma; extranodal marginal zone B-cell lymphoma of mucosa-associated tissue)

- **Nodal marginal zone lymphoma**
  (Synonyms include: Monocytoid B-cell lymphoma; parafollicular B-cell lymphoma; nodal marginal zone B-cell lymphoma)

- **Splenic marginal zone lymphoma**
  (Synonyms include: Splenic B-cell marginal zone lymphoma; splenic lymphoma with villous lymphocytes; splenic lymphoma with circulating villous lymphocytes)

- **Follicular lymphoma**

- **Paediatric-type follicular lymphoma**

- **Diffuse large B-cell lymphoma (DLBCL), NOS**

- **Diffuse large B-cell lymphoma associated with chronic inflammation**
  (Synonyms include: Pyothorax-associated lymphoma)

- **EBV-positive diffuse large B-cell lymphoma, NOS**
  (Synonyms include: EBV positive DLBCL of the elderly; EBV associated B-cell lymphoproliferative disorder of the elderly; senile EBV-associated B-cell lymphoproliferative disorder; age-related EBV-positive lymphoproliferative disorder)

- **Primary diffuse large B-cell lymphoma of the CNS**
  (Synonyms include: Primary CNS lymphoma; primary intraocular lymphoma; lymphomatosis cerebri)

- **Primary cutaneous diffuse large B-cell lymphoma, leg type**

- **ALK-positive large B-cell lymphoma**

Exhibit 3                                                                                             Page 1

(Synonyms include: Large B-cell lymphoma expressing the ALK kinase and lacking the t(2;50) translocation; ALK-positive plasmablastic B-cell lymphoma)

- **B-lymphoblastic leukaemia/lymphoma, not otherwise specified**
  (Synonyms include: B-cell acute lymphoblastic leukaemia; common lymphoblastic leukaemia; common precursor B-lymphoblastic leukaemia; pre-B lymphoblastic leukaemia; pre-pre B lymphoblastic leukaemia; precursor B-lymphoblastic leukaemia/lymphoma; precursor B-cell lymphoblastic lymphoma; precursor B-cell lymphoblastic leukaemia, NOS; pro-B lymphoblastic leukaemia)

- **B-lymphoblastic leukaemia/lymphoma with recurrent genetic abnormalities**

- **B-cell lymphoma, unclassifiable, with features intermediate between DLBCL and classical Hodgkin lymphoma**
  (Synonyms include: Grey zone lymphoma; large B-cell lymphoma with Hodgkin's features; Hodgkin-like anaplastic large cell lymphoma; Mediastinal grey-zone lymphoma; Hodgkin-like anaplastic large cell lymphoma)

- **B-cell prolymphocytic leukaemia**
  (Synonyms include: Prolymphocytic leukaemia, B-cell type)

- **Burkitt lymphoma**
  (Synonyms include: Burkitt tumour; malignant lymphoma, undifferentiated, Burkitt type; malignant lymphoma, small noncleaved Burkitt type; Burkitt cell leukaemia)

- **Burkitt-like lymphoma with 11q aberration**

- **EBV-positive mucocutaneous ulcer**

- **Hairy cell leukaemia**
  (Synonyms include: Leukaemic reticuloendotheliosis)

- **HHV8-associated lymphoproliferative disorders**
  (Synonyms include: Large B-cell lymphoma arising in HHV8-associated multicentric Castleman disease; HHV8 positive plasmablastic lymphoma; Kaposi sarcoma herpes virus positive plasmablastic lymphoma)

- **High-grade B-cell lymphoma**
  (Synonyms include: B-cell lymphoma, unclassifiable, with features intermediate between DLBCL and Burkitt lymphoma)

- **Intravascular large B-cell lymphoma**
  (Synonyms include: Angioendoteliotropic lymphoma; angiotropic large cell lymphoma; malignant angioendotheliomatosis; angioendotheliomatosis proliferans syndrome; intravascular lymphomatosis)

---

Exhibit 3                                                                                                   Page 2

- **Lymphoplasmacytic lymphoma/Waldenstrom macroglobulinemia**
  (Synonyms include: Malignant lymphoma, lymphoplsmactyoid)

- **Large B-cell lymphoma with IRF4 rearrangement**

- **Lymphomatoid granulomatosis**
  (Synonyms include: Angiocentric immunoproliferative lesion)

- **Mantle cell lymphoma**
  (Synonyms include: Mantle zone lymphoma; malignant lymphoma, lymphocytic, intermediate differentiation, diffuse; malignant lymphoma, centrocytic; malignant lymphomatous polyposis; in situ mantle cell lymphoma (for in situ mantle cell neoplasia))

- **Plasmablastic lymphoma**

- **Primary cutaneous follicle centre lymphoma**
  (Synonyms include: Reticulohistiocytoma of the dorsum (Crosti's disease);  Crosti lymphoma)

- **Primary mediastinal (thymic) large B-cell lymphoma**
  (Synonyms include: Mediastinal (thymic) large B-cell lymphoma; mediastinal large B-cell lymphoma; primary mediastinal clear cell lymphoma of B-cell type; mediastinal diffuse large cell lymphoma with sclerosis)

- **Primary effusion lymphoma**
  (Synonyms include: Body cavity-based lymphoma)

- **Splenic B-cell lymphoma/leukaemia, unclassifiable**
  (Synonyms include: Lymphocytic lymphoma simulating hairy cell; prolymphocytic variant of hairy cell leukemia; splenic marginal zone lymphoma, diffuse variant; splenic red pulp lymphoma with numerous basophilic villous lymphocytes; splenic B-cell lymphoma with villous lymphocytes)

- **T-cell/histiocyte-rich large B-cell lymphoma**
  (Synonyms include: histiocyte-rich/T-cell-rich large B-cell lymphoma; histiocyte-rich/T-cell-rich large B-cell lymphoma; T-cell-rich lymphoma; (Large) B-cell lymphoma rich in T-cells and simulating Hodgkin disease; T-cell-rich large B-cell lymphoma; T-cell-rich/histiocyte-rich large B-cell lymphoma)

- **Adult T-cell leukaemia/lymphoma**

- **Aggressive NK-cell leukaemia**
  (Synonyms include: Aggressive NK-cell leukaemia/lymphoma)

- **Anaplastic large cell lymphoma, ALK-positive**

Exhibit 3                                                                                           Page 3

(Synonyms include: Anaplastic large cell lymphoma; Ki-1 lymphoma)

- **Anaplastic large cell lymphoma, ALK-negative**
  (Synonyms include: Anaplastic large cell lymphoma)

- **Angioimmunoblastic T-cell lymphoma and other nodal lymphomas of T follicular helper (TFH) cell origin**

- **Breast implant—associated anaplastic large cell lymphoma**
  (Synonyms include: Seroma-associated anaplastic large cell lymphoma)

- **Chronic lymphoproliferative disorder of NK cells**
  (Synonyms include: Chronic NK-cell lymphocytosis; chronic NK large granular lymphocyte lymphoproliferative disorder; NK-cell lineage granular lymphocyte proliferative disorder; NK-cell LGL lymphocytosis; NK-cell large granular lymphocyte lymphocytosis; indolent large granular NK-cell lymphoproliferative disorder; indolent leukaemia of NK cells)

- **EBV-positive T-cell and NK-cell lymphoproliferative diseases of childhood**
  (Synonyms include: Epstein-Barr virus (EBV) T-cell lymphoproliferative disease of childhood; fulminant EBV-positive T-cell lymphoproliferative disorder of childhood; sporadic fatal infectious mononucleosis)

- **Extranodal NK/T-cell lymphoma, nasal type**
  (Synonyms include: Angiocentric T-cell lymphoma; malignant reticulosis, NOS; malignant midline reticulosis; polymorphic reticulosis; lethal midline granuloma; T/NK cell lymphoma; angiocentric immunoproliferative lesion)

- **Hepatosplenic T-cell lymphoma**

- **Intestinal T-cell lymphoma**
  (Synonyms include: Enteropathy associated T-cell lymphoma; enteropathy-type intestinal T-cell lymphoma; enteropathy-type T-cell lymphoma; classic enteropathy-associated T-cell lymphoma; malignant histiocytosis of the intestine)

- **Mycosis fungoides**

- **NK-lymphoblastic leukaemia/lymphoma**

- **Peripheral T-cell lymphoma, NOS**
  (Synonyms include: Peripheral T-cell lymphoma, unspecified; T-cell lymphoma, NOS; peripheral T-cell lymphoma, pleomorphic small cell; peripheral T-cell lymphoma, pleomorphic medium and large cell; peripheral T-cell lymphoma, large cell; lymphoepithelioid lymphoma; Lennert lymphoma)

- **Primary cutaneous CD30-positive T-cell lymphoproliferative disorders**

Exhibit 3                                                                 Page 4

- **Primary cutaneous peripheral T-cell lymphomas, rare subtypes**

- **Subcutaneous panniculitis-like T-cell lymphoma**

- **Sezary syndrome**
  (Synonyms include: Sezary disease)

- **T-cell prolymphocytic leukaemia**
  (Synonyms include: Prolymphocytic leukaemia, T-cell type)

- **T-cell large granular lymphocytic leukaemia**
  (Synonyms include: T-cell large granular lymphocytosis; CD8+T-cell chronic lymphocytic leukaemia; T-cell lymphoproliferative disease of granular lymphocytes; T-gamma lymphoproliferative disease)

- **T-lymphoblastic leukaemia/lymphoma**
  (Synonyms include: Precursor T-lymphoblastic leukaemia/lymphoma; T acute lymphoblastic leukaemia).

Exhibit 3                                                                 Page 5

EXHIBIT 4

## EXHIBIT 4: QUALIFYING DIAGNOSIS AND QUALIFIED PHYSICIANS FOR COMPENSATION AWARDS

(a)     A "Qualifying Diagnosis" means (i) for living Settlement Class Members, a diagnosis of NHL, documented in an anatomic pathology report signed by the Diagnosing Physician; or (ii) for Settlement Class Members deceased prior to the Effective Date, a diagnosis of NHL, documented in an anatomic pathology report, which was produced while the Settlement Class Member was living, and which was signed by the Diagnosing Physician; provided, however, that for purposes of applications and determinations regarding Accelerated Payment Awards, "Qualifying Diagnosis" refers to a diagnosis of NHL consistent with the requirements set forth in Section 7.2(a)(v).

(b)     A "Diagnosing Physician" means a doctor of medicine or osteopathy who has a current American Board of Medical Specialties board certification in Pathology as of the date of the pathology report referenced in paragraph (a) of this Exhibit 4, and who diagnosed the Settlement Class Member with NHL.  The Claims Administrator may, subject to the advance approval of the Settlement Administrator in the Settlement Administrator's discretion, accept a Qualifying Diagnosis from an otherwise qualified Diagnosing Physician whose board certification is from a current American Osteopathic Association board certification in Pathology as of the date of the pathology report referenced in paragraph (a) of this Exhibit 4, rather than an American Board of Medical Specialties board certification in Pathology.

(c)     A "Qualified Physician" means a doctor of medicine or osteopathy who (i) has an active, unencumbered license to practice medicine in the state where the Settlement Class Member at issue was diagnosed with or treated for NHL; (ii) relied on the Qualifying Diagnosis and treated the Settlement Class Member at issue for the Qualifying Diagnosis; (iii) has, for the 12-month period prior to the Qualifying Diagnosis, maintained an active medical practice (at least 40 hours per month) and/or held an active (not retired) academic appointment that includes treatment of patients; (iv) has an American Board of Medical Specialties board certification in Hematology or Medical Oncology that is current as of the date he or she certifies the Qualified Physician Certification; and (v) was so licensed and certified on the date that he or she relied on the Qualifying Diagnosis and treated the Settlement Class Member at issue for the Qualifying Diagnosis.

Exhibit 4                                                                                                          Page 1

EXHIBIT 5

## EXHIBIT 5: COMPENSATION AWARD GUIDELINES

### Part 1. Definitions

(a)     "Tier" refers to one of the four levels of compensation into which any Settlement Class Member's claim may fall.

(b)     "Tier Determination" refers to the Claims Program's determination as to which one of the four Tiers a Settlement Class Member falls in accordance with the Tier Guidelines and Tier Criteria.

(c)     "Tier Guidelines" refers to the guidelines enumerated in Part 3(a) below.

(d)     "Tier Criteria" refers to the factors enumerated in Part 3(b) below.

(e)     "Group A Medical Conditions" refers to conditions currently known to be a separate cause of NHL and/or separate risk factors known to convey a significantly increased risk of NHL: First Degree Relative with NHL, First Degree Relative with Other Lymphoma, Leukemia or Myeloma, Organ or Stem Cell Transplant, Certain Autoimmune Disorders[1], Epstein-Barr virus under certain circumstances[2], Certain Immunosuppressive Medications[3], HIV/AIDS, Hepatitis C virus, Certain Bacterial Infections[4], or Radiation Exposure as treatment for prior cancer.

---

[1]   The autoimmune disorders included in Group A Medical Conditions are: Polymyositis/dermatomyositis; Ulcerative colitis; Polymyalgia rheumatica; Chronic rheumatic heart disease; Sjogren's syndrome; Celiac's disease, but, only if Class Member has enteropathy associated T-cell lymphoma; Systemic Lupus erythematosus; Polyarteritis nodosa; Discoid lupus erythematosus; Sarcoidosis; Crohn's disease; Systemic sclerosis; Rheumatoid arthritis; Hashimoto's disease; Psoriasis; Autoimmune hemolytic anemia; Behcet's Disease; Immune thrombocytopenic purpura; Myasthenia gravis; and Primary biliary cirrhosis.

[2]  A Settlement Class Member with Epstein-Barr virus is deemed to have a Group A Medical Condition if the Settlement Class Member's NHL subtype is Burkitt Lymphoma, extranodal natural killer/ T-cell NHL, post-transplant NHLs and AIDS-associated NHLs, including EBV positive DLBCL and central nervous system NHL.

[3]  The immunosuppressive medications included in Group A Medical Conditions are:  infliximab; adalimumab; etanercept; golimumab; certolizumab pegol; azathioprine; 6-mercaptopurine; and cyclosporin.

[4]  The following bacterial infections will be deemed to be Group A Medical Conditions if associated with the corresponding NHL subtype: *H. Pylori*, associated with gastric MALT lymphoma; *C. psittaci* infection (i.e. chlamydia), associated with ocular adnexal lymphoma; and *Campylobacter jejuni*, associated with MALT lymphoma.

---

Exhibit 5                                                                                                    Page 1

(f)    "Group B Medical Conditions" refers to conditions which separately convey a moderate increased risk of NHL:  Prior History of Cancer, First-Degree or Second-Degree Family Member with History of Cancer, Smoking (current smoker or former smoker with I ppd/20 year history), Hepatitis B virus, Obesity at time of diagnosis of NHL (Body Mass Index greater than 30), Diabetes, or Breast Implants in certain circumstances[5].

(g)    "Compensation Range" refers to the specific monetary ranges that make up the lower and upper bounds for the amount of a Claims Program Award from the Compensation Fund that the Claims Program may award for a specific Tier.

**Part 2.  Eligibility for Claims Program Awards.**  To be eligible to receive a Claims Program Award, a Settlement Class Member must meet the criteria for eligibility set forth in Section 6.1 and Section 6.2(a)(ii)(3).

**Part 3.  Standards for Claims Program Awards.**  The Claims Program will be responsible for determining the amount of the Claims Program Award each Settlement Class Member will receive.

(a)    The amount of the Claims Program Award that any Settlement Class Member will receive is dependent on the Tier Determination made by the Claims Program for that Settlement Class Member.  The Claims Program will follow the following Tier Guidelines when making Tier Determinations:

(i)    Any such Settlement Class Member who falls into Tier One will automatically be included in Tier One and cannot advance to Tiers Two, Three or Four.

(ii)    Tier Two excludes any such Settlement Class Member who meets any of the criteria for Tier One.  Any such Settlement Class Member with one or more of the Tier Criteria in the Tier Two category is automatically included in Tier Two and cannot advance to Tiers Three or Four.

(iii)    Tier Three excludes any such Settlement Class Member who meets any of the Tier Criteria for remaining in Tier One or Tier Two.  Any such Settlement Class Member with one or more of the Tier Criteria in the Tier Three category is automatically included in Tier Three and cannot advance to Tier Four.

(iv)    Tier Four excludes any such Settlement Class Member who meets any of the Tier Criteria for remaining in Tiers One, Two, or Three.

(b)    The Claims Program will make Tier Determinations in accordance with the following Tier Criteria as they pertain to the Settlement Class Member:

---

[5] A Settlement Class Member with breast implants is deemed to have a Group B Medical Condition if her NHL subtype is breast implant-associated anaplastic large cell lymphoma.

Exhibit 5                                                                                                          Page 2

| Tier | Tier Criteria |
|------|---------------|
| Tier One | If the Settlement Class Member meets either of the following two criteria, the Settlement Class Member is in Tier One:<br><br>(i) More than 80 years of age at the time of the Qualifying Diagnosis.<br><br>(ii) Received a Qualifying Diagnosis prior to January 1, 2015 and their Roundup Claims against the Defendant are not barred by the applicable statutes of limitations and statutes of repose.[6]<br><br>If the Settlement Class Member does not fit within Tier One, move to Tier Two. |
| Tier Two | If the Settlement Class Member is not in Tier One, and meets any of the following criteria, the Settlement Class Member is in Tier Two:<br><br>(i) At least 60 and not more than 80 years of age at the time of Qualifying Diagnosis.<br><br>(ii) Medical records confirm the existence of one or more Group A Medical Conditions.<br><br>(iii) Remission for five or more years.<br><br>(iv) Proof of exposure to Roundup Products,[7] in accordance with Part 4 of this Exhibit 5, with frequency and duration of exposure between 12 and 36 months.<br><br>If the Settlement Class Member does not fit within Tier One or Tier Two, move to Tier Three. |

---

[6] Roundup Claims brought by Settlement Class Members who received a Qualifying Diagnosis prior to January 1, 2015 are presumed to be barred by statutes of limitations and statutes of repose. Therefore, Settlement Class Members who received a Qualifying Diagnosis prior to January 1, 2015 will only be eligible for a Compensation Award if the Settlement Class Member can rebut this presumption by proving that their Roundup Claims against the Defendant are not barred by the applicable statutes of limitations and statutes of repose. All other Settlement Class Members who received a Qualifying Diagnosis prior to January 1, 2015 will not be eligible for, and cannot receive, any Compensation Award.

[7] All references in the Settlement Agreement and this Exhibit 5 to "exposure to Roundup Products" mean exposure to Roundup Products through the application of Roundup Products. Exposure "through the application of Roundup Products" includes exposure through mixing and any other steps associated with application, whether or not the individual performed the application, mixing, or other steps associated with application himself or herself.

Exhibit 5                                                                                         Page 3

| Tier | Tier Criteria |
|------|---------------|
| Tier Three | If the Settlement Class Member is not in Tier One or Two, and meets any of the following criteria, the Settlement Class Member is in Tier Three:<br><br>(i) At least 45 years of age and less than 60 years of age at the time of Qualifying Diagnosis.<br><br>(ii) Medical records confirm the existence of one or more Group B Medical Conditions.<br><br>(iii) Occupation that elevates NHL risk separate and apart from Roundup Products' use:  cleaning service, electrician, hairdressing, handling fission products/jet propellant/solvents, metal working, painting, pest exterminator, petroleum refinery, textiles, woodworking, x- or gamma radiation.<br><br>(iv) Remission for three to five years.<br><br>(v) Proof of exposure to Roundup Products, in accordance with Part 4 of this Exhibit 5, with frequency and duration of exposure between 36 and 60 months.<br><br>If the Settlement Class Member does not fit within Tiers One, Two, or Three, move to Tier Four. |
| Tier Four | If the Settlement Class Member is not in Tiers One, Two, or Three, the Settlement Class Member is eligible for Tier Four.  Tier Four Settlement Class Members must meet all of the following criteria:<br><br>(i) Less than 45 years of age at the time of Qualifying Diagnosis.<br><br>(ii) No Group A Medical Conditions or Group B Medical Conditions.<br><br>(iii) NHL recurrence, remission for less than three years, or active NHL.<br><br>(iv) Proof of exposure to Roundup Products, in accordance with Part 4 of this Exhibit 5, with frequency and duration of exposure in excess of 60 months. |

(c)    The Claims Program will determine Claims Program Awards for each Settlement Class Member within the following Compensation Ranges for each Tier:

| Tier | Low Pay | High Pay |
|------|---------|----------|
| Tier One | $10,000 | $10,000 |
| Tier Two | $10,000 | $25,000 |
| Tier Three | $25,000 | $65,000 |
| Tier Four | $65,000 | $200,000 |

Exhibit 5                                                                                                          Page 4

(i)     The Claims Program shall determine the amount of the Claims Program Award for each Settlement Class Member within the Compensation Range for the Tier that the Settlement Class Member's claim may fall into.  The Claims Program has the discretion to choose an amount for the Claims Program Award within the given Compensation Range for that Tier.  In choosing the amount of a Claims Program Award within the bounds of the Compensation Ranges of any Tier, and ensuring equitable treatment of similarly situated claimants, the Claims Program should consider factors such as whether the claimant is a Settlement Class Member or a Representative Claimant, and the individual circumstances of the Settlement Class Member, including but not limited to:

(1)     The existence of risk factors for the development of NHL, including the Group A Medical Conditions, Group B Medical Conditions, occupation, and/or any other risk factors or exposures associated with the development of NHL;

(2)     The age at the time of Qualifying Diagnosis and at the time the Claims Program Award will be paid;

(3)     The type and severity of the NHL;

(4)     The extent of the demonstrated exposure to Roundup Products; and

(5)     The sufficiency of the Settlement Fund to pay anticipated future Claims Program Awards.

(d)     The Claims Program, Settlement Administrator, or the Claims Administrator may deviate from the Tier Guidelines when making Tier Determinations only in exceptional cases.  The Claims Program, Settlement Administrator, and the Claims Administrator may not deviate from the Compensation Range for a given Tier in choosing a Claims Program Award, except to the extent that the Claims Program is permitted to do so pursuant to Section 6.2(a)(ii)(1).

(e)     No Settlement Class Member may receive any Claims Program Award totaling more than U.S. $200,000 unless there is a showing of Extraordinary Circumstances pursuant to the terms of Section 6.2(a)(ii)(1).

**Part 4. Proof of Roundup Products Exposure.**  To be eligible to receive a Compensation Award the Settlement Class Member must include proof demonstrating the alleged circumstances and extent of the Settlement Class Member's exposure to Roundup Products in the Accelerated Payment Claim Package or Claims Program Claim Package, as set forth in Section 7.2 (or, if the Compensation Fund continues as provided in Section 13.4(c), as provided in the Compensation Fund Continuation Terms).  The form of such proof will depend on whether the claimed exposure to Roundup Products is through the application of Roundup Products in a professional capacity (agricultural or industrial turf, and ornamental use) or in residential use.  A Settlement Class Member claiming exposure to Roundup Products in both a professional capacity and in residential use may present proof of either or both forms of exposure.

Exhibit 5                                                                                                                    Page 5

(a) <u>Professional Capacity</u>.  Settlement Class Members applying for a Compensation Award on the basis of exposure to Roundup Products in a professional capacity (agricultural or industrial turf, and ornamental use) must include, at a minimum, as it relates to the Settlement Class Member: (i) an affirmation stating under penalty of perjury the circumstances and extent of the alleged exposure to Roundup Products, including, for each location where such exposure occurred, to the extent the Settlement Class Member can recall or verify from available records, identification of the location, the start and end dates of exposure, the occupation, the frequency of exposure (*e.g.*, average time spent each day applying Roundup Products or otherwise being exposed to Roundup Products applied by others), the approximate size of the area where Roundup Products were applied, the regularity of exposure, and the Settlement Class Member's proximity to the application of Roundup Products; and (ii) employment records sufficient to demonstrate employment in an occupation in which Roundup Products would be applied in the ordinary course of business during the period of time when the exposure to Roundup Products is alleged to have occurred, or, if such records are not available, an explanation of why it is not possible to supply such records.  The proof of exposure to Roundup Products may also include records in the possession, custody, or control of the Settlement Class Member demonstrating the Settlement Class Member's exposure to Roundup Products.

(b) <u>Residential Use</u>.  Settlement Class Members applying for a Compensation Award on the basis of the exposure to Roundup Products in residential use must include, at a minimum, as it relates to the Settlement Class Member, an affirmation stating under penalty of perjury the circumstances and extent of alleged exposure to Roundup Products and stating the address(es) where such alleged exposure occurred.  For each address where such exposure occurred, the applicant shall state the start and end dates of exposure, the frequency of exposure (*e.g.*, average time spent each day applying Roundup Products or otherwise being exposed to Roundup Products applied by others), the approximate size of the area where Roundup Products were applied, the regularity of exposure, and the Settlement Class Member's proximity to the application of Roundup Products.  The proof of exposure to Roundup Products may also include photocopies of receipts for the purchase of Roundup Products, photographs of any Roundup Products in the possession of the Settlement Class Member, or other records in the possession, custody, or control of the Settlement Class Member demonstrating the Settlement Class Member's exposure to Roundup Products.

(c) The Monsanto Parties do not waive or concede any position or arguments they have for or against, and retain full right and ability to contest, an individual Settlement Class Member's claim of exposure to Roundup Products in any action or proceeding, including any Roundup Lawsuit and with respect to any and all Roundup Claims between one or more Settlement Class Member Parties and any of the Monsanto Parties.  The Monsanto Parties and Related Parties will not be precluded from contesting a Settlement Class Member's claim of exposure to Roundup Products, even if the Settlement Class Member receives an Accelerated Payment Award, Claims Program Award, or is deemed eligible to participate in the Diagnostic Accessibility Grant Program, and the Monsanto Parties and Related Parties will not be bound by the Claims Administrator's, Claims Program's or DAGP Administrator's determination that a Settlement Class Member has submitted sufficient proof of exposure to Roundup Products in connection with the application for an Accelerated Payment Award, Claims Program Award, or participation in the Diagnostic Accessibility Grant Program.

Exhibit 5                                                                                                    Page 6

EXHIBIT 6

## EXHIBIT 6: FORM OF RELEASE

## CONFIDENTIAL RELEASE OF ALL CLAIMS

### Recitals

1.      By signing this Confidential Release Of All Claims ("Release"), I, _____, the undersigned Releasing Party,[*] represent that I am a Settlement Class Member as defined in the Settlement Agreement dated as of _____, 2021 (the "Agreement") and filed with the Court in *Robert Ramirez, et al. v. Monsanto Company*, Case No. 3:16-md-02741-VC & 3:19-cv-02224-VC, or an authorized Representative Claimant.  I understand that the terms of the Agreement govern the resolution of my Claim.  I acknowledge that I have been given the opportunity to review the Agreement prior to my execution of this Release and the opportunity to review it with my Counsel, if I so chose.  A copy of the Agreement is available at [Settlement Website URL].

2.      I further understand that, as a condition precedent to accepting a Compensation Award from the Settlement Program, I am required to submit, among other things, a release of any and all past, present or future Claims for injury, damages and/or losses of any kind, or wrongful death that I (and any other Releasing Party, below) have, or may have in the future, against the Defendant and all other Released Persons arising from, related to, or in any way allegedly caused by in whole or in part, or connected with the Product User's use of or exposure to any Roundup Products.[†]

3.      Accordingly, in consideration for the amount being paid by the Defendant, I hereby acknowledge the terms and consideration referenced herein as adequate and in return give and make the following releases, waivers, acknowledgements and agreements for the benefit of Defendant and the Released Persons.  This Release of claims for my personal injury is also entered into by my spouse, if applicable, who will execute a signature page hereto.  Spouses are not entitled to a separate payment under the Settlement Program by

---

[*] All capitalized terms used in this Release and not defined herein shall have the meanings assigned to them in the Agreement.

[†] "Roundup" or "Roundup Product" or "Roundup Products" means any glyphosate-containing product developed, manufactured, distributed, sold, and/or marketed by the Defendant (or any of its direct or indirect subsidiaries), or by any Person to the extent such product contains glyphosate exclusively supplied by the Defendant (or any of its direct or indirect subsidiaries), under any name or brand: (a) prior to or as of the Settlement Date; or (b) after the Settlement Date if the product has a chemical formulation identical to a Roundup Product developed, manufactured, distributed, sold, and/or marketed prior to or as of the Settlement Date.  Exhibit 1 to the Agreement contains a list of names and brands of Roundup Products of which the Defendant is currently aware following reasonable inquiry.  A product not on the list but meeting the foregoing definition shall be a Roundup Product under the Settlement Agreement and this Release.

Exhibit 6                                                                                                          Page 1

reason of their relationship with the Product User who is the subject of this Release. However, nothing in this Release precludes a spouse from making their own claim, on their own behalf, as a Product User.

4.  By signing this Release and accepting and receiving any Compensation Award issued, both I, and any spouse who executes this Release, irrevocably agree to be bound by the Agreement and the Settlement Program and the decisions of the Claims Administrator, Settlement Administrator, Lien Administrator or other administrators under the Settlement Program.  I further understand that receipt of a Compensation Award includes circumstances where all or part of my Compensation Award is paid to resolve or reduce any lien against my award.

**Release**

5.  The term "<u>Defendant</u>" for purposes of this Release means Monsanto Company.

6.  The term "<u>Released Person</u>" or "<u>Released Persons</u>" means (a) Monsanto Company and Bayer AG and each and all of their respective past, present, or future, direct or indirect, predecessors, successors, parents, subsidiaries, affiliates, divisions, joint ventures, and joint venturers (collectively, the "<u>Monsanto Group</u>"); (b) the past, present and future manufacturers, formulators, distributors, marketing agents, commissionaires, resellers, retailers (including, without limitation, wholesale distributors, private label distributors, and all retailers and retail distributors), clinical researchers, agents, licensees, contractors and consultants of or with respect to Roundup Products, and any and all past, present, or future suppliers of materials, components, and services used in the development, registration, formulation, manufacture, distribution, handling, sale or marketing of Roundup Products, including the labeling and packaging thereof, and each and all of their respective past, present, or future, direct or indirect, predecessors, successors, parents, subsidiaries, affiliates, divisions, joint ventures, and joint venturers; and (c) any past, present or future officer, director, shareholder, owner, employee, partner, trustee, representative, agent, servant, insurer, attorney, predecessor, successor, or assignee of any of the above.  All Released Persons are third-party beneficiaries of the Agreement for purposes of enforcing the release and indemnity provisions herein for each Person described in clauses (a), (b),  and (c) of this paragraph, their respective past, present, and/or future parents, subsidiaries, divisions, affiliates, joint venturers, predecessors, successors, assigns, and transferees and their respective past, present and/or future shareholders (or the equivalent thereto), directors (or the equivalent thereto), officers (or the equivalent thereto), owners, managers, principals, employees, consultants, advisors, attorneys, agents, servants, representatives, heirs, trustees, executors, estate administrators, and the personal representatives (or the equivalent thereto), and the respective insurers of all such Persons referred to in clauses (a), (b), and (c) of this paragraph to the extent of their capacity as the insurer of such Persons.

7.  The term "<u>Releasing Party</u>" or "<u>Releasing Parties</u>" means (i) me, (ii) any current spouse, or former spouses who were spouses at any time from the date of the alleged Roundup-related injury, asserting an unfiled Claim of any kind by reason of their relationship to me, and (iii) any and all Persons who independently, derivatively or otherwise, by reason

Exhibit 6                                                                                                          Page 2

of their relationship with or to me, have sued or asserted a Claim against, or could have sued or asserted a Claim against, Defendant or any other Released Person, including but not limited to, any and all of my spouses, domestic partners, heirs, beneficiaries, next of kin, executors, administrators, successors, and assigns.  Without in any manner limiting the foregoing, this Release is expressly intended to include and does include any and all Claims which any spouse, domestic partner, heir, beneficiary, next of kin, agent, estate, executor, administrator, personal representative, successor and assign, or any person or entity otherwise entitled to a Claim, may now or may hereafter have or assert against Defendant and/or the Released Persons, whether known or unknown, and any and all other claims, whether known or unknown, arising out of or by reason of or in any manner connected with the Product User's alleged use of or exposure to Roundup Products and the alleged injuries.

8.      In return for good and valuable consideration, the sufficiency of which is acknowledged, I do hereby on my own behalf and on behalf of each other Releasing Party and with regard to claims arising from the injuries that resulted in my Compensation Award, knowingly and voluntarily **RELEASE, REMISE, ACQUIT and FOREVER DISCHARGE, and AGREE and COVENANT NOT TO SUE,** Defendant and the Released Persons and each of them from:

   a.      any and all past, present or future rights, remedies, actions, claims, counterclaims, demands, causes of action, suits at law or in equity, verdicts, suits of judgments, judgments and/or Liens, including any of the foregoing for wrongful death, survival actions of any kind, personal injury and/or bodily injury, sickness, medical complications, disease, emotional distress and/or injury, mental or physical pain and/or suffering, emotional and/or mental harm, financial or psychological harm, fear of disease or injury, Non-Hodgkin's lymphoma ("NHL"), future NHL, fear of future NHL, cancer, future cancer, fear of future cancer, treatment or surgery, loss of enjoyment of life, loss of society, loss of companionship, loss of income, loss of wages, loss of consortium, past or future medical expenses, medical screening or monitoring, future cost of insured services, past cost of insured services or any other form of injury, and including any of the foregoing for direct damages, indirect damages, consequential damages, incidental damages, punitive or exemplary damages, statutory and other multiple damages or penalties of any kind, pre-judgment or post-judgment interest, or any other form of damages whatsoever, whether past, present or future, and whether based upon contract, breach of contract, warranty or covenant, breach of warranty or covenant, tort, negligence, strict liability, gross negligence, recklessness, willful or wanton conduct, malice, oppression, conscious disregard, joint and several liability, guarantee, contribution, reimbursement, subrogation, indemnity, defect, failure to warn, fault, misrepresentation, common law fraud, statutory consumer fraud, quantum meruit, breach of fiduciary duty, violation of statutes or administrative regulations and/or any other legal (including common law), statutory, equitable or other theory or right of action, whether presently known or unknown, developed or undeveloped, discovered or undiscovered, foreseen or unforeseen, matured or unmatured, accrued or not accrued, past, present or future, or now recognized by law or that

Exhibit 6                                                                                                    Page 3

may be created or recognized in the future by statute, regulation, judicial decision or in any other manner that in any way may arise from, relate to, or are in any way connected with (1) the Product User's use of or exposure to any Roundup Products (as defined above), and/or any injury, losses, or damages of any kind ever claimed, or may at any time in the future be claimed, to have been caused, in whole or in part, by any such use of or exposure to Roundup Products or from any medical treatments allegedly occurring because of the use of or exposure to any Roundup Products; (2) claims relating to the availability of future Medicare-covered expenses, and any claims arising out of such medical treatments, including any private cause of action I or any other Person may have under 42 U.S.C. 1395y(b)(3)(A); and/or (3) claims arising from or related to the Settlement Program and the decisions of the Claims Administrator, Settlement Administrator, Claims Program, Lien Administrator and other administrators of the Settlement Program (collectively subpart (a) are "<u>Claims</u>"), which any Releasing Party may have ever had, may now have, or at any time hereafter may have, against Defendant or any of the Released Persons; and

**b.**     any and all debts, liabilities, covenants, promises, contracts, agreements and/or obligations of whatever kind, nature, description or basis, whether fixed, contingent or otherwise, whether presently known or unknown, developed or undeveloped, discovered or undiscovered, foreseen or unforeseen, matured or unmatured, or accrued or not accrued, which are, or may be, in any way connected with the Product User's use of or exposure to any Roundup Products, and/or with any injury, losses, or damages ever claimed, or may at any time in the future claim, to have been caused, in whole or in part, by any such use of or exposure to any Roundup Products or from any medical expenses allegedly incurred because of the Product User's use of or exposure to any Roundup Product; (collectively subpart (b) are "<u>Liabilities</u>"), which Defendant or any Released Person may have ever had, may now have or at any time hereafter may have to me or any other Releasing Party.

The Claims and Liabilities set forth in Paragraph 8 (a) and (b) are the "<u>Released Claims and Liabilities</u>."  This Release is irrevocable by me upon my execution as of the date set forth beneath my name and my submission of it to the Claims Administrator and my acceptance and receipt of a Compensation Award.

**9.**     Without in any manner limiting the foregoing, I (and/or any other Releasing Party), pursuant to the applicable law of my state of residence or any other state's law found to be applicable, by signing this Release and accepting any Compensation Award issued, specifically release and give up any and all rights to and claim of pecuniary loss, injury or damage as those terms are defined in the applicable state's wrongful death statute and as interpreted by the courts of the applicable state, which might accrue to me and/or my estate and others by virtue of the death of any Releasing Party, whether such claims are pursued directly or indirectly or by some person or persons in a representative capacity, if such claims arise in any way from or are in any way connected or related to Releasing Party's use of or exposure to any Roundup Product.  It is expressly understood and agreed by Releasing Parties and Defendant and the Released Persons that a substantial

Exhibit 6                                                                                                    Page 4

reason and consideration of Defendant and the Released Persons in forbearing from any further steps in defending against the Claim and in agreeing to fund the Agreement as set forth in this Release and in the Agreement is the settlement, release and elimination at this time of any and all claims that Releasing Parties or others have now or in the future might have, absent this Release, for the wrongful death of any Releasing Party or Product User in relation to the use of or exposure to any Roundup Product.

10.   Releasing Parties further understand and agree that under the present state of the law in my state of residence or in any other state found to be applicable that absent this Release and regardless of the entry of any judgment which might result in litigation by Releasing Parties against Defendant or the Released Persons, certain of Releasing Party's relatives, dependents or others might have claims for the death of Releasing Party against some or all Released Persons; and Releasing Parties further understand and agree that by executing this Release and accepting any Compensation Award issued, Releasing Parties acknowledge that they have received fair, just and adequate consideration for any claims for the wrongful death of Releasing Party which may arise in relation to Releasing Party's use of or exposure to any Roundup Product. Releasing Parties further understand and agree that by executing this Release and accepting any Compensation Award issued, Releasing Parties, pursuant to the law of their state of residence or any other state's law found to be applicable, have forever remised, released, acquitted, forever discharged and given up any and all Released Claims and Liabilities that Releasing Parties or others might have against Defendant and the Released Persons for any actual or alleged wrongful death of a Releasing Party arising from or alleged to arise from Releasing Party's use of or exposure to any Roundup Products.

11.   I acknowledge that I (and/or any other Releasing Party) may in the future learn of additional or different facts as they relate to the Released Claims or Liabilities, the Defendant and/or Released Persons' activities, and/or any injury I (and/or any other Releasing Party) have ever claimed, or may at any time in the future claim, was caused, in whole or in part, by the use of or exposure to any Roundup Product. I understand and acknowledge the significance and consequences of releasing all of the Released Claims and Liabilities. To the extent that any law, statute, ordinance, rule, regulation, case, court order, judicial process or other legal provision or authority (each a "Law"), including, but not limited to, the provisions of Section 1542 of the California Civil Code, may at any time purport to preserve my and/or any other Releasing Party's right to hereinafter assert any such unknown and/or unanticipated Claims and/or Liabilities, I hereby (on my own behalf and on behalf of each other Releasing Party) specifically and expressly waive (to the fullest extent permitted by applicable Law) each Releasing Party's rights under such Law, including, without limitation, Section 1542 of the California Civil Code, as amended, which provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PERSON.**

Exhibit 6                                                                                                    Page 5

12.     I, on behalf of myself and other Releasing Parties, also hereby expressly waive and fully, finally and forever settle and release any and all Released Claims and Liabilities that I, and any other Releasing Party, may have against Defendant and/or the Released Persons under § 17200, et seq., of the California Business and Professions Code or by any law of the United States or of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable or equivalent to such provisions.

13.     On my own behalf and on behalf of each other Releasing Party, I acknowledge and agree that the releases set forth in this Release are irrevocable and unconditional, inure to the benefit of Defendant and each Released Person, and are intended to be construed as broadly as possible so that Defendant and other Released Persons shall never be called upon to pay any further sums or expenses or be liable, directly or indirectly, to any Person seeking contribution and/or indemnity from Defendant or the Released Persons, or any of them, by reason of any legal actions brought against them by me or other Releasing Parties pertaining in any way to, or arising from, or connected with the Released Claims and Liabilities.

14.     **WITHOUT LIMITING THE FOREGOING, THIS RELEASE IS SPECIFICALLY INTENDED TO OPERATE AND BE APPLICABLE EVEN IF IT IS ALLEGED, CHARGED OR PROVED THAT SOME OR ALL OF THE RELEASED CLAIMS AND LIABILITIES ARE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE, NEGLIGENCE PER SE, STRICT LIABILITY, GROSS NEGLIGENCE, BREACH OF WARRANTY, VIOLATION OF LAW, DEFECTIVE PRODUCT, CONSCIOUS DISREGARD, FRAUD, OPPRESSION,  MISREPRESENTATION, MALICE, AND/OR CONDUCT OF ANY TYPE (INCLUDING, BUT NOT LIMITED TO, WILLFUL, WANTON, OR INTENTIONAL CONDUCT) BY ONE OR MORE RELEASED PERSON AND/OR ANY OTHER PERSON.  THIS RELEASE IS SPECIFICALLY INTENDED TO AND DOES INCLUDE, BUT IS NOT LIMITED TO, A RELEASE OF, AND COVENANT NOT TO SUE FOR, DAMAGES OF ANY KIND, OR FOR A WRONGFUL DEATH CLAIM THAT MAY BE BROUGHT AT ANY TIME BY OR ON BEHALF OF ANY OF THE RELEASING PARTIES, THEIR ESTATES,  HEIRS OR BENEFICIARIES IN CONNECTION WITH ANY OF THE FACTS, EVENTS AND/OR INCIDENTS, THAT GAVE RISE TO OR ARE IN ANY WAY CONNECTED WITH ANY OF THE RELEASED CLAIMS AND LIABILITIES.**

## Attorneys' Fees; Division of Any Compensation Award Payment

15.     I understand that Defendant and the Released Persons are not responsible for any attorneys' fees, costs (including, but not limited to, court costs), ad litem fees, common benefit fees, costs or assessments, or fees and expenses that I or my Counsel have incurred or may at any time incur, including, but not limited to, in connection with the entering into of this Release and having any pending lawsuit dismissed, other than administrative costs as outlined in the Agreement.  I understand that, with respect to any Compensation Award that may be made to me under the Settlement Program, any division of such Compensation Award between me, any current spouse or other person executing this Release, and our respective Counsel (if any) shall be determined by me and such other Person(s), and such division, or any dispute in relation to such division, shall in no way affect the validity of this Release or any stipulation of dismissal with prejudice provided to dismiss my pending lawsuit.  Releasing Party represents and

Exhibit 6                                                                                                                    Page 6

warrants that any legal expenses, bills, costs or contingency fee agreements resulting or arising out of representation of Releasing Party by any attorney in relation to Releasing Party's alleged exposure to Roundup Products, other than those for the services of Class Counsel or the Legal Services Program, are Releasing Party's responsibility to pay, and that any Liens based on any legal expenses, bills, costs or contingency fee agreements incurred as a result of Releasing Party's alleged exposure to or use of Roundup Products will be satisfied solely by Releasing Party except as set forth in the Agreement and approved by the Court.  Releasing Party will indemnify, repay and hold Defendant and the Released Persons harmless from any such claims.

## Covenant Not To Pursue Certain Claims

**16.** I hereby agree and covenant that I will never:  (i) take any legal, or other action to initiate, pursue or maintain, or otherwise attempt to execute upon, collect or otherwise enforce, any of the Released Claims and Liabilities of or against Defendant or any Released Person, (ii) institute any new legal action against any Defendant or any Released Person relating to any injury I (and/or any other Releasing Party) have ever claimed, could have claimed or may at any time hereafter claim, were caused in whole or in part by the use of or exposure to any Roundup Product, whether that use or exposure has occurred in the past or occurs in the future, and/or (iii) attempt to execute or collect on, or otherwise enforce, any judgment that may be entered against Defendant or any Released Person in any legal action described in clause (ii) or maintain my pending legal action against Defendant or other Released Persons relating to alleged injuries from exposure to or use of Roundup Products after accepting and receiving any Compensation Award issued.  I further agree and covenant that I will not take any legal or other action to initiate, pursue or maintain a claim against the Released Persons, Claims Administrator, Settlement Administrator, Claims Program, Lien Administrator, nor any employee, agent or representative of any of them, in connection with the Settlement Program, except, with respect to each such Person's own willful misconduct.

## Dismissal of Pending Action

**17.** It is further agreed and understood that, to the extent applicable, the pending Claim or cause of action brought by me or on my behalf shall be concluded by entry of a stipulation of dismissal with prejudice with my consent and the consent of all Releasing Parties in accordance with the terms of the Agreement and upon accepting and receiving a Compensation Award.

## Liens

**18.** I understand and acknowledge that all Liens against my Compensation Award or the costs and expenses incurred in resolving any such Liens against my Compensation Award are the **sole** responsibility of the Persons executing this Release and not Defendant or any other Released Person.

**19.** I represent and warrant that all bills or costs, or Liens obligations resulting from or arising out of or relating in any way to my alleged exposure to or use of Roundup Products and

Exhibit 6                                                                                          Page 7

diagnosis of non-Hodgkin's Lymphoma that are not satisfied or resolved by the Lien Administrator have been or will be paid, resolved or otherwise satisfied by me or my Counsel on my behalf, including any Liens or claims based on any hospital or medical expenses incurred by a Government Payor or any other Person including providers and insurers, as a result of my alleged injuries, prior to the distribution of any of the settlement proceeds to me or any other individual or entity acting on my behalf. Nothing herein shall be construed to restrict my Counsel's right to use portions of my Compensation Award to extinguish or resolve any such Liens arising from or relating to my Compensation Award. Furthermore, I agree that, upon request, I or my Counsel shall provide, or shall cause the Claims Administrator or Lien Administrator to provide, to Defendant confirmation of the satisfaction and discharge of any or all such Liens for which I am responsible for their resolution.

20.     I expressly agree and undertake to release, protect, indemnify, and hold harmless Defendant and the Released Persons from all damages, costs and expenses incurred on account of any Claims, Liens, demands, rights, or causes of action by any Governmental Payor, individual or entity, including but not limited to any financial institution, medical provider, doctor, hospital, chiropractor, health insurer, worker's compensation insurer, other insurers, HMO, Medicare, Medicare Advantage, Medicaid, Governmental Authority Third-Party Payor/Providers, Other Insurer, any other government program or any other government entity, federal or state or local, or any other third party, claiming or asserting:

a.     a right on behalf of or through me or other person who is a Settlement Class Member as defined in the Agreement as against the Defendant or Released Persons arising from or relating to the Released Claims;

b.     a Lien upon, subrogated interest in, or right or entitlement to the proceeds of my Compensation Award from this settlement, in whole or in part, for any reason, including the provision of medical and/or hospital care and/or the payment of medical and/or hospital expenses by any third-party provider/payor;

c.     a right to reimbursement or subrogation for any reason arising out of the consideration payable under the Settlement Agreement or this Release;

d.     a right to recovery by, or reimbursement related to Medicare Parts A & B, Medicare Part C, and/or Medicare Part D, for conditional payments made or to be made with respect to covered items and services (or any portion thereof), pursuant to 42 U.S.C. § 1395y(b), and corresponding regulations, including but not limited to 42 CFR § 411.22, 411.24, 422.108, and 423.462, including any amendments thereto or interpretations thereof that may be placed upon such statutes and regulations by any state or federal court (sometimes commonly known as the "Medicare Secondary Payer" laws and program);

e.     a right against the Defendant or Released Persons due to the fact that I am, if in fact I am or become, a party to bankruptcy proceedings at such time as to affect the rights of Defendant or Released Persons under the Agreement or this Release; or

Exhibit 6                                                                                                    Page 8

f.      a right by operation of contract, law or equity, for medical expenses, disability benefits or any other charge or expense, directly, indirectly by way of assignment, or by subrogation, relating to the incidents that form the basis of this Release.

21.     The indemnification and hold harmless provisions in this Section specifically include the payment of all reasonable costs and expenses of investigation, defense, settlement, attorneys' fees, judgments, court costs and any and all other costs and expenses of defending any such claim.  It is the express intent of the Parties that the indemnities provided in this Section be construed as broadly as possible to encompass every conceivable Lien.

22.     I understand and agree that the settlement of my Claims against Defendant and Released Persons could impact my right to future Medicare benefits, including the denial by Medicare of claims for future benefits related to the injury claims being released in this Release.  It is further understood and agreed that I hereby waive any right to assert in the future any claims I may have relating to the matters referenced in this paragraph, known and unknown, including any private cause of action I may have under 42 U.S.C. § 1395y(b)(3)(A) against any of the Released Persons, even though if such claims were known, such knowledge would materially affect the terms of this Release.

23.     I agree that I and/or my Counsel on my behalf shall take all necessary steps to provide and permit the release of confidential information and otherwise cooperate with and facilitate the satisfaction by or on behalf of Defendant of any reporting obligations under Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 ("MMSEA"), the release from any MMSEA reporting obligations, or the reporting requirements of any other Governmental Authority.  I acknowledge and agree that the confidentiality of this Release or my application for a Compensation Award does not bar Defendant from reporting information required to be disclosed under Section 111 of the MMSEA or applicable regulations.

24.     I expressly warrant and represent that this Section is a material provision of this Release and the Agreement.  If it is determined that I have provided false or misleading information with respect to any payments made by Medicare or other Governmental Payor for medical treatment, I shall forfeit to Defendant the settlement funds in the amount of any unpaid Liens and fines, penalties, attorneys' fees, or other costs and expenses assessed by Medicare (or its agent) or the U.S. federal government (or its agent) under 42 U.S.C. § 1395y, if any.  I agree that any forfeited funds may be applied towards payment of any of my outstanding liens.

**Nature of Settlement Award Payments**

25.     I also hereby state and acknowledge, as set forth in the Agreement and agreed to by Defendant and the Released Persons, that all Compensation Awards paid pursuant to the Settlement Program constitute damages on account of personal injuries or physical injuries or physical sickness within the meaning of Section 104 of the Internal Revenue Code of 1986, as amended, arising from the physical injuries alleged to have resulted from the  use of or exposure to any Roundup Product, and no portion of the proceeds paid

Exhibit 6                                                                                                      Page 9

under the Settlement Program represents punitive or exemplary damages, nor prejudgment or post-judgment interest, nor damages arising from non-physical injuries.  I hereby waive and dismiss with prejudice any and all present claims for punitive or exemplary damages and waive any and all future claims for punitive or exemplary damages.  No warranty or representation of the tax consequences, if any, is made by Defendant or the Released Persons.

## Indemnification for Released Claims and Liabilities; Contribution and Indemnity Claims Extinguished

26.     I hereby agree, jointly and severally with any other Persons executing this Release, to INDEMNIFY and HOLD HARMLESS Defendant and each Released Person from and against the following:  (i) any and all Claims that may be asserted, made or maintained at any time by, on behalf of, or for the benefit of, any Releasing Party, or someone claiming by, through or under any Releasing Party, against Defendant or any Released Person, with respect to any of the aforementioned Released Claims and Liabilities; (ii) any and all damages, losses, costs (including, but not limited to, court costs), expenses (including, but not limited to, legal fees and expenses) and/or Liabilities incurred or suffered by, or imposed on, Defendant or any Released Person in connection with, arising out of or resulting from any Claim described in clause (i) of this sentence (including, but not limited to, any amount paid or to be paid in satisfaction of any such Claim) and/or, without limitation of the foregoing, any breach by me, my representatives or Counsel (or any Person executing this Release) of any of the terms of this Release; (iii) any and all Claims made or asserted (prior to, on or after the date of this Release) arising by virtue of any common law and/or statutory claim for wrongful death in any way, arising out of, relating to, resulting from, in whole or in part, by the use of or exposure to any Roundup Product brought by, or on behalf of, any heir, beneficiary, next-of-kin, or estate of Releasing Party; and (iv) any and all Claims made or asserted (prior to, on or after the date of this Release), including claims for contribution and/or indemnity, by any other Person against Defendant or any Released Person in any way, arising out of, relating to, resulting from, in whole or in part, by the use of or exposure to any Roundup Product by me or my Product User.  Further, to the extent necessary under law to give effect to this paragraph and/or to extinguish claims for contribution and/or indemnity against Defendant and any Released Person for the Released Claims and Liabilities, or to satisfy such indemnity obligation that arises due to a contribution or indemnity claim by a third party, I further agree, jointly and severally with any Person executing this Release: (1) to reduce any judgment Releasing Parties might recover against any Persons other than a Released Person by release and discharge in an amount, fraction, portion, or percentage necessary under applicable state or federal law to bar, eliminate, or satisfy claims against Defendant or the Released Persons for contribution and/or indemnity to the fullest extent permitted by applicable state or federal law arising from any Claims or Liabilities hereby released, including any amount re-allocated by applicable state or federal statute or common law to Defendant or the Released Persons resulting from uncollectability and/or insolvency of other Persons determined to be at fault, as well as (2) to indemnify and hold harmless Defendant and any Released Persons in accordance with this Paragraph 26 as may still be necessary after having performed clause (1) above of this Paragraph 26.

Exhibit 6                                                                                                    Page 10

Releasing Parties shall execute any additional documentation that may be required under applicable state or federal law in order to give effect to this provision.

a. The indemnification set forth in this Section specifically includes, but is not limited to, the payment of all reasonable costs and expenses of investigation, defense, settlement, attorneys' fees, judgments, court costs and all other costs and expenses of defending any such claims.  This indemnity is specifically intended to operate and be applicable even if it is alleged or proved that all or some of the damages being sought were caused as a whole or in part by any act, omission, negligence, gross negligence, breach of contract, intentional conduct, violation of statute or common law, breach of warranty, product defect, strict liability or any other conduct whatsoever of Defendant or the Released Persons.

b. If, despite the provisions of this paragraph, Defendant or any Released Persons incur any payment or judgment due to any claim, including a claim for contribution or indemnity arising out of a claim brought by a Releasing Party against another person, the Releasing Party shall indemnify, repay and hold harmless Defendant and the Released Person for such amount or shall not attempt to execute or to collect any judgment or any portion of any judgment obtained against one or more of the non-Released Persons to the extent or in a manner that the execution or collection of the judgment or any portion thereof would create in the judgment debtor any right to recover from Defendant or any of the Released Persons any sums based on claims for contribution, indemnity, and/or subrogation.

## Non-Disparagement

27. I will not directly or indirectly make any negative or disparaging statements against Defendant or the Released Persons maligning, ridiculing, defaming, or otherwise speaking ill of them, their products or their business affairs, practices, policies, standards, or reputation, provided that nothing in the Agreement or this Release shall be deemed to interfere with (a) any Party's communications with family members and Counsel or (b) any Party's obligation to report transactions with appropriate governmental, taxing and/or registering agencies.

## Acknowledgement of Comprehension

28. **IN CONSIDERATION FOR THE RELEASES, UNDERSTANDINGS, WARRANTIES, AND REPRESENTATIONS MADE BY THE RELEASING PARTY IN THIS RELEASE AND AFTER EXECUTION AND DELIVERY OF THIS RELEASE BY THE RELEASING PARTY AND RECEIPT OF ANY REQUIRED COURT APPROVALS, MONSANTO COMPANY SHALL PAY THE COMPENSATION AWARD, AS DEFINED BELOW, AND OTHER GOOD AND VALUABLE CONSIDERATION TO THE RELEASING PARTY, WITH THE FUNDS TO BE DISBURSED BY THE CLAIMS ADMINISTRATOR FROM THE SETTLEMENT FUND, PURSUANT TO THE TERMS OF THE AGREEMENT, INCLUDING, BUT NOT LIMITED TO, THE RELEASING PARTY'S ELIGIBILITY TO RECEIVE THE COMPENSATION AWARD, AFTER EXECUTION OF THIS RELEASE.  THE PAYMENT OF THE COMPENSATION AWARD IS FOR SETTLEMENT OF THE**

Exhibit 6                                                                                                    Page 11

RELEASED CLAIMS AND INCLUDES, BUT IS NOT LIMITED TO, ANY COURT COSTS, EXPENSES, ATTORNEYS' FEES AND COMMON BENEFIT ASSESSMENTS, INCURRED BY THE RELEASING PARTY.  THE EXECUTION AND RETURN OF THIS RELEASE IS A CONDITION PRECEDENT TO THE PAYMENT OF THE COMPENSATION AWARD TO THE SETTLEMENT CLASS MEMBER.

29.    I AM ENTERING INTO THIS RELEASE FREELY AND VOLUNTARILY, WITHOUT BEING INDUCED, PRESSURED OR INFLUENCED BY, AND WITHOUT RELYING ON ANY REPRESENTATION OR OTHER STATEMENT MADE BY OR ON BEHALF OF, DEFENDANT OR ANY OTHER PERSON.  I UNDERSTAND THE TERMS OF THE AGREEMENT AND HOW THE CLAIMS PROGRAM, CLAIMS ADMINISTRATOR AND/OR SETTLEMENT ADMINISTRATOR, DETERMINED THE AMOUNT OF MY AWARD, ACKNOWLEDGE AND ACCEPT THE NATURE, VALUE AND SUFFICIENCY OF THE CONSIDERATION DESCRIBED IN THIS RELEASE, INCLUDING THE AMOUNT OF A MONETARY AWARD FROM THE SETTLEMENT PROGRAM PURSUANT TO THE AGREEMENT.  I ACKNOWLEDGE THAT I HAVE BEEN PROVIDED THE OPPORTUNITY TO REVIEW THE AGREEMENT AND HAVE READ THIS RELEASE, AND I HAVE HAD AN OPPORTUNITY TO OBTAIN ADVICE FROM, AND ASK QUESTIONS OF, COUNSEL OF MY CHOOSING REGARDING THE TERMS AND LEGAL EFFECT OF THE AGREEMENT AND THIS RELEASE AND MY DECISION TO PARTICIPATE IN THE SETTLEMENT PROGRAM FUNDED PURSUANT TO THE AGREEMENT.

30.    FURTHER, I ACKNOWLEDGE THAT I HAVE BEEN INFORMED OF ALL THESE MATTERS, AND THAT I HAVE HAD THE OPPORTUNITY TO BE ASSISTED BY COUNSEL, EITHER THROUGH CLASS COUNSEL, THE LEGAL SERVICES PROGRAM IF IT IS IN PLACE AT THE TIME OF THIS RELEASE, OR PRIVATE COUNSEL THAT I MAY RETAIN AT MY OWN EXPENSE.  I FURTHER ACKNOWLEDGE THAT I UNDERSTAND THIS RELEASE AND THE AGREEMENT AND I FURTHER UNDERSTAND THAT ANY AMOUNTS PAID TO ME WILL BE PAID SUBJECT TO LIENS AND THE PROVISIONS OF THE AGREEMENT AND THIS RELEASE.

31.    I ALSO ACKNOWLEDGE THAT THE SETTLEMENT PROGRAM AND THE AGREEMENT ARE TO RESOLVE THE CLAIMS OF NUMEROUS CLAIMANTS AND THAT THE AWARD TO ME MAY BE FOR A SUM DIFFERENT THAN AWARDS TO OTHER CLAIMANTS BASED ON THE TERMS OF THE AGREEMENT AND I ACCEPT AND AGREE TO THOSE TERMS.

## Waiver of Certain Provisions Regarding Timing of Any Payments

32.    If I have any civil action pending in any jurisdiction that has enacted, promulgated or otherwise adopted any law containing provisions that establish specific time periods within which funds, if any, must be paid to me in connection with the release of such civil action (including, but not limited to, Pennsylvania Rule of Civil Procedure 229.1), I hereby (i) specifically and expressly waive (to the fullest extent permitted by applicable law) my rights under any such provisions and (ii) agree that any decision about any Compensation Award and the payment of any Compensation Award shall be made solely in accordance with the terms and conditions of the Settlement Program set forth in the Agreement, including the criteria and allocation established by the Claims Administrator, Settlement Administrator, or Claims Program.

Exhibit 6                                                                                                    Page 12

**Informed Consent and Submission to Authority of Settlement Program**

**33.** I understand that I have the right to make an informed decision regarding participation in the Settlement Program. I further understand that the Settlement Program provides a means outside of the control of Defendant to make Compensation Awards based on objective criteria, including categories subject to specified reductions which have been outlined to me, and which will be applied to my Claim if applicable and based on the facts of my Claim.

**No Admission of Fault**

**34.** I understand and agree that Defendant has entered into the Agreement solely by way of compromise and resolution. The Agreement, and this Release, are not, and shall not be construed at any time to be, an admission of liability, responsibility or fault of or by Defendant or any other Released Person.

**Representations and Warranties**

**35.** I hereby represent and warrant that: I have full power, authority and capacity to enter into this Release, which is enforceable in accordance with its terms. Except with respect to Liens, I have the sole right to receive any and all Compensation Awards with respect to my Claim under the Settlement Program. Neither I nor any other Releasing Party has sold, assigned, transferred or otherwise disposed of, or pledged or otherwise encumbered, any of the Released Claims and Liabilities in whole or in part. If I am signing as a Legal Representative of a Product User, I will attach to the signed Release valid proof of authority to enter into the Release.

**36.** I and any Person executing this Release further specifically warrant and represent that to the extent any bankruptcy action is pending, I and other Releasing Parties will take all necessary actions to notify the Bankruptcy Court of this settlement and will fulfill all obligations to said Bankruptcy Court. I further agree, jointly and severally with any Person executing this Release, to indemnify, defend, and hold harmless, up to the amount of the Compensation Award issued to me, Defendant and the Released Persons from any loss, claim, expense, demand, or cause of action of any kind or character, including costs and attorneys' fees that result from the failure, if any, of any or all Releasing Parties to fulfill their obligations to said Bankruptcy Court. Upon request, Releasing Parties further agree that we will provide written confirmation that we fulfilled said Bankruptcy Court obligations. I and any Person executing this Release acknowledge that Defendant entered into the Agreement in reliance upon the representations and warranties made in this Release.

**Governing Law**

**37.** THIS RELEASE, INCLUDING ITS CONSTRUCTION AND INTERPRETATION, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAW OF THE STATE OF MISSOURI, WITHOUT REGARD TO ANY CHOICE-OF-LAW RULES THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION.

Exhibit 6                                                                                                      Page 13

## Forum Selection

**38.**     If any Party to this Release should institute any action at law or in equity to enforce the terms of this Release, then venue for any such action shall be exclusively in the United States District Court for the Northern District of California and shall be filed as part of *In re: Roundup Products Liability Litig.*, MDL No. 2741.

## Severability

**39.**     I agree that if any provision of this Release is adjudicated to be invalid, illegal or unenforceable in any jurisdiction, the relevant provision shall be deemed modified to the extent necessary to make it enforceable in such jurisdiction and, if it cannot be so modified, this Release shall be deemed amended to delete herefrom the invalid or unenforceable provision, and this Release shall be in full force and effect as so modified. Any such modification or amendment shall apply only to the operation of this Release in the particular jurisdiction in which such adjudication was made and shall not affect such provision in any other jurisdiction.  To the fullest extent permitted by applicable law, I hereby (on my own behalf and on behalf of each other Releasing Party) specifically and expressly waive any provision of law that renders any provision of this Release invalid, illegal or unenforceable in any respect.

## Legal Representatives and Spouses

**40.**     If I am signing this Release as a legal representative of a Person or an estate of such Person who was injured or suffered death allegedly caused by the use of or exposure to any Roundup Product ("allegedly injured person or alleged decedent"), then (i) all references in this Release to my injury from the use of or exposure to any Roundup Product shall mean the injury from the use of or exposure to any Roundup Product of such allegedly injured person or decedent, all references in this Release to any person claiming by, through or under, or in relation to me shall also mean any person claiming by, through or under, or in relation to such allegedly injured person or decedent, (ii) if such allegedly injured person or alleged decedent is not deceased, he or she shall also be a Releasing Party, (iii) if such allegedly injured person or decedent is deceased, I am executing this Release both individually and on behalf of the estate of such allegedly injured person or decedent, for the injuries claimed on behalf of the decedent, and (iv) prior to the submission of this Release to Defendant, I have or will obtain judicial approval of this Release at my own expense, to the extent required under applicable Law.

**41.**     Notwithstanding anything to the contrary herein, it is expressly agreed that any claim or cause of action which my spouse executing this Release may have for any loss, injuries or damages which s/he may suffer solely as a result of his/her actual personal exposure to Roundup Products is reserved and unaffected by this Release.  The execution of this Release by my spouse, individually, is only as to her derivative claims because of his/her relationship to me.

Exhibit 6                                                                                          Page 14

**Other Terms and Conditions**

**42.**     Use of Release: No portion of this Release shall be deemed or construed as an admission on the part of any Defendant.

**43.**     Construction of Release: The terms of this Release have been negotiated by Counsel for Defendant and Class Counsel and the language of the Release shall not be construed in favor of or against anyone based on which party drafted the document.  The headings used herein are for reference only and shall not affect the construction of this Release.

**44.**     Entire Agreement: This Release constitutes the entire agreement between Releasing Party and Defendant and the Released Persons with respect to the subject matter of this Release, and there are no other written or oral agreements, understandings or arrangements except as set forth herein.  The terms of this Release may not be modified or waived except in writing signed by the parties hereto.

**Definitions**

**45.**     "Claims" has the meaning set forth in Paragraph 8 of this Release.

**46.**     "Counsel" means, with respect to any particular Person, a lawyer representing a claimant either as a Class Counsel, or as a designated lawyer under the Legal Services Program established in the Settlement Agreement, or a lawyer privately retained by an individual claimant.

**47.**     "Compensation Award" means any payment resulting from a Compensation Award or other consideration or remuneration under the Agreement, which payment is subject to Liens, the attorneys' fees and costs provision in a retention agreement with Counsel, other common benefit attorney fees and costs assessed by a court, and/or administrative expenses.

**48.**     "Governmental Authority" means any government or political subdivision, department, commission, board, bureau, agency, or other governmental authority, whether United States federal, state, District of Columbia, city, county, municipal, territorial, or otherwise domestic, or foreign, or supranational, or any instrumentality whether domestic, foreign, or supranational.

**49.**     "Governmental Payor" means (a) any federal, state, or other governmental body, agency, department, plan, program, or entity that administers, funds, pays, contracts for, or provides medical items, services, and/or prescription drugs, including, but not limited to, the Medicare Program, the Medicaid Program, Tricare, the Department of Veterans Affairs, and the Indian Health Service and (b) any entity paid by such a plan, program, or entity to provide benefits under contract on a prepaid or capitated basis.

**50.**     "Liabilities" has the meaning set forth in Paragraph 8 of this Release.

**51.**     "Lien" means any statutory lien of a Governmental Payor or any mortgage, lien, pledge, charge, security interest, hypothecation, assignment, encumbrance, subrogation right,

Exhibit 6                                                                                                          Page 15

reimbursement claim, right of indemnity, right to payment, third-party interest or adverse claim, of any nature whatsoever, in each case whether statutory or otherwise, held or asserted by any Person.

52. "Other Insurer" means any Person other than a Governmental Payor, a provider, a patient, or a relative or guardian of a patient that is obligated, under contract, agreement or otherwise, to pay health care costs of a Settlement Class Member, including, without limitation, a self-insured plan operated by an employer or a corporate or association health insurer or liability insurer.

53. "Person" means a natural person, partnership (whether general or limited), limited liability company, trust, estate, association (including any group, organization, co-tenancy, plan, board, council or committee), corporation, Governmental Authority, custodian, nominee or any other individual or entity (or series thereof) in its own or any representative capacity, in each case, whether domestic or foreign.

54. "Personal Signature" or "Signature" means the handwritten or electronic signature by the person whose signature is required on the document.  Unless otherwise specified in this Settlement Agreement, a Personal Signature on a document may be submitted by: (a) an actual original handwritten "wet ink" signature on hard copy; or (b) a PDF or other electronic image of an actual handwritten "wet ink" signature on a hard document; or (c) an electronic signature authorized, signed and submitted by the person whose signature is required and administered by DocuSign or a similar approved vendor.

55. "Product User" means, in relation to any particular Releasing Party, the natural person (including the deceased natural person) who is the Settlement Class Member who receives a Compensation Award who allegedly was exposed to Roundup.

56. "Released Claims and Liabilities" has the meaning provided in Paragraph 8 of this Release.

57. "Released Person" or "Released Persons" has the meaning provided in Paragraph 6 of this Release.

58. "Releasing Party" or "Releasing Parties" has the meaning provided in Paragraph 7 of this Release.

59. "Settlement Program" means the program for payment of Accelerated Payment Awards and the Claims Program.

## Miscellaneous

60. Where the context so requires, terms used in the singular in this Release shall be deemed to include the plural and *vice-versa*.

61. This Release may be executed in counterparts, each of which shall be an original and all of which shall together constitute one and the same instrument.

Exhibit 6                                                                                                              Page 16

**Certification of Medicare Status**

**62.**     Have you ever been enrolled in Medicare, now or in the past?   [**Check one**]

Yes: _____          No: _____

**IN WITNESS WHEREOF**, I have executed this Release effective as of the date set forth under my name below:

| SIGNATURE BY PRODUCT USER / RELEASING PARTY‡ | |
|---|---|
| **Signature of Releasing Party:** | |
| **Printed Name:** | |
| **Social Security No.:** | |
| **Date of Birth:** | |
| **Date of Signature:** | _____ / _____ / _____<br>(month)   (day)   (year) |

---

‡      INSTRUCTION: The Release must be executed with the Personal Signature of the Releasing Party.  If executed on behalf of a Releasing Party by a legal representative (e.g., legal guardian), evidence of such authority must be attached and submitted with the Release executed with the Personal Signature of the legal representative.

Exhibit 6                                                                                     Page 17

| NOTARIZATION | |
| --- | --- |
| BEFORE ME, the undersigned authority, the Person known to be the Releasing Party named above personally appeared on the Signature Date shown and acknowledged under oath to my satisfaction that he/she has signed, sealed and delivered this document as his or her act and deed for the purposes therein expressed and in the capacity therein expressed. | |
| **Signature of Notary:** | |
| **Notary Public in and for the State or Jurisdiction of:** | |
| **Date Notary Commission Expires:** | _____ / _____ / _____ <br> (month)   (day)   (year)    _____ Notary:  Check here if your Notary Commission has no expiration date under the law of your jurisdiction. |
| **Place Notary Seal or Stamp in this Space, or Notary Number:** | |
| | _____ Notary:  Check here if your jurisdiction does not require a seal or stamp. |

To be notarized in accordance with the applicable laws or rules governing notarization in the state in which the Releasing Party executes this Release.

Exhibit 6      Page 18

## SPOUSE / DERIVATIVE CLAIMANT—RELEASING PARTY[§]

| SIGNATURE BY SPOUSE / DERIVATIVE CLAIMANT | |
|---|---|
| **Printed Name of Product User:** | |
| **Signature of Spouse/Derivative Claimant:** | |
| **Printed Name:** | |
| **Social Security No.:** | |
| **Date of Birth:** | |
| **Relationship to Claimant:** | |
| **Date of Signature:** | _____/_____/_____<br>(month)  (day)  (year) |

---

[§]   INSTRUCTION: The Release must be executed with the Personal Signature of any current spouse of the Releasing Party.  In connection with any divorced, estranged or deceased spouses who were spouses at the time of the Releasing Party's use of or exposure to any Roundup Product and alleged injury, an indemnity agreement in the form agreed to by the Parties shall be executed and supplied by the Releasing Party together with this executed Release in lieu of signature by such divorced, estranged or deceased spouse.

Exhibit 6                                                                                    Page 19

| NOTARIZATION | |
|---|---|
| BEFORE ME, the undersigned authority, the Person known to be the Spouse/Derivative Claimant named above personally appeared on the Signature Date shown and acknowledged under oath to my satisfaction that he/she has signed, sealed and delivered this document as his or her act and deed for the purposes therein expressed and in the capacity therein expressed. | |
| **Signature of Notary:** | |
| **Notary Public in and for the State or Jurisdiction of:** | |
| **Date Notary Commission Expires:** | _____ / _____ / _____  <br> (month)   (day)   (year) | _____Notary:  Check here if your Notary Commission has no expiration date under the law of your jurisdiction. |
| **Place Notary Seal or Stamp in this Space, or Notary Number:** | |
| | _____ Notary:  Check here if your jurisdiction does not require a seal or stamp. |

To be notarized in accordance with the applicable laws or rules governing notarization in the state in which the Spouse/Derivative Claimant executes this Release.

Exhibit 6                                                                                                     Page 20

**CERTIFICATION OF COUNSEL**

**(COUNSEL FOR RELEASING PARTIES)**

I, _____, hereby represent and declare that
_____ ("Releasing Party") and _____
("Spouse" or "Releasing Party") (collectively the "Releasing Parties") is/are currently
represented by the undersigned counsel, either because I have been privately retained by the
Releasing Parties or have provided them with legal services pursuant to the Settlement
Agreement's Legal Service Program. I have provided Releasing Party(-ies) with a copy of the
Release to which this Certification of Counsel is attached and have made available to Releasing
Party(-ies) a copy of the Settlement Agreement referred to in the Release (which copies include
all attachments). I, or an employee of the firm working under my direction and authority,
informed Releasing Party(-ies) of the terms and legal effect of all of the foregoing documents
and Releasing Party(-ies)'s decision to participate in the Settlement Program, and I, or an
employee of the firm working under my direction and authority, answered any and all questions
Releasing Party(-ies) may have had. I hereby certify that Releasing Party(-ies), having had a full
opportunity to read, understand, and inquire of counsel about the terms and conditions of the
foregoing documents, does not have, and I do not have, any objection to the terms of this Release
or any of the other foregoing documents. I further agree to be bound by my obligations as
Counsel in the "Liens" section in this Release and all of the terms of the Settlement Agreement
applicable to Counsel.

COUNSEL FOR RELEASING PARTY(-IES):

By:_____

Name:_____

Title:_____

Dated: _____

Exhibit 6                                                                                           Page 21

## AMENDMENT TO RELEASE OF ALL CLAIMS

THIS AMENDMENT TO RELEASE OF ALL CLAIMS ("Amendment") is made and entered into by the Product User/Releasing Party _____ ("Product User/Releasing Party") who accepted a Compensation Award, on the date signed below.

## I. RECITALS

WHEREAS the Product User/Releasing Party has executed a separate Release of All Claims, ("Release"), with all of those terms and conditions incorporated herein in full;

WHEREAS the Release allows for amendments if signed by both parties;

WHEREAS the Product User/Releasing Party is or was married to _____ ("Spouse") and is separated or estranged from Spouse;

WHEREAS the Product User/Releasing Party is unable to obtain the signature of Spouse on the Release due to divorce or estrangement from Spouse, or due to Spouse's death;

WHEREAS Spouse may have claims against Defendants;

WHEREAS the Released Parties seek a full and complete release and indemnification from the Product User/Releasing Party and Spouse; and

WHEREAS, the Product User/Releasing Party is willing to provide an indemnification on behalf of Spouse to the Released Parties on this Amendment.

## II. INDEMNIFICATION

**Indemnification**.  The Product User/Releasing Party agrees to hereby bind Spouse and Spouse's heirs, personal representatives, successors, and assigns and to INDEMNIFY, REPAY and HOLD HARMLESS the Released Parties from any claim or judgment, including any multiple damages (including double damages), against Released Parties by any Spouse, parent, child or other relatives of Spouse, or any other person or entity (including federal or state governments, agencies thereof, or entities operating under any contract with any such federal or state government, agency, or entity), whose rights arise by or through Spouse's alleged injuries and/or all other claims.  The indemnification set forth in this Subsection specifically includes, but is not limited to, the payment of all reasonable costs and expenses of investigation, defense, settlement, attorneys' fees, judgments, court costs and all other costs and expenses of defending any such claims.  This indemnity is specifically intended to operate and be applicable even if it is alleged or proved that all or some of the damages being sought were caused as a whole or in part by any act, omission, negligence, gross negligence, breach of contract, intentional conduct, violation of statute or common law, breach of warranty, product defect, strict liability or any other conduct whatsoever of the Released Parties.  It is understood and agreed that the Product User/Releasing Party will defend (with counsel selected by Monsanto Company), hold harmless, and indemnify the Released Parties from and against all costs and expenses incurred for liens, demands, rights, causes of action, and any other claims from Spouse

Exhibit 6                                                                                           Page 22

which have been or may be asserted in the future against the Released Parties arising from or relating in any way to the Product User/Releasing Party's alleged exposure to Roundup Products.

**<u>Signature</u>**

CAUTION!  THIS IS AN INDEMNITY AGREEMENT.  READ BEFORE SIGNING.

   IN WITNESS WHEREOF, I, PRODUCT USER/RELEASING PARTY, having read the foregoing Confidential Indemnity Agreement carefully, and knowing and understanding its contents, after the same has been read over and having had an opportunity to review and discuss with counsel, and that all provisions have been fully agreed to, understood and comprehended, and signed my name as my free act and deed this _____ day of _____, 2021.


       _____
       PRODUCT USER/RELEASING PARTY'S NAME

STATE OF _____  )
          ) SS:
COUNTY OF _____  )


   BEFORE ME, a Notary Public in and for said County and State, personally appeared the above-named PRODUCT USER/RELEASING PARTY'S NAME who acknowledged that he did sign the foregoing Release, understood its contents, and that the same is his own free act and duty.

   SWORN TO BEFORE ME and subscribed in my presence on this _____ day of _____, 2021.


       _____
       NOTARY PUBLIC

Please place Seal or Stamp


To be notarized in accordance with the applicable laws or rules governing notarization in the state in which the Product User/Releasing Party executes this Release.

EXHIBIT 7

## EXHIBIT 7: DIAGNOSTIC ACCESSIBILITY GRANT PROGRAM SERVICE AREAS

The Diagnostic Accessibility Grant Program is intended to increase access to NHL Diagnostic Evaluation among Settlement Class Members, including to address regional disparity to such access through the distribution of grants to medical providers in the service areas identified through the three-part process in this Exhibit 7.  This Exhibit 7 sets forth the process by which the DAGP Administrator will develop the List of Service Areas.  The DAGP Administrator shall select DAGP Grantees (and determine DAGP Grant amounts) pursuant to the guidelines set forth below with the objective of increasing the availability of NHL Diagnostic Evaluation to the greatest number of DAGP Eligible Settlement Class Members, subject to the limitations set forth in Section 8.3(b).

**Part 1.  Identification of Geographic Areas with the Greatest Number of DAGP Eligible Settlement Class Members.**

(a)    <u>Geographic Areas with High Populations of Putative Settlement Class Members with High Likelihood of Exposure</u>.  The DAGP Administrator has identified regions with high populations of putative Settlement Class Members with high likelihoods of exposure utilizing occupational data provided by the Settlement Class Notice Agent, which includes nationwide geographical information regarding where farmworkers and certain non-farmworkers (for example, landscaping and groundskeeping workers) reside or work in the highest concentrations.  Table 1 lists geographic areas with high populations of putative Settlement Class Members with high likelihood of exposure based upon the following two factors:

(i)    <u>Density</u>.  The density of putative Settlement Class Members with high likelihood of exposure was calculated from the sum of at-risk farmworkers and landscapers / groundskeepers, based on data from the USDA and the Bureau of Labor Statistics. Each of the geographic areas listed in Table 1 has a minimum of (approximately) 20,000 for the at-risk population.[*]

(ii)    <u>Clusters</u>.  Where possible, geographic areas in Table 1 are sized using a 100- to 150-mile radius from the largest clusters of Settlement Class Members in the geographic area, with each node in the cluster consisting of a county.[†]

Part 1 is only a study of geographic areas for purposes of determining which areas have the highest numbers of putative Settlement Class Members with high likelihood of exposure.  Part 1 does not identify nor determine any service areas.  In Part 2, disparities in access to NHL Diagnostic Evaluation within and across the geographic areas identified in Part 1 will occur and thereafter service areas shall be selected.

Table 1: Geographic Areas with High Populations of Putative Settlement Class Members with High Likelihood of Exposure

---

[*] One geographic area (North Florida) is below this minimum.
[†] Some areas include a very small percentage of at-risk population outside of the 100- to 150-mile radius.

Exhibit 7                                                                                     Page 1

| Geographic Area | TOTAL USDA Farm Labor and BLS Landscapers / Groundskeepers |
|---|---|
| SOCAL | 121,804 |
| YAKIMA | 116,912 |
| NORTHEAST | 104,282 |
| MID-ATLANTIC | 92,372 |
| WESTERN_LAKE_MICHIGAN | 82,372 |
| FRESNO | 82,195 |
| CENTRAL_COAST | 65,035 |
| CENTRAL_FLORIDA | 65,035 |
| SACRAMENTO | 52,171 |
| NORTHERN_PLAINS | 50,298 |
| MICHIGAN | 47,967 |
| SOUTH_FLORIDA | 47,303 |
| PORTLAND | 46,862 |
| DALLAS | 44,691 |
| EAST_TEXAS | 43,065 |
| ERIE_ONTARIO | 39,385 |
| SO_IDAHO-UTAH | 35,078 |
| PHOENIX_EL_PASO | 31,589 |
| SOUTH_TEXAS | 31,463 |
| OHIO_RIVER | 27,861 |
| ATL_NASHVILLE | 27,298 |
| CAROLINA_EAST | 26,368 |
| WESTERN_GATEWAY | 25,712 |
| COLORADO | 20,930 |
| NORTH_TEXAS | 20,603 |
| CAROLINA_WEST | 20,497 |
| WESTERN_WASHINGTON | 20,207 |
| NORTH_FLORIDA | 18,848 |
| **Total Assigned to Geographic Areas** | **1,408,204** |
| **Total Unassigned to Geographic Area** | **42,403** |
| **% Assigned to Geographic Area‡** | **97%** |

Figures 1 through 4 further illustrate the density and clusters within and among geographic areas listed in Table 1.

---

‡ Over 97% of the estimated at-risk population of farmworkers and landscapers/groundskeepers are accounted for in geographic areas in Table 1, with less than 3% unassigned to one of the areas.

Exhibit 7                                                                                                    Page 2

Figure 1: Density of USDA Farm Labor and BLS Landscapers / Groundskeepers



Figure 2: Distribution of Clusters within the Table 1 Geographic Areas.
Each circle is a county.

Figure 3: Geographic Distribution of Population, wherein larger and darker circles denote larger populations of USDA Farm Labor and BLS Landscapers / Groundskeepers

Exhibit 7                                                                                                          Page 3



Figure 4: Assigned and Unassigned Populations, wherein red circles denote populations of USDA Farm Labor and BLS Landscapers / Groundskeepers unassigned to a Table 1 geographic area.



(b)     Geographic Areas with High Populations of Registered Settlement Class Members.  The DAGP Administrator may identify additional Part 1 geographic areas as actual Settlement Class Member data become available pursuant to the registration process described in Article V.

**Part 2.  Identification of Disparities in Access to NHL Diagnostic Evaluation Within and Among Geographic Areas Identified in Part 1**.

Exhibit 7                                                                                                    Page 4

(a)    Limited NHL Diagnostic Evaluation Capability and Capacity.  The DAGP Administrator shall prioritize those geographic areas identified in Part 1 based upon the capability or capacity to deliver or coordinate NHL Diagnostic Evaluation to the population of Settlement Class Members within and across the areas utilizing factors which include but are not limited to the following:

(i)    The number of primary health providers and service options;

(ii)    The number or amount of clinical and medical personnel or diagnostic equipment required to conduct the forecasted demand for NHL Diagnostic Evaluation;

(iii)    The proximity of such providers and services to Settlement Class Members and the reasonableness of required travel time to access those providers and services; and

(iv)    Whether the population in the area is designated, or has been designated in the past, as a medically underserved population by the United States Department of Health and Human Services, or federal, state, or local public health agencies.

(b)    Cultural and Economic Barriers.  The DAGP Administrator shall further prioritize those geographic areas identified in Part 1 by the presence of cultural and economic barriers which include but are not limited to the following:

(i)    Economic resources to pay for NHL Diagnostic Evaluation (e.g., a population's relative poverty rate);

(ii)    Language (e.g., non-English speaking populations residing or working in the United States);

(iii)    Limited knowledge of health providers or services;

(iv)    Mobility (e.g., many agricultural workers do not live near where they work, or they move regularly from one worksite to another); and

(v)    The existence of unusual local conditions that are a barrier to access to NHL Diagnostic Evaluation for Settlement Class Members.

**Part 3.  Selection of Service Areas.**

(a)    Within 90 days following entry of the Preliminary Approval Order, the DAGP Administrator shall publish the List of Service Areas.

(b)    The DAGP Administrator may modify the List of Service Areas with 30 days' notice to Class Counsel and Counsel for the Defendant, who may appeal such modified List of Service Areas to the Settlement Administrator within 30 days of its publication on the Settlement Website.

Exhibit 7                                                                                                              Page 5

        (c)      Either Class Counsel or a Settlement Class Member may petition the DAGP Administrator to add additional service areas, subject to the approval of the Settlement Administrator.

Exhibit 7                                                                                           Page 6

EXHIBIT 8

## EXHIBIT 8: SCIENCE PANEL DETERMINATION FORM

This form shall be filled out by the Science Panel without attribution to any individual Science Panel member.

After you have concluded the Scientific Analysis and reached the Science Panel Determination, you must fill out this form and deliver it to the Settlement Administrator, as set forth in Section 12.3(a) of the Settlement Agreement.  You must answer the questions provided and in answering the questions you may only select from the specific answer choices provided for on this form.

All questions must be answered by majority vote of the Science Panel, as set forth in Section 12.2(a) of the Settlement Agreement.

## Question No. 1:

Can exposure to Roundup Products cause NHL in humans, as assessed according to the criteria in Section 12.2(b) and Section 12.2(d) of the Settlement Agreement? [*]

        Yes: _____            No: _____

If you answered "No" to question 1, in the chart below check "No" and enter "Causation Not Shown Finding," sign the form, and deliver it to the Settlement Administrator.  Do not answer question 2 if you answer "No" to question 1.

If you answered "Yes" to question 1, proceed to question 2.

## Question No. 2:

If you answered "Yes" to question 1, at what threshold internal dose level (dose greater than xx micrograms/day over a lifetime) can exposure to Roundup Products cause NHL in humans, as assessed according to the criteria in Section 12.2(c) and Section 12.2(d) of the Settlement Agreement?

        Your answer must be recorded in the chart below as follows:

---

[*] All references in the Settlement Agreement and this Exhibit 8 to "exposure to Roundup Products" mean exposure to Roundup Products through the application of Roundup Products.  Exposure "through the application of Roundup Products" includes exposure through mixing and any other steps associated with application, whether or not the individual performed the application, mixing, or other steps associated with application himself or herself.

Exhibit 8                                                                                          Page 1

If you conclude that exposure to Roundup Products can cause NHL in humans at or above a threshold internal dose level (dose greater than xx micrograms/day over a lifetime), as assessed according to the criteria in Section 12.2(c) and Section 12.2(d) of the Settlement Agreement, in the chart below check "Yes," enter the specific threshold internal dose level (dose greater than xx micrograms/day over a lifetime), and enter "Causation Shown Finding."  You must set forth a threshold internal dose level for NHL if you have checked "Yes."  If you are unable to determine a threshold internal dose level for NHL and you have checked "Yes," change your answer to "No" and enter "Causation Not Shown Finding."  Sign the form, and deliver it to the Settlement Administrator.

*       *       *

| | Yes | No | Threshold Internal Dose Level | Finding Type:<br>• Causation Not Shown Finding<br>• Causation Shown Finding |
|---|---|---|---|---|
| NHL | | | | |

On behalf of the Science Panel, the undersigned hereby certifies that such determinations were duly made:

_____

Science Panel Chairperson

Dated:  _____

Exhibit 8                                                                                                      Page 2

EXHIBIT 9

## EXHIBIT 9: SCIENCE PANEL STIPULATION

### STIPULATION OF ADMITTED FACTS

IT IS HEREBY STIPULATED AND AGREED, by and between the Plaintiff [insert name of Settlement Class Member Party(ies)] and Defendant [insert name of Monsanto Party or Related Party] as follows:

1. On February 3, 2021, a class action settlement and settlement agreement was reached by and among Monsanto Company, and class representatives and subclass representatives, individually and on behalf of a defined settlement class and subclasses.  On [DATE], the United States District Court for the Northern District of California entered a Final Order and Judgment approving the class action settlement and settlement agreement, and certifying the settlement class and subclasses under Rule 23 of the Federal Rules of Civil Procedure.

2. The settlement agreement defined a term, Roundup Products, to mean: any glyphosate-containing product developed, manufactured, distributed, sold, and/or marketed by Monsanto (or any of its direct or indirect subsidiaries), or by any Person to the extent such product contains glyphosate exclusively supplied by Monsanto (or any of its direct or indirect subsidiaries), under any name or brand: (i) prior to or as of the settlement date; or (ii) after the settlement date if the product has a chemical formulation identical to a Roundup Product developed, manufactured, distributed, sold, and/or marketed prior to or as of the settlement date.

3. The Science Panel was an independent group of five scientists who are recognized, independent, appropriately credentialed epidemiologists, biostatisticians, toxicologists, or hematologists/oncologists, amongst others, and/or scientific or medical professionals with similar backgrounds and qualifications.

Exhibit 9                                                                                     Page 1

4.   The Science Panel was compromised of the following individuals:  [insert names of Science Panel members and their affiliations].

5.   The Science Panel was not under the control or influence of any party and did not include scientists employed by any party.

6.   The Science Panel conducted an independent, four-year review of the scientific evidence regarding whether exposure to Roundup Products through the application of Roundup Products can cause Non-Hodgkin's Lymphoma in humans.  The Science Panel was instructed that if a majority finds that such causation has not been established, then it should undertake no further inquiry.  If the Science Panel finds that causation has been established, then it was instructed to determine, by majority vote, at what threshold internal dose level (dose greater than xx micrograms/day) such causation has been established.

7.   The Science Panel conducted its work by reviewing the following existing body of scientific evidence:

   a.   Published EPA, Health Canada, JMPR, ECHA, EFSA, New Zealand, Japanese, and Australian carcinogenicity assessments of glyphosate, glyphosate-based herbicides, and/or surfactants.

   b.   IARC Monograph 112 regarding glyphosate.

   c.   All published studies and reviews regarding glyphosate, glyphosate-based herbicides and/or surfactant epidemiology, exposure/dose, animal toxicology, genotoxicity, and chemical structure and activity.

   d.   All registrant-supplied studies and data submitted to EPA, Health Canada, JMPR, ECHA, EFSA, New Zealand, Japanese, and Australian pesticide regulatory authorities concerning glyphosate, glyphosate-based herbicides, and/or surfactants regarding epidemiology, exposure/dose, animal toxicology, genotoxicity, and chemical structure and activity, provided that if the Science Panel believes that the underlying data for a particular study is necessary for a complete review of that study, the Science Panel shall not

Exhibit 9                                                                                                          Page 2

consider that study unless such underlying data are contained within the document productions made as of the Settlement Date by any Person in prior litigation involving Roundup Claims or are otherwise publicly available.

8.  The Science Panel had complete discretion to weigh this body of evidence and to conduct further analyses as it believes necessary to assess whether exposure to Roundup Products causes Non-Hodgkin's Lymphoma in humans.

9.  [The Science Panel's determination is that it has not been established that the application of Roundup Products can cause Non-Hodgkin's Lymphoma in humans.] or [The Science Panel's determination is that the application of Roundup Products has been shown to cause Non-Hodgkin's Lymphoma in humans, but only at or above the threshold internal dose level (dose greater than [xx] micrograms/day).] or [The Science Panel's determination is that the application of Roundup Products has been shown to cause Non-Hodgkin's Lymphoma in humans at any internal dose level.]

10. The parties have agreed that the Science Panel's determination should be considered as that of an independent expert and its determination should be given the same weight given to the testimony of any other independent expert witness.

Exhibit 9                                                                                                   Page 3

EXHIBIT 10

### EXHIBIT 10: [PROPOSED] PRELIMINARY APPROVAL ORDER

### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | :  MDL NO. 2741 |
| | : |
| | :  Case No. 3:16-md-02741-VC |
| THIS DOCUMENT RELATES TO: | : |
| | :  **Hon. Vince Chhabria** |
| *Ramirez, et al. v. Monsanto Co.*, Case No. 3:19-cv-02224 | |

### [PROPOSED] ORDER
### (1) GRANTING PRELIMINARY APPROVAL OF THE SETTLEMENT AGREEMENT;
### (2) APPOINTING CLASS COUNSEL AND SUBCLASS COUNSEL;
### (3) APPROVING THE DISSEMINATION OF SETTLEMENT CLASS NOTICE;
### (4) SCHEDULING A FAIRNESS HEARING; AND
### (5) STAYING THE FILING AND PROSECUTION OF ROUNDUP-RELATED ACTIONS BY SETTLEMENT CLASS MEMBERS

Exhibit 10                                                                                           Page 1

Before the Court is the Motion of Proposed Class Counsel for an Order: (1) Granting Preliminary Approval of the Settlement Agreement; (2) Appointing Class Counsel and Subclass Counsel; (3) Approving the Dissemination of Settlement Class Notice; (4) Scheduling a Fairness Hearing; and (5) Staying the Filing and Prosecution of Roundup-Related Actions by Settlement Class Members (the "Preliminary Approval Motion"), pursuant to Rules 23(a), 23(b), and 23(e) of the Federal Rules of Civil Procedure.

WHEREAS, a proposed Settlement Agreement has been reached by and among defendant Monsanto Company ("Defendant"), by and through its attorneys, and the Class Representatives and Subclass Representatives, by and through Class Counsel and Subclass Counsel, individually and on behalf of a defined proposed Settlement Class and Subclasses;

WHEREAS, the Court, for the purposes of this Preliminary Approval Order, adopts all defined terms as set forth in the Settlement Agreement;

WHEREAS, this matter has come before the Court pursuant to the Preliminary Approval Motion;

WHEREAS, the Defendant does not oppose the Court's entry of this Preliminary Approval Order;

WHEREAS, the Court finds that it has jurisdiction over the action and each of the Parties for purposes of settlement and asserts jurisdiction over the Class Representatives and Subclass Representatives for purposes of considering and effectuating the Settlement Agreement;

WHEREAS, the Court held a Preliminary Approval Hearing on **_____, 2021**; and

WHEREAS, the Court has considered all of the presentations and submissions related to the Preliminary Approval Motion and, having presided over and managed the proceedings in MDL

Exhibit 10                                                                                          Page 2

No. 2471 as Transferee Judge since the October 3, 2016 Transfer Order, is familiar with the facts, contentions, claims, and defenses as they have developed in these proceedings, and is otherwise fully advised of all relevant facts in connection therewith;

**IT IS HEREBY ORDERED AS FOLLOWS:**

## I.      PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT

1.      The Court finds that the requirements of Rules 23(a)(1)-(4), 23(b), and 23(e) of the Federal Rules of Civil Procedure have been satisfied for purposes of preliminary approval of the Settlement Agreement, such that notice of the Settlement Agreement should be directed to Settlement Class Members and a Fairness Hearing should be set.

2.      The Settlement Agreement, including all Exhibits attached thereto, are preliminarily approved by the Court.

## II.     FINDINGS REGARDING THE SETTLEMENT CLASS AND SUBCLASSES

3.      The Settlement Class consists of, only for purposes of the Settlement Agreement: (i) those individuals who are either citizens or Residents of the United States as of February 3, 2021 or who claim exposure to Roundup Products through the application of Roundup Products in the United States and who as of February 3, 2021 both (1) have been exposed to Roundup Products through the application of Roundup Products and (2) have not commenced an individual, non-class lawsuit or retained counsel for the pursuit of any individual, non-class personal injury or false advertising claims arising from, resulting from, in any way relating to or in connection with such exposure; and (ii) all Derivative Claimants.  "Exposure to Roundup Products through the application of Roundup Products" includes exposure through mixing and any other steps associated with application, whether or not the individual performed the application, mixing, or other steps associated with application himself or herself.

4.      The following Persons are excluded from the Settlement Class:

Exhibit 10                                                                                                    Page 3

a       Judicial officers and associated court staff assigned to this case, and their immediate family members;

b       Past and present (as of the Settlement Date) officers, directors, and employees of the Defendant or any of its direct or indirect subsidiaries; and

c       All those otherwise in the Settlement Class who timely and properly exclude themselves from the Settlement Class in the manner approved by the Court and set forth in the Settlement Class Notice.

5.       The Settlement Class consists of two Subclasses.

a.       Subclass 1 means Settlement Class Members who have been diagnosed with NHL as of February 3, 2021, and their Derivative Claimants.

b       Subclass 2 means Settlement Class Members who have not been diagnosed with NHL as of February 3, 2021, and their Derivative Claimants.

6.       The Court finds that it will likely be able to certify the Settlement Class and Subclasses for purposes of judgment on the proposed Settlement Agreement.  The Settlement Class and Subclasses likely meet the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a)(1)-(4) of the Federal Rules of Civil Procedure and the predominance and superiority requirements of Rule 23(b)(3) of the Federal Rules of Civil Procedure.

7.       The following Class Representatives are preliminarily appointed: Robert Ramirez; Jerry Agtarap; Dexter Owens; John Elko; Aaron Sheller; and Kabe Cain.

8.       The following Subclass Representatives are preliminarily appointed for each of the Settlement Subclasses:

a.       Subclass 1:  Robert Ramirez; and

b       Subclass 2:  Jerry Agtarap; Dexter Owens; John Elko; Aaron Sheller; and Kabe Cain.

9.      Elizabeth J. Cabraser (lead), Robert L. Lieff, and Steven E. Fineman of Lieff Cabraser Heimann & Bernstein, LLP; Samuel Issacharoff; James R. Dugan, II (co-lead) and TerriAnne Benedetto of the Dugan Law Firm, APLC; William M. Audet (co-lead) of Audet & Partners, LLP; and Elizabeth Fegan of FeganScott LLC are preliminarily appointed as Class Counsel under Rule 23(g)(3) of the Federal Rules of Civil Procedure.

10.      William M. Audet of Audet & Partners, LLP is preliminarily appointed as Subclass Counsel for Subclass 1 and TerriAnne Benedetto of the Dugan Law Firm, APLC, and Elizabeth Fegan of FeganScott LLC are preliminarily appointed as Subclass Counsel for Subclass 2 under Rule 23(g)(3) of the Federal Rules of Civil Procedure.

## III.    FINDINGS REGARDING THE SETTLEMENT AGREEMENT

11.      Under Rule 23(e)(2) of the Federal Rules of Civil Procedure, in order to approve the Settlement Agreement, the Court must determine whether the proposed Settlement Agreement is fair, reasonable, and adequate.  Rule 23(e)(2) sets forth factors that the Court must consider in reaching that determination.  The Court's scrutiny of the proposed settlement will be as rigorous at the preliminary approval stage as at the final approval stage.  *Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1036-1037 (N.D. Cal. 2016).

12.      The Parties have provided sufficient information, including in the Preliminary Approval Motion and related submissions and presentations, "to allow the district court to carefully evaluate the strength of the claims, the risks of litigating those claims all the way through, and the value of the relief each class member will receive from the settlement."  *Cotter*, 193 F. Supp. 3d at 1037.  The proposed Settlement Agreement is the product of intensive, thorough, serious, informed, and non-collusive negotiations overseen by the Court-appointed mediator

Kenneth Feinberg; has no obvious deficiencies; does not improperly grant preferential treatment to the Class Representatives, Subclass Representatives, or segments of the Settlement Class; and is fair, reasonable, and adequate.  Accordingly, the Court has taken the Rule 23(e)(2) factors and applicable precedent into account in finding that it will likely be able to approve the proposed Settlement Agreement as fair, reasonable, and adequate.

13.     The Court finds that it will likely be able to approve, under Rule 23(e)(2) of the Federal Rules of Civil Procedure, the proposed Settlement Agreement.

## IV.     NOTICE TO SETTLEMENT CLASS MEMBERS

14.     Under Rule 23(c)(2) of the Federal Rules of Civil Procedure, the Court finds that the Settlement Class Notice set forth in Exhibit 2 to the Settlement Agreement, and the Settlement Class Notice Plan set forth in the Preliminary Approval Motion and the Declaration of Shannon R. Wheatman filed on February 3, 2021, including an extensive publication campaign, (a) is the best practicable notice; (b) is reasonably calculated under the circumstances to apprise Settlement Class Members of the pendency of the Lawsuit and the Settlement Agreement and of their right to object to or exclude themselves from the proposed Settlement Agreement; (c) is reasonable and constitutes due, adequate, and sufficient notice to all persons entitled to receive notice; and (d) meets all applicable requirements of Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause) and other applicable laws and rules.

15.     The Court approves the Settlement Class Notice and the Settlement Class Notice Plan, and hereby directs that the Settlement Class Notice be disseminated pursuant to the Settlement Class Notice Plan to Settlement Class Members under Rule 23(e)(1) of the Federal Rules of Civil Procedure.

16.     No later than twenty (20) days after entry of this Preliminary Approval Order (including the provision approving the Escrow Agreement), the Defendant shall make the payment

Exhibit 10                                                                                                          Page 6

into the Settlement Fund set forth in Section 3.6(a)(ii) of the Settlement Agreement, which shall be used to effectuate the Settlement Class Notice Plan and other purposes as specified in that Section.

17.     The Settlement Class Notice shall be posted on the Settlement Website twenty (20) days after entry of this Preliminary Approval Order, on _____**, 2021**, so as to commence the Settlement Class Notice Plan, as well as the period during which Settlement Class Members may Opt Out from the Settlement Class or object to the Settlement Agreement.

## V.     OPT OUT AND OBJECTION PROCEDURES

18.     The Opt Out procedure set forth in Section 4.2 of the Settlement Agreement and the instructions in the Settlement Class Notice regarding the procedures that must be followed to Opt Out of the Settlement Class are approved.

19.     Any Settlement Class Member wishing to Opt Out of the Settlement Class must submit a written request to Verus LLC (as the preliminarily approved Claims Administrator), of his or her intention to Opt Out of the Settlement Class.  Such written request must be postmarked, emailed, or submitted through the Settlement Website no later than the date one hundred and fifty (150) days following the commencement of the Settlement Class Notice Plan (described in Paragraph 17), which is the last day of the Opt Out period.  The last day of the Opt Out period is _____**, 2021**.

20.     To be effective, the Opt Out notice must set forth the Settlement Class Member's printed name, address, telephone number, and date of birth and enclose a copy of his or her identification issued by any Governmental Authority or other bona fide identification, along with a sentence stating:  "I wish to exclude myself from the Settlement Class in *Robert Ramirez, et al. v. Monsanto Company*, Case No. 3:16-md-02741-VC & 3:19-cv-02224-VC" (or substantially similar clear and unambiguous language).  The Opt Out notice must contain the dated Personal

Exhibit 10                                                                                                          Page 7

Signature of the individual Settlement Class Member.  The Settlement Class Member must either (i) mail the signed written request to a physical address to be identified in the Settlement Class Notice; (ii) email a complete and legible scanned copy or photograph of the signed written request to an email address to be identified in the Settlement Class Notice; or (iii) submit a complete and legible scanned copy or photograph of the signed written request through the Settlement Website. Attorneys for Settlement Class Members may submit a written request to Opt Out on behalf of a Settlement Class Member, but such request must contain the Personal Signature of the Settlement Class Member.  A valid request to Opt Out from the Settlement Class will become effective as of the later of twenty-one (21) days of receipt by Verus LLC (as the preliminarily appointed Claims Administrator) or the resolution of any challenge to the validity of the request brought by Class Counsel or the Defendant.

21.     Pursuant to Section 4.5 of the Settlement Agreement, the Defendant shall have the right, in its discretion, to terminate and render null and void the Settlement Agreement following notice of Opt Outs and prior to the Fairness Hearing if the Defendant determines, in its sole discretion, that the number or nature of the qualified Opt Outs frustrates the purpose of the Settlement Agreement.  To exercise that right, the Defendant must provide written election to terminate the Settlement Agreement under Section 4.5 of the Settlement Agreement to Class Counsel and the Court prior to the Fairness Hearing.

22.     The procedure for objecting to the Settlement Agreement, as set forth in Section 19.1 of the Settlement Agreement, is approved.

23.     A Settlement Class Member who wishes to object to any aspect of the Settlement Agreement must submit to the Court a written statement of the objection(s).

Exhibit 10                                                                                      Page 8

24.     The written statement of objection(s) must include a detailed statement of the Settlement Class Member's objection(s), as well as the specific reasons, if any, for each such objection, including any evidence and legal authority the Settlement Class Member wishes to bring to the Court's attention.  That written statement also must contain the Settlement Class Member's printed name, address, telephone number, written evidence establishing that the objector is a Settlement Class Member, and any other supporting papers, materials, or briefs the Settlement Class Member wishes the Court to consider when reviewing the objection.  A written statement of objection(s) must contain the dated Personal Signature of the Settlement Class Member making the objection.

25.     All objections shall be filed no later than thirty (30) days prior to the date set for the Fairness Hearing (*i.e.*, _____, **2021**), or they will be deemed waived.

26.     A Settlement Class Member may object on his or her own behalf or through an attorney hired at that Settlement Class Member's own expense, provided the Settlement Class Member has not submitted a written request to Opt Out.  An attorney asserting objections on behalf of Settlement Class Members must:  (a) file a notice of appearance with the Court by _____, **2021**; (b) file a sworn declaration attesting to his or her representation of each Settlement Class Member on whose behalf the objection is being filed or a copy of the contract (to be filed *in camera*) between that attorney and each such Settlement Class Member; and (c) otherwise comply with the procedures described in Section 19.1 of the Settlement Agreement.

27.     A Settlement Class Member (or counsel individually representing him or her, if any) seeking to make an appearance at the Fairness Hearing must file with the Court, by _____, **2021**, a written notice of his or her intention to appear at the Fairness Hearing stating the matters the Settlement Class Member intends to present to the Court.  Filing a written

Exhibit 10                                                                                                          Page 9

statement of objection(s) is a prerequisite to appearing at the Fairness Hearing, but this requirement may be excused for good cause shown.

28.     Any Settlement Class Member who fails to comply with the provisions of Section 19.1 of the Settlement Agreement will waive and forfeit any and all rights he or she may have to object to the Settlement Agreement, except that the Court will only require substantial compliance with the requirements for submitting an objection.

29.     No later than fifteen (15) days prior to the date set for the Fairness Hearing, *i.e.*, by **_____, 2021**, Verus LLC (as the preliminarily appointed Claims Administrator) shall prepare and file with the Court, and serve on Class Counsel and Counsel for the Defendant, a list of all persons who have timely Opted Out of the Settlement Class or objected to the Settlement Agreement.

## VI.    FAIRNESS HEARING

30.     A formal Fairness Hearing shall take place on the **_____ day of _____, 2021 at _____ o'clock in the a.m./p.m.**, at which the Court will consider submissions regarding the proposed Settlement Agreement, including any objections, and whether:  (a) to approve thereafter the Settlement Agreement as fair, reasonable, and adequate, pursuant to Rule 23 of the Federal Rules of Civil Procedure, (b) to certify the Settlement Class and Subclasses, and (c) to enter the Final Order and Judgment, as provided in Article XX of the Settlement Agreement. The Fairness Hearing shall be subject to adjournment by the Court without further notice, other than that which may be posted by the Court on the Court's website.

31.     Class Counsel and Counsel for the Defendant shall file any response to the objections, or any papers in support of final approval of the Settlement Agreement, no fewer than fourteen (14) days prior to the date set for the Fairness Hearing, *i.e.*, by **_____, 2021**.

Exhibit 10                                                                                           Page 10

32.     Class Counsel shall file a motion for attorneys' fees, costs, and Class Representative and Subclass Representative service awards at least thirty (30) days prior to the deadline for objecting to the Settlement Agreement.

## VII.   STAY ORDER

33.     This matter and all Roundup Lawsuits and Related Party Lawsuits brought by Settlement Class Member Parties are stayed.  No Settlement Class Member Party may file or prosecute any Roundup Claims, Roundup Lawsuits, and Related Party Lawsuits[*] in any forum or jurisdiction (whether federal, state, or otherwise) against any of the Monsanto Parties or the Related Parties, and any such filings are stayed; provided, however, that this Paragraph shall not apply to any Opt Outs beginning as of the date their Opt Out becomes effective.  The stay and prohibition set forth in this Paragraph shall remain in effect until 90 days following the conclusion of the Initial Settlement Period.  The provisions of this Paragraph will be superseded in connection with the Court's decision regarding final approval of the Settlement Agreement and final certification of the proposed Settlement Class and Subclasses.  This order is entered pursuant to the Court's Rule 23(e) findings set forth above, in aid of its jurisdiction over the members of the proposed Settlement Class and the settlement approval process under Rule 23(e).

## VIII.  TOLLING OF STATUTES OF LIMITATION

34.     The statutes of limitation applicable to (a) any and all Roundup Claims that have been or could be asserted by or on behalf of any Settlement Class Member Party against any Monsanto Party, and (b) any and all Claims, counterclaims, and defenses of the Settlement Class Member Parties and the Monsanto Parties with respect to the Roundup Claims between any Settlement Class Member Party and any Monsanto Party will be tolled and stayed to the extent not

---

[*] As defined in the Settlement Agreement.

Exhibit 10                                                                                                      Page 11

already tolled by the initiation of an action in the Lawsuit or a Roundup Lawsuit; provided, however, that the tolling set forth in this Paragraph shall not apply to any Opt Outs, beginning as of the date their Opt Out becomes effective.  The tolling set forth in this Paragraph shall remain in effect until 90 days following the conclusion of the Initial Settlement Period.  Notwithstanding anything to the contrary in this Preliminary Approval Order, the tolling set forth in this Paragraph shall expire under the circumstances set forth in Section 18.2(b)(iii) of the Settlement Agreement.

36. Any time already elapsed as to any Settlement Class Member Parties on any applicable statutes of limitations prior to entry of this Preliminary Approval Order will not be reset, and no expired Claims will be revived, by virtue of the Settlement Agreement or this Preliminary Approval Order.

## IX.   OTHER PROVISIONS

36. Kenneth R. Feinberg, Law Offices of Kenneth R. Feinberg, PC, is preliminarily appointed to serve as the Settlement Administrator.

37. Wolf Garretson, LLC is preliminarily appointed to serve as the DAGP Administrator and the Lien Administrator.

38. Verus LLC is preliminarily appointed to serve as the Claims Administrator, and is appointed as the administrator of the Settlement Fund escrow account within the meaning of § 1.468B-2(k)(3) of the Treasury Regulations.

39. Citibank, N.A. acting through its Citi Private Bank business unit is appointed as the Escrow Agent.

40. Kinsella Media, LLC and Signal Interactive Media, LLC are appointed to serve as the Settlement Class Notice Agent.

41. The Court has reviewed the proposed Escrow Agreement and Article XV of the Settlement Agreement and approves the Escrow Agreement and Article XV of the Settlement

Exhibit 10                                                                                                    Page 12

Agreement and authorizes that the Settlement Fund escrow account established pursuant to the Escrow Agreement be established as a qualified settlement fund within the meaning of § 1.468B-1 of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code of 1986, as amended.

42.     The Defendant has the right to communicate orally and in writing with, and to respond to inquiries from, Settlement Class Member Parties on matters unrelated to the Settlement Agreement in connection with the Defendant's normal business.

43.     If the Settlement Agreement is terminated or is not consummated for any reason, the Court's findings with respect to certification of the Settlement Class and Subclasses shall be void, and the Plaintiffs and the Defendant shall be deemed to have reserved all of their rights to propose or oppose any and all class certification issues.

44.     The deadlines set forth in Paragraphs 25, 26, 27, 29, 30, and 31 of this Preliminary Approval Order may be extended, and the Fairness Hearing may be adjourned, by Order of the Court, for good cause shown, without further notice to the Settlement Class Members, except that notice of any such extensions or adjournments shall be included on the Settlement Website. Settlement Class Members should check the Settlement Website regularly for updates and further details regarding extensions of these deadlines.

45.     Class Counsel, Counsel for the Defendant, the Settlement Administrator, the Claims Administrator, the DAGP Administrator, the Lien Administrator, the Settlement Class Notice Agent, and the Escrow Agent are authorized to take, without further Court approval, all actions under the Settlement Agreement that are permitted or required to be taken following entry of this Preliminary Approval Order and prior to entry of the Final Order and Judgment, including effectuation of the Settlement Class Notice Plan.

Exhibit 10                                                                                                    Page 13

46.     Class Counsel and Counsel for the Defendant are authorized to use all reasonable procedures in connection with administration and obtaining approval of the Settlement Agreement that are not materially inconsistent with this Preliminary Approval Order or the Settlement Agreement, including making, without further approval of the Court, minor changes to the Settlement Agreement, to the form or content of the Settlement Class Notice, or otherwise to the extent the Parties jointly agree such minor changes are reasonable and necessary.

47.     The Court shall maintain continuing jurisdiction over these proceedings (including over the administration of the qualified settlement fund) for the benefit of the Settlement Class as defined in this Preliminary Approval Order.

**SO ORDERED** this _____ day of _____, 2021.

_____
The Honorable Vince Chhabria
United States District Court Judge

Exhibit 10                                                                                    Page 14

EXHIBIT 11

EXHIBIT 11: [PROPOSED] FINAL ORDER AND JUDGMENT

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | : MDL NO. 2741 |
| | : |
| | : Case No. 3:16-md-02741-VC |
| THIS DOCUMENT RELATES TO: | : |
| | : **Hon. Vince Chhabria** |
| *Ramirez, et al v. Monsanto Co.*, Case No. 3:19-cv-02224 | |

## [PROPOSED] FINAL ORDER AND JUDGMENT

Before the Court is the Motion of Class Counsel for an Order Granting Final Approval of the Settlement Agreement and Certification of the Settlement Class and Subclasses, pursuant to Rules 23(a), 23(b), and 23(e) of the Federal Rules of Civil Procedure.

WHEREAS, on April 24, 2019, the original complaint in the *Robert Ramirez, et al. v. Monsanto Company*, Case No. 3:16-md-02741-VC & 3:19-cv-02224-VC (N.D. Cal.) was filed in the Court.  On February 3, 2021, an amended complaint in the Lawsuit was filed in the Court on behalf of Class Representatives and Subclass Representatives.  On February 3, 2021, a Settlement Agreement was entered into by and among defendant Monsanto Company ("Defendant"), by and through its attorneys, and the Class Representatives and Subclass Representatives, individually and on behalf of the Settlement Class and Subclasses, by and through Class Counsel;

Exhibit 11                                                                                    Page 1

WHEREAS, the Court, for the purposes of this Final Order and Judgment, adopts all defined terms as set forth in the Settlement Agreement;

WHEREAS, on _____, **2021**, the Court entered a Preliminary Approval Order that, among other things:  (i) preliminarily approved the Settlement Agreement; (ii) appointed Class Counsel and Subclass Counsel; (iii) approved the Settlement Class Notice and Settlement Class Notice Plan and directed that the Settlement Class Notice be disseminated to Settlement Class Members according to the Settlement Class Notice Plan; (iv) scheduled a Fairness Hearing for final approval of the Settlement Agreement; and (v) stayed the filing and prosecution of Roundup-related actions by Settlement Class Members;

WHEREAS, in the Settlement Agreement the Settlement Class is defined as follows:  (i) those individuals who are either citizens or Residents of the United States as of February 3, 2021 or who claim exposure to Roundup Products through the application of Roundup Products in the United States and who as of February 3, 2021 both (1) have been exposed to Roundup Products through the application of Roundup Products and (2) have not commenced an individual, non-class lawsuit or retained counsel for the pursuit of any individual, non-class personal injury or false advertising claims arising from, resulting from, in any way relating to or in connection with such exposure; and (ii) all Derivative Claimants.  "Exposure to Roundup Products through the application of Roundup Products" includes exposure through mixing and any other steps associated with application, whether or not the individual performed the application, mixing, or other steps associated with application himself or herself;

WHEREAS, Section 1.1(b) of the Settlement Agreement identifies certain Persons that are excluded from the Settlement Class;

Exhibit 11          Page 2

WHEREAS, in the Settlement Agreement the Subclasses are defined as follows: (i) "Subclass 1" means Settlement Class Members who have been diagnosed with NHL as of February 3, 2021, and their Derivative Claimants; and (ii) "Subclass 2" means Settlement Class Members who have not been diagnosed with NHL as of February 3, 2021, and their Derivative Claimants;

WHEREAS, [●] Settlement Class Members have chosen to be excluded from the Settlement Class by timely filing written requests for exclusion.  The Opt Outs are listed at the end of this Final Order and Judgment in Exhibit A;

WHEREAS, [●] Settlement Class Members submitted objections to the Settlement Agreement under the process set by the Preliminary Approval Order;

WHEREAS, on _____, 2021, the Court held the Fairness Hearing to consider whether the Settlement Agreement was fair, reasonable, adequate, and in the best interests of the Settlement Class and Subclasses;

WHEREAS, the Court, having heard arguments of counsel for the Parties and of the persons who appeared at the Fairness Hearing, having reviewed all materials submitted, having considered all of the files, records, and proceedings in the Lawsuit, and being otherwise fully advised;

**IT IS HEREBY ORDERED AS FOLLOWS:**

1.    This Final Order and Judgment certifies the Settlement Class and Subclasses under Rule 23 of the Federal Rules of Civil Procedure for settlement purposes only.

2.    The Court finds that the requirements of Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure are met.  The Court finds that for settlement purposes:  (a) the Settlement Class Members are so numerous that their joinder is impracticable; (b) there are questions of law and fact common to the Settlement Class and Subclasses; (c) the claims of the

Exhibit 11                                                                                          Page 3

Class Representatives and Subclass Representatives are typical of the Settlement Class Members and the respective members of the Subclasses; (d) the Class Representatives and Subclass Representatives and Class Counsel and Subclass Counsel have fairly and adequately represented and protected the interests of all Settlement Class Members; and (e) the questions of law or fact common to the Settlement Class and Subclasses predominate over any questions affecting only individual Settlement Class Members, and a class action is superior to other available methods for the fair and efficient resolution of the controversy.

3.     The Court confirms the appointment of Robert Ramirez, Jerry Agtarap, Dexter Owens, John Elko, Aaron Sheller, and Kabe Cain as Class Representatives; as well as Robert Ramirez as Subclass 1 Representative and Jerry Agtarap, Dexter Owens, John Elko, Aaron Sheller, and Kabe Cain as Subclass 2 Representatives, who were preliminarily approved in the Preliminary Approval Order.

4.     Pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, the Court confirms the appointment of Elizabeth J. Cabraser (lead), Robert L. Lieff, and Steven E. Fineman of Lieff Cabraser Heimann & Bernstein, LLP; Samuel Issacharoff; James R. Dugan, II (co-lead) and TerriAnne Benedetto of the Dugan Law Firm, APLC; William M. Audet (co-lead) of Audet & Partners, LLP; and Elizabeth Fegan of FeganScott LLC, as Class Counsel; and William M. Audet of Audet & Partners, LLP as Subclass Counsel for Subclass 1, and TerriAnne Benedetto of the Dugan Law Firm, APLC and Elizabeth Fegan of FeganScott LLC as Subclass Counsel for Subclass 2, who were preliminarily approved in the Preliminary Approval Order.

5.     If a proposed settlement class satisfies Rules 23(a) and (b) of the Federal Rules of Civil Procedure, the Court must determine whether the settlement itself is fair, reasonable, and adequate.  *See* Fed. R. Civ. P. 23(e)(2) (enumerating factors the Court must consider).  The

Exhibit 11                                                                                          Page 4

Court has analyzed the Rule 23(e)(2) factors in light of applicable precedent and has concluded that the Settlement Agreement is fair, reasonable, and adequate.

    a.    Class Counsel and the Class Representatives have adequately represented the Settlement Class, and Subclass Counsel and Subclass Representatives have adequately represented their respective Subclasses;

    b.    The Settlement Agreement was negotiated at arm's length under the supervision of the Court-appointed mediator;

    c.    The relief provided to the Settlement Class is adequate, taking into account the costs, risks, and delay of trial and appeal in the absence of settlement; the effectiveness of the proposed methods of distributing the Settlement Agreement relief to the Settlement Class; the terms and timing of the proposed fee award; and any agreement required to be identified under Rule 23(e)(3).

    d.    The Settlement Agreement treats Settlement Class Members equitably relative to each other.

6. Therefore, pursuant to, and in accordance with, Rule 23 of the Federal Rules of Civil Procedure, the Court hereby fully and finally approves the Settlement Agreement in its entirety and finds that the Settlement Agreement is fair, reasonable, and adequate, including with respect to each Subclass. The Court also finds that the Settlement Agreement is in the best interests of the Class Representatives and Subclass Representatives and all Settlement Class Members, including the members of the Subclasses, and is consistent and in compliance with all applicable laws and rules. The Court further finds that the Settlement Agreement is the product of intensive,

thorough, serious, informed, and non-collusive negotiations overseen by the Court-appointed mediator Kenneth Feinberg.   The Court further finds that the Parties have evidenced full compliance with the Preliminary Approval Order.

       7.     The Parties are ordered to implement, perform, and consummate each of the obligations set forth in the Settlement Agreement in accordance with its terms.  All objections to the Settlement Agreement are found to be without merit and are overruled.

       8.     Notice in the form of the Settlement Class Notice was provided to Settlement Class Members pursuant to the Settlement Class Notice Plan approved in the Preliminary Approval Order, including an extensive publication campaign.  Class Counsel worked together with the Settlement Class Notice Agent to fashion a Settlement Class Notice Plan that was tailored to the Settlement Class Members.  Class Counsel have established that the Settlement Class Notice Plan was implemented.  Class Counsel caused to be established and maintained a public website that provided information about the proposed Settlement Agreement, including the Settlement Agreement, frequently asked questions, the Preliminary Approval Order, and relevant dates for objecting to the Settlement Agreement and submitting requests to Opt Out of the Settlement Class, and the date and place of the Fairness Hearing, and also caused to be established an automated telephone system that uses a toll-free number to provide information about the Settlement Agreement.

       9.     The Court finds that the Settlement Class Notice disseminated pursuant to the Settlement Class Notice Plan:  (a) was implemented in accordance with the Preliminary Approval Order; (b) constituted the best notice practicable under the circumstances; (c) constituted notice that was reasonably calculated, under the circumstances, to apprise Settlement Class Members (i) of the effect of the Settlement Agreement (including the use of the Science Panel

Determination and the Releases provided for therein), (ii) of the amount of attorneys' fees and costs sought by Class Counsel, (iii) of their right to Opt Out or object to any aspect of the Settlement Agreement, (iv) of their right to revoke an Opt Out prior to entry of this Final Order and Judgment, and (v) of their right to appear at the Fairness Hearing; (d) constituted due, adequate, and sufficient notice to all persons entitled to receive notice of the Settlement Agreement; and (e) satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause) and other applicable laws and rules.

10.     The Defendant complied with the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), 1453, 1711-1715, and its notice requirements by providing appropriate federal and state officials with information about the Settlement Agreement.

11.     All Settlement Class Member Parties are barred and enjoined from filing or prosecuting any Roundup Claims, Roundup Lawsuits, and Related Party Lawsuits in any forum or jurisdiction (whether federal, state, or otherwise) against any of the Monsanto Parties or the Related Parties, until 90 days following the conclusion of the Initial Settlement Period.  The injunction set forth in this Paragraph supersedes the stay and prohibition set forth in the Preliminary Approval Order.  Following the conclusion of the Initial Settlement Period, Settlement Class Members can sue for Compensatory Damages in the tort system for any Roundup Claim against the Monsanto Parties or the Related Parties under, at the time, and subject to the terms and conditions set forth in Section 7.13, Section 7.16, and Article XIII of the Settlement Agreement. In any suit in the tort system for any Roundup Claim against the Monsanto Parties or the Related Parties, the Settlement Class Member may seek Compensatory Damages only and remains bound by all provisions of the Settlement Agreement other than the bar on bringing Roundup Claims for

Exhibit 11                                                                                                  Page 7

Compensatory Damages in the tort system.  The provisions of the Settlement Agreement that permit Settlement Class Members to sue for Compensatory Damages in the tort system for Roundup Claims against the Monsanto Parties or the Related Parties set forth solely the time, circumstances and terms and conditions under which Settlement Class Members may bring such lawsuits consistent with the Settlement Agreement.  Such provisions shall not be construed as suggesting that any Settlement Class Member would have a valid Roundup Claim or that any such lawsuit or Roundup Claim has or would have merit, and are without prejudice to the rights of the Monsanto Parties and the Related Parties to defend against any such lawsuits or Roundup Claims.

12.     The statutes of limitation applicable to (a) any and all Roundup Claims that have been or could be asserted by or on behalf of any Settlement Class Member Party against any Monsanto Party, and (b) any and all Claims, counterclaims, and defenses of the Settlement Class Member Parties and the Monsanto Parties with respect to the Roundup Claims between any Settlement Class Member Party and any Monsanto Party will be tolled and stayed to the extent not already tolled by the initiation of an action in the Lawsuit or a Roundup Lawsuit.  The tolling set forth in this Paragraph shall remain in effect until 90 days following the conclusion of the Initial Settlement Period.  Any time already elapsed as to any Settlement Class Member Parties on any applicable statutes of limitations prior to entry of the Preliminary Approval Order will not be reset, and no expired Claims will be revived, by virtue of the Settlement Agreement or this Final Order and Judgment.

13.     The Class Action Complaint is hereby dismissed with prejudice, without further costs, including Claims for interest, penalties, costs, and attorneys' fees.

14.     As set forth in Article XVII of the Settlement Agreement, the Class Representatives and Subclass Representatives, each Settlement Class Member, and the Settlement

Exhibit 11                                                                                                    Page 8

Class, on behalf of the Settlement Class Member Parties, have waived and released, forever discharged, and held harmless the Monsanto Parties and the Related Parties of and from any and all Released Claims.  Accordingly, the Court hereby orders the dismissal with prejudice, and without further costs, including Claims for interest, penalties, costs, and attorneys' fees, of all Released Claims pending in the Court.  The Settlement Class Member Parties are hereby permanently barred and enjoined from filing or prosecuting any Released Claims or any Claims challenging the validity of the Releases in any forum or jurisdiction (whether federal, state, or otherwise).  The Settlement Agreement will be the exclusive remedy for any and all Released Claims by or on behalf of any and all Settlement Class Member Parties, and no Settlement Class Member Party will recover, directly or indirectly, any sums for Released Claims other than those received under the terms of the Settlement Agreement, if any.

15.     The Court will enter the Science Panel Determination and the Science Panel's written report on its public docket upon receipt, pursuant to Section 12.7(f) of the Settlement Agreement.

16.     The Science Panel Determination shall have the evidentiary use in connection with Roundup Claims and in Roundup Lawsuits and Related Party Lawsuits described in Section 12.3 of the Settlement Agreement.

17.     The Monsanto Parties and the Settlement Class Member Parties shall be bound to the agreement on the Science Panel Stipulation as described in described in Section 12.3 of the Settlement Agreement.

18.     Following the entry of the written report reflecting the Science Panel Determination on the Court's public docket, the Settlement Class Member Parties are hereby permanently barred and enjoined from acting in any way contrary to or inconsistent with the

Exhibit 11                                                                                                           Page 9

agreement set forth in Section 12.3 of the Settlement Agreement regarding the evidentiary use of the Science Panel Determination or the agreement on the Science Panel Stipulation, or otherwise precluded by the Settlement Agreement, in any Roundup Lawsuit or Related Party Lawsuit or with respect to any Roundup Claims.

19.    The Court finds that the Science Panel is not an arbitration panel and that the Science Panel Determination shall be final and shall not be subject to judicial review, including under the Federal Arbitration Act or other similar statute, rule, or regulation.

20.    Any and all Persons, including the Monsanto Parties and the Settlement Class Member Parties, are hereby barred and enjoined from, at any time, in any forum or jurisdiction (whether federal, state, or otherwise), seeking discovery or disclosure from the Science Panel, any Science Panel member, any of the Science Panel's authorized contractors, or any Person to whom disclosure is made pursuant to Section 12.6(a)(iv) of the Settlement Agreement, including any written discovery, requests for documents, subpoenas of any kind, or notices of deposition, except to the extent permitted by Section 12.5(d) of the Settlement Agreement.  The Monsanto Parties and the Settlement Class Member Parties are hereby barred and enjoined from making use in any legal, legislative, administrative, or regulatory action, proceeding, or matter of any discovery or disclosure from the Science Panel, any Science Panel member, any of the Science Panel's authorized contractors, or any Person to whom disclosure is made pursuant to Section 12.6(a)(iv) of the Settlement Agreement that becomes available through any other means, except to the extent permitted by Section 12.5(d) of the Settlement Agreement.

21.    The Settlement Class Member Parties and the Monsanto Parties are hereby barred and enjoined from, at any time, in any forum or jurisdiction (whether federal, state, or otherwise), calling any Science Panel member, any of the Science Panel's authorized contractors,

Exhibit 11                                                                                                    Page 10

or any Person to whom disclosure is made pursuant to Section 12.6(a)(iv) of the Settlement Agreement, to provide testimony, whether as a fact witness, an expert witness, or in any other capacity, and from making use in any legal, legislative, administrative, or regulatory action, proceeding, or matter of any testimony from any Science Panel member, any of the Science Panel's authorized contractors, or any Person to whom disclosure is made pursuant to Section 12.6(a)(iv) of the Settlement Agreement, that becomes available through any other means, except to the extent permitted by Section 12.5(d) of the Settlement Agreement.

22.     The Science Panel members, any of its authorized contractors, and any Person to whom disclosure is made pursuant to Section 12.6(a)(iv) of the Settlement Agreement, are hereby barred and enjoined from serving as an expert witness or consultant, or providing any voluntary testimony including by affidavit, in any Roundup Lawsuit, Related Party Lawsuit, or in any legal, legislative, administrative, or regulatory action, proceeding, or matter asserting or alleging Roundup Claims, otherwise arising from, resulting from, in any way relating to or in connection with Roundup Products, or against the Monsanto Parties or the Related Parties arising from, resulting from, in any way relating to or in connection with exposure to glyphosate or a similar factual predicate raised in the Lawsuit, in all such cases whether brought by a Settlement Class Member Party, an Opt Out, or any other Person, at any time, except to the extent permitted by Section 12.5(d) of the Settlement Agreement.

23.     As set forth in the Preliminary Approval Order, the Court confirms the appointment of Kenneth R. Feinberg, Law Offices of Kenneth R. Feinberg, PC, as the Settlement Administrator, Wolf Garretson LLC as the DAGP Administrator and Lien Administrator, Verus LLC as the Claims Administrator, and Citibank, N.A. acting through its Citi Private Bank business

Exhibit 11                                                                                              Page 11

unit as the Escrow Agent, and confirms that the Court retains continuing jurisdiction over those appointed.

24.     The Court approves the plan for operation of the Legal Services Program, in accordance with Section 11.3 of the Settlement Agreement, approves _____ as the Legal Services Program Counsel, and approves the compensation plan for the Legal Services Program Counsel that has been submitted by the Settlement Administrator.

25.     The Court retains continuing and exclusive jurisdiction over the Parties and their counsel, all Settlement Class Members and Settlement Class Member Parties, the Settlement Administrator, DAGP Administrator, Lien Administrator, Claims Administrator, Escrow Agent, and the Settlement Agreement, to interpret, implement, administer, and enforce the Settlement Agreement and this Final Order and Judgment, including as set forth in Section 12.3(d)(iii) and Section 12.3(e)(iii) of the Settlement Agreement.  Any disputes or controversies arising from, resulting from, in any way relating to or in connection with the interpretation, implementation, administration, and enforcement of the Settlement Agreement will be made by motion to the Court, except as otherwise provided in the Settlement Agreement.  In addition, the Parties and the Settlement Class Member Parties are hereby deemed to have submitted to the exclusive jurisdiction of the Court for any suit, action, proceeding, or dispute arising from, resulting from, in any way relating to or in connection with the Settlement Agreement, including any dispute relating to the agreement regarding the evidentiary use of the Science Panel Determination, the agreement on the Science Panel Stipulation, and compliance with the requirements contained in Section 12.3(d)(iii) and Section 12.3(e)(iii) of the Settlement Agreement.  For the avoidance of doubt, the Court shall have jurisdiction to oversee the requirements contained in Section 12.3(d)(iii) and Section 12.3(e)(iii) of the Settlement Agreement and to issue binding orders as necessary to

Exhibit 11                                                                                        Page 12

implement or enforce them.  The Court also retains continuing jurisdiction over the "qualified settlement fund," as defined under § 1.468B-1 of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code of 1986, as amended, created under the Settlement Agreement.  The Court retains continuing jurisdiction over any requests for attorneys' fees and reimbursement of costs.

26.    This Final Order and Judgment incorporates and makes a part hereof the Settlement Agreement (which includes the Exhibits) filed with the Court on February 3, 2021, including definitions of the terms used therein.  This Final Order and Judgment shall serve as an enforceable injunction by the Court for purposes of the Court's continuing jurisdiction related to the Settlement Agreement.

27.    Notwithstanding anything to the contrary in this Final Order and Judgment, this Final Order and Judgment and the Settlement Agreement shall not effect a release of any rights or obligations that any insurer has under or in relation to any contract or policy of insurance to any named insured, insured, additional insured, or other insured Person thereunder.

28.    This Final Order and Judgment, the Settlement Agreement, and the documents relating thereto, and any actions taken by the Defendant in the negotiation, execution, or satisfaction of the Settlement Agreement:  (a) do not and shall not, in any event, constitute, or be construed as, an admission of any liability or wrongdoing, or recognition of the validity of any claim made by any Settlement Class Member Party in this or any other action or proceeding; and (b) shall not, in any way, be construed as, offered as, received as, used as, or deemed to be evidence, admissible or otherwise, of any kind, or used in any other fashion, by any Settlement Class Member Party, Class Counsel, or any of the Monsanto Parties or Related Parties in any litigation, action, hearing, or any judicial, arbitral, administrative, regulatory or other proceeding

Exhibit 11                                                                                          Page 13

for any purpose, except a proceeding to resolve a dispute arising under, or to enforce, the Settlement Agreement.  Without limiting the foregoing, neither the Settlement Agreement nor any of its provisions, negotiations, statements, or court proceedings relating to its provisions, nor any actions undertaken in the Settlement Agreement, will be construed as, offered as, received as, used as, or deemed to be evidence, admissible or otherwise, or an admission or concession of any liability or wrongdoing whatsoever on the part of any Person, including, but not limited to, the Monsanto Parties or the Related Parties.  This Paragraph shall not apply to disputes between the Defendant and its insurers, as to which the Defendant reserves all rights.  For the avoidance of doubt, this Paragraph does not apply to the Parties' agreement regarding the evidentiary use of the Science Panel Determination or the Science Panel Stipulation as set forth in Paragraph 16, Paragraph 17 and Section 12.3 of the Settlement Agreement.  In the event this Paragraph conflicts with Paragraph 16, Paragraph 17 or Section 12.3 of the Settlement Agreement, the latter shall control.

29.     Without further approval from the Court, and without the express written consent of Class Counsel and Counsel for the Defendant, on behalf of all Parties, the Settlement Agreement is not subject to any change, modification, amendment, or addition.

30.     The terms of the Settlement Agreement and of this Final Order and Judgment are forever binding on the Parties, Settlement Class Members, and Settlement Class Member Parties, as well as their respective heirs, executors, administrators, predecessors, successors, affiliates, and assigns.  The Opt Outs listed in Exhibit A hereto are excluded from the Settlement Class pursuant to request and are not bound by the terms of the Settlement Agreement or this Final Order and Judgment.

Exhibit 11                                                                                                   Page 14

31.     Sixty (60) days after the final round of payments to Settlement Class Members, Class Counsel must file a "Post-Distribution Accounting," with accompanying declarations from themselves and the Settlement Administrator, explaining in detail when payments were made, the number of Settlement Class Members who were sent payments, the total amount of money paid out, any concerns communicated by Settlement Class Members to the Settlement Administrator and Class Counsel since entry of the Final Order and Judgment, and how any concerns or issues were resolved.  Class Counsel are expected to diligently supervise the administration of the Settlement Agreement and remain in close contact with the Settlement Administrator.

32.     If the Settlement Agreement is terminated as provided for in Article XXIII of the Settlement Agreement, this Final Order and Judgment (and any orders of the Court relating to the Settlement Agreement) shall be null and void and be of no further force or effect, except as otherwise provided by the Settlement Agreement, and any unexpended funds in the Settlement Fund, or unexpended payments made to Class Counsel for Settlement Class Notice will be returned to the Defendant forthwith.

33.     In the event that the Settlement Agreement does not become effective pursuant to its terms, the Court shall vacate the Preliminary Approval Order and this Final Order and Judgment.

**SO ORDERED** this _____ day of _____, 2021.

_____
The Honorable Vince Chhabria
United States District Court Judge

Exhibit 11                                                                                               Page 15

Exhibit 11                                                                              Page 16

# EXHIBIT A

Exhibit 11                                                                 Page 17

***Robert Ramirez, et al. v. Monsanto Company***,
**No. 3:16-md-02741-VC & 3:19-cv-02224-VC**
**Exclusions**

[To be listed]

Exhibit 11                                                                 Page 18

EXHIBIT 12

## EXHIBIT 12: SCHEDULE OF CERTAIN SETTLEMENT CLASS MEMBER DATES AND DEADLINES

This Exhibit 12 is provided solely for the convenience of Settlement Class Members.  Any inconsistency between this Exhibit 12 and the text of Article I–Article XXX of the Settlement Agreement will be resolved in favor of the latter, and the omission of any date or deadline from this Exhibit 12 has no significance with respect to the existence or operation of such date or deadline.  Under the Settlement Agreement, funding for the Diagnostic Accessibility Grant Program and Compensation Fund may cease prior to the registration and application deadlines set forth below and Settlement Class Members seeking to participate in those programs may not be able to do so due to the unavailability of funds, even where the deadline to register or apply listed below has not occurred.  Settlement Class Members seeking to participate in the Diagnostic Accessibility Grant Program and Compensation Fund are encouraged to register or apply early.

### Opt Outs and Objections

| Event | Date | Section |
|---|---|---|
| **Deadline to Opt Out** | 150 days following commencement of Settlement Class Notice Plan | Section 4.2(a) |
| **Valid requests to Opt Out become effective** | The later of 21 days of receipt by the Claims Administrator or the resolution of any challenge to the validity of the request | Section 4.2(d) |
| **Deadline to object to Settlement Agreement** | As ordered by the Court | Section 19.1(a) |
| **Deadline to revoke Opt Out** | Entry of the Final Order and Judgment | Section 4.3 |

### Registration

| Event | Date | Section |
|---|---|---|
| **Registration to participate in the Funded Class Benefits opens** | 40 days after entry of the Preliminary Approval Order | Section 5.2(a) |
| **Registration Deadline** | 45 days prior to the conclusion of the Initial Settlement Period (unless extended following that period as provided in Section 13.4(c)) | Section 5.2(d) |
| **Deadline to appeal determination that applicant is not authorized to act on behalf of a given Settlement Class Member** | 30 days after receiving the Claims Administrator's determination that applicant is not authorized to act on behalf of a given Settlement Class Member | Section 5.2(c)(iii) |

### Diagnostic Accessibility Grant Program

| Event | Date | Section |
|---|---|---|
| **DAGP Applications open** | Effective Date | Section 8.4 |

Exhibit 12                                                                                                          Page 1

| | | |
|---|---|---|
| **Deadline for submitting DAGP Application** | 45 days prior to the conclusion of the final budget period | Section 8.4(b) |

**Compensation Fund**

| Event | Date | Section |
|---|---|---|
| **Accelerated Payment Award applications open** | 30 days after entry of the Preliminary Approval Order | Section 6.2(a)(i) |
| **Claims Program Award applications open** | 60 days after entry of the Final Order and Judgment | Section 6.2(a)(ii)(2) |
| **Deadline for submitting Claim Packages** | 180 days after Effective Date, or 180 days after receipt of a Qualifying Diagnosis (whichever is later), subject to the qualifications set forth in Section 7.3(a) | Section 7.3(a) |
| **Claims Administrator to determine sufficiency and completeness of Claims Program Claim Package\*** | 90 days after receiving Claims Program Claim Package | Section 7.4(b) |
| **Deadline for submission of Deficiency cure materials for Claim Packages** | 120 days after Claims Administrator sends Notice of Deficiency | Section 7.5(b) |
| **Accelerated Payment Determination\*** | 30 days from the date when a completed Accelerated Claim Package that is not deficient and meets the applicable requirements set forth in Section 7.2(a) is received by the Claims Administrator. | Section 7.7(a) |
| **Claims Program Determination\*** | 90 days from the date when a completed Claims Program Claim Package that is not deficient and meets the applicable requirements of Section 7.2(b) is received by the Claims Administrator | Section 7.8(a) |
| **Deadline to appeal eligibility determination for Claims Program Award to Settlement Administrator** | 60 days after receiving Notice of Claims Program Determination | Section 7.10(a)(i)(1) |
| **Deadline to challenge the amount of the Claims Program Award in mediation** | 60 days after receiving Notice of Claims Program Determination | Section 7.10(a)(ii)(1) |
| **Deadline to appeal the mediation offer to the Settlement Administrator** | 60 days after receiving the mediation offer | Section 7.10(a)(ii)(2) |
| **Deadline to accept or reject amount of the Claims** | 60 days after receiving the offer that results from the appeal | Section 7.10(a)(ii)(3) |

Exhibit 12                                                                                      Page 2

| Program Award after appeal to the Settlement Administrator | | |
|---|---|---|

\* This deadline may be extended upon application by the Claims Administrator to the Settlement Administrator, in the Settlement Administrator's sole discretion.

Exhibit 12                                                                                          Page 3