## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

IN RE: ROUNDUP PRODUCTS LIABILITY
LITIGATION

_____

THIS DOCUMENT RELATES TO:

*Ramirez, et al. v. Monsanto Co.*,
Case No. 3:19-cv-02224

MDL No. 2471

Case No. 3:16-md-02741-VC

**DECLARATION OF MATTHEW L.
GARRETSON REGARDING THE
DIAGNOSTIC ACCESSIBILITY
GRANT PROGRAM**

I, Matthew L. Garretson, do hereby depose and declare as follows:

1.      I am the co-founder of Wolf Garretson, LLC and am an attorney licensed to practice law in the State of Ohio (Ohio Supreme Court, Atty. No. 0070029).  My Curriculum Vitae and summary of professional experience are attached hereto as Exhibit A.  I have personal knowledge of the facts set forth herein and if called and sworn as a witness, I could and would testify competently thereto.

2.      Wolf Garretson, LLC provides design, coordination and oversight of complex administrative operations and claims processing in settlement programs related to individuals or businesses that experience a catastrophic event.  More specifically, Jason Wolf (co-founder of Wolf Garretson, LLC) and I have designed and overseen numerous nationally prominent medical diagnostic / medical consultation programs related to specified medical conditions following exposure to a product or an environmental hazard.

3.      I personally have been appointed (or organizations I have led have been appointed) to provide settlement administrative services by numerous parties and federal and state courts in a broad variety of national mass tort, multi-district litigation ("MDL"), and class

action matters.  A representative list of such engagements follows, and a more comprehensive list is contained in Exhibit A:

a.      *Deepwater Horizon Litigation,* MDL 2179 (United States District Court, Eastern District of Louisiana), including the design and implementation of a 21-year periodic medical evaluation program that involved over 22,000 eligible class members who are entitled to medical consultation services at approximately 150 locations through 70+ medical provider organizations.  As part of this settlement, I served as trustee of a $100+ million grant program ("Gulf Region Health Outreach Project") to improve capacity and access to healthcare in underserved communities in the Gulf Coast region.

b.      *National Football League Players' Concussion Injury Litigation,* MDL 2323 (United States District Court, Eastern District of Pennsylvania), including the design and implementation of a baseline assessment program comprised of a national network of medical service providers to perform baseline assessment and follow-up care of neurocognitive function for an estimated 17,000 players over 10+ years.

c.      *National Collegiate Athletic Association Student-Athlete Concussion Injury Litigation*, MDL 2492 (United States District Court, Northern District of Illinois Eastern Division), including the design of a decades-long medical-monitoring program that includes online screening as well as medical evaluations for athletes that qualify for further in-person evaluations.  This settlement class includes millions of former student-athletes.

d.      *In re World Trade Center Disaster Site Litigation*, MDL Docket Nos. MC100, 102-03 (United States District Court for the Southern District of New York), including serving as the Allocation Neutral for claims asserted against the WTC Captive Insurance Company, Inc. relating to the September 11th Consolidated Cases.

4.      In addition to the above-referenced matters related to medical diagnostic and / or consultation programs – and as highlighted in Exhibit A – I have been appointed and / or organizations I have led have been appointed in dozens of high profile MDL and class action matters to design and oversee the administrative activities to process claims for compensation (including claims package processing, medical record review and award allocation); to resolve the claimants' or class members' healthcare liens (such as those asserted by Medicare, Medicaid, and other governmental agencies and / or private health insurance providers); to arbitrate and mediate claims as required by the settlement documents; to disburse funds; to manage the assets of settlement trusts (including serving personally as trustee); to develop policies and procedures to ensure the orderly and uniform administration of such trusts; to maintain and manage a class member education and outreach center; to report to the court; and to liaise with counsel and / or a settlement program's oversight body.

5.      In addition to leveraging our prior experiences, the Wolf Garretson team has spent over 600 hours working on the design of the Diagnostic Accessibility Grant Program (the "DAGP") to ensure it meets the objective of increasing access to NHL Diagnostic Evaluation among Settlement Class Members, including to address regional disparity to such access, utilizing $210,000,000 to fund the features and benefits described below.

6.      The DAGP includes a four-year outreach campaign (the "Outreach Campaign") to inform DAGP Eligible Settlement Class Members of the objectives of the DAGP, including the availability of NHL Diagnostic Evaluation from medical providers who receive DAGP Grants and how to conduct initial self-evaluation for NHL indicators.

a.      To this end, we have designed and will continuously advance the Outreach Campaign to leverage the communication channels that best reflect how various cohorts of

DAGP Eligible Settlement Class Members (including those cohorts who are migrant and / or seasonal workers and therefore reside in multiple locations throughout any given year) receive and share information regarding healthcare, including technology (such as cell phones), social media, as well as existing community-based health, labor and education advocacy groups.

b.     We have also conducted considerable research on and had significant dialogue with organizations that provide training and technical assistance to community and migrant health centers nationwide; and, with organizations that focus upon grassroots, localized communication (including delivering low-literacy, bilingual health education materials and outreach) regarding worker and health-related causes and initiatives.

c.     Furthermore, based upon our work in other settlements and upon the research describe above, we have a working, practical knowledge and established relationships with community-based health centers, systems and associations (such as Federally Qualified Health Centers (FQHCs)) that are best positioned to provide access to NHL Diagnostic Evaluation to many of the DAGP Eligible Settlement Class Members.  Notably, for a point of reference, there are approximately 850 federally funded health centers in the United States, and we estimate 10% to 15% of these already receive funds targeted to meet migrant and seasonal workers' health needs.  Many of these community-based health centers that receive such targeted funds have established "outreach" and education infrastructure and telehealth capabilities.  We intend to leverage those relationships to inform DAGP Eligible Settlement Class Members about the availability of NHL Diagnostic Evaluation and to further facilitate the initial self-evaluation and decision-making by DAGP Eligible Settlement Class Members.

d.     Such organizations and advocates have been and will continue to be instrumental in the development of Outreach Campaign strategies (including message testing)

and, as established trusted voices, many of such organizations will be further vetted and selected to participate as outreach partners and communication channels to ensure that the various cohorts of DAGP Eligible Settlement Class Members receive information about the DAGP and have the opportunity to consider their options in a meaningful way.  In addition to helping overcome any cultural or economic biases which may otherwise dissuade certain cohorts from engaging with a healthcare system (e.g., lack of economic resources to pay for such services, language barriers, limited knowledge of healthcare providers or services, lack of available local providers or services, limited mobility and / or time required to access healthcare services), such organizations and advocates also will be instrumental in ensuring that influencers, such as employers, are appropriately educated so that they may serve as promoters of NHL Diagnostic Evaluation.

      e.     Finally, in our process of identifying effective communication channels and organizations that serve as trusted voices in the communities with high percentages of at-risk populations, we will leverage the knowledge, insights and response-rate data gained by the Settlement Class Notice Agent through the Settlement Class Notice process, including survey data, Bureau of Labor Statistics (BLS) county-level data (i.e., where certain Settlement Class Members – including farm, landscaping, and groundskeeping workers – reside or work in the greatest concentrations), and response rates to various messages delivered through various media channels (e.g., TV, radio, print, online media, on-ground outreach and earned media) in order to finely-tune the Outreach Campaign.

      f.     In sum, the Outreach Campaign is designed to not only find its intended audience, but to increase the probability that the DAGP Eligible Settlement Class Member will comprehend and act upon the message being delivered: That is, the importance of early

discovery and diagnosis of NHL, knowledge of how to conduct initial self-evaluation for NHL indicators, and the availability of telehealth and / or in-clinic evaluation services available to them.

7.     In order to accomplish the DAGP's objective of increasing access to NHL Diagnostic Evaluation among Settlement Class Members, including to address regional disparity to such access, my colleagues and I have designed a three-part process to identify those geographic areas with regional disparity to access to NHL Diagnostic Evaluation.  Exhibit 7 of the Settlement Agreement outlines this process.    In summary (and as explained in detail in Exhibit 7), the process first (Part 1) identifies geographic areas with high populations of putative Settlement Class Members with high likelihood of exposure based upon density of at-risk workers (from BLS data provided by the Settlement Class Notice Agent), as well as identifies the largest clusters of such at-risk workers within those regions.  The data associated with the Settlement Class Notice and Settlement Class Member registration process will also inform our identification of areas with density and clusters of at-risk workers.  Part 2 of the three-part process involves our analysis of disparities in access to NHL Diagnostic Evaluation within the geographic areas identified in Part 1, which includes the evaluation of the capability and capacity of medical providers within the geographic areas identified in Part 1 to deliver or coordinate NHL Diagnostic Evaluation, as well as an evaluation of the cultural and economic barriers which may otherwise impede a DAGP Eligible Settlement Class Member in receiving such evaluations (e.g., economic resources, lack of healthcare coverage in the past, language barriers, mobility, etc.).  Finally, in Part 3, the DAGP Administrator identifies and publishes an initial List of Service Areas in which to focus the distribution of grants to medical providers.  Importantly, this presumptive List of Service Areas may be modified upon the review and analysis of Settlement

Class Member registration data (provided by the Settlement Class Notice Agent and the Claims Administrator), subject to the procedures set forth in the Settlement Agreement, to ensure the service areas encompass the most at-risk and medically-underserved populations and, therefore, that the DAGP is meeting the objective of increasing access to NHL Diagnostic Evaluation among Settlement Class Members, including to address regional disparity to such access.

8.      One of the most significant and innovative features of the DAGP is that it is designed as a grant program.  This design differs from certain other medical monitoring programs described above (BP and NFL) and for good reason.  Unique to this settlement is that our objective is to increase "accessibility" to NHL Diagnostic Evaluation.  By definition (and through the three-part service area identification process described above), the DAGP Administrator will be identifying geographic areas with disparities in access to NHL Diagnostic Evaluation.  In this respect, the program cannot simply tell DAGP Eligible Settlement Class Members to go to a clinic for evaluations for which the DAGP Administrator will reimburse the medical provider.  Rather, for this present settlement, the DAGP Administrator must help increase the *capacity* and *capability* of medical providers to reach the at-risk population and to provide the NHL Diagnostic Evaluation services described more fully below.  So, rather than just reimbursing medical providers that conduct NHL Diagnostic Evaluation, the DAGP enables the DAGP Administrator to provide grants to increase the capabilities and capacity of medical providers in the service areas to perform evaluations, including augmenting the availability of credentialed and licensed professionals and related resources (e.g., equipment) required to conduct such evaluations.  This design is "fit-for-purpose" in the sense that it does not just tell the most at-risk DAGP Eligible Settlement Class Members that if you get the evaluations, the

DAGP will pay for it.  Rather, the design is to ensure the resources to conduct such evaluations are available in the first place.

9.      To help medical providers increase capacity and capability, grant applications will be evaluated by the DAGP Administrator to determine the prospective grantee's: capabilities to perform or arrange for the progressive phases of NHL Diagnostic Evaluation (as discussed more fully below); credentialed and licensed personnel to conduct the evaluation methodologies that are generally accepted as appropriate among the medical community; the estimated number of Settlement Class Members within the provider's service area who are DAGP Eligible Settlement Class Members, and who would not otherwise have access to NHL Diagnostic Evaluation services; number and types of staff, qualification levels, and full-time equivalents that can adequately serve DAGP Eligible Settlement Class Members; ability to collect patient-level data necessary to report on the DAGP outcome and performance measures; fraud, waste and abuse policies; and, for prospective grantees that will solely provide telehealth services, their telehealth resources.  The above factors will be evaluated along with the prospective grantee's plan for delivering NHL Diagnostic Evaluation to DAGP Eligible Settlement Class Members in the prospective grant period, including a forecast of number of participating DAGP Eligible Settlement Class Members; an analysis of unmet needs in the prospective grantee's service area (which in some instances could involve upgrades to the prospective grantee's evaluation / testing capabilities); and, the prospective grantee's plans for increasing their capacity and capabilities accordingly.

10.     Following the grant application process, the DAGP Administrator will enter into contracts with selected grantees consistent with the contracting process described in Article VIII of the Settlement Agreement.  In each budget period during the four-year DAGP, grant amounts

will be allocated in a manner that the DAGP Administrator determines will increase the availability of NHL Diagnostic Evaluation to the greatest number of DAGP Eligible Settlement Class Members in the service areas.   To help ensure the DAGP's objective is being accomplished, the DAGP Administrator will maintain oversight of the grantees in a manner that has proven effective in prior programs, including orientation and training for the grantee's designated grant leader; review of the grantee's outcome and performance measures; audit of the grantee's performance; remedial measures (and / or termination) of any grantee that is not in compliance with the grant contract; and, controls and financial management procedures related to the grant.  Grant renewals will be based upon the grantee's outcomes and performance in the prior grant period and additional grantees may be processed into any given service area during the term of the DAGP to the extent necessary to effectuate service area coverage and program outcomes.   The DAGP Administrator will serve as a resource to the grantees and maintain regular communication with them throughout the grant period.

11.     Another unique feature of the DAGP is the utilization of the grant funds to increase the availability for DAGP Eligible Settlement Class Members of telehealth consultations with medical practitioners.  Such consults will provide added convenience and accessibility for DAGP Eligible Settlement Class Members to receive education regarding potential signs and symptoms of NHL and to further facilitate their initial self-evaluation and decision-making.  The telehealth option is not intended to replace an "in clinic" consultation (as described below) but rather to extend the accessibility of benefits to the maximum number of DAGP Eligible Settlement Class Members.  The telehealth consult's primary objective will be to assist in identifying NHL signs and symptoms and to provide DAGP Eligible Settlement Class Members with guidance as to whether they should continue with diagnostic evaluations at a

brick-and-mortar clinic in their service area.  Further, this telehealth consultation option will appeal to some DAGP Eligible Settlement Class Members, such as those who have questions for a medical practitioner; who desire to interact with a medical practitioner in the convenience of their home environment; who are hesitant to visit a DAGP Grantee's brick-and-mortar location; and who reside in a location that is not close to DAGP Grantee clinic in their service area (and therefore would prefer to have an initial consultation via telehealth prior to driving to a clinic). This telehealth consult is an option and not a prerequisite to a DAGP Eligible Settlement Class Member receiving in-person NHL Diagnostic Evaluation.  Using this tool not only may improve the DAGP Eligible Settlement Class Member's experience but will also help extend the benefits delivered by the DAGP funds, as many DAGP Eligible Settlement Class Members may end their progression through the DAGP benefits at the optional telehealth step whereas – in the absence of telehealth services – they otherwise would progress straight to a clinic, which is more costly.

12.     As referenced throughout the foregoing description of the DAGP, the grants provided to medical providers will enable them to increase their capabilities and capacity to perform NHL Diagnostic Evaluation.  Importantly, the DAGP is not intended to limit or prescribe the evaluation methodologies so long as the methodologies are generally accepted as appropriate among the medical community for the Settlement Class Member in question in view of that individual's profile and characteristics.  Grantees may provide diagnostic evaluations through methodologies based upon their clinical determination of what is appropriate for the patient in question and to sequence the process through which discovery of NHL may be facilitated.  For illustrative purposes, based upon our experience and discussions with medical / clinical resources, a DAGP Eligible Settlement Class Member who presents to a DAGP Grantee after conducting self-assessment or receiving a telehealth consultation could receive a physical

examination and certain blood tests that could indicate signs of NHL (Phase 1).  Based upon signs or symptoms detected during the physical examination and / or results of the blood testing, the physician may order additional tests, including imaging and / or biopsies, to make a diagnosis of the DAGP Eligible Settlement Class Member's condition (Phase 2).  In circumstances when the DAGP Grantee determines that Phase 2 testing is warranted for a particular Settlement Class Member, but the community-based health center lacks the capability to perform the additional Phase 2 testing within their clinic setting, the design of DAGP is such that the additional testing by the appropriate specialist at another facility will be facilitated. An iterative process through which DAGP Grantees might apply evaluation methodologies (from self-assessment through diagnostic testing), based upon their clinical determination of what is appropriate for the patient in question, is illustrated below.



Diagnostic Accessibility Grant Program - Class Member Flow

| Outreach | Self Assessment | Teleconsult optional | Exam + Blood Work | Imaging | Biopsy |
|---|---|---|---|---|---|
| DAGP Administrator conducts an outreach campaign to educate Class Members on the signs and symptoms of Non-Hodgkin's Lymphoma | Using the guidance provided in the outreach campaign (and supporting online instructional resources), Class Member completes a self-assessment and examination. | Class Member opts for a telehealth consult. Class Member may be referred for an in-person examination and blood work. | Class Member receives the Phase 1 Evaluation, including a physical exam with blood work. | Physician orders diagnostic imaging as part of Phase 2 Testing. | Physician orders biopsy of lymph node or bone marrow as part of Phase 2 Testing. |

13.    To further comprehend the potential impacts and extensive reach that the $210,000,000.00 DAGP budget may have on the capabilities and capacity of medical providers

in the service areas to perform or arrange for NHL Diagnostic Evaluations, my colleagues and I evaluated the following:

a.      The $210,000,000 in total DAGP funds includes a maximum of $10,500,000 (or 5% of the total DAGP funds) for the Outreach Campaign.  Approximately $20,000,000 (or 10% of the DAGP Grant funds) may be used for telehealth services for DAGP Eligible Class Members residing in or outside of the List of Service Areas.  Further, no more than 17.5% (or approximately $35,000,000) of the DAGP Grant funds may be used for any NHL Diagnostic Evaluation outside of the List of Service Areas, meaning approximately $140-145 million shall be utilized for DAGP Grants within the List of Service Areas to increase capabilities and capacity to provide for NHL Diagnostic Evaluation.

b.      The Total USDA Farm Labor and BLS Landscapers / Groundskeepers data (Table 1 of Exhibit 7 of the Settlement Agreement) identifies a list of 28 geographic areas that encompass approximately 97% of the estimated at-risk population of farmworkers and landscapers / groundkeepers.   Approximately 1,408,204 farm workers and landscapers / groundskeepers are estimated to live or work in those locations.  Identifying these locations is important as the Settlement Class Notice Agent estimates that 84% of glyphosate is applied in agricultural settings on field crops.[1]  While these locations will be further prioritized based upon the three-part process of identifying the List of Service Areas (as described in paragraph 7 of this Declaration), for purposes of highlighting the potential impacts and reach of the DAGP, we utilized a population of 1,408,204 as the most at-risk and medically-underserved.

c.      Having identified the most at-risk / underserved population, we then modeled the average costs of the services which DAGP Grantees might utilize (from

---

[1] Wheatman Declaration p.6 citing U.S. Environmental Protection Agency, *Memorandum on Glyphosate: Response to Comments, Usage, and Benefits*, at https://www.epa.gov/sites/production/files/2019-04/documents/glyphosate-response-comments-usage-benefits-final.pdf (last visited January 23, 2020).

telemedicine through Phase 1 and Phase 2 exams and testing as illustrated in paragraph 12, above).  While, as explained in paragraph 8 above, the DAGP Grants are not meant to simply reimburse medical providers who provide NHL Diagnostic Evaluation, to the extent generally accepted rates for the delivery of services includes the costs of staffing, equipment and overhead in the general healthcare marketplace, these rates are an instructive metric as to the amount of additional capacity that DAGP Grants may create.

        d.      To determine the estimated costs of the services that may be utilized by DAGP Grantees, we studied different pricing methodologies employed by payers nationally - notably private insurance rates, Medicare fee schedules and models, and the Prospective Payment System (PPS) that is commonly utilized by Federally Qualified Health Centers (FQHC). While all of these rate methodologies incorporate several factors and are adjusted by insurers based on the locality of the provider (to account for cost-of-living adjustments, malpractice insurance rates, and additional overhead costs), in our assessment, the national cost ranges serve as reasonable baselines for estimating the costs of the iterative phases of evaluation. For purpose of our modeling, we have assumed the following "unit" cost ranges as follows: Telehealth Consult, $30; Phase 1, $300; Phase 2, $1,500 to $8,000 (notably the clinical pathways become more complex in this latter phase as DAGP Eligible Settlement Class Members could receive multiple different type of imaging or biopsies).

        e.      Based upon the estimates of at-risk population and using the above-referenced costs as a proxy for forecasting increases in capacity and capability to perform or arrange for evaluations, it is our opinion that:

                i.      The $10,500,000 in available Outreach Campaign funds (which are to be sufficiently focused upon the affected populations in the service areas and

medically underserved populations) is sufficient to educate the entire at-risk population residing or working in the List of Service Areas (whether they ultimately register to receive DAGP benefits or not) about the importance of early discovery and diagnosis of NHL and knowledge of how to conduct initial self-evaluation for NHL indicators, and the availability of telehealth and / or in-clinic evaluation services available to them for NHL Diagnostic Evaluation.

      ii.      The approximately $20,000,000 in funds for telehealth services is sufficient to provide 500,000 to 700,000 "units" of telehealth consultations, making such consultations available to nearly 40% to 50% of the most at-risk population in the List of Service Areas. Even assuming a high concentration of DAGP Eligible Settlement Class Members within this population and then assuming a historically robust participation rate, it is our opinion that these 500,000 to 700,000 available units are sufficient to accomplish the DAGP's objective.

      iii.      Finally, the balance of approximately $175,000,000 in DAGP funds (of which approximately $140-145 million of which shall be utilized for DAGP Grants within the List of Service Areas) is more than adequate to cover the maximum referrals for diagnostic evaluation that, based on our experience, we expect to arise from the initial telehealth and other intake consultations. Based on the budget metrics above, the DAGP Grants could likely increase the capacity and capability for Phase 1 evaluations by over 100,000 and increase the Phase 2 evaluation capacity by greater than 20,000. This would represent up to 15-20% of

initial consults progressing to Phase 1 testing and then up to 20% of those persons proceeding to Phase 2, each of which is higher than we expect.

iv.     For the foregoing reasons, we believe the DAGP budget and regional focus will greatly increase access to NHL Diagnostic Evaluation among Settlement Class Members with high likelihood of exposure to Roundup Products, including addressing regional disparity in such access.

14.     My colleagues and I have spent considerable time reviewing and making suggestions on the language in the Settlement Agreement, and have had extensive discussions with the parties over the course of nearly a year, to ensure the written agreement of the parties provides the DAGP Administrator with the authority and flexibility to execute the operating procedures required for accomplishing the DAGP's objectives, including concerning the grant criteria, as well as the vetting, selection, contracting, education and oversight of DAGP Grantees (in each case, as described in detail in Article VIII of the Settlement Agreement), to increase access to NHL Diagnostic Evaluation among Settlement Class Members, including to address regional disparity to such access.

15.     Based upon the foregoing, I believe that Wolf Garretson, LLC is ready and well qualified to serve as the DAGP Administrator for the above-captioned Class Action Settlement.


I declare under penalty of perjury that the foregoing is true and correct.

Executed in Park City, Utah this 1st day of February 2021.


Matthew L. Garretson