DANIEL C. BURKE (*Pro Hac Vice*)
**BERNSTEIN LIEBHARD LLP**
10 E. 40th Street
New York, NY 10016
Tel: (212) 779-1414
Fax: (212) 779-3218
Email: dburke@bernlieb.com
*Attorney for Plaintiffs*

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 <br><br> Case No. 16-md-02741-VC |
| THIS DOCUMENT RELATES TO: <br><br> **ALL CASES** | **BERNSTEIN LIEBHARD LLP'S OBJECTION TO CO-LEAD COUNSEL'S MOTION TO SUPPLEMENT PRE-TRIAL ORDER 12: COMMON BENEFIT FUND ORDER TO ESTABLISH A HOLDBACK PERCENTAGE** <br><br> Hearing date: March 3, 2021 <br> Time: 1:00 PM |

Bernstein Liebhard LLP (hereinafter "BL") submits the within Objection to Plaintiffs' Co-Lead Counsel's (hereinafter "Co-Leads") Motion to Supplement Pre-Trial Order 12 (hereinafter "PTO 12"): Common Benefit Fund Order to establish a holdback percentage (Dkt. 12394) (hereinafter "Co-Leads' Motion to Supplement").

### ARGUMENT

The instant application by the Plaintiffs' Co-Leads to establish a total holdback of eight and one-quarter percent (8.25%), with eight percent (8%) to be borne by individual claimants' counsel, and one-quarter percent (0.25%) to be assessed as a cost to claimants is unfair on its face and in application, lacks transparency, and is excessive, and thus should not be permitted by this Honorable Court.

Indeed, the questions posed by the Court in its January 26, 2021 Order (Dkt. 12463) underscore precisely the reasons why the instant motion must be denied.

## I.   Holding Back A Percentage Of Attorneys' Fees For Potential Distribution To The Co-Leads Is Unnecessary On Its Face

It has been widely reported in the press,[1] and most recently acknowledged by Plaintiffs' Executive Committee member Michael Baum, Esq., in his submission to the Court on January 25, 2021 (Dkt. 12457), that Defendants have agreed to pay over *ten billion dollars* ($10,000,000,000.00) to settle various claimants' Roundup cancer claims.

It is respectfully submitted, upon information and belief, that the Co-Leads, through their individual fee contracts with their clients, have already significantly, and more importantly, adequately, been compensated for the work they performed, and for which they now seek to be compensated again.   The eight percent (8%) fee assessment the Co-Leads' motion now seeks represents in excess of an additional *eight hundred million dollars* ($800,000,000.00), to be paid for the work they undoubtedly would have nevertheless performed on behalf of their own clients, and indeed *did* perform, notwithstanding there being no fixed common benefit fee percentage in place since the inception of the MDL.

An article published online in Environmental Health News on July 30, 2020 ("EHN Article") noted that one of the Co-Lead firms, The Miller Firm, settled over 5,000 cases for approximately eight hundred, forty-nine million dollars ($849,000,000.00).[2]   At a standard 40% fee-first retainer agreement/fee contract, The Miller Firm could already have recovered as much as three hundred, forty

---

[1] *See, e.g.,* Patricia Cohen, The New York Times, "Roundup Maker to Pay $10 Billion to Settle Cancer Suits," June 24, 2020, https://www.nytimes.com/2020/06/24/business/roundup-settlement-lawsuits.html.

[2] Carey Gillam, Environmental Health News, "Some US Roundup plaintiffs balk at signing Bayer settlement deals; $160,000 average payout eyed," July 30, 2020, https://www.ehn.org/bayer-roundup-settlement-2646836532.html.

BERNSTEIN LIEBHARD LLP'S OBJECTION TO MOTION TO SUPPLEMENT PTO 12

million dollars ($340,000,000.00) in Roundup fees from their own clients' cases in less than five (5) years.  It stretches credulity that such a recovery could be deemed inadequate when looked at on a *quantum meruit* basis.  BL is unaware of any public statement by any of the parties involved disputing the accuracy of the settlement amount or the number of claimants involved.

It should be noted that BL does not have the benefit of a press article (or any public statement or filing) that articulates how many clients were ultimately represented by the other Co-Lead firms or the Executive Committee firms, nor the value of any settlement offers made to those firms.  Because this information is not publicly available, it is impossible for BL to accurately assess how much the Co-Lead and Executive Committee firms earned in fees, and accordingly whether the fees earned were fair or adequate in the context of the work performed.

BL therefore requests a full accounting and leave to: 1) audit all documents that set forth the retainer percentages of claimants with settled cases, gross settlement amounts offered and per-case averages achieved by the Co-Lead and Executive Committee firms, as well as time and expense records and any other records kept by the Co-Leads and Executive Committee firms; 2) examine and inspect any and all records, criteria or formulas used to arrive at the proposed assessment percentage; 3) review any minutes, e-mails, texts, correspondence or other writing concerning the proposal; and 4) conduct full discovery as to the bases of the Co-Leads' claims of entitlement to an assessment of 8.25%.

## II.   <u>Co-Lead Counsel Have Already Received a Premium On Their Settlements, Obviating The Need For a Holdback</u>

The July 30, 2020 EHN article, *supra*. reported that one of the Co-Lead firms, The Miller Firm obtained a per-case average settlement offer for its clients of approximately $160,000.00.  BL has been in negotiations with Defendants discussing potential resolution of its inventory of claims. Upon information and belief, the Co-Leads were offered a premium to settle their cases, and

BERNSTEIN LIEBHARD LLP'S OBJECTION TO MOTION TO SUPPLEMENT PTO 12

Defendants' best offers to resolve non-leadership cases were significantly less.  As set forth above, however, without a full accounting and discovery, it is impossible for BL to accurately assess precisely how much of a benefit/premium the Co-Leads have already realized.

It is respectfully suggested, however, that if the numbers published in the EHN article are accurate, the premium alone paid to The Miller Firm may have approached two hundred million dollars ($200,000,000.00) as compared to a non-leadership firm with a comparable inventory.  Surely the Common Benefit doctrine does not contemplate or support an additional windfall at the expense of the individual plaintiffs' counsel, where by virtue of their work in leadership positions, the Co-Leads have already reaped fees multifold per case as compared to non-leadership firms.

Lastly, it must be noted that the leadership firms secured significant verdicts in the three (3) cases that were ultimately tried.  *Johnson v. Monsanto* resulted in a verdict of $289 Million in July, 2018, later reduced to $20.6 Million; *Hardeman v. Monsanto* resulted in a verdict of $80 Million in March, 2019, later reduced to $25 Million; and *Pilliod v. Monsanto* resulted in a verdict of $2.055 Billion, later reduced to $86.7 Million.  Upon information and belief, the fees generated by the leadership firms on the three (3) trial cases likely total between $40-50 Million.

## III.   The Proposed Eight (8%) Percent Holdback From Attorneys' Feed Is Excessive

In the event the Court enters an Order directing any holdback, eight (8%) percent is clearly excessive.  As set forth in Sections I and II., *supra*., the Co-Lead firms were already compensated handsomely on the basis of their own existing fee contracts with their clients and by achieving a premium on settlement values by virtue of their work as Co-Leads.  An additional eight-hundred million dollars in common benefit fees to be shared primarily among the three (3) Co-Lead firms[3]

---

[3] Given the January 25, 2021 submission of Michael Baum, Esq. requesting an extension of the deadline to respond to the motion, it is clear that there is not even unanimity among leadership as to the direction any common benefit holdback should take.

4

BERNSTEIN LIEBHARD LLP'S OBJECTION TO MOTION TO SUPPLEMENT PTO 12

over and above what they have already received in settlements would clearly be an unprecedented windfall at the expense of the individual plaintiffs' counsel's fee contracts, and surely not what is contemplated by the Common Benefit doctrine.  The individual plaintiffs in this MDL are already represented by attorneys who have their own contingency fee agreements/contracts with their clients, and have invested significant time and shouldered substantial costs in acquiring, screening, prosecuting and negotiating their claims.

As noted in the Co-Leads' instant motion, the original assessment percentage sought by leadership was seven percent (7%) inclusive of fees and costs.  Motion To Approve An Order Establishing A Common Benefit Fund (December 16, 2016) (hereinafter "2016 CBF Motion"), (Dkt. 74).  That motion enumerated the factors the Co-Leads considered, including *inter alia*, the number of cases, anticipated participating cases, and the percentages adopted and obtained in other cases.  *Id.*

In the motion now before the Court, the Co-Leads acknowledge that even as late as 2018, there were only approximately 8,000 filed cases.  Co-Leads Motion to Supplement (Dkt. 12394), at 6. Moreover, inherent in the 2016 CBF Motion was the position taken by the Co-Leads that a seven (7%) percent assessment on fewer than 8,000 cases would adequately compensate them from the work that lay ahead.

In the instant motion, however, the Co-Leads acknowledge that there are now as many as 125,000 filed and unfiled cases, yet they argue this increase in the amount of cases can somehow negatively impact them financially.  Although the Co-Leads dedicate much of their brief to the increase in case acquisition by non-leadership firms following the Court's *Daubert* ruling and their successes at trial, they acknowledge that much of the substantive work they allege positioned the cases to be settled had already been completed.  The later-acquisition and prosecution of cases did nothing to increase the burden on leadership, financial or otherwise.

Yet, the instant application requests an eight percent (8%) assessment on 125,000 cases, where the Co-Leads were willing to accept seven percent (7%) on less than 8,000 cases, and must therefore be carefully scrutinized.  Although the number of cases potentially subject to assessment based upon the same amount of work performed by the Co-Leads has increased more than fifteen-fold, they nevertheless seek to increase the percentage value of the assessment as well.  Furthermore, the instant motion states that "the CLC believe that a holdback of eight percent – *only one percent higher* than requested three years ago – is fair and reasonable under the circumstances," suggesting that a percentage point of ten billion dollars is *de minimus*.  Co-Leads Motion to Supplement (Dkt. 12394), at 14, fn. 13 (emphasis added).  The Co-Leads argument glosses over the fact that "only one percent" equals *over one hundred million dollars* ($100,000,000.00).

## CONCLUSION

The relief sought in Co-Lead's Motion seeking an assessment of eight and one-quarter percent (8.25%) is unfair on its face and in application, lacks transparency, and is excessive.  Accordingly, it is respectfully submitted that the Co-Leads' Motion must be denied in its entirety.

Dated: February 4, 2021

Respectfully submitted,

/s/Daniel C. Burke
Daniel C.  Burke, Esq.
BERNSTEIN LIEBHARD LLP
10 East 40th Street
New York, New York 10016

*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 4th day of February, 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

/s/ Daniel C. Burke

BERNSTEIN LIEBHARD LLP'S OBJECTION TO MOTION TO SUPPLEMENT PTO 12