Robin Greenwald
rgreenwald@weitzlux.com
Weitz & Luxenberg
700 Broadway
New York, NY  10003
Telephone: (212) 558-5500
Facsimile:  (212) 344-5461

Michael Miller
mmiller@millerfirmllc.com
The Miller Firm LLC
108 Railroad Avenue
Orange, VA  22960
Telephone: (540) 672-4224
Facsimile:  (540) 672-3055

Aimee Wagstaff, SBN 278480
aimee.wagstaff@andruswagstaff.com
Andrus Wagstaff, PC
7171 West Alaska Drive
Lakewood, CO  80226
Telephone: (303) 376-6360
Facsimile:  (303) 376-6361

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 16-md-02741-VC |
| This document relates to: | **PLAINTIFFS' CO-LEAD COUNSEL'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO AMEND PRE-TRIAL ORDER 12: COMMON BENEFIT FUND ORDER TO ESTABLISH A HOLD BACK PERCENTAGE** |
| **ALL CASES** | |

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................ 1

II.     DISCUSSION ............................................................................................................. 6

A.   A Common Benefit Holdback Is Warranted ..................................................... 6

B.   Neither Monsanto Nor MDL Leadership Firms' Own Clients Have Compensated
Common Benefit Attorneys for Common Efforts or Expenditures................................. 9

C.   The Court Should Issue a Holdback Order Applicable to Past and Future Settlements
Involving Plaintiffs' Counsel Who (i) Have One or More Cases Pending in the MDL, and/or
(ii) Have Voluntarily Availed themselves of the Participation Agreement, or (iii) Otherwise
Have A Nexus To the MDL Through Association With Participating Counsel and/or Use of
Common Benefit Work Product. ................................................................................... 13

i.   The MDL Leadership Has Conferred a Substantial Benefit to *All* Roundup Cases and
Claims      14

ii.  The Court Has Subject-Matter Jurisdiction .................................................. 16

iii. The Court Has the Authority, as a Matter of Precedent and Policy, to Enter a Holdback
Order within the Scope of PTO 12 – At the Very Least ...................................... 18

III.    A Holdback of 8.25% Is Appropriate ................................................................. 25

IV.     CONCLUSION ........................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*Avandia Marketing Sales Practices,* 658 Fed.Appx. 29, 36 (3d Cir. 2016) ................................... 5

*Barrera v. Monsanto Company* (Del. Super. Ct., May 31, 2019) Prod.Liab.Rep. (CCH) P 20636 .................................................................................................................................. 16

*Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980) .................................................... 7

*Briggs v. Merck Sharp & Dohme,* 796 F.3d 1038, 1051 (9th Cir. 2015)..................................... 15

*Drake v. DePuy Orthopaedics, Inc.,* No.13-20140, 2017 WL 6502489, at *1 (N.D. Ohio Dec. 19, 2017)....................................................................................................................... 7

*Gray, Ritter & Graham, PC v. Goldman Phipps PLLC,* 511 S.W.3d 639, 649 (Tex. App. 2015) ................................................................................................................................. 21

*Hartland v. Alaska Airlines* 544 F.2d 992, 1001 (9th Cir. 1976) ......................................... 20, 23

*In re Actos (Pioglitazone) Products Liability Litigation,* 274 F.Supp.3d 485, 532 (W.D. La. 2017).......................................................................................................................... 7

*In re Avandia Marketing Sales Practices,* 658 Fed.Appx. 29 (3d Cir. 2016).............................. 20

*In re Avandia Marketing, Sales Practices and Products Liability Litigation,* 2012 WL 6923367, at *5 (E.D. Pa. Oct. 19, 2012) ......................................................................... 11

*In re Avandia Marketing, Sales Practices and Products Liability Litigation,* 617 Fed.Appx. 136, 141-144 (3d Cir. 2015) ..................................................................................... 17, 19

*In re Avandia Marketing,* 2015 WL 4480827, at *6 (E.D. Pa., July 21, 2015,) ............... 15, 20, 23

*In re Baldwin-United Corp.,* 770 F.2d 328, 338 (2d Cir. 1985) ......................................... 18

*In re Bextra and Celebrex Marketing Sales Practices and Prod. Liab. Litig.,* MDL No. 1699, 2006 WL 471782 (N.D.Cal. 2006)........................................................................... 6, 11

*In re Bone Screw,* 1996 WL 900349, at *3................................................................. 25

*In re C.R. Bard, Inc., Pelvic Repair System Products Liability Litigation)* 2019 WL 385416, at *11–12 (S.D.W. Va., Jan. 30, 2019)................................................................... 11, 13

*In re DePuy Orthopaedics, Incorporated, Pinnacle Hip Implant Product Liability Litigation,* 888 F.3d 753, 791 (5th Cir. 2018 ............................................................................... 5

*In re Deepwater Horizon,* MDL No. 2179, ECF No. 2038 (J.P.M.L. Feb. 4, 2021)................... 17

*In re Diet Drugs* 582 F.3d 524, 548 (3d Cir. 2009)..................................................... 9

*In re General Motors LLC Ignition Switch Litigation* 2019 WL 5865112, at *3 (S.D.N.Y., Nov. 8, 2019)................................................................................................. 14

*In re General Motors LLC Ignition Switch Litigation,* 2016 WL 10880229, at *2. (S.D.N.Y., Feb. 10, 2016) ................................................................................................................................ 12

*In re General Motors LLC Ignition Switch Litigation,* 2020 WL 4586820, at *12 (S.D.N.Y., Aug. 10, 2020) ............................................................................................................................ *passim*

*In re General Motors LLC Ignition Switch Litigation,*2019 WL 5865112, at *3 (S.D.N.Y., Nov. 8, 2019) ................................................................................................................................ 19

*In re Genetically Modified Rice Litigation,*  2010 WL 716190, at *5 (E.D. Mo., Feb. 24, 2010) ................................................................................................................................ 21, 25

*In re Genetically Modified Rice Litig.,* 764 F.3d 864, 874 (8th Cir. 2014) ........................... 21-22

*In re High Sulfur Content Gasoline Prods. Liab. Lit.,* 517 F.3d 220 (5th Cir. 2008).................... 9

*In re Kugel Mesh Hernia Patch Prods. Liab. Litig.,* 1:07-md-01842, Doc. 4563 (D.R.I. May 9, 2014)............................................................................................................................... 12

*In re Latex Gloves,* 2002 WL 32151775 ......................................................................... 17, 19

*In re Oil Spill by the Oil Rig DEEPWATER HORIZON in the Gulf of Mexico, on April 20, 2010* (E.D. La., Dec. 28, 2011, No. 10-2771) 2011 WL 6817982 ........................................... 20

*In re Protegen Sling and Vesica System Products Litigation,* MDL No. 1387, 2002 WL 31834446, at *1 (D.Md. Apr. 12, 2002) ............................................................................ 25

*In re Showa Denko K.K. L-Tryptophan Products Liability Litigation-II* 953 F.2d 162, 166 (4th Cir. 1992) .................................................................................................................... 20

*In re Trasylol Prods. Liab. Litig.,* 1:08-md-01928 (S.D.Fla. Nov. 2, 2012) ............................... 11

*In re Vioxx Products Liability Litigation* 760 F.Supp.2d 640, 648 (E.D. La. 2010) ... 10, 14, 16-17

*In re VW "Clean Diesel" Marketing Lit.,* 914 F.3d 623, 640 (9th Cir. 2019).............................. 14

*In re Yasmin and Yaz Prods. Liab. Litig.,* 3:09-md-02100, Doc. 3856 (S.D. Ill. Nov. 20, 2015) 12

*In re Zantac (Ranitidine) Products Liability Litigation,* No.20-2924, 2020 WL 1669444, at *7 (S.D. Fla. Apr. 3, 2020) ................................................................................................. 7

*In re Zyprexa Products Liability Litigation,* 467 F.Supp.2d 256, 265 (E.D.N.Y. 2006).......... 7, 10

*In re: Depuy Pinnacle,* 3:11-md-02244, Doc. 1031 ............................................................. 25

*In re: Talcum Powder,* 3:16-md-2738-FLW-LGHG, CMO 7(a) ............................................... 25

*Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 (1982)............. 17

*Marcial Ucin, S.A. v. SS Galicia* 723 F.2d 994, 997 (1st Cir. 1983) .......................................... 20

*Pilliod v. Monsanto Co.*, 2019 WL 2158266 ...................................................................... 16

*Schnabel v. Lui* 302 F.3d 1023, 1038 (9th Cir. 2002).......................................................... 20

*Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 772 (9th Cir. 1977). ......................................... 16

**Other Authorities**

Baker and Herman, *Lawyers of Lawyers: Parsing the Complexities of Claimant Representation in Mass Tort MDLs,* 24 LEWIS CLARK L. REV. 469, 489 (Spring 2020) ................................... 10

**Treatises**

Federal Judicial Center, MANAGING MULTIDISTRICT LITIGATION IN PRODUCTS LIABILITY CASES, A POCKET GUIDE FOR TRANSFEREE JUDGES, at pp.14–15 (2011).............................................. 20

MANUAL FOR COMPLEX LITIGATION § 20.312 (4th ed. 2004) ....................................................... 7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I. **INTRODUCTION**

In response to the Court's Order of January 26, 2021, and the Objections that have been submitted, undersigned counsel would like to make it clear at the outset that:

- The hold-back sought is a provisional measure, to hold funds in escrow, pending an ultimate determination by the Court on final assessment of common benefit cost reimbursement and/or fees. The Court, upon subsequent Fee Petition against some or all of the Fund, would determine the amount of common benefit fees and/or expenses that have been earned; while undersigned counsel believe that a full 8.25% award is more than justified in this case, any unearned portion of the Fund could be returned to the individually retained counsel;

- PTO 12 established two separate accounts within the Common Benefit Fund: the "Legal Fees Fund" (to be funded only by attorney fees for common benefit work) and the "Expense Fund" (to be funded by client awards for common benefit expenses);

- The proposed common benefit fee and expense fund is intended to compensate *all* firms that have performed work for the common benefit of Roundup Plaintiffs collectively, (whether in State and/or Federal Court), and not just the MDL leadership. In fact, undersigned counsel believe there should be approximately 20 non-MDL leadership firms compensated for common benefit work;

- While providing both direct and indirect benefits and assistance to any and all plaintiffs and law firms pursuing Roundup claims against Monsanto, undersigned counsel only seek to invoke the Court's jurisdiction to assess common benefit contributions from firms that have one or more cases pending in the MDL, and/or have availed themselves of the Participation Agreement,[1] and/or have availed themselves of the Court's jurisdiction through the explicit or implicit use of MDL work product, or by seeking the assistance of Special Master Feinberg in settlement talks;

- The contingency fees earned by the MDL Leadership and other Common Benefit Firms have been, and would continue to be, subject to the same common benefit assessment with respect to their own client-related contingency fees; indeed, such contribution would represent a significant percentage of the funds deposited into the Fund.[2]

In addition, it is significant to note that:

- Of the approximately 400 law firms who are subject to the provisions of PTO 12, only 19 (less than 5%) object to the proposed 8.25% hold-back, in whole or in part; which

---

[1] The MDL leadership did not request, nor did the Court require, participating counsel or persons who used common benefit work product to execute a Participation Agreement, and leadership did not condition their assistance on execution of the agreement.  Indeed, on numerous occasions MDL leadership provided common benefit work product after a participating counsel declined to execute the Participation Agreement. Declaration of Robin Greenwald (Greenwald Decl.) at ¶ 19. A copy of the Participation Agreement is attached to the Greenwald Decl. as Exhibit (Ex.) 1.

[2] If, for example, a client of MDL Leadership Firm X received $150,000 from Monsanto, subject to a 40% contingency fee, MDL Leadership Firm X would have to contribute $12,000.00 (8.00%) to the "Legal Fees Funds" out of its own $60,000 contingency fee, to be split, per the Court's ultimate allocation, with the other eligible Common Benefit Firms. Additionally, in this instance, the client would contribute $375 from her award to the "Expense Fund."

means that: 381 Firms (approximately 95%) have no objection; and,

- Some firms, indeed, voluntarily entered into the Participation Agreement, fully and expressly acknowledging that at least some common benefit fees and/or expenses would be taxed against their own contingency fees.

Finally, the MDL Leadership repeatedly attempted to negotiate with Monsanto for all Roundup Plaintiffs on a "global" basis. It was Monsanto that insisted upon settling with individual plaintiff firms on a confidential, "firm docket" basis.

For these reasons, for the reasons stated in undersigned counsel's original Motion and Memorandum, and for the reasons further stated below, the motion to supplement PTO 12 should be granted and the defendant should be ordered to hold back 8.25% of any judgment or settlement paid to a firm with cases in the MDL, that either explicitly or implicitly used the MDL leadership work product, and/or availed itself of the Participation Agreement or Mr. Feinberg as Settlement Master, pending further Orders of the Court.

## **Short Answers to the Questions Posed by the Court**

1. Given how this case has developed, is it necessary to issue an order requiring that a percentage of each recovering plaintiff's attorney's fees be held back for potential distribution to co-lead counsel?

    Yes, although, as noted, the funds will be held for the potential benefit of all attorneys who contributed to the common benefit effort, and not just "co-lead counsel".

2. Can the Court meaningfully evaluate the need for a hold-back without understanding how much of a premium co-lead counsel has already received on their settlements compared to the typical settlement?

    Yes. The entitlement to common benefit fees is not dependent on the extent to which an attorney has or has not separately earned contractual client fees[3].

    If the Court disagrees, and feels that it needs such information to make a meaningful determination, should the Court request a report from the Special Master?

    Yes. Because the settlements are confidential, the undersigned do not have access to settlements involving other firms' clients. In addition, the settlements are complex, with valuation dependent on participation requirements, opt-out rates, extraordinary injuries, and other factors.

3. If a hold-back is warranted, should the Court consider anew the universe of cases that should be subject to a hold-back?

---

[3] Of note, when it was clear defendant would not entertain a "global" resolution, the MDL leadership firms negotiated their cases separately with Monsanto. Greenwald Decl. at ¶ 4.

2

No. However, the Court may want to utilize Special Master Feinberg to assess the extent to which individual firms have or have not used MDL work product and should be deemed to fall within the scope of the Order.[4]

4.  If a hold-back is truly warranted, why shouldn't it be much lower than the 8% requested by co-lead counsel?

As noted, the hold-back is intended as a provisional measure; it can be reduced or increased,[5] if necessary, once the Court has had the opportunity to quantify the true *quantum* at issue, on a complete record. As set forth on ADDENDUM A to the Memorandum in Support of the Motion, 8% falls well within the range of provisional holdbacks that are typically imposed in these types of cases.

## Standing of and Representations by the Objectors

The pleadings and affidavits submitted by the objectors present an incomplete and inaccurate picture of the Roundup litigation. Even a cursory review of the docket demonstrates that the claims of certain objectors regarding their relationship to the MDL are understated.[6]

The Category 3 Objectors suggest, for example, that they are only tenuously related to the MDL by virtue of improvident removal. However, Category 3 Objector Karen Barth Menzies serves as co-counsel with two executive committee firms in one of the Wave I trial cases and utilized MDL work product.[7] Additionally, the law firms of Category 3 Objectors Fletcher V. Trammell and Andrew Kirkendall signed the Participation Agreement and agreed to be bound by any common benefit order by this Court in exchange for access to the MDL document depository, all MDL discovery, and all trial materials from the three trials. Declaration of Aimee Wagstaff

---

[4] The Court, in its January 26, 2021 Order, also asks whether the holdback should include cases in which a settlement has already been reached and the money has already changed hands, or should it be limited to the cases that have not yet settled? While much of the information regarding existing settlements remains confidential, it is MDL Leadership's understanding that, even where settlement agreements have been reached, and payments by Monsanto have been made, most if not all of the proceeds are being held in qualified settlement funds, subject to further settlement administration. In connection with several relatively limited prior settlements of individual trial cases, the CLC believes counsel held back 7% based on PTO 12 and the initial hold-back request. Greenwald Decl. at ¶ 17.

[5] As leadership firms likely will represent approximately half of the proceeds paid into a common benefit fund, see Greenwald Decl. at ¶ 18, they would not be paid any common benefit award until after 50% of funds are paid, and, further, depending on the cases the Court orders to be subject to the order, 8% could be insufficient to compensate for their work.

[6] *See, e.g., In re GM,* 477 F.Supp.3d at 184 (ordering further factual submissions where objectors "have asserted that they did not use Common Benefit Work Product in their state-filed cases and unfiled matters, and Lead Counsel has, through its own investigation, discovered otherwise.").

[7] *See* Carriere v. Monsanto Company, 3:18-cv-05778-VC.

3

(Wagstaff Decl.) at ¶ 4. These objectors obtained preference trials in JCCP 4953 only because Judge Smith held that "much of the coordinated work has been completed" (by MDL leadership); and because Objectors would have the "benefit of directly relevant opinions" from this Court, and the *Pilliod* and *Johnson* trials. Declaration of Robin Greenwald (Greenwald Decl.), Ex. 2 (JCCP 4953, 12/9/2020 Order, pp. 5-6). Category 3 Objectors have already retained CLC developed experts. Declaration of Michael Miller (Miller Decl.) at ¶ 7, 8,11.

Objector Beasley Allen similarly states that it only "represent a small number of plaintiffs that had their cases improperly removed to the MDL" and contends that their cases "have not received MDL work product from MDL Leadership." Doc. 12528, at p.2. However, not only has Beasley Allen filed Roundup cases directly in federal court, but one client (Seidl) is part of the Wave II trial pool and directly benefited from MDL common benefit work product.[8] Greenwald Decl. at ¶ 6. Beasley Allen and other similarly situated Wave I, II, or III counsel are entitled to use the liability depositions taken by the CLC as well as the liability exhibits that have been used to obtain three large punitive damage awards should their Wave cases go to trial.  Beasley Allen has also coordinated with Weitz & Luxenberg to obtain CLC developed experts in its state court cases. Greenwald Decl. at ¶ 7.

Objector Napoli, who claims he has but a few cases in the MDL—which alone subjects him to PTO 12—recently filed a motion before the JPML, over Monsanto's objection, to transfer a lawsuit for "thousands" of members of the National Black Farmer's Association in order to "prevent inconsistent rulings on discovery and other pretrial issues, while conserving resources for all the parties, their respective counsels, and the judiciary." The JPML ruled in Napoli's favor on February 4, 2021, and transferred those thousands of clients to this Court. Doc. 12524. Napoli has also retained at least one CLC developed expert. Greenwald Decl, Ex. 3; Miller Decl. at ¶ 9.

While Objector Lanier signed onto the "Category 1" Objection, he served as co-counsel

---

[8] Seidl v. Monsanto Company, 3:2017cv00519; Ward v. Monsanto Company 3:2017cv06495; Benge v. Monsanto Company 3:2019cv02835; Kirby v. Monsanto Company3:2019cv02047. On January 22, 2021, the CLC designated Dr. Portier, Dr. Ritz, Dr. Weisenburger, and Dr. Jameson to testify as to general causation for Beasley Allen's Wave II trial case. Greenwald Decl. at ¶ 6.

with an official member of the MDL's expert discovery team in preparation for the *Drevyanko* and *Bognar* trials set in St. Louis County in 2020 and is thus subject to PTO 12.[9] *See, e.g., In re Avandia Marketing Sales Practices,* 658 Fed.Appx. 29, 36 (3d Cir. 2016) ("*Avandia II*") (law firm deemed subject to the MDL holdback when associating signatory to the MDL participation agreement in preparing a state court case for trial). What is more, after entering that case, the Lanier firm contacted MDL leadership to discuss retention of the MDL experts. Wagstaff Decl. at ¶ 5. The experts designated in *Drevyanko* and *Bognar* were prepared by the CLC, including Dr. Portier, Dr. Ritz, Dr. William Sawyer, Dr. James Mill, and Dr. Barry Boyd.[10]   For Mr. Lanier to claim his "firm has not retained any experts that were engaged by CLC and MDL Leadership, nor have we received any work product, report, or testimony prepared by those experts" (Doc. 12526-3, at ¶6) is untrue and baffling in light of his role in *Bognar* and *Drevyanko*.[11]   The scheduling order in Mr. Lanier's state court cases, moreover, provides that:

> [The] parties agree that discovery in In re: Roundup Prods. Liab. Litig., MDL No. 2741, the multidistrict litigation proceeding in the Northern District of California, and discovery in any cases brought in any Missouri or California court may be used in this action as if it were conducted in this action, including all expert depositions and document production.

Greenwald Decl.nEx. 6, ¶ 1. *Drevyanko* and *Bognar* resolved prior to trial and, upon information and belief, Mr. Lanier resolved all of his Roundup cases shortly thereafter. It is further believed the Lanier Law Firm has a fee interest in several MDL cases, further subjecting it to PTO 12.

---

[9] *See* Greenwald Decl., Exs. 4, 5 (Dockets for Drevyanko et al V Monsanto, 18SL-CC00988, Bognar, et al., v. Monsanto, 18SL-CC02199). Mr. Lanier's co-counsel in *Drevyanko* and *Bognar,* The Sill Law Group and The Holland Law Firm, signed participation agreements and are considered two of a group of firms who have conducted work for the common benefit of all litigants. The Sill Law Group paid significant monies to the CLC to help generate, develop, and retain the MDL's expert. Wagstaff Decl. at ¶¶ 2, 5. The CLC assisted the *Bognar and Drevyanko* trial teams in contacting and retaining the CLC experts. Further, it is believed the trial teams utilized the work (*i.e.,* deposition cuts) from the *Gordon* trial team, which included CLC members and The Holland Law Firm. Wagstaff Decl. at ¶ 3, 5.

[10] Miller Decl., at ¶10. Notably, only the case-specific experts were noticed for deposition demonstrating that the general causation experts had simply incorporated their prior reports submitted by the CLC and their depositions defended by the CLC.

[11] *See also, e.g., In re DePuy Orthopaedics, Incorporated, Pinnacle Hip Implant Product Liability Litigation,* 888 F.3d 753, 791 (5th Cir. 2018) ("Lanier's failure to disclose the donation, and his repeated insistence that Morrey Sr. had absolutely no pecuniary interest in testifying, were unequivocally deceptive.").

The only objector to describe any attempt to conduct his or her own general liability discovery is Mr. Onder. However, Onder has waited more than five years after first filing a Roundup case to even notice a deposition of a Monsanto employee. The CLC, moreover, recently obtained a scheduling order for one of Onder's scheduled trials in Missouri issued on February 2, 2020, which has nearly the same stipulation of using the MDL discovery in his Missouri Roundup litigation as set forth above for the Lanier state cases. Greenwald Decl., Ex. 7.

Moreover, much of Onder's Declaration amounts to little more than a complaint that the MDL experts are unavailable to testify in his cases. Apart from the fact that the CLC *has* made their experts available where their schedules permit, *see infra/supra*, this gripe ignores that Onder's clients were given a virtual road map of the parameters of admissible expert testimony, the universe of relevant scientific literature, and workarounds to Monsanto's inevitable attacks, all by virtue of the publicly available reports, recorded *Daubert* testimony, and volumes of trial testimony made available through the CLC's hard work.

Objector Bernstein Liebhard, LLP's assertions are equally baseless. As an initial matter, the Court had made very clear that settlement negotiations with Monsanto and the Special Master should be held strictly confidential, and the Miller Firm has repeatedly warned their clients about maintaining confidentiality. It is unfortunate that an unidentified client did leak information, albeit inaccurate, about a settlement, but attorneys before the Court should not be broadcasting and amplifying that inaccurate leak. Objector Bernstein, as a seasoned law firm, should know that an article based on a client's estimate of the Miller Firm's fees are meaningless as there over 100 law firms with a fee interests in "The Miller Firm Settlement" including Objector Onder who has a fee interest in several hundred cases. Miller Decl. at ¶ 12.

## II.  DISCUSSION

### A.  A Common Benefit Holdback Is Warranted

A common benefit assessment is standard practice in mass tort MDLs to compensate those attorneys who perform the work and make the capital contribution necessary for the benefit of all plaintiffs. *See, e.g., In re Bextra and Celebrex Marketing Sales Practices and Prod. Liab. Litig.,*

MDL No. 1699, 2006 WL 471782 (N.D.Cal. 2006) (Breyer, J.).[12] See also *In re Actos (Pioglitazone) Products Liability Litigation,* 274 F.Supp.3d 485, 532 (W.D. La. 2017) ("Large MDLs such as this one are expensive to mount, sustain, and bring to conclusion, and require a continuous influx of capital…with no assurance the named attorney or firm would receive any remuneration whatsoever…."); *In re Zyprexa Products Liability Litigation,* 467 F.Supp.2d 256, 265 (E.D.N.Y. 2006) (citing MANUAL FOR COMPLEX LITIGATION § 20.312 (4th ed. 2004); *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980) (the common benefit doctrine is rooted in equity).

In some mass torts where success appears to be a foregone conclusion (such as where a product is recalled by the FDA), there are dozens of firms willing to assume the financial risk and other responsibilities of appointment to a plaintiff steering committee. *See, e.g., Drake v. DePuy Orthopaedics, Inc.,* No.13-20140, 2017 WL 6502489, at *1 (N.D. Ohio Dec. 19, 2017) (95 attorneys applied for application to leadership position for recalled hip device); *In re Zantac (Ranitidine) Products Liability Litigation,* No.20-2924, 2020 WL 1669444, at *7 (S.D. Fla. Apr. 3, 2020) (67 attorneys interviewed for leadership positions for recalled medication). Here, by contrast, success was far from certain, the number of firms willing to expose themselves and their law firms to the demands of litigating a case of this complexity and to extreme financial risk was an order of magnitude smaller. *See, eg.* Rec. Docs. 10-14 and 16-17. In fact, after dozens of law firms declined the offer to join the leadership team, just six law firms were left to carry the financial risk of this litigation. To this day, no other firm has even sought to join the executive committee. Wagstaff Decl. at ¶ 2. [13]

The firms who steered this litigation from the outset took tremendous financial risk on a commitment to seek justice for cancer victims with no assurance of success. Such high-risk

---

[12] Judge Breyer explains that the Court's authority derives from the Supreme Court's common benefit doctrine, as established in *Trustees v. Greenough,* 105 U .S. 527 (1881), and refined in, *Central Railroad & Banking Co. v. Pettus,* 113 U.S. 116 (1884), *Sprague v. Ticonic National Bank,* 307 U.S. 161 (1939), *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375 (1970), and *Boeing Co. v. Van Gemert,* 444 U.S. 472 (1980), and applied in the MDL context, in, inter alia, *In re Air Crash Disaster at Florida Everglades on December 29, 1972,* 549 F.2d 1006, 1019-21 (5th Cir.1977), and *In re MGM Grand Hotel Fire Litigation,* 660 F.Supp. 522, 525-29 (D.Nev.1987).

[13] *See* Rec. Doc. 62 ("The Court may alter the leadership counsel or the allocation of responsibilities if circumstances warrant, either on a party's motion or sua sponte").

commitment to victims of defective products should be encouraged and rewarded. At the same time, a majority of the claims that have been brought to-date were asserted, relatively lately, by firms who conducted minimal to no substantive legal work and only after the MDL leadership obtained jury verdicts, thereby minimizing the risk of those firms' marketing investments. See Motion at 7, Figure.

Contrary to the suggestion of some objectors, the MDL leadership engaged in unprecedented transparency throughout the litigation, sharing nearly all non-confidential work product publicly and in a well-organized fashion *via* the Baum Hedlund website. These materials together included all trial transcripts, expert reports, video testimony played at trial, trial exhibits, trial briefs, and all major discovery documents. Every law firm has had the ability to access an informal "trial package" which has provided a detailed road map with the documents necessary to obtain a multi-million or multi-billion dollar verdict.[14]

The CLC has also created a more formal and extensive Trial Package, which includes confidential and non-public work product and other materials, which is made available to firms, with appropriate safeguards, upon request. Contrary to the suggestion of some Objectors, MDL Leadership Firms have also offered and assisted other firms in obtaining suitable experts.[15] Leadership, at their expense, also traveled the country for five years, speaking at conferences at which they presented the underlying science, Monsanto's liability, litigation status, and more.

Similarly, the significant depositions of Monsanto corporate representatives, experts and third-parties were all conducted by MDL leadership, and trials and trial dates on the horizon were won or secured by leadership. The majority of Roundup Plaintiffs and their counsel who are now settling with Monsanto have presumably found such common benefit materials sufficient to inform

---

[14] See, in particular, the contemporaneous public availability of the following documents: Edwin Hardeman v. Monsanto | Roundup Litigation | Baum Hedlund (baumhedlundlaw.com); Pilliod v. Monsanto Co. | Leading Roundup Litigation Attorneys (baumhedlundlaw.com); Dewayne Johnson v. Monsanto Company | California State Court (baumhedlundlaw.com); Monsanto Papers | Declassified Secret Documents (baumhedlundlaw.com); and Monsanto Papers - U.S. Right to Know (usrtk.org).

[15] Greenwald Decl. at ¶¶ 6,7. It is true that a few experts have indicated that they are unwilling or unable to take on new cases for additional plaintiffs, but that is largely beyond MDL Leadership's control.

their negotiations, as they have not conducted any additional discovery of Monsanto. And, no one can credibly argue that Monsanto would be engaging in negotiations with such firms but for the efforts and successes of MDL leadership. Finally, only a few non-leadership firms have requested access to the document depository; they cannot access the millions of pages of Monsanto's documents without gaining access through leadership. Put simply, these firms are able to settle their cases despite doing minimal substantive legal work "precisely because Lead Counsel and others in the MDL did a massive amount of substantive legal work on their behalf." *In re General Motors LLC Ignition Switch Litigation*, 2020 WL 4586820, at *12 (S.D.N.Y., Aug. 10, 2020) ("*In re GM*"). Indeed, the "mere availability of the discovery...substantially influenced [Defendant's] evaluation of *every* plaintiffs case." *In re Diet Drugs* 582 F.3d 524, 548 (3d Cir. 2009).

Separately, and perhaps more importantly, the MDL leadership opened courtrooms for plaintiffs all over the country by obtaining favorable preemption, *Daubert, Sargon,* summary judgment, punitive damage, and venue rulings in both trial and appellate courts. Miller Decl. at ¶¶ 13-33. It is not an exaggeration to say that each and every substantive legal victory in every jurisdiction has been obtained by and through the involvement of the MDL leadership firms.

### B.    Neither Monsanto Nor MDL Leadership Firms' Own Clients Have Compensated Common Benefit Attorneys for Common Efforts or Expenditures

The undersigned are aware of no case – nor have the Objectors pointed to one [16] – in which the Court precluded a common benefit assessment based on the successful recovery of contingency fees earned under agreements with their individually retained clients.

Absent a fee-shifting statute or some type of an agreement, a defendant such as Monsanto is not called upon to compensate plaintiffs, or their attorneys, for common benefit efforts or expenditures.[17] Rather, a defendant like Monsanto in the typical mass tort case compensates

---

[16] The "Category 2" Objectors, in a footnote, cite to *In re High Sulfur Content Gasoline Prods. Liab. Lit.*, 517 F.3d 220 (5th Cir. 2008), which involved access to, and consideration of, the relative contributions of, and awards to, the common benefit firms, in the allocation of a lump sum class action fee – **not** the consideration or review of contingency fees collected by class counsel with respect to their own clients' recoveries under individual retainer agreements.

[17] In many cases, a firm's past investment might well weaken its bargaining position due to depleted resources.

plaintiffs based on the perceived level of risk or exposure it faces at trial. In this particular case, it is impossible to know whether MDL leadership firms, and/or any other firms, may have been able to obtain higher average settlement offers on behalf of their clients, as such information is confidential at Monsanto's insistence. *See* PTO 200. But it would not be surprising if that were the case – *not* as "compensation" to those firms for their common benefit efforts or expenditures, but because they are likely perceived to pose greater levels of risk and exposure to Monsanto based on knowledge of and commitment to the case. *See, e.g.,* Baker and Herman, *Lawyers of Lawyers: Parsing the Complexities of Claimant Representation in Mass Tort MDLs,* 24 LEWIS CLARK L. REV. 469, 489 (Spring 2020) ("An attorney serving in MDL leadership is frequently a lawyer who, even without a leadership appointment, would warrant or demand premium recoveries for her clients, based on her own knowledge, experience, skill at trial (including trial verdicts to date), reputation, commitment, financial wherewithal, or the size and quality of her inventory"). Indeed, while the precise settlement amounts remain confidential, it is our general impression that other law firms that are not in leadership roles also commanded higher-than-average settlement offers for their clients, based on Monsanto's perception of those attorneys' skills, knowledge, reputation, the quality of cases, commitment to trial, and track records in previous mass tort litigation. Greenwald Decl. at ¶ 15.

Moreover, the contingent fees that the common benefit attorney firms earn under agreement with their own individually retained clients are paid out of those clients – and only those plaintiffs' – recoveries. A common benefit fee recognizes MDL leadership's work on behalf of all plaintiffs, particularly those represented by "free-riding" attorneys. As Judge Fallon observed:

> At first blush to award common benefit fees might be criticized as double dipping and not appropriate. But on closer scrutiny it clearly is not. It is true that many of those who have done common benefit work have their own clients and have received or will receive a fee from them. But it is not double dipping because the common benefit fee will not come from any client. Instead it will come from the attorneys, most of whom have not done any common benefit work but have received enormous benefit from it. Thus as between a common benefit attorney who expended considerable time, resources, and took significant economic risks to produce the fee, and the primary attorney who did not, it is appropriate and equitable that the former receive some economic recognition from the beneficiary of this work.

*In re Vioxx Products Liability Litigation* (E.D. La. 2010) 760 F.Supp.2d 640, 653; *see also, e.g.,* *In re Zyprexa*, 467 F.Supp.2d at 265 ("In a complex multi-party litigation, attorneys designated with responsibilities for actions beyond those in which they are retained may be compensated for their work not only by their own clients, but also by those other parties on whose behalf the work is performed and on whom a benefit has been conferred.").

Significantly, the client contingency fees earned by MDL leadership firms and other Common Benefit Attorneys will be subject to the same common benefit assessment. So, as a practical matter, the greater the recoveries they have achieved for their own clients, the more they will have to pay into the Fund and to share with other Common Benefit Attorneys. At the same time, firms that have settled for less money per client will contribute less to the fund. But, because the purpose of the common benefit doctrine is to ensure that the burden is spread fairly among all Roundup Plaintiffs (and their attorneys), the Court does not compare settlement agreements between firms as a basis for awarding, or not awarding, common benefit fees[18].

While Objectors have made much of the fact that Monsanto did not agree to a "global settlement" in this regard, such analysis is not one of the *Johnson* factors. Although the MDL Leadership would have preferred to settle globally, and in fact tried to secure same, firm-to-firm settlements are now commonplace in MDLs, and that structure has never affected the entitled to a common benefit fee. *See, e.g., See, e.g., In re C.R. Bard, Inc., Pelvic Repair System Products Liability Litigation*) 2019 WL 385416, at *11–12 (S.D.W. Va., Jan. 30, 2019) ("…the court finds the lack of a global settlement does not warrant reducing the fee award."); *In re Avandia Marketing, Sales Practices and Products Liability Litigation,* 2012 WL 6923367, at *5 (E.D. Pa.

---

[18] Further, the "per case average cannot be considered in a vacuum. These settlements are complex, highly negotiated between lawyers for months (or even years) with dozens of highly detailed deal terms and valuation dependent on several factors, such as injuries included, qualification and participation requirements, opt-out rates, extraordinary injuries, defense walk-away conditions, release conditions, and many other factors. Often a favorable term (*i.e.,* an easier threshold for clients to participate or a low qualification/participation rate) is negotiated in return for a lower value or vice versa.  The terms are actually the complex part of settlements, and each term is negotiated based on the specific attorney's decision on what is best for his/her clients.

Oct. 19, 2012); *In re Bextra*, 2006 WL 471782 (no global settlement – order establishing fee based on percentage proportion of gross amount recovered by every client represented by "participating counsel"); *In re Trasylol Prods. Liab. Litig.*, 1:08-md-01928 (S.D.Fla. Nov. 2, 2012) (no global settlement; order granting aggregate fee requested by MDL leadership); *In re Kugel Mesh Hernia Patch Prods. Liab. Litig.*, 1:07-md-01842, Doc. 4563 (D.R.I. May 9, 2014) (no global settlement; order granting 8% common benefit fee); *In re Yasmin and Yaz Prods. Liab. Litig.*, 3:09-md-02100, Doc. 3856 (S.D. Ill. Nov. 20, 2015) (no global settlement; aggregate fee award granted).

There is also no legal authority for "the proposition that a lawyer who occupies a leadership position in aggregate proceedings outside of the class action context cannot settle some or all of his or her own cases.... If anything, by settling for as much money as he could get…, Lead Counsel set a benchmark for other plaintiffs...to use in negotiating their own settlements." *In re General Motors LLC Ignition Switch Litigation,* 2016 WL 10880229, at *2. (S.D.N.Y., Feb. 10, 2016).

As noted, Monsanto was adamant that it would not negotiate on a "global" basis, and frankly the parties would have been hindered in such attempt by several (yet to settle) law firms' refusal to stop advertising long enough to negotiate a settlement and, according to Monsanto, now appear to have signed thousands of clients without reliably being able to confirm clients' non-Hodgkin's lymphoma diagnosis. Based on Bayer's June 2020 press release, tens of thousands of "claims still subject to negotiation largely consist of cases generated by TV advertising and for which plaintiffs' law firms have provided little or no information on the medical condition of their clients."[19] In any event, Monsanto's unwillingness to entertain a "global" settlement with MDL Leadership does not alter the purpose of the common benefit fee award:[20]

> The efforts of plaintiffs' leadership on behalf of the common benefit are in constructing a theory of liability, developing cross-cutting expert testimony that is applicable to general theories of liability in these MDLS, securing pretrial rulings for all plaintiffs, and reducing

---

[19] https://media.bayer.com/baynews/baynews.nsf/id/Bayer-announces-agreements-to-resolve-major-legacy-Monsanto-litigation.

[20] Further, the Common Benefit Attorneys' first and foremost ethical obligation is to their own clients. It is unclear if the objectors are suggesting the CLC and PEC should have rejected individual offers for their clients in the face of Monsanto's refusal to engage in a "global" resolution; however, such a suggestion is contradictory to these firms' ethical obligations to their own clients with whom they have contractual relationships.

the bargaining power each defense counsel has in negotiating settlements with individual plaintiffs .... Far from failing to provide a common benefit in the form of a global settlement, the plaintiffs' leadership facilitated the settlement of tens of thousands of cases through its persistent efforts to weaken the defendants' factual and legal standing compared to individual plaintiffs across the country.

*In re C.R. Bard,* 2019 WL 385416, at *12.

When the leadership first filed Roundup cases in the fall of 2015 and there was significant financial risk and uncertainty facing plaintiff contingency lawyers in preparing Roundup cases for trial, Monsanto was adamant it would not settle any cases - ever. Now that the financial barrier and uncertainty in getting to the courtroom for any single plaintiff has been substantially reduced, so has Monsanto's bargaining position. Firms can now use MDL leadership's prior legal briefing, rely on the favorable rulings in multiple courts, rely on leadership's experts, use the liability trial deposition cuts, and replicate the trial package, thereby saving substantial time and money. While trial is still expensive and time-consuming, it no longer requires original work or risking a firm's financial well-being to adequately represent one's client – it simply requires hard work.

**C.    The Court Should Issue a Holdback Order Applicable to Past and Future Settlements Involving Plaintiffs' Counsel Who (i) Have One or More Cases Pending in the MDL, and/or (ii) Have Voluntarily Availed themselves of the Participation Agreement, or (iii) Otherwise Have A Nexus To the MDL Through Association With Participating Counsel and/or Use of Common Benefit Work Product.**

While the CLC requested only that the Court amend PTO 12 to require a definite holdback percentage, the Court has invited briefing on whether it should consider anew the scope of PTO 12. The circumstances of this litigation warrant an expansion of the current scope of the holdback to encompass the entire universe of settlements, because all Roundup Plaintiffs have undoubtedly benefited from the efforts and expenditures of common benefit attorneys. At a minimum, however, the Court should maintain the scope of PTO 12 and interpret its language broadly and as intended.

Many of the objectors, and indeed some of the reported cases, use the word "jurisdiction" in connection with the outer contours of a common benefit assessment. But, in parsing through the considerations, the courts have essentially wrestled with three fundamental questions: (i) what would be fair and equitable for the Court to order under the circumstances; (ii) what does the Court

13

have subject-matter jurisdiction to order; and (iii) what does the Court have the authority to enter, as a matter of precedent and policy.

In this particular case: (i) the Court should impose a holdback with respect to the judgment or settlement of each and every Roundup claim; (ii) the Court has subject-matter jurisdiction to enter such an order, by virtue of its jurisdiction over the MDL, the defendant, the MDL plaintiffs, and the attorneys representing the MDL plaintiffs; and (iii) the Court has the authority to assess settlements of all MDL cases; the unfiled and state-filed cases of firms who have formally entered into the MDL Participation Agreement; the unfiled and state-filed cases of firms with at least one case in the MDL; the unfiled and state cases of firms who have used the services of Special Master Feinberg; and the unfiled and state-filed cases of firms who have, either explicitly or implicitly, benefited from or used the common benefit work product.

It is important to keep in mind, before addressing these issues in turn, that the holdback assessment has little effect on the recoveries of plaintiffs. While Objectors would have the Court focus solely on them, it is actually their *attorneys* who benefit from the efforts of the Common Benefit Firms, and the attorneys who pay the common benefit assessments out of their contingency fees.[21] Indeed, here, we are requesting 8% of the 8.25% be paid by the attorneys from their contingency fees. Therefore, whether for so-called "jurisdictional" purposes, or as a matter of basic precedent and policy, it is important to consider the nexus between the MDL and the attorney who derived fees from the settlement in question, as opposed to the plaintiff or claimant in question.[22]

It is additionally relevant that many firms, including firms that have never represented a plaintiff in a federal case, have nevertheless invoked the services of the MDL-appointed mediation special master Kenneth Feinberg, thus submitting to the Court's authority and jurisdiction.[23]

---

[21] *In re Vioxx, supra,* 760 F.Supp.2d at 653 ("the common benefit fee will not come from any client. Instead it will come from the attorneys, most of whom have not done any common benefit work but have received enormous benefit from it").

[22] *See, e.g., In re VW "Clean Diesel" Marketing Lit.,* 914 F.3d 623, 640 (9th Cir. 2019) (it is the lawyers who stood to gain or lose fees that were the real parties-in-interest for standing purposes, not the litigants).

[23] *See, e.g.* PTO 200 (order applicable to all counsel engaged in mediation with Mr. Feinberg); *see also, e.g., In re General Motors LLC Ignition Switch Litigation* 2019 WL 5865112, at *3

i.    **The MDL Leadership Has Conferred a Substantial Benefit to *All* Roundup Cases and Claims**

It is well-settled that, absent an appropriate common benefit mechanism, the MDL will present "windfall opportunities to state court litigators" (and litigators with unfiled cases) seeking to "benefit from this work product without fair consideration." *In re Avandia,* 2015 WL 4480827, at *5. "Lead Counsel would be undercompensated, and the incentives to perform work for the common benefit in this and future MDLs would be insufficient." *In re GM,* 477 F. Supp. 3d at191. And as in *GM,* "the work performed by Lead Counsel has undoubtedly been of tremendous value to those who asserted claims…, regardless of forum." 477 F.Supp.3d at 183.

It would be a fiction, in large mass tort cases, to compartmentalize attorney-client relationships and conclude that a law firm's actions on behalf of its clients in the MDL are unrelated to its actions on behalf of its clients in state court. The very purpose of bellwether trials, for example, is "to facilitate settlement in similar cases by demonstrating the likely value of a claim..." *Briggs v. Merck Sharp & Dohme*, 796 F.3d 1038, 1051 (9th Cir. 2015). Plaintiffs' counsel thus makes filing decisions seeking to increase the odds that a client with a strong case will be the first to trial. That filing decision not only benefits the individual client, but is made by the firm on behalf of all of its clients whose settlement prospects will increase if the first trials are successful. Likewise, a firm that files a client's lawsuit in an MDL seeks to access the discovery and related common benefit work product not only on behalf of that one client, but on behalf of all of its clients pursuing related claims. Even, therefore, "in the absence of bad faith, there is a strong argument for taxing the unfiled claims of a lawyer who gains access to common benefit work product by filing a single claim in the MDL." *In re GM,* 477 F. Supp.3d at 182.

The nature of the settlements in this case also prevents compartmentalization of a firm's Roundup clients. Monsanto has not made any distinction in the settlement of cases among those that are filed in the MDL, filed in state court, and unfiled. All clients of a firm (or collection of firms) belong to the same settlement fund. Because those aggregate settlements involve a

---

(S.D.N.Y., Nov. 8, 2019) (firms availed themselves of MDL jurisdiction over state-filed and unfiled cases through use of MDL appointed special master and MDL approval of trust fund).

requirement that a certain percentage of clients opt-in for the settlement to take effect, the claims of MDL-filed clients are inextricably linked with the claims of a firm's other Roundup clients. Because the Court ordered parties in the MDL to mediate the claims (PTO 141) it was the firm's MDL clients that propelled settlement talks for the firm's entire pool of clients.

Separate and apart from the utilization of discrete work product, the unwavering commitment of MDL leadership from their initial filings through the present changed the landscape of the litigation. The evidence developed by MDL leadership and the carefully considered rulings by the MDL Court paved the way for state court litigants,[24] and the availability of that work product and precedent paved the way for firm-wide settlements encompassing both filed and unfiled cases. *In re GM,* 477 F.Supp.3d at 182 ("access to common benefit work product may benefit a lawyer (and, by extension, her clients) even if it is never put to concrete use, let alone filed, in another action").

### ii.        The Court Has Subject-Matter Jurisdiction

As set forth in a scholarly opinion by Judge Furman in the *GM Ignition Switch Litigation,* the question of scope is not really a question of subject-matter jurisdiction. "For starters, it seems wrong to say that where, as here, a court's order directs a party or counsel to say that where, as here, a court's order directs a party or counsel before it to act that the court lacks *subject-matter jurisdiction.*" *In re GM,* 477 F.Supp.3d at 187 (emphasis in original). The Court has jurisdiction over the MDL itself.[25] The Court has jurisdiction over the defendant. And the Court has jurisdiction

---

[24] For example, Judge Winifred Smith presiding over the California State Cases gave this Court's opinion great deference, adopting this Court's preemption decision and deeming persuasive this Court's opinions on *Daubert*, in part "because the goal of consistency in the JCCP and the MDL suggests that the court pay greater attention to the orders of other trial courts than would otherwise be that case." *Pilliod v. Monsanto Co.,* 2019 WL 2158266, at *2, *9 (Cal.Super.). Judge Medinilla in Delaware stated that "[t]his Court is guided by the MDL …defers to the MDL Court's assessment of the science and underlying studies." *Barrera v. Monsanto Company* (Del. Super. Ct., May 31, 2019) Prod.Liab.Rep. (CCH) P 20636. This Court's *Daubert* rulings figured prominently in the first and only St. Louis City Case to pick a jury. Greenwald Decl., Ex. 8 (Excerpts of 1/16/2020 Hearing Transcript, Wade v. Monsanto, No. 1722-CC00370). Judge May presiding over the first St. Louis County case for trial adopted this Court's preemption ruling. Greenwald Decl., Ex. 9 (Adams v. Monsanto, 17SL-CC02721, Order Denying SJ).

[25] Transferee courts have the authority to appoint lead counsel to effectively manage MDL proceedings. *Vincent v. Hughes Air West, Inc.,* 557 F.2d 759, 772 (9th Cir. 1977). However, this

16

over the plaintiffs' counsel who have cases pending in the MDL and "an undeniable interest in policing the conduct of attorneys involved in an MDL" *In re Deepwater Horizon,* MDL No. 2179, ECF No. 2038 (J.P.M.L. Feb. 4, 2021).

Whether "jurisdictional" or simply prudential, *Hartland* would seem to imply that the MDL court's jurisdiction over the defendant, without more, is insufficient. But, significantly, the existing version of PTO 12 does not run afoul of *Hartland,* because in that case the plaintiff lawyer in question never represented any client in the MDL, nor signed a formal participation agreement – nor did he even access or utilize MDL work product or any special master appointed by the court. Rather, "the district court sought to impose a direct tax on complete strangers to the litigation pending before the court." *In re GM,* 477 F.Supp.3d at 187. When it comes to the *Rice* decision, at the same time, Judge Furman observes that all lead counsel proposed to do – which is the same thing that Judge Furman did in *GM* and what Your Honor did in PTO 12 – is simply "require the defendant – that is, *a party in the case or controversy pending before the court* – to hold back a portion of any award to the client of *counsel appearing before the court.*" *In re GM,* 477 F.Supp.3d at 187 (emphasis in original). Whether or not a holdback extending to unfiled or state court plaintiffs represented by the same plaintiffs' counsel is an appropriate *exercise* of the court's power, it is not, in Judge Furman's view, a "jurisdictional" question. Rather, the court's conclusion to the contrary in *Rice* is "pure *ipse dixit.*" *Id.* at 187.

That the issue is not one of subject-matter jurisdiction is further bolstered by the fact that, contrary to the well-established principle that parties cannot confer subject-matter jurisdiction on a federal court by consent,[26] MDL courts universally allow counsel to agree to be bound by a court's holdback orders in exchange for access to MDL common benefit work product. *In re GM,* 477 F.Supp.3d at 187 (citing *In re Avandia Marketing, Sales Practices and Products Liability Litigation,* 617 Fed.Appx. 136, 141-144 (3d Cir. 2015), and *In re Latex Gloves,* 2002 WL

---

authority would be "illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation"; from whence derives an "inherent authority to compensate common benefit counsel in complex litigation." *In re Vioxx Products Liability Litigation* 760 F.Supp.2d 640, 648 (E.D. La. 2010).

[26] *See, e.g., Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 (1982).

32151775 at *1). *See also, e.g., In re Vioxx,* 760 F.Supp. 640 (common benefit fee assessed on recoveries from both state and federal court cases under voluntary opt-in settlement agreement).

The court also notes that "it is commonly accepted that a federal court has the power to regulate the conduct of counsel appearing before it, even where such regulates non-parties to the case itself." *In re GM,* 477 F.Supp.3d at 188. For example, there is no debate about a federal court's ability to issue protective orders. *In re GM,* 477 F.Supp.3d at 188-189 (quoting *Seattle Times v. Rhinehart,* 467 U.S. 20, 35 (1984) ("We have no question as to the court's jurisdiction to do this under the inherent equitable powers of courts of law over their own process, to prevent abuses, oppression and injustices")); *see also, e.g., In re Baldwin-United Corp.,* 770 F.2d 328, 338 (2d Cir. 1985) (a court has authority under the All Writs Act "to enjoin and bind non-parties to an action where needed to preserve the Court's ability to reach or enforce its decision in the case over which it has proper jurisdiction").

In this litigation, the Court has directed, for example, that "All discovery obtained in these proceedings which is used in any state court litigation is subject to this Order and any protective order(s) entered by this Court," (PTO 7(I)(C)) and that "The parties are ordered to provide a copy of this order to each state court judge who is currently assigned to a Participating Case as defined in Pretrial Order No. 12..." PTO 31. Recently, the Court ordered that "the parties are reminded that settlement discussions in this MDL are confidential and that the Court will not hesitate to enforce the confidentiality requirement with sanctions if necessary." PTO 200. The Court would give no heed to attorneys arguing they could breech these orders if done on behalf of state court clients.

In issuing a holdback order, Judge Furman concludes, the transferee court "is not exercising jurisdiction over cases or parties not before it; it is exercising jurisdiction over the MDL"; and within the scope of that jurisdiction, the transferee court "has the authority to regulate the conduct of the MDL parties and MDL counsel, even where such regulation affects the interests of others." *In re GM,* 477 F.Supp.3d at 189.

      **iii.**    **The Court Has the Authority, as a Matter of Precedent and Policy, to Enter a Holdback Order within the Scope of PTO 12 – At the Very Least**

As a matter of jurisdiction or precedent and policy, it is beyond question that the Court can and should impose a common benefit assessment with respect to all cases pending in the MDL.

It is also clear that the Court can and should impose a common benefit assessment with respect to settlements entered into by attorneys who voluntarily entered into the PTO 12 Participation Agreement. *See, e.g., In re Avandia,* 617 Fed.Appx. at 141-144; *In re GM,* 477 F.Supp.3d at 187; *In re Latex Gloves,* 2002 WL 32151775 at *1).[27]

Courts have also imposed assessments with respect to the settlement of state court cases where the attorneys either had some cases in the MDL and/or otherwise used, either explicitly or implicitly, MDL work product in the state court cases. *See, e.g., In re GM,* 477 F.Supp.3d at 184-185 (courts appear to be unanimous in concluding that the MDL court has the authority to assess fees from counsel who utilized MDL work product in their state court or unfiled cases) (citing numerous examples).  And courts have also imposed assessments with respect to the settlement of unfiled cases by attorneys with MDL cases.  *See, e.g., In re GM,* 477 F.Supp.3d at 180-181.

Finally, courts have found a basis for assessment where the attorney has invoked an MDL-appointed mediator or special master. *See, e.g., In re General Motors LLC Ignition Switch Litigation,* 2019 WL 5865112, at *3 (S.D.N.Y., Nov. 8, 2019).[28]

When this Court entered PTO 12 in early 2017, it placed all counsel on notice that they could be subject to a common benefit fee assessment and that filing a case in federal court and/or using the MDL leadership's work product would result in the imposition of a common benefit fee. The CLC requested the holdback order early in this litigation to put firms on notice. Participating attorneys, as defined in PTO 12, made the strategic decision on behalf of themselves and all of their clients that the benefits of having at least one case in the MDL and/or accessing MDL discovery or otherwise using leadership's work product would be worth the assessment. Those

---

[27] As the conduct of an attorney is generally imputed to his or her client, allowing a party to evade the decisions of his agent would be inconsistent with our system of representative litigation. *In re GM,* 477 F.Supp.3d at 192 (citing *S.E.C. v. McNulty,* 137 F.3d 732, 739 (2d Cir. 1998)).

[28] *See also, e.g., In re Vioxx,* 760 F.Supp. 640 (common benefit fee assessed by MDL court on recoveries from both state and federal court cases that were settled together under one master settlement agreement).

attorneys have thus knowingly and purposefully subjected themselves to the Court's authority and jurisdiction for purposes of a common benefit assessment arising from their settlements.

Whether viewed from a jurisdictional lens or as a matter of policy and precedent, this Court's PTO 12 falls within the generally accepted discretion to assess a common benefit holdback on all attorneys except those who both have no cases in the MDL *and* do not in any way use MDL common benefit work product, federal discovery material, or the MDL appointed Settlement Master. *See* Federal Judicial Center, MANAGING MULTIDISTRICT LITIGATION IN PRODUCTS LIABILITY CASES, A POCKET GUIDE FOR TRANSFEREE JUDGES, at pp.14–15 (2011); *In re GM, supra,* 477 F.Supp.3d at 175; *In re Oil Spill by the Oil Rig DEEPWATER HORIZON in the Gulf of Mexico, on April 20, 2010* (E.D. La., Dec. 28, 2011, No. 10-2771) 2011 WL 6817982, at *6.[29] This Court's PTO 12 is also consistent with the generally accepted authority to exercise jurisdiction over the cases of firms who voluntarily agree to the Court's authority and jurisdiction through, for example, either an "implicit" or explicit agreement to an assessment in exchange for access to common benefit work product. *See, e.g., In re Avandia Marketing,* 2015 WL 4480827, at *6 (E.D. Pa., July 21, 2015,).[30]

Notably, no one objected to PTO 12 when it was entered, and there has not been a single objection to PTO 12 in the four years since.[31]

Because the scope of PTO 12 is properly framed in terms of the Court's jurisdiction, its propriety is easily distinguishable from the district court orders in *Hartland*, *Showa Denko*, and *Rice.* As noted, the existing scope of PTO 12 does not run afoul of the *Hartland* or *Showa Denko*

---

*Deepwater Horizon* was subsequently amended on other grounds, but the court reaffirmed that assessment would apply to "state court plaintiffs represented by counsel who have participated in or had access to the discovery conducted in this MDL.". *See* 2012 WL 161194 (E.D. La.).

[30] The District Court's order was affirmed on appeal, but the Third Circuit declined to reach an opinion as to whether a firm's implied agreement to an assessment through the use of MDL work-product was sufficient, in and of itself, to establish jurisdiction. *In re Avandia Marketing Sales Practices,* 658 Fed.Appx. 29 (3d Cir. 2016).

[31] *See, e.g., Schnabel v. Lui* 302 F.3d 1023, 1038 (9th Cir. 2002) (personal jurisdiction argument waived where party fails to make timely objection); *Marcial Ucin, S.A. v. SS Galicia* 723 F.2d 994, 997 (1st Cir. 1983).

decisions,[32] because it does not apply to settlements with plaintiffs who are represented by attorneys with no MDL cases, who did not in any manner use the CLC's work product, and who did not seek assistance from Mr. Feinberg. Rather, it properly applies to lawyers, and only to lawyers, who have availed themselves of the MDL's jurisdiction. *See, e.g., In re GM,* 477 F.Supp.3d at 187 (S.D.N.Y. 2020) (distinguishing a holdback similar to PTO 12 from *Hartland* and *Showa Denko*).

In *Rice*, the Eighth Circuit affirmed a district court's determination that it did not have jurisdiction to assess common benefit fees over the state clients of objecting attorneys who also had MDL clients *because* the state clients "neither agreed to be part of the federal MDL nor participated in the MDL Settlement Agreement." 764 F.3d at 874. Like *Hartland*, some state litigants in *Rice* properly waived jurisdiction and agreed to an assessment in exchange for common benefit work. *Id.*, at fn. 2. The objecting lawyers in *Rice*, however, scrupulously separated the federal and state plaintiffs so that the MDL settlement agreement "related exclusively to plaintiffs whose cases were included in the federal rice MDL" while "the GMB4 state court settlement agreement, resolved the claims of state court litigants." *Gray, Ritter & Graham, PC v. Goldman Phipps PLLC* (Tex. App. 2015) 511 S.W.3d 639, 649.  No such separation exists here; many of the objectors actually participated in an MDL settlement agreement either through entering the MDL mediation program with the Court appointed Special Master Kenneth Feinberg, and/or by including both MDL and state clients in one settlement pool. What is more, Monsanto was willing to offer these attorneys a settlement of their Roundup cases solely because the MDL leadership paved the way for that to occur.

Furthermore, in *Rice*, the PSC did not move to seek an assessment of a common benefit fees until late in the litigation and <u>after</u> the objecting attorneys filed their cases in the MDL. *In re Genetically Modified Rice Litigation* (E.D. Mo., Feb. 24, 2010, No. 4:06 MD 1811 CDP) 2010 WL 716190, at *5. The objectors in *Rice* timely objected to the District Court's assertion of

---

[32] *See Hartland v. Alaska Airlines* (9th Cir. 1976) 544 F.2d 992, 1001; *In re Showa Denko K.K. L-Tryptophan Products Liability Litigation-II* (4th Cir. 1992) 953 F.2d 162, 166.

jurisdiction, and they could not have been put on notice that filing a case in the MDL would lead to a common benefit fee on their state cases.  Here, by contrast, the MDL leadership moved for a common benefit holdback order almost immediately upon creation of the MDL and before the objecting firms filed cases in the MDL. The court quickly issued PTO 12 which put law firms on notice as of February 2017 that all of their cases would be subject to a common benefit fee if they had a case in the MDL or otherwise availed themselves to the MDL work product benefits.[33] Therefore, by filing cases in the MDL or otherwise availing itself of the Court's jurisdiction and never timely objecting to PTO 12, objectors knowingly and purposefully waived any jurisdictional objections to PTO 12. Through "their course of conduct and implicit consent" they remain subject to PTO 12. *In re GM,* 477 F.Supp.3d at 192.

It is not unreasonable to conclude that by filing in the MDL, a law firm was seeking the benefit of leadership's work product. There are certainly benefits for a firm to have a case in the MDL. Monsanto, for example, has settled many of the Wave cases (and often all cases by a law firm with a wave case) to date. Thus, when one of their client's cases is included in a Wave, the attorney only has to conduct case-specific discovery; she will not have to retain general causation experts, can rely on this court's prior rulings, and have the opportunity to present a comprehensive liability case with the MDL's Trial Package. All such knowledge and material has been available and used for the benefit of the firms' unfiled and state-court filed clients.

Finally, in *Rice*, there were truly separate spheres of litigations where the state litigants and MDL litigants each independently conducted extensive discovery and prepared cases for trial. *Id.* Thus, by the course of the parties' conduct in *Rice* there could be no finding of an implicit agreement to be bound by an MDL common benefit order in exchange for work-product. Here,

---

[33] For example, as explained above, the CLC's experience is that the discovery orders in most, if not all, state court cases include a provision that the discovery obtained in the MDL will apply to the state court cases. That is because Monsanto is unwilling to redo the discovery it did in the MDL. Greenwald Dec. at ¶ 14. It would be an outlier state court case that retakes all depositions and asks all new document requests and other discovery without using the discovery MDL leadership obtained; if such a case exists by one of the Objector counsel he or she should make that known.

objectors would have the Court believe there is a parallel and independent litigation ongoing in Missouri and other states. In reality, there is not. In fact, it is largely the MDL law firms conducting the state court litigations as well, and the objecting attorneys had and have every intention of using the leadership's work product. Even firms with no cases in the MDL and who have not signed a participation agreement can be shown to have implicitly agreed to be bound by PTO 12 through their "conduct" including "extensively using MDL work product." *In re Avandia,* 2015 WL 4480827, at \*6; see footnote 58, *supra*.

Currently, there are approximately 4,000 cases pending in the MDL, representing only three percent of the estimated 125,000 existing filed and unfiled cases. Amending PTO 12, as requested by objectors, to limit the common benefit assessment solely to federal cases would lead to what PTO 12 was designed to prevent, "an extreme version of the free-rider problem: the lawyer who files only one case in the MDL to gain access to common benefit work and then leverages the knowledge gained from that work to settle dozens or hundreds of unfiled claims." *In re GM ,* 477 F.Supp.3d 170, 181.

The simple fact remains that *all* Roundup attorneys and Plaintiffs have benefitted from MDL leadership's efforts – irrespective of whether or where their cases are filed or unfiled and whether their individually retained attorneys have cases pending in the MDL, have formally availed themselves of MDL work product, or have entered into a formal Participation Agreement. Indeed, the extensive work that this Court has conducted in issuing opinions and managing the litigation has had a direct effect on each and every Roundup case or claim, irrespective of whether or where an attorney might have filed his or her cases.

The *Hartland* decision does not dictate a different result. *Hartland* was not a mass tort; it involved an airplane crash of 111 people -- a single, catastrophic event. The issue was whether the district court could tax *two* cases – one filed in state court and the other unfiled. The JPML transferee order identified the cases by name that were subject to centralization. The federal and state cases proceeded at the same time and along parallel tracks. There is no record or mention that the state and unfiled case in *Hartland* used, either implicitly or explicitly, or otherwise received a

23

benefit from, the MDL work product to achieve settlement. Equity dictated against assessment of these two cases under the circumstances.

There is another significant distinction between *Hartland* and the Roundup litigation. *Hartland* was decided in 1976, 45 years ago and well before the advent of the mass tort practice as it exists today. Not only was the court not faced with a mass tort case, but the court could not have predicted what mass torts would become -- a situation well illustrated by Roundup. There was no internet, so no mass marketing for cases. Back then, attorney advertising was generally not even permitted. Now attorneys obtain mass tort cases largely through mass internet advertising. That has generated a cottage industry of advertiser attorneys; attorneys who sit on the sidelines while others litigate the major aspects of a new mass tort – early dispositive issues (such as preemption in Roundup), *Daubert*, and bellwether jury trials. Prior to MDL leadership and other common benefit attorneys obtaining positive results of these litigation milestones, these firms warehouse their cases; in other words, they do not even file cases until sufficient successes have been obtained in the mass tort action by others. It is only then that these attorneys file some of their warehoused cases and increase advertising for additional cases exponentially, with a concomitant increase in case filings. Nowhere is this better illustrated than Figure 1 in Plaintiffs' motion. See Motion at 7. In essence, the Ninth Circuit in *Hartland* was not faced with – nor could it forsee – that a substantial portion of the mass tort legal practice would become a business model where law firms merely "invest" in the litigation, warehousing cases and waiting until the litigation's risks are over and the likelihood of ultimate success – settlement – is predicted; essentially these attorneys do no substantive work while watching the litigation from afar and waiting for the small group of attorneys who develop and litigate the tort and take all the risk to deliver a successful outcome. It would be a miscarriage of justice – and an incentive for attorneys time and again to avoid MDLs and to wait in the wings rather than act as lawyers – to allow attorneys to do no substantive while watching the litigation from afar and waiting for the small group of attorneys working to develop and litigate the tort and taking all the risk to deliver a successful outcome and then have a settlement offer delivered to them as a result of that work. After all, it is indisputable

24

that Monsanto would not have been, or in the future be, willing to offer these attorneys a dime in settlement but for the work of the leadership and other common benefit attorneys. Would it fair – or an equitable precedent to set - not to tax attorneys who did not propound discovery, did not take depositions, did not hire experts, did not respond to defense motions, did not try or work up cases for trial, and essentially did not participate substantively in the litigation? This is precisely why an entire body of law has developed to prevent free riders from avoiding common benefit fees.

## III.   A Holdback of 8.25% Is Appropriate

The CLC would emphasize that the current motion seeks a holdback of 8.25%, which may or may not be the common benefit fee and cost reimbursement that the Court ultimately approves. Due to the presence of ongoing litigation and negotiation, and the confidential nature of the settlements which have been reached, it is difficult to determine at this point how large the Fund might be. But the undersigned believe that a Common Benefit Fee of 8% from the attorneys (along with an additional 0.25% assessment from the clients for common expenses) will be more than justified based on the *Johnson* factors, as outlined in MDL leadership's Motion, and is certainly supported by the caselaw as a provisional measure in these types of MDLs. *See generally,* ATTACHMENT A to Motion, Rec. Doc. 12394 at 25-26. *See also, e.g., Genetically Modified Rice Lit.,* 2010 WL 716190, at *6 (noting that courts have ordered contributions between 9% and 17% in MDLs for common benefit work, and approving holdback of 9%-11%) (citing *In re Protegen Sling and Vesica System Products Litigation,* MDL No. 1387, 2002 WL 31834446, at *1 (D.Md. Apr. 12, 2002) (9%); *Turner,* 422 F.Supp.2d at 684 (12%); *In re Bone Screw,* 1996 WL 900349, at *3 (17%)). Finally, Objector Beasley Allen recently asked for and received an 8% holdback in the Talcum Powder MDL, and Objector Lanier asked for and received a 10% holdback in the Depuy Pinnacle MDL *In re: Talcum Powder,* 3:16-md-2738-FLW-LGHG, CMO 7(a); *In re: Depuy Pinnacle*, 3:11-md-02244, Doc. 1031.

## IV.   CONCLUSION

For the foregoing reasons, the CLC respectfully requests that the Court amend PTO No. 12

to establish a common benefit fee of eight percent and a cost assessment of one quarter of one percent and deny the relief sought by each Objector.

Dated:  February 18, 2021

Respectfully submitted,

/s/ Robin Greenwald
Robin Greenwald
rgreenwald@weitzlux.com
Weitz & Luxenberg
700 Broadway
New York, NY 10003

/s/ Mike Miller
Michael Miller
mmiller@millerfirmllc.com
The Miller Firm LLC
108 Railroad Ave
Orange, VA 22960

/s/ Aimee Wagstaff
Aimee Wagstaff
aimee.wagstaff@andruswagstaff.com
Andrus Wagstaff, P.C.
7171 West Alaska Drive
Lakewood, CO 80226

*Co-Lead Counsel for Plaintiffs*
*in MDL No. 2741*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of February, 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

/s/ Robin Greenwald