<sub>

</sub>

Robin Greenwald
rgreenwald@weitzlux.com
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Telephone: (212) 558-5802
Facsimile:  (212) 344-5461

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br><br>**ALL ACTIONS** | MDL No. 2741<br><br>Case No. 16-md-02741-VC<br><br>**DECLARATION OF ROBIN L. GREENWALD  IN SUPPORT OF PLAINTIFFS' CO-LEAD COUNSEL'S REPLY MEMORANDUM ON  MOTION TO AMEND PRE-TRIAL ORDER 12: COMMON BENEFIT FUND ORDER TO ESTABLISH A HOLD BACK PERCENTAGE** |

### DECLARATION OF ROBIN L. GREENWALD

I, Robin L. Greenwald, declare and state:

1.      Weitz & Luxenberg (W&L) filed the first Roundup case in the Central District of California in October 2015. Even prior to that time, my colleagues and I hired scientific consultants and met with many potential Roundup clients. Over the last five-plus years, W&L has devoted enormous human and financial resources in its representation of victims of Monsanto's Roundup products in litigation before this Court and several state courts.

2.      W&L undertook the financial burdens of these cases without any assurance that it would recoup those costs as Monsanto vigorously defended the lawsuits, even before centralization in this Court, on preemption grounds and then later on numerous other legal grounds, including expert admissibility under *Daubert* and venue issues in Missouri state court.

3. W&L's commitment to the litigation never faltered. From the work before this Court to preparing 24 plaintiff cases for trial in Missouri state court, Monsanto was well aware that it either had to settle or face dozens more trials.

4. Negotiations with Monsanto began in May 2019, shortly after this Court issued PTO xxx. At the outset, five of the six leadership firms negotiated together. Negotiations were protracted and at times contentious. Plaintiffs' counsel made clear that they wanted to negotiate a global resolution. But despite our position, Monsanto was only willing to negotiate settlements firm by firm. At some point in time, Monsanto started negotiating separately even with leadership firms (although The Miller Firm and W&L negotiated their agreements together from beginning to end). Despite the trial victories and many more trials on the horizon in 2020 (pre-COVID), it took our firm nearly 13 months to reach its settlement with Monsanto.

5. The W&L settlement with Monsanto involves over 100 law firms.

6. Neither I nor my colleagues agreed to withhold experts from any other law firm working on Roundup cases. To the contrary, I have continued to fulfill my MDL co-lead duty to attorneys in Waves I, II and III by designating general causation experts and working with counsel for Monsanto to take additional depositions of some of these experts, as well as providing suggestions of oncologists and other experts for specific causation. By way of example, on January 22, 2021, the CLC designated Dr. Portier, Dr. Ritz, Dr. Weisenburger, and Dr. Jameson to testify as to general causation for Wave II trial case, and that filing was on behalf of Objector, Beasely Allen as well as others not objecting.

7. I have also been contacted by experts who I have retained in Missouri cases – both general and specific causation experts – who have been contacted by Roundup attorneys, including objector Beasely Allen and Napoli, to work on their behalf in their state cases. Dr. Charles Benbrook, for example, hired by leadership in the MDL and state cases, informed me that he has

already been retained by 17 counsel for Roundup litigation, including three objector law firms. Dr. Portier has informed me that he has been retained to date by 16 law firms, including two objector law firms. And Dr. Sawyer reports that he has been retained by 20 law firms, also including objector law firms. I have consistently supported those experts' participation and work with the other firms. I have never agreed with Monsanto or anyone else to withhold experts from other firms. To the contrary, I have assisted attorneys both in federal and state court actions, including some of the objectors here, to obtain expert witnesses.

8. Contrary to the Objectors' claims that the MDL leadership did not assist in establishing state court Roundup litigation, the opposite is true. In fact, collectively the MDL leadership firms led the charge in state court litigation also. In St. Louis Missouri state court, W&L secured trial dates for 34 individual plaintiffs in four separate cases (a 5-plaintiff trial (Kane v. Monsanto; a 14-plaintiff trial (Winston v. Monsanto, later renamed Chaplick v. Monsanto; a 5 plaintiff trial (Seitz v. Monsanto), and a 10-plaintiff trial (Neal v. Monsanto). Getting these cases prepared for trial was a daunting task, as Monsanto conducted extensive discovery of each plaintiff, including the depositions of plaintiff and his or her spouse, plaintiff's treating physicians (often several such treating doctors), and employers for occupational users. Monsanto also conducted physical inspections at each of the locations where the plaintiff sprayed Roundup. It was also a financial drain; following fact discovery, for each plaintiff, W&L conducted an extensive specific causation expert work up, including an expert oncologist, an industrial hygienist, a toxicologist, and often a pathologist and an economist, for each plaintiff.

9. Monsanto fought venue issues hard in St. Louis City, making motions to sever and transfer in every case and appealing several of the rulings. W&L briefed venue issues three times before the Missouri Supreme Court and ultimately prevailed in retaining venue in the City of St. Louis for plaintiffs first exposed to Roundup before April 1998.

10. W&L, together with the other co-lead firms, also spearheaded Roundup litigation in Delaware state court, securing a favorable *Daubert* decision in that court.

11. The pioneering state court work by W&L, The Miller Firm, and AndrusWagstaff also helped set the process in place for all attorneys to successfully try and settle their Roundup cases in state or federal court.

12. W&L, together with other leadership counsel, conducted extensive document review of the millions of pages of documents produced by Monsanto, took every Monsanto corporate deposition, conducted extensive research into the scientific issues, opposed numerous Monsanto motions, and prepared multiple experts for deposition, Daubert, and trial. In my experience, leadership firms and only a few non-leadership firms performed all of this work.

13. Leadership did not do the work totally alone. Based on our best estimate, there are likely 20 non-MDL leadership firms that will be subject to compensation from the common benefit fund for common benefit work.

14. Based on my experiences litigating Roundup cases in Missouri state courts, it is my understanding that most, if not all, case management orders include a provision that the discovery obtained in the MDL will apply to the state court cases because Monsanto was unwilling to redo the discovery it did in the MDL and plaintiffs' counsel did not oppose the provision.

15. Leadership also presented at numerous conferences around the country for the past five years about the Roundup litigation. These conferences provided substantive information and a roadmap for intake of cases and litigating cases once retained. I estimate that leadership presented to attorneys about the Roundup litigation at 24 conferences. In addition, I am chair of the Pesticide Litigation Group of the American Association of Justice. AAJ holds two conventions per year, and since the summer convention of 2016 I have presented the Roundup litigation at every convention to group members. I have also presented the Roundup litigation to a larger AAJ audience at two of those conferences.

16. While the precise settlement amounts of other law firms remain confidential, it is our understanding that other law firms that are not in leadership roles also commanded higher-than-average settlement offers for their clients, based on Monsanto's perception of those attorneys'

skills, knowledge, reputation, the quality of cases, commitment to trial, and track records in previous mass tort litigation.

17. While settlements remain confidential, it is the understanding of MDL leadership, including the undersigned, that when settlement agreements are reached and payments by Monsanto are made, they are held in qualified settlement funds, subject to further settlement administration. In the few circumstances of settlement of individual trial cases, it is my further understanding that those firms held back 7% (or more) based on PTO 12 and the initial holdback request.

18. Regarding contributions likely to be made to the common benefit fund pursuant to PTO 12, it is my estimate, based on discussions with other leadership firms, that the leadership firms will likely represent approximately half of the proceeds paid into the common benefit fund.

19. MDL leadership did not make signing the Participation Agreement a prerequisite to obtaining MDL work product. In fact, the MDL leadership more often than not shared MDL work product with *no* signed participation agreement.

20. I have also been informed that many law firms, including law firms that do not have cases in the MDL, have used the services of Settlement Master Ken Feinberg.

21. Attached hereto as Exhibit 1 is a true and correct copy of PTO No. 12 Common Benefit Fund Law Firm Participation Agreement.

22. Attached hereto as Exhibit 2 is a true and correct copy of JCCP 4953, 12/9/2020 Order on CCP 36 preference.

23. Attached hereto as Exhibit 3 is a true and correct copy of the Brief in Support of Motion Requesting Approval of Tag-Along Action in Support of National Black Farmers Association, National Black Farmers Association v. Monsanto.

24. Attached hereto as Exhibit 4 is a true and correct copy of the Docket for Drevyanko *et al.*, v. Monsanto, 18SL-CC00988.

25. Attached hereto as Exhibit 5 is a true and correct copy of the Docket for Bognar, *et al.*, v. Monsanto, 18SL-CC02199.

26. Attached hereto as Exhibit 6 is a true and correct copy of Case Management Order, Anna Bognar, *et al.,* v. Monsanto.

27. Attached hereto as Exhibit 7 is a true and correct copy of Amended Scheduling Order, Allan Shelton, *et al.*, v. Monsanto.

28. Attached hereto as Exhibit 8 is a true and correct copy of Excerpts of 1/16/2020 Hearing Transcript, Wade, *et al.*, v. Monsanto, No. 1722-CC00370.

29. Attached hereto as Exhibit 9 is a true and correct copy of Order Denying Summary Judgment, Adams v. Monsanto, 17SL-CC02721.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 18, 2021

Respectfully Submitted,

Robin Greenwald
Declarant