# EXHIBIT 8

```
              IN THE CIRCUIT COURT OF MISSOURI
              22nd JUDICIAL CIRCUIT, DIVISION 3
                Honorable Elizabeth Hogan, Judge
```

**CHRISTOPHER WADE, ET AL.,**     )
                                  )
                Plaintiffs,       )
                                  )
v.                                )   No. 1722-CC00370
                                  )
**MONSANTO COMPANY, ET AL.,**     )
                                  )
                Defendants.       )
_____

### TRANSCRIPT OF HEARING
_____

On January 16, 2020, the above-entitled cause came on regularly for hearing before the Honorable Elizabeth Hogan, Judge of Division 3 of the Twenty-Second Judicial Circuit in the City of St. Louis.

```
        SHERRY L. GANTNER, CCR #839, RPR, CSR (MO & IL)
                    OFFICIAL COURT REPORTER
                      CITY OF ST. LOUIS
                 TWENTY-SECOND JUDICIAL CIRCUIT
```

```
 1       Appearance of Counsel:

 2

 3   For the Plaintiff:

 4   O'Leary, Shelton, Corrigan, Peterson, Dalton

 5   & Quillin, LLC

 6   1034 S. Brentwood, Penthouse 1-A, 23rd Floor

 7   St. Louis, MO  63117

 8   By:  James Corrigan

 9

10   The Miller Firm, LLC

11   The Sherman Building

12   108 Railroad Avenue

13   Orange, VA  22960

14   By:  David Dickens, Michael Miller, Jeffrey
        Travers
15

16   For the Defendant Monsanto:

17   Husch Blackwell, LLP

18   190 Carondelete Plaza, Suite 600

19   St. Louis, MO  63105

20   By:  Erik Hansell, Chris Miller, JoAnn Sandifer

21
     Arnold & Porter Kaye Scholer, LLP
22
     250 West 55th Street
23
     New York, NY  10019
24
     By:  Julie duPont
25
```

3

```
 1   McDermott, Will & Emery

 2   333 SE 2nd Avenue, Suite 4500

 3   Miami, FL  33131

 4   By:  Anthony Upshaw

 5
     For the Defendant Osborn & Barr:
 6
     Armstrong Teasdale, LLP
 7
     7700 Forsyth Blvd., Suite 1800
 8
     St. Louis, MO  63105
 9
     By:  Scott Jansen, John Cowling
10

11   For Courtroom View Network:

12   Lewis Rice, LLC

13   600 Washington Avenue, Suite 2500

14   St. Louis, MO  63101

15   By:  Joseph Martineau

16

17

18

19

20

21

22

23

24

25
```

1      **MR. MILLER:**  Good morning, Your Honor.

2      **THE COURT:**  Good morning.

3      **MR. MILLER:**  Michael Miller.  It's my first

4  time to speak with you in open court.  I will be

5  brief.  It's my nature.

6           We've tried a couple of these and here is

7  what happened and the Court needs to rule.  We think

8  the issue is:  Does Roundup cause cancer?  And did it

9  cause cancer or was it a substantially contributing

10 factor in causing the cancer of these plaintiffs.  We

11 think those are the issues before the Court.

12          We don't think what New Zealand did or

13 Guatemala did regulatorily with a product that may be

14 a little bit like Roundup is relevant to that.  That's

15 what the defendants will take us down a trail that

16 will double the length of this trial and talk about

17 issues that are not relevant to the singular issues in

18 this case.  Does Roundup cause cancer and did it

19 contribute and was it a substantially contributing

20 cause in these plaintiffs?

21          ==Judge Chhabria in the federal court said it==

22 ==best:==  ==Quote, "What the scientific studies show, not==

23 ==what the EPA concluded they've show."==  ==Certainly in==

24 ==Judge Chhabria's view what the EPA thought about the==

25 ==scientific studies was not relevant.==  I don't think

1  misleading to put a cancer warning on the Roundup
2  labels.  That's central to this case where the
3  plaintiffs' chief allegation is that Monsanto has
4  failed to warn.
5          Now, plaintiffs' general causation experts
6  ignore the 40-plus years of research and regulatory
7  assessments regarding Roundup and non-Hodgkin's
8  lymphoma.  Instead, they primarily rely on the 2015
9  international agency for research on cancers finding
10 that glyphosate is a probable carcinogen.  But
11 importantly, this finding is a hazard assessment.  And
12 what is that?  It means it addresses whether
13 glyphosate under any conceivable scenario can cause
14 cancer.
15         Your Honor, that is not the question that
16 the jury or you need to answer.  The question is
17 whether glyphosate or Roundup causes non-Hodgkin's
18 lymphoma in humans at real-world exposures.  And
19 courts have rejected this IARC-type evidence under
20 *Daubert*.  And I'll refer you to the case of *Allen*
21 *v. Pennsylvania Eng Corp*. from the Fifth Circuit.
22         And in fact, Judge Chhabria in the MDL court
23 in San Francisco recognized that IARC alone is too
24 limited and too abstract and lacks any quantitative
25 significance.

1          Again, the IARC decision that came out in
2   2015 did not consider data that has come out since,
3   including a recent 2018 publication from the National
4   Cancer Institute Agricultural Health Study.  That
5   perspective cohort study in 2018 concluded there was
6   no association between Roundup and non-Hodgkin's
7   lymphoma, including any of its subtypes.
8          Now, plaintiffs' experts purport to use a
9   Bradford Hill methodology.  But just because you are
10  saying you're using that methodology, it doesn't mean
11  it passes *Daubert* muster.  Here, none of plaintiffs
12  pass the *Daubert* muster.
13         Let's start with Dr. Portier.  Dr. Portier
14  is a biostatistician.  He is not a medical doctor.
15  And he was an adviser to the IARC working group.  And
16  it's important to understand that Dr. Portier was
17  retained by the plaintiffs' counsel in this litigation
18  mere days after the IARC decision was announced.  And
19  Dr. Portier had worked for the same plaintiffs'
20  counsel in an earlier litigation before the IARC
21  working group ever got to him.
22         Now, when we are trying to figure out
23  whether something causes cancer in humans, it's common
24  sense that you want to look at the data in humans.
25  Well, Dr. Portier concedes that the currently

1  available epidemiological evidence does not support a
2  causal relationship. He concedes that. Because he
3  cannot rely on human data, Dr. Portier concocts a
4  theory of causation based on animal and cell studies
5  done in the lab to make up for this lack of support he
6  has in human studies.
7           Now, Missouri has adopted *Daubert* law. And
8  in *Daubert*, there's a long line of case law that says
9  animal studies are not sufficient to provide proof of
10 causation, particularly here where we have human data.
11 And that's *Norris v. Baxter Healthcare* from the Tenth
12 Circuit.
13          Now, at the heart of Dr. Portier's opinion
14 is something that he refers to as a "pooling affect"
15 where he basically finds animal studies from different
16 years, from different animals, conducted by different
17 investigators, combines them all together, does some
18 statistical analysis and comes up with a finding that
19 there's a statistically significant finding of cancer
20 in rodents.
21          Now, Judge Portier -- or, I'm sorry,
22 Judge Chhabria did not permit Portier to testify about
23 this pooling method, concluding that it bears poorly
24 under the traditional *Daubert* criteria because it is
25 not subject to objective testing and it appears to

1   graphical representation of all these results.  But,
2   again, Judge Chhabria in the MDL court concluded that
3   this forest plot was, quote-unquote, "ridiculous."
4   That was at the *Daubert* proceeding in March of 2018.
5          **THE COURT:**  The chart he called ridiculous?
6          **MS. DUPONT:**  Yes.
7          And there was a reason for that.  First,
8   most of the data on her chart included data that was
9   not adjusted for the important confounder of other
10  pesticides.  And importantly, many of the studies that
11  Dr. Ritz relies on actually go on to do this
12  adjustment, to take the overall number that they find
13  with glyphosate and then adjust that number to control
14  for other pesticides.  Because those other pesticides
15  are perpetually causes of non-Hodgkin's lymphoma.
16  It's very important to control those confounders.
17         But she only presents the data about the
18  unadjusted confounder.  That's misleading.  It's also
19  misleading because she puts about 30 different results
20  up on this forest plot.  But they are only from a
21  handful of studies that she likes.
22         **THE COURT:**  It was my understanding from the
23  motion she was allowed to testify if she adjusted it
24  for the other pesticides, but you believe now there is
25  some issue that she is no longer making those?

1          **MS. DUPONT:**  She goes back and forth
2    depending upon the ruling she gets from the court.  So
3    when Judge Chhabria said you have to adjust, she
4    changed it.  She went back in the *Pilliod* trial and
5    did it the original way.
6          **THE COURT:**  Go ahead.  I'm sorry.
7          **MS. DUPONT:**  For this reason, at a minimum,
8    this Court should exclude the chart.  But given that
9    this chart can't really be separated from her
10   opinions, I would ask that the Court find all of her
11   opinions unreliable.
12         Now, Dr. Jameson.  Dr. Jameson is a chemist
13   and a toxicologist.  He is not a medical doctor.  He
14   was also on the IARC working group that evaluated
15   glyphosate.  And Judge Chhabria excluded a vast
16   majority of Dr. Jameson's opinions because they were,
17   quote/unquote, too different inquiries from the ones
18   the jury would be required to undertake.  And what did
19   he mean by that?
20         Well, Jameson, like IARC, did a hazard
21   assessment.  And, again, a hazard assessment means
22   whether under any conceivable scenario could Roundup
23   cause non-Hodgkin's lymphoma.  Judge Chhabria
24   concluded that it's not a high enough bar to prove
25   causation by a preponderance of the evidence.

1            Jameson simply cannot bridge the gap and
2    explain how rodent studies explain the causal
3    relationship between Roundup and non-Hodgkin's
4    lymphoma in humans.
5            And additionally, plaintiffs should not be
6    permitted to sneak Dr. Jameson in as an expert by
7    claiming he is a lay witness.  He is simply an expert,
8    not a lay witness.  They can't evade *Daubert* scrutiny
9    by claiming he is just a fact witness.  Because
10   ultimately this will just be expert testimony
11   disguised as fact witness testimony.
12           Finally, witnesses Dr. Blair and Dr. Ross,
13   who also served on the IARC subcommittee, should not
14   be permitted to offer expert testimony because they
15   were not qualified to give their opinion and only
16   parrots the analysis of IARC.
17           **MR. MILLER:**  Good afternoon, Your Honor.
18           When you listen to counsel, you would think
19   that Monsanto won the *Daubert* hearing.  They have
20   never won a *Daubert* hearing, first off.  We had a
21   seven-day *Daubert* hearing in front of Judge Chhabria,
22   and Dr. Portier was allowed to testify.  Dr. Ritz was
23   allowed to testify.  Every expert we had was allowed
24   to testify.  Some were limited in some ways.
25           But then we went before judge -- and I can

1  talk about it, the ways they were limited.  The pool
2  analysis thing is a very minute part of Dr. Portier's
3  thing and he doesn't even use it.  So I don't even
4  know.  It's a non-issue.
5          The Dr. Ritz thing, that's even more of a
6  non-issue.  But first I want to take the *Daubert* trail
7  about every judge has looked at this and simply denied
8  their motions.
9          After Judge Chhabria denied a lot of the
10 case to go forward, we went to Judge Karnow, who is
11 the chief civil judge in San Francisco, heard it under
12 what they call the "Sargon test" out there and denied
13 it and allowed all of those experts to testify in the
14 first trial that was the *Johnson* trial.
15         And then we went over across the bay to
16 Oakland to Judge Smith.  She reheard all of the Sargon
17 and denied Monsanto's motions.  All those experts were
18 allowed to testify.
19         We went to Delaware and they used the
20 *Daubert* standard there and had an extensive briefing.
21 Judge Medinilla, I think, heard it all.  Spent four
22 months writing her opinion; denied everything.
23         Then we had Judge May, here in St. Louis
24 County, August 19th.  Heard it all; denied everything.
25         And the reason they never won this is

1    of non-Hodgkin's lymphoma in the vast majority of
2    cases.
3             Despite the fact that causes of most
4    non-Hodgkin's lymphoma are unknown, for each of these
5    three experts, Roundup will always be the cause of
6    these plaintiffs' non-Hodgkin's lymphoma, as long as
7    the plaintiff was exposed to some threshold amount.
8             In fact, Dr. Nabhan testified at the *Daubert*
9    hearing that if he was presented with 100 patients,
10   100 patients would all use Roundup above a certain
11   threshold, he would say that Roundup was the cause in
12   100 percent of those cases.  These always -- Roundup
13   opinions -- are precisely the type of opinions that
14   has been rejected by courts as not meeting *Daubert*
15   standards.  And I refer the Court to *In Re: Lipitor* in
16   the Fourth Circuit in 2014.
17            Now, first, plaintiffs haven't offered a
18   reliable opinion of Roundup that is capable of causing
19   non-Hodgkin's lymphoma.  In fact, Dr. Nabhan was
20   actually excluded by Judge Chhabria and not able to
21   give general foundation opinions in his courtroom.
22            Now, the plaintiffs argue that they have
23   considered all of the epidemiology.  They rely on a
24   mere sliver of the evidence to rule Roundup has a
25   potential cause for plaintiffs' non-Hodgkin's

1    conclude it.

2            Now, Dr. Nabhan, counsel questioned his

3    testimony and said something along the lines of if

4    there is a hundred plaintiffs, he would say that they

5    cause cancer in 100 percent of those.  We cite what

6    Judge Chhabria's response to that was when a similar

7    argument was made to them on Page 3 of our opposition.

8    He goes, that's not what Nabhan said.  All right.

9    They didn't say that they would never rule it out.

10           And then they cite to his deposition

11   testimony.  But they cite to their question to

12   Dr. Nabhan, as somehow their question is proof that he

13   would claim that Roundup caused cancer in everybody

14   who has ever been exposed.  But he says specifically

15   in his deposition, you have to look at the case, and

16   you have to review the case.  And that's what he did

17   here.  Same with Dr. Schiff.  Same with Dr. Boyd.

18           Dr. Boyd is an oncologist working at Yale

19   Medical School.  And counsel mentioned he didn't rule

20   out immunodeficiency.

21           Your Honor, it's clearly not correct.  We

22   cite his testimony on Page 22 of our opposition where

23   he specifically talks about the fact that he ruled out

24   that Mr. Wade had a primary immunodeficiency.  He

25   points to the fact that it was actually the medication

1   90 percent of non-Hodgkin's lymphoma cannot be
2   explained is something that they need to rule out.
3           And importantly, again, all three of them
4   can see that each of these plaintiffs could have
5   gotten NHL even if they have never been exposed to
6   Roundup.
7           And counsel mentioned that Dr. Nabhan, he --
8   there was a comment about the hundreds of cases and
9   Chhabria made a remark about that, but even in this
10  litigation, Dr. Nabhan has looked at tens of cases,
11  maybe 20 or 30 at this point, and he has concluded in
12  each and every one of those cases that non-Hodgkin's
13  lymphoma causes cancer.
14          I would just reiterate that each of these
15  experts, the method is unreliable, and they should be
16  excluded.
17          **MR. DICKENS:**  Nothing further.
18          **THE COURT:**  Next.
19          **MS. MILLER:**  Benbrook motion.
20          **THE COURT:**  Before you get started
21  actually -- when Judge Norton walked in, it reminded
22  me -- one of the motions that one of you filed that I
23  read in the last or reviewed mentioned somebody named
24  Donna Farmer in a footnote.  I don't know if it's the
25  same Donna Farmer, but I do know a Donna Farmer who

1   registration and reregistration of Roundup

2   formulations; the labeling responsibilities of

3   pesticide manufacturers under federal and state

4   regulations, including Monsanto's obligations

5   regarding Roundup label; the stewardship obligations

6   of a pesticide manufacturer, including obligations

7   regarding the stewardship of Roundup; the standard of

8   care for a pesticide manufacturer; whether certain

9   publications related to glyphosate safety were

10  ghostwritten by Monsanto; and the sufficiency of the

11  Roundup label during all relevant times.

12          That is not as broad as the opinions he

13  actually purports to give and has tried to give in

14  other cases, and I will tell you that Dr. Benbrook is

15  routinely limited in his testimony in other courts.

16          Dr. Benbrook is offered as an advocate; that

17  is what he does.  He looks at documents every juror is

18  capable of reading and understanding and takes an

19  advocacy position on how the jury should interpret

20  those documents.

21          ==This is so true that Judge Chhabria in the==

22  ==MDL, when he reviewed what Dr. Benbrook was planning==

23  ==to talk about==, stated that it looked like he was going

24  to testify on every aspect of the case and every topic

25  in the case, which no one could be an expert on, and

1   that he was not going to be allowed to do that. And
2   he invited the plaintiffs' lawyers to give him a more
3   narrowed list of topics for Dr. Benbrook's testimony.
4          So the plaintiffs' counsel did. And they
5   included early EPA action and IBT, which was the
6   laboratory who used to do testing, if you are familiar
7   with that issue; Monsanto's refusal to study
8   formulated product; Monsanto's termination of a TNO
9   study and ghostwriting.
10         Judge Chhabria found Topics 1 through 3 --
11  you don't have to write these down because there is a
12  later slide that lists them -- were not proper
13  subjects of expert testimony and that maybe
14  ghostwriting might be for somebody but that
15  Dr. Benbrook was not qualified to talk about
16  ghostwriting either. So he was withdrawn from that
17  litigation.
18         That gives you a taste of how far-reaching
19  his opinions are.
20         His opinions generally fall into five major
21  categories. The first is what I've talked about,
22  where the plaintiff cherry picks documents out of
23  Monsanto's corporate records which, as we can all
24  figure out are very voluminous. And then he
25  speculates on the meaning of those documents and

1  expertise.  This toxicologist can't base an entire
2  causation opinion on epidemiology studies that he is
3  not capable of really understanding and going through.
4          Again, those were unadjusted for other
5  pesticides, otherwise they don't show -- when you
6  adjust them for other pesticides they don't show any
7  association between glyphosate and non-Hodgkin's
8  lymphoma.  It's just not good science and it's not a
9  proper methodology for establishing causation.
10         In some other cases he actually did a dose
11 exposure, dose kind of calculation where he looked at
12 things like skin surface and skin absorption.  He
13 didn't do that here.  This is all he did is kind of do
14 off the exposure days, plop them in, two lines, one
15 chart each of these two epidemiology studies, ignoring
16 the more recent and more robust Agricultural Health
17 Study and said voila, there you have it.
18         Judge Chhabria in the MDL said failing to
19 take account of likely confounders by relying on only
20 unadjusted, minimally adjusted data is a serious
21 methodological concern.
22         The other reason this specific causation
23 opinion should be excluded is because he ignores other
24 risk factors for non-Hodgkin's lymphoma.  That's in
25 that stipulation that the plaintiffs have made that he

1  defense counsel to say he is relying on two
2  epidemiology studies is not remotely true.
3         He has got -- he has a general causation
4  opinion based on Bradford Hill.  He's reviewed the
5  epidemiology studies, he's done a course in
6  epidemiology.  But when comparing him to Dr. Ritz who
7  is head of the department of UCLA and president of the
8  International Society Environmental Epidemiology, yes,
9  he is going to defer the detailed opinion to Dr. Ritz.
10 But he is qualified to opine on epidemiology.  We are
11 not going to repeat the detailed analysis with him
12 when he is on the stand.  It will just be -- and
13 Dr. Ritz is going to do that.
14         So Judge Chhabria specifically ruled that
15 case-specific experts could rely on the epi studies
16 defense counsel mentions to rule in Roundup as a cause
17 of plaintiffs' cancer.  That's been ruled on under
18 *Daubert*.
19         So he is not -- he is not going to repeat
20 the analysis of the oncologist ruling out other
21 medical causes of NHL.  So he is not going to give the
22 ultimate opinion that Roundup was the cause of
23 plaintiffs' NHL, but he is qualified and will testify
24 that the plaintiffs were exposed to enough Roundup to
25 cause NHL.  And he has been specifically -- the Ninth

1    absorption.  So I don't know how --

2           **MS. MILLER:**  For what?  But for what because

3    he didn't calculate it in the plaintiffs.  It's just

4    general this is what goes on and then he says I'm just

5    going to look at exposure days.  I didn't look at

6    dermal absorption.

7           **MR. TRAVERS:**  It does much more than that.

8    I just want to also read from the Judge Chhabria's

9    later opinion post trial.  That is his July 12, 2019

10   opinion denying their post trial motions.  He stated

11   that Dr. Weisenberg's testimony was admissible where

12   he testified that the plaintiffs and "quote" exposure

13   levels still far exceeded the threshold used in most

14   of the epidemiological literature, specifically the

15   McDuffie and Eriksson studies.  Dr. Sawyer is also

16   going to testify that the plaintiffs' exposure far

17   exceed that.

18           Some important parts of his dermal

19   absorption opinions, he needs to explain it will be

20   helpful to the jury to know how different -- how

21   different -- where different personal protective gear

22   affects the exposure, what parts of the body have

23   greater exposure, how different spraying techniques

24   affect exposure.  So that will help the jury

25   understand how the different plaintiffs were exposed