Alan B. Morrison
George Washington University Law School
2000 H Street NW
Washington D.C. 20052
Tel. 202.994.7120
abmorrison@law.gwu.edu

Arati C. Furness, CA Bar No. 225435
N. Majed Nachawati
S. Ann Saucer
Misty A. Farris
FEARS NACHAWATI, PLLC
5473 Blair Road
Dallas, Texas 75231
Tel. 214.890.0711 / Fax 214.890.0712
afurness@fnlawfirm.com
mn@fnlawfirm.com
asaucer@fnlawfirm.com
mfarris@fnlawfirm.com

[Additional counsel listed on signature page]

***Counsel for Objectors Howard Gee, Jr.,
Arleen Ward, Noel Alvarez, and William
Lawrence Craven***

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br>Case No. 16-md-02741-VC |
| This document relates to: | **BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL BY FOUR OBJECTING CLASS MEMBERS** |
| Ramirez, et al. v. Monsanto Co.<br><br>Case No. 3:19-cv-02224 | Re: Dkt. No. 12531<br><br>Date: March 31, 2021<br>Time: 10:00 AM<br>Place: Courtroom 4, 17th floor<br>Judge: Honorable Vince Chhabria |

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    A HEIGHTENED LEVEL OF SCRUTINY IS REQUIRED ..........................................2

III.   THERE IS NO ACTUAL CASE OR CONTROVERSY, AND THE CLASS REPRESENTATIVES DO NOT SATISFY RULE 23(a)................................................4

    A.     The Contrived Class Definition Establishes That The Settlement Is Not Legitimate. ...........................................................................................5

    B.     The Class Representatives Are Not Typical and Are Not Adequate Representatives. ................................................................................................7

    C.     The $25,000 Incentive Awards for the Class Representatives Vitiate Their Ability To Represent the Class. ....................................................................12

IV.   FORCING CLASS MEMBERS TO DECIDE WHETHER TO OPT OUT BEFORE THEY ARE DIAGNOSED WITH NHL IS CONTRARY TO LAW BECAUSE IT DOES NOT GIVE THEM A MEANINGFUL CHOICE.........................15

V.    THE COMPENSATION PROGRAM IS UNREASONABLE AND UNFAIR TO CLASS MEMBERS. ..........................................................................................18

    A.     The 180-Day Deadline for Filing Is Unnecessary and Unreasonable...................19

    B.     The Compensation Program Is Unlikely to Deliver Significant Money to Class Members. ...................................................................................................20

    C.     The Proof and Other Barriers Will Make Significant Recoveries Unlikely..........23

    D.     The Parties Have Failed to Submit Evidence Needed to Assess  the Reasonableness of This Settlement...................................................................27

VI.   THE FOUR-YEAR STAY SERIOUSLY HARMS CLASS MEMBERS AND HELPS MONSANTO. ................................................................................................30

VII.  THE SCIENCE PANEL BENEFITS ONLY MONSANTO..........................................31

    A.     There Is No Need for a Science Panel. ................................................................32

    B.     The Design of this Panel Is Fatally Flawed..........................................................33

    C.     The Mandatory Stipulation Underscores the Unfairness of the Use of the Panel. .....................................................................................................................35

    D.     The Mandatory Findings of the Science Panel Violate Article III. .....................37

    E.     Four Years Are Only Needed to Justify the Stay.................................................39

VIII. OTHER SIGNIFICANT ASPECTS OF THE SETTLEMENT  CONFIRM ITS ONE-SIDEDNESS. .....................................................................................................40

IX.   CONCLUSION ...........................................................................................................43

Brief in Opposition to Motion for Preliminary Approval by Four Objecting Class Members
Case No. 16-md-02741-VC

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997) ........................................................................................*passim*

*Armstrong v. Manzo*,
380 U.S. 545 (1965) .................................................................................................. 18

*In re Asbestos Litig.*,
134 F.3d 668 (5th Cir. 1998), *rev'd, Ortiz v. Fibreboard Corp.*, 527 U.S. 815
(1999) ........................................................................................................................ 7

*In re Asbestos Litig.*,
90 F.3d 963 (5th Cir. 1996), *vacated, Ortiz v. Fibreboard Corp.*, 521 U.S.
1114 (1997)................................................................................................................ 7

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) .................................................................................... 3

*Brown v. Ticor Title Ins. Co.*,
982 F.2d 386 (9th Cir. 1992) .................................................................................... 4

*Commodity Futures Trading Comm'n v. Schor*,
478 U.S. 833 (1986) ..................................................................................... 38, 39, 42

*Edenborough v. ADT, LLC*,
No. 16-CV-02233-JST, 2019 WL 4164731 (N.D. Cal. July 22, 2019) ................ 13

*General Telephone Co. of Southwest v. Falcon*,
457 U.S. 147 (1982) .................................................................................................. 4

*Georgine v. Amchem Prods., Inc.*,
83 F.3d 610 (3d Cir. 1996) ...................................................................................... 8

*Hansberry v. Lee*,
311 U.S. 32 (1940) .................................................................................................... 2

*Harris v. Vector Marketing Corp.*,
No. C–08–5198 EMC, 2012 WL 381202 (N.D. Cal. Feb. 6, 2012) ...................... 13

*Kansas v. Nebraska*,
574 U.S. 445 (2015) ................................................................................................ 38

*Marron v. Superior Court*
    (2003) 108 Cal. App. 4th 1049, 134 Cal. Rptr. 2d 358 ......................................................30

*Muskrat v. United States*,
    219 U.S. 346 (1911) ...........................................................................................................5

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50 (1982) ...........................................................................................................38

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999) ...................................................................................................9, 19

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) .....................................................................................................3, 4

*Plaut v. Spendthrift Farm, Inc.*,
    514 U.S. 211 (1995) ...........................................................................................................38

*Radcliffe v. Experian Info. Sols. Inc.*,
    715 F.3d 1157 (9th Cir. 2013) ...............................................................................3, 12, 14

*Rodriguez v. W. Pub. Corp.*,
    563 F.3d 948 (9th Cir. 2009) ...........................................................................................12

*Staton v. Boeing Co.*,
    327 F.3d 938 (9tth Cir. 2003) ....................................................................................12, 14

*Stern v. Marshall*,
    564 U.S. 462 (2011) ...........................................................................................................38

*United States v. Raddatz*,
    447 U.S. 667 (1980) ...........................................................................................................38

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .....................................................................................................2, 4

## Statutes & Rules

Ariz. Rev. Stat. Ann. § 14-3110 .................................................................................................31

Cal. Code Civ. Proc. § 377.34 ....................................................................................................30

Fed. R. Civ. P. 11 .........................................................................................................................42

Fed. R. Civ. P. 23 ................................................................................................................*passim*

Brief in Opposition to Motion for Preliminary Approval by Four Objecting Class Members
Case No. 16-md-02741-VC

Fed. R. Civ. P. 68 .............................................................................................................32

Idaho Code Ann. § 5–327(2) ...........................................................................................31


**Other Authorities**

International Agency for Research on Cancer, *Some Organophosphate*
    *Insecticides and Herbicides*, IARC Monographs on the Evaluation of
    Carcinogenic Risks to Humans, Vol. 112 (2015), available at
    https://publications.iarc.fr/549 .................................................................................32

Reyes et al., *Cost of Disease Progression in Patients with Chronic Lymphocytic*
    *Leukemia, Acute Myeloid Leukemia, and Non-Hodgkin's Lymphoma*, The
    Oncologist 24(9): 1219-1228 (Sept 2019), available at
    https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6738303/ .................................28

Hong et al., *Spending on Antineoplastic Agents in the United States*, Journal of
    Oncology Practice, 14(11) (Nov. 18, 2018), available at
    https://ascopubs.org/doi/full/10.1200/JOP.18.00069 .........................................29

Morrison et al., *Economic Burden of Patients with Diffuse Large B-Cell and*
    *Follicular Lymphoma Treated in the USA*, Future Oncology 14(25) 2627-2653
    (2018), available at
    https://www.futuremedicine.com/doi/pdfplus/10.2217/fon-2018-0267................29

Brief in Opposition to Motion for Preliminary Approval by Four Objecting Class Members
Case No. 16-md-02741-VC

## I.      INTRODUCTION

This Opposition is filed on behalf of Howard Gee, Jr., Arleen Ward, Noel Alvarez, and William Lawrence Craven, each of whom is a United States citizen exposed to Roundup in the United States before February 3, 2021, and none of whom commenced a lawsuit relating to this exposure or retained counsel to do so before that date. Mr. Gee, Ms. Ward, and Mr. Alvarez have been diagnosed with Non-Hodgkin's Lymphoma ("NHL"), and Mr. Craven has not at this time. Undersigned counsel have agreed to represent these four objectors without charge in this proceeding to protect their rights.

This is the second attempt by Monsanto and a group of class-action attorneys to remove lawsuits against Monsanto and its cancer-causing product Roundup from the court system.  The first attempt was quickly withdrawn in the face of severe criticism from this Court.  While making superficial efforts to respond to those concerns, this second effort also fails because it is a one-way street that provides no benefits and imposes many burdens on the proposed class.

Although this Roundup MDL has been underway for over four years, and other Roundup cases have been litigated in state courts, the impetus for this engineered class action settlement does not come from lawyers who have been handling Roundup cases and believe that an alternative method for resolving them is essential.  Instead, the lawyers who are behind this settlement – and it is surely the lawyers and not Roundup victims – are class-action lawyers who seek to impose their views on all those who have been exposed to Roundup, in exchange for a very large fee.[1]  But an even bigger winner here will be Monsanto, which will get a four-year stay of litigation by class members, who will also lose their right to seek punitive damages and

---

[1] By contrast, many of the lawyers who were behind the proposed settlement in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), were experienced plaintiffs' asbestos lawyers who had been trying those cases for years.

be saddled with the results of an ill-conceived science panel.  In exchange, class members will be shunted into an alternate compensation system that features modest payments, increased complexity, and high hurdles to qualify.

As the multiple objections to preliminary approval demonstrate, this proposed settlement is opposed by those most familiar with the litigation of cases involving dangerous products like Roundup because they recognize that this proposal would benefit Monsanto and class counsel at the expense of the millions of people exposed to Roundup.  As this objection will show, this is not a real lawsuit, but an effort to create an alternative dispute resolution mechanism in the guise of a class-action settlement.  That kind of effort calls for a legislative solution, not a manufactured lawsuit that lacks the adversity required by Article III.

There is, in short, no reason for this Court to allow this attempted diversion of Roundup claims to continue, and for the reasons set forth in this objection and the others that will be filed, the Court should deny the motion for preliminary approval of the proposed settlement.  The Court should also make it clear that the use of a class action to resolve all Roundup claims should be rejected once and for all, just as the Supreme Court rejected a similar attempt 24 years ago in *Amchem*.

## II.      A HEIGHTENED LEVEL OF SCRUTINY IS REQUIRED.

Class actions are an exception to the rule that only the named parties are bound by the outcome of a lawsuit.  *See Hansberry v. Lee*, 311 U.S. 32, 40-41 (1940). "In order to justify a departure from that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011) (internal quotation marks and citations omitted). That principle is secured by Rule 23(a)(4), which requires that "the representative parties ... fairly and adequately

protect the interests of the class," and it also "serves to uncover conflicts of interest between named parties and the class they seek to represent," as well as the "competency and conflicts of class counsel." *Amchem*, 521 U.S. at 625, 626 n. 20. The Due Process Clause similarly protects the class by requiring that "the named plaintiff at all times adequately represent the interests of the absent class members." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (citation omitted). Class actions and settlements that do not comply with Rule 23(a)(4) and the Due Process Clause cannot be sustained.

"[W]here, as here, the 'settlement agreement is negotiated *prior* to formal class certification ..., there is an even greater potential for a breach of fiduciary duty owed the class.'" *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1168 (9th Cir. 2013) (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)). Accordingly, this settlement "must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *Id*.

In 2018, Rule 23(e)(1)(B), which guides district courts regarding giving notice to the class of a proposed settlement, was amended to emphasize the importance of that decision. That amendment also makes clear that there are substantial burdens on the parties to provide the necessary record from which the court can conclude that it "will *likely* be able to (i) approve the proposal under Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(1)(B) (emphasis added).  The Advisory Committee notes for this portion of the 2018 amendments contain eight paragraphs.  Objectors quote the first paragraph in full because it captures the purpose of the amendment and provides the framework for measuring whether the submission of class counsel satisfies the standard

imposed by that Rule.  Objectors submit that it does not, and they will demonstrate where it falls far short in the sections that follow.

> The decision to give notice of a proposed settlement to the class is an important event. It should be based on a solid record supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object. The parties must provide the court with information sufficient to determine whether notice should be sent. At the time they seek notice to the class, the proponents of the settlement should ordinarily provide the court with all available materials they intend to submit to support approval under Rule 23(e)(2) and that they intend to make available to class members. The amended rule also specifies the standard the court should use in deciding whether to send notice—that it likely will be able both to approve the settlement proposal under Rule 23(e)(2) and, if it has not previously certified a class, to certify the class for purposes of judgment on the proposal.

Fed. R. Civ. P. 23 advisory committee's note, 2018.

## III.     THERE IS NO ACTUAL CASE OR CONTROVERSY, AND THE CLASS REPRESENTATIVES DO NOT SATISFY RULE 23(a).

"Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Wal-Mart Stores*, 564 U.S. at 349. "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem*, 521 U.S. at 625-26 (citations, quotation marks, and brackets omitted). "The Rule's four requirements—numerosity, commonality, typicality, and adequate representation— effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores*, 564 U.S. at 349 (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982); quotation marks omitted).  Without adequate representation, a court order approving a claim-preclusive class action settlement agreement cannot satisfy due process as to all members of the class. *See Phillips Petroleum*, 472 U.S. at 812 ("[T]he Due Process Clause ... requires that the named plaintiff at all times adequately represent the interests of the absent class members.") (citation omitted); *Brown v. Ticor Title Ins. Co*., 982 F.2d 386, 390 (9th Cir. 1992)

("[I]f the plaintiff was not adequately represented in the prior action or there was a denial of due process, then the prior decision has no preclusive effect.") (citation omitted).

## A.     The Contrived Class Definition Establishes That The Settlement Is Not Legitimate.

This is not a real lawsuit between adverse parties which Article III requires.  This is an arrangement between Monsanto and class counsel, precisely the kind of "friendly suit" which the Supreme Court dismissed in *Muskrat v. United States,* 219 U.S. 346, 359-60 (1911).  The best evidence that this is a contrived proceeding is the class definition in section 1.1(a) of the Settlement Agreement, which includes all individuals who had been exposed to Roundup before February 3, 2021, and who "have not commenced an individual, non-class lawsuit or retained counsel for the pursuit of any individual, non-class personal injury." Dkt. 12531-2, p. 6 or 266. There are a number of respects in which the class definition raises serious concerns under both Article III and Rule 23(a), and under *Amchem,* class members are protected from unwarranted class definitions, and courts are directed to "demand undiluted, even heightened, attention [to them] in the settlement context."  521 U.S. at 620.

First, there is no good reason why the class is limited to those who have already been exposed when Monsanto has no intention of stopping the sale of Roundup, or changing its composition, so that thousands of individuals will continue to run the risk of contracting NHL from Roundup through post-February 3, 2021 exposure.  If this were a real lawsuit, why would any class representative (or class counsel) create a wholly artificial cut-off date and not include everyone who will be exposed to Roundup in the future?

Second, there is no legitimate reason why a class representative or class counsel who sought to help all similarly situated victims of Roundup would not include everyone who had an NHL diagnosis pre-February 2021 (to make the class larger and justify a larger fee), but instead

exclude those who either filed suit or had retained a lawyer before the second amended complaint was filed.  The most likely explanation for the artificial cutoff is that, if an individual had a lawyer, she or he would almost certainly have an NHL diagnosis because almost no lawyer would take an exposure-only case. But if the class included individuals who had valid claims and a lawyer, they would be much more likely to object to the settlement than would be those without a claim.

Another feature of the class definition shows that this is not a legitimate lawsuit.  Persons exposed to Roundup are excluded if they have retained a lawyer or filed suit, unless the lawsuit or the retainer was for a class action.  As a result of this sculpted exception, which excludes individuals who filed a "non-class lawsuit" or retained counsel to pursue a "non-class personal injury" claim, only the named plaintiffs had the right to retain a lawyer before February 3, 2021, and the lawyers that they retained just happened to be class counsel in this lawsuit.  And as part of the same package, creating a class of one, those lawyers filed this friendly lawsuit in which they purport to represent the rest of the class who could not have their own lawyer when the case was filed.  There is one troublesome answer to why the definition has an exclusion for class action counsel: without it, this second amended complaint could not have been filed because there would be no one who would not have had a lawyer, and hence no one who would meet the definition of a class member to be available as a named plaintiff. And that would mean that this deal could not go forward.  There may be other cases involving class definitions as contrived as this, but counsel is not aware of any, let alone any that have been approved over objections of the kind being filed here.

Brief in Opposition to Motion for Preliminary Approval by Four Objecting Class Members
Case No. 16-md-02741-VC

**B.      The Class Representatives Are Not Typical and Are Not Adequate Representatives.**

Quite apart from the artificial nature of the class definition and its implication for Article III's case or controversy requirement, there are serious doubts that the chosen class representatives are adequate champions for these damages' subclasses.  As to the five plaintiffs who have not yet been diagnosed with NHL, they have no present claim for damages and may never have one.  They have no more of a current Roundup NHL claim than do any of the lawyers in this case or the tens of millions of other Americans currently uninjured by Roundup. Accordingly, they lack standing under Article III to represent Subclass Two, quite apart from the requirements of Rule 23.

Moreover, the settlement applies not only to undiagnosed NHL victims, but also purports to adjudicate the legal rights of derivative claimants, who include the present and future family members of the class.   Settlement Agreement, § 2.1(24), Dkt. 12531-2, p. 10 of 266. This will include children who are not yet born and spouses to whom they are not yet married. There is no justiciable case and controversy as to family members that do not exist in the present. *See In re Asbestos Litig*., 90 F.3d 963, 1019 (5th Cir. 1996) (Smith, J., dissenting) ("No person included in the[se] categories meets the irreducible constitutional minimum of standing for any claim."), *vacated*, *Ortiz v. Fibreboard Corp.*, 521 U.S. 1114 (1997). Where, as here, the class by definition includes persons who could not be aware of injury or exposure, the class "could never meet rule 23's requirement of notice to class members." *In re Asbestos Litig.,* 134 F.3d 668, 674–75 (5th Cir. 1998) (Smith, J., dissenting), *majority rev'd, Ortiz v. Fibreboard Corp*., 527 U.S. 815 (1999). For this proposition, Judge Smith cited his dissenting opinion in *In re Asbestos Litigation*, which the Supreme Court cited with approval in *Amchem*, 521 U.S. at 628 (citing Judge Smith's dissent, 90 F.3d at 999-1000, with approval).

The one named plaintiff who has an NHL diagnosis does have a claim, but he still is not a proper class representative.  In the ordinary situation, a client will retain a lawyer to handle his case, which will either be brought on an individual or a class basis.  However, the consequences of choosing the class action route are significant.  Most important, once the class has been certified (and probably before), the client has a limited ability to accept a generous settlement offer and abandon the class.  Paragraph 48 of this Court's Civil Standing Order makes that very point:

> In the event of a pre-certification settlement or dismissal of a proposed class action, the named plaintiffs may not simply dismiss the lawsuit without court approval. Rather, the parties must submit a request for dismissal explaining how a dismissal would not prejudice the unnamed class members whose claims are not being resolved by the settlement. In particular, the parties must consider whether the unnamed class members need to be notified of the dismissal.

For that reason and others, a lawyer advising a client to file a class action would be obligated to inform the client of the benefits and burdens of the two options. That is because, as the Supreme Court has made clear, "each plaintiff in an action involving claims for personal injury and death has a significant interest in *individually* controlling the prosecution of his case; each has a substantial stake in making individual decisions on whether and when to settle." *Amchem,* 521 U.S. at 616 (quoting the Third Circuit's decision below, *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 633 (3d Cir. 1996)) (brackets and quotation marks omitted; emphasis added).

Under the circumstances here, objectors have serious doubts that any lawyer for plaintiff Ramirez explained to him that he had an option to file an individual case, regardless of whether putative class counsel would represent him in such a case.  Plaintiff Ramirez was the original named plaintiff when this case was filed on April 24, 2019. He is the only representative of putative Subclass One under the Second Amended Complaint, and therefore Movants must demonstrate his adequacy as the Subclass One representative. If Ramirez fails as the Subclass

8

One representative, the entire class fails, because separate subclasses must exist for (i) putative class members diagnosed with NHL, in contrast to (ii) putative class members without such a diagnosis. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) ("[I]t is obvious after *Amchem* that a class divided between holders of present and future claims (some of the latter involving no physical injury and attributable to claimants not yet born) requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel.") (citing *Amchem*, 521 U.S. at 627).

In the original complaint filed in 2019 on behalf of plaintiff Ramirez, his counsel alleged in the opening paragraph that the complaint was brought "individually on behalf of all others similarly situated."  Ramirez Compl., Case 3:19-cv-02224-VC, Dkt. 1, p. 2 of 36. His June 2020 first amended complaint and his February 2021 second amended complaint contained the same allegations, in the same location, but with an "and" included after "individually" so that they read "individually and on behalf of all others similarly situated." Case 3:19-cv-02224-VC, Dkt. 15, p. 2 of 51; Dkt. 19, p. 2 of 53. Thus, all three versions assert that the complaints sought individual as well as class relief.

The allegations that counsel had brought individual claims against Monsanto present a problem for class certification because, in their motion for preliminary approval, class counsel made several contradictory statements in their effort to show that the claims of plaintiff Ramirez are typical of those of others in the class and in particular those in Subclass One, for which he is the sole proposed class representative.  Here is what the motion said:

> Plaintiffs' claims are typical of those held by the other members of the class in that each of them was exposed to Roundup, and none has commenced an individual personal injury lawsuit against Defendant or retained counsel to do so.

Motion for Preliminary Approval of Proposed Class Settlement ("Mot. for Prelim. Approval"),

Dkt. 12531, p. 37 of 83.  The statement is wholly inconsistent with the opening allegations of all

three complaints, but it is consistent with this allegation from page 24 of the motion:

> The class here includes all persons exposed to Roundup who have not yet filed
> litigation or retained counsel to do so, and is divided into subclasses of those who
> have been diagnosed with NHL and those who have not.

*Id.* at p. 35 of 83. In light of the allegations of the complaint, plaintiff Ramirez does not meet

class counsel's own chosen description of the class, and therefore he cannot be a member of it.

Even more significant for plaintiff Ramirez, as someone who filed a claim for his

individual personal injuries against Monsanto and retained a lawyer to do so, he cannot represent

a class all of whose remaining members have not done either, because his claims are not typical

of theirs, as Rule 23(a)(4) requires.  Class counsel's technical class definition tries to get around

this difficulty by limiting the exclusion to those who, prior to February 3, 2021, did not file or

retain counsel to pursue "individual, non-class" claims. The problem is that the only person in

the United States that apparently falls within that exclusion is Ramirez.

There is another, independent reason why the claim of plaintiff Ramirez is not typical of

the others in Subclass One. Paragraph 6 of the 2019 complaint for which Ramirez was class

representative alleged as follows:

> In 2018, Plaintiff was diagnosed with Double Expressor Large B-Cell non-
> Hodgkin's Lymphomas (NHL) at the Salinas Valley Memorial Hospital in Salinas
> and underwent chemo treatment at Stanford University Hospital. Plaintiff was
> found to be in remission in 2018, but continues to require a colostomy bag and
> cancer screening.

Case 3:19-cv-02224-VC Dkt. 1, p. 3 of 36.  Those are serious and potentially life-threatening

injuries, for which Ramirez would easily be able to find counsel who would promptly file an

individual claim for him against Monsanto.  Was he ever explained that option, either in 2019 or

before the second amended complaint was filed? Why did he choose (assuming he was given the choice) to file a class action rather than an individual action? What was disclosed to him about the risks and benefits of filing a class action, if anything? Was he told at any time that his current counsel would not represent him individually, but only as a class representative, even if this settlement were rejected by the Court or abandoned? Does he fully understand the rights he, and the rest of the putative class members he claims to represent, would be giving up, including the real effects of the science panel?  Whatever the facts, objectors are entitled to learn the circumstances under which plaintiff Ramirez decided to file these class complaints and support the settlement in order to determine whether his claims are typical of the rest of the class.

 If plaintiff Ramirez had a lawyer who explained to him his options regarding the current proposed settlement, he would be much better off than almost everyone else in the class. Consider the plight of a class member who recognizes the need for a lawyer to decide whether to opt out.  Because of the class definition, most class members do not have lawyers to represent them in this case.  Even if they have an NHL diagnosis, they are likely to have grave difficulties finding a lawyer who will read the 369-page preliminary approval submission, fully interview them, and render an opinion on whether to opt out, almost certainly without being paid for that advice.  That difficulty will be magnified for the vast majority of the class with no current NHL diagnosis because they may never have a claim for which the attorney could represent them and hope to be able to earn a reasonable fee.  Because plaintiff Ramirez had (or should have had) a lawyer to help him decide whether to seek individual or class relief, he does not have a claim that is typical of the class of those who currently suffer from NHL and who must make the opt out choice in the near future on their own.  Accordingly, because he is effectively in a class of one

11

because of this carefully crafted class definition, he cannot satisfy the typicality requirement of Rule 23(a)(4).

### C.     The $25,000 Incentive Awards for the Class Representatives Vitiate Their Ability to Represent the Class.

There is another problem regarding the role of class representatives in this case.  The settlement proposes that they each be paid $25,000 as "service" awards, *see* Settlement Agreement, § 25.1, Dkt. 12531-2, p. 108 of 266, but they have not submitted affidavits explaining what they have done to justify those payments.  In addition, given the nature of this very complex settlement (including its derivation from the prior withdrawn version), it is highly unlikely that any named plaintiff had any role in the negotiations or did anything else of benefit to the class to justify a $25,000 award.  In other words, there are serious doubts whether they can be proper class representatives because of the very high service fee that they will receive only if the settlement is approved.

Where named plaintiffs are offered service awards, the Court must "scrutinize carefully the awards so that they do not undermine the adequacy of the class representatives." *Radcliffe*, 715 F.3d at 1163.  *Radcliffe* thus reversed the approval of the settlement "because the interests of class representatives who would get incentive awards diverged from the interests of the absent class members." *Id.* at 1167. There, as here, "[t]here is a lack of congruent interests between Settling Plaintiffs and the class at large because the class representatives would be expected to support the settlement so that class counsel would request awards on their behalf." *Id.* at 1166 (citing *Rodriguez v. W. Pub. Corp.*, 563 F.3d 948, 960 (9th Cir. 2009)). The $5,000 awards in *Radcliffe* were found to be excessive where no class member would receive more than $750 under that settlement.  *Id.* at 1162.  Similarly, in *Staton v. Boeing Co.*, 327 F.3d 938, 975-78 (9[t]th

Brief in Opposition to Motion for Preliminary Approval by Four Objecting Class Members
Case No. 16-md-02741-VC

Cir. 2003), the court of appeals reversed the district court's approval of a class-action settlement because the settlement provided for disproportionately large payments to class representatives. [2]

In most cases, questions relating to claims for service awards would be resolved when the Court rules on attorneys' fees. Here, however, the proposed payment of $25,000 to each class representative raises the question of whether those payments disqualify them being proper class representatives because the terms of the compensation program that Monsanto has offered make it unlikely that most class members will recover more than $25,000. The proposed settlement has four Tiers, each of which (other than Tier One) requires substantial evidence to support an award; and for the most generous of them, a number of requirements prevent a class member from even being eligible for that payment. Settlement Agreement, Dkt. 12531-2, pp. 187-88 of 266. The maximum amount allowed for the first two Tiers, and the minimum for the third Tier, is the same $25,000 which class representatives will receive for their service. *Id.* at p. 188 of 266. However, the Subclass Two representatives will not have to show that they have or will ever have NHL, let alone prove that they are eligible for any injury-related benefit as all other class members do. Because the class representatives may receive $25,000 for doing very little for the class, while only a few class members will be lucky to receive that much at all and must meet demanding standards of proof to earn any payment, these class representatives are atypical of the rest of the class and they cannot adequately represent the class either. As a result, they are little more than legal mannequins created in an unsuccessful attempt to satisfy Rule 23.[3]

---

[2] *See also Edenborough v. ADT, LLC*, No. 16-CV-02233-JST, 2019 WL 4164731, at *5 (N.D. Cal. July 22, 2019) ("incentive payments of $10,000 or $25,000 are quite high") (quoting *Harris v. Vector Marketing Corp.*, No. C–08–5198 EMC, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012), and reducing incentive awards from $10,000 to $5,000 each).

[3] The preferential treatment for class representatives is further demonstrated by the special rules on proof applicable to them, discussed *infra* at 25. In addition, because plaintiff Ramirez supported the prior settlement that was withdrawn because of its deficiencies, it is doubtful that

13

***

Objectors believe that the record establishes that the named plaintiffs cannot satisfy the requirements of Rule 23 to be proper class representatives.  If the Court has any doubts on this question, objectors can file a motion asking the Court for leave to depose each class representative. This discovery would clarify whether the named plaintiffs are adequate class representatives, whether they have conflicts with unnamed members of the putative class, and whether Mr. Ramirez in particular meets the class definition.  A court order appears necessary because Section 24.1 of the settlement agreement precludes any discovery of the parties, absent court order, although section 19.1(d) of the settlement allows class counsel to take discovery from any objector without such an order.  *Id.* at pp. 107, 103 of 266. Therefore, objectors suggest that, after class counsel file their reply on March 11th, the Court decide whether it can deny preliminary approval without any further evidence or, if not, whether it wishes to hear argument on whether to allow objectors to depose the class representatives and, depending on that ruling, whether to re-schedule the preliminary approval hearing now scheduled for March 31, 2021.[4]

---

he is likely to exercise independent judgment about the merits of this settlement, which is required of an adequate class representative under Rule 23(a)(4).

[4] Discovery from class representatives is permitted in this circuit when issues are raised as to whether they meet the requirements of Rule 23.  For example, the Ninth Circuit has discussed the fact that they gave testimony and the terms of named class members' retainer agreements, in the course of analyzing the requirement of adequacy of representation. *See, e.g., Radcliffe*, 715 F.3d at 1163-64, 1166-67. *See also Staton*, 327 F.3d at 958 (reporting that "[t]he district court … permitted discovery on the allegations of outright collusion between class counsel and [the defendant] and concluded that there was no proof that collusion had occurred")

Brief in Opposition to Motion for Preliminary Approval by Four Objecting Class Members
Case No. 16-md-02741-VC

IV.    **FORCING CLASS MEMBERS TO DECIDE WHETHER TO OPT OUT BEFORE THEY ARE DIAGNOSED WITH NHL IS CONTRARY TO LAW BECAUSE IT DOES NOT GIVE THEM A MEANINGFUL CHOICE.**

Objectors believe that the notice plan is inadequate because it will not reach many of the individuals who have been exposed to Roundup.  But even if every person who has been exposed to Roundup were hand-delivered a copy of the notice, the opt-out requirement would still be unlawful because class members are being required to make the significant choice on whether to exclude themselves when they lack the information that they need to make an informed decision. Under the proposed settlement, if class members fail to exclude themselves by the 150-day deadline, they are stuck with the settlement, *id.* at p. 236 of 266, which means they lose the right to seek punitive damages, they are barred from suing for at least four years, and they will be locked in by the preordained results of the secret and very unscientific science panel (discussed *infra* at Sec. VII).  This is not the "meaningful chance to consider their options" that this Court considered essential when it expressed grave concerns about the prior version of this settlement.

Indeed, this case is the paradigm situation that concerned the Court in *Amchem*:

> Many persons in the exposure-only category, the Court of Appeals stressed, may not even know of their exposure, or realize the extent of the harm they may incur. Even if they fully appreciate the significance of class notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out.

521 U.S. at 628. That statement from *Amchem* is applicable here for several reasons.

First, it is a virtual certainty that almost no class members will have lawyers to help them make the opt-out decision both because the class definition excludes anyone who had a lawyer on February 3rd, and because no more than a miniscule number of class members, especially those without an NHL diagnosis, will have retained counsel in the interim.  The settlement agreement recognizes that class members will need help in navigating the compensation program

by providing free legal assistance to them in filing their claims, but it does not make those services available to assist class members in making the vital and difficult choice of whether to opt out at the front end. Settlement Agreement, § 11.1, Dkt. 12531-2, p. 59 of 266.

Several facts are very important in assessing whether the choice that all class members must make is one for which they will have the information and experience to enable them to make a reasoned decision. Many, or perhaps most, class members who will contract NHL are workers with limited educations for whom reading, let alone understanding, the 266-page settlement agreement, or even the 15 pages of questions and answers, will be very challenging to say the least.

Even if class members understand the pros and cons of opting out, they still have the problem of evaluating which benefits and burdens are most significant for each person and how to weigh them.  For the vast majority of the class who do not yet have an NHL diagnosis, let alone any idea how serious their disease will be, the process of choosing may be little more informed than a coin toss.  As class counsel observed, "No as-yet-undiagnosed class member, of course, can know today if or when he or she will develop NHL" Mot. for Prelim. Approval, Dkt. 12531, p. 65 of 83.  But far from the "insurance policy" they claim the settlement to be, the requirement of a front-end-only opt out is a trap for most class members who will surely not exercise that right, leaving them with a four-year delay before they can go to court, along with the loss of the ability to seek punitive damages when they do.  Finally, no one other than an experienced lawyer who handles toxic tort cases (which almost no class member will have), can sensibly factor in the negative impact that the science panel will have on a particular class member's case, especially because its findings will not be announced for four years.

There is one further benefit to Monsanto and serious harm to class members that is buried amid the 266 pages of settlement documents. If class members fail to opt out now, they are in the class forever.  The current compensation program runs for four years, but even if it is extended, it will either run out of money or Monsanto will stop funding it. At that point, class members who develop NHL will be able to sue but without being able to seek punitive damages and with the expected negative consequences of the science panel.  That is clear from section 13.4(e) which governs when the fund has expired and applies "the terms and conditions set forth in Section 7.13 and Article XIII" which are the limits on class member suits discussed above.  Settlement Agreement, Dkt. 12531-2, p. 77 of 266. But unlike those class members whose claims ripened earlier, those who sue after the fund has ended will not even have a compensation fund to which they can apply, and thus they will receive no benefits in exchange for the burdens that the settlement imposes on them.  Once again, Monsanto has included another one-sided provision and class counsel has agreed to it.[5]

***

This objection cannot be divorced from the objection discussed above that there is no case or controversy as to the uninjured class members suing for damages arising from a disease that they do not have and may never have. There is a reason that the law allows only people with actual injuries to sue. It is only then that people can assess their own injuries and that the law can assess how those injuries may be lawfully compensated. So, too, with opt-out rights. It is fundamentally unfair, and at odds with basic due-process protections, to force someone to opt out

---

[5] As noted above, the definitions of both Subclasses include Derivative Claimants. Settlement Agreement, § 2.1(24), Dkt. 12531-2, p. 10 of 266.  Thus, section 13.4 would also entrap individuals who would never have received proper notice and never had an opportunity to opt out because those individuals were either not married to the class member, or the child was unborn, during the limited opt out period.

17

now when she has no idea what her circumstances might be if she becomes injured.  The opt-out

right as offered here, therefore, violates fundamental due process principles because it is not

offered "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545,

552 (1965).

## V.    THE COMPENSATION PROGRAM IS UNREASONABLE AND UNFAIR TO CLASS MEMBERS.

Before explaining how unreasonable Monsanto's compensation program is, it is worth

stating the obvious: Monsanto does not need a class settlement, an opt out, or even a pending

lawsuit to set up a compensation program like this for those who have been diagnosed with

NHL.  It could do that tomorrow without obtaining permission from anyone exposed to

Roundup, any lawyer, or any judge, federal or state. It could also conduct the research on the

causes of, and treatments for, NHL, which it should have been doing for years, and it could fund

a diagnostic program entirely on its own. And if it thought that its voluntary compensation

program was so complicated that claimants needed legal assistance, it could provide for that also.

It might even be able impose some modest conditions on those who voluntarily chose to enter the

program and later decided not to accept the offer that the program made.  But that is not the case

here where the loss of the right to seek punitive damages, the four-year stay on going to court,

and having to litigate with the virtually certain adverse findings of the science panel are imposed

on everyone who does not opt out, even if they do not have NHL now.

Class counsel's memorandum in support of preliminary approval extols the virtues of the

compensation program and downplays the very significant price that must be paid for not opting

out.  But if the compensation program were fair, Monsanto would not need to extract the

conditions that the settlement imposes, because class members would flock to the promise of the

"certain and immediate" payment touted by class counsel. Mot. for Prelim. Approval, Dkt.

Brief in Opposition to Motion for Preliminary Approval by Four Objecting Class Members
Case No. 16-md-02741-VC

12531, p. 54 of 83.  The problem is that the program is not fair, let alone generous enough to attract individuals with Roundup-induced NHL.  In this respect, the situation is like those in *Amchem* and *Ortiz, supra,* where the defendants sought to achieve by class settlement what they could have achieved by ordinary settlements, if their offers to injured individuals had been fair.

## A.      The 180-Day Deadline for Filing Is Unnecessary and Unreasonable.

In this case, many aspects of this program show that it is very Monsanto-friendly.  First, to apply for compensation, a class member must register with the Claims Administrator, and the agreement provides that a class member may register until 45 days prior to the conclusion of the initial four years under the settlement.  Settlement Agreement, § 5.2(d), Dkt. 12531-2, p. 25 of 266.  There is a catch, however. A class member who wishes to seek compensation must do so within 180 days of receiving a qualified diagnosis.  *Id.* at § 7.3(a), p. 35 of 266. Thus, while technically a class member need not register promptly, a failure to do so may result in missing the 180-day deadline for submitting a claim for compensation.  For that reason, section 5.2(a) of the settlement agreement is misleading when it states that the registration process "is solely for the purpose of facilitating and administering Settlement Class Member participation in the Funded Class Benefits." *Id.* at p. 24 of 266. In fact, accepting that statement at its face value is likely to lead to the loss not only of the right of access to the compensation program, but also loss of rights from not opting out entirely.

That problem raises a more fundamental question: why does the settlement impose such a short deadline for filing compensation claims?  Neither section 7.3, which establishes this requirement, nor the question and answers designed to inform the class about the compensation program (see question 20), offers any justification for the 180-day rule.  By comparison, for much easier tasks, the Claims Administrator has 120 days just to make an initial review of the

Brief in Opposition to Motion for Preliminary Approval by Four Objecting Class Members
Case No. 16-md-02741-VC

submission and 90 days to review the final package. *Id.* at p. 37 of 266. And there is apparently

no penalty if those shorter deadlines for the Claims Administrator are missed. More

fundamentally, for most individuals who receive an NHL diagnosis, their first thoughts will be

about treatment, the impact on their families, and whether they will be able to continue their

work and other life activities, not filing a compensation claim.

There are also a number of aspects of the compensation program that confirm the

unreasonableness of that deadline, whose only beneficiary is Monsanto.  For example, the factors

listed in the various Tiers suggest that well-advised claimants will want to include as much

information showing the impact of NHL on their health and lives as possible.  Leaving aside

problems for non-English speakers and the inability of large segments of the class to understand

the requirements, it is not as though most of the class members will have an existing file from

which they can extract the very detailed and extensive information required by section 7.2(b).

Moreover, the settlement recognizes the need of many class members to obtain assistance from

lawyers, but there is no assurance that the lawyers will be available to provide meaningful help

in this short time frame.  On the other hand, class members will have every incentive to submit

their applications as soon as possible because they cannot be paid until they are approved.  More

basically, there is no apparent reason (other than to make recovery less likely) why class

members must submit their requests within any time frame other than that of an applicable

statute of limitations, and the inclusion of this unreasonably short deadline further supports the

conclusion that this settlement is a one-way street favoring Monsanto.

**B.    The Compensation Program Is Unlikely to Deliver Significant Money to Class
       Members.**

Perhaps the most important part of the deal for most claimants is how much they can

expect to receive under the compensation provisions. However, the information provided to class

members is extremely confusing and largely incomplete, even if the class member has NHL and counsel, which most do not at this time.  This uncertainty further complicates the ability of class members to make a meaningful opt-out choice.

Objectors are very concerned about the Accelerated Payment Awards described in sections 6.1(a)(ii) and 6.2(a)(i), which offer an immediate payment of $5,000 to anyone who has a Qualifying Diagnosis and proof of exposure to Roundup for more than 12 months before receiving the diagnosis.  *Id.* at pp. 27-28 of 266. It does not take much imagination to foresee the temptation for needy class members at the prospect of receiving what will amount to several months or more of hard-earned wages, simply for signing a paper that precludes future lawsuits over a disease whose future course is unknown.  Even with a current NHL diagnosis, class members are not likely to have their own attorney to advise them unless they are very ill already.

These accelerated awards will start as soon as there is preliminary approval, but the Legal Service Program under Article XI, that might in theory provide much-needed advice to class members who might be contemplating accepting the $5,000, will not start until there is a Final Order of Approval, which will be many months and possibly years down the road.  *Id.* at p. 59 of 266. Of course, the decision to accept the $5,000 offer is one for the client, but without competent legal advice for class members, these awards are likely to be a trap for many unwary class members and a cheap way for Monsanto to avoid future litigation.  Last, although this Court will not actually approve the Accelerated Payment Awards provision if it authorizes notice, unsuspecting class members are unlikely to realize that fact, and so accept the $5,000 on the basis of the misapprehension that the Court has concluded that this offer is a reasonable one.

Brief in Opposition to Motion for Preliminary Approval by Four Objecting Class Members
Case No. 16-md-02741-VC

Turning to the other payments, Exhibit 5 provides for four Tiers of payments:

| Tier | Low | High |
|---|---|---|
| Tier One | $10,000 | $10,000 |
| Tier Two | $10,000 | $25,000 |
| Tier Three | $25,000 | $65,000 |
| Tier Four | $65,000 | $200,000 |

*Id.* at p. 188 of 266. Objectors' counsel consider themselves to be reasonably sophisticated

lawyers, but they had great difficulties parsing the relation between Part 3a and Part 3b of

Exhibit 5.  *Id.* at p. 186 of 266. They have reached the conclusion that Part 3a controls, so that

each class member falls into one and only one Tier, starting with the lowest tier first.  That

conclusion is based on Part 3(a)(i) (and the analogous provisions for the other Tiers), which

provides that "Any such Settlement Class Member who falls into Tier One will automatically be

included in Tier One and cannot advance to Tiers Two, Three or Four."  *Id.*

To understand how this program will operate, the starting point for each Tier is that it has

an age bracket.  Thus, if a class member falls into that bracket, he or she cannot, in the words of

Exhibit 5, "advance" to any other Tier that would pay a larger amount.  But in addition to age,

there are three other criteria in Tier Two and four in Tier Three that serve as trip wires that

prevent class members from getting to a higher Tier.  For example, if a 44-year-old class member

were exposed to Roundup for between 12 and 36 months, that person would be stuck in Tier

Two, and could not "advance" to any other Tier, even if the person had no medical conditions

listed in Groups A or B, and still had active NHL, and thus would meet all the other requirements

for Tier Four, except length of exposure.  *Id.* at pp. 187-88 of 266. Settlement grids that take the

factors listed in these Tiers into account in determining the amount of payment to an individual

can generally be fair, but the rigidity, complexity, and the all or nothing character of these Tiers is arbitrary, unreasonable, and unnecessary.

The complexity of the Tiers underscores a point made above regarding the difficulty that most class members will have in deciding whether to opt out: class members cannot possibly understand this system on their own since no undiagnosed class members will have a lawyer and very few of the rest will either.  Class counsel's memorandum proclaims that class members have "no need to retain counsel," Mot. for Prelim. Approval, Dkt. 12531, p. 22 of 83, which is arguably true for the compensation program; but that neglects the need for a lawyer for the most important decision a class member will make: whether to stay in or opt out of the class. Therefore, the complexity of the compensation program further compounds the opt-out decision that all class members must make.

**C.      The Proof and Other Barriers Will Make Significant Recoveries Unlikely.**

In addition to these problems, the first two Tiers are quite limited in the amounts available, and even Tier Three qualifiers are assured only of $25,000, with anything above that, up to $65,000, left to the discretion of the Claims Administrator.  Settlement Agreement, Dkt. 12531-2, p. 188 of 266. It is only in Tier Four that payments can exceed $65,000, and for that Tier, class members must be under 45 at the time of diagnosis. *Id.* Moreover, within Tier Four, the other criteria appear to raise significant barriers to qualify. The most daunting is that class members must provide "Proof of exposure to Roundup Products, in accordance with Part 4 of this Exhibit 5, with frequency and duration of exposure in excess of 60 months."  *Id.* Part 4 includes a full page of detailed "proof" requirements that also apply to Tiers Two and Three, although the exposure periods are shorter. *Id.* at p. 189 of 266.

For example, class members who were exposed at work must submit a sworn statement

showing

> for each location where such exposure occurred, to the extent the Settlement Class
> Member can recall or verify from available records, identification of the location,
> the start and end dates of exposure, the occupation, the frequency of exposure
> (*e.g.*, average time spent each day applying Roundup Products or otherwise being
> exposed to Roundup Products applied by others), the approximate size of the area
> where Roundup Products were applied, the regularity of exposure, and the
> Settlement Class Member's proximity to the application of Roundup Products.

*Id.* at p. 190 of 266. In addition, they must submit for *each* employer

> employment records sufficient to demonstrate employment in an occupation in
> which Roundup Products would be applied in the ordinary course of business
> during the period of time when the exposure to Roundup Products is alleged to
> have occurred, or, if such records are not available, an explanation of why it is not
> possible to supply such records.

*Id.*

These requirements must be met for the entire period of required exposure under each

Tier. These requirements are not easy to satisfy because most class members with occupational

exposure did not have long term contracts with a single employer, and many were itinerant

workers who are likely to have great difficulty even recalling all the places they worked, and

when.  On top of that, they must gather all this information and make their submissions within

180 days of the qualifying NHL diagnosis, or they will forfeit their right to obtain any

compensation. Whatever proof requirements there may be for a trial in court, those mandated by

Exhibit 5 are surely unreasonable for an alternative compensation system, especially given the

minimal amounts available under Tiers Two and Three.  But the larger question is how class

counsel, purporting to act in the best interests of the class it seeks to represent, could have agreed

to these proof requirements.

Two proof-related matters concerning the six class representatives are worthy of note. First, to receive their "service" awards, the class representatives do not have to submit any information to the Claims Administrator, let alone meet the standards of proof applicable to all other class members.  Indeed, the five that do not currently have NHL will receive their award and may never develop the disease. They nonetheless will receive $25,000, which gives them as much as the top of Tier Two and the bottom of Tier Three - and 250% more than those who receive the Accelerated Payment option for which a Qualified Diagnosis is required.  Second, they are still eligible to apply for benefits under the compensation program, and, if they do, according to Exhibit 5, Part(c)(i), the fact that they are class representatives is specifically stated as a factor when "choosing the amount of a Claims Program Award within the bounds of the Compensation Ranges of any Tier." *Id.* at p. 189 of 266. These facts reinforce the conclusion that the class representatives are not typical of the class as a whole under Rule 23(a)(3) and that their financial incentives to support the settlement make them inadequate class representatives under Rule 23(a)(4).

Then there is the preclusion from Tier Four based on having Group A Medical Conditions or Group B Medical Conditions.  *Id.* at p. 188 of 266. The affidavits submitted by Doctors Grossbard and Mehta suggest that persons with those diseases have an increased risk of contracting NHL. *See* Dkt. 12531-18, p. 4 of 6. That might be a reason why the Claims Administrator might decide to give a class member a benefit in the lower range of a given Tier, but not why all class members should automatically be excluded from the most generous benefits category.  (After all, these doctors did not, and could not, say that Roundup is not a substantial contributing factor for cancers other than NHL.) This treatment is especially harsh regarding Group B which includes many very common diseases: "Prior History of Cancer, First-Degree or

Brief in Opposition to Motion for Preliminary Approval by Four Objecting Class Members
Case No. 16-md-02741-VC

Second-Degree Family Member with History of Cancer, Smoking (current smoker or former

smoker with 1 ppd/20 year history), Hepatitis B virus, Obesity at time of diagnosis of NHL

(Body Mass Index greater than 30), Diabetes, or Breast Implants in certain circumstances." Mot.

for Prelim. Approval, Dkt. 12531, p. 21 n.4 of 83. Again, if there were any doubt that the

compensation program contained little of benefit to class members, this vast array of

circumstances excluding class members from Tier Four is further evidence to support that

conclusion.

As if these barriers were not enough, the settlement contemplates that Monsanto will not

be a bystander in the compensation process as it is given the express right to appeal rulings in

favor of class members.  Indeed, its participation is expected to be so frequent and so vigorous

that section 7.10(b) of the agreement limits Monsanto's right to appeal to 17.5% of the awards in

any year, which it will undoubtedly reserve for the more generous ones where it contests the

"proof" of exposure. Settlement Agreement, Dkt. 12531-2, p. 42 of 266. Nowhere do the parties

explain why Monsanto should have any right to object or appeal when it has a fixed amount that

it will pay, with no right of reversion.  This appeal right is another fact that shows that the

compensation program is heavily weighted in Monsanto's favor and is far from the "certain and

immediate" benefit that class counsel proclaim. Mot. for Prelim. Approval, Dkt. 12531, p. 54 of

83.[6]

---

[6] Monsanto's right to appeal is in addition to the extensive audit process built into the settlement.
Settlement Agreement, § 7.11, Dkt. 12531-2, p. 43 of 266.

D.      **The Parties Have Failed to Submit Evidence Needed to Assess the Reasonableness of This Settlement.**

The motion for preliminary approval does not contain adequate evidence demonstrating the percentages of class members that would fall into each Tier, even though, as class counsel claims, the ranges were "negotiated in the wake of the inventory deals." *Id.* at 53 of 83. Monsanto has settled a large number of cases, and there is certainly information available as to the age of those claimants at the time of diagnosis, as well as information about the ranges of payments for NHL. Competent evidence, based on these case histories, as to the number of putative class members in each tier is necessary to comply with paragraph 1(e) of the District Court's Procedural Guidance for Class Action Settlements, which requires the parties to provide "The anticipated class recovery under the settlement, the potential class recovery if plaintiffs had fully prevailed on each of their claims, and an explanation of the factors bearing on the amount of the compromise." If most class members will be stuck in Tiers One or Two, that would further demonstrate why the settlement compensation program is not a significant benefit for most of the class.[7] Instead of meeting these requirements, the class proponents' calculations assume, based on unidentified "other personal injury trusts," that only 35% of filed claims will be approved. See Decl. Eveland ¶ 17 [Doc. 12531-5, Pages 10-11 of 14].

There is also substantial evidence to believe that Monsanto, which has access to the relevant data, does not expect to have to pay out the dollar amounts in the four Tiers to a significant number of class members.  Last June Monsanto set aside $9.6 billion to settle approximately 125,000 individual lawsuits, which would result in an average payout of $76.800

---

[7] The affidavit submitted by Dr, Grossbard states that most NHL patients are afflicted later in life, suggesting that older class members will not escape Tiers One and Two.

Brief in Opposition to Motion for Preliminary Approval by Four Objecting Class Members
Case No. 16-md-02741-VC

per case.[8]  There is $1.325 billion in the compensation fund, and even if class members received

an average of only $38,400 (one half of what is being paid in the inventory deal), that would

mean that only about 34,500 class members would be paid before the money ran out.  Of course,

there is an alternative explanation:  Monsanto has designed the compensation program so that

very few if any class members will recover anything close to the $38,400 average, and so the

money will not run out.  Once again, this raises the question of whether class counsel obtained

the data from Monsanto to do this very simple arithmetic or do some other projection along these

lines to verify that the compensation program would do what it promises to justify the very

significant benefits to Monsanto from the settlement.

The settlement values provided by the compensation fund are also woefully inadequate

given the severity of the injuries. The *highest* level of recovery under the Claims Program is

$200,000 unless the Claims Program determines, in its sole judgment, that a claimant has shown

"Extraordinary Circumstances" meriting a higher award. Settlement Agreement, § 6.2(a)(ii)(1),

Dkt. 12531-2, p. 29 of 266. But the costs of treating NHL are high. In *2014 dollars*, the mean

costs of medical treatment in just the first 12 months after diagnosis ranged from $103,498

without disease progression to $146,185 with disease progression.[9] The rapid inflation of cancer

care costs since 2014 makes the Compensation Ranges under the Claims Program even more

inadequate, simply to cover medical costs.[10]

---

[8] https://www.bayer.com/en/media/integrated-annual-reports - 2020 report at 74.

[9] Reyes et al., *Cost of Disease Progression in Patients with Chronic Lymphocytic Leukemia, Acute Myeloid Leukemia, and Non-Hodgkin's Lymphoma*, The Oncologist 24(9): 1219-1228 (Sept 2019), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6738303/.

[10] Spending on antineoplastic drugs alone has risen between 12% and 15% per year in recent years. *See* Hong et al., *Spending on Antineoplastic Agents in the United States*, Journal of Oncology Practice, 14(11) (Nov. 18, 2018), available at https://ascopubs.org/doi/full/10.1200/JOP.18.00069.

28

Recovery under the compensation program ranges from $10,000 for people in Tier 1 to a maximum of $200,000 for the very few class members who will make it to Tier 4. *Id.* Ten thousand dollars would not pay for a single month of treatment for NHL.[11] And even class members in Tier 4—who are by definition less than 45 years old and have active NHL, NHL recurrence, or have been in remission for less than three years—may be offered as little as $65,000. *Id.* at p. 188 of 266. Aside from the complete failure of this system to cover the objective medical needs of people with NHL, the compensation ranges essentially value the pain and suffering of the class members at zero.

***

Given the limited time available to review the very complicated settlement agreement, there may well be other serious problems with the compensation plan.  But these flaws alone are more than enough to raise serious questions as to whether, without regard to the other major problems with the settlement, the compensation plan will deliver real relief to a significant number of class members, even within its quite modest dollar award ranges.  However one might describe the compensation fund, class counsel's characterization of it as "straightforward" is seriously amiss. Mot. for Prelim. Approval, Dkt. 12531, p. 13 of 83.  Because the principal benefits to class members from the settlement are of dubious value, the Court should deny preliminary approval for that reason alone.

---

[11] *See* Morrison et al., *Economic Burden of Patients with Diffuse Large B-Cell and Follicular Lymphoma Treated in the USA*, Future Oncology 14(25) 2627-2653, 2636 (2018), available at https://www.futuremedicine.com/doi/pdfplus/10.2217/fon-2018-0267.

## VI.    THE FOUR-YEAR STAY SERIOUSLY HARMS CLASS MEMBERS AND HELPS MONSANTO.

On its face, a four-year delay before class members who do not opt out can sue is an obvious benefit to Monsanto – no payments and no litigation costs for four years –by which time many class members will be discouraged and either not sue or decide to take an inadequate offer. According to Monsanto's expert, Dr. Grossbard, and as evidenced by the creation of age-of-diagnosis factors in the compensation grid, many class members will be older when they learn they have NHL, which makes it more likely that, with the four-year delay, they will die from NHL or some other cause before they are even able to sue, let alone see their cases to settlement or judgment. [12]

But there is an even more pernicious consequence to a class member's ability to recover full compensation for those who must wait for four years to sue. If they die before their case is concluded, under California law, for example, their families would lose the right to recover for the pain and suffering experienced during their lives. Cal. Code Civ. Proc. § 377.34; *Marron v. Superior Court* (2003) 108 Cal. App. 4th 1049, 134 Cal. Rptr. 2d 358.  Because most members of the purported class do not yet have NHL, there is no evidence in the record regarding where they were exposed to Roundup.  But we do know that about 40 million Americans live in California (or more than 13% of the population of 330 million), and because California has a major agricultural sector and is home to many golf courses, a very large segment of the class is likely to have been exposed to Roundup there. As a result, many class members will be penalized

---

[12] Because the lawyers who will assist with the claims process will be chosen by class counsel and will be paid from the settlement fund, they are not likely to give disinterested advice as to whether a class member should take a compensation offer or go to court once the four-year stay is lifted.

by the four-year delay causing them to lose the ability to recover for pre-death pain and suffering

damages penalty if they die from NHL or any other cause before their cases are concluded.  Once

again, the stay has given Monsanto a major advantage, which class counsel has unjustifiably

downplayed by calling it "a minor concession."[13] Mot. for Prelim. Approval, Dkt. 12531, p. 55

of 83.

### VII.    THE SCIENCE PANEL BENEFITS ONLY MONSANTO.

A central feature of the settlement, and the major reason why it appears that Monsanto

has agreed to it, is the creation of a science panel in Article XII. Settlement Agreement, Dkt.

12531-2, p. 61 of 266. Unlike last June's version of this settlement when the findings of the

science panel were stated to be legally binding, this time its conclusions are labeled "advisory."

However, as this and other objections show, as a practical matter, if the findings are favorable to

Monsanto, they will make a class member's right to sue close to illusory. Indeed, as objectors

demonstrate *infra* at Sec. VII.C, the Stipulation that the settlement makes admissible in every

case is virtually indistinguishable in terms of its practical effect from the binding effect of the

science panel's rulings under the prior settlement.  But if, contrary to all expectations, given the

stringency of the requirements to find causation under sections 12.2 and 12.3(b), *id.* at pp. 63, 65

of 266, the findings were favorable to class members, Monsanto would still retain its preemption

defense, Mot. for Prelim. Approval, Dkt. 12531, p. 18 of 83, and class members would still be

obliged to establish specific causation, *i.e.,* prove that Roundup caused NHL in them.  The

---

[13] Objectors have not examined the applicable law of every state, but they have determined that
California is not alone in its treatment of pre-death pain and suffering damages. *See*, *e.g.*, Ariz.
Rev. Stat. Ann. § 14-3110 ("upon the death of the person injured, damages for pain and suffering
of such injured person shall not be allowed"); Idaho Code Ann. § 5–327(2) (limiting damages to
medical expenses, out-of-pocket expenses, and loss of earnings).

science panel is, in short, another one-way street that has no place in this settlement, and its inclusion further demonstrates that the settlement is all about protecting Monsanto and not helping members of the class.

## A.     There Is No Need for a Science Panel.

There can only be one reason for the science panel: Monsanto expects, with good reason, that, as currently established, the panel will produce a result that will be favorable to Monsanto. The real world, however, has already convened a science panel through an internationally agreed upon system: The IARC Glyphosate Working Group.  That panel, populated with 17 qualified subject matter experts from 11 countries, reviewed all the available, reliable scientific evidence and published its conclusions in a 452-page report in 2015.[14]  Relying on that science, plaintiffs have prevailed at trial in three Roundup cases, and the only reason for Monsanto's science panel is that it hopes to change that outcome in future Roundup trials.

Why does Monsanto need the science panel, as well as the alternative compensation program if that program is procedurally and substantively fair to class members?  With a fair program, there should be relatively few class members who will exercise their right to sue after being given a final offer, especially because (a) they will have to wait until the four-year stay is concluded; (b) they cannot seek punitive damages; and (c) the final offer in the compensation program will become an offer of judgment under Rule 68 and similar state law provisions, which will enable Monsanto to recover its litigation costs from class members who fail, for any reason, to obtain a judgement that is more favorable than the final offer.  Settlement Agreement, § 7.13(e), p. 46 of 266.  Should any class member sue Monsanto, the company will almost

---

[14] International Agency for Research on Cancer, *Some Organophosphate Insecticides and Herbicides*, IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Vol. 112 (2015), available at https://publications.iarc.fr/549.

certainly point to its offer immediately, thereby starting the running of its costs, unlike the typical case where the offer is not made until the litigation is well underway.

Another important use for Monsanto for the science panel's findings is to have them available to deploy in other Roundup litigation brought by persons not part of this class because they have opted out or because their exposure to Roundup occurred solely after February 3, 2021.[15]   Neither group would be stuck with the conclusions of the science panel, or the Stipulation that will bind all class members. Nonetheless, Monsanto would surely raise the panel's findings as a reason not to settle and as a reminder to counsel for a plaintiff of the practical barriers to recovery for those who disagree with them. They would also be used as a tool in *Daubert* hearings and in cross-examination of any experts that a plaintiff secured.  And in all those cases, Monsanto would certainly tout that class counsel and the Court approved the panel and its method of operation, further increasing Monsanto's ability to fend off future litigation.   In addition, a ruling by the science panel favorable to Monsanto would encourage it to discontinue its compensation program (which would mean not covering anyone exposed to Roundup after February 3, 2021), by making its termination payment of $200 million.  It would do that because litigation in the face of that favorable science panel decision would create a new significant additional practical and perhaps even legal barrier for any future plaintiff.

**B.      The Design of this Panel Is Fatally Flawed.**

Furthermore, this science panel cannot be defended because of multiple design flaws that call into question the rationale for its existence and the good faith (or lack of skepticism) of those who agreed to it.  First, among its most irrational aspects is the requirement that it operate in a

---

[15] If a class member is also exposed to Roundup after February 3, 2021, the four-year stay and the findings of the science panel are also applicable to any litigation brought by that class member.  Settlement Agreement, § 12.8, Dkt. 12531-2, p. 73 of 266.

Brief in Opposition to Motion for Preliminary Approval by Four Objecting Class Members
Case No. 16-md-02741-VC

closed universe of available data, limited to existing studies, with virtually no opportunity to consider new evidence.  Why would any legitimate scientific panel want to exclude any evidence if it were truly seeking the right answer to the question of whether Roundup causes NHL?  In addition, the included studies are the very ones that this Court reviewed and found sufficient to allow the case to go to the jury in *Hardeman v. Monsanto Co.,* 16-cv-525, N.D. Cal.  There is no need to re-study them, especially in the artificial way proposed in the settlement.  Furthermore, in light of the allegations of "Scientific Fraud" and "Monsanto's False Representations Regarding the Safety of Roundup" in sections E and F of the Second Amended Complaint filed by class counsel with the proposed settlement, Case 3:19-cv-02224-VC, Dkt. 19, pp. 13-14 of 53, and the evidence presented in the three Roundup NHL trials, it is curious that class counsel appears to have accepted Monsanto's science panel as a good faith means of resolving questions about the safety of Roundup.

There is also no requirement that the panel give any explanation for its conclusions; all it has to do is check one box and then fill in a number in a second one. Settlement Agreement, Dkt. 12531-2, p. 223 of 266. It does not have to "show its homework," give any reasoned justification for its findings, or even indicate whether the panel was unanimous or deeply divided in its finding as to whether Roundup can cause NHL. And on the dosage finding, its conclusion could easily be a compromise, with some urging a lower number, yet no one will ever know the facts.

Moreover, the entire process will operate in secret, and the panel members cannot be subject to discovery on any aspect of their work, which will seriously undermine the efforts of class members and courts to determine what the panel actually concluded and why.  See Settlement Agreement, § 12.6(b)&(c) (No Discovery; No Testimony), p. 69 of 266. And when the findings are offered in evidence, they cannot be "cross-examined," nor can any of the panel

members.  While the conclusions of every study are important, how the authors reached their

conclusions is at least as important, but that information will not be available to assess the

findings of the science panel. And if the panel decided to explain why it reached its findings, the

special verdict form (Exhibit 8), would be "the operative document" no matter how much the

explanation raised questions about the validity of the finding.[16] Settlement Agreement, § 12.3(a),

Dkt. 12531-2, p. 64 of 266.

## C.    The Mandatory Stipulation Underscores the Unfairness of the Use of the Panel.

Exhibit 9 is the Stipulation that every class member will have to sign regarding the

impact of the science panel's determinations on the class member's NHL claim.  While class

counsel is correct that the "admissibility of the panel decision itself is subject to challenge based

on *Daubert/Frye* in light of any new scientific evidence *beginning three years after the decision*

*is issued,*" Mot. for Prelim. Approval, Dkt. 12531, p. 76 of 83 (emphasis added), that limited

ability to attack the panel's finding down the road is cold comfort to class members whose cases

will be heard before then.  Exhibit 9, which will be read to the jury, describes the science panel

in paragraph 3 as

> an independent group of five scientists who are recognized, independent,
> appropriately credentialed epidemiologists, biostatisticians, toxicologists, or
> hematologists/oncologists, amongst others, and/or scientific or medical
> professionals with similar backgrounds and qualifications.

Settlement Agreement, Dkt. 12531-2, p. 226 of 266. And in paragraph 6, the panel is described

as having

> conducted an independent, four-year review of the scientific evidence
> regarding whether exposure to Roundup Products through the application

---

[16]  The proponents of the settlement filed an amendment at the eleventh hour. We do not believe
that it addresses the many deficiencies in the Science Panel, including the unavailability of
proper discovery. We are happy to address the amendment at oral argument, or in further
briefing if the Court will so direct.

of Roundup Products can cause Non-Hodgkin's Lymphoma in humans.

*Id.* at p. 227 of 266.

The most unreasonable part of the Stipulation is the final paragraph 10: "The parties have agreed that the Science Panel's determination should be considered as that of an independent expert and its determination should be given the same weight given to the testimony of any other independent expert witness." *Id.* at p. 228 of 266. That provision wins the award as the most pro-Monsanto provision in the entire settlement agreement. It would mandate that the findings receive special "independent" status and hence are more believable as such. That status would be automatically conferred on a secret unexplained set of findings, whose authors cannot be cross-examined, and whose conclusions must be given the same, if not greater, weight than an expert witness for the plaintiff, who has been qualified to testify by the judge hearing the case, was subject to pre-trial discovery, and will be cross-examined in front of the jury. Subjecting class members to paragraph 10 is surely not part of the American system of adversary justice and should not be countenanced by this Court.

It is one thing for Monsanto to argue that the science panel is neutral and will not in any way burden class members, even though that is its intent, but quite another for class counsel to disregard the impact of the panel on class members who choose not to accept a compensation offer and sue Monsanto. But class counsel's limited discussion of the likely impact of the science panel's determination, *see* Mot. for Prelim. Approval, Dkt. 12531, pp. 28-29 of 83, seriously downplays the most significant benefit that Monsanto expects to derive from the results of the science panel. This benefit to Monsanto, and the detriment to those exposed to Roundup, will extend far beyond those who are members of this settlement class, but will reach those who will be harmed by Monsanto's continued sale of Roundup who are not part of this class. And

Brief in Opposition to Motion for Preliminary Approval by Four Objecting Class Members
Case No. 16-md-02741-VC

when extolling the benefits of the settlement to the class, it is not true, as class counsel claim, that "[a]ll that they surrender now (if they do not opt out initially) are claims for punitive damages and medical monitoring," *id.* at p. 72 of 83 – they also are trapped by a four year stay and the outcome of the science panel.

**D.      The Mandatory Findings of the Science Panel Violate Article III.**

Quite apart from the above defects in the science panel, the requirement that the courts must give unquestioned obedience to its findings raises serious questions under Article III of the Constitution.  The judicial independence of Article III judges enables them to guard against two dangers: forcing them to undertake non-judicial acts and taking away their core powers.  The first precludes federal judges from rendering advisory opinions in matters that do not meet the requirements of a case or controversy.  This violation of Article III is the subject of the first argument in this brief, where objectors demonstrate that this is not a legitimate lawsuit, between truly adverse parties, but rather an arrangement between a company that wishes to rid itself of costly lawsuits and class action attorneys who believe that settlements of mass torts, not litigation, is the best way to resolve these matters.

The second, which applies to the findings of the science panel, involves situations in which Article III judges are stripped of some of their powers, here the power to decide whether scientific evidence should be admitted into evidence, a function which this settlement delivers to the science panel. There are a variety of situations in which the Supreme Court has struck down encroachments on the ability of Article III courts to do their jobs, none exactly like this, but all supporting the conclusion that the role the settlement assigns to the findings of the science panel impermissibly infringes on the powers of Article III judges.

Brief in Opposition to Motion for Preliminary Approval by Four Objecting Class Members
Case No. 16-md-02741-VC

For example, the power of Article III judges to "render dispositive judgments" prevents Congress from re-opening final judicial decisions, such as by reviving a lapsed statute of limitations. *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219 (1995). And when Congress twice tried to assign certain functions in bankruptcy cases to non-Article III judges, the Court rejected both efforts. *Stern v. Marshall*, 564 U.S. 462 (2011); *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50 (1982). On the other hand, the Court has allowed Congress to permit administrative agencies to decide certain claims that would otherwise have to be adjudicated by a court. *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848-51 (1986). It has also allowed special masters to make findings where the Court exercised independent review of the record and rendered the ultimate decision. *Kansas v. Nebraska*, 574 U.S. 445, 453 (2015). Similarly, magistrate judges are permitted to rule on suppression motions because the district judge will review their decisions de novo. *United States v. Raddatz,* 447 U.S. 667 (1980). Other examples abound, but the principle is undisputed: Congress may assign some judicial functions to persons who are not Article III judges, but with some limits.

The first problem with analogizing the permissible delegations to this one is that in those situations the delegation of power to another entity was made by Congress or Article III courts themselves. But here the denigration of the judicial power to decide the admissibility of the findings of the science panel is being made by a for-profit business and attorneys for a class of plaintiffs seeking money damages from it. Objectors know of no case when private parties have been allowed to undermine a core power of Article III judges, and that alone is a reason to render inoperative the effects of the panel's findings.

Second, as objectors explained above, the manner by which the panel will make its decisions is the very antithesis of how Article III judges determine which proffered scientific

evidence will be admitted.  Briefly stated, the flaws here fall into two categories: the process by which the findings are made, and the limits on the judge's discretion regarding what to do with the panel's findings.  On the former, no Article III judge applying *Daubert* would allow a jury to hear evidence concerning a study that was strictly limited to a fixed list of prior publications, those doing the studies were precluded from asking for or receiving outside advice, and the panel members did not have to explain the reasons behind their conclusions.  And if such a study were even considered for admission, a federal judge would not be barred from allowing opposing counsel to cross-examine those who did the study or from arguing that the findings were not supported by the reasons given and unjustified by the limited evidence the panel considered. Nor would any Article III judge be required to follow the mandates of the proposed Stipulation to which all class members are bound, and which virtually decides the case for Monsanto.  Yet all that is precisely what this settlement does regarding the findings of the science panel.  Because the settlement seeks to remove these "essential attributes of judicial power" that the Supreme Court has required remain with Article III judges, *Schor*, 478 U.S. at 851, the science panel, and hence this settlement, which is at its heart, cannot stand.

E.     **Four Years Are Only Needed to Justify the Stay.**

Finally, the panel will take four years to reach its conclusion even though it is only reviewing the existing science regarding Roundup and NHL and is not even examining its connection to other forms of cancer.  Given the closed universe of materials that the panel may consider, and the absence of any requirement of producing a reasoned explanation for its conclusions, there is no reason why it should take anywhere near that long – except that is the length of the stay of all litigation brought by class members that Monsanto demanded.  Once again, this incredibly Monsanto-friendly combination of the stay and the science panel

demonstrates how unfair the overall agreement is and how little class counsel obtained in exchange for all of the benefits achieved by Monsanto.

## VIII.   OTHER SIGNIFICANT ASPECTS OF THE SETTLEMENT CONFIRM ITS ONE-SIDEDNESS.

Objectors have identified several other flaws in the settlement that underscore how one-sided it is.

1. The settling parties also cite as a class benefit Monsanto's promise to seek permission from the Environmental Protection Agency (EPA) to add a link to its Roundup label which would reference certain information, selected entirely by Monsanto, regarding whether exposure to Roundup causes NHL in humans.  Settlement Agreement, § 9.1, Dkt. 12531-2, p. 58 of 266.  Because all class members have already been exposed to Roundup, it is hard to understand how future labeling changes can benefit them, especially since Monsanto has made it clear that it will continue to sell Roundup.  In all likelihood, Monsanto has decided to request this labeling link, which is of no real help even to future Roundup users, as part of its ongoing efforts to derail NHL Roundup litigation through its preemption defense.  If EPA approves that request, Monsanto will cite the agreement of class counsel in this case, and perhaps even the Court's approval of the Settlement, to bolster its preemption argument, thereby hoping to make it more difficult, if not impossible, for others exposed to Roundup to prevail on their NHL claims.  Finally, as with most of the rest of the supposed benefits under the settlement, Monsanto could make this request to EPA at any time, without permission of class counsel, the Court, or anyone else.  Doing so in this context is little more than a fig leaf used to cover up the benefit that it – not the class – will derive from seeking the label change.[17]

---

[17] Although not relevant to the pending motion, objectors dispute that adding a link to the Roundup label that contains scientific reference will increase the information available to

40

2. The first page of the Notice states that "**You Could Benefit from a $2 Billion Settlement,"** *id.* at p. 152 if 266, implying to the ordinary class member that the settlement fund available for distribution is $2 billion.  That is not correct.  The details appear four pages later:

| BENEFIT | AMOUNT |
|---|---|
| Compensation Fund | At least $1.325 billion |
| Diagnostic Accessibility Grant Program | $210 million |
| Research Funding Program | $40 million |
| Settlement Administration Costs, Advisory Science Panel Costs, Settlement Class Notice Costs, Taxes, and Escrow Agent Fees and Expenses | Up to $55 million |

*Id.* at p. 156 of 266. That amounts to $1.630 billion, with the rest coming in via $170 million in attorneys' fees and $200 million in a termination fee if Monsanto decides not to continue with the settlement beyond the current four years.  Indeed, even in this box, the "at least" regarding the compensation fund is misleading because that can be increased in the first four years only if not all the money is spent for diagnostics, research, administration, and attorneys' fees. Monsanto and class counsel should not have called this a $2 billion settlement in their notice to the class because that figure significantly overstates what class members may receive in benefits beyond what is in the table above. Even then, the parties should affirmatively state that the diagnostic program provides no *treatment* to any class member: it will simply tell class members whether they have NHL, which will enable them to register with the compensation program.

---

homeowners and workers who actually use Roundup.  A meaningful change would include a label, not a link, that would at least state "WARNING: Roundup has been shown to cause NHL in some circumstances." Better yet, Roundup should be removed from the market or be used only with proper protective equipment.

Brief in Opposition to Motion for Preliminary Approval by Four Objecting Class Members
Case No. 16-md-02741-VC

3.  Objectors are required to submit with their objection "written evidence" of class membership, with no explanation of what would suffice. *Id.*, § 19.1(a), Dkt. 12531-2, p. 102 of 266.  It is unclear whether objectors represented by counsel must also comply with this requirement.  Would a statement by the class member that he was exposed to Roundup before February 3, 2021 suffice, and if not what else is necessary?  Lack of clarity aside, this requirement is plainly intended to discourage objections or to be a basis to reject them for non-compliance if they are submitted, which only benefits class counsel and Monsanto, not the class.

A further potential burden on class members who wish to object is found in the answer to Question 59. *Id.* at p. 174 of 266. It requires attorneys for objectors to "File a declaration stating every settlement class member that he/she is representing/filing an objection." *Id.* This burdensome and unnecessary requirement appears to be an effort by the settling parties to import the "written evidence" that applies to individuals filing their own objections into objections filed by counsel.  It should suffice for counsel for an objector to state, consistent with Rule 11, that he or she has a good faith belief that each objector is a member of the class.  Anything more is an attempt to create an unauthorized barrier to the right of class members Rule 23(c)(2)(iv) to be heard through their counsel.

4.  Section 19.1(d) specifically authorizes the parties to take "reasonable discovery" of any objector, without approval of the Court and without showing any cause. *Id.* at p. 103 of 266. By contrast, under section 24.1, the parties have precluded all discovery of them absent a court order. *Id.* There is no basis for that discriminatory treatment, yet class counsel readily consented to these settlement-friendly, but class-unfriendly provisions, whose only purpose can be to lessen the likelihood that there will be significant objections.

## IX.    CONCLUSION

For the foregoing reasons, the Court should (a) deny preliminary approval to the

proposed settlement; and (b) direct the parties and their counsel not to submit further proposals

for class action settlements for claims involving Roundup, or in the alternative (c) authorize

objectors to take the depositions of the six class representatives.

Dated: March 4, 2021

Respectfully Submitted,

*/s/ Arati C. Furness*
Arati C. Furness, CA Bar No. 225435
N. Majed Nachawati
S. Ann Saucer
Misty A. Farris
FEARS NACHAWATI, PLLC
5473 Blair Road
Dallas, Texas 75231
Tel. 214.890.0711 / Fax 214.890.0712
afurness@fnlawfirm.com
mn@fnlawfirm.com
asaucer@fnlawfirm.com
mfarris@fnlawfirm.com

Alan B. Morrison
George Washington University Law School
2000 H Street NW
Washington D.C. 20052
Tel. 202.994.7120
abmorrison@law.gwu.edu

Gerald Singleton, Esq.
SINGLETON LAW FIRM, APC
450 A Street, 5th Floor
San Diego, CA 92101
Tel.  619.771.3473 / Fax 619.255.1515
gerald@SLFfirm.com

Brief in Opposition to Motion for Preliminary Approval by Four Objecting Class Members
Case No. 16-md-02741-VC

Amy Carter
Heather V. Davis
CARTER LAW GROUP, P.C.
5473 Blair Road
Dallas, TX 75231
Tel. 214.390.4173
amy@clgtrial.com
hdavis@clgtrial.com

James G. Onder
W. Wylie Blair
Mark E. Berns
ONDER LAW, LLC
110 E. Lockwood, 2nd Floor
St. Louis, MO 63119
Tel. (314) 963-9000/Fax. (314) 963-1700
blair@onderlaw.com
onder@onderlaw.com
berns@onderlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of March 2021, a copy of the foregoing

Opposition was filed with the Clerk of the Court through the CM/ECF system which sent notice

of the filing to all appearing parties of record.

*/s/ Arati C. Furness*
FEARS NACHAWATI, PLLC
5473 Blair Road
Dallas, Texas 75231
Tel. (214) 890-0711
Fax (214) 890-0712
afurness@fnlawfirm.com

Brief in Opposition to Motion for Preliminary Approval by Four Objecting Class Members
Case No. 16-md-02741-VC