Behram V. Parekh, CA SBN 180361
DALIMONTE RUEB STOLLER LLP
515 S. Figueroa Street, Suite 1550
Los Angeles, California 90071
T: 619.821.2305
F: 855.203.2035
E: behram.parekh@drlawllp.com

*Counsel for objecting putative class
member Adam Williams*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br>Case No. 16-md-02741-VC |
| This document relates to: | OPPOSITION OF PUTATIVE CLASS MEMBERS TO MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT [D.E. 12531] |
| *Ramirez, et al. v. Monsanto Co.*<br>Case No. 3:19-cv-02224 | |
| | Date: March 31, 2021<br>Time: 10:00 AM<br>Place: Courtroom 4, 17th floor<br>Judge: Honorable Vince Chhabria |

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................................................ 1

II.  ARGUMENT .................................................................................................................... 3

   A.   The Contemplated Science Panel Abrogates a Class Member's Constitutional Right to a
      Jury Trial, Violates Article III, and Impinges States' Rights ............................................ 3

     1.   The Science Panel Makes the Purported Exit to the Tort System Illusory ..................... 4

        a.   The Science Panel's Composition ................................................................ 5

        b.   The Science Panel's Causation Standard ...................................................... 6

        c.   The Science Panel's Confidentiality Protections ........................................ 10

        d.   Use of the Science Panel's Determination at Trial ..................................... 12

     2.   The Proposed Science Panel Also Violates Article III and States' Rights ................... 14

        a.   Article III Judicial Power Must be Exercised by Article III Courts or Be Subject to
           Their Ultimate Supervision and Control ..................................................... 14

        b.   The Science Panel Exercises Judicial Power in Violation of Article III ................... 17

        c.   The Implementation of the Science Panel Impinges States' Rights .......................... 19

   B.   The Proposed Settlement Lacks Critical Information Necessary to Allow the Court and
      Class Members to Properly Evaluate It ........................................................................ 20

     1.   Preliminary Approval Can Only Be Granted Upon an Extensive Factual Record ........ 20

     2.   Neither the Court nor Future Claimants Can Determine if the Compensation Offered
        Under the Settlement is Fair and Reasonable ............................................................. 22

     3.   The Record Lacks Any Evidence That Subclass 2 Was Adequately and Independently
        Represented. ............................................................................................................. 28

III. CONCLUSION .............................................................................................................. 33

OPP. OF PUTATIVE CLASS MEMBERS TO MOT. FOR PRELIM. APPROVAL
Case No. 3:16-md-02741-VC

## TABLE OF AUTHORITIES

**Federal Cases**

*Acevedo-Diaz v. Aponte,*
   1 F.3d 62 (1st Cir. 1993) ..................................................................... 16

*Amchem Products, Inc. v. Windsor,*
   521 U.S. 591 (1997) ................................................................. 28, 29, 32

*Commodity Futures Trading Comm'n v. Schor,*
   478 U.S. 833 (1986) ................................................................ 15, 17, 19

*Cotter v. Lyft,*
   193 F. Supp. 3rd 1030 (N.D. Cal. 2016) ................................... 1, 21, 23

*Dimick v. Schiedt,*
   293 U.S. 474 (1935) .............................................................................. 4

*Granfinanciera, S.A. v. Nordberg,*
   492 U.S. 33 (1989) .............................................................................. 16

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) ........................................................... 20

*In re Abilify (Aripiprazole) Products Liability Litigation,*
   299 F. Supp. 3d 1291 (N.D. Fla. 2018) .......................................... 9, 10, 11

*In re Clay,*
   35 F.3d 190 (5th Cir. 1994) .......................................................... 15, 16

*In re Roundup Products Liability Litigation,*
   390 F. Supp. 3d 1102 (2018) ........................................................ 3, 9, 10

*In re Silicone Gel Breast Implant Prod. Liab. Litig.,* (MDL 926), No. CV 92-P-10000-S,
   1996 WL 34401813 (N.D. Ala. May 31, 1996) ............................. 12, 13

*In re Texas General Petroleum Corp.,*
   52 F.3d 1330 (5th Cir. 1995) ............................................................. 16

*Kansas v. Nebraska,*
   574 U.S. 445 (2015) ........................................................................... 15

*Northern Pipeline Constr. Co. v. Marathon Pipeline Co.,*
   458 U.S. 50 (1982) ............................................................................. 15

*Oil States Energy Services, LLC v. Greene's Energy Group, LLC,*
   138 S. Ct. 1365 (2018) ....................................................................... 16

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999) ............................................................................... 29, 30, 32, 33

*Parklane Hosiery Co. v. Shore*,
    439 U.S. 322 (1979) ................................................................................... 4, 6, 7, 8

*Parsons v. Bedford*,
    28 U.S. 433 (1830) ............................................................................................... 4

*Plaut v. Spendthrift Farm, Inc.*,
    514 U.S. 211 (1995) ........................................................................................... 15

*Ross v. Rhodes Furniture, Inc.*,
    146 F.3d 1286 (11th Cir. 1998) ......................................................................... 16

*Sprint Communications, Inc. v. Jacobs*,
    571 U.S. 69 (2013) ............................................................................................. 15

*Stern v. Marshall*,
    564 U.S. 462 (2011) ........................................................................................... 15

*Wellness Int'l Network, Ltd. v. Sharif*,
    575 U.S. 665, 135 S. Ct. 1932 (2015) ................................................ 14, 15, 17, 19

*Whitman v. American Trucking Assns.,
Inc.*, 531 U.S. 457 (2001) .................................................................................. 15

## State Cases

*Johnson v. Monsanto Co.*,
    52 Cal. App. 5th 434 (2020) ......................................................................... 25, 26

## Federal Statutes

28 U.S.C. § 1651 .................................................................................................... 20

## Federal Rules

Fed. R. Civ P. 23(e) ...................................................................... 1, 20, 21, 22, 26, 28

## State Regulations

Title 27, Article 7, Section 25721 of the California Code of Regulations..................... 7

## I.       INTRODUCTION

Undersigned counsel represents putative class members who retained counsel after February 3, 2021, who have not yet filed suit, and who were exposed to Roundup. Counsel for those putative class members respectfully requests the Court, for the reasons stated herein, deny putative Class Counsels'[1] Motion for Preliminary Approval of Proposed Class Settlement, Appointment of Interim Class and Subclass Counsel, Direction of Notice Under Fed. R. Civ P. 23(e), Scheduling of A Fairness Hearing, and Stay of the Filing and Prosecution of Roundup-Related Actions by Settlement Class Members [Doc. 12531] ("Revised Motion").

In June, 2020 the same class representative and counsel that have brought the Revised Motion brought their initial motion to approve a proposed settlement class [D.E. 11042] ("Original Motion"). The Court, in denying various motions to extend time to respond as to the Original Motion, and citing to *Cotter v. Lyft*, 193 F. Supp. 3rd 1030, 1036-37 (N.D. Cal. 2016), noted that "wait[ing] until the final approval stage before fully considering objections" to the proposed settlement agreement would be "wrong," particularly with "complex, expensive-to-administer settlements like the one proposed" [D.E. 11182 at 2].

The Court went on to note that it was "skeptical of the propriety and fairness of the proposed settlement" and listed out some of its concerns. *Id*. at 3. The Court then concluded that rather than delay the hearing, it would be more expeditious to allow the parties to the Original Motion to move to Plan B if they wished rather than waste time and effort litigating their Plan A. *Id*. at 4. In response to the Court's Order, filing counsel withdrew the Original Motion.

Instead of moving on to Plan B, however, filing counsel for the Original Motion have now filed just a modified version of Plan A that, while facially appearing to address the Court's stated concerns, really does not do so. For example, the Revised Motion continues to contain a "Science Panel" which they now claim is "advisory" only. However, the deliberations of that

---

[1] Proponents of the Motion are referred to herein as Class Counsel for ease of reference, however, since no class has yet been certified, the Court has not actually appointed them class counsel.

OPP. OF PUTATIVE CLASS MEMBERS TO MOT. FOR PRELIM. APPROVAL
Case No. 3:16-md-02741-VC

panel continue to be secret, are not subject to full discovery, dispute, or challenge, panelists are still only allowed to consider current data and not future data, panelists are still not allowed to conduct their own research, the panels' findings continue to be locked-in, and the panels' findings are now, instead of binding, admissible as stipulated facts, without objection, in any subsequent proceeding – making the findings of such panel, in effect, indisputable by plaintiffs' counsel in any future litigation or jury trial.

The Revised Motion also continues to prohibit punitive damages in any future proceedings, claiming that the class settlement and the private settlements to date are sufficient to achieve reform and deterrence. That is clearly not the case. Has Monsanto and Bayer admitted that Roundup causes cancer? Has Monsanto and Bayer stopped selling Roundup? Has Monsanto and Bayer even asked the EPA to put a clear warning on the label that Roundup can cause cancer? It is clear that neither the punitive damages verdicts to date, nor the private settlements, have changed Monsanto's and Bayer's behavior in any measurable way. Rather, the punitive damages verdicts to date have led Monsanto and Bayer to attempt to craft a class settlement which would permit them to keep selling Roundup, without sufficient warnings and without admitting that Roundup causes cancer, while cutting off their fear of future punitive damages awards.

Finally, the Revised Motion continues to lack critical information necessary to allow the Court and putative class members to properly evaluate it, failing to provide sufficient information to allow a determination if the compensation offered in the settlement is fair and reasonable, nor whether the subclasses were appropriately represented.

For the reasons discussed herein, as well as those presented in briefs filed by other putative class members, and any oral argument allowed by the Court, putative class members respectfully request that the Court deny the Motion.

## II.     ARGUMENT

### A.     The Contemplated Science Panel Abrogates a Class Member's Constitutional Right to a Jury Trial, Violates Article III, and Impinges States' Rights

In the *Roundup* jury trials which preceded this settlement, plaintiffs' experts opined that exposure to Roundup causes non-Hodgkin's lymphoma ("NHL") and Monsanto's experts opined to the contrary.  Judges, including this Court, considered *Daubert* challenges[2], juries weighed the evidence presented by each side and, *each time*, juries ruled in favor of the plaintiffs.  In doing so, jurors found both general and specific causation and awarded both compensatory and punitive damages.

Facing consistent adverse jury verdicts, Monsanto has orchestrated an uncommon alternative to a traditional jury trial for class members dissatisfied with Monsanto's compensation offer and for those class members who develop NHL after Monsanto discontinues the compensation fund.  To this end, the proposed settlement provides for an immediate stay of all Roundup litigation in favor of the appointment of a Science Panel which, after four years, will "determine" whether Roundup causes NHL.  The Panel's determination will then be cloaked with the imprimatur of an "independent" expert opinion at trial, not subject to challenge, with undue influence on the outcome of cases filed by dissatisfied class members.

Although the Science Panel is arguably the centerpiece of the proposed settlement, Class Counsel's Motion for Preliminary Approval gives it short shrift other than to repeatedly describe it as "advisory."  In fact, virtually every provision related to the Panel's composition and analysis is problematic.  Worse yet are the provisions regarding the confidentiality and admissibility of

---

[2] It bears noting that in ruling on Defendants' Summary Judgment and *Daubert* motions in the Roundup MDL, this Court found that the testimony of three plaintiffs' experts – Dr. Portier, Dr. Ritz and Dr. Weisenburger, offered "independent and relatively comprehensive opinions that the epidemiological and other evidence demonstrates glyphosate causes NHL in some people exposed to it.  Accordingly, their opinions are admissible, which means the plaintiffs have presented enough evidence to defeat Monsanto's summary judgment."  *In re Roundup Products Liability Litigation*, 390 F. Supp. 3d 1102, 1109 (2018).

the panel's determination at trial. Together, they constitute an abrogation of the right to jury trial afforded by the Seventh Amendment and Federal Rule 38(a).

A party's right to a jury trial is fundamental to our history and jurisprudence.  Indeed, the Supreme Court has long proclaimed that "[t]he trial by jury is justly dear to the American people. It has always been an object of deep interest and solicitude, and every encroachment upon it has been watched with great jealousy." *Parsons v. Bedford*, 28 U.S. 433, 446 (1830).  While modern legal developments have changed the form of civil jury trials, the core right to a jury trial in the Seventh Amendment remains inviolate.  In this regard, the Supreme Court has cautioned "maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935).  In other words, any legal reform that affects the right to jury trial or erodes the jury's fact-finding function is unconstitutional. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 346 (1979) ("… to sanction creation of procedural devises which limit the province of the jury to a greater degree than permitted at common law in 1791 is in direct contravention of the Seventh Amendment.")

Under this approach, the Seventh Amendment clearly guarantees prospective Roundup plaintiffs the right to a jury trial.  Their legal actions for monetary damages would have been tried before a jury at common law garnering Seventh Amendment protection.  The fact that a proposed class action device alters the form in which they ultimately arrive before a jury has no effect on the underlying nature of their claims.  Yet, here, the proposed settlement's Science Panel provisions encroach on those class members' Seventh Amendment right to jury trial.

### 1.  The Science Panel Makes the Purported Exit to the Tort System Illusory

As detailed below, the settlement creates a "Science Panel" that will spend four years studying, in complete secrecy, the existing science on Roundup's NHL carcinogenicity but will not consider new evidence nor do any of its own studies.  The Panel will then make a

pronouncement as to whether Roundup causes NHL. If the Science Panel finds general causation, then it must decide on a minimum dose.  The Panel's determinations cannot be questioned in any respect, because the Panel's deliberations are secret.  Its conclusions cannot even be cross-examined at trial.  The Panel's conclusion will be admissible by either side as stipulated facts in any future lawsuit that class members might bring if they choose to reject Monsanto's compensation offer or if they are diagnosed with NHL after Monsanto discontinues the compensation fund, which it can do as soon as approximately four years after final approval of the proposed settlement.  *See* ECF No. 12531-2, Article XIII, at 70-74.

The proposed settlement also provides that "[i]n any and all Roundup Lawsuits . . . the court or other tribunal shall (1) permit the full and fair introduction of the Science Panel Determination as evidence, (2) permit full and fair admission of the Science Panel Stipulation, including by permitting references to it and reading it or submitting it in writing to the jury (as the court or tribunal deems appropriate), and (3) not instruct or otherwise tell the jury it is not bound by any of the stipulated facts in the Science Panel Stipulation. ECF No. 12531-2 at § 12.3(d)(iii).

It is unclear how such a procedure could ever benefit future claimants who may not receive an NHL diagnosis until well after Monsanto elects to discontinue the compensation fund. In such an instance, the future claimants will enter the tort system with their hands tied by the burdens of the Science Panel's confidential and un-rebuttable determinations and no right to punitive damages, all given up for absolutely no benefit.

### a.  The Science Panel's Composition

Under the terms of the Settlement Agreement, there are certain criteria that must be met before someone can be considered as a potential Science Panel member. Each Science Panel member must be "recognized, independent, appropriately credentialed epidemiologists, biostatisticians, toxicologists, or hematologists/oncologists, amongst others, and/or scientific or medical professionals with similar backgrounds and qualifications[.]" ECF No. 12531-2 at

§12.1(c).  However, he or she cannot have "been retained as [a] testifying or consulting expert[] in any action or proceeding associated with the Lawsuit, MDL No. 2471, Roundup Products, or any lawsuit brought against the Monsanto Parties or the Related Parties in any forum that arises from, results from, in any way relates to or is in connection with exposure to glyphosate or a similar factual predicate raised in the Lawsuit[.]" *Id.* Lastly, he or she cannot "have expressed a view regarding any question the Science Panel is to address" and "must submit sworn affidavits to the Settlement Administrator . . . attesting to their satisfaction of the requirements of this Section 12.1(c) [of the Settlement Agreement]." *Id.*

It is one thing to exclude experts who were retained by either party in the Roundup litigation, but the exclusion of anyone who has "expressed a view" regarding glyphosate or any question the Science Panel is far too broad.  Indeed, in 2015, Dr. Christopher Portier, one of plaintiffs' experts, authored a letter to the European Food Safety Authority ("EFSA"), *which was co-signed by 96 world renowned scientists*, urging the European Commission to disregard the "flawed" EFSA findings on glyphosate in its formulation of health and environmental policy for Europe.[3]  Under the above-described conditions, all 96 scientists who signed the letter are precluded from the Science Panel.

### b.  The Science Panel's Causation Standard

Section 12.2 of the Settlement Agreement outlines the parameters of the Science Panel research. Pursuant to section 12.2(d), the Science Panel is limited to considering only the following body of scientific evidence, and nothing else:

- Published EPA, Health Canada, JMPR, ECHA, EFSA, New Zealand, Japanese, and Australian carcinogenicity assessments of glyphosate, glyphosate-based herbicides, and/or surfactants.

- IARC Monograph 112 regarding glyphosate.

- All published studies and reviews regarding glyphosate, glyphosate-based herbicides and/or surfactant epidemiology, exposure/dose, animal toxicology, genotoxicity, and chemical structure and activity.

---

[3]  *See* https://www.efsa.europa.eu/sites/default/files/Prof_Portier_letter.pdf

OPP. OF PUTATIVE CLASS MEMBERS TO MOT. FOR PRELIM. APPROVAL
Case No. 3:16-md-02741-VC

- All registrant-supplied studies and data submitted to EPA, Health Canada, JMPR, ECHA, EFSA, New Zealand, Japanese, and Australian pesticide regulatory authorities concerning glyphosate, glyphosate-based herbicides, and/or surfactants regarding epidemiology, exposure/dose, animal toxicology, genotoxicity, and chemical structure and activity, provided that if the Science Panel believes that the underlying data for a particular study is necessary for a complete review of that study, the Science Panel shall not consider that study unless such underlying data are contained within the document productions made as of the Settlement Date by any Person in prior litigation involving Roundup Claims or are otherwise publicly available.

*See* ECF No. 12531-2 at §12.1(d).

Even though the world of medical science is ever evolving, the Settlement Agreement not only limits the panel to the body of scientific evidence described *supra*, it bars the Science Panel from considering new scientific evidence that falls within the aforementioned body of scientific evidence without first petitioning the *Settlement Administrator*, someone with absolutely no scientific background, for permission and allowing the parties to state their views on the panel's request. *See Id.* at § 12.2(e).

The Settlement Agreement then prescribes the standard the Science Panel must apply in making its causation determination. Under the settlement, a "'Causation Shown Finding' means the Science Panel Determination has concluded that causation has been shown for NHL in humans pursuant to the standard set forth [in the Settlement Agreement], but only at or above the threshold internal dose level (dose greater than xx micrograms/day) set forth in the Science Panel Determination as provided in Section 12.2(c)."[4] *Id.* at §12.3(b). The Science Panel must include

---

[4] Section 12.2(c) states that: "If the Science Panel finds that causation has been established as to NHL, it shall determine the threshold internal dose level at which such causation has been established. In so doing, the Science Panel shall presume that such threshold internal dose level is 1100 micrograms per day over a lifetime of 70 years, the NSRL adopted by the State of California, unless the Science Panel determines otherwise by calculating a threshold internal dose level for added risk using the methodology used by California OEHHA in their Initial Statement of Reasons regarding setting a Benchmark Dose, Cancer Slope Factor, and NSRL for glyphosate (as described in Title 27, Article 7, Section 25721 of the California Code of Regulations, and Fred Parham & Christopher Portier, *Benchmark Dose Approach*, *in* RECENT ADVANCES IN QUANTITATIVE METHODS IN CANCER AND HUMAN HEALTH RISK ASSESSMENT 239 (L. Edler & C. P. Kitsos eds., 2005)).

OPP. OF PUTATIVE CLASS MEMBERS TO MOT. FOR PRELIM. APPROVAL
Case No. 3:16-md-02741-VC

a threshold internal dose level if they make this finding, unless it determines under standards set forth in the Settlement Agreement that causation has been established at any internal dose level, and it includes that determination in its report. *Id.* Failure to include a threshold internal dose level for NHL is considered a finding of "Causation Not Shown" for NHL unless the Science Panel issues the missing threshold internal dose level within the parameters outlined in the Settlement Agreement. *Id.*  The Science Panel must also determine what "dose" causes NHL but sets a standard that is impossible to meet and was certainly not required of plaintiffs' experts in the Roundup MDL trials.[5]

Importantly, the Science Panel cannot find causation if they conclude that the epidemiology has a positive association – even a statistically significant association – but cannot rule out "chance, confounding or bias." In this regard, Section 12.2(b) of the Settlement provides that:

> (b) To find that causation has been established as to NHL, ***the Science Panel must conclude***: (i) based on the body of scientific evidence described below, that there is reliable evidence overall (1) of a positive association between exposure to Roundup Products and NHL in humans, (2) ***that such positive association is not due to chance, confounding, or bias****,* and (3) that based on an application of the Bradford Hill Guidelines, "we can pass from [the] observed association to a verdict of causation;" and (ii) that such reliable evidence makes it more likely than not that exposure to Roundup Products can cause NHL.

The import of this language is to *require* the Science Panel to rule out "chance, confounding or bias" from the epidemiology evidence and the settlement unreasonably sets a

---

[5] The concept of internal dose in the context of Roundup is, by itself, fundamentally flawed. The trials and settlements to date have never discussed an internal dose, but rather, have discussed exposure. By requiring the Science Panel to determine dose, and presumably requiring plaintiffs to prove that they received such dose at trial, the Science Panel has been effectively set up to cause failure.

OPP. OF PUTATIVE CLASS MEMBERS TO MOT. FOR PRELIM. APPROVAL
Case No. 3:16-md-02741-VC

*stricter evidentiary standard* than applied in a *Daubert* analysis or a civil trial.  Indeed, it would preclude the Science Panel's reliance on the epidemiological studies that formed the core of the plaintiffs' cases against Monsanto in the Roundup MDL.  An examination of this Court's *Daubert* analysis in the Roundup MDL is illustrative.

As a threshold matter, Monsanto previously acknowledged that "epidemiology is central to the general causation inquiry, and where such evidence exists, it must be addressed by the experts."  *In re Roundup*, 390 F. Supp. 3d at 1116.  Epidemiology studies examine whether an association exists between an agent like glyphosate and an outcome like NHL.  "When assessing whether an epidemiological study can form a reliable basis for an expert's opinion, a court must determine whether the study adequately considered confounding variables and possible sources of bias."  *Id*. at 1117.  "Reliable epidemiological studies should account for confounders where they are identified, although '*failure to control for every conceivable potential confounder does not necessarily render the results of an epidemiological study unreliable*.'"  *Id.* (quoting *In re Abilify (Aripiprazole) Products Liability Litigation*, 299 F. Supp. 3d 1291, 1322 (N.D. Fla. 2018)) (emphasis added).  Using this standard, the Court then evaluated the case-control studies and the meta-analysis relied upon by plaintiffs' experts and the Agricultural Health Study ("AHS") relied upon by Monsanto's experts.  *Id.* at 1116-1123.  The Court concluded that the "upshot of all this is that the epidemiology evidence is open to different interpretations, and the potential flaws in the data from the case-control studies and meta-analyses are not overwhelmingly greater that the potential flaws in the data from the AHS study." *Id.* at 1126.

Against this backdrop, the Court found that plaintiffs' expert Dr. Portier conducted a literature review of the epidemiological evidence and agreed with the IARC's conclusion "that the evidence supported a credible causal interpretation *but could not definitively rule out chance, bias or confounding*." *Id.* at 1131 (emphasis added).  Nevertheless, the Court held that "[w]ith respect to Dr. Portier's epidemiology-related conclusions – both his finding of association between glyphosate exposure and NHL and his application of the Bradford Hill factors that turn

9

on epidemiology studies – it is not difficult to conclude that much of his analysis is sufficiently reliable to be admissible." *Id.* at 1133. Importantly, the Court noted that "Monsanto can cross-examine Dr. Portier on the apparent weaknesses in his analysis, and there is little reason to think that a jury will not understand those weaknesses." *Id.* at 1134.

Similarly, Dr. Weisenburger offered an epidemiology opinion that considered the same set of studies and faced the same criticisms from Monsanto. This Court found Dr. Weisenburger's testimony admissible *even though he could not fully rule out confounding factors in the epidemiology*. *Id.* at 1144 ("In addition, Dr. Weisenburger considered other possible explanations for the observed results and, among other things, concluded that 'confounding due to the use of other pesticides does not fully explain the increased risk estimates for glyphosate' in light of the results in some studies that controlled for use of other pesticides. … None of these conclusions offends *Daubert's* requirements.").

This Court's *Daubert* ruling on general causation makes clear that when it comes to epidemiology, it is impossible to rule out completely chance, confounding, or bias as contributing to a positive association. *Id.* at 1116-17. That does not mean, however, that experts cannot rely on such studies when determining causation. *Id.* It only means that they have to confirm any positive association by application of the "Bradford Hill criteria" with other facts, such as toxicology and genotoxicity as was done by Plaintiffs' experts in the Roundup MDL. What is more, application of the Bradford Hill criteria – a universally accepted and reliable methodology for determining causation – requires only a finding of a positive association within the epidemiology. It does not require a definitive determination ruling out the role of chance, bias, and confounding in epidemiological evidence to find causation when there are other powerful lines of evidence to corroborate an observed association.

### c. The Science Panel's Confidentiality Protections

The Settlement Agreement unequivocally requires that the Science Panel and any authorized contractors "conduct their work in private." ECF No. 12531-2 at § 12.6(a). To this

end, *all* documents and information of the Science Panel related to the Scientific Analysis must be "held in conformity with strict confidence." *Id.* Moreover, class members are barred from seeking discovery or disclosure from the Science Panel, any Science Panel member, any of the Science Panel's authorized contractors, or any other person to whom a disclosure was made pursuant to Section 12.6(a)(iv) of the Settlement Agreement. *Id.* at § 12.6(b). This bar on discovery includes "any written discovery, requests for documents, subpoenas of any kind, or notices of deposition[.]"[6] *Id.* Class members are also not allowed to use any such discovery or disclosure that might become available through any other means. *Id.*

In addition to the ban of all discovery, class members are barred from calling "any Science Panel member, any of the Science Panel's authorized contractors, or any Person to whom disclosure is made pursuant to Section 12.6(a)(iv) [of the Settlement Agreement], to provide testimony, whether as a fact witness, an expert witness, or in any other capacity," and from using any such testimony that becomes available through any other means. *Id.* at § 12.6(c).

The parties carved out a very limited exception to the ban on discovery and testimony from the Science Panel and its affiliates. This exception triggers only if, three or more years after the Science Panel's determination, a party challenges the admissibility of the determination on the basis that **new** scientific evidence rendered the determination inadmissible under *Daubert* or *Frye*. *See id.* at § 12.6(b), and even that exception only applies to a party seeking to **rebut** a challenge to the Science Panel's determination. Under section 12.5(d), "[i]f a Daubert/Frye Challenge is made, the party opposing the challenge may seek to depose or otherwise obtain testimony from the Science Panel members to **rebut** the claim that the **new** scientific evidence

---

[6] Apparently admitting to at least one of the serious flaws with the proposed Settlement Agreement, the proponents of the settlement filed the day before this brief was due a proposed amendment to the Settlement Agreement. [D.E. 12665] attempting to address the secrecy of the Science Panel. The proposed amendment, however, does not address the numerous shortcomings of the Science Panel identified herein, nor does it seriously alleviate the secrecy concerns nor provide the type of robust discovery normally allowed of experts in both federal and state courts. Given the lateness of the amendment, objectors will be prepared to address this amendment more fully at oral argument, or in supplemental briefing if allowed by the Court.

OPP. OF PUTATIVE CLASS MEMBERS TO MOT. FOR PRELIM. APPROVAL
Case No. 3:16-md-02741-VC

*affects the validity of the Science Panel Determination* or renders it unreliable, and such deposition or other testimony may be used in connection with that or subsequent Daubert/Frye Challenge(s)." *Id*. at § 12.5(d).

Of course, the use of "science panels" in mass tort litigation is not unheard of. Judge Sam Pointer, handling the consolidated MDL in the breast implant cases, appointed a "National Science Panel" to assist him in examining scientific issues.[7] But even there, the parties were afforded the protections of Federal Rule 706 including discovery into, and cross-examination of, the Panel's work, and, there, the court remained fully accountable on appellate review. The secrecy requirements of the Settlement Agreement with regard to the Science Panel are anathema both to properly conducted science, which thrives on publication, peer review, and robust debate, and the judicial process, which again is supposed to be public and transparent.

### d.  Use of the Science Panel's Determination at Trial

While the Science Panel has some discretion concerning the content and format of its written report, the Science Panel is required to include with its report a completed copy of the "Science Panel Determination" form, which is attached to the Settlement Agreement as Exhibit 8. ECF No. 12531-2 at § 12.3(a). According to the terms of the agreement, "[t]he Science Panel Determination Form shall be the operative document for determining whether the Science Panel has made a Causation Not Shown Finding or a Causation Shown Finding . . . for purposes of the Settlement Agreement and the evidentiary use of the Science Panel Determination under it, notwithstanding any additional content contained in the Science Panel's written report." *Id.* "The Science Panel Determination shall be final and not appealable." *Id.*

Section 12.3 of the Settlement Agreement also details the effect the Science Panel Determination has on class members who opt to pursue their claims in the tort system. *Id.* at § 12.3. The use of the Science Panel Determination is applicable to all claims involving Roundup, including false advertising claims, whose factual predicates include any Roundup products that

---

[7] *See In re Silicone Gel Breast Implant Prod. Liab. Litig.*, (MDL 926), No. CV 92-P-10000-S, 1996 WL 34401813, at *1 (N.D. Ala. May 31, 1996).

OPP. OF PUTATIVE CLASS MEMBERS TO MOT. FOR PRELIM. APPROVAL
Case No. 3:16-md-02741-VC

can cause NHL. *Id*. at § 12.3(d)(i). The Settlement Agreement bars Monsanto and class members from introducing a Causation Shown Finding without also introducing the threshold internal dose level, and requires the Science Panel Determination to be described as concluding that causation is not shown for doses lower than such threshold internal dose level. *Id*. at § 12.3(b). Finally, each class member must stipulate to the admissibility of the Science Panel's findings, which can be introduced into evidence and cannot be contradicted.  *Id*. at § 12.3(d)(ii).

Accordingly, the proposed settlement requires class members to forego any discovery or testimony from the Science Panel and yet still admit, for evidentiary purposes at trial, that the Science Panel (1) was comprised of independent, qualified, and recognized experts, (2) who reviewed the existing body of scientific evidence, and (3) whose determination should be considered as that of an independent expert and should be given the same weight given to the testimony of any other independent expert.  Further, while the settlement claims to afford class members the ability to introduce testimony from other "paid" experts, the proposed settlement requires class members to covenant and agree to "not contradict any of the stipulated facts contained in the Science Panel Stipulation or assert that the Science Panel reached a conclusion inconsistent with the Science Panel Stipulation," effectively rendering that provision meaningless. *Id.* at Ex. 9.  In actual operation and effect, the conclusion of the Science Panel will not be "advisory" but binding on the plaintiffs at least at trial, if not earlier at summary judgment, in every venue, state or federal.

Under the terms of the Settlement Agreement, in an exit to the tort system, class members must accept the results of the Science Panel with all of the defects discussed above.  Further, they give up their right to punitive damages.  In return, however, they get nothing.  Unlike other settlements where there are some benefits to the rights given up, such as defendants' waiver of certain defenses, there is no such benefit provided here.  Monsanto retains all of its rights and defenses, while class members give up many of theirs.  Further, they surrender those rights in

perpetuity, whereas Monsanto can effectively cap its liability by simply choosing not to renew the Settlement Agreement.

For the reasons discussed above, the purported exit to the tort system is illusory, results in significant detriments to putative class members ability to litigate their cases, and violates class members' Seventh Amendment rights.

### 2. The Proposed Science Panel Also Violates Article III and States' Rights

As this Court previously recognized in considering the prior settlement proposal, whether the factual determination of general causation (as to whether Roundup causes NHL) may be delegated to a Science Panel, raises significant constitutional concerns under Article III.  ECF No. 11182 at 3.  Although the current proposed settlement, again including the proposed use of a Science Panel, has been tweaked at the margins, this Court's constitutional concern still inheres. Use of the Science Panel, as proposed, unconstitutionally delegates Article III judicial power to a body without Article III safeguards, potentially impinges on states' rights, and, as discussed *supra*, impairs the Seventh Amendment right to a jury trial.

### a. Article III Judicial Power Must be Exercised by Article III Courts or Be Subject to Their Ultimate Supervision and Control

Article III provides that "[t]he judicial Power of the United States shall be vested in one supreme Court and in such inferior Courts as the Congress may from time to time ordain and establish."  Art. III, § 1.  "Congress has in turn established 94 District Courts and 13 Courts of Appeals, composed of judges who enjoy the protections of Article III:  life tenure and pay that cannot be diminished."  *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 135 S. Ct. 1932, 1938 (2015).  The judicial power extends "to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties."  Art. III, § 2.  Article III judicial power has been construed to extend to "any matter which, from its nature, is the subject of a suit at the

common law, or in equity, or in admiralty." *Stern v. Marshall*, 564 U.S. 462, 484 (2011).[8] Critically, this includes the adjudication of private rights such as are at issue in this case.

Article III judges are vested with the authority (and the obligation) to "render dispositive judgments" in all cases within their jurisdiction. *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219 (1995); *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013). That includes the obligation to decide issues of fact as well as issues of law. *Stern*, 564 U.S. at 484. Article III judicial power, because it is exclusively vested in Article III courts and Article III judges, may not be delegated to others who lack the procedural safeguards of life tenure and salary protection. *See, e.g., Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 472 (2001); *Plaut*, 514 U.S. at 219; *Sharif*, 135 S. Ct. at 1957-58 (C. J. Roberts, dissenting).

Article III serves two purposes: (1) to protect individuals' rights to an independent and impartial federal adjudicator, and (2) to safeguard the judiciary from inter-branch encroachment. *See, e.g.*, *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848-51 (1986) (recognizing that Article III is a structural safeguard to ensure separation of powers as well as a personal right); *accord Sharif*, 135 S. Ct. at 1943; *Stern*, 564 U.S. at 483.

Of course, Article III judges may use non-Article III adjuncts to assist them in their duties, without running afoul of Article III, so long as the Article III judge remains ultimately responsible for the judgment or exercises the "essential attributes of judicial power." *Schor*, 478 U.S. at 851; *see also Stern*, 564 U.S. at 500-01 (rejecting notion that bankruptcy court was permissible "adjunct" because bankruptcy court had power to resolve all questions of fact and law and enter final judgments); *Kansas v. Nebraska*, 574 U.S. 445, 453 (2015) (use of special master permissible where court exercised independent review of the record and rendered ultimate decision). Authority to conduct jury trials is one essential attribute of Article III power and therefore cannot be delegated to adjuncts. *In re Clay*, 35 F.3d 190, 193 (5th Cir. 1994); *cf. Schor*, 478 U.S. at 853

---

[8] Three categories of cases are understood to be excluded from Article III: territorial cases, courts-martial, and public-rights disputes. *See Northern Pipeline Constr. Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 71 (1982) (plurality opinion).

OPP. OF PUTATIVE CLASS MEMBERS TO MOT. FOR PRELIM. APPROVAL
Case No. 3:16-md-02741-VC

(affirming delegation of authority to CFTC in part because CFTC was not authorized to hold jury trials). *De novo* review is one crucial way to ensure that an Article III court, rather than an adjunct, exercises the essential attributes of judicial power. *See, e.g.*, *In re Texas General Petroleum Corp.*, 52 F.3d 1330, 1337 (5th Cir. 1995).

Common non-Article III adjuncts include special masters, magistrate judges, bankruptcy judges, law clerks, and, as is relevant here, juries. Each of these types of adjuncts is permissible so long as the adjunct does not exercise essential judicial powers, or if it does, is subject to *de novo* review by an Article III court. For example, juries exercise judicial power through fact-finding, but they do not violate Article III because jury trials are subject to the ultimate supervision and control of Article III courts. *See, e.g.*, *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1289 (11th Cir. 1998). (noting that district court can set aside jury verdict, without violating Seventh Amendment right to jury trial, where pre-verdict motion was made on similar grounds); *Acevedo-Diaz v. Aponte*, 1 F.3d 62, 66 (1st Cir. 1993) (court reviews *de novo* determination to set aside jury verdict based on lack of evidence).

So long as use of a non-Article III adjunct does not violate Article III, there is no independent violation of the Seventh Amendment right to a jury trial. *See Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 138 S. Ct. 1365, 1379 (2018) ("This Court's precedents establish that, when Congress properly assigns a matter to adjudication in a non-Article III tribunal, the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder.") (internal quotation marks omitted). "Thus, in a suit that would have been tried at common law in England in 1789, a litigant has both a Seventh Amendment right to a jury and an Article III right to an Article III court." *In re Clay*, 35 F.3d at 194; *see also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53-54 (1989) (holding that test for whether an Article III court is necessary is the same test as whether a party has a Seventh Amendment right to a jury trial).

To the extent Article III is a personal right, it may be waived. *Sharif*, 135 S. Ct. at 1943; *Schor*, 478 U.S. at 848-49. However, to the extent Article III's structural or separation-of-powers purpose is implicated, a litigant may not consent to an Article III violation. *Id.* at 1943-44; *Schor*, 478 U.S. at 851 ("When these Article III limitations are at issue, notions of consent and waiver cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect.").

### b. The Science Panel Exercises Judicial Power in Violation of Article III

The potential litigation encompassed by the proposed settlement is plainly within the bounds of Article III's judicial power such that the litigants have a right to have their disputes resolved by an Article III court and by jury trial. As explained below, however, the proposed Science Panel independently exercises attributes of judicial power and is largely *not* subject to the supervision or control of this Court. As a result, the use of the Science Panel runs afoul of Article III (and therefore the Seventh Amendment right to a jury trial).

First, the Science Panel is tasked with determining general causation, which is generally part of a jury's role. When a jury performs that task, it is subject to the supervision of the district court, such that the jury's exercise of such judicial power is consistent with Article III. Under the terms of the proposed settlement, however, the Science Panel operates independently of the Court and it is not subject to the Court's supervision. Indeed, the Science Panel's proceedings are entirely confidential, and its causation determination is final and non-appealable.

Second, unlike a jury trial, in which the district court oversees *voir dire* to ensure selection of a fair and impartial jury, the proposed settlement precludes any court oversight as to the Science Panel's composition. Instead, the members of the Science Panel need only be approved by the Settlement Administrator. Moreover, the proposed settlement sets out numerous limitations as to which experts are eligible to participate on the Science Panel. Those limitations preclude experts who have been involved in the litigation, have communicated with experts involved in the

litigation, or have written about glyphosate.  These limitations effectively ensure that the Science Panel will be chosen primarily from scientists who have previously worked for chemical companies, which will likely result in a highly biased panel.  And, if that proves to be true, the proposed settlement does not provide any mechanism for the Court to object to or correct the Science Panel's composition.

Third, also unlike a jury trial, where the district court exercises ultimate control and oversight of factual findings (*i.e.*, by ruling on the admissibility of evidence, setting aside verdicts that are not supported by the facts or law), pursuant to the proposed settlement the Court here would lack any meaningful oversight over the Science Panel's causation determination.  The proposed settlement itself establishes what evidence the Science Panel can and cannot consider (such as new studies).  Moreover, the proposed settlement requires that the Science Panel conclude that causation is not due to chance, bias, or confounding, which is a stricter standard than this Court would apply to prove causation.

Fourth, for class members that opt out and choose to proceed to trial, the Science Panel's causation determination will play a vital part of any legal proceeding, but unlike a jury's causation determination, will not be subject to any Court review.   The Science Panel's causation determination will automatically be admissible at trial as that of an expert opinion, and the parties are not permitted to cross-examine, question, or conduct any discovery as to that determination. In addition, the Panel's findings are to be stipulated facts.  In effect, therefore, the Science Panel's causation determination is likely to be binding (and possibly determinative) in any future jury trial, taking that determination away from an impartial jury subject to the Court's supervision (and therefore compliant with Article III and the Seventh Amendment right to a jury).

In sum, the proposed settlement envisages a Science Panel that is vested with Article III powers, but without the protections required for exercising those powers.  And, the Science Panel cannot reasonably be considered a mere adjunct, permissible under Article III, because it operates independently of the Court and is not subject to its supervision.  Rather, the proposed settlement

delegates functions to the Science Panel that would otherwise be performed by a jury (under the supervision of the Court) or by the Court itself.  Thus, use of the Science Panel is inconsistent with Article III and litigants' Seventh Amendment right to a jury trial.

Although it is possible that the Science Panel's constitutional infirmities could be cured by the parties' consent, there is reason to doubt that there is adequate consent here.  First, as the Supreme Court has explained, consent is only relevant to an Article III violation that injures a personal, as opposed to a structural right.  *Sharif*, 135 S. Ct. at 1943-44; *Schor*, 478 U.S. at 848-49, 851.  Arguably, the proposed settlement implicates only individual rights since there is no inter-branch conflict.  But even assuming that to be true, there is reason to doubt that the class members have knowingly and voluntarily waived Article III's guarantee of an impartial and independent adjudicator.  For class members who opt out of the compensation fund and eventually have the opportunity to enter the tort system, it is not clear that by opting out, those class members have understood, and therefore knowingly consented to, the fact that a non-Article III body will make the causation determination that will effectively be binding on the jury.  And it is doubtful that there will even be a substantial number of class members who knowingly opt out, because it is highly unlikely that individuals not yet diagnosed with NHL will understand that they may be bound by the class action unless they opt out.

### c.  The Implementation of the Science Panel Impinges States' Rights

In addition to violating Article III, in the context of putative class members with cases filed or to be filed in state court, the requirements imposed not just on class members, but on the state courts and judges, potentially also impinges on the rights of the fifty states in the furtherance of their constitutional and judicial processes.  Section 12.3(d)(iii) instructs that a state court or tribunal must, regardless of any state law, rule, or constitutional provisions: 1) permit the admission of the Science Panel Determination as evidence; 2) permit the admission of the Science Panel Stipulation; and 3) *not instruct or otherwise tell the jury it is not bound by the stipulated facts in the Science Panel Stipulation*. ECF No. 12531-2 at § 12.3(d)(iii) (emphasis

19

added).  Thus, not only do the parties have to agree to be bound by the requirements of Settlement Agreement, but it imposes restrictions upon *state court judges*, as to that they can and cannot instruct in the course of conducting their trials.[9]  Class Counsel simply seem to take this significant imposition on states' rights as granted, and do not even discuss whether such an imposition on the authority of state courts and judges is permitted under All Writs Act, 28 U.S.C. § 1651.  That such a significant issue of the limits of federal power is not even mentioned, much less discussed in detail, is yet another telling example of the many defendant friendly restrictions and provisions that Class Counsel appear to have blithely agreed to.

B.      **The Proposed Settlement Lacks Critical Information Necessary to Allow the Court and Class Members to Properly Evaluate It**

1.      **Preliminary Approval Can Only Be Granted Upon an Extensive Factual Record**

The standard for preliminary approval of a proposed settlement under Rule 23 is high. Rule 23(e)(1) provides that that the settling parties "must provide the court" with information sufficient to establish that "the court will *likely* be able to" grant final approval and class certification. Fed. R. Civ. P. 23(e)(1) (emphasis added). The recent amendments to Rule 23 emphasize that preliminary approval "should be based on a solid record supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object." Fed. R. Civ. P. 23 and Adv. Comm. Notes, 2018 Amend. Ensuring that the record is sufficiently robust to justify final approval is especially important where, as here, no class has been certified in the action prior to settlement. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

This Court has vigilantly scrutinized proposed settlements in light of this high standard. In its July 6, 2020 Order expressing skepticism of the prior proposed settlement in this case, this

---

[9] The last-minute Amendment to the Settlement Agreement does nothing to change this concern, as even after allowing deposition testimony, the instructions to the presiding judge remain the same.

OPP. OF PUTATIVE CLASS MEMBERS TO MOT. FOR PRELIM. APPROVAL
Case No. 3:16-md-02741-VC

Court recognized that "careful scrutiny must be given to class action settlements at the preliminary approval stage." ECF No. 11182 at 2. Quoting at length from its opinion in *Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030 (N.D. Cal. 2016) (Chhabria, J.), the Court found that in "complex, expensive-to-administer settlements like the one proposed here," "lax review [of a proposed settlement] makes little practical sense, from anyone's standpoint." ECF No. 11182 at 2 (quoting *Cotter*, 193 F. Supp. 3d at 1036). This is because, among other things, if the Court "misses a serious flaw in the settlement," or "identif[ies] a potentially serious flaw at the preliminary stage but waits until final approval to conclude that it's fatal," class members could be deprived of "the court protection that Rule 23 demands" or "falsely assured that the settlement is in her best interest." *Cotter*, 193 F. Supp. 3d at 1036. The Court recognized that "by scrutinizing the agreement carefully at the initial stage and identifying any flaws that can be identified, the court allows the parties to decide how to respond to those flaws (whether by fixing them or opting not to settle) before they waste a great deal of time and money in the notice and opt-out process." *Id*. at 1037.

The Northern District of California Procedural Guidance for Class Action Settlements provides litigants and their counsel with guidance on the type of information necessary for courts to properly scrutinize a proposed settlement. Of particular importance here, settling parties are required to present courts in this District with the following information at the preliminary approval stage:

> e.     The anticipated class recovery under the settlement, the potential class recovery if plaintiffs had fully prevailed on each of their claims, ***and an explanation of the factors bearing on the amount of the compromise***.

*See* Proc. Guidance for Class Action Sett., Prelim. Appr., ¶1(e) (emphasis added).[10]

With that guidance in mind and examined considering the rigorous standard of Rule 23(e), the Settlement Agreement and accompanying motion reveals that the parties have once

---

[10] Available at https://cand.uscourts.gov/ClassActionSettlementGuidance (last updated Dec. 5, 2018).

OPP. OF PUTATIVE CLASS MEMBERS TO MOT. FOR PRELIM. APPROVAL
Case No. 3:16-md-02741-VC

again failed to provide the Court with enough information to evaluate the propriety of the proposed settlement. In particular, the proposed settlement is deficient with respect to two key issues, which are described in detail below:

First, the proposed settlement and accompanying motion lack the necessary factual foundation that would inform the Court and class members whether class members are receiving grossly disproportionate treatment as compared to the plaintiffs in the inventory settlements negotiated by Monsanto.

Second, the settlement documents do not to include any declarations from subclass counsel attesting to their independent representation and compensation, a necessary requirement to ensure that there are no conflicts of interest between subclasses comprised of both class members with a present NHL diagnosis and those without.

Because the Court cannot apply the rigorous scrutiny to the proposed settlement required by Rule 23 at this stage without a sufficient factual record on these issues, it should either require the parties to supplement the record to address these concerns or deny preliminary approval.

## 2. Neither the Court nor Future Claimants Can Determine if the Compensation Offered Under the Settlement is Fair and Reasonable

The Settlement Agreement provides for two types of compensation: Accelerated Payment Awards and Claims Program Awards. Accelerated Payment Awards of $5,000 are available on an expedited basis and require only a streamlined showing of exposure and diagnosis. *See* ECF No. 12531-2 at §§ 6.1(a)(i), 7.2(a). Class members may be eligible for a Claims Program Award purportedly ranging from $10,000 to $200,000 (or supposedly more under an undefined and unchallengeable "extraordinary circumstances" scenario subject to the unfettered discretion of the Class Administrator) if they submit more detailed records for review. *Id.* at §§ 6.2(a)(ii), 7.2(b). The amount awarded to an individual claimant is determined using a four-tier structure, with predetermined award ranges for those who meet the criteria for each tier as determined by

the Class Administrator, but with no explanation for how a particular claimant will receive a specific award within that range. *Id*. at Ex. 5.

These predetermined awards, which all require a diagnosis of NHL at minimum, are undeniably modest on their face for claims arising out of a diagnosis of an aggressive cancer. The Settlement Agreement provides for $10,000 for Tier 1, $10,000-$25,000 for Tier 2, $25,000-$65,000 for Tier 3, and $65,000-$200,000 for Tier 4.[11] *Id*. Upon closer inspection, the amount of these awards demands additional scrutiny because of the difficulty for class members to qualify for compensation under either Tier 3 or Tier 4. For example, to even be considered for Tier 3 status, and thus a *maximum* award of $65,000, a claimant must meet the following, non-exhaustive criteria:

(a) be under 60 years old at the time of an NHL diagnosis;

(b) have medical records showing the absence any of the following "Group A" medical conditions: "First Degree Relative with NHL, First Degree Relative with Other Lymphoma, Leukemia or Myeloma, Organ or Stem Cell Transplant, Certain Autoimmune Disorders, Epstein-Barr virus under certain circumstances, Certain Immunosuppressive Medications, HIV/AIDS, Hepatitis C virus, Certain Bacterial Infections, or Radiation Exposure as treatment for prior cancer"; and

(c) have proof of exposure to Roundup Products with frequency and duration of exposure of not less than 36 months.

---

[11] Proponents of the settlement filed a proposed amendment to the Settlement Agreement the day before this brief was due [D.E. 12665]. As part of that proposed amendment, proponents now allow for a putative class member in any tier, not just Tier 4, to apply for an additional award in "Extraordinary Circumstances." This modification, however, only makes the problem of the tiers worse, giving the Class Administrator complete discretion to award some putative class members an undefined amount for an undefined reason, without any change to the total dollar amount available for compensation either under the specific Tier categories or under the "Extraordinary Circumstances" cap. As discussed *infra*, the total settlement amount is unlikely to be sufficient to pay all putative class members at the end of the four-year initial settlement period, and this addition of effectively unfettered discretion on the part of the claims administrator to pay certain putative class members extra only adds to that concern.

OPP. OF PUTATIVE CLASS MEMBERS TO MOT. FOR PRELIM. APPROVAL
Case No. 3:16-md-02741-VC

*See* ECF No. 12531-2, Ex. 5 at 3-4.

As onerous as those Tier 3 requirements are, the Settlement Agreement contemplates that some claimants meeting those requirements may receive as little as $25,000. Furthermore, obtaining a Tier 4 classification is nearly impossible. Indeed, to be eligible for the highest range of compensation under the Settlement Agreement of $65,000 to $200,000, a claimant must:

(a)  be under 45 years old at the time of an NHL diagnosis;

(b)  not have an history *any* of the Group A medical conditions listed above;

(c)  not have a history *any* of the following "Group B" medical conditions: "Cancer, First-Degree or *Second-Degree* Family Member with History of Cancer, Smoking (current smoker or former smoker with I [sic] ppd/20 year history), Hepatitis B virus, Obesity at time of diagnosis of NHL (Body Mass Index greater than 30), Diabetes, or Breast Implants in certain circumstances";

(d)  not have been employed in any of the following occupations: cleaning service, electrician, hairdressing, handling fission products/jet propellant/solvents, metal working, painting, pest exterminator, petroleum refinery, textiles, woodworking, x- or gamma radiation"; and

(e)  provide proof of exposure to Roundup Products with frequency and duration of exposure in excess of 60 months.

*See Id.*

To illustrate the unlikelihood of a claimant obtaining Tier 4 status, consider the following example: a 25-year-old with a clean personal and family health record who has been exposed to Roundup since she began working at age 18, and who develops NHL and goes blind as a result, will be ineligible for Tier 4 compensation, and thus subject to a maximum payout of $65,000, if she was born with diabetes. If that same claimant did not have diabetes and instead had a pristine heath record prior to her NHL diagnosis, she would nevertheless be limited to Tier 3 compensation if her uncle, a second-degree family member, has a history of prostate cancer.

The paucity of the Claim Program Awards is laid bare when viewed in relation to the astronomical verdicts returned against Monsanto in favor of the plaintiffs in each of the three cases that have proceeded to trial to date. In those three cases, the juries returned damages awards in the aggregate amount of approximately $2.5 billion. *See Pilliod v. Monsanto Co.*, Alameda Superior Court Case No. RG17862702 (damages award of $2.055 billion reduced to $86.7 million); Hardeman v. Monsanto Co., No. 3:16-cv-00525 (N.D. Cal.) (damages award of $80 million reduced to $25.2 million); *Johnson v. Monsanto Co.*, 52 Cal. App. 5th 434 (2020), *pet. for rev. denied* (Oct. 21, 2020) (damages award of $289 million reduced to $10.2 million).[12] The contrast between what those plaintiffs would have received under the proposed settlement and the verdicts they received is shocking. If each of the plaintiffs had submitted their claims under the proposed settlement's compensation structure instead, all of the plaintiffs, Mr. and Mrs. Pilliod, Mr. Hardeman, and Mr. Johnson, would have all fallen within Tier 2, and thus their award would have ranged from $10,000 to a maximum of $25,000 each.[13]

Of course, the very nature of a settlement is a compromise of claims in order to reduce the risk of an unfavorable result at trial, so these verdicts—while illuminating—are an imperfect measure of the fairness of the proposed settlement. But attempting to evaluate the fairness of the proposed settlement in other ways exposes a critical flaw of the Settlement Agreement and Motion for Preliminary Approval: there is no explanation of how the parties arrived at the agreed-upon Claims Program Award amounts in the tier structure. Thus, there is no basis for the Court to determine whether "the relief provided for the class is adequate." Fed. R. Civ. P. 23(e)(2)(C). The lack of this vital information also runs afoul of this District's Procedural Guidance requirement that the parties provide "an explanation of the factors bearing on the amount of the compromise." *See* Proc. Guidance for Class Action Sett., Prelim. Appr., ¶1(e).

---

[12] Only *Johnson* is final. *Pilliod* and *Hardeman* are pending on appeal.
[13] Mr. & Mrs. Pilliod and Mr. Hardeman were all over 60 years old, limiting them to Tier 2; Mr. Johnson was 45, however, his exposure before diagnosis was under 36 months, again limiting him to Tier 2.

OPP. OF PUTATIVE CLASS MEMBERS TO MOT. FOR PRELIM. APPROVAL
Case No. 3:16-md-02741-VC

Without this information, the Court cannot engage in the rigorous scrutiny required by Rule 23(e).

There is, however, another data point by which the proposed settlement could be measured. As the Motion for Preliminary Approval briefly notes, Monsanto has separately agreed to resolve the majority of its outstanding cases with present claimants. *See* ECF 12531 at 42 (citing Bayer AG June 24, 2020 Press Release, which states that the settlement amount is $8.8 billion to $9.6 billion). Class Counsel's Motion for Preliminary Approval hints at the terms of those inventory settlements as a possible basis for the amounts of the Claims Program Awards here, stating that the awards "were negotiated in the wake of the inventory deals resolving the majority of outstanding individual cases." *Id.* The Motion also extolls the virtue of the proposed settlement on the grounds that the allocation factors are like those used in the inventory settlements, stating: "the compensation fund uses objective factors and a tier system common to mass tort settlements." *Id.*

Thus, the Motion draws a direct line between the allocation of compensation in the inventory settlements and the Claims Program Awards in the proposed settlement. Yet despite that connection and the obvious similarities between the plaintiffs in the inventory settlements and class members here, Monsanto, who controls access to that information, has not provided the Court with any details about the terms of the inventory settlements, including the payment amounts, the compensation framework, eligibility requirements, medical exclusions, and the required quantum of proof demanded, all of which appear in the proposed settlement for class members.[14] Such information would allow this Court to compare the compensation offered to

---

[14] This information is likely covered by confidentiality agreements or a protective order, however, Monsanto could provide it in anonymized summary format, including a settlement matrix with compensation tiers, much like the one attached to the Settlement Agreement. However, according to publicly available sources, Bayer reserved $10.9 billion to settle all claims related to Roundup, of which $2 billion is being used for this proposed class settlement, leaving approximately $8.9 billion to settle what are approximately 125,000 individual claims currently pending. *See, https://www.wsj.com/articles/bayer-posts-third-quarter-loss-on-agriculture-woes-11604393190.* Assuming all of these individual cases are paid out of this reserve, simple math would result in an average case value of $71,200 per case. In the

OPP. OF PUTATIVE CLASS MEMBERS TO MOT. FOR PRELIM. APPROVAL
Case No. 3:16-md-02741-VC

nearly identically-situated individuals, all of whom are seeking compensation due to an NHL diagnosis after prolonged exposure to Roundup. It would also reveal whether factors that exclude class members from placement in higher tiers under the proposed settlement were also used to limit compensation under the inventory settlements, or whether those exclusionary factors were manufactured under the proposed settlement for the purpose of depressing the monetary value of the claims.

Because Monsanto has not presented the Court with this highly-relevant information in connection with the proposed settlement, the Court lacks key information that would allow it to identify whether the class members are receiving disproportionate treatment as compared to the plaintiffs in the inventory settlements that Monsanto separately negotiated. While there are other factors to consider when evaluating the fairness of the proposed settlement as a whole, a finding that the Claims Program Awards in the proposed settlement are grossly disproportionate to those in the inventory settlements would carry substantial weight and may warrant a rejection of the settlement as a whole. This is especially true because, as discussed above, the parties provide no other explanation for how they arrived at the amounts of the Claims Program Awards, or even what factors were used in arriving at those amounts during negotiations.

Further, despite Mr. Eveland's declaration, it is unlikely that the amount set aside in the settlement to pay class claims, $1.325 billion, will be enough to fully pay even the claims of all class members at the end of four years. First, Mr. Eveland's declaration is based upon assumption upon assumption, only some of which Mr. Eveland supports with data. One of the key assumptions which Mr. Eveland makes, however, in order to get to his conclusion, is that only 35% of submitted claims will be approved for *any award at all*. *See*, Eveland Decl. at p. 10 para. 17 [D.E. 12509-15]. He provides no justification for this enormous reduction other than his

---

declaration of Mr. Eveland submitted in support of the Motion, Mr. Eveland's numbers show that putative class members, however, will only receive an average of $25,587 ($1,207,372,500 in total compensation awards divided by $47,187 approved claims), or approximately one-third of the average individual recovery. *See,* Eveland Decl. at p.13 Table 3 [D.E. 12509-15].

OPP. OF PUTATIVE CLASS MEMBERS TO MOT. FOR PRELIM. APPROVAL
Case No. 3:16-md-02741-VC

supposed experience with "other personal injury trusts with similar requirements for proof of injury and product exposure." By not providing any data regarding the specifics of these "other personal injury trusts," neither objectors nor the Court can determine whether this huge reduction is justified in any way. Further, Mr. Eveland has *already* up to that point reduced the total number of potential class members making claims to just 7.5% of those with NHL diagnosis potentially falling in Subclass 1 and 27.7% of those with an NHL diagnosis potentially falling in Subclass 2. *Id.* at pp. 7-10, paras. 14-16, and Table 1. Those reductions are supposedly made on the basis of the ratio of current claims either filed in court or with retained lawyers with a slight bump due to notice. Presumably, however, the lawyers who have accepted such clients *have already determined those are valid claims*. Thus, Mr. Eveland *double counts* the elimination of potentially invalid claims, first by reducing the newly expected claims based upon the number of estimated plaintiffs to date, then *again* by reducing for supposedly invalid claims. Without Mr. Eveland's reduction to just 35% the number of valid claims paid, Mr. Eveland's own calculations show that the amount necessary in settlement to pay just the claims he expects to be filed over the next four years would be approximately $3.5 billion, not $1.325 billion.

In its Order regarding the prior settlement, the Court asked why, given the significant damages awarded by juries in these cases "would a potential class member want to replace a jury trial and the right to seek punitive damages with the process contemplated by the settlement agreement?" ECF No. 11182 at 3. The proposed settlement leaves the question unanswered. Accordingly, there is no "solid record" upon which the Court can grant preliminary approval under Rule 23(e).

### 3.  The Record Lacks Any Evidence That Subclass 2 Was Adequately and Independently Represented.

In *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 597, 620 (1997), the Supreme Court held that Rule 23(a)(4)'s adequacy-of-representation requirement demands "heightened" rigor for settlement classes and reversed a "class-action certification [that] sought to achieve global

settlement of current and future asbestos-related claims." Because the settlement's "essential allocation decisions" favored some claimants over others, class members' interests were "not aligned," and the Court could find no assurance — "either in the terms of the settlement or in the structure of the negotiations — that the future claimants were adequately represented." *Id.* at 626-27.

Only two years later, in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 858 (1999), the Supreme Court again invalidated a global settlement that lacked structural protections "at the precertification stage." The Court stressed that "the District Court took no steps at the outset to ensure that the potentially conflicting interests of easily identifiable categories of claimants [would] be protected" to guard against potential conflicts, "relying instead on its post-hoc findings at the fairness hearing." *Id.* at 831-32. Unlike *Amchem*, which concentrated on the adequacy of the named plaintiffs, this time the Court trained its attention on class counsel. *Id.* at 856 n.31. It is "obvious after *Amchem*," the Court held, that a class of "present and future claims" "requires division into homogeneous subclasses" with "separate representation to eliminate conflicting interests of counsel." *Id.* at 856.

In both cases, the Supreme Court confronted the question of what "structural assurance[s]" are necessary to guarantee that a settlement-only class of all claimants who may one day hold a particular claim—the currently injured, as well as those not yet manifesting injury—reflects "fair and adequate representation for the diverse groups and individuals." *Amchem*, 521 U.S. at 627; *see Ortiz*, 527 U.S. 815.

The proposed settlement ostensibly satisfies *Amchem's* and *Ortiz's* structural protection requirements. First, the class members are separated into two Subclasses based on whether the member has been diagnosed with NHL as of February 3, 2021. Class members who did receive an NHL diagnosis and therefore will be able to seek Claims Program Awards immediately upon final approval are in Subclass 1, while Subclasses 2 includes members who have not been

diagnosed with NHL as of February 3, 2021. Both Subclasses include their members' Derivative Claimants. *See* ECF No. 12531-2 at § 1.2.

Additionally, consistent with *Amchem* and *Ortiz*, the Motion for Preliminary Approval seeks to appoint Elizabeth Fegan and TerriAnne Benedetto as separate counsel for Subclass 2 (in addition to their appointment as Class Counsel). ECF No. 12531 at 8. But *Amchem* and *Ortiz* require more than the naming of separate subclass counsel as a formality — they require that the Court "ensure" that the potentially conflicting interests of Subclass members are actually protected. See *Ortiz*, 527 U.S. at 832.

Based on the record before it, the Court cannot determine whether the interests of Subclass 2 members are adequately protected because the Motion does not describe the details of counsel's representation. The Motion states only that "this Settlement followed *Amchem*'s suggestion and included subclasses, each represented throughout the negotiation process for this Settlement by separate representatives and counsel." ECF No. 12531 at 28. Moreover, neither Ms. Fegan nor Ms. Benedetto filed Declarations describing their representation of Subclass 2. In fact, the only description of their work that is even arguably specific to their representation of Subclass 2 is confined to one short paragraph in the Decl. of Elizabeth J. Cabraser, which states:

> At all times during the necessary stages of the negotiations, the Subclasses were also represented by ... proposed Subclass Counsel (William Audet for Subclass One; TerriAnne Benedetto and Elizabeth Fegan for Subclass Two).

*See* ECF No. 12531-1 at ¶12.

That is hardly enough information for the Court to conclude that Subclass 2 was adequately represented. The proposed settlement treats the requirement of separate representation as a mere formality, and consequently there is simply no information in the record about what Ms. Fegan and Ms. Benedetto did to independently represent and protect the interests of the members of Subclass 2.

Rule 23(a)'s adequacy of representation requirement cannot be so casually disregarded here because there is a very strong potential conflict between the interests of those with present claims and those with future claims under the terms of the Settlement Agreement. Specifically, the proposed settlement expires after four years if the parties do not mutually agree to an extension, at which point Monsanto can walk away after paying $200 million as an "End Payment" to be allocated among the compensation fund and research programs. *See* ECF No. 12531-2 at § 13.3(b)(i). Perhaps obviously, if Monsanto chooses to walk away, the compensation funds will not be replenished once they are depleted by claims.

Therefore, class members who have been diagnosed with NHL—Subclass 1—are most likely to actually receive at least some payment from the compensation fund, while there is no assurance that any compensation will be available to members who have not yet developed NHL and may not until after the proposed settlement expires—members of Subclass 2, which Class Counsel admits is the "majority of class members." ECF No. 12531 at 34. Yet unless they opt-out of the settlement before they suffer any injury as a result of Roundup exposure, members of Subclass 2 will remain bound by the other provisions of the proposed settlement, including losing their ability to seek punitive damages, as well as the Science Panel provisions described above, whereby they will be left with no choice but to enter the tort system with the burdens of the Science Panel's confidential and un-rebuttable determinations.

This potential conflict in the proposed settlement raises the possibility that the interests of members of Subclass 2 were improperly sacrificed in order to obtain guaranteed compensation for members of Subclass 1. In *Amchem*, the Supreme Court zeroed in on this divide between present and future claims as the "most salient[]" intra-class conflict, explaining that, "for the currently injured, the critical goal is generous immediate payments," but "[t]hat goal tugs against the interest of [future-injury] plaintiffs," who may not "realize the extent of the harm they may incur," and thus would "seek sturdy back-end opt-out rights and 'causation provisions that keep pace with changing science and medicine, rather than freezing in place the science.'" 521 U.S. at

31

610-11, 626, 628. Unless the Court can ensure that this fundamental conflict has been accounted for, the proposed settlement provides "no structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Id.* at 627.

Class Counsel may argue that other provisions of the proposed settlement, such as the Diagnostic Accessibility Grant Program, inure solely to the benefit of Subclass 2 and therefore ensure that the Subclasses equally benefit from the settlement. That is not true. Without getting into the detailed problems posed by the Diagnostic Accessibility Grant Program, not the least of which is that there is no standardized medical early screening test for NHL, here, as in *Amchem*, neither "the terms of the settlement" nor "the structure of the negotiations" alone can assure the Court that the all members of the class have been adequately represented. *Id*. Concerns about these potentially discriminatory terms could only be alleviated by a factual foundation that would allow the Court and members of Subclass 2 to ensure that the terms are fair, adequate, and reasonable. Counsel for Subclass 2's failure to proffer any details about their purported independent representation of those class members and how their interests were adequately represented renders the proposed settlement deficient, because if the Court cannot ensure that this fundamental conflict was accounted for by counsel and sub-class representatives, the parties' "global compromise" can provide "no structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Id.*

Finally, these conflict of interest concerns are amplified by the lack of any information about how counsel for Subclass 2 is being compensated for their purportedly independent representation of the Subclass. By seeking to be appointed as both Class Counsel and counsel for Subclass 2, ECF No. 12531 at 8, and given that there is only one pot of attorneys' fees requested, *id*. at 22-23, it appears that Ms. Fegan and Ms. Benedetto will be compensated out of the same pot of attorneys' fees as all other attorneys representing the class, including those attorneys representing Subclass 1. As in *Ortiz*, this creates a serious risk of skewed incentives, because "with an already enormous fee within counsel's grasp, zeal for the client may relax sooner than it

32

would in a case brought on behalf of one claimant." 527 U.S. at 852 n.30. As such, this structure may be an "example of the conflict noted in *Amchem.*" *Id.* at 853.

This additional concern solidifies the conclusion that the Court cannot evaluate the fairness of the proposed settlement without details regarding the adequacy of counsel's representation of Subclass 2.

## III.    CONCLUSION

For at least the foregoing reasons, as well as those advanced by other objectors, putative class members respectfully request that the Court deny the Motion.

Dated: March 4, 2021                         Respectfully Submitted,

                                   By:    /s/ *Behram V. Parekh*
                                          Behram V. Parekh, CA SBN 180361
                                          DALIMONTE RUEB STOLLER LLP
                                          515 S. Figueroa Street, Suite 1550
                                          Los Angeles, California 90071
                                          T: 619.821.2305
                                          F: 855.203.2035
                                          E: behram.parekh@drlawllp.com

                                          *Counsel for putative class member*
                                          *Adam Williams*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 4th day of March, 2021, a copy of the foregoing Motion was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

By: <u>/s/ *Behram V. Parekh*</u>
   Behram V. Parekh, CA SBN 180361
   DALIMONTE RUEB STOLLER LLP
   515 S. Figueroa Street, Suite 1550
   Los Angeles, California 90071
   T: 619.821.2305
   F: 855.203.2035
   E: <u>behram.parekh@drlawllp.com</u>

   *Counsel for putative class member*
   *Adam Williams*