Russell Post
BECK REDDEN LLP
1221 McKinney Street, Suite 4500
Houston, TX 77010
Telephone: (713) 951-3700
Fax: (713) 951-3720
rpost@beckredden.com

David F. Engstrom (SBN 314688)
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: (650) 721-5859
Fax: (650) 725-0253
dfengstrom@law.stanford.edu

*Counsel for Objectors Arnold & Itkin LLP and Kline & Specter, P.C.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL NO. 2741 |
| | Case No. 3:16-md-02741-VC |
| THIS DOCUMENT RELATES TO: | **Memorandum of Law in Opposition to Motion for Preliminary Approval of Proposed Class Settlement, Appointment of Interim Class and SubClass Counsel, Direction of Notice under Fed. R. Civ. P. 23(e), Scheduling of a Fairness Hearing, and Stay of the Filing and Prosecution of Roundup-Related Actions by Settlement Class Members** |
| Ramirez, et al. v. Monsanto Co., | |
| Case No. 3:19-cv-02224 | |
| | Re:    Dkt. No. 12531 |
| | Date:   March 31, 2021 |
| | Time:  10:00am |
| | Place:  Courtroom 4, 17th Floor |
| | Judge:  Honorable Vince Chhabria |

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

 I. The Notice Program Fails to Satisfy Bedrock Principles of Due Process ........................................................................................................... 2

  A. Constitutionally Adequate Notice Must Assure "Informed Decisions" ........................................................................................... 2

  B. The Amorphous and Uncertain Nature of This Exposure-Only Class Forecloses Adequate Notice and an "Informed Decision" ................ 3

  C. The Content of the Proposed Notice Compounds the Inherent Problems with the Proposed Settlement Class ........................................... 9

 II. The Proposed Class Action Violates Rule 23's Vital Structural Safeguards ........................................................................................................ 13

  A. Plaintiffs' Proposed Class Fails Threshold Requirements for Certification Because Individualized Factual and Legal Questions Predominate ................................................................................ 13

   1. Predominance Is More, Not Less, Important in the Settlement Class Action Context ..................................................... 13

   2. The Proposed Class Action Fails to Satisfy Rule 23 Because the Claims Present Overwhelming Factual and Legal Variations ..................................................................... 16

   3. Plaintiffs' Assorted Efforts to Overcome the Predominance of Individualized Law and Fact Issues Fail ..................................................................................... 21

  B. The Proposed Class Action Fails to Meet Adequacy Under Rule 23(a)(4) ............................................................................... 25

   1. Putative Class Counsel Failed to Follow Pre-Certification Procedural Formalities ............................................. 26

   2. Allocational Conflicts Abound ..................................................... 28

   3. The Proposed Class Action Poses Elemental Adequacy Problems ....................................................................... 30

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC i

III.   The Proposed Settlement Is Not Fair, Reasonable, or Adequate ...........................33

    A.   The Proposed Settlement's Lowball Value to Putative Class Members Is Unfair, Unreasonable, and Inadequate ...................................34

    B.   The Proposed Settlement Imposes Numerous Unfair and Unreasonable Constraints on Putative Class Members' Litigation Rights .............................................................................................35

        1.   The Unexplained Four-Year Litigation Standstill .........................36

        2.   The Surrender of Punitives Damages ............................................38

        3.   The Juror-Baffling Science Panel ..................................................40

CONCLUSION ........................................................................................................44

CERTIFICATE OF SERVICE ................................................................................45

APPENDIX

    A     Declaration of Professor Howard M. Erichson

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    ii

# TABLE OF AUTHORITIES

**Case**                                                                                                              **Page(s)**

*Acosta v. Trans Union, LLC,*
   243 F.R.D. 377 (C.D. Cal. 2007) ........................................................................................29

*Allen v. McCurry,*
   449 U.S. 90 (1980).............................................................................................................43

*Amchem Products, Inc. v. Windsor,*
   521 U.S. 591 (1997).................................................................................................. *passim*

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)...........................................................................................................42

*Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas,*
   571 U.S. 49 (2013).............................................................................................................17

*Bell v. 3M Co.,*
   344 F. Supp. 3d 1207 (D. Colo. 2018)..............................................................................19

*In re Bluetooth Headset Prods. Liab. Litig.,*
   654 F.3d 935 (9th Cir. 2011) .............................................................................................26

*Briseno v. ConAgra Foods, Inc.,*
   844 F.3d 1121 (9th Cir. 2017) .......................................................................................2, 5

*Buchanan v. Tata Consultancy Servs., Ltd.,*
   No. 15-CV-01696-YGR, 2017 WL 6611653 (N.D. Cal. Dec. 27, 2017) ...........................24

*Castano v. American Tobacco Co.,*
   84 F.3d 734 (5th Cir. 1996) ..............................................................................................18

*Chinitz v. Intero Real Estate Servs.,*
   2020 WL 7042871 (N.D. Cal. Dec. 1, 2020) .....................................................................6

*Clark v. Cantrell,*
   529 S.E.2d 528 (S.C. 2000) ..............................................................................................39

*Comcast Corp. v. Behrend,*
   569 U.S. 27 (2013).............................................................................................................13

*Connecticut Ret. Plans & Tr. Funds v. Amgen Inc.,*
   660 F.3d 1170 (9th Cir. 2011), *aff'd*, 568 U.S. 455 (2013)................................................13

*Daniel F. v. Blue Shield of California,*
   305 F.R.D. 115 (N.D. Cal. 2014) ......................................................................................24

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC

iii

*DeLuca v. Merrell Dow Pharm.*,
 911 F.2d 941 (3d Cir. 1990)..........................................................................................42

*Dewey v. Volkswagen Aktiengesellschaft*,
 681 F.3d 170 (3d Cir. 2012)..........................................................................................27

*In re Diet Drugs*,
 No. 1203, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000)..........................9, 22, 30, 36

*Eisen v. Carlisle & Jacquelin*,
 417 U.S. 156 (1974).................................................................................................2, 4

*Ferrington v. McAfee, Inc.*,
 No. 10-cv-01455-LHK, 2012 WL 1156399 (N.D. Cal. Apr. 6, 2012) ..............29, 34

*Fitzhenry-Russell v. Coca-Cola Co.*,
 No. 5:17-CV-00603-EJD, 2019 WL 11557486 (N.D. Cal. Oct. 3, 2019) ..................5

*In re Fosamax Prod. Liab. Litig.*,
 248 F.R.D. 389 (S.D.N.Y. 2008) ..................................................................................23

*Fount-Wip, Inc. v. Reddi-Wip, Inc.*,
 568 F.2d 1296 (9th Cir. 1978) ......................................................................................42

*In re General Motors Corp. Pick-Up Truck Fuel Tank*
 *Products Liability Litigation*,
 55 F.3d 768 (3d Cir. 1995)....................................................................................15, 29

*Georgine v. Amchem Prods.*,
 83 F.3d 610 (3d Cir. 1996).........................................................................4, 7, 8, 9

*Hanlon v. Chrysler Corp.*,
 150 F.3d 1011 (9th Cir. 1998) ..........................................................15, 21, 25, 32, 33

*Hardeman v. Monsanto Co.*,
 No. 16-525 (N.D. Cal.) ................................................................................................32

*Hefler v. Wells Fargo & Co.*,
 No. 16-CV-05479-JST, 2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) ...................35

*Hernandez v. Burger*,
 102 Cal. App. 3d 795 (1980) .......................................................................................17

*Hill v. Novartis Pharm. Corp.*,
 No. 1:06-CV-00939-AWI, 2012 WL 967577 (E.D. Cal. Mar. 21, 2012)................18

*Hoge v. Parkway Chevrolet, Inc.*,
 No. CIV.A. H-05-2686, 2007 WL 3125298 (S.D. Tex. Oct. 23, 2007) ......................6

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    iv

*Hubbard v. RCM Techs. (USA)*,
    No. 19-CV-06363-YGR, 2020 WL 6149694 (N.D. Cal. Oct. 20, 2020) ..................... 10, 12, 13

*Hughes v. Kore of Ind. Enter., Inc.*,
    731 F.3d 672 (7th Cir. 2013) ........................................................................................... 5

*In re Hyundai & Kia Fuel Economy Litigation*,
    926 F.3d 558 (9th Cir. 2019) ........................................................................... 14, 21, 25

*Jabarri v. Farmer*,
    965 F.3d 1001 (9th Cir. 2020) ..................................................................................... 14

*Jacobs v. CBS Broadcasting, Inc.*,
    291 F.3d 1173 (9th Cir. 2002) ..................................................................................... 43

*Johnson v. Monsanto Co. et al.*,
    No. GC16550128 (Cal. Super.) .................................................................................... 32

*Johnson v. Raybestos-Manhattan, Inc.*,
    740 P.2d 548 (Haw. 1987) ..................................................................................... 19, 32

*Juris v. Inamed Corp.*,
    685 F.3d 1294 (11th Cir. 2012) ..................................................................................... 8

*Levya v. Medline Indus. Inc.*,
    716 F.3d 510 (9th Cir. 2013) ....................................................................................... 23

*Lewallen v. Medtronic USA, Inc.*,
    No. C 01-20395 RMW, 2002 WL 31300899 (N.D. Cal. Aug. 28, 2002) ..................... 20

*Local Joint Executive Bd. of Culinary/Bartender Trust Fund*
    *v. Las Vegas Sands, Inc.*,
    244 F.3d 1152 (9th Cir.), *cert. denied*, 534 U.S. 973 (2001) ..................................... 14

*Lozano v. AT & T Wireless Servs., Inc.*,
    504 F.3d 718 (9th Cir. 2007) ................................................................................. 18, 20

*Mars Steel v. Continental Illinois Nat'l Bank & Trust*,
    834 F.2d 677 (7th Cir. 1987) ....................................................................................... 15

*Mathias v. Accor Economy Lodging, Inc.*,
    347 F.3d 672 (7th Cir. 2003) (Posner, J.) ................................................................... 38

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ................................................................................. 18, 24

*Meachem v. Wing*,
    227 F.R.D. 232 (S.D.N.Y.) ............................................................................................. 7

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                               v

*Miller v. Ghirardelli Chocolate Co.*,
  No. 12-CV-04936-LB, 2015 WL 758094 (N.D. Cal. Feb. 20, 2015)........................................5

*Mirfasihi v. Fleet Mortg. Corp.*,
  356 F.3d 781 (7th Cir. 2004) ........................................................................................29

*Molski v. Gleich*,
  318 F.3d 937 (9th Cir. 2003) ..................................................................10, 12, 29, 35

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
  339 U.S. 306 (1950)............................................................................................2, 6

*In re Nat. Football League Players' Concussion Injury Litig.*,
  307 F.R.D. 351 (E.D. Pa. 2015)..................................................................8, 10, 22

*In re Nissan Motor Corp. Antitrust Litig.*,
  552 F.2d 1088 (5th Cir. 1977) ........................................................................10

*O'Donovan v. CashCall, Inc.*,
  278 F.R.D. 479 (N.D. Cal. 2011)........................................................................24

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*,
  910 F. Supp. 2d 891 (E.D. La. 2012) ..........................................................9, 23

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999)........................................................................................30

*Paz v. Brush Engineered Materials, Inc.*,
  555 F.3d 383 (5th Cir. 2009) ........................................................................19

*Pilliod v. Monsanto Co.*,
  No. RG17862702 (Cal. Super.)..............................................................................32

*Potter v. Firestone Tire & Rubber Co.*,
  863 P.2d 795 (Cal. 1993) ................................................................................19

*Public Utility Dist. No. 1 of Snohomish County, Washington
  v. Federal Emergency Management Agency*,
  371 F.3d 701 (9th Cir. 2004) ........................................................................43

*Renaud v. Martin Marietta Corp.*,
  749 F. Supp. 1545 (D. Colo. 1990), *aff'd*, 972 F.2d 304 (10th Cir. 1992) ..............................42

*Rodriguez v. West Publishing Corporation*,
  565 F.3d 948 (9th Cir. 2009) ........................................................................39

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
  944 F.3d 1035 (9th Cir. 2019) ........................................................................10

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                                    vi

*Rollins v. Dignity Health,*
    336 F.R.D. 456 (N.D. Cal. 2020)....................................................................................29, 30

*S.A. Empresa De Viacao Aerea Rio Grandense v. Boeing Co.,*
    641 F.2d 746 (9th Cir.1981) ........................................................................................17

*Schneider v. Chipotle Mexican Grill, Inc.,*
    No. 16-cv-02200-HSG, 2020 WL 511953 (N.D. Cal. Jan. 31, 2020) .......................5

*Senne v. Kansas City Royals Baseball Corp.,*
    934 F.3d 918 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 248 (2020)..........................18

*Six Mexican Workers v. Ariz. Citrus Growers,*
    904 F.2d 1301 (9th Cir. 1990) ....................................................................................35

*Spann v. J.C. Penney Corp.,*
    314 F.R.D. 312 (C.D. Cal. 2016)................................................................................10

*Stanley v. Novartis Pharm. Corp.,*
    11 F. Supp. 3d 987 (C.D. Cal. 2014) .........................................................................18

*In re Telectronics Pacing Systems, Inc.,*
    172 F.R.D. 271 (S.D. Ohio 1997)...............................................................................30

*United States v. Microsoft,*
    147 F.3d 935 (D.C. Cir. 1998) ....................................................................................42

*Valentino v. Carter-Wallace, Inc.,*
    97 F.3d 1227 (9th Cir. 1996) ......................................................................................24

*Vassallo v. Baxter Healthcare Corp.,*
    696 N.E.2d 909 (Mass. 1998) .....................................................................................19

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.,*
    895 F.3d 597 (9th Cir. 2018) ......................................................................................33

*In re Volkswagen,*
    895 F.3d at 610–11 ......................................................................................................33

*In re Wal-Mart Stores, Inc.,*
    No. 06-02069 SBA, 2008 WL 1990806 (N.D. Cal May 2, 2008) .............................6

*Walker v. Liggett Group, Inc.,*
    175 F.R.D. 226 (S.D. W.Va. 1997).............................................................................30

*Wash. Mutual Bank, FA v. Superior Court,*
    15 P.3d 1071 (Cal. 2001) ............................................................................................17

*Watts v. S. Bound R.R. Co.,*
    38 S.E. 240 (S.C. 1901) ..............................................................................................39

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC        vii

*Yandle v. PPG Indus., Inc.*,
　　65 F.R.D. 566 (E.D. Tex. 1974).................................................................4

*Zepeda v. Paypal, Inc.*,
　　No. C 10-1668 SBA, 2017 WL 1113293 (N.D. Cal. Mar. 24, 2017)..................40

*Zinser v. Accufix Research Inst., Inc.*,
　　253 F.3d 1180 (9th Cir. 2001) ...................................................17, 18, 19, 24, 30

**Statutes**

Cal. Civ. Proc. Code § 377.34 ............................................................................36

**Rules**

Fed. R. Civ. P.
　　23...............................................................................................................3
　　23(c)(2)(B) ...........................................................................................2, 4
　　23(e)(2) .....................................................................................................33

**Other Authorities**

Elizabeth J. Cabraser & Samuel Issacharoff,
　　*The Participatory Class Action*,
　　92 N.Y.U. L. Rev. 846, 859 (2017) .......................................................23

Center for Justice & Democracy,
　　*Fact Sheet: Caps on Compensatory Damages:  A State Law Summary*
　　(Aug. 22, 2020), https://centerjd.org/content/fact-sheet-caps-compensatory-
　　damages-state-law-summary..................................................................20

Thomas B. Colby,
　　*Clearing the Smoke from Philip Morris v. Williams:*
　　*The Past, Present, and Future of Punitive Damages*,
　　118 Yale L.J. 392, 479 (2008) ...............................................................39

Wilson Elser,
　　*Punitive Damages Review, 50-State Survey* (2014),
　　https://www.wilsonelser.com/writable/files/Legal_Analysis/Punitive_Damage
　　s_Review/2014-wilson-elser-punitive-damages-review.pdf; ..................20

Fed. Jud. Ctr., Judges' Class Action Notice and
　　Claims Process Checklist and Plain Language Guide 3 (2010),
　　https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf; ..................6

David F. Engstrom

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC

viii

FEDERAL JUDICIAL CENTER,
    NEUTRAL SCIENCE PANELS: TWO EXAMPLES OF PANELS OF COURT-APPOINTED
    EXPERTS IN THE BREAST IMPLANTS PRODUCT LIABILITY LITIGATION (2001),
    https://www.fjc.gov/content/neutral-science-panels-two-examples-panels-
    court-appointed-experts-breast-implants-product-1 ...............................................41

Myriam Gilles,
    *Opting Out of Liability: The Forthcoming, Near-Total Demise of the Modern
    Class Action*, 104 MICH. L. REV. 373, 388 (2005)..................................................16

Alexandra D. Lahav,
    *The Knowledge Remedy*,
    98 TEX. L. REV. 1361 (2020) ...................................................................................41

David Marcus,
    *The Short Life and Long Afterlife of the Mass Tort Class Action*,
    165 U. PA. L. REV. 1565, 1596 (2017)....................................................................15

1 MCLAUGHLIN ON CLASS ACTIONS § 4:45 (17th ed.)................................................30

Mike McWilliams & Margaret Smith,
    *An Overview of the Legal Standard Regarding Product Liability Design
    Defect Claims and A Fifty State Survey on the Applicable Law in Each
    Jurisdiction*, 82 DEF. COUNS. J. 80, 83 (2015).........................................................19

NEWBERG ON CLASS ACTIONS
    § 4:61 (5th ed.)........................................................................................................18
    § 4:62 (5th ed.)..................................................................................................15, 23
    § 13:15 (5th ed.)......................................................................................................35
    § 13:50 (5th ed.)......................................................................................................27
    § 13:56 (5th ed. 2020).............................................................................................29

DAVID G. OWEN,
    PRODUCTS LIABILITY LAW § 11.4 ............................................................................19

Tarini Parti & Sabrina Siddiqui,
    *Biden Expects U.S. to Have Covid-19 Vaccines for All Adults by End of May*,
    WALL ST. J. (March 2, 2021) ...................................................................................37

Eric A. Posner & Cass R. Sunstein,
    *Dollars and Death*,
    72 U. CHI. L. REV. 537 (2005) ................................................................................36

RESTATEMENT (SECOND) OF JUDGMENTS § 28(5)(c).................................................43

RESTATEMENT (THIRD) OF TORTS: PHYSICAL & EMOTIONAL HARM § 47.....................19

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC        ix

Catherine M. Sharkey,
   *Punitive Damages As Societal Damages*,
   113 YALE L.J. 347, 359 (2003) ................................................................39

Georgene Vairo,
   *Mass Tort Bankruptcies: The Who, the Why and the How*,
   78 AM. BANKR. L.J. 93, 134 (2004) ............................................................8

Victoria A.B. Willis & Judson R. Peverall,
   *The "Vanishing Trial": Arbitrating Wrongful Death*,
   53 U. RICH. L. REV. 1339 (2019) .............................................................20

7B CHARLES ALAN WRIGHT ET AL.,
   FEDERAL PRACTICE AND PROCEDURE § 1805 (3d ed. 2005) ...................................15

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    x

## INTRODUCTION

This Court knows well the litigation around Monsanto's Roundup herbicide and its exposure of thousands of farm workers, landscapers, suburban homeowners, and others to possible Non-Hodgkin's Lymphoma (NHL).  Many putative class members already suffer, or will soon suffer, from what is a serious, debilitating, and sometimes deadly disease.  Those injuries will affect not only past and current Roundup users, but also their spouses, families, and others in far-flung communities around the United States, Mexico, and beyond.

Monsanto's liability for these injuries is being addressed through trials and settlements with individual plaintiffs.  Monsanto now seeks to determine—and cabin—its future liability for Roundup through a settlement whose principal benefits run to putative Class Counsel and Monsanto, not to the putative class members.  The proposed settlement puts those class members—some already suffering from NHL, others only exposed to Roundup—to a Hobson's choice between an anemic compensation package and a hobbled tort action.

This Court should reject the proposed settlement for three major reasons, each independently sufficient to reject the proposal.  First, the proposal does not provide putative class members with proper notice. Second, the proposal fails to satisfy Rule 23's requirements for class certification.  Third, the settlement is not fair, adequate, or reasonable under Rule 23(e).

The American legal system has long struggled with mass torts of precisely this variety, with numerous and dispersed victims, latent and variable injuries, and non-signature diseases. However, the proposed settlement—a Frankenstein-ian mix of a sprawling, anyone-without-a-lawyer class; notice via media blitz; a cy-près-like patchwork approach to medical monitoring; a secretive and de facto issue-preclusive Science Panel (with inscrutable procedures for handling its findings in court); and, above all else, limited compensation for the injured, far out of line

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                1

with litigated judgments to this point—cannot be the answer and is neither an appropriate nor a wise use of this Court's power.  The motion should be denied.

## ARGUMENT

### I.    The Notice Program Fails to Satisfy Bedrock Principles of Due Process

Putative Class Counsel hopes to bind legions of unaware individuals to a class settlement that will compromise valuable substantive rights without affording them the fair notice required by both the Due Process Clause and Rule 23.  Nearly a quarter-century ago, the Supreme Court expressed grave reservations about "whether class action notice sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous" as exposure-only plaintiffs.  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 628 (1997) (emphasis added).  This case is a walking embodiment of the Court's constitutional and Rule 23 concerns, and the insufficiency of the proposed notice scheme is fatal to the proposed settlement.

### A.    Constitutionally Adequate Notice Must Assure "Informed Decisions"

"Notice and an opportunity to be heard [are] fundamental requisites of the constitutional guarantee of procedural due process." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974).  To satisfy due process, "notice must be 'reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)).  Rule 23 similarly requires "the best notice practicable under the circumstances," which as a baseline matter "include[es] individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128–29 (9th Cir. 2017).

At their essence, these notice requirements can be distilled to an overriding imperative: "The ultimate goal of giving notice is to enable class members to make *informed decisions* about

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    2

whether to opt out or, in instances where a proposed settlement is involved, to object or to make claims." Fed. R. Civ. P. 23 (2018 advisory committee's note).  Thus, in evaluating the adequacy of a proposed notice program, the Court must ask itself whether it is realistic to conclude that absent class members whose rights will be affected by the proposed settlement will be able to make an "informed decision."

The proposed notice program flunks that test, and it is doubtful that any other notice program directed at "legions so unselfconscious and amorphous," *Amchem*, 521 U.S. at 628, could pass it.  That is so because of the compounding effect of two characteristics of the proposed class: (i) it is composed of an unidentifiable and amorphous group of individuals to whom it will be impossible to deliver individual notices, and (ii) by definition, many of the individuals have been exposed to an allegedly toxic substance but have not manifested any injury, so they have little incentive to consume the information needed to make an informed decision about a settlement that will extinguish certain arcane portions of claims they may someday have if they fall prey to a disease they have likely never heard of, much less worry about.  This Court should reject the proposed class settlement—once and for all.

**B.     The Amorphous and Uncertain Nature of This Exposure-Only Class Forecloses Adequate Notice and an "Informed Decision"**

The proposed class definition encompasses millions of unidentifiable individuals whose only common traits are that they "have been exposed to Roundup Products through the application of Roundup Products in the United States" and they "have not commenced an individual, non-class lawsuit or retained counsel for the pursuit of any individual, non-class personal injury or false advertising claims arising from, resulting from, any way relation to or in connection with such exposure."  Settlement § 1.1(a).  Many of these absent class members have high-value individual tort claims that they would (and should) prefer to bring as independent lawsuits.  If they cannot be notified of the proposed settlement in a way that actually gives them

the opportunity to decide whether to participate, then they should not be forced to abandon their claims in exchange for what the settlement's proponents are offering.

Faced with this challenge, the proposed notice program does not contemplate individualized notices to identifiable individuals and instead substitutes a media-only approach. *See* Mot. at 59 & Wheatman Decl.[1]  That approach falls well short of constitutional requirements in two distinct ways.

*First*, individualized notice is the baseline due process expectation:  "Individual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort."  *Eisen*, 417 U.S. at 173–174; *see also* Fed. R. Civ. P. 23(c)(2)(B) (requiring "individual notice to all members who can be identified through reasonable effort.").  Putative Class Counsel argue (Mot. at 59) that individualized notice is not feasible here with "reasonable effort" because of an apparent lack of individualized records and that this justifies the irregular, media-only approach.  But a perceived need for an irregular form of notice is not a saving grace. Instead, it is a concession that class adjudication is not appropriate in this context.  *See Georgine v. Amchem Prods.*, 83 F.3d 610, 633–634 (3d Cir. 1996) (noting the proposed class action was not superior to alternative means of adjudication, in part, because of the serious concerns related to the notice program); *see also Yandle v. PPG Indus., Inc.*, 65 F.R.D. 566, 572 (E.D. Tex. 1974) (same).

Moreover, although media-focused notice programs are sometimes acceptable substitutes for individual notices, such an approach is usually reserved for low-value consumer classes where the rights to be vindicated are less personal than the rights vindicated here.  For example,

---

[1] The notice program does include direct notices to 41,000 individuals who have already self-reported as having NHL. Other than that, the Wheatman Declaration alludes to potential individualized notices to exposure-only plaintiffs but provides little information about how many potential class members would be reached by the proposed notice or how the 266,000 groups alluded to represent all those that can be ascertained through reasonable effort. *See* Wheatman Decl. at ¶ 56–60.

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    4

the Ninth Circuit has acknowledged that a media notice program might deny an absent class member the opportunity to opt out and pursue individual litigation, but that abstract possibility is not a realistic concern in low-value consumer class actions involving claims that could not be brought otherwise. *Briseno*, 844 F.3d at 1129 (explaining that in "low-value consumer class actions" the risk "is virtually nonexistent" that inadequate notice would deny class members "the opportunity to opt out and pursue individual litigation"); *Schneider v. Chipotle Mexican Grill, Inc.*, No. 16-cv-02200-HSG, 2020 WL 511953, at *3, *10-*11 (N.D. Cal. Jan. 31, 2020) (approving notice by "digital media campaign" to settlement class consisting of consumers who dined at fast-food restaurant); *Fitzhenry-Russell v. Coca-Cola Co.*, No. 5:17-CV-00603-EJD, 2019 WL 11557486, at *3 (N.D. Cal. Oct. 3, 2019) (approving non-individualized notice for class action related to the purchase of soft drinks); *Miller v. Ghirardelli Chocolate Co.*, No. 12-CV-04936-LB, 2015 WL 758094, at *3 (N.D. Cal. Feb. 20, 2015) (approving largely publication notice plan in class action regarding purchase of grocery store items); *see also Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672, 676–77 (7th Cir. 2013) (holding that sticker notices on two allegedly offending ATMs, as well as publication in the state's principal newspaper and on a website, provided adequate notice to class members in an action challenging ATM fees).

This case is different, and so should be the notice standards.  The proposed class members are individuals who have been exposed to Roundup, a potentially lethal toxic substance.  It is a statistical certainty that some of them will receive a catastrophic cancer diagnosis and will have valuable personal injury claims.  Empirically, such claims have generated verdicts as great as $1 billion and awards of punitive damages up to $44.8 million. *See* Mot. at 49–50 n.13.  It is undeniable that these unfortunate members of the proposed class will have substantial personal injury claims that bear no resemblance to the universe of low-

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                                5

value consumer class actions in which courts have proven willing to tolerate non-individualized media notice programs.

The problems posed by non-individualized notice are especially acute in this case because the proposed class is defined so broadly as to have virtually no boundaries.  *See In re Wal-Mart Stores, Inc.*, No. 06-02069 SBA, 2008 WL 1990806, at *5 (N.D. Cal May 2, 2008) (noting that the vague class definition would "render the process of providing adequate notice unmanageable").  Unlike a media campaign directed at a discrete and identifiable group of class members who can be expected to recognize themselves as the targets of the advertising campaign, this proposed class includes everyone who has been "exposed to Roundup Products through the application of Roundup Products in the United States."  The Court might as well certify a class of everyone in the United States who ever bought a Coca-Cola or played with Tinker Toys as a child.  Any notice so ubiquitous is likely to be useless and will meaningfully reach only a small fraction of those targeted.[2]

Recall that "the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected."  *Mullane*, 339 U.S. at 314.  It cannot be said that the proposed advertising campaign "is reasonably certain to inform" the proposed class members in a meaningful way.

*Second*, the deficiency of the notice program is compounded by the fact that the proposed class members have not yet manifested any injury—which means they are unlikely to identify themselves as the objects of the advertising campaign and unlikely to acquire sufficient information about the settlement to make an "informed decision."  *See Hoge v. Parkway*

---

[2] This falls well below Federal Judicial Center guidance that a notice program should reach 70%-95% of a proposed class.  *See* Fed. Jud. Ctr., Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide 3 (2010), https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf; *see also Chinitz v. Intero Real Estate Servs.*, 2020 WL 7042871 (N.D. Cal. Dec. 1, 2020) (citing FJC guidance).

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    6

*Chevrolet, Inc.*, No. CIV.A. H-05-2686, 2007 WL 3125298, at *19 (S.D. Tex. Oct. 23, 2007) (rejecting notice program and expressing doubt that "any form of publication notice" could be effective given the unlikelihood that potential class members would be aware they had been injured) (citing *Amchem Products, Inc.*, 521 U.S. at 628); *Meacham v. Wing*, 227 F.R.D. 232, 234 (S.D.N.Y.) (granting certification of a class of presently injured but denying certification as to "future eligible persons" who "would not have received meaningful notice or the opportunity to be heard prior to the approval of this settlement.").  Even if a non-individualized program of media notice might be sufficient for claimants who have suffered an injury and are motivated to seek redress, it is insufficient here.

This problem came to the fore 25 years ago in *Georgine v. Amchem Products*, 83 F.3d 610 (3d Cir. 1996), when the Third Circuit admonished that "[i]t is unrealistic to expect every individual with incidental exposure to asbestos to realize that he or she could someday contract a deadly disease and make a reasoned decision about whether to stay in this class action." *Id.* at 633–634.  The Supreme Court added weight to the warning, expressing its doubts "whether class action notice sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous" as those exposure-only plaintiffs.  *Amchem*, 521 U.S. at 628.

Here, as in *Amchem*, it is unrealistic to expect every individual who was exposed to Roundup to realize that he or she was exposed, much less that he or she could someday develop a deadly disease—particularly an obscure disease many individuals have never heard of.  It is doubly unrealistic to assume that these individuals could make a reasoned decision about whether to opt out of this class action.  A media campaign directed at unaware claimants who may not presently know of exposure, are asymptomatic, and, in some cases, have never even *heard* of NHL, simply cannot meet the requirements of due process or Rule 23, because the class members do not have a realistic chance to make informed decisions.  See *Amchem*, 521 U.S. at

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    7

628 (noting that "even if [class members] fully appreciate the significance of class notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out"); *see also Georgine*, 83 F.3d at 633–634 ("It is unrealistic to expect every individual with incidental exposure to asbestos to realize that he or she could someday contract a deadly disease and make a reasoned decision about whether to stay in this class action.").  What is worse, Monsanto *still* sells Roundup to consumers.  Why would a class member take seriously the risk of cancer from a product still sold at Home Depot?

We are aware of no prior case finding non-individualized notice sufficient in relation to exposure-only plaintiffs who have little reason to anticipate future cancer—the dangerous combination in this case.[3]  Because of these two compounding factors, the proposed notice program satisfies neither Rule 23 nor the Due Process Clause.

An examination of the cases cited by putative Class Counsel to justify their proposed notice program underscores the program's inadequacy.  None of those cases authorized a generalized advertising campaign to individuals who had little reason to believe that they had suffered a significant injury.  None is remotely comparable to the proposed settlement class action in this case:

| | |
|---|---|
| *In re Nat. Football League Players' Concussion Injury Litig.*, 307 F.R.D. 351, 385 (E.D. Pa. 2015) | • Individualized notice sent to every readily identifiable class member based on extensive records of former NFL players<br>• Potential future injuries readily apparent and extensively documented<br>• The settlement fund was uncapped and had a sixty-five-year life |
| *Juris v. Inamed Corp.*, 685 F.3d 1294, 1319 (11th Cir. 2012) | • Limited Fund Class Action<br>• Individualized notice to 250,000 potential class members |

---

[3] At least one commentator agreed as of 2004.  *See* Georgene Vairo, *Mass Tort Bankruptcies: The Who, the Why and the How*, 78 AM. BANKR. L.J. 93, 134 (2004) ("[N]either *Mullane* nor any case following it involved claimants who were not only unknown to the party sending the notice but who were in essence unknown to themselves and who therefore would not recognize themselves as the intended targets of the notice even were the notice actually received.").

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    8

| | |
|---|---|
| *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891, 936 (E.D. La. 2012) | • Individualized notice to 1.1 million potential class members<br>• No latent injuries (economic loss and property damage only) |
| *In re Diet Drugs*, No. 1203, 2000 WL 1222042, at *36 –*39 (E.D. Pa. Aug. 28, 2000) | • Individualized notice to 944,723 potential class members<br>• Additional notice sent to learned intermediaries—748,128 physicians who had potentially prescribed the drugs and 108,288 pharmacists who had filled prescriptions<br>• Drugs only available through prescription, had to be consciously ingested, and potential class members were made aware of the risks associated with the drugs when they were withdrawn from the market |

When the amorphous nature of this class and the uncertain nature of the future injury are combined, it is apparent that the initial notice and opt-out period is fanciful.  Why would an exposure-only Roundup user bother to opt out?  The truth is, given inertia, the vast majority will not.  As a practical matter, virtually all potential claimants will be bound to the settlement agreement precisely because they lacked "the foresight needed to decide, intelligently, whether to stay in or opt out." *Amchem*, 521 U.S. at 628; *see also Georgine*, 83 F.3d at 633–634 (doubting the adequacy of the notice because it will not lead to a "reasoned decision"). The Advisory Committee on the Federal Rules of Civil Procedure has stated that the touchstone of Rule 23 is the ability to make an "informed decision."  Fed. R. Civ. P. 23 (2018 advisory committee's note).  No informed decision could be made in this case.

### C.    The Content of the Proposed Notice Compounds the Inherent Problems with the Proposed Settlement Class

For the reasons stated, it is difficult to imagine any class notice that could satisfy Rule 23 and the Due Process Clause in this case.  But even if such notice were possible, the content of this proposed notice falls short.

David F. Engstrom

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In judging a class notice, the test is whether the notice "describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1044 (9th Cir. 2019).   To pass this test, a notice must "contain[] adequate information, presented in a neutral manner, to apprise class members of the essential terms and conditions of the settlement."  *Id.*   There are two dimensions to this requirement.

In form, a class notice must "present information about a proposed settlement neutrally, simply, and understandably," as perceived by the "average class member." *Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 330 (C.D. Cal. 2016); *see also In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104 (5th Cir. 1977).

In substance, a class notice "must include all information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class."  *Hubbard v. RCM Techs. (USA)*, No. 19-CV-06363-YGR, 2020 WL 6149694, at *2 (N.D. Cal. Oct. 20, 2020); *see also NFL*, 821 F.3d at 435; *Nissan*, 552 F.2d at 1104.  "[N]otice is not adequate if it misleads potential class members." *Hubbard*, 2020 WL 6149694 at *2 (citing *Molski v. Gleich*, 318 F.3d 937, 951 (9th Cir. 2003)).

The content of the proposed notice flunks both requirements because it does not adequately describe the rights proposed class members will surrender if they fail to opt out— especially the right to seek punitive damages, which has been a source of recovery for past plaintiffs and will be a significant point of settlement leverage for future plaintiffs.   The forfeiture of this right is "information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class," *id.*, but the proposed notice obscures it.

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC          10

1      *First*, the form of the notice does not "neutrally, simply, and understandably" convey the

2  compromise of punitive damages—much less their potential significance—viewed from the

3  perspective of an "average class member."  In the short-form notice, for example, the release of

4  punitive damages is hidden in a section misleadingly titled "Rights Under the Settlement" and

5  placed where putative class members are unlikely to see it—in the middle of the final paragraph,

6  in small print, without any emphasis:

7

8     **Rights Under the Settlement:** If you do nothing and later develop NHL, or reject your compensation award, you will keep your
right to sue Monsanto about any compensatory damage claims (such as costs to treat NHL and pain and suffering) but you will

9  not be able to sue for punitive and other damages. If you do not want to stay in the class for any reason, including because you
want to pursue your own lawsuit now, you must exclude yourself by **Month XX, 2021.** You can also object to the settlement by

10  **Month XX, 2021.** The Court will hold a hearing on **Month XX, 2021** to consider whether to approve the settlement.

11  Settlement at 151/265. (highlighting added).  The long-form notice is hardly any better, burying

12  the forfeited punitive damages claims in small print, in obscure locations.  *See, e.g, id.*, at 152,

13  156, 170/265.  And in answer to the question "What if I do nothing?", *the notice does not even*

14  *mention punitive damages*.  *Id.* at 174/265.

15

16      By contrast, the class notice touts the settlement's benefits.  From the beginning, the

17  short-form notice advertises (in bold lettering and large print) that class members can "Benefit

18  from a $2 Billion Settlement" with awards of "up to $200,000" each.  Settlement at 151/265.  A

19  paragraph later, it reemphasizes these benefits in a special, bulleted section.  *See id.*  The short-

20  form is also careful to clarify that class members "keep [their] right to sue Monsanto about any

21  compensatory damage claims," which it defines as the "costs to treat NHL and pain and

22  suffering."  *Id.*  The long-form notice similarly begins with an emphasis on the program's

23  benefits and its retention of the "right to sue Monsanto for compensatory damage claims (such as

24  costs to treat NHL and pain and suffering)." *Id.* at 152/265; *see also id.* at 154–55.  It also dwells

25  much more heavily on the advantages of the settlement than the disadvantages.  *Compare id.* at

26  159–68 (advantages) *with id.* at 156 (disadvantages).  This is hardly a "neutral" presentation.

27

28

*Second*, the substance of the notice does not "include all information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt-out or remain a member of the class." *Hubbard*, 2020 WL 6149694 at *2. Quite the contrary. The average class member is unlikely to have any understanding of punitive damages of what punitive damages are, much less their potential value. Yet the notice offers only a brief (and somewhat misleading) description of such claims, asserting that "punitive damages do not pay people for their losses; it is a monetary award that is used to discourage a defendant and others from committing similar acts in the future." Settlement at 156/265.

At best, this notice understates the potential value of a punitive damages claim; at worst, it mischaracterizes the nature of such a claim. *See Molski*, 318 F.3d at 951 (misleading notices are inadequate). The assertion that "punitive damages do not pay people for their losses" can easily leave the impression in the mind of an average person that the class member would not receive the vaguely-described "monetary award that is used to discourage a defendant and others from committing similar acts in the future." Settlement at 156/265. Thus, the notice fails to adequately convey that class members will lose a right to seek an additional monetary award beyond compensatory damages. At the very least, it provides no indication of the potential magnitude of those awards, which dwarfs the maximum recovery obtainable via the settlement. One would think that the potential for recovery of millions of dollars in additional damages would be "information that a reasonable person would consider to be material in making an informed, intelligent decision" about the proposed settlement. It is no surprise that Monsanto did not want to advertise these numbers; it is a surprise that putative Class Counsel appears to have been so accommodating.

Similar deficiencies afflict the other compromises in the proposed settlement. The notice makes no direct mention of the four-year moratorium on lawsuits and does not explain the

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement, Case No. 3:16-MD-02741-VC                12

consequences of agreeing to admissibility of a third-party science panel.  *See* Settlement at 151–52, 156, 170/265.[4]

At bottom, the class notice portrays the benefits of the proposed settlement as substantial and the rights a class member would forfeit as de minimis.  This skewed portrait fatally compromises the proposed class members' ability to make "an informed, intelligent decision of whether to opt-out or remain a member of the class." *Hubbard*, 2020 WL 6149694, at *2.

<center>*     *     *</center>

Put simply, Rule 23(b)(3) classes rely on adequate notice; that notice is the engine of the class action mechanism.  There is no such adequate notice here.  That, alone, should doom movants' effort.

## II.     The Proposed Class Action Violates Rule 23's Vital Structural Safeguards

A class action may only be certified if the trial court finds, after a rigorous analysis, that Rule 23's vital safeguards are satisfied.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *Connecticut Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1175 (9th Cir. 2011), *aff'd*, 568 U.S. 455 (2013).  The class action proposed here fails to satisfy two such safeguards: predominance and adequacy under Rules 23(b)(3) and 23(a)(4), respectively.  We discuss each in turn.

### A.     Plaintiffs' Proposed Class Fails Threshold Requirements for Certification Because Individualized Factual and Legal Questions Predominate

#### 1.     Predominance Is More, Not Less, Important in the Settlement Class Action Context

For a Rule 23(b)(3) class to be certified, "the questions of law or fact common to class members [must] predominate over any questions affecting only individual members."[5]

---

[4] Putative class members would have to piece together the four-year moratorium by comparing references to the science panel, Settlement at 152/265, with the time period allowed for its work. *Id.* at 63–64/265.

David F. Engstrom

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    13

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623; *see also Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir.), *cert. denied*, 534 U.S. 973 (2001).

Putative Class Counsel concedes the importance of Rule 23(b)(3)'s predominance inquiry but insists (Mot. at 39) that this inquiry can be diluted or short-circuited because they seek merely to certify a settlement class, not a litigation class. In their view, then, predominance is tiered: There is a full predominance inquiry when the case is litigated but predominance lite when, as here, the case is to be resolved via settlement.

Any such notion of "predominance lite" in the context of a settlement class, however, runs directly contrary to decades of consistent precedent.[6] As *Amchem* itself noted, and as the en banc Ninth Circuit recently re-affirmed, a court asked to certify a settlement class action must give "*undiluted, even heightened, attention*" to Rule 23's terms in order to "block[] unwarranted or overbroad class definitions" and ensure the class has "sufficient unity" such that absentees "can fairly be bound by decisions of class representatives." *In re Hyundai & Kia Fuel Economy Litigation*, 926 F.3d 558 (9th Cir. 2019) (quoting *Amchem*, 521 U.S. at 619) (emphasis added).[7]

---

[5] We do not separately consider Rule 23(a)(2)'s commonality requirement, as it is subsumed by Rule 23(b)(3)'s predominance requirement. *See Amchem*, 521 U.S. at 609.

[6] It is true, as putative Class Counsel recognizes (Mot. at 29), that manageability concerns fall away in a settlement class action. *See Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial."). However, this commonsense (and circular) observation proves nothing more than that manageability does not matter where there is no occasion for management.

[7] Putative Class Counsel plays fast and loose with Ninth Circuit precedent here, asserting (at Mot. 29) that *Jabarri v. Farmer*, 965 F.3d 1001 (9th Cir. 2020), "held" that "predominance is easier to satisfy in the settlement context." *Jabarri*, of course, "held" no such thing. Instead, the *Jabarri* court carefully parsed the Ninth Circuit's extensive en banc decision in *Hyundai*, where an eleven-judge panel concluded that, while "manageability" concerns fall away in litigation class actions, those concerns are replaced by "undiluted, even heightened, attention" to ensure a class has "sufficient unity," particularly cases involving "sprawling" classes with "members who had wide-ranging injuries." *Id*. at 559.

---

David F. Engstrom

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement, Case No. 3:16-MD-02741-VC                    14

Other Ninth Circuit precedent is in accord. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), explains, for example, that settlement approval "requires a higher standard of fairness" and "a more probing inquiry than may normally be required."[8]  If the proposed class members' claims are to be entrusted to the negotiated outcome of a deal struck by those who purport to represent all of their interests but without any realistic threat of trial as leverage, the class had better have sufficiently similar claims to justify such treatment.  Declaration of Professor Howard M. Erichson at ¶¶ 8-9, 19-20 (hereinafter "Erichson Decl.") (attached as Appendix "A").

Predominance concerns are graver still on those occasions—as here, and common in the mass tort context—"when individual stakes are high and disparities among class members great." *Amchem*, 521 U.S. at 625; *see also id.* (noting that mass torts cases "present significant questions, not only of damages but of liability and defenses of liability, . . .  affecting the individuals in different ways") (quotation marks omitted).

Indeed, precisely because individualized, fact-intensive, litigant-specific questions pervade most mass torts cases, numerous commentators have correctly observed that mass tort class actions frequently do not and cannot satisfy Rule 23's exacting predominance requirement. *See* Newberg on Class Actions § 4:62 (5th ed.) (recognizing that *Amchem* "stands for the proposition that common issues are generally unlikely to predominate in most mass tort cases where plaintiffs have sustained significant personal injuries"); *see also* 7B Charles Alan Wright et al., Federal Practice And Procedure § 1805 (3d ed. 2005) ("[A]ttempts to invoke Rule 23 for mass products-liability claims have met with major difficulties. . . ."); David

---

[8] Other circuits agree.  *See, e.g., In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 788, 805 (3d Cir. 1995) (emphasizing that courts must be "even more scrupulous than usual in approving settlements where no class has yet been formally certified" because the 'danger of a premature, even a collusive, settlement [is] increased'") (quoting *Mars Steel v. Continental Illinois Nat'l Bank & Trust,* 834 F.2d 677, 680 (7th Cir. 1987)).

David F. Engstrom

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement, Case No. 3:16-MD-02741-VC                    15

Marcus, *The Short Life and Long Afterlife of the Mass Tort Class Action*, 165 U. PA. L. REV. 1565, 1596 (2017) (observing that *Amchem* "all but killed the mass tort class action"); Myriam Gilles, *Opting Out of Liability: The Forthcoming, Near-Total Demise of the Modern Class Action*, 104 MICH. L. REV. 373, 388 (2005) ("At this point, courts and commentators appear to agree: the mass tort class action is dead as a doornail.").

In sum, Rule 23(b)(3) demands that "the questions of law or fact common to class members [must] predominate over any questions affecting only individual members," and, rather than endorsing "predominance lite" for settlement classes, both the U.S. Supreme Court and the Ninth Circuit have admonished trial courts to give *heightened* attention to Rule 23's vital safeguards when there is a class settlement sans litigation.

### 2. The Proposed Class Action Fails to Satisfy Rule 23 Because the Claims Present Overwhelming Factual and Legal Variations

With the predominance inquiry properly framed, the proposed settlement plainly fails to satisfy Rule 23(b)(3)'s vital safeguards. Common issues do not predominate over individual ones, and the class as a whole does not enjoy "sufficient unity," for two related reasons: pervasive individualized fact issues, as compounded by the need to apply diverse state laws.

First, putative class members' claims turn on numerous individualized fact issues that swamp any common issues. The sprawling, residual nature of the proposed class—defined primarily by class members' relationship to counsel rather than by their relationship to Monsanto's tortious conduct—makes substantial variation in the circumstances of individual class members inevitable. Among the agricultural, aquacultural, landscaping, and groundskeeping workers and homeowners who have been exposed to Roundup but not yet retained counsel, some will be older than others; some will have worked with Roundup for a longer duration than others; some will used more Roundup than others; some will have taken fewer safety precautions than others; some will be damned with weaker immune systems than

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                 16

others; some will have had more bacterial or viral infections than others; and some will suffer from more severe NHL than others.

These variations, in turn, connect to key fact issues, each requiring individualized proof, that would dominate the adjudication of any particular putative class member's claim. Among these are:

- the duration and intensity of the plaintiff's exposure to Roundup

- whether Roundup exposure was the but-for cause of a plaintiff's NHL, and the relative contribution of other individual risk factors (*e.g.*, age, family or genetic history, past infections)

- whether the plaintiff did or did not take recommended safety precautions

- whether the plaintiff would have heeded an instruction or warning had Monsanto supplied one

- the amount and types of damages sustained by the plainitff as a result of NHL caused by exposure

Importantly, while individualized fact issues would predominate and thus preclude certification even if a single set of laws applied, plaintiff-by-plaintiff variation is magnified here by the likely necessity of applying diverse state laws.[9]   *See Amchem*, 521 U.S. at 624

---

[9]   In cataloguing pervasive disabling conflicts of laws, we assume that the law of the many states in which putative class members suffered exposure to, or purchased or otherwise acquired Roundup—and not Missouri, for instance, where Monsanto is headquartered—provides at least some rules of decision.  A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits.  *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 65 (2013).  And, in a putative class action like this one, California's choice-of-law rules require this Court to apply California's three-part governmental interest test to each non-forum state with an interest in the application of its law and to each claim upon which certification is sought, as well as, separately, questions of compensatory and punitive damages.  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1188 (9th Cir. 2001); *see S.A. Empresa De Viacao Aerea Rio Grandense v. Boeing Co.*, 641 F.2d 746, 749 (9th Cir.1981) (recognizing that the court must conduct "a separate choice-of-law inquiry . . . with respect to each issue in a case); *Wash. Mutual Bank, FA v. Superior Court*, 15 P.3d 1071, 1081 (Cal. 2001) (recognizing that "a separate conflict of laws inquiry must be made with respect to each issue in the case").

A full choice-of-law analysis would thus require claim-by-claim consideration of each dyad of Missouri and 49 other states.  In this case, however, the overwhelming weight of authority suggests that the state in which putative class members reside, purchased Roundup, or suffered Roundup exposure would supply the rule of decision for tort claims—and different states might also supply the law that governs the calculation of compensatory or punitive damages.  *See, e.g., Hernandez v. Burger*, 102 Cal. App. 3d 795, 802 (1980) ("[W]ith respect to

("Differences in state law . . . compound these disparities."); *Zinser*, 253 F.3d at 1190

("'[P]roliferation of disparate factual and legal issues is compounded exponentially' when [the] law[s] of multiple jurisdictions apply.") (quoting *Castano v. American Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996)); *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 928 (9th Cir. 2019), cert. denied, 141 S. Ct. 248 (2020) ("We have been particularly concerned about the impact of choice-of-law inquiries in nationwide consumer class actions and products liability cases."); *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 728 (9th Cir. 2007) ("[T]he law on predominance requires the district court to consider variations in state law when a class action involves multiple jurisdictions."). *See also Castano*, 84 F.3d at 741 (reversing certification of a nationwide class noting that "[i]n a multi-state class action, variations in state law may swamp any common issues and defeat predominance," because "[v]ariations in state law magnify the differences" between class members' claims). A leading treatise says it best: "Generally speaking, common issues do not predominate in a multistate class action based on state law when there is significant variation in the laws of the various jurisdictions." NEWBERG ON CLASS ACTIONS § 4:61 (5th ed.)

Virtually every element of every claim advanced on behalf of the putative class reflects material variation among jurisdictions. Consider just a sampling of the state-by-state differences in tort alone:

---

regulating or affecting conduct within its borders, the place of the wrong has the predominant interest."); *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 592 (9th Cir. 2012) (noting that each of the 44 different states where car sales took place "has a strong interest in applying its own consumer protection laws to those transactions"); *Stanley v. Novartis Pharm. Corp.*, 11 F. Supp. 3d 987, 1007 (C.D. Cal. 2014) (applying California law, not New Jersey law, to a product liability claim where New Jersey placed injuring drug into the stream of commerce in California); *Hill v. Novartis Pharm. Corp.*, No. 1:06-CV-00939-AWI, 2012 WL 967577, at *11 (E.D. Cal. Mar. 21, 2012) (same). As a result, putative Class Counsel could not carry their burden, if they sought to, that a single state's law applies to this case.

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    18

- The liability standard for design defect claims varies by state depending on whether the state adopts one of three approaches (or a blend of two of the three): (i) consumer expectation; (ii) risk-utility; (iii) reasonable alternative design.[10]

- In assessing defendant liability where the seller reportedly did not know or have reason to know of the dangers inherent in its product, states differ as between the "state of the art" approach as against the "hindsight approach."[11]

- In the course of failure to warn claims, roughly half of states employ a rebuttable "heeding presumption" that flips the burden to the defendant to prove that a plaintiff would not have heeded an adequate instruction or warning, had such an instruction or warning been supplied.[12]

- Medical monitoring claims are recognized in some states but not others.[13]

- Some states permit "fear" claims after the plaintiff has been tortiously exposed to a toxic agent, whereas, in other states, fear claims are not permitted.[14]

- Compensatory damages (for instance, non-economic damages) are capped in some states but not others, and cap amounts vary widely by state.[15]

---

[10] *See* Mike McWilliams & Margaret Smith, *An Overview of the Legal Standard Regarding Product Liability Design Defect Claims and A Fifty State Survey on the Applicable Law in Each Jurisdiction*, 82 DEF. COUNS. J. 80, 83 (2015).

[11] *Compare Johnson v. Raybestos-Manhattan, Inc.*, 740 P.2d 548, 549 (Haw. 1987) ("It is clear, therefore, that in a strict products liability action, the issue of whether the seller knew or reasonably should have known of the dangers inherent in his or her product is irrelevant to the issue of liability.") *with Vassallo v. Baxter Healthcare Corp.*, 696 N.E.2d 909, 923 (Mass. 1998) (holding that "a defendant will not be held liable . . . for failure to warn or provide instructions about risks that were not reasonably foreseeable at the time of sale or could not have been discovered by way of reasonable testing prior to marketing the product").

[12] *See* DAVID G. OWEN, PRODUCTS LIABILITY LAW § 11.4, at 760-61 (2005) (noting that "almost half the states" have adopted the heeding presumption to help plaintiffs prove causation for certain types of claims).

[13] *See Zinser*, 253 F.3d at 1192 (noting state variation in recognition of medical monitoring claims); *Bell v. 3M Co.*, 344 F. Supp. 3d 1207, 1223 (D. Colo. 2018) (compiling numerous opinions "in which courts find that medical monitoring does not constitute a valid cause of action absent a present physical injury" while also compiling numerous opinions "reaching the opposite conclusion" and ultimately finding "the question of the validity of medical monitoring claims absent a present physical injury is one that has divided state and federal courts in recent decades") (quotation marks omitted).

[14] *Compare Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795, 816 (Cal. 1993) (authorizing recovery for fear of a cancer diagnosis after toxic exposure, provided certain conditions are met, including that plaintiff is "more likely than not" to develop cancer) *with Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 396-397 (5th Cir. 2009) (applying Mississippi law) (holding plaintiffs could not recover in negligence for emotional harm due to fear of contracting cancer in the future); *see also* RESTATEMENT (THIRD) OF TORTS: PHYSICAL & EMOTIONAL HARM § 47, Reporters' Note to cmt. k (2012) (compiling divergent authority).

---

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    19

- Punitive damages are available in some states but not others, and are available in the event of death in some states but not others. Where available, punitive damages are often capped, and cap amounts vary widely by state.[16]

The proposed settlement flattens these and other legal variations, each one embodying a state's considered policy choice about whether and how to compensate the injured, and substitutes, instead, a simplistic, four-tiered grid. This cuts to the core of the *Amchem* Court's call for caution when "individual stakes are high and disparities among class members great." *Amchem*, 521 U.S. at 625. Faced with a kaleidoscope of plaintiff-by-plaintiff and state-by-state legal and factual variation, putative Class Counsel cannot have exercised unconflicted judgment solely for the benefit of the relevant subclass members. And absent class members cannot fairly be bound without depriving them of the benefit of the appropriate substantive law applicable to their claims. *See Lozano*, 504 F.3d at 728 (holding that the district court reasonably concluded that predominance was defeated when the standard for upholding a class action waiver differed from state to state); *Lewallen v. Medtronic USA, Inc.*, No. C 01-20395 RMW, 2002 WL 31300899, at *4 (N.D. Cal. Aug. 28, 2002) (finding individual issues relating to statutes of limitation, consent, assumption of risk, and comparative fault predominated over common ones in the AneuRx stent graft case). The depth and breadth of the plaintiff-by-plaintiff and state-by-state variations in the proposed class compel the conclusion that common issues do not predominate over individual ones.

---

[15] *See* Center for Justice & Democracy, *Fact Sheet: Caps on Compensatory Damages: A State Law Summary* (Aug. 22, 2020), https://centerjd.org/content/fact-sheet-caps-compensatory-damages-state-law-summary.

[16] *See* Wilson Elser, *Punitive Damages Review, 50-State Survey* (2014), https://www.wilsonelser.com/writable/files/Legal_Analysis/Punitive_Damages_Review/2014-wilson-elser-punitive-damages-review.pdf; *see also* Victoria A.B. Willis & Judson R. Peverall, *The "Vanishing Trial": Arbitrating Wrongful Death*, 53 U. RICH. L. REV. 1339, 1362–63 (2019) (explaining that, in 29 states, punitive damages are recoverable in cases of wrongful death; in the remainder, the wrongful death statute is interpreted to disallow such damages).

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC          20

### 3.   Plaintiffs' Assorted Efforts to Overcome the Predominance of Individualized Law and Fact Issues Fail

Putative Class Counsel tries to paper over this kaleidoscope of plaintiff-by-plaintiff and state-by-state variation by arguing that this case resembles the small handful of past certified mass-torts class actions, that individualized damages questions cannot defeat predominance, and that the proposed settlement's "structure" supports a predominance finding.  All of these efforts fail.

Putative Class Counsel first argues (Mot. at 30) that this case satisfies predominance because it involves a "single disease, a single product, and a single common question of causality."  But the trio of cases marshalled in support—the Ninth Circuit's recent en banc *Hyundai* decision, the decades-old *Diet Drugs* case, and the *NFL Concussion* case—merely underscore what an extreme outlier this Court's certification of the proposed class would be.

In *Hyundai*, the Ninth Circuit found that common questions could overcome narrow state-law variations, but only after observing that "class members were exposed to uniform fuel-economy misrepresentations and suffered identical injuries within only a small range of damages."  926 F.3d at 559; *see also id*. ("This cohesive group of individuals suffered the same harm in the same way because of the automakers' alleged conduct.").  The *Hyundai* court specifically noted that the settlement before it was "a far cry from *Amchem*, which involved a 'sprawling' asbestos settlement class with members who had wide-ranging injuries, some exposure-only and others imminently fatal."[17]  *Id*.  For all these reasons, *Hyundai* shares little in common with the Roundup litigation.

---

[17] To that extent, *Hyundai* shares more in common with *Hanlon v. Chrysler Corp.*, another case on which putative Class Counsel repeatedly rely.  In that case—a class action to recover damages for a defective minivan latchgate—the Ninth Circuit affirmed the district court's certification of a settlement class action featuring "small differences in damages and potential remedies" and only "idiosyncratic" and "inconsequential" differences in substantive state law and remedies. *Hanlon*, 150 F.3d at 1022–23.  In particular, the court noted that the proposed class did not advance "personal injury or wrongful death" claims.  *Id*.

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                21

Putative Class Counsel's reliance on *Diet Drugs* is similarly misplaced. In that decades-old decision, the district court certified a settlement class resolving claims that an already-withdrawn diet aid, used largely by "middle aged women," caused heart problems. *In re Diet Drugs*, 2000 WL 1222042, at *2. Blessing a settlement that was arguably more generous than the one proposed here,[18] the district court rested heavily on the fact that class members had ingested the same product in similar doses over a "finite and relatively short period of time." *Id.* at *41. The court likewise leaned on the consensus among experts that the heart condition was detectable shortly after discontinued use of the drug—meaning that, unlike the instant case, the harm caused by diet drugs was not latent. And, the court credited a growing set of peer-reviewed studies at the time that left few "scientific uncertainties" that might undermine class cohesion or call into question whether class-wide adjudication was the superior approach. *Id.* at *46, *59.

Putative Class Counsel's reference to the *NFL Concussion* litigation is likewise misdirected. That litigation featured a discrete set of professional athletes who played football for knowable periods of time under a common set of rules and in uniform settings prescribed and pervasively controlled by the defendant. *See In re Nat. Football League*, 307 F.R.D. at 381 ("[A]ll injuries stem from repeated participation in the same activity, NFL Football, an activity created and administered only by the NFL Parties."). Furthermore, the members of the class—NFL players all—"self-associate[d]" and "[thought] of themselves as a discrete group," which made them "far more cohesive" than in a "typical mass tort." *Id.* at 381. The *NFL Concussion*

---

[18] As described further in Part III, *infra*, the *Diet Drug* settlement combined substantial medical monitoring with multiple intermediate and back-end opt-out opportunities. *Diet Drugs*, 2000 WL 1222042 at *25, *55 (noting "four separate opt-out opportunities"). Here, the proposed settlement contains only a single opt-out period beyond the initial one and significantly impedes class members' future litigation efforts.

David F. Engstrom

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement, Case No. 3:16-MD-02741-VC          22

case thus sits apart from the proposed settlement here, with its sprawling class of lawyer-less and unwary Roundup users.[19]

This thin and readily distinguishable authority is telling, and it underscores a simple reality. Mass-tort class actions have always sat on shaky ground and, since *Amchem*, have progressively narrowed to a distinct and limited set of contexts: gas well blowouts, toxic spills, and other "single-situs" torts[20]; an occasional pharmaceutical or medical device case[21]; and a small handful of cases that, like the *NFL Concussion* case, involve self-conscious and readily identifiable class members or boast other aggregation-friendly features, whether homogeneous class members, time-limited and relatively invariant toxic exposures, a signature disease, or narrowly banded damages. None of these conditions obtains here.

Putative Class Counsel's remaining arguments miss the mark. Isolating one part of the wide plaintiff-by-plaintiff and state-by-state variation that pervades this case, putative Class Counsel focus in on damages and assert (at Mot. 32-33) that courts have found Rule 23(b)(3)'s predominance requirement met even where separate proceedings would be required to determine individualized compensation calculations. It is true that damages alone cannot defeat certification. *See*, *e.g.*, *Levya v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013). It is also

---

[19] In fact, two members of putative Class Counsel have argued for the revival of the mass-torts class action in cases where technological advances and MDL centralization make possible a "participatory class action," defined by "engagement and participation by claimants and their individual lawyers, enabled by direct, frequent, and court-authorized communications among class counsel, class members, non-class counsel, and the courts themselves." Elizabeth J. Cabraser & Samuel Issacharoff, *The Participatory Class Action*, 92 N.Y.U. L. REV. 846, 859 (2017). As noted above, the proposed settlement, with its sprawling class of lawyer-less Roundup users, sits far outside this optimistic model of information flows.

[20] *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891, 927 (E.D. La. 2012) (collecting single-situs cases); NEWBERG ON CLASS ACTIONS § 4:62 (5th ed.) (observing that, to the extent mass tort cases survive certification, they tend to involve "mass accident[s]" with "a single event" at their core).

[21] Lower courts have nearly unanimously rejected class certification in pharmaceutical and medical device liability actions, including those seeking medical monitoring for future injury, because the proposed class actions failed to satisfy Rule 23's requirements. *See In re Fosamax Prod. Liab. Litig.*, 248 F.R.D. 389, 396 (S.D.N.Y. 2008) (collecting cases).

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement, Case No. 3:16-MD-02741-VC                 23

irrelevant.  Cases are legion in which variation in available damages was a central component of the court's finding that individualized questions eclipsed common ones.  *See*, *e.g.*, *Zinser*, 253 F.3d at 1189 (finding a lack of predominance after noting that "causation and damages" would present "many triable individualized issues"); *Daniel F. v. Blue Shield of California*, 305 F.R.D. 115, 130 (N.D. Cal. 2014) ("With regard to damages, individual issues also predominate."); *O'Donovan v. CashCall, Inc.*, 278 F.R.D. 479, 495 (N.D. Cal. 2011) (holding that "the issue of damages . . . presents an issue that would need to be evaluated on a case-by-case basis").  In any event, state-by-state and plaintiff-by-plaintiff variation in damages is only the beginning, not the end, of the drastic legal and factual variation that characterizes the sprawling, residual class proposed here.

Equally wide of the mark is putative Class Counsel's related suggestion (at Mot. 31-32) that variation in the availability of *punitive* damages cannot defeat predominance because punitives sound in society's interest in deterrence.  Putative Class Counsel cites no authority for the novel proposition that variation in punitives cannot defeat predominance,[22] and the Ninth Circuit has suggested otherwise.  *See Mazza*, 666 F.3d at 596 (considering "material differences in remedies given by state laws," including the availability of "punitive damages" and "treble damages," in concluding that "variances in state law overwhelm common issues and preclude predominance for a single nationwide class"); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1231 (9th Cir. 1996) ("[W]e were clearly troubled in *Dalkon Shield* by the problems that would

---

[22] The sole case cited in support, *Buchanan v. Tata Consultancy Servs., Ltd.*, No. 15-CV-01696-YGR, 2017 WL 6611653 (N.D. Cal. Dec. 27, 2017), was a job discrimination case in which the court observed in passing that, at an eventual trial in a case sought to be certified as a litigation class action, the question of whether punitive damages should be awarded was "capable of proof with evidence common to the class."  *Id*. at *19.  Contrary to putative Class Counsel's suggestion, the case did not address the question of whether differences in the availability of punitive damages across states could defeat the cohesiveness inquiry in a settlement class action.

David F. Engstrom

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    24

arise in endeavoring to apply the varying punitive damage standards of fifty different jurisdictions.").

Putative Class Counsel fare no better with a final argument (at Mot. 31): that the "structure of the Settlement" somehow supports a predominance finding. The *Amchem* Court emphatically rejected any such notion, holding that putative class members' common interest in settlement benefits cannot provide the "glue" needed to satisfy predominance. *See Amchem*, 521 U.S. at 623; *Hyundai*, 926 F.3d at 558; *see also Hanlon*, 150 F.3d at 1022 ("Settlement benefits cannot form part of a Rule 23(b)(3) analysis."). So should this Court.

\* \* \*

In short, putative Class Counsel errs in their framing of the predominance standard to be applied in settlement class actions. They are wrong on the balance of common and individual questions. And, in their many pages of briefing, they do not point to a single certified settlement class in a mass tort case like this one. They don't because they can't; no mass tort remotely like this one has ever before been certified.

### B.     The Proposed Class Action Fails to Meet Adequacy Under Rule 23(a)(4)

Above, we show that this putative class cannot be certified because it fails the predominance inquiry of Rule 23(b)(3). That, alone, compels this Court to deny putative Class Counsel's motion for certification. But, even if it were otherwise, class certification would nevertheless be improper for another and individually sufficient reason: A class action can only be certified if the class representatives and class counsel alike fairly and adequately protect the interests of the class. *See* Rules 23(a)(4) and 23(e)(2)(A). Here, both the class representatives and putative Class Counsel are inadequate; that, unto itself, is disqualifying.

Rule 23's adequacy safeguards are critical; they "serve[] to uncover conflicts of interest between named parties and the class they seek to represent" as well as the "competency and conflicts of class counsel." *Hyundai*, 926 F.3d at 566 (quoting *Amchem*, 521 U.S. at 625).

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    25

Because every class member is competing against every other member for benefits in a situation that is often zero-sum, the adequacy inquiry ensures that claimants with different interests are represented by representative plaintiffs whose interests mirror their own—and, simultaneously, represented by counsel whose undivided loyalties run exclusively to them.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) ("[C]ourts. . . must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations.").

Here, numerous adequacy problems loom large and give this Court ample reason to deny putative Class Counsel's motion.  They include:  (1) putative Class Counsel's failure to observe pre-certification procedural formalities in designating class and subclass counsel; (2) pervasive allocational conflicts; and (3) other, more elemental adequacy concerns, including a peculiar, lawyer-centered class definition that excludes identical claims and the proposed settlement's sprawling, uniquely expansive, *Amchem*-like nature.

### 1.    Putative Class Counsel Failed to Follow Pre-Certification Procedural Formalities

First, putative Class Counsel failed to observe critical pre-certification procedural formalities prior to negotiating the proposed settlement.  For an accounting, the Court need look no further than current putative Class Counsel's own expert.[23]  *See* Plaintiff Aaron Sheller's Corrected Second Renewed Motion to Appoint Fegan Scott LLC as Interim Class Counsel for the Medical Monitoring Class, Exhibit A, Declaration of Professor Charles Silver on Adequacy of Representation [Dkt. 11611-1] [hereinafter Silver Decl.].  That expert saw multiple problems in the making of Plan A:

---

[23] This expert, Professor Charles Silver of the University of Texas School of Law, was retained during the summer of 2020 to offer an opinion about the failures of fellow putative Class Counsel in negotiating the now-withdrawn Plan A.

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    26

- Prior to the start of negotiations, putative Class Counsel failed to request that this Court formally designate class and subclass counsel. Silver Decl. at 17-18 (noting that the first formal attempt to do so came in June 2020, roughly a year into the negotiations that produced Plan A).

- Putative Class Counsel failed to tie subclass counsel's fees to subclass recoveries to ensure that their financial interests ran only to subclass members. Silver Decl. at 19 (criticizing the lack of "ex ante fee-setting").

- The proposed subclass 2 was "headless" throughout the Plan A negotiations (until the filing of the First Amended Class Action Complaint), because the sole class representative in the initial complaint had already been diagnosed with NHL.[24] Silver Decl. at 15; *see also* Cabraser Decl. ¶ 6 (attesting that settlement negotiations began in July 2019).

- Putative Class Counsel failed to police conflicting loyalties where lawyers within their ranks were simultaneously representing MDL inventory claimants and putative class members—a plain-vanilla *Amchem / Ortiz* violation. Silver Decl. at 17-18 (noting certain putative Class Counsel's representation of MDL inventory clients, calculating the substantially higher fees available in those representations (33% versus 12%), and concluding that "[t]he potential for an *Ortiz*-style conflict is obvious").[25]

Putative Class Counsel's motion, filled with boilerplate recitals about heated and protracted negotiations, is silent on how, if at all, the above concerns were addressed. Neither the Second Amended Class Action Complaint nor the Class Action Settlement Motion or supporting materials details who among putative Class Counsel represented which class starting when or what precautions were taken to assure independent and unconflicted judgment.

Yet even if formalities were observed in the renewed negotiations that yielded Plan B, there is still good reason to doubt that subclass counsel exercised their independent and undivided judgment solely for the benefit of the subclass members because, try as they might, these lawyers were not writing on a clean slate. To the contrary, the Plan B negotiations necessarily built on the foundation laid in Plan A. At times, putative Class Counsel suggests

---

[24] This is a plain-vanilla violation of adequacy. *See Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 187–89 (3d Cir. 2012) (rejecting settlement class action where all class representatives fell into one subclass but not the other).

[25] This is also problematic. *See* NEWBERG ON CLASS ACTIONS § 13:50 (5th ed.) ("Simultaneous settlement of. . . a class suit and an inventory of individual suits may be a warning sign that the class's claims have been compromised in return for benefiting the other settlement.").

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement, Case No. 3:16-MD-02741-VC                    27

(Mot. at 64-66) that Plan B is a "revised version" of Plan A that takes account of this Court's concerns. At others, putative Class Counsel says (Mot. at 2) that Plan B rebuilt Plan A "from the studs on up." Either way, putative Class Counsel cannot paper over these grave procedural deficiencies, that infected the negotiations as the core structure of the proposed settlement took form. Adequate representation cannot be retrofitted.

**2. Allocational Conflicts Abound**

These procedural infirmities are all the more worrying because the proposed settlement is rife with allocational conflicts. For those Roundup victims who do not live in one of the benighted areas covered by the Diagnostic Accessibility Grant Program, the proposed settlement provides no programmatic benefit at all. *See* Settlement Art VIII (detailing grants to medical providers in particular service areas). Similarly, the proposed settlement's tort-litigation impediments last forever; the payment system does not. *See* Settlement Art. VII, XIII (providing for a four-year "Initial Settlement Period," followed by a default extension unless putative Class Counsel and Monsanto negotiate a different one). For a proposed class member who falls within the class by virtue of Roundup exposure as of February 3, 2021, but who receives an NHL diagnosis the day after the benefits period ends, the proposed settlement is pure downside. It brings only foregone punitive damages, juror-baffling Science Panel stipulations, and a potentially shrunken settlement fund. *See* Part III, *infra*.

These allocative conflicts, and the denial of entire species of relief to subgroups within the proposed class, raise significant red flags.[26] *See, e.g.*, *Rollins v. Dignity Health*, 336 F.R.D. 456, 465 (N.D. Cal. 2020) (denying certification of a settlement class and calling for subclassing where some class subgroups would not benefit from class-wide prospective relief and so faced

[26] *See* Advisory Committee notes to Rule 23(e)(2)(D) ("Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief.").

powerful incentives to prioritize immediate cash compensation); *Ferrington v. McAfee, Inc.*, No. 10-cv-01455-LHK, 2012 WL 1156399, at *13 (N.D. Cal. Apr. 6, 2012) (finding disqualifying conflict where settlement "would require an unknown subset of the class to relinquish its claims against Defendants for no consideration"); *see also Molski*, 318 F.3d at 955 (finding settlement conflicted where it "released almost all of the absent class members' claims with little or no compensation"); *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir. 2004) (rejecting proposed class settlement where it denied relief to an entire subclass); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 388 (C.D. Cal. 2007) ("The Court is aware of no case in which a settlement was allowed that partitioned a class so as to provide relief to one segment and to deny it completely to another.").  *See generally In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 797 (3d Cir. 1995) ("[A] settlement that offers considerably more value to one class of plaintiffs than to another may be trading the claims of the latter group away in order to enrich the former group."); Newberg on Class Actions § 13:56 (5th ed. 2020) ("A distribution of relief that favors some class members at the expense of others may be a red flag that class counsel have sold out some of the class members at the expense of others, or for their own benefit.").

Putative Class Counsel ignore these concerns and argue (Mot. at 27-28) that adequacy is fully satisfied here by the division of the proposed class into two subclasses:  one subclass for those with current NHL diagnoses, another subclass for those who have only suffered Roundup exposure.  It is true that *Amchem* drew a bright line in this regard:  Future claimants must be separated from current claimants and represented by named plaintiffs and subclass counsel whose loyalties run exclusively to them.  But as the above subclassing cases illustrate, *Amchem* did not define the outer limit of the obligations imposed by Rule 23(a)(4) or 23(e)(2).  *See, e.g.*, *Rollins*, 336 F.R.D. at 465 (denying certification and noting the need for subclassing).  Past

mass-torts cases, including the *Diet Drugs* case to which putative Class Counsel frequently analogize, have gone further to ensure formal alignment of interests between class counsel and class members and to protect against allocative conflicts, including those that result from variation in state law. In *Diet Drugs*, the settlement class included five discrete subclasses, keyed to the duration of drug ingestion and whether class members had been diagnosed with specific levels of valvular regurgitation. *Diet Drugs*, 2000 WL 1222042 at *19; *see also In re Telectronics Pacing Systems, Inc.*, 172 F.R.D. 271 (S.D. Ohio 1997) (creating a system of nine subclasses to address variations in state law).

That said, courts also rightly recognize that, where allocational conflicts are pervasive and subclassing cannot plausibly account for numerous uncommon issues, there may be a more basic problem with class certification. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 857 (1999) (noting that "at some point there must be an end to reclassification with separate counsel"); *Zinser*, 253 F.3d at 1192 n.8 (affirming trial court denial of certification and noting that "variations in state law cannot be so simply resolved" by subclassing); *Walker v. Liggett Group, Inc.*, 175 F.R.D. 226, 232 (S.D. W.Va. 1997) (rejecting subclassing as option where class was "uniquely expansive"); *see also* 1 MCLAUGHLIN ON CLASS ACTIONS § 4:45 (17th ed.) ("When the number or complexity of uncommon issues is too great, subclasses no longer offer an effective control mechanism and the need to parse the class too many times indicates a broader problem with class alignment."). Here, the inadequacy of putative Class Counsel's subclasses in addressing the allocational conflicts that dot the proposed settlement may demand a similar conclusion.

### 3. The Proposed Class Action Poses Elemental Adequacy Problems

The proposed settlement's failings under Rules 23(a)(4) doom certification. But, to focus on putative Class Counsel's failure to observe procedural formalities or adequately slice and dice

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement, Case No. 3:16-MD-02741-VC
30

the putative class risks missing the forest for the trees.  In two further and critical respects, the proposed class action poses more elemental adequacy problems and renders certification an unwise and inappropriate use of this Court's power.

First, the peculiar class definition at the heart of the proposed class action, as in *Amchem* and *Ortiz*, sweeps in anyone who has not yet filed suit or retained counsel for the purpose of doing so.  Erichson Decl. at ¶ 23 ("[T]he proposed class action is defined to carve out a large group of persons whose claims are otherwise identical to those of the class members, and the carve-out cannot be explained in terms of the requirements or goals of the class action rule.  This peculiar way of defining a class—which featured prominently and troublingly in both *Amchem* and *Ortiz*—is troubling here as well.").  A strong inference is that the class was drawn this way, either because putative Class Counsel are, themselves, representing claimants (and, understandably, don't want to be swept into this one-sided scheme), or because the exclusion tempers opposition to the proposed settlement from other, non-Class Counsel lawyers.  Erichson Decl. at ¶ 24.

A further inference is perhaps even more troubling—and it is inescapable.   The class definition advanced in the proposed settlement *could not* include already-represented individuals because, if properly counseled, these individuals would opt out in droves.  *Id*.  With the four litigated judgments in the Roundup litigation consistently hitting eight figures,[27] individuals who have already found counsel and are preparing to litigate their cases are demonstrably better off than they would be under the proposed settlement.  *Id*.; *see also* Part III, *infra*.

---

[27] When evidence of defendant's tortious conduct is presented to juries, judgments are high, even after remittitur.  *E.g., Hardeman v. Monsanto Co.*, No. 16-525 (N.D. Cal.) ($75 million reduced to $20 million); *Johnson v. Monsanto Co. et al.*, No. GC16550128 (Cal. Super.) ($250 million reduced to $39.25 million); *Johnson*, 52 Cal. App. 5th at 454, 462 (from $37 million to $14.3 million); *Pilliod v. Monsanto Co.*, No. RG17862702 (Cal. Super.) (from $1 billion each to $24.5 million and $44.8 million).

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                                          31

1
2
3
4
5
6
7
8
9
10

Second, it cannot be forgotten that this is a sprawling settlement encompassing tens of thousands of putative class members, each with an individualized set of circumstances and holding claims governed by different state laws. Many of those injured by Roundup are migrant workers who reside in any of fifty states, the District of Columbia, Mexico, and elsewhere. As already noted, some will be old, others young; some will have worked with Roundup for years, others months; some will have used Roundup in high quantities, others in lesser amounts; some will be blessed with strong immune systems, others will be cursed with the opposite; some—but only some—will perish, while others will live lives that are dimmed and diminished, in each of one thousand different ways.

11
12
13
14
15
16
17
18
19
20
21
22

The proposed settlement compresses all of this variation into a simple four-tiered grid, and so it is putative Class Counsel and Monsanto who have decided who will receive money and how much, and who will take nothing at all. That approach to essential allocation decisions might be defensible where a class is especially cohesive, where damages are relatively bounded, and where uniform law provides the rule of decision. *See*, *e.g.*, *Hanlon*, 150 F.3d at 1021 (affirming the district court's finding of adequacy where the case lacked a "structural conflict of interest based on variations in state law" where, among other things, "differences in state remedies are not sufficiently substantial so as to warrant the creation of subclasses"); *id*. at 1021 (noting further that "the prospects for irreparable conflict of interest [were] minimal" because the class featured "relatively small differences in damages and potential remedies").

23
24
25
26
27
28

But in a sprawling, anyone-without-a-lawyer mass tort like this one with significant plaintiff-by-plaintiff and state-by-state variation, there is simply inadequate assurance that even well-intentioned counsel could have exercised independent judgment and served as the loyal and unconflicted champion for each absent class member, while hashing out the proposed settlement's myriad moving parts. Rules 23(a)(4) and (e)(2) do not allow putative Class Counsel

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement, Case No. 3:16-MD-02741-VC          32

to make so many choices on behalf of so many, no matter how expert counsel may be or how reasonable those choices may seem.  That is the teaching of *Amchem*, and it is why certifying the proposed class and approving the proposed settlement would be an inappropriate and unwise use of this Court's power.

## III.   The Proposed Settlement Is Not Fair, Reasonable, or Adequate

Last but not least, putative Class Counsel's motion must be denied because the proposed settlement flunks Rule 23(e).  A class settlement may not be approved unless it "is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e).  The proposed settlement is none of these things.

The standard this Court must apply in assessing a settlement is admittedly open-ended. *See* Fed. R. Civ. P. 23(e)(2) (listing numerous factors); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 895 F.3d 597, 610 (9th Cir. 2018) ("There are few, if any, hard-and-fast rules about what makes a settlement "fair" or "reasonable.").  But even so, this Court's Rule 23(e) inquiry must be searching—and, where as here, a proposed settlement is negotiated pre-certification, a Court must be especially scrupulous in assessing its terms.  *In re Volkswagen*, 895 F.3d at 610–11 ("When, as here, the settlement was negotiated before the district court certified the class . . . we require the district court to undertake an additional search . . . .") (quotation marks omitted); *Hanlon*, 150 F.3d at 1026 (calling for "a more probing inquiry" under Rule 23(e)); *Ferrington*, 2012 WL 1156399 at *8 ("When the class settlement precedes formal, adversarial class certification, the approval of the settlement requires a higher standard of fairness.").

Distilling its many moving parts to their essentials, the proposed settlement couples a low-ball compensation program with a draconian set of constraints on future litigation.  Erichson Decl. at ¶ 13.  The resulting choice facing putative class members is an illusory one—an unfair

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    33

Hobson's choice between two bad alternatives.  On one side of that choice are stingy compensation packages, with a patchwork of programmatic relief that will never reach many putative class members, and dollar amounts far out of line with the actual damages suffered by many Roundup users and the trial judgments achieved by plaintiffs to this point.  On the other side of that choice is a delayed and hobbled tort action, with punitive damages stripped away, but newly weighed down with juror-baffling fact stipulations based on the Science Panel's findings.

### A.   The Proposed Settlement's Lowball Value to Putative Class Members Is Unfair, Unreasonable, and Inadequate

The simplistic, four-tiered settlement grid, whatever its other defects, offers what is, at best, restricted compensation to those injured by Roundup.  Awards top out at $200,000 absent "extraordinary" circumstances, even though a plaintiff's potential at trial may be multiples of that amount depending on the extent of a putative class member's disease and, if the person dies, the wrongful death benefits that beneficiaries may pursue.  Settlement at § 6.1.

Even eyeballing the proposed settlement's compensation grid confirms its inadequacy in compensating those who are suffering or will suffer from NHL.  But the stinginess of the proposed settlement is still clearer when compared to the handful of litigated judgments to this point.  Those judgments, as noted previously, have consistently reached eight figures, even after remittitur.[28]

Disparities between settlement amounts and results achieved in analogous litigation contexts is a standard factor courts use to gauge a settlement's adequacy.  *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 6619983, at *8 (N.D. Cal. Dec. 18, 2018) (comparing recoveries in other, similar cases); NEWBERG ON CLASS ACTIONS § 13:15 (5th ed.) (noting the "adequacy by analogy" approach and the tendency of courts to look "at the amount plaintiffs

---

[28] *See* note 28, *supra* (detailing litigated judgments of $20 million, $39.25 million, $24.5 million, and $44.8 million).

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    34

recovered in similar cases").  Here, the yawning disparities between the settlement compensation and recent litigated judgments compels the conclusion that the settlement falls below what is fair, reasonable, and adequate.

The programmatic relief—particularly the cy-près-like Diagnostic Accessibility Grant Program—likewise fails under Rule 23(e).  Cy-près awards are a disfavored substitute for direct distribution of benefits to class members, particularly where, as here, their benefits flow in patchwork fashion.  *See Molski*, 318 F.3d at 954–55; *see also Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1308 (9th Cir. 1990) (holding that a cy près distribution of humanitarian aid in Mexico was an abuse of discretion because, given the "broad geographic distribution of the class," there was "no reasonable certainty" that any class member would benefit from it, even though the money would go "to areas where the class members may live").

**B.    The Proposed Settlement Imposes Numerous Unfair and Unreasonable Constraints on Putative Class Members' Litigation Rights**

The proposed settlement's inadequate compensation and its patchwork programmatic relief are alone enough to deny putative Class Counsel's motion.  But the proposed settlement couples stingy compensation and uneven benefits with a raft of unfair litigation impediments designed to steer putative class members away from litigation by restricting their ability to vindicate their rights in court.  Erichson Decl. at ¶¶ 12-14.  Three such impediments stand out as particularly unfair and unreasonable:  (1) an unexplained and inexplicable four-year litigation standstill; (2) the release of medical monitoring claims and punitive damages; and (3) a secretive Science Panel whose outputs—and the procedures for handling those outputs at trial—will, for all intents and purposes, carry issue-preclusive effect with baffled jurors.[29] We discuss each in turn.

---

[29] These three examples do not exhaust the proposed settlement's litany of unfair and unreasonable impediments.  Two further examples include:  (1) the punitive provision that

David F. Engstrom

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                                35

### 1.    The Unexplained Four-Year Litigation Standstill

First, the four-year standstill on litigation is an unreasonable constraint on litigation— and, worse, a clear boon for Monsanto.  Over the next four years, some putative class members will tragically die from NHL.  When that happens in states such as California, damages for pain and suffering will die with them.[30]  Survivors in other states will be left with wrongful death and survival actions that offer inferior remedies.[31]  For many putative class members and their loved ones, the four-year litigation stay is hardly, as putative Class Counsel put it (Mot. at 44), a "small concession."

Putative Class Counsel nonetheless reassure this Court (Mot. at 53-54) that a four-year standstill is defensible because the COVID-19 pandemic will stymie litigation in any event.  This is nonsense.   With vaccination rates steadily rising,[32] courthouses—which are, in many instances, *already* re-opened as a result of the resourcefulness and pluck of judges and court staff—will soon return to something close to business-as-usual.  In any event, putative Class Counsel's pandemic argument fails on its own terms.  The course of the pandemic and the actual status of the nation's courthouses, not an arbitrary four-year immunity from liability for

---

penalizes putative class members for even requesting a compensation determination by making the claims administrator's offer an offer of judgment under Fed. R. Civ. P. 68, allowing Monsanto to pursue what amounts to a sanction depending on the litigation result, *see* Settlement at § 7.13(e); and (2) the proposed settlement's provision of only a single opt-out period beyond the initial opportunity to stay out, which stands in stark contrast to the *Diet Drugs* settlement—a case on which putative Class Counsel repeatedly rely—which combined substantial medical monitoring with multiple intermediate and back-end opt-out opportunities, *see Diet Drugs*, 2000 WL 1222042 at *25, *55.

[30] Cal. Civ. Proc. Code § 377.34 ("In an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death. . .  and do not include damages for pain, suffering, or disfigurement.").

[31] *See generally* Eric A. Posner & Cass R. Sunstein, *Dollars and Death*, 72 U. Chi. L. Rev. 537 (2005) (explaining that tort law inadequately compensates in the event of death and thus leads to "underdeterrence").

[32] Tarini Parti & Sabrina Siddiqui, *Biden Expects U.S. to Have Covid-19 Vaccines for All Adults by End of May*, Wall St. J. (March 2, 2021), https://www.wsj.com/articles/biden-to-announce-merck-will-help-make-johnson-johnson-vaccine-11614693084.

---

David F. Engstrom

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    36

Monsanto, should determine when Roundup victims can present their claims at trial.  *See* Part I, *supra*.

Putative Class Counsel's remaining arguments in support of the four-year litigation standstill fare no better.  Under Plan A, the stated reason for a litigation stay was to leave time for the Science Panel to do its work.  *See* Settlement (Plan A) § 16.2(b) ("The Settlement Agreement provides for a standstill period so that the Science Panel may conduct the Scientific Analysis and issue the Science Panel Determination.").  This time round, putative Class Counsel again invokes the Science Panel—and adds in the need to "facilitate the operation of the Funded Class Benefits."  *See* Settlement § 18.2(b).  Neither of these grounds make sense.  For starters, it was never obvious why class members cannot request and receive compensation even as other class members choose to pursue their claims in court.  After all, delay tends to benefit defendants in litigation, especially tort litigation, as claimants' bills mount, memories fade, evidence disappears, and, as noted previously, victims pass away.  Justice delayed serves only Monsanto's interests.  Nor is it clear why litigation cannot proceed while the Plan B Science Panel performs its "advisory" work—or, for that matter, why that work is a four-year undertaking.  As with the Science Panel in its Plan A guise, the Plan B Science Panel—a mere sifter and sorter of evidence—does not perform any actual science.  *See* Part III.A.3, *infra*.

Perhaps the best putative Class Counsel can say here is where it lands in its motion:  that the standstill is "critical to the deal" (Mot. at 67) and "an important piece of what Monsanto bargained for" (Mot. at 69).  But that does not make it either fair or reasonable.  Instead, the standstill is emblematic of a wider settlement that offers limited compensation while simultaneously disabling putative class members from vindicating their rights in court.

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC           37

## 2.       The Surrender of Punitive Damages

The proposed settlement's release of punitive damages is a second litigation impediment that is plainly designed to shunt unwary class members who fail to opt out at the outset into an anemic compensation scheme.   As with the unexplained four-year litigation standstill, the proposed settlement's provision surrendering punitive damages on behalf of absent class members is not fair, adequate, or reasonable.

In the Roundup trials to this point, punitive damages have figured prominently, and jurors have proven consistently willing to award them once educated about Monsanto's conduct.  *See* note 28, *supra*.  Against that backdrop, and with the curtain pulled back on Monsanto's conduct, a shield against punitive damages understandably sits at the top of the company's wish-list. Erichson Decl. at ¶ 15.

Yet, while it's certainly understandable that Monsanto would want protection from punitive damages, it's less clear why putative Class Counsel would trade away such damages so lightly.  Defending their decision, putative Class Counsel contend (Mot. at 5, 48) that "punitive damages are not an individual right" and that this fact justifies their surrender in the proposed settlement.   This is wrong.   For starters, some states explicitly frame punitive damages as individual rights.  *See*, *e.g.*, *Watts v. S. Bound R.R. Co.*, 38 S.E. 240, 242 (S.C. 1901) ("[P]unitive damages go to the plaintiff, not as a fine or penalty for public wrong, but in vindication of a private right which has been willfully invaded."); *see also Clark v. Cantrell*, 529 S.E.2d 528, 533 (S.C. 2000) ("Punitive damages . . . serve to vindicate a private right of the injured party by requiring the wrongdoer to pay money to the injured party.").

Moreover, punitive damages serve the *twin* goals of deterrence and punishment. Punitive damages, of course, serve to deter by protecting society from future misconduct; as such, they can be seen in societal terms.  *See*, *e.g.*, *Mathias v. Accor Economy Lodging, Inc.*, 347

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    38

F.3d 672 (7th Cir. 2003) (Posner, J.).  But punishment is also an aim—and that's different. Punitive damages are a reward for a plaintiff who has been harmed by the defendant's reprehensible conduct.  This grounding in the particular harm the plaintiff has sustained is why due process review of punitive damages compels courts to consider "the relationship between the penalty and the harm to the victim caused by the defendant's actions." *Cooper Indus., Inc. v. Leatherman Tool Grp.*, Inc., 532 U.S. 424, 435 (2001); *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996) (holding that the "disparity between the harm or potential harm suffered by [the plaintiff] and [the] punitive damages award" is one of the three guideposts for due process review of punitive damages).  The Supreme Court's jurisprudence makes plain that punitive damages are a particularized—and deeply personal—form of punishment.

In sum, it is a gross oversimplification for the movants to imply that potential class members have no individual right to recover punitive damages.  The substantive law of most states grants them such a right—and does so to vindicate their individual interests in punishing especially culpable wrongdoers for injuries inflicted on them personally.[33]  As a result, to wrest punitive damages from putative class members without adequate consideration constitutes a serious deprivation and should not be done lightly.

Putative Class Counsel try (Mot. at 48 & n.12) a final argument:  that the release of punitive damages is reasonable because the Ninth Circuit has rejected the notion that punitive damages can be considered in gauging a proposed settlement's adequacy.  But the case on which putative Class Counsel relies, *Rodriguez v. West Publishing Corporation*, 565 F.3d 948 (9th Cir. 2009), holds no such thing.  At best, *Rodriguez* stands for the proposition that a proposed

---

[33] Academic commentators agree.  *See* Catherine M. Sharkey, *Punitive Damages As Societal Damages*, 113 YALE L.J. 347, 359 (2003) ("The prevailing justification for punitive damages is individually oriented, retributive punishment."); Thomas B. Colby, *Clearing the Smoke from Philip Morris v. Williams: The Past, Present, and Future of Punitive Damages*, 118 YALE L.J. 392, 479 (2008) ("To punish the defendant for the wrong done to the plaintiff is to vindicate the plaintiff's private interest in revenge—a legitimate goal of the civil law.").

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    39

schedule of settlement payouts *could* be deemed reasonable even where the dollar ranges do not encompass *maximum* available damages in the form of the treble damages provided for in federal antitrust law.  *Id.* at 965 ("We have never precluded courts from comparing the settlement amount to both single and treble damages. By the same token, we do not require them to do so in all cases.").  *Zepeda v. Paypal, Inc.*, the other case on which putative Class Counsel relies, is no different.  No. C 10-1668 SBA, 2017 WL 1113293, at *12 (N.D. Cal. Mar. 24, 2017) (rejecting the contention that a settlement, to be fair, must reflect the "maximum potential recovery").

Contrary to putative Class Counsel's suggestion, there is no barrier to this Court's consideration of the proposed settlement's release of punitive damages.  In the course of that consideration, this Court should conclude that the proposed settlement's surrender of punitive damages, whether standing alone or combined with the other litigation impediments designed to maximally shunt putative class members into an anemic compensation scheme, is not fair, adequate, or reasonable.

### 3.    The Juror-Baffling Science Panel

The Science Panel is a third litigation impediment, and a third barrier to putative class members' ability to vindicate their rights in court, that renders the proposed settlement neither fair, adequate, nor reasonable.

Though putative Class Counsel describe the Science Panel as "advisory only" and a mere "guidepost" (Mot. at 6), the reality is that the use of its outputs at trial will carry something approaching issue-preclusive effect.  Under the proposed settlement, the Science Panel's findings "will constitute stipulated facts" in any subsequent proceeding, and the parties "will not contradict any of the stipulated facts contained [therein]."  Settlement § 12.3(d)(ii).  Nor may either side "instruct or otherwise tell the jury it is not bound by any of the stipulated facts [therein]."  *Id.* at § 12.3(d)(iii).  In the very next breath, however, the parties agree that neither of

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    40

these restrictions impairs their right to "contest the result of the Science Panel determination." *Id*. at § 12.3(d)(iv).

This is hardly a model of drafting clarity, but the practical effect is clear:  In the event of a negative or high-threshold finding by the Science Panel, trial counsel for putative class members must stay strangely mum about the stipulation, even as they adduce evidence— including scientific studies and also, based on a late-breaking amendment to the proposed settlement agreement, exit-interview deposition testimony from Science Panel members [Dkt. 12665]—that calls into question the Science Panel's findings.  The potential for juror confusion, with an elephant-sized stipulation sitting in a corner of the jury box even as new and contradictory studies and piped-in deposition testimony are entered into evidence, is obvious.  There is a reason that muddying evidence is a defense tactic, not a plaintiff one.   Juror bafflement tends to harm the party with the burden of proof.

The Science Panel's practically binding effect at trial exacerbates two further concerns that render the proposed settlement unfair, inadequate, and unreasonable.  First, the proposed Science Panel is blindered—and, relatedly, it does not in fact "do" any science.  Falsely billed in Plan A as a "knowledge remedy,"[34] the Plan B version of the Science Panel still cannot produce scientific knowledge in any usual sense.  It cannot perform any primary research.  It cannot requisition research from others.  And it cannot consider materials beyond a closed set, even emergent and highly probative research, at least not without the Settlement Administrator's leave or a complex reconsideration process.     Settlement § 12.2.   Instead, the Panel performs a

---

[34] *See* Dkt. 11042 at 2, 20; *see also* Alexandra D. Lahav, *The Knowledge Remedy*, 98 TEX. L. REV. 1361 (2020).

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC            41

weighing of already-existing scientific knowledge—a sorting and sifting of studies or, in scientific and social scientific parlance, a "meta-analysis."[35]

This is a crucial fact, for it is a cornerstone of the civil justice system that juries, not judges or experts, sift evidence and make fact determinations.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (noting that the function of the judge at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"); *Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1301 (9th Cir. 1978) ("It is the jury, not the judge, which weighs the contradictory evidence and inferences, judges the credibility of witnesses, . . . and draws the ultimate conclusion as to the facts . . . .") (quotation marks omitted).

A similar anxiety about invading the province of judges animates courts' insistence on reserving decision authority when expert panels or technical advisors are retained pursuant to Fed. R. Evid. 706.  *See, e.g., DeLuca v. Merrell Dow Pharm.*, 911 F.2d 941, 956 n.17 (3d Cir. 1990) (noting acceptability of using court-appointed expert in Bendectin case because judge retained decision authority); *United States v. Microsoft*, 147 F.3d 935, 955 & n.22 (D.C. Cir. 1998) (vacating appointment of special master in antitrust case, and noting that "[t]o the extent that adjudication may lead the court into deep technological mysteries," appointment of an expert witness under Rule 706 is "a far more apt way of drawing on expert resources than the district court's unilateral, unnoticed deputization of a vice-judge"); *Renaud v. Martin Marietta Corp.*,

---

[35] A comparison of the proposed Science Panel to earlier efforts by courts to draw expertise into mass-torts cases is stark.  The "neutral science panels" used in the breast implant litigation in the 1990s, or the panel created in the Dupont C8 litigation, suffered from no such constraints. Indeed, the latter panel performed actual bench science—drawing blood samples from thousands of community members in order to generate estimates about general causation.  *See* FEDERAL JUDICIAL CENTER, NEUTRAL SCIENCE PANELS: TWO EXAMPLES OF PANELS OF COURT-APPOINTED EXPERTS IN THE BREAST IMPLANTS PRODUCT LIABILITY LITIGATION (2001), https://www.fjc.gov/content/neutral-science-panels-two-examples-panels-court-appointed-experts-breast-implants-product-1 (describing breast implant panels); Lahav, *supra* note 34, at 1366-69 (describing C8 science panel).

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    42

749 F. Supp. 1545, 1548 (D. Colo. 1990), aff'd, 972 F.2d 304, 308 (10th Cir. 1992) (noting testimony of three court-appointed experts, but also noting that the judge retained full decision authority).

The proposed settlement runs roughshod over these concerns and binds absent class members to a determination that, at the least, seriously impinges, and, at the worst, wholly forfeits their right to trial. On those grounds alone, this Court should reject the proposed settlement as unfair, inadequate, and unreasonable. But the Science Panel raises a second concern that is perhaps even more fundamental: The Science Panel is cloistered—a secret, black box process that operates with strict controls on ex parte contacts and (based on the late-breaking settlement amendment), only glancing adversarial testing by way of a one-day, exit-interview deposition of Science Panel members but no live testimony at trial. Settlement § 12.6; Dkt. 12665.

Note the grave effect: The proposed settlement effectively binds absent class members to a Science Panel determination that results from a decision process that would not itself carry issue-preclusive effect in ordinary civil litigation. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 28(5)(c) (noting that issue preclusion is available only where there has been a "full and fair opportunity" to litigate); *Allen v. McCurry*, 449 U.S. 90, 95 (1980) (stating and applying the general rule that issue preclusion is unavailable where the prior determination was made on a partial record or without full discovery and adversarial testing); *Public Utility Dist. No. 1 of Snohomish County, Washington v. Federal Emergency Management Agency*, 371 F.3d 701, 708 (9th Cir. 2004) (denying preclusion where "there was 'no hearing, no testimony, no subpoenaed evidence, no argument, no opportunity to test any contention by confrontation'"); *Jacobs v. CBS Broadcasting, Inc.*, 291 F.3d 1173, 1176–1179 (9th Cir. 2002) (holding that a lack of adversarial testing, cross examination, and examination of evidence from other parties defeated preclusion).

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement, Case No. 3:16-MD-02741-VC                43

In sum, like the settlement of which it is a part, the Science Panel process is more than just a concession.  It is a capitulation—and one that is contrary to the bedrock norms of due process and the American adversarial system.  Approving the proposed settlement would not be an appropriate or wise use of this Court's power under Rule 23(e).

## CONCLUSION

The motion should be denied.

Respectfully submitted,

_____/s/ David F. Engstrom_____
David F. Engstrom (SBN 314688)
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: (650) 721-5859
Fax: (650) 725-0253
dfengstrom@stanford.edu

Russell Post
**Beck Redden LLP**
1221 McKinney Street, Suite 4500
Houston, TX 77010
Telephone: (713) 951-3700
rpost@beckredden.com

Dated:  March 4, 2021

*Counsel for Objectors Arnold & Itkin LLP and Kline & Specter, P.C.*

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    44

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that service of this document was accomplished pursuant to the Court's electronic filing procedures by filing this document through the ECF system.

_____/s/ *David F. Engstrom*_____
David F. Engstrom

Dated:  March 4, 2021

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                45