# APPENDIX A

Declaration of Professor Howard M. Erichson

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL NO. 2741 |
| | Case No. 3:16-md-02741-VC |
| THIS DOCUMENT RELATES TO: | **Declaration of Professor Howard M. Erichson** |
| Ramirez, et al. v. Monsanto Co., Case No. 3:19-cv-02224 | |

I.    INTRODUCTION AND QUALIFICATIONS

1.    I am a Professor of Law whose scholarship focuses on the procedure and ethics of complex litigation, particularly issues concerning class and non-class resolution of mass disputes. Counsel for objectors have retained me to provide my opinion on whether the proposed Class Action Settlement Agreement filed February 3, 2021 in *In re Roundup Products Liability Litigation*, MDL 2741 (N.D. Cal.) is a fair and appropriate use of the class action device. After setting forth my qualifications, I will explain why, in my view, the proposed settlement raises concerns of unfairness to future Roundup plaintiffs and why it is not an appropriate use of the class action device for resolving this mass tort litigation.

2.    I am currently a Professor of Law at Fordham University, where I have been a tenured professor since 2008, teaching Civil Procedure, Complex Litigation, Professional Responsibility, and Torts. For the prior thirteen years, I was on the tenure-track and tenured faculty at Seton Hall University School of Law, where in 2007 I was named the John J. Gibbons Professor of Law. I have been a Visiting Professor at Columbia Law School and Vanderbilt Law School, and a Visiting Scholar at NYU Law School. I

am the co-author of a leading casebook on complex litigation (Marcus, Sherman, Erichson, & Bradt, COMPLEX LITIGATION: CASES & MATERIALS ON ADVANCED CIVIL PROCEDURE (West Academic 7th ed. forthcoming 2021)), as well as a new casebook on civil procedure (Erichson & Glover, CIVIL PROCEDURE (Aspen 2021)). I have published numerous articles on the procedure and ethics of civil litigation, with particular focus on litigation and settlement of mass disputes. Some of my articles that have particular relevance to this declaration are *Aggregation as Disempowerment: Red Flags in Class Action Settlements*, 92 Notre Dame L. Rev. 859 (2016); *The Problem of Settlement Class Actions*, 82 Geo. Wash. L. Rev. 951 (2014); *Consent Versus Closure*, 96 Cornell L. Rev. 265 (2011) (with B. Zipursky); *CAFA's Impact on Class Action Lawyers*, 156 U. Pa. L. Rev. 1593 (2008); *A Typology of Aggregate Settlements*, 80 Notre Dame L. Rev. 1769 (2005); *Beyond the Class Action: Lawyer Loyalty and Client Autonomy in Non-Class Collective Representation*, 2003 U. Chi. Legal F. 519; *Informal Aggregation: Procedural and Ethical Implications of Coordination among Counsel in Related Lawsuits*, 50 Duke L.J. 381 (2000); and *Mass Tort Litigation and Inquisitorial Justice*, 87 Geo. L.J. 1983 (1999). My work has been widely cited by courts and in legal scholarship. Past roles of relevance to this declaration include serving as an Advisor to the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION, as Chair of the Civil Procedure Section of the Association of American Law Schools, as Co-Reporter for the MASS TORT LITIGATION MANUAL of the American College of Trial Lawyers, and as a member of the Third Circuit Task Force on Selection of Class Counsel. I have served as a consultant on a number of mass tort settlements and as an expert regarding various aspects of complex civil litigation. Earlier in my career, I served as a law clerk to Justice Stewart Pollock of the

New Jersey Supreme Court and to Chief Judge James L. Oakes of the U.S. Court of Appeals for the Second Circuit, and I practiced as a litigator at Cleary, Gottlieb, Steen & Hamilton in New York. I graduated from Harvard University and from NYU Law School, where I served as editor-in-chief of the NYU Law Review. Much of the work of my career—especially in my published law review articles—has been devoted to seeking to understand the structures of mass dispute resolution, the incentives that drive those structures, and the ways in which masses of claimants may be treated unfairly in settlements purportedly negotiated on their behalf. My curriculum vitae is attached.

3.  I have reviewed the proposed Class Action Settlement Agreement filed February 3, 2021 in *In re Roundup Products Liability Litigation*, MDL 2741. Based on my experience and knowledge, I can offer some perspective on the structure of the proposed settlement and how this attempt fits into the history of mass tort litigation. Structurally, the proposed settlement is a novel and interesting attempt to use Rule 23 to achieve a comprehensive resolution of mass tort litigation by sweeping future claims into a process for generating compensation offers, and by imposing litigation constraints on those who decline to participate in the compensation program. But in important respects the effort replicates the problems that plagued the efforts to sweep up future claims in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) and *Fibreboard Corp. v. Ortiz*, 578 U.S. 815 (1999). The proposed Roundup class settlement structure, even as it attempts to navigate around some of the pitfalls of past efforts, raises concerns about fairness to future claimants and appears to violate the constraints of Rule 23 that are intended to ensure that the class action device is used only under circumstances where class members' claims are sufficiently cohesive to

justify class treatment. In reviewing the proposal, the court should worry about several categories of concerns: whether the proposal's assurances of fairness are real or illusory, keeping in mind the skepticism that courts should bring to mass tort settlement class actions; whether the class members (future Roundup claimants) are being treated fairly relative to those carved out of the class definition (Roundup plaintiffs with pending cases); and whether the class members' claims and interests diverge in ways that belie predominance and undermine adequacy of representation.

II.   THE HISTORY OF MASS TORT SETTLEMENT CLASS ACTIONS HAS BEEN ONE IN WHICH DEFENDANTS SEEK CLOSURE, WOULD-BE CLASS COUNSEL AGREE TO PROVIDE IT, AND COURTS PUSH BACK TO PREVENT UNFAIRNESS

4.   The history of mass tort settlement class actions has been one in which defendants and would-be class counsel, in case after case, have agreed to terms that would sweep claims into a single massive deal, and courts have pushed back by asking two broad types of questions: Are the claims sufficiently cohesive to justify class treatment at all? And do the deals provide sufficient structural protection to warrant binding class members, or do they instead raise concerns that class members are being treated unfairly?

5.   In *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), a consortium of asbestos defendants struck a deal with would-be class counsel to resolve future asbestos claims by using a Rule 23(b)(3) settlement class action to sweep up claims that had not yet been filed. Like the proposed Roundup settlement class action, the *Amchem* class was defined as exposed persons who had not filed a case by a certain date. The Supreme Court in *Amchem* rejected the deal for multiple reasons, especially concerns about predominance, adequacy, the conflict of interest between class members with current asbestos-related ailments and exposure-only class members who might be diagnosed

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

later with such ailments, and whether the negotiating lawyers had struck a deal that advantaged the so-called "inventory claims" (*i.e.*, the claims of plaintiffs whose cases had already been filed) over the future claims of class members. Similarly, in *Fibreboard Corp. v. Ortiz*, 578 U.S. 815 (1999), an asbestos defendant struck a deal with would-be class counsel to resolve future asbestos claims by a settlement class action to sweep up claims that had not yet been filed, but this one was attempted as a Rule 23(b)(1)(B) "limited fund" class action. The Supreme Court rejected the *Ortiz* settlement, which raised many of the same concerns as the *Amchem* settlement but had the additional problem of inadequate justification for invocation of the "limited fund" concept. As in *Amchem*, the *Ortiz* class definition carved out the claims of persons who already had filed cases, raising concerns about whether lawyers were disadvantaging future claimants relative to present clients.

6.   After *Amchem* and *Ortiz*, and in light of a slew of decisions by Courts of Appeals decertifying mass tort litigation class actions, mass tort lawyers shied away from using the class action device to resolve mass torts involving personal injuries or deaths. One important exception, however, was in the mass tort litigation over the "fen-phen" diet drug combination. Wyeth negotiated a nationwide Rule 23(b)(3) settlement class action that won judicial approval in part by using a set of intermediate and back-end opt-out rights to provide the sort of structural assurance of fairness that the Supreme Court demanded in *Amchem*. *Brown v. American Home Prods.*, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000). By some accounts, the fen-phen settlement turned out to be a disaster for Wyeth. As Professor Marcus summarizes it, "a flood of claimants wildly in excess of what Wyeth projected overwhelmed the $3.55 billion pledge to fund the settlement. … Even as Wyeth desperately poured additional funds into the settlement

Declaration of Professor Howard M. Erichson
3:16-md-02741-VC

to dissuade high-value claimants from opting out, tens of thousands of claimants chose their own tort suits rather than collect from the desiccated compensation program. In the end, the parties reworked their deal to cut out back-end opt-out rights. The whole misadventure has cost Wyeth at least $21 billion." David Marcus, *Some Realism about Mass Torts*, 75 U. Chi. L. Rev. 1949, 1965-66 (2008) (reviewing and citing Richard A. Nagareda, MASS TORTS IN A WORLD OF SETTLEMENT (2007)). *See also* Samuel Issacharoff & Richard A. Nagareda, *Class Settlements Under Attack*, 156 U. Pa. L. Rev. 1649, 1691-92 (2008) (calling the fen-phen settlement "[t]he most ambitious class settlement to be approved in the mass tort area since *Amchem*" and noting that "[t]he back-end opt-out rights created by the original fen-phen class settlement, like many novel experiments in the law, proved to be vulnerable in practice" due to numerous and dubious claims, unexpectedly large numbers of opt-outs, and other problems).

7.   Since the fen-phen debacle, the challenge of mass tort settlements may be described in terms of how to navigate between the Scylla of *Amchem* (having a deal rejected for failing to respect the constraints of Rule 23 and failing to treat future claimants fairly) and the Charybdis of fen-phen (failing to provide sufficient closure for the defendant). Many mass tort resolutions have occurred by non-class aggregate settlements, where—if done correctly under the requirements of legal ethics rules (particularly the "aggregate settlement rule" of ABA Model Rule of Professional Conduct 1.8(g) and its equivalents)—claimants are given disclosure of the material terms of the deal before deciding whether to give their informed consent to participate in the settlement. Some mass tort settlements have used ethically questionable means to pressure lawyers and clients to participate, such as the Vioxx deal's provision that lawyers

withdraw from representing clients who decline to participate in the settlement. In others, parties have attempted to revive the settlement class action, with mixed success. Recently, in the opioid MDL, some of the plaintiffs' lawyers proposed a promising new structure for attempting to use Rule 23 to achieve a comprehensive settlement, but the Sixth Circuit rejected the proposed "negotiation class action" as outside the bounds of the rule. *See In re National Prescription Opiate Litig.*, 976 F.3d 664 (6th Cir. 2020). The broad point is that one can see the proposed Roundup settlement class action as an effort by Monsanto and by putative class counsel to sweep massive numbers of future claims into a single comprehensive deal, providing closure to the defendant and providing fees to class counsel, but the fact that these negotiating parties (Monsanto and putative class counsel) share an interest in achieving the deal does not answer the question of whether the dispute is suitable for class treatment or whether the deal treats future claimants fairly.

III.   SETTLEMENT CLASS ACTIONS AND THE RISK OF ILLUSORY ASSURANCE OF FAIRNESS

A.   MASS TORT SETTLEMENT CLASS ACTIONS REQUIRE CAREFUL SCRUTINY AND MUST PROVIDE STRUCTURAL ASSURANCE OF FAIRNESS

8.   When dealing with any proposed settlement class action, a starting point is to recognize the problem that lawyers negotiating a deal as putative class counsel lack the leverage that comes with being able to take class claims to trial. This is an important difference between class actions certified solely for settlement purposes and class actions that reach settlement after being certified for litigation. The latter, while not immune to bad settlement proposals, at least involve a negotiation in which plaintiffs' counsel can threaten to take the class claims to trial if not satisfied with the defendant's offer, and in which plaintiffs' counsel are not dependent upon the

defendant for the power to represent the class. I have written about this issue in *The Problem of Settlement Class Actions* (2014) and elsewhere, and other scholars in the field of complex litigation have similarly recognized the structural concern that settlement class actions favor defendants and disfavor absent class members because putative class counsel lack the power to try class claims and their power and fees as class counsel depend upon striking a deal. The problem occurs whenever putative class counsel negotiate a deal prior to obtaining class certification, but it occurs in its most concerning form in cases, such as this one, where it is unlikely that the claims could ever be certified as a class action for litigation purposes.

9. The Supreme Court and the Ninth Circuit have made it clear that, while the inadequate-leverage problem does not render settlement class actions impermissible as a rule, it provides a reason for district courts to scrutinize such proposed deals closely and to permit such settlement class actions only in appropriate cases. In *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621 (1997), the Supreme Court noted that "if a fairness inquiry under Rule 23(e) controlled certification, eclipsing Rule 23(a) and (b), and permitting class designation despite the impossibility of litigation, both class counsel and court would be disarmed. Class counsel confined to settlement negotiations could not use the threat of litigation to press for a better offer." The Ninth Circuit has employed similar reasoning to explain the proper mindset for courts to adopt when reviewing settlement class actions: "But where, as here, class counsel negotiates a settlement agreement before the class is even certified, courts 'must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations.'" *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th

Cir. 2012) (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011)). "In such a case, settlement approval 'requires a higher standard of fairness' and 'a more probing inquiry than may normally be required under Rule 23(e).'" *Id.* (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

10. In other words, to whatever extent courts may sometimes attach a presumption of fairness to deals negotiated at arm's length between adversary parties on their way to trial, they ought not apply the same presumption to deals negotiated by counsel who lack the power to try the claims they are purporting to settle. The bottom line is that the nature of settlement class actions—particularly the problem of incomplete leverage on the part of putative class counsel—gives reason to be wary of a proposed deal in which putative class lawyers accede to future advantages desired by the defendant, at the expense of future claimants, in exchange for current fees or other benefits obtained by the putative class lawyers.

11. After describing the conflicts of interest within the class and the risk of inadequate representation, Justice Ginsburg's *Amchem* majority opinion concluded that "[t]he settling parties, in sum, achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected." 521 U.S. at 627. *See also Ortiz*, 527 U.S. at 856 (quoting *Amchem* on the need for "structural assurance"). Thus, in any proposed use of a settlement class action to resolve mass tort litigation, a key question is whether the proposal includes sufficient structural assurance both to establish adequate representation within the meaning of Rule 23(a)(4) and to establish that the settlement itself is fair, reasonable, and adequate within the meaning of Rule 23(e). Thus, attention focuses on the structure of the proposed deal as well as the structure of the process by which the deal was reached.

B. THE PURPORTED ASSURANCE OF FAIRNESS IN THE PROPOSED DEAL PROVIDES ONLY ILLUSORY CONTROL TO FUTURE CLAIMANTS BECAUSE IT IMPAIRS THE VALUE OF FUTURE CLAIMS IN LITIGATION

12. The proponents of this settlement emphasize, as a hallmark of their deal, that future claimants will have the opportunity to decide whether to accept the compensation offer from the settlement fund or instead to proceed with their claims in litigation. *See*, *e.g.*, Motion for Preliminary Approval of Class Settlement (Feb. 3, 2021) at 3 ("As noted, this fund is completely optional for class members, and class members do not have to decide whether to participate in it or to accept the amount offered until after they develop NHL. Class members who choose not to do so retain the right to sue Monsanto in the tort system."). Providing each claimant with an opportunity to decide whether to accept or reject the settlement would indeed be a significant structural assurance of fairness; indeed, such informed consent is the centerpiece of the "aggregate settlement rule" that governs disclosure and consent in non-class settlements by which mass tort litigation may be resolved. The question is whether the "optional" nature of the compensation offers in this settlement is real or illusory.

13. At its heart, the proposed Class Action Settlement Agreement in the Roundup litigation combines a compensation program with a set of constraints on future litigation. There is of course nothing inherently problematic about the first aspect of the proposal, *i.e.*, the creation of a program to generate individual compensation offers. To the extent Monsanto seeks to establish a program for making settlement offers to persons diagnosed with Non-Hodgkin's Lymphoma after exposure to Roundup, Monsanto can do so on its own or under the aegis of the MDL court, and does not need judicial imprimatur in the form of class certification. Indeed, Bayer created a program for generating individual compensation offers in the Baycol mass

tort litigation of the early 2000's. The original Gulf Coast Claims Facility established by BP in 2010 after the Deepwater Horizon oil spill offers another example of a defendant-created process for generating individual settlement offers where each claimant can decide whether to accept the offer and provide a release, or whether instead to decline the offer and retain the right to proceed in the courts with a tort claim. There are many ways that a mass tort defendant can structure a program for generating individual settlement offers or a non-class aggregate settlement to resolve large numbers of claims with the informed consent of each claimant who participates. While some non-class mass tort settlements are subject to confidentiality provisions and therefore not publicly available, a number of settlement agreements are publicly available and have usefully been discussed and gathered by Professor Burch in her book, Elizabeth Chamblee Burch, MASS TORT DEALS: BACKROOM BARGAINING IN MULTIDISTRICT LITIGATION (Cambridge 2019), and on websites Professor Burch created to make such information broadly accessible, https://www.elizabethchambleeburch.com/mdl-data and https://mdl.law.uga.edu/.

14. A compensation program or non-class aggregate settlement that non-coercively allows each claimant to decide whether to participate can provide a sound way to resolve large numbers of claims in mass tort litigation, but that is not what this proposed settlement does. Rather, the proposal put forth by Monsanto and putative class counsel would create a compensation program in which, if a claimant does not accept the compensation offer generated by the process, the claimant may *not* go forward in the courts with a tort claim under the usual rules. A claimant who declines the compensation offer would face four impediments in attempting to litigate the claim in the courts: a four-year litigation moratorium, a ban on punitive damages, a ban on

1      medical monitoring claims, and a stipulation to the admissibility of a science panel

2      report.

3   15. Impediments to future litigation are nothing new as a wish-list for defendants.

4      Prospective defendants often create hurdles to future litigation against them by

5      imposing arbitration clauses on customers or employees, or by lobbying for tort

6      reform legislation. Indeed, the U.S. Chamber of Commerce regularly fights against

7      punitive damages (*see* https://www.chamberlitigation.com/cases/issue/punitive-

8      exemplary-noneconomic-damages) and against medical monitoring claims (*see*

9      https://www.chamberlitigation.com/cases/issue/products-liability/medical-

10     monitoring). The question presented by the proposed Class Action Settlement

11     Agreement in the Roundup litigation is whether a defendant should be able to achieve

12     these sorts of litigation impediments by using the court's power, via class certification,

13     to impose such limits on all potential future claimants who fail to opt out at the outset.

14     In my view, this would be a troubling use of the court's power and a problematic way

15     to resolve the claims of future Roundup plaintiffs.

16   16. Professor Rave has written, in the context of non-class MDL settlements, about

17     settlement "terms that impair the litigation value of claims outside the settlement" and

18     thereby pressure plaintiffs to accept whatever compensation is offered. D. Theodore

19     Rave, *Closure Provisions in MDL Settlements*, 85 Ford. L. Rev. 2175, 2185 (2017).

20     He labels these "[t]he more troubling closure provisions" as compared with other ways

21     of achieving comprehensive resolutions. The impediments to future litigation that are

22     incorporated into the proposed Roundup settlement may be understood as terms that

23     aim to achieve closure by impairing the litigation value of claims of those who decline

24     the compensation offers, and all the more troubling because they seek to use the

imprimatur of the court to impose these terms on absent class members. Similarly, Professor Nagareda wrote about opt-out class settlements in which the right to opt out is meaningless because the deal alters the class members' underlying legal rights to make future litigation unattractive. Richard A. Nagareda, *Closure in Damage Class Settlements: The Godfather Guide to Opt-Out Rights*, 2003 U. Chi. Legal F. 141. He wrote that an opt-out class settlement "becomes an offer that class members cannot refuse in the sinister sense of *The Godfather* when it seeks to … induce people to relinquish their preexisting rights to sue not simply by positing an attractive alternative avenue for redress but also by altering those rights themselves." *Id.* at 163. My concern is that Monsanto and putative class counsel have crafted a deal that would bring closure to Monsanto by impairing the legal rights of future Roundup claimants, making each purportedly "optional" compensation offer from the settlement fund an offer the claimant cannot refuse.

17. In contrast to the other constraints imposed on future litigation by the proposed settlement, the proposed science panel may, at first glance, appear neutral. Whereas the four-year standstill, the ban on punitive damages, and the ban on medical monitoring claims neatly fit on a mass tort defendant's wish-list, the fourth constraint—essentially a stipulation to the admissibility of evidence from a science panel—may appear to be merely a neutral means of injecting scientific expertise into future Roundup litigation. But when viewed in the context of mass tort resolutions and standard approaches to scientific expert testimony, the science panel should be understood as a concession to the defendant. In the absence of the proposed panel, scientific expertise could be brought into future Roundup litigation by court-appointed experts or by party-selected experts. Court-appointed experts and panels have a history

DAVID M. ENGSTROM

in mass tort litigation even though they remain uncommon (I wrote about the use of court-appointed expert panels in the breast implant litigation in my article, *Mass Tort Litigation and Inquisitorial Justice* (1999)). If this court or another decides to appoint a panel of scientific experts in the Roundup litigation, it could do so under Federal Rule of Evidence 706 and the creation would not be controlled by Monsanto or by putative class counsel. The use of party-selected experts, too, has a long and prominent history in mass tort litigation (indeed, *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) was a case in the Bendectin mass tort litigation). If a court in future Roundup cases admits the testimony of scientific experts, Monsanto could put forth its own experts, and the plaintiffs' experts could be put forth by counsel for those future plaintiffs or through coordinated processes within the MDL. The problem with allowing the negotiating parties in this settlement to create, in advance, scientific testimony for use in future cases is two-fold. It is not simply that science tends to advance over time, although this is true and deeply problematic for any pre-negotiated science panel. The other problem is that the parties proposing to create this science panel—that is, Monsanto and putative class counsel— share an interest in maximizing participation in the settlement and minimizing future litigation. Negotiators on both sides of mass settlements understandably seek to maximize the comprehensiveness of their deal (as I have written about in *Consent Versus Closure* (2010), *Aggregation as Disempowerment* (2016), and elsewhere). While there are plenty of good things to say about achieving closure in mass settlements, it is important to keep in mind the incentives of the negotiating parties and how this can impact fairness for those not at the negotiating table, such as future plaintiffs. A defendant such as Monsanto generally desires protection from future

litigation. Those negotiating with a defendant such as Monsanto can maximize the size of the deal—with implications for the size of attorneys' fees—by negotiating terms that provide the defendant with the protection it desires. This can provide real benefits for claimants, but it also means that the negotiating parties have a strong incentive to make future litigation unappealing, rather than to increase plaintiffs' chance of success in future litigation. It is reasonable to expect that both Monsanto and putative class counsel would prefer that every person who becomes eligible to receive compensation accept the compensation offer and provide a release, rather than pursue future litigation against Monsanto. Thus, with regard to terms of engagement for future litigation—whether related to the science panel or otherwise—one should not expect either Monsanto or putative class counsel to view the issues the same way future litigating counsel would view them. The risk is that the sort of panel created by parties negotiating a comprehensive settlement would be a panel unfavorable to future plaintiffs.

IV.   **IF THE COURT DOES NOT FIND THAT COMMON ISSUES PREDOMINATE OVER INDIVIDUAL ISSUES, THE COURT CANNOT CERTIFY THE PROPOSED CLASS**

18. Importantly, the Court in *Amchem* and *Ortiz* emphasized that the requirements of Rule 23(a) and (b) cannot be ignored in settlement class actions. Even as the Court acknowledged that settlement class actions sidestep the need to worry about trial manageability, the Court insisted that "other specifications of the Rule—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context." *Amchem*, 521 U.S. at 620. "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id*. at 623. Rule 23(e) provides a separate layer of protection by requiring that any

class settlement be approved by the court, "[b]ut it is not the mission of Rule 23(e) to assure the class cohesion that legitimizes representative action in the first place." *Id.*

19. The *Amchem* Court held that *trial manageability* need not be considered as a factor for evaluating superiority under Rule 23(b)(3) in a case that is not being certified as a class for trial. The Court's language about the predominance inquiry, however, made it clear that its point about trial manageability does not extend to the requirement of *predominance* as an assurance of *class cohesiveness*. Unless the class is sufficiently cohesive to warrant class action treatment—that is, cohesive enough to warrant deploying the power of the court to bind absent class members to an outcome negotiated by those purporting to represent all of their interests—a settlement class action is impermissible.

20. It is useful to keep in mind the reasons for taking the predominance requirement seriously in settlement class actions. These reasons explain why it is, and should be, so difficult to certify settlement class actions in mass tort litigation involving personal injuries or deaths. First, the predominance requirement helps to ensure that absent class members will not be bound unless class members share sufficient commonality of interests to instill confidence in loyal representation by class representatives and class counsel. In this regard, the predominance requirement goes hand in hand with adequacy of representation. Second, unless common questions predominate over individual questions, the class cannot be certified for litigation and class counsel are thus disarmed in their negotiations; their only path to getting the benefits that come with representing the class is to reach agreement with the defendant. In personal-injury mass torts—asbestos, Baycol, blood products, DBCP, hip implants, lead paint, MTBE, Propulsid, talc, tobacco, Vioxx, Yaz, Zyprexa, and others—issues of individual

exposure, individual medical causation, and individual defenses ordinarily overwhelm the common issues related to defendants' liability (even though the latter issues often are hotly disputed as well). Because these claims generally are governed by state tort law, variations in plaintiffs' claims are compounded by the applicability of different laws. These intra-class variations (both plaintiff-plaintiff factual differences and state-state legal differences) bear on several pieces of the class certification analysis—including commonality, typicality, adequacy, and superiority—but the predominance inquiry arguably captures the nature of the problem in the clearest terms. Thus, in personal-injury mass torts, plaintiff-plaintiff and state-state variations ordinarily make class certification inappropriate, and I cannot see any good reason why the Roundup litigation should be distinguishable in this regard.

## V.   THE CLASS DEFINITION RAISES CONCERNS ABOUT CONFLICTS OF INTEREST AND SETTLEMENT INADEQUACY

21. The proponents define their proposed class as follows:

> "Settlement Class" means (i) those individuals who are either citizens or Residents of the United States as of February 3, 2021 or who claim exposure to Roundup Products through the application of Roundup Products in the United States and who as of February 3, 2021 both (1) have been exposed to Roundup Products through the application of Roundup Products and (2) *have not commenced an individual, non-class lawsuit or retained counsel for the pursuit of any individual, non-class personal injury or false advertising claims arising from, resulting from, in any way relating to or in connection with such exposure*; and (ii) all Derivative Claimants. "Exposure to Roundup Products through the application of Roundup Products" includes exposure through mixing and any other steps associated with application, whether or not the individual performed the application, mixing, or other steps associated with application himself or herself.

Class Action Settlement Agreement (Feb. 3, 2021), at 2-3 (emphasis added).

22. The most noteworthy aspect of this class definition is that it carves out anyone who has already hired a lawyer or filed a suit. This piece of the definition is so central to the proposed deal that one might fail to notice what is troubling and strange about it.

The right question to ask is: Why doesn't the class include all persons exposed to Roundup? If "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," as required by the superiority requirement of Rule 23(b)(3), then why isn't it superior for all? And if the class is sufficiently cohesive to meet the requirements of predominance and other related aspects of Rule 23, shouldn't that cohesiveness extend to all Roundup-exposed persons rather than merely those who have not yet retained counsel or filed suit? *Amchem* explicitly held that the requirement of predominance cannot be met by a common interest in the settlement, but rather must derive from the claims themselves.

23. In other words, the proposed class action is defined to carve out a large group of persons whose claims are otherwise identical to those of the class members, and the carve-out cannot be explained in terms of the requirements or goals of the class action rule. This peculiar way of defining a class—which featured prominently and troublingly in both *Amchem* and *Ortiz*—is troubling here as well. As one accustomed to examining the incentives that drive lawyers' conduct in mass dispute resolution, I naturally ask who benefits from this class definition. Unless I am missing something, none of the possible explanations are good.

24. One possible explanation is that there may be lawyers who seek to represent the class and who also represent individual clients with Roundup claims. Another possible explanation is that other lawyers with Roundup clients would object to the deal if their own clients were included. Either way, consider the situation in terms of legal ethics rules that protect against client-client and lawyer-client conflicts of interest, which in turn inform the adequacy inquiry under Rule 23(a)(4). *See*, *e.g.*, Cal. Rule of Prof. Conduct 1.7(b) ("A lawyer shall not, without informed written consent …, represent a

client if there is a significant risk the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with another client, a former client or a third person, or by the lawyer's own interests."). If the provisions of the proposed deal are terms that Roundup claimants ought to find satisfactory, and if the proposed class action really is a superior way to resolve the dispute, then shouldn't we expect lawyers to prefer that their Roundup clients be included rather than excluded? By excluding Roundup claimants who have already hired lawyers, the proposed class definition implicitly suggests that the drafters expect that lawyers would prefer to keep their clients out of the deal, which says something about whether the deal treats class members fairly relative to those excluded from the class—a point that bears both on Rule 23(a)(4) adequacy of representation and on Rule 23(e) settlement fairness.

## VI.   CONCLUSION

25. The proposed Roundup settlement proposes a creative use of Rule 23 in an attempt to provide closure to Monsanto while trying to navigate around problems of past mass torts as well as concerns voiced by this court in response to the first proposed Roundup settlement. The question is whether the proposed class meets the requirement of sufficient cohesion for invocation of the class action device, and whether the proposed deal provides sufficient structural assurances of fairness to warrant approval. On the first question, I worry not only that the lack of predominance renders the proposed class uncertifiable for litigation under Rule 23(b)(3) and thus creates the leverage problem described above, but also that it renders the class insufficiently cohesive to warrant the use of the court's power through class certification to impose the deal on absent class members. On the second question, I

worry that the deal's apparent structural assurances of fairness may be illusory. In theory, a future claimant diagnosed with Non-Hodgkin's Lymphoma may choose to proceed with a tort claim in litigation rather than to accept the compensation offer under the settlement (or even to file a claim thereunder). But in reality, won't the impediments to future claims—the standstill, the punitive damages ban, the medical monitoring ban, and the science panel—essentially coerce plaintiffs to accept the compensation offers by impairing the value of future claims in litigation? The fact that the settlement class was defined to exclude any Roundup claimants who have already hired lawyers bodes poorly for the fairness of the settlement, in that it raises questions about whether the lawyers who know the litigation best would not choose to include their own clients in the deal in light of their individual duty of loyalty to their clients. It is this entire set of concerns that renders the settlement, in my opinion, an improper use of the court's power to impose this negotiated deal on future Roundup plaintiffs.

March 3, 2021                    /s/ *Howard M. Erichson*
                                 Howard M. Erichson

# HOWARD M. ERICHSON

Fordham University School of Law
150 West 62nd St.; New York, NY 10023
erichson@law.fordham.edu; 646-312-8233

## ACADEMIC APPOINTMENTS

**Fordham University School of Law**, New York, NY, 2008-present

. Professor of Law, 2008-present
. Courses Taught: Civil Procedure, Complex Litigation, Legal Process, Professional Responsibility, Torts
. Honors: Teacher of the Year, 2012; Dean's Distinguished Research Award, 2019
. Selected Administrative Roles: House Leader, 2019-21; Chair, House System Working Group, 2018-19; Chair, Adjunct Faculty Committee, 2008-10 & 2016-19; Chair, RTP Scholarship Subcommittee, 2018-20; Chair, Self-Study & ABA Site Visit Committee, 2014-16; Member, Dean Search Committee, 2014-15; Chair, Teaching Committee, 2013-14; Chair, Faculty Hiring Committee, 2011-13; Co-Chair, Faculty Scholarship Committee, 2010-12; Director of Adjunct Faculty, 2008-10 & 2016-19

**Seton Hall University School of Law**, Newark, NJ, 1995-2008

. John J. Gibbons Professor of Law, 2007-08; Professor, 2001-07; Associate Professor, 1998-2001; Assistant Professor, 1995-98
. SBA Professor of the Year, 1998; SBA Professor of the Year Nominee, 1997, 1998, 2001, 2006, 2007; Dean's Fellow, 2004-07; University Faculty Excellence Award, 1998

## OTHER EMPLOYMENT

**Cleary, Gottlieb, Steen & Hamilton**, New York, NY. Litigation Associate, 1992-95.

**Chief Judge James L. Oakes**, U.S. Court of Appeals, Second Circuit. Law Clerk, 1991-92.

**Justice Stewart G. Pollock**, Supreme Court of New Jersey.  Law Clerk, 1990-91.

**The Green Vale School**, Glen Head, NY.  Humanities Teacher, 1985-87.

## EDUCATION

**New York University School of Law**, J.D., cum laude, 1990
. Editor-in-Chief, *New York University Law Review*
. Goodman Memorial Prize for outstanding scholarship and character
. Weinfeld Prize for distinguished scholarship in civil procedure
. Rubin Law Review Prize
. Order of the Coif

**Harvard University**, A.B., cum laude, Government, 1985

## VISITING ACADEMIC APPOINTMENTS

**Chuo Law School**, Tokyo, Japan.  Visiting Professor, April 2010.
. Lectures on U.S. Litigation Process

**Fordham University School of Law**, New York, NY. Visiting Professor, 2007-08.
. Civil Procedure, Complex Litigation

**Vanderbilt Law School**, Nashville, TN.  Visiting Professor, Short Courses.
. Ethics in Multiparty Litigation (Spring 2007)
. Problems in Resolving Mass Litigation (Fall 2005)

**Columbia Law School**, New York, NY.  Fensterstock Visiting Professor, Fall 2002.
. Civil Procedure, Complex Litigation

**New York University School of Law**, New York, NY.  Visiting Scholar, 2001-02.

## JUDICIAL AND PROFESSIONAL APPOINTMENTS

**American Law Institute**, Elected Member, 2005-present
    Adviser, Principles of the Law of Aggregate Litigation, 2004-10; Members
    Consultative Group, Restatement 3d Torts: Physical Harm, 2006-10, Restatement 3d
    Consumer Contracts, 2013-17, Restatement 3d Conflict of Laws, 2015-
**Association of American Law Schools**, Civil Procedure Section
     Chair, 2004; Chair-Elect, 2003; Secretary, 2002; Executive Committee, 2002-05
**New Jersey District V(A) Ethics Committee**, Member, 2000-04
**New Jersey Supreme Court Civil Practice Committee**, Member, 2000-08
     Chair, Subcommittee on Protective Orders, 2002-06
**Third Circuit Task Force on Selection of Class Counsel**, Member, 2001-02

## BAR ADMISSIONS

New Jersey, 1990
New York, 1991
United States District Court:  District of New Jersey, Southern District of New York,
Eastern District of New York, Southern District of Texas

## PEER REVIEWS

Aspen Law & Business, Cambridge University Press, Columbia Law Review, Harvard
Law Review, NYU Law Review, Oxford University Press, Stanford Law Review,
University of Chicago Press, Yale Law Journal

## MEDIA APPEARANCES (SELECTED)

Associated Press, Bloomberg, Bloomberg Radio, Die Zeit, Financial Times, Houston
Chronicle, Law360, Law.com, National Law Journal, National Public Radio, New York
Times, Reuters, Wall Street Journal

**PUBLICATIONS**

**Books**

CIVIL PROCEDURE (with J. Maria Glover) (Aspen 2021)

COMPLEX LITIGATION: CASES & MATERIALS ON ADVANCED CIVIL PROCEDURE (with R. Marcus & A. Bradt) (West Academic) (7th ed. forthcoming 2021)

COMPLEX LITIGATION: CASES & MATERIALS ON ADVANCED CIVIL PROCEDURE (with R. Marcus & E. Sherman) (West Academic) (5th ed. 2010, 6th ed. 2015)

INSIDE CIVIL PROCEDURE: WHAT MATTERS AND WHY (Aspen/Wolters Kluwer) (1st ed. 2009, 2nd ed. 2012, 3rd ed. 2017)

MASS TORT LITIGATION MANUAL, American College of Trial Lawyers (LexisNexis/Matthew Bender 2006) (H. Erichson & A. Fickler, Co-Reporters)

**Book Chapter**

Private Lawyers, Public Lawsuits: Plaintiffs' Attorneys in Municipal Gun Litigation, in T. Lytton, ed., SUING THE GUN INDUSTRY: A BATTLE AT THE CROSSROADS OF GUN CONTROL AND MASS TORTS (U. of Michigan Press 2005)

**Law Review Articles**

Case-Linked Jurisdiction and Busybody States, 105 *Minn. L. Rev. Headnotes* 54 (2020) (with J. Goldberg & B. Zipursky)

Aggregation as Disempowerment, 92 *Notre Dame L. Rev.* 859 (2016)

The Problem of Settlement Class Actions, 82 *Geo. Wash. L. Rev.* 951 (2014)

Consent versus Closure, 96 *Cornell L. Rev.* 265 (2011) (with B. Zipursky)

The Trouble with All-or-Nothing Settlements, 58 *Kansas L. Rev.* 979 (2010)

CAFA's Impact on Class Action Lawyers, 156 *U. Penn. L. Rev.* 1593 (2008)

A Typology of Aggregate Settlements, 80 *Notre Dame L. Rev.* 1769 (2005)

Doing Good, Doing Well, 57 *Vand. L. Rev.* 2087 (2004)

Beyond the Class Action: Lawyer Loyalty and Client Autonomy in Non-Class Collective Representation, 2003 *U. Chi. Legal F.* 519

Informal Aggregation: Procedural and Ethical Implications of Coordination among Counsel in Related Lawsuits, 50 *Duke L.J.* 381 (2000)

Coattail Class Actions: Reflections on Microsoft, Tobacco, and the Mixing of Public and Private Lawyering in Mass Litigation, 34 *U.C. Davis L. Rev.* 1 (2000)

Mass Tort Litigation and Inquisitorial Justice, 87 *Georgetown L.J.* 1983 (1999)

Interjurisdictional Preclusion, 96 *Michigan L. Rev.* 945 (1998)

Modern Mass Tort Litigation, Prior-Action Depositions and Practice-Sensitive Procedure, 63 *Fordham L. Rev.* 989 (1995) (with M. Lowenthal)

## Shorter Law Review Articles

The Dark Side of Consensus and Creativity: What Mediators of Mass Disputes Need to Know About Agency Risks, 88 *Fordham L. Rev.* 2155 (2020)

What Is the Difference between a Conclusion and a Fact?, 41 *Cardozo L. Rev.* 899 (2020)

MDL and the Allure of Sidestepping Litigation, 53 *U. Ga. L. Rev.* 1287 (2019)

Searching for Salvageable Ideas in FICALA, 87 *Fordham L. Rev.* 19 (2018)

Settlement in the Absence of Anticipated Adjudication, 85 *Fordham L. Rev.* 2017 (2017)

Judge Jack Weinstein and the Allure of Antiproceduralism, 64 *DePaul L. Rev.* 393 (2015)

The Chevron-Ecuador Dispute, Forum Non Conveniens, and the Problem of Ex Ante Inadequacy, 1 *Stan. J. Complex Litig.* 417 (2013)

The Role of the Judge in Non-Class Settlements, 90 *Wash. U.L. Rev.* 1015 (2013)

Uncertainty and the Advantage of Collective Settlement, 60 *DePaul L. Rev.* 627 (2011)

Mass and Complex Litigation in the United States, 44 *Hikakuho Zasshi: Journal of Comparative Law* 185 (2010) (in Japanese, translated by Hisaei Ito)

Court-Ordered Confidentiality in Discovery, 81 *Chi.-Kent L. Rev.* 357 (2006)

Mississippi Class Actions and the Inevitability of Mass Aggregate Litigation, 24 *Miss. Coll. L. Rev.* 285 (2005)

Comments on a Class Action Rule for Mississippi, 24 *Miss. Coll. L. Rev.* 309 (2005)

The End of the Defendant Advantage in Tobacco Litigation, 26 *Wm. & Mary Envtl. L. & Pol'y Rev.* 123 (2001)

Of Horror Stories and Happy Endings: The Rise and Fall of Preclusion-Based Compulsory Party Joinder under the New Jersey Entire Controversy Doctrine, 9 *Seton Hall Const. L.J.* 757 (1999)

Cost-Conscious Alternatives to Massive United States Discovery, 23 *Kokusai Shōji Hōmu: Journal of the Japanese Inst. of Int'l Bus. L.* 1225 (1995) (with G. Grumbach) (in Japanese)

Note, Nationwide Personal Jurisdiction in all Federal Question Cases: A New Rule 4, 64 N.Y.U. L. Rev. 1117 (1989)

## Other Publications

How to Exaggerate the Size of Your Class Action Settlement, *Cal. Daily Journal* (Nov. 8, 2017)

What MDL and Class Actions Have in Common: A Response to Burch, Monopolies in Multidistrict Litigation, 70 *Vand. L. Rev. En Banc* 29 (2017)

Op-ed, New Republican Bill Would Gut Class Actions, Not Improve Them, *TheHill.com* (Feb. 20, 2017)

Op-ed, Beware the Settlement Class Action, *California Daily Journal* (Nov. 24, 2014)

Why the Supreme Court Should Give the Easy Answer to an Easy Question: A Response to Professors Childress, Neuborne, Sherry & Silberman, 66 *Vand. L. Rev. En Banc* 179 (2013)

The Home-State Test for General Personal Jurisdiction, 66 *Vand. L. Rev. En Banc* 81 (2013)

Foreword: Lawyering for Groups, 81 *Fordham L. Rev.* 3039 (2013) (with B. Zipursky)

Debate: The Future of Mass Torts, 159 *U. Penn. L. Rev. PENNumbra* 231 (2011) (with S. Campos)

Foreword: Civil Procedure and the Legal Profession, 79 *Fordham L. Rev.* 1827 (2011)

Foreword: Reflections on the Adjudication-Settlement Divide, 78 *Fordham L. Rev.* 1117 (2009)

Public and Private Law Perspectives: Transcript of Professor Howard Erichson, 37 *Sw. L. Rev.* 665 (2008)

Getting Students Onboard, *in* S. Friedland & G. Hess, eds., Teaching the Law School Curriculum (Carolina Academic Press 2004)

Foreword: Multidistrict Litigation and Aggregation Alternatives, 31 *Seton Hall L. Rev.* 877 (2001)

A Tribute to Justice Stewart G. Pollock, 30 *Seton Hall L. Rev.* 430 (2000)

A Hero of Moderate Proportions, 74 *N.Y.U. L. Rev.* 1217 (1999)

Taking a Closer Look: Justices Reaffirm Need for Judicial Scrutiny of Mass Tort Settlement Class Actions, *Legal Times* (Aug. 16, 1999).

Driving Full Circle: How New Jersey Navigated the Entire Controversy Doctrine, 156 *N.J.L.J.* 221 (April 19, 1999)

Strengthening Ethics in a Million-Lawyer World, *Nat'l L.J.* (Aug. 3, 1998), at A24

Enough is Enough: Solving the Problem of Punitive Overkill in Multiple-Plaintiff Litigation, 152 *N.J.L.J.* 246 (April 20, 1998)

Dealing with Issue Preclusion in Complex Cases, 148 *N.J.L.J.* 204 (April 21, 1997)

## Blog

Co-Editor, Mass Tort Litigation Blog, http://lawprofessors.typepad.com/mass_tort_litigation

## Amicus Brief

*Taylor v. Sturgell*, U.S. Supreme Court 07-371, Brief of Civil Procedure and Complex Litigation Professors as *Amici Curiae* in Support of Petitioner (Feb. 26, 2008) (with D. Shapiro & J. Leubsdorf)

## SELECTED PRESENTATIONS

*Hot Topics in Civil Procedure*, Wolters Kluwer Webinar Series (Oct. 28, 2020)

*What Is the Difference between a Conclusion and a Fact?*
- Civil Procedure Unavailability Workshop (Sept. 1, 2020)
- Cardozo Law School Symposium, *Ten Years After Iqbal* (Mar. 15, 2019)

*If Multidistrict Litigation is the New Normal, Do Lawyers Need New Rules?*, Cardozo Law School (Feb. 13, 2020)

*Access to Justice in Mass Disputes: Mediation as Opportunity and Threat*, Fordham Law School (Nov. 1, 2019)

*MDL at 50: The Allure of Sidestepping Litigation*, University of Georgia Law School (Feb. 12, 2019)

*Civil Litigation Reform in the Trump Era*, Fordham Law School (Feb. 28, 2018)

*Class Action Reform*, Moderator, Fordham Law School American Constitution Society (Nov. 1, 2017)

*Kuriansky Conference on Judaic & Middle Eastern Studies*, Moderator, University of Connecticut, Stamford (Oct. 18, 2017)

*Multi-District Litigation Roundtable*, George Washington Law School (Apr. 28, 2017)

*Fairness in Class Action Litigation Act*, Federalist Society Teleforum (March 31, 2017)

*Do People Get Their Day in Court?*, Fordham Law School (Mar. 6, 2017)

*Who is Representing the Plaintiff?: Ethical and Logistical Challenges to Multi-Plaintiff Litigation in the MDL Program*, Panelist, ABA Environmental & Energy, Mass Torts, and Products Liability Litigation Committees Joint CLE Seminar, Squaw Valley, CA (Jan. 28, 2017)

*Settlement in the Absence of Anticipated Adjudication*, Colloquium on Civil Litigation Ethics in a Time of Vanishing Trials, Fordham Law School (Oct. 21, 2016)

*Aggregation as Disempowerment*
- Colloquium on Complex Litigation, University of Texas Law School (Nov. 5, 2019)
- ALI Conference on the Future of Aggregate Litigation, NYU Law School (Apr. 12, 2016)
- Fordham Law Faculty Workshop (Jan. 21, 2016)

*Class Action Ethics in Antitrust Cases*, American Antitrust Institute, Washington (Nov. 18, 2015)

*The Aggregate Settlement Rule*, ALI Annual Meeting Ethics Panel, Washington (May 17, 2015)

*Judge Jack Weinstein and the allure of Anti-Proceduralism*
- Fordham Law Scholarship Retreat (May 12, 2014)
- Clifford Symposium, DePaul Law School, Chicago (April 24, 2014)

*Ethical Implications of the Supreme Court's Recent Class Action Decisions*, Institute for Law & Economic Policy Symposium, Boca Raton, FL (luncheon speaker) (April 4, 2014)

*The Problem of Settlement Class Actions*
- Legal Ethics Shmooze, Fordham Law School (June 18, 2013)
- Fordham Law Scholarship Retreat (May 22, 2013)
- Seton Hall Law Faculty Workshop (April 11, 2013)
- George Washington Law School Symposium on Class Actions (March 8, 2013)

*Mass Torts as Quasi Class Actions: The Role of Judicial Oversight*, ABA National Conference on Professional Responsibility, San Antonio, TX (May 30, 2013)

*Forum Non Conveniens & the Problem of Ex Ante Inadequacy*, Lessons from Chevron Symposium, Stanford Law School (Feb. 8, 2013)

*Lawyering for Groups: Civil Rights, Mass Torts & Everything in Between*, Fordham Law School (Nov. 30, 2012)

*Compensation Funds, Class Settlements, & Non-Class Settlements for Resolving Mass Disaster Litigation*, AALS Workshop on Torts, Environment & Disaster, Berkeley, CA (June 9, 2012)

*Ethical Issues in Aggregate Settlements*, Institute for Law & Economic Policy, Symposium on the Future of Class Actions, Puerto Rico (luncheon speaker) (April 27, 2012)

*The Role of the Court in Aggregate Litigation*, ILEP Symposium, Puerto Rico (April 27, 2012)

*Outsourcing Settlement*, University of Georgia Scholarship Colloquium (Feb. 13, 2012)

*Loyalty in Civil Rights Litigation*, NAACP LDF Civil Rights Institute, Airlie, VA (Oct. 6, 2011) (with R. Lenhardt)

*Navigating the Perils of Aggregate Settlements*, AAJ Annual Convention (July 11, 2011)

*Symposium on Actuarial Litigation*, University of Connecticut (April 15, 2011)

*Procedural Options for Mass Dispute Resolution in the U.S.*, University of Windsor Class Actions Conference, Windsor, Canada (March 29, 2011)

*Ethical Considerations in Mass Tort Settlements*, National Law Journal/Fordham Roundtable Series, New Orleans (Nov. 12, 2010) (with B. Zipursky)

*Clients, Causes & Conflicts: Legal Ethics for the Cause Lawyer*, NAACP LDF Civil Rights Institute, Airlie, VA (Oct. 8, 2010) (with B. Zipursky)

*The Hardest Case: Amchem Products v. Windsor*, AALS Civil Procedure Workshop, New York (June 11, 2010)

*Mass & Complex Litigation in the U.S.*, Institute of Comparative Law, Chuo Law School, Tokyo (April 17, 2010)

*Uncertainty & the Advantage of Collective Settlement*, Clifford Symposium, DePaul Law School (April 8, 2010)

*Consent versus Closure*
- Critical Perspectives on Aggregate Litigation, George Washington Law School (March 12, 2010)
- Fordham Law Faculty Workshop (Feb. 11, 2010) (with B. Zipursky)

*The Trouble with All-or-Nothing Settlements*, Kansas Law Review Symposium on Aggregate Litigation since *Ortiz* & *Amchem* (Oct. 30, 2009)

*Mass Settlements, Legal Ethics, & the Problem of Forced Consent*, Houston Law School Litigation Colloquium (April 9, 2009)

*Against Settlement: Twenty-Five Years Later*, Fordham Law Review Symposium (April 3, 2009)

*Complex Litigation*, Federal Judicial Center Workshop for Fourth Circuit Judges, Baltimore (March 10, 2009)

*Mass Settlement Contracts with Plaintiffs' Law Firms*, Vanderbilt Law School (Jan. 30, 2009)

*Ethical Considerations of Creative Mass Tort Settlements*, ACI Drug & Medical Device Litigation Conference (Dec. 11, 2008)

*Toxicology & the Trial & Settlement of Mass Torts*, Symposium on the Toxico-Legal Interface, Duke University (Sept. 26, 2008)

*Cause Lawyering as Collective Representation*, Legal Ethics Shmooze, Fordham Law School (June 3, 2008)

*CAFA's Impact on Class Action Lawyers*
- Fordham Law Faculty Workshop (Jan. 31, 2008)
- University of Pennsylvania Law Review Symposium, Philadelphia (Dec. 1, 2007)

*Rule Reform & Mass Tort Litigation*, Kentucky Supreme Court Mass Tort & Class Action Litigation Committee, Frankfort, KY (Jan. 24, 2008)

*Public & Private Law Perspectives on Asbestos Litigation*, Southwestern Law School Symposium, Los Angeles (Jan. 18, 2008)

*The Ethics of Aggregate Settlements*, ABA Conference on Professional Responsibility, Chicago (May 31, 2007)

*Roscoe Pound, Popular Dissatisfaction, & Modern Mass Litigation*, Hamline University Law School, St. Paul, MN (April 13, 2007)

*Ethical Constraints in Complex Litigation*, Fourth National In-House Counsel Conference on Managing Complex Litigation, New York (Feb. 6, 2007)

*Policing Ethics in Class Actions*, AALS Annual Meeting, Washington (Jan. 6, 2007)

*Settlement as Aggregation*, Fordham Law Faculty Workshop (Dec. 14, 2006)

*Mississippi Class Actions & the Inevitability of Mass Aggregate Litigation*
- Vanderbilt Law School Faculty Workshop (Oct. 25, 2005)
- Symposium on Class Actions, Mississippi College of Law (Feb. 18, 2005)

*Secrecy in Litigation*, AALS Annual Meeting, San Francisco (Jan. 8, 2005)

*A Typology of Aggregate Settlements*
- Vanderbilt Law School Faculty Workshop (Oct. 7, 2004)
- Brooklyn/Cardozo Mass Torts Workshop (April 21, 2004)
- AALS Conference on Torts & Civil Procedure, New York (June 18, 2003)

*Ethical Pitfalls in Aggregate Settlements*, Federation of Defense & Corporate Counsel Symposium, Milwaukee (Sept. 10, 2004)

*Doing Good, Doing Well*, Symposium on Lawyers as Activists, Vanderbilt Law School (March 19, 2004)

*Beyond the Class Action: Lawyer Loyalty & Client Autonomy in Non-Class Collective Representation*
- Seton Hall Faculty Scholarship Retreat (Jan. 25, 2003)
- Columbia Law School Faculty Workshop (Nov. 14, 2002)
- University of Chicago Legal Forum (Nov. 1, 2002)

*Symposium on Multidistrict Litigation*, Seton Hall Law School (March 30, 2001)

*The Tobacco Litigation & the Future of Mass Tort Procedure*, Symposium on Toxic Torts, William & Mary Law School (March 23, 2001)