Paul J. Napoli (NY 2513141)
Hunter J. Shkolnik (NY 2031458)
NS PR LAW SERVICES, LLC
270 Muñoz Rivera, Suite 201
Hato Rey, Puerto Rico 00918
pnapoli@nsprlaw.com
hunter@napolilaw.com
Phone: (212) 397-1000
Fax: (312) 610-5680

Thomas C. Goldstein (MD 9512120307)
Eric F. Citron (MD 1608240002)
Daniel Woofter (MD 1812120199)
Goldstein & Russell, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20815
tg@goldsteinrussell.com
Phone: (202) 362-0636
Fax: (866) 574-2033

Christopher L. Schnieders (KS 22434)
NAPOLI SHKOLNIK, PLLC
6731 W. 121st Street, Suite 201
Overland Park, KS 66209
cschnieders@napolilaw.com
Phone: (212) 397-1000
Fax: (312) 610-5680

*Counsel for Objector-Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL NO. 2741<br>Case No. 3:16-md-02741-VC |
| THIS DOCUMENT RELATES TO:<br><br>*Ramirez, et al. v. Monsanto Co.*,<br>Case No. 3:19-cv-02224 | **OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS SETTLEMENT, APPOINTMENT OF INTERIM CLASS AND SUBCLASS COUNSEL, DIRECTION OF NOTICE UNDER FED. R. CIV P. 23(e), SCHEDULING OF A FAIRNESS HEARING, AND STAY OF THE FILING AND PROSECUTION OF ROUNDUP-RELATED ACTIONS BY SETTLEMENT CLASS MEMBERS**<br><br>Date: March 31, 2021<br>Time: 10:00 AM<br>Place: Courtroom 4, 17th floor<br>Judge: Honorable Vince Chhabria |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

IDENTITY AND INTEREST OF OBJECTORS ......................................................... 3

ARGUMENT ...................................................................................................................... 4

I.   The Constitution Prohibits Binding The Exposure-Only Class To The Proposed
Settlement .................................................................................................................... 4

    A.   The kind of notice proposed here is never sufficient to bind an absent exposure-
only class member ................................................................................................. 4

    B.   Binding an exposure-only class is only permissible, if at all, with certain special
factors that are absent here ................................................................................ 11

    C.   It is assuredly unconstitutional to bind those who do not know they've been
exposed, which the proponents admit this settlement does ............................ 21

II.   The Settlement's Quasi Back-End Opt-Out Right Does Not Excuse This Constitutional
Failure ....................................................................................................................... 26

    A.   The settlement terminates a constitutionally protected right to be "made whole"
with compensatory damages without adequate notice ................................... 26

    B.   The right to litigate that the back-end opt out preserves is far less valuable than
the status quo ....................................................................................................... 30

    C.   A full, back-end opt-out right would be an unambiguous improvement ...................... 41

III.   Co-Lead Counsel Also Cannot Prove Superiority Under Rule 23(b)(3) ............................ 42

IV.   If The Court Denies The Motion For Preliminary Approval, New Interim Counsel
Should Be Appointed To Attempt A Truly Separate Settlement ......................... 46

CONCLUSION .................................................................................................................... 48

i

# TABLE OF AUTHORITIES

## Cases

*Allen v. Monsanto Co.*,
  2013 WL 6153150 (W. Va. Nov. 22, 2013) ........................................................................ 24

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) .................................................................................................. *passim*

*Ark. Dep't of Health & Human Servs. v. Ahlborn*,
  547 U.S. 268 (2006) .............................................................................................................. 27

*Carey v. Piphus*,
  435 U.S. 247 (1978) .............................................................................................................. 27

*Churchill Vill., L.L.C. v. Gen. Elec.*,
  361 F.3d 566 (9th Cir. 2004) ................................................................................................ 23

*Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*,
  532 U.S. 424 (2001) .............................................................................................................. 27

*Cotter v. Lyft, Inc.*,
  60 F. Supp. 3d 1067 (N.D. Cal. 2015) .................................................................................. 24

*Deposit Guar. Nat'l Bank, Jackson v. Roper*,
  445 U.S. 326 (1980) .............................................................................................................. 43

*Elsea v. U.S. Eng'g Co.*,
  463 S.W.3d 409 (Mo. Ct. App. 2015) ................................................................................... 24

*Farbwerke vormals Meister Lucius & Bruning v. Chem. Found.*,
  39 F.2d 366 (3d Cir. 1930) ................................................................................................... 29

*Flores v. Dart Container Corp.*,
  2021 WL 107239 (E.D. Cal. Jan. 12, 2021) ......................................................................... 23

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) .............................................................................................. 22

*Hefler v. Wells Fargo & Co.*,
  2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) ...................................................................... 24

*In re Actos (Pioglitazone) Prod. Liab. Litig.*,
  274 F. Supp. 3d 485 (W.D. La. 2017) ................................................................................... 24

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
  689 F.3d 229 (2d Cir. 2012) ................................................................................................. 23

*In re Bluetooth Headset Prod. Liab. Litig.*,
  654 F.3d 935 (9th Cir. 2011) ................................................................................................ 23

*In re Citric Acid Antitrust Litig.*,
  1996 WL 655791 (N.D. Cal. Oct. 2, 1996) ........................................................................... 24

ii

*In re Corrugated Container Antitrust Litig.*,
  659 F.2d 1332 (5th Cir. 1981) ............................................................ 23

*In re Deepwater Horizon*,
  732 F.3d 326 (5th Cir. 2013) .............................................................. 20

*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014) .............................................................. 20

*In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*,
  369 F.3d 293 (3d Cir. 2004) ........................................... 18, 19, 22, 36

*In re Evans Prods. Co.*,
  2009 WL 2448145 (Bankr. S.D. Fla. Aug. 6, 2009) .............................. 5

*In re High-Tech Employee Antitrust Litig.*,
  2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ...................................... 24

*In re Hyundai & Kia Fuel Econ. Litig.*,
  926 F.3d 539 (9th Cir. 2019) .............................................................. 23

*In re Inter-Op Hip Prosthesis Liab. Litig.*,
  204 F.R.D. 330 (N.D. Ohio 2001) ...................................................... 24

*In re Johns-Manville Corp.*,
  600 F.3d 135 (2d Cir. 2010) ............................................................ 7, 8

*In re NCAA Student-Athlete Concussion Injury Litig.*,
  332 F.R.D. 202 (N.D. Ill. 2019) .................................................... 18, 23

*In re NFL Players Concussion Injury Litig.*,
  821 F.3d 410 (3d Cir. 2016) ......................................................... 17, 22

*In re Online DVD-Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir. 2015) .............................................................. 23

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  330 F.R.D. 11 (E.D.N.Y. 2019) .......................................................... 23

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
  148 F.3d 283 (3d Cir. 1998) ................................................................. 7

*In re Tyco Int'l, Ltd.*,
  236 F.R.D. 62 (D.N.H. 2006) ............................................................. 24

*In re Veritas Software Corp. Sec. Litig.*,
  2005 WL 3096079 (N.D. Cal. Nov. 15, 2005) ..................................... 24

*In re Vioxx Prod. Liab. Litig.*,
  869 F. Supp. 2d 719 (E.D. La. 2012) .................................................. 24

*In re Volkswagen & Audi Warranty Extension Litig.*,
  273 F.R.D. 349 (D. Mass. 2011) ........................................................ 24

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
  2017 WL 2212783 (N.D. Cal. May 17, 2017) ..................................... 24

*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004) ............................................................ 23

*Jabbari v. Farmer*,
  965 F.3d 1001 (9th Cir. 2020) ......................................................... 23

*Jimenez v. Allstate Ins. Co.*,
  765 F.3d 1161 (9th Cir. 2014) ......................................................... 23

*Juris v. Inamed Corp.*,
  685 F.3d 1294 (11th Cir. 2012) ....................................................... 23

*Kane v. Johns-Manville Corp.*,
  843 F.2d 636 (2d Cir. 1988) .............................................................. 5

*Leyva v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013) ........................................................... 23

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
  339 U.S. 306 (1950) ........................................................................ 10

*O'Connor v. Uber Techs., Inc.*,
  2019 WL 1437101 (N.D. Cal. Mar. 29, 2019) ................................. 23

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985) ..................................................... 8, 27, 30, 44

*Pitts v. Terrible Herbst, Inc.*,
  653 F.3d 1081 (9th Cir. 2011) ......................................................... 44

*Richie v. Blue Shield of California*,
  2014 WL 6982943 (N.D. Cal. Dec. 9, 2014) ................................... 24

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) ........................................................... 23

*Sandpiper Vill. Condo. Ass'n., Inc. v. Louisiana-Pac. Corp.*,
  428 F.3d 831 (9th Cir. 2005) ........................................................... 23

*Sheldon v. Sill*,
  49 U.S. (8 How.) 441 (1850) ........................................................... 28

*Sprint Commc'ns Co. v. APCC Servs., Inc.*,
  554 U.S. 269 (2008) ........................................................................ 30

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) ........................................................................ 27

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ........................................................... 23

*Stephenson v. Dow Chem. Co.*,
  273 F.3d 249 (2d Cir. 2001) ..................................................... 6, 7, 8

*Sullivan v. DB Investments, Inc.*,
  667 F.3d 273 (3d Cir. 2011) ........................................................... 23

iv

*Tice v. Am. Airlines, Inc.*,
   162 F.3d 966 (7th Cir. 1998) ................................................................... 28

*Torres v. Mercer Canyons Inc.*,
   835 F.3d 1125 (9th Cir. 2016) ................................................................. 23

*United States v. Stonehill*,
   83 F.3d 1156 (9th Cir. 1996) ................................................................... 28

*Uppal v. CVS Pharmacy, Inc.*,
   2015 WL 10890652 (N.D. Cal. Sept. 11, 2015) ...................................... 24

*Vargas v. Ford Motor Co.*,
   2020 WL 1164066 (C.D. Cal. Mar. 5, 2020) ........................................... 23

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002) ................................................................. 23

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................................... 8

*White v. Experian Info. Sols., Inc.*,
   2009 WL 10670553 (C.D. Cal. May 7, 2009) ......................................... 24

*Zepeda v. PayPal, Inc.*,
   2017 WL 1113293 (N.D. Cal. Mar. 24, 2017) ......................................... 24

## Rules

Fed. R. Civ. P. 23 ............................................................................... *passim*

Fed. R. Civ. P. 23(b)(3) ...................................................................... *passim*

Fed. R. Civ. P. 23(c)(2)(B) ......................................................................... 9

## Other Authorities

6 Am. Jur. 2d *Assignments* § 47, Westlaw (database updated Feb. 2021) .................................. 36

*Annotated Manual for Complex Litigation* (4th ed.),
   Westlaw (database updated May 2020) ............................... 36, 38, 43, 44

Laura B. Bartell, *Due Process for the Unknown Future Claim in Bankruptcy—Is This
Notice Really Necessary?*, 78 Am. Bankr. L.J. 339 (2004) ...................... 10

Deborah R. Hensler, *Happy 50th Anniversary, Rule 23! Shouldn't We Know You Better
After All This Time?*, 165 Univ. Pa. L. Rev. 1599 (2017) ........................ 44

*Key Statistics for Non-Hodgkin Lymphoma*, Am. Cancer Soc'y (Jan. 12, 2021),
   https://www.cancer.org/cancer/non-hodgkin-lymphoma/about/key-statistics.html ................ 39

Luoping Zhang et al., *Exposure to Glyphosate-Based Herbicides and Risk for Non-
Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence*, Mutat Res. Author
Manuscript (July 1, 2020), ncbi.nlm.nih.gov/pmc/articles/PMC6706269/ ......................... 5, 38

The proposed class-action settlement now before the Court claims to be very different from the one this Court all-but-summarily rejected several months ago. But whatever differences there might be, they are not material; the proposal remains facially uncertifiable under both the Constitution and Federal Rule of Civil Procedure 23. At bottom, there remains an effort here to do something the Supreme Court directly warned against in the most analogous case any court has ever decided: namely, to bind a huge and difficult-to-identify class of absent plaintiffs whose only present connection to the matter is that they were exposed (sometimes, the proponents admit, even unknowingly) to the product at issue. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 628 (1997). Courts have rightly questioned whether that is *ever* appropriate, and to the extent any have allowed such settlements to go forward, there have been special features of the "exposure-only" classes in those cases that worked to minimize the risks posed to their members' due-process rights. Here, however, the settlement proponents have sought to take this extraordinary step not *because* of special protective features of the exposure-only class they seek to create, but *in spite* of special risks that they themselves acknowledge. There is no reason for this Court to sanction that effort.

That is particularly so for two reasons. First, it would be relatively easy to avoid the worst of the constitutional risks with a simple but important change to the settlement. The current proposal allows exposure-only class members a "back-end" right to opt out of *some* features of the settlement at the time they actually get sick. But despite the contrary assurances of class counsel, the right to litigate that it preserves is in truth watered down to the point of being practically water. And perhaps more importantly, the settlement's proponents cannot explain why it is necessary to water down that right *at all*—the settlement could easily preserve a real back-end opt-out right for absent class members allowing them to freely decide at the appropriate time whether the settlement has secured them anything of value relative to their constitutional right to go it alone. That the

1

class-action attorneys negotiating this settlement were happy to forego that basic procedural protection—or that Monsanto was unwilling to agree to it (or perhaps both)—says all one needs to know about what is happening to the rights of exposure-only class members here.

Second, while it would not alone avoid the constitutional defects, those defects would at least be more forgivable if collective litigation was obviously superior in some way to individual suits for the exposure-only class—as Rule 23(b)(3) itself requires. But the settlement proponents have just blown straight by the question, assuming that there is a problem here that cries out for a class-action as a remedy. In reality, exposure-only class members are well protected as it is by their right (and strong incentive) to find an attorney and prosecute their high-value claims whenever they get sick. At that time, they will also be armed with the best science developed in the interim supporting whatever claim they may have. And unlike in typical consumer class actions, these plaintiffs are not at risk of losing their claims entirely to a statute of limitations (precisely because they have not yet been injured) and do not hold the type of low-value claims that cannot be efficiently prosecuted absent aggregation. Nor is there a threat of widespread bankruptcy or some similar emergency of the kind that motivated the extraordinary steps plaintiffs tried (and courts *still* rejected) in the asbestos cases. Nor is this class action even going to generate the supposed benefit of "global peace"—a term defendants already routinely use as a euphemism for the killing off of absent class members' valid claims—because Monsanto plans to keep on selling Roundup, leaving it exposed to a set of future plaintiffs who will retain the right to (somehow) prove that their first exposure to Roundup occurred after February 3, 2021.

Accordingly, even if the Constitution permitted a proposal to certify an exposure-only subclass and settle its claims as proposed here (and it does not), this Court would still have to reject that proposal under Rule 23(b)(3). To put a fine point on it, this class settlement proposal is

2

superior to individual actions by those class members only when it comes to generating class-action attorneys' fees and limiting Monsanto's future exposure to things like punitive damages. Needless to say, that is not what Rule 23(b)(3) contemplates as the kinds of advantages that make a class action "superior to other available methods for fairly and efficiently adjudicating the controversy." At this point, the proponents should either *start* with a settlement that provides a full-blown back-end opt-out right and work from there, or else stop flirting with the constitutional violation Justice Ginsberg persuasively identified for the Supreme Court nearly 25 years ago in *Amchem*. *See* 521 U.S. at 597. And absent one of those changes, the Court should be no more impressed with this proposal than the one that came before.

This leads to a final point: This is now the second time that these putative class counsel have delivered a result that does not even protect the minimum constitutional rights of the people they purport to represent. The problem may be the personnel, or it may be the process of trying to simultaneously settle the interests of a class of presently injured plaintiffs and a much-broader and more-inchoate class of exposure-only plaintiffs who can more easily be made to give away the longer tail risks that defendants most want to foreclose. Either way, the current subclasses are not doing the trick, and this Court should direct that if negotiations are to continue, any exposure-only class be represented by new interim counsel in pursuit of an entirely separate settlement agreement that concerns only the rights and interests of that particular class.

## IDENTITY AND INTEREST OF OBJECTORS

The objectors are:

1.     The National Black Farmers Association, which has its own case consolidated into the MDL, and which represents the interests of members who were exposed to Roundup Products (Roundup) before February 3, 2021; have not as of February 3, 2021 commenced an individual,

non-class lawsuit or retained counsel for the pursuit of any relevant non-class lawsuit; and otherwise meet the requirements of either Subclass 1 or Subclass 2, as defined in the new settlement agreement.

2.      Sabrina Jo Benham, Andrea Coomer, Rick Free, and Gary Hosford—individuals represented by undersigned, who were exposed to Roundup before February 3, 2021; retained undersigned after February 3, 2021 and had not previously commenced an individual, non-class lawsuit or retained counsel for the pursuit of any relevant non-class lawsuit; were diagnosed with NHL prior to February 3, 2021; and otherwise meet the requirements of Subclass 1.

3.      Margaret Lower, David Smoker, Lynette Waliany, and Roger Wilmot—individuals represented by undersigned, who were exposed to Roundup before February 3, 2021; retained undersigned after February 3, 2021 and had not previously commenced an individual, non-class lawsuit or retained counsel for the pursuit of any relevant non-class lawsuit; were not diagnosed with NHL as of February 3, 2021 and have not been diagnosed with NHL to date; and otherwise meet the requirements of Subclass 2.

## ARGUMENT

### I.      The Constitution Prohibits Binding The Exposure-Only Class To The Proposed Settlement.

#### A.      The kind of notice proposed here is never sufficient to bind an absent exposure-only class member.

The Supreme Court cautioned decades ago against doing what the parties are trying to do here—bind those "with no perceptible … disease at the time of the settlement," including those who "may not even know of their exposure, or realize the extent of the harm they may incur." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 628 (1997). Indeed, the Court made quite clear that it had doubts about "whether class action notice sufficient under the Constitution and Rule 23

could *ever* be given to legions so unselfconscious and amorphous." *Id.* (emphasis added). This is because, "[e]ven if they fully appreciate the significance of class notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out." *Id.* And so, to be clear, the starting point for analysis of the proposal here—the *very best* its proponents can say—is that they are trying something as to which there are grave constitutional doubts.

The parallels between *Amchem* and this case are quite striking. *Amchem* involved a proposed global settlement seeking to resolve both current and future asbestos-related claims. 521 U.S. at 597. There, like here, the courts faced a "flood of lawsuits" when the "exposure inflicted upon millions of Americans … began to take [its] toll." *Id.* at 598 (quoting Report of The Judicial Conference Ad Hoc Committee on Asbestos Litigation 2-3 (Mar. 1991)). For asbestos-related diseases, just like NHL and other potential diseases caused by exposure to Roundup, the "latency period" could last decades, such that "a continuing stream of claims c[ould] be expected," and the "final toll of … related injuries [wa]s unknown." *Id.*[1]; *cf.* Luoping Zhang et al., *Exposure to Glyphosate-Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence*, Mutat Res. Author Manuscript (July 1, 2020), ncbi.nlm.nih.gov/pmc/articles/PMC6706269/ (noting median latencies between 15 to 20 years for NHL for low-dose, long-term exposure). And in *Amchem*, the asbestos manufacturers sought to

---

[1] *See also Kane v. Johns-Manville Corp.*, 843 F.2d 636, 639 (2d Cir. 1988) ("A significant characteristic of these asbestos-related diseases is their unusually long latency period. An individual might not become ill from an asbestos-related disease until as long as forty years after initial exposure. Hence, many asbestos victims remain unknown, most of whom were exposed in the 1950's and 1960's before the dangers of asbestos were widely recognized. These persons might not develop clinically observable symptoms until the 1990's or even later."); *In re Evans Prods. Co.*, 2009 WL 2448145, at *8 (Bankr. S.D. Fla. Aug. 6, 2009) (noting that "[d]ecades might pass before these persons even realize any harm has come to them" from asbestos).

achieve global peace by settling the future, unfiled claims of potential asbestos claimants, much like Monsanto is trying to do here. 521 U.S. at 600-01.

Accordingly, the settling parties in *Amchem* proposed a similar class of potential claimants who: (1) had not already filed an asbestos claim against the defendants, and (2) either had been exposed to asbestos or had family members who had been exposed. *See* 521 U.S. at 603. The agreement also attempted, like this one, to enjoin certain types of claims that would otherwise have been available under state law. *See id.* at 604. And although the *Amchem* Court declined to resolve the due process issue in light of its ultimate holding that the proposed class could not satisfy Rule 23 for other reasons—in particular, the conflict faced by attorneys attempting to resolve present and future claims at the same time—it expressly recognized "the gravity" of the due process question. *Id.* at 628.

Lower courts then took *Amchem*'s warning seriously. For example, the Second Circuit relied on Justice Ginsberg's opinion for the Court in *Amchem* to address concerns regarding representation and notice in settlement-only class action proceedings in *Stephenson v. Dow Chemical Co.*, 273 F.3d 249, 251 (2d Cir. 2001), *aff'd in relevant part by an equally divided court*, 539 U.S. 111 (2003) (per curiam). In that case, two veterans commenced separate state-law actions based on allegations that they were exposed to Agent Orange during the Vietnam War, both of which were filed long after a broad settlement agreement was reached in a Rule 23(b)(3) class action against the same defendants based on "virtually identical" allegations. *Id.* at 251-52, 255-56. That agreement purported to resolve the claims of individuals who had been exposed to Agent Orange but had not yet manifested injuries. *Id.* at 252. And the plaintiffs fit within the prior class, so their claims were transferred by the MDL Panel to the Eastern District of New York, where the class action settlement had been adjudicated. *See id.* at 256.

6

Although the Second Circuit relied on other parts of Rule 23 to hold that the plaintiffs were not bound by the prior settlement, the court of appeals also believed that the plaintiffs "likely received inadequate notice" of the class action settlement because "*Amchem* indicates that effective notice could likely not ever be given to exposure-only class members." 273 F.3d at 261 n.8. And in a later case, the Second Circuit picked up where *Stephenson* and *Amchem* left off—applying the "bedrock concepts of due process of law" set forth therein to conclude that a plaintiff company was not bound by prior bankruptcy court orders where the plaintiff's claims were inchoate at the time of the orders and the prior notice of the proceedings was thus insufficient to bar the company from bringing claims that would otherwise have been precluded. *In re Johns-Manville Corp.*, 600 F.3d 135, 138, 154-58 (2d Cir. 2010) (per curiam).

"In *Amchem*," the Second Circuit reasoned, "the Supreme Court was concerned that, even if the exposure-only claimants 'appreciate[d] the significance of class notice,' they might 'not have the information or the foresight needed to decide, intelligently, whether to stay in or opt out.'" 600 F.3d at 158 (quoting *Amchem*, 521 U.S. at 628) (alteration in original). "Similarly," the court of appeals continued, "even if [the company] received the Notice document, it could not have anticipated from the way the proceedings unfolded that its contribution and indemnity claims—which were abstract, 'unimaginable,' and inchoate at the time—would be enjoined." *Id.* Thus, "it c[ould not] be said," the court concluded, that the plaintiff company "had constitutionally sufficient notice of the 1986 Orders, as interpreted by the bankruptcy court in 2004." *Id.*; *cf. In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 313 (3d Cir. 1998) (noting that *Amchem* was concerned with "exposure-only" plaintiffs whose injury might manifest in the future, and who may be currently unaware of their injury).

What happened in *Stephenson* and *In re Johns-Manville Corp.* should serve as a cautionary tale here because both this Court and "the class-action defendant itself ha[ve] a great interest in ensuring that the absent plaintiff[s]" may be bound. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985). The defendants in *Stephenson* believed they had negotiated for global peace by reaching the Agent Orange settlement in 1984. But nearly two decades later, the Second Circuit permitted a suit to go forward for plaintiffs with "virtually identical claims against th[o]se defendants," because "they were inadequately represented and, therefore, due process considerations prevent[ed] the earlier class action settlement from precluding their claims." 273 F.3d at 251. The asbestos-company and insurer defendants in *In re Johns-Manville Corp.*, too, believed they were protected—in that case, by Chapter 11 bankruptcy orders from 1986, discharging certain claims. But there, again, the Second Circuit permitted suit to go forward against the defendants nearly three decades later, because the plaintiff had not received adequate notice of the prior proceedings and thus could not be bound by the 1986 orders. 600 F.3d at 137-38. In the interim, the Supreme Court has made very clear that classes should not be certified in the first place where they imperil the constitutional rights of absent class members. *See generally Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011); *Amchem*, 521 U.S. 591. There is thus no reason to allow the present settlement proponents to re-run the traps that eventually forced the courts to find constitutional violations in cases like *Amchem*, *Stephenson*, and *In re Johns-Manville Corp.*

That is particularly true because the intuition underlying the doubts in *Amchem* is exactly right—it *is* impossible to ask absent putative class members who have only been exposed to a risky product, and might one day have a claim, to intelligently assess notice of a settlement that purports to resolve those claims of injury they don't yet and might never have. Such class members would have to obtain excellent advice from lawyers (and maybe Bayesian statisticians) about their odds

of one day having one or another kind of claim and then intelligently evaluate the risk that they could be left out in the cold by settling their claim now when the injuries might turn out to be *much* worse than they presently anticipate. Needless to say, they probably won't get that advice; its cost might well eclipse the settlement offer. And, for related reasons, it would be fair to wonder whether the immediate compensation such a settlement typically offers (as this one does, *see* New Settlement 24 & Ex. 6 (describing $5,000 "Accelerated Payment Awards")) is designed to coerce poorer class members away from the preservation of their claims.

And that is not all: The foregoing ignores that the premise of the *dubitante* statement in *Amchem* was that class members would otherwise "fully appreciate the significance of [the] class notice" they received. *Amchem*, 521 U.S. at 628. In other words, the concern in *Amchem* was with binding absent class members *even on the assumption* that they were all highly intelligent native English speakers who actually received, read, and fully understood the terms of the class notice. We explain below that, in this particular case, this premise is located on approximately the other side of the visible universe from practical reality. But the more important point may be that class-action notice is always partly fictional—after all, the requirement is only for the best notice practicable, Fed. R. Civ. P. 23(c)(2)(B); *Amchem*, 521 U.S. at 617—and the lack of a present injury approximating the harm that will face the plaintiff when the real claim accrues is thus particularly important in assessing how fair it is to charge someone with having failed to opt out after "receiving" such notice. It is one thing to say that someone has forfeited their right because, knowing they were a smoker who had lung cancer, they nonetheless ignored or missed regular advertisements regarding a class-action settlement about smoking and lung cancer and so failed to opt out. It is another thing to charge every living smoker—no matter how healthy—with failing to

attend to the same notices related to a settlement about a disease they don't yet have and probably never will.

Put another way, even assuming class members are "alive and actually see the notice, they [might] not recognize themselves as affected in any way by the [proceeding] and will, therefore, take no action to ensure their interests are represented." Laura B. Bartell, *Due Process for the Unknown Future Claim in Bankruptcy—Is This Notice Really Necessary?*, 78 Am. Bankr. L.J. 339, 354 (2004) (due process notice concern as applied in the analogous bankruptcy context). The "opportunity to be heard" is "the fundamental requisite of due process of law." *Id.* (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)). And notice cannot be constitutionally sufficient as applied to those who "are not only unknown to the" defendant, "but are also unknown to themselves." *Id.*

Accordingly, purporting to terminate the individual rights of an exposure-only plaintiff based on class-action notice is doubly dubious from a due process perspective. First, it is not fair to assume that someone without present injury would even attend to the kind of notice that a class action typically provides, as *Amchem* itself recognizes. And then, as *Amchem* makes perfectly clear, even if we assume that the best notice imaginable actually reaches the class members, it is still unfair to assume that the average person who does not yet know the extent of their injury will have made an intelligent decision to give up their rights when they default into doing nothing at all. *Amchem*, 521 U.S. at 628 ("Even if they fully appreciate the significance of class notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether to … opt out.").

**B.      Binding an exposure-only class is only permissible, if at all, with certain special factors that are absent here.**

These grave constitutional doubts are sufficient reason alone to reject this settlement, particularly because better procedural protection for absent class members is obviously workable here. *See infra* Part II(C). But as we explain below, this case is even more unconstitutional in this regard than would be the average class action, or a case like *Amchem* itself.

Accordingly, this Court need not go so far as to say that exposure-only class members can never be bound to a class action to decide the motion here. Given that *Amchem* requires the Court's analysis to begin from a place of serious constitutional doubts, the right approach is to *at least* demand a persuasive showing from the settlement proponents that those doubts should be overcome by something special about this case. But, here, the opposite is true: Not only does this case lack the kinds of special features present in cases where courts have approved classes even vaguely like this one, but it is in fact much *worse* than the average class action in every relevant way on precisely this score.

1.      To see this, we must first explain our understanding of the size and scope of the settlement class (or, perhaps, how difficult it is to understand what size and scope the settlement class in fact has). To that end, we discuss four separate factors below: (1) the amorphous class definition; (2) the enormous size and scope of the class; (3) the difficulty of identifying individual class members and potential class members; and (4) the difficulty in actually reaching class members with effective notice.

The definition of "Settlement Class" in the latest agreement includes "those individuals" who, as of February 3, 2021, "have been exposed to Roundup Products through the application of Roundup Products" as residents or citizens of the United States, or through Roundup's application in the United States. MDL Doc. 12531-2, at 2 (Feb. 4, 2021) (New Settlement). The settlement

then defines "Exposure to Roundup Products through the application of Roundup Products" as including "exposure through mixing and any other steps associated with application, *whether or not the individual performed the application, mixing, or other steps associated with application himself or herself.*" *Id.* at 3 (emphasis added). Read for its plain meaning, this means that if you were exposed to Roundup before February 3, 2021, because you *or* someone else applied it, you are a class member if either (1) that exposure happened in the United States; or (2) it happened anywhere on the planet, and you are a U.S. resident or citizen. Along with that already colossal set of claims, the claim also includes those with derivative claims, such as the widow of a farmer who dies in 2040 and whose autopsy reveals for the first time that the cause was end-stage lymphoma. *Id.*[2]

These "Settlement Class" members are further divided into two subclasses. "Subclass 1" is made up of those class members "who have been diagnosed with NHL as of February 3, 2021." New Settlement 3. For those much more ordinary class members, the settlement provides a compensation scheme intended to substitute for litigation over the harms Roundup has already caused them. *See infra* pp. 38-40. And, notably, the definition of "exposure" is unlikely to be very important for this class—at least when it comes to preserving their right to an individual action— because the limitation to those already diagnosed with cancer is the much more meaningful filter.

---

[2] For some reason—the proponents do not say what—the class definition also *excludes* anyone who "commenced an individual, non-class lawsuit or retained counsel for the pursuit of any individual, non-class personal injury or false advertising claims arising from, resulting from, in any way relating to or in connection with such exposure." New Settlement 2-3. This careful rephrasing has at least avoided the problem where the first settlement excluded its own class representatives, because they had (of course) retained lawyers. *See* MDL Doc. 11156, at 2-3 (July 3, 2020). But it remains impossible to see how a class that is *defined* to exclude plaintiffs with lawyers is well-represented by plaintiffs with lawyers. At a minimum, this Court should require the settlement proponents to explain what legitimate purpose was served by excluding all represented plaintiffs, and disclose any contemporaneous evidence of this provision's intent, because it appears designed to facilitate a standing challenge to any fairness objection lodged by any class member who happens to have the assistance of competent legal counsel.

12

"Subclass 2," on the other hand, includes all those who have been exposed to Roundup and "have not been diagnosed with NHL as of February 3, 2021." New Settlement 3. For those plaintiffs, the settlement agreement provides an opt-in medical monitoring program that only lasts for four years maximum, *infra* pp. 37-38, and they cannot participate in the compensation program unless they are diagnosed with NHL—and even then, only if the compensation program still exists, *infra* pp. 38-39. This subclass's members are not receiving very much at all and giving up a lot in the event that they eventually develop cancer. *See infra* pp. 38-41. And, importantly, the breadth of *this* class is limited only by the exposure definition above.

And that is precisely way it is both so dangerous that we do not yet know how to read the limitation to those exposed "through the application of Roundup products," and so disconcerting that the proposal would leave so much ambiguity surrounding such a critical detail. On its face, that definition is broad enough to encompass almost every living casual golfer, school child, teacher, park user, or produce eater, since each was exposed to some amount of Roundup because they or someone else applied it. It does seem unlikely that this was intended; the settlement's reference to "application" was presumably meant to do some work. But this is at least a vivid demonstration of how casual the settlement proponents have been with absent class members' rights. Because the settlement is much better for Monsanto than it is for future claimants in the exposure-only class (as we explain in part below, and others will no doubt elaborate), it is certain that Monsanto will later argue that those with very serious claims in 2050 are foreclosed from seeking punitive damages and subject to other legal disabilities the settlement imposes if they were in any way exposed before February 3, 2021, and failed to opt out. And so, assuming the proponents are not trying to bind the entire living population of the United States (and then some), the best that can be said for the settlement is that no one bothered to clearly identify who is safe

13

from such an argument and who needs to take action immediately to fully protect their right to go it alone.

Moreover, even ignoring the breadth of the actual definition and limiting the class members to the individuals we presume the parties *intended* to bind—perhaps those "close" to the process of applying Roundup, or something like that—the agreement still reaches tens and possibly hundreds of thousands of individuals who are unlikely to have a meaningful chance to opt out. Consider an infant born in January of this year to a migrant farm worker who comes home with his clothes covered in Roundup from mixing it all day. Or an organic farmer downwind from a large-scale industrial farm. The bottom line point is that, when the class is so amorphous, it is virtually certain to include (and terminate the rights of) a large number of people who do not even know they were exposed, certainly did not know the extent of their exposure, were (by definition) unaware of any injury at the time they were asked to opt out, and exceedingly unlikely to attend to the notice that purported to partially dispose of their future claim, in large part because the settlement proponents could not even define the class with any precision.

Not only is this class particularly difficult to define, it is also huge—no matter what clarified definition the proponents might (someday) settle on. Indeed, no one disputes that this definition reaches a massive number of exposure-only class members. In Co-Lead Counsel's own words, "Settlement Class Members are very diverse and geographically widespread." MDL Doc. 12531, at 20 (Feb. 4, 2021) (Mem.). As they put it, the "ubiquity of Roundup" means that it would bind individuals "in the U.S., U.S. territories and possessions, and Mexico," and that is just looking at those *most at risk. Id.*

In fact, the enormous size and scope of the class may be best shown by the ludicrously ambitious notice program the settlement proponents have announced. Because "Roundup is used

14

in residential garden and lawn care, large properties such as golf courses, schools, universities and parks, and within the entire agricultural industry," Co-Lead Counsel proposes directing notice not just to farms and other agricultural institutions, but also businesses and organizations such as greenhouses, vineyards, grounds maintenance businesses, landscaping businesses, sports fields, golf courses, schools and universities, cemeteries, and even diplomatic establishments and government entities, among others. Mem. 20. They seek to reach international military and diplomatic media, and have a specific campaign targeted at *all of Mexico*. *Id.* at 21-22. The proponents are in fact quite up front about how atypical and ambitious it is to attempt to provide notice this widespread. *See id.* at 20 ("A central feature of the Settlement is a notice plan of unprecedented breadth, including a focus on reaching and informing individuals who may be itinerant, lack exposure to traditional media, or do not speak English as a first language."); *id.* at 22 (noting the "methodology and research deployed to develop and update" what Co-Lead Counsel describe as a "full comprehensive and state-of-the-art notice plan"). But while they view that as a credit to their settlement, they have it precisely backwards from a constitutional perspective: That such widespread and ambitious notice is necessary reflects only the constitutional challenge they have created for themselves by trying to use class-action notice to adjudicate the rights of an absent class *they chose* to define so broadly.[3]

So far, we have noted that the class is ill-defined and enormous. But it gets worse, because the individual class members are also very difficult to identify. Some classes are very discrete,

---

[3] The settlement proponents also seem to get backwards that widespread, ambitious, and *expensive* class notice programs are the opposite of a good thing from Rule 23(b)(3)'s perspective. As explained below, *infra* Part III, if enormous resources and efforts will be burned up from the settlement fund just to notify potential class members of their claims, the correct inference is that individual suits would be the superior and more efficient vehicle for resolving the relevant claims, not that those resources should be wasted for the sake of constitutionally adequate notice.

15

even if they are large: Everyone who worked in a given office building for the last ten years can probably be identified by their employers' records and social security numbers. Indeed, in the digital age, this can be true even for massive classes, like all "Netflix users." But this is not remotely one of those classes. The proponents acknowledge that the vast bulk of members are home and garden users, *see* Mem. 20-21, and there is almost certainly no way to identify who those people are. And even those who might be identified from farm employment rolls include an unusually high number of migrant and itinerant workers or non-citizens who lack ordinary identifying information. *See id.* The proportion of class members who can be identified by the defendant or a neutral party and contacted directly is thus likely to be relatively small. *Cf. id.* (noting "approximately 41,000 individuals *with NHL* who have *opted in to receive information* related to their disease"). Indeed, the "U.S. Direct Notice/Third Party Notice" campaign consists of mailing "posters" to "approximately 2,700 stores … asking *them* to post notice" and "[s]end[ing] letter[s] to large retailers (e.g., Lowes, Home Depot) *asking if they would like to receive* posters so they can post notice," in an attempt to reach some of the "approximately *266,000* potential Settlement Class Members." *Id.* (emphasis added). In other words, the notice campaign almost entirely relies on putative exposure-only class members to identify themselves—which they are, again, very unlikely to be able to do given that they lack present injury by definition.

Finally, the proponents themselves have outwardly acknowledged that this is a particularly difficult class to reach, even if one makes generous assumptions about the adequacy of publication notice under ordinary conditions. Co-Lead Counsel acknowledge, for example, that even if we look only at those class members who are most at risk, that still includes many who "may be itinerant, lack exposure to traditional media," and "do not speak English as a first language." Mem. 20. There is just no world in which this Court can rely on such individuals to be able to self-identify

16

and then make an informed decision to opt out, even with a supposedly "state-of-the-art" notice plan.[4]

2.      That brings us to the striking contrast between these facts and the very limited set of cases in which courts have been willing to approve anything that resembles an exposure-only class. As this Court has itself noted, MDL Doc. 11182, at 3 (July 6, 2020) (PTO 214), those cases present special considerations that at least might help make such an agreement kosher: They involve particularly discrete classes, or perhaps groups that are routinely contacted for collective resolution of disputes and so familiar with what needs to be done to protect their rights. And this case looks nothing like them.

Start with *In re NFL Players Concussion Injury Litigation*, 821 F.3d 410 (3d Cir. 2016), the case the proponents themselves identify as a leading precedent for what they are trying to do. *See* Mem. 2 n.1. Co-Lead Counsel note that "the NFL class [was] made up of a relatively small number of individuals, all centrally understanding their relation to the NFL." *Id.* at 46-47 n.11. And, indeed, the closed universe of former NFL football players is a set of easily identifiable individuals who are likely reachable with direct notice and, on top of it all, very likely aware of the serious risk of developing CTE that they face based on the issue's extraordinary publicity. Football players are celebrities, and high-profile cases of suicide and other brain ailments associated with CTE were consistently splashed across front pages and sports media that class

_____

[4] Even assuming that such individuals *could* self-identify and then make an informed decision to opt out, it is worth noting that to exercise the opt-out right, the settlement agreement would require undocumented immigrants who fall within the class definition to provide their "name, address, telephone number, date of birth, and enclose a copy of his or her identification issued by any Governmental Authority or other bona fide identification"—in other words, to out themselves as undocumented immigrants. *See* New Settlement 18-19. It should be obvious that such individuals, even if they might *want* to exercise their opt-out right, would find little comfort in the agreement's assurance that "[n]o Opt Out request will be denied on the grounds that the Settlement Class Member is an undocumented alien." *See id.* at 19.

members were particularly likely to follow. There was even a feature film entitled "Concussion" that was made about the issue, starring Will Smith. These class members were also well known to and represented by players unions and other associations that have their interests in mind and would know how best to find them. That kind of class action is plainly extraordinary on every measure, even compared to an average class case. Indeed, it is fair to say that—from a due process perspective—it is *much* closer to an action joining a large number of individuals who affirmatively opt *in* than it is to a case like this.[5]

Accordingly, this Court was right to explain that there is a strong argument that "[t]here's nothing wrong with certifying a class of people who are candidates to suffer harm in the future when the class is narrow and readily identifiable—for example, NFL players who have not yet developed CTE." PTO 214, at 3. "In a case like that, it's relatively easy to ensure that the class members are notified and given [a] meaningful chance to consider their options before deciding whether to opt out of the settlement." *Id.* But "[a] class that includes all Roundup users who will get cancer in the future is very different." *Id.* Thus, it is quite "dubious" that, for example, "a migrant farmworker or someone who is employed part time by a small gardening business would receive proper notification (much less the opportunity to consider their options in a meaningful way)." *Id.*

Much the same can be said of the class members bound by the settlement approved in *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation*, 369 F.3d 293 (3d Cir. 2004). Proponents suggest that "[t]he key Settlement elements" here are "based

---

[5] The same is true of the very similar, future-injury class of former athletes who competed in the National Collegiate Athletic Association (NCAA), particularly given that it followed on the similar NFL action. *See In re NCAA Student-Athlete Concussion Injury Litig.*, 332 F.R.D. 202, 209-10 (N.D. Ill. 2019), *aff'd sub nom. Walker v. NCAA*, 2019 WL 8058082 (7th Cir. Oct. 25, 2019).

18

on" the settlement the Third Circuit upheld in *Diet Drugs*. Mem. 2 n.1. But the agreement there "embrace[d] all persons who took Pondimin or Redux"—prescription medications that the defendant ultimately took off the shelves "after data came to light suggesting a link between use of the drugs and valvular heart damage … and after the [FDA] issued a public health advisory alert." *Diet Drugs*, 369 F.3d at 298-99. Thus, like the settlement in the NFL case, the settlement in *Diet Drugs* attempted only to bind those who had exposed *themselves* to the potential harms, ensuring that class members could fully identify themselves as potential class members. And the class was of course readily identifiable and easy to define because these were drugs that had to be prescribed, and there was no confusion over what it meant to be "exposed" to them. On top of that, the FDA's public health advisory alert and the likelihood that many or most users would eventually have been warned off the medication by their own doctors made it so that the class members were very likely aware that they faced a serious medical risk.

In contrast, Monsanto seeks to bind not just those who actually used Roundup themselves, but also those who have been exposed by *someone else's* use of Roundup—indeed, even someone else's mere preparation of Roundup for use—"legions" assuredly far more "amorphous" and "unselfconscious," *Amchem*, 521 U.S. at 628, than the users of Fen-Phen. And there has been no similar public health advisory blasted to the public like the FDA warning against Pondimin and Redux; indeed, many class members are likely to take precisely the opposite message from their employers' continued use of Roundup and its continued availability on hardware store shelves. Monsanto's offer to "seek permission from the EPA to include in the labeling of Roundup Products a reference … *consisting of links* to the scientific evidence" that will be *considered* by the science panel, "to the extent the Defendant has permission to disclose such documents or such documents are otherwise available in the public domain," New Settlement 54 (emphasis added), looks pretty

empty indeed as any kind of "warning" while Monsanto continues to market and sell Roundup. The message that continued sale provides here must thus be considered for the effect it necessarily has on the notice program that Co-Lead Counsel have proposed.

The third settlement that Co-Lead Counsel point to (at 2 n.1) is less helpful still, because it wasn't about future injury at all. Rather, it only involved class members who had already suffered damages related to the Deepwater Horizon oil spill. *See In re Deepwater Horizon*, MDL No. 2169, Doc. 6430, at 3-11 (E.D. La. May 3, 2012) (class definition of Economic and Property Damages Settlement Class in *Deepwater Horizon* settlement agreement), *available at* https://bit.ly/3bcxMOq; *see also In re Deepwater Horizon*, 739 F.3d 790, 798-99, 803-04 (5th Cir. 2014) (settlement class only included individuals with present injuries "causally related" to the Deepwater Horizon oil spill); *In re Deepwater Horizon*, 732 F.3d 326, 344 (5th Cir. 2013) (including those without injuries related to spill "would call into question the validity of the Settlement Agreement"); *cf. id.* at 341 n.8 (noting that including claimants "who have suffered no actual injury … also may call into question whether the settlement class satisfies the predominance test for certification") (quotation marks omitted). The opposite is true here.

In short, the settlement proponents are trying to bind a class of exposure-only individuals that looks nothing like the discrete and identifiable individuals from the very agreements the proponents used as their model—former NFL players, former users of Fen-Phen drugs they were prescribed, and those who were *injured* by the Deepwater Horizon oil spill. Even assuming it was appropriate to bind the exposure-only members of the classes in those first two cases, neither stands for the proposition that it passes constitutional muster to bind the exposure-only class here.

**C.** **It is assuredly unconstitutional to bind those who do not know they've been exposed, which the proponents admit this settlement does.**

The above alone suffices to reject the parties' attempt to certify an exposure-only class here. But worse, the proponents admit that their class definition necessarily includes individuals who do not even know of their exposure and yet makes no effort to carve them out of the class. *See* Mem. 62. There is absolutely no doubt that this violates the Constitution. A person who has no knowledge that they even could have a claim cannot be expected to opt out even if the class notice were somehow fed directly into their brain.

Co-Lead Counsel argue that this is acceptable because the "overwhelming majority of class members here know or have reason to know of their actual or potential exposure to Roundup products." Mem. 62. But this is absurd. As an initial matter, the proponents do not explain why it matters what a potential class member had "reason to know"; a person will never opt out to preserve a claim they do not know they have just because they had a reason to know they had it. And we are talking here about a *notice* regime: If this is the kind of claim that many people should know they have but don't, then attorneys representing those individuals should be making very sure that, as part of the putative resolution of their claims, the notice effectively conveys the information that class members are missing. Nor do the proponents explain why it is permissible to terminate the rights of some class members without due process simply because a "majority" of the other class members will have their constitutional rights protected—particularly given that it was proponents' own decision not to exclude the unaware class members from their class definition.[6] The simple reality is that one cannot give effective notice of a suit to someone who

---

[6] The failure to exclude those who lacked knowledge of their exposure makes it all the more strange that the proponents chose to exclude all the class members with lawyers.

does not know *either* that they were injured *or* that they were exposed to the risk. That person has no reason to take any action with respect to any lawsuit whatsoever.

Accordingly, to say this "is not a standard class or standard Settlement," Mem. 59, is more than an understatement. Indeed, not a *single* case cited by the proponents includes a settlement agreement that binds masses of unwitting class members who do not know of their exposure and thus could not make an intelligent opt-out decision, even given thorough notice of the risks. In each of the cited cases, the class members *knew* of their exposure, even in those instances where class definitions included those who had not yet been harmed. They could thus make an informed decision on the front end on whether or not to opt out.

We can start again with the primary agreements that Co-Class Counsel indicate were the framework for the proposed settlement that was reached here. In *Diet Drugs*, essentially none of the class members would have been unaware that they were prescribed and were taking the diet drugs. And we hope it goes without saying that former professional football players in the NFL must have known that they were former professional football players in the NFL. *See In re NFL*, 821 F.3d at 420; *see also* Mem. 46-47 n.11 (acknowledging that "the NFL class is made up of a relatively small number of individuals, all centrally understanding their relation to the NFL"). Notably, this is not to say that these groups *should* have known of their exposure, as proponents say about their proposed class. It is to say, instead, that they almost certainly had *actual* knowledge of their exposure, and thus an opportunity to actually take some action in response to the notice they received.

The same goes for other cases that Co-Lead Counsel heavily rely upon. *Hanlon v. Chrysler Corp.*, cited throughout Co-Lead Counsel's brief (at 25, 29, 66, and 68), involved a settlement class of Chrysler minivan owners. 150 F.3d 1011, 1018 (9th Cir. 1998). Minivan owners know

22

they own minivans. And former NCAA athletes know they played college sports. *In re NCAA*, 332

F.R.D. at 209-10; *see* Mem. 32, 37, 46, 47.

In fact, this important requirement—that all of the class members *know* they are in the class

when they receive notice—can be said for every case with a non-mandatory class approved for

settlement that is cited by Co-Lead Counsel for any proposition in their brief.[7]

---

[7] *Jabbari v. Farmer*, 965 F.3d 1001, 1005 (9th Cir. 2020) (class made up of certain Wells Fargo customers); *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 553 (9th Cir. 2019) (class made up of certain "purchasers of Hyundai Elantra and Sonata vehicles"); *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1132 (9th Cir. 2016) (class made up of certain seasonal-work applicants and workers employed by defendant); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 940 (9th Cir. 2015) (class made up of certain individuals with a Netflix subscription); *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1162-63 (9th Cir. 2014) (class made up of certain Allstate employees); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 511 (9th Cir. 2013) (class made up of certain "current and former hourly employees in Medline's three California distribution warehouses"); *Juris v. Inamed Corp.*, 685 F.3d 1294, 1305 (11th Cir. 2012) (class made up of certain individuals who had received breast implants); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 233 (2d Cir. 2012) (class made up of certain "investors who purchased AIG's publicly traded securities"); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 954 (9th Cir. 2009) (class made up of certain purchasers of a BAR/BRI course); *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 571 (9th Cir. 2004) (class made up of certain defective dishwasher owners); *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 939 (9th Cir. 2011) (class made up of certain Bluetooth headset purchasers); *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 285 (3d Cir. 2011) (class made up of certain purchase of De Beers diamonds); *Sandpiper Vill. Condo. Ass'n., Inc. v. Louisiana-Pac. Corp.*, 428 F.3d 831, 835 & n.2 (9th Cir. 2005) (class made up of certain individuals who own or owned property that used defendant's siding); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 525 (3d Cir. 2004) (class made up of certain consumers and third-party payors of Coumadin dispensed pursuant to prescriptions); *Staton v. Boeing Co.*, 327 F.3d 938, 948 (9th Cir. 2003) (class made up of certain African American Boeing employees); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1046 (9th Cir. 2002) (class made up of certain "freelancers" who worked for Microsoft); *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1332, 1333 (5th Cir. 1981) (class made up of "all purchasers of corrugated containers and sheets against thirty-seven manufacturers"); *Flores v. Dart Container Corp.*, 2021 WL 107239, at *3 (E.D. Cal. Jan. 12, 2021) (class made up of certain employees of the defendants); *Vargas v. Ford Motor Co.*, 2020 WL 1164066, at *1 (C.D. Cal. Mar. 5, 2020) (class made up of owners of certain Ford vehicles); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 24 (E.D.N.Y. 2019) (class made up of certain persons, business, and entities that accepted Visa and Mastercard for payment); *O'Connor v. Uber Techs., Inc.*, 2019 WL 1437101, at *1 (N.D. Cal. Mar. 29, 2019) (class made up of Uber drivers); *Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *1 (N.D. Cal. Dec. 18, 2018) (class made up of "all persons who purchased Wells Fargo common stock between February 26, 2014 and September 20, 2016"), *aff'd sub nom. Hefler v. Pekoc*, 802 F. App'x 285

23

Meanwhile, even accepting that this requirement can (for some reason) be avoided if a "majority" or "overwhelming majority" of class members know that they were injured, the proponents have not even shown that this is true. Particularly because the class is ill-defined, there is simply no basis to assume that most of the exposure-only class actually knows that they were handling Roundup or exposed by someone else who was handling it. Instead, the proponents merely assert this as fact by *ipse dixit*.

---

(9th Cir. 2020); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 2212783, at *2 (N.D. Cal. May 17, 2017) (class made up of certain owners and lessees of a Volkswagen, Audi, or Porsche 3.0-liter TDI vehicles); *Zepeda v. PayPal, Inc.*, 2017 WL 1113293, at *1 (N.D. Cal. Mar. 24, 2017) (class made up of certain PayPal account owners); *In re Actos (Pioglitazone) Prod. Liab. Litig.*, 274 F. Supp. 3d 485, 554 (W.D. La. 2017) (class made up of certain individuals prescribed and injured by diabetes medication); *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1070 (N.D. Cal. 2015) (class made up of Lyft drivers); *Uppal v. CVS Pharmacy, Inc.*, 2015 WL 10890652, at *1 (N.D. Cal. Sept. 11, 2015) (class made up of certain pharmacists employed by CVS); *In re High-Tech Employee Antitrust Litig.*, 2015 WL 5158730, at *2 (N.D. Cal. Sept. 2, 2015) (class made up of certain employees of defendants); *Richie v. Blue Shield of California*, 2014 WL 6982943, at *1 (N.D. Cal. Dec. 9, 2014) (class made up of certain current and former employees of Blue Shield); *In re Vioxx Prod. Liab. Litig.*, 869 F. Supp. 2d 719, 722 (E.D. La. 2012) (*opt in* personal injury class members made up of certain "individuals with qualifying injuries caused by Vioxx"); *In re Volkswagen & Audi Warranty Extension Litig.*, 273 F.R.D. 349, 351-52 (D. Mass. 2011) (class made up of certain owners and lessees of model years 1997-2004 Audi A4 vehicles or model years 1998-2004 Volkswagen Passat vehicles); *White v. Experian Info. Sols., Inc.*, 2009 WL 10670553, at *3 (C.D. Cal. May 7, 2009) (class members made up of certain consumers who had received a Chapter 7 discharge and were subject to a post-bankruptcy credit report by a defendant that contained possible errors); *In re Tyco Int'l, Ltd.*, 236 F.R.D. 62, 66 (D.N.H. 2006) (class made of up of "all persons and entities who purchased or otherwise acquired Tyco securities between December 13, 1999 and June 7, 2002"); *In re Veritas Software Corp. Sec. Litig.*, 2005 WL 3096079, at *1 (N.D. Cal. Nov. 15, 2005) (class made up of "persons who bought Veritas stock between January 3, 2001 and January 16, 2003"), *vacated in part*, 496 F.3d 962 (9th Cir. 2007); *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 336 (N.D. Ohio 2001) (class made up of certain individuals injured by defective hip replacement); *In re Citric Acid Antitrust Litig.*, 1996 WL 655791, at *1 (N.D. Cal. Oct. 2, 1996) (class made up of individuals "who purchased citric acid directly from any of the defendants at any time during the period from January 1, 1991 to and including June 30, 1995"); *Elsea v. U.S. Eng'g Co.*, 463 S.W.3d 409, 415 (Mo. Ct. App. 2015) (class made up of individuals who, because of their employment, had to work inside the county courthouse during a certain period of time); *Allen v. Monsanto Co.*, 2013 WL 6153150, at *2 (W. Va. Nov. 22, 2013) (class made up of those who lived, worked, or attended school in a certain radius of a chemical plant).

As set forth in Part I(B) above, migrant farmers are an admittedly huge part of the exposure-only class. *See* Mem. 20-21. So much so, in fact, that Co-Lead Counsel concede the need to make massive outreach efforts, to the tune of tens of millions of dollars, in trying to reach these individuals here and in Mexico. *Id.* And many do not speak, let alone read, English. So even assuming that there are identifying labels on the bulk products they—or those they work with—are mixing and applying, it is unlikely that such class members would even know what it is that they are handling. Even the assumption that the products are labeled may not be true. Migrant farmers may be told what to do and how to do it, using bulk Roundup product that is not always labeled.

At best, the numbers of those who fall into Subclass 2 but do not know it is unknown, and Co-Lead Counsel—who has the burden to demonstrate that this settlement comports with the Constitution and Rule 23—have not done the work to explain how many of the unwitting would be bound. If their response is that it is impossible to know, then that just begs the question how the Court can safely conclude that resolving this case as a class action is consistent with the rules and respects the constitutional rights of the absent class members who proponents themselves cannot identify.

The bottom line is that it is simply never going to be constitutional to bind, in a Rule 23(b)(3) class, individuals who do not even know that they were exposed to a product that might cause them harm in the future. That is because no notice—and certainly not the notice program here—can ever inform them of the fact that they may have a claim with the particularity necessary to provide them a meaningful choice whether or not to opt out.

OPPOSITION TO MOTION FOR PRELIMINARY
APPROVAL OF CLASS ACTION SETTLEMENT
MDL NO. 2741, CASE NO. 3:16-MD-02741

## II.     The Settlement's Quasi Back-End Opt-Out Right Does Not Excuse This Constitutional Failure.

Against the foregoing, Co-Lead Counsel attempt to argue that this Court's concerns about the adequacy of class-action notice to determine the rights of absent class members have been ameliorated because their exposure-only class members are now giving up fewer rights than the settlement proponents put at risk before. And they are half right about that: The substantially watered down back-end opt-out right in the current settlement is an improvement over what came before. But it cannot suffice to address this Court's previously stated concerns about the legality of binding masses of exposure-only class members for two reasons. First and foremost, the settlement still threatens to take away exposure-only class members' property right to be "made whole" without their consent, which means that only notice that is good enough for fully terminating absent class-member damages claims will do. And second, exposure-only class members are being asked to give up other extremely valuable litigating rights in exchange for almost no offsetting benefit, which would put them in a much worse off position than they currently inhabit. Accordingly, if the parties wish to bind *this* exposure-only class to the terms in *this* agreement, anything short of a full, back-end opt-out right is necessarily insufficient.

### A.     The settlement terminates a constitutionally protected right to be "made whole" with compensatory damages without adequate notice.

The right to be "made whole" with compensatory damages is a property right that is subject to the full protection of the due process clause, and despite Co-Lead Counsel's assertion that class members "retain their right to sue Monsanto for compensatory damages on any legal theory," Mem. 19, the actual terms of the settlement would require class members to give up that property right. Because "a chose in action is a constitutionally recognized property interest possessed by each of the plaintiffs," absent class-action plaintiffs "must receive notice plus an opportunity to be heard."

*See Shutts*, 472 U.S. at 807, 811-12; *see also id.* at 812 ("[D]ue process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court."). And as Part I explains, because the proposed notice program here does not provide the process that is necessary to terminate a "chose in action," the settlement is accordingly unconstitutional.

In response, Co-Lead Counsel suggest that they are not taking away a property right because there is no right to an award of punitive damages. *See* Mem. 48. But their own premise is that the plaintiff deprived of a punitive-damages claim "has been made whole for his injuries by compensatory damages." *Id.* (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003)). That premise is emphatically necessary—the property right is not the right to get some kind of compensation, it is the right to be "made whole." And that is in fact a right that the settlement claims the power to terminate on behalf of absent class members without notice sufficient for that purpose.

"[O]ver the centuries the common law of torts has developed a set of rules to implement the principle that a person should be compensated fairly for injuries caused by the violation of his legal rights." *Carey v. Piphus*, 435 U.S. 247, 257 (1978). To "be compensated fairly," *id.*, plaintiffs are entitled to "compensatory damages" that "redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct," *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432 (2001). And the right to seek such redress, or "chose in action," is a property right that includes, for example, the right to "medical damages." *Ark. Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 285 (2006) (recognizing, in a unanimous opinion, that an individual "at all times until judgment retain[s] her entire chose in action—a right that included her claim for medical damages"); *see, e.g., United States v. Stonehill*, 83 F.3d 1156, 1159 (9th Cir.

1996) (holding that under California law, "[a] cause of action to recover money in damages, as well as money recovered in damages, is a chose in action and therefore a form of personal property," and "a cause of action in tort, being a thing in action, is personal property") (quotation marks omitted); *see also Sheldon v. Sill*, 49 U.S. (8 How.) 441, 444 (1850) ("The statute includes every such right as is ordinarily termed a chose in action; by which is meant, not a right which may be sued for, but one which can be realized only by suit; not a claim to property in specie, which may, if opportunity offer, be exercised by caption or entry, but a right to a debt, or damages, or money which can be recovered only by action."); *Tice v. Am. Airlines, Inc.*, 162 F.3d 966, 970 (7th Cir. 1998) (recognizing "the right, grounded both in due process and in the property right represented by the lawsuit *chose in action*, of each individual to assert her own claim").

Pressed against this touchstone, the proponents own fragile language gives the problem away. According to the proponents, "[t]he Settlement preserves class members' right to bring *almost* any claim, class or individual, for compensatory damages or equitable relief after the litigation stay period, including but not limited to claims for personal injury, fraud, misrepresentation, negligence, fraudulent concealment, negligent misrepresentation, breach of warranty, false advertising, and violation of any unfair and deceptive acts or practices statute." Mem. 44 (emphasis added). Of course, being made "almost" whole is not being made whole. And, indeed, this language seems designed to obscure a critical risk to absent class members' compensatory damage claims lurking in the settlement.

Seeing this is as simple as noting that the settlement's definition of "compensatory damages" in fact excludes compensation for certain kinds of damages—a definitional step that would be unnecessary if the settlement meant to preserve the chose in action in full. In particular, the agreement defines "Compensatory Damages" as excluding "damages for medical monitoring for

28

undiagnosed injuries," and, critically, "*any damages that were increased because of the absence of medical monitoring for any injuries.*" New Settlement 5 (emphasis added). In other words, the settling parties have taken away the property right to be "made whole" by limiting damages for those diagnosed in the future to the harm that would have existed had the disease been caught by a medical monitoring program early on, even if the disease is in fact diagnosed much later and causes much more harm. To give a concrete example, if someone is diagnosed with (or killed by) Stage 4 NHL (or any other non-NHL disease caused by Roundup), the definition of "compensatory damages" limits any award to the damages that would have occurred had they been in a medical monitoring program that identified the disease at Stage 1. Even worse, the settling parties take away any right to seek medical monitoring, even though the settlement's own purported medical monitoring program ends after four years—the very moment at which class members can start bringing their watered-down individual tort suits that can no longer get them the medical monitoring they will need to be made whole. *See infra* pp. 37-38. To put a fine point on it, Monsanto has eliminated any liability for the monitoring necessary to protect class members from unsuspectingly developing the kinds of late-stage disease that will probably kill them, while also eliminating any liability for the harms that late-stage disease will cause if and when it arises. That should not be held out as making members "whole."

Ultimately, "a chose in action is property; and an act which takes property … without legal procedure to determine their rights and without compensation is a deprivation of property without due process of law and is violative of the Fifth Amendment to the Constitution." *Farbwerke vormals Meister Lucius & Bruning v. Chem. Found.*, 39 F.2d 366, 371 (3d Cir. 1930), *aff'd*, 283 U.S. 152 (1931). And here, the settlement proponents' only argument is that it is fine if they take

half a loaf without due process because they are leaving the other half behind for its owner. To state that argument plainly is to refute it.

### B.     The right to litigate that the back-end opt out preserves is far less valuable than the status quo.

Even leaving this point aside, the settlement must fail for the separate reason that it deprives exposure-only class members' claims of much of their present litigation value even if they do opt out on the back end. Co-Lead counsel are thus wrong to say that class members "give up relatively little" in this new agreement. Mem. 44. Not only do class members lose the leverage of punitive damages claims, they also expose themselves to the findings of a "science panel" that is both advisory-in-name-only and almost certain to leave their claims worse off than they are now. And that is on top of the lost medical monitoring claims and compensatory damage limitations described above.

The courts have not yet considered whether the property-right principles articulated above are offended by the practical devaluation of the right to litigate after opting out. But they obviously should be: When the class settlement has deprived the future opt-out plaintiff of much of the leverage they would otherwise have had, their claim is clearly worth less money. And part of the reason we understand a "chose in action" as a personal property right governed by the due process clause that cannot be terminated without the right to opt out is precisely because, by the time of the founding, such claims were viewed as property that could be assigned for compensation. *See, e.g.*, *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 277-79 (2008). Making an assignable right half as valuable through a settlement the person cannot practically escape (for the reasons given above) is indistinguishable from just asserting the right to dispose of half of it without the due process required by cases like *Shutts* and its progeny. *See supra* pp. 26-30.

OPPOSITION TO MOTION FOR PRELIMINARY
APPROVAL OF CLASS ACTION SETTLEMENT
MDL NO. 2741, CASE NO. 3:16-MD-02741

Proponents main response is, essentially, that it is fair to take these parts of the claim away because they are either not themselves property rights or are otherwise protected by the settlement. Punitive damages, they argue, "are not an individual right," and Monsanto has already suffered enough from "the scope and features of this Settlement," "the private settlements to date," and "the vast amounts paid to fund all of them"—which, according to Co-Lead Counsel, already "achieve the publicity, reform, and deterrence functions customarily served by punitive damages." Mem. 5. And as for medical monitoring, Co-Lead Counsel argue that "[t]his function is taken up in the Settlement's Diagnostic Accessibility Grant Program." *Id.* We address those arguments in turn below. But it is important to start with describing what is actually going on here.

Exposure-only class members—and particularly those who might develop a *non*-NHL disease caused by Roundup yet forever be bound as an exposure-only class member—have little to gain and much to lose by being bound to these terms. And the proponents only suggest otherwise, throughout their argument, by simply ignoring the strength of absent class members in the status quo. Every Roundup case that has gone to trial thus far has resulted in a substantial award for the plaintiff. And for just that reason, future plaintiffs are already likely to have a strong issue-preclusion argument on causation if and when their cases ripen. It is thus no wonder that Monsanto seeks to take away the right to be made whole by compensatory damages, *supra* pp. 26-30, and punitive damages and medical monitoring claims in their entirety, *infra* p. 36; and to hit the breaks for a four-year period, during which time a science panel determination will likely be produced in their favor, *infra* pp. 32-36 & n.8, for essentially everyone that has or will have a claim in the near term (as it will likely be many years before anyone *exposed* to Roundup *for the first time* after February 3, 2021, will develop a serious Roundup-related disease). Simply put, Monsanto right now faces an enormous long-tail risk—in the MDL as a whole, and in individual cases—and this

31

settlement allows them to take that off the table in a way that will make it much easier for them to avoid settling for any substantial sum with future opt outs. That leverage *belongs* to class members and should not be taken away without their consent, period. But even if it could be, they should not be getting so very little in return.

1.    To that end, we should start by rejecting the proponents suggestion that class members are getting a better deal in the settlement than they would if "consigned to individual litigation alone," given the "risks" and "delay" they would face. Mem. 6-7. This fails to acknowledge the great many Roundup plaintiffs (including many of Co-Lead Counsel's *own clients*) who have *not* gone to trial have and yet have already received settlements that are far more substantial than anything the settlement's compensation scheme would offer. The proponents note that class members "are not covered by the *current* inventory settlements," *see id.* at 7, which is unsurprising because they have no present injury. But of course that does not mean that they would not be covered by *future* "inventory settlements" among groups of plaintiffs who later develop diseases. Roundup plaintiffs are currently batting 1.000 at trial, *see infra* Part III; it is hard to see why individuals would face serious obstacles in obtaining reasonable settlements of their cases much more favorable than the settlement offers. And that is particularly true given that the settlement includes *a four-year stay* created entirely for Monsanto's benefit.

2.    Worse, however, is the proponents claim that the science panel provides some kind of benefit to absent class members. That proposition withstands not the slightest scrutiny. Although the newly formulated science panel purports to address this Court's previous concerns, it is advisory in name only, and overwhelmingly likely to leave Monsanto in a *much* stronger position than it now occupies. To see that, we unfortunately need to explain the features of the science panel in some length.

Under the terms of the new settlement, the science panel is tasked with examining "the body of scientific evidence … to determine whether exposure to Roundup Products causes NHL in humans." New Settlement 59. That determination is either "a Causation Not Shown Finding (that causation has not been established for NHL) or a Causation Shown Finding (that causation has been established for NHL *at or above the specific threshold internal dose level*)." *Id.*

That italicized portion is critical. "A 'Causation Shown Finding' means the Science Panel Determination has concluded that causation has been shown for NHL in humans," but "only at or above the threshold internal dose level (dose greater than xx micrograms/day) set forth in the Science Panel Determination." New Settlement 61. The science panel "*must* include a threshold internal dose level in a Causation Shown Finding," unless the panel is able to conclude "that causation has been established for NHL at *any* internal dose level, no matter how small," *id.* (emphasis added)—a result that seems unlikely, to say the least. And here's the rub: If the "Science Panel Determination does not include a threshold internal dose level for NHL," and the panel cannot agree on one, then "the Science Panel shall be considered under the Settlement Agreement to have made a Causation Not Shown Finding for NHL." *Id.*

In other words, the determination will be a "Causation Not Shown Finding for NHL" unless the science panel's five members can agree not only that there is a casual link between Roundup and NHL, but also at what precise *level* of exposure, measured in micrograms per day, Roundup causes NHL in humans. And that design risks two enormous injuries for absent class members. First, the sheer likelihood that no particular dose level will be agreed upon overwhelmingly stacks the deck towards a "Causation Not Shown" finding for every future plaintiff. And second—and perhaps worse—the setting of a threshold level guarantees that there will be a (potentially very

33

large) set of plaintiffs required to tell their juries that there was a "Causation Not Shown" finding *as to them*, even if they are extremely close to the threshold dose level the science panel chooses.

None of this is answered by the fact that the panel's decision is now "advisory." The agreement provides that in any follow-on lawsuit brought by a class member, "the Parties agree that the court or other tribunal shall … permit the full and fair introduction of the Science Panel Determination as evidence," and "not instruct or otherwise tell the jury it is not bound by any of the stipulated facts in the Science Panel Stipulation." New Settlement 62. And class members are proscribed from asserting "that the Science Panel reached a conclusion inconsistent with the Science Panel Determination," *i.e.*, that the science panel found a causal link but could not determine the precise internal dosage at which causation is established. *Id.* So a huge number of plaintiffs will face their opt-out choice in the future knowing that their jury will be told that a neutral panel of experts, agreed to by the parties, made a "Causation Not Shown" finding as to them. To say that this is worse than the status quo where all three juries to consider the issue have dropped enormous liability judgments on Monsanto is a gross understatement.

Indeed, the text of the Science Panel Stipulation well demonstrates just how prejudicial this purportedly "advisory" determination will be. Future plaintiffs cannot contest reading this document to the jury, nor contradict it in any way. New Settlement 62. And it tells the jury that the "Science Panel was an independent group of five scientists" who are highly qualified, who were "not under the control or influence of any party and did not include scientists employed by any party," and who "conducted an independent, four-year review of the scientific evidence." New Settlement Ex. 9, at 1-2. It provides that the "parties have agreed that the Science Panel's determination should be considered as that of an independent expert and its determination should

be given the same weight given to the testimony of any other independent expert witness." *Id.* at 3. And, consistent with the above, it only provides three options to present to the jury as its conclusion:

> [The Science Panel's determination is that it has not been established that the application of Roundup Products can cause Non-Hodgkin's Lymphoma in humans.] or [The Science Panel's determination is that the application of Roundup Products has been shown to cause Non-Hodgkin's Lymphoma in humans, but only at or above the threshold internal dose level (dose greater than [xx] micrograms/day).] or [The Science Panel's determination is that the application of Roundup Products has been shown to cause Non-Hodgkin's Lymphoma in humans at any internal dose level.]

*Id.*

Future plaintiffs are thus stipulating to the admission of evidence that thoroughly explains how qualified the panel of scientists was, and how thorough their process was, for arriving at a single conclusory sentence that cannot be put into context: "The Science Panel's determination is that it has not been established that the application of Roundup Products can cause Non-Hodgkin's Lymphoma in humans." This is a Trojan Horse that proponents seek to slip in under the radar on the suggestion that it is advisory only and might even *benefit* future plaintiffs, *see* Mem. 6, all the while designed to provide Monsanto with a powerful evidentiary tool to counter the causal-finding successes plaintiffs have already had in every jury trial thus far.

Moreover, it must be remembered that while the issue the science panel decides can provide a complete defense for Monsanto (*i.e.*, the absence of general causation), Monsanto will be able to deploy all of its criticisms of the science without any serious impediment on the issue of *specific* causation, notwithstanding what the science panel says on the more general question. Accordingly, even in the very unlikely universe where the science panel says something so good for plaintiffs

that they are better off than where they already stand after three full jury trials, they will still have won very little at all.[8]

3.    Exposure-only class members are also being asked to give up their right even to *seek* punitive damages claims and medical monitoring claims, which is obviously also designed to greatly diminish their bargaining leverage. *See* Mem. 5. That problem is not answered by saying that there is no right to an *award* of punitive damages, which is all the proponents can seriously argue. Some jurisdictions actually consider the punitive damages claim itself a "chose in action." *See, e.g.*, 6 Am. Jur. 2d *Assignments* § 47, Westlaw (database updated Feb. 2021) (citing jurisdictions that allow assignment of punitive damages claims as a chose in action, and some that do not).[9] And cases that the proponents cite as examples of where punitive damages claims have been terminated—like *Diet Drugs*—do not map onto this one for the reasons already given above. *See supra* pp. 17-24 & n.7.

More importantly, however, this argument just ignores that the status quo is that future opt outs *have* punitive damages claims that have been very successful for Roundup plaintiffs in the past. The proponents ask this Court to "[r]ecall that during all Roundup litigation, a total of three cases progressed through trial and achieved a punitive damages verdict." Mem. 49. Another way

---

[8] The settlement proponents themselves seem to have recognized their vulnerability to attack on the truly lopsided nature of the science panel. On the literal eve of the filing deadline for these objections, Co-Lead Counsel filed an amendment to the latest agreement adding new provisions to the science panel portions of the settlement. *See* MDL Doc. 12665-1 (Mar. 3, 2021) (New Settlement Amendment). The settlement now allows Monsanto and one "Lead Deposition Counsel" for the class to depose each member of the science panel—testimony that may be used in follow-on class member tort cases, but only when the Science Panel Determination and Stipulation are also introduced into evidence. *Id.* at 2-4.

[9] The fact that the right to seek punitive damages may be a chose in action in certain jurisdictions but not others is also a reason why certifying the class may not meet the predominance and typicality requirements of Rule 23, and might require subclassing to make sure that certain groups of class members are adequately represented. *See, e.g.*, *Annotated Manual for Complex Litigation* § 22.754 (4th ed.), Westlaw (database updated May 2020) (*AMCL*).

of saying that is that Roundup plaintiffs have been awarded punitive damages in 100% of the trails that have gone to the jury. And although the proponents try to make much of the fact that those awards were reduced, they still ranged from $10.3 to $44.8 million even at their reduced level. It is quite clear that Monsanto would like to take the risk of even occasional judgments in amounts like those off the table—not just to remove the possibility of such awards themselves, but also to shift the bargaining leverage in any follow-on case that is later brought by a class member. Taking that bargaining leverage away from absent class members when they have no effective chance to opt out is unconstitutional. *Supra* Part I.

4.      As for medical monitoring claims, the proponents argue that this "function is taken up in the Settlement's Diagnostic Accessibility Grant Program," or DAGP. Mem. 5. But that is a bait-and-switch. The settlement's DAGP program begins with an outreach campaign "to inform DAGP-eligible Settlement class members of the objectives of the DAGP, including how to conduct initial self-evaluation for NHL indicators and about the availability of NHL diagnostic evaluations from [third-party] medical providers who receive DAGP grants." *Id.* at 13; *see* New Settlement 45. By terms, this outreach campaign ends after four years. *See* New Settlement 45. In addition, the DAGP administers a grant program that awards grants to select third-party medical providers so that *they* can provide NHL Diagnostic Evaluation services to DAGP Eligible Settlement Class Members, and this *also* ends, by terms, after four years. *See id.* at 47.[10] Thus, the agreement's medical monitoring program ends as soon as class members may begin bringing tort suits against

_____

[10] Specifically, grants are awarded to certain third-party medical providers "on a fixed-length budget period, … which shall not be longer than 12 months," the last of which "shall end on the date that is four years from the date the first budget period began." New Settlement 47. And because the first budget period begins "30 days following the Effective Date," *id.*—the date the settlement becomes final, *id.* at 6-7—that means the DAGP grant program ends as soon as the initial four-year freeze on litigation is lifted.

Monsanto, at which point they are forever barred from seeking medical monitoring. And as noted above, even the compensatory damages claims class members are purported to retain are artificially limited by the very thing this settlement takes away and then bars future plaintiffs from seeking—medical monitoring. This cannot be construed as beneficial for exposure-only class members relative to the status quo, particularly given the long latency of the disease and the unlikelihood that four years of a meager medical monitoring program will help. [11]

5.      And here is the worst part: In exchange for the valuable Monsanto-friendly giveaways outlined above, there is essentially *no* offsetting benefit for the exposure-only class members in *any* part of the settlement.

Many, if not most, exposure-only class members will not have a diagnosis of NHL until long past the time that the claims period is guaranteed. Under the terms of the settlement agreement, the compensation program is only guaranteed for a period of four years. *See* New Settlement 70. After that period, the proponents *say* the parties "will negotiate whether to extend the compensatory portion of the Settlement into future years (with additional funding), taking into account the success of the Settlement and the state of the science on Roundup exposure, including the Advisory Science Panel Determination." Mem. 18; *see* New Settlement 70-71. But if no agreement to extend the compensation program is reached, Monsanto has the unilateral right to end the compensation program for $200 million in additional compensation program funds. *See* Mem. 18; New Settlement 71. And, importantly, many exposure-only class members that develop NHL will not receive a diagnosis until long after the guaranteed claims program period. *See* Zhang

---

[11] In addition to being simply unfair, courts that have "applied Rule 23(b)(3) have generally found that common issues did not predominate[,] … that differing state laws controlled the claims for medical monitoring," and that "nationwide or multistate class certification was not a superior method of resolving such claims." *AMCL* § 22.74.

et al., *supra* (noting median latencies between 15 to 20 years for NHL for low-dose, long-term exposure).

In truth, not even the initial period of four years is guaranteed for the compensation program. Monsanto is only required to pay $1.325 billion into the compensation fund. New Settlement 14. And the agreement provides that "[t]he Claims Program, the Claims Administrator, and the Settlement Administrator will not make any Compensation Awards during the Initial Settlement Period that cause the aggregate total amount of all Compensation Awards issued to exceed" that amount. *Id.* at 26. In other words, once those funds are gone, the compensation program is over unless Monsanto *agrees* to put more in.

That $1.325 billion would probably not even cover the average claims of those who are diagnosed with NHL *year to year*. *See Key Statistics for Non-Hodgkin Lymphoma*, Am. Cancer Soc'y (Jan. 12, 2021), https://www.cancer.org/cancer/non-hodgkin-lymphoma/about/key-statistics.html (estimating that in 2021 about "81,560 people (45,630 males and 35,930 females) will be diagnosed with NHL," and about "20,720 people will die from this cancer (12,170 males and 8,550 females)"). Indeed, Monsanto has already settled *some* of the inventory claims for over $10 billion, nearly ten times the amount it seeks to put into the compensation fund now, for harms caused by a product it refuses to take off the shelves. This Court ought to take a hard look at whether class members can rely on the possibility that Monsanto will agree to adding more funds into the compensation scheme to keep the program alive even during the initial claims period, let alone for years beyond.

And even if $1.325 billion is sufficient to cover the benefits claims of the class, it is only sufficient because the actual amounts provided by the scheme are a mere fraction of what Monsanto has paid to each inventory claimant to date. On this front, we encourage the Court to

ask putative class counsel who have also settled for their own plaintiffs on an inventory basis to compare the awards their inventory plaintiffs secured to what they would have secured under the settlement's compensation scheme. And, having done so, the natural follow-up question is why the settlement favors *even the class representatives themselves*, who presumably could have been included in the Co-Lead Counsel's settled inventory and received a much better deal for themselves as a result.

Moreover, the foregoing concerns only how bad a deal this is for those class members who have or will develop *NHL* due to their exposure to Roundup. It is quite possible that, as the science develops, it will come to light that other serious non-NHL illnesses are also caused by Roundup. That was true for asbestos, Agent Orange, and cigarettes—all of which cause a host of illnesses, the full extent of which were unknown in the early stages of discovering their harmful effects. The settlement here, though, only provides a benefits program for those members of the class who develop an NHL-related illness. In other words, if an exposure-only class member develops a non-NHL-related disease that is later shown to be caused by Roundup, that class member will forever remain an "exposure-only" member of Subclass 2. And in return for the loss of a constitutional right to full compensatory damages and greatly-diminished bargaining and litigating rights, those members get literally nothing from this settlement—not even four short years of "medical monitoring," because that program is designed only to provide "NHL Diagnostic Evaluation," "mean[ing] evaluation of an individual for NHL." *See* New Settlement 44-45.

The upshot is that exposure-only class members will be left much worse off than the status quo when they go to exercise their right to litigate at the time they develop Roundup-related diseases like NHL. Indeed, they are likely to have received essentially nothing in the interim, and to have lost most of their bargaining leverage in exchange. And for the reasons given above, they

40

will have had no effective choice in the matter. Whether or not this is fair, it is not due process of law. The settlement must therefore be rejected.

### C.     A full, back-end opt-out right would be an unambiguous improvement.

That does not mean, however, that no settlement could ever be possible. Assuming the actual benefits of the settlement for exposure-only class members improved (a matter we expect other opponents to address), there is an elegant option that would at least go a long way towards avoiding the due-process concern raised in *Amchem*: namely, a full, back-end opt-out right for Subclass 2, which may be exercised when those class members are diagnosed with any condition—NHL-related or otherwise—that is covered by any part of the settlement to which they have been bound. And a side benefit of this design is that it can partially allay any doubts the Court may have about whether class members are getting a defensible bargain or not. If this agreement is truly beneficial to the class, then the settling parties have little to worry about in allowing a full back-end opt out that preserves all of Subclass 2's litigation rights.

In addition, this design has two major benefits in terms of ensuring that the rights of these absent class members are fully protected going forward.

*First*, because it does not bind future plaintiffs by taking away any rights immediately, it avoids the risk that the claims of exposure-only class members will be partially eliminated or devalued relative to the status quo without any effective notice whatsoever. Critically, these class members are currently in a good position to benefit from the evolution of the science, especially those who might later develop non-NHL diseases shown to be caused by Roundup. This Court itself previously raised the concern that this is "an area where the science may be evolving." PTO 214, at 2. Accordingly, taking away these class members' rights now could thus leave them *much* worse off than they would have been had they simply retained the right to litigate at the time their

41

diseases develop. Given that it was *still* unconstitutional to bind legions of exposure-only class members in the asbestos litigations to an immediate settlement—even though the asbestos defendants were filing left and right for bankruptcy, *see Amchem*, 521 U.S. at 598—the settling parties here need an especially good theory for why exposure-only class members are better off agreeing to *any* alternative resolution of their well-protected future claim. Because no such theory exists—and, at the very least, none has been provided by the settlement proponents, who have the burden of establishing the settlement's fairness—a full, back-end opt-out right is necessary to protect these potential plaintiffs as the science develops.

*Second*, a full, back-end opt-out right has the added benefit of motivating the settling parties to fairly administer the claims process in the agreement, and to negotiate an extension of the compensation program in good faith. If Monsanto faces the possibility of a flood of back-end opt outs should they negotiate in bad faith or should it turn out that the compensation program is a terrible deal after all, the company will not attempt any gotcha strategies down the road. Instead, they are likely to fund the compensation scheme—or agree to enhancements—precisely because they want to continue dissuading plaintiffs from litigation as efficiently as possible. In contrast, the kinds of present giveaways the settlement includes leaves the welfare of exposure-only class members almost entirely to chance or Monsanto's unilateral good will.

## III.    Co-Lead Counsel Also Cannot Prove Superiority Under Rule 23(b)(3).

The foregoing analysis also reveals a closely related problem that arises under Rule 23(b)(3), rather than the Constitution. The Rule explicitly requires that a class action only be certified if it is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). And this is a case where individual adjudication is a very attractive option—particularly for the plaintiffs, and even more particularly for those who have

only been exposed to Roundup. The Court should thus avoid the instinct to default to the class device just because a lot of total plaintiffs may be involved. This is not a case where claimants would otherwise have a difficult time obtaining representation, nor one in which the claims are so small as to make pursuing individual litigation irrational. Hundreds of firms across the nation stand ready to take on any plaintiff who has a claim that their injuries were caused by Roundup, and will no doubt have a good incentive to take these claims in the future given the scale of the injury involved. And so even if the Court concludes that a class action is possible under the Constitution, it should reject a class-action settlement like this one as worse than the status quo when it comes to fairly and efficiently resolving absent class members' claims.

In general, "using class actions in dispersed mass tort cases" is "disfavored." *AMCL* § 22.7 (collecting cases). And that is particularly true in "cases involving significant personal injuries." *Id.* "The aggregation of individual claims in the context of a classwide suit is an evolutionary response to the existence of injuries unremedied." *Deposit Guar. Nat'l Bank, Jackson v. Roper*, 445 U.S. 326, 339 (1980). But this is not a case where "individual litigation may not be a superior, or even feasible, alternative for resolution" because "each individual claim [is] too small." *AMCL* § 22.7. Here, individual litigation *is* superior because the individuals who develop cancer as a result of using Roundup have a demonstrably excellent remedy available to them—the tort system—and every incentive to seek it out. Indeed, they are very likely to quickly secure an attorney and, if they want to avoid litigation, to be able to bargain with Monsanto for a fair resolution of their claims.

The efficacy of this remedy has already proven itself in the form of three substantial jury awards for injured plaintiffs, and the many more settlements for inventories of others represented by plaintiffs' firms. Consolidating these potentially monumental claims into a class will not serve

the purposes of Rule 23, but rather would only serve to help Monsanto escape liability for their proven wrongful behavior. *See also AMCL* § 22.7 ("The trend appears to be that cases involving significant personal injuries should not be certified for trial, particularly on a nationwide or multistate basis, because individual issues of causation and individual damages often predominate and state law often varies").

In the typical class action suit, many individuals have very small claims they would never litigate otherwise. Anyone who has received a class-action postcard providing notice of their right to $1.50 or a coupon for their injuries is familiar with the device. Such cases are often suited to "the goals [Rule 23's] proponents have long held out for it: efficient management of mass claims, efficient and fair compensation of losses due to defendants' negligence or statutory and regulatory violations, and optimal deterrence of illegal behavior." Deborah R. Hensler, *Happy 50th Anniversary, Rule 23! Shouldn't We Know You Better After All This Time?*, 165 Univ. Pa. L. Rev. 1599, 1603 (2017). In those small-value cases, bringing claims together can be truly efficient, provide some compensation for harms unlikely to be otherwise remedied, and perhaps most importantly, deter against misconduct where a bad actor would not otherwise face *any* liability— let alone liability on the scale of their wrongdoing. *See, e.g.*, *Shutts*, 472 U.S. at 809 ("For example, this lawsuit involves claims averaging about $100 per plaintiff; most of the plaintiffs would have no realistic day in court if a class action were not available."). The Ninth Circuit has therefore called "the aggregation of similar, small, but otherwise doomed claims" the "core concern" of Rule 23. *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1091 (9th Cir. 2011).

In marked contrast, a class action here would result in Monsanto paying relative peanuts to individuals diagnosed with life-altering cancer, and quite possibly paying *nothing* to those who develop non-NHL diseases caused by its products. Such a suit would flip the goals of Rule 23 on

44

their head—it would lead to neither fair compensation for the serious losses experienced by cancer patients and their families *nor* optimal deterrence of illegal behavior—when doing nothing special at all would have worked just fine.

Again, the key analytical step is simply to consider the status quo for an exposure-only class member. If they one day receive a diagnosis, their statute of limitations will start running only then. At that point, they are likely to find a legal system well-armed with attorneys who have handled cases like theirs against Monsanto in the past. They will also know the scale and value of their injuries—not to mention the value of a dollar decades down the road. They will know then how clear it is that Monsanto understood the dangers it was imposing on users, and how clearly the science supports general and specific causation. And they are overwhelmingly likely to have a claim value that makes it very efficient to threaten litigation, particularly given the number of firms competing for their business and the number of experienced experts likely to be available to testify.

The class device is certainly not meant to protect guilty defendants from an onslaught of meritorious litigation. Decreasing damages for wrongful behavior is hard to justify under the goals of Rule 23. Whereas in the normal class action, plaintiffs who would otherwise receive nothing get something, here, plaintiffs who would otherwise receive *a lot* will receive comparably little. And yet—even though "global peace" for a defendant is probably not a legitimate concern of Rule 23—this is not even a case where the class-action proponents can claim global peace as a benefit, because Monsanto is planning to keep on selling Roundup into the future. If Monsanto wants to seek protection from potentially debilitating liability, it should probably start by taking Roundup off the shelves. Failing that, it should be prepared to defend, one at a time, against meritorious claims—even if it imposes liability on a very large scale that just happens to be the same large scale as the harms it has caused and the revenues it has reaped from selling Roundup along the way.

45

## IV.   If The Court Denies The Motion For Preliminary Approval, New Interim Counsel Should Be Appointed To Attempt A Truly Separate Settlement.

This is now the second time that these putative class counsel have tried to bind the same exact subclasses that this Court all-but rejected out of hand the last time. Having now had two failed bites at the apple, it is clear that the current representation and negotiation structure is inadequate to the task at hand.

The first go around, Co-Lead Counsel also sought to bind "Settlement Class Members who have not been diagnosed with NHL as of the Settlement Date, and their Derivative Claimants." MDL Doc. 11042-2, at 3 (June 24, 2020) (Old Settlement). *Compare* New Settlement 3 ("Settlement Class Members who have not been diagnosed with NHL as of February 3, 2021, and their Derivative Claimants."). The first settlement, too, defined exposure to include exposure from someone else's application of Roundup. *Compare* Old Settlement 3, *with* New Settlement 3. Indeed, aside from the date of first exposure, the only substantive change to the class definition is that it now carefully carves out the lead class plaintiffs from the part of the definition that excludes claimants who have filed lawsuits or retained counsel. *Compare* Old Settlement 3, *with* New Settlement 2-3.[12]

To be sure, the current settlement does seem to be unilaterally better for the exposure-only class. But that ironically demonstrates exactly the concern that should make the Court wary of this latest settlement attempt, as well as future attempts that modify neither the class definition nor the structure of negotiations. Presented with this Court's admonishment that certifying "[a] class that includes all Roundup users who will get cancer in the future …. is dubious," PTO 214, at 3, nothing

---

[12]   *See* MDL Doc. 11156, at 2-3 (noting that settlement's own purported class representatives were not members of the class as settlement proponents defined it because they had (of course) retained attorneys).

about that "dubious" reach changed, and yet class counsel was (somehow) able to move the needle in favor of the class. All that suggests is that class counsel did not come close to the best deal available for the exposure-only class the first time around, and probably lack an adequate incentive to do so under the circumstances. Monsanto is just negotiating against itself—seeking out the nadir at which the Constitution permits it to take the most away from the claims of the absent class members with future injuries at the lowest expense.

This makes some sense precisely because—in the absence of a settlement—it would be impossible to certify a present class to litigate claims of injury that class members don't yet have. Among other things, if this class prevailed, it would be impossible to know how much money Monsanto should pay its unknown number of members for their unknown injuries. But those are the future claims of the exposure-only class that Monsanto seeks to compromise. Accordingly, putative class counsel will be straight out of a job if they cannot get Monsanto to agree to a deal— they have no meaningful threat to go to trial instead. And that means their economic incentive is to agree to any deal Monsanto offers and this Court can accept.

Even if it were possible for class counsel to represent the exposure-only class without this structural conflict, the Court should at least require more separation between the two classes at issue here. We understand that the separate subclasses are represented by separate attorneys in formally separate negotiations. But given that this was the exact scenario that led to a conflict of interest in *Amchem*, 521 U.S. 625-27, if yet another class settlement for exposure-only plaintiffs is going to be tried, this Court should require that any deal reached be one that the parties can accept without regard to what happens to the presently injured class. Otherwise, the pressure on class counsel as a whole to trade away important pieces of the inchoate claims of future class members in exchange for a global deal that puts a big-ticket number on the total claims of those

47

with present injuries is just too great. Even the exposure-only subclass's counsel knows that number will be used to calculate its fees, and the biggest sweeteners for Monsanto are likely to come from absent, exposure-only class members who cannot protect themselves by opting out. And so, if either class cannot get Monsanto to agree to a deal that works with respect to just that class's members, the best conclusion is that there is still a conflict of interest of the kind identified in *Amchem*, and no class-action resolution should be reached at all.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion at MDL Doc. 12531, including as amended at MDL Doc. 12665.

Dated: March 4, 2021

Respectfully submitted,

/s/ Thomas C. Goldstein

Paul J. Napoli (NY 2513141)
Hunter J. Shkolnik (NY 2031458)
NS PR LAW SERVICES, LLC
270 Muñoz Rivera, Suite 201
Hato Rey, Puerto Rico 00918
pnapoli@nsprlaw.com
hunter@napolilaw.com
Phone: (212) 397-1000
Fax: (312) 610-5680

Christopher L. Schnieders (KS 22434)
NAPOLI SHKOLNIK, PLLC
6731 W. 121st Street, Suite 201
Overland Park, KS 66209
cschnieders@napolilaw.com
Phone: (212) 397-1000
Fax: (312) 610-5680

Thomas C. Goldstein (MD 9512120307)
Eric F. Citron (MD 1608240002)
Daniel Woofter (MD 1812120199)
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20815
tg@goldsteinrussell.com
Phone: (202) 362-0636
Fax: (866) 574-2033

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 4th day of March, 2021, a copy of the forgoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.


*/s/ Thomas C. Goldstein*