Gerson H. Smoger
SMOGER &ASSOCIATES
13250 Branch View Lane
Dallas, TX 75234
Telephone: (510) 531-4529
Facsimile: (510) 531-4377)
gerson@texasinjurylaw.com

Steven M. Bronson, Esq. (SBN 246751)
**THE BRONSON FIRM APC**
7777 Fay Avenue, Suite 202
La Jolla, CA 92037
Telephone: 619-374-4130
Facsimile: 619-568-3365
sbronson@thebronsonfirm.com

*Counsel for Objector Melinda Sloviter*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br>Case No. 16-md-02741-VC |
| This document relates to: | **BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL BY OBJECTING CLASS MEMBER MELINDA SLOVITER AND MOTION TO STRIKE THE DECLARATION OF AMIT R. MEHTA, M.D.** |
| Ramirez, et al. v. Monsanto Co. | |
| Case No. 3:19-cv-02224 | |
| | Re: Dkt. No. 12531 |
| | Date: March 31, 2021<br>Time: 10:00 AM<br>Place: Courtroom 4, 17th floor<br>Judge: Honorable Vince Chhabria |

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.   CONSTITUTIONAL REQUIREMENTS DO NOT ALLOW SUBCLASS 2 TO BE
      CERTIFIED ...................................................................................................... 2

    A.   Article III's Requirement of a Case or Controversy is Not Met by Subclass 2...... 3

    B.   Notice to the Impossibly Broad Subclass 2 "Future Only Claimants," is Inherently
      Deficient.................................................................................................... 5

III.  THE PROPOSED PAYMENTS TO NHL VICTIMS ARE WOEFULLY INADEQUATE
      AND POORLY EXPLAINED ........................................................................... 8

    A.   The Paltry Accelerated Payment Awards. ............................................. 8

    B.   The Compensation Grid is Byzantine, Deficient in Explanation, and Inadequate. 9

    C.   Evidentiary Support for the Proposed Settlement Grid is Lacking...................... 12

        1.   The Testimony of Class Proponent's Expert, Amit R. Mehta, M.D., Is
           Neither Relevant nor Reliable and, Thus, Fails Under *Daubert*.............. 13

        2.   Class Proponent's Use of the Declaration of Monsanto Trial Expert
           Michael R. Grossbard, M.D. Should Be Disregarded.............................. 14

    D.   Claimants' Medical Costs Will Easily Eat Up Any Proceeds From the Proposed
      Settlement. .............................................................................................. 15

    E.   The Release Required of Those Who Accept Any Payments Is Wildly Overbroad.
      ................................................................................................................ 17

    F.   The Mirage of "Free" Legal Representation Presents More Problems Than It
      Solves. .................................................................................................... 18

    G.   The Primary Purpose of the Advisory Science Panel is to Assist Monsanto in
      Defending Cases Against Anyone Who Does Not Accept Their Settlement. ...... 19

    H.   The "Offer of Proof" is Designed to Disadvantage Opt-Out Cases.................... 25

    I.   The Litigation Stay is Uniquely Beneficial to Monsanto. .................................. 26

IV.   RIGHTS LOST BY ALL CLASS MEMBERS................................................................ 30

    A.   The Broad Stay Only Benefits Monsanto. ........................................................ 30

    B.   Settlement Proponents' Papers are Inaccurate in Describing Class Member's
      Ability to Return to the Court System as All Class Members Expressly Release
      All Unknown Future Claims.................................................................... 30

    C.   Class Members Lose the Benefit of True Medical Monitoring. ......................... 34

    D.   The Settlement Includes Known Potential Claimants Without Offering Them
      Compensation. ........................................................................................ 35

        1.   Claims for Those Diagnosed with NHL before 1/1/15 Should Not be
           Included................................................................................................. 35

        2.   Derivative Claimants Should Not Be Included....................................... 36

i

       3.     Those Suffering from Multiple Myeloma Should Not be Included.......... 37

E.     The Punitive Damages Waiver Does Not Comport With Constitutional Guidance Nor Is It a Fair Compromise Beneficial to the Class. ........................................... 38

V.    THE SETTLEMENT MISSTATES ANY BROAD BENEFITS IT ALLEGEDLY PROVIDES ................................................................................................................. 41

A.     Any Benefits From the DAGP are Illusory........................................ 41

B.     The "Labeling Addition" Cannot be Considered a Settlement Benefit. ............... 42

C.     The One-Way Ability to Use the Science Panel's Findings Provides No Benefits to the Class................................................................................................ 44

VI.   THE COMPARATOR SETTLEMENTS THAT THIS COURT IS POINTED TO ARE NOTHING LIKE THE SETTLEMENT PROPOSED HERE.......................................... 44

A.     "In re Diet Drugs." ................................................................................. 44

B.     "In re National Football League Players Concussion Injury Litigation." ............ 46

C.     "In re Deepwater Horizon." ................................................................... 47

VII.  CONCLUSION ........................................................................................................... 48

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re "Agent Orange" Prod. Liab. Litig.*,
  996 F.2d 1425 (2d Cir. 1993), *cert. denied*, 510 U.S. 1140 (1994).......................................7

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997) ........................................................................................................ 2, 3, 7

*Blue Cross and Blue Shield of Alabama v. Unity Outpatient Surgery Ctr., Inc.*,
  490 F.3d 718 (9th Cir. 2007) ......................................................................................... 28, 29

*BMW of N. Am., Inc. v. Gore*,
  517 U.S. 559 (1996) ................................................................................................................ 38

*Boeken v. Philip Morris, Inc.*
  (2007) 127 Cal. App. 4th 1640, 26 Cal. Rptr. 3d 638 ........................................................ 38

*Clinton v. Jones*,
  520 U.S. 681 (1997) ................................................................................................................ 27

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) .................................................................................................... 13, 21, 22

*In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*,
  369 F.3d 293 (3d Cir.)..................................................................................................... 45, 46

*In re Diet Drugs Prods. Liab. Litig.*,
  Nos. 1203, 99–20593, 2000 WL 1222042 (Aug. 22, 2000) ......................................... 44, 45

*Dow Chemical Co., v. Stephenson*,
  273 F.3d 249 (2001), *affirmed in part, with the companion Isaacson case vacated due
  to the use of the All Writs Act to effectuate removal jurisdiction*, 539 U.S. 111 (2003) ........................7

*Ellis v. Costco Wholesale Corp.*,
  657 F. 3d 970 (9th Cir. 2011) ............................................................................................... 13

*Georgine v. Amchem Products, Inc.*,
  83 F.3d 610 (3rd Cir. 1996), *aff'd*, 521 U.S. 591 ................................................................7

*Grodzitsky v. American Honda Motor Co., Inc.*,
  957 F.3d 979 (9th Cir. 2020) ............................................................................................... 13

*Guoliang Ma v. Harmless Harvest, Inc.*,
  No. 16-CV-07102, 2018 WL 1702740 (E.D.N.Y. March 31, 2018)................................... 43

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

*Hansberry v. Lee*,
   311 U.S. 32 (1940) ................................................................................................ 17

*Hardeman v. Monsanto Co.*,
   385 F. Supp. 3d 1042 (N.D. Cal. 2019) ................................................ 12, 21, 38

*Johnson v. Monsanto Co.*,
   52 Cal. App. 5th 434 (2020) ................................................ 11, 12, 38, 40

*Johnson v. Monsanto Co.*,
   No. GC16550128, 2018 WL 5246323 (Cal. Super. Oct. 22, 2018) ................... 12

*Koby v. ARS Nat'l Servs., Inc.*,
   846 F.3d 1071 (9th Cir. 2017) ............................................................. 43

*Kourtis v. Cameron*,
   419 F.3d 989 (9th Cir. 2005) ............................................................... 17

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ......................................................................... 3, 4

*Mace v. Van Ru Credit Corp.*,
   109 F.3d 338 (7th Cir. 1997) ................................................................. 2

*In re Nat'l Football League Players Concussion Injury Litig.*,
   821 F.3d 410 (3d Cir. 2016) ................................................... 27, 46, 47

*In re Oil Spill by the Oil Rig "Deepwater Horizon in the Gulf of Mexico on April 20, 2010*,
   295 F.R.D. 112 (2013) ..................................................................... 47, 48

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815, 119 S. Ct. 2295, 144 L. Ed. 2d 715 (1999) .......................... 3, 41

*Philip Morris USA v. Williams*,
   549 U.S. 346 (2007) ...................................................................... 38, 40

*Pilliod v. Monsanto Co.*,
   No. RG-17-862702, 2019 WL 3540107 (Cal. Super. July 26, 2019) ............ 12, 38

*In re Roundup Prod. Liab. Litig.*,
   390 F. Supp. 3d 1102 (N.D. Cal. 2018) ............................................... 21, 22

*Simon II Litig. v. Philip Morris USA Inc.*,
   407 F.3d 125 (2d Cir. 2005) ................................................................. 40

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ......................................................................... 4

*Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28 (2002) ................................. 7

iv

*Taylor v. Sturgell*,
553 U.S. 880 (2008) ............................................................................................... 17

*Urie v. Thompson*,
337 U.S. 163 (1949) ............................................................................................... 36

*Whitmore v. Arkansas*,
495 U.S. 149 (1990) ................................................................................................. 4

## Statutes & Rules

7 U.S.C. § 136j(a)(1)(E) ............................................................................................. 43

Cal. Civ. Code § 3294 ................................................................................................ 38

Cal. Code Civ. Proc. § 36, subds. (a), (d), (f) ......................................................... 28

Cal. Code Civ. Proc. §377.34 .................................................................................... 28

Cal. Code Civ. Proc. § 998 ........................................................................................ 26

California Civil Code Section 1542 ...................................................................... 17, 31

Fed. R. Civ. P. 1 ......................................................................................................... 26

Fed. R. Civ. P. 23 .......................................................................................... 2, 3, 7, 27

Fed. R. Civ. P. 23(c)(5) ............................................................................................... 3

Fed. R. Civ. P. 23(e) .................................................................................................. 43

Fed. R. Civ. P. 68 ................................................................................................. 25, 26

Fed. R. Evid. 702 ....................................................................................................... 13

Ga. Code Ann. § 9-11-68 ........................................................................................... 26

## Other Authorities

American Cancer Society, *Can Non-Hodgkin Lymphoma Be Found Early?* (Aug. 1,
2018), *available at* https://www.cancer.org/cancer/non-hodgkin-
lymphoma/detection-diagnosis-staging/detection.html ...................................... 42

American Cancer Society, *Key Statistics About Malignant Mesothelioma* (Jan. 9, 2019)
*available at* https://www.cancer.org/cancer/malignant-mesothelioma/about/key-
statistics.html ..................................................................................................... 11

American Cancer Society, *Key Statistics for Lung Cancer* (Jan. 12, 2021) *available at*
https://www.cancer.org/cancer/lung-cancer/about/key-statistics.html ............... 11

Katelyn Ashton, *50-State Survey of Statutes of Limitations and Repose in Prescription Product Liability Cases*, Butler Snow (Nov. 16, 2020) *available at* https://www.jdsupra.com/legalnews/50-state-survey-of-statutes-of-20476/ ........................ 36

Cancer Research UK, *Non-Hodgkin Lymphoma Survival*, *available at* https://www.cancerresearchuk.org/about-cancer/non-hodgkin-lymphoma/survival; .......................... 27

Catherine T. Struve, *The FDA and the Tort System: Postmarketing Surveillance, Compensation and the Role of Litigation* ............................................. 35

Centers for Disease Control and Prevention, *National Diabetes Statistics Report 2020: Estimates of Diabetes and Its Burden in the United States*, *available at* https://www.cdc.gov/diabetes/pdfs/data/statistics/national-diabetes-statistics-report.pdf .............................................................. 10

Maxx Chatsko, *How Much Money Does Monsanto Make From Roundup?* The Motley Fool (May 26, 2016) *available at* https://www.fool.com/investing/2016/05/26/how-much-money-does-monsanto-make-from-roundup.aspx ................................................. 30

Craig M. Hales, et al., *Prevalence of Obesity and Severe Obesity Among Adults: United States, 2017-2018* ....................................................... 10

Deposition of Michael L. Grossbard, M.D. (Nov. 26, 2019), *available at* https://www.docketbird.com/court-documents/Janzen-v-Monsanto-Company/Exhibit/cand-3:2019-cv-04103-00025-015 .................................... 15

Federal Trade Commission, *Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns* (Sep. 2015), *available at* https://www.ftc.gov/system/files/documents/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns/class_action_fairness_report_0.pdf .............................. 8

GL Henriksen *et al.*, *Serum Dioxin and Diabetes Mellitus in Veterans of Operation Ranch Hand*, Epidemiology 8(3): 252 (May 1997), *available at* https://pubmed.ncbi.nlm.nih.gov/9115019/ ........................................... 34

International Agency for Research on Cancer, *IARC Monographs Volume 112: Evaluation of Five Organophosphate Insecticides and Herbicides* (Mar. 20, 2016), *available at* https://publications.iarc.fr/549 ............................................ 20

Kaplan, *A Prefatory Note,* 10 B.C. Ind. & Com. L. Rev. 497, 497 (1969) ........................... 2

*Lymphoma- Non-Hodgkin: Diagnosis* (Jan. 2020), *available at* https://www.cancer.net/cancer-types/lymphoma-non-hodgkin/diagnosis ............................ 42

*Lymphoma- Non-Hodgkin: Statistics* (Jan. 2020) *available at* https://www.cancer.net/cancer-types/lymphoma-non-hodgkin/statistics ...................................... 27, 28

Maxx Chatsko, *How Much Money Does Monsanto Make From Roundup?* ............................ 30

National Cancer Institute, *Cancer Statistics* (Sep. 25, 2020), *available at*
https://www.cancer.gov/about-cancer/understanding/statistics ............................................... 10

National Cancer Institute, *Second-Degree Relative*, *available at*
https://www.cancer.gov/publications/dictionaries/genetics-dictionary/def/second-
degree-relative .......................................................................................................................... 10

NCHS Data Brief, no. 360, National Center for Health Statistics (Feb. 2020) *available at*
https://www.cdc.gov/nchs/products/databriefs/db360.htm .................................................... 10

*Report to Congress, Pursuant to Dodd-Frank Wall Street Reform and Consumer
Protection Act § 1028(a)* (2015), *available at*
https://files.consumerfinance.gov/f/201503_cfpb_arbitration-study-report-to-
congress-2015.pdf .................................................................................................................... 7

Carolina Reyes *et al.*, *Cost of Disease Progression in Patients with Chronic
Lymphocytic Leukemia, Acute Myeloid Leukemia, and Non-Hodgkin's Lymphoma*,
The Oncologist 24(9): 1219-1228, 1223 (Sept 2019), *available at*
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6738303/ ................................................. 15

Taylor Sisk, *A Lasting Legacy: DuPont, C8 Contamination and the Community of
Parkersburg Left to Grapple With the Consequences*, Environment Health News
(Jan. 7, 2020), *available at* https://www.ehn.org/dupont-c8-parkersburg-
2644262065.html .................................................................................................................... 34

Trial Lawyers Federal Civil Procedure Committee, *Survey of State Offer of Judgment
Provisions* (Oct. 2004), *available at*
https://www.utcourts.gov/committees/civproc/materials/Offer%20of%20Judgment%
20Survey.pdf ........................................................................................................................... 26

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

## I.    INTRODUCTION

There can be no doubt that proposed class counsel ("settlement proponents") have vast experience in both class actions and the resolution of large-scale litigation.[1] And the settlement that has been negotiated with Monsanto is facially appealing, as any settlement with a projected 2 billion dollars in payments would be. This brief is then not written to contest the good faith of those who negotiated a settlement in order to attempt to craft a proposed solution to Monsanto's problem of long-term future litigation. Rather, this brief is written to address serious constitutional and fairness concerns the proposed settlement raises.

Unlike other mass settlements, no one involved in the negotiation of the proposed massive individual Roundup settlement, estimated by Bayer to be up to 9.6 billion dollars,[2] nor any counsel with significant involvement in the Roundup litigation, is proffering this proposed resolution. Generally, such proposed resolutions, even when deficient, are crafted by those working in the trenches of a particular litigation. Here, settlement proponents have not tried a Roundup case or prepared to go to trial, have not taken any depositions in a Roundup case, have not conducted any discovery in a Roundup case, nor have they argued any motions before this Court.

Thus, one thing that appears to be clearly missing from the proposed settlement is experience in the intricacies of toxic tort trial practice. When it is viewed from the perspective of a toxic tort trial practitioner with experience representing individuals harmed by toxic

---

[1] Objector Melinda Sloviter was exposed to Roundup before February 3, 2021. Before objecting to this proposed settlement, she had not filed a lawsuit against Defendants nor had she retained counsel before February 3, 2021.

[2] Bayer Annual Report 2020 (Feb. 25, 2021), *available at* https://www.bayer.com/sites/default/files/2021-02/Bayer-Annual-Report-2020.pdf

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

substances, rather than classes, it becomes clear this settlement is woefully deficient. *See* Declaration of Gerson H. Smoger, attached hereto as Exhibit "A."

Below, many of this settlement's intricacies will be discussed in some detail to display the broad nature of the settlement's deficiencies, including the breadth of those proposed to be included as part of the settlement, the byzantine claims process, the truncated ability for class members to leave the settlement's confines and try their cases in court, and the inadequacy of the general benefits supposedly afforded to class members and the public at large. At bottom, this settlement is neither constitutionally permissible not substantively fair to putative class members.

## II. CONSTITUTIONAL REQUIREMENTS DO NOT ALLOW SUBCLASS 2 TO BE CERTIFIED

In *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997)*,* the inquiry into the propriety of a future personal injury class began by looking at the historical roots of class actions under Rule 23. The Supreme Court found that the drafters of Rule 23 "had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'" *Amchem*, 521 U.S. at 617 (quoting Kaplan, *A Prefatory Note*, 10 B.C. Ind. & Com. L. Rev. 497, 497 (1969)). The Court then cited with approval language from what was then a recent Seventh Circuit opinion: "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Id.* (quoting *Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 344 (7th Cir. 1997)). But small value cases are not at issue here. Roundup Non-Hodgkin's Lymphoma ("NHL") cases have significant trial value. Hundreds of attorneys have already demonstrated that Roundup NHL victims have individual claims worth pursuing outside a class action.

Also, while binding many class members to a settlement or judgment is a necessary corollary to allowing persons with sufficiently similar claims to be aggregated into a class, it is the binding of absent members that has consistently troubled courts from a constitutional and due process perspective. To do so, case law, Rule 23, and constitutional due process require that certain parameters be met. One of these is that class representatives who bring an action themselves have a current justiciable claim pursuant to Article III of the Constitution. A second is that those that the class action seeks to bind are afforded proper notice. Finally, constitutional infirmities cannot be buried behind multiple subclasses. If the class is divided into subclasses, the text of Subsection (c)(5) states: "When appropriate... a class may be divided into subclasses *that are each treated as a class* …." Fed. R. Civ. P. 23(c)(5) (Italics added). Here, none of the class representatives of Subclass 2 ("who have <u>not</u> been diagnosed with NHL as of February 3, 2021, and their Derivative Claimants" (Mot., 8)) have a justiciable "claim or controversy," as required by Article III, and the vast breadth of Subclass 2 renders constitutionally required notice impossible.

### A.   Article III's Requirement of a Case or Controversy is Not Met by Subclass 2.

Article III of the Constitution confines federal judicial power to "Cases" or "Controversies." This limit preserves the separation of powers by confining courts to their proper adjudicative function and preventing advisory opinions that would intrude on the legislative and policy making functions that the Constitution assigns to Congress and the President. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992). Article III requirements apply no differently in class actions than in ordinary litigation. The class action is a procedural device that cannot alter the separation-of-powers commands of Article III any more than it can alter or confer substantive rights. *Amchem*, 521 U.S. at 613; *Ortiz v. Fibreboard* Corp., 527 U.S. 815, 865

(1999) (Rehnquist, C.J., concurring). Accordingly, a court may neither certify a class nor render a class judgment with respect to persons whose claims are outside its Article III power.

The "irreducible constitutional minimum" of standing under Article III requires that 1) the plaintiff suffers from a concrete injury in fact; 2) the injury is fairly traceable to the alleged conduct of the defendant; and 3) the injury is likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61. Here, any individual action brought by any of the Subclass 2 proposed class representatives would not be possible, because their claims have not yet arisen. Given that NHL is the only individual claim made as part of this class action, the claims for any member of Subclass 2 by definition have not yet occurred. They, therefore, fail the injury-in-fact test: the invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. *See id*. Whether they will develop NHL in the future is entirely unknown. But this potential injury is not "concrete" in either a "qualitative [or] temporal sense." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). See also *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), reconfirming *Lujan* (In order to have standing under Article III, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.").

Injury-in-fact is lacking here because no class representative or any class member has a present claim or controversy to litigate. No Subclass 2 proposed representative has a diagnosis of NHL that can be redressed at the present time. Unaccrued, contingent tort claims do not meet the requirements of Article III, and permitting federal courts to adjudicate them undermines the adversarial system that Article III preserves and on which the legitimacy and accuracy of judicial decision-making depends. Subclass 2 does not meet the constitutional requirements of Article III.

**B.**     **Notice to the Impossibly Broad Subclass 2 "Future Only Claimants," is Inherently Deficient.**

The proposed membership of Subclass 2 is likely broader than any class action that has ever been certified. With certain caveats, artfully designed to bring this class action without disturbing the clients retained by the vast number of lawyers already before this Court, Subclass 2 includes all people who "have been exposed to Roundup Products through the application of Roundup Products." *See* Settlement Agreement, § 1.1(a), Dkt. 12531-2, pp. 6-7 of 266. To make this breadth abundantly clear, the settlement agreement provides the most expansive reading possible of "application": "Exposure 'through the application of Roundup Products' includes exposure through mixing and any other steps associated with application, *whether or not the individual performed the application, mixing, or other steps* associated with application himself or herself." (Emphasis supplied). *See id*. Both perversely and quite unbelievably such exposure is without time constraints, either in the past *or in the future*:

> Section 12.8 <u>Settlement Class Members' Subsequent Exposures</u>. For the avoidance of doubt, if a Settlement Class Member is further exposed to Roundup Products on or after February 3, 2021, the evidentiary use under Section 12.3, the Releases under Article XVII, and the stay described in Section 18.2(b)(i) shall apply to Claims arising from, resulting from, in any way relating to or in connection with such exposure to the same extent as Claims arising from, resulting from, in any way relating to or in connection with exposure prior to February 3, 2021.

*Id.* at p. 73 of 266. Essentially, if a mother sits in her yard while her husband applies Roundup for one day, her future exposure to Roundup for the rest of her life is covered by this proposed settlement.

Settlement proponents' papers and the settlement agreement make this breadth clear:

> Roundup is used in residential garden and lawn care, large properties such as golf courses, schools, universities and parks, and within the entire agricultural industry. The ubiquity of Roundup requires a comprehensive notice program in the U.S., U.S. territories and possessions, and Mexico.

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

See Preliminary Approval Motion, Dkt. 12531, p. 31 of 83. Note that the word "*ubiquity*" was chosen by settlement proponents themselves. Indeed, this ubiquity is further demonstrated by their description of where notice needs to go:

> Farms in counties w/ 1,000+ farmworkers, Businesses/Organizations (e.g., greenhouses, herbicide consultants, weed control, vineyards, farm labor/management/organizations/services, landscape, grounds maintenance, sports fields,  cemeteries, garden centers, golf courses, schools/universities, Diplomatic establishments, and Government entities (building directors, weed supervisors, public works directors).

*Id.*

The inherent difficulties of conveying meaningful notice to large numbers of unknown, exposure-only class members was immediately apparent to this court. *See* Pretrial Order No. 214: Denying Motions To Alter Schedule On Motion For Preliminary Approval, Dkt. 11182. Overriding the detailed efforts to inform members of this proposed class is the fact that, by definition, the members of Subclass 2 have no symptoms of disease nor any existing legal representation. Even if it were theoretically possible to provide notice to this diffuse class, the vast majority will disregard notices they assume are inapplicable to them. Apprising healthy class members of their opportunity to be heard and participate in the proceedings is a meaningless gesture. *Mullane v. Central Hanover Bank* & *Trust Co.,* 339 U.S. 306, 314-15 (1950) ("when notice is a person's due, process which is a mere gesture is not due process."). Basic information that is crucial and typically available at the time that a plaintiff's cause of action accrues – at minimum here the diagnosis of NHL, the nature and seriousness of NHL, the medical and other costs it will entail, its impact on life and livelihood – are all lacking. And giving meaningful notice regarding future exposure should be relegated to the theatre of the absurd.

The lower court in the *Amchem* litigation found that obstacles to providing adequate notice to future victims were "insurmountable." *Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 633 (3rd Cir. 1996), *aff'd,* 521 U.S. 591. Although the U.S. Supreme Court has not ruled on this issue definitively, Justice Ginsberg, for the Court, recognized "the gravity of the question whether class action notice sufficient under the Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous." *Amchem,* 521 U.S. at 628. See also *In re "Agent Orange" Prod. Liab. Litig.,* 996 F.2d 1425, 1435 (2d Cir. 1993), *cert. denied*, 510 U.S. 1140 (1994) (providing an opt-out right to a person "unaware of an injury would probably do little good."), *abrogated in part on other All Writs Act grounds*, *Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 31 (2002); *Dow Chemical Co., v. Stephenson,* 273 F.3d 249, 261 n.8 (2001) ("We also note that plaintiffs [who had no injury at the time of notice] likely received inadequate notice. *Shutts* provides that adequate notice is necessary to bind absent class members. [*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)]. As described earlier, *Amchem* indicates that effective notice could likely not ever be given to exposure-only class members. *Amchem*, 521 U.S. at 628."), *affirmed in part, with the companion Isaacson case vacated due to the use of the All Writs Act to effectuate removal jurisdiction*, 539 U.S. 111 (2003).

Class action notice programs are often met with low response rates even when money or other tangible relief might actually be going to members of the class. In 2015 the Consumer Financial Protection Bureau reviewed 105 settlements and found a median claims rate of 8%.[3] When the Federal Trade Commission reported on a similar survey in 2019 the median rate was

---

[3] Consumer Protection Bureau, *Arbitration Study: Report to Congress, Pursuant to Dodd-Frank Wall Street Reform and Consumer Protection Act § 1028(a)* (2015) at 22, *available at* https://files.consumerfinance.gov/f/201503_cfpb_arbitration-study-report-to-congress-2015.pdf

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

9%.[4] This survey was even more telling with respect to optouts: "The percentage of consumers who excluded themselves or objected were miniscule, with weighted averages of these rates hovering at 0.0003% and 0.01%, respectively."[5] And these were in financial matters. The rates are likely to be much lower when nothing is being offered and those exposed, many unaware of their exposure, are only apprised of their right to opt out of a class action covering a future injury that for each individual is unlikely to occur. Due process cannot tolerate this result.

## III.   THE PROPOSED PAYMENTS TO NHL VICTIMS ARE WOEFULLY INADEQUATE AND POORLY EXPLAINED

### A.   The Paltry Accelerated Payment Awards.

The settlement initiates what it describes as an "Accelerated Payment Award." This award may be requested if the claimant: 1) provides required proof of exposure; 2) that the first exposure occurred more than 12 months before diagnosis; and 3) a "Qualifying Diagnosis" of NHL prior to 2026. *See* Settlement Agreement, § 6.1(a)(ii), Dkt. 12531-2, p. 27 of 266. After certain quite complicated administrative steps, a claimant may receive the sum of $5000, *id.* at § 6.2(a)(i), and is then required to sign a full individual release of claims, *id.*, § 6.2(a)(i)(3).

Nowhere in the proposed settlement agreement do counsel explain why this paltry sum of $5000 is being made available in exchange for a *full release* of all claims from someone suffering with a life-threatening form of cancer. Nor does it explain this sum in relation to the jury verdicts already obtained to date. No doubt Monsanto knows that desperate and sick people might need such an expedited infusion of cash. Certainly, it is worth it to Monsanto to remove

---

[4] Federal Trade Commission, *Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns* (Sep. 2015) at 22, *available at* https://www.ftc.gov/system/files/documents/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns/class_action_fairness_report_0.pdf
[5] *Id.* at 22.

---

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

these potential claims from its books. Furthermore, nowhere does this settlement explain how the

sum of $5000 was arrived at nor why this amount is in the best interests of desperate, likely low

wage people suffering from a life-threatening illness. It appears that Monsanto has negotiated a

trap for the unwary to limit its own financial risk.

> **B.   The Compensation Grid is Byzantine, Deficient in Explanation, and Inadequate.**

Paragraph 1(e) of the District Court's Procedural Guidance for Class Action Settlements

states that the court must be provided: "The anticipated class recovery under the settlement, the

potential class recovery if plaintiffs had fully prevailed on each of their claims, and an

explanation of the factors bearing on the amount of the compromise." There has really been no

reasoned attempt to do this. Absent that, there is no ability to discern the basis for the four-tiered

compensation grid which constitutes the settlement's major estimated expenditure. Nor is there

any attempt to explain the monetary reasons behind the establishment of each NHL tier.

Basically, the putative class members are asked to believe that the completed grid is some bizarre

form of *res ipsa loquitur*. But how the monetary offers in this grid were arrived at or how

numbers were allocated to different tiers do not in any way speak for themselves.

In dissecting the compensation grid, it appears to be divided into four tiers with each

claimant seeking to achieve placement in the highest tier possible. The tiers are strictly defined

by four placement factors and only one element needs to exist in order to place a claimant into

the lowest possible tier for compensation purposes. The consistent factor for each tier can be

abbreviated, albeit without specificity: 1) the older a claimant is at the time of diagnosis, the

lower the compensation; 2) the shorter the time of exposure, the lower the compensation; and 3)

the less severe the current progress of the disease is, the lower the compensation. In addition to

these, those with NHL are relegated to no more than Tier 2 (maximum $25,000) if they have

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

ever suffered from virtually any medical condition ever associated with NHL (*See* Settlement

Agreement, Exhibit 5, Dkt. 12531-2, p. 186 of 266, regardless of severity or time of the

condition's diagnosis. Absent any of these factors and after fulfilling the age, exposure, and

disease severity criteria for Tier 3, claimants cannot move up further than Tier 3 if any factor that

has ever been shown to be associated with NHL in any epidemiological study, *see id.*, including

14 different occupations without respect to time worked, can be checked off -- irrespective of

whether there is a scientific consensus on such factors, *see id.* at p. 188 of 266.

The Tier 3 relegating factors are noteworthy. A brief look at just some of these factors

makes it clear that it is almost impossible for a claimant to rise beyond Tier 3 with its range of

$25,000 to $65,000. One relegating factor is whether any first or second degree relative ever had

cancer --- basically whether any parent, sibling, child, aunt, uncle, grandparent, grandchild,

niece, nephew, or half-sibling ever had cancer.[6] Given that approximately 39.5% of people will

be diagnosed with cancer in their lifetimes, those relegated to no greater than Tier 3 under this

criterion alone will likely be everyone but orphans.[7] Another common factor relegating a

claimant to Tier 3 is obesity, which is common throughout the population at all age levels,

(prevalence 40% aged 20-39, 44.8% aged 40-59, and 42.8% aged 60 and older).[8] Diabetes is a

disease suffered by 10.5% of the U. S. population.[9] Moreover, if it were even possible to pass

---

[6] National Cancer Institute, *Second-Degree Relative*, *available at*
https://www.cancer.gov/publications/dictionaries/genetics-dictionary/def/second-degree-relative
[7] National Cancer Institute, *Cancer Statistics* (Sep. 25, 2020), *available at*
https://www.cancer.gov/about-cancer/understanding/statistics
[8] Craig M. Hales, et al., *Prevalence of Obesity and Severe Obesity Among Adults: United States,
2017-2018*, NCHS Data Brief, no. 360, National Center for Health Statistics (Feb. 2020)
*available at*  https://www.cdc.gov/nchs/products/databriefs/db360.htm
[9] Centers for Disease Control and Prevention, *National Diabetes Statistics Report 2020:
Estimates of Diabetes and Its Burden in the United States*, *available at*
https://www.cdc.gov/diabetes/pdfs/data/statistics/national-diabetes-statistics-report.pdf.

these hurdles, Tier 4 requires an NHL diagnosis before the age of 45, ignoring latency,[10] and the

frequency of exposure criterion requires a minimum exposure in excess of 60 months (or 20

years for a seasonal worker spraying three months a year). Given these criteria, Monsanto hardly

has to worry about Tier 4 payments which might have been why until settlement proponents'

March 3, 2021, amendment only those eligible for Tier 4 could seek extraordinary relief under

the proposed settlement. *See* Settlement Agreement, § 6.2(a)(ii)(1), Dkt. 12531-2, p. 29 of 266.[11]

The minimal compensation offered pursuant to this grid is demonstrated by the four

people who have gone to trial: Dewayne Johnson, Mr. and Mrs. Pilliod, and Edwin Hardeman.

Collectively, if each of them received the highest award they qualify for under the class

compensation structure, none of the four's maximum would be more than $25,000. Mr. and Mrs.

Pilliod would each come in at Tier 2, because Mr. Pilliod was born on May 5, 1941 and Mrs.

Pilliod was born on April 17, 1944. Edwin Hardeman would come in at Tier 2, because he was

born on July 20, 1948. By age alone Dewayne Johnson would be Tier 4, but he would be

relegated to Tier 2 because he did not have more than 36 months of exposure.[12] In other words,

---

[10] NHL's age prevalence pattern is similar to that of other environmental toxins. The main cause of malignant mesothelioma is working with asbestos as to which 72 years old is the mean age at the time of diagnosis. *See* American Cancer Society, *Key Statistics About Malignant Mesothelioma* (Jan. 9, 2019) *available at* https://www.cancer.org/cancer/malignant-mesothelioma/about/key-statistics.html. Lung cancer is highly associated with smoking and the mean age at the time of diagnosis is 70. *See* American Cancer Society, *Key Statistics for Lung Cancer* (Jan. 12, 2021) *available at* https://www.cancer.org/cancer/lung-cancer/about/key-statistics.html. As tobacco use and asbestos exposure indicate, delayed onset is often a matter of latency, not causation.

[11] Under the amendment the administrator now has discretion over all four tiers. However, the amendment sets no criteria for this discretion. Nor does it explain why the change was made. The result only makes the settlement more amorphous with the exception of one constant – none of Monsanto's overall payment obligations appear to change.

[12] Johnson started working on the job where he was exposed to Roundup in June 2012 and he first went to see a doctor about his developing rash in July 2014. *See Johnson v. Monsanto Co.*, 52 Cal. App. 5th 434, 437-38 (2020)

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

rather than the over $2 billion in verdicts these plaintiffs received collectively, with this class Monsanto would only have had to pay a maximum of $100,000 in total to all four plaintiffs.[13]

Further, the payment structure does not take into account pain and suffering or the extent of treatment. It makes it irrelevant whether or not after NHL diagnosis someone had multiple years and/or multiple courses of chemotherapy and/or radiation, stem cell transplant, CAR-T therapy, or all of them. Nor does it account for possible disabilities caused by NHL, such as going blind, never being able to walk again or any other future limitations.

### C.    Evidentiary Support for the Proposed Settlement Grid is Lacking.

The motion bases the grid on the declarations of settlement proponents expert Amit Mehta, M.D., and Monsanto's expert, Michael L. Grossbard, M.D. These declarations on their own demonstrate the patently unequal abilities of Monsanto and settlement proponents to negotiate this highly complex deal, one that requires knowledge of epidemiology, toxicology, and medicine. Settlement proponents' expert Dr. Mehta presents an incompetent declaration which rather than giving the basis for each grid factor, merely provides summary approval. It should be stricken by this Court. Monsanto's expert's declaration cannot be the basis for settlement proponents' argument that the established grid along with all of its caveats and

---

[13] *See Hardeman v. Monsanto Co.*, 385 F. Supp. 3d 1042, 1048 (N.D. Cal. 2019) (compensatory damages set at $5 million; punitive damages reduced from $75 million to $20 million); *Johnson v. Monsanto Co.*, No. GC16550128, 2018 WL 5246323, at *5 (Cal. Super. Oct. 22, 2018) (compensatory damages set at $39.25 million; punitive damages reduced from $250 million to $39.25 million); *Johnson*, 52 Cal. App. 5th at 463 (2020) (compensatory damages reduced to $10.25 million; punitive damages reduced further to $10.25 million); *Pilliod v. Monsanto Co.*, No. RG-17-862702, 2019 WL 3540107, at *12 (Cal. Super. July 26, 2019) (compensatory damages for two plaintiffs set at $6.1 million and $11.2 million; punitive damages reduced from $1 billion each to $24.6 million and $44.8 million).

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

exclusions is appropriate for the putative class. This court should expect an independent review from settlement proponents. Dr. Grossbard's affidavit should be disregarded.

1.     The Testimony of Class Proponent's Expert, Amit R. Mehta, M.D., Is Neither Relevant nor Reliable and, Thus, Fails Under *Daubert*.

Dr. Mehta's declaration should be stricken. Neither he nor it can survive any possible examination pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993).[14] Here, it is unclear what Dr. Mehta based his opinions on or what qualifies him to render any opinions on the relationship of glyphosate to NHL, much less its potential confounders described within the tiers. *See Ellis v. Costco Wholesale Corp.*, 657 F. 3d 970, 982 (9th Cir. 2011), holding that *Daubert* applies at the class certification stage.

On his "Linked in" page, Dr. Mehta describes his work since 2016 as "Expert Physician Consultant: Advising Investors in the Oncology Disease Space." He also advertises himself as a "Medical Expert Witness for Legal casework in Hematology/Oncology - advised on numerous cases nationally." Additionally, he works as the "CMO and Co-Founder of FoodyMD: Evidence-Based Cancer Nutrition. Empowering physicians and the public with data-driven knowledge of foods with anti-cancer nutritional value."[15] What Dr. Mehta does not do is any work or study related to herbicides nor does he have any research experience in herbicide toxicology or epidemiology. He is also not someone who has done scientific research related to NHL epidemiology nor has he contributed to any studies about NHL. Dr. Mehta describes his research

---

[14] *Daubert* clearly applies to motions in support of class certification, as the Ninth Circuit in *Grodzitsky v. American Honda Motor Co., Inc.*, 957 F.3d 979, 986-87 (9th Cir. 2020) affirmed the exclusion of an expert offered in support of class certification where the expert's testimony suffered from scientific and methodological flaws despite being based on general principles.
[15] *See* Amit Mehta, LinkedIn, *available at* https://www.linkedin.com/in/amit-mehta-436b2081; https://www.doximity.com/pub/amit-mehta-md-30a272cf (last visited Mar. 1, 2021). *See also* Amit R. Mehta, MD, Doximity, *available at* https://www.doximity.com/pub/amit-mehta-md-30a272cf (last visited Mar. 1, 2021).

focus as: "Disease conditions involved in research including prostate, lung, breast, kidney, and leukemia." C.V. of Amit R. Mehta, M.D., Dkt. 12531-19, p. 3 of 6. Notably, lymphomas are not even mentioned. In fact, the one cancer he has written about is prostate cancer. From his declaration, the only thing we do know about his past experience is that he has done a significant number of "medical expert witness reviews" and that he has worked on cases that "*include exposure to benzene* and development of NHL." *See* Declaration of Amit R. Mehta, M.D., Dkt. 12531-18, at ¶ 5 (emphasis supplied). Nowhere does his declaration or his C.V. even mention glyphosate.

Dr. Mehta's rushed four-page declaration, signed in North Carolina on the day before filing, is entirely conclusory: "My opinion … is that there are supporting scientific/medical data such that it is reasonable to include each of the conditions set forth in the Group A and Group B Medical Conditions in Exhibit 5, as posing, respectively, a significantly increased risk or a moderately increased risk of developing NHL." *See* Declaration of Amit R. Mehta, M.D., Dkt. 12531-18, at ¶ 15. There is no further evaluation or explanation regarding the many Group A and Group B factors he supports. This is astonishing in a case of this magnitude. Dr. Mehta's declaration should be stricken.

### 2.    Class Proponent's Use of the Declaration of Monsanto Trial Expert Michael R. Grossbard, M.D. Should Be Disregarded.

The use of Dr. Grossbard as an expert is anathema to the class. Dr. Grossbard has been one of Monsanto's most frequently used expert witnesses in Roundup litigation. He was a defense witness in the Hardeman case, in the cases of *Sanders v. Monsanto* and *Calderon v. Monsanto*,[16] as well as many others. Before this court, Dr. Grossbard has already opined that it is

---

[16] *See In re Roundup Products Liability Litigation*, MDL No. 2741, 16-MD-2741-VC, Report of Michael L. Grossbard, M.D. RE: Edwin Hardeman, *available at*

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

"impossible" to conclude that exposure to "even high degrees of glyphosate" is associated with NHL.[17] Having consistently testified that NHL cannot be caused by glyphosate, Dr. Grossbard is incompetent to delineate which factors might attenuate or contribute to that causation. Any advocate for the accuracy of the grid must first believe in the underlying causation before delineating contributing factors. Indeed, from the perspective of Dr. Grossbard there should be no grid nor payments at all. His declaration should not be allowed to be used in support of the settlement's grid.

### D. Claimants' Medical Costs Will Easily Eat Up Any Proceeds From the Proposed Settlement.

NHL is an expensive disease to treat. In 2019, Reyes *et. al.* found that "[d]isease progression within 12 months among patients with NHL was associated with higher mean costs compared with no disease progression ($146,185 vs. $103,498, $p < .001$),"[18] but both are substantially more than anyone in Tiers 1 through 3 are eligible to receive. However, inexplicably the settlement takes pains to make sure that medical costs are not considered, most likely for the obvious reason that these costs will be significantly higher than the amounts the grid offers claimants:

> For the avoidance of doubt, to the extent a Settlement Class Member's medical records are provided in a Claim Package or otherwise to the Claims Administrator or Settlement Administrator, such medical records are not being provided to show

---

https://www.docketbird.com/court-documents/In-re-Roundup-Products-Liability-Litigation/Exhibit/cand-3:2016-md-02741-02591-002.  *See also Janzen v. Monsanto Co.*, 19-cv-4103, Deposition of Michael L. Grossbard, M.D. (Nov. 26, 2019), *available at* https://www.docketbird.com/court-documents/Janzen-v-Monsanto-Company/Exhibit/cand-3:2019-cv-04103-00025-015

[17] *See* Report of Michael L. Grossbard at 8.

[18] Carolina Reyes *et al.*, *Cost of Disease Progression in Patients with Chronic Lymphocytic Leukemia, Acute Myeloid Leukemia, and Non-Hodgkin's Lymphoma*, The Oncologist 24(9): 1219-1228, 1223 (Sept 2019), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6738303/

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

and shall not be used to evaluate the medical costs for any medical services that a
Settlement Class Member has incurred or may incur.

*See* Settlement Agreement, § 7.2(e), Dkt. 12531-2, p. 35 of 266.

While the proposed settlement will not consider medical costs, there is nothing to prevent

hospitals, insurance companies, and governmental entities from enforcing their medical cost lien

rights. Medicare and Medicaid have statutory rights to seek reimbursement and by contract so do

most worker insurance plans under ERISA. The settlement indicates that there will be an attempt

by the settlement administrators to negotiate with governmental entities, but it makes no

promises. *See id.* §§ 16.1(a)(i), 16.2, pp. 93-94, 96 of 266. Those facing hospital or medical liens,

especially those covered under ERISA, are left to fend on their own. On the other hand, one

thing that the settlement does make clear is that Monsanto will have no responsibility in this

regard. The release required to be signed by all those who accept settlement payments — even

the paltry $5000 "Accelerated Payment Award" — releases, holds harmless, and indemnifies

Monsanto from any obligations to "any Governmental Payor or any other Person, including any

provider." *See id.* § 16.1(a)(ii), p. 94 of 266; *see also id.* §§ Sections 16.1(a)(i), 17.1(d), and

Exhibit 6, pp. 94, 97, 192-208. The indemnification of Monsanto is made clear:

> **Notice of Indemnification.** SETTLEMENT CLASS MEMBER PARTIES
> ACKNOWLEDGE THAT THIS SECTION 16.3 COMPLIES WITH ANY
> REQUIREMENT TO EXPRESSLY STATE THAT LIABILITY FOR SUCH
> CLAIMS IS INDEMNIFIED AND THAT THIS SECTION IS CONSPICUOUS
> AND AFFORDS FAIR AND ADEQUATE NOTICE.

*Id.* at § 16.3(b), p. 96 of 266. Given the fact that settlement payments will almost always be less

than the medical bills for NHL, it is unclear what, if any, money will be left for claimants that

accept their awards.

### E.     The Release Required of Those Who Accept Any Payments Is Wildly Overbroad.

Class action releases comport with notice when they relate to the claims made on behalf of the class. *Hansberry v. Lee*, 311 U.S. 32, 40 (1940). Here, that claim is that Roundup can cause NHL and, given that class members are only being represented with respect to NHL, that personal injury should be the limit of what is released. *See*, *e.g.*, *Taylor v. Sturgell*, 553 U.S. 880 (2008) holding there is no "virtual representation" exception to general rule against nonparty claim preclusion, abrogating *Kourtis v. Cameron*, 419 F.3d 989 (9th Cir. 2005).

However, the scope of the mandated release (Exhibit 6) required to be signed by any individual claimant who receives money, including those who get the paltry $5000 accelerated payment, is far broader than most plaintiffs are required to sign after contentious and well-represented litigation. *See* Settlement Agreement, Exhibit 6, Dkt. 12531-2, pp. 192-208. First, while the settlement offers no possible compensation for anything other than NHL, paragraph 8 is so broad that it not only releases any possible tort claim but also any possible contract claims against Monsanto. Paragraph 11 then waives all possible future claims, including an express waiver of California Civil Code Section 1542. Paragraph 12 releases all claims under California's Section 17200 and any comparable law in any other state. In paragraphs 20 and 21 claimants agree to indemnify and hold Monsanto harmless from any possible liens, including agreeing to reimbursement provisions for Monsanto, such as attorneys' fees, with the indemnity to be "construed as broadly as possible."

As if this was not comprehensive enough, every individual release also includes a mandatory non-disparagement clause:

> 27. I will not directly or indirectly make any negative or disparaging statements against Defendant or the Released Persons maligning, ridiculing, defaming, or

otherwise speaking ill of them, their products or their business affairs, practices, policies, standards, or reputation…

*See* Settlement Agreement Exhibit 6, Dkt. 12531-2, p. 202 of 266.

While there are many reasons that this may benefit Monsanto, such a provision buried within a class action settlement is quite shocking and unheard of. Essentially, Monsanto is requiring any class member who accepts any money from ever speaking ill about them, particularly to the press. And given the request that the Court approve the release as part of the settlement, and Monsanto presumably only requested it in order to enforce it, Monsanto will likely use this Court's imprimatur to impose silence on unwitting settling class members. That settlement proponents have gone along with this draconian hammer for the mere pittance the proposed settlement offers the class members is equally shocking.

### F.      The Mirage of "Free" Legal Representation Presents More Problems Than It Solves.

A key settlement feature trumpeted by the proponents of the settlement is the "Legal Services Program," which would create a team of in-house settlement lawyers to "afford free legal advice" to the class members. *See* Settlement Agreement, § 11.3(a), Dkt. 12531-2, p. 60 of 266. But these lawyers are mistakenly described as "free" when they are actually prepaid from a legal settlement fund which should otherwise go to the injured and needy class members. And in practice, they are likely to do little more than steer claimants deeper down the rabbit hole of the pittances offered in the inadequate proposed settlement. This is because they cannot truly give reasoned advice regarding the prospects of opting out, because they are *barred* by the settlement from "represent[ing]" anyone who opts out of the settlement or who otherwise brings a tort claim against Monsanto." *Id.* at § 11.3(c), p. 61 of 266. Thus, these lawyers, purportedly in place to "advise" Roundup victims in assessing whether to participate in the settlement (or to opt out and

sue), would have no incentive to advise them to do anything other than accept the meager settlement proceeds (and help them do it). Rendering this advice, constricted as it is, does not put the claimant's interests first. Administrative help in filling out forms is not real legal representation. This preclusion thus shackles these lawyers to the lie of trumpeting the legal services plan as a purported benefit to victims who will be herded into the proposed settlement with a claimed "reduced risk" and "no need to retain counsel." Preliminary Approval Motion, Dkt. 12531, p. 22 of 83.

The intent of this provision is made more untenable by the fact that the settlement effectively prevents class members from retaining outside counsel (who might advise them to opt out). The proponents assert that class members can use the "Legal Services Program" but are "free to employ counsel of their choice." *Id.* at p. 27 of 83. In reality, no such choice exists, because the settlement limits the fees of any "outside counsel" to a mere "7.5%" of the already meager "amount awarded" under the settlement. *See* Settlement Agreement, § 6.2(d), Dkt. 12531-2, p. 30 of 266. Due to this fee cap, no outside "counsel" is likely to represent a class member in navigating the claims process.

A final provision to make sure that all advice given is to support the settlement is that no attorney in the "free legal services" program could have represented an objector. *See id.*, § 11.3(c), p. 60 of 266. Clearly, the only point to this provision is to make sure that any counsel likely to understand the faults of this settlement is precluded from representing any settlement members who are in doubt about whether to accept the settlement proceeds.

### G.   The Primary Purpose of the Advisory Science Panel is to Assist Monsanto in Defending Cases Against Anyone Who Does Not Accept Their Settlement.

The terms under which the science panel is required to operate are heavily weighted towards assisting Monsanto in its defense against anyone who has NHL and has the temerity to

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

exercise their severely attenuated back end opt-out right. The parameters of operation for the panel are so one-sided that at best it can only be assumed that the negotiators on behalf of the putative class did not understand the concepts they agreed to. Monsanto certainly understood them and likely created them as they amount to a defendant's wish list in any toxic tort litigation.

First, the science panel is predetermined to find no causation by discounting competent scientific evidence and applying the wrong analytical yardstick. The settlement requires the panel to definitively rule out "chance, bias, or confounding" causes for associations observed by scientists. *See* Section 12.2(b) ("that such positive association is not due to chance, confounding, or bias"). This requirement misapprehends the science of epidemiology. Monsanto, but apparently not settlement proponents, is quite aware that these three factors cannot be ruled out by a science panel -- even if a panel reviewing all of the epidemiological data finds a positive association. Indeed, when Monograph 12 was released in 2015 and finalized in 2017 by IARC after an exhaustive review by an esteemed science panel, the epidemiology itself was concluded to be "limited," meaning that chance, bias and confounding could not be entirely ruled out.[19] This led IARC to place glyphosate into the 2A category as "probably carcinogenic to humans."[20]

Section 12.2(b) prompts the science panel to ignore the scientific evidence based on factors that are inappropriate for toxic exposure to herbicides. Dkt. 12531-2, p. 63 of 266. While epidemiological studies regarding pharmaceuticals can be interventional with confounding factors and bias controlled for in advance, including through the administration of a known dose, studies of environmental toxins are almost always observational. The toxic substance in these

---

[19] International Agency for Research on Cancer, *IARC Monographs Volume 112: Evaluation of Five Organophosphate Insecticides and Herbicides* (Mar. 20, 2016), *available at* https://publications.iarc.fr/549
[20] *Id.*

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

studies is not "administered" in pre-controlled doses and generally for most toxic substances the actual dose that enters the body is unknown. For the most part, retrospective estimates of exposure are used as surrogates for actual dose, but these estimates, however carefully obtained, are always subject to chance, bias, or confounding factors. Nor can any of the three major epidemiological techniques – cross-sectional studies, case-control studies, or cohort studies – be rendered immune from these factors. This is particularly true when the studies are done retrospectively, because the data available is not pre-controlled and is often incomplete or entirely missing. In the end, based on the entirety of studies reviewed, an observational effect may be concluded but by the very nature of the science of epidemiology such a conclusion will not be totally absent "chance, confounding, or bias." See the Declaration of George C. Rodgers, M.D., Ph.D., attached hereto as Exhibit "C," for a critical analysis of the Science Panel's directions.

This Court's own *Daubert* ruling on general causation stated that epidemiology cannot completely rule out "chance, bias, or confounding." *See In re Roundup Prod. Liab. Litig*., 390 F. Supp. 3d 1102, 1131 (N.D. Cal. 2018). But, as this court noted, that is not the end of the analysis. Rather, a positive association needs to be confirmed by information from other disciplines, such as toxicology and genotoxicity. *Id.* at 1117.

.       Similarly, Sir Bradford Hill's viewpoints, given as part of his famous address, do not require that epidemiology rule out chance, bias, and confounding factors in order to find causation when there are other powerful lines of evidence to corroborate an observed association. Thus, in the MDL trial of *Hardeman*, this court found that plaintiff's expert Dr. Chris Portier's testimony "supported a credible causal interpretation," even though he "could not definitively rule out chance, bias, or confounding." *See Id.* at 1131. This court also allowed the testimony of

Dr. Weisenburger even though he could not fully rule out confounding factors in the epidemiology. *See id*. at 1144 ("In addition, Dr. Weisenburger considered other possible explanations for the observed results and, among other things, concluded that 'confounding due to the use of other pesticides does not fully explain the increased risk estimates for glyphosate' in light of the results in some studies that controlled for use of other pesticides…. None of these conclusions offends *Daubert's* requirements.")

Ironically, the settlement grid at Tiers 2 and 3 reduces compensation levels based almost entirely on a host of supposed "confounding" factors. In his affidavit, Monsanto's frequent trial expert, Dr. Grossbard, cherry picks from any study that has ever associated a medical or lifestyle finding with NHL. *See generally* Affidavit of Michael L. Grossbard, M.D. But the acknowledgment of these factors by the advocates for the settlement means that they are aware that alternative causative explanations render it impossible to completely rule out chance, bias or confounding factors. Indeed, no retrospective observational study is capable of controlling for and thereby eliminating all of these factors.

Of course, this impossible standard is a far more rigorous standard than that required by the legal system. Admissibility pursuant to *Daubert* and its progeny does not require the elimination of alternative factors. And the vast majority of jurisdictions include some version of "caused or contributed to" as part of the jury's charge when concluding whether there is causation. Notably, at least three separate trial courts have already concluded that Plaintiff's experts have passed necessary gatekeeping scrutiny. Under these circumstances, it most certainly cannot be in the interest of putative class members to take a fresh look at a matter that Monsanto has already lost over and over again.

Moreover, pursuant to the terms of the settlement, even if the science panel were to find that Roundup can cause NHL, that general causation finding is not the end of the panel's work. The next charge of the panel is to define a minimum internal dose required for Roundup to cause NHL. *See* Settlement Agreement, § 12.3(b), Dkt. 12531-2, p. 65 of 266. This determination ignores the fact that there is a marked difference between dose and exposure. Exposure is the availability of a toxic substance to enter the body whereas dose is what has actually entered the body. Distinguished from pharmaceutical studies, which can calculate an administered dose, epidemiological studies, which for environmental toxins are almost always retrospective, routinely rely on exposure estimates as surrogates for dose and this evidence is usually characterized by frequency, proximity, and duration. Indeed, even the settlement grid acknowledges that all that can be retrospectively determined is exposure and not dose, as the grid's requirements are based entirely on exposure estimates. Nor are there any persistent long-term biomarkers for glyphosate from which such a dose calculation can be retrospectively made based on degradation over time.

When dose calculations are made by regulators, they are generally made by an extrapolation from experimental, non-epidemiological data. These data are incapable of evaluating most specific human endpoints, including the human variants of NHL. The result is likely that this small group of siloed scientists will be unable to agree on a calculation that in the real world no scientists would ever attempt to authoritatively make, particularly in the absence of interventional studies which would be unethical, if not unlawful, to conduct on humans. However, if the scientists on the panel are stumped by this impossible task and cannot agree on a threshold dose needed to cause NHL, the settlement agreement inexplicably requires the panel to revert to a "no causation" finding for NHL, regardless of its earlier positive general causation

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

finding. *See* Settlement Agreement, § 12.3(b), Dkt. 12531-2, p. 65 of 266 ("If the Science Panel Determination does not include a threshold internal dose level for NHL, that shall be considered under the Settlement Agreement as a Causation Not Shown Finding for NHL.")

In all cases for opt outs, Monsanto will then be able to present courts and juries with its "causation not shown" finding from an "independent science panel" as a "stipulated fact." None of the juries or courts will be told that this finding was preordained by the parameters given to the panel; nor will plaintiffs' attorneys be able to cross examine members of the panel live in court while judges are even forbidden from telling juries that they are not bound by the "stipulated facts." Settlement Agreement, § 12.3(d)(iii)(3), Dkt. 12531-2, p. 66 of 266. Given these preconditions, the result of giving such a finding to any court or jury unfamiliar with the intricacies of the science will inevitably cause judges to eliminate plaintiff experts in pretrial hearings with the alternative goal being to get juries to give inordinate weight to these findings when deliberating. Monsanto knows this. *See id.*, § 12.3(d)(i-iv).

The charge to the science panel is set up in a way that, even in the unlikely event that the panel makes a positive finding of causation, trials will still be extraordinarily difficult, if not impossible to win. While the lack of a finding of general causation will likely win the day for Monsanto, Monsanto retains its ability to challenge specific causation, which means that plaintiffs will be forced to revisit many of the elements of general causation anyway. Even more significantly, if the panel has made a positive causation finding, that means the panel has assigned a threshold internal dose necessary to cause NHL. Monsanto can argue that causation cannot be proven unless the plaintiff can calculate a personal internal dose level that is greater than the agreed-upon minimum internal dose. *Id.*, § 12.3d(v).

High on the wish list of any toxic tort defendant is to require a plaintiff to prove a minimum internal dose. It is extraordinarily difficult for plaintiffs to go back years and provide evidence for just the time and duration of exposure given the frequent lack of records, witnesses, and the vicissitudes of personal recollection. Yet, even with precise exposure information, as well as its specific duration and concentration, it is impossible to calculate past internal dose. For instance, wind drift alone on a particular day can cause marked differences in an internal dose, and the number of factors that need to be accounted for make this one factor pale in comparison. But the stipulation provided to the jury will almost certainly require trials to be mired in this statistical calculation with it being plaintiff's burden to prove the impossible.

No doubt Monsanto will also argue at trial that the science panel has already considered and ruled on the scientific studies which have driven prior verdicts, arguing that any of its own conduct should not come before the jury because punitive damages are not part of the case. (See *In Re: Diet Drugs* discussion below.) As a result, the settlement's imposition of the science panel's findings as stipulated facts, the prohibition of expert discovery and cross-examination of the panel, the requirement that all courts admit the science panel's determination, and the likely argument that the jury should not be able to consider Monsanto's conduct, mean that any alleged right to a jury trial will be severely, if not irreparably, undermined.

### H. The "Offer of Proof" is Designed to Disadvantage Opt-Out Cases.

Section 7.13(e) inserts another item that is uniquely beneficial to Monsanto: "the amount of last offer by the Claims Program will be treated as an offer of judgment for purposes of obligation to pay costs in the event of a tort-system judgment below that amount." Settlement Agreement, § 7.13(e), Dkt. 12531-2, p. 46 of 266. This is an automatic Rule 68 benefit that

Monsanto gets while at the same time it can argue to any court that it was the MDL court that required the offer be made and it is not in truth making such an offer in true hopes of settlement.

By structuring the "offer" in this fashion, Monsanto achieves many objectives. Class members being advised by attorneys who cannot represent them if they opt out will explain to them the downside cost risks of not accepting the offer. Thus, the provision serves to deter prospective opt-outs. Secondly, other than for those who originally opted out, trial courts will be told that Monsanto has no interest in settling but it was obligated to insert this offer, which allows Monsanto to continue to deny any liability in the particular individual action and still gain the benefits of having made the offer. Third, the cost effects of the offer of judgment begin to accrue at the beginning of the case rather than when it would normally be made in the latter stages of litigation. Finally, while Federal courts allow an Offer of Judgment pursuant to Fed. R. Civ. P. 68(a), many states do not, or the rules under which they can be made are vastly different.[21]

## I.     The Litigation Stay is Uniquely Beneficial to Monsanto.

The settlement includes a "litigation stay" of at least four years – subject to extension – that would bar class members from pursuing any claims against Monsanto. Settlement Agreement, § 2.1(41), Dkt. 12531-2, p. 12 of 266; Preliminary Approval Motion, Dkt. 12531, p. 30 of 83. According to the settlement proponents, this "litigation stay" is "critical to the deal." Preliminary Approval Motion, Dkt. 12531, p. 78 of 83. But on its face, such a stay violates Fed.

---

[21] For instance, Cal. Code Civ. Proc. § 998 in California limits the repayment to the net amount received, *see* Ga. Code Ann. § 9-11-68 and for a survey, American College of Trial Lawyers Federal Civil Procedure Committee, *Survey of State Offer of Judgment Provisions* (Oct. 2004), *available at* https://www.utcourts.gov/committees/civproc/materials/Offer%20of%20Judgment%20Survey.pdf.

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

R. Civ. P. 1 (applying Rules to promote "speedy" adjudication) and Fed. R. Civ. P. 23 (permitting approval of class-action settlements only if "fair, adequate, and reasonable" despite any "costs, risks, *and delay of trial* and appeal") (emphasis supplied). The main cases cited as the supposed basis for the proposed settlement included no such stay, *see, e.g.*, *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 423-25 (3d Cir. 2016), and the motion for preliminary approval certainly does not cite any similar settlement including such an extraordinary "standstill" provision. Indeed, the Supreme Court has held that a similarly lengthy stay was an abuse of discretion, even when it was designed to allow the President of the United States to carry out his official and all-important duties. *See Clinton v. Jones*, 520 U.S. 681, 707-08 (1997) (finding stay constituted an abuse of discretion despite the "high respect that is owed to the office of the Chief Executive").

Here, there can be no question but that this stay is uniquely beneficial to Monsanto. Indeed, the proponents of the settlement do not even try to articulate a settlement benefit for putative class members. To the contrary, for injured Roundup victims with NHL, the stay will likely be detrimental to their claims in both patent and latent ways.

First, during the stay and its aftermath, many Roundup victims will die before having a chance to obtain justice at trial. NHL is often a terminal cancer, with about 20% of victims dying *within the first year*, and about 30-40% not surviving five years.[22] As even the settlement proponents concede, an "NHL" victim's "life and death" can be measured in "a matter of months versus years." Preliminary Approval Motion, Dkt. 12531, p. 57 of 83. Thus, many class members

---

[22] Cancer Research UK, *Non-Hodgkin Lymphoma Survival*, *available at* https://www.cancerresearchuk.org/about-cancer/non-hodgkin-lymphoma/survival; *See also* Cancer.Net, *Lymphoma- Non-Hodgkin: Statistics* (Jan. 2020) *available at* https://www.cancer.net/cancer-types/lymphoma-non-hodgkin/statistics

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

diagnosed with NHL will likely die during the pendency of the stay. Beyond the heartache and lack of justice inherent for class members who get NHL, this result would run afoul of the protections provided to the elderly and victims in extremis by many state courts, leaving them unable to get closure during their life.[23] For example, California provides both dying and elderly (over 70) parties a statutory trial-calendar *preference* of 120 days [Cal. Code Civ. Proc. § 36, subds. (a), (d), (f)] in order to take account of their circumstance.[24] Pursuant to the proposed settlement, they would have to wait until the end of the stay before they can even initiate their request for calendar preference after which their heirs in many states, such as California, will not be entitled to seek the same damages as the cancer victims would have when alive. [*See* Cal. Code Civ. Proc. §377.34 (non-economic damages for pain and suffering die with the victim).] Additionally, this four-year standstill without an attorney[25] may create proof problems for those who do not opt out in the initial 150-day period and need to assemble all the information necessary to support exposure. *See Blue Cross and Blue Shield of Alabama v. Unity Outpatient Surgery Ctr., Inc.*, 490 F.3d 718, 724 (9th Cir. 2007) (reversing stay and explaining that "[d]elay 'inherently increases the risk that witnesses' memories will fade and evidence will become stale").

Finally, this delay may well get worse. Although initially set at four years, the litigation stay can be *extended*. *See* Preliminary Approval Motion, Dkt. 12531, p. 29 of 83. The proposed settlement expressly contemplates a "Potential Extension" that would be "negotiated" once again

---

[23] There are roughly 20,000 deaths a year in the country from NHL.  *See id.*

[24] Monsanto knows that Johnson obtained a preferential trial setting in California, because he was in dire circumstances. *See* Motion by Plaintiff Dewayne Johnson for Trial Preference, *Johnson v. Monsanto Co.*, No. CGC-16-550128 (Aug. 29, 2017), *available at* https://usrtk.org/wp-content/uploads/2016/09/trial-preference-aug-2017.pdf.

[25] As discussed above, no outside attorney is likely to represent a claimant when fees are limited to 7.5% and no attorney provided by the settlement is permitted to represent opt-outs.

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

by "Monsanto" and settlement proponents. *Id.* And the settlement proponents concede that such an extension might include "extend[ing] the litigation stay." *Id.* Now, people diagnosed with NHL soon after any settlement approval would face not an expedited trial setting but some unknown number of years *beyond* the guaranteed four-year stay just to file suit.

Despite all of this, the settlement proponents insist that the litigation stay poses "no prejudice to class members." *Id.* at 80 of 83. After all, the proponents' state, "despite years of public controversy about Roundup," the affected "class members" have to date "not filed lawsuits or even retained counsel." *Id.* Of course, no one in Subclass 2 has. None of them legally would or could – by definition they have not been diagnosed with cancer yet and, as discussed above, do not have a cognizable claim to make at this time.

Undaunted, the proponents try to justify the settlement's built-in delays by invoking "COVID," which (they assure the Court) will already delay trials beyond "the four-year window." *Id.* at 5. Beyond being callous, this argument makes no sense. The proponents present no evidence that, despite the ongoing vaccinations, the COVID-19 delays will last another four years. But no matter how long any such delays last for, the settlement's proposed delay will just add four more years to the back end, with any Roundup litigation commenced in four years already stacked up behind existing dockets. Contrary to the proponents' claims, the proposed stay will greatly "prejudice" class members.

Of course, the party that has much to gain from any stay is Monsanto. While litigation is stayed, Monsanto will continue to sell Roundup, making billions of dollars in profit. For example, in 2016, Monsanto reportedly made $1.9 billion in profit from Roundup sales (plus

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

another $6 billion in profit from selling its Roundup-related genomic seeds).[26] At that rate, while funding the settlement at "up to" $2 billion, during the litigation stay, Monsanto would make about that much each year from Roundup alone. In addition, while Monsanto would like to pay little or nothing in tort claims for the next four years, it would accumulate countless tens or hundreds of millions in interest on that money not being paid to Roundup victims.

## IV.   RIGHTS LOST BY ALL CLASS MEMBERS

### A.   The Broad Stay Only Benefits Monsanto.

Addressed above are the benefits Monsanto receives from a stay on NHL litigation, but this is not all that is stayed. The settlement class includes false advertising claims, though there is no compensation offered for such claims. *See* Settlement Agreement, § 1.1(a), Dkt. 12531-2, pp. 6-7 of 266. And apparently this was not enough for Monsanto. Section 2.1(70) buries the breadth of what "Roundup Claims" are as it broadly defines them not only to include the anticipated personal injury tort claims but also:

> other tort claims (including claims for fraud, misrepresentation, fraudulent concealment, negligent misrepresentation, and failure to warn), warranty claims, false advertising claims, and claims for violations of any consumer protection or unfair and deceptive acts or practices statute.

*Id.* § 2.1(70), p. 15 of 266. How much would other manufacturers be willing to pay for such a respite from their consumers and other customers?

### B.    Settlement Proponents' Papers are Inaccurate in Describing Class Member's Ability to Return to the Court System as All Class Members Expressly Release All Unknown Future Claims.

Class Proponents insist that:

---

[26] Maxx Chatsko, *How Much Money Does Monsanto Make From Roundup?* The Motley Fool (May 26, 2016) *available at* https://www.fool.com/investing/2016/05/26/how-much-money-does-monsanto-make-from-roundup.aspx.  Since Bayer's acquisition of Monsanto, Bayer has filed a consolidated financial report.  This makes it difficult to estimate Monsanto's true financial current picture.

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

> The Settlement preserves class members' right to bring almost any claim, class or individual, for compensatory damages or equitable relief after the litigation stay period, including but not limited to claims for personal injury, fraud, misrepresentation, negligence, fraudulent concealment, negligent misrepresentation, breach of warranty, false advertising, and violation of any unfair and deceptive acts or practices statute.

PreliminaryApproval Motion, Dkt. 12531, p. 55 of 83. However, this is entirely inconsistent with the actual text of the Settlement Agreement. The class-wide release language is found in Article XVII. Section 17.2 explicitly releases all "unknown claims" on behalf of all Settlement Class Members.[27] Dkt. 12531-2, pp. 98-99 of 266. This complete release of unknown claims is forcefully reiterated in "Section 17.3 Scope of Releases."[28]

---

[27] Section 17.2 <u>Release of Unknown Claims</u>. In connection with the releases in Section 17.1, the Class Representatives and Subclass Representatives, all Settlement Class Members (on behalf of themselves and the associated Settlement Class Member Parties), and the Settlement Class acknowledge that they are aware that they may hereafter discover Claims now unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true, with respect to actions or matters released herein, whether such Claims or facts now exist, hereafter may exist, or might have existed. Class Representatives and Subclass Representatives, all Settlement Class Members, and the Settlement Class explicitly took unknown or unsuspected Claims into account in entering into the Settlement Agreement and it is the intention of the Parties fully, finally and forever to settle and release all Claims as provided in Section 17.1 with respect to all such matters.

[28] Section 17.3 <u>Scope of Releases</u>.
(a) The Class Representatives and Subclass Representatives (on behalf of themselves, the Settlement Class Members, and the associated Settlement Class Member Parties) acknowledge that they have been informed of Section 1542 of the Civil Code of the State of California (and similar statutes) by counsel and that they do hereby expressly waive and relinquish all rights and benefits, if any, which they have or may have under said section (and similar statutes) which reads as follows:
A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.
(b) The Parties acknowledge that the foregoing waiver of the provisions of Section 1542 of the California Civil Code and all similar provisions of the statutory or common law of any other state, territory, or other jurisdiction was separately bargained for and that the Parties would not have entered into the Settlement Agreement unless it included a broad release of unknown

A complete release of "unknown claims" on behalf of an entire class is anything but an unexpurgated right to proceed with litigation after the stay. Moreover, notice is not given for this loss of "unknown" rights. However, settlement proponents' motion never attempts to explain why such a release would be provided on behalf of the entire class.

One can only speculate that Monsanto wanted this provision, because it is acutely aware that the discovery rule in most states tolls the statute of limitations, allowing individuals to sue long after actual exposure when they reasonably discover the existence of an injury causally related to Roundup. This permits actions for diseases which might later be determined to be related to glyphosate until after diagnosis or their relationship to glyphosate is apparent.

It would make sense that the purpose of such release language is to insulate Monsanto from suits related to any subsequently discovered causal nexus between glyphosate and either latent injury or later discovered injuries, as Monsanto is acutely aware of the development of the science and medicine regarding one of its former herbicides, 2,4,5-T.

Monsanto began to manufacture the herbicide 2,4,5-T in the late 1940s. It was later used very heavily in Vietnam as it constituted 50% of what was called Agent Orange. In the early 1990s Congress signed a bill tasking the National Academy of Science's Institute of Medicine to study the effects of Agent Orange on Vietnam veterans in order to determine whether they should be compensated for exposure. More than forty years after 2,4,5-T was first sold, in 1994 veterans were compensated for NHL, chloracne, Hodgkin's disease, porphyria cutanea tarda,

---

Claims arising from, resulting from, in any way relating to or in connection with the matters released herein.
(c) The Settlement Class Member Parties intend to be legally bound by the Releases.
(d) The Releases are not intended to prevent the Defendant or any Monsanto Parties from exercising its rights of contribution, subrogation, or indemnity under any law.

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

respiratory cancers, and soft tissue sarcomas. The results of newer studies broadened the number of diseases requiring compensation to include prostate cancer in 1996, multiple myeloma in 1998, diabetes mellitus Type-2 in 2000, AL amyloidosis in 2007, ischemic heart disease and Parkinson's disease in 2008, and peripheral neuropathy in 2010. *See* the Declaration of Gerson H. Smoger, attached hereto as Exhibit "A" hereto.

Even for pharmaceuticals, which require official reporting of adverse incidents, there are countless examples where pharmaceuticals were required to be withdrawn based on adverse medical information discovered 10 or more years later,[29] 15 or more years later,[30] 20 or more years later,[31] or even 25 or more years later.[32] As latency progresses and the epidemiology of

---

[29] The following drugs remained on the market 10-14 years before they were withdrawn due to health concerns: Ergamisol (Levamisole) treatment for worms, arthritis and cancers 1989, withdrawn 2000 due to neutropenia, agranulocytosis, and thrombotic vasculopathy; Meridia (Sibutramine) appetite suppressant first sold 1997, withdrawn 2010 due to increased heart disease and stroke risk; Seldane (Terfenadine) antihistamine first sold 1985, withdrawn 1998 due to fatal heart problems; Trasylol (Aprotinin) heart bypass bleeding reduction first sold for use in 1993, withdrawn 2007 due to kidney damage and death; Efocaine (Butamben) local anesthetic first sold in 1952, withdrawn 1964 due to paraplegia; Tigason (Etretinate) for psoriasis first sold in 1985, withdrawn 1998 due to high risk of birth defects.

[30] The following drugs remained on the market 15-19 years before they were withdrawn due to health concerns: Permax (Pergolide mesylate) for Parkinson's symptoms first sold in 1988, withdrawn 2007 due to heart valvulopathy; Pacatal (Mepazine) for anesthesia first sold 1955, withdrawn 1970 due to seizures and intestinal paralysis; Laverna (Oxyphenisatin) laxative first sold in 1955, withdrawn 1973 due to liver failure; and Fenormin (Phenformin hydrochloride) for type-2 diabetes first sold 1959, withdrawn 1977 due to fatal lactic acidosis.

[31] The following drugs remained on the market 20-24 years before they were withdrawn due to health concerns: Pondimin (Fenfluramine) appetite suppressant first sold in 1973, withdrawn 1997 due to PPH and cardiac valvulopathy; and Reserpoid and Rau-Sed (Reserpine) for hypertension first sold 1954, withdrawn 1977 due to irregular heartbeat, hearing loss, and vision problems; Survector (Amineptine) Anti-depressant first sold 1978, withdrawn 1999 due to hepatotoxicity.

[32] The following drugs remained on the market more than 25 years before they were withdrawn due to health concerns: Accutane (Isotretinoin) acne medication first sold 1982, withdrawn 2009 due to birth defects, miscarriage, and premature deaths among pregnant women who used it, as well as suicidal ideation and inflammatory bowel disease; Zantac (Ranitidine), treatment for stomach problems first sold 1983, withdrawn 2020 due to carcinogenicity; Asterol (Diamthazole dihydrochloride) antifungal agent first sold in 1951, withdrawn 1977 due to

33

glyphosates matures, it is unknown now how many diseases may in the future be related to glyphosate, particularly given its genotoxicity.

### C.  Class Members Lose the Benefit of True Medical Monitoring.

The settlement argues that it provides for medical monitoring but that is not what the Diagnostic Accessibility Grant Program ("DAGP"), discussed further below, does. The reason that it is not true medical monitoring is that it is only looking for one already known endpoint, NHL. This is the antithesis of true medical monitoring which should appropriately be designed to broadly look at health outcomes in a toxin-exposed population, not to look at that population with blinders on. For example, the medical monitoring conducted in West Virginia of 70,000 of the 80,000 people in the community exposed to Dupont's C8 concluded that there was a probable link between C8 and six conditions: testicular cancer; kidney cancer; thyroid disease; ulcerative colitis; hypertension; and high cholesterol. These conditions had not been clearly associated with C8 before the class action medical monitoring took place.[33] While not initiated by a class action lawsuit, the medical monitoring of Air Force veterans exposed to Agent Orange showed glucose abnormalities and an increase of diabetes, which were not suspected at the time the project was initiated.[34]

---

neurotoxicity; Stilphostrol (Diethylstilbestrol) multiple uses, most vaginally related first sold in 1941, tablet form withdrawn in 1975 and gradually limited due to birth defects and vaginal adenocarcinoma in daughters; Cylert (Pemoline) ADHD and narcolepsy treatment first sold 1975, withdrawn 2005 due to liver failure; and Tresamide (Sulfathiazole) antimicrobial first sold 1939, withdrawn 1970 due to kidney and liver damage and death.

[33] Taylor Sisk, *A Lasting Legacy: DuPont, C8 Contamination and the Community of Parkersburg Left to Grapple With the Consequences*, Environment Health News (Jan. 7, 2020), *available at* https://www.ehn.org/dupont-c8-parkersburg-2644262065.html.

[34] GL Henriksen *et al.*, *Serum Dioxin and Diabetes Mellitus in Veterans of Operation Ranch Hand*, Epidemiology 8(3): 252 (May 1997), *available at* https://pubmed.ncbi.nlm.nih.gov/9115019/.

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

These types of findings from medical monitoring are the most likely reason Monsanto required that all settlement members waive medical monitoring on a class-wide basis. Medical monitoring can be one of the best ways to discover the causal connection to diseases not originally fully appreciated, such as those discussed above in Section IV.B. Properly conducted, the monitoring of exposed populations can discern patterns of disease causation that requires further research along with methods for early intervention. Medical monitoring programs can provide essential information-gathering tools, which can be an important avenue by which the health care community learns of safety and efficacy information.[35] However, from Monsanto's perspective, medical monitoring can create future liability, as it did with Dupont subsequent to the C8 medical monitoring.

>   **D.**   **The Settlement Includes Known Potential Claimants Without Offering Them Compensation.**

>>   1.   Claims for Those Diagnosed with NHL before 1/1/15 Should Not be Included.

Roundup claims for NHL class members who first received a Qualifying Diagnosis prior to January 1, 2015, are presumed by the settlement to have their claims denied unless they are able to go through the difficult effort of proving that these claims would not have been barred by an applicable statute of limitations or repose. *See* Settlement Agreement, § 6.1(a)(iv), Dkt. 12531-2, pp. 23-24 or 266. However, even if they are able to traverse what can often be a legal minefield for attorneys with experience in these matters, a successful result relegates a claimant to placement in Tier 1 and a *de minimus* recovery of no more than $10,000. *Id.* at Exhibit 5: Compensation Award Guidelines, Dkt. 12531-2, p. 187 of 266.

---

[35] See, e.g., Catherine T. Struve, *The FDA and the Tort System: Postmarketing Surveillance, Compensation and the Role of Litigation*, 5 Yale J. Health Policy & Ethics 587, 591 (2005).

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

Given this, why are these individuals forced to be class members in the first place? The vast majority of jurisdictions have instituted a "discovery rule" pursuant to which the limitations period does not begin to run until a person knows or should have known of his or her injury. [36] *See, e.g., Urie v. Thompson,* 337 U.S. 163 (1949). Claimants should be free to litigate this. It is not fair to strip victims of cancer of the right to legal redress and a jury trial for failing to opt out when they are still forced to navigate all of the hurdles that they would have had to navigate in litigation with a far greater monetary upside. It seems, therefore, that the only reason these individuals were included in the settlement was to saddle more victims with the four-year stay and loss of the ability to seek punitive damages.

Finally, as worded, it appears that this limitation even includes individuals who were first diagnosed before January 1, 2015, but later relapsed. Despite their clearly declining condition, these individuals would at best be eligible for no more than a $10,000 award from the settlement grid. What is fair about that?

2.   <u>Derivative Claimants Should Not Be Included.</u>

The settlement defines "Derivative Claimants" to mean "spouses, parents, children who are dependents, or any other Persons who have or assert a right to maintain a Roundup Claim against the Monsanto Parties or the Related Parties by reason of their relationship with a Settlement Class Member, including a deceased Settlement Class Member." Settlement Agreement, § 2.1(24), Dkt. 12531-2, p. 10 of 266. It makes clear that any Derivative Claimants are not eligible for Compensation Awards. *Id.*, § 6.1(c), p. 28 of 266.

---

[36] Katelyn Ashton, *50-State Survey of Statutes of Limitations and Repose in Prescription Product Liability Cases*, Butler Snow (Nov. 16, 2020) *available at* https://www.jdsupra.com/legalnews/50-state-survey-of-statutes-of-20476/

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

Here these claims are included in the settlement without any availability of compensation and the impossibility of meaningful notice. Derivative claims by spouses or children of those suffering from cancer are released, although such claims can be quite substantial. Yet, here those spouses and children have neither the right to opt out nor receive compensation. Indeed, spouses may not have married yet; children may be unborn. Without a present relationship with a class member, they cannot even influence the person who does have the power to opt out now and determine the future of their claims. As a result, they are just another group of potential claimants engulfed by the settlement, along with its stay, punitive damages waiver, and insidious science panel.

3.     Those Suffering from Multiple Myeloma Should Not be Included.

Defendant Monsanto knows that Roundup-exposed individuals who suffer from the cancer multiple myeloma have also brought actions against the company. As Bayer states in its own annual report: "Plaintiffs allege personal injuries resulting from exposure to those products, including non-Hodgkin lymphoma (NHL) *and multiple myeloma*, and seek compensatory and punitive damages."[37] (Emphasis supplied.) Yet notably Section 2.1(52) states: "'NHL' … does not include multiple myeloma." Settlement Agreement, § 2.1(52), Dkt. 12531-2, p. 13 of 266.

If those who develop multiple myeloma cannot be compensated, why are they included in the class at all? Why should they be forced to endure the litigation stay and the loss of the ability to seek punitive damages when the settlement offers them nothing? Certainly, Monsanto realizes there is some relationship, as one of the factors relegating NHL settlement class members to Grid

---

[37] Bayer Annual Report 2020 (Feb. 25, 2021) at 112, *available at https://www.bayer.com/sites/default/files/2021-02/Bayer-Annual-Report-2020.pdf*

Tier 2 is whether a First Degree Relative has been diagnosed with NHL or myeloma. *See* Settlement Agreement, Exhibit 5: Compensation Award Guidelines, Dkt. 12531-2, p. 185 of 266.

### E.   The Punitive Damages Waiver Does Not Comport With Constitutional Guidance Nor Is It a Fair Compromise Beneficial to the Class.

Under the proposed settlement, all class members must "release" their claims for "punitive" damages against Monsanto, including both known and shockingly "*unknown*" claims. *See* Settlement Agreement, § 17.1(a), Dkt. 12531-2, p. 97 of 266. The basis for doing so is unconstitutional. The fact of doing so is not fair to the individuals enveloped within the broad class definition.

Punitive damages should "properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *Philip Morris USA v. Williams*, 549 U.S. 346, 352 (2007); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996). To date, multiple juries have awarded punitive damages, finding that Monsanto's malicious misconduct regarding Roundup warranted such punishment and deterrence. See the Declaration of Gerson H. Smoger, attached as Exhibit "A," enclosing a very small part of the evidence regarding defendant Monsanto's outrageous conduct. *See also* Pretrial Order No. 214, Dkt. 11182, p. 3 of 4 (citing jury "verdicts" with "punitive damages"); Preliminary Approval Motion, Dkt. 12531, p. 60 n.13 of 83 (acknowledging awards in *Hardeman*, *Johnson*, and *Pilliod*). Moreover, the first appellate court to review one of these verdicts (*Johnson* in California) affirmed the jury's punitive-damages award as supported by "substantial evidence that Monsanto acted with a willful and conscious disregard of others' safety," including "corporate malice" in continuing to market Roundup despite the known "possible link with NHL." *Johnson v. Monsanto Co.* (2020) 52 Cal. App. 5th 434, 458, 460, 266 Cal. Rptr. 3d 111, 132, 134; *see* Cal. Civ. Code § 3294 (California punitive damages statute); *Boeken v. Philip Morris, Inc.* (2007) 127 Cal. App. 4th 1640, 1689, 26

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

Cal. Rptr. 3d 638, 675 ("purpose of punitive damages [in California] is to punish wrongdoers and thereby deter the commission of wrongful acts").

This reality rebuts Monsanto's theoretical argument that recovering punitive damages is "rare and arduous." *See* Preliminary Approval Motion, Dkt. 12531, p. 60 of 83. Moreover, if punitive damage awards were so rare, Monsanto would not be so intent on having them released. *See* Pretrial Order No. 214, Dkt. 11182, p. 3 of 4.

The settlement proponents also assert that Monsanto has somehow *already been* punished and deterred enough by the "amounts" of compensatory damages paid in settling existing cases and to be paid under this settlement. *See* Preliminary Approval Motion, Dkt. 12531, pp. at 16, 60 of 83 (contending that the "magnitude" of payouts "has already served the societal interest in deterrence and punishment"). Monsanto's payment of compensatory damages cannot be considered to be punishment for any misconduct proven to have been malicious or oppressive. These are distinct measures of damages for a reason. No principled reason exists to consider the payment of compensatory settlements to cancer victims as justification for barring warranted punishment for causing that cancer with malicious conduct. Indeed, the Release required of every NHL victim who accepts settlement funds states clearly that the settlement payments are for only "damages on account of personal injuries" and do *not* "represent[] punitive or exemplary damages." Settlement Agreement, Exhibit 6: Form of Release, item 25, Dkt 12531-2, pp. 200-201 of 266. Given Monsanto's consistent "no admission of wrongdoing" posture, it can safely be presumed that every release of an individual claim to date has contained similar language.

Secondly, settlement proponents are wrong when they assert that Monsanto should not pay further punitive damages because no individual "class member" has a personal "entitlement" to punitive damages in that they are intended only to benefit "society as a whole." Preliminary

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

Approval Motion, Dkt. 12531, p. 59 of 83. The incorrectness of this statement is made apparent

by the three punitive damage verdicts that juries have already rendered. Any amount that might

be paid by Monsanto from these three punitive awards necessarily has *not* punished Monsanto

for anything but its conduct harming those individual plaintiffs. *See Williams*, 549 U.S. at 353

(due process "forbids a State to use a punitive damages award to punish a defendant for injury

that it inflicts upon nonparties"). Nor would any individual punitive damage award do so if not

precluded by this settlement. The individual nature of these awards is precisely why each of the

three jury verdicts was *reduced* to assure that the punitive damages satisfied due-process

concerns (Preliminary Approval Motion, Dkt. 12531, p. 60 n.13 of 83; *e.g.*, *Johnson*, 52

Cal.App.5th at 461-62), and to date only one (*Johnson*) has actually been paid. *See Simon II*

*Litig. v. Philip Morris USA Inc.*, 407 F.3d 125, 139 (2d Cir. 2005) (rejecting even a lump-sum

punitive damages award because the "conduct relevant to the reprehensibility analysis must have

a nexus to the specific harm suffered by the plaintiff, and ... it [can]not be independent of or

dissimilar to the conduct that harms the plaintiff.").[38]

Moreover, in waiving all rights to punitive damages against Monsanto on behalf of the

class, the settlement proponents make no effort to account for the value of the claim which the

class is giving up. *See Simon II*, 407 F.3d at 127-28, where the Second Circuit held "that [Judge

Jack Weinstein's] order certifying this punitive damages class must be vacated because there is

no evidence by which the district court could ascertain the limits of either the fund or the

---

[38] Here, the settlement, even worse than *Simon II*, proposes no payment for punitive damages
"prior to an actual determination and award of compensatory damages." *Simon II Litig*., 407 F.3d
at 138.  No effort is even made to calculate what is being lost. This proposal thus raises even
more concerns than the proposition rejected in *Simon II*.

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

aggregate value of punitive claims against it, such that the postulated fund could be deemed inadequate to pay all legitimate claims, and thus plaintiffs have failed to satisfy one of the presumptively necessary conditions for limited fund treatment under *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S. Ct. 2295, 144 L. Ed. 2d 715 (1999)."

Finally, nothing indicates that exposure to compensatory liability has now "deterred" Monsanto from continuing the misconduct creating that liability. To the contrary, despite prior verdicts adjudging Roundup as the cause of victims' cancers, Monsanto has continued unabated in manufacturing and selling Roundup with glyphosate. The settlement reflects Monsanto's continued denial of *any* "liability or wrongdoing" at all (Sections 26.1, 26.2), which Bayer just recently reiterated in its annual report. ("Bayer believes it has meritorious defenses and intends to defend the safety of glyphosate and our glyphosate-based formulations vigorously."[39]) And now, Monsanto pushes this settlement to allow it to keep selling Roundup long into the future while being protected even from "unknown" conduct worthy of punishment and from the future exposure of its present victims. Far from being deterred, Monsanto offers this "settlement" as a path to *continue* its malicious conduct.

## V.     THE SETTLEMENT MISSTATES ANY BROAD BENEFITS IT ALLEGEDLY PROVIDES

### A.     Any Benefits From the DAGP are Illusory.

In forming the DAGP, there is an implicit assumption that there is a need for heightened outreach to affected populations. Although settlement proponents offers no evidence to support this central conclusion, the ultimate question is whether extending such outreach will enhance survival. Unfortunately, there is no evidence that it will. As stated by the American Cancer

---

[39] Bayer Annual Report 2020 (Feb. 25, 2021) at 113, *available at*
https://www.bayer.com/sites/default/files/2021-02/Bayer-Annual-Report-2020.pdf

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

Society: "At this time, there are no widely recommended screening tests for non-Hodgkin lymphoma (NHL). This is because no screening test has been shown to lower the risk of dying from this cancer."[40]

The existing methods currently in place for diagnosing NHL are all invasive and would not be conducted by a screening process, such as the DAGP. One way to diagnose NHL is by tumor biopsy, which requires surgery to examine a mass in order to get confirmation of the disease by a pathologist. A second mechanism would be to conduct rather expensive diagnostic electronic tests, such as CT, CAT, or PET scans or MRIs. Yet, these are not only individually expensive, they involve doses of radiation or the administration of radioactive isotopes that themselves may increase cancer risk. A final diagnostic technique is by bone marrow aspiration, which is a highly invasive and painful procedure.[41] Clearly, no medical authority would encourage these types of tests on a preventative basis. But at present, these are the tests necessary to diagnosis NHL.

### B.   The "Labeling Addition" Cannot be Considered a Settlement Benefit.

Article IX of the settlement agreement attempts to tout a proposed "Labeling Addition" as a true benefit to the class as a whole. Dkt. 12531-2, p. 58 of 266. However, to the extent that the proposed settlement agreement alleges that it requires Monsanto to seek permission from the EPA to include "links" to "scientific evidence" on its labels, the value is *de minimis* compared to what the proposed class is relinquishing. It can hardly be considered an arms-length negotiation when the touted "Labeling Addition" here does not require Monsanto to include any real warning

---

[40] The American Cancer Society, *Can Non-Hodgkin Lymphoma Be Found Early?* (Aug. 1, 2018), *available at* https://www.cancer.org/cancer/non-hodgkin-lymphoma/detection-diagnosis-staging/detection.html.
[41] Cancer.Net, *Lymphoma- Non-Hodgkin: Diagnosis* (Jan. 2020), *available at* https://www.cancer.net/cancer-types/lymphoma-non-hodgkin/diagnosis.

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

at all on its refashioned label. Instead, the labeling provision simply and only possibly provides for unknown "links" to unspecified scientific evidence which in any case no putative class member is likely to look up or even understand if they do. The proposed agreement does not even require Defendant to provide settlement proponents with a copy of its proposal before submission to the EPA; nor does it mandate the use of the most obvious word – CANCER.

In actuality, the "Labeling Addition" set forth in the proposed settlement agreement is pretty much a "worthless" exercise. *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1079 (9th Cir. 2017) (explaining that injunctive relief was worthless in reversing approval of settlement under Rule 23(e)). Article IX essentially states that the Defendant will provide for labeling as approved by the EPA. Defendant could do this and even might still have to do this without the settlement agreement. *See* 7 U.S.C. § 136j(a)(1)(E). Surely, nothing in the settlement proponents' submission explains why the proposal for a labeling addition cannot be sent to the EPA by Monsanto absent this settlement agreement given that changed labels would be just one part of the commitment to "transparency" that Bayer trumpets in its recent annual report.[42] In any case, under these circumstances the "Labeling Addition" has "no real value" for purposes of a Rule 23(e) evaluation. *See Guoliang Ma v. Harmless Harvest, Inc.*, No. 16-CV-07102, 2018 WL 1702740, at *7 (E.D.N.Y. March 31, 2018) (rejecting proposed settlement agreement under Rule 23(e) and explaining that labeling provision of agreement was worthless).

Far from value, the addition will likely be used to further Monsanto's defenses. The settlement agreement explicitly allows Monsanto to continue to argue its preemption defense. *See* Settlement Agreement, § 12.7(i), Dkt. 12531-2, p. 73 of 266. No doubt an argument will be

---

[42] Bayer Annual Report 2020 (Feb. 25, 2021) at 64, *available at* https://www.bayer.com/sites/default/files/2021-02/Bayer-Annual-Report-2020.pdf

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

made to state courts around the country that, based upon this Court's *imprimatur* of a labeling

requirement, actions should be preempted.

> **C.**     **The One-Way Ability to Use the Science Panel's Findings Provides No Benefits to the Class.**

As if this brief has not delineated enough one-sided provisions, the ways that the science

panel's conclusions may be used outside of the framework of NHL tort litigation stretches any

possible bounds. The settlement at Section 12.3(f) actually states:

> The **agreement and stipulation** regarding evidentiary use of the Science Panel Determination **shall not apply** in any legal, legislative, administrative, or regulatory action, proceeding, or matter between an Opt Out and any Monsanto Party or Related Party**, but nothing in the Settlement Agreement precludes a Monsanto Party or Related Party from seeking to introduce or otherwise use the Science Panel Determination in such a lawsuit or other proceeding or matter in any way**. (emphasis supplied)

Settlement Agreement, § 12.3(f), Dkt. 12531-2, p. 67 of 266. Nothing more needs to be said

other than what possible benefit could this provision provide to the class when the results of the

science panel can only be used by Monsanto outside of tort litigation? On the other hand, the

benefit to Monsanto is obvious.

## VI.     THE COMPARATOR SETTLEMENTS THAT THIS COURT IS POINTED TO ARE NOTHING LIKE THE SETTLEMENT PROPOSED HERE

> **A.**     **"In re Diet Drugs."**

The Motion for Preliminary Approval emphasizes that the class settlement is modeled off

of the *In re Diet Drugs* settlement. *See, e.g.*, Preliminary Approval Motion, Dkt. 12531, pp. 13

n.1, 18 of 83. It does not emphasize that at the time of the settlement the implicated drug had

long been off the market and was not continuing to be sold. It does not emphasize that any label

changes would be unnecessary for a withdrawn drug. It does not emphasize that a science panel

was not created, even though dose is far easier to calculate for a prescription pharmaceutical. It

does not emphasize that the compensation scheme within the settlement was substantially more

---

44

for the suspect heart valve disease than the compensation here for a much deadlier cancer. In fact, the only similarity between these cases is the release of punitive damages for those who exercised their back end opt-out. However, even settlement proponents admit that unlike the release of medical monitoring here, in *Diet Drugs* the punitive-damages release was deemed fair in part because it left intact a "medical monitoring program." *Id.* at p. 60 of 83 (*citing In re Diet Drugs Prods. Liab. Litig.*, Nos. 1203, 99–20593, 2000 WL 1222042 at *49 n.22 (Aug. 22, 2000)).

Moreover, far from being a positive example of the trial efficacy of limiting all damages to a compensatory component, the *Diet Drugs* case illustrates the myriad problems caused by eliminating such damages in state court cases. In *Diet Drugs*, the plaintiffs who tried to exercise a "downstream" opt-out, exiting to the tort system, found themselves enjoined by the federal court from: 1) offering into evidence in the state court trials a long list of extremely relevant evidentiary exhibits and depositions; 2) making any statement or argument to the court or to the jury related directly or indirectly to the forbidden evidence; or 3) introducing any evidence or making any statement before or argument to the court or jury related directly or indirectly to malicious, wanton "or other similar conduct of Wyeth, however described." *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*, 369 F.3d 293, 302-03 (3d Cir.) (quoting PTO 2625), *cert. denied*, 543 U.S. 960 (2004); *see also id.* at 300-01 (quoting PTO 2625, PTO 2680). Two plaintiffs, Clara Clark and Linda Smart, found their trial counsel slapped with injunctions, and their state court trials could not be held until after the plaintiffs' counsel successfully appealed to the Third Circuit.

Far from being a model of judicial efficiency, *Diet Drugs* illustrates that federal limits imposed on state court trials create a practical quagmire for the plaintiffs and a gift to defendants

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

with opportunities to delay trial settings and box plaintiffs into Hobson's choices (*e.g.*, whether to risk a trial delay to appear in federal court and fight off injunction threats). While the MDL court's injunctions were reversed "[i]nsofar as the injunctions barred the use of evidence that was relevant to genuine issues in the state trial–apart from punitive, multiple, or exemplary damages," 369 F.3d at 315, the injunctions made "it very difficult for plaintiff to try the case." *Id.*

B.        **"In re National Football League Players Concussion Injury Litigation."**

As this court made clear in Pretrial Order No. 214, the class of everyone exposed to Roundup in the United States is in no way comparable to the known and identifiable class of retired, professional NFL football players whose head injury claims were settled in *In re National Football League Players Concussion Injury Litigation*, 821 F.3d 410 (3d Cir. 2016) ("*NFL Concussion*"). Pretrial Order No. 214, Dkt. 11182, p. 3 of 4. Nevertheless, settlement proponents still cite to this case nine times in their motion.

More specifically, unlike the diffuse population of the Roundup class, the estimated population of retired players in *NFL Concussion* was 21,070, and over 5,000 filed suit in the MDL proceedings. 821 F.3d at 425, 433, 438. The estimate of class members who received notice of the settlement through direct mail and secondary publication was 90%—and that notice was in addition to the extensive national media coverage of the case. *Id*. at 438. The Third Circuit reasoned that, "[b]y the time of the settlement, many of the retired players in this class already had counsel and had sued the NFL, suggesting that their claims were valuable enough to pursue in court and that the players were informed enough to evaluate the settlement." *Id.* (note omitted).

In *NFL Concussion*, the monetary award that class counsel secured for the retired athletes was uncapped and inflation adjusted. *Id*. at 432. The Third Circuit was able to conclude that

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

future claimants were in fact thus adequately represented in the negotiations. *Id.* at 433. Class counsel had "a comprehensive database of the claims and symptoms of retired players." *Id*. at 436. Of the 5,000 who filed suit, an estimated 3,900 had no current qualifying diagnosis of head injury. *Id*. at 433. Because so many retired players "with no currently compensable injuries have already taken significant steps to protect their rights and interests," the class was not defeated by *Amchem*'s strict analysis of adequacy of representation and the Supreme Court's concern that the risk apparent to a "futures" asbestos class would be too nebulous for their rights and interests in the settlement to be protected. *Id*. Thus, *Amchem*'s inadequacy of representation holding was distinguishable in *NFL Concussion,* because approximately a quarter of the entire class filed suit. The class participation in *NFL Concussion* is certainly not in any way comparable to the situation here.

The *NFL* settlement also is distinguishable because the terms of individual settlements were substantial, unlike the minimal payments to cancer victims here. The *NFL* settlement compensated retired players who had one of six qualifying diagnoses in amounts ranging from $1.5 million to $5 million per class member. *Id*. at 423-24. The settlement is not only uncapped and inflation-adjusted, but it also will remain in place for 65 years, and does not require that the player show that his time in the NFL caused the onset of the qualifying diagnosis. *Id.* at 425, 433. The Third Circuit thus agreed that the settlement represented a fair deal.

### C.        "In re Deepwater Horizon."

The settlement of the BP oil spill resolved claims arising from a single past event with class members limited to cleanup workers and coastline residents within a specific geographical area that had already developed a "Specified Physical Condition." *See* BP Medical Settlement Agreement, *Deepwater Horizon*, Rec. Doc. 6273-1 (April 18, 2012) at ¶¶ I(A); *In re Oil Spill by*

the Oil Rig "Deepwater Horizon in the Gulf of Mexico on April 20, 2010, 295 F.R.D. 112, 133

(2013).

As stated in the Declaration of Stephen J. Herman, Co-Lead Class Counsel, attached as

Exhibit "B" at para.26:

> There are important differences between the BP Medical Class Settlement and the
> Proposed Class Settlement in the above-captioned case, including particularly: a.
> BP was a "single event" case; b. All of the relevant exposure had already
> occurred; c. The class members could be specifically identified and provided with
> individualized notice; d. All of the claims were governed by general maritime
> law; e. The BP Medical Class Members were entitled to **both** immediate
> compensation from the settlement program for acute and chronic conditions **and
> also** the ability to come back and sue BP in the future in the event of a later-
> manifested physical condition or disease; and f. The potential future claims for
> punitive damages that were released in the Back-End Litigation Option process
> were uncertain and legally challenging.

Unlike here, where class members who opt out on the back end must stipulate to the

admissibility of a (likely adverse) Science Panel determination on causation, the *Deepwater*

*Horizon* defendants agreed to stipulate to both exposure and BP's fault, limiting the necessary

issues for trial for those who chose the Back-End Litigation Opt-Out option. (See the Declaration

of Stephen J. Herman at fn. 8) Here, Defendant Monsanto has not conceded anything in

exchange for Plaintiffs' concessions.

## VII.   CONCLUSION

For the foregoing reasons, the Court should deny preliminary approval to the proposed

settlement and strike the Declaration of Amit R. Mehta, M.D.

March 4, 2021                                  */s/ Gerson H. Smoger*
                                               Gerson H. Smoger
                                               SMOGER &ASSOCIATES
                                               13250 Branch View Lane
                                               Dallas, TX 75234
                                               (510) 531-4529
                                               (510) 531-4377 (facsimile)
                                               gerson@texasinjurylaw.com

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC

Steven M. Bronson, Esq. (SBN 246751)
**THE BRONSON FIRM APC**
7777 Fay Avenue, Suite 202
La Jolla, CA 92037
Telephone: 619-374-4130
Facsimile: 619-568-3365
sbronson@thebronsonfirm.com

*Counsel for Objector Melinda Sloviter*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of March 2021, a copy of the foregoing Objection was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

*/s/ Gerson H. Smoger*
Gerson H. Smoger
SMOGER &ASSOCIATES
13250 Branch View Lane
Dallas, TX 75234
(510) 531-4529
(510) 531-4377 (facsimile)
gerson@texasinjurylaw.com

Objector Sloviter's Brief in Opposition to Motion for Preliminary Approval
Case No. 16-md-02741-VC