# EXHIBIT A

# DECLARATION OF GERSON H. SMOGER

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | * * * * | MDL No. 2741<br><br>Case No. 3:16-md-02741-VC |
| This Document Relates to: | * * * | DECLARATION OF GERSON H. SMOGER, J.D., Ph.D. IN SUPPORT OF |
| Ramirez, et al.<br><br>       Plaintiff(s),<br><br>v.<br><br>Monsanto Co.,<br><br>       Defendant(s). | * * * * * * * * * * | OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS SETTLEMENT, APPOINTMENT OF INTERIM CLASS AND SUBCLASS COUNSEL<br><br>Judge Vince Chhabria |
| Case No. 3:19-cv-02224 | * * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I, Gerson H. Smoger, declare as follows:

1. I am an attorney licensed to practice law in the states of California and Texas, as well as numerous federal courts, including the United States Supreme Court. Before February 3, 2021, I have not represented anyone with respect to Roundup containing glyphosate. No one is paying me

Declaration of Gerson H. Smoger, Ph.D., J.D.
Case No. 3:16-md-02741-CV; Page 1 of 7

either for preparing this declaration or the brief it is being attached to.

2.  For three decades I have served as the Chair or Co-chair of the American Association for Justice's Herbicides and Pesticides Litigation Group. I also currently serve on the boards of Public Citizen and Public Justice, and as the Vice-Chair of the Pound Civil Justice Institute. I serve on the advisory boards of U.C Berkeley's Civil Justice Research Initiative, the Human Rights Center at U.C. Berkeley, and Physicians for Human Rights. I have previously served as the Vice-Chair of the American Bar Association's Toxic Torts, Hazardous Substances and Environmental Law Committee. I received my J.D. from Berkeley Law (formerly Boalt Hall) and my Ph.D. from the University of Pennsylvania.

3.  As a trial lawyer, in 2012 I was named by Public Justice as Trial Lawyer of the Year. During my career, one of my specialties has been in trying toxic tort cases. I have both tried to verdict and represented plaintiffs exposed to herbicides.

4.  As to the claims of future class members, I successfully argued the case of *Stephenson v. Dow Chem. Co.*, 273 F.3d 249 (2d Cir. 2001) *aff'd in relevant part by evenly divided vote and rev'd in part sub nom. Dow Chem Co. v Stephenson*, 539 U.S. 111 (2003) in both the Second Circuit and the United States Supreme Court. These courts affirmed the right to collaterally attack the 1984 Agent Orange settlement, which had purported to settle the claims of future claimants who had no injuries at the time of the settlement. (To clarify the "rev'd,", the Supreme Court affirmed the case of *Stephenson* in its entirety but remanded the companion *Isaacson* case related to a question regarding whether it has been properly removed from state court.)

5.  The facts regarding Agent Orange and herbicide exposure stated herein became known to me through my extensive experience as a litigator representing the rights of individuals exposed to Agent Orange, as a member of the Agent Orange Coordinating Council, and in other litigation where these issues were central. The basis for my knowledge includes the documentary and testamentary evidence uncovered in litigation and through my service on the Council, depositions that I personally took as a litigator (including one identified below), trial exhibits, a wealth of scientific literature and evidence (including studies and sources identified herein), and scientific conferences I was invited to attend and participate in.

6. Agent Orange was a 50/50 mixture of two herbicides, 2,4,5-T and 2,4-D. The development and use of these herbicides began towards the end of World War II. Widespread use in agriculture began in the early 1950s.

7. Monsanto was one of the major manufacturers of 2,4,5-T. It manufactured its 2,4,5-T at a plant in Nitro, West Virginia. Almost immediately, workers at the plant started to get ill, many suffering from a skin condition called chloracne. It was later found that the implicated chemical was an impurity endemic to the 2,4,5-T production process, (TCDD) which has been colloquially called dioxin though it is only one of a number of dioxin congeners.

8. Monsanto sold its 2,4,5-T both domestically and for use in Vietnam. An estimated 19 million gallons of Agent Orange were mixed, loaded, and sprayed in Vietnam. Dow Chemical also produced 2,4,5-T.

9. In 1965, Dow Chemical found that the higher the temperature used to manufacture 2,4,5-T, the more dioxin was created. Dow changed its manufacturing processes and shared these changes with Monsanto. Monsanto rejected these changes and did not change their production processes. Higher temperature production resulted in greater and quicker production, meaning more money could be earned by Monsanto by continuing to manufacture as it did.

10. With the widespread international use of 2,4,5-T in agriculture and the massive use of it during the Vietnam War, beginning in the early 1970s the medical and scientific community began directing its attention to determining whether adverse health effects were associated with 2,4,5-T.

11. Because cancers, especially lymphopoietic malignancies, such as lymphomas and myelomas, can have lengthy latency periods, the ability of epidemiology to capture such malignancies in studies due to herbicide exposure did not begin to occur for decades. As such, almost three decades passed following the first widespread use of 2,4,5-T before independent scientists began to implicate 2,4,5-T as a causative agent for cancer.

12. The first reported evidence of any linkage came from Sweden with clinical reports in the late 1970s by a group of Scandinavian physicians. *See, e.g.,* L. Hardell, *Malignant Lymphoma of Histiocytic Type and Exposure to Phenoxyacetic Acids or Chlorophenols*, Lancet 55-56 (Jan. 6,

1979); H. Olsson, *Non-Hodgkin's Lymphoma of the Skin and Occupational Exposure to Herbicides*, Lancet 579-580 (Sept. 12, 1981). These were followed with epidemiological studies by the same group. *See* L. Hardell, *Malignant Lymphoma and Exposure to Chemicals, Especially Organic Solvents, Chlorophenols and Phenoxy Acids: A Case-Control Study*, British J. Cancer 43, 169-176 (1981); L. Hardell, *Relation of Soft-Tissue Sarcoma, Malignant Lymphoma and Colon Cancer to Phenoxy Acids, Chlorophenols, and Other Agents*, Scand. J. Work Environ. Health 7, 119-130 (1981).

13. In the early 1980's while several lawsuits related to 2,4,5-T were proceeding, including those by Vietnam veterans, two studies of the highly exposed Monsanto workers in Nitro, West Virginia were published: Judith A. Zack and William R. Gaffey, *A Mortality Study of Workers Employed at the Monsanto Company Plant in Nitro, West Virginia*, *in* Human and Environmental Risks of Chlorinated Dioxins and Related Compounds 575-91 (R. Tucker, A. Young, and A. Gray, 26 vol. 1983) and Judith A. Zack and Raymond R. Suskind, *The Mortality Experience of Workers Exposed to Tetrachlorodibenzodioxin in a Trichlorophenol Process Accident*, Journal of Occupational and Environmental Medicine 22, 11-14 (Jan. 1980). These studies showed no statistically significant increase in cancers among the very highly exposed workers. Monsanto issued a press release headlined "Study Fails to Link 'Agent Orange' to Deaths of Industrial Workers." Both at the EPA and in the Agent Orange litigation these studies were used to buttress Monsanto's position that human beings, unlike animals, were relatively immune from the effects of 2,4,5-T's contaminant and that the significant toxicological findings should be ignored.

14. A review after the Agent Orange litigation was settled revealed inconsistencies between the two papers of the Monsanto workers in Nitro, West Virginia. The studies used different measures to estimate exposure, which resulted in workers listed as unexposed in one study being listed as exposed in the other. Additionally, other workers who should have been included were not. I deposed Monsanto's epidemiologist William R. Gaffey and he testified that the data was all assembled for his study *before* he created the study protocol. This is something that should never be done when conducting an epidemiological study as it leads to the ability to adjust the protocol to "fit" the data.

15. Due to toxicological evidence showing that TCDD was one of the most potent carcinogens ever studied (which was known to Monsanto scientists while it was being sold) in 1985 the Environmental Protection Agency terminated all uses of 2,4,5-T in the United States.

16. Beginning in 1990, I represented the Agent Orange Coordinating Council on a *pro bono* basis. This council was put together by Admiral Elmo Zumwalt, Chief of Naval Operations in Vietnam. The Council was compromised of 25 veteran service organizations, including the American Legion, the Veterans of Foreign Wars, the Disabled American Veterans, and the Vietnam Veterans of America. The purpose of the Council was to seek compensation for Agent Orange-exposed Vietnam veterans. Through 1990 there was no compensation available for Agent Orange exposure from the then Veterans Administration. A team was created by the Council to lobby Congress to either compensate veterans or at least study the adverse human health effects of Agent Orange exposure. This three-person team included a representative from the Vietnam Veterans of America, Admiral Zumwalt, and me.

17. In response to the concerns voiced by Vietnam veterans, their families and the scientific community, Congress recognized a need for an objective scientific appraisal of the association between the increased risk of disease and exposure to Agent Orange and the other herbicides used in support of military operations in Vietnam. In 1991 Congress passed the Agent Orange Act of 1991, Pub. L. No. 102-4, § 3, 105 Stat. 11, 13-15 (codified as amended at 38 U.S.C. § 1116 (1991)).

18. The law tasked the National Academy of Science's Institute of Medicine (NAS-IOM) to create a special committee to study the science and medicine regarding the herbicides used in Vietnam. After an extensive review, the NAS-IOM committee concluded that "sufficient evidence" existed to find a "positive association" between exposure to Agent Orange and the onset of three cancers: soft tissue sarcoma, non-Hodgkin's lymphoma, and Hodgkin's disease.

19. Pursuant to ongoing studies and analysis by the NAS-IOM, over time research has periodically led to a number of compensable conditions related to herbicide exposure: 1) in 1994, Chloracne, Hodgkin's disease, Non-Hodgkin's Lymphoma, Porphyria Cutanea Tarda, Respiratory Cancers, and Soft Tissue Sarcomas; 2) in 1996, Prostate Cancer; 3) in 1998, Multiple Myeloma; 4) in

Declaration of Gerson H. Smoger, Ph.D., J.D.
Case No. 3:16-md-02741-CV; Page 5 of 7

2000: Diabetes Mellitus Type 2; 5) in 2007: AL Amyloidosis; 6) in 2008, ischemic heart disease and Parkinson's Disease; and 7) in 2010, peripheral neuropathy.

20. Monsanto's conduct with regard to its relatively more recent herbicide, Roundup with glyphosate, has not been dissimilar from the way it previously handled its 2,4,5-T herbicide. This is demonstrated, for instance, by MONGLY03400272-MONGLY03400273, MONGLY03316369-MONGLY03316371, and MONGLY02078597 – MONGLY02078599 which were each listed as exhibits in the Sixth Amended plaintiffs' Exhibit List in the trial of *Pilliod v. Monsanto*, case number RG17862702, in the Superior Court of the State of California, County of Alameda (Exhibit List attached hereto as Exhibit A1).

21. MONGLY03400272 - MONGLY03400273 is an internal Monsanto power point on Monsanto's business objective called Freedom to Operate, or FTO. It was admitted as Plaintiffs' Exhibit 464 in the trial of *Pilliod v. Monsanto*, case number RG17862702, in the Superior Court of the State of California, County of Alameda (Attached hereto as Exhibit A2). It shows that Monsanto had corrupted segments of the published scientific literature and improperly influenced governmental agency positions on glyphosate generally and Roundup specifically. Monsanto's business objective behind these endeavors is internally called its "freedom to operate," which means the freedom to sell chemicals unencumbered by the reality of the harmful effects they may cause.

22. MONGLY03316369 - MONGLY03316371 is an internal Monsanto memo on Freedom to Operate. It was admitted as Plaintiffs' Exhibit 621 in the trial of *Pilliod v. Monsanto*, case number RG17862702, in the Superior Court of the State of California, County of Alameda (Attached hereto as Exhibit A3). It shows Monsanto's goals and plans to ensure their "Freedom to Operate" business objective.

23. MONGLY02078597 – MONGLY02078599 is a Monsanto internal email discussing how Monsanto "ghost wrote" the Williams, et al., 2000 paper. It was admitted as Plaintiff's Exhibit 9 in the trial of *Pilliod v. Monsanto*, case number RG17862702, in the Superior Court of the State of California, County of Alameda (Attached hereto attached as Exhibit A4). It shows that Monsanto routinely engaged in the practice of ghost-writing papers supposedly authored by independent academic scientists.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, that if called to testify I could and would testify competently to the facts stated in this declaration, and that this declaration was executed in Berkeley, California, on March 4, 2021.

*[signature]*

Gerson H. Smoger, J.D., Ph.D.

Declaration of Gerson H. Smoger, Ph.D., J.D.
Case No. 3:16-md-02741-CV; Page 7 of 7