Tobi L. Millrood
*President*
American Association for Justice
777 6th Street NW, Suite 200
Washington, DC 20001

Robert S. Peck*
*Counsel of Record*
Center for Constitutional Litigation, PC
2117 Leroy Place, NW
Washington, DC 20008
T: (202) 944-2874
F: (646) 365-3382
robert.peck@cclfirm.com

*Attorneys for Proposed Amicus Curiae*
*American Association for Justice*

*APPEARANCE PRO HAC VICE*
PER PTO-1 ENTERED 10/6/2016

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 16-md-2741-VC |
| THIS DOCUMENT RELATES TO: | **BRIEF OF THE AMERICAN ASSOCIATION FOR JUSTICE AS AMICUS CURIAE** |
| *Ramirez, et al. v. Monsanto Co.* Case No. 3:19-cv-02224 | Hon. Vince Chhabria |

i

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................... ii

TABLE OF AUTHORITIES ............................................................................... iiii

IDENTITY AND INTEREST OF AMICUS CURIAE ....................................... 1

SUMMARY OF ARGUMENT ............................................................................. 2

ARGUMENT ........................................................................................................ 5

    I.    THE SEVENTH AMENDMENT'S RIGHT TO TRIAL BY JURY PROVIDES
        FUNDAMENTAL PROTECTIONS TO LITIGANTS THAT MAY NOT BE
        UNKNOWINGLY AND UNINTELLIGENTLY WAIVED ........................................... 5

    II.   THE FUNDAMENTAL RIGHT OF ACCESS TO THE COURTS GUARANTEES
        LITIGANTS A MEANINGFUL OPPORTUNITY TO PURSUE THEIR CLAIMS
        AT A MEANINGFUL TIME .................................................................................. 19

CONCLUSION .................................................................................................. 26

CERTIFICATE OF SERVICE ........................................................................ 26

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

1

**TABLE OF AUTHORITIES**

2

<u>Cases</u>

3

*Aetna Ins. Co. v. Kennedy*, 301 U.S. 389 (1937) ............................................................. 6

4

*Aguilar-Ayala v. Ruiz*, 973 F.2d 411 (5th Cir. 1992) ..................................................... 9

5

6

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) .............................................. 1, 25, 26

7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................... 6, 8, 15

8

*Armstrong v. Manzo*, 380 U.S. 545 (1965) ..................................................................... 19

9

10

*Barnes v. Am. Tobacco Co.*, 989 F. Supp. 661 (E.D. Pa. 1997) ............................... 15, 16

11

*Barraza v. C. R. Bard Inc.*, 322 F.R.D. 369 (D. Ariz. 2017) .................................... 16

12

*Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959) .......................................... 16

13

*Blakely v. Washington*, 542 U.S. 296 (2004) ................................................................ 5

14

15

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) .................................................... 23

16

*Brady v. United States*, 397 U.S. 742 (1970) ......................................................... 5, 18

17

*Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016) ................................................ 17

18

*Carlough v. Amchem Prods., Inc.*, 158 F.R.D. 314 (E.D. Pa. 1993) ........................... 1

19

20

*Christopher v. Harbury*, 536 U.S. 403 (2002) ............................................................. 19

21

*Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424 (2001) .............. 23, 24

22

*Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993) ...................................... 11, 12, 13

23

24

*Day v. NLO*, 851 F. Supp. 869 (S.D. Ohio 1994) ....................................................... 16

25

*Diaz v. First Am. Home Buyers Prot. Corp.*, 732 F.3d 948 (9th Cir. 2013) .................. 18

26

*Dimick v. Schiedt*, 293 U.S. 474 (1935)......................................................................... 6

27

*Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) ................................................. 11

28

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ............................................................. 13

*Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66 (2013).......................................... 17

*Georgine v. Amchem Prods., Inc.*, 83 F.3d 610 (3d Cir. 1996) .................................. 25

*Gete v. I.N.S.*, 121 F.3d 1285 (9th Cir. 1997) ................................................................ 5

*Herber v. Johns-Manville Corp.*, 785 F.2d 79 (3d Cir.1986) ..................................... 16

*Hodges v. Easton*, 106 U.S. 408 (1882)......................................................................... 5

*In Paoli Railroad Yard PCB Litig.*, 35 F.3d 717 (3d Cir.1994) ............................... 16

*In re Nat'l Hockey League Players' Concussion Inj. Litig.*, 327 F.R.D. 245 (D. Minn. 2018).... 15

*In re Roundup Prods. Liab. Litig.*, No. 16-MD-02741-VC,
   2020 WL 3723305 (N.D. Cal. July 6, 2020) .................................................. 7, 21

*In re Unisys Sav. Plan Litig.*, 173 F.3d 145 (3d Cir. 1999) ....................................... 8

*Jacob v. New York City*, 315 U.S. 752 (1942) .............................................................. 5

*Johnson v. Zerbst*, 304 U.S. 458 (1938) .................................................................... 5, 6

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ............................................. 19

*Mathews v. Eldridge*, 424 U.S. 319 (1976)................................................................. 19

*Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020)................................................. 23

*Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322 (1979)......................................... 5

*Philip Morris USA v. Williams*, 549 U.S. 346 (2007).................................................. 24

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ............................................. 22

*Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 863 P.2d 795 (1993)............................ 15

*Primiano v. Cook*, 598 F.3d 558 (9th Cir. 2010) ....................................................... 12

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ........................................................ 13

iv

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

*S. Pac. Transp. Co. v. I.C.C.*, 871 F.2d 838 (9th Cir. 1989) ........................ 19

*Solis v. Cty. of Los Angeles*, 514 F.3d 946 (9th Cir. 2008) ........................ 18

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ............... 23

*Swearingen v. Gillar Home Health Care, L.P.*, 759 F. App'x 322 (5th Cir. 2019)........................ 9

*Tamosaitis v. URS Inc.*, 781 F.3d 468 (9th Cir. 2015) ........................ 5

*U.S. Sec. & Exch. Comm'n v. Jensen*, 835 F.3d 1100 (9th Cir. 2016) ......................... 18

*United States v. Olano*, 507 U.S. 725 (1993)........................ 5

*Walls v. Cent. Contra Costa Transit Auth.*, 653 F.3d 963 (9th Cir. 2011) ..................... 6

*Wyeth v. Rowatt*, 244 P.3d 765 (2010)........................ 25

## <u>Other Authorities</u>

Y. Bastion, *et al.*, *Elderly Patients with Aggressive non-Hodgkin's Lymphoma: Disease Presentation, Response to Treatment, and Survival,* J. of Clinical Oncology, Aug. 1997 ....... 20

Michael V. Ciresi, Roberta B. Walburn & Tara D. Sutton, *Decades of Deceit: Document Discovery in the Minnesota Tobacco Litigation*, 25 Wm. Mitchell L. Rev. 477 (1999) ......... 24

Fed. R. Evid. 401 ........................ 10

Fed. R. Evid. 402 ........................ 10

Fed. R. Evid. 702 ........................ 11, 13

Fed. R. Civ. P. 32 ........................ 9

K. S. Shrader-Frechette, Risk and Rationality: Philosophical Foundations for Populist Reforms (1991) ...................... 14

v

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

## IDENTITY AND INTEREST OF AMICUS CURIAE

The American Association for Justice (AAJ) is a national, voluntary bar association established in 1946 to strengthen the civil justice system, preserve the right to trial by jury, and protect access to the courts for those who have been wrongfully injured. With members in the United States, Canada, and abroad, AAJ is the world's largest plaintiff trial bar. AAJ members practice law in every state in the United States and primarily represent plaintiffs in personal injury actions, employment rights cases, consumer cases, and other civil actions. AAJ has served as a leading advocate for the right of all Americans to seek legal recourse for wrongful conduct. Victims of toxic exposure are frequently represented by AAJ members in their civil suits.

AAJ's mission, set forth in its bylaws, aims to "Preserve the constitutional right to trial by jury" and "Further the rule of law and the civil justice system." To that end, it often participates in cases throughout the country as amicus curiae. Relevant to the matter before this Court, AAJ participated in the district court as amicus curiae in *Carlough v. Amchem Prods., Inc.*, 158 F.R.D. 314 (E.D. Pa. 1993), which eventually became *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), in which it also participated as amicus curiae.

AAJ does not argue in support of either party in this case relating to the motion for preliminary approval and proposed settlement. Rather, AAJ speaks on behalf of the fundamental rights of trial by jury and access to the courts.

1

## SUMMARY OF ARGUMENT

Although the proposed settlement agreement (Agreement) addresses some of the specific concerns expressed by this Court with its previous iteration, the current version continues to raise serious constitutional concerns and, as such, does not warrant approval.

It erroneously treats the availability of a kind of jury trial for class members who reject an offer of compensation as sufficient to satisfy Seventh Amendment concerns, without coming to grips with the essential elements of that right that the proposal eliminates.

Nowhere is that disconnect with jury-trial rights more evident than with the proposed Science Panel. Though now deemed "advisory" rather than binding and its members now subject to at least one deposition, the Science Panel is accorded a cachet that gives it a preferred position as scientific fact, when, by the Agreement's own terms, it may not even reflect the actual conclusion reached by its four-year effort. If the panel unanimously agrees that general causation is established between Roundup and non-Hodgkin's lymphoma (NHL) but cannot assign a threshold dosage for exposure, the jury is falsely told that the panel concluded that causation was not proven. Even if that result is exposed through the depositions now being permitted by an amendment to the Agreement, the lack of document and other discovery, and the unavailability of cross-examination by counsel representing litigating parties, the Agreement allows false information to go to the jury and be entered as stipulated facts that cannot meet any conceivable test for introduction as evidence.

Moreover, regardless of the conclusion it reaches, the Panel and its work receive a special status that is not enjoyed by contrary evidence brought forth by the opposing party. That contrary

2

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

evidence must emerge from the crucible of a reliability challenge and be subject to vigorous cross-examination. On the other hand, the jury would see the Science Panel conclusions as so unassailable, being the product of so-called "independent" scientists selected by opposing parties and not subject to the standard type of instruction that expert evidence is not binding, that its conclusory evidence must be valid for it generated no cross-examination in court to raise questions about how it reached its conclusion and what it considered. The design and guaranteed admission of the Science Panel conclusion harms the jury's constitutionally consecrated responsibility as a factfinder who has exclusive responsibility to determine the credibility of evidence and the weight it should be accorded.

When, at least seven years down the road, the proposed settlement allows the Panel's conclusion to be subject to a reliability challenge, the challenge permitted is illusory and inconsistent with the standards employed under Federal Rule of Evidence 702 (Rule 702), which, at its most basic level, focuses on the reliability of the evidence to assist the factfinder.

The proposed settlement also cannot be reconciled with essential features of the right to jury trial when it eliminates the potential remedies of medical monitoring and punitive damages, for which there is no adequate quid pro quo. Both medical monitoring and punitive damages are determinations within the ambit of jury determination. The diagnostic grant program anticipated by the proposed settlement is not a substitute for medical monitoring when it is either unavailable to a class member or the class member chooses the medical provider.

Punitive damages vindicate each state's determination of what must be done to deter and punish egregious misconduct. Its elimination undermines that important public policy function

3

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

without justification. Moreover, the notion that Monsanto has been punished sufficiently by the scope of its liability and the amount of money it is putting into the settlement fails to apprehend that the assessment of punitive damages is individualized to a plaintiff, rather than the harm allegedly done to others. Finally, a bar on punitive damages also provides a free pass to Monsanto, which still does not admit that its product causes NHL, to engage in future misconduct that could affect class members while it undertakes steps as other industries have to advance a false narrative about its product.

The proposed settlement also abridges the fundamental right of access to the courts by denying a meaningful opportunity to pursue claims in the courts at a meaningful time. The delays occasioned by the Science Panel's study are unjustifiable, particularly in light of the largely useless evidence it will produce. As creative and extensive the notice regime it establishes is, it still fails to provide the type of notice that justifies inclusion in the class of persons who lack any perceptible NHL at the time of the settlement, for whom any notice at this time would be inadequate.

Constitutional requirements and values must inform the approval process for any proposed class settlement. That is true of the current proposal, as well as any future iterations of it. In this instance, respect for what the Constitution requires is lacking, and the proposal should not receive this Court's approval.

4

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

1

2

3

4

**ARGUMENT**

5

## I. THE SEVENTH AMENDMENT'S RIGHT TO TRIAL BY JURY PROVIDES FUNDAMENTAL PROTECTIONS TO LITIGANTS THAT MAY NOT BE UNKNOWINGLY AND UNINTELLIGENTLY WAIVED.

6

The Seventh Amendment establishes the right to trial by jury in civil cases as a fundamental

7

right. *Jacob v. New York City*, 315 U.S. 752, 752-53 (1942); *Hodges v. Easton*, 106 U.S. 408, 412

8

(1882); *see also Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 338 (1979) (Rehnquist, J.,

9

dissenting). The rights it embraces extend to plaintiffs and defendants alike. *Tamosaitis v. URS*

10

*Inc.*, 781 F.3d 468, 488 (9th Cir. 2015).

11

Like its criminal-jury counterpart in the Sixth Amendment, the civil jury "is no mere

12

procedural formality, but a fundamental reservation of power in our constitutional structure."

13

*Blakely v. Washington*, 542 U.S. 296, 305-06 (2004) (referring to the Sixth Amendment right). Its

14

fundamental qualities are not lightly put aside or diminished in any way.

15

16

To be sure, constitutional rights, including the jury-trial guarantee, are subject to forfeiture

17

or waiver. Forfeiture consists of "the failure to make the timely assertion of a right." *United States*

18

*v. Olano*, 507 U.S. 725, 733 (1993). Waiver, on the other hand, is the "intentional relinquishment

19

or abandonment of a known right." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). A valid waiver

20

of "constitutional rights not only must be voluntary but must be knowing, intelligent acts done

21

with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United*

22

*States*, 397 U.S. 742, 748 (1970). *See also Gete v. I.N.S.*, 121 F.3d 1285, 1293 (9th Cir. 1997)

23

(holding same and also establishing that clear and convincing evidence must support waiver)

24

(footnote omitted). Indeed, "federal courts 'indulge every reasonable presumption against waiver'

25

26

27

28

5

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

of fundamental constitutional rights' and 'do not presume acquiescence in the loss of fundamental rights.'" *Walls v. Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 969 (9th Cir. 2011) (quoting *Zerbst*, 304 U.S. at 464). *See also Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937) (applying the principle to the civil right to jury trial as a fundamental right).

Once empaneled, federal civil juries serve as judges of the facts, and "any seeming curtailment of [that role] should be scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935). The jury's factfinding function embraces prerogatives that must remain unimpaired in order to enable jurors to discharge their constitutionally confirmed responsibilities to make credibility determinations, weigh evidence, and draw legitimate inferences from the facts presented. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

Aspects of the proposed settlement burden the Seventh Amendment's jury-trial rights in ways that cannot be justified. In particular, members of the settlement class who do not accept a compensation offer and opt to pursue a jury trial must accept as evidence the conclusions of a Science Panel without the right to test those conclusions themselves in court through the crucible of cross-examination before the jury and must accept more limited remedies than otherwise available. In addition, certain future claimants with undiagnosed injury are forced into a settlement structure in which their jury rights are sharply curtailed. These constitutionally based flaws should not receive this Court's approval.

    **A.**    **The Mandate that the Science Panel's Conclusions Be Entered into Evidence Without Prior Full Discovery or Contemporaneous Cross-Examination Impinges on the Jury-Trial Right.**

6

In the previously proposed class settlement, this Court questioned, with good reason, the constitutionality and lawfulness of a proposal to treat as binding the conclusions of a science panel on issues of general causation. *In re Roundup Prods. Liab. Litig.*, No. 16-MD-02741-VC, 2020 WL 3723305, at *2 (N.D. Cal. July 6, 2020). Given that "judges have been allowing these cases to go to juries, and juries have been reaching verdicts in favor of the plaintiffs, awarding significant compensatory and punitive damages," this Court asked why "a potential class member [would] want to replace a jury trial and the right to seek punitive damages with the process contemplated by the settlement agreement?" *Id.* It further noted that the science at issue was "evolving" and could well establish a reliable causal connection that would prejudice a Roundup user later diagnosed with NHL who did not opt out of the settlement when the deadline for doing so was set. *Id.*

In response to the questions raised by the Court, the proponents of the settlement made the conclusions of the Science Panel "advisory," rather than binding. ECF No. 12509-2, Class Action Settlement Agreement, art. XII, § 12.3(c), at 61. The change from binding to advisory may make the problems noted by this Court less stark, but they remain evident as the Panel's conclusions cannot be challenged in the same way as opposing scientific evidence will be disputed. The special treatment accorded the Science Panel's unadorned conclusion provides it with an outsized influence on the jury despite the likelihood that it will be outdated at the time of its issuance.[1]

---

[1] The Science Panel is limited in its review to specified existing literature identified in the Agreement. ECF No. 12509-2, art. XII, § 12.3(a), (d), at 59-60. Should new and relevant studies be published during the course of its four-year existence, the panel may not add the new literature to its study unless the Settlement Administrator determines good cause exists to permit the new

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

      1.     *Admission of the Science Panel's conclusions without the challenges that will be made to opposing scientific evidence undermines the jury's constitutionally assigned factfinding function.*

As judges of fact, the jury-trial right includes all necessary elements to make jurors' determinations meaningful. The process for admitting evidence, including expert testimony, cannot detract from the jury's responsibility to make credibility determinations, *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 167 (3d Cir. 1999), or to assign weight to competing evidence. *Anderson*, 477 U.S. at 255. The rules governing the proposed Science Panel, however, do precisely that.

The new proposal grants unquestioned admissibility to the Science Panel's determinations on causation in the jury trials of class members for at least a three-year period of time following the Panel's four-year study period. ECF No. 12509-2, art. XII, § 12.3(d), at 61-63. Moreover, the Panel's decision on causation and threshold exposure levels is deemed admissible notwithstanding any "subsequent changes in facts, law, or scientific opinion regarding Roundup Products, Roundup Claims, or the issues determined by the Science Panel." ECF No. 12509-2, art. XII, § 12.5(a), at 64. The Agreement thus overrides both law and scientific fact as admissible evidence, yet cannot be questioned. While new developments might otherwise undermine the reliability of the panel evidence, the manner of its presentation as the product of a four-year study by independent scientists selected jointly by counsel for plaintiffs and defendant would, perversely, give it enhanced reliability in the eyes of the jury.

---

scientific evidence's inclusion after receiving a petition seeking that permission from the Science Panel and after considering the responsive views of the parties to the Agreement. ECF No. 12509-2, art. XII, § 12.3(e), at 60.

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

Although "subject to argument, to contrary evidence, and to challenge based on subsequent scientific development,"[2] the Panel's conclusions will be developed in private under strict confidentiality rules and largely immune from discovery. ECF No. 12509-2, art. XII, § 12.6(a) & (b), at 64-65. In addition, no member of or person knowledgeable about the Science Panel's determinations may be called as a "fact witness, an expert witness, or in any other capacity," ECF No. 12509-2, art. XII, § 12.6(c), at 65, rendering the conclusions exempt from cross-examination. An eleventh-hour amendment to the Agreement now authorizes depositions of each Panel member, if adverse to the class, by a court-appointed examiner for the settlement class. ECF No. 12665-1, at 2, adding new § 12.6(d). This new substitute for in-court examination is more than weak tea. It is harmful error where credibility is at issue. *See Swearingen v. Gillar Home Health Care, L.P.*, 759 F. App'x 322, 326 (5th Cir. 2019) ("Only through live cross-examination can the jury fully appreciate the strength or weakness of the witness'[s] testimony, by closely observing the witness'[s] demeanor, expressions, and intonations.") (quoting with ellipses, *Aguilar-Ayala v. Ruiz*, 973 F.2d 411, 419 (5th Cir. 1992)).

> 2. *The agreement mandates that false expert evidence be admitted without any opportunity to show its falsity.*

The inability to probe the Science Panel's conclusion before the jury is sufficient by itself to demonstrate an irreconcilable conflict with what is essential for the jury to make its credibility and weight judgments. *See id.* Federal Rule of Civil Procedure 32(a)(4) permits a party to use "the

---

[2] It is unclear whether the limitation of "challenge based on subsequent scientific development" forecloses use of existing science at odds with the panel's conclusions.

9

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

deposition of a witness, whether or not a party, if the court finds ... (E) on motion and notice, that exceptional circumstances make it desirable—in the interest of justice and with due regard to the importance of live testimony in open court—to permit the deposition to be used." Neither as a general matter can it be anticipated in each and every case a class member litigates that Rule 32(a)(4) can be satisfied. That truism advises that this Court reject the plans for the Science Panel. Still, one further feature of the settlement even more starkly demonstrates how far off the rails and how one-sided the proposal is.

If the Science Panel concludes that general causation exists, and even reaches that conclusion unanimously, the jury will still be told that the panel found "Causation Not Shown," if the panel members cannot agree on a threshold internal dose level for NHL. ECF No. 12509-2, art. XII, § 12.3(b), at 61-63. To be clear, if all Panel members agree that the literature inexorably supports the conclusion that long-term use of Roundup causes NHL, but splinter among themselves at what threshold dosage level triggers NHL, the jury will be told that the Panel concluded that there is no causal connection between Roundup and NHL, the exact opposite of what the panelists found. Depositions, after the fact, confirming that situation demonstrate that the Science Panel stipulation that must be entered into evidence upend the entire reason for rules governing the admissibility of evidence. The rules make only relevant evidence admissible, Fed. R. Evid. 402, and introduction of a false portrayal of the Science Panel's conclusion on causation neither meets the test for relevancy, *see* Fed. R. Evid. 401, nor may be "stipulated" into evidence by agreement of the parties.

10

The Agreement's new anticipated minuet of introducing the false conclusion and then allowing it to be undermined by deposition reading without instruction to the jury that the stipulation is not binding can only confuse the jury, rendering it incompetent at the outset as expert evidence, which is required to be reliable and aid the jury. Fed. R. Evid. 702.

The automatic admissibility requirement thus sanctions presentation to the jury of false evidence and gives that evidence an imprimatur of reliability and neutrality not enjoyed by any conflicting evidence introduced by the opposing party. The settlement's requirement of admissibility without full discovery or in-court cross-examination then strikes at the heart of the jury's constitutionally mandated function of assessing the evidence by giving special – and unwarranted – cachet to the panel's *reported* conclusion.

>    3.    *The door opened to Daubert/Frye challenges is illusory.*

Three years after the Science Panel reports its conclusion on causation,[3] the proposed settlement makes its admissibility subject to challenge under *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993), or *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). ECF No. 12509-2, §

---

[3] The three-year moratorium on admissibility challenges, in reality, extends even longer than three years. Any challenge must be based on new scientific evidence that "did not exist during the Scientific Analysis." ECF No. 12509-2, art. XII, § 12.5(b), at 64. If it takes four years for the Science Panel to survey already identified relevant literature, as the settlement suggests, then a new study that did not exist until after that date, may take even longer, suggesting that admissibility challenges based on new science may not be available when the moratorium on admissibility challenges is finally lifted. Equally problematic, a study published while the Science Panel was engaged but not considered by it would be ineligible to serve as a basis for the *Daubert* challenge under the proposed settlement. The limitations imposed even seven years after the settlement is approved undermine a jury's access to credible and reliable expert evidence and cannot be reconciled with the Seventh Amendment.

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

12.5(b), at 64. Still, the type of *Daubert/Frye* challenge permitted is an absurdly truncated one. As the Ninth Circuit has explained, a *Daubert* assessment examines the "reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing *Daubert*, 509 U.S. at 592-94). To test admissibility, the opposing party does not muster contrary scientific evidence, as the settlement agreement suggests would happen at this point, but instead attacks the methodology employed through an examination of the process and through cross-examination. *Id.* (citing *Daubert*, 509 U.S. at 596). The Agreement renders that impossible because of the confidentiality requirements and bar on calling witnesses knowledgeable about the process.

The newly amended proposed Agreement permitting depositions of Panel members fails to resolve these problems and still may not be introduced in a hearing to test the evidence's reliability. The three-year delay in reliability challenges places any deposition testimony, no matter how relevant, off limits, during which the Science Panel evidence is introduced and deemed "stipulated." Even when *Daubert/Frye* challenges are permitted, the Agreement still limits those challenges to contrary evidence, not to methodological challenges, based solely on "new scientific evidence" that renders "the Science Panel Determination inadmissible." ECF No. 12509-2, art. XII, § 12.5(b), at 64.

Notably, the contrary scientific evidence proffered by the party opposing the Science Panel conclusion remains subject to the full array of *Daubert/Frye* challenges. In other words, the settlement asks this Court "to license one side of a debate to fight freestyle, while requiring the

12

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

other to follow Marquis of Queensberry rules," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992), a result this Court should not abide.

The requirements for presentation of the Science Panel conclusion and the limitations on its characterization by the opposing party places an unwarranted judicial thumb on the scales in favor of the Science Panel findings and impinges on jury functions protected by the Seventh Amendment. Courts admit an "expert's scientific, technical, or other specialized knowledge [if it] will help the trier of fact to understand the evidence or to determine a fact in issue," and is reliable. Fed. R. Evid. 702. If it is unhelpful to the factfinder, it is not admissible. The scientific knowledge conveyed must be "ground[ed] in the methods and procedures of science." *Daubert*, 509 U.S. at 590.

A district court will not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," because a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Yet, with respect to the causation conclusion and the exposure threshold that the Science Panel adopts, the settlement proposal requires acceptance of an expert *ipse dixit*, without regard to the studies consulted, the weight given to any particular study or set of studies, the methodology employed to weigh contrasting studies, or the extent of information available to determine the exposure threshold, even after the new amendments, for at least the three-year period following the Science Panel's work.

Critically, the special status that envelops the Panel's conclusions provides it with credibility that does not attend contrasting scientific evidence that, while admissible, could be

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

subject to criticism on precisely the same grounds as the Science Panel's conclusions. The jury, however, will be aware only of one side's evidentiary flaws, even if identical to those that might be lodged against the Science Panel. Moreover, the unquestioned admissibility of a scientific conclusion that was the product of four years of study by scientists selected by both Monsanto and class counsel provides it with an air of validity and reliability that will not be accorded a distinguished expert offered by the other side. The expert is "sponsored" by a side and will lack the false neutrality claimed by the Science Panel[4] by virtue of its selection process. It is human nature to question a scientific opinion subjected to relentless cross-examination, even if objectively reliable and credible, yet treat a conclusion that has not received similar treatment in court, such as the proposed Science Panel's reported determination, as beyond reproach. In our adversarial system, where evenhandedness is a watchword, this approach cannot be tolerated. The resulting differential treatment of the two pieces of expert evidence undermines the jury's ability to make

---

[4] Though the Science Panel is intended to be "independent" of the parties, see ECF No. 12509-2, § 12.1(c), at 58, that criterion is not the same as being neutral. Scientific methodology recognizes that all researchers suffer from "contextual biases" that reflect a person's "personal, social, cultural, or philosophical emphases," and which play into an assessment of risk based on "existing probabilistic data" that may not fit the approach the researcher would take if "conducting their own (new) studies." K. S. Shrader-Frechette, Risk and Rationality: Philosophical Foundations for Populist Reforms, at 40 (1991) (parenthetical in orig.). Because "scientists and risk assessors make constitutive value judgments whenever they follow one methodological rule rather than another," contextual biases are "impossible to avoid." *Id.* at 41. That inherent bias that from methodological preferences suggests that reliability and credibility require delving into the basis for an opinion and what might have been discounted in arriving at that opinion, rather than simply accepting an unexplored conclusion as the proposed settlement requires.

14

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

the credibility and weight determinations that is part of its constitutionally protected responsibilities. *See Anderson*, 477 U.S. at 255.

**B.     The Limitation on Remedies for Class Members Choosing a Jury Trial Also Burdens Seventh Amendment Rights.**

Class members who choose not to accept a settlement offer and opt instead for a jury trial lose the opportunity to seek medical monitoring and punitive damages. ECF No. 12509-2, art. XVII, § 17.1(a) & (b). Both limitations improperly burden the right to trial by jury.

*1.     Medical monitoring claims must be presented to a jury.*

At least 23 states, and quite possibly more, permit medical monitoring as a remedy at least in some cases. *See In re Nat'l Hockey League Players' Concussion Inj. Litig.*, 327 F.R.D. 245, 260-63 (D. Minn. 2018) (noting the different approaches to medical monitoring and stating that other states provide ambiguous guidance about medical monitoring). California, for example, holds that "the cost of medical monitoring is a compensable item of damages where the proofs demonstrate, through reliable medical expert testimony, that the need for future monitoring is a reasonably certain consequence of a plaintiff's toxic exposure and that the recommended monitoring is reasonable." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1009, 863 P.2d 795, 824 (1993).

Presentation of claims for compensation to pursue medical monitoring fit within the jury's ambit. In *Barnes v. Am. Tobacco Co.*, 989 F. Supp. 661 (E.D. Pa. 1997), *aff'd on other grounds*, 161 F.3d 127 (3d Cir. 1998), *cert. denied*, 526 U.S. 1114 (1999), a plaintiff class of smokers filed a medical-monitoring case against cigarette manufacturers. The defendant-manufacturers

15

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

demanded a jury pursuant to the Seventh Amendment, which the plaintiffs resisted because, rather than damages, the plaintiffs sought a medical-monitoring *program*. Holding that the cause of action sounds in negligence and was analogous to an action for future medical expenses, the court found that, "although the relief requested by plaintiffs is considered equitable,"  it is informed by the fact that the plaintiffs also had "an adequate remedy at law—the award of lump sum damages," rendering the relief sought under plaintiffs' medical monitoring fund, for the purposes of the Seventh Amendment analysis, . . . inherently both legal and equitable." *Id.* at 668. The *Barnes* court noted that medical monitoring cases are often submitted to jury determination. *Id.* (citing *In Paoli Railroad Yard PCB Litig.*, 35 F.3d 717 (3d Cir.1994); *Herber v. Johns-Manville Corp.*, 785 F.2d 79 (3d Cir.1986); *Day v. NLO*, 851 F. Supp. 869 (S.D. Ohio 1994)).

Other courts have reached similar conclusions given either remedies prayer for of medical monitoring with compensatory damages or a medical-monitoring program funded by the defendant. *See Barraza v. C. R. Bard Inc.*, 322 F.R.D. 369, 386 (D. Ariz. 2017) (collecting cases). Further support for trying the case before a jury is found in *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 508 (1959), where the Court held that the presence of equitable remedies could not deprive a party of their jury-trial right for the indisputably legal causes.

Because a claim for medical monitoring entitles a plaintiff to the right to a jury trial, the elimination of that remedy, including damages that would fund medical monitoring of the plaintiff outside of the program established, the proposed settlement would impinge upon the plaintiff's right to trial by jury while providing nothing in return for giving up that right.

16

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

      2.     *Diagnostic services offered in the settlement, if unaccepted, cannot displace*
            *claims for medical monitoring before a jury.*

The settlement attempts to address the need for medical monitoring by establishing a "Diagnostic Accessibility Grant Program . . . to increase access to NHL Diagnostic Evaluation among Settlement Class Members, including to address regional disparity to such access through the distribution of grants to medical providers in specified service areas." ECF No. 12509-2, art. VIII, § 8.1, at 44. As laudable as it is to focus, as the proposal does, on underserved areas of the country where Roundup usage is prevalent, the program does not guarantee diagnostic monitoring to all class members nor does it allow class members to choose monitoring by their own physician. Where a class member does not receive diagnostic services, by design or choice, the loss of medical monitoring as a remedy comes without any *quid pro quo* in return.

No penalty should attach to the rejection of these settlement offers, as these class members receive no benefit. The Supreme Court has made plain that an unaccepted settlement offer cannot have legal consequence in federal court. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016). The Court held, adopting a critical passage from Justice Kagan's dissent from three years earlier:

> An unaccepted settlement offer—like any unaccepted contract offer—is a legal nullity, with no operative effect. As every first-year law student learns, the recipient's rejection of an offer "leaves the matter as if no offer had ever been made." Nothing in Rule 68 alters that basic principle; to the contrary, that rule specifies that "[a]n unaccepted offer is considered withdrawn." So assuming the case was live before—because the plaintiff had a stake and the court could grant relief—the litigation carries on, unmooted.

*Id.* at 162 (quoting with approval and adopting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 81 (2013) (Kagan, J., dissenting) (internal citations omitted)). The Ninth Circuit anticipated the

17

                                                 BRIEF OF THE AMERICAN
                                         ASSOCIATION FOR JUSTICE
                                           AS AMCIUS CURIAE
                                           Case No. 16-md-2741-VC

1   *Campbell-Ewald* holding, adopting it in *Diaz v. First Am. Home Buyers Prot. Corp*., 732 F.3d 948,

2   954 (9th Cir. 2013).

3

4       While supporters of the settlement may assert that the plaintiff has waived any jury right

5   with respect to medical monitoring because the settlement spells out the elimination of that remedy

6   for those who do not opt out of the settlement class entirely, the argument fails because it cannot

7   meet the standard for a valid waiver.

8

9       For fundamental constitutional rights, courts "'indulge every reasonable presumption

10  against waiver.'" *U.S. Sec. & Exch. Comm'n v. Jensen*, 835 F.3d 1100, 1107 (9th Cir. 2016)

11  (quoting *Solis v. Cty. of Los Angeles*, 514 F.3d 946, 953 (9th Cir. 2008)). A valid waiver of

12  "constitutional rights not only must be voluntary but must be knowing, intelligent acts done with

13  sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United

14  States*, 397 U.S. 742, 748 (1970).

15

16      The settlement subclass who is permitted to choose a jury trial after rejecting a monetary

17  offer receives no guaranteed benefit and must make the decision against opting out without

18  representation or knowledge that the diagnostic services may not be available and the

19  compensation actually offered is meager. A voluntary, knowing, and intelligent wavier is not made

20  behind such a veil of ignorance. For that reason, as explained further below, the notice and thus

21  the waiver is inadequate. That inadequacy, also explained below, is even more acute for Class 2

22  members, who have already been exposed to Roundup but have no diagnosis of NHL that would

23  permit them to seek damages now.

24

25

26

27

28

                                    18

1
2

**II.  THE FUNDAMENTAL RIGHT OF ACCESS TO THE COURTS GUARANTEES LITIGANTS A MEANINGFUL OPPORTUNITY TO PURSUE THEIR CLAIMS AT A MEANINGFUL TIME.**

3
4

The right of access to the courts is fundamental. *See Christopher v. Harbury*, 536 U.S. 403,

5

415 n.12 (2002) (finding that past cases have variously grounded the right in the Article IV

6

Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment

7

Due Process Clause, and the Fourteenth Amendment's Equal Protection and Due Process Clauses).

8
9

At its most basic level, and as a "fundamental requirement of due process," it guarantees the

10

"opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*,

11

424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The concept

12

finds colloquial expression in the axiom that "[a]t some point, justice delayed is justice denied."

13
14

*S. Pac. Transp. Co. v. I.C.C.*, 871 F.2d 838, 848 (9th Cir. 1989). It also embraces the concept that

15

the access afforded must be equal in "protect[ing] civil litigants who seek recourse in the courts,

16
17

either as defendants hoping to protect their property or as plaintiffs attempting to redress

grievances." *Logan v. Zimmerman Brush Co*., 455 U.S. 422, 429 (1982).

18
19

The settlement bakes into its proposal unwarranted delay sufficient to deny meaningful

20

access to justice. It also tips the playing field significantly and improperly in favor of Monsanto as

21
22

defendant by the way that the Science Panel operates. The examination of the literature is tipped

23

in favor of a no-causation result due to its backward look at the existing literature identified in the

24

proposed settlement agreement, the hurdles it places on consideration of any science developed

25

during the course of the panel's four-year study, and its default in favor of a no-causation finding

26
27
28

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

when the Panel concludes that causation exists but cannot agree on a threshold dosage level. The favoritism afforded this questionable approach impinges upon equal access to the courts.

### A.    Waiting Four Years to Commence Jury Trials for a Science Panel to Provide a One-Line Piece of Evidence Based on Existing Data Denies Meaningful Access to the Courts.

The proposed settlement postpones jury trials for settlement class members during the four years that the Science Panel, once appointed, works to produce its one-line conclusion about whether general causation exists and, if it does, the Panel's determination of the threshold internal dose level for NHL. ECF No. 12509-2, art. XII, § 12.2(a), at 59. The new amendments submitted to this Court on March 3, now permitting depositions of the panel members, underscore how ill-conceived the Science Panel is and why a four-year delay for its meager output should not push the right of access to the courts long into the future. The concession to depositions highlights the highly questionable nature of the endeavor, and the mandated delay harms class members seeking their day in court.

NHL can be very aggressive, especially in elderly people. *See* Y. Bastion, *et al.*, *Elderly Patients with Aggressive non-Hodgkin's Lymphoma: Disease Presentation, Response to Treatment, and Survival,* J. of Clinical Oncology, Aug. 1997, at 2945-53. These members of the settlement class may not survive four years of waiting – and the compensation offered in settlement hardly provides meaningful damages.

Other settlement class members may have more time, but may also see a "no causation" determination by the Science Panel as eminently wrong, particularly in light of the jury trials that have occurred to date, where causation was satisfactorily proven and large damages awarded. *See*

20

*In re Roundup Prods. Liab. Litig.*, 2020 WL 3723305, at *2 (acknowledging those cases). If these class members believe that their best chance of fairly presenting their case must include a *Daubert/Frye* challenge to the announced Science Panel conclusion, they must wait at least an additional three years on top of the original four and may only rely upon new studies that post-date the Science Panel's conclusion. Unlike a traditional *Daubert* hearing, the settlement disallows any exploration of that conclusion that goes beyond the Panel's *ipse dixit,* even if their own evidence will not receive the same deferential treatment. The value of that unexplorable conclusion based on what may be stale literature cannot outweigh class members more timely need for proceeding with their cases.

While the motion seeking approval of the proposed settlement suggests that existing backlogs and other delays built into the system create similar delays so that there is no ultimate cost, ECF No. 12509, Mot. for Preliminary Approval 34, it is difficult to understand why the same structural problems delaying cases today will not also delay cases four and seven years hence. The delays required by the settlement terms have no compelling justification for abridging class members' rights of access to the courts.

**B.      The Settlement's Opt-Out Structure Fails to Provide the Type of Notice Necessary to Assure Fair Access to the Courts.**

The proposed settlement provides impressively extensive notice, yet still fails to provide the type of notice necessary to satisfy constitutional standards, let alone those applicable under Rule 23. It is beyond cavil that potential class members have a right to opt out of the class and seek to vindicate their rights through individualized litigation. *See Phillips Petroleum Co. v. Shutts*, 472

21

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

U.S. 797, 812 (1985) ("[D]ue process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court"). To make an intelligible decision to remain within the settlement class or opt-out, a person will naturally wish to know what the settlement offers. The new "extraordinary circumstances" standard to permit higher settlement offers within the matrix only adds to the uncertainty a potential class member faces in deciding whether to opt out entirely, or take a chance with the offer and the more limited opt-out for class members. Without transparency about the actual offer, any notice is inherently inadequate.

Here, that failure renders opting out a matter of guesswork, rather than intelligent decision-making. The proposed settlement contemplates a stay of litigation while the court considers the settlement's propriety. ECF No. 12509, at 66-67. The 150-day opt-out period, however, coincides with the period of the stay, rendering any meaningful evaluation of the settlement by people choosing to opt out of the settlement class ephemeral. While they may choose to opt out of the proposed settlement as is, it is entirely possible that changes in the settlement, such as elimination of the Science Panel, might make a difference in the opt-out determination. At the other extreme, changes could make the proposed settlement less desirable and thereby cause people who did not opt out regret their decision.

C.     **The Settlement's Bar on Punitive Damages in Trials by Class Members Fails to Provide Sufficient Notice to Those without an NHL Diagnosis and Would Excuse Continuing Egregious Misconduct.**

The proposed settlement bars class members who opt for jury trials from seeking punitive damages. ECF No. 12509-2, art. XVII, § 17.1(a), at 93. It justifies this prohibition by citing the

22

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

1   traditional explanation that no one has a right to punitive damages, as though these individuals

2   give up nothing at all by foregoing that category of damages. ECF No., 12509, at 48 (citing *State*

3   *Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003)). Contemporary jurisprudence

4   largely denies that punitive damages serve any compensatory function. *See Cooper Indus., Inc. v.*

5   *Leatherman Tool Grp., Inc*., 532 U.S. 424, 432 (2001). Nonetheless, last year, the Supreme Court

6   threw some doubt into that understanding by holding that "punitive damages aren't merely a form

7   [of] compensation." *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1609 (2020). Regardless, the

8   lack of any generalized right to punitive damages in any particular case does not license the parties

9   to this proposed settlement to deny to future litigants what a state has authorized.

10        Juries assess punitive damages in furtherance of a "'State's legitimate interests in punishing

11  unlawful conduct and deterring its repetition.'" *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538

12  U.S. 408, 416 (2003) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). Because

13  it is the *state's* interest that is at stake, each state is accorded "considerable flexibility in

14  determining the level of punitive damages that they will allow in different classes of cases and in

15  any particular case." *BMW*, 517 U.S. at 568. By barring punitive damages entirely, the proposed

16  settlement displaces the interests of the various states.

17        In advocating for this provision, the proponents also suggest that Monsanto has received

18  sufficient punishment through the large verdicts already rendered against it and through its

19  commitment of up to $2 billion in this settlement. ECF No. 12509, at 49. However, it is not the

20  parties' or this Court's abstract view that controls on what is sufficient. Instead, an empaneled jury

21  in an individual case, as an initial matter, must make the determination whether to impose punitive

23

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

damages as "an expression of its [and the community's] moral condemnation." *Cooper Indus.*, 532 U.S. at 432. Then, in assessing the amount of punitive damages in accordance with instructions from the Court, the jury must consider a number of factors, yet still take care to assure that the punishment is individualized to the particular plaintiff before them and not aimed at "punish[ing] for harm caused strangers." *Philip Morris USA v. Williams*, 549 U.S. 346, 355 (2007). Thus, under this established rubric, which reflects considerations of due process, it does not matter to the ultimate punitive damage assessment that others have received compensation, even substantial compensation plus punitive damages, because the amount of punitive damages in any one case must reflect the harm to *that plaintiff*. If the jury oversteps in that regard, both the trial court and an appellate court can recalibrate the damages. *See Cooper Indus.*, 532 U.S. at 436.

Another problem with the prohibition on punitive damages, besides there being no *quid pro quo* to justify it, is that it would constitute a "get out of jail free" card for future misconduct. If Monsanto were to ghost-write new studies that falsely throw doubt on the NHL general causation for Roundup in order to promote its continued use, the effort might well warrant punitive damages for those vulnerable individuals who chose to continue use of the product until receiving an NHL diagnosis. The tactic was a favorite one of the tobacco industry. *See Philip Morris*, 549 U.S. at 350 (the jury found that Philip Morris "knowingly and falsely led [the plaintiff] to believe" smoking was safe and awarded $79.5 million in punitive damages); Michael V. Ciresi, Roberta B. Walburn & Tara D. Sutton, *Decades of Deceit: Document Discovery in the Minnesota Tobacco Litigation*, 25 Wm. Mitchell L. Rev. 477, 478 (1999).

24

Other industries have also used their public relations departments to gin up studies putatively authored by medical experts to hide the deleterious effects of their products. In a case brought as a result of developing breast cancer due to a combined estrogen-progestin hormone therapy manufactured and marketed by the defendant, the evidence showed that the defendant, Wyeth, "financed and manipulated scientific studies and sponsored medical articles to downplay the risk of cancer while promoting certain unproven benefits" and resulted in a $58 million punitive damage award. *Wyeth v. Rowatt*, 244 P.3d 765, 780 (2010), *cert. denied*, 564 U.S. 1019 (2011).

Because the settlement proposal frees Monsanto from any concern about punitive damages from class members who will be future claimants, the disincentive to engage in that type of reprehensible behavior is entirely lifted, undermining the important deterrent effect that punitive damages has.

In addition, notice is insufficient to remove punitive damages for class members who comprise Subclass 2 (class members who were exposed to Roundup but are not yet diagnosed with NHL as of February 3, 2021, and their Derivative Claimants). ECF 12509-2, art. I, § 1.2, at 3.

In *Amchem*, the Supreme Court acknowledged but did not rule on the misgivings expressed by the Third Circuit concerning the adequacy of notice when a settlement class is tied to "persons with no perceptible asbestos-related disease at the time of the settlement." 521 U.S. at 628 (citing *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 633 (3d Cir. 1996)). The same concerns obviously apply as well to undiagnosed or latent NHL whose exposure preceded the February 3, 2021 date. The *Amchem* Court highlighted the "gravity of the question whether class action notice sufficient

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

under the Constitution and Rule 23 could ever be given to legions so unselfconscious and

amorphous" without ruling on it when it stated:

> any persons in the exposure-only category, the Court of Appeals stressed, may not even know of their exposure, or realize the extent of the harm they may incur. Even if they fully appreciate the significance of class notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out.
> Family members of asbestos-exposed individuals may themselves fall prey to disease or may ultimately have ripe claims for loss of consortium. Yet large numbers of people in this category—future spouses and children of asbestos victims—could not be alerted to their class membership. And current spouses and children of the occupationally exposed may know nothing of that exposure.

*Id.*

Thus, as a matter of access to the courts, the notice of what is given up by failing to opt out

is lacking and cannot bind these Subclass 2 members.

## CONCLUSION

For the foregoing reasons, the proposed settlement infringes fundamental constitutional

rights that should guide this Court's decisions on approval, whether in its current form or in revised

form.

Dated: March 5, 2021

Respectfully submitted,

/s/ Robert S. Peck
Robert S. Peck
*Counsel of Record*
Center for Constitutional Litigation, PC
2117 Leroy Place, NW
Washington, DC 20008
T: (202) 944-2874
F: (646) 365-3382
robert.peck@cclfirm.com

26

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC

Tobi L. Millrood
*President*
American Association for Justice
777 6th Street NW, Suite 200
Washington, DC 20001

*Attorneys for Amicus Curiae*
*American Association for Justice*

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of March, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of California using the CM/ECF filing system. Counsel for all parties are registered CM/ECF users and will be served by the CM/ECF system pursuant to the notice of electronic filing.

*/s/ Robert S. Peck*
Robert S. Peck
Center for Constitutional Litigation

BRIEF OF THE AMERICAN
ASSOCIATION FOR JUSTICE
AS AMCIUS CURIAE
Case No. 16-md-2741-VC