Leslie Brueckner (SBN 140968)
Ellen Noble
PUBLIC JUSTICE
475 14th Street, Suite 610
Oakland, CA 94612
Telephone: (510) 622-8205
lbrueckner@publicjustice.net
enoble@publicjustice.net

*Counsel for Amicus Curiae Public Justice*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 16-md-02741-VC |
| This document relates to: | *AMICUS CURIAE* BRIEF OF PUBLIC JUSTICE, P.C. IN OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT, APPOINTMENT OF INTERIM CLASS AND SUBCLASS COUNSEL, AND DIRECTION OF NOTICE |
| *Ramirez, et al. v. Monsanto Co.* Case No. 3:19-cv-02224 | |
| | The Honorable Vince Chhabria |

# Table of Contents

INTEREST OF AMICUS CURIAE ......................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................ 2

ARGUMENT ........................................................................................................................... 7

I.    The Notice and Opt-Out Rights of Rule 23 are Mandated by Due Process. ................... 7

II.   The Proposed Settlement Infringes on Class Members' Constitutional Rights
      to Receive Notice and a Meaningful Opportunity to Opt Out. ....................................... 9

    A.  The Science Panel Impermissibly Infringes on Class Members' Rights. ................... 10

        1.  The Settlement Appears to Make It Difficult, If Not Impossible, for the Science
            Panel to Find that Roundup Causes NHL. .......................................................... 11

        2.  Class Members Who Reenter the Tort System Must Stipulate to the Admissibility
            of the Science Panel Findings and Will Be Restricted in Their Ability to
            Effectively Rebut Any Such Findings. ................................................................ 14

        3.  The Science Panel's Determination is Locked In for Three Years After the Initial
            Four-Year Period and Will Be Difficult to Overcome Even if Significant New
            Scientific Evidence Emerges Once the Three Years is Up. ................................ 15

        4.  The Settlement Does Not Offer Any "Knowledge Remedy" to Class Members to
            Counterbalance the Science Panel's Potential Negative Impact on Class Members'
            Rights. ................................................................................................................. 16

    B.  The Release of Punitive Damages Impermissibly Infringes on Class Members'
        Rights. ........................................................................................................................ 17

        1.  Monsanto Has Not Been Deterred. ..................................................................... 18

        2.  The Settlements Cited by Class Counsel Does Not Support the Release of Punitive
            Damages. ............................................................................................................. 19

    C.  The Litigation Stay Impermissibly Infringes on Class Members' Rights. ................. 23

CONCLUSION ...................................................................................................................... 26

i

## Table of Authorities

**Page(s)**

**Cases**

*Amchem v. Windsor Prods., Inc.*,
  521 U.S. 591 (1997)................................................................................................ *passim*

*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014) ...............................................................................5, 21, 22

*In re Diet Drugs Prods. Liab. Litig.*,
  No. 1203, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000)......................................20, 21

*In re Diet Drugs Prods. Liab. Litig.*,
  369 F.3d 293 (3d Cir. 2004).................................................................................. *passim*

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974)....................................................................................................18

*Hansberry v. Lee*,
  311 U.S. 32 (1940)........................................................................................................7

*Hardeman v. Monsanto*,
  Case Nos. 19-16636, 19-16708 (9th Cir.)................................................1, 2, 11, 12

*Johnson v. Monsanto Co. et al.*,
  No. GC16550128 (Cal. Super.)....................................................................................19

*Marron v. Superior Court*,
  134 Cal. Rptr. 2d 358 (4th Dist. 2003) .......................................................................23

*In re Nat'l Football League Players' Concussion Injury Litig.*,
  307 F.R.D. 351 (E.D. Pa. 2015).................................................................................10

*In re Oil Spill*,
  295 F.R.D. 112 (E.D. La. 2013)............................................................................21, 22

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999).......................................................................................................1

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985).......................................................................................................8

*Pilliod v. Monsanto Co.*,
  No. RG17862702 (Cal. Super.)...................................................................................19

*In re Roundup Prods. Liab. Litig.*,
  390 F. Supp. 3d 1102 (N.D. Cal. 2018) ................................................................12, 13

*In re Shell Oil Refinery*,
    136 F.R.D. 588 (E.D. La. 1991)................................................................................21

*Stephenson v. Dow Chem. Co.*,
    273 F.3d 249 (2d Cir. 2001)..................................................................................9

*The Dutra Grp. v. Batterton*,
    139 S. Ct. 2275 (2019).........................................................................................18

**Statutes**

Cal. Civ. Code § 36.........................................................................................................24

**Rules**

Fed. R. Civ. P. 23........................................................................................... *passim*

**Other Authorities**

3B James W. Moore & John E. Kennedy, Moore's Federal Practice (2d ed. 1993) ......................7

Alexandra D. LaHav, *The Knowledge Remedy*,
    98 Tex. L. Rev. 1361 (2000)............................................................................16, 17

*In re Roundup Prods. Liab. Litig.*,
    No. 16-02741, Transcript of Proceedings (March 7, 2018)......................................13

## INTEREST OF AMICUS CURIAE

Public Justice is a national public interest advocacy organization that specializes in precedent-setting and socially significant civil litigation and is dedicated to pursuing justice for the victims of corporate and governmental abuses. Litigating throughout the federal and state courts, Public Justice prosecutes both individual cases and class actions designed to advance consumers' and victims' rights, environmental protection and safety, civil rights and civil liberties, occupational health and employees' rights, the preservation and improvement of the civil justice system, and the protection of the poor and the powerless.

Public Justice strongly supports the use of class actions as a tool for achieving widespread justice.  At the same time, Public Justice has a long history of objecting to class action settlements that purport to bind exposure-only mass tort victims.  Among other cases, we opposed the future-victim settlements in *Amchem v. Windsor Prods., Inc*., 521 U.S. 591 (1997), and in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), arguing that neither Rule 23 nor due process permits class-wide resolution of exposure-only personal injury claims.  The proposed Settlement in this case raises similar concerns because it seeks to resolve the unaccrued personal injury claims of millions of individuals who have been exposed to Roundup, the best-selling herbicide manufactured by Monsanto.

Public Justice is also co-lead appellate counsel before the U.S. Court of Appeals for the Ninth Circuit in *Hardeman v. Monsanto*, Case Nos. 19-16636, 19-16708, which yielded an $80 million jury verdict on behalf of Edwin Hardeman, who contracted non-Hodgkin's lymphoma ("NHL") from his long-term exposure to Roundup.  Although this Settlement excludes individuals who, like Mr. Hardeman, have already retained counsel, Public Justice has an interest

1

in preserving the rights of all persons who have been injured by Roundup—and other dangerous products—to access justice via the tort system.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Like this case, *Amchem v. Windsor Products, Inc*., 521 U.S. 591 (1997), involved an attempt to use the class action device to settle mass numbers of unaccrued personal injury claims. In *Amchem*, as here, the settlement sought to resolve the personal injury claims of millions of individuals who had been exposed to a toxic product but had not yet suffered any injury and thus could not currently seek damages for any future injuries in individual lawsuits.  In the Third Circuit's words, "[t]hese 'futures claims' of 'exposure-only' plaintiffs would be extinguished even though they have not yet accrued." *Georgine v. Amchem Prods.*, Inc., 83 F.3d 610, 617 (3d Cir. 1996), *aff'd sub nom. Amchem v. Windsor Prods., Inc*, 521 U.S. 591 (1997).

As in this case, the settling parties in *Amchem* sought certification under Fed. R. Civ. P. 23(b)(3), which requires that class members be given notice and the right to exclude themselves from the class.  The district court certified the class as requested, and then approved a plan to give notice to the class, which explained that class members could exclude themselves from the litigation by filing an opt-out form by a certain deadline.  All class members who did not opt out by that deadline would have been bound by the settlement even if they had no current injury and no idea they were ever exposed to asbestos

The Third Circuit reversed.  Although its decision turned on the class certification criteria of Fed. R. Civ. P. 23(a) and (b)(3), the Court of Appeals recognized that the "[p]roblems in

---

[1] Public Justice has no financial interest in *Hardeman* or any other Roundup-related case. Public Justice certifies that no person or entity, other than amicus curiae and its counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief, in whole or in part.

2

adequately notifying and informing exposure-only plaintiffs of what is at stake in this class

action may be insurmountable." 83 F.3d at 633.  These problems, in the Court's view, were at

least three-fold:

> *First, exposure-only plaintiffs may not know that they have been exposed to asbestos within the terms of this class action*. Many, especially the spouses of the occupationally exposed, may have no knowledge of the exposure. For example, class representatives . . . did not learn that their husbands had been occupationally exposed to asbestos until the men contracted mesothelioma. *Second, class members who know of their exposure but manifest no physical disease may pay little attention to class action announcements*. Without physical injuries, people are unlikely to be on notice that they can give up causes of action that have not yet accrued. *Third, even if class members find out about the class action and realize they fall within the class definition, they may lack adequate information to properly evaluate whether to opt out of the settlement*.

*Id*. (emphases added).

In affirming the result and virtually all of the Third Circuit's analysis, the Supreme Court

in *Amchem* echoed its observations about the capacity of persons with unmanifested injuries to

receive constitutionally adequate notice and a meaningful opportunity to opt out.  *See Amchem*,

521 U.S. at 628.

Although *Amchem* ultimately did not decide whether the settlement violated the class

members' notice and opt-out rights (because it decided the case on predominance and adequacy-

of-representation grounds), the Court went out of its way, "[i]n accord with the Third Circuit," to

"recognize the gravity of the question whether class action notice sufficient under the

Constitution and Rule 23 could ever be given to legions so unselfconscious and amorphous."  *Id*.

* * *

In our view, this case presents the same "grave" question presented in *Amchem*: whether

the constitutionally mandated rights of absent class members to receive adequate notice and a

3

meaningful opportunity to opt out of a proposed settlement can be satisfied in a toxic tort case involving millions of unaccrued personal injury claims.

In their preliminary approval motion, class counsel say the answer is yes because here, unlike in *Amchem*, class members are afforded a second right to exclude themselves from the class action after they have been offered relief under the Settlement.  *See* Mot. for Preliminary Approval, ECF No. 12509, at 2 (arguing that "not a single class member can lose the right to sue Monsanto for compensation in the tort system unless he or she individually decides—after being diagnosed with NHL—to participate in the compensation fund and accept payment, in return for a release.").  This feature of the Settlement, class counsel argue, distinguishes *Amchem* from this case and eliminates any due process concerns relating to notice and the right to opt out.

Public Justice respectfully disagrees.  In our view, the second opt-out is too heavily encumbered to meaningfully distinguish this case from *Amchem*.  There are at least four reasons why this is so.

First, any class member who opts out at the back end and files their own case against Monsanto must stipulate to the admissibility of the findings of a "Science Panel" that, for reasons explained below, is likely to issue a finding of No Causation—a finding that it will be difficult to effectively rebut because, among other things, the court in any such case "shall not instruct or otherwise tell the jury it is not bound by any of the stipulated facts in the Science Panel Stipulation." Section 12.6(d).[2]

Second*,* the Settlement prohibits any class member who rejects the Settlement's relief and files their own lawsuit from seeking any punitive damages from Monsanto.  *See* Section

---

[2] The original Settlement is ECF No. 12531-2.  The amendments to the Settlement are ECF No. 12665-1 (filed March 3, 2021).  Section 12.6(d) is one of the amendments to the Settlement.

17.1(a).  This is particularly concerning because, unlike the cases relied on by class counsel, where the wrongful conduct at issue had been addressed, *see In re Diet Drugs Prods. Liab. Litig.*, 369 F.3d 293, 296 (3d Cir. 2004); *In re Deepwater Horizon*, 739 F.3d 790, 795 (5th Cir. 2014), Monsanto has not been deterred from selling Roundup or altered its practices in any meaningful way.  By limiting the threat of significant punitive damages for personal injury claims related to Roundup, this Settlement allows Monsanto to continue business as usual— which means that its customers will continue to get NHL from Roundup.

Third, the Settlement imposes a four-year litigation stay, starting *after* the Science Panel is established, on any class members who seek to reenter the tort system after being diagnosed with NHL, purportedly in order to give the Science Panel time to complete its work and issue its findings as to whether Roundup causes cancer.  *See* Section 18.2(b).  Many class members who get NHL during the Settlement period may not live long enough to file suit.  Those that do may emerge from the stay finding it difficult, if not impossible, to find attorneys willing to pursue their claims, particularly if the Science Panel issues a "No Causation" finding.

This brief argues that these restrictions effectively bring this case within the scope of the concerns articulated by *Amchem*.  As *Amchem* suggests, because this case includes exposure-only future victims, the initial opt out is constitutionally inadequate.  While a fully unrestricted back-end opt out *might* cure that problem, the second opt-out in this case is, in our view, so compromised as to render this Settlement violative of due process.

The settling parties may respond that any restrictions on class members' rights are justified by the judicial efficiencies that will result from class-wide resolution of mass tort claims.  Any such argument should be rejected.  As the Third Circuit has said, "[a]s appealing as the efficiencies of a nationwide mass tort class settlement may be, . . . the Supreme Court has

repeatedly cautioned that they cannot override fundamental principles of due process or faithful application of controlling law." *In re Diet Drugs*, 369 F.3d at 297 (citing *Ortiz*, 527 U.S. at 845-48; *Amchem*, 521 U.S. at 620; *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)).

Although this Settlement may be the result of sincere bargaining by creative counsel, "larger institutional and fairness issues are at stake." *In re Diet Drugs*, 369 F.3d at 296.   In particular, "[b]ecause a class settlement disposes of the rights of many people who are absent from the proceeding and only virtually represented by class counsel, due process considerations such as adequacy of notice . . . have special force." *Id.* at 297 (citing *Ortiz*, 527 U.S. at 847-48). And where, as here, a class action settlement encompasses the unaccrued claims of personal injury victims, the inherent difficulty in giving notice raises "serious fairness concerns." *Georgine*, 83 F.3d at 634.

In light of these concerns, Public Justice urges this Court to deny the motion for preliminary approval.

## ARGUMENT

**I.     The Notice and Opt-Out Rights of Rule 23 are Mandated by Due Process.**

As a threshold matter, it bears emphasis that the rights to notice and opt-out embodied in Rule 23(b)(3) have constitutional dimensions. This is perhaps best revealed by the history of the modern class action rule.

Prior to 1966, when Rule 23 was amended to its present form, the federal rules did not permit any class actions seeking damages at law to bind absent class members without their express consent.  At the time, Rule 23 limited the binding effect of "common question" damages classes to the parties and class members who affirmatively chose to intervene in the action-in other words, a type of "opt-in" procedure.  *See* 3B James W. Moore & John E. Kennedy, Moore's Federal Practice ¶ 23.02-1, at 23-73 (2d ed. 1993).  This restriction reflected the "principle of general application in Anglo-American jurisprudence that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process."  *Hansberry v. Lee*, 311 U.S. 32, 40 (1940).

The 1966 amendments to Rule 23 expanded the reach of class actions.  Most notably, new Rule 23(b)(3) permitted, for the first time, absent class members to be bound to a judgment in a common-question damages class action without their affirmative consent.  The Rules Advisory Committee included a number of procedural protections in the new Rule to safeguard the due process interests of absent class members.  Foremost among these protections were the mandatory notice and opt-out provisions of new Rule 23(c)(2), which require that absent class members be given notice and the opportunity to exclude themselves from classes certified under Rule 23(b)(3).

At the time, the Committee noted that, in damages cases:

> the interests of individuals in pursuing their own litigations may be so strong here
> as to warrant denial of a class action altogether.  Even when a class action is
> maintained under subdivision (b)(3), this individual interest is respected.  Thus
> the court is required to direct notice to the members of the class of the right of
> each member to be excluded from the class upon his request.

Note of Rules Advisory Committee to 1966 Amendments to Rule 23, 39 F.R.D. 69, 104-05

(1966).  The Committee Note further reflects that the mandatory notice and opt-out provisions

were necessary "to fulfill requirements of due process to which the class action procedure is of

course subject." *Id.* at 107 (citing, *inter alia*, *Hansberry*, 311 U.S. at 32; *Mullane v. Cent.*

*Hanover Bank & Trust Co*., 339 U.S. 306 (1950)).

The constitutionality of Rule 23(b)(3) classes was affirmed in *Phillips Petroleum Co. v.*

*Shutts*, 472 U.S. at 810-13 & n.3.  *Shutts* made clear that the notice and opt-out requirements

embodied in the Rule are not merely procedural niceties, but rather are indispensable

requirements of due process.  Thus, the Court stated that a court wishing "to bind an absent

plaintiff concerning a claim for money damages or similar relief at law . . .  must provide

minimal procedural due process protection." 472 U.S. at 811-12.  Such minimal protection must

include "notice plus an opportunity to be heard and participate in the litigation, whether in person

or through counsel . . . [and] an opportunity [for the absent plaintiff] to remove himself from the

class by executing and returning an 'opt out' or 'request for exclusion' form to the court."  *Id*. at

812.

## II.     The Proposed Settlement Infringes on Class Members' Constitutional Rights to Receive Notice and a Meaningful Opportunity to Opt Out.

Against this backdrop, it should be clear that this Settlement raises due process concerns. Just as in *Amchem*, this class includes millions of individuals who have been exposed to a hazardous product and have not yet suffered any personal injury.[3]

Although some exposure-only class members may be more cognizant of their exposure than the asbestos victims in *Amchem*, many of them will not understand they are part of this class even if they receive notice. As the Third Circuit observed in *Georgine*, even class members who know they have been exposed "may pay little attention to class action announcements." 83 F.3d at 633. And class members who realize that they have been exposed and actually read the class notice may lack the information they need to understand the valuable rights they would be giving up if they don't opt out. *Amchem* suggests that "legions so unselfconscious and amorphous" cannot receive constitutionally adequate notice. *Amchem*, 521 U.S. at 628; *see also Stephenson v. Dow Chem. Co.*, 273 F.3d 249, 261 n.8 (2d Cir. 2001) ("We also note that plaintiffs [with unmanifested personal injuries] likely received inadequate notice. . . . As described earlier, *Amchem* indicates that effective notice could likely not ever be given to exposure-only class

---

[3] The class includes all U.S. citizens and residents who, "as of February 3, 2021 both (1) have been exposed to Roundup Products through the application of Roundup Products and (2) have not commenced an individual, non-class lawsuit or retained counsel for the pursuit of any individual, non-class personal injury or false advertising claims arising from, resulting from, in any way relating to or in connection with such exposure; and (ii) all Derivative Claimants." Section 1.1(a). There are two subclasses within the Settlement. "Subclass 1" includes "Settlement Class Members who have been diagnosed with NHL as of February 3, 2021, and their Derivative Claimants." Section 1.2. "Subclass 2" includes "Settlement Class Members who have not been diagnosed with NHL as of February 3, 2021, and their Derivative Claimants." *Id.* The concerns outlined in this brief are particularly relevant to Subclass 2, which consists of individuals who have not yet been diagnosed with NHL.

members."), *aff'd in relevant part by evenly divided vote Dow Chem Co. v. Stephenson*, 539 U.S. 111 (2003).[4]

Class counsel argue that *Amchem* is inapposite because here, unlike in *Amchem*, class members who get NHL and don't like the amount of money they are offered under the Settlement have the right to reject the Settlement benefits and reenter the tort system.  *See* Mot. for Preliminary Approval at 59-60.  In our view, however, that right to reenter the tort system is too comprised by the Science Panel, the punitive-damages release, and the litigation stay to meaningfully distinguish *Amchem*, as we now explain.

**A.  The Science Panel Impermissibly Infringes on Class Members' Rights.**

First, the Settlement empowers a "Science Panel" to determine whether Roundup causes NHL, and its findings will be admissible in the trials of any class members who seek to opt-out after they get cancer.  *See generally* Section 12.  The five-member Panel, which cannot include any of the recognized experts in the field (Section 12.1(c)), is restricted to considering only existing scientific evidence (subject to a "good cause" exception entrusted to the Settlement Administrator, Section 12.2(e)); cannot conduct any of its own scientific studies or do any

---

[4] The National Football League settlement, one of three settlements cited by class counsel as models for the proposed Settlement (*see* Mot. for Preliminary Approval at 2), does not pose the same *Amchem* issues as this case.  Although a subclass included players that may suffer harm in the future, the class of retired NFL players was narrow and identifiable, making comprehensive, individualized notice possible on the front end of the settlement, thereby ensuring that class members had an unencumbered right to opt out of the settlement.  *See In re Nat'l Football League Players' Concussion Injury Litig*., 307 F.R.D. 351, 381 (E.D. Pa. 2015), *amended sub nom. In re Nat'l Football League Players' Concussion Injury Litig*., No. 2:12-MD-02323-AB, 2015 WL 12827803 (E.D. Pa. May 8, 2015), *and aff'd sub nom. In re Nat'l Football League Players Concussion Injury Litig*., 821 F.3d 410 (3d Cir. 2016), *as amended* (May 2, 2016) (noting that *Amchem* does not prevent class actions for personal injuries "where, as here, 'there are no unknown future claimants and the absent class members are readily identifiable and can be given notice and an opportunity to opt out.'") (footnote and citations omitted).

independent research, Section 12.2(f); and must operate "in private" and can only be subjected to limited discovery (Section 12.6 (setting forth various provisions regarding "Science Panel Confidentiality")).[5]

The Settlement further provides that after four years of the Settlement's approval, the Panel must issue a determination as to causation, which will then be admissible in any trials conducted by class members who decide to reject the Settlement's relief and pursue their own litigation.  Section 12.3(d).

The Settlement portrays the Science Panel as an independent body that will have "complete discretion" to operate without outside influence or bias.  Section 12.2(f).  But as explained below, the Settlement Panel's remit makes it quite likely that the Science Panel will issue a finding of No Causation—and any such finding will be difficult for class members to effectively rebut in their individual tort cases against Monsanto.

**1. The Settlement Appears to Make It Difficult, If Not Impossible, for the Science Panel to Find that Roundup Causes NHL.**

One of the most concerning aspects of the Settlement is that it appears to erect a stricter standard for determining the admissibility of scientific evidence than the *Daubert* standard governing civil trials—a standard that could supplant this Court's own *Daubert* determination in *Hardeman* and require a finding of No Causation.  Two provisions are of particular note in this regard.

---

[5] Although Science Panel members can now be deposed (*see* Section 12.6(d), ECF No. 12665-1 (filed March 3, 2021)), they "shall make no public statements about the work of the Science Panel or status of the Scientific Analysis . . ." (Section 12.6(a)) and cannot be subjected to any written discovery or called to testify at trial.  Sections 12.6(b), (c).  If any Science Panel documents or information are disclosed to regulators, the parties must be "given prompt written notice thereof and, to the extent practicable, an opportunity to seek a protective order or other confidential treatment . . .."  Section 12.6(a)(iii).

First, the Settlement provides that "[t]o find that causation has been established as to NHL, the Science Panel must conclude: (i) based on the body of scientific evidence described below, that there is reliable evidence overall (1) of a positive association between exposure to Roundup Products and NHL in humans, (2) that such positive association *is not due to chance, confounding, or bias* . . . ."  Section 12.2(b) (emphasis added)

The highlighted phrase—"that such positive association [between Roundup and NHL] is *not due to chance, confounding, or bias*"—appears contrary to well-recognized methodology for determining the admissibility of expert witness testimony under *Daubert*.  As this Court's *Daubert* ruling on general causation makes clear, when it comes to epidemiology, it is impossible to completely rule out "chance, confounding, or bias" as contributing to a positive association between Roundup and NHL.  *See In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102 (N.D. Cal. 2018).  But, as this Court found, that does not mean that experts cannot rely on such studies when determining causation.  *See id.* at 1117.  It just means that they have to confirm any positive association by application of the "Bradford Hill criteria"—which is what the plaintiffs' experts did in *Hardeman*.  *Id.* at 1116.

Importantly, application of the Bradford Hill criteria, a universally accepted and reliable methodology for determining causation, requires only a finding of a positive association within the epidemiology.  *Id.* at 1130-31.  Bradford Hill does not require a definitive determination ruling out the role of chance, bias, and confounding factors in epidemiological evidence to find causation when there are other lines of evidence to corroborate an observed association.  *Id.* at 1331-32.  In *Hardeman*, for example, this Court found that plaintiffs' expert Dr. Christopher

Portier's testimony "supported a credible causal interpretation" even though he "could not definitively rule out chance, bias, or confounding." *Id*. at 1131.[6]

Under the Settlement, in contrast, in order to find that Roundup causes NHL, the Science Panel cannot find causation unless it can determine that any demonstrated association "is not due to chance, confounding, or bias" (Section 12.2(b))—a test that seems to override this Court's *Daubert* ruling.

Equally concerning is the Settlement's requirement that, unless the Science Panel finds that any exposure to Roundup, no matter how insignificant, causes NHL, it *must* find "Causation Not Shown" *unless* it can establish a "threshold internal dose level" for NHL.  Section 12.3(b); *see also* Ex. 8 to Settlement Agreement, Science Panel Determination Form at 1-2.  Because herbicides can't be tested on humans, and exposure levels are impossible to measure retroactively, it is hard to see how the Science Panel could determine a "threshold internal dose level" for NHL.  Yet if it cannot make such a finding, the Panel *must* find No Causation regardless of the strength of any demonstrated association between Roundup and NHL.  *See id*. § 12.3(b) (providing that "[i]f the Science Panel Determination does not include a threshold internal dose level for NHL, . . . the Science Panel shall be considered under the Settlement Agreement to have made a Causation Not Shown Finding for NHL.").  Even if the Science Panel

---

[6] That is not surprising in the context of a pesticide.  As Dr. Portier explained at the *Daubert* hearing, it is nearly impossible to rule out chance, bias and confounding factors in the epidemiology for pesticides, which (unlike pharmaceuticals) cannot be tested on humans.  When asked what conclusions he reached based on the epidemiology regarding the link between glyphosate and NHL, Dr. Portier testified: "What I concluded is that causality is possible, but there's still the possibility of bias, chance, and confounding in these data. I believe it's not likely that these things would explain the entire association.  So my conclusion is that the data supports an association of glyphosate with NHL."  *In re Roundup Products Liability Litigation*, No. 16-02741 VC, Transcript of Proceedings (March 7, 2018) (Direct Examination of Dr. Christopher Portier).

*can* determine a threshold internal dose level for NHL, moreover, it might be difficult, if not impossible, for a plaintiff who reenters the tort system to prove that her Roundup exposure meets that level.

### 2. Class Members Who Reenter the Tort System Must Stipulate to the Admissibility of the Science Panel Findings and Will Be Restricted in Their Ability to Effectively Rebut Any Such Findings.

The Settlement also mandates that any class members who elect to pursue their own cases against Monsanto must stipulate to the admissibility of the Science Panel's determination. *See* Section 12.3(d)(iii). In the event of a No Causation finding, this provision could infringe on the ability of any class member to recover against Monsanto outside the class.

The settling parties defend this provision on the ground that is it merely "advisory" and thus will not unduly prejudice class members if they elect to reenter the tort system. *See* Mot. for Preliminary Approval at 6. Yet this Settlement requires class members to (1) stipulate to the admissibility of the Science Panel's findings (*see* Section 12(d)(ii)); (2) bans them from "contradict[ing] any of the stipulated facts contained in the Science Panel Stipulation . . ." (*id.*); and (3) under the recently filed amendment, actually purports to prohibit any presiding court, state or federal, from "instruct[ing] or otherwise tell[ing] the jury it is not bound by any of the stipulated facts in the Science Panel Stipulation." Section 12.6(d)(1).

If the Science Panel findings are not to be mandatorily conclusive, but merely one piece of evidence, the normal course would be that a trial judge should be able to instruct the jury that it is not bound by the Science Panel's findings, but may find that other evidence outweighs them or is more persuasive. This provision barring judges from putting the Science Panel's conclusions in perspective would seem to undermine the ability of trial courts to properly instruct juries, and might give the Science Panel's conclusions overpowering force.

**3. The Science Panel's Determination is Locked In for Three Years After the Initial Four-Year Period and Will Be Difficult to Overcome Even if Significant New Scientific Evidence Emerges Once the Three Years is Up.**

The Settlement further provides that the Science Panel's determination cannot be challenged based on new scientific evidence prior to three years after the expiration of the four-year settlement period. *See* Section 12.5(b). Class members who do not opt out at the front end cannot sue for four years after the Panel is formed if they decide to reject the Settlement after getting NHL, *see* Section 7.13, *and* they must stipulate to the admissibility of the Science Panel's findings for three years after that, *see* Section 12.5(b). That alone is a significant restriction on class members' rights.

This restriction is amplified by the fact that any class members who want to challenge the Science Panel's findings in their individual cases against Monsanto must prove that "new scientific evidence . . . has rendered the Science Panel Determination inadmissible under the standards of *Daubert* . . ." (*id*.)—an onerous burden given that the Science Panel need not give any basis for its findings. *See* Section 12.6(a).

In addition, the Settlement further provides that "[i]f a [*Daubert*] Challenge is made," only "the party *opposing* the challenge may seek to depose or otherwise obtain testimony from the Science Panel members to rebut the claim that the new scientific evidence affects the validity of the Science Panel Determination or renders it unreliable, and such deposition or other testimony may be used in connection with that or subsequent [*Daubert*] Challenge(s)." Section 12.5(d) (emphasis added). Although this provision appears to operate in an even-handed fashion (by affording any "party opposing [a *Daubert*] challenge" to "depose or otherwise obtain testimony from the Science Panel members"), *id.*, it could give a substantial advantage to

Monsanto because—as explained above—the Science Panel's remit makes it quite likely the Panel will find No Causation.

>    4.  **The Settlement Does Not Offer Any "Knowledge Remedy" to Class Members to Counterbalance the Science Panel's Potential Negative Impact on Class Members' Rights.**

Nor will the Science Panel offer any benefits to class members that might offset its potential adverse impact on their ability to prove their independent cases against Monsanto. Class counsel previously argued that the Science Panel's findings as to whether Roundup causes NHL will provide a "knowledge remedy" to class members akin to the groundbreaking class settlement of claims against Dupont Chemical arising out of the company's poisoning of the Ohio river with ammonium perflurooctanoate (aka "C8").  *See* ECF No. 11042, Mot. for Preliminary Approval, at 20-21 (citing Alexandra D. LaHav, *The Knowledge Remedy*, 98 Tex. L. Rev. 1361 (2000) ("*Knowledge Remedy*")).

But the Dupont settlement created a "a settlement fund to filter the water and, as importantly, *to conduct independent research on the health effects of C8*."  *Knowledge Remedy*, 98 Tex. L. Rev. at 1364 (emphasis added).  That independent research ultimately "determined which types of cancer were reliably linked to C8 and which were not, *allowing plaintiffs with personal injuries to prove general causation in their follow-on tort suits*"—suits that are still being litigated today.  *Id*. (emphasis added).

In this Settlement, in contrast, the Science Panel is not allowed to conduct any independent research into whether Roundup causes NHL (*see* Section 12.2(f)), and the Settlement's $40 million "Research Funding Program" will only conduct "research into the diagnosis and treatment of NHL"—*not* research into whether Roundup causes NHL.  *See* Section 10.1.  So this Settlement does not offer a "knowledge remedy" at all.  And, importantly, the

Dupont settlement was reached years after 3M, the manufacturer of C8, announced that it would stop making the dangerous chemical. *See Knowledge Remedy*, 98 Tex. L. Rev. at 1363. Here, in contrast, Roundup will continue to be sold throughout the world.

Unlike the Dupont settlement, moreover, which contained a costly water filtration program designed to protect the class, *see Knowledge Remedy*, 98 Tex. L. Rev. at 1364, this Settlement does nothing to protect class members and future Roundup users from the dangers of Roundup, which remains the world's most popular herbicide. The only affirmative obligation the Settlement imposes on Monsanto is to seek permission from the EPA to include "links to the scientific evidence . . . existing at the commencement of the Initial Settlement Period" on its product labels. Section 9.1; *see also* Section 12.2(d) (describing studies to be referenced on the proposed label). Even assuming that consumers will actually consult hyperlinks on a product label before deciding whether to purchase Roundup, what consumer will have the stamina and ability to wade through the mountain of scientific evidence on the relationship between glyphosate and NHL? What is needed is an actual cancer warning—which this Settlement does not provide.

\*   \*   \*

For all these reasons, we believe that the Science-Panel feature of the Settlement significantly infringes on class members' ability to reenter the tort system and recover from Monsanto. That alone, is our view, is reason enough to deny the motion for preliminary approval.

**B. The Release of Punitive Damages Impermissibly Infringes on Class Members' Rights.**

The Settlement also prohibits class members who choose to reenter the tort system from seeking punitive damages. *See* Section 17.1(a). Exposure-only class members that refuse any

award from the Settlement, may—after a four-year litigation stay and only if they agree to the admissibility of the Science Panel's findings—sue Monsanto for compensatory but not punitive damages.  *See* Section 17.13.

### 1.  Monsanto Has Not Been Deterred.

Class counsel argue that this release of punitive damages is reasonable because no one class member is "entitled" to punitive damages, even though they serve deterrent and exemplary functions for society as a whole.  Mot. for Preliminary Approval at 46-47.  But just because a plaintiff does not have a right to *receive* a certain amount—or any—punitive damages, does not mean that the plaintiff has no "right to *seek* punitive damages."  *The Dutra Grp. v. Batterton*, 139 S. Ct. 2275, 2287 (2019) (emphasis added).  And just because a right serves a social objective, like deterrence, doesn't make it any less of a right.  Punitive damages may be "private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence," but the underlying policies of retribution and deterrence are served by assigning the right to seek punitive damages to private parties.  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974).  If defendants could sign away plaintiffs' rights to seek punitive damages without their informed consent, the common law doctrine of punitive damages wouldn't serve its purpose.

The more glaring problem, however, is that this Settlement will release punitive damages—which are designed to deter wrongful conduct—even though Monsanto *has not been deterred*.  Monsanto continues to sell worldwide the same harmful weed killer products that gave rise to this MDL.  In the three Roundup cases to go to trial thus far, all three juries concluded that the plaintiffs' long-term exposure to Roundup products caused their NHL, found Monsanto's

conduct reprehensible, and awarded substantial punitive damages.[7]  These awards all reflect the juries' determinations that Monsanto's conduct—and its ongoing sales of a product it knows to be dangerous—is worthy of substantial punishment.

      Class counsel nonetheless claim that "the magnitude of the amounts Monsanto is paying, both in this Settlement and in the inventory deals, has already served the societal interests in deterrence and punishment that warrant punitive damages."  Mot. for Preliminary Approval at 48.  But Monsanto continues to produce and sell its Roundup products without a cancer warning—*and it will continue to do so under the terms of this Settlement*.  The fact that Monsanto has not stopped selling its harmful products—or at least warned users that exposure to Roundup may cause NHL—despite these substantial damages awards and inventory settlements, shows that the company plans to *tolerate* the deadly costs of its products.  This Settlement allows Monsanto to budget for the future costs of paying off people who develop NHL from Roundup exposure, thereby enabling it to continue its harmful practices and limiting the one tool— punitive damages—that could actually incentivize a large corporation like Monsanto to pull its dangerous products from the shelves or at least warn that the products may cause NHL.

    **2.**  **The Settlements Cited by Class Counsel Does Not Support the Release of Punitive Damages.**

      In defense of the punitive damages release, class counsel principally rely on the class settlement in *In Re Diet Drugs*, 369 F.3d 293, which similarly contained a back-end opt-out with

---

[7] *See Hardeman v. Monsanto Co.*, No. 16-525 (N.D. Cal.) (jury awarded $75 million in punitive damages, remitted to $20 million), *appeal pending*, No. 19-16636 (9th Cir.); *Johnson v. Monsanto Co. et al.*, No. GC16550128 (Cal. Super.), *affirmed in part as modified, reversed in part by Johnson v. Monsanto Co.*, 52 Cal. App. 5th 434 (2020) (jury awarded $250 million in punitive damages, remitted to $10.3 million); *Pilliod v. Monsanto Co.*, No. RG17862702 (Cal. Super.) (jury awarded $2 billion in punitive damages, remitted to $69 million), *appeal pending*, No. A158228 (Cal. App.).

a punitive-damages release.  *See* Mot. for Preliminary Approval at 2 n.1, 46-48.  That reliance is misplaced for three reasons.

First, *Diet Drugs*, unlike here, does not involve  "exposure-only" class members that "may not even know of their exposure, or realize the extent of the harm they may incur." *Amchem*, 521 U.S. at 628.  In approving the settlement in *Diet Drugs*, the district court emphasized that the valvular lesions associated with use of the diet drugs at issue "are not latent."  *In re Diet Drugs*, No. 1203, 2000 WL 1222042, at *18 (E.D. Pa. Aug. 28, 2000). "If [such lesions] are going to occur, they are going to occur during drug use (or shortly thereafter) and be demonstrable on echocardiogram." *Id.*  The court held "there is no evidence that the use of the drugs results in any increased risk of regurgitation that is 'latent' and not detectable" and thus, "as it relates to latency, the 'futures' problem present in *Amchem* is not present here."  *Id.* at *46-47.  This distinction alone renders the *Diet Drugs* settlement inapposite.

Second, in *Diet Drugs*, unlike here, there was no ongoing threat to consumers because the appetite-suppressing drugs linked to valvular heart damage were removed from the market in September of 1997—two years before the parties reached a tentative settlement agreement that included a waiver of punitive damages.  *See In re Diet Drugs*, 369 F.3d at 298-99.  As a result, there was no ongoing conduct to deter.  Here, in contrast, Monsanto continues to sell Roundup worldwide.

Third, in *Diet Drugs*, unlike here, the punitive damages waiver was justified by the fact that, "[i]n exchange for the release," the defendant could "not raise a defense based on a statute of limitations or repose or a defense based on improper splitting of a cause of action."  *In re Diet Drugs*, No. 1203, 2000 WL 1222042, at *20.  As the district court in *Diet Drugs* observed, the defendant's waiver of a statute of limitations or claim-splitting defense "protect[s] the class

20

against some of the main risks they face toward recovery." *Id*. at *49 n.22.  The court further explained that "[m]any class members might be barred from filing suit, 'given that there were only about 18,000 claims filed out of six million people as of the time' the Settlement was negotiated" and the "[s]tatute of limitation defenses could also have the effect of requiring class members to bring suit before determining the state of their health." *Id*.  This significant consideration for the punitive-damages release was central to the court's finding that the release was reasonable.  *See id.; cf. In re Shell Oil Refinery*, 136 F.R.D. 588, 591 (E.D. La. 1991), *aff'd sub nom. Watson v. Shell Oil Co*., 979 F.2d 1014 (5th Cir. 1992) (approving plan for a single punitive damages trial where all opt-out plaintiffs were given the opportunity to waive their right to seek punitive damages in exchange for quick trial dates).  No such waiver of Monsanto's possible legal defenses exists here.

The punitive damages release in *In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014)—another case the proposed Settlement is modeled after (*see* Mot. for Preliminary Approval at 2 n.1)—is just as distinguishable.[8]

First, as in *Diet Drugs*, *Deepwater Horizon* did not present the same *Amchem* issues as this case because the medical class in *Deepwater Horizon* was not defined by exposure to a widespread toxic substance.  Rather, the class was "based upon objective criteria, including participation in Response Activities, residency in objectively-defined geographic areas, and the *manifestation of* clearly-identified Specified Physical Conditions."  *In re Oil Spill*, 295 F.R.D. at

---

[8] *Deepwater Horizon* involved a class action settlement of claims related to the 2010 explosion aboard an offshore drilling rig, and the subsequent discharge of oil into the Gulf of Mexico.  *Id.* at 795.  The settlement included a back-end litigation option "which preserve[d] Class Members' ability to sue BP for compensatory damages for Later-Manifested Physical Conditions" but did not allow class members to seek or recover *punitive* damages.  *In re Oil Spill*, 295 F.R.D. 112, 120 (E.D. La. 2013).

133 (emphasis added).  Injuries were acute, not latent.  As a result, class members were provided

with meaningful individualized notice of the settlement at the front end—thereby ensuring a full

and fair opportunity to opt out.

Second, as in *Diet Drugs*, there was no ongoing threat to safety from the BP oil spill.

The *Deepwater Horizon* settlement resolved claims arising from a single past event, whereas this

Settlement resolves unmanifested claims related to Monsanto's continued sales of Roundup.

Third*, a *Deepwater Horizon* class member could receive immediate compensation under

the settlement for medical conditions *and still also* reenter the court system to sue BP for later-

manifested physical conditions. *See id.* at 140.  Unlike this Settlement, which puts class members

in an either-or situation, *Deepwater Horizon* class members could enjoy the benefits of the

settlement and then still opt out on the back end to pursue litigation for compensatory damages.

*Id.*

Fourth, and perhaps most importantly, unlike here where class members who opt out on

the back end must stipulate to the admissibility of a (likely adverse) Science Panel determination

on causation, the *Deepwater Horizon* defendants agreed to stipulate to both "(a) *the fact of*

*exposure* of the Class Member to oil and/or dispersants during the *Deepwater Horizon* Incident

or Response Activities" *and* "(b) *the alleged fault* of BP for the *Deepwater Horizon* Incident."

*Id.* at 125 (emphases added).  BP "also agreed to forego defenses based on prescription, statute

of limitations or repose, laches, and certain other defenses."  *Id.*  No such stipulations in class

members' favor exist here.[9]

---

[9] In support of the Settlement's release of punitive damages, class counsel cite a number
of additional cases where the settlements at issue did not actually waive any rights to seek
punitive damages.  *See* Mot. for Preliminary Approval at 47 & n.12 (citing *In re Volkswagen
"Clean Diesel" Mktg., Sales Prac., & Prod. Liab. Litig.*, No. MDL 2672, 2017 WL 2212783, at
*24 (N.D. Cal. May 17, 2017); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009);

\*   \*   \*

In light of the above, we believe that the Settlement's release of punitive damages for class members that opt out at the back end, in combination with the lack of meaningful notice of their rights at the front end, raises the same due process concern in *Amchem*, rendering this Settlement fatally flawed.

### C.  The Litigation Stay Impermissibly Infringes on Class Members' Rights.

Class members' ability to reenter the tort system is further impeded by the Settlement's four-year litigation stay, which prejudices class members' rights without any offering any countervailing benefits to anyone other than Monsanto.

First, there is no doubt the stay will harm some class members.  The sad truth is that many class members will die from NHL while the stay is still in place. And in California, where many class members work and live, family members are barred from seeking any recovery for their loved one's pain and suffering if the victim dies before a judgment is recovered.  *See Marron v. Superior Court*, 134 Cal. Rptr. 2d 358, 366 (4th Dist. 2003) ("Although a victim ordinarily may be entitled to compensation for pain and suffering sustained from a defendant's breach of a noncontractual obligation, that compensation generally cannot be recovered after the victim's death . . . ").  Other states may have similar restrictions.

Even those class members with NHL who survive the stay will have a more difficult time finding counsel if they have to wait years to file suit—particularly if they are forced to stipulate

---

*Zepeda v. PayPal, Inc.*, No. C 10-1668 SBA, 2017 WL 1113293, at \*12 (N.D. Cal. Mar. 24, 2017)).  These cases merely show that courts will approve settlement agreements even when objectors argue that the settlement amount did not reflect an award for punitive damages. This is no surprise: a settlement is a bargain—the award will not reflect the maximum available damages.

to the admissibility of an adverse Science Panel ruling and cannot bring any claim for punitive damages.  These are serious impediments, not mere trivialities.

Class counsel portray the litigation stay as a "minor concession" because, "as a practical matter," class members who get NHL within the four-year stay period "would not be able to obtain relief for years."  Mot. for Preliminary Approval at 43.  But that's not necessarily so.  In California, for example, the courts expedite hearings for the elderly or seriously infirm so that they do not have to wait to seek justice.  *See* Cal. Civ. Code § 36(a).  Other states may have similar statutes, not to mention less crowded dockets than California's.  And with COVID-19 restrictions easing, there is no reason to assume trials will remain delayed.[10]

That aside, the notion that the litigation stay is harmless ignores that it will likely have a chilling effect on many class members' willingness to reenter the tort system—a fact that further undermines class counsel's attempt to distinguish this case from *Amchem*.  A class member who is diagnosed with NHL will face a choice:  either accept the relief offered by the Settlement or refuse the Settlement's relief and wait, possibly for *years*, for the stay to expire (during which time they might die from NHL) on the chance that they will be able to find a lawyer willing to take their case despite the punitive-damages waiver and the Science Panel's (likely adverse) findings.  Many, maybe even most, class members in that situation will likely take the money upfront, which is no doubt what Monsanto intends.  Painting this as a "minor concession"

---

[10]   Dewayne Johnson, a terminally ill Roundup victim, received a preferential trial setting pursuant to Cal. Civ. Code § 36(a) and recorded the first verdict against Monsanto, all despite a greater backlog of Roundup cases than will exist during the months following the opt-out period on account of the settlements. Alva and Alberta Pilliod likewise utilized § 36(a) to become the third verdict against Monsanto.  More cases likely would have received expedited trials under this provision had it not been for the pandemic—but those restrictions are easing.

ignores this chilling effect—and further weakens class counsel's reliance on the back-end opt-out as a way of distinguishing *Amchem*.

Nor can it be said that the litigation stay has some countervailing benefits for class members that might justify the stay's infringement on their rights. Class counsel argue that the stay is needed to allow "the Settlement programs [to] operate," Mot. for Preliminary Approval at 42-43, but why is that so? Neither the Diagnostic Accessibility Grant Program nor the Research Funding Program will be impeded if class members are allowed to reenter the tort system at will after their injuries manifest. And the Science Panel can do its work without any litigation stay, let alone a four-year one. Why not allow class members who get NHL before the Science Panel has issued its findings to reenter the tort system as soon as they prefer?

*     *     *

In the final analysis, the only party that will benefit from the litigation stay is Monsanto. Those intrepid souls that do reject the Settlement's compensatory benefits and try to sue Monsanto will be encumbered by the Science Panel's findings and the waiver of punitive damages—both significant restrictions in their own rights.

This brings us full circle back to *Amchem*. As argued above, the teaching of *Amchem* is that the inclusion of unmanifested personal injury claims in a class action raises serious due process concerns. The Settlement's proffered right to reenter the tort system could only meaningfully distinguish this case from *Amchem* if that right were not substantially encumbered. Because that is not true here, on this basis alone this Settlement should be rejected.

## <u>CONCLUSION</u>

We therefore urge the Court to deny the motion for preliminary approval of the proposed

Settlement.


Dated: March 5, 2021

Respectfully submitted,

 /s/ Leslie Brueckner

Leslie Brueckner (SBN 140968)
Ellen Noble
PUBLIC JUSTICE
475 14th Street, Suite 610
Oakland, CA 94612
Telephone: (510) 622-8205
lbrueckner@publicjustice.net
enoble@publicjustice.net

*Counsel for Amicus Curiae Public Justice*

26

**Certificate of Service**

I certify that on March 5, 2021, this *amicus curiae* brief was served on all parties or their

counsel through the CM/ECF system.

Dated: March 5, 2021

/s/ Leslie Brueckner
Leslie Brueckner