Pages 1 - 106

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

IN RE:  ROUNDUP PRODUCTS        )
LIABILITY LITIGATION.           )      **NO. 16-md-02741 VC**
                                )
_____ )

San Francisco, California
Wednesday, March 3, 2021

**TRANSCRIPT OF ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:

    ANDRUS WAGSTAFF PC
    7171 W. Alaska Drive
    Lakewood, Colorado 80226
    BY:  **AIMEE H. WAGSTAFF, ATTORNEY AT LAW**

    WEITZ & LUXENBERG P.C.
    700 Broadway
    New York, New York 10003
    BY:  **ROBIN L. GREENWALD, ATTORNEY AT LAW**

    THE MILLER FIRM LLC
    108 Railroad Avenue
    Orange, Virginia 22960
    BY:  **MICHAEL J. MILLER, ATTORNEY AT LAW**

For the Category 1 Objectors:

    MOLOLAMKEN LLP
    600 New Hampshire Avenue, N.W.
    Washington, D.C. 20037
    BY:  **JEFFREY A. LAMKEN, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported Remotely By: Ana M. Dub, RDR, RMR, CRR, CCRR, CRG, CCG
    CSR NO. 7445, Official U.S. Reporter

```
 1    APPEARANCES VIA ZOOM:   (CONTINUED)

 2    For the Category 2 Objectors:
                           DALIMONTE RUEB STOLLER LLP
 3                         515 S. Figueroa Street, Suite 1550
                           Los Angeles, California 90071
 4                BY:  BEHRAM V. PAREKH, ATTORNEY AT LAW

 5

 6    For the Category 3 Objectors:
                           TRAMMELL, PC
 7                         3262 Westheimer Road, Suite 423
                           Houston, Texas 77098
 8                BY:  MELISSA L. BINSTOCK-EPHRON
                       ATTORNEY AT LAW

 9

10    For The Napoli Firm:
                           GOLDSTEIN AND RUSSELL
11                         7475 Wisconsin Ave, Suite 850
                           Bethesda, Maryland 20814
12                BY:  ERIC F. CITRON, ATTORNEY AT LAW

13

14    For Defendants:
                           ARNOLD PORTER KAYE SCHOLER LLP
15                         601 Massachusetts Avenue, N.W.
                           Washington, D.C. 20001-3743
16                BY:  WILLIAM HOFFMAN, ATTORNEY AT LAW

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| **Wednesday - March 3, 2021** | **1:05 p.m.** |

P R O C E E D I N G S

---o0o---

**THE CLERK:**  Calling Case Number 16-MD-2741,

In Re Roundup Products Liability Litigation.

Counsel for the plaintiffs, please state your appearances

for the record.

**MS. GREENWALD:**  Robin Greenwald for the plaintiff

steering committee.

**THE COURT:**  Hello.

**MS. WAGSTAFF:**  Good afternoon, Your Honor.  Aimee

Wagstaff for the plaintiffs.

**THE COURT:**  Good afternoon.

**MR. MILLER:**  Good afternoon, Your Honor.  Michael

Miller for plaintiffs steering committee.

**THE COURT:**  Hello.

**THE CLERK:**  For defendant?

**MR. HOFFMAN:**  I'm William Hoffman for Monsanto,

Your Honor.

**THE COURT:**  Hello.

**THE CLERK:**  And for the objectors?

**MR. LAMKEN:**  Good afternoon.  Jeff Lamken for the

Category 1 objectors.

**THE COURT:**  Welcome to the party.

**MR. LAMKEN:**  Thank you.

 1          **MR. PAREKH:**  Good afternoon, Your Honor.  Behram

 2   Parekh on behalf of the Category 2 objectors.

 3          **THE COURT:**  Hello.

 4          **MS. EPHRON:**  Afternoon.  Melissa Ephron on behalf of

 5   the Category 3 objectors.

 6          **THE COURT:**  Hello.

 7          **MR. CITRON:**  Good afternoon, Your Honor.  This is Eric

 8   Citron appearing on behalf of the Napoli firm.

 9          **THE COURT:**  I had some trouble hearing you.

10          **MR. CITRON:**  Good afternoon, Your Honor.  Is it

11   working any better now?

12          **THE COURT:**  Yes.

13          **MR. CITRON:**  This is Eric Citron appearing on behalf

14   of the Napoli firm.

15          **THE COURT:**  Hi.  You didn't want to have a category

16   number?

17          **MR. CITRON:**  Yeah, I guess not.

18          **THE COURT:**  Okay.

19          **MR. CITRON:**  I missed the category memo, I think.

20          **THE COURT:**  We'll call you Category Zero.

21          **MR. CITRON:**  That's not my dog.

22          **THE CLERK:**  That's Category 4.

23                      (Laughter.)

24          **THE COURT:**  All right.  So I have a couple of basic

25   factual questions, just to start off, that I think are mostly

1    for lead counsel, although some of them may be for Mr. Hoffman.

2              **THE CLERK:**  Hold on, Judge.

3              **THE COURT:**  I guess the first series of --

4              **THE CLERK:**  Before you get started, there's a little

5    bit of feedback.  So I'm going to ask that if anybody is not

6    speaking, please turn your microphones off until it's time for

7    you to speak.

8         Thank you.

9              **THE COURT:**  Okay.  I think the first set of questions

10   are about the participation agreement.  If you're a lawyer and

11   you have a case in the MDL, do you have to sign the

12   participation agreement?

13             **MS. GREENWALD:**  No.  Your Honor, I'm sorry.

14   Your Honor, you do not need to sign the participation agreement

15   if you're in the MDL.  You have full rights to the materials as

16   an MDL attorney.

17             **THE COURT:**  Okay.  And then what if you're a lawyer

18   and you have a case in the MDL and you have other state court

19   cases?  Do you have to sign the participation agreement in

20   order to be allowed to use the MDL work product in the state

21   court cases?

22             **MS. GREENWALD:**  So usually that appears in the context

23   of the case management orders in the state courts.

24        So, for example, in Missouri, there's a provision in case

25   management orders that discovery in the multidistrict

 1    litigation and in the JCCP are considered discovery in those

 2    cases.

 3          And then some of the orders that Your Honor has put forth

 4    in the MDL are incorporated by reference, such as protective

 5    orders, ESI orders, because the discovery done in the MDL is

 6    actually used in the state court cases.  Monsanto --

 7                **THE COURT:**  Right.

 8                **MS. GREENWALD:**  -- doesn't reproduce all of the

 9    documents.

10                **THE COURT:**  Right.  But as far as trying to figure out

11    who has to sign this participation agreement and who has signed

12    the participation agreement, it sounds like what you're

13    saying -- and correct me if I'm misunderstanding -- if you are

14    a lawyer with a case in the MDL, you don't sign the

15    participation agreement, and the fact that you also have state

16    court cases doesn't cause you to sign the participation

17    agreement.

18          So, in other words, lawyers that have cases both in the

19    MDL and state court have not signed this participation

20    agreement.  Is that correct?

21                **MS. GREENWALD:**  So -- yes.

22          So maybe I should step back a little bit, Your Honor, and

23    say that we, as a leadership, made a decision early on not to

24    restrict use of MDL material to lawyers who needed it,

25    particularly in the MDL.

1          So, for example, there are lawyers in some of the wave
2    cases that wanted access to expert materials, documents, other
3    discovery who either didn't want to sign the participation
4    agreement or just didn't sign the participation agreement, and
5    we didn't restrict or tether their right to have that material
6    on the signature of the participation agreement.

7          THE COURT:  I understand.

8          MS. GREENWALD:  Could we have?  We probably could
9    have.  But we did not do that in this case.

10         THE COURT:  I understand.  So, but let me just make
11   sure I understand.  I'm trying to figure out who --

12         MS. GREENWALD:  Right.

13         THE COURT:  -- has signed -- I'm trying to identify
14   the different universes of lawyers -- right? -- or different
15   categories of lawyer within this universe.

16         MS. GREENWALD:  Correct.

17         THE COURT:  So there's lawyers that have cases in the
18   MDL.  They have had access to all the material, and they have
19   not signed the participation agreement.  They've not needed to
20   sign the participation agreement.

21         MS. GREENWALD:  I do think maybe a couple of people in
22   the MDL have signed it who have some cases.  In fact, I'm
23   almost certain a couple have.  Whether they had to or not is
24   another question.  But some have signed them.

25         THE COURT:  Okay.  And as a general matter, there was

 1    nothing separate that a lawyer with an MDL case had to do if

 2    they also had state court cases?

 3           **MS. GREENWALD:**  Correct.

 4           **THE COURT:**  Okay.  So the lawyers who signed the

 5    participation agreement, are those lawyers that had state court

 6    cases but no case in the MDL?

 7           **MS. GREENWALD:**  I believe that some of the lawyers who

 8    signed the participation agreement did not have cases in the

 9    MDL.

10        So Ms. Wagstaff is on, and I know she has all of the

11    participation agreements.  She was the repository for the

12    participation agreements.

13        So I'm pretty sure that of the lawyers who have signed

14    participation agreements, some have only cases in the state

15    courts, but most of them have at least one or more cases in the

16    MDL.

17        Aimee, am I right about that?  Is there any other

18    category?

19           **MS. WAGSTAFF:**  Your Honor, I think that Ms. Greenwald

20    is correct.

21        And there's -- there's no uniform bright line as to who

22    signed the actual participation agreement, especially as we

23    were going and, as you can recall back in 2019, the frantic

24    pace that we were at, and you probably read in Mr. Miller's

25    declaration how he had all of these trials going.

1        We would send out a participation agreement when we

2   remembered, quite frankly, and then they would sign it.  And we

3   would follow up as we remembered, is sort of how it went.  We

4   were going so fast that, you know, we would look back.  And we

5   never withheld information because somebody didn't sign it.

6   And sometimes we were too busy to remember to follow up to get

7   it signed.

8        So there's no real pattern as to who --

9        **THE COURT:**  Okay.  That's helpful and understandable

10  under the circumstances.

11       Do you know how many lawyers signed the participation

12  agreement?

13       **MS. GREENWALD:**  I think we have nine.  Right?  We had

14  nine.  Maybe a few more have come in recently.

15       **MS. WAGSTAFF:**  I think it may be a few more than that.

16  But if that's important to the Court to get an exact number, I

17  can text my paralegal.

18       **THE COURT:**  No.  I think a rough estimate is perfectly

19  fine.

20       **MS. WAGSTAFF:**  I would say around 10 to 15 is a rough

21  estimate.

22       **THE COURT:**  Okay.  And then, so it sounds like what

23  you're saying regarding the participation agreement is that

24  there's no real correlation between the lawyers who signed the

25  participation agreement and the lawyers who received access to

1   work product from the MDL or from -- or from lead counsel,

2   generally.

3        **MS. GREENWALD:**  That's correct, Your Honor.

4        The one thing we did always insist on was that they sign

5   the confidentiality agreement because obviously there's

6   documents within the common benefit work product that are

7   confidential and they're still confidential.  And we wanted to

8   make sure people understood that requirement; so we were

9   vigilant on that.

10       **THE COURT:**  Okay.

11       **MS. GREENWALD:**  But as Aimee said, we were not

12  vigilant on the participation agreement in recognition of the

13  fact we never wanted clients not to have the benefit of our

14  work for the work that their lawyers were doing for them.

15       **MS. WAGSTAFF:**  And, Your Honor, as a practical matter,

16  it usually wasn't the highest on the totem pole requesting the

17  information.  And so, often, they would have the authority to

18  sign the protective order but they would tell us they need to

19  get back to us on whether they would sign the participation

20  agreement.  Time would go by.  We would forget to follow up.

21  You know, we were all going a hundred miles an hour, and that's

22  sort of how it happened in the real world.

23       **THE COURT:**  Fair enough.

24       And then you mentioned that maybe 10 to 15 lawyers signed

25  the participation agreement.  And I don't really know if it

```
 1   matters, but do you happen to know how many cases we're talking
 2   about that were handled by lawyers who signed the participation
 3   agreement?
 4        MS. WAGSTAFF:  Over -- we're talking in the thousands.
 5   I mean, I would -- "I don't know" is the answer, although my
 6   best guess would be, if you added up those particular law
 7   firms, I wouldn't be surprised if it was 15- to 20,000 cases.
 8        THE COURT:  Okay.
 9        MS. WAGSTAFF:  Again, I don't know for certain because
10   some cases are on tolling agreements and I haven't followed
11   those cases -- those law firms' dockets as closely as my own.
12        THE COURT:  Okay.  And then this might be for
13   Monsanto, but obviously, we had Pretrial Order Number 12 which
14   authorized the establishment of a holdback fund, or whatever
15   you want to call it; but it never set the percentage -- it
16   never set the percentage of people's recoveries that would be
17   held back.
18        And now, fast-forward several years later, Monsanto's been
19   entering into these settlement agreements with various lawyers
20   and their clients.  What's been happening with that money?
21        MR. HOFFMAN:  So some money has changed hands in some
22   of the agreements into qualified settlement funds, but my
23   understanding is that no payments have been made to claimants
24   yet.  And the arrangement that we've had in those agreements is
25   that it will be the responsibility of plaintiffs' counsel to
```

1   execute on any amended order.

2       So my understanding is there's no escrow fund that has

3   been established at this point.  I could be wrong about that,

4   but Ms. Greenwald or Mr. Miller or Ms. Wagstaff will correct

5   me.  But we've not had any list of participating cases that

6   we've seen.

7           THE COURT:  So just to make sure I understand, you're

8   saying some money has changed hands, but it hasn't reached the

9   hands of plaintiffs with whom you have settled?

10          MR. HOFFMAN:  That's correct.

11          THE COURT:  So where is the money?

12          MR. HOFFMAN:  It goes into, essentially, a staging

13  area, a qualified settlement fund that is set up for this

14  purpose by agreement of a defendant and the settling plaintiff

15  firm.  The firm will have a qualified settlement fund from

16  which it will eventually distribute funds.

17          THE COURT:  So these different -- you've reached

18  settlements with these different firms.

19          MR. HOFFMAN:  And each one has a qualified settlement

20  fund.

21          THE COURT:  Their clients -- each firm has a separate

22  fund?

23          MR. HOFFMAN:  That's correct.

24          THE COURT:  I see.

25          MS. WAGSTAFF:  And, Your Honor, an important fact also

1    is, the money from the qualified settlement funds hasn't

2    reached the claimants but it also hasn't reached the lawyers.

3          **MS. GREENWALD:**  And one thing I wanted to add also,

4    Your Honor, maybe it would be of benefit to you, is that my

5    understanding is that settlement agreements have a provision

6    that the plaintiffs' firm settling the cases understand that

7    they are obligated to comply with whatever holdback order

8    Your Honor issues.

9          Again, Mr. Hoffman can confirm that I'm right about that,

10   but that's what I understand.

11         **THE COURT:**  Mr. Hoffman?

12         **MR. HOFFMAN:**  Well, all of these agreements are

13   subject to confidentiality; but at least with respect to

14   leadership, those provisions are in the agreements.  And, of

15   course, logic would suggest that they should be in all of them,

16   given where the fund is.  So I think that's --

17         **THE COURT:**  What do you mean "given where the fund

18   is"?  What does that mean?

19         **MR. HOFFMAN:**  Given where the escrow fund associated

20   with Pretrial Order 12 sits, which is not there yet.

21         I apologize for the ambiguity.

22         **THE COURT:**  Okay.  I think I understand the answers to

23   those questions.

24         Now I'll ask plaintiffs.  I want to try to pin you down on

25   who you think should be subject to a holdback, the different

1   categories of cases for which there should be a holdback.  And

2   I'm going to write them down --

3          **MS. GREENWALD:**  Okay.

4          **THE COURT:**  -- as you tell them to me, because it's

5   not totally clear from your papers what categories of cases you

6   think should be subject to a holdback for a common benefit

7   fund.

8       So --

9          **MS. GREENWALD:**  Okay.

10         **THE COURT:**  -- the easy one is any cases that are part

11  of this MDL.  Right?

12         **MS. GREENWALD:**  Correct.

13         **THE COURT:**  So that's number one.

14         **MS. GREENWALD:**  Right.

15         **THE COURT:**  And we should really be speaking of them

16  in terms of cases, not in terms of lawyers.

17      So any cases that are part of the MDL is number one.

18  Right?

19         **MS. GREENWALD:**  So, Your Honor -- I'm sorry.

20         **THE COURT:**  No.  Sorry.  Go ahead.

21         **MS. GREENWALD:**  I was going to say, I think that the

22  common benefit doctrine actually does focus on the attorney and

23  so does PTO 12, actually.  So any attorney who has one or more

24  cases in the MDL.

25         **THE COURT:**  Okay.  I'm asking you to think of it in

1   terms of cases.

2           **MS. GREENWALD:**  Okay.  Okay.  All right.

3           **THE COURT:**  So, and the question is, we've got --

4   because you're not asking for a holdback of an attorney's fees.

5   You're asking for a holdback of a percentage of a plaintiff's

6   recovery.  Correct?

7           **MS. GREENWALD:**  No.  We're asking for a holdback of

8   attorneys' fees.  The 8.25 percent, 8 percent of the

9   8.25 percent is from the attorney's contingency fee.  It is not

10  from the client.

11          **THE COURT:**  But wait a minute.  But you're asking for

12  8.25 percent of -- okay.  Let's say a plaintiff settles for

13  $100,000.  Okay?  You're asking for 8,250 of those dollars to

14  go into a common benefit fund.  Right?

15          **MS. GREENWALD:**  Correct.

16          **THE COURT:**  Okay.

17          **MS. GREENWALD:**  And 8,000 of that would come from the

18  attorney's fee.

19          **THE COURT:**  Right.

20          **MS. GREENWALD:**  $250 would come from the client share

21  of the recovery.

22          **THE COURT:**  But it's a percentage of the total

23  settlement.

24          **MS. GREENWALD:**  Correct.

25          **THE COURT:**  Okay.  So any cases that are part of the

```
 1    MDL is number one.  Right?
 2            MS. GREENWALD:  Right.
 3            THE COURT:  Number two is any cases where the lawyer
 4    representing the plaintiff in state court or anywhere -- any
 5    case where the lawyer representing the plaintiff has signed the
 6    participation agreement.  Right?
 7            MS. GREENWALD:  Correct.
 8            THE COURT:  Okay.  So there are about 4,000 cases in
 9    the MDL.  So all of those cases would be covered by the
10    holdback order.  And a settlement in any of those cases,
11    8.25 percent of that settlement would have to go into the
12    common benefit fund.
13        And then for any lawyer -- let's say a lawyer has 10,000
14    state court cases in North Carolina, an additional 10,000
15    prospective plaintiffs in North Carolina who they represent but
16    the cases haven't been filed yet.  That's 20,000 cases.
17            MS. GREENWALD:  Right.
18            THE COURT:  And any settlement for any of those 20,000
19    cases, there would need to be an 8 percent holdback,
20    8.25 percent holdback based on the fact that the lawyer who
21    represents those 20,000 people signed the participation
22    agreement?
23            MS. GREENWALD:  Correct.
24            THE COURT:  Okay.  And then, so other than cases that
25    are part of the MDL and cases where the plaintiff is
```

```
 1   represented by a lawyer who signed the participation agreement,

 2   what other types of cases do you say should be subject to a

 3   holdback order from this MDL?

 4         MS. GREENWALD:  So certainly, under PTO 12 -- and

 5   we --

 6         THE COURT:  We'll get to --

 7         MS. GREENWALD:  Okay.

 8         THE COURT:  We'll get to PTO 12 --

 9         MS. GREENWALD:  So any --

10         THE COURT:  -- in a moment.

11         MS. GREENWALD:  All right.

12         THE COURT:  I'm just trying to get clarity --

13         MS. GREENWALD:  Categories.

14         THE COURT:  -- on what you are asking for now.

15      What are you asking for in this motion?  What cases are

16   you arguing should be subject to a holdback order in this

17   motion that you filed?

18         MS. GREENWALD:  I think in the motion we're asking for

19   now, we would say all cases that are settling or are soon to be

20   subject to a settlement agreement should be subject to the

21   holdback order.

22         THE COURT:  So any lawsuit or prospective lawsuit

23   against Monsanto for Roundup, whether in federal or state

24   court, whether the lawyer signed an agreement or not, every

25   single lawsuit in the country should be subject to a holdback
```

1   order that I issue so that every single lawsuit in the country,

2   8.25 percent of the settlement has to go in the fund.

3            **MS. GREENWALD:**  I would even -- I would add one other

4   category to that, and that would also include unfiled --

5            **THE COURT:**  Is it possible to have another category?

6   Is there --

7            **MS. GREENWALD:**  There is.  There's a lot of unfiled

8   cases.

9            **THE COURT:**  Yeah.  That's what I -- yeah, right.

10           **MS. GREENWALD:**  I didn't hear -- I didn't hear you --

11           **THE COURT:**  I said plaintiff --

12           **MS. GREENWALD:**  -- say "unfiled."

13           **THE COURT:**  -- plaintiff or prospective plaintiff.

14           **MS. GREENWALD:**  Okay.  I'm sorry.  I didn't -- I

15   didn't -- yes.  So that would be --

16           **MS. WAGSTAFF:**  I was going to say, Your Honor, I would

17   change your phrasing just a little bit.  Instead of making it

18   as broad as you just said, I would add the category of cases

19   where lawyers -- where their lawyer has a case in the MDL.  I

20   would make that a subcategory.

21       And then another category I would make cases where their

22   lawyer has benefited from the common benefit work product.  And

23   if that happens to be all of the cases, we can't help that.

24       But there could -- someone could make an argument, that

25   I think is beyond the scope of this call, that they didn't

1   benefit from the common benefit work product.  But I would not

2   just throw it out there and say "every case forever and ever

3   and ever" because I think there could be cases where they

4   didn't benefit from the common benefit work product.  I just

5   don't really know at this moment, as I sit here, who those

6   would be.

7        So I would say another subcategory would be cases where

8   the lawyers have -- where they're represented by a lawyer with

9   a case in the MDL, and then the other one is cases where their

10  lawyers benefited from our work product.

11           THE COURT:  Okay.  So let's start over again.

12       So number one is any case in the MDL.

13           MS. GREENWALD:  Right.

14           THE COURT:  Number two is any case -- shall we say

15  "claim" so that it covers both cases that are filed and cases

16  that are not yet filed?

17           MS. GREENWALD:  Sure, that's fine.

18           THE COURT:  Any case in the MDL.

19       Any case or claim not in the MDL where the person's lawyer

20  signed the participation agreement.  Right?

21           MS. GREENWALD:  Correct.

22           THE COURT:  That's Category 2.

23           MS. GREENWALD:  Correct.

24           THE COURT:  And Category Number 3 is any case or

25  claim -- even if the lawyer didn't sign the participation

```
1    agreement and even if the case is not in the MDL, any case or

2    claim where the lawyer and the client benefited from

3    MDL work product.

4            MS. GREENWALD:  Correct.  That's where I was going

5    when I was saying that it would really be any case at this

6    juncture, because at this juncture, Your Honor, any lawyer or

7    any cases or claims that are receiving a settlement offer from

8    Monsanto necessarily had to have benefited from the

9    MDL work product.  Monsanto never even made a settlement offer

10   in any of the three trials -- Pilliod, Hardeman, or Johnson --

11   at any point.  And so --

12           THE COURT:  So the -- hold on a second.  We can --

13           MS. GREENWALD:  Okay.

14           THE COURT:  -- get to argument, but I just want to

15   sort of define some of our terms --

16           MS. GREENWALD:  Okay.

17           THE COURT:  -- here.

18       And so -- but so -- and so you're defining

19   "MDL work product" very broadly.  You're saying it's not some

20   database of information that is being kept as work product

21   developed by the lead counsel.

22           MS. GREENWALD:  Correct.

23           THE COURT:  You're saying any -- any -- anybody who is

24   receiving a payment, anybody who is -- any case, any claim

25   where a plaintiff or a prospective plaintiff receives a payment
```

1  from Monsanto, they are, by definition, benefiting from

2  MDL work product because MDL work product, according to your

3  definition, is the hard work that you did at trial, setting the

4  stage for these other people to obtain a payment from Monsanto

5  once Monsanto cried uncle.

6         **MS. GREENWALD:**  Can I add to that, Your Honor?  And I

7  would say --

8         **THE COURT:**  Well, before you add to it, is what I'm

9  saying --

10        **MS. GREENWALD:**  The answer is yes.  Yes, the answer is

11  yes, with the addition that the appointment of

12  Special Master Feinberg as settlement master was a key moment

13  in changing from litigation to settlement discussions.  That

14  was a pivotal point in this litigation.  There had been three

15  successful trials and no discussions of settlement, at least to

16  our knowledge, certainly not with leadership.

17        **THE COURT:**  Again, I'm just trying to get --

18        **MS. GREENWALD:**  No.  But that --

19        **THE COURT:**  -- definitions here.

20        **MS. GREENWALD:**  But that --

21        **THE COURT:**  So you're --

22        **MS. GREENWALD:**  -- that is an important point.

23        **THE COURT:**  So you're -- so the categories, any case

24  or claim where the lawyer and the client benefited from

25  MDL work product.

 1        And "MDL work product" is defined broadly to include any

 2    materials that they might have gotten access to from your

 3    database, expert materials or deposition transcripts or

 4    whatever.  It also includes the coattails that they rode in on

 5    as a result of your success- -- the successful results that you

 6    achieved.  And it also includes the benefit of having

 7    Ken Feinberg being appointed by me to settle the MDL cases, and

 8    he also was hired by you all to settle all the other cases.

 9        Is that --

10        **MS. GREENWALD:**  Right.  So, yes, with the caveat that

11    it's not -- I don't want the Court to think that we're saying

12    that because we took a deposition or we made a motion or we

13    hired an expert, that, by definition, forever subjects all

14    cases in the future to a common benefit holdback.  That's

15    not -- we're not trying to have a broad, sweeping scope of

16    20 years any time anyone uses anything in this MDL.

17        We're saying at this juncture, given the status of

18    99.99 percent of the Roundup cases, the 125,000 or so that

19    Monsanto represents are out there, either filed or unfiled,

20    that the small number of cases that were worked up are what

21    triggered this Court and Monsanto, frankly, to come to the

22    bargaining table not only with leadership, but with, I think,

23    virtually most of the lawyers out there.

24        While all those lawyers -- not "all those lawyers."

25        **THE COURT:**  You don't need to --

1          **MS. GREENWALD:**  Many --

2          **THE COURT:**  Let me just interrupt.

3      You don't need to argue that.  I mean, that's obvious.

4          **MS. GREENWALD:**  I just --

5          **THE COURT:**  That is absolutely true.  There's no

6  question about that, that you winning -- and, by the way, you

7  guys, did you do the Johnson trial and the Pilliod trial too?

8          **MS. GREENWALD:**  The Miller Firm had both Johnson and

9  the Pilliods along -- and they tried that case along with the

10 Baum Hedlund firm.

11     And then, as you know, Hardeman was before you with

12 Ms. Wagstaff and Ms. Moore.

13         **THE COURT:**  Okay.

14         **MS. GREENWALD:**  So every trial has been leadership.

15         **THE COURT:**  Right.

16     I don't think there's any question that the reason all of

17 these cases have settled is because you won those trials.

18 Like, that's not -- you spilled a lot of ink about that, but

19 that's sort of obvious.  But I think that's only the sort of

20 starting point to figuring out what the right answer is in

21 connection with a common benefit fund.

22     Now, do you perceive -- do you perceive your request as a

23 request to expand the universe of cases subject to a holdback

24 from PTO 12, or do you interpret PTO 12 as contemplating a

25 holdback for all of those cases?

1          **MS. GREENWALD:**  That's the question I've thought about

2    most before coming here today.

3        I'm going to say it's mostly in PTO 12 with one caveat.

4          **THE COURT:**  Okay.

5          **MS. GREENWALD:**  So I believe that PTO 12 is clear that

6    all cases are subject to an assessment.

7        In your categories, Your Honor, frankly, the one if you

8    have a case in the MDL, then all of those lawyer's cases, filed

9    or unfiled, are subject to an assessment under PTO 12.

10       Certainly, under PTO 12, your second category of people

11   who signed a participation agreement, those lawyers' both filed

12   and unfiled cases are subject to a holdback assessment under

13   your PTO 12.

14       I believe anyone who used the services of Ken Feinberg to

15   settle their cases would fall within the ambit of your PTO 12.

16       The one area where I think there's --

17          **THE COURT:**  Why?

18          **MS. GREENWALD:**  Well, because in PTO 12, it says

19   (reading):

20          "This Order . . . applies to all plaintiffs or

21       other claimants from other non-MDL 2741 proceedings

22       and their counsel who voluntarily submit to

23       this Court's jurisdiction . . . ."

24   And so I would say --

25          **THE COURT:**  So by entering -- I mean, but I -- I mean,

1    didn't I appoint Ken Feinberg to be the -- to settle the cases

2    in the MDL?  I mean, of course he was perfectly free to broker

3    settlements for other cases, and you all were perfectly free to

4    use him to do so and to pay him to do so.  But I mean, I

5    appointed him -- and this is probably a small point, but I

6    mean, I think it's worth mentioning that I don't think I ever

7    appointed him to settle all the cases nationwide.

8         I mean, that was his choice and your choice to get him

9    involved in that.  Right?

10        **MS. GREENWALD:**  That would be very difficult to do

11   because most lawyers represent clients in both categories.

12   Right?  So most lawyers have some cases in the MDL, some

13   unfiled cases, and then a number of cases in various state

14   courts.  And so it would be a peculiar -- it would be, I think,

15   unprecedented -- I can't think of any situation where you would

16   go to Monsanto and say:  I'm only -- go to Mr. Feinberg and

17   say:  Please help me settle the 25 percent of my cases which

18   are in the MDL.  I'm going to ignore my other 75 percent of my

19   clients.

20        That isn't the way mass tort works.

21        **THE COURT:**  Well, right.  But as a matter of my

22   authority, though.  Right?  I mean, I know that I have the

23   authority to appoint Ken Feinberg to settle the cases before

24   me.  But do I have the authority to appoint Ken Feinberg to

25   settle a pending state court case in North Carolina?  I mean, I

1    can order you and Monsanto to go meet with Ken Feinberg,

2    the court-appointed mediator.

3            **MS. GREENWALD:**  Right.

4            **THE COURT:**  Can I order -- could I appoint a

5    mediator -- as the MDL judge, could I appoint a mediator and

6    order the lawyer who is representing a plaintiff in a

7    North Carolina state court to go meet with him and try to

8    settle their case?

9            **MS. GREENWALD:**  No, I don't think -- no, I don't think

10   you could.

11           But if that lawyer then comes into this Court's ambit and

12   says, "I would like Mr. Feinberg to help me settle my cases

13   with Monsanto.  I need help.  I need the services of

14   Mr. Feinberg to help me negotiate with Monsanto," I believe

15   that lawyer then takes action to voluntarily submit to

16   this Court's jurisdiction because you had established

17   Mr. Feinberg as the settlement master for the Roundup

18   litigation.

19           And in so doing, if a lawyer comes in and says,

20   "Mr. Feinberg" -- by the way, who's paid by the leadership for

21   all of these services he's been providing.  If you come in and

22   say, "I would like Mr. Feinberg to help me settle my entire

23   docket of cases," I believe that lawyer is submitting to the

24   jurisdiction of this Court.

25           **THE COURT:**  Okay.  And I interrupted you when you were

 1    talking about --

 2            **MS. GREENWALD:**  That's okay.

 3            **THE COURT:**  -- paragraph 4, and I think you --

 4            **MS. GREENWALD:**  Right.

 5            **THE COURT:**  -- were starting to say that --

 6            **MS. GREENWALD:**  Right.  So the one area that I think

 7    is gray.

 8            **THE COURT:**  Yeah.

 9            **MS. GREENWALD:**  Right.  So the gray area is the lawyer

10    who has no cases in the multidistrict litigation at all, not

11    even one case filed here, no participation agreement, no

12    association with lawyers in the MDL, and has not used in any

13    kind of meaningful way MDL work product.

14            **THE COURT:**  What does that mean, "association with

15    lawyers in the MDL"?

16            **MS. GREENWALD:**  So a number of -- a number -- so I

17    mean, there's ways to be part of an MDL and ways there's not.

18    And I think one result that would be so unfortunate is to have

19    gamesmanship --

20            **THE COURT:**  Let's try to hold off on arguing about

21    what --

22            **MS. GREENWALD:**  Okay.

23            **THE COURT:**  -- would be unfortunate and what wouldn't

24    be unfortunate, and just let's try and figure out what is

25    covered by PTO 12.

1          **MS. GREENWALD:**  So, for example, if you have a lawyer

2     who has a case in the MDL and there's a lawyer who has cases

3     only in state court but that lawyer also is co-counseling with

4     a lawyer in a case in the MDL, many courts have found that that

5     lawyer is part of the MDL by the association of that

6     co-counseling of a case with the MDL case, and therefore that

7     person does have -- that attorney does have a nexus to the MDL.

8          **THE COURT:**  By co-counseling with a lawyer who has an

9     MDL case, they're co-counseling in the MDL case or they're

10     co-counseling in a state court case?

11          **MS. GREENWALD:**  In an MDL case.

12        So, for example, assume, hypothetically, that there's a

13     lawyer who has only state court cases, but that lawyer has been

14     asked to participate in one of the wave cases by an MDL lawyer.

15          **THE COURT:**  Okay.

16          **MS. GREENWALD:**  And that lawyer has a fee agreement

17     with that lawyer to help litigate that wave case.

18        That lawyer, under many of the decisions in holdback

19     orders, would be considered a lawyer who's participating in the

20     MDL.

21          **THE COURT:**  And that's the gray -- but that's gray as

22     it relates --

23          **MS. GREENWALD:**  No, I don't think it is.  I don't

24     think that one is.

25        I think it's the lawyer who doesn't have any of those.  So

 1    it's the state court lawyer who does not have any --

 2            **THE COURT:**  Wait.  Hold on.  Before we get to this

 3    next category, I'm now fixated on this lawyer who --

 4            **MS. GREENWALD:**  Okay.

 5            **THE COURT:**  -- associated with counsel in an MDL case.

 6       Where is the language in the PTO that applies to that?

 7            **MS. GREENWALD:**  Well, you'd be submitting to the

 8    jurisdiction of this Court.  You'd be -- you'd be co-counseling

 9    in a wave case.  You'd be participating in filing expert

10    reports.  You would be complying with all the -- all the

11    procedures that you've put in place for wave cases.

12            **THE COURT:**  So are you saying that -- are you

13    contemplating a lawyer who is helping with the MDL but hasn't

14    made an appearance?  Is that what you're talking about?

15            **MS. GREENWALD:**  It could be.  It could be.

16       I mean, we've seen it more the other way.  We focus on

17    that with some objectors who have -- are partici- -- in fact,

18    we've mentioned -- so, for example, one of the objectors, the

19    Gibbs firm, is litigating a case with one of the Wave 2 cases,

20    I believe.  And so -- but I don't know whether that firm has

21    filed an appearance in that case.  I really don't know.

22            **THE COURT:**  Okay.  So let me just see if I -- so let

23    me see if I understand this category before you move on to --

24            **MS. GREENWALD:**  Okay.

25            **THE COURT:**  -- the other category.

1      So let's say I am a plaintiff, I have NHL, and I live in

2  North Carolina.  And I've hired a lawyer, and that lawyer is

3  representing me in state court in North Carolina.  Okay?

4          **MS. GREENWALD:**  Okay.

5          **THE COURT:**  Suing Monsanto for causing my NHL.

6      And then let's say the case moves along, drags along

7  slowly, as they tend to do.  And then my lawyer happens to get

8  involved in one of the MDL cases and assists some other lawyer,

9  who already had that MDL case, in working the case up for

10  trial.

11          **MS. GREENWALD:**  Right.

12          **THE COURT:**  As a result of that lawyer doing that, the

13  MDL judge has the authority to order an 8.25 percent holdback

14  of any recovery that I obtain in my North Carolina state court

15  case?

16          **MS. GREENWALD:**  Well, again, it's not coming out of

17  the client's pocket.

18          **THE COURT:**  As a result of my lawyer separately, like,

19  joining some MDL case and providing assistance and working up

20  an MDL case for trial?

21          **MS. GREENWALD:**  Right, because I don't think that's

22  any different than a lawyer who has one case in the MDL.

23      So under PTO 12, if you have one case in the MDL, PTO 12

24  says that that lawyer's filed and unfiled cases, whether

25  they're filed in state or federal court, are subject to the

```
 1   holdback.
 2         THE COURT:  Maybe that's a problem with PTO 12.
 3         MS. GREENWALD:  Well, Your Honor, that's pretty common
 4   in pretty much all of the common benefit orders that have come
 5   down the pike since PTO 12.
 6         THE COURT:  But maybe that's a problem with the common
 7   benefit orders.
 8         MS. GREENWALD:  But --
 9         THE COURT:  I will say that we're in a little bit of a
10   state of confusion right now, and I take primary responsibility
11   for that.
12       This language in PTO 12 was submitted to me early on in
13   the case.  If I recall correctly, both Monsanto and the lead
14   counsel agreed on this language that we're talking about right
15   now in paragraph 4.  And I have to say that I adopted it
16   uncritically and put it into Pretrial Order 12.
17       And I apologize for not drilling down harder on this
18   language and thinking through the issues more carefully when I
19   adopted -- or when I was considering the language, because
20   I think that -- first of all, the language of paragraph 4 in
21   PTO 12 is very badly written.  I mean, it's virtually
22   incomprehensible.  And, number two, I think that this
23   discussion sort of highlights how broadly PTO 12 tries to reach
24   and how many cases PTO 12 purports to affect.
25       And so maybe now is the time to get into the discussion
```

1    about it.  Let me give you my tentative view about it, about

2    PTO 12.  And I know you were about to describe some even

3    further removed category of cases, but I'm not sure that --

4    that PTO ought to apply to, but I'm not a hundred percent sure

5    it's necessary to do that because I think -- I think there are

6    three questions that an MDL judge has to ask, three questions

7    that I should have asked before deciding whether there should

8    be a holdback and a common benefit fund and before deciding on

9    the scope of the holdback order and the common benefit fund.

10         The first question, I think, is:  Do I have jurisdiction

11   to apply the holdback order to this particular category of

12   cases or claims?  And I think there are some cases and claims

13   that an MDL judge probably has jurisdiction to apply a holdback

14   order to and there are some categories of cases and claims that

15   an MDL judge does not have jurisdiction to apply a holdback

16   order to.

17         I think -- and when I say -- I think I should say now,

18   just to be clear, when I use the word "jurisdiction," I tend to

19   agree with Judge Furman's analysis of the jurisdictional issue.

20   And I noticed, as I was reading his opinion, he kept saying:

21   It's not a jurisdictional question, at least not subject matter

22   jurisdiction.

23              MS. GREENWALD:  Right.

24              THE COURT:  And I think he's probably right that it's

25   not subject matter jurisdiction.  But I think -- and I see

1   Mr. Citron sort of half agreeing with me or maybe disagreeing

2   with me with his head movements.  But I think that -- I think

3   that it is a jurisdictional question.  It's a question of

4   whether the Court has the authority to reach its tentacles out

5   so far to cover some case in state court or some unfiled claim.

6       I'm not sure it's right to call it subject matter

7   jurisdiction.  I mean, when I think of subject matter

8   jurisdiction, I think of diversity jurisdiction and federal

9   question jurisdiction and whether there's a case or controversy

10   within the meaning of Article III.

11       And, of course, there is here a case or controversy within

12   the meaning of Article III.  There are, like, 4,000 cases or

13   controversies within the meaning of Article III that we have as

14   part of this MDL.

15       So I'm not sure that it's right to call it subject matter

16   jurisdiction, but I do think that it's a question about the MDL

17   court's jurisdiction or authority to reach so far into other

18   disputes and order the parties to those disputes to do certain

19   things.

20       So we can get back -- and, Mr. Citron, I would be happy to

21   hear from you on that at some point.  Am I pronouncing your

22   last name correctly?

23           **MR. CITRON:**  (Nods head.)

24           **THE COURT:**  Yes?  Okay.

25       But anyway, so I think when I say "jurisdiction," what I

mean is the Court has to conduct the kind of inquiry that is
called for by the *Vincent* case in the Ninth Circuit and the
*Heartland* case in the Ninth Circuit and that case in the -- the
*Rice* case in the Eighth Circuit and then the older one from the
Fourth Circuit whose name I can't remember.  That's the first
thing is, you have to ask yourself, as those cases require us
to do, do I have the authority to reach so far into those other
cases or those other disputes?

        And my tentative view is that the authority of the MDL
judge is far more limited than what seems to be contemplated by
Pretrial Order 12 and by many of the other pretrial orders
that -- holdback orders that judges have entered in MDLs.

        I think, unfortunately, when you get one of these big
cases and both sides agree to the language of a proposed order
and nobody's coming in and objecting -- I'm not making excuses
because, as I said, I should have looked at it more critically.
But the reality of litigation is that judges are busy enough
that when both sides agree on language, they're sort of less
inclined to look at it really critically.

        And I think that probably in these MDLs, judges aren't
thinking carefully enough about the reach of their authority,
the scope of their authority on the front end, and that
certainly was the case with me.

        So my tentative view is that I only have the authority to
require -- I mean, I think I basically agree with Mr. Citron on

1   this, that I only have the authority to require a holdback for

2   actual cases in the MDL and maybe, maybe cases filed by lawyers

3   who signed the participation agreement.  Maybe I have the

4   jurisdiction or authority to require a holdback for those

5   cases.

6        The other cases, I tend to believe that MDL courts do not

7   have the authority to require a holdback.  It's outside the

8   scope of their jurisdiction or their reach or whatever term you

9   want to attach to it.

10        So that's the first question.

11        The second question is from sort of a parallel line of

12   cases -- right? -- this *Alyeska* footnote and the cases that

13   have derived from that -- right? -- and the common benefit fund

14   cases that came before *Alyeska*.

15        But those cases talk about whether a common benefit fund

16   is appropriate and whether the universe of people to whom the

17   common benefit fund would apply is identifiable and whether

18   it's -- whether the benefit that they received is measurable

19   and all that kind of stuff.

20        I think you have to ask whether a common benefit fund is

21   appropriate under that line of cases.  And I think that at

22   least as it relates to the cases that are part of the MDL, that

23   probably is appropriate.  Perhaps it's also appropriate as to

24   the -- as to the cases where the lawyer signed a participation

25   agreement, although, again, I'm not so sure about that.

1          And then the third thing you have to do is the Court still

2     has to decide, in the exercise of its own discretion, whether a

3     common benefit fund is appropriate and whether a holdback is

4     appropriate and, if so, how much the holdback should be.

5          And then, I guess number four, if the Court decides that

6     there should be a common benefit fund, then, number four,

7     the Court will have to figure out at the end of the day how

8     that fund should be allocated.

9          And on that, on number three and four -- I mean, maybe

10    four is premature now.  I think it probably is.  But on

11    number three, whether a common benefit fund should be

12    established, just as a matter of discretion and equity, I guess

13    my inclination is that, again, perhaps for the cases that are

14    part of the MDL, although I still have some questions about

15    that, and probably not for the cases where lawyers signed a

16    participation agreement but the cases are not part of the MDL

17    because --

18         And the reason for that has sort of already been brought

19    out in this discussion.  The use of the participation agreement

20    was not particularly systematic, and under the circumstances,

21    it doesn't seem to make any sense to require a plaintiff whose

22    lawyer happened to sign the participation agreement to be

23    subject to a holdback, whereas a plaintiff whose lawyer

24    happened not to sign the participation agreement not be subject

25    to a holdback.  That doesn't seem particularly equitable.

1        And so I think it probably -- my tentative view is that it

2   probably makes sense to only give serious consideration to a

3   holdback for the cases that are part of the MDL.

4        And like I said, I have some further questions about that.

5   Maybe I'll throw them out there now, just so that I don't

6   forget.

7        I think if you go back and you look at the origins of the

8   common benefit fund doctrine, if you look back at all these old

9   cases from, like, the first half of the 20th century, what you

10  will generally see, or maybe always see, is that the concern is

11  that the person who goes first -- like the lead plaintiff --

12  the lead plaintiff who achieves, as a result of their

13  successful litigation, a common benefit for a defined group of

14  people, for an identifiable group of people, the concern that

15  the courts have -- at least as far as the origins of the

16  doctrine go, the concerns that the courts have are:  We don't

17  want this lead plaintiff who accomplished the result to pay for

18  her own attorneys' fees.  Right?

19       We don't want Ms. Sprague -- is that her name?  Sprague?

20  "SPROG."  "SPRAIG."  I don't know how you pronounce it.  We

21  don't want Ms. Sprague to, in that case from, like, 1950 or

22  whatever it was, we don't want her to pay for her own

23  attorneys' fees because if she has to pay for her own

24  attorney's fees, what she's essentially paying for is the

25  benefit -- she's incurring fees for the benefit of herself and

1   equally for those 14 other people who had those deposits in the

2   bank.  Right?  And so we want to make her whole.  Right?  We

3   want to make sure that we make Ms. Sprague whole, and so we're

4   going to use a common benefit fund to spread the cost of her

5   attorneys' fees, her fees that she incurred, around.

6        At some point -- and maybe it's with the advent of the

7   MDL -- it seems like the purpose of the common benefit fund

8   kind of morphed.  Right?  It was no longer so much about making

9   sure that the lead plaintiff was made whole and didn't have to

10  pay attorneys' fees for a benefit that -- full attorneys' fees

11  for a benefit for other people.  Right?  It became more about

12  obsessing about free riders and not wanting free riders to get

13  any unfair -- any sort of unfair benefit from the work of the

14  leader -- right? -- the work of the lead counsel.

15       And it also morphed, by the way, at some point -- and,

16  again, perhaps with the advent of the MDL.  It morphed from

17  worrying about the plaintiff, the lead plaintiff having to pay

18  fees for the benefit of other people to worrying about the lead

19  lawyer -- right? -- doing too much work that benefits other

20  plaintiffs.

21       And I guess in terms of whether I should exercise -- and

22  I think -- so maybe -- so, anyway, to the extent that we're

23  applying this common benefit fund doctrine to MDLs, the one

24  that originated back in the day, it's almost an entirely

25  different doctrine now than it used to be.  And I question

1   whether it's sort of strayed too far from its origins perhaps.

2   But in any event, maybe that train has left the station.

3       But I think that one important lesson from the doctrine is

4   that one of the major things we should be concerned with is,

5   the plaintiff and the lawyer who are taking the lead, are they

6   not getting fair compensation for the work that they did.

7   Right?  I mean, in Ms. Sprague's case, she would have had to

8   pay her own lawyers' fees, own attorneys' fees if there hadn't

9   been this contribution from these other beneficiaries.

10      Here, is there any real concern that the lawyers who did

11  the lead work, the front work -- right? -- and I know it's not

12  just the lead counsel.  I know that there are lead counsel and

13  there are a number of other firms who also did heavy lifting --

14  right? -- in furtherance of these trial victories and in

15  furtherance of moving the MDL along.

16      But is it really -- is there any real concern that these

17  lawyers have not been adequately compensated for the work that

18  they did?  I'm not really sure that there is.

19      And if there's no real concern that the lawyers in this

20  MDL have not been adequately compensated for the work that they

21  did, then why should there be a holdback order at all?  Why

22  does there need to be a holdback order and a common benefit

23  fund at all?

24      That would be, I think, a question of -- I think you could

25  get into an interesting academic discussion of whether the

common benefit fund doctrine has steered too far from its

origins and whether a court even has the authority to order a

common benefit fund in a situation like this, where the counsel

that did the work has already been adequately compensated.

     That might be an interesting question.  I'm not sure we

need to worry about that because I think -- I think it's a

pretty common practice now to have these common benefit funds

and there sort of seems to be a consensus that it's okay to do.

     But I still think there's a question of exercising --

the Court exercising its discretion to decide whether a common

benefit fund is appropriate under the circumstances.  And I do

wonder -- I'm not sure I have complete information; so I'm not

sure the question can be answered.  But I do wonder if it would

be appropriate as a matter of discretion to establish a common

benefit fund at all in this case in light of my assumption that

the lawyers who did the front -- all the front work have been

more than adequately compensated already.

     So that was, I realize, a very long and winding and

probably confusing expression of my tentative thoughts.  And

I guess I'll sort of leave it to -- why don't we start with the

first issue.

     I mean, my first tentative conclusion for Ms. Greenwald or

whoever is dealing with it is, I don't think that an MDL court

has the authority to go beyond a holdback order for cases that

are actually in the MDL and possibly cases where there's a

 1   participation -- where the lawyer signed a participation

 2   agreement.

 3          **MS. GREENWALD:**  So, Your Honor, we obviously believe

 4   you do have that authority.  You have your equitable powers.

 5       So maybe I can step back a bit.

 6          **THE COURT:**  But a court's equitable powers only go so

 7   far.  So that begs the question.

 8          **MS. GREENWALD:** Understood.  Understood.  But you have

 9   a litigation here where, basically, six law firms and firms

10   working with them -- so maybe it's 20 in total.  We don't have

11   an exact number because, of course, there hasn't been an

12   opportunity yet for people to apply -- literally carried the

13   bags for 125,000 cases.

14       So when you look at the chart -- which I don't know how to

15   share a screen very well, but this is in our brief on page 7 --

16   I think this chart really answers it all.

17       Up until there were the *Daubert* decision and the

18   verdicts -- the verdict in the Johnson case, there were cases

19   pretty much filed only by leadership and a few other people

20   working with leadership.  It was a small --

21          **THE COURT:**  Let me just interrupt you because I

22   don't -- I don't want to take -- I don't want to make this

23   hearing any longer than it's going to be.

24       You took the lead and other law firms took the lead.  You

25   filed these cases.  You put yourself out on an island.  You

worked very hard.  You spent a lot of money.  You got incredible results.  And then lots of people started filing cases, and they all received -- they all got their settlements because you achieved such a good result.  There's no question about that, and you don't need to convince me of that.

The thing you need to convince me of is -- the point that you make is beside the point when it comes to the question of what is the power of an MDL judge to order a plaintiff in a state court case or some plaintiff who hasn't filed a case to pay a percentage of their recovery into a fund.  That's really -- the point you make about how much of a benefit everybody got from your hard work is really not relevant to that.

**MS. GREENWALD:**  I mean, I think that Judge Furman, in all three of his decisions, addresses that answer in depth.  He explains how lawyers who lead litigations, both in state and federal court -- here, the same lawyers were doing both, which was one of the unique aspects of this litigation because there were only a very few firms working in this case.  And we wanted to put maximum pressure on Monsanto, and they wouldn't waive *Lexecon*, so we wanted to make sure we had pressure in state cases as well to get trials.  So we were in both places working full-time getting these cases litigated and ready for trial.

And frankly, those 50 or so clients who we worked up for trial, in fact, bear the burden of expenses here.  They didn't

1    all get jury verdicts, by the way.  They're in these

2    settlements like everybody else, except for the few people who

3    got trial dates.

4        And so it's not that different from the early litigation.

5    But what's changed is the concept of mass torts.  And so to not

6    tax lawyers who literally sit on the sidelines, advertise,

7    warehouse cases, and do nothing until we deliver a settlement

8    to them, basically at their door, would be to incentivize

9    lawyers to do nothing in the future.  Don't practice law.

10   Advertise, get cases, put them in your docket, and wait for the

11   lawyers who are doing the litigation to bring it home.

12       And, you know, the objectors --

13         THE COURT:  That happens now with common benefit

14   funds.  I mean, this case is a good example.  Right?

15       I issued PTO 12.  Anybody who was paying attention was on

16   notice of the likelihood of a common benefit fund and spoke --

17   had questions as to what the scope would be.

18       And I could have given you exactly what you wanted in

19   PTO 12.  Right?  I could have said:  We're going to start the

20   holdback now, and we're going to set up the fund now, and

21   anybody who settles is going to have to pay in 8.25 percent or

22   10 percent or 12 percent.  And there still would have been TV

23   lawyers running their ads and acquiring clients and sitting

24   there and waiting for the settlement to come in.

25       I mean, you're acting like adoption of a common benefit

```
1    fund is going to prevent that from happening in the future or
2    something.  I mean, that is a reality of mass tort litigation.
3          MS. GREENWALD:  But I don't think it matters that
4    there wasn't -- you issued a holdback order back then.  I think
5    it disincentivizes lawyers in the future from dedicating their
6    time and efforts into a case, particularly a case like this,
7    which was a complex case.
8          THE COURT:  Let me ask.  The problem is, you're
9    talking about a policy issue now, and you're talking about an
10   issue that I could take into account in the exercise of my
11   discretion.  But I don't see how it's relevant to the authority
12   of a federal court to reach a particular distance to particular
13   parties.
14        I mean, the MDL process does not give us -- does not
15   expand our jurisdiction.  It does not give us greater power
16   than we already have to manage our cases.  It's just that we
17   have to manage this big clump of MDL cases.  But it doesn't --
18        I mean, by your logic, let's say that you brought just one
19   case.  Okay?  Let's say there was no MDL.  There's no MDL.  You
20   brought a single case against Bayer, or Monsanto, alleging that
21   Roundup caused cancer in your client.  And you spent -- worked
22   really hard and you spent a lot of money and you won the case
23   and you won a 50-gazillion-dollar verdict.
24        MS. GREENWALD:  Mm-hmm.
25        THE COURT:  And then TV lawyers start advertising.
```

1    And a TV lawyer in North Carolina -- I don't know why I keep

2    using North Carolina.  But a TV lawyer in North Carolina starts

3    advertising on late-night cable in North Carolina and gets

4    10,000 clients and enters into negotiations with Monsanto to

5    settle the cases on behalf of the 10,000 clients.

6         On your theory, because you had a trial in my court, I

7    could order the 10,000 clients in North Carolina -- I would

8    have the authority, the jurisdiction, the power -- whatever you

9    want to call it -- to order the 10,000 clients in

10   North Carolina to hold back 8 percent of their recovery to make

11   sure that you, the person who did the trial in my courtroom,

12   get adequately compensated.

13        MS. GREENWALD:  I don't think that's at all what

14   multidistrict litigation is all about.  That --

15        THE COURT:  Do you think that I have the authority to

16   do that on my example that I --

17        MS. GREENWALD:  No, I don't.  That's not a

18   multidistrict litigation where the Court appoints a group of

19   people, leadership, to litigate the entirety of a mass tort.

20   You take on --

21        THE COURT:  No, no, no.  See, this is one of the big

22   problems with your argument and with, I think, a lot of people

23   who operate too frequently in the MDL world.

24        It's not -- I was not assigned to resolve every tort claim

25   in the country.  I was assigned to adjudicate every federal

1   case, every federal tort case involving Roundup.  And frankly,

2   the federal cases are dwarfed by the state cases.  There are,

3   like, 4,000 federal cases and -- what?  I don't know -- 200,000

4   state cases.

5       And I am not responsible -- the MDL judge is not

6   responsible for those cases, not responsible for rounding up

7   those cases, not responsible for adjudicating those cases, not

8   responsible for making sure what happens in those cases, and

9   not responsible for ordering people to do things in those

10   cases.

11       And it's this sort of federal supremacy mentality that has

12   kind of seeped into the MDL world that I think is causing these

13   kinds of arguments to be sort of accepted.  But I just don't --

14   I don't think that's right.

15       I don't think I have -- just like in my example about the

16   10,000 North Carolina cases after I've tried a single case,

17   just as I don't have the authority to order a holdback in those

18   10,000 North Carolina cases, I don't have the authority to

19   order a holdback in the 10,000 North Carolina state cases that

20   exist now against Monsanto.

21       **MS. GREENWALD:**  But you don't -- those parties --

22   those lawyers aren't before you in that hypothetical.

23       So in this hypothetical -- in our case here, if you have a

24   case --

25       **THE COURT:**  It doesn't matter that the lawyers are

1    behind me.  It's the clients.  It's the cases that you're

2    asking me to assert jurisdiction over, and it's the recovery of

3    the client that you're asking me to require a chunk be taken

4    out of.

5            MS. GREENWALD:  Your Honor, it's not coming from the

6    client.  It is a hundred percent not coming from the client.

7        Going back to your hypothetical initially, if you have a

8    $100,000 settlement and there's an 8 percent holdback, that

9    would be $8,000 that comes out of the attorney's contingency

10   fee.  So what that lawyer --

11           THE COURT:  But what you're asking me to do is issue

12   an order that says:  If somebody sues in state court and they

13   win a judgment -- let's say they win a million dollars in state

14   court.  You're asking me to order that 8 percent of that

15   million dollar judgment be taken out and held back.  And you're

16   further asking me to say that it needs to come from the

17   lawyer's portion.

18       But you are asking me to issue an order that affects a

19   judgment that was obtained in state court.

20           MS. GREENWALD:  So, okay.  Right now, we're not

21   even -- so the hypothetical of someone down the road who tries

22   a case in state court and hires experts and does all the

23   discovery and does all the work, that's not before us now.

24       What's before us now are all these cases --

25           THE COURT:  Do you think that I have the authority to

do that?

        MS. GREENWALD:  I think that lawyer can come to you
and say that that is an inequitable application to his or her
case because that lawyer --

        THE COURT:  But you think I have the authority to do
it?

        MS. GREENWALD:  I think you --

        THE COURT:  You think a federal court has the
jurisdiction to go reach into that judgment, that state court
judgment, and require that a portion of the judgment be held
back?

        MS. GREENWALD:  I think that -- if that lawyer used
common benefit work, the answer is yes, maybe.

        THE COURT:  But I thought you said that even if the
lawyer didn't use common benefit --

        MS. GREENWALD:  No, no, no, no, no, no.  If a
lawyer --

        THE COURT:  Your broad definition of "common benefit
work" is that you achieved a good result and they --

        MS. GREENWALD:  No, no.  Common benefit work is the
experts we worked up in this case.

        THE COURT:  Wait a minute.  But that's not what you
said at the beginning of this hearing.  You said that common
benefit work was anybody who benefited from the work; anybody
who either used the materials or got a recovery of any sort as

1   a result of your groundbreaking work.

2          MS. GREENWALD:  Right.  But how can anyone sit across

3   a table from Monsanto right now in negotiations and ask for any

4   money for their clients if they can't say:  The science is on

5   our side.  The law is on our side.  Monsanto's liable because

6   of all the depositions that were taken, because of all the

7   documents that were gone through.

8        In order to have a level playing field with Monsanto in

9   any negotiation at all, you have to have access to all the work

10  we put together.  You have to.

11         THE COURT:  But what does that have to do with my

12  authority to -- forget about the state court judgment.  Let's

13  just stick with settlements, because I don't want to confuse

14  things unnecessarily.

15       I just don't understand what any of that has to -- these

16  are all policy arguments you're making.  But what does that

17  have to do with my authority to reach out to North Carolina and

18  require a plaintiff in North Carolina who filed a lawsuit, who

19  has no connection to the MDL and gets a settlement from

20  Monsanto, to pay 8 percent of that into a fund for this MDL?

21         MS. GREENWALD:  Okay.  So that's the one I said PTO 12

22  does not necessarily touch.

23       But can I change that hypothetical and have that --

24         THE COURT:  Sure.

25         MS. GREENWALD:  -- North Carolina lawyer have one case

1    in your MDL?

2        You have authority --

3            THE COURT:  I don't understand why that -- I don't

4    understand --

5            MS. GREENWALD:  Because that lawyer --

6            THE COURT:  -- why that matters.

7            MS. GREENWALD:  You have authority over that lawyer,

8    and that lawyer -- so a lawyer who's in the MDL, who benefits

9    from all the common benefit work, they don't just apply that

10   knowledge and that information to that one client.

11       As a lawyer, you know what you know, and you have an

12   obligation to represent all your clients zealously.  So there's

13   no way I, as an MDL lawyer -- or as a person, not an MDL

14   lawyer, but I've signed a participation agreement --

15           THE COURT:  But that happens in the legal system all

16   the time.

17       I mean, I think back to my work in the City Attorney's

18   Office, and we worked on marriage equality starting in the

19   early years.  And we worked up expert witnesses.  We developed

20   research.  We worked up strategy.  And we like to think, at

21   least, that other people who were fighting for marriage

22   equality around the country benefited from our hard work in

23   preparing the experts.  And they used some of our experts and

24   stuff like that.  So they benefited from the work that we did.

25       That happens all the time in the legal system.  The first

 1   person wins a case, and then the other person rides the

 2   coattails.

 3        But it doesn't -- all of the stuff that you're talking

 4   about really does not seem to me go to the authority of a

 5   federal court to require parties in other cases to do things.

 6        And just the fact that a plaintiff who filed a lawsuit in

 7   North Carolina state court happens to be using the same lawyer

 8   as a plaintiff who filed a federal case in the MDL doesn't give

 9   me authority to order the plaintiff in North Carolina to do

10   something with their recovery.

11        **MS. GREENWALD:**  So, Your Honor, I mean, for example,

12   the Third Circuit in *Avandia* reached out and taxed and accessed

13   cases that were on file, the lawyers who appeared before the

14   MDL.

15        **THE COURT:**  But that was only lawyers who signed -- I

16   mean, that sort of gets us into the question of participation

17   agreement.  Right?  Because in *Avandia*, it was only lawyers

18   who -- it was only clients whose lawyer signed the

19   participation agreement and agreed that their clients' cases

20   would be subject to the holdback order in the MDL.

21        **MS. GREENWALD:**  Well, but -- yes.  But there was also

22   the other case -- there was a couple of *Avandia* cases -- where

23   the lawyer did not sign a participation agreement, but he

24   associated, actually, with Michael Baum and some other lawyers

25   to ask them to come in and try the case with him.  And that

1  pulled him into the common benefit assessment.

2          **THE COURT:**  I don't remember reading that in the --

3          **MS. GREENWALD:**  That's the one that's 658 Fed

4  Appendix 29.  It's in our brief.

5      It's -- the reality is, is that in dozens -- I know you're

6  not -- you are looking at this from a fresh lens, but it would

7  turn the common benefit doctrine on its head as it exists

8  today.

9      I mean, mass torts -- you mentioned *Heartland* earlier,

10 which I just want to spend a moment contrasting the *Heartland*

11 situation from what we have here.  I mean, in *Heartland*, it was

12 a single-event case.  It's not a mass tort.  The lawyer who had

13 those two cases, one unfiled, one filed -- every court that's

14 talked about it -- was a stranger to the litigation.  That

15 lawyer settled three months after the MDL formed the discovery

16 committee in the MDL.  And so you're not -- it's not a case

17 like this where nothing happened --

18          **THE COURT:**  But the --

19          **MS. GREENWALD:**  -- until everything --

20          **THE COURT:**  -- *Heartland* case --

21          **MS. GREENWALD:**  -- everything was wrapped with a bow.

22          **THE COURT:**  But that's not what the *Heartland* case was

23 concerned with, and that's not what the *Vincent* case was

24 concerned with or the *Rice* case.

25      The concern that those courts had is:  Does a federal MDL

1   court that has jurisdiction over this clump of federal cases,

2   does it have the jurisdiction to reach out and require

3   parties -- people who are not parties to the litigation do

4   stuff to benefit the plaintiffs in the litigation and the

5   lawyers in the litigation?

6           MS. GREENWALD:  But the lawyer in *Heartland* had

7   nothing to do with the MDL.  He had no cases in the MDL.  He

8   had a case filed in Alaska in state court, and the other one

9   wasn't filed at all.

10          THE COURT:  Right.

11          MS. GREENWALD:  And he --

12          THE COURT:  But the Court in *Heartland* was not focused

13  on whether the lawyer had a connection.  The Court was focused

14  on whether the plaintiffs or claimants in those other cases had

15  any connection to the MDL.

16      And that's the point.  It's not -- you cannot exercise

17  jurisdiction over a plaintiff through a lawyer who's

18  representing some other client in your case.

19          MS. GREENWALD:  Again, this holdback is not coming out

20  of the client's compensation.

21          THE COURT:  But it's exercising jurisdiction over that

22  case.  Right?  It's exercising jurisdiction -- it's reaching

23  out and exercising power over that dispute.  And it's a dispute

24  over which the MDL court, I'm feeling quite confident and more

25  confident as we have this discussion, does not have the power

1    over.

2          **MS. GREENWALD:**  So the result would be, if the Court

3    finds that only cases in the MDL are subject to a holdback, in

4    future MDLs, lawyers will put one case in the MDL so they can

5    get the benefit of all the work that the MDL leadership does

6    and put every other case they have in state court.  It's

7    basically an invitation --

8          **THE COURT:**  First of all --

9          **MS. GREENWALD:**  -- to avoid MDLs.

10         **THE COURT:**  Well, no.  First of all, I'm confident

11   that you people are smart enough to figure out how to deal with

12   that; for example, an agreement that only this -- the work

13   product can only be used in the federal MDL cases and it can't

14   be used in some other lawyer's state court cases.  The other

15   answer is get a common benefit fund in the state court cases.

16      I mean, it's interesting.  You're talking about all of the

17   benefit that you conferred upon everybody as a result of

18   winning three trials.  Right?  Two of those trials were in

19   state court.

20         **MS. GREENWALD:**  That's correct.

21         **THE COURT:**  One trial was in San Francisco

22   Superior Court.  The other trial was in Alameda County

23   Superior Court.

24      There are all these cases in California, in the California

25   court system, and they're all being adjudicated by one judge.

1   So what is to stop you from going to Judge Smith in Alameda

2   County, who, as I understand it, controls all -- is

3   adjudicating all of the California cases, and get a common

4   benefit fund -- ask her to establish a common benefit fund, if

5   she believes it's appropriate to do so?

6         MS. GREENWALD:  That might be true there, but that

7   wouldn't be true for the many, many more cases that are in

8   Missouri, where there is no such thing as a JCCP.

9         And so, for example, in the county, while there are

10   administrative judges, the courts -- the cases are assigned to

11   whatever judge is assigned to the case when it is filed.  And

12   so there is no centralization.

13         I actually asked our local counsel before this conference

14   today whether he has any precedent that he knows of in Missouri

15   where either the county state court or the city state court has

16   addressed and awarded a common benefit, and he said no, not in

17   any --

18         THE COURT:  Maybe the answer is no.  Maybe they

19   haven't figured out how to do it because these judges in these

20   MDL cases are doing what I did in PTO 12 and overreaching, and

21   so there's no -- people don't feel the need to establish one in

22   the state courts.

23         But all of these things that you're talking about are

24   serious policy issues, and I imagine that people could have

25   reasonable disagreements about the solution to those policy

1    issues.

2         But federal courts are courts of limited jurisdiction, and

3    they can't just reach anywhere and order anybody to do

4    anything.

5         And what you're -- see, you're not looking at it from the

6    standpoint of the power of the federal district court.  You're

7    looking at it from a more practical standpoint, which is

8    understandable.

9         You're saying:  Okay, here's this practical problem.  We

10   have these tort cases all over the country, this mass tort.

11   They're in federal court.  They're in state court.  They're in

12   all these different states.  And we need to figure out a way to

13   coral them and get them dealt with in as -- from the

14   perspective of leadership counsel, as efficiently and

15   effectively as possible.

16        And I understand that.  But all of the problems that

17   you're raising are problems about dealing with litigation

18   efficiently, but they don't really -- they're not really

19   arguments for an expansion of the federal court's power; or to

20   the extent that they are an argument for expansion of the

21   federal court's power, you've got to go to Congress and ask

22   Congress to expand the power of the Federal District Courts,

23   which would be perfectly fine with me, by the way.

24        But as it stands now, I just don't think -- I don't think

25   I have the power to reach out to those other cases.

1          **MS. GREENWALD:**  So a couple more things, and then I

2     might -- so you mentioned a couple of other cases, the *Rice*

3     case.  Again, there were two independent settlement procedures

4     going on, one in the state court, one in the federal court.

5     They conducted separate discovery in those cases.  They

6     prepared separate cases for trial.  Those were two very

7     distinct cases.

8          And then --

9          **THE COURT:**  That happened here too.  Right?  I mean,

10    there were two cases that went to trial in state court.

11         **MS. GREENWALD:**  Right.  But the discovery that was

12    used in every single solitary case, whether in Missouri,

13    California, or wherever, was predominantly what was done in

14    this MDL.

15         Again, the order that's an attachment to our -- an exhibit

16    to our affidavit, that provision appears, to my knowledge, in

17    every Missouri case that has a case management order; that the

18    discovery in the multidistrict litigation is deemed discovery

19    in that state case.  And so it is incorporated into those

20    cases.

21         And so, essentially -- I mean, I realize, Your Honor, I'm

22    a sinking ship here trying to convince you to the contrary.

23    But I mean, even in *GM*, I know Judge Furman did not assess

24    state court cases, but he assessed the unfiled cases of lawyers

25    who were before him.  And he did not -- he said specifically

that he was not saying that he didn't have jurisdiction to
assess the state court cases, but that he was leaving that to
the state court judges, because there was very close
coordination in *GM* between the state court judges and
Judge Furman.  I think they had, like, weekly calls or biweekly
calls.  They participated in various procedures together, much
like you did with the JCCP in *Daubert*.  And I know you invited
other judges to attend that as well.  That happened throughout
the *GM* case.

And so there are all these judges out there, quite
honestly, then that are acting extrajudicious because there are
dozens and dozens and dozens of case management orders and
assessments and holdbacks right now -- in fact, by objectors
here.  The recent *3M* order is Mr. Lanier, the Gibbs firm, and
the Watts firm.  And they have written a broad, broad, broad
holdback that was just signed by the Court.

Same in the talc case, which is Beasley Allen.  The
same -- much broader than your case management order.
Remarkably broader.  In fact, it says right in the order that
any case that benefited from MDL work product is subject to the
assessment.  And it has a two-tier assessment, basically
strong-arming lawyers into getting into a participation
agreement early on, which we did not do, which is if you sign a
participation agreement now, your assessment will only be
9 percent; but if you don't and I later find, when you settle

1  your case or you try your case, that you actually benefited

2  from MDL work product, your assessment is now 15 percent.

3      Those have been issued in the last few months.

4      **THE COURT:**  So part of it -- I mean, obviously, I

5  haven't scrutinized all those orders in detail.  But you say

6  anybody who benefits from common benefit work.

7      I mean, I think that this sort of bleeds into the issue of

8  the participation agreement.  I mean, I think to the extent you

9  have an order that says "Any lawyer who's participating in this

10  MDL or has a case in this MDL" -- right? -- "or who signs a

11  participation agreement sort of agreeing to use the work

12  product that's created by this MDL in exchange for agreeing to

13  be subject to a holdback order," that's -- that's one thing.  I

14  mean, maybe that's okay.  Like I said, I'm not really -- I'm

15  less -- I'm sort of not really sure about the participation

16  agreement issue.

17      But let's assume that that -- let's assume that the Court

18  has jurisdiction to do that.  Let's assume that the Court has

19  jurisdiction to say there's a holdback for anybody who -- any

20  of the cases in the MDL and for any lawyer who has state cases

21  but wants to sign a participation agreement and use the

22  MDL work product and agrees to be subject to a holdback order

23  in exchange for that.  I think that's probably fine.

24      Again, if it is subject matter jurisdiction -- and

25  Mr. Citron raises this point in his brief.  If it is subject

1    matter jurisdiction, then that may not be fine.  But I'm not

2    sure that subject matter jurisdiction is the right way to think

3    of it.

4           **MS. GREENWALD:**  But it's really exercising authority

5    over the lawyers.  Right?  So the MDL judges are saying:  If

6    you are -- if you are going to -- if you are going to use

7    MDL work product, you are going to be assessed a holdback; and

8    it's going to be staggered, depending on whether you're going

9    to do it voluntarily or I have to do fact finding later to see

10   if you actually used it or not.

11        And I don't -- if it's jurisdictional, Your Honor, it

12   shouldn't matter if someone signs it.  In fact, there's cases

13   out there that talk about how it's not the participation

14   agreement itself that gives the Court authority, but it's

15   the Court's order.

16        So lawyers can sign anything they want between lawyers.

17   It's just a contract.  In fact, I can't remember the name of

18   the case and I apologize, but there's a whole discussion about

19   that would be a breach of contract --

20           **THE COURT:**  It's the *Rice* --

21           **MS. GREENWALD:**  *Rice.*  Okay.

22           **THE COURT:**  -- the *Rice* case, I think.

23           **MS. GREENWALD:**  But what matters is whether that

24   participation agreement, the substance of it is incorporated

25   into a court order.  And if it is --

1          **THE COURT:**  Right.  Right.  And so I agree with what

2     you're saying or I think I agree with what you're saying; that

3     if there's a court order that says anybody who's subject to

4     this participation agreement, who voluntarily signs the

5     participation agreement, voluntarily submits to the

6     jurisdiction of the Court as it relates to this issue is

7     subject to a holdback, I think that's probably fine.  Right?

8          But, of course, you're saying that my power, the power of

9     the MDL court reaches much further than that, to people who

10    simply got a settlement in state court because of the fact that

11    trials were won in California.  And I just don't see how I

12    could possibly have the authority to order somebody to hold

13    back --

14         **MS. GREENWALD:**  I mean, I know that -- I don't want to

15    belabor this because I don't want to dominate the entire time.

16    But, for example, I can read what was written most recently in

17    the talc litigation.

18         The fourth category that the order applies to is

19    (reading):

20              "All cases and/or claims of any ovarian cancer

21         clients of any counsel who received, used, or

22         benefited from the common benefit work product."

23         **THE COURT:**  But my question is:  How much care --

24    looks like Ms. Wagstaff got kicked out.

25                         (Pause in proceedings.)

1          **THE COURT:**  Probably not the first time you've been

2    kicked out of court.

3      My question, Ms. Greenwald, about the order you just read

4    to me, was that one of those orders that was put together by

5    counsel at the beginning of an MDL that the judge signed?

6          **MS. GREENWALD:**  No.  This is a recent order by the

7    chief judge of the District of New Jersey.  It was signed on, I

8    want to say, September or October of -- I'm looking for the

9    date.

10         **THE COURT:**  I mean, my question is --

11         **MS. GREENWALD:**  And the one in --

12         **THE COURT:**  -- how much --

13         **MS. GREENWALD:**  I'm sorry.

14         **THE COURT:**  Are these orders opposed?  Are they

15   unopposed?  How much consideration are the judges giving to the

16   scope of their power when they're signing these proposed orders

17   that are put in front of them by both sides?

18         **MS. GREENWALD:**  I mean, the time to oppose those

19   motions -- those orders are when they're issued.  And to my

20   knowledge, there aren't any objections in talc.  I can't

21   promise you that because I don't work on talc litigation; so I

22   would defer to someone on the phone, one of my colleagues who

23   might be in talc.

24      But the reality is that courts across the country,

25   district courts across the country commonly and routinely issue

orders like this where they hold that they're putting together
a small group of lawyers who are going --

**THE COURT:**  I understand.

**MS. GREENWALD:**  And I know I've said that a hundred
times, and I don't mean to repeat myself.

**THE COURT:**  I mean, the fact that something is
repeatedly done in an MDL doesn't mean that courts have the
authority to do it.  I think that this may be an example of
sort of MDLs gone wild.

**MS. GREENWALD:**  One last thing, Your Honor, and then
I --

**THE COURT:**  Sure.

**MS. GREENWALD:**  The pocket guide for transferee judges
actually states what you cannot assess, and sort of by default,
it would show what you can.  I'm just trying to -- I want to
find it so I can try to be organized here.

Here.  It says --

**THE COURT:**  You cited the pocket guide in your brief,
and I saw that.

**MS. GREENWALD:**  This is a different provision that I
read last night.  I was reading it again.

**THE COURT:**  Okay.

**MS. GREENWALD:**  It says (reading):

"Contributions cannot be imposed by a transferee
judge on attorneys who have no cases in the MDL and

1     who do not use federal discovery material."

2        So implicitly, the pocket guide certainly anticipates that

3 district courts have authority to assess common benefit

4 holdbacks in cases where there is -- the lawyer does have a

5 case or more in the MDL and/or used federal discovery

6 materials.

7        **THE COURT:**  Okay.  I think what we should do -- why

8 don't we do this.  Why don't we take a short break because

9 we've been going for an hour and a half and the court reporter

10 could use a break.

11        And then maybe I could hear from the -- I don't want to

12 take too much time with the objectors on this issue, but maybe

13 I could hear briefly from the objectors on the stuff that we've

14 discussed so far.

15        And then, after that, maybe we can turn to whether, as a

16 matter of discretion, I should order a common benefit fund and

17 a holdback and, if so, who it should apply to, whether it

18 should just be the cases in the MDL or whether it should

19 include cases represented by lawyers who signed the

20 participation agreement.

21        So why don't we resume at 2:45.

22        **THE CLERK:**  Court's in recess.

23              (Recess taken at 2:37 p.m.)

24           (Proceedings resumed at 2:50 p.m.)

25        **THE COURT:**  Okay.  Do any of the objectors have

1  anything they want to say about this authority power issue?

2        **MR. PAREKH:**  Your Honor, Behram Parekh on behalf of

3  the objectors who have cases in front of the MDL but did not

4  sign the participation agreement and have other cases that are

5  not in front of the MDL.

6        Just very briefly, Your Honor, I think Your Honor is

7  absolutely correct in terms of the reach of the federal court's

8  authority.

9        And I think the issue in terms of whether or not this

10 refers to subject matter jurisdiction -- and this may be

11 arcane, and I probably shouldn't even be going here -- but the

12 Fourth Circuit in *Showa Denko*, I think, actually gets it right

13 in terms of why this is a matter of subject matter

14 jurisdiction.  And the reason that it gets it right is that

15 it's not just a case or controversy that brings you the subject

16 matter jurisdiction, but it's a case or controversy between a

17 set of parties.

18       And here, the only parties in front of Your Honor are the

19 people who are actually in the MDL litigation and have a client

20 in the MDL litigation.  That client is a party, Monsanto is a

21 party, and the case or controversy is between that client and

22 Monsanto.

23       **THE COURT:**  But -- I mean, I agree with much of what

24 you just said, but courts have the power to order parties

25 not -- people who are not parties to the litigation to do stuff

 1   all the time as part of the exercise of their jurisdiction over

 2   the case.

 3        And so I guess to me, I have subject matter jurisdiction

 4   over these 4,000 cases, or whatever they are.  And the question

 5   is:  How much power do I have, can I exercise in furtherance of

 6   my adjudication of these 4,000 cases?

 7        So I'm not exactly sure why it's a question of subject

 8   matter jurisdiction as opposed to just my authority to reach

 9   out and do X or Y or Z.  I mean, at some point it's beyond my

10   authority.  Right?

11        I have the authority to order Facebook to respond to a

12   subpoena of somebody's posts in a case, a witness's posts or a

13   party's -- plaintiff's posts, or whatever.  I have the

14   authority to do that because it has a sufficient nexus with the

15   case that I'm adjudicating.  But I don't have the authority to

16   order Facebook to stop running election ads.

17        And I don't know if it's a question of subject matter

18   jurisdiction or if it's -- like, the better way to think of it

19   and the better way to label it is just outside my authority.

20        **MR. PAREKH:**  I think that's true.  But, I mean, for

21   example, the subpoena power authority is authority that is

22   explicitly conferred on the Court, and I think that's where the

23   sort of limit lies.

24        There's no legislation, there's no congressional act,

25   there's no constitutional provision that gives the Court

 1    Article III authority to reach people who are not in front of

 2    it other than through an explicit grant, such as the subpoena

 3    power.

 4        I do admit this is probably more arcane than we need to

 5    get to, and I apologize.

 6        **THE COURT:**  Then why -- I mean, I used Ms. Sprague as

 7    an example of one of those old common benefit fund cases.  Why

 8    was it appropriate for -- I guess -- what I was going to ask

 9    is:  Why was it appropriate for the Court to order Ms. Sprague

10    to receive money to which these other people had a rightful

11    claim?  Right?

12        But I guess the answer is that there was a pot of money in

13    the bank and it was a dispute between Ms. Sprague and the bank,

14    and the Court had the authority to order that as a remedy.

15        **MR. PAREKH:**  Exactly, Your Honor.

16        And I think the *Vincent* case really sort of makes that

17    distinction as well.  It's different when you're talking about

18    a common fund because the Court has authority over the *res* in

19    the common fund.  And so anybody who accesses that common fund,

20    the Court then has authority over.

21        Here, there is no common fund.  The plaintiffs didn't --

22    the lead counsel didn't establish a common fund.  And I think

23    that is a huge and significant distinction in between

24    the Court's authority over people who have access to it or not.

25        And to address one of Ms. Greenwald's issues in terms

1    of --

2         **THE COURT:**  Can I just ask you before you -- I'm sorry

3    to interrupt, but I just want to ask you:  Does it matter for

4    purposes of this case, for purposes of any of the objectors

5    here, whether it is labeled subject matter jurisdiction or some

6    other kind of jurisdiction or just, like, authority?  Does it

7    matter?

8         **MR. PAREKH:**  It doesn't, Your Honor.  I apologize.  It

9    was just sort of my own personal interest.

10        **THE COURT:**  Yeah.  No.  I mean, I've been kind of

11   obsessing about it too.  But anyway, go ahead.

12        **MR. PAREKH:**  And to address one of Ms. Greenwald's

13   concerns about if Your Honor does do what we're asking for

14   here, how will that affect future litigations?  Won't these

15   unscrupulous lawyers supposedly advertise, keep 10,000 cases,

16   and then do nothing with them?

17        Well, you know, the solution is to do what happens in a

18   lot of these MDLs and reach a global settlement agreement with

19   a common fund.  No one questions, when a common fund is

20   created, that those lawyers have an ability to assess the

21   common fund for a common benefit.

22        And, you know, that didn't happen here, and I think that's

23   where all of this controversy stems from.

24        **THE COURT:**  Okay.  Anybody else from the objectors

25   have anything they want to say?

1          **MS. EPHRON:**  Yes, Your Honor.  Melissa Ephron for

2     Category 3 objectors.

3          I wanted to address the participation agreement.  In terms

4     of the participation agreement, we did not voluntarily sign the

5     agreement simply to sign the agreement.  For us, it was made a

6     condition precedent to receiving work product.

7          And for the first time today CLC is saying that they were

8     so unorganized that they didn't have certain people sign the

9     participation agreement and they, nonetheless, gave the work

10    product, while others did sign the participation agreement.

11         It would be grossly unfair to penalize the firms that did

12    sign the participation agreement and actually complied with an

13    assessment as a result.

14         **THE COURT:**  Okay.  I understand that point.

15         Anybody else?

16         **MR. CITRON:**  Judge, Eric Citron.

17         I just wanted to offer one point of clarification that

18    I think would be helpful, which is that I do think what is

19    going on here -- and this -- and the right way to think about

20    it is a jurisdictional issue, but not necessarily a subject

21    matter jurisdictional one.

22         You know, like if you were asked to decide a really

23    interesting case that I was arguing in another courtroom in the

24    Northern District of California before another judge, you

25    couldn't do that.  It's not within your jurisdiction just

because I'm a lawyer in front of you.  It is, of course, within
the federal subject matter jurisdiction.  It's just not your
case or controversy to decide at that moment.

     **THE COURT:**  I think that's a very good way to think
about it.  I mean, and then does it matter -- does the word --
my clerks and I were discussing during the break that the word
"jurisdiction" sort of carries -- it has sort of intense
connotation.  Right?  I mean, is there a difference between
calling it jurisdiction -- in your hypo, in your example that
you just gave, is it that I lack jurisdiction, or is it better
to label it "authority" or "power," that I lack authority to
decide that case next door?

     **MR. CITRON:**  I think --

     **THE COURT:**  Judge Breyer, by the way, would be very
disappointed to hear that I lacked the authority to decide his
case.

                  (Laughter.)

     **THE COURT:**  Go ahead.

     **MR. CITRON:**  I think it is a question of jurisdiction
in the sense that what's not going on is that you've got the
merits wrong or that there isn't legal authority that supports
the order.  You know, is a court doing something to a thing
that is not its thing to decide.

    And so an appellate court could say:  You didn't have the
power to do that even with the consent of the parties, for

1    example.

2         In that sense, I do think it is jurisdictional, but I

3    wouldn't refer to it by the knee-jerk reference to subject

4    matter jurisdiction because I think it's just a little bit

5    beside the point whether it could be within the federal subject

6    matter jurisdiction or not.

7         One issue is you may end up asked to decide things that

8    wouldn't be within federal subject matter jurisdiction.

9         And what I think is actually going on here are disputes

10   that are well addressed by contract law and that you're being

11   invited, essentially, to decide either contract or

12   quasi-contract cases that may or may not be federal and

13   certainly aren't before you.  And I think --

14        **THE COURT:**  Are you talking about -- are you referring

15   to the lawyers -- are you referring to the clients whose

16   lawyers signed the participation agreement?

17        **MR. CITRON:**  So with respect to clients who signed --

18   lawyers who signed, that presents, quite obviously, I think, as

19   a good contract case, you know.

20        But what Ms. Greenwald I think is seeking is an

21   *in personam* judgment against the person who signed that

22   agreement so that she can recover some money from them.

23        **THE COURT:**  Well, but that --

24        **MR. CITRON:**  And that requires --

25        **THE COURT:**  I mean, I've got this case.  Right?  And

1   I've got these lawyers who are par- -- I've got these lawyers

2   who are participating in the case, and I've got these other

3   lawyers who are coming in, saying:  I have state court cases

4   and I want to use the work product that's generated from this

5   federal case.  And in exchange for the work product, I'm

6   willing to -- the work product that was generated as part of

7   this case, I'm willing to subject myself to the authority of

8   the judge who's adjudicating this case.

9        It seems to me there's a much closer nexus between this

10  case and the case of the client who's represented by that

11  lawyer who signed the agreement.

12       Now, there's a question about whether -- I mean, the

13  client better know that the lawyer signed that agreement to --

14            **MR. CITRON:**  Yeah.

15            **THE COURT:**  -- agree to give up that client's -- I

16  think that's a potentially big problem -- right? -- is that:

17  Are these lawyers really telling their clients that they've

18  agreed to withholding of 8 percent of their recovery?

19       But putting that aside, if a lawyer signs the agreement

20  and says, "Give me the work product from this federal case that

21  this judge is presiding over in exchange for my agreement to be

22  subject to this judge's holdback order," that's a pretty

23  close -- don't you think that's a pretty close nexus to the

24  case such that it makes it different from your hypo?

25            **MR. CITRON:**  Yes.

 1            **THE COURT:**  I'm deciding the case that was assigned to

 2   a judge down the hall?

 3            **MR. CITRON:**  Yes, I think it is different.  I think we

 4   would consider that -- or I think it would be right to consider

 5   that appropriately within what's called the ancillary

 6   jurisdiction of the Court.

 7        So the Court sometimes has the power to decide ancillary

 8   disputes that are close enough -- related closely enough to the

 9   matter before it that it doesn't exceed its jurisdiction by

10   deciding them.  This certainly feels like that.

11        I still think the thing you identified as a real concern

12   is a good reason to conceptualize these as *in personam* actions

13   against attorneys and not an effort to assess a state court

14   case, because if that state court plaintiff says, "Hey that

15   guy's" -- "I didn't agree to this.  This isn't fair.  It's

16   raising the costs.  It's going to impose some other cost on

17   me," you could be -- you could be being asked to go too far.

18            **THE COURT:**  In other words, maybe the better way to do

19   these things is to say:  You have a contractual obligation --

20   if you want to agree -- if you want to use work product in this

21   MDL, you have a contractual obligation to transmit to us

22   X percent of your fees that you get from the case.

23        And so you're not actually, like, exercising authority

24   over or issuing an order that governs the transfer of money

25   from Monsanto to the plaintiff in North Carolina.  You're

1    issuing an order that governs the economic relationship between

2    the lawyer who's using the federal work product and the -- and

3    the plaintiffs' lawyers in this case and Monsanto, I guess.

4         **MR. CITRON:**  I think that's right.

5         And I think all I'm saying further to that is that the

6    source of substantive law that's likely to decide when this is

7    fair or what the appropriate price is, is all contract law.

8         In the ordinary course, it's probably better to let a

9    state court with, you know, common law equity jurisdiction and

10   familiarity with the principles decide that case in the first

11   instance.  There might be circumstances where it's in the

12   interest of the MDL to exercise ancillary jurisdiction when

13   it's available.

14        But in the absence of both a voluntary agreement and a

15   court order embodying it, I can't find any source of federal

16   jurisdiction -- or jurisdiction in this Court over those

17   controversies.

18        **THE COURT:**  Okay.  Anything else?

19        **MS. EPHRON:**  Your Honor, if I may, Melissa Ephron

20   again for Category 3 objectors.

21        If we're going to pivot this idea of the Court's reach on

22   the basis of a contract, then we really need to look at the

23   *Avandia* case and the *GM* case.

24        In both of those cases, perhaps, yes, there was a valid,

25   enforceable contract with all the material terms there,

1   including the amount of the holdback.  In *Avandia*, it's

2   express; and in *GM*, it's express.

3       In our case, the participation agreement is entirely

4   silent about the amount of the holdback --

5           **THE COURT:**  Okay.  But let me stop you there for a

6   second and just -- it seems like there are two questions or at

7   least two questions I have to answer as it relates to people in

8   your category.

9       So you all signed -- or you represent lawyers who signed

10  the participation agreement.  Is that right?

11          **MS. EPHRON:**  Yes, Your Honor.

12          **THE COURT:**  Okay.  So the first question is whether I

13  have the -- in this case, whether I have the power, in light of

14  the fact that you signed the agreement, whether I have the

15  power to order you to order a holdback for your cases.

16      And then the second and separate question is whether, even

17  if I have the power, should I do it under these circumstances?

18          Which one -- which issue are you speaking to right now?

19          **MS. EPHRON:**  The former, whether you have the power.

20          **THE COURT:**  Okay.  And why shouldn't I have the power

21  to do that, given that you signed the participation agreement

22  and agreed to subject yourself to my orders regarding holdbacks

23  and regarding common benefit fund?

24          **MS. EPHRON:**  The basis for that is, we're saying the

25  participation agreement, in essence, creates a contract.  But

1    when you have a material term missing from the contract --

2    here, the amount of the participation -- the amount of that

3    holdback -- it's going to belie the existence of the contract.

4    It's a basic idea of contract law that you need to have the

5    material terms there.

6         In our case, unlike in *Avandia*, unlike in *GM*, the

7    percentage of the holdback is demarcated as yet to be

8    determined.  That's a material term.  It's absent.  There's no

9    contract.

10        **THE COURT:**  But the language of the participation

11   agreement says (reading):

12            "This agreement incorporates by reference any

13        order of the Court regarding assessments and

14        incorporates fully all defined terms from such

15        orders.  Participating counsel represents that it has

16        read PTO 12 and voluntarily agrees to be bound by its

17        terms set forth more specifically in this

18        participation agreement."

19        So you have -- you read PTO 12.  You knew that it hadn't

20   set the percentage yet.  You agreed to be bound not only by PTO

21   12, but by the order that was coming up sometime in the future

22   that would set a percentage.  How is that not a contract?

23        **MS. EPHRON:**  As it stands right now, a material term

24   is missing, the amount of the holdback.  That's a material

25   term.  If a material term is missing -- and it still is

 1   missing -- there's no contract.

 2          **THE COURT:**  Okay.  Anything else?

 3          **MS. EPHRON:**  Not as to that former point.

 4          **THE COURT:**  Okay.  Anything else to any other point?

 5          **MS. EPHRON:**  Yes, Your Honor.

 6          **MR. MILLER:**  Your Honor, at the appropriate time, we'd

 7   like to respond.

 8          **THE COURT:**  Okay, Mr. Miller.

 9          **MR. MILLER:**  Thank you, Your Honor.

10          **THE COURT:**  Go ahead, Ms. Ephron.

11          **MR. MILLER:**  On this very issue about --

12          **THE COURT:**  No, no, no, no, no.  She was not done.

13   She was getting ready to speak.

14          **MR. MILLER:**  Oh, excuse me.  I'm sorry.  I apologize.

15          **MS. EPHRON:**  As to your second question of whether CLC

16   is entitled to compensation at all, our position is that they

17   are not on the basis that they've already been adequately

18   compensated through two means:  their own premium settlement

19   values and through their fee splits.

20      First, CLC has already been adequately compensated through

21   their own premium settlement values.

22          **THE COURT:**  I'm sorry.  This is a long hearing.  I

23   don't need to hear you repeat stuff that you've already written

24   in your brief.

25      So do you have anything that you want to add based on this

1    discussion?

2         **MS. EPHRON:**  Simply that CLC is already receiving

3    quite a lot, an estimated $2 billion from settling their own

4    dockets at a premium.  And they're also receiving compensation

5    through fee splits that they'll be getting from referred cases.

6    They've already been adequately compensated multiple times

7    over.  There's simply no reason for them to receive further

8    compensation when they settled their cases for a premium at the

9    expense of others, and there's also no global settlement in

10   this circumstance.

11        **THE COURT:**  Okay.  So maybe we could turn -- I'm happy

12   for you all on the plaintiff -- on the lead counsel side to

13   respond to anything that you want to respond to.

14        But I want to sort of start moving to the question of,

15   assuming I have the authority only to -- I want you to assume,

16   for purposes of this discussion, that I will continue to

17   believe that I only have the authority to order a holdback for

18   cases in the MDL and potentially cases where the lawyer

19   signed -- whose lawyer signed the participation agreement.  And

20   I want you to further assume that even if I'm wrong about the

21   limitations on my authority, that I would exercise my

22   discretion to decline to order a holdback as to anything except

23   for those two groups, potentially those two groups.

24        What -- should I -- should I establish a -- should I order

25   a holdback at all?  And, if so, I guess the subquestion is:

1    Can't I be pretty confident that the lawyers who did the

2    up-front work in this case have already been adequately

3    compensated?

4         But if you wanted to respond to something that somebody

5    else said, you should feel free to do so.

6              **MR. MILLER:**  If I could, Your Honor.

7         Yes, I think the Court clearly has jurisdiction over the

8    participating attorneys.  The Third Circuit told us that in

9    *In Re Avandia*.  They said the district court had jurisdiction

10   to adjudicate whether this particular firm breached the

11   attorney participation agreement and thereby violated Pretrial

12   Order, in that case, Number 70.

13        So that clearly applies to the firms that signed the

14   participation agreement.  And the fact that we have been paid

15   for representing our own clients totally misses the point.

16        This is the common benefit doctrine.  It goes back to the

17   1880s.

18             **THE COURT:**  Right.  And the common benefit doctrine

19   back in the 1880s and the 1890s and the 1940s and 1960s was all

20   about making sure that people like you and your clients were

21   adequately compensated for their attorneys' fees.

22        So it doesn't totally miss the point to focus on whether

23   you were adequately compensated.  That's actually how the

24   doctrine originated.  And it's only recently, with the advent

25   of the MDLs, that it's sort of turned into this focus on free

1    riders as opposed to making sure that the leaders, the people

2    who are out front, are compensated adequately.

3        So it's not beside the point at all.  It's an important

4    factor in the analysis.

5             MR. MILLER:  All right, Your Honor.  Fair enough.  We

6    have been compensated.  We are lawyers who try to run a

7    for-profit law firm.  Sometimes we don't.  Sometimes --

8             THE COURT:  Let me ask you this:  Do you believe that

9    anybody who did the up-front work -- I mean, maybe the answer

10   is you don't know because you haven't -- there haven't -- not

11   everybody has come forward and asked for compensation.  But do

12   you believe that anybody who did the up-front work has not been

13   adequately compensated for the work that they've done?

14           MR. MILLER:  I think the answer is I don't know,

15   Your Honor.

16           THE COURT:  Do you believe that you have not been

17   adequately compensated for the work that you've done?

18           MR. MILLER:  I have not made any common benefit fee at

19   all in this case.

20           THE COURT:  I'm just asking you, do you believe --

21   because the purpose of the common benefit fund is for the

22   people who did the up-front work.  And the people who did most

23   of the up-front work are, of course, lead counsel.  And your

24   firm is lead counsel and Ms. Greenwald's firm and

25   Ms. Wagstaff's firm.

1        So do you believe that anybody in lead counsel has not

2   been adequately compensated for the work that they've done in

3   these cases?

4        **MR. MILLER:**  I don't even know how to answer that.  I

5   really don't.

6       Ms. Wagstaff?

7        **THE COURT:**  It's with a "yes" or "no."  Have you been

8   compensated less or more than your lodestar, for example?

9        **MR. MILLER:**  I really can't -- I don't know.  I mean,

10  we intend to -- we will be compensated on our contingency fees

11  for the work we have done for our clients; that is true.

12       **THE COURT:**  Okay.  And is that adequate for all the

13  work that you've done in these cases?

14       **MR. MILLER:**  If Your Honor denies the common benefit

15  motion, it's going to have to be.  I don't know what else to

16  say, honestly.

17       **THE COURT:**  Well, part of whether there should be a

18  common benefit fund -- and then, if there is, part of the

19  allocation -- is whether you've been adequately compensated.

20  So why can't you answer that question?

21       **MR. MILLER:**  I'm trying to answer as honestly as I

22  can.  I think we're going to be adequately compensated from our

23  individual clients on our contingency fees.  But I don't

24  think -- if Your Honor is inclined to not give us a common

25  benefit, obviously we're not going to get compensated

1    adequately, or not at all, on the common benefit.  So that's

2    the answer.

3         **THE COURT:**  The question is whether you've been

4    adequately compensated for all the work that you've done.

5    Right?  I mean, that's -- again, that's the -- that's sort of

6    the origin of the common benefit doctrine, is we want to make

7    sure the people out front are adequately compensated; they're

8    not deprived of money as a result of their initial efforts.

9         And I'm assuming that your unwillingness to say that you

10   have not been adequately compensated for all the work that

11   you've done in these cases means that you've been adequately

12   compensated for all the work that you've done in these cases.

13        **MR. MILLER:**  I don't know how to answer.  I really

14   don't.

15        **THE COURT:**  I don't know what to do with that answer.

16        Does anybody else want to take a crack at answering that

17   question?

18        **MS. GREENWALD:**  I can try.  Oh, do you want to do it?

19        **MS. WAGSTAFF:**  You can go first, Robin, or I can go.

20        **MS. GREENWALD:**  You go.  You go.  I've dominated.

21        **MS. WAGSTAFF:**  So to date, none of us have really been

22   compensated, I would say.  We have signed master settlement

23   agreements which have participate rates.  And as Mr. Hoffman

24   started this discussion, the money is in the QSF.  So we --

25        **THE COURT:**  Yeah, but considering what you stand to

1    recover, will that --

2          MS. WAGSTAFF:  Right.  And so I would say -- I would

3    say, as far as the lodestar, I'm not sure that I've done that

4    actual analysis, to be honest with you.

5      I will say this:  that Monsanto has had a finite pot of

6    money that they have been willing to settle for this tort, and

7    so our clients did lose money, I think, on settlements based on

8    the infusion of hundreds of thousands of cases.

9          So if you look at it from that point of view, our

10   clients -- and then, in essence, because our fees are tied to

11   our clients, you know, we -- lost money based on the

12   infusion -- based on our success.  I mean, it's a simple way to

13   look at it.

14         THE COURT:  Based on all the TV lawyers coming in

15   after you --

16         MS. WAGSTAFF:  Yeah.  I mean, it's anyone on this

17   call.  There's 144 people on this call.  Anyone who's talked to

18   Monsanto has heard that they had a finite pot of money to

19   settle these cases.

20         So, I mean, the argument is, you know, if you add up the

21   gross number, that it seems like a lot of money; but if you

22   think about what each one of our clients will get, our clients

23   did suffer because of the infusion of TV lawyers' marketing.

24   There is no doubt about that.

25         THE COURT:  Okay.  Anything else you all want to say

 1   about whether I should order a holdback at all and, if so,

 2   whether it should include the cases of the lawyers who signed

 3   participation agreements?

 4        **MS. WAGSTAFF:**  Your Honor, I would like to comment on

 5   something Mr. Citron and you said that I actually agreed with,

 6   considering this to be sort of a contractual discussion and

 7   how, you know, at the beginning of this hearing, we were

 8   talking about you assessing the recovery of the client, sort of

 9   the top of it, and then, by the time you and Mr. Citron were

10   talking, you were talking about the attorney to attorney.

11        I think that if you go down that path, which I agree with

12   that thinking, it would be very easy for the courts to leave

13   the 0.25 percent from the clients and not assess the clients on

14   cases you believe you do not have authority to assess.

15        What I mean by that is, if there is an MDL lawyer -- you

16   can use me, for example -- and I have a case in St. Louis, you

17   could assess me my fees as a contractually either express or

18   implied contract with the MDL lawyers, you could assess me my

19   8 percent and not assess the client.  Say the 8 percent

20   applies --

21        **THE COURT:**  It's not your 8 percent.  It's --

22        **MS. WAGSTAFF:**  At some point it becomes my 8 percent

23   because we have a contractual agreement.

24        **THE COURT:**  Well, but it's 8 percent of the total

25   recovery.  So it would be probably, like, 15 percent of your

1    fees.  Right?

2            MS. WAGSTAFF:  Correct.  I mean, I don't know.  It

3    depends on what agreement they have with --

4            THE COURT:  Yeah, assuming, like, a 40 percent.

5            MS. WAGSTAFF:  But that is one way, again, to look at

6    it, is that, you know, you do have authority and jurisdiction

7    over the lawyers who voluntarily choose to appear in front of

8    your court, and you can split that and say that you're not

9    going to assess the clients on their expenses, because at some

10   point, the gross recovery does split into two pieces and it

11   does become attorney fees and client --

12           THE COURT:  But why should it be a holdback from the

13   transaction between Monsanto and the plaintiff in the Missouri

14   case?  Right?  I mean, why should it be a holdback from that

15   transaction as opposed to just a contractual obligation on the

16   part of the lawyer -- on the part of you, the lawyer, to pay --

17   on the part of the lawyer in Missouri to pay lead counsel?

18           MS. WAGSTAFF:  You mean -- so I guess I'm not

19   following what you're saying.  You mean why now -- because

20   we're using me as an example.

21           THE COURT:  Yeah.  Sorry.  That got confusing.  But

22   let's make -- let's keep you as the lead counsel in the MDL,

23   okay --

24           MS. WAGSTAFF:  Okay.  That's easy.

25           THE COURT:  -- in the example.

```
 1          And let's say you have a lawyer who has signed a
 2     participation agreement and has agreed to pay you part of their
 3     fees in exchange for work product.  Right?
 4          If anything, shouldn't my order be the attorney -- once
 5     the attorney gets their portion of the attorneys' fees in the
 6     state court -- in the Missouri case, they should be required to
 7     pay a percentage of those fees to you?
 8               MS. WAGSTAFF:  It could be that, Your Honor.
 9               THE COURT:  As opposed to a holdback on the
10     transaction between Monsanto and the plaintiff in Missouri.
11               MS. WAGSTAFF:  It could be -- it could be that,
12     Your Honor.
13          I think that holdback is just sort of the way that it has
14     been done in the past.
15               THE COURT:  It's obviously much more efficient to do
16     it that way.
17               MS. WAGSTAFF:  Well, and it's much more efficient,
18     too, because the money -- I mean, I don't know how to say this
19     very nicely; but once the money goes out of the barn, sometimes
20     it's hard to get it back in.
21          And so right now -- let's go back to the beginning.  Let's
22     say I settle the case for $100,000 and it's in a QSF.  There's
23     going to come a point when that money needs to be --
24               THE COURT:  What's QSF?
25               MS. WAGSTAFF:  A qualified settlement fund.
```

1          **THE COURT:**  Okay.

2          **MS. WAGSTAFF:**  It's what we talked about at the

3    beginning.  Every law firm has a qualified settlement fund --

4          **THE COURT:**  Right.

5          **MS. WAGSTAFF:**  -- once they settle and enter into an

6    MSA.

7          And so that money is sitting in there.  There will be a

8    point when we agree with Mr. Hoffman and his team that the

9    money needs to be disbursed.  There will be a point, hopefully

10   sooner rather than later.  Okay?

11         So there's this pot of money sitting in the Andrus

12   Wagstaff QSF.  At some point in the future, we're going to have

13   to disburse that money.  And it's at that point, when the money

14   gets disbursed out of the QSF -- so let's go back to your

15   $100,000 example.  So we would have, let's assume, a 40 percent

16   contingency fee.  And just take case expenses out of it for

17   ease of this example.

18         That 100,000 claim, you would send $40,000 from the QSF to

19   my law firm, and you would send $60,000 to the client.  Right?

20         And so it's at that distribution point when the holdback

21   happens.  And at that distribution point, you've already sort

22   of made the split from the hundred percent recovery -- $100,000

23   recovery to fees and client award.  And so at that point, the

24   $40,000 going to my law firm would be assessed $8,000.

25         And so the 8- -- so the QSF administrator would be ordered

1  to send at that point -- once the split has been made into fees

2  and expenses -- so you're not really assessing the overall

3  canopy of the recovery.  You're assessing, okay, and then once

4  that split happens, and then you would say your $250 would be

5  assessed to the client's 60,000.  Right?  So they would get

6  $59,750, would go to the client under that example.

7        Are you following me?

8              THE COURT:  I am, yeah.

9              MS. WAGSTAFF:  Okay.  And so at that point, if there

10 are cases in state court or cases of -- for sure MDL lawyers

11 who have state court cases that you wanted to assess, you could

12 assess them at that point, because there will always be that

13 point, that moment before it leaves the QSF when it becomes

14 attorney fees and client awards.

15       And as a practical matter, each client signs a

16 distribution statement, agreeing to the amounts and all of

17 these other things.  And so while it is just a big pot of money

18 now, it's not always like that.

19             THE COURT:  That makes sense.

20       Let me ask you a couple -- you or whoever wants to answer

21 them a couple other questions.

22       And we're in a realm now of talking about exercise of

23 discretion, not what the MDL court has the power to do, but

24 exercise of discretion.

25       Would it be fair under the current circumstances to

1  require a holdback, or whatever you want to call it, of the

2  people whose lawyers signed the participation agreement and not

3  require a holdback of the people whose lawyers didn't sign the

4  participation agreement, either because they refused to sign it

5  or they didn't get around to it or whatever?  It seems a little

6  bit unfair.

7          **MS. WAGSTAFF:**  So I mean, I can take a stab at this,

8  if you want, unless --

9          **THE COURT:**  Sure.

10          **MS. GREENWALD:**  Go ahead.  Go ahead, Aimee.

11          **MS. WAGSTAFF:**  So my thought would be that it would --

12  that there's no doubt that the people who voluntarily submit to

13  the participation agreement should be subjected to this.

14      For Ms. Ephron to argue that her law firm is somehow

15  surprised or taken -- taken aback by the legal ramifications of

16  signing a participation agreement seems a little bit

17  disingenuine.

18      But by the same token, I believe that all of the lawyers

19  who use common benefit work product -- for example -- and you

20  may not know this -- we have a document depository.  It's

21  called Crivella West, whatever.  That's the name of it.  And

22  Monsanto has just produced documents one time to that

23  depository.  And we house deposition transcripts and other

24  things there, and we have work product there.  And that's sort

25  of where we did all of our document searches.

1      There was a law firm last -- or a couple weeks ago who

2  asked me for access to that, and I sent them the participation

3  order, and they said, "We don't want to sign that," presumably

4  because they knew what was going on here and they thought maybe

5  they wouldn't be subjected to it, and we gave them access to

6  it.

7      I think that anyone who has access to these -- to our work

8  product should be assessed.  And I don't think it's unfair for

9  the people who took the extra step to not be assessed.  I mean,

10  for anyone who really believes that this contract or this

11  participation agreement had no legal consequence, I don't think

12  is accurate.

13          **THE COURT:**  Yeah, I agree with you on that point.

14      I guess my question is more, this is messy.  And you've

15  got this universe of people who obtained access to this work

16  product, whether they ended up -- we don't know whether they

17  ended up needing to use it -- right? -- before they reached

18  their settlements.  But they, at a minimum, obtained access to

19  it.  We don't know if they ended up needing to use it.  We

20  don't know if they actually benefited from the work product as

21  opposed to just the fact that Monsanto lost three trials.  And

22  it seems very likely that the lawyers who did the up-front work

23  have been more than adequately compensated for their time and

24  expenses.

25      So in light of all that messiness and in light of the fact

1    that the lawyers who did the up-front work are likely to have

2    been more than adequately compensated for their time, maybe we

3    should just skip it, at least as it relates to the lawyers who

4    signed the participation agreement but did not have cases in

5    the MDL, particularly given that there is a more tenuous nexus

6    to those people and those clients than there is to the cases

7    that we're actually in the MDL.

8        MS. WAGSTAFF:   And, Your Honor, I would -- I would

9    argue that the case -- that the definition of "a case in the

10   MDL" is not as simple as one might hope and that a person who

11   has a fee interest in cases in the MDL qualifies as a lawyer in

12   the MDL.

13       THE COURT:   What does that mean, "a fee interest in

14   the MDL"?

15       MS. WAGSTAFF:   So lawyer- -- this goes back to the

16   earlier conversation with co-counseling.  But lawyers often

17   have fee interests in a lot of other people's cases.  So the

18   40 percent -- the 40 percent lawyer fee is not usually enjoyed

19   by one law firm.

20       So when you looked at Mr. Miller's declaration,

21   Ms. Greenwald's declaration, and my declaration and you saw

22   that in our -- I don't remember the numbers off the top of my

23   head, Your Honor.  I'm sorry.  But it was something like

24   125 law firms, or something, are participating in our

25   settlement agreement.  Those are lawyers and law firms that

 1  have fee interests in the cases that we have.

 2      So when you consider -- when everyone keeps throwing

 3  around these numbers that are not accurate on the fees that

 4  leadership has made, oftentimes a percentage of any law firm's

 5  fees go to other law firms.

 6      And so you can't -- it would be a wrong assumption to

 7  assume that Weitz & Luxenberg, Miller Law Firm, or

 8  Andrus Wagstaff enjoyed all 40 percent of our fees in every

 9  case we had.  That's just not even close to accurate.  And

10  everyone on this call knows that, that's a mass tort lawyer.

11          **THE COURT:**  But all of that is to say, I mean, to the

12  extent that -- so now we're talking about lawyers who have a

13  fee interest in an MDL case who haven't appeared in the MDL

14  case?  And so we're going to try and go and figure out who has

15  a fee interest in each MDL case and assess all of their state

16  cases based on the fact that they had a fee interest in the MDL

17  case?  Is that what you're --

18          **MS. WAGSTAFF:**  I would propose that you appoint

19  Special Master Feinberg to make some of those decisions of

20  which -- of who qualifies for having used common benefit work

21  product and things of that nature.  I don't know that I would

22  ever be able to know that, or I don't know that you would ever

23  be able to know that.

24          **THE COURT:**  Isn't it -- I mean, so all this talk about

25  use of work product, isn't it kind of a fiction?  I mean, at

1    least in this case.

2         I mean, the main reason that you have been arguing that we

3    need a common benefit fund is to disincent- -- or I don't

4    know -- to adjust the incentives as it relates to lawyers who

5    just sit on the sidelines and do nothing.  Right?  Most of the

6    focus in these common benefit -- in the arguments you're making

7    for a common benefit fund is about making sure that the

8    do-nothings don't get some sort of unfair windfall or something

9    like that.  But the do-nothings aren't using MDL work product.

10   They're just sitting there on the sidelines.

11        And whether somebody is a do-nothing or they're not a

12   do-nothing, isn't the reality that most of the people who have

13   gotten settlements from Monsanto, they haven't really done much

14   in their cases, and the settlement value that they got bears no

15   relationship to whether they had access to your work product or

16   not?

17        **MS. WAGSTAFF:**  This is a purely philosophical question

18   now because I have no idea what other people settled for.

19        There are firms that did a lot of work in their cases.

20   There's a lot of -- there are some firms in St. Louis that did

21   a lot of work in their cases.  There are some -- there are --

22   you know, there are some non-leadership firms that tried a

23   case.

24        My co-counsel in the Hardeman case before you is not on

25   leadership, and she did a lot of work in this case.

1        So there are firms that did that.  And you would have to

2   ask Monsanto, who I would render would not want to tell you

3   their settlement strategy, whether or not if they have access

4   to our work product, it makes a difference.

5        But the thought that Monsanto would be settling their

6   cases at all if they didn't have our work product seems a

7   little unfair to leadership.

8        **THE COURT:**  Well, but I mean, we know that Monsanto

9   has settled cases with lawyers who didn't have your work

10   product.  Right?  I mean, we have, like, the TV lawyers who are

11   just keeping clients on the sideline, never had access to your

12   work product.  Right?

13        **MS. WAGSTAFF:**  They have access to our work product.

14   I mean, our work product -- we have our work product that is,

15   you know, the Crivella West, where you have to affirmatively

16   ask us for it.  But also, we've put our work product out to the

17   world.  And it's on ECF, and it's -- I mean, your *Daubert*

18   order, for example, if I'm correct, all the *Daubert* briefing,

19   you know, our expert reports were attached as exhibits.  You

20   and the former JCCP judge held seven days of, you know, pretty

21   intense *Daubert* testimony.  Trial testimony is out there.  All

22   of that stuff is publicly available.

23        **THE COURT:**  That's not stuff that -- I mean, as long

24   as you've been adequately compensated for the work that you

25   have done, why should we care whether other people are

1  benefiting from stuff that's publicly available on the docket?

2  I mean, that's not -- I mean, again, that's our legal system.

3  Right?

4      We all benefit from stuff that we find on dockets and

5  stuff that we find on Westlaw and transcripts of hearings and

6  things like that and complaints that were filed.  I mean, when

7  did the lawyers from a previous case who filed that stuff need

8  to be compensated by lawyers who benefited from it later on?

9      MS. WAGSTAFF:  Well, that's the common benefit

10  doctrine sort of as it plays in.  I mean, this isn't a

11  single-event case, or this isn't a case that has, you know,

12  five or six cases.  These lawyers knew that we were doing the

13  work.  They knew that we were generating the general causation

14  arguments.  They knew that once, you know, the risk was gone,

15  that they could come in.

16      It's an entirely different model than a single-event case

17  or even your case on -- your example on marriage equality.

18  I think it's very different.

19      THE COURT:  Okay.  Is there anything else that the

20  plaintiffs want to say on all of this?

21      MS. GREENWALD:  Your Honor, I just want to -- if I can

22  just raise one issue about sort of making someone whole.

23      So as you know, 0.25 percent of the holdback request

24  relates to expenses.  And, of course, frankly, that was based

25  on what we anticipated to be the assessment of cases that are

1   in PTO 12, which is clearly larger than what I'm hearing you

2   say today.

3        And so that is a place where clients, individually, are

4   going to be harmed because, as we mentioned in our brief, we

5   worked up about 50 plaintiffs for trial.  And that means that

6   we had experts, specific causation experts for each one of

7   those.  Monsanto deposed them, their families.  They did home

8   inspections.  They deposed their treating doctors, et cetera.

9   I won't go on too much.

10        **THE COURT:**  When you say you worked up 50 cases for

11   trial, how many of those were in state court and how many of

12   those were in federal court?

13        **MS. GREENWALD:**  They're all in state court, except for

14   ones that -- well, we know that there's Stevick and Hardeman

15   and then the one --

16        **THE COURT:**  Why is it my -- so all of the ones in

17   state court -- you're talking about all your clients who worked

18   up all these cases for trial in state court.  Why is that any

19   of my business?

20        Why don't you go to the state court to try to -- if you

21   think that somebody got an -- is getting an unfair benefit from

22   all of the work and all of the expenses that your clients

23   incurred in state court, why is it my business to compensate --

24   figure out and compensate it?

25        **MS. GREENWALD:**  Because for the same reason that --

1          THE COURT:  Their cases are not in my court.

2          MS. GREENWALD:  But the lawyers -- some of the lawyers

3     who worked on those cases -- and remember, the MDL strategy,

4     our leadership strategy was to put maximum pressure on Monsanto

5     in multiple courts.  That is what we did in order to get trial

6     dates and to bring this case to a point of settlement.

7          And so, again, I mean, under the theories of equity and

8     common benefit doctrines, it would allow courts -- the Court,

9     at least in connection with the participation agreement, to

10    assess a percentage on at least MDL clients, and then other

11    clients that those lawyers have, for purposes of the expenses

12    of the litigation.

13         Otherwise, there's no question that clients for whom we

14    and some other lawyers -- it's not just us -- prepared trials

15    will bear the unfair burden of those litigation costs.

16         And that was all done for the common good of every single,

17    solitary plaintiff in this case, all 140,000 or 125,000, half

18    of which have never even been filed.  But those trial dates is

19    what the pressure point was that made Monsanto come to the

20    table.  And we all know that.  Everybody knows that.

21         THE COURT:  Yeah.  I know I said three hours ago

22    everybody knows that.

23         MS. GREENWALD:  I know.  I know.

24         But those clients aren't being made whole if there's not a

25    broad enough brush for assessments.

1          **THE COURT:**  Okay.  Anybody else have any last word

2     they want to throw in?

3          **MS. EPHRON:**  Your Honor, if I may, as to the

4     Category 3 objectors, a lot of us have not settled.  In fact,

5     Trammell, PC, Ingersoll Dreyer, we have cases that are set for

6     trial this summer, because we haven't --

7          (Court reporter interrupts for clarification of record.)

8          **MS. EPHRON:**  I just wanted to say that many of the

9     Category 3 firms have not settled.  We've been unable to settle

10    because of the values at play.

11         Nobody is paying for our experts.  We're paying for them

12    ourselves.  Nobody is paying for our clients' depositions or

13    their families' or their treaters' depositions.  We're paying

14    for those ourselves.  In fact, we have two cases set for trial

15    this summer and more preference hearings.  In fact, we have one

16    next week.

17         So we haven't settled.  And to say that everybody in this

18    litigation has benefited from leadership settlement is simply

19    inaccurate.

20         **THE COURT:**  And so what is your point as it relates to

21    this motion?

22         **MS. EPHRON:**  My point simply is that it's -- to say

23    that, you know, we are riding on coattails and we've simply sat

24    idly by is inaccurate.  That's incredibly inaccurate for many

25    of the objectors here.

1        **THE COURT:**  Right.  But that can be sorted out after,

2   when a decision is made as to how to distribute the proceeds

3   from the common benefit fund.

4        **MS. EPHRON:**  Yes.

5        **THE COURT:**  The fact that some lawyers have not been

6   sitting idly by doesn't seem particularly relevant to whether a

7   common benefit fund should be established.  It seems relevant

8   to who should get what percentage of the money from that fund

9   at the end of the day.

10       **MS. EPHRON:**  That is correct.

11       **THE COURT:**  Okay.  Anything else?

12      Give me one second.  I'm going to take just a two-minute

13   break, and then I'm going to come back and wrap it up.

14                  (Recess taken at 3:42 p.m.)

15                  (Proceedings resumed at 3:44 p.m.)

16       **THE COURT:**  I was reminded of one more question when I

17   was just chatting with my law clerk.  It might be -- I seem to

18   remember this coming up in Mr. Citron's brief.

19      So I don't know.  Maybe I'll ask you.  I think it was you

20   who argued that -- you were talking about the *Avandia* case out

21   of the Third Circuit, the unpublished opinion.  And you were

22   talking about the participation agreement and how, for there to

23   be, quote/unquote, jurisdiction -- I'm very sorry.  One second.

24   I had a 3:45 appointment.  I didn't think the hearing would go

25   on this long.  Let me be right back.

1          **MR. CITRON:**  Okay.

2                    (Recess taken at 3:45 p.m.)

3                (Proceedings resumed at 3:46 p.m.)

4          **THE COURT:**  You were arguing in your brief, I think,

5    that two things have to happen for the Court to exercise

6    authority over the recovery of someone whose lawyer signed a

7    participation agreement.  The lawyer has to sign a

8    participation agreement.  That's number one.  And number two is

9    that the agreement has to be, quote/unquote, incorporated into

10   a court's order.

11         And I don't really -- when I was reading *Avandia*, I didn't

12   really understand what it meant for an order to be

13   incorporated -- excuse me -- for a participation agreement to

14   be incorporated into an order, nor did I understand the magic

15   of incorporating.

16         I mean, number one, I don't know what "incorporating"

17   means.  But the way we did it in PTO 12, why isn't that enough?

18   Because the order says if you're an attorney and you sign a

19   participation agreement with lead counsel, you're going to be

20   subject to PTO 12 and you're going to be subject to a holdback.

21   And then their participation agreement contains an

22   acknowledgment by the lawyer that says -- that says:  I've read

23   PTO 12, and I agree to be bound by the Court's orders regarding

24   holdbacks.

25         To the extent that something more is required to

1 incorporate it, I don't know what that is.  And if something

2 more is required, I don't know why that would matter.

3   So if you or anybody else wishes to speak to that

4 question, that was the one kind of hanging question that I had.

5   **MR. CITRON:**  Sure.  I think it might be helpful to

6 explain the point.

7   I really do think that the best practice is to adjudicate

8 these controversies between attorneys as causes of action

9 against the people you're trying to get the money from.  And

10 that's probably true even if it's going to be decided in the

11 ancillary jurisdiction of your court.

12   Someone should file a complaint, say what source of law

13 they're using, whether it's California state law or some other

14 source of law.  Otherwise, we're going to have a hard time

15 figuring out what the principles are that resolve the kinds of

16 disputes we've been hearing today between some of the

17 attorneys.

18   I think, though, when an agreement has been incorporated

19 into a court order, then you can essentially ask the Court by

20 motion to enforce its order against the person who's bound by

21 it.  That's the --

22   **THE COURT:**  The Court construes it, and it's the law

23 of the Court.  Correct?

24   **MR. CITRON:**  Correct.  So --

25   **THE COURT:**  MDL --

1          **MR. CITRON:**  -- that's the magic -- oh, I'm sorry.

2          **THE COURT:**  No, no.  Go ahead.

3          **MR. CITRON:**  So that's the magic of incorporation if

4    there's a plausible argument to be made that what's been

5    violated is not a contract, which requires a contract cause of

6    action --

7          **THE COURT:**  But then, so then --

8          **MR. CITRON:**  -- but the Court --

9          **THE COURT:**  Okay.  I get that.  But what is -- I mean,

10   so then what is incorporation, and why isn't it incorporated

11   here?  I mean, it seems kind of incorporated to me here.

12         **MR. CITRON:**  Yeah.  I think my main objection to

13   viewing it as incorporated here -- and I'm not sure how strong

14   it is.  It doesn't apply to us; so I'm not sure I'm the best

15   person to speak to it.

16      But, you know, as you noted, the language in that section

17   of the PTO about who it applies to is awfully murky.  It

18   includes a narrow category and then a broader category that

19   includes the narrow one and then an even broader category that

20   includes all of those too.  That's a weird way to define

21   something.  And the first time I read it, I actually thought it

22   was just intended to cover people who had affirmatively signed

23   the agreement, you know.

24         **THE COURT:**  Me too.  And then I read it ten more

25   times, and each time I had a different interpretation.

1          **MR. CITRON:**  That's why I think the way -- if you are

2     going to be asked to enforce the agreement because it's a

3     breach of one of your orders, I think it's at least kind of

4     important that people sign the order first -- sign the

5     agreement first, and then you record sort of --

6          **THE COURT:**  Well, I understand what you're saying.

7     But it makes clear -- oh, I'm sorry.

8          I do understand what you're saying.  But if nothing else,

9     this makes clear that if you sign the participation agreement,

10    you're subject to the order and any subsequent orders that

11    come.  And the participation agreement makes clear that the

12    person is subject to this order and any orders that come.

13         So whatever murkiness exists, I'm not sure it applies --

14         **MR. CITRON:**  And did you say -- I hadn't seen this

15    before.  But did you say that the participation agreement

16    itself tells people "Pay attention to PTO 12"?

17         **THE COURT:**  I acknowledge that I've read PTO 12 and

18    that I'm subject to PTO 12 and subject to any further orders of

19    the Court regarding holdbacks and the settlement and stuff.

20         **MR. CITRON:**  I think that that probably -- that at

21    least strengthens the idea that what's been breached is the

22    court order there, and not just a contract.

23         **THE COURT:**  Okay.  All right.  Okay.

24         Any last word from anybody before we wrap up?

25                        (No response.)

1          **THE COURT:**  All right.  I guess this might take a

2    little bit to put together a ruling.

3       Just let me ask -- let me ask the plaintiffs one more

4    question.  This is a mechanical question.

5       It sounds like from this discussion -- if I were to

6    conclude, for example, that the only cases that should be

7    subject to a holdback, whether as a matter of power or as a

8    matter of discretion or both, if I conclude that the only cases

9    that should be subject to a holdback are cases in the MDL, the

10   4,000 cases or however many there are in the MDL, it sounds

11   like there's not necessarily any urgency for me to order that

12   and order the percentage quickly.

13      Like, I can just -- I'm going to need to take my time to

14   write an order about all this other stuff -- write a ruling

15   about all this other stuff, and I can just include that in that

16   ruling that I issue a few weeks from now or something like

17   that.  Is that right?

18          **MS. GREENWALD:**  So I think --

19          **THE COURT:**  I'm not --

20          **MS. GREENWALD:**  I'm sorry.  I didn't mean to --

21          **THE COURT:**  No.  Go ahead.

22          **MS. GREENWALD:**  I think that's a question that maybe

23   you have to ask Monsanto, because we don't know any settlements

24   but our own.  And so we might know for ourselves when money's

25   about to go from the qualified settlement funds into the hands

1    of clients and into the hands of lawyers, but we don't know

2    that for others.  So there could be cases in the MDL where

3    lawyers only have a couple cases and there isn't even a QSF.  I

4    don't know.

5         And so I'm going to put William on the spot and see if

6    maybe he can answer that better than we can as to timing.

7              MR. HOFFMAN:  I think several weeks is fine,

8    Your Honor.  None of the QSFs are likely to fund out to

9    claimants in that time frame.  And if there's an individual

10   case in the MDL that's settled in that time frame, which is

11   possible, we'll figure out a way to deal with it so that

12   there's no risk to anyone.

13             THE COURT:  Well, could I just -- would there be any

14   problem with me saying that no payout should be made until I

15   issue my order on the -- no payouts should be made in the MDL

16   cases until I issue my order on holdback?

17             MR. HOFFMAN:  I have no objection to that --

18             THE COURT:  Is it necessary?

19             MR. HOFFMAN:  -- Your Honor.

20             THE COURT:  You have no objection, but is it

21   necessary?

22             MR. HOFFMAN:  I don't think so at this point.

23             THE COURT:  Okay.

24             MR. HOFFMAN:  Perhaps if you haven't issued your

25   ruling and a case -- an individual claimant's situation becomes

1  ripe, we can approach you about that.

2      THE COURT:  I would appreciate that.  Why don't we do

3  it that way.

4      MR. HOFFMAN:  Okay.  That's fine.

5      THE COURT:  You let us know if you need something from

6  us, because I think it would be better if -- like I said, it

7  may take me a little while.  But I think we shouldn't have

8  money going into lawyers' hands in MDL cases without

9  establishing the holdback, assuming I decide -- I want to make

10  clear, I'm still undecided as to whether there should be a

11  holdback even in the MDL cases, but I want to think about that

12  some more.

13      MR. HOFFMAN:  We'll take care of it, Your Honor.

14      THE COURT:  And then let me make sure.  Just searching

15  my brain to see if I have anything else.

16      Okay.  I'll circle back if I end up having any other

17  questions.

18      Thanks very much.

19      ALL:  Thank you, Your Honor.

20          (Proceedings adjourned at 3:55 p.m.)

21                   ---o0o---

22

23

24

25

1

2                        __CERTIFICATE OF REPORTER__

3            I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6     DATE:  Friday, March 5, 2021

7

8     _____

9          Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
                    Official United States Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25