# EXHIBIT 2

Steven J. Leibach, M.D.

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4   IN RE: ROUNDUP PRODUCTS      ) MDL No. 2741

 5   LIABILITY LITIGATION         )

 6   ------------------------     ) Case No. MDL No.

 7   This document relates to:    ) 3:16-md-02741-VC

 8   Pecorelli v. Monsanto,       )

 9   Case No. 3:16-cv-06936-VC    )

10

11

12              VIDEOTAPED DEPOSITION OF

13

14                STEVEN J. LEIBACH, M.D.

15                   July 23, 2020

16

17                Libertyville, Illinois

18

19

20

21            GOLKOW LITIGATION SERVICES

           877.370.3377 ph | 917.591.5672 fax

22                  deps@golkow.com

23

24
```

Steven J. Leibach, M.D.

1

2

3              The videotaped deposition of

4    STEVEN J. LEIBACH, M.D., called by the Defendant

5    for examination, taken pursuant to the Federal

6    Rules of Civil Procedure of the United States

7    District Courts pertaining to the taking of

8    depositions, taken before CORINNE T. MARUT, C.S.R.

9    No. 84-1968, Registered Professional Reporter and a

10   Certified Shorthand Reporter of the State of

11   Illinois, at the offices of Cassiday Schade, LLP,

12   1870 West Winchester Road, Suite 148, Libertyville

13   Illinois, on July 23, 2020, commencing at 1:04 p.m.

14

15

16

17

18

19

20

21

22

23

24

Steven J. Leibach, M.D.

```
 1   APPEARANCES:
 2   ON BEHALF OF THE PLAINTIFF:
 3        MOLL LAW GROUP
          22 West Washington Street, 15th Floor
 4        Chicago, Illinois  60602
          312-462-1700
 5        BY:  REBECCA FREDONA, ESQ.
               rfredona@molllawgroup.com
 6
 7
 8   ON BEHALF OF THE DEFENDANT:
 9        SHOOK, HARDY & BACON L.L.P.
          2555 Grand Boulevard
10        Kansas City, Missouri  64108-2613
          816-474-6550
11        BY:  JANE J. BARTLEY, ESQ.
               jbartley@shb.com
12
13
14   ON BEHALF OF THE DEPONENT:
15        CASSIDAY SCHADE, LLP
          222 West Adams Street
16        Chicago, Illinois 60606-5312
          847-932-6922
17        BY:  MARC BENJOYA, ESQ.
               mbenjoya@cassiday.com
18
19
20
21   VIDEOTAPED BY:  MILO SAVICH
22
23   REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968
24
```

Steven J. Leibach, M.D.

```
 1                    I N D E X
 2    STEVEN J. LEIBACH, M.D.              EXAMINATION
 3         BY MS. BARTLEY...............    6
           BY MS. FREDONA...............   53
 4         BY MS. BARTLEY...............   59
           BY MS. FREDONA...............   64
 5         BY MS. BARTLEY...............   65
 6
 7
 8                  E X H I B I T S
 9    LEIBACH DEPOSITION EXHIBIT          MARKED FOR ID
10      No. 1    Defendant Monsanto Company's        8
                 Third Amended Notice to Take
11               Oral and Videotaped Deposition
                 of Dr. Steven Leibach
12
        No. 2    Curriculum Vitae,                   8
13               Steven J. Leibach, M.D.
14      No. 3    Medical records;                   23
                 Confidential-Pecorelli-
15               MPecorelli-NO&H-000035 - 000043
16      No. 4    medical record;                    38
                 Confidential-Pecorelli-
17               MPecorelli-AmitaHABMC-MD-
                 000045 and 000046
18
        No. 5    Death Certificate,                 49
19               Michael Daniel Pecorelli Sr.
20      No. 6    Johns Hopkins Hospital             60
                 Surgical Pathology report;
21               Confidential-MPecorelli-
                 JHRL-000002 and 000003
22
23
24
```

Steven J. Leibach, M.D.

1          THE VIDEOGRAPHER:  We are now on the record.

2    My name is Milo Savich, and I am a videographer for

3    Golkow Litigation Services.

4                Today's date is July 23, 2020, and the

5    time is 1:04 p.m.

6                This video deposition is being held in

7    Libertyville, Illinois, in the matter of Roundup,

8    Pecorelli vs. Monsanto Company.  This case is being

9    heard in the United States District Court, Northern

10   District of California.

11               The deponent is Dr. Steven Leinbach

12   (sic).

13        THE WITNESS:  Leibach.

14        THE VIDEOGRAPHER:  Leibach.

15               Will counsel please identify themselves

16   for the record.

17        MS. FREDONA:  Rebecca Fredona on behalf of

18   Plaintiff.

19        MS. BARTLEY:  Jane Bartley for Monsanto.

20        MR. BENJOYA:  Marc Benjoya with Cassiday's

21   office on behalf of the doctor.

22        THE VIDEOGRAPHER:  The Court Reporter is Corey

23   Marut, who will now swear in the witness, and we

24   may then proceed.

Steven J. Leibach, M.D.

```
 1              (WHEREUPON, the witness was duly

 2         sworn.)

 3              STEVEN J. LEIBACH, M.D.,

 4   called as a witness herein, having been first duly

 5   sworn, was examined and testified as follows:

 6                   EXAMINATION

 7   BY MS. BARTLEY:

 8     Q.    Would you please introduce yourself to

 9   the jury by stating your full name.

10     A.    Yes, my name is Dr. Steven Leibach.

11     Q.    And do you understand that we're here

12   today taking your videotaped deposition in a

13   lawsuit filed by Mark Pecorelli?

14     A.    Yes.

15     Q.    And are you aware that Mike Pecorelli

16   was diagnosed with non-Hodgkin's lymphoma?

17     A.    Yes.

18     Q.    And do you have an understanding that in

19   this lawsuit, Mike Pecorelli's son Mark alleges

20   that his -- that the herbicide Roundup caused his

21   father's non-Hodgkin's lymphoma?

22     A.    Yes.

23     Q.    And do you understand that you are not a

24   party, meaning that you are neither a Plaintiff nor
```

Steven J. Leibach, M.D.

```
 1                    (WHEREUPON, Leibach Deposition

 2                    Exhibit No. 4 was marked for

 3                    identification:  Medical record;

 4                    Confidential-Pecorelli-MPecorelli-

 5                    AmitaHABMC-MD-000045 and 000046.)

 6   BY MS. BARTLEY:

 7        Q.    Do you see that there?

 8        A.    Um-hmm.

 9        Q.    Do you see a date, this is kind of in

10   the upper right-hand corner, of February 4 of 2011?

11        A.    Yes.

12        Q.    Okay.  Do you see your name here

13   identified as the consulting physician?

14        A.    Yes.

15        Q.    Do you know how this would have come

16   about that you would have been asked to provide a

17   consult at Alexian Brothers Medical Center?

18        A.    I was asked to see the patient regarding

19   his history of malignancy because I had previously

20   seen him.

21        Q.    Was this -- do you have any memory in

22   terms of was this another request of the son, for

23   example, or were you simply on -- on rounds, so to

24   speak, at the hospital or -- I'm basically asking
```

Steven J. Leibach, M.D.

1   you if you have any specificity in your memory.

2       A.    I don't have a specific memory of why I

3   was called, but I believe that I was likely called

4   by the primary care physician.

5       Q.    Okay.  In this lengthy paragraph on

6   page 45, I'm going to ask you to draw your eye down

7   about seven lines down.

8            You make reference to the bronchoscopy

9   that you had strongly recommended that

10  Mr. Pecorelli pursue.

11           Do you see reference to the

12  bronchoscopy?

13      A.    Yes.

14      Q.    Am I pronouncing that right?

15      A.    Yes.

16      Q.    Okay.  And then in the next sentence,

17  did you note that Mr. Pecorelli never followed up

18  and set that up?

19      A.    Yes.

20      Q.    Okay.  And do you note again here that

21  he has a significant smoking history, correct?

22      A.    Yes.

23      Q.    Okay.  Same paragraph.  I'm going to ask

24  you to draw your eye five lines from the bottom of

Steven J. Leibach, M.D.

1    this paragraph.

2           You summarize that you saw the patient

3    and recommended no further treatment for his

4    lymphoma, but you had strongly recommended that he

5    get this pulmonary consultation and bronchoscopy --

6    bronchos- --

7         A.    Bronchoscopy.

8         Q.    Thank you very much.  Is that correct?

9         A.    Yes.

10        Q.    And did you note here that Mr. Pecorelli

11   declined your recommendation for that consult and

12   bronchoscopy?

13        A.    Yes.

14        Q.    Okay.  If you'll turn to page 46 on the

15   back side here, under your Assessment No. 1, you

16   note, "Probable second primary lung carcinoma in

17   this heavy smoker."

18           Did I read that right?

19        A.    Yes.

20        Q.    Can you explain for the jury in this

21   medical oncology setting, when you use the word

22   "primary," what do you mean when you're referring

23   to a "primary lung carcinoma in this heavy smoker"?

24        A.    What it refers to is the suspicion that

Steven J. Leibach, M.D.

1    I had that a cancer was developing within his lungs

2    evolving specifically from cancerous lung tissue.

3         Q.    And for what reason did you use the word

4    "primary"?

5         A.    Exactly what I just said in my answer,

6    meaning that it evolved specifically from lung

7    tissue, that it wasn't necessarily in my

8    guesstimate at the time a tumor that arose

9    elsewhere in the body and metastasized to the

10   lungs.

11        Q.    And for what reason did you refer to the

12   fact that he was a heavy smoker?

13        A.    Please repeat the question.

14        Q.    And for what reason did you refer in the

15   first line of your assessment to the fact that he

16   was a heavy smoker?

17        A.    Primary lung cancer is well known to be

18   associated with heavy smoking.

19        Q.    And on your second line of your

20   assessment, did you note again that his lymphoma

21   was in remission and seems unrelated to his current

22   symptoms?

23        A.    Yes.

24        Q.    And can you explain why his lymphoma

Steven J. Leibach, M.D.

1    seemed unrelated to these symptoms which he's

2    demonstrating at this time?

3         A.    That was my assessment at the time based

4    on my best guess after reviewing his clinical

5    presentation and the imaging studies.

6         Q.    And did your plan once again include

7    encouraging him to proceed with a bronchoscopy?

8         A.    Yes.

9         Q.    Let's go ahead and you can set that

10   record aside, and I'm going to ask you to turn your

11   attention back to the Northwest Oncology &

12   Hematology records, starting at page 38.

13        A.    Okay.

14        Q.    Do you see a date here of April 7, 2011

15   in the upper right-hand corner?

16        A.    Yes.

17        Q.    Okay.  And for this one I'm going to ask

18   you to jump all -- we're going to go right to your

19   Assessment and Plan at the bottom of page 39, and

20   it kind of starts at the bottom of 39 and continues

21   to the top of page 40.

22             Is it accurate that by the time of this

23   visit, since you last saw him, Mr. Pecorelli has

24   now received a diagnosis of malignant fibrous

Steven J. Leibach, M.D.

 1   histiocytoma?

 2        A.    Yes.

 3        Q.    Okay.  And is it accurate that he

 4   received that diagnosis at Alexian Brothers Medical

 5   Center?

 6        A.    Yes.

 7        Q.    Now, did you have an opportunity to

 8   review the pathology from Alexian on that

 9   diagnosis?

10        A.    I reviewed the pathology report, yes.

11        Q.    Okay.  So, even though you weren't the

12   diagnostic physician, did you have an opportunity

13   to form an opinion as to whether you agreed with

14   that diagnosis?

15        A.    The pathologist not only gave his

16   opinion, but he sent the slides to Johns Hopkins

17   University pathologist, their reference, very

18   famous reference pathology lab.  And they confirmed

19   the diagnosis.

20        Q.    So, did you form an opinion about

21   whether you agreed with the diagnosis of malignant

22   fibrous histiocytoma?

23        A.    Based on the pathologic reviews that

24   were done, I did agree that that was the diagnosis.

Steven J. Leibach, M.D.

1      Q.    And is another term for malignant

2  fibrous histiocytoma pleomorphic sarcoma?  Is that

3  correct?

4      A.    I don't know.

5      Q.    Okay.  There are different categories of

6  cancer such as lymphomas and sarcomas, though,

7  right?

8      A.    Correct.

9      Q.    Okay.  And just to be clear, sarcomas

10  and lymphomas are two different types of cancer, is

11  that right?

12      A.    Yes.

13      Q.    Okay.  And this lesion that was spotted

14  in Mr. Pecorelli's lung that has now been diagnosed

15  as malignant fibrous histiocytoma, that's a

16  sarcoma, is that right?

17      A.    Correct.

18      Q.    So, to be clear, this lesion that was

19  spotted in Mr. Pecorelli's lung, that was not

20  diagnosed as lymphoma, correct?

21      A.    Yes.  That's correct.

22      Q.    Okay.  So, in fact, back on your

23  Assessment and Plan on the bottom of page 39, did

24  you note that as to Mr. Pecorelli's lymphoma, there

Steven J. Leibach, M.D.

1  is NED?

2      A.    Yes.

3      Q.    And can you explain to the jury what

4  does NED stand for?

5      A.    No observable evidence of disease.

6      Q.    Okay.  And that relates to his prior

7  diagnosis of lymphoma, correct?

8      A.    Yes.

9      Q.    Okay.  And on the last line on page 39

10  you note "Non-compliance"?

11      A.    Yes.

12      Q.    What were you referring to there?

13      A.    I was referring to the patient's

14  inability to follow some of the directions that we

15  had given him regarding proceeding with smoking

16  cessation as well as the recommended bronchoscopy

17  at the time that we recommended it.

18      Q.    So, do your records reflect that you

19  recommended that Mr. Pecorelli quit smoking but he

20  refused?

21      A.    Yes.

22      Q.    And on page 40, do your records reflect

23  that further treatment for Mr. Pecorelli's

24  malignant fibrous histiocytoma was recommended but

Steven J. Leibach, M.D.

```
 1   he refused further treatment?

 2        A.    At that time he did, yes.

 3        Q.    Okay.  And do your records reflect that

 4   Mr. Pecorelli was recommended to take certain

 5   pulmonary medications or medications for his lung,

 6   but he refused to take them?

 7        A.    Yes.

 8        Q.    Okay.  And do your records also reflect

 9   that you spent time discussing in detail

10   Mr. Pecorelli's diagnosis and gave him sufficient

11   opportunity to ask any questions he might have and

12   answered his questions?

13        A.    Yes.

14        Q.    Let's go ahead and turn to the last

15   record in this set, which begins on Bates stamp

16   page 35.

17        A.    Okay.

18        Q.    This is another three-page record.  So,

19   I'm going to draw your attention, I'm going to take

20   you all the way to page 37.

21        A.    Okay.

22        Q.    There is a reference to the fact -- on

23   page 37, there is a reference to the fact that

24   Mr. Pecorelli was seen in collaboration with you on
```

Steven J. Leibach, M.D.

1   this date and that you were present in the office

2   suite that day.

3          So, I guess my question to you would be,

4   would you have seen Mr. Pecorelli on this date or

5   would you have just signed off in a capacity of

6   supervising?

7       A.   No, I saw him.

8       Q.   You saw him this day.  Okay.

9       A.   He was seen initially by my physician

10  assistant.

11      Q.   Okay.

12      A.   But then I came in and also visited with

13  him.

14      Q.   Okay.  So, under the assessment in this

15  record, which I guess begins at the bottom of

16  page 36, by this point in time Mr. Pecorelli has

17  had a stent and an XRT for his malignant fibrous

18  histiocytoma, his lung cancer, correct?

19      A.   His malignant fibrous histiocytoma.

20      Q.   Right.

21      A.   Yes.

22      Q.   He's had a stent and XRT therapy,

23  correct?

24      A.   Right.

Steven J. Leibach, M.D.

1      Q.    Okay.  And then the PET scan one month

2   later on -- strike that.

3            And did -- did your physician assistant

4   note under your assessment that Mr. Pecorelli was

5   unwilling to quit or even cut down on his smoking

6   at that time?

7      A.    Yes.

8      Q.    Okay.  And did she also note under the

9   assessment that Mr. Pecorelli's lymphoma continued

10  to be NED?

11     A.    Yes.

12     Q.    Which means no evidence of active

13  disease?

14     A.    Yes.

15     Q.    Is that correct?  Okay.

16            And, in fact, Dr. Leibach, am I correct

17  that throughout the entirety of your care and

18  treatment of Mr. Pecorelli, ever since before his

19  bone marrow biopsy in August of 2010 and the PET

20  scan of September of 2010, throughout your care and

21  treatment, there have been no diagnostic tests or

22  any evidence demonstrating active lymphoma, is that

23  correct?

24     MS. FREDONA:  Objection; form.

Steven J. Leibach, M.D.

```
 1        MR. BENJOYA:  Go ahead.

 2   BY THE WITNESS:

 3        A.    Yes, that's correct.

 4   BY MS. BARTLEY:

 5        Q.    I'm going to go ahead and turn your

 6   attention to Exhibit No. 5, which is the death

 7   certificate.

 8                    (WHEREUPON, Leibach Deposition

 9                    Exhibit No. 5 was marked for

10                    identification:  Death Certificate,

11                    Michael Daniel Pecorelli Sr.)

12   BY MS. BARTLEY:

13        Q.    And if you could take a look at the top

14   of the death certificate, do the first couple lines

15   indicate that Mr. Pecorelli passed away on March 28

16   of 2012 at the age of 82?

17        A.    Yes.

18        Q.    Okay.  And then down on one of the last

19   boxes on the bottom of the certificate identifies

20   the name and address of the person completing the

21   cause of death on this form, and it lists your name

22   and address, is that correct, Dr. Leibach?

23        A.    Yes.

24        Q.    Now, do you recall, how did it come
```

Steven J. Leibach, M.D.

1   about that you were requested to identify

2   Mr. Pecorelli's cause of death for this Cook County

3   death certificate?

4        A.    I'm not sure.

5        Q.    You just don't recall one way or

6   another?

7        A.    I don't know.  We're often -- when a

8   patient expires related to a malignancy and we were

9   the primary treating physician for that malignancy,

10  we've often been called upon to sign the death

11  certificate.  And I believe that's what the

12  circumstance was here.

13       Q.    Okay.  And what did you identify as

14  Mr. Pecorelli's cause of death?

15       A.    Malignant fibrous histiocytoma.

16       Q.    And that's the sarcoma in the left lung

17  that we were discussing earlier in the deposition,

18  correct?

19       A.    Yes.

20       Q.    Okay.  And that term, malignance --

21  strike that.

22       A.    Yeah, this wasn't -- this is a typo.

23  It's not malignant fibrosis.  It's malignant

24  fibrous.

Steven J. Leibach, M.D.

1    Q.    Fibrous.  Correct.  Thank you for

2   clarifying.

3          And you recall earlier in the deposition

4   that we discussed different types of cancers and

5   you clarified that sarcoma and lymphomas are two

6   different types of cancers, right?

7    A.    Yes.

8    Q.    Okay.  And to be clear, Mr. Pecorelli's

9   lymphoma was not his cause of death, correct?

10   A.    That's correct.  To the best of my

11  knowledge.

12   Q.    And on this death certificate, although

13  there are spaces on this form where you could have

14  identified and listed other significant conditions

15  which contributed to Mr. Pecorelli's death, no

16  other medical conditions are listed.  Is that

17  correct?

18   A.    That's correct.

19   Q.    Generally, Dr. Leibach, during your

20  course -- your care and treatment of Mr. Pecorelli,

21  would you have ever -- is it your practice to

22  review pathology slides themselves or do you

23  generally defer to the pathologist and just review

24  the pathology reports?

Steven J. Leibach, M.D.

1    A.    Most often I defer to the pathologist's

2    reports.  But not uncommonly, if it's a confusing

3    case or just out of my own interest, I would go

4    down to the pathology suite and review the slides.

5    I did not in this case.

6    Q.    But, certainly, if you ever had any

7    questions, you could always pick up the phone and

8    talk to the pathologist if you wanted to?

9    A.    Yes.

10   Q.    As a practicing medical oncologist, are

11   you aware of any diagnostic test or marker or

12   chemistry stain that you could use which can

13   determine the cause of a patient's non-Hodgkin's

14   lymphoma?

15   A.    I'm not aware of any.

16   Q.    As a practicing medical oncologist, are

17   you aware of any diagnostic test which can

18   determine if glyphosate or Roundup caused or

19   contributed to a patient's non-Hodgkin's lymphoma?

20   A.    No.

21   Q.    During the course of your treatment of

22   Mr. Pecorelli, was there anything you observed that

23   suggested to you that glyphosate or Roundup caused

24   or contributed to his lymphoma?

Steven J. Leibach, M.D.

 1  smoking causing -- his smoking causing a particular

 2  type of malignancy.

 3  BY MS. FREDONA:

 4      Q.    Have you ever told a patient that

 5  Roundup did not cause their non-Hodgkin's lymphoma?

 6      A.    I never talked to any patient about

 7  Roundup.

 8      Q.    To get an idea, in 2011, Mr. Pecorelli

 9  had an abdominal mass.  Is that correct?

10      A.    Yes.

11      Q.    Okay.  Do you know if that mass was ever

12  biopsied?

13      A.    I think you're referring to the

14  paraspinal mass?

15      Q.    Yes, Doctor.

16      A.    I believe that that was biopsied at the

17  Hines VA Hospital.

18      Q.    Okay.  All right.  Would a biopsy be

19  needed to determine that that mass was not

20  non-Hodgkin's lymphoma?

21      A.    Could you rephrase the question?

22      MS. BARTLEY:  I think you're talking --

23      MS. FREDONA:  I'm sorry?

24      MS. BARTLEY:  I think you're talking about

Steven J. Leibach, M.D.

1    2011.  You're talking about -- make sure you're

2    talking about the same thing.  You might want to

3    clarify.

4         MS. FREDONA:  All right.  Let's see here.

5    BY MS. FREDONA:

6         Q.    In 2011, a PET scan showed -- let's see

7    here -- we had another mass --

8         A.    I don't have that.

9         Q.    -- that came back.

10        MR. BENJOYA:  If you don't have it, make sure

11   you get it.

12   BY THE WITNESS:

13        A.    I don't have the records from Loyola

14   regarding the biopsy of the paraspinal mass.  I

15   just have the bone marrow biopsy.

16   BY MS. FREDONA:

17        Q.    Okay.  And regarding the paraspinal

18   mass, would a biopsy be needed to determine whether

19   or not it's non-Hodgkin's lymphoma?

20        A.    Yes.

21        Q.    As you sit here today, do you plan on

22   providing any opinions as to the cause of

23   Mr. Pecorelli's non-Hodgkin's lymphoma?

24        A.    I have no opinion about that.

Steven J. Leibach, M.D.

1        MS. FREDONA:  Yours.

2                    FURTHER EXAMINATION

3   BY MS. BARTLEY:

4        Q.    Dr. Leibach, you were asked about the

5   difference between remission and cure, right?

6        A.    Yes.

7        Q.    And remission, I believe your definition

8   included the fact that that cancer has the ability

9   to come back during his lifetime, right?

10       A.    Yes.

11       Q.    Okay.

12       A.    Which cancer are you talking about?

13       Q.    Well, the non-Hodgkin's lymphoma, right?

14       A.    Okay.

15       Q.    At the time you started treating Mike

16  Pecorelli, he was in complete remission, correct?

17       A.    With regard to his non-Hodgkin's

18  lymphoma?

19       Q.    Correct.

20       A.    To the best of my knowledge, yes.

21       Q.    Right.  And to the best of your

22  knowledge, throughout the rest of his lifetime, his

23  non-Hodgkin's lymphoma did not come back.  Is that

24  correct?

Steven J. Leibach, M.D.

```
 1        A.    That's correct.

 2        MR. BENJOYA:  And that's an opinion that you

 3   hold to a reasonable degree of medical certainty.

 4   True?

 5        THE WITNESS:  Yes.

 6        MS. BARTLEY:  And I'm going to ask to mark

 7   this as Exhibit No. 6.

 8                    (WHEREUPON, Leibach Deposition

 9                    Exhibit No. 6 was marked for

10                    identification:  Johns Hopkins

11                    Hospital Surgical Pathology report;

12                    Confidential-MPecorelli-

13                    JHRL-000002 and 000003.)

14   BY MS. BARTLEY:

15        Q.    Doctor, you were asked a question about

16   whether a patient with non-Hodgkin's lymphoma has a

17   greater risk to develop another cancer.  Do you

18   remember that question?

19        A.    Yes.

20        Q.    And, so, what I've handed you -- earlier

21   in the deposition you talked about the Johns

22   Hopkins reference lab, do you recall that, where

23   the pathology for the malignant fibrous

24   histiocytoma was sent?
```

Steven J. Leibach, M.D.

```
 1        A.    Yes.

 2        Q.    And based on that being, I believe you

 3   kind of referred to it as a reputable lab, you

 4   agreed with the diagnosis of the malignant fibrous

 5   histiocytoma.  Is that fair?

 6        A.    Yes.

 7        Q.    If you'll take a look at this.  This is

 8   the biopsy that was sent to Johns Hopkins Hospital.

 9              Do you see on page 2 that first

10   paragraph refers to lung left main stem

11   endobronchial biopsy?

12        A.    Yes.

13        Q.    Do you see where I'm talking about here?

14              And the end of that paragraph is where

15   the diagnosis was delivered of "Fragments of high

16   grade undifferentiated pleomorphic sarcoma

17   (malignant fibrous histiocytoma grade 3)."

18              Now, first of all, grade 3 means that

19   when this was diagnosed it had not spread to his

20   lymph nodes, correct?

21        A.    That does -- that's a pathologic term.

22   That's not a staging term.

23        Q.    Okay.

24        A.    Grade 3 is a pathologic term referring
```

Steven J. Leibach, M.D.

```
 1    of Tape 1.  It's also the end of the deposition of

 2    Dr. Steven Leibach, and we're going off the video

 3    record.

 4              Thank you, Doctor.

 5                 (WHEREUPON, the following

 6                  proceedings were had off the video

 7                  record:)

 8         THE REPORTER:  Signature?

 9         MR. BENJOYA:  Waived.

10              (Time Noted:  2:08 p.m.)

11              FURTHER DEPONENT SAITH NAUGHT.

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Steven J. Leibach, M.D.

```
 1
          I, CORINNE T. MARUT, C.S.R. No. 84-1968,
 2    Registered Professional Reporter and Certified
      Shorthand Reporter, do hereby certify:
 3            That previous to the commencement of the
      examination of the witness, the witness was duly
 4    sworn to testify the whole truth concerning the
      matters herein;
 5            That the foregoing deposition transcript
      was reported stenographically by me, was thereafter
 6    reduced to typewriting under my personal direction
      and constitutes a true record of the testimony
 7    given and the proceedings had;
              That the said deposition was taken
 8    before me at the time and place specified;
              That the reading and signing by the
 9    witness of the deposition transcript was waived;
              That I am not a relative or employee or
10    attorney or counsel, nor a relative or employee of
      such attorney or counsel for any of the parties
11    hereto, nor interested directly or indirectly in
      the outcome of this action.
12
                  _Corinne J Marut_____
13            CORINNE T. MARUT, Certified Reporter
14
              (The foregoing certification of this
15    transcript does not apply to any
      reproduction of the same by any means, unless under
16    the direct control and/or supervision of the
      certifying reporter.)
17
18
19
20
21
22
23
24
```