# EXHIBIT 4

Ron D. Schiff, M.D., Ph.D.

```
 1                 UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF CALIFORNIA
 2

     IN RE: ROUNDUP PRODUCTS        Case No. 3:16-md-02741-VC
 3   LIABILITY LITIGATION
                                    MDL 2741
 4

 5   This document relates to:

 6   Gerard Cervantes v.
     Monsanto Company
 7   Case No. 3:19-cv-03015

 8
                                - - -
 9
                           MARCH 5, 2021
10
                                - - -
11

             Videotaped remote deposition of
12       RON D. SCHIFF, MD, PhD, held at the location of the
         witness in Tampa, Florida, commencing at 10:01 a.m.,
13       on the above date, before Joan L. Pitt, Registered
         Merit Reporter, Certified Realtime Reporter, and
14       Florida Professional Reporter.
15                              - - -
16               GOLKOW LITIGATION SERVICES
             877.370.3377 ph | 917.591.5672 fax
17                     deps@golkow.com
18
19
20
21
22
23
24
25
```

Ron D. Schiff, M.D., Ph.D.

```
 1            APPEARANCES VIA VIDEOCONFERENCE

 2

 3   Counsel for Plaintiff:

 4       REBECCA FREDONA, ESQUIRE
         Moll Law Group

 5       22 West Washington Street, 15th Floor
         Chicago, Illinois 60602

 6       312.462.0427
         rfredona@molllawgroup.com

 7

 8   Counsel for Defendant:

 9       MICHELLE M. FUJIMOTO, ESQUIRE
         Shook, Hardy & Bacon LLP

10       Jamboree Center
         5 Park Plaza, Suite 1600

11       Irvine, California 92614
         949.475.1500

12       mfujimoto@shb.com

13       JOSEPH D. PIORKOWSKI JR.
         The Piorkowski Law Firm, PC

14       1800 K Street, NW, Suite 1000
         Washington, DC 20006

15       202.257.7662
         jpiorkowski@lawdoc1.com

16

17
     ALSO PRESENT:

18
         Sarah Howard, Videographer

19

20

21

22

23

24

25
```

Ron D. Schiff, M.D., Ph.D.

```
 1                      - - -

 2                  I N D E X

 3                      - - -

 4   TESTIMONY OF:  RON D. SCHIFF, MD, PhD

 5   DIRECT EXAMINATION BY MS. FUJIMOTO              7

 6   CROSS-EXAMINATION BY MS. FREDONA             151

 7   REDIRECT-EXAMINATION BY MS. FUJIMOTO         153

 8

 9

10              E X H I B I T   I N D E X

11   SCHIFF           DESCRIPTION              PAGE

12   Exhibit 1   Defendant Monsanto Company's Notice    8

13               of Remote Video Conference

14               Deposition of Ron D. Schiff, M.D.,

15               Ph.D.

16   Exhibit 2   Curriculum Vitae of Ron D. Schiff,    15

17               MD, PhD, dated May 26, 2015

18   Exhibit 3   Deposition Transcript of Ron D.       23

19               Schiff, MD, PhD, testimony taken

20               October 22, 2019

21   Exhibit 4   Deposition Transcript dated           23

22               November 12, 2019

23

24

25
```

Ron D. Schiff, M.D., Ph.D.

| 1 | Exhibit 5 | Article entitled "On Recent | 52 |
| 2 | | Meta-Analyses of Exposure to | |
| 3 | | Glyphosate and Risk of Non-Hodgkin's | |
| 4 | | Lymphoma in Humans," Kabat, et al. | |
| 5 | Exhibit 6 | Expert Report dated January 21, 2021 | 65 |
| 6 | Exhibit 7 | Plaintiff's R.26 General Causation | 70 |
| 7 | | Expert Disclosures | |
| 8 | Exhibit 8 | Plaintiff's Rule 26 Specific Expert | 76 |
| 9 | | Disclosures | |
| 10 | Exhibit 9 | Various Medical Records, | 93 |
| 11 | | Nonsequential, beginning | |
| 12 | | Confidential-Cervantes-GCervantes- | |
| 13 | | DreyerMC-MD-000891, ending 000261 | |
| 14 | Exhibit 10 | Article titled "Occupation and Risk | 109 |
| 15 | | of Non-Hodgkin's Lymphoma and | |
| 16 | | Chronic Lymphocytic Leukemia," by | |
| 17 | | Zheng, et al. | |
| 18 | Exhibit 12 | Article titled "Occupational | 112 |
| 19 | | Exposure to Benzene in Non-Hodgkin | |
| 20 | | Lymphoma in a Population-Based | |
| 21 | | Cohort: The Shanghai Women's Health | |
| 22 | | Study," by Bassig, et al. | |

23

24

25

```
 1   Exhibit 13   Article titled "Agricultural          115
 2                Pesticide Use Familial Cancer and
 3                Risk of Non-Hodgkin Lymphoma," Chiu,
 4                et al.
 5   Exhibit 14   Article titled "Body Mass Index and    119
 6                Risk of Non-Hodgkin's and Hodgkin's
 7                Lymphoma:  A Meta-Analysis of
 8                Perspective Studies," Larsson and
 9                Wolk
10   Exhibit 15   Article entitled "Exposure to          155
11                Glyphosate and Risk of Non-Hodgkin
12                Lymphoma and Multiple Myeloma:  An
13                Updated Meta-Analysis, Donato, et
14                al.
15   Exhibit 16   Invoice dated 1/26/2021               156
16
17
18
19
20
21
22
23
24
25
```

Ron D. Schiff, M.D., Ph.D.

```
 1                        - - -

 2           THE VIDEOGRAPHER:  We are now on the record.

 3      My name is Sarah Howard, and I'm a videographer for

 4      Golkow Litigation Services.

 5           Today's date is March 5, 2021, and the time is

 6      10:01 a.m.

 7           This video deposition is being held in the

 8      matter of Roundup, Gerard Cervantes vs. Monsanto,

 9      for the United States District Court, Northern

10      District of California, Case No. 3:16-md-02741.

11           The deponent is Dr. Ron D. Schiff.

12           All parties to this deposition are appearing

13      remotely and have agreed to the witness being sworn

14      in remotely.  Due to the nature of remote reporting,

15      please pause briefly before speaking to ensure all

16      parties are heard completely.

17           Will counsel please identify themselves.

18           MS. FREDONA:  Rebecca Fredona on behalf of

19      plaintiff.

20           MS. FUJIMOTO:  Michelle Fujimoto of Shook,

21      Hardy & Bacon on behalf of Defendant Monsanto.

22           MR. PIORKOWSKI:  Joe Piorkowski, also on behalf

23      of Defendant Monsanto.

24           THE VIDEOGRAPHER:  The court reporter is Joan

25      Pitt and will now swear in the witness.
```

```
1             THE COURT REPORTER:  Doctor, let me have you

2        raise your right hand, please.  Do you swear or

3        affirm the testimony you give will be the truth, the

4        whole truth, and nothing but the truth?

5             THE WITNESS:  I do.

6             THE COURT REPORTER:  Thank you.

7             RON D. SCHIFF, MD, PhD, called as a witness by

8    the Defendant, having been first duly sworn, testified

9    as follows:

10                     DIRECT EXAMINATION

11   BY MS. FUJIMOTO:

12        Q.   Good morning, Dr. Schiff.  As you know, my name

13   is Michelle Fujimoto, and I'm representing Defendant

14   Monsanto and taking your deposition as an expert witness

15   in the Gerard Cervantes matter.

16             Do you understand that?

17        A.   Yes, I do.

18        Q.   Okay.  And I know we've met before.  I took

19   your deposition in a couple of cases in the fall of

20   2019.  And I can tell you that I have done my best to

21   review your prior depositions in the Wade case where you

22   testified regarding Chester Meeks, the cases I took your

23   deposition in in Harris and Hernandez, and then I also

24   understand you recently were deposed on specific cases

25   in Carmen and Schafer.
```

Ron D. Schiff, M.D., Ph.D.

```
1              You recall those depositions?

2       A.   I do.  There was one other deposition in the

3    Roundup litigation that you did not mention.

4       Q.   Which one is that?

5       A.   Caballero.

6       Q.   Ah, yes.  I read that as well.  Thank you for

7    the reminder.

8              And so what my hope is is to not rehash all of

9    that testimony, but I do want to -- particularly from

10   the 2019 testimony, I will be asking questions to

11   confirm whether you still hold those opinions or whether

12   something has changed since then, but hopefully we'll be

13   efficient.

14             Let me first start just administratively, if

15   you would take your stack of exhibits out, if you don't

16   already have them, and I'll ask you -- on the top of the

17   Cervantes stack should be a notice of deposition.  I'm

18   going to mark that as Exhibit No. 1 to the deposition.

19             (Schiff Exhibit 1 was marked for

20   identification.)

21      A.   I have it.

22      Q.   All right.  And have you seen that before

23   today, Doctor?

24      A.   Yes.  I received two prior copies of the notice

25   of deposition in the Cervantes case.  This one arrived
```

1    yesterday in the midafternoon.

2        Q.   And did you bring with you or provide to your

3    counsel documents responsive to the requests so that

4    they could be produced to us?

5        A.   All of the relevant documents have been

6    provided to plaintiff's counsel with a request that they

7    be forwarded to defense counsel.

8        Q.   Okay.

9             MS. FUJIMOTO:  Rebecca, we didn't get anything

10       from you.

11            MS. FREDONA:  I believe he's talking about the

12       CV, the testimonial history, obviously, his reports.

13       I believe his -- if you want his current invoice, I

14       could get that to you.  Obviously, he prepared for

15       today's deposition.  So then, if I send it now, it

16       would have to be updated and sent back to you.

17            MS. FUJIMOTO:  Okay.  Well, no, I would

18       appreciate it if you would e-mail anything that's

19       responsive to the requests, but certainly the

20       invoices that relate to this case and, as we

21       requested, his other Roundup cases.

22            MS. FREDONA:  I think we're going to be

23       objecting to the other Roundup cases as overbroad.

24            MS. FUJIMOTO:  Are you?

25            MS. FREDONA:  Yes.

Ron B. Schiff, M.D., Ph.D.

```
1              MS. FUJIMOTO:  Okay.  All right.  And -- but

2      you are going to produce an invoice related to this

3      case?

4              MS. FREDONA:  Yes.  I am putting in a request

5      right now.

6              THE WITNESS:  May I clarify that?

7  BY MS. FUJIMOTO:

8      Q.   Sure.

9      A.   I have already invoiced and been paid for my

10 work on the Cervantes case up to and including the

11 preparation of my report, and that was -- you know, that

12 already is in the possession of plaintiff's counsel.

13     Q.   And how many --

14     A.   The work that I've done preparing for today's

15 deposition has not been invoiced yet.  That will be sent

16 sometime between Monday and Wednesday, but if you let me

17 step away from the computer for 10 seconds, I can tell

18 you how much it's been for my preparation for this

19 deposition up through yesterday.  Would you like that

20 information?

21     Q.   I would like that information.  Thank you.

22     A.   All right.  I'm going to turn off my video,

23 step away from the computer, and I'll be right back on.

24             MS. FUJIMOTO:  Rebecca, can you tell me how

25      much or how many hours and the amount of the invoice
```

Ron B. Schiff, M.D., Ph.D.

```
 1        that he submitted to you?
 2             MS. FREDONA:  I am -- I just e-mailed the --
 3        our paralegal to send it to me.
 4             MS. FUJIMOTO:  All right.
 5             THE WITNESS:  I can tell you that.
 6   BY MS. FUJIMOTO:
 7        Q.   Okay.
 8        A.   Okay?
 9        Q.   Hang on.  Hang on.  Doctor, and I know you've
10   been deposed many, many times, so we don't have to go
11   over ground rules, but it is really hard on Zoom.  So
12   let's -- I want to make sure we don't talk over each
13   other.
14             Let me ask you the question.  Based on the
15   invoice that you submitted to plaintiff's counsel, can
16   you tell me how many hours you spent on the Cervantes
17   matter?
18        A.   That was 11 hours for reviewing the records and
19   preparing the report.
20        Q.   And what is your hourly rate, and what was the
21   total on that invoice?
22        A.   $600.  Total amount $6,600.
23        Q.   Okay.  And how many hours have you spent on the
24   Cervantes matter since you submitted that invoice?
25        A.   Through yesterday, one hour and 45 minutes
```

1    preparing for today's deposition.

2        Q.   Okay.  And, Dr. Schiff, have you -- in

3    preparing your report or anything related to the

4    Cervantes case, did you speak with or interview Mr. or

5    Mrs. Cervantes?

6        A.   I did not.

7        Q.   Okay.  Have you spoken with any of

8    Mr. Cervantes' treating physicians?

9        A.   I have not.

10       Q.   Have you had any communications at all with

11   either Mr. or Mrs. Cervantes or his treating physicians?

12       A.   No.  In fact, negligible consultations about

13   this case even with plaintiff's counsel.

14       Q.   And have you -- do you have any documents

15   related to any communications with any of other -- any

16   of plaintiff's other experts?

17       A.   In this case, or in all cases?

18       Q.   In this case.

19       A.   I believe that I was sent a three-page document

20   by general causation expert witness Dr. Dennis

21   Weisenburger where I only looked at the first page.

22       Q.   Do you have that with you now?

23       A.   I do.

24       Q.   Okay.

25            MS. FUJIMOTO:  Rebecca, we would ask that you

Ron B. Schiff, M.D., Ph.D.

```
 1        provide that as well.  Do you have that, and can you

 2        e-mail it to me?

 3             MS. FREDONA:  Depending what exactly is the

 4        document he's talking about.

 5        A.   It is entitled "Specific Causation Report for

 6   Mr. Gerard Cervantes."  It is a -- it is a five-page

 7   document signed by Dr. Weisenburger and dated January

 8   18, 2021.

 9             MS. FREDONA:  All right.  This is the report

10        we've already forwarded with Dr. Weisenburger.

11             MS. FUJIMOTO:  Okay.

12   BY MS. FUJIMOTO:

13        Q.   And have you had any communications with

14   Dr. Weisenburger or any of the other experts for

15   plaintiffs in this case?

16        A.   Concerning this case --

17        Q.   Yes.

18        A.   -- no.

19        Q.   Okay.  Now, Dr. Schiff, as I recall your prior

20   testimony, you have not had a clinical practice or

21   treated a patient since 2015; is that correct?

22        A.   I retired from clinical practice in May 2015.

23        Q.   And is that why the CV that you produced for

24   this case and all other cases is dated May 26, 2015?

25        A.   That's correct.  There are no changes.
```

1      Q.    So you have not had a clinical practice since

2    2015 and you have not published any paper or article in

3    the peer-reviewed literature since then; right?

4      A.    That is also correct.

5      Q.    And, in fact, you haven't published any paper

6    or article in the peer-reviewed literature for more than

7    30 years, since 1990; is that still correct?

8      A.    That sounds about right.

9      Q.    And prior to 1990, you had never published any

10   full articles or papers in the peer-reviewed literature

11   regarding non-Hodgkin lymphoma; correct?

12     A.    There is a slight exception to that.  I did

13   work on human T-lymphotrophic virus type 1, which does

14   cause a type of mature T-cell lymphoma, and there was an

15   article that was published on that.  Other than that,

16   anything having to do with lymphoma was abstracts only.

17     Q.    Correct.  And the two abstracts regarding

18   peripheral T-cell lymphoma that are on your CV, those

19   never made it into the peer-reviewed literature as full

20   papers; correct?

21     A.    I never submitted them.  I prepared those as I

22   was planning to leave academia.

23     Q.    So the answer is correct that abstracts were

24   never published as full papers; right?

25     A.    That is correct.

1      Q.   And you mentioned a fully published paper that

2   I guess tangentially related to lymphoma.  Which one are

3   you talking about?

4      A.   It was a paper that I published with one of our

5   fellows or advanced trainees in 1988 concerning, as I

6   said before, HTLV-1.

7      Q.   And is that on your CV?

8      A.   It is.

9      Q.   Okay.  Let's mark as Exhibit No. 2 to the

10   deposition your CV, and you can point me or tell me the

11   last known author on that paper.

12          (Schiff Exhibit 2 was marked for

13   identification.)

14      A.   It's page 7, and the first author is Headley.

15      Q.   Okay.  And that relates to adult T-cell

16   lymphoma, "Leukemia/lymphoma:  A retroviral malignancy

17   endemic in South Carolina"; is that right?

18      A.   That is correct.

19      Q.   Where was that published?

20      A.   That was just published in a journal for the

21   state medical association.  The abbreviation there is

22   Journal of the South Carolina Medical Association.

23      Q.   So is that a peer-reviewed journal?

24      A.   I'm remembering that from 33 years ago, but I

25   do believe that there was peer review before it was

1    published.  That's a long time ago and I cannot tell you

2    the details of that.  I never interacted with that

3    journal on any other occasion.

4        Q.   I mean, it's certainly not a journal in the

5    sense of any of the others where your articles are

6    listed; right?

7        A.   Well, it's a state medical association journal.

8    And, along those lines, JAMA is the American Medical

9    Association.  This one is South Carolina, which is a

10   small state and one of only 50.

11       Q.   Do you know whether this journal even has an

12   impact factor?

13       A.   I would have no idea.  I don't even know if

14   that was being ascertained back in 1988.

15       Q.   And so am I correct that since 2015 your only

16   source of income has been litigation consulting and

17   testifying; right?

18       A.   That's my only source of earned income, that's

19   correct.

20       Q.   And a large part of your work other than

21   testifying on behalf of Roundup plaintiffs is doing

22   toxic tort litigation involving benzenes and PCBs;

23   right?

24       A.   I've also done those, yes, but I have also

25   worked in medical liability litigation and in patent

Ron D. Schiff, M.D., Ph.D.

1   litigation.

2      Q.   Okay.  And in the toxic tort litigation, both

3   in other cases and in Roundup cases, you have testified

4   to the opinion that benzene and PCBs are

5   across-the-board causative causes of non-Hodgkin

6   lymphoma; right?

7      A.   With benzene, I have not testified according to

8   that in any case, and, in fact, I dealt with causation

9   non-Hodgkin lymphoma by benzene in my report on

10  Mr. Cervantes.  There is a, you know, a summary

11  discussion of that.

12         But the benzene work that I have done had to do

13  with one case of acute lymphoblastic leukemia in an

14  adult, and all the other work has been in patients with

15  myelodysplastic syndromes, which are myeloid rather than

16  lymphoproliferative malignancies.

17     Q.   Dr. Schiff, is it your testimony here today

18  that you have not testified in any benzene-related cases

19  that benzene causes lymphoma?  Is that what you're

20  telling me?

21     A.   What I'm -- no, that is not what I'm telling

22  you, because the question that you asked me before was

23  that it was an across-the-board cause of non-Hodgkin

24  lymphoma.  So the answer to that is -- the original

25  question that you asked me is no.

1            If you want to ask more specific questions

2    about prior testimony, I'm happy to discuss that with

3    you.

4        Q.   Well, my specific question to you right now is:

5    Is it your testimony that you have never testified in

6    any case that benzene is a known cause of non-Hodgkin

7    lymphoma?

8            MS. FREDONA:  Objection.  Asked and answered.

9        A.   I do not remember testimony dealing with that,

10   especially not across-the-board as you mentioned it

11   earlier.  The one case where I did testify in the

12   lymphoproliferative malignancy case had to do with acute

13   lymphoblastic leukemia.  The World Health Organization

14   can decide whether that counts as a non-Hodgkin lymphoma

15   or not.  As a clinician, I would say that it does not,

16   but the World Health Organization classification has

17   been repeatedly broadened over the years.

18            If the subject came up in another deposition

19   besides the one in acute lymphoblastic leukemia, I would

20   need to be refreshed about what case it was, what I

21   said, and what the context was.

22       Q.   Okay.  Let's do that.  If you go to the stack

23   of exhibits.  And this isn't in one of your other toxic

24   torts.  This is in the Wade case, which is a Roundup

25   case.  If you would take the transcript -- it's a big

```
 1   transcript -- in the Christopher Wade vs. Monsanto

 2   Company case.  Your deposition was taken on October 22,

 3   2019, and you were testifying regarding Plaintiff

 4   Christopher Meeks.  Do you recall that?

 5       A.   I do.

 6       Q.   Okay.  And I want you to move to -- go to page

 7   149.  I'm going to be reading your testimony from page

 8   149, line 18; to 150, line 12.

 9            So the question on page 149, starting at line

10   18, says:

11            "So I think we said before you said benzene was

12       a risk factor for non-Hodgkin lymphoma; is that

13       right?

14            "Answer:  It is.

15            "Question:  And is benzene a risk factor for

16       LPL?

17            "Answer:  I've not seen benzene data in LPL.  I

18       do not have an opinion about whether it would be

19       likely to be a risk factor specifically for LPL or

20       WM.

21            "Question:  Okay.  And you've said PCBs are a

22       risk factor for non-Hodgkin lymphoma?

23            "Answer:  Yes, they are.

24            "Question:  And do you have an opinion whether

25       PCBs are a risk factor for LPL?"
```

1           And here's your answer:  "Well, the answer to
2      that is, again, the LPL etiology studies that I'm
3      looking at does not include analysis of PCBs; but
4      once again, even though we have learned that in
5      non-Hodgkin lymphoma they are considered an
6      across-the-board causative risk factor for
7      non-Hodgkin lymphoma, there's no evidence that
8      Mr. Meeks had any kind of unusual or extraordinary
9      exposure to PCBs."
10          Do you see that?
11     A.   I do.
12     Q.   Do you disagree with that statement now?
13     A.   I agree with it, but I have also summarized the
14  part about benzene in my current report on
15  Mr. Cervantes, and I would like to read that to you to
16  give a more complete explanation of my opinion.
17     Q.   Wait.  We will talk about your report later,
18  and certainly to the extent that report disagrees with
19  or contradicts prior testimony, we're going to get to
20  that.
21     A.   It doesn't contradict prior testimony.
22     Q.   My question to you is:  Given only what I read
23  from the Harris deposition, do you still agree with and
24  accept that answer?
25     A.   I said that -- "So I think we said before you

1    said that benzene was a risk factor for non-Hodgkin

2    lymphoma; is that right?"

3         And I said:  "It is."

4    Q.   My question --

5    A.   That does not talk about an across-the-board

6    risk factor.  It talks about whether it is a -- is

7    considered a risk factor.  And, again, I expand on that

8    in my current report on Mr. Cervantes.  My answer --

9    Q.   Dr. Schiff --

10   A.   -- to the question is incomplete unless I can

11   include that.

12   Q.   Dr. Schiff, my only question to you right now

13   is:  I had read into the record, so the record's clear,

14   the questions and answers that you gave in Harris.

15        My only -- my only question to you right now is

16   that, given the questions that were asked then, do you

17   still maintain that the answers that you gave to those

18   questions are correct?

19        MS. FREDONA:  Objection.  Asked and answered.

20   A.   First of all, it was Meeks.

21        Sorry.  Is there an objection?

22        MS. FREDONA:  There was an objection.  Asked

23        and answered.

24   A.   Okay.  First, it was Meeks, not Harris; and

25   second of all, you've been asking me about across the

1    board, and my response here does not talk about across

2    the board.  It talks about a risk factor.

3         Q.   Okay.  Dr. Schiff --

4              (Telephone interruption.)

5              THE WITNESS:  Excuse me.  I have to interrupt

6         this for one second.  I'm sorry.

7              MS. FUJIMOTO:  Go off the record, please.

8              THE VIDEOGRAPHER:  The time is 10:22 a.m.

9         We're off the record.

10             (Recess at 10:22 a.m.)

11             THE VIDEOGRAPHER:  The time is 10:22 a.m. and

12        we're back on the record.

13   BY MS. FUJIMOTO:

14        Q.   Dr. Schiff, the only -- the only question that

15   I have -- and you keep referencing it.  So it's on page

16   150 of the Wade testimony, where you say "even though we

17   have learned that in non-Hodgkin lymphoma they are

18   considered across-the-board causative risk factors for

19   non-Hodgkin lymphoma."

20             So my question is:  Do you agree or disagree

21   with that as you sit here today?

22        A.   What you just read, Ms. Fujimoto, has to do

23   specifically with PCBs, not benzenes.

24        Q.   Okay.  Let me ask you this then:  If you

25   would -- let me, while I had read that in --

Ron B. Schiff, M.D., Ph.D.

1          MS. FUJIMOTO:  I'm sorry, Court Reporter, but

2     I'm going to have the Wade deposition transcript

3     marked as Exhibit 3, and then I'm going to mark as

4     Exhibit 4 the deposition transcript from Harris.

5          (Schiff Exhibit 3 was marked for

6  identification.)

7          (Schiff Exhibit 4 was marked for

8  identification.)

9  BY MS. FUJIMOTO:

10     Q.   If you would pull that in front of you,

11  Dr. Schiff.  It is the Anthony Harris vs. Monsanto

12  Company case, and I took your deposition in that case on

13  November 12, 2019.

14     A.   Am I done with the deposition transcript on

15  Mr. Meeks?

16     Q.   Oh, no, keep it -- keep it near you.  Thank

17  you.

18     A.   Okay.

19     Q.   Okay.  And if you go to page 100, and I'm going

20  to be reading page 100, line 16 to 21.  I said:

21          "Question:  Okay.  Welcome back, Dr. Schiff.

22     Let's see if there's at least a couple of things

23     that we can agree on.  I think we might.

24          You agree, do you not, that benzene is a

25     recognized cause of non-Hodgkin lymphoma?

```
1                "Answer:  Yes."

2           And then you go on to point out about

3      glyphosate and coffee and caffeine.

4           But do you now take back that answer, or do you

5      agree with that testimony as you sit here today?

6      A.   No, I do not, but it's out of context, and I am

7      still asking to be given the opportunity to explain the

8      context.  Yes, benzene is a risk factor for the

9      development of non-Hodgkin lymphoma.

10     Q.   Okay.  Doctor, here is the question and the

11     answer:

12              "You agree, do you not, that benzene is a

13         recognized cause of non-Hodgkin lymphoma?

14              "Answer:  Yes."

15          That's what you testified to in November, on

16     November 12, 2019; correct?

17     A.   I still agree with that.

18     Q.   And you go on later, on page 101 -- and I said,

19     at line 6:

20              "Okay.  And you agree that PCBs, or

21         polychlorinated biphenyls, are a recognized cause of

22         lymphoma as well; right?"

23              And you said:  "Answer:  You know that I agree

24         with that."

25              Correct?
```

```
 1      A.    Correct.

 2      Q.    You testified to that.  And then we went on,

 3   and I said:

 4            "Certainly cigarettes contain things like

 5      benzene and benzanthracene and 1,3-Butadiene."

 6            Or whatever.  However you pronounce it.

 7            And you said --

 8            And I said:  "Cigarette smoke contains all

 9      those chemicals; right?"

10            And you said:  "That's correct."

11            Did I read that right?

12      A.    You did.  Later on you asked me:

13            "Are those -- "And those are recognized causes

14      of non-Hodgkin lymphoma; right?"

15            And I said:  "No."

16            That's on the same page.

17      Q.    Doctor, do you agree that the World Health

18   Organization currently considers benzene to be a cause

19   of non-Hodgkin lymphoma?

20      A.    I'm going to do what you have previously

21   instructed me repeatedly not to do.  I'm going to tell

22   you what I wrote in the report on Mr. Cervantes, the

23   current case, dealing with specifically that.

24            I will read the parts relevant to benzene.

25      Q.    Doctor, are you going to be addressing part of
```

Ron D. Schiff, M.D., Ph.D.

1    your report that responds to the World Health

2    Organization?

3        A.    Yes.

4        Q.    Okay.  That's my question.  So before you read

5    that, I just want a yes or no answer.

6              Are you aware that the World Health

7    Organization considers benzene a cause of non-Hodgkin

8    lymphoma?  Yes or no?

9        A.    IARC has found a positive epidemiologic

10   association between benzene exposure and the development

11   of non-Hodgkin lymphoma, although the data are less

12   consistent than for the associations between benzene and

13   the myeloid malignancies, acute myeloid leukemia and

14   myelodysplastic syndromes, or between PCBs and

15   non-Hodgkin lymphoma.

16             That's in my report, and that summarizes my

17   thoughts about this at the time my prior depositions

18   were taken and today.

19       Q.    I understand what you wrote about what IARC

20   found.  Fair enough.  So then, based on that, do you

21   agree that the World Health Organization, through IARC,

22   has classified benzene as a carcinogen?  How about that?

23       A.    IARC has classified benzene as a carcinogen,

24   yes.  With respect to non-Hodgkin lymphoma, as I

25   indicated, they have found a positive epidemiologic

1    association between benzene exposure and the development

2    of non-Hodgkin lymphoma; and then I commented in my

3    report about the consistency of that epidemiologic

4    association.

5        Q.   And the World Health Organization, through

6    IARC, has also published on and evaluated the data from

7    animal studies and other in vitro laboratory data

8    related to benzene; correct?

9        A.   That is correct.

10       Q.   Okay.  And so taking together all of the

11   epidemiologic data, do you agree or disagree that the

12   WHO, through IARC, considers benzene a cause of

13   non-Hodgkin lymphoma?  Yes or no?

14       A.   In the summary sections of their benzene

15   monographs in, I believe 2012 and 2018, they do not list

16   sufficient or limited evidence for non-Hodgkin lymphoma.

17   If you define your question in that way, the answer is

18   no.  However, again, they do report a positive

19   epidemiologic association between benzene exposure and

20   the development of non-Hodgkin lymphoma.

21           So it does not rise to what IARC considers even

22   limited evidence in this particular circumstance, but,

23   again, a positive epidemiologic association with some

24   inconsistency in the data is recognized by them in two

25   monographs in a row.

Ron B. Schiff, M.D., Ph.D.

1    Q.   And, in your mind, in that setting, that is not

2  enough to consider a particular agent to be a cause of

3  non-Hodgkin lymphoma?  Is that what you're telling us?

4    A.   No.  That's two separate things that you're

5  asking me, Ms. Fujimoto.  One is whether I consider it

6  to be a risk factor for non-Hodgkin lymphoma, where I've

7  told you yes; but then when you asked me about the World

8  Health Organization, of which IARC is what you want to

9  call a division, a subsidiary, or one of its agencies,

10  the answer to that is it describes the positive

11  epidemiologic association, but it does not say that

12  there is sufficient evidence or even limited evidence

13  for benzene as a direct cause of non-Hodgkin lymphoma.

14         So those are two completely different

15  questions, and now I have answered both of them in one

16  response, highlighting the distinction.

17    Q.   Well, Dr. Schiff, I think you're reading way

18  more into some of my questions than are in them.  I'm

19  being very specific as to saying risk factor versus

20  cause.  Okay?  And I'm well aware of the distinctions,

21  because I know you are too.

22         So final question on this -- and you can commit

23  or not commit, either way -- but, in your opinion, is

24  benzene a cause of non-Hodgkin lymphoma?

25         MS. FREDONA:  Objection.  Asked and answered.

1    BY MS. FUJIMOTO:

2        Q.   Yes or no?

3        A.   Again, I believe that it is.  Again, I have

4    highlighted IARC's ruling on that particular matter,

5    which is a little bit different from what I have said to

6    you.

7        Q.   And Dr. --

8        A.   Talking about both.

9        Q.   So, Dr. Schiff, if we then go on from benzene

10   generally to cigarette smoking, I recall in the Carmen

11   deposition you were asked your opinions regarding

12   smoking and non-Hodgkin lymphoma, and I won't rehash all

13   of that, but my question to you is whether I understood

14   your testimony correctly.

15       Do you hold the opinion that smoking is a risk

16   factor for follicular lymphoma in women?

17       A.   Yes.

18       Q.   Okay.  And you had testified, I think, that, in

19   talking about the data, that the strongest relationship

20   that has been found in the various studies, including

21   the InterLymph studies, is between smoking and

22   follicular lymphoma in women; is that right?

23       A.   It is.

24       Q.   Do you believe that it rises to the level of

25   being a cause of follicular lymphoma in women?

Ron D. Schiff, M.D., Ph.D.

 1      A.   I do.

 2      Q.   Some of the other risk factors -- let me ask

 3   you this, and this is based on your testimony in Wade

 4   regarding Plaintiff Meeks.

 5           Some of the other risk factors for non-Hodgkin

 6   lymphoma that you recognize would include immune

 7   suppression or immunity dysregulation; is that right?

 8      A.   That is correct.

 9           May I put away Mr. Harris' deposition

10   transcript?

11      Q.   Keep it nearby, please.

12      A.   Okay.

13      Q.   You also agree that age is a risk factor for

14   non-Hodgkin lymphoma; right?

15      A.   Not directly a causative risk factor, but a

16   risk factor, yes.

17      Q.   Okay.  The older we get, the more likely or the

18   greater the risk of developing diseases, including

19   non-Hodgkin lymphoma; is that right?

20           MS. FREDONA:  Form.

21      A.   That's an association, yes.

22      Q.   You agree that autoimmune diseases are risk

23   factors for non-Hodgkin lymphoma?

24      A.   Some.  There's better documentation in some

25   than in others, but as a class, yes.

1      Q.   Okay.  Radiation?  Do you consider that a risk

2   factor for non-Hodgkin lymphoma?

3      A.   In certain situations and scenarios, yes.

4   Probably not across the board.

5      Q.   And same question related to first-degree

6   relatives or a family history of non-Hodgkin lymphoma.

7   Is that considered by you to be a risk factor?

8      A.   Yes, it is a risk factor, though, obviously,

9   not a causative one.

10      Q.   What do you mean by that, not causative?

11      A.   Well, this is also outlined in detail in my

12   report on Mr. Cervantes and in my reports on the other

13   Roundup plaintiffs for whom I have submitted reports.

14         The point is that there's nothing about being a

15   male, for example, or being Caucasian, for example, that

16   directly causes non-Hodgkin lymphoma.  The risk is

17   higher in those groups, among others, but I make the

18   distinction that if you have a particular occupational

19   or nonoccupational exposure like, for example,

20   glyphosate, or if you are infected with HTLV-1,

21   especially from birth, then under those conditions we

22   are identifying risk factors that are causative.

23         With regard to aging, aging itself I do not

24   consider a causative risk factor, but in my report I

25   acknowledge that as one ages one may acquire and

Ron B. Schiff, M.D., Ph.D.

1  accumulate predisposing mutations in hematopoietic stem

2  cells or other cells in the bone marrow, by which I'm

3  referring to progenitor cells, or the natural decline in

4  immune system function which accompanies aging, those

5  would be causative risk factors.

6      Q.   Dr. Schiff, I'm going to move to strike as

7  nonresponsive.

8          I was asking you about family history,

9  first-degree relatives, and you mentioned risk factor

10 but not a causative one, and that's why I asked you

11 about that.

12         Is it your opinion that the recognition that a

13 person who has a first-degree relative who had

14 non-Hodgkin lymphoma is at a higher risk of developing

15 non-Hodgkin lymphoma themselves is not a causal

16 relationship?

17         MS. FREDONA:  Objection.  Form.

18     A.   Sorry.

19         Correct.  It's a risk factor, but what happens

20 in a relative does not happen -- does not cause what

21 happens in you.  That's the only point that I'm trying

22 to make with that distinction.  It is a risk factor, and

23 there is pretty good consensus on that, but that doesn't

24 mean that my relative caused my non-Hodgkin lymphoma.

25 That would make no sense.

1      Q.   Of course.  Do you agree, though, that in

2   certain instances inheritable gene mutations that can

3   cause a disease like non-Hodgkin lymphoma can be passed

4   from a parent to a child?

5      A.   That --

6           MS. FREDONA:  Objection.  Form.

7      A.   Sorry.

8           That is the implication, yes, but most of the

9   research over the past 20 years or so has focused on

10   acquired mutations rather than inherited mutations in

11   the causation of non-Hodgkin lymphoma; but, yes, that

12   potential remains and that is likely the mechanism or at

13   least one of the mechanisms that underlies a positive

14   family history in a first -- positive family history of

15   non-Hodgkin lymphoma in a first-degree relative being

16   associated with an increased risk of developing

17   non-Hodgkin lymphoma.

18      Q.   Right.  So have you done the research related

19   to the heritability of certain mutations that can

20   connect non-Hodgkin lymphoma in a parent and child?

21           MS. FREDONA:  Objection.  Form.

22      A.   I'm sure I have read about that in the past.

23   If you ask me about a specific mutation or other genetic

24   predisposing condition, I will comment on it to the best

25   of my ability.

Ron B. Schiff, M.D., Ph.D.

1      Q.    Well, we do know that one of the common genetic

2   anomalies that is seen in non-Hodgkin lymphoma is a

3   translocation between chromosomes 14 and 18; right?

4      A.    That is correct.  That specifically is

5   something that one looks for.

6      Q.    Right.  People, in the cytological testing that

7   is done, if it's done in a particular case, will often

8   look for the translocation between chromosomes and 14

9   and 18; right?

10          MS. FREDONA:  Objection.  Form.

11     A.    That's in follicular lymphoma and in those

12  cases of diffuse large B-cell lymphoma that arose from

13  follicular lymphoma.

14     Q.    And we know that chromosomes 14 -- that

15  chromosome 14 is present in, I think literature

16  suggests, 900 to 1,200 genes; right?

17     A.    Yeah, I assume that that's an accurate

18  estimate, but I don't recall looking at something like

19  that, how many genes are on chromosome 14.

20     Q.    And chromosome 18 probably has 2-, 300 genes?

21     A.    Perhaps.  I never looked at that, and, you

22  know, and, I mean, I would not see that that was

23  relevant to what we're discussing, but nonetheless,

24  those are not points that I have looked into

25  specifically, the number of genes on each of those

1    chromosomes.

2        Q.   All right.  And so going back then to your

3    prior testimony in the Harris case, you had testified

4    that it is generally accepted that the majority of

5    cancers are caused by genetic mutations, either

6    inherited, acquired, or random.  Do you remember that?

7        A.   I do.

8        Q.   And you testified to that in Carmen as well;

9    right?

10        A.   Also correct.

11        Q.   And you agree with -- and you still agree with

12    that, I assume?

13        A.   I do.  The proportions are open to debate, but

14    those are the general mutation mechanisms.

15        Q.   Okay.  And at the time of the Harris

16    deposition, you testified that the percentage of

17    mutations that are random are probably in the range of

18    80 percent-plus, but there's differing numbers that are

19    in the literature; is that right?

20        A.   I would like to see my testimony on that

21    specifically to look at the context as well as exactly

22    what I said.

23        Q.   Okay.  Harris.  Go to the Harris deposition

24    transcript, and it is on page 152, line 22, and it goes

25    to 153, 8.  Or, actually -- yeah, 152, 22.

```
 1              "Question:  Doctor, would you agree that it's
 2       generally accepted in the medical community that a
 3       certain percentage of cancers are caused by random
 4       mutations?
 5              "Answer:  Yes, I agree with that.
 6              "Question:  Okay.  Do you know what percentage?
 7              "Answer:  Yeah.  This is an area that's of
 8       interest to me.
 9              "Question:  Okay."
10         And you go on to say:  "Because currently that
11       is being assessed as approximately 80 percent, maybe
12       even higher."
13         And then you go on to talk about the evolving
14       data.
15         So my question, Doctor, is:  Is that still your
16     opinion, or has it changed since 2019 in terms of what
17     the data suggests about percentage of mutations that are
18     random?
19     A.   Okay.  I did understand your first question
20     correctly, because you have just restated it.  That is
21     not, however, what you asked me in my deposition in the
22     Harris case.  You did not ask me what percentage of
23     mutations are random.  You asked me what percentage of
24     cancers are caused by random mutations.  That's a
25     completely different thing.
```

Ron B. Schiff, M.D., Ph.D.

1           My responses in that whole sequence from the
2    bottom of page 152 through most of page 153 are
3    unchanged.  I also pointed out how -- that there is sort
4    of an academic zeitgeist about genetic versus
5    environmental cancer causations.  Zeitgeist is
6    z-e-i-t-g-e-i-s-t.  And I pointed out that when I was in
7    training I was taught that 85 percent of cancers were
8    environmentally caused.  And that has changed primarily
9    as a result of the Human Genome Project.
10          I would also point out that at the top of page
11   152, which you directed me to, I also pointed out, as I
12   did today repeatedly, that advanced age, it's probably
13   safest to say that it has not been defined as a causal
14   risk factor.  So that goes back to the same point.
15          But here what you have asked me about is what
16   percentage of mutations are random, whereas what I
17   testified about in 2019 in Harris is what percentage of
18   cancers are caused by mutations.
19   Q.    Okay.  Doctor, I'm going to move to strike as
20   nonresponsive.
21          So then let me ask you here -- we will -- we
22   will -- we have the transcripts on the record and
23   attached as exhibits.
24          So setting aside your prior testimony, as you
25   sit here today, what percentage of cancers, in your

1  assessment, are considered random, as a result of random

2  mutations?

3      A.   I would still say that about 80 percent of

4  cancers, according to current thinking, are caused by

5  mutations.  I am not speculating on what percentage of

6  those mutations are as defined in the Tomasetti article,

7  random versus inherited versus environmentally caused.

8      Q.   Okay.  And at the time I deposed you in Harris,

9  we talked about the Tomasetti paper, but you had not

10  read it yet; correct?

11      A.   That's correct.

12      Q.   And you -- according to your testimony in the

13  Carmen case, you've since read it; is that right?

14      A.   No.  I've looked at it, but, again, I don't see

15  the relevance to it, and I pointed out four critiques,

16  which were applicable in Carmen and are equally

17  applicable today.

18      Q.   And in Carmen you said that you considered the

19  Tomasetti paper to be an exercise in theoretical

20  computational biology; right?

21      A.   Yes.

22      Q.   And you said you didn't think it was relevant

23  or applicable; correct?

24      A.   Also correct.

25      Q.   Okay.  Do you know whether others in the

1  scientific community agree or disagree with you on that?

2     A.   I have not read anything that specifically

3  cites that article in anything that I have done in

4  preparation for my work in the Roundup litigation.

5     Q.   Have you looked?

6     A.   No, I've not looked at a citation index.

7     Q.   So if I were to tell you, when I looked at the

8  citation index for Tomasetti, it's been cited more than

9  238 times by other articles in peer-reviewed literature,

10  do you have any reason to dispute that?

11     A.   I would ask how many of those had anything

12  whatsoever to do with the questions at issue in the

13  Roundup litigation.  The Tomasetti article has very,

14  very broad implications, but out of those 200, in how

15  many cases were the authors of those 200 papers that

16  cited Tomasetti dealing with the questions that we're

17  dealing with today?  I would venture to guess that it

18  was few or none.  Of course, that's just speculation, so

19  it's not admissible, but --

20     Q.   Right, so --

21     A.   -- if you'd like to direct me to an article, I

22  would be happy to comment on it.

23        MS. FUJIMOTO:  Move to strike.  Nonresponsive.

24  BY MS. FUJIMOTO:

25     Q.   My question to you, Dr. Schiff, is:  If I were

1    to tell you that the Tomasetti article has been cited

2    238 times by other articles in the peer-reviewed

3    literature, do you have any basis upon which to dispute

4    that?

5            MS. FREDONA:  Objection.  Asked and answered.

6        A.   The answer is no, but I would ask:  What were

7    those other articles about?

8            MS. FUJIMOTO:  Move to strike, nonresponsive,

9        after the answer "no."

10   BY MS. FUJIMOTO:

11       Q.   Dr. Schiff, the Tomasetti paper was published

12   in a journal of science called Science; right?

13       A.   That is correct.

14       Q.   Do you know what the impact factor of Science

15   is?

16       A.   Near the top of all scientific journals.

17       Q.   All right.  Do you know what the impact factor

18   of the Tomasetti article is based on its citation

19   numbers?

20       A.   I would have no knowledge about that.

21       Q.   And, Dr. Schiff, based on your prior testimony,

22   am I correct that you are not aware of any methodology

23   for determining whether a patient -- a particular person

24   like Mr. Cervantes -- falls into the 80 percent of

25   cancers that are caused by random mutations?

1          MS. FREDONA:  Objection.  Form.

2     A.    All right.  There are two things here.  First,

3 I would indicate to you as part of a continuation of my

4 previous answer -- and I get that you move to strike as

5 nonresponsive any answer that I give you that you don't

6 like or disagree with, but the bottom line is, what is

7 the impact -- I would suggest that the impact factor of

8 the Tomasetti article in studies that deal with any of

9 the scientific issues involved in the Roundup litigation

10 is zero or pretty close to it.  And, you know, I'm going

11 to --

12     Q.    Doctor --

13     A.    I'm sorry?

14     Q.    Did you hear my question?

15     A.    Yes, and I responded in part to the previous

16 question because I didn't finish with my answer to that.

17 If you'd care to restate the current question, I will

18 focus now on that.

19     Q.    Thank you.  Am I correct that you have

20 acknowledged or it's your opinion that there is no

21 methodology available for determining whether a

22 particular patient like Mr. Cervantes falls within the

23 80 percent of cancers that are caused by random

24 mutations?

25          MS. FREDONA:  Objection.  Form.

1    A.   Again, I don't know about how to identify

2    random mutations versus inherited mutations or

3    environmentally caused mutations, which, you know, with

4    regard to that, if you want to figure out inherited

5    versus random, you would have to be able to find the

6    same mutation in a parent that you found in the

7    individual who developed, in this case, non-Hodgkin

8    lymphoma.

9         So among all mutations, you know, we're still

10   back at the 80 percent number, and unless you identify a

11   mutation, you won't know if the mutation is playing an

12   active pathogenetic role, and unless you can identify

13   the mutation in a parent or other close relative, you

14   won't know whether the mutation is inherited or

15   acquired.

16   Q.   Am I also correct, Dr. Schiff, that there is no

17   methodology that you're aware of for us to know what

18   percentage of gene mutations that lead to non-Hodgkin

19   lymphoma are sporadic versus attributable to a specific

20   exposure?

21        MS. FREDONA:   Objection.   Form.

22   A.   I would say that that's correct, because when

23   we study the acquired mutations we do not know how they

24   were acquired, what caused them, were they random in DNA

25   replication, as the Tomasetti article emphasizes, or

Ron B. Schiff, M.D., Ph.D.

1    were they due to an environmental cause.  Tomasetti

2    chooses to answer that question by talking about

3    probabilities.

4        Q.   Right.  Okay.  And following that thinking

5    through then, so if you have a particular plaintiff like

6    Mr. Cervantes, who has more than one risk factor for a

7    disease like non-Hodgkin lymphoma, there's no method by

8    which you or anyone else can weigh or quantify those

9    risk factors to compare them; is that right?

10        MS. FREDONA:  Objection.  Incomplete

11    hypothetical.  Form.

12        A.   Are you talking specifically about the role of

13    mutations in the development of his non-Hodgkin

14    lymphoma?

15        Q.   I'm talking about risk factors.

16        Let me try this again.  Am I correct that if

17    you have a plaintiff like Mr. Cervantes, who has more

18    than one risk factor, that there is no methodology by

19    which you can quantify or weigh those risk factors to

20    compare them to one another to determine a cause?

21        MS. FREDONA:  Same objection.

22    BY MS. FUJIMOTO:

23        Q.   You can't do it; right?

24        A.   I am very interested in that question and have

25    thought about answering that based on considerations of

Ron D. Schiff, M.D., Ph.D.

1    the relative risk associated with each individual risk

2    factor and the degree of exposure or the degree to which

3    that risk factor is manifest in an individual.  However,

4    I have never seen any publications dealing with that.  I

5    will say again I'm highly interested in that, but this

6    all comes from the concept of multifactoriality.

7           Many diseases, perhaps most, have more than one

8    cause.  The fact that there is more than one cause in

9    the case of a patient with a specific disease doesn't

10   mean that one cause eliminates or mitigates another.

11   Those are all causes or contribute to cause the

12   occurrence of the disease in that individual.

13          So the fact that Mr. Cervantes has multiple

14   risk factors for the development of non-Hodgkin lymphoma

15   certainly does not rule out that Roundup, glyphosate,

16   belongs on the list.

17   Q.   Okay.  You're reading way too much, Dr. Schiff.

18   One step at a time.  Let me ask you again.

19          Am I right that there is no method and not

20   enough data available to give you a method by which you

21   can weigh or quantify the risks -- different risk

22   factors to determine how much, if at all, they

23   contributed to causing a person's non-Hodgkin lymphoma?

24   Right?

25          MS. FREDONA:  Objection.  Form.

```
1       A.   No, I did answer that in my previous answer.  I
2   answered it in detail, and I will say that if you
3   compare the relative risks of the different risk factors
4   that are manifest in a particular case you can perhaps
5   get some idea of the relative importance of each
6   individual risk factor in causation.  However, it is
7   true there is no universally recognized algorithm for
8   making such a quantitative evaluation.
9       Q.   And have you -- since your deposition a year
10  and a half ago, have you attempted to do research or to
11  develop a method by which you can actually quantitate or
12  give value to the competing risk factors?
13          MS. FREDONA:  Objection.  Form.
14      A.   I actually worked on that briefly in 2016 and
15  did nothing further with it.
16      Q.   Okay.  And, in fact, this isn't something --
17  this development of a method for doing that is not
18  something that you've given any serious scientific
19  thought to recently; right?
20      A.   Not since --
21          MS. FREDONA:  Objection.  Form.
22      A.   Sorry.
23          Not since the summer of 2016 when the PCB
24  litigation was winding down.
25      Q.   Well, you were asked about it in 2019 in the
```

```
 1    glyphosate context; right?

 2        A.    Correct.

 3        Q.    And you said that it was -- that you didn't

 4    have a method but it's something that interests you and

 5    that it's something that you play around with when you

 6    have nothing else to do.

 7              Do you remember that testimony?

 8        A.    I would characterize that testimony as

 9    accurate; however, I will point out also that I've done

10    no work on that since the summer of 2016.

11        Q.    Right.  So that's my -- that's my question.  I

12    mean, because you're an expert in this litigation, and

13    in the Wade case, where you were testifying about

14    Mr. Cheeks -- or Meeks, sorry -- on page 207, you said:

15              "You know, I've actually tried to develop a

16        little bit of a quantitative method for that, but

17        that's just something that, you know, that I play

18        around with when I have nothing else to do, and it's

19        not something you can find in the literature."

20              Do you remember that testimony?

21        A.    I do.

22        Q.    And so my question is:  Since 2019, have you

23    looked in the literature or made any serious effort to

24    find data to develop a methodology by which you can

25    weigh or quantify particular risk factors in a
```

Ron B. Schiff, M.D., Ph.D.

1    particular plaintiff like Mr. Cervantes?

2         A.   As I recall, my effort in that was confined to

3    approximately the summer of 2016.  I have done no

4    additional research and nothing else.  Thinking about

5    it, sure; research, no.

6         Q.   Okay.  Fair enough.  So let me back up a minute

7    on the causation question.  And you know this,

8    Dr. Schiff, because we've talked about it in the past,

9    but...

10             There is something called general causation

11   where you're determining whether or not a particular

12   agent can cause cancer, and then there's case-specific

13   or specific causation where you're evaluating whether or

14   not certain things caused or what the cause of a

15   particular patient or plaintiff's cancer is; right?

16             MS. FREDONA:  Objection.  Form.

17        A.   That is correct.

18        Q.   And in this Roundup litigation, you hold the --

19   strike that.

20             So here in Roundup, am I right that any

21   case-specific opinions that you hold are predicated on

22   your general causation opinion that glyphosate or

23   Roundup is a carcinogen that can cause non-Hodgkin

24   lymphoma; right?

25             MS. FREDONA:  Object to form.

Ron B. Schiff, M.D., Ph.D.

1        A.    That is correct.

2        Q.    And am I also correct that your general

3    causation opinion is based on the IARC monograph and

4    your reliance on the other general causation experts

5    designated by plaintiffs?

6        A.    No, it relies on sources other than that,

7    because I have read critical general causation

8    references, and, actually, among the general causation

9    references that I read dealing with that, besides IARC,

10   three others are cited in here.

11            But as -- no, I have been asked to testify

12   about other general causation literature in essentially

13   all of my prior Roundup depositions.  So I have read all

14   of that.  How I introduced my section on lymphoma caused

15   by Roundup, which is my general causation section of my

16   report, is that I am deferring a detailed discussion of

17   general causation regarding the association between

18   Roundup and non-Hodgkin lymphoma to plaintiff's present

19   or past general causation experts.  I will highlight

20   only those aspects which would be of interest to

21   clinicians, especially medical oncologists and

22   hematologists, caring for patients with non-Hodgkin

23   lymphoma.  That is me in my clinical capacity.

24       Q.    Well, understood.  So are you saying that -- in

25   Carmen and Schaefer and Harris and Wade, did you not

Ron B. Schiff, M.D., Ph.D.

1    testify that you are not setting yourself out as a

2    general causation expert?

3        A.   I'm continuing to testify to that, but in each

4    case I was asked general causation questions.  My

5    preference in each case has been to defer discussion of

6    general causation to the general causation experts.

7    That has not held back defense counsel from asking me

8    about it.

9        Q.   Well, but to be fair, I mean, because your

10   general causation opinion is the predicate for your

11   case-specific opinions, I want to make sure I understand

12   what you're relying upon and how you got there.  Okay?

13          You previously testified that your general

14   causation opinion was based on IARC and a reliance on

15   the other general causation experts.  Are you saying

16   here today that there are other aspects to your

17   methodology in reaching your general causation opinion?

18       A.   I would prefer to defer my general causation

19   opinion to IARC and to the other general causation

20   experts, which is exactly what I wrote in the report in

21   Mr. Cervantes' case, but I am prepared, as I have had to

22   be in the prior depositions, to answer questions that

23   go -- that go beyond that to other general causation

24   literature that I have read.

25       Q.   Okay.  And speaking of the other general

1   causation literature that you read, in your Cervantes

2   report, you know, you cite to -- you have 21 citations;

3   correct?

4        A.   Yes.

5        Q.   And you cite to IARC and a few other articles

6   that you think are important, like Zhang and Pahwa, and

7   Leon; right?

8        A.   That's correct.

9        Q.   But you don't cite to Andreotti, do you?

10       A.   I do not, but Andreotti is covered in Zhang.

11       Q.   You don't cite the largest and most frequently

12   looked to study on the relationship between glyphosate

13   and non-Hodgkin lymphoma?

14            MS. FREDONA:   Objection.   Form.

15       A.   To which study are you referring, Ms. Fujimoto?

16       Q.   Andreotti, 2018, and all of the publications

17   related to it that come out of Agricultural Health

18   Study.

19       A.   Okay.   I read Andreotti, and am recognizing

20   also that, instead of citing each individual general

21   causation study separately, I am well aware that Zhang,

22   which was published the year after Andreotti, included

23   an analyzed Andreotti, compared it with earlier

24   Agricultural Health Study data, and actually calculated

25   and recalculated their meta-analysis based on whether

1    they relied on the original AHS data from 2005 or the

2    updated AHS data from Andreotti 2018.  So by citing

3    Zhang, that certainly indicates that I am familiar with

4    those considerations.

5        Q.   Okay.  And I'll ask you more about this later,

6    but you didn't cite to the Kabat paper from 2020, did

7    you?

8        A.   I didn't know about the existence of the Kabat

9    paper until I received that as a delivery yesterday

10   afternoon in the first of two boxes of exhibits for

11   today's depositions.

12       Q.   Okay.  So even though you relied heavily on the

13   Zhang paper, you weren't aware of a later paper that

14   lays out quite a number of criticisms and differing

15   findings?

16           MS. FREDONA:  Objection.  Form.

17       A.   I'd like to pull that paper out, and I'm happy

18   to discuss it with you.

19       Q.   Okay.  We will.  It's in that stack.

20       A.   I have it.

21       Q.   All right.  If you take a look, let's mark as

22   Exhibit --

23           MS. FUJIMOTO:  I'm sorry.  Court Reporter, what

24       am I on?  Exhibit 5?

25           THE COURT REPORTER:  This will be 5, yes,

1      ma'am.

2              MS. FUJIMOTO:  Exhibit 5.  Great.  Thank you.

3              (Schiff Exhibit 5 was marked for

4      identification.)

5      BY MS. FUJIMOTO:

6      Q.   So we're going to mark as Exhibit No. 5 a paper

7      from May of 2020, lead author is Geoffrey Kabat,

8      K-a-b-a-t, and it's entitled "On Recent Meta-Analyses of

9      Exposure to Glyphosate and Risk of Non-Hodgkin's

10     Lymphoma in Humans."

11             Do you have that in front of you, Doctor?

12     A.   I do.  I received it yesterday.  That's the

13     first time I looked at it.

14     Q.   Okay.  And if you would go to the introduction,

15     that first paragraph, second sentence, the authors say:

16     "Risk assessments by numerous international and national

17     health agencies have determined glyphosate to be safe

18     and noncarcinogenic."

19             Do you see that?

20     A.   That is part of their argument, yes.  They cite

21     one particular article for that, which has to do with

22     the European Union assessment.

23     Q.   Right.  And do you have reason to disagree with

24     that?

25     A.   I accept that there is controversy associated

Ron B. Schiff, M.D., Ph.D.

1    with it, but I've also looked into the reasons of the

2    controversy, and I have also considered exactly what it

3    is that sets Kabat in contradistinction to Zhang.

4        Q.    Okay.  Let me ask you this:  In the Wade case,

5    at that time, in 2019, you said that you had not

6    reviewed in detail any of the reports by the EPA, Health

7    Canada, the European Chemical Agency, the Australian

8    regulatory agency, the New Zealand agency, Japan, or any

9    other international agencies that had evaluated the

10   safety and noncarcinogenicity of glyphosate.

11            Do you remember that?

12       A.    I do.

13       Q.    Have you reviewed them since?

14       A.    I have not, but I have introduced other things

15   that I have reviewed dealing with that, and I believe

16   that it was in one of the depositions you took from me

17   in 2019.  If not, it would have been the Caballero

18   deposition.

19       Q.    So my question, though, Doctor, is:  If you're

20   offering opinions here on general causation and whether

21   or not glyphosate is a carcinogen, why would you not

22   look to all of the major international and national

23   health agencies that have looked at the question?

24            MS. FREDONA:  Objection.  Form.

25       A.    Because I preferred to look at the original

1    scientific documentation, and among the others, I have

2    focused on IARC, but as we've already discussed today,

3    and as I've cited in my reports --

4              (Court Reporter connection lost.)

5              (The following was transcribed from videotape.)

6       A.   -- I have also looked at other components of

7    that literature as well.

8       Q.   But, Doctor, are you aware, at least, that the

9    EPA, Health Canada, the European Chemical Agency, and

10   all the other international health agencies that have

11   looked at the question have concluded that glyphosate is

12   safe and noncarcinogenic?  You're aware of that; right?

13      A.   I am also --

14              MS. FREDONA:  Objection.  Form.

15      A.   Sorry.

16              I am also aware --

17      Q.   Yes or no?  Are you aware of it, Doctor?

18      A.   It's not a yes or no question.

19      Q.   Say yes or no, and then I'll let you explain.

20   Are you aware?

21      A.   I am aware.

22      Q.   Thank you.  Go ahead and finish.

23      A.   All right.  Thank you.  I am also aware and

24   have repeatedly testified that the EPA reassessment in

25   approximately the 2016 time frame was flawed.

1           The 2020 EPA article, which was brought up by

2    defense counsel last week, I asked to be provided with a

3    copy of, and I have not.  I tried finding it online, and

4    I could not identify what it was that was being referred

5    to.  I am also aware that questions have arisen about --

6    and I can't remember whether it was a European Union

7    ruling on this or a specific German government ruling on

8    it, where there are also questions about the scientific

9    integrity.

10          The principal distinction, and I'm continuing

11   to answer your questions specifically and explicitly, is

12   that what you're asking me about is the opinions of

13   regulatory bodies.  What I am talking about is, in this

14   particular case, the contrast is with IARC, which is not

15   a regulatory body, which exists to weigh the evidence

16   and to make assessments based on that and defer

17   regulatory rulings to other groups.  And that's a huge

18   difference.

19       Q.   Dr. Schiff, try to stay focused on the

20   question, please.

21       A.   I'm very --

22          THE VIDEOGRAPHER:  Sorry for interrupting.  The

23       court reporter was just getting back.  She was

24       disconnected.

25          MS. FUJIMOTO:  Oh, okay.  Where did you get

Ron D. Schiff, M.D., Ph.D.

1       off, Joan?

2           THE VIDEOGRAPHER:  Should I go off the video

3       record?

4           MS. FUJIMOTO:  No.

5           THE VIDEOGRAPHER:  Okay.

6           THE COURT REPORTER:  I'll read the answer that

7       I have.

8           MS. FUJIMOTO:  Okay.

9           THE COURT REPORTER:  Question:  Because I

10      preferred to look at the original scientific

11      documentation, and among the others, I have focused

12      on IARC, but as we've already discussed today, and

13      as I've cited in my reports --

14          That's all I've got.

15          MS. FUJIMOTO:  Okay.

16  BY MS. FUJIMOTO:

17      Q.   All right.  So the point you were making,

18  Dr. Schiff, is that you're relying on the 2015

19  monograph -- IARC monograph on glyphosate; right?

20      A.   Yes, because it's a scientific study employing

21  weight of the evidence approach.  It is not a regulatory

22  document.

23      Q.   And -- but you already know this, and we won't

24  go into detail, but you know that IARC employed a method

25  by which it did a hazard assessment; right?

1        A.    That is correct.

2        Q.    And that's a different analysis than the risk

3    assessments that health agencies do; right?

4        A.    Yes.  That has been discussed in the follow-up

5    literature to the IARC monograph.  I've heard the

6    difference, but to someone like me, that is not of

7    primary importance.  IARC still analyzed all of the

8    epidemiologic evidence, as well as the animal and

9    mechanistic data, they did their own independent

10   meta-analysis, and that is what I looked at with respect

11   to IARC.

12       Q.    So have you reviewed the follow-up

13   reassessments by the EPA and the other health agencies

14   after IARC published its monograph in 2015?

15       A.    If there was one particular one that Mr. Hogue

16   referred to last week, in 2020, I have not seen it, I

17   have not received it, despite my requests, and I have

18   not been able to find it online.  So the answer to that

19   question is no.

20       Q.    Have you seen any other follow-up -- prior to

21   2020 -- any other follow-up or additional publications

22   by any of the health agencies like the EPA where they

23   looked at IARC monograph in 2015 and said, oh, let's go

24   back and look at what IARC did and reassess glyphosate?

25            MS. FREDONA:  Objection.  Form.

1   BY MS. FUJIMOTO:

2       Q.   Did you see any of those later follow-ups by

3   the EPA and other health agencies?

4           MS. FREDONA:  Objection.  Form.

5       A.   What I have read and actually provided to

6   defense counsel, who appeared not to know about it in

7   the past, was the Pearce article from 2015 about "IARC

8   Monographs:  40 years of Evaluating Carcinogenic Hazards

9   to Humans."

10          I've looked at and provided the Bloomberg News

11  article about the apparent collusion between the EPA and

12  Monsanto in EPA's reassessment during the period of time

13  that Scott Pruitt was the director of the EPA, and I

14  know that I have looked at at least one other study that

15  was published as criticism of the IARC process and the

16  findings of the glyphosate monograph.  Right now I can't

17  find that.

18          MS. FUJIMOTO:  Move to strike.  Nonresponsive.

19  BY MS. FUJIMOTO:

20      Q.   My simple question to you, Doctor, was not what

21  other things you looked at.  Right now my question to

22  you is:  Did you review any of the follow-up

23  publications by the EPA or other international health

24  agencies regarding their reassessment of the glyphosate

25  data after the IARC monograph?  Have you seen any of

1   those?

2       A.   The answer is no, but the EPA is not a health

3   agency.

4       Q.   So go back to the Kabat paper marked as

5   Exhibit 5, please.  Do you have that in front of you?

6       A.   I do.

7       Q.   If you go to the second page, which is page --

8   it's obscured, so the second page of the article, and up

9   at the top left-hand column -- it actually starts -- I

10  apologize, Doctor -- on the right-hand column at the

11  bottom of the first page and then goes on to the next

12  page.  And it's talking about -- if you see, it's

13  talking about the Zhang meta-analysis that you relied

14  upon.  Do you see that?

15      A.   I do.

16      Q.   And the Kabat authors say, "The selection of

17  risk estimates from the six studies included in that

18  meta-analysis is open to question on a number of

19  grounds:  (1) inconsistent definitions of exposure

20  across studies; (2) evidence of bias in case-control

21  studies; (3) uncertainty about the latency period for

22  NHL; and (4) selection of the highest of available

23  estimates from the AHS and from a pooled analysis of US

24  case-control studies."

25          Do you see that?

1      A.   I see that.

2      Q.   Do you have an opinion as to whether the Zhang

3   meta-analysis applied inconsistent definitions of

4   exposure?

5           Or strike that.  Bad question.  Apologies.

6           Do you have an opinion as to whether the

7   studies that were included in the Zhang meta-analysis

8   had inconsistent definitions of exposure?

9      A.   I believe that that applies to virtually every

10   analysis, every meta-analysis of an environmental

11   hazard.  The studies are not constructed to be

12   completely uniform with regard to the study population

13   or the nature or extent of exposure.  Meta-analyses have

14   ways to deal with that, and as I understand it, Zhang

15   employed detailed statistical measures to analyze that

16   exact fact.

17      Q.   Do you know whether or do you agree that there

18   is evidence of bias in the case-control studies that

19   were part of the Zhang meta-analysis?

20           MS. FREDONA:  Objection.  Form.

21      A.   All epidemiologic studies are subject to bias.

22   However, what's missing from the very pointed and

23   one-sided discussion in the Kabat paper is that cohort

24   studies, including the AHS, whether it's the 2005 report

25   or the 2018 Andreotti update, also have estimates, also

1    have parameters of bias that help to move the ultimate

2    statistical finding, they bias it toward the null.

3         So cohort studies are not immune to that, and

4    Zhang looked at cohort as well as case-control studies

5    and attempted to analyze the nature and sources of bias

6    in each of them.

7    Q.   Do you agree or disagree that there is an

8    uncertainty about the latency period for non-Hodgkin

9    lymphoma?

10   A.   I agree with that.

11   Q.   Do you agree or disagree that the Zhang

12   meta-analysis selected the highest available estimates

13   from the Agricultural Health Study?

14   A.   Here I'm going to draw one of my distinctions

15   between Zhang and Kabat.  Zhang had an a priori

16   hypothesis, which --

17   Q.   Can you answer the question and then go to

18   that, please?

19        Do you agree that the Zhang meta-analysis

20   selected the highest of available estimates from the AHS

21   and from the pooled analyses of the US case-control

22   studies?  Yes or no?  And then you can go on and

23   explain.

24   A.   The answer is yes.

25        MS. FREDONA:  Objection.

```
 1      A.    Sorry.
 2            The answer is yes, but I am going to insist on
 3      explaining that.  The point is that that was part of
 4      Zhang's a priori hypothesis to look at that at the
 5      highest levels of exposure where such information was
 6      available, and so they did.  Other meta-analyses did not
 7      look at that, but Zhang focused on it, and it made the
 8      adjustments, among other things, as to which AHS study
 9      was included.
10            Kabat's only identifiable a priori hypothesis
11      is to criticize Zhang by whatever means necessary.
12      Zhang had a scientifically based a priori hypothesis,
13      and it had to do with trying to find some sort of
14      consensus exposure-response estimate.  Kabat was not
15      concerned with that.  Kabat was just concerned with
16      criticizing Zhang.  That's my answer.
17      Q.    Okay.  Doctor, do you agree that the Zhang
18      meta-analysis did not assess ever exposure to
19      glyphosate?
20      A.    I'd have to look that up, because I believe
21      that that was discussed.
22            Yeah, actually, that's not true.  Where they
23      didn't have a --
24      Q.    Is it true, Doctor, that they basically worked
25      off the hypothesis that heavy exposure is what was
```

Ron B. Schiff, M.D., Ph.D.

1    associated with NHL?  Isn't that what Zhang did?

2       A.   Well, that just contradicts with the last prior

3    question that you asked me.  So Zhang certainly did take

4    into account the issue of ever versus never exposed,

5    especially in studies where there was not a highest

6    exposed group, and they dealt with that in there.

7       Q.   Doctor, so you're aware that Kabat did a

8    separate analysis, a sensitivity analysis, and basically

9    came up with a different conclusion than the Zhang

10   meta-analysis; right?

11      A.   I am aware of that.  And I know one of the

12   other reasons that they did that, for example, is they

13   decided we don't like the criteria that Zhang applied to

14   the McDuffie paper, so -- I'm sorry -- the Ericsson

15   paper, so, hey, we're just not going to use that, and

16   that's what they did.  It's kind of typical of Kabat's

17   methodology.

18           MS. FUJIMOTO:  Move to strike as nonresponsive

19      after "I am aware of that."

20   BY MS. FUJIMOTO:

21      Q.   Doctor, the question is -- let me just get to

22   this.  Are you -- are you prepared right now to walk

23   through all of the studies on glyphosate to determine

24   the strength of association and whether or not there is

25   consistency of any strong associations across all of the

1  glyphosate studies?

2       MS. FREDONA:  Objection.  Form.

3   A.   Well, what you're asking me to do is to conduct

4  my own meta-analysis.  Others have done that before me.

5  If you wish for me to look at any individual paper or

6  group of papers, I'm happy to do that and I will

7  highlight for you what I believe are the relevant

8  statistics and conclusions.

9   Q.   No, that's not the question, Doctor.  Let me --

10  you mention in your -- in your report -- and I know

11  you're familiar with the Bradford Hill criteria and the

12  Hill criteria for general causation.

13       So my question to you, though, is:  Can we walk

14  through today the methodology where one looks across all

15  studies for associations and whether those associations

16  are strong, whether they're consistent and reproducible,

17  whether there's biological plausibility, whether there's

18  a dose-response, all of those criteria?  I want to know

19  whether you applied that methodology here; and if so, I

20  want to walk through each and every assessment.

21       MS. FREDONA:  Objection.  Form.

22   A.   I certainly did not apply the methodology of a

23  statistical specialist or statistician.  I read the

24  studies, I read the meta-analyses, I read IARC, and I

25  formed my own conclusions based on that.

1          If you want to get specific about any studies,

2    any individual study, group of studies, or all of the

3    studies, I'm happy to answer your questions to the best

4    of my ability.

5         Q.   Well, so let me mark as Exhibit No. 6, Doctor,

6    to the deposition your report in Cervantes.

7              (Schiff Exhibit 6 was marked for

8    identification.)

9    BY MS. FUJIMOTO:

10        Q.   And, you know, I'm looking at it, and you

11   basically have 21 citations; right?

12        A.   Yes.

13        Q.   And these are the articles that, presumably,

14   rely -- that you relied upon in forming your opinions;

15   right?

16        A.   About specific causation in Mr. Cervantes'

17   case.  You're asking me right now about nothing but

18   general causation.  I dealt with that in my report and I

19   read the relevant sentences into the record of today's

20   deposition.

21        Q.   Well, but my question is:  You don't have a

22   report served where you walk through any Hill criteria

23   or any methodology laying out your assessment of the

24   published studies to determine or arrive at your general

25   causation opinion; right?

Ron D. Schiff, M.D., Ph.D.

```
1              MS. FREDONA:  Objection.  Form.

2    BY MS. FUJIMOTO:

3         Q.   Have you prepared a report like that?

4              MS. FREDONA:  Objection.  Form.

5         A.   I have not prepared a report like that, nor

6    have I been asked in any Roundup litigation to serve as

7    a general causation expert.

8         Q.   That's my point.

9         A.   You're treating me as though a general

10   causation expert, and I'm responding by telling you that

11   I will look at any of the articles that you want me to

12   and I will give you my opinions about them.

13        Q.   My question to you, Doctor, is:  I don't want

14   to walk through, if we don't have to, general causation

15   methodology if you're not a general causation expert.

16   But you keep fighting me on questions, so let me ask you

17   this then -- and I asked it early on.

18             Is it correct, since you're not offering

19   yourself as a general causation expert, that in terms of

20   your general causation opinion you basically are relying

21   upon IARC and the other general causation experts in the

22   litigation?

23             MS. FREDONA:  Objection.  Form.

24        A.   I've answered that before.  The answer is that

25   I'm relying on them, but I also read the relevant
```

Ron B. Schiff, M.D., Ph.D.

1    literature for myself, and while my preference is to

2    defer general causation opinions to the general

3    causation experts, I'm willing to answer any questions

4    you have about any of that literature.

5         But I made it very clear in my report that I

6    was only going to focus on certain things.  That does

7    not mean that I did not read or understand or pay

8    attention to the other scientific contributions to this

9    subject.

10   Q.   Am I right that we do not have from you any

11   list of all of the literature that you have reviewed or

12   looked at in terms of general causation?

13        MS. FREDONA:  Objection.  Form.

14   BY MS. FUJIMOTO:

15   Q.   Right?

16   A.   I have never been asked to prepare a list, so

17   no, no such list exists.

18   Q.   And we don't have from you a report that lays

19   out your methodology and how you applied that

20   methodology to the published literature in arriving at a

21   general causation conclusion or opinion, we don't have

22   that either; right?

23        MS. FREDONA:  Objection.  Form.

24   A.   I did state in the introductory sections of my

25   report that I relied on the Hill criteria.  I didn't

1   spell those criteria out as regards to each report,

2   because, after all, I'm not the general causation

3   expert.

4        Q.   There's my point.  So you reference the Hill

5   criteria in your report -- I know you understand what it

6   is, but in your report you do not walk through the Hill

7   methodology and you do not tell us how you analyzed all

8   of the glyphosate published literature, how you applied

9   the Hill criteria, and arrived at a conclusion?  That's

10  not in here, is it?

11       MS. FREDONA:  Objection.  Form.

12       A.   I did not spell it out as one would expect to

13  see it in a general causation report.  That does not

14  mean that I didn't go through that and that the outcomes

15  of such an analysis are not evident throughout my

16  report, including the lymphoma caused by Roundup

17  section, the exposure section, the differential etiology

18  other risk factors section, and the conclusion section.

19            If I was as unfamiliar with the general

20  causation literature as you are implying, I would not

21  have been able to write those sections.  So there again,

22  I'm not the general causation expert, but that does not

23  mean I'm not familiar with the general causation

24  literature or have not formed opinions about it.

25       Q.   The question was -- no, I'm not going to do it

1    again.  I think it's pretty apparent.

2            So in terms of your general causation opinions,

3    you reference Hill, but am I right that you do not in

4    your report lay out your assessment of all of the

5    literature that you reviewed and how you applied that

6    methodology to arrive at your conclusion?  Right?

7            MS. FREDONA:  Objection.  Form.

8        A.   It's not in my report, but I go through that

9    process when I read epidemiology literature.  The

10   conclusions and outcomes of that type of analysis are

11   indeed in my report.  The individual steps, no.  I did

12   not write about consistency or biological plausibility

13   with regard to, for example, the Hursey paper.  There's

14   no role for that.  That was not part of what I was asked

15   to do in this litigation.

16           If you'd like to ask me about that paper, I'm

17   happy to answer the questions.  The same with any other

18   paper.  It's not in the report.  And may I remind you

19   that in two prior Roundup litigation cases there was no

20   report.  One of them is the Meeks case that you've

21   already asked me a number of questions about.  I was not

22   asked to prepare a report in that, and I was not asked

23   what would I have put into or omitted from my report had

24   I been asked to prepare one.

25       Q.   Doctor, you answered my question five minutes

1    ago, so I'm not going to move to strike, because I can't

2    even remember what the first part of the answer was.

3          So let's go here:  Do you see in the stack the

4    General Causation Expert Disclosures?  I'm going to mark

5    that as Exhibit 7.  It's Plaintiff's R.26 General

6    Causation Expert Disclosures in Cervantes.

7          (Schiff Exhibit 7 was marked for

8    identification.)

9    BY MS. FUJIMOTO:

10   Q.   Do you see that?

11   A.   Can I possibly clean up any of these other

12   papers that are accumulating in front of the computer?

13   Q.   Not yet, because you may have to review them

14   again.

15         So I've marked that as Exhibit 7.  Have you

16   seen this general designation before?

17   A.   It arrived yesterday, and I do not -- yeah, I

18   looked at who the general causation experts were.  I did

19   not read the disclosure form.

20   Q.   All right.  So are these the general causation

21   experts that you're deferring to in terms of the general

22   causation question of glyphosate?

23   A.   That is correct.

24   Q.   And do you know Dr. Christopher Portier?

25   A.   I have read his opinion in general causation in

1    earlier glyphosate litigation.  I have read at least one

2    of his published articles.  I have never met him nor

3    spoken to him.

4        Q.   And I have the same question regarding the

5    other general causation experts:  Drs. Ritz,

6    Weisenburger, and Jameson.

7        A.   Okay.  With regard to Dr. Ritz, I have read her

8    opinions in prior Roundup litigation.

9        Q.   Okay.

10       A.   I have not read any of her academic articles.

11   I have not met her.  I have not spoken with her.

12       Q.   Okay.

13       A.   With regard to Dr. Weisenburger, I have read

14   his opinion, general causation opinion in the earlier

15   Roundup litigation, I looked at the first page of his

16   titled "Specific Causation Opinion in the Cervantes

17   litigation," but did not read the whole thing, and I am

18   familiar with a number of his articles, because he is,

19   in a sense, a clinical guy, expert in the diagnosis of

20   non-Hodgkin lymphoma and its various subtypes.  That's

21   what he does for work every day.

22            I also had a telephone conversation with him in

23   approximately November 2020 concerning the

24   classification of one case in the earlier Roundup

25   litigation where I reviewed the records, spoke with the

1    attorneys, was not asked to write a report, and was

2    never deposed.

3           Oh.  And in terms of Dr. Jameson, I'm not sure

4    that I heard of Dr. Jameson before I got yesterday's

5    disclosure statement, so I don't know who that is.

6       Q.   Okay.  But to the extent you know what their --

7    I guess my question is:  To the extent you are deferring

8    to them on general causation, I take it you have

9    reviewed their reports?

10      A.   As indicated, I have reviewed reports from

11   Drs. Weisenburger, Ritz, and Portier in earlier Roundup

12   litigation.  I have no reports or anything from

13   Dr. Jameson.

14      Q.   Okay.  And did you re-review any of those

15   general causation reports for this case in particular?

16      A.   I did not, in part because I had an extremely

17   limited amount of time between when I was asked to

18   participate and when the report was due.  So I looked

19   only at the essentials having to do with materials

20   directly concerning this case.

21      Q.   When were you first asked to get involved in

22   this case?

23      A.   My report was dated January 21.  I was asked to

24   get involved possibly on January 20.  If it wasn't

25   January 20, it would have been January 19.

1      Q.   So you were retained in this case either on the

2    same day or the day before you wrote and signed a

3    report?

4      A.   Something like that.  I can -- I can look up

5    the exact date from the material about the invoice, but

6    it was in that range, yes indeed.

7      Q.   So -- and you spent 11 hours in one day?

8      A.   No, that was over two days.  Yes.

9      Q.   Okay.

10      A.   I didn't do anything else on those two days.

11      Q.   Did you -- I see a reference list, but I don't

12    see a list of the materials for Cervantes that you

13    reviewed.  Did you review medical records from

14    Mr. Cervantes?

15      A.   Okay.  The answer to that is that there is the

16    reference list, but if you go to the section on the

17    third page of my report --

18      Q.   Okay.

19      A.   -- titled "factual synopsis," I selected the

20    term "synopsis" intentionally.  I usually entitle the

21    section factual review --

22      Q.   Right.

23      A.   -- but I didn't have all that much to go on, so

24    I called it a synopsis.  The first paragraph there

25    describes everything that I looked at that isn't in the

Ron D. Schiff, M.D., Ph.D.

```
 1    reference list, and it's the medical records, and the
 2    Plaintiff Fact Sheet, and Mr. Cervantes' deposition.
 3    And I listed the limitations on what medical records I
 4    had access to.  That explains why I looked at the first
 5    page of Dr. Weisenburger's report, because I wanted to
 6    see if he knew something that I didn't have access to.
 7         Q.   Did he?
 8         A.   No.
 9         Q.   All right.  So you -- do you know if you got
10    all of his medical records, or you just don't know?
11         A.   I looked at all of the records that I was sent.
12         Q.   Right.
13         A.   In terms of full disclosure, I'm going to tell
14    you this:  I got everything sent to me electronically.
15    That's how I prepared my report.  I had the computer
16    with those records in front of me and I had my work
17    computer next to it and I went from there.
18         Q.   Okay.
19         A.   Only at 5:00 o'clock on the day of the deadline
20    did I receive hard copies.  I was a little upset, so I
21    put those away without looking at them.  I looked at the
22    group headings of the different rubber-banded sections,
23    and they matched up exactly with what I had seen
24    electronically over the previous whatever it was -- day
25    and a half or two days.  So I have no reason to believe
```

1    that there is any additional information in the hard

2    copy records that I got on the 21st relative to what I

3    looked at electronically on the 20th and the 21st.

4        Q.   And so you wrote this factual synopsis based on

5    your review of the records, the fact sheet, and

6    plaintiff's deposition; is that right?

7        A.   That is correct.

8        Q.   And you've tried to note kind of the

9    limitations or exactly what records you had; right?

10       A.   Yes.  I do want to clarify.  I looked in

11   Dr. Weisenburger's report at the first page.  There was

12   no information on that page that was new to me, but I

13   want to make clear that I don't know exactly what

14   records Dr. Weisenburger had available to him.  That I

15   can't comment on.

16       Q.   And you don't know whether you got everything

17   available?

18       A.   From the deposition, which indicates that a lot

19   of the records that I did not have were generally not

20   available, that was actually discussed in Mr. Cervantes'

21   deposition.  I do not know the contents of the

22   additional records that I received 45 minutes before

23   today's deposition, but I'd be happy to look at them and

24   answer questions about them.

25       Q.   But you didn't ask the plaintiff's lawyer,

1    "Hey, did you send me everything that's available?"

2        A.    Oh, yes, I did.

3        Q.    Okay.  And what was the answer?

4        A.    "Yes."

5        Q.    Okay.  All right.  So if you would go to your

6    exhibit stack and get the Plaintiff's Rule 26 Specific

7    Expert Disclosures, and I'm going to mark that as

8    Exhibit No. 8 to the deposition.

9            (Schiff Exhibit 8 was marked for

10   identification.)

11       A.    I have it.

12       Q.    Okay.  And if you'll see on the second page you

13   are listed as a case-specific expert; right?

14       A.    That is correct.

15       Q.    And that's consistent with your understanding,

16   meaning that your role here is as a case-specific

17   expert; right?

18       A.    Okay.  That's on the third page.  Am I missing

19   something on the second page that you're referring to?

20       Q.    No.  My apologies.  I have two-sided print

21   here.

22       A.    Okay.

23       Q.    So the third page.

24       A.    Third page.  There are some things in that

25   disclosure concerning me that are not accurate --

Ron D. Schiff, M.D., Ph.D.

1     Q.    Okay.

2     A.    -- and I informed plaintiff counsel about that

3   as soon as I received this.  I want to make it clear

4   that I did not write this, I did not sign it, and I did

5   not see it or know of its existence until I got the

6   FedEx delivery yesterday afternoon.

7     Q.    Okay.  And you already -- that's the question I

8   was going to ask, whether you'd seen it, so...

9           But you've seen it now.  What is incorrect?

10    A.    Okay.  I am not holding myself out as a

11  toxicology or an epidemiology expert.  That is to say I

12  am not a toxicologist and I am not an epidemiologist.

13          In terms of my understanding of epidemiology,

14  which comes up in every deposition that I've given in

15  Roundup, cancer specialists have to be familiar with the

16  causes of their patients' cancer.  They have to know

17  something about the epidemiology literature and the

18  causes of the different cancers on a general basis.

19          Epidemiology turns up in our textbooks, in our

20  journal articles, at least those that are read by

21  oncologists and hematologists, they turned up in the

22  American Board of Internal Medicine exam preparation

23  materials, and, yes, they turned up on the board exam as

24  well.

25          So in that regard, you know, I do have some

Ron D. Schiff, M.D., Ph.D.

1    background in epidemiology, but to avoid having to

2    answer the question specifically, I'm going to give you

3    the answer up front.  I am not an epidemiologist.

4          With regard to toxicology, I'm also not a

5    toxicologist.  With genotoxicity, I do have some

6    background in molecular and cellular biology, as you

7    know, although it was not related directly to any of the

8    matters at issue in the Roundup litigation.  However,

9    nobody ever asked me about genotoxicity experiments or

10   mechanisms.

11        Q.   Right.

12        A.   So I don't object to leaving that in there, but

13   now you know the limitation on that.

14        Q.   Fair enough.  And I understood or expected that

15   you would -- you would be candid about that.

16          And in terms of the genotoxicity, as I recall,

17   your prior testimony is that you certainly have a

18   general understanding, but you haven't reviewed in

19   detail the genotoxicity studies, all of them related to

20   glyphosate, to evaluate them in that context; is that

21   right?

22        A.   Certainly not comprehensively, but I've looked

23   at some of the principles as put forward especially, but

24   not exclusively, by IARC.

25          I also want to point out for completeness,

Ron D. Schiff, M.D., Ph.D.

```
 1    because I am transparent, complete, and objective that

 2    whoever prepared this got my address wrong.  My street

 3    address ███████████████████████████.

 4         Q.   Okay.  Thank you.  And you know

 5    Dr. Weisenburger.  You've already referenced

 6    Dr. Weisenburger.  Do you know Dr. Benbrook?

 7         A.   I'm sorry.  I know Dr. Weisenburger through one

 8    telephone conversation, having read his general

 9    causation opinion, and being familiar with some of his

10    pathology articles, but I've never met him.

11         Q.   Did you see his specific causation report in

12    this case?

13         A.   Yes, but, again, I only looked at the first

14    page because there was a time limitation and I wanted to

15    figure out if he had access to any medical facts that I

16    did not know about.

17         Q.   Do you know if Dr. Benbrook served a

18    case-specific report in this Cervantes matter?

19         A.   I don't believe I have seen a report by that

20    person.  I don't believe that I heard that name before

21    my receipt of this specific causation disclosure

22    document, and I do not know Dr. Benbrook.  I do not

23    think I have previously heard of him.  I have not read

24    anything by him.  And that's the best I can do with it.

25         Q.   What about Dr. William Sawyer, toxicologist?
```

1    Are you -- did you see his case-specific report in

2    Cervantes, in this Cervantes case?

3        A.   No, I have not.

4        Q.   Are you aware of his opinions, his general

5    cause or case-specific cause opinions?

6        A.   I have to give a qualified answer to that,

7    because in Roundup litigation that I participated as a

8    consultant with no report, no deposition, no trial

9    testimony for a different law firm, Dr. Sawyer was a

10   plaintiffs' expert, and the attorney who handles the

11   expert witnesses was supposed to interview or prep him

12   in Sanibel, Florida, and then on the same trip drive two

13   hours north and do that with me.  She never made it to

14   Tampa.  So that's the extent of what I know about

15   Dr. Sawyer and his involvement.

16       Q.   And do you know anything about his

17   qualifications or his reliability in terms of his

18   opinions?  Do you agree with him?  Disagree with him?

19       A.   I don't think I've ever read one of his actual

20   opinions or any research articles that he's published.

21   So the answer to that is I have no idea.

22       Q.   Okay.  All right.  Well, then let's go back

23   then.  So we know that you, and others, but you're here

24   today to offer case-specific opinions about Gerard

25   Cervantes.  And as I understand it from, again, prior

1   depositions, the methodology that you use for your

2   case-specific opinions is what's referred to as

3   differential etiology; is that right?

4       A.   That's a lawyer term, but I have acknowledged

5   and, in fact, embraced it.  But, yes, it's for looking

6   at the possible causes that are identifiable in a

7   specific case.

8       Q.   And so you've already -- my next question was

9   going to be that this case-specific methodology called

10  differential etiology is a legal concept or framework

11  that was developed by lawyers; right?

12      A.   Correct.

13      Q.   It's not something that you ever used in your

14  medical practice; right?

15      A.   Also correct.

16      Q.   And because it's a legal construct, you're not

17  aware of any medical or scientific publications that

18  reference this differential etiology methodology or how

19  to apply it to cases?

20      A.   That's correct.

21      Q.   And so if we then go through that for

22  Mr. Cervantes -- before we look at his medical records,

23  we've already established that -- in a case like this

24  where there's more than one risk factor, we've already

25  talked about the limitations or inability to really

1    weigh or quantify each risk.

2        A.   Well, common sense comes into play, but in

3    terms of quantitation, not really.

4        Q.   Okay.  And I think I'm deposing you too often,

5    because our minds are starting to work together, because

6    I saw you reference common sense a number of times in

7    your report.

8             And so my question then is:  You know, you

9    don't have a method for weighing and quantifying the

10   risks, is part of your -- the way you arrive at your

11   opinions is to apply common sense?

12       A.   If I mix Roundup every day for 45 years whereas

13   I smoke one cigarette in my life, I'm going to reach the

14   conclusion that Roundup was more of a substantial factor

15   in causing or contributing to my non-Hodgkin lymphoma

16   than smoking.  That's common sense.  It's an extreme

17   case, but that illustrates what I'm talking about.

18       Q.   So you don't have -- you can't quantify, but

19   you apply common sense or what I guess we could

20   colloquially called gestalt?

21       A.   Sure.

22       Q.   Okay.  So you just kind of look at the risk

23   factors and use this common sense gestalt way of saying,

24   okay, I think this factor is more substantial or is or

25   is not a cause of this person's cancer?

```
 1              MS. FREDONA:  Objection.  Form.
 2   BY MS. FUJIMOTO:
 3       Q.   Is that a fair assessment?
 4       A.   Yes.  I'm interested in the other, as we
 5   discussed at length earlier, but I have not formalized
 6   it.
 7       Q.   And am I correct that you cannot identify any
 8   publication or methodology that determines whether a
 9   person like Mr. Cervantes would have gotten non-Hodgkin
10   lymphoma even if he had never used glyphosate?
11              MS. FREDONA:  Objection.  Form.
12       A.   Okay.  That's a more complex question, and that
13   has been dealt with in the PCB non-Hodgkin lymphoma
14   literature having to do with the legal but for question.
15   The only way that we can really answer that is by
16   looking at the relative risk for any specific candidate
17   carcinogen, in this case, glyphosate, Roundup.
18       Q.   But as I think you've tried to explain many
19   times and did most recently in Schafer, you don't have
20   that ability to do that in the glyphosate litigation
21   because the data is not there like it is in the PCB
22   litigation; is that fair?
23       A.   No, that's actually not correct.  That's a
24   different issue altogether, because we still have
25   relative risk and meta relative risk in glyphosate,
```

1    Roundup, and we can certainly look at that and estimate

2    what proportion of cases might be due to the exposure to

3    that particular carcinogen.

4        Q.   Right, but in the glyphosate context, didn't

5    you say that you can't really -- and this was Schafer --

6    you can't really quantify exposure or risks

7    specifically, because you said, "The data aren't broken

8    down like that and there's no exposure metric that is

9    based on continuous rather than ordinal or discontinuous

10   variables."

11           That's what I'm not sure what you mean.  I want

12   to understand what you meant there.

13       A.   That's actually not correct and may either be a

14   misinterpretation or an oversimplification.  The biggest

15   difference and the most obvious one is that in PCBs we

16   have biospecimen data.  We can determine the amount of

17   each individual PCB congener or any combination you like

18   in the blood serum of a patient or plaintiff.  We can't

19   do that as part of our exposure assessment with Roundup.

20   We have to look at things like frequency and duration of

21   exposure, work conditions, and so on.

22           That's different, but it is all we have and we

23   have to do the best with that; and there are different

24   degrees of exposure that become apparent in evaluating

25   these individual cases, but that is really not the same

1    as the original question of quantitating the

2    contribution of different causes --

3        Q.    Right.

4        A.    -- to the occurrence of a specific disease in

5    one case.

6            Does that answer your latest question

7    adequately?

8        Q.    It does, actually.  And so what I'll do is

9    I'll -- in order to get more granularity, I'll ask about

10   the exposure part of that later when we talk about

11   Mr. Cervantes.

12           So let me go back then and ask you this:  Are

13   you able to identify any published -- any publication

14   that lays out a methodology to determine whether a

15   person would have gotten non-Hodgkin lymphoma without

16   any exposure to either glyphosate or a carcinogen?

17       A.    Well --

18           MS. FREDONA:  Objection.  Form.

19       A.    Sorry.

20           What you do is you extrapolate that from the

21   relative risk.  And, for example, here the relative risk

22   is very similar for non-Hodgkin lymphoma causation

23   between Roundup and PCBs.  It's about 1.4, which means

24   that about 40 of -- and I'm rounding this off -- about

25   40 of 140 cases are due -- 40 out of 140 cases of

1    non-Hodgkin lymphoma in the population being looked at

2    are due to exposure to the carcinogen, and if you do the

3    math, dividing 40 by 140, that's about 30 percent.

4         However, that is an indirect way of trying to

5    answer the but for question.  They go through that in

6    the PCB litigation, and, you know, anyone can judge how

7    much weight they want to put on that, but that's part of

8    the common sense aspect of it.  You look at what other

9    candidate risk factors or causative risk factors there

10   are and you include that in your assessment every time.

11       Q.   Okay.  And -- but there -- so is there a

12   publication that lays out that process or methodology?

13       A.   Well, yes.  I mean, again, that's in the PCB

14   and non-Hodgkin lymphoma meta-analysis, which is

15   Reference 8 in my Cervantes report.  Now, I did not

16   discuss that aspect of it in my report --

17       Q.   Right.

18       A.   -- but that discussion is in their article.

19       Q.   Okay.  That's not my question.  I'm framing it

20   poorly, perhaps.  It's not what is the citation of the

21   publication that gives you that kind of relative risk.

22   I'm asking whether there's a publication that shows that

23   the methodology that you described is a scientifically

24   or medically acceptable one.

25       A.   Well, again, Freeman and Kohles used that exact

1    methodology to characterize the excess risk in

2    non-Hodgkin lymphoma patients due to PCB exposure.

3        Q.    So is there any publication in the glyphosate

4    setting?

5        A.    I have not seen anything corresponding to that,

6    but you can apply the identical method to the almost

7    identical meta relative risk and again come up with

8    about a 30 percent of cases.  But, again, that has to be

9    tempered by what other risk factors there are,

10   recognizing, again, that risk factors don't cancel each

11   other out.

12       Q.    Right.  And so is there a method by which you

13   can determine which 40 people out of the 140 that were

14   exposed, which ones non-Hodgkin lymphoma were caused by

15   a particular exposure?

16       A.    Well, that is the area that I was interested in

17   for my own independent research back in 2016.  So it has

18   to do with the magnitude of the relative risk, and it

19   has to do with the extent of the exposure and finding

20   some way, not in today's published literature, which

21   enables you to integrate those types of statistics.

22             So I gave you an answer before about extensive

23   Roundup exposure versus a person who smoked one

24   cigarette in their lifetime.  The individual risk

25   factors have to be analyzed and some degree of common

Ron B. Schiff, M.D., Ph.D.

```
1    sense or reasoning applied.
2         Q.   But, Doctor, the bottom line is, though, that
3    although you've been interested in developing a method
4    by which you can determine which patients' NHL were
5    caused by their exposure, you haven't come up with that
6    method and certainly haven't published on it; right?
7         A.   I have not published it, but --
8         Q.   And you haven't come up with a method, because
9    you haven't given it much thought since 2016; right?
10        A.   Yes, but --
11             MS. FREDONA:   Objection.
12        A.   -- in 2016, I thought that I knew how I wanted
13   to proceed with that, and I actually have told you today
14   a couple of times what metrics I focused on.
15        Q.   And so --
16        A.   And Freeman and Kohles applied that in PCBs.  I
17   have not seen that reasoning applied in Roundup except
18   that the principle is identical.
19        Q.   So the answer then, am I right, that neither
20   you nor anyone else has published a methodology, an
21   acceptable methodology by which anyone can tell which 40
22   people out of the 140 exposed to the carcinogen
23   developed their cancer as a result of that particular
24   exposure; right?
25             MS. FREDONA:   Objection.  Form.  Asked and
```

Ron B. Schiff, M.D., Ph.D.

```
 1        answered.

 2        A.   Only within the parameters that I described

 3   before having to do with extent of exposure versus the

 4   overriding significance of any other candidate risk

 5   factors in that case.

 6        Q.   And if we look at --

 7        A.   That's how you analyze it from one case to the

 8   next.

 9        Q.   And if we do the -- go through your example,

10   the 1.4 relative risk tells you that 40 out of 140

11   exposed people will get the cancer as a result of their

12   exposure, you said that that's about 30 percent of

13   the -- of the exposed group; right?

14        A.   I think it's actually about 28.6 percent, but I

15   would say that's close enough.

16        Q.   Okay.  And so am I right that there is not

17   methodology by which one can determine the 30 percent,

18   28 or 30 percent of people, that you can attribute their

19   cancer to a particular exposure; right?

20             MS. FREDONA:  Objection.  Form.

21        A.   That's correct.  You have to look at all of the

22   exposures and make a determination accordingly based on

23   evaluation of those different candidate risk factors.

24        Q.   And you do that utilizing common sense and

25   gestalt; right?
```

1      A.   Well, whatever information I can take from the

2   published literature is included in that, and my section

3   on differential etiology in Mr. Cervantes' case includes

4   references to the published literature.

5      Q.   Okay.

6      A.   But the key point is that these risk factors do

7   not cancel each other out and as long as one of them is

8   present, it may be playing some role, difficult or

9   impossible as it may be to quantitate its role.

10      Q.   And so if you have a situation where there's

11   two or three or more risk factors that you say have to

12   stay in the equation, but you can't quantitate each of

13   them specifically, then the only method or thing that

14   you can do is kind of use your common sense or what we

15   call gestalt to weigh each one and determine which one

16   or which ones should be considered causes?

17           MS. FREDONA:   Objection.   Form.

18      A.   Yes, but it's not just a touchy-feely analysis

19   of that or a results driven one.   It looks again at the

20   relative risks, it looks again at the exposure

21   information, and it looks again about what the

22   literature says about the results of each of those

23   exposures.   Sometimes there's an exposure to a

24   carcinogen but it doesn't cause the -- it doesn't cause

25   the cancer in question.   That has to be taken into

Ron B. Schiff, M.D., Ph.D.

1   account as well.

2       Q.   Understood.  All right.  So am I correct then

3   that there is also no method by which you can tell

4   either by a person's symptoms, clinical course,

5   treatment, pathology, or radiology findings to determine

6   whether they were ever exposed to glyphosate?

7           MS. FREDONA:  Objection.  Form.

8       A.   No such distinguishing factor has been

9   identified to date that I'm aware of.

10      Q.   And I assume -- it sounds like you did review

11  the medical records; right --

12      A.   Yes.

13      Q.   -- of Mr. Cervantes?

14      A.   Whatever was made available to me.

15      Q.   Okay.  And I looked through what I had, and am

16  I correct that not one of those medical records

17  references glyphosate or Roundup?

18      A.   Well, you know, first of all, there's a problem

19  with that, because I can't guarantee you that I have any

20  occupational history taken by any of Mr. Cervantes'

21  health care providers at all, nor do I know what was the

22  content of the occupational history or environmental

23  exposure history.

24      Q.   Right.

25      A.   I think the absence of medical records are

1    extremely relevant here.

2        Q.   Okay.  So the question was:  In the medical

3    records that you reviewed, did you see anywhere a

4    reference to glyphosate or Roundup exposure?

5        A.   No, but so much documentation was missing that

6    I can't say that it's not in there and that some health

7    care provider did not explicitly address that.

8        Q.   But you don't know that one way or another?

9        A.   I can't know that, because so many medical

10   records were missing.  Have you known me in prior

11   reports to have a total one and a half pages of factual

12   review, especially on somebody whose medical history

13   goes back 16 years?

14       Q.   Yeah, that's a tough one.

15            So let me ask you this then:  Of the medical

16   records that you did review -- and I've added some for

17   us to take a specific look at, but let me ask you by

18   memory.  In the medical records you did have, did you

19   see the reference to his 30 years of exposure to

20   benzene, PCBs, and other chemicals?

21       A.   Okay.  My recollection of that, which may be

22   imperfect because there was only a small window of time

23   when I was actually looking at these documents, is that

24   that came from his deposition testimony and not from his

25   medical chart.  If I'm wrong about that, please point me

Ron B. Schiff, M.D., Ph.D.

1   toward it, but that I don't remember.

2       Q.   Okay.

3       A.   And certainly that did not make it into my

4   factual synopsis.

5       Q.   All right.  Let's do this then.  We're going to

6   mark as Exhibit No. 9 --

7            MS. FUJIMOTO:  Am I at 9, Court Reporter?

8       Joan.  Sorry.

9            THE COURT REPORTER:  Yes.

10           MS. FUJIMOTO:  Okay.

11  BY MS. FUJIMOTO:

12      Q.   We're going to mark as Exhibit No. 9 to the

13  deposition -- you'll see it would have been what you got

14  this morning, Dr. Schiff.  It's a small group of

15  Cervantes medical records.

16           (Schiff Exhibit 9 was marked for

17  identification.)

18      A.   I have it.  I want to clarify that I have not

19  previously seen these.  I received these today at about

20  9:15 and I did not look through them --

21      Q.   I understand.

22      A.   -- in advance of the depo.

23      Q.   Understood.  And let me state this for the

24  record and Rebecca.  Exhibit 9 is a -- is not the full

25  set of Mr. Cervantes' medical records.  I have basically

1    pulled, I guess, key records or records that I may ask

2    questions about so that we can look at references.

3         But certainly, if you feel the need to look

4    back through all of his records at some point, you're

5    free to do that, because this -- I'm not representing

6    this as a full set.  It's just certain ones.  Okay?

7    A.   Yes.

8    Q.   And that's another reason why, if you look at

9    the Bates numbers at the bottom of the pages, they're

10   not going to be sequential.  So we'll just have to bear

11   with one another in finding the references I'm going to

12   ask you about.

13   A.   Are they organized by date?

14   Q.   Yeah, they're basically sequential by date,

15   yes.

16   A.   So I'm happy if you refer to anything you want

17   me to look at according to the date rather than the

18   Bates number.

19   Q.   Okay.  That's perfect.  Okay.  So if you go to

20   the first page of that, the Bates number at the bottom

21   is 891, and that is a September 8, 2004, progress note

22   regarding Mr. Cervantes.

23        And if you look at the subjective paragraph

24   down towards the bottom, it says, "He works for NiGas in

25   the field and has significant exposures."

1          Do you see that?

2     A.    I do.

3     Q.    Okay.  And so were you aware that Mr. Cervantes

4  was employed at a company called Northern Illinois Gas

5  Company, or Nicor, for 30 years, between 1980 and 2009?

6     A.    I knew that he was employed by that company.

7  That was also the natural gas provider where I grew up.

8  And there are references to Nicor in the differential

9  etiology section of my report.  So the answer is yes.  I

10 don't know that I necessarily knew about the 30 years.

11    Q.    Okay.

12    A.    Yeah, I do have that.

13    Q.    All right.

14    A.    24 to 30 years, that's what I took out of his

15 deposition.

16    Q.    All right.  And did you recall that part of his

17 work with the gas company involved sealing things

18 underground with primers, tar, and other chemicals?

19    A.    I did not list his work, with the exception of

20 his welding.  I listed what his chemical exposures were,

21 specifically benzene, PCBs, asbestos, gasoline and

22 diesel fumes, natural gas and associated fumes.  Those

23 are the ones related to Nicor.  And then, of course, the

24 welding with the oxyacetylene torch.

25    Q.    Okay.  So you then -- it sounds like you were

Ron B. Schiff, M.D., Ph.D.

1   familiar with the history of exposure to benzenes, PCBs,

2   and the other things that you listed; right?

3        A.   That's correct, but I believe that my

4   familiarity with that is from his deposition.  I do not

5   recall specifically seeing that in the medical records,

6   because I didn't cite that in the factual synopsis

7   section.

8        Q.   Gotcha.  Okay.  So if you -- here's one.  If

9   you go to the October 7, 2004, progress note.  And I'm

10  kind of going in order, so it's a few pages in.  The

11  Bates number is 873.

12       A.   Okay.  That appears to be the middle page of

13  the October 7, 2004, note.

14       Q.   Yes, you got it.

15       A.   I'm there.

16       Q.   And the bottom sentence says, "Today he also

17  told me that he was part of the team that went in to

18  clean up mercury contamination for Nicor."

19            Do you see that?

20       A.   I do.

21       Q.   Do you recall -- did you ever see that

22  reference to exposure to mercury?

23       A.   I did not.  If I did, I can assure you it would

24  have made it into my report.

25       Q.   Important; right?

Ron B. Schiff, M.D., Ph.D.

1    A.   Except that mercury is not a known cause of

2    lymphoma.

3    Q.   But it's an important exposure for a lot of

4    reasons; right?  You would have put it in --

5    A.   Absolutely.  Oh, yeah, if it -- I mean, I put

6    things that had nothing to do with lymphoma in my

7    report.  Everything that I saw went into my report.

8    Mercury is not in there, because I did not see a

9    reference to it.

10   Q.   Okay.  So if you go further down into the

11   medical records to Bates number -- it's basically lots

12   of zeros and a 3 -- and the date of the visit was --

13   A.   It was May 10, 2005.  I have it.

14   Q.   You got it.  Okay.  So if you go down to the

15   past medical history, it's down kind of the next page,

16   and it says, "Strong history of exposure to benzenes,

17   hydrocarbons, tar, mercaptan, as well as other organic

18   and inorganic chemicals; mainly respiratory exposure and

19   also cutaneous exposure."

20        Do you see that?

21   A.   I do see it.

22   Q.   And was that something that you had seen when

23   you did your review?

24   A.   I mean, we mentioned some of these.  Benzene,

25   which is spelled wrong in the report.  A little bit

Ron D. Schiff, M.D., Ph.D.

1    embarrassing, because I trained at Northwestern Memorial

2    Hospital.  Hydrocarbons, technically -- you know,

3    hydrocarbons is a very broad term.  It means any organic

4    chemical.  I don't recall knowing about tar or

5    mercaptan.

6            But if I don't see glyphosate, Roundup, in

7    there, when Mr. Cervantes was obviously trying to be

8    meticulous in what he recalled and told his health care

9    providers, it may be because he hadn't thought about it

10   or made the association at the time.  2005 was well

11   before this became more widely known even in the medical

12   community, much less in the general community.  So he

13   might not have, you know, been thinking that Roundup

14   belonged on that list, or he might have forgotten about

15   his Roundup use and so on.  I can't otherwise speak to

16   his motivation or intention, but I can certainly try to

17   offer insight into the context.

18       Q.   Okay.  Well, I was not asking you anything

19   about why you think he didn't mention glyphosate

20   exposure.  I'm simply trying to walk through the medical

21   records to show what exposures are documented in the

22   medical records and whether or not you had seen and

23   understood that exposure at the time you formed your

24   opinion.  That's all I'm looking for here.  Okay?

25           So the question is:  When you looked through

Ron L. Schiff, M.D., Ph.D.

1   the medical records, you saw these entries that

2   reference exposure to benzenes, PCBs, asbestos, welding

3   fumes, and the other things that you listed in your

4   report; right?

5       A.   That's correct.

6       Q.   If you'd go to kind of the middle of the

7   Exhibit 9, it is the October 2, 2008, progress note.

8   The Bates number is 783.

9       A.   October 2, 2008?

10      Q.   Yes.

11      A.   I have it.

12      Q.   783 is the Bates number.  And under -- kind of

13  towards the bottom of the page, it says, "Works at

14  Nicor.  Also suing employer for river" -- street," I

15  guess -- "st contamination event.  Only employee

16  remaining in lawsuit.  Extensive asbestos exposure.

17  Also benzene exposures, PCB exposure times 30 years.

18  Co-worker also has a history of non-Hodgkins lymphoma."

19          Do you see that?

20      A.   I do see that.  I do not know what "river st"

21  means.  I do not recall encountering that in reading his

22  deposition, which I'm sure you understand, based on the

23  time course of my prior work on this case, I did not

24  have much time for it.  I do remember vaguely about

25  suing his employer and getting in trouble at work

Ron D. Schiff, M.D., Ph.D.

 1   because of that.  That I remember.  I do not know about

 2   what "river st contamination" means.  If you have more

 3   information about that, I'd be happy to comment on it.

 4      Q.   Sure.  I just wanted to know did you know that

 5   Mr. Cervantes and others at Nicor, including one

 6   particular -- co-worker in particular sued the employer

 7   alleging that their non-Hodgkin lymphoma was as a result

 8   of an exposure or contamination at one of the sites at

 9   which they worked.

10         MS. FREDONA:  Objection.  Form.

11      A.   Although I pride myself on my memory, in this

12   particular case I remember about the lawsuit but not the

13   context of it.  I do not remember if it was tied in with

14   non-Hodgkin lymphoma or some other medical condition or

15   just based on the exposure.

16         If you wanted to refer me to the relevant

17   citation in the deposition, I'd be happy to comment

18   about that, but I don't have a specific memory of that.

19      Q.   Okay.  Do you know -- did you know or take into

20   account that one of Mr. Cervantes' co-workers also was

21   diagnosed with non-Hodgkin lymphoma?

22      A.   I believe I remembered that, yes, but for any

23   more detailed questioning I would like to be directed to

24   the exact part of his deposition.

25      Q.   And you had mentioned earlier that you

Ron D. Schiff, M.D., Ph.D.

```
 1   understood as well that Mr. Cervantes worked as a welder

 2   for many years; is that right?

 3       A.   That's correct, yes.  Well, for three or four

 4   years.

 5       Q.   And you understand, I assume, that IARC has

 6   classified welding fumes as a Class 1 carcinogen?  Were

 7   you aware of that?

 8       A.   I'm going to respond to that by citing the

 9   parallel with what IARC said about benzenes in exactly

10   the same way.  In the 310-page IARC monograph that I

11   received from you yesterday, the section on non-Hodgkin

12   lymphoma clinical studies or epidemiology studies on

13   page 259 talks about the results of the existing cohort

14   and case-control studies and concludes the evidence is

15   not consistent across study design -- that's in the

16   case-control -- and was not observed in some of the

17   longer studies.  So they go into explanations for that.

18            They also critique the limited data available

19   from cohort studies, but if you advance from pages 259

20   and -60 to page 265, under evaluation, sufficient

21   evidence for carcinogenicity, welding fumes caused

22   cancer of the lung, positive associations have been

23   observed with cancer of the kidney; and then they go

24   into sufficient evidence in humans for the

25   carcinogenicity of ultraviolet radiation from welding,
```

1    which causes ocular melanoma.

2         There is no mention of non-Hodgkin lymphoma in

3    their conclusions, which is the same thing as regards

4    benzene and non-Hodgkin lymphoma where they discuss the

5    epidemiologic evidence, they cite a positive

6    association, but none of that makes it into their final

7    evaluation.

8         That's the distinction that I was attempting to

9    make with benzene, and it's appropriate, because that's

10   really the same distinction that you have with regard to

11   the occupation of welding.

12         MS. FUJIMOTO:  Move to strike.  Nonresponsive.

13   BY MS. FUJIMOTO:

14   Q.    Doctor, the question is:  Were you aware that

15   IARC classifies welding and molybdenum trioxide and -- I

16   can't even read it here -- the other fumes related to

17   welding as a Group 1 carcinogen?  Are you aware of it?

18   A.    I did not read anything having to do with

19   molybdenum trioxide or indium tin oxide.  I did not read

20   that.  I only looked at welding, because that's what I

21   thought was relevant.

22   Q.    And is it correct that the IARC Monograph 118

23   looked at welding and welding by-products and

24   categorized welding as a Group 1 carcinogen?

25   A.    Yes, but not for non-Hodgkin lymphoma.  No

1  sufficient evidence.  No limited evidence.

2       I'm now going to look at the other two

3  chemicals in realtime while we're talking and I will see

4  about the parallel things here.

5    Q.  You can look at that anytime.  You answered my

6  question.  My next question is:

7    A.  The molybdenum trioxide, inadequate

8  evidence --

9    Q.  Doctor, that's not my question.

10   A.  You asked me about --

11   Q.  You don't have a question pending.  No, I asked

12  you whether the IARC monograph classified welding as a

13  Group 1 carcinogen.  You said yes.  That's the answer.

14      My next question is:  Did you investigate the

15  types of welding or welding products used by

16  Mr. Cervantes?

17   A.  I do not hold myself out as an expert in

18  welding, but if he was exposed to molybdenum --

19   Q.  Doctor, no, wait.  The question is:  Did you

20  investigate the types of welding or welding products

21  that Mr. Cervantes used?  That's the question.  Did you

22  investigate that?

23   A.  I am not an expert in welding.

24   Q.  I didn't ask you that.  I didn't ask you if

25  you're an expert in welding.

1       My question is:  Did you investigate or look

2   into what welding or welding products were used by

3   Mr. Cervantes?

4       MS. FREDONA:  Objection.  Asked and answered.

5   BY MS. FUJIMOTO:

6       Q.    Pretty simple question.

7       A.    You have told me about two of them, which I

8   have investigated now, as well as reading or looking

9   over --

10      Q.    I didn't tell you that those were things that

11  he was exposed to, Dr. Schiff.  I don't understand the

12  problem.

13      Here's the question:  Did you look into or

14  investigate what welding Mr. Cervantes did or what

15  welding products he used?  Do you know?

16      A.    Of course he used an oxyacetylene torch.  In

17  terms of other products, no, I did not look into that,

18  of course, because I am not an expert in welding.

19      Q.    All right.  Did you look into and investigate

20  the duration or dose of his exposure to the welding or

21  welding by-products?

22      A.    Yes.

23      Q.    And what was the duration and dose of his use

24  of those products?

25      A.    Three times weekly for five to 25 minutes per

Ron B. Schiff, M.D., Ph.D.

1    occasion for three or four years.

2         Q.   And is that it?

3         A.   That's it.  That's all that was available in

4    his deposition.

5         Q.   All right.  And from that information, were you

6    able to do any calculations as to the extent of his

7    exposure to the welding fumes?

8         A.   That was my assessment of his exposure.

9         Q.   But you aren't able to quantify whether it was

10   minimal, moderate, or extensive?

11        A.   I have no expertise in that.  I do not claim

12   that.

13        Q.   Okay.  You also understand from his records

14   that he was exposed to diesel fumes while operating a

15   backhoe?

16        A.   That is correct.

17        Q.   Okay.  And exposed to tar when he worked on gas

18   lines; right?

19        A.   No, tar did not come up in his deposition, and

20   I did not record the circumstances under which he was

21   exposed to gasoline and diesel fumes while employed at

22   Nicor.  So I know he was exposed and I recorded that.  I

23   do not know the circumstances.

24        Q.   Okay.  And, Dr. Schiff, did you calculate the

25   degree or amount of exposure that Mr. Cervantes had to

1    PCBs and benzene?

2        A.    With benzene, he had exposure three times

3    weekly, his PCB exposure was described as occasional,

4    and those were the only exposure assessments that I

5    could find.

6            Now, in contrast to PCBs where IARC is

7    definitive, and benzene where IARC is not, we can also

8    say that with regard to benzene -- I'm sorry -- welding,

9    molybdenum trioxide, and indium tin oxide, none of those

10   are lymphoma carcinogens; and even if they were, they

11   would not negate or even mitigate his exposure to a

12   known lymphoma carcinogen in Roundup.

13       Q.    Dr. Schiff, did you calculate or quantify the

14   amount of exposure that Mr. Cervantes had to PCBs and

15   benzene?

16       A.    Yes.  Benzene was three times weekly during his

17   exposure during his employment at Nicor.

18   Polychlorinated biphenyls exposure was occasional.  And,

19   of course, PCBs are another Monsanto product.  That's

20   all the information I was given.  I don't have

21   biospecimens for the PCBs.  I don't have more details

22   about benzene exposure.  So it was not possible to

23   quantitate those, and yet IARC didn't seem to think that

24   benzene causes non-Hodgkin lymphoma.

25       Q.    So you were not able to quantify the exposures

1    that Mr. Cervantes had to PCBs or benzene?

2        A.    Beyond what I've already stated and restated,

3    no, but it also makes no difference.

4        Q.    How then do you rule them out as potential

5    causes of his non-Hodgkin lymphoma?

6        A.    Well, that's not a particularly difficult

7    question, because his non-Hodgkin lymphoma may well be

8    multifactorial, and, once again, the exposures that he

9    had, the risk factors do not cancel each other out, so

10   it doesn't matter.

11            He did have exposure to glyphosate, Roundup.

12   That part is known, that part we've documented as well

13   as we can, and we know that that is associated with an

14   increased relative risk of developing non-Hodgkin

15   lymphoma.

16       Q.    So, Doctor, you also, I take it, recognize that

17   he had a history of a first-degree relative, his mother,

18   with non-Hodgkin lymphoma?

19       A.    That is correct, and I --

20       Q.    And you also note --

21       A.    Oh, excuse me.  I believe that also came from

22   his deposition, not from the medical records that I have

23   available.

24       Q.    And you also note in your report that he had a

25   high BMI; right?

Ron E. Schiff, M.D., Ph.D.

1    A.   I dealt with that in detail.  Yes.

2    Q.   Well, you -- okay.  Let me go back to your

3   report here.  Do you consider his high BMI to be a risk

4   factor for him for non-Hodgkin lymphoma?

5    A.   There is some evidence of it, but the evidence

6   is not of a yes or no nature.  InterLymph looked at that

7   and determined that usual BMI is not the parameter of

8   interest; and, of course, that would include BMI at the

9   time of diagnosis.  InterLymph has defined young adult

10  BMI between ages 18 and 30 as being more predictive.  We

11  don't have corresponding anthropometric data on

12  Mr. Cervantes.

13   Q.   So you don't know whether he had a high BMI

14  during the periods of time in his life where it's most

15  relevant for your assessment; is that right?

16   A.   To the InterLymph assessment, yes, that's

17  correct.

18   Q.   Well, is that the assessment you're using?

19   A.   It is.  I wanted to point out that my

20  assessment is based on published research from a large

21  and accredited study based at the National Cancer

22  Institute.  It's not something that is a free-floating

23  opinion that I came up with.

24   Q.   Doctor, would you go back to the stack of

25  Cervantes and pull the article by Zheng, Z-h-e-n-g,

1    called "Occupation and Risk of Non-Hodgkin's Lymphoma

2    and Chronic Lymphocytic Leukemia"?

3            (Schiff Exhibit 10 was marked for

4    identification.)

5        A.    May I put away IARC Monograph 118 on Roundup?

6        Q.    Yes.

7        A.    Thank you.

8        Q.    Do you have that?

9        A.    No, not yet.  I'm still searching for it.

10   Could you please repeat the first author?

11       Q.    Zheng.  Tongzhang Zheng, Z-e -- Z-h-e-n-g.

12       A.    I have it now.

13       Q.    Thank you.  And I'll just ask you, have you

14   seen this paper before?

15       A.    Not until it was delivered to me yesterday

16   afternoon.

17       Q.    Okay.  So you did not factor it in in your

18   assessment of Mr. Cervantes' welding exposure?

19       A.    That is correct.

20       Q.    Okay.  If you'd look at the abstract there, and

21   two-thirds down you'll see that they found that there

22   was an increased risk -- oh, let me go back.  I'm sorry.

23            For the record, the title of the study is

24   "Occupation and Risk of Non-Hodgkin's Lymphoma and

25   Chronic Lymphocytic and Leukemia," and they say the

1    point of the paper is to investigate the association

2    between occupation and the risk of non-Hodgkin lymphoma

3    and chronic lymphocytic leukemia.  Do you see that?

4        A.   I do.

5        Q.   And they found that there was an increased risk

6    for welders and solderers with an odds ratio of 2.9 and

7    the confidence interval going from 1.2 to 6.9.  Do you

8    see that?

9        A.   Yes, and a few lines above that, it also

10   reports an elevated odds ratio, which is statistically

11   significant for agricultural and forestry occupations.

12       Q.   Correct.  Yes.  Sure.

13       A.   So it's all in there, but yes.

14       Q.   Sure.  There's lots of studies out there

15   looking at farmers and other agricultural occupations

16   and risk of disease; right?

17       A.   Yes, but you directed me here specifically to

18   the business about welding and soldering --

19       Q.   Right.

20       A.   -- and I wanted to point out that there is

21   agricultural data also.

22       Q.   Understood, Dr. Schiff, but I'm talking about

23   Mr. Cervantes' exposure to welding fumes in his

24   occupation, his welding occupation.

25            So if you then go to page 471 of that article

1   down in the right-hand column, bottom paragraph, the

2   authors note, "A significantly increased risk of NHL was

3   also observed among metalworking machinery and equipment

4   workers, fabricators, assemblers, welders, and

5   solderers."

6          Did I read that correctly?

7      A.   I need to call your attention to the fact that

8   there are a whole lot more subjects in this study with

9   agricultural occupations than that are with anything

10  having to do with metalworking, whether it was machine

11  work or welding or soldering.  That may --

12         MS. FUJIMOTO:  Move to strike.  Nonresponsive.

13  BY MS. FUJIMOTO:

14     Q.   Dr. Schiff, if your counsel wants to walk you

15  through these articles and point out all the things you

16  want to, she is free to do that.

17         My question to you is:  Am I correct or did I

18  read this correctly?  Quote, "A significantly increased

19  risk of NHL was also observed among metalworking

20  machinery and equipment workers, fabricators,

21  assemblers, welders, and solderers."

22         Did I read that correctly?

23     A.   Yes, and I gave you the context for it.

24     Q.   If you would then go to page 472 and Table 2.

25  And if you look at Table 2, at the very bottom there's

Ron E. Schiff, M.D., Ph.D.

1    welders and solderers, and if you look -- they looked at

2    the different subtypes among men in this study.  And

3    Mr. Cervantes had diffuse large B-cell lymphoma; right?

4         A.    That's correct.

5         Q.    And if you look under the diffuse NHL under

6    welders and solderers, the odds ratio is 3.4; correct?

7         A.    Yes.

8         Q.    A tripling of the risk; is that right?

9         A.    Correct.

10        Q.    All right.  If you'd go back to the stack for

11   Mr. Cervantes and pull out the paper by Bassig,

12   B-a-s-s-i-g, and I'm going to mark this exhibit as

13   Exhibit 12.  It's called "Occupational Exposure to

14   Benzene in Non-Hodgkin Lymphoma in a Population-Based

15   Cohort:  The Shanghai Women's Health Study."

16            (Schiff Exhibit 12 was marked for

17   identification.)

18   BY MS. FUJIMOTO:

19        Q.    Are you familiar with that, Doctor?

20        A.    We have two comments.  Number 1, in the Zhang

21   paper that you just referred to, that comparison was

22   based on a grand total of five cases with diffuse

23   lymphoma.

24            With regard to Bassig, this is a paper that,

25   like the other one, I just received yesterday afternoon.

Ron L. Schiff, M.D., Ph.D.

1      Q.   So you weren't aware of this paper and did not

2   factor it into your opinions regarding Mr. Cervantes;

3   correct?

4      A.   That is correct.

5      Q.   If you go to the introduction, it says,

6   "Benzene is a common occupational solvent that has been

7   used in multiple industries, particularly as a chemical

8   intermediate in the production of plastics and in rubber

9   manufacturing, and has been used as a solvent in common

10  consumer products worldwide."

11          Do you see that?

12     A.   Yes.

13     Q.   Do you agree with that observation?

14     A.   There's nothing controversial about that.

15     Q.   All right.  And it says, "Moreover, exposure to

16  benzene is ubiquitous in the general population because

17  it is present in gasoline, automobile emissions, and

18  cigarette smoke."

19          Did I read that correctly?

20     A.   That is correct.

21     Q.   And I assume you don't have controversy with

22  that either; right?

23     A.   Correct.

24     Q.   And then if you'd go to the middle paragraph

25  and the first full paragraph in that middle column, I

1    mean, and they say, "Exposure to benzene, which is

2    classified by the International Agency for Research on

3    Cancer as a Group 1 carcinogen, has been concluded to

4    cause acute myeloid leukemia (AML) based in part on

5    results from several case-control and occupational

6    cohort studies in a variety of human populations."

7            Did I read that correctly?

8        A.   Yes, you did.

9        Q.   And then they go on into the next column where

10   it says, "Benzene is also a suspect lymphomagen based on

11   positive associations with non-Hodgkin lymphoma overall

12   or with specific NHL subtypes observed in some

13   occupational cohort and case-control studies, although

14   the strength of the evidence is not as strong as the

15   association with AML."

16           Did I read that correctly?

17       A.   I already referred to that specifically citing

18   the same reference, but yes.

19       Q.   Let's see.  Are you aware of the literature

20   that reports that a family history of NHL or any

21   hematopoietic cancer increases a person's risk of

22   getting NHL by two- or threefold?

23       A.   I don't remember the relative risk effect, but

24   I am aware that a positive family history of non-Hodgkin

25   lymphoma or certain B-cell lymphoproliferative

1  malignancies in general increase the risk of an

2  individual developing non-Hodgkin lymphoma.

3      Q.   Do you have any reason to question or dispute

4  that data suggests a two- to threefold increase in risk

5  if you have a first-degree relative?

6      A.   I know you sent me a reference on that, and I

7  would like to look at that to see what their relative

8  risk is.  Can you direct me to that reference?

9      Q.   Sure.  Yeah.  That's Chiu.  I was trying to --

10  we're running tight on time.  So it's the Chiu case or

11  paper, C-h-i-u, and we can mark that as Exhibit 13, and

12  it's called "Agricultural Pesticide Use, Familial

13  Cancer, and Risk of Non-Hodgkin Lymphoma."

14          (Schiff Exhibit 13 was marked for

15  identification.)

16  BY MS. FUJIMOTO:

17      Q.   Have you seen that before?

18      A.   I have not.  I recognize that Dr. Weisenburger

19  is a co-author.  So is Dr. Zhang, formerly, and I think

20  again, from National Cancer Institute.

21      Q.   Yes.

22      A.   But yes.  I'm not familiar with this.

23      Q.   And on the introduction, this is where I ask

24  you the question.  It simply says, "A family history of

25  NHL or hematopoietic cancer, including leukemia,

Ron B. Schiff, M.D., Ph.D.

```
1   multiple myeloma, or" -- "and lymphoma in close

2   relatives have been" -- "has been consistently

3   associated with a two-to threefold higher risk of NHL."

4           Do you see that?

5       A.   Yes.  I'm also looking at the relevant

6   articles.  I would --

7       Q.   Yes.  You're ahead of me.  It's 3 and 6.  3 and

8   6.  Right.  So have you seen the Linet paper, which is

9   Reference 3?

10      A.   I have seen more recent Linet papers from 2008

11  and 2014 dealing with this, and I would defer to them

12  for an assessment of the relative risk.

13      Q.   Gotcha.  Have you seen the Reference No. 4,

14  Zhu, Z-h-u, that paper?

15      A.   From 1998.  No, I have not.

16      Q.   And did you see the Paltiel, P-a-l-t-i-e-l,

17  paper cited as Reference 5?

18      A.   That's from 2000, which is 21 years ago, and I

19  have not seen that.

20      Q.   And what about No -- let's see.  They reference

21  3 through 6.  So Reference 6 is Pottern, "Familial

22  Cancers Associated with Subtypes of leukemia and

23  non-Hodgkin's lymphoma."  Did you see that?

24      A.   That's a 30-year-old paper; and no, I have not

25  seen it.
```

1    Q.   So I guess your point, though, is that it has

2  been recognized for decades that a familial cancer in a

3  close -- or strike that.

4         It's been recognized for decades that when a

5  person has a close relative with a history of NHL or any

6  hematopoietic cancer that they are at a two- to

7  threefold higher risk of getting NHL themselves;

8  correct?

9         MS. FREDONA:  Objection.  Form.

10   A.   That's what it says in this paper, but I would

11 like to refer to Linet's paper from the InterLymph study

12 to get a more recent assessment of that, because that

13 was one of the things that they looked at.  I also want

14 to point out --

15   Q.   Do you think it's lower?

16   A.   I'm sorry?

17   Q.   Do you think the relative risk is lower?

18   A.   No, I didn't say that.  I said I wanted to look

19 to see what it was.  I did not make any assumptions

20 about whether it was lower or higher.

21   Q.   Okay.  Let me do this --

22   A.   I will say the inclusion of this paper

23 indicates that there is little evidence that a family

24 history of cancer modifies the association of

25 agricultural exposures with NHL.  That's the point of

Ron D. Schiff, M.D., Ph.D.

1    this paper, isn't it?

2         Q.   It is.  And that's fine.  And let me tell you

3    this, Doctor, again.  I'm limited in my time, so I need

4    to get through this.  If you -- if your counsel wants to

5    go back and have you talk about any of these other

6    papers, she's free to do that, but I need for you in my

7    time to answer my questions.  Okay?

8         A.   I'm happy to go long to answer all of your

9    questions.

10        Q.   Okay.  That would be perfect.  Great.

11             So when we go back then to Mr. Cervantes'

12   exposure -- right? -- we know and you accept and

13   recognize in your report that, setting aside glyphosate

14   exposure, he was exposed through his work to welding

15   fumes, to benzene, to PCBs, to asbestos, to mercury, to

16   diesel fumes, and to tar; correct?

17        A.   That is correct.  No, I --

18        Q.   You also know that he has a first-degree

19   relative, his mother, that had non-Hodgkin lymphoma;

20   correct?

21        A.   That is correct.

22        Q.   And we also know -- we don't know how he was as

23   a young adult, but certainly in the medical records that

24   you got you recognize that he had a high BMI that is

25   also a risk factor for NHL; is that correct?

1      A.   Not according to InterLymph, no.  Young adult

2   is the relevant parameter.

3      Q.   And you don't know what his BMI was when he was

4   a young adult?

5      A.   That is correct.  It's not recorded anywhere to

6   which I've had access.

7      Q.   And so have you seen -- if you go to the stack

8   there, I also included an article by Larsson, "Body Mass

9   Index and Risk of Non-Hodgkin's and Hodgkin's lymphoma:

10  A Meta-Analysis of Perspective Studies."  I'm going to

11  mark that as Exhibit 14.

12          (Schiff Exhibit 14 was marked for

13  identification.)

14     A.   Okay.  So far I cannot find that.

15          Now I have it.

16     Q.   Great.  Thank you.  If you'd look at the

17  abstract, it says, "We conducted a meta-analysis of

18  perspective studies to summarize the epidemiologic

19  evidence regarding the association of body mass index

20  with non-Hodgkin's lymphoma and Hodgkin's lymphoma

21  incidence and NHL mortality."

22          Do you see that?

23     A.   I do.

24     Q.   And at the very bottom, for the summary RRs,

25  for overweight there was one relative risk, and the

Ron D. Schiff, M.D., Ph.D.

1    relative risk for obesity was 1.41.  Do you see that?

2        A.   Yeah, except that's for Hodgkin lymphoma.

3        Q.   Okay.  So I went too far down.  The summary RR

4    for the increase in BMI for the NHL incidence is up

5    above; correct?

6        A.   Yes.

7        Q.   And it has a 1.14 with the confidence interval

8    being 1.04 to 1.26; correct?

9             And my question is:  Do you consider that then

10   to constitute a risk factor for NHL?

11       A.   Well, yes, I do, but please recognize that I

12   cited six articles dealing with this subject in my

13   report and reached the conclusion that excess BMI as a

14   young adult was indeed a risk factor for diffuse large

15   B-cell lymphoma.  All of the references that I cited are

16   newer than the one that you gave.  So it's not like I'm

17   trying to deny this or to minimize it.  I put six

18   references in my report about this.

19       Q.   Sure.

20       A.   All included in yours.

21       Q.   Okay.  That's fair enough.  So I just wanted to

22   make sure we were clear on whether you considered and

23   put in risk factors -- or obesity or BMI as one of his

24   risk factors.  That's all.

25       A.   I discussed it in my report, yes.

Ron E. Schiff, M.D., Ph.D.

1    Q.   All right.  So then let's get to the glyphosate

2    exposure then, Mr. Cervantes' glyphosate exposure.  I

3    take it your assessment of his exposure is based on his

4    fact sheet and his deposition testimony; is that right?

5    A.   That is correct.

6    Q.   And your opinion in your report is that his

7    exposure was, quote, "extensive," close quote; right?

8    A.   That is also correct.

9    Q.   And what method -- did you have a methodology

10   to assess the total duration by days and months of his

11   exposure?

12   A.   Yes.  I had the cut points that appeared in the

13   published literature, and whenever there is a published

14   literature indicating a higher risk category, he greatly

15   exceeded the amount of exposure for those.  That's based

16   not only on Zhang, but also you can look that up in

17   Pahwa and in the original articles of McDuffie and

18   Ericsson.

19   Q.   And you and I have already talked at length

20   about Pahwa and the biologic inconsistencies of Tables

21   3, 4, and 5.  Do you remember that discussion?

22   A.   No, not explicitly, but I will pull that

23   article and I'll be --

24   Q.   Don't have time.  We'll get there if I have

25   some time at the end.  I promise.

Ron D. Schiff, M.D., Ph.D.

```
 1      A.   Okay.  Well, I don't remember --

 2      Q.   We talked about it at length in Harris.

 3      A.   Okay.

 4      Q.   So anything that you recall that you testified

 5   to in Harris or Hernandez that you want to take back in

 6   terms of Pahwa?

 7      A.   You would have to direct me to something that

 8   you want to question in my deposition transcripts.  I

 9   don't recall anything I want to take back.

10      Q.   All right.  So what was your assessment in

11   terms of the days, months, and duration of his exposure?

12   How many days?  How many hours?  How many -- what number

13   did you give him?

14      A.   All right.  So there is some ambiguity in what

15   was found in his deposition.  In terms of his lawn

16   service business, which he operated from 1998 to 2004,

17   he sprayed each property weekly during eight months of

18   the year between April and November, which represent the

19   growing season in northern Illinois.  What I don't know

20   is whether he sprayed each property on the same day or

21   whether he sprayed some properties on Monday, some

22   Tuesday, some Wednesday, some Thursday, some Friday.

23   The total number of properties and the frequency of

24   spraying, you know, would not be affected by how many

25   days per week that he did it, but he did that practice
```

1   weekly on each property for 35 weeks per year, which

2   reflects the eight months that he used Roundup in his

3   lawn care business.  Each application required one and

4   one-half to two hours for multiple properties that he

5   sprayed during each workday.

6        It was similar at home, except that he did that

7   between 1982 and 2004, a much longer period; and in

8   2004, in conjunction with his lymphoma diagnosis, he

9   discontinued using the product.

10   Q.   Did you calculate what quantity by volume of

11   glyphosate he used?

12   A.   Of course not.  That information was not

13   provided and that would be deferred to an industrial

14   hygienist or toxicologist.

15   Q.   Can you tell me, in terms of your method,

16   Doctor, what is your definition or threshold numbers for

17   minimal exposure or moderate exposure versus extensive

18   exposure, which is what you claim he had?

19   A.   First of all, I haven't been given any

20   individual plaintiff case to review by the attorneys

21   I've worked with in the Roundup litigation that did not

22   have extensive exposure.  We're not talking about

23   borderline or minimal cases or anything like that.

24   That's come up in prior depositions, and I've always

25   answered it the same way.

Ron D. Schiff, M.D. / Ph.D.

1          In that regard, for a quantitative standard,

2     again, I look at the cut points that were used in the

3     literature to determine above which there was a

4     statistically significant increased risk and below which

5     there may not have been.

6          Mr. Cervantes' exposure was substantially above

7     each of those cut points.

8     Q.   And I'm asking you what that cut point is.

9     What is the difference between moderate exposure and

10    extensive exposure?  Where is that number?

11    A.   I am not making a distinction specifically

12    between that.  I am just telling you what the cut points

13    are.  Our choices are number of years of glyphosate use,

14    number of days per year of glyphosate use, and lifetime

15    days of glyphosate use.  All of those have, as I said,

16    cut points that are established in the literature, and

17    he was well in excess of those cut points for exposure

18    in every case.

19    Q.   Well, that's Pahwa; right?

20    A.   Yes.

21    Q.   And we already know that, from Pahwa, if you

22    look at those numbers, you know, a person that used it

23    more than two days a year but only once, you know, one

24    year for 15 minutes each time would, under Pahwa, have a

25    greater increased risk of NHL than someone that used

Ron L. Schiff, M.D., Ph.D.

```
 1   glyphosate lifetime 25 years for five hours 10 times a

 2   year; right?

 3       A.   Neither the data --

 4            MS. FREDONA:  Objection.  Form.

 5       A.   Sorry.

 6            Neither the data nor Judge Chhabria would allow

 7   a proportional statement like that to be made.  We only

 8   have one --

 9            MS. FUJIMOTO:  Move to strike.  Nonresponsive.

10   BY MS. FUJIMOTO:

11       Q.   Dr. Schiff, from Pahwa, if you compare Tables

12   3, 4 and 5, isn't it correct that two or more days of

13   use even in one year increases the risk more, according

14   to Pahwa, than someone that used it for 25 years; right?

15            MS. FREDONA:  Objection.  Form.

16       A.   That's the data we have, and Mr. Cervantes used

17   it for a lot more than two days in one year.

18       Q.   So my question is:  Is that your cutoff?  What

19   is your cutoff between moderate use or moderate exposure

20   and extensive exposure?

21       A.   The answer to that and the best answer that I

22   can give is that if you have someone who applied it with

23   that frequency and duration for six years of

24   occupational use and 22 years of use at his residences,

25   in both settings weekly during the eight months of the
```

 1   year when the weather was not too cold, that's

 2   extensive.

 3        I cannot bracket when extensive goes down to

 4   moderate and moderate goes down to minimal.  I can't do

 5   that, but I haven't had to, because every one of these

 6   plaintiffs has had extensive exposure.

 7   Q.   That was the question.  That's all I needed to

 8   know.  So you've never seen a plaintiff, a Roundup

 9   plaintiff, where you have not quantified their exposure

10   as extensive; right?

11        MS. FREDONA:  Objection.  Form.

12   A.   I'm going to give you a parallel to that to

13   answer it.

14   Q.   Could you say yes or no first and then give me

15   the parallel?

16   A.   That is correct.

17   Q.   Okay.

18   A.   I am not being -- I am not being given cases to

19   review where Roundup exposure is limited to someone who

20   eats a bowl of Cheerios once or twice a week.  It's the

21   exact same principle that IARC has not investigated

22   water or oxygen for possible carcinogenicity.  It's

23   exactly the same thing.  That would be absurd.  The only

24   cases that I'm being presented with have had extensive

25   exposure in excess of the cut points and by any

Ron D. Schiff, M.D., Ph.D.

```
1    reasonable criterion.
2        Q.   But you don't have any criterion; right?
3             MS. FREDONA:  Objection.  Form.
4        A.   No --
5        Q.   For the difference between minimal, moderate --
6    I wouldn't know, if I looked at a glyphosate case and
7    the person used it for two times in one year, but that
8    was it, whether you would consider that minimal,
9    moderate, or extensive; right?
10             MS. FREDONA:  Objection.  Form.
11       A.   I have not been presented with a plaintiff for
12   whom that was even remotely applicable to their clinical
13   situation.
14       Q.   Okay.  Assume that for me.  Assume that I give
15   you medical records of a patient with NHL and that
16   person says, "I used Roundup three times in one year."
17             MS. FREDONA:  Objection.  Form.  Incomplete
18       hypothetical.
19   BY MS. FUJIMOTO:
20       Q.   And that's it.  Do you consider that minimal,
21   moderate, or extensive?
22             MS. FREDONA:  Same objection.
23       A.   I will not be talked into bracketing what is
24   the difference between minimal and moderate and moderate
25   and extensive.  I will say that I would advise an
```

Ron E. Schiff, M.D., Ph.D.

1    attorney that three lifetime applications of Roundup was

2    not very much and yet I would call their attention to

3    the --

4         Q.   Pahwa?

5         A.   -- lifetime -- to the days per year of

6    glyphosate use cited in Pahwa, and based on -- I can't

7    remember now whether it was McDuffie or Ericsson.  So,

8    you know, I would cite that, but I'm not being asked to

9    render an opinion about any case even remotely like

10   that.

11        Q.   So without being able to bracket then between

12   minimal, moderate, and extensive, is this a case where

13   you look at data but ultimately, when you review a

14   person's glyphosate exposure, you're using your common

15   sense/gestalt method to determine whether it's

16   extensive?

17             MS. FREDONA:  Objection form.

18        A.   Along with the cut points that determine

19   increased risk of developing non-Hodgkin lymphoma.  Both

20   have to come into play necessarily.

21        Q.   When you looked at Mr. Cervantes' deposition

22   and the medical records, did you form an opinion as to

23   whether he was careful when he used glyphosate?

24             MS. FREDONA:  Objection.  Form.

25        A.   Well, his medical records did not mention

1    Roundup use whatsoever.

2        Q.    Right.   So think about his deposition

3    testimony.

4        A.    In his deposition, what I reported was that he

5    typically wore long pants, socks, and work boots when

6    applying Roundup.   He also wore cotton gloves when the

7    weather was not too hot, but he wore no other protective

8    equipment and reported that he occasionally got Roundup

9    on his hands while spraying.   Whether he was careful or

10   not is a value judgment.   What I reported was objective

11   testimony about how he applied the Roundup.

12       Q.    So you don't have an opinion as to whether he

13   was careful or not?   You're going to not make that

14   judgment; is that right?

15       A.    Well, I know that, again, he wore long pants,

16   socks, and work boots.   He did not apply the Roundup

17   barefoot or while wearing shorts.   I know that he did

18   not wear other protective equipment and that he only

19   wore cotton gloves when it was not very hot outside.

20            But we match that up with what the warning

21   labels look like on the Roundup product, and I don't

22   think he disregarded anything that was made available to

23   the purchaser.

24       Q.    And do you agree with Dr. Sawyer that,

25   according to Mr. Cervantes' deposition testimony, that

1   he used appropriate spraying equipment and was

2   consistent and meticulous when he used it?

3       A.   I do not recall that.  I do not recall reading

4   about that subject in Mr. Cervantes' deposition, but I

5   would be happy to take a look at it if you directed me

6   to the page numbers; and as I indicated earlier, I have

7   not read Dr. Sawyer's report, so I can't say whether I

8   agree with him or not.

9       Q.   Okay.  Doctor, would you go back to your report

10  in Cervantes that we marked as Exhibit No. 6.  Do you

11  have that?

12      A.   I have it.

13      Q.   Okay.  And so Mr. Cervantes had DLBCL; right?

14  Diffuse large B-cell lymphoma?

15      A.   That is correct.

16      Q.   Is that the most common subtype of NHL?

17      A.   It is.

18      Q.   Okay.  And on page 7 of your report, you say

19  "...since it is known that his lymphoma relapsed..."

20           Do you see that?  Bottom of --

21      A.   What section is that?

22      Q.   Fourth paragraph, page 7, under disease status

23  and prognosis.

24      A.   I'm not finding what you just read.

25      Q.   The fourth paragraph on page 7, last sentence.

Ron E. Schiff, M.D., Ph.D.

```
1    "In any event, the published survival milestones are

2    only of theoretical interest in Mr. Cervantes' case,

3    since it is known that his lymphoma relapsed four years

4    after the initiation of first-line treatment with R-CHOP

5    and three one-half years after he underwent autologous

6    stem cell transplantation."

7         Do you see that?

8    A.   Yes.

9    Q.   Okay.  Why -- do you consider the -- you

10   considered it a relapse in 2009.  Does that mean -- is

11   that the same thing for you as recurrence, or is it

12   different?

13   A.   Okay.  The relapse that I endorse in my report

14   is 2008, not 2009.  Specifically, it was December 2008.

15   Q.   Well, but is that the same thing as a

16   recurrence when you say "relapse"?

17   A.   Yes.

18   Q.   Okay.  Did you read the deposition testimony of

19   his oncologist, Dr. Raheem?

20   A.   No, I did not.

21   Q.   Dr. Raheem testified that it was not a

22   recurrence of the DLBCL, that it behaved more like a

23   follicular lymphoma and it responded to rituximab alone.

24        Any reason to agree or disagree with that?

25   A.   Yes.  I do not have access to the documentation
```

1   on which he based his opinion.  I do believe that he did

2   benefit from single-agent rituximab in that setting, but

3   I would have to see the report of a biopsy from the

4   relapse in 2008 to know whether it was the same type as

5   his original lymphoma or a different type.

6       Q.   And there wasn't one, was there?

7       A.   I don't have record of it, but my records are

8   so spotty that I can't say with certainty that it wasn't

9   done.

10      Q.   All right.  Well, according to Dr. Raheem, it

11  was not biopsied and so his opinion was based on other

12  aspects of the behavior, both clinically and otherwise,

13  of the lymphoma.

14      A.   The only definitive determinant would be a

15  biopsy.  You can't go off behavior because of overlap

16  among the different subtypes.

17      Q.   So you don't know whether it was a recurrence

18  or not, because you don't have a biopsy; right?

19      A.   I have documentation that -- or I have

20  reference to the fact that in 2008 he had symptoms,

21  recurrent fatigue and night sweats and development of

22  bone and joint pain, the CT scan showed recurrence or

23  progression of the lymphoma in abdominal and pelvic

24  lymph nodes, and a PET scan later in December 2008

25  developed hypermetabolic generalized lymphadenopathy.  A

1   bone marrow in January 2009 was negative.

2        So whether you call it a recurrence or a

3   relapse, we don't know exactly what it was if there was

4   no biopsy, but it was considered likely enough to be

5   some sort of lymphoma recurrence or progression that he

6   required and received treatment for it.

7        But it's a matter of speculation to say, oh,

8   no, no, it's not his original diffuse large B-cell, it's

9   a follicular.  Without a biopsy, that's guesswork.

10  Q.   Dr. Raheem also testified that in his opinion,

11  as the treating physician for Mr. Cervantes, that he is

12  effectively cured since it's been over 10 years since he

13  has been disease-free.

14       Do you agree or disagree with that?

15  A.   Well, I address that in -- I address that

16  specifically in the same section of my report where I

17  indicate that there is -- that a clearly favorable

18  aspect of Mr. Cervantes' prognosis is that he has now

19  survived with a complete response for approximately 12

20  years since the initiation of Rituxan immunotherapy in

21  early 2009 for his relapse.

22       But then I go to say continued remission is not

23  assured and I talk about the difference between relapse

24  leading to a stem cell transplant and relapse after a

25  stem cell transplant, as well as the risk of other

Ron D. Schiff, M.D., Ph.D.

1    complications that I have no documentation of that can

2    occur if someone is transplanted for non-Hodgkin

3    lymphoma.  Please --

4        Q.   My question for you, Doctor, is:  Looking at --

5    you gave a lot of information in your report about

6    general data about kind of median survival, potential

7    risk of complications, potential risk of recurrence,

8    that kind of thing generally, but you didn't, at least

9    in my mind, apply that specifically to Mr. Cervantes,

10   and so that's what I'm trying to understand.

11           What is the value of his likely survival, not

12   based on these general numbers, but based on his own

13   unique situation, and that is that he's been

14   disease-free for 12 years?

15       A.   Okay.  Well, first of all, the last medical

16   records that I have on him are from February 2011, which

17   is 10 years ago.

18           Second, I did talk about the individual aspects

19   of this with regard to his survival to date and with

20   regard to the fact that he was transplanted for a

21   relapse and that the consideration would be different in

22   estimating survival if he relapsed after transplant.

23           I understand what you're saying.  I'm

24   optimistic that he will have no further problems from

25   his lymphoma, but I'm also explicitly stating that it is

1    not a guarantee that no such problems will occur.

2       Q.   Understood.  Nothing's a guarantee; right?

3       A.   Correct.

4       Q.   But the best you can do as an expert is assess

5    his prognosis.  And I take it, from what you said,

6    you're optimistic it's fairly good?

7       A.   Yes.

8       Q.   And so let me just, so that I can clarify for

9    you -- I know you had limited records.  If you'd go to

10   the stack of Cervantes' records we marked as Exhibit 9.

11      A.   I have them.

12      Q.   Okay.  Let's go towards the back here so that

13   we get, you know, closer in time, since you didn't have

14   the more recent ones.

15           There is a progress note in May, May 17, 2018.

16   It's way -- I mean, there's -- it's only a few pages

17   from the back.

18      A.   I have it.

19      Q.   Oh, you're -- great.  Bates is 197.

20           And in the history, it's -- he's basically

21   there for his annual physical and checkup with

22   Dr. Raheem, and he says, "For exercise, he walks 4 to

23   6 miles daily and does workouts five to six days

24   weekly."

25           Do you see that?

Ron D. Schiff, M.D., Ph.D.

1      A.   I do.

2      Q.   So he's exercising and feeling good; right?

3      A.   I'm also aware from his deposition that as much

4   as he loves to lift weights, he only lifts the Olympic

5   bar with no plates on it.  That's 45 pounds.

6      Q.   Okay.  But he certainly lifts weights and runs

7   pretty regularly; right?

8      A.   Well, it says walks, not runs, but yes, he is

9   active.  That has always been a motivation of his and he

10  got back to it as soon as his physical condition would

11  permit.

12     Q.   Right.  And did you see his deposition

13  testimony and that of his wife, both of whom say he's

14  doing great and has no limitations?

15     A.   I can't say that I remember that, but I would

16  have no reason to disagree with it.

17     Q.   All right.  So if we go all the way to the

18  second to the last page of Exhibit 9, it's from

19  January 15, 2020, that's the most recent one I have,

20  last year, and in the assessment/plan, you'll see it

21  says, "Here today for six-month follow-up and doing

22  well.  No clinical concerns for disease recurrence."

23          Do you see that?

24     A.   I do.

25     Q.   Okay.  So at least as of last year in our

1  record he's still disease-free and doing pretty well;

2  right?

3      A.   He still has a mild normocytic anemia, which is

4  documented as recently as that progress note, on top of

5  which there is still the fact that, regardless of how

6  his prognosis looks at present, he still did develop

7  lymphoma.  He got non-Hodgkin lymphoma.  He went through

8  extremely intensive treatment.  He suffered

9  complications not only of the lymphoma but of the

10  different phases of his treatment as well.  That must

11  not be overlooked.

12      Q.   No, we're not overlooking his NHL diagnosis,

13  his treatment, his complications, all of that.  What

14  we're looking at, though, in terms of potential

15  prognosis, one of the more important factors is how far

16  away that person is from having had the disease; right?

17      A.   No disagreement with that.

18      Q.   Okay.  You do say in your report that there

19  might be a risk, estimated 10 percent, of developing

20  acute myeloid leukemia or a mild dysplastic syndrome;

21  right?

22      A.   Yes.

23      Q.   And what is the source for that 10 percent?

24      A.   Yeah, I cited the -- I have it right here.  I

25  cited the non-Hodgkin lymphoma article in the Pazdur,

```
 1    "Cancer Management:  A Multidisciplinary Approach."

 2    It's recognized that there can be hematopoietic stem

 3    cell damage following transplantation for conditions

 4    like non-Hodgkin lymphoma and Hodgkins disease.  So

 5    there is a citation for that.

 6        Q.   Yeah, no, I saw that.  I looked at that.  I

 7    mean, UBM Medica, from 2010.  Do you know what the

 8    impact factor is of UBM Medica?

 9        A.   No, but the authors that contributed that

10    chapter to the book and who wrote and edited that book

11    in general, those are very well-known individuals; and

12    the book, while it was being produced originally in

13    association with a widespread free oncology journal

14    called, simply, Oncology, which was very popular, very

15    highly regarded.

16            Since I retired, I do not know whether they are

17    updating that little book or whether the journal known

18    as Oncology is still in existence; and if so, what its

19    format is like.

20        Q.   Okay.  So you don't know that it's kind of

21    considered a provider of business news for medical

22    people?

23        A.   Oncology?  No, it's --

24        Q.   No, this UBM Medica that published this book.

25        A.   Well, the book is specifically educational.
```

Ron B. Schiff, M.D., Ph.D.

1       Q.    Okay.  And --

2       A.    And here's another --

3       Q.    Do you know how many employees UBM Medica has?

4       A.    I would have no idea about that.

5       Q.    Like, less than 100; right?

6       A.    I will say this:  One of the co-authors of the

7    chapter on non-Hodgkin lymphoma that I cited, Dr. Brian

8    Chiu, is the first author of the family history paper

9    that you sent me yesterday.  The last author of the

10   chapter in -- on non-Hodgkin lymphoma was one of my

11   medical oncology attending physicians during my

12   residency at Northwestern, which is the place where

13   Mr. Cervantes had his transplant.  So -- and Leo Gordon

14   was another hematology/oncology physician at

15   Northwestern, and, in fact, my wife worked for him.

16          So these are all -- and Jane Winter was in that

17   group.  These are all highly respected medical --

18   academic medical oncologists and hematologists.  Who

19   published this is of secondary consideration.  I'm

20   interested in the content.

21      Q.    Hey, I think you're really reading in way too

22   much here.

23      A.    I don't think so.

24      Q.    So let me ask you this:  Has this book been

25   updated since 2010?

Ron E. Schiff, M.D., Ph.D.

1      A.   I was not able to get an updated version before

2   I retired, and I haven't looked since I retired.

3      Q.   And what is the -- in terms of current data, do

4   you know what the time frame is for when AML or MDS

5   generally develops after chemo?

6      A.   Well, it's a period of years, but it also

7   depends on the specific circumstance.  I did not look up

8   the post-stem cell transplant latency relative to

9   Mr. Cervantes' case.  I did not attempt to research

10  that.

11     Q.   Isn't it -- the data suggests that the risk of

12  AML after transplant is about one to five years?

13     A.   That might be the peak risk.  I don't think

14  that encompasses all of the risk.

15     Q.   Do you know what the risk is when you've been

16  disease-free for 12 years?

17     A.   I believe that the risk does not go to zero,

18  but, obviously, the further he is out, the better the

19  prognosis overall.

20          MS. FREDONA:  Michelle, would we be able to get

21      a time?

22          MS. FUJIMOTO:  Yes.  Let me finish up here

23      pretty soon, and then we'll take a break and see how

24      much more we want.  I will tell you, Rebecca,

25      because of the -- a lot of time was spent on general

```
 1      stuff that we can just adopt for Rehak that we won't

 2      go as long in Rehak.

 3          MS. FREDONA:  I believe we have an agreement

 4      for three hours.

 5          MS. FUJIMOTO:  Right, right, but I won't go --

 6      I won't take that, as long, in Rehak.  So we can

 7      take a short break now or we can just keep going,

 8      but I'm almost done.

 9          THE WITNESS:  That's your preference.

10          MS. FUJIMOTO:  Okay.  Let's keep going.

11          MS. FREDONA:  Does the court reporter have a

12      time?

13          THE COURT REPORTER:  According to my computer,

14      it says three hours and 6 minutes.

15          MS. FUJIMOTO:  Right.  And the doctor already

16      said he's welcome to go longer.

17          MS. FREDONA:  Yes, but we're not.

18          MS. FUJIMOTO:  Okay.

19          MS. FREDONA:  We have an agreement for three

20      hours.

21          MS. FUJIMOTO:  Well, then I can take the time

22      from Rehak to go over all of this as well.  I would

23      say that, Rebecca, we need to finish up, at least

24      for a few more minutes, this deposition.  Given the

25      longevity and nonresponsiveness of so many of the
```

Ron D. Schiff, M.D., Ph.D.

```
 1        answers, I would hazard to guess that any relief

 2        sought by the court would take that into account.

 3              So why don't we agree to go until 10:30 and I

 4        will take 30 minutes -- I will take 30 minutes off

 5        of my time from Rehak.

 6              MS. FREDONA:  Okay.  If the doctor agrees to

 7        minus 30 minutes off of Rehak to add 30 minutes to

 8        this deposition, that's fine with us.  That would

 9        leave 24 minutes left on this deposition.

10              MS. FUJIMOTO:  Correct.

11              THE WITNESS:  May I request an objection to

12        defense counsel's last remarks, but I have no

13        objection to rearranging the time in the manner

14        proposed?

15              MS. FUJIMOTO:  Okay.  Sounds good.  Let's do

16        that.

17   BY MS. FUJIMOTO:

18        Q.   So, Doctor, moving on then, there are a number

19   of references in Mr. Cervantes' medical records that

20   document that after the NHL he had things like

21   hyperlipidemia, sleep apnea, AFib, arthritis, and so

22   forth.

23              Do you have an opinion as to whether those

24   conditions are related at all to his NHL?

25        A.   The complications that I listed are the ones
```

1    that I believe are related to his disease and/or

2    treatment.  If I did not list the one -- any of the ones

3    that you just mentioned that I did not list, such as

4    hyperlipidemia, I either didn't think they were related

5    or I didn't encounter them.

6        Q.   Okay.  And so -- and it may be because you

7    didn't have later records, I don't know, but certainly

8    his treating physician, Dr. Raheem, testified that

9    hyperlipidemia, sleep apnea, AFib, and arthritis were

10   not related to his NHL.

11           Do you agree or disagree?

12       A.   I agree that it's related to neither his NHL

13   nor his treatment.

14       Q.   Okay.  And on page 9 of your report, you

15   referenced Mr. Cervantes' psychological effects of NHL?

16       A.   Yes.

17       Q.   You have a paragraph.  And you start that

18   paragraph with "It's a matter of common sense..."

19           Do you see that?

20       A.   "...as well as personal and professional

21   experience."

22       Q.   Sure.  And so using that, you basically are

23   just commenting that cancer is stressful; right?

24       A.   That's correct, but in addition to that, I

25   reproduced what Mr. Cervantes said about the effects on

Ron E. Schiff, M.D., Ph.D.

1    him personally during the course of his deposition.

2    Depression and anxiety during his treatment for

3    lymphoma.

4        Q.   And so you then go on in your report to discuss

5    his glyphosate exposure and some of his risk factors

6    that we've already talked about, and then you -- after

7    discussing these risk factors, you go to your conclusion

8    paragraph, which is Paragraph -- or Section 10 that

9    starts on Paragraph 12; right?

10       A.   Yes.

11       Q.   And your conclusion is that glyphosate exposure

12   was a substantial contributing cause of his NHL; right?

13       A.   A substantial factor in causing or contributing

14   to cause his non-Hodgkin lymphoma, yes.

15       Q.   And you don't tell us in your report how or

16   why -- if or why you rule out his PCB exposure, his

17   benzene exposure, his welding exposure, and that kind of

18   thing.  Did you rule those out as potential causes?

19       A.   Okay.  As a matter of fact, I did list all of

20   those explicitly, and in every case we've already

21   discussed it.  I'll be brief.

22            When you talked about some of his late comormid

23   medical conditions, you did not mention the things that

24   I put in the report that are almost certainly due to his

25   lymphoma or treatment for lymphoma:  Recurrent

Ron B. Schiff, M.D., Ph.D.

1    respiratory infections, an episode of zoster complicated

2    by postherpetic neuralgia.  Those are all definitely

3    related to his lymphoma.

4        Q.    Okay.  Can we go back to my question?

5        A.    I will, but that relates to what you asked me

6    before, which was really a rather incomplete issue.

7              With regard to the other candidate risk

8    factors, I dealt with all of them in my differential

9    etiology section.  They're all in there.  I'll tick

10   through them.  One of them was high body mass -- okay.

11       Q.    You're misunderstanding, Doctor.  You

12   absolutely go through -- you talk about those risk

13   factors in your report.  I get that.  It's here.  It's

14   attached.

15             My question is whether -- because what you

16   don't explicitly say, or even if you did, just tell me

17   now sitting here today, do you rule out each of those

18   other risk factors as a substantial contributing factor

19   in causing Mr. Cervantes' NHL?

20             MS. FREDONA:  Objection.  Form.

21       A.    I've dealt with all of that.  For example, I do

22   rule out welding based on the information that you

23   provided to me yesterday and that we discussed at length

24   today.  I spoke about the possibilities of contributions

25   from benzene and PCBs --

Ron B. Schiff, M.D. / Ph.D.

1       Q.   Right.

2       A.   -- and benzene in gasoline and diesel fumes.

3   We talked about the high BMI.  And I acknowledge all of

4   those, but once again, the key principle is that none of

5   those cancels out Roundup.

6       Q.   I understand.

7       A.   All I've said is that Roundup is a substantial

8   factor in causing or contributing to cause.  I'm not

9   denying the significance of the other candidate risk

10  factors that I have acknowledged and written about and

11  testified about today.

12      Q.   Okay.  So, in your opinion, is Mr. Cervantes'

13  exposure to PCBs a -- still a risk factor for being a

14  substantial cause of his lymphoma?

15           MS. FREDONA:  Objection.  Form.

16      A.   It is possible that it is, but in contrast to

17  the PCB litigation in which I took -- in which I

18  participated earlier, I do not have biospecimen data

19  quantitating Mr. Cervantes' PCB levels.  That's an

20  apples-and-oranges comparison, but I certainly

21  acknowledge that he had PCB occupational exposure and

22  that IARC regards PCB as a Group 1 carcinogen with

23  limited evidence of causation of non-Hodgkin lymphoma.

24      Q.   Okay.  And so you've ruled out welding fumes,

25  though; right?  Is that what you said?

```
1       A.   Yes, that's correct.

2       Q.   Have you ruled out benzene?

3       A.   No, I have not, but I had what I'm sure you

4   would have to acknowledge is a balanced discussion of it

5   in my report and again in my deposition today.

6       Q.   Have you --

7       A.   The evidence for benzene is not as strong as it

8   is for PCBs, not according to IARC, and not according to

9   me.  My own opinion is there is enough data that

10  suggests that benzene probably does cause or contribute

11  to cause lymphoma, and that's what I said before, and

12  that's what I wrote.

13      Q.   Great.  Okay.  Do you rule out or include gas

14  and diesel fumes?

15      A.   To the extent that they contain benzene, they

16  get lumped in with the benzene.  I can't tell you which

17  benzene exposure is more relevant than other benzene

18  exposure, but the point is that the main lymphoma

19  carcinogens associated with those fuels and their fumes

20  supposedly is benzene, and it all then comes back to how

21  you interpret what IARC says about benzene as a lymphoma

22  carcinogen.

23      Q.   Okay.  Do you continue to include his mother

24  having NHL?  Family history?

25      A.   I do.  I do include that as a risk factor,
```

1    although not a causative one.

2        Q.   Do you include high BMI still, or did you take

3    that out with regard to Mr. Cervantes?

4        A.   I acknowledge that he had a high BMI at the

5    time of diagnosis, and I believe the way that I put it

6    is that his BMI was high other than during periods of

7    severe weight loss.  What I don't know, in answer to the

8    InterLymph data, is what his BMI was as a young adult.

9    Therefore, I cannot comment on whether obesity during

10   young adulthood indeed represented a risk factor.

11         On top of that, to the extent that obesity is a

12   risk factor for developing non-Hodgkin lymphoma, I can't

13   come up with a plausible mechanism for how that is.

14       Q.   So do you -- so you ruled that out in terms of

15   a potential cause for Mr. Cervantes?  You ruled that

16   out?

17       A.   I would not -- you know, I would consider it as

18   a risk factor, but it does not meet the criteria for a

19   positive association that was defined by the InterLymph

20   group.

21       Q.   All right.  And so I walked through those and

22   what you're -- what I think you're still including and

23   not including.  So you have -- on the one hand you have

24   Mr. Cervantes' 30-year exposure to benzene that you keep

25   on the list, PCBs, and gas and diesel twofold under the

Ron D. Schiff, M.D., Ph.D.

1    benzene, he has a first-degree relative, a mother, with

2    NHL; and on the other hand you have glyphosate exposure

3    at home and with his lawn company for 20 years' exposure

4    while he wore long pants, boots, and sometimes gloves;

5    and your conclusion following what we've already

6    discussed today is that glyphosate is the only

7    substantial contributing factor to causing

8    Mr. Cervantes' NHL?

9         MS. FREDONA:  Objection.  Form.  Misstates the

10        record.

11   BY MS. FUJIMOTO:

12        Q.   Is that right?

13        A.   I never stated that, and I never implied it.  I

14   indicated that there were multiple active candidate risk

15   factors, of which Roundup exposure was one, and that the

16   presence of other risk factors does not negate or

17   counteract or even mitigate the predisposing effect of

18   Roundup exposure.

19        Q.   Okay.  Thank you for the clarification.

20             And so is it possible or have you ascribed

21   percentage of contribution that glyphosate versus

22   benzene versus PCBs versus family history?  Have you --

23   have you arrived at a quantification of a percentage of

24   contribution for these factors?

25        MS. FREDONA:  Objection.  Form.

Ron D. Schiff, M.D., Ph.D.

```
 1      A.   We've already discussed that at the present
 2   time it is not possible to do that.
 3      Q.   Okay.  There's just no method by which you can
 4   do it; right?
 5      A.   Well, I mean, you know, I have explored that as
 6   a matter of interest, but I have not published it.
 7   There's nothing in the literature that deals with that,
 8   at least not as of 2016.  I haven't looked since then.
 9   And I don't automatically know of something that allows
10   the construction of an algorithm or a hierarchy for the
11   different exposures.
12      Q.   Okay.  Doctor, have you heard the Latin term
13   "ipse dixit"?
14      A.   Yes.
15      Q.   Do you know what that means?  Okay.
16      A.   Vaguely.
17           MS. FUJIMOTO:  All right.  Why don't we go off
18      the record.
19           THE VIDEOGRAPHER:  The time is 1:22 p.m. and
20      we're off the record.
21           (Recess from 1:22 p.m. until 1:28 p.m.)
22           THE VIDEOGRAPHER:  The time is 1:28 p.m. and
23      we're back on the record.
24           MS. FUJIMOTO:  I have no further questions for
25      Dr. Schiff at this time.  I'll pass him to you,
```

```
 1        Rebecca.
 2             MS. FREDONA:  All right.
 3                    CROSS-EXAMINATION
 4  BY MS. FREDONA:
 5     Q.   Good afternoon, Dr. Schiff.  I only have a
 6  couple of questions.
 7             As for Mr. Cervantes' co-worker coming down
 8  with non-Hodgkin lymphoma, do you know how many co-
 9  workers Mr. Cervantes had over the 24 to 30 years he
10  worked at Nicor Gas?
11     A.   No, I do not.
12     Q.   Okay.  And did you examine his co-worker to
13  determine his cause of cancer?
14     A.   No, I did not.
15     Q.   Okay.  The defense introduced a lot of research
16  papers today that you haven't seen.  Did you have a
17  chance to completely review them in order to form a
18  complete and thorough opinion?
19     A.   No, absolutely not.
20     Q.   Okay.  And of those papers, the excerpts that
21  you were shown, do you believe that they're
22  cherry-picked?
23             MS. FUJIMOTO:  Object to form.  Foundation.
24     A.   Well, you know, I certainly believe that was my
25  conclusion in the case of the Kabat paper.
```

Ron D. Schiff, M.D., Ph.D.

1    Q.   Okay.  And it's important to read a whole paper

2    in order to form a complete and thorough opinion on it?

3    A.   Correct.

4    Q.   Okay.  All right.  So to sum it up, you've been

5    given hundreds of pages of papers and not given a chance

6    to thoroughly examine and critique them?

7    A.   That's true.  I looked at what I could, but it

8    was very limited to -- compared to my usual review

9    process.

10   Q.   All right.  And we cut you off a couple of

11   times.  Is there anything still sitting in your head

12   that you'd like to finish explaining?

13   A.   Well, you know, I mean, the main issues are

14   that many, if not most, diseases are multifactorial,

15   that the presence of more than one risk factor does not

16   rule out any of the other risk factors, that it is often

17   not possible to tell which risk factor is the but for

18   risk factor.

19        I believe that's the case with Mr. Cervantes,

20   but certainly he had extensive glyphosate Roundup

21   exposure, and, therefore, it must be considered a

22   substantial factor in causing or contributing to cause

23   his lymphoma.

24        I also believe that the medical records that I

25   had on him and my -- and my report and my deposition

1    testimony that dealt with these issues probably

2    significantly understated, and I don't mean in the

3    technical aspects of, his diagnosis, but also the

4    complications of his lymphoma and his treatment.  I just

5    didn't have an comprehensive overview of that.

6            And, of course, today, 45 minutes before the

7    deposition, I received medical records that were not in

8    my possession previously, and obviously I could not

9    become acquainted with those.

10   Q.   Okay.  Anything else?

11   A.   That's all I can think of right now.

12           MS. FREDONA:  Okay.  We have no more questions.

13           MS. FUJIMOTO:  Okay.  I just have, actually,

14       kind of administrative -- you reminded me.  Thank

15       you.

16                    REDIRECT-EXAMINATION

17   BY MS. FUJIMOTO:

18   Q.   Doctor, the last article that we didn't

19   reference is Donato, entitled "Exposure to Glyphosate

20   and Risk of Non-Hodgkin Lymphoma and Multiple Myeloma:

21   An Updated Meta-Analysis," and that's from 2020.

22           Just take a look at that and let me know if

23   you've seen it or not.

24   A.   Okay.  Well, right now I do not have that and

25   I'm continuing to look for it.

Ron D. Schiff, M.D., Ph.D.

```
 1        Q.    Okay.

 2        A.    Is there any chance that that was with the

 3   Rehak exhibits instead of the Cervantes exhibits?

 4        Q.    It shouldn't have been.

 5        A.    Well, I will say this:  The documentation that

 6   I have in front of me now is pretty much out of control.

 7        Q.    Okay.  All right.  Well, I'll ask you if we

 8   find it later for -- in your stack, then we'll reference

 9   it in Rehak, but does that -- I'll show you this.  Look

10   at the thing.  Does that ring a bell?  Do you recognize

11   that at all?

12        A.    Yeah, it does ring a bell, but I don't believe

13   that I had that prior to yesterday.

14        Q.    Okay.

15        A.    And I still can't find it among the exhibits I

16   received yesterday.

17             MS. FUJIMOTO:  Okay.  Well, I'm just going to

18        ask the court reporter to mark that as the next

19        exhibit or final exhibit in order.  Joan, I think

20        it's 15?

21             THE COURT REPORTER:  Yes, ma'am.

22             MS. FUJIMOTO:  Okay.  As 15.  And it's by first

23        author Donato, a 2020 publication entitled "Exposure

24        to Glyphosate and Risk of Non-Hodgkin Lymphoma and

25        Multiple Myeloma:  An Updated Meta-Analysis."
```

1          (Schiff Exhibit 15 was marked for

2     identification.)

3     BY MS. FUJIMOTO:

4          Q.   So, Dr. Schiff, I'm not going to ask you

5     specifics about it.  My question is whether -- you

6     recall seeing it, but did you read and consider it when

7     you formulated your opinions about Mr. Cervantes?

8          A.   Okay.  I did not read it, at least -- you know,

9     if I'm familiar with this from the past.  I just found

10    it.  Okay?  So what's happening is that the exhibits

11    from this case are out of control, and I would ask again

12    whether I will be allowed to clean up Cervantes before

13    progressing on to Rehak.

14         Q.   Absolutely.

15         A.   Okay.  So with regard to -- with regard to this

16    paper, I encountered Dr. Boffetta, who is the senior

17    author, in conjunction with the PCB litigation, and I am

18    well aware that he is predisposed to not recognize

19    occupational or environmental carcinogens, especially in

20    situations where there's any degree of controversy.

21         Dr. Boffetta is someone who had to give up an

22    appointment to a government position as the chief

23    epidemiologist for France because of conflict of

24    interest owing to his excessive affiliation with

25    industry in the past.

Ron E. Schiff, M.D., Ph.D.

```
 1              I went ahead and looked that up.  Now, I'm

 2   happy to try to answer any specifics about this, but

 3   this is not something that I would particularly weight

 4   because of my concern about conflict of interest.

 5              MS. FUJIMOTO:  Move to strike.  Nonresponsive.

 6   BY MS. FUJIMOTO:

 7       Q.   The question, Doctor, is whether, when you

 8   formed your opinions with regard to Mr. Cervantes, had

 9   you reviewed this Donato paper and considered it in

10   coming to your opinion?  Yes or no?

11       A.   The answer is no.

12              MS. FUJIMOTO:  Thank you.  No further

13       questions.  We can go off, I guess.

14              THE VIDEOGRAPHER:  The time is 1:36 p.m. and

15       we're off the record.

16              (Discussion off the record.)

17              (Schiff Exhibit 16 was marked for

18   identification.)

19              (Whereupon, the deposition concluded at

20   1:36 p.m.)

21

22

23

24

25
```

Ron D. Schiff, M.D., Ph.D.

```
 1                C E R T I F I C A T E

 2          I, Joan L. Pitt, Registered Merit Reporter,

 3    Certified Realtime Reporter, and Florida Professional

 4    Reporter, do hereby certify that, pursuant to notice,

 5    the deposition of RON SCHIFF, MD, PhD, was duly taken on

 6    March 5, 2021, at 10:01 a.m. remotely before me.

 7          The said RON SCHIFF, MD, PhD, was duly sworn by

 8    me according to law to tell the truth, the whole truth

 9    and nothing but the truth and thereupon did testify as

10    set forth in the above transcript of testimony.  The

11    testimony was taken down stenographically by me.  I do

12    further certify that the above deposition is full,

13    complete, and a true record of all the testimony given

14    by the said witness, and that a review of the transcript

15    was not requested.

16

17    _____                        _____

18     Joan L. Pitt, RMR, CRR, FPR

19    (The foregoing certification of this transcript does not

20    apply to any reproduction of the same by any means,

21    unless under the direct control and/or supervision of

22    the certifying reporter.)

23

24

25
```

```
 1                          LAWYER'S NOTES

 2      PAGE    LINE

 3      _____   _____    _____

 4      _____   _____    _____

 5      _____   _____    _____

 6      _____   _____    _____

 7      _____   _____    _____

 8      _____   _____    _____

 9      _____   _____    _____

10      _____   _____    _____

11      _____   _____    _____

12      _____   _____    _____

13      _____   _____    _____

14      _____   _____    _____

15      _____   _____    _____

16      _____   _____    _____

17      _____   _____    _____

18      _____   _____    _____

19      _____   _____    _____

20      _____   _____    _____

21      _____   _____    _____

22      _____   _____    _____

23      _____   _____    _____

24      _____   _____    _____

25
```