# EXHIBIT 5

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3
 4
 5    ----------------------------x
                                  )
 6    IN RE: ROUNDUP PRODUCTS     ) MDL No. 2741
      LIABILITY LITIGATION        ) Case No. MDL No:
 7    _____ ) 3:16-md-02741-VC
                                  )
 8    This document relates to:   )
                                  )
 9    Christine Karman, individually )
      and as Representative of the  )
10    Estate of Robert Karman v.    )
      Monsanto Co.                  )
11    Case No. 3:19-cv-01183-VC     )
      _____x )
12
13
14          REMOTE VIDEOTAPED DEPOSITION OF
15            DENNIS D. WEISENBURGER, M.D.
16             THURSDAY, MARCH 4, 2021
17           9:03 A.M. PACIFIC STANDARD TIME
18
19
20
21
22
23
24    Pages: 1 - 125
25    Reported by: Leslie A. Todd, CSR No. 5129 and RPR
```

Dennis D. Weisenburger, M.D.

```
 1                A P P E A R A N C E S

 2

 3   ON BEHALF OF PLAINTIFF:

 4       REBECCA FREDONA, ESQUIRE
         Moll Law Group
 5       22 West Washington Street
         15th Floor
 6       Chicago, Illinois 60602
         (312) 629-8800

 7

 8   ON BEHALF OF DEFENDANT:

 9       LINDLEY J. BRENZA, ESQUIRE
         BARTLIT BECK, LLP
10       1801 Wewatta Street
         Suite 1200
11       Denver, Colorado 80202
         (303) 592-3100

12

13
     ALSO PRESENT:
14
         LARRY MAHER, Videographer
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                 C O N T E N T S

 2   EXAMINATION OF DENNIS D. WEISENBURGER, M.D.   PAGE

 3        By Mr. Brenza                            7

 4        By Ms. Fredona                           120

 5

 6                 E X H I B I T S

 7            (Attached to transcript)

 8   WEISENBURGER DEPOSITION EXHIBITS              PAGE

 9   No. 1    Defendant Monsanto Company's

10            Notice to Take Oral and

11            Videotaped Deposition of Dennis

12            D. Weisenburger, M.D.               8

13   No. 2    Specific Causation Report for

14            Mr. Robert Karman, dated 01/15/21,

15            by Dennis D. Weisenburger, MD        8

16   No. 3    Curriculum Vitae of Dennis D.

17            Weisenburger, M.D.                   9

18   No. 4    Testimony History of Dennis

19            Weisenburger, M.D. 2014 to Present   9

20   No. 5    Article entitled, "Obesity is

21            Associated with Increased Relative

22            Risk of Diffuse Large B-Cell

23            Lymphoma: A Meta-Analysis of

24            Observational Studies," authored

25            by Castillo, et al.                  44
```

1          E X H I B I T S   C O N T I N U E D

2               (Attached to transcript)

3    WEISENBURGER DEPOSITION EXHIBITS              PAGE

4    No. 6     Article entitled, "Pesticide

5              exposure as risk factor for

6              non-Hodgkin lymphoma including

7              histopathological subgroup analysis,"

8              authored by Eriksson, et al.        45

9    No. 7     Article entitled, "Glyphosate use

10             and associations with non-Hodgkin

11             lymphoma major histological sub-

12             types: Findings from the North

13             American Pooled Project," authored

14             by Pahwa, et al.                    45

15   No. 8     SEER Incidence Data, 1975 - 2017    76

16   No. 9     Medical records for Robert Karman

17             of Advocate Sherman Hospital,

18             Bates Nos. Confidential-Karman-

19             RKarman-AdvocateSH-MD-000346 to

20             000352                              94

21   No. 10    Medical records for Robert Karman

22             of PMG Cardiology/Elgin, Bates Nos.

23             Confidential-Karman-RKarman-

24             PresenceMG-000021 to 000025         94

25

Dennis D. Weisenburger, M.D.

```
 1          E X H I B I T S   C O N T I N U E D

 2              (Attached to transcript)

 3   WEISENBURGER DEPOSITION EXHIBITS                PAGE

 4   No. 11    Medical records for Robert Karman,

 5             various Bates numbers beginning

 6             Confidential-Karman-RKarman-ASJHE-

 7             MD-000934                              94

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Dennis D. Weisenburger, M.D.

```
 1              P R O C E E D I N G S

 2              ------------------

 3              THE VIDEOGRAPHER:  We are now on the

 4   record.  My name is Larry Maher.  I am a

 5   videographer for Golkow Litigation Services.

 6   Today's date is Thursday, March 4th, 2021, and the

 7   time is 9:03 a.m. Pacific Standard Time.

 8              This remote video deposition is being

 9   held in the matter of Roundup (Karman v. Monsanto

10   Company) for the United States District Court,

11   Northern District of California.

12              The deponent is Dennis D. Weisenburger,

13   MD.

14              All parties to this deposition are

15   appearing remotely and have agreed to the witness

16   being sworn in remotely.  Due to the nature of

17   remote reporting, please pause briefly before

18   speaking to ensure all parties are heard

19   completely.

20              Will counsel please identify themselves.

21              MS. FREDONA:  Rebecca Fredona on behalf

22   of plaintiff.

23              MR. BRENZA:  Lin Brenza with Bartlit

24   Beck on behalf of Monsanto.

25              THE VIDEOGRAPHER:  The court reporter is
```

Dennis D. Weisenburger, M.D.

1    Leslie Todd.  She will now swear in the witness.

2              DENNIS D. WEISENBURGER, MD,

3         and having been first duly sworn,

4       was examined and testified as follows:

5              THE REPORTER:  Okay, Counsel, proceed,

6    please.

7                        EXAMINATION

8    BY MR. BRENZA:

9         Q    Thank you, Doctor.  Thank you for

10   raising your hand there.

11        A    Good morning.

12        Q    Almost got the whole screen covered

13   there.

14             I -- we -- we did a deposition

15   yesterday, so again I'm going to assume you know

16   the rules.  Just the same -- I'm just going to ask

17   the same thing I asked yesterday, which is if you

18   don't understand a question or you don't hear the

19   question, would you just please let me know.  And

20   if you don't say anything, I'm going to assume

21   that you heard and understood my question.  Okay?

22        A    Yes.  Yes.

23        Q    Let me begin just by marking some

24   exhibits.  We're going to mark the same type of

25   exhibits as before.  So Exhibit 1 is going to be

1    the notice for this deposition.

2              (Weisenburger Exhibit No. 1 was

3              marked for identification.)

4    BY MR. BRENZA:

5         Q    And before -- I'll stop there for a

6    second.

7              Doctor, do you have the documents for

8    today's deposition?

9         A    Yes, I do.

10        Q    Okay.  So if you would look at

11   Exhibit 1, that's the notice of deposition, put

12   a "1" on it so you remember which -- which one it

13   is.

14        A    Okay.

15        Q    Exhibit 2 is going to be your report in

16   the Karman case, which should be in your folder,

17   No. 2.

18              (Weisenburger Exhibit No. 2 was

19              marked for identification.)

20   BY MR. BRENZA:

21        Q    Do you have that one?

22        A    Yes.

23        Q    Okay.  Exhibit 3 is going to be your CV.

24   That should be in folder 3 of your materials.

25        A    Yes.

Dennis D. Weisenburger, M.D.

```
 1                  (Weisenburger Exhibit No. 3 was
 2                  marked for identification.)
 3     BY MR. BRENZA:
 4          Q    And Exhibit 4 is going to be your list
 5     of prior testimony.  That should also be in folder
 6     number 4.
 7          A    Yes.
 8                  (Weisenburger Exhibit No. 4 was
 9                  marked for identification.)
10     BY MR. BRENZA:
11          Q    Okay.  Good.  We'll stop there for now
12     and just -- I'm going to ask you a few questions.
13               Did you -- have you seen the deposition
14     notice for today prior to now?
15          A    Yes.
16          Q    Okay.  When did you have a chance to
17     look at that?
18          A    Well, a few days ago.
19          Q    Okay.  So that would be, what, Monday,
20     Tuesday of this week?
21          A    Probably.  I don't remember when they
22     sent it to me.
23          Q    Okay.  And so that's March 1 or March 2?
24          A    Probably.  I don't remember.
25          Q    When you -- who sent it to you?
```

Dennis D. Weisenburger, M.D.

```
1          A     The Moll firm.
2          Q     Did you read it when they sent -- sent
3    it to you?
4          A     Yes, I did.
5          Q     Okay.  Did you notice that there was a
6    list of requested documents at the -- the back of
7    it?
8          A     Yes.
9          Q     Did you review your files to see if you
10   had any materials that fit those criteria?
11         A     Yes.
12         Q     Did you find materials that met the
13   requests of the deposition notice for today?
14         A     Yes, I think some of the materials were
15   sent to you.  The billings should -- should have
16   been sent to you, but apparently they weren't.
17               And, you know, we discussed yesterday
18   that since I've provided a written report, a
19   detailed written report, I usually haven't
20   provided my written notes -- my handwritten notes
21   in previous cases.
22         Q     Do you have handwritten notes for the
23   Karman case?
24         A     Yes, I do.
25         Q     Are those notes a record of your
```

Dennis D. Weisenburger, M.D.

1   conversation with Christine Karman?

2        A    Yes, some of them are.

3        Q    How many pages of notes do you have

4   recording your conversation with Christine Karman?

5        A    Two.

6        Q    What other notes do you have?

7        A    Notes that I took from her deposition.

8   And of course, notes I took from the medical

9   records.  A few notes I took from the deposition

10  of -- of the doctor, Dr. Nabrinsky.  That's it.

11       Q    Did you speak to anyone else about this

12  case, about Mr. Karman's case, other than Ms. --

13  Ms. Christine Karman?

14       A    No.

15       Q    You didn't -- you didn't have a

16  conversation with Dr. Nabrinsky?

17       A    No.

18       Q    Or any other physician that may have

19  seen Mr. Karman while he was alive?

20       A    No.

21       Q    How many pages are these other notes

22  that you have other than the two note -- pages of

23  notes from your conversation with Ms. Karman?

24       A    Two pages from her deposition and two

25  pages from the medical record.

Dennis D. Weisenburger, M.D.

```
 1          Q    Is that it?

 2          A    Yes.

 3          Q    And so when you say the medical records,

 4    does that include the notes you have about

 5    Dr. Nabrinsky?

 6          A    Yes.

 7          Q    So if you'll -- if you'll turn to page 4

 8    of the deposition notice, you'll see the request

 9    for production.  And tell me when you're there.

10          A    Okay.

11          Q    So the first request is:  "Documents to

12    show the total amount Dr. Weisenburger has billed

13    in connection with his work as an expert in

14    litigation involving Roundup, including, but not

15    limited to, his work regarding plaintiff in this

16    case."

17               Do you see that?

18          A    Yes.  For --

19          Q    See -- go ahead.

20          A    For this case, I billed for 16 hours,

21    for a total of $12,000.  And in preparation for

22    the deposition, it would be an additional four

23    hours.  I haven't -- as I told you yesterday, I

24    haven't kept track of my billings in prior cases.

25          Q    And your rate in this case is -- is $750
```

1   per hour?

2       A    Yes.

3       Q    And again, you're charging a different

4   rate for your deposition today, right?

5       A    Yes.

6       Q    Today you're charging a flat rate of

7   $5,000 for at most three hours, right?

8       A    Yes.

9       Q    Do you believe that you've provided to

10  counsel material sufficient to show your overall

11  compensation in connection with your work on any

12  Roundup cases?

13      A    I've disclosed it for each case this

14  week.

15      Q    I understand.  So your -- your

16  disclosures are case by case, right?

17      A    Right.

18      Q    Was there a time or -- or -- if you look

19  at all the disclosures together that the Moll

20  group received materials from you that are

21  sufficient to show all your billings in the

22  Roundup litigation?

23      A    Well, they have the documentation.  They

24  can send it to you.

25      Q    That's what I'm trying to determine,

Dennis D. Weisenburger, M.D.

```
 1   if -- if you've given them the documentation.
 2        A    Well, of course.  They paid me.
 3        Q    Well, I thought you had just said that
 4   you had disclosed the documentation for each
 5   particular case on a case-by-case basis.
 6        A    Yeah, but I billed them for all five
 7   cases in one itemized bill.
 8        Q    Okay.  So you're referring to --
 9        A    They should have provided that to you.
10        Q    So you're referring to the five cases
11   that the Moll group has concerning Roundup?
12        A    Yes.
13        Q    But there are other cases you've worked
14   on with other firms that involve Roundup, right?
15        A    Yes.  But I haven't kept track of -- I
16   mean, this is over -- over at least four years.  I
17   haven't kept track of it in a systematic way.
18   So...
19        Q    Do you have records of what you billed
20   in -- in the other Roundup cases?
21        A    Probably I do in my tax paperwork.  But
22   it -- it would take some work to -- to parse it
23   out.
24        Q    And that material --
25        A    I don't see why it's relevant.
```

```
 1        Q    Those materials you have to date not
 2   provided to the Moll firm, right?
 3        A    No, those materials I haven't -- they
 4   haven't asked for them.
 5        Q    Okay.  So let me just back up.
 6             You referenced the five cases.  Are
 7   those five cases Roundup litigation cases that the
 8   Moll law firm hired you to work on?
 9        A    Yes.
10        Q    And I think you described them a bit
11   yesterday, but let me just make sure I understand.
12   They initially asked you to work on those cases
13   sometime in mid-2020?
14        A    Yes.
15        Q    And you initially declined.  You
16   initially said no because you -- you were too
17   busy.
18        A    Yes.
19        Q    But then in December of 2020, you
20   decided you wanted to work on those cases, and you
21   called Mr. Moll?
22        A    Yes.
23        Q    And you told Mr. Moll that you were
24   available to work on those cases.
25        A    I said I was available to work on some
```

1    cases, yeah.

2         Q    And -- and he hired you to work on those

3    cases and be a testifying expert in his -- in his

4    Roundup litigation.

5         A    Yes.

6         Q    Let me just make sure I know the cases.

7    I think I know two of them.

8              The -- is one of them the Peterson case?

9         A    Yes.

10        Q    Is one of them the Karman case?

11        A    Yes.

12        Q    What are the other three that you told

13   Mr. Moll you -- you were available to work on?

14        A    Pecorelli, Cervantes, and Schafer.

15        Q    And those are all cases where Mr. Moll's

16   law firm is -- is claiming that Roundup caused

17   their -- their client to have cancer, right?

18        A    Yes.

19        Q    Specifically non-Hodgkin's lymphoma.

20        A    Yes.

21        Q    And you did provide to the Moll law firm

22   a unified billing for all five of those cases.

23        A    Yes.

24        Q    And it was your assumption that would be

25   provided to me, right?

1      A    Yes.  When I spoke to Mr. Moll last

2  week, I said that he should -- he should forward

3  those to you because he has them.

4      Q    Okay.

5           MR. BRENZA:  And I'll just put on the

6  record, Rebecca, I don't think we've received

7  anything.  So if you could see if that is being

8  held up or -- or just what the status of it is.

9           MS. FREDONA:  I'm going to send it to

10  you right now.

11          MR. BRENZA:  Okay.

12  BY MR. BRENZA:

13      Q    Did you also provide Mr. Moll or someone

14  else or Rebecca or somebody else from his firm

15  your -- your case notes?

16      A    No.

17      Q    Okay.  So they don't have those yet?

18      A    No.

19      Q    So if you'll look at document Request

20  No. 3 of Exhibit 1.  Do -- do you see the request

21  numbered 3?

22      A    Yes.

23      Q    It says:  "All documents that

24  Dr. Weisenburger will consider as part of his

25  opinions and expected testimony in this case."

1              Do you see that?

2         A    Yes.

3         Q    And did you understand that that request

4    sought your -- your notes from communications with

5    Ms. Karman or -- or other sources of information

6    you considered?

7         A    Yes.  As I told you before, I discussed

8    this with Mr. Moll, and we agreed that I wouldn't

9    provide the notes since I've -- I've written a --

10   a detailed specific causation report, which you

11   have.  So the report reflects the contents of the

12   notes.

13              I've done -- done the same thing in

14   previous depositions with the Wagstaff firm.

15              MR. BRENZA:  I don't want to go off the

16   record.  I just want to -- but I'm going to get up

17   for a moment, so don't -- don't go away.  Okay.  I

18   just want to get a document.

19              (Brief pause.)

20              THE VIDEOGRAPHER:  Doctor, while we have

21   a second, could I get you to adjust your shot.

22   The bottom of your mouth is dropping out of the

23   bottom of the frame.  So I'd like to see more of

24   your -- there we go.  Thank you.

25   BY MR. BRENZA:

Dennis D. Weisenburger, M.D.

```
 1        Q    Let me continue on through Exhibit 1.
 2             Number -- do you see that Request No. 4
 3   asks for:  "All documents that Dr. Weisenburger
 4   reviewed, referred to or relied on in forming any
 5   opinion related to this case.  This request
 6   includes all documents that contain data or other
 7   information considered by Dr. Weisenburger in the
 8   course of formulating his opinions."
 9             Do you see that?
10        A    Yes.  Yes.
11        Q    Did you understand that that request
12   also sought your notes in this case?
13        A    As I told you, we discussed the notes.
14   I'm not sure which of these refers to the notes.
15   None of them says "notes," so it could be any one
16   of these.  But I understood that that's what you
17   were requesting, yes.
18        Q    Okay.  And then if you look at No. 9.
19   Do you see that?
20        A    Yes.
21        Q    It requests:  "All documents referencing
22   or recording any communications with Christine
23   Karman, such as notes or other materials relating
24   to the substance of any such communications."
25             Do you see that?
```

```
 1        A    Yes.

 2        Q    And you understood that request directly

 3   asked for the notes of your conversation with

 4   Ms. Karman, right?

 5        A    Yes.

 6        Q    And -- and you and Mr. Moll decided not

 7   to provide those because it wasn't your practice

 8   to do that?

 9             MS. FREDONA:  Objection.  Misstates the

10   record.

11             THE WITNESS:  If -- I asked Mr. Moll

12   what we should do, and I told him what I had done

13   in the past, and we agreed that we wouldn't submit

14   the handwritten notes.  I have submitted the

15   handwritten notes in cases where I don't provide a

16   written -- a written opinion, but I haven't done

17   it in cases where I've provided a written opinion.

18             So I asked for his advice.  I mean, I

19   don't have a problem providing the notes if -- if

20   doctor -- if Mr. Moll agrees.  But it's not been

21   what we have been doing with this Monsanto

22   litigation over the past few years.

23             The -- the Wagstaff firm, we never

24   provided the written notes when I provided a

25   formal written report.
```

Dennis D. Weisenburger, M.D.

```
 1   BY MR. BRENZA:

 2         Q    And -- and --

 3         A    Why don't you request it?

 4         Q    I'm going -- I'm going to request that

 5   those be produced.  I think that these notes are a

 6   little different maybe than notes that you've had

 7   in the past in that they represent conversations

 8   you've had that provided factual inputs to your

 9   report that -- that without those notes we're not

10   aware of.

11         A    I've done this in every case.

12         Q    You -- you've interviewed plaintiffs --

13         A    -- in every case.

14         Q    Okay.  Well, I -- whatever you've done

15   in the past, I'm going to ask for them here

16   because I believe we have a right to have them,

17   and I -- it's part of shaping the questions for

18   your deposition is knowing what -- what you and

19   Ms. Karman said to each other.

20              MR. BRENZA:  So maybe, Rebecca, you can

21   decide.  We can take this up later or whatever you

22   want to do, but I do think we're entitled to have,

23   at the very least, the notes of his conversation

24   with Ms. Karman, since that's factual inputs that

25   we have no way of verifying at this point.
```

1      MS. FREDONA:  Yes, we could take that up

2  later.

3      MR. BRENZA:  Okay.

4  BY MR. BRENZA:

5      Q    So given that we don't have the notes,

6  let me -- let me ask you what your conversation

7  with Ms. Karman comprised.  What did you ask her?

8      A    Well, we talked about where they lived

9  and the use of Roundup on the two residences by

10  Mr. Karman.  We talked about his practices, what

11  clothing he wore, what he sprayed, how he sprayed

12  it, et cetera.  We talked about other possible

13  exposures to pesticides, solvents, and other

14  chemicals.

15      We talked about his health in general.

16  We talked about -- I asked her questions about a

17  list of known risk factors for non-Hodgkin's

18  lymphoma.  We talked about their family history,

19  medical history.  I asked his usual height and

20  weight.  You know, that's basically what we did.

21      Q    Is that -- does that cover it?

22      A    Yes.

23      Q    When did you have this conversation with

24  Ms. Karman?

25      A    On -- on January 8th.

Dennis D. Weisenburger, M.D.

```
 1          Q    And that's 2021?

 2          A    Yes.

 3          Q    How long did the conversation last?

 4          A    Oh, approximately one hour.

 5          Q    Who else was on that call?

 6          A    No one else.

 7          Q    So let me -- let me go through each of

 8     the things that you flagged for me and -- and try

 9     to find out what Ms. Karman told you.

10               What did she say about Mr. Karman's

11     practices concerning the use of Roundup?

12          A    It's all outlined in my written report

13     in paragraphs 2 and 3.

14          Q    Okay.  So your report is based not on

15     Ms. Karman's sworn deposition but on your

16     conversation with her.

17               MS. FREDONA:  Objection.  Misstates the

18     testimony.

19               THE WITNESS:  With a -- for the most

20     part, yes.

21     BY MR. BRENZA:

22          Q    And you said paragraphs 2 and 3 of your

23     report are based on what she told you about

24     Mr. Karman's use of Roundup.

25          A    Yes.
```

1      Q     Was Ms. Karman an important source of

2  information to you because Mr. Karman is

3  deceased?

4      A     Yes.

5      Q     There -- there are no records of

6  Mr. Karman's use of Roundup, are there?

7      A     I don't know the answer to that.

8      Q     You're not aware of any, are you?

9      A     No.

10     Q     So the only source of information is

11  what Ms. Karman says now, right?

12     A     Yes.

13     Q     And Ms. Karman is in the middle of a

14  lawsuit with Monsanto, right?

15     A     That's correct.

16     Q     Did you have any way of verifying or

17  checking or -- you know, what Ms. Karman told you

18  about Mr. Karman's use of Roundup?

19         MS. FREDONA:  Objection.  Form.

20         THE WITNESS:  No.

21  BY MR. BRENZA:

22     Q     Did you accept what Ms. Karman told you?

23     A     Yes.

24     Q     Did Ms. Karman tell you that Mr. Karman

25  sprayed Roundup once per week for eight months of

1    the year?

2          A    Yes.

3          Q    That's March through October.  Those are

4    the months that she said he used it?

5          A    Yes.

6          Q    Every week?

7          A    That's what she said, once a week.

8          Q    And each of those times, 30 minutes per

9    week, right?

10         A    Well, on average.  It's an estimate.

11         Q    That's what she said.

12         A    Yes.

13         Q    And were the properties that Ms. Karman

14   was describing her -- Mr. Karman's Roundup use in

15   Chicago?

16         A    Well, I'm --

17         Q    I'm sorry.  They're in Illinois.  Elgin,

18   Illinois.

19         A    Yeah.  Yeah, Elgin, Illinois.  I don't

20   know if that's in the Chicago area or not.

21         Q    Did Ms. Karman tell you that her husband

22   had used Roundup from 1980 to 1989 at their

23   Hanover Park property?

24         A    Yes.

25         Q    Did she say that he purchased

Dennis D. Weisenburger, M.D.

```
 1    Ready-to-Use Roundup during that time period?
 2         A    Yes.
 3         Q    And did she tell you that he applied it
 4    from one-gallon jugs with a hand pump and a
 5    10-inch hose and wand?
 6         A    Yes.
 7         Q    Did she tell you that he used
 8    approximately half a gallon of Roundup each month?
 9         A    Yes.
10         Q    Did she tell you that he wore short-
11    sleeved shirts when he sprayed Roundup?
12         A    Yes.
13         Q    Did she tell you that he wore jeans when
14    he sprayed Roundup?
15         A    Yes, jeans or Bermuda shorts.
16         Q    Did she tell you that he wore gym shoes
17    when he sprayed Roundup?
18         A    Yes.
19         Q    And he wore socks with those shoes,
20    right?
21         A    Yes.
22         Q    According to Ms. Karman.
23         A    Yes.
24         Q    Did she tell you that sometimes if it
25    was cold, he would wear cloth gloves?
```

```
 1         A    Yes.
 2         Q    Did she tell you that after spraying,
 3   Mr. Karman would wash his hands, and in warm
 4   weather or windy days he would change clothes
 5   after spraying and take a shower?
 6         A    Yes.
 7         Q    Did she tell you that in colder weather
 8   he would sometimes wear the same clothes for the
 9   rest of the day and shower at the end of the day
10   or the next morning?
11         A    Yes.
12         Q    Did she tell you how she remembered
13   these facts about Mr. Karman's use of Roundup?
14         A    No.  But they were in response to
15   specific questions that I asked.
16         Q    Did Mr. Karman say that she made a
17   special point of monitoring Mr. Karman's use of
18   Roundup?
19         A    No, but they often worked together in
20   the yard.  She did some yard work too.  So, you
21   know, she -- she was there some of the time he was
22   working.
23         Q    That's what she said?
24         A    Yes.
25         Q    Did she say any other ways that she
```

1    would know Mr. Karman's use -- you know, the

2    details of Mr. Karman's use of Roundup?

3         A    No.

4         Q    Did she then describe Mr. Karman's use

5    of Roundup from the 1989 to 2015 time period?

6         A    No.  We went through the first time

7    period.  I -- much of the information is the same,

8    yes, but he spayed -- sprayed more frequently and

9    used more Roundup at the second residence.

10        Q    So maybe you didn't hear the question.

11             Did -- did Ms. Karman tell you about

12   Mr. Karman's use of Roundup in the 1989 to 2015

13   time period?

14        A    Yes.

15        Q    Did she describe his use of -- of

16   Roundup on a one-acre parcel at a place called

17   Robinhood Drive?

18        A    Yes.

19        Q    Did she say that Mr. Karman at that

20   location from 1989 to 2015 sprayed once a week

21   eight months of the year?

22        A    Yes.

23        Q    And did she say that on each of those

24   occasions he would spray for two to three hours?

25        A    Yes.

Dennis D. Weisenburger, M.D.

```
 1        Q    Did she say that he used the same
 2   methods as he did previously in terms of the
 3   clothing he wore and the -- and the washing he --
 4   he undertook?
 5        A    Yes.
 6        Q    Did she describe to you any other
 7   pesticides that Mr. Karman used at either of those
 8   properties?
 9        A    Well, she did say that he -- he had
10   tried a product called Spectracide, but that it
11   didn't really work and so he didn't use it.
12        Q    Do you know what Spectracide is?
13        A    I didn't look it up because he only used
14   it a few times.
15        Q    What did she say about the number of
16   times that he used it?
17        A    She said he -- basically he didn't use
18   it.  That he tried it, it didn't work, and so he
19   didn't use it.
20        Q    How many times did he try it?
21        A    I don't know.
22        Q    Did you make an assumption about how
23   many times he would have used Spectracide in
24   your -- for purposes of your report?
25        A    I -- I guess I did.  The term she used
```

1    was, "He didn't use it."  He preferred Roundup and

2    he used Roundup.  And so...

3         Q    Are you assuming that he used

4    Spectracide maybe three times, two or three times?

5         A    Probably something like that.  I

6    don't -- that would be -- that would be a guess.

7         Q    Yeah, and I -- I'm not asking you to

8    guess.  I'm asking you what you have assumed for

9    purposes of your opinions in this case about his

10   use of Spectracide.

11        A    I assume he used it a few times.

12        Q    And -- and when you say "a few," how

13   many -- what range of times are you referring to?

14        A    I don't know.  Less than ten.

15        Q    Do you know what's in Spectracide?

16        A    I don't.  I didn't -- I didn't look it

17   up.  I didn't pursue it because he didn't really

18   use it.

19        Q    What did Ms. Karman tell you about the

20   sprayer that Mr. Karman used for Roundup in the

21   1989 to 2015 time period?

22        A    I think it was the same sprayer that was

23   part of the gallon jugs that he bought.

24        Q    Okay.

25        A    It was the same sprayer.

1    Q    He --

2    A    Not a separate sprayer.

3    Q    He continued to use the -- the premixed

4    Roundup that came in a -- in a spray bottle?

5    A    Yes.

6    Q    What did Ms. Karman tell you about

7    the way Mr. Karman sprayed Roundup when he -- when

8    he did spray it?

9    A    Well, he mostly did mist spraying of --

10   of specific areas, and he did some spot spraying,

11   and both -- at both places he -- he mist sprayed

12   approximately 75 percent of the time and spot

13   sprayed 25 percent of the time.

14   Q    What -- what's the difference between

15   mist spraying and spot spraying?

16   A    Well, for spot spraying, you -- you

17   adjust the nozzle to spray a specific stream of

18   Roundup, so it's for spraying a specific weed.  It

19   targets a specific small area.

20        And for mist spraying, you open up the

21   nozzle and it sprays a broad, fine mist.

22   Q    Did you -- did you do any analysis to

23   determine whether Mr. Karman would have had

24   inhalational exposure to Roundup?

25   A    No, but it's very likely he did.

1    Q    Did you do any analysis to conclude

2  whether Mr. Karman likely had transdermal exposure

3  to Roundup?

4    A    Well, he most certainly did.

5    Q    And when you say that, is that based on

6  any calculations that you've done?

7    A    No.

8    Q    And that's true for the inhalational and

9  for the spot spraying, right?

10   A    Yes.

11   Q    Are you relying on the opinions of other

12  experts in this case to determine the extent to

13  which Mr. Karman was or was not exposed to

14  Roundup?

15   A    No.

16   Q    Are you basing your opinions in this

17  case on the number of days that Mr. Karman used

18  Roundup according to Mrs. Karman?

19   A    Yes.

20   Q    You said that one of the things you

21  discussed with Ms. Karman was other chemical

22  exposures that Mr. Karman may have had?

23   A    Yes.  So I asked about solvents and I

24  asked about other chemical exposures, and he had

25  no other chemical exposures that she knew about.

Dennis D. Weisenburger, M.D.

```
 1          Q    Okay.  And -- and that's -- you asked

 2    about that because exposure to solvents and

 3    certain other chemicals can be a cause or a risk

 4    factor for non-Hodgkin's lymphoma.  Right?

 5          A    Yes.

 6          Q    And she -- again, Mr. Karman wasn't

 7    available to answer those questions, so -- so you

 8    had to rely on what Ms. Karman knew or could

 9    remember, right?

10          A    Yes.

11          Q    Did Ms. Karman have any records to help

12    her refresh her memory about what exposures

13    Mr. Karman might have had over the course of his

14    life?

15               MS. FREDONA:  Objection.  Speculation.

16               THE WITNESS:  No, I -- no, I didn't ask

17    that question.

18    BY MR. BRENZA:

19          Q    Did she mention any records of that kind

20    of exposure?

21          A    No, she didn't.

22          Q    Did she say anything to you about how

23    she would know all of Mr. Karman's exposures to

24    other possible risk factors for non-Hodgkin's

25    lymphoma?
```

Dennis D. Weisenburger, M.D.

```
 1        A    Well, I think just being married to him
 2   and living with him, and -- I don't know.  You'd
 3   have to ask her that, but that, you know, she --
 4   she would be the most -- the most -- the closest
 5   person to him, so she would be the one who would
 6   know or should know.
 7        Q    But -- but your conversation with her,
 8   it was -- it was just to determine that she didn't
 9   know any such exposures.
10        A    She said that as far as she knew, he
11   wasn't exposed to any solvents or other organic
12   chemicals or toxic chemicals.
13        Q    And -- but you didn't explore how far
14   that knowledge went, right?
15        A    What do you mean by that?
16        Q    Well, you didn't explore whether there
17   might have been -- whether Mr. Karman might have
18   been exposed to things that Mrs. Karman didn't
19   know about.
20             MS. FREDONA:  Objection.
21             THE WITNESS:  Well, what kind of
22   question would I ask her?  Can you tell me about
23   some exposures that you don't know about?  What
24   kind of question would that be?
25   BY MR. BRENZA:
```

```
 1        Q    Well, I'm just trying to get -- get
 2   clear what your conversation with her was and what
 3   it did and didn't cover.  She was just relaying
 4   what she knew about.  She couldn't provide you
 5   with information about things that didn't happen
 6   in her presence, right?
 7        A    No.  I mean, in -- in her deposition,
 8   she -- she did describe his work as an electrical
 9   engineer, and she also in her deposition said that
10   he had no chemical exposures during his work.
11            So, you know, I didn't know that in
12   advance, but I still asked her questions to -- to
13   be sure of that.  So that's going back pretty far,
14   30, 40 years.
15        Q    You also discussed with Ms. Karman
16   Mr. Karman's general health, right?
17        A    Yes.
18        Q    What did Ms. Karman tell you about
19   Mr. Karman's general health?
20        A    Well, she said he had -- in general, had
21   been healthy.  That he was a smoker, that he had a
22   smoker's cough, and that he did have some
23   arthritic changes in his hands, but otherwise, he,
24   you know, was healthy and functional.
25        Q    Was -- was the arthritis, was that
```

1   rheumatoid arthritis or -- or a different kind of

2   arthritis?

3        A    Osteoarthritis.

4        Q    Osteoarthritis.

5             Any other factors that she relayed to

6   you about Mr. Karman's health?

7        A    No.

8        Q    What other risk factors did Ms. Karman

9   provide you information about concerning

10  Mr. Karman?

11       A    Well, she provided his height and

12  weight -- his usual weight prior to getting his

13  lymphoma.  And of course, I calculated the BMI,

14  which was -- which was elevated, so he was

15  overweight according to his BMI.

16            And from the medical records, I saw that

17  his mother had -- had a non-Hodgkin's lymphoma of

18  the stomach.  And -- you know, and I asked about

19  other -- I'm getting that confused with another

20  case.  I'm sorry.  I'm getting that confused with

21  another case.

22            The only -- the only risk factor that I

23  identified was his -- his overweight.

24       Q    Okay.  And what was the BMI that you

25  calculated for Mr. Karman?

1          A     It was 27.3.

2          Q     So that gives him a roughly 27 percent

3     increase in risk for non-Hodgkin's lymphoma?

4          A     That's correct.

5          Q     The item you mentioned about the family

6     history of non-Hodgkin's lymphoma, was that

7     something from a different case?

8          A     Yeah, that was a different case.  It's a

9     case I'm doing tomorrow.  I'm sorry.

10         Q     That's okay.  I just wanted to make sure

11    I understand what part of it was from the other

12    case and what part of it applies to Mr. Karman.

13               Other than -- other than his height,

14    weight and body mass, did Ms. Karman relay to you

15    any other factors that increased Mr. Karman's risk

16    of non-Hodgkin's lymphoma?

17         A     No.  We talked about the family history,

18    and there was no family history of any kind of

19    hematopoietic cancer in -- in his parents or his

20    children.  So there was no family history.

21               THE REPORTER:  Doctor, I'm sorry, you

22    said there was no history of any kind of -- some

23    kind of cancer?  I missed that one word.

24               THE WITNESS:  Hematopoietic.

25               THE REPORTER:  Thank you.

```
 1    BY MR. BRENZA:

 2         Q    Doctor, have you been disclosed as an

 3    expert in Roundup litigation in other countries?

 4         A    I have.

 5         Q    Have you been disclosed as an expert in

 6    Australia?

 7         A    I believe so.

 8         Q    Have you been disclosed as an expert in

 9    Canada?

10         A    Yes.

11         Q    What other countries?

12         A    That's all.

13         Q    Taking them separately, let's start with

14    Australia.  Have you had communications with

15    counsel in Australia concerning Roundup litigation

16    there?

17         A    Yes.

18         Q    When was the first such communication?

19         A    I don't have my files here on that.  It

20    would have been sometime last year, probably in

21    the second half of last year.

22         Q    The second half of 2020, right?

23         A    Yes.

24         Q    And how many such communications were

25    there?
```

Dennis D. Weisenburger, M.D.

```
 1        A    I don't know the answer to that.  We --
 2   we had some e-mail communications, and then we had
 3   two telephone conversations.
 4        Q    Two telephone and some e-mail?
 5        A    Yes.
 6        Q    How -- how long were your telephone
 7   conversations?
 8             MS. FREDONA:  We're going to object.
 9   What's the relevance with his Australian
10   communications?  I thought this was a case-
11   specific deposition.
12             MR. BRENZA:  It -- it goes to bias.  And
13   it goes to -- yeah, that's -- I think that's
14   sufficient.
15             THE WITNESS:  Well, I -- I don't
16   remember.  Probably 15 minutes to 30 minutes.
17   BY MR. BRENZA:
18        Q    Each one?
19        A    Yes.
20        Q    When was the last conversation you had
21   with counsel for Australia?
22        A    Again, I don't know precisely.  Late
23   last year.
24        Q    Late 2020?
25        A    Yes.
```

1       Q     Have you consulted with the experts that

2    are working with the lawyers in the Australian

3    Roundup litigation?

4       A     No.

5       Q     When you were speaking with the lawyers

6    in -- for -- for the Australian litigation, was

7    anybody else present?

8       A     Yes.  There were some other lawyers, and

9    they have different names for their lawyers in

10   Australia.  It's a British system.  I don't

11   remember what they're called.

12            So there were some lawyers and there

13   were some -- I don't know -- people who -- who

14   actually do the work in the court.

15            MS. FREDONA:  We're just going to put in

16   a standing objection on the Australian issue.

17   BY MR. BRENZA:

18      Q     Do you have documents that record your

19   conversations with lawyers for the Australian

20   Roundup litigation?

21      A     No.

22      Q     How many e-mails do you have?

23      A     I don't know.

24      Q     Have you been paid for your work on the

25   Australian litigation?

Dennis D. Weisenburger, M.D.

```
 1        A    No.

 2        Q    Have you prepared a bill for it?

 3        A    Yes.

 4        Q    How much have you prepared a bill for

 5   for your work in the Australian litigation so far?

 6        A    Well, I've asked for a retainer of

 7   $10,000.

 8        Q    And you say you asked for it.  I take it

 9   it hasn't been paid yet?

10        A    It hasn't been paid yet, yes.

11        Q    I'm going to ask you all the same

12   questions about Canada now.

13             Have you spoken with lawyers in -- for

14   litigation in Canada having to do with Roundup?

15        A    Yes.

16             MS. FREDONA:  Same objection on the

17   record for the Canada lawyers.

18   BY MR. BRENZA:

19        Q    Have you -- have you been -- well, when

20   was -- when was the first conversation you had

21   with lawyers for a Roundup litigation in Canada?

22        A    It was earlier in 2020.  I don't

23   remember.  Probably the spring of 2020.

24        Q    How many conversations were there?

25        A    I don't remember.
```

Dennis D. Weisenburger, M.D.

```
 1        Q    How long did they last?
 2        A    Oh, anywhere from five minutes to, I
 3   don't know, 15 or 30 minutes.  I don't remember.
 4        Q    Were there e-mail communications with
 5   the Canadian lawyers as well?
 6        A    Yes.
 7        Q    How many?
 8        A    I don't know.
 9        Q    Have you kept a -- let me -- before
10   going into that.
11             Have you spoken to experts for the
12   plaintiffs' lawyers in the Canadian Roundup
13   litigation?
14        A    No.
15        Q    Was anyone other than lawyers involved
16   in your conversations with the Canadian lawyers?
17        A    No.
18        Q    Have you kept a record of how many hours
19   you've worked on the Canadian Roundup litigation?
20        A    Yes.
21        Q    How many hours have you worked on it?
22        A    I don't have those records here with me.
23        Q    Are you billing them at the same rate
24   that you bill for the U.S. litigation?
25        A    Well, back early last year, I was
```

1    billing -- I can't remember how much I billed.

2    Initially in the Roundup litigation, I billed $500

3    an hour.  And then last year, sometime in spring,

4    I increased my rate to $650 a year.  And then in

5    the fall, I increased it to $750 a year because I

6    was getting so many requests.

7            So I can't remember what I -- all I --

8    all I've actually been paid for -- been paid in

9    the Canadian litigation is the retainer, which at

10   that time was $5,000.

11        Q    You have a bill for work in excess of

12   that, right?

13        A    I haven't billed them.  I have -- I've

14   been tabulating hours, but I haven't billed them.

15   Because it's moved very slowly.  So...

16        Q    And as you sit here today, you don't

17   know -- excuse me -- you don't know the amount

18   that you would bill if you were going to send a

19   bill out today for your work on the Canadian

20   litigation?

21        A    I don't.

22        Q    Have you -- have you told me everything

23   that Ms. Karman told you in your conversation with

24   her?

25        A    I think so, yes.  As far as I know.

```
 1        Q    In terms of calculating the increased

 2   risk you believe Mr. Karman experienced as a

 3   result of using Roundup, did you perform an

 4   analysis where you calculated how many days he

 5   used Roundup?

 6        A    Yes, I did.

 7        Q    And did you compare the number of days

 8   that you believe Mr. Karman used Roundup with the

 9   number of days referenced in the Eriksson study

10   and the North American Pooled Project study?

11        A    Yes.

12        Q    And those are items number 1 and

13   number 2 in your reference list, right?

14        A    Yes.

15        Q    And let me -- let me mark them for our

16   use today.

17             So Exhibit 5 for today is going to be

18   what's in your folder 5.  It's the Castillo

19   article.

20        A    Okay.

21             (Weisenburger Exhibit No. 5 was

22             marked for identification.)

23   BY MR. BRENZA:

24        Q    Exhibit 6 is going to be the Eriksson

25   article.
```

Dennis D. Weisenburger, M.D.

```
1        A    Okay.

2        Q    It's Eriksson 2008.

3             (Weisenburger Exhibit No. 6 was

4             marked for identification.)

5   BY MR. BRENZA:

6        Q    And Exhibit 7 will be the Pahwa article,

7   and that's Pahwa 2019.

8        A    Okay.

9             (Weisenburger Exhibit No. 7 was

10            marked for identification.)

11  BY MR. BRENZA:

12       Q    So let me actually start with the

13  Castillo article.

14            We talked a little bit about this

15  previously, but I want to find out how it applies

16  to Mr. Karman.

17            What's the significance of the Castillo

18  article for your analysis of Mr. Karman and his

19  non-Hodgkin's lymphoma?

20       A    Well, it's a meta-analysis of overweight

21  and obesity in relationship to diffuse large

22  B-cell lymphoma.

23       Q    And DLBCL is the kind of non-Hodgkin's

24  lymphoma that Mr. Karman had?

25       A    Yes.
```

1     Q    And I think you put in your report it
2  was also the germinal center type of DLBCL.
3     A    Yes, that's actually an error in my
4  report.  They didn't do all of the tests to
5  determine that.  So -- so I can't really say what
6  type it was.
7     Q    What kind of tests would be needed to
8  determine whether it was germinal center or not?
9     A    Well, typically pathologists do a small
10 panel of immunostains.
11    Q    Do you know why those weren't done in
12 Mr. Karman's case?
13    A    I don't.  One -- one of them was done,
14 and I must have misread the pathology report,
15 because when I went back and looked at it
16 yesterday, I realized that the stain was CE10, and
17 I must have misread it as positive when in fact it
18 was negative.
19         Unfortunately, I haven't been able to
20 review these slides because they've been
21 destroyed.  So I have to rely on the pathologist's
22 report.
23    Q    And -- and is CE10 one of the
24 immunostains that you would do to determine if the
25 cancer was -- was a germinal center cancer?

```
 1        A    Yes.

 2        Q    And it was negative.

 3        A    And it was negative, yes.

 4        Q    Does that -- does that tell you one way

 5   or the other if it was germinal center or not?

 6        A    No, it doesn't.  You have to do all

 7   three of the stains.

 8        Q    Why is that?

 9        A    Well, because there's an algorithm in

10   how to interpret the stains.

11        Q    Okay.  We kind of got off on a tangent

12   there.  We were talking about Castillo.

13             Does the Castillo article tell you that

14   Mr. Karman had an increased risk of non-Hodgkin's

15   lymphoma because he was overweight?

16        A    Yes.

17        Q    And it's -- if we want to find out what

18   you're relying on, is it page 126, the Table 3?

19        A    Yes.

20        Q    And it's the entry for -- for male in

21   the third column, right?

22        A    Yes.

23        Q    1.27 risk ratio.

24        A    Right, yes.

25        Q    So was Mr. Karman's overweight a
```

1    contributing factor to his non-Hodgkin's lymphoma?

2         A    It may well have been, yes.

3         Q    Let me direct your attention now to

4    Exhibit 6.  That's the Eriksson paper.

5              Do you have that?

6         A    I do.

7         Q    So which part of the Eriksson paper do

8    you rely on for your opinions about Mr. Karman?

9         A    The data in Table 2.

10        Q    Table 2 is -- is the table that shows

11   what the authors concluded was the increased risk

12   for different numbers of days using Roundup.

13        A    Yes.

14        Q    Do you rely on any other tables in

15   Eriksson Exhibit 6?

16        A    No.

17        Q    Does Table 3 provide a figure for the

18   increased risk of diffuse large B-cell lymphoma

19   specifically?

20        A    It does provide some information, yes.

21   It -- for glyphosate, the odds risk ratio was

22   1.22.  But it's not statistically significant.

23        Q    Does the fact that it's not

24   statistically significant tell you that the study

25   authors were unable to conclude that glyphosate

1    increased the risk of diffuse large B-cell

2    lymphoma?

3        A    Well, I'm sorry.  You have to repeat the

4    question.

5        Q    Does the fact that the figure for

6    glyphosate on Table 3 is not statistically

7    significant tell you that the authors were unable

8    to conclude that glyphosate was a significant

9    causal factor of diffuse large B-cell lymphoma?

10       A    Yes.  I don't believe they made that

11   statement in their paper.  There were only

12   29 cases of lymphoma exposed to glyphosate.  So if

13   maybe one-third of those was diffuse large B-cell

14   lymphoma, it means they had only eight or nine

15   cases of exposed people.

16            So the numbers are very small, and

17   that's one reason -- and could be one reason why,

18   you know, the finding is not significant.  So it's

19   difficult in these case-control studies when the

20   numbers are small to make much -- to draw any real

21   conclusions.

22       Q    And -- and that's a drawback of -- of

23   this particular study is it didn't have a lot of

24   people in it.  Right?

25       A    Well, they had a lot of people, but it

1    didn't have a lot of people exposed to glyphosate.

2         Q    Okay.  And -- and the result of not

3    having a lot of people exposed to glyphosate was

4    they couldn't make conclusions about whether

5    Roundup or glyphosate caused non-Hodgkin's

6    lymphoma of the diffuse large B-cell type, right?

7         A    Yes.

8              MS. FREDONA:  Object to form.

9              THE WITNESS:  Yes.

10   BY MR. BRENZA:

11        Q    Are there any other parts of Exhibit 6

12   that you rely on besides Table 2?

13        A    Not for the purposes of this case, no.

14        Q    Did you consider Table 7?

15        A    I have, yes.  For this case, I didn't,

16   but --

17        Q    You chose not to consider it in this

18   case, Mr. Karman's case?

19        A    No, because it doesn't really give any

20   information by number of days.

21        Q    Table 7 is -- contributes to the paper

22   in that it attempts to control for more exposures

23   to other things that might cause non-Hodgkin's

24   lymphoma, right?

25        A    That's true.  Yes.

1        Q     And -- and that's the multivariate
2   analysis, right?
3        A     Yes.
4        Q     And when other things are controlled
5   for, there's no longer a significant relationship
6   between glyphosate and non-Hodgkin's lymphoma,
7   right?
8        A     Well, the odds ratio is increased to
9   1.51, but it's no longer statistically
10  significant, that's correct.
11       Q     And when it's no longer statistically
12  significant, it means you can't tell if that's a
13  true result or just the result of chance, right?
14       A     That's correct.
15       Q     So going back to Table 2 now, what do
16  you -- what do you take from Table 2?
17       A     Well, Table 2 is a surrogate for
18  dose-response, where less than ten days would be
19  lower dose and greater than ten days would be
20  higher dose, and what you can see is that the odds
21  ratio increases from 1.69 to 2.36.  And the latter
22  odds ratio is statistically significant.
23       Q     Does Mr. Eriksson or any of the other
24  researchers on Exhibit 6, do they describe what
25  they consider to be a day -- an exposure day for

Dennis D. Weisenburger, M.D.

1   purposes of Table 2?

2        A     I don't believe they do.  I interpreted

3   it as a day or -- yeah, as a day, using it at

4   least once in a day.  A day is a day.  I -- so --

5   it could be shorter than 24 hours.  It's unlikely

6   it was 24 hours.  So it was some period in one

7   day.

8        Q     In your understanding of Exhibit 6, a

9   day is any part of a day in which Roundup or

10  glyphosate was used, right?

11       A     That's how I would interpret it, yes.  I

12  mean, I don't know whether they actually define it

13  in the paper.  I'd have to go back and read the

14  paper.

15       Q     And that could be anything from, as you

16  said, a 24-hour -- a 24-hour day to a two-second

17  day, right?  I mean, there's no distinguishing how

18  long the use is in this analysis of days of use,

19  right?

20            MS. FREDONA:  Objection.  Form.

21            THE WITNESS:  We can't know how long --

22  how long it was used.  We can't know for each of

23  the individual persons who were exposed.  The data

24  is not provided.

25  BY MR. BRENZA:

1      Q    So -- so your understanding for purposes

2  of your opinions in the case is that a day is

3  any -- any part of the day ranging from two

4  seconds to 24 hours?

5      A    You -- in my opinion, it was probably

6  longer than two seconds, but I don't know how much

7  longer.

8      Q    If -- if you look at the -- the number

9  of study participants in the figures that you have

10 relied on, are they found in the second column of

11 Table 2?

12     A    On Table 2?

13     Q    Yes.

14     A    Yes.

15     Q    And for less than ten days, does Table 2

16 show that there were 12 cases and nine controls?

17     A    Yes.

18     Q    And for greater than ten days, does it

19 show that there were 17 cases and nine controls?

20     A    Yes.

21     Q    Controls are individuals that have been

22 recruited into the study that do not have the

23 disease that's being studied, right?

24     A    That's correct.

25     Q    Is it common in case-control studies to

1    use more controls than cases?

2         A    Usually you do use more controls than

3    cases, yes.  Either -- either -- in the Nebraska

4    study, I think we did 2-to-1 or 3-to-1 controls to

5    cases.  So --

6         Q    And that's pretty standard, right?

7    That's -- that's a normal ratio of cases to

8    controls?

9         A    Usually you use -- you use at least the

10   same number of cases and controls, but I think

11   most studies use more cases than controls, yes,

12   either 2-to-1 or 3-to-1.

13        Q    And that's because you can recruit as

14   many controls as you need to to make sure you're

15   not getting a biased result, right?

16        A    Yes.

17        Q    But that's not what the Eriksson study

18   did, right?

19        A    What they -- what they say is they had a

20   total of 910 cases and 1,016 controls.  So they

21   had approximately a 1-to-1 ratio.  But in Table 2,

22   for many of the numbers there are more cases than

23   controls.

24        Q    So that doesn't comply with the

25   standards that are normal for doing this kind of

1    analysis, right, the way they did the analysis for

2    glyphosate?

3              MS. FREDONA:  Object to form.

4              THE WITNESS:  That's a -- that's

5    probably a question for an epidemiologist.

6    BY MR. BRENZA:

7         Q    Well, would you agree it raises -- at

8    the very least, it raises questions about what

9    they did?

10             MS. FREDONA:  Objection.  Form.

11             THE WITNESS:  So what they said is in

12   the univariate analysis, the unexposed category

13   consisted of subjects that were unexposed to all,

14   included pesticides.  So their controls were --

15   were not exposed to any of the pesticides

16   considered in the study.

17   BY MR. BRENZA:

18        Q    So that's a separate question, but that

19   doesn't address the reason why there are fewer

20   controls than cases, rather than 2-to-1 or 3-to-1

21   ratio as you would normally see, does it?

22        A    It may be the answer.  I don't know.

23        Q    It's a separate question, though.  If

24   their controls were not like the cases in that

25   they had been unexposed to any pesticides, that

Dennis D. Weisenburger, M.D.

```
1   raises a question about how comparable the cases
2   in the controls actually are, doesn't it?
3        A    Yes.  That's been one of the -- one of
4   the things that's been criticized about this
5   study.
6        Q    And -- and you agree with that
7   criticism, right?
8        A    Well, I can tell you in the Nebraska
9   study we -- we didn't do this.  We -- we literally
10  accepted the control -- if we were looking at
11  glyphosate, we would accept it as a control,
12  people who could have been exposed to other
13  pesticides but not glyphosate.
14       Q    That's -- that's the right way to do it,
15  right?
16       A    They also match -- you know, they always
17  match the controls by age, sex and -- age and sex
18  and year of enrollment too.  That may have
19  affected it, but I suspect those are the reasons
20  why there are fewer controls than there are cases
21  in -- in many of these categories.
22       Q    And selecting controls that have been
23  similarly exposed to the cases, but for the
24  substance you're examining, that's the right way
25  to do this kind of study, isn't it?
```

Dennis D. Weisenburger, M.D.

```
1              MS. FREDONA:  Objection.  Form.
2              THE WITNESS:  It's a better -- it's a
3    better way to do it, yes.  I'm not going to say
4    it's wrong because they did it.  They're
5    experienced epidemiologists, they published it.
6    But I think a better way to do it is to use
7    controls that are fully differing in the exposure
8    of interest.
9    BY MR. BRENZA:
10        Q    And -- and when you studied this
11   problem, that's the way you did it, right?
12        A    Yes.
13        Q    All right.  We talked a little bit about
14   Pahwa, Exhibit 7, yesterday.  Let's -- let's talk
15   about it again.  If you would get out Exhibit 7.
16        A    Okay.
17        Q    What part of the Pahwa 2019 article that
18   we marked as Exhibit 7 do you rely on for your
19   opinions in this matter?
20        A    I'm relying primarily on the data in
21   Table 4.
22        Q    Anything else?
23        A    Well, I'm relying on the -- you know,
24   all the other information in -- in the paper as
25   well.  I've read the paper.  I understand how it
```

```
 1   was done.
 2        Q    And you're an author on this paper,
 3   right?
 4        A    Yes.
 5        Q    But I think you've said previously you
 6   weren't the lead researcher.  The lead researchers
 7   were the first author and the last author,
 8   M. Pahwa and S.A. Harris, right?
 9        A    Yes.
10        Q    And you said that you had spoken on the
11   phone at least once to -- to Shelly Harris, right?
12        A    I don't actually remember.  I think I
13   have.
14        Q    But -- but you say you've never met any
15   of the other -- you never met any of the authors
16   on this paper.
17        A    Well, I know some of the authors
18   personally, sure, but --
19        Q    Oh, you do.  Okay.
20        A    -- I haven't met Manisha Pahwa, and I --
21   and I don't know whether I've actually met Shelly
22   Harris or not.  I don't -- I don't actually know
23   that.  I may have.
24        Q    Which -- which of the authors have you
25   actually met in -- in the past?
```

1        A    John Spinelli, Aaron Blair, Shelia Zahm,

2   Ken Cantor, James Dosman.  So I know many of these

3   people.

4        Q    Okay.  But the -- but the lead

5   researchers, M. Pahwa and S.A. Harris, you never

6   met in person, and -- and M. Pahwa, you never

7   spoke to directly.  Is that right?

8        A    That's -- that's correct.

9        Q    But you do agree with -- with this

10  paper.  You do agree with the way it was

11  published, right?

12       A    Yes.

13       Q    Are you -- all right.  So you -- for

14  purposes of your opinions in this matter, you rely

15  on Table 4.  Do you rely on the part of Table 4

16  that provides statistics for NHL overall?

17       A    Yes.

18       Q    And looking at the NHL overall, there

19  are six -- one, two, three -- I'm not sure whether

20  it's five or -- it might be five columns.  Is

21  that -- is that what you see?

22       A    Yeah, there's -- there's six columns.

23       Q    Well, six -- okay.  Yeah, six columns

24  including the categories for the number of days

25  per year of glyphosate use, right?

Dennis D. Weisenburger, M.D.

```
 1         A    Yes.

 2         Q    And for no days, zero days, there are --

 3    there's a -- there are odds ratios and confidence

 4    intervals provided, right?

 5         A    Yes.

 6         Q    The first odds ratio is adjusted for

 7    certain things, but not as many things as the --

 8    the second odds ratio, right?

 9         A    Yes.

10         Q    So that's odds ratio B -- is odds

11    ratio B, the second odds ratio, the one that you

12    selected to use in this case?

13         A    Yes.

14         Q    Why did you select the odds ratio B to

15    use in your opinions in this case?

16         A    Well, because it's adjusted for -- in

17    addition to all the things adjusted for in

18    column A, it -- it additionally adjusts for the

19    use of three other potentially confounding

20    pesticides.

21         Q    And those potentially confounding

22    pesticides are 2,4-D, Dicamba and Malathion,

23    right?

24         A    Yes.

25         Q    And those are all potential confounders
```

Dennis D. Weisenburger, M.D.

1    because they may also increase the risk of

2    non-Hodgkin's lymphoma, right?

3         A    Yes.

4         Q    The -- the number provided for zero days

5    of exposure is 1.0.  That's by definition, right?

6    That's because you're going to compare exposed

7    cases to the rate that you observed in people who

8    have never been exposed.  Right?

9         A    That's correct.

10        Q    And -- and you have to define it as 1.0

11   because even people who have never sprayed Roundup

12   or used glyphosate still get non-Hodgkin's

13   lymphoma, right?

14        A    Yes.

15        Q    So you need to compare it not to whether

16   they get non-Hodgkin's lymphoma, but whether they

17   get it at a higher rate than people who have never

18   used Roundup, right?

19        A    That's correct.

20        Q    The rate for -- the risk ratio for

21   people who have used glyphosate between zero and

22   two times -- two days per year is 0.74, right?

23        A    Yes.

24        Q    And under the column that you've

25   selected to use for this case.

```
 1        A     Right.  Yes.

 2        Q     And -- and when the risk ratio becomes

 3   less than 1.0, the -- what that means is that

 4   people who have used glyphosate between zero and

 5   two days a year have a lower rate of non-Hodgkin's

 6   lymphoma than people have never used Roundup.

 7   Right?

 8        A     Well, I wouldn't interpret it that way.

 9   I would say that it's -- it's no different than

10   those who never used Roundup.

11        Q     But that's what the statistics tell you.

12              If you take them at face value, it's

13   telling you that actually people in that category

14   get non-Hodgkin's lymphoma at a less rate than

15   people who have never used glyphosate?

16        A     No, the statistics tell you that 0.74 is

17   no different than 1.0.

18        Q     And that's because it's not

19   statistically significant; is that why you say

20   that?

21        A     Yes.

22        Q     The -- the number you use for your

23   opinion in this case is the figure given for more

24   than two days per year.  Right?

25        A     Yes.
```

Dennis D. Weisenburger, M.D.

```
1          Q    And under the odds ratio B, you -- you

2    select the number 1.73, right?

3          A    Yes.

4          Q    And that has a confidence interval

5    ranging from 1.02 to 2.94, right?

6          A    Yes.

7          Q    Is it true that the actual number, again

8    just taking these statistics at face value, is

9    somewhere within the range provided by the

10   confidence interval?

11         A    Yes, but the best estimate is 1.73 --

12   yeah, 1.73.  So that's -- the number 1.0 would

13   place your reliance on.

14         Q    So 1.73 means a 73 percent greater rate

15   of non-Hodgkin's lymphoma compared to people who

16   have never used Roundup, right?

17         A    That's correct.

18         Q    And is that the increased risk that you

19   believe Mr. Karman experienced as a result of

20   using Roundup?

21         A    Well, that -- that's a risk for NHL

22   overall.  I believe the -- the number for diffuse

23   large B-cell lymphoma is actually more relevant to

24   this case.  It's further down in that same column.

25         Q    But that's -- that's not the number you
```

1    included in your report, right?

2         A    I included both numbers.

3         Q    Okay.  I see it.

4              So -- so then you -- well, let me just

5    stop -- let me just finish with the first number,

6    the 1.73 odds ratio, that means that there was a

7    73 percent increase if you look at it by number of

8    days per year from using Roundup in this -- under

9    this study.  Right?

10        A    It refers to overall --

11        Q    And then --

12             THE REPORTER:  I'm sorry.  Doctor, can

13   you repeat that again?  I didn't hear it clearly.

14             THE WITNESS:  So the 1.73 odds ratio

15   refers to non-Hodgkin's lymphoma overall.

16             THE REPORTER:  Thank you.

17   BY MR. BRENZA:

18        Q    You referenced the next group of numbers

19   for diffuse large B-cell lymphoma, right?

20        A    Yes.

21        Q    And there again, people who have used it

22   for zero days have a -- a 1.0 risk by definition,

23   right?

24        A    Yes.

25        Q    Which doesn't mean that people who don't

1   use Roundup never get non-Hodgkin's lymphoma,

2   right?

3       A    That's correct.

4       Q    It just means that however many cases

5   are explained by other things, that's how many

6   cases we're going to see compared to for people

7   who have used Roundup.

8            MS. FREDONA:  Objection.  Form.

9            THE WITNESS:  Well, you -- basically you

10  assign a risk of 1.0 to those who didn't use

11  Roundup.

12  BY MR. BRENZA:

13      Q    And then again for the range of zero to

14  two, up to two days per year, the risk for people

15  who use Roundup or glyphosate goes down, according

16  to these statistics, to 0.7, right?

17      A    Well, it -- I wouldn't interpret it that

18  way.  The number is lower, but -- but it -- the

19  number is statistically no different than 1.0.  So

20  I would say that there -- I would say there's no

21  increased risk based on -- on that -- on that

22  number 0.7.

23            But I wouldn't say there was a decreased

24  risk.  I wouldn't even say it's lower, although

25  the number is actually lower.  The confidence

Dennis D. Weisenburger, M.D.

```
1    interval is wide, and, you know, it could be as
2    high -- it could be as high as 1.4, right?
3         Q    But -- but you said in a previous
4    discussion that the number given in that column is
5    the best estimate, right?
6         A    Yes, it's the best estimate, but it's
7    not statistically significant from 1.0.
8         Q    And -- and the best estimate in -- for
9    people who use Roundup up to two days a year is
10   less than people who have never used Roundup at
11   all, right?
12        A    Yes, but it's not statistically
13   significant from 1.0.  That's what the confidence
14   interval tells you.
15        Q    But this also tells you that there's no
16   clear dose-response to using Roundup, doesn't it?
17        A    Well, if you consider the greater than
18   two days, there is a dose-response.
19        Q    Well, dose-response means that as you
20   use more of the studied substance, you get an
21   increased occurrence of the study disease, right?
22             MS. FREDONA:  Objection.  Form.
23             THE WITNESS:  Yes, and that's what we're
24   seeing in this table.
25   BY MR. BRENZA:
```

1        Q    And in this table we're seeing that if

2   you increase the use of Roundup to -- up to two

3   days per year, you get a lower rate of cancer than

4   if you don't use Roundup at all.

5        A    Well, I -- I would say you don't -- you

6   don't see an increased risk with less than two

7   days -- less than or equal to two days of use, you

8   don't see an increase.  It's the same as people

9   who are unexposed.

10       Q    Well, you would agree that at the very

11   least this doesn't establish a dose-response

12   relationship, right?

13       A    Well, not -- not the first number,

14   zero -- greater than zero but less than or equal

15   to two.  But you have to consider the second

16   number greater than two days to look at a dose-

17   response.

18       Q    A real dose-response would show a linear

19   or a continuous increase based on continuous

20   increases of exposure, right?

21       A    In an ideal world, yes.

22       Q    Well, that's what dose-response means,

23   right?

24       A    Dose-response means that the risk goes

25   up as the dose goes up, and in this case the

1   people who had the highest dose or the most

2   intensive exposure have an over twofold increased

3   risk that's statistically significant for diffuse

4   large B-cell lymphoma.  That's what the data tells

5   you.

6        Q    Now, it's important not to just pick one

7   number or a couple of numbers from a study like

8   this that -- that compares a variety of different

9   exposures and time periods and -- and other ways

10  of looking at the problem, right?

11            MS. FREDONA:  Objection.  Form.

12            THE WITNESS:  I considered all the data

13  in this paper.

14  BY MR. BRENZA:

15       Q    So let's look at Table 3.  That's the

16  table right before the one that you chose to put

17  in your report.  Do you see it?

18       A    Yes.

19       Q    Table 3 looks at it in a slightly

20  different way.  It looks at the number of years

21  that someone uses glyphosate.

22       A    That's right.

23       Q    And if you look at the numbers for

24  diffuse large B-cell lymphoma, do you see that

25  there's a number for the odds ratio of zero

Dennis D. Weisenburger, M.D.

```
 1   days -- of zero years of use, right?

 2        A    Yes.

 3        Q    And that's -- that's 1.0 by definition,

 4   right?

 5        A    Yes.

 6        Q    Then reading further down, there's a

 7   number for between zero and 3.5 years of

 8   glyphosate use, right?

 9        A    Yes.

10        Q    And the number there is 1.61.  Right?

11        A    Yes.

12        Q    And then there's another number for

13   greater than 3.5 years of glyphosate use, right?

14        A    Yes.

15        Q    And the number there is 0.93, right?

16        A    Yes.

17        Q    Those figures tell you, if you just take

18   them at face value, best estimates, that using

19   glyphosate for more years reduces your risk rather

20   than increases it, right?

21        A    Well, I wouldn't -- again, I wouldn't

22   interpret it that way.  I would say that based on

23   this data in Table 3, the number of years is not

24   predictive of an increased risk.

25        Q    And that's also a -- a factor in
```

1  deciding whether a dose-response relationship has

2  been established by any given study, right?

3       A    Yes.  It's another way to look at

4  dose-response, yes.

5       Q    And you agreed with doing this study and

6  looking at it a number of different ways, right?

7       A    Yes.

8       Q    Because if you look at it in any one

9  particular way with particular cutoffs that, you

10 know, from epidemiology and statistics that you

11 can generate what's called spurious results.

12          MS. FREDONA:  Objection.  Form.

13          THE WITNESS:  I don't think anybody

14 wants to generate spurious results.

15 BY MR. BRENZA:

16      Q    I'm not saying that anyone would want

17 to, but it can happen as a result of the way data

18 is analyzed in terms of where the cut points are,

19 right?

20      A    Yes.

21      Q    And so it's important to do the analysis

22 more than one way, to see if you are seeing a real

23 effect or an artifact from the way you happen to

24 have done the statistics.

25      A    That's correct.

```
 1        Q    And that's also why in addition to
 2   Table 3 and Table 4, the authors also perform the
 3   analysis in Table 5, right?
 4        A    That's correct.
 5        Q    And Table 5 looks at yet a different
 6   way.  It looks at the number of years used times
 7   the days per year that the material was handled,
 8   right?
 9        A    Yes.
10        Q    And just to carry over what I think you
11   told me previously, that there is an error in
12   Table 5.
13        A    Yes.
14        Q    If you -- if you would tell me what --
15   tell me what the error is, and then how it can be
16   corrected.
17        A    Yeah, so the categories of lifetime days
18   should be different.  Of course, zero is the same,
19   but the second category should be less than or
20   equal to 7, instead of greater than zero, dash,
21   less than or equal to 3.5.  So it should be
22   greater than zero but less than or equal to 7, and
23   then the third item should be greater than 7,
24   instead of greater than 3.5.
25        Q    Okay.
```

Dennis D. Weisenburger, M.D.

```
1                    MR. BRENZA:  Doctor, we've been going

2     for about an hour and a half.  I -- if -- I

3     propose we take a short break.  Folks may --

4                    THE WITNESS:  Okay.

5                    MR. BRENZA:  -- like to get some coffee,

6     and it might be -- might be helpful for everyone

7     to just have a five-minute break.

8                    THE WITNESS:  Sounds good.  Thank you.

9                    THE VIDEOGRAPHER:  We are going off the

10    record at 10:36 a.m.

11                   (Recess.)

12                   THE VIDEOGRAPHER:  We're back on the

13    record at 10:50 a.m.

14    BY MR. BRENZA:

15        Q    Doctor, I -- I've had a chance to look

16    at your -- the invoice that you submitted in this

17    particular case, and as you said, it shows

18    approximately 16 hours at $750 an hour for a total

19    of $12,000.  I think that's what you said, right?

20        A    Yes.

21        Q    And then there was a retainer of $10,000

22    that you noted against that, for a total due of

23    2,000.

24        A    That's --

25        Q    Am I right?
```

Dennis D. Weisenburger, M.D.

```
1              A    Yes.

2              Q    Did you receive a retainer in each of

3    the five cases that you and Mr. Moll agreed you

4    would be an expert witness in?

5              A    Yes.

6              Q    Was the retainer the same amount,

7    $10,000 for each case?

8              A    Yes.

9              Q    Have you put in a similar amount of time

10   in each of those other cases as you have for this

11   one?

12             A    Oh, some took more time and some took

13   less time.  I don't remember exactly -- I don't

14   remember exactly how much it was.  I mean, I -- I

15   have the invoices here, but, you know, the hours

16   ranged -- I can tell you what the hours ranged

17   from.

18             Q    Sure.

19             A    One case was 27 and a half hours, one

20   was 23 and a half hours, one was 20 hours, one was

21   14 and a half hours, and this one was 16 hours.

22   So this was -- yeah, this was a little bit shorter

23   than some of the others.  It depended entirely on

24   how many medical records I got, primarily, and

25   other -- other things that I would have reviewed.
```

1    Q    And you were able to take these -- these

2    five cases from Mr. Moll because you had cleared

3    your schedule to some degree in order to be able

4    to take on more Roundup testifying work, right?

5    A    Yes.

6    Q    And your involvement in these cases

7    has -- has increased from maybe the middle of last

8    year to the present -- the present day.

9    A    Yes, because of COVID everything slowed

10   down, of course.  And I was trying to finish my

11   cases with the Wagstaff firm, so I really didn't

12   want to take on any new cases, you know, until I

13   kind of saw that I would have enough time to deal

14   with them without being stressed out.  I was

15   working full time last year, so I have to do this

16   on my spare time, nights and weekends.

17   Q    And you -- you cut back on your -- your

18   regular work to make more time for litigation

19   work, right?

20   A    Yes, and to transition towards

21   retirement.

22   Q    And -- and when you say "transition

23   towards retirement," when -- when do you plan on

24   retiring?

25   A    Sometime later this year.

Dennis D. Weisenburger, M.D.

1    Q    And when that happens, will you continue

2    earning money as an expert witness in litigation?

3    A    Yes, I'll finish the work that I've

4    started.  I'm not sure I'll take new cases, but

5    I'll at least finish the work that I've started,

6    yes.

7    Q    Okay.  So you're not necessarily

8    retiring as a -- as a witness.  You're retiring

9    from your job at the hospital or the university

10   where you work.

11   A    Yes.

12   Q    Okay.  And just to be clear, City of

13   Hope, is it a hospital or a school or both?

14   A    Well, it's a hospital and a clinic, but

15   it has a graduate school and a research institute.

16   So it's not just a hospital.

17   Q    It's a teaching hospital, is that how

18   you would describe it, or --

19   A    Well, you asked me, do -- we do teach

20   researchers, Ph.D. researchers, and we do teach

21   fellows.  So these are people who have trained --

22   already trained in medicine and had an internship

23   and a residency, so they're coming here for

24   specialized training, mainly in -- in basic

25   research or to become a specialized

1  hematopathologist, like myself, or specialized

2  hematologist or something like that.  So it does

3  specialty training.

4       Q    I would like to ask you some questions

5  about non-Hodgkin's lymphoma broadly.  And -- and

6  also some questions about the -- the SEER data,

7  which you'll find, I think, in folder number 8,

8  and we'll mark that as Exhibit 8.

9            (Weisenburger Exhibit No. 8 was

10            marked for identification.)

11  BY MR. BRENZA:

12       Q    Tell me when you -- when you have it.

13       A    Yes.  I have it.

14       Q    Yesterday we talked about non-Hodgkin's

15  lymphoma generally.  Do you remember that?

16       A    Yes.

17       Q    And you agree that non-Hodgkin's

18  lymphoma is a fairly common cancer, right?

19       A    Yes, it's fairly common.

20       Q    And it's caused by a variety of things,

21  some of which aren't yet known.

22       A    That's correct.

23       Q    And I think you said yesterday that if

24  you look at all the cancer that's caused by known

25  risk factors, it only accounts for around

1   30 percent of all the non-Hodgkin's lymphoma; is

2   that right?

3        A    That's a rough estimate.  That's a

4   guesstimate.

5        Q    But is that your best understanding of

6   it?

7        A    I haven't really sat down to calculate a

8   number, so that's my guesstimate.

9        Q    Is there an understanding about that in

10  the medical community?

11       A    Not that I know of.

12       Q    If you look at the SEER data that we've

13  marked as Exhibit 8, do you see there that there's

14  a chart that shows the incidence of non-Hodgkin's

15  lymphoma over a number of decades?

16       A    Yes.

17       Q    And at -- I think it's the very last

18  page of Exhibit 8.  Do you see that?

19       A    Yes.

20       Q    There it shows that from 1975 to, it

21  looks like, about 1990 or maybe 1995, the rate of

22  non-Hodgkin's lymphoma increased.

23       A    Yes.

24       Q    And then from 1995 to the present day,

25  the rate of non-Hodgkin's lymphoma either stayed

```
1   the same or went down a little bit.  Is that
2   right?
3        A    Yeah.  It probably stayed pretty much
4   the same.
5        Q    Is that the understanding in the medical
6   community that you're aware of that the rate of
7   non-Hodgkin's lymphoma has roughly stayed the same
8   over the last 25 years?
9        A    Yes.
10       Q    Now, over that same time period, the
11  rate of glyphosate use has increased tremendously,
12  hasn't it?
13       A    Yes.
14       Q    But that has not resulted in an overall
15  increase in the rate of non-Hodgkin's lymphoma
16  looking at the population as a whole.  Fair?
17       A    Well, you can't -- you can't see it on
18  this graph.
19       Q    And this graph is the rate of
20  non-Hodgkin's lymphoma looking at the population
21  as a whole.
22       A    Yes.
23       Q    Does that tell you that there's a lot of
24  other things that are causing non-Hodgkin's
25  lymphoma other than Roundup?
```

Dennis D. Weisenburger, M.D.

1      A    Well, we know that.  The graph doesn't
2  tell me that, but -- we know that.
3      Q    And one of those things are -- one of
4  the significant things are, I think we talked
5  about earlier, random mutation, right?
6      A    Right.
7      Q    People just from the normal processes of
8  their body and living, cell replication happens as
9  a normal part of being alive, errors occur, and
10  sometimes that results in non-Hodgkin's lymphoma.
11      A    That's correct.
12      Q    And that could account for over half of
13  all the people that present with non-Hodgkin's
14  lymphoma.  Right?
15      A    It could, yes.
16      Q    And then when you see a non-Hodgkin's
17  lymphoma that's caused by random mutation, that's
18  not going to have any indication in the medical
19  records that that's what caused it, right?
20      A    No.  There's no way to -- to know that.
21      Q    And likewise, there is no way to know if
22  a particular non-Hodgkin's lymphoma was or was not
23  caused by Roundup, right?
24      A    Well, generally, hematologists and
25  oncologists don't ask questions about pesticide

1    use, for example.

2         Q    Well, but there's -- there's no test

3    that you can do on a pathology slide or a sample

4    of a tumor or something that tells you that this

5    particular tumor was caused by any particular

6    thing, including Roundup, right?

7         A    Yes.

8         Q    So you've used -- instead of a direct

9    test, you've used a method called differential

10   etiology, right?

11        A    Yes.

12        Q    And before we get into that, I just want

13   to -- I think -- I don't mean to, you know,

14   disparage your opinions, but I just -- I just want

15   to get it clear that there's no test in

16   Mr. Karman's medical records that shows glyphosate

17   in his body at any time at any concentration,

18   right?

19        A    It was never mentioned.

20        Q    So there's no such test, right?

21        A    Well, there is a test.  It just wasn't

22   done.

23        Q    Okay.  But there's no test in his

24   medical records.

25        A    That's correct.

Dennis D. Weisenburger, M.D.

```
1        Q    And there's no test of his non-Hodgkin's

2   lymphoma that shows precisely what caused it,

3   right?

4        A    That's correct.

5        Q    So differential etiology is a method by

6   which you consider all the possible causes that

7   you can identify and try to select the ones that

8   you believe are most likely to have caused the

9   cancer at issue, right?

10       A    Yes.  You go through the list, you rule

11  all them -- you rule some out, you rule some in.

12       Q    And you can only work with the factors

13  that you know about, obviously, right?

14       A    Yes.

15       Q    So if Mr. Karman had exposures that

16  Mrs. Karman didn't know about, there's no way you

17  could take those into account in your analysis,

18  correct?

19            MS. FREDONA:  Objection.  Incomplete

20  hypothetical.

21            THE WITNESS:  That's correct.  I also

22  had the medical records to rely on.

23  BY MR. BRENZA:

24       Q    And likewise, if Mrs. Karman was wrong

25  about the amount of Roundup that Mr. Karman used,
```

Dennis D. Weisenburger, M.D.

```
1   there's no way you could take that into account in
2   your analysis either, right?
3            MS. FREDONA:  Same objection.
4            THE WITNESS:  No, I relied on her -- her
5   information.
6   BY MR. BRENZA:
7        Q    Are there factors that -- other than --
8   well, let me -- let me back up.
9            Is age a factor -- a risk factor for
10  non-Hodgkin's lymphoma?
11       A    Yes, it is.
12       Q    And being male is a risk factor for
13  non-Hodgkin's lymphoma, right?
14       A    Yeah, unfortunately, it is.
15       Q    And being white is also a risk factor
16  for non-Hodgkin's lymphoma, right?
17       A    Yes.
18       Q    And Mr. Karman was all three of those
19  things, right?
20       A    Yes.
21       Q    He was 77 when he presented with his
22  non-Hodgkin's lymphoma, right?
23       A    Yes.
24       Q    He was also overweight, right?
25       A    Yes.
```

1       Q     And he had a number of other risk

2    factors that he experienced over the course of his

3    life, such as being a heavy smoker, right?

4       A     Well, that would be a risk factor for

5    lung cancer but not for non-Hodgkin's lymphoma.

6       Q     Is it your opinion that smoking has

7    absolutely no effect on your risk of non-Hodgkin's

8    lymphoma?

9       A     Yes.

10      Q     Mr. Karman also consumed large amounts

11   of alcohol.  Do you see that in his records?

12            MS. FREDONA:  Objection.  Form.

13            THE WITNESS:  Well, he had a few beers

14   every day.

15   BY MR. BRENZA:

16      Q     Yeah, I think it -- it ranged -- it

17   ranged up to maybe four or more per day in some of

18   those records, right?

19      A     Something like that, yes.

20      Q     And you know from -- from being in the

21   medical field all your life that people usually

22   underreport the amount of alcohol and smoking that

23   they do to their doctors.  Right?

24            MS. FREDONA:  Objection.  Form.

25            THE WITNESS:  Yes.  But I think -- yeah,

1    that's true.

2    BY MR. BRENZA:

3        Q    Was Mr. Karman's consumption of alcohol

4    a risk factor for his non-Hodgkin's lymphoma?

5        A    No.  In fact, alcohol is protective.

6        Q    Well, I got that going for me, so --

7    okay.

8             So were there any other known risk

9    factors that you saw for Mr. Karman other than his

10   age, race, gender, and weight?

11       A    No.  But his weight was the only one

12   that was modifiable.  Obviously his age, his sex,

13   and his race are all things he can't do anything

14   about.  So...

15       Q    And -- and what's modifiable --

16       A    I considered those risk factors, but

17   they're not really causative risk -- risk factors.

18       Q    Well, what's modifiable is important

19   when you're treating a patient, right?  You

20   don't -- you obviously can't treat him for

21   something that can't be changed.

22       A    Yeah.  Or -- or you can't prevent it.

23       Q    But when you're determining etiology

24   after the fact, what's modifiable is just as

25   relevant as things that are modifiable, right?

Dennis D. Weisenburger, M.D.

1          A     Say that again.

2          Q     When you're -- when you're treating --

3   when you're doing an etiology analysis after the

4   fact, what's modifiable is -- is equally relevant

5   to what isn't modifiable.

6          A     No.  His -- his risk of being a

7   77-year-old white male would be the same as other

8   77-year-old white males in general.  His obesity

9   increased his risk a little bit, and his Roundup

10  use increased his risk even more.

11         Q     But isn't it true that his risk from

12  being a 77-year-old white male, while not

13  modifiable, still is a -- a substantial cause of

14  non-Hodgkin's lymphoma in the population at large?

15              MS. FREDONA:  Objection.  Form.

16              THE WITNESS:  I wouldn't consider it a

17  cause.  I would consider it a risk factor but not

18  a cause.  Otherwise, all 77-year-old men have an

19  increased risk of non-Hodgkin's lymphoma, and then

20  what do you compare it to, 65-year-old men,

21  55-year old men?  Sure, then it is increased, but

22  it isn't increased compared to other 77-year-old

23  men without other co-risk factors.

24  BY MR. BRENZA:

25         Q     But the studies that you cited, the

1    Eriksson study and the Pahwa study, they didn't

2    attempt to look at just the risks of 77-year-old

3    men, right?

4         A    No, they looked at -- generally they

5    looked at adults of -- of all ages.

6         Q    And isn't it right that as you age, one

7    of the reasons that non-Hodgkin's lymphoma becomes

8    more common is your immune system begins to age?

9         A    Well, that's -- that possibly does play

10   a role, but I don't believe it's a very important

11   role.  Because the immune system, it does age, but

12   not to the degree that it puts people at increased

13   risk for lymphoma due to things like Epstein-Barr

14   virus or other immunodeficiencies.  It's a mild --

15   it's a mild -- very mild immune deficiency at

16   best.

17        Q    Is it your view -- is --

18        A    I was going to say I just don't think

19   the immunodeficiency is -- plays a major role.  It

20   could play a minor role, but I don't think it's

21   important -- very important.

22        Q    Is it your view that the reason

23   non-Hodgkin's lymphoma becomes more common in the

24   elderly is because they've just been exposed to

25   more time -- you know, more substances, more

Dennis D. Weisenburger, M.D.

```
 1    viruses, more chance of random mutation over the
 2    course of their lifetime?
 3          A    Yes.
 4               MS. FREDONA:  Objection.  Form.
 5    BY MR. BRENZA:
 6          Q    So it's the accumulation of all the
 7    insults from being alive that long that eventually
 8    catch up with you.
 9          A    I think that's probably the most
10    important factor, yes.
11          Q    Okay.  Just to cover a few other items
12    quickly.  Materials that you considered for your
13    report, I know you considered Mr. Karman's medical
14    records, right?
15          A    Yes.
16          Q    And you've talked about your
17    conversation with Ms. -- Mrs. Peterson -- or,
18    sorry, Mrs. Karman.
19               You didn't have any -- you didn't have
20    any conversations with the treating physicians,
21    right?
22          A    No, but I had Dr. Nabrinsky's
23    deposition, so I did -- I did review that.
24          Q    Okay.  And you selected some literature,
25    the Pahwa and the Eriksson paper particularly, and
```

Dennis D. Weisenburger, M.D.

1    the Castillo paper that we talked about, right?

2         A    Yes.

3         Q    Did you rely on or consider any of the

4    EPA's analysis about the risks of glyphosate in

5    connection with non-Hodgkin's lymphoma?

6         A    Yes, but I did that in my general

7    causation reports.

8         Q    Okay.  So -- so to the extent you did

9    that, it wasn't for this case specifically.  It

10   was part of a more general effort that you've

11   undertaken to testify in these Roundup cases.

12        A    Yes.

13        Q    Is the same true for the analyses of

14   other public health agencies from other countries?

15        A    Yes.

16        Q    Did you in one way or another consider

17   the opinions of the EFSA, the European Food Safety

18   agency?

19        A    Yes.

20        Q    And the Australian counterpart to that,

21   the --

22        A    I didn't -- other than EPA and EFSA, I

23   didn't look at others because I did this probably

24   four or five years ago.  So I looked at the two

25   main ones that were -- were published at the time.

1    And the reviews -- I haven't reviewed them, but I

2    suspect they follow the same pattern of the EPA

3    and EFSA.

4        Q    Just to be clear, the EPA and EFSA are

5    the only two that you've actually read and

6    considered.

7        A    Yes.

8        Q    I want to go back to our previous

9    discussion on differential etiology.  Is part of

10   the methodology that you used identifying all of

11   the possible causal factors for Mr. Karman's

12   non-Hodgkin's lymphoma?

13       A    I'm sorry.  I was distracted.  Could you

14   repeat that?

15       Q    As part of your analysis for Mr. Karman

16   under your differential etiology approach

17   accounting for -- or identifying all of the

18   possible causal factors for his non-Hodgkin's

19   lymphoma?

20            MS. FREDONA:  Objection.  Form.

21            THE WITNESS:  Yes, all the known risk --

22   causal risk factors, yes.

23   BY MR. BRENZA:

24       Q    And with respect to those known causal

25   risk factors, you would need to know how

Dennis D. Weisenburger, M.D.

1    significant each of those factors are, right, what

2    their probabilities are?

3        A    Well, if you rule them out, you don't.

4    If you rule them in, then you have to do a

5    detailed evaluation of each one, and part of it

6    would be to review the literature and look at the

7    risk factors and the odds ratios or risk ratios.

8        Q    And we talked -- I think we discussed

9    earlier, if -- if something is either unknown to

10   you or unknown to medical science, there's no way

11   you could put that on the list of possible causal

12   factors for Mr. Karman, right?

13            MS. FREDONA:  Objection.  Incomplete

14   hypothetical.

15            THE WITNESS:  That's true.  I mean, if I

16   don't know about it, if it's not known, then it

17   would be impossible to put it on a list.

18   BY MR. BRENZA:

19       Q    And also impossible to weight it

20   properly in terms of what risk it might have posed

21   to Mr. Karman, right?

22            MS. FREDONA:  Same objection.

23            THE WITNESS:  Right.

24   BY MR. BRENZA:

25       Q    So you've concluded that glyphosate or

1    Roundup is the -- is a substantial causal factor

2    in Mr. Karman's non-Hodgkin's lymphoma, right?

3         A    Yes.

4         Q    How would we know if you were wrong

5    about that?

6              MS. FREDONA:  Objection.  Incomplete

7    hypothetical.

8              THE WITNESS:  I don't know how you would

9    know.

10   BY MR. BRENZA:

11        Q    Are you familiar with the concept of

12   falsifiability in science?

13        A    Not specifically, no.  If you could

14   define that or explain it.

15        Q    I don't -- I don't want to be answering

16   questions today.  I want to be asking them.  So

17   I'm going to -- I'm just going to leave it at

18   where it is.

19             Is it your opinion that non-Hodgkin's

20   lymphoma is a multifactor -- factorial causal

21   disease?

22        A    Yes.

23             MS. FREDONA:  Objection.  Form.

24   BY MR. BRENZA:

25        Q    And what are the -- is it -- do you have

```
1   an opinion about what the factors are that combine
2   to produce non-Hodgkin's lymphoma?
3        A    Well, it -- it can have one or more
4   known risk factors with -- which would increase
5   their risk.
6        Q    Is there a mechanist- -- mechanistic
7   understanding of how those known risk factors
8   produce non-Hodgkin's lymphoma?
9        A    Well, they would -- they would increase
10  the genetic damage to -- to the cells over time,
11  and at some point the cell would go from being a
12  normal cell to a damaged cell to a premalignant
13  cell, and finally to a real malignant cell.
14       Q    Is it known how many mutations or points
15  of damage are needed for a cell to become
16  malignant?
17            MS. FREDONA:  Objection.
18            THE WITNESS:  Yeah, there are studies
19  that have looked at that for different types of
20  cancers.  It varies for different types of
21  cancers.
22  BY MR. BRENZA:
23       Q    Is it known for non-Hodgkin's lymphoma?
24       A    Yes, for many of the subtypes it is.
25       Q    And what's the -- what's the answer for
```

Dennis D. Weisenburger, M.D.

1    non-Hodgkin's lymphoma?

2        A    Well, as we talked before, non-Hodgkin's

3    lymphoma is very heterogeneous.  So I'm not sure

4    if I know of a figure for all of non-Hodgkin's

5    lymphoma.  It would be highly variable depending

6    on the subtype.  It could be very few.  It could

7    be very many.

8        Q    And just to put some kind of numbers on

9    those, what -- what -- how would you bound that in

10   terms of the numbers of mutations or points of

11   damage that are needed to generate a non-Hodgkin's

12   lymphoma?

13       A    Well, I believe that all lymphomas have

14   some genetic damage, so there would be some

15   genetic damage in -- in all or almost all of the

16   cases.

17            There is a paper -- there's a paper on

18   diffuse large B-cell lymphoma that was published

19   recently that showed an average number of genetic

20   abnormalities of, I think it was -- I think it was

21   17.  But they ranged from zero to, I don't know,

22   quite a high number.  From zero to 48 with an

23   average of 17 genetic alterations per tumor.

24            So that -- you know, that's -- that's an

25   average or median and a range for diffuse large

1    B-cell lymphoma from one study.

2         Q    And do you find that study to be

3    reliable?

4         A    Yeah, I think it's a good study.

5         Q    You know, Doctor, at another time that

6    we had a deposition together, I asked you about a

7    number of areas where you were an expert and where

8    you're not an expert.

9         A    Yes.

10        Q    Do you remember that?

11        A    Yes.

12        Q    I don't propose to do the same thing

13   today, but I just want to make sure that the

14   answers you gave me previously are still correct

15   and -- and you haven't gained any or lost any

16   expertise in the last day.  Is that fair?

17        A    Yes, nothing's changed.

18        Q    I'm going to do -- I have some questions

19   that are going to be about Mr. Karman's medical

20   records.  So if you would get out -- it's going to

21   be in folders 12, 13 and 14.

22        A    Okay.

23        Q    And we'll mark those 9, 10 and 11,

24   respectively.

25                  (Weisenburger Exhibit Nos. 9, 10

Dennis D. Weisenburger, M.D.

```
 1                and 11 were marked for

 2                identification.)

 3    BY MR. BRENZA:

 4        Q    Tell me when you're -- when you've got

 5    them.

 6        A    I've got it.

 7        Q    Okay.  So let's start with Exhibit 9,

 8    which you'll find in his -- in your folder No. 12.

 9    And this is a set of medical records from

10    November 25th, 2015.

11                Do you see that?

12        A    Yes.

13        Q    And do you -- do you recall having seen

14    this medical record in the past?

15        A    Yes, I have.

16        Q    It shows that Dr. Nabrinsky ordered some

17    imaging.  Is that fair?

18        A    Yes.

19        Q    And Mr. Karman had some imaging, and

20    this is -- this is the report of that.

21        A    Yes.

22        Q    This was after Mr. Karman began his

23    treatment for non-Hodgkin's lymphoma, right?

24        A    Yeah, it's after he had his treatment.

25        Q    So Mr. Karman was started on something
```

Dennis D. Weisenburger, M.D.

1    called R-CHOP, right?

2         A    Yes.

3         Q    But because he was sick with other

4    things, he couldn't complete the treatment

5    regimen.  Right?

6              MS. FREDONA:  Objection.  Form.

7              THE WITNESS:  Yes.

8    BY MR. BRENZA:

9         Q    And the -- the other things included

10   chronic obstructive pulmonary disease.  Right?

11        A    Yes.  He had -- he had exacerbations of

12   his chronic obstructive pulmonary disease, and he

13   developed multiple episodes of -- of pneumonia,

14   and he had cardiac arrythmias.  So I think the

15   main -- those are the main reasons they stopped

16   the R-CHOP.

17        Q    And -- and just to back up a little bit,

18   do you know what COPD is?

19        A    Yeah, it's chronic obstructive pulmonary

20   disease.  It's sort of chronic bronchitis and

21   emphysema combined.  It's usually due to smoking.

22        Q    And I'm going to refer to it as COPD

23   just because it's a lot shorter.

24              When you say it's a combination of -- of

25   bronchitis and emphysema, what -- what are those?

Dennis D. Weisenburger, M.D.

1    Can you explain that a little more?

2         A    Well, chronic bronchitis is just

3    inflammatory -- inflammation of the airways.  And

4    emphysema means that some of the small air sacs in

5    the lungs sort of deteriorate and become larger

6    sacs, and so the surface area of the lung

7    decreases somewhat.

8         Q    And the -- the result of those two

9    things working together is that it makes it very

10   hard to breathe, right?

11        A    Well, it can, yes, especially if people

12   are exerting themselves.  A lot of these people

13   can do fine as long as they don't exert themselves

14   too much.  But when it exacerbates, it causes

15   coughing, it can cause wheezing, it can cause

16   shortness of breath.  So...

17        Q    And Mr. Karman's COPD was caused by a

18   lifetime of heavy smoking, right?

19        A    Most likely, yes.

20        Q    I think I saw somewhere in the medical

21   records he had a 45-pack-year history.

22        A    Yes.

23        Q    Does COPD get better?

24        A    Well, it can, yes.  If you stop smoking

25   and, you know, take care of yourself in general,

1    avoid getting -- try to avoid getting infections,

2    but it's certainly not reversible.  It's mostly

3    permanent damage.

4         Q    You mentioned that he had instances of

5    pneumonia.  What was the context of that?

6         A    Oh, well, it's unclear.  I think they --

7    they thought he was having aspiration, which means

8    he was not swallowing his food properly and some

9    of the food was going into his lung.  That's

10   called -- and then you get an infection, usually a

11   bacterial infection associated with that

12   aspiration of food, and that's called aspiration

13   pneumonia.

14            I think he was having some trouble

15   swallowing, and so they thought that was at least

16   part of the reason for his pneumonia.  People with

17   chronic bronchitis and COPD can, you know, have an

18   increased risk of pneumonia in general too.  So --

19   and he was debilitated, and he -- and he was

20   immunosuppressed from the chemotherapy.  So he had

21   a lot of risk factors.

22        Q    His COPD was not in any way caused by

23   Roundup in your opinion, right?

24        A    I don't believe it was.  No.

25        Q    And the pneumonia he had, that wasn't

1    caused by Roundup either, right?

2        A    No.

3        Q    And his arrythmias, which we haven't

4    talked about yet, but -- those weren't caused by

5    Roundup either, right?

6        A    No.

7        Q    And the same thing for the aspiration,

8    right, not caused by Roundup?

9        A    No, but the chemotherapy probably played

10   a role, and he wouldn't have had chemotherapy if

11   he hadn't had the lymphoma.  So I'm sure the

12   chemotherapy played some role in this.  That's why

13   they stopped the chemotherapy.

14       Q    So he couldn't complete the -- it's

15   normally six times that you get R-CHOP, right?

16       A    Usually six, yes.  Sometimes four,

17   sometimes eight, but usually six.

18       Q    And he got through three of them; is

19   that right, or --

20       A    Two.

21       Q    Two of them.  And then -- and he was so

22   sick from all of these things that he couldn't

23   continue with the full R-CHOP regimen, right?

24            MS. FREDONA:  Objection.  Form.

25            THE WITNESS:  That's correct.

1    BY MR. BRENZA:

2        Q    And so one of the things they did was

3    eliminate one of the parts of R-CHOP, right?

4        A    Yes.  So he was having these cardiac

5    arrythmias of various types, and the drug that

6    they eliminated, which is called doxorubicin or --

7    or another brand name is Adriamycin, is known to

8    be cardiotoxic.  So the reason they dropped that

9    drug out was because he was having the arrythmias,

10   and they didn't want to increase any toxicity to

11   the heart.  So they dropped that drug out and gave

12   him the other drugs.

13       Q    And the arrhythmias, that's a -- that's

14   a whole separate issue for Mr. Karman, right?

15   That's a separate disease, I should say.  I mean,

16   I don't know --

17       A    Yeah, it's separate from the COPD, yes.

18       Q    Do you know -- well, first, what -- what

19   is a cardiac arrythmia?  What did he have?  What

20   was wrong with him?

21       A    Well, he had various arrythmias.  He had

22   the atrial fibrillation.  He had abnormal -- he

23   had some ventricular abnormalities.  I don't

24   remember exactly what they were.  But it was

25   basically these different cardiac arrhythmias that

1    made them drop out the Adriamycin from the

2    chemotherapy and just give him the R-CVP.

3         Q    Do you know what was causing his

4    arrhythmias, his atrial fibulation, and his

5    ventricular abnormalities?

6         A    I don't think that -- I don't think they

7    knew what it was.  These -- these are fairly

8    common in elderly people, particularly when

9    they're ill.  I think they're -- they were

10   concerned that it was maybe the Adriamycin, and --

11   and so they discontinued it so that if it was the

12   Adriamycin, that things would -- you know, things

13   would get better.  But I don't think they really

14   did get better.

15        Q    So the imaging we've -- we're looking at

16   now marked as Exhibit 9, it describes a number of

17   things that I'm not sure I understand, so I want

18   to ask you what you -- how you understood them.

19             It described a -- well, let me say, it

20   describes some lymph nodes.

21        A    Right.  So it's a PET-CT scan of the --

22   of the chest, and what they found were enlarged

23   hypermetabolic lymph nodes in the right

24   paratracheal area, which was an area that he had

25   had previous disease.

1      Q    So that part of his NHL was not getting

2    better with treatment.

3      A    Yeah.  This was done about ten days

4    after he finished the fourth course of

5    chemotherapy.  So you would expect things to

6    get -- be getting better, but they weren't.

7      Q    Were there other aspects of this imaging

8    that showed that some parts of his NHL was getting

9    better?

10     A    I think there were lymph nodes that

11   weren't -- that had been enlarged in the past that

12   weren't enlarged in this study.

13     Q    That's -- that's --

14     A    They were enlarged cervical lymph nodes.

15   Yeah.  So I mean I -- so this is often what

16   happens, some lymph nodes respond to the treatment

17   and other ones don't.

18     Q    Would it be fair to say that as of

19   the -- the date of the -- of Exhibit 9 that

20   Mr. Karman was about where he started when it came

21   to his non-Hodgkin's lymphoma?

22         MS. FREDONA:  Objection.  Form.

23         THE WITNESS:  Well, he -- we don't know

24   that because I didn't do an extensive restaging.

25   But he never had -- I don't think he ever had a

1    complete response or a complete remission.  So --

2    BY MR. BRENZA:

3         Q    Well, some --

4         A    -- he had -- he had persistent disease.

5         Q    Some things got better, some things got

6    worse or didn't get better.  But on balance, would

7    you say it -- it was basically a standstill from

8    where he was when he started treatment?

9              MS. FREDONA:  Objection.  Form.

10             THE WITNESS:  Well, I can't say that

11   because he didn't -- they didn't do all the tests

12   that they did when he was first started, so we

13   don't know the extent of his tumor.  We do know

14   that he did have an enlarging hypermetabolic tumor

15   in the chest, which was the site of previous

16   lymphoma.  You know, they didn't -- some of it got

17   better and some of it didn't go away, and so he

18   was having persistent and, what they called,

19   progressive disease.  So his disease was advancing

20   despite the four doses of chemotherapy.

21   BY MR. BRENZA:

22        Q    And in the second paragraph, there's

23   reference to patchy ground-glass opacities.  Do

24   you see that?

25             It's on the second page.

Dennis D. Weisenburger, M.D.

```
 1         A     On the second page.

 2               Right.  So that's looking at the rest of

 3    the lung.  He's talking about the lung here.

 4         Q     Yes.

 5         A     So that could be related to pulmonary

 6    edema or pneumonia.  It's hard to know.  What does

 7    he -- what does the radiologist say?  He says it's

 8    suspicious for secondary pulmonary parenchymal

 9    involvement by lymphoma.  But then he also

10    suggests it could be due to infection or

11    interstitial pneumonitis, but -- so he doesn't

12    know what it is.

13               It's -- it's a more generalized change

14    in the lungs, which -- you know, which is -- they

15    don't know what -- they don't comment what -- what

16    it is.  It's not usually the -- I mean, it could

17    be due to the lymphoma too because it was patchy

18    and -- so they don't know what it is.  It could be

19    advancing lymphoma.  It could be infection.  It

20    could be toxicity from the chemotherapy.  It could

21    be viral pneumonia.  They don't know what it is.

22         Q     And -- and you don't have any insight

23    beyond what was reported in this record, right?

24         A     No.

25         Q     Do you see reference in the -- in the
```

1    second paragraph to coronary artery calcification?

2              It's at the very end of paragraph 2.

3       A    Right, yeah.  That's -- that's common in

4    elderly people.  It -- it could have played some

5    role in -- in his heart disease.  There's no way

6    to know.

7       Q    And just to be clear of what that is,

8    that's I guess what a lot of people call hardening

9    of the arteries.  That's when the inside of your

10   arteries gets coated with calcium?

11      A    Yeah, the wall of the arteries.

12      Q    And that tends to close the arteries so

13   that blood can't flow through it as easily?

14      A    That's -- that's true.  It's one --

15   that's one of the features.

16      Q    And again, that's -- that's not related

17   to Roundup or non-Hodgkin's lymphoma; that's --

18   that's a standalone medical condition that

19   Mr. Karman had, right?

20      A    Yes.

21      Q    Looking at paragraph 3, do you see that

22   that paragraph generally reports no hypermetabolic

23   lymph nodes in the pelvic area?

24      A    Yeah.  So he previously had a lot of

25   disease in the abdomen, and it had pretty much

Dennis D. Weisenberger, M.D.

1    gone away.  So, you know, he did have some

2    response to the chemotherapy.

3         Q    And then paragraph 4 says:  "There's no

4    metabolically active areas noted within the

5    osseous structures."  Do you see that?

6         A    Yes.

7         Q    And osseous structures, that's -- that's

8    bones, right?

9         A    Yes.

10        Q    And it's saying here that there was no

11   -- no non-Hodgkin's lymphoma seen in his bones,

12   right?

13        A    That's correct.

14        Q    All right.  Would you turn now to the

15   next exhibit we've marked, No. 10.  It's in your

16   folder 13.

17             This is a medical record as of

18   December 3rd, 2015, right?

19        A    Yes.

20        Q    So this is also after he had completed

21   as much of the chemotherapy that he -- as he was

22   going to be able to do or chose to do, right?

23        A    Yes.

24        Q    And if you look at the medical history

25   at the bottom of page 1 of Exhibit 10, do you see

```
 1   a list of conditions that Mr. Karman had as of

 2   December 3rd, 2015?

 3        A    Yes.

 4        Q    The first one is hypertension.

 5   That's -- that's high blood pressure, right?

 6        A    Right.

 7        Q    That's not related to Roundup in any

 8   way, right?

 9        A    Correct.

10        Q    And the next one is hyperlipidemia.

11   That's -- he has high cholesterol.  Is that

12   what -- what you would see it as?

13        A    Yeah, cholesterol and other lipids, yes.

14        Q    Again, not related to Roundup, right?

15        A    Correct.

16        Q    The next one is non-Hodgkin's lymphoma,

17   which obviously your opinion is that it was

18   related to Roundup.

19             The next one is renal insufficiency.  Do

20   you see that?

21        A    Yes.

22        Q    And renal insufficiency is that his

23   kidneys were not working well.

24        A    Yes.

25        Q    Again, not related to Roundup, right?
```

Dennis D. Weisenburger, M.D.

```
1        A     No.   Probably related to his
2   deteriorating medical conditions in general.   One
3   sees that -- often sees that as people -- in
4   people who are very ill.
5        Q     And if you'll look at the, I guess it's,
6   the third page of Exhibit 10, do you see a list of
7   medications that Mr. Karman was taking as of
8   December 3rd, 2015?
9              Tell me when you see it.
10       A     Yes, I see it.
11       Q     Well, where it -- well, why don't I just
12  read it.   The first one is -- well, why don't I
13  let you read them since you probably know what
14  these are.
15       A     Well, Cardizem CD, Guaifenesin,
16  multiple vitamins, minerals, prednisone.   Tumeric,
17  curcumin.
18       Q     So none of those medicines are for
19  non-Hodgkin's lymphoma, right?
20       A     Probably not.   I don't know why he was
21  on the prednisone.   That may have been to -- I
22  don't know.   I don't know why he was on the
23  prednisone.
24       Q     But that's not a -- that's not a
25  treatment for non-Hodgkin's lymphoma, is it?
```

```
 1         A     It's part of the R-CHOP and the R-CVP.
 2   That's what the P is.
 3         Q     Okay.  But this is not part of the
 4   R-CHOP, right?  This is something else.
 5         A     Right.
 6         Q     Is prednisone a -- given as an
 7   antiinflammatory or --
 8         A     Yes, it can be used for that, sure.
 9         Q     So would it be -- would it be normal to
10   give someone that because of lung problems or lung
11   infection?
12         A     No, it wouldn't.  Maybe he was taking it
13   for his chronic lung disease.  This -- this looks
14   like a list of medications that he was on when he
15   came in to the hospital in December.  So those are
16   things he was taking at home.
17         Q     Yes.
18         A     I don't -- I don't know why he was on
19   the prednisone.  Maybe it was for his chronic lung
20   disease.  Just the -- for the inflammation.
21         Q     So now I want to ask you about what
22   we've marked as Exhibit 11, which should be in
23   your folder 14.
24               Tell me when you have it.
25         A     I have it.
```

1      Q    You'll see now that this is December 6,

2  2015.  So near the end of his life, right?

3      A    Yes.

4      Q    And the reason for his visit is

5  tachyarrhythmia.  Do you see that?

6      A    I don't -- I don't see that.

7      Q    It's page 3 of Exhibit 11.

8      A    Page 3.  Oh, tachyarrhythmia, okay.

9      Q    What is tachyarrhythmia?

10     A    Well, tachy means fast, so the heart was

11  beating fast and it was beating abnormally.

12     Q    And what causes that?

13     A    It could be cardiac disease.  It could

14  be -- could be stress.  It could be drugs he's

15  taking.  We don't really know what's causing it.

16     Q    And he -- during this time period, he

17  was continuing to smoke, right?

18     A    Probably at home he was.  In the

19  hospital, I don't think they would have let him.

20  But probably at home he was smoking.  I don't know

21  the answer to that, but it's likely.

22     Q    And the tachyarrhythmia, fast heart

23  beating, that's not anything to do with Roundup,

24  right?

25     A    No.

Dennis D. Weisenburger, M.D.

1      Q    And by this point, he had -- he had

2   stopped the treatments for his non-Hodgkin's

3   lymphoma, right?

4      A    Yes.

5      Q    If you'll look at the sixth page, you'll

6   see a -- a consultation report for December 6th,

7   2015.

8      A    Okay.

9      Q    Do you see past medical history there?

10     A    Yes.

11     Q    And it shows that as of 2016, he had

12  the -- the same problems he had last -- from the

13  last medical record, plus also a few more.  The

14  first one listed is non-Hodgkin's lymphoma, right?

15     A    Yes.

16     Q    Then it goes on to list hypertension,

17  COPD, atrial fibrillation with rapid ventricular

18  response, dyspnea, pneumonia, and dysphagia with

19  aspiration.  Do you see that?

20     A    Yes.

21     Q    So those are problems with his heart,

22  his lungs, his ability to eat, and other things as

23  well, right?

24     A    Right.

25     Q    Would it be fair to say that, you know,

1    completely apart from his non-Hodgkin's lymphoma,

2    he was -- this was a very sick individual?

3              MS. FREDONA:  Objection.  Form.

4              THE WITNESS:  Yes, he was very sick at

5    this point.  In fact, he died, you know, nine days

6    later.  So...

7    BY MR. BRENZA:

8         Q    If you turn to the next page, do you see

9    that --

10        A    He died three days later.

11        Q    If you turn to the next page, do you

12   see that there's another record there for

13   Mr. Karman?

14        A    Okay.

15        Q    And do you see that under the

16   Impression, the second point references "multiple

17   significant comorbidities as mentioned above"?

18        A    Correct.

19        Q    And comorbidities are -- well, why don't

20   I let you explain what a comorbidity is.

21        A    Well, morbidity is a list of things that

22   make you ill.  It's a list of diseases.  And

23   comorbidity means there is more than one.  So

24   there are multiple -- multiple diseases that, you

25   know, could pre- -- predispose to death.

Dennis D. Weisenburger, M.D.

```
1          Q    And -- and do you see under the
2    Recommendations, there's a discussion about
3    whether Mr. Karman should have a gastronomy tube?
4          A    Yes.
5          Q    What -- what is a gastronomy tube?
6          A    It's a gastroscopy.  It -- it's a tube
7    that they put through the abdomen into the stomach
8    to -- to feed the patient when he can't swallow or
9    can't feed himself.
10         Q    Would that be fair to say that's an
11   intensive and desperate measure?
12              MS. FREDONA:  Objection.  Form.
13              THE WITNESS:  It's a palliative measure
14   at best for him because it's only going to perhaps
15   keep him alive longer.  It's really not going
16   to -- you know, it'll provide some of the
17   nutrition that he isn't getting.
18   BY MR. BRENZA:
19         Q    And do you see under the
20   Recommendations, there's a discussion that was had
21   between Mr. Karman and his family where they
22   declined to have the gastronomy tube put in?
23         A    Right.  Well, they -- I think the
24   thinking there was probably that he couldn't take
25   more chemotherapy.  He was dying of cancer.  Why
```

1    should we prolong his suffering by keeping him

2    alive longer?  So they refused to -- they refused

3    the treatment, which is, you know, families -- a

4    common decision that families have to make.

5         Q    And it would be fair to say that

6    Mr. Karman was dying of a lot of things, not just

7    the cancer, right?

8         A    Right.  He had advanced progressive

9    non-Hodgkin's lymphoma, and he had other

10   comorbidities that all -- all contributed to his

11   rapid decline.

12        Q    And that includes problems with his

13   heart, his kidneys, his lungs, his ability to

14   swallow, all the things that we've talked about so

15   far.

16        A    Yes.  It's not uncommon for elderly

17   people to die like this.

18        Q    Would it be fair to say that, you know,

19   based on what you can see in the medical records,

20   there's no way to tell what was the actual final

21   cause of his death?

22        A    No.  He died at home.  He didn't have an

23   autopsy.  So we don't have the full information,

24   but it was -- it was due to multiple

25   comorbidities, including non-Hodgkin's lymphoma.

```
 1              MR. BRENZA:  Let me just stop, maybe go

 2   off the record for a second and get a time check.

 3              THE VIDEOGRAPHER:  We're going off the

 4   record at 11:54 a.m.

 5              (Recess.)

 6              THE VIDEOGRAPHER:  We're back on the

 7   record at 11:58 a.m.

 8   BY MR. BRENZA:

 9        Q    Doctor, you mentioned that Mr. Karman

10   had only been able to complete four of the

11   recommended six sessions of chemotherapy.  Do you

12   remember that?

13        A    Yes.

14        Q    And some of those sessions were not the

15   full R-CHOP therapy because of the other health

16   problems he had that prevented the treatment from

17   being given to him.  Right?

18        A    Yes.

19        Q    If Mr. Karman had been able to accept

20   six treatments with R-CHOP, is it likely that he

21   would have had a good outcome from his

22   non-Hodgkin's lymphoma?

23              MS. FREDONA:  Objection.  Incomplete

24   hypothetical.

25              THE WITNESS:  Well, that's a -- a
```

1  difficult question.  I think he would -- he would

2  have had a higher likelihood of having a good

3  response, maybe even a complete response.  We

4  won't really ever know that.  But certainly six

5  courses of CHOP is more effective than two courses

6  of CHOP.

7  BY MR. BRENZA:

8      Q    Is it fair to say that his preexisting

9  comorbidities prevented what would have otherwise

10  been a probably successful treatment of his

11  non-Hodgkin's lymphoma?

12     A    Yes.

13     Q    When he was diagnosed, he was diagnosed

14  as stage IIIB, right?

15     A    Yes, I believe that's correct.

16     Q    What does that staging tell you?

17     A    It means that he had disease above and

18  below the diaphragm but not involving extranodal

19  sites, like the bone marrow or the liver.  So

20  that's the stage III.  And the B means that he had

21  what are called B symptoms, so that's usually

22  fever, night sweats or significant weight loss.

23  So he did have night sweats, I believe.

24     Q    And that -- that's a -- that's a serious

25  case of non-Hodgkin's lymphoma, but not a -- it's

Dennis D. Weisenburger, M.D.

1    not as serious as it can be, right?

2        A    Yes, he had -- he had a lot of disease

3    above and below the diaphragm.  So he had advanced

4    stage disease, and that in itself is a poor

5    prognostic indicator.

6        Q    In your experience, when people present

7    with non-Hodgkin's lymphoma in their late 70s, is

8    the disease generally advanced?

9        A    It's highly variable.  I'm not -- I'm

10   not sure the answer to that, whether older people

11   have more advanced disease than younger people.  I

12   don't think that's necessarily true.

13           But it's -- it's not uncommon for older

14   people not to be able to tolerate the R-CHOP

15   because of advanced age or other comorbidities.

16   So that's not uncommon.

17       Q    What -- when that happens and the older

18   people are not able to tolerate R-CHOP, is that

19   generally because they have other preexisting

20   comorbidities?

21       A    Often that's the case, or sometimes they

22   just get profound immunosuppression from the

23   R-CHOP and get infections.  So elderly people are

24   more frail and -- and more -- have more

25   complications from R-CHOP.

Dennis D. Weisenburger, M.D.

```
1        Q    Are there backup treatments besides
2   R-CHOP that can be used for people who want those
3   treatments that can't tolerate R-CHOP?
4        A    Yes, but they're not as effective.
5        Q    What are the backup treatments?
6        A    I'm sorry?
7        Q    What are the backup treatments?
8        A    Well, there are a variety of backup
9   treatments.  R-CVP that he -- that he did receive
10  would be one.  That's generally not thought to be
11  curative.  There were other drugs like
12  bendamustine, lenalidomide, and combinations of
13  drugs that people try.  But usually if an elderly
14  person can't tolerate R-CHOP, the outcome isn't
15  good.
16       Q    Are most elderly patients able to
17  tolerate R-CHOP?
18       A    Again, that's sort of out of my area of
19  expertise.  Certainly some are; others are not.
20       Q    You had mentioned that Mr. Karman used
21  Spectracide.  Did Mrs. Karman give you any more
22  details about why he used Spectracide on -- was
23  there a specific weed that he wanted to use that
24  on or --
25       A    No, I think he wanted to try -- he -- he
```

1  wanted to try something else besides Roundup.  But

2  he found that it wasn't as effective as Roundup.

3       Q    Did Mrs. Karman say anything about other

4  gardening chemicals, fertilizers, insecticides,

5  other things like that that Mr. Karman used?

6       A    I didn't ask about fertilizers.  He

7  didn't use any other pesticides.

8       Q    And did she relay to you any specific

9  instances where she became aware of Mr. Karman

10  encountering or getting Roundup on his body to an

11  extent beyond what you would expect from just

12  using the product?

13       A    No.

14       Q    Did she convey to you any information

15  about the label on the Roundup that Mr. Karman

16  used?

17       A    No.

18       Q    Did she convey to you any information

19  about whether Mr. Karman followed the directions

20  that would have been on Roundup?

21       A    No.

22       Q    Did she tell you about anyone other than

23  herself that knew about Mr. Karman and his use of

24  Roundup?

25       A    No.

Dennis D. Weisenburger, M.D.

1            MR. BRENZA:  So I think that's -- I'm

2    going to stop there for the day.  We're still

3    going to ask for your notes, and that's something

4    that we'll have to work out with your counsel.

5            But I want to save a little bit of time

6    to resume this if we ever have to if we get those

7    notes.  So I'm going -- I'm going to stop here and

8    leave it at that.

9            Are you going to go or --

10           MS. FREDONA:  I only have a couple of

11   questions.

12                    EXAMINATION

13   BY MS. FREDONA:

14      Q    Dr. Weisenburger, of those notes that

15   you took, did you incorporate that information

16   into your report that you wrote for us?

17      A    Yes, for the most part.

18      Q    Okay.  Then just to clear something up,

19   maybe I heard it wrong.  We were talking about the

20   plaintiff having a 27 BMI.

21      A    Yes.

22      Q    Okay.  Does that mean he's at a

23   27 percent higher risk for non-Hodgkin's lymphoma?

24      A    No.  It just happens to work out that

25   way, but -- but they're two different numbers.

```
 1         Q    Okay.  All right.

 2              MS. FREDONA:  I think that's everything

 3    I've got.

 4              MR. BRENZA:  Okay.  Subject to, you

 5    know, continuing if we get those notes, I'm done.

 6              THE WITNESS:  All right.  Thank you.

 7              MR. BRENZA:  Thank you.

 8              THE VIDEOGRAPHER:  Madam Court Reporter,

 9    can I read off?

10              THE REPORTER:  Yes.

11              THE VIDEOGRAPHER:  This concludes

12    today's remote deposition of Dr. Dennis D.

13    Weisenburger consisting of three files.  The time

14    is 12:08 p.m. Pacific Standard Time.  We are off

15    the record.

16              THE WITNESS:  I want to read and sign.

17              THE REPORTER:  All right.  Thank you.

18              (Whereupon, the deposition of

19              DENNIS D. WEISENBURGER, M.D.

20              was concluded at 12:08 p.m.

21              Pacific Standard Time.)

22

23

24

25
```

Dennis D. Weisenburger, M.D.

```
 1        CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

 2        The undersigned Certified Shorthand Reporter

 3   does hereby certify:

 4        That the foregoing proceeding was taken before

 5   me remotely via Zoom videoconferencing at the time

 6   therein set forth, at which time the witness was

 7   duly sworn; That the testimony of the witness and

 8   all objections made at the time of the examination

 9   were recorded stenographically by me and were

10   thereafter transcribed, said transcript being a

11   true and correct copy of my shorthand notes

12   thereof; That the dismantling of the original

13   transcript will void the reporter's certificate.

14        In witness thereof, I have subscribed my name

15   this date:  March 10, 2021.

16

17        _____

18        LESLIE A. TODD, CSR, RPR

19        Certificate No. 5129

20

21   (The foregoing certification of

22   this transcript does not apply to any

23   reproduction of the same by any means,

24   unless under the direct control and/or

25   supervision of the certifying reporter.)
```

Dennis D. Weisenburger, M.D.

```
 1              INSTRUCTIONS TO WITNESS

 2        Please read your deposition over carefully and

 3   make any necessary corrections.  You should state

 4   the reason in the appropriate space on the errata

 5   sheet for any corrections that are made.

 6        After doing so, please sign the errata sheet

 7   and date it.

 8        You are signing same subject to the changes

 9   you have noted on the errata sheet, which will be

10   attached to your deposition.  It is imperative

11   that you return the original errata sheet to the

12   deposing attorney within thirty (30) days of

13   receipt of the deposition transcript by you.  If

14   you fail to do so, the deposition transcript may

15   be deemed to be accurate and may be used in court.

16

17

18

19

20

21

22

23

24

25
```

Dennis D. Weisenburger, M.D.

```
 1                    - - - - - -

 2                  E R R A T A

 3                    - - - - - -

 4    PAGE LINE CHANGE

 5    _____ _____ _____

 6    REASON: _____

 7    _____ _____ _____

 8    REASON: _____

 9    _____ _____ _____

10    REASON: _____

11    _____ _____ _____

12    REASON: _____

13    _____ _____ _____

14    REASON: _____

15    _____ _____ _____

16    REASON: _____

17    _____ _____ _____

18    REASON: _____

19    _____ _____ _____

20    REASON: _____

21    _____ _____ _____

22    REASON: _____

23    _____ _____ _____

24    REASON: _____

25
```

Dennis D. Weisenburger, M.D.

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2        I,_____, do hereby

 3   certify that I have read the foregoing pages, and

 4   that the same is a correct transcription of the

 5   answers given by me to the questions therein

 6   propounded, except for the corrections or changes

 7   in form or substance, if any, noted in the

 8   attached Errata Sheet.

 9

10   _____

11   DENNIS D. WEISENBURGER, M.D.          DATE

12

13

14   Subscribed and sworn to

15   before me this

16   _____day of_____,20____.

17   My commission expires:_____

18   _____

19   Notary Public

20

21

22

23

24

25
```