# EXHIBIT 7

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

   IN RE:  ROUNDUP PRODUCTS

4  LIABILITY LITIGATION            MDL No. 2741

5  This document relates to:       Case No. MDL No.

   James Peterson v. Monsanto Co.,    3:16-md-02741-VC

6  Case No. 3:18-cv-072171--VC

7  -------------------------------/

8

9

10

11              REMOTELY CONDUCTED

12      DEPOSITION OF DENNIS D. WEISENBURGER, M.D.

13              Duarte, California

14           Wednesday, March 3, 2021

15

16

17

18

19

20

21  Stenographically reported by:

   LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC

22  California CSR No. 10523

   Washington CSR No. 3318

23  Oregon CSR No. 19-0458

   Texas CSR No. 11318

24

25  Job No.:  270092

```
 1                    Wednesday, March 3, 2021

 2                        9:06 a.m. PST

 3

 4           Remotely conducted videotaped deposition

 5           of DENNIS D. WEISENBURGER, M.D., before

 6           Lorrie L. Marchant, a Certified Shorthand

 7           Reporter, Registered Merit Reporter,

 8           Certified Realtime Reporter, California

 9           Certified Realtime Reporter and Certified

10           Realtime Captioner.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Dennis D. Weisenburger, M.D.

```
 1                A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4            MOLL LAW GROUP

              BY:  REBECCA FREDONA, Esq.

 5            22 West Washington Street, 15th Floor

              Chicago, IL 60602

 6            (312) 462-1700

              rfredona@molllawgroup.com

 7

 8   FOR THE DEFENDANT:

 9            BARTLIT BECK, LLP

              BY:  LINDLEY J. BRENZA, ESQ.

10            1801 Wewatta Street, 12th Floor

              Denver, CO 80202

11            (303) 592-3130

              lindley.brenza@bartlitbeck.com

12

13   ALSO PRESENT:

14            Lisa Allen, video technician

15                      ---oOo---

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X
 2              INDEX OF EXAMINATION
 3   EXAMINATION BY                           PAGE
 4    MR. BRENZA                                 7
      MS. FREDONA                              118
 5
                     ---oOo---
 6
        INDEX OF EXHIBITS MARKED FOR IDENTIFICATION
 7
      EXHIBIT        DESCRIPTION                PAGE
 8
      Exhibit 1     Defendant Monsanto Company's    11
 9                  Notice to Take Oral and
                    Videotaped Deposition of Dennis
10                  D. Weisenburger, M.D.
11    Exhibit 2     Specific Causation Report for   12
                    Mr. James Peterson
12
      Exhibit 3     Curriculum Vitae of Dennis D.   12
13                  Weisenburger, M.D.
14    Exhibit 4     Testimony History of Dennis     12
                    Weisenburger, M.D. 2014 to
15                  Present
16    Exhibit 5     Article entitled "Obesity is    67
                    Associated with Increased
17                  Relative Risk of Diffuse Large
                    B-Cell Lymphoma:  A
18                  Meta-Analysis OF Observational
                    Studies"
19
      Exhibit 6     Article entitled "Pesticide     67
20                  exposure as risk factor for
                    non-Hodgkin lymphoma including
21                  histopathological subgroup
                    analysis"
22
23                     ---oOo---
24
25
```

```
 1       INDEX OF EXHIBITS MARKED FOR IDENTIFICATION
 2     EXHIBIT        DESCRIPTION                    PAGE
```

```
 3     Exhibit 7     Article entitled "dlyphosate use   68
                     and associations with
 4                   non-Hodgkin lymphoma major
                     histological sub-types: findings
 5                   from the North American Pooled
                     Project"
 6
       Exhibit 8     Article entitled "Stem cell        68
 7                   divisions, somatic mutations,
                     cancer etiology, and cancer
 8                   prevention"
 9     Exhibit 9     Article entitled "Pathological     79
                     Classification of Non-Hodgkin's
10                   Lymphoma for Epidemiological
                     Studies"
```

```
11
12                    ---oOo---
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    DUARTE, CALIFORNIA
 2               WEDNESDAY, MARCH 3, 2021
 3                    9:06 a.m. PST
 4          THE VIDEOGRAPHER:  We are now on video
 5    record.  My name is Lisa Allen.  I'm the
 6    videographer representing Golkow Litigation
 7    Services.  Today's date is third [sic], 2021.  The
 8    time is approximately 9:06 a.m.
 9          This remote video deposition is being held
10    in the matter of James Peterson versus Monsanto for
11    the United States District Court, Northern District
12    of California.  The deponent today is Dennis D.
13    Weisenburger.
14          All parties to this deposition are
15    appearing remotely and have agreed to the witness
16    being sworn in remotely.  Due to the nature of
17    remote reporting, please pause briefly before
18    speaking to ensure all parties are heard completely.
19          Will counsel please identify themselves.
20          MS. FREDONA:  Rebecca Fredona on behalf of
21    plaintiff.
22          MR. BRENZA:  Lin Brenza with Bartlit Beck
23    on behalf of Monsanto.
24          THE VIDEOGRAPHER:  The court reporter --
25    the court reporter is Lorrie Marchant and will now
```

Dennis D. Weisenburger, M.D.

```
1    swear in the witness.

2              DENNIS D. WEISENBURGER, M.D.,

3      FIRST DULY SWORN/AFFIRMED, TESTIFIED AS FOLLOWS:

4                EXAMINATION BY MR. BRENZA

5              BY MR. BRENZA:

6      Q.   Morning, Doctor.

7      A.   Morning.

8      Q.   I want to just make sure you understand the

9    ground rules for today.  I -- I think you've been

10   deposed a number of times, but let me just ask you,

11   how many times have you been deposed in the past?

12     A.   Oh, dozens of times.

13     Q.   Can you be any more precise?

14     A.   No.

15     Q.   How many times have you been deposed in the

16   last, let's say, two years?

17     A.   Oh, gosh.  Maybe 10 to 15 times.

18     Q.   And in those depositions, did those have to

19   do with Roundup or other things?

20     A.   No, they all had to do with Roundup.

21     Q.   So I'm not going to go through all the

22   rules because I think you understand how -- how this

23   deposition will work.  The one thing I do want to

24   get your agreement on is that if you don't

25   understand a question or you don't hear it, that
```

Dennis D. Weisenburger, M.D.

1    you'll let me know and I'll repeat the question or

2    rephrase it so you do understand.  If you don't --

3    if you don't say anything, I'm going to assume that

4    you did understand the question.  Okay?

5        A.   Yes.

6        Q.   What is your current -- well, let me ask

7    you, do you -- do you have a current medical

8    practice?

9        A.   I do.  In January I went part time at City

10   of Hope.  I'm still doing hematopathology.

11       Q.   So you're still seeing patients?

12       A.   Well, I see their pathology slides.  I

13   don't actually see patients.  I'm a pathologist.

14       Q.   Okay.  So that's kind of the nature of your

15   practice all through your life, then?  You -- you --

16   you're -- as a pathologist you don't -- you don't

17   actually see the actual person, you just see their

18   slides?

19       A.   No.  When I -- when I was an intern or a

20   medical student obviously I saw patients, but I

21   don't -- I haven't seen patients now for many years.

22       Q.   Okay.  But you're still doing pathology

23   for -- for actual patients?

24       A.   Yes.

25       Q.   And you said in January you made a change.

1    What -- what -- what happened in January?

2        A.   Well, I decided to go part time rather than

3    be full time.  So I'm 60 percent FTE at City of

4    Hope.

5        Q.   And -- and FTE is full time equivalent?

6        A.   Yes.

7        Q.   Just -- just another point, because it's a

8    deposition, let's try not to use abbreviations,

9    acronyms, things like that because it isn't always

10   clear to whoever hears this deposition later what --

11   what we're talking about.  And if I do it, I'll

12   try -- I'll try my best not to do it too.  I know

13   it's very easy to slip into that.

14           So 60 percent you're doing with pathology.

15   Is there another -- are you devoting another

16   40 percent to something else now or -- or just

17   reducing your overall work?

18       A.   Well, I'm doing more Roundup litigation

19   cases.  And, you know, I'm planning to retire within

20   the next year, so I'm just trying to phase into

21   that.

22       Q.   How much of your -- your day is spent on

23   Roundup litigation now?

24       A.   Oh, that's tough to say.  Maybe -- maybe

25   20 percent of my time, 10 to 20 percent of my time.

```
 1        Q.   And that's reviewing possible cases for
 2   plaintiff's lawyers or what -- what's the -- what's
 3   the -- I -- without disclosing any specific
 4   communications, what's the general nature of what
 5   you're doing?
 6        A.   Well, I review -- review cases, screen
 7   cases, and then, you know, I prepare cases like this
 8   for -- for trial.
 9        Q.   You said you'd been -- you'd given about
10   10 to 15 depositions over the last couple of years
11   in Roundup.  Have you -- have you also testified at
12   some trials?
13        A.   Yes, I've testified in two trials, the
14   Hardeman trial and the Pilliod trial.  I think you
15   should have that.  It should have been sent to you.
16        Q.   Yes.  Well, so I -- and hopefully you got
17   what I sent to you.  Let's -- let's -- let's stop
18   for a minute and verify that.
19        A.   I did.
20        Q.   Did you get a -- did you get a box of
21   documents from me?
22        A.   Yes.
23        Q.   Do you have them in front of you now?
24        A.   Yes.
25        Q.   So I'm going -- so we're going to mark a
```

1   few -- mark some things for the -- use in the

2   deposition.  And I'm just going to read them out,

3   what I'm marking and what number I'm going to give

4   them.  And so if you want to just write this number

5   on each of the items as I -- as I read it, it will

6   help you remember what we marked as what.  Okay?

7       A.   They're all in nicely labeled fold --

8   folders, numbered.

9       Q.   Yes.  So now we're going to take them out

10  of the folders, or at least I am.  So Number 1 is

11  going to be what's, I think, in your Folder

12  Number 1.  We're going to mark that as Exhibit 1.

13  That's the notice of deposition for today.

14          (Marked for identification purposes,

15           Exhibit 1.)

16          THE WITNESS:  Okay.

17          BY MR. BRENZA:

18      Q.   You got that?

19      A.   Yeah.  I'm just going to leave them in the

20  folders since they're already --

21      Q.   Okay.  As -- just -- yeah, however you want

22  to do it, but --

23          Number 2, Exhibit Number 2, is going to be

24  what's in your Folder Number 2.  It's your -- it's

25  your report in this case, in the Peterson case.

1                    (Marked for identification purposes,

2                     Exhibit 2.)

3                    THE WITNESS:  Yes.

4                    BY MR. BRENZA:

5          Q.    And Exhibit Number 3 is in your Folder

6     Number 3, and that's the CV that you provided, okay?

7                    (Marked for identification purposes,

8                     Exhibit 3.)

9                    THE WITNESS:  Yes.

10                   BY MR. BRENZA:

11         Q.    And Exhibit Number 4 is in your Folder

12    Number 4, and that's going to be a list of prior

13    testimony.  Do you see that?

14         A.    Yes.

15                   (Marked for identification purposes,

16                    Exhibit 4.)

17                   BY MR. BRENZA:

18         Q.    So this is -- is this what you were

19    referring to when you said that you thought you had

20    provided that to me?

21         A.    Yes.

22         Q.    And I'm familiar with the Hardeman case and

23    Pilliod case.  The -- the first item you have listed

24    here is the -- is something with Johnson & Johnson.

25    What's the nature of that?

1        A.    It was a medicolegal case.   A young man

2    developed a lymphoma that was related to his

3    medication.

4        Q.    And -- and it was a -- I take it a

5    medication that was manufactured by Johnson &

6    Johnson?

7        A.    Yes.

8        Q.    And you testified on behalf of the

9    plaintiff in that lawsuit?

10       A.    Yes.

11       Q.    Now, the -- the Hardeman case was another

12   case where an individual claimed that Roundup caused

13   his non-Hodgkin's lymphoma; right?

14       A.    Yes.

15       Q.    And you testified for the plaintiff in that

16   case; right?

17       A.    Yes.

18       Q.    Your -- your -- the general thrust of your

19   testimony was that you believe that Roundup did

20   cause the non-Hodgkin's lymphoma in that case;

21   right?

22       A.    Yes.  And it was a substantial contributing

23   cause.

24       Q.    Substantial.  So when you say "substantial

25   contributing cause," what do you mean by that?

Dennis D. Weisenburger, M.D.

1      A.   Well, it played a substantial role.

2      Q.   Does that mean that it would have happened

3  without that factor or was it -- does that mean it

4  was a necessary factor?

5           MS. FREDONA:  Objection.  Form.

6           THE WITNESS:  Well, it means that it was a

7  significant factor in that case.  It's possible a

8  person could have developed lymphoma without the

9  exposure, but the exposure with -- to Roundup

10 increased his risk significantly.

11          BY MR. BRENZA:

12     Q.   It was the same -- was your testimony in

13 Pilliod the same kind of testimony you testified on

14 behalf of the plaintiff?

15     A.   Yes.

16     Q.   And you again testified that you believe

17 the plaintiff's non-Hodgkin's lymphoma had had as a

18 substantial contributing factor Roundup; right?

19     A.   Yes.

20     Q.   Have you ever testified that Roundup didn't

21 cause the non-Hodgkin's lymphoma at issue?

22     A.   No.  When I review cases, if I find such

23 cases I usually advise the lawyers to not pursue

24 them.

25     Q.   Did you review the Peterson case before it

```
 1    was filed?

 2         A.   I -- I don't know when it was filed.  I --

 3    I think I -- I reviewed it afterwards.

 4         Q.   Okay.  So you didn't have a -- you weren't

 5    consulted for that kind of advice in the Peterson

 6    case?

 7         A.   No.

 8         Q.   Does the -- what we've marked as Exhibit 4,

 9    does that exhaust all the times you've testified in

10    court over the last five years?

11         A.   Yes.

12         Q.   Okay.  So the next item I want to talk

13    about is your CV.  So we marked that as Number 3,

14    Exhibit 3.  Do you have it?

15         A.   Yes.

16         Q.   Exhibit 3 is -- is Exhibit 3 a -- a

17    complete and up-to-date version of your curriculum

18    vitae.

19         A.   Yeah, this is the most recent update, I

20    believe.

21         Q.   When was the last time you updated it?  Is

22    the -- is the date at the bottom correct,

23    July 17th --

24         A.   Yes.  That's -- that's the date.

25         Q.   -- 2020?
```

Dennis D. Weisenburger, M.D.

1          So as a pathologist, have you -- have you

2    been practicing as a pathologist since you left

3    med -- medical school?

4       A.   Pretty much.  I did an internship in

5    internal medicine and then I did a pathology

6    residency followed by a fellowship in

7    hematopathology and then I began -- and -- and then

8    I was in private practice for about two-and-a-half

9    years doing general pathology.  And then I went to

10   the University of Nebraska, where I did

11   hematopathology for 28 years.

12      Q.   Is hematopathology a -- a subspecialty of

13   pathology?

14      A.   Yes, it is.

15      Q.   What's the nature of hematopathology?

16      A.   Well, we're experts in diagnosing diseases

17   of the blood and bone marrow and the immune system.

18      Q.   Have you been asked to diagnose forms of

19   non-Hodgkin's lymphoma?

20      A.   Yes.

21      Q.   Over the course of your career how many

22   cases of non-Hodgkin's lymphoma do you think you've

23   had occasion to evaluate?

24      A.   Thousands.

25      Q.   In -- in -- in your -- to your knowledge

Dennis D. Weisenburger, M.D.

1    and experience, is there a -- a test that can tell

2    you whether a particular non-Hodgkin's lymphoma has

3    been caused by Roundup?

4        A.   No.

5        Q.   So for those thousands of cases you've

6    looked at, in none -- in of those cases could you

7    definitively say that what you were looking at was

8    caused by Roundup; right?

9            MS. FREDONA:  Objection.  Form.

10           THE WITNESS:  None of the cases in my

11   pathology practice; that's correct.

12           BY MR. BRENZA:

13       Q.   And -- and the same is true for other

14   environmental causes; right?

15           MS. FREDONA:  Objection.  Form.

16           THE WITNESS:  For the most part, yes, it's

17   true.

18           BY MR. BRENZA:

19       Q.   And that would be exposure to other toxins?

20   There's no -- there's no test that's to show whether

21   a non-Hodgkin's lymphoma has been caused by exposure

22   to workplace toxins; right?

23       A.   That's correct.

24       Q.   And -- and that's true for radiation;

25   right?

Dennis D. Weisenburger, M.D.

```
1        A.   Yes.

2        Q.   Other chemicals that -- that people may

3   come into contact with?

4        A.   Yes.

5        Q.   You said that most cases.  So I take it

6   there were maybe a -- is it -- am I right that

7   there's only a handful of times when the nature of

8   the non-Hodgkin's lymphoma provides you with

9   information about its cause?

10       A.   That's correct.

11       Q.   And why don't I just let you describe what

12  those instances are where -- those -- you know,

13  those rare cases where you can tell by looking at a

14  non-Hodgkin's lymphoma what caused it.

15       A.   Well, usually we -- we can do -- we can do

16  some stains that will identify viruses or bacterial

17  organisms that lead -- lead to non-Hodgkin's

18  lymphoma.

19       Q.   So it's -- it's -- it's in those two

20  categories, viruses and bacterial infection?

21       A.   Primarily, yes.

22       Q.   And in those instances, you're looking at a

23  pathology sample where -- where the virus or the

24  bacteria in question are still there; right?

25       A.   Yes.
```

1      Q.   And you can see that they're the -- they're

2  the bad actor in this particular non-Hodgkin's

3  lymphoma?

4      A.   Yes.

5      Q.   And that's not true for all viruses; right?

6  That's just true for certain viruses?

7      A.   Yeah.  Certain viruses that cause

8  non-Hodgkin lymphoma.

9      Q.   And that's Hepatitis B?

10     A.   Well, it's Epstein-Barr virus.  It's some

11  of the human herpes viruses.  There are ways to

12  demonstrate Hepatitis B and Hepatitis C in tissue,

13  but we don't routinely do those tests in -- in

14  pathology practice.

15     Q.   Okay.  So -- so the main ones that you

16  would -- that you -- you would see in the ordinary

17  practice of medicine are the Epstein-Barr virus and

18  the -- certain of the herpes viruses?

19     A.   Yeah.  Like Human Herpesvirus-8 is -- is a

20  known cause.

21     Q.   What kinds of bacterial infections would

22  you see in a -- in an -- an -- an NHL sample that

23  you were evaluating?

24     A.   Well, usually it's Helicobacter pylori,

25  which is a bacterium in the stomach that is a risk

1    factor for non-Hodgkin lymphoma and also for gastric

2    carcinoma.

3         Q.    And that causes a very specific kind of

4    non-Hodgkin's lymphoma; right?

5         A.    Yeah.  It -- it causes mainly two types:

6    one is the so-called gastric MALT lymphoma, that's

7    M-A-L-T in caps, MALT lymphoma, or diffuse large

8    B-cell lymphoma.

9         Q.    Did you have any information about

10   Mr. Peterson's samples that would lead you to rule

11   in or rule out any of those viruses in a pathology

12   sample of his?

13        A.    No, none of those tests were done.

14        Q.    So we were -- we were talking about your

15   practice of pathology.  You said you -- you've been

16   a dedicated pathologist for closing in on 30 years;

17   is that -- is that fair?

18        A.    Yeah.  I began my practice in around early

19   1980s.  So almost 40 years.

20        Q.    Were you -- were you -- well, were you

21   asked to evaluate any of Mr. Peterson's pathology?

22        A.    Yes, I did review the -- the diagnostic

23   tissue slides in this case.

24        Q.    Did they -- what did they tell you?

25        A.    Well, they -- they -- they told me that the

1    diagnosis that was originally made was correct,

2    diffuse large B-cell lymphoma.

3        Q.   And if I'm remembering correctly, those

4    slides were of a enlarged lymph node from his --

5    from his neck; is that right?

6        A.   Yes.

7        Q.   Did those slides tell you anything else

8    besides the fact that he had diffuse large B-cell

9    lymphoma?

10       A.   Well, one could subcategorize it as -- as

11   what we call -- we -- we tried to categorize them as

12   germinal center type or nongerminal center type and

13   his was a germinal center type.

14       Q.   So you -- you're going to have to explain

15   that to me a little bit.  What -- what is a germinal

16   center type?

17       A.   Well, it's -- it's a type that has a -- a

18   phenotype similar to cells that come out of germinal

19   centers in -- in normal lymph nodes.  So we have

20   certain markers that we can do to try to

21   subcategorize the cells, and in this case, and other

22   cases of diffuse large B-cell lymphoma, we apply

23   some antibodies to the tissue and -- and try to

24   determine if it's a germinal center type or if it's

25   a nongerminal center type.

Dennis D. Weisenburger, M.D.

1    Q.   What's the significance of whether it's a
2  germinal center type or not?
3    A.   Well, a germinal center type tends to have
4  a better prognosis and can usually be treated with
5  standard chemotherapy like Mr. Peterson got.
6         If it's a nongerminal center type, some
7  clinicians might decide to treat it differently or
8  more aggressively because it has -- it -- it has a
9  less good prognosis.
10    Q.   So Mr. Peterson was treated with something
11  called R-CHOP?
12    A.   That's correct.
13    Q.   Is that a pretty standard first-line
14  treatment for non-Hodgkin's lymphoma?
15    A.   Yes, it is.
16    Q.   And it worked well for Mr. Peterson; right?
17    A.   Yeah --
18         MS. FREDONA:  Objection.  Form.
19         THE WITNESS:  Yes, it did.
20         BY MR. BRENZA:
21    Q.   After about three-and-a-half months of
22  treatment, is it fair to say that Mr. Peterson's
23  prognosis is very good right now?
24         MS. FREDONA:  Objection.  Form.
25         THE WITNESS:  I would say the prognosis is

Dennis D. Weisenburger, M.D.

1    good, yes.

2              BY MR. BRENZA:

3        Q.   He's -- he's in complete remission; right?

4        A.   Yes.

5        Q.   And -- and that means that the cancer is

6    gone from his body as far as testing can tell you?

7        A.   Yeah.  He has no detectable evidence of

8    disease.

9        Q.   And he hasn't had any detectable evidence

10   of disease four years now; right?

11       A.   For approximately four years; that's

12   correct.

13       Q.   And every year that goes by it's less

14   likely that he's going to ever have another

15   occurrence of his non-Hodgkin's lymphoma; right?

16       A.   That's correct.

17       Q.   So -- so he's -- you're always careful to

18   use the word -- not to use the word "cure" with

19   respect to cancer, but as close as you can come to

20   that, is it fair to say that he's cured?

21             MS. FREDONA:  Object to form.

22             (Simultaneous speakers - unclear.)

23             THE WITNESS:  Well, will be cured, yes.  I

24   don't really --

25             (Stenographer clarification.)

```
1              THE WITNESS:  So I don't usually apply
2     "non" on this line of testimony.  Oncologists and
3     hematologists usually wait for five years with no
4     evidence of disease before they tell the patient
5     they're most likely cured.  But sometimes you can
6     have -- can have late relapses in diffuse large
7     B-cell lymphomas.  So one can't be entirely sure
8     that he's cured.  But he -- he's very likely to --
9     to be cured based on his four years of complete
10    remission.
11             BY MR. BRENZA:
12        Q.   Okay.  Now, getting back to the germinal
13    center nature of the DLBCL in this case, is that a
14    description of the type of B cell that's causing the
15    non-Hodgkin's lymphoma?
16        A.   Yes.
17        Q.   And what's -- can you describe what -- what
18    the germinal center is in somewhat concise way or is
19    that just too big of a explanation to -- to try?
20        A.   Well, in -- in the immune system, there are
21    anatomical structures in lymph nodes and other
22    lymphoid organs called germinal centers, and those
23    are the places that the B cells are kind of educated
24    to respond to specific -- what we call antigens.
25    They could be viruses, they could be bacteria, it
```

Dennis D. Weisenburger, M.D.

1    could be other compounds.

2         So the education of the B cell occurs in

3    the germinal centers and -- and O cells have a very

4    specific phenotype; that is, they have a certain

5    group of markers which characterize them.  And we

6    use those same markers when we try to maybe do our

7    testing in lymphoma diagnosis, particularly in

8    follicular lymphoma or diffuse large B-cell

9    lymphoma.

10    Q.   Okay.  Let me just ask you a few questions

11   about how you first got involved in this case.

12         Do -- who -- who hired you for this

13   litigation?

14    A.   Mr. Moll contacted me last spring or summer

15   about getting involved in some of his cases.  And at

16   the time I declined because I was very busy at work

17   and with other cases.  But then in the fall, late

18   fall, my workload kind of leveled off, and so I

19   contacted him and said I'd be interested in doing

20   some cases if he still was interested, and he was.

21   And so late last fall, you know, was when we moved

22   forward.

23    Q.   And just to be a little more precise, do

24   you -- do you remember what month it was in the fall

25   of 2020?

Dennis D. Weisenburger, M.D.

```
 1       A.   Let me look.  I don't exactly remember.  My
 2   first billing was in December.  So I know I talked
 3   to him on the phone prior to that.
 4       Q.   And -- and you -- you said your first
 5   billing was in December.  So that implies that you
 6   had done some work, I guess, up to that point;
 7   right?
 8       A.   You know, I talked to him in June and July
 9   on the phone and then I think in -- in late November
10   we talked again about doing more work.  So that
11   would be the timeline.  And then I actually, I
12   think, received a shipment of cases in late
13   December, sometime in -- sometime in December.
14       Q.   How many cases did Mr. Moll hire you for?
15       A.   Five case -- five cases.  Yeah.  So I
16   started working on this case in early December.
17       Q.   And of those five cases, those are all
18   cases where plaintiff is saying that Roundup caused
19   non-Hodgkin's lymphoma; right?
20       A.   Yes.
21       Q.   Did you -- did you review all five of those
22   cases?
23       A.   I did, yes.
24       Q.   And did you conclude that in each of those
25   cases that Roundup had caused the non-Hodgkin's
```

Dennis D. Weisenburger, M.D.

```
1    lymphoma?
2        A.   Yes, I did.  But they were all prescreened
3    by his -- his staff.
4        Q.   Do -- did you review medical records in
5    each of those cases?
6        A.   Yes, I did.
7        Q.   And -- and one of those cases, I take it,
8    was Mr. Peterson's; right?
9        A.   Yes.
10       Q.   So you've reviewed his medical records;
11   right?
12       A.   Yes, I did.
13       Q.   In your report you say you had a telephone
14   interview with Mr. Peterson; is that right?
15       A.   Yes.
16       Q.   When did you speak with Mr. Peterson on a
17   telephone interview?
18       A.   It was on December 14th.
19       Q.   Were you in your office in Duarte?
20       A.   Yes.
21       Q.   Do you know where Mr. Peterson was?
22       A.   Illinois.
23       Q.   How long did the conversation last?
24       A.   Approximately -- approximately an hour.
25       Q.   Who else was on the call?
```

```
1        A.    Just Mr. Peterson.

2        Q.    Just the two of you?

3        A.    Yes.

4        Q.    Do you have notes of your conversation with

5   him?

6        A.    Yes.

7        Q.    So we'll get to it later, but part of the

8   deposition notice is a set of document requests to

9   you, and -- and one of the things that it seeks is

10  your notes or any other record of communications

11  with Mr. Peterson.  So if you would, when we're done

12  with the deposition today, provide those to -- to

13  Rebecca and she'll look at them and decide whether

14  to pass them on to us.  But I -- I can tell you it

15  falls within the scope of what we've asked for.

16  Okay?

17       A.    Yeah.  In -- in past depositions if I -- if

18  I had -- if I had issued a formal report I haven't

19  usually provided my notes.  And I did discuss this

20  with Mr. Moll last week and he -- he agreed not to

21  do that.  So you'll have to work that out with him.

22       Q.    Okay.  Well, the first step is them having

23  your notes, so let's make sure that they at least

24  have them and then we can discuss it from there.

25  Okay?
```

Dennis D. Weisenburger, M.D.

```
1        A.    Okay.

2        Q.    So how -- how -- how many pages of notes do

3   you have on your -- your conversation with

4   Mr. Peterson?

5        A.    Two.

6        Q.    So on your conversation with Mr. Peterson

7   what did you say and what did he say?  Let's start

8   with what you said.

9        A.    Well, I have a standard list of questions

10   that I go through with each person I interview.  We

11   talk about their Roundup use, where they used it,

12   how much they used, what kind of clothing they wore,

13   what kind of protective equipment they wore,

14   et cetera.

15          We also talk about other risk factors for

16   non-Hodgkin's lymphoma, other chemical exposures,

17   other pesticide use.  I usually talk a little bit

18   about their medical history.  They kind of get

19   recent follow up.  We talk about family history.  I

20   usually ask them his usual height and weight.  You

21   know, that -- in general that's at least the

22   questions that I go through that -- to try to

23   answer -- answer all the questions I need.

24        Q.    Did -- did Mr. Peterson provide to you any

25   information in your interview with him that allowed
```

1   you to tailor your opinion to him beyond just what

2   you had found in his medical records?

3       A.   Yes.  Well, I also, you know, reviewed

4   his -- his -- his fact sheet.  I also reviewed his

5   deposition.  So I already had some information

6   before I talked to him.

7       Q.   What did -- what Mr. Peterson tell you in

8   response to your questions to him?

9       A.   Well, it's all listed in my specific

10  causation report, which you have.

11      Q.   Okay.  So in your report, which we've --

12  we've marked -- marked as Exhibit 2, what

13  information in your report depends on what

14  Mr. Peterson told you in the -- in your telephone

15  interview with him?

16      A.   Well, most of the information.  The

17  information either came from his deposition or his

18  fact sheet or from the telephone interview.  So, you

19  know, some things weren't -- some things weren't

20  clear from the deposition and the fact sheet, so --

21  you know, so I -- I asked a -- a -- a -- a -- a

22  specific group of questions on various -- various

23  topics and the results you can find there in the

24  second paragraph of the -- of my specific report.

25      Q.   So in the -- in the second paragraph you --

```
 1    you talk about -- it looks like mainly

 2    Mr. Peterson's use of Roundup; is that right?

 3        A.   Yes.

 4        Q.   In your report, which -- which facts on

 5    which you rely came from your interview with

 6    Mr. Peterson versus all the other things you

 7    described?

 8             MS. FREDONA:  Objection.  Form.

 9             THE WITNESS:  Well, I would say all the

10    facts in Paragraph 2 came from him.

11             BY MR. BRENZA:

12        Q.   Okay.  Did Mr. Peterson tell you anything

13    about his history encountering toxic substances

14    other than Roundup?

15        A.   We -- we did talk a little bit about that,

16    yes.

17        Q.   What did he tell you?

18        A.   Well, he told me about his photography and

19    developing photographs, which -- which I do describe

20    in -- on the second page of my report.  Other than

21    that, he had no exposure to any toxins that I

22    thought were of interest in this case.

23        Q.   Did he have exposure to other toxins that

24    you did not think were of interest in this case?

25        A.   Not really, no.
```

1    Q.   With respect to the photographic hobby,

2    Mr. Peterson developed his own film; right?

3    A.   That's correct.

4    Q.   In the course of developing his own film,

5    he used chemicals that are appropriate to doing

6    that; right?

7    A.   Yes.

8    Q.   Did he tell you what chemicals specifically

9    he used?

10   A.   Well, he used developer and he used fixer

11   solutions.  He didn't tell me what was in those

12   solutions, but he did say that he was very careful

13   not to get -- get the chemicals on his skin.  He

14   always wore rubber gloves and he used tongs to

15   handle the wet pictures.  So the amount of exposure

16   he would have had to those chemicals would have been

17   very, very minimal.

18   Q.   Okay.  But as you sit here today, you

19   don't -- you don't know exactly what chemicals those

20   were that Mr. Peterson was using; right?

21   A.   I do not.

22   Q.   And did Mr. Peterson talk to you at all

23   about the -- the room in which he did his

24   photographic development?

25   A.   No.

```
 1        Q.   So I take it as you sit here today you
 2   don't have any information from Mr. Peterson about
 3   the degree that that room was ventilated?
 4        A.   I do not.
 5        Q.   We'll -- we'll get into this in more
 6   detail, but with respect to Mr. Peterson's use of
 7   Roundup, is your view that -- that -- that he was
 8   exposed to Roundup through inhalation or through
 9   dermal contact or through something else or a
10   combination of something else?
11        A.   Both dermal and inhalation probably.
12        Q.   And Mr. Peterson, when he was using
13   Roundup, he was -- he was outside; right?
14        A.   Yes.
15        Q.   And we'll get -- we'll get into the -- more
16   of the details of what he told you about his
17   specific use in a little while, but I just wanted to
18   touch on those issues.
19             What else did Mr. Peterson tell you on your
20   telephone interview with him, other than describing
21   his -- his use of Roundup and his other toxic
22   exposures?
23        A.   Well, I've already answered that question.
24   I don't know what exactly to tell you.  He told me
25   he was in complete remission.  He told me about his
```

1    use of the photography chemicals.  He -- he had used

2    Weed B Gon, which is a form of 2,4-D, a -- a -- a --

3    a few times to treat specific weeds, but only a few

4    times.  He told me that there wasn't really a family

5    history of cancer, although his mother had developed

6    lung cancer at an old -- at an -- very old age.  No

7    other family history of cancer.  He did have a

8    history of smoking when he was younger, but he

9    hadn't smoked in quite a few years.

10          Those -- and -- and then we went

11   through a -- a -- you know, I went through a list of

12   standard risk factors for non-Hodgkin's lymphoma.

13   And, you know, he didn't have any other of the known

14   risk factors for non-Hodgkin's lymphoma, so I went

15   through that list.

16       Q.   Okay.  So with respect to known risk

17   factors for non-Hodgkin's lymphoma, what percentage

18   of all the non-Hodgkin's lymphoma can be explained

19   by the known risk factors?

20          MS. FREDONA:  Objection.  Form.

21          THE WITNESS:  Well, it depends on how

22   extensive one does -- does an investigation.  But,

23   you know, what I've usually said in previous

24   testimony is somewhere around 20 or 30 percent of

25   cases probably could be linked to some -- some

Dennis D. Weisenburger, M.D.

1    etiology that can be specifically identified.  The

2    majority of cases are really not investigated much

3    and so we don't really know in those cases.

4              BY MR. BRENZA:

5        Q.   Is it fair to say that there are likely

6    contributing factors to non-Hodgkin's lymphoma that

7    have not yet been discovered?

8        A.   That's true.

9        Q.   And there are contributing factors to

10   non-Hodgkin's lymphoma that don't appear in medical

11   records very often?

12       A.   Yes.

13       Q.   Is random genetic mutation a cause of

14   non-Hodgkin's lymphoma?

15       A.   Yes, it probably is.

16       Q.   Is it true that -- that there's an emerging

17   understanding in the medical community that random

18   mutation is a substantial contributing factor to a

19   lot of cancer, perhaps the majority of cancer?

20             MS. FREDONA:  Objection.  Form.

21             THE WITNESS:  Well, it -- this is the

22   explanation that is used to explain cases that are

23   not related to either hereditary -- hereditary

24   factors or environmental factors.  But random

25   genetic mutations certainly plays a role in many

 1   cases of non-Hodgkin lymphoma.

 2            BY MR. BRENZA:

 3       Q.   And -- and -- and that's the -- just to get

 4   a better understanding of what the random mutations

 5   are, are the -- are -- are the random mutations the

 6   result of mistakes when the cell replicates itself?

 7       A.   Yes.

 8       Q.   And -- and cells replicating themselves is

 9   just part of living; right?  It's -- it's -- happens

10   every day to everybody?

11       A.   Yes.

12            MS. FREDONA:  Objection.  Form.

13            BY MR. BRENZA:

14       Q.   So -- so in a -- in a substantial majority

15   of cases when people get cancer, it's -- it's not

16   because they did anything wrong or exposed

17   themselves to anything in particular; it can just be

18   because their body eventually -- you know, their

19   cells made a mistake in replicating and that mistake

20   turned into a cancer?

21            MS. FREDONA:  Objection.  Form.  Incomplete

22   hypothetical.

23            THE WITNESS:  Well, I -- that does occur in

24   many cases, yes.  It -- but we -- but we don't

25   really know -- we don't really know if there were

 1    environmental or hereditary causes in those cases.

 2         BY MR. BRENZA:

 3    Q.   One of the things that's related to

 4    non-Hodgkin's lymphoma, if not a cause of it, is

 5    age; right?

 6    A.   Yes.

 7    Q.   It's true that the -- the older somebody

 8    gets, the more likely they are to get non-Hodgkin's

 9    lymphoma; right?

10    A.   Yes.  That's true for most types, not all

11    types, but most types.

12    Q.   Is the -- is it true for DLBCL?

13    A.   Yes.

14    Q.   And so with respect to DLBCL, is it -- is

15    the reason aging seems to be associated with getting

16    that form of non-Hodgkin's lymphoma that as you age,

17    your immune system gets weaker?

18    A.   Well, that's -- that's one of the

19    hypotheses, yes.

20    Q.   Is that a hypothesis that you give

21    credibility to?

22    A.   Well, it may play a role, but I don't think

23    it's a major role because the -- the -- the immune

24    deficiency in elderly people is usually mild and so

25    it's just really unclear what role it plays.

1      Q.   What's your view of why aging seems to be

2   associated with non-Hodgkin's lymphoma and other

3   types of cancer?

4      A.   Well, I think as you said, you have random

5   mutations that accumulate over time.  You also have

6   mutations from environmental factors that would

7   accumulate over time.  So as you become older, you

8   are likely to have more of these genetic

9   abnormalities, including mutations.  And, you know,

10  if you get the right combination of those in the

11  right order, then you could develop a cancer.

12     Q.   Is -- is it your understanding that

13  non-Hodgkin's lymphoma and DLBCL specifically is the

14  result of many mutations combining together?

15     A.   I'm not sure what you mean by "many."  You

16  know, we have cases of -- cases where we don't find

17  much in the way of genetic abnormalities and then we

18  have cases where there are lots of genetic

19  abnormalities.  So it -- it's really a spectrum.

20     Q.   Okay.

21     A.   But certainly -- certainly there are

22  genetic abnormalities in most of the cases.

23     Q.   Okay.  I mean, I -- I had read that, for

24  example, to have any kind of cancer you have to

25  disable the gene that's responsible for cell

Dennis D. Weisenburger, M.D.

1    suicide; is that right?

2        A.    Usually there are some abnormalities in

3    genes of that sort yes, at least in -- in lymphoma,

4    but not always.

5        Q.    And -- and I'm just using this as an

6    example, but the things that I've looked at suggest

7    that you need -- you need a few or -- or a group of

8    mutations before you can really have cancer.  Is --

9    is that your view or -- or not?

10       A.    In general, yes.

11       Q.    Is there any genetic test of which you're

12   aware that can tell you what caused a particular

13   non-Hodgkin's lymphoma?

14       A.    Well, we certainly have certain genetic

15   abnormalities that characterize certain subtypes of

16   lymphoma.  So, you know, we -- we know, for example,

17   that the Bcl-2 translocation that Mr. Peterson had

18   occurs in about 30 percent of diffuse large B-cell

19   lymphomas and probably around 90 percent of

20   lymphomas.  So it's a relatively common genetic

21   abnormality and we usually look for it.

22       Q.    Does the Bcl-2 mutation that Mr. Peterson

23   had tell you what caused his non-Hodgkin's lymphoma?

24       A.    No.

25       Q.    Did -- do any of the other genetic tests

1    that Mr. Peterson had tell you anything about what

2    caused his non-Hodgkin's lymphoma?

3         A.   No.

4         Q.   What is the Bcl-2 genetic mutation?

5    What -- what does that signify?

6         A.   Well, it's usually not a mutation.  It --

7    it -- it can be a mutation, but usually it's a

8    reciprocal translocation of the B cell to G and --

9    and one of the immunoglobulin genes that then

10   upregulates the Bcl-2 gene and increases the

11   production of the Bcl-2 protein.

12        Q.   So let -- this is going to -- this is going

13   to involve a few questions because I -- I -- I'm not

14   sure I -- I understand this completely, but

15   you're -- you're going to help me as we go.

16             The B cells, their -- their function in the

17   human body is to recognize foreign invaders; right?

18        A.   Yes, foreign invaders or foreign proteins.

19        Q.   And -- and the way they recognize them or

20   disable them is through something called immune

21   globulins; right?

22        A.   Right.  They produce proteins called

23   immunoglobulins.

24        Q.   That's -- and for a layman, that's what

25   I've always thought of as an antibody; right?

Dennis D. Weisenburger, M.D.

1        A.    Yes.

2        Q.    Okay.  So for the B cells to recognize a

3   lot of possible invaders, there have to -- they have

4   to have the ability to change up their immune

5   globulins to -- to be different in -- in every

6   B cell; right?

7        A.    Yes.  There's a whole array of B cells that

8   produce antibodies to a whole array of -- of

9   abnormal proteins or invaders.

10       Q.    And the way B cells can change that immune

11  globulin is by shuffling a certain part of their own

12  genome that codes for that immune globulin; right?

13       A.    Right.  So class switching and somatic

14  hypermutation are the two mechanisms that B cells

15  use to tailor the antibodies to specific proteins or

16  invaders.

17       Q.    It's -- it's part of the -- the life

18  mission of a B cell to shuffle its own genes; right?

19       A.    Yes.

20       Q.    And sometimes that goes wrong; right?

21       A.    Yes.

22       Q.    And part of their immune globulin genes get

23  stuck onto some other part of the genome in the

24  B cell that's not supposed to be part of this

25  shuffling; right?

Dennis D. Weisenburger, M.D.

1       A.   Well, that -- that's what happens in the --
2    in the so-called (14;18) translocation, where the
3    Bcl-2 gene on Chromosome 18 translocates to
4    Chromosome 14 and then it's upregulated and produces
5    increased amounts of Bcl-2 protein.  So yeah, it's
6    a -- it's a reciprocal translocation, which is a
7    genetic abnormality that occurs as a result of
8    immunoglobulin heavy-chain rearrangement.
9       Q.   And that's -- and that -- when you say
10   (14;18) translocation, is that the Bcl-2
11   translocation that Mr. Peterson had?
12      A.   Yes.
13      Q.   Were there other genetic mutations or
14   defects that were found in Mr. Peterson that were
15   informative to you?
16      A.   No, they only looked for three
17   abnormalities, which are the three abnormalities we
18   usually look for in diffuse large B-cell lymphoma.
19   So they found one of the three.  There were no
20   rearrangements of the BCL6 gene and there were no
21   rearrangements of the MYC gene -- that's capital
22   M-Y-C gene.  Only -- only the rearrangement of the
23   Bcl-2 gene was found.
24      Q.   Why do they look for those three mutations
25   in a patient with non-Hodgkin's lymphoma?  Is that

Dennis D. Weisenburger, M.D.

1    relevant to their treatment?

2         A.    Yes, because if -- if one of those -- if

3    either the Bcl-2 gene or the BCL6 gene are

4    arranged -- are rearranged in combination with the

5    MYC gene, you have what is called a double hit; that

6    is, you have a translocation involving Bcl-2 or BCL6

7    in combination with a translocation involving the

8    MYC gene.  And those patients have a very -- usually

9    have a very aggressive disease and often are treated

10   with more aggressive therapy.

11        Q.    Okay.  And -- and when you find a

12   translocation with the MYC gene, is that also a

13   function of the B cell's, you know, normal shuffling

14   of its genome gone wrong?

15        A.    Yes.

16        Q.    Is that true for all three of those types

17   of mutations?

18        A.    Yes.

19        Q.    You mentioned that Mr. Peterson had used

20   2,4-D; right?

21        A.    Yes.  He'd used it a few times.

22        Q.    How many times did he say he used it?

23        A.    He said only a few times.  So I -- I didn't

24   try to quantitate that further.

25        Q.    Why did Mr. Peterson use 2,4-D?  What did

```
 1    he tell you?
 2        A.   There was -- there were certain weeds that
 3    seemed to be more susceptible to that, to 2,4-D.
 4    I'm trying to see here.  It was in his ...
 5        Q.   Are you -- are you consulting your notes of
 6    your conversation?
 7        A.   Yeah.  Yeah.  So there was a weed called
 8    Creeping Charlie.  This is the weed that he usually
 9    used it on because it seemed to work better.
10        Q.   When did he use 2,4-D?
11        A.   Well, when he wanted to treat Creeping
12    Charlie.
13        Q.   I mean, but he didn't tell you whether it
14    was within the last year or last three years or
15    10 years or anything?
16        A.   No, he didn't.
17        Q.   Okay.
18        A.   That -- that he only used it a few times.
19        Q.   Did he tell you about any precautions he
20    used when he used 2,4-D?
21        A.   No.
22        Q.   Did he tell you about the type of
23    applicator that he used for 2,4-D?
24        A.   No.
25        Q.   Does 2,4-D -- is that a -- a risk factor
```

1    for non-Hodgkin's lymphoma, exposure to 2,4-D?

2        A.    Well, there are some studies which have

3    shown increased risk with 2,4-D, but the most recent

4    review by IARC did not characterize it -- it said --

5    I think was -- it said possibly -- possibly

6    increased the risk.  So it was -- it was not -- it

7    was not definitive.

8        Q.    What's your -- your view of the risks

9    associated with the use of 2,4-D?  Is that a --

10   any -- any increase in the risk of non-Hodgkin's

11   lymphoma at all or -- or --

12       A.    Probably -- probably extensive heavy use of

13   2,4-D does -- that's my opinion -- does increase the

14   risk for non-Hodgkin's lymphoma.  But using it a few

15   times would not increase the risk.

16       Q.    And -- and for purposes of the opinion you

17   just voiced, what's a few times?  How -- how -- how

18   few times do you have to limit yourself?

19       A.    I don't have a specific number.  Less than

20   10 times over a lifetime or something like that.  A

21   few times.  Occasional use would not increase risk.

22   It's usually the studies that are done are done in

23   farmers primarily who used it extensively for many

24   years.

25       Q.    And that's -- that's -- that's also true of

Dennis D. Weisenburger, M.D.

1    glyphosate; right?  It's --

2        A.   Yes.

3        Q.   A lot of the studies are in farmers that

4    have used tons of the material over the course of

5    many years?

6        A.   Yes.

7             MS. FREDONA:  Objection.  Form.

8             BY MR. BRENZA:

9        Q.   You said that Mr. Peterson smoked when he

10   was younger.  What did he tell you about the amount

11   that he smoked when he was younger?

12       A.   Didn't really talk about the amount.  He

13   said he had -- had been a smoker from age 20 to 66,

14   but then he quit.  So I don't know how much he

15   smoked.  I didn't really pursue it because smoking's

16   not a risk factor for non-Hodgkin's lymphoma.

17   So ...

18       Q.   That's somewhat unintuitive since it is a

19   risk factor for other cancers; right?

20       A.   Some other cancers, yes.  But it isn't a

21   risk factor for non-Hodgkin's lymphoma.

22       Q.   Is there a -- a study that you rely on for

23   that?

24       A.   Well, there are many studies.  There are

25   many studies.

1    Q.   Can you just give me one or two that you
2  have in mind?
3    A.   Well, there -- there were studies that I
4  was involved in that were done by the InterLymph
5  Consortium that looked at smoking over a number of
6  different papers and different subtypes.  And
7  smoking just is not considered a risk factor for
8  non-Hodgkin's lymphoma or for diffuse large B-cell
9  lymphoma.
10    Q.   Would -- are you an author on those
11  studies?  If I search for your name, would I find
12  them?
13    A.   You might.  I -- I don't -- I don't have
14  a -- a specific study in mind, but I have reviewed
15  this topic in the past and it's not a accepted or
16  known risk factor.
17    Q.   Did Mr. Peterson tell you about any other
18  possible risk factors that he had the experienced
19  in -- in the course of his life?
20    A.   Those are the only things.
21    Q.   Now, when -- when Mr. Peterson was first
22  diagnosed with DLBCL, I think you -- you mentioned
23  it was the result of a biopsy of a lymph node;
24  right?
25    A.   Yes.

1    Q.   And it was a -- a -- a lymph node in his

2    neck that they -- they used.  Did he then undergo

3    further imaging or testing to determine the nature

4    and extent of his disease?

5    A.   Yes.  It's in my report.  He had CT scans

6    which were -- revealed enlarged lymph nodes in his

7    abdomen in the mesentery and the retroperitoneum, a

8    possible mass in the colon that was biopsied and

9    thought to be lymphoma.  So he had disease above and

10   below the diaphragm.  And also the bone marrow was

11   positive.  So he had what -- what -- what was

12   thought to be Stage 4 disease.

13   Q.   So Stage 4 means it was relatively

14   extensive?

15   A.   Yes.

16   Q.   Does it take a certain amount of time for

17   non-Hodgkin's lymphoma to progress from, you know,

18   the first cancerous cell to Stage 4?

19   A.   Yes.

20   Q.   How long does it take for non-Hodgkin's

21   lymphoma to progress from a first cancerous cell to

22   a -- to a -- a full-blown Stage 4 like Mr. Peterson

23   had when he was diagnosed?

24   A.   Well, there's no way -- way to really know

25   that.  Some people say that it takes years, but it

Dennis D. Weisenburger, M.D.

1    could -- it could occur relatively quickly.

2       Q.   Well, what's -- what's your best

3    understanding of that?  Do you have any -- well, let

4    me ask you, do you have an understanding based on

5    the thousands of slides that you've looked at of

6    people who had non-Hodgkin's lymphoma?

7            MS. FREDONA:  Objection.  Form.

8            THE WITNESS:  Well, that -- that work

9    wouldn't really reflect on my knowledge regarding

10   your question.

11           BY MR. BRENZA:

12      Q.   Okay.

13      A.   In general, people think that it takes a

14   significant period of time, usually years, to go

15   from the first cell until a known cancer.  But there

16   are intervening mutations occurring along that

17   timeline which could be random or could be due to

18   environmental factors.  So he could have had his

19   first cell with the Bcl-2 translocation years ago

20   and had random mutations and mutations induced by

21   Roundup occurring during that period of time.

22      Q.   Would you -- would you agree that by the

23   time Mr. Peterson was diagnosed that his

24   non-Hodgkin's lymphoma was extensive?

25      A.   Yes.

```
 1        Q.   His -- you -- you cite in your report some
 2   of the measurements for the lymph nodes.  Are those
 3   relatively large lymph nodes as imaging like this
 4   goes?
 5        A.   Yeah.  Particularly the -- the -- the tumor
 6   in the neck, which was over 6 centimeters.
 7        Q.   Was -- was one of the -- the symptoms that
 8   Mr. Peterson was experiencing from his DLBCL
 9   abdominal pain?
10        A.   Yes.
11        Q.   Is that a common symptom for non-Hodgkin's
12   lymphoma when it's in the abdomen?
13        A.   No, it's not.  No, it's not, but it could
14   have been related to the tumors in his -- in his
15   abdomen.  We don't really know.
16        Q.   What -- what's the significance of the
17   detection of DLBCL from his bones?
18        A.   Well, that's -- you know, when -- when
19   diffuse large B-cell lymphoma spreads to the bone
20   marrow it -- that's -- that's how we characterize it
21   as Stage 4.  It's one of the sites that makes it a
22   Stage 4, so ...
23        Q.   And -- and -- and you -- when DLBCL spreads
24   to the bone marrow, where -- where is it coming
25   from?  Where is the origin of it?
```

1    A.    Well, it's usually coming from the -- one

2    of the other sites.

3    Q.    What -- I mean, the other sites listed

4    in -- in your report or what -- what other sites are

5    you talking about?

6    A.    One -- one can't really know, but, you

7    know, it -- it -- it -- it's probably coming from

8    one of the other sites, either this -- the abdominal

9    masses or the -- or -- or the neck mass.

10    Q.    So those are the lymph nodes that were

11    enlarged?

12    A.    Yes.

13    Q.    Mr. Peterson, we talked about, got --

14    R-CHOP.  Do you have familiarity with the R-CHOP

15    treatment?

16    A.    Yes.

17    Q.    What's your -- what's your knowledge of the

18    R-CHOP treatment?

19    A.    Well, it's -- it's a -- a combination of

20    various chemotherapeutic agents, plus rituximab,

21    which is an -- which is an antibody therapy used and

22    immunotherapy used against the B cells.  It's

23    usually given in six courses, and it -- it's -- it's

24    the standard chemotherapy for most cases of diffuse

25    large B-cell lymphoma.

1       Q.   You said rituximab is a -- an

2   antibody-based treatment against the B cells?

3       A.   Right.  It's an antibody against CD20,

4   which is a -- a -- which is a protein molecule on

5   the surface of the B cells.

6       Q.   And is that a -- a protein that you'd find

7   on healthy B cells, as well as cancerous ones?

8       A.   Yes.

9       Q.   So am I right that rituximab goes after

10  healthy cells, as well as unhealthy ones?

11      A.   Yes.

12      Q.   But if you have cancer, that's good --

13  that's a good trade?

14      A.   Yes.

15      Q.   So let's talk about Mr. Peterson's use of

16  Roundup and other herbicides.

17           Did -- did Mr. Peterson tell you that he

18  had used Roundup starting in 2013?

19      A.   Yes.

20      Q.   Did he say when in 2013 he started using

21  Roundup?

22      A.   No.

23      Q.   And then did he tell you that he used

24  Roundup until 2016?

25      A.   Yes.  Through -- through 2016.

Dennis D. Weisenburger, M.D.

```
 1        Q.   Through 2016.  And when you say "through,"
 2   he used it all the way through the -- the last month
 3   when you would likely see weeds in Chicago?
 4        A.   Yes.  Yes.
 5        Q.   Is that October?  Is that -- what -- what
 6   did you -- what did you assume about the period of
 7   time or what did he tell you about the period of
 8   time during the year that he used Roundup?
 9        A.   He used it from April through October, so
10   about seven months of the year.  I usually put that
11   in my report.  I guess I didn't put it in my report.
12   Oh, I did put it in my report.  It's there.  It's
13   there.
14        Q.   And did he tell you that he used Roundup
15   one to two times per month for each of those months,
16   those seven months?
17        A.   Yes.
18        Q.   Did Mr. Peterson tell you that in the first
19   two years that he used Roundup he used it as
20   a premade solution, ready to -- ready to use?
21        A.   Yes.
22        Q.   And he applied it with a pump sprayer with
23   a short hose that was part of the package of Roundup
24   that he had purchased; right?
25        A.   Yes.
```

```
 1        Q.   Did he tell you how many gallons of Roundup
 2   he applied, the -- the commercial solution, during
 3   that time period?
 4        A.   I asked him that, but he was unable to tell
 5   me.
 6        Q.   But what he -- what he did say is it was
 7   1 gallon at a time; right?
 8        A.   Yes.  Yes.
 9        Q.   But he couldn't say how many gallons over
10   those two years?
11        A.   No.
12        Q.   After that he started using Roundup that he
13   had to mix himself; right?
14        A.   Yes.
15        Q.   And when he -- when he would mix Roundup,
16   he would wear rubber gloves?
17        A.   Sometimes he did, yes.
18        Q.   How often did he wear rubber gloves when he
19   was mixing Roundup?
20        A.   Again he wasn't really able to tell me.
21   I -- I -- I asked him that, but he wasn't able to
22   tell me.  He -- he said sometimes he wore gloves,
23   sometimes he didn't.  So that's -- I'm unclear on
24   that.
25        Q.   Your report also says that he usually wore
```

Dennis D. Weisenburger, M.D.

```
 1   pants, long-sleeve shirts, and ankle-high leather
 2   shoes or sneakers and socks; right?
 3       A.   Yes.
 4       Q.   Did he tell you how often he wore those
 5   things when he was using Roundup?
 6       A.   Usually that's what he wore.
 7       Q.   Okay.
 8       A.   Well, probably almost always.
 9       Q.   Did Mr. Peterson tell you about any
10   specific incidents where he spilled on himself or --
11   or was exposed to a greater extent than you would
12   expect from somebody just using the product?
13       A.   Well, when he mixed it, sometimes he would
14   get it on his hands.  When he sprayed it, he would
15   get it on his clothes and on his skin, on his hands,
16   on his face.
17       Q.   And then he -- he also would wash himself
18   if that happened; right?
19       A.   Yeah.  So if he got it on his hands while
20   he was mixing, he -- you know, after he finished his
21   mixing he would go wash it with soap and water.  If
22   he got it on his hands or his face while he was
23   spraying, he would wait until he was finished
24   spraying and then he would go wash his hands and his
25   face.
```

Dennis D. Weisenburger, M.D.

1     Q.   Did you do any calculation of the amount of

2   Roundup that might have entered Mr. Peterson's body?

3     A.   I did not.

4     Q.   As you sit here today, you don't know for

5   sure that any Roundup entered Mr. Peterson's body;

6   right?

7          MS. FREDONA:  Objection.  Form.

8          THE WITNESS:  Well, if he got it on his

9   skin, some of it would have entered his body.  He

10   could have inhaled it too.

11          BY MR. BRENZA:

12     Q.   You don't have any record of -- of a test

13   that detected any Roundup in Mr. Peterson ever;

14   right?

15     A.   Was no reason for him to do that test,

16   for -- for -- for have -- having such test.  They're

17   not -- they're not commonly or routinely done.

18     Q.   Right.  I'm just trying to verify that

19   there are no such tests; right?  Nobody -- nobody

20   tested him for Roundup and there are no tests

21   showing that glyphosate was in his body; right?

22     A.   That's correct.

23          MS. FREDONA:  Objection.  Form.

24          BY MR. BRENZA:

25     Q.   Are you relying on other experts in this

1    case for an opinion about the extent to which

2    Mr. Peterson was exposed to Roundup?

3        A.    No.

4        Q.    Now, you said he might have been exposed

5    through his skin; right?

6        A.    Right.

7        Q.    Did you -- did you do any calculation about

8    how much Roundup would have been absorbed by

9    Mr. Peterson based on exposures that he described to

10   you?

11       A.    No, I did not.

12       Q.    Did you do any calculation about how much

13   Roundup might -- Mr. Peterson might have been

14   exposed to from inhalational exposure?

15       A.    I -- I didn't do any calculations.

16       Q.    How did you evaluate Mr. Peterson's

17   exposure to Roundup?

18       A.    Based -- based on the -- the -- the history

19   which was given in the report that he used it

20   relatively frequently, that he did get it on his

21   skin, and he got it on his clothing.  And he wore

22   the clothes the whole day, so if he got it on his

23   clothing, he would continue -- he would have

24   continued to be exposed during the whole day until

25   he showered, took -- took off his clothes at night

```
 1    and showered.
 2            So, you know, he had skin -- skin exposure.
 3    He would get it on his clothes, and those would --
 4    and -- and he -- and he probably -- he most likely
 5    inhaled some.  So he had some exposure each time he
 6    sprayed.
 7       Q.   Was -- was your analysis in this report
 8    from Mr. Peterson based on a number of days that he
 9    used Roundup?
10       A.   Yes.
11       Q.   Do you have knowledge as you sit here today
12    of -- of how much Roundup is absorbed through the
13    skin?
14       A.   Well, there are studies that have been done
15    on that topic.  I have not reviewed them recently,
16    but Roundup is absorbed through the skin.  That's
17    well-known.
18       Q.   But -- but in terms of figuring out
19    Mr. Peterson's exposure, you didn't rely on those
20    studies; right?
21       A.   Not specifically, no.
22       Q.   Same with inhalational exposure, you didn't
23    look at studies that discussed how much inhalational
24    exposure using Roundup would be likely to cause;
25    right?
```

Dennis D. Weisenburger, M.D.

```
 1              MS. FREDONA:  Objection --

 2              THE WITNESS:  I have -- I have reviewed

 3    studies that also looked at that, yes.

 4              THE STENOGRAPHER:  And what was your

 5    objection, Counsel?

 6              MS. FREDONA:  Form.

 7              THE STENOGRAPHER:  Thank you.

 8              BY MR. BRENZA:

 9       Q.   Are you familiar with the -- the vapor

10    pressure of Roundup?

11       A.   I've -- I -- I've seen it.  I think it's in

12    the IARC report, but I -- I don't remember it, no.

13       Q.    Is it important to you in -- in your

14    opinions in this case?

15       A.   No.

16       Q.   What about the droplet size for Roundup

17    of -- with a normal applicator?  Is that of

18    relevance to you?

19              MS. FREDONA:  Objection.  Form.

20              THE WITNESS:  Probably not.  He sprayed

21    mostly in mist spray.  So that would be a smaller

22    droplet size, a -- a fine mist.  It's -- it's a

23    small -- relatively small droplet size and that's

24    mainly what he did, which would make it more likely

25    that he would get it on his skin and his clothes.
```

```
 1            BY MR. BRENZA:

 2       Q.   In the course of rendering your opinions in

 3   this case, did you come to an opinion about the

 4   blood concentration of glyphosate that Mr. Peterson

 5   may or may not have experienced?

 6       A.   I didn't calculate any blood concentration.

 7       Q.   Was it -- was it relevant to -- to how

 8   Roundup is excreted from the body?

 9       A.   Yes.  It's important to know that.  It's --

10   it's absorbed from the skin and from the respiratory

11   tract.  It moves through the tissues, eventually

12   gets in the blood, and then it's excreted primarily

13   in the urine.  So everything that's excreted goes

14   through the blood.

15       Q.   Do you consider Roundup to be a mutagen?

16       A.   Yes.

17       Q.   Do you have specific studies that you rely

18   on for that conclusion?

19       A.   Yes.  They would be included in my general

20   causation reports.

21       Q.   Are you -- are you relying on your general

22   causation reports in this case?

23       A.   Of course.

24       Q.   Now, you -- you relied in your report that

25   we've marked as Exhibit 2 on the fact that
```

Dennis D. Weisenburger, M.D.

1    Mr. Peterson said he used Roundup 10 days per year;

2    right?

3         A.   Yes.

4         Q.   And you say this puts him in a increased

5    risk category; right?

6         A.   Yes.

7         Q.   And for that you cite two -- you rely on

8    two studies; right?

9         A.   Yes.

10        Q.   That's the Erikson study?  That's one of

11   them; right?

12        A.   Yes.

13        Q.   And the other one is the North American

14   Pooled Project study; right?

15        A.   Yes.

16        Q.   And the second one you were -- you were

17   part of that study; right?

18        A.   Yes.

19        Q.   Why did you select those two studies to

20   rely on for purposes of your report?

21        A.   Well, because they both speak to those

22   response effects which were demonstrated.  And so

23   what -- what I'm trying to show here is that people

24   who have more exposure have a higher risk of

25   developing non-Hodgkin's lymphoma and specifically

1  diffuse large B-cell lymphoma.

2      Q.   Are there other studies that evaluate

3  whether Roundup or glyphosate causes non-Hodgkin's

4  lymphoma at all?

5      A.   Yeah, there's -- there are -- there are --

6  are case control studies.  There are some cohort

7  studies.  There are some meta-analysis.

8      Q.   Are you --

9           THE STENOGRAPHER:  What kind of analysis?

10          THE WITNESS:  Meta, M-E-T-A --

11          THE STENOGRAPHER:  Meta, okay.  Yeah.

12          THE WITNESS:  -- analysis.

13          THE STENOGRAPHER:  Thank you.

14          BY MR. BRENZA:

15      Q.   Are you -- are you familiar with a study

16  called the Agricultural Health Study?

17      A.   Yes, I am.

18      Q.   And you know that that was a study of

19  54,000 licensed pesticide applicators; right?

20      A.   Yes.

21      Q.   Is there a reason why you chose not to rely

22  on the Agricultural Health Study for your opinions

23  in this case?

24      A.   Well, I -- I -- I did not place a lot of

25  reliance on that study for the reasons that I

Dennis D. Weisenburger, M.D.

1    outlined in my general causation reports.

2        Q.    And -- and I don't want to go through line

3    by line of your general causation reports, but why

4    don't you just tell me what -- what the central

5    reasons are that you -- that you decided not to rely

6    on the Agricultural Health Study for Mr. Peterson.

7            MS. FREDONA:  Objection.  Form.

8            THE WITNESS:  Well, the Agricultural Health

9    Study suffers from a -- a significant problem with

10   exposure misclassification.  And also, the follow up

11   time and the exposures in that study may not be

12   enough to demonstrate an effect.  So those are the

13   two main reasons.

14           BY MR. BRENZA:

15       Q.    Okay.

16       A.    There are -- there are other issues too,

17   but those are the two main reasons.  Both of those

18   reasons would -- would make it difficult to -- to --

19   to find any positive findings because -- just

20   that -- period.  Put a period there.  Find any

21   positive findings.

22       Q.    So the exposure -- the exposure

23   misclassification you refer to, that's a function of

24   people getting things wrong on a survey; right?

25       A.    Well, getting the exposure wrong, yes.

Dennis D. Weisenburger, M.D.

1      Q.   So they -- say they were --

2      A.   I --

3      Q.   Go ahead.

4      A.   This -- this deposition is supposed to

5   mainly focus on specific causation.  So I -- you

6   know, I've deposed -- I've been deposed many times

7   about the Agricultural Health Study.

8      Q.   Okay.  Yeah, I -- I -- I understand.  And

9   I'm not going to spend a lot of time on this.  I

10  just want to get the general understanding that

11  it's -- it's -- it's a function of, in your mind,

12  people not knowing their own exposures when they're

13  asked about it on a survey.

14          MS. FREDONA:  Objection.

15          THE WITNESS:  Well, actually, that's not

16  true.  It's -- the -- the -- the nature of the study

17  led to many of the people being misclassified.  So

18  people who were not exposed were classified as being

19  exposed and people who were -- who -- who were

20  exposed -- exposed may -- may not have been

21  categorized adequately as to the degree of exposure.

22  So there's a -- there are many -- there -- there are

23  major problems in that study with exposure

24  misclassification.  And -- and -- and that's why I

25  don't provide my primary -- my primary reliance on

Dennis D. Weisenburger, M.D.

1    that study, because I think it has significant flaws

2    that -- that are problematic.  So I relied more on

3    the case control studies.

4              BY MR. BRENZA:

5        Q.   Well, and -- and let me -- let me just ask.

6    Is the reason why you believe there's

7    misclassification in the Agricultural Health Study

8    because the farmers that were asked misreported

9    their exposure to the pesticides they were asked

10   about?

11       A.   No.  The farmers probably did a pretty good

12   job of -- of providing their exposures.  The problem

13   is that -- and again, you should really just read

14   my -- I shouldn't have to go through all this.  You

15   should really be reading this from my general

16   causation reports.  But the exposure

17   misclassification was mainly because they didn't --

18   in -- in 37 percent of the people, they -- they

19   didn't have any follow up information at a time when

20   glyphosate use was increasing dramatically.  So if

21   in the initial questionnaire they said they didn't

22   use glyphosate and then afterwards they started

23   using glyphosate, the study wouldn't know that

24   because --

25       Q.   Okay.

1        A.   -- 37 percent of the people didn't ask --

2    didn't -- didn't answer the second questionnaire.

3    So there was a lot of manipulation of data and

4    imputation of data which also could be very

5    problematic.

6        Q.   And you said that the --

7        A.   A major flaw -- it's a major flaw in a

8    cohort study when you don't have reliable follow-up

9    information periodically on what they are using and

10   continuing to use.  Okay?

11       Q.   You said a second reason you didn't rely on

12   the Agricultural Health Study is because it didn't

13   follow up long enough; is that right?

14       A.   Well, in the first report the follow up was

15   inadequate.

16            In the second report it's much better, but

17   it's incomplete.

18       Q.   How long does a follow-up have to occur for

19   you to find that the study is adequate?

20            MS. FREDONA:  Objection.  Form.

21            THE WITNESS:  Should -- for -- for

22   non-Hodgkin's lymphoma in this kind of a setting it

23   should be probably 30 years or -- or longer.

24            BY MR. BRENZA:

25       Q.   Because that's how long it takes sometimes

1    for non-Hodgkin's lymphoma to occur?

2        A.    Yes.

3        Q.    So would you agree that controlling for

4    other pesticides is a important thing to do if

5    you're -- if you're studying glyphosate in

6    non-Hodgkin's lymphoma?

7              MS. FREDONA:  Objection.  Form.

8              THE WITNESS:  Yeah.

9              BY MR. BRENZA:

10       Q.    In the --

11             MR. BRENZA:  So why don't we -- why don't

12   we take a minute and mark a couple more exhibits for

13   today.  I want to mark as Exhibit 5 the document

14   that appears in your Folder Number 5.  It's the

15   Castillo study.

16             (Marked for identification purposes,

17              Exhibit 5.)

18             MR. BRENZA:  C-A-S-T-I-L-L-O.

19             Exhibit 6 will be the Erikson study.

20   That's also in Folder 6.

21             (Marked for identification purposes,

22              Exhibit 6.)

23             MR. BRENZA:  Exhibit 7 will be the Pahwa

24   study that's also in Folder 7.

25   ///

Dennis D. Weisenburger, M.D.

```
 1                (Marked for identification purposes,
 2           Exhibit 7.)
 3           MR. BRENZA:  And just to make things
 4   interesting, Exhibit 8 will be the Tomasetti article
 5   that's in your Folder 9.  So Exhibit 8 is in
 6   Folder 9.
 7                (Marked for identification purposes,
 8           Exhibit 8.)
 9           THE WITNESS:  Okay.
10           BY MR. BRENZA:
11      Q.   So let's begin with the -- well, let's
12   begin with the Castillo study.  So you included this
13   in -- in your materials for purposes of your report.
14   Why did you include the Castillo study, Exhibit 5,
15   in your materials that you relied on?
16      A.   Well, because it's a recent meta-analysis
17   regarding obesity and specifically diffuse large
18   B-cell lymphoma.  So it's -- it's relevant to this
19   case.
20      Q.   And that's because Mr. Peterson was obese
21   during certain parts of his life; right?
22      A.   Yeah.  I would probably better categorize
23   him as overweight.  But when I look at this
24   parameter, I usually try to focus on what -- what
25   was his usual weight before he got lymphoma.  So in
```

Dennis D. Weisenburger, M.D.

1    his case, his usual weight was about 175 pounds and

2    he's 5 foot 6 inches tall.  So his BMI calculates to

3    be 28.2.  So that would be considered overweight

4    rather than obese.

5         Q.    And -- and where are you getting that

6    175-pound average for Mr. Peterson?  Is that

7    something he told you or something you're getting

8    from the medical records?

9         A.    Yeah, that's something he told me.  So I

10   asked him what was his average weight during his

11   adult lifetime.  He may have been heavier that --

12   than -- than that at times.  But that was sort of

13   his usual weight, his average weight.

14        Q.    Did you ask him about his weight when he

15   was a younger person in his 20s, 30s, 40s?

16        A.    I probably asked him what his weight was in

17   his 40s and 50s.  That's usually what I do.

18        Q.    And he said 175?

19        A.    Yes.

20        Q.    What's the significance of weight for risk

21   of getting non-Hodgkin's lymphoma?

22        A.    Well, there's a small risk for people who

23   are overweight or obese.

24        Q.    What's the magnitude of the risk?

25        A.    I include it in my report.  It's an odds

1    ratio of 1.27.  So about a 27 percent increased

2    risk.

3        Q.    Is that specific to the BMI that you

4    calculated for Mr. Peterson or is that for all

5    overweight and obese?

6        A.    No, that's for being overweight and male.

7    It's on Table 3.

8        Q.    Is the risk for NHL increased as the BMI

9    continues to increase?

10       A.    It -- it does, but not very much, actually.

11   If you go to the Table 4, which is for people who

12   have a BMI of 30 or greater, it goes up a little bit

13   to, for males, 1.4.  So it goes up from 1.27 to 1.4.

14   So it goes up a little bit, but not much.

15       Q.    Is there a reason why increasing body

16   weight results in increasing probability of getting

17   non-Hodgkin's lymphoma?

18       A.    Well, we don't really know precisely how

19   obesity or overweight contributes to risk.  There

20   are a number of hypotheses, but we don't really know

21   for sure.  It's thought to induce kind of a -- a

22   inflammatory state in the -- in the tissues.  It

23   increases insulin and a number of insulin-like

24   growth factors that could affect immune cells.

25   But -- but we don't really understand in detail how

```
 1    obesity or overweight increases risk.  We don't

 2    understand that.

 3        Q.   You're familiar with what's called the SEER

 4    data, S-E-E-R?

 5        A.   Yes.

 6        Q.   Is -- is SEER data reliable?

 7        A.   Yes.

 8        Q.   Are you familiar with the SEER data and

 9    what it shows about the rates of non-Hodgkin's

10    lymphoma in the United States over the last few

11    decades?

12        A.   Yes.

13        Q.   Has the -- has the rate of non-Hodgkin's

14    lymphoma basically stayed the same over the last

15    three decades --

16        A.   It's --

17        Q.   -- so the '90s --

18        A.   Yeah, it's been pretty level over the

19    last -- I -- I -- I haven't looked at the curves

20    lately, but at least two decades, yeah, probably

21    three decades.  I'm not sure.

22        Q.   And -- and prior to that, in the '70s and

23    '80s, there was an increase in non-Hodgkin's

24    lymphoma; right?

25        A.   That's right.
```

1      Q.   But it's -- that's leveled off up to and

2  including the present day?

3      A.   That's correct.

4      Q.   Do you have an understanding of what caused

5  that increase and then leveling off of non-Hodgkin's

6  lymphoma?

7      A.   People don't really understand that very

8  well.  Some of the increase was probably due to HIV

9  infection.  But there have been a number of studies

10  that tried to understand that and we -- we don't

11  really know very well why it increased dramatically

12  during a certain period of time and then it leveled

13  off.  Some of it probably was due to better

14  diagnosis.  Some -- some of it may have been due to

15  other environmental factors which we -- we don't

16  know.  So it -- it's not a well-understood

17  phenomenon.

18      Q.   If -- if increasing weight is a factor in

19  non-Hodgkin's lymphoma, why hasn't the obesity

20  epidemic caused a substantial increase in the rate

21  of non-Hodgkin's lymphoma?

22      A.   Well, there -- as you -- as you know, there

23  are many known risk factors for non-Hodgkin's

24  lymphoma, and some of them may be causing increases

25  and some of them, because of mitigation, may be

1    causing decreases.  And so it's an interplay of many

2    different risk factors.  And you might not see an

3    increase because of all the different contributions

4    of different risk factors.

5        Q.   Did you -- did you rule out Mr. Peterson's

6    weight as a likely contributing factor to his

7    non-Hodgkin's lymphoma?

8        A.   No.  It may have been a minor contributing

9    factor.

10       Q.   When you say "a minor contributing factor,"

11   what -- what percentage of responsibility are you

12   assigning to his weight?

13       A.   It was a minor contributing factor.  So the

14   odds ratio is only 1.27, you know, which is not much

15   of an increase.  So it could have played a role.  It

16   may well have played a role.  But I think the

17   Roundup played a more important role in this case.

18       Q.   And when you say that, what -- what

19   increased risk are you assigning to Roundup for

20   Mr. Peterson?

21       A.   At least a over twofold increased risk.

22       Q.   And that's from the Erikson and -- Erikson

23   paper and the Pahwa paper?

24       A.   Yes.

25       Q.   So another factor that is a risk factor for

1    non-Hodgkin's lymphoma is being male; right?

2        A.    Yes.

3        Q.    Did you rule out being male as a

4    substantial contributing factor to Mr. Peterson's

5    non-Hodgkin's lymphoma?

6        A.    Well, things like age and sex we really

7    don't have any control over.  So, you know, half of

8    the population is male and gets old.  So, you know,

9    that all is factored into the background incidence

10   rates for the most part.  So those are not

11   modifiable factors either.

12       Q.    Right.  And I'm not -- I'm not suggesting

13   they are.  I'm just trying to get at the idea

14   that -- were you able to rule out that Mr. Peterson

15   got non-Hodgkin's lymphoma because he was 73 and --

16   and male and a little overweight?

17           MS. FREDONA:  Objection.  Form.

18           THE WITNESS:  Well, I -- I wouldn't really

19   consider the age or the sex in my -- my list of

20   causes of NHL.  The weight, I think, was a minor

21   factor and I think the Roundup was a substantial

22   factor in this case.  We don't usually attribute

23   cause to some unknown factor when we have a known

24   factor -- a known risk factor in the case.

25   ///

```
 1              MR. BRENZA:  I don't know whether you guys
 2   want to take a break or keep going.  I'm happy to do
 3   either one.
 4              THE WITNESS:  Yeah, why don't we take a
 5   break, maybe a five-minute break or so.
 6              MR. BRENZA:  Okay.  This would be -- this
 7   would be a decent time to do that if we're going to
 8   do it and -- and --
 9              THE WITNESS:  Okay.  That sounds good.
10              MR. BRENZA:  We're more than halfway
11   through.  And I'll just ask the court reporter to
12   give me a -- a time on the record after we go off.
13              THE VIDEOGRAPHER:  We're now going off the
14   record.  The time is 10:54 a.m.
15              (Recess taken, from 10:54 to 11:07.)
16              THE VIDEOGRAPHER:  We are now back on the
17   record.  The time is 11:07 a.m.
18              BY MR. BRENZA:
19       Q.   Doctor, in your report you say that
20   Mr. Peterson's NHL is consistent with a chemical
21   etiology.  What's the basis of your conclusion
22   there?
23       A.   Well, the -- the latency period for NHL --
24   the median latency is probably about 20 years, but
25   it's sort of a bell-shaped curve.  So there are
```

1    people who develop NHL, you know, after a few years
2    of exposure and then there are people who develop
3    NHL many years of -- after exposure.  So, you know,
4    this case has a -- a -- a relatively short latency
5    period, but would fall on the curve.  So, you know,
6    it is consistent with a chemical etiology.
7         Q.   So you said it can be from two to -- two
8    years to -- to more than 20 years; right?
9         A.   Well the median latency is about 20 years,
10   so that means that's the middle; right?  So you're
11   going to have cases that occur earlier and cases
12   that occur later.  That's the median latency.  So
13   the latency could be as short as two years or as
14   long as 30 or 40 years.
15        Q.   And if you look at just the part of that
16   curve that covers cases that have occurred in two
17   years, that's a -- that's a very improbable part of
18   the curve to be on, isn't it?
19        A.   Well, it would be -- yeah, it's a small
20   number of cases that would occur, but there are
21   cases that occur early for, you know ...
22        Q.   And are there known chemical exposures
23   other than, in your opinion, Roundup that -- that
24   are -- have been shown to produce non-Hodgkin's
25   lymphoma in as little as two years?

Dennis D. Weisenburger, M.D.

1       A.   Well, one would see a similar shaped curve

2   in these people who have solvent exposures.

3       Q.   You said what exposures?

4       A.   Solvent, mixed solvent --

5       Q.   Okay.

6       A.   -- exposures.

7       Q.   Like benzene?

8       A.   Like benzene.  Or most of the literature

9   really is on mixed solvent exposure, so -- but it

10  would include benzene, obviously.

11      Q.   And that's -- those are -- things like

12  benzene you encounter when you pump gas into your

13  car; right?  It's part of gasoline?

14           MS. FREDONA:  Objection.  Form.

15           THE WITNESS:  Yeah, there -- there could be

16  a -- could be a -- a very -- very small exposure to

17  benzene pumping gas in your car, but we all do it.

18           BY MR. BRENZA:

19      Q.   Do you have a -- you said it was a -- a

20  very few cases that might occur within two years of

21  an exposure, a chemical exposure.  What -- what

22  percentage of -- of the cases occur within just two

23  years of an exposure?

24      A.   Would be a small percentage.  I don't have

25  a number for you.

1        Q.    Are we talking about three standard

2    deviations --

3              (Simultaneous speakers - unclear.)

4              THE WITNESS:  More than two years.  Not --

5    not less than two years, but more than two years.

6              BY MR. BRENZA:

7        Q.    Well, let's talk about --

8        A.    I suppose it could occur less than two

9    years, too, but that would be even less likely.

10   So ...

11       Q.    So two to four years, are we talking about

12   three standard deviations, that -- that kind of

13   thing?

14       A.    Yeah, two or three standard deviations.  I

15   haven't -- I haven't calculated it.  You know,

16   it's -- it's -- it's -- in -- in some ways it's

17   hypothetical.  But, you know, if you look at my

18   paper, which you have in your file about latency,

19   the curves there are in -- although I didn't

20   reference the data in that paper, the data on

21   solvent exposure is very consistent with what I say

22   in that paper.

23              We -- we know that people who get leukemia

24   after chemotherapy for another kind of cancer can

25   get the disease within just a few years.  So -- so

1   we know that it doesn't take a long time to develop

2   the second cancer in -- in -- in cases like that.

3       Q.   And -- and the article you're referring to,

4   is that -- is it the Pahwa paper?

5       A.   No, it's the one in cancer research.  I

6   don't know which one it is.  I think you have it in

7   your file.

8       Q.   I -- I'm sure we do.  I just don't have it

9   as -- for today, but ...

10      A.   Oh, I thought -- I thought it was.  Yeah.

11  It's -- it's Number 11.

12      Q.   Oh.  Okay.  Let's -- let's mark -- I guess

13  we're up to 9 -- your paper "Pathological

14  classification of non-Hodgkin's lymphoma for

15  Epidemiological Studies," 1992.  It's the paper that

16  appears in your Folder Number 11.

17          (Marked for identification purposes,

18           Exhibit 9.)

19          BY MR. BRENZA:

20      Q.   So -- so tell me, Doctor, what the

21  significance of this paper is to your opinions about

22  the latency of non-Hodgkin's lymphoma.

23      A.   Well, it's -- it's a paper that sort of

24  tries to discuss the relevant literature regarding

25  latency back 30 years ago.  And as I said, it

1    doesn't include the more recent data on solvent

2    exposures.  But the data from solvent exposures or

3    the data from glyphosate would look like Curve B,

4    for the most part, where you've got a median latency

5    of about 20 years.  But you see that there's a long

6    tail at the end and there's also, you know, an

7    upslope fairly early on where you see small numbers

8    of cases.

9        Q.   Okay.  When you're -- when you're referring

10   to Curve B, you're talking about Figure 4 --

11       A.   Yeah.

12       Q.   -- your -- on your -- in your paper?

13       A.   Yes.

14       Q.   Can you -- can you describe what the -- the

15   units are for the axes of this Table -- Figure 4 in

16   your paper?

17       A.   Well, it's hypothetical.  But, you know,

18   for the purpose of solvents or the glyphosate, I

19   would say probably they were 5-year intervals.

20       Q.   And what about the cases?  I -- I mean, I

21   guess they're not absolute numbers of cases.  They

22   are percentages of cases; right?

23       A.   Well, if it was a real curve based on real

24   data, it would be a number -- number of cases.

25       Q.   Okay.  And -- and when you say the time is

```
1   5-year intervals, I -- that works out as to what you

2   just said, which is that the -- the median is at

3   about 20 years after exposure; right?

4       A.   Right.

5       Q.   And if -- and in terms of the number of

6   cases, can you -- as you sit here today can you put

7   a -- a number on that, or -- or is it just -- is it

8   fair to say that if you add up the space under

9   Curve B, it should add up to be 100 percent of the

10  cases and that's all we really know?

11      A.   Yes.

12           MS. FREDONA:  Objection.  Form.

13           BY MR. BRENZA:

14      Q.   So you have to -- you have to do a little

15  calculus to figure out what any given value is, but

16  it could be done?

17      A.   Yeah, but it's -- it -- it -- it -- it's --

18  in some ways it's hypothetical because other than --

19  other than the data that I give here and the data on

20  solvents -- mixed solvent exposure, there isn't a

21  lot of data on latency for non-Hodgkin lymphoma.

22  And it may differ for different subtypes too.  We

23  don't -- we don't know that either.

24      Q.   Well, as you -- as you sit here today, is

25  there -- is there a way that you would correct
```

1    Curve B as it applies to non-Hodgkin's lymphoma?

2        A.    No.

3        Q.    Okay.  Now, you -- you -- would you turn to

4    the -- the document we've marked as Exhibit 7.

5    It's -- it's the Pahwa paper.

6        A.    Okay.

7        Q.    And you'll -- and you see that you're

8    listed as an author for this paper; right?

9        A.    Yes.

10       Q.    And I know you've been likely questioned

11   about this at other of your depositions, but I don't

12   have the benefit of those, so I'm going to need to

13   ask you probably some of the same questions, but I'd

14   just -- I ask that you just bear with me and try to

15   answer them as best you can.  Okay?

16       A.    Okay.

17       Q.    What was the process by which the paper

18   we've marked as Exhibit 7 was written?

19           MS. FREDONA:  Objection.  Form.

20           THE WITNESS:  Well, the -- the data from

21   the various case control studies was submitted to

22   our colleagues in Toronto.  Dr. Pahwa, who's the

23   first author, and Dr. Shelley Harris, who's the last

24   author, were the two main people who analyzed the

25   data and wrote the paper.  There were various drafts

1    of the paper that were submitted to the other

2    authors for review and comment and critique.  And,

3    you know, after a number of iterations, there was a

4    final draft that was accepted and submitted.

5            BY MR. BRENZA:

6        Q.   Did you have a -- a role in writing the

7    words of Exhibit 7?

8        A.   No.  I probably made some corrections and

9    suggestions for corrections, but most of the paper

10   was written by the -- the two primary authors that I

11   mentioned.

12       Q.   If you had forcefully disagreed with any of

13   the words of Exhibit 7, would they have been changed

14   to comply with your requests?

15           MS. FREDONA:  Objection.  Form.  Incomplete

16   hypothetical.

17           THE WITNESS:  Well, I think we -- we -- we

18   had a vigorous debate and, you know, I -- I probably

19   would have emphasized more, particularly in the

20   conclusions, the findings with regard to greater

21   than two days per year, especially for NHL overall

22   and for diffuse large B-cell lymphoma.  But

23   epidemiologists are very conservative and cautious,

24   and so they -- they -- they -- they wrote a -- a --

25   I would say a more conservative report --

```
 1          BY MR. BRENZA:

 2      Q.   And -- and --

 3      A.   -- which is -- which is fine, the data's

 4  there.  One can look at the data and make up one's

 5  own mind.

 6      Q.   Is -- is -- you're going to have to fill in

 7  some of the names here.  Is -- M. Pahwa, is that

 8  a -- is that a man or a woman?

 9      A.   That's a good question.  I think it's a

10  man.

11      Q.   Is he an epidemiologist?

12      A.   Yes.  Maybe an epidemiologist in training,

13  I'm not sure, or a junior epidemiologist.

14      Q.   But you -- you said the epidemiologists

15  wanted to be conservative.  Which -- which of the

16  authors were you referring to?

17      A.   Oh, I don't remember.

18      Q.   I see there's another Pahwa in the middle

19  of the list of authors, Punam Pahwa.  Is -- is --

20      A.   Yeah.  That's probably his wife.

21      Q.   Okay.

22      A.   I've actually never met these people.

23  We -- we corresponded on the telephone, but I --

24  I -- you know, I've never actually met some of these

25  people.
```

1      Q.   What about S.A. Harris?  Is that a -- is

2   that a man or a woman, or don't know?

3      A.   I think it's a woman.  I don't see the

4   name, though.  Oh, yeah.  Yeah, Shelley Harris is a

5   woman.  Sure.

6      Q.   And have you -- have you ever met Shelley

7   Harris?

8      A.   I -- I -- I don't remember whether I have

9   or not.

10      Q.   Okay.  What was your contribution to

11   Exhibit 7?

12      A.   So we -- some years ago we did a large

13   epidemiologic study of non-Hodgkin lymphoma in

14   Nebraska when I -- when I was in Nebraska.  And so

15   we contributed the data from that study to this

16   pooled analysis.

17      Q.   Was the study from Nebraska, was that

18   published?

19      A.   Yes.  There were a series of articles

20   published from that study.

21      Q.   And -- and were you listed as an author?

22      A.   Yes.

23      Q.   Were the studies -- were -- were -- were

24   those Nebraska studies studies of non-Hodgkin's

25   lymphoma?

```
 1        A.    Yes.

 2        Q.    And -- and pesticide use?

 3        A.    Yes.

 4        Q.    Did you agree with Exhibit 7 when it was

 5   finalized for publication?

 6        A.    Yeah, for the most part I did, yes.

 7        Q.    But you wouldn't have agreed to have your

 8   name on it if you didn't agree with the paper;

 9   right?

10        A.    That's right.

11        Q.    And you rely on it now?

12        A.    Yes.

13        Q.    So let's -- am I right that parts of

14   Exhibit 7 that are most relevant to your opinions

15   of -- of Mr. Peterson are the tables beginning on

16   Page 6 and then continuing onto Page 7, Tables 3, 4,

17   and 5?

18        A.    Yes.

19        Q.    I -- you'll see on Tables 3, 4, and 5

20   there's a -- a figure for non-Hodgkin's lymphoma

21   overall, and then a separate figure for diffuse

22   large B-cell lymphoma.  Do you see that?

23        A.    Yes.

24        Q.    Do you know why those two ways of looking

25   at non-Hodgkin's lymphoma were broken apart?
```

Dennis D. Weisenburger, M.D.

```
1         A.   Well, NHL overall, it can -- can -- it --
2    it -- it -- it encompasses all the non-Hodgkin's
3    lymphomas in the study.  And then, because we were
4    able to pool all these different studies together,
5    we had a large number of cases, so we could actually
6    break out some of the major subtypes of
7    non-Hodgkin's lymphoma, so that enough cases of
8    follicular lymphoma, enough cases of diffuse large
9    B-cell lymphoma, and enough cases of small
10   lymphocytic lymphoma, to do a more subtype-specific
11   analysis.
12            And then the rest of the cases went into
13   the -- the other category, which is at the bottom of
14   the tables.
15        Q.   For purposes of this case, did you choose
16   to use the non-Hodgkin's lymphoma overall figure?
17        A.   No, I did not.  Well, actually I did.  I
18   did.  I did, but from Table 4.
19        Q.   Right.  But -- but -- so I didn't ask you
20   about which table yet, but I was just asking whether
21   you chose the non-Hodgkin's lymphoma overall figure.
22        A.   Yes, I did.
23        Q.   Why did you use that figure?
24        A.   Well, because I think it's sort of
25   comparative to the -- comparative to the Erikson
```

1    paper.  In both of those papers we could look at

2    dose-response effect.  And so I wanted to just show

3    some consistency.

4         Q.   Did you -- did you rely on Table 4?

5         A.   I did, yes.

6         Q.   Are Tables 3 and 5 also correct?

7         A.   Yes.  Table 5, there is an error in

8    Table 5, you know, where it says in each of the

9    categories greater than zero, less than or equal to

10   3.5 and then greater than 3.5.  It should actually

11   be 7.  That was a -- an error in the paper on

12   Table 5.

13        Q.   So where are you -- where are you reading

14   from?

15        A.   I'm just telling you on Table 5 the --

16   the -- the categories are -- are in error.  They

17   probably carried the same categories over from

18   Table 3 and -- and didn't change them.  I mean,

19   it -- it -- it -- it doesn't have any -- it doesn't

20   change any of the other data.  It's just that the --

21   the number of years -- the two number of years

22   categories is incorrect.  It should be greater --

23   greater than zero and less than or equal to 7 and

24   then greater than 7.

25        Q.   Okay.  How did you find out that that error

Dennis D. Weisenburger, M.D.

1  was in the paper?

2      A.   Oh, I found out later when I was going

3  through the paper and some things didn't make sense.

4  And so I -- I went back to the primary authors and

5  said, "Gee, is this really right," and they looked

6  and they said, "No."

7      Q.   Are the odds ratios provided in Table 5

8  correct?

9      A.   Yes.

10      Q.   Once you make that correction for the

11  number of days exposed; right?

12      A.   Yeah, the -- everything is correct in that

13  table except the years -- except -- except the --

14  the lifetime days is wrong for each of those

15  categories.

16      Q.   Okay.  And there are two different odds

17  ratios provided for each of the tables; right?

18      A.   Right.

19      Q.   First one is adjusted for a limited set of

20  factors, and the second one is adjusted for more

21  factors, including use of other pesticides; right?

22      A.   Yes.

23      Q.   Would you agree that the -- that the more

24  adjusted figure that takes into account other

25  exposures to pesticides is the -- the better figure

1    for understanding the true incidence of

2    non-Hodgkin's lymphoma?

3            MS. FREDONA:  Objection.  Form.

4            THE WITNESS:  Yes.  I think it's more

5    reliable.

6            BY MR. BRENZA:

7        Q.   And that's the one you used; right?  You

8    used the odds ratio in Table 4 for the B level of

9    adjustments?

10       A.   Yes.

11       Q.   Is dose response a important factor in

12   evaluating the reliability of statistics?

13       A.   Oh, it's an important factor in -- in

14   interpreting -- it -- it's an important factor in

15   interpreting the data.

16       Q.   Okay.  And if you'll look at Table 4, it

17   shows that for people who had no exposure to

18   glyphosate, they had a reference incidence of

19   non-Hodgkin's lymphoma of 1 or odds ratio of 1;

20   right?

21       A.   Yeah.  That's by convention.

22       Q.   Yeah, that's by -- by -- when you say "by

23   convention," it means that they -- the authors made

24   it that way because that's what they wanted to

25   compare to?

```
 1        A.    Right.
 2        Q.    Then it shows that if you had between zero
 3   and two days of use of Roundup, your risk of
 4   non-Hodgkin's lymphoma went down; right?
 5        A.    Yeah, but if you look at the confidence
 6   intervals, I would say it didn't really change.
 7   But -- the numbers went down, but if you interpret
 8   the data you'd probably say it didn't really change.
 9   Certainly didn't go up.
10        Q.    I'm sorry.  Are you done?
11        A.    They -- they didn't go up.
12        Q.    And then if you add more than two days,
13   your risk went up again?
14        A.    Yes.
15        Q.    Does the -- so that's -- that's not a
16   dose-response relationship; right?  That's --
17        A.    Well, it is, because you have almost a
18   twofold increased risk, which is statistically
19   significant at greater than two days, where it's not
20   increased less than two days and -- and it's almost
21   double from your controls, which is one.  So it
22   shows an increase that's statistically significant
23   at greater than two days.
24        Q.    And when you look at the confidence
25   interval for the number that you're using, it spans
```

Dennis D. Weisenburger, M.D.

1  1.02 to 2.94; right?

2      A.  That's correct.

3      Q.  So does that mean that the -- the true

4  value lies somewhere within that confidence

5  interval?

6      A.  Yes.  The best estimate is 1.73.

7      Q.  Correspondingly for the previous category

8  of zero to two days, the confidence interval spans

9  .46 to 1.19; right?

10     A.  Yes.

11     Q.  And the true answer for that lies somewhere

12  in that interval; right?

13     A.  Yes.  The best estimate is 0.74.

14     Q.  So the best estimate is that using Roundup

15  for two days is actually protective of non-Hodgkin's

16  lymphoma compared to people who have never used it;

17  right?

18     A.  I wouldn't -- I wouldn't interpret it that

19  way.  That doesn't actually make sense.  There's no

20  difference between 1 and 0.74.

21     Q.  So it --

22         (Simultaneous speakers - unclear.)

23     A.  -- statistically significance difference

24  between those two numbers.  So it means that less

25  than two days of exposure probably doesn't increase

1    risk at all, or at least risk that we can measure.

2        Q.   When you have a -- a pattern like this

3    where there's one figure for the background of

4    people who have never used it and then people who

5    have used it a little show that they're -- they have

6    less NHL and then people who have used it more have

7    more NHL, does that cause you to have to ask more

8    questions about whether the data you're using is

9    sufficiently accurate?

10           MS. FREDONA:  Objection.  Form.

11           THE WITNESS:  Well, what you would like to

12   see is you would like to see it go up in the

13   intermediate category, in the middle category, and

14   then go up -- up even higher in the greater than two

15   days category.  But epidemiology doesn't always work

16   that way.  And the way I would interpret this is

17   that if you have exposure less than two days per

18   year, your risk is not increased.  I don't believe

19   it's decreased.  But if you have more than two days

20   of exposure, then it's -- has about a 73 percent

21   increased risk, which is statistically significant.

22           BY MR. BRENZA:

23       Q.   Now, when you say what you would like to

24   see is a continuous curve or line, why do you say

25   that?

1      A.   Well, for a strong carcinogen, you would

2   see that.   Okay?   For a strong carcinogen, you would

3   see that no exposure gives you no increase by

4   definition.   Exposure gives you some increase in

5   risk and high exposure gives you a high increase in

6   risk.   That's what you would expect for a strong

7   carcinogen if you have adequate numbers and a good

8   study, and that's what they look for in animal

9   studies, for example.   Okay?

10         In human data it's not so straightforward

11   because of the epidemiology tools we use.   Could

12   also mean that small -- relatively infrequent or

13   small exposures to glyphosate don't give an

14   increased risk, but significant exposures give an

15   increased risk.   That's another way to interpret the

16   data.   Okay?

17      Q.   Okay.   Let me -- let me just change

18   subjects now.   I don't want to run out of time

19   without getting to some of these.

20         How many hours have you worked on

21   Mr. Peterson's case so far?

22      A.   That's a good question.   So, yes.   You want

23   to know the hours or the dollars?

24      Q.   Both.

25      A.   Both.   I had asked this to be sent to you.

Dennis D. Weisenburger, M.D.

```
 1    Apparently it wasn't sent.  So on the initial workup
 2    of the case and writing of the report it was
 3    14-and-a-half hours.  I bill at $750 an hour.  So
 4    the amount that I billed was $10,875.  So that's
 5    what I have received.
 6             And then I put in a few more hours
 7    preparing for this deposition.  Let's see.
 8    Another -- another 4.5 hours that hasn't yet been
 9    billed.
10        Q.   So that's another $3,375?
11        A.   I haven't done the math.
12        Q.   Think I did that right.  And then I know we
13    sent you a check that -- for -- for you to appear
14    today for the time that -- I take that -- take it
15    it's for the time you're -- you're testifying now;
16    right?
17        A.   Yes.
18        Q.   And that was for $5,000 today?
19        A.   Yes.
20        Q.   How did you set that $5,000 fee?
21        A.   I don't know.  I -- I thought it was an --
22    it was a reasonable fee.  I didn't know how many
23    hours it was going to take at the time, so it just
24    seemed easier to -- just to set a price.
25        Q.   Have you -- have you charged that $5,000
```

1    fee for other depositions you've given?

2        A.   I -- I actually haven't given any

3    depositions for quite a while.  I've done it both

4    ways.  I've -- I've -- I've charged a flat rate and

5    I've charged by the hour.

6        Q.   Are the -- are the Roundup cases the first

7    ones where you've charged $5,000 for a -- a 3-hour

8    deposition?

9        A.   I think so.  I may have done it before, but

10   I -- I just don't remember.  I have used a flat rate

11   before, but I don't remember what it was.

12       Q.   Have you -- have you been paid for your

13   time so far?

14       A.   I have, yes.

15       Q.   In preparing your report, did you use a

16   technique called differential etiology?

17       A.   Yes.

18       Q.   Is that in any way related to differential

19   diagnosis?

20       A.   They're really synonyms.  One -- one --

21   they both mean the same thing, more or less.

22       Q.   So differential diagnosis is something

23   you're familiar with from practice of medicine;

24   right?

25       A.   Yes.

1       Q.   And why don't I just let you define it.

2   What -- what do you -- how -- what does that mean in

3   the practice of medicine?

4       A.   Well, a differential diagnosis you have a

5   patient who presents with a constellation of signs

6   and symptoms and laboratory abnormalities and so you

7   make a list of the possible diseases that he might

8   have or she might have.  And then you go through the

9   list and -- and eliminate them one at a time and

10  hopefully you have one left which is the right

11  answer.

12       And with differential etiology we sort of

13  do the same thing.  We -- we list all the known risk

14  factors and then we -- as I did in this case, and

15  then we -- and then I went through the list and

16  tried to eliminate all the known risk factors in

17  this case, and I -- and I had two remaining.  One

18  was that he was overweight and one that he used

19  Roundup.

20       Q.   So for differential etiology to work,

21  you -- you have to have identified all the possible

22  causes of the plaintiff's non-Hodgkin's lymphoma;

23  right?

24       A.   Basically all the known risk factors

25  that -- that are causative.

Dennis D. Weisenburger, M.D.

```
 1        Q.    And you have to know what percentage of
 2   risk each of those known risk factors represents;
 3   right?
 4        A.    Well, you don't unless you rule them in,
 5   and -- and then it's useful to know.  But if you
 6   rule them out it doesn't really matter.
 7        Q.    And in the course of doing differential
 8   etiology, you can't account for causes of
 9   non-Hodgkin's lymphoma that are not known risk
10   factors; right?
11        A.    Well, those -- those would be considered
12   what we call idiopathic.  We don't know the cause.
13   So if you go through all the known risk factors and
14   you don't find a known cause, then you would come to
15   the conclusion that it was an unknown cause which we
16   say is idiopathic, we don't know the cause.  So
17   that's kind of how it works.
18        Q.    And -- and some percentage of non-Hodgkin's
19   lymphoma, a significant percentage, we talked about
20   earlier is the result of random genetic mutation;
21   right?
22        A.    Either random genetic mutations or
23   mutations due to something that we don't know.
24        Q.    And -- and if there's a random genetic
25   mutation or mutations caused by something that isn't
```

1    yet understood to be a cause of non-Hodgkin's

2    lymphoma, those things aren't going to show up in

3    the medical records; right?

4         A.   No.

5         Q.   And you're not going to have any way to

6    account for them in your differential etiology;

7    right?

8         A.   Well, I am, because I do go through the

9    medical records and I do go through the list of

10   potential etiologies with the candidate when I -- or

11   with the patient when I -- when I do my telephone

12   interview.  So I do try to eliminate every known

13   risk factor in -- in -- in my exercise of

14   differential etiology.  That's part of the

15   methodology.

16        Q.   Right.  And I -- I understand that's what

17   you did.  I'm just asking you about the things that

18   you couldn't do as part of that.  And part of the --

19   what you couldn't do is account for random genetic

20   mutation or mutations caused by causal factors that

21   aren't yet known; right?

22        A.   Correct.

23        Q.   So when you prepared your report, other

24   than the medical records and your conversation with

25   Mr. Peterson, did you do any other research

1    specifically to prepare your report?

2        A.   Well, I've done a lot of research in the

3    past on this whole subject.  I have 40 years of

4    experience.  So, you know, the -- the issues that I

5    found glyphosate I had -- I had already written my

6    general causation report.  On obesity I had

7    researched that for prior cases, so I didn't have to

8    do a lot of additional research in this case.

9        Q.   Let me -- I -- I -- I skipped something I

10   wanted to ask you about on differential etiology and

11   how it compares to differential diagnosis.

12            When you -- when you do a differential

13   diagnosis, you -- you have a patient that you're --

14   that's the subject of your analysis; right?

15       A.   Yes.

16       Q.   And you can -- if you reach a diagnosis,

17   you can then treat them for that diagnosis or do

18   further testing or do other things to confirm that

19   your diagnosis is correct; right?

20       A.   Sometimes, yes.

21       Q.   With differential etiology there's no way

22   to ever know whether your etiology is correct;

23   right?

24       A.   Well, legally we just have to know that it

25   was a substantial contributing risk, which was --

1    which means more -- more likely than not, basically.

2    So those are the legal standards.  So the standards

3    are somewhat different in -- in the two settings.

4        Q.   Well, not just the standards.  It's also

5    what you can know, right, because you in the one

6    case you can confirm or refute your hypothesis

7    because you have a live patient and -- and in the

8    other case you could never really know -- you can't

9    really test whether your etiology is right?

10       A.   Well, it's the same in both scenarios.

11   Sometimes you treat the patient knowing -- thinking

12   that he has a bacteria -- that it's more likely than

13   not it is a bacterial pneumonia so you treat him for

14   bacterial pneumonia even though you don't know.

15   So --

16       Q.   And -- and if -- and if you give him

17   antibiotics and he doesn't get better, then you --

18   maybe you conclude that that wasn't the right answer

19   and you try something different; right?

20       A.   Yeah, or you give him another antibiotic,

21   or you go back and look for RL infection again.

22   So -- well, it's really -- it's really not that

23   different.

24       Q.   But let me -- let me put it a different

25   way.  If -- if -- if you're wrong about Roundup

```
 1   being a substantial factor in Mr. Peterson's

 2   non-Hodgkin's lymphoma, how do we know that?

 3        A.   It's my professional opinion.  You -- you

 4   have to draw your own professional opinion.

 5        Q.   But how could we test what you say to see

 6   if it's true or not?

 7        A.   You can read my report.

 8        Q.   Anything else?

 9        A.   You could read all the literature that has

10   been published on Roundup, everything in my general

11   causation report and -- and the more recent

12   literature.  But, you know, otherwise you may not be

13   able to make a decision like I have.

14        Q.   You said that you thought that

15   Mr. Peterson's non-Hodgkin's lymphoma had as a

16   substantial cause Roundup, and you thought as a

17   minor contributing factor is weight.  Are there any

18   other factors that you think contributed to

19   Mr. Peterson's non-Hodgkin's lymphoma?

20        A.   Causative factors?

21        Q.   Yes.

22        A.   No.  Those are the two.

23        Q.   Let me just -- I know you're -- you're --

24   correct me if I'm wrong, but you're holding yourself

25   out as an expert in oncology, hematology, pathology;
```

Dennis D. Weisenburger, M.D.

```
 1    is that -- is that right?

 2        A.   Yes.

 3        Q.   Are there other areas that you're -- hold

 4    yourself out as an expert in for this case?

 5        A.   Well, I've had considerable experience and

 6    some training in epidemiology.  I wouldn't consider

 7    myself an epidemiologist, but I can --

 8             (Simultaneous speakers - unclear.)

 9             BY MR. BRENZA:

10        Q.   Are you an expert in epidemiology?

11        A.   I'm sorry?

12        Q.   Are you an expert in epidemiology?

13        A.   Well, I'm not an epidemiologist.  Let me

14    say that.  But I -- I have done epidemiology studies

15    and I have read -- I've read and written

16    epidemiology reports and -- and, you know, obviously

17    I read all the epidemiology papers critically in --

18    in -- in -- in the Roundup litigation.  So I would

19    say I'm an expert in epidemiology, but I don't have

20    formal training in epidemiology.

21             And I can say the same about toxicology.

22    You know, as a physician, we do get educated in

23    epidemiology.  We do get some education in

24    toxicology.  But I don't -- I don't purport to be a

25    card-carrying epidemiologist or a card-carrying
```

1    toxicologist.  I'm a pathologist.  So pathologists

2    do all kinds of things.

3        Q.    Okay.  And -- and -- and I'm -- I'm just

4    trying to start by listing the things that you are

5    an expert in because I'm going to go through a list

6    now of things that you're not an expert in and

7    hopefully you'll agree.  But before I do that, I

8    wanted to -- to make sure that I allowed you to --

9    to say what you felt like your expertise was.

10            So if there's anything else you want to

11    add, I'm ceding the floor to you at the moment.

12       A.    Well, I'm willing to answer any questions

13    you have.

14       Q.    Okay.  Do you have any legal training?

15       A.    No.  Other than self-training.

16            (Simultaneous speakers - unclear.)

17            THE WITNESS:  Baptism by fire.

18            BY MR. BRENZA:

19       Q.    Is that -- is your self-training the result

20    of being an expert witness in lawsuits?  Is that --

21    is that what you're referring to?

22       A.    Yes.  Yes.

23       Q.    Okay.

24       A.    I have no formal legal training.

25       Q.    And -- and I'm -- and I'm not trying to

1    diminish your expertise in any way by going through

2    these.  I just want to get the -- the lay of the

3    land in terms of what your -- what your expertise is

4    and what it isn't.

5              Are you -- are you an expert in herbicides?

6        A.    I would say no.

7        Q.    Are you an expert in glyphosate or Roundup?

8        A.    Probably as much as anyone else, except

9    somebody employed at Monsanto.

10       Q.    Well, have you -- have you published

11   anything about Roundup or glyphosate?

12       A.    Well, we have the Pahwa paper.

13       Q.    Yeah.  Other than the Pahwa paper.

14       A.    Yeah.  The -- the -- the -- the first

15   DeRousse paper was a pooled analysis of the case

16   control studies, so those are the two that mainly

17   focused on glyphosate.

18       Q.    Okay.  But you -- you're not an expert in

19   the chemistry of glyphosate; right?  You're --

20   you're just talking about your studies that -- sort

21   of epidemiological studies about it; right?

22       A.    That's correct.

23       Q.    Like if I -- if I asked you to draw a --

24   the molecule -- glyphosate molecule, you -- would

25   you be able to do that?

Dennis D. Weisenburger, M.D.

```
 1        A.    Not today.  I could find it quickly.

 2        Q.    I understand.  I'm just trying to get an

 3   idea of how -- how facile you are with -- with

 4   certain areas of the knowledge.

 5              You say you -- you -- you felt like you

 6   were a expert in toxicology.  Are you an expert

 7   in -- in toxic substances?

 8        A.    No, not really.

 9        Q.    Have you ever told a patient or -- or

10   another doctor that glyphosate caused any particular

11   non-Hodgkin's lymphoma?

12        A.    No.

13        Q.    Have you ever conducted any animal studies?

14        A.    I have.  When I was younger I did, but

15   not -- not with glyphosate.

16        Q.    But you have -- you have done animal

17   studies?

18        A.    Yes.

19        Q.    Okay.  What was -- what were the -- what

20   were you -- just briefly, what were your -- what

21   were you testing?

22        A.    Well, I was testing -- testing atrazine and

23   nitrosoatrazine, which is another herbicide, in --

24   in mice.  And -- and then I worked with a number of

25   cancer researchers in -- in Nebraska where did I the
```

1    pathology on the animals for some of their studies

2    using other chemicals.

3        Q.   Okay.  Are you an expert in oxidative

4    stress?

5        A.   No.

6        Q.   Are you an expert in the genotoxicity -- of

7    genotoxicity?

8        A.   I -- I understand a lot of genotoxicity.

9    It's just something that has been very interesting

10   to me in trying to understand what causes genetic

11   abnormalities in lymphoma.  So I'm -- I'm not a

12   card-carrying toxicologist, but I -- I have -- I

13   think I have a bit of experience in -- in -- in

14   reading the literature on this.

15       Q.   Do you -- in your -- in your medical

16   practice, have you previously relied on the IARC

17   for -- for anything?

18       A.   In my medical practice?

19       Q.   Well, let -- let me back up because I'm --

20   so IARC is the International -- what is it --

21   something research on cancer.

22       A.   Agency.

23       Q.   Agency.  They're a part of the World Health

24   Organization that evaluates substances; right?

25       A.   Right.

1    Q.   Have you ever relied on IARC in your

2  medical practice?

3    A.   No.

4    Q.   Did you consider any regulatory findings

5  for purposes of preparing your report in this case?

6    A.   Yes, I reviewed the EPA reports on

7  glyphosate and the -- some of the European reports

8  on glyphosate.  I did review those.  They're

9  referenced in my general causation report.

10    Q.   Okay.  So this is back to your general

11  causation rather than for -- for Mr. Peterson

12  specifically?

13    A.   Yes.

14         MR. BRENZA:  Let me just ask the -- the

15  video tech for time on the record, if I could.

16         THE VIDEOGRAPHER:  2 hours, 41 minutes.

17         BY MR. BRENZA:

18    Q.   All right.  We're coming down to the

19  homestretch here, Doctor.

20         Do you consider non-Hodgkin's lymphoma to

21  be a common cancer?

22    A.   It's relatively common.  It's number -- I

23  don't know, number 5 or 6 or 7, depending on whether

24  you're male or female.

25    Q.   It's more common in male; right?

```
 1        A.   Yes.

 2        Q.   Is it true that over the course of a

 3   lifetime, the odds are about 1 in 50 that a -- that

 4   a male will get non-Hodgkin's lymphoma?

 5        A.   I don't know.  I haven't looked at that

 6   data recently.  It's probably true.

 7        Q.   That would make it about 2 percent, a

 8   2 percent lifetime risk for a male?  Does that seem

 9   like about right?

10        A.   It seems like it's about right.  I -- I --

11   I don't know off the top of my head.

12        Q.   If you would -- we marked -- we marked as

13   Exhibit 6 the Erikson paper.  If you could quickly

14   pull that out.

15        A.   Okay.

16        Q.   Tell me when you're ready.

17        A.   I'm ready.

18        Q.   The part of the Erikson paper you rely on

19   are the -- is the Table 2 and Table 3; am I right

20   about that?

21        A.   Yes, mainly Table 2.

22        Q.   And Erikson and his other researchers

23   performed -- this is what's called a case control

24   study; right?

25        A.   Yes.
```

Dennis D. Weisenburger, M.D.

```
1        Q.   In a case control study they -- they start
2   with people who already have the disease and ask
3   them what they've been exposed to; right?
4        A.   Yes.
5        Q.   And then they compare that to people who
6   don't have the disease and ask them what they've
7   been exposed to; right?
8        A.   Yes.
9        Q.   And then they compare those two things?
10       A.   Yes.
11       Q.   Case control studies have their
12  limitations; right?
13       A.   They do.
14       Q.   One of the limitations is something called
15  recall bias; right?
16       A.   Yes.
17       Q.   Recall bias is -- is the effect when you
18  ask somebody who already has a disease to recall the
19  exposures over the course of their life that might
20  have caused that disease compared to asking that
21  same question to someone who doesn't have the
22  disease?
23       A.   Yes.
24       Q.   Was the Erikson paper subject to recall
25  bias?
```

Dennis D. Weisenburger, M.D.

1    A.   It probably was.  You don't really know for

2    sure.  You know, in my general causation report I

3    discuss this whole issue of recall bias and -- and

4    actually a nice study that was done somewhat based

5    on the Nebraska data where we -- we didn't really

6    find, at least in our study, any evidence of recall

7    bias.  So recall bias can be a factor in the study,

8    but, you know, it's -- it's difficult to measure.

9    Q.   In Table 2 you rely on the -- the figures

10   that -- that Erikson gives for glyphosate more than

11   10 days and -- and less than 10 days; right?

12   A.   Yes.

13   Q.   And for greater than 10 days, it shows that

14   there were 17 cases and 9 controls; right?

15   A.   Yes.

16   Q.   So in that whole category there were

17   26 total people; right?

18   A.   Yes.

19   Q.   For purposes of Erikson's study we marked

20   as Exhibit 6, how much -- how -- how long is a

21   exposure day?

22   A.   I -- I think it's -- a day is a day.  So if

23   I used it today it's one day and if I used it

24   tomorrow it's two days.

25   Q.   Okay.  So -- so your understanding is --

1                (Simultaneous speakers - unclear.)

2                THE WITNESS:  We don't know how long the

3      exposures were in those days.

4                BY MR. BRENZA:

5      Q.   So it could have been five seconds, could

6      have been two hours?

7      A.   Well, it's unlikely to be five seconds, but

8      could have been two hours or it could have been one

9      hour or it could have been eight hours.

10     Q.   Okay.  But for purposes of your opinion in

11     this case, it doesn't matter to you which of those

12     is -- is the case; right?

13     A.   Well, obviously it would be nice to have

14     more information, but this is the information we

15     have.

16     Q.   And -- and in terms of comparing the

17     Erikson figures to Mr. Peterson, you took -- you

18     took the Erikson study to simply refer to any use in

19     a given day as one exposure day; right?

20     A.   Well, that's how I believe they -- they --

21     they tabulated it.

22     Q.   And -- and correspondingly, you -- you made

23     the same assumption about Mr. Peterson: if he had

24     any use in a given day, that's one exposure day for

25     him; right?

```
1      A.   Yes, but at least quantitated the amount of

2   time he used it each day.

3      Q.   Yes.  And I guess the next question is, you

4   know, do you have any reason to know whether

5   Mr. Peterson's exposure days are the same as the

6   Erikson exposure days?

7      A.   I don't.

8      Q.   Do you see in Table 3 there's a -- there

9   are further figures provided for individual types of

10  lymphoma?

11     A.   Yes.

12     Q.   And one of those types is diffuse large

13  B-cell lymphoma; right?

14     A.   Yes.

15     Q.   That's -- that's the one Mr. Peterson had;

16  right?

17     A.   Yes.  Yes.

18     Q.   And -- and for glyphosate, do you see that

19  the figure given is 1.22 with confidence interval of

20  .44 to 3.35?  Do you see that?

21     A.   Yes.

22     Q.   So for large -- diffuse large B-cell

23  lymphoma, according to Table 3, there -- there isn't

24  a significant relationship between glyphosate and

25  that type of non-Hodgkin's lymphoma; right?
```

Dennis D. Weisenburger, M.D.

```
1        A.   Well, that's for ever and ever use.  And so

2    the odds ratio is a little bit increased,

3    22 percent, but -- but it's for ever and ever, so

4    they're not looking at any sort of dose response in

5    this subtype.  And, you know, other case control

6    studies have shown no significant increase with ever

7    and ever either.  It's a very crude metric to use in

8    epidemiology.

9        Q.   Okay.  Would you turn to Table 7 of the

10   Erikson paper, Exhibit 6.

11       A.   Okay.

12       Q.   And you see there they do something called

13   a multivariate analysis?

14       A.   Yes.

15       Q.   Do you know what -- what he does in that

16   table, what the multivariate analysis is?

17       A.   Right.  So they do adjustments.  They say

18   in the -- in the footnote adjustments were made for

19   age, sex, and year of diagnosis.  And then also in

20   the methods they say that adjustments were made for

21   other pesticides.

22       Q.   When you account for exposure to other

23   pesticides, are you attempting to correct for the

24   effects of those other pesticides on the subjects

25   that you're examining?
```

1    A.    Yes.

2    Q.    And when Mr. Erikson did that, according to

3  Table 7, there was no longer a statistically

4  significant connection between glyphosate and

5  non-Hodgkin's lymphoma; right?

6    A.    Well, the odds ratio was still increased,

7  but it decreased from 2.02 to 1.51 and -- and you're

8  correct, it was no longer statistically significant.

9    Q.    And when it's not statistically

10 significant, that means it's indistinguishable from

11 chance; right?

12   A.    Well, what -- what it means is you --

13 you -- you -- you -- you can't have a lot of

14 confidence in the number.

15   Q.    Did -- did the -- the Pahwa paper attempt

16 to correct for other pesticides exposures?

17   A.    Yes, it did.  That's actually one of the

18 strengths of the Pahwa paper.

19   Q.    And when it corrected for other exposures,

20 the risk ratios in general went down; right?

21   A.    Yes.  That's usually the case.

22   Q.    Because those other exposures are causing a

23 certain amount of non-Hodgkin's lymphoma; right?

24   A.    That's -- that's the reason you do it.

25   Q.    Let me just --

Dennis D. Weisenburger, M.D.

```
 1              (Simultaneous speakers - unclear.)
 2              THE WITNESS:  The -- the -- the numbers
 3    were -- were even still statistically significant
 4    after adjustment in Table 4.
 5              BY MR. BRENZA:
 6        Q.    Doctor, if you would -- we -- we're running
 7    out -- out of time, so I'm just going to ask you
 8    some quick questions.
 9              If you pull out Exhibit 8, which will be in
10    your Folder 9, the Tomasetti article.
11        A.    Okay.
12        Q.    Have you seen the Tomasetti article
13    previously?
14        A.    Yeah, I saw it some time ago.
15        Q.    And you're -- you're familiar with his
16    primary conclusion, which is a lot, perhaps the vast
17    majority of cancer is caused by random mutation;
18    right?
19        A.    Well, he -- what -- what he says is that
20    random mutation plays an important role in many
21    cancers.  There are cancers where -- where we know
22    the cause, for example, cigarette smoking, and so
23    random mutations would play a much lesser role in --
24    in that kind of a situation.  So it's an interesting
25    paper.  It was very controversial paper.  There were
```

Dennis D. Weisenburger, M.D.

1    a lot of papers written in response to it arguing

2    the various points.

3        Q.   What's your -- what's your overall reaction

4    to Tomasetti now that you've read the paper and all

5    the responses to it?

6        A.   Oh, I think there's some truth in it, that

7    random mutations do play a role in -- in cancer.

8    But hereditary factors also play a small role and

9    environmental factors can play a -- a significant

10   role or a minor role depending on the cancers you

11   look at and the exposures you look at.  So all three

12   are important.

13       Q.   And -- and -- and does that -- what you

14   just said, does that all apply to non-Hodgkin's

15   lymphoma?

16       A.   Yes.

17       Q.   Did you -- did you -- you reviewed

18   Mr. Peterson's medical records; right?

19       A.   Yeah.

20       Q.   Did you see any other factors in his

21   medical records that you believed would be a

22   contributing factor, whether substantial or not, to

23   his non-Hodgkin's lymphoma?

24       A.   Other than his overweight and his Roundup

25   use, I didn't find any.

Dennis D. Weisenburger, M.D.

```
 1              MR. BRENZA:  All right.  Well, I -- I think
 2   we're probably at the end of our time for today.  So
 3   I'm going to wrap this up, Doctor.  I think we have
 4   a -- some quality time scheduled for tomorrow as
 5   well.  So we'll see -- I'll see you then.  But thank
 6   you for your time now.
 7              Thank you, Rebecca and we'll -- I mean,
 8   that's all for Mr. Peterson and we'll -- we'll --
 9   we'll go on to the next tomorrow.
10              THE WITNESS:  Okay.
11              THE VIDEOGRAPHER:  This concludes --
12              MS. FREDONA:  Wait.  I only have a couple
13   of questions.
14              THE WITNESS:  Go ahead.
15              MS. FREDONA:  Oh, okay.  Just seeing if the
16   videographer caught that.
17                  EXAMINATION BY MS. FREDONA
18              BY MS. FREDONA:
19       Q.   Dr. Weisenburger, those notes that you were
20   talking about, all of that information, did you
21   incorporate it into your expert report?
22       A.   Yes.  All the relevant information I
23   incorporated into my expert report.
24       Q.   And earlier you stated that you did not
25   perform any calculations to -- in regards to
```

1    Mr. Peterson's exposure.  Does that sound about

2    right?

3        A.   Yeah, except for the number of -- I

4    estimated the total number of times he used Roundup

5    and calculated how many times per year.  Those are

6    the only calculations that I did in this -- this

7    case.

8        Q.   And for a further assessment on exposure

9    would you refer to another expert?

10       A.   Yes.  I think, you know, there are experts

11   who do this for a living who -- who do toxicology

12   and exposure assessment.  I -- you know, they --

13   they -- they're the kind of people who need to do

14   that.  It requires a special expertise that I don't

15   really have.

16           MS. FREDONA:  Okay.  I have no more

17   questions.

18           MR. BRENZA:  So thank you.

19           (Simultaneous speakers - unclear.)

20           THE STENOGRAPHER:  I just need to get her

21   statement quickly.

22           Go ahead, Lisa.

23   ///

24   ///

25   ///

1           THE VIDEOGRAPHER:  This concludes the video

2   deposition of Dennis Weisenburger.  The time is

3   12:16 p.m.  We are now off the record.

4           (Deposition concluded at 12:16 p.m. PST)

5                     ---oOo---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dennis D. Weisenburger, M.D.

```
 1              STENOGRAPHER'S CERTIFICATE

 2         I, LORRIE L. MARCHANT, Certified Shorthand

 3  Reporter, Certificate No. 10523, for the State of

 4  California, hereby certify that DENNIS D.

 5  WEISENBURGER, M.D.  was by me duly sworn/affirmed to

 6  testify to the truth, the whole truth and nothing

 7  but the truth in the within-entitled cause; that

 8  said deposition was taken at the time and place

 9  herein named; that the deposition is a true record

10  of the witness's testimony as reported to the best

11  of my ability by me, a duly certified shorthand

12  reporter and a disinterested person, and was

13  thereafter transcribed under my direction into

14  typewriting by computer; that request [ X ] was [  ]

15  was not made to read and correct said deposition.

16         I further certify that I am not interested

17  in the outcome of said action, nor connected with,

18  nor related to any of the parties in said action,

19  nor to their respective counsel.

20         IN WITNESS WHEREOF, I have hereunto set my

21  hand this 10th day of March, 2021.

22

23

24         LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC

       Stenographic Certified Shorthand Reporter #10523

25
```

1          ACKNOWLEDGMENT OF DEPONENT

2

             I,_____, do

3    hereby certify that I have read the
     foregoing pages, and that the same

4    is a correct transcription of the answers
     given by me to the questions therein

5    propounded, except for the corrections or
     changes in form or substance, if any,

6    noted in the attached Errata Sheet.

7

     _____

8                                    DATE

9

10

11

12

13

14

     Subscribed and sworn

15   to before me this
     _____ day of _____, 20_____.

16

     My commission expires:_____

17

18   _____

     Notary Public

19

20

21

22

23

24

25

Dennis D. Weisenburger, M.D.

```
1                    - - - - - -

                   E R R A T A

2                    - - - - - -

3    PAGE   LINE   CHANGE

4    _____  _____  _____

5       REASON:  _____

6    _____  _____  _____

7       REASON:  _____

8    _____  _____  _____

9       REASON:  _____

10   _____  _____  _____

11      REASON:  _____

12   _____  _____  _____

13      REASON:  _____

14   _____  _____  _____

15      REASON:  _____

16   _____  _____  _____

17      REASON:  _____

18   _____  _____  _____

19      REASON:  _____

20   _____  _____  _____

21      REASON:  _____

22   _____  _____  _____

23      REASON:  _____

24   _____  _____  _____

25      REASON:  _____
```