**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:    202-847-4030
Fax:    202-847-4005

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

*Attorneys for Defendant*
*MONSANTO COMPANY*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION<br><br>*Cervantes v. Monsanto Co.*, 3:19-cv-03015-VC<br>*Karman v. Monsanto Co.*, 3:19-cv-01183-VC<br>*Pecorelli v. Monsanto Co.*, 3:16-cv-06936-VC<br>*Peterson v. Monsanto Co.*, 3:18-cv-07271-VC<br>*Rehak v. Monsanto Co.*, 3:19-cv-01719-VC<br>*Schafer v. Monsanto Co.*, 3:19-cv-02169<br>*Seidl v. Monsanto Co.*, 3:17-cv-00519-VC | MDL No. 2741<br><br>Case No.: 3:16-md-02741-VC<br><br>**DEFENDANT MONSANTO COMPANY'S NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERTS BARRY BOYD, LAUREN PINTER-BROWN,  AND RON SCHIFF ON RULE 702 GROUNDS**<br><br>Hearing date: May 28, 2021<br>Time: |

MONSANTO'S MOTION TO EXCLUDE SPECIFIC CAUSATION EXPERT TESTIMONY IN WAVE TWO CASES
3:16-MD-02741-VC

1

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

2

**PLEASE TAKE NOTICE THAT** beginning on May 28, 2021, in Courtroom 4 of the United States

3

District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco,

4

CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its

5

Motion to Exclude Testimony of Barry Boyd, Lauren Pinter-Brown, and Ron Schiff.  Monsanto seeks

6

an order excluding opinion of this witness under Federal Rule of Evidence 702 and *Daubert v. Merrell*

7

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

8

9

DATED:  March 19, 2021

10

Respectfully submitted,

11

*/s/ Michael X. Imbroscio*

12

Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)

13

Covington & Burling LLP
One City Center

14

850 10th St. NW

15

Washington, DC 20001
Tel: 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

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

2

3

INTRODUCTION ............................................................................................................1

4

BACKGROUND .............................................................................................................2

5

I.     Wave Two Plaintiffs Have Disclosed a Handful of Specific Causation Experts for
       Whom the Court Has Not Previously Ruled. ........................................................2

6

7

II.    The Wave Two Plaintiffs All Had Risk Factors Associated with NHL. .................3

8

III.   Plaintiffs' Experts All Purport to Use a Differential "Etiology" in Forming Their
       Specific Causation Opinions. ...............................................................................6

9

LEGAL STANDARD.......................................................................................................7

10

ARGUMENT ...................................................................................................................8

11

I.     Dr. Schiff's Testimony Reveals That the Experts' "Differential Etiology"
       Methodology Is Results Driven and Made for Litigation. .......................................8

12

13

II.    Plaintiffs' Experts Failed to Properly Assess Potential Alternative Causes of
       Plaintiffs' NHL. ...................................................................................................9

14

       A.     Dr. Schiff Admits He Cannot Rule Out or Weigh Risk Factors, and
              Always Concludes Roundup was a Substantial Cause. .............................10

15

16

       B.     Dr. Pinter-Brown Likewise Automatically Includes Roundup as a
              Substantial Cause and Does Not Weigh or Eliminate Other Risk Factors. ...15

17

       C.     Dr. Boyd Also Does Not Meaningfully Consider Alternative Causes, and
              His Testimony Regarding His Methodology Conflicts with Dr. Schiff's.........17

18

19

III.   Plaintiffs' Experts Have Not Reliably Ruled Out Unknown Causes of Plaintiffs
       NHL and Instead Always Point to Roundup.........................................................18

20

IV.    Monsanto Preserves Its Arguments That Plaintiffs' Experts Ruled in Roundup as
       a Cause of Each Plaintiff's NHL Based on Inadequate and Flawed Studies. .........19

21

CONCLUSION ................................................................................................................20

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

<u>Cases</u>

4

*In re Aredia & Zometa Prod. Liab. Litig.*,

5
    483 F. App'x 182 (6th Cir. 2012) ............................................................................. 7

6

*Claar v. Burlington N. R.R. Co.*,
    29 F.3d 499 (9th Cir. 1994) ...................................................................................... 10

7

*Clausen v. M/V New Carissa*,

8
    339 F.3d 1049 (9th Cir. 2003) ........................................................................... 6, 9, 10

9

*Daubert v. Merrell Dow Pharm., Inc.*,

10
    509 U.S. 579, 589 (1993) ................................................................................ 7, 12, 20

11

*Hayes v. Tractor Supply Co.*,
    170 N.C. App. 405, 612 S.E.2d 399 (2005) ............................................................. 8

12

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig.*,

13
    892 F.3d 624 (4th Cir. 2018) ............................................................................... 8, 17

14

*In re Mirena Ius Levonorgestrel-Related Products Liability Litigation (No. II)*,

15
    341 F.Supp.3d 213, 241 (S.D.N.Y., 2018) ............................................................. 13

16

*Poust v. Huntleigh Healthcare*,
    998 F. Supp. 478 (D.N.J. 1998) ............................................................................... 8

17

*In re Roundup Prods. Liab. Litig.*,

18
    358 F. Supp. 3d 956, 957 (N.D. Cal. 2019) ....................................................... 8, 18

19

*Solis v. BASF Corp.*,

20
    979 N.E.2d 419, 365 Ill.Dec. 815 (Ill. App. 1 Dist., 2012) ..................................... 8

21

*Wehmeier v. UNR Indus., Inc.*,
    213 Ill. App. 3d 6, 572 N.E.2d 320 (1991) .............................................................. 8

22

*Westberry v. Gislaved Gummi AB*,

23
    178 F.3d 257 (4th Cir. 1999) .............................................................................. 6, 10

24

*Yates v. Ford Motor Co.*,

25
    No. 5:12-CV-752-FL, 2015 WL 3463559 (E.D.N.C. May 30, 2015) ......................... 8

## <u>Other Authorities</u>

26

Federal Rule of Evidence 702 .........................................................................*passim*

27

28

MONSANTO'S MOTION TO EXCLUDE SPECIFIC CAUSATION EXPERT TESTIMONY IN WAVE TWO
CASES
3:16-MD-02741-VC

1

**INTRODUCTION**

2      The Wave 2 Plaintiffs have designated an array of new specific causation experts that do not

3 meet the standards of Rule 702 this Court imposed in Pre-Trial Order 85 ("PTO 85").   While

4 purporting to rely on the same differential etiology/diagnosis methodology the Court previously

5 permitted, these experts in fact fall woefully short of the first round of experts, which this Court

6 bluntly described to have "barely inched over the line" in opining that Roundup®-branded products

7 ("Roundup") specifically caused the plaintiffs' non-Hodgkin's lymphoma (NHL).   In striking

8 manner, each of these new experts is nakedly outcome-driven.  To be sure, they continue to "rule in"

9 Roundup based on the same flawed studies the general causation experts rely on without accounting

10 for the Plaintiffs' specific NHL sub-types.  But even setting that deficiency aside, they do their real

11 methodological violence in their consideration of other potential risk factors.  In their unwavering

12 adherence to their conclusion that Roundup is always to blame, they offer no coherent, defensible

13 principle undergirding their specific causation opinions, ultimately acknowledging that they cannot

14 rule out many significant risk factors and instead simply professing no obligation to do so.

15      The mere invocation of the phrase "differential etiology" or "differential diagnosis" cannot

16 sanitize what is otherwise an outcome-driven conclusion devoid of any reliable scientific basis.  These

17 experts repeatedly failed to reliably account for *known* risk factors for NHL that other plaintiffs'

18 experts admit are well-accepted risk factors, and they at the same time casually ignore the potential

19 that unknown factors, which account for most NHL cases, might explain the plaintiff's NHL.

20      And unlike the experts the Court previously addressed, these experts fully admit they have no

21 reliable scientific method to weigh causes against one another—the very subject on which their

22 testimony will purportedly assist a jury under Rule 702.  The bottom line for these witnesses is that

23 Roundup will always be the cause of every plaintiff's NHL as long as the plaintiff was exposed to

24 some amount of Roundup at some point in their life—regardless of the plaintiff's individual medical

25 history and risk factors, regardless of the fact that the cause of NHL cannot be determined in the vast

26 majority of cases, and regardless of when or how much a plaintiff allegedly used Roundup.  That is

27 not science—that is courtroom advocacy in a lab coat.  This Court has previously described the

28 "daunting challenge" of establishing specific causation in these cases.  These new experts do not meet

1    that challenge, and the Court should exclude them.

2                                    **BACKGROUND**

3    **I.      Wave Two Plaintiffs Have Disclosed a Handful of Specific Causation Experts for
             Whom the Court Has Not Previously Ruled.**

4

5              On June 14, 2019, this Court scheduled two waves of cases, grouped by governing state law,

6    to be prepared for transfer back to their home districts.  The second wave consists of cases filed in

7    Illinois and North Carolina.  The Wave Two Plaintiffs have disclosed the following new specific

8    causation experts, all of whom, like the specific causation experts disclosed in the bellwether trials,

9    purport to use a differential diagnosis (or differential "etiology") in reaching their conclusion that

10   Roundup caused each individual Plaintiff's specific subtype of NHL.[1]

11   •   **Dr. Barry Boyd** is an oncologist, *see* Declaration of Michael Imbroscio (March 19, 2021)

12       ("Imbroscio Decl."), Ex. 1, Boyd (*Seidl*) Dep. at 10:19-20, who has been disclosed in multiple

13       Roundup cases across the country.  In clinical practice, Dr. Boyd has never told any patient that

14       Roundup caused his or her cancer.  *Id.* at 37:13-20.  For Wave Two of the MDL, Dr. Boyd has

15       been disclosed by Randall Seidl.

16   •   **Dr. Lauren Pinter-Brown** is an oncologist and internist.  Imbroscio Decl., Ex. 2, Pinter-Brown

17       *Peterson* Report at 1.  She has never conducted any scientific research regarding pesticides of any

18       kind, including glyphosate.  *See* Imbroscio Decl., Ex. 3, Pinter-Brown (*Peterson*) Dep. at 81:7-

19       23.  Prior to being retained by Plaintiffs' counsel, Dr. Pinter-Brown had not reviewed any of the

20       literature on which she now relies, and she has found Roundup to be a substantial contributing

21       factor to the plaintiff's NHL in every case in which she has been retained as a paid expert.  *Id.* at

22       28:23-29:2.  Dr. Pinter-Brown has been disclosed by numerous Plaintiffs in this litigation,

23       including, in Wave Two, James Peterson and Michael Pecorelli.

24   •   **Dr. Ron Schiff** is an oncologist who left clinical practice in 2015 and has not published anything

25       in the peer-reviewed literature since 1990.  Imbroscio Decl., Ex. 4, Schiff (*Schafer*) Dep. at 11:14-

26

27   ---
     [1] As in Wave 1, consistent with the Court's prior guidance, *see* Imbroscio Decl., Ex. 24, Transcript
28   of January 4, 2019 Case Management Conference at 9-10, for ease of review and efficiency Monsanto
     is filing a single brief to address these multiple Plaintiffs and the three new specific causation experts
     Plaintiffs have named in Wave 2.

21.  In his clinical practice, Dr. Schiff never told any patient that his or her lymphoma was caused by Roundup.  Imbroscio Decl., Ex. 5, Schiff (*Harris*) Dep. at 92:8-93:4.  Since leaving the practice of medicine, his sole source of earned income has been working as an expert witness.  Imbroscio Decl., Ex. 6, Schiff *Rehak* Dep. at 109:18-22.  Dr. Schiff has never ruled out Roundup as the cause of a plaintiff's disease in any case that Plaintiffs' lawyers have asked him to review.  Imbroscio Decl., Ex. 4, Schiff (*Schafer*) Dep. at 29:12-17.  And he has never seen a plaintiff that he did not characterize as having "extensive" exposure to Roundup.  Imbroscio Decl., Ex. 7. Schiff (*Cervantes*) Dep. at 126:7-16.  Dr. Schiff has been disclosed by Gerard Cervantes, Robert Karman, Lorraine Rehak, and John Schafer.

## II.    The Wave Two Plaintiffs All Had Risk Factors Associated with NHL.

As set forth at length in Monsanto's prior motion to exclude specific causation experts, (MDL ECF No. 2420), "non-Hodgkin's lymphoma" is an umbrella term used to describe more than sixty different sub-types of cancer involving the lymphocytes, a type of white blood cell.  The various sub-types have different clinical and prognostic characteristics and may also have different risk factors and causes.  However, in the vast majority of all NHL cases, the cause is unknown.  The relevant medical history, NHL diagnosis, and alleged Roundup exposure for each of the seven Wave 2 Plaintiffs is summarized below.

- **Gerard Cervantes**, a resident of Sugar Grove, Illinois, was diagnosed with diffuse large B-cell non-Hodgkin's lymphoma ("DLBCL") in October 2004.  *See* Imbroscio Decl., Ex. 8, *Cervantes* Plaintiff Fact Sheet at 4; Imbroscio Decl., Ex. 9, Cervantes Dep. at 59:2-6, 165:18-20.  Mr. Cervantes occasionally used Roundup residentially, but alleges his primary exposure occurred in the course of operating his lawn care business, which he started in 1998.  Imbroscio Decl., Ex. 9, Cervantes Dep. at 61:13-16, 71:14-17, 103:1-13.  Mr. Cervantes has a family history of cancer, and his mother developed and died from NHL.  *Id.* at 165:1-6.  He also has a history of obesity, and was exposed to asbestos, polychlorobiphenyl ("PCB"), and benzene over the course of approximately 30 years while working as a welder and in other related roles for Nicor Gas Company.  *Id.* at 40:4-44:14.  Mr. Cervantes did not wear any personal protective equipment during his exposures to these substances.  *Id.* at 47:1-7, 48:3-13, 49:13-19.  He also has a history

of occupational exposure to gasoline, diesel, and welding rod fumes. *Id.* at 51:5-16, 73:13-17, 170:15-171:12. In 2004, Mr. Cervantes claimed that his NHL was caused by exposure to methylene chloride in his drinking water as part of a class action lawsuit. *Id.* at 12:20-14:2. In this lawsuit, he now claims his NHL was caused by exposure to Roundup.

- **Robert Karman**, a former resident of Elgin, Illinois, was diagnosed with DLBCL in July 2015, and passed away in December 2015. Imbroscio Decl., Ex. 10, Karman Dep. at 112:5-16, 233:5-19, 254:9-24. He was 77 at the time of his diagnosis and death. Imbroscio Decl., Ex. 11, Schiff (*Karman*) Dep. at 102:22-103:2. Mr. Karman's Roundup use was exclusively residential. Imbroscio Decl., Ex. 10, Karman Dep. at 264:14-265:14. Mr. Karman's wife never saw him get Roundup on his hands or body while using it, and testified that Mr. Karman never mentioned getting Roundup on his body while using it. *Id.* at 144:5-13, 192:20-193:1, 200:24-201:10. Mr. Karman had several risk factors for NHL, including advanced age and an approximately 50-year smoking history. *Id.* at 223:6-15.[2]

- **Michael Pecorelli**, a former resident of Elk Grove, Illinois, was diagnosed with splenic marginal zone lymphoma in July 2004, at the age of 75. Imbroscio Decl., Ex. 12, Pecorelli Dep. at 280:21-288:3. In 2011, Mr. Pecorelli also developed an unrelated cancer in his lung called a sarcoma or malignant fibrous histiocytoma (MFH). Imbroscio Decl., Ex. 13, Pinter-Brown (*Pecorelli*) Report at 4-5; Imbroscio Decl., Ex. 14, Pinter-Brown (*Pecorelli*) Dep. at 22:21-23:5. Mr. Pecorelli passed away in January 2021, at the age of 82. Imbroscio Decl., Ex. 12, Pecorelli Dep. at 98:17-99:7. Mr. Pecorelli's sole cause of death was listed as MFH.[3] Mr. Pecorelli was an almost 70 year-long, 1 pack-per-day smoker, starting at the age of 12. *Id.* at 301:6-19. In addition to Mr.

---

[2] There are several inaccuracies on Mr. Karman's Plaintiff Fact Sheet in this case, including stating that: (1) Mr. Karman did not smoke; (2) Mr. Karman had Lupus and other diseases that he did not have; (3) he was exposed to Roundup starting in "1980" in Elgin, Illinois, but Mr. Karman's wife testified that they did not live in Elgin until 1991/1992; and (4) Mr. Karman used "Roundup powder," but Mr. Karman's wife testified he only used the ready-mix liquid in the same one gallon container. At her deposition, Mr. Karman's wife confirmed that her testimony was accurate and the PFS was not. Imbroscio Decl., Ex. 10, Karman Dep. at 289:1-297:2.

[3] As explained in Monsanto's Motion for Summary Judgment on Statute of Limitations and Proximate Causation Grounds, Monsanto is entitled to summary judgment on Plaintiff's wrongful death claim in the *Pecorelli* case because the undisputed facts establish that Mr. Pecorelli died as a result of his MFH, and Plaintiff has introduced no admissible evidence to the contrary.

Pecorelli's age and extensive smoking history, Mr. Pecorelli's son testified that Mr. Pecorelli was exposed to other pesticides in the course of operating his landscaping business. *Id.* at 89:2-90:15, 101:20-103:4, 259:11-261:16.

- **James Peterson**, a resident of Hoffman Estates, Illinois, was diagnosed with DLBCL in February 2017 at age 73. Imbroscio Decl., Ex. 15, Second Amended *Peterson* Fact Sheet at 16. In addition to his age and weight, Mr. Peterson was potentially exposed to a number of different carcinogens throughout his life, including photographic development chemicals in the 1970's and 80's, and occupational exposure to gasoline and diesel. Imbroscio Decl., Ex. 16, Peterson Dep. at 25:8-29:12, 52:13-18, 54:4-11. Mr. Peterson did not always wear personal protective equipment during his exposure to these carcinogens. *Id.* at 26:3-5, 54:12-19.

- **Lorraine Rehak**, a resident of Palos Hills, Illinois, was diagnosed in June 2014 with low grade, Stage II follicular NHL. Imbroscio Decl., Ex. 17, First Amended *Rehak* Fact Sheet at 5. Ms. Rehak has been a steady smoker for 42 years—smoking a full pack every day according to her medical records—despite doctor warnings advising her to quit. Imbroscio Decl., Ex. 18, Rehak Dep. at 199:21-200:14. She also has an extensive family history of cancer, including her grandmother, who died of stomach cancer, her father, who died of liver and pancreatic cancer, and her sister, who currently has thyroid cancer. Imbroscio Decl., Ex. 17, First Amended *Rehak* Fact Sheet at 3-4. Ms. Rehak alleges primarily passive occupational exposure to Roundup while working in customer service and sales at a lawn care company, and residential exposure. *Id.* at 8-9.

- **John Schafer**, a resident of Roseville, Illinois, was diagnosed with follicular lymphoma in January 2018, and with DLBCL in February 2018. Imbroscio Decl., Ex. 19, Third Amended *Schafer* Fact Sheet at 5; Imbroscio Decl., Ex. 20, Schiff (*Schafer*) Expert Report at 7-8. In addition to age and weight, Mr. Schafer's risk factors include Hashimoto's Thyroiditis, an autoimmune disease. Imbroscio Decl., Ex. 21, Schafer Dep. at 224:24-225:13, 227:08-21. Mr. Schafer claims occasional residential exposure to Roundup from 1985-2006 and from 2012-2018. Imbroscio Decl., Ex. 19, Third Amended *Schafer* Fact Sheet at 9-10.

- **Randall Seidl**, a resident of Charlotte, North Carolina, was diagnosed with grade 3 follicular

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

lymphoma in November 2014.  Imbroscio Decl., Ex. 22, Seidl Dep. at 192:12-14, 233:13-18.  Mr. Seidl's Roundup use was exclusively residential.  *Id.* at 156:20-22.  He claims to have used it at 3 or 4 different residences beginning in 1990, but that his most extensive Roundup usage occurred from 2005-2010 in San Antonio, Texas.  Mr. Seidl had an increased risk of developing NHL based on his age (57) at the time of his diagnosis.  Imbroscio Decl., Ex. 1, Boyd (*Seidl*) Dep. at 92:11-14.

## III.   Plaintiffs' Experts All Purport to Use a Differential "Etiology" in Forming Their Specific Causation Opinions.

Like other specific causation experts previously assessed in this MDL, these experts purport to reach their specific causation opinions through what they claim is a differential etiology.  As this Court has acknowledged, "differential diagnosis" is a term courts use to describe the "scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated."  *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1057 (9th Cir. 2003) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999)).  This process requires an expert to first "rule in" all potential causes—*i.e.*, "to compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration."  *Id.*  The expert must then "rule out" the possible causes using a scientific method until only the most likely cause remains.  *Id.*

The "differential etiology" performed by Plaintiffs' experts, while it has a similar name, is fundamentally different from the accepted medical practice of differential diagnosis.  It purports to use a comparable methodology, but to discern the fundamental cause of a disease rather than to diagnose the disease itself.  *See, e.g.*, Imbroscio Decl., Ex. 11, Schiff (*Karman*) Dep. at 121:10-15.  As discussed below, unlike a differential diagnosis the differential "etiology" is a "legal construct" that is not used in actual medical practice and has no support in published scientific literature.

Each of Plaintiffs' experts here utilizes a legal perversion of the "differential diagnosis" process that strays far from any reliable methodology because their process is designed to lead to their pre-ordained conclusion.  First, they rule in Roundup by uncritically relying on the same flawed studies the general causation experts rely on and without taking account of the Plaintiffs' specific subtype of NHL.  *See, e.g.*, Imbroscio Decl., Ex. 4, Schiff (*Schafer*) Dep. at 42:8-20.  While quick to

rule in Roundup in every case, these experts refuse to also rule in known NHL risk factors, even when other experts (assessing different Plaintiffs) readily agree that such risk factors should be ruled in for any reliable differential diagnosis.  Second, the experts purport to rule out every other relevant NHL risk factor except Roundup, again without considering the specific sub-type at issue, and without applying the same reasoning and methodological rigor to the potential alternative causes that they apply to Roundup.  And throughout their analyses, these experts ignore altogether the possibility that Plaintiffs' NHL may have no known cause, as would be the case where NHL is caused by a yet to be discovered factor or from the random mutation that inevitably occurs through normal cell division.  According to each of these experts, if the Plaintiff came into contact with Roundup, that fact alone automatically excludes the possibility of an idiopathic or unknown cause.

**LEGAL STANDARD**

Under Federal Rule of Evidence 702, an expert may give opinion testimony only if (a) the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (b) "the testimony is based on sufficient facts or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) the expert "has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  In other words, an expert must be qualified and must offer testimony that is both relevant and reliable.  *Id.*; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  Here, the experts' opinions should be excluded on the grounds that (1) they are not reliable, and (2) they are not helpful to the jury because the experts automatically conclude Roundup was the cause without weighing or eliminating other risk factors in any reliable manner.

In the specific causation context, Rule 702 requires experts purporting to use a differential diagnosis to carry out both aspects of that methodology—"ruling in" all possible causes and "ruling out" all but the subject cause—in a reliable fashion.  To reach an admissible causation opinion through a reliable differential diagnosis, an expert must "accurately diagnose the nature of the disease, reliably rule in the possible causes of it, and reliably rule out the rejected causes."  *In re Aredia & Zometa Prod. Liab. Litig.*, 483 F. App'x 182, 188 (6th Cir. 2012).  Because the inherent malleability of this methodology can shroud what may be little more than subjective guesswork, the district court must

1   "delve into the particular witness's method of performing a differential diagnosis to determine if his

2   or her ultimate conclusions are reliable." *Poust v. Huntleigh Healthcare*, 998 F. Supp. 478, 496

3   (D.N.J. 1998).   Courts have consistently held that expert opinions that pay lip service to this

4   methodology but do not reliably apply it should be excluded.   *See, e.g.*, *In re Lipitor (Atorvastatin*

5   *Calcium) Mktg., Sales Practices & Prod. Liab. Litig.*, 892 F.3d 624, 642–45 (4th Cir. 2018).

6       In these personal injury cases, specific causation—here, whether Roundup caused each

7   Plaintiff's NHL—is an essential element of Plaintiffs' claims.   *See, e.g.*, *Wehmeier v. UNR Indus.,*

8   *Inc.*, 213 Ill. App. 3d 6, 28, 572 N.E.2d 320, 335 (1991); *Yates v. Ford Motor Co.*, No. 5:12-CV-752-

9   FL, 2015 WL 3463559, at *2 (E.D.N.C. May 30, 2015).   Under both North Carolina and Illinois law,

10   whether a chemical caused an individual's injury is beyond the experience and common knowledge

11   of lay jurors, so each Plaintiff must prove it through expert testimony.   *See, e.g.*, *Solis v. BASF Corp.*,

12   979 N.E.2d 419, 437, 365 Ill.Dec. 815, 833 (Ill. App. 1 Dist., 2012); *Hayes v. Tractor Supply Co.*,

13   170 N.C. App. 405, 409, 612 S.E.2d 399, 402 (2005).   If Plaintiffs fail to present an admissible expert

14   opinion to establish specific causation, summary judgment is appropriate.   *In re Roundup Prods. Liab.*

15   *Litig.*, 358 F. Supp. 3d 956, 957 (N.D. Cal. 2019).   ("To defeat Monsanto's motion for summary

16   judgment on this issue, the plaintiffs must present at least one admissible expert opinion to support

17   [his] specific causation argument.").

18                                     **ARGUMENT**

19   **I.   Dr. Schiff's Testimony Reveals That the Experts' "Differential Etiology" Methodology**
         **Is Results Driven and Made for Litigation.**

20
21       The differential etiology Plaintiffs' experts invoke does little more than dress up in the

22   trappings of scientific method a pre-determined conclusion that Roundup caused Plaintiffs' NHL.

23   Perhaps the best illustration of the unscientific nature of their testimony is Dr. Schiff's admission that

24   the "methodology" he employs, which he calls a "differential etiology," was invented purely for

25   litigation, Imbroscio Decl., Ex. 11, Schiff (*Karman*) Dep. at 120:14-20 ("Q.   And is [differential

26   etiology] a twist of phrase from the medical community based on differential diagnosis?   A.

27   Absolutely.   I only use that phrase because of you guys."), and is "completely different" from the type

28   of differential diagnosis he would conduct in medical practice, *id.* at 121:10-13.   In fact, Dr. Schiff

has never used his "differential etiology" in medical practice, and admitted that there are no publications regarding his differential etiology method or how it should be used to assess the cause of a person's cancer.  Imbroscio Decl., Ex. 7, Schiff (*Cervantes*) Dep. at 80:22-81:20 ("Q.  It's not something that you ever used in your medical practice; right?  A.  Also correct.  Q.  And because it's a legal construct, you're not aware of any medical or scientific publications that reference this differential etiology methodology or how to apply it to cases?  A.  That's correct.").  Dr. Schiff further admitted that in cases where a plaintiff has more than one risk factor, and despite labeling his methodology a "differential etiology," there is *no method* by which he or anyone else can weigh each risk factor to determine which one(s) are the causes of plaintiff's cancer.  *Id.* at 43:16-45:8; Imbroscio Decl., Ex. 6, Schiff (*Rehak*) Dep. at 78:22-79:10, 106:20-107:3.  Yet that is precisely what Plaintiffs' experts purport to do here.  Indeed, Dr. Schiff testified that he has not given any serious thought to developing a methodology to weigh and compare risk factors to determine the cause of a plaintiff's cancer; rather, this is something he "plays around with" in his spare time.  Imbroscio Decl., Ex. 7, Schiff (*Cevantes*) Dep. at 46:3-21.  Instead, Dr. Schiff just uses "common sense and a gestalt approach" to assess the cause of a plaintiff's cancer.  *Id.* at 82:22-83:6 ("Q.  Okay.  So you just kind of look at the risk factors and use this common sense gestalt way of saying, okay, I think this factor is more substantial or is not a cause of this person's cancer?  Is that a fair assessment?  A.  Yes.").

Dr. Schiff's "common sense" "gestalt approach" is not a rigorous or reliable scientific methodology.  His opinions should be excluded in their entirety on this basis alone.  Taken more broadly, Dr. Schiff's testimony betrays the reality that each of these experts, in addition to the specific flaws in their testimony identified below, have employed an outcome-driven, made-for-litigation methodology that always results in concluding Roundup was the cause of Plaintiffs' NHL based on nothing more than their *ipse dixit*.

## II.   Plaintiffs' Experts Failed to Properly Assess Potential Alternative Causes of Plaintiffs' NHL.

All of Plaintiffs' experts failed to adequately address the numerous potential causes of Plaintiffs' NHL other than Roundup, which is required for their opinions to be admissible.  *See Clausen*, 339 F.3d at 1058 ("A differential diagnosis that fails to take serious account of other

potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation.") (quoting *Westberry*, 178 F.3d at 265); *see also* PTO 85 ("The next question is whether the experts adequately assessed all of the potential causes of the plaintiffs' NHL, and properly ruled out factors other than glyphosate, while at the same time declining to rule out glyphosate itself.").  The first step in a differential diagnosis is to "compile a comprehensive list of hypotheses that might explain" the plaintiff's injury.  *Id.*  The Ninth Circuit instructs experts to "[i]nclud[e] even rare entities in the list [to] ensure[] that such disorders are not overlooked."  *Id.* (citation and quotation marks omitted).  Then, in the second step of a differential diagnosis, the expert must "rule out" each of the possible causes until only the most likely cause remains.  Many of Plaintiffs' experts failed to consider (or "rule in") known alternative causes altogether, thus failing to satisfy step one.  Even when the experts did mention potential alternative causes, they dealt with such causes so casually that it is impossible to even discern whether they ruled in a cause and then ruled it out, or did not rule in the cause in the first place.

Regardless of which step in the differential diagnosis is involved, the experts' testimony reveals that they did not seriously consider that something other than Roundup could have caused Plaintiffs' NHLs.  Instead, each started with the conclusion that Roundup was the cause, and then sought to justify that conclusion—and insulate it from scrutiny by the Court—by paying lip service to other potential causes.  An expert conducting a differential diagnosis "must provide reasons for rejecting alternative hypotheses 'using scientific methods and procedures' and the elimination of those hypotheses must be founded on more than 'subjective beliefs or unsupported speculation.'" *Clausen*, 339 F.3d at 1058 (quoting *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994)).  Plaintiffs' experts have failed to do so here, and instead have engaged in a flawed, results-driven "always Roundup" methodology—precisely the type of unreliable approach that Rule 702 prohibits.

### A.   Dr. Schiff Admits He Cannot Rule Out or Weigh Risk Factors, and Always Concludes Roundup Was a Substantial Cause.

As discussed above, Dr. Schiff does not have a method by which he systematically rules in all potential causes and then systematically rules out potential alternative causes to arrive at his conclusion as to what caused a plaintiff's NHL.  Instead, he starts with the conclusion that exposure

to Roundup—above a threshold that he cannot define, *see* Imbroscio Decl., Ex. 7, Schiff (*Cervantes*) Dep. at 126:3-6—is always a substantial contributing factor.  Even more damning, and in stark contrast to the experts in *Hardeman*, *Stevick*, and *Gebeyehou*, he makes no attempt to quantify any of the Plaintiffs' exposure to Roundup, even though this is the sole basis on which he rules in Roundup as a causative factor.  *See, e.g.*, Imbroscio Decl., Ex. 6, Schiff (*Rehak*) Dep. at 66:9-72:9.  Then, although he may list or recognize other risk factors, he does not employ any method to assess and rule out alternative causes; he simply concludes that *every* potential cause is a contributing factor, despite admitting that he cannot ascribe a weight or percentage to any of them.  *See, e.g.*, Imbroscio Decl., Ex. 7, Schiff (*Cervantes*) Dep. at 145:15-146:11.  His "gestalt approach" is the definition of *ipse dixit*, not a reliable scientific methodology.

**Gerard Cervantes** has a range of risk factors for NHL that Dr. Schiff himself opines are known causal risk factors, including exposure to welding fumes, benzene, PCBs, mercury, tar, and gasoline, a first-degree relative who died of NHL, and obesity.  Indeed, Dr. Schiff has previously testified in other non-Roundup litigation that benzene and PCBs are "across the board causative risk factors" for NHL.  *Id.* at 19:6-23.[4]  Yet—despite purporting to apply a differential etiology—Dr. Schiff admitted that he did not quantify or calculate the amount of Mr. Cervantes' exposure to welding fumes, benzene, PCBs, tar or other chemicals Dr. Schiff identifies as carcinogens, and that such exposures "make[] no difference" in his view because Mr. Cervantes' "non-Hodgkin lymphoma may well be multifactorial . . . *so it doesn't matter*."  *Id.* at 103:14-107:10 (emphasis added).  In other words, Dr. Schiff admitted that he could not rule out PCBs, benzene, gasoline, tar exposure, family history of NHL or high BMI as potential causative risk factors for Cervantes NHL.  So, because he could not rule them out as required under a differential diagnosis methodology, he simply concluded that, along with Roundup, *all* of Mr. Cervantes' many risk factors were substantial contributing factors to his NHL.  *Id.* at 145:15-146:11.  Dr. Schiff reached this remarkable conclusion despite admitting that (1) he did not quantify Mr. Cervantes' exposure to glyphosate or any other chemical,

---

[4] As explained in Monsanto's Motion to Exclude the Testimony of Dr. Weisenburger, Monsanto does not take the position that PCBs are associated with an increased risk of NHL.  However, Dr. Schiff's opinions in this case stand in stark contrast to his prior testimony, and underscore that his conclusions are litigation-driven.

*id.* at 121:1-8, 145:15-146:11, and (2) he has no methodology by which to weigh risk factors against each other, *id.* at 43:16-45:8.  What Dr. Schiff has offered comes nowhere close to the methodology the Court allowed to go forward in PTO 85.  Indeed, the Court made clear that while it was "skeptical of [those experts'] conclusions, the experts' "core opinions" were that "plaintiffs had no other significant risk factors and were exposed to enough glyphosate to conclude that it was a substantial factor in causing their NHL."  PTO 85 at 6.  But Dr. Schiff does not even profess to say that Mr. Cervantes has no other significant risk factors.  He simply says they do not matter to him and brushes them aside because they stand in the way of his litigation-driven desired outcome.  At bottom, the *sole basis* for Dr. Schiff's conclusion that Roundup was a substantial factor in causing Mr. Cervantes' NHL was his exposure to Roundup, which Dr. Schiff characterized as "extensive" without attempting to quantify.  Allowing Dr. Schiff to testify given this record cannot be supported by any reading of Rule 702 and *Daubert*.

**Robert Karman's** risk factors included his age (77 at the time of diagnosis), extensive smoking history, and weight.  Again, Dr. Schiff did not clearly rule out that any of these risk factors could have caused Mr. Karman's NHL rather than Roundup.  Instead, when pressed at his deposition regarding whether he ruled out these risk factors, he only offered that these risk factors are referenced in his expert report for Mr. Karman.  Imbroscio Decl., Ex. 11, Schiff (*Karman*) Dep. at 101:14-101:22.  But Dr. Schiff did not offer any explanation, either in his report or at his deposition, for how he concluded that Roundup was a substantial causative factor in Mr. Karman's NHL as opposed to any of Mr. Karman's other admitted risk factors.  *Id.* at 116:9-18, 118:16-21.  As discussed above, he has no reliable scientific basis to do so.  This inability—indeed outright refusal—to offer any basis for his analysis flies in the face of the methodology the Court allowed to proceed in PTO 85 and makes a mockery of Rule 702 that this Court should not countenance.

Dr. Schiff also concluded that **Lorraine Rehak's** exposure to glyphosate was "extensive," even though her alleged exposure was primarily as a bystander around others mixing or spraying Roundup, and her personal use was limited to 2-3 times per year.  Imbroscio Decl., Ex. 6, Schiff (*Rehak*) Dep. at 65:8-14.  Dr. Schiff's opinion that Ms. Rehak's exposure to glyphosate was "extensive" lacks any foundation, as he relied only on Ms. Rehak's speculation that she *could* have

been exposed if others mixing glyphosate spilled it and tracked it into the office, *id.* at 66:21-25, and that she *could* have stepped in newly sprayed areas at her residences when others sprayed it, *id.* at 70:13-18.  Dr. Schiff did not do any research on absorption or dissipation rates of glyphosate, and thus had no scientific basis to assess the plausibility of Ms. Rehak's layperson exposure claims.  *Id.* at 67:20-25.  Dr. Schiff further admitted that he (1) does not know how many, or how big the residences were where Ms. Rehak alleges she was secondarily exposed, (2) does not know what Ms. Rehak wore on her feet, if anything, when she allegedly walked through newly sprayed areas, and (3) has no data or foundation to assess the degree or amount of Ms. Rehak's personal exposure to glyphosate.  *Id.* at 66:9-72:9.  In short, Dr. Schiff has done nothing more than parrot Ms. Rehak's allegations.  That is naked lawyer-driven advocacy, not legitimate expert testimony.  *See, e.g.*, *In re Mirena Ius Levonorgestrel-Related Products Liability Litigation (No. II)*, 341 F.Supp.3d 213, 241 (S.D.N.Y., 2018) (expert testimony should be excluded if it is "'speculative or conjectural'").  Dr. Schiff cannot be permitted to testify that Ms. Rehak's "extensive" exposure to glyphosate caused her NHL when, unlike prior experts who testified before the Court, he admits that he has *no basis to assess that exposure*.

Dr. Schiff also failed to address Ms. Rehak's other risk factors for NHL, including her 36-year pack-per-day smoking history and significant family history of various cancers.  Even Dr. Sawyer, who has been disclosed as a plaintiff expert in nearly every Roundup case—including every other Wave 2 case—testified that he would not agree to serve as an expert in Ms. Rehak's case because it "had **serious confounding factors** and **it was not [his] opinion that glyphosate substantially contributed** to [Ms. Rehak's NHL]."  Imbroscio Decl., Ex. 22, Sawyer (*Karman*) Dep. at 11:21-25 (emphasis added); *see also id.* at 12:2-5 (". . . the biggest elephant in the room was heavy smoking history and follicular NHL.  *I recommended not proceeding*.") (emphasis added).  But these "serious confounding factors" were not enough to alter Dr. Schiff's predetermined conclusion that Roundup is always a substantial cause for every plaintiff, including Ms. Rehak.  After being shown a number of studies, all but one of which he had never reviewed, Dr. Schiff admitted that cigarette smoking is a risk factor for follicular lymphoma in women.  Imbroscio Decl., Ex. 6, Schiff (*Rehak*) Dep. at 43:5-45:14.  Dr. Schiff further admitted that the data support an exposure-response

1   relationship—*i.e.*, the longer and more a woman smokes, the greater the risk of follicular

2   lymphoma—but he could not quantify Ms. Rehak's increased risk of NHL due to her smoking history.

3   *Id.*  Dr. Schiff was also unaware of a study reporting elevations in NHL risk proportionate to the

4   number of family members with non-hemolymphopoietic cancers—Ms. Rehak had seven such family

5   members.  *Id.* at 61:13-64:20.  In fact, Dr. Schiff admitted that the increased risk associated with

6   family history in this study is similar to the increased risk associated with glyphosate in the studies

7   he purports to rely on.  *Id.* at 62:12-16 ("That's a borderline statistical significance based on a small

8   number of cases.  Q.  Right.  Which you give credence to in the glyphosate setting; right?  A.  Yes.").

9   Rather than meaningfully confront how this newly-presented data might undermine his conclusion,

10  Dr. Schiff simply resorted to saying that Roundup, Ms. Rehak's smoking, and Ms. Rehak's family

11  history were *all* causes of her NHL, and that he could not quantify or compare these causes to one

12  another.  *Id.* at 78:22-79:7.  No reasonable reading of Rule 702 would permit an expert whose stated

13  methodology has been so devastatingly demolished to simply declare that none of it really matters

14  anyway.

15          Finally, Dr. Schiff similarly failed to meaningfully address **John Schafer's** potential

16  alternative causes, including an autoimmune disorder, age, and weight.  Dr. Schiff claimed that Mr.

17  Schafer's autoimmune disease, Hashimoto's Thyroiditis, is not associated with lymphomas outside

18  the thyroid, but the very article Dr. Schiff relied upon to support that proposition did not in fact limit

19  the increased risk of NHL associated with Hashimoto's to lymphomas confined to the thyroid.

20  Imbroscio Decl., Ex. 4, Schiff (*Schafer*) Dep. at 85:9-20.  Dr. Schiff further admitted that there is a

21  positive association between obesity and both follicular and diffuse large b-cell lymphoma, *id.* at

22  86:11-88:1, and agreed that Mr. Schafer "was diagnosed with non-Hodgkin lymphoma at the most

23  common age for his diagnosis," *id.* at 89:17-90:16.  As was the case with the other Plaintiffs, the only

24  meaningful data point for Dr. Schiff's causation opinion was whether Mr. Schafer was exposed to

25  glyphosate and later developed NHL.  *Id.* at 38:3-10 ("so even if a plaintiff has a significant

26  autoimmune disease *of the highest risk* . . . you would still attribute Roundup exposure as a substantial

27  contributing factor in a plaintiff's development of non-Hodgkin lymphoma; is that right?  A.  That is

28  correct.") (emphasis added).  Such an unapologetic "always Roundup" methodology cannot be found

1    to be reliable under Rule 702.

2            **B.     Dr. Pinter-Brown Likewise Automatically Includes Roundup as a Substantial
3                     Cause and Does Not Weigh or Eliminate Other Risk Factors.**

4            Dr. Pinter-Brown, like Dr. Schiff, made no attempt to quantify the amount of Roundup James

5    Peterson or Michael Pecorelli were exposed to, and expressly disclaimed any expertise to do such

6    calculations, even though her entire causation opinion rests on those Plaintiffs' exposure to Roundup.

7    Imbroscio Decl., Ex. 3, Pinter-Brown (*Peterson*) Dep. at 132:2-10.  Instead, according to Dr. Pinter-

8    Brown, *any* use of Roundup more than twice a year qualifies as "intensive," and therefore is a cause

9    of an individual's NHL.  *Id.* at 114:3-7 ("Q.  So what did you do to figure out if his exposure was

10   intensive?  A.  I looked at the papers and what they defined as intensive.  And in some papers they

11   defined it as two days per year."); *see also id.* at 115:3-11.  The Court has excluded similar testimony

12   before, and should do so again here.  *See* PTO 85 (excluding similar testimony by Drs. Weisenburger

13   and Nabhan).  But the inquiry should not stop there, because unlike the experts at issue in PTO 85,

14   Dr. Pinter-Brown has made no effort to rely on the Plaintiffs' actual exposure levels.  For her, more

15   than two days was sufficient to reach the conclusion that Roundup was a substantial cause of a

16   plaintiffs' NHL.

17           Also like Dr. Schiff, Dr. Pinter-Brown discounts risk factors other than Roundup without any

18   serious analysis.  Her cursory and unscientific treatment of James Peterson's and Michael Pecorelli's

19   numerous alternative causes illustrates that if a plaintiff is exposed to Roundup for more than two

20   days per year, she will always conclude that Roundup was a substantial cause of their NHL.  In fact,

21   Dr. Pinter-Brown confirmed as much at her deposition, when she testified that she would find

22   Roundup to be a substantial factor *no matter what other risk factors a plaintiff had*.  Imbroscio Decl.,

23   Ex. 14, Pinter-Brown (*Pecorelli*) Dep. at 125:13-126:19; *see also id.* at 115:20-116:3 ("Q.  If Mr.

24   Pecorelli had autoimmune disorder and had the same exposure to Roundup, in that scenario would

25   you opine that his Roundup was likely a substantial contributing factor to his non-Hodgkin

26   lymphoma?  A.  I would opine if -- if he had the appropriate exposure, as he did, that it was a

27   significant contributing factor to the development of his lymphoma.").

28           **James Peterson's** risk factors for NHL included age, weight, and exposure to chemicals he

                                                - 15 -

1    used to develop his own film.  Dr. Pinter-Brown ruled out Mr. Peterson's age (73 at the time of his

2    diagnosis) as a causal factor, despite acknowledging that age is a risk factor for NHL, Imbroscio

3    Decl., Ex. 3, Pinter-Brown (*Peterson*) Dep. at 55:9-11, but admitting that she had "no idea" how much

4    Mr. Peterson's age increased his chances of developing NHL, *id.* at 150:19-151:1.  She similarly

5    dismissed Mr. Peterson's weight as irrelevant.  *Id.* at 60:6-9, 148:19-23.  Dr. Pinter-Brown also did

6    not consider Mr. Peterson's exposure to chemicals used to develop his own film, even though she

7    admitted that (1) she knew nothing about what those chemicals were, *id.* at 17:11-13, (2) she had no

8    information about how much exposure to these chemicals Mr. Peterson might have experienced, *id.*

9    at 18:25-19:9, 47:8-10, and (3) she assumed, without any evidence, that Mr. Peterson only developed

10   his film in a well-ventilated room, *id.* at 20:20-21:2.  Dr. Pinter-Brown's thoroughly unscientific

11   treatment of this potential exposure is emblematic of her entire approach to specific causation.

12   Evaluation of alternative causes is not a medical or scientific process for Dr. Pinter-Brown: it is

13   merely box-checking to arrive at her pre-determined conclusion that Roundup was the cause.

14        **Michael Pecorelli** also had significant risk factors for NHL, including an extensive smoking

15   history and exposure to a variety of chemicals.  Dr. Pinter-Brown concluded that Mr. Pecorelli's 70-

16   year smoking history was not related in any way to his NHL, Imbroscio Decl., Ex. 14, Pinter-Brown

17   (*Pecorelli*) Dep. at 67:18-21; 71:14-72:1, even though Plaintiffs' other experts acknowledge smoking

18   as a risk factor, Imbroscio Decl., Ex. 11, Schiff (*Karman*) Dep. at 111:23-112:5.  Dr. Pinter-Brown

19   also listed "2,4-RD [2,4-D], Sevin Insect Killer (carbaryl), diazinon, and Weed B Gon" chemicals as

20   potential factors in Mr. Pecorelli's case because "there's also been associations with non-Hodgkin's

21   lymphoma with some or all of them."  Imbroscio Decl., Ex. 14, Pinter-Brown (*Pecorelli*) Dep. at

22   87:15-24.  Yet Dr. Pinter-Brown admitted that she had not reviewed the literature on 2,4-D, Carbaryl,

23   and diazinon sufficiently to say whether the chemicals are substantial contributors to Mr. Pecorelli's

24   NHL.  *Id.* at 87:25-89:7; 90:2-91:7.  Further, she made no attempt to evaluate other chemicals Mr.

25   Pecorelli would have been exposed to between 1953 and 1974 during his work in landscaping before

26   Roundup was commercially marketed.  *Id.* at 92:11-93:24.  Ultimately, like her evaluation of Mr.

27   Peterson, Dr. Pinter-Brown's consideration of Mr. Pecorelli's alternative causes was essentially

28   meaningless, as she has admitted that (1) she does not attempt to rule out alternative causes, *id.* at

91:16-22 ("You have not attempted to rule out diazinon as a substantial contributing factor to Mr. Pecorelli's non-Hodgkin lymphoma; is that correct?  A.  I've not attempted to rule it out."); *see also id.* at 117:12-16, and (2) will conclude that Roundup is a substantial factor *regardless* of what alternative risk factors a plaintiff has, *see id.* at 126:9-19 ("Q.  If Mr. Pecorelli had all five of these risk factors, plus his exposure to Roundup, you still would have opined that Roundup exposure was a substantial contributing factor to his splenic marginal zone lymphoma; is that right?  A.  . . . if that was the case I would have mentioned all five."); *see also id.* at 115:20-116:3.

C. **Dr. Boyd Also Does Not Meaningfully Consider Alternative Causes, and His Testimony Regarding His Methodology Conflicts with Dr. Schiff's.**

Dr. Boyd does not have a name for his methodology.  When pressed at this deposition, Dr. Boyd claimed that his methodology is "similar" to the Bradford Hill criteria, though he expressly disclaimed performing a Bradford Hill assessment.  Imbroscio Decl., Ex. 1, Boyd (*Seidl*) Dep. at 78:4-13.  Dr. Boyd purported to evaluate **Randall Seidl's** exposure to glyphosate and potential risk factors as part of a "balancing" analysis to arrive at a "relative effect" for Roundup, *id.* at 79:3-80:4—an analysis which his co-expert Dr. Schiff has claimed is impossible, *see, e.g.*, Imbroscio Decl., Ex. 7, Schiff (*Cervantes*) Dep. at 90:6-9 ("But the key point is that these risk factors do not cancel each other out and as long as one of them is present, it may be playing some role, difficult or impossible as it may be to quantitate its role."); *see also id.* at 43:16-45:8.  Dr. Boyd also admitted that he could not rule out age as a contributing factor to Mr. Seidl's NHL, Imbroscio Decl., Ex. 1, Boyd (*Seidl*) Dep. at 96:20-97:6, that Mr. Seidl's age at the time of his diagnosis (57) was "within the spectrum of increasing risk after age 55 to 60," *id.* at 92:11-14, and that 57 was not an unusual age to see a patient with NHL even if that patient has never been exposed to Roundup, *id.* at 92:21-24.

\*          \*          \*

Taken as a whole, these experts' reasoning closely tracks that of the experts excluded in *Lipitor*, whose conclusions "focused almost exclusively on the fact that [the plaintiff] took the drug and later developed the disease, rather than explaining what led her to believe that it was a substantial contributing factor as compared to other possible causes."  892 F.3d at 645.  Here, as in *Lipitor*, the experts' reports simply "dismiss other possible causes in favor of [Roundup] in a cursory fashion that

1  appeared closer to an *ipse dixit* than a reasoned scientific analysis." *Id.*  The Court should exclude

2  each expert's opinion on that basis.

3  **III.    Plaintiffs' Experts Have Not Reliably Ruled Out Unknown Causes of Plaintiffs' NHL and Instead Always Point to Roundup.**

4  Just as they fail to engage with the known alternative risk factors confronting Plaintiffs, these

5  experts take an equally unscientific and dismissive approach to the idiopathic causes responsible for

6  most NHL cases:  they simply ignore the prospect.  This Court has already acknowledged that because

7  the vast majority of NHL cases have no identifiable cause, an expert's specific causation opinion is

8  inadmissible if it fails to account for or adequately grapple with idiopathy.  *In re Roundup*, 358 F.

9  Supp. 3d at 959.  To be admissible "an expert must have a way to differentiate Roundup users who

10 developed NHL because they used the product from Roundup users who would have developed NHL

11 regardless." *Id.*  These experts are unable to offer any reliable method for placing Plaintiffs in one

12 category and not the other, and thus any such testimony cannot possibly be helpful to a jury tasked

13 with that very assessment.  Indeed, unlike prior experts, they do not "rel[y] heavily on the plaintiffs'

14 exposure levels in drawing their conclusions." PTO 85 at 6.  Rather, they engage in an "always

15 Roundup" methodology that determines Roundup to be the cause no matter the exposure.  But, as the

16 Court made clear in discussing idiopathy, exposure alone is not enough.

17 For the most part, these experts made no attempt to address idiopathy.  For example, **Dr.**

18 **Boyd's** report does not address idiopathy at all.  *See* Imbroscio Decl., Ex. 23, Boyd (S*eidl*) Report.

19 **Dr. Pinter-Brown's** expert reports acknowledge that the cause of NHL "is unknown in most

20 patients."  Imbroscio Decl., Ex. 2, Pinter Brown (*Peterson*) Report at 4; Imbroscio Decl., Ex. 13,

21 Pinter-Brown (*Pecorelli*) Report at 4.  However, the portions of her reports which contain her specific

22 causation analyses do not mention idiopathy, and provide no explanation as to how she reached her

23 conclusions in light of her admission that most cases of NHL have no known cause.  Imbroscio Decl.,

24 Ex. 2, Pinter-Brown (*Peterson*) Report at 5-6; Imbroscio Decl., Ex. 13, Pinter-Brown (*Pecorelli*)

25 Report at 5-6.  When pressed at her depositions, Dr. Pinter-Brown confirmed that most patients' NHL

26 has no identifiable cause, Imbroscio Decl., Ex. 14, Pinter-Brown (*Pecorelli*) Dep. at 126:21-127:4,

27 127:16-24, 128: 19-129:5, and that "we're all exposed to carcinogens every day all our lives,"

28

Imbroscio Decl., Ex. 14, Pinter-Brown (*Peterson*) Dep. at 46:4-19, 133:8-13.  Despite acknowledging the reality of idiopathy, Dr. Pinter-Brown does not address it in any meaningful way.  Her testimony effectively treats all cases caused by idiopathic causes as if they were caused by Roundup, and should be excluded on this basis alone.

**Dr. Schiff's** testimony is even more remarkable.  In October 2019, Dr. Schiff testified in another Roundup case that eighty percent "of the patients [he] treated with non-Hodgkin lymphoma did not have a known cause of their non-Hodgkin lymphoma."  Imbroscio Decl., Ex. 5, Schiff (*Harris*) Dep. at 88:2-90:13; *see also* Imbroscio Decl., Ex. 7, Schiff (*Cervantes*) Dep. at 38:3-7.  He also admitted that he never once told a patient that their NHL was caused by Roundup.  Imbroscio Decl., Ex. 5, Schiff (*Harris*) Dep. at 92:24-93:4.  In contrast, since becoming an expert in this litigation, he has found Roundup to be the cause of every Plaintiff's NHL thus far, no matter the subtype or other risk factors present.  *Id.* at 91:3-7, 91:18-22; *see also* Imbroscio Decl., Ex. 4, Schiff (*Schafer*) Dep. at 29:12-17.  To explain this about-face, he points to his purportedly new "recognition of the lymphoma risks associated with glyphosate and Roundup" when IARC issued its Monograph in 2015, right as he retired from medical practice and became a full-time expert witness.  Imbroscio Decl., Ex. 5, Schiff (*Harris)* Dep. at 88:13-89:5.  He stands by his new recognition, despite the fact that the literature upon which the IARC Monograph was based, and on which he relies to rule in Roundup (*e.g.*, McDuffie 2001 and Eriksson 2008), existed for many years before he retired.

Dr. Schiff's inability to offer any rational explanation for the striking contrast between his testimony that eighty percent of the patients he treated had no known cause for their NHL and his conclusion that Roundup was the cause of every Plaintiffs' NHL thus far—apart from the obvious outcome-driven one—renders his testimony unreliable and inadmissible under Rule 702.  In his view, once a Plaintiff establishes exposure to Roundup, that exposure will trump any potential idiopathic or known risk factor in every situation.  That conclusion defies any modicum of reliability and should not be tolerated by this Court.

## IV.   Monsanto Preserves Its Arguments That Plaintiffs' Experts Ruled in Roundup as a Cause of Each Plaintiff's NHL Based on Inadequate and Flawed Studies.

Monsanto moves to exclude, under Rule 702, Plaintiffs' specific causation experts on the

grounds that they ruled in Roundup as a cause of each Plaintiff's NHL based on unreliable science. In particular, Monsanto maintains that the experts improperly rely on a small subset of flawed studies that do not establish a sufficiently high odds ratio to be relevant, and that they do not adequately account for Plaintiffs' individual subtypes when ruling in Roundup as a cause.  However, consistent with the Court's direction not to re-litigate issues previously ruled upon by the Court, but in order to fully preserve the appellate record, Monsanto hereby incorporates the following pleadings that were filed on the MDL docket addressing this issue:

- Monsanto Company's Motion to Exclude Testimony of Dr. Chadi Nabhan, Dr. Andrei Shustov, and Dr. Dennis Weisenburger on *Daubert* Grounds (ECF No. 2420);
- Monsanto's Company's Reply in Support of Motion to Exclude Testimony of Dr. Chadi Nabhan, Dr. Andrei Shustov, and Dr. Dennis Weisenburger on *Daubert* Grounds (ECF No. 2525);
- The Transcript of the February 13, 2019 Hearing (ECF No. 2763);
- Monsanto Company's Motion for Directed Verdict (ECF No. 2975);
- Monsanto Company's Motion for Judgment as a Matter of Law and for a New Trial (ECF No. 3976);
- Monsanto Company's Reply in Support of Motion for Judgment as a Matter of Law and for a New Trial (ECF No. 4301).

Monsanto also incorporates the most recent science on glyphosate, including the scientific literature published since the above pleadings were submitted to the Court, attached as exhibits 2-4 to Monsanto's contemporaneously-filed Motion to Exclude Plaintiffs' General Causation Experts, and the United States Environmental Protection Agency's Interim Registration Decision on glyphosate, attached as Exhibit 5 to that Motion.[5]

### CONCLUSION

For the foregoing reasons, the Court should grant Monsanto's motion to exclude these specific causation experts on Rule 702 and *Daubert* grounds and grant summary judgment in Monsanto's favor because Plaintiffs have failed to present at least one admissible expert opinion to support specific causation in each of their cases.

---

[5] By incorporating by reference its prior filings, Monsanto is in no way waiving any of the arguments raised therein.

Dated:  March 19, 2021

By:  */s/ Michael X. Imbroscio*

Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
Covington & Burling LLP
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

Attorney for Defendant Monsanto Company

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of March, 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

_/s/ Michael X. Imbroscio_