# EXHIBIT 3

Lauren C. Pinter-Brown, M.D.

```
 1              IN THE UNITED STATES DISTRICT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3

 4   IN RE: ROUNDUP PRODUCTS      )

     LIABILITY LITIGATION         )

 5                                )

                                  )  MDL No. 2741

 6                                )

                                  )  Case No. MDL No

 7   This document relates to:  )  3:16-md-02741-CV

                                  )

 8   James Peterson v.            )

     Monsanto, Co.                )

 9   Case No.                     )

     3:18-cv-07271-CV.            )

10                                )

                                  )

11

12                    - - - -

13                   REMOTE

14                 VIDEOTAPED

15        EXPERT WITNESS TESTIMONY OF

16        LAUREN C. PINTER-BROWN, M.D.

17            (Pages 1 - 156)

18     Monday, March 1, 2021, 1:42 p.m.

19                    - - - -

20

21

22

23

24   REPORTED BY:  ELAINA BULDA-JONES, CSR #11720

25
```

Lauren C. Pinter Brown, M.D.

```
1                    APPEARANCES
2
3    For the Plaintiff:
4         BY: JENNIE LEE ANDERSON, ESQ.
          Andrus Anderson LLP
5         155 Montgomery Street, Suite 900
          San Francisco, California 94104
6         415.986.1400
          Jennie@andrusanderson.com
7
          BY: REBECCA FREDONA, ESQ.
8         The Moll Law Group
          22 West Washington Street, 15th Floor
9         Chicago, Illinois 60602
          312.462.1700
10        RFredona@molllawgroup.com
11
12   For the Defendant:
13        BY: LINDLEY J. BRENZA, ESQ.
          BartlitBeck LLP
14        1801 Wewatta Street, Suite 1200
          Denver, Colorado 80202
15        303.592.3130
          Lindley.brenza@bartlitbeck.com
16
17
     Also present:
18
          David Kim, videographer
19
20
21
22
23
24
25
```

Lauren C. Pinter-Brown, M.D.

```
 1                 INDEX OF EXAMINATIONS

 2

 3   EXAMINATIONS                                    PAGE

 4    MR. BRENZA                                       5

 5

 6

 7

 8                  INDEX OF EXHIBITS

 9     NO.                 DESCRIPTION           PAGE

10   Exhibit 1      Defendant Monsanto Company's    5
                    Notice to Take Oral and
11                  Videotaped Deposition of
                    Lauren C. Pinter-Brown, M.D.,
12                  F.A.C.P.

13   Exhibit 2      Expert Report of Dr. Lauren      5
                    Pinter-Brown in Support of
14                  Specific-Causation on Behalf
                    of James Peterson
15
     Exhibit 3      Curriculum Vitae of Lauren C.    5
16                  Pinter-Brown, M.D., F.A.C.P.

17   Exhibit 4      Reference List of Dr. Lauren     5
                    Pinter-Brown in Support of
18                  Specific Causation on Behalf
                    of James Peterson
19
     Exhibit 5      Exposure of Glyphosate-Based   121
20                  Herbicides and Risk for
                    Non-Hodgkin Lymphoma: A
21                  Meta-Analysis and Supporting
                    Evidence, Luoping Zhang, 5
22                  February 2019

23

24

25
```

1          THE VIDEOGRAPHER:  We are now on the

2   record.  My name is David Kim.  I'm a videographer

3   for Golkow Litigation Services.

4          Today's date is March 1st, 2021, and the

5   time is 1:42 p.m.

6          This remote video deposition is being held

7   in the matter of Roundup, James Peterson V Monsanto

8   Company, for the U.S. District Court, for the

9   Northern District of California.

10         The deponent is Lauren C. Pinter-Brown.

11         All parties to this deposition are

12   appearing remotely and have agreed to the witness

13   being sworn in remotely.

14         Due to the nature of remote reporting,

15   please pause briefly before speaking to ensure all

16   parties are heard completely.

17         Will counsel please identify themselves.

18         MR. BRENZA:  Lin Brenza -- I'm sorry.

19         Lin Brenza for Monsanto.

20         MS. ANDERSON:  Good afternoon.  This is

21   Jennie Anderson of Andrus Anderson on behalf of

22   plaintiff.

23         MS. FREDONA:  Rebecca Fredona on behalf of

24   plaintiff.

25         THE VIDEOGRAPHER:  The court reporter is

1    Elaina Bulda-Jones, and she will now swear in the

2    witness.

3              LAUREN C. PINTER-BROWN, M.D.,

4    called as a witness by the Defendants herein, being

5    first duly sworn by the Certified Shorthand Reporter

6    was thereupon examined and testified as is

7    hereinafter set forth.

8                   EXAMINATION

9    BY MR. BRENZA:

10       Q.   Okay.  I'm sorry, Doctor, for getting --

11   kind of a bunch of housekeeping stuff, but let's --

12   let's hope we can move along.

13             I am going to just begin by identifying

14   for the record and marking as Exhibits 1 through 4

15   the deposition notice in this case, so that's going

16   to be Exhibit 1.  Your report in the case, that's

17   going to be Exhibit 2.  Your CV in the case, and

18   that's going to be Exhibit 3.  And your list of

19   materials relied on, and that's going to be

20   Exhibit 4.

21             (Whereupon, Exhibit 1, Exhibit 2, Exhibit

22   3 and Exhibit 4 were marked for identification.)

23   BY MR. BRENZA:

24       Q.   So hopefully we can talk about those if --

25   and I don't know whether the documents have been

Lauren C. Pinter Brown, M.D.

```
1    sent to everybody by now.

2              But let's just begin with, Doctor, have

3    you been deposed before?

4         A.   Yes.

5         Q.   How many times?

6         A.   I have no idea.  But just this morning.

7         Q.   Yeah.  I understand you did it this

8    morning.

9         A.   Let's say 15.  I don't know.

10        Q.   Okay.  So you -- you're -- you're an old

11   hand, you know how this works?

12        A.   I think I do.

13        Q.   I'm not going to go over all the rules,

14   but I -- the only thing I'm going to ask is, if you

15   don't understand something I say, particularly

16   because we're doing this on the internet, will

17   you -- will you let me know so that I can rephrase

18   it or repeat it and then if you don't say anything,

19   I'm going to assume that you understood my question,

20   okay?

21        A.   Absolutely.

22        Q.   Okay.  What's your current practice?

23        A.   You mean who's in my practice or where do

24   I work?

25        Q.   Well, let's start with, where do you work?
```

Lauren C. Pinter Brown, M.D.

1      A.   I work at the University of California

2  Irvine.

3      Q.   What do you do there?

4      A.   I'm a professor of medicine and

5  dermatology.

6      Q.   In your report, you say that you see

7  patients with non-Hodgkin's lymphoma.

8           Is that still true?

9      A.   Absolutely.

10      Q.   And I think your report, you said you see

11  quite -- quite a few -- just getting your report --

12  70 -- 70 a week; is that right?

13      A.   At least.

14      Q.   And those are 70 separate patients?

15      A.   Yes.

16      Q.   Just out of curiosity, why -- why are you

17  in the dermatology department if you're seeing

18  non-Hodgkin's lymphoma patients?

19      A.   I have a special research interest in skin

20  lymphomas.

21      Q.   Okay.  So that there are some lymphomas

22  that are skin lymphomas?

23      A.   There are.

24      Q.   Okay.  And those are -- you're interested

25  in those and so that's why you're in that

1    department.

2            Are the -- are some of the cases that you

3    see with lymphoma diffuse large B-cell lymphoma?

4        A.    Yes.

5        Q.    Is -- and that's known as DLBCL, right?

6        A.    Correct.

7        Q.    Is that the most common kind of

8    non-Hodgkin's lymphoma?

9        A.    It vies with follicular lymphoma for being

10   the two most common.

11       Q.    And -- and non-Hodgkin's lymphoma, is that

12   considered to be -- you're seeing 70 cases a week.

13   Is that considered to be a common cancer?

14       A.    No, it's not a common cancer.  It's just

15   that I only see patients with lymphoma.

16       Q.    Well, in the list of all types of cancer

17   that can occur, where does non-Hodgkin's lymphoma

18   rank?

19       A.    Like five or six.

20       Q.    Okay.  So you don't consider a cancer

21   that's number five or number six in the list of all

22   cancers you can have to be a common cancer?

23       A.    No, because the numbers, by the time you

24   get down to five or six, the numbers of patients are

25   a lot less than, say, breast cancer or prostate

1  cancer.  It maybe five or six, but the numbers

2  affected are -- are much smaller.

3      Q.  Isn't it true that over the course of a --

4  of a normal person's lifespan, one out of 50 are

5  going to get non-Hodgkin's lymphoma?

6      A.  I don't know where -- where one out of 50

7  comes.  In a year, the new cases in the U.S., about

8  70,000.

9      Q.  At one point you were -- you were the

10  director of lymphoma at UCLA; is that right?

11      A.  Yes.

12      Q.  But that's not -- that's no longer true,

13  right?

14      A.  That's no longer true.

15      Q.  What happened to cause you to no longer be

16  the director of lymphoma at UCLA?

17      A.  I left UCLA.

18      Q.  Why did that happen?

19          MS. ANDERSON:  Objection.  Lin, where's --

20  where are you going with this questioning?

21          MR. BRENZA:  I -- I'm just asking

22  questions.  I don't -- I don't have an answer to

23  that.

24          MS. ANDERSON:  Can we go off the record

25  for just a minute?

```
 1                    MR. BRENZA:  Sure.

 2                    THE VIDEOGRAPHER:  We are now going off

 3   the record.  And the time is 1:49 p.m.

 4                    (Whereupon, a brief recess was taken.)

 5                    THE VIDEOGRAPHER:  We are now going back

 6   on the record.  And the time is 2:01 p.m.

 7                    MR. BRENZA:  Okay.  So I had previously

 8   asked the doctor why she had left UCLA, and I think,

 9   Jennie, you wanted to say something on the record.

10                    MS. ANDERSON:  You can -- you can re-ask

11   your answer -- you can re-ask your question.

12                    MR. BRENZA:  Okay.

13                    MS. ANDERSON:  And -- and Dr. Pinter-Brown

14   will -- I may need to limit her, if you're going

15   down the road further, then -- then I may have to

16   limit the questioning.

17                    But please go ahead and pose your -- your

18   question.

19                    MR. BRENZA:  Okay.

20        Q.   So, Dr. Pinter-Brown, you left UCLA as

21   director of lymphoma.

22                    My question, was why -- why did you leave?

23        A.   Because I was discriminated against and

24   harassed.  I chose to leave, and it's the subject of

25   litigation.
```

Lauren C. Pinter-Brown, M.D.

```
 1        Q.   Are you -- have you been instructed by
 2   your lawyer in that litigation to not answer
 3   questions in this deposition about that lawsuit?
 4        A.   That's correct.
 5        Q.   Okay.  In any event, now you are in the
 6   dermatology department at UC Irvine.
 7             Is your work there similar to the work at
 8   UCLA or different?
 9        A.   Well, I'll correct you.  I'm -- I'm in the
10   department of medicine, and I have a dual
11   appointment in dermatology.
12             My work is very similar.  I continue to
13   have three full days of clinic, and I only see
14   patients with lymphoma.  I continue to do clinical
15   research in lymphoma.  I continue to teach fellows,
16   the community, patients.  So really, my role hasn't
17   changed.  And I'm the lead lymphoma physician at
18   UC Irvine.
19        Q.   Which -- what kind of research are you
20   conducting?
21        A.   I do clinical research that has to do with
22   novel treatments usually, for different kinds of
23   lymphoma.
24        Q.   And what areas are you teaching in?  Is it
25   also lymphoma-related?
```

1      A.   Only lymphoma-related.  I teach people

2   about lymphoma.

3           MR. BRENZA:  Okay.  Have the documents

4   that I -- I think that you all should have them.  I

5   wanted to ask you about the notice of deposition for

6   today.  Can you -- do you -- do you all see a file

7   from my office or from the court reporter that has

8   the documents for today?

9           THE WITNESS:  I -- I can speak for me.  I

10  got a -- something from Elaina, but it's only one

11  paper.  It's the Chang paper.  And that's all that's

12  contained in my file unless somehow it doesn't open.

13  And that's the only thing I've received.

14          MS. ANDERSON:  Oh, it looks like there was

15  a typo in the -- let me forward it to you now.  It

16  looks like there was a typo in the -- in the e-mail

17  that -- address for Dr. Pinter-Brown.

18          Okay.  I just forwarded you the zip drive.

19          MR. BRENZA:  Okay.  While we're -- while

20  we're waiting for that to go through, I'll just ask

21  some other questions.

22      Q.   Doctor, how were you first retained in

23  this matter relating to Mr. Peterson?

24      A.   Mr. Moll reached out to me because I had

25  done some other cases.

Lauren C. Pinter-Brown, M.D.

```
 1        Q.   And when you say "other cases," similar
 2   cases about Roundup?
 3        A.   Yeah.  Yes.
 4        Q.   And he knew of you from -- from your work
 5   in those other cases?
 6        A.   I have no idea how he --
 7        Q.   Maybe somebody from his office -- somebody
 8   from his office contacted you and asked you to be a
 9   witness in this case for Mr. Peterson?
10        A.   He did ask me to be involved with some of
11   his cases.
12        Q.   Okay.  And -- and when did he ask you to
13   be involved with some of his cases?
14        A.   I don't exactly remember.  I'll say six
15   months.
16        Q.   What did he say he wanted you to do?
17        A.   I don't know if he ever actually said
18   specifically.  I guess as -- act as an expert
19   witness.  I mean, I don't think there was some --
20   there were any specifics there that I remember.
21        Q.   Did you -- did you receive materials
22   specific to Mr. Peterson?
23        A.   Yes.
24        Q.   Did you receive Mr. Peterson's medical
25   records?
```

Lauren C. Pinter-Brown, M.D.

```
1        A.   I received medical records.  I don't know
2   if they are all of his medical records.  But I
3   received medical records to review, yes.
4        Q.   Did you review his deposition testimony?
5        A.   I believe I did.  I'll look at my report
6   so that I'm being totally accurate.  In my report, I
7   list everything that I reviewed.
8        Q.   And -- and when you say that, what --
9   where did you -- did you list it as a citation in
10  the text of your report or are you talking about
11  your materials relied upon list?
12       A.   My -- I'm -- I'm talking about -- here.
13  I'm going to find you the section.  I'm trying to
14  find you the section.  It's a little bit of a
15  challenge.  Well, you know what -- that's strange.
16  I don't -- I don't see it on my report but usually I
17  put it on there.
18            MS. ANDERSON:  Yeah, we --
19            THE WITNESS:  Here.  I got it.  Okay.
20  It's hard -- I'm looking at it, like this little
21  window.  It's under Background in the first
22  paragraph and what's included in his medical records
23  that I received; the plaintiff's deposition; and the
24  deposition of one of his physicians, a Dr. Shulman.
25
```

Lauren C. Pinter-Brown, M.D.

1    BY MR. BRENZA:

2        Q.   What -- what, if anything, did you learn

3    from those materials that informed your opinion in

4    this case?

5             MS. ANDERSON:  Objection.  Form.

6             THE WITNESS:  Well, I learned about his

7    medical history and I learned about his work history

8    and I learned about what he did when he worked.

9    BY MR. BRENZA:

10       Q.   And what was your understanding of the job

11   or jobs that he held over the course of his life?

12       A.   Well, that's listed in his social history.

13            He worked as a radio operator in the

14   Korean War.  He had a hobby of doing photography.

15   He explained in deposition how he developed his own

16   film and pictures.  And he worked as a U.S. postal

17   carrier, outside.  He worked as a production

18   planner.  And then he controlled -- was responsible

19   for maintaining the property that he lived in.

20       Q.   And with respect to his hobby of

21   photography, did you understand that he developed

22   his own film?

23       A.   Yes.  I've done the same, so I understood

24   the process he was talking about.

25       Q.   Are you an expert in the chemicals used

1    for developing film?

2        A.    Not anymore.

3        Q.    Did you assume that he was exposed to

4    certain chemicals in the course of developing his

5    own film?

6        A.    Well, the way he described it, he used

7    tongs as most -- I know I did when I did that.  And

8    so your exposure is really pretty minimal.  The

9    tongs, at least the tongs that I used to use, which

10   is what I was assuming he was talking about,

11   are probably almost a foot long.

12            And you don't get -- you pour the

13   chemicals into a -- some basins.  You don't inhale

14   them.  You don't get close to them.  You don't put

15   your hands in the chemicals.  So I think I drew from

16   my own personal experience as to the type of

17   exposure that one might have when they are

18   developing film.

19       Q.    Did you assume that the tongs were an

20   effective form of personal protective equipment?

21       A.    I -- I think -- yes, because I -- I know

22   that, at least when I developed film, and I was a

23   kid so I probably wasn't as careful as him, in no

24   way did I ever get chemicals on my hands or on my

25   body or anywhere.

Lauren C. Pinter-Brown, M.D.

1    Q.   Did you assume that Mr. Peterson followed

2  the recommended procedures for avoiding contact with

3  the chemicals he used to develop his own film?

4    A.   Well, he -- he explained that he used

5  tongs, not his hands.  I have seen people use their

6  hands to move the paper in the basin, pick the paper

7  up sometimes.  But he actually goes on to say that

8  he used tongs and so that -- I think that's a very

9  effective way of not having immediate contact with

10  the chemicals.

11    Q.   What are the chemicals that are used in

12  developing film?

13    A.   I don't remember any longer.

14    Q.   Did Mr. Peterson tell you what he used?

15    A.    I think he mentioned in his deposition

16  that he used the Kodak products.  Those are the same

17  ones I used, but I -- I couldn't tell you.  I know

18  one's a fixer and one's a developer, but I don't

19  think that -- that I remember what's in there, nor

20  did he spell it out because he was talking about

21  kind of generic products that you would buy as a

22  hobbyist, you know, developing film.

23    Q.   So the fact that you -- it's common to use

24  tongs, do you understand that those chemicals are

25  toxic?

Lauren C. Pinter-Brown, M.D.

```
 1              MS. ANDERSON:  Objection.  Form.
 2              THE WITNESS:  I would assume you use tongs
 3   because they're chemicals and you don't want your
 4   fingers on them.
 5   BY MR. BRENZA:
 6       Q.   Why -- why would that matter?  Why would
 7   you want to avoid touching chemicals in the course
 8   of developing film?
 9       A.   I don't think it's unique to the -- the
10   course of developing film.  I think that when --
11   when people are using chemicals, it's probably
12   prudent, unless they're meant to be on your skin or
13   in your nose or in your mouth, that you take
14   precautions.  And that's just kind of a general
15   concept that I would personally have about how I
16   would support myself around chemicals, be it a
17   chemistry lab or, like I did in college or -- or a
18   hobby such as this.
19       Q.   So your -- so your view on this is, it's
20   not based on what specific chemicals Mr. Peterson
21   used, it's more a general philosophical view about
22   chemicals in general?
23       A.   That's how I would view it.  I don't know
24   if he viewed it differently.  That wasn't discussed.
25       Q.   What kind of inhalational exposure does
```

Lauren C. Pinter Brown, M.D.

```
 1    someone get when they're developing their own film?

 2              MS. ANDERSON:  Objection.  Form.

 3              THE WITNESS:  I guess it would depend on

 4    if they were stupid enough to put their nose in the

 5    basin or -- or in the jar, the container of

 6    chemicals, how large an area they're using, how well

 7    ventilated it is.  So I'm not sure.

 8              I don't remember during his deposition

 9    that that was gone into in great detail.

10    BY MR. BRENZA:

11         Q.   When you're developing film, you're in a

12    room that has no light, correct?

13         A.   It can have a red light.  It just can't

14    have regular light.

15         Q.   And does that, in your experience,

16    preclude windows to the outside while you're

17    developing the film?

18              MS. ANDERSON:  Objection.  Form.

19              THE WITNESS:  I don't know if there's a

20    way to have windows.  Certainly there might be some

21    other form of ventilation other than windows in a

22    room.

23              I'm not a professional photographer.  And

24    you're talking about something I did when I was 13.

25    So, you know, I'm not sure I have the expertise or
```

1    database to answer some of these questions.

2    BY MR. BRENZA:

3        Q.    In your experience, as limited as it may

4    be, when you're using a darkroom to develop film, it

5    generally doesn't have great ventilation, does it?

6            MS. ANDERSON:  Objection.  Form.

7            THE WITNESS:  Actually, I don't know --

8    my -- my family had a camera store, a photography

9    business.  And so actually my parents made very sure

10   that the kids had a room with good ventilation.  So

11   I'm not sure we could say that all rooms don't have

12   ventilation.

13           And I know that -- that in high school,

14   when I did photography again, it was a huge room.

15   It was well ventilated.  I didn't feel like I was

16   stifling.  So I don't know how they ventilated it.

17   But I'm not sure that we can make a blanket

18   statement like that.

19   BY MR. BRENZA:

20       Q.    Okay.  But you don't know whether in any

21   of that's true about the rooms that Mr. Peterson

22   used when he was developing film, right?

23       A.    I --

24           MS. ANDERSON:  Objection.  Form.

25           THE WITNESS:  Sorry.

Lauren C. Pinter-Brown, M.D.

```
 1              I don't believe anyone asked him, and I
 2   have not asked him.
 3   BY MR. BRENZA:
 4        Q.   And therefore, you don't know, right?
 5        A.   Correct.
 6        Q.   Have you managed to receive those
 7   documents yet?
 8        A.   Let's see.  Okay.  Once again, I have --
 9   Chang's article.  Let me see if there's more.
10              MS. ANDERSON:  It's a zip file.
11              THE WITNESS:  Right.  No, I've opened it
12   up on an iPad.  Let me see if there's more -- no,
13   it's the same thing.  So when I open it up, at least
14   on my iPad, all I get is that Chang paper.
15              MS. ANDERSON:  Are you receiving it from
16   me?  Did you get -- is the e-mail from me?
17              THE WITNESS:  Yes.  So in my -- when I'm
18   looking at it on this iPad, I know it's limited, all
19   I can see is the one paper in its entirety.  I -- I
20   do have some papers here if you want me to try and
21   pull papers.  I have some.  They're not like right
22   here immediately with me, but I can pull them.  Or I
23   can try and pull them.
24              MR. BRENZA:  Well, the thing I wanted to
25   ask you about is the deposition notice, but I take
```

1    it you haven't seen the deposition notice because --

2         THE WITNESS:  I've seen it in my e-mail.

3         MR. BRENZA:  Okay.  Then let me -- then I

4    just -- let me -- let's -- let's talk about it,

5    then.  Actually, before I go on to the deposition

6    notice.

7         Q.   Have you kept a record of how long you've

8    been working on Mr. Peterson's case?

9         A.   I jot down times I start and stop on

10   things.  But I have not added them up yet, nor have

11   I written up an invoice.  If you're going to ask me

12   how long I've spent?

13        Q.   Yes.

14        MS. ANDERSON:  Dr. Pinter-Brown, wait

15   for -- wait for him to ask a question.  Even though

16   you may know where he's going, please wait for --

17   for Mr. Brenza to pose a question.

18        THE WITNESS:  Right.  Sorry.

19   BY MR. BRENZA:

20        Q.   So how long have you spent?

21        A.   I couldn't tell you.  The answer is, I

22   don't know.  I haven't added it up.

23        Q.   Can you estimate for purposes of today?

24   On the order of 50 hours or less than that or more

25   than that?

Lauren C. Pinter-Brown, M.D.

```
 1        A.   No, I think it's less than that.

 2        Q.   I mean, 25?

 3        A.   I really -- I really don't know.  And I --

 4   I don't like guessing because I could be very

 5   inaccurate.

 6        Q.   Well, it's information that we're entitled

 7   to have so I guess I'd ask your -- your counsel to

 8   send that along when you've produced a final

 9   version.

10             MR. BRENZA:  Is that agreeable?

11             MS. ANDERSON:  That's fine with me.

12             MR. BRENZA:  Okay.

13             MS. ANDERSON:  We're prepared to do that.

14   BY MR. BRENZA:

15        Q.   And your billing rate is $750 an hour; is

16   that right?

17        A.   That's set by UC Irvine.

18        Q.   And the work you've done has been

19   reviewing Mr. Peterson's medical records, his

20   transcript, the other transcript you mentioned, and

21   then writing your report and giving this deposition

22   today?

23        A.   Yes.

24        Q.   Anything else?

25        A.   I -- I think I briefly reviewed some of
```

1    the articles that are germane to this topic.  I -- I

2    did a literature search of something that I found in

3    your expert's report.

4         Q.   Was what?

5         A.   It had to do with a mutation that the

6    patient had -- would have that I did not find on the

7    medical records.  Other than that, I think that just

8    about covers it.

9         Q.   What was the mutation that -- that you

10   found that -- was this Dr. Bellow's (phonetic)

11   report?

12        A.   Yes.

13        Q.   What was the mutation that you -- you saw

14   in her report?

15        A.   A mutation I've never seen before and

16   that's why I looked it up.  It starts with an E.

17        Q.   And what did you find when you looked up

18   for information about this particular mutation?

19        A.   I found that it was a mutation that's

20   associated with solid tumors but not lymphomas,

21   which explains why I've never seen it before.

22        Q.   Okay.

23        A.   I totally focused on lymphoma.

24        Q.   And do you understand that the mutation

25   Dr. Bellow flagged was a mutation in the DNA repair

Lauren C. Pinter-Brown, M.D.

```
1    mechanisms?

2        A.   Yes.  It's a mutation for DNA repair, and

3    it's associated with lung cancer and some other

4    solid tumors.

5        Q.   Anything else that you did besides that

6    review?

7        A.   Other than, as I said, reviewing a few of

8    the articles briefly on this topic.  That was pretty

9    much it.  I -- one other thing I briefly reviewed

10   was one of the plaintiff's expert's reports.  And

11   that came after I wrote this report.

12       Q.   And who is that?

13       A.   Dr. Weisenburger.

14       Q.   Okay.  Do you know Dr. Weisenburger?

15       A.   I do.

16       Q.   How do you know him?

17       A.   He's very well-known in the lymphoma

18   community, and I've been reading his papers my

19   entire career.

20       Q.   Have you ever worked with him?

21       A.   No.

22       Q.   Have you ever socialized with him?

23       A.   I shared a car with him once at a

24   conference.  That's the extent of it.

25       Q.   Okay.  And have you spoken to him?  I
```

Lauren C. Pinter-Brown, M.D.

```
 1    assume if you -- probably spoken to him at
 2    conferences?
 3         A.   No, actually, I really haven't.  The
 4    sharing of the car was a one-off.
 5         Q.   Okay.  One thing I didn't see in your
 6    materials, and maybe I just missed it, but did you
 7    have a list of the times that you've testified in --
 8    in depositions or at trial in the last four or
 9    five years?
10         A.   Yes.  There is a -- it's not a list.  It's
11    a number of depositions that have been taking --
12    taken in the last five years that relate to this
13    litigation.  Of course I've been deposed in my own
14    litigation as well.
15         Q.   When you say "a number," is that something
16    you're referring to in your report or...
17         A.   Yes, there were three other plaintiffs.
18         Q.   Three other cases involving Roundup?
19         A.   Yes.
20         Q.   And in each of those cases, did you do a
21    similar amount of work, you reviewed the medical
22    history and talked to the -- reviewed the
23    transcripts of the treating physicians and the --
24    and the plaintiffs if they were still alive?
25              MS. ANDERSON:  Objection.  Form.
```

Lauren C. Pinter-Brown, M.D.

```
 1            THE WITNESS:  For those cases, I read

 2   whatever literature -- whatever records I was

 3   provided.  In one instance, I was able to speak with

 4   the plaintiff.  And prior to writing those reports,

 5   I -- I spent an extended time reviewing the

 6   literature on this topic.

 7   BY MR. BRENZA:

 8       Q.   And in each of those other cases, you --

 9   you were representing the plaintiff, right, or you

10   were testifying for the plaintiff?

11       A.   Yes.

12       Q.   In each of those cases, did you conclude

13   that Roundup had been the cause of that plaintiff's

14   non-Hodgkin's lymphoma?

15            MS. ANDERSON:  Objection.  Form.

16            THE WITNESS:  No.  I -- I concluded that

17   it was a significant contributory factor.

18   BY MR. BRENZA:

19       Q.   In each of those cases, every one of those

20   cases?

21       A.   Yes.

22       Q.   Significant contributory factor, is that

23   what you said?

24       A.   Yes.

25       Q.   Have you ever been involved in a Roundup
```

Lauren C. Pinter-Brown, M.D.

```
 1    case where you didn't conclude that Roundup was a

 2    significant contributory factor to the plaintiff's

 3    injury?

 4         A.   Yes.

 5         Q.   When was that?

 6              MS. ANDERSON:  It's -- I'm going to -- I'm

 7    going to object -- object here for a moment.

 8              But, Dr. Pinter-Brown, was this a case

 9    where you were disclosed as an expert?

10              THE WITNESS:  Not sure.  Probably -- I'm

11    not sure, but probably not.  They would be cases

12    that someone told me about and I would have said

13    that it was not a contributory factor.

14    BY MR. BRENZA:

15         Q.   So these aren't cases where -- the cases

16    you're referring to now aren't cases where you were

17    working on the case as a paid witness, right?

18         A.   Right.

19              MS. ANDERSON:  Objection.  Form.

20              But you can answer.

21    BY MR. BRENZA:

22         Q.   So let me -- let me rephrase my question.

23              Has there ever been a case when you've

24    been a paid witness where you concluded that Roundup

25    was not a significant contributory factor to the
```

1   plaintiff's injury?

2        A.   No.

3             MS. ANDERSON:  Objection to form.

4   BY MR. BRENZA:

5        Q.   Was your answer no?

6        A.   No.

7             MS. ANDERSON:  And just as a reminder,

8   Dr. Pinter-Brown, I know -- I know it's -- it's the

9   second deposition of the day, but just give me just

10  a moment in order to place any objections on the

11  record I may have.

12            THE WITNESS:  Sorry.

13            MS. ANDERSON:  No worries.

14  BY MR. BRENZA:

15       Q.   So you said you -- there were three other

16  cases involving Roundup and then your -- your

17  discrimination lawsuit where you had testified,

18  right?

19       A.   Where I've been deposed.

20       Q.   Been deposed.

21            Are there any other cases where you've

22  been deposed in the last five years?

23       A.   Not that I can recall.

24       Q.   And in any of those cases have you

25  testified at a trial?

Lauren C. Pinter-Brown, M.D.

1      A.    No.  Well, other than my own.

2      Q.    Has your -- has your case gone to trial

3  or...

4      A.    Yes.

5      Q.    Okay.  Are you waiting a verdict; is

6  that -- or a judgment?

7           MS. ANDERSON:  Is this -- is this relevant

8  to --

9           MR. BRENZA:  Only to understand what we're

10  talking about.  I mean, if you don't want to answer

11  it, I guess I'll -- I don't -- I can move on.

12           MS. ANDERSON:  Well, it's totally

13  irrelevant.

14           MR. BRENZA:  I'm just trying to understand

15  where -- what the status of this prior testimony is.

16           MS. ANDERSON:  Of the -- of her deposition

17  testimony in the Roundup cases?

18           MR. BRENZA:  No, in the -- in the other --

19  in her other lawsuit.

20           MS. ANDERSON:  Why is that relevant?

21  BY MR. BRENZA:

22      Q.    Doctor, when did you begin working on

23  writing your report?

24      A.    Probably a couple of weeks before it was

25  submitted, and I don't remember the date it was

```
 1   submitted.

 2        Q.   In your report, you use a method called

 3   differential etiology; is that right?

 4        A.   I'm not a lawyer.  I -- I don't know what

 5   you call it, but I saw other people's reports --

 6   sorry -- and so that I could see the contents of

 7   what the reports involved and I followed that

 8   content.

 9        Q.   Okay.  So when you're talking about these

10   other reports, are you talking about other expert

11   reports from plaintiffs who have Roundup cases?

12        A.   Yes.

13        Q.   Whose -- whose reports did you model your

14   report on?

15        A.   I think I saw one from Dr. --

16             MS. ANDERSON:  Form.

17             Go ahead.

18             THE WITNESS:  I saw one from Dr. Shustov.

19   BY MR. BRENZA:

20        Q.   Okay.

21        A.   And I can't remember the other physician's

22   name.

23        Q.   And how did you get those reports?

24        A.   From a prior plaintiff's attorney on those

25   other cases.
```

Lauren C. Pinter-Brown, M.D.

1    Q.   And you still have those other reports,

2   right?

3    A.   I'm not sure I do.

4    Q.   You think that between the time -- between

5   the time when you reviewed them for this case and

6   today that you destroyed them?

7         MS. ANDERSON:  Objection.

8   Mischaracterizing her testimony.

9         THE WITNESS:  I didn't review them for the

10  report today.  I reviewed them when I wrote my

11  initial expert's report.  And thereafter I looked at

12  my own reports and mimicked the content and the

13  organization.

14  BY MR. BRENZA:

15   Q.   So it was your very first expert report in

16  the Roundup cases that you reviewed these other

17  experts?

18   A.   Correct.

19   Q.   And then you destroyed their reports after

20  that?

21   A.   The cases are no longer active.

22        MS. ANDERSON:  Objection.  Form.

23        Go ahead.

24  BY MR. BRENZA:

25   Q.   Is that -- is that a yes or a no?

Lauren C. Pinter-Brown, M.D.

```
1        A.    Yes.

2        Q.    Did the reports that you reviewed to, you

3   know, model your report in this case or your prior

4   reports in -- did -- did they use a method called

5   differential etiology?

6        A.    I don't know what the method's called.

7        Q.    Well, you know what -- you know what

8   differential diagnosis is, right?

9        A.    Yes.

10       Q.    That's a -- that's a term that has meaning

11  in the medical community, right?

12       A.    It does.

13       Q.    And that's when you try to figure out

14  what's wrong with somebody by eliminating all the

15  things that are not wrong with them?

16       A.    No, that's not exactly what a differential

17  diagnosis is.

18       Q.    Okay.  Well, you tell me what a

19  differential diagnosis is.

20       A.    A differential diagnosis is you think of

21  all the things that could possibly look like what

22  the person's complaining about and then you plan

23  your -- your study of that person in a way such that

24  you can rule out or rule in possibilities until you

25  arrive at the diagnosis that you think is the most
```

```
 1   reasonable.
 2        Q.   And -- and in the course of ruling out and
 3   ruling in, you have the patient before you, right?
 4             MS. ANDERSON:  Objection.  Form.
 5             THE WITNESS:  No.  You have -- you do your
 6   history and your physical so in that way you have
 7   the patient before you.  But I don't have the
 8   patient before me as I'm thinking about their case
 9   or reviewing their results.  That's done using the
10   information that I've already gleaned from the
11   patient, from doing a history and a physical and
12   looking at their laboratories and their imaging and
13   their biopsies.
14   BY MR. BRENZA:
15        Q.   Isn't it part of the differential
16   diagnosis, an iterative process where you -- you
17   form a hypothesis and then you test it and if it's
18   wrong, you form a new hypothesis about what might be
19   wrong with the patient?
20             MS. ANDERSON:  Objection.  Form.
21             THE WITNESS:  No, that's not how I was
22   taught to do it, and that isn't how I do do it.
23   BY MR. BRENZA:
24        Q.   So you just make one guess and if it's
25   right or wrong, you stay with it?
```

```
 1        A.   No, I make --
 2             MS. ANDERSON:  Objection.  Form.
 3             THE WITNESS:  Sorry.
 4             I make multiple guesses.  What -- if
 5   there's only one guess, there's only one guess.  But
 6   if it's a complex situation and there's multiple
 7   possibilities, I list all the possibilities.  I
 8   design an evaluation to rule in or out certain
 9   things or weigh certain things higher on the list
10   than others because of the data that I have.  And
11   then I go through, when I'm studying the patient,
12   and ascertain what makes the most sense in that --
13   in that case.
14   BY MR. BRENZA:
15        Q.   And in the course of evaluating all of
16   those possibilities for a patient, is it -- is it
17   important that you include all the possibilities
18   that would describe the symptoms of the patient?
19             MS. ANDERSON:  Objection.  Form.
20             THE WITNESS:  Yes.  Sometimes -- sometimes
21   there's some things that -- that would be on your
22   list but they are not very likely because of the way
23   the person is presenting.  They might still be
24   listed but -- but you wouldn't actively pursue them
25   unless your initial, more important, or top
```

Lauren C. Pinter-Brown, M.D.

1    contenders, you know, didn't -- didn't result in an

2    answer.

3           So you would leave them in the list so

4    that maybe you don't forget about them.  But you

5    would say they're so unlikely here that I'm not

6    going to pursue this initially.

7    BY MR. BRENZA:

8        Q.   Is part of a successful application of

9    differential diagnosis evaluating the likelihood of

10   each of the possible diagnoses you're considering?

11       A.   I'm sorry, can you ask me again?

12       Q.   Is part of a successful application of

13   differential diagnosis evaluating the likelihood of

14   each of the possible diagnoses you're considering?

15           MS. ANDERSON:  Objection.  Form.

16           THE WITNESS:  I'm having problems with the

17   word "likelihood."

18   BY MR. BRENZA:

19       Q.   Well, you were the one who was talking

20   about some of them are likely and some of them are

21   not.  That's what I'm just asking you what --

22       A.   Oh.  Well, I know what I --

23       Q.   It's important to know what's -- what's

24   likely and what isn't when you're doing a

25   differential diagnosis?

Lauren C. Pinter Brown, M.D.

1          A.    I guess my problem is I know what I mean

2    by likely, and I wasn't sure what you meant.

3                But if you mean the same thing I mean,

4    likely means it fits the clinical picture and the --

5    and the images.  Not that statistically it's more

6    likely.  If that makes sense.  That it's a more

7    common disease.  So -- does that make sense?

8          Q.    Yes, I think I understand.  You're saying

9    it's more likely based on what you know about the

10   patient?

11         A.    Correct.

12         Q.    And so my question, then -- let me tailor

13   it a little better -- is, is it important in

14   differential diagnosis that you evaluate the

15   likelihoods of particular symptoms and diagnoses for

16   a specific patient in front of you?

17         A.    One more time.

18         Q.    Is it important for differential diagnosis

19   that you evaluate the likelihoods of the different

20   diagnoses for the specific patient in front of you?

21               MS. ANDERSON:  Objection.  Form.

22               THE WITNESS:  Maybe I shouldn't have used

23   the word "likelihood" because it can be taken

24   different ways.

25               But -- but I'll say what I mean by it is

1    the best fit.  So what is the diagnosis that has the

2    best fit with what I know about the person.  That

3    diagnosis will be regarded as being on top and then

4    we will look for things to confirm it -- or I will

5    look for things to confirm it or not confirm it.  If

6    I find something that doesn't confirm it, then I

7    have to move off of that idea and move to another

8    one.

9    BY MR. BRENZA:

10        Q.   Now, in the course of evaluating

11   Mr. Peterson, you were -- you weren't actually

12   trying to diagnose him, right, we already know

13   what -- what he had, right?

14        A.   Well, it's not such a different process

15   when I'm reading somebody's medical records.  I

16   wouldn't take everything that I read, nor do I

17   always take everything that I read, in someone

18   else's medical records as the truth because

19   different people have a different understanding of

20   illnesses, of the patients, the patient may tell

21   them something different.

22             So when I'm reading Mr. Peterson's

23   records, I'm looking at it critically the same way

24   that I would if a patient was sitting in front of me

25   and telling me a story.  I can't ask the patient

 1    more questions, but I can interrogate Mr. Peterson's

 2    records, to the extent that they're provided to me.

 3         If I have a question, I can search through

 4    the record until I find the answer.  And hopefully,

 5    someone who is taking care of him did the test that

 6    I was looking for or not.  So it's not so different

 7    really if I read somebody's records and somebody

 8    said the patient had diffuse large B-cell lymphoma

 9    but I looked at the pathology and I disagreed, I

10    would so state.

11         Q.   Do you have any reason to think that

12    Mr. Peterson did not have non-Hodgkin's lymphoma?

13         A.   No.  I'm just telling you what my process

14    is.

15         Q.   Okay.  So it's your process, but that's

16    not -- in this particular case, you already know

17    what Mr. Peterson had wrong or -- or at least

18    there's records showing you that?

19         MS. ANDERSON:  Object to form.

20         THE WITNESS:  I can tell you that in the

21    case of Mr. Peterson, I evaluated all of his history

22    and tried to find documentation to support all of

23    it.

24         So as an example, we talked about that

25    mutation.  I did not receive any information that

1    told me that that mutation was of importance to

2    Mr. Peterson.  Even in his neurologic condition.

3    And so I really don't know what's wrong with him

4    neurologically and I would -- I would not abide by

5    any of the diagnoses I find in the chart, which are

6    all different, and so I -- I have no idea what --

7    what his neurologic problem is really from reading

8    the -- the record.

9    BY MR. BRENZA:

10        Q.   Doctor, let me -- let me just -- I'm not

11   asking you about his neurological problems.

12        A.   I know, I'm just -- you asked --

13        Q.   This case is about non-Hodgkin's lymphoma,

14   right?

15        A.   Sure.  Sure.

16        Q.   That's what I'm asking you about.

17             MS. ANDERSON:  Respectfully, your question

18   was very broad and not focused on the non-Hodgkin's

19   lymphoma.  I think you asked --

20   BY MR. BRENZA:

21        Q.   Well, my question was, we already -- we

22   already know that he had non-Hodgkin's lymphoma,

23   right, that's -- that's -- you didn't have to look

24   back --

25             MS. ANDERSON:  That wasn't the question,

1    but if you want to pose that question, you may.

2              THE WITNESS:  Yes, that -- that sounded

3    reasonable, and there was documentation to sustain

4    that.

5    BY MR. BRENZA:

6         Q.   So what you're being asked to do in this

7    case is not diagnose Mr. Peterson, but -- but to

8    tell us what caused his non-Hodgkin's lymphoma,

9    right?

10             MS. ANDERSON:  Objection.  Form.

11             THE WITNESS:  One of the things I'm being

12   asked for is to try and understand what might have

13   contributed to him developing non-Hodgkin's

14   lymphoma.

15   BY MR. BRENZA:

16        Q.   And in your medical practice, that's not

17   something you normally do when a patient comes in

18   and presents with a disease, right, you don't -- you

19   don't do an extended analysis to figure out what

20   caused their disease?

21             MS. ANDERSON:  Objection.  Form.

22             THE WITNESS:  I do it every single time I

23   see a patient.

24   BY MR. BRENZA:

25        Q.   You do that?

1      A.    Yes.

2      Q.    You -- have you ever told anybody that

3  their disease was caused by Roundup?

4          MS. ANDERSON:  Objection.  Form.

5          THE WITNESS:  I've never told anyone their

6  disease is caused by anything because I don't agree

7  with the word "cause."

8          However, I have had patients who are

9  farmers and have extensive pesticide exposure.  And

10  I have told them that I'm concerned that that's one

11  of the reasons they got non-Hodgkin's lymphoma.

12  BY MR. BRENZA:

13      Q.    Okay.  And pesticide -- you know, we're --

14  now you're talking about a lot of different

15  pesticides, though, right?  There are pesticides,

16  fertilizers.  Farmers have a lot of chemical

17  exposures, right?

18      A.    I assume they do.  But when -- when I used

19  to -- when I have said that to people, it has not

20  been in the same -- the same situation as this where

21  I am being asked about a specific chemical.  So I

22  have not taken the time that I have with that

23  patient to go through their receipts or every single

24  pesticide that they might have used in their career

25  because it's not germane to my medical practice in

Lauren C. Pinter-Brown, M.D.

1    taking care of them with their illness.

2        Q.   In that context your -- your job is to

3    treat their illness, not to figure out all the

4    things that might have contributed to causing it,

5    right?

6            MS. ANDERSON:  Objection.  Form.

7            THE WITNESS:  No.  My job is to treat

8    their illness and if there's something about them

9    that made them more susceptible to having lymphoma,

10   it can be modified to advise the patient or their

11   other treating physicians to modify that.  And

12   that --

13   BY MR. BRENZA:

14       Q.   Is there any -- I'm sorry.  I'm sorry, if

15   I interrupted you, please continue.

16       A.   That's the reason why -- why a similar

17   activity occurs in the clinic, it's not litigation,

18   but a similar activity occurs so that if there's

19   something that's contributing to someone forming a

20   lymphoma, I advise them to remove it or modify it.

21       Q.   Is there any test that you have to

22   determine whether non-Hodgkin's lymphoma was caused

23   by any particular factor in the environment?

24       A.   As I've mentioned before --

25           MS. ANDERSON:  Objection.  Form.

1        THE WITNESS:  -- if you're going to

2   continue to use the word "cause," I'm going to have

3   to answer you the same way each and every time

4   you -- answer.

5        I think that there are multiple

6   contributing factors in some patients as to why they

7   get lymphoma.  And I would not use the word "cause."

8   If you'd like to rephrase your question so that I

9   can answer the content of the question better, I'm

10  happy to do so.

11  BY MR. BRENZA:

12      Q.   But is there any test that tells you what

13  environmental exposures were substantial

14  contributing factors to producing a particular

15  non-Hodgkin's lymphoma?

16        MS. ANDERSON:  Objection to form.

17        THE WITNESS:  Not that I can do in my

18  clinic.

19  BY MR. BRENZA:

20      Q.   Are -- are there other tests that you --

21  that you're aware of that can answer that question?

22      A.   I suppose if I was an epidemiologist or a

23  toxicologist, there may be some things that I could

24  do with someone's tissue perhaps.  I don't know.

25  I'm not is an epidemiologist, and I'm not a

1    toxicologist.

2        Q.   Okay.  So you're -- you're speculating

3    now?

4        A.   Well, I'm speculating looking at some of

5    the papers in the literature where they've looked at

6    people's hair and nails and things like that trying

7    to understand what exposures they might have had.

8    And so I -- I assume that since those studies do

9    happen, that perhaps there may be somebody with

10   expertise that might want to do that with a group of

11   patients.  Just as it has been done in the past.

12       Q.   So my question is really about you, not

13   about what other people might be able to do.

14            Are you aware of any test that can tell

15   you whether a patient's particular non-Hodgkin's

16   lymphoma had any particular environmental exposure

17   as a substantial contributing factor?

18       A.   You've asked me if I'm aware of any

19   particular test.  But I'm going to answer you, do I

20   do any particular test in clinic, no, I don't.

21       Q.   Okay.  And the tests that you described,

22   they're tests for exposures, but they're not tests

23   for whether those exposures were substantial

24   contributing factors, right?

25            MS. ANDERSON:  Objection.  Form.

Lauren C. Pinter-Brown, M.D.

```
1              THE WITNESS:  You're out of my area of
2    expertise.
3    BY MR. BRENZA:
4         Q.   Okay.  In -- in doing a differential
5    etiology, so trying to figure out what may have
6    contributed to Mr. Peterson's non-Hodgkin's
7    lymphoma, did you have to consider every exposure
8    that he may have had over the course of his life
9    that could have been a substantial contributing
10   factor to his non-Hodgkin's lymphoma?
11             MS. ANDERSON:  Objection.  Form.
12             THE WITNESS:  I think we're all exposed to
13   carcinogens every day all of our lives.  And I don't
14   know what they are.  I couldn't tell you what mine
15   are.
16             But to the extent of my ability, looking
17   at his records, I did consider everything that I
18   could see in his records that seemed like a
19   significant exposure.
20   BY MR. BRENZA:
21        Q.   Would you agree that just looking at his
22   records is no guarantee that you've become aware of
23   every meaningful exposure he's had over the course
24   of his life?
25        A.   I don't know what else you'd look at.  But
```

Lauren C. Pinter-Brown, M.D.

1    that's the only data there is.

2        Q.   Well, that's all the data you have, right?

3        A.   Yes, unless -- unless we're -- we're

4    implanted with something over our lives that

5    registers what we're exposed to.

6        Q.   Well --

7        A.   There's no --

8        Q.   Did you -- did -- just out of curiosity,

9    did you talk to Mr. Peterson?

10       A.   No.

11       Q.   Is there a reason why you didn't talk to

12   him?

13       A.   It wasn't offered.

14       Q.   Is your view that non-Hodgkin's lymphoma

15   is a multifactorial cancer?

16            MS. ANDERSON:  Objection.  Form.

17            THE WITNESS:  What does "multifactorial

18   cancer" mean?

19   BY MR. BRENZA:

20       Q.   Is it your view that non-Hodgkin's

21   lymphoma is the product of a number of different

22   environmental factors working together?

23       A.   I'm still not sure I understand, but --

24            MS. ANDERSON:  Dr. Pinter-Brown, if you

25   don't understand, ask him to rephrase the question.

Lauren C. Pinter-Brown, M.D.

```
1              THE WITNESS:  Okay.
2              Rephrase the question, please.
3    BY MR. BRENZA:
4         Q.   Are you aware of a theory of cancer
5    that -- that suggests that cancer is a result of the
6    accumulation of mutations that occur over the course
7    of a lifetime?
8              MS. ANDERSON:  Objection.  Form.
9              (Whereupon, a telephonic interruption.)
10             THE WITNESS:  Sorry.
11             Yes.
12   BY MR. BRENZA:
13        Q.   Is that a view of cancer that you
14   subscribe to yourself?
15        A.   Well, I think in some cancers we don't
16   know what the mutations are.  It's a general
17   hypothesis.
18        Q.   Well, but it's a -- it's -- it's an
19   accumulation of more than one mutation over more
20   than one period of time --
21             MS. ANDERSON:  Objection.  Form.
22   BY MR. BRENZA:
23        Q.   -- that leads to cancer?
24        A.   Sometimes.
25        Q.   Well, most of the time, right?  I mean,
```

Lauren C. Pinter-Brown, M.D.

```
 1    it's a theory of what -- how cancer works, not just

 2    sometimes.

 3         A.   Well, there's some cancers where there's a

 4    definitive mutation and that's what causes the

 5    cancer.  That's not true for all cancers, but it's

 6    true for some.  And then on the other side of things

 7    there's cancers where we don't know what the

 8    mutation is.

 9              So I view it as a hypothesis.  How can you

10    tell me that it's true if we don't know what the

11    mutation is?

12         Q.   Well, isn't it true that there are some --

13    there are some necessary mutations but there have to

14    be other mutations as well?

15              MS. ANDERSON:  Objection.  Form.

16              THE WITNESS:  That's a hypothesis.  But

17    for -- for most cancers we don't know what the

18    necessary mutation is.  That's an area of research.

19    BY MR. BRENZA:

20         Q.   And with respect to non-Hodgkin's

21    lymphoma, would you agree that it's the result of

22    multiple factors over the course of a lifetime, not

23    just one single thing?

24         A.   I don't know the answer to that because

25    there's different mutations for -- for different
```

1    kinds of non-Hodgkin's lymphomas.  And sometimes we

2    don't know the mutation.  And in no case that I can

3    think of do we know what the mutation is; that is, a

4    single mutation that caused the cancer.

5         Q.   But you -- you were the one who was

6    refusing to say -- use the word "causation" and you

7    wanted to talk about substantial contributing

8    factors.  I took from that that you -- it was your

9    understanding that there was more than one thing

10   that caused -- together, had to work together to

11   form non-Hodgkin's lymphoma.

12            Did I get that wrong or -- or is that

13   right?

14            MS. ANDERSON:  Objection.  Form.

15            THE WITNESS:  I -- I think that in many

16   cases we never know why it happens.  In some cases,

17   we can identify several things that might have

18   contributed to the person developing lymphoma.

19   BY MR. BRENZA:

20        Q.   Are you done?

21        A.   Yes.

22        Q.   Is one of the things that -- the emerging

23   understanding of cancer is embracing that random

24   mutation is a significant source of mutations for --

25   that lead to cancer?

```
 1        A.   Can you rephrase the question or -- or
 2   state it again?
 3        Q.   Let me -- let me back up and then maybe
 4   it'll -- I can break it down.
 5             Are you familiar with random mutation?
 6        A.   Yes.
 7        Q.   Is random mutation mutation that occurs in
 8   the body just through the normal processes of the
 9   body operating?
10        A.   Yes.
11        Q.   And B-cells, which are central to certain
12   types of non-Hodgkin's lymphoma, they undergo random
13   mutation, right?
14        A.   They can undergo random mutation.
15        Q.   They undergo -- I don't know if you'd call
16   it random, but they undergo a mutation all the time,
17   right, that's almost their job description?
18        A.   Oh, that's a -- that's a separate --
19   that's a separate kind of mutation.  So you're
20   talking about chromosomal mutations or are you
21   talking about the ability of a cell to -- to
22   recognize a certain antigen?
23        Q.   Well, the -- the way B-cells recognize
24   antigens is by shuffling up part of their genome
25   every time they divide, right?
```

Lauren C. Pinter-Brown, M.D.

1       A.   I'm not sure if that's really how it

2   happens.  And I'm -- I -- I don't think I have

3   enough immunology background to state exactly how a

4   B-cell learns to approach a certain antigen.

5            But when you're talking about random

6   mutations the common inference would be cytogenic

7   mutations; that is, abnormalities in the chromosomes

8   that do not necessarily serve the cell.  That's

9   really different than mutations or a differentiation

10  process that a B-cell might undergo to enable it to

11  hit a certain antigen.

12       Q.   Yeah, I understand that.

13            But what I was going to go to next is that

14  in the course of shuffling up its genome to do this

15  adaptive mutation it's more prone to maladaptive

16  mutation.

17       A.   Is there a question?

18            MS. ANDERSON:  Objection.  Form.

19  BY MR. BRENZA:

20       Q.   Is that right?

21       A.   In the process of cell division, there is

22  an opportunity for mutation of the genome.  That's

23  any cell.

24       Q.   But B-cells have an extra mission

25  statement that involves shuffling part of their

1    genome to a greater extent, right?

2              MS. ANDERSON:  Objection.  Form.

3              THE WITNESS:  I -- I think that -- that

4    this is a very complicated area and -- and the way

5    you're stating it, I can't answer the question.  I

6    think that B-cells -- I don't know how you would

7    know that B-cells are more likely to mutate than a

8    breast cell.  That's why we have breast cancer.

9    BY MR. BRENZA:

10        Q.   Well --

11        A.   That's why lymphoma isn't the most common

12   cancer.  So I -- I -- I don't think that either of

13   us probably have the knowledge to have an educated

14   conversation in this way.

15        Q.   Would you agree at least that B-cells are

16   susceptible to the same kinds of random mutation

17   that can lead to cancer as other cells in the body?

18        A.   Yes.

19             MS. ANDERSON:  Objection.  Form.

20             THE WITNESS:  Yes.  Sorry.

21   BY MR. BRENZA:

22        Q.   Go ahead and answer.

23        A.   Yes, was the answer.

24        Q.   And those random mutations, they could be

25   caused just by having to -- having to reproduce the

Lauren C. Pinter-Brown, M.D.

1  cell, right?

2      A.   Yes.

3      Q.   They can be caused by things in the

4  environment that -- that you -- maybe you eat or --

5  or breathe?

6           MS. ANDERSON:  Objection.  Form.  Is there

7  a question?

8           MR. BRENZA:  It's a -- it's a "isn't that

9  right?"  I mean, if you want me to add that every

10  time, I will.  But it doesn't seem necessary.

11          THE WITNESS:  They can be caused by

12  carcinogens that are in the environment.

13  BY MR. BRENZA:

14      Q.   And in the case of non-Hodgkin's lymphoma

15  they can be caused by radiation, right?

16      A.   Yes.

17      Q.   Chemicals?

18      A.   Yes.

19      Q.   Industrial toxins?

20      A.   I don't know what an industrial toxin is.

21      Q.   Chemical -- chemicals that you encounter

22  in the workplace.

23      A.   I've never done a study of chemicals in

24  the workplace.  I know that OSHA puts up signs that

25  says there's carcinogens in some workplaces.

1          To me, that's kind of an overbroad

2    statement.  I'm not sure I want to answer yes or no.

3          Q.   Okay.  Based on your patients, you're

4    not -- you don't think that your patients have

5    gotten non-Hodgkin's lymphoma because of exposures

6    in the workplace?

7          A.   I don't know the answer to that, for the

8    most part.

9          Q.   One of the factors that is a risk factor

10   for non-Hodgkin's lymphoma is increasing age, right?

11         A.   Yes.

12         Q.   And the reason -- the reason that's

13   understood is that the immune system becomes

14   somewhat less effective as you age, right?

15         A.   That's the hypothesis.

16         Q.   And when cancer occurs, the immune system

17   can't knock it down like it would if you were a

18   younger person?

19         A.   That's the hypothesis.

20         Q.   Is it that a hypothesis that you give

21   credibility to?

22         A.   It makes sense.  Has it ever been proven,

23   no.

24         Q.   And what's your -- what's your view on --

25   on the reason cancer becomes more common as people

Lauren C. Pinter-Brown, M.D.

1    age, if it's not that?

2        A.    Well, you could also say that as people

3    age they are more -- exposed to more carcinogens.

4        Q.    Yeah.

5        A.    There's lots of --

6        Q.    Is that what you think is the cause of

7    cancer when people age?

8             MS. ANDERSON:  Objection.  Form.

9             THE WITNESS:  As I told you before, if you

10   use the word "cause," I'm not going to be able to

11   answer the question.  Number one.

12            And number two, I think there's multiple

13   reasons that predispose people to cancers.  And if

14   you tell me that -- which is the truth, that as

15   people age there's more lymphomas, I can think of

16   more than one reason why that might be the case.

17            One of them might be that their immune

18   system is not so strong.  Another might be that

19   they've had 80 or 90 years of exposure to the world.

20   BY MR. BRENZA:

21       Q.    Anything else?

22       A.    Oh, I don't know.  If I keep thinking

23   about it, I'll -- I'll probably think of more

24   things.

25       Q.    Well, isn't this a question that you've

1    ever had to answer for yourself as -- as a doctor

2    who practices in non-Hodgkin's lymphoma every day?

3         A.   No, because I -- my research doesn't

4    relate to why age causes increased non-Hodgkin's

5    lymphomas.  I can think about it, but I haven't

6    thought about it in the depth that maybe you're

7    asking because this is not my area of research.

8         Q.   Mr. Peterson was 73 when he was diagnosed,

9    right?

10        A.   I'm going to look at my report, but we'll

11   tentatively say yes.  Hang on.

12             Yes.

13        Q.   That's the -- that's the age range when

14   people are most likely to have non-Hodgkin's

15   lymphoma, right?

16        A.   Well, as we said before, there's lots of

17   non-Hodgkin's lymphomas.  Some of them are more

18   common in 20-year-olds.

19        Q.   Mr. Peterson's non-Hodgkin's lymphoma is

20   not more common in 20-year-olds, is it?

21        A.   No.

22        Q.   Mr. Peterson's non-Hodgkin's lymphoma was

23   the kind of lymphoma that people get when they're in

24   their 70s, right?

25        A.   In their 60s.  It starts in their 60s.

1      Q.   But it accelerates in their 70s?

2      A.   I don't know if it --

3           MS. ANDERSON:  Objection.  Form.

4           THE WITNESS:  I don't know if it

5   accelerates.  I believe the median age of somebody

6   with diffuse large B-cell lymphoma is somewhere in

7   the 60s.

8   BY MR. BRENZA:

9      Q.   Okay.  And -- and median age is only one

10  measure, right?  If you're looking at rate, it

11  continues to increase as someone gets into their

12  70s, right?

13     A.   The rate of non-Hodgkin's lymphomas does.

14     Q.   Yes.  Including DLBCL, right?

15     A.   That is a non-Hodgkin's lymphoma.

16     Q.   Another risk factor for non-Hodgkin's

17  lymphoma is being male, right?

18          MS. ANDERSON:  Objection.  Form.

19          THE WITNESS:  Again, though, I guess in

20  general, males are more commonly people that have

21  non-Hodgkin's lymphomas.  There's some non-Hodgkin's

22  lymphomas where there's no gender difference.  And

23  there's some non-Hodgkin's lymphomas where there's

24  more females.

25

Lauren C. Pinter-Brown, M.D.

```
 1   BY MR. BRENZA:
 2        Q.   So let's talk about DLBCL since that's
 3   what Mr. Peterson had.  That's one where being male
 4   is -- puts you at an increased risk, right?
 5             MS. ANDERSON:  Objection.  Form.
 6             THE WITNESS:  Marginally -- sorry.
 7             Marginally.
 8   BY MR. BRENZA:
 9        Q.   Okay.  And then another risk factor he had
10   was being white, right?
11        A.   Well, I'm not sure I agree with you.
12        Q.   Why -- why do you say that?
13        A.   Because when you look at statistics for
14   non-Hodgkin's lymphomas, unfortunately minorities
15   are underrepresented.  They're underrepresented in
16   clinical trials, and they're underrepresented in
17   SEER databases.  So, yeah, the majority of people
18   are Caucasian or at least were Caucasian in this
19   country.
20             I'm not sure I would put a tremendous
21   amount of emphasis on some of these things.
22        Q.   Okay.  You don't think it had anything to
23   do with why Mr. Peterson got non-Hodgkin's lymphoma?
24             MS. ANDERSON:  Objection.  Form.
25             THE WITNESS:  I'm -- I don't think that's
```

1    a very important factor.

2    BY MR. BRENZA:

3        Q.    Is it a factor that you gave any

4    importance to at all?

5        A.    Me personally, no.

6        Q.    Is another factor that increases your risk

7    of getting the kind of NHL that Mr. Peterson had

8    having a large body mass index?

9        A.    No.

10       Q.    Did you consider that Mr. Peterson was, at

11   least in some of his records, obese?

12       A.    No.

13       Q.    It wasn't important to your diagnosis?

14       A.    No, unfortunately --

15       Q.    Or your etiology?

16       A.    -- most of our population is obese.

17       Q.    Over the last, let's say two decades, so

18   2000 to the present, what's happened to the overall

19   rate of non-Hodgkin's lymphoma in the United States?

20       A.    2000 to the present, is probably starting

21   to level off.  But prior to that, it went up a great

22   deal, particularly in the '70s and the '80s, but

23   that increase of incidence started even before that

24   time.

25       Q.    So in the '60s and '70s and the '80s the

1    rate of NHL increased in the United States?

2        A.   It did.

3        Q.   And then in the '90s, 2000s, and 2010s,

4    it -- it's remained basically level?

5        A.   It's starting to level off.

6        Q.   And when you say "starting to level off,"

7    it's -- it's leveled off, it's not going up anymore,

8    is it?

9        A.   I haven't seen the most recent charts, to

10   be honest.

11       Q.   It's -- there's -- there's -- if you had

12   the set of documents I sent, one of them was that

13   chart.

14       A.   Too bad.  Well, you -- you can describe to

15   me what the chart is.

16       Q.   Well, I don't want -- I don't want to tell

17   you what the answer is.  I want you to tell me the

18   answer.

19       A.   Okay.  Sorry.

20       Q.   Do you know whether the pattern you've

21   described to me in the United States is -- fits the

22   world, overall?

23            MS. ANDERSON:  Objection.  Form.

24            THE WITNESS:  I -- I have heard that it

25   fits industrial countries.  I have not heard that it

Lauren C. Pinter Brown, M.D.

```
 1   fits necessarily all third world countries.

 2   BY MR. BRENZA:

 3       Q.   In your opinion, what are the predominant

 4   factors that substantially cause non-Hodgkin's

 5   lymphoma?

 6           MS. ANDERSON:  Objection.  Form.

 7           THE WITNESS:  I'm not going to answer a

 8   question where you ask me the cause of non-Hodgkin's

 9   lymphoma because there isn't a cause.

10   BY MR. BRENZA:

11       Q.   I tried to use substantially there, but

12   let me -- let me try to use the -- you wanted to say

13   contributing factor.

14           So what are the -- let me start the

15   question again.

16           What are the factors that are the

17   predominant contributing factors to non-Hodgkin's

18   lymphoma?

19       A.   Well, there's a list, and it's the list

20   that I have in my report.  So if you want to go

21   through it.

22           There's some infectious agents.  There's

23   some -- some immune alterations, be they autoimmune,

24   acquired, or iatrogenic immune deficiencies.  There

25   are some genetic conditions.  They're exposures to
```

Lauren C. Pinter-Brown, M.D.

1    chemicals, to radiation, as you mentioned.  I think
2    that's the -- those are the main.  I maybe left
3    something out.  I'll look at my own report.
4            But those are the main things that you
5    look at when you're meeting a patient and trying to
6    try and figure out why are they sitting before you
7    and is there something you can do so that they don't
8    sit before you repeatedly.
9        Q.   Do you -- do you have an opinion about
10   what percentage of non-Hodgkin's lymphoma has as one
11   of its substantial contributing factors Roundup?
12       A.   No, because I haven't been asking the
13   question of people, do they get exposed to Roundup.
14       Q.   Are you aware of any science done by
15   anyone in the medical community that could tell you
16   what percentage of all non-Hodgkin's lymphomas has
17   as one of its substantial contributing factors
18   Roundup?
19       A.   No, it would be so difficult because you
20   would have to have time and really a research
21   project devoted to asking people what their
22   exposures were in clinic.
23           And, A, there's no time in clinic to do
24   that on a regular basis.  And, B, as I told you, my
25   focus, when I'm looking at contributing factors, is

1    what can I fix.  So if somebody tells me there's --

2    they're a farmer in the field all day, I might

3    advise them, and I have advised people, perhaps they

4    need to be very careful in doing their job.

5          But a lot of the focus is on things that

6    are very easily altered.  For instance, if somebody

7    has Hepatitis B, I'm going to get it treated.

8    That's easy.  So asking everybody all the different

9    things that they might have been exposed to is not

10   germane in a clinical practice.

11         And as I've mentioned to you, that's not

12   my area of research.

13      Q.   So Hepatitis B is one of the viruses that

14   can cause non-Hodgkin's lymphoma, right?

15         MS. ANDERSON:  Objection.  Form.

16   BY MR. BRENZA:

17      Q.   Or can be a substantial contributing

18   factor of non-Hodgkin's lymphoma?

19      A.   Thank you.

20         It could be a substantial contributing

21   factor.

22      Q.   Hepatitis B?

23      A.   Yes.

24      Q.   And that's true for Hepatitis C?

25      A.   Yes.

Lauren C. Pinter-Brown, M.D.

1    Q.   Right?

2         Epstein-Barr virus?

3    A.   No.  Epstein-Barr virus is a little

4    different.  It's not clear -- it's involved in some

5    tumors.  It's not totally clear what its role is in

6    the tumor, although there are some hypotheses in

7    certain kinds of lymphomas.

8    Q.   In your report, you mention industrial

9    agricultural and household exposures.  That's pretty

10   broad, like can you -- can you shed a little more

11   light on what you're talking about with that?

12        MS. ANDERSON:  Where in the report?

13   BY MR. BRENZA:

14   Q.   So I think, Doctor, you tell me, but I'm

15   looking at Section 6 of your report, paragraph 2.

16        And you say, "The cause of DLBCL is

17   unknown in most patients.  However" -- and then you

18   go on to list a number of factors.

19        Do you see that?

20   A.   Yes.

21   Q.   Is this -- is this the part of your report

22   where you describe the other things that can be

23   substantial contributing factors to DLBCL?

24   A.   It's not the best part of the report.

25   They're -- they're kind of listed in table form.

```
 1    The -- the better part would be analysis -- the next
 2    section, where it says, "Analysis of patient's
 3    risk," where each thing is not all lumped together,
 4    like in the sentence that you pointed out, but looks
 5    at things a tad bit more granularly.
 6        Q.   Well, it looks like Mr. -- what you think
 7    you know about Mr. Peterson, but it doesn't discuss
 8    a lot of things like household or agricultural or
 9    industrial exposures.
10            MS. ANDERSON:  Objection.  Form.
11    BY MR. BRENZA:
12        Q.   Right?
13        A.   Well, again, I'm limited to what I
14    received as information, and I did consider all the
15    exposures that I read about.  But I really don't
16    know what's in his house.  I don't know if he dyes
17    his hair.  I mean, there's lots of different
18    exposures that people have that have been linked to
19    non-Hodgkin's lymphomas, and I did not see an
20    extensive list where anybody chose to ask this
21    particular plaintiff about every single possible
22    exposure that people have mentioned in the medical
23    literature.
24        Q.   Mr. Peterson was treated with something
25    called R-CHOP, right?
```

Lauren C. Pinter-Brown, M.D.

1     A.   Yes.

2     Q.   Do you know -- you know what that -- that

3   is, right?

4     A.   Yes.

5     Q.   It's -- it's sort of the most common thing

6   that people get treated with when they have

7   non-Hodgkin's lymphoma, right?

8     A.   No.

9     Q.   No?

10    A.   They --

11    Q.   Well --

12    A.   It's a common regimen for diffuse large

13  B-cell lymphoma.

14    Q.   Okay.  For that -- for the kind of NHL

15  that Mr. Peterson had?

16    A.   It's a common regimen.

17    Q.   And with respect to Mr. Peterson, the

18  R-CHOP -- well, let me -- the R-CHOP ultimately

19  cured him, right?

20    A.   Well, his diagnosis was 2017.  We usually

21  consider people cured when they're five years out

22  from their diagnosis.  We're not quite there yet.

23  And there are still some people who have late

24  relapses, though they are not common.

25    Q.   You'd agree, though, that his prospects

 1    are looking pretty good at this point?

 2              MS. ANDERSON:  Objection.  Form.

 3              THE WITNESS:  I know that he's still in

 4    complete remission and the longer he stays that way,

 5    the more of a chance that it won't return.

 6    BY MR. BRENZA:

 7        Q.   Do -- do you have an opinion about what

 8    exactly Roundup does or doesn't do that might cause

 9    it to contribute to non-Hodgkin's lymphoma?

10              MS. ANDERSON:  Objection.  Form.

11              THE WITNESS:  Well, there were some papers

12    related to people and some related to cells that

13    shows that it -- that it causes genetic damage.  And

14    that might be one of the ways that it might engender

15    non-Hodgkin's lymphomas.

16    BY MR. BRENZA:

17        Q.   Is that your opinion in this case?

18              MS. ANDERSON:  Objection.  Form.

19              THE WITNESS:  My opinion about what?

20    BY MR. BRENZA:

21        Q.   About how Roundup may be a substantial

22    contributing factor to non-Hodgkin's lymphoma.

23        A.   I think that is a hypothesis of -- of why

24    it might do that.

25        Q.   Is it a hypothesis that you're standing

1    behind in this case?

2              MS. ANDERSON:  Objection.  Form.

3              THE WITNESS:  I don't know what "stand

4    behind" -- I'm not -- I'm not a -- an expert witness

5    in terms of the toxicology here.  But I -- but the

6    papers I read make sense to me that it might

7    engender instability in cells and cause cancer.

8    BY MR. BRENZA:

9        Q.   Is there any other way -- go ahead.

10       A.   I'm not an expert in toxicology.

11       Q.   Is there any other way that you're -- that

12   you believe Roundup may act as a substantial

13   contributing factor to non-Hodgkin's lymphoma than

14   what you just described?

15       A.   I saw some papers where it described

16   Roundup as a -- or -- I can't remember if it was

17   Roundup or -- or glyphosate, as an immunosuppressive

18   compound.  And I've seen a lot of different

19   hypotheses.  But, again, I'm not a toxicologist.

20   This is not my area of expertise.  And I leave that

21   to the people whose area it is.

22       Q.   Okay.  So you're not going to be --

23             MS. ANDERSON:  Objection.  Form.

24             THE WITNESS:  I'm not going to do that.

25

1  BY MR. BRENZA:

2      Q.   You're not going to be testifying about

3  how Roundup may or may not have caused

4  Mr. Peterson's non-Hodgkin's lymphoma?

5           MS. ANDERSON:  Objection to form.

6           THE WITNESS:  That's correct.

7  BY MR. BRENZA:

8      Q.   When Mr. -- what were the symptoms that

9  Mr. Peterson first presented with when he was

10  diagnosed with non-Hodgkin's lymphoma?

11      A.   Well, what I read in the record was weight

12  loss, fatigue, and abdominal distension.

13      Q.   Is an abdominal distension a common

14  symptom of non-Hodgkin's lymphoma?

15      A.   It can be in certain patients.  It can be

16  something that's seen.

17      Q.   In your experience, is it common?

18      A.   Please define "common" for me.

19      Q.   Happening -- it happens to a substantial

20  number of people who have non-Hodgkin's lymphoma?

21      A.   When a patient has a big abdominal mass

22  and they're fairly thin people, they will present

23  with abdominal distension.  If their non-Hodgkin's

24  lymphoma isn't in their abdomen, they won't present

25  with abdominal distention.  Or if they're very big,

Lauren C. Pinter-Brown, M.D.

1    fat people they may not notice that they have

2    abdominal distension.

3        Q.   And -- and Mr. Peterson's NHL was in his

4    abdomen, right?

5        A.   Yes.

6        Q.   And when you say "distension," is that --

7    that's a -- that's a -- that means that the -- that

8    the belly is sticking out, right?

9        A.   Correct.

10       Q.   Just to put it in simpler word?

11       A.   Correct.

12       Q.   So I can make sure I understand.

13            When Mr. Peterson was diagnosed, did he

14   have a fully developed case of non-Hodgkin's

15   lymphoma?

16            MS. ANDERSON:  Objection.  Form.

17            THE WITNESS:  Please ask the question in a

18   different way.  I don't understand it.

19   BY MR. BRENZA:

20       Q.   Well, are there stages that people are

21   given to describe how far along their non-Hodgkin's

22   lymphoma is?

23       A.   We do stage patients with non-Hodgkin's

24   lymphoma.

25       Q.   When -- when Mr. Peterson was diagnosed

1  with NHL, he was a Stage IV, right?

2      A.   Correct.

3      Q.   That's -- that's the farthest advanced

4  stage there is, right, that's as far -- that's --

5  that's an advanced case of cancer at that point?

6      A.   It's -- it's a cancer that involves things

7  that aren't lymph nodes.

8      Q.   And that happens when -- and I'm not

9  trying to play games here.  I'm just trying to get a

10  sense of what -- you know what Stage IV cancer

11  means, like what -- what -- what does it mean when

12  somebody gets that stage?

13      A.   It's really different, and I'm glad you

14  asked the question.

15           So you're thinking about it like Stage IV

16  breast cancer.  Solid tumors and blood tumors are

17  really different in terms of what does it mean.

18  What it means when somebody has breast cancer is the

19  cell's completely gone out of its milieu and it's in

20  some other organ and it's really bad.

21           Lymphomas are blood cells they can go

22  anywhere they want.  So there are some non-Hodgkin's

23  lymphoma where most people present with Stage IV and

24  it doesn't make any difference.  So, yes, we have

25  staging for non-Hodgkin's lymphomas.  Stage IV is

Lauren C. Pinter-Brown, M.D.

1    the highest stage.  It means something's not in a

2    lymph node.  And it has a different prognosis than

3    Stage I and a slightly different treatment.

4            MS. ANDERSON:  Lin, can we take a break?

5    If you have a few more questions, by all means, but

6    we've been on the record for about an hour and 15

7    minutes, so...

8            MR. BRENZA:  Okay.  Let me go a little

9    longer.  Yeah, we'll stop in a few more.

10       Q.   When Mr. Peterson was diagnosed, his

11   medical record described his condition as having

12   extensive lymphadenopathy, right?

13       A.   There is probably a radiographic report

14   that used those words.

15       Q.   And -- and that lymphadenopathy means

16   what?

17       A.   Big lymph nodes.

18       Q.   So swollen, big lymph nodes?

19       A.   Yes.

20       Q.   Is that a sign of non-Hodgkin's lymphoma?

21       A.   It can be.

22       Q.   Is that one of the ways that non-Hodgkin's

23   lymphoma is diagnosed, is to look for

24   lymphadenopathy?

25       A.   It can be.

1    Q.   Is that a way that you have tried to

2  diagnose non-Hodgkin's lymphoma?

3    A.   When it involves lymph nodes.  My patients

4  with skin don't have lymph nodes.  They have a rash.

5    Q.   But let's talk about DLBCL, okay, since

6  that's what the case --

7    A.   Same thing for DLBCL.  It's not always in

8  lymph nodes.  So certainly, if there was a big lymph

9  node, a consideration would be non-Hodgkin's or

10  Hodgkin's lymphoma.

11    Q.   And this extensive lymphadenopathy, is

12  that -- does that mean there's more than one lymph

13  node involved?

14    A.   I assume so.  That term is used in a lot

15  of different ways by a lot of different people.  But

16  I assume it means that there's different lymph node

17  groups involved.

18    Q.   Well, and you -- you know that

19  Mr. Peterson had more than one lymph node involved

20  when he was first diagnosed, right?

21    A.   Yes.

22    Q.   That tells you that he had non-Hodgkin's

23  lymphoma for a while, right, that it had progressed?

24         MS. ANDERSON:  Objection.  Form.

25         THE WITNESS:  Maybe you can ask me the

1    question and explain the word "a while."

2    BY MR. BRENZA:

3        Q.   You tell me.  I mean, how long does it

4    take for somebody to -- to develop extensive

5    lymphadenopathy?

6        A.   If they have diffuse large B-cell

7    lymphoma?

8        Q.   Yes.

9        A.   Maybe a couple of months.

10       Q.   Okay.

11       A.   Maybe in weeks.

12       Q.   Did you see that Mr. Peterson had a FISH

13   analysis?

14       A.   Yes.

15       Q.   Was there anything about the FISH analysis

16   that you took to be significant for concluding

17   whether Roundup had anything to do with his

18   non-Hodgkin's lymphoma?

19       A.   No.  The FISH analysis is performed for a

20   different reason.

21       Q.   Okay.

22           MR. BRENZA:  Let's -- we can stop for a

23   minute there.  Jennie, how long do you want to go

24   off for?

25           MS. ANDERSON:  We'll just take a -- is --

Lauren C. Pinter-Brown, M.D.

1    Dr. Pinter-Brown, a ten-minute break?

2              THE WITNESS:  Fine.

3              MS. ANDERSON:  Does that sound good?

4              MR. BRENZA:  Okay.  So we'll be back --

5    and when we go off the record I'd appreciate it if

6    the videographer just give us a time, time on the

7    record, after we're off.

8              THE VIDEOGRAPHER:  We are now going off

9    the record.  And the time is 3:19 p.m.

10             (Whereupon, a brief recess was taken.)

11             THE VIDEOGRAPHER:  We are now going back

12   on the record.  And the time is 3:32 p.m.

13   BY MR. BRENZA:

14        Q.   Doctor, in your report you say that DLBCL

15   is the most common lymphoma in adults; is that

16   correct?

17        A.   As I said before, it is almost equal with

18   follicular lymphoma.  Each one's about a third.

19        Q.   Is -- is the reason you said that DLBCL

20   was the most common is that it's slightly more than

21   follicular lymphoma?

22        A.   I don't know.  I'm not sure why I wrote

23   that in that particular report.  They're -- they're

24   quite -- they're almost even.  Maybe it's off by a

25   percent or so.

Lauren C. Pinter-Brown, M.D.

1        Q.   We sent you a -- a notice of deposition

2   for today.  I'm not sure if you've had a chance to

3   see it.  It should be in the materials that

4   hopefully somebody has succeeded in sending to you,

5   but if -- if you don't have it, I'm -- I propose to

6   just read to you portions I want to ask you about.

7   Particularly a list of documents that we're looking

8   for.

9        Okay.  So the first one is documents

10  relating to your -- your billing.  So I think we've

11  asked for those previously and -- and would you just

12  provide those to your counsel and I'm sure they'll

13  send them out to us when -- when you do that?

14       A.   Of course.

15       Q.   Do you know when -- do you have a plan for

16  when you are going to bill for this case?

17       A.   Probably by the end of the week when I

18  have some time again.

19       Q.   Okay.  There's also a request here for

20  your records for billings you've done with other

21  Roundup-related cases.  I'm not sure if you provided

22  those to your counsel or not, but I'd ask that you

23  do that as well.

24       A.   Okay.

25       Q.   Okay.  The next item is all documents that

1    you considered in support of your opinions.  And I

2    think that's on your materials considered list.

3           Does that list, to your knowledge,

4    completely exhaust all the materials that you saw in

5    connection with this lawsuit?

6        A.   I believe so.

7        Q.   Is the curriculum vitae that we were

8    provided up to date and accurate?

9        A.   I'm not sure which date you have.  It's --

10   it's an ever-changing document, but I'm sure it's

11   pretty accurate.  There may have been a paper

12   published recently that's not on there or some talks

13   I've given that aren't on there.

14       Q.   So it's -- the one that we have is -- says

15   last updated November 6, 2015.

16       A.   No, that's a typo.  That -- that, for

17   sure, is a typo.  Somebody -- we're not able to get

18   it off of there.

19           I think I probably gave you the June.  You

20   probably have the June document.

21       Q.   June of what year?

22       A.   Of last year.  Because we have to --

23       Q.   Of '20?

24       A.   We update them every June.

25       Q.   2020?

Lauren C. Pinter-Brown, M.D.

```
 1        A.   Yeah.  So there will be a few more invited
 2    talks and a few more papers.  But otherwise, I mean,
 3    the bulk of my career hasn't changed.  That would be
 4    the only difference.
 5        Q.   Okay.  Well, then I'd just ask that you
 6    also provide an updated copy that -- to your
 7    counsel, that they also forward that to us so we
 8    have an accurate and -- and up-to-date CV for you,
 9    okay?
10        A.   Yes, but it will only be accurate the
11    moment you get it because papers are coming out all
12    the time.
13        Q.   I understand.  But the one we have now
14    looks like it's five years out of date, so...
15        A.   Oh, no, it is not.  For sure, it is not.
16    That's unfortunately something that can't be removed
17    from my CV, and my CV's too long to retype it.
18        Q.   We talked about your prior testimony in
19    the last four or five years.
20             Have you spoken with Dr. Shulman at all?
21        A.   No.
22        Q.   Any communications with him whatsoever?
23        A.   No, I don't know who he is.
24        Q.   Well, he's -- he was the treating
25    physician for Mr. Peterson.
```

Lauren C. Pinter-Brown, M.D.

```
1         A.    Yeah, but I don't know him -- I don't
2    know -- personally I don't know where he is.  I
3    wouldn't have any way of contacting him.
4         Q.    Okay.
5              MS. ANDERSON:  Lin, I just wanted to make
6    a note, and we're happy to -- to provide an updated
7    CV, if appropriate, but the -- the last paper on
8    this CV is dated April of 2019.
9              MR. BRENZA:  Okay.
10        Q.    The last item that's requested in the
11   notice of deposition is, "All documents referencing
12   any communications with anyone other than counsel
13   regarding glyphosate and/or glyphosate-based
14   formulation."
15             Have you had any communications with
16   anyone about glyphosate or glyphosate-based
17   formulations?
18        A.    No.
19        Q.    Is this some of your knowledge from
20   reviewing the medical literature in this field?
21        A.    Yes.
22        Q.    And -- and you began to learn about
23   Roundup in connection with your work -- lawsuits for
24   plaintiffs who claim that their non-Hodgkin's
25   lymphoma was caused by Roundup, right?
```

1    A.   No.  I -- I heard about Roundup and other

2    pesticides long before that.  But prior to accepting

3    these three cases, it was the opportunity that I've

4    had to really spend a lot of time looking at the

5    literature and making my own independent decision

6    about what I thought.

7    Q.   Have you done any research on Roundup?  I

8    mean, other than reading from the literature?

9    A.   No.

10   Q.   You haven't -- you haven't published

11   anything on Roundup, right?

12   A.   No.

13   Q.   Have you given a talk on Roundup?

14   A.   No, no more than I give talks to patients

15   all the time.  There's always a slide that lists

16   what the possible risk factors or why somebody might

17   get lymphoma.  And it usually does state that

18   pesticides are in question.  It doesn't say anything

19   about Roundup specifically.

20   Q.   What I was really getting at, too, is, is

21   you haven't spoken at conferences or other things

22   about Roundup or pesticides?

23   A.   No.

24   Q.   Does -- does non-Hodgkin's lymphoma have

25   a -- a latency period?

Lauren C. Pinter-Brown, M.D.

1          A.    I don't understand what that means.

2          Q.    Is there a period of time between all the

3     exposures that are necessary, in your view, to

4     produce non-Hodgkin's lymphoma and the time that

5     non-Hodgkin's lymphoma occurs?

6                MS. ANDERSON:  Objection.  Form.

7                THE WITNESS:  I don't understand what you

8     mean by all the exposure -- could you --

9     BY MR. BRENZA:

10         Q.    Well, you don't want to talk about one

11    particular cause, so I'm trying to put it in your

12    words.

13         A.    Okay.  Well, each thing would be

14    different.  So as an example, there is a drug that

15    rheumatologists use and it causes a T-cell lymphoma.

16    There, it takes very little of that drug to cause

17    the lymphoma.  There may be other things, like we --

18    like radiation that may take much longer to cause

19    cancers.  So I think the answer would be that it

20    depends on what you're talking about.

21         Q.    Do you have an opinion about how long

22    Roundup takes to cause lymphoma or to be a

23    substantial factor in lymphoma?

24                MS. ANDERSON:  Objection.  Form.

25                THE WITNESS:  I would say from reading the

1  medical literature, that it looks like exposures to

2  pesticides might have a latency that's like eight

3  years, something like that.

4  BY MR. BRENZA:

5       Q.   And Roundup --

6       A.   In that range.

7       Q.   Is Roundup in that category?

8       A.   Well, it is a pesticide, yes.

9       Q.   Are you an expert -- what -- what areas do

10 you hold yourself out as an expert in?

11      A.   I am an expert on non-Hodgkin's lymphomas.

12 And that includes, for sure, treating them, their

13 prognosis, contributing factors to why they might

14 form, maybe some other things.  But that's -- that,

15 for sure, I'm an expert about.

16      Q.   Are you an expert in epidemiology?

17      A.   No.

18           MS. ANDERSON:  Objection.  Form.

19 BY MR. BRENZA:

20      Q.   Do you have any legal training?

21      A.   No.

22      Q.   Are you -- are you a toxicologist?

23      A.   No.

24      Q.   Are you a statistician?

25      A.   No.

1    Q.   Have you ever conducted an epidemiological

2  study?

3    A.   I've been involved in a registry, which is

4  kind of an observational study.  I don't know if

5  you -- there were some epidemiologic factors that

6  were looked at.  But if you're talking about a study

7  that's solely done for epidemiology purposes, no.

8    Q.   You -- I believe your resumé said you

9  were -- you had a period of time serving on the

10  committee for the National Cancer Institute?

11    A.   Yes.

12    Q.   Is that -- is that something you're still

13  doing or...

14    A.   No.

15    Q.   What was your role with the National

16  Cancer Institute?

17    A.   I was on the steering committee for T-cell

18  lymphomas.  The steering committee is involved in

19  setting the research agenda for the nation with

20  respect to these groups called cooperative groups.

21    Q.   What are cooperative groups?

22         (Whereupon, a telephonic interruption.)

23         THE WITNESS:  Sorry.

24         They're -- groups that are set up that

25  have many, many, many institutions that agree to

1    participate in a certain agenda of clinical trials.

2    They're funded by the U.S., by the National Cancer

3    Institute.  And they are developed to answer usually

4    big research questions that require thousands of

5    patients.

6    BY MR. BRENZA:

7        Q.   Is the National Cancer Institute a

8    respected institution?

9        A.   Yes, I think so.

10           MS. ANDERSON:  Objection.  Form.

11           THE WITNESS:  I'm not sure by whom.  But,

12   yes, I'm sure it's -- yes, it's -- it's our national

13   cancer institute.  We don't have another one.

14   BY MR. BRENZA:

15       Q.   And -- and you have respect for it, right,

16   since you served on it?

17           MS. ANDERSON:  Objection.  Form.

18           THE WITNESS:  I guess.  I -- I haven't

19   done that much research with the National Cancer

20   Institute or that much of an association.  Was I

21   honored to be on that steering committee, yes, I

22   was.

23   BY MR. BRENZA:

24       Q.   In general, is the work of the National

25   Cancer Institute solid science?

Lauren C. Pinter-Brown, M.D.

```
 1              MS. ANDERSON:  Objection.  Form.
 2              THE WITNESS:  By the work of the National
 3   Cancer Institute, I assume you're talking about the
 4   researchers that are at the National Cancer
 5   Institute?
 6   BY MR. BRENZA:
 7        Q.   If that's the way you want to interpret
 8   it, yes.
 9        A.   Some of the studies are designed better
10   than others.
11        Q.   Is it generally true that the work of the
12   National Cancer Institute is solid science?
13              MS. ANDERSON:  Objection.  Form.  Asked
14   and answered.
15              THE WITNESS:  I don't know what "solid
16   science" means.  I'm -- I'm not sure how to answer
17   your question.
18   BY MR. BRENZA:
19        Q.   Are you -- are you -- are you quibbling
20   with the results of the National Cancer Institute?
21              MS. ANDERSON:  Do you have a specific
22   study that you want to ask her about?
23              MR. BRENZA:  Not at this time.
24              THE WITNESS:  Do I answer?
25              MR. BRENZA:  Yes.
```

1          THE WITNESS:  I've seen studies from

2     researchers at the National Cancer Institute that

3     could have been designed better.

4     BY MR. BRENZA:

5          Q.   What studies are those?

6          A.   There was one done on a drug romidepsin.

7     I thought it was poorly designed and poorly

8     executed.

9          Q.   Any others?

10          A.   No, that's the one that comes to mind

11     because I was involved with it.  I thought it could

12     have been done a little bit better.

13          Q.   What about the SEER data.  Are you

14     familiar with SEER?

15          A.   Yes.

16          Q.   And that's a program to collect statistics

17     on disease and cancer?

18          A.   Yes.

19          Q.   Are the SEER statistics, in your opinion,

20     reliable?

21          A.   Not wholly, no.

22          Q.   What -- what parts of them are not

23     reliable?

24          A.   Well, when you get SEER data, they -- they

25     may report, particularly in lymphomas, a pathology

Lauren C. Pinter-Brown, M.D.

```
 1    result that isn't accurate.

 2              Also, the classification of lymphomas

 3    changes every few years.  So it may be that some

 4    lymphoma is brand new or called something different

 5    and it won't have been reported to the SEER

 6    database.

 7              So there are, like anything else,

 8    limitations to what the SEER database can do

 9    accurately.  As well, in the case of lymphomas, it's

10    well-known that the diagnostic accuracy is much

11    better at an academic institution rather than a

12    community.  So that may be another reason why the

13    diagnosis may not be fully accurate.

14        Q.   Did you -- do you use SEER data in any way

15    in your practice?

16        A.   Not in my practice but often when I give

17    lectures.  Sometimes when I give lectures, I should

18    say.

19        Q.   You'll cite SEER data?

20        A.   Yes, usually because that's the only data

21    that exists on a particular topic.

22        Q.   Are you aware of other sources of data

23    beyond SEER that -- that show the overall rates of

24    non-Hodgkin's lymphoma in the United States?

25        A.   I've looked at SEER data most commonly
```

1    because you can look at it over different decades.

2    However, there probably is data from the Social

3    Security index.  They -- there's an index, and it

4    talks about, you know, deaths of people.  There's

5    probably databases if someone wanted to pull death

6    certificates in a particular area.

7            So I think -- again, this is not my area

8    of research -- but there's other ways that people

9    can collect outcomes data on patients that aren't --

10   that isn't SEER data.

11       Q.   Are you aware of having -- that having

12   been done by anyone?

13       A.   I saw a paper on a -- a specific kind of

14   lymphoma that used the Social Security index.  I

15   think I have in the past seen papers that rely upon

16   death certificates.  So I can't quote you a specific

17   paper but I'll bet if I looked really hard, I could

18   find something like that.

19       Q.   I want to ask you some questions about

20   your materials relied on list.  So we've marked that

21   as Exhibit 4.  I don't know if you have it available

22   to you.  It could also -- hopefully these things

23   have been sent to you at least once by now.

24       A.   Now, let's see if anything else came.  I'm

25   trying to pull up something that looks promising.

Lauren C. Pinter-Brown, M.D.

1      Q.   If you do, I can tell you, it -- it should

2  be a -- in a bunch of numbered exhibits, and I'll

3  tell you, it's -- it's Number 4 in that set of

4  folders.

5      A.   Well, if it's because of how I'm trying to

6  look at this.  But all I keep getting is that Chang

7  paper.

8      Q.   I would -- I would think that would be one

9  of the last ones, not one of the first ones, but...

10      A.   It's the only -- it's -- I go right to the

11  end.

12          MS. ANDERSON:  Yeah, that's strange.

13          THE WITNESS:  Well, let me keep looking.

14  BY MR. BRENZA:

15      Q.   Are you -- are you seeing --

16      A.   Oh, it's the same thing.  All I get is --

17  it may be that I'm looking at it on an iPad maybe.

18  It gives me 26 pages or something, and it's that

19  whole article.  And that's all it is.

20      Q.   All right.

21      A.   27 pages.  Excuse me.

22      Q.   Somehow it's not getting through to you.

23      A.   I'm not sure -- I'm sure a phone wouldn't

24  be better.  In fact, it'd probably be worse.

25      Q.   Well, let me just -- let me ask you about

 1   some of the things you put on your list, then.  I'll

 2   try to --

 3       A.   Wait, wait.  Here's another one.  There's

 4   a new e-mail.  Hang on.

 5       Q.   Okay.

 6       A.   This one's not downloading, though, but --

 7   oh, here we go.  Let's try it again.  There's the

 8   Chang paper again.  No, that's it.

 9       Q.   Same?

10       A.   Same thing.  Sorry.

11       Q.   Well, at least I have a few questions

12   about the Chang paper, so -- we'll get there.

13            Let's -- let me just ask you about your

14   materials considered.  There -- there are a few

15   things on here I just wanted to get your idea of

16   why -- you know, why you relied on them.

17            The very first document is one by John

18   Acquavella.  It's called "Exposure misclassification

19   in studies of agricultural pesticides."

20            Do you know why -- you know, what --

21   what -- why you relied on that document?

22       A.   I think rely is a strong word.  I think

23   that most of the papers that are on that list are

24   all papers that I read about this topic.  Some of

25   them I wouldn't have relied on.  Relying being the

Lauren C. Pinter-Brown, M.D.

1    English word like informed me of something

2    necessarily.  But to get a handle on what all the

3    different papers are, what the problems are with the

4    studies, what the good things are with the studies,

5    what kind of variables they looked at.

6            And I -- I spent a very long time doing

7    that because I wanted to read the literature.  And

8    so I -- I can't tell you why each and every -- what

9    I got out of each and every paper.  Some of the

10   papers I might have gotten out that I didn't think

11   it was a good paper, you know, but I read it

12   nonetheless.  I -- because I wanted to understand

13   the breadth and depth of the papers in this area.

14       Q.   Okay.  Well, let me -- let me kind of flip

15   the questioning, then, a little bit.

16            What papers were the most important to

17   form your opinions in this case?

18       A.   To me, the -- the best paper that I read,

19   that -- that made the most sense was Zhang.  And I

20   read it towards the end of reading all the

21   literature.

22       Q.   And -- and just to be sure we're talking

23   about the right -- the same paper, it's -- it's

24   spelled Z-H-A-N-G, and it's 2019?

25       A.   Yes, I think that's right.  And it's a

1    meta-analysis.

2        Q.   So that's the one that you -- you put the

3    most weight on?

4        A.   Yes.  Because the discussion was so clear

5    and seemed to consider most of the variables that I

6    had been concerned about and addressed most of --

7    most, if not all, of the issues that I was concerned

8    about.

9        Q.   Are there any other papers that you

10   thought were particularly important to forming your

11   opinions in this case?

12       A.   There may have been some others, but that

13   really was the standout for me when I -- as soon as

14   I read it.  I didn't have a lot of criticisms about

15   the paper.  Whereas, I had lists of things about all

16   the other studies that, you know, I was a little

17   disturbed about.  And so I would say that that was

18   the most persuasive to me.

19       Q.   Did you review any of the EPA's analysis

20   of Roundup?

21       A.   No, I -- I did not have access to that.

22       Q.   Did you review any of the analyses from

23   public health agencies in Europe?

24       A.   Well, if you consider the WHO a public

25   health agency in Europe, IARC, of course.

Lauren C. Pinter-Brown, M.D.

1        Q.    That's not what I'm referring to.  IARC,

2   do you know what IARC is?

3        A.    It's a subgroup of the WHO.

4        Q.    Right.  IARC is -- and WHO is part of the

5   UN, right?

6        A.    I'm not sure exactly how WHO, what the

7   organizational structure is.  But I know the WHO

8   isn't from the U.S., so...

9        Q.    Well, and IARC doesn't --

10       A.    It's another part of the world.

11       Q.    IARC doesn't have any authority to

12  regulate anything anywhere, right?

13       A.    No, and that's what makes reading their

14  monograph so helpful.

15       Q.    The -- the entities in Europe that

16  actually decide whether Roundup can be sold there,

17  they had opinions about whether Roundup caused

18  cancer, right?

19       A.    I heard they did.  I didn't --

20             MS. ANDERSON:  Objection.  Form.

21             THE WITNESS:  Sorry.

22             I did not read their papers.

23  BY MR. BRENZA:

24       Q.    Okay.  So you -- if they had opinions

25  you're not aware of them?

Lauren C. Pinter-Brown, M.D.

```
 1              MS. ANDERSON:  Objection.  Form.
 2   BY MR. BRENZA:
 3        Q.    You can go ahead and answer.
 4        A.    Your question was?
 5        Q.    If -- if the European regulatory agencies
 6   had opinions about the safety of Roundup, you're not
 7   aware of them?
 8              MS. ANDERSON:  Same objection.
 9              THE WITNESS:  I didn't -- I didn't read
10   their information.
11   BY MR. BRENZA:
12        Q.    What about the positions from the health
13   agencies that regulate in Canada, did you -- did you
14   review any material from them?
15        A.    No, I did not.
16              MS. ANDERSON:  Objection.  Form.
17   BY MR. BRENZA:
18        Q.    Japan?
19        A.    No.
20        Q.    I'm just going to -- I'm just going to --
21   I can repeat the same question every time, but I
22   just want to find out if you've looked at any other
23   regulatory -- any of the opinions of the regulatory
24   bodies from any country other than the United
25   States?
```

Lauren C. Pinter-Brown, M.D.

```
 1       A.   No, and -- and as we discussed, I didn't
 2  read the EPA's either.
 3       Q.   Right.  So you did not, not even the
 4  United States, but nothing else outside of the
 5  United States?
 6       A.   No.
 7       Q.   Did you read any of the EPA's criticisms
 8  of Zhang, the Zhang article that you rely on?
 9       A.   I did not read -- read the EPA's
10  information.  I didn't have access to it.
11       Q.   Do you know the -- well, you did read IARC
12  opinion, right?
13       A.   I did.
14       Q.   And did you -- did you -- well, let me ask
15  you.
16            As part of your practice of medicine, do
17  you rely on the IARC for -- for your practice?
18            MS. ANDERSON:  Objection.  Form.
19            THE WITNESS:  I rely on a part of the WHO.
20  It's not the IARC.
21  BY MR. BRENZA:
22       Q.   Which -- which part of the WHO do you rely
23  on?
24       A.   They write the classification for
25  lymphomas.
```

Lauren C. Pinter-Brown, M.D.

```
1        Q.   Okay.  I don't remember which part that
2   is, but it's not IARC, right, it's some other part
3   of the WHO?
4        A.   It's -- I think it's just the WHO, and the
5   IARC is a part of the WHO.
6        Q.   So getting back to my original question.
7             Is there -- is there any -- ever -- is
8   there ever a time that, in your practice of medicine
9   when you're treating actual patients, that you rely
10  on IARC?
11       A.   No.
12       Q.   Are you familiar with how IARC works, the
13  procedures they use?
14       A.    I did go and read about it.  I couldn't
15  quote it to you at this moment.  But because I was
16  reading their information, I actually did a little
17  research on my own to understand who they were and
18  how they come about.  And so the -- that's the best
19  I could tell you.  I -- I did it so that I could
20  ascertain how unbiased they were or if they were
21  biased.
22       Q.   And you had to do some research on that
23  because as a practicing doctor in the area of
24  non-Hodgkin's lymphoma, you didn't know about IARC
25  until you got involved with these lawsuits, right?
```

Lauren C. Pinter-Brown, M.D.

```
1                MS. ANDERSON:  Objection.  Form.  Form.
2                THE WITNESS:  That's correct.  I hadn't
3     heard of IARC before and I wanted to know who's
4     IARC.
5     BY MR. BRENZA:
6          Q.   And did you say they were biased or
7     unbiased?
8          A.   They seem very unbiased.
9          Q.   They seem unbiased.
10               Why do you say that?
11         A.   Because they're a group of -- they're very
12    much like my WHO committee that makes the
13    classifications.  They're a group of scientists that
14    are selected to review a topic in great detail, with
15    great focus, and to be objective about it.  And they
16    don't answer to anyone other than themselves
17    publishing their -- their monographs.
18         Q.   Did they have procedures to allow third
19    parties or the public to participate in their
20    deliberations?
21         A.   I don't remember --
22               MS. ANDERSON:  Objection.  Form.
23               THE WITNESS:  -- that part.
24    BY MR. BRENZA:
25         Q.   Do they consider testing information
```

1    that's been submitted to the regulatory bodies in

2    order to prove that chemicals are safe?

3              MS. ANDERSON:  Objection.  Form.

4              THE WITNESS:  My impression was that they

5    use the scientific literature and in that way,

6    perform an analysis in an objective fashion.

7    BY MR. BRENZA:

8         Q.   So when you say "the scientific

9    literature," that's the -- that's -- that's the

10   articles that show up in -- in all of these

11   publications, right?

12        A.   Yes, things that are published in the

13   scientific literature which have to be reviewed by

14   peers.

15        Q.   But it doesn't include the -- the study

16   data that's presented to regulatory bodies to

17   evaluate whether -- whether chemicals are safe?

18             MS. ANDERSON:  Objection.

19             THE WITNESS:  As I told --

20             MS. ANDERSON:  Form.

21             THE WITNESS:  As I told you, I don't

22   remember that part, but my impression is that their

23   evaluation is totally objective.  That they don't

24   look at data that's not peer-reviewed.

25

Lauren C. Pinter-Brown, M.D.

```
 1   BY MR. BRENZA:

 2        Q.   Okay.  And you -- you know that peer

 3   review is -- it's an important part of checking

 4   the -- the veracity of scientific literature, right?

 5        A.   Yes.

 6        Q.   Do you have -- have you -- are your

 7   articles peer-reviewed?

 8        A.   Most of them.

 9        Q.   Are there biases that occur in terms of

10   what researchers decide to publish?

11             MS. ANDERSON:  Objection.  Form.

12             THE WITNESS:  Can you ask the question in

13   a different way?

14   BY MR. BRENZA:

15        Q.   Are you -- do you know about the -- a bias

16   against publishing negative results?  Have you ever

17   heard about that?

18        A.   Yes, I've heard about it.

19        Q.   So -- so there are biases that operate on

20   researchers in deciding what to publish, right?

21        A.   Well, in the past, there have been those

22   biases, but people are well aware of that and are

23   making more of an effort to allow both the

24   presentation and publication of negative studies

25   because they're very informative.
```

Lauren C. Pinter-Brown, M.D.

```
 1        Q.   In order to get a fair review, you have to
 2   have publication of both positive and negative
 3   results, right?
 4             MS. ANDERSON:  Objection.  Form.
 5             THE WITNESS:  As long as they're
 6   well-designed studies and the peer review thinks
 7   they're worthy of publication.
 8   BY MR. BRENZA:
 9        Q.   Are you familiar with a study called the
10   Agricultural Health Study?
11        A.   Yes.
12        Q.   You chose not to rely on that study,
13   right?
14        A.   I read it.  I read all the iterations of
15   it.  And it's a single negative study in this area,
16   which makes you wonder why.
17        Q.   It's also the only study that looked at
18   54,000 licensed pesticide applicators, right?
19        A.   It looked at people in a particular way,
20   as I remember, that were coming to buy pesticides
21   and get their license.  So in that way, they
22   selected people somewhat differently than maybe some
23   other studies did.  In that -- in some ways, there
24   are some positive things about it, and there's also
25   some criticisms.
```

1    Q.   And another positive thing about the

2    Agricultural Health Study is that it's a prospective

3    study rather than a case controlled study, right?

4    A.   A prospective study is usually preferable.

5    However, there are problems with doing them

6    sometimes.

7    Q.   And there are problems with

8    case-controlled studies, right?

9    A.   There can be problems with --

10   MS. ANDERSON:  Objection.  Form.

11   THE WITNESS:  There can be problems with

12   any kind of study.

13   BY MR. BRENZA:

14   Q.   One of the problems with case-controlled

15   studies is recall bias, right?

16   MS. ANDERSON:  Objection.  Form.

17   THE WITNESS:  Same problem with

18   prospective trials.

19   BY MR. BRENZA:

20   Q.   Well, prospective trials, no, they don't

21   have that problem because people are asked about

22   their exposures before they have an illness, right?

23   A.   Right, but you're still asking them to

24   recall -- to -- to recount what they remember.

25   Q.   That's not -- that's not what I meant by

1    recall bias.  I think, Doctor, you must be familiar

2    with this.

3           Recall bias is the bias that occurs when

4    you ask people who have cancer to recall things that

5    might have caused that cancer in their -- in their

6    prior lives.

7        A.   Right.  A case-controlled study might not

8    have that.

9        Q.   And -- and when you ask people who are

10   already sick to remember things in their past that

11   might have caused it, they tend to remember more

12   things than people who are healthy.  That's the

13   recall bias, right?

14       A.   They may look at it differently.  But we

15   know from -- from trials that looked at farmers'

16   recall of what pesticides they used, in realtime

17   that -- that sometimes they're very inaccurate even

18   when you're doing a prospective collection of data.

19          So there's inaccuracies whenever you are

20   using somebody's recollection of what they did.  For

21   various reasons.  Either because you're right, they

22   could have an illness and they could put a different

23   significance on something than they would have

24   before or maybe they just don't remember.  Maybe

25   there's so many things that they used that they just

1    don't remember properly.  And that's part of the

2    problem with these studies.

3        Q.   Is there -- is there a reason why you

4    chose to not give weight to the Agricultural Health

5    Study?

6            MS. ANDERSON:  Objection.  Form.

7            THE WITNESS:  It's not that I didn't give

8    weight to it.  I -- as I told you, I read it.  I

9    read it in all its iterations and I asked myself why

10   is that the only negative study.  I could see some

11   things about the design that weren't optimal.  Other

12   researchers pointed out other things that weren't

13   optimal.  But it's not at all that I didn't give it

14   weight.  I --

15   BY MR. BRENZA:

16       Q.   Go ahead.  I'm sorry.

17       A.   In fact, I -- I have read quite a lot of

18   papers about it, trying to understand it.

19       Q.   And -- and you say it's the only negative

20   study, but that's not quite true, is it?  There are

21   a lot of studies that don't find a significant

22   connection between Roundup and cancer, aren't there?

23       A.   I would --

24           MS. ANDERSON:  Objection.  Form.

25           THE WITNESS:  I would say really that when

1    you look at the literature, that that study stands

2    out as something really different than the other

3    studies.

4    BY MR. BRENZA:

5        Q.   And it's different because it looked at

6    54,000 licensed pesticide applicators, whereas most

7    of the other studies looked at a few hundred, maybe

8    at best a few thousand cases.

9            MS. ANDERSON:  Objection.  Form.

10           THE WITNESS:  Is that -- is that a

11   question?

12   BY MR. BRENZA:

13       Q.   Well, that's -- yes, it's a question.

14       A.   And the question is?

15       Q.   Isn't that right?

16       A.   No.  I don't -- I -- I don't know why it's

17   negative.  I think there's a lot of confounding

18   reasons why.

19       Q.   I said "different."  I wasn't asking you

20   why it was negative.

21       A.   Well, different could be that it's the

22   only negative trial.  That's how I interpreted your

23   question.  Different could be the design as well.

24           You can re-ask the question in a more

25   clear fashion.

Lauren C. Pinter-Brown, M.D.

1      Q.   Well, there are a lot of studies other

2   than the Agricultural Health Study that don't find a

3   significant connection between Roundup and

4   non-Hodgkin's lymphoma, right?

5           MS. ANDERSON:  Objection.  Form.

6           THE WITNESS:  There are some studies that

7   do not show statistical significance because the

8   numbers are -- by the time you get down to a little

9   subgroup, are quite small.  And that's why the Zhang

10  meta-analysis is so helpful.

11  BY MR. BRENZA:

12     Q.   And significance -- statistical

13  significance, is that an important -- is that

14  important to you?

15     A.   It's something you look at.

16     Q.   Is it important?  Is it the -- is it

17  important to you in understanding the studies?

18     A.   Can you ask that in a different way?  I

19  think I'm going to answer it in a different way than

20  you intend.

21     Q.   Well, is -- is a study presenting a

22  statistically significant result or not important to

23  you in evaluating the meaning of that study?

24     A.   It's a -- it's a part of the data

25  that's -- that's important to look at.  And then

1    sometimes we look at whether something's

2    statistically significant or not and we try and

3    understand that result.  So I think in and of

4    itself, it isn't the end-all and be-all of

5    interpreting a study.  There are some studies for

6    which there are no statistical significance and they

7    tell us something very important.

8        Q.   Well, if it's -- if the result is not

9    statistically significant, does that mean that

10   the -- that the result can't be distinguished from

11   chance, from a random occurrence?

12            MS. ANDERSON:  Objection.  Form.

13            THE WITNESS:  In a particular study but

14   there might be a reason for that.  For instance,

15   maybe there just aren't enough subjects in that --

16   in that cell.  Again, I'm not a statistician.  But

17   I -- I absolutely know that that is not the end-all

18   and be-all of interpreting a study, whether

19   something shows statistical significance.

20   BY MR. BRENZA:

21       Q.   What else do you look at?

22       A.   And for that reason -- huh?

23       Q.   What else do you need to look at?

24       A.   Well, for that reason, there are

25   meta-analyses that combine studies so that you get

```
 1    larger amounts of patients and you can see a

 2    difference.  That's exactly why we have

 3    meta-analysis.

 4        Q.   So meta-analyses combine results from

 5    different studies, right?

 6        A.   They do.

 7        Q.   And meta-analyses can't do anything to

 8    correct errors or biases in the underlying data,

 9    right?

10        A.   Well, some meta-analysis --

11             MS. ANDERSON:  Objection.  Form.

12             THE WITNESS:  -- only assume -- will only

13    allow certain studies to be part of a meta-analysis

14    if they meet certain criterion.  And in that way

15    they try to adjust for different forms of data that

16    come from different studies.

17             Again, I'm not a statistician.  So if

18    we're going to get into a discussion of how people

19    set up meta-analyses, I'm probably not the best

20    person to ask.

21    BY MR. BRENZA:

22        Q.   Yeah.  So my -- my only question to you,

23    and I think you can answer this yes or no, is, do

24    meta-analyses do anything to correct for underlying

25    errors or biases in the data?
```

Lauren C. Pinter-Brown, M.D.

```
 1        A.    I'm not a statistician.  I don't think I
 2   can tell you how they do, but I know that there are
 3   ways that they attempt to correct for -- for
 4   heterogeneity in studies.  And -- and I don't know
 5   if that's what you mean by biases.
 6        Q.    No, it isn't.  Heterogeneity is something
 7   different.
 8        A.    So what kind of biases in a study are you
 9   trying to --
10        Q.    No.
11        A.    -- ask me about?
12        Q.    Prompted bias, recall bias, you know, the
13   biases we talked about.
14        A.    Well, that has to do with study design.
15   And as I said, each study has positives and
16   negatives.  What a meta-analysis attempts to do is
17   to get enough patients where some of that washes
18   out.
19        Q.    And -- and so my only question was whether
20   the -- whether the meta-analyses correct for
21   underlying biases or errors in the data?
22              MS. ANDERSON:  Objection.  Form.  Asked
23   and answered.
24              THE WITNESS:  I'll tell you again, I can't
25   answer the question.  That's not my area of
```

1    expertise.

2    BY MR. BRENZA:

3        Q.   Did you calculate an exposure for

4    Mr. Peterson?

5        A.   Well, by calculate, there's not much of a

6    calculation.  I didn't do one of those intensity

7    calculations that you see in some of the papers

8    where they take into account what kind of protective

9    devices were used.

10           But in a very rough way, there are some

11   rough criterion that were used for high exposures

12   and doesn't require a big calculation.  You can see

13   by the history that he gives that he used the

14   drug -- he used the pesticide very extensively.

15   This wasn't someone who used it for an hour a year.

16   This is someone that -- that used it for several

17   days per year.

18   BY MR. BRENZA:

19       Q.   So he -- he -- I think in his records he

20   said he used it for once or twice over a seven-month

21   period, like from April to October.

22       A.   Here -- well, it's in my report.  So we

23   don't have to --

24       Q.   Okay.  Then show me where.

25       A.   I took -- I took it from his deposition.

1          So he used a handheld sprayer bottle.

2      Q.   Where -- just direct me to where you're

3   looking.

4      A.   Five.

5      Q.   Page 5?

6      A.   Yeah.

7      Q.   Exposure history, yes.

8      A.   He used a gallon of Roundup in a year's

9   period spraying in a wide area, standing up, even in

10  windy conditions.  He sprayed one to two times per

11  month for an hour-period.  With the only exception

12  being in the winter when he didn't spray.

13     Q.   So one to two times per month from April

14  to October is about seven to 14 times per year.

15     A.    I don't know if it's April to October.

16  He -- what I got -- what -- the impression I got was

17  that winter, though he didn't say the months, maybe

18  was December and January.  Perhaps February.

19     Q.   Do you know where Mr. Peterson lives?

20     A.    No, actually, I don't.  But I've lived in

21  areas where there's winter and I do know -- I

22  haven't always lived in Los Angeles.  So I do know

23  when there was winter in Boston, which is where I

24  lived before.

25     Q.   Mr. Peterson lived in Chicago.

Lauren C. Pinter-Brown, M.D.

1          A.    Okay.

2          Q.    And there aren't a lot of weeds until

3    April at the earliest.

4                MS. ANDERSON:  Objection to form.

5                THE WITNESS:  Who -- who says that?

6                MS. ANDERSON:  I think there are four

7    seasons.

8                MR. BRENZA:  Well, we'll -- we'll take

9    that up later.

10         Q.    But let's assume he sprayed somewhere

11   between seven and 14 times a year.

12               Do you want to say -- what do you want to

13   say, how many times did he spray?  What's your

14   opinion?

15         A.    I'm not making an opinion.  I'm going to

16   say exactly what he said.  One to two times per

17   month for a one-hour period except in the winter

18   when he didn't spray.  I don't have an opinion about

19   it.  I can only use what -- what the man said.

20         Q.    Well, you have an opinion about how many

21   hours he sprayed, right, over the course of --

22         A.    Well, if it's one to two times per month,

23   all right, let's go on the big side.  Two times per

24   month for an hour for the majority of the year, in a

25   standing position, sometimes in the wind.  And if

Lauren C. Pinter-Brown, M.D.

1  you're talking about Chicago, I know it gets windy

2  there.

3      Q.   Let's break it down.

4           How many hours per year is he spraying, in

5  your opinion?

6           MS. ANDERSON:  Objection.  Form.

7           THE WITNESS:  Let's -- you know, I -- I --

8  I don't know what he means by winter.  But let's say

9  it's 20 hours.  Let's say it's an entire day,

10  morning and night.

11 BY MR. BRENZA:

12      Q.   20 hours of spraying per year.

13           And do you know how many years he sprayed?

14      A.   It says he started spraying in 2013.  Then

15  he started using concentrate until 2016.  And then

16  he was diagnosed and he stopped.

17      Q.   So at most, four years?

18      A.   Yes.

19      Q.   So that would be a total lifetime exposure

20  of 80 hours of spraying.  Is that your opinion?

21      A.   Whatever the calculation is.  But that's

22  not the criterion that's used in the papers.  So I'm

23  not sure where we're going with this.

24      Q.   Well, I'm trying to understand how

25  you've -- you said, in your report, that his

1    exposure was intensive, right?

2        A.   Yes.

3        Q.   So what did you do to figure out if his

4    exposure was intensive?

5        A.   I looked at the papers and what they

6    defined as intensive.  And in some papers they

7    defined it as two days per year.

8        Q.   Is that what you understood intensive to

9    mean?

10           MS. ANDERSON:  Objection.  Form.

11   BY MR. BRENZA:

12       Q.   When you used that word?

13       A.   That's what it states in the paper.

14       Q.   Two days per year is intensive use, in

15   your opinion?

16           MS. ANDERSON:  Objection.  Form.

17           THE WITNESS:  There's no opinion here.

18   I'm using the same papers we used when we're looking

19   at the data, what their definition of extensive use

20   is.

21   BY MR. BRENZA:

22       Q.   And that -- I just want to understand what

23   you're -- you're saying -- you're making a statement

24   about his use.  So I want to understand what your

25   basis for that is.

```
 1              What -- what is your basis for saying his

 2   use was intensive?

 3        A.   As I previously stated, I went back to the

 4   papers.  I looked at the methods section, how they

 5   defined intensive use, and I applied that to the

 6   patient.

 7        Q.   And what was that, two days per year?

 8        A.   It was some that were two days per year.

 9        Q.   Is that what you used for your opinion in

10   this case?

11        A.   Yes.

12        Q.   Is that the Erikkson paper?

13        A.   I'd have to go look.  If you want me to, I

14   can go look through the papers.  But most of the

15   papers used similar definitions.

16        Q.   And when you say two days per year, is

17   that continuous eight-hour days or how many hours is

18   that?

19              MS. ANDERSON:  Objection.  Form.

20              THE WITNESS:  That's the problem with the

21   medical literature, isn't it?

22   BY MR. BRENZA:

23        Q.   What's the answer?

24        A.   I don't know.  All it says in the paper is

25   two days per year.  That's all you got.  Two days
```

Lauren C. Pinter-Brown, M.D.

1    per year.  They asked the patients the same thing.

2         Q.   Oh, so when you -- when you applied that

3    analysis to your opinions in this case, what did you

4    assume was meant by that?

5         A.   I made no assumptions.  I -- I thought

6    that the researchers probably asked the patients how

7    many days per year have you sprayed, and they

8    answered.  Just as Mr. Peterson would answer in his

9    deposition.

10        Q.   So -- so a day, in your mind, is as little

11   as a few minutes in a given day?

12             MS. ANDERSON:  Objection.  Form.

13             THE WITNESS:  I'm -- I'm just using the

14   same criterion they used in papers.  Had they --

15   BY MR. BRENZA:

16        Q.   But I want to know what that criterion is.

17        A.   Then you need to ask the researchers, I

18   guess, what they meant by it.

19        Q.   You're saying you applied that to

20   Mr. Peterson.  And I -- so I need to know what you

21   did.

22        A.   I looked at the papers.  I saw what they

23   defined in their subjects.  And I applied it to the

24   patient because that's all I have.  They didn't say

25   anything more in the paper.  But if you're curious,

Lauren C. Pinter-Brown, M.D.

1  and I'm curious, we would need to go back to those

2  researchers and ask them to explain themselves

3  better.  That's what's written in the literature,

4  and that's what's available.

5      Q.  So you -- you concluded that

6  Mr. Peterson's use was intensive because he sprayed

7  some part of two days per year?

8          MS. ANDERSON:  Objection.  Form.

9          THE WITNESS:  I've answered you many

10  times.  I don't know how else to answer you.

11  BY MR. BRENZA:

12      Q.  I don't think you've answered me once, and

13  that's why I'm asking these questions over and over.

14      A.  It's written in my report, and that's your

15  answer.  I said that I thought his exposure was

16  significant, and I based that on looking at the

17  other papers and looking at their definition.

18          Do I think that, that definition,

19  describes every person in the universe, that it so

20  lacks, no.  Do I spray Roundup even one day, even

21  one minute per year, no, I do not.

22          So there are people that actually use this

23  product and they distinguish themselves from the

24  rest of the population as actually using it to a

25  significant degree.

Lauren C. Printer Brown, M.D.

```
1         Q.   In this section of your paper you don't

2    cite any literature.  And what literature are you

3    using for this analysis?

4         A.   I went through the papers on the reliance

5    list in their methods section.  And I looked to see

6    how did they define intensive users because they do

7    define it.  Most of them used a similar definition

8    because they're trying to reproduce data from

9    another trial so they're trying not to introduce a

10   lot of variables.  But if you look at the papers in

11   the methods section, this is the definition that

12   they have, one of them.

13        Q.   When you say --

14        A.   Some I can't -- I can't reproduce.  There

15   was a calculation where they did not show how they

16   arrived at the degree of protective equipment, and

17   so I couldn't reproduce that calculation.  So I used

18   the data, as best I could, what is written in these

19   journals as to what kinds of people were they

20   studying.

21        Q.   So all I need to know is how you figured

22   out that Mr. Peterson's use was intensive.

23             MS. ANDERSON:  Objection.  Form.

24   BY MR. BRENZA:

25        Q.   Your opinion.  And I -- I just want to
```

Lauren C. Pinter-Brown, M.D.

1   know what your basis for it is.

2       A.   I compared him to the patients in the

3   study.

4       Q.   And in which study?

5       A.   In almost all of them.

6       Q.   Which?  Give me -- give me one or two.

7       A.   Okay.  All right.  Would you like me to

8   pull up the papers and the methods section?  That's

9   what I would need to do.

10       Q.   Is there a reason why you didn't even cite

11   them in your report?

12       A.   Yes, because they --

13           MS. ANDERSON:  Objection.  Form.  And

14   argumentative, by the way.

15           THE WITNESS:  They all basically say the

16   same thing.

17   BY MR. BRENZA:

18       Q.   All right.  Show me, then.

19       A.   You can go off the record while I try and

20   find the papers.  If that's what you like, I'm more

21   than happy to do so.

22       Q.   I need to know -- I mean, it's up -- it's

23   really up to you, Doctor, what you need to do to

24   answer my question, but I just want to know what

25   your basis was for concluding that Mr. Peterson's

1    use was intensive.  It's your word.

2         A.    I have answered you the best I can.

3              MS. ANDERSON:  Asked and answered.

4              MR. BRENZA:  All right.  Let me --

5    let's --

6              MS. ANDERSON:  -- and it suffers from

7    other form objections as well.

8              MR. BRENZA:  Let's -- let's go off the

9    record for -- for a while and let you try to find

10   whatever paper you relied on.

11             THE VIDEOGRAPHER:  We are now going off

12   the record.  And the time is 4:24 p.m.

13             (Whereupon, a brief recess was taken.)

14             THE VIDEOGRAPHER:  We are now going back

15   on the record.  And the time is 4:40 p.m.

16   BY MR. BRENZA:

17        Q.    Doctor, did you have a chance to review

18   the -- your -- your articles to answer my question?

19        A.    Yes.

20             MS. ANDERSON:  Objection.  Form.

21   BY MR. BRENZA:

22        Q.    So my -- my questioning was how you

23   concluded that Mr. Peterson's use was, as you say,

24   quote/unquote, intensive.

25             MS. ANDERSON:  Objection.  Form.

1    BY MR. BRENZA:

2         Q.   Do you have an answer for that now?

3         A.   Well, the answer's the same.  You had

4    asked me to show you which papers defined exposure,

5    so I went to my reliance list trying to remember

6    which papers.  Then I remembered that Zhang

7    summarized all the other papers, and that's where I

8    found the information.

9         Q.   All right.  So the Zhang study we'll mark

10   as Exhibit 5.  It's -- it's item Number 20 in what I

11   sent, but I realize you may not have been able to

12   open those materials.

13             (Whereupon, Exhibit 5 was marked for

14   identification.)

15             MR. BRENZA:  But for the court reporter's

16   benefit, we'll mark it as 5.

17        Q.   You want to show me in the Zhang study

18   what you're relying on?

19        A.   I'm -- I'm not relying on this, but it's a

20   summary.  If you go to Table -- I believe it's A-1.

21   Actually, we're on page 38.

22             Dr. Zhang starts to summarize how

23   different studies characterized exposure.  And you

24   will see at least two references, though there are

25   more, to the use of greater than two days per year,

Lauren C. Pinter-Brown, M.D.

1    the use of greater than ten days per year.

2         Q.   So table -- I'm looking at Table 1.

3         A.   A-1.

4         Q.   Of Exhibit 5.

5              What did you say, Table 1 has -- so show

6    me what you're relying on.

7         A.   I told you I'm not relying on this.

8              MS. ANDERSON:  Objection.  Form.

9              THE WITNESS:  This is a summary.

10   BY MR. BRENZA:

11        Q.   So -- okay.  Well, I'm not sure why we're

12   talking about it, then.

13             I wanted to know the basis for your

14   opinion that Mr. Peterson's --

15        A.   Yes.

16        Q.   -- use was intensive?

17        A.   I've answered this for you so many times.

18             I looked at the papers, and I looked at

19   their definition.  In this table, it's very nice to

20   see that Dr. Zhang has summarized all of the studies

21   used in this meta-analysis what definition they used

22   for significant exposure.

23             So you can see for the Erikkson trial, it

24   was greater than ten days.  For McDuffie it was

25   greater than two days.  Some of the trials used any

Lauren C. Pinter-Brown, M.D.

1  exposure.

2          But here, I am erring on the side of

3  trials that didn't just look at people that had ever

4  had an exposure but those that they thought had a

5  significant exposure and that's how they defined it.

6  I can't do better than that.

7     Q.   Well, I understand how they define it

8  because you are showing me.  But I want to know what

9  you used for your opinions in this case.  I'm

10  entitled to know that.

11    A.   I used the medical literature.  And you

12  certainly are entitled.  And I've told you multiple

13  times.

14    Q.   And I want to know what you took to be the

15  limit for Mr. Peterson's exposure before you would

16  call him intensively exposed?

17         MS. ANDERSON:  Objection.  Asked and

18  answered.  And -- and where in her report --

19         MR. BRENZA:  I'm not going to answer --

20  ask this again.  If -- if the doctor won't answer

21  this, I'm going to move to bar her from testifying

22  about this at trial.

23         I'm entitled to know what calculation

24  underlies her -- her opinion in this case.  If she's

25  going to keep it secret at this deposition, then

1    she's not going to be allowed to testify about it at

2    trial.  It's your choice.  Answer my question, or

3    we'll -- we'll --

4              THE WITNESS:  You're talking to me?

5    BY MR. BRENZA:

6         Q.   Yes.

7         A.   It's not a calculation.  They say in

8    these -- in these studies if somebody used it for

9    more than two days per year they considered that

10   significant.  And that's the people they studied.

11        Q.   And that's what -- is that what you used

12   for your opinion --

13        A.   Yes.

14        Q.   -- in this case?

15        A.   Yes.  I used the same definition as the

16   trials that we looked at.

17        Q.   But Mr. Peterson, you considered him

18   intensively exposed if he used Roundup for two days

19   per year or more?

20        A.   The same as Dr. McDuffie.

21        Q.   That's -- okay.  So that's what you --

22   that's your definition of intensive for your report?

23             MS. ANDERSON:  Objection.  Form.

24   BY MR. BRENZA:

25        Q.   It's a question.

1        A.   What's -- I'm sorry, what's the question?

2    I missed it.

3        Q.   Your -- is your definition of intensive

4    use for purposes of your opinions in this case two

5    days per year or more?

6             MS. ANDERSON:  Objection.  Can you please

7    point us to where in her report she uses the

8    intensive.

9             MR. BRENZA:  Paragraph 7 of Roman

10   numeral VII.

11            Quote, "Mr. Peterson had significant

12   exposure to Roundup.  His use of Roundup was

13   intensive."

14            MS. ANDERSON:  Uh-huh.

15            THE WITNESS:  I -- I'm using the same

16   definition that I found in the medical literature.

17   It's not my personal definition.  I don't have a

18   personal definition because this isn't my area of

19   research.  So I am -- I am using the same medical

20   literature that I reviewed to determine whether I

21   thought that -- that Roundup could possibly cause

22   non-Hodgkin's lymphomas.

23   BY MR. BRENZA:

24       Q.   And the definition you used was two days

25   per year?

Lauren C. Pinter-Brown, M.D.

```
 1        A.    Greater than two days per year.

 2              MS. ANDERSON:  Form.

 3              THE WITNESS:  Greater than ten days per

 4   year.

 5   BY MR. BRENZA:

 6        Q.    With -- with that definition, how many

 7   hours is a day, in your opinion?

 8        A.    It's not my opinion.  I'm -- I'm using the

 9   definition from the medical literature.

10        Q.    But you're applying it to -- to

11   Mr. Peterson.  You have to have some --

12        A.    Did he use it two days per year?  He used

13   it two days per year.

14        Q.    Okay.  So any part of two days per year

15   he's intensively exposed, in your opinion?

16        A.    Because these studies did not define it

17   any clearer, I can only go by what it says in the

18   study.  And at face value, it says greater than two

19   days per year.  So I used the same definition.  I

20   can't make up my own definition.  What good does

21   that do?

22        Q.    Well, I'm just trying to understand what

23   you thought that meant.  Right?  And it has to mean

24   something.

25        A.    It means just what it says in the table
```

1    because I don't --

2         Q.   When you're talking about Mr. Peterson.

3         A.   I don't get to speak to Dr. McDuffie.  It

4    says just what it says in the paper.  Greater than

5    two days per year.  Any use greater than two days

6    per year.  Some people, some subjects may have sat

7    there all day.  Some subjects may have sprayed half

8    the day.  All they asked the subjects was, do you

9    spray more than two days per year.  They didn't --

10   they didn't ask them to tell them how many hours.

11        Q.   Did -- did you evaluate in those studies

12   their -- their regression of exposure to other

13   pesticides?

14             MS. ANDERSON:  Objection.  Form.

15             THE WITNESS:  I'm not sure I understand

16   the question.

17   BY MR. BRENZA:

18        Q.   Let me back up, then.

19             Is exposure to other pesticides a risk

20   factor for non-Hodgkin's lymphoma?

21        A.   Are you asking me if other pesticides have

22   been implicated in being a risk factor for

23   non-Hodgkin's lymphoma?

24        Q.   Yes.

25        A.   Yes.

Lauren C. Pinter-Brown, M.D.

1      Q.   To see if Roundup is the cause of any

2   non-Hodgkin's lymphoma, you have to correct for the

3   effect of other pesticides that people are exposed

4   to, right?

5      A.   You can try to correct but it's quite

6   difficult, as we discussed previously.

7      Q.   It's difficult, but you have to do it or

8   else you don't know if you have a real result,

9   right?

10      A.   I'm not a statistician nor an

11   epidemiologist.  But I know that many studies have

12   attempted to correct for other pesticides in that

13   people have written about the difficulty and the

14   problems with doing that.

15           So in theory, it's -- it should be done.

16   But in reality, there are problems doing them, as I

17   understand it.

18      Q.   Now, Mr. Peterson wore gloves when he

19   sprayed Roundup, right?

20      A.   I'll go and look at my report as to what

21   he said he used.

22      Q.   Tell me where you're reading when you find

23   it.

24      A.   It would be in exposure history.

25           He said sometimes he wore vinyl or latex

Lauren C. Pinter-Brown, M.D.

1    gloves but not always.

2       Q.   And he sprayed with an applicator that had

3    a wand, right, so it was distant from his body?

4       A.   Well, he said he used the handheld sprayer

5    bottle.  So I would assume when you use a handheld

6    sprayer bottle --

7            MS. ANDERSON:  No, don't assume.  Don't

8    assume anything, Dr. Pinter-Brown.

9            THE WITNESS:  Okay.

10           To me, handheld means you're holding the

11   sprayer bottle.  That doesn't necessarily mean that

12   you're using a wand all the time.

13   BY MR. BRENZA:

14      Q.   He said that he wore long -- long sleeves

15   when he sprayed, right?

16      A.   It says he wore long-sleeved shirts and

17   pants.

18      Q.   And you didn't put it in your report, but

19   he also wore shoes, right?

20      A.   Yes, though I can't remember if they were

21   work boots or sneakers or maybe he didn't say.

22      Q.   And that amount of covering is adequate,

23   according to the directions on Roundup, right?

24      A.   I don't know --

25           MS. ANDERSON:  Objection.  Form.

```
 1    BY MR. BRENZA:

 2        Q.    You don't know?

 3        A.    I haven't read the label lately.

 4        Q.    Have you ever read the label?

 5        A.    Yes, I did read it at one time.

 6        Q.    Did you do any analysis -- well, let me --

 7    let me back up.

 8              Did you -- did you conclude that he was

 9    primarily exposed through his skin or through

10    inhalation?

11        A.    Well, I was concerned about both.  I was

12    concerned when he said he sprayed it even in windy

13    conditions because wearing long-sleeved shirt and

14    pants doesn't cover all of you.  And particularly,

15    it doesn't cover your mouth or your nose.

16              In addition, he didn't always wear gloves.

17    So I was also concerned that perhaps using a

18    handheld sprayer he might have gotten it on his

19    hands.

20        Q.    Now, did Mr. Peterson ever say that?

21        A.    I'm only going by what was on

22    Mr. Peterson's deposition as I didn't speak to him

23    directly.

24        Q.    And he didn't say he got it on his hands,

25    did he?
```

```
 1              MS. ANDERSON:  Objection.  Form.
 2              THE WITNESS:  I don't know -- I can't
 3     remember if the deposition says one way or the
 4     other.  But I would imagine if it said he did get it
 5     on his hands many times, I would have commented on
 6     that.  But it may be that the deposition didn't say
 7     it either way.
 8     BY MR. BRENZA:
 9         Q.   And -- and he didn't say anything about
10     spilling large amounts of Roundup on himself at some
11     point, right?  He didn't have any, like, unusual
12     events that would have exposed him to a larger than
13     normal amount?
14              MS. ANDERSON:  Objection.  Form.
15              THE WITNESS:  I did not read that in the
16     deposition, but it doesn't mean it didn't happen.  I
17     just don't know the answer.
18     BY MR. BRENZA:
19         Q.   Did you form an opinion about whether his
20     exposure was primarily cutaneous or inhalational or
21     did you feel like they were exactly equal?
22         A.   You asked me the same question before, and
23     I told you I -- I was concerned about both.  And I
24     don't know if one was more than the other because I
25     don't know how many days were windy versus calm and
```

1    how many days he didn't wear gloves versus he did.

2        Q.   Did you do any calculations to determine

3    how much Roundup Mr. Peterson could have absorbed

4    through his skin?

5        A.   No, I'm incapable of doing that.

6        Q.   How about how much Roundup he may have

7    inhaled as a result of applying Roundup?

8            MS. ANDERSON:  Objection.  Form.

9            THE WITNESS:  I'm not a toxicologist.  I'm

10   not capable of doing that.

11   BY MR. BRENZA:

12       Q.   Did you do any analysis of the droplet

13   size or vapor pressure or any other factors that

14   bear on inhalational exposure?

15           MS. ANDERSON:  Objection.  Form.

16           THE WITNESS:  I would leave that to

17   toxicology experts.

18   BY MR. BRENZA:

19       Q.   So by leaving it to -- that means you --

20   you didn't do that, right?

21       A.   It's out of my area of expertise.

22       Q.   Are there other factors that have been

23   implicated in causing cancer by the IARC?

24       A.   I'm sorry, ask me again.

25       Q.   Well, let me -- let me ask you a more

1    specific question.  That's pretty broad.

2              Do you know what benzene is?

3        A.   Of course.

4        Q.   Is benzene a carcinogen, causes cancer?

5        A.   Certain kinds of cancer, yes.

6        Q.   And benzene is in gasoline, right?

7        A.   I think so.

8        Q.   So every time Mr. Peterson pumped his own

9    gas he'd get a dose of benzene, right?

10             MS. ANDERSON:  Objection.  Form.

11             THE WITNESS:  You know, as I stated, in

12   all of our everyday lives, we're getting a dose of

13   carcinogens.

14   BY MR. BRENZA:

15       Q.   Same thing about eating red meat, IARC

16   said red meat is a possible human carcinogen, right?

17       A.   I don't know.  I can tell you that red

18   meat isn't considered a -- a substantial

19   contributing factor to non-Hodgkin's lymphoma.  And

20   that's my area of expertise.

21       Q.   What about charred -- charred meat?

22       A.   No, that isn't considered a contributing

23   factor for non-Hodgkin's lymphoma, although it is

24   considered a factor for other kinds of solid tumors.

25       Q.   What about nitrates, like bacon and cured

```
1   meats?

2        A.   Same thing.  Other kinds of cancers.

3        Q.   Night shift work?

4        A.   I don't know about that.

5        Q.   All right.  So you -- you -- you've relied

6   on Zhang, so let's -- let me ask you.

7             First of all, have you ever spoken to

8   Dr. Zhang?

9        A.   No.

10        Q.   So all you know about the Zhang paper is

11   by reading the paper?

12        A.   Yes.  When we read the medical literature,

13   you are supposed to be able to know what you need to

14   know about the paper from reading it because most

15   people don't have the opportunity of speaking to the

16   author.

17        Q.   Understood.  I just want to make sure you

18   didn't do something beyond what might be expected.

19             The Zhang paper combines the results of a

20   number of different studies, right?

21        A.   Yes.

22        Q.   And I think you said before that one of

23   the ways meta-analyses try to improve their odds of

24   getting it right is to select the studies that go

25   into their meta-analysis, right?
```

Lauren C. Pinter-Brown, M.D.

```
 1        A.   Yes, I believe that's what they do, but,
 2   again, not a statistician, not an epidemiologist.
 3        Q.   One of the studies that Dr. Zhang selected
 4   for inclusion was the Agricultural Health Study,
 5   right?
 6        A.   Yes.
 7        Q.   In fact, she said it was a study of the
 8   highest quality, right?
 9        A.   I don't know.  I would have to look at the
10   paper.  Do you want to tell me where to look?
11        Q.   I'm just -- I'm asking, just asking what
12   you understood.
13             MS. ANDERSON:  Objection.  Form.
14   BY MR. BRENZA:
15        Q.   Dr. Zhang didn't use all of the data from
16   the Agricultural Health Study, right?
17             MS. ANDERSON:  Objection.  Form.  Did you
18   have a question for Dr. Pinter-Brown?
19             MR. BRENZA:  There was a "right" at the
20   end of that.
21             THE WITNESS:  Since I don't know all the
22   data that's available from the AHS study, I couldn't
23   tell you if Dr. Zhang used every bit of data from
24   the study.
25
```

```
 1   BY MR. BRENZA:

 2        Q.   Well, Dr. Zhang expressly stated that she

 3   wasn't going to use all the data from the

 4   Agricultural Health Study, right?  She didn't -- she

 5   said she was only going to use the data from the

 6   most heavily exposed part of the study.

 7        A.   Show me which part of the article you're

 8   referring to and I'll be glad to look at it.

 9        Q.   It's on page 8, Section 2.4, "Selection of

10   the most highly exposed category."

11             Do you see that?

12        A.   Hang on.  I'm on page 8.  Tell me again.

13        Q.   Section 2.4, the heading is, "Selection of

14   the most highly exposed category."

15        A.   Do you have a question?

16        Q.   Well, first -- my question is, do you see

17   that?

18        A.   I do.

19        Q.   Did you see in the second paragraph she

20   says, "We prioritized highest cumulative exposure

21   based on evidence of glyphosate persistence in the

22   environment."

23             And she goes on from there.

24        A.   I see that sentence.  What are you asking

25   me?
```

Lauren C. Pinter-Brown, M.D.

```
1        Q.   So my question to you, my original

2   question was, did you understand that Mr. -- that

3   the Zhang study authors selected from the

4   Agricultural Health Study the most highly exposed

5   individuals?

6             MS. ANDERSON:  Objection.  Form.

7             THE WITNESS:  I asked you to show me where

8   in the paper it says that, and you haven't shown it

9   to me yet.  So, you know, I would have to relook at

10  the paper, unless you know where it is, to find out

11  where that statement is made.

12  BY MR. BRENZA:

13       Q.   Well, I thought I -- I thought what I read

14  to you was pretty on point, but maybe it's...

15       A.   No, I think it's not.  I think -- I'm

16  trying to find it.

17            MS. ANDERSON:  Dr. Pinter-Brown, there's

18  not a -- there's not a question pending.

19            THE WITNESS:  Oh, sorry.

20            MS. ANDERSON:  That's okay.

21  BY MR. BRENZA:

22       Q.   Well, it might be Table 1.  It might be

23  the table you referred to me -- referred to me

24  earlier.

25            If you look at the case numbers, you
```

Lauren C. Pincer Brown, M.D.

1    see -- well, let's -- do you see the -- the line

2    that has the study Andreotti?

3         A.   I'm still trying to get to the table.

4              Yes, I see where it says Andreotti.

5         Q.   And if you look over at the next column,

6    it says case number.  Exposures and total.

7              Do you see that?

8         A.   Yes.

9         Q.   And she has 55 exposed cases out of 575

10   total.

11        A.   Yes.

12        Q.   That's -- that's a lot less than the total

13   of the Agricultural Health Study, right?

14        A.   I -- I assume that there was 575 in

15   Andreotti.  I'd have to look it up to make sure that

16   that's true.  I don't remember the numbers from each

17   study.

18        Q.   Well, let me just ask you this.

19             If -- you can -- you can read as much as

20   Zhang as you -- as you need to, but if Dr. Zhang

21   didn't use all the information that was available to

22   her from the Agricultural Health Study, that would

23   concern you, wouldn't it?

24             MS. ANDERSON:  Objection.  Form.

25             THE WITNESS:  Excuse me.

Lauren C. Pinter-Brown, M.D.

```
 1            No, it wouldn't because I believe that the
 2   section that you originally showed me is her
 3   reasoning for why she wants to look at people that
 4   are heavily exposed versus looking at any kind of
 5   exposure.  There's -- her -- one of -- I didn't know
 6   if she's a her or a him or them or whatever.
 7            But part of what makes this paper strong
 8   to me is the very specific discussion of why the --
 9   the valuation was performed in the way it was.
10   BY MR. BRENZA:
11      Q.   At any time an analysis picks and chooses
12   through the data, it creates the potential for bias
13   in the result, right?
14            MS. ANDERSON:  Objection.  Form.
15            THE WITNESS:  If it's done with a -- with
16   a well-thought-out reason, it would be more
17   supportable.  So when people do meta-analysis, as I
18   understand it, they don't pick every single paper as
19   you stated.  They pick papers that serve a certain
20   purpose, either have the appropriate data, the
21   appropriate patient population, and that doesn't
22   necessarily mean they have a bias in terms of that
23   it will affect their outlook, that they already know
24   what they want to find, but merely, that they're
25   trying to make their study in a way that will
```

Lauren C. Pinter-Brown, M.D.

1  clearly answer a question as best as possible.

2  BY MR. BRENZA:

3      Q.   I understand your argument that it doesn't

4  necessarily mean the author is biased, but if the

5  author is biased, that's how it's going to look,

6  right, they're going to pick and choose the data

7  that support them?

8           MS. ANDERSON:  Objection.  Form.

9           THE WITNESS:  I don't know Dr. Zhang, but

10  I'm going to assume that Dr. Zhang is a scientist

11  and is not biased.  The only report that I found

12  that was biased is the one that you kept sending me

13  in the e-mail which was supported by Monsanto.  The

14  minute I read that, I was very concerned about bias.

15  BY MR. BRENZA:

16      Q.   So which -- which study are you talking

17  about now?

18      A.   The one that I kept getting in the e-mail.

19      Q.   I thought you were getting -- I thought

20  you were getting the Zhang, the one we just talked

21  about in the e-mail?

22      A.   No.

23           MS. ANDERSON:  She said Chang.

24           THE WITNESS:  Chang.  Maybe I didn't say

25  it clearly enough, but Chang.

Lauren C. Pinter-Brown, M.D.

1           So I'm going to assume, not knowing

2    Dr. Zhang, that Dr. Zhang is a scientist, is trying

3    to answer a question clearly, and that the peers

4    that reviewed Dr. Zhang's paper are also scientists

5    and would also identify if there was significant

6    bias so significant that the results can't be

7    trusted.  That they would refuse the publication of

8    the paper.

9           I review papers.  And I don't approve

10   every one.  And I'm sure everyone that looks at

11   papers for peer review doesn't approve most of them.

12   BY MR. BRENZA:

13      Q.   And, again, I understand your inclination

14   to believe the authors of the Zhang article are not

15   biased.  My question was different.

16           It was, if authors are biased, it will

17   look like that in terms of picking the data that

18   support their point of view?

19      A.   But that's why you have to peer review --

20           MS. ANDERSON:  Objection.  Form.

21           THE WITNESS:  Sorry.  I'm so sorry.

22           MS. ANDERSON:  That's okay.

23           THE WITNESS:  That's why you have

24   peer-reviewed journals.  Because you don't pick your

25   friends.  You don't get to pick your friends and

1    your buddies and your colleagues to review your

2    article.  The editor of the journal picks people,

3    sometimes at random.  And they may be very much not

4    in your camp and may be looking for reasons to ding

5    your article so it doesn't get published.

6            So that really is the whole point of peer

7    review.  Is that you have people that don't have a

8    stake in whether your paper is published or not.

9    They're just trying to look at it objectively and

10   decide, is this worthy of publication?  Do I believe

11   this data?  Was it designed properly?  Was it

12   executed properly?  That's what a peer review is.

13   BY MR. BRENZA:

14       Q.   Now, Doctor, we talked about the overall

15   incidence of non-Hodgkin's lymphoma having leveled

16   off in the last two or three decades, right,

17   remember that?

18       A.   We did talk about it.

19       Q.   And during that same period, the use of

20   Roundup has increased dramatically, right?

21            MS. ANDERSON:  Objection.  Form.

22            THE WITNESS:  I'm not --

23            MS. ANDERSON:  Calls for speculation.

24            THE WITNESS:  I'm not an agricultural

25   worker.  I know when Roundup was put on the market.

Lauren C. Pinter-Brown, M.D.

1    I don't know that in the last decade that -- that

2    it's been increasing or increasing in the areas

3    where these statistics come from.  I just can't

4    answer that question.

5    BY MR. BRENZA:

6        Q.   If Roundup use has increased substantially

7    over that time period and yet the rate of

8    non-Hodgkin's lymphoma has basically stayed the

9    same, doesn't that tell you that Roundup is not a

10   very significant factor in all the non-Hodgkin's

11   lymphoma in the world?

12            MS. ANDERSON:  Objection.  Form.

13            THE WITNESS:  Well, I can think of various

14   reasons why that wouldn't be true.

15            First of all, you talked about latency.

16   BY MR. BRENZA:

17       Q.   Let me stop you.

18            Are you giving reasons that you believe to

19   be correct or are you just making stuff up at this

20   point?

21            MS. ANDERSON:  Objection.

22   BY MR. BRENZA:

23       Q.   I want your --

24            MS. ANDERSON:  Harassing the witness.

25

```
 1   BY MR. BRENZA:

 2        Q.   I want your --

 3             MR. BRENZA:  No, I'm not harassing.  I

 4   want the -- I want an answer that represents the

 5   witness's point of view, not an academic discussion

 6   what other people may think.

 7             THE WITNESS:  I'm the only one speaking

 8   here, and I'm -- and when I give you somebody else's

 9   information, like when I told you what I read in the

10   medical literature, I will do so.  So if you'd like

11   to ask me the question again I will attempt to

12   answer it as I would answer it personally.

13   BY MR. BRENZA:

14        Q.   Very well.

15             Isn't it true that if the rate of

16   non-Hodgkin's lymphoma has basically stayed the same

17   over the last three decades, but the rate of Roundup

18   has gone up substantially, that you could conclude

19   that Roundup is not a significant cause of

20   non-Hodgkin's lymphoma?

21        A.   No.

22             MS. ANDERSON:  Objection.  Form.

23             THE WITNESS:  And that's my opinion.

24   BY MR. BRENZA:

25        Q.   So what's the basis of that opinion?
```

1        A.    As you discussed before, there's a --

2    there's a latency period.  So you cannot equate the

3    same graph that you use for Roundup use with the

4    same graph for non-Hodgkin's lymphoma because it

5    will be offset by many years.

6              In addition --

7        Q.    How many years?

8        A.    By whatever you think the latency is.

9    We've discussed perhaps the latency is somewhere

10   around eight years.  I don't really know what the

11   latency is.  I'm making that number up.

12             As well, there has been quite a lot of

13   publicity about pesticide use in carcinogenesis.

14   And it may be that the practice of agricultural

15   workers have changed over the year, that they don't

16   use it in the same fashion.

17             There's so many reasons that I can think

18   of to say that your statement is not something I

19   would accept.

20       Q.    Well, if Roundup was a big factor in

21   non-Hodgkin's lymphoma, how could you have a big

22   increase in the use of Roundup and not see anything

23   in the NHL rates?

24             MS. ANDERSON:  Object to form.  Asked and

25   answered.

Lauren C. Pincer Brown, M.D.

1           THE WITNESS:  Big is not a scientific

2    word.  What is big?  A big contributing factor to

3    non-Hodgkin's lymphoma?  I don't know what that

4    means.  A big increase in Roundup use?  I don't know

5    what that means.

6    BY MR. BRENZA:

7         Q.   Well, I asked you before, and you

8    didn't -- you didn't give me an answer, so I can't

9    really form a better question.

10           But I asked you what percentage of

11   non-Hodgkin's lymphoma's caused -- or is in part

12   caused by Roundup, and you said you couldn't answer

13   that.

14        A.   That's right.  Because the data doesn't

15   exist.  I won't make something up for you.

16        Q.   What's the -- what's the -- what's your

17   understanding of the latency of Roundup,

18   non-Hodgkin's lymphoma related to Roundup?

19        A.   There is some discussion in the papers

20   that they believe the latency is somewhat long on

21   the range -- for some reason eight years sticks in

22   my mind.  I'm not sure why.

23           But there -- there is a discussion, which

24   is how I would get my impression, in the medical

25   articles that I read, talking about what they

1   thought the latency might be.  I think probably it

2   is not known exactly what it would be.

3        Q.   What's your best estimate of -- of the

4   range for that?

5        A.   Again --

6             MS. ANDERSON:  Objection.  Form.

7             THE WITNESS:  I am not an epidemiologist

8   so I can only look at the medical literature written

9   by epidemiologists who are expert in this field and

10  do use -- do research this.  Just as I focus on

11  treatments for non-Hodgkin's lymphoma, they are

12  focused on this.  And look at their opinions and

13  their estimates.

14  BY MR. BRENZA:

15       Q.   And -- and as you sit here today, do you

16  have an opinion about what those estimates show?

17            MS. ANDERSON:  Objection.  Form.

18            THE WITNESS:  I -- something about eight

19  years or 10 to 12 years sticks in my mind.  But if

20  we really want the numbers so that I can quote from

21  an article, we would have to go back and look at the

22  literature.

23  BY MR. BRENZA:

24       Q.   I asked you earlier about IARC.

25            Are there any other international bodies

Lauren C. Pinter-Brown, M.D.

1  that have credibility, in your mind, with respect to

2  Roundup and non-Hodgkin's lymphoma?

3      A.    No.  That was the body that I chose to

4  look at.  And I explained the reasons why earlier in

5  the deposition.

6      Q.    Now, you -- you said in your report you

7  looked at Mr. Peterson's medical records.  Did you

8  see a -- anything about his family history of

9  cancer?

10     A.    Only that his mother had lung cancer, and

11 she was a smoker.

12     Q.    Is a family history of cancer a risk

13 factor for non-Hodgkin's lymphoma?

14     A.    Only if it's a lymphoid malignancy.

15     Q.    So in your opinion, the mother's lung

16 cancer is not a risk factor for Mr. Peterson?

17     A.    That's correct.  Especially since we know

18 that she smoked.

19     Q.    And I asked you about his weight and I

20 think you said you didn't think it was significant.

21           Is that true no matter when his life he

22 was overweight or obese?

23     A.    Yes.

24     Q.    Does it matter to you if he was obese as a

25 young adult or something like that?

```
 1       A.    No.

 2       Q.    In your report you make mention of

 3  Mr. Peterson's past medical history, something

 4  called elevated glycosylated hemoglobin?

 5       A.    Yes.

 6       Q.    What -- that doesn't have anything to do

 7  with glyphosate, does it?

 8       A.    No.  It has to do with diabetes and

 9  diabetes risks.

10       Q.    What -- what is glycosylated hemoglobin?

11       A.    It's a hemoglobin that has sugar on it,

12  and it becomes elevated when someone's sugar is too

13  high in their blood.

14       Q.    Okay.  So that's completely unrelated to

15  glyphosate?

16       A.    Completely unrelated.

17       Q.    So there is also mention of

18  diverticulitis.

19       A.    Yes.

20       Q.    What -- what is that?

21       A.    A diverticulum is a little pocket that

22  forms -- primarily it forms in people's intestines.

23  You could think of it like a weak place on a tire.

24  And sometimes food collects in the little pocket and

25  it gets inflamed.  It's a very common thing.
```

1     Q.    Is -- what are the manifestations of it

2   for the patient, pain?

3     A.    Abdominal pain, perhaps fever.

4     Q.    Can you -- can you state with a reasonable

5   degree of medical certainty that you have eliminated

6   all possible contributing factors to Mr. Peterson's

7   non-Hodgkin's lymphoma?

8           MS. ANDERSON:  Objection.  Form.

9           THE WITNESS:  Ask me again.  I'm sorry,

10  I'm not sure I understand what you're asking.

11  BY MR. BRENZA:

12    Q.    Are you stating to a reasonable degree of

13  medical certainty that you have eliminated as risk

14  factors all other risk factors Mr. Peterson had

15  other than Roundup?

16          MS. ANDERSON:  Objection.  Form, again.

17          THE WITNESS:  No.  And I didn't intend to.

18  BY MR. BRENZA:

19    Q.    Is there a probability that something you

20  haven't accounted for was substantially responsible

21  for Mr. Peterson's non-Hodgkin's lymphoma?

22    A.    No, but if you look on statement 6, I do

23  mention that he's over the age of 60, and some might

24  consider that a risk factor.

25    Q.    How much of a risk factor is that?

Lauren C. Pinter-Brown, M.D.

```
 1        A.   I have no idea.

 2        Q.   Do you know -- have you heard of Bradford

 3   Hill criteria?

 4        A.   Yes, but I couldn't recount to you right

 5   now what they were.  But I did read about them.

 6        Q.   Did you -- you didn't -- you didn't use

 7   them in your -- forming your opinions in this case,

 8   right?

 9        A.   I did not, but some of the authors that I

10   have read did.

11             MS. ANDERSON:  Mr. Brenza, I believe

12   you're out of time.

13             Can the videographer please give us a time

14   check.

15             THE VIDEOGRAPHER:  You're about 30 seconds

16   out from hitting three hours.

17             MR. BRENZA:  Okay.  I guess I'll wrap it

18   up.

19        Q.   Doctor, I just ask when you produce your

20   bills and -- and the other materials that we asked

21   for that you just turn them over to your counsel.

22        A.   Okay.

23        Q.   And I'm sure they'll send them on to me in

24   response to the deposition notice.

25             And, also, if -- if you want to see the
```

Lauren C. Pinter-Brown, M.D.

1  deposition notice, and you haven't received it from

2  anyone today, please -- please get it from counsel.

3  We tried to send it to you a number of times, but

4  apparently that just isn't working, so...

5      A.   It's okay.

6      Q.   Okay.

7           MS. ANDERSON:  Yeah, we've review -- we've

8  reviewed the depo notice.

9           MR. BRENZA:  Good.

10          MS. ANDERSON:  Prior to the deposition,

11  so...

12          MR. BRENZA:  Very well.  Thank you.

13          THE VIDEOGRAPHER:  Great.  This concludes

14  the video deposition of Lauren C. Pinter-Brown.  We

15  are now going off the record.  And the time is

16  5:23 p.m.

17          (Whereupon, the deposition was concluded

18  at 5:23 p.m.)

19

20

21

22

23

24

25

Case 3:16-md-02741-VC  Document 12789-4  Filed 03/19/21  Page 154 of 157
Lauren C. Pinter-Brown, M.D.

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3           Please read your deposition over carefully

 4  and make any necessary corrections.  You should

 5  state the reason in the appropriate space on the

 6  errata sheet for any corrections that are made.

 7           After doing so, please sign the errata

 8  sheet and date it.

 9           You are signing same subject to the

10  changes you have noted on the errata sheet, which

11  will be attached to your deposition.

12           It is imperative that you return the

13  original errata sheet to the deposing attorney

14  within thirty (30) days of receipt of the deposition

15  transcript by you.  If you fail to do so, the

16  deposition transcript may be deemed to be accurate

17  and may be used in court.

18

19

20

21

22

23

24

25
```

Lauren C. Pinter-Brown, M.D.

```
 1                      ERRATA SHEET

 2

 3   PAGE    LINE      CHANGE

 4   _____   _____   _____

 5                   REASON:_____

 6   PAGE    LINE      CHANGE

 7   _____   _____   _____

 8                   REASON:_____

 9   PAGE    LINE      CHANGE

10   _____   _____   _____

11                   REASON:_____

12   PAGE    LINE      CHANGE

13   _____   _____   _____

14                   REASON:_____

15   PAGE    LINE      CHANGE

16   _____   _____   _____

17                   REASON:_____

18   PAGE    LINE      CHANGE

19   _____   _____   _____

20                   REASON:_____

21   PAGE    LINE      CHANGE

22   _____   _____   _____

23                   REASON:_____

24

25
```

```
 1                ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4

 5          I,_____, do hereby certify

 6   that I have read the foregoing pages, and that the

 7   same is a correct transcription of the answers given

 8   by me to the questions therein propounded, except

 9   for the corrections or changes in form or substance,

10   if any, noted in the attached Errata Sheet.

11

12

13        _____   _____

14        LAUREN C. PINTER-BROWN, M.D.    DATE

15

16

17

18

19

20

21

22

23

24

25
```

Lauren C. Pinter-Brown, M.D.

```
 1   STATE OF CALIFORNIA  )

 2   COUNTY OF YOLO       )

 3        I, ELAINA BULDA-JONES, a Certified Shorthand

 4   Reporter of the State of California, duly authorized

 5   to administer oaths pursuant to Section 2025 of the

 6   California Code of Civil Procedure, do hereby

 7   certify that

 8            LAUREN C. PINTER-BROWN, M.D.,

 9   the witness in the foregoing deposition, was by me

10   duly sworn to testify the truth, the whole truth and

11   nothing but the truth in the within-entitled cause;

12   that said testimony of said witness was reported by

13   me, a disinterested person, and was thereafter

14   transcribed under my direction into typewriting and

15   is a true and correct transcription of said

16   proceedings.

17        I further certify that I am not of counsel or

18   attorney for either or any of the parties in the

19   foregoing deposition and caption named, nor in any

20   way interested in the outcome of the cause named in

21   said deposition dated the  1st day of

22   March, 2021.

23

24

25   ELAINA BULDA-JONES, RPR, CSR 11720 )
```