# EXHIBIT 5

Ron Schiff, M.D., Ph.D.

```
 1                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2
 3     --------------------------§
       IN RE:  ROUNDUP PRODUCTS   §    Master File No.
 4     LIABILITY LITIGATION       §    3:16-md-02741-VC
                                  §
 5                                §       MDL NO. 2741
                                  §
 6     THIS DOCUMENT RELATES TO:  §
                                  §
 7     ANTHONY HARRIS,            §
                                  §
 8         Plaintiff,             §
       vs                         § Case No. 3:16-cv-03199-VC
 9                                §
       MONSANTO COMPANY,          §
10                                §
           Defendant.             §
11     ------------------------   §
12                          - - -
13                   November 12, 2019
14                          - - -
15
              Videotaped deposition of RON SCHIFF, MD, PhD,
16     held at Shook, Hardy & Bacon, LLP, 100 North Tampa
       Street, Suite 2900, Tampa, Florida 33602,
17     commencing at 8:55 a.m., on the above date, before
       Tami Cline, Registered Merit Reporter, Certified
18     Realtime Reporter, and Florida Professional
       Reporter.
19
                               - - -
20
                   GOLKOW LITIGATION SERVICES
21            877.370.3377 ph | 917.591.5672 fax
                       deps@golkow.com
22
23
24
25
```

```
 1    APPEARANCES:
 2      THE MILLER FIRM, LLC
        BY:  BRIAN BRAKE, ESQ.
 3      Attorneys at Law
        108 Railroad Avenue
 4      Orange, Virginia 22960
        540-672-4224
 5      Bbrake@millerfirmllc.com
        Representing Plaintiff
 6

        SHOOK, HARDY & BACON, LLP
 7      BY:  MICHELLE M. FUJIMOTO, ESQ.
        Attorneys at Law
 8      5 Park Plaza, Suite 1600
        Irvine, California 92614-8502
 9      949-475-1500
        Mfujimoto@shb.com
10      Representing Defendant
11
12    ALSO PRESENT:
13      Matthew Allison, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

1             MS. FUJIMOTO:  Move to strike; nonresponsive.

2    BY MS. FUJIMOTO:

3       Q.   All right.  Let's -- let's do this then.  You

4    practiced oncology and had a clinical practice up

5    until 2015, right?

6       A.   2015, that's correct.

7       Q.   Okay.  And since that time your work has

8    solely been and your income has solely been working

9    as an expert witness in litigation, right?

10      A.   My earned income, yes.

11      Q.   Okay.  And prior to 2015 in your clinical

12   practice, you have previously testified that a large

13   majority of your non-Hodgkin's lymphoma patients --

14   strike that.  Bad question.

15           Am I correct that prior to 2015 a substantial

16   majority of patients you treated with -- for

17   non-Hodgkin's lymphoma had no known cause of their

18   lymphoma?

19      A.   What is also present in the deposition

20   testimony that you're quoting is my discussion of

21   what it means about no known cause.  It was in the

22   context of idiopathic descriptions of etiology and

23   non-Hodgkin lymphoma.  Every disease has a cause.

24   Idiopathic simply means that the cause is not known

25   in this circumstance or the cause is not known in

1  this case.  It doesn't mean there is no cause.

2       Consequently, it is true at that level of

3  defining it that I was unable to pinpoint the cause

4  of non-Hodgkin lymphoma in the majority of patients

5  that I evaluated and treated during my career in

6  practice.  However, that does not mean that all of

7  those cases of non-Hodgkin lymphoma did not have a

8  cause, because they all did.

9    Q.   Okay.  You're assuming way more than you need

10  to on the question.  That's why I was trying to be

11  specific about no known cause.  So I'm accepting

12  your definition of idiopathic.

13       So confirm for me, Doctor, that when you were

14  in practice as an oncologist, over 80 percent of

15  your non-Hodgkin lymphoma patients had no known

16  cause for their lymphoma.  Yes or no?

17    A.   Can't give that as a yes-or-no answer either.

18  The point is that the answer is it is correct but

19  within the context that I provided in my previous

20  answer.  On top of that, recognition of the lymphoma

21  risks associated with glyphosate and Roundup just

22  coincidentally happened to coincide with the period

23  of time that I retired from clinical practice.

24       So from the standpoint of a practicing

25  medical oncologist and hematologist, the Roundup

```
 1    business was new.  It was the spring of 2015.
 2    That's when I retired.
 3       Q.   And, Doctor, you know that Roundup has been
 4    on the market since the '70s, right?
 5       A.   That's correct.
 6       Q.   All right.  So let me ask you this:  In the
 7    Wade case on October 22, 2019, the transcript,
 8    page 182:
 9            "Question:  Okay.  So when you say that a
10    substantial majority of the patients you treated
11    with non-Hodgkin lymphoma did not have a known
12    cause of their non-Hodgkin lymphoma, what
13    percentage would you put on substantial majority?
14            "Answer:  I would say over 80 percent."
15            Do you now disabuse that answer or do you
16    stand by that answer?
17       A.   Okay.  Two things:  Number one, it was the
18    Meeks case, not the Wade case.  The Wade case is the
19    caption for all of the, I believe, multidistrict,
20    multiplaintiff litigation, of which Mr. Harris is
21    one plaintiff and Mr. Meeks is -- was another
22    plaintiff.  But I'm relying on the context that I
23    have given to interpret my answer and the way that I
24    have explained it today.
25            In terms of whether I knew the causes of
```

1    those patients' lymphomas in realtime, what I said
2    then was accurate.  It was the best representation
3    of my memory, and it's what I recall and would
4    answer from scratch today even if not reminded.  The
5    point is that making that statement requires
6    interpretation, and I have tried to provide it.
7        Q.   And let me just state for the record, I'm
8    referring to his deposition on October 22, 2019.
9    The caption is Christopher Wade, et al. vs Monsanto,
10   and I will state that it was not -- you can see on
11   the record it was not an MDL case.  It was in the
12   Circuit Court of the city of St. Louis and the state
13   of Missouri.
14       A.   But the plaintiff was Mr. Meeks.
15       Q.   No question pending.  I'm just stating for
16   the record that it was not an MDL case.  It was a
17   state of Missouri case.
18       A.   Well, I'm not an expert in legal procedure,
19   and that's fine.  But the plaintiff, again, was
20   Chester Meeks and his wife.
21       Q.   But you spent the last --
22            MR. BRAKE:  Is now a good time for a break?
23            MS. FUJIMOTO:  No.
24            MR. BRAKE:  Okay.
25            MS. FUJIMOTO:  I'll finish up my section, and

 1       then we'll take a quick break.

 2    BY MS. FUJIMOTO:

 3       Q.   All right.  In this litigation, have you ever

 4    seen a Roundup plaintiff where you determined that

 5    Roundup was not the cause of their non-Hodgkin

 6    lymphoma?

 7       A.   Not yet.

 8       Q.   Okay.  So you -- every time you've ruled in

 9    Roundup as the cause, right?

10       A.   At the risk of going too far with my answer,

11    I will say that I have only seen plaintiffs who,

12    like Mr. Harris, have had extensive Roundup

13    exposure.  I'm not being sent patients who had

14    two days per year or 3.5 years or up to -- you know,

15    3.5 or ten lifetime days.  I haven't been sent cases

16    like that.  I'm sure they're out there, but those

17    are not the ones that I have been asked to review.

18       Q.   So in your career as an expert witness and

19    your testimony here in this litigation, have you

20    ever seen a Roundup plaintiff where you ruled out

21    glyphosate or Roundup as a cause?

22       A.   Not yet.

23       Q.   All right.

24       A.   But in other medical-legal work that I have

25    done, I have reviewed medical records and I have

1    reviewed supporting documentation, and I have often

2    times told the attorneys who were retaining me that

3    they didn't have a case or that the plaintiff was

4    not a strong plaintiff.

5           MS. FUJIMOTO:  Move to strike; nonresponsive

6       after the answer "no."

7    BY MS. FUJIMOTO:

8       Q.   So let -- let me make sure I understand, and

9    I do recall prior testimony on this.  So in your

10   clinical practice prior to 2015, you never told one

11   of your patients that their non-Hodgkin lymphoma was

12   caused by Roundup or glyphosate, correct?  Yes or

13   no?

14      A.   The Roundup lymphoma link was only becoming

15   known at the time that I retired from practice, on

16   top of which my practice was in the city of Tampa.

17   We did not have a rural or agricultural population

18   that became my plaintiffs.  I had no reason to be

19   suspicious of anybody in terms of pesticide

20   exposure.  Obviously if I had known then what I know

21   now, I would have asked relevant questions, but I

22   didn't know it, mostly because the material wasn't

23   available, and so I did not ask.

24      Q.   For whatever reason prior to 2015, did you

25   ever tell a non-Hodgkin lymphoma patient of yours

```
 1    that their non-Hodgkin lymphoma was caused by
 2    Roundup or glyphosate?  Yes or no?
 3       A.   For the reasons that I have explained, the
 4    correct answer is no.
```



```
 1                    C E R T I F I C A T E

 2          I, Tami Cline, Registered Merit Reporter,

 3     Certified Realtime Reporter, and Florida

 4     Professional Reporter, do hereby certify that,

 5     pursuant to notice, the deposition of RON SCHIFF,

 6     MD, PhD was duly taken on November 12, 2019 at

 7     8:55 a.m. before me.

 8          The said RON SCHIFF, MD, PhD was duly sworn

 9     by me according to law to tell the truth, the whole

10     truth and nothing but the truth and thereupon did

11     testify as set forth in the above transcript of

12     testimony.  The testimony was taken down

13     stenographically by me.  I do further certify that

14     the above deposition is full, complete, and a true

15     record of all the testimony given by the said

16     witness, and that a review of the transcript was not

17     requested.

18

19     _____

20     Tami Cline, RMR, CRR, FPR

21      (The foregoing certification of this transcript does

22     not apply to any reproduction of the same by any

23     means, unless under the direct control and/or

24     supervision of the certifying reporter.)

25
```

1                          LAWYER'S NOTES

2     PAGE    LINE

3     _____   _____   _____

4     _____   _____   _____

5     _____   _____   _____

6     _____   _____   _____

7     _____   _____   _____

8     _____   _____   _____

9     _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____

25