# EXHIBIT 6

1              UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
2

    IN RE: ROUNDUP PRODUCTS        Case No. 3:16-md-02741-VC
3   LIABILITY LITIGATION

                                    MDL 2741
4

5   This document relates to:

6   Lorraine Rehak v. Monsanto
    Company
7   Case No. 3:19-cv-01719-VC

8
                            - - -
9

                         MARCH 5, 2021
10

                            - - -
11

            Videotaped remote deposition of
12       RON D. SCHIFF, MD, PhD, held at the location of the
         witness in Tampa, Florida, commencing at 2:02 p.m.,
13       on the above date, before Joan L. Pitt, Registered
         Merit Reporter, Certified Realtime Reporter, and
14       Florida Professional Reporter.

15                          - - -

16            GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
17                 deps@golkow.com

18

19

20

21

22

23

24

25

```
 1            APPEARANCES VIA VIDEOCONFERENCE

 2

 3    Counsel for Plaintiff:

 4        REBECCA FREDONA, ESQUIRE
          Moll Law Group
 5        22 West Washington Street, 15th Floor
          Chicago, Illinois 60602
 6        312.462.0427
          rfredona@molllawgroup.com

 7

 8    Counsel for Defendant:

 9        MICHELLE M. FUJIMOTO, ESQUIRE
          Shook, Hardy & Bacon LLP
10        Jamboree Center
          5 Park Plaza, Suite 1600
11        Irvine, California 92614
          949.475.1500
12        mfujimoto@shb.com

13        JOSEPH D. PIORKOWSKI JR.
          The Piorkowski Law Firm, PC
14        1800 K Street, NW, Suite 1000
          Washington, DC 20006
15        202.257.7662
          jpiorkowski@lawdoc1.com

16

17

      ALSO PRESENT:

18

          Sarah Howard, Videographer

19

20

21

22

23

24

25
```

Ron D. Schiff, M.D., Ph.D.

```
 1                        - - -

 2                    I N D E X

 3                        - - -

 4   TESTIMONY OF:  RON D. SCHIFF, MD, PhD

 5   DIRECT EXAMINATION BY MS. FUJIMOTO              7

 6   CROSS-EXAMINATION BY MS. FREDONA             103

 7   REDIRECT-EXAMINATION BY MS. FUJIMOTO         107

 8

 9

10            E X H I B I T   I N D E X

11     SCHIFF            DESCRIPTION            PAGE

12   Exhibit 1   Defendant Monsanto Company's Notice      8

13               of Remote Video Conference

14               Deposition of Ron D. Schiff, M.D.,

15               PhD

16   Exhibit 2   Invoice dated 1/25/2021              10

17   Exhibit 3   Plaintiff's Rule 26 General          13

18               Causation Expert Disclosures

19   Exhibit 4   Plaintiff's Rule 26 Specific         13

20               Causation Expert Disclosures

21   Exhibit 5   Various Medical Records,             18

22               nonsequential, Beginning

23               Confidential-Rehak-LRehak-PCCare-

24               000051, ending 000336

25
```

Ron D. Schiff, M.D., Ph.D.

| 1 | Exhibit 6 | Expert Report dated December 24, | 19 |
| 2 | | 2020 | |
| 3 | Exhibit 7 | Article titled "Cigarette Smoking | 26 |
| 4 | | and Risk of Non-Hodgkin Lymphoma:  A | |
| 5 | | Pooled Analysis from the | |
| 6 | | International Lymphoma Epidemiology | |
| 7 | | Consortium (InterLymph), Morton, et | |
| 8 | | al. | |
| 9 | Exhibit 8 | Article entitled "The Association | 30 |
| 10 | | Between Cigarette Smoking and | |
| 11 | | Non-Hodgkin Lymphoid Neoplasms in a | |
| 12 | | Large US Cohort Study," Diver, et | |
| 13 | | al. | |
| 14 | Exhibit 9 | Article titled "Cigarette Smoking, | 36 |
| 15 | | Passive Smoking, and Non-Hodgkin | |
| 16 | | lymphoma Risk: Evidence from the | |
| 17 | | California Teachers Study," Lu, et | |
| 18 | | al. | |
| 19 | Exhibit 10 | Article titled "Cigarette Smoking | 42 |
| 20 | | and Risk of Non-Hodgkin Lymphoma | |
| 21 | | Subtypes Among Women," Morton, et | |
| 22 | | al. | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

Ron D. Schiff, M.D., Ph.D.

```
 1   Exhibit 11   Article titled "Occurrence of Bcl-2      50
 2                Oncogene Translocation with
 3                Increased Frequency in the
 4                Peripheral Blood of Heavy Smokers,"
 5                Bell, et al.
 6   Exhibit 12   Article titled "Family History of       61
 7                Hemolymphopoietic and Other Cancers
 8                and Risk of Non-Hodgkin's Lymphoma,"
 9                Negri, et al.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Ron D. Schiff, M.D., Ph.D.

```
 1                          - - -

 2              THE VIDEOGRAPHER:  We are now on the record.

 3       My name is Sarah Howard, and I am a videographer for

 4       Golkow Litigation Services.

 5              Today's date is March 5, 2021, and the time is

 6       2:02 p.m.

 7              This video remote deposition is being held in

 8       the matter of Roundup, Lorraine Rehak vs. Monsanto,

 9       for the United States District Court, Northern

10       District of California, Case No. 3:18-md-02741.

11              The deponent is Ron -- I'm sorry -- Dr. Ron D.

12       Schiff.

13              All parties to this deposition are appearing

14       remotely and have agreed to the witness being sworn

15       in remotely.  Due to the nature of remote reporting,

16       please pause briefly before speaking to ensure all

17       parties are heard completely.

18              Will counsel please identify themselves.

19              MS. FREDONA:  Rebecca Fredona on behalf of

20       plaintiff.

21              MS. FUJIMOTO:  Michelle Fujimoto of Shook,

22       Hardy & Bacon on behalf of Defendant Monsanto.

23              THE VIDEOGRAPHER:  The court reporter is Joan

24       Pitt and will now swear in the witness.

25              THE COURT REPORTER:  Doctor, let me have you
```

Ron D. Schiff, M.D., Ph.D.

```
 1      raise your right hand.  Do you swear or affirm the

 2      testimony you give will be the truth, the whole

 3      truth, and nothing but the truth?

 4           THE WITNESS:  I do.

 5           THE COURT REPORTER:  Thank you.

 6           RON D. SCHIFF, MD, PhD, called as a witness by

 7      the Defendant, having been first duly sworn, testified

 8      as follows:

 9                    DIRECT EXAMINATION

10      BY MS. FUJIMOTO:

11      Q.   Welcome back, Dr. Schiff.  I want to state for

12      the record before we get rolling as to the

13      Rehak-specific questions that I just deposed you in the

14      Cervantes matter and asked a number of questions

15      regarding general matters not specific to Mr. Cervantes,

16      in particular, questions about methodology, literature,

17      and basically issues related to general causation and

18      methodology for specific causation.

19           I understand that you are in agreement, as is

20      plaintiff's counsel, that rather than go through all of

21      those same questions and answers again here that we will

22      agree to basically accept and adopt and incorporate

23      those questions and answers into this deposition and

24      just move forward from there.

25           Is that correct from your end?
```

Ron D. Schiff, M.D., Ph.D.

```
 1        A.   That's correct.

 2             MS. FUJIMOTO:  Rebecca, you good?

 3             MS. FREDONA:  Correct.

 4   BY MS. FUJIMOTO:

 5        Q.   Okay.  Let me take a quick look.  I see you,

 6   Rebecca, sent the invoice; right?  Let me take a look.

 7             Okay, good.  Thank you.

 8             So let's get started with administratively

 9   attaching, Doctor, from the Rehak stack, the notice of

10   deposition.  Do you have that?

11        A.   I do.

12             MS. FUJIMOTO:  Okay.  And we're going to mark

13        that, Court Reporter, as Exhibit No. 1 to the Rehak

14        deposition.

15             (Schiff Exhibit 1 was marked for

16   identification.)

17   BY MS. FUJIMOTO:

18        Q.   And my question to you, Dr. Schiff, is:  Did

19   you -- your counsel just sent me your invoice for Rehak,

20   and in addition to that, did you produce or provide

21   counsel with any other documents responsive to the

22   requests?

23        A.   Since this morning's deposition, or in general

24   in regard to my notice of deposition on Mrs. Rehak?

25        Q.   In general.  The notice of deposition for
```

1    Mrs. Rehak.

2        A.   Everything that I know to provide has been

3    provided.

4        Q.   Okay.  And I take it then you don't have any

5    handwritten notes or files that are specific to your

6    opinions related to Ms. Rehak?

7        A.   That is correct.

8        Q.   Did you -- as it sounds like in Cervantes, did

9    you get Mrs. Rehak's materials and records that you

10   reviewed -- were those electronic?

11       A.   No.

12       Q.   Okay.  So you did get some medical records

13   regarding Ms. Rehak in hard copy?

14       A.   That's correct.

15       Q.   What else did you get?

16       A.   Medical records and deposition, plus whatever

17   you've sent me yesterday and today, and, of course, my

18   reference list.

19       Q.   All right.  So you got medical records.  Did

20   you get her -- any fact sheets?

21       A.   I don't think so, but I'm going to check.

22            No.

23       Q.   Did you receive deposition transcripts?

24       A.   Hers.

25       Q.   Okay.  Any others?

1      A.   No.

2      Q.   Did you receive any reports from any of the

3   other experts, whether it be general or case-specific?

4      A.   No.

5      Q.   And I take it then you didn't -- have you seen

6   anything related to testimony by her treating physicians

7   by way of transcripts or anything else?

8      A.   No.

9      Q.   So you basically got some medical records

10   pertaining to Ms. Rehak and her deposition transcript;

11   is that right?

12      A.   That's correct.

13      Q.   And it looks like your counsel just produced

14   for me an invoice.  Do you have that in front of you?

15      A.   I do not, but it's close at hand and I could

16   get that if I need to.

17      Q.   Okay.  Yeah, why don't we -- why don't we do

18   that and mark that as Exhibit No. 2.

19           MS. FUJIMOTO:  Court Reporter, are you able to

20       do that if I send that to you electronically?

21           THE COURT REPORTER:  Yes, ma'am, I can do that.

22           MS. FUJIMOTO:  Okay.  So just make a note I'll

23       mark as Exhibit 2 to the deposition Dr. Schiff's

24       invoice related to Ms. Rehak.

25           (Schiff Exhibit 2 was marked for

1    identification.)

2          MS. FUJIMOTO:  And, Rebecca, we can deal with

3       this off the record later, but I'm going to ask that

4       we retroactively attach just as an exhibit, the last

5       exhibit to Dr. Schiff's deposition in Cervantes, his

6       invoice, since that wasn't sent to me until later.

7          MS. FREDONA:  Sounds good.

8          MS. FUJIMOTO:  Okay.

9          THE WITNESS:  I haven't sent an invoice for

10      Mr. Cervantes' deposition.

11   BY MS. FUJIMOTO:

12      Q.  Oh, not the deposition.  You sent -- Rebecca,

13   during your deposition, provided to me a copy of your

14   invoice related to the Cervantes matter, the one that

15   you had submitted.

16      A.  Correct.  I know how much time I spent on that

17   case since then, and I can do the same on Ms. Rehak.

18      Q.  Right.  No, fair enough.

19          So, according to the invoice that was produced,

20   Doctor, it looks like -- is it accurate to say that you

21   were retained in this case on December 15, 2020?

22      A.  December 15, 2020, approximately.  It might

23   have been, you know, a day or so before that, but that's

24   when I started working on it.

25      Q.  Sure.  And so you spent -- let's add this up.

1    Let's see.  You spent about 13 hours between December 15

2    and December 23; is that right?

3        A.   I'm counting 21 1/2 hours, but I'm going to add

4    it again.

5        Q.   21?

6        A.   21 1/2.

7        Q.   Okay.  So 21 1/2 hours.  And was that all

8    reviewing materials?

9        A.   That was reviewing the materials and preparing

10   my report.

11       Q.   Okay.  So it did include the preparation of

12   your report then; correct?

13       A.   Yes.

14       Q.   Okay.  And since December 23, do you have an

15   estimate or can you tell me how many hours you've spent

16   on the Rehak case?

17       A.   An hour and three-quarters of deposition

18   preparation.

19       Q.   Okay.  So, Doctor, let's -- I had already asked

20   you -- we are adopting the testimony regarding generic

21   opinions into this case, but I do want to ask you

22   specific to Ms. Rehak whether it is also the case that

23   you are, in your general opinion, relying upon and

24   deferring to the general causation experts that have

25   been designated in this case.

1      A.   That is correct.

2      Q.   Okay.  So I will mark as Exhibit 3 to the

3  deposition -- it's in your stack -- Plaintiff's Rule 26

4  General Causation Expert Disclosures related -- or

5  served in the Rehak matter.

6           (Schiff Exhibit 3 was marked for

7  identification.)

8  BY MS. FUJIMOTO:

9      Q.   And, Doctor, am I correct that, just as in

10  Cervantes, in the Rehak matter Drs. Portier, Ritz,

11  Weisenburger, and Jameson are the general experts

12  designated by plaintiffs in Rehak?

13      A.   Correct.

14      Q.   And you had indicated earlier that at some

15  point you had reviewed some of the generic or general

16  causation reports of these experts but did not do so

17  specific to this case; is that right?

18      A.   That is correct.  And I'd like to ask -- well,

19  I'm sure you'll get there, but there are still the

20  errors in the specific expert designations.

21      Q.   Oh, that's right.  Okay.  So that's what we're

22  going to get to right now.  We'll mark as Exhibit No. 4

23  to the deposition Plaintiff's Rule 26 Specific Causation

24  Expert Disclosures.

25           (Schiff Exhibit 4 was marked for

1    identification.)

2    BY MS. FUJIMOTO:

3        Q.   And that's where you and Dr. Benbrook are

4    listed; correct?

5        A.   Correct.

6        Q.   And am I correct that you would like to make

7    note on the record that the address is wrong?

8        A.   Yes.

9        Q.   Tell me again what the correct street name is.

10       A.   Stonington, S-t-o-n-i-n-g-t-o-n.

11       Q.   Stonington.  Okay.  And as you testified

12   before, your clarification is that, although you have

13   some general knowledge of toxicology and epidemiology,

14   you don't hold yourself out as an expert in those areas?

15       A.   That is correct.

16       Q.   And genotoxicity, same thing, meaning you have

17   some training and knowledge of molecular biology, but

18   you're not an expert in genotoxicity?

19       A.   I'm probably closer to an expert in that than

20   on epidemiology and toxicology.  So I would not have

21   myself offered to put that in, but if you want to leave

22   that in, it can stay in.  And, again, in the Roundup

23   litigation, I've never been asked a genotoxicity

24   question.

25       Q.   All right.  And so you -- and, again, you had

1    indicated that you've done some review of some of the

2    genotoxicity data on glyphosate but not an in-depth

3    review for purposes of forming an opinion?

4         A.   That's correct.

5         Q.   Okay.  And then same question as to

6    Dr. Benbrook.  Do you know whether, even though he's on

7    this list, whether he even served a general -- or a

8    specific causation report regarding Ms. Rehak?

9         A.   I do not know that.

10        Q.   Do you -- I'd asked you before about

11   Dr. Sawyer.  Do you know whether Dr. Sawyer was asked to

12   review this case?

13        A.   I have no idea.

14        Q.   Okay.  I'm going to represent to you that in

15   the Carmen case he was designated and actually had

16   reviewed all of a group of six cases, and he was asked:

17             "Question:  One question we did have is, it

18        appears you were retained in six cases, but we've

19        not seen a report for the Rehak case.  Did you

20        prepare a report for the Rehak case?

21             "Answer:  No.

22             "Question:  Why not?

23             "Answer:  I found that the case had serious

24        confounding factors and it was not my opinion that

25        glyphosate substantially contributed to the

 1      malignancy.

 2           "Question:  What were those confounding

 3      factors?

 4           "Answer:  As I recall, there were several, but

 5      the biggest elephant in the room was heavy smoking

 6      history and follicular NHL.  I recommended not

 7      proceeding."

 8           If you assume for me, Dr. Schiff, that that is

 9   Dr. Sawyer's sworn testimony in the Carmen case, I take

10   it you disagree with him?

11      A.   Well, I do, because, among other things,

12   Mr. Carmen did not have follicular lymphoma.

13      Q.   No, he was asked about Rehak.

14      A.   Okay.  Because you just -- you asked me twice

15   relative to Mr. Carmen.

16      Q.   No.  I'm sorry.  Let me clarify.  The

17   deposition of Dr. Sawyer was in the Carmen case --

18      A.   Okay.

19      Q.   -- and he was asked in that case:  "Why didn't

20   you serve a report in Rehak?"

21      A.   Okay.

22      Q.   And he said:

23           "I found that the case had serious confounding

24      factors and it was not my opinion that glyphosate

25      substantially contributed to the malignancy."

Ron B. Schiff, M.D., Ph.D.

```
 1              And he was asked:  "What are those confounding

 2        factors," as to Ms. Rehak?

 3              And he said:  "As I recall, there were several,

 4        but the biggest elephant in the room was heavy

 5        smoking history and follicular NHL.  I recommended

 6        not proceeding."

 7              That was his testimony as to Ms. Rehak and why

 8   he wouldn't take the case.  My question to you is:  Are

 9   you -- do you disagree with him?

10        A.   I have not seen that deposition transcript nor

11   do I know the context, but in terms of what you have

12   read to me, yes, I disagree.

13              However, there is also another mistake in the

14   specific causation expert designation which I needed to

15   bring to your attention.

16        Q.   Okay.

17        A.   This pertains only to Ms. Rehak, not to

18   Mr. Cervantes.  When it talks about the types of

19   non-Hodgkin lymphoma, it says specifically large B-cell

20   lymphoma.  This in actual fact is a follicular lymphoma.

21              Again, I did not -- this was not written by me,

22   it was not signed by me, and I did not see it until

23   yesterday afternoon.

24        Q.   Okay.  And so your point is -- and we'll go

25   through the medical records in your report, but
```

Ron B. Schiff, M.D., Ph.D.

```
 1    Ms. Rehak, the type of NHL she had was follicular

 2    lymphoma; right?

 3        A.   That's correct.

 4        Q.   All right.  So let's mark as Exhibit 5 to the

 5    deposition the stack of medical records regarding

 6    Ms. Rehak.  You would have gotten those this morning,

 7    Dr. Schiff.

 8             (Schiff Exhibit 5 was marked for

 9    identification.)

10    BY MS. FUJIMOTO:

11        Q.   And again I will clarify for the record that

12    this Exhibit 5 is a collection of portions or parts of

13    Ms. Rehak's medical records that I felt were important

14    with respect to the questions that I'll be asking you.

15             Do you know whether or to -- whether you had

16    received, Dr. Schiff, all of Ms. Rehak's medical

17    records, or do you have the same concerns you had in the

18    Cervantes matter?

19        A.   In the Cervantes matter, I know that I did not

20    receive all of the records.  In Ms. Rehak's case, I had

21    medical records that were satisfactory for me to

22    reconstruct her case covering the time period between

23    her hospital admission on June 15, 2014, and the final

24    medical record that I have, which was on June 15, 2020;

25    so a period of exactly six years to the day.
```

1     Q.   And did you ask whether these comprise the

2   entirety of Ms. Rehak's medical records?

3     A.   I did not, because I was able to reconstruct

4   her case in a manner satisfactory to me and my ordinary

5   methods.  I did not recognize any missing material.

6     Q.   Fair enough.  And I'm going to want to go

7   through the medical records, so keep that with you, but

8   I will just for administrative purposes go ahead and

9   mark as Exhibit No. 6 to the deposition your report

10   dated December 24, 2020, regarding Lorraine Rehak.  That

11   way we can go to that as well.

12         (Schiff Exhibit 6 was marked for

13   identification.)

14   BY MS. FUJIMOTO:

15     Q.   And in your report, as you mentioned, Doctor,

16   you walk through in fair detail the parts of her medical

17   records that you reviewed and felt were important in

18   terms of reconstructing her diagnosis and treatment; is

19   that right?

20     A.   I reviewed all of the medical records that I

21   received.  I incorporated into the report what I thought

22   was relevant.

23     Q.   Fair enough.  Okay.  So if you'd go then back

24   to Exhibit No. 5, which is her collection of medical

25   records, and if you'd go to -- we're going to do the

Ron B. Schiff, M.D., Ph.D.

```
1    same thing.  Okay?  We're going to go to -- by date as
2    opposed to Bates number.
3            So did you notice, if you go to the fourth page
4    of Exhibit 5, it's a handwritten intake sheet from June
5    15, 2014, Saint Joseph Medical Center, and it notes in
6    her history that she is a pack-per-day smoker.
7            Do you see that?
8       A.   I do.
9       Q.   And you recognize that Ms. Rehak had a lifetime
10   history of having smoking; right?
11      A.   The first reference to that in my report is
12   from that hospitalization where I noted that she smoked
13   one pack of cigarettes per day.  The records that I had
14   did not say at that time how long she had smoked for.
15      Q.   Okay, yeah, because I don't -- you are very
16   detailed in your reports normally, and you are for
17   Rehak, but it didn't mention the extent of it other than
18   a pack per day.  So let's go through that then.  If you
19   would go back to Exhibit 5, the medical records.
20      A.   But I have to ask you:  Were you on the fourth
21   page that had printing on it?  Because right now that
22   looks to me like the page where she had her orders sent
23   and does not contain any information about smoking
24   history.  I see that on the third page, but not with
25   respect to an amount.
```

Ron B. Schiff, M.D., Ph.D.

```
 1      Q.   It was this.  Do you see it?  The Bates number
 2  on the bottom --
 3      A.   I see it now.  I see it now.  One pack per day.
 4      Q.   All right.  And then -- well, let's go through
 5  the notations.  If you move forward through the records
 6  to the -- it's a Health Information Management Report
 7  dated June 15, 2014.  It's a typewritten
 8  Oncology/Hematology Consultation.
 9      A.   I have it.
10      Q.   Okay.  Bates is 13 at the bottom.
11      A.   Yes.
12      Q.   If you go down to the bottom, under habits, it
13  says, "Smoker one pack per day.  Consumes one to two
14  alcoholic beverages a day."
15           Do you see that?
16      A.   Yes.  That's in my report.
17      Q.   Okay.  And then family history, let's go ahead
18  and make a note of this while we're in the medical
19  records.  "Father had pancreatic cancer, one aunt had
20  breast cancer, and another aunt had colon cancer."
21           Correct?
22      A.   Yes.  Also in my report.
23      Q.   Yes.  You understood that she has a family
24  history of other cancers; right?
25      A.   That's correct.
```

Ron B. Schiff, M.D., PH.D.

```
1          Q.   Okay.  All right.  Moving forward to the

2     discharge summary from that June 15, 2014,

3     hospitalization, and the Bates number at the bottom is

4     57.

5          A.   I have it.

6          Q.   Okay.  And if you'd go to the brief HPI --

7          A.   Yes.

8          Q.   -- at the bottom, it says, "She is a smoker of

9     one pack of cigarettes a day all of her life.  There is

10    a strong family history of carcinoma.  Her brother's

11    left kidney surgery for cancer required nephrectomy a

12    year ago.  Father died three years back with liver and

13    pancreatic carcinoma and was on chemotherapy."

14              You were aware of that history as well;

15    correct?

16         A.   Not with regard to the brother.

17         Q.   Okay.

18         A.   I did not have this discharge summary among the

19    records that was provided.

20         Q.   Okay.

21         A.   So the family history that I knew from that

22    hospitalization of positive family history for cancer

23    was father and two aunts.

24         Q.   Okay.  But -- so if you didn't have this

25    discharge summary, were you aware that she had been
```

```
 1   smoking all of her life since she was 18?

 2       A.   No.   In time -- in the time frame of that

 3   hospitalization, I did not know the duration of her

 4   smoking history.   I did encounter that in a later record

 5   and incorporated that into my report.

 6       Q.   Okay.   So let's go then forward to the

 7   February 5, 2015.   It is a Cancer Clinics of Excellence

 8   report, and the bottom Bates says "Rehak-NuclearO," lots

 9   of 0's and a 2.

10       A.   Please repeat the date.

11       Q.   February 5, 2015.

12       A.   I have found Bates Nos. 3 through 5, but I do

13   not yet have Bates No. 2.   I'm going to continue to look

14   for it.

15       Q.   Yeah, they're not particularly -- it's about a

16   third of the way through.   It looks like this.

17       A.   Okay.   Hopefully, I'll find it momentarily.

18            I have it.

19       Q.   Great.   Thank you.   So this is dated

20   February 5, 2015, and under family history, it notes,

21   "Father is deceased at age 72 having experienced

22   pancreas cancer at age 72, and diabetes."   Mentions

23   mother having hypertension and so forth, and one sister

24   having Grave's Disease, thyroid gland cancer and thyroid

25   problems.   And it says, "Paternal grandmother is
```

1    deceased at age 67 having experienced stomach cancer at

2    age 67."

3         Do you see all that in terms of the familial

4    history of cancer?

5    A.   I do, but here it lists her brother as having

6    no history of cancer.

7    Q.   Okay.

8    A.   It's the paternal cousin who did.

9    Q.   Yes.  Later on -- sorry.  Later on it mentions

10   a maternal aunt with small intestine cancer, paternal

11   aunt with breast cancer, and a paternal cousin with

12   kidney cancer; right?  That's what this report says?

13   A.   That is correct.  And I did not have this

14   report either.

15   Q.   Okay.  An then if you go to social history, it

16   says, "Current everyday smoker one pack per day for 36

17   years (36 pack years).  Active drinker two drinks a day

18   three days a week.  Patient indicated use of the

19   following products:  Beer, liquor and cigarettes."

20        Did you have that information?

21   A.   Yes.  And, as a matter of fact, I'm finding the

22   whole thing, including those other family members,

23   dictated in my report.  This is the consultation report

24   from the radiation oncologist.

25   Q.   Okay.

1      A.    So I did document the family history with

2   regard to all of those other relatives and the fact that

3   the smoking history was now determined to be 36 pack

4   years, continuing to smoke one pack per day.

5      Q.    Okay.  And where is that in your report?

6      A.    Well, it's in the factual review section with

7   the date of February 5, 2015, the same as the date of

8   this report.  So if you want to know what page it is in

9   the entire report, I believe it's page 6.

10     Q.    I'm sorry.  I'm talking about your expert

11  report.  Did you note in your expert report?

12     A.    Yes.  That's exactly what I'm talking about.

13  It's all in there, because I did have the radiation

14  oncology consultation.

15     Q.    Okay.  So let's see.  It will be page 6.

16  Although your pages aren't numbered, I added that.

17     A.    They go by date in the factual review section.

18  So it's the last paragraph on the sixth page.

19  February 25, 2015.

20     Q.    Okay.  I've got it.  I've got it.  So on page 6

21  of your report, you note her family history of her

22  sister with a history of thyroid cancer, paternal

23  grandmother with gastric cancer, stomach cancer,

24  paternal aunt with breast cancer, maternal aunt with

25  small intestinal rather than colon cancer, paternal

Ron B. Schiff, M.D., Ph.D.

1    cousin with a history of kidney cancer, and a smoking

2    history of 36 pack years, and she was continuing to

3    smoke a pack per day.

4         So you did -- you did have that information

5    when you formed your opinion; is that right?

6    A.    That's correct.

7    Q.    And as we indicated earlier, it is your opinion

8    that to the extent smoking is a risk factor for

9    non-Hodgkin lymphoma, it is only with regard to

10   follicular lymphoma in women; is that right?

11   A.    Within follicular lymphoma, it's only women.

12   There's less evidence in other cancers, but InterLymph

13   clarifies the association with women with follicular

14   lymphoma.

15   Q.    Okay.  And so if we look at -- and it should be

16   in your stack -- it's the Morton article from 2005, and

17   we'll mark that as Exhibit 7.

18        (Schiff Exhibit 7 was marked for

19   identification.)

20   BY MS. FUJIMOTO:

21   Q.    If you would find that and confirm for me that

22   this is a publication arising from the International

23   Lymphoma Epidemiology Consortium, which we all refer to

24   as the InterLymph study; is that right?

25   A.    Yes, but I haven't found the article yet.

Ron B. Schiff, M.D., Ph.D.

```
 1      Q.   It should be in the stack.  It's called
 2  "Cigarette Smoking and Risk of Non-Hodgkin Lymphoma:  A
 3  Pooled Analysis From the International Lymphoma
 4  Epidemiology Consortium (InterLymph)."  First author is
 5  Lindsay Morton.
 6           Were you able to find that, Doctor?
 7      A.   No, ma'am.
 8      Q.   Okay.  Were you -- but I think you -- let me
 9  look at your report.  I think you cited to this.  You're
10  probably familiar with it.
11      A.   I cited to other papers first, of Morton, not
12  2005.
13      Q.   Okay.  But you didn't cite to any Morton or --
14  any Morton paper in your reference list, did you?  Or
15  did you?  I don't see it.
16      A.   Okay, I'll look at that in a minute, but right
17  now I'm looking through the materials that you sent as
18  part of the packet on Ms. Rehak yesterday.  I do not see
19  a Morton reference there.
20           If there was a Morton reference in the
21  Cervantes stack, which we did not discuss, I can look
22  for it, but I don't remember seeing that this morning.
23           Meanwhile, on my current reference list --
24      Q.   Yeah, I did not ask you about this paper by
25  Morton, because Mr. Cervantes was not a smoker.
```

1          Did you -- let me ask you this:  Your reference

2    list for Rehak, does it include any publications

3    regarding smoking history and the relationship to NHL

4    and, in particular, follicular lymphoma?

5          A.   Yes.  It's Reference No. 5, where the first

6    author is Linet, and Morton is the third author.  But,

7    yes, it's right there.

8          Q.   And it says, "Medical History, Lifestyle,

9    Family History, and Occupational Risk Factors for

10   Follicular Lymphoma"; is that right?

11         A.   That's it.

12         Q.   And what was the relative risk that Linet found

13   for follicular lymphoma in women and smoking?  Do you

14   recall?

15         A.   No.  I have to look that up.

16         Q.   Do you have it with you?

17         A.   I'm looking at that article right now, and I

18   will know something about it very shortly.

19         Q.   Okay.

20         A.   It's not in the abstract, but it is in Table 3

21   where we look at history of cigarette smoking more than

22   six months or more than 100 cigarettes in lifetime.  For

23   women, the odds ratio is 1.22.  95 percent confidence

24   interval is 1.09 to 1.37.  Again, that is Table 3.

25         Q.   Okay.  And is that -- that's certainly what is

1    consistent with the range of odds ratios found in the

2    Morton 2005 paper that you're not able to find that

3    should have been included, but in Table 4 of that paper,

4    the odds ratio for follicular lymphoma ranges from 1.2

5    to 1.3, depending upon the pack years.  Greater than 36

6    pack years is a 1.3 odds ratio.

7            Is that consistent with your understanding of

8    the overall data regarding follicular lymphoma in women

9    and smoking?

10    A.   Yes, although again I want to repeat that I've

11    never seen the 2005 paper that you're referring to.

12    Q.   Okay.  Let's look at -- did your exhibits

13    include Diver, the Diver piece?

14    A.   Yes.

15    Q.   Okay.

16    A.   There are additional smoking data having to do

17    with exposure-response relationships in Table 6 in the

18    Linet paper that I cited.

19    Q.   And what does that tell you?

20    A.   Well, it's very similar, very similar odds

21    ratios, and there are some that -- and this appears not

22    to be broken down by gender, so that has limited

23    applicability to the question of gender, but some of

24    these comparisons do not reach statistical significance,

25    and those that do are in the same range as we saw in

Ron B. Schiff, M.D., Ph.D.

```
 1   Table 3 where it is broken down by gender, and what you

 2   described from the 2005 article, which, as I indicated,

 3   I have never seen.

 4       Q.   Okay.  So let's take a look at Diver here, if

 5   you have that paper, and I'll mark that as Exhibit No. 8

 6   to the deposition.

 7           (Schiff Exhibit 8 was marked for

 8   identification.)

 9   BY MS. FUJIMOTO:

10       Q.   Do you have that in front of you, Doctor?

11       A.   I will in a moment.

12       Q.   All right.

13       A.   I have it.

14       Q.   Okay.  Had you seen Diver or were you familiar

15   with this study before you did your report and formed

16   your opinions in this Rehak case?

17       A.   I was not.  The other study is more recent than

18   this, and that is one reason.

19       Q.   Okay.  This is "The Association Between

20   Cigarette Smoking and Non-Hodgkin Lymphoma Lymphoid

21   Neoplasms in a Large US Cohort Study."

22           If you would take a look at the results of

23   that.  And they report a relative risk for current

24   smoking associated with NHL incidence in women was 1.37

25   and in men was .88.  So they found an overall increase
```

1    in NHL risk in women but not men; is that right?

2        A.   Yes.  That's consistent with InterLymph.

3        Q.   And then among current smokers there was a

4    positive relationship between years smoked and the risk

5    of NHL in women, but no association in men.

6            Do you see that?

7        A.   I do.

8        Q.   Is that consistent with InterLymph findings?

9    Do you know?

10       A.   Well, I did not see in the InterLymph

11   follicular lymphoma article that the data were broken

12   down in that manner.  I'm looking at the relative data

13   here, and what we're calling attention to is that the --

14   yes, the trend for women is statistically significant.

15   However, the individual breakdown by category is only

16   significant for women who have smoked more than 50

17   years, which does not apply to Ms. Rehak.

18       Q.   Okay.  So if you look at Diver then, if you go

19   on to the next sentence, it says, "In women, the

20   positive associations with current smoking" -- so

21   current -- "were strongest for follicular lymphoma," and

22   the relative risk was 2.13, so a doubling of the risk.

23           Do you see that?

24       A.   I do not see the 2.13 in Table 2.

25       Q.   It's in the abstract for Diver.

1      A.   I understand that.  I'm in Diver and going back

2   and forth between the abstract and the actual

3   representation of the data.

4      Q.   Okay.

5      A.   So, you know, with regard to years smoked, it

6   is the trend that is positive, but the actual comparison

7   is only positive for more than 50 -- more than 50 years

8   of smoking; and for the 2.13 for current smokers, I'm

9   looking in Table 2 and I'm seeing a relative risk of

10   1.37, which is statistically significant.

11      Q.   Let me find that table, because I'm reading

12   from the abstract too.

13      A.   Okay.  But that actually is not follicular

14   lymphoma.

15      Q.   I know, but follicular, so that's the key,

16   because the Table 2 is the general.  So the subtypes --

17   smoking, says current.

18           Here you go.  So the age, former smokers, years

19   since quitting.  I'm looking for the follicular number

20   on Table 3.

21      A.   Yeah, it's not broken down by subtype in Table

22   3, and in the text there is reference to Figure 1 and to

23   Supplemental Table --

24      Q.   Ah, here it is.  Okay.

25      A.   I do not have the supplemental table, and so

1    far -- okay, here I have Figure 1, and I'm looking at

2    follicular and I am seeing -- yes, I am seeing a

3    statistically significant increased --

4        Q.   In current?

5        A.   -- adjusted rate ratio for current smokers in

6    terms of the risk of developing follicular lymphoma.  So

7    there it is.  Figure 1 is the only place we're going to

8    see the actual data.

9        Q.   Yeah, you found it.  Okay.  And that's

10   certainly -- and what is seen is it's in women, current

11   smokers in women; right?

12       A.   That is correct.

13       Q.   Okay.  And, in fact, if you -- looking down

14   below that Figure 1 in the paper, at the bottom of the

15   first left-hand column and going into the right-hand, it

16   says, "Indeed, our study, like many other studies" --

17   and they list six references -- "found a higher risk of

18   follicular lymphoma among current smokers, but in our

19   study this association was limited to women.  The large

20   InterLymph consortium of case-control studies identified

21   a significant increased risk of follicular lymphoma

22   associated with current smoking and number of years

23   smoked, which did not differ by gender."

24       A.   Yeah, except that that InterLymph citation,

25   which is Reference 7, is to the 2005 paper.

1    Q.   Right.  And so what you're telling me is that

2    in the Linet paper of 2015 they've updated the

3    InterLymph data and, in fact, the increased relative

4    risk has been stratified by gender, and it's increased

5    in women with follicular lymphoma; is that right?

6    A.   That is correct, and that's also in my report,

7    but yes, exactly.

8    Q.   And what did you say are the general -- is the

9    relative risk found by Linet for follicular lymphoma in

10   women?

11   A.   I've already put that away, so I'm going to

12   bring it out again and find it again as quickly as I

13   can.

14        For ever smokers versus never smokers, the odds

15   ratio is 1.22.  95 percent confident interval is 1.09 to

16   1.37.  That's on page 31.

17   Q.   And what is it for follicular lymphoma in women

18   for current smokers?

19   A.   Well, again, that's what I just read.  Odds

20   ratio is 1.22.  95 percent confidence interval is 1.09

21   to 1.37.

22   Q.   And that's current female smokers for

23   follicular lymphoma?

24   A.   I think it's ever smokers.

25   Q.   Right.

```
1        A.   I'll have to look again to see if there is --

2    yes.  Okay.  So here's what the problem is.  If we go to

3    Table 6 -- and I believe I mentioned this before -- when

4    they look at other smoking metrics specifically, not

5    just history of, meaning ever smokers versus never

6    smokers, but if they look at smoking status, including

7    current smokers, age started smoking cigarettes

8    regularly, frequency of cigarette smoking, duration of

9    cigarette smoking, lifetime cigarette exposure, in Table

10   6, these are not broken down by gender.

11            Now, there is an appendix, and I'm going to the

12   appendix next, because I do have that.

13       Q.   Okay.

14       A.   And the appendix appears to be based on

15   geographic location of the study population.  So I don't

16   think that is going to help me give you a better answer

17   to your question.

18       Q.   So -- but what we do have is the Diver paper

19   that does stratify current smoking -- current female

20   smokers with follicular lymphoma; right?

21       A.   That is correct.

22       Q.   And Linet 2015, to your review, doesn't address

23   that particular category; right?

24       A.   That is also correct.

25       Q.   So let's look at the next paper that has some
```

1    particulars.  We'll mark as Exhibit 9 to the deposition

2    the Lu paper.  L-u.

3            (Schiff Exhibit 9 was marked for

4    identification.)

5        A.   I have it.

6        Q.   That is called "Cigarette Smoking, Passive

7    Smoking, and Non-Hodgkin Lymphoma Risk:  Evidence from

8    the California Teachers Study."

9            Are you familiar with the California Teachers

10   Study?

11       A.   Yes.  I've had this article since before or

12   during my prior Roundup litigation depositions.

13       Q.   Okay.  So although you didn't put this on your

14   reference list for Rehak, you're familiar with it?

15       A.   Well, yes.  Again, I mean, the Linet reference,

16   the InterLymph reference, is newer than this, but --

17       Q.   Right, but it doesn't give us specific data on

18   current women smokers with follicular lymphoma, though.

19       A.   That is correct.  You seem to have flagged page

20   573, which comes, actually, after the text of the

21   article and the references, and under follicular

22   lymphoma, there are no statistically significant

23   comparisons.

24       Q.   Yeah, I don't know what you mean "flag."  I

25   wouldn't have flagged anything in any of these exhibits.

1   Someone may have.

2        573 is an Appendix Table 1 in Lu.  Is that what

3   you're talking about?

4        A.   Yes.

5        Q.   Okay.  Well, that's not the stratification I'm

6   talking about.  If you'd look at Table 4.  And it gives

7   you relative risk for follicular lymphoma.  And Table --

8   yeah, okay.

9        Do you see that?

10       A.   I do.

11       Q.   Okay.  And you look for intensity under

12  follicular lymphoma and you have -- it depends on which

13  category you're looking at, but you pretty much have

14  relative risks that go above 2 both for greater than 40

15  years smoking 2.89, intensity greater than 3 is 2.42,

16  and intensity in terms of years greater than 50 years is

17  2.26, the 21 to 50 is 1.31.  Do you see that?

18       A.   No, I do not, because I'm looking in Table 4,

19  I'm looking under follicular lymphoma.

20       Q.   Right.  Page 569?

21       A.   Yes.

22       Q.   Okay.

23       A.   And which -- are the relative risks that you

24  are citing is under intensity?

25       Q.   Right.

1    A.   All right.  So the one with greater than 3.0 is

2    statistically significant.  The one that's 2.1 to 3.0 is

3    borderline statistically significant.  Both have

4    relative risks greater than 2.  But the problem is that

5    this entire table deals with passive smoking and not

6    actively smoking.

7    Q.   Right, because what they're doing is, if you

8    recall, if you remember this study, they're looking at

9    the effect of not just risk, but passive smoking as

10   well.  So the influence of -- even on current smokers --

11   of also having that additional layer of passive smoking.

12   A.   But we don't know anything about that in

13   Ms. Rehak's case, so I would maintain that Table 4 is

14   not relevant to her case.

15   Q.   Okay.  Let's go then to the discussion on page

16   568 then.  Okay?  And the right-hand column almost

17   middle of the way down, it says, "Second, the present

18   study demonstrated that the estimated relative risks of

19   NHL associated with smoking were strengthened when women

20   with household passive smoking were excluded from the

21   reference category."

22        Do you see that?

23   A.   I do.

24   Q.   And then it says, "Third, our data further

25   strengthened the evidence regarding the increased risk

1    of follicular lymphoma among ever smokers that was

2    observed in previous studies and particularly in women."

3              And do you see that all the citations they

4    give?

5        A.   All of this makes sense.  Passive smoking is

6    not as big a risk factor as active smoking, and this is

7    well-documented in a number of studies, including the

8    InterLymph study, which is more recent; and, of course,

9    all of that is discussed in my report.

10       Q.   Okay.  And so you certainly -- if you go to the

11   references about the increased risk of follicular

12   lymphoma in women, they reference 4, a paper by Besson;

13   Reference 13, which is Morton, which we've talked about;

14   15, Parker; 16 is Schollkopf; 24 is Stagnaro; and 30 is

15   De Stefani.

16             Did you review any of those citations that were

17   listed?

18       A.   No, I did not.  I reviewed primarily

19   InterLymph, which is more recent than any of this.

20       Q.   Understood it's more recent, but the Morton

21   studies from 2003 and 2005, unlike your Linet 2015,

22   which I think is a good paper -- I'm not suggesting it's

23   not -- but the Morton papers actually stratify the

24   increase in risk in follicular lymphoma in women; right?

25       A.   Well, I haven't read those papers, so I don't

Ron B. Schiff, M.D., Ph.D.

1    have a comment about that.  I'm now going to look to see

2    if I can find anything about that in the text discussion

3    in the InterLymph paper.

4        Q.   Are you looking at Linet again?

5        A.   Yes, I am.

6        Q.   Okay.

7        A.   At this level of examination, the only thing

8    that I can find is on page 29 in the discussion section.

9    "Reasons for the female-specific modest increase in

10   follicular lymphoma risk associated with cigarette

11   smoking are not clear, but these results are consistent

12   with those of a recent meta-analysis of 24 studies,

13   which reported a 43 percent increased risk of follicular

14   lymphoma in female smokers compared with nonsmokers, but

15   no association of smoking status, duration, or intensity

16   in males."

17            And I'm now going to tell you what article that

18   cites.  That's an article by Castillo from 2012, which

19   I'm also not familiar with.

20       Q.   Okay.

21       A.   The title of the article is "Cigarette Smoking

22   is Associated With a Small Increase in the Incidence of

23   Non-Hodgkin Lymphoma:  A Meta-Analysis of 24

24   Observational Studies."

25            And I'm seeing now that there is an earlier

1    InterLymph reference cited, which is, in fact, Morton

2    2005, where what they write in the 2014 article is "The

3    current analysis with more than twice as many studies

4    and threefold more follicular lymphoma cases than our

5    earlier InterLymph consortium analysis" -- and, again,

6    that's the Morton 2005 paper -- "provides more precise

7    estimates of follicular lymphoma risk.  20 percent

8    increase in our analysis of current smokers versus

9    31 percent in our earlier assessment, and identified a

10   similar significant relationship with increasing

11   duration of smoking, establishing that this association

12   is not likely to be confounded by alcohol, BMI, or a

13   variety of other risk factors evaluated here."

14         I think that's all we can take away from this

15   InterLymph study.

16   Q.   Okay.  That's very helpful.  Thank you.

17         One last Morton, to see if you've seen it, I

18   also put in the stack, and it has to do with your recent

19   reference there to duration and what data we have.  So

20   this is Morton from 2003, and it's -- so also InterLymph

21   study, as I understand it.

22         Let me look.  Maybe not.

23         Same Morton, though, and it's called "Cigarette

24   Smoking and Risk of Non-Hodgkin Lymphoma Subtypes Among

25   Women."  So that's very specific to women.

```
 1            (Schiff Exhibit 10 was marked for

 2    identification.)

 3    BY MS. FUJIMOTO:

 4       Q.   Have you seen that paper before?

 5       A.   No, and I don't believe that you sent that to

 6    me with the other exhibits for the Rehak deposition.

 7       Q.   Are you sure?  Could you check one more time?

 8       A.   Going through it again for what's probably the

 9    fourth time today.  I can tell you exactly what articles

10    are in this packet, but neither of the earlier two by

11    Morton are among them.

12       Q.   Okay.  So let me just read this, and you tell

13    me whether you're familiar with the data and/or whether

14    you agree or disagree with it.

15            They say, "The increased risk of follicular

16    lymphoma appears to be associated with increased

17    intensity and duration of smoking and cumulative

18    lifetime exposure to smoking.  Compared with nonsmokers,

19    women with a cumulative lifetime exposure of 16 to 33

20    pack years and 34 pack years or greater experienced

21    50 percent increase in risk and 80 percent increase in

22    risk, respectively."

23            So what they found is, for example, for

24    Ms. Rehak, a greater than 34 pack year history increases

25    her risk by 80 percent.  The relative risk is 1.8 with a
```

```
 1   confidence interval of 1.1 to 3.2.

 2          Is that data you were familiar with?

 3      A.   No, it is not.

 4      Q.   Do you agree or disagree with it?

 5      A.   Well, I haven't seen the article, and I still

 6   don't have the article, so at this point I can neither

 7   agree nor disagree.

 8          I will make two points.  The first of them is

 9   that I'm looking to see if Linet 2015, or more

10   correctly, 2014, cited the 2003 paper, and I'm still

11   looking for it.

12      Q.   Well, my question, Doctor, was:  These data

13   report an 80 percent increase in risk of lymphoma in

14   women who have more than 34 pack years of smoking.  And

15   do you -- does that sound consistent with your knowledge

16   of other data?

17      A.   In general, it seems somewhat high, but it

18   might be consistent, but at no time am I disputing that

19   cigarette smoking is a risk factor for the development

20   of follicular lymphoma in women.  I'm not disputing

21   that, but again, it does not rule out or exclude or

22   diminish or even mitigate the role of -- the causative

23   role of Roundup.

24          You know, and again I'm going back here to the

25   study that we looked at earlier with the 2.13 relative
```

1    risk, which is the Diver paper, and that's current

2    smokers, and they did find a positive relationship trend

3    between years smoked and lymphoma risk, but it was the

4    trend that was positive.  It was only women who smoked

5    50 or more years who exhibited a positive -- a

6    statistically significant elevated relative risk for

7    that group alone.  And that we covered.

8             So, you know, so that's the distinction.  I

9    mean, different studies are going to give different

10   data, there's no dispute, but I'm also not disputing

11   that smoking is a risk factor for the development of

12   follicular lymphoma in women.

13       Q.   Do you agree that that risk gets higher the

14   more and longer a woman smokes?

15       A.   I think that, in particular, the paper that I

16   just looked at, which is the Diver paper, which in the

17   table that I'm looking at does not break down by

18   lymphoma subtype but only non-Hodgkin lymphoma overall,

19   there are a couple of statistics that indicate an

20   exposure-response relationship by virtue of a

21   statistically significant p-value for trend.

22             Years smoked is one, but it's only significant

23   for an individual group, to those who smoked 50 or more

24   years.

25             Cigarettes per day has a positive p-value for

1    trend, but none of the individual tertiles reaches

2    statistical significance.

3           Years since quitting does not even have a

4    positive p-value for trend.

5           Age began smoking does have a statistically

6    significant one, but only ages 17 or 18 or age at

7    starting smoking have a statistically significant

8    relative risk for that one age bracket.

9           And, of course, under current smoking, we

10   already discussed earlier that current smokers have a

11   p-value -- sorry -- relative risk of 1.37, statistically

12   significant; former smokers have a relative risk of

13   1.14, borderline statistically significant; and a

14   p-value for trend that is statistically significant.

15       Q.   Doctor, do you -- in using your common sense

16   methodology, do you think it's common sense that the

17   longer and more a woman smokes, the greater her risk of

18   follicular lymphoma?

19       A.   My methodology is certainly not based

20   exclusively on common sense in any particular aspect.  I

21   look at the data first and I go off the data.  It is

22   intuitive that there is an exposure-response

23   association, but we've already seen in the limited

24   discussion we've had of this topic that that is not

25   consistent.

1        But, again, I am not making the argument that

2   cigarette smoking is not a risk factor for the

3   development of follicular lymphoma in women.

4        Q.   No, I understand that, Doctor, and I appreciate

5   that, but at the same time, you've already told us in

6   the Cervantes case that when you're looking at risk

7   factors in a person that has more than one risk factor,

8   and including glyphosate exposure, that there's no way

9   to quantify and weigh each risk factor to compare with

10  one another and the best that you can do is kind of

11  gauge by the data how great their risk is.

12        And so I'm trying to ascertain from you whether

13  someone that smokes, you know, a pack per day for 36 to

14  40 years is going to be, in your mind, at a greater

15  risk -- whatever the number is -- greater risk of

16  getting follicular lymphoma than someone that smoked

17  for, you know, a few cigarettes for five years.

18        MS. FREDONA:   Objection.   Form.   Misstates the

19     record.

20        A.   We've looked at a lot of data that deals with

21  that, and we don't necessarily have a consensus complete

22  answer.   The weight of the evidence suggests that there

23  is a positive exposure-response, which I've already

24  acknowledged, but I think that's really all that you can

25  say about it.

Ron B. Schiff, M.D., Ph.D.

1          The one that broke it down most is the Diver

2     paper.  There are limitations in there because of the

3     lack of subtype data, and there are limitations also in

4     the InterLymph for that reason.

5          You know, I mean, with Diver, the data that we

6     looked at that looked at all those parameters is not

7     broken down by lymphoma subtype.  The data that we have

8     for follicular lymphoma in the Diver paper is broken

9     down by never smoker, former smoker, or current smoker

10    only, not by exposure-response.  So, you, know, I can't

11    infer results of data that I have not seen or that does

12    not exist.

13    Q.  And there's biological plausibility, is there

14    not, Doctor, with regard to the development of lymphoma

15    and cigarette smoking?

16    A.  I don't know that the exact mechanism is

17    proven, but by virtue of the number of carcinogens in

18    tobacco smoke, it certainly seems plausible.

19    Q.  Is it correct -- hang on.  I want to reference

20    this.

21         Do you still have Diver in front of you?

22    A.  I do.

23    Q.  I think it's the Diver case.  There it is.  Or

24    paper.

25         Bear with me, Doctor.  I'm looking for

1    something.

2        A.    Take your time.

3        Q.    Okay.  What I was looking for is in the Lu

4    paper, which we marked as Exhibit 9.

5        A.    I'm there.

6        Q.    Okay.  And if you'd go to the last page of the

7    article before the references start.  Or the references

8    start on that.  It's page 570.  Left column, second full

9    paragraph.

10           And it says, "The chromosomal translocation

11   t(14;18) has been hypothesized by some research to be a

12   potential biologic mechanism for the association between

13   follicular lymphoma and active smoking.  This somatic

14   mutation joins the immunoglobulin heavy chain gene on

15   chromosome 14 with the bcl-2-2 gene on chromosome 18 and

16   results in overexpression of bcl-2-2 protein, which

17   inhibits apoptosis.  Both increasing age and smoking

18   have been associated with (14;18) translocation."

19           Do you see that?

20       A.    I do.

21       Q.    Do you agree with or subscribe to that current

22   thinking with regard to the (14;18) translocation?

23       A.    Well, you know, this paper was written 10 years

24   ago and this is expressed as a hypothesis, including

25   speculation about the mechanism.  Yes, it is definitely

Ron B. Schiff, M.D., Ph.D.

1    plausible.

2         On the other hand, we do not have cytogenetic

3    or molecular data on Ms. Rehak with regard to -- and I

4    want to make sure that I cover this exactly -- with

5    regard to either her fine needle aspiration and core

6    biopsy of the left retroperitoneal mass on June 16,

7    2014, or her bone marrow examination on June 30, 2014.

8         Q.   The testing to determine whether she had a

9    chromosome (14;18) translocation was not done; correct?

10        A.   That's my point.

11        Q.   Right.  So it's not that she didn't have it,

12   that translocation, it's that it wasn't tested; right?

13        A.   I didn't say that she didn't have it, and I

14   didn't say that she did have it.  I stated that it

15   wasn't done.  I don't have data, I haven't seen data on

16   that, and I believe that I have full reports on both the

17   lymph node and bone marrow specimens.

18        Q.   Right.  Now, so we don't know whether she had

19   this translocation, but we do know, don't we, that a

20   large percentage of people with follicular lymphoma,

21   when they are tested, turn out to have this

22   translocation; right?

23        A.   That's correct.

24        Q.   And that's why it is of such interest in

25   looking at biological mechanisms by which follicular

1    lymphoma occurs; right?

2        A.   That's always of interest, yes.

3        Q.   Okay.  If you would go to your stack and pull

4    the two-page paper by Douglas Bell, and we're going to

5    mark that as --

6             MS. FUJIMOTO:  I think -- are we on 11, Joan?

7             THE COURT REPORTER:  I have 10.

8             MS. FUJIMOTO:  10.  I marked 10; right?

9             THE COURT REPORTER:  Let me check.  Hold on.

10            MS. FUJIMOTO:  I think I marked 2003 Morton --

11            excuse me -- as Exhibit 10.

12            THE COURT REPORTER:  We'll just have to go with

13            that then.

14            MS. FUJIMOTO:  Okay.  You and I will have to

15            get together after to make sure we have our exhibit

16            numbers right.  So I'm going to mark as Exhibit

17            No. 11 the piece by Bell, Liu, and Corotpassi

18            entitled "Occurrence of Bcl-2 Oncogene Translocation

19            With Increased Frequency in the Peripheral Blood of

20            Heavy Smokers."

21            (Schiff Exhibit 11 was marked for

22    identification.)

23    BY MS. FUJIMOTO:

24        Q.   Doctor, have you seen this at all at any time

25    in the past?

1      A.   Well, this paper is 26 years old.  I was

2   certainly subscribing to the Journal of the National

3   Cancer Institute in 1995, but until I received this

4   article in the packet concerning Ms. Rehak yesterday, I

5   did not have any recollection of having read it.

6      Q.   Okay.  And so certainly even as far back in the

7   '90s research was being done on the (14;18)

8   translocation, its impact on the bcl-2 oncogene, and its

9   relationship to different cancers, including lymphoma;

10   right?

11      A.   That's correct.

12      Q.   And if you look here, what they did in this

13   study is to measure, basically, the blood levels of --

14   peripheral blood levels, and finding in heavy smokers

15   versus nonsmokers, and in particular they were looking

16   for the bcl-2-2 oncogene translocation within that

17   blood; right?

18      A.   Correct.

19      Q.   And what they found was that when they looked

20   for these mutations, the frequency of the mutations in

21   smokers, they found that there was an increase in heavy

22   smokers; right?

23      A.   You're looking at Figure 1?

24      Q.   No, I was looking at the text in the first

25   column.  Let's do this so that we don't get too -- so

1    that I don't get it wrong.

2         If you go to the left-hand column on the first

3    page, they explain, "The chromosomal translocation

4    t(14;18) (q32;q21) juxtaposes the bcl-2 gene (also known

5    as BCL2), with the immunoglobulin heavy-chain gene and

6    is the most common translocation observed in

7    non-Hodgkin's lymphoma (NHL) occurring in 85 percent of

8    follicular lymphomas."

9         Do you see that?

10   A.   That's correct.

11   Q.   Right.  So, like, a big majority of follicular

12   lymphomas, when they looked for it, they find this

13   t(14;18) -- right? -- this translocation?

14   A.   Yes.

15   Q.   And their point is that when you -- when this

16   happens, it upregulates the bcl-2-2 gene, which is

17   thought to delay or eliminate programmed cell death,

18   which may facilitate the accumulation of additional

19   transforming mutations and oncogenes or tumor suppressor

20   genes, eventually leading to lymphoma.

21        Do you see that?

22   A.   I do.

23   Q.   And that's the thought when it comes to the

24   chromosome (14;18) translocation -- right? -- is that

25   when these two chromosomes get mixed up and fused and

1    translocate that they upregulate the bcl-2-2 gene, which

2    delays or eliminates cell death, so you have

3    uncontrolled cell growth, and with that additional

4    growth you're increasing the likelihood that there's

5    going to be even more or additional mutations in either

6    the gas pedal, an oncogene, or you lose the brakes in a

7    tumor suppressor gene; right?

8        A.   Here's the problem with your --

9             MS. FREDONA:  Objection.  Form.

10       A.   Sorry.

11            Here is the problem with your argument.  Okay?

12   First of all --

13       Q.   It's not argument.  I'm asking you if that's

14   the correct interpretation of that piece.

15       A.   It's very, very incomplete, because this piece

16   also points out that exposure to pesticides and heavy

17   smoking have been associated with an increased risk of

18   NHL.  It is inferred that the rising incidence of NHL is

19   the result of environmental exposures.

20            Now, again, this paper is from 1995.  There

21   were no glyphosate lymphoma papers going back that far.

22   What we don't know is as follows:  Number 1, as

23   previously stated, we don't know whether Ms. Rehak had

24   the (14;18) translocation or not.  We don't know what

25   are the other causes of the (14;18) translocation

1    besides cigarette smoking.  We certainly don't know that

2    there are no other causes, and we don't know whether

3    glyphosate is associated with that, because if it's a

4    follicular lymphoma, we already know that the vast

5    majority have that translocation, but it's not true that

6    the vast majority of people with follicular lymphoma are

7    heavy smokers.

8            Therefore, other causes may be able to bring

9    about that translocation, and for all we know -- and we

10   don't know one way or the other -- glyphosate may be

11   one.

12           MS. FUJIMOTO:  Move to strike.  Really

13      nonresponsive.

14   BY MS. FUJIMOTO:

15      Q.   Dr. Schiff, let me ask you this then:  If you

16   look at the Bell paper, am I correct that the paradigm

17   that they're using in Bell says that the chromosomal

18   translocation in 14 and 18 can result in an upregulation

19   of bcl-2-2 gene, which can delay or eliminate programmed

20   cell death, and with that additional uncontrolled growth

21   you can get additional mutations in either oncogenes or

22   tumor suppressor genes?  Is that what they're looking at

23   in Bell?

24           MS. FREDONA:  Objection.  Form.

25      A.   Looking at the t(14;18) translocation and the

1    effect on bcl-2 gene expression, yes, but nowhere in

2    that paper --

3        Q.   Okay.  Thank you.

4        A.   No --

5        Q.   That's all I'm asking you.  I want to make sure

6    the paradigm is correct.

7        A.   I'm still answering the question.

8        Q.   You're not.  You're answering some question

9    that's not been asked.

10       A.   That you asked two questions ago.  Nowhere does

11   it say in this paper --

12       Q.   You've already answered that, and I'm not -- I

13   didn't ask you whether this paper says anything.  I'm

14   asking --

15       A.   I'm answering the question about t(14;18) and

16   bcl-2, and you still asked me that again.

17       Q.   No.  Because you're not answering the question.

18   I think I got the answer this time before you started

19   off on answering another question, so I'll stick with

20   that.

21            If you go to the middle column, Doctor, on

22   Bell, second full paragraph, they say, "Translating the

23   number of positive t(14;18) determinations into a mean

24   frequency per million cells showed a dose-dependent

25   increase in t(14;18) translocations with higher levels

1    of cumulative smoking exposure."

2              Did I read that correctly?

3       A.    Yes, you did.

4       Q.    They go on to then a sentence later saying,

5    "The association between pack years and t(14;18)

6    frequency was most highly significant, but cigarette

7    smoke per day and years of smoking showed similar

8    positive associations."

9              Did I read that correctly?

10      A.    Yes, you did.

11      Q.    And then go to the right-hand column, first

12   full paragraph.  They say, "We have observed that the

13   frequency of bcl-2 translocations is, on average,

14   3.6-fold higher in heavy smokers than in nonsmokers.

15   The identical translocation occurs in 85 percent of

16   follicular lymphomas.  These results are consistent with

17   two recent epidemiologic studies showing 2.3-fold and

18   3.8-fold increased risks, respectively, for NHL among

19   heavy smokers."

20              Did I read that correctly?

21      A.    There are some things that you left out.

22      Q.    Did I read those sentences correctly?

23      A.    You read them correctly, but that's only --

24      Q.    I didn't leave anything out in the sentences;

25   right?

1     A.   You left a lot out of the story.

2     Q.   I'm not telling a story.  I'm asking you about

3   what is in this paper.  You can tell me later how you

4   interpret this or what story you want to tell.  I'm not

5   telling you a story.

6     A.   Are you going to let me have the opportunity to

7   do that?

8     Q.   No.  Well, certainly Rebecca will, for sure.

9          They -- in reading this statement correctly,

10   they reference Nos. 8 and 9, and it is a paper by Brown

11   and a paper by Linet, or Linet, and my question to you

12   is whether or not you have looked at or seen those

13   references.

14     A.   I have not.  I have seen a later reference by

15   Linet, which is the 2014 InterLymph study.

16     Q.   Correct.  And you've talked about that.

17     A.   Correct.

18     Q.   Okay.  So then, with that, let's close this

19   out.  We do know -- let's see what we can agree on -- is

20   you agree from the records that Ms. Rehak smoked a pack

21   of cigarettes per day from the age of 18 until now;

22   right?

23          MS. FREDONA:  Objection.  Asked and answered.

24     A.   Correct.

25     Q.   So that's 40-plus years.  But at the time of

1   her diagnosis in 2015, she had up to that point smoked a

2   pack per day of cigarettes for 36 years; right?

3         MS. FREDONA:  Objection.  Form.

4   A.   Yes.

5   Q.   Okay.  Did you notice in the medical records

6   that she kept smoking despite warnings from her doctors

7   to stop?

8   A.   That's correct.  Smoking is addicting.

9   Q.   And cigarettes have benzene and other chemicals

10  in them that are known carcinogens; right?

11        MS. FREDONA:  Objection.  Asked and answered.

12  A.   That's correct.

13  Q.   And if you calculate 36 pack years, you have

14  365 packs of cigarettes for 36 years, and that's 13,140

15  packs of cigarettes, and if you times that by 20, 20

16  cigarettes in a pack, by the time of her diagnosis,

17  Ms. Rehak had smoked 262,800 cigarettes; right?

18        MS. FREDONA:  Objection.  Form.

19  A.   Okay.  Yes.

20  Q.   And she also has, by way of her medical

21  records, a significant family history of different

22  cancers; right?

23  A.   Correct.

24  Q.   And we already noticed, and you note this in

25  your report on her, that her dad had liver and

Ron B. Schiff, M.D., Ph.D.

1    pancreatic cancer, her grandmother had stomach or

2    gastric cancer, her sister had thyroid cancer, an aunt

3    had colorectal, or I think you thought it was a stomach

4    cancer as well, an aunt had breast cancer, and she had a

5    cousin with kidney cancer; right?

6         A.    All correct, yes.

7         Q.    Did you do any research to determine whether

8    there are any common genetic pathways between all of

9    these cancers?

10        A.    I think that there are some pathways that are

11   in common among multiple cancers, but I did not do any

12   research specifically about the signaling pathways in

13   the cancers in Ms. Rehak's family history.

14        Q.    Okay.  So then, for example, do you know

15   whether her grandmother's stomach or gastric cancer, her

16   aunt's colorectal cancer, her aunt's breast cancer all

17   had STK11 gene mutation pathways?

18        A.    There's no data on any of that for either

19   Ms. Rehak or her relatives with the history of breast

20   cancer -- of any kind of cancer, nor would I expect that

21   from the medical records or the deposition.

22        Q.    Right.  But we do have data that tells us that

23   one of the -- that the STK11 pathway is a genetic

24   mutation that is commonly seen in gastric or stomach

25   cancer and colorectal cancer and in breast cancer;

1    right?

2         A.   Yes, that's correct.

3         Q.   Also, if you look at the mutations in the TP53

4    gene, am I correct that we see those mutations in liver

5    cancer, colorectal cancer, stomach cancer, and breast

6    cancer?

7         A.   That is correct.  We see that one in a variety

8    of cancers.

9         Q.   And we also see BRCA2 mutations in pancreatic

10   and in breast cancers; right?

11        A.   And ovarian, that's correct.

12        Q.   And we see mutations in the CDH1 or E-cadherin

13   gene in breast cancer and in stomach cancer; right?

14        A.   Yes, and possibly in others as well.  All

15   that's correct.

16        Q.   And the APC -- a mutation in the APC gene is

17   seen in thyroid cancer and in stomach cancer; right?

18        A.   Yes, but we still have no data about any of

19   these genes in Ms. Rehak nor in her relatives with the

20   history of cancer.

21        Q.   What did you do, if anything, Dr. Schiff, to

22   rule out an inherited or genetic predisposition to

23   Ms. Rehak's cancer?

24        A.   Well, I'm aware that she does not have a

25   documented family history of a hematopoietic or lymphoid

1    malignancy, and looking at the family history data that

2    you have brought to my attention, all of which is older

3    than the InterLymph project, InterLymph did not see fit

4    to include data about other cancers in their family

5    history analysis of lymphoma risk factors.

6              So the answer to that is that all of that has

7    not been examined to the same extent that a positive

8    family history of hematologic malignancy is, but as I'm

9    aware, positive family history of hematologic malignancy

10   is the main family history risk factor for the

11   development of non-Hodgkin lymphoma.  You have another

12   paper that deals with that.

13       Q.   Yes.  I'm going to ask you to get that.  That's

14   the Negri paper I'm going to mark as Exhibit 12 to the

15   deposition.  And it's called "Family History of

16   Hemolymphopoietic and Other Cancers and Risk of

17   Non-Hodgkin's Lymphoma."

18            (Schiff Exhibit 12 was marked for

19   identification.)

20   BY MS. FUJIMOTO:

21       Q.   Do you have that in front of you, Doctor?

22       A.   I do.

23       Q.   And here it says, in the abstract, they

24   investigated the risk of lymphomas, hem lymphopoietic

25   cancers, and non-HLP, so non-hemolymphopoietic cancers,

1   in first-degree relatives of non-Hodgkin lymphoma;

2   correct?

3        A.   That's correct.

4        Q.   And if you go to the right side of the

5   abstract, you see that it says, "A family history of

6   cancer of the liver, breast, and kidney increased NHL

7   risk."

8            Do you see that?

9        A.   Yes.

10       Q.   So the odds ratio for a family history of liver

11   cancer was 2.1 with a CI at 1 to 4.2; correct?

12       A.   Yes.  That's borderline statistical

13   significance based on a small number of cases.

14       Q.   Right.  Which you give credence to in the

15   glyphosate setting; right?

16       A.   Yes.

17       Q.   Do you give credence to it here?

18       A.   The answer to that is you have to acknowledge

19   it in whatever setting it occurs.  So I acknowledge that

20   with glyphosate and I am pointing it out, because I

21   don't think you would, in the family history context.

22       Q.   Okay.  Well, I think we all agree or disagree

23   on what a confidence interval that includes 1 means.  I

24   just want to make sure you're applying it consistently

25   too.  Your interpretation is more important than mine.

1          It also says that with a family history of

2  breast cancer the odds ratio was 2, a doubling of the

3  risk, and the CI was 1 to 3.6; right?

4      A.   Yes, that is correct.  Again, borderline

5  statistically significant.

6      Q.   And a family history of kidney cancer had an

7  odds ratio of 4.6 with a CI at 1 to 20.9; right?

8      A.   Yes.  Borderline statistically significant.

9      Q.   And Ms. Rehak had a family history of liver

10 cancer, breast cancer, and kidney cancer; right?

11     A.   That's correct.

12     Q.   And if you finish the data there in Negri, it

13 says the OR was elevated for all cancer sites.  So when

14 they combined all cancer sites, OR 1.7 with a CI of 1.2

15 to 2.4, and the risk increased with the number of

16 affected relatives; correct?

17     A.   That's correct, except that Table 5 shows, at

18 best, borderline significance.

19          No, that's fine, I'll accept that as written in

20 the abstract.  Yes.

21     Q.   Okay.  And you were mentioning Table 5.  We

22 could walk through a bunch of these, but there are --

23 they basically lay out the cancer site and give an odds

24 ratio depending upon the site; right?

25     A.   Yes.  There are very small numbers for all of

Ron B. Schiff, M.D., Ph.D.

1   these, and the most common cancers are, of course, the

2   best represented, including colorectal, lung, and

3   breast.

4        Q.   Right, the two -- exactly.  The ones we just

5   talked about; correct?

6        A.   Most of the ones.  There's very few kidney

7   cancers that give rise to that borderline statistically

8   significant elevated odds ratio.

9        Q.   And one of the things they otherwise found,

10  though, was that the risk increases as the number of

11  affected relatives increases; right?  That's the finish

12  of the abstract?  "Also when HLP cancers were excluded"?

13       A.   Well, again, this is what I wanted to point out

14  before.  For all sites, excluding hematopoietic cancers,

15  Table 5 does not show that, regardless of the adjustment

16  model used.

17       Q.   And we know that Ms. Rehak had at least seven

18  relatives with some type of cancer; right?

19       A.   Yes.  The data in this study goes up to three

20  relatives.

21       Q.   And she had a lot more than that; right?

22       A.   Correct.

23       Q.   Let me ask you about -- let's go back to your

24  report.  And you lay out in your report kind of a

25  recitation of what you understand was Ms. Rehak's

1    exposure to glyphosate; right?

2        A.   Yes.   That's taken from her deposition, and it

3    includes citations to the deposition, but yes, that is

4    correct.

5        Q.   That's my point is that you relied upon her

6    deposition; right?

7        A.   That's the only data that I had.

8        Q.   Okay.   And so let me make sure I understand

9    then, as you lay out, that other than her testimony that

10   she would herself spray some lawns during ride-alongs

11   two to three times a year, that all of her other alleged

12   exposure is bystander exposure; right?

13           MS. FREDONA:   Objection.   Form.

14       A.   That's correct.

15       Q.   And as bystander exposure, one of the things

16   you mentioned on page 6 -- yeah, I think -- oh, wait.

17   Not 6.   16, I think.

18           Yeah.   On the 16th page of your report, at the

19   first paragraph, you say Ms. Rehak's office was -- at

20   ChemLawn -- was located less than 100 feet away from the

21   warehouse where other employees mixed Roundup.

22           So in terms of her exposure at work, I mean, it

23   was -- she was an office worker; right?   She wasn't

24   mixing or spraying it when she was in the office?

25           MS. FREDONA:   Objection.   Form.

1       A.   Yes, except that back -- there was back and

2   forth traffic between her office and the warehouse where

3   the Roundup was being mixed --

4       Q.   Right.

5       A.   -- and that mechanisms were mentioned for how

6   Roundup could be tracked into the office from the

7   warehouse, and then also that Ms. Rehak did spray lawns

8   periodically during the ride-alongs.

9       Q.   Right.  Okay.  But I'm focusing now -- we'll

10  get to that, but on the bystander exposure when she was

11  in the office, it was her -- and you cite to her

12  deposition -- it was her that theorized that Roundup

13  being mixed in the warehouse could have entered the

14  office area if the employees mixing it spilled it on the

15  floor or their clothing and stepped on it and then

16  walked over to other areas with glyphosate,

17  contaminating desks, telephones, or paperwork; right?

18          MS. FREDONA:  Objection.  Form.

19      A.   I certainly wouldn't be comfortable with that

20  type of exposure, even if indirect.

21      Q.   Do you have any evidence that people in the

22  warehouse that she worked in actually did spill

23  glyphosate and did track it around all over the place?

24      A.   I have only her deposition testimony to speak

25  to that.

1     Q.   Do you think it makes sense that people would

2   be mixing a herbicide and be -- you know, spill it and

3   get it on their clothes and boots and then just walk

4   around and contaminate other areas?

5     A.   The vast --

6          MS. FREDONA:  Objection.  Form.

7     A.   Sorry.

8          The vast majority of depositions that I have

9   read indicate that Roundup frequently made contact with

10  the skin, thereby defining transdermal exposure, and

11  that, obviously, if you were walking through the areas

12  where it was spilled or sprayed, you would get it on

13  your footwear.

14         So these are things that are highly plausible.

15  To what extent they actually happened, I only have the

16  information from her deposition testimony.

17    Q.   Right.  And she testified that they could have.

18  She didn't say, "Oh, I know they did"; right?

19    A.   That's correct.

20    Q.   And did you do anything to research what the

21  absorption rate or properties of glyphosate are?

22    A.   Properties, yes.  Absorption rate, no.

23    Q.   So do you know how quickly it evaporates or

24  dissipates when it's spilled on the ground?

25    A.   According to Monsanto, it's pretty quick.

Ron B. Schiff, M.D., Ph.D.

1    However, this is not application outdoors.  This is

2    spillage in an area where it is being mixed.  Different

3    metrics may apply to that, and I'm not familiar with

4    them nor have I seen any data.

5         Q.   All right.  So you wouldn't know what the

6    absorption rate was or the metric would be that you

7    would use to estimate, if the glyphosate was spilled,

8    how long it would either stay on a person's clothes, on

9    their boots, or hands in this setting?

10             MS. FREDONA:  Objection.  Form.

11        A.   Well, we know that glyphosate has certainly

12   been detected in the urine of agricultural workers,

13   documenting absorption.  We have no data on that for any

14   aspect or portion of Ms. Rehak's exposure, so we cannot

15   be precise about that.

16        Q.   So you cannot say -- in terms of your opinion

17   about her exposure, you don't know whether or not it's

18   feasible that glyphosate would not be absorbed quickly

19   or that it would somehow be tracked different places and

20   be able to be absorbed by other people?

21             MS. FREDONA:  Objection.  Form.

22        A.   I think it is feasible that it would be tracked

23   and it would be absorbed by those who come into

24   secondary contact with it.

25        Q.   And how do you know that?  Is that common sense

1    to you, or you have data?

2         MS. FREDONA:  Objection.  Form.

3    A.   As I have indicated repeatedly, I do not have

4    data about that regarding Ms. Rehak, but, again, we know

5    that glyphosate can be detected in the urine of

6    agricultural workers with exposure.  Therefore --

7    Q.   Yes.  Those are agricultural workers who are

8    mixing and spraying it, actually using it; right?

9    A.   That's correct.

10   Q.   Okay.  Not bystander data?

11   A.   We don't know one way or the other, but the

12   point is that she did have plenty of bystander exposure,

13   as well as the times that she did spray it.

14   Q.   Well, so let's go to that then.  So we've

15   already said she said that occasionally, three or four

16   times a year, she's go on ride-alongs and sometimes she

17   would actually spray the glyphosate herself; right?

18   A.   That's correct.

19   Q.   And she wore rubber boots but no other

20   protective equipment; right?

21   A.   Yes.

22   Q.   But she didn't have -- did -- strike that.

23        Did she have any information, as to each time

24   she did apply it herself, how big the residences were or

25   how long she sprayed it?

1       A.   I did not see any description of that in her

2    deposition.

3       Q.   Okay.  And then from what you also recount here

4    is that, in terms of her other potential exposures, is

5    that she would be near others, either her boyfriend or

6    the landlord and his -- I don't know if it's his wife or

7    his helper -- but she would be near others who were

8    spot-treating weeds where she lived; right?

9            MS. FREDONA:  Objection.  Form.

10      A.   That's correct.

11      Q.   I'm sorry?

12      A.   That's correct.

13      Q.   Okay.  And then -- so she would -- she would be

14   kind of doing yard work nearby, or she said sometimes

15   she would walk, I guess, barefoot in areas where the

16   Roundup was sprayed?

17      A.   Well, I don't think it has to be barefoot.  She

18   might have been wearing sandals or something like that.

19      Q.   I was going to say, I mean, does it make sense

20   to you, Dr. Schiff, that someone, particularly someone

21   who worked at a chemical company, ChemLawn, would walk

22   barefoot through areas, whether it's grass or concrete,

23   that was freshly sprayed with a weed killer?

24           MS. FREDONA:  Objection.  Form.  Incomplete

25       hypothetical.  Mischaracterization of the

1        plaintiff's employment.

2        A.   Well, certainly one would hope that didn't

3    happen, but that's not the same as to say that it didn't

4    happen or even that it couldn't happen.

5        Q.   Well, do you know whether these times that she

6    walked in the areas that were sprayed whether she had

7    on -- whether she was barefoot, had sandals on, had

8    shoes on, tennis shoes, boots?

9        A.   I certainly wouldn't do it, but I also don't

10   know what kind of warnings that were available from the

11   manufacturer or from her employer during the 1980s.

12       Q.   My question was:  Do you know what she wore

13   when she says she walked through these areas that had

14   been sprayed?

15       A.   No, because if she had testified as to that, it

16   would have been in my report.  We did talk about skin

17   contact at the two residence concerns, one in Lemont,

18   Illinois, and one in Joliet.  She did testify as to the

19   occurrence of skin contact.

20       Q.   And certainly the degree of skin contact,

21   whether it's hands or feet, would be different depending

22   upon whether the hands or feet were bare or whether they

23   were covered with a sandal or a full boot or a glove;

24   right?

25            MS. FREDONA:  Objection.  Form.

1     A.    Presumably, yes.

2     Q.    And you don't know what she had on or didn't

3    have on at any of the specific times where she says she

4    was in an area of spraying; right?

5     A.    She did not appear to indicate that she had any

6    protective equipment on during those two residential

7    exposures.  She listed rubber boots only for her

8    occupational exposure on the ride-alongs.  That's all

9    the information we have.

10     Q.    All right.  Did you see or were you aware that

11   ChemLawn, her company, also used diazinon?  It's an EPA

12   restricted pesticide.

13     A.    I do not remember if I looked that up.

14     Q.    So do you know whether or not Ms. Rehak was or

15   could have been exposed to diazinon while she was in her

16   office?

17     A.    Yes, we do know that.  That was discussed in

18   her deposition, and it did make its way into my report.

19          This is the last sentence in my differential

20   etiology section, which reads, "She had no contact with

21   diazinon, used as an insecticide by ChemLawn during her

22   employment there."  There's a citation to the part of

23   the deposition where she discussed that.  And, you know,

24   just to be clear, again, diazinon is an insecticide.

25   It's not an herbicide.

1      Q.   But she didn't have any information -- or did

2  you see any information -- I mean, she may not have used

3  it for her exposure, but do you know whether or not it

4  was mixed in the warehouse adjacent to her office?

5      A.   All that I know is that she said that she had

6  no contact with it.   That's what she testified.

7      Q.   So it's possible that it could have been mixed

8  in the warehouse and she didn't even know it?

9          MS. FREDONA:   Objection.

10     A.   I don't know anything about whether diazinon

11 ever requires mixing or is only in a ready-to-use

12 formulation.   I have no idea.

13     Q.   Okay.   But you are aware that IARC considers

14 diazinon a 2A carcinogen?

15     A.   That's correct.   And, presumably, that's why

16 she was asked about it in her deposition, but she denied

17 having contact.   Either way, we've talked about a lot of

18 other candidate risk factors, but they don't negate her

19 glyphosate, Roundup, exposure.

20     Q.   No.   Understood.   I'm not talking about

21 negating, but certainly, as we've discussed in this

22 deposition and in Cervantes, is that when you are

23 comparing or evaluating this differential etiology, when

24 you're looking at her risk factors, that you weigh or

25 you are looking at her smoking history, her family

Ron B. Schiff, M.D., Ph.D.

1  history, and her glyphosate exposure, yet you're not

2  able to quantify any of those risk factors for purposes

3  of comparing their impact or contribution to her cancer;

4  right?

5          MS. FREDONA:  Objection.  Form.

6      A.   That is correct.  We only know that she has

7  exposure to those risk factors, which is qualitative.

8      Q.   Right.  Okay.  And so in terms of that, what we

9  know is that Ms. Rehak had personal use exposure two or

10 three times a year on ride-alongs and bystander exposure

11 when she was working or basically in the area where

12 others were spot-treating weeds; right?

13     A.   That is correct.

14     Q.   And we also know that she had, at the time of

15 diagnosis, a 36 pack year history of smoking, so, as I

16 had already pointed out, we're talking over 262,000

17 cigarettes, all of which contain benzene and other

18 chemicals that are accepted as known carcinogens, and

19 she has a family history of six different cancers in six

20 different family members, many of which have common

21 genetic mutations, we know all that; right?

22     A.   No, we don't --

23         MS. FREDONA:  Objection form.  Asked and

24     answered.

25     A.   Sorry.

Ron B. Schiff, M.D., Ph.D.

1            We don't know what genetic mutations were

2     present in her or in her cancer-affected relatives.  We

3     don't know about that.

4            What we do know is that she did have those

5     various risk factors.  You know, I think there is not a

6     whole lot of evidence suggesting that

7     nonlymphoproliferative and nonhematologic malignancies

8     increase the risk of developing non-Hodgkin lymphoma.

9     InterLymph didn't even include that in their large and

10     comprehensive analysis.

11            But what we do know, which is in the final

12     paragraph of my exposure section, is that with six years

13     of occupational exposure and a total of 17 years of

14     exposure at least twice monthly to approximately once

15     per week at her residences, I expressed my opinion that

16     her exposure to Roundup was extensive.

17       Q.    Right.  And we've already talked --

18       A.    I'm not denying the cigarettes.  I'm not

19     denying the family history.  All of them are accepted

20     risk factors for non-Hodgkin lymphoma.

21       Q.    And would you agree -- we've already talked

22     about the fact that you are not able to quantify or give

23     me a threshold as to what constitutes extensive

24     exposure.  I know that you consider her glyphosate

25     exposure to be extensive.

1          Would you agree that her smoking for 36 years,

2    a pack per day, would be considered extensive?

3        A.   Well, of course.  And, you know, let's just put

4    a bit of a personal spin on this.  Okay?  I've never

5    smoked, including because of the health reasons.  In

6    addition to that, I have a lawn service at my house, and

7    every few months we remind them not to use Roundup on my

8    property.  Not that I don't want to come out and spray

9    Roundup when you're here.  I don't want to mix Roundup

10   in your truck.  I don't even want it applied on my

11   property.

12          What's that based on?  It's not based on common

13   sense.  It's based on my review of the science and the

14   conclusions that I've drawn from that review.

15       Q.   Okay.  Well, Doctor, I don't know -- so are

16   you -- are you suggesting that your personal experience

17   is something that you're utilizing as part of your

18   expert opinion, or was that just a -- I don't know --

19   you just felt like you needed to tell me?

20       A.   It was neither.  It indicates how I have

21   translated --

22       Q.   Let me go back.

23       A.   -- my scientific review of this into my own

24   personal activities and why I think that what you are

25   dismissing as irrelevant noncontributory concerns cannot

Ron B. Schiff, M.D., Ph.D.

1    be treated in that manner.

2        Q.   Okay.  You're just totally going off on a

3    tangent here, Doctor.  I wasn't saying anything was

4    irrelevant.  Let me try this again.

5        A.   Then why are we spending so much time talking

6    about smoking and family history?

7        Q.   Right.  Do you consider a 36-year pack year

8    history of smoking extensive?

9             MS. FREDONA:  Objection.  Asked and answered.

10       A.   Yes, I do.

11       Q.   Thank you.  Do you consider a family history of

12   six different cancers in six close family members to be

13   an extensive or significant family history of cancer?

14       A.   Extensive, yes, but significant for non-Hodgkin

15   lymphoma development, I believe that that answer is not

16   clear, because none of those family members was known to

17   have a hematopoietic or lymphoproliferative malignancy.

18       Q.   Do you consider Ms. Rehak's smoking to be a

19   contributing cause or a contributing factor in causing

20   her follicular lymphoma?

21       A.   Yes, and that is acknowledged in the second

22   paragraph of my differential etiology section.

23       Q.   Do you consider her family history of cancers

24   to be a contributing factor in causing her lymphoma?

25       A.   I would say the only thing that supports that

```
 1   is that one article that we discussed today, but there
 2   is no supportive evidence in the big, giant InterLymph
 3   study where the emphasize was on family history of
 4   lymphohematopoietic cancers.
 5        Q.   Is that a yes or a no?  Do you consider her
 6   family history to be a contributing factor in causing
 7   her lymphoma?
 8        A.   If it's contributing --
 9             MS. FREDONA:  Objection.  Asked and answered.
10        A.   Sorry.
11             If it's a contributing factor, it's much less
12   of one.
13        Q.   But have you ruled it out, or you keep it in?
14        A.   My position is that I don't need to rule it out
15   absolutely, the same as with smoking, the same -- yeah,
16   it doesn't need to be ruled out.  These risk factors are
17   present, and Roundup is among them.  And, you know, you
18   make the point about the extensive smoking history.  I
19   made the point in my report, while acknowledging her
20   smoking history, about her prolonged exposure to
21   Roundup.
22        Q.   Okay.  Of course.  Absolutely.  And so -- but
23   here we have three risk factors that you've not ruled
24   out, that you consider extensive, and you aren't able to
25   quantify, qualitatively or otherwise, the variable
```

Ron B. Schiff, M.D., Ph.D.

1    degree of contribution of any of them; right?

2         MS. FREDONA:  Objection.  Form.  Misstates the

3      record.

4      A.   They cannot be quantitated in terms of a

5    hierarchy of which is more important than others; they

6    can only be listed, but I believe that her family

7    history of nonhematopoietic, nonlymphoid cancers is of

8    less importance as a risk factor for the development of

9    non-Hodgkin lymphoma than her Roundup exposure or her

10   smoking exposure.

11     Q.   Okay.  So even though it's still on the list,

12   you can't rate them by hierarchy or give a percentage of

13   which one contributed more than the other, except for

14   her family history, and you believe that that would be

15   less?

16         MS. FREDONA:  Objection.  Form.

17     A.   That's correct.

18     Q.   Okay.  Let's go back through some more of

19   Ms. Rehak's medical records.  So that's going to be

20   Exhibit 5.

21         And I'm just going to state, Doctor, I mean,

22   it's kind of halfway through -- this would have been

23   April -- I mean going back to that February 5, 2015,

24   medical record, and, basically, I'm just looking at the

25   plan of care.  It's -- the Bates number is 3.

```
1              And it says, "The patient has been diagnosed
2    with Stage IIA follicular lymphoma with presentation in
3    the retroperitoneal and pelvic lymph nodes."
4              Are you in agreement with their diagnosis and
5    staging of her follicular lymphoma?
6         A.   I'm going to go back into my report to see what
7    I put in the diagnosis section so I don't rely on my
8    memory, and I'm going to go back to my summary of the
9    radiation therapy consultation note.
10             So, yes, my opinions section, No. 1, diagnosis
11   and staging, begins with the statements, "Ms. Rehak's
12   diagnosis Grade I to II follicular lymphoma.  The stage
13   of her lymphoma is Stage IIA with a bulky
14   retroperitoneal and pelvic lymph node mass."
15             So, yes, I agree with that.
16        Q.   Okay.  And it notes that she had residual
17   uptake of the disease, and they recommended
18   consolidative radiation for the residual disease; right?
19        A.   That's correct.
20        Q.   And you agree with that treatment approach and
21   assessment?
22        A.   I do.  It was the right thing to do.
23        Q.   Okay.  And then if you'd go to about the middle
24   of the packet, it's the August 26, 2015, Presence Care
25   Center report.  The Bates number at the bottom is 8.
```

Ron B. Schiff, M.D., Ph.D.

1   Lots of zeroes and an 8.

2      A.   I have it.

3      Q.   Okay.  And on the assessment and plan, it says,

4   "The patient has had excellent clinical response and

5   radiographic response following consolidative radiation

6   therapy to the abdominal and pelvic adenopathy.  I asked

7   her to return in follow-up in six months and she will

8   have another PET scan next year."

9           Do you see that?

10     A.   Yes, I do see that.

11     Q.   So I take it -- does that mean that Ms. Rehak

12  had -- you know, she was diagnosed with her lymphoma,

13  she had treatment, and at least to that treatment at

14  this point she had responded very well?

15     A.   I would agree that she did, but after her

16  radiation and in a period of time overlapping with this

17  particular follow-up note from the radiation oncologist,

18  she was also getting maintenance rituximab.

19     Q.   Right.  Right.  Okay.  So she had rituximab and

20  radiation; right?

21     A.   After her initial treatment, yes, that's

22  correct.

23     Q.   And that was -- is that where you had said in

24  your report that she only had a partial response, not a

25  complete response to therapy?  Were you talking about

Ron B. Schiff, M.D., Ph.D.

1   the radiation, or the rituximab, or both?

2       A.   Yes, I was -- yes, I was talking about both in

3   that regard.

4       Q.   Well, but didn't she -- you know what the

5   difference between a complete metabolic response is --

6   between that and a complete anatomic response; right?

7       A.   Sure.

8       Q.   Explain that to me.

9       A.   Well, the complete metabolic response indicates

10  that the area of previously increased uptake of

11  radioactive material on the PET scan, which corresponds

12  to visualized tumor from the CT portion of the exam, is

13  gone.  In other words, there's no more increased uptake

14  above background of radioactive material.

15          With regard to the anatomic response, that

16  means disappearance.  A complete response requires

17  disappearance of all previously identified disease.

18          And you have to look at both of those as time

19  go on -- time goes on.  They're both important.

20      Q.   Okay.  And certainly she had a complete

21  metabolic response; right?

22      A.   That is correct.

23      Q.   Okay.  And then in terms of the anatomic

24  response, I mean, she had -- and you note this in your

25  report -- she had quite a large, bulky tumor mass to

Ron B. Schiff, M.D., Ph.D.

1    start off with; right?

2         MS. FREDONA:  Objection.  Form.

3    A.   That's correct.

4    Q.   And what would have been the likelihood that it

5    would have resolved right after treatment?  I mean,

6    wouldn't it be anticipated that she might have a little

7    residual mass that you'd have to take care of later?

8    A.   Yes, it might have.  I mean, it certainly could

9    have resolved in realtime with treatment.  The

10   expectation is that, with such a bulky mass on

11   presentation, it's going to take time for it to go away.

12   Q.   Right.

13   A.   There's no disagreement about that.

14   Q.   Okay.

15   A.   But if we look at when she began her chemo,

16   which was July 21, 2014, she still had a 2.7 by 2.4

17   centimeter -- that's a 1-inch mass -- on the left side

18   of the pelvis on June 15, 2020.

19   Q.   And so -- right.  So what is a Lugano

20   classification?

21   A.   I don't remember that.  I never used that in

22   practice, and I've never paid attention to it when I've

23   come across it since then.

24   Q.   Do oncologists use it now?

25   A.   Perhaps in the academic setting, but I believe

Ron B. Schiff, M.D., Ph.D.

1    that, instead of having a classification system like

2    that, you simply describe what the findings are.  The

3    purpose of having a classification like that is to

4    standardize the reporting of results from one clinical

5    trial to another.

6        Q.   Okay.  And so if you go -- now, her mass and

7    her response to -- her anatomic response to therapy was

8    eventually complete; right?

9        A.   Well, we just went through why her anatomic

10   response was not.  Her metabolic response on the PET

11   portion of the PET CT scans that she had was complete.

12       Q.   Have you seen post-2015 medical records?

13       A.   Well, sure.  I have medical records going up to

14   June 15, 2020 --

15       Q.   Right.

16       A.   -- as indicated earlier.

17       Q.   Okay.  And are you saying she still has

18   lymphoma?

19       A.   I'm saying that I don't know that, because once

20   again, just like in the other situations that we

21   discussed in other settings today, we do not have a

22   biopsy of the residual 1-inch mass in the left side of

23   the pelvis.  I would hope that she didn't have lymphoma,

24   but I certainly would not be confident about that

25   without a biopsy diagnosis to prove whether this was all

1    scar tissue or something else.

2        Q.   And so do you have any indication or any

3    information in the other medical records in the absence

4    of a biopsy to determine whether or not that's a benign

5    residual mass or whether she still has lymphoma?

6        A.   Well, the answer to that is, you know, I dealt

7    with this explicitly in the third section of my

8    opinions, the section entitled "Disease Status and

9    Prognosis."  We say that -- I say, "The regression has

10   stopped short of permanent disappearance of the bulky

11   retroperitoneal left-sided pelvic lymph node mass.  As

12   such, in the absence of a biopsy of the residual soft

13   tissue mass in the left hemipelvis demonstrating

14   exclusively fibrotic scar tissue with no evidence of

15   persistent disease, Ms. Rehak must be regarded as having

16   achieved a partial rather than complete response."

17          That's just basic radiographic criteria.

18       Q.   Right.

19       A.   The point is I don't have evidence that she has

20   developed new sites or that it has progressed, but, on

21   the other hand, it's not totally gone, so you don't

22   know.

23       Q.   All right.  So the mass isn't gone, we don't

24   know if it's lymphoma?

25       A.   Correct.

Ron B. Schiff, M.D., Ph.D.

1     Q.   Okay.  So do you have an opinion one or another

2  whether she more likely than not still has lymphoma or

3  does not?

4     A.   Well, here too I'd like to be optimistic, but

5  follicular lymphoma behaves differently than diffuse

6  large B-cell lymphoma with the higher tendency to

7  relapse even after fairly intensive combined modality

8  therapy like she had.  And with that --

9          (Telephone interruption.)

10    A.   We did talk about --

11    Q.   Right.  Well, so you do talk about in your

12 report kind of an intermediate prognosis, and ultimately

13 you say -- you reference, "It is a matter of common

14 sense that a median survival in the range of 10 years

15 does not represent a desirable outcome for a patient

16 diagnosed with Stage II follicular lymphoma at age 54 as

17 was the case for Ms. Rehak"; right?

18    A.   Yes, but that's not the question you just

19 asked.  The question that you just asked had more to do

20 specifically with the prognosis given her current

21 disease status.

22          What we know is that these do tend to relapse,

23 because for standard treatment the response to initial

24 treatment may last for as little as one to three years,

25 although with early-stage disease you can -- you can get

1   cures.

2          In addition, follicular lymphoma does have a

3   relatively high likelihood of transforming to

4   intermediate grade lymphoma, specifically diffuse large

5   B-cell, and that risk does not appear to completely go

6   away with time.

7          So the point is that it is speculative as to

8   whether she has active lymphoma now or not.  I do feel

9   optimistic about her, primarily because there is no

10  evidence of disease progression as of last June, but,

11  again, she does have a residual mass and we don't know

12  precisely what it is.

13      Q.  Okay.  So you say that median survival in the

14  range of 10 years.  Is that what you think her median

15  survival is right now even though she's gone six years

16  without evidence of disease?

17      A.  Well, you know, we commented on that, that she

18  has now survived with what I am calling a partial

19  response for more than six years since the initiation of

20  her treatment on July 21, 2014.  We took a look at the

21  prognostic factors that go into that, but we also went

22  into that in a little bit more detail, some of which I

23  already just discussed.

24          Obviously, the longer she goes without having

25  lymphoma progression the better it is in terms of the

Ron B. Schiff, M.D., Ph.D.

1    likelihood of a long-term favorable outcome.  There's no

2    dispute with that.  Six and a half years is better than

3    four years is better than two years.  All of that is

4    very good.  And, again, she has not had any kind of

5    progression.  No new sites.  No enlargement of the

6    residual site.

7        Q.   So with all of that, my question is:  Do you

8    think that her median survival -- or her likely survival

9    is only 10 years, or it's going to be longer; right?

10            MS. FREDONA:  Objection.  Asked and answered.

11       A.   Well, the point is that, you know, we don't

12   know that, and there are all sorts of problems in

13   applying population data from clinical trials to

14   individuals.  So that's another issue where we're

15   talking about individuals.

16            Everybody has heard stories of a patient who's

17   been told, "You have three months to live," and then 10

18   years later they go back to the doctor and say, "Guess

19   what?  I'm still around."  That's the problem with

20   applying population statistics to individuals.

21            In Ms. Rehak's case, she has done quite well

22   with the rather aggressive treatment that she's had.

23   The hope and expectation is that she'll continue to do

24   well, but that stops well short of certainty, primarily

25   because of the nature of her lymphoma, which is

1   follicular, and the fact that she has a residual mass on

2   follow-up imaging.

3       Q.   Right.  And with all that and that statement --

4   this is why I'm confused -- if you go back to your

5   disease status and your prognosis, the last paragraph on

6   that page 13, you say, "Up to 90 percent of patients

7   have advanced-stage disease (III or IV) at the time of

8   diagnosis."

9            That's not true of Ms. Rehak; right?  She was a

10  2A; right?

11      A.   That's correct, but she had bulky 2A disease.

12      Q.   Sure.  And then you say, "While the median

13  survival time for patients with follicular lymphoma,

14  even for those with stage III or IV disease, now exceeds

15  10 years."

16           Do you see that?

17      A.   That's correct.

18      Q.   But she only had Stage II, not III or IV, and

19  she survived six years and has no evidence of

20  progression or residual disease.  So her -- it is common

21  sense that her likely survival is going to well exceed

22  10 years, don't you think?

23           MS. FREDONA:  Objection form.

24      A.   I certainly hope so, but the point is that last

25  sentence of my disease status and prognosis section says

Ron B. Schiff, M.D., Ph.D.

1    in the range of 10 years.  It doesn't indicate that it's

2    exactly 10 years or anything like that.  It's in the

3    range of 10 years.  But even if we take that a little

4    bit further and we say, great, remains disease-free for

5    12 or 15 years, starting at age 54, that's still not

6    such a good outcome.

7        Q.   So, Doctor, then you also reference in your

8    report -- you have that same paragraph that you had in

9    Cervantes, basically saying that cancer is stressful;

10   right?

11       A.   Correct.

12       Q.   Okay.  Did you see in Ms. Rehak's medical

13   records her history of psychiatric issues and her

14   little -- her hospitalization in 2019?

15           MS. FREDONA:  Objection.  Form.

16   BY MS. FUJIMOTO:

17       Q.   Having suicidal thoughts and so forth?

18       A.   I do not remember that specifically, but I'm

19   going to look at that in my report.

20       Q.   Okay.  Because my question to you is going to

21   be whether or not you are connecting that as somehow

22   related to her lymphoma or whether, based on the records

23   and what she said about her financial problems and her

24   breakup with her boyfriend, whether they're unrelated,

25   or you have no opinion?

```
 1              MS. FREDONA:  Objection.  Form.
 2      A.   Well, what I put in the last part of my factual
 3   review was that she testified to experiencing depression
 4   or anxiety related to her diagnosis of non-Hodgkin
 5   lymphoma beginning at the time of diagnosis and
 6   persisting until a beneficial response to treatment was
 7   established.
 8              So the situation there is that I did not have a
 9   previous record of similar psychiatric symptoms from
10   2019, and in terms of other possible causes or
11   contributing factors, I don't know anything about that,
12   whether it's relationships, financial, or what have you.
13   In that regard, I only know what she testified to.
14      Q.   Okay.  So you're basing what you just told me
15   on her deposition testimony; right?
16      A.   That's correct.
17      Q.   So you didn't look at her medical records
18   related to her suicidal thoughts being caused by her
19   breakup with her boyfriend, her drinking alcohol, she
20   was drunk at the time, and her relationship with her
21   mother?
22              MS. FREDONA:  Objection.  Form.
23      A.   It's not that I didn't look at those medical
24   records.  I didn't have medical records that described
25   that.
```

1      Q.   Okay.  If you look at -- I'm trying to find the

2   suicidal -- the reference.  Did you have records from

3   2019?

4      A.   I had some, yes.  I had --

5      Q.   Did you see a record that reported she was

6   sexually molested by a friend of her father's when she

7   was 10 years old?

8      A.   I don't recall that, but --

9      Q.   Would that contribute to depression?

10     A.   Yes, except that she testified that her

11  depression and anxiety began at the time of diagnosis.

12          What I have from 2019 is blood tests and a

13  chest x-ray report from May 28 of that year, and the

14  most recent progress note available from Dr. Kumar was

15  June 24, 2019, at which time she was asymptomatic, and

16  her most recent medical record of any type is the CT

17  scan of the chest, abdomen, and pelvis that I mentioned

18  before from June 15, 2020.

19          So I do not remember any of those other aspects

20  of her personal and social history.  In regards to prior

21  sexual trauma, I don't remember if I encountered that or

22  not.

23     Q.   Okay.  So --

24     A.   I do not recall seeing that in her deposition,

25  and more recent problems with alcohol, relationships,

1    and suicide, I'm quite confident that I never saw

2    anything concerning that.

3        Q.   Okay.  So go back then to Exhibit 5.  And I

4    found -- I hadn't tagged it, but it is -- the bottom is

5    Rehak-NorthPFPD and lots of 0's and a 1.  The date is

6    May 12, 2019.

7        A.   I have it.

8        Q.   Okay.

9        A.   No, I don't.  I have -- my Bates No. 1 is the

10   Radiation Oncology Consultation Note.

11       Q.   Go further.  Go further.  Yeah, go further,

12   because it's pages 1 and 2, but the records are from

13   North PFPD, and it's basically an emergency report.

14       A.   I have not seen anything so far that looks like

15   that.

16       Q.   It looks like this.

17       A.   I'm happy to page through this in detail.

18       Q.   Yeah, here.  Look at the -- you'll see lines

19   through it like this, Doctor, and it's like about --

20   very close to the end.

21       A.   Okay, I'll page through it from the end.

22       Q.   Okay, yeah.  It has, like, long black lines

23   through them because it's a PCR document.

24       A.   That's what I'm looking for.

25       Q.   Okay.

```
 1        A.    Okay.  North Palos EPCR.

 2        Q.    Yes.  So that's the one.  And it basically is a

 3   911 response to psychiatric problem/abnormal

 4   behavior/suicide attempt.  And then if you go to the

 5   next page, which is 2, it gives the narrative of what

 6   happened.  Do you see that?

 7        A.    I do.

 8        Q.    It says, "In summary, Ambulance 802 dispatched

 9   for psych evaluation."  Blah, blah.  "Upon arrival crews

10   had a 59-year-old female sitting upstairs in her room.

11   Patient was visually upset and was stated that she has

12   had enough.  Patient stated that she wanted to go to

13   sleep and never wake up.  Patient stated that she has

14   been going through a lot of family issues and recently

15   went through a breakup.  Patient said she feels she

16   needs help and wanted to go to the hospital to talk to

17   someone."

18              Do you see that?

19        A.    I do.

20        Q.    And do you think those kinds of problems

21   certainly can contribute to depression and other anxiety

22   or problems that she testified to in her deposition?

23              MS. FREDONA:  Objection.  Form.

24        A.    There's a few problems with that.  Okay?

25   Because after this encounter where I am going to insist
```

Ron B. Schiff, M.D., Ph.D.

```
1   on looking at what the physician found, as well as what

2   the --

3       Q.   Yeah.

4       A.   -- paramedics found --

5       Q.   Okay.

6       A.   -- she was in Dr. Kumar's office June 24, which

7   was six weeks later.  She was asymptomatic.  And her

8   deposition testimony tied in her anxiety and depression

9   only to her lymphoma diagnosis and treatment.

10          So the point is that this may have been a

11  transient problem rather than ongoing one.  I'm looking

12  now at --

13      Q.   Go to page 6, Doctor.  I think that's what

14  you're looking for.

15      A.   That's exactly where I am.

16      Q.   Psychiatric evaluation.  There it is.

17          The bottom line is -- I will be, literally,

18  right back here.

19          Sorry.  I had a little puppy scratching at the

20  door.

21          So on page 00006, it is May 12, 2019, and this

22  is the psych eval.  And you'll see that she -- it says,

23  "Patient states she has been increasingly depressed and

24  anxious about family and relationship issues.  Patient

25  recently had her 16-year relationship with her boyfriend
```

 1    ended when she found out he was cheating on her.  It was

 2    also recently found out he had hepatitis C.  Patient is

 3    unsure whether or not she contracted hepatitis C,

 4    although she states she has not had sexual relations

 5    with him for 10 years.  She wants to be checked for hep

 6    C.  She states she is increasingly depressed about her

 7    ex-boyfriend's treatment of her, as well as the

 8    treatment she has of her mother, who she stays this" --

 9    I think it should say "disrespects her."  "She feels

10    helpless."

11           And then at the end, it says, "Patient does

12    feel helpless about her life and does not want" --

13    "still feel the need to go on living."

14           So that was the psych eval.

15           Doctor, let me ask you this:  As a matter of

16    practice as a physician, don't you -- do you agree that

17    medical records are more reliable sources than the

18    deposition testimony of someone who has an active

19    lawsuit and has a pecuniary gain potential?

20           MS. FREDONA:  Objection.  Form.

21       A.   Well, regardless of the motivation, I always

22    prefer to rely on the source documents.  Medical records

23    preferable to deposition testimony.  However, in these

24    medical records, it mentions a history of non-Hodgkin

25    lymphoma, but it does not have any tie-in between

1    non-Hodgkin lymphoma and her active psych symptoms.

2            So I think that those symptoms were more acute

3    and were what she was focused on, but, again, I know

4    that six weeks later none of that appears to be a

5    problem.  And when she was deposed, it appeared to tie

6    in with her non-Hodgkin lymphoma.

7            I cannot make a judgment beyond that.

8    Certainly the factors cited in the psychiatric history

9    are all legitimate factors why someone would feel

10   anxious, depressed, and suicidal.  I'm not taking

11   anything away from that, but just like non-Hodgkin

12   lymphoma, those psych symptoms can also be

13   multifactorial.

14           And, again, I want to reiterate that the

15   deposition was more than six months after this ER visit.

16   So, you know, we have the other side of the coin that,

17   if this was known by defense counsel at the time,

18   Ms. Rehak was not questioned about that.  She was not

19   asked about it as you are asking me about that, with no

20   prior exposure to these records.

21       Q.   Doctor, am I correct that when we -- strike

22   that.  Let me do this one last thing.

23           So if you go to the very last page of

24   Exhibit 5, the last record I have is a November 5, 2020,

25   record, and it's the last -- second to the last page.

1      A.   I have it.

2      Q.   Okay.  HPI says, "Ms. Lorraine Rehak returns

3   for follow-up.  She reports feeling fine with no new

4   symptoms of abdominal pain, nausea, or vomiting.  Denies

5   any night sweats, anorexia, or weight loss.  Denies any

6   chest pain, shortness of breath."  And it references

7   kind of her CT scan and so forth.

8           And then if you go to the back or the end of

9   that report, under impression, he says, "History of

10   follicular grade II non-Hodgkin lymphoma.  Status post

11   chemo/radiation therapy.  Clinical no evidence of

12   recurrence OncoType progression of disease."

13           It's kind of worded weird, but does that -- do

14   you read that to mean there's no indication that she has

15   any recurrence or progression of the lymphoma?

16      A.   The reference to "OncoType" is just flat-out

17   confusing in this section.  It might mean that something

18   that he said into voice recognition software was

19   transcribed incorrectly, but on the other hand, OncoType

20   is a type of diagnostic and, more correctly, prognostic

21   testing that is available for a number of malignancies

22   initially developed for breast cancer, but now more

23   widely available.

24           I do not know whether he is talking about

25   OncoType evidence of disease progression that had

1    already been looked for or that he was considering.  I

2    have no idea.  I certainly haven't seen results of

3    OncoType testing.

4        Q.   But it certainly seems like one of the things

5    he's saying is that there's no clinical evidence that

6    her lymphoma has recurred or progressed?

7        A.   Correct.  It might have persisted, but

8    recurrence or progression has not been documented,

9    that's correct, there's no evidence of that.

10       Q.   And am I right -- and we went through this with

11   Cervantes, but I want to ask you for Rehak.

12            Am I correct that in reviewing all of the

13   medical records regarding her clinical findings, her

14   radiological findings, and her pathology and histologic

15   and cytologic findings with regard to her lymphoma that

16   is there nothing unique or different in those -- that

17   information that would tell you that Ms. Rehak was

18   exposed to glyphosate; is that correct?

19            MS. FREDONA:  Objection.  Form.

20       A.   Yes, that's correct, that there is no way to

21   distinguish a glyphosate-caused lymphoma from a

22   nonglyphosate-caused lymphoma, nor is there a way to

23   rule it out, nor is there a way to tie it in exclusively

24   with smoking or positive family history or any other

25   factor that could be listed.

Ron B. Schiff, M.D., Ph.D.

```
1         Q.   And in these medical records, there's certainly

2    a lot of discussion about her family history and

3    cigarette smoking; right?

4         A.   That's correct.

5         Q.   But glyphosate is not mentioned once, is it?

6         A.   I agree with that, but that also depends, based

7    on personal experience and the numerous medical records

8    that I have read in clinical practice and subsequently,

9    about how detailed an oncologist or other physician is

10   in inquiring about occupational environmental history.

11        Q.   And so looking --

12        A.   Even what I did was that I would ask about

13   occupation, but I would only take it further if I heard

14   something suspicious.  So I do not expect to see a full

15   toxicological history in medical records like

16   Ms. Rehak's.

17             And that is probably the explanation.  Should

18   we as physicians do a better job with that?  Yeah.  Do

19   we have time to do that?  Not necessarily, because we

20   have to diagnosis and treat the disease as it presents.

21        Q.   So are you criticizing her treating physicians

22   for not asking her whether she used glyphosate or some

23   pesticide?

24        A.   Quite the contrary.  I'm saying that that's up

25   to standard of care.
```

1     Q.   Sure.  And so am I right then you agree that by

2   looking at every word in Ms. Rehak's medical records

3   that there is nothing in here that would tell anyone,

4   you or anyone else, that she was exposed to glyphosate;

5   right?

6     A.   Well, of course, most of the records that I

7   receive today, which I have not reviewed, are new to me,

8   and I have not gone through them systematically.  There

9   are some thing in there that look familiar.  Some things

10  are not.  So --

11    Q.   In her medical records?

12    A.   I'm sorry?

13    Q.   In her medical records?

14    A.   The medical records that I received via FedEx

15  today.

16    Q.   All right.  Well, those are just part of her

17  overall medical records, which --

18    A.   I understand that, but some of them were not

19  previously known to me and I have not reviewed them, but

20  I have not seen a reference to Roundup exposure in the

21  medical records that I did have or in any of the medical

22  records that we discussed during this deposition that I

23  received this morning.

24    Q.   All right.  And there's certainly no other --

25  setting aside whether or not glyphosate or Roundup is or

Ron B. Schiff, M.D., Ph.D.

1    is not mentioned, and it's not, but setting that aside,

2    there's nothing in her medical records that you as a

3    doctor or anyone else would look to and know that she

4    was exposed to glyphosate; right?

5        A.   Well, the medical records don't address that at

6    all either way.

7        Q.   Well, and there's nothing -- I guess that's a

8    way of tieing up.  There's also nothing medical, nothing

9    unique about her clinical symptoms, presentation,

10   pathology, anything else, that you would see and go,

11   "Oh, she must have been exposed to glyphosate"?

12       A.   Well, no, I mean, the situation there is, if a

13   patient comes into a medical office and says, "I was

14   spraying glyphosate an hour ago and now my eyes are

15   irritated," so you could make a connection from that.

16   And, by golly, that's all the warning that you get on

17   the label.  But in actual fact you can't distinguish

18   lymphomas clinically or pathologically, regardless of

19   the cause.

20       Q.   Right.  Okay.  And that was -- that was what I

21   was asking.

22           MS. FUJIMOTO:  Let's go off the record.  I

23       think I'm pretty well done, Rebecca, but let me look

24       at my notes.  Okay?

25           MS. FREDONA:  All right.

Ron D. Schiff, M.D., Ph.D.

```
1            MS. FUJIMOTO:  Be right back.

2            THE VIDEOGRAPHER:  The time is 4:25 p.m. and

3      we're off the record.

4            (Recess from 4:25 p.m. until 4:26 p.m.)

5            THE VIDEOGRAPHER:  The time is 4:26 p.m. and

6      we're back on the record.

7            MS. FUJIMOTO:  I have no further questions at

8      this point, Dr. Schiff.

9            THE WITNESS:  Thank you, Ms. Fujimoto.

10           MS. FUJIMOTO:  Oh, you're on mute, Rebecca.

11           MS. FREDONA:  It occurred to me, Michelle.

12                      CROSS-EXAMINATION

13   BY MS. FREDONA:

14      Q.   I only have a couple of questions.  Very

15   similar to the last deposition.

16           Can cancer exacerbate patients with anxiety and

17   depression?

18           MS. FUJIMOTO:  Object to the form.

19      A.   One would expect it to.

20           Sorry.

21      Q.   I'm sorry?

22      A.   One would expect it to.

23      Q.   Okay.  All right.  So today defense introduced

24   a lot of papers as exhibits that you have never seen

25   before.  Did you get a chance to review those papers
```

Ron D. Schiff, M.D. / Ph.D.

1    completely?

2        A.   No.

3        Q.   Okay.  And those papers, the defense picked out

4    certain excerpts and showed them to you.  Do you think

5    those excerpts were cherry-picked?

6            MS. FUJIMOTO:  Object to form.

7        A.   Well, I think that they are selected in support

8    of defense legal strategy even if careful examination

9    indicates that they don't support defense legal

10   strategy.

11       Q.   Okay.  And is it important for -- strike that.

12           Is it important to read a whole paper in order

13   to form a complete and thorough opinion regarding that

14   paper?

15       A.   Yes, it is.

16       Q.   Okay.  And we cut you off a couple of times.

17   Is there anything still sitting in your head that you

18   would like to finish explaining?

19       A.   Absolutely.  All right.  And I'll make this

20   brief.  Okay?  First, the question is, which I raised

21   when we were discussing it, with regard to the Bell

22   paper, what else causes t(14;18).  We don't know for

23   sure that that translocation is directly caused by

24   glyphosate exposure.  We've looked at evidence today

25   that smoking causes it, but we don't know what other

1    causes there might be.

2         Once again, we do know that that chromosomal

3    translocation is found in a strong majority of

4    follicular lymphoma cases, but there are also patients

5    with follicular lymphoma who have that translocation who

6    don't smoke.  And, according to that, we are left with

7    the fact that smoking is obviously not the only cause of

8    follicular lymphoma.

9         The InterLymph study tries to do a systematic

10   examination of occupational and lifestyle and family

11   history risk factors, and we've discussed those I would

12   have to say in pretty much detail, a degree of detail

13   that satisfies me.

14        The InterLymph study in -- as published in

15   2014, is actually more recent and certainly more

16   comprehensive with the larger number of patients than

17   the older studies that I was asked to look at which

18   supposedly supported the defense strategy.

19        Now, the next issue that came up where I really

20   couldn't get any of the words out had to do with

21   continuation of smoking.  This is something that was

22   also a big deal in the Carmen deposition, and, in fact,

23   he was questioned about it by opposing counsel, and

24   plaintiff's counsel actually picked up and responded to

25   it so that even though I had become aware of it and was

Ron L. Schiff, M.D., Ph.D.

1   putting it in my report, a little bit later on I

2   realized that I was not the only person who did it.

3          What I did say today was that smoking and

4   tobacco and nicotine are physiologically addicting.  So

5   you could have all the warning labels in the world and

6   it's still difficult or impossible to quit using tobacco

7   products.

8          Glyphosate, which doesn't have much of a

9   warning label, and certainly nothing about cancer, which

10  has been contested in the present litigation, or I

11  should say in the first wave of cases, the use of

12  glyphosate to get weeds out of your yard or out of the

13  properties that you're treating as a lawn service worker

14  or owner is not addictive.  There are other options, and

15  even if you conclude that it works better than other

16  products on the market, which I'm more than willing to

17  stipulate, there's still no physiological addiction that

18  makes you continue to use glyphosate.  And, of course,

19  the warning label does not bring up a carcinogenic risk.

20         The final point is one that I've made

21  repeatedly during the day, but we've always plowed

22  through that, and it bears repetition as part of how I

23  sum up today's depositions, and that is that diseases

24  are multifactorial and that you can identify risk

25  factors that may cause or contribute to cause a specific

Ron L. Schiff, M.D., Ph.D.

1  disease, and there might be two or three or more, but

2  the important thing is they don't cancel each other out.

3  Those are all contributing factors.

4         And the amount of time that we spent today,

5  especially on smoking with regard to Ms. Rehak, but also

6  that we looked at with BMI with Mr. Cervantes and some

7  of his other occupational exposures, to me, I am

8  inferring that an argument is being made that if he had

9  those other exposures to candidate lymphoma risk factors

10 that glyphosate is unimportant, and I need to emphasize

11 that that's not the case.  There is nothing in

12 epidemiology that supports that.  And that's all I have.

13        MS. FREDONA:  All right.  I have no more

14    questions.

15                    REDIRECT-EXAMINATION

16 BY MS. FUJIMOTO:

17    Q.   I have a couple follow-up questions.

18        Doctor, you laid out or made it a point to

19 mention that the glyphosate or Roundup label doesn't

20 have a warning about cancer.  I take it, though, you're

21 aware that the EPA has basically told Monsanto that they

22 cannot put a cancer warning on the glyphosate label

23 because, based on the evidence, that would be considered

24 misleading?

25    A.   I am aware of the EPA's position on that.  I

Ron D. Schiff, M.D., Ph.D.

1    think that it is highly compromised for political

2    reasons.  I have gone through that in depositions dating

3    back to 2019, and I have provided supporting

4    documentation for that opinion as recently as -- I can't

5    remember -- either last week or two weeks ago.

6          So the answer is I would not put weight on the

7    EPA opinion in this case.  There are other things for

8    what the EPA says may be fine, but Scott Pruitt's EPA

9    has no credibility.

10   Q.   Doctor, are you suggesting that Monsanto should

11   listen to you rather than listening to the EPA as to

12   what legally it can put on a label?

13         MS. FREDONA:  Objection.  Form.

14   A.   There's no recommendation or obligation to

15   listen to me.  I'm offering my opinion.  I think they --

16   Q.   If there --

17   A.   I think they should look at the data from the

18   basic scientific literature, I think they should look at

19   IARC, which, remember, is not a regulatory body, and

20   they should base their decision-making off of that and

21   not off of potential litigation outcomes and financial

22   losses, which, after all, are driving the defense

23   posture in all of this litigation.

24         And I'm saying that as an observer, not an

25   attorney, not a business expert.  That's just how it

Ron L. Schiff, M.D., Ph.D.

```
 1  appears to me as I've read everything that I've come

 2  across over the course of the past almost two and a half

 3  years.  I was first approached about Roundup litigation

 4  on November 2018.

 5      Q.  Yeah.  So you're really offering that opinion

 6  based on the fact that you haven't practiced clinical

 7  medicine for six years but, rather, have only been doing

 8  litigation testifying and consulting and have testified

 9  that Roundup exposure was extensive and caused

10  plaintiffs' cancer in all 17 cases that you've testified

11  in; right?

12      A.  I do many things --

13          MS. FREDONA:  Objection.  Form.

14      A.  Sorry.

15          I do many things besides expert witness work,

16  so it is not true that all I have done since retirement

17  from clinical practice is this.

18      Q.  Your only source of income is litigation;

19  right?

20      A.  No, my only source of earned income is this,

21  but let me go on the record as saying this is not

22  financially driven for me, nor is it politically driven.

23      Q.  Doctor --

24      A.  I had no dog in the fight in November 2018 when

25  I was asked to look at the glyphosate literature.
```

Ron D. Schiff, M.D., Ph.D.

1       Q.    Doctor, do you -- are you suggesting that

2   Monsanto should not follow the legal directives of the

3   EPA, the entity -- the federal entity that regulates

4   Roundup?

5       A.    What I think is that, even though the most

6   recent EPA re-evaluation was relatively recent,

7   approximately five years ago, I think it's time for

8   another one.

9       Q.    Well, Dr. Schiff, I think you need to go do

10  some updated research, because you've already said you

11  haven't seen the more recent EPA and other regulatory

12  papers that have come out since 2015.  There have been

13  quite a number of them.

14          So if you -- do you not agree that it is the

15  responsibility of a responsible scientist or doctor

16  who's serving as an expert to go and research on his own

17  the appropriate and relevant literature that pertains to

18  the subjects at issue, whether it's glyphosate or

19  smoking and lymphoma, or family history, or anything

20  like that?  Wouldn't a responsible scientist do that on

21  his own?

22          MS. FUJIMOTO:  Objection.  Form.  Counsel is

23      testifying.

24      A.    Yes.

25      Q.    And wouldn't you agree that if you had done

Ron B. Schiff, M.D., PH.D.

1    that you might have seen some of the articles that we --

2    I asked you about today and wouldn't have been surprised

3    by them?  You would have actually had more than 11

4    references on your reference list for your report;

5    right?

6         A.   I'd like to answer the question, please.

7              MS. FREDONA:  Objection.  Form.

8         A.   Sorry.

9              So here's the thing.  In the past 24 hours, I

10   have looked, albeit briefly, at Kabat and Donato.  In

11   addition to that, one week ago I asked defense counsel

12   and plaintiffs' counsel to put me in touch with the 2020

13   EPA statement.  I still don't have it, I still haven't

14   seen it, and as I indicated earlier today, I did an

15   online search for it and I couldn't find what was being

16   referred to.

17             On top of that, I have reason to believe that

18   what the EPA has done in the context of their 2015/2016

19   review was not motivated by pure science and that, in

20   terms of what Monsanto should do in terms of looking at

21   data from IARC or the primary scientific literature or

22   what the EPA says, here's another example from my

23   personal life.  I know you don't like those, but it's

24   directly relevant.  My --

25        Q.   I just think it's irrelevant for an expert to

1    be talking about personal experience, but we can let the

2    judge decide that.  No worries.

3        A.    Absolutely.  My governor says I don't need to

4    wear a mask and I no longer have to stay out of bars on

5    South Howard Street in Tampa, I could go there and do

6    that as much as I want, effective immediately.  The

7    problem is that I, as a responsible reviewer of the

8    existing scientific data, reject that, just as Monsanto

9    at some point should have even had the thought we're

10   going to incur more liability if we don't warn, if we

11   don't withdraw the product, as it has been banned for

12   sale or manufacture in other countries, and yet they

13   haven't.

14          You still see Monsanto commercials for Roundup

15   in various media, along with advertisements for Roundup

16   plaintiffs' attorneys.  Both sides are represented.

17   And, you know, you just have to exercise independent

18   judgment.

19          But the point is that they are accepting the

20   EPA's tainted ruling while not paying due heed to the

21   actual scientific literature or to the IARC review.  We

22   talked about Kabat and we've talked about Donato.  I

23   haven't seen anything that makes me change my mind about

24   that, allowing for the fact that I've only had those

25   references in my possession for 24 hours.

Ron B. Schiff, M.D., Ph.D.

```
1      Q.   Well, and that's really because you haven't
2   undertaken any effort on your own to get the relevant
3   literature and publications from the EPA, from the
4   independent scientific community, or from the
5   international regulatory community that have responded
6   to, evaluated the evidence, and dealt with the IARC 2015
7   monograph?  You haven't done that; right?
8           MS. FREDONA:  Objection form.
9   BY MS. FUJIMOTO:
10     Q.   And that's why you haven't seen all these
11  things and have not factored them into your opinions?
12     A.   But what I haven't seen --
13          MS. FREDONA:  Same objection.
14     A.   Sorry.
15          What I haven't seen are actual new scientific
16  studies, because there aren't any.  I haven't seen a
17  revision of IARC's opinion either from a new monograph
18  or from an entry in Lancet, Oncology, or the New England
19  Journal of Medicine.
20          With regard to that, I have no reason to
21  believe that IARC does not stand behind its 2015
22  determination, and all of the other things that you've
23  asked me if I looked at fall short of being scientific
24  data or weight of the evidence analysis of scientific
25  data.
```

Ron E. Schiff, M.D., Ph.D.

```
 1        Q.   Final question.  Are you saying that you

 2   believe that Monsanto should ignore its legal

 3   obligations with regard to what the EPA requires or does

 4   not require with regard to Roundup?

 5        A.   I have no opinion on Monsanto's legal

 6   obligations --

 7        Q.   Okay, thank you.

 8        A.   -- because, after all, I'm not an attorney --

 9        Q.   Right.

10        A.   -- but by the same token, I know how tainted

11   the EPA's input into this subject is.

12             MS. FUJIMOTO:  Okay.  I have no further

13        questions.

14             MS. FREDONA:  I have no further questions as

15        well.

16             THE VIDEOGRAPHER:  The time is 4:41 p.m. and

17        we're off the record.

18             (Whereupon, the deposition concluded at

19   4:41 p.m.)

20

21

22

23

24

25
```

Ron D. Schiff, M.D., Ph.D.

```
 1              C E R T I F I C A T E

 2          I, Joan L. Pitt, Registered Merit Reporter,

 3   Certified Realtime Reporter, and Florida Professional

 4   Reporter, do hereby certify that, pursuant to notice,

 5   the deposition of RON SCHIFF, MD, PhD, was duly taken on

 6   March 5, 2021, at 2:02 p.m. remotely before me.

 7          The said RON SCHIFF, MD, PhD, was duly sworn by

 8   me according to law to tell the truth, the whole truth

 9   and nothing but the truth and thereupon did testify as

10   set forth in the above transcript of testimony.  The

11   testimony was taken down stenographically by me.  I do

12   further certify that the above deposition is full,

13   complete, and a true record of all the testimony given

14   by the said witness, and that a review of the transcript

15   was not requested.

16

17   _____                          _____

18    Joan L. Pitt, RMR, CRR, FPR

19   (The foregoing certification of this transcript does not

20   apply to any reproduction of the same by any means,

21   unless under the direct control and/or supervision of

22   the certifying reporter.)

23

24

25
```

Ron D. Schiff, M.D., Ph.D.

```
 1                       LAWYER'S NOTES

 2      PAGE    LINE

 3      _____   _____   _____

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____

25
```