# EXHIBIT 9

Gerard F. Cervantes

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4    IN RE: ROUNDUP PRODUCTS        ) MDL No. 2741

5    LIABILITY LITIGATION           ) Case No. MDL No.

6    ------------------------       ) 3:16-md-02741-VC

7    This document relates to:      )

8    Gerard Cervantes v.            )

9    Monsanto Co.,                  )

10   Case No. 3:19-cv-03015-VC      )

11

12

13            VIDEOTAPED DEPOSITION OF

14

15              GERARD F. CERVANTES

16               June 23, 2020

17

18             Chicago, Illinois

19

20

21

22           GOLKOW LITIGATION SERVICES

        877.370.3377 ph | 917.591.5672 fax

23              deps@golkow.com

24

Gerard F. Cervantes

1

2

3              The videotaped deposition of

4   GERARD F. CERVANTES, called by the Defendant for

5   examination, taken pursuant to the Federal Rules of

6   Civil Procedure of the United States District

7   Courts pertaining to the taking of depositions,

8   taken before CORINNE T. MARUT, C.S.R. No. 84-1968,

9   Registered Professional Reporter and a Certified

10  Shorthand Reporter of the State of Illinois, at the

11  Hyatt Place, 28 North Franklin Street, Chicago,

12  Illinois, on June 23, 2020, commencing at 8:55 a.m.

13

14

15

16

17

18

19

20

21

22

23

24

Gerard F. Cervantes

```
 1    APPEARANCES:

 2    ON BEHALF OF THE PLAINTIFF:

 3          MOLL LAW GROUP

            22 West Washington Street, 15th Floor

 4          Chicago, Illinois  60602

            312-462-1700

 5          BY:  REBECCA FREDONA, ESQ.

                 rfredona@molllawgroup.com

 6

 7

 8    ON BEHALF OF THE DEFENDANT:

 9          SHOOK, HARDY & BACON L.L.P.

            JPMorgan Chase Tower

10          600 Travis Street, Suite 3400

            Houston, Texas  77002-2926

11          713-227-8008

            BY:  JAMES SHEPHERD, ESQ.

12               eshepherd@shb.com

13

14

15

16

17    VIDEOTAPED BY:  MILO SAVICH

18

19    REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968

20

21

22

23

24
```

Gerard F. Cervantes

```
 1                    I N D E X
 2    GERARD F. CERVANTES                 EXAMINATION
 3         BY MR. SHEPHERD...............   6
           BY MS. FREDONA............... 234
 4         BY MR. SHEPHERD.............. 247
           BY MS. FREDONA............... 255
 5
 6
 7
 8                    E X H I B I T S
 9    G. CERVANTES DEPOSITION EXHIBIT    MARKED FOR ID
10    No. 1     Defendant Monsanto Company's       16
                Fifth Amended Notice to Take
11              Oral and Videotaped Deposition
                of Plaintiff Gerard Cervantes
12
      No. 2     4/22/16 medical record;           39
13              Confidential-Cervantes-
                GCervantes-DreyerMC-MD-000105
14              through 000107
15    No. 3     5/25/16 medical record;           42
                Confidential-Cervantes-
16              GCervantes-DreyerMC-MD-000108
17    No. 4     Roundup ready-to-use label       123
18    No. 5     Roundup Pro label               125
19    No. 6     8/7/19 letter from US EPA        201
20    No. 7     Plaintiff Fact Sheet            214
21
22
23
24
```

Gerard F. Cervantes

```
1         THE VIDEOGRAPHER:  We are now on the record.

2    My name is Milo Savich, and I am a videographer for

3    Golkow Litigation Services.

4              Today's date is June 23, 2020, and the

5    time is 8:55 a.m.

6              This video deposition is being held in

7    Chicago, Illinois, in the matter of Roundup, Gerard

8    Cervantes vs. Monsanto.  This case is being heard

9    in the United States District Court, Northern

10   District of California.

11             The deponent is Gerard Cervantes.

12             Will counsel please identify themselves

13   for the record.

14        MS. FREDONA:  Rebecca Fredona on behalf of

15   Plaintiff.

16        MR. SHEPHERD:  James Shepherd on behalf of

17   Defendant, Monsanto Company.

18        THE VIDEOGRAPHER:  The Court Reporter is Corey

19   Marut who will now swear in the witness and we may

20   then proceed.

21             (WHEREUPON, the witness was duly

22              sworn.)

23        MR. SHEPHERD:  I just note for the record that

24   Monsanto continues to receive records from medical
```

Gerard F. Cervantes

1   providers who have treated Mr. Cervantes as well as

2   other types of records.  Monsanto, therefore,

3   reserves its rights to continue the deposition past

4   today's date based on additional records being

5   available.

6       MS. FREDONA:  We'd like to put an objection to

7   that on the record as well.

8               GERARD F. CERVANTES,

9   called as a witness herein, having been first duly

10  sworn, was examined and testified as follows:

11                  EXAMINATION

12  BY MR. SHEPHERD:

13      Q.    Good morning, Mr. Cervantes.

14      A.    Good morning.

15      Q.    How are you today?

16      A.    Real good.

17      Q.    Could you please state your full name

18  for the record.

19      A.    Gerard F. Cervantes.

20      Q.    What's the "F" stand for?

21      A.    Francis.

22      Q.    What's your home address?

23      A.    ████████████████████████████████████

24  ███████████████

Gerard F. Cervantes

```
1         A.     Simmons Middle School.

2         Q.     Where did you attend high school?

3         A.     East Aurora High School.

4         Q.     And did you graduate from there?

5         A.     Yes.

6         Q.     What year?

7         A.     1977.

8         Q.     Did you attend college or technical

9   school after high school?

10        A.     No.

11        Q.     Do you hold any other -- any degrees or

12  certifications?

13        A.     No.

14        Q.     Do you have any medical training?

15        A.     No.

16        Q.     Any legal training?

17        A.     No.

18        Q.     Have you ever testified at trial before?

19        A.     No.

20        Q.     Have you ever been involved in a civil

21  lawsuit prior to this one, either as a Plaintiff or

22  as a Defendant?

23        A.     Yes.

24        Q.     Okay.  When was that?
```

Gerard F. Cervantes

1              Let me ask you this.  How many?  Is it

2   just one?

3       A.    One.

4       Q.    Okay.  And when was that?

5       A.    Let me think of the date.  I'm thinking

6   around 2006.

7       Q.    And what was the nature of that lawsuit?

8       A.    Water was the nature of the lawsuit, and

9   it was a class action suit.

10      Q.    Okay.  What were the allegations that

11  you recall?

12      A.    That there was not a backflow system in

13  the boiler area of the water.

14      Q.    Is this in your home?

15      A.    No.  At Nicor Gas Company.

16      Q.    You were a Plaintiff I'm assuming?

17      A.    Yes.  My name was in there on the class

18  action.

19      Q.    Do you know where the case was filed?

20  Was it in State Court, Federal Court?

21      A.    I do not know because I was not the

22  person that I guess spearheaded it, but it never

23  went anywhere.

24      Q.    It was -- this case was ultimately

Gerard F. Cervantes

1    dismissed?

2        A.    Yes.  To my knowledge.

3        Q.    And you didn't give a deposition or any

4    trial testimony in that case?

5        A.    No.

6        Q.    Did you give a statement of any kind, a

7    written statement or a statement to attorneys?

8        A.    When I had talked to an attorney, it was

9    class action; and they just asked how I -- how long

10   I worked there and --

11       Q.    But you didn't make a sworn statement,

12   either written in or verbally, that was submitted

13   to the Court about circumstances or anything like

14   that?

15       A.    No.  It was just my name was added to

16   it.

17       Q.    Okay.

18       A.    And there were other people that I guess

19   spearheaded it and did all -- took it to the --

20       Q.    And what was the -- what was the injury,

21   I guess, as a result of there not being a backup on

22   the flow system at Nicor?

23       A.    That people were getting sick.

24       Q.    Do you know any specific type of

Gerard F. Cervantes

1    sickness that they were alleging they got?

2         A.    It was a range.

3         Q.    Okay.  What was the sickness that you

4    alleged that you had?

5         A.    Cancer.

6         Q.    And that was your NHL cancer?

7         A.    Yes.

8         Q.    And as a result of there not being a --

9    did you say it was a backflow?

10        A.    That's what -- yes, it was --

11        Q.    Not -- so, there was no backflow system

12   and as a result of that, I'm assuming that there

13   were chemicals that were coming into the

14   environment that workers were breathing.  Is that

15   the gist of the allegations?

16        A.    Yes.

17        Q.    And do you know which chemicals it was

18   that you were exposed to?

19        A.    I do not.

20        Q.    But it was your allegation at least in

21   that lawsuit that there were chemicals that you

22   were exposed to as a result of your employment at

23   Nicor that caused your non-Hodgkin's lymphoma?

24        A.    Yes.  That -- other people had gotten

Gerard F. Cervantes

1   sick, and just -- maybe not cancer, but illnesses.

2   So, that's the only illness that I had.

3        Q.   Do you know if other people that were

4   part of that lawsuit developed or had non-Hodgkin's

5   lymphoma?

6        A.   I don't know about non-Hodgkin's

7   lymphoma.  Some had cancer, but I don't know their

8   specific.

9        Q.   Do you know why the case was ultimately

10  dismissed?

11       A.   I do not know.  I just know it didn't go

12  anywhere.

13       Q.   Okay.  It never got to trial?

14       A.   No.

15       Q.   Do you remember the name of your

16  attorney?

17       A.   I do not know because, like I said, it

18  was a class action.  The other person who

19  spearheaded it used an attorney.

20       Q.   Okay.  Do you remember the name of the

21  person that spearheaded it?

22       A.   Let me think.  Bruce Brummel.

23       Q.   Brummel?

24       A.   Um-hmm.

Gerard F. Cervantes

1      Q.    B-r-u-m-e?

2      A.    M-m-e-l.

3      Q.    Okay.

4      A.    And he is deceased.

5      Q.    Do you know if the case would have been

6    entitled Brummel vs. Nicor?

7      A.    I really don't remember.  Can't recall.

8    But I do know that he has passed away.

9      Q.    He's passed away.  Okay.

10           All right.  Have you ever filed for

11   bankruptcy?

12     A.    No.

13     Q.    Have you ever been arrested?

14     A.    No.

15     Q.    Ever been charged with committing a

16   crime?

17     A.    No.

18     Q.    Ever been convicted of committing a

19   crime?

20     A.    No.

21     Q.    All right.

22           MR. SHEPHERD:  Let's go ahead and mark this as

23   Exhibit 1.

24                  (WHEREUPON, G. Cervantes Deposition

Gerard F. Cervantes

1                    Exhibit No. 1 was marked for

2                    identification:  Defendant Monsanto

3                    Company's Fifth Amended Notice to

4                    Take Oral and Videotaped Deposition

5                    of Plaintiff Gerard Cervantes.)

6    BY MR. SHEPHERD:

7         Q.    Mr. Cervantes, the Court Reporter has

8    handed you what we've marked as Exhibit 1 to your

9    deposition.

10             Have you seen this document before or

11   one similar to it?  This is the fourth version I

12   believe.  Fifth version.  Sorry.

13        A.    Yes.

14        Q.    Okay.  When did you see it?

15        A.    Been a while.

16        Q.    I'm sorry?

17        A.    It's been a while.

18        Q.    Okay.  But you have -- you did receive

19   it at some point it's your belief?

20        A.    Yes.

21        Q.    It's the Notice of your deposition.

22   It's really just a simple legal document that tells

23   us that there's going to be a deposition, where to

24   go, those sort of things.

Gerard F. Cervantes

```
 1        Q.    And what was his title, if you recall?

 2        A.    Maintenance supervisor.

 3        Q.    Are there any co-workers with whom you

 4   worked with most frequently when you were at Nicor?

 5        A.    I'm sorry.  What was that?

 6        Q.    Were there any co-workers who you worked

 7   with most frequently while you were at Nicor?

 8        A.    Yes.

 9        Q.    Who -- what were their names?

10        A.    Norm Tatum, Rich Discianno, and Barbara

11   Draper.

12        Q.    And were Norm, Rich and Barbara on your

13   team?

14        A.    Yes.

15        Q.    Did they work under you or with you?

16        A.    Under me.

17        Q.    Do you know whether or not Norm, Rich

18   and Barbara, any of them were part of the class

19   action lawsuit?

20        A.    They were not.

21        Q.    And do you know why they were not?

22        A.    To my knowledge, never got sick.

23        Q.    Okay.  Now, I've seen or I saw in your

24   medical records that while you worked at Nicor you
```

Gerard F. Cervantes

```
 1   were exposed to extensive amounts of asbestos.  Is

 2   that right?

 3        A.    No.

 4        Q.    No.

 5        A.    Not extensive.

 6        Q.    Okay.  How much asbestos would you say

 7   you were exposed to?

 8        A.    I don't know how much.

 9        Q.    How were you exposed to asbestos while

10   working at Nicor?

11        A.    Management had informed us that some of

12   the old gas pipe was protected by a coating that

13   had some asbestos in it.

14        Q.    Okay.  And how often would you have been

15   exposed to that particular coating on that pipe?

16        A.    Not sure how often because there's

17   different material that we work with.  Some of the

18   gas mains are plastic and some are steel.

19        Q.    Okay.  Let me show you this.  I'm going

20   to mark it as Exhibit 2.

21                    (WHEREUPON, G. Cervantes Deposition

22                    Exhibit No. 2 was marked for

23                    identification:  4/22/16 medical

24                    record;
```

Gerard F. Cervantes

1              Confidential-Cervantes-GCervantes-

2              DreyerMC-MD-000105 through 000107.)

3    BY MR. SHEPHERD:

4        Q.    Okay.  The Court Reporter has handed you

5    Exhibit 2, Mr. Cervantes, which is just four pages

6    of medical records.  Maybe not even four.  Three

7    pages of medical records that we've received.  For

8    the record they're Bates Nos. DreyerMC-MD-105

9    through 107.

10            This is where I got the information

11   about the asbestos exposure.  But before we go

12   through those, let me ask you this.

13            When you go to your physician, they ask

14   you for information regarding your history and your

15   current complaints.  Would you agree with that?

16       A.    Yes.

17       Q.    And it's important that you give them

18   accurate information so they can provide the

19   healthcare that you are seeking, right?

20       A.    Yes.

21       Q.    All right.  So, this is a record from

22   Dreyer Clinic, Inc.  Have you ever been a patient

23   there?

24       A.    Yes.

Gerard F. Cervantes

1      Q.    All right.  And if you look at the first

2  page of Exhibit 2, you'll see up at the top

3  right-hand corner your name there,

4  Gerard F. Cervantes, correct?

5      A.    Correct.

6      Q.    And the date of birth on the -- just

7  below that is ███████.  That's your date of birth,

8  correct?

9      A.    Correct.

10     Q.    All right.  And then the visit date is

11  April 22, 2016.

12           Do you see that?

13     A.    Correct.

14     Q.    All right.  Now, if you look on the last

15  page of Exhibit 2, down three-quarters of the way

16  down, there's a section that says "PMH."

17           Do you see that?

18     A.    Yes.

19     Q.    And I'll tell you I believe that stands

20  for Past Medical History.

21           It says, "Large B-cell lymphoma,

22  primarily liver involvement, stage IIB/E, stage 4."

23           Did I read that correctly?

24     A.    Correct.

Gerard F. Cervantes

1    Q.    And is that consistent with your

2  recollection of your non-Hodgkin's lymphoma?

3    A.    Correct.

4    Q.    Below that it says, "Occ med."

5          Do you see that?

6    A.    Yes.

7    Q.    And it says, "Hazardous exposures -

8  benzene/PCB/asbestos by 30 years."

9          Did I read that correctly?

10    A.    Correct.

11    Q.    Did you report to your doctor at the

12  Dreyer Clinic that you had been exposed to benzene,

13  PCB and asbestos for 30 years?

14    A.    That is what they asked me as far as

15  what we use at work and what I've used.

16    Q.    Now, let me give you.

17    MR. SHEPHERD:  Mark that as Exhibit 3 if you

18  would, please.

19          (WHEREUPON, G. Cervantes Deposition

20          Exhibit No. 3 was marked for

21          identification:  5/25/16 medical

22          record;

23          Confidential-Cervantes-GCervantes-

24          DreyerMC-MD-000108.)

Gerard F. Cervantes

```
 1   BY MR. SHEPHERD:

 2        Q.    Mr. Cervantes, the Court Reporter has

 3   now handed you Exhibit 3, and this is another

 4   medical record from Dreyer Clinic.  You're the

 5   patient, right?  Gerard F. Cervantes is there on

 6   the first --

 7        A.    Correct.

 8        Q.    Top of the first page?

 9        A.    Correct.

10        Q.    And here the visit date is May 25 of

11   2016.

12              Do you see that?

13        A.    Where do I see that at?

14        Q.    Just one line below your name.

15        A.    Oh.  Yes.

16        Q.    And then the note starts -- it's a

17   progress note signed by Karen M. Burgner.  Do you

18   remember Dr. Burgner?

19        A.    Yes.

20        Q.    Is she somebody you saw at the Dreyer

21   Clinic?

22        A.    Correct.

23        Q.    How many times would you say you have

24   seen Dr. Burgner?  Is she your primary?
```

Gerard F. Cervantes

1        A.    She's my primary.  Once a year.

2        Q.    All right.  So, below that it says,

3    "Married."  Social history is "Married," correct?

4    You were married?

5        A.    Correct.

6        Q.    "Retired from Nicor"?

7        A.    Correct.

8        Q.    "Running own lawn care business"?

9        A.    Correct.

10        Q.    And then it says, "Extensive asbestos

11    exposure.  Also benzene exposures, PCB exposure

12    times 30 years."

13            Did I read that correctly?

14        A.    That is correct.

15        Q.    Do you --

16        A.    And the 30 --

17        Q.    Go ahead.  I'm sorry.

18        A.    The 30 years would be minus three years

19    as a meter reader and three years as -- in

20    management.

21        Q.    Do you recall telling Dr. Burgner that

22    you had extensive asbestos exposure?

23        A.    Not extensive.  But as I stated to you,

24    the -- what they said was small traces of asbestos

Gerard F. Cervantes

1    that coated the pipe.  But I do not recall

2    extensive.

3        Q.    In your dealings with Dr. Burgner over

4    the years, do you find that she's an accurate

5    person?

6        A.    To my knowledge, yes.

7        Q.    Generally what you've told her over your

8    time being her patient, she's reflected that back

9    to you when you've talked about it.  Is that true?

10       A.    Yes.

11       Q.    Okay.  And you'll agree with me, at

12   least here, she wrote that you had extensive

13   asbestos exposure, correct?

14       A.    That's what she wrote.

15       Q.    And there is no way she would have known

16   that other than with -- other than having a

17   conversation with you.  Is that true?

18       A.    Yes.

19       Q.    Did you -- anyone go with you to your

20   doctor's appointments generally?

21       A.    Oncologist, yes.  Dr. Burgner, myself.

22       Q.    And who would have gone with you to your

23   oncologist?  Would that have been your wife?

24       A.    My wife.

Gerard F. Cervantes

1      Q.    Anyone other than your wife?

2      A.    No.

3      Q.    How were you exposed to PCB?  And you

4   told me it was 30 years minus 6.  So, for 24 years,

5   what was your exposure to asbestos while at Nicor?

6      A.    Working on the main, the gas mains.

7      Q.    And PCB stands for polychlorobiphenyl,

8   right?

9      A.    I believe so.

10      Q.    Do you know if polychlorobiphenyl is a

11   known human carcinogen?

12      A.    I do not.  Or don't recall.

13      Q.    Did you become aware of the dangers of

14   asbestos at some point?

15      A.    No training on it.  Just hearsay and

16   know that it's not anything that's good.

17      Q.    Do you know that asbestos has been known

18   to cause certain types of cancers?

19      A.    I've heard.

20      Q.    You have heard those TV commercials I'm

21   sure, right?

22      A.    Yes.

23      Q.    I don't think anybody has escaped those

24   TV commercials.

Gerard F. Cervantes

1           When you worked around asbestos at the

2    time that you were dealing with it, did you wear

3    any sort of personal protective equipment?

4        A.    No, because it was not brought to our

5    attention for many years that there were traces of

6    it in the coating.  So, we were not even

7    knowledgeable of it.

8        Q.    You also had told Dr. Burgner that you

9    were exposed to benzene in your job, is that right?

10       A.    Correct.

11       Q.    How were you exposed to benzene?

12       A.    That's a product that was used to help

13   keep corrosion on the gas pipe once you disturb the

14   coating of it and then try to put it back into a

15   non-corrosive state.

16       Q.    How often would you say that you were

17   exposed to benzene on your job at Nicor?  Was it

18   every time you touched a pipe?

19       A.    No.  Three times a week as when I was a

20   welder, but once I promoted out of that position

21   and I was a lead person, I didn't have to deal with

22   it much because I had a welder on the team and that

23   was -- on the crew and that was his job.

24       Q.    Did you become aware of the dangers of

Gerard F. Cervantes

1   benzene at some point?

2        A.    Later as I worked there.

3        Q.    At the time that you worked there and

4   were being exposed to benzene three times a week

5   for however many years, did you wear personal

6   protective equipment to protect you from benzene

7   exposures?

8        A.    No because the company informed us that

9   OSHA guidelines stated that it was not required

10  because of the short period of time that it was

11  used as well as outside where we work, the

12  ventilation was adequate and didn't need any of

13  that.

14       Q.    And who at the company would have

15  informed you of that information, that PPE wasn't

16  needed for benzene exposure because of the duration

17  and the places in which you were exposed?

18       A.    Training supervisors as well as

19  supervisors themselves I guess.

20       Q.    So, at least it was your understanding

21  from the training supervisors and the supervisors

22  itself that there was safe levels of benzene that

23  you could be exposed to and you were -- the benzene

24  you were exposed to was safe?

Gerard F. Cervantes

```
 1        MS. FREDONA:  Objection; form.

 2   BY MR. SHEPHERD:

 3        Q.    Or at least safe enough that you didn't

 4   need to wear personal protective equipment.  Is

 5   that correct?

 6        A.    Correct.

 7        Q.    All right.  And then PCBs, how were you

 8   exposed to PCBs in your work at Nicor?

 9        A.    Not really sure PCB.  Give me that

10   definition again.

11        Q.    I think it's polychlorobiphenyl.

12        A.    Not knowledgeable on that.

13        Q.    Okay.  Did you wear any PPE when you

14   were working as a welder or on the street

15   maintenance team at any point?

16        A.    While welding, other than welding

17   gloves, welding goggles, you know, cotton clothing.

18        Q.    But no respirator?

19        A.    No.

20        Q.    Do you work with -- did you work with

21   any other chemicals in the workplace at Nicor that

22   you're aware of?

23        A.    No.

24        Q.    Have you considered a lawsuit against
```

Gerard F. Cervantes

1   the -- either Nicor or the manufacturers of

2   asbestos, benzene or PCBs that you used at Nicor

3   for your cancer?

4       A.   What was that again?

5       MS. FREDONA:  Objection; form.

6   BY MR. SHEPHERD:

7       Q.   Have you considered a lawsuit against

8   Nicor or any of the manufacturers of the benzene,

9   PCB and asbestos used at Nicor?

10      MS. FREDONA:  Objection; form.

11  BY MR. SHEPHERD:

12      Q.   You can answer if you understand the

13  question.

14      A.   To my knowledge, that class action suit

15  was the water, but I don't know if anything else

16  was included in there.  I was a name that was added

17  to it.  I was not the person that spearheaded it.

18      Q.   Did you apply any pesticides when you

19  worked at Nicor?

20      A.   No.

21      Q.   Did you apply any insecticides or bug

22  spray when you worked at Nicor?

23      A.   No.

24      Q.   Did you apply any rodenticides when you

Gerard F. Cervantes

```
 1   worked at Nicor?

 2        A.    I don't know what that is.

 3        Q.    Like rat poison?

 4        A.    No.

 5        Q.    Were you exposed to gasoline or diesel

 6   fuel while you worked at Nicor?

 7        A.    To fill up the equipment.

 8        Q.    How often would you say that you were

 9   exposed to gasoline fumes when you worked at Nicor?

10   Was it a daily basis?

11        A.    No.  As needed to fill up the machine or

12   the truck, but also the night garage, that was one

13   of their main requirements so that when we went out

14   to work in the morning for, let me say, to be

15   efficient, that was a basic thing that they didn't

16   want us to do.  The night garage fueled everything.

17        Q.    What -- help me understand the machine.

18   What machine would --

19        A.    A digging, a backhoe.  We used a backhoe

20   to dig in the ground to get to the underground

21   facility and pipes.

22        Q.    And were those fueled by gasoline or

23   diesel, do you know?

24        A.    The backhoe was diesel and the trucks,
```

Gerard F. Cervantes

1    to my knowledge, were gasoline.

2        Q.    And whenever you were out on a job and

3    you needed access to the pipeline for whatever

4    reason, you'd use the backhoe?

5        A.    Correct.

6        Q.    There was a backhoe operator, though,

7    you didn't actually operate it?

8        A.    I was an operator.

9        Q.    You were an operator?

10       A.    Yes.

11       Q.    Did you ever have any workplace injuries

12   while at Nicor?

13       A.    No.

14       Q.    Did you ever take medical leave outside

15   of the medical leave you took for non-Hodgkin's

16   lymphoma while you were at Nicor?

17       A.    Other than a cold or called in sick,

18   basic like that, no.

19       Q.    Were you ever disciplined or suspended

20   while at Nicor?

21       A.    No.

22       MR. SHEPHERD:  We have been going about an

23   hour.  Let's take a quick break, if that's okay

24   with you.

Gerard F. Cervantes

```
 1        THE WITNESS:  Sure.

 2        MR. SHEPHERD:  All right.  Let's say --

 3        THE VIDEOGRAPHER:  The time is 9:56 a.m., and

 4    we're going off the video record.

 5                 (WHEREUPON, a recess was had

 6                  from 9:56 to 10:06 a.m.)

 7        THE VIDEOGRAPHER:  The time is 10:06 a.m., and

 8    we're back on the video record.

 9    BY MR. SHEPHERD:

10        Q.    Mr. Cervantes, if you would, could you

11    pull out Exhibit 3 again out of the stack there.

12    It's the single-page record there, the one dated

13    5/25/16.

14        A.    Got it.

15        Q.    So, we were reading here earlier.  It

16    said, "Extensive asbestos exposure.  Also benzene

17    exposures, PCB exposure by 30 years."

18              I want to focus on the next few lines.

19              It says, "Co-worker also has history of

20    non-Hodgkin's lymphoma."

21              Do you know which -- what's the name of

22    that co-worker, do you recall?

23        A.    Yes.  Gary Cichy.

24        Q.    How do you spell his last name?
```

Gerard F. Cervantes

1  says, "Working 50 hours a week."  Are you working

2  50 hours a week somewhere other than Nicor?

3      A.    Oh, no.  That was -- the 50 hours a week

4  was because there's so much overtime involved.

5      Q.    Okay.  But you retired in 2014 I

6  thought?

7      A.    Retired from 2014, but remember those

8  five years I was not at the company.  I was being

9  paid 50% of my base pay.

10     Q.    That was from 2009 to 2014?

11     A.    '14, correct.  I was not at the company

12 at all.

13     Q.    Okay.  But this medical record that we

14 are looking at is dated 2016.

15     A.    Okay.

16     Q.    And it's talking about harassment at

17 work from Mr. Adam, is your supposition, and you're

18 working 50 hours a week.

19           And I guess my question is if you

20 retired from Nicor in 2014, why in 2016 are -- is

21 she noting that you are working 50 hours a week and

22 that you are being harassed by Mr. Adam?

23     A.    Well, I don't -- maybe she -- the only

24 thing I can think of is her dates are wrong.

Gerard F. Cervantes

1      Q.    Okay.

2      A.    Everything there is correct until I left

3  there in 2009.

4      Q.    Okay.  So, you think that you took --

5  Mr. Adam became your supervisor approximately 2007,

6  2006, 2007?

7      A.    Correct.

8      Q.    And continued in that --

9      A.    Until 2009.  I'm sorry.

10     Q.    And continued in that role until 2009?

11     A.    Um-hmm.

12     Q.    And at that point you were working 50

13  hours a week?

14     A.    40 hours a week.

15     Q.    Plus overtime?

16     A.    Plus overtime.  But when I came back to

17  the gas company after my initial first time of

18  cancer, my doctor gave me a written note that I

19  could only work 40 hours a week full time because

20  there was so much, I say, overtime because of

21  emergency situations that came up and I was too

22  weak to work all those extra hours.

23            So, prior to that, yes, 50 hours a week,

24  60 hours a week; but once I came back to work, they

Gerard F. Cervantes

1  could only work me 40 hours a week.

2      Q.    Okay.  And I know your initial -- and I

3  don't have a lot of medical records or any medical

4  records actually from your initial diagnosis, but

5  that was in 2004?

6      A.    Correct.

7      Q.    How long were you out of work after that

8  initial diagnosis and treatment?

9      A.    Approximately two years.

10     Q.    So, you returned to work in

11  approximately 2006?

12     A.    July 24 of 2006.

13     Q.    Okay.  And you stayed working 40 hours a

14  week at that point as a supervisor on the street

15  maintenance crew, right?

16     A.    Not a supervisor.  As a lead person.

17     Q.    Lead person.  Sorry.

18     A.    Correct.

19     Q.    Until you took the 50% leave in 2009

20  when your cancer reoccurred?

21     A.    Correct.

22     Q.    And then from 2009 until 2014 you

23  received the 50% pay but you didn't actually go to

24  work at all?

Gerard F. Cervantes

1     A.     That is correct.

2     Q.     When you retired in 2014, if you had

3    been going to work or if you had gone back to work,

4    would Mr. Adam have been your supervisor?

5     A.     I would guess yes.  Supervisors get

6    promoted, get repositioned all the time.  So, I

7    don't know when he was relocated, so to speak.

8     Q.     All right.  Let's talk a little bit

9    about other work other than Nicor.

10           Best I can tell from looking at your

11   Plaintiff Fact Sheet and the records that I have,

12   including your Complaint, before working for Nicor

13   you worked for something called ASC Lawn Care.  Is

14   that right?

15    A.     Correct.

16    Q.     Was that also known as Dr. J Lawn Care?

17    A.     Correct.

18    Q.     So, that was the same company, ASC and

19   Dr. J?

20    A.     Correct.

21    Q.     And you owned those -- that company?

22    A.     Correct.

23    Q.     When did you start that company?

24    A.     In 1998.

Gerard F. Cervantes

```
1        Q.    And it was a lawn care company?

2        A.    Correct.

3        Q.    What sort of things did the company do?

4        A.    Maintenance work.  Not new lawn care.

5              So, the basic scope would be cutting

6    grass, trimming bushes, putting down mulch, what we

7    call bed edging, and at that initial time,

8    maintaining weeds, weed control.

9        Q.    And did this happen at residences or at

10   commercial properties?

11       A.    As we started out as residential and as

12   we grew, incorporated commercial properties also.

13       Q.    How much time did you spend in that job

14   over the years at ASC or Dr. J?

15       A.    From 1998 until present.  I still do

16   lawn care.

17       Q.    How many hours a week would you say you

18   work in lawn care?

19       A.    It varied from 20 hours a week to 40

20   hours a week.

21       Q.    And how -- what was the factor that

22   caused the variance in the number of hours that you

23   were working?

24       A.    As the company grew, more customers,
```

Gerard F. Cervantes

1    more clients.

2        Q.    So, it started at 20 hours a week and

3    now it's up to 40?

4        A.    I work 30 to 40 hours a week now.

5        Q.    And as the owner, are you the one that's

6    actually doing the work or do you have crews that

7    do that for you?

8        A.    Very small company.  Myself, my

9    daughter, my son-in-law, and if I have, say, a big

10   mulch job or something, I'll hire a high school

11   person.

12       Q.    Your -- when the company first started

13   back in 1998, was it just you?

14       A.    Myself.  We got started because my

15   daughter at the time was 14 years old and she

16   wanted to get a job.  And, so, I told her, "I'll

17   show you how to run your own company, your own

18   business, so that you don't ever have to work for

19   nobody."  So, it was her and I initially.

20       Q.    And when we were speaking earlier, you

21   indicated that you knew the properties at which you

22   worked over time.

23             Do you have a recollection of all the

24   properties that you've worked at over time from '98

Gerard F. Cervantes

1    to present?

2         A.    Most of them, yes.

3         Q.    How many are there approximately?

4         A.    Now or then?

5         Q.    Let's talk about in total.

6         A.    In total?

7         Q.    Um-hmm.

8         A.    Initially just small residential yards

9    to get started and then going forward and growing.

10   I'd say at my busiest we had three nursing homes,

11   two large churches, and two good size subdivisions

12   that we would maintain their common area, and about

13   20 residential.

14        Q.    And where -- what time period was that

15   peak where you had that -- that level of business

16   going?

17        A.    That level of business?  '98 I started.

18   Let me think.  Probably '99.

19        Q.    And would you say that you maintained

20   that level of business from '99 to the present?

21        A.    No.  We've -- not that big anymore.

22        Q.    How long were you that big?  '99 to

23   when?

24        A.    Until I got sick in 2004.

Gerard F. Cervantes

1      Q.     Not for any particular company, just her

2  own?

3      A.     It's her own business.

4      Q.     Do you have copies of the tax returns

5  for ASC Lawn Care going back to 1998?

6      A.     I don't know if I have them going back

7  that far.

8      Q.     You do have some of the tax returns for

9  the company, though, in your possession?

10     A.     Either myself or my daughter does.

11     Q.     Is that anything that you've produced to

12  your counsel --

13     A.     No.

14     Q.     -- for the lawsuit?  No.

15            Do you have any sort of -- going to kind

16  of sound weird -- but a document retention policy

17  for ASC Lawn?  In other words, do you keep your

18  documents for a certain amount of time and then

19  clear them out or is it kind of throw them in a

20  drawer and they stay there?

21     A.     Maybe five years going back.

22     Q.     So, other than you, your daughter, your

23  son-in-law, maybe some high school kids that you

24  hire from time to time, have there been any other

Gerard F. Cervantes

1   employees of ASC Lawn Care, to your recollection?

2        A.    Yes.  In the busy time that I had told

3   you, we had two employees probably, maybe, maybe

4   three at the most.

5        Q.    Do you recall any of their names?

6        A.    I'm trying to think because it was such

7   a long time ago.

8        Q.    I understand.

9        A.    Not at this time.  Hopefully they'll pop

10  up in my head.

11       Q.    If they do, just let us know and you can

12  put their names on the record.  Okay?

13       A.    Okay.

14       Q.    The employees that you did have at ASC,

15  including these two folks that you didn't know and

16  yourself and your daughter, were they W-2 employees

17  or did you give them 1099 miscellaneous, do you

18  recall?

19       A.    To my recall, treated them as an

20  independent contractor.

21       Q.    Okay.

22       A.    And, again, I didn't do the books at

23  that time.

24       Q.    If we want to see those books, the best

Gerard F. Cervantes

1  person for us to talk to would be Joyce.  Is that

2  right?

3      A.   Yes, but I don't believe we have

4  anything going back to 1998.

5      Q.   Is Joyce still alive?

6      A.   Yes.

7      Q.   And she lives in Florida with Jim?

8      A.   Yes.

9      Q.   How did you and Jim get together to sort

10  of become partners in this business?

11      A.   When I moved into my house in '96, he

12  was a neighbor kitty-corner across the street and

13  we became friends.

14      Q.   It was in this job at ASC Lawn Care that

15  you allege you were exposed to Roundup, is that

16  right?

17      A.   We used the product, yes.

18      Q.   Did you work with any other chemicals

19  during your time at ASC Lawn Care?

20      A.   No.

21      Q.   No fertilizers, anything like that?

22      A.   No.

23      Q.   Do you use any other weed control

24  products?

Gerard F. Cervantes

1    A.    No.

2    Q.    You said that you did a lot or you did

3  mulching, is that right?

4    A.    Correct.

5    Q.    Where did you get your mulch?

6    A.    Primarily from Montgomery Landscape.

7    Q.    Do you know if that mulch was treated in

8  any way with either pesticides or herbicides?

9    A.    Not to my knowledge.  I just purchase

10  it.

11    Q.    Was it in bags or did you buy it in

12  bulk?

13    A.    Bulk.

14    Q.    Was it a particular type of mulch that

15  you normally use, black, cedar, red?

16    A.    Dark brown in color.

17    Q.    Okay.  I think you've answered these

18  questions sort of around and about, but I'm going

19  to ask them just so it's clear on the record.

20          Did you apply any pesticides when you

21  worked at ASC Lawn Care?

22    A.    The only thing that we used for weed

23  control was Roundup.  I didn't use any fertilizer

24  myself or work with that at all.

Gerard F. Cervantes

1      Q.    Did you apply any insecticides or bug

2   spray in your job at ASC?

3      A.    No.

4      Q.    How about any rodenticide, some rat

5   poisoning or anything like that?

6      A.    No.

7      Q.    Did you actually push the mowers, use

8   the weed eaters, those sort of things --

9      A.    Correct.

10      Q.    -- on that job?

11            Were those gas-powered or electric?

12      A.    Gas-powered.

13      Q.    So, to some degree you were exposed to

14   gasoline fumes in that job at ASC Lawn, would you

15   agree?

16      A.    Yes.  The equipment requires gasoline to

17   be used.

18      Q.    Did you ever have any workplace injuries

19   while you were at ASC Lawn Care?

20      A.    None.

21      Q.    Did you ever take medical leave while

22   you were at ASC Lawn Care?

23      A.    None.

24      Q.    Other than the non-Hodgkin's lymphoma

Gerard F. Cervantes

```
1        A.    Yes.   Partner, I can't stand TV.

2        Q.    Was your TV watching always at night,

3   back then, '98 to 2004?

4        A.    Yeah, most of the time, in the, you

5   know, early evening and weekends.  You know what I

6   mean.

7        Q.    You don't recall a specific Roundup

8   advertisement, though.  Is that correct?

9        A.    No, I couldn't give you one now other

10  than I know that they're on TV still.  And once we

11  determined that that's what we are going to use, I

12  don't -- I don't vary.  I don't go and get

13  different multiple products to use.

14            Military keeps me or has trained me to

15  be very specific, very, how you say, my wife says

16  I'm so predictable.  Routine.

17       Q.    There is a way to do it and a way to do

18  it right and that's the way you do it, right?

19       A.    Correct.

20       Q.    Other than TV ads, did you see any other

21  type of advertisements, print, newspaper, anything

22  like that, that you can recall?

23       A.    No.  When you go into Home Depot, I

24  mean, I go -- if I'm going to get something for
```

Gerard F. Cervantes

1    weeding, I go to that section and they have their

2    different products and go from there.

3        Q.    Do you remember, and I know this was 22

4    years ago, but do you remember any specifics about

5    the advertisements that you saw that made you

6    decide that Roundup was the way to go?

7        A.    No.

8        Q.    Other than the TV advertisements that

9    you saw, was there anything else that influenced

10   your decision to use or go with Roundup back in

11   1998?

12       A.    No.

13       Q.    Now, I know we talked about your use of

14   Roundup in your lawn care business.  Did you also

15   use Roundup at your personal residences?

16       A.    Yes.  Roundup was our choice of product

17   for anything pertaining to killing weeds or killing

18   grass, whatever we needed to use.

19       Q.    I noticed on your Plaintiff Fact Sheet

20   and I think also in your Complaint, but don't hold

21   me on the Complaint, definitely on the Plaintiff

22   Fact Sheet, that you indicated you used Roundup

23   between 1998 and 2004.  Is that right?

24       A.    Correct.

Gerard F. Cervantes

1      Q.    Prior to 1998, you did not use it in

2   your personal residences?

3      A.    Yes, I did at home for personal

4   reference.  But it was limited.

5      Q.    When you say "limited," what do you mean

6   by that?

7      A.    Cut my grass, maintain my flower beds or

8   whatever, and I do a lot of pulling of weeds.  But

9   I would spray them first, let them die and then we

10  pull them.

11     Q.    And would you use the ready-to-use at

12  your home when you used it back then?

13     A.    Correct.

14     Q.    So, let's step back, then.

15           Outside of your commercial use, your use

16  at ASC Lawn, when did you first start using

17  Roundup, to your knowledge, at your personal

18  residences?

19     A.    When I purchased my first home on Spruce

20  Street.

21     Q.    Okay.  So, that would have been -- my

22  memory is already gone -- 1986, is that right?

23     A.    I believe that's what I said.  I'm not

24  sure.

Gerard F. Cervantes

1        Q.     '82.  1982.

2        A.     '82 is when I purchased my first home.

3        Q.     At Spruce Street you started using

4   Roundup?

5        A.     Correct.

6        Q.     And you would have used the

7   ready-to-use?

8        A.     At that time, yes.

9        Q.     So, that would have been generally

10  gallon jug, you think it's white, would have like a

11  hose maybe the diameter of a straw that would

12  connect to a trigger that you could point and use

13  on the weeds, is that right?

14       A.     Correct.

15       Q.     Did you always use the trigger to

16  actually apply the Roundup when you used it at your

17  home prior to 1998?

18       A.     Yes.

19       Q.     And you would use that on a -- on a spot

20  basis?

21       A.     Correct.

22       Q.     It wasn't applied in bulk, let's say?

23       A.     Correct.

24       Q.     If you bought your first gallon jug of

Gerard F. Cervantes

1    Roundup in 1982, can you give me an estimate of how

2    many gallons you would have used up until 1998 when

3    you started your lawn care business?

4              I mean did you use a gallon a season, a

5    gallon a year, a gallon every five years?  Just

6    your best guess.

7        A.    A couple gallons a season.

8        Q.    And how many season -- so, does that

9    mean you'd use eight a year or a spraying season

10   would be once a year?  I don't know what spraying

11   season is in Illinois.

12       A.    Season is from April till November.

13       Q.    Okay.  So, you'd use a couple gallons a

14   year basically?

15       A.    I would estimate that.

16       Q.    Estimate.

17             I want to break down personal property

18   use, your houses, and then your work.  Okay?

19       A.    Okay.

20       Q.    For personal, you used herbicides like

21   Roundup to kill weeds around the house?

22       A.    Correct.

23       Q.    Did it work?

24       A.    Yes.  I would have went to another

Gerard F. Cervantes

1      Q.     After you went back to work at Nicor,

2   there were times in which you had to go into the

3   hole and you would wear a protective equipment, a

4   respirator?

5      A.     Correct.

6      Q.     And that respirator would have organic

7   vapor cartridges on it or cartridges on it?

8      A.     Cartridges on it.

9      Q.     Were you fit tested for the respirator?

10     A.     Correct.

11     Q.     You were?

12     A.     Correct, yes.

13     Q.     Somebody at Nicor fit tested you for it?

14     A.     Yes.

15     Q.     And you were trained on how to properly

16  put it on?

17     A.     Yes.

18     Q.     Did you ever wear a dosimeter when you

19  worked at Nicor?

20     A.     I don't know what that is.

21     Q.     Like a little badge that would

22  monitor how much --

23     A.     No.

24     Q.     -- exposure you have to certain

Gerard F. Cervantes

```
 1    chemicals.

 2         A.    No.

 3         Q.    You continued to do lawn care work after

 4    your NHL diagnosis, correct?

 5         A.    Correct.

 6         Q.    But you never used Roundup again.  Is

 7    that correct?

 8         A.    Don't use it.

 9         Q.    When did you first learn that your

10    co-worker -- I forget his name -- Gary --

11         A.    Cichy.

12         Q.    -- Cichy had NHL?

13         A.    I believe he got sick within a year

14    before I did I think.

15         Q.    And when you got NHL, did you and

16    Mr. Cichy at that time discuss the possibility that

17    maybe it was the chemicals at your work that had

18    led to your non-Hodgkin's lymphoma?

19         A.    No, not the chemicals at work.

20         Q.    What did you all discuss might have been

21    the cause of your non-Hodgkin's lymphoma?

22         A.    The water.  And he was a taxidermist.

23    So, he dealt with a lot of things there.  So,

24    didn't know where it came from.
```

Gerard F. Cervantes

1      Q.    There is -- in your medical records,

2  there are a number of instances in which it's

3  indicated that your mother had non-Hodgkin's

4  lymphoma and eventually died from it.  Is that

5  correct?

6      A.    Correct.

7      Q.    I also saw, I believe in your Plaintiff

8  Fact Sheet, that your mother had stomach cancer?

9      A.    Well, we just called it stomach cancer.

10  It was non-Hodgkin's lymphoma located in her

11  stomach.

12      Q.    Okay.

13      A.    Example with me, I had non-Hodgkin's

14  lymphoma but it was all located in my liver.  So,

15  sometimes you say liver cancer.

16      Q.    Gotcha.

17      A.    Easier than saying the long word.

18      Q.    You had what subtype of non-Hodgkin's

19  lymphoma?

20      A.    Large B-cell non-Hodgkin's lymphoma.

21      Q.    Do you know what type your mother had?

22      A.    I do not know.

23      Q.    Is there anyone that would know what

24  type of subtype your mother had?

Gerard F. Cervantes

```
1        A.    I could ask an older sister.

2        Q.    Okay.

3        A.    All I know is non-Hodgkin's lymphoma

4   located in her stomach.

5        Q.    One of your sisters may know; you're

6   just not sure?

7        A.    Correct.  I never went to any doctors

8   visits with her.

9        Q.    Is your father still alive?

10       A.    No, deceased.

11       Q.    Did you use any pesticides after your

12  NHL diagnosis?

13       A.    No, I don't use anything.

14       Q.    So, since being diagnosed with NHL, you

15  don't use anything to control weeds, chemical-wise,

16  is that right?

17       A.    I don't use anything.

18       Q.    How do you -- how do you deal with the

19  weeds that you used to deal with using Roundup

20  nowadays?

21       A.    At my home I use -- you know what a

22  weed-whacker is of course.  I use that and I just

23  trim it down to the ground.

24       Q.    And how about commercially?
```

Gerard F. Cervantes

1     A.    I don't -- if I were to take care of

2  your property, I'd tell you right up front, "I'm a

3  cancer survivor.  I don't use any granular or

4  Roundup, weed killer.  So, that's not anything I

5  can offer to you."

6     Q.    When did you start making that statement

7  to commercial customers?  Right when you went back

8  in 2006?

9     MS. FREDONA:  Objection; misstates the record.

10  BY MR. SHEPHERD:

11     Q.    Go ahead.

12     A.    When I went back afterwards, I'm trying

13  to think, 2006, yes, I just told them I don't offer

14  that service.

15     Q.    Okay.  So, starting in approximately

16  2006 when you finished your treatment for your

17  initial onset of non-Hodgkin's lymphoma, when you

18  were doing commercial jobs, you would specifically

19  tell the owners of the properties on which you were

20  doing those commercial jobs that you could not use

21  granular or Roundup or anything like that?

22     A.    Yes.  I did not use it.

23     Q.    Okay.  And that was because of you were

24  a cancer survivor?

Gerard F. Cervantes

1        A.      Correct.

2        Q.      Have you ever spoken with anyone at

3   Monsanto about how to use Roundup?

4        A.      No.  Wouldn't even know how to get ahold

5   of them.

6        Q.      Have you ever communicated with any

7   salesman or sales representatives from Monsanto?

8        A.      No.

9        Q.      Have you ever communicated with any

10  salesman or sales representatives at Home Depot or

11  Ace Hardware or any other place where you bought

12  Roundup about how to use it?

13       A.      No.

14       Q.      Have you ever communicated with anyone

15  at Monsanto about anything?

16       A.      No.

17       Q.      Did anyone or -- well, did anyone other

18  than you ever spray Roundup at your personal

19  properties?

20       A.      My house, I take care of the outside.

21       Q.      No one else ever did spray Roundup at

22  your house other than you?

23       A.      No.  They cut the grass, but not with

24  any Roundup.

Gerard F. Cervantes

1      Q.    Have you ever used a product called

2    Eraser, to your knowledge?

3      A.    Don't know what that is.

4      Q.    Ever used a product called Buccaneer?

5      A.    No.

6      Q.    Ever used a product named Envy?

7      A.    No.

8      Q.    Ever used a product called Halex,

9    H-a-l-e-x, GT?

10     A.    Never heard of that product in my life.

11     Q.    How about Flexstar GT?

12     A.    No.

13     Q.    Have you ever used a product called

14   Credit 41 Extra?

15     A.    No.

16     Q.    Do you change your own oil on your car?

17     A.    On my car?  Jiffy Lube.  No.  I'm sorry.

18     Q.    Do you do your own pest control at the

19   house or do you hire somebody to do that?

20     A.    It's hired help.

21     Q.    Do you have any sort of craftsman

22   hobbies, woodworking, painting, anything like that

23   that you do?

24     A.    None.  I exercise for fun, boxing,

Gerard F. Cervantes

1    skipping rope, working out.

2         Q.    Do you do your own home repairs?

3         A.    I'm not the most handy person.  As far

4    as like electrical, no.  Can I paint?  Yes.  Can

5    I -- but --

6         Q.    How about plumbing?

7         A.    No.

8         Q.    Ever use primer solvent or glue for PVC

9    pipe?

10        A.    No, I don't do any of that.

11        Q.    Do you build any furniture?

12        A.    No.

13        Q.    How about sawing, do you saw wood?

14        A.    No.  Not a carpenter at all.

15        Q.    Is it fair to say that in your lifetime

16   you've been exposed to welding torch fumes?

17        A.    I was a welder for three years at the

18   gas company, yes.

19        Q.    So, at least based upon what we've

20   talked about today, in addition to Roundup, you

21   have been exposed to, in some degree or another,

22   benzene, correct?

23        A.    Correct.

24        Q.    PCBs, correct?

Gerard F. Cervantes

```
 1        A.    Correct.

 2        Q.    Gasoline exhaust, correct, or fumes,

 3   gasoline fumes?

 4        A.    From equipment.

 5        Q.    Diesel fuel, correct?

 6        A.    Correct.  It's there when I'm running

 7   the machine.

 8        Q.    Welding torch fumes, right?

 9        A.    For three years as a welder.

10        Q.    PCBs?

11        A.    It's -- yes.

12        Q.    Moving quick.

13              Now, I told you this a little before.  I

14   don't have a lot of medical records from you prior

15   to maybe the last five or six years.  I'm not sure

16   exactly why.  I've asked my folks to follow up on

17   that and they are.  But I need to get a little bit

18   of background from you about your early medical

19   history because I just don't know it.  Okay?

20        A.    Okay.  Yes.

21        Q.    Did you have any serious health

22   conditions as a child or as a young adult?

23        A.    None.

24        Q.    Have you ever been diagnosed with any
```

Gerard F. Cervantes

```
 1   cancer besides your NHL?

 2        A.    None.  2004 was the first time.

 3        Q.    No skin cancer, nothing like that?

 4        A.    None.

 5        Q.    Do you have any -- have you ever

 6   suffered from any immune deficiency?

 7        A.    None.

 8        Q.    Do you have or have you been diagnosed

 9   with lupus?

10        A.    None.

11        Q.    Have you ever been diagnosed with

12   Crohn's disease?

13        A.    None.

14        Q.    Have you ever been diagnosed with

15   ulcerative colitis?

16        A.    None.

17        Q.    Do you have rheumatoid arthritis, to

18   your knowledge?

19        A.    I have arthritis to my knowledge.

20        Q.    But not rheumatoid.  So you have

21   arthritis that goes with getting old, not arthritis

22   from your body's immuno system attacking itself,

23   right?  Do you know?

24        A.    Not sure what type it is.
```

Gerard F. Cervantes

1       Q.    Okay.  But you have arthritis?

2       A.    Yes.

3       Q.    Do you take any medications for your

4   arthritis?

5       A.    I take a nutritional supplement for

6   anti-inflammatory, BiOmega fish oil.

7       Q.    What is that called, do you know, the

8   supplement that you take?

9       A.    The product name is USANA.  That's the

10  company.

11      Q.    Okay.

12      A.    And then within that I take fish oil.  I

13  take a -- what they call Procosa for your joints

14  and Proflavanol is an anti-inflammatory.

15      Q.    And when did you start taking the USANA

16  products?

17      A.    In 2004, three months before I was

18  diagnosed because it took them three months to find

19  my cancer.  So, I was in search of anything to try

20  and get me healthy.

21      Q.    Have you ever been diagnosed with celiac

22  disease?

23      A.    No.

24      Q.    Do you have any ulcers or have you had

Gerard F. Cervantes

1      A.    No.

2      MS. FREDONA:  Now I'm done.

3      MR. SHEPHERD:  I'm done.  Thank you so much.

4      THE VIDEOGRAPHER:  Okay.

5      THE WITNESS:  Thank you.

6      THE VIDEOGRAPHER:  The time is 3:01 p.m.  This

7   is the end of Tape 3.  It's also the end of the

8   deposition of Gerard Cervantes, and we're going off

9   the video record.

10              (WHEREUPON, the following

11               proceedings were had off the video

12               record:)

13      THE REPORTER:  Signature?  Reading and

14   signing?

15      MS. FREDONA:  Waived.

16          (Time Noted:  3:01 p.m.)

17       FURTHER DEPONENT SAITH NAUGHT.

18

19

20

21

22

23

24

Gerard F. Cervantes

1

     I, CORINNE T. MARUT, C.S.R. No. 84-1968,

2  Registered Professional Reporter and Certified
Shorthand Reporter, do hereby certify:

3        That previous to the commencement of the
examination of the witness, the witness was duly

4  sworn to testify the whole truth concerning the
matters herein;

5        That the foregoing deposition transcript
was reported stenographically by me, was thereafter

6  reduced to typewriting under my personal direction
and constitutes a true record of the testimony

7  given and the proceedings had;

        That the said deposition was taken

8  before me at the time and place specified;

        That the reading and signing by the

9  witness of the deposition transcript was waived;

        That I am not a relative or employee or

10  attorney or counsel, nor a relative or employee of
such attorney or counsel for any of the parties

11  hereto, nor interested directly or indirectly in
the outcome of this action.

12

      *Carinne J Marut*

13     CORINNE T. MARUT, Certified Reporter

14

        (The foregoing certification of this

15  transcript does not apply to any
reproduction of the same by any means, unless under

16  the direct control and/or supervision of the
certifying reporter.)

17

18

19

20

21

22

23

24