# EXHIBIT 10

```
 1                IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF CALIFORNIA
 2
       IN RE:                       )   MDL No. 2741
 3     ROUNDUP PRODUCTS             )   Case No.
       LIABILITY LITIGATION         )   3:16-md-02741 VC
 4     _____)
                                    )
 5     This document relates to:    )
                                    )
 6     Christine Karman, Individually )
       and as Representative of the  )
 7     Estate of Robert Karman,      )
       v. Monsanto Co.               )
 8                                   )
       Case No. 3:19-cv-01183-VC     )
 9     _____)
10
11              The video-recorded deposition of
12     CHRISTINE KARMAN, taken pursuant to the Federal
13     Rules of Civil Procedure of the United States
14     District Courts pertaining to the taking of
15     depositions, before Pauline M. Vargo, an Illinois
16     Certified Shorthand Reporter, C.S.R. No. 84-1573,
17     at the offices of Shook, Hardy & Bacon, Suite 4700,
18     111 South Wacker Drive, Chicago, Illinois, on
19     November 13, 2019, commencing at 9:13 a.m.
20
21
22
23                  GOLKOW LITIGATION SERVICES
                         877.370.3377 ph
24                       deps@golkow.com
```

Christine Karman

```
 1              A P P E A R A N C E S
      Present on Behalf of the Plaintiff:
 2         MOLL LAW GROUP
           22 West Washington Street, 15th Floor
 3         Chicago, Illinois 60602
           312.462.1700
 4         BY:  STEPHEN CADY, ESQ.
               scady@molllawgroup.com
 5
 6    Present on Behalf of the Defendant:
 7         SHOOK, HARDY & BACON, LLP
           2555 Grand Boulevard
 8         Kansas City, Missouri 64108.2613
           816.474.6550
 9         BY:  ROBERT D. HOMOLKA, ESQ.
               rhomolka@shb.com
10
11    VIDEOGRAPHER:
12         CARY DAVIDOW
           Golkow Litigation Services
13
14    REPORTED BY:
15         PAULINE M. VARGO, RPR, CRR
           Illinois CSR No. 84-1573
16
17
18
19
20
21
22
23
24
```

Christine Karman

```
 1                    I N D E X

 2              Wednesday, November 13, 2019

 3   WITNESS                              EXAMINATION

 4   CHRISTINE KARMAN

 5        By Mr. Homolka...................Page 6

 6        By Mr. Cady......................Page 258

 7        By Mr. Homolka...................Page 276

 8        By Mr. Cady......................Page 301

 9

10        Afternoon Session Commenced......Page 160

11

12

13

14

15                  E X H I B I T S

16   DEPOSITION EXHIBIT                   MARKED FOR ID

17     Exhibit 1    Notice of Deposition          12

18     Exhibit 2    8/3/15 Email                  37

19     Exhibit 3    Yard/chicken shed depiction   66

20     Exhibit 4    Plat of Survey                97

21     Exhibit 5    2015 Second Installment       98

                    Property Tax Bill

22

       Exhibit 6    Nationwide Home Insurance     100

23                  Homeowner Policy Declarations

24
```

Christine Karman

```
1                    E X H I B I T S
2                       Continued
3     DEPOSITION EXHIBIT                 MARKED FOR ID
4        Exhibit 7    Nationwide Title Clearing      102
                       Correspondence re release of
5                      Mortgage
6        Exhibit 8    Residential assessment notice  102
                       for ███████████, Elgin
7
         Exhibit 9    Correspondence re satisfaction 104
8                      of mortgage
9        Exhibit 10   State Farm Auto Insurance policy 105
10       Exhibit 11   Depiction of Mr. Karman's      106
                       handwritten journal
11
         Exhibit 12   2 Depictions of house under    129
12                     construction
13       Exhibit 13   2 Depictions of house under    131
                       construction
14
         Exhibit 14   2 Landscape/yard depictions    145
15
         Exhibit 15   2 Depictions of house exterior 149
16
         Exhibit 16   Birthday Celebration depiction 154
17
         Exhibit 17   Father and daughters depiction 156
18
         Exhibit 18   Family depiction               157
19
         Exhibit 19   Depiction of Mr. and Mrs. Karman 158
20
         Exhibit 20   Google Maps depiction of       194
21                     Robin Hood house and property
22       Exhibit 21   Plaintiff's Fact Sheet         226
                       CONFIDENTIAL-KARMAN-RKARMAN-
23                     PFS-000001 through 000028
24
```

Christine Karman

```
 1                   THE VIDEOGRAPHER:  Good morning.  We
 2          are going on the video record at 9:13 a.m.
 3                      My name is Cary Davidow.  I'm the
 4          videographer in association with Golkow
 5          Litigation Services.  The court reporter
 6          today is Pauline Vargo of Golkow Litigation
 7          Services.
 8                      Here begins the videotaped
 9          deposition of Christine Karman taking place at
10          111 South Wacker Drive, Suite 4700, Chicago,
11          Illinois.  Today's date is November 13th,
12          2019.
13                      This deposition is being held in
14          the matter of Christine Karman versus Monsanto
15          Corporation, filed in the United States
16          District Court, Northern District of
17          California, Case No. 3:19-cv-01183 VC.  This
18          deposition is being taken on behalf of the
19          Defendants.  The party at whose instance this
20          deposition is being recorded on an audiovisual
21          recording device are the Defendants.
22                      Will counsel please identify
23          themselves for the video record and the
24          parties which they represent.
```

Christine Karman

```
 1                  MR. CADY:  Stephen Cady from Moll Law
 2       Group for Plaintiff.
 3                  MR. HOMOLKA:  Robert Homolka from
 4       Shook Hardy & Bacon for the Defendant.
 5                  THE VIDEOGRAPHER:  Will the court
 6       reporter swear in the witness, please.
 7                  THE REPORTER:  Will you raise your
 8       right hand, please, to be sworn.
 9                  (The witness was duly sworn.)
10                  CHRISTINE KARMAN,
11  called as a witness herein, having been first duly
12  sworn, was examined and testified as follows:
13                      EXAMINATION
14  BY MR. HOMOLKA:
15       Q.    Good morning.
16       A.    Good morning.
17       Q.    How are you doing today?
18       A.    I -- cold.
19       Q.    Okay.  I will be asking most of the
20  questions today.  My name is Bobby Homolka.  I
21  represent the Defendant in this lawsuit.
22       A.    Okay.
23       Q.    And you understand you are here today
24  related to a lawsuit that you have filed on behalf
```

Christine Karman

```
1          A.    Yes.

2          Q.    And that was a normal six-month visit?

3          A.    Yes, it was.

4          Q.    And it looks like there was a order to

5    get some C-scans or CAT scans?

6          A.    Yes.

7          Q.    Then we have July 1st of '15, correct?

8          A.    Correct.

9          Q.    And he talks about having a CAT scan?

10         A.    Yes.

11         Q.    And he has noted some -- that he's

12   noticed some swelling on his left leg --

13         A.    Yes.

14         Q.    -- on July 1st.  Is that consistent with

15   your memory kind of how this went?

16         A.    I don't quite remember the swelling of

17   the leg, but I remember the first CAT scan.

18         Q.    Were you with him at like the visit, I'm

19   going to say the visit in June here that he noted,

20   where it looks like it triggered and they were

21   concerned enough with his condition or health to

22   say, you know what, let's get a CAT scan and try to

23   figure out what's going on?

24         A.    Yes, I was.
```

Christine Karman

1      Q.    Do you recall them talking generally

2   about any conditions they were concerned about at

3   that time or they thought may be affecting him?

4      A.    No, I don't.  We had -- we had -- we had

5   separate appointments on the same day, so he would

6   go first, I would go second and we were done, and

7   he said he had to go for this CAT scan.

8      Q.    And it looks like July 6, '15, Debbie

9   called him?

10     A.    Debbie?

11     Q.    Debbie.

12     A.    Yes, yes.

13     Q.    Do you know who Debbie is?

14     A.    Debbie is a nurse in Dr. Myrda's office.

15     Q.    Did you ever have conversations with

16  Debbie about Roundup or exposure to pesticides?

17     A.    No.

18     Q.    All right.  If you continue over, it

19  sounds to me like they wanted him to come in, do a

20  biopsy because they had some concern maybe with

21  some lymph nodes from that CAT scan?

22     A.    Yes.

23     Q.    July 9th, he references, "Chris and I

24  went to Dr. Myrda to get more info."  Is that you?

Christine Karman

```
1          A.    That would be me.

2          Q.    Didn't get much other than need a

3    biopsy, correct?

4          A.    Correct.

5          Q.    July 23rd, you go to Dr. Aron?

6          A.    Right.

7          Q.    And it looked to me from the medical

8    records he performed the biopsy?

9          A.    Yes, he did.

10         Q.    Then we move on to July 27th, correct?

11         A.    Yes.

12         Q.    Correct me if I'm wrong, looking at the

13   medical records, it looked like July 27 was really

14   a rough day and the day that you got confirmed

15   news?

16         A.    Yeah.

17         Q.    And that was the confirmation of the

18   lymphoma?

19         A.    Yes.

20         Q.    July 30th, you went to Dr. Aron's office

21   and saw Dr. -- I can't even pronounce that name.

22         A.    Dholakia.

23         Q.    Who is that doctor, do you know?

24         A.    I have no idea.
```

Christine Karman

```
 1           Q.    Was that doctor, to your knowledge,

 2    involved with much of his treatment?

 3           A.    I don't believe so.

 4           Q.    Then you move on to see Dr. Myrda again,

 5    or he did?

 6           A.    Right.

 7           Q.    And it looks like let's get the

 8    oncologist appointment, and that's when you saw or

 9    he saw Dr. Nabrinsky?

10           A.    Right.

11           Q.    Just for the record, he spelled it with

12    an "I," N-a-b-r-i-n-s-k-i.  Earlier -- earlier we

13    talked and you mentioned a Nabrinsky and you

14    spelled it with an "O."  This is the same doctor,

15    though, right --

16           A.    Yes.

17           Q.    -- that you had the conversation with.

18    I just want the record to be clear that whether

19    it's spelled --

20           A.    Right.  There were a small package of

21    cards here.  I thought they were in here somewhere.

22           Q.    Hold on.  I think your attorney has

23    those.  We will look at them.  I think they were

24    doctor cards just to make sure we have all those
```

Christine Karman

1   doctors?

2       A.   Okay.

3       Q.   So Dr. Nabrinsky was the first

4   oncologist, it looks like, he saw?

5       A.   Yes.

6       Q.   He referenced a bone marrow test on

7   August 3rd.  Do you recall him having a bone marrow

8   test done?   I think he is referring to he may need

9   one here.  I just --

10      A.   Vaguely, vaguely, yes.  I'm going to say

11  yes.  I'm not guessing.  Yes, because I questioned

12  I think why he needed a bone marrow.

13      Q.   And why did you question that?

14      A.   Pardon?

15      Q.   Why did you question that?

16      A.   I just didn't see -- it didn't seem to

17  me that it needed something to be done, not knowing

18  anything about cancer.

19      Q.   It says like you thought it's a little

20  early in the process?

21      A.   Yeah, yes, I did; yes, I did.

22      Q.   Let's do the chemotherapy, see what

23  happens?

24      A.   Yes.

Christine Karman

```
 1    him.

 2          Q.     The cotton shirt?

 3          A.     Cotton shirt.

 4          Q.     Or a flannel shirt if it was cool?

 5          A.     Yes.

 6          Q.     And when you did it, you would use your

 7    gloves?

 8          A.     Yes.

 9          Q.     And when he had a cold, he would wear a

10    mask?

11          A.     Yes.

12          Q.     That would be true for the gravel drive

13    as well?

14          A.     Yes, it would.

15          Q.     As far as the times you saw him using a

16    pesticide, including Roundup, would the same -- the

17    same thing we talked about earlier be true in that

18    he would get as close down to the gravel and to the

19    weeds as possible to spray them?

20          A.     Can you repeat that, please?

21          Q.     Absolutely.  When you saw him using the

22    Roundup on the gravel drive, would it be similar to

23    what you said earlier in that he would try to get

24    the end of the sprayer or the nozzle or the wand as
```

Christine Karman

1    close to the weed as possible?

2        A.    No.

3        Q.    What would he do on the gravel drive?

4        A.    I believe he held it at arm's length

5    until he got close to the side grass along the

6    driveway.

7        Q.    Arm's length, pointing down still,

8    though?

9        A.    Pointing down, yes.

10       Q.    So he would do more of a -- was it a

11   direct spray in the middle of the gravel?

12       A.    I don't remember.

13       Q.    But he would be -- would he be spraying

14   more, I guess more often than he did in the grass

15   on the gravel?

16       A.    Only where there was weeds.

17       Q.    So still where there was weeds, still

18   pointed it down, correct?

19       A.    Right.

20       Q.    He would get near the grass and be more

21   careful?

22       A.    As he got near the grass, yes.

23       Q.    At any time on the gravel drive did you

24   ever see him spraying it up in the air, straight up

Christine Karman

1    in the air --

2         A.    Never.

3         Q.    -- or in his face?

4         A.    Never.

5         Q.    Did you ever see him spill it on

6    himself?

7         A.    No.

8         Q.    Did he ever come inside from doing work

9    on the gravel drive and tell you that he had got

10   Roundup all over his body --

11        A.    No.

12        Q.    -- or on his body?

13        A.    No, he did not.

14        Q.    Earlier you talked about the times that

15   he would spray the back area in Exhibit 3, it would

16   take three to four minutes.  Can you estimate how

17   long it would take the times he would spray the

18   gravel drive?

19        A.    No, I can't.

20        Q.    Did you ever see him wearing a mask when

21   he was spraying the gravel drive?

22        A.    No, I did not.

23        Q.    And is it true at least with the gravel

24   drive as well -- strike that.

Christine Karman

```
1              With the gravel drive, is it the same as

2    earlier in that this would have occurred in the,

3    give or take, eight months when the weather allowed

4    it?

5         A.    Yes.

6         Q.    In other words, you didn't see him

7    spraying the gravel drive at any time in those

8    three or four winter months?

9         A.    No, I did not.

10                  (Deposition Exhibit 14 was marked

11                   for identification.)

12                  MR. HOMOLKA:  Exhibit 14.

13                  MR. CADY:  Got it, thank you.

14   BY MR. HOMOLKA:

15        Q.    Two more photos that I have put

16   together.   Are those photos you brought today?

17        A.    Yes.

18        Q.    And is that on Robin Hood?

19        A.    Yes, it is.

20        Q.    The bottom photo looks to me to be kind

21   of, for lack of better words, a landscaped area on

22   the property?

23        A.    Yes, it is.

24                  MR. HOMOLKA:  Do you mind handing me
```

Christine Karman

1          the photo if I'm asking her questions.

2                    MR. CADY:  This one?  Oh, the actual

3          original?

4                    MR. HOMOLKA:  Yes.  I will just look

5          at it.

6     BY MR. HOMOLKA:

7          Q.    Is this in your back, side or front

8     yard?

9                    MR. CADY:  I think that's the only

10         one, counsel.

11         A.    My backyard.

12         Q.    Do you remember when this photo was

13    taken, or can you approximate for us?

14         A.    No, I can't.  I can't approximate.

15    I don't remember.

16         Q.    It looks to be a area that you have

17    stones around the grass, correct?

18         A.    Correct.

19         Q.    And is there mulch in there too?

20         A.    No.

21         Q.    What is that?  Is there dirt in there?

22    What is that?

23         A.    It's our dirt.

24         Q.    You have some flowers in there?

Christine Karman

1        A.      That's very hard to say.  I don't know.

2    I don't have an answer.

3        Q.      Would he do it more or less than once a

4    month?

5        A.      I don't know.

6        Q.      Would he use -- would you use both

7    Roundup and Spectracide when you did the work

8    around the culverts?

9        A.      Yes.

10       Q.      When you saw him working out there, did

11   he use Spectracide, Roundup or both?

12       A.      You know, I don't know.  I don't know

13   that I ever paid attention to what he was using, to

14   be honest.

15       Q.      Were you ever out there in that area

16   with him when he was doing work?

17       A.      On occasion, yes.

18       Q.      The times that you weren't with him, is

19   it fair to say that you know he did some work out

20   there, trying to work on the weeds?

21       A.      Yes.

22       Q.      But you just can't say for certain

23   whether it was Roundup, Spectracide or a

24   combination of both?

Christine Karman

1      A.     That's true.  He would come in the house

2    to tell me he worked outside.

3      Q.     How long would he work the times you

4    remember him working around the culvert?  Would

5    that be -- we estimated earlier the patches would

6    take three or four minutes a time.  I think you

7    said the gravel driveway would take a little

8    longer, would take longer than that.

9      A.     Right.

10     Q.     The culverts, are you able to estimate

11   me how long it would take you when you were out

12   there trying to do weed control, how long it would

13   take you to work on that area?

14     A.     I have no idea because there is gravel

15   and dirt and garbage to clean up.

16     Q.     So it sounds to me like the work in the

17   culvert, whether it was you or your husband doing

18   it, there were a number of things you did out

19   there?

20     A.     Right.

21     Q.     Picking up trash?

22     A.     Yes.

23     Q.     Dealing with the mud and the rocks?

24     A.     Right.

Christine Karman

1          Q.      Dealing with the weeds?

2          A.      Right.

3          Q.      And the best you can do today is I guess

4    testify that your husband did the work around the

5    culvert as needed?

6          A.      Yes.

7          Q.      When he did the weed control

8    specifically in the area, you didn't see what

9    product he was using?

10         A.      That's true.

11         Q.      During that time when you were doing the

12   work, was the Roundup product you would use in

13   there yourself, was it any different than what you

14   explained to us earlier?

15         A.      No, it wasn't.  The same.

16         Q.      I'm sorry.  In other words, it was the

17   same kind of size container with the wand that you

18   described earlier?

19         A.      Yes.

20         Q.      Did your husband ever come in after

21   working in the culvert and tell you that he had

22   spilled Roundup specifically on him --

23         A.      Never.

24         Q.      -- or got it on his person?

Christine Karman

```
 1        A.    Never.

 2        Q.    Am I right that sitting here today,

 3   although you know he did some work out there, you

 4   just -- you don't have a specific memory of

 5   watching him actually do the weed control out

 6   there?

 7        A.    No, I don't.

 8        Q.    The shed we talked about --

 9        A.    Yes.

10        Q.    -- or you just mentioned, I'm sorry,

11   where was the shed located that you said he did

12   some work around?  And I'm going to hand you this,

13   actually.  If one of the pictures gives us an idea,

14   that would be helpful.

15        A.    I thought it did.

16              You're not going to see it, but

17   basically this picture.

18        Q.    Hold on for a second.  Here is what I'm

19   going to do.  I printed off some maps of your

20   property.  I'm going to hand them to you.  We will

21   mark one if it looks like it is something that

22   would be helpful.  How is that?

23        A.    Okay.

24        Q.    I just want you to look at them.  Just
```

Christine Karman

1   so you know, these are the same.  I stapled them.

2        A.    They are all current.

3        Q.    There is three copies, but if you just

4   look at the top one and tell me if you can see a

5   better area of where the shed would be, if that's

6   okay, and we will mark it.

7             MR. CADY:  We don't have an objection

8        to that.

9             MR. HOMOLKA:  I wish they were

10       colored, but...

11   BY THE WITNESS:

12       A.    Not here, definitely not there.  That's

13   it, huh?

14   BY MR. HOMOLKA:

15       Q.    There is one more down there.

16       A.    Is there?

17       Q.    Yeah.

18             Here, just for the record, let's just

19   mark that since you are going to do something on

20   it.

21       A.    You're not going to see it in full.

22   You're going to have to...

23             (Deposition Exhibit 20 was marked

24              for identification.)

Christine Karman

1    BY MR. HOMOLKA:

2         Q.    I'm marking Exhibit 20, which is a

3    Google Maps I brought of the property on Robin

4    Hood, and the witness is going to try to mark an

5    area where the shed was.

6         A.    Is.

7         Q.    Or is.

8              MR. CADY:  Do you have a copy of that,

9         counselor?

10             MR. HOMOLKA:  Yeah.

11             MR. CADY:  Thank you.

12   BY THE WITNESS:

13        A.    Do you see it?

14   BY MR. HOMOLKA:

15        Q.    Oh, my goodness, I do, I do.

16        A.    Two little windows.

17             MR. CADY:  I'm trying to see where she

18        marked it here, if you don't mind.  I see it.

19        Okay.  Thank you.

20   BY MR. HOMOLKA:

21        Q.    How big was that shed?

22        A.    That shed is probably 12 by 12.

23        Q.    Your eyesight is way better than mine.

24        A.    I know what's there.

Christine Karman

1      Q.     And so you couldn't tell me how many

2   times he specifically used Roundup in this last

3   kind of area we are talking about which is more

4   globally just around the lawn when weeds came up;

5   is that fair?

6      A.     No, I can't, because we didn't go up

7   there, that region.  No, I can't.

8      Q.     Would he primarily do his lawn work on

9   the weekends?

10     A.     No.

11     Q.     When would he primarily do the lawn

12  work?

13     A.     Tuesdays.

14     Q.     And is that when he would mow the lawn?

15     A.     Yes.

16     Q.     And then he would -- let me finish.  And

17  then he would also do kind of what we've talked

18  about today.  Would he also be on Tuesday -- would

19  it also be Tuesdays when he would do the gravel

20  driveway if it needed it?

21     A.     That I can't answer because I don't know

22  the answer to.  I don't know when he did it.

23     Q.     What about the area on that hill that we

24  started today with on Exhibit 3?  Would that be

Christine Karman

```
 1    primarily on Tuesdays or some other time during the

 2    week?

 3                MR. CADY:  I'm just going to object to

 4         the form of the question.  Sure, you can

 5         answer it, if you know.

 6    BY THE WITNESS:

 7         A.    Okay.  Again, it would depend on when do

 8    the weeds come up.

 9    BY MR. HOMOLKA:

10         Q.    Fair enough.  So this last category I'm

11    trying to ask you about and not doing a very good

12    job where it was just where weeds came up as

13    necessary?

14         A.    Yes.

15         Q.    Are you with me on that, kind of?

16         A.    I'm with you on that.

17         Q.    Let me make sure I understand it.

18                You couldn't tell me if he would do it

19    on Tuesdays or any other day.  It's just you would

20    see him using weed control as needed around the

21    lawn?

22         A.    Yes.

23         Q.    And you can't tell me whether it was

24    10 times or 100 times?
```

Christine Karman

```
1          A.    No, I can't.

2          Q.    Is that right?

3          A.    No, I can't.

4          Q.    Do you recall seeing him, though, using

5    Roundup in other places of the grass that we

6    haven't talked about?

7          A.    Yes.

8          Q.    And when you saw him using it, would it

9    be the same product that you mentioned earlier and

10   you described earlier?

11         A.    Yes.

12         Q.    Would he be doing it in the same method

13   that we talked about earlier, specifically holding

14   the wand as close to the weed or the ground as

15   possible to be careful not to kill grass --

16         A.    Yes.

17         Q.    -- and directly spray the weed?

18         A.    Yes.

19         Q.    And you never saw him spraying it up in

20   the air --

21         A.    Never.

22         Q.    -- or on its face?

23         A.    Never.

24         Q.    You never saw it spilled on him?
```

Christine Karman

```
 1        A.    No.

 2        Q.    He never told you he spilled it on him,

 3   right?

 4        A.    Never.

 5        Q.    He never told you that any of the

 6   bottles were defective and for some reason leaking

 7   all the way down his arm --

 8        A.    No.

 9        Q.    -- or on his body?

10        A.    No.

11        Q.    And all the times you saw him use

12   Roundup on Robin Hood he wore some sort of shoes

13   and jeans?

14        A.    Yes.

15        Q.    And then a cotton shirt, correct?

16        A.    Correct.

17        Q.    Or a flannel shirt?

18        A.    Correct.

19        Q.    And a mask when he had a cold?

20        A.    When he had a cold, yes.

21        Q.    And sometimes a hat?

22        A.    Sometimes a hat.

23        Q.    And I believe you said earlier when he

24   got dirty doing lawn work he would -- or let me ask
```

Christine Karman

1    you this:  When he got dirty doing the lawn work,

2    would he shower or do something else?

3         A.    He would sit out on the back porch and

4    relax and have a beer or two.

5         Q.    Who did the laundry for y'all?  Did he

6    do the laundry or did you?

7         A.    I did.

8         Q.    Would you launder his clothes that he

9    wore on Tuesdays to do yard work?  Would you

10   launder them after each time so that they were

11   clean for his next -- I guess next Tuesday night

12   lawn work?

13        A.    Yes.

14        Q.    We talked about earlier there were three

15   locations you had mentioned to me where you

16   recalled yourself buying Roundup.

17        A.    Um-hmm.

18        Q.    Menards, and you gave me the street.

19   You already did.

20        A.    Okay.

21        Q.    Or the town.  Home Depot?

22        A.    Yes.

23        Q.    Handy Andy?

24        A.    Yes.

Christine Karman

1        Q.    And let me just make sure I have it

2   right.  You personally recall buying Roundup at all

3   three of those locations?

4        A.    I do at Menards and Home Depot.  I don't

5   recall Handy Andy.

6        Q.    Did you have a loyalty program or

7   anything like that at Menards or Home Depot?

8        A.    No.

9        Q.    How would you purchase the Roundup and

10  other products at those locations?

11       A.    Generally cash.

12       Q.    Can you tell me how many times you

13  purchased Roundup at either of those locations

14  throughout your life?

15       A.    No, I can't.

16       Q.    Can you tell me how often you would need

17  to purchase Roundup, like how long a container of

18  it would last?

19       A.    Again, I can't tell you that.

20       Q.    Just to be clear, you would purchase

21  Roundup?

22       A.    Yes.

23       Q.    And you did it really based on two

24  things, I think: the price as compared to

Christine Karman

1          Q.     A couple more and we are done with this

2    area and we will take our break and end with some

3    medical stuff.

4                 What are you hoping -- what are you

5    hoping to get or obtain out of this lawsuit?

6          A.     Guarantee that none of my grandchildren

7    or my children will get the same thing as my

8    husband.  It's heartbreaking to watch them.

9          Q.     It's -- I'm sorry?

10         A.     It's heartbreaking to watch my two

11   youngest daughters worrying about their children.

12         Q.     Do they worry about their children

13   specific --

14         A.     Yes, they do.

15         Q.     I'm sorry.  Specifically as it relates

16   to Roundup?

17         A.     It's one of the things; that there is so

18   many things out there, you know, but it's an added

19   attraction.

20         Q.     They don't use Roundup now?

21         A.     No, they don't.

22         Q.     What, if anything, could have Monsanto

23   done, my client, what could they have done, if

24   anything -- or strike that.

Christine Karman

```
 1                What do you believe my client did,

 2    Monsanto, what do you believe they did that has --

 3    that has not forced you but has led to you filing

 4    this lawsuit?

 5                MR. CADY:  I object to the form of the

 6         question.  You can answer if you have an

 7         answer.

 8    A.    I -- I --

 9    Q.    That's fine.  Do you believe that my

10    client should have done something differently?

11    A.    Absolutely.

12    Q.    Tell me what you think that is.

13                MR. CADY:  I object to the form of the

14         question.  You can answer if you know.

15    A.    Put the skeleton back on the labels.

16    Everybody understands the skeleton.

17    Q.    So I understand what you just said.

18    When you say "skeleton," do you mean they could

19    have provided a different warning on the product?

20    A.    A skeleton.

21    Q.    An actual skeleton?

22    A.    I think everybody understands what that

23    skeleton was.

24    Q.    Anything else other than that?  And I'm
```

Christine Karman

1    sorry I chuckled, but it's visual to me.

2         A.    I know, I know, but I thought of --

3         Q.    It's visual.

4         A.    I -- I don't know that there is anything

5    else they could have done.  I don't know.

6         Q.     Your husband is a cigarette smoker,

7    correct, or was a cigarette smoker?

8         A.    Yes, he was.

9         Q.    For more than 50 -- more than 55 years;

10   is that right?

11        A.    He did stop three times for about a

12   total of 12 years or so.

13        Q.    So he smoked over a 50-year period with

14   some quits in between?

15        A.    Yes.

16        Q.    And why did he stop the times he

17   stopped?

18        A.    He just wanted to stop.

19        Q.    And he was aware that smoking could

20   cause lung cancer, COPD, those types of things, at

21   some point in his life?

22        A.    Yes.

23        Q.    And he continued to smoke, correct?

24        A.    Yes, he did.

Christine Karman

1          Q.    And there was a warning on every one of

2    those cigarettes after 1966, every one of those

3    packs.  Do you recall that?

4          A.    Yes.

5          Q.    And it was right on the side to read

6    things like "May cause lung cancer"?

7          A.    Yes.

8          Q.    Then it changed to "Can cause lung

9    cancer, emphysema," all that stuff.  Do you

10   remember?  I mean, you are a smoker.  Do you

11   remember seeing the labels?

12         A.    Yes, yes.

13         Q.    And those warnings labels that were on

14   those packs of cigarettes that you have to pick up

15   20 times to empty that pack, every time that he

16   looked at that warning label he was warned about

17   using those cigarettes, wasn't he?

18         A.    Yes, he was.

19         Q.    And he continued to smoke, right?

20         A.    Correct.

21               MR. CADY:  I object to the form of the

22         question.

23   BY MR. HOMOLKA:

24         Q.    And those warnings really didn't impact

Christine Karman

```
1    his decision whether or not to smoke, did it?

2              MR. CADY:  Objection, calls for

3         speculation.

4              THE WITNESS:  I don't have to answer?

5              MR. CADY:  You can answer the

6         question.

7              THE WITNESS:  I -- do I have to answer

8         the question?

9              MR. CADY:  You have to give a response

10        to this question, yes.

11   BY THE WITNESS:

12        A.    Yes.  You asked if he ignored them.

13   Yes, he did.

14             MR. HOMOLKA:  Let's take a break, and

15        then I do want to just forewarn you.  I tried

16        to save some sensitive medical stuff until the

17        end, and I think I've done that, and I would

18        jump away from it.  I've got to ask a few.  So

19        we will talk about some stuff, so get yourself

20        something to drink.

21             THE WITNESS:  Okay.  Stronger than

22        Coke and coffee?

23             MR. HOMOLKA:  Let's go off the record.

24             THE VIDEOGRAPHER:  Going off the video
```

Christine Karman

```
 1        Q.     -- and said we need to get some scans

 2    done and come back, and they scheduled some CT

 3    scans.

 4        A.     Yes.

 5        Q.     Do you recall that?

 6        A.     Yes.

 7        Q.     That was June 22nd.  Do you recall him

 8    having symptoms prior to that, symptoms, medical

 9    issues, anything prior to that?

10        A.     Just that he was concerned about that --

11    that lump he had.

12        Q.     And that lump surfaced around that time

13    in June, to your knowledge?

14        A.     I think a little earlier.

15        Q.     So June 22nd, so sometime prior to

16    June 22nd --

17        A.     Yes.

18        Q.     -- he started to notice this lump?

19        A.     Right.

20        Q.     And is the lump what led him to the

21    doctor on that specific instance?

22        A.     Yes.

23        Q.     In other words, was he experiencing any

24    night sweats?
```

Christine Karman

1        A.      No, nothing.

2        Q.      Any fever?

3        A.      Nothing.

4        Q.      Any other symptom that you can recall

5    other than the fact that he had this lump in his

6    left groin?

7        A.      No.

8        Q.      And where did you guys go that first

9    time in June?  You went to see Dr. --

10       A.      We went to see Dr. Myrda.

11       Q.      Who was his PCP?

12       A.      Yeah, and that was for his six-month

13   checkup.

14       Q.      Then in July he went to who for the CT

15   scan?  Nabrinsky?

16       A.      Nabrinsky.

17       Q.      Do you remember who ended up -- the

18   pathologist was?  Do you remember who the

19   pathologist was that looked at the pathology?

20       A.      I don't know if that was Dr. Aron.

21       Q.      I'm going to say a name.  Do you

22   remember Dr. Liu, L-i-u, a woman pathologist?

23       A.      No, I don't.

24       Q.      Lanting (phonetic spelling), Ameripath,

Christine Karman

```
 1    who reviewed the pathology in July 27th.  It's not

 2    uncommon you wouldn't know her.  She would review

 3    the pathology and share it, so...

 4         A.    Right.

 5         Q.    Do you remember a Dr. Gloria Ma, M-a --

 6         A.    No.

 7         Q.    -- that was at Advocate Sherman

 8    Hospital?

 9         A.    No.

10         Q.    She is the one who did the record on

11    July 27th that diagnosed this lymphoma as a diffuse

12    large B cell.  Have you ever heard that term?

13         A.    I've heard that term.

14         Q.    If you don't remember her, do you

15    remember who you first heard that from, either the

16    diagnosis of lymphoma or diffuse large B cell

17    lymphoma?

18         A.    I believe I first heard it from

19    Dr. Nabrinsky.

20         Q.    I'm going to try to nail down something

21    here for myself and actually Steve.

22               What medical doctor did you have the

23    most contact with, the most discussions with at the

24    time that this suspicious lump appeared and to when
```

Christine Karman

```
 1    you found out this is lymphoma?

 2         A.    Dr. Nabrinsky.

 3         Q.    Nabrinsky, okay.  Once you found out

 4    that this was a lymphoma, what doctor was the most

 5    involved from your view with his chemo treatment

 6    and monitoring his course after the diagnosis?

 7         A.    Dr. Nabrinsky.

 8         Q.    Other than Dr. Nabrinsky, what doctor

 9    would you say would be the next doctor that had the

10    most contact with your husband and you?

11         A.    I don't remember his name.

12         Q.    What about Dr. Aron, A-r-o-n?

13         A.    No.

14         Q.    What about Hassad Al Shah --

15         A.    No.

16         Q.    -- internal medicine?

17               Well, what about Dr. -- well, Dr. Myrda?

18         A.    We did not see Dr. Myrda during this

19    period of time.

20         Q.    What about Steven Grossman from --

21         A.    No.  I can tell you he was a

22    cardiologist.

23         Q.    How about Diana Solis?  Do you remember

24    her?
```

Christine Karman

```
1          A.    I saw that.  I have seen that name, but
2    I don't know.
3          Q.    We'll figure it out.
4                Did you bring some cards of doctors with
5    you?  Is that what you brought?
6          A.    Yeah.  What did we do with them?  Did I
7    throw them in here?
8          Q.    I don't know if that would help.
9          A.    The doctor cards.  I don't see them in
10   here.  Remember the little package of doctor cards?
11   I thought we threw them in here.
12               MR. HOMOLKA:  They were with that disk
13       you grabbed from her.
14               MR. CADY:  Right.  It would have been
15       with the journal.
16               THE WITNESS:  I don't have the
17       journal.
18               MR. CADY:  Right, because we have the
19       journal over here.  It's not with the journal,
20       I don't believe.  Actually, that stuff is all
21       with you.
22   BY MR. HOMOLKA:
23         Q.    I think you brought some doctors' cards.
24   I'm just interested if that would help us get a --
```

Christine Karman

```
1        A.     Yes.

2        Q.     -- and then there was a delay.  Do you

3   remember any doctors telling you or telling him

4   that the treatment had to be delayed because of his

5   COPD exacerbations?

6        A.     I don't remember that.  I know it was

7   delayed because -- I thought it was because of

8   the -- well, but it might be part of COPD, the

9   heart arrhythmia or whatever.

10        Q.     What about the pneumonia?  Do you

11   remember that playing a role or possibly playing a

12   role?

13        A.     Possibly playing a role.  I'm not exact

14   on that.  I can't.

15        Q.     Regardless of the reason, do you recall

16   the doctors having to put that second cycle, that

17   second round of chemo on hold?

18        A.     I don't remember why.

19        Q.     But do you remember them having to do

20   it?

21        A.     Yes.

22        Q.     You just don't remember the specific

23   reason?

24        A.     Right.
```

Christine Karman

```
 1          Q.     And then what happened just that you
 2    recall after that once you got to November?  Did he
 3    respond in any positive way to that first round of
 4    chemo?
 5          A.     No.
 6          Q.     You eventually ended up taking him --
 7    Robert Mandel?  Sorry.  I'm throwing another name
 8    out at you out of the blue.
 9          A.     I don't know who he is.
10          Q.     That's fine.  Zubair Ahmad?
11          A.     I don't know him or her.
12          Q.     Okay.  Do you remember that he was
13    discharged after they put it on hold the second
14    round and he went back home at the end of October,
15    early November?
16          A.     Yes.
17          Q.     And at some point in November he
18    deteriorated?
19          A.     Yes.
20          Q.     You took him back to the hospital?
21          A.     Yes.
22          Q.     And among other things, he was
23    experiencing coughing, shortness of breath --
24          A.     Yes.
```

Christine Karman

```
 1        Q.      -- chest tightness, chest discomfort,

 2    all that?

 3        A.      Yes.

 4        Q.      Anything else you recall him suffering

 5    from at that time specifically, or did I get it

 6    about right?

 7        A.      I don't remember anything else.  I think

 8    they've got it all.

 9        Q.      And then he is seen back in the hospital

10    on or around November 20th to the 25th, and he was

11    going to be discharged home with hospice in

12    December.  Do you recall that at one point?

13        A.      Yes.

14        Q.      But then did hospice just come to the

15    hospital?

16        A.      No.

17        Q.      Did he go home?

18        A.      Yes, we went home.

19        Q.      For a brief period of time?

20        A.      Yes.

21        Q.      And were you with him when he passed --

22        A.      Yes.

23        Q.      -- on the 15th?

24        A.      Yes.
```

Christine Karman

```
1        Q.    Anyone else in the room with you?

2        A.    My daughter, Catherine.

3        Q.    Now, take a deep breath.

4        A.    I'm good.

5              MR. CADY:  Do you need anything,

6        Christine?  Do you need a tissue or anything?

7              THE WITNESS:  No.  I just get

8        emotional when I hear that particular time.

9              MR. CADY:  Of course.

10             MR. HOMOLKA:  I think that's

11       understandable.

12             MR. CADY:  Didn't mean to interrupt

13       you.

14             MR. HOMOLKA:  No, that's fine.  I just

15       want to make sure I have the questions done.

16   BY MR. HOMOLKA:

17       Q.    After he passed --

18       A.    Yes.

19       Q.    -- you moved on being a grandma and a

20   mother?

21       A.    Yes.

22       Q.    Plowing ahead the best you could?

23       A.    Yes.

24       Q.    Did you need to seek any medical
```

Christine Karman

```
 1    treatment?

 2         A.    I did -- I did go to the -- have Mike

 3    take me to the hospital one time in January because

 4    I was trying to put some things in order and I was

 5    sitting up all night, and Bobbie called me and she

 6    said, "How are you doing?"  And I said, "Fine."  I

 7    said, "I'm not fine."  She said, "I will be right

 8    there," and Mike took me.  Mike came and got me.

 9    I was just suffering from anxiety and high blood

10    pressure.

11         Q.    And that was your son Mike?

12         A.    Yeah.

13         Q.    So Mike -- that was in January when --

14         A.    That was in January, like towards the

15    end of January.

16         Q.    Of '16?

17         A.    '16, yes.

18         Q.    Other than Mike coming to get you that

19    day for some anxiety --

20         A.    Right.

21         Q.    -- and other things you described --

22         A.    Right.

23         Q.    -- did you have to get any medical

24    treatment?
```

Christine Karman

```
 1          A.     That's correct.

 2          Q.     What type of things was he doing to help

 3     build that house?

 4          A.     He did some wood handling, you know,

 5     maybe bringing lumber up to the kids -- not kids --

 6     journeymen, hiring people to do the plumbing,

 7     talking with inspectors, sweeping, burning garbage.

 8                 I don't think he did anything with like

 9     the painters and the drywallers and the roofers and

10     the guys who put in the insulation.  I don't

11     believe he did any of that.  His forte was "I want

12     to be a carpenter," which he could maybe nail a few

13     things.

14          Q.     So were there other people who were

15     undertaking tasks such as roofing?

16          A.     Yeah, there were roofers.

17          Q.     Painting?

18          A.     Painters.

19          Q.     Anyone laying wood or other flooring?

20          A.     Flooring, yes.

21          Q.     Those were other people?

22          A.     Those were other, I will use the term

23     "professionals."

24          Q.     Okay.  Would you consider your husband a
```

Christine Karman

1    professional in that sense?

2        A.    No.

3        Q.    And then we went over a bunch of

4    questions about your husband's use of Roundup

5    around your property at Robin Hood.  Do you

6    remember those questions?

7        A.    Yes, yes.

8        Q.    Okay.  And we talked about there was an

9    area in your backyard, I think it was a brown spot

10   as we described it where your husband, you do

11   specifically recollect him using Roundup on that

12   spot; is that correct?

13       A.    That's correct.

14       Q.    And then just to be fair, I know we were

15   also talking about a culvert in the front of the

16   house, is that correct, or on the side of the

17   house?

18       A.    Correct, correct.

19       Q.    Okay.  And I do believe you testified

20   you could not say for certain whether he had used

21   Roundup in that culvert or not; is that correct?

22       A.    That's correct.

23       Q.    Do you have any reason to believe that

24   he would have used a different chemical on that

Christine Karman

```
1    culvert that he would not have used on the back

2    spot that we -- that you had testified about

3    earlier?

4         A.   No.

5              MR. HOMOLKA:  Object to form.  You can

6         answer.

7         A.   No, I don't believe.  No, I don't.

8         Q.   So you think that he would have been

9    using the same products on the culvert, in the side

10   and the front that he would have used at the back

11   on those brown spots?

12             MR. HOMOLKA:  Object to form.

13        A.   Yes.

14        Q.   And we are talking about a period

15   anywhere between 1990 to 2014 or 2013 to 2014, that

16   would have been your husband's use of Roundup; is

17   that correct?

18        A.   Correct.  I think, to be honest, he used

19   it in Hanover Park, which was prior 1989.

20        Q.   So he had used it at a location other

21   than the Robin Hood property?

22        A.   I think in Hanover Park he did.

23        Q.   Okay.  And what was in Hanover Park that

24   he --
```

Christine Karman

```
1          A.    Our house.

2          Q.    I'm sorry.  Let me finish these

3     questions, Christine.

4                So what was in Hanover Park that you

5     believe your husband would have used Roundup for?

6          A.    Weeds, he would have used it for weeds.

7     We had a house there.

8          Q.    You had a house there?

9          A.    Yes.

10         Q.    So it would have been residential use

11    around the lawn and the yard --

12         A.    Right.

13         Q.    -- for weed control?

14         A.    Yes.

15         Q.    Do you specifically recall him using

16    Roundup at the Hanover house property before Robin

17    Hood?

18         A.    No, I don't.

19              MR. HOMOLKA:  That's fine.  I mean, I

20        was going to say it was asked and answered.

21        That's what I thought she told me.

22              MR. CADY:  Okay.  Sorry.

23    BY MR. CADY:

24         Q.    Yeah, let him object before you --
```

Christine Karman

```
 1        A.    Okay.

 2        Q.    -- answer these questions or respond.

 3              Okay.  My original question was just

 4   going to be, do you have a perfect recollection of

 5   every single day and every single event that has

 6   taken place between 1989 and 2014?

 7                   MR. HOMOLKA:  Object to form.  Go

 8        ahead.

 9   BY THE WITNESS:

10        A.    Can I answer?

11   BY MR. CADY:

12        Q.    Yeah.

13        A.    No, I do not.

14        Q.    So it's possible that when we are

15   talking about your husband's use of Roundup during

16   those times that you may not perfectly recollect

17   every single time he used that product; is that

18   correct?

19        A.    That's correct.

20        Q.    And you were also asked some questions

21   earlier about, you know, your husband's hobbies and

22   things that he had done just throughout his life

23   generally, and I know you had spoken about

24   vacations you and he used to take prior to his NHL
```

Christine Karman

```
 1    diagnosis.  Is that correct, you guys used to take

 2    vacations before he was diagnosed with NHL?

 3         A.    Yes.

 4         Q.    Okay.  Did you take any vacations after

 5    he was diagnosed with NHL?

 6         A.    No.

 7         Q.    And why did you stop traveling or why

 8    did you stop vacationing after his cancer

 9    diagnosis?

10              MR. HOMOLKA:  Object to form.  You can

11         answer.

12              THE WITNESS:  I can answer?

13              MR. HOMOLKA:  Yes.

14    BY THE WITNESS:

15         A.    Because of his health issues, because he

16    was beginning to get very weak.

17    BY MR. CADY:

18         Q.    And do you recall the last time that he

19    would have planned a vacation for the two of you

20    before his passing?

21         A.    Yes.

22         Q.    Could you tell us a little bit about

23    that.

24         A.    I don't remember the exact date, but I
```

Christine Karman

```
1          need to.  We are going to waive.  We're going

2      to waive it.

3              THE VIDEOGRAPHER:  Counsel, are we

4      concluded?

5              MR. HOMOLKA:  We are good.

6              THE VIDEOGRAPHER:  We are going off

7      the video record at 3:39 p.m. at the end of

8      Video 3.

9                  (At 3:39 p.m., the deposition was

10                  concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Christine Karman

```
1           CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2                 I, PAULINE M. VARGO, a Certified
    Shorthand Reporter of the State of Illinois,
3   C.S.R. No. 84-1573, do hereby certify:
4                 That previous to the commencement of the
    examination of the witness, the witness was duly
5   sworn to testify the whole truth concerning the
    matters herein;
6
                  That the foregoing deposition transcript
7   was reported stenographically by me and thereafter
    reduced to typewriting under my personal direction;
8
                  That the reading and signing of said
9   deposition was waived by counsel for the respective
    parties and the witness;
10
                  That the foregoing constitutes a true
11  record of the testimony given by said witness
    before this reporter;
12
                  That I am not a relative, employee,
13  attorney or counsel, nor a relative or employee of
    such attorney or counsel, for any of the parties
14  hereto, nor interested directly or indirectly in
    the outcome of this action.
15
          CERTIFIED TO THIS 29th DAY OF NOVEMBER, 2019.
16
17  _____
          Pauline M. Vargo, RPR, CRR
18        Illinois Certified Shorthand
          Reporter No. 84-1573P
19
20
21
22
23
24
```