# EXHIBIT 11

```
 1                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF FLORIDA
 2

     -------------------------------§
 3   IN RE:  ROUNDUP PRODUCTS           §
     LIABILITY LITIGATION               §
 4   _____   §
                                        §
 5   This document relates to:          § MDL No. 2741
                                        §
 6   Christine Karman, Individually     § Case No. MDL No.
     and as Representative of the       § 3:16-md-02741-VC
 7   Estate of Robert Karman,           §
                                        §
 8   vs.                                §
                                        §
 9   Monsanto Co.                       §
     Case No. 3:19-cv-01183--VC         §
10   ------------------------------- §
11
                              - - -
12
                    Friday, February 19, 2021
13
                              - - -
14
15         This is the Remote Videotaped Deposition of
16      RON D. SCHIFF, M.D., Ph.D., commencing at
17      2:05 p.m., on the above date, before
18      Kelly J. Lawton, Registered Professional
19      Reporter, Certified Court Reporter, and Licensed
20      Court Reporter.
21
22
23                            - - -
                    GOLKOW LITIGATION SERVICES
24         877.370.3377 ph | 917.591.5672 fax
                       deps@golkow.com
25
```

```
 1    APPEARANCES VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:
 2       MOLL LAW GROUP
         BY:  REBECCA FREDONA, ESQUIRE
 3            rfredona@molllawgroup.com
         22 West Washington Street, Floor 15
 4       Chicago, Illinois, 60602
         (312) 462-1700
 5       Representing Plaintiff
 6
 7       BARTLIT BECK LLP
         BY:  LINDLEY J. BRENZA, ESQUIRE
 8            lindley.brenza@bartlitbeck.com
         1801 Wewatta Street, 12th Floor
 9       Denver, Colorado 80202
         (303) 592-3130
10       Representing Defendant
11
12       SHOOK HARDY & BACON LLP
         BY:  MICHELLE M. FUJIMOTO, ESQUIRE
13            mfujimoto@shb.com
         Jamboree Center
14       5 Park Plaza, Suite 1600
         Irvine, California 92614
15       (949) 475-1500
         Representing Defendant
16
17
18
     ALSO PRESENT:
19
         GABRIEL ARROWWOOD, Videographer
20
21
22
23
24
25
```

Ron D. Schiff, M.D., Ph.D.

```
 1                        - - -

 2                    I N D E X

 3                        - - -

 4   Testimony of:  RON D. SCHIFF, M.D., Ph.D.
```

```
 5       DIRECT EXAMINATION BY MR. BRENZA..............    6

 6       CROSS-EXAMINATION BY MS. FREDONA..............  149

 7       REDIRECT EXAMINATION BY MR. BRENZA...........   151
```

```
 8

 9

10                    E X H I B I T S

11              (Attached to Transcript)

12
```

```
13    SCHIFF DEPOSITION EXHIBITS                       PAGE

14   Exhibit 1     Expert Report of Ron D. Schiff,      34
                   M.D., Ph.D.

15

     Exhibit 2     Curriculum Vitae of Ron D. Schiff,   34
16                 M.D., Ph.D.

17   Exhibit 3     Depositions and Trial Testimony       34

18   Exhibit 4     SEER NHL Incidence Data 1975 - 2017   69

19   Exhibit 5     "Mutation Research-Reviews in         73
                   Mutation Research" (Zhang 2019)

20

     Exhibit 6     Defendant Monsanto Company's Notice   82
21                 to Take Oral and Videotaped
                   Deposition of Ron D. Schiff, M.D.,
22                 Ph.D.

23   Exhibit 7     "Stem Cell Divisions, Somatic         91
                   Mutations, Cancer Etiology, and
24                 Cancer Prevention" (Tomasetti 2017)

25
```

```
 1                    E X H I B I T S
 2                (Attached to Transcript)
 3
     SCHIFF DEPOSITION EXHIBITS                    PAGE
 4
    Exhibit 8    December 12, 2015 Medical Records -   132
 5                Bates Numbered
                  Confidential-Karman-RKarman-ASJHE-MD
 6                -000934 through
                  Confidential-Karman-RKarman-ASJHE-MD
 7                -001393
 8  Exhibit 9    "Integrative Assessment of Multiple   144
                  Pesticides as Risk Factors for
 9                non-Hodgkin's Lymphoma Among Men"
                  (De Roos 2003)
10
    Exhibit 10   "Glyphosate Use and Associations     147
11                with non-Hodgkin's lymphoma Major
                  Histological Sub-types:  Findings
12                from the North American Pooled
                  Project" (Pahwa 2019)
13
    Exhibit 11   "Pesticide Use and Risk of           148
14                non-Hodgkin Lymphoid Malignancies in
                  Agricultural Cohorts from France,
15                Norway and the USA:  A Pooled
                  Analysis from the AGRICOH
16                Consortium" (Leon 2019)
17
18
19
20
21
22
23
24
25
```

Ron D. Schiff, M.D., Ph.D.

```
 1                        - - -

 2               THE VIDEOGRAPHER:  We are now on the record.

 3         My name is Gabriel Arrowwood.  I'm a videographer

 4         for Golkow Litigation Services.

 5               Today's date is February 19th, 2021.  The

 6         time is 2:05 p.m.

 7               This remote video deposition is being held in

 8         the matter of Karman versus Monsanto Company, for

 9         the United States District Court, Northern

10         District of California.

11               The deponent is Ron D. Schiff, M.D.

12               All parties to this deposition are appearing

13         remotely and have agreed to the witness being

14         sworn in remotely.

15               Due to the nature of remote reporting, please

16         pause briefly before speaking to ensure all

17         parties are heard completely.

18               Will counsel please identify themselves.

19               MS. FREDONA:  Rebecca --

20               MR. BRENZA:  Lindley Brenza with Bartlit Beck

21         for Monsanto.

22               MS. FREDONA:  Rebecca Fredona on behalf of

23         plaintiff.

24               MS. FUJIMOTO:  And Michelle Fujimoto of

25         Shook, Hardy & Bacon on behalf of defendant,
```

Ron D. Schiff, M.D., Ph.D.

```
1        Monsanto, as well.

2           THE VIDEOGRAPHER:  The court reporter is

3        Kelly Lawton and will now swear in the witness.

4           THE COURT REPORTER:  Doctor, would you please

5        raise your right hand.

6           Do you swear or affirm the testimony you're

7        about to give will be the truth, the whole truth,

8        and nothing but the truth?

9           THE WITNESS:  I do.

10          THE COURT REPORTER:  Thank you.

11          RON SCHIFF, M.D., Ph.D., called as a witness

12     by the Defendant, having been first duly sworn,

13     testified as follows:

14                  DIRECT EXAMINATION

15     BY MR. BRENZA:

16       Q.   Doctor, have you -- have you had your

17     deposition taken on the Internet before?

18       A.   No.

19       Q.   So this is a first for both of us.

20       A.   That's correct.

21          THE WITNESS:  And I'm curious about one

22        thing.  In the gallery, there is one rectangle

23        that is labeled "witness capture."  I don't know

24        who that is or what that is, and I would

25        appreciate an explanation, please.
```

Ron B. Schiff, M.D., Ph.D.

```
 1              THE VIDEOGRAPHER:  That is my recording

 2         device to record the video for this conference,

 3         showing your face.

 4              THE WITNESS:  Thank you.

 5    BY MR. BRENZA:

 6         Q.   You've had your deposition taken dozens of

 7    times, right?

 8         A.   A couple of dozen, yes, sir.

 9         Q.   And so I'm not going to go over the rules.

10              You understand the rules of a deposition

11    generally, right?

12         A.   I do.

13         Q.   The one thing I will ask before we move

14    forward as a sort of ground rule is if you don't

15    understand a question, will you tell that to me so I

16    can rephrase it or ask it again?

17         A.   Yes, sir.

18         Q.   Okay.  And if you don't -- if you don't say

19    anything, I'm going to assume that you understood my

20    question.

21              Is that fair?

22         A.   Yes, it is.

23         Q.   Okay.  So let's begin with your background.

24              Currently -- well, did you -- did you retire

25    from seeing patients in 2015?
```

Ron B. Schiff, M.D., Ph.D.

1      A.   Correct.  May of that year.

2      Q.   So let's -- since May of 2015, what has your

3   work comprised?

4      A.   I have done medical/legal consulting in three

5   different areas:  One is medical liability, which is

6   the largest number of cases; the next is products

7   liability, or toxic torts; and the third is patent

8   litigation, which is perhaps the most intensive and

9   emersive of those three.

10      Q.   Do you have cases involving each of those

11   areas going right now?

12      A.   I do not have an active plaintiff -- I'm

13   sorry, an active patent case at this time.  I think

14   the other two areas are, in fact, active.

15      Q.   Okay.  So -- and the first one, you said

16   medical liability, that's -- is that brightly thought

17   of as medical malpractice-type litigation?

18      A.   Or medicine negligence, but yes.

19      Q.   And do you -- do you generally --

20           I'm sorry.  Were you finished?

21      A.   Yes.

22      Q.   Is that -- do you generally testify on behalf

23   of a -- an individual who claims that they were

24   injured by their doctor?

25      A.   The vast majority of my medical liability

1  work has been on behalf of the -- of the -- has been

2  on behalf of the defendants.

3      Q.  On behalf of the defendants.  So on behalf of

4  doctors?

5      A.  Yes.  Or healthcare institutions, but yes.

6      Q.  So you said you also have some products

7  liability and toxic tort litigation.

8          What's in your portfolio of that kind of

9  litigation right now?

10     A.  Active cases have to do with glyphosate

11  Roundup with benzene and with polychlorinated

12  biphenyls.

13     Q.  Okay.  Is that it?

14     A.  Well, there is another group of cases that

15  have to do with other petroleum industry exposures,

16  including the Deep Water Horizon Gulf oil spill and

17  entering discussions about working on some

18  trichloroethylene cases.

19     Q.  But those last two, you haven't got active

20  cases going yet?

21     A.  With respect to the Deep Water Horizon Gulf

22  oil spill, I have reviewed medical records, and I

23  have had a number of conferences with the attorneys

24  involved.  I have not written any reports, nor been

25  asked to testify.

1    Q.   And your work in that -- for the Deep Water

2    Horizon litigation, is that on behalf of individuals

3    who claim to have been hurt by exposure to petroleum?

4    A.   That's correct.

5    Q.   So you represent the plaintiffs in that

6    litigation?

7    A.   It's not just the petroleum or the oil

8    products; it's also possible injury due to exposure

9    to the dispersants that were used.

10   Q.   Okay.  But in any event, you're basically

11   testifying for the plaintiffs in that litigation --

12   A.   Yeah.  I haven't testified yet, but I have

13   been retained by plaintiff's attorneys in that case.

14   Q.   Okay.  Let's go to the other three areas you

15   mentioned.  Glyphosate -- let's start with the

16   glyphosate/Roundup, since that's what we're -- this

17   case is about.

18        Have you testified in four or five other

19   glyphosate/Roundup-type cases?

20   A.   Four depositions.  No trial testimony.

21   Q.   So this is your fifth today?

22   A.   That's correct.

23   Q.   And each of those cases, you testified on

24   behalf of the plaintiff that said they got -- they

25   were hurt by glyphosate?

```
 1          A.    Also correct.

 2          Q.    And each of those cases you've -- you came to

 3    the opinion that glyphosate caused non-Hodgkin's

 4    lymphoma in the individual that you were reviewing?

 5                MS. FREDONA:  Objection; form.

 6                THE WITNESS:  Sorry.

 7          A.    Yes, I did.

 8          Q.    Have you ever had a glyphosate case where you

 9    looked at it and concluded that glyphosate didn't

10    cause the cancer of the plaintiff?

11          A.    I have not.

12                I'm happy to explain the reason for that

13    though.

14          Q.    If you have a reason, yeah, I mean, I -- go

15    ahead.

16          A.    The attorneys in the glyphosate litigation

17    have only provided me with cases where there has been

18    what I would regard as extensive Roundup exposure; no

19    one whose exposure was limited to eating a bowl of

20    Cheerios once or twice a week.  All was much more

21    extensive than that.

22          Q.    Okay.  So you believe in each of the cases

23    you've seen, they were cases involving extensive

24    Roundup exposure?

25          A.    Those are the only kinds of cases that I've
```

Ron D. Schiff, M.D., Ph.D.

1    been sent thus far.

2        Q.   And in every single one of those cases, you

3    concluded that it was Roundup that caused cancer, not

4    anything else in the world?

5        A.   No, I didn't say that.

6             I concluded that it was a substantial factor

7    in causing or contributing to cause the non-Hodgkin

8    lymphoma.

9        Q.   Okay.  But you've never looked at a case and

10   said, you know, this person had other risk factors

11   that probably caused their cancer, rather than

12   Roundup.

13            You never reached -- you never reached that

14   conclusion, right?

15       A.   That's also not correct.

16            In each case, I have taken into account other

17   risk factors, whether causative or not, and I have

18   dealt with that in my differential etiological

19   analysis.

20            The point is that diseases in general, and

21   cancers in particular, certainly may be

22   multifactorial.  There may be more than one

23   identifiable cause.  The causes or potential causes

24   do not negate or even mitigate each other, and,

25   therefore, you can have a disease, cancer or

1    otherwise, that is caused by more than one factor.

2        Q.   Let me rephrase the question then.

3            All the Roundup cases you've litigated -- or,

4    you've testified about, you've found that Roundup was

5    a substantial factor in causing the cancer of every

6    one of those plaintiffs?

7        A.   That's correct.

8        Q.   Okay.  How about benzene?  Is your testimony

9    in those cases, your benzene cases, similar to

10   Roundup in that you usually testify on behalf of the

11   plaintiff?

12       A.   Yes.

13       Q.   Have you ever testified on behalf of the

14   defendant in a benzene case?

15       A.   I have not.

16       Q.   Did you -- in every one of the benzene cases

17   in which you've testified, did you conclude that

18   benzene was a substantial factor in injuring the

19   plaintiff?

20       A.   Yes.

21       Q.   What's the injury that's -- you've concluded

22   is attributable to benzene?

23       A.   The majority of the benzene cases that I have

24   worked on have involved myelodysplastic syndromes.

25   Those are myeloid malignancies of the bone marrow, as

 1     opposed to non-Hodgkin lymphoma, which is a lymphoid

 2     malignancy of the lymph tissue.

 3              I have had one lymphoproliferative malignancy

 4     in benzene in which I was involved.  That was the

 5     very first one.

 6       Q.   And even in that one, you found that benzene

 7     was a substantial factor in causing that cancer?

 8       A.   I believed that it was.  The decision went

 9     the other way in court.

10       Q.   Okay.  Is the same thing also true with

11     respect to your work on PCBs, that you usually

12     testify on behalf of the plaintiff?

13       A.   Yes.

14       Q.   Have you testified in about 16 PCB cases?

15       A.   I don't know the exact number, but that

16     sounds roughly accurate.

17       Q.   And in each of those cases, you've testified

18     on behalf of the plaintiff, right?

19       A.   Yes.

20       Q.   And every one of those cases you found that

21     PCBs was a substantial factor in injuring the

22     plaintiff, right?

23       A.   Yes.

24       Q.   What's the injury that you opined was caused

25     by PCBs?

Ron D. Schiff, M.D., Ph.D.

```
 1        A.   In the PCB litigation, in each case the

 2   plaintiffs developed a non-Hodgkin lymphoma of

 3   different subtypes.

 4             In one case there was also a malignant

 5   melanoma, for which IRAC found there was sufficient

 6   evidence of PCB causation.  However, that was outside

 7   the scope of the litigation, and I was not given the

 8   opportunity to testify about the association between

 9   PCB exposure and malignant melanoma.

10        Q.   Is the NHL, the non-Hodgkin's lymphoma that

11   you've attributed to PCBs, is that the same injury

12   that you attribute to Roundup in this litigation?

13             MS. FREDONA:  Objection; form.

14             THE WITNESS:  Sorry.

15        A.   Yes.

16        Q.   And in each of those PCB cases where you

17   found that the PCBs caused non-Hodgkin's lymphoma,

18   did you conclude that the PCBs were a substantial

19   factor in causing the plaintiff's non-Hodgkin's

20   lymphoma?

21        A.   I did.

22        Q.   Did you ever -- have you ever had a PCB case

23   where you concluded that the plaintiff's

24   non-Hodgkin's lymphoma wasn't caused by the PCBs?

25        A.   I have to answer that question with a
```

Ron D. Schiff, M.D., Ph.D.

1    qualification.  One of the plaintiffs for whom I

2    worked had most of his exposure outside the United

3    States before he immigrated here.  This was an issue

4    for me, and I brought it up to plaintiff's counsel.

5    But nonetheless, they wished to proceed because, of

6    course, you cannot distinguish which phase of the

7    exposure in a person's lifetime is responsible for

8    the disease that he or she ultimately developed.

9         But that had more to do with whether Monsanto

10   was the likely manufacturer, and I could not offer an

11   opinion about that.

12        Q.   Getting back to the question I asked you:

13   Did you ever have a PCB case where you concluded that

14   PCBs didn't cause the non-Hodgkin's lymphoma of the

15   plaintiff you represented?

16        A.   No.

17             And part of the reason for that is that in

18   the PCB litigation, we had exposure assessments based

19   on biospecimens.

20        Q.   And by those exposure assessments, that means

21   you were able to detect PCBs in the body of each of

22   your plaintiffs?

23        A.   That's correct.

24        Q.   You don't have anything like that for

25   Roundup, do you?

```
 1       A.    No.

 2             MS. FREDONA:  Objection.

 3   BY MR. BRENZA:

 4       Q.    You don't have any evidence whatsoever that

 5   Roundup was or ever was in the body of Mr. Karman,

 6   right?

 7             MS. FREDONA:  Objection; argumentative.

 8       A.    The answer to that is that individuals with

 9   occupational or nonoccupational glyphosate exposure

10   have been found to have glyphosate in the blood and

11   in the urine indicative of absorption.  Those data

12   were not obtained on Mr. Karman or on any other

13   plaintiff for whom I have reviewed the records.  But

14   that appears to be an accepted part of the mechanism

15   of the absorption, distribution, metabolism, and

16   excretion of glyphosate.

17             So the fact is, there are no biospecimens

18   available, and exposure assessments have to be based

19   on considerations of how frequently and for how long

20   that individual plaintiff was exposed.

21       Q.    So just to put that in sort of plain English,

22   you don't have any biological test showing that

23   Roundup or glyphosate was ever in the body of

24   Mr. Karman, right?

25             MS. FREDONA:  Objection.
```

Ron D. Schiff, M.D., Ph.D.

1      A.   I also have no data indicating that he had no

2  glyphosate accumulation in his body.  That type of

3  data is not generally available for anyone.

4      Q.   Could you answer the question I just asked

5  you.

6           Do you have a test that shows that Mr. Karman

7  ever had glyphosate or Roundup in his body?

8      A.   I have no test --

9           MS. FREDONA:  Objection.

10     A.   I have no test that demonstrates that he

11 either did or didn't have glyphosate in his body.

12 There is no test like that that's widely applicable

13 or available.

14     Q.   Okay.  So your understanding of Mr. Karman's

15 exposure is based on your extrapolation, we'll say,

16 from what you understand his use of the product was,

17 right?

18     A.   Well, that's not extrapolation.  It's based

19 directly on my understanding of his use of the

20 product.

21     Q.   Okay.  Your understanding of -- it depends on

22 Mr. Karman's use of the product, right, in this case?

23           MS. FREDONA:  Objection; form.

24 BY MR. BRENZA:

25     Q.   And your knowledge of Mr. Karman's use of

1    Roundup comes entirely from the testimony of his

2    widow, right?

3        A.    That's the only source I have, yes.

4        Q.    And her knowledge of Mr. Karman's use of

5    Roundup comes from once in awhile noticing that he

6    was using Roundup in their yard?

7            MS. FREDONA:  Objection; form; argumentative.

8        A.    She was questioned extensively about it under

9    oath under penalty of perjury.  I -- and she was

10   questioned repeatedly while defense counsel looked

11   for internal inconsistencies in her testimony.

12           I did my best putting that together,

13   recognizing that it was not the direct testimony of

14   the decedent, but I was able to satisfy myself that I

15   was getting a consistent, precise, and accurate

16   picture.

17       Q.    Well, Mrs. Karman didn't keep a log of every

18   time her husband used Roundup, did she?  She didn't

19   say anything like that at her deposition.

20           MS. FREDONA:  Objection.

21       A.    In my experience, most plaintiffs don't and

22   indicate that even when testifying for themselves.

23       Q.    And just to stick with Mrs. Karman, she

24   didn't keep any records whatsoever of her husband's

25   use of Roundup?

```
 1              MS. FREDONA:  Objection.

 2         A.   Nor would I have expected her to.

 3         Q.   And she didn't say that she watched him apply

 4    Roundup every time he used it, did she?

 5         A.   I don't remember what she said dealing

 6    specifically with that point.

 7         Q.   Do you know how much Roundup Mr. Karman used

 8    over the course of his life?

 9         A.   In terms of the quantity of Roundup, I do not

10    know that, but I know what the documented usage was,

11    according to Ms. Karman's deposition testimony, and I

12    included that in my report.

13         Q.   Did you -- did you perform an exposure

14    analysis to figure out how much glyphosate Mr. Karman

15    likely had in his body at any given time?

16         A.   That would be outside the scope of where I

17    would claim expertise.  I would defer that to an

18    industrial hygienist or a toxicologist.

19         Q.   Okay.  So let's talk about what you consider

20    to be your expertise.

21              What is your expertise?

22         A.   Medical oncology and hematology and molecular

23    and cellular biology.

24         Q.   You're not -- you're not an expert in

25    exposure to Roundup or any other substance, right?
```

1     A.   You're referring to exposure assessment.

2   That's correct.

3     Q.   And by "exposure assessment" -- well, why

4   don't you tell me, how do you -- what do you

5   understand "exposure assessment" to mean?

6     A.   I do not perform anything like job exposure

7   metrics or calculations of lifetime exposures using

8   metrics like parts per million or parts per million

9   years.  I look at the available data about the number

10  of times an individual was exposed and under what

11  conditions.  When I have found that there is

12  consistency and appears to be reliability in that

13  data, that's what I include in my opinion.

14    Q.   Is it important to you how much Roundup

15  Mr. Karman used each time he sprayed?

16    A.   I have not seen statistics that use that

17  metric to correlate with risk of developing

18  non-Hodgkin lymphoma.

19    Q.   Does it -- does it -- is it relevant to your

20  opinions how much he used each time?

21    A.   On a common-sense basis, one would think the

22  more the better, but that also applies to the

23  frequency, the duration, and the total number of

24  occasions.

25    Q.   And when you say "the more the better," you

Ron D. Schiff, M.D., Ph.D.

1    mean the more the better for Mr. Karman's lawsuit?

2         A.   No.   I mean --

3              MS. FREDONA:   Objection.

4         A.   Yeah, no.   That's absolutely not what I'm

5    saying.

6              The point is that the greater the degree of

7    exposure, according to any of those metrics, the more

8    likely it is that one would expect that non-Hodgkin

9    lymphoma would result.

10             However, as I indicated a moment ago, there

11   are not many exposure-response data in the published

12   literature.   There's some studies that looked at

13   that, but those are limited relative to the universe

14   of literature.

15             I'm happy to go over that with you in however

16   much detail you would like.

17        Q.   Well, we may get there.   But let's finish

18   what we're doing now.

19             So I'm not -- I'm still not sure I got an

20   answer to the question I asked you.

21             But is it important to your opinions how much

22   Roundup Mr. Karman used each time he used Roundup?

23             MS. FREDONA:   Objection; asked and answered.

24        A.   I do believe I answered that.

25             What was important to my opinion in

Ron B. Schiff, M.D., Ph.D.

```
 1    establishing extensive exposure had to do with how
 2    frequently he applied it, how many years he applied
 3    it, and -- yeah, really those are the two things to
 4    which I had access.
 5        Q.   Okay.  So your opinion is based on the number
 6    of days and the number of years that Mr. Karman used
 7    Roundup?
 8        A.   Yes.
 9        Q.   Not based on how much he used each time he
10    went out and sprayed?
11        A.   That information was not available to me, nor
12    have I -- nor have I seen exposure-response data
13    based on that information in the literature.  So even
14    if I had that data, I would not necessarily have
15    known how to apply it specifically to his case.
16        Q.   Is it relevant to your opinions the manner in
17    which Mr. Karman sprayed Roundup?
18        A.   To an extent, yes.  I mean, you know, the
19    difference between Roundup concentrate that he had to
20    mix or the ready-to-use premixed product, whether he
21    had inhalational exposure only or whether there was
22    also a transdermal component, I do also look at that.
23        Q.   And in this case you concluded that
24    Mr. Karman's exposure was entirely inhalation, right?
25        A.   Yes.  I had to conclude that, because
```

Ron D. Schiff, M.D., Ph.D.

```
 1    Ms. Karman did not give any deposition testimony
 2    about skin contact with the Roundup.
 3           I will point out that every other plaintiff
 4    in whom I have -- for whom I have read deposition
 5    testimony --
 6      Q.   I don't want to hear about other plaintiffs
 7    right now.  I just want you to answer the questions
 8    that --
 9           MS. FREDONA:  Objection.
10      Q.   -- I'm asking you.
11           Did you take into account what -- the vapor
12    pressure of glyphosate?
13      A.   Of course not.
14      Q.   Do you know what the vapor pressure of
15    glyphosate is?
16      A.   I would have no idea.
17      Q.   And so I take it that it is irrelevant to
18    your opinions in this case?
19      A.   Yes, it is.
20      Q.   What about droplet size, is that of any
21    relevance to your opinions in this case?
22      A.   It is not.
23      Q.   How about wind conditions, relevant?
24      A.   Only to the extent that I would expect that
25    on a windy day, someone would be less likely to apply
```

1    Roundup.

2            In regard to these questions, as well as what

3    you asked me earlier, I would say that I found it a

4    surprise that there was no mention of transdermal

5    exposure, because, frankly, I don't know how you

6    avoid it not just in mixing, but in applying Roundup.

7        Q.   But you have no evidence in this case of

8    transdermal exposure, correct?  That's through the

9    skin.

10       A.   There is no deposition testimony that it

11   occurred.  That doesn't mean that I'm satisfied that

12   it did not occur.

13       Q.   I understand that.

14           But my question is:  What evidence are you

15   relying on or not?  And my question is:  Do you have

16   any evidence that Mr. Karman was exposed through his

17   skin?

18           MS. FREDONA:  Objection.

19       A.   You won't let me talk about other plaintiffs,

20   so I will have to repeat, there is no deposition

21   testimony supporting that from Ms. Karman.

22       Q.   And Ms. Karman is the only source of evidence

23   you have about Mr. Karman's exposure?

24           MS. FREDONA:  Objection; asked and answered.

25   ///

```
 1    BY MR. BRENZA:

 2         Q.   Right?

 3         A.   That's correct.

 4         Q.   Did you take into account how many hours

 5    Mr. Karman used Roundup when he sprayed?

 6         A.   I took a look at that, but I focused more on

 7    the number of such occurrences than on the duration

 8    of each occurrence.

 9         Q.   And is the reason you focused on days and

10    years rather than the amount of Roundup that would

11    have been available for Mr. Harmon -- or, Karman to

12    inhale, because that fit the literature in terms of

13    assessing his risks?

14              MS. FREDONA:  Objection; form.

15         A.   Yes.  The literature dealt with those

16    particular metrics, exposure metrics, yes.

17         Q.   Are you confident that just assessing

18    somebody's days and years of Roundup use is a

19    sufficient way to assess their exposure?

20         A.   I am sure that having more information would

21    be better.  But when all of the information that is

22    available is of that type, there is no choice.

23         Q.   Let me back up a little bit.

24              We were -- we never really got through your

25    resume.  You got to the part where you were
```

Ron D. Schiff, M.D., Ph.D.

1    testifying -- prior to your profession as a -- as an

2    expert witness testifier, did you -- did you practice

3    as a medical doctor?

4        A.    Yes, I did, until I retired from clinical

5    practice in May 2015.

6        Q.    Did you see patients with non-Hodgkin's

7    lymphoma?

8        A.    Yes.  Many.

9        Q.    How many?

10       A.    I would say hundreds over the course of my

11   career.

12       Q.    And did you -- in all those hundreds of

13   cases, did you ever tell one of your patients that

14   the reason they had non-Hodgkin's lymphoma was

15   because of glyphosate?

16       A.    The first public health information about

17   glyphosate was coming out only as I retired.  In

18   addition to that, my practice was urban and suburban,

19   not agricultural or rural.  So A, I was not alert to

20   it, and B, I did not have patients that would likely

21   be exposed.

22       Q.    So is the answer to my question that you --

23   that you never told any patients in the hundreds that

24   you saw over your career that Roundup caused their

25   non-Hodgkin's lymphoma?

Ron D. Schiff, M.D., Ph.D.

```
 1              MS. FREDONA:  Objection; form.

 2        A.   Well, I explained the reason for that,

 3    which --

 4        Q.   You never gave me the actual answer to the

 5    question.

 6              Did you ever tell that to one of your

 7    patients?

 8        A.   I did not, because the information was not

 9    available, and I did not have a group of patients

10    that were likely to have the types of exposures

11    involved.

12        Q.   And just going forward -- I mean, it's

13    obviously your choice -- but if you begin your answer

14    with either a yes or a no, it will avoid me having to

15    go back and re-ask the question in order to get a

16    clear answer.

17              You can then add, you know, whatever you

18    think you need to add.  But the way you've answered,

19    you just start explaining why you're not going to

20    give me an answer, and then I have to re-ask the

21    question.

22              So you don't have to respond to this, but

23    just so you know, we can speed things up, if you

24    choose to proceed that way.

25              When were you hired in this litigation?
```

Ron B. Schiff, M.D., PH.D.

```
 1        A.    The first time I was approached about

 2   participating in any Roundup litigation was

 3   November 2018.  This particular litigation group of

 4   plaintiffs, I think, was November of 2020, but I'm

 5   not a hundred percent sure.  I could be -- it could

 6   have been November, it could have been October, but I

 7   think -- I think November is probably my best

 8   estimate.

 9        Q.    So roughly four months ago; is that about

10   right?

11        A.    Three to four, yes.

12        Q.    Three to four months.

13              Who approached you?

14        A.    The Moll Law Group in Chicago, M-o-l-l.

15        Q.    And what did they tell you that they wanted

16   you to do?

17        A.    They wanted me to review some plaintiff cases

18   and advise them about the suitability of proceeding

19   along the road of litigation.

20        Q.    How did the Moll Law Group find you?

21        A.    It was a referral from one of the original

22   firms involved in the first wave of Roundup

23   litigation.

24        Q.    Do you know what firm referred you to the

25   Moll Group?
```

1    A.    Yes.    The Miller Firm.

2    Q.    Miller Shakman, is that -- no.  Different

3    Miller firm.

4          So over the four months that you were -- that

5    you have been retained on this litigation, how many

6    hours have you spent working on the plaintiff's

7    lawsuit for Mr. Karman?

8    A.    I do not know the answer to that.  If you

9    wanted to give me a few minutes, I could add it up.

10         But I have been paid for my work in reviewing

11   the submitted materials and preparing a report.  So

12   there already is an existing paid invoice on that,

13   which I'm sure is accessible to you.

14         Since that payment, I have worked on

15   deposition prep.  I have that sitting next to me at

16   the computer.  And if you want, I can add that time

17   up, up until today, and I can tell you what that

18   amount is.

19   Q.    Yeah, I'd like to know.  If you would do

20   that, that would be great.

21         I don't actually have your original invoice

22   either, at least I'm not aware of having it.  So if

23   you would just include that or tell me what it is,

24   and we can add it together.

25   A.    All right.  So please give me a minute here.

 1        Q.   And I'm just going to talk while you're --
 2   while you're reading.
 3             Just do I understand that the -- that you
 4   were paid sort of a flat rate to review the case and
 5   write a report?
 6        A.   No.  It was hourly.
 7             And I believe that up until the submission of
 8   my report, I was paid for, I think, 23 and
 9   three-quarter hours.
10             Please let me add that up again.
11        Q.   Sure.
12        A.   23 and three-quarter hours up to and
13   including the submission of my report.  Since then --
14   and that was all invoiced and paid.
15             Since then, beginning on February 9, in terms
16   of deposition preparation prior to today, I have
17   spent four hours.
18        Q.   And do I understand -- well, what's your --
19   what's your hourly rate for each of those hours?
20        A.   I believe it is $600, yes.
21        Q.   Let's talk about what you reviewed in that
22   time.
23             What records were you provided?
24        A.   Okay.  What I had was fairly extensive
25   medical records, all of which were summarized and

Ron D. Schiff, M.D., Ph.D.

```
 1    described in my report.  And the only other items
 2    that I had that were not medical records were
 3    Mr. Karman's death certificate and Ms. Karman's
 4    deposition.
 5        Q.   Okay.
 6        A.   All of the medical records that I received
 7    were abstracted and included in my report, and I'm
 8    prepared to answer questions about any aspect about
 9    that.
10        Q.   And, again, I think we will get to that.  But
11    I just want to -- for now, I just want to make a list
12    of what you got.
13            So you -- and I think we have -- we probably
14    both share the same set of medical records.  So
15    that's good.
16            You've reviewed the deposition of
17    Ms. Christine Karman, right?
18        A.   Yes.
19        Q.   Did you -- did you review any other
20    depositions in the case?
21        A.   I have been provided with no other
22    depositions, only hers.
23        Q.   Did you speak with any of Mr. Karman's
24    treating physicians or oncologists?
25        A.   At no time.
```

1      Q.   Have you spoken to anybody about Mr. Karman's

2   case other than lawyers for the Moll Law Firm?

3      A.   No.

4      Q.   Go ahead.

5      A.   The answer is no.

6      Q.   Did you -- were you provided with a set of

7   medical literature by the lawyers from the Moll Law

8   Firm?

9      A.   No.

10      Q.   How did you arrive at the set of literature

11   that you relied on in your report?

12      A.   Attorneys for whom I worked in prior Roundup

13   litigation sent me some references.  Others were

14   sought and procured by me.  And in a couple of cases,

15   there are articles that I was unfamiliar with and

16   that were set in front of me by opposing counsel at

17   my depositions.

18      Q.   You said some of them were sought and

19   procured.  I mean, that means you asked for them, and

20   the lawyers got them for you?

21      A.    In some cases, yes.  In other cases, I did my

22   own literature search.

23      Q.   Which articles were the ones that you sought

24   and procured?

25      A.   Okay.  I'm going -- okay.  I will tell you

Ron D. Schiff, M.D., Ph.D.

```
 1    in -- from my reference list, which has 21 items, I

 2    will tell you specifically which ones I either

 3    obtained on my own or asked attorneys to provide me,

 4    okay?

 5        Q.   Let me -- let me -- let me stop you before

 6    you start doing that, because we need to do some

 7    housekeeping.

 8            MR. BRENZA:  We're going to mark your --

 9        we're going to mark your report as Exhibit 1.

10            (Schiff Exhibit 1 was marked for

11    identification.)

12            MR. BRENZA:  So you might want to just put a

13        one on that.

14            We're going to mark your CV as Exhibit 2.

15            (Schiff Exhibit 2 was marked for

16    identification.)

17            MR. BRENZA:  And we're going to mark your

18        list of prior deposition testimony, Exhibit 3.

19            (Schiff Exhibit 3 was marked for

20    identification.)

21    BY MR. BRENZA:

22        Q.   So if you would write those numbers, if you

23    can, on those documents so you remember which ones

24    they are.  We just need to -- just need -- the court

25    reporter is going to later going to try to
```

Ron D. Schiff, M.D., Ph.D.

1    reconstruct what we're talking about, and we need to

2    mark them.

3        A.    Okay.  Those three I'll remember.

4             For full disclosure, I want to tell you that

5    since my last deposition in the Roundup litigation, I

6    have given exactly one other deposition, which is not

7    on that list.

8             If you have my list of depositions and trial

9    testimony, I am assuming that the last one on it is

10   Caballero versus Monsanto from December 2019.

11       Q.    That's correct.

12       A.    Nine days ago I gave a deposition in one of

13   the benzene cases, which was Vaughn, V-a-u-g-h-n,

14   versus Dade, D-a-d-e, Paper and Bag, et al.  That's

15   the only deposition that I have given during the

16   coronavirus pandemic, and I have not been to court.

17       Q.    Okay.  And just so you're aware, there should

18   be a copy of your report, the -- your CV, and your

19   prior testimony in the materials that I sent you.

20       A.    I do not remember seeing -- I sought -- I saw

21   my CV.  I do not remember seeing my report, but, you

22   know, again, I haven't really had time to go through

23   here.

24             But, no, my report is not in there and my

25   deposition --

1     Q.   It should be there.  It will be one of the

2  top -- one of the things on top, probably right

3  underneath it, deposition notice and a couple smaller

4  things underneath.

5     A.   I have the notice of deposition; again,

6  received today 11:30 local.  I have two copies of my

7  CV.  And, yes, I have depositions and trial

8  testimony.  I do not have my report --

9     Q.   Okay.

10     A.   -- my copy of my report.  I don't have a copy

11  of -- your copy of my report.  But again, I don't

12  care; I don't need that.

13     Q.   Well, yeah, if it comes to that, we'll cross

14  that bridge.

15          I suspect if you go through that stack,

16  you'll find it, but we don't -- right now, it's fine

17  to just proceed.

18          So you added one thing to your deposition

19  testimony that we've marked as Exhibit 3.

20          Does that bring it up to current, complete,

21  accurate status?

22     A.   Yes, sir.

23     Q.   Your CV, is there anything you need to add to

24  that that we've marked as Exhibit 2?

25     A.   Mercifully, that's been unchanged since I

```
 1    retired in May 2015.

 2        Q.   Yeah, that's what worries me is it says

 3    "May 2015" on it.

 4        A.   I'm not -- (garbled audio) -- about that, no.

 5        Q.   There's nothing other than your testimony

 6    from these other lawsuits that supplements that CV,

 7    right?

 8        A.   That's correct.

 9        Q.   And then -- okay.  So then we're going to

10    your report that we've marked as Exhibit 1, and you

11    were going to go through your list of references and

12    tell me which one of the ones that you found and

13    which are the ones that the lawyers gave you.

14        A.   Yes.

15            Okay.  So starting at the top, the Hill

16    reference, which is basically, you know, the first

17    epidemiology reference in the literature, I had that

18    all along.

19            The second, the Swerdlow, is just the front

20    section of the 2016 World Health Organization

21    reclassification of hematopoietic and lymphoid

22    tissues.  I knew about that and I had a journal

23    article discussing it, but I had to ask for that

24    particular thing.  And an attorney, I do not remember

25    who, provided it for me.
```

1          Number 3 is a chapter from the current

2    edition of Cecil Textbook of Medicine, now known as

3    Goldman-Cecil Medicine, and I had that.

4          Number 4 is a chapter in an older, very

5    clinically oriented oncology textbook from 2010,

6    which I also had.

7          Guyton, which is Number 5, was the Lancet

8    publication in anticipation of the full IARC

9    monograph dealing with glyphosate and other

10   organophosphate pesticides, and I acquired that right

11   around the time I was retiring and giving testimony

12   in St. Louis in the PCB litigation.  I do not recall

13   if I found that or if an attorney gave that to me and

14   said, "You might be interested in this."  I just

15   don't recall.  That's from nearly six years ago.

16          The -- Number 6 is the IARC monograph that

17   was, as I said, anticipated by the Guyton publication

18   in the Lancet, and I asked for that at -- no,

19   actually, I have two copies of that.  The first one

20   was sent to me by the attorneys who originally

21   engaged me in Roundup litigation for whom I did only

22   nominal work.  I subsequently acquired another copy,

23   I believe, from The Miller Firm.

24          The next one, Zhang, is a meta-analysis that

25   I believe was also sent to me by The Miller Firm, but

Ron D. Schiff, M.D., Ph.D.

1    I think I also had independently obtained a copy of

2    that based on the literature search.

3            Freeman and Kohles is the meta-analysis of

4    the polychlorinated biphenyl non-Hodgkin lymphoma

5    litigation, and I already had that from my

6    involvement in that litigation provided to me by

7    those attorneys.

8            The same goes for the Lancet oncology

9    article, Lauby-Secretan, et al, which was published

10   in anticipation of the IARC monograph concerning

11   PCBs, and that one was provided to me by the

12   attorneys I worked for in the PCB litigation.

13           The same is true of that IARC monograph 107

14   dealing with the PCBs.  You'll note that unlike

15   glyphosate, there was a three-year interval between

16   when the publication of the monograph was announced

17   and abstracted in the Lancet and when the monograph

18   came out.  That's why Lauby-Secretan was 2013, and

19   Monograph 107 was 2016.

20           The next two, which are Leon and Pahwa, were

21   provided to me by The Miller Firm, if my memory is

22   correct on that.

23           Loomis, which is Reference Number 13 in my

24   list, was an article that I sought out specifically

25   for application to some other work that I was doing

1    outside the Roundup litigation.

2         14 and 15 are two of the epidemiology

3    references, which were also provided to me

4    originally -- actually, they came from two sources:

5    One was The Miller Firm, and one was the firm that I

6    worked for -- or, that hired me originally way back

7    in November 2018.

8         The next one, which is Patel, was one that I

9    requested.  If memory serves, I saw a reference to it

10   in some other material that I had, and I asked The

11   Miller Firm to provide me with that and they did.

12        The next one, which is Morton, that is an

13   article that I had in my files from when it was

14   published in Blood almost 13 years ago.  I already

15   had that.  I was already interested in that copy.

16        Number 18 is another publication from IARC,

17   this one in New England Journal of Medicine.  This

18   represents, as far as I know, all that IARC has

19   communicated about overweight or obesity and cancer

20   risk.  I was interested in that.  I searched for that

21   myself, I found that myself, and so on.

22        The next three, the final three, in other

23   words, Numbers 19 through 21 on my reference list,

24   were all part of a journal of the National Cancer

25   Institute monograph from 2014 dealing with the

Ron L. Schiff, M.D., Ph.D.

1    methods and findings of the InterLymph project.  And

2    as far as I recall, I had all of those, too, before I

3    started working on any aspect of Roundup litigation.

4         Q.   Okay.  Thank you.  That helps.

5              Just one quick question.  What was the -- you

6    mentioned a firm that originally hired you in

7    November of 2018.

8              Do you remember the name of that firm?

9         A.   Yes.  Balaban Law Group in Denver.

10             I'd like to explain that they sent me two

11   cases.  I had a couple of follow-up conversations

12   with them and some e-mails after that.  But as far as

13   I know, they never did any further work in this

14   litigation.

15             And I -- you know, I don't know if they were

16   included in the original settlement, because I

17   thought they were, but they said no.  So I'm still

18   sitting on those two case files.  I have no idea

19   and --

20        Q.   But they were another law firm that

21   represents plaintiffs saying that they were hurt by

22   Roundup?

23        A.   That's correct.

24        Q.   Okay.  So let's continue through your -- what

25   you -- what you looked at.  So we've gone through

Ron D. Schiff, M.D., Ph.D.

1    your literature now.

2            Did you review any of the reports from the

3    EPA?

4        A.    Not in conjunction with working on

5    Mr. Karman's case, no.

6        Q.    Do you know that the EPA has evaluated

7    glyphosate to determine whether it causes cancer?

8        A.    I am aware that there have been a couple of

9    such evaluations.  But the one which was ongoing in

10   approximately 2016, if I have the year correct, was

11   highly controversial.  This was discussed by me in an

12   earlier deposition where I cited to an article in

13   Bloomberg Businessweek, and I was asked if I got my

14   scientific information from Bloomberg.  My response,

15   which I believe was cut off, was not my scientific

16   information, but that it was a perfectly acceptable

17   source for business news, which is what this was,

18   so --

19       Q.    Yeah.  My only question to you Doctor, is:

20   Are you aware that the -- that the EPA has reviewed

21   glyphosate to determine whether it causes cancer?

22       A.    I am aware of it.  But I'm also aware of the

23   controversy surrounding their review.

24       Q.    Are you aware that EPA has reviewed

25   glyphosate numerous times over the last -- over

 1    decades to determine whether it causes cancer?

 2        A.    I already said that, yes.

 3              I'm aware of two particular reviews where

 4    initially I thought that it was implicated, and then

 5    they rescinded that approximately five or six years

 6    ago.  But, yes.

 7        Q.    Well, are you aware that every single review

 8    that the EPA conducted concluded that Roundup doesn't

 9    cause cancer?

10        A.    I am not aware of that, no.

11        Q.    Do you -- are you aware that the EPA decides

12    what warnings companies like Monsanto have to put on

13    labels for Roundup?

14        A.    I am aware that they decided.  But I am also

15    aware, especially through this, of the political

16    considerations that go into that decision.

17        Q.    And are you aware that the EPA has never

18    required a warning that Roundup causes cancer?

19        A.    I am aware that the EPA has never required

20    one.  But that does not mean that there's no evidence

21    that Roundup does not cause non-Hodgkin lymphoma.

22        Q.    But you're aware that every time the EPA has

23    reviewed Roundup, it's concluded that Roundup

24    probably doesn't cause cancer?

25              MS. FREDONA:  Objection; asked and answered.

Ron D. Schiff, M.D., Ph.D.

```
 1        A.   I am not aware of that, no.

 2             And also, my previous response may have been

 3   grammatically incorrect.  So please bear that in mind

 4   when you look at that --

 5        Q.   Well, why don't you correct it.  I'm not --

 6   I'm not sure what you mean by that.

 7        A.   Okay.  Can I ask, please, to have that prior

 8   response read back to me?  It was the one about

 9   whether I was aware that -- it has something to do

10   with whether I was aware that it did not cause

11   cancer.

12             THE COURT REPORTER:  Okay.  The question was:

13        "And are you aware that the EPA has never

14        required a warning that Roundup causes cancer?

15             Answer:  I am aware that the EPA has never

16        required one.  But that does not mean there's no

17        evidence that Roundup does not cause

18        non-Hodgkin's lymphoma."

19             THE WITNESS:  Thank you.

20        A.   There was one extra negative in there.  It

21   should have been that there was no evidence that

22   Roundup causes non-Hodgkin lymphoma.

23             So, you know -- so, yes.  There were too many

24   negative terms in that to be correct, but I got it

25   figured out.
```

1    Q.   So is what you just said the correct answer?

2    A.   What I just said now is the correct answer --

3    Q.   Okay.

4    A.   -- that the EPA did not require labeling

5    about cancer causation, but that doesn't mean that

6    there's no evidence of cancer causation.

7    Q.   But you understand that the EPA decides based

8    on something called the weight of evidence, right,

9    the -- well, let me just stop there.

10         Do you -- well, let me -- let me get -- back

11   up.

12         Do you know what the weight of evidence

13   standard is?

14   A.   I do.  It has --

15        MS. FREDONA:  Object to form.

16        THE WITNESS:  Sorry.

17   A.   It has to do with reviewing all of the

18   available scientific literature.  I --

19   Q.   And you understand the EPA uses the weight of

20   evidence standard to determine whether glyphosate

21   causes cancer, right?

22   A.   So does IARC.

23   Q.   And EPA using the weight of evidence standard

24   concluded that the weight of evidence did not support

25   a conclusion that Roundup causes cancer, right?

Ron D. Schiff, M.D., Ph.D.

1       A.   That was their conclusion.  But how they

2   reached that conclusion has been controversial, and

3   it contradicts the IARC findings from within a year

4   prior.

5       Q.   And when you say "it's controversial," you

6   mean that you disagree with it, right?

7       A.   No.  It means that others disagree with it,

8   and that has made its way into some of the

9   literature.

10      Q.   Well, you disagree with the EPA on this

11  point, right?

12      A.   I do.

13      Q.   And you side with IARC, right?

14      A.   I believe that --

15           MS. FREDONA:  Form.

16      A.   -- yes, I do agree with IARC's assessment in

17  this case.

18      Q.   When you were practicing medicine, did you

19  consult IARC to determine causes of cancer that your

20  patients may or may not have been exposed to?

21      A.   I would not have expected a practicing

22  medical oncologist or a hematologist to have

23  familiarity with IARC.

24           So the answer is no, I did not.

25      Q.   And I take it then that you were not aware of

```
 1    any other practicing oncologist that consulted IARC

 2    in the course of actually practicing medicine?

 3           MS. FREDONA:  Objection; form.

 4      A.   That doesn't mean that there aren't any.

 5    But, no, I have not been aware of any.

 6      Q.   Do you know the procedure that IARC used when

 7    it was reviewing glyphosate?

 8      A.   I do.

 9      Q.   Did IARC -- was it open to the public?

10      A.   I don't know the answer to that.

11      Q.   Did they accept submissions from the public?

12      A.   Also don't know the answer to that.

13           I am not an expert in IARC's -- in the

14    details of IARC's proceedings.  I know the

15    generalities but not the details.

16      Q.   Do you know if IARC entertained criticisms of

17    their decision-making after they had made the

18    decision?

19      A.   Yes, they did.

20      Q.   Did they change their -- or, did they respond

21    to those criticisms in any way?

22      A.   I believe so, yes.

23      Q.   How did they -- how, in your opinion, did

24    they respond?

25      A.   There were some publications from people who
```

Ron D. Schiff, M.D., PH.D.

1    participated in the working group that responded to

2    the outside criticisms.

3        Q.   Was there a procedure where IARC would

4    formally hear criticisms of their conclusions and

5    reevaluate whether they might have made a mistake?

6        A.   I am not familiar with their mechanism for

7    that.

8             However, I also do have two articles prepared

9    by IARC itself dealing with the criticisms of the

10   evaluation of glyphosate and --

11       Q.   But -- oh, I'm sorry.

12       A.   -- of their records in general.

13       Q.   I understand that you may have articles where

14   people who served on IARC tried to defend their

15   decisions.

16            But my question was:  Is there a formal

17   procedure for them to hear criticisms and respond to

18   them in case they might have made a mistake?

19       A.   The fact that I have two communications

20   produced specifically by IARC suggests that there is

21   such a procedure.  I am not familiar with the

22   mechanisms of it.

23       Q.   What -- are you -- are the articles you're

24   relying on in your -- in your list of materials?

25       A.   Of course not.  That was not what I was asked

1    to opine on by the attorneys who hired me --

2        Q.   Okay.  So you're just adding that to your

3    opinion now?

4        A.   No.  These were things that I became familiar

5    with and answered questions about during prior

6    aspects of the Roundup litigation.

7             I certainly did not expect to be questioned

8    about the internal IARC protocols as part of today's

9    deposition.  But these are things that I'm familiar

10   with and I did look at previously.

11       Q.   Could you -- could you read the titles of the

12   articles that you're referring to now --

13       A.   Yes.

14       Q.   -- so we can have them on the record?

15       A.   Yes.  I have two, and both of them were cited

16   in my prior deposition testimony.

17            The first, under the heading International

18   Agency for Research on Cancer, World Health

19   Organization, is entitled "Originally Prepared As a

20   Confidential Briefing for Governing Counsel Members

21   on IARC Evaluation of Glyphosate and Requests for

22   Meetings From Crop Life."  That's the first one.

23       Q.   And that's an article?

24       A.   It is a communication directly from IARC.

25   It's -- it was produced by IARC.  It's not from a

1    journal.

2        Q.   And who was it sent to?

3        A.   I do not know the answer to that.  It was a

4    statement that they put out, and I do not know to

5    whom they originally sent it.

6        Q.   I mean, just from the title you read, it

7    sounds like talking points.  It doesn't sound like an

8    article.

9        A.   It might be.

10           But it is their response, and it seems to

11   indicate that there's a mechanism for such a

12   response.

13       Q.   Well, you can't really tell if it's just them

14   trying to defend what they've already decided, rather

15   than legitimately taking into account other points of

16   view, right?

17       A.   No.  That's absolutely incorrect.

18           With everything I do, I read it independently

19   and make up my own mind about it.  If I thought that

20   there was something that IARC was putting out there

21   that I disagreed with, I would have gone crying to

22   the attorneys about that.

23           But I did not find anything disagreeable or

24   objectionable in that or in the other publication --

25   not publication -- the other communication from IARC,

1    which I'm happy to give you the title of as well.

2        Q.   Please do.

3        A.   This one is entitled "Briefing Note for IARC

4    Scientific and Governing Counsel Members" prepared by

5    the IARC director and dated January 2018.

6        Q.   And I'm just going to ask that you produce

7    copies of both of those.  I'm sure your lawyer will

8    work -- can work with you to do that.  But I want

9    to -- I want to make sure I have what you're relying

10   on as what you understand to be IARC's procedure for

11   responding to criticisms.

12       A.   I'm happy to do it.

13            These are also cross-reference --

14   cross-referenced in my earlier deposition in the

15   Roundup litigation.  In other words, these should

16   both be part of exhibits from those.

17            But I'm happy to provide them to the Moll Law

18   Group.

19       Q.   Okay.  Did you review reports from any other

20   public health agencies from countries outside the

21   United States?

22       A.   I have done a little bit of independent

23   literature search for that or search for

24   communications about it.  Haven't looked at that now

25   in probably a year, maybe a little bit more.

Ron B. Schiff, M.D., Ph.D.

```
 1              But I have identified a listing of countries
 2     that were -- that had a ban or restricted the sale or
 3     use of glyphosate herbicides.  What I have from that
 4     is just from the Internet that's dated November 2019,
 5     but that is my country listing for that.
 6        Q.   Did you know that the public health agency
 7     that's in charge of the European Union reviewed
 8     glyphosate to determine whether it caused cancer?
 9        A.   No.
10              I have not systematically followed any of
11     this.  I have only looked for an overview, and it
12     appears that when I looked for that overview, it was
13     15 months ago.
14              So if a component of the European Union has
15     done anything about that since, I am not familiar
16     with it.
17        Q.   No, this would not be in the last 15 months.
18     This has -- this has happened over a matter of years.
19        A.   If you would like to give me the details of
20     that, I'm happy to listen and comment.
21        Q.   Well, I just want to find out what you know
22     and what you're relying on.
23              Did you -- did you know anything about the
24     public health agencies that decide whether glyphosate
25     can be used in the EU, what they decided?
```

1          MS. FREDONA:  Objection; form.

2      A.    I'm aware that Austria, Belgium, Czech

3   Republic, and Denmark have restricted or banned the

4   importation, sale, and/or use of glyphosate-based

5   herbicides.  That's very superficial information.

6   Again, it's from 15 months ago.  But all of those are

7   European Union countries.

8      Q.    And when you say "restricted," you -- you're

9   not -- that could be as simple as requiring

10   protective equipment when it's being sprayed or

11   determining what time of the year it can be used,

12   things like that, right?

13      A.    Well, no.

14          In Belgium, for example, sale to

15   nonprofessional users was banned.  That's -- I would

16   say that was a restriction.

17          Czech Republic, in about the same time frame,

18   put strict restrictions on the use of glyphosate and

19   banned preharvest spraying.  I believe that was

20   called green burndown.

21      Q.    And that's different than using Roundup to

22   spray on weeds, right?

23      A.    It is.  But it's still a use of it.  It's

24   still an agricultural use.

25      Q.    But it means, in that particular instance,

1    Roundup was still available to use on weeds, right?

2        A.   I don't know the answer to that.

3            These are very superficial explanations about

4    some countries.  I have not sought out additional

5    information about that.  I --

6        Q.   Okay.

7        A.   -- would not have imagined that I would be

8    expected to provide expert testimony on regulatory

9    decisions concerning glyphosate from around the

10   world.

11       Q.   Well, is it important to you that experts in

12   public health and safety and pesticides have reviewed

13   Roundup from around the world and decided that it

14   doesn't cause cancer?  Is that -- is that relevant to

15   your opinions in any way?

16       A.   I'm interested in --

17           MS. FREDONA:  Objection.

18       A.   I'm interested in learning as much as I can

19   about all of these opinions.  But the opinions on

20   which I rely are heavily geared toward IARC and above

21   and beyond IARC my reviews of the original

22   literature.

23       Q.   What about, say, Canada?  Did you review

24   anything from the public health agencies in Canada?

25       A.   I reviewed McDuffie, which is an original

Ron D. Schiff, M.D., Ph.D.

```
1       research article from there.
2              I did not look up any public health
3       information from Canada --
4          Q.   Okay.  McDuffie is a researcher.  She
5       doesn't -- she's not a public health official, right?
6          A.   Exactly.
7              So the researchers provide the original,
8       unfiltered data.  Public health agencies can
9       interpret it and make recommendations however they
10      see fit.
11             I have to make my opinions based on what the
12      scientific evidence looks like to me.  You might say
13      I used my own weight of evidence approach.
14             But among the authorities, I would point out
15      that IARC, with its weight of evidence approach, is
16      assiduous in saying that they do not make regulatory
17      decisions or recommendations.  They only assess and
18      communicate the scientific evidence.  That's what's
19      important to me.
20         Q.   Did you review any studies on glyphosate or
21      Roundup from the Australian public health officials?
22             And here I'm just looking for a yes or a no.
23         A.   No, no.
24         Q.   What about Japan?
25         A.   No.
```

1          And quite frankly, I also don't see what that

2    has to do with Mr. Karman.

3          Besides which, in my report I also made clear

4    that I was deferring my comments about general

5    causation to the general causation experts that have

6    been retained in this litigation or in other Roundup

7    litigation.

8          Now, I --

9    Q.   Okay.

10   A.   -- and say that, but I'm always put through

11   the ringer about offering general causation opinions

12   even though I do not hold myself out as the general

13   causation expert having to do with glyphosate

14   causation of non-Hodgkin lymphoma.

15   Q.   Well, but you're giving opinions about

16   whether glyphosate can cause cancer, aren't you?

17   A.   I'm being asked to give opinions of a general

18   causation nature.  I'm happy to do it, but I want to

19   qualify that this is not how I define my specific

20   role in Roundup litigation.

21          I'd like to read you from Section 8 of my

22   opinions in my report.  "I am deferring a detailed

23   discussion of general causation regarding the

24   association between Roundup and non-Hodgkin lymphoma

25   to plaintiff's present or past general causation

Ron B. Schiff, M.D., Ph.D.

```
1    experts.  I will highlight only those aspects which

2    would be of interest to clinicians, especially

3    medical oncologists and hematologists caring for

4    patients with non-Hodgkin lymphoma."

5            That represents my stance on that.

6            Now, I try to make that point every time, and

7    I have always been asked to comment on and interpret

8    and opine about the general causation literature.

9            So I'm prepared to do that, although I don't

10   think that's my role in this litigation.

11   Q.   Would you -- would it be fair to say that

12   it's outside of your expertise?

13           MS. FREDONA:  Objection.

14   A.   I would say that defense counsel has

15   repeatedly included that in my areas of expertise by

16   consistently questioning me about it, and in each

17   case, I have been prepared to answer the questions.

18           So at one point, you know, they would say:

19   Why didn't I -- why did I not answer questions about

20   general causation?  And then when I did answer it,

21   they would say, well, I'm not a general causation

22   expert.

23           I think that in this case and other cases

24   that I've been involved in, my report speaks for

25   itself, including those qualifications.
```

1          If you'd like to ask me more about general

2     causation, I will.  My reliance will be on the

3     scientific data.  It won't be on the reactions of

4     various and sundry regulatory and government agencies

5     around the world to the scientific data.  I'm much

6     less interested in that.

7          Q.   But why are you not interested in what the

8     experts in public health and epidemiology that work

9     for public health agencies have to -- have to say?

10         A.   Because I'm interested in the data, and I'm

11    interested in the weight of evidence approach,

12    especially put forward by IARC, whose methods are

13    transparent and where I have read both sides of the

14    issue.

15         Q.   Is it important to you that in relying on

16    IARC that their methods are transparent?

17         A.   Sure.  It makes it better.

18         Q.   And by "transparent," do you mean that the

19    procedures that they use are open to the public and

20    possess characteristics of error correction?

21         A.   I still don't know about to what extent

22    they're open to the public.  I do know that they

23    invite observers to the working group that are not

24    participants in the working group, that industry is

25    represented, and that the members of the working

1    group who analyze the scientific evidence and apply

2    the weight of evidence approach are independent.

3    They are not IARC people.  They are independent

4    scientists.

5         Q.   How do those scientists get selected to serve

6    on IARC?

7         A.   I believe that, first of all, they can

8    volunteer for it, and I believe that sometimes IARC

9    will reach out to them.  I don't know that off the

10   top of my head.  Again, I'm not an expert in the

11   internal processes of IARC.  I'm familiar with the

12   generalities of it.  And I know that the working

13   group and its membership are independent.

14        Q.   Let me just -- so you've described the areas

15   that you consider yourself to be an expert.

16             Let me just go through a list of areas where

17   you may agree with me that you're not an expert, and

18   we can -- well, let's just -- let's just go through

19   them.

20             Do you have any legal training?

21        A.   No.

22        Q.   Are you an expert in the law?

23        A.   No.

24        Q.   Are you an expert in herbicides?

25        A.   No.

Ron D. Schiff, M.D., Ph.D.

```
 1        Q.    Have you ever studied glyphosate

 2   specifically?

 3        A.    No --

 4        Q.    Have you ever published any --

 5        A.    -- this litigation.

 6              THE COURT REPORTER:  I didn't hear that,

 7        sorry.

 8   BY MR. BRENZA:

 9        Q.    I'm sorry, I spoke over you.  Could you

10   repeat that?

11        A.    Except in preparation for this litigation.

12        Q.    Okay.  And the publications you've written in

13   this litigation are expert reports to help plaintiffs

14   sue Monsanto, right?

15              MS. FREDONA:  Objection.

16        A.    I don't regard those as publications at all,

17   and I don't regard those at all as outcome-driven, as

18   you are implying.

19              I have reported on medical facts and on my

20   opinions of those medical facts and certain ancillary

21   information such as literature references,

22   depositions, and so forth.

23        Q.    Well, what is it that you published in

24   connection with your work on Roundup?

25              I'm not -- I don't understand your answer.
```

1        A.   I have never published anything on Roundup.

2        Q.   Okay.  I thought you said you had in

3    connection with this litigation.  I --

4        A.   No.

5        Q.   I must have misunderstood you.

6        A.   What I have produced in connection with this

7    litigation have been my reports, which, again, are

8    not outcome-driven in any sense.

9        Q.   Well, they're not outcome-driven, but every

10   single time you've produced a report, you've

11   concluded that Roundup caused the cancer in the

12   plaintiff that was at issue, right?

13            MS. FREDONA:  Objection; asked and answered;

14       argumentative.

15       A.   Every single plaintiff for whom I have been

16   asked to review records has had a history of

17   extensive exposure and has had evidence of

18   non-Hodgkin lymphoma.

19       Q.   And so is the answer to my question yes, that

20   every single time you've produced a report in this

21   litigation it's concluded that the plaintiff --

22   plaintiff's cancer was caused by Roundup?

23            MS. FREDONA:  Same objection.

24       A.   What I am inferring from your question --

25       Q.   Just answer -- start with a yes or a no.

Ron D. Schiff, M.D., Ph.D.

```
 1        A.    The answer is yes.

 2              But I'd like to give you my explanation of

 3    that, because what I'm inferring from your question

 4    is that the outcome of my report is somehow

 5    predetermined, which it is not.

 6        Q.    Did you ever publish anything on the risk

 7    factors for non-Hodgkin's lymphoma?

 8        A.    The answer to that is yes.  I have a

 9    publication dating back to the 1980s on HTLV-1 in

10    mature T-cell non-Hodgkin lymphoma.

11        Q.    Other than that, have you published on --

12    anything on risk factors for non-Hodgkin's lymphoma?

13        A.    I have not.

14        Q.    Have you ever published anything on

15    herbicides or Roundup specifically?

16        A.    No.

17        Q.    Have you published on other toxic substances?

18        A.    No.

19        Q.    Have you ever conducted a prospective

20    statistical epidemiological study?

21        A.    Reverting back to HTLV-1, we did an analysis

22    of HTLV-1 prevalence in the blood donor population

23    among the blood banks of coastal South Carolina.

24    That qualifies, I believe, as an epidemiologic study.

25    It has nothing to do with the present legal matter,
```

```
 1    and I have, you know -- my career exclusively after

 2    1992 has been clinical.

 3        Q.   Okay.  So there's -- you've never done a

 4    prospective epidemiological study like -- involving

 5    Roundup or any other herbicides, right?

 6        A.   That's correct.

 7        Q.   Have you ever designed a prospective

 8    statistical epidemiological study?

 9        A.   Well, I believe I designed or participated in

10    the design of the blood bank study that I just

11    mentioned --

12        Q.   Okay.

13        A.   -- with pesticides, however.

14        Q.   Okay.  And other than that one time, any

15    other times that you designed a study?

16        A.   No.

17        Q.   Have you -- do you treat -- when you were

18    treating patients, did you treat them for toxic

19    exposures?

20        A.   Yes.  I believe that it would come up that I

21    had patients whose cancers and blood diseases were

22    caused by toxic exposures.

23        Q.   Well -- but I'm talking about sort of as a

24    toxicologist, acute toxic phenomenon.

25        A.   I suspect the line, the way I've seen some
```

Ron E. Schiff, M.D., Ph.D.

```
 1    bone marrow failure syndrome cases that were due to
 2    acute exposures.  I don't remember the details of
 3    that right now.
 4        Q.   Do you consider yourself an expert
 5    toxicologist?
 6        A.   I am not a toxicologist.
 7        Q.   Are you an expert in animal studies?
 8        A.   I am not.
 9        Q.   Are you an expert in genotox -- genotoxicity
10    studies?
11        A.   I haven't done them, but I believe that my
12    background in molecular and cellular biology enables
13    me to interpret the literature with reliability.
14        Q.   Are you an expert in oxidative stress?
15        A.   The same answer for that.
16        Q.   Is non-Hodgkin's lymphoma considered to be a
17    common cancer?
18        A.   Unfortunately, that's a question that depends
19    on one's perspective.  I believe that it's now about
20    Number 5 on the list of cancer diagnoses in the
21    United States.
22             You might be a primary care practitioner and
23    rarely see a case, but if you're a medical oncologist
24    or a hematologist who does not restrict your practice
25    to a certain disease or a group of diseases, you will
```

1    probably see plenty of cases.

2        Q.   Is that because it disproportionately strikes

3    when people are elderly?

4        A.   Well, certainly ageing is a risk factor for

5    the development of non-Hodgkin lymphoma; that's no

6    question about that.  But, you know, it all

7    depends -- it also depends in the context of your

8    original question about your practice setting.

9        Q.   You said -- you said it was Number 5.

10            So putting aside your practice setting, it's

11   still considered to be a relatively common cancer,

12   right?

13       A.   Well, it's -- you know, it's not as common as

14   lung cancer or prostate cancer or skin cancer or

15   breast cancer, but it's getting closer to that

16   category.

17            And, you know, and one of the things that you

18   provided was incidence data going back at least

19   45 years, which actually shows the trend in the U.S.

20   population, as reported by the SEER, S-E-E-R,

21   program.

22       Q.   Is the SEER program, is that a good program?

23       A.   It is.

24            I participated in that during my clinical

25   practice when I was chair of the cancer committee at

1    University Community Hospital and its successor,

2    Florida Hospital, Tampa.  It's now been renamed

3    again, and if you want, I can give you that name.

4    But that's what it was called when I was there.

5         Q.    Is the SEER data accurate and reliable?

6         A.    Well, it all depends on what is input by the

7    individual cancer registries.

8              But, you know, I do believe that they have

9    statistical validation procedures for it, they have

10   very close follow-up for it, and the cancer

11   registrars who contribute data are highly trained.

12   So in that regard, I do believe that it's a reliable

13   source of general population statistics outside of

14   the peer-reviewed published literature.

15        Q.    When you said that you participated in that,

16   what was your role in participating in that SEER

17   data?

18        A.    As chair of the cancer committee, oversight

19   of the cancer data office was among my

20   responsibilities.

21             All of the data that they accrued and when

22   they submitted it and so forth had to go through me

23   to review.  And then every three years, we had a cite

24   visit by someone from the -- I can't remember what

25   the organization is now -- it's the accrediting

1    counsel for the cancer centers --

2            THE COURT REPORTER:  Doctor, you trailed off.

3        I didn't hear the last part of that.  I'm sorry.

4            THE WITNESS:  Sorry.

5        A.    Every three years we had a cite visit from a

6    professional member, a physician member of the

7    organization responsible for accrediting academic and

8    Community Hospital cancer programs.  So our data was

9    reviewed and discussed in that setting as well.

10       Q.    Just before -- just while it's on my mind, do

11   you know Dr. Bello, by any chance?

12       A.    I have had a couple of patients with

13   Dr. Bello, and I believe that she was an expert in

14   one of the earlier Roundup cases where I provided an

15   opinion and a written report.  I've never met her.

16       Q.    Okay.  Do you have an opinion about her, or

17   not yet?

18       A.    I don't have an opinion that I care to offer

19   in this setting.

20       Q.    Well, if it's going to ever be offered, I

21   want to hear it now, so...

22       A.    Well, you know, we -- I remember that in the

23   case of one patient, we disagreed about the best

24   treatment plans.  But, you know, this is something

25   that we're talking about from ten years ago or more.

1    I cannot come up with what a patient was or what the

2    circumstance was.  And I also remember that I did not

3    agree with her assessment of the Roundup case where

4    she had provided a defense opinion.

5         But, you know, I don't -- I don't remember

6    the details of that.  That would have been something

7    that I worked on over a year and a half ago.

8    Q.   And I understand you disagree with her on

9    these Roundup cases, because you're testifying on

10   opposite sides.

11        With respect to the patient, did that

12   disagreement rise above sort of ordinary professional

13   disagreement or -- and do you infer anything more

14   than that from that situation?

15   A.   No, certainly not.

16        MS. FREDONA:  Object to form.

17   A.   It was -- you know, it was a difference of

18   opinion about how to manage a specific patient.  As I

19   recall, it had to do with the requirement for

20   additional chemotherapy before an autologous stem

21   cell transplant.  So, I mean, we're talking about a

22   technical issue there.

23        On top of that, if and when I'm presented

24   with a defense expert report in the Roundup

25   litigation, which I agree with in total or in part, I

 1     am more than happy to acknowledge that.

 2             I didn't say that I agreed in -- that I

 3     disagreed in total with her report.  I remember that

 4     there was one or more aspects with which I did not

 5     agree.

 6             And if you wanted to give me time to locate

 7     that report and refresh myself, I could probably do

 8     that.

 9             But do I remember something that I was

10     working on with that degree of detail from, you know,

11     fall of 2019?  I'm afraid not.

12         Q.   I'm not going to ask you to do that today.

13     But let's move on.  Let's get back to sort of basic

14     facts of non-Hodgkin's lymphoma.

15             Do you -- do you have the SEER data that I

16     sent to you in the package?

17         A.   It's right in front of me.

18             MR. BRENZA:  Okay.  I'm going to mark that as

19         exhibit -- I think we're up to 4.

20             (Schiff Exhibit 4 was marked for

21     identification.)

22     BY MR. BRENZA:

23         Q.   So we'll just call that Exhibit 4.  If you

24     want to write four on it somewhere, that might be

25     helpful.

1      A.   Okay.

2      Q.   And looking at the third page of Exhibit 4,

3   do you see that there is a chart that charts

4   non-Hodgkin's lymphoma cases from 1975 to 2018?

5      A.   I do.

6      Q.   Does that look, to you, correct as, you know,

7   the -- reflecting the incidence of non-Hodgkin's

8   lymphoma over the preceding decades?

9      A.   I remember seeing before a more pronounced

10  decrease after approximately the mid-1990s.  And,

11  again, that's approximate that I'm seeing here.

12          Here I'm seeing the rate of new cases

13  continuing to increase, albeit more gradually, until

14  almost 2005 and then a very slight decline

15  thereafter.

16     Q.   Just getting to the question I asked:  Does

17  that -- is the chart I've given you an accurate

18  representation of the incidence of non-Hodgkin's

19  lymphoma in the United States from 1975 to 2018, if

20  you know?

21     A.   The answer to that is it looks pretty similar

22  to data that I've seen elsewhere, but not

23  identical in --

24     Q.   Is the -- is the data you've seen elsewhere

25  SEER data, or is it from another source?

1        A.    SEER data.

2        Q.    Well, let's just make do with this.  And if

3    you -- if you have another source of SEER data that

4    you've been using, I'd ask that also get produced.

5    But let's just go with Exhibit 4 for now.

6              Is it fair to say that from 1995 to 2018 the

7    rate of non-Hodgkin's lymphoma has stayed the same or

8    maybe gone down a little bit?

9        A.    That's what it looks like, yes.

10       Q.    Is that consistent with your knowledge of NHL

11   incidences?

12       A.    Yes.

13             But there are many factors that go into that.

14   This is not -- this -- the shape of this curve is not

15   the product of any one specific factor.

16       Q.    I understand that.  But I'm just trying to

17   get the parameters as you see them right now.

18             Looking from 1975 to 1995, there was a

19   gradual increase in the rates of non-Hodgkin

20   lymphoma, right?

21       A.    Well, it was -- yeah, I mean, "gradual" is a

22   value judgment.  It was actually pretty dramatic,

23   representing almost a doubling of the incidence in

24   that time.

25       Q.    And you've said in the past that you thought

1    that was because of PCBs; is that right?

2        A.    I believe that PCBs were a contributing

3    factor.

4              But by the same token, I would not rule out

5    the importance of other things like the HIV/AIDS

6    epidemic improved diagnostic methods and so forth.

7    Diagnostic methods in lymphoma have changed

8    tremendously over the time interval covered on this

9    SEER graph.

10       Q.    And diagnostic methods are important because

11   if you have a better diagnostic, you find more cases,

12   even if they were there all along?

13       A.    Yes.

14             But you also classify them correctly, which

15   has not always been possible.  New diagnostic

16   technologies have contributed to that.

17       Q.    Now, you know that Roundup started to get

18   used in larger quantities in the mid to late 1990s,

19   right?

20       A.    That's correct.

21       Q.    And I think one of your articles that you've

22   relied on says there was a 16 times increase in the

23   amount of Roundup used starting in the mid-1990s

24   through, say, 2006, 2009, somewhere in there?

25       A.    I don't remember which article that was, and

1    I would like for you to point that out to me so I can

2    double-check it, but --

3        Q.   It was the Zhang article.

4        A.   Okay.  So I will look at that --

5        Q.   It's in your -- it's in your stack.

6             MR. BRENZA:  And why don't I just mark it

7        now.  We'll, mark it as 5.

8             (Schiff Exhibit 5 was marked for

9    identification.)

10   BY MR. BRENZA:

11       Q.   This is the Zhang article, Z-h-a-n-g.  And

12   I'm looking at Page 4 of it.

13            Tell me when you're there.

14       A.   I'm on Page 4.

15       Q.   Okay.  Do you see in the first paragraph, the

16   paragraph that's titled 1.1?

17       A.   Yes.

18       Q.   Do you see that?

19       A.   I see the statement in question.  And I'm now

20   looking --

21       Q.   Wait.  Let me just read it.  It says:  "In

22   the United States alone, usage increased nearly 16

23   fold between 1992 and 2009."

24            Do you see that?

25       A.   I do see that.  That's correct.

Ron D. Schiff, M.D., Ph.D.

1      Q.   And you agree with that, right?

2      A.   Well, I'm looking at the reference on which

3   that statement was based, and I have no independent

4   familiarity with the reference.

5           But, you know, I also have no reason to

6   disagree with this statement in the Zhang article.

7      Q.   You rely on the Zhang article for your

8   report, right, your opinions in this case?

9      A.   That's correct.

10     Q.   So looking at the SEER data from 1992 through

11   the present, what we see is not a 16 times increase

12   in non-Hodgkin's lymphoma, but really no increase at

13   all, right?

14     A.   That's implying that glyphosate exposure is

15   the only thing that contributes to the development of

16   non-Hodgkin lymphoma.

17          I can assure you that whatever effect that it

18   is having simply goes into the mix with all of the

19   other factors that cause non-Hodgkin lymphoma.

20     Q.   Well, is it -- do you -- do you consider

21   Roundup to be a very significant factor in the cause

22   of non-Hodgkin's lymphoma?

23     A.   In the case of individuals, I think we can

24   say that.

25          I think in terms of public health, I don't

1    have an answer to that, because I don't know how many

2    individuals or what proportion of individuals have

3    had extensive exposure, enough to trigger an

4    increased risk.  I don't know that.  I don't know

5    that there are data that deal with that.

6        Q.   Well, I mean, looking at the SEER data,

7    that's public health data, right?

8        A.   Exactly.

9        Q.   And that tells you there isn't a change in

10   the rate of non-Hodgkin's lymphoma during the time

11   period that Roundup use goes up dramatically, right?

12       A.   It has -- it is absolutely not a reflection

13   of the prevalence of Roundup use.  We have no idea

14   about that because there are other factors that are

15   going on.

16            That speaks to the differential etiology or

17   the other risk factors of non-Hodgkin lymphoma.

18            Roundup use is certainly in the mix, but, you

19   know, I mean, my role in this is to interpret this

20   for an individual patient or plaintiff, not to opine

21   on what proportion of the total non-Hodgkin lymphoma

22   disease burden in the United States is attributable

23   to Roundup exposure.

24            And I haven't seen any data that speaks to

25   that.

1    Q.   Well, from looking at the SEER data, you

2    could tell that whatever effect you think Roundup is

3    having, it's small, right?

4    A.   It has to be balanced against any changes in

5    exposure to other risk factors.

6    Q.   There are -- there are other -- a lot of

7    other risk factors that are accounting for the vast

8    majority of non-Hodgkin's lymphoma cases, right?

9    A.   I don't know the percentages of those.  We

10   can maybe make an inference from the meta relative

11   risk, as put forward by IARC and by Zhang and by a

12   couple of other publications.

13        So if you want to say that there is a meta

14   relative risk of 1.41 to 1.46 statistically

15   significant, that means that there is an increase in

16   the risk of developing non-Hodgkin lymphoma of 41 to

17   46 percent above the general population.

18        So that means that if you have, just say for

19   example, 145 patients with non-Hodgkin lymphoma, it

20   means that about 45 of them were due to Roundup, and

21   you can't identify which ones.  But that's as far as

22   you can push on the public health interpretation of

23   the causation of lymphoma by Roundup exposure.

24        And how that figures in to a graph like this,

25   which has to do with all possible causes or

1    combination of causes, nobody can answer that

2    question.

3        Q.   Well, all I'm asking you is, taking the SEER

4    data as accurate, you can -- you can tell from that

5    graph that whatever you think Roundup is doing, it's

6    not doing very much.  Most -- like, 99 percent of

7    non-Hodgkin's lymphoma is being caused by other

8    things.

9            MS. FREDONA:  Objection.

10       Q.   Otherwise, that line would move.

11           MS. FREDONA:  Asked and answered.

12       A.   Well, first of all, I can't begin to support

13   that 99.9 percent assertion.  I don't know where that

14   comes from.  But on the face of it, that is

15   unsustainable and unsupportable.

16       Q.   Well, I'm asking you to look at the SEER data

17   and tell me what you see.

18       A.   I'm looking at the SEER data, and I'm telling

19   you that I can't tell whether the shape in this curve

20   is influenced, for example, by changes in the smoking

21   rate, by prevention of full-blown AIDS with improved

22   HIV antiretroviral therapy, or any changes in the

23   pattern of use of Roundup.  You can't infer that from

24   here.

25       Q.   I mean, do you have any evidence for what you

Ron B. Schiff, M.D., Ph.D.

1    just said, that changes in AIDS treatment or smoking

2    or other things are responsible for the SEER data?

3         MS. FREDONA:  Objection.

4    A.   Well, I think -- okay.  I think that we can

5    safely say that changes in SEER data having to do

6    with introduction of PCBs into the environment and

7    restriction on their sale in the late 1970s was

8    reflected in changes in the shape of the curves.

9         And I was actually looking for the SEER data

10   that reflected that, but I don't have that at hand

11   because, after all, we're dealing with Roundup

12   litigation here, not PCB litigation.

13        But I have seen that.  And in that particular

14   case, the inference is that environment exposures in

15   general, maybe not PCBs specifically, were

16   responsible for the changes in the SEER curves.

17        Here, I don't have that.

18        But neither you, nor I, nor anyone else can

19   say what percentage of change in those green squares

20   was due to increased use of Roundup versus changes in

21   other causes.

22   Q.   You just said that part of this is

23   attributable to PCB -- PCBs, right?

24   A.   It is possible that part of the increase

25   between -- part of the increase that was left over

Ron E. Schiff, M.D., Ph.D.

```
 1    here before the late 1970s, and presumably for a
 2    period of time beyond, because PCBs are, after all,
 3    persistent organic pollutants, may be due to the
 4    ubiquitous exposure of humans to those environmental
 5    contaminants.
 6         Q.   And so PCBs are -- do you attribute the rise
 7    of the line, the SEER data line from '75 to '95, do
 8    you attribute that to PCBs?
 9         A.   No, not exclusively.  I'm saying that PCBs
10    may be a contributing factor, but that time period
11    also encompasses the beginning of the HIV/AIDS
12    epidemic in the period in which there was no
13    successful treatment for HIV infections, nothing that
14    prolongs survival, reduce the risk of complications,
15    or what have you.
16              Now we have that.  And that may be why, in
17    the last 15 years or so, that may be part of the
18    reason things are beginning to look better.
19              On the other hand, there's a lot more people
20    on immunosuppressive medication now than there used
21    to be.  Immunologic disorders are being recognized
22    more frequently than they used to be.
23              There are a whole host of factors that go
24    into this.  So we can analyze those factors for an
25    individual, but in terms of trying to dissect them
```

Ron D. Schiff, M.D., Ph.D.

1    out for basically a broad public health statistic

2    like this one, I don't see how it's possible.

3    There's too many things going on that influence these

4    data.

5        Q.   You reference PCBs a lot in your report.

6             Do PCBs have anything to do with glyphosate?

7        A.   No -- well, yes.  Both manufactured by

8    Monsanto, but that's the extent of it.

9             They're chemically different.  They both

10   cause non-Hodgkin lymphoma, and they're both

11   recognized as carcinogens by IARC Group I for PCBs,

12   Group 2A for glyphosate.

13       Q.   But your opinions in this case don't have

14   anything to do with PCBs, right?

15       A.   I think that I learned some things from the

16   PCB litigation that enabled me to analyze the

17   situation with regard to Roundup more accurately.

18       Q.   Are you saying that Mr. Karman was exposed to

19   PCBs?

20       A.   Well, I -- first of all, I haven't said that,

21   and I haven't put that in my opinions.  But of course

22   he was exposed to PCBs, because they're ubiquitous in

23   the environment.

24       Q.   Do PCBs have the same -- is the mechanism by

25   which they cause non-Hodgkin's lymphoma understood?

1    A.   There are data about it as well, and, you

2    know, with PCBs, there is also evidence of

3    immunologic and endocrine disruption, and so forth,

4    as well as genotoxicity and oxidative stress.  So

5    there's some overlap there.

6         But they're chemically and completely

7    different classes, so there would be no basis on

8    which to assume that the mechanisms of causation of

9    lymphoma are identical.

10   Q.   Do you know if the SEER data for the U.S.

11   holds true for the world as a -- as a whole?

12   A.   I believe that there are certain statistics

13   that are common throughout the world, but I also know

14   that with regard to lymphoma, there are geographic

15   variations as well.

16        So in that regard, because geographic

17   variations have been established, I would have to say

18   that you can't just make a blanket application of the

19   SEER data to other countries.

20   Q.   So we talked a little bit -- well, I

21   should -- let me -- before I go on, I want to mark

22   one more thing in your -- make sure I get it marked

23   for your exhibits.  That's your -- the deposition

24   notice.  So that should be in the stack that I sent

25   you.

 1          MR. BRENZA:  We'll just mark that as a 6,

 2      just so we have that as a record.

 3          (Schiff Exhibit 6 was marked for

 4      identification.)

 5      BY MR. BRENZA:

 6      Q.    Let me know when you have it.

 7      A.    I have it and I'm marking it.

 8      Q.    You'll see that at the back of it there's a

 9      request for production?

10      A.    Yes.

11      Q.    Have you -- have you seen this request for

12      production before?

13      A.    No.  I got this at 11:30.

14      Q.    Well, yeah, you wouldn't -- you would have

15      received it from your lawyers, not in my -- not in --

16      just in my package, but before this.

17          But would you -- would you look at the

18      request for production and tell me if you have any

19      materials that meet the description of documents that

20      are requested?

21      A.    Yes.  I will tell you that.

22          I will also say that the first and only time

23      that I was provided with the notice of deposition was

24      in the FedEx package from your office at 11:30

25      today --

Ron B. Schiff, M.D., Ph.D.

1      Q.    Okay.

2      A.    -- attorneys.

3            And I'm looking at this to see what the date

4      is on this document.  And it says "February 16 caused

5      to be served via U.S. mail and e-mail."  But this is

6      the only one that I had.

7            Now, going through this, we already discussed

8      about the billing and invoice.  I told you that I had

9      already invoiced and been paid for the work I did up

10     to and including preparation of the report, and I

11     counted up for you how many hours I worked on

12     preparing for this deposition.

13     Q.    Yeah.  So that's Number 1, right?

14     A.    That's Number 1.

15           Item --

16     Q.    Number 2?

17     A.    -- invoice or bill.  You know, I'm happy for

18     you to obtain from the Moll Law Group the billing and

19     payment information on the group of plaintiffs that

20     I've gotten from them, not just limited to

21     Mr. Karman.

22           Number --

23     Q.    Okay.

24     A.    -- 3, all documents that I will consider in

25     support of his opinions and expected testimony in

1    this case.

2          Actually, those are the documents that are on

3    my reference list that, of course, you've asked me

4    about things that have gone well beyond those

5    documents.

6          Number 4, all documents that I reviewed,

7    referred to, and/or relied on in forming any opinion

8    relating to this case.  This request includes all

9    documents that contain data or other information that

10   I considered in the course of formulating my

11   opinions.

12         Again, that's -- the relevant things are my

13   reference list.  If there are other things that you

14   asked me about dealing with other documents, I have

15   mentioned those.  And then the two that you asked for

16   me to provide to the Moll Law Group, to forward to

17   you, I told you that I would do so.  The current CV,

18   you obviously already have, because you sent me two

19   copies of it with this packet.

20         Number 6, documents sufficient to show any

21   testimony I have provided as an expert witness over

22   the past four years.

23         I've given you something going back almost

24   six years, that you sent a copy of back to me in my

25   packet, plus the one deposition that was not included

Ron D. Schiff, M.D., Ph.D.

```
 1    in that listing yet, I've already updated you about
 2    during the course of this deposition.
 3            Number 7, communications with Dr. Nabrinsky,
 4    there have been none.
 5            Number 8, communications with Dr. Myrda,
 6    there have also been none.
 7            Number 9, documentation of communications
 8    with anyone other than counsel regarding glyphosate
 9    and/or glyphosate-based formulation, nothing in
10    regard to this case.
11            With regard to other glyphosate litigation,
12    it's only been with the relevant attorneys.
13            I believe that I did have a telephone
14    conference regarding a particular plaintiff with a
15    general causation expert in approximately
16    November 2019, although I could be wrong about that.
17    There was an attorney on the phone in that case, and
18    I had specific questions about the classification of
19    one of the lymphoproliferative malignancies.  And we
20    got one of the general causation experts on the case
21    on the phone, and we had a, you know, 15-minute
22    conversation.  That had nothing to do with
23    Mr. Karman.
24       Q.   Is it known what causes non-Hodgkin's
25    lymphoma?
```

1        A.   The best answer that I can give to that is

2    that there is a section of my report entitled

3    "Etiology:  Risk Factors for the Development of

4    non-Hodgkin Lymphomas."  I put in there, you know, a

5    fairly detailed listing of all of the risk factors

6    that have been identified by scientific and clinical

7    research over the years.

8             In terms of more detail about any of those

9    categories, I'm happy to try to answer that.

10            We also dealt in the report -- or, I should

11   say I dealt in the report with the question of

12   idiopathic determination, idiopathic considerations

13   of causation of non-Hodgkin lymphoma where you can

14   say that most cases of the non-Hodgkin lymphoma are

15   considered idiopathic; that is, the cause is unknown.

16            And that came up during Ms. Karman's

17   deposition.  It was brought up by defense counsel.

18            But my response to that is diseases don't

19   just happen.  Every disease has one or more causes,

20   even if not yet discovered by scientific research.

21   This applies to the causes of disease in individuals,

22   as well as populations.  Regarding "causation

23   idiopathic" means not yet known or not known in this

24   case, not there is no cause.

25            But in terms of the candidate causes, you

1    know, that's a decent-sized paragraph in Item

2    Number 7 in my Opinion section.

3        Q.   Is it becoming emerging knowledge in the

4    medical community that a great percentage of all

5    cancer, including non-Hodgkin's lymphoma, is a result

6    of random genetic mutation?

7        A.   Yeah, that's an extremely interesting

8    question.  And, I mean, this is something that I've

9    been interested in literally for decades.

10           And a lot of it truly depends on the

11   scientific zeitgeist, z-i -- no, z-e-i-t-g-e-i-s-t.

12           When I was in training sometime last century,

13   we were taught that 85 percent of cancers were

14   environmentally causes.  Now we're taught that the

15   vast majority of cancers are caused by genetic

16   mutations.

17           Now, genetic mutations mean different things

18   to different people.  They can truly be inherited

19   mutations where your tendency to develop the cancer

20   is inherited as a gene or a complex of genes or at

21   least as a predisposition from one of more of your

22   parents, or it can be acquired mutations, which come

23   on during life, primarily as a result of

24   environmental exposures but possibly also as a result

25   of ordinary mistakes in DNA replication.

1      Q.   B-cells are at the core of non-Hodgkin's

2    lymphoma, right?

3      A.   I'm sorry, which cells?

4      Q.   B-cells, BAB.

5      A.   No.  B and T.  B are more common, but there

6    are also many T-cell non-Hodgkin lymphomas.

7      Q.   But the one we're talking about today with

8    Mr. Karman, that was a B-cell, right?

9      A.   Diffuse large B-cell in particular.  So, yes,

10   B-cell.

11     Q.   And B-cells, those are cells of the body that

12   make antibodies, right?

13     A.   They differentiate into cells that make

14   antibodies, that's correct.

15     Q.   A part of the way they do that is by

16   shuffling and remixing their own genetic material

17   every time they divide, right?

18     A.   That's kind of an oversimplification, but,

19   yes, I'm okay with that conceptually.

20          It also depends on what antigens people are

21   exposed to and so forth.  But, yes, that's how that

22   works.

23     Q.   So those cells are intended to undertake

24   greater genetic variation and recombination than most

25   cells of the body, right?

1          MS. FREDONA:  Object to form.

2     A.   Yes.

3          THE WITNESS:  Sorry.

4     A.   But there's an important distinction, okay?

5   Because if you are talking about an ordinary antibody

6   response to any sort of an antigen, a cancer antigen,

7   a microorganism, what have you, that's a polyclonal

8   process.

9          However, to form a malignancy, such as

10  non-Hodgkin lymphoma, that's a monoclonal process.

11  Something else goes wrong in terms of whatever

12  genetic recombination event or rearrangement we are

13  talking about.

14         So that's the difference between a normal

15  polyclonal recombination event and a malignant

16  monoclonal event.

17    Q.   So these B-cells, they're going about their

18  business, reshuffling so that they have a wide

19  variety of antibodies, but sometimes something goes

20  wrong and they become cancerous?

21    A.   Well, that can happen in any other type of

22  tissue and is not directly a consequence of the

23  antibody production process itself.  That -- you

24  know, that can happen in the cells of the

25  gastrointestinal lining, for example, so --

Ron D. Schiff, M.D., Ph.D.

1      Q.    -- based on the cell is dividing rapidly?

2      A.    Yes, yes.

3            And you're more likely to see those problems

4      in rapidly dividing tissue.  There's no question

5      about that.

6            And, you know, all of the blood-forming cells

7      divide relatively rapidly and so can be considered

8      susceptible.

9            But antibody production is a function.  It's

10     not a malignant process, obviously, and it's not

11     responsible for the occurrence of the malignant

12     process.

13     Q.    But it can give rise to the mutation that

14     does result in the malignancy, right?

15     A.    Well, it can.

16           I mean, that's -- you know, that's how you

17     get monoclonal proteins or monoclonal gammopathies

18     among the B-cell lymphoproliferative neoplasms.  But

19     you also get those kinds of clonal gene

20     rearrangements and carcinogenic events in other types

21     of tissue and organs as well.

22     Q.    Did you -- did -- one of the articles I put

23     in your stack was an article by Dr. Tomasetti.

24           And I know you only got the package from me

25     this morning, but I'm wondering if you might not have

Ron D. Schiff, M.D., Ph.D.

```
1    run across that article previously?

2        A.   Okay.  So let's answer that.

3            This article was not anything that I sought

4    out or that was given to me by any of the attorneys

5    for whom I worked.  If memory serves, Ms. Fujimoto

6    put that in front of me at a deposition in a federal

7    case in the fall of 2019.  It was just basically

8    plopped down on the table in front of me.  I looked

9    at it.  I thought it was interesting and I

10   contemplated it, although, obviously, I could not

11   answer any questions about it.

12           I'm happy to answer questions about it now,

13   if you'd like.

14           MR. BRENZA:  Well, before we go on, let's

15       just mark that as Number 7.

16           (Schiff Exhibit 7 was marked for

17   identification.)

18   BY MR. BRENZA:

19       Q.   You put a seven on at, that would be great.

20       A.   Yes, I'm doing it.

21       Q.   So have you had a chance to read the article

22   now?

23       A.   Well, not really.  I've looked at certain

24   aspects of it, and without prompting, I'm going to

25   give you some feedback about it, okay?
```

```
 1              So there are four points that I want to make.
 2              Number one, this is basically an exercise in
 3    theoretical or computational biology.  There's a lot
 4    of assumptions that go into it.  You can accept the
 5    assumptions or you can question them, but I don't
 6    think anyone can dispute that that's what this is.
 7    This is theoretical biology.  There's a bunch of
 8    assumptions that go into it.
 9        Q.   Let me -- let me stop.  I want -- I want to
10    take each of those one by one.  We'll get to all
11    four, I promise you, but I don't want it to just be
12    one big giant paragraph on the record.
13        A.   All right.
14        Q.   When you say it's -- would you say
15    computational biology?
16        A.   Yeah.  Theoretical and computational biology,
17    yes.
18        Q.   What does that -- what does that mean?
19        A.   Well, "theoretical biology" means that this
20    is not really based on specific experiments designed
21    to test the hypothesis.  Computational believes --
22    "computational" means that it's based on
23    sophisticated mathematical modeling.
24              Now, what you did not send me is their
25    appendix, and the appendix to this article is really
```

Ron B. Schiff, M.D., Ph.D.

 1    mind-boggling in terms of what's included in it.  It

 2    goes through the details of their methods, with a

 3    heavy emphasis on their mathematical methods, which I

 4    claim no expertise.

 5           But I will say this, in terms of estimating

 6    what is the proportion of driver mutations that

 7    result from any particular cause, environment,

 8    inheritance, or what they prefer to call "random

 9    mutations during DNA replication," what they come up

10    with is a mathematical formula that looks like this.

11           I will tell you, that unlike physics in

12    biology, there are almost no relationships between

13    variables that require this type of statistical

14    parsing in order to come up.

15           Now, I know that this is meant to be

16    representational, and that's fine.  But that's only

17    the basis for the additional mathematical work that

18    you find in this paper that looks like this.

19           You don't find it in the clinic, you don't

20    find it in the biology lab that does experiments.

21    It's limited to things like theoretical and

22    computational biology.  Not that there's not a place

23    for it, because there is, and I'm not questioning

24    that.

25           But nonetheless, that is one of the

Ron B. Schiff, M.D., Ph.D.

```
 1    characteristics of this particular research that
 2    perhaps, can be thought to limit its applicability.
 3        Q.   You said you had a few other -- I want to
 4    make sure you put on the record whatever you were
 5    going to say before I broke it up.
 6        A.   All right, all right.  That's -- let me try
 7    and remember that.  Let me try and remember that now.
 8    I know I had three other things.  That was one.
 9             Okay.  So, yeah, so we've actually covered
10    two things there, theoretical and computational
11    biology, and the complex mathematical relationships
12    among the possibilities of cancer causation, okay,
13    those are three variables that are described at the
14    beginning of the article.
15             So the next point that I want to make is they
16    go through some examples with regard to different
17    types of cancers.
18             If you've looked at the article, you will
19    recognize that non-Hodgkin lymphoma is not one of
20    them.  They do not rate -- non-Hodgkin lymphoma by
21    the proportion of driver events that are due to DNA
22    replication or to inherited or acquired mutations or
23    to environmental causes.
24             They make plenty of generalizations here, and
25    the generalizations are fine, but their specific
```

```
 1    examples are what they call "all cancers extreme

 2    scenario:  Adenocarcinoma of the lung, adenocarcinoma

 3    of the pancreas, and adenocarcinoma of the prostate."

 4    In the appendix, they also get into breast cancer,

 5    which is also an adenocarcinoma.

 6          So I'm just saying there that while there may

 7    be many fine generalizable things that can be taken

 8    from this research, specific application to

 9    non-Hodgkin lymphoma is not included.

10          The fourth thing is one of the premises which

11    touches on the whole business about resting on

12    assumptions.

13          And this one here, I would be fascinated to

14    see what Dr. Vogelstein said in reply to this.

15          But their argument is based on what they say,

16    and they -- I'm reading this just from the abstract,

17    although they get into this in the text as well:

18    "The data reveal a strong correlation, median 0.80,

19    between cancer incidence and normal stem cell

20    divisions in all countries regardless of their

21    environment."

22          So it's a correlation between cancer

23    incidence and normal stem cell divisions.  How many

24    times have stem cells divided before giving rise to

25    cancer in a clone?
```

Ron E. Schiff, M.D., Ph.D.

```
 1              Here's the problem with that, and the problem

 2    with that also apply to lymphoproliferative

 3    malignancies.  Let's take acute lymphoblastic

 4    leukemia as an example, most cases which are B-cells;

 5    they're not exactly non-Hodgkin lymphoma, but there's

 6    a lot of overlap.  And you have to really go through

 7    some tortuous maneuvers to see how this interacts

 8    with the World Health Organization classification

 9    system.

10              But the bottom line is, there is childhood --

11    common acute childhood leukemia, which is a precursor

12    of B-cell acute lymphoblastic leukemia, but you also

13    can get that in adults.

14              And I have a family history of that.

15              And the point is that there are obviously a

16    lot fewer normal stem cell divisions that have

17    occurred before the childhood peak in incidence of

18    acute lymphoblastic leukemia and the adults who

19    develop acute lymphoblastic leukemia mostly past age

20    40.

21              This is the fundamental assumption of that

22    paper, and it doesn't work.

23              And you can say the same thing about

24    Hodgkin's lymphoma, there's a peak incidence in the

25    late teens and in the college-age years, then there's
```

Ron D. Schiff, M.D., Ph.D.

```
 1    a drop off, and then there's another peak after age

 2    40 or 45.

 3              How exactly is that reflective of the number

 4    of normal stem cell divisions that have transpired

 5    before the onset of cancer?

 6              So, you know, what I'm bringing up,

 7    obviously, is another theoretical consideration, but

 8    at least that's based on clinical observations that

 9    are well-established.

10    Q.   Do you -- do you agree that sort of a

11    predominant understanding of cancer in the present

12    day is that it's attributable to an accumulation of

13    driver gene mutations?

14    A.   Again, that is how it is taught these days.

15    And as we learn more about the molecular

16    abnormalities that correlate with cancer, if not are

17    proven to cause it, that's -- again, that's what we

18    hear, that's what we believe, and so on.

19              But the point is that some of those mutations

20    may be inherited, other of those mutations may be

21    acquired, and in the acquired group, we find those

22    that are due to environmental insults.

23    Q.   And also some that are attributable to errors

24    in replication just -- that just happen as -- because

25    of living?
```

Ron D. Schiff, M.D., Ph.D.

1      A.   Dr. Vogelstein's paper makes that distinction

2  between environmental and replicative errors.  He

3  makes that distinction.  So he has a perspective on

4  looking at this, and, you know, and he has a

5  reasonable method of trying to analyze it.

6          How you take this and apply it to an

7  individual case, you can't do it.

8      Q.   Well, I'm not -- I understand that.

9          But I'm just trying to find out whether you

10  agree that -- what I take to be the overall --

11  overarching thrust of the paper, which is a lot of

12  cancer just happens because of errors in replication

13  from just living.

14          MS. FREDONA:  Objection.

15      A.   Yes, that is the theme of the paper, okay?

16  But we've already talked about how he comes to that

17  and about the most fundamental underlying assumption

18  and about all of the convoluted math necessary to

19  reach that conclusion, so --

20      Q.   Do you disagree?

21      A.   I'm -- all that I'm able to say is this is a

22  way of analyzing the problem.

23          A lot of this does has to -- have to do with

24  definitions, because how do you know that some

25  replication errors do not occur as a result of

Ron D. Schiff, M.D., Ph.D.

1    genotoxicity or for that matter, oxidative stress?

2    He's saying those go in a different bucket; those go

3    in the environmental category and not the R category.

4         But I'll tell you what else Dr. Vogelstein

5    does not agree with in this -- or, does not deal with

6    in this, he does not deal with the issue of DNA

7    repair, because DNA repair corrects most of these

8    replicative errors when they are made.

9         If they are not immediately corrected, they

10   then become incorporated in perpetuity and to

11   subsequent generations of DNA with every replication,

12   starting with the very first one after it occurs.

13        So the point is that they're also the

14   kinetics of the DNA repair process, which is itself

15   extremely complicated and is estimated to involve at

16   least 100 enzymes.  So --

17   Q.   Does the --

18   A.   Go ahead.

19   Q.   Does the human body, in the -- in the

20   overwhelming majority of cases, repair genetic damage

21   when it occurs?

22   A.   Yes.

23        But in some cases it can't, and in some cases

24   there's so much genetic damage that the systems can't

25   overcome it.

Ron D. Schiff, M.D., Ph.D.

```
 1            And I'll give an example of that.  If there's
 2     actually chromosome damage, in other words, much
 3     larger scale than a little point mutation in the DNA
 4     sequence, the DNA repair mechanisms, in general, are
 5     powerless to overcome that.
 6         Q.   And is that something you think Roundup does?
 7         A.   Well, the -- you know, the literature
 8     indicates that Roundup can cause genotoxicity, and we
 9     know that some case of diffuse large -- diffuse large
10     B-cell lymphoma have associated chromosomal
11     abnormalities.
12            However, we did not see that in Mr. Karman's
13     case, and we do not know which particular cases of a
14     diffuse large B-cell lymphoma with a chromosomal
15     abnormality.  And I will tell you --
16            THE COURT REPORTER:  Doctor, I can't hear you
17        when you turn away.
18            THE WITNESS:  I'll be right back.  I'm
19        looking that up.
20         A.   There are a number of gene rearrangements
21     that do occur in diffuse large B-cell lymphoma with
22     some regularity.
23            Mr. Karman was not known to have any of them,
24     and even if he did, one would not know whether a
25     specific genetic abnormality, an acquired genetic
```

1    abnormality, or acquired mutation or gene

2    rearrangement was due directly to the glyphosate

3    exposure or not.  There's no way to tell that right

4    now.

5         And it's also worth pointing out that

6    Mr. Karman's lymph node biopsy on July 27 of 2015 did

7    not include a chromosome analysis and neither did his

8    bone marrow examination three weeks -- or, two weeks

9    later on August 10th, 2015.

10        So in point of fact, we don't know whether he

11   had one of these gene rearrangements or not.  It

12   wasn't looked for, and if you don't look for

13   something, there's no way you can find it.

14        Q.   Mr. Karman had a number of factors that are

15   risk factors for non-Hodgkin's lymphoma, right?

16        A.   Yes.  I dealt with those in my report.

17        Q.   And, yeah, I understand that, but I just want

18   to ask you about a few of them.

19        A.   Right.

20        Q.   One of the factors is that he was male,

21   right?

22        A.   That's correct.

23        However, as I pointed out in my report, I

24   don't view that as a causative risk factor; it's an

25   association.  But I don't know the mechanism by which

1    male gender actually causes lymphoma.

2        Q.   Well, nobody knows the mechanism by which

3    lymphoma occurs, right?

4        A.   No, that's not true.  In many cases, it is

5    known.

6             But in case of male sex, there's not even a

7    plausible mechanistic explanation.

8        Q.   Another risk factor that he had was that he

9    was white?

10       A.   That's correct.

11            That, again, is a -- is an observed

12   association.  And that goes hand-in-hand with some of

13   the geographic variations and incidence worldwide.

14   So we don't know if there's something exposure-wise

15   or an element in genetic susceptibility that leads to

16   differences in ethnicity or nationality in terms of

17   risk of developing non-Hodgkin lymphoma.

18       Q.   But we do know that if you're white and

19   you're male, you have a higher risk of getting

20   non-Hodgkin's lymphoma?

21       A.   That's correct.

22       Q.   And then possibly the single greatest risk

23   factor he had was he was 77 years old when he was

24   diagnosed, right?

25       A.   Well, that's one of them.  But there -- at

Ron D. Schiff, M.D., Ph.D.

```
 1    least there are some plausible explanations for how
 2    that may occur.
 3        Q.   Well, but isn't it right that in your
 4    seventies, that's the peak of when people get
 5    non-Hodgkin's lymphoma, whether they've been exposed
 6    to Roundup or not?
 7        A.   Yes.
 8             The incidence is highest after age 60.  But
 9    that's correct.
10        Q.   And there's a plausible explanation for why
11    that occurs, right?
12        A.   Yes.  A couple of them.
13        Q.   What's that?  What are those?
14        A.   Well, one of them is that there is more time
15    to acquire harmful gene mutations that predispose to
16    the development of non-Hodgkin lymphoma.
17             But the other thing has to do with
18    age-related involution of the immune system, meaning
19    that the body's protected mechanisms against the
20    development of a malignancy like non-Hodgkin lymphoma
21    become compromised.
22        Q.   So one theory -- tell me if you're familiar
23    with this -- is that cancer is arising in our bodies
24    all the time, but a well-functioning immune system
25    kills the cancer before it can take over?
```

1       A.    That's the immune surveillance theory.

2             It's hard to come by specific data that

3       directly demonstrate that, especially in individuals.

4       But that concept has been around now for more than

5       40 years and on its face is widely accepted.

6             I mean, you know, I can certainly buy into

7       that, although, you know, I don't really know how

8       many times cancer really develops in a particular

9       individual.  All we know is the surveillance data

10      like SEER provides about how often cancers occur in

11      different age groups and other different populations

12      for different types of cancer.

13      Q.    But in general, you agree that cancer arises

14      periodically, if not all the time, and our immune

15      systems fight it back?

16      A.    Yes.

17            I mean, as a general concept, that's fine.

18      But I'm also suspecting that there's a lot of

19      individual differences in that.

20      Q.    And then as you get older, your immune system

21      starts to get tired?

22      A.    It's partly that and partly because the cells

23      in question, the susceptible cells, have acquired

24      genetic mutations that can predispose to cancer, yes.

25      Q.    So it's two things then:  It's your immune

Ron D. Schiff, M.D., Ph.D.

1    system gets tired, and maybe you've got some cancers

2    that are tougher to kill than they were?

3         A.   Well, those are two of the most obvious

4    plausible mechanisms.

5              There are other things that can occur as well

6    with that like telomeres and all that.  But that's, I

7    think, beyond the scope of what we're getting into

8    now.

9              In terms of the clinically supportable

10   things, the risk of accumulating harmful mutations

11   and an age-related decline in immune function are

12   probably the most important.

13        Q.   Another risk factor that Mr. Karman had

14   besides being 77 and male and white is he had had a

15   history of obesity, right?

16        A.   Well, I dealt with the obesity fairly

17   extensively in my report, because obesity is a

18   relatively complex risk factor for non-Hodgkin

19   lymphoma.

20             The strongest evidence appears to be in

21   diffuse large B-cell lymphoma, which is what

22   Mr. Karman had.

23             But it appears that the biggest predictor is

24   not so-called usual body mass index, which means the

25   BMI at the time of diagnosis, but it's actually BMI

Ron D. Schiff, M.D., Ph.D.

1    as a young adult.

2         The InterLymph project looked at that, and I

3    put citations to that research in my report.  It's

4    all very interesting that for the vast majority of

5    patients who develop non-Hodgkin lymphoma in older

6    age, like Mr. Karman, we don't have height, weight,

7    and BMI data from when they were, you know, 18 to

8    30 years old.

9         So, you know, one can talk about that and

10   say, well, maybe BMI as a young adult is more

11   important than usual BMI, and that may be true.  But,

12   you know, the correlation appears to hold up most

13   strongly according to InterLymph for the young adult.

14   Q.   But what we do know about Mr. Karman is that

15   when he presented with non-Hodgkin's lymphoma, he was

16   technically obese.

17   A.   Well, you know, I'm one of these guys that

18   actually, for one reason or another, doesn't like the

19   word "obese."  In the non-Hodgkin lymphoma

20   literature, both 30 and 35 have been used as the

21   cutoffs.

22        And what I indicated was that between the

23   first date for which BMI data were available back in

24   2011, that was May 20, 2011, and the date of his

25   referral to Dr. Nabrinsky on August 3, 2015, his BMI,

1    as I put it", reproducibly ranged between 30.5 and

2    32.48 kilograms per square meter."

3              So, you know, I mean, I would call that

4    overweight; others would call that obese.  But the

5    numbers speak for themselves.

6       Q.   But is it fair to say that if that's the way

7    he was in his, you know, thirties, that he would --

8    he would have experienced that increased risk of

9    non-Hodgkin's lymphoma that you mentioned earlier?

10      A.   Yes.  But that's an assumption we can't make

11   because we don't have that data.

12             And also, you know, people tend to be an

13   awfully lot more active when they are between 18 and

14   30 than they are when they're in their seventies.

15   And, again, at the time of diagnosis, Mr. Karman was

16   77.

17      Q.   Mr. Karman also was a heavy smoker, right?

18      A.   That's correct.  He definitely smoked, yes.

19      Q.   And he had been smoking for 30 years at

20   least, right?

21      A.   Yeah.

22             I came across a couple of different estimates

23   of his smoking history, and, you know, it might be

24   they were both correct depending on the time at which

25   they were recorded.

Ron D. Schiff, M.D., Ph.D.

1          But, yes, I mean, there's no question that he

2     did smoke consistently as an adult.

3          Q.   And one area in the medical literature I'm

4     not sure if you put it in your report, it said

5     45-pack years.

6          A.   Regarding him or regarding as a risk factor

7     for --

8          Q.   No, regarding Mr. Karman.

9          A.   No, I did not see one that high.

10          Let me try and find my two references to that

11     in his -- perhaps you can help me with that where I

12     dealt with smoking history, because the first one was

13     just a static one when he first presented to a family

14     practice clinic in 5/8/03.  It says he smoked a pack

15     and a half a day.  But we didn't know for how long or

16     anything like that.

17          Q.   Well, yeah, so a pack and a half today -- a

18     day for 30 years is 45 pack years.

19          A.   Right.  But I did not have a finding of

20     30 years' smoking duration that goes along with that

21     particular report.

22          And I am still looking for -- here we go.

23     May 20th, 2011, a smoking history of 16-pack years

24     was recorded.  So obviously, at that time, he was

25     approximately 73 years old, if I'm doing to math

1    correctly.

2         And then I think we're going to take a look

3    at his referral to the medical oncologist as the next

4    data point, and it might be the only remaining data

5    point.

6         Yeah.  Okay.  So that one was the 45-pack

7    years, that's correct.  That was at the time of

8    referral to Dr. Nabrinsky, and the date on that would

9    have been August 3, 2015.

10        So, of course, you know, that leads to the

11   question of whether one of these two estimates was

12   accurate and the other not or whether he really

13   consumed 29-pack years between 2011 and 2015, which,

14   of course, appears unlikely.

15   Q.   Well, and you know, Doctor, from treating

16   patients that when you ask them about how much they

17   drink or how much they smoke, they almost always

18   underestimate their actual use, right?

19        MS. FREDONA:  Objection.

20   A.   It's common to underestimate, that's correct.

21   Q.   I mean, it would be -- it's extremely rare

22   that someone accurately reports their smoking and

23   drinking, right?

24   A.   Well, I can't judge that.  I mean, the point

25   is that I'm not disputing that Mr. Karman was a

1    regular smoker.

2         Q.   Okay.

3         A.   And I'm sure Dr. Nabrinsky took pains to

4    establish the most precise estimate as he could,

5    which is how he came up with the 45-pack years.

6    That's not in dispute.

7         Q.   Okay.  And the 45-pack years, I mean, it

8    isn't really necessary to think that it might have

9    been even more than that, because that's already

10   enough to cause very serious health problems, right?

11        A.   I would agree.

12        Q.   And one of the problems Mr. Karman had was

13   chronic obstructive pulmonary disease, right?

14        A.   That's correct.

15        Q.   And why don't you just tell us what that is.

16        A.   Okay.  Well, there's a few different types of

17   it.

18             But in its most common usage, it refers to

19   emphysema, which is where the air sacs in the lining

20   of the lung -- the lining of the lung become

21   expanded, and the airways themselves become less

22   compliant.

23             So, you know, there are several different

24   patterns of that, which can include too much carbon

25   dioxide being retained or not enough oxygen -- or

Ron D. Schiff, M.D., Ph.D.

```
 1    some combination of that.  And there are downstream
 2    consequences for the cardiovascular system and in
 3    some cases, even to the liver.
 4           So, you know, I have no trouble believing
 5    that he had what I call "chronic obstructive airways
 6    disease," and, you know, the common term for that is
 7    COPD.  I don't doubt that whatsoever.
 8           But, of course, that --
 9       Q.   And --
10       A.   -- doesn't cause lymphoma.
11       Q.   The -- no.  But it does make it hard to
12    breathe, right?
13       A.   Absolutely.
14       Q.   And that was one of the problems that
15    Mr. Karman was having before and during his treatment
16    for non-Hodgkin's lymphoma?
17       A.   Yes, that's correct.
18           And I think -- I think it certainly became a
19    bigger problem while he was on treatment, which was
20    really just the last four months or so of his life.
21           But that whole point I dealt with in detail
22    at the end of Section 9 in the opinions in my report.
23       Q.   And just before we move on to that, the
24    smoking, not only does it cause COPD, but it also can
25    cause cancer, right?
```

Ron D. Schiff, M.D., Ph.D.

1        A.    Absolutely.

2        Q.    And everyone knows that it can cause lung

3    cancer, but it also increases your risk for

4    non-Hodgkin's lymphoma, doesn't it?

5        A.    Yes.

6              Although the strongest data there are

7    actually for follicular non-Hodgkin lymphomas, rather

8    than for diffuse large B-cell.

9              I won't dispute that it can also play a role

10   in diffuse large B-cell, but in actual fact,

11   follicular lymphoma has, on a statistical basis, the

12   strongest association reported, and that, too, comes

13   from the InterLymph project.

14       Q.    Another factor Mr. Karman had is that he was

15   a relatively heavy drinker, right?

16       A.    I don't believe that causes lymphoma.

17             I do not know much about his alcohol

18   consumption besides the few places that it was

19   recorded in the office notes.

20             But I would not regard that as being a risk

21   factor for lymphoma.

22       Q.    Well, alcohol increases cancer, doesn't it?

23       A.    Certain types of cancer, yes.

24       Q.    Okay.  And is it -- has it been ruled out as

25   a factor for non-Hodgkin's lymphoma?

1       A.   Well, I haven't seen that among, you know,

2    listings or risk factors stating, you know, certainly

3    as far back as the non-Hodgkin lymphoma textbook by

4    Armitage in 2010 whether they looked at just about

5    all risk factors that were known or under

6    investigation at the time.

7            So I certainly have never seen convincing

8    data identifying alcohol consumption as a risk

9    factor.

10      Q.   And did you, in your -- reaching your

11   opinions in this case, did you rule out any of the

12   causes we just discussed for -- any of the risk

13   factors we just discussed as a -- as a cause of

14   Mr. Karman's non-Hodgkin's lymphoma?

15      A.   Well, I mean, yes.  That's -- you know,

16   that's the whole content of the Section 9 of my

17   report, which is "Differential Etiology:  Other Risk

18   Factors."

19           You know, obviously, he was male, he was

20   older, and he was white.  But other than Roundup

21   exposure and smoking, I did not find risk factors for

22   the development of the lymphoma in his medical

23   records or in Ms. Karman's deposition.

24           And the ones that I listed in that second

25   paragraph of that section include immunodeficiency

1    states, by which I mean inherited or acquired,

2    autoimmune disorders, specific infections, and then

3    no family history of malignancies of the blood or

4    bone marrow or other candidate carcinogenic

5    exposures.

6           Now, I did go into the business about smoking

7    and about, you know, this question of asbestos

8    exposure and about exposure to other pesticides and

9    to fertilizers and then to obesity and then about how

10   I concluded that section with the discussion of how

11   COPD may or may not be related to the events

12   occurring at the end of Mr. Karman's life.

13          But the point is the defense attorney, who

14   took Ms. Karman's deposition, questioned her in some

15   detail, rather aggressively in my opinion, about

16   whether he really would have paid attention and

17   modified his behavior if there was a warning label

18   about carcinogenicity of Roundup.  And -- you know,

19   and she used the term that, you know, if -- she

20   referred to a prominent warning as a skeleton, which

21   is certainly very colorful.

22          But then the attorney said, Well, why would

23   that have made a difference, because he continued

24   smoking despite the fact that the Surgeon General has

25   warned against that since the mid-'60s, and those

1    warnings appear on every pack of cigarettes; to

2    which, you know, the plaintiff's attorney

3    responded -- and it was my mental comeback even

4    before I got to the plaintiff's attorney response --

5    that smoking and tobacco and nicotine are

6    physiologically addicting, but using Roundup

7    occupationally or nonoccupationally is not.

8         And, you know -- and I mean, that's just a

9    huge discriminator right there.

10    Q.   Well, yeah, and I'm not really asking you at

11    all about that right now.

12         But what I'm trying -- what I'm trying to

13    find out is:  Did you rule out that he got

14    non-Hodgkin's lymphoma because he was old or white or

15    male?

16    A.   Well, again, being white or male are not

17    causative risk factors; they are associations.  Being

18    older could be a causative risk factor through the

19    two prominent mechanisms that we discussed earlier.

20         But other things that were raised by the

21    defense counsel during the deposition has --

22    Q.   Yeah, I'm not interested in defense counsel

23    during the deposition.  I just want you to answer my

24    questions.

25    A.   But you asked me originally:  Have I gone

1    through other possible causes of Mr. Karman's

2    lymphoma?  And I'm attempting to answer that

3    question.

4         Q.   I'm asking you:  Did you rule out that he got

5    non-Hodgkin's lymphoma because he was old or white or

6    male?

7              Those are the -- those are -- that's the

8    question right now.

9         A.   I don't think that his gender or his

10   ethnicity caused his non-Hodgkin lymphoma.  No, I do

11   not think that.  There's no chance.  Because there's

12   no plausible explanation for how that works.

13             In terms of aging, we talked about plausible

14   explanations for how that might work, and that's

15   fine.  And, in fact, I stipulated at the beginning of

16   my differential etiology section that he was male, he

17   was older, and he was white.  So that's all in there.

18   I'm not disputing any of that.

19             But you have to call attention to how these

20   different things could work.  And for gender and

21   ethnicity, there isn't a mechanistic explanation.

22             For aging, it's an indirect one, but, yes,

23   that's possible.

24        Q.   Well, and for gender and ethnicity, wouldn't

25   it be more accurate to say that it's -- there isn't a

1     known mechanism yet?

2         A.   Sure.

3              And it could be that it comes down to

4     different environmental exposures.  I'm not disputing

5     that either, but --

6         Q.   Or it could be a genetic -- something

7     genetic, right?

8         A.   Well, we don't have evidence of that because

9     we don't have genetic changes in diffuse large B-cell

10    lymphoma that are restricted through gender or

11    ethnicity.  The chromosomal abnormalities that are

12    detected with some regularity in patients with

13    diffuse large B-cell lymphoma don't seem to occur

14    only in certain demographic groups.

15        Q.   Do -- there are -- there are other causes of

16    non-Hodgkin's lymphoma that you talked about,

17    including viral infection, right?

18        A.   Yes.

19        Q.   And hepatitis B and C, those are -- those are

20    potentially risk factors for NHL, right?

21        A.   Under certain circumstances, yes.

22             He did have hepatitis virus testing early in

23    his course.  I'm going to try to find that, but --

24        Q.   And what about Epstein-Barr virus, that's a

25    cause of non-Hodgkin's lymphoma, right?

Ron D. Schiff, M.D., Ph.D.

```
1        A.    Yeah, not so much, okay?

2              It can cause Burkitt's lymphoma in

3    Sub-Saharan Africa, and it can cause post-transplant

4    lymphoproliferative malignancies in developed

5    countries, including the United States.

6              So in terms of causing garden-variety

7    non-Hodgkin lymphoma like diffuse large B-cell

8    lymphoma in an elderly individual, no.

9              And in terms of the hepatitis virus, he had

10   an acute hepatitis virus profile on August 8, 2015,

11   five days after first seeing Dr. Nabrinsky and

12   ordered by him, and that he was all negative.

13       Q.    Did you rule out that he got non-Hodgkin's

14   lymphoma because he was a heavy smoker?

15       A.    No.

16             Smoking certainly is a risk factor for

17   non-Hodgkin lymphoma, although as I mentioned, the

18   association is stronger for follicular non-Hodgkin

19   lymphoma than for diffuse large B-cell.  But it's

20   still on the list.  It still belongs to be on the

21   list.

22       Q.    And you've given opinions before that

23   benzene -- exposure to benzene is a possible cause of

24   non-Hodgkin's lymphoma, right?

25       A.    I have given that opinion before.
```

Ron D. Schiff, M.D., Ph.D.

```
 1              I will say that in the case of benzene, it's

 2   relatively controversial.  IARC looked at that in

 3   2010 or nine -- I don't remember, I think 2010, and

 4   again in 2018, and it didn't shed much more light on

 5   it.  So there is evidence of what they call an

 6   "association," but there are studies that come out,

 7   really, on both sides of that.

 8              It is more controversial, in my opinion.

 9   There's probably enough evidence from positive

10   studies that it is a risk factor.  It's one of the

11   organic solvents that can cause or contribute to

12   cause non-Hodgkin lymphoma.

13       Q.    And benzene is in gasoline, right?

14       A.    Correct.

15       Q.    So if you -- if you pump your own gas, you're

16   getting a dose of benzene?

17       A.    Well, actually, that's been looked at on a

18   limited basis.  Yes, you do.

19              But the point is that in terms of the

20   exposure-response analysis that you find in the

21   literature, there are certain cutoff having to do

22   with parts per million or parts per million year

23   where they kind of comport with the regulatory bar

24   that you need to have more exposure than just someone

25   who pumps their own gas or lives in an urban area in
```

1    order to have the increased risk of non-Hodgkin

2    lymphoma.

3         So the point is with that, that, you know,

4    there is no safe threshold for benzene exposure, in

5    my opinion.

6         But the point is that if you talk about

7    what's excessive exposure there, it appears to be, by

8    consensus, scientific literature and regulatory

9    agencies alike, more than you get just from pumping

10   your own gas or living downtown.

11        Q.   You talked -- you talked about your report

12   using a differential etiology methodology, right?

13        A.   Correct.

14        Q.   And is that terminology a twist of phrase

15   from the medical community based on differential

16   diagnosis?

17        A.   Absolutely.  I only use that phrase because

18   of you guys.  Doctors don't ordinarily talk about

19   differential etiology.  We talk about differential

20   diagnosis.

21        And in point of fact, the judge in the Ninth

22   District in San Francisco only accepted the

23   "differential etiology" term because all the lawyers

24   were using that, so --

25        Q.   So it's a lawyer term; it's not a -- it's not

 1    a doctor's term?

 2        A.    Exactly.

 3              I mean, the point is, doctors who are

 4    involved in products liability litigation understand

 5    the term, and, you know, eventually, we make

 6    ourselves comfortable with using it in doing that

 7    type of analysis.

 8              But in terms of our patients in the office,

 9    clinic, or hospital, we never say that.

10        Q.   Well, and there is some major differences

11    between differential diagnosis and differential

12    etiology, as you've done it in your report, right?

13        A.   They're completely different.

14              Differential diagnosis is:  What does the

15    patient have?  And differential etiology is:  How did

16    the patient get it?

17        Q.   And in differential diagnosis, you're dealing

18    with a much more narrow question, right, of what does

19    a patient have, not everything in the world that

20    could have caused it, and you're also dealing with a

21    patient that you can treat and see if it helps,

22    right?  You can -- you can experiment, so to speak?

23        A.   You have no idea of the complexity that goes

24    into some differential diagnosis questions, including

25    in the legal setting.  The World Health Organization

Ron D. Schiff, M.D., Ph.D.

1   reclassifications of myeloid and lymphoproliferative

2   malignancies, or neoplasms as they call it, has

3   actually contributed to, rather than settled a lot of

4   those arguments.  But, you know, in actual fact, we

5   just have to deal with that.

6         In terms of differential diagnosis, the

7   pathologists learned the new terminology before we

8   do, and then we learn about it.  And then only after

9   that do clinical trials incorporate the revised

10  vocabulary and terminology and classifications into

11  the studies that are done about diagnosis and

12  treatment.  And we can't use those for awhile.

13        So we always have to take what I call a

14  cumulative and inclusive approach to clinical data

15  but also to etiologic and epidemiologic data, because

16  these classification schemes will change at a drop of

17  a hat.

18        So, you know -- so the point is, the

19  differential diagnosis is not necessarily

20  straightforward at all --

21     Q.   Well, I'm not suggesting it's

22  straightforward.  That's -- I'm not trying to --

23     A.   Well, you used -- you used the --

24     Q.   -- diminish the role of the doctors --

25     A.   But believe me, it can be very challenging.

1        Q.   But what I'm -- what I'm saying is, you're

2    dealing with a single live person that you're trying

3    to diagnose, and you can come up with a hypothesis

4    and treat them, and if it doesn't work, you can say,

5    Well, I made a mistake, I'll try something else.

6            You can sort of iteratively close in on what

7    the right answer is, right?

8            MS. FREDONA:  Objection; form.

9        A.   Yeah, unfortunately, that's not realistic.

10   It -- you got to do everything you can to get it

11   right the first time.

12           And frankly, differential etiology is not

13   that critical.

14           But differential diagnosis is a point of

15   contention in a lot of products liability litigation

16   as well, disagreements between plaintiff and defense

17   experts on what is the actual diagnosis.

18           In the Roundup litigation, mercifully, most

19   cases are actually quite clear.  So, you know, how

20   they interface with the World Health Organization

21   classification scheme might be a different matter.

22           But mostly, everybody knows what everybody

23   else is talking about with regard to the diagnosis of

24   individuals.

25       Q.   Okay.  I'd like to talk a little bit about

```
 1    Mr. Karman's medical history.

 2           He got treated with something called R-CHOP,

 3    right?

 4       A.   That's correct.

 5       Q.   And he didn't get through all the cycles of

 6    it because he had comorbidities; is that the right

 7    word?

 8       A.   And complications.  But, yes, that's correct.

 9       Q.   And comorbidities are problems that he's

10    having even before he got non-Hodgkin's lymphoma,

11    right?

12       A.   Yes.

13       Q.   And "morbidity" means that it damages your

14    health --

15       A.   Well, morbidity --

16       Q.   -- leading to death, right?  I mean --

17       A.   "Morbidity" refers to disease states.  So --

18       Q.   Okay.

19       A.   -- talk about comorbidity, it means other

20    conditions.

21           He also certainly had complications of his

22    treatment, and some of those complications were

23    shared by the lymphoma, by the chemo, and by his

24    comorbid conditions.

25       Q.   And one of the comorbidities was COPD.  We
```

 1    talked about that, right?

 2        A.    That's correct.

 3        Q.    And he also had issues with his heart, right?

 4        A.    Well, the cardiac issues were a little bit

 5    more obscure to figure out, because the main ones

 6    have to do with a cardiac rhythm disturbance, not

 7    cardiac muscle damage.

 8              Nonetheless, when he had the arrhythmia

 9    during the late September 2015 hospitalization for

10    pneumonia, the decision was made not only to postpone

11    the third cycle of treatment but also to remove

12    doxorubicin, which is the "H" in CHOP -- that

13    means hydroxydaunomycin-- but to remove that from the

14    regimen.

15              And, you know, you can make a big old case

16    that that's your most important drug.  But they

17    didn't like the heart rhythm disturbance; they

18    figured there must be a deeper cardiac problem, and,

19    therefore, they don't want to give him any more

20    Adriamycin, which, by the way, I agree with.

21        Q.    Yeah, but just getting back to the narrow

22    question I had:  One of his comorbidities was that he

23    had a problem with his heart, right?  He had atrial

24    fibrillation with rapid ventricular response?

25        A.    Well, that's the heart rhythm disturbance in

```
 1    question.

 2            But on top of that, when he was hospitalized

 3    even later than all that, November 20th, which was

 4    15 days into his fourth and final cycle of R-CHOP --

 5    I don't have full records from that

 6    hospitalization -- but he had an echocardiogram that

 7    was normal.  And, again, the date on that was

 8    somewhere between November 16 and November 20, 2015.

 9    What that tells me is his left ventricle was pumping

10    okay, his left atrium was not enlarged, and his

11    cardiac valves were functioning normally.  They were

12    structurally and functionally normal.

13            So he didn't have, you know, left ventricular

14    failure.  He didn't have heart muscle damage.  He did

15    have a heart rhythm disturbance.  What caused that

16    was not clear.

17            And, you know, atrial fibrillation can be a

18    cause of congestive heart failure, or it can be

19    caused by congestive heart failure.

20            But his case, he did not have congestive

21    heart failure, did not have any kind of heart muscle

22    or valvular disorder, according to the ECHO from

23    November 2015, just a few weeks before he died.

24        Q.   Did that echocardiogram shed any light on

25    what was causing the fibrillation?
```

1      A.   No.

2           But the point is, if it's negative, it

3      wouldn't tell me that.  So I have no idea.  Possibly,

4      you know, he had an oxygen problem that triggered it

5      and so on.  But there's no way to tell.

6           An ECHO -- an ECHO isn't going to give that

7      information.

8      Q.   But still a fibrillation is a serious

9      problem, right?  Whether it's caused by congestive

10     heart failure or not, you'd rather not have your

11     heart fibrillating, right?

12     A.   Yeah, it can be, because it can push someone

13     over into congestive heart failure, who doesn't have

14     the tendency, but who is predisposed.

15          More to the point though, it can cause

16     strokes, because the irregular electrical activity in

17     the heart interferes with the beating of the heart;

18     clots can form on the heart valves; and on the left

19     side of the heart, some of those clots can break off

20     and go to the brain.

21          So the whole thing that you want to do in

22     treating atrial fibrillation and preventing it once

23     it's already occurred and is controlled or in

24     treating -- or, preventing its complications is to

25     try to prevent someone from having a stroke.

1            But, you know, to the fact that it's a sign

2     that there's something wrong with the heart, you

3     don't want to do anything to make the heart worse.

4     That's why Adriamycin was withdrawn, and -- you know,

5     and then weeks after that, lo and behold, he had an

6     ECHO and the ECHO was okay.

7        Q.   Did -- now, many people -- the vast majority

8     of people that have non-Hodgkin's lymphoma, if

9     they -- if they get through the R-CHOP regimen, have

10    excellent chances to be completely cured, right?

11       A.   Well, you know, I did put some statistics

12    about that in the Opinion section of my report.

13            And, you know, I put some qualifiers in

14    there, that in my opinion are extremely important.

15    Maybe they're important to me and not so much

16    important on the legal side.  But the point is, there

17    are many factors that affect the survival statistics;

18    and that is, that they are all based on individual

19    clinical studies.  So your survival statistics

20    reflect what treatment you're actually giving a

21    patient, and those treatments do change somewhat over

22    time.

23            But the patient populations are heterogeneous

24    with regard to stage; other prognostic factors; the

25    treatment regimen, which I just referred to; and what

1    statistical parameters they're looking like.

2          That's why you can look at all the survival

3    data in the world, and it's not going to tell you

4    exactly how your patient is going to do.

5      Q.   I understand that.

6          There's no -- in medicine, there's no --

7    there's no such thing as a sure thing --

8      A.   But on top of.

9      Q.   But if Mr. Karman could have gotten through

10   the R-CHOP, isn't it right that he would have most

11   likely been fine?

12         MS. FREDONA:  Objection; incomplete

13     hypothetical.

14     A.   Yeah, not only that, but that's also

15   extremely speculative.

16         I understand that Dr. Nabrinsky wanted to

17   take a relatively aggressive approach with him and

18   felt that it was warranted.

19         And, again, I agree with that.

20         But R-CHOP is difficult chemotherapy to give

21   somebody who is 77, regardless of what their existing

22   comorbidity is.

23         So when I cited ten-year progression-free and

24   overall survival rates of 36.5 and 43.5 percent,

25   that's specifically for people with R-CHOP for

Ron D. Schiff, M.D., Ph.D.

1      advanced stage non-Hodgkin lymphoma.

2              But if you focus down on diffuse large B-cell

3      and prognostic factors comparable to Mr. Karman, the

4      four-year progression-free and four-year overall

5      survival are only about 55 percent.

6              And, of course, in this case, sadly, it was a

7      moot point because he died less than four months

8      after he began first-line treatment, just 12 days

9      after he began second-line treatment with a

10     substantially less intensive regimen.

11     Q.   Mr. Karman, even though he didn't get through

12     the whole R-CHOP sequence, he did get through some of

13     it.  And you characterize his reaction as an

14     "incomplete response," I think.  Is that the way you

15     say it?

16     A.   Well, I call it a mixed response.  And

17     actually --

18     Q.   A mixed response?

19     A.   A mixed response.

20             One of the things that I did do today in

21     preparing for the deposition is I did go back and I

22     took a look again at the CT pulmonary angiogram

23     report from October 26th, 2015, and the PET report on

24     November 25, 2015.

25             The CT pulmonary angiogram obviously looks

1    only at the chest, and that study technique does tend

2    to magnify the size of lymph nodes in the chest, even

3    making normal lymph nodes look like they're

4    abnormally enlarged.

5         The point is, there were some abnormally

6    enlarged lymph nodes in the chest at the time of the

7    CT pulmonary angiogram on October 26, 2015.  But the

8    PET CT report a month later, November 25, 2015, just

9    reported progression in two sites within the chest

10   and doesn't say anything about hypermetabolic

11   lymphadenopathy anywhere, in this chest or otherwise.

12        So I was puzzled by that.  And I don't know,

13   should I take that to mean that all of his other

14   lymph nodes responded?  Or should I take it to mean

15   that, well, they were still there, but maybe they

16   weren't taking up reactivity -- radioactivity?  Or

17   should I interpret it to mean that the radiologist

18   didn't comment on them, plain and simple?

19        So I don't know the answer to that.  But I

20   went back and I looked at those two reports

21   side-by-side today.

22   Q.   Well, I mean, is it -- is it fair to say that

23   the mixed response Mr. Karman had, some of his lymph

24   nodes resolved and some of them didn't?

25   A.   More than likely that's what it means, yes.

1          But he did have progression in two new sites.

2    That's what prevents this from being a partial or

3    complete response.

4        Q.    Okay.  And then that was in November -- was

5    that November of 2015?

6        A.    Yes.

7              The CT pulmonary angiogram was

8    October 26, 2015, and the PET CT was

9    November 25, 2025, in both cases during inpatient

10   hospitalizations.

11       Q.    Okay.  I'm going to ask you to find in the

12   stack I sent you a set of medical records from

13   December 12th, 2015.  And in front of it, it looks

14   like this.  It looks like a --

15       A.    I have it.  It's an EKG.

16       Q.    -- I guess.

17             MR. BRENZA:  And why don't we mark that as 8,

18        medical records from December 12th, 2015.

19        (Schiff Exhibit 8 was marked for

20   identification.)

21   BY MR. BRENZA:

22       Q.    And I have a few questions on this one.

23             If you would turn to the Health Information

24   Management sheet, it's got -- the last four numbers

25   is -- are 1357.

Ron D. Schiff, M.D., Ph.D.

```
1              Do you see those numbers at the bottom of the

2    page?

3         A.   I have it.

4         Q.   And do you see that this is an evaluation of

5    Mr. Karman on December 12th, 2015, right?

6         A.   Yes, I do see that.

7              I do not recall what specialist

8    Dr. Stinneford was, S-t-i-n-n-e-f-o-r-d.  And right

9    now, I'm going to look to see if I actually have that

10   report among my own medical records.

11             I did not attach -- if I did, I did not

12   attach and bring significance to its content.  But

13   let me see if I've got it.

14        Q.   Yeah, and I'm not seeing the name that you're

15   referring to.

16        A.   It's the doctor who signed this report.  It's

17   on the second page.

18        Q.   Oh, on the next page?

19        A.   Yeah.

20        Q.   Yes.

21             Well, I -- you know, before you try to find

22   other records, I don't know if you're going to

23   disagree with any of this, because it's pretty

24   high-level.  So you may want to see what questions I

25   ask before you --
```

```
 1        A.   Yeah, absolutely.

 2             The point is that I don't think I have that

 3   in my medical records file for Mr. Karman.  But I

 4   have this in front of me, and I'm happy to answer any

 5   questions about it.

 6        Q.   Okay.  So this is a record from very shortly

 7   before Mr. Karman passed away, right?

 8        A.   Yeah.  About three days.

 9        Q.   And his medical -- you see the medical

10   history summary?

11        A.   Yes.

12        Q.   And do you agree that all these things that

13   are listed are things that he had wrong with him?

14        A.   That's correct.

15        Q.   And so the first one is non-Hodgkin's

16   lymphoma, right?

17        A.   Yes.

18        Q.   But then what follows is hypertension, COPD,

19   atrial fibrillation with rapid ventricular response,

20   dyspnea, and pneumonia, dysphagia was aspiration,

21   right?

22        A.   That's correct.

23        Q.   So he had all those problems at the time he

24   went in for this -- for this particular consultation,

25   right?
```

```
1        A.   I agree with that.

2        Q.   And within a few days of this -- well, one of

3   the problems he was having is he couldn't eat

4   anymore, right?

5        A.   That's correct.

6        Q.   And the doctors thought about placing a

7   feeding tube, but he and his family decided they

8   didn't want that, right?

9        A.   Yes.

10        Q.   Is it fair to say that the records reflect

11   that Mr. Karman had decided not to keep going at this

12   point?

13        A.   Well, not in general.  I mean, that was about

14   one particular intervention.  They didn't talk about

15   intravenous feedings, which would have been another

16   option; just about placing a nasogastric tube, which

17   is uncomfortable and compromises quality of life.

18             I definitely did not have this, and it

19   seems like the -- (garbled audio) -- talked about

20   placing a gastrostomy tube, which is where the

21   feedings go directly into the stomach from the

22   outside and not down the tube through the nose.

23        Q.   Well, that's -- and that's mentioned on the

24   next page, right?

25        A.   That's what I'm looking at, yes.
```

1      Q.   And they declined the gastrostomy tube as

2    well?

3      A.   Gastrostomy tube, that's correct.

4           This also appears to be an inpatient

5    consultation.  He was still in Presence Saint Joseph

6    Hospital, and if the date of this was the 12th, that

7    was the date that he was discharged home with

8    hospice.

9      Q.   And getting back to my original question:

10   Once they declined the feeding tube and he wasn't

11   able to eat or drink, isn't it fair to say that

12   Mr. Karman had decided not to keep going?

13     A.   That's consistent with it.

14          But, you know, we don't have documentation of

15   a broader discussion about this, because, you know,

16   there's another note that says, "I do not want to go

17   home."  And then he changed his mind.

18          So, you know, yes, I did not have any of

19   these things:  The consultation by Dr. Riaz or the

20   consultation by Dr. Stinneford or the consultation by

21   Dr. Allam -- sorry.  That last one was not a

22   consultation; it was the discharge summary.

23     Q.   And if you'll -- if you -- yeah, if you turn

24   to the page with the Bates number 1359 at the bottom.

25     A.   Yes.  That's the discharge summary.

Ron D. Schiff, M.D., Ph.D.

```
 1        Q.   The discharge summary.

 2             And then it says:  "Underlying prolonged

 3   illness of COPD and chronic active smoker, underlying

 4   non-Hodgkin's lymphoma, on chemotherapy, and comes to

 5   the hospital for increasing shortness of breath and

 6   worsening overall condition."

 7             Right?

 8        A.   That's correct.

 9        Q.   And then later on in that same paragraph it

10   says:  "The patient has been (blank) he was refusing

11   to follow recommendations.  On further discussing

12   with the family members on several occasions and with

13   the overall prognosis with long-term medical problems

14   and with his overall poor quality of life, the

15   patient was recommended hospice."

16             Do you see that?

17        A.   Yes.

18             Like you, I don't know what should have been

19   in the space that's blank.  But everything else is

20   accurate, yes.

21        Q.   And, again, just getting back to my original

22   question:  As a doctor, you understand that at

23   advanced age, with all these comorbidities, that it

24   was a rational decision for Mr. Karman to refuse any

25   further treatment and not continue, right?
```

1    A.   Well, you know, I'm not disputing that.

2         But, remember, I didn't have access to any of

3    these three reports prior to just now.

4         But in addressing the general issue, I

5    pointed out that his COPD played a significant role

6    in the acute respiratory illnesses but resulted in

7    his hospitalizations and in his progressive

8    generalized weakness and overall deterioration

9    between when the lymphoma was diagnosed and when he

10   died.

11        But the lymphoma, the lymphoma treatment, and

12   the immunosuppression attributable to both the

13   lymphoma and its treatment more likely than not were

14   major contributing factors as well.

15        So, you know, I mean, I think that it's

16   disingenuous to imply or conclude that he basically

17   died of COPD and its complications.  I think it was

18   more complicated than that.

19    Q.   Well, you have to agree, though, that COPD

20   and his other comorbidities played a very substantial

21   factor in his decision to not continue with his life,

22   right?

23    A.   There's no question about that.

24        But the course that was taken was doubtless

25   influenced by his lymphoma and its treatment as well.

Ron B. Schiff, M.D., Ph.D.

```
 1              MR. BRENZA:  Okay.  Doctor, do -- I'm not

 2       sure how much more time we have.

 3              Maybe we should just go off the record for a

 4       second and just get the videographer to give us a

 5       time check.  I think we may be getting toward the

 6       end of our time here.

 7              THE WITNESS:  I'm happy to go on as long as

 8       you need, up to another hour or hour and a

 9       quarter.

10              MR. BRENZA:  Well, we have an agreement that

11       I want to live by that this would take three

12       hours, but -- so I'm not going to make you do

13       that.  But I just want to make sure that we're on

14       track.

15              So why don't we go off the record.

16              If you need to use the restroom, too, you can

17       just take a, like, a one-minute break, and the

18       videographer can just chime in with where we are

19       on the clock.

20              THE WITNESS:  I'm going to get a drink.  Can

21       I stop my video?

22              THE VIDEOGRAPHER:  One moment, please.

23              The time is 5:00 p.m.  Off the record.

24              (Recess from 5:00 until 5:02 p.m.)

25              THE VIDEOGRAPHER:  The time is 5:02 p.m.  On
```

1          the record.

2     BY MR. BRENZA:

3          Q.   So, Doctor, we -- the one area we really

4     didn't have time to cover extensively or really

5     almost at all is the medical literature that you rely

6     on.

7          A.   Okay.

8          Q.   What -- so why don't I just ask you this:

9     What's the single most important study from your

10    perspective that underlies your report?

11         A.   All right.  Well, I'm taking that to mean

12    that you're asking me about my general causation

13    opinions, okay?

14              And with respect to general causation, as a

15    clinical guy, a medical oncologist and hematologist,

16    I'm interested in IARC, and I'm interested in Zhang.

17              Why?  Because those are overviews that do the

18    heavy lifting in summarizing the individual studies

19    for me.

20              Yes, I've read all of the individual studies,

21    and I have opinions about them.  But, you know, in my

22    report, I, you know, explicitly chose not to go

23    through all that.  I cited IARC; I cited, you know,

24    parallels with PCB litigation; and I devoted almost a

25    whole paragraph to Zhang.

1          And, you know, and so those -- you know,

2     those are going to be the most important things.

3          Q.   And Zhang is what's called a meta-analysis,

4     right?

5          A.   Correct.

6          Q.   And a meta-analysis combines data from other

7     studies into a new study, right?

8          A.   Yes, that's correct.

9          Q.   But it can't fix any of the flaws that exist

10    in the underlying data that it's combining, right?

11         A.   No.

12              But it can recognize them, it can identify

13    inconsistencies, and it can attach value or weight to

14    the individual studies based on their strengths and

15    weaknesses.

16         Q.   Are you familiar with the study called the

17    Agricultural Health Study?

18         A.   Yes.

19         Q.   And you chose not to rely on that at all in

20    your report, right?

21         A.   Well, I didn't cite it in my report.  But I'm

22    certainly, you know, very well-familiar with that

23    study.  There's no question about that.

24         Q.   But you didn't -- you didn't use it as part

25    of your opinions, did you?

Ron D. Schiff, M.D., Ph.D.

1      A.   I did not.

2           But the point is, that the data from the

3      Agricultural Health Study is also included in the two

4      meta-analyses that I've cited in the IARC report,

5      which included its own meta-analysis and in the

6      pooled analysis, so --

7      Q.   And are you referring to Zhang and -- IARC

8      and Zhang now?

9      A.   IARC and Zhang but also Leon and --

10     Q.   Pahwa?

11     A.   Yeah.

12     Q.   So it's important to you that those

13     studies -- those four sources correctly took into

14     account the Agricultural Health Study, right?

15     A.   Absolutely.

16          I mean, you know, the influence of the

17     Agricultural Health Study is all over those

18     meta-analyses.

19     Q.   And the Agricultural Health Study is the

20     largest prospective study that's ever been done on

21     pesticide use, right?

22     A.   I don't remember that exactly, but I think

23     that is correct.

24     Q.   And one of those pesticides was glyphosate?

25     A.   Yes.

Ron D. Schiff, M.D., Ph.D.

1       Q.   And the Agricultural Health Study, you found,

2   that there was no -- that glyphosate didn't cause any

3   kind of cancer, right?

4            MS. FREDONA:  Objection.

5       A.   Okay.  Was not expecting to answer specific

6   questions about that.

7            But in point of fact, the 2003 paper by

8   De Roos, which is the Agricultural Health Study

9   population at that time, reports a statistically

10  significant odds ratio of 2.1 in their logistic

11  regression model.

12           So in actual fact, yes, De Roos, in one of

13  her studies, is able to be cited as showing evidence

14  of causation of non-Hodgkin lymphoma by glyphosate

15  exposure.

16      Q.   And this is the article that I put in your

17  packet, that De Roos 2003:  "Integrative Assessment

18  of Multiple Pesticides as Risk Factors for

19  Non-Hodgkin's Lymphoma Among Men"?

20      A.   That's the one.

21      Q.   And where were you looking to say that

22  De Roos finds a connection between glyphosate and

23  NHS?

24      A.   Okay.  This is an Internet copy; this is not

25  from the journal.  So the page number here is not

1    going to correspond to the page in the journal

2    article.  But I am looking at Page 5 of 9 in Table 3.

3              MR. BRENZA:  And I'm not sure what we're up

4         to in terms of exhibits, but why don't we give

5         this one -- I think we're up to 9.  So why don't

6         we mark this as 9.

7              (Schiff Exhibit 9 was marked for

8    identification.)

9         A.   Yeah, I can't vouch for where we are on

10   exhibits, but I just marked this one 9.

11        Q.   I think that's right.

12             So what page, 5 of 9, you said?

13        A.   Yes.  And I'm talking specifically about

14   Table 3.

15        Q.   Okay.  I see it.

16             So you're going down to herbicides and then

17   the entry for glyphosate and then you're reading over

18   to the third column; is that correct?

19        A.   Correct, yes.

20        Q.   Logistical Regression?

21        A.   Yes.

22        Q.   If you read over to the Hierarchical

23   Regression, which is the next column over, you see

24   that the correlation is no longer statistically

25   significant, right?

Ron D. Schiff, M.D., Ph.D.

```
 1        A.    I agree with that.

 2        Q.    And do you have a reason basis to say why you

 3   prefer the logistical regression over the

 4   hierarchical regression?

 5        A.    Well, first of all, I'm acknowledging that

 6   both of them make valid points about the association.

 7   But in regard to the hierarchical regression model,

 8   that relies on putting in and attempting to control

 9   for other possible exposures, which we don't know if

10   they're complete or how they were decided on.

11             So I'm going to try to find that in the

12   Methods section.

13        Q.    But everything else being equal, you'd rather

14   control for other exposures, right?

15        A.    Assuming that it was -- well, yeah.  I mean,

16   the point is that with that, if you have a random

17   grouping of people in whom you either do or don't

18   have one specific exposure, you can get value out of

19   that.

20             But if you're trying to account for every

21   possible exposure, you don't know if you have really

22   been exhaustive in compiling the list and if you have

23   the accurate factors in there.

24             Now, you know, these are questions that are

25   much better directed toward a statistician, someone
```

Ron D. Schiff, M.D., Ph.D.

```
 1    who is familiar with advanced statistical modeling

 2    techniques.

 3              But what I'm trying to look at here under

 4    hierarchical regression is that they're mostly

 5    looking at other pesticides.  And we are

 6    well-aware -- yeah -- yeah, a whole lot of other

 7    ones, and yet one of the criticisms of this De Roos

 8    paper and the AHS in general has to do with exposure

 9    classification.

10              Now, the -- you know, the concepts and the

11    statistical outcomes of exposure misclassification

12    are, again, better directed to a -- an expert on

13    statistics or at least an expert in epidemiology; in

14    other words, an epidemiologist who deals with that on

15    a regular basis.

16              But the point is that this relies on

17    questionnaires where there was a lot of missing data

18    and on the ability of people to recall the

19    circumstances of all of their different pesticide

20    exposures, which maybe some of them were good at it;

21    maybe some of them weren't so good.

22              But the point is that by going to a

23    hierarchical regression analysis, you're pinning a

24    lot of effort on the fact that you are getting a

25    representative sample of accurate exposure
```

 1    information.

 2            And I don't know that you can do that.

 3            So the point is that De Roos presents the

 4    results of the logistic regression and the results of

 5    the hierarchical regression, and, yeah, we look at

 6    both of those and we judge accordingly.

 7            And, you know, and when you get right down to

 8    it, the differences aren't that huge, because the

 9    lower confidence interval is 1.1 for logistical and

10    0.9 for hierarchical, and both of them have a pretty

11    substantial odds ratio, 2.1 versus 2.6.

12            So the point is, not everything goes away,

13    but, yes, statistical significance compared between

14    those two types of analysis, that does go away.

15            MR. BRENZA:  I want to just -- I'm going to

16        call it quits, but I just want to make sure we

17        mark things correctly.

18            So the De Roos article, we've marked as 9.

19            I'd like you to -- we previously marked Zhang

20        as 5.

21            I'd like you to mark the Pahwa article as 10.

22            (Schiff Exhibit 10 was marked for

23    identification.)

24            THE WITNESS:  Okay.  I've just now misplaced

25        the article we were just talking about, so please

Ron D. Schiff, M.D., Ph.D.

```
1        let me find that again.

2              All right.  I have it.  And what number am --

3        oh, that's Number 9.

4              MR. BRENZA:  No.  The Pahwa is going to be

5        10.

6              THE WITNESS:  Oh, the De Roos Number 9.

7              MR. BRENZA:  De Roos is 9.

8              THE WITNESS:  And you want me to mark Pahwa

9        10.

10             MR. BRENZA:  You said that was one of the

11       important ones, so -- to you, at least.  So Pahwa

12       is 10.

13             And then you also said Leon is important,

14       right?

15             THE WITNESS:  Yes.

16             MR. BRENZA:  So we'll mark that as 11.

17             (Schiff Exhibit 11 was marked for

18    identification.)

19             THE WITNESS:  Okay.  Right now --  all right.

20       Pahwa is 10.

21             Okay.  And now I have Leon.  Leon is 11?

22             MR. BRENZA:  Yes.

23             THE WITNESS:  All right.  They're all marked.

24             MR. BRENZA:  And I think that's all we have

25       time for today, so --
```

1          MS. FREDONA:  Actually, I have a couple of

2      questions.

3          MR. BRENZA:  Go ahead.

4          MS. FREDONA:  All righty.

5                    CROSS-EXAMINATION

6  BY MS. FREDONA:

7      Q.   Doctor, as for the internal IARC protocol, do

8  you work for IARC?

9      A.   Do I work for IARC?

10     Q.   Yes.

11     A.   No.  Of course not.

12     Q.   Okay.  Are you on a board or a committee of

13  IARC?

14     A.   No.  Never have been.

15     Q.   As for your opinions of the EPA reviews of

16  glyphosate, why do you consider them controversial?

17     A.   Because from what I have read about it, there

18  was a tremendous amount of industry influence,

19  especially going from Monsanto toward the EPA

20  assessment team.

21     Q.   Have you ever told any of your patients that

22  chemical exposure did not cause their non-Hodgkin's

23  lymphoma?

24     A.   No.

25     Q.   Have you ever told a patient that Roundup did

1    not cause their non-Hodgkin's lymphoma?

2        A.    No.

3              But, again, I retired in the spring of 2015

4    when the findings of IARC were first becoming

5    disseminated in the general medical literature.

6              I distinguish that from the types of

7    epidemiology literature where the individual studies

8    began to appear back in the '90s.  Those are not

9    things that would be read by clinicians in my field.

10   Once it hit the Lancet would that attract the type of

11   attention of somebody like me.

12       Q.    Okay.  Why didn't you find vapor pressure and

13   droplet size relevant in this case?

14       A.    Well, I mean, there's a couple reasons for

15   that.  Number one, I have no expertise in that.

16   Number two, I had two data for it.  Number three, I

17   had no scientific studies that incorporated those

18   parameters.

19       Q.    Okay.  All right.  And as for the SEER data,

20   has smoking rates gone down in the past few years?

21       A.    Well, yes.  Absolutely.

22              I mean, there was certainly a period of time

23   when smoking among men went down but among women,

24   continued to increase.  But overall, smoking rates

25   are less than they were historically in the United

1    States.

2        Q.   All right.  And with the smoking rates

3    reduced, could that be compensating for the increased

4    Roundup usage in the SEER data?

5            MR. BRENZA:  Calls for speculation.

6        A.   Sure.

7            But the point is that we don't know.  And,

8    you know, this speaks to the speculation issue.  We

9    don't know to what extent each of those contributes

10   to the observed pattern.

11           So, yes, we would expect that smoking would

12   mitigate the risk, whereas Roundup exposure would

13   increase it.

14       Q.   All right.  One last question:  In your

15   expert opinion, to a reasonable degree of scientific

16   and medical certainty, was Roundup exposure a

17   substantial factor in causing Mr. Karman's

18   non-Hodgkin's lymphoma?

19       A.   Yes, it was.

20           MS. FREDONA:  All right.  I have no more

21       questions.

22           MR. BRENZA:  I have just one follow-up line.

23                   REDIRECT EXAMINATION

24   BY MR. BRENZA:

25       Q.   Doctor, you said that you'd read something

Ron D. Schiff, M.D., Ph.D.

```
 1     that -- on the Internet or somewhere that the EPA was

 2     controlled by industry, and Monsanto had control over

 3     the EPA.

 4          What exactly are you referring to?

 5          MS. FREDONA:  -- the record.

 6     A.   Okay.  No, that -- no, that was not the

 7     Internet.  That was something from Bloomberg, and

 8     this was something that was provided to me

 9     unsolicited by attorneys that I worked with

10     previously.

11          I have an article, first author Waldman,

12     W-a-l-d-m-a-n entitled:  Does the words -- "Does the

13     World's Top Weed Killer Cause Cancer?  Trump's EPA

14     Will Decide."

15          This was from Bloomberg Businessweek,

16     July 13, 2017.

17     Q.   July, what was the date?

18     A.   July 13, 2017.

19     Q.   I'll just ask that -- your counsel is

20     probably going to be gathering up a few things to

21     give to us anyway -- that you produce that, along

22     with whatever else you put together for -- as a

23     result of this deposition.

24     A.   Yeah.  I have those two and -- I'm sorry, I

25     have that one, and I have the two things that were
```

 1     the IARC statements --

 2        Q.   Yes.

 3        A.   -- in response to criticisms.

 4             So I will produce those.

 5             And very soon, we will invoice the Moll Law

 6     Group, and then you will have access to the work that

 7     I did after I submitted my report.

 8        Q.   And we should be getting your invoice.  I

 9     don't think we've gotten them yet.  So why don't you

10     include those, if you haven't already.

11        A.   Well, the Moll Law Group has the earlier one.

12     So I would hope that they could just send that to

13     you.

14             MR. BRENZA:  So -- yeah.  So, in fact, I

15        just -- whenever you get this package of stuff

16        from the doctor, just include that stuff with it,

17        please.

18             MS. FREDONA:  All righty.  May I have your

19        e-mail address?

20             MR. BRENZA:  Why don't -- I'll give it to you

21        offline.  Yeah, I mean...

22             THE VIDEOGRAPHER:  Are you ready to go off

23        the record, Mr. Brenza?

24             MR. BRENZA:  Yes.

25             THE VIDEOGRAPHER:  The time is 5:19 p.m.  Off

Ron D. Schiff, M.D., Ph.D.

1        the record.

2                (Whereupon, the deposition concluded at

3     5:19 p.m.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ron D. Schiff, M.D., Ph.D.

```
 1                 C E R T I F I C A T E

 2              I, KELLY J. LAWTON, Registered Professional

 3     Reporter, Licensed Court Reporter, and Certified

 4     Court Reporter, do hereby certify that prior to the

 5     commencement of the examination, RON D. SCHIFF, M.D.,

 6     Ph.D., was duly remotely sworn by me to testify to

 7     the truth, the whole truth, and nothing but the

 8     truth.

 9              I do further certify that the foregoing is a

10     verbatim transcript of the testimony as taken

11     stenographically by me at the time, place, and on the

12     date hereinbefore set forth, to the best of my

13     ability.

14              I do further certify that I am neither a

15     relative nor employee nor attorney nor counsel of any

16     of the parties of this action, and that I am neither

17     a relative nor employee of such attorney or counsel,

18     and that I am not financially interested in the

19     action.

20     ____  _____      _____

21              KELLY J. LAWTON, RPR, LCR, CCR

22              (The foregoing certification of this

23     transcript does not apply to any reproduction of the

24     same by any means, unless under the direct control

25     and/or supervision of the certifying reporter.)
```

Ron D. Schiff, M.D., Ph.D.

```
 1                 INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5     and make any necessary corrections.  You should state

 6     the reason in the appropriate space on the errata

 7     sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10     and date it.  It will be attached to your deposition.

11

12          It is imperative that you return the original

13     errata sheet to the deposing attorney within thirty

14     (30) days of receipt of the deposition transcript by

15     you.  If you fail to do so, the deposition transcript

16     may be deemed to be accurate and may be used in

17     court.

18

19

20

21

22

23

24

25
```

Ron D. Schiff, M.D., Ph.D.

```
 1                   - - - - - -

 2                 E R R A T A

 3                   - - - - - -

 4   PAGE    LINE    CHANGE

 5   _____   _____   _____

 6      REASON: _____

 7   _____   _____   _____

 8      REASON: _____

 9   _____   _____   _____

10      REASON: _____

11   _____   _____   _____

12      REASON: _____

13   _____   _____   _____

14      REASON: _____

15   _____   _____   _____

16      REASON: _____

17   _____   _____   _____

18      REASON: _____

19   _____   _____   _____

20      REASON: _____

21   _____   _____   _____

22      REASON: _____

23   _____   _____   _____

24      REASON: _____

25
```

Ron D. Schiff, M.D., Ph.D.

```
 1                 ACKNOWLEDGMENT OF DEPONENT

 2

 3            I, RON SCHIFF, M.D., Ph.D., do hereby

 4     acknowledge that I have read the foregoing pages, 1

 5     to 159, and that the same is a correct transcription

 6     of the answers given by me to the questions therein

 7     propounded, except for the corrections or changes in

 8     form or substance, if any, noted in the attached

 9     Errata Sheet.

10

11

12     _____        _____

13     RON SCHIFF, M.D., Ph.D.                         DATE

14

15

16

17

18     Subscribed and sworn to before me this

19     _____ day of _____, 20___.

20     My Commission expires: _____

21

22     _____

       Notary Public

23

24

25
```

```
 1                        LAWYER'S NOTES

 2

 3     PAGE    LINE

 4     _____   _____    _____

 5     _____   _____    _____

 6     _____   _____    _____

 7     _____   _____    _____

 8     _____   _____    _____

 9     _____   _____    _____

10     _____   _____    _____

11     _____   _____    _____

12     _____   _____    _____

13     _____   _____    _____

14     _____   _____    _____

15     _____   _____    _____

16     _____   _____    _____

17     _____   _____    _____

18     _____   _____    _____

19     _____   _____    _____

20     _____   _____    _____

21     _____   _____    _____

22     _____   _____    _____

23     _____   _____    _____

24     _____   _____    _____

25     _____   _____    _____
```