# EXHIBIT 12

Mark A. Pecorelli

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4  IN RE: ROUNDUP PRODUCTS       ) MDL No. 2741

 5  LIABILITY LITIGATION          )

 6  ------------------------      ) Case No. MDL No.

 7  This document relates to:     ) 3:16-md-02741-VC

 8  Pecorelli v. Monsanto,        )

 9  Case No. 3:16-cv-06936-VC     )

10

11

12              VIDEOTAPED DEPOSITION OF

13

14                MARK A. PECORELLI

15                November 12, 2019

16

17                Chicago, Illinois

18

19

20

21           GOLKOW LITIGATION SERVICES

            877.370.3377 ph| 917.591.5672 fax

22                deps@golkow.com

23

24
```

Mark A. Pecorelli

1

2

3      The videotaped deposition of MARK A. PECORELLI,

4    called by the Defendant for examination, taken

5    pursuant to the Federal Rules of Civil Procedure of

6    the United States District Courts pertaining to the

7    taking of depositions, taken before CORINNE T.

8    MARUT, C.S.R. No. 84-1968, Registered Professional

9    Reporter and a Certified Shorthand Reporter of the

10    State of Illinois, at the offices of Shook, Hardy &

11    Bacon L.L.P., Suite 4700, 111 West Wacker Drive,

12    Chicago, Illinois, on November 12, 2019, commencing

13    at 9:04 a.m.

14

15

16

17

18

19

20

21

22

23

24

Mark A. Pecorelli

```
 1    APPEARANCES:

 2    ON BEHALF OF THE PLAINTIFF:

 3          MOLL LAW GROUP

             22 West Washington Street, 15th Floor

 4          Chicago, Illinois  60602

             312-448-9945

 5          BY:  STEPHEN CADY, ESQ.

                  scady@molllawgroup.com

 6

 7

 8    ON BEHALF OF THE DEFENDANT:

 9          SHOOK, HARDY & BACON L.L.P.

             2555 Grand Boulevard

10          Kansas City, Missouri  64108-2613

             816-474-6550

11          BY:  JANE J. BARTLEY, ESQ.

                  jbartley@shb.com

12

13

14

15    VIDEOTAPED BY:  MILO SAVICH

16

17    REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968

18

19

20

21

22

23

24
```

Mark A. Pecorelli

```
 1         THE VIDEOGRAPHER:  We are now on the record.

 2              My name is Milo Savich, and I am a

 3    videographer for Golkow Litigation Services.

 4              Today's date is November 12, 2019, and

 5    the time is 9:04 a.m.

 6              This video deposition is being held in

 7    Chicago, Illinois, in the matter of Roundup,

 8    Pecorelli vs. Monsanto Company.  This case is being

 9    heard in the United States District Court, Northern

10    District of California.

11              The deponent is Mark Pecorelli.

12              Will counsel please identify themselves

13    for the record.

14         MR. CADY:  Stephen Cady for the Plaintiff from

15    Moll Law Group.

16         MS. BARTLEY:  Jane Bartley for Monsanto

17    Company.

18         THE VIDEOGRAPHER:  The Court Reporter is Corey

19    Marut who will now swear in the witness and we may

20    then proceed.

21                   (WHEREUPON, the witness was duly

22                    sworn.)

23

24
```

1              MARK A. PECORELLI,

2   called as a witness herein, having been first duly

3   sworn, was examined and testified as follows:

4                   EXAMINATION

5   BY MS. BARTLEY:

6       Q.    Good morning.

7       A.    Good morning.

8       Q.    My name is Jane Bartley, and I'm an

9   attorney for Monsanto Company.

10             Can you please introduce yourself, and

11   please state your full name.

12       A.    My name is Mark A. Pecorelli.

13       Q.    Have you ever been deposed before?  Have

14   you ever had your deposition taken before?

15       A.    Yes.

16       Q.    Okay.  How many times have you been

17   deposed?

18       A.    Once.

19       Q.    Just once.  And what was the nature of

20   that -- that legal action?

21       A.    It was inheritance.  I was trustee in --

22   of my parents' trust.

23       Q.    And, so, did that result in a dispute in

24   which you had to be deposed?

Mark A. Pecorelli

```
 1    question.

 2         Q.    Well, you -- on your Plaintiff's Fact

 3    Sheet on page 34.

 4         A.    Right.

 5         Q.    You refer to Sevin Insect Killer.

 6               I'll let you get to that page first.

 7         A.    Okay.  I believe you if it's on there.

 8    It rings a bell.  I'm not sure.

 9         MR. CADY:  Turn to the page, Mark, and look

10    at --

11         THE WITNESS:  Okay.

12         MR. CADY:  -- what she's asking you about.

13    BY THE WITNESS:

14         A.    37?  So, it's going to be going --

15    BY MS. BARTLEY:

16         Q.    34.

17         A.    34.  34.

18         Q.    Okay.  Do you see the reference to Sevin

19    Insect Killer on page 34?

20         A.    No, I don't.

21         MR. CADY:  Here.  You got it.

22    BY THE WITNESS:

23         A.    Oh, okay.  I was looking for a number 7.

24    Okay.  I'm sorry.
```

Mark A. Pecorelli

1   BY MS. BARTLEY:

2        Q.    Okay.

3        A.    Yeah.

4        Q.    So, do you have a memory of your

5   father --

6        A.    Yes.

7        Q.    -- using Sevin Insect Killer?

8        A.    Yeah.

9        Q.    Okay.  And here's there's a reference

10  to, on that same line, "Used as pesticide to

11  maintain plants"?

12       A.    If there was a disease on the plants,

13  yes.  Not maintain them, you know.  It was to -- it

14  was an insect killer.

15       Q.    Okay.  So, was Sevin Insect Killer used

16  at the nursery?

17       A.    Not sure.

18       Q.    Okay.

19       A.    Something is confusing about the Sevin.

20  I think it's Diazinon Sevin.  I don't know.  I

21  don't recall.

22       Q.    Well, I just want to make sure.  When

23  you referenced Diazinon earlier, were you thinking

24  of two separate things, Diazinon and Sevin Insect

Mark A. Pecorelli

1  Killer, or were you --

2       A.    I think they're together.  This was

3  called Diazinon Sevin.  I'm not sure.

4       Q.    Okay.  What did you mean on the

5  Plaintiff's Fact Sheet when you said, "Used as

6  pesticide to maintain plants"?

7       MR. CADY:  Objection; asked and answered.  You

8  can answer.

9  BY THE WITNESS:

10       A.    If it had mites or any kind of a bug

11  like that.  It's to kill the bug so it doesn't kill

12  the plant.

13  BY MS. BARTLEY:

14       Q.    So, when you listed it on the

15  Plaintiff's Fact Sheet in terms of identifying it

16  as something your father used, where did he use it

17  at?  In what aspect of the landscaping business?

18       A.    The nursery.

19       Q.    At the nursery?

20       A.    The nursery and on plants, if we

21  installed them, as maintenance, all the way as

22  maintenance.  So, if we installed a plant or

23  something and you spray for that so it doesn't

24  have -- they're mites.  There's -- I can't recall

1    the name of the bugs.  But that's what -- that

2    takes care of it.

3        Q.    Okay.  So, again, I'm just thinking of

4    the different aspects of your father's landscaping

5    business.  It was applied at the nursery?

6        A.    Yes.

7        Q.    Okay.  Was it applied on landscaping

8    jobs?

9        A.    Some.

10        Q.    Okay.  Was it applied for weekly routine

11    lawn work?

12        A.    No, no, no, it wasn't a weekly deal.

13        Q.    Okay.

14        A.    No.

15        Q.    Okay.

16        A.    There's like a spider mite that's on the

17    elder spruce that comes in.  That takes care of

18    that.

19        Q.    Did your father ever apply any

20    insecticides or bug spray in the context of his --

21    totality of his landscaping business, in any aspect

22    of his landscaping business?

23        A.    For bugs?

24        Q.    Yes.  Separate and apart from

Mark A. Pecorelli

1    pesticides.  I'm talking about insecticides, bug

2    spray.

3         A.    No, just -- no, no.

4         Q.    Nothing like that?

5         A.    No.

6         Q.    Okay.  Did your father ever utilize or

7    apply any rodenticides, rodents?

8         A.    No.

9         Q.    At the landscaping business?

10        A.    No.

11        Q.    Okay.

12        A.    Cats out there for the rodents.

13        Q.    You indicated on the Plaintiff's Fact

14   Sheet that your father would have been exposed to

15   solvents in the landscaping business.  Right?  What

16   solvents would he have been exposed to?

17        A.    I'm not sure.  Give me the -- solvents

18   meaning what?

19        MR. CADY:  What page are you on, Counsel?

20   That might help.

21        MS. BARTLEY:  Let's see.  It's page 13.

22        MR. CADY:  Okay.

23   BY THE WITNESS:

24        A.    13.  Okay.

Mark A. Pecorelli

1   BY MS. BARTLEY:

2       Q.   I might have that page wrong.

3       MR. CADY:  Yeah, I don't think that's it.

4   BY MS. BARTLEY:

5       Q.   Page 15.

6       A.   Okay.

7       MR. CADY:  Okay.

8   BY THE WITNESS:

9       A.   Okay.  Let's see.

10  BY MS. BARTLEY:

11      Q.   So, on page 15, the question was -- that

12  you were asked to answer was have you -- excuse

13  me -- your father ever worked in any of the

14  occupations or workplaces listed below.  If so,

15  please check yes.

16          And one of the questions was in an

17  industry in which he would have handled solvents,

18  about halfway, less than halfway down the page.

19          And you indicated 1 and 2, meaning the

20  two references to the landscaping business.  So, my

21  question --

22      A.   The only thing I can think of is

23  solvents was for cleaning our hands as a solvent.

24  A hand cleaner.  Only thing I can think of that I

Mark A. Pecorelli

```
 1    had to come out to the nursery.  "What are you

 2    doing?"  When he was retired.  "What are you doing

 3    there?"  I mean, he just -- that was his life,

 4    work.

 5            I mean, going to -- when he died in '12

 6    in January, it was nice weather I believe and he

 7    was like, "Let's go to work."

 8            I mean, forget it.  Strike that.  Strike

 9    that.  I don't.

10       MR. CADY:  Whenever you get to a good stopping

11    point, Counselor, it might be good to take a break.

12    We have been going for about an hour and maybe 40

13    minutes, 30 minutes.

14       MS. BARTLEY:  Absolutely.

15       MR. CADY:  Okay.

16       MS. BARTLEY:  That's fine.  Do you want to go

17    ahead and go off the record?

18       MR. CADY:  Yeah, if you're at a good point.

19       MS. BARTLEY:  Okay.

20       THE VIDEOGRAPHER:  Okay.  The time is 10:40

21    a.m.  This is the end of Tape 1, and we're going

22    off the video record.

23                 (WHEREUPON, a recess was had

24                  from 10:40 to 10:53 a.m.)
```

Mark A. Pecorelli

```
 1          THE VIDEOGRAPHER:   The time is 10:53 a.m.

 2   This is the beginning of Tape 2, and we're back on

 3   video record.

 4   BY MS. BARTLEY:

 5      Q.    I think before we took a break we were

 6   talking about your father's employment history and

 7   his retirement.

 8             Let me switch gears here a little bit

 9   and ask you about yourself.

10             Where are you currently working?

11      A.    I'm disabled.

12      Q.    You're disabled.  Okay.  What year --

13      A.    I'm on disability.

14      Q.    You're on disability.  What year did you

15   go on disability?

16      A.    2010.

17      Q.    Okay.  And why did you go on disability?

18   What's the nature of the disability?

19      A.    Lung cancer.

20      Q.    And I'm going to follow up and ask you a

21   couple questions about that here in a little bit.

22             Before you went on disability, what did

23   you do to earn a living?

24      A.    Worked --
```

Mark A. Pecorelli

1      Q.    Landscaping?

2      A.    Worked for landscaping.

3      Q.    Okay.

4      A.    Nursery, actually.

5      Q.    Worked at the nursery?

6      A.    Nursery, um-hmm, planting and designing.

7  Didn't do no lawn maintenance, no nothing.

8      Q.    How old were you when you started that

9  type of work?

10      A.    14 maybe.

11      Q.    And, so, since the age of 14 have you

12  always been in the landscaping and nursery work?

13      A.    Yes.  And garden center, retail.

14      Q.    And other than that short period of time

15  that you had your own nursery I believe it was --

16      A.    Well, it was my --

17      Q.    -- have you always worked for your

18  father?

19      A.    Yes.

20      Q.    Okay.  And, so, did you yourself apply

21  herbicides in the context of your own business

22  landscaping work as well as working for your

23  father?

24      A.    And the nursery, yes.

Mark A. Pecorelli

1      Q.    Okay.  And the nursery.  And, so, did

2  you apply Roundup?

3      A.    Yes.

4      Q.    Did you apply pesticides?

5      A.    Yes.

6      Q.    Did you apply Sevin Insect Killer?

7      A.    No, I didn't do anything for lawns.

8      Q.    When you say you didn't do anything for

9  lawns, you didn't do any of the weekly lawn work?

10     A.    Right.

11     Q.    Okay.

12     A.    But, yes, I have applied pesticides, you

13  know, at the nursery.

14     Q.    Okay.  And, so, did you -- did you apply

15  the Surflan and Treflan or Treflan that you

16  referred to earlier in the deposition?

17     A.    Yes, but it was small amount.  I mean,

18  it was like coffee cans full.  We just have a

19  coffee can after we dug a hole.

20     Q.    Okay.  And did you apply the Diazinon?

21     A.    That was for grubs.  No.

22     Q.    And --

23     A.    Now, the Diazinon, that was -- you're

24  confusing me.  That was for bugs?  I don't recall.

Mark A. Pecorelli

1    The Diazinon was for insect killer?

2         Q.    Well, I'm asking you.

3         A.    I don't recall.  I might have.  I don't

4    recall.

5         Q.    Okay.  Has your father ever filed a

6    workers' compensation claim for injuries or

7    accidents on the job?

8         A.    No.

9         Q.    And had your father ever applied for any

10   Social Security disability income?

11        A.    Not -- no.

12        Q.    And had your father ever been denied

13   life insurance coverage?

14        A.    No.

15        Q.    Did your father ever serve in the

16   military or in the Reserves?

17        A.    Air Force.

18        Q.    Air Force?

19        A.    Yeah.

20        Q.    Okay.  And what dates or years was he in

21   the Air Force?

22        A.    Two years.  I know that he served two

23   years in the Air Force.

24        Q.    And do you know what years those were?

Mark A. Pecorelli

1      A.    I don't recall offhand.

2      Q.    Do you know where he was stationed?

3      A.    No.

4      Q.    Do you know what his military

5   occupational specialty was?

6      A.    Cook.

7      Q.    Do you know if he had any exposure to

8   chemicals or hazardous materials as part of his job

9   responsibilities in the military?

10     A.    No.

11     Q.    You don't know --

12     A.    No, no, he didn't.

13     Q.    -- or he did not?

14     A.    He did not.

15     Q.    He did not.  Okay.

16           Did he ever serve in combat or in a

17   combat zone?

18     A.    No.

19     Q.    I should say that differently.

20           Do you know or do you not know one way

21   or the other?

22     A.    No.  I know that he didn't.

23     Q.    He was never --

24     A.    He was never in no contact or war.

Mark A. Pecorelli

```
1        Q.    Okay.  Did your father ever receive any

2   citations or medals in the military?

3        A.    Don't know.

4        Q.    You don't know?

5        A.    Don't know.

6        Q.    Okay.  Did your father ever sustain any

7   injuries while he was in the military?

8        A.    No.

9        Q.    Do you know if your father ever received

10  a medical discharge in the military?

11       A.    No.

12       Q.    Okay.

13       A.    I don't.

14       Q.    Do you know what type of discharge he

15  had?

16       A.    Time served.  I...

17       Q.    What hobbies or activities did your

18  father like to do on a regular basis?

19       A.    He liked the market, stock market.  He

20  was a guru in that.  That's -- and work.  All I

21  know.

22       Q.    Did he do a lot of investing?

23       A.    Sure, yeah.

24       Q.    And when you say he liked to do that,
```

Mark A. Pecorelli

1     Q.    So, in other words --

2     A.    That's a wrong date.  That's all I got

3   to say.

4     Q.    Okay.  What's the right date?

5     A.    It was before 2010 because I quit using

6   it in 2000 -- I -- 2010 I quit.

7     Q.    When did your father quit?

8     A.    Before that.

9           We're talking the house now in

10  Elk Grove, right, just the house, or are we talking

11  residential in Elk Grove or whatever?

12    Q.    When did your father stop using it for

13  the purposes of his landscaping business?

14    A.    2008 maybe.

15    Q.    Okay.

16    A.    2008.  I'd have to say.  Maybe before

17  that.  Maybe a year before that even.

18    Q.    Okay.  When did your father stop using

19  Roundup for the purposes of his home residence?

20    A.    That would be about the same time.  For

21  his home residence.

22    Q.    On ██████████?

23    A.    On ██████████.

24    Q.    He stopped using it --

Mark A. Pecorelli

```
1        A.     Right.

2        Q.     -- in 2008, both -- for all intents and

3   purposes, whether it's his business or home, he

4   stopped using Roundup in 2008, is that right?

5        A.     Maybe '7, '7 and '8, yes.

6        Q.     2007 to 2008?

7        A.     2008, we weren't -- all's we were doing

8   for the nursery was cutting weeds.  But, I mean, we

9   still used Roundup on jobs.  Not him personally,

10  but the company.

11       Q.     I'm only asking about your dad.

12       A.     Okay.  All right.  So, I would say --

13       Q.     When did he stop applying Roundup for

14  the purposes of his landscaping business?

15       MR. CADY:  Objection.  I think he's asked and

16  answered that.

17       MS. BARTLEY:  He just -- he just said not him

18  personally.  So, I'm asking the question again.

19  BY THE WITNESS:

20       A.     What I answered before was 2000 -- I'm

21  sorry.  2000 --

22       MR. CADY:  She is asking for your best

23  estimate, Mark, within a few years.

24  BY MS. BARTLEY:
```

Mark A. Pecorelli

```
 1        Q.    I'm going to --

 2        A.    2004 maybe, maybe '5, '4.

 3        Q.    So, I'm --

 4        A.    2004.

 5        Q.    Okay.  Your -- so, again, just to make

 6   sure we're on the same page.  When did your father

 7   personally stop applying Roundup for the purpose of

 8   his landscaping business?  In the context of his

 9   business, when did he personally --

10        A.    2004, '5 maybe.  2004 or '5, yeah.

11        Q.    2004 or '5?

12        A.    Yes.

13        Q.    Okay.  Now, in what year, to the best of

14   your ability, did he personally stop applying or,

15   you know, last time he applied Roundup himself for

16   the purpose of his residence or home address on

17   ██████████████

18        A.    Maybe a year before that, whenever the

19   pool was gone.  I don't -- I can't give you an

20   exact year.  Maybe 2000.  2000.

21        Q.    2000?

22        A.    I would say, yeah.

23        Q.    2000 at home.  Okay.

24        A.    Maybe even -- at the home we're talking
```

Mark A. Pecorelli

1   now.

2        Q.    At the home --

3        A.    At the residential.

4        Q.    -- on ████████

5        A.    Maybe even a little bit before that

6   because, see -- even, you know, even ten years.

7              He's got an oak tree in the backyard

8   there, okay, which provides shade.

9        Q.    Right.

10       A.    And where shade, weeds don't grow.  So,

11  I'm -- this is -- I'm just trying -- not guessing,

12  but I'm trying to go back to give you a date.

13       Q.    Okay.

14       A.    And to my recognization.

15       Q.    And -- and you're confident that his use

16  started in 1976 or so and that he stopped using, he

17  personally stopped using it in the landscaping

18  business around 2004, 2005?

19       A.    Maybe even 2000.

20       Q.    It could have been 2000 when he stopped

21  using it in the landscaping business?

22       A.    2002, yeah, right, what you got there.

23  It's a guess.  I can't answer that.

24       Q.    Okay.  I understand.

Mark A. Pecorelli

1        A.    I mean, we're going back.

2        Q.    I know.

3        A.    2000.  That's 20 years.

4        Q.    Exactly.  It's hard to say when he might

5   have --

6        A.    I don't know what I did yesterday.  No,

7   I'm just kidding.

8        Q.    I understand.  It's hard to say when he

9   might have --

10       A.    Right.

11       Q.    -- personally stopped using it, right?

12       A.    Right.

13       Q.    It could have been 2000, right?

14       A.    Could have been.

15       Q.    And it could have been 2000 when he

16   stopped using it around your -- your home address,

17   right?

18       A.    A little bit before.  The home address,

19   before 2000.

20       Q.    And it was before 2000?

21       A.    Yeah, yes.

22       Q.    Okay.  And even before 2000 I think your

23   testimony was you were doing most of the work

24   around the home address in terms of the yardwork

1   answer that, no.

2          But I do know that he has talked to the

3   company themselves.  800 number or some kind of

4   question number or something.

5       Q.   Okay.

6       A.   That I do know.  But what the

7   conversation was, I don't know.

8       Q.   Okay.  No idea what the conversation was

9   about?

10      A.   Something to do with the product.  What,

11  I don't know.  I can't specifically tell you, no.

12      Q.   Do you have any idea what year that was?

13      A.   No.  No.

14      Q.   Your best estimate?

15      A.   No estimate.  I can't give you.  I don't

16  know what year it was.

17      Q.   Was it after his diagnosis of lymphoma?

18      A.   Oh, before.  It would be before that.

19      Q.   Way before the diagnosis?

20      A.   Yes.

21      Q.   Okay.  Did you hear the conversation?

22      A.   No.  But I knew -- I knew he was calling

23  them.

24      Q.   Okay.  Have you ever communicated with

Mark A. Pecorelli

```
1    anyone at Monsanto about anything?

2         A.    No.

3         Q.    Do you recall if your father ever

4    used -- I'm going to list, give you a list of some

5    herbicides.

6               Do you recall if your father ever used

7    Eraser?

8         A.    No.

9         Q.    Buccaneer?

10        A.    No.

11        Q.    Envy?

12        A.    No.

13        Q.    Halex GT?

14        A.    No.

15        Q.    Flexstar GT?

16        A.    No.

17        Q.    Credit 41 Extra?

18        A.    No.

19        Q.    Tomahawk?

20        A.    No.

21        Q.    Would your father ever have tried

22   generic glyphosate products to save some money?

23        A.    No.

24        Q.    How do you know he wouldn't have ever
```

```
 1   bought a generic?

 2        A.    Because I know.  It's always by

 3   Monsanto.  I mean, because -- I know because of

 4   where it's stored, it loaded up, whatever.

 5        Q.    Because of what?

 6        A.    Putting it on the truck, loading it up

 7   when we go out to the farm.  It's always been

 8   Monsanto.

 9        Q.    It's always been Monsanto?

10        A.    Roundup.

11        Q.    Okay.  You noted -- we mentioned before

12   you noted on your Fact Sheet that your father used

13   a pesticide called Sevin Insect Killer.  I think

14   it's on page 34.  Right?

15              And then over the course of today's

16   deposition you also mentioned a couple of other

17   products, Diazinon?

18        A.    I think that's the same as Sevin.

19        Q.    Okay.

20        A.    I'm not sure.  I'm not sure.

21        Q.    All right.  If in your mind you're

22   viewing them as the same thing, we'll keep those

23   together, Diazinon --

24        A.    That's --
```

Mark A. Pecorelli

```
 1        Q.    -- Sevin Insect Killer.  Okay.

 2        A.    That's what I believe.

 3        Q.    And you also mentioned Weed and Feed?

 4        A.    Weed and Feed wasn't -- it was a

 5   herbicide, but that was granule.  That wasn't a

 6   spray.

 7        Q.    Okay.  That's a granule.

 8              And 24-RD?

 9        A.    2,4.

10        Q.    2,4-RD?

11        A.    Yeah, okay, 2,4-RD.

12        Q.    Okay.  And then something called either

13   Surflan or Treflan?

14        A.    Right.

15        Q.    Okay.

16        A.    That was granule too.

17        Q.    I'm going to try to streamline this and

18   kind of -- to the best that I can.

19              For each of those other products,

20   herbicides or pesticides, would you have purchased

21   those products at the same two stores that you

22   mentioned for Roundup, the farm supply and --

23        A.    No.

24        Q.    No?
```

Mark A. Pecorelli

1       MR. CADY:  Him or his father?

2       MS. BARTLEY:  I apologize.

3  BY THE WITNESS:

4       A.    My father.

5  BY MS. BARTLEY:

6       Q.    Your father.

7       A.    No.  As a matter of fact, I don't think

8  so because that you can get just about anywhere

9  in -- no, I don't -- no.

10      Q.    Okay.

11      A.    I don't think they came from either one

12 of them places.

13      Q.    So, as to each of these products that we

14 just listed, those would not have been purchased at

15 the same stores?

16      A.    I don't think so, no.

17      Q.    Where would these products have been

18 purchased?

19      A.    That would have been like a hardware, a

20 hardware store.  I mean, anybody, an Ace maybe.

21      Q.    Okay.  Was there --

22      A.    Ace Hardware.

23      Q.    Was there a particular Ace Hardware

24 store that your father shopped at?

Mark A. Pecorelli

```
1        A.    No.  There was no particular.  There was
2   always different hardwares, Ace Hardwares through
3   wherever we were going.  You know what I'm saying?
4        Q.    Okay.
5        A.    They haven't -- they throw sales on
6   them, leaders, you know, lead you in there to get
7   your -- Weed-B-Gon I guess they call it.  2,4-RD is
8   what it is.  Weed-B-Gon.  I'm almost sure that's
9   what it's called.  It's 2,4-RD.
10        Q.    Okay.  Was there an Ace Hardware store
11   close to your house that you used most frequently?
12        A.    No.
13        Q.    And other than Weed and Feed being a
14   granule, the others, the Diazinon, Sevin Insect
15   Killer, the 2,4-RD, Weed-B-Gon and the Surflan or
16   Treflan, these were all liquids that --
17        A.    No.  The Treflan and Surflan was
18   granule.
19        Q.    That was granule as well?
20        A.    Yes.  And I believe the -- and the other
21   two I believe were -- say them again.
22              The 2,4-RD is a liquid, which was I'm
23   almost sure recommended from Roundup that it can be
24   added to their product.  Not the Pro, but
```

1    beforehand, the 2,4-RD.  That was a liquid form.

2        Q.    2,4-RD was not a granule, then.  It was

3    a liquid?

4        A.    Correct.

5        Q.    Okay.  All right.  So, the only one that

6    was granule was the Weed and Feed.

7        A.    No, and the Surflan, Treflan.

8        Q.    Oh, okay.

9        A.    Yeah.  Granule.

10       Q.    Okay.  When your father applied these

11   products, what did he wear when he utilized these

12   products?  Would it be similar clothing to what he

13   wore applying Roundup or something?

14       A.    It wouldn't be the full jump --

15   jumpsuit.  It would be just regular denims and his

16   regular work boots, steel toe.

17       Q.    When you say "regular denims," what do

18   you mean?

19       A.    Jeans.

20       Q.    Just jeans?

21       A.    You know, yeah.  That's what that was.

22       Q.    Okay.  So, when he applied these

23   products -- and, again, I'm just referring to the

24   same list of products that I just mentioned a

Mark A. Pecorelli

```
 1    July of 2004.

 2              Does that sound about right?

 3         A.   Sounds about right.

 4         Q.   Okay.

 5         A.   To my --

 6         Q.   All right.

 7         MR. CADY:  Mark, we're on page 26 of this, by

 8    the way.

 9         THE WITNESS:  Oh, okay, yes.  Follow along

10    with that?  Okay.

11    BY MS. BARTLEY:

12         Q.   Do you recall which doctor made the

13    diagnosis?

14         A.   I don't recall --

15         Q.   Okay.

16         A.   -- today.

17         Q.   Do you recall any doctor telling you

18    what subtype of non-Hodgkin's lymphoma your father

19    had?

20         A.   No.

21         Q.   Okay.  Do you recall any doctor telling

22    you what stage of illness your father was at when

23    he was diagnosed?

24         A.   No.
```

Mark A. Pecorelli

1        Q.     Okay.  Do you recall any doctor or

2    healthcare provider making any statements to you

3    about your father's prognosis at the time he was

4    diagnosed?

5        A.     No.

6        Q.     Okay.  Did any of your father's

7    physicians ever tell you or your father that the

8    cause of his non-Hodgkin's lymphoma was unknown?

9        A.     No.  Nobody's told me that.

10        Q.     Okay.  Did any physicians ever tell you

11    or your father a cause of his non-Hodgkin's

12    lymphoma?

13        A.     Not -- not that I can remember.

14        Q.     Okay.  Did your father or any members of

15    his family ever ask a physician what the cause of

16    his non-Hodgkin's lymphoma was?

17        A.     They -- they asked what his profession

18    was, what he did for a living, and he mentioned

19    that.  What was said, I don't -- I don't recall.

20        Q.     You don't recall physicians saying any

21    response?

22        A.     Well, nobody could predict exactly.  I

23    don't know.  I don't know.

24        Q.     Okay.  So, just to make sure I

Mark A. Pecorelli

1   understand your testimony.  You don't recall any

2   physician ever telling you a cause of your father's

3   non-Hodgkin's lymphoma?

4        A.    Just said there was possibilities of

5   chemical use of Roundup.

6        Q.    So, a doctor said there was a

7   possibility of what?

8        A.    Could be possibility with the lymphoma.

9        Q.    I'm sorry?

10       A.    From his profession.

11       Q.    From his profession?

12       A.    Um-hmm.

13       Q.    Okay.  What specifically were they

14   referring to?

15       A.    Chemical use.

16       Q.    Okay.  Did they -- okay.  First of all,

17   what doctor are we referring to?

18       A.    I'm -- I'm not sure.  I'm not sure.  The

19   one that diagnosed.  They don't know.  I don't

20   know.  I don't know.

21       Q.    Okay.  Do you remember anything

22   specifically or --

23       A.    No.

24       Q.    Okay.  So, do you recall any doctor

Mark A. Pecorelli

1    referring to any specific chemical?

2          A.    No.

3          Q.    Okay.  Did your father ever come to

4    believe that his non-Hodgkin's lymphoma was caused

5    by glyphosate or Roundup?

6          A.    Repeat that.

7          Q.    Did your father before he passed away,

8    did he ever have the belief that his non-Hodgkin's

9    lymphoma was caused by glyphosate or Roundup?

10          A.    I think so, yes.

11          Q.    You think so?

12          A.    Yes.

13          Q.    Did he express that to you?

14          A.    Yes, yes.  For me to stop using it.

15          Q.    He asked you to stop using it?

16          A.    Yeah.  He said -- yes.

17          Q.    Okay.  What did he say?

18          A.    Just what he said.  "Don't be using any

19    more chemicals."

20          Q.    Did he say why?

21          A.    They're bad.

22          Q.    So, did he say "Don't be using any more

23    chemicals" or did he refer to Roundup?

24          A.    Specifically the Roundup.

Mark A. Pecorelli

1    Q.    Okay.  So, he asked you not to use

2  Roundup before he died in 2012?

3    A.    No.  Even before he even -- after he was

4  diagnosed I believe.

5    Q.    In 2004?

6    A.    Yes.

7    Q.    Okay.  And, so, he had expressed concern

8  about a connection between his Roundup and his

9  cancer back in around 2004?

10    A.    Yes.

11    Q.    Okay.  And you discussed that with him

12  in 2004?

13    A.    Meaning discussing what?  He mentioned

14  to me -- he wasn't sure himself.

15    Q.    Okay.

16    A.    Mentioned to me, "The chemical's no

17  good."

18    Q.    Okay.

19    A.    I mean, not -- "Stay away from it."

20    Q.    And you had that -- you had that

21  conversation with him about that time of his

22  diagnosis?

23    A.    Correct.

24    Q.    Okay.  All right.

Mark A. Pecorelli

1      A.    Might not have been at '4.  Might have

2   been a year later.  Yes.

3      Q.    All right.

4      A.    In that ballpark.

5      Q.    But he was concerned about you?

6      A.    Yes.

7      Q.    Okay.  What are you claiming in this

8   lawsuit in terms of what you believe Monsanto did

9   wrong?

10      A.    Made my father go through a lot of

11   suffering and took -- shortened his life and

12   business.

13      Q.    And business?  It took his?

14      A.    Business.

15      Q.    Okay.

16      A.    That simple.

17      Q.    Do you understand that all pesticides

18   and herbicides have risks?

19      A.    Everything's got a risk.  But that

20   there, yes.

21      Q.    Is there anyone that we haven't already

22   discussed that went to any medical appointments

23   with your father, anyone that we haven't discussed

24   yet?

Mark A. Pecorelli

1      A.     I don't know if we put down Donna.  I

2  mean, we have her name.  We've mentioned her name,

3  but --

4      Q.     We talked about that, yeah.

5      A.     She's been to appointments.

6      Q.     Yeah.  Okay.  Anybody else?

7      A.     Not that I can think of.

8      Q.     Okay.

9      A.     My mom, but she's gone, you know.

10      Q.     Um-hmm.  Those individuals that we

11  talked about that would have attended medical

12  appointments with your father, you, Donna, for

13  example, would anyone have sent, to your knowledge,

14  anyone have sent e-mails or text messages --

15      A.     No.

16      Q.     -- to the doctors, to your father's

17  doctors?  Do you have any knowledge of e-mails or

18  text messages to your father's doctors?

19      A.     No.

20      Q.     Okay.  Okay.  Do you know what treatment

21  your father underwent with regard to his

22  non-Hodgkin's lymphoma, what treatment was

23  recommended?

24      A.     Chemo.

Mark A. Pecorelli

1       A.    I don't --

2       Q.    -- did he stop smoking?

3       A.    I don't recall.

4       Q.    So, do you remember any conversations

5  with doctors where you discussed the fact that your

6  father was refusing treatment for his lung cancer?

7  Does that ring a bell at all?

8       A.    He didn't refuse treatment that I know

9  of, no.  For the lung cancer, the only thing they

10  could -- there was no -- the only thing that I know

11  about, the doctors, that they mentioned radiation

12  and I took him to the radiation.

13              (WHEREUPON, Pecorelli Deposition

14               Exhibit No. 10 was marked for

15               identification:  4/1/11 medical

16               records;

17               Confidential-Pecorelli-MPecorelli-

18               NO&H-000030 through 000043.)

19  BY MS. BARTLEY:

20       Q.    I'm going to show you some records that

21  I'm marking as Exhibit No. 10.  These are some

22  records that were provided to us from the office of

23  Northwest Oncology & Hematology in

24  Elk Grove Village.

Mark A. Pecorelli

1                If you will turn to -- again, I'm

2    looking at the Bates stamp pages.

3        A.    Um-hmm.

4        Q.    If you'll turn to page 30.  I guess it's

5    the front page.

6        A.    Okay.

7        Q.    And up at the top left corner, about

8    maybe two inches down from the page, do you see a

9    date here of April 1st of 2011?

10       A.    Yes, I do.

11       Q.    For this office visit.  Do you remember

12    a doctor by the name of Sara Ray Greenhill, MD?  Do

13    you remember that doctor at all?

14       A.    No.

15       Q.    Okay.  Do you remember if you would have

16    gone to any medical appointments with

17    Dr. Greenhill?

18       A.    Not that I recall.

19       Q.    Okay.

20       A.    But I've been to appointments.

21       Q.    At this office?

22       A.    At this office.  At the hospital.

23       Q.    Okay.  And if you will look under --

24    about halfway down this first page under "Past

Mark A. Pecorelli

1   Medical History," do you see the diagnosis of "Lung

2   cancer - sarcoma"?

3        A.    I see that.

4        Q.    As well as COPD.  Okay.

5        A.    Um-hmm.

6        Q.    And then under "Social History" it says,

7   "Patient is a current smoker," right?

8        A.    That's what it says.

9        Q.    Okay.  And then under "Risk Factors,"

10  does it appear there that your father reported to

11  Dr. Greenhill that he started smoking at the age of

12  12?

13       A.    I have no idea.

14       Q.    Is that what's recorded in the records?

15       A.    That's what it says.  That's what it

16  says.

17       Q.    All right.  And does it indicate a

18  history of smoking one pack per day?

19       A.    That's what it says.

20       Q.    Okay.  If you'll turn the page to

21  page 31, under at the bottom of the page under

22  "Impression & Recommendations, Problem No. 1.

23  Lung cancer."

24       A.    Um-hmm.

Mark A. Pecorelli

1       Q.     About four lines down, it says, "Patient

2   is very reluctant to proceed with any testing or

3   take any medications."

4              And then drop two more lines down,

5   "Patient is refusing CT chest and bronchoscopy.  He

6   is an agreeable to antibiotics and nebs."  I think

7   that refers to nebulizers.  Okay?

8       A.     Okay.

9       Q.     All right.  Does that record appear to

10  reflect that at first he wouldn't undergo tests or

11  medications, but then he did eventually agree to

12  take some medications, some antibiotics?

13      A.     I believe so.  My dad definitely didn't

14  believe in medicine.  But go ahead.

15      Q.     Okay.

16      A.     That's what it's showing here.

17      Q.     And then if you'll just look up at the

18  last page of this record, page 32.  The very first

19  paragraph on this page, it reads, "Patient is

20  somewhat delusioned (sic) as to his diagnosis.  He

21  feels that since his ten radiation treatments he no

22  longer has cancer.  In fact, his son states the

23  patient denies he has cancer."

24      A.     His son?  Okay.  All right.  I'm on the

Mark A. Pecorelli

1   top paragraph here.

2        Q.    Yeah.  Do you think that might have been

3   you at this appointment?

4        A.    Denying that he has lung cancer?

5        Q.    No, not you denying.  That "In fact, his

6   son states that the patient" --

7        A.    My father.

8        Q.    -- meaning your father denied that he

9   had cancer.

10        Do you remember your father being in a

11   state where he was in denial that he had lung

12   cancer?

13        A.    He was in denial with cancer, period,

14   with lymphoma, even when it was with lymphoma, you

15   know.

16        Q.    Okay.

17        A.    That -- I'm not sure.

18        Q.    So, do you remember going with him to

19   medical appointments after the lung cancer

20   diagnosis where he was refusing to have diagnostic

21   tests and treatment for his lung cancer?

22        A.    They -- no, because they took him --

23   they -- now that's at a clinic.  He went to

24   Northwest Community where he's from, Leibach,

Mark A. Pecorelli

1  Dr. Leibach, and took every test.  He said Hines

2  took every test possible imaginable that he could

3  do.  That he couldn't do anything for my father.

4       Q.    Okay.

5       A.    That I recall.

6       Q.    All right.  So, you don't recall your

7  father refusing to undergo the treatment options

8  that were recommended for his lung cancer?

9       A.    He -- no, no.

10      Q.    Okay.  All right.  You can go ahead and

11 set that aside.

12      A.    Okay.

13      Q.    I'm just going to mark as Exhibit No. 11

14 the Complaint that was filed in this case and just

15 ask you a couple of background questions about the

16 lawsuit.

17                 (WHEREUPON, Pecorelli Deposition

18                  Exhibit No. 11 was marked for

19                  identification:  Complaint, Mark

20                  Pecorelli v. Monsanto Company.)

21 BY MS. BARTLEY:

22      Q.    How did you first become involved in

23 this lawsuit, in this particular lawsuit?

24      A.    Knowing that my dad used Roundup and

Mark A. Pecorelli

1    that it produced non-Hodgkin.

2        Q.   Did you respond to an ad you saw on

3    television, for example?

4        A.   I heard it through somebody and also

5    heard it through an ad also.

6        Q.   You heard it through someone and you

7    heard it through an ad?

8        A.   Might have been a doctor possibly saying

9    it could be some of his chemical use.  I don't -- I

10   don't recall.

11       Q.   It might have been a doctor?

12       A.   It might have been a doctor, but then

13   also -- as a matter of fact, it was a doctor --

14       Q.   Okay.

15       A.   -- that said for his profession, what he

16   did, and using Roundup, that it would be what could

17   have caused it.  Could be numerous things.  I don't

18   know.  He didn't know either.

19       Q.   Earlier I asked you if there was a

20   doctor who ever said what might have caused his

21   cancer and you said --

22       A.   He said -- and same thing I just said

23   now, that it could have been.  From his profession

24   using chemicals.  Okay?

Mark A. Pecorelli

1      Q.    Okay.

2      A.    And knowing that, finding out facts

3  later after he passed that they have with the

4  lymphoma.

5      Q.    Okay.  So, again, I'm just trying to

6  confirm.

7            There was a doctor who referred to the

8  possibility of chemicals as the cause of his

9  lymphoma?  Do I have --

10     A.    Oh, yeah.  On his lymphoma, yes.

11     Q.    Okay.  But you don't know which doctor

12  it is, is that right?

13     A.    No.  I think it might have been

14  Dr. Leibach.

15     Q.    Might have been Dr. Leibach?

16     A.    Yes.

17     Q.    Okay.  And Dr. Leibach is your doctor as

18  well?

19     A.    Yes.

20     Q.    Okay.  And while we're on that subject,

21  I understand that you have -- you indicate on the

22  Plaintiff's Fact Sheet that you have history of

23  cancer, is that correct?

24     A.    Yes.

Mark A. Pecorelli

1      Q.    Okay.  And your -- you have lung cancer,

2  correct?

3      A.    Yes.

4      Q.    Okay.  And are you currently a smoker?

5      A.    Yes.

6      Q.    Okay.  And at what age did you start

7  smoking?

8      A.    When did I start?

9      Q.    Yeah.

10     A.    18, 19.

11     Q.    Okay.

12     A.    Maybe.  I don't recall.

13     Q.    And how old were you when you were

14  diagnosed with lung cancer?

15     A.    48.

16     Q.    And what's the state of your current

17  health?

18     A.    Excellent.

19     Q.    Excellent.  Are you cancer-free?

20     A.    Right now, yes.

21     Q.    Congratulations.

22     A.    Thank you.

23     Q.    So, again, just to confirm, when

24  Dr. Leibach, you believe it might have been, was

Mark A. Pecorelli

1  referring to chemicals, did he refer to any

2  specific chemicals?

3       A.    Well, what's in Roundup, he said that's

4  very possible, yes, with the lymphoma.

5       Q.    So, Dr. Leibach specifically referred to

6  Roundup?

7       A.    Yes.  How do you pronounce it?  Glys- --

8       Q.    Glyphosate?

9       A.    Yes.

10      Q.    So, he specifically referred to

11  glyphosate?

12      A.    He said it's very possible.

13      Q.    Okay.  Did you ask him that question or

14  did he offer that information?

15      A.    He stated that information.  Not for me.

16  For my father.  Because I didn't -- for his

17  lymphoma.

18      Q.    All right.  So, were you present during

19  this conversation between Dr. Leibach and your

20  father?

21      A.    Spoke to my father first, told my father

22  I believe, and yes.  He spoke to me.  My dad was --

23      Q.    Okay.  You understand -- so, your

24  testimony is there was a conversation between your

1  father and Dr. Leibach?

2      A.    That -- he -- I think he mentioned it to

3  me, that it's possible.

4      Q.    Who?

5      A.    Dr. Leibach.

6      Q.    He mentioned it to you, not your father?

7      A.    Yes.  I didn't hear it mention it to my

8  father, but you're saying that he did.

9      Q.    No, I'm not saying anything.  I'm asking

10  you --

11      A.    Oh.

12      Q.    -- if any doctor has ever told you about

13  any possible causes --

14      A.    Yes.

15      Q.    -- for your father's lymphoma or told

16  your father about --

17      A.    Told me, yes.  My father, I don't know

18  if he told him too.

19      Q.    Okay.

20      A.    Okay.

21      Q.    So, now -- you don't know if anybody

22  told your father anything, but you're saying --

23      A.    I can't answer that.  I can't answer

24  that.  I didn't hear that -- I didn't hear him tell

1  him directly, but he told me what was going on and

2  what the progress, because he -- he was a second

3  opinion.

4      Q.    Right.

5      A.    For my father.

6      Q.    Okay.

7      A.    Maybe even a third.  I don't -- I'm not

8  sure.

9      Q.    All right.  So, if I understand your

10 testimony now, you don't know of anybody that told

11 anything to your father, is that right?

12     A.    That I heard of, right.

13     Q.    Okay.  So, now what I understand is that

14 Dr. Leibach said something to you?

15     A.    Correct.

16     Q.    Correct.  And Dr. Leibach said what to

17 you?

18     A.    It's possible from the chemical use that

19 he's been handling.

20     Q.    Did he mention a specific chemical?

21     A.    The glyph- -- I can't pronounce it.

22     Q.    Glyphosate.

23     A.    Glyphosate.

24     Q.    Okay.  And that was said to you, not --

1    not to your father?

2         A.    I -- my dad has a hard time hearing.

3         Q.    Yeah.

4         A.    I'm almost sure he told him, too.  I

5    mean, it wasn't --

6         Q.    You think --

7         A.    So, he turned around and said, "I'll

8    tell you.  He's not listening."

9         Q.    Okay.

10        A.    Something like that in that form.  That

11   was a while ago.

12        Q.    And so if this was said to you, when

13   did -- when was that said?

14        A.    I couldn't tell you.  Whenever he

15   checked him out.  You got the medical records.

16   When he went over it.

17        Q.    The first appointment with Dr. Leibach?

18        A.    No.  It wasn't -- it wasn't -- because

19   he diagnosed him -- he's the one that also did

20   the -- filed for -- through the radiation.

21        Q.    Okay.

22        A.    So, somewhere in that line there.

23        Q.    Okay.  So, at some point you had a

24   conversation with Dr. Leibach at some point before

Mark A. Pecorelli

```
 1   your father's death in 2012 about a possible

 2   correlation between glyphosate and your father's

 3   lymphoma?

 4        A.    Correct.

 5        Q.    Okay.  And Dr. Leibach suggested that

 6   there could be a --

 7        A.    A connection there, yes.

 8        Q.    A possible connection.  Okay.  Very

 9   good.

10              Had you heard of Monsanto before your

11   involvement in this lawsuit?

12        A.    Yeah, I heard of Monsanto years ago.

13        Q.    How did you find your attorneys?

14        A.    Through another attorney.

15        Q.    And what firm was that attorney from?

16        A.    Arlington Heights.  Cary Lind I think it

17   was.  Cary Lind.

18        Q.    Cary Lind?

19        A.    A couple -- a couple --

20        Q.    Cary Lind who is handling your estate

21   dispute?

22        A.    Yes.

23        Q.    Okay.

24        A.    He mentioned, and also I think maybe
```

Mark A. Pecorelli

```
 1    Barts gave me the Moll Group.  I'm not sure who

 2    directed me over here.  It was with the -- spoke

 3    with somebody else about it, another law firm, and

 4    they're out of California; and I just didn't see

 5    that being right with the -- having the firm out of

 6    the state, the state that I'm in, and recommended

 7    me to...

 8         Q.    Did you read the Complaint before it was

 9    filed?

10         A.    Did I read the Complaint?

11         Q.    Yeah, before it was filed.

12         A.    No.

13         Q.    Okay.  Have you had any discussions with

14    any other Roundup Plaintiffs?

15         A.    No.

16         Q.    Okay.  On your Plaintiff's Fact Sheet

17    there was a question of are you seeking

18    compensation for any medical bills and your answer

19    was "Unsure."

20              Have you made up your mind about whether

21    you're seeking any compensation for any medical

22    bills?

23         A.    I don't know at this time.

24         Q.    You don't know.  Okay.
```

Mark A. Pecorelli

1              Do you know if your father sustained any

2    out-of-pocket or unreimbursed medical expenses

3    related to his lymphoma?

4         A.    Not sure.

5         Q.    Okay.  Also on the Plaintiff's Fact

6    Sheet, it asked if you're making any claims for any

7    non-medical out-of-pocket expenses, and you

8    indicated "N/A" or not applicable.  I just want to

9    confirm.

10        A.    What do you mean "not applicable"?

11        Q.    Well, you -- the question was posed to

12   you and you said, "Not applicable."

13             So I just want to confirm that you're

14   not making that type -- that claim for

15   out-of-pocket non-medical expenses.

16        A.    Well --

17        MR. CADY:  I'm just going to object that we're

18   asking about legal theories here that he might

19   not --

20        MS. BARTLEY:  It's his -- it's a Plaintiff's

21   Fact Sheet, not an attorney's Fact Sheet.

22        MR. CADY:  It is a Plaintiff's Fact Sheet.

23        MS. BARTLEY:  And it's his answer on the

24   Plaintiff's Fact Sheet.  So, I'm just confirming --

Mark A. Pecorelli

1      A.    2003 might have been when he stopped

2  using it.

3  BY MR. CADY:

4      Q.    Do you recall when he would have started

5  using it?

6      A.    When the product -- '76 probably back

7  then.

8      Q.    Okay.

9      A.    Yes.  At the time he was using it.

10     MR. CADY:  Okay.  I think that is all I have.

11     MS. BARTLEY:  Thank you.

12     MR. CADY:  Off the record.

13     THE VIDEOGRAPHER:  Okay.  The time is 3:51

14  p.m.  This is the end of Tape 4, and it's also the

15  end of the deposition of Mark Pecorelli.  And we're

16  going off the video record.

17                (WHEREUPON, the following

18                proceedings were had off the video

19                record:)

20     THE REPORTER:  Signature?  Read and sign?

21     MR. CADY:  No, we will waive it.

22                (Time Noted:  3:51 p.m.)

23                FURTHER DEPONENT SAITH NAUGHT.

24

Mark A. Pecorelli

1

      I, CORINNE T. MARUT, C.S.R. No. 84-1968,

2   Registered Professional Reporter and Certified
Shorthand Reporter, do hereby certify:

3         That previous to the commencement of the
examination of the witness, the witness was duly

4   sworn to testify the whole truth concerning the
matters herein;

5         That the foregoing deposition transcript
was reported stenographically by me, was thereafter

6   reduced to typewriting under my personal direction
and constitutes a true record of the testimony

7   given and the proceedings had;

         That the said deposition was taken

8   before me at the time and place specified;

         That the reading and signing by the

9   witness of the deposition transcript was waived;

         That I am not a relative or employee or

10  attorney or counsel, nor a relative or employee of
such attorney or counsel for any of the parties

11  hereto, nor interested directly or indirectly in
the outcome of this action.

12

   _____

13      CORINNE T. MARUT, Certified Reporter

14

         (The foregoing certification of this

15  transcript does not apply to any
reproduction of the same by any means, unless under

16  the direct control and/or supervision of the
certifying reporter.)

17

18

19

20

21

22

23

24