# EXHIBIT 16

James Peterson

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4   IN RE:  ROUNDUP PRODUCTS      ) MDL No. 2741

 5   LIABILITY LITIGATION          ) Case No. MDL

 6   -----------------------------) No. 3:16-md-02741-VC

 7   This document relates to:     )

 8   James Peterson v. Monsanto Co.)

 9   Case No. 3:18-cv-07271        )

10   -----------------------------)

11

12           The videotaped deposition of JAMES

13   PETERSON, called for examination, taken before JULIANA

14   F. ZAJICEK, a Registered Professional Reporter and a

15   Certified Shorthand Reporter, at the offices of Shook,

16   Hardy & Bacon L.L.P., Suite 4700, 111 South Wacker

17   Drive, Chicago, Illinois, on November 14, 2019, at

18   9:00 a.m.

19

20

21

22

23

24
```

James Peterson

```
 1    PRESENT:

 2    ON BEHALF OF THE PLAINTIFF:

 3          MOLL LAW GROUP

 4          22 West Washington Street, 15th Floor

 5          Chicago, Illinois 60602

 6          312-462-1700

 7          BY:  STEPHEN CADY, ESQ.

 8              scady@molllawgroup.com

 9

10    ON BEHALF OF THE DEFENDANT:

11          SHOOK, HARDY & BACON L.L.P.

12          111 South Wacker Drive, Suite 4700

13          Chicago, Illinois 60606

14          312-704-7700

15          BY:  GEORGE R. DOUGHERTY, ESQ.

16              gdougherty@shb.com

17

18

19    THE VIDEOGRAPHER:

20          MR. CAREY DAVIDOW,

21          Golkow Litigation Services.

22

23

24
```

James Peterson

```
 1                    I N D E X
 2  WITNESS:                              PAGE:
 3   JAMES PETERSON
 4        EXAM BY MR. DOUGHERTY...............   5
 5        EXAM BY MR. CADY...................  258
 6        FURTHER EXAM BY MR. DOUGHERTY.......  264
 7                 E X H I B I T S
 8  PETERSON EXHIBIT                      MARKED FOR I
 9   No. 1    Defendant Monsanto Company's      17
             Notice to take Oral and Videotaped
10           Deposition of Plaintiff James
             Peterson
11
    No. 2    Copy of Walmart receipt          86
12
    No. 3    Copy of photograph              86
13
    No. 4    Copy of photograph              86
14
    No. 5    Copy of photograph              86
15
    No. 6    Copy of photograph              86
16
    No. 7    Plaintiff Fact Sheet, dated     132
17           2/26/19
18  No. 8    Plaintiff Fact Sheet, date      151
             5/13/2019
19
    No. 9    First Amended Plaintiff Fact     228
20           Sheet, 05/08/2019
21  No. 10   Complaint and Jury Demand        238
22  No. 11   Medical record from Illinois     249
             Gastroenterology Group, dated
23           4/28/14;
             Confidential-Peterson-JPeterson-
24           IGG-000017
```

James Peterson

```
 1        THE VIDEOGRAPHER:  Good morning.  We are now on

 2    the record.  My name is Carey Davidow and I am the

 3    videographer from Golkow Litigation Services.

 4             Today's date is November 14, 2019.  And

 5    the time is now 9:14 a.m.

 6             This deposition is being held at 111 South

 7    Wacker Drive, Suite 4700, Chicago, Illinois, in the

 8    matter of James Peterson versus Monsanto Company,

 9    filed in the United States District Court, Northern

10    District of California.

11             The deponent today is James Peterson.

12             The court reporter to -- the court

13    reporter today is Juliana Zajicek.

14             Will counsel please identify themselves

15    for the video record and the parties which they

16    represent.

17        MR. CADY:  Stephen Cady from Moll Law Group for

18    the Plaintiff.

19        MR. DOUGHERTY:  George Dougherty for Monsanto.

20        THE VIDEOGRAPHER:  And will the court reporter

21    swear in the witness, please.

22                  (WHEREUPON, the witness was duly

23                   affirmed.)

24
```

James Peterson

```
 1                     JAMES PETERSON,

 2    called as a witness herein, having been first duly

 3    sworn, was examined and testified as follows:

 4                      EXAMINATION

 5    BY MR. DOUGHERTY:

 6         Q.    Good morning, Mr. Peterson.

 7         A.    Hi.

 8         Q.    Thank you for coming.  My name is George

 9    Dougherty.  I represent Monsanto, as you know.  We met

10    earlier.

11         MR. DOUGHERTY:  You know, for the record, I need

12    to say that we continue to receive medical records and

13    so forth from various providers and as well as records

14    from employers and other types of records from

15    Monsanto.  Therefore, we reserve the right to -- to

16    continue the deposition past this date based on the

17    additional records as they become available.

18         MR. CADY:  Of course Plaintiff's counsel

19    reserves the right to object to that as we come to it,

20    if we do.

21         MR. DOUGHERTY:  Yes.  We can fight about it

22    later.

23    BY MR. DOUGHERTY:

24         Q.    Can you give me your home address, please?
```

James Peterson

```
 1        Q.    And how long did you run, can I call it

 2    the camera business?

 3        A.    Weddings and portraits is about what I

 4    did.

 5        Q.    So how long were you in that business for?

 6        A.    Well, it was off and on.  It wasn't a

 7    steady job because I had steady jobs.  This was to

 8    earn extra money.

 9              I did it -- oh, man, that's a tough one to

10    come up with dates.  I stopped doing it about the year

11    2000, late '90s, something like that.  I didn't do any

12    after that.

13        Q.    And when did you start doing it roughly?

14        A.    That's what I'm trying to figure out.  Can

15    we come back?  I've got to think about that.

16        Q.    Okay.

17        A.    I can't come up with something very fast.

18    I think one of the first weddings I did was -- I don't

19    remember.  I know -- people in the camera club were

20    already doing weddings, so I just hooked up with one

21    of them and they brought me to a place where I could

22    start learning.  It was for a guy that had a company

23    that did weddings, and then I did them for him for a

24    little while and then I went off on my own because you
```

James Peterson

1    make more money if you handle the whole thing.

2        Q.    Did you do black and white or color or

3    both?

4        A.    Nobody was interested in black and white.

5    I -- I mean, if somebody wanted me to do something in

6    black and white for a specific purpose, I would do it,

7    but the vast majority of it was color.

8        Q.    And did you develop your own pictures or

9    how did that work?

10       A.    Not for this business, not for the

11   business.  I mean, you -- I had a lab do it because

12   they were better and faster and they could handle the

13   volume.

14       Q.    Did you ever develop pictures yourself?

15       A.    I did when I was starting in photography,

16   oh, a long time ago.  '70s.  I did black and white and

17   I didn't -- I haven't done any of that in -- I

18   probably haven't done any of this this millennia, you

19   know, I haven't done any in the 2000s, because after

20   it was -- unless somebody wanted it, there is no point

21   in doing it because it took a long, long time.  I

22   mean, nowadays you can do it on a computer, not then.

23   I didn't want to live in the basement doing that.

24       Q.    So you were developing pictures in the

James Peterson

```
 1   '70s, at least --

 2        A.    And the '80s I did some black and white,

 3   and I think -- I probably -- this is my best estimate

 4   is I didn't do any after maybe the '80s, early '90s.

 5   That was it.  You know, by then everything was

 6   mechanized to the point where no point spending that

 7   time on it.

 8        Q.    And do you remember any of the substances

 9   or chemicals or things you used to develop the

10   pictures?

11        A.    Well, just the normal -- it was all -- all

12   of the products were -- Kodak I think is the main --

13   is the black and white developer, stop bath and fixer

14   were the three.

15        Q.    Stop bath?

16        A.    Yeah, stop bath.  That stops the

17   development.  When you get it to where you think you

18   want it, you take it out of there and you throw it in

19   there, and then the fixer fixes it so it doesn't fade.

20        Q.    And were those, like, chemicals, liquid

21   chemicals?  I mean, I see them in the movies where

22   they --

23        A.    Yeah, they were like --

24        Q.    -- dump them in the bath?
```

James Peterson

1        A.    Yep, that's what it was, in a tray, yeah,

2    liquid in a tray.

3        Q.    And did you wear any protection when you

4    were working with those chemicals?

5        A.    Sometimes.  Not always.

6        Q.    And was there a thing that would determine

7    whether or not you wore protection or not?

8        MR. CADY:  I'm going to object to the form of

9    the question.

10            You can answer.

11       THE WITNESS:  Pardon?

12       MR. CADY:  That's just for the record.  You can

13   answer the question.

14       THE WITNESS:  Oh, okay.

15   BY THE WITNESS:

16       A.    Say it again.  Sorry.

17   BY MR. DOUGHERTY:

18       Q.    Yeah, I'll try to fix it.  He -- he has to

19   object sometimes just to protect, it means he doesn't

20   like --

21       A.    Oh.

22       Q.    -- the question in some way.

23       A.    Okay.

24       Q.    Sometimes I'll try to fix it.

James Peterson

```
1        A.    All right.

2        Q.    Sometimes I won't.

3        A.    Okay.

4        Q.    On this one, what determined whether or

5  not you would wear protection when you were working

6  with these chemicals in connection with the

7  photography?

8        A.    At one point -- it gets off on a sidetrack

9  here -- there were some products, not any that I used,

10  I don't think, that would cause problems if you used

11  them like every day all of the time.  I didn't, you

12  know.  I -- I tried to avoid -- unless there was a

13  specific job and they wanted it done a specific way, I

14  avoided those things, you know, doing all of that

15  labor intensive stuff, but there were some -- one

16  person in particular that I met, he ran a business

17  doing black and white photography for decades, he was

18  a Yugoslavian photographer, and he had a problem.  I

19  don't know what chemicals he would use, but he had a

20  problem with them, and he got some kind of a medical

21  problem for him and he had to get -- he had to go to

22  the -- get it diagnosed at the -- I think the -- he

23  finally ended up at the Mayo Clinic to get it properly

24  diagnosed, and then he said it was from chemicals, but
```

James Peterson

```
 1   what chemicals, how long -- I know it was forever

 2   because he's -- that was what he did his whole life.

 3   So that's an extreme case.

 4        Q.    Do you remember what the diagnosis was?

 5        A.    Yeah.  That he got some kind of a

 6   poisoning from the chemicals, but I don't -- that's

 7   all.  You know, I just met the guy because I was

 8   buying a camera from him, a big camera.

 9        Q.    Do you remember what the chemicals were?

10        A.    No.  No, I don't.

11        Q.    And do you remember wearing protection

12   when you were dealing with some of these developing

13   relating -- related chemicals?

14        A.    Sometimes, but more than dealing with

15   them, I didn't put my hands in them.  I -- I used

16   tongs because it's easier to pick up the paper when

17   it's wet if you use tongs and you don't have to put

18   your fingers in the developer, I mean.  You know, you

19   store it in jugs on the side, you pour it into the

20   tray, and when you start doing the actual developing,

21   you always grab the paper by tongs, either metal ones

22   or they had these rubber ones that grab better.

23        Q.    So you were careful not to get that --

24        A.    Yeah.
```

James Peterson

```
1          Q.     -- stuff on your hands?

2          A.     Yeah.

3          Q.     All right.  And do you remember using

4    anything other than the what you called the fixer or

5    the stop bath product?

6          A.     Well, the developer.

7          Q.     Okay.

8          A.     The developer, fixer -- developer, stop

9    bath and fixer, those are the three main ones you --

10   you use for black and white photography.  The rest of

11   the things that you use to change it are done in the

12   enlarger which has no chemicals.

13         Q.     And you think these were all Kodak prod --

14   products that you were using?

15         A.     Yeah, I pretty much stuck to Kodak.  I

16   knew how to use theirs and how to mix them and all of

17   that stuff.

18         Q.     Now, I know you said you didn't find any

19   documents responsive to --

20         A.     Um-hum.

21         Q.     -- the requests set forth in Exhibit 1.

22                Do you have a recollection of having any

23   documents that were responsive that you either threw

24   out or got rid of in some way?
```

James Peterson

```
 1        A.    No.

 2        Q.    Is your only use --

 3        A.    Unless you would count -- no, I don't

 4   think so.  I did get receipts for all of the medical

 5   attention I got, you know, they would send me --

 6   because my insurance covered what Medicare didn't

 7   cover, so they'd always send me something after the

 8   thing was concluded.  It went to Medicare, then it

 9   went to my backup insurance I paid for, and the only

10   thing I did mostly was just look at the bottom

11   right-hand corner, how much do I owe.  If it said

12   zero, I dumped it.

13        Q.    All right.  I guess in fairness to you,

14   you also got receipts when you purchased Roundup,

15   correct, and did you just throw those out as a matter

16   of course?

17        A.    Yeah.  The only reason why I saved the one

18   for that thing is because I didn't know if it worked

19   yet.

20        THE WITNESS:  Is that mine?

21        MR. CADY:  That's yours.

22        THE WITNESS:  Thank you.

23   BY MR. DOUGHERTY:

24        Q.    Did you ever use Roundup when you were
```

James Peterson

```
 1   working for someone else on a job?

 2        A.    No, no.

 3        Q.    You never farmed or --

 4        A.    No.

 5        Q.    -- anything like that?

 6        MR. CADY:  Wait for him to finish the question

 7   before you answer, James.

 8   BY MR. DOUGHERTY:

 9        Q.    You never did any yard work as a business

10   for other people, correct?

11        A.    No.  You are right, correct.

12        Q.    That will make things shorter later on

13   today.

14              What, if anything, did you do to prepare

15   for your deposition here today?

16        A.    We had a meeting, Mr. Cady and I, about a

17   week ago, about an hour and he --

18        MR. CADY:  He is not going to ask about what we

19   talked about in that meeting, just so you know.

20   BY THE WITNESS:

21        A.    I'm just going to say we talked about him

22   explaining to me what was going to happen.

23   BY MR. DOUGHERTY:

24        Q.    All right.  Where was the meeting?
```

James Peterson

```
1    just getting too old for that, but otherwise, earlier

2    than that when I was just old, they would -- it -- it

3    turned out to be what you thought you could do in the

4    day.  They'd load you up -- they'd try and load you up

5    with more than you could possibly do in a day and then

6    it's a negotiation between the -- the supervisor and

7    the letter carrier, and you are -- the deal there was

8    you are supposed to call in, even if you told them,

9    this is at least an hour more than I can deliver, you

10   call in, you tell them, I'm out here and I've got an

11   hour's worth of mail and I'm not on the overtime list.

12   So then he decides, you know, deliver it or bring it

13   back, that kind of stuff.  So your -- your day is

14   totally flexible.  It's at the -- it's at the whim of

15   the supervisor.

16        Q.    What time did you typically start?

17        A.    It was around 7:30.

18        Q.    And, you know, there is no typical end

19   time, it would just depend on the day?

20        A.    Yeah.  If there was a holiday, you are

21   going to have at least two days' worth of mail when

22   you start because you didn't deliver any the other

23   day.  If you get a really bad weekend when there were

24   two days in there for some reason, that mail wasn't
```

James Peterson

1    delivered for whatever reason.  For example, the

2    supervisor can tell you to curtail any bulk mail.  It

3    does not have to go.  So you could have a load under

4    your case that every day the supervisor is just

5    saying -- you know, he is trying to look good, he is

6    not using overtime, it just piles up, and then one day

7    he might say, Hey, I'm going to give you four hours

8    overtime, stay out there until midnight or whatever,

9    you know, get it delivered.  Clean up the -- all of

10   the stuff I've been telling you not to deliver, so.

11   That kind of stuff.  They controlled that.

12       Q.    The name of your supervisor?

13       A.    Huh.  You know how many you have over that

14   period of years, there is just no way.

15       Q.    Do you remember the last one or the first

16   one?

17       A.    No.  I wiped that out of my memory banks

18   apparently.  He was a good guy though, the last one I

19   had.

20       Q.    Do you remember anybody you worked with,

21   the name of anybody you worked with?

22       A.    Yeah.  Roger Emmerich, he was next to me,

23   he was in the case next to me, and Eddy Weisenberg.

24       Q.    Are these guys all letter carriers like

James Peterson

1    you?

2         A.    Yeah, because you are surrounded by

3    nothing but letter carriers on all sides.  It's a --

4    there were 115 letter carriers in that office, maybe

5    30 in each of three sections.  And you move around

6    because when you get another route, you move to that

7    section.

8         Q.    All right.  Based on what you said,

9    correct, you never used chemicals, pesticides,

10   herbicides, rodenticides in this job, never did

11   anything like that?

12        A.    No.

13        Q.    You never used diesel fuel, gasoline?

14        A.    Only to fill up the trucks, because it was

15   our responsibility if we had a truck.  Two tons and

16   two-and-a-half tons were diesel.  The cars were all

17   gasoline.  So you had to fill those up.  That was your

18   responsibility.  They give you a credit card.

19        Q.    Did you have a two-ton truck?

20        A.    Yes.  They gave me that at the beginning.

21   When you are a starter, when you are -- when you are

22   new, carriers that have been there a while, they don't

23   want them, so that you get them.

24        Q.    Why?

James Peterson

1    A.    Because they are big and at a moment's

2  notice they could tell you to put a -- to load a heavy

3  load or unload a heavy load, and if your route is

4  stable and it has nothing to do with that, it is hard

5  for them to give you that duty.  If there is a big

6  heavy thing that has to be delivered, they give it to

7  you.  So when you are beginning, you are on the short

8  end of that one.

9    Q.    How long did you have a truck for?

10   A.    Quite a while when I started.  They liked

11  the fact that I didn't bitch about it.  I just -- I

12  did it.  I had a two-and-a-half ton for a long time.

13  They only had one at the post office and then later a

14  lot of two tons.

15   Q.    So for --

16   A.    And then finally I got down to where I bid

17  on the apartment route and that was an LLV, long life

18  vehicle.  It was aluminum.  The little box ones you

19  see on the road.

20   Q.    Yeah, right.

21   A.    Yeah, those -- those came in in the '90s.

22   Q.    So did you use your truck like every day?

23   A.    Yeah.  The vehicle you are assigned to,

24  you use the same one every day unless you are assigned

James Peterson

```
 1   a different one for a specific purpose, like you

 2   needed a truck to do what they told you to do and you

 3   had to have special training to be driving a truck.

 4        Q.   How many times a week would you have to

 5   fill up the truck with diesel fuel?

 6        A.   Oh, it had huge tanks.  You didn't have to

 7   fill them up every week.  Maybe two weeks, something

 8   like that, I'm guessing, two, two-and-a-half weeks.

 9        Q.   Do you remember how many gallons it held?

10        A.   I have no idea.  I just put the nozzle in

11   and waited until it got full.

12        Q.   Did you wear gloves when you were putting

13   the nozzle in?

14        A.   No.  Oh, in the winter.

15        Q.   Oh, yeah, but --

16        A.   But that's it.  Not -- not regularly, no.

17        Q.   They would just be normal gloves?

18        A.   In the winter?

19        Q.   Yeah.

20        A.   Yeah.  Well, we had good ones because if

21   you are going to be out in the cold all day, you

22   don't -- you don't -- you don't go with cheap ass

23   gloves.

24        Q.   Did you ever take any medical leaves when
```

James Peterson

1    you were at the post office?

2         A.    What's a medical leave?  What do you mean,

3    medical leave?

4         Q.    I don't know.  Time off for a medical

5    issue.

6         A.    Yeah, because they had a program that --

7    they passed the Family Medical Leave Care Act and

8    it's -- something like that it's called, and my mom

9    got cancer and I took time off to help her when she

10   got cancer.

11        Q.    And is she passed now from cancer?

12        A.    Yeah, yeah, in 2012.

13        Q.    I was just going to ask you.  My

14   recollection, it was 2012?

15        A.    Yeah.

16        Q.    How long did you have off for dealing with

17   that issue?

18        A.    I just took it when I needed it.  Very

19   little time, but she had to go to a lot of different

20   doctors, you know, if you get that old, in your late

21   '80s, '90s, you've got eye problems, ear problems, you

22   know, hearing aids, eye problems.

23              Most of the time I could work it in

24   because you get two days off a week and it rotates and

James Peterson

1    then every, what is it, sixth or seventh week you get

2    a three-day weekend, you know, if it just falls right,

3    you get three days in a row off, and I could usually

4    fit it in to -- to do it then, you know, move it

5    around, but sometimes I couldn't and I did use Family

6    Medical Leave Act a few times.

7        Q.   And would that have mostly been towards,

8    you know, the 2008, 2009, 2010 --

9        A.   Oh, yeah, yeah, when she was really sick.

10       Q.   All right.  Any workplace injuries while

11   you were at the post office?

12       A.   Um-hum.  That's a -- that's a -- that's a

13   sore memory for me.

14       Q.   And what injuries do you recall?

15       A.   I injured my -- the flippers, I call them

16   flippers, they had steel plates on the -- on the dock

17   where we loaded the big trucks, and I think I was

18   probably driving the two-and-a-half ton then, and one

19   of the jobs I had was to pick up the mail from the

20   Woodfield post office, because you need a big truck

21   for that, you pick up all of their mail and you bring

22   it over to the other post office where the semi comes

23   in.  You know, it's kind of a -- it gets bigger and

24   bigger.

James Peterson

1      Q.    All right.  In the fact sheet here, when

2  you looked on the last page it had your electronic

3  signature.

4            Did you give permission --

5      A.    Which one is this?

6      Q.    This is Exhibit 7 on the last --

7      A.    Page 7?

8      Q.    -- page of Exhibit 7.  So flip to the --

9  here, let me show you.

10     MR. CADY:  It is Page 10, James.

11  BY MR. DOUGHERTY:

12     Q.    It will be Page 10.

13     A.    Okay.

14     Q.    So this is Page 10.  It has your

15  electronic signature at the bottom.

16            Did you give someone permission to sign

17  your name here?

18     A.    I don't remember.

19     Q.    Did you understand that you were declaring

20  that the statements in here were true and accurate to

21  the best of your knowledge?

22     A.    Yeah, I read that part of it when I --

23  when I did it, but I don't know about the signature

24  thing.

James Peterson

1      Q.    Okay.  Anything looking at this now that

2  you see in -- in this document that's inaccurate?

3      MR. CADY:  Take a minute to review it, James.

4           And, again, Counselor, this is the -- not

5  the amended fact sheet, correct?

6      THE WITNESS:  Right.

7      MR. DOUGHERTY:  It's not, yeah, so.

8      MR. CADY:  Okay.  I just wanted to confirm.

9  Thank you.

10  BY MR. DOUGHERTY:

11      Q.    You added a couple of things later, I

12  think, so we'll talk about those.

13      A.    Up to Page 2 is okay.

14           These are all okay.  Like working in that

15  industry, okay.

16           (Reading to self.)

17           Why is -- why is -- yeah, I asked about

18  this.  Maybe I should ask you.  Why is school teacher

19  on there?

20      Q.    Where are we talking about?

21      MR. CADY:  What page are you on, James?

22      THE WITNESS:  Three.  About No. 6 or 7 down the

23  list of industries.

24  BY MR. DOUGHERTY:

James Peterson

```
1        Q.    I -- I -- I actually don't know.  I could

2   venture a guess, but I'm not supposed to guess.

3        A.    Oh, okay.

4        Q.    Probably because schools are often old

5   buildings.

6        A.    Oh, okay.

7        Q.    Right.  If I had to guess.

8        A.    Okay.  Because I did teach school, but it

9   was after my regular job in the evening I taught -- I

10  taught adult education.

11       Q.    Oh, when did you do that?

12       A.    For 30 years.

13       Q.    Really?

14       A.    Yeah.

15       Q.    Where?

16       A.    Harper College part of it, part of it for

17  High School District 211.

18       Q.    Good for you.

19             What -- what did you teach?

20       A.    Photography.  Gee, what a guess.

21             Okay.  Healthcare provider, Northwest

22  Community.  I didn't know that was his middle name.

23  All right.  Okay.

24             MR. CADY:  You can't mumble, James, it is really
```

James Peterson

1  hard for the court reporter to take that down.

2      THE WITNESS:  Okay.

3      MR. CADY:  Okay.  I just want to confirm.  We've

4  got to get a clean record here.

5      THE WITNESS:  Okay.

6  BY THE WITNESS:

7      A.    I think -- I think they might be missing

8  one for medical history.

9  BY MR. DOUGHERTY:

10     Q.    What do you think we are missing?

11     A.    When I was in for the chemo treatment

12 sequestered, ManorCare was not the first one I was at.

13 I was at another one for a short time and then I went

14 to ManorCare.

15     Q.    Okay.

16     A.    Just so that you know.

17     Q.    We'll see if that turns up in one of the

18 amended ones.

19     A.    Okay.

20     Q.    Maybe I missed that.

21     A.    Yeah, could be.  Oh, here is 4, this way,

22 okay.  Condition and procedure, medication...

23     Q.    Don't -- don't -- don't read out loud.  He

24 is right.  She is going to be writing down everything

James Peterson

```
 1   you say.

 2       MR. CADY:  I can already tell we are making her

 3   life harder.  Let's not -- let's do our best here.

 4   BY THE WITNESS:

 5       A.   Is arthritis an immune -- autoimmune

 6   disease?

 7   BY MR. DOUGHERTY:

 8       Q.   I don't think so, but you disclosed

 9   arthritis somewhere.

10       A.   Okay.

11       Q.   I'm going to ask you about that later.

12       A.   I just -- just want to make sure.  I do

13   have it.

14            Nope, those are all okay.  No, no.  Okay.

15       Q.   It looks good?

16       A.   No.  Rheumatoid arthritis, maybe that's --

17   but it's a no here, but I -- I have arthritis in my

18   wrist.

19       Q.   Not as a result of rheumatoid arthritis,

20   just use, I guess, right?

21       A.   I don't know why it's there.  It is there

22   though.

23       Q.   Okay.

24       A.   I was diagnosed.
```

James Peterson

```
1        MR. CADY:  Thank you.

2        THE VIDEOGRAPHER:  Going off the video record at

3   3:44 p.m. at the end of Media 3.

4              (Time Noted:  3:44 p.m.)

5           FURTHER DEPONENT SAITH NAUGHT.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

James Peterson

```
 1                    REPORTER'S CERTIFICATE

 2              I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,

 3      a Registered Professional Reporter and Certified

 4      Shorthand Reporter, do hereby certify:

 5              That previous to the commencement of the

 6      examination of the witness herein, the witness was

 7      duly sworn to testify the whole truth concerning the

 8      matters herein;

 9              That the foregoing deposition transcript

10      was reported stenographically by me, was thereafter

11      reduced to typewriting under my personal direction and

12      constitutes a true record of the testimony given and

13      the proceedings had;

14              That the said deposition was taken before

15      me at the time and place specified;

16              That I am not a relative or employee or

17      attorney or counsel, nor a relative or employee of

18      such attorney or counsel for any of the parties

19      hereto, nor interested directly or indirectly in the

20      outcome of this action.

21              IN WITNESS WHEREOF, I do hereunto set my

22      hand on this 25th day of November, 2019.

23                   Juliana F. Zajicek

24              JULIANA F. ZAJICEK, Certified Reporter
```