1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**WILKINSON STEKLOFF LLP**
Brian L. Stekloff (*pro hac vice*)
(bstekloff@wilkinsonstekloff.com)
Rakesh Kilaru (*pro hac vice*)
(rkilaru@wilkinsonstekloff.com)
2001 M St. NW
10th Floor
Washington, DC 20036
Tel:    202-847-4030
Fax:    202-847-4005

**COVINGTON & BURLING LLP**
Michael X. Imbroscio (*pro hac vice*)
(mimbroscio@cov.com)
One City Center
850 10th St. NW
Washington, DC 20001
Tel: 202-662-6000

**HOLLINGSWORTH LLP**
Eric G. Lasker (*pro hac vice*)
(elasker@hollingsworthllp.com)
1350 I St. NW
Washington, DC 20005
Tel: 202-898-5843
Fax: 202-682-1639

**BRYAN CAVE LEIGHTON PAISNER LLP**
K. Lee Marshall (CA Bar No. 277092)
(klmarshall@bclplaw.com)
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111
Tel: 415-675-3400
Fax: 415-675-3434

*Attorneys for Defendant*
*MONSANTO COMPANY*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 Case No.: 3:16-md-02741-VC |
| *Cervantes v. Monsanto Co.,* 3:19-cv-03015-VC *Karman v. Monsanto Co.*, 3:19-cv-01183-VC *Pecorelli v. Monsanto Co.,* 3:16-cv-06936-VC *Peterson v. Monsanto Co.*, 3:18-cv-07271-VC *Schafer v. Monsanto Co.*, 3:19-cv-02169 *Seidl v. Monsanto Co.*, 3:17-cv-00519-VC | **DEFENDANT MONSANTO COMPANY'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER** Hearing date: May 28, 2021 Time: 10:00 a.m. |

1  **TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

2  **PLEASE TAKE NOTICE THAT** beginning on May 28, 2021, in Courtroom 4 of the United States

3  District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco,

4  CA 94102, or as ordered by the Court, Defendant Monsanto Company ("Monsanto") will present its

5  Motion to Exclude Testimony of Dr. William Sawyer.  Monsanto seeks an order excluding opinions

6  of this witness under Federal Rule of Evidence 702.

7  DATED:  March 19, 2021

8  Respectfully submitted,

9  /s/ *K. Lee Marshall*

10  K. Lee Marshall
    BRYAN CAVE LEIGHTON PAISNER LLP

11  Three Embarcadero Center, 7th Floor
    San Francisco, California 94111

12  Tel:    415-675-3400
    klmarshall@bclplaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

LEGAL STANDARD............................................................................................................5

ARGUMENT .........................................................................................................................6

I.      The Court Should Exclude Dr. Sawyer's General Causation Opinions. ..................6

II.     The Court Should Exclude Dr. Sawyer's Specific Causation Opinions. ..................7

       A.      Dr. Sawyer's Opinion that Roundup Is a "Substantial Contributing Factor" to Each Plaintiff's NHL Is Not the Proper Subject of Toxicology Expert Testimony.......................................................................................................8

           1.      Dr. Sawyer is Not Qualified to Draw Conclusions on Causation from the Epidemiology Studies....................................................8

           2.      Dr. Sawyer's Comparisons of Plaintiffs' Alleged Exposure Doses to "Exposure Thresholds" in Various Epidemiological Studies Do Not Support His Opinions on Specific Causation............................8

           3.      The Epidemiology Data on Which Dr. Sawyer Relies is Unreliable.............10

           4.      None of the Epidemiology Studies on which Dr. Sawyer Relies Supports His Opinion that Roundup Caused Plaintiff Pecorelli's Splenic Marginal Zone Lymphoma or Plaintiff Seidl's and Plaintiff Schafer's Follicular Lymphomas. ...................................................10

       B.      Dr. Sawyer Did Not Consider Other Potential Causes of Each Plaintiff's NHL. ..................................................................................................................11

III.    The Court Should Exclude Dr. Sawyer's Opinions Regarding the George Study.................12

IV.     The Court Should Exclude Dr. Sawyer's Opinions Regarding Trace Chemicals.................14

V.      Dr. Sawyer Should Not Be Permitted to Opine on Monsanto Company Documents and Regulatory Duties.........................................................................15

CONCLUSION.....................................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*Apple, Inc. v. Samsung Electronics Co., Ltd.,*
    2013 WL 5955666 (N.D. Cal. Nov. 6, 2013)..................................................................... 6

*City of New York v. FedEx Ground Package Sys., Inc.,*
    No. 13 Civ. 9173 (ER), 2018 WL 2941455 (S.D.N.Y. Oct. 10, 2018)........................... 15

*Cooper v. Brown,*
    510 F.3d 870 (9th Cir. 2007)............................................................................................ 6

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993).......................................................................................................... 6

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.,*
    285 F.3d 609 (7th Cir. 2002)............................................................................................ 8

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997).................................................................................................... 7, 13

*Guidroz-Brault v. Missouri Pacific R. Co.,*
    254 F.3d 825 (9th Cir. 2001).......................................................................................... 15

*Marmo v. Tyson Fresh Meats, Inc.,*
    457 F.3d 748 (8th Cir. 2006)................................................................................... 6, 7, 12

*Oracle America Inc., et al. v. Hewlett Packard Enterprise Co.,*
    No. 16-cv-01393-JST, 2018 WL 6511146 (N.D. Cal. Dec. 11, 2018) ........................... 15

*In re: Roundup Prods. Liab. Litig.,*
    390 F. Supp. 3d 1102 (N.D. Cal. 2018) ................................................................. 3, 9, 10

*Sanchez v. Boston Sci. Corp.,*
    No. 2:12-CV-05762, 2014 WL 4851989 (S.D. W. Va. Sept. 29, 2014)......................... 15

*White v. Ford Motor Co.,*
    312 F.3d 998 (9th Cir. 2002)............................................................................................ 5

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER

**INTRODUCTION**

Several Wave 2 Plaintiffs have designated Dr. William Sawyer to provide testimony regarding their alleged levels of exposure to various Roundup®-branded herbicides ("Roundup"). Dr. Sawyer *also* seeks to offer opinions regarding "general causation" and "specific causation." For the reasons below, Dr. Sawyer's opinions do not meet the requirements for expert admissibility under Federal Rule of Evidence 702 and should be excluded.

*First*, with respect to Dr. Sawyer's purported "general causation" opinions, in Wave 1, the plaintiffs admitted that Dr. Sawyer would "not offer an opinion on general causation." *See* Dkt. 9141, Amended Pretrial Order No. 201. Thus, the Court found this portion of Monsanto's motion to be moot. *Id.* Nevertheless, here, Dr. Sawyer again purports to offer "general causation" opinions in his reports pertaining to Wave 2 Plaintiffs. *See, e.g.,* Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 7; 23-175.[1] To the extent Dr. Sawyer seeks to offer the opinion that Roundup generally is capable of causing non-Hodgkin's lymphoma ("NHL"), that opinion should be excluded because it does not follow any valid or recognizable methodology. Dr. Sawyer's "opinions" regarding general causation merely parrot other experts and should be excluded.

*Second*, with respect to Dr. Sawyer's specific causation opinions, the Wave 1 plaintiffs conceded that Dr. Sawyer would not "offer a differential diagnosis opinion as to any individual plaintiff." *See.* Dkt. 9141, Amended Pretrial Order No. 201. Accordingly, the Court found that "[Dr. Sawyer] may not opine that a plaintiff's 'exposure to Roundup was sufficient to cause NHL.'" *Id.* Despite the Court's ruling, Dr. Sawyer attempts to assert that very opinion with respect to several of the Wave 2 Plaintiffs, opining in his reports that each Plaintiff's exposures to Roundup were sufficient "to substantially contribute to the development" of that Plaintiff's NHL. *See* Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 6-7, 178-179.

These opinions should be excluded because Dr. Sawyer did not follow a valid methodology in

---

[1] Dr. Sawyer submitted largely the same expert report for each of the above-captioned Plaintiffs, with the exception of certain Plaintiff-specific information included in each report. *See* Marshall Decl., Ex. 2, Sawyer *Karman* Dep. at 12:6-13. For clarity and efficiency, unless otherwise noted, Monsanto's citations throughout this brief are to Dr. Sawyer's report in *Cervantes*. Monsanto is attaching case-specific excerpts of Dr. Sawyer's reports in the other five cases. *See* Marshall Decl. Ex. 3, Sawyer *Karman* Rpt. at 1, 7-29, 175-179; Ex. 4, Sawyer *Pecorelli* Rpt. at 1, 7-37, 183-187; Ex. 5, Sawyer *Peterson* Rpt. at 1, 7-26, 173-177; Ex. 6, Sawyer *Schafer* Rpt. at 1, 7-39, 187-191; Ex. 7, Sawyer *Seidl* Rpt. at 1, 6-30, 148-152. The full reports are available upon request.

reaching them.  Rather, he concludes that Roundup was a potential cause of each Plaintiff's NHL based purely on extrapolations from cherry-picked epidemiology studies, notwithstanding his lack of training in epidemiology and his consistent admissions in this and other Roundup cases that he has not actually analyzed the epidemiological details of any of the studies from which he plucks individual, exposure-related data points.  And he did not reliably analyze or rule out many other possible causes of Plaintiffs' NHL.  Moreover, with respect to several of Plaintiffs' specific subtypes of NHL, Dr. Sawyer admitted that he is not aware of any study or data that shows a statistically significant increased risk for those subtypes associated with glyphosate use.  Dr. Sawyer's conclusion that Roundup was a "substantial contributing factor to" the development of each Plaintiff's cancer is therefore based on nothing more than impermissible *ipse dixit* and is not helpful to the jury.

*Third*, Dr. Sawyer's opinions are based on data that is universally considered to be inadequate for scientific analysis.  Specifically, Dr. Sawyer's reliance on the George mouse study to demonstrate that Roundup is a cancer "promoter" is inconsistent with the conclusions of all scientific panels and regulators that have reviewed that study, including both the EPA (which has concluded on multiple occasions that Roundup is not a human carcinogen) and IARC.  Indeed, IARC concluded that the George study is "inadequate" for the evaluation of glyphosate.  Nevertheless, Dr. Sawyer attempts to offer opinions based primarily on the George study that even Plaintiffs' general causation expert, Dr. Portier, previously admitted that he would not be willing to offer.

*Fourth*, Dr. Sawyer's opinion that trace chemicals in Roundup caused or contributed to Plaintiffs' cancers is based merely on assertions that those chemicals have been associated with cancer *at much higher doses*.  There is no scientific causation evidence linking them to NHL at doses remotely comparable to those at issue here, nor is there any scientific evidence suggesting that exposure to Roundup is a cancer risk because of these trace chemicals.  Indeed, Dr. Sawyer does not even calculate the doses of these chemicals to which Plaintiffs were allegedly exposed.

*Fifth*, Dr. Sawyer seeks to offer opinions regarding Monsanto company documents and regulatory duties, which are beyond his area of expertise and the realm of proper expert testimony.

## BACKGROUND

Six of the remaining Wave 2 Plaintiffs have designated Dr. Sawyer as an expert.  *See, e.g.,*

Marshall Decl., Ex. 8, Plaintiff's R. 26 Specific Causation Expert Disclosures in *Cervantes*[2]; Ex. 9, Plaintiff's Specific Causation Expert Disclosures in *Seidl*.  Among other topics, Dr. Sawyer's reports set forth opinions on what he characterizes as "general causation" and "specific causation."  *See* Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 5-7.  Dr. Sawyer seeks to opine that each Plaintiff's alleged exposure to Roundup was "a substantial contributing factor to the development of his NHL." *Id.* at 6.  In addition, Dr. Sawyer also purports to offer an unsupported opinion that Roundup is a cancer promoter, based on the George study, and that various trace chemicals in Roundup contributed to each Plaintiff's development of NHL.  Finally, Dr. Sawyer purports to offer opinions regarding various EPA regulations and Monsanto's corporate state of mind.

<u>General and Specific Causation</u>

Three types of evidence are used to evaluate whether an agent is capable of causing a particular outcome at human-relevant exposure levels: epidemiological, animal, and mechanistic evidence.  *See In re: Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1115-1130 (N.D. Cal. 2018).  Epidemiology, which studies the incidence and etiology of disease in human populations, is "central to the general causation inquiry, and where such evidence exists, it must be addressed."  *Id.* at 7.  Dr. Sawyer, however, has conceded repeatedly that he has not evaluated the merits of any of the epidemiology studies for purposes of determining causation, and instead is "deferring" to other experts on that subject.  *See, e.g.,* Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 23; Ex. 10, Sawyer *Schafer* Dep. at 21:17-22:1;  96:23-97:12.  The general causation portions of Dr. Sawyer's reports instead discuss glyphosate's history; the ingredients in various Roundup formulations; the routes of potential exposure to glyphosate; and various factors purportedly affecting dermal absorption.  *See* Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 43-166.  In other words, Dr. Sawyer's "general causation" opinion is merely a discussion of the properties of Roundup, not an analysis of whether Roundup can cause NHL in humans when used in accordance with label instructions.

Dr. Sawyer's reports also purport to address specific causation—whether Roundup caused Plaintiffs' cancers specifically—but do so only by attempting to determine whether Plaintiffs' exposures were similar to those sustained by applicators in various epidemiology studies.  Marshall

---

[2] Plaintiffs Karman, Pecorelli, Peterson, and Schafer submitted the identical expert disclosures for Dr. Sawyer.

Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 5-7; 20-29; 178-79.  As Dr. Sawyer admits, however, he has not calculated any actual absorption dose of Roundup for any of the Wave 2 Plaintiffs.  *See* Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 6; Ex. 11, Sawyer *Cervantes* Dep. at 93:22-25; 96:7-12; Ex. 2, Sawyer *Karman* Dep. at 26:21-27:1; Ex. 10, Sawyer *Schafer* Dep. at 40:2-41:13.  Instead, he merely compares the number of days Plaintiffs allege they were exposed to Roundup to data in certain epidemiological studies whose quality and methodology he did not evaluate.  Specifically, Dr. Sawyer describes Plaintiffs' alleged uses of Roundup, which he based on "historical information received through review of personal fact sheets, deposition, photographs and direct interview pertaining to [Plaintiff's alleged] exposure events, circumstances and details."  Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 6.  Dr. Sawyer's analysis consists of comparing the total number of days on which Plaintiffs allegedly used Roundup to various "exposure day" levels mentioned in six epidemiology studies.  Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 5-7; 20-29; 178-79.

Importantly, Dr. Sawyer's "specific causation" opinion does not reliably account for other possible causes of Plaintiffs' NHL, including Plaintiffs' exposures to other known or possible human carcinogens, smoking histories, obesity, and family histories of cancer.  *See* Marshall Decl., Ex. 11, Sawyer *Cervantes* Dep. at 21:12-23; 22:14-25:14; 25:15-30:3; 39:13-18; 49:12-58:12; 59:24-61:16; 61:17-84:3; Ex. 12, Sawyer *Peterson* Dep. at 80:7-82:11; Ex. 2, Sawyer *Karman* Dep. at 40:1-19; 44:2-50:6; Ex. 13, Sawyer *Pecorelli* Dep. at 77:14-78:3; 78:25-79:5; 90:24-92:8; 93:24-94:1; 95:24-96:12; Ex. 14, Sawyer *Seidl* Dep. at 15:8-17:13; 19:24-20:22; 21:25-23:16; 24:22-25; 29:8-30:10; 47:10-52:11.  In other words, unlike other specific causation experts in the litigation, Dr. Sawyer does not conduct a true differential diagnosis.

### Promotion

The George study is a small mouse study in which various combinations of (1) a known carcinogen, (2) a known tumor promotor, (3) Roundup, (4) 2- dimethylbenz[a]anthracene ("DMBA"), and (5) 7, 12-O-tetradecanoyl-phorbol-13-acetate ("TPA") were painted on the skins of the subject animals.  Marshall Decl., Ex. 15, George, J., et al., *Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach*, 73 Journal of Proteomics 951 (2010) ("George 2010") at 953.  While it purported to find that Roundup facilitated the growth of cancer, *id.*, due to multiple flaws in

the study design—including that it omitted histopathology (the standard scientific confirmation of cancer)—the George study has been rejected as evidence of promotion (or carcinogenicity), including by both IARC and EPA. *See, e.g.*, Marshall Decl., Ex. 16, EPA Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Dec. 12, 2017) at 70; Ex. 17, IARC, *Glyphosate in Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos, Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans* (2015) at 32. Notwithstanding this uniform disapproval of the George study, Dr. Sawyer relies on the study to support his conclusion that Roundup can promote cancer in Plaintiffs. *See, e.g.*, Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 53-57, 177-178.

<u>Trace Chemicals</u>

Roundup, like all herbicides, contains certain trace chemicals as byproducts of the manufacturing process. Dr. Sawyer seeks to testify that various trace chemicals in Roundup are carcinogens, and thus caused or contributed to Plaintiffs' NHL. Dr. Sawyer provides no science linking any of the trace chemicals to NHL at any dose remotely approximating the minuscule amounts to which Plaintiffs could have been exposed, and none attributing NHL in people exposed to Roundup to the presence of those trace chemicals. Dr. Sawyer never even calculates a dose of these trace chemicals to which Plaintiffs allegedly were exposed.

<u>EPA Regulations and Corporate State of Mind</u>

Finally, Dr. Sawyer seeks to offer improper opinion testimony regarding the relevant EPA regulations, Monsanto's corporate state of mind, and the sufficiency of the Roundup label. Dr. Sawyer is unqualified to discuss these topics, which are plainly outside the scope of his expertise.

## **LEGAL STANDARD**

A proposed expert witness must possess "knowledge, skill, experience, training, or education" sufficient to qualify him as an expert on the subject to which his testimony relates. Fed. R. Evid. 702. When an expert's field of expertise is not related to the subject on which he seeks to offer testimony, such testimony is inadmissible. *See White v. Ford Motor Co.*, 312 F.3d 998, 1008-09 (9th Cir. 2002). Apart from qualifications, expert testimony must be (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) the result of applying those principles and methods

reliably to the facts of the case.  Fed. R. Evid. 702.  The trial judge is charged with the responsibility of acting as a gatekeeper to "ensure that any and all scientific testimony … is not only relevant, but reliable."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  The proponent of the expert bears the burden of proving that the expert's proffered testimony is admissible.  *See, e.g.*, *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

## ARGUMENT

### I.   The Court Should Exclude Dr. Sawyer's General Causation Opinions.

Dr. Sawyer should not be allowed to offer an opinion on general causation—*i.e.,* that Roundup is generally capable of causing NHL in humans—because he has not followed any valid methodology to reach such an opinion.  As an initial matter, courts have repeatedly held that an expert may not testify on matters outside his specific subject matter of expertise, *Apple, Inc. v. Samsung Electronics Co., Ltd.*, 2013 WL 5955666, at *2 (N.D. Cal. Nov. 6, 2013).  In the context of toxicologists specifically, courts have noted that although "a toxicologist may testify that exposure to a chemical caused a person's symptoms and injuries," there is no "blanket rule that toxicologists are qualified to render an opinion on causation."  *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006).  Dr. Sawyer's reports in these cases do not adequately set forth an acceptable methodology for reaching a general causation opinion.  Moreover, to the extent Dr. Sawyer attempts to apply the Bradford Hill criteria (a method for assessing causation)—which he only briefly mentions in his reports in this case—he has not reliably applied that methodology.

The Bradford Hill criteria can be applied only *after* epidemiology data demonstrates an association.  *See* Marshall Decl., Ex. 18, Reference Manual on Scientific Evidence at 598–99; *see also* Marshall Decl., Ex. 19*,* A. Bradford Hill, *The Environment and Disease: Association or Causation?*, 58 Proc. R. Soc. Med. 295, 295 (1965).  Critically, Dr. Sawyer has admitted that he has not evaluated the epidemiological studies for purposes of determining causation.  *See, e.g.,* Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 23 (admitting that he looked at the six epidemiology studies referenced in his report "primarily with respect to dose assessment."); Ex. 10, Sawyer *Schafer* Dep. at 21:17-22:1; 97:5-12.  Rather, he has deferred the detailed analysis of the epidemiology studies to other experts. Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 23; Ex. 12, Sawyer *Peterson* Dep. at 43:8-25; 59:18-

60:7; Ex. 13, Sawyer *Pecorelli* Dep. at 29:6-15; 32:3-11; 33:13-17; Ex. 10, Sawyer *Schafer* Dep. at 43:10-19.  Because Dr. Sawyer has not analyzed the epidemiology evidence to determine whether there is an association between Roundup and NHL, he cannot properly reach any general causation opinion.

Nor can Dr. Sawyer testify about animal or mechanism studies without explaining how such evidence can be properly extrapolated to humans.  *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 145 (1997) (excluding animal data where expert failed to adequately extrapolate to humans).  Here, although Dr. Sawyer describes certain animal and genotoxicity studies in his reports, he admits he did not fully analyze them for purposes of determining causation and offers no explanation for how the results of those studies can be extrapolated to reach a conclusion that Roundup can cause NHL in humans.  *See* Marshall Decl., Ex. 10, Sawyer *Schafer* Dep. at 97:5-12 ("I defer to other experts in this case . . . as I focused primarily on the dose aspects as opposed to the review of the entire body of animal and human epidemiological studies with respect to general causation.").

## II.   The Court Should Exclude Dr. Sawyer's Specific Causation Opinions.

Dr. Sawyer likewise did not use a reliable methodology to reach his specific causation opinions, which should be excluded.  Dr. Sawyer did not physically examine Plaintiffs or review all of the medical records for some Plaintiffs.  Marshall Decl., Ex. 12, Sawyer *Peterson* Dep. at 26:10-12; Ex. 10, Sawyer *Schafer* Dep. at 11:14-17; 29:9-12; 30:2-31:8.  Nor did he perform a true differential diagnosis in these cases.  Nevertheless, he seeks to opine that Roundup was "a substantial contributing factor to" the development of each Plaintiff's cancer.  *E.g.,* Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 6, 179.  Those opinions should be excluded because Dr. Sawyer has not followed any valid methodology.  *See*, *e.g.*, *Marmo*, 457 F.3d at 758.

Dr. Sawyer apparently concludes that Roundup is "a substantial contributing factor" for each Plaintiffs' NHL based primarily on exposure-related data extracted from epidemiology studies, which, as explained above, he has not fully evaluated for purposes of determining causation.  Moreover, there is nothing "specific" about such a causation analysis—it would deem Roundup to be a "substantial contributing factor" for *any individual anywhere in the world* who alleges exposure to Dr. Sawyer's hypothetical threshold amount of glyphosate.  As if to confirm the point, Dr. Sawyer did not attempt to analyze many of Plaintiffs' other potential risk factors, instead deferring that analysis to other experts

or simply ignoring it altogether.  Dr. Sawyer's results-driven process does not resemble any sort of valid specific causation analysis and should be excluded.

### A.   Dr. Sawyer's Opinion that Roundup Is a "Substantial Contributing Factor" to Each Plaintiff's NHL Is Not the Proper Subject of Toxicology Expert Testimony.

The purported foundation for Dr. Sawyer's "specific causation" opinions is his comparison of the number of days Plaintiffs used Roundup to thresholds from six epidemiology studies, which, according to him, demonstrate that a person with a certain level of exposure, calculated by Dr. Sawyer in "exposure days," is always at an increased risk of developing NHL.  Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 5-7; 20-29; 178-179.  Dr. Sawyer should be prohibited from offering his "specific causation" opinions for multiple reasons.

### 1.   Dr. Sawyer is Not Qualified to Draw Conclusions on Causation from the Epidemiology Studies.

Dr. Sawyer is not an epidemiologist, does not consider himself an epidemiology expert and has specifically disclaimed any attempt to evaluate or interpret the relevant epidemiology studies for purposes of determining causation.  *See* Marshall Decl., Ex. 10, Sawyer *Schafer* Dep. at 21:17-25; 97:5-12; Ex. 12, Sawyer *Peterson* Dep. at 43:8-25.  Indeed, Dr. Sawyer consistently testifies that he defers to epidemiologists on virtually every aspect of the epidemiology studies, from big-picture questions about the sufficiency of human data to show a connection between Roundup and NHL, to other matters such as epidemiological study design, statistical analysis of data, and the validity of epidemiological studies.  *See, e.g.,* Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 23; Ex. 12, Sawyer *Peterson* Dep. at 43:8-25; 59:18-60:7; Ex. 13, Sawyer *Pecorelli* Dep. at 29:6-15; 32:3-19; 33:13-17; Ex. 10, Sawyer *Schafer* Dep. at 43:10-19; 96:23-97:19.  The Court should not allow Dr. Sawyer to opine on topics that exceed his expertise, including extracting alleged thresholds from studies he is not qualified to evaluate.  *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002).

### 2.   Dr. Sawyer's Comparisons of Plaintiffs' Alleged Exposure Doses to "Exposure Thresholds" in Various Epidemiological Studies Do Not Support His Opinions on Specific Causation.

Even if Dr. Sawyer were qualified to analyze the epidemiology data on which he based his opinions, that analysis could not justify his conclusion that Roundup caused a *particular plaintiff's*

- 8 -

cancer.  Dr. Sawyer has repeatedly confirmed that under his counting-of-days "analysis," all of the following are deemed irrelevant: the actual amount of Roundup allegedly absorbed in each Plaintiff's body, the intensity of any exposure, the type of equipment each Plaintiff used to apply Roundup, Plaintiffs' use of any personal protective equipment, and Plaintiffs' efforts to clean Roundup off of their skins after exposure events.  *See, e.g.,* Marshall Decl., Ex. 10, Sawyer *Schafer* Dep. at 44:5-24; 47:1-9; 50:2-18; 52:10-53:8;  Ex. 1, Sawyer *Cervantes* Rpt. at 6; Ex. 2, Sawyer *Karman* Dep. at 26:21-27:1; *see also* Marshall Decl., Ex. 12, Sawyer *Peterson* Dep. at 29:6-15 (admitting he did not ask Mr. Peterson about hygiene practices after using Roundup); Ex. 11, Sawyer *Cervantes* Dep. at 18:10-19:5 (admitting he did not analyze Mr. Cervantes's spraying equipment ); Ex. 14, Sawyer *Seidl* Dep. at 34:23-38:3 (admitting he has not analyzed Mr. Seidl's spraying equipment).  Instead, the sole determining factor for his "analysis" is the number of "exposure days" each Plaintiff allegedly experienced and whether that number exceeds thresholds from Dr. Sawyer's handpicked epidemiology studies.  However, even *general* causation cannot be established with epidemiology alone, as Plaintiffs' experts concede and as this Court has previously determined.  *See* Marshall Decl., Ex. 20, Tr. of Proceedings, Testimony of Dr. Christopher J. Portier, *Pilliod v. Monsanto Co.,* No. RG-170862702 (Cal. Sup. Ct. Alameda Cnty. Apr. 3, 2019) at 1893:3–8; *see also In see also In re: Roundup*, 390 F. Supp. 3d at 1116 ("[w]hether [an] agent *causes* the outcome, however, cannot be proven by epidemiological studies alone").  Without question, it cannot establish specific causation.  But that is what Dr. Sawyer has done: he has concluded that Roundup caused each Plaintiff's cancer merely because Plaintiffs were exposed to Roundup for a number of days that exceeds the minimal "exposure days" threshold presented by certain epidemiological data points from studies he has not fully analyzed.

Moreover, as Dr. Sawyer has expressly acknowledged, exposure and absorption are not equivalent concepts.  *See, e.g.,* Marshall Decl., Ex. 11, Sawyer *Cervantes* Dep. at 93:22-25; 94:1-99:23.  Dr. Sawyer admits that Roundup exposure can be harmful, even under his flawed theory, only if it is absorbed into the body.  *Id.* at 98:13-100:3.  Yet he concedes that he did not determine the amount of Roundup that each Plaintiff allegedly *absorbed*.  *See* Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 6; Ex. 11, Sawyer *Cervantes* Dep. at 93:22-25; 96:7-12; Ex. 2, Sawyer *Karman* Dep. at 26:21-27:1; Ex. 10, Sawyer *Schafer* Dep. at 40:2-41:13.  Thus, Dr. Sawyer cannot draw conclusions on specific

causation based on his calculated "exposure days," which say nothing about the amount of Roundup that was actually absorbed by each Plaintiff.

### 3.   The Epidemiology Data on Which Dr. Sawyer Relies is Unreliable.

Additionally, most of the epidemiology data on which Dr. Sawyer relies for his specific causation opinions is unreliable because it was not adjusted for the use of other pesticides.  Although his reports focus on six epidemiology studies, Dr. Sawyer has stated in this MDL that the "three primary studies" on which he relies for his specific causation opinions are McDuffie, Eriksson, and Andreotti. Marshall Decl., Ex. 21, Sawyer *Giglio* Dep. at 66:5-10.[3]  Dr. Sawyer concedes that Andreotti, which is part of the Agricultural Health Study, "did not find a statistically elevated risk of NHL" (Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 24-25), so that study does not support his conclusions on specific causation.  Dr. Sawyer also relies on Eriksson and McDuffie, which he states reported odds ratios of 2.36 and 2.12, respectively, for those with greater than ten days per lifetime of exposure (in Eriksson) and greater than two days per year of exposure (in McDuffie).  Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 24.  However, those studies did not adjust for exposure to other pesticides.  *See* Marshall Decl., Ex. 21, Sawyer *Giglio* Dep. at 78:13-80:18; Ex. 2, Sawyer *Karman* Dep. at 59:23-62:19; *see also In re Roundup Prods., Liab., Lit.*, 390 F. Supp. 3d at 1119–20.  As this Court has already determined, "[f]ailing to take account of likely confounders by presenting and relying upon only unadjusted (or minimally adjusted) estimates is a serious methodological concern." *Id.* at 1140.  Dr. Sawyer's reliance on unreliable data from studies that did not adjust for other pesticide exposure provides another basis for exclusion of his specific causation opinions.[4]

### 4.   None of the Epidemiology Studies on which Dr. Sawyer Relies Supports His Opinion that Roundup Caused Plaintiff Pecorelli's Splenic Marginal Zone Lymphoma or Plaintiff Seidl's and Plaintiff Schafer's Follicular Lymphomas.

[3] The other three studies on which Dr. Sawyer relies—Leon, Zhang, and Pahwa—are not "principal" studies. Rather, they are meta-analyses or pooled analyses that combine data from *other* principal studies like McDuffie, Eriksson, and Andreotti.  *See* Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 25-27.  Furthermore, Leon found no association between risk of NHL overall and use of glyphosate. Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 25-26; *see also* Marshall Decl., Ex. 22, EPA, *Memorandum: Glyphosate: Epidemiology Review of Zhang et al. (2019) and Leon et al. (2019) publications for Response to Comments on the Proposed Interim Decision* (Jan. 6, 2020) at 13-17.  Thus, that study does not support Dr. Sawyer's conclusions.  And Zhang has been sharply criticized for its faulty methodologies and flawed conclusions.  *See id.* at 2-13.

[4] Dr. Sawyer further admits that he has not reviewed a number of recent publications on glyphosate, including new findings by EPA, Health Canada, and the Agency for Toxic Substances and Disease Registry.  *See* Marshall Decl., Ex. 12, Sawyer *Peterson* Dep. at 26:4-9; 70:2-73:25; Ex. 2, Sawyer *Karman* Dep. at 13:8-12.  Dr. Sawyer's refusal to consider these publications confirms that his specific causation opinions are unreliable.

Plaintiff Pecorelli had a rare subtype of NHL known as splenic marginal zone lymphoma ("MZL").  Marshall Decl., Ex. 13, Sawyer *Pecorelli* Dep. at 13:21-14:15.  Plaintiff Seidl and Plaintiff Schafer had a subtype of NHL known as follicular lymphoma.  Marshall Decl., Ex. 14, Sawyer *Seidl* Dep. at 33:7-10; Ex. 10, Sawyer *Schafer* Dep. at 17:20-18:25.  Splenic MZL and follicular lymphoma are distinct subtypes of NHL with unique risk factors and causes.  As Dr. Sawyer has admitted, he is not aware of any study finding that glyphosate is associated with splenic MZL.  Marshall Decl., Ex. 13, Sawyer *Pecorelli* Dep. at 22:23-29:5; 35:3-41:7.  Similarly, Dr. Sawyer conceded that he is not aware of any study showing a statistically significant association between follicular lymphoma and glyphosate.  Marshall Decl., Ex. 14, Sawyer *Seidl* Dep. at 33:11-34:18; Ex. 10, Sawyer *Schafer* Dep. at 84:11-23; 85:9-23; 88:9-18; 92:12-16.  Thus, because Dr. Sawyer's opinions on specific causation are based on epidemiology studies that he admits do not show a statistically significant increased risk of splenic MZL or follicular lymphoma associated with glyphosate use, Dr. Sawyer's specific causation opinions as to Plaintiff Pecorelli's splenic MZL and Plaintiff Seidl's and Plaintiff Schafer's follicular lymphomas are fundamentally unreliable and should be excluded for this reason as well.

### B.    Dr. Sawyer Did Not Consider Other Potential Causes of Each Plaintiff's NHL.

Dr. Sawyer's failure to consider other possible causes of each Plaintiff's NHL confirms that his "specific causation" opinions are not reliable opinions on *specific* causation.  In his reports, Dr. Sawyer claims that he performed "differential diagnoses," Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 5, yet he paradoxically admits that he did not review all of the medical records for some Plaintiffs, did not physically examine Plaintiffs, and expressly deferred the analysis of genetic predisposition to other experts, *id.* at 17 n. 34; *see also* Marshall Decl., Ex. 11, Sawyer *Cervantes* Dep. at 21:12-23; Ex. 12, Sawyer *Peterson* Dep. at 26:10-12; Ex. 10, Sawyer *Schafer* Dep. at 11:14-17; 29:9-12; 30:2-31:8.

Moreover, during his deposition, Dr. Sawyer admitted that Mr. Cervantes's family history of NHL, exposure to welding fumes, and obesity; Mr. Karman's obesity; and Mr. Pecorelli's occupational exposure to other chemicals are risk factors for those Plaintiffs' NHL.  Marshall Decl., Ex. 11, Sawyer *Cervantes* Dep. at 21:12-23; 22:14-25:14; 25:15-30:3; 38:10-39:18; 49:12-61:1; Ex. 2, Sawyer *Karman* Dep. at 40:1-19; Ex. 13, Sawyer *Pecorelli* Dep. at 77:14-78:3; 78:25-79:5; 90:24-92:8; 93:24-94:1; 95:24-96:12. Yet, without any explanation, he brushed those factors aside to reach his conclusion that

Roundup must have caused those Plaintiffs' NHL.[5]  Dr. Sawyer also candidly admitted that he lacked more than two decades of information about Mr. Pecorelli's potential occupational exposures when assessing his cancer risk.  Marshall Decl., Ex. 13, Sawyer *Pecorelli* Dep. at 77:14-78:24.  And Dr. Sawyer refused to consider or simply ignored several of Plaintiffs' other chemical exposures, environmental and occupational exposures, extensive smoking histories, and various other factors that may have contributed to their cancers.  Marshall Decl., Ex. 11, Sawyer *Cervantes* Dep. at 61:17-84:3 (failing to properly consider Mr. Cervantes exposure to benzene); Ex. 12, Sawyer *Peterson* Dep. 80:7-82:11 (ignoring Mr. Peterson's use of malathion); Ex. 2, Sawyer *Karman* Dep. at 44:2-49:22 (ignoring Mr. Karman's 50 pack-year smoking history); Ex. 14, Sawyer *Seidl* Dep. at 15:8-17:13; 19:24-20:22; 21:25-23:16;  24:22-25;  29:8-30:10;  47:10-52:11 (ignoring Mr. Seidl's other occupational and environmental exposures).  These represent just some of the many examples in these cases of Dr. Sawyer's failure to properly consider, analyze, rule out, and testify about other potential causes of a Plaintiff's NHL.  By omitting a fulsome analysis of Plaintiffs' potential risk factors or deferring such an analysis to other experts, Dr. Sawyer relinquished any basis to offer a specific causation opinion. He cannot properly reach such an opinion without considering each Plaintiff's individual circumstances, such as whether their cancers might be attributable to some factor other than Roundup. *See, e.g., Marmo*, 457 F.3d at 758 (affirming district court's exclusion of toxicologist where toxicologist "did not exclude confounding factors, which 'leaves open the possibility of competing causes of the disease' and raises questions about the competency of expert testimony.").

In sum, there is nothing "specific" about Dr. Sawyer's specific causation opinion.  His methodology consists of simply counting days of exposure and seeing if they exceed exposure-days plucked from hand-selected epidemiology studies he is not qualified to analyze, with only a cursory and incomplete examination of Plaintiffs' unique circumstances.  Thus, any specific causation opinion he attempted to offer would be based on nothing more than his say-so, and should be excluded.

### III.   The Court Should Exclude Dr. Sawyer's Opinions Regarding the George Study.

Based primarily on the George study, Dr. Sawyer seeks to opine that Roundup "promoted"

---

[5] Monsanto does not necessarily agree that all of these other substances are known or potential carcinogens. However, because at least some of Plaintiffs' experts are of the opinion that these substances are or may be carcinogens, Dr. Sawyer erred by failing to rule out Plaintiffs' alleged exposures to them.

cancer in Plaintiffs.  This opinion should be excluded because the George study has been rejected as inadequate for scientific analysis.  The George study was a small study that, in relevant part, was designed to determine if glyphosate *initiated* tumors or if it *promoted* tumors generated by a known tumor initiator.  It concluded that glyphosate "*failed* to provoke neoplastic development when tested as tumor initiator or complete carcinogen," but did show "carcinogenic potential" as a tumor promotor.  Marshall Decl., Ex. 15, George 2010 at 954 (emphasis added).  The George study was evaluated by several major national and international agencies—including EPA and IARC—and the study was uniformly found by them to be inadequate for scientific purposes:

- Marshall Decl., Ex. 16, EPA, Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Dec. 12, 2017) at 70 ("A number of studies were **judged to be inadequate in protocol, conduct or reporting** and were not considered in the analysis of glyphosate . . . An initiation-promotion study (George et al., 2010) in male Swiss mice that tested a commercial formulation of glyphosate (41%) on the skin.  Study deficiencies included small number (20) of animals, tested only males, and lack of histopathological examination." (emphasis added)).

- Marshall Decl., Ex. 17, IARC, *Glyphosate in Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos, Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans* (2015) at 32 ("Short duration of treatment, no solvent controls, and lack of any histopathological evaluation, Age at start, NR (mice weighed 12–15 g bw) The Working Group concluded **this was an inadequate study for the evaluation of glyphosate**." (emphasis added)).

- Marshall Decl., Ex. 23, BAuA[6], Proposal for Harmonized Classification and Labeling: N phosphonomethyl)glycine; Glyphosate (ISO), CLH Report for Glyphosate (2016) at 66 ("**[George] cannot contribute to a decision on the classification of glyphosate**." (emphasis added)).

Despite this consensus view rejecting the George study as inadequate and unreliable, Dr. Sawyer strays far into the realm of speculation by opining that Roundup can promote cancer in humans and did promote cancer in Plaintiffs, based primarily on his interpretation of this study.  Moreover, Dr. Sawyer makes an unsupported leap by inferring from a study of chemicals painted on mouse skin that Roundup specifically can promote *NHL* in humans.  *See, e.g.*, *Joiner*, 522 U.S. at 145.  Even Plaintiffs' general causation expert, Dr. Portier, has testified that he *cannot* conclude that glyphosate is a cancer promoter based solely on the George study.  *See* Marshall Decl., Ex. 29, Portier *Hardeman* Dep. at 157:19-158:18 (Dr. Portier admitting that he would "want to see a lot more evidence" in addition to

---

[6] The BAuA is Germany's Federal Institute for Occupational Safety and Health.

the George study before affirmatively concluding that glyphosate/Roundup is a cancer promoter). Yet that is effectively what Dr. Sawyer seeks to do, warranting exclusion of such opinion.

## IV.   The Court Should Exclude Dr. Sawyer's Opinions Regarding Trace Chemicals.

Like most pesticides, Roundup contains trace amounts of certain chemicals in addition to its active ingredient. EPA considers these chemical "impurities" to be safe because they are present at extremely low (i.e. "trace") levels. *See, e.g.*, Marshall Decl., Ex. 24, EPA, Proposed Interim Registration Review Decision Case No. 0178 (April 2019), at 10 (finding that glyphosate is not likely to be carcinogenic to humans despite noting that "[m]ost pesticide products contain substances in addition to the active ingredient . . . .").[7] There is no scientific evidence of causation linking these trace chemicals to NHL at doses remotely comparable to those at issue here; indeed, Dr. Sawyer does not even calculate the dose of these chemicals to which Plaintiffs were allegedly exposed. And Dr. Sawyer has pointed to no scientific evidence suggesting that exposure to Roundup is a cancer risk *because of these trace chemicals*. *See* Marshall Decl., Ex. 25, Sawyer *Lamb/Cohen* Dep. at 176:20-177:5.

Dr. Sawyer nevertheless intends to offer unsupported testimony that trace levels of these chemicals (assuming they were even present in the particular bottles of Roundup allegedly used by Plaintiffs) are carcinogenic *and* that they caused or contributed to Plaintiffs' cancers. *See* Marshall Decl., Ex. 1, Sawyer *Cervantes* Rpt. at 49-51. This testimony is designed solely as a sideshow to distract, confuse, and provoke fear in the jury. At the most recent Roundup trial, Dr. Sawyer dramatically implied, without any scientific evidence, that trace ingredients in Roundup could kill a person upon opening the Roundup bottle. Marshall Decl., Ex. 26, Tr. of Proceedings, Testimony of Dr. William R. Sawyer, *Pilliod v. Monsanto Co.,* No. RG-170862702 (Cal. Sup. Ct. Alameda Cnty. Apr. 11, 2019) at 3131:6-3132:16 ("A: [Ethylene oxide] is a sterilization gas. It kills every type of biological life on earth . . . if I had a little air in the bottle, as one of our jurors has sitting there, that over time that air in the bottle, the ethylene oxide would accumulate in that air space. Q: . . . So this actually has Roundup that's been sitting in here for a while. If I were to open up this cap, what would happen? A: There would be ethylene oxide escaping from that head space."). Dr. Sawyer's

---

[7] *See also* Marshall Decl., Ex. 27, Tr. of the Dep. of Charles Benbrook, *Hall, et al. v. Monsanto Co.,* No. 1622-CC01071 (Mo. Cir. Ct. St. Louis Cty. May 23, 2018) at 277:20-278:4 (admitting that he has no reason to believe that the "impurities" in Roundup can cause NHL).

1    unsupported comments on these trace chemicals are speculative, inappropriate, and inadmissible.  *See*

2    *Guidroz-Brault v. Missouri Pacific R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001).  They should be excluded.

3    **V.      Dr. Sawyer Should Not Be Permitted to Opine on Monsanto Company Documents    and Regulatory Duties.**

4

5        If permitted, Dr. Sawyer also intends to offer inadmissible expert testimony on Monsanto

6    company documents and Monsanto's regulatory duties.  This proffered testimony is beyond Dr.

7    Sawyer's area of expertise and beyond the realm of proper expert testimony.  Having an expert narrate

8    company documents, under the guise of explaining terminology, is improper expert testimony because

9    it invades the province of the jury.  *See Sanchez v. Boston Sci. Corp.*, No. 2:12-CV-05762, 2014 WL

10   4851989, at *32 (S.D. W. Va. Sept. 29, 2014); *City of New York v. FedEx Ground Package Sys., Inc.*,

11   No. 13 Civ. 9173 (ER), 2018 WL 2941455, at *4 (S.D.N.Y. Oct. 10, 2018).  Moreover, even a properly

12   qualified expert may not opine as to the intent, motive, or state of mind of a corporation or its officers,

13   because that would substitute the expert's judgment for the jury's.  *See, e.g.,  Oracle America Inc., et*

14   *al. v. Hewlett Packard Enterprise Co.*, No. 16-cv-01393-JST, 2018 WL 6511146, at *3 (N.D. Cal. Dec.

15   11, 2018).  Accordingly, Dr. Sawyer should be precluded from offering opinions related to Monsanto

16   company documents or Monsanto's supposed state of mind.

17       Relatedly, Dr. Sawyer is not qualified to opine on the ultimate issue of the adequacy of

18   Roundup's EPA-regulated labeling.  He has never drafted the labeling for an herbicide.  *See* Marshall

19   Decl., Ex. 28, Sawyer *Pilliod* Dep. at 337:7-11.  He has never been asked by EPA or any other regulator

20   to opine on the contents of a label for an herbicide.  *Id.* at 337:22-338:2.  And he has never been invited

21   by EPA to advise on labeling.  *Id.* at 338:3-6.  In fact, in the past, Dr. Sawyer has specifically deferred

22   to other experts on these topics and has refused to answer questions about them.  *See, e.g.,* Marshall

23   Decl., Ex. 25, Sawyer *Lamb/Cohen* Dep. at 177:23-178:18; 191:5-19.  Dr. Sawyer is unqualified to

24   offer any opinions about Monsanto's compliance with EPA regulatory requirements, and accordingly,

25   any such opinions should be excluded.

26                                          **CONCLUSION**

27       For the reasons set forth above, the Court should grant Monsanto's Motion to Exclude

28   Testimony of Dr. William Sawyer.

DATED: March 19, 2021                         Respectfully submitted,

                                              */s/ K. Lee Marshall*_____

                                              K. Lee Marshall
                                              BRYAN CAVE LEIGHTON PAISNER LLP
                                              Three Embarcadero Center, 7th Floor
                                              San Francisco, California 94111
                                              Tel:      415-675-3400
                                              klmarshall@bclplaw.com

                                              Attorneys for Defendant Monsanto Company

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 19th day of March, 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

*/s/ K. Lee Marshall*

MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER