# EXHIBIT 2

William Sawyer, Ph.D.

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2
 3   IN RE:  ROUNDUP PRODUCTS          | MDL No. 2741
                                       |
 4   LIABILITY LITIGATION              |
                                       |
 5   --------------------------------|
                                       |
 6   This document relates to:         |
                                       |
 7   Christine Karman, Individually    |
     and as Representative of the      |
 8   Estate of Robert Karman v.        |
     Monsanto Co.                      |
 9   Case No. 3:19-cv-01183            |
                                       |
10   --------------------------------|
11
12                    - - -
13            Thursday, February 18, 2021
14                    - - -
15        This is the Remote Videotaped Deposition of
16   WILLIAM SAWYER, Ph.D., commencing at 2:02 p.m., on
17   the above date, before Susan D. Wasilewski,
18   Registered Professional Reporter, Certified Realtime
19   Reporter, Certified Manager of Reporting Services,
20   Certified Realtime Captioner, and Florida
21   Professional Reporter.
22                    - - -
23            GOLKOW LITIGATION SERVICES
24        877.370.3377 ph | 917.591.5672 fax
25                  deps@golkow.com
```

```
 1     APPEARANCES VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:
 2        MOLL LAW GROUP
          BY:  FATIMA ABUZERR, ESQUIRE
 3            fabuzerr@mollawgroup.com
          22 West Washington Street, 15th Floor
 4        Chicago, Illinois 60602
          Phone:  (312) 462-1700
 5        Representing the Plaintiff
 6
 7        DENTONS
          BY:  FREDERIC NORRIS, ESQUIRE
 8            rick.norris@dentons.com
          601 South Figueroa Street, Suite 2500
 9        Los Angeles, California 90017
          Phone:  (213) 623-9300
10        Representing Defendant Monsanto Company
11
12        DENTONS
          BY:  JOHN VALES, ESQUIRE
13            john.vales@dentons.com
          101 JFK Parkway
14        Short Hills, New Jersey 07078
          Phone:  (973) 912-7100
15        Representing Defendant Monsanto Company
16
17     ALSO PRESENT VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:
18        NANCY HOLMSTOCK, Videographer
19
20
21
22
23
24
25
```

William Sawyer, Ph.D.

```
 1                          - - -
 2                        I N D E X
 3                          - - -
 4   Testimony of:  WILLIAM SAWYER, Ph.D.          PAGE
 5       DIRECT EXAMINATION BY MR. NORRIS............   6
 6       CROSS-EXAMINATION BY MS. ABUZERR............  57
 7       REDIRECT EXAMINATION BY MR. NORRIS.........  59
 8
 9
10                     E X H I B I T S
11       (Attached to transcript except where noted)
12    WILLIAM SAWYER, Ph.D. DEPOSITION EXHIBITS       PAGE
13
     Exhibit 1     Defendant Monsanto Company's Notice    8
14                 of Remote Video Conference
                   Deposition of William Sawyer, Ph.D.
15
     Exhibit 2     Expert Report                         10
16                 Toxicology Consultants & Assessment
                   Specialists, LLC
17
     Exhibit 3     Curriculum Vitae                      10
18                 William R. Sawyer, Ph.D.
19   Exhibit 4     Trials and Depositions - Past Three   10
                   Years
20
     Exhibit 5     Invoice #11577                        11
21
     Exhibit 6     Death Certificate                     20
22                 * To be produced by Plaintiff's
                   counsel
23
     Exhibit 7     Medical records Summary               21
24                 * To be produced by Plaintiff's
                   counsel
25
```

William Sawyer, Ph.D.

```
 1              E X H I B I T S
 2      (Attached to transcript except where noted)
 3   WILLIAM SAWYER, Ph.D. DEPOSITION EXHIBITS      PAGE
 4   Exhibit 8     Pathology Report - 2 pages         21
                   * To be produced by Plaintiff's
 5                 counsel
 6   Exhibit 9     Medical Records                    21
                   Winters Family Practice - 81 pages
 7                 * To be produced by Plaintiff's
                   counsel
 8
     Exhibit 10    Medical Records                    21
 9                 Winters Family Practice - 256 pages
                   * To be produced by Plaintiff's
10                 counsel
11   Exhibit 11    Medical Records                    21
                   Sherman Hospital - 360 pages
12                 * To be produced by Plaintiff's
                   counsel
13
     Exhibit 12    30 Exhibits from the deposition of 22
14                 Dr. Nabrinsky
                   * To be produced by Plaintiff's
15                 counsel
16   Exhibit 13    Plaintiff Fact Sheet               22
                   * To be produced by Plaintiff's
17                 counsel
18   Exhibit 14    Article - Tobacco use and          46
                   non-Hodgkin lymphoma: Results from
19                 a population-based case-control
                   study in the San Francisco Bay
20                 Area, California
                   Paige M. Bracci, et al.
21
22
23
24
25
```

```
1                        - - -

2              THE VIDEOGRAPHER:  We are now on the record.

3       My name is Nancy Holmstock.  I'm a videographer

4       for Golkow Litigation Services.  Today's date is

5       February 18, 2021, and the time is now 2:02 p.m.

6              This remote video deposition is being held

7       in the matter of In Re:  Roundup Products

8       Liability Litigation, MDL Number 2741, as it

9       relates to Christine Karman, individually and as

10      Representative of the Estate of Robert Karman vs.

11      Monsanto Company, Case Number 3:19-cv-01183, for

12      the United States District Court, Northern

13      District of California.

14             The deponent is Dr. William Sawyer.

15             All parties to this deposition are appearing

16      remotely and have agreed to the witness being

17      sworn in remotely.  Due to the nature of remote

18      reporting, please pause briefly before speaking

19      to ensure all parties are heard completely.

20             Will counsel please identify yourselves for

21      the record starting with the taking attorney.

22             MR. NORRIS:  Yes.  Hi.  Good afternoon.  My

23      name is Rick Norris from the Dentons law firm on

24      behalf of Monsanto Company.

25             MS. ABUZERR:  My name is Fatima Abuzerr from
```

William Sawyer, Ph.D.

```
1        Moll Law Group representing the Plaintiff.

2             THE VIDEOGRAPHER:  The court reporter is

3        Susan Wasilewski and will now swear in the

4        witness.

5             THE COURT REPORTER:  Would you raise your

6        right hand?

7             Do you solemnly swear or affirm the

8        testimony you're about to give will be the truth,

9        the whole truth, and nothing but the truth?

10            THE WITNESS:  Yes, I do.

11            THE COURT REPORTER:  Thank you.

12            WILLIAM SAWYER, Ph.D., called as a witness

13   by the Defendant, having been duly sworn, testified

14   as follows:

15                   DIRECT EXAMINATION

16   BY MR. NORRIS:

17       Q.   Good afternoon, Dr. Sawyer.  How are you

18   this afternoon?

19       A.   Very good.

20       Q.   Are your dogs with you again this afternoon?

21       A.   Yes.  Also, I know it's required to

22   announce, that our son is sitting here and I don't

23   think he's intending on staying.

24            THE WITNESS:  But, ██████, if you are going

25       to stay, I have to announce you.
```

William Sawyer, Ph.D.

```
1                    ████████      Oh, no.  I just wanted to
2      tell you about a dolphin.
3          A.    Okay.  He wants to tell me about a dolphin,
4      but that will have to wait.
5          Q.    Okay.
6          A.    All right.  He's gone.
7          Q.    We would bore him pretty quickly, I'm sure.
8          A.    That's for sure.
9          Q.    Are you sufficiently familiar with the
10     admonitions that we can dispense with those today?
11         A.    Yes.
12         Q.    Again, I've read a couple of your
13     transcripts from earlier this week.  We are on Zoom.
14     You did a very good job on Monday with me, asking me
15     to repeat my questions when needed.  If for any
16     reason you need me to reask a question because you
17     didn't understand it, please let me know.
18     Obviously, if you do answer the question as asked,
19     we'll assume that you understood it as asked.  Do
20     you understand that?
21         A.    I do.
22         Q.    I also sent you a link to the Golkow remote
23     deposition site.  Did you get that and are you able
24     to access it?
25         A.    Not working.  I have a sense -- if you have
```

William Sawyer, Ph.D.

```
 1    any question -- see, I have the e-mail that came
 2    from VTC Credentialing and it has, of course, the
 3    Zoom meeting information, but I don't see a second
 4    link here.
 5        Q.   It was from me and it's in the chat of the
 6    Zoom platform.
 7        A.   Oh, okay.  Yeah, sure.  Let me go to that.
 8    There we go.  From Rick there are two different
 9    links.  Okay.  The first link is opening.  I'll
10    click on the second one as well.  That one is
11    opening.  Log in information?
12            THE COURT REPORTER:  That's the realtime
13        feed, Doctor.  Ignore the second link.
14        A.   Oh, okay.  Okay.  Yeah, here we go.
15    Exhibit 1 through 5.
16        Q.   Perfect.  All right.  Can you pull up
17    Exhibit 1 for me?
18        A.   Sure.
19            (Sawyer Exhibit 1 was marked for
20        identification.)
21    BY MR. NORRIS:
22        Q.   I have premarked as Exhibit 1 to this
23    deposition the notice of deposition of Dr. Sawyer in
24    the matter of Christine Karman.  Have you reviewed
25    this document before, Dr. Sawyer?
```

William Sawyer, Ph.D.

1     A.   Yes.

2     Q.   All right.  Did you bring any documents with

3   you today in response to this notice?

4     A.   No.  Well, I sent the -- all of the invoices

5   for the five cases this morning.

6     Q.   And I also have a list of the documents that

7   you've reviewed specific to Robert Karman that are

8   listed on page 204 of your report.  Other than those

9   documents, have you reviewed any other documents

10  specific to Mr. Robert Karman?

11    A.   No.

12    Q.   Do you have any physical documents with you

13  today relating to this case?

14    A.   No.

15    Q.   Do you have any access to any computers or

16  tablets or other devices other than the computer

17  you're using for this deposition?

18    A.   Yes.  I have an iPhone but I don't intend on

19  using it and it's on silence.

20    Q.   If at any point during this deposition you

21  need to look at or refer to a document, please let

22  us know what you were looking at and referring to.

23    A.   Will do.

24    Q.   I have also premarked as Exhibit 2 your

25  expert report in this matter, which is 204 pages.

```
 1          (Sawyer Exhibit 2 was marked for

 2    identification.)

 3    BY MR. NORRIS:

 4      Q.   Can you confirm to the best of your ability

 5    that that appears to be a true and accurate copy of

 6    your report?

 7      A.   Yes, it is.

 8          (Sawyer Exhibit 3 was marked for

 9    identification.)

10    BY MR. NORRIS:

11      Q.   Finally, I've marked as Exhibit 3 to this

12    deposition the most recent copy of your CV, which I

13    previously marked on Monday, and your former

14    testimony list as Exhibit 4, which went through

15    December 8th, 2020.

16          (Sawyer Exhibit 4 was marked for

17    identification.)

18    BY MR. NORRIS:

19      Q.   It does not yet include the new testimony

20    you've given this week, but aside from that, do

21    those two documents appear to be true and accurate

22    copies of your CV and former testimony?

23      A.   I looked at all five.  I don't see the CV.

24      Q.   You don't see Exhibit 3?

25      A.   I tried that.  I'll look again.  Oh, yeah, I
```

William Sawyer, Ph.D.

1   don't know why it didn't come up.  Yeah, everything

2   that you've asked is correct and up-to-date.

3        Q.   Thank you.  Let us turn to Exhibit 5.

4             (Sawyer Exhibit 5 was marked for

5   identification.)

6   BY MR. NORRIS:

7        Q.   This is your bill for the Robert Karman

8   matter, correct?

9        A.   Yes.

10       Q.   It appears to be dated February 11th, 2021?

11       A.   Yes.

12       Q.   And it appears that you were retained in

13  this case right around July 16th, 2020; is that

14  correct?

15       A.   Yes.

16       Q.   One question we did have is it appears you

17  were retained in six cases but we have not seen a

18  report for the Rehak case.  Did you prepare a report

19  for the Rehak case?

20       A.   No.

21       Q.   Why not?

22       A.   I found that the case had serious

23  confounding factors and it was not my opinion that

24  glyphosate substantially contributed to the

25  malignancy.

William Sawyer, Ph.D.

1    Q.    What were those confounding factors?

2    A.    As I recall, there were several, but the

3    biggest elephant in the room was heavy smoking

4    history and follicular NHL.  I recommended not

5    proceeding.

6    Q.    Thank you.  All right.  I have your report

7    from this case as well as the other cases, the other

8    five cases listed on your invoice.  It appears that

9    all of those reports are generally the same with the

10   exception of case-specific information for the

11   individual plaintiffs.  Would you generally agree

12   with that?

13   A.    Yes.

14   Q.    Did you perform any independent -- with that

15   in mind, did you perform any independent research

16   above and beyond the general research about

17   glyphosate, glyphosate litigation, confounding

18   factors, that was specific only to Mr. Karman that

19   would not apply to other plaintiffs?

20   A.    Possibly but that's covered in the report.

21   For example, BMI, body mass, doesn't apply to all

22   the plaintiffs, but I assessed that for Mr. Karman.

23   Q.    I understand that you assessed that for

24   Mr. Karman but is your -- is -- and it appears that

25   you have cited a study on page -- you have cited --

William Sawyer, Ph.D.

1    you have a section on obesity and BMI as potential

2    NHL risk factors.  Is there anything different in

3    that section from your prior reports as it relates

4    to Mr. Karman?

5        A.   Not with respect to studies but, obviously,

6    the calculations are different, the weight and

7    height are different.

8        Q.   Understood.  Have you read, reviewed or

9    considered any new studies relating to glyphosate or

10   glyphosate-based herbicides since I deposed you on

11   Monday?

12       A.   No.

13       Q.   Have you spoken with any of Plaintiff's

14   experts specifically regarding this case?

15       A.   Not regarding this case, no.

16       Q.   Do you know who Plaintiff's other experts

17   are in this case?

18       A.   I think so.

19       Q.   Who do you believe that they are?

20       A.   I think they are Dr. Portier,

21   Dr. Weisenburger, Dr. Ritz, I think Dr. Schiff or

22   Dr. Brown, and Dr. Benbrook.

23       Q.   Have you spoken with any of Mr. Karman's

24   treating physicians about this case?

25       A.   No, I haven't.

William Sawyer, Ph.D.

```
 1        Q.    Have you read the deposition of a

 2   Dr. Nabrinsky, Mr. Karman's treating oncologist?

 3        A.    I'll check my list but I don't think so.

 4              No, only the medical records.

 5        Q.    Same answer -- have you reviewed -- I assume

 6   it's the same answer but just to confirm, you have

 7   not reviewed the deposition of a Dr. Jerry Myrda,

 8   correct?

 9        A.    No.

10        Q.    That was correct?

11        A.    Correct.

12        Q.    Have you reviewed any reports of Monsanto

13   experts in this case?

14        A.    No.

15        Q.    Will you be offering an opinion on what

16   actually caused Mr. Karman's death in this matter?

17        A.    No.

18        Q.    Would it be safe to say that you are not --

19   you are not specifically diagnosing Mr. Karman with

20   DLBCL but at this point you have no reason to

21   dispute that diagnosis?

22        A.    Correct.  I thoroughly reviewed the

23   pathology records and I -- first of all, I wouldn't

24   try to rediagnosis this, you know, I'm not a

25   diagnosing physician, but certainly the diagnosis is
```

William Sawyer, Ph.D.

1    consistent with all of the evidence from the

2    pathology biopsies.

3        Q.    I know that you -- one of the things that

4    you have reviewed is the deposition of a

5    Ms. Christine Karman; is that correct?

6        A.    Yes.

7        Q.    Did you receive and review all of the

8    exhibits to that deposition?

9        A.    I'm going to check my folder which contains

10   everything I have on the Karman matter, and I see I

11   have her deposition transcript and I have the Karman

12   Property Exhibits Number 3 through 20, and --

13   actually, I have 3 through 21.  I don't see Number 1

14   or 2.

15           I do have, interestingly enough, the

16   exhibits from Dr. Nabrinsky's deposition ranging

17   from Number 1 through 30.

18           And that's all I have.

19       Q.    So you have the exhibits but you don't have

20   his deposition?

21       A.    That's right.

22       Q.    Did you review the --

23       A.    Oh, wait a minute.  Hang on.  I do have the

24   deposition of Dr. Nabrinsky in this folder, yes.

25       Q.    Is it correct, though, that you have not

William Sawyer, Ph.D.

1    reviewed it prior to today?
2        A.   I don't remember.  Let me check my report.
3             I did not review it and the reason being,
4    from what I could see, there was a lot of treatment
5    information which was not relevant to me.  What's
6    relevant is the medical history, the cigarette
7    smoking and alcohol and other factors,
8    pharmaceutical regimens and so on, that were present
9    prior to the diagnosis.
10       Q.   Am I correct then, going back to
11   Ms. Christine Karman's deposition, did you review --
12   am I correct that you did not get Exhibit 2 to her
13   deposition?
14       A.   I'll check again.  I don't see Exhibit 1 or
15   2, no; no, 3 through 21.
16       Q.   Woops.  All right.  Too many screens going
17   on, hitting the wrong buttons.
18            Did you read the entire deposition of
19   Ms. Karman?
20       A.   Yes.
21       Q.   You also reviewed -- on your report there is
22   a document labeled 451, Images of property from
23   estate of R. Karman, multiple files.
24            My question to you is did you review any
25   images of Mr. Karman's property other than those

William Sawyer, Ph.D.

1    that were attached as exhibits to the deposition of

2    Ms. Karman?

3        A.   It's common for me to look at current Google

4    Earth views, and if I did, I may have included one

5    in my report, so I'd have to check the report and

6    see if I have any figures, figures of the property

7    that I obtained as opposed to what was in the

8    record.

9            Figure 1 was in the record.

10           Figure 2 and 3 were in the exhibits.

11           Figure 4 was in the exhibits.

12           So the answer is no, I did not find the need

13   to do any Google Earth research with respect to

14   imaging.

15       Q.   The images that are in the deposition of

16   Ms. Karman, as well as also in your report, all

17   relate to their house on Robinhood, correct?

18       A.   Yes.

19       Q.   Did you do any Google image searches for the

20   house on Spruce Avenue?

21       A.   Probably not.  I would have included

22   something if I had.

23       Q.   So it's correct that you have not reviewed

24   any photographs of the Spruce Avenue property?

25       A.   Let me check.  No, you know, I did not and

William Sawyer, Ph.D.

1    as I recall the reason I didn't, the Google imagery

2    was not available during that era.  It's just so

3    long ago.  I think they were there in the 1980s,

4    1980 to, like, 1989, and I didn't feel that would be

5    a good idea, to use, you know, photos from 40 years

6    or so later.  Things change in 40 years, trees grow

7    differently, et cetera.

8        Q.   Understood.  All right.  What I'd like to do

9    just to -- well, strike that.

10           Item Number 452 on your report is entitled

11   "Nabrinsky medical records, Fox Valley Hematology

12   Oncology..."

13           How many pages of records did you get from

14   that facility?

15       A.   On Nabrinsky?  Let's see.

16           Well, see, the way they are filed and named,

17   there is the Sherman Hospital medical records, there

18   is the Winters Family Practice, and then another

19   file at Sherman Hospital, and then a file at Winter

20   Family Practice.  I almost think those are duped

21   files.  Let me see.  Yeah, they are the same files.

22           So let me open up Sherman Hospital.  Okay.

23   And that is 360 pages.

24           And then the other one that I'll open is the

25   Winters Family Practice.  That's 81 pages.

William Sawyer, Ph.D.

1        And let's see what else we have.  See, this
2   other Sherman Hospital, I'm going to open it.  Yeah,
3   it's duplicate, 630 -- I mean 360, so that one is a
4   dupe.
5        And then this other Winters, that's 81
6   pages, so that's a duplicate.
7        Let's see if there is any others here.
8        There is the Robert Karman medical summary,
9   which is a two-page document provided by the law
10   firm, which I didn't rely on, and there is the
11   Robert Karman death certificate.
12        Then there is the -- oh, yeah.  And then
13   there's the Karman pathology, which is two pages,
14   and then there is the Winters Family Practice, 276
15   pages.
16        Let me see if there is anything else.
17   Q.   Winters Family was 256 pages, you said?
18   A.   Yeah, the second file I have is 256 pages,
19   as opposed to the other Winters Family Practice that
20   was 81 pages, and I don't know why the difference
21   but, yeah.
22   Q.   Do you have any -- so I understand that you
23   have Nabrinsky medical records within the Nabrinsky
24   deposition, but do you have a separate file for
25   Nabrinsky medical records?

William Sawyer, Ph.D.

1      A.   No.

2      Q.   Okay.  So did you review the medical records

3    from Nabrinsky that were attached to his deposition?

4      A.   The exhibits?

5      Q.   Yes, the exhibits.

6      A.   Yeah, I have the exhibits.  I think there is

7    21.  Let me see.  Let's open this.  No, 30, there is

8    actually 1 through 30 exhibits, and as I recall,

9    they're all medical records.

10     Q.   Okay.  Are -- I'm going to do some

11   housekeeping here in a second, but before I do that,

12   anything else that you have that you reviewed as

13   you're clicking through your files?

14     A.   No.  This is everything that I have in the

15   Karman folder, and everything I've done in this case

16   I've kept in that folder.

17     Q.   Okay.  So please keep track with me as I go

18   through this to make sure we're all on the same

19   page, if you can.

20          I am going to attach as Exhibit 6 to the

21   deposition the death certificate.

22     A.   Okay.  Yeah, I have that.

23          (Sawyer Exhibit 6 was marked for

24   identification.)

25   BY MR. NORRIS:

William Sawyer, Ph.D.

```
 1        Q.   I am going to attach as Exhibit 7 to the

 2   deposition the medical summary.

 3             (Sawyer Exhibit 7 was marked for

 4   identification.)

 5   BY MR. NORRIS:

 6        Q.   I am going to attach as Exhibit 8 to the

 7   deposition the two pages of pathology.

 8             (Sawyer Exhibit 8 was marked for

 9   identification.)

10   BY MR. NORRIS:

11        Q.   I am going to attach as Exhibit 9 to the

12   deposition the 81 pages from Winters Family Practice

13   medical records, that file.

14             (Sawyer Exhibit 9 was marked for

15   identification.)

16   BY MR. NORRIS:

17        Q.   I am going to attach as Exhibit 10 the

18   256-page file from Winters Family.

19             (Sawyer Exhibit 10 was marked for

20   identification.)

21   BY MR. NORRIS:

22        Q.   I am going to attach as Exhibit 11 the

23   360-page file from Sherman Hospital medical records.

24             (Sawyer Exhibit 11 was marked for

25   identification.)
```

William Sawyer, Ph.D.

```
 1    BY MR. NORRIS:

 2         Q.   And lastly, I will attach collectively as

 3    Exhibit 12 the 30 exhibits from the deposition of

 4    Dr. Nabrinsky.

 5              (Sawyer Exhibit 12 was marked for

 6    identification.)

 7    BY MR. NORRIS:

 8         Q.   Have I now -- have I now, as I've gone

 9    through that list, have I now identified and

10    attached all of the medical records you understand

11    that you received and reviewed in this case,

12    Dr. Sawyer?

13         A.   Yes.  I also have plaintiff's fact sheet.

14         Q.   Let's mark that as Exhibit 13.

15              (Sawyer Exhibit 13 was marked for

16    identification.)

17    BY MR. NORRIS:

18         Q.   Are there any other documents related to

19    this case, Mr. and Mrs. Christine Karman, that I

20    have not yet -- that we have not yet identified that

21    you've reviewed?

22         A.   No.

23         Q.   All right.  That's the housekeeping for now.

24    Jumping more into your opinions, Dr. Sawyer, can you

25    turn to page 12 of your report?
```

William Sawyer, Ph.D.

1      A.    Okay.

2      Q.    You note that Dr. Nabrinsky told Mr. Karman

3    that his lymphoma was caused primarily by

4    pesticides.  Do you see that note?

5      A.    Nancy wrote that the physician stated the

6    lymphoma was caused by exposure to, quote,

7    fertilizer, pesticides and asbestos, quote, yes.

8      Q.    I'm about ready to get there but do you see

9    the paragraph just above that?

10     A.    Yes, I do.

11     Q.    Okay.  And it's your -- and that came

12   straight from the deposition of Ms. Karman, correct?

13     A.    Yeah, page 30, yeah.

14     Q.    Do you have any knowledge that Dr. Nabrinsky

15   meant Roundup in that conversation?

16     A.    No, I can't read into that.  I have no

17   information on that.

18     Q.    And then you also just noted that his

19   daughter, Nancy, wrote an e-mail that the lymphoma

20   was caused by exposure to fertilizers, pesticides

21   and asbestos, correct?

22     A.    Yes.

23     Q.    That e-mail, did you review that e-mail?

24     A.    I don't think so.  I'm trying to think where

25   that came from.  I think it was in one of the

William Sawyer, Ph.D.

1    medical records, but I should have quoted it.  I
2    don't know.
3        Q.   You have not -- did you note in the exhibits
4    to Mr. Nabrinsky's -- sorry, not Mr. Nabrinsky --
5    Dr. Nabrinsky's deposition?
6        A.   Did I read -- I'm not -- I couldn't --
7        Q.   Let me start over.  I know you mentioned
8    that you have not -- you didn't read in any detail
9    Dr. Nabrinsky's deposition.  Do you have any way of
10   disputing whether he was presented with this e-mail
11   and denied saying that comment?
12       A.   No, I can't opine on that in any way, no
13   information.
14       Q.   Whether or not he said or did not -- whether
15   or not Dr. Nabrinsky said or did not say that, I
16   assume that's one of those questions that you will
17   leave for a determination to the jury?
18       A.   Absolutely.  In fact, either way, it doesn't
19   affect my opinion.
20       Q.   And you agree that Roundup is not a
21   fertilizer, correct?
22       A.   That's correct.
23       Q.   And you agree that Roundup doesn't contain
24   asbestos, correct?
25       A.   It does not.

William Sawyer, Ph.D.

```
 1      Q.   Do you have any way of knowing whether a
 2   common layperson would consider Roundup to be a
 3   pesticide?
 4      A.   By definition, it is; however, common people
 5   often refer to insecticide in the same manner as a
 6   pesticide and don't realize that a herbicide is also
 7   a pesticide.
 8      Q.   You interviewed Ms. Karman on January 11th,
 9   2021, correct?
10      A.   Yes.
11      Q.   Did you interview her before or after you
12   read --
13      A.   Can you repeat that, please?
14      Q.   Did you interview her before or after you
15   read her deposition?
16      A.   After.
17      Q.   And you agree that this was two years after
18   her deposition in this case, the interview was two
19   years after her deposition?
20      A.   Approximately, yes.
21      Q.   It was six years after Mr. Karman's passing?
22      A.   Yes.
23      Q.   Did you record the interview with
24   Ms. Karman?
25      A.   Did I what with the interview?
```

William Sawyer, Ph.D.

```
 1       Q.   Record.  Record.

 2       A.   No.

 3       Q.   Other than what is in your report, did you

 4   take any notes of the interview with Ms. Karman?

 5       A.   No.  Everything went directly into the MS

 6   Word file.

 7       Q.   There -- there is a notation -- well, strike

 8   that.

 9            How long was your interview with Ms. Karman?

10       A.   1.13 hours.

11       Q.   On Monday you testified that your assistant

12   is sometimes with you on these dep -- on these

13   interviews.  Was she present for this interview?

14       A.   Yes.

15       Q.   And was this over the phone or conducted via

16   Zoom or video platform?

17       A.   This was phone.  In cases where it's a Zoom,

18   I note that in my notations for my invoices, and

19   there is no notations on the invoice it's Zoom, so

20   it was telephone only.

21       Q.   I noted in your report that you do an

22   exposure-day calculation for Mr. Karman's exposure

23   to Roundup.  Other than an exposure-day calculation,

24   did you otherwise calculate Mr. Karman's dose of

25   exposure to Roundup?
```

William Sawyer, Ph.D.

```
 1      A.   No.

 2      Q.   When creating your exposure-day

 3 calculations, do you attempt to use the most

 4 conservative numbers possible for your exposure

 5 calculations?

 6      A.   That's right.

 7      Q.   I noted in your review of the deposition of

 8 Ms. Karman that you did not make any reference in

 9 your summary to exposures or use of Roundup at the

10 Spruce Avenue property, correct?

11      A.   Yes.

12      Q.   Do you agree that she was asked repeatedly

13 in that deposition whether she recalled Mr. Karman

14 using Roundup at that location; is that correct?

15      A.   Yes.

16      Q.   And in fact, she said:  "I visually mentally

17 cannot see him using Roundup as it related to that

18 location."  Correct?

19      A.   Yes.  Correct.

20      Q.   Despite this testimony, is it correct that

21 Ms. Karman told you that she had a recollection of

22 Mr. Karman spraying at the Spruce Avenue property

23 once per week for about 30 minutes each occasion for

24 eight months per year starting in 1980?

25      A.   Yes.
```

William Sawyer, Ph.D.

```
 1      Q.   And then you used that number in your
 2   exposure-day calculations, correct?
 3      A.   I did.
 4      Q.   Did you ask Ms. Karman what had changed as
 5   it relates to her memory of the use of Roundup at
 6   that location?
 7      A.   Did I ask her?
 8      Q.   Yes.
 9      A.   Probably.
10      Q.   Do you recall what she said?
11      A.   No.
12      Q.   Do you recall if you asked her about the
13   Spruce Avenue location directly?
14      A.   Yes.
15      Q.   Why did you do that?
16      A.   I asked her initially as part of my
17   questioning when did your husband first use Roundup,
18   and she stated at the Spruce property.
19      Q.   You noted on your report that -- at page 15
20   that Ms. Karman advised during her deposition that
21   some of the information on her -- on the preliminary
22   [sic] fact sheet was incorrect; is that correct?
23      A.   Yes.
24      Q.   Some of the errors that were in there was
25   that the PF -- the preliminary [sic] fact sheet
```

William Sawyer, Ph.D.

1    notes that he did not smoke but, in fact, he smoked

2    for greater than 50-year pack-year; is that correct?

3        A.   Yes.

4        Q.   The Social Security number was wrong,

5    correct?

6        A.   Could have been.  I don't remember on that

7    one.

8        Q.   And the only location of use has the Elgin,

9    Illinois location on -- not the Hanover Park

10   location on Spruce; is that correct?

11       A.   Yes.

12       Q.   It said Mr. Karman had had organ

13   transplants, lupus, was treated with radiation.  All

14   those were incorrect; is that correct?

15       A.   Yes.

16       Q.   You also note in your exposure-day

17   calculations that Mr. Karman started using Roundup

18   at the Robinhood location in 1990; is that correct?

19       A.   Yes.

20       Q.   Do you agree that Ms. Karman testified that

21   they did not begin using Roundup at that location

22   until 1991 or 1992, correct?

23       A.   Yes.

24       Q.   Probably because they did not have a yard in

25   that first year as they had to fertilize and plant

William Sawyer, Ph.D.

1    the grass, correct?

2        A.   I'm looking at the report.

3             She explained that the -- yeah, she told me

4    in the interview, the yard of their one-acre

5    property had only been rough graded when she moved

6    in, so she recalled that Mr. Karman began using

7    Roundup in the spring of 1990, and that's what's in

8    my table, is spring of 1990.

9        Q.   That's from the interview but not from the

10   deposition, correct?

11       A.   Right.  She insisted that was the correct

12   information.

13       Q.   You also noted on page 18 from your

14   interview with Ms. Karman that she told you that

15   when he sprayed Roundup at the Robinhood location,

16   it took him between one hour and one-and-a-half

17   hours on that property -- one hour to one-and-a-half

18   hours per occasion; is that correct?

19       A.   Yeah, between one hour and one-and-a-half

20   hour to spray all areas of the property.  He sprayed

21   about every two weeks on weekends during eight

22   months of the year.

23       Q.   And you used the one to one-and-a-half hours

24   in your exposure-day calculation, correct?

25       A.   I used the range of 1 to 1.5.

William Sawyer, Ph.D.

1    Q.   And that's how -- essentially, with respect

2    to the minimum and maximum exposure days, the only

3    thing that differentiates between the minimum and

4    maximum exposure days is -- the only variable that

5    is changed is how many hours per event, correct?

6    A.   Yes.

7    Q.   So the minimum is one hour per event, the

8    maximum is 1.5 hours per event, and the middle is

9    about one-and-a-quarter per event, correct?

10   A.   Yes.

11   Q.   Now, Ms. Karman was also asked at her

12   deposition to provide time estimates for various

13   locations of spraying that Mr. Karman did, correct?

14   A.   Yes.

15   Q.   You note one on page 18 of your report that

16   it took three to four minutes for her husband to

17   spray the areas marked in Exhibit 3; is that

18   correct?

19   A.   Yes.  As an example, those spots that she

20   marked with a pen, those little -- it's hard to say

21   they're circles, but they're little ovals, those

22   spots took that amount of time.  Now, those were not

23   the only spots in the yard by any means.

24   Q.   Understood.  But, for example, she was asked

25   about how long it took to spray the gravel path and

William Sawyer, Ph.D.

1    she could not -- the gravel driveway and she could

2    not give an estimate, correct?  This is at her

3    deposition.  You want to refer to page 144.

4        A.   The part about a CV mask -- I don't see the

5    time on page 144.

6        Q.   Lines 14 and 19.

7        A.   Okay.  Right.  No, I see -- no, I can't,

8    yes.

9        Q.   If you look at page 191, lines 10 to 15, she

10   couldn't provide an estimate on the amount of time

11   it took to spray the culverts; is that correct?

12       A.   Correct.

13       Q.   On page 207 she was asked, you know, about

14   other -- spot treating the weeds throughout the yard

15   and she couldn't give a high or a low estimate on

16   how long that process took.  That's page 307, lines

17   3 to 15.

18       A.   Answer:  That's hard to say.  That's really

19   hard to say.  I know I can't give you a specific

20   time.

21       Q.   At no point was she able to provide an

22   estimate for any of the work during her deposition

23   as to how long it took Mr. Karman to spray; is that

24   correct -- other than the three to four minutes on

25   Figure 3; is that correct?

William Sawyer, Ph.D.

1        A.   Well, on page 25 there is the -- no, no,

2    that's not right.

3             No, I guess that's probably about the only

4    entry.  I'm looking.

5             On page 95 the question was:  And so you are

6    estimating that the other eight months he would use

7    it a couple times a month to treat the areas in

8    Exhibit 3?

9             Answer:  Right.

10            Question:  And when he would treat the areas

11   that we've marked in Exhibit 3, would that be, you

12   know, a 10- to 15-minute thing, or would it be

13   longer?

14            Answer:  When he was treating them?

15            Yeah.

16            And then it says:  Shorter.

17            How long would it take him to treat those

18   areas each time?

19            Three to four minutes.

20            Yeah, it seems that's about all she could

21   recall.

22       Q.   Now, she also said that he used it

23   approximately eight months per year and you used

24   full -- for your calculations you used a full eight

25   months per year to generate your exposure-day

William Sawyer, Ph.D.

1     calculations; is that correct?

2         A.    Yes.

3         Q.    Would you agree that there were likely many

4     years from 1990 through 2015 where you could not

5     spray in Chicago for a full eight months out of the

6     year, or you wouldn't spray in Chicago for a full

7     eight months out of the year?

8         A.    Well, I would have to say November,

9     December, January, and February would certainly be

10    out.  Whether in an early spring, March, or late

11    fall, in October, it's possible, but I'm not a

12    meteorologist and I never lived in Chicago.  I can

13    say I spent five-and-a-half years in central Indiana

14    at the medical school in Indianapolis, so I have

15    some understanding of the weather in Chicago, you

16    know, based on Indianapolis, but it's not exactly

17    the same.

18            You know, eight hours is possible -- or, I

19    mean, eight months is possible.

20        Q.    I guess is it likely that it was eight

21    months every year, or is it more likely that there

22    were years where he did not spray eight months out

23    of the year?

24        A.    Certainly that's possible.  You know, the

25    problem is I can't create data.  This is what she

William Sawyer, Ph.D.

1    told me as a fact in the case, and in my capacity,

2    it wouldn't be right or honorable for me to try to

3    adjust or change or, you know, alter what has been

4    testified to or told to me in interview.  I -- I'm

5    giving it to you as I received it and, you know,

6    that's the best I can do.

7        Q.   All right.  A few other questions on your --

8    on this.  From any of the information you reviewed,

9    are you able to opine that Roundup ever got on a

10   portion of Mr. Karman's skin that had been damaged?

11       A.   Damaged skin.  I am not aware of any

12   testimony or information regarding damaged skin.

13       Q.   Were you still looking or are you -- or can

14   I go on?

15       A.   No.  The only thing I'm aware of, in

16   deposition she stated that he never had any reaction

17   on his skin.  That's --

18       Q.   Sorry.  I don't want to cut you off if

19   you've got --

20       A.   Go ahead.

21       Q.   Are you going to be offering any opinion in

22   this case that Mr. Karman was exposed to Roundup or

23   glyphosate as a result of any spraying that

24   Ms. Karman did?

25       A.   No.

William Sawyer, Ph.D.

1     Q.   You mentioned -- now, Ms. Karman mentioned

2   that she personally used Spectracide; is that

3   correct?

4     A.   Yes.  She said that she preferred that over

5   the Roundup because -- I think she said it was

6   cheaper, as I recall.

7     Q.   It looks like you note in Footnote 39 of

8   your report that contains diquat dibromide,

9   hopefully my pronunciation is correct, but is that

10  correct?

11    A.   Yes, diquat, correct.

12    Q.   Did you do any research in this case on

13  whether that is a carcinogen?

14    A.   Not for this case but I'm familiar with

15  diquat.  It is not a class 2A carcinogen.

16    Q.   And what is that based on?

17    A.   IARC and other agencies.  And I think -- let

18  me check one other thing in my report.

19         No, that's all I have in my report.

20    Q.   Would it make any difference to your

21  opinions in this case as it relates to Mr. Karman if

22  he had 50 exposure days of use of Roundup as opposed

23  to 67, I think, was the minimum that you note in

24  your report?

25    A.   No.

William Sawyer, Ph.D.

1      Q.    Would it make any difference to your

2    opinions in this case if Mr. Karman had 11 days of

3    exposure days as compared to the exposure days

4    calculated in your report?

5      A.    No.  I'd still have the same opinion based

6    upon the studies.

7      Q.    Can you go to Table 1 of your report?

8      A.    Table 201?

9      Q.    No, Table 1.

10     A.    Oh, okay.  I didn't think I had that many

11   tables.  Okay.

12     Q.    Are you going to offer an opinion in this

13   case that any of the medical conditions identified

14   in Table 1 are related to his NHL diagnosis?

15     A.    No.

16     Q.    The first medical record listed there is

17   September 3rd, 2014.  Did you review any medical

18   records predating September 2014?

19     A.    I don't believe so.

20     Q.    Mr. Karman had COPD, correct?

21     A.    Yes.

22     Q.    That is caused by smoking, correct?

23     A.    Yes.

24     Q.    Would you agree that it is not caused by

25   Roundup?

William Sawyer, Ph.D.

```
 1      A.   Correct.

 2      Q.   Will you be offering an opinion in this

 3   matter as to the impact his COPD had on his

 4   treatment?

 5      A.   No.  That would really fall into the realms

 6   of the oncologist, not me.

 7      Q.   In 2014 you noted that he was suffering from

 8   chronic bronchitis, correct?

 9      A.   Yes.

10      Q.   Is that a disease that is common in smokers?

11      A.   It is.

12      Q.   Is that a disease that is caused by Roundup?

13      A.   No.

14      Q.   In 2014 he also had pneumonia, correct?

15      A.   Yes.

16      Q.   You would agree that people who smoke are

17   more likely to develop pneumonia, correct?

18      A.   Yes.

19      Q.   And you agree that Roundup doesn't cause

20   pneumonia; is that correct?

21      A.   Not unless you drink it and aspirate into

22   the lung and have chemical pneumonitis, no.

23      Q.   You note on page -- I'm going to go back and

24   forth here for a second, just so you know.

25           You note in Table 2 that he had moderate
```

William Sawyer, Ph.D.

```
 1    obesity, BMI of 31.  Is that correct?

 2        A.   Yes.

 3        Q.   If you take his weight on September 18th,

 4    2014, of 199 pounds, based on his height, would you

 5    agree that that is a BMI between 32.1 and 33.1?

 6        A.   Excuse me.  I just -- I could either trust

 7    you or look it up in my report.

 8        Q.   Please don't trust me on that calculation.

 9        A.   No, no, not the calculation.  The height.

10        Q.   Oh, sorry.

11        A.   I forget what it was.  I have it in my

12    report but I hate to waste time looking for it.

13        Q.   I show it, by the way, if you're looking for

14    the height, if you look at Table 1, just above that

15    entry on September 18, '14, you've listed his height

16    at 66.75 inches.

17        A.   Excellent.  Okay.  And I believe the weight

18    in that record was -- did you say 204?

19        Q.   No.  September 18th, it's 199.

20        A.   199, okay.  So that's a BMI about -- of

21    31.5.

22        Q.   31.5?

23        A.   Yeah.  Yeah.  I use a table, so it's a

24    little better, but yeah.  What did you believe it

25    was?
```

William Sawyer, Ph.D.

1      Q.   I have 30 -- I had between 32.1 and 33.1,
2   but I used an online calculator.
3      A.   Hmm.  Let me check this again to go with
4   that height.
5           Yeah, it could be closer to 32, but
6   definitely no higher, but the point is -- I don't
7   want to mislead anyone and be careful with this,
8   that a BMI of 32 is roughly 2 milligram per meter
9   square above 30, and we know that at 5 milligram per
10  kilogram, DBLC risk increases by 13 percent, and
11  he's only about halfway there.
12          So, you know, he may have a 7 percent
13  increase risk from his body weight, it's really not
14  very much, and I want to be careful that I don't
15  overstate that to the jury.  It has to be considered
16  with respect to his NHL risk, which was 2.3 or 2.4
17  times higher, as this was only a mere 7 percent
18  higher, and so it's not a very significant factor
19  but yet it is there.
20      Q.   Let me -- I want to ask you about Footnote
21  12 on that same page 9.
22      A.   On page 9?
23      Q.   Yes.
24      A.   Okay.  Okay.
25      Q.   You note his BMI was less than 30 throughout

William Sawyer, Ph.D.

1    most of his NHL prediagnostic years.  I guess my

2    question for you is where did you get that

3    information from?

4        A.   I asked his wife if she recalled his weight

5    over the years, and if it were -- you know, when did

6    his weight go over 195 or greater, and she indicated

7    that he gained weight as he aged, and prior to the

8    diagnosis he weighed around -- I have to look it up.

9    I think she said around 200.  Let's see if it's in

10   my interview.

11            I didn't enter the weight.  All I can say is

12   that she told me that he gained weight as he aged

13   and his maximum weight was just prior to his

14   diagnosis.  That's why I included that footnote.

15       Q.   Will you be offering any opinions as to

16   Mr. Karman's life expectancy absent his NHL

17   diagnosis?

18       A.   No.

19       Q.   If Mr. Karman had never used Roundup, would

20   you be able to say that Mr. Karman would not have

21   been diagnosed with NHL?

22       A.   No.  He would have been at the background

23   rate of NHL.

24       Q.   Is it correct that you also can't say that

25   he wouldn't have been diagnosed on the exact same

William Sawyer, Ph.D.

1    day if he had not used Roundup?

2        A.   It's possible he could have been diagnosed

3    on the same day, it is possible but not likely.

4        Q.   Why do you say that?

5        A.   Because of the -- both the induction and

6    promoter activity of his many years of glyphosate

7    exposure accelerating the malignant process even if

8    it was induced by another agent.

9        Q.   Are you going to tell the jury in this case

10   that you have ruled out all other causes of DLBCL in

11   Mr. Karman other than Roundup?

12       A.   I'm going to state that he had a slight 7

13   percent increase from his body weight, his BMI

14   index.  Other than that, I haven't found any

15   significant confounding factors.

16       Q.   Is the body weight, the increased risk from

17   body weight an independent -- a risk that is

18   independent of use of Roundup?

19       A.   Yes.

20       Q.   I know that you are of the opinion that his

21   DLBCL was not caused by smoking, but in those cases

22   where you have opined that a particular lymphoma

23   like NFL is caused by smoking, are you of the

24   opinion that smoking is an independent risk factor

25   separate and apart from the Roundup?

William Sawyer, Ph.D.

```
 1      A.   I heard you but I didn't quite understand
 2   the question.
 3      Q.   Yes.  One of the opinions that you're going
 4   to offer in this case is that his DLBCL was not
 5   caused by smoking, correct?
 6      A.   Yes.
 7      Q.   But you are of the opinion that smoking
 8   causes follicular lymphoma, correct?
 9      A.   Yes.
10      Q.   In those cases where it's a follicular
11   lymphoma case, are you of the opinion that the --
12   that smoking and Roundup are separate independent
13   risk factors for disease?
14      A.   Yes.
15      Q.   I want to talk with you a little bit about
16   your smoking opinion.
17      A.   My opinion is don't do it.
18      Q.   Don't ask you about it?
19      A.   Don't smoke.
20      Q.   That's fair.  I quit long ago.
21      A.   I never started so I didn't need to quit,
22   but that's -- congratulations.  I know it's -- I
23   understand it's very difficult to do.
24      Q.   I quit before the age of 20.  I was just --
25   you know.
```

William Sawyer, Ph.D.

```
 1        A.    Well, you're smart.

 2        Q.    You noted in your report that Mr. Karman had

 3   a greater than 50-year -- 50 pack-year smoking

 4   history, correct?

 5        A.    Yes.

 6        Q.    And just maybe this has been covered, but

 7   just in simple term, a pack-year of smoking history

 8   is someone who smokes one pack per day for a year,

 9   correct?

10        A.    Correct.

11        Q.    Thus, if Mr. Karman had a 50 pack-year

12   smoking history, we are essentially saying he smoked

13   the equivalent of a pack a day every day for 50

14   years?

15        A.    Yes.  Right.

16        Q.    He started smoking at the age of 16,

17   correct?  To help you with the math, because I know

18   you're going to have to do some math, you note his

19   date of birth on page 7 and when he started smoking

20   on page 11 of your report.

21        A.    Page 11?  Yeah, but I just don't see the age

22   16.  I don't know why.

23        Q.    I did the math based on the two pieces of

24   information.

25        A.    Oh.
```

William Sawyer, Ph.D.

1       Q.   That he was born in 1938 and he started

2   smoking in 1954.

3       A.   Yeah, that's correct.  Right.

4       Q.   And he was over the age of 60 when he was

5   diagnosed with NHL, correct?

6       A.   Yes.

7       Q.   And he smoked for greater than 33 years,

8   correct?

9       A.   Yes.

10      Q.   The smoking section in your report, which I

11  believe starts on page 169 --

12      A.   Okay.  Page 169?

13      Q.   I think so.  One second.  Yes.

14      A.   All right.  Let's see.  Okay.

15      Q.   This section of your report, Smoking as

16  Potential NHL Risk Factor, is identical in all five

17  of the reports that you've served involving the Moll

18  Law Group in the last month, correct?

19      A.   Yes.

20      Q.   All right.  One of the studies that you rely

21  upon is Bracci?

22      A.   That's right.

23      Q.   Which is from 2005:  Tobacco use and

24  non-Hodgkin's lymphoma: results from a

25  population-based case-control study in the San

1    Francisco Bay Area.

2          Correct?

3    A.    Yes.  I have the PDF in front of me on the

4    screen.

5          (Sawyer Exhibit 14 was marked for

6    identification.)

7    BY MR. NORRIS:

8    Q.    Give me one second.  I am going to mark that

9    exhibit as Exhibit 14 to the deposition, that study.

10   A.    I should point out it is already marked from

11   October 16th, 2018, as Sawyer Exhibit 27.

12   Q.    Sounds good.  I don't know if that case was

13   identical in facts to this case, but we will -- I

14   want to point you to one portion of this study.

15   A.    Okay.

16   Q.    This study looked at NHL risk from smoking

17   and it was a case-control study based on NHL cases

18   in a particular hospital in San Francisco, correct?

19   A.    Yes.

20   Q.    All right.  And they looked at NHL risks

21   based on types of tobacco use, correct?

22   A.    That's right.

23   Q.    They looked at -- you know, they tracked

24   people when they first started smoking, when they

25   stopped smoking, correct?

1    A.    Yes.

2    Q.    Age at diagnosis, correct?

3    A.    Yes, as well as snuff or chewing tobacco,

4    pipes.

5    Q.    And they looked at -- oh, strike -- go

6    ahead.  Sorry if you were not done.

7    A.    I'm done.  That's good.

8    Q.    All right.  I'm going to direct you to page

9    339.  I'll pull up my screen so you can see it.

10    A.    I'm on it.  Okay.  The screen has started

11    screen sharing.  Share screen.  There we go.

12    Q.    And let me just make sure we're all on the

13    same page.

14          Do you see where I've highlighted there?

15    A.    Yes.

16    Q.    All right.  It noted that risk estimates for

17    NHL were increased somewhat for men greater than or

18    equal to 60 years of age who ever used tobacco, and

19    it found a risk ratio of 1.4, CI of 0.97 to 2.0,

20    correct?

21    A.    Yeah.  That's on the table on the next page,

22    right.

23    Q.    If you first smoked cigarettes at less than

24    15 years of age, correct, they found a risk ratio of

25    1.8?

William Sawyer, Ph.D.

```
1        A.   Yes.

2        Q.   And Mr. Karman started at 16, almost 15,

3   correct?

4        A.   Yes.

5        Q.   And that if they smoked cigarettes for at

6   least 33 years, they found a risk ratio of 1.5, a

7   confidence interval of 1 to 2.3, correct?

8        A.   Right.

9        Q.   So you agree that Mr. Karman fit two of

10  those three categories squarely, correct?

11       A.   Yes.

12       Q.   He nearly fit the third category, correct?

13       A.   Yes.

14       Q.   And all three of those found elevated risks

15  for cigarette smoking; is that all correct?

16       A.    Not statistically significant but elevated

17  ORs, and as in any assessment, toxicologists look at

18  more than one study, and cigarette smoking has

19  been -- of any of the drugs or chemicals out there,

20  cigarette smoking has been extensively assessed in

21  human studies, and this is the closest you can get

22  to trying to establish -- somebody who wanted to

23  establish -- with a bias wanted to establish some

24  kind of relationship between smoking and NHL

25  overall, this would be the piece of information,
```

William Sawyer, Ph.D.

1    because the other studies are neg -- totally

2    negative, and this is not statistically significant.

3    It does not support sufficient -- this in itself,

4    this study, is insufficient to support a

5    relationship between those three categories of

6    smoking and NHL.

7        Q.   Even for someone with Mr. Karman's smoking

8    history?

9        A.   Yes.  Those three categories I just said,

10   all three of these are nonsignificant, and in

11   keeping with the studies on DLBCL, there is just no

12   evidence, there's no statistically significant

13   findings and the evidence is just not there.  It is

14   for follicular but not for overall, and keep in mind

15   that the NHL overall study includes the follicular

16   people, although diluted out with nonfollicular

17   cases, they are still part of that statistic, so

18   part of what you're looking at here is from

19   follicular lymphoma.

20           In other words, in this study, in these

21   three categories you're pointing to, they did not

22   segregate out the follicular lymphomas.

23       Q.   Understood.  Now, it does say, though, that

24   although estimates for some smoking intensity and

25   duration factors among men greater than 60 years of

William Sawyer, Ph.D.

1    age were significantly increased for those in the

2    highest quartiles of exposure, there were no

3    consistent linear trends among the risk estimates.

4         Do you agree that Mr. Karman had a

5    significant smoking history, correct?

6    A.   Yes.

7    Q.   That's all I have on that study.

8         MR. NORRIS:  Why don't we go ahead and take

9    a quick break.

10        THE VIDEOGRAPHER:  The time is now 3:19 p.m.

11   Going off the record.

12        (Recess from 3:19 p.m. until 3:27 p.m.)

13        THE VIDEOGRAPHER:  We are back on the

14   record.  The time is now 3:27 p.m.

15   BY MR. NORRIS:

16   Q.   Dr. Sawyer, do you agree that the scientific

17   literature is constantly evolving?

18   A.   Yes.

19   Q.   And you agree that -- and I think we just

20   talked about this -- well, strike that.

21        Do you agree that one study may show that a

22   substance acts as a potential cause of cancer but

23   another study comes along and suggests the opposite,

24   correct?

25   A.   Yes.  That's why one has to evaluate each

William Sawyer, Ph.D.

1    study for its strengths and weaknesses, including

2    the strength of the finding, the significance,

3    whether it is a dose-response, whether it's coherent

4    between groups and consistent, all of those factors,

5    and then weigh, using the weight of evidence, of all

6    of the studies, and draw a conclusion.  That is the

7    proper methodology I followed.

8        Q.   And in line with that point, you agree that

9    new studies should not be disregarded just because

10   they are new, correct?

11       A.   No, not disregarded just because they are

12   new, no.

13       Q.   And do you agree it is important as a

14   toxicologist to keep abreast on the latest

15   literature on a particular substance before offering

16   an opinion as to its toxicity or carcinogenicity?

17       A.   Yes.

18       Q.   And that toxicologists should look at all

19   the studies, not just those studies that support a

20   particular hypothesis or position?

21       A.   Correct.

22       Q.   And you politely accused me of, arguably, of

23   being biased just a minute ago, but along those

24   vein, do you agree that within the studies, a

25   toxicologist should not cherry-pick those numbers

William Sawyer, Ph.D.

1    that only support their position or hypothesis?

2        A.    Absolutely, and that's why I included the

3    Agricultural Health Study.  It doesn't matter to me

4    whether it's negative or not.  It is a study that

5    offered a dose metric with respect to exposure days.

6    There are other studies of NHL and glyphosate that

7    offer no metric whatsoever.

8        Q.    Speaking of the exposure days, I want -- I

9    want -- I spent a little bit of time with it on

10   Monday but I just wanted to ask you a few other

11   questions on that.

12        As it relates to any -- leaving aside

13   Roundup or glyphosate, can you cite to me any

14   regulatory agency that sets its thresholds of

15   exposure to a known carcinogen based on the number

16   of days used per year?

17       A.    No, but this is not a regulatory matter.

18   This is -- these are human epidemiologic studies

19   that have used exposure days as an exposure metric.

20   Just as I said before, the benzene studies used,

21   ultimately, risk is measured in units of benzene PPM

22   years, and smoking is actually measured in

23   pack-years.

24        In the case of glyphosate, it would be nice

25   if we could use milligram per kilogram body weight,

William Sawyer, Ph.D.

```
1    but the studies were not conducted that way, so it's

2    not possible to do that.

3         My methodology is not self-proclaimed;

4    rather, it is the methodology that was prescribed in

5    the human epidemiologic studies which I have

6    referenced.

7    Q.   With respect to exposure days, would you

8    agree that the only study that addresses exposure

9    days is Ericsson?

10   A.   No.

11   Q.   Which other study or studies?  Sorry.  I --

12   A.   All six that I've included in my dose metric

13   assessment, including the Agricultural Health Study

14   uses exposure days.

15   Q.   Okay.  I thought on Monday you told me that,

16   for example, Pahwa and McDuffie address it in days

17   of use per year, not in an exposure day as you

18   define that term in your report.  Am I correct about

19   that?

20   A.   Yes, but it's still days of use, exposure

21   days.

22   Q.   Okay.  And does Andreotti use the same

23   exposure-day principle that you -- exposure-day

24   calculation that you have used?

25   A.   Not as an eight-hour time-weighted average
```

William Sawyer, Ph.D.

1    exposure day.  My measurements are modeled after the

2    Ericsson study, which uses eight-hour time-weighted

3    exposure days.  In the Agricultural Health Study,

4    exposure days simply mean any day that it was used,

5    and the Agricultural Health Study has used the

6    exposure days and broke it up into tertiles, three

7    tertiles or four quartiles.

8        Q.   But the exposure-day metric that you use

9    comes from -- that you use in your report comes from

10   Ericsson; is that correct?

11       A.   Yes, and that's -- the reason is that's the

12   most demanding approach, to require not just using

13   it on a given day, but using it for eight hours on a

14   given day.  It -- or eight hours cumulatively.  It's

15   a more demanding approach in the Ericsson study, and

16   I chose to model after the Ericsson study simply

17   because it provides a more demanding assessment than

18   if I used just any spraying on a given day.

19       Q.   Would you agree that Ericsson just stands

20   for the proposition of what they found based on the

21   29 cases in that study as it relates to increased

22   risk?

23       A.   Yes, I do; however, I also need to point out

24   that this included initially 1,108 enrolled

25   controls, resulting in 1,016 controls, and as far as

William Sawyer, Ph.D.

1    cases, 534 males and 376 females, which is a little

2    shy of a thousand.

3           So it could be misleading to tell the jury

4    that the case only involved 29 cases.

5      Q.   Do you agree that there are only 29 cases

6    that used glyphosate greater than one day per year,

7    correct?  Strike that.  I want to reask that

8    question because that was wrong.

9           You agree that there are only 29 cases in

10   that study that used glyphosate greater than one

11   exposure day?

12     A.   Yes, but that could be misstated in a manner

13   of leading someone to believe, who doesn't

14   understand the design of these studies, that the

15   study only included 29 people when, in fact, it

16   included nearly 2,000 people.

17     Q.   Understood.  And there were 18 controls that

18   used glyphosate greater than one exposure day per

19   year, correct?

20     A.   Yes.

21     Q.   And of the control -- and of the cases,

22   those 29 cases, exactly 12 used it less than or

23   equal to 10 days, 10 exposure days, and exactly 17

24   used it greater than 10 exposure days, correct,

25   glyphosate?

```
1        A.    Of the cases, yes.

2        Q.    And there are exactly nine controls in each

3    category, correct?

4        A.    Yes.

5        Q.    Do you intend to conduct a site visit in

6    this case?

7        A.    No.

8        Q.    Is there anything particularly relevant to

9    Mr. Karman and his case that you think it would be

10   important for the jury to know as it relates to his

11   exposures?

12       A.    The only thing I see is he did not wear

13   gloves.

14       Q.    I am almost done.  You agree that his --

15   that Mr. Karman's wife also smoked cigarettes for

16   essentially 60 years when they lived together,

17   correct?

18       A.    Yes.

19       Q.    I asked you the other day, but it's your

20   opinion that secondhand -- that the levels of

21   benzene exposure from secondhand smoke are not a

22   risk factor for NHL; is that correct?

23       A.    I haven't found any studies that support

24   that range.

25       Q.    Do you have -- do you plan to offer any
```

William Sawyer, Ph.D.

1    other opinions in this case that are not included in

2    your report or have not been given in this

3    deposition today?

4        A.   No.

5            MR. NORRIS:  One second.  All right.  Those

6        are all the questions I have, unless Fatima, did

7        you have any questions?

8            MS. ABUZERR:  Yeah, I do.  I just have a

9        couple.

10           MR. NORRIS:  Okay.

11                    CROSS-EXAMINATION

12   BY MS. ABUZERR:

13       Q.   Dr. Sawyer, I just want to go back to

14   talking about BMI.  Now, we talked about that

15   Mr. Karman's BMI might be roughly around -- what did

16   we say, 31.5 to 33?

17       A.   Yes.

18       Q.   But does BMI distinguish between fat and

19   muscle?

20       A.   No.

21       Q.   Okay.  So when taking into consideration

22   someone's BMI, we're just talking about an

23   estimation of what their body fat percentage might

24   be?

25       A.   Right.  It's an average among the

William Sawyer, Ph.D.

1    population.  It includes sedentary people, it

2    includes laborers, athletes, all -- you know, it's

3    just an average of the population.

4        Q.   Okay.  And you would agree that muscle

5    weighs more than fat?

6        A.   Yes.  A person who is highly muscular will

7    show a higher BMI than a person of the same size who

8    is composed largely of fat.

9        Q.   Okay.  And when we were talking -- when you

10   were talking about earlier that his BMI might be

11   roughly around the 31.5 and 33 percent, it's

12   possible that Mr. Karman's BMI could have been lower

13   than that depending on his muscle?

14            MR. NORRIS:  Objection; form.

15       A.   Yes, with respect to the definition body

16   fat, yes.  I mean, the body mass index number

17   wouldn't change; however, the proportion of fat to

18   muscle would change.

19       Q.   Okay.  And, Dr. Sawyer, in your expert

20   opinion, to a reasonable toxicological certainty,

21   was Mr. Karman's exposure to Roundup a significant

22   factor in contributing to his development of

23   non-Hodgkin's lymphoma?

24       A.   Yes.

25       Q.   And can you explain why?

William Sawyer, Ph.D.

1      A.   The only confounding factor I found was a
2   very slight, at the most 7 percent, increase in risk
3   from the BMI measurement, and his exposure to
4   Roundup placed him, based on the study evidence, in
5   at least a 2.3-fold risk, 200 -- over 200 percent
6   increase, as opposed to a 7 percent increase from
7   the slightly increased BMI.
8           And without finding other risk factors,
9   certainly the dose of glyphosate over the years did
10  serve as a causative or contributing factor to his
11  NHL.
12          MS. ABUZERR:  Okay.  Those are the only
13     questions I have.  Thank you, Dr. Sawyer.
14                  REDIRECT EXAMINATION
15  BY MR. NORRIS:
16     Q.   Dr. Sawyer, just to confirm, the 2.3 number
17  you were using comes from Ericsson, correct?
18     A.   Yes.  McDuffie also has a similar number.
19     Q.   Do you think that it is still appropriate to
20  use McDuffie in light of Pahwa, which included
21  McDuffie's figures?
22     A.   Yes.
23     Q.   And on neither -- am I correct that with
24  McDuffie, they did not control for other pesticides,
25  correct?

A. I have to check that. I forget.

On page 1156 in McDuffie, in the top right-hand column, the fourth line under Questionnaire reads: With permission, we modified the questionnaire to create postal and telephone interview questionnaires. To control for the effects of other variables known or suspected to be associated with the development of NHL after conducting an extensive literature review, we used the postal questionnaires to capture -- blah, blah, blah.

And then if we look at the various tables, we see in Table 2, under Footnote d: Glyphosate is the only phosphonic acid herbicide reported by more than one percent of responders, Roundup, Touchdown, Victor, Wrangler, Laredo do not include dicamba, and Rustler is a mixture of dicamba and glyphosate.

So the glyphosate is the predominant chemical in these studies, and we do see that glyphosate revealed a dose-response relationship and that is shown in Table 8.

Q. For the calculation in Table 8, did they -- did they -- of 2.12 with a CI of 1.20 to 3.73, did they adjust for other pesticides?

A. In that statistic, no.

William Sawyer, Ph.D.

1     Q.   That's the only statistic that gets above 2

2  for glyphosate in McDuffie, correct?

3     A.   Yes.

4     Q.   And the statistic for -- that you have cited

5  from Ericsson of 2.34 -- or 2.36, you agree that

6  they also did not adjust for other pesticide

7  exposures, correct?

8     A.   On page 1659, the second paragraph reads:

9  When different NHL entities were analyzed

10  separately, the OR for the subtype small lymphocytic

11  lymphoma, et cetera, was increased for both phenoxy

12  herbicides and especially glyphosate.

13          And if we keep reading, the -- an entity

14  diffuse DLBCL was significantly associated with

15  exposure to phenoxyacetic acids, but not to other

16  herbicides.  On the other hand, the group follicular

17  lymphoma was not clearly associated with phenoxy

18  acids and only nonsignificantly with glyphosate.

19  The category "other B-cell lymphoma," example,

20  mantel and marginal, was significantly associated

21  with exposure to phenoxyacetic acids, and an

22  increased risk was also indicated for glyphosate.

23          So there appears to be some separation here.

24     Q.   I understand that, but you're -- the number

25  2.3 that you cited in your last -- in your answer

William Sawyer, Ph.D.

1    when Ms. Abuzerr was asking you questions was from

2    Table 2, correct?

3        A.    Yes.

4        Q.    And it says at the bottom of Table 2 that

5    adjustment was made for age, sex, and year of

6    diagnosis or enrollment, but it does not say whether

7    it was made for other pesticides; is that correct?

8        A.    It's what it states, but also there is an

9    indication in what I read to you that there was

10   separation, a speciation, for example, the

11   phenoxyacetic acids versus glyphosate, that leads me

12   to believe that Table 2 may have been distinguished.

13       Q.    Can you say to a reasonable degree of

14   scientific certainty that Table 2 did -- the numbers

15   in Table 2 did adjust for other pesticide and

16   herbicide exposures?

17       A.    No; however, the paragraph at the top right

18   column of page 1659 implies that it may have.  I

19   just don't know for sure.

20            MR. NORRIS:  I'll move to strike as

21       nonresponsive after no.

22       Q.    One other question that was raised while you

23   were asking -- Ms. Abuzerr was asking you questions

24   was confounding.  In your opinion is age a

25   confounding factor for non-Hodgkin's lymphoma?

William Sawyer, Ph.D.

```
 1      A.   No.  The risk of lymphoma increases in the
 2   seventh and eighth decade of life; however, the risk
 3   of lymphoma actually increases even during the sixth
 4   decade based on the SEER registry, but the point is
 5   that the risk from the glyphosate is added to that
 6   natural increased risk.
 7      Q.   Just so -- because sometimes I have trouble
 8   tracking this.  When you say the sixth decade of
 9   life, that means when you're in your fifties, when
10   you say your seventh decade of like, that's when you
11   are in your sixties.  Am I correct about that?
12      A.   Yes, that's how the SEER registry defines
13   it, and when I say SEER registry, it's S-E-E-R, all
14   capital.
15      Q.   Gotcha.  One last -- one last topic.  What
16   -- we know that Mr. Karman had a 35-year latency.
17   What literature are you relying upon to support a
18   latency of that length?
19      A.   The studies in my report, and latency is
20   based on -- those studies that I included in my
21   report show minimum required latency; in other
22   words, one can handle a carcinogen, such as a
23   cigarette in lung cancer, and lung cancer typically
24   has a much longer latency than NHL, typically, on
25   the average, 20 years, but that doesn't mean a
```

1    smoker can't develop cancer 40 years later while

2    smoking throughout that period.

3            In this case, this is not a case where

4    Mr. Karman used glyphosate 40 years ago and then

5    stopped using it for the next 40 years.  That's not

6    what we're dealing with.  We're dealing with a

7    fellow who continued to use the carcinogen and what

8    toxicologists require in these analyses is the

9    minimal latency period, the person has to exceed the

10   minimal latency period.

11           The fact that he managed to go that many

12   years without contracting NHL is -- does not

13   preclude the causation of the carcinogen.

14           MR. NORRIS:  Okay.  That's all the questions

15      I have.

16           THE VIDEOGRAPHER:  Any follow-ups?

17           MS. ABUZERR:  No.

18           THE VIDEOGRAPHER:  Okay.  It is February 18,

19      2021.  The time is now 3:59 p.m., completing

20      today's deposition.

21           (Whereupon, the deposition concluded at

22      3:59 p.m.)

23

24

25

William Sawyer, Ph.D.

```
 1              C E R T I F I C A T E

 2          I, Susan D. Wasilewski, Registered

 3   Professional Reporter, Certified Realtime Reporter,

 4   Certified Manager of Reporting Services, Certified

 5   Realtime Captioner, and Florida Professional

 6   Reporter, hereby certify that the witness named

 7   herein appeared via Remote Counsel/Zoom technology

 8   on Thursday, February 18, 2021, and was duly sworn.

 9          I FURTHER CERTIFY that I was authorized to

10   and did stenographically report the examination of

11   the witness named herein; that a review of the

12   transcript was not requested; and that the foregoing

13   transcript is a true record of my stenographic

14   notes.

15          I FURTHER CERTIFY that I am not related to

16   or an employee of any of the parties, nor am I

17   related to or an employee of any of the parties'

18   attorneys or counsel connected with this action, nor

19   am I financially interested in the outcome of this

20   action.

21          WITNESS my hand this 21st of February, 2021.

22

23   _____

24   Susan D. Wasilewski, RPR, CRR, CMRS, CRC, FPR

25
```

William Sawyer, Ph.D.

```
 1                          LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____   _____

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25
```