# EXHIBIT 4

**TCAS**

**Toxicology Consultants & Assessment Specialists, LLC**
6450 Pine Avenue, Sanibel, FL 33957
29 Fennell Street, Skaneateles, NY  13152
(239) 472-2436 [FL]  (315) 685-2345 [NY]  (800) 308-0080 U.S./CA
E-mail: drsawyer@experttoxicologist.com & Website: experttoxicologist.com

Toxic Exposures · Environmental Testing · Risk Assessment · Forensic Toxicology · Causation Evaluation

January 22, 2021

Ken Moll, Esq.
Moll Law Group, PC
22 W. Washington St, 15th Floor
Chicago, IL 60602

**Re: Pecorelli v. Monsanto**

Dear Attorney Moll:

Per your request with regard to this matter, I have reviewed the complete list of pertinent documents as compiled in Appendix A. Based upon the information provided and the application of generally-accepted toxicological methodology and referenced sources as cited herein, I have stated my opinions in this matter to reasonable toxicological certainty.

Pecorelli v. Monsanto
January 22, 2021
Page 7

Hence, this toxicological assessment has four fundamental objectives: (1) to arrive at a scientifically-reliable exposure dose estimation for Mr. Pecorelli (*in units of 8-hour time-weighted exposure days*) based upon the available objective evidence; (2) to assess the potential of toxicological confounding risk factors contributing to his NHL onset; (3) to provide a general causation assessment of personal protective gear (PPE), product formulation, toxicological factors such as absorption, distribution, metabolism and excretion (ADME), and mechanism of action of Roundup; and (4) to render a scientifically-supported and reliable opinion as to whether Mr. Pecorelli's Roundup exposures (dose) were sufficiently above the thresholds within the peer-reviewed studies to substantially contribute to the development of his NHL.

## A.  Plaintiff Background Summary

Michael Pecorelli was born ▇▇▇▇▇▇▇▇, in Chicago, Illinois, and died on March 28, 2012 at the age of 82 from malignant fibrosis histiocytoma.[3] He served in the US Air Force during the pre-Korean War period from 1948 until 1950.[4] He was survived by his wife, Joyce Pecorelli, his son, Mark Pecorelli and two other sons. Mrs. Joyce Pecorelli passed away in 2014.

Mr. Pecorelli owned and operated a landscaping business which at different times included a nursery and a garden center. He used Roundup® concentrate formulations occupationally and residentially from approximately 1975 to 2000.

Mr. Pecorelli was diagnosed with stage IV splenic marginal zone lymphoma on July 14, 2004,[5] and on July 19, 2010, he had a recurrence of B-cell lymphoma which was confirmed with a spinal mass biopsy.[6]

---

Lawson, A., et al., "Three Methods to Assess Levels of Farmers' Exposure to Pesticides in the Urban and Peri-urban Areas of Northern Benin," 2017, Tunisian Plant Protection Journal, Vol.12, pp. 91–108.

Illyassou, K., et al., "Risk Assessment for Small Farmers Exposed to Plant Protection Products in the Niger River Valley," 2017, Comm. Appl. Biol. Sci.

EPA, "Risk Assessment Methodology for Hazardous Substances: How to assess the risk, cost and benefit of new hazardous substances for use in New Zealand," 2018, Environmental Protection Authority.

[3] The death certificate listed malignant fibrosis histiocytoma as cause of death.

[4] Medical records of Michael Pecorelli, p. 900. He did not see combat.

[5] Northwest Oncology and Hematology, p. 11 of 751.

[6] Hines VA Medical Center, p. 574 of 1427.

Pecorelli v. Monsanto
January 22, 2021
Page 8

**Employment History**

Mr. Pecorelli was self-employed as a landscaper in Chicago, Illinois, from 1953 until his death in March 2012.[7] He expanded his landscape business to include plant sales in the mid-1970s and then in 1978, he opened Windy City Landscaping and Nursery where he raised mature nursery stock.

**Medical History**

Mr. Pecorelli's medical records reveal a significant history of a possible calcified lymphadenopathy in his lung in 1999. Morphologic and immunophenotypic findings were suggestive of chronic lymphocytic leukemia/prolymphocytic leukemia.[8] Also, a colonoscopy and biopsy in November 2000 revealed possible inflammatory bowel disease or infection. A history of chronic obstructive pulmonary disease (COPD) was noted in 2010; however, a diagnosis date was not given.[9] He did not have a history of obesity as a review of his medical records provided the following documented statistics: on 8/13/2004, he weighed 152 pounds with a BMI of 22;[10] on 10/28/2004, he weighed 155 pounds at 69 inches with a BMI of 23;[11] on 8/18/2010, he weighed 145.7 pounds with a BMI of 22.[12] His son, Mark Pecorelli, confirmed that his father had always had a slim build.[13]

In January 2004, about eight months prior to his lymphoma diagnosis, Mr. Pecorelli began suffering from pruritus (itchy skin) and weight loss. He experienced an erythematous rash on his trunk, buttocks, scalp and lower extremities. He was evaluated by his primary care physician and two separate dermatologists. He was prescribed oral steroids, topical steroids, several antihistamines and antidepressants for his chronic pruritus without relief.[14]

A bone marrow biopsy was performed for **probable chronic lymphocytic leukemia** in July 2004.[15] The pathology results reported a diagnosis of "B cell lymphoproliferative

---

[7] Plaintiff Fact Sheet, p. 2.

[8] Loyola University Medical Center medical records, p. 13 of 26.

[9] Northwest Oncology & Hematology, p. 47 of 54.

[10] Edward Hines VA medical records, p. 120 of 3358.

[11] Id., p. 117 of 3358.

[12] Id., p. 58 of 3358.

[13] Telephone Interview of Mark Pecorelli by Dr. Sawyer on January 12, 2021.

[14] Edward Hines VA medical records, pp. 3218-3219 of 3358.

[15] Id., p. 1427 of 3358.

Pecorelli v. Monsanto
January 22, 2021
Page 9

disorder most consistent with **splenic marginal zone lymphoma**",[16] a slow-growing (indolent) B-cell non-Hodgkin's lymphoma (NHL). Mr. Pecorelli subsequently underwent six cycles of CVP-R therapy for splenic marginal zone lymphoma with good response.[17]

In April 2005, he had benign lipomas removed from his right lateral forearm and right superior deltoid.[18]

Mr. Pecorelli remained in remission from the lymphoma until July 2010 when a biopsy of a spinal mass confirmed B-cell lymphoma. He was administered steroids and ten cycles of palliative radiation treatment.[19]

A bone marrow aspiration and biopsy performed on August 5, 2010, was negative for lymphoma.[20] A full body PET/CT scan on September 8, 2010, revealed near complete resolution of the paraspinal mass, but demonstrated FDG avid disease involving the left hilar region. Pulmonary consultation was recommended, but Mr. Pecorelli declined.[21] A brain scan on September 7, 2010, revealed a 5 mm nodule in the deep lobe of the left parotid gland which corresponded to the area of intense uptake on the PET scan. It was unchanged from prior studies on March 30, 2010, and January 26, 2010. "It probably represents a pleomorphic adenoma, the most common tumor in the parotid gland."[22]

A left mainstem endobronchial biopsy at Alexian Brothers Medical Center on February 8, 2011, revealed "Fragments of high, undifferentiated pleomorphic sarcoma (**malignant fibrous histiocytoma, grade 3**)."[23]  This was treated with the placement of a stent and a course of radiation therapy.[24]

In November 2011, Mr. Pecorelli presented to the ER with hemoptysis and chest pain. A CT scan on November 25, 2011, demonstrated a left apical upper lobe mass and left lower lobe nodule. The differential diagnoses were endobronchial plug, lymphoma or primary lung cancer. Another abdominal mass was found, but he refused any further

---

[16] Edward Hines VA medical records, p. 1884 of 3358.

[17] Id., p. 938 of 3358.

[18] Id., p. 493 of 3358.

[19] Id., p. 935-936 of 3358.

[20] Id.,  782 of 1427

[21] Arti Lakhani, MD, deposition exhibit 3, pp. 2-3 of 17. Edward Hines VA Medical records, p. 1495 of 3358.

[22] Edward Hines VA medical records, p 523 of 3358.

[23] Pathology.pdf, p. 9 of 37.

[24] Hines Medical Records, p. 722.

Pecorelli v. Monsanto
January 22, 2021
Page 10

diagnostic testing or treatment.[25] Mr. Pecorelli's physician voiced concern that the mass was likely lymphoma; however, Mr. Pecorelli stated that he did not want any further treatment.[26] No further testing was performed.[27]

On January 14, 2012, Mr. Pecorelli was discharged to hospice care and died on March 28, 2012. His cause of death was malignant fibrosis histiocytoma. It was noted that tobacco did not contribute to his death.[28]

**Table 1**
**Summary of Mr. Pecorelli's Medical History**

| Date | Procedure/Symptoms | Findings/Diagnosis | Reference/Notes |
|---|---|---|---|
| 6/8/1999 | Chest, PA and LAT CPT<br><br>Chronic smoker with dyspnea on exertion | Possible calcified lymphadenopathy in right hilum. No acute pulmonary process identified | 396342_126_001_Loyola UnivMed_001_0025.pdf, page 24 of 26. |
| 7/20/1999 | Comprehensive metabolic panel<br><br>High WBC and lymph | Morphologic and immunophenotypic findings are suggestive of chronic lymphocytic leukemia/Prolymphocytic leukemia. Quantitation of prolymphocytes is somewhat difficult due to morphologic variation within the peripheral blood smear; prolymphocytes appear to comprise up to 50% of lymphocytes. | 396342_126_001_Loyola UnivMed_001_0025.pdf, pages 13-14 of 26. |
| 11/27/2000 | Colonoscopy and biopsy-<br><br>Rectal bleeding for several months | Low rectal polypoid mass. Multiple fragments of colonic mucosa with severe acute and chronic inflammation with cryptitis and multiple crypt abscesses. No granulomas present. Suggestive of inflammatory bowel disease but rule out infectious process. | 396342_126_001_Loyola UnivMed_001_025.pdf pages 3, 25 of 26. |

---

[25] Edward Hines VA medical records, p. 722 of 3358.

[26] Id., p. 667 of 3358.

[27] Deposition of Dr. Kanofsky dated March 13, 2020.

[28] Death record of Michael Pecorelli Sr., Northwest Oncology records.

Pecorelli v. Monsanto
January 22, 2021
Page 11

**Table 1**

**Summary of Mr. Pecorelli's Medical History**

| Date | Procedure/Symptoms | Findings/Diagnosis | Reference/Notes |
|------|--------------------|--------------------|------------------|
| 7/6/2004 | Probable chronic lymphocytic leukemia vs lymphoma.<br><br>Chief complaint of intensive diffuse pruritis occurring over the past 6 months. Pruritis has failed to respond to systemic antihistamines, topical and systemic corticosteroids (prednisone) and other topical therapies. CBC has been abnormal for a long time. | Lymphocytosis with peripheral blood smear findings most consistent with chronic lymphocytic leukemia. Palpable splenomegaly and CT imaging of abdomen and pelvis from June 26 revealing splenomegaly and aortocaval lymphadenopathy. He may have RAI stage II CLL. Severe pruritis. Etiology remains uncertain. "While lymphoma may cause pruritis, I would have anticipated an excellent response to corticosteroid therapy and, at least by report, he had no improvement following systemic steroid treatment." WBC: 13,600 | 396342_005_002_ EdwardHinesJrVAHospMed RecsDept_002_00751.pdf, pages 8-10 of 751.<br><br>Weight: 157 lbs.<br>Height: 5'6 |
| 7/14/2004 | Bone marrow core biopsy, aspirate smear and peripheral blood | B cell lymphoproliferative disorder most consistent with splenic marginal zone lymphoma | 396342_005_002_ EdwardHinesJrVAHospMed RecsDept_002_00751,pdf, page 11 of 751. |

## NHL Diagnosis and Pathology

Based on the initial peripheral blood flow cytometry studies in 2004, a differential diagnosis of hairy cell leukemia was proposed. A bone marrow biopsy was performed on July 14, 2004, at Alexian Brothers Medical Center to further clarify this diagnosis.[29] Mr. Pecorelli's reported pathology is as follows:

- Bone marrow core biopsy - Numerous atypical lymphoid nodules are scattered throughout the bone marrow. The nodules are generally non-paratrabecular and are composed of relatively monotonous, mildly atypical cells. Only rare larger lymphoid cells are present in the nodules; they have irregular nuclei that are generally rather mature in appearance. No interstitial infiltrate of atypical lymphocytes are noted, and no metastatic tumor is seen. CD-20 stain demonstrates that the great majority of the cells within the lymphoid nodules are CD-20 positive B cells. CD-3 stain

---

[29] Edward Hines VA medical records, p. 1427 of 3358.

Pecorelli v. Monsanto
January 22, 2021
Page 12

demonstrates a modest number of T cells admixed with the B lymphocytes in the marrow. CD-10 is negative on the B cell population. The B cells are also negative for DBA,44.[30]

- Flow cytometry studies were originally done on the peripheral blood. Based on these flow cytometry studies, a differential diagnosis of hairy cell leukemia versus hairy cell leukemia variant versus splenic lymphoma with villous lymphocytes (splenic marginal zone lymphoma) was developed. Flow cytometry on the bone marrow material showed many of the same results as found in the peripheral blood: the atypical lymphocytes were negative for CD-5, positive for CD-25, and demonstrated a CD-19 positive, Lambda light chain restrictive B cell population. However, flow cytometry studies in the bone marrow revealed that the majority of the lymphocytes were CD-11 negative and virtually all of the cells appear to be <u>CD-103 negative</u>, whereas the peripheral blood showed a dimly positive CD-103. Hairy cell leukemia is almost always <u>strongly CD-103 positive</u> while splenic marginal zone lymphoma is nearly always CD-103 negative. Therefore, the bone marrow has a morphology and immunophenotype (lack of CD-103 and DBA,44) that is most consistent with <u>splenic marginal zone lymphoma</u>.[31]

Mr. Pecorelli subsequently underwent six cycles of CVP-R therapy for splenic marginal zone lymphoma with good response and then declined further chemotherapy. He remained in remission until July 2010, when a soft tissue mass in the left paraspinal region was confirmed following an MRI.[32] (It was noted that, "since the last visit, he's been admitted to the hospital five times due to falling down."[33]) A biopsy of the spinal mass on July 19, 2010, revealed B-cell lymphoma. His pathology was reported as follows:

- Core biopsy showed skeletal muscle infiltrated by lymphoid cells with lymphoid cells showing marked apoptosis. CD-20 and BCL-6 show diffuse positivity. CD-3 and CD-5 highlight T lymphocytes. CD-23 is positive in many cells. CD-10 shows positivity focally in few cells. Cyclin D1 is positive in very few scattered cells. Ki-67 is high and is positive in approximately 70-80% of cells. BCL-2 is positive in many cells.[34] <u>Immunostains consistent with B cell lymphoma</u>.[35]

---

[30] Edward Hines VA medical records, pp. 1883-1885 of 3358.

[31] Id.

[32] Id., 1014 of 1427

[33] Deposition of Dr. Kanofsky, p. 57 of 100.

[34] Pathology.pdf, p. 6 of 37.

[35] Edward Hines VA medical records, p. 872 of 3358.

Pecorelli v. Monsanto
January 22, 2021
Page 13

**Family Medical History**

Mr. Pecorelli's family history is negative for blood disorders and lymphoma. His son, Mark Pecorelli, has a history of resected non-small cell lung carcinoma.[36]

According to Mark, Mr. Pecorelli had three sisters, but little is known of their medical history because his mother died of uncertain causes when he was very young. He then lived in an orphanage home.[37] According to medical records, Mr. Pecorelli's father died of complications with alcoholism[38] while one sister was diagnosed with breast cancer in her 80s.[39] Significant family medical history of coronary artery disease is also noted.[40]

**History of Tobacco, Alcohol and Drug Use**

Mr. Pecorelli reported his current smoking as one pack per day at his initial oncology consultation on July 6, 2004. Another medical record notes that Mr. Pecorelli began smoking cigarettes at age 16[41] and estimated that he smoked ¾ to 1 pack of cigarettes a day for 50 years.[42] Other records indicate that he has a 70-pack-year history.[43] A June 30, 2010, medical record noted a history of half a pack per day for 60 years.[44] A November 28, 2011, encounter noted 0.5-1 pack per day for the last 68-70 years (34 to 70 pack-years).[45] His available medical records noted that he did not consume alcohol (hard liquor) but that he previously consumed 1-2 beers every few days.[46] He never used illicit drugs.[47]

**Deposition of Mark Pecorelli (son of Michael Pecorelli), November 12, 2019**

Mark Pecorelli (DOB ▮▮▮▮) is the youngest of three sons of Michael Pecorelli and Joyce Pecorelli. Since the age of 14, Mark has worked in landscaping, nursery and garden center retail. For a short time, Mark Pecorelli had his own landscape company, Sun-Tree

---

[36] Northwest Oncology and Hematology, p. 43 of 54.

[37] Deposition of Mark Pecorelli, November 12, 2019, p. 124.

[38] Mark Pecorelli reported in his telephone interview that his paternal grandfather did not suffer from alcoholism, but his maternal grandfather did.

[39] Northwest Oncology and Hematology, p. 8 of 751.

[40] Northwest Oncology and Hematology_001_0053, pp. 36-37 of 54.

[41] Edward Hines VA medical records, p. 995 of 3358.

[42] Id., page 731 of 3358.

[43] Alexian Brothers Medical Center, p. 46 of 410. Northwest Oncology and Hematology, p. 31 of 54.

[44] Pathology.pdf, p. 6.

[45] Edward Hines VA medical records, p. 731 of 3358.

[46] Id., p. 731 of 3358.

[47] Id., pp. 1009-1010 of 3358.

Pecorelli v. Monsanto
January 22, 2021
Page 14

Landscaping and Nursery, but he always worked for his father in the landscaping business and therefore, is able to provide details of his father's use of Roundup®.[48] Mark Pecorelli has lived at ███████████████████████████, (formerly his parents' home) for all but two years of his life. His parents purchased the home in 1961.[49] His father died March 28, 2012; his mother in April 2014 at age 79. Mark Pecorelli has been on disability for lung cancer since 2010.[50]

Mark's father, Michael Pecorelli, was born and raised in Chicago, Illinois. He graduated from high school and then served in the US Air Force for two years where his occupational specialty was food service. He did not see combat and did not have any exposure to chemicals or hazardous materials.[51] He then earned a CDL and drove heavy trucks as part of his landscaping work.[52] Mark Pecorelli found his father's Pesticide Applicator licenses from 1973 and 1974 and testified that his father was licensed every year after purchasing the land for his nursery in 1978.[53]

Mark Pecorelli testified that his father started in the landscaping business as Windy City Landscaping in 1953 wherein he performed lawn maintenance for residential clients.[54] Mark estimated that somewhere between 1974 and 1976, his father opened a garden center in Elk Grove Village where he bought plants wholesale and sold them retail.[55] He operated the garden center at ███████████████████████ for approximately three to four years while continuing his weekly lawn maintenance business as well.[56] Then in approximately 1978, his father purchased the Woodstock, Illinois, land that he developed into the Windy City Nursery.[57] The nursery was a 29.5-acre[58] corner property at the intersection of Illinois Route 47 and Charles Road where Mr. Pecorelli grew landscaping plants. Plant stock at the nursery included evergreens, shade trees, shrubs and perennials such as lilies.[59] After 1978, when he added the nursery to his business, Mr.

---

[48] Deposition of Mark Pecorelli, November 12, 2019,  p. 101.

[49] Id., p. 51.

[50] Id., p. 100.

[51] Id., p. 104.

[52] Id., p. 47.

[53] Id., p. 26.

[54] Id., p. 65.

[55] Id., p. 71.

[56] Id., pp. 72-73,

[57] Id., pp. 26 and 75.

[58] Per Mark Pecorelli's testimony; however, the plat (Exhibit 5) indicates it is 27.2 acres.

[59] Deposition of Mark Pecorelli, November 12, 2019, pp. 69-70.

Pecorelli v. Monsanto
January 22, 2021
Page 15

Pecorelli discontinued his weekly lawn maintenance service.[60] He continued landscape designing and planting/installation and he maintained the jobs that he installed. These landscaping jobs generally involved removing old shrubs and bushes and installing new landscaping for residential properties and commercial properties - 70% residential, 30% commercial.[61] He had between two and five employees at different times, depending on the need.[62] Mark estimated that his father worked eight or more hours a day[63] and usually took two weeks of vacation in mid-January.[64]



**Figure 1.** Aerial view of the nursery property of Mr. Pecorelli's Windy City Landscaping and Nursery

Mark Pecorelli reported that his father always used Roundup brand concentrated herbicide at all locations - home, garden center, nursery and on landscaping jobs.[65] Mark recalled that his father may have begun using Roundup in 1975, but he was certain that he was using it in 1976.[66] For home use, his father purchased one 2.5-gallon jug of

---

[60] Id., p. 67.

[61] Id., pp. 68-69 and p. 216.

[62] Id., p. 80.

[63] Id., p. 75.

[64] Id., p. 107.

[65] Id., p. 223.

[66] Id. pp. 160-161.

Pecorelli v. Monsanto
January 22, 2021
Page 16

concentrate per year and stored it in the garage at his home.[67] His father mixed the Roundup concentrate with water at the nursery in a 55-gallon drum, about 20 gallons at a time, and then transferred it into a backpack sprayer. Mark believes it was mixed in a ratio of one ounce of concentrate to one gallon of water.[68] After spraying at the nursery, the leftover Roundup solution in the backpack was used at the home residence.[69]

Mark Pecorelli stated that the original Roundup concentrate that his father used was "for industrial use"[70] and could only be purchased from the "Farm Service."[71] The product did not contain surfactant so his father added the "sticker" (not specified).[72] The Roundup Pro concentrate, which his father used in later years when it became available, already contained a surfactant.

He testified that when his father first purchased Roundup, the label was a 3" by 4" booklet "with a lot of pages" that he read thoroughly; his father "read it all the time."[73] There was a lot of information in the booklet that he referenced when he was using the Roundup. Whenever the label booklet changed, he would read the booklet from "cover to cover." "It was like his bible, …when he's using the chemical."[74]

At the nursery, Roundup was regularly sprayed on the 20 acres of planting area.[75] Mark estimated that his father did 80% of the Roundup spraying at the nursery and he did the other 20%.[76]

Roundup was sprayed between the rows and between individual plants, many of which were set in 4'x4' or 4'x6' areas. When the transplants were young, this left a lot of area to spray.[77] Mark testified that his father did the Roundup spraying at the nursery in sections. "It wasn't that he went out and sprayed for a week straight. We'd do them in sections because we're also doing digging and the other part of the business, landscaping."[78] He

---

[67] Id., pp. 163-167.

[68] Id., p. 238.

[69] Id., pp. 223-225.

[70] Id., p. 153.

[71] Id., pp. 153-155.

[72] Id., pp. 21-22.

[73] Id., pp. 167-168.

[74] Id., p. 174.

[75] Id., p. 220, p. 223.

[76] Id., p. 121.

[77] Id., pp. 220-221.

[78] Id., p. 222

Pecorelli v. Monsanto
January 22, 2021
Page 17

estimated that it would take his father a total of two weeks or 80 hours to get all the sections sprayed one time.[79] Since his father generally sprayed each area twice per year,[80] this resulted in about 160 hours per year that his father sprayed Roundup at the nursery.

Mr. Pecorelli sprayed Roundup two different times of the year at the nursery and Mark stated that spraying typically occurred "…early spring and not-late fall. Like end of July, beginning of August."[81] The start of the first spraying each season depended on when the temperature reached the 70s, and in Chicago, that was typically in April or May.[82]

Mark testified that sometimes Mr. Pecorelli sprayed Roundup more than twice per year because "sometimes an area would get away on him…"[83] At the open (unplanted) ground at the nursery, he sprayed Roundup from a 15 gallon tank sprayer attached to the back of a tractor/four-wheeler on a three-point hitch.[84] He had seen his father do this on a few occasions when, "sometimes the grass got too tall on us for the mower to cut. Thick. He would spray it with Roundup, knock it out."[85]

Mark testified that his father used Roundup in his landscape projects for clients and at the nursery and the garden center, but he did not use Roundup for his "weekly mowing clients."[86] On the landscape installation jobs, his father sprayed Roundup on the site one time before the grading was done.[87] He estimated that 30% of his father's landscape jobs required the use of Roundup.[88] It took his father a minimum of 1 hour to a maximum of 4 hours to apply Roundup on a job, depending on the project.[89]

While the nursery spraying was typically finished by early August, some of his landscaping jobs required spraying later in August.[90] Mark estimated that his father

---

[79] Id., pp. 222-223.
[80] Id., p. 180 and p. 222.
[81] Id., p. 178.
[82] Id., p.177.
[83] Id., p. 226.
[84] Id., pp. 232-233.
[85] Id., p. 241.
[86] Id., p. 223, p. 209.
[87] Id., p. 211.
[88] Id., p. 212.
[89] Id., pp. 216-218.
[90] Id., p. 222, pp. 178-189.

Pecorelli v. Monsanto
January 22, 2021
Page 18

stopped spraying Roundup sometime between 2000 and 2005 for the landscaping business.[91]

Mark testified that his father used Roundup at his home at ████████████ ██████ from 1975/1976 until approximately 2000.[92] He sprayed Roundup around their above-ground pool and along the side of the garage on the pea-gravel walkway.[93] There was pea gravel about 4 feet wide around the 18' round pool and about four feet wide and 20 to 25 feet long for the walkway.[94] It took his father about 10 minutes to spray these areas[95] and he sprayed once every two months or approximately twice per year.[96] Mark had taken over most of the yardwork at their home before 2000, and his father's use of Roundup had declined by then as well.[97] As their back yard oak tree matured, there was more shade and less weed growth.

Mark Pecorelli testified that his father always wore a one-piece long, sleeved and zippered denim jumpsuit while mixing Roundup at the nursery.[98]  He wore leather steel-toed boots. He wore eyeglasses that were safety work glasses and a mask with filter cartridges.[99] He always washed his hands with soap and water after mixing the product.[100]

He wore jeans and a denim, long-sleeved shirt or the jumpsuit when spraying Roundup at home. He always wore the jumpsuit, mask and eyeglasses when spraying Roundup for his business. He removed his clothing before leaving the nursery and brought them home for laundering. The work clothes were washed after each use, and he would put on clean work clothes to spray at home rather than wear the same ones from work. [101]

Mark testified that his father may have worn gloves when handling "a sticker bush or something like that" but he did not always wear gloves when using Roundup.[102]

---

[91] Id., pp. 196-197.
[92] Id., p. 198, p. 200.
[93] Id., p. 202.
[94] Id., pp. 203-206.
[95] Id., p. 208.
[96] Id., p. 204.
[97] Id., pp. 198-199.
[98] Id., p. 227.
[99] Id., pp. 227-231.
[100] Id., p. 231.
[101] Id., pp. 250-254.
[102] Id., p. 229.

Pecorelli v. Monsanto
January 22, 2021
Page 19

He used a 5 gallon backpack sprayer for application in all aspects of his business and home spraying.[103] He had about 4 or 5 backpacks that were maintained over the years. The hand pump sprayer had a three foot rubber hose attached to a wand with a squeeze trigger.[104] The nozzles were adjusted to control the spray and he used a pin to clean the tips.[105] His father rinsed the tank at the well when he was finished spraying.[106]

Mark testified that his father typically sprayed in the morning when the temperature and wind conditions were the best for spraying. He was careful to avoid any run-off or waste of the product.[107]

There was a fuel tank at the nursery, but his father did not usually use it; the employees typically filled the tractors and the lawnmowers with fuel.[108] Additionally, there was a trailer on the nursery property where they kept supplies, but there were no buildings on the property.[109]

Mark testified that his father used Scott's Turf Builder Weed and Feed granules on the lawn at his home.[110] He used liquid 2,4-D (possibly Weed-B-Gon) which was added to the original "industrial" Roundup concentrate, but not the PRO concentrate.[111] He believes the 2,4-D was added to the Roundup and used at the hedge line at the nursery where there were no plants.[112] They also used lady bugs and praying mantis as pesticides for the plants.[113] Mark also recalled that they occasionally used Surflan and/or Treflan in the holes left after digging up nursery plants to prevent weeds from growing there. He testified that they "didn't use it that much."[114] It was in granular or powder form and they used it in small amounts; coffee cans full.[115] For example, two coffee cans (about 4 pounds) per year after a truck dug a large shade tree out of the ground. Mark also recalled

---

[103] Id., p. 232.

[104] Id., pp. 234-236.

[105] Id., p. 239.

[106] Id.

[107] Id., pp. 248-250.

[108] Id., p. 94.

[109] Id., p. 19.

[110] Id., pp. 144-145.

[111] Id., pp. 262-263.

[112] Id., p. 142.

[113] Id., p. 82.

[114] Id., p. 84.

[115] Id., p. 83 and p. 102.

Pecorelli v. Monsanto
January 22, 2021
Page 20

that his father used Diazinon in pellet form for grubs; he thought it might be the same thing as Sevin. "It's to kill the bug so it doesn't kill the plant."[116] His father used Goop hand cleaner and this is what he referred to as a solvent on the Plaintiff Fact Sheet.[117]

His father wore the jumpsuit whenever he sprayed a liquid and the two piece denims when applying the granules with a cyclone spreader.[118] The Sevin was applied once per year for about 10 jobs.[119] The Weed and Feed was applied two or maybe three times in a season on "not too many jobs;" it was more often when he had the maintenance business before 1978.[120]

Mark testified that his father believed that Roundup caused his NHL. In around 2005 after his cancer diagnosis, his father told him to stop using Roundup, that it was no good and to "stay away from it."[121]

**Summary of Telephone Interview with Mark Pecorelli, January 12, 2021**

In this telephone interview, Mr. Mark Pecorelli provided an overview of his father's businesses and confirmed specific details from his deposition testimony regarding his father's Roundup use and exposure to other chemicals.

According to Mark, Michael Pecorelli started his landscaping business in 1953 wherein he performed weekly lawn maintenance (such as mowing and trimming) for his residential clients. In approximately 1975, Michael Pecorelli opened a three to four acre retail garden center where he sold gardening supplies, sod and plants that he purchased wholesale. He continued operating both the retail center and weekly lawn maintenance until about 1978 when he purchased a large parcel of land and developed about 20 acres into the Windy City Nursery for growing mature landscaping plants. From 1978 until the mid-2000s, Mr. Michael Pecorelli actively operated the nursery and a landscape design and installation business under the name of Windy City Landscaping and Nursery. Mark worked with his father in all of the aforementioned businesses.

Mark reported that Michael Pecorelli used Roundup at his home residence, the retail garden center, the nursery and at the properties of his clients in the landscape design

---

[116] Id., p. 89.

[117] Id., p. 93.

[118] Id., pp. 263-268.

[119] Id.

[120] Id., pp. 269-270.

[121] Id., pp. 291-292.

Pecorelli v. Monsanto
January 22, 2021
Page 21

and installation business. He began using Roundup at the garden center and at his home residence when it became available in 1975 or 1976. Mr. Pecorelli initially used the Roundup concentrate that was only available for professional users such as farmers and then used Roundup Pro when it became available.

For clarity, the telephone interview was structured according to the four locations where Michael Pecorelli applied Roundup. Mark was questioned about his father's Roundup exposure at each of the four locations and the following sections summarize his responses.

**Home residence**: Mr. Michael Pecorelli used Roundup at his home property from approximately 1976 to 2000. He primarily sprayed the pea-gravel surrounding the above-ground pool and in the walkway along the side of the garage; the pool was removed in 1997 but he continued spraying the other areas until 2000. Mark stated that he helped his father with the yard work, but his father generally did the Roundup spraying. He estimated that depending on their growth, the weeds typically needed to be sprayed twice a year. He reported that his father sprayed Roundup with a backpack sprayer; it required about 10 minutes each time.

**Retail Garden Center**:  Mark stated that his father was the only person who mixed and sprayed Roundup at the three to four acre garden center. He mixed the "industrial" strength Roundup as directed and applied it with a backpack sprayer to the areas around the plant stock. The shrubs and trees were in containers (from one to 25 gallons in size) or transplanted in the ground to ball and burlap with bark mulch around them. At the garden center, his father mixed and sprayed Roundup about two to four times per week for about two hours at a time. Spraying took place between April and August. He stated that, to the best of his recall, his father may not have worn gloves while using Roundup at the garden center.

**Windy City Nursery**: At the nursery farm, his father did all of the Roundup mixing and most of the spraying. When he bought the property in 1978, he immediately sprayed the land to kill the weeds, cultivated the ground and then planted. Transplants were grown into mature landscaping material. Michael Pecorelli sprayed Roundup around the plants and between the rows. Mark explained that a 4'x4' space would contain one plant so when the transplant was young, there was lots of space for weeds to grow and therefore, a lot of area to spray. Mark explained that his father sprayed the nursery in sections, rather than all at one time, and each section was sprayed twice per season. His father generally started spraying at the nursery in May after the weeds had come up, and then

Pecorelli v. Monsanto
January 22, 2021
Page 22

again in late summer/early fall. He estimated that his father probably sprayed Roundup 10 to 15 days each time, for up to 7 or 8 hours per day. His father sprayed at the nursery consistently until about 2000; thereafter, his ankles and legs began swelling up and he couldn't maintain the same workload.

All of the spraying around the plantings at the nursery was done with a backpack sprayer. Mark reported that the nozzle would clog frequently, his father carried a pin with him to clear it out as he sprayed. He is not sure if his father wore gloves or how often, but he remarked that if his father were wearing gloves, he would had to have taken them off to use the pin. He also saw his father blow through the nozzle to clear the clogs. Mark reported that the backpack sprayers sometimes leaked the Roundup solution from the orange airhole at the top while they were spraying. The triggers and the wands often leaked, and there were occasions when the hose blew off the sprayer.

There was an area at the nursery that didn't contain any plantings and consisted of weeds and grass (see upper right corner of photograph in **Figure 1**). There were also times when the weeded area became too overgrown to mow so Mr. Pecorelli sprayed the area with a 4'-6' bar sprayer pulled behind a tractor. The nozzles on the bar frequently clogged up and had to be corrected or the "chemical was wasted." Mark remarked that his father made sure that the sprayers were working effectively and stopped spraying to clear any clogged nozzles to avoid wasting the expensive chemical. He reported that the Roundup solution dripped on his father's hands and down his arms while he worked to unclog the nozzles on the spray bar.

Mark reported that there was no running water at the nursery for his father to wash his hands after handling Roundup. His father had remarked on occasion while eating lunch at the nursery that he was "eating" the Roundup. They lived about an hour's drive from the nursery so unless they stopped for dinner on the way home, they didn't wash their hands with soap and running water until they got home. Mark stated that sometimes they showered at night before going to bed; other times, they showered in the morning before going to work.

**Landscaping jobs**:   The landscape design and installation part of the Windy City Landscaping and Nursery business typically performed about 25 jobs per year. These jobs involved installing entire landscapes, both residential and commercial. His father would go to the job and spray the lot with "lots of Roundup" before grading was done. Mark described that his father would often have to spray tall plant and weeds, getting drift on himself. Since the aim was to kill all the vegetation, he noted that his father would "go

Pecorelli v. Monsanto
January 22, 2021
Page 23

a little wild" with the spraying. He also noted that his father would come in contact with the Roundup as he walked through the sprayed weeds. Mark stated that when using so much Roundup, his father couldn't avoid getting it on him. He estimated that his father sprayed Roundup about 6 to 8 hours per week during the month of July.

Mark reported that he himself was usually the one who applied the malathion and Diazinon which were used for bagworms, but he didn't use it very often. Mark was also the Surflan applicator; his father did not handle the Surflan. His father used Sevin occasionally for roses.

**Exposure Factors**

Mr. Pecorelli sustained steady Roundup® exposures through direct application of Roundup® from approximately 1975 to 2000 (25 years).

Mark Pecorelli reported that his father carried a pin to unclog the nozzles which clogged frequently from touching the tip on the ground or from material in the tank. He stated that his father often blew through the nozzles to clear them. The triggers and the wands often leaked. There were occasions when the hose blew off the sprayer.[122]

**Roundup Product Used**

Mark testified that his father always used brand name Roundup.[123] He used Roundup Pro which did not require a "sticker"[124] or surfactant. Mark Pecorelli found a Roundup Pro label in the trailer at the nursery about a year prior to his deposition and saved it. (See **Figure 2** below.) He believes that his father removed the label from the container before disposing of it because it had instructions and phone numbers on it.[125] Prior to using the Roundup Pro, they used "regular Roundup," to which they added a surfactant.[126] Michael Pecorelli  purchased Roundup from the farm service in Woodstock and later, from Shermin's Landscape Supplies in Addison.[127]

---

[122] Telephone interview with Mark Pecorelli.

[123] Deposition of Mark Pecorelli, November 12, 2019, p. 150.

[124] Id., p. 21.

[125] Id., p. 19.

[126] Id., p. 21.

[127] Id., pp. 151-152.

Pecorelli v. Monsanto
January 22, 2021
Page 24





**Figure 2. Roundup Pro label per deposition of Mark Pecorelli, Exhibit 2**

## Personal Protective Equipment (PPE)

Mark Pecorelli testified that his father always wore a one-piece denim jumpsuit while mixing and applying Roundup at the nursery and in his landscaping business.[128]  He wore

---

[128] Id., pp. 227, 251.

Pecorelli v. Monsanto
January 22, 2021
Page 25

the long-sleeved, zippered suit with leather steel-toed boots. He wore eyeglasses that were safety work glasses and a mask with filter cartridges.[129] He always washed his hands with soap and water after mixing the product.[130]

Mr. Pecorelli wore jeans and a denim, long-sleeved shirt or the jumpsuit when spraying Roundup at home.

## Potential Confounding Exposures

**Table 2** summarizes toxicological findings pertaining to potential confounding exposures as revealed in deposition and in telephone interview with Mark Pecorelli.

**Table 2**

**Additional Interview Questions Presented to Mark Pecorelli**

| Potential Causative Factors | Comments |
|---|---|
| Family medical history | Yes |
| Alcohol consumption history | Only beer occasionally |
| Smoking history and pack-year calculations | Yes (34-70 pack-years) |
| Drugs-of-abuse | No |
| Any history of obesity? | No |
| Prior pharmacological regimens | No |
| Any history of prior hematopoietic malignancies or other cancers? | No |
| Ever been prescribed long-term immunosuppressive pharmaceuticals such as prednisone? | No |
| Ever prescribed cyclophosphamide or any other drugs to treat cancer prior to NHL treatment? | No |
| History of organ transplant? | No |
| Ever been diagnosed with HIV, AIDS? | No |
| Ever been diagnosed with Hepatitis B or C? | No |
| Ever been diagnosed with Crohn's disease? | No |
| Ever been diagnosed with rheumatoid arthritis? | No |
| Ever been diagnosed with ulcerative colitis? | No |
| Significant radiological exposures or CT scans prior to NHL treatment? | No |

---

[129] Id., pp. 227-231.

[130] Id., p. 231.

Pecorelli v. Monsanto
January 22, 2021
Page 26

**Table 2**

**Additional Interview Questions Presented to Mark Pecorelli**

| Potential Causative Factors | Comments |
|---|---|
| Ever lived near or adjacent to a Superfund site? | No |
| Paint and/or paint solvent exposure? | No |
| Exposure to benzene? | No |
| Exposure to petroleum products? | No |
| Any unusual or chronic gasoline exposures? | No |
| Use of solder for pipe welding? | No |
| Ever welded pipes? | No |
| Ever used plumbing PVC glue? | No |
| Use of a wasp killer or other insecticide/pesticide? | Possibly some limited use |
| Use of Ortho Weed B Gon or herbicide other than Roundup? | No |
| Ever used 2,4-D? | Yes |
| Ever used Weed & Feed? | Yes |
| Ever used Snake-A-Way? | No |
| Ever used Sevin? | Yes |
| Use of any other home gardening/landscape chemicals not previously mentioned | Yes<br>See Table 3 |
| Ever farmed or been exposed to livestock? | No |
| Other underlying chemical exposures? | No |

**Summary of Mr. Pecorelli's Use of Diazinon and Sevin**

**Table 3** summarizes Mr. Pecorelli's use of Diazinon (and other chemicals), a chemical known to "possibly" cause NHL in humans. However, based on Mark Pecorelli's testimony, it was used in pellet form rather than an aerosol spray. Per Mr. Pecorelli's deposition:

Pecorelli v. Monsanto
January 22, 2021
Page 27

> "Q. Okay. Any other herbicides that you recall using?
>
> A. Not that I recall. He used some for grubs, Diazinon, pellet form. It comes out of a spreader."[131]

Based upon deposition of Mr. Pecorelli, he seems to have conflated diazinon with Sevin.

> "Q. Well, I just want to make sure. When you referenced Diazinon earlier, were you thinking of two separate things, Diazinon and Sevin Insect Killer, or were you --
>
> A. I think they're together. This was called Diazinon Sevin."[132]

Mark Pecorelli reported personally using Diazinon, which was used for bagworms, and he stated that he was the primary user of it as opposed to his father.  He also used it infrequently.[133] More importantly, the use of pellets in a spreader minimizes potential inhalation and dermal exposures compared to an aerosol spray.

---

[131] Id., p. 83.

[132] Id., pp. 88-89.

[133] Telephone interview with Mark Pecorelli, January 12, 2021.

Pecorelli v. Monsanto
January 22, 2021
Page 28

**Table 3**
**Carcinogenicity of Substances to Which Mr. Pecorelli Reported Potential Exposure**

| Name | Ingredients (per MSDS) | Known to Cause NHL? | Probable Human Carcinogen? | Comments |
|---|---|---|---|---|
| 2,4-D | Dimethylamine salt of 2,4-D Acid 46.5% | No | No | IARC classified 2,4-D as possibly carcinogenic to humans (Group 2B) based on inadequate evidence in humans and limited evidence in experimental animals. MSDS reports 2,4-D is classified as Group 2B: *Possible human carcinogen*[134] |
| Diazinon | Diazinon 100% | **YES** | **YES** | Limited evidence of carcinogenicity in humans for non-Hodgkin lymphoma and lung cancer. Evidence in humans is from studies of agricultural exposures in the USA and Canada published since 2001. Classification of diazinon in Group 2A was also based on strong evidence that diazinon induced DNA or chromosomal damage. IARC and the MSDS reports diazinon is classified as an IARC Group 2A: Probable human carcinogen[135] |
| Goop Hand Cleaner | Petroleum distillates, Hydrotreated (light), 33.25%, Water, c9-11-Pareth-8, Oleic acid, triethanolamine, glycerin, DMDM Hydantoin, fragrance | No | No | "This product , when used in accordance with instructions, presents no immediate or long-term health hazard.[136] |
| Scott's Turf Builder | Ingredients are withheld | No | No | MSDS indicates no carcinogens[137] |
| Sevin-5 | Carbaryl [63-25-2] 5% | No | **YES** | MSDS indicates product contains a carcinogen[138]. Carbaryl is an EPA "likely human" carcinogen due to kidney and liver cancer risk in animals. Human studies revealed no consistent associated risk.[139,140,141] Carcinogenicity of quartz is limited to lung cancer via inhalation. |
| Surflan | Oryzalin, 40.4%, glycerin <30%. Oryzalin: 3,5-dinitro-$N^4,N^4$-dipropyl sulfanilamide | No | YES | Oryzalin is carcinogenic in rats, based on an increase in mammary gland tumors in females and skin and thyroid tumors in both sexes. It has been classified as a Group C carcinogen. SDS reports that oryzalin is a carcinogen under Cal. Prop. 65.[142] |
| Treflan | Alpha, alpha, alpta-Trifluoro-2,6-dinitro-N,N-dipropyl-p-toluidine {Trifluralin} and other proprietary ingredients | No | No | Contains naphthalene which has caused causer in some lab animals but not anticipated to be a carcinogenic risk to humans.[143] |

Pecorelli v. Monsanto
January 22, 2021
Page 29

**Scope of Exposures and Exposure-Day Calculations**

Since Mr. Pecorelli's occupational exposure was much greater than his residential exposure, only his occupational use of Roundup has been included in the following quantitative exposure calculations. Also his Roundup exposures at the retail garden center, while significant, are difficult to calculate with the information provided. Hence, the garden center exposures have not been included within the calculations for occupational 8-hour time-weighted exposure. Thus, his total exposure is *significantly underestimated* herein.

**Table 4** summarizes the calculation of Mr. Pecorelli's occupational Roundup® exposures. The descriptions of the Roundup® products used, frequency of applications and exposure intervals were obtained from the available records which include the Plaintiff Fact Sheet, Mark Pecorelli's deposition testimony and a telephone interview of Mark Pecorelli conducted on January 12, 2021.

Pecorelli v. Monsanto
January 22, 2021
Page 30

**Table 4**

**Calculation of Mr. Michael Pecorelli's Roundup® Exposure Days**

| Location | Dates | Years | Events Per Year | Hours Per Event | Total Hours | Exposure Days (8 hours/day) |
|---|---|---|---|---|---|---|
| ~~Retail Garden Center~~ | ~~1975-1978~~ | ~~3~~ | ~~3 times per week x 22weeks~~ | ~~2.0~~ | ~~396~~ | ~~49.5~~ |
| Windy City Landscaping and Nursery **Nursery property** | 1978 - 2000 | 22 | 2 | 80 | 3520 | 440 |
| Windy City Landscaping and Nursery **Landscape Clients** | 1978 - 2000 | 22 | 25 x 30%[144] | 2.5[145] | 413 | 52 |
| | | | | Totals: | **3,933** | **492** |

The information compiled in **Table 4** reveals that Mr. Michael Pecorelli sustained a minimum of **492** exposure-days [**3,933** hrs ÷ 8 hrs/day], as a result of his occupational use of Roundup. Based on the deposition of Mark Pecorelli on November 12, 2019, and his interview on January 12, 2021, the actual number of exposure days was much higher as his father's use of Roundup at the garden center and at his home were not included in the above calculation.

**NHL Latency Interval**

On the basis of his first reported exposure to Roundup®, Mr. Pecorelli's latency interval to date of diagnosis was approximately **28 years** (1976-2004).

---

[144] Thirty percent of the 25 landscaping jobs that Windy City Landscaping and Nursery performed each year per deposition of Mark Pecorelli, November 12, 2019, p. 212 and telephone interview.

[145] Midpoint value. Between 1 hour for the small jobs and 4 hours for the largest per deposition of Mark Pecorelli, November 12, 2019, p. 216.

Pecorelli v. Monsanto
January 22, 2021
Page 31

## Glyphosate Human NHL Studies

My toxicological opinions with respect to dose are based, in part, on six (6) primary epidemiological studies that provide objective data with respect to several prongs of the Bradford Hill criteria. My toxicological opinion is grounded in animal experimental evidence, *in vitro* human studies and human epidemiological studies as summarized within this report and previously provided by Dr. Portier, et al., in the Federal Daubert motion proceedings. Specifically, I have assessed dose response, temporality, latency period, biological plausibility (toxicological mechanisms), coherence (demonstrated by molecular-based studies) and animal studies as well as the strength of association and consistency with the toxicological mechanisms of Roundup formulation ingredients. I have used the six primary epidemiological studies which include Eriksson, et al., 2008,[146] McDuffie, et al., 2001,[147] Andreotti, et al., 2018,[148] Leon, et al., 2019,[149] Zhang, et al., 2019[150] and Pahwa, et al., 2019,[151] primarily with respect to <u>dose assessment</u>.

My toxicological focus on these studies is on study design, statistical power and exposure thresholds at different odds ratios, etc. I am using these study results in my toxicological assessment in conjunction with generally-accepted, peer-reviewed studies on genotoxicity (including direct human studies) mechanisms of action (promotion, etc.) absorption, distribution, metabolism and excretion (ADME), etc. In general, I have relied on studies that have documented the various aspects of the Bradford Hill criteria at or in excess of the 95% confidence threshold. However, I am deferring to the epidemiologist with respect to the internal statistical designs and meta-analysis bio-statistical methodologies employed within each study. Summaries of these six studies are provided below:

---

[146] Eriksson, M., et al., "Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis," 2008, International Journal Cancer, Vol.123, pp. 1657 – 1663.

[147] McDuffie H., et al., "Non-Hodgkin's lymphoma and specific pesticide exposures in men: Cross-Canada study of pesticides and health," 2001, Cancer Epidemiology, Biomarkers & Prevention, Vol.10, pp. 1155 – 1163.

[148] Andreotti, G., et al., "Glyphosate Use and Cancer Incidence in the Agricultural Health Study," 2018, JNCI J Natl Cancer Inst., Vol.110 (5), doi: 10.1093/jnci/djx233.

[149] Leon, Maria, et al., "Pesticide use and risk of non-Hodgkin lymphoid malignancies in agricultural cohorts from France, Norway and the USA," 2019, International Journal of Epidemiology, pp. 1–17.

[150] Zhang, L., et al., "Exposure to Glyphosate Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence," July-September 2019, Mutation Research/Reviews in Mutation Research, Volume 781, pp. 186-206. https://doi.org/10.1016/j.mrrev.2019.02.001

[151] Pahwa, M. et al., "Glyphosate use and associations with non-Hodgkin lymphoma major histological sub-types: findings from the North American Pooled Project," 2019 Jun 27, Scand J Work Environ Health. pii: 3830. doi:10.5271/sjweh.3830

Pecorelli v. Monsanto
January 22, 2021
Page 32

1. **Eriksson, M., et al., 2008 study:**[152]   This is a peer-reviewed, case-control study of exposure to pesticides as a risk factor for non-Hodgkin's lymphoma (NHL) in cases in Sweden between 1999 and 2002. Different exposure levels were classified according to days of exposure.

   In this study, the association of glyphosate exposure with non-Hodgkin's lymphoma followed a dose response pattern with an odds ratio (OR) of 1.69 for 10 days of exposure or less, and 2.36 for greater than 10 days of exposure.

   The human epidemiological studies have demonstrated statistically significant increased rates of NHL associated with glyphosate exposure. These studies include several different "exposure day" thresholds:  "ever/never," greater than one day and <10 days and greater than 10 days.

2. **McDuffie, H., et al., 2001:**[153]   This is a Canadian case-control study which investigated the association of specific pesticides and non-Hodgkin's lymphoma that created dose-response levels based on days/year of personally mixing or applying herbicides. The study revealed that glyphosate exposures between >0 and ≤ 2 days per year had an NHL odds ratio (OR) of 1.0 while exposures greater than 2 days of exposure per year had an NHL odds ratio of 2.12.

   The published McDuffie, et al., study presented "Table 5" in which glyphosate exposure was stratified according to "unexposed," ">0 and ≤2 days," and ">2 days" of per year exposure. The study documented statistically significant dose-responses: an odds ratio of **2.12** (1.20–3.73) for the ">2 days" per year group which was statistically significant.

3. **Andreotti, G., et al., 2018:**[154] The "Agricultural Health Study" (AHS) is an ongoing cohort study which includes 54,251 licensed pesticide applicators from Iowa and North Carolina with 82.8% reporting use of glyphosate. The study is funded by the National Cancer Institute and the National Institute of Environmental Health.[155] An updated

---

[152] Eriksson, M., et al., "Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis," 2008, International Journal Cancer, Vol.123, pp. 1657 – 1663.

[153] McDuffie H., et al., "Non-Hodgkin's lymphoma and specific pesticide exposures in men: Cross-Canada study of pesticides and health," 2001, Cancer Epidemiology, Biomarkers & Prevention, Vol.10, pp. 1155 – 1163.

[154] Andreotti, G., et al., "Glyphosate Use and Cancer Incidence in the Agricultural Health Study," 2018, JNCI J Natl Cancer Inst., Vol.110 (5), doi: 10.1093/jnci/djx233.

[155] Id.

Pecorelli v. Monsanto
January 22, 2021
Page 33

evaluation of glyphosate and cancer risk was conducted in the AHS[156] and included cancer incidences through 2012 in North Carolina and 2013 in Iowa. The reported lifetime days' frequency of pesticide application is shown in **Table 5**.

**Table 5**

**Demographics of "Agricultural Health Study"[157] Cohort (Applicators n = 54,251)**

| Lifetime days of glyphosate use (Quartiles) | Lifetime days of glyphosate use (Tertiles) |
|---|---|
| 1 – 13.74 | 1 – 19.9 |
| 13.75 – 38.74 | 20 – 61.9 |
| 38.75 – 108.4 | ≥ 62.0 |
| ≥ 108.5 | |

Exposure days can be compared to **Table 5** with the corresponding quartiles or tertiles of the Agricultural Health Study to determine if his exposure was consistent with that of these applicators. The Agricultural Health Study did not find a statistically elevated risk of NHL; however, the study is useful with respect to comparison of other epidemiological studies.

4. **Leon, et al., 2019:**[158] In this analysis combining data from >300,000 farmers or agricultural workers from France, Norway and the USA and accruing more than 3.5 million person-years under risk, the possible association between pesticide use and the risk of lymphoid malignancies was investigated. Specifically, the authors investigated the relationship of the "ever use" of 14 selected pesticide chemical groups and 33 individual active chemical ingredients with non-Hodgkin's lymphoid malignancies (NHL). Pesticide use was derived from self-reported history of crops cultivated combined with crop-exposure matrices (France and Norway) or self-reported lifetime use of active ingredients (USA). Cox regression models were used to estimate cohort specific hazard ratios (HRs) and 95% confidence intervals (CIs) which were combined using random effects meta-analysis to calculate meta-hrs.

During follow-up, 2,430 NHL cases were diagnosed in 316,270 farmers accruing 3,574,815 person-years under risk. Moderately elevated meta-HRs were seen for NHL overall or certain subtypes with use of specific pesticides compared with "never" use

---

[156] Id.

[157] Id.

[158] Leon, Maria, et al., "Pesticide use and risk of non-Hodgkin lymphoid malignancies in agricultural cohorts from France, Norway and the USA," 2019, International Journal of Epidemiology, pp. 1–17.

Pecorelli v. Monsanto
January 22, 2021
Page 34

of the same pesticides. In particular, elevated hazard ratios of diffuse large B-cell lymphoma (DLBCL) <u>were seen with glyphosate use</u> (1.36, CI: 1.00–1.85). It is noteworthy that although this study found no association between risk of *all types of NHL overall* and ever use of glyphosate, there was a statistically-elevated risk of borderline significance for DLBCL (the most common type of NHL).

5. **Zhang, L., et al., (2019)**:[159] The Zhang, et al., study is a meta-analysis design that included the most recent update of the Agricultural Health Study (AHS) cohort published in 2018 along with five case-control studies. The study reported that glyphosate-based herbicide (GBH) exposure is associated with increased risk of NHL in humans. Using the highest exposure groups when available in each study, they further reported that the overall meta-relative risk (meta-RR) of NHL in glyphosate-based herbicide exposed individuals was increased by 41% (meta-RR = 1.41, 95% CI, confidence interval: 1.13‑1.75). For comparison, a secondary meta-analysis using high-exposure groups with the earlier AHS (2005) determined a meta-RR for NHL of 1.45 (95% CI: 1.11‑1.91) which was higher than the meta-RRs reported previously.

6. **Pahwa, M. et al., (2019):**[160] In a 2019 study, the associations between glyphosate use and NHL incidence, overall, and by histological sub-type, were evaluated in a pooled analysis of case-control studies. NHL cases were recruited from cancer registries and hospitals in four states between 1991 and 1994, as well as six Canadian provinces. This analysis included 5,131 controls and 1,690 cases of NHL; 647 diffuse large B-cell lymphoma, 468 follicular lymphoma, 171 small lymphocytic lymphoma and 404 other sub-types. The authors found that subjects who had ever used glyphosate had an excess of NHL overall (OR 1.43, 95% CI 1.11-1.83). After adjustment for other pesticides, the OR for NHL overall with "ever use" was 1.13 (95% CI 0.84-1.51) with a statistically-significant association for handling glyphosate more than two days per year (OR 1.73, 95% CI 1.02-2.94, P-trend=0.2). In pesticide-adjusted NHL sub-type analyses, the ordinal measure of lifetime-days was statistically significant (P=0.03) for small lymphocytic lymphoma (SLL) and associations were elevated, but not statistically significant, for "ever years" or "days/year" of use. The authors also showed

---

[159] Zhang, L., et al., "Exposure to Glyphosate Based Herbicides and Risk for Non-Hodgkin Lymphoma:  A Meta-Analysis and Supporting Evidence," July-September 2019, Mutation Research/Reviews in Mutation Research, Volume 781, pp. 186-206. https://doi.org/10.1016/j.mrrev.2019.02.001.

[160] Pahwa, M. et al., "Glyphosate use and associations with non-Hodgkin lymphoma major histological sub-types: findings from the North American Pooled Project," 2019 Jun 27, Scand J Work Environ Health. pii: 3830. doi:10.5271/sjweh.3830

Pecorelli v. Monsanto
January 22, 2021
Page 35

that subjects handling glyphosate more than two days per year had an excess of DLBCL (OR 2.14, 95% CI 1.07-4.28).

These findings (as summarized in **Table 6**) are consistent with results reported from prior meta-analyses but show higher risk for NHL due to the focus on the highest exposure groups. The authors caution on the interpretation of the numerical risk estimates because of the heterogeneity between the studies.

Nevertheless, <u>all</u> of the evidence from these studies of glyphosate-exposed mice support this association in humans and mechanistic studies of glyphosate-induced immunosuppression/inflammation, endocrine disruption, genetic alterations and oxidative stress suggest clinically-plausible links between GBH exposure and NHL development. The authors conclude "*The overall evidence from human, animal and mechanistic studies presented here <u>supports a compelling link</u> between exposures to GBHs[161] and increased risk for NHL.*"

---

[161] Glyphosate-based herbicides.

Pecorelli v. Monsanto
January 22, 2021
Page 36

## Summary of Epidemiological Studies

**Table 6** shows the various exposure parameters and assessment metrics for the six (6) epidemiological studies noted herein.

**Table 6**

**Exposure Parameters for Six Referenced Epidemiological Studies[162]**

| Study | Type of study | Exposure Parameters | |
|---|---|---|---|
| | | **Metrics (dose intervals)** | **Cut-off between Cases and Controls** |
| McDuffie, H. et al., 2001 | Case-control study of men in six Canadian provinces. | Unexposed<br>>0 days and ≤2 days<br>>2 days/year | Cases were diagnosed with STS, HD, NHL or MM between 9/1/1991 and 12/31/1994. Controls did not have NHL diagnoses. |
| Eriksson, M., et al., 2008 | Case-control study of men and women in Sweden | ≥1 day and ≤ 10 days<br>>10 days | Cases were newly diagnosed NHL patients aged 18-74 years. Controls were randomly selected from the population registry. |
| Andreotti, G., et al., 2018 | Prospective cohort study of pesticide applicators | Never use<br>Quartiles ranging from 1 day to ≥ 108.5 days<br>Tertiles ranging from 1 day to ≥ 62.0 days | Cases reported ever use of glyphosate. Reference subjects may have used any other pesticides. |
| Leon, et al, 2019 | Pooled analysis of three agricultural worker cohorts | Ever use | Cases reported ever use of glyphosate. Reference subjects may have used any other pesticides. |
| Zhang, et al., 2019 | Meta-analysis | Ever use | 6 studies included in primary analysis: one cohort and five case-control. |
| Pahwa, M. et al., 2019 | Case-control study | 2 days/year | Subjects handling glyphosate more than two days/year had an excess of DLBCL (OR 2.14, 95% CI 1.07-4.28. |

---

[162] All studies in the table revealed statistically significant increased rates of some type of NHL except Andreotti, et al., 2018. Leon, et al., reported a borderline statistic of 1.36, CI: 1.00–1.85.

Pecorelli v. Monsanto
January 22, 2021
Page 37

**Comparisons of Exposure Days to Human Epidemiological Studies**

The results of the "exposure-day" calculations (based on validated, reported exposure intervals in the above tables) indicate that Mr. Pecorelli's cumulative exposures were above <u>all</u> of the exposure threshold metric cut-offs. . That is, he exceeded the *"ever use"* threshold, the *">0 and ≤ 2 days"* threshold, the *">2 days per year"* threshold, the *"≥1 day ≤ 10 days"* total threshold*, and the *">10 days"* total exposure threshold.

Putting this into a dose-metric context, Mr. Pecorelli's 8-hour time-weighted ***492 exposure-days*** greatly exceeds the greatest exposures defined in all studies including the Agricultural Health Study. (Note that no statistically-significant finding of NHL was reported in the Agricultural Health Study). Thus, Mr. Pecorelli was clearly <u>above the range of exposure metrics for applicators</u> as cited within the human epidemiological studies that revealed *statistically significant increased NHL cases among glyphosate applicators*.

Pecorelli v. Monsanto
January 22, 2021
Page 183

**Summary of Objective Toxicological Factors**

The generally-accepted, peer-reviewed toxicological literature is not based on unsubstantiated, subjective opinions, but rather statistically significant data at the 95% level of confidence. The various 8 prongs of the well-established Braford Hill criteria have been evaluated in my assessment by considering the strength of various associations within genotoxicity and other mechanistic studies, the specificity of the adverse effect(s) as well as their consistencies among different studies.

Additionally, dose-responsiveness has been evaluated among the various genotoxicity and other mechanistic studies as referenced within this report (in some cases using human equivalent dosing (HED methodology). Also, coherence of studies among different study designs has been considered along with latency (temporality) and experimental studies in which animal dose equivalency comparisons to human dosage were assessed.

Expert opinions must always be based on objective, reliable evidence without deviation from the generally accepted methodology. Using the weight-of-evidence methodology of significant findings within the human epidemiological studies that employ dose-metrics, coupled with a scientific understanding of the genotoxic mechanisms, bone distribution/ADME and the mechanisms in which the Roundup mixtures are absorbed, distributed to bone marrow and other locations, retention time in such tissues prior to metabolism and excretion, reliable toxicological opinions are provided.

The evidence of glyphosate potency when applied as a chemical mixture has also been evaluated from both mechanistic findings and dose-response evidence. Mr. Pecorelli's exposure histories have been compared to the dose-metrics in human epidemiological studies with respect to determining whether 8-hour time-weighted exposure day thresholds were exceeded.

Pecorelli v. Monsanto
January 22, 2021
Page 184

## Evidential Considerations

The following evidential factors are useful in formulating an objective toxicological assessment of Mr. Pecorelli with regard to his Roundup® exposures and subsequent NHL diagnosis:

- **Diagnosis:** Mr. Pecorelli's pathology reports provide clinical diagnoses of chronic lymphocytic leukemia CLL (a form of NHL) and marginal zone NHL. Marginal zone lymphoma is uncommon compared to DLBCL, the most prevalent form of NHL.

- **Prolonged Acute Exposure and Absorption:** For approximately (at least) 22 years, Mr. Pecorelli used a backpack sprayer and small tractor sprayer to apply Roundup to his large 29 acre nursery grounds. His son explained that during use, Mr. Pecorelli contacted Roundup on his hands and forearms along with spray drift. He also observed his father using a pin (without gloves) to routinely unclog sprayer heads as well as blowing on the nozzle with his mouth. His son also reported that Mr. Pecorelli typically bathed in the mornings resulting in 12+ hours of dermal exposure before bathing with soap and water.

- **Chronic Glyphosate Exposure:** Mr. Pecorelli mixed and applied Roundup® at a minimum of 22 years. It is uncertain what percent of time Mr. Pecorelli wore gloves or whether or not they were actually *protective* gloves.

- **Dermal Absorption Rates Higher than Presented by Monsanto**:  As previously discussed in great detail, the correct dermal absorption rate for glyphosate ranges between 3% and greater (as opposed to the defective values recently issued by Monsanto's contractor, DTL Laboratory). Additionally, numerous other factors are known to increase skin absorption of glyphosate including (but not limited to) elevated temperatures, continuing to wear herbicide-soaked clothing and gloves, sweating (which contributes to increased skin absorption) and cracked skin as well as the various surfactants formulated in the actual Roundup products (as most of the dermal absorption studies were performed on pure glyphosate without the additives).

- **Personal Protective Equipment (PPE):** Mr. Mark Pecorelli reported that his father always wore a one-piece denim jumpsuit while mixing and applying Roundup at the nursery and in his landscaping business. He wore the long-sleeved, zippered suit with leather steel-toed boots. He wore eyeglasses that were safety work glasses and a mask with filter cartridges.  He always washed his hands with soap and water after mixing the product. However, Mr. Pecorelli wore jeans and a denim, long-sleeved shirt or the jumpsuit when spraying Roundup at home.

Pecorelli v. Monsanto
January 22, 2021
Page 185

- **Mechanism of Carcinogenicity:** Mr. Pecorelli's exposures are to Roundup® product, not to glyphosate alone. Roundup® and glyphosate have been demonstrated in several studies to repeatedly cause DNA damage with promotion by Roundup® being more damaging than glyphosate alone. Genotoxicity is the <u>first stage</u> in cancer formation. Wozniak, et al.,[466] and other studies as referenced in this report further demonstrated that Roundup®, at a higher dose, was even able to impede the natural repair of damaged DNA.

  The George, et al., study[467] documented cancer promotion at relatively low dermal exposure doses in mice. The dose levels, when converted to human doses, are reasonably similar to that sustained by applicators (when applying the HED factor and dermal absorption rate of 3%). More importantly, the test model employed DMBA (as found in cigarette smoke/tar). This primary carcinogen was dermally applied at low doses on the shaved skin of mice with no tumors produced unless glyphosate was also applied to the skin in which case 40% of the animals developed tumors (2.8 tumors per animal). The mechanism of glyphosate carcinogenesis is important with respect to tumor promotion among smokers prior to the onset of NHL. The George study reveals substantial promotion (40% of the mice with tumors) with realistic concentrations of glyphosate as compared to that of applicators using HED methodology.

- **Latency of non-Hodgkin's Lymphoma**: The compilation of peer-reviewed latency estimates presented herein (see **Table 21**) demonstrates latency intervals within a typical range of 2 to 25 years. Based upon the study findings, the weight of available evidence indicates that a minimum latency interval of 2 to 25 years is required and is scientifically reliable.

  Mr. Pecorelli's clinical NHL diagnosis and latency of **28 years** was sufficient to exceed the minimal latency requirement. It is noteworthy that studies by Eriksson, et al., (2008) found an increased effect estimate for subjects with more than 10 years of glyphosate exposure prior to diagnosis of NHL; thus <u>favoring a longer NHL latency interval</u>.

---

[466] Wozniak, E., et al., "The mechanism of DNA damage induced by Roundup 360 PLUS, glyphosate and AMPA in human peripheral blood mononuclear cells – genotoxic risk assessment," 2018, Food and Chemical Toxicology, doi: 10.1016/j.fct.2018.07.035

[467] George, J., et al., "Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach," 2010, Journal of Proteomics, Vol. 73, pp. 951 – 964.

Pecorelli v. Monsanto
January 22, 2021
Page 186

- **Scope of Exposure in Comparison to Epidemiological Studies:** Mr. Pecorelli's exposure doses in units of duration and frequency were compared to the reference doses in six epidemiological studies. The studies included Eriksson, et al.[468], McDuffie, et al.[469], Leon, et al., 2019, [470] (study combining data from >300,000 farmers or agricultural workers from France, Norway and the USA), the Agricultural Health Study (AHS), Pahwa, M. et al., 2019 [471] and Zhang, L., et al., (2019). [472]

  The Zhang, et al., study is a meta-analysis design that included the most recent update of the Agricultural Health Study cohort published in 2018 along with five case-control studies. Mr. Pecorelli's calculated 8-hour, time-weighted exposure dose of ***492 exposure-days*** was consistently <u>in excess</u> of the threshold exposure doses reported within all of the studies revealing statistically significant increased rates of NHL.[473]

---

[468] Eriksson, M., et al., "Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis," 2008, International Journal Cancer, Vol.123, pp. 1657 – 1663.

[469] McDuffie H., et al., "Non-Hodgkin's Lymphoma and Specific Pesticide Exposures in Men: Cross-Canada Study of Pesticides and Health," 2001, Cancer Epidemiology, Biomarkers & Prevention, Vol.10, pp. 1155 – 1163.

[470] Leon, Maria, et al., "Pesticide use and risk of non-Hodgkin lymphoid malignancies in agricultural cohorts from France, Norway and the USA," 2019, International Journal of Epidemiology, pp. 1–17.

[471] Pahwa, M. et al., "Glyphosate use and associations with non-Hodgkin lymphoma major histological sub-types: findings from the North American Pooled Project, 2019 Jun 27. Scand J Work Environ Health. pii: 3830. doi:10.5271/sjweh.3830

[472] Zhang et al., "Exposure to Glyphosate-Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta- Analysis and Supporting Evidence," 2019, Mutation Research-Reviews in Mutation Research https://doi.org/10.1016/j.mrrev.2019.02.001

[473] The Leon study was of borderline statistical significance (@ 95% confidence interval, but not exceeding it).

Pecorelli v. Monsanto
January 22, 2021
Page 187

## Summary and Conclusions

My toxicological assessment of the current matter includes assessment of the human epidemiological studies discussed above, the dose/response (biological gradient), strength of association, consistency and coherence of the six primary studies and the studies of various chemical formulants and additives found in the Roundup product as well as experimental evidence including absorption, distribution (*i.e.,* measurement in bone marrow), metabolism and excretion (ADME) and the various mechanisms of carcinogenesis (including genotoxicity, impairment of DNA repair mechanisms and promotion). Additionally, I have focused on dermal absorption, the manner and degree to which Roundup penetrates the clothing, skin, the lack of adequate PPE and additive toxicological effects of POEA and POEA derivatives used in the product. I have carefully examined Mr. Pecorelli's history for any potential  toxicological factors and have found a positive, first generation family cancer and a 34 to 70 pack-year smoking history. However, CLL and marginal cell NHL are not causally linked to smoking in the aforementioned, peer-reviewed human epidemiological studies.[474]

Based on the findings of applicable studies as noted herein and on the basis of sufficient exposure, dose, duration and episodic exposures to Roundup® consistent with the human exposure durations in the epidemiological studies, it is my opinion, to reasonable toxicological certainty, that Mr. Pecorelli's exposure to Roundup® was a substantial contributing factor to his development and subsequent diagnoses of CLL/marginal cell NHL.

William R. Sawyer, Ph.D.
Chief Toxicologist

---

[474] See above Figure 17, "Table 3" from Taborelli, et al., study results as published (2017).