# EXHIBIT 10

```
 1                UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

 2

 3   IN RE:  ROUNDUP PRODUCTS      |  MDL No. 2741

                                   |

 4   LIABILITY LITIGATION          |

                                   |

 5   ----------------------------|

     This document relates to:    |

 6                                 |

     John Schafer v. Monsanto Co. |

 7   Case No. 3:19-cv-02169        |

                                   |

 8   ----------------------------|

 9

10                        - - -

11              Tuesday, February 16, 2021

12                        - - -

13

14        This is the Remote Videotaped Deposition of

15   WILLIAM SAWYER, Ph.D., commencing at 8:34 a.m., on

16   the above date, before Susan D. Wasilewski,

17   Registered Professional Reporter, Certified Realtime

18   Reporter, Certified Manager of Reporting Services,

19   Certified Realtime Captioner, and Florida

20   Professional Reporter.

21                        - - -

22              GOLKOW LITIGATION SERVICES

23          877.370.3377 ph | 917.591.5672 fax

24                  deps@golkow.com

25
```

```
 1    APPEARANCES VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:

 2       MOLL LAW GROUP

         BY:  REBECCA FREDONA, ESQUIRE

 3            rfredona@molllawgroup.com

         22 West Washington Street, 15th Floor

 4       Chicago, Illinois 60602

         Phone:  (312) 462-1700

 5       Representing the Plaintiff

 6

 7

 8       NELSON MULLINS RILEY & SCARBOROUGH LLP

         BY:  MICHAEL W. HOGUE, ESQUIRE

 9            michael.hogue@nelsonmullins.com

         1320 Main Street, 17th Floor

10       Columbia, South Carolina 29201

         Phone:  (803) 799-2000

11       Representing Defendant Monsanto Company

12

13

14    ALSO PRESENT VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:

15       CARRIE HOWARD, Videographer

16

17

18

19

20

21

22

23

24

25
```

William Sawyer, Ph.D.

```
 1                         - - -
 2                      I N D E X
 3                         - - -
 4    Testimony of:  WILLIAM SAWYER, Ph.D.          PAGE
 5         DIRECT EXAMINATION BY MR. HOGUE.............  5
 6         CROSS-EXAMINATION BY MS. FREDONA...........  96
 7         REDIRECT EXAMINATION BY MR. HOGUE...........  98
 8
 9
10                      E X H I B I T S
11                 (Attached to transcript)
12     WILLIAM SAWYER, Ph.D., DEPOSITION EXHIBITS     PAGE
13    Exhibit 1   Defendant Monsanto Company's Notice     6
                  of Remote Video Conference Deposition
14                of William Sawyer, Ph.D.
15    Exhibit 2   Invoice #11581                          7
                  Toxicology Consultants & Assessment
16                Specialists, LLC
17    Exhibit 3   Expert Report                           8
                  Toxicology Consultants & Assessment
18                Specialists, LLC
19    Exhibit 4   Curriculum Vitae                        8
                  William R. Sawyer, Ph.D.
20
      Exhibit 5   Trials and Depositions - Past Three     9
21                Years
22
23
24
25
```

William Sawyer, Ph.D.

```
1                    - - -

2           THE VIDEOGRAPHER:  We are now on the record.

3     My name is Carrie Howard and I am the

4     videographer for Golkow Litigation Services.

5           Today's date is February 16th, 2020, and the

6     time is 8:34 a.m. Eastern.

7           This remote video deposition is being held

8     in the matter of Roundup Products Liability

9     Litigation.  This is for the United States

10    District Court, Northern District of California.

11          The deponent is Dr. William Sawyer.

12          Now, all parties to this deposition are

13    appearing remotely and have agreed to the witness

14    being sworn in remotely.  Due to the nature of

15    remote reporting, please pause briefly before

16    speaking to ensure all parties are heard

17    completely.

18          Now will counsel please identify themselves.

19          MR. HOGUE:  Michael Hogue for Monsanto.

20          MS. FREDONA:  Rebecca Fredona on behalf of

21    the Plaintiff.

22          THE VIDEOGRAPHER:  And the court reporter is

23    Ms. Susan and will now swear in the witness.

24          THE COURT REPORTER:  Would you raise your

25    right hand?
```

William Sawyer, Ph.D.

```
 1          Do you solemnly swear or affirm the

 2     testimony you're about to give will be the truth,

 3     the whole truth, and nothing but the truth?

 4          THE WITNESS:  Yes, I do.

 5          THE COURT REPORTER:  Thank you.

 6          MR. HOGUE:  I hate to say this, but can I go

 7     off the record a second?  My dad is in the

 8     hospital and he's calling right now.  Just one

 9     second and I'll be right back with you.

10          THE WITNESS:  Certainly.

11          THE VIDEOGRAPHER:  That's okay.  The time is

12     8:35 a.m. and we're off the record.

13          (Recess from 8:35 a.m. until 8:42 a.m.)

14          THE VIDEOGRAPHER:  The time is 8:42 a.m. and

15     we're on the record.

16          WILLIAM SAWYER, PhD, called as a witness by

17     the Defendant, having been duly sworn, testified as

18     follows:

19                    DIRECT EXAMINATION

20     BY MR. HOGUE:

21     Q.   Dr. Sawyer, my name is Michael Hogue.  We --

22     you may not recall.  We met briefly about a year or

23     two ago.  One of my colleagues, I believe Eric

24     Paine, was taking your deposition.  I came down to

25     the Sanibel, Florida area, although I haven't had a
```

 1    chance to, you know, ask questions before, but,

 2    anyway, I wanted to walk you through the -- kind of

 3    the Schafer case and ask some questions about it.

 4         We sent a deposition notice and you said

 5    yesterday that you had that and we'll mark that as

 6    Exhibit 1.

 7         (Sawyer Exhibit 1 was marked for

 8    identification.)

 9    BY MR. HOGUE:

10    Q.   Did you receive that?  Did you look at the

11    document request in the notice of deposition?

12    A.   Yes.

13    Q.   Other than your report and your CV and the

14    materials that were served with your report, your

15    list of materials, your list of testimony, is there

16    anything else that you are relying upon for your

17    opinions?

18    A.   No.

19    Q.   Did you bring any additional materials with

20    you that weren't already served?

21    A.   No.

22    Q.   Okay.  When did you get -- first get

23    involved with the case related to Mr. Schafer?

24    A.   Approximately May of 2020.

25    Q.   Okay.  And how did you become involved?

William Sawyer, Ph.D.

```
 1      A.   I received a phone call from Attorney Moll.

 2      Q.   And how much time have you spent working on

 3   Mr. Schafer's case?

 4      A.   I did pull out invoices after our deposition

 5   yesterday, so I do have that invoice and I can

 6   e-mail it to you right now if you'd like.

 7      Q.   Okay.  My e-mail is Michael --

 8      A.   Hang on.  Let me just go to the tab, you

 9   know, and then I can click on that and e-mail it.

10      A.   Okay.  Michael, I'm ready.

11      Q.   It's Michael -- M-i-c-h-a-e-l-- .Hogue --

12   H-o-g-u-e --@NelsonMullins -- Mullins is

13   M-u-l-l-i-n-s -- .com.

14      A.   Okay.  It's on its way.

15      Q.   All right.  We're going to mark as Exhibit 2

16   these invoices so that -- and if it's okay, we can

17   either get from me or the witnesses these exhibits

18   and I'll get it to the court reporter after the

19   deposition, but Exhibit 1 will be the notice of

20   deposition, Exhibit 2 will be these invoices.

21           (Sawyer Exhibit 2 was marked for

22   identification.)

23   BY MR. HOGUE:

24      Q.   All right.  Any other documents other than

25   these invoices?
```

William Sawyer, Ph.D.

```
1       A.   No.

2       Q.   All right.  And we will mark your report as

3    Exhibit 3.

4            (Sawyer Exhibit 3 was marked for

5    identification.)

6    BY MR. HOGUE:

7       Q.   And my question to you, Doctor, is:  Is your

8    -- does your report have the attachments of your CV

9    and materials considered list along with it, or do

10   you want to mark them separately?

11      A.   Well, the MCL is at the end of the report;

12   however, the CV is not.  That would be separate.

13      Q.   So we'll mark your report and matters

14   considered list as Exhibit 3 and your CV as

15   Exhibit 4.  Does that work?

16      A.   Yes.

17           (Sawyer Exhibit 4 was marked for

18   identification.)

19   BY MR. HOGUE:

20      Q.   And in a deposition yesterday there was a --

21   also a listing of the matters where you listed all

22   your testimony for the past, I think, four years; is

23   that right?

24      A.   Three or four years, yes.

25      Q.   Okay.  And you produced that in this case as
```

 1   well; is that right?

 2       A.   Yes.

 3       Q.   Okay.  We'll mark that as Exhibit 5.  That's

 4   the testimony list.

 5            (Sawyer Exhibit 5 was marked for

 6   identification.)

 7   BY MR. HOGUE:

 8       Q.   And the only thing that should be updated

 9   from that is I think you updated with something

10   yesterday, and, obviously, yesterday's deposition as

11   well; is that right?

12       A.   The list of trials and depositions was

13   updated, but the copy you received was the update.

14       Q.   Okay.  But then yesterday's deposition was

15   not on there, right?

16       A.   Oh, no, I didn't -- Jenn has not updated the

17   list since yesterday, no.

18       Q.   All right.  And I think that was the -- was

19   that the Peterson case?

20       A.   Yes.

21       Q.   Okay.

22       A.   Unless you were sleeping through it.

23       Q.   No, I was -- no.  There's -- sometimes I get

24   confused.  I'm on the Schafer case.  So I just want

25   to make sure that's what it was.

William Sawyer, Ph.D.

```
 1      A.   I'm just joking with you, because I get
 2   confused equally.  You'll find that out.
 3      Q.   All right.  Let me see if I've gotten this
 4   e-mail now.
 5           There it is.
 6           MR. HOGUE:  Rebecca, do you have this?
 7           MS. FREDONA:  The testimonial history?
 8           MR. HOGUE:  No, his invoice that he just
 9      sent to me.
10           MS. FREDONA:  I do -- let's see if it came
11      through.  I haven't gotten it.
12           THE WITNESS:  I sent it to Michael.
13           MR. HOGUE:  I will forward you what he sent
14      me, Rebecca.  It's -- let's see if it comes up.
15           No.  What's your e-mail, Rebecca?
16           MS. FREDONA:  Rfredona --
17           MR. HOGUE:  Okay, I got it.  It came up.  So
18      I'm just forwarding you his e-mail with the
19      attachment.
20   BY MR. HOGUE:
21      Q.   So, Doctor, looking at your invoice, which
22   is Exhibit 2, you listed some time started in July
23   1, 2020; is that right?
24      A.   Yes.
25      Q.   And what was your total time?  Did you list
```

William Sawyer, Ph.D.

```
 1    that in total?  32 hours?

 2    A.   Yes.

 3    Q.   All right.  Other than this $15,000 that

 4    you've listed here, is there any other time that

 5    you've spent working on the Schafer case?

 6    A.   No.

 7    Q.   All right.  Are there any other documents

 8    that you brought with you that relate to the notice

 9    of deposition?

10    A.   No.

11    Q.   And I'm excluding things in your report that

12    you've listed, but anything else?

13    A.   No.

14    Q.   All right, Doctor.  You had -- how many --

15    well, did you meet Mr. Schafer in person at any

16    time?

17    A.   No.

18    Q.   Have you had any conversations with

19    Mr. Schafer's other experts?

20    A.   Not -- only an initial call, I think, an

21    initial conference call that might have been -- it

22    should be on the invoice, actually, if there was

23    one.  I'm looking.

24         No, I don't see anything.

25    Q.   Are you relying upon anything that was --
```

William Sawyer, Ph.D.

1     A.   Oh, no, hang on.  I'm sorry.  I see a call

2     on December 15th, but that states Attorney Moll

3     only, so I would have to say no.

4     Q.   Okay.  Did you -- so you're not relying upon

5     anything that any other expert told you specifically

6     about Mr. Schafer or his type of cancer; is that

7     right?

8     A.   Correct.  However, I am relying upon prior

9     work of Dr. Portier and Dr. Ritz with respect to the

10    initial general causation work that they performed.

11    Q.   But not specifically about Mr. Schafer?

12    A.   No.

13    Q.   Okay.

14    A.   I should also state Dr. Weisenburger,

15    Dr. Schiff or Dr. Brand, and Dr. Charles Benbrook.

16    Q.   Okay.  But are those -- you're talking about

17    with respect to specifically Mr. Schafer, or general

18    issues?

19    A.   General causation issues.

20    Q.   Okay.  So you haven't had any conversations

21    with Mr. -- excuse me -- with Dr. Weisenburger about

22    Mr. Schafer's specific case; is that right?

23    A.   Correct.

24    Q.   Have you had any in-person meetings with

25    Mr. Schafer?

William Sawyer, Ph.D.

```
1      A.   No, just two telephone conference

2  interviews, the initial interview and then a

3  follow-up.

4      Q.   And those are listed in your report?

5      A.   Yes, as well as the invoice, and I should

6  point out that on one or two of the calls,

7  Mrs. Schafer was present.

8      Q.   Okay.  And do you recall anything

9  specifically that Mrs. Schafer said?

10     A.   Yes.  If I look at my report, I can answer

11  that.

12     Q.   Okay.  Did you make notations in your report

13  that -- for things that Ms. Schafer said?

14     A.   I believe so.  I'd have to check the report,

15  if you would like.

16     Q.   Okay.  Well, I'll go through the report.  If

17  there's something that Ms. Schafer said that's not

18  in your report, you know, I would want to make sure

19  I know what that is.

20     A.   Understood.  It's just difficult for me to

21  recall things unless we start discussing a specific

22  topic.

23     Q.   Okay.

24     A.   For example -- and I think this is in the

25  report -- Mrs. Schafer seemed to have a better
```

William Sawyer, Ph.D.

1    recall of addresses, actual house numbers and the

2    street names, and she also pointed out that she

3    believed her husband had some memory lapse issues

4    from his accident, I believe when he fell off a

5    horse, but I think some of that is covered in my

6    report, actually.

7        Q.   Okay.  All right.  So you had the two

8    conversations with Mr. Schafer; is that right?

9        A.   Yes.

10       Q.   And, in general, what were those

11   conversations about?

12       A.   Initially, the first interview covered and

13   focused heavily on potential alternative

14   toxicological etiological factors in terms of his

15   general history, in terms of his history, if any, of

16   tobacco, alcohol, drugs of abuse, pharmaceutical

17   regimens, immunosuppressants, other confounding

18   chemicals, radiological exposures; and then I also

19   tested him with respect to his recall of when he

20   sprayed, where, how, personal protective equipment,

21   et cetera.

22            And then during the follow-up interview,

23   that was specific questions where I found I had

24   insufficient information to assess his exposures at

25   specific locations or during certain time intervals;

William Sawyer, Ph.D.

1    and I relied heavily upon his deposition with

2    respect to that information, but when it was not

3    available, I asked questions and included that

4    detail in my report.

5        Q.   Okay.  Did you find there were issues with

6    Mr. Schafer's recollection of how long he was

7    spraying or where he was spraying, those types of

8    details?

9        A.   Well, there were differences at times

10   between his deposition and his plaintiff's fact

11   sheet and his interview and Mrs. Schafer; and

12   wherever possible, I relied on his sworn testimony,

13   and wherever there are differences, I advise you

14   right now, I am not a juror and I'm not going to

15   make a decision on who is right and who is wrong.  I

16   simply put down all the information available, and

17   wherever possible, I rely on his sworn testimony.

18       Q.   Well, you indicated that he had some memory

19   lapse from falling off a horse.  I'm just trying to

20   assess whether you identified areas where he just

21   couldn't recall the type of exposure or not.

22       A.   Yes.  I'll give you a good example.  There

23   was a period of time following his accident and

24   brain trauma in which he stated he did not spray

25   Roundup.  His wife insisted that he did during that

William Sawyer, Ph.D.

1    time and he just couldn't remember.

2         To be on the conservative side --

3    conservative side of the exposure assessment, I

4    excluded that data in its entirety and assumed that

5    he did not spray, even though there is testimony he

6    did.

7         So I -- in all cases I took a conservative

8    position in terms of his spray locations, dates, and

9    times, wherever problem.

10   Q.   So is it your normal practice to take a

11   conservative view of what exposure a plaintiff has?

12        MS. FREDONA:   Objection; form.

13   A.   I'm not sure I understand that question.

14   Are we talking about -- well, you'll have to ask the

15   question again.   I don't fully understand it.

16   Q.   Well, you said that you analyzed the data

17   conservatively for exposure, and I'm just trying to

18   understand, is that your normal practice when you're

19   analyzing exposure for a case?

20   A.   It is.   I present, wherever possible, a

21   minimum and maximum to provide a reasonable range of

22   error, that is an error rate, and when possible, I

23   do so.

24        Now, there are cases where the testimony in

25   the deposition or the plaintiff interview states, "I

```
 1    used it two hours and I know it was two hours," and
 2    I said, "Well, can you give me a range?" and they
 3    say, "No."
 4          Okay.  So that -- in a case like that, I do
 5    not have a range, because I rely on information that
 6    are in the records as facts in the case.  I do not
 7    try to create facts in the case myself, and if the
 8    information is available, I do provide a range, and
 9    in this case I probably have provided a range, as I
10    recall.
11    Q.   Okay.  Are you familiar with the various
12    subtypes of non-Hodgkin lymphoma?
13    A.   Many of them.  I can't say all 105 or
14    whatever, but yeah.
15    Q.   Well, what type of non-Hodgkin lymphoma did
16    Mr. Schafer have?
17          What I'm -- I'm asking if you have an
18    understanding.  Let me ask it this way.
19    A.   I -- yeah.
20    Q.   What is your understanding of Mr. Schafer's
21    type of non-Hodgkin lymphoma?
22    A.   I believe it was a B-cell lymphoma, what we
23    call a follicular cell origin.  I don't recall --
24    I'd have to look at my report to see if there was
25    any further transformations, but I believe it was
```

William Sawyer, Ph.D.

```
1     primarily a B-cell follicular architecture.

2        Q.   All right.  We'll go to your report.  I

3     think on page 5 of your report --

4        A.   Okay.

5        Q.   -- that's where you discuss that he was --

6     are you with me?  Do you have your report?

7        A.   I do.

8        Q.   About the -- under the introduction, about

9     the fourth line down, you say:  "Mr. Schafer was

10    diagnosed with a high-grade follicular lymphoma

11    (grade 3), which later transformed to a diffuse

12    large B-cell lymphoma."

13         Do you see that?

14       A.   I do.

15       Q.   And that's your understanding of what he --

16    the type of non-Hodgkin lymphoma Mr. Schafer had; is

17    that right?

18       A.   Yes.

19       Q.   So he first developed a follicular lymphoma,

20    is that your understandings?

21       A.   That's correct.

22       Q.   Okay.  And that follicular lymphoma at some

23    point in time later transformed from that follicular

24    lymphoma to a diffuse large B-cell; is that right?

25       A.   Yes.
```

William Sawyer, Ph.D.

1      Q.   And you don't have any expertise in

2   determining what subtype of non-Hodgkin lymphoma a

3   patient has, do you?

4      A.   I would not provide that opinion.  I believe

5   that would be, really, a diagnostic opinion.  I

6   fully understand it.  I've been through medical

7   school pathology and I've used pathology throughout

8   the past 34 years of my training and experience, so

9   I understand the mechanisms.  I have a degree, a

10   master's in cellular and molecular biology, I

11   understand the transformation process, but I am not

12   the person to make the diagnosis.  I want to make

13   that clear.

14      Q.   And you would defer to a pathologist or an

15   oncologist for actually determining that subtype of

16   non-Hodgkin lymphoma; is that right?

17      A.   Correct.

18      Q.   Okay.  In some of your cases, you cite to

19   certain subgroups of studies that look at various

20   subtypes of non-Hodgkin lymphoma; is that right?

21      A.   Yes.

22      Q.   And do you believe that the different

23   subtypes of non-Hodgkin lymphoma are different types

24   of cancer?

25      A.   I'll -- I'm not sure I understand the

William Sawyer, Ph.D.

1    question.  There's ICD classification codes for

2    different subtypes of lymphoma.  I'm not sure what

3    you're asking me.  It's too general.

4        Q.   Okay.  So have you seen literature

5    indicating that the different subtypes of

6    non-Hodgkin lymphoma are really different types of

7    cancer?

8            MS. FREDONA:  Objection; form.

9        A.   They all have different genetical

10   configurations and transformations that

11   differentiate the ultimate ICD code name.  Again,

12   the term "cancer" is so general, I don't understand

13   what you're asking me about different types of

14   cancers.  There's cellular and molecular differences

15   between these subtypes that receive different ICD,

16   international code, names.

17           In terms of different types of cancer, I --

18   if you're asking me about general classes, well,

19   certainly a lymphoma is very different than that of

20   a malignancy of the epithelial glandular cells of

21   the colon.  Those are two different types of cancer,

22   but in terms of subtypes of lymphoma, there are

23   cellular and molecular identification processes

24   which differentiate them, but they all share similar

25   stem cell lineage and so forth.

William Sawyer, Ph.D.

1          So I would be cautious about that general

2     term.  I don't know if this is some kind of term

3     that you made up, or what.  I'm not sure.

4          Q.   Okay.  Do you have an opinion on what caused

5     Mr. Schafer's follicular lymphoma to develop?

6          A.   Well, certainly the rather extensive

7     exposure to Roundup over the years, which resulted

8     in approximately 39 eight-hour time-weighted

9     exposure days certainly contributed or caused his

10    malignancy.  That is clear.

11         Q.   Okay.  What studies do you think are

12    reliable for assessing the risk of follicular

13    lymphoma with the use of Roundup or glyphosate?

14         A.   The studies I have listed in Table 7 of my

15    report on page 38.

16         Q.   Okay.

17         A.   Those are studies that provide exposure

18    metrics, which I relied on.  My role in this case is

19    to determine whether or not -- one of my roles, as I

20    pointed out in my introduction of the report, is to

21    determine whether or not the dose -- and the metric

22    in this case is exposure days -- was sufficient to,

23    within a 95 percent confidence interval rate of

24    error, increase the risk of Mr. Schafer developing

25    NHL, and certainly that dose is consistent with

William Sawyer, Ph.D.

1    increased risk in the development of his NHL.

2         And I've also made a very thorough analysis

3    in terms of potential contributing confounding

4    factors.

5    Q.   Doctor, you've mentioned Table 7 on page 38.

6    Those are McDuffie, Eriksson, Andreotti, Leon,

7    Zhang, and Pahwa studies; is that right?

8    A.   Yes.

9    Q.   And under Pahwa, you mentioned that the

10   glyphosate handled more than two days per year had

11   an excess of DLBCL and list an odds ratio of 2.14;

12   is that right?

13   A.   Yes.

14   Q.   In your exposure parameters and your

15   discussion here, it doesn't -- you don't

16   specifically call out any, you know, analyses

17   specifically for follicular lymphoma; is that right?

18        MS. FREDONA:   Objection; form.

19   A.   Not exactly.   These studies, in general,

20   with the exception of that statistic there from

21   Pahwa, generally include follicular in the

22   statistical analysis.

23        One thing I should point out is that I have

24   already been deposed by Monsanto in great detail

25   with respect to the issue of follicular lymphoma in

William Sawyer, Ph.D.

1    the human epidemiologic studies, and specifically

2    these six studies.

3        Q.   Okay.  Well, I guess, for Mr. Schafer's

4    case, would you specifically look for the subgroup

5    analysis of follicular in these six studies?

6        A.   As I've stated in the prior depositions on

7    this issue of follicular lymphoma, there is one

8    study that shows an elevated risk, but it was not

9    statistically significant, and the problem with

10   follicular lymphoma is that it occurs at a much

11   lower frequency than DLBCL, which is the most common

12   type of lymphoma, and the studies lack the

13   statistical power, that is, the what we call a type

14   2 error in biostatistics, to definitively detect the

15   follicular lymphoma because it occurs at such a low

16   background rate.

17       Q.   Okay.  So you wouldn't point to any specific

18   one of these six studies to say that one's the most

19   applicable to follicular lymphoma; is that right?

20       A.   That's correct.

21       Q.   Okay.  You're aware that some follicular

22   lymphomas transform into diffuse large B-cell

23   lymphoma; is that right?

24       A.   Yes.

25       Q.   And what's your understanding of that

William Sawyer, Ph.D.

1    process?

2            MS. FREDONA:  Objection; form.

3        A.   It can occur ultimately from the initial

4    insult that caused the transformation in the first

5    place, or it can also occur secondary to

6    chemotherapy, especially if a heavily mutagenic

7    agent, such as cyclophosphamide, is used, and there

8    are some means for the pathologist to actually look

9    at the biopsy or pathology results and opine upon

10   the transformation process, and in this case I would

11   defer that to a pathologist.

12       Q.   Okay.  So the -- well, Mr. Schafer's diffuse

13   large B-cell came from his follicular lymphoma, is

14   that your understanding?

15           MS. FREDONA:  Objection; form.

16       A.   I'm going to take a look at the report.

17           I see that most of the B-cells are BCL6

18   positive and CD10 positive.  The report also refers

19   to slightly more than 50 percent of neoplastic cells

20   with the ND1 stains, some compatible with follicular

21   lymphoma with a diffuse pattern, cytologically low

22   grade, but discordantly higher proliferative rate;

23   such tumors may behave more like large B-cell

24   lymphoma than low-grade follicular lymphoma; and

25   then following excisional lymph node biopsy on

William Sawyer, Ph.D.

```
 1    February 2nd, 2018, the pathology showed high-grade

 2    follicular lymphoma (grade 3) with germinal center

 3    immunophenotype.

 4         So I would say that the -- I would have to

 5    defer that to the pathologist.  It's not really

 6    clear.

 7    Q.   Okay.  So you don't know whether his diffuse

 8    large B-cell was caused by his follicular lymphoma

 9    transforming to DLBCL or whether it's -- he had two

10    different cancers at the same time; you just don't

11    know, is that what you're saying?

12         MS. FREDONA:  Objection.

13    A.   Well, it would -- go ahead, I'm sorry.

14         MS. FREDONA:  I objected, but you can go

15    ahead.

16    A.   Okay.  Yeah, well, it would appear it's

17    possible that it was a transformation from the

18    follicular, but I'm not sure of that and I would

19    prefer to defer that to the pathologist, as the

20    pathology report is not crystal clear and I think

21    that you're asking a question that really should be

22    answered by the pathologist.

23    Q.   Okay.  Let me ask it this way.  Do you have

24    any opinion whether there's any evidence that

25    Roundup or glyphosate have any effect on follicular
```

William Sawyer, Ph.D.

```
 1    lymphomas transforming to diffuse large B-cell

 2    lymphomas?

 3       A.   I'm not aware of any studies that have been

 4    performed to assess that question.  We know that,

 5    from studies that I've cited in my report, that

 6    certainly Roundup, that is the mixture of the

 7    adjuvants and glyphosate itself, causes mutagenic

 8    transformations in humans, and we know that certain

 9    chemotherapeutic agents, as I said a moment ago, for

10    example, cyclophosphamide is highly mutagenic and

11    can cause transformations.

12           So from a scientific plausibility

13    standpoint, the answer is yes, but I am not opining

14    in this case whether that occurred or not.  I defer

15    that to the pathologist.

16       Q.   Okay.  But you're not specifically -- I

17    think you started off your answer and that's -- I

18    just want to be clear on that, that you're not aware

19    of any study that's looked at patients who had

20    follicular lymphoma, had exposure to Roundup, and

21    determined whether there was any increased risk of

22    them developing diffuse large B-cell lymphoma; is

23    that right?

24           MS. FREDONA:  Objection; form.

25       A.   I don't understand the question.
```

William Sawyer, Ph.D.

```
1       Q.   Yeah.  There's no study looking at patients
2    with follicular lymphoma and then looking at those
3    patients with and without exposure to Roundup to see
4    if they have a higher risk of transformation to
5    diffuse large B-cell; is that right?
6       A.   Right.  I answered that earlier.  I'm not
7    familiar with any such studies.
8       Q.   Okay.  So we're going to look at your expert
9    report, Exhibit Number 3, and did you prepare this
10   report yourself?
11      A.   Yes.  Could I also -- I hate to do this --
12   but ask for just a five-minute break as --
13      Q.   Sure.
14      A.   -- there are some workers doing some
15   exterior work here that are waiting to have a
16   question answered, and so I can probably be back in
17   under five minutes.
18      Q.   Yeah, we can take five or 10, whatever you'd
19   like.  I'm flexible.
20      A.   All right.  Thank you.
21      Q.   What time do you want to say?  It's 9:18 on
22   my telephone.  What time --
23      A.   Let's say 9:25.
24      Q.   9:25, I'll see you then.
25      A.   Okay.
```

William Sawyer, Ph.D.

```
 1              THE VIDEOGRAPHER:  Okay.  The time is

 2       9:18 a.m. and we're off the record.

 3              (Recess from 9:18 a.m. until 9:26 a.m.)

 4              THE VIDEOGRAPHER:  The time is 9:26 a.m. and

 5       we are on the record.

 6  BY MR. HOGUE:

 7       Q.   Doctor, we were just talking about your

 8  report, Exhibit 3.  Does it contain all of your

 9  opinions in this case?

10       A.   Yes.

11       Q.   It includes your general causation opinions

12  as well as your case-specific opinions related to

13  Mr. Schafer; is that right?

14       A.   Yes.

15       Q.   Did you have all the information you needed

16  to come to your conclusions and your opinions?

17       A.   Yes.

18       Q.   All right.  And I think I asked this, but I

19  want to be clear.  All the materials that you're

20  relying upon are in your report or on your materials

21  reviewed list; is that right?

22       A.   Yes.

23       Q.   There's nothing else that I need to be

24  looking at at this point in time?

25       A.   No.
```

William Sawyer, Ph.D.

```
 1      Q.   Is there anything you need to add to your

 2   CV, which is going to be attached as Exhibit 4?

 3      A.   No.

 4      Q.   We've talked about who all that you've

 5   talked to.  Have you talked with anybody else,

 6   Mr. Schafer's friends or family, coworkers, any of

 7   his doctors, anything else?

 8      A.   No, I haven't.

 9      Q.   Okay.  Have you conducted any physical

10   examination of Mr. Schafer?

11      A.   No.  That would be up to the treating

12   physicians.

13      Q.   So what depositions in the case have you

14   read?

15      A.   If you turn to the very last page of my

16   report, I have read Helen Schafer, who is the

17   spouse, the deposition transcript of John Schafer, I

18   believe --

19      Q.   Do you have --

20      A.   I believe that's it.

21      Q.   Okay.  You haven't read any depositions of

22   any treating doctors; is that correct?

23      A.   No, I have not.

24      Q.   Did you review any of Mr. Schafer's medical

25   records?
```

William Sawyer, Ph.D.

```
 1      A.   Yes.
 2      Q.   And did -- did you review all of his medical
 3   records?
 4           MS. FREDONA:   Objection; form.
 5      A.   With respect to -- well, not treatment
 6   records.  I have not reviewed treatment records
 7   other than through pathology, and later pathology
 8   records, but I focused upon review of the medical
 9   records with respect to identification of any prior
10   pharmaceutical regimens or other radiological
11   exposures, such as excessive CT scans, that type of
12   thing, and other evidence of consumption of alcohol,
13   tobacco, and toxic exposures, if any; and I have
14   summarized in my report his medical history and as
15   well as the family medical history of
16   first-generation malignancies within the family
17   history.
18      Q.   Did you summarize and write down in your
19   report any medical record that you found to be
20   important?
21      A.   Yeah.  I mean, if you look at page 8 of my
22   report, you'll see Footnote 5, 6, 7, 8, 9, 10, 11,
23   12, 13, 14 -- 14 footnotes, 7 -- Footnote 17 as
24   well, 16.
25           There's probably 17-plus footnotes to the
```

William Sawyer, Ph.D.

```
 1   medical records, and if you want, I can go through

 2   each one of those footnotes with you, if you'd like.

 3       Q.   I just wanted to make sure there wasn't

 4   something in particular that you wanted to

 5   additionally identify as we sit here today as an

 6   important medical record.

 7       A.   Not beyond what I've already included in the

 8   report.

 9       Q.   Okay.  Table 1 is a summary of Mr. Schafer's

10   medical history 2010 to 2018.  Did you prepare that?

11       A.   Yes.

12       Q.   And that's from your review of the medical

13   records?

14       A.   Right.

15       Q.   All right.  Let's go to page 5 of your

16   report.  Towards the bottom, under the objectives,

17   it says, "One of the primary objectives of this

18   toxicological assessment is to arrive at a

19   scientifically accurate and reliable time-weighted

20   exposure dose for Mr. Schafer based on an 8-hour

21   time-weighted exposure days," and that's "for

22   comparison with the human epidemiologic studies of

23   applicators"; is that right?

24       A.   That's correct.

25       Q.   And why is one of your primary objectives to
```

William Sawyer, Ph.D.

```
1    arrive at a time-weighted exposure dose for the
2    plaintiff based on an eight-hour weighted exposure
3    days?
4        A.   Well, in causation analyses, I follow the
5    Bradford Hill and weight of evidence methodologies.
6    One of the factors, one of the main prongs of the
7    Bradford Hill analysis, is that of dose-response;
8    and it is important to assess that, and that's
9    exactly what I've done.
10       Q.   Okay.  So it's important for your
11   toxicological assessment to be scientifically
12   accurate and reliable in this assessment; is that
13   right?
14       A.   Of course.
15       Q.   And what are the important steps you've used
16   to make an assessment of the scientifically accurate
17   and reliable time-weighted exposure dose for
18   Mr. Schafer?
19       A.   I've reviewed initially the plaintiff fact
20   sheet -- and let me just check the list, but I
21   believe photos -- yeah, the photos of the Roundup
22   product, and the depositions of Mr. and
23   Mrs. Schafer, and the photographs of the Roundup
24   containers, along with a number of -- a pretty large
25   number of deposition exhibits, and I have
```

William Sawyer, Ph.D.

1    interviewed Mr. Schafer twice, along with his wife,

2    who was also present; and I've documented all the

3    sources of the information that I've gathered in

4    calculating the most accurate but conservative

5    assessment of Mr. Schafer's exposure, keeping in

6    mind that there are areas where I've stated in my

7    report insufficient information and I discontinued

8    completely some of his exposures due to lack of

9    sufficient information to make the calculations.

10   Q.   Okay.   On page 6, you say you calculated a

11   cumulative time-weighted dose for Mr. Schafer using

12   a simple additive mathematical methodology in units

13   of eight-hour time-weighted exposure days; is that

14   right?

15   A.   Yes.

16   Q.   And can you describe your simple additive

17   mathematical methodology?

18   A.   Sure.   If you turn to page 31, Table 4,

19   you'll see the calculation methodology, and I used

20   the eight-hour time-weighted average because one of

21   the studies, that is the Eriksson study, a Swedish

22   study, specifically stated in that study that

23   Eriksson was using the Swedish workday as the

24   definition of a exposure day; and after follow-up

25   with the government of Sweden, I learned at one

William Sawyer, Ph.D.

1    point in time they used a six-hour workday, but that

2    was only experimental, and during the time of the

3    Eriksson study, they were using an eight-hour

4    workday in Sweden.

5            So if you look at Table 4, you will see

6    columns of information.  For example, two events per

7    year, at

8    1 1/2 to 2 hours per event, gives total hours,

9    additive methodology of 3.0 minimum, 3.5 max -- or

10   4.0 max with a mid point of 3.5.  That is the simple

11   additive methodology that I'm referring to.

12       Q.   So you identify places and times of

13   exposure, number of events of exposure, and then how

14   long those exposures are, multiply them together to

15   get total hours, and then divide by 8 to get a

16   exposure day; is that right?

17       A.   Yes.  In the far right-hand column, you'll

18   see the label "exposure days 8 hours/day."

19       Q.   Okay.  While we're looking at Table 4, one

20   thing I want to make sure we correct is, if you look

21   at 1995 to 1998, you have, in the mid column

22   exposure days, you have 91.5.  And that, based upon

23   the math, should be 9.  Is that an error in your

24   chart?

25       A.   It is; and, fortunately, that was not added

William Sawyer, Ph.D.

```
 1    in as an error to the final result.
 2       Q.   So the 27 hours would be divided by 8 to get
 3    to 9 eight-hour days, but that doesn't change your
 4    39 total; is that right?
 5       A.   Right.
 6       Q.   So we should just take out that 91.5 and
 7    make it 9, you agree with that, right?
 8       A.   I do.
 9       Q.   Okay.  So has this simple additive
10    mathematical methodology been used in any
11    epidemiology study?
12       A.   Yes.
13       Q.   What study was that?
14       A.   A good example is Eriksson.
15       Q.   Okay.  Does the Eriksson article describe
16    this simple additive mathematical model?
17       A.   Yes.
18       Q.   Okay.  Do you have the Eriksson study
19    available to you?
20       A.   Yes.
21       Q.   Okay.  And can you show me or tell me where
22    in the Eriksson article it makes reference to this
23    simple additive mathematical model?
24       A.   Yes.  On page 1658, second paragraph from
25    the bottom on the left column, last sentence:  As in
```

William Sawyer, Ph.D.

1    our previous lymphoma studies, we used a minimum

2    criteria of one full day exposure to be categorized

3    as exposed.

4           Next, the tables and the method -- the

5    results method and tables show various numbers of

6    these exposure days, such as for glyphosate, less

7    than or equal to 10-day or greater than 10-day, or

8    for phenoxy acids, phenoxyacetic acids, rather, less

9    than or equal to 45 days or greater than 45 days.

10          There's different time intervals that are

11   all based upon that statement of the criterion, a

12   full day of exposure, and I also referenced and

13   reviewed the prior studies by Eriksson, which he

14   referred to, and he uses this additive method of

15   exposure.

16   Q.   Which prior Eriksson studies?

17   A.   The Hardell, Eriksson, and Lenner study from

18   1981 and -- I forget the other one.  Let's see.

19          The other study was the Hardell and Eriksson

20   case-control study from 1999.

21   Q.   Okay.  So you believe that -- well, I mean,

22   let's look at that one statement you focused on in

23   Eriksson, I think 2008.  "As in our previous

24   lymphoma studies, we used a minimum criterion of one

25   full day exposure to be categorized as exposed,"

William Sawyer, Ph.D.

1    that's the sentence you're referring to?

2        A.   Yes.  And, as I said, I researched the

3    definition in Sweden of how many hours in a full day

4    exposure based on the time range of this study being

5    conducted.

6        Q.   Do you know whether that required a -- well,

7    let me -- in Eriksson, were they looking at farmers

8    in the study?

9        A.   I'm sorry.  I didn't understand the

10   question.

11       Q.   What group of people were being studied in

12   the Eriksson study?

13       A.   In which study?

14       Q.   The Eriksson study.

15       A.   The current study that we're --

16       Q.   Yes, 2008.

17       A.   Well, it covered as in materials method

18   section four out of seven health services regions in

19   Sweden associated with the university hospitals in

20   Lund, et cetera, and recruitment of cases and

21   controls.

22       Q.   Okay.

23       A.   It included patients aged 18 to 74 years

24   with newly diagnosed NHL, and --

25       Q.   So -- well, Doctor, let me -- I'm trying to

William Sawyer, Ph.D.

1    go back to explore on this the way they calculated

2    this.  Do you know whether they calculated an hour,

3    you know, for eight different days to make a day, or

4    whether they required at least one day of spraying

5    of a full day of eight hours to be included?

6         MS. FREDONA:  Objection; form.

7    A.   By definition, eight hours of exposure was

8    required to be considered exposed, and that counted

9    as one exposure day, and then the cumulative

10   exposures were compiled by additive methodology.

11   Q.   Okay.  Doctor, let's go to -- back to page 6

12   of your report.  At the bottom of that page, you

13   say:  "The POEM methodology has been peer-reviewed,

14   generally-accepted, used internationally, and tested

15   with a known rate of error as published within the

16   seven studies footnoted below."

17        Do you see that?

18   A.   Yes.

19   Q.   Is that the same thing as the UK POEM model?

20   A.   Yes.

21   Q.   What does the POEM methodology consider that

22   your simple additive mathematical model does not

23   consider?

24   A.   They're apples and oranges.  The Eriksson

25   methodology and the methodology studied in all six

William Sawyer, Ph.D.

```
 1    of the dose metric studies I've referenced are based

 2    on days of exposure as opposed to the POEM method,

 3    which is calculating the internal systemic dose.

 4    And as I've explained in my report, the P-O-E-M

 5    method, that is the Predicted Operator Exposure

 6    Model method, provides a dosage in units of

 7    milligram per kilogram per day, which is designed to

 8    be applied against the AOEL, that is the Acceptable

 9    Operator Exposure Limit, and the AOEL is not a

10    measure of cancer risk; it's, rather, a measure of

11    reproductive toxicity in rats.

12         So all the POEM method does from a systemic

13    dose basis is it gives me a means to determine if a

14    person had an exposure dosage that was in a

15    reasonable range of the AOEL.  It doesn't provide

16    any information specific to cancer endpoint, because

17    the human studies were not studied -- it did not use

18    the milligram per kilogram per day dose methodology.

19         So, for example, if one of your experts were

20    to calculate Mr. Schafer's dose in milligram per

21    kilogram per day, that expert would have nothing to

22    compare it to other than animals, and it's not

23    acceptable methodology to determine whether a person

24    has a causal link to a chemically induced cancer

25    based only on animal studies.  Human data is needed.
```

William Sawyer, Ph.D.

```
 1            And I'm sure you agree with that.

 2       Q.   You did not use the POEM methodology in your

 3   assessment of Mr. Schafer; is that right?

 4       A.   Correct, I did not make a milligram per

 5   kilogram per day dose calculation.

 6       Q.   And in previous cases, you have used the

 7   POEM methodology in your assessment; is that right?

 8       A.   I have on occasion, yes.

 9       Q.   And so are you saying it's inappropriate to

10   do so?

11       A.   No, but in cases where it's a simple

12   procedure, for example, a farmer who is using a

13   sprayer of a given application rate, for example, a

14   tractor sprayer, applying a certain application rate

15   over a certain area of acreage with a known number

16   of applications, for example, six times a year, it's

17   very simple to plug in the data into the POEM

18   method.

19            In a case like this, where we have multiple

20   properties, many of which we don't have much

21   information on the number of hectares or acres for

22   each property, and we're uncertain in some of the

23   work here on Mr. Schafer how much product he used on

24   each property, it becomes more difficult to apply

25   the POEM methodology.
```

William Sawyer, Ph.D.

1            And in this case it would have been a very

2    difficult task and it would not have yielded much

3    information other than the milligram per kilogram

4    per day dose to compare to the AOEL, so I did not

5    pursue it.  This is not a case where a calculation

6    would be reasonably simple.  It would, rather, be

7    very complex and it would be open to tremendous

8    criticism by your team, and I thought that would be

9    a bad idea to go -- to make a calculation in which a

10   lot of uncertainty would be present.  I felt as a

11   scientist, as a toxicologist, that would not be wise

12   and, therefore, did not apply the POEM method in

13   this case.

14   Q.   Does your simple additive mathematical

15   methodology, has it been peer-reviewed?

16   A.   Yes.  I take you back to the six studies

17   that I've used.  All of those studies use days of

18   exposure as the dose metric.

19   Q.   Do you know if they use the same metric by

20   your additive mathematical methodology?

21   A.   It's not my methodology.  It's the

22   methodology used in the studies I've referenced.

23   It's very clear that the studies have used the

24   accumulated exposure days.  Only one study makes it

25   clear that it's an eight-hour time-weighted exposure

William Sawyer, Ph.D.

 1    day.  The other studies appear to be using just any

 2    amount of spraying on a given day as an exposure

 3    day.

 4         So my calculations are ultraconservative in

 5    that I'm using an eight-hour time-weighted average,

 6    when, in fact, the studies don't necessarily -- some

 7    of the studies don't necessarily use a requirement

 8    of eight hours of spray time, just, rather, spraying

 9    on any given day.

10         So it's not my methodology.  That's really

11    insulting, and I really hope you don't try to

12    convince the court that I have made up some

13    methodology.  That's just very inappropriate and

14    disingenuous on your part.  It's a methodology that

15    has been peer-reviewed and published and it is based

16    upon additive exposure days.

17    Q.   Is there a known error rate in the simple

18    additive mathematical methodology?

19    A.   Yes, there is.

20    Q.   Okay.  And what is that?

21    A.   It's called the 95 percent confidence

22    interval.  All the studies I've cited use the 95

23    percent level of certainty in their confidence

24    interval.

25    Q.   That's looking at the relative risk and the

William Sawyer, Ph.D.

1    confidence of that relative risk for a specific

2    endpoint like non-Hodgkin lymphoma, right?

3        A.   Correct, but that error rate reflects the

4    amount of variability and error in the overall data

5    set.

6        Q.   But that error rate is not a calculation of

7    whether the exposure reported is accurate or not; is

8    that -- is that correct?

9             MS. FREDONA:   Objection; form.

10       A.   I think you're referring to reporting errors

11   such as recall bias.   That's possible.   There could

12   be some recall bias, and that's something that the

13   epidemiologists and Dr. Ritz have paid special

14   attention to, and I would defer you to Dr. Ritz or

15   Dr. Portier with respect to the internal design of

16   the study and the -- how the questionnaire recall

17   bias could be a factor, but that is something that

18   is covered within each of the epidemiological

19   studies.

20       Q.   Okay.   So, Doctor, whether I refer to it as

21   the simple additive mathematical methodology or

22   yours, I am simply saying the methodology that

23   you're applying.   So I will just say the simple

24   additive mathematical methodology if that's more

25   soothing to you, but that is the one that you're

William Sawyer, Ph.D.

1    applying; is that right?

2        A.   Of course.  That is the methodology that has

3    been used in the six studies that offer dose

4    metrics.

5        Q.   Okay.  And in the simple additive

6    mathematical methodology, it does not consider the

7    types of equipment a person is using when applying

8    Roundup; is that right?

9        A.   That's correct.

10       Q.   And it doesn't consider the type of clothing

11   a person is wearing while applying Roundup; is that

12   right?

13       A.   Yes.

14       Q.   And the simple additive mathematical

15   methodology does not consider the types of personal

16   protective gear a person is using or wearing while

17   applying Roundup, right?

18       A.   Correct.  The studies are limited in those

19   respects, yes.

20       Q.   And the simple additive mathematical

21   methodology does not consider whether a person is

22   spot-spraying or continuously spraying Roundup; is

23   that right?

24       A.   Correct.  And I should state that, as

25   covered in my report, glyphosate is not

William Sawyer, Ph.D.

1    instantaneously fully absorbed through the skin.  It

2    takes hours, many hours, to fully absorb the

3    glyphosate.  So in a case where a homeowner only

4    sprays for two hours on a given day will continue to

5    absorb that exposure over the next 12 to 24 hours.

6         If a person is working eight hours a day,

7    even though they accumulate more exposure, on a

8    relative basis that person who sprayed only two

9    hours is actually continuing to absorb even though

10   that person did not work eight hours.

11        So that is something to be aware of when

12   considering studies that did not require a full

13   eight hours of exposure.

14   Q.   So in the simple additive mathematical

15   methodology, does spot-spraying count the same as

16   continuous spraying?

17   A.   I'm not sure I understand the question.

18   Q.   Well, if I go out in my yard and I

19   spot-spray, I walk around and I spray occasionally

20   when I see a, you know, weed that I want to kill,

21   does that count the same for a one-hour period, if I

22   do that for an hour, as if I'm out spraying

23   continuously for an hour?

24        MS. FREDONA:  Objection; form, incomplete

25        hypothetical.

William Sawyer, Ph.D.

1    A.   I still don't understand.

2    Q.   So you understand spot-spraying, a person

3    goes out and searches for something and sprays and

4    then moves on to the next spot, as opposed to

5    continuously spraying down a fence line or something

6    of that nature?

7         MS. FREDONA:   Same objection.

8    A.   Well, those are two different techniques.

9    Fence line exposures, when holding the wand in a

10   more horizontal position, results in a much higher

11   level of drift below that as opposed to a sprayer

12   that's pointing directly to the ground.

13        There's differential factors in what you're

14   asking me, so I think you would have to be very

15   specific in your question.

16   Q.   Okay.  If a person goes in his yard and

17   sprays one time on a spot every 10 minutes for 60

18   minutes, being six different squirts on something

19   for an hour, does that count the same for -- in your

20   exposure methodology as a person who goes in their

21   backyard and continuously sprays Roundup for an

22   hour?

23        MS. FREDONA:   Objection; form, incomplete

24        hypothetical.

25   A.   I still don't understand the question.

1    Q.   So if a person sprays Roundup, hits the

2    trigger six times in an hour versus 60 times in an

3    hour, do they count the same in your exposure model?

4         MS. FREDONA:   Same objection.

5    A.   The studies, for example, Eriksson, do not

6    make such a distinction.  It's simply number of

7    hours of working as a sprayer.  There's no

8    distinction in the human studies as to how many

9    times the trigger is pushed.

10   Q.   Okay.

11   A.   I'm sure that makes, you know, an

12   interesting point for you to use in a Daubert

13   motion, but it's utter nonsense, because the studies

14   do not record how many times the triggers are

15   pushed.  Rather, it's a matter of how many hours in

16   a working day, in the Eriksson study, are used to

17   certify that person as an exposure day.

18        Other studies that I've referenced just use

19   the given exposure-day, that is, it was used on a

20   given day and that is counted as a day.  So these

21   studies are not providing the level of detail you're

22   asking, and then you turn around and say it's my

23   design.  It's not my design.  It's the studies that

24   I am following very closely and assessing

25   Mr. Schafer in comparison to those studies, and the

William Sawyer, Ph.D.

1     fact that the number of trigger pushes was not

2     recorded by Mr. Schafer, nor in the studies, is very

3     misleading.

4         Q.   Do you recall my question?

5         A.   I do, and it just doesn't make any sense.

6         Q.   Okay.  So my question is whether a person

7     actually sprays Roundup one time, six times, or 60

8     times over the course of an hour, in your -- well,

9     in the simple additive mathematical methodology,

10    that hour counts the same; is that correct?

11        MS. FREDONA:  Objection; form, found -- I'm

12    sorry.  Objection; form, incomplete hypothetical.

13        A.   No, I can't answer that the way it was

14    asked.  It's not my methodology.  It's the

15    methodology used by Eriksson, McDuffie, et al., in

16    the studies that I've referenced, all six of them.

17    It's based on days of spraying.  So I really don't

18    know how to answer your question.  It's not

19    consistent with the studies.

20        Q.   If a person tells you in an interview they

21    go out in their yard and they spot-spray for an

22    hour, do you count that as one hour of spraying

23    Roundup?

24        MS. FREDONA:  Objection; incomplete

25    hypothetical.

William Sawyer, Ph.D.

1      A.   Yes.

2      Q.   And if a person tells you they go out in the

3   yard and they continuously spray for an hour, do you

4   count that as one hour of spraying Roundup?

5           MS. FREDONA:  Same objection.

6      A.   Yes.

7      Q.   In your assessment of exposure using the

8   simple additive mathematical methodology, does it

9   matter to you whether the person spot-spraying

10  sprays often or doesn't spray often?

11          MS. FREDONA:  Objection; form.

12     A.   I don't understand the question.

13     Q.   When you are assessing the exposure of an

14  individual, do you ask them, when they are spraying,

15  how they -- how they go about spraying Roundup?

16          MS. FREDONA:  Objection; form.

17     A.   Yes.  That's covered in detail in my report.

18     Q.   Okay.  And does that detail in your report

19  about how they spray, does that affect the time that

20  you identify in your time-weighted eight-day average

21  for exposure?

22     A.   Yes, it is, in the sense that my report

23  details the intensity of exposure.  However, the

24  methodology of the studies are strictly based upon

25  exposure days, and in the Eriksson study, an

William Sawyer, Ph.D.

1    eight-hour exposure day.

2         So I used the eight-hour exposure day in my

3    calculations because that is the methodology that is

4    followed and presented in the six studies.  The six

5    studies do not make any calculation differences for

6    the intensity of spraying; however, I do provide in

7    my report an assessment of the intensity of

8    exposure, for example, whether the person wore

9    gloves, whether they had spillage on their back from

10   a backpack, the level of accidents in terms of

11   dermal exposure accidents, washing of hands with

12   soap, the time between spray time and showering or

13   bathing with soap, et cetera.

14        Those are all factors that are important and

15   I reference from studies in the literature; however,

16   the dose metric studies in humans do not include

17   those details.  They're just simply based on

18   exposure days.

19   Q.   So those features about how much Roundup a

20   person actually gets on their skin you describe as

21   intensity of the exposure?

22        MS. FREDONA:  Objection; form.

23   A.   I didn't understand the question.

24   Q.   Okay.  What -- you used the word "intensity"

25   of the exposure.  What is the intensity of exposure,

William Sawyer, Ph.D.

```
 1    and what do you mean by that?

 2       A.   Well, on page 27 in our report, I stated in

 3    the first paragraph:  "Mr. Schafer stated that until

 4    about 2015-16 he did not wear any personal

 5    protective equipment (PPE) during his Roundup

 6    applications."

 7            Quote, "I didn't wear any protective

 8    equipment because the chemicals" -- "commercials,"

 9    rather -- "showed all of the people using the

10    product; they were in shorts, they didn't have any

11    protective gloves, any protective gear at all, so I

12    assumed it was safe based on the depiction in the

13    commercial."

14            And then he explains when he began wearing

15    rubber gloves, et cetera.

16            So certainly I inquire and determine what

17    level of protection the individual had, what

18    accidents, if any, occurred, the spray conditions,

19    the type of equipment, whether it was a backpack, if

20    it leaked, if the trigger leaked, if the person had

21    to unscrew the nozzle and unclog it, and whether

22    they blew it out with their mouth.

23            These are all things that I ask about and

24    ascertain to determine the intensity of exposure,

25    but the human studies that have dose metrics don't
```

William Sawyer, Ph.D.

1    delineate that level of detail, and it's --

2    therefore, I follow the methodology that was used in

3    the studies that offer dose metric to calculate

4    exposure days, but I also supplement that in my

5    report with more specific information as to the

6    nature of the exposures.

7         And I don't know why you have a problem with

8    that.  I really, honestly, don't.  I think

9    there's -- you're just making up stuff.

10   Q.   So the additive mathematical model doesn't

11   include intensity of exposure in the analysis; is

12   that correct?

13   A.   As I said, it does not include a detailed

14   analysis of the intensity of exposure.  It simply is

15   based upon exposure day.  So the studies are taking

16   an average of people who are exposed, some of which

17   may be fully equipped with PPE, others who are in

18   shorts and sandals.  It's a -- it's -- it does not

19   delineate.  It's simply an average of all of them.

20   Q.   Are the circumstances of how a person

21   applies Roundup important for your assessment of

22   causation?

23   A.   Yes.

24   Q.   Is the intensity of exposure important for

25   your assessment of causation?

William Sawyer, Ph.D.

1     A.   Yes, it is helpful to determine what level

2     of intensity the exposures were, of course.  That

3     holds true for any chemical exposure.

4     Q.   And the calculation of the number of

5     exposure days does not factor in either the

6     intensity or the circumstances of the application;

7     is that right?

8     A.   That is correct.  That's how the studies are

9     designed and it is what it is.  That's what we have

10    to work with.  This nonsense of conveying to the

11    court that it's my -- it's my methodology and my

12    failure to include these things in the design is

13    unfounded.  I am following the study design, the

14    peer-reviewed, generally accepted studies.

15         And I can't go back and change those

16    studies.  It is what it is.  They use an exposure

17    day and the number of exposure days, and those

18    studies are showing a dose-response based upon the

19    number of exposure days.  You know, that's what we

20    have to work with, and I'm still a little confounded

21    why you have a problem with it.

22    Q.   So you say the studies have a dose-response.

23    Are you meaning that the higher the dose or exposure

24    to Roundup, the higher the risk of non-Hodgkin

25    lymphoma?

William Sawyer, Ph.D.

```
1              MS. FREDONA:  Objection; form.

2       A.    Yeah.  For example, in the McDuffie study, a

3   positive dose-response was found for glyphosate.

4       Q.    So if a person has 39 exposure days, as

5   you've calculated for Mr. Schafer, does he have less

6   risk of non-Hodgkin lymphoma than somebody who was

7   exposed to 100 days of -- full-weighted days of

8   exposure to Roundup?

9              MS. FREDONA:  Objection; form.

10      A.    Based upon the studies and general

11   toxicological principles, yes.

12      Q.    And would a person who had 10 exposure days

13   have less risk than somebody who was exposed to 39?

14      A.    Based upon the studies and general

15   toxicological principles, yes.

16      Q.    Have you done anything to assess what the

17   difference in the risk is between a person who is

18   exposed to 5 or 10 or 20 or 40 or 100 exposure days?

19              MS. FREDONA:  Objection; form.

20      A.    Yes.  Yes.  For example, the McDuffie study

21   reveals odds ratios greater than 2 with exposures

22   greater than 10 days; whereas the less than 10-day

23   exposure, I think was about a 1.67 risk level, but

24   I'm going to check that right now to make sure I'm

25   accurate.
```

William Sawyer, Ph.D.

1           Yes.  On page 1160, bottom of the left-hand

2      column, last sentence reads:  "Table 9 also shows

3      the dose-response relationship comparison of

4      subjects who reported no pesticide exposure and

5      those who reported using five or more pesticides."

6           Let me look at Table 9.

7      Q.   Which study?

8      A.   I'm looking at McDuffie.

9           No, that's not the correct table.  I think I

10     should be looking at Eriksson.  Let's see.

11          Yeah, on page -- I'm in Eriksson on page

12     1658, right-hand column, second to last paragraph:

13     "Dose-response analyses regarding herbicides in

14     total and glyphosate yielded an increased odds ratio

15     in the higher exposed group, Table II.  For

16     phenoxyacetic acids, however, no such association

17     was demonstrated."

18          So that's in Table II.  And, yeah, I was

19     actually correct.  It is a -- less or equal to 10

20     days was a 1.69 odds ratio, greater than 10 days was

21     a 2.36 odds ratio, and combination of less than 10

22     days or greater than 10 days was statistically

23     significant, or greater than 10 days by itself was

24     statistically significant.

25     Q.   Okay.  Doctor, so that's what you would

1   apply, those odds ratios, for patients who have

2   greater than 10 days of exposure, exposure-days to

3   Roundup, is that what you're saying?

4       A.   Yes, that the control group has an odds

5   ratio of 1.0, less than on or equal to 10 days is a

6   1.69 odds ratio, greater than 10 days is a 2.36 odds

7   ratio.

8           The study -- again, I really don't

9   understand why you're saying that in your last

10  question I  summarized this.  This is what the data

11  shows.  It's objective scientific data.  It's not

12  something I made up; and I know you keep implying

13  that, and it's very irritating.

14      Q.   I'm trying to understand your opinions.  I'm

15  not sure why you keep saying what I am implying.

16  I'm just asking questions about your opinions.  So

17  I'm trying to be as deferential as I can, but I do

18  have questions I need to ask.  So I just want to be

19  straightforward as I can be on that, but...

20          So for your opinions, for people like

21  Mr. Schafer, who have 39 exposure-days, according to

22  your calculation, you would apply the Eriksson study

23  and look at the 2.36, is that what you're saying?

24          MS. FREDONA:  Objection; form.

25      A.   Yes, I would -- I would consider him greater

William Sawyer, Ph.D.

1    than 10 days based upon the study design and based

2    upon his eight-hour time-weighted average of 39

3    exposure days, yes, I would -- I would include him

4    in the greater than 10 days exposure group,

5    certainly.

6        Q.   And do you know how many patients in the

7    Eriksson study actually had exposure days that were

8    100 or more?

9        A.   No.  The study does not provide that

10   information.

11       Q.   But you would expect that the patients who

12   had 100 or more exposure days to glyphosate to have

13   a higher risk of non-Hodgkin lymphoma than patients

14   like Mr. Schafer, who had 39; is that right?

15           MS. FREDONA:  Objection; form, incomplete

16       hypothetical.

17       A.   I'm not going to make any assumptions on

18   that question.  I need to point out that it would be

19   pretty unusual to have somebody with 800 hours of

20   exposure and it's unlikely there would be a

21   sufficient number of such persons to provide a

22   statistical count.  That's an enormous amount of

23   exposure, and based upon my experience in assessing

24   Roundup exposures, there wouldn't be many people who

25   fit that bill.

William Sawyer, Ph.D.

1    Q.   Okay.  Doctor, now, Mr. Schafer says that he

2    sprayed Roundup at his residence where he lived; is

3    that right?

4    A.   Yes.

5    Q.   He didn't spray any Roundup at work, right?

6    A.   Correct.

7    Q.   It's --

8    A.   Especially when he was working with the FBI.

9    Q.   He didn't spray any Roundup on crops; is

10   that right?

11   A.   Right.  He didn't have any crops.

12   Q.   And he didn't spray Roundup similar to a

13   farmer; is that right?

14        MS. FREDONA:  Objection; form.

15   A.   I would disagree with that.  I have

16   carefully, fully interviewed many farmers who use

17   similar spray equipment as he did, that it's not

18   unusual for a farmer, especially for their home use,

19   to use very simplistic equipment, so --

20   Q.   If you -- if you go to page 14 of your

21   report --

22   A.   Yes.

23   Q.   -- the first full paragraph, last sentence,

24   it says:  "I didn't do" -- this is a quote from his

25   deposition.  "I didn't do a farmer spray.  I just

William Sawyer, Ph.D.

1    walked through and individually sprayed the weeds."

2          Do you see that?

3    A.    Yes, that's what he said, but that's not

4    what you asked me.

5    Q.    Okay.  And so are you saying that

6    Mr. Schafer, despite what he said, did spray similar

7    to the way farmers spray Roundup?

8          MS. FREDONA:  Objection.

9    A.    As I stated, I have assessed numerous

10   farmers, some who have used tractor sprayers with up

11   to 32 sprayer heads, and I've interviewed and I've

12   assessed farmers who also used prepackaged Roundup

13   to spot-spray weeds around their barn and their shed

14   and their -- and even on their own residential

15   property.

16          Not all farmers operate with tractors.  In

17   fact, many farmers use backpack sprayers.  That's

18   very common.  So I think you're just being too broad

19   in general with respect to that question.  Not all

20   farmers only spray with tractor boom sprayers.

21   That's just -- that's just not true.  There's

22   farmers who very often use backpacks or other

23   devices, including a number of different sprayers.

24   Q.    Mr. Schafer didn't spray Roundup as part of

25   being a professional lawn care worker, he didn't do

William Sawyer, Ph.D.

1    that, right?

2        A.    Correct.  What he said in his deposition,

3    which accompanies that quote about "I didn't do a

4    farmer spray" is he was trying to explain that he

5    sprayed individual weeds.  He did not perform

6    broadcast spraying.

7        Q.    Okay.  Are you aware that farmers had an

8    increased risk of non-Hodgkin lymphoma before

9    Roundup existed?

10       A.    Yes.

11       Q.    Do farmers generally have -- well, let me

12   strike that.

13             Over the past 20 or 30 years, have farmers

14   generally had exposure to other chemicals in

15   addition to Roundup?

16             MS. FREDONA:  Objection; form.

17       A.    Historically, prior to Roundup, in the 1950s

18   and '60s, farmers used a product known as 2,4-D,

19   which historically contained a chemical called

20   dioxin, specifically tetrachlorodibenzo-p-dioxin, as

21   a contaminant of the product.

22             So historically, going back many, many

23   years, there was a product out that was known to

24   cause lymphoma, NHL, and that is the 2,4-D; 2,4,5-T

25   product that contained the dioxin contaminant, the

William Sawyer, Ph.D.

1    same contaminant known to be in Agent Orange.

2       Q.   So is it your opinion that 2,4-D increases

3    the risk of non-Hodgkin lymphoma?

4       A.   Certainly did historically, in the 1950s and

5    '60s, when it contained the dioxin contaminant.

6       Q.   Is it -- is it your opinion that malathion

7    increases the risk of non-Hodgkin lymphoma?

8       A.   Yes.  Malathion is a IARC 2A carcinogen.

9    Certainly it does carry risks, based on studies, of

10   causing NHL.

11      Q.   Does diazinon increase the risk of

12   non-Hodgkin lymphoma?

13      A.   In animals, it has shown to have

14   carcinogenic potential.  I believe, with respect to

15   humans, it has not reached the level of a 2A

16   carcinogen.  I believe it's a 2B and it's uncertain

17   whether it causes cancer in humans.

18      Q.   In the studies that you've looked at that

19   looked at glyphosate, have they also looked at these

20   other chemicals, including diazinon, if you recall?

21      A.   I don't recall, and --

22      Q.   Okay.

23      A.   But I can add that it -- diazinon is not a

24   2A carcinogen.

25      Q.   All right.  So, Doctor, have you assessed

William Sawyer, Ph.D.

1    whether Mr. Schafer, at his residence, was exposed

2    to other chemicals, including diazinon, 2,4-D, and

3    malathion?

4         MS. FREDONA:  Objection.

5    A.   Yes.  Turn to page 28 and 29 in my report,

6    and on page 29, partway down Table 2, you will see

7    "ever used 2,4-D?"  The answer is "no."

8         And I should add, even if he had used it,

9    2,4-D had undergone reformulation in terms of the

10   TCDD dioxin contaminant during the years he used it.

11        I should also add that if you were to look

12   at my report, I have a brief section in my report

13   with respect to the classification of 2,4-D by

14   Monsanto, and the document I referenced in my report

15   from Monsanto states that it is not a carcinogen.

16   Q.   Okay.  But my question is you believe it

17   does cause non-Hodgkin lymphoma, 2,4-D; is that

18   right?

19   A.   As I said, during the early years of

20   production, when it contained the dioxin impurity,

21   it certainly did, but that had long been

22   reformulated before Mr. Schafer had any opportunity

23   to use it, but he stated in my interview that he had

24   never used it, and that's documented on page 28, I

25   believe.

William Sawyer, Ph.D.

1      Q.   Okay.  And if Mr. Schafer had used diazinon,

2    2,4-D, or malathion, would that have changed your

3    opinions in any way?

4           MS. FREDONA:  Objection; incomplete

5       hypothetical.

6      A.   In your question, you asked for 2,4-D,

7    diazinon, and what was the third thing?

8      Q.   Malathion.

9      A.   If he had used malathion, I would have

10   questioned him further on his type of use,

11   protective equipment, how often he used it, so on.

12     Q.   Okay.  So would you agree that farmers

13   historically have been exposed to diazinon, 2,4-D,

14   and malathion?

15          MS. FREDONA:  Objection; form.

16     A.   During what years are you asking?

17     Q.   The same years the McDuffie and Eriksson

18   studies were being conducted.

19          MS. FREDONA:  Same objection.

20   BY MR. HOGUE:

21     Q.   '80s, '90s.

22     A.   Well, as we already covered, I think

23   yesterday in deposition it was my statement that

24   malathion was considered in the McDuffie study and,

25   in fact, did show a significant association with

William Sawyer, Ph.D.

1    NHL.

2            With respect to diazinon, diazinon is simply

3    not a Class 2A human carcinogen.

4    Q.   So --

5    A.   And the third chemical that you asked me

6    about --

7    Q.   2,4-D.

8    A.   -- 2,4-D, according to Monsanto, in a sworn

9    certified document, it's not a carcinogen anymore;

10   and as I stated, 2,4-D historically, predating the

11   -- by many, many years, or decades -- predating the

12   studies, contained dioxin.

13   Q.   So, Doctor, this is my question:  You agree

14   that farmers have historically been exposed to

15   chemicals that Mr. Schafer himself has not been

16   exposed to, you would agree with that, wouldn't you?

17           MS. FREDONA:  Objection; form.

18   A.   I don't understand the question.

19   Q.   Yeah.  I mean, there are studies that look

20   at exposure of farmers that have exposure to Roundup

21   and other chemicals, including many of these

22   insecticides and herbicides we've been discussing,

23   right?  I mean, you're aware that farmers have been

24   historically exposed to multiple different

25   chemicals, right?

 1          MS. FREDONA:  Objection.

 2      A.   Well, that is -- yes.  That is the purpose

 3  of, in the McDuffie study or Eriksson study, for

 4  example, of ascertaining exposure of many different

 5  agricultural pesticides and herbicides.

 6      Q.   Great.  And so you're -- and your opinion is

 7  Mr. Schafer was not exposed to those types of other

 8  chemicals, right?

 9          MS. FREDONA:  Objection; form.

10      A.   Yes, that is the purpose of my review of the

11  potential causative factors table, which I recited

12  on page 28 and 29.  I should point out there are

13  some decoy questions in there that are clearly not

14  potential causative factors, such as the use of

15  latex paints or the use of weed -- Miracle-Gro.  So

16  I just want to point that out, that not all of the

17  chemicals that I've listed are associated with NHL.

18      Q.   Okay.  Are you aware of any studies that

19  have analyzed the risk of residential users using

20  Roundup that shows an increased risk of non-Hodgkin

21  lymphoma?

22          MS. FREDONA:  Objection; form.

23      A.   That's a very interesting question.

24          (Telephone interruption.)

25          I'm sorry.  Interrupted here.

William Sawyer, Ph.D.

```
 1            Very interesting question.  There are no
 2    studies that study only residential users.  The
 3    studies that I am relying on use a combination of
 4    residential and agricultural exposures.
 5       Q.   Okay.  Have you seen studies of residential
 6    users or household users of other chemicals that
 7    increase the risk of non-Hodgkin lymphoma in farmers
 8    but have not been found to increase the risk of
 9    non-Hodgkin lymphoma in residential use?
10            MS. FREDONA:  Objection; form.
11       A.   No.
12       Q.   One of the differences you would say between
13    Mr. Schafer and the typical farmer in the '80s and
14    '90s was that Mr. Schafer wasn't exposed to a lot of
15    different chemicals other than Roundup; is that --
16    is that right?
17       A.   Yes.
18       Q.   Okay.  Doctor, let's go to Table 4 of your
19    report.  I think it's around page 30.
20       A.   Okay.
21       Q.   First, on page 30, at the top it says Table
22    33, and that's before Table 4.  Is that supposed to
23    be Table 3, or is that supposed to be Table 33?
24       A.   I'm sorry, I don't -- oh, I see it.  Table
25    33.
```

1          It's Table 3.  A typo.

2     Q.   Okay.  I just -- that's what I was guessing,

3     but I don't know for sure.

4          So in your calculation on Table 4, you come

5     to an average, or mid, I guess, exposure risk of 39

6     hours -- 39 exposure days; is that right?

7     A.   Yes, with a range of 30 to 48 eight-hour

8     exposure days.

9     Q.   Okay.  And you cite some of your data comes

10    from the deposition of Mr. Schafer and some of it

11    comes from interviews that you had with Mr. Schafer;

12    is that right?

13    A.   I didn't understand the question.

14    Q.   Well, your chart, if you go to what's

15    Table -- listed as Table 33, on page 30, you have

16    footnotes, and some of the citations as to where you

17    get the amount of spraying and how long he sprayed

18    was from his deposition, and some of it was from

19    interviews with Mr. Schafer; is that right?

20    A.   Yes, and I stated earlier in the deposition

21    the sources that I used.

22    Q.   Okay.  And in your assessment to get to the

23    39 exposure days, you say other than some years,

24    1999 to 2050 and then in 2010, other than those

25    years, you say he had a -- two days a year, one in

1    spring, one in the fall, where he sprayed Roundup

2    for a -- different periods of hours, somewhere

3    between 1.5 hours and four hours per day.  That's in

4    your Chart 4, right?

5        A.   Yes.  Also, 1986 to '88, only .5 hour per

6    event twice a year.

7        Q.   Okay.  And I think that you say in your

8    report that during -- for those two seasonal sprays,

9    he used a specific type of Control Extended -- he

10   said Extended and you changed it to -- or I think --

11   let's go to page 13, Footnote 31.

12            So in Footnote 31, you say:  "Mr. Schafer

13   referred to the larger jug of Roundup he used in the

14   spring and fall as 'extended use' in the deposition;

15   however, he clarified during his interview that this

16   was not Extended Control Roundup."

17            Do you see that?

18       A.   That's correct.

19       Q.   Okay.  What type of Roundup do you believe

20   it was?

21       A.   Roundup Weed & Grass Killer.

22       Q.   Okay.  Is that referenced anywhere in your

23   report?  Is that --

24       A.   He did state on page 24.

25       Q.   Okay.

William Sawyer, Ph.D.

1    A.   And I believe he also stated this for his

2    period that you're referring to in that footnote,

3    that he always purchased and applied Roundup

4    ready-to-use products, and he explained that it was

5    generally the Weed & Grass Killer product.

6    Q.   Okay.  I think that's what you say on

7    page -- the picture on page 25.  Is the

8    concentration of glyphosate 2 percent in that

9    product?

10   A.   Yes.  Yes, it is.

11   Q.   And if you look at page 26, I think you

12   indicate that he has spot-sprayed using this other

13   Roundup that has 1 percent glyphosate; is that

14   right?

15   A.   Yes, that has the -- that is the Extended

16   Control product, yes.

17   Q.   So it's your opinion, based upon talking to

18   Mr. Schafer, that he used these two different types

19   of Roundup, the 2 percent, you know, in the spraying

20   in the fall and then the 1 percent for

21   spot-spraying; is that right?

22   A.   No, the spot spraying is 2 percent Roundup

23   Weed & Grass Killer.

24   Q.   Okay.  What did he use the 1 percent on?

25   A.   He used that on certain years, which I think

William Sawyer, Ph.D.

1    I explained earlier in the report, where he only

2    sprayed twice per year, with the exception of

3    Footnote 31.

4        Q.   So when he sprayed twice a year, you believe

5    it was with the 1 percent glyphosate?

6        A.   Yes.  That was the Extended Control.

7        Q.   Okay.

8        A.   It's 1 percent glyphosate, yes.

9        Q.   All right.  So, Doctor, if we look

10   specifically at the time period in Table 4 that

11   relates to the period of 1995 to 1998 --

12       A.   Yes.

13       Q.   Okay.  We've already corrected that the 91.5

14   is supposed to be 9, right?

15       A.   Correct.

16       Q.   All right.  And the way you calculate this

17   is you say he had two seasons.  That was -- even

18   though this is 1995 to 1997, you indicate he sprayed

19   Roundup '95 and '96, because in '97 he had his head

20   injury and said he wasn't spraying; is that right?

21       A.   Right.

22       Q.   Okay.  So you agree that those two years

23   would have been 1995 and 1996; is that right?

24       A.   Yes.

25       Q.   So two seasons.  And so on the top, you have

William Sawyer, Ph.D.

1    the events, the once in the fall, once in the

2    spring, so that's where you have your two events for

3    2.5 to 3 hours; is that right?

4        A.   Yes.

5        Q.   If I understand your calculation on the

6    bottom part of that, it's two years, and each year

7    you're saying he had 24 times that he sprayed

8    Roundup with spot spray for 1.5 hours; is that

9    right?

10       A.   Yes.

11       Q.   And you believe that information came from

12   an interview with Mr. Schafer and that was not

13   specifically in his deposition; is that right?

14       A.   Correct.

15       Q.   And so when Mr. Schafer was talking to you

16   about this, he was describing that as spot-spraying;

17   is that right?

18       A.   Which?  The two events per year or the 24?

19       Q.   The 24.

20       A.   That was spot spraying, yes.

21       Q.   And he said in his deposition that he was --

22   that he -- twice a year he sprayed and then

23   spot-sprayed it.  So that's the spot-spraying, these

24   24 events per year, right?

25       A.   Yes.

1    Q.   And how did you go about asking how long he

2    did that?  I mean, did you just ask him how long he

3    spot-sprayed?

4    A.   My specific question that I always ask is

5    from -- in cases where there is mixing, I ask, "From

6    the point in time when you began" -- "you opened the

7    container and began to mix, okay, then throughout

8    your spray time until you were done spraying and put

9    the equipment away, how long did that period of time

10   require?"

11   Q.   Okay.  And he -- now, he didn't mix the

12   Roundup, that's -- he always used the ready to be

13   sprayed, right?

14   A.   That's correct, yes.

15   Q.   Okay.  So he told you that he spot-sprayed

16   for an hour and a half each time he spot-sprayed?

17   A.   Yes.

18   Q.   And did he tell you how often?  If you go to

19   page 30, your report discusses the 1995 to 2000 time

20   frame.  It says:  "Then spot-sprayed one of four

21   sections of the property every week, 1.5 hours per

22   section"?

23   A.   That's right.

24   Q.   Okay.

25   A.   And he explained he had to do it by section;

William Sawyer, Ph.D.

```
 1    he couldn't possibly do it all in one day, it was

 2    just too much property.

 3         Q.   Okay.  And he had a horse farm on this

 4    property, right?

 5         A.   Yes.

 6         Q.   And you looked at the pictures from his

 7    deposition that relate to this piece of property,

 8    right?

 9         A.   Yes.

10         Q.   And I think in your report you actually

11    refer to Deposition Exhibit -- one of his pictures,

12    I think it was the plaintiff's Deposition

13    Exhibit 5D, page 16, in your report?

14         A.   That's correct.

15         Q.   That's one of the pictures.  Do you know how

16    much of the property, of this 2.5-acre property, was

17    the property where the horses stayed?

18         A.   No.

19         Q.   I mean, did you look at the picture showing

20    that most of the horse area the horses were in was

21    all dirt?

22              MS. FREDONA:  Objection.

23         A.   All I have is the photo in front of me.  I

24    can't make any judgments as to the entire property

25    based on one snapshot of a photo at a given time
```

1    point.

2         Q.   So did you look at his deposition exhibits?

3         A.   Yes.

4         Q.   Okay.  Maybe I can show you on my screen

5    here.

6              Is that showing the horse?

7         A.   Yes, and some type of artifact behind him.

8    Looks like blue ink or something.

9         Q.   Okay.  Yeah, obviously --

10        A.   I don't think they're UFOs, but...

11        Q.   Okay.  So in this picture, a lot of this

12   area, I mean, there's -- you wouldn't be spraying

13   Roundup on this dirt area, would you?

14        A.   I wouldn't, no.

15        Q.   Okay.

16        A.   Now, it's possible that during the various

17   seasons he sprayed weeds and did a good job and

18   they're gone.  I mean, I can't speculate on exactly

19   what happened, but, yeah, I see the dirt.

20        Q.   Okay.  And looking back at your report, the

21   picture that you include in your report, there --

22   you see that this area is a desert-type area.  Do

23   you see that?

24        A.   Yes.  There also appears to be some type of

25   ground cover growth.  I'm not sure what it is,

1    whether it's grass or some type of prickly weed, I

2    don't know, but there appears to be something

3    growing there.

4        Q.   Do you know whether Mr. -- when you read his

5    deposition that he described there being not much

6    vegetation because of the desert there?

7        A.   That's what he stated.  I'm not, you know,

8    able to read into that, but that's what he said,

9    yes.

10       Q.   Did you do any assessment of whether 1.5

11   hours of spot-spraying a week was needed in this

12   desert terrain?

13            MS. FREDONA:  Objection; form.

14       A.   Only in the sense that I included the photo

15   of Schafer's 5D exhibit in my report, and if those

16   dark objects in the foreground are weeds and they

17   had covered a significant portion of his property,

18   it would certainly take all of that time to

19   spot-spray those weeds.  That would be a

20   time-consuming process to spray each of those weeds

21   over a large area.

22            So, I mean, I -- that photo certainly

23   indicates the possibility that it would take at

24   least that amount of time, but I don't have

25   photographs of the entire property over different

1    months of the year, so I'm not in a good position to

2    make any judgment with respect to what you have

3    brought to my attention.

4        Q.    Well, this -- on page -- I guess there is a

5    picture -- Figure 4 is in -- you say Deposition

6    Exhibit 5D is one that you put in your report,

7    right?

8        A.    Yes.

9        Q.    And that's a discussion of the property

10   where you're discussing him spraying the property

11   once a week, 24 times a year, for an hour and a

12   half, right?

13       A.    Correct.

14       Q.    And you still believe that is a conservative

15   estimate of his spraying of Roundup in 1995 to 1996?

16       A.    Yes.  I, in fact, didn't include the later

17   two years, which he stated he did not spray and his

18   wife insisted he did.

19       Q.    Okay.  Doctor, if you go to the period of

20   2007 to -- and then 2008 to 2017, those are the same

21   property, right?  That's the Roseville property?

22       A.    2007 through which year?

23       Q.    2017.  It's on page 30, the bottom.

24       A.    I'm on that page.  I see that.

25       Q.    Okay.  And this is what he told you about,

1    this is the first -- 2007 spring and fall being

2    three to four hours, and then after that first year,

3    2.5 to 3 hours each time; is that right?

4        A.   Yes, but I am confused, because I thought

5    you said the same property as 19 --

6        Q.   No, no, I said 2007 is the same as two

7    thousand -- okay.  If you look at Table 4, you break

8    out 2007 as different than 2008 through 2017.  So

9    that's what I was looking at.

10       A.   Oh.

11       Q.   2007 through 2017 was -- his exposure was at

12   his Roseville, Illinois spot -- place, right?

13       A.   Yes, that's correct, no question about it,

14   and there was a reason for the difference.

15       Q.   Okay.

16       A.   And I believe that's in the text of my

17   report.

18       Q.   Correct.  You said the first year it was

19   three to four hours he was spraying, whereas after

20   that it was 2.5 to 3 hours, right?

21       A.   Yes.

22       Q.   Did he explain why there was a difference?

23       A.   Yes, and I think that's in the text of my

24   report.  As I recall, it was -- it was -- I hate to

25   guess.  I'm going to look, because I think what it

William Sawyer, Ph.D.

1    was was a new property that was -- I thought he used

2    the word "a mess."  Let me see if I can find it.

3        Q.   Doctor, that's okay.  I don't need to spend

4    more time for you to look to see if there was a

5    difference.  Just three to four hours the first

6    year, 2.5 to 3 hours after that.

7             You also indicated that he spot-sprayed

8    twice per month from March through September for two

9    hours; is that right?

10       A.   Yes.

11       Q.   That was in 2007.  And then from 2008 to

12   2017, an average of one to two times a month for 30

13   to 60 minutes per event, right?  So that's what you

14   based your assessments on?

15       A.   Yes.

16       Q.   Did you assess at all what the growing

17   season for grass or weeds was in Illinois?

18       A.   I asked, yeah, specifically what months he

19   sprayed.

20       Q.   And is it your belief that in March in

21   Illinois you have grass and weeds that are growing?

22       A.   I'm not familiar with Roseville, whether

23   that would be a similar climate to Indiana versus

24   Missouri versus Chicago.  I'm not sure.

25       Q.   So that's not a type of assessment that you

William Sawyer, Ph.D.

1    do to analyze whether your assumptions are

2    conservative or not; is that correct?

3       A.   I mean, I do look for obvious errors that

4    exist.  You know, I grew up and lived right up

5    through 2003 full-time in New York State and spent

6    five years in Indiana, central Indiana, and weeds

7    begin to grow, begin to break through in Indiana

8    certainly, depending on each year, but things start

9    to turn green in Indiana, especially in southern

10   Indiana, in March, where in upstate northern New

11   York State we had snow on the ground until April.

12           I mean, I just -- I can't be much more

13   precise than that.  I'm not an agronomist or a

14   botanical expert. As I -- again, this is a fact in

15   the case in terms of -- I treated it as a fact in

16   the case --

17      Q.   Okay.

18      A.   -- and if there is some question about that,

19   I'm sure you will cross-examine Mr. Schafer, as a

20   well-qualified attorney, and get to the bottom of

21   it, but as a toxicologist, I have done the best I

22   can with it and I really can't rule out March.  I

23   think it's possible, but I just don't have the

24   expertise as a botanist and meteorologist to go any

25   further than I did.

William Sawyer, Ph.D.

1      Q.   Okay.  For your opinions, did you base them

2  on Mr. Schafer never bathing or washing off after he

3  sprayed Roundup?

4           MS. FREDONA:   Objection; form.

5      A.   On page 22, last paragraph, I've provided

6  some information with respect to that question.

7      Q.   You said Mr. Schafer typically bathed in the

8  mornings; is that right?

9      A.   Yes.

10      Q.   So for your opinions, did you ask him

11  whether he ever washed off after he sprayed Roundup?

12      A.   Yes.

13      Q.   And what did he say?

14      A.   That he washed his hands with soap after

15  spraying.

16      Q.   Okay.  Did he tell you anything else about

17  what he washed after he sprayed?

18      A.   That's the only thing he washed.

19      Q.   And did he wash his hands after spraying

20  since the beginning of his use of Roundup?

21      A.   No.

22      Q.   One of the things you say is -- let's see

23  what page.  Well, you said -- maybe it's page 22 --

24  that his wife said -- "At times, his wife even told

25  him that she could smell the Roundup on him."  Is

William Sawyer, Ph.D.

1    that right?

2       A.   Correct.

3       Q.   Is that what he told you?

4       A.   I need to look at that page.

5       Q.   Page 22 of the report -- right? -- where you

6    said Mr. Schafer typically bathed in the morning,

7    the next sentence says:  "At times, his wife even

8    told him that she could smell the Roundup on him."

9       A.   Yeah, that's information I ascertained

10   directly from Mr. Schafer.

11      Q.   And did you ask Mr. Schafer or Mrs. Schafer

12   what Roundup smells like?

13      A.   I don't recall.

14      Q.   Is there a specific smell for Roundup?

15           MS. FREDONA:  Objection.

16      A.   Yes.

17      Q.   Okay.  What is that?  What is the --

18      A.   I would describe it as a pungent, a sweet --

19   well, semisweet pungent odor.

20      Q.   You also say there that Mr. Schafer reported

21   that he typically wore shorts, T-shirt, sandals, and

22   often walked through the weeds as he sprayed, right?

23      A.   Yes.

24      Q.   Did he ever wear any other clothing other

25   than T-shirt, shorts, and sandals?

William Sawyer, Ph.D.

```
 1      A.   Yes.  It depended on where he lived.  When

 2   he was in Illinois, he wore long sleeves and pants

 3   in cold weather.

 4      Q.   Did you write that down in your report?

 5      A.   No.

 6      Q.   Okay.  Is there any reason you didn't write

 7   that down in your report?

 8      A.   It's more of a self-evident thing.  Illinois

 9   weather can get quite cool, and it's just logical,

10   whereas his residence in Arizona or California would

11   be quite different in terms of the conditions.

12      Q.   Okay.  Do you describe what types of long

13   sleeves or long pants he wore in Illinois?

14      A.   No.

15      Q.   Did he describe in what months he wore long

16   sleeves and long pants in Illinois?

17      A.   No.  He just stated that if it were warm

18   weather, he typically would wear the shorts and

19   sandals; if it were cool weather in April or May,

20   for example, he would wear long pants, long sleeves.

21      Q.   Doctor, why don't we take a quick break.  I

22   think we've been going about two-and-a-half hours,

23   maybe a little more, but I just want to make sure I

24   have everything else I need to cover in the next 20

25   to 30 minutes.  Okay?  Now a good time for a break?
```

William Sawyer, Ph.D.

```
 1      A.   Yeah, but what time?  Let's actually

 2   designate a time so we don't waste -- I don't want

 3   to waste your time or anyone else's.

 4          MR. HOGUE:  Yeah.  Why don't we say we start

 5      back at -- I have 11:08.  If we start back at

 6      11:13, five minutes, I'm fine with that, and I

 7      think probably 20 minutes is what I'll have left,

 8      and I'm pretty sure I have that time, since we've

 9      taken a couple of breaks, including mine that

10      started the day with my dad.  So I apologize for

11      that, but...

12          So about 20 minutes left, is that right,

13      Court Reporter?

14          That's all right.  We can go off and take

15      five minutes.

16          THE WITNESS:  Please take more time if you

17      need to for your dad.

18          MR. HOGUE:  No, I'm good.  I'll finish up

19      with him after the deposition in about 20 or 30

20      minutes.  All right.  Thanks.

21          THE VIDEOGRAPHER:  Okay.  The time is

22      11:09 a.m. and we're off the record.

23          (Recess from 11:09 a.m. until 11:18 a.m.)

24          THE VIDEOGRAPHER:  The time is 11:18 a.m.

25      and we are on the record.
```

William Sawyer, Ph.D.

1    BY MR. HOGUE:

2        Q.   Doctor, I want to go to page 33 of your

3    report, and then to page 34.  You say that these are

4    the six main studies you looked at for your opinions

5    related to the exposure and the risk of non-Hodgkin

6    lymphoma; is that correct?

7        A.   No, that's not right.

8        Q.   Okay.

9        A.   I explained in my report and in deposition

10   these are the six studies that offer a dose metric.

11       Q.   Okay.  And those are the Eriksson study, the

12   McDuffie study, the Andreotti study, the Leon study,

13   the Zhang study, and the Pahwa study, right?

14       A.   Yes.

15       Q.   Okay.  And for the Eriksson study, did it

16   specifically break out the risk of follicular

17   lymphoma?

18       A.   One of the studies did.  Let me take a look.

19            Yes.  If you look at page 1658 of Eriksson,

20   Eriksson states that:  "On the other hand, the group

21   follicular lymphoma was not clearly associated with

22   phenoxyacetic acids, and only nonsignificantly with

23   glyphosate."

24            And that's an important point to consider

25   with the epidemiology in terms of limitations of

William Sawyer, Ph.D.

1    Type 2 error, that is, inability to have a

2    significant level of confidence but yet an increased

3    odds ratio due to the small sample size.

4          In other words, the follicular lymphomas

5    occur at such a less -- a smaller rate that it

6    increases the Type 2 error, that is, the ability to

7    see a change at a statistically significant level

8    due to the small sample size.

9    Q.   Okay.  And did the McDuffie study

10   specifically look at follicular lymphoma?

11   A.   No.  They make no mention of it.

12   Q.   And --

13   A.   I think one of the meta-analyses did examine

14   for follicular and found it was at an increased odds

15   ratio, but not significant.

16   Q.   Okay.  So let's talk about the next one on

17   your list, which was the Andreotti 2018.  Did it

18   specifically discuss follicular subtype of the

19   non-Hodgkin lymphoma with the exposure to Roundup?

20   A.   It did, on page -- the page number -- page 5

21   of 8.

22   Q.   Okay.

23   A.   And it's not significant and nonelevated.

24   Q.   And page -- I guess it's Table -- Table 2

25   they discuss follicular lymphoma with a -- is that

William Sawyer, Ph.D.

1    what you're talking about?

2        A.   On page -- Table 2 continued, page 5 of 8,

3    yes.

4        Q.   And in -- it had a -- with the highest

5    exposure, it had a 0.85 odds ratio or relative risk

6    for follicular lymphoma with the highest exposure to

7    Roundup, right?

8        A.   Yes.  And, also, if you look at Table 3 on

9    page 6 of 8, you will see follicular lymphoma began

10   not showing a significant increase.  You know, the

11   Quartile 3 exposure group got a 1.06, but it was

12   nonsignificant.

13       Q.   I think the one I'm looking at says 1.03.  I

14   don't know that that's different between -- I'm

15   looking at what was published on page 514, but

16   anyway, you would not say that there is any

17   association between follicular lymphoma and

18   glyphosate shown in the Andreotti study, would you

19   agree with that?

20       A.   Right, it was nonsignificant.  And I'm

21   looking again, just to be clear on the record, I'm

22   looking at page 5 of 8 and page 6 of 8.

23       Q.   Okay.  And does the -- the next study you

24   cite is the Leon study, right?

25       A.   Yes.

1    Q.   And does the Leon study look at follicular

2    lymphoma?

3    A.   As I recall, yes.

4    Q.   I think if you go to --

5    A.   Page 16 of 24.

6    Q.   Okay.  And in that, there's a section

7    talking about follicular lymphoma; is that right?

8    A.   Yes.

9    Q.   And there were 214 follicular lymphomas in

10   that study; is that right?

11   A.   Yes.

12   Q.   And in that study, they didn't report an

13   increased risk of follicular lymphoma with the use

14   of glyphosate -- is that right? -- if you look at

15   Table 2?

16   A.   Well, yes, but if you look at Paragraph 3 on

17   page 1525, under "follicular lymphoma," it's

18   reported:  "During follow-up, 214 follicular

19   lymphoma cases were diagnosed.  None of the chemical

20   groups or active ingredients was associated with

21   follicular lymphoma.  Moderately elevated mHRs but

22   with wide CIs" -- that's confidence intervals --

23   "were observed in association with ever use of a few

24   active ingredients, of which the least imprecise

25   estimate corresponds to terbufos," which was, again,

William Sawyer, Ph.D.

1    nonsignificant.

2           And so, really, they found no significant

3    associations.

4           And then if we look at Table 2, yeah, we see

5    the raw data as well.

6    Q.   Specifically for glyphosate, the hazard

7    ratio was 0.79, less than 1, right?

8    A.   That's right.

9    Q.   And so in the Leon study, you would not say

10   that glyphosate was associated with follicular

11   lymphoma; is that right?

12   A.   Yes.

13   Q.   All right.  And then the next study you talk

14   about is the -- is it the Pahwa study?  The Zhang

15   study?

16          The Zhang study.  And did the Zhang study

17   look at follicular lymphoma?

18   A.   No, it did not.

19   Q.   Don't see anything either.  All right.

20          And then the last one you cite to is the

21   Pahwa study.  You say that there -- in your

22   analysis, there are 468 follicular lymphomas

23   analyzed, right?

24          Do you see that?  That's what you put in

25   your report.

William Sawyer, Ph.D.

1      A.   Yeah, that's correct, and --

2      Q.   If you look at the Pahwa study, it also says

3  468 follicular lymphomas, right?

4      A.   Right.  That's in Table 1.  Yeah.

5      Q.   Is Pahwa the largest study of the number of

6  follicular lymphomas that have been analyzed?

7      A.   Number-wise, it appears that way, yes.

8      Q.   And in Table 2, it shows that the follicular

9  lymphoma odds ratio with glyphosate is 0.69, right?

10      A.   It does; however, the statistic I was

11  speaking of earlier that is important with respect

12  to significance and possible dose-response measure

13  is in Table 4, and that's regarding the frequency of

14  glyphosate handling and associations with

15  non-Hodgkin lymphoma.

16          And for follicular lymphoma, the control

17  group had an odds ratio of 1.0, and then the greater

18  than zero but less than two-year or equal to

19  two-year group was a .81, and the greater than two

20  days exposure was an odds ratio of 2.21, the

21  confidence interval of .99 to 4.93.

22          So that was a nonsignificant confidence

23  interval, but only by a hair.  It just missed

24  confidence at the 95 percent level.  So that -- that

25  included -- and here's the important thing to

William Sawyer, Ph.D.

1    recall, is that that included only eight cases, and

2    if you look at the greater than zero and less than

3    two-year exposure, it's only seven cases.

4         So, see, the number of cases is fairly

5    small, so it's -- you have to take in consideration

6    that it's not the most prevalent type of lymphoma,

7    and therefore, the P2 error, that is the error of

8    not -- having a significant effect but only what

9    appears be a slightly increased odds ratio, is what

10   we're dealing with in this case.

11   Q.   Doctor, for follicular lymphoma there,

12   you're looking at the OR with, I guess, superscript

13   A, and then there's an OR with superscript B.  Do

14   you see that?

15   A.   Yes.

16   Q.   And for the superscript B, greater than two

17   days follicular lymphoma, the odds ratio was 1.33

18   with a reference range of 0.55 to 3.23, right?

19   A.   Yes, I see that.

20   Q.   And that's not a significant association for

21   greater than two days of use of glyphosate with

22   follicular lymphoma, right?

23   A.   It is not, no.  And, again, as I state, the

24   number of cases are rather small.

25   Q.   And the difference between the number that

William Sawyer, Ph.D.

1    you cited and the one -- the one that's the 1.33

2    that's not significant is that in B they adjusted

3    for other chemicals, including 2,4-D, dicamba, and

4    malathion, right?

5        A.   Yes.

6        Q.   So after they adjusted for those exposures,

7    the risk reported was not significant and not close

8    to significant, right?

9        A.   If the -- the value was similar in the fact

10   that the confidence interval went all the way to

11   3.23, as low as .55.  It was a very wide confidence

12   interval due to the low number of cases.

13           And this is a good example, again, where the

14   odds ratio of 2.21, which was almost significant at

15   the 95 percent level certainty, is not significantly

16   different from 1.33 based on the range of a .55 to

17   3.23.  You see that the 2.21 odds ratio is within

18   that range, and if you look at the range of the A

19   footnote, that range is .99 to 4.93, and you'll see

20   that the 1.33 falls within that range.

21           So it would be false to state that the odds

22   ratio of A column versus the B column are different.

23   They're not.  They're the same.  Neither of them are

24   different.

25       Q.   Doctor, one more question on this.  If you

William Sawyer, Ph.D.

1    go to page -- it's my page 5, upper left-hand

2    corner, right under the conclusion of -- where it's

3    talking about follicular lymphoma, it says -- or

4    subtypes of lymphoma, it says:  "There are no

5    association" -- excuse me.

6         Quote:  "There was no association apparent

7    for FLB."  Follicular lymphoma.

8         Do you see that?

9    A.    That's correct.  As I said, it was not a

10   statistically significant finding.  It was close,

11   but it was not statistically significant.

12   Q.    So you agree with the authors of the study

13   that there was no association apparent between

14   glyphosate and follicular lymphoma in the Pahwa

15   study?

16   A.    At the 95 percent level of certainty, yes.

17   At the 94 percent level of certainty, that wouldn't

18   be true.  It would be significant at the 94 percent

19   level of certainty.  So I agree with that based on

20   the use of the 95 percent confidence interval, yes,

21   I agree.

22   Q.    But if you adjust for these other chemicals

23   and their confounding on the data, it wouldn't be

24   significant at or even close to significant at the

25   95 percent confidence level; is that right?

1     A.   That's true.

2     Q.   All right.  So, Doctor, as far as -- well,

3    let me -- I want to make sure I've covered the rest

4    of your opinions.  You don't have any opinion on

5    Mr. Schafer's prognosis; is that right?

6     A.   I do not.

7     Q.   And you don't have any opinions as to

8    whether his diffuse large B-cell lymphoma will

9    reoccur or not, right?

10     A.   That's correct.

11     Q.   And do you understand that Mr. Schafer is

12    currently in remission?

13     A.   Yes.

14     Q.   And you will not be providing any opinion

15    about whether or what the likelihood of him staying

16    in remission?

17     A.   Correct.

18     Q.   You will defer to the oncologist or other

19    treating doctors and experts on those issues; is

20    that right?

21     A.   Yes.

22     Q.   With respect to the two different types of

23    Roundup that you said Mr. Schafer used, do you know

24    what surfactants were used in those two different

25    types of Roundup?

William Sawyer, Ph.D.

```
 1      A.   Yes.

 2      Q.   And what were they?

 3      A.   Doctor, are you waiting on me?

 4      A.   No, I'm looking at my report.

 5      Q.   Okay.

 6      A.   I think the easiest way to handle this is

 7   turn to page 57, Table 13, and I've identified from

 8   periods of time what surfactants were used.  For

 9   example, very commonly, from 2002, even to the more

10   current years, tallow amine, t-a-l-l-o-w a-m-i-n-e,

11   was very common, and yet you see in 1999, when

12   Mr. Schafer was using Roundup, there was a number of

13   products that were used.  It varies with time.

14          And on Table 14, the very next page, on the

15   Ready-To-Use Weed & Grass Killer, with EPA

16   registration of July 13th, 1992, we have the

17   polyoxyethylene alkylamine, and as we saw on the jug

18   label that Mr. Schafer had, that showed the

19   pelargonic acid, which the pelargonic acid is not

20   actually -- well, it could have some surfactant

21   actions, but it actually strongly assists in killing

22   the weeds.

23      Q.   So on Table 14, which of the two types of

24   Roundup that Mr. Schafer said he used?  The first

25   one?
```

William Sawyer, Ph.D.

```
1        A.    Well, he used the Weed & Grass Killer.

2        Q.    Okay.

3        A.    That one was registered in July 13th, '92.

4              We also have the Weed & Grass Killer

5     Ready-To-Use towards the bottom of that table, on

6     page 58, registered in May 20th, 1998, which

7     contained, again, the polyoxyethylene alkyl

8     phosphate ester.  It also contained polyethylene

9     glycol, dipropylene glycol, which is a little

10    different.

11             And then further down on the table on page

12    59, there is Roundup Weed & Grass Killer

13    Ready-To-Use with a 2002 label.  Again, very

14    similar.  I think maybe the silicone emulsion was

15    added.  No, that was there previously as well.

16       Q.    Was the -- is the extended version that you

17    were talking about for Mr. Schafer, the one he

18    referred to as the extended version of Roundup, is

19    that listed in Table 14?

20       A.    No, I don't have any data on the extended.

21       Q.    Okay.  All right.  I want to make sure that

22    I have covered all the important opinions that you

23    have in your report.  Have I -- is there something

24    else about his exposure or his use of Roundup that

25    is -- that I have not yet covered?
```

William Sawyer, Ph.D.

1      A.   The only thing I can point out is, still on

2   Table 14, the very last entry, where it says

3   "multiple formulations," it's a different EPA

4   registration number, but it's still for -- it's for

5   Roundup Ready-To-Use Weed & Grass Killer III.  I

6   don't know that he used that, but it is -- it is

7   possible, but it's not real important.

8      Q.   Okay.  Anything else?  I know you have a lot

9   of generic opinions that I have not covered, nor do

10  I have time to today, that have been covered in the

11  past, but I'm trying to -- if there is anything else

12  specific to Mr. Schafer or his case, I'd like to

13  make sure I know about it so I can cover it.

14           There's nothing else outside of your report;

15  is that correct?

16     A.   Yes.

17           MR. HOGUE:  All right.  I think that's the

18     questions I have today.

19                    CROSS-EXAMINATION

20  BY MS. FREDONA:

21     Q.   Good morning, Dr. Sawyer.  I only have a

22  couple of questions again.

23           Of all the studies that you've reviewed, is

24  there any indication that Roundup exposure increases

25  the risk of follicular lymphoma?

William Sawyer, Ph.D.

1    A.   Well, follicular lymphoma is a closely

2    related lymphoma to DLBCL, and studies, the six

3    epidemiological studies that I've focused on, are

4    with respect to dose metrics; and with respect to

5    other studies linking follicular lymphoma to NHL, I

6    defer to other experts in this case, such as

7    Dr. Ritz, Dr. Portier, Dr. Weisenburger, as I

8    focused primarily on the dose aspects as opposed to

9    the review of the entire body of animal and human

10   epidemiological studies with respect to general

11   causation, and, really, that's the area that has

12   previously been covered by Dr. Portier and Dr. Ritz.

13   Q.   So whether or not Mr. Schafer's diffuse

14   B-cell lymphoma had developed as a result of this

15   follicular lymphoma, that's an issue you would defer

16   to another expert?

17   A.   Yes.  It's very possible that's what

18   happened, but I'm not really the expert to make that

19   decision.

20   Q.   All right.  And in your expert opinion, to a

21   reasonable degree of toxicological certainty, did

22   Mr. Schafer's exposure to Roundup -- was that a

23   significant factor contributing to his development

24   of non-Hodgkin lymphoma, the B-cell?

25        MR. HOGUE:  Objection; leading.

William Sawyer, Ph.D.

1      A.   Yes, based on the dosage and exposure days,

2   which he exceeded all known dose metrics.  He's

3   beyond all of the dose metric ranges of the six

4   studies.  Well, not beyond that of the agricultural

5   health study, but of the five studies, he exceeds

6   the ranges, metric ranges associated as with

7   statistically significant rates of NHL.  It is my

8   opinion that NHL was certainly a strong contributing

9   factor to the development of his NHL.

10          MS. FREDONA:  All right.  Thank you very

11      much, Dr. Sawyer.  I have no more questions.

12                   REDIRECT EXAMINATION

13   BY MR. HOGUE:

14      Q.   Doctor, I have one question that I left off,

15   and maybe I did ask it, but I want to -- you don't

16   have any opinions about Mr. Schafer's treatment or

17   additional treatment that he will need; is that

18   correct?

19      A.   That's correct.  That's definitely not my

20   area.  That's for treating oncologists.

21          MR. HOGUE:  All right.  Thanks, Doctor.

22          THE WITNESS:  Okay.  Very good.

23          THE VIDEOGRAPHER:  Okay.  Are we ready to go

24      off record?

25          MR. HOGUE:  Yes.  As far as the exhibits, I

```
 1    have written down Exhibits 1 through 5.  I know
 2    we discussed other articles, which we didn't
 3    mark.  I don't know that -- I think they're
 4    pretty easily identifiable.  If Dr. Sawyer wants
 5    to make them additional exhibits, I am fine with
 6    that, but I'm also fine not marking them as
 7    separate exhibits.
 8         Rebecca, do you have any suggestions?
 9         MS. FREDONA:  I have no opinion on the
10    matter.
11         MR. HOGUE:  Dr. Sawyer, I believe I have --
12    I know I have the notice of deposition, your
13    invoices now, your report with your attachments,
14    your CV, and your testimony list, which I can
15    send to the court reporter, as well as your
16    counsel, and I am fine not marking any of the
17    studies that we have discussed by name.  Is that
18    okay with you, or would you rather send to your
19    counsel or me the studies that you were referring
20    to?
21         THE WITNESS:  No, I think we're all set.
22         MR. HOGUE:  Okay.  I will send the court
23    reporter Exhibits 1 through 5 today.  Thank you.
24         THE WITNESS:  Thank you.
25         THE VIDEOGRAPHER:  Okay.  The time is
```

William Sawyer, Ph.D.

1        11:48 a.m. and we are off the record.

2             (Whereupon, the deposition concluded at

3     11:48 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

William Sawyer, Ph.D.

```
 1              C E R T I F I C A T E

 2          I, Susan D. Wasilewski, Registered

 3   Professional Reporter, Certified Realtime Reporter,

 4   Certified Manager of Reporting Services, Certified

 5   Realtime Captioner, and Florida Professional

 6   Reporter, hereby certify that the witness named

 7   herein appeared via Remote Counsel/Zoom technology

 8   on Tuesday, February 16, 2021, and was duly sworn.

 9          I FURTHER CERTIFY that I was authorized to

10   and did stenographically report the examination of

11   the witness named herein; that a review of the

12   transcript was not requested; and that the foregoing

13   transcript is a true record of my stenographic

14   notes.

15          I FURTHER CERTIFY that I am not related to

16   or an employee of any of the parties, nor am I

17   related to or an employee of any of the parties'

18   attorneys or counsel connected with this action, nor

19   am I financially interested in the outcome of this

20   action.

21          WITNESS my hand this 17th of February, 2021.

22

23   _____

24   Susan D. Wasilewski, RPR, CRR, CMRS, CRC, FPR

25
```

William Sawyer, Ph.D.

```
 1                        LAWYER'S NOTES

 2    PAGE    LINE

 3    _____   _____    _____

 4    _____   _____    _____

 5    _____   _____    _____

 6    _____   _____    _____

 7    _____   _____    _____

 8    _____   _____    _____

 9    _____   _____    _____

10    _____   _____    _____

11    _____   _____    _____

12    _____   _____    _____

13    _____   _____    _____

14    _____   _____    _____

15    _____   _____    _____

16    _____   _____    _____

17    _____   _____    _____

18    _____   _____    _____

19    _____   _____    _____

20    _____   _____    _____

21    _____   _____    _____

22    _____   _____    _____

23    _____   _____    _____

24    _____   _____    _____

25
```