# EXHIBIT 11

William Sawyer, Ph.D.

```
 1                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF CALIFORNIA
 2
 3    IN RE:  ROUNDUP PRODUCTS          |MDL No. 2741
                                        |
 4    LIABILITY LITIGATION              |
                                        |
 5    --------------------------------|
      This document relates to:         |
 6                                       |
      Gerard Cervantes v. Monsanto Co. |
 7    Case No. 3:19-cv-03015            |
                                        |
 8    --------------------------------|
 9
10                      - - -
11              Tuesday, February 16, 2021
12                      - - -
13
14         This is the Remote Videotaped Deposition of
15    WILLIAM SAWYER, Ph.D., commencing at 1:33 p.m., on
16    the above date, before Susan D. Wasilewski,
17    Registered Professional Reporter, Certified Realtime
18    Reporter, Certified Manager of Reporting Services,
19    Certified Realtime Captioner, and Florida
20    Professional Reporter.
21                      - - -
22              GOLKOW LITIGATION SERVICES
23         877.370.3377 ph | 917.591.5672 fax
24                  deps@golkow.com
25
```

William Sawyer, Ph.D.

```
 1    APPEARANCES VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:
 2       MOLL LAW GROUP
         BY:  REBECCA FREDONA, ESQUIRE
 3            rfredona@molllawgroup.com
              FATIMA ABUZERR, ESQUIRE
 4            fabuzerr@molllgroup.com
         22 West Washington Street, 15th Floor
 5       Chicago, Illinois 60602
         Phone: (312) 462-1700
 6       Representing the Plaintiff
 7
 8
 9       NELSON MULLINS RILEY & SCARBOROUGH LLP
         BY:  ERIC A. PAINE, ESQUIRE
10            eric.paine@nelsonmullins.com
         1320 Main Street, 17th Floor
11       Columbia, South Carolina 29201
         Phone:  (803) 799-2000
12       Representing Defendant Monsanto Company
13
14
15    ALSO PRESENT VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:
16       MELISSA JAMES, Videographer
17
18
19
20
21
22
23
24
25
```

William Sawyer, Ph.D.

```
 1                       - - -
 2                   I N D E X
 3                       - - -
 4    Testimony of:  WILLIAM SAWYER, Ph.D.          PAGE
```

```
 5        DIRECT EXAMINATION BY MR. PAINE.............   6
 6        CROSS-EXAMINATION BY MS. FREDONA...........  106
```

```
 7
 8
 9
10                E X H I B I T S
11        (Attached to transcript except where noted)
12    WILLIAM SAWYER, Ph.D., DEPOSITION EXHIBITS     PAGE
```

```
13    Exhibit 1    Expert Report                        8
                   Toxicology Consultants & Assessment
14                 Specialists, LLC
15    Exhibit 2    Invoice                             12
                   * To be provided by Plaintiff's
16                 counsel
17    Exhibit 3    Materials Considered List           14
                   * To be provided by Plaintiff's
18                 counsel
19    Exhibit 4    Pathology Report                    16
                   * To be provided by Plaintiff's
20                 counsel
21    Exhibit 5    Body Mass Index Calculator Page     26
22    Exhibit 6    Article - Body mass index and risk  33
                   of non-Hodgkin's and Hodgkin's
23                 lymphoma: A meta-analysis of
                   prospective studies
24                 Susanna C. Larsson, et al.
```

```
25
```

William Sawyer, Ph.D.

```
 1                    E X H I B I T S
 2          (Attached to transcript except where noted)
 3    WILLIAM SAWYER, Ph.D., DEPOSITION EXHIBITS        PAGE
 4   Exhibit 7    IARC Monograph - Welding, Molybdenum   49
                  Trioxide, and Indium Tin Oxide
 5                Volume 118
 6   Exhibit 8    Article - Occupation and Rick of       53
                  Non-Hodgkin's Lymphoma and Chronic
 7                Lymphocytic Leukemia
                  Tongzhang Zheng, et al.
 8
     Exhibit 9    Article - Exposure to benzene at       70
 9                work and the risk of leukemia: A
                  systematic review and meta-analysis
10                Abdul Khalade, et al.
11   Exhibit 10   Article - Occupational Exposure to     72
                  Benzene and Non-Hodgkin Lymphoma in
12                a Population-Based Cohort: The
                  Shanghai Women's Health Study
13                Bryan A. Bassig, et al.
14
15
16
17
18
19
20
21
22
23
24
25
```

William Sawyer, Ph.D.

```
1                        - - -

2              THE VIDEOGRAPHER:  We are now on the record.

3       My name is Melissa James.  I'm a videographer for

4       Golkow Litigation Services.  Today's date is

5       February 16th, 2021, and the time is 1:33 p.m.

6              This remote video deposition is being held

7       in the matter of In Regard:  Roundup Products

8       Liability Litigation, Number MDL Number 2741,

9       Gerard Cervantes vs. Monsanto Company, Case

10      Number 3:19-cv-03015, for the court United States

11      District Court, Northern District of California.

12             The deponent is Dr. William Sawyer.

13             All parties to this deposition are appearing

14      remotely and have agreed to the witness being

15      sworn in remotely.  Due to the nature of remote

16      reporting, please pause briefly before speaking

17      to ensure all parties are heard completely.

18             Will counsel please identify themselves.

19             MS. FREDONA:  Rebecca Fredona and Fatima

20      Abuzerr on behalf of Plaintiff.

21             MR. PAINE:  I am Eric Paine with Nelson

22      Mullins Riley & Scarborough on behalf of

23      Monsanto.

24             THE VIDEOGRAPHER:  The court reporter is

25      Susan Wasilewski and will now swear in the
```

```
 1      witness.
 2           THE COURT REPORTER:  Would you raise your
 3      right hand?
 4           Do you solemnly swear or affirm the
 5      testimony you're about to give will be the truth,
 6      the whole truth, and nothing but the truth?
 7           THE WITNESS:  Yes, I do.
 8           THE COURT REPORTER:  Thank you.
 9           WILLIAM SAWYER, PhD, called as a witness by
10      the Defendant, having been duly sworn, testified as
11      follows:
12                    DIRECT EXAMINATION
13      BY MR. PAINE:
14      Q.   Doctor Sawyer, would you give us your full
15      name for the record, please?
16      A.   William Robert Sawyer.
17      Q.   Dr. Sawyer, we know each other, we've done
18      this a few times before but this is our first time
19      doing it in a remote environment, virtual
20      environment.  So I know you know the rules of
21      depositions, but just to refresh since it has been a
22      little while, it's even more important than normal
23      for us to make sure we don't speak over one another
24      and that Susan has a chance to get everything down
25      on a clean record.  So, as they said, if you would
```

William Sawyer, Ph.D.

```
1    give me a pause before you begin answering my
2    question, I'm going to try and do the same courtesy
3    and pause before I ask you the next question unless
4    you've given an answer.  Okay?
5        A.   Yeah.  That's a very good point regarding
6    the pause.
7        Q.   All right.  Also, since you and I aren't
8    here together, there are some natural limitations --
9    or we aren't in the same room together, there are
10   some limitations with exchanging exhibits and
11   likewise.  If you are looking at a document or
12   you're looking at something on your screen, I do not
13   know what that is just given -- given our current
14   virtual environment.  So if something like
15   that happens, would you please identify for me what
16   you're referring to or what you're looking to when
17   you're consulting something.  Okay?
18       A.   I'll do that.
19       Q.   All right.  And then finally, if you would
20   agree with me, please don't communicate with anyone
21   else while we're on the record, including text
22   messages, e-mails, phone calls, anything like that.
23   If you need to take a break, we can certainly do
24   that, but if you would refrain from other
25   communications while we're on the record, I'd
```

```
 1    appreciate that too.

 2        A.   Yes.

 3        Q.   All right.  Is there anyone else in the room

 4    with you, Doctor?

 5        A.   Yes.

 6        Q.   Who is with you, please?

 7        A.   We have -- I have to disclose this.

 8             THE WITNESS:  Come on.  Expose yourself.

 9        A.   It's a golden retriever.

10        Q.   Okay.  We can stipulate the golden retriever

11    will stay, and the other dog too.

12        A.   And a little Shetland, but they'll be quiet.

13    They actually are better in my office.  They zone

14    out and dream about not working.

15        Q.   It sounds like a pretty good life.

16        A.   Yeah.

17        Q.   Any other humans in the room with you?

18        A.   None.

19        Q.   All right.  Very good.  Dr. Sawyer, I'm

20    going to move through this as efficiently as

21    possible.  Again, you and I have done this a number

22    of times before, so let me introduce the first

23    exhibit to your deposition.

24             (Sawyer Exhibit 1 was marked for

25    identification.)
```

William Sawyer, Ph.D.

```
 1    BY MR. PAINE:
 2       Q.   Are you able to access the shared exhibit
 3    folder on Golkow?
 4       A.   Yes.
 5       Q.   Okay.  Very good.  If you would just give
 6    that a second, I've marked as Exhibit 1 to your
 7    deposition a copy of your report for the Cervantes
 8    case.  Are you able to see that?
 9       A.   I think I need to click on one item.  We are
10    set up for it and we've used it already.  I'm just
11    trying to remember how to activate it.
12       Q.   If there is any trouble, I can share my
13    screen with you and move through the document, but
14    it should be available momentarily in the shared
15    exhibits folder.
16       A.   Oh, I know.  I'm just trying to remember how
17    to call that folder up.
18            THE COURT REPORTER:   He needs the link to
19        the exhibit folder.
20       A.   It's just I forget how to click onto that.
21       Q.   Yeah.  I think that was sent through the
22    court reporter yesterday.
23            MS. FREDONA:  I think I need the link as
24        well.
25       A.   Okay.  Here's the link.  You know what?  I
```

William Sawyer, Ph.D.

1    didn't click on it.  It's right here.  Link to

2    provide to witness, marked exhibits.  There we go.

3    Download all files.

4        Q.   Okay.  I think there was an e-mail from the

5    court reporter yesterday that had that link in

6    there.  I don't know that I have it right now.

7        A.   I have the e-mail I can send around.

8        Q.   Okay.  Yeah, if you wouldn't mind doing that

9    and then --

10       A.   What I'll do is I'll just do -- right now it

11   has John Kalas, of course, Eric, James Meredith, Ken

12   Moll, so I'll need to add additional.  Who else

13   would like that?

14            MS. FREDONA:  Me.

15            THE WITNESS:  Okay.  Rebecca, what is -- let

16       me see if your e-mail comes up.  No.  What are

17       the first three letters of your e-mail?

18               (Discussion off the record.)

19   BY MR. PAINE:

20       Q.   Okay.  While that's coming through, Doctor,

21   are you able to see Exhibit 1 in your folder?

22       A.   Yes.

23       Q.   Okay.  Very good.  And that's the first page

24   at least.  That's your report for the Cervantes

25   case?

William Sawyer, Ph.D.

1      A.   It is.

2      Q.   And does that report, to the best of your

3   ability, contain the opinions you intend to give at

4   trial in this case?

5      A.   Yes.

6      Q.   All right.  Did you have access to all the

7   information you felt that you needed in order to

8   reach your opinions in the Cervantes case when you

9   prepared this report?

10          Doctor, did you understand my question?

11     A.   Yeah, I'm just looking over my report.

12          Yes.  I mean, the only thing I can -- it's

13  rather picky, but the only thing I wish I had and I

14  still don't have but I've been trying to get it for

15  years is a formulation of the surfactants and the

16  so-called inert ingredients for the different

17  products, and in my report, on one of the tables, I

18  have a compilation of what I've accumulated thus far

19  from review of Monsanto confidential or internal

20  documents, but I don't really have the --

21  necessarily the full printout of product ingredients

22  for the products used by Mr. Cervantes.

23     Q.   Okay.  Did you have all -- aside from that,

24  did you have the information you felt you needed

25  regarding Mr. Cervantes's case to reach the opinions

William Sawyer, Ph.D.

1    that you've discussed in your report?

2        A.    Yeah.   Like I say, the Roundup Pro and the

3    Roundup Grass and Weed Killer used, there is

4    different -- I have some of the years of the EPA

5    registry data, but not necessarily all of it.   I

6    beyond that I have everything, yeah.

7        Q.    Okay.   Have you submitted any invoices for

8    your work in the Cervantes case to Plaintiff's

9    counsel?

10        A.    Yes.   I just submitted one.   I do have a PDF

11    of it I could provide.

12        Q.    Yeah.   If you would provide that, we'll mark

13    that as Exhibit 2 and we'll provide that to the

14    court reporter later, but if you can provide that to

15    Rebecca and she can just send it on to me, that'd be

16    great.

17            (Sawyer Exhibit 2 was marked for

18    identification.)

19    BY MR. PAINE:

20        Q.    As to that, for the moment, just in the

21    interest of moving on quickly, do you recall how

22    much your invoice was for regarding your work on the

23    Cervantes case?

24        A.    Somewhere in the proximity of around

25    $12,000.

William Sawyer, Ph.D.

```
 1          MS. FREDONA:  We don't want you to guess,

 2     Doctor.

 3     A.   Yeah.  Well, plus the initial retainer, so,

 4     yeah, I don't -- I don't know exactly without

 5     looking.  I could look now.  I mean, it's easiest

 6     enough to do.

 7     Q.   That's okay.  Let's -- we'll let the invoice

 8     speak for itself, but could you estimate for me

 9     roughly how much time you've spent on the Cervantes

10     case up to the point we began today's deposition,

11     please?

12     A.   I really need to look at the invoice to be

13     accurate.

14          Are you waiting for me?

15     Q.   Yes.

16     A.   Oh, okay.  Well, I'll look at the invoice

17     then.

18          Okay.  A total of 29.9 hours and the invoice

19     amount that went out was $13,470.64, and plus the

20     initial retainer was $9,000.

21     Q.   Okay.  And then from the date of that

22     invoice, whatever it is, up until the time we began

23     this deposition today, can you estimate how much any

24     additional time you've spent on the Cervantes case?

25     A.   Okay.  I'm going to look at my sheet to see
```

William Sawyer, Ph.D.

```
1    if there are any hours logged.

2           None.

3    Q.   All right.  Doctor, on your report, one of

4    the last entries on the very last page talks about

5    new materials reviewed specific to Gerald Francis

6    Cervantes' case, one of which is Number 456, a

7    medical summary.

8           Was that provided to you by Plaintiff's

9    counsel?

10   A.   It was; however, I did not rely on it.  I

11   went through all the medical records and

12   specifically included the diagnoses and pathology

13   findings and history of any adverse pharmaceuticals,

14   drugs, alcohol, et cetera, directly from the medical

15   records.

16   Q.   Okay.  I have seen the medical summary

17   that's Item Number 456 on your Materials Considered

18   List, so I'm going to ask that to be produced and

19   we're going to mark that in absentia as Exhibit 3 to

20   your deposition.

21          MR. PAINE:  Would you make sure that gets to

22      me, Ms. Fredona?

23          MS. FREDONA:  Yes.

24          MR. PAINE:  Thank you.

25          (Sawyer Exhibit 3 was marked for
```

William Sawyer, Ph.D.

```
 1   identification.)

 2       A.   Just to be clear, I think the exhibit for

 3   the invoice, is that going to be Exhibit 2?

 4       Q.   Yes, sir.

 5       A.   Okay.

 6       Q.   Yep.  So Exhibit 3 will be the medical

 7   summary that's Item Number 456.

 8            And then let me ask you, too, Item Number

 9   452 on your list in your report is Pathology, and it

10   says:  (New 11/30/20)

11            What is that, please?

12       A.   Additional records are received on November

13   30th of 2020.

14       Q.   Okay.  Did you receive the original liver

15   biopsy results for Mr. Cervantes?

16       A.   You mean prior to November?

17       Q.   Have you at any time seen the liver biopsy

18   results from when Mr. Cervantes was originally

19   diagnosed with non-Hodgkin lymphoma back in 2004?

20       A.   Oh, you mean from the needle biopsy.  Yes.

21       Q.   You have seen that report?

22       A.   That gave a final pathology confirmation of

23   DLBCL?  I believe so.  That's out of -- I'm looking

24   now on the report.  It's on page 10, actually, in my

25   report, from Advocate Medical Group.
```

William Sawyer, Ph.D.

```
1        Q.   All right.  So I have not seen that myself.

2    Would you please produce that through Ms. Fredona as

3    Exhibit 4 to your deposition?

4        A.   Yeah.  Let me make a note here.

5        Q.   Okay.

6             (Sawyer Exhibit 4 was marked for

7    identification.)

8        A.   Okay.

9        Q.   Okay.  All right.  I understand that you

10   have spoken with Mr. Cervantes at some point; is

11   that correct?

12       A.   Yes.

13       Q.   All right.  When did you speak with him,

14   please?

15       A.   January 7th, 2021.

16       Q.   And consistent with our earlier agreement,

17   what exactly are you looking at to confirm the date

18   when you spoke with him, please?

19       A.   My report.

20       Q.   Okay.

21       A.   And specifically page -- oh, where'd it go?

22       Q.   That's okay.  I just -- I just needed to

23   know generally the document.

24             How long was your discussion with

25   Mr. Cervantes?
```

William Sawyer, Ph.D.

```
 1      A.   Well, I can answer that easily because I

 2   have the invoice on the screen, which I'm looking

 3   at.  On January 7th, the interview was 1.09 hours.

 4      Q.   Have you spoken with Mr. Cervantes at any

 5   other point in time?

 6      A.   I'm looking at the report.  No.

 7      Q.   Okay.  And were there any recordings made of

 8   that conversation with Mr. Cervantes?

 9      A.   No.

10      Q.   Did you take any notes from those

11   conversations other than what has been incorporated

12   into your report?

13      A.   No.

14      Q.   Did you review Mr. Cervantes' deposition?

15      A.   Yes.

16      Q.   Were there any inconsistencies between what

17   Mr. Cervantes told you in your conversation with him

18   and what he testified about in his deposition?

19      A.   Let me check the report.  I'm not finding

20   anything that was conflicting with respect to the

21   information I relied on.

22      Q.   Is there anything that you recall that

23   conflicted with his deposition in terms of any other

24   information, whether you relied on it or not?

25      A.   I wouldn't know because I -- it wouldn't be
```

William Sawyer, Ph.D.

1    in my report.  If it was something to do with his

2    income or the tax return or something of that sort,

3    or money spent on this or that, I don't pay any

4    attention to that, really, so if there was

5    something -- you know, there's nothing in my report

6    that I am finding that is conflicting.

7        Q.   Have you read any other depositions in this

8    case other than Mr. Cervantes' deposition?

9        A.   No.

10       Q.   Did you conduct any kind of a site visit or

11   inspection of any of the places where Mr. Cervantes

12   worked or was exposed to Roundup?

13       A.   No.

14       Q.   Did you investigate any of the equipment

15   that Mr. Cervantes used to apply Roundup?

16       A.   I'm looking at the exhibits.  I don't think

17   there was much there other than the labels.  As far

18   as equipment, I don't have any photos or other means

19   of examining the equipment.

20       Q.   Do you know the brand name or model number

21   of any -- the backpack sprayer that Mr. Cervantes

22   used to apply Roundup?

23       A.   No.  He did not specify, and I am looking at

24   my report.  I asked questions regarding the backpack

25   and all I am finding is that he used it about a year

William Sawyer, Ph.D.

1    into his business, is when he went primarily to

2    using the backpack.  He switched the backpack after

3    one year of occupational use.  So, no, I do not have

4    any specifics on the backpack or backpacks that he

5    used.

6        Q.   Have you reviewed any of the expert reports

7    from any of the defense experts that were served

8    last week?

9        A.   No, I have not received any.

10       Q.   Now, switching a little more specifically

11   and away from kind of the housekeeping to

12   Mr. Cervantes, do you agree that he was diagnosed

13   with diffuse large B-cell lymphoma?

14       A.   Yes.

15       Q.   And to your knowledge, is that one of, if

16   not the most, common form of non-Hodgkin lymphoma?

17       A.   Yes.

18       Q.   Did you make an independent diagnosis of

19   DLBCL in his case or are you relying on his medical

20   records for that?

21       A.   I fully reviewed the pathology results, of

22   course, and have some underlying expertise in

23   pathology, in medical school pathology and I used

24   pathology as a toxicologist for many years.  I also

25   have a master's in cellular and molecular biology

William Sawyer, Ph.D.

1    and I have some understanding of the classification

2    systems based on the genetics for lymphoma.

3            However, I don't make diagnoses as a

4    toxicologist.  I refer to the pathologist with

5    respect to diagnoses, and in this case I have

6    reviewed the results and everything is very

7    consistent with DLBCL.  I don't have any reason to

8    doubt the diagnosis.

9    Q.  Now, are you intending to tell the jury in

10   this case that you have ruled out all other possible

11   causes of Mr. Cervantes' DLBCL other than Roundup

12   use?

13           MS. FREDONA:  Objection; form.

14   A.  Are you asking that in terms as a primary

15   contributing factor, or are you asking was there any

16   possible exacerbation from any other exposure?

17   Q.  Let me ask it two ways.  That's a good

18   point.  Are you going to tell the jury that you have

19   ruled out all other causes of Mr. Cervantes' DLBCL

20   other than Roundup?  Let me ask you that first.

21           MS. FREDONA:  Objection.

22   A.  From a toxicological standpoint, yes.

23   Q.  Are you going to tell the jury that you have

24   ruled out all other potential substantial

25   contributing factors other than Roundup to

William Sawyer, Ph.D.

1    Mr. Cervantes' DLBCL?

2           MS. FREDONA:  Objection; form.

3    A.   Did you use the word -- or just read back if

4    you wish -- significant contributing factors or

5    possible contributing factors?

6    Q.   I said significant or substantial, I'm not

7    sure which, but not -- I did not say possible.  So I

8    can ask it again.

9    A.   No, no.  I can answer it now that you said

10   that.

11   Q.   Okay.

12   A.   The answer to that question, yes, I have,

13   and I say that with respect to acknowledging, as in

14   my report at page 18, or it might be page 17, the

15   family medical history is positive for a single

16   first-generation family history relative with

17   cancer, and I also made a footnote on Table 1 that

18   medical genetics will be deferred to the oncologist.

19   I am not going to provide an opinion on medical

20   genetics, but with respect to chemical and

21   toxicological or radiological pharmaceutical causes,

22   I have ruled out any substantial contributing

23   factors.

24   Q.   Now, are you going to tell the jury that

25   Roundup was the only substance that Mr. Cervantes

William Sawyer, Ph.D.

1    ever encountered or was exposed to that might have

2    caused or contributed to his non-Hodgkin lymphoma?

3            MS. FREDONA:  Object to form.

4    A.    With respect -- I'm sorry.  I should have

5    waited.

6            MS. FREDONA:  No, go ahead.

7    A.    With respect to agents, there are non --

8    known to cause NHL in humans, yes.  Now, if you want

9    to back off a bit and talk about animal studies or

10   something else that's a remote possibility, I'd have

11   to think through that further, but as far as any

12   agents that are known in humans to cause NHL, yeah,

13   that I have carefully reviewed and have found none.

14   Q.    Let's talk for a moment about his family

15   history.  You mentioned in your report that

16   Mr. Cervantes' mother had non-Hodgkin lymphoma,

17   right?

18   A.    Yes.  I did say a moment ago there was one

19   relative, a first-generation relative with cancer.

20   Q.    Correct.  And in your report you also

21   mentioned that she had never used Roundup, right?

22   A.    Yes.

23   Q.    Okay.  So Mr. Cervantes has a first-degree

24   family relative, his mother, that had non-Hodgkin's

25   lymphoma that developed having nothing to do

William Sawyer, Ph.D.

```
1    whatsoever with any Roundup exposure, correct?
2       A.   That's right.
3            MS. FREDONA:  Objection.
4       A.   Well, I don't -- I disagree with the
5    question in the way it was phrased, but I agree that
6    the etiology was unknown, but I don't know that we
7    can confirm that it had nothing to do with Roundup
8    possibly from a dietary cause.  I haven't looked at
9    that, so I want to be careful on that in terms of
10   agreeing with that blanket statement.
11      Q.   Well, let me be very precise.  You can't say
12   to a reasonable degree of scientific certainty that
13   Roundup, glyphosate, had anything whatsoever to do
14   with the development of non-Hodgkin lymphoma in
15   Mr. Cervantes' mother, can you?
16      A.   Correct.  And I also footnoted that I would
17   leave the medical genetics to the oncologist to
18   opine upon.
19      Q.   Sure.  But based on your own reading,
20   experience, training, and work as a toxicologist, do
21   you agree that having a first-degree relative with
22   non-Hodgkin lymphoma independently increases the
23   risk for having non-Hodgkin lymphoma in
24   Mr. Cervantes himself?
25      A.   Yes, and that's why if you look at my report
```

William Sawyer, Ph.D.

```
 1    on Table 1, out of all those categories I
 2    investigated, you will see a yes regarding family
 3    medical history.
 4        Q.   Dr. Sawyer, can you think of any
 5    scientifically validated test or method or procedure
 6    that could eliminate Mr. Cervantes' family history
 7    of non-Hodgkin lymphoma as a cause or a substantial
 8    contributing factor to his non-Hodgkin lymphoma?
 9             MS. FREDONA:   Objection; form.
10        A.   Possibly.  I was thinking about this a
11    moment ago.  I could have, I suppose, to investigate
12    that further, determined if his mother had any
13    significant pharmacological regimens that cause
14    immunosuppression and/or are linked to NHL, or if
15    she had been prescribed long-term immunosuppressant
16    drugs, such as prednisone systemically on a
17    long-term basis, or if she received cyclophosphamide
18    treatment for rheumatoid arthritis, or if she has
19    AIDS, if she received cyclosporin treatment for
20    AIDS.  I can go on and on.  There are possibilities
21    that I have investigated in this case, even such
22    things as -- as in Table 1 of my report.  It's
23    possible there are -- there could be a cause for her
24    NHL that has not been investigated.
25             So I think it's incorrect to just assume and
```

William Sawyer, Ph.D.

1    to mislead the jury by indicating that it's genetic

2    when we don't really know that.  You know, I

3    wouldn't do that in this case.  With Mr. Cervantes,

4    I carefully explored to see if I could find any

5    other possible cause for his NHL and I was not able

6    to find one, and so before we make a blanket

7    conclusion that the mother had NHL due to some

8    genetic cause that was passed on to the son, I think

9    one would have to go through and do a full workup.

10       Q.   You haven't actually done that to eliminate

11   any other potential causes in Mr. Cervantes' mother

12   other than saying she was not exposed to Roundup,

13   correct?

14       A.   Correct.

15       Q.   Now, in your report -- you referred to

16   Table 1 a couple of times.  In your report on

17   Table 1 there is a line for any history of obesity

18   and you said no.  Is that your understanding?

19   Page 17.

20       A.   Yes.

21       Q.   And also in your report on page 15 you noted

22   that Mr. Cervantes was 5' 11" and was 215 to 220

23   pounds during his forties, correct?

24       A.   Yes, but he -- for most of his life he was

25   below a BMI of 30, and that's why I have not

William Sawyer, Ph.D.

1    included him as an obesity factor.

2        Q.   Well, let's get there.  Obesity is defined

3    as a BMI of 30 or higher, correct?

4        A.   Yes.

5        Q.   And at 5' 11" and 215 pounds or higher,

6    Mr. Cervantes had a BMI that was 30 or higher,

7    didn't he?

8            MS. FREDONA:  Objection.

9        A.   For a period of time.  Hang on one sec.  I

10   want to pull out my BMI chart.  Since you made that

11   statement, I want to see if it is accurate.

12       Q.   Doctor, let me see if I can save you some

13   time.  I'm going to mark as Exhibit -- this will be

14   5 to your deposition, a BMI calculation done based

15   on the parameters you gave for Mr. Cervantes in your

16   report.

17           MR. PAINE:  For the record, I think this is

18       going to show up in the folder as Exhibit 2.  I

19       was not able to change the manual or the --

20       (garbled audio) -- manually, but Madam Court

21       Reporter, if you could make sure this correctly

22       reflects that the Cervantes BMI calculation that

23       I've just marked is Exhibit 5 to the deposition.

24           (Sawyer Exhibit 5 was marked for

25       identification.)

```
 1    BY MR. PAINE:
 2        Q.   Dr. Sawyer, are you able to -- are you able
 3    to see that yet?  If not, I can share my screen with
 4    you.
 5             MS. FREDONA:  We're going to object to the
 6        exhibit on foundation.
 7        Q.   Dr. Sawyer, I've just shared my screen.  Are
 8    you able to see what I've marked as Exhibit 5 to
 9    your deposition?
10        A.   I'm looking at the screen and it's showing
11    my report.  It didn't change.  Maybe it's because
12    I'm looking at the wrong thing.  Hang on.
13        Q.   Sure.
14        A.   Oh, I see.  I -- yeah, I have it now.  Yeah.
15    Okay.
16        Q.   Okay.  And so this was something I took off
17    the National Heart, Lung and Blood Institute,
18    Calculate Your BMI, standard BMI calculator.  You
19    can see that at the height of 5' 11" and a weight of
20    215 pounds, the calculated BMI is 30.0, correct?
21        A.   Yeah, that's correct.  You know, I use the
22    same -- I have a printout chart rather than a
23    calculator but it's still from NIH and that is
24    correct, but my point is if you look-- I did a
25    weight history with him over the phone and if you
```

William Sawyer, Ph.D.

1   actually follow his weight history, for most of --

2   more than most of his life he was borderline BMI or

3   under.

4        Q.   So you said, as you've indicated in your

5   report, that in his forties he was between 215 and

6   220 pounds, and he was 215 pounds at diagnosis of

7   NHL, right?

8        A.   Right.

9        Q.   So how old was he when he was diagnosed with

10  NHL, 44, 45, somewhere in there?

11       A.   Yes, and so he was really only borderline

12  BMI of 30 for a short time.  Most of his life, the

13  vast majority of his life, he was under the 30

14  number -- and as they had a threshold of BMI of 30.

15            So, really, I think it's a bit of an

16  exaggeration to use his BMI of 30 as representative

17  of his first 30 or so years of life.

18       Q.   But you do agree, as you've stated in your

19  report, that a BMI of 30 or higher, which is obese,

20  increases a person's chances for developing

21  non-Hodgkin lymphoma, right?

22       A.   Well, it does, and then that -- one has to

23  consider the science in terms of what the studies

24  shows in terms of risk level, and I added some new

25  studies to my report, I'm sure you're aware of, but

1    one of those -- actually, two of those actually show

2    that the amount of increased risk from a BMI over

3    30, although it is statistically significant, it's

4    of a very minor amount compared to the risk of NHL

5    from glyphosate.

6          And I can refer you to the study in my

7    report.

8    Q.   Well, I've got it and I'm familiar with the

9    one you cited, so let me ask you a few other things.

10         In your report you also cited that same

11   study for the proposition that a BMI of 30 or higher

12   is specifically associated with an even further

13   increased risk of DLBCL, which is exactly the same

14   type of NHL that Mr. Cervantes had, correct?

15   A.   Right, but it's only like a 13 percent

16   increased risks as opposed to over a 200 percent

17   increase.  I mean, the relative risk ratio with

18   respect to the subtype of DLBCL is only 1.13.  It's

19   statistically significant but a very low level risk.

20   So I think it's only fair, and for someone at your

21   caliber, who I respect, I think you'll appreciate

22   that one has to compare that risk level of the

23   glyphosate versus the marginal obesity, and it's --

24   it's just, you know, a factor almost on the order of

25   a magnitude lower.

William Sawyer, Ph.D.

```
1        Q.   Doctor --

2        A.   Not an order of magnitude.  About five or

3    seven times lower.

4        Q.   Okay.  You've just referred me to a study or

5    studies on glyphosate that have found odds ratios of

6    relative risk around 2, correct?

7        A.   I couldn't hear your last word.

8        Q.   Sure.  You just referred in your answer to

9    some studies on Roundup or glyphosate that have

10   referred to or found odds ratios of relative risks

11   around 2, but there are also a number of

12   epidemiologic studies that have found no increased

13   risk, no statistically significant increased risk

14   for glyphosate or Roundup use, correct?

15       A.   Yes.

16            MS. FREDONA:  Objection; form,

17       argumentative.

18       Q.   And there are some studies on Roundup or

19   glyphosate, epidemiologic studies, that have found

20   relative risks or odds ratios that are on the same

21   order, even if statistically significant, as the

22   relative risks or odds ratios for obesity that

23   you've cited from this study in your report,

24   correct, around 1.07 or 1.13?

25            MS. FREDONA:  Same objection.
```

William Sawyer, Ph.D.

1      A.   Correct, but those were, for example, at the

2   very lowest end of glyphosate exposure of, for

3   example, one day or equal or less than two-day.  The

4   greater than 10-day exposure days of glyphosate then

5   peaked above the risk level of 2.

6      Q.   Now, Doctor, take a look at page 173 of your

7   report, which is where you discuss the study by

8   Larsson and Wolk about obesity and BMI as a

9   potential risk factor for NHL.  Let me know -- let

10   me know when you get there, please.

11      A.   I'm there.

12      Q.   Okay.  And what you're describing there as

13   that study's result is that there is a seven percent

14   increased risk of NHL for each five kilogram per

15   meter square increment of BMI, correct?

16      A.   Right.

17      Q.   Okay.  And for DLBCL it's a 13 percent

18   increase per five kilogram per meter square

19   increment of BMI, also correct, right?

20      A.   Right, but he's at the threshold already, so

21   there is no additional increment.

22      Q.   Well, that was my next question.  It is five

23   kilogram per meter square increase compared to what?

24      A.   Compared to 30.

25      Q.   To 30?

William Sawyer, Ph.D.

1     A.   Yes.

2     Q.   You're confident that's that -- that's what

3   the Larsson study tells you?

4     A.   Well, that's, yeah, the definition of

5   obesity.  In other words, the control group is the

6   nonobese group.  The experimental group is the obese

7   group, and the cut-off is 30.

8     Q.   And what was, according to Larsson, the

9   weight -- the average or median weight of the

10  control group, please?

11    A.   I don't know.  I'm interested in BMI, not

12  weight.

13    Q.   Sure.  Okay.  Let me ask it that way.  What

14  was the average or median BMI for the control group

15  in the Larsson study?

16    A.   I don't recall.

17    Q.   For each increment of five kilograms per

18  meter square above obesity, which is where you say

19  the risk starts, that would correspond to an

20  additional seven percent increased risk for

21  non-Hodgkin and an additional 13 percent increased

22  risk per increment for DLBCL, right?

23    A.   No, because he was at a BMI of 30 for a

24  short period of time and --

25    Q.   Right.  I'm not speaking necessarily of

William Sawyer, Ph.D.

```
 1    Mr. Cervantes.  If you had someone who was a 31 BMI,
 2    they would have an additional seven percent
 3    increased risk over the 30 BMI's seven percent,
 4    right?
 5         MS. FREDONA:  Objection; incomplete
 6      hypothetical.
 7    Q.   If they were 32, it would increase another
 8    increment of seven percent.  If they were 33, it
 9    would increase yet another increment of seven
10    percent, correct?
11         MS. FREDONA:  Same objection.
12    A.   I don't think so.
13    Q.   Tell me where the logic is wrong according
14    to how you've described the Larsson study results,
15    please.
16    A.   Well, I'm going to have to open the Larsson
17    study itself.
18    Q.   Okay.  I tell you what, I'll mark it as an
19    exhibit.
20         (Sawyer Exhibit 6 was marked for
21      identification.)
22    BY MR. PAINE:
23    Q.   And, Doctor, this should show up in a moment
24    in the exhibit folder as Exhibit 3.  Although,
25    again, I can't change the numerical tag for the
```

William Sawyer, Ph.D.

1    exhibit, this should actually be Exhibit 6, so if

2    the court reporter would make that change.

3          This is the Larsson study, 2011, that you've

4    cited.  Let me know -- here.  I'll share my screen

5    just to move this along.

6    A.   I have the study opened already now.

7    Q.   Okay.  Well, I'm going to -- I'm going to

8    share my screen anyway just so we're all literally

9    on the same page.  This is the study you cited on

10   page 173 of your report?

11   A.   Yes.

12   Q.   Okay.  The abstract says:  The summary

13   relative risks for a five kilogram per meter square

14   increase in BMI were 1.07, 95 confidence intervals,

15   1.04 to 1.01, for NHL incidence.

16         Right?

17   A.   That's what it reads.

18   Q.   Okay.  And then it goes on and says:  BMI

19   was significant positively associated with risk of

20   diffuse large cell lymphoma, 1.13, confidence

21   interval, 1.02 to 1.26.

22         Right?

23   A.   Yes.

24   Q.   So as you're looking at the Larsson study

25   now, do you agree that those are incremental changes

1    with each increment of -- I'm sorry.

2         Do you agree that those are incremental

3    changes in risk with each increasing increment of

4    weight?

5    A.   Not necessarily.  It depends on the BMI that

6    has a relative risk of 1, and on page 2427 of the

7    study, for example, there is a summation of the

8    different studies that have been conducted and

9    results from those studies, and there is a line

10   drawn vertically up and down on that page, on the

11   table, which has a 1 under it.  That's -- it

12   means that that's the comparative point, that's

13   the -- if you take all the studies as a whole, that

14   shows where the risk is.

15        And then we see under the diffuse large

16   B-cell lymphoma category, about -- one, two, three,

17   four, five, six, seven, eight -- about eight studies

18   with the relative risk percentages provided.  Now,

19   it doesn't tell us really what -- at what starting

20   point 1 would be.

21   Q.   Okay.  You've told me that you think the

22   starting point is 30 for obesity, right?

23   A.   Well, by definition, yeah, I think so, but

24   it really -- I really can't -- the study doesn't

25   seem clear on that point.

William Sawyer, Ph.D.

1     Q.   Okay.  Well, let's go to my more immediate

2     question, which is down here.  You're looking at

3     Figure 2, right?  And the overall risk for DLBCL,

4     which is at the top third of that column, is a

5     relative risk of 1.13, right?  That's what that

6     diamond shows?

7     A.   That's right, overall, it's 1.13, yeah.

8     Q.   And underneath it says:  Figure 2 - Relative

9     risks of non-Hodgkin lymphoma incidence per five

10    kilograms per meter square increase in body mass

11    index stratified by subtype.  Right?

12    A.   Right, but if a person weighed 90 pounds and

13    was 6 feet tall, that 5 kilogram per meter increase

14    would not put them at risk.  One would have to be

15    above ideal weight, above a level in which the risk

16    levels begin.  The risk levels begin in this table

17    at what's marked 1.  That's neutral.  Below 1 means

18    less risk of cancer, greater than 1 means increased

19    risk of cancer.

20    Q.   Right.  My question is about the increment.

21    So let's assume you're right, that the incremental

22    risk starts at obesity of BMI equals 30.  Now, let's

23    assume a person is -- has a BMI of 31 and another

24    person has a BMI of 32.  The person at 30, according

25    to this chart, has a risk -- relative risk for DLBCL

William Sawyer, Ph.D.

1    from their obesity of 1.13, right?

2        A.   No.  I think the way this works is a five

3    kilogram per meter increase, and you said one.

4        Q.   So what's the change in risk for each

5    increment of weight or BMI above 30 for DLBCL

6    according to this chart?  Do you know?

7        A.   Well, a five milligram -- or I mean a five

8    kilogram per meter square increase.

9        Q.   Sure.  Do you know how a five kilogram per

10   meter squared increase translates to a change in

11   BMI?  It's one point, isn't it?  Dr. Sawyer?

12       A.   I'm thinking.  The relative risk of NHL

13   mortality associated with a five kilogram per meter

14   increase in BMI was 1.14.  But, see, that is giving

15   us a risk ratio, that's an RR, initially of 1.07,

16   but if we take someone and increase them by five

17   kilogram per meter squared in terms of BMI, then

18   what we see is a 14 percent or a 1.14 risk ratio.

19       Q.   You're talking about mortality.  I didn't

20   ask you about mortality.

21       A.   Oh.

22       Q.   Let me ask it this way, Doctor.  I'll try

23   and cut to the chase.

24            If a person with a BMI of 30 has a relative

25   risk of 1.13 for DLBCL according to this chart, does

William Sawyer, Ph.D.

1    a person who has a BMI of 40 have exactly the same

2    increased risk according to this data?

3          MS. FREDONA:  Objection; form, speculation.

4    A.   No.  No, no, no.  That person would have

5    been at an elevated -- more elevated risk.  It would

6    be a higher risk than the seven percent risk,

7    obviously.

8    Q.   Or 13, according to this, for DLBCL, right?

9    A.   Yes.

10   Q.   Okay.  Excess weight is something that a

11   person carries with him or her every single day, day

12   in and day out, 365 days a year, so long as they are

13   overweight or obese, right?

14         MS. FREDONA:  Objection.

15   A.   I'm not sure I understand the question.

16   Q.   Sure.  It's -- you don't -- weight doesn't

17   have half-life, does it, excess weight?  You either

18   are overweight or obese, or you're not, right?

19         MS. FREDONA:  Objection; form.

20   Q.   It's an ongoing continuous exposure so long

21   as the person is obese, correct?

22         MS. FREDONA:  Objection.

23   A.   It is; however, I made an assessment of

24   Mr. Cervantes, of what he weighed over time.  If I

25   recall, I even talked with him about his high school

1    weight and what sports he played, and he explained

2    what his weight was over time, and he reached the

3    BMI of 30 not too long before the NHL, but most of

4    his life he was -- the vast portion of his life

5    before the NHL he was under a BMI of 30.

6         So I think it's -- I think if we're kind of

7    pushing the study here a little to try to show that

8    this is a substantial contributing factor.  I think

9    that based on the statistics in the study, if at

10   all, it's a very -- if there even was an increased

11   risk from his weight, it's very small, in the seven

12   to 14 percent range at the highest.

13   Q.   Doctor, are you able to cite for me any

14   study in the peer-reviewed medical or scientific

15   literature about the duration or requiring a certain

16   length of time for obesity to become a risk factor

17   for a patient for non-Hodgkin lymphoma?

18   A.   No.

19   Q.   Is there any scientifically validated test

20   or method or procedure that you can identify that

21   allows you to assess the degree to which any

22   particular risk factor contributed to a given

23   person's non-Hodgkin lymphoma?

24        MS. FREDONA:  Objection; form.

25   A.   Yes, and I have applied the methodology of

William Sawyer, Ph.D.

1    risk ratios and odd ratios in this case based upon

2    the peer-reviewed generally accepted studies that

3    I've referenced in my report, which I've used for

4    dose comparisons, and I even included this in the

5    obesity BMI meta-analysis for that purpose, to

6    determine comparatively the risk level of his

7    borderline obesity in his later years of his life to

8    that of the glyphosate, and the glyphosate in this

9    case increased his risk of NHL by more than twofold.

10   Whereas, the borderline obesity was a much, much

11   lower risk ratio comparatively.  The elephant in the

12   living room is the NH -- is the glyphosate, not the

13   borderline obesity.

14       Q.   So, Doctor, is there anything else to the

15   methodology, any other factor that goes into this

16   methodology other than comparing the relative sizes

17   or risks from various epidemiologic studies in order

18   for you to determine whether or not any given factor

19   was a substantial contributing factor to a patient's

20   NHL?

21       A.   Well, toxicologists rely primarily on risk

22   ratios and odd ratios in any of the tests, even in a

23   bioassay.  This is a standard practice, a generally

24   accepted practice.  I'm not sure what other avenues

25   you're referring to.  There really -- from

William Sawyer, Ph.D.

1    mathematical standpoints, this is what we use.

2       Q.   So what's the threshold whether a factor, in

3    your opinion, is considered just a contributing

4    factor versus a substantial contributing factor?  Is

5    there such a threshold?

6       A.   Yes.  If the risk of the agent, in this case

7    Roundup, glyphosate, is greater than the other

8    background factors, certainly that would be a

9    substantial contributing factor as opposed to a

10   minor contributing factor.

11      Q.   So is there anything else other than the

12   relative size of the risk or any -- sorry.  That's a

13   terrible question.

14          Is there any other factor you take into

15   account other than size of the risk in determining

16   whether something is or is not a substantial

17   contributing factor to a patient's NHL?

18          MS. FREDONA:  Objection; form.

19      A.   I don't understand the question.

20      Q.   Sure.  You just told me that what you took

21   into account was the size of the relative risk of

22   the odds ratio and you gave me an example of

23   glyphosate.  I think that you compared that to

24   others, and for instance, in this case you said the

25   glyphosate odds ratio relative risk was 2, and then

William Sawyer, Ph.D.

1   that was larger than the risk for, say, obesity,

2   right?

3       A.   By a wide a margin.

4       Q.   Right.  So what I want to know is is there

5   any other factor that you take into account in

6   deciding whether a given factor is a substantial

7   contributing factor other than the comparative size

8   of the relative risks?

9           MS. FREDONA:  Same objection.

10      A.   Well, duration of exposure is important but

11  that would be a factor that would ultimately result

12  in the measurement of the odds ratio or risk ratio.

13      Q.   All right.  Let's turn to page 8 of your

14  report, Doctor.  You talked about Mr. Cervantes

15  being a certified pipeline welder.  Tell me, did he

16  give you any details about what his training

17  involved for him to become a welder?

18      A.   I'm moving some files.  I have too many

19  files open.

20          Okay.  I interviewed him and asked quite a

21  few questions regarding his occupational history.

22      Q.   Okay.  My specific question is did you ask

23  him any questions or did he provide you any

24  additional details about what training he undertook

25  to become a welder?

William Sawyer, Ph.D.

1    A.   No.  I didn't ask him about the training,

2  no.

3    Q.   Do you know how long his training took to

4  become a welder?

5    A.   No.

6    Q.   Do you know what types of welding he was

7  trained on?

8    A.   Yes, that I did specifically discuss with

9  him.  I asked him a series of questions.  The only

10  thing he welded was steel pipage, and I asked him

11  specifically if ever brazed, if he ever soldered, if

12  he ever cut with a torch into a freon line running

13  air conditioning systems.  I also talked to him

14  about what type of welding rod he used.  He made it

15  very clear the only thing he ever welded was steel

16  and that the pipage that they used was steel pipage.

17    Q.   Okay.  I'm asking more specifically about

18  during his training.  Do you know if he received any

19  training on any other type of welding other than oxy

20  acetylene welding?

21    A.   I don't know.

22    Q.   But you don't know if he was ever trained on

23  TIG welding, do you?

24    A.   No.

25    Q.   You don't know if he was ever trained on MIG

William Sawyer, Ph.D.

1    welding, do you?

2        A.   No, but I know he didn't perform those

3    duties, so I think it's irrelevant.

4        Q.   Right.  My question, Doctor, is you don't

5    really know how long or how much or what type of

6    additional training he underwent to become a welder

7    in the first place, do you?

8        A.   No, but more importantly, I know that he

9    only welded steel occupationally, and if he had a

10   couple of weeks' training on another type of

11   welding, I don't find that relevant.

12       Q.   You're assuming it was a couple weeks,

13   right?  You don't really know how long his training

14   was, do you?

15           MS. FREDONA:  Objection.

16       A.   I know he was trained to weld to work on

17   steel pipage.  That's -- he made it clear to me

18   that's all the gas company used.  I questioned him

19   on copper and different materials and different

20   fluids inside pipes and gases.  The only thing he

21   worked on was steel pipage for the company.

22       Q.   Let me be very clear.  Did you ask him

23   anything about the training he underwent to become a

24   welder?

25       A.   No, I did not ask him about training, but I

William Sawyer, Ph.D.

1    asked him what he welded, and I think you're trying

2    to blow up a nonrelevant area.

3        Q.   Well, that's interesting because my son is

4    training to be a welder, so I'm trying to figure out

5    if Mr. Cervantes underwent the kind of extensive

6    training my son is undergoing.  So if you don't

7    know, that's fine.

8            Let me ask you this.

9            MS. FREDONA:  Objection; argumentative.

10       Q.   Do you know what certification involved for

11   him to become certified as a pipeline welder?

12       A.   What was the first two words?

13       Q.   Do you know anything about what the

14   certification involved for him to become a certified

15   pipeline welder?

16       A.   No, I didn't ask him about that.

17       Q.   Do you know if he had to show proficiency in

18   other types of welding other than welding steel pipe

19   in order to become a certified pipeline welder?

20       A.   No.

21       Q.   Do you know if he had to undergo any

22   recertification for his job as a certified pipeline

23   welder?

24       A.   No.

25       Q.   You didn't ask him that, right?

William Sawyer, Ph.D.

```
1            MS. FREDONA:  Objection; asked and answered.

2       Q.   You can answer, Doctor.

3       A.   No.

4       Q.   Do you know the total amount of time that

5   Mr. Cervantes spent welding during his adult

6   lifetime?

7       A.   No.

8       Q.   Do you know how much time in total

9   Mr. Cervantes spent around others who were doing

10  welding in his proximity during his adult lifetime?

11      A.   No.  All I know is he welded steel and it is

12  irrelevant to causing NHL.

13      Q.   You mentioned a moment ago that

14  Mr. Cervantes told you something about the welding

15  rods that he used.  What did he tell you about that?

16      A.   All I recall is he said it was for welding

17  steel.

18      Q.   That he used rods to help draw a bead to

19  weld steel together?

20      A.   I believe so.

21      Q.   Do you know what type of rods those were?

22      A.   No.

23      Q.   Do you know what the constituents of those

24  rods were?

25      A.   No.
```

William Sawyer, Ph.D.

1    Q.   Do you know what byproducts welding of those

2    rods might give off, either gaseous or particulate?

3    A.   No, I do not.

4    Q.   When he was using the oxygen acetylene gas

5    welding, do you know what mixture of gases he used?

6    And I'm talking about proportions of the gases he

7    used.

8         MS. FREDONA:  Objection; foundation.

9    A.   I don't understand the question.  Are you

10   asking me is it -- if he had a -- some means of

11   measuring the oxy to acetylene ratio while using the

12   torch?

13   Q.   Very good.  That's exactly what I'm asking.

14   A.   I didn't ask him that, no.

15   Q.   Doctor, I'm sorry, there's a banging going

16   on in the background.  I'm not sure where it's from.

17   It's a little bit distracting.  Is that on your end,

18   Dr. Sawyer?  Do you know where it's coming from?

19   A.   I know exactly what it is.

20   Q.   Is that the dogs?

21   A.   Oh, no.  They're sleeping.  It's coming

22   from -- it's coming from my roof.

23   Q.   I was going to say, you and I have had a

24   history of being in rooms where construction is

25   going on nearby.  I don't know if it's you or me or

William Sawyer, Ph.D.

1    just bad karma.

2        A.   Well, in Florida, in hurricane zone coast,

3    the insurance companies recently -- the laws

4    changed, that if your roof is more than 20 years old

5    and asphalt, your insurance is canceled, terminated.

6    So I've been trying to get the roofer here for about

7    three months to install a new aluminum roof, and

8    wouldn't you know they showed up during our

9    deposition.  Well, during the deposition this

10   morning they showed up.  It's just terrible timing.

11       Q.   Darn the luck.  Well, I can get through.

12   It's just a little distracting.  If we have to use

13   this for the record at any point, we might want to

14   explain that to whoever is watching, but --

15       A.   I think it will --

16       Q.   -- other than you or me, we might be able to

17   shut it off, but that's okay.  We'll soldier on.

18       A.   I think it will diminish soon.  I think the

19   section of roof right over my office is complete.

20   It kind of sounds like they're moving on, so

21   hopefully it will get better.

22       Q.   All right.  No problem at all.  Like I said,

23   I was just asking to see if we could eliminate it,

24   but maybe it will take care of itself.

25       A.   At least they're not welding up there.

William Sawyer, Ph.D.

```
 1      Q.   They're not welding up there.  That might

 2   have been quieter.

 3           So, Doctor, let me mark as -- a new exhibit

 4   to your deposition.  This is going to show up in the

 5   record as Exhibit 4.  It will actually be, I think,

 6   Exhibit 7.

 7           MR. PAINE:   Is that correct, Ms. Court

 8      Reporter?

 9           THE COURT REPORTER:  (Indicating.)

10           MR. PAINE:  7, okay.  We got the hand signal

11      for 7.

12      Q.   Doctor, I'm marking it as what will be

13   Exhibit 7 to your December, the IARC Monograph

14   Number 118?

15           (Sawyer Exhibit 7 was marked for

16   identification.)

17   BY MR. PAINE:

18      Q.   And this may take a little bit of time to

19   load just because it's rather large, so I'm going to

20   share my screen with you and we can look at this

21   together.

22           Doctor, are you familiar with this monograph

23   from IARC on welding?

24           MS. FREDONA:  Object to the exhibit and

25      foundation.
```

William Sawyer, Ph.D.

1     Q.   Go ahead, Doctor.  You can answer that.

2     A.   I need to flip the page down and look at the

3  date.

4     Q.   Sure.  Here, I'll scroll through it.  It

5  should be in your exhibit folder any second now, but

6  I'll scroll and stop on anything you want, but it

7  looks like here it says L?on, France, 2018.

8     A.   That -- I reviewed a summary document which

9  included the molybdenum trioxide and indium tin

10  oxide, but I don't remember seeing a full monograph.

11  I know there was a summary document that I reviewed

12  recently but this is not it.  How many pages is

13  this?

14     Q.   It's pretty big.

15     A.   Yeah, that's what I gather.

16     Q.   As you know from prior experience with IARC

17  documents, they tend to be rather lengthy.  It looks

18  like it's about 320 pages.

19     A.   Yeah.  So the answer is no.

20     Q.   Okay.  So you have not reviewed this in

21  detail at any prior point in time, correct?

22     A.   Right.

23     Q.   Okay.  Let's just cut to the chase.  I'm

24  going to skip down here to their summary, which is

25  on page 33, General Remarks.  Right here, do you see

William Sawyer, Ph.D.

1    what I've highlighted in that first paragraph under

2    General Remarks on page 33?

3        A.   Yes.

4        Q.   Welding fumes were classified as

5    carcinogenic to humans, Group 1, by the Working

6    Group, an upgrade from the earlier classification of

7    fumes as possibly carcinogenic to humans, Group 2B,

8    in 1989, (IARC, 1990).

9             Did I read that correctly?

10       A.   Yes.

11       Q.   So IARC classifies welding fumes as class 1

12   known human carcinogens according to this monograph,

13   correct?

14       A.   Yes.

15       Q.   Do you have any reason to disagree with IARC

16   that welding fumes are carcinogenic to humans?

17       A.   No.  It depends what's being welding, but

18   no.

19       Q.   And as opposed to glyphosate, which is a

20   class 2 probable human carcinogen, according to

21   IARC, this is a higher, more definitive

22   classification for welding fumes, correct?

23            MS. FREDONA:  Objection; argumentative,

24       form.

25       Q.   You can answer, Doctor.

William Sawyer, Ph.D.

1      A.   Yes.

2      Q.   Did you do any calculation of Mr. Cervantes'

3   exposure to welding fumes when you prepared your

4   opinions in this case?

5      A.   Only that I assessed what he was welding and

6   he was welding nothing that emitted carcinogenic

7   fumes.

8      Q.   I'm sorry.  That broke up a little bit.  I

9   had trouble hearing the -- sort of the last couple

10  sentences there.

11     A.   He was welding steel and no other

12  substances, and welding steel does not release

13  carcinogenic material.

14     Q.   What's your basis for that, please?  Can you

15  point me to any published article, peer-reviewed

16  information, data or otherwise?

17          MS. FREDONA:  Objection.

18     Q.   You can answer, Doctor.

19     A.   The studies I'm familiar with, which have

20  documented primarily pulmonary malignancies with

21  welding, or those few studies that have shown NHL

22  with welding, are specific to the substance being

23  welded and certain releases of particulate matter

24  and/or certain heavy metals or organic substances,

25  such as fluorinated and chlorinated hydrocarbons and

William Sawyer, Ph.D.

1    dioxins that form in the pyrolysis of the materials

2    inside the pipes.

3        Q.   Would you agree that over Mr. Cervantes'

4    career as a welder and as a supervisor of welders,

5    he was likely exposed to a substantial amount of

6    welding fumes?

7            MS. FREDONA:  Objection; form.

8        Q.   You can answer, Doctor.

9        A.   Yes.  However, again, he was welding steel

10   only, not substances or materials inside pipage that

11   can cause NHL.

12           (Sawyer Exhibit 8 was marked for

13   identification.)

14   BY MR. PAINE:

15       Q.   Doctor, I'm going to mark as Exhibit 8 to

16   your deposition -- this will show up as Exhibit 5

17   but just chronologically or in numerical order we're

18   marking this to be Exhibit Number 8.  It should show

19   up in your folder any moment, but I'm going to share

20   my screen to get us moving here.

21           Doctor, what I've marked as Exhibit 8 to

22   your deposition is an article entitled Occupation

23   and Risk of Non-Hodgkin's Lymphoma and Chronic

24   Lymphocytic Leukemia published in the Journal of

25   Occupational and Environmental Medicine in May of

William Sawyer, Ph.D.

1    2002 by Dr. Zheng and colleagues.  Do you see that

2    on my screen now?

3        A.   I do.

4        Q.   All right.  And I'm just going to ask you a

5    few questions about the abstract here.  Do you see

6    that this was a study that was designed and

7    investigated the association between non-Hodgkin

8    lymphoma and various occupational exposures?

9        A.   Yes.

10       Q.   All right.  And if you look down here, do

11   you see the results that I'm about to highlight:

12   The results of this study found that welders and

13   solderers had an odds ratio of 2.9 that was

14   statistically significant.

15       A.   Correct.

16       Q.   All right.  Do you have any reason to

17   disagree with that, what the authors found here?

18       A.   No; however, it's not specific to the

19   welding that Mr. Cervantes performed.  What you're

20   doing would be the same as if I took a general study

21   that showed that agricultural workers have an

22   increased rate of NHL; therefore, it's the

23   glyphosate.

24            You know, there are specific studies that

25   show what type of fumes and chemicals induce NHL or

William Sawyer, Ph.D.

1    upper respiratory malignancies or small cell lung

2    cancer and so forth, and this study is a very

3    general study.  It doesn't mean that Mr. Cervantes

4    fits into that study because that study includes all

5    types of welding and cutting of different materials,

6    and Mr. Cervantes was not involved with the welding

7    of any carcinogens or products with -- inside the

8    pipage.

9        Q.   Have you reviewed this study before?

10       A.   No, but obviously it's not a specific

11   investigation of different types of welding.  It's

12   simply a grouping of IC -- of codes and Dr. Blair

13   has performed a lot of work in the past using the

14   methodology of work -- occupational coding which

15   does not discriminate what chemicals or carcinogens

16   were specifically released.  This is not a study

17   where someone went out in the field and -- with air

18   monitors and did testing to determine what was

19   exposed.

20       Q.   Let's look and see what else this study

21   says.  I'm going to go down here to Table 2.  Do you

22   see that this says:  Risk of NHL and CLL by

23   histologic subtype for select industries and

24   occupations among men in Kansas and Nebraska?

25       A.   Right, and this is exactly what I just said.

William Sawyer, Ph.D.

```
 1    This is by industry CIC code.  That is a code for
 2    different types of work.  It doesn't have any
 3    information specifically as to -- I mean, we could
 4    look up agricultural production crops or we could
 5    look up pesticide applicators as a code.  It doesn't
 6    tell us specifically what pesticide was used.
 7         Q.   So, Doctor, when Mr. Cervantes worked as a
 8    welder for -- (garbled audio) -- would he have fit
 9    into one of the SIC or SOC codes that were described
10    and studied in this paper by Dr. Zheng and
11    colleagues?
12         A.   I'm not sure I understand the question.
13         Q.   Sure.  You told me, you know, this doesn't
14    account for the specific types of welding and that
15    these were classified only by looking at SIC and SOC
16    codes, right?
17         A.   Yes.
18         Q.   Okay.  So my question to you is during the
19    times that Mr. Cervantes worked as a welder, would
20    he have fit one of the SIC or SOC codes that were
21    used in this study?
22         A.   He would; however, this is a general code
23    classification of all different types of welding and
24    soldering.
25         Q.   Doctor, let's look at what they say about
```

William Sawyer, Ph.D.

1    welders and solderers.  Do you see here -- I'm

2    trying to highlight just this bottom line of Table

3    2, are his welders and solderers, and under diffuse

4    NHL it has an odds ratio of 3.14 that's

5    statistically significant, correct?

6        A.    Yes.

7        Q.    And Mr. Cervantes had a form of diffuse

8    non-Hodgkin lymphoma, correct?

9        A.    Yes.

10       Q.    But you would still argue that this data

11   doesn't apply to him, I take it?

12       A.    That's not what I said.  That's --

13       Q.    Okay.

14       A.    I said that this data does not specify what

15   type of welding and chemicals cause the disease.  It

16   just shows that as a group, which includes some very

17   hazardous types of emissions from welding certain

18   materials and certain metals and certain processes,

19   results in NHL.

20            I mean, this is -- it's exactly -- what

21   you're doing would be -- again, it would be me like

22   looking at this study and looking at the SOC code

23   for a pesticide applicator and then using that by

24   itself and claiming and purporting that it caused

25   Mr. Cervantes' cancer.  That's not how it works.

William Sawyer, Ph.D.

1    You have to have specific studies that determine

2    what chemical and at what dose and follow the

3    Bradford Hill criteria with coherence of the

4    studies, consistency of the studies, and a

5    dose-response relationship, and animal control

6    studies, to show causation.

7         This does not do all of that.  This simply

8    shows that if you take all of the welders and

9    solderers there are and you group them all together,

10   there is definitely a risk of NHL, but it doesn't

11   speciate what type of welding or what chemicals are

12   involved.

13   Q.   So, Doctor, let me ask you this.  Do you

14   consider yourself a fair, impartial and unbiased

15   investigator when you approach a case and are asked

16   to offer opinions like in Mr. Cervantes' case?

17   A.   Yes.

18   Q.   And do you agree that a fair and impartial

19   investigator would consider all possible exposures

20   that could have caused or contributed to a person's

21   cancer --

22   A.   Yes.

23   Q.   -- like Mr. Cervantes?

24        Do you agree that failure to consider

25   exposures to other known carcinogens would be a

```
 1    deviation of the impartial toxicologist's duty to

 2    consider all of the evidence fairly?

 3           MS. FREDONA:  Objection.

 4    A.    I'm not sure what you mean.

 5    Q.    Sure.  Is it consistent with the duties of

 6    an impartial investigator to fail to consider

 7    exposure to all known carcinogens that a patient may

 8    have encountered?

 9           MS. FREDONA:  Objection; form.

10    A.    Yes; however, the study you're showing me is

11    being used in an improper way.

12    Q.    Well, you told me that you hadn't reviewed

13    this study before I showed it to you, right?

14    A.    This is a --

15    Q.    Sorry.  It's yes or no.  You hadn't reviewed

16    this study before I showed it to you, right?

17    A.    Not this particular study, but certainly I

18    have reviewed many studies on different types of

19    welding, and this particular study does not even

20    remotely resemble specifically any one type of

21    welding and materials and/or contents of pipes that

22    form pyrolysis products that are dangerous and cause

23    cancer.

24    Q.    You hadn't reviewed the IARC Monograph 118

25    on welding before I showed it to you, correct?
```

William Sawyer, Ph.D.

1      A.   That's correct.

2      Q.   And is there any study on welding or welding

3   exposures that you've cited on your Materials

4   Considered List for this case?

5      A.   No.

6      Q.   Doctor, do you agree that failure to

7   consider exposure to other known carcinogens would

8   mean that the toxicology expert failed to adhere to

9   a reliable methodology?

10          MS. FREDONA:  Objection; form,

11      argumentative.

12      A.   If intentional, yes.  As you can see in my

13   Table Number 8, I think it was, I had listed welding

14   and soldering on my list to investigate, and I have

15   investigated that and questioned Mr. Cervantes

16   specifically with what he was welding and what was

17   in the pipes to assess whether any carcinogenic

18   products from pyrolysis were formed, and as to

19   whether he used differential materials that are

20   known to release carcinogenic fumes, and he did not.

21      Q.   Dr. Sawyer, are you going to tell the jury

22   that you ruled out exposure to welding fumes as a

23   cause of Mr. Cervantes' non-Hodgkin lymphoma?

24          I'm sorry.  Dr. Sawyer?

25      A.   I think that the --

William Sawyer, Ph.D.

1       Q.   Sorry.  I think your microphone was off.

2    I'm not sure if you started your answer.  It sounded

3    like you picked up in the middle of a word, so let

4    me reask my question and then if you could, tell me

5    your answer.

6            Are you going to tell the jury that you can

7    rule out exposure to welding fumes as a cause of

8    Mr. Cervantes' non-Hodgkin lymphoma?

9       A.   The question is not right.  I can rule out

10   his welding fumes but not welding fumes in general.

11   There are welding fumes that are highly

12   carcinogenic, but he wasn't exposed to any

13   carcinogenic welding fumes in the process he used.

14      Q.   That's based on what you know about his

15   occupational exposures, right?

16      A.   Yes.

17      Q.   Are you going to tell the jury that you

18   excluded benzene as causing or contributing to

19   Mr. Cervantes' non-Hodgkin lymphoma?

20      A.   I have.  I questioned him thoroughly on the

21   material he used and it is a material that does not

22   contain benzene.

23      Q.   So is there any question in your mind about

24   whether or not Mr. Cervantes was exposed to benzene

25   in his occupation?

William Sawyer, Ph.D.

1      A.   Based on the research I've performed, he was

2   not.

3      Q.   So you intend to tell the jury that

4   Mr. Cervantes was not, in fact, occupationally

5   exposed to benzene, is that -- do I have that right?

6           MS. FREDONA:   Objection.

7      A.   Well, I should add to that at part per

8   million-years -- that's hyphenated, PPM-years --

9   associated with leukemia.  He definitely was not

10  exposed to 20 part per million-years in his work as

11  -- if any benzene was released, it would have been

12  hundreds or thousands of times lower than 20 part

13  per million-years.

14     Q.   And how do you reach that conclusion?

15     A.   Based on air levels measured in microgram

16  per cubic meter as opposed to PPM from impurities in

17  benzene -- impurity of products containing benzene.

18  Since the Benzene Reformulation Act, products such

19  as paint, paint thinners, and other

20  hydrocarbon-based products generally have benzene

21  contaminant levels less than .1 percent.

22     Q.   So when was the Benzene Reform Act you've

23  just mentioned enacted?

24     A.   I think it was around 1980, approximately.

25     Q.   And do you know when it was fully

William Sawyer, Ph.D.

1    implemented for all products?

2        A.   I'm not sure.

3        Q.   I'm sorry.  Did you say "not sure"?

4        A.   Not sure.

5        Q.   Do you have any actual air quality

6    measurements, any air measurements whatsoever of any

7    of the air around any of the work sites where

8    Mr. Cervantes did his job as far as benzene goes?

9    Sorry, terrible question.

10           Do you have any actual air measurements for

11   content of benzene for any of the work sites where

12   Mr. Cervantes worked?

13       A.   No.

14       Q.   You've seen Mr. Cervantes' medical records

15   and understand that there are numerous mentions of

16   benzene exposure in his medical records, right?

17       A.   Yes.

18           MS. FREDONA:  Objection; form.

19       Q.   So are you saying all of those medical

20   records are wrong?

21           MS. FREDONA:  Same objection.

22       A.   They are not related to any specific item to

23   be evaluated.

24       Q.   Do you know where the information about

25   benzene exposure in his medical records came from?

William Sawyer, Ph.D.

1     A.   I would believe -- I have to believe from

2   the patient; however, I think at some point I read

3   that Mr. Cervantes denied making those statements.

4   I believe that was in his deposition.

5     Q.   And so what specifically did Mr. Cervantes

6   tell you about whether or not he had been exposed to

7   benzene?

8     A.   Let me check the report.

9     Q.   I think what you're looking for may be on

10   page 18, if that helps, 18 or 19.

11        Sorry, Dr. Sawyer, you're on mute.  I'm not

12   sure if you've got an answer for me or you're still

13   looking.

14     A.   Still looking.

15        Yes, what he stated was that it was the

16   assumption that benzene arose from the use of

17   cold-tar, c-o-l-d-tar, coating.

18     Q.   Did you ask him why he made the assumption

19   that he now tells you is incorrect, that the

20   cold-tar contained benzene?

21     A.   No, he -- I don't recall any answer on that.

22     Q.   In your opinion, Doctor, does benzene cause

23   non-Hodgkin lymphoma?

24     A.   There are studies that make that association

25   at a statistically significant level; however, what

William Sawyer, Ph.D.

1    is generally accepted is that benzene causes acute

2    myeloid leukemia, known as AML.

3        Q.   That's a different question than what I

4    asked.

5             Doctor, in your opinion, does benzene cause

6    non-Hodgkin lymphoma?

7        A.   I would have to review the current human

8    epidemiological studies to be certain of that.  My

9    opinion is going to be based upon the weight of

10   evidence of the study evidence, not an off-the-cuff

11   opinion, and certainly AML is strongly associated

12   with benzene exposures exceeding approximately 20

13   part per million-years.

14       Q.   And so as we sit here today, you don't have

15   a firm opinion on whether or not benzene exposure

16   causes non-Hodgkin lymphoma, am I understanding that

17   correctly?

18       A.   I would assess it the same way I assessed

19   glyphosate in this matter.  I would review carefully

20   the available studies and then decide.  If I were to

21   do that and found that there was sufficient evidence

22   of studies in linking NHL with benzene, I would be

23   at odds with what's generally accepted by a number

24   of agencies.  So I would -- I would want to look

25   very carefully.

William Sawyer, Ph.D.

1     Q.   So as we sit here today, you don't have an

2     opinion to a reasonable degree of scientific

3     certainty whether or not benzene causes non-Hodgkin

4     lymphoma, correct?

5     A.   As I said, there are -- there are some human

6     studies that make that association but I would want

7     to further review the literature before making that

8     determination.

9     Q.   Okay.  So again, my simple question is as we

10    sit here today, you have not formed an opinion to a

11    reasonable degree of scientific certainty that

12    William Sawyer thinks benzene exposure does or does

13    not cause non-Hodgkin lymphoma, correct?

14         MS. FREDONA:  Objection; asked and answered.

15    A.   Again, I would follow the scientific

16    methodology as I have in this case regarding

17    glyphosate and then make that decision.

18    Q.   Okay.

19    A.   I'm not comfortable just making an

20    off-the-cuff decision.

21    Q.   Okay.  But we've got a case here in front of

22    us, Mr. Cervantes, whose medical records talk about

23    benzene exposure, right?

24    A.   Yes; however, there is no evidence of

25    benzene exposure.  There's no quantitative evidence

William Sawyer, Ph.D.

```
 1    either, and even if there was quantitative evidence,
 2    it would require being at the OSHA limit of one PPM
 3    for 40 consecutive years, and he only worked with
 4    benzene -- or benzene -- with welding with that
 5    cold-tar about three times a week.  It's in an
 6    outdoor environment.  Reaching a 1 PPM air level of
 7    benzene for 40 consecutive years, 40 hours per week,
 8    is not reasonable from a person who works outside
 9    only three times a week welding, especially when
10    benzene is not a significant emission from welding.
11         There are no studies that show welding fumes
12    with benzene exceeding the OSHA limit, unless there
13    is another agent involved that converts to benzene.
14    Q.   I wasn't asking about welding fumes.  You
15    don't have any PPM levels or any benzene exposure
16    for Mr. Cervantes at all, do you?
17    A.   No, and neither do you.  There aren't any.
18    Q.   I didn't say I did, but I'm not the one
19    offering opinions.
20         So my question is simply what data do you
21    have, if any, about the actual levels of benzene
22    exposure in or around where Mr. Cervantes worked?
23         MS. FREDONA:  Objection.
24    A.   I do in the sense that if I speculate and I
25    assume that he was exposed at the OSHA limit of one
```

William Sawyer, Ph.D.

1    part per million, he would have to be exposed at

2    that level 40 hours a week for 40 years to sustain a

3    level consistent with benzene-related hematopoietic

4    malignancy.

5        Q.   So you're relying on a reference dose from

6    OSHA to determine whether or not he had sufficient

7    exposure to benzene?

8            MS. FREDONA:   Objection.

9        A.   No.  I said if I speculated and assume he

10   was exposed at the OSHA standard, which is not

11   feasible in an outdoor environment working only

12   three -- doing it three times a week, when the human

13   epidemiologic studies clearly show that the 20 to 40

14   PPM years are required to induce a benzene

15   hematopoietic malignancy.

16           Now, how could a person who is working only

17   three days a week outdoors for a short period of

18   time -- not 40 years, but far less than 40 years --

19   could reach that level?  It's just not feasible.

20       Q.   Well, that wasn't my question, Doctor, with

21   all respect.  My question is whether you would look

22   to, as you've just told me, the OSHA reference dose

23   to determine whether someone's exposure was or was

24   not related to their cancer for benzene, right?

25       A.   No, I would not use the OSHA occupational

William Sawyer, Ph.D.

```
1    standard for causation purposes.  What I said was
2    I'm very familiar with the benzene studies that have
3    shown hematopoietic malignancies and they require 20
4    to 40 PMM-years of exposure, and it's just
5    unreasonable to imagine how somebody could be
6    exposed to that level in an outdoor environment only
7    working occasionally three times a week welding.
8        Q.   But again, your reference was to an OSHA
9    reference dose, right, as part of your answer, or
10   did I imagine it?
11           MS. FREDONA:  Objection.
12       Q.   We'll move on.
13           Doctor, the body metabolizes benzene, right?
14       A.   Yes.
15       Q.   And benzene metabolites are themselves
16   carcinogenic, right?
17       A.   Yes.  The theory -- and again, even with
18   benzene, the mechanism is still not absolutely
19   confirmed, but there is an intermediate metabolite
20   which has oxidative properties and mutagenic
21   properties that is thought to cause the
22   hematopoietic malignancies.
23       Q.   Doctor, you cited one article in your report
24   by Khalade, K-h-a-l-a-d-e, with respect to
25   occupational exposure to benzene and hematopoietic
```

William Sawyer, Ph.D.

1    cancers, right?

2        A.   Yes.  I'm going to open the study.  Okay.

3        Q.   Okay.  And I'll mark that as well.  This

4    should show up as Exhibit Number 9.  It's going to

5    be marked as 6 but, again, we're going to change

6    that to correct the numbers.

7            (Sawyer Exhibit 9 was marked for

8    identification.)

9    BY MR. PAINE:

10       Q.   And I'm going to put this up on my screen

11   so everybody can see it.

12           Is this the Khalade study that you cited in

13   your report, Doctor?

14       A.   Yes, and in the results you will see where I

15   used the 40 PPM-years as the lower dose that is

16   statistically and significantly associated with AML.

17   That's the type of -- a type of hematopoietic

18   malignancy.

19       Q.   Okay.  And, Doctor, this article is entitled

20   "Exposure to benzene at work and the risk of

21   leukemia:  a systematic review of meta-analysis."

22   Right?

23       A.   Yes.  Yes.  This is a very wide ranging

24   meta-analysis that includes a lot of data.

25       Q.   Okay.  But it's primarily concerned with

William Sawyer, Ph.D.

1    leukemia, right?

2        A.    Yes.  As I said, leukemia is the malignancy

3    that has been generally accepted as being causally

4    linked to benzene.

5        Q.    Okay.  This article does not discuss

6    non-Hodgkin lymphoma, specifically DLBCL, does it?

7        A.    No.

8        Q.    And Mr. Cervantes did not have leukemia, did

9    he?

10       A.    Correct.

11       Q.    And in your report this was the only article

12   that you cited about benzene exposure and leukemia

13   or lymphoma, correct?

14       A.    Yes.  This study is the appropriate study as

15   AML is the most sensitive malignancy in the

16   literature that shows up in the highest frequency

17   with the greatest sensitivity to benzene.

18       Q.    Did you search for or cite any studies in

19   the peer-reviewed published medical or scientific

20   literature on benzene exposure and a possible

21   increased risk of NHL specifically?

22       A.    I have in great detail in the past but not

23   recently.

24       Q.    Did you site any of those articles in your

25   reference list in this case?

William Sawyer, Ph.D.

```
 1      A.   No, since it's not conceivable that Mr. --

 2   could have -- it's not possible to reach a 40 PPM

 3   exposure limit, a 40 PPM-year dosage, I should say,

 4   in the case of Mr. Cervantes simply because he's

 5   working only three times a week for a short period

 6   of time in an outdoor environment welding, and there

 7   are no studies that show welding of steel in an

 8   outdoor environment for that few hours a week could

 9   possibly result in a 40 PPM-years of benzene

10   exposure.  It's just not conceivable.

11           (Sawyer Exhibit 10 was marked for

12   identification.)

13   BY MR. PAINE:

14      Q.   Doctor, I'm going to mark as Exhibit 10 to

15   your deposition an article by Bassig that was

16   published in 2015.  This will be Exhibit 10 by my

17   reckoning.  It will show up for the moment as

18   Exhibit 7 in your folder, but again, I'm going to

19   share my screen with you so we can look upon this

20   together.

21           So, Doctor, are you able to see the article

22   that I've marked here as Exhibit 10?  This is

23   entitled "Occupational Exposure to Benzene and

24   Non-Hodgkin Lymphoma in a Population-Based Cohort:

25   The Shanghai Women's Health Study."
```

William Sawyer, Ph.D.

1      A.   Yes.

2      Q.   Okay.  And I take it you haven't seen this

3   article before, correct?

4      A.   No.

5      Q.   All right.  Let's look just here at the

6   Results section of this article.  I'm going to

7   highlight just this section here.  The results were

8   that:  Women ever exposed to benzene had a

9   significantly higher risk of NHL, hazard ratio 1.87,

10  95 percent confidence interval, 1.19 to 2.96.

11          Did I read that correctly?

12     A.   Yes.

13     Q.   So these authors, these investigators, found

14  that any exposure, ever exposure, to benzene was

15  significantly associated with an increased risk of

16  NHL, correct?

17     A.   Yes.

18     Q.   Do you have any reason to disagree with this

19  article's conclusions?

20     A.   I would have to review the article to --

21          MS. FREDONA:  Let me object to the

22      introduction of the exhibit.  Go on.

23          MR. PAINE:  On what basis?

24          MS. FREDONA:  Well, number one, you're

25      showing our expert three paragraphs of it and he

William Sawyer, Ph.D.

1          hasn't gotten a chance to read it all.

2               MR. PAINE:  Okay.

3          Q.  Well, let's take a break.  If you want to

4     read it, Doctor, be my guest.

5          A.  I'll do that on the clock.  I'm not going to

6     take a break --

7          Q.  No, we're not going to go off -- we're not

8     going to go off the clock.  I've got limited time.

9          A.  Well, I'm certainly not going to take a

10    break while you take a break and I'm working.  I've

11    been going at it all day.  I --

12         Q.  Okay.  We'll keep going.  You haven't

13    reviewed this or any other similar article finding

14    an increased risk of NHL for people who have ever

15    been exposed to benzene, correct?

16              MS. FREDONA:  Objection; form.

17         A.  I don't understand the question.

18         Q.  Sure.  We'll move on.

19              Do you agree that an impartial investigator

20    would have, in fact, considered data like this study

21    as part of a thorough investigation before reaching

22    an opinion that benzene does not cause or does cause

23    non-Hodgkin lymphoma?

24              MS. FREDONA:  Objection; form.

25         A.  Well, certainly I did in that I assumed

William Sawyer, Ph.D.

1    hypothetically that NHL is caused by benzene, and I

2    assessed his benzene exposure in my report and

3    determined that it was just not possible under the

4    circumstances based upon the welding or the product

5    that he used outdoors only three times a week.

6        Q.   Let's take a look at -- you said that he

7    knocked tar coating off the pipes that he ultimately

8    welded, right?  Page 15 in your report.

9        A.   Page 15?  I don't see that on 15.

10       Q.   Sorry.  My mistake.  16, it's on 16, the

11   first paragraph:  The tar coating on the pipe had to

12   be knocked off.

13            So the question to you, Doctor, is how did

14   he knock that off and did it create any dust or

15   particulates when he did that?

16            MS. FREDONA:  Objection; form and

17       speculation.

18       A.   There is insufficient information to

19   speculate a significant exposure.

20       Q.   So you don't know?

21       A.   Well, tar coating is generally sticky and

22   doesn't form dust.

23       Q.   Do you know what the product was that he was

24   knocking off?

25       A.   Yes.  He called it cold-tar hot wrap, which

William Sawyer, Ph.D.

1    I researched, c-o-l-d -tar hot wrap.

2        Q.   So let me ask you this, Doctor.  You said he

3    was knocking off tar coating on the pipe, right?  So

4    it was already in place when he got there, right?

5        A.   Yes.

6        Q.   So do you or Mr. Cervantes know what that

7    product was that was originally applied that he

8    knocked off?

9        A.   He told me it was called cold-tar wrap or

10   cold-tar hot wrap.  He said that's -- that's what

11   they -- that's what the gas company used.

12       Q.   Okay.  You're assuming it's the same product

13   that he reapplied later on; is that correct?

14       A.   That's what he stated.

15       Q.   But you didn't ask him or ascertain whether

16   that knocking off of the existing coal tar from the

17   pipes created any dust or particulate matter,

18   correct?

19       A.   No.  I asked him how -- what he did and he

20   explained it to me.

21       Q.   What did he say other than "I knocked it

22   off"?

23       A.   That he removed it before welding the pipe.

24       Q.   So how did he knock it off?

25       A.   I don't recall.

William Sawyer, Ph.D.

1    Q.   So you don't know if he sanded it off, if he

2    knocked it off with a hammer, if he used a wire

3    brush or anything like that, do you?

4    A.   I don't recall if he -- I think he scraped

5    it but I'm not sure.

6    Q.   And again, you don't have any quantitation

7    of how much of that knocked off tar coating created

8    in terms of particulate matter or dust or anything

9    like that, right?

10    A.   No quantitative; however, the material that

11    he used is not a carcinogenic material, and it was

12    nonfriable, meaning it was a material that did not

13    produce significant dust.

14    Q.   Okay.  So are you talking about what you've

15    identified in Footnote 36 on page 19 of your report

16    as Perma-Patch Black Cold Patch?

17    A.   That's one of them, yes.

18    Q.   Okay.  What were the others?

19    A.   The same product, different manufacturer.

20    Q.   So how do you know if it's the same -- I

21    guess I don't understand.  You said "for example" in

22    your footnote.  What were the other products?  What

23    were their names?  Who were their manufacturers?

24    A.   A similar product containing similar

25    ingredient.

William Sawyer, Ph.D.

1      Q.   Which product?  Which manufacturer?

2      A.   I don't know.  I didn't -- I didn't include

3   it.

4      Q.   So do you have your files with anything else

5   you researched besides Perma-Patch Black Cold Patch?

6      A.   No, but they contain the same ingredients, a

7   mixture primarily of asphalt with a certain amount

8   of binder without any benzene.

9      Q.   And specifically what did you look up for

10   Perma-Patch Black Cold Patch?  Was it the safety

11   data sheet or some other source?

12      A.   I looked at the ingredients on the product.

13      Q.   And what was the source?

14      A.   I don't understand about the source.

15      Q.   You said you looked at the ingredients.  Did

16   you actually look at the product itself?

17      A.   No, I looked at the ingredients of the

18   product.

19      Q.   Where did you find them?

20      A.   Granger sells it.  Granger is a very large

21   commercial supplier of contractor products used in

22   construction.

23      Q.   Sure.  I'm familiar with Granger.  My

24   question to you is did you look at the safety data

25   sheet, the SDS, for this product?

William Sawyer, Ph.D.

1      A.   I believe so but there was nothing

2   hazardous, there was nothing listed on the SDS of

3   any value.  It was blank.

4      Q.   Did you look up the historical ingredients

5   for Perma-Patch Black Cold Patch back to the 1980s

6   or earlier, when Mr. Cervantes would have

7   encountered it?

8      A.   No.  I looked up the product that he told me

9   was used and used for many years by his company.

10      Q.   So he hasn't worked there since 2009, right?

11      A.   Right.

12      Q.   And you don't know what the ingredients in

13   that product were at or near the times that

14   Mr. Cervantes used it, you only know what's in the

15   ingredients currently listed on the Granger catalog,

16   right?

17           MS. FREDONA:  Objection.

18      A.   Or other similar products.  They all contain

19   the same ingredient.

20      Q.   What was your sources for the ingredients in

21   those products?  Was that the Granger catalog too?

22      A.   No.

23      Q.   What else did you look at?

24      A.   I searched using Google.

25      Q.   And did you search those products

William Sawyer, Ph.D.

1    historically or did you search more current

2    formulations for those products?

3        A.   Everything I could find.

4        Q.   I ask you again, sir, do you have any

5    documents, any records of these searches to share

6    with us, share with me, to show you -- show me what

7    you looked at?

8        A.   I included one in my footnote where I wrote

9    "for example," and I provided the source.

10       Q.   Right.  And my question is you didn't

11   preserve any of your records, any of your searches,

12   didn't print anything out about these other products

13   by other manufacturers that you're telling me were

14   similar to the current formulation for Perma-Patch

15   Black Cold Patch?

16       A.   No, because I could --

17            MS. FREDONA:  Objection.

18       A.   -- I could not find any with benzene or any

19   other carcinogenic materials other than silica.

20       Q.   How far back --

21       A.   Silica was listed; however, silica is --

22   there's no reasonable way to generate significant

23   silica inhalation, and even if it were inhaled,

24   silica causes lung cancer, not NHL.

25       Q.   I'm just asking you, Doctor, if you've got

William Sawyer, Ph.D.

1    any documents, search records, anything like that

2    that you can share with me to share what you looked

3    up for these other similar products?

4       A.   No, I didn't save any or print any of that

5    because it was all negative.  There was no

6    carcinogens present other than silica.

7       Q.   Doctor, what's a cold primer?

8       A.   A cold primer?

9       Q.   Yep.  That's the next sentence in your

10   report on page 16:  A cold primer was painted on the

11   pipe before the new fitting was welded.

12           What's a cold primer?

13           Sorry, Doctor, are you consulting something?

14      A.   No, I'm just reading, trying to recall.  I

15   don't recall.

16      Q.   What were the ingredients in this cold

17   primer Mr. Cervantes used?

18      A.   I don't recall.

19      Q.   Did you look it up?

20      A.   No.

21      Q.   Do you know what the product was called

22   beyond cold primer, the manufacturer's name or the

23   name of the product itself?

24      A.   No.

25      Q.   Did you do any investigation at all into

William Sawyer, Ph.D.

1     this cold primer?

2         A.   No.

3         Q.   So you don't know if it was petroleum-based

4     or latex-based or something else, right?

5              MS. FREDONA:   Objection.

6         A.   (Nodding head.)

7         Q.   I'm sorry.  I didn't hear your answer,

8     Doctor?

9         A.   Correct.

10        Q.   Do you know if the cold primer gave off any

11    fumes, any solvent odors, anything like that?

12        A.   No.

13        Q.   Did it contain solvents?

14        A.   I don't -- again, I don't know what the

15    product cold --

16        Q.   I take it you don't have any air

17    measurements or levels of particulate matter, fumes

18    or volatiles coming off this cold primer in the

19    proximity of Mr. Cervantes when he was applying this

20    or when he was around this applying, right, being

21    applied?

22        A.   No, but I do know that products sold during

23    his era of working, which was, I think, about 1983

24    to '87, which was the era of time, those four years

25    or so, he was welding, I don't believe there were

William Sawyer, Ph.D.

1    products on the market that were loaded with

2    benzene.  If it's a trace level, no amounts of

3    benzene were in products, no different than painting

4    with an oil-based paint or using turpentine or

5    lacquer thinner, there is trace quantities of

6    benzene present.

7            So it's highly unlikely that this cold

8    primer would have contained benzene at levels to

9    reach a 40 part per million-year exposure via

10   inhalation.

11   Q.   You don't know what the ingredients were and

12   you don't know what the air quality measurements

13   were in or around the area where it was being

14   applied while Mr. Cervantes was there, correct?

15   A.   No, but I do know that products made during

16   that era of time were largely benzene free, and the

17   speculation one would have to make is unreasonable.

18   It would be -- it's unreasonable for me to speculate

19   that this cold primer contained enough benzene to

20   create a chronic exposure to the level associated

21   with NHL or --

22   Q.   Doctor, I'm not just -- I'm not just asking

23   about benzene.  You don't know what was in it, do

24   you?

25   A.   No.  I said I do not know what the cold

William Sawyer, Ph.D.

1    primer was; some type of product that was painted on

2    the pipe before the fitting was welded but I -- no,

3    I don't know what it was.

4        Q.   Dr. Sawyer, did Mr. Cervantes read the

5    Roundup labels for the products that he used?

6        A.   He testified that he did not do so as, one,

7    there was no label wording to that effect; and he,

8    number two, "always talked to the person that I

9    signed the contract with and said, you know, it's

10   not going to go in the lawn, in the grass, and we

11   didn't use it, like, on rainy days where it is not

12   going to be effective and blow off, and we didn't

13   use it on very windy days just for safety reasons."

14       Q.   So, sorry, Doctor, I'm not sure how that

15   relates to my question.  Did Mr. Cervantes read the

16   Roundup label for the products that he used?

17       A.   Well, again, on page 15, it's an

18   implication.  He states:  Mr. Cervantes was asked

19   whether after reading the product label he felt it

20   was necessary to post warnings.

21            With respect to that statement, which is

22   from his deposition, I believe, it implies he did,

23   but I'd prefer not to offer any opinion on that

24   because it's not clear.

25       Q.   Do you recall if Mr. Cervantes testified

1    that he was not aware of ever getting any Roundup on

2    his clothes?  Or if you'd like, we can look at his

3    deposition.  It's at page 130, line 8 through line

4    10.

5         Are you with me, Doctor?

6    A.   No, I don't -- I don't have that open yet.

7    Q.   Here, I'll share my screen.  Doctor, I'm

8    sharing with you page 130 from Mr. Cervantes'

9    deposition.  Do you see here at line 8:  Did you

10   ever get material Roundup concentrate on you or your

11   clothes?

12        Answer:  On my clothes, not that I'm aware

13   of.

14   A.   Okay, but he also said in deposition about

15   his skin.  The question in the deposition that I

16   referenced reads:  Did you ever feel Roundup spray

17   or spill on your exposed skin when you applied it?

18        Answer:  There were times when I'm using the

19   sprayer that it felt, my hand, wet and stuff, so I

20   don't know if the trigger was leaking or something

21   was leaking there.

22   Q.   Right, and I'm going to get to that, but --

23   and you're right, so let me ask you this.  Did

24   Mr. Cervantes ever tell you he got Roundup anywhere

25   on his skin except on his hands?

William Sawyer, Ph.D.

1          I'm asking you, Doctor, what he told you.

2     A.   Yes.

3     Q.   So what did he tell you about getting

4     Roundup on his skin in places other than his hands,

5     if that's what he told you?

6     A.   Well, on page 16, the last three lines:

7     When he came in contact with Roundup on his hands,

8     he would usually just wipe them off as he didn't

9     have access to soap and water.  He recalled that the

10    residential -- or the residue in the hand sprayer

11    leaked and the trigger leaked Roundup onto his

12    fingers and both his hands.  The nozzle also leaked

13    and he also recalled that he used to put Teflon tape

14    on it to reduce the leakage.

15    Q.   Okay.  Dr. Sawyer, my question is really

16    simple.  Did Mr. Cervantes ever tell you he got

17    Roundup on his body anywhere other than on his

18    hands?

19    A.   Not that I have recorded.

20    Q.   Do you recall him saying that he would pump

21    the Roundup container with one hand and spray with

22    the other?

23    A.   Yes.

24    Q.   So when he was spraying Roundup, if the lawn

25    or trigger or what have you was leaking, he would

William Sawyer, Ph.D.

1    have only gotten Roundup on the spraying hand while

2    applying, right?

3         MS. FREDONA:  Objection; hypothetical.

4    A.   Well, if you've ever used Roundup and

5    carried the container around, or even used the

6    backpack sprayer, you find that pumping the sprayer

7    causes fatigue.  Most people who use it use --

8    rotate and use both hands.

9    Q.   So what did Mr. Cervantes do?  Did he ever

10   tell you that while spraying he got Roundup on more

11   than one hand?  Again, my question is specifically

12   about spraying.  I understand you're telling me some

13   people get fatigue and sometimes they switch hands.

14        What I want to know is did Mr. Cervantes

15   tell you that he ever got Roundup on his nonspraying

16   hand while applying Roundup?

17   A.   No.  I didn't ask him that specific

18   question.

19   Q.   Did he tell you how much of his hand got wet

20   while he was applying Roundup?

21   A.   Yes.

22   Q.   How much of his hand got wet while he was

23   applying Roundup, according to what he told you?

24   A.   He specifically told me that when he

25   unscrewed the nozzle and worked on the nozzle, that

William Sawyer, Ph.D.

1    it would drip between his fingers onto his hand.

2       Q.   And was that the extent of his exposure on

3    his hand to Roundup when he was applying it,

4    according to what he told you?

5       A.   Yes, with respect of the exposure which he

6    was aware of, yes.

7       Q.   Are you aware of any additional exposure

8    beyond what he told you while applying Roundup?

9       A.   Yes.

10      Q.   And what was that?

11      A.   I can turn you to different areas in my

12   report that show actual measurements using gauze

13   pads on different areas of the body, and when

14   spraying, how much material binds to the test pads

15   tested by the laboratory, and just because a person

16   feels that they only had exposure on their hands

17   doesn't negate the exposure to the rest of the body

18   that they're not aware of.

19      Q.   But I want to know what he told you.

20   According to what he told you, the extent of him

21   getting Roundup on his hands was between the fingers

22   and onto his hands when he unscrewed it during the

23   application process, right?

24      A.   And, actually, he also explained that his

25   fingers and hand would get wet from the trigger

William Sawyer, Ph.D.

1    area.

2        Q.   That's on the spraying hand, right?

3        A.   Yes, and I did not ask him if he only

4    handled the wand with his left hand or right hand.

5    I did not ask him that but it is reasonable that a

6    person spraying as much as he did would have some

7    level of fatigue from pumping and occasionally

8    switch hands.

9        Q.   Did you ask him if he ever switched hands?

10       A.   No.

11           MS. FREDONA:  Objection; asked and answered.

12       Q.   If Mr. Cervantes washes his hands shortly

13   after or immediately after spilling or getting any

14   Roundup on them, that would reduce his exposure,

15   right?

16           MS. FREDONA:  Objection; hypothetical.

17           MR. PAINE:  He's an expert.  I can ask him

18       hypotheticals.

19       Q.   Go ahead, Doctor.

20           MS. FREDONA:  It's an incomplete

21       hypothetical.

22       A.   Really, I don't understand the full

23   question.

24       Q.   Sure.  If he washed his hands shortly after

25   getting Roundup on them, that would reduce his

William Sawyer, Ph.D.

1    exposure to Roundup, right?

2         MS. FREDONA:  Same objection.

3    A.   That's very vague.  What do you mean by

4    shortly and do you include soap?

5    Q.   Let's say it's 10 minutes, within 10 minutes

6    of exposure and, fine, with soap.

7         MS. FREDONA:  Same objection.

8    A.   And the question is would that reduce

9    exposure or completely negate exposure?

10   Q.   Reduce.

11   A.   Certainly it would reduce it, yes.

12   Q.   Would it be reduced if he just used water to

13   clean his hands within a few minutes of getting

14   Roundup on him?

15   A.   To a much lesser extent.

16        MS. FREDONA:  Objection; incomplete

17   hypothetical.

18   A.   To a much lesser extent, yes.

19   Q.   Now, Mr. Cervantes testified that he wore

20   gloves during the spring and fall when he was

21   applying Roundup, right?

22   A.   Not exactly.  He testified and he explained

23   to me that they were cloth gloves and that the

24   gloves would become wet.

25   Q.   Did Mr. Cervantes ever tell you if his

William Sawyer, Ph.D.

1    gloves got soaked through with Roundup?

2        A.   I never asked him about soaked through.

3    What he told me was that from the leakage they would

4    become wet.

5        Q.   Even cotton gloves provide some protection

6    against Roundup contacting the skin or hands, don't

7    they?

8        A.   Only if it's a quantity of Roundup that does

9    not saturate the cotton.  Saturated cotton has the

10   same concentration of Roundup on the outside as it

11   does on the inside if the cotton is saturated, so it

12   really depends on how wet the cotton is.

13          In the studies that I've included in my

14   report, the gloves are not sopping wet.  They are

15   not -- and the pants in the studies that I use, and

16   the shirts, are not soaking wet but, rather, have a

17   measurable amount of Roundup on the outside and

18   typically about a 20 percent or so concentration on

19   the inside of the fabric.  So it does cause a

20   certain level of protection but not complete by any

21   means.

22       Q.   Did Mr. Cervantes ever tell you how many

23   times, if any, that his gloves became saturated with

24   Roundup?

25       A.   I don't know where that came from.  He

William Sawyer, Ph.D.

1    didn't tell me that his clothing became saturated

2    from Roundup.  Where did you come up with that?

3        Q.   Well, you used the term saturated, so I just

4    asked you if he ever told you that his clothes or

5    his gloves became saturated with Roundup.

6        A.   No.  He just said wet.

7        Q.   Okay.  Did he tell you how many times his

8    gloves became wet with Roundup?

9        A.   No.

10       Q.   Did Mr. Cervantes ever tell you he ever

11   experienced any skin damage or skin irritation in

12   connection with using Roundup?

13       A.   No, and, actually, in response to the prior

14   question, he told me he only wore the gloves in

15   colder weather.

16       Q.   What did Mr. Cervantes tell you about any

17   dermal contact he may have received during mixing

18   Roundup?  Up to this point we've been talking about

19   applying, so I want to ask you about dermal contact

20   during mixing.  What did he tell you about dermal

21   contact during mixing Roundup?

22       A.   That he mixed the concentrated Roundup on

23   site where he was working and he poured it, the

24   solution, into a backpack sprayer by hand, and he

25   occasionally contacted Roundup on his hands, and

William Sawyer, Ph.D.

1    would sometimes rinse but only if possible or

2    practical; otherwise, he would merely wipe off the

3    concentrate solution and continue on to the next

4    task, and I referenced his deposition for that

5    information.

6         Q.   And was that dermal contact while mixing

7    Roundup concentrate confined to his hands, as you

8    understand it?

9         A.   That's what the deposition on page 142 to

10   143 indicates.

11        Q.   Do you agree that Mr. Cervantes was

12   reasonably careful and meticulous in his mixing and

13   application of Roundup?

14        A.   Define meticulous.

15        Q.   Well, that's a term you -- I think you used

16   in your report, so I'm just asking you.  Is that

17   your impression, that he was reasonably careful and

18   meticulous in his mixing and application of Roundup?

19        A.   He told me that but I have no means of going

20   back in history and observing, but that's what he

21   told me.

22        Q.   Now, Dr. Sawyer, you have not done any

23   calculation of an absorbed dose of Roundup or

24   glyphosate for Mr. Cervantes, did you?

25        A.   No.

William Sawyer, Ph.D.

1      Q.   In this case you -- and in your report here

2  you talk about Mr. Cervantes having what you've

3  described as a minimum exposure dose of 126 exposure

4  days, right?

5      A.   Yes.

6      Q.   Okay.  And just for reference, I'm looking

7  at page 22 or your report.  You've got a table

8  there, Table 2, which provides calculations for

9  minimum and maximum exposure days that run from 126

10  minimum to a maximum of 248 eight-hour exposure

11  days.  Do I understand that correctly?

12     A.   Yes.

13     Q.   All right.  And that represents the

14  cumulative time in days that Mr. Cervantes was

15  mixing or using Roundup, in your opinion, right?

16     A.    No, it's not my opinion.  It's the

17  mathematical additivity of the amount of time he

18  testified and stated in the interview that he used

19  the product.

20     Q.   Okay.  But, in other words, you've reached

21  an opinion that he has 126 to 248 exposure days,

22  eight-hour days of Roundup, including mixing and

23  application, and that's what you're going to tell

24  the jury in this case, right?

25     A.   Yes.

William Sawyer, Ph.D.

1    Q.   Okay.  Exposure days are different than

2    exposure dose, correct?

3    A.   If you're referring to a dose in milligram

4    per kilogram per body weight, yes; however, many

5    toxicological agents are measured in units of

6    exposure time, such as benzene is not measured in

7    milligram per kilogram per day dose, but, rather,

8    it's measured in benzene PPM exposure years, and

9    that's because the studies were run that way.  At a

10   given air level of ventilation for a given amount of

11   time, 40 hours per week, and the number of years at

12   that level required to produce the toxicological end

13   effect, which is leukemia.

14        And the same holds true in this study

15   design.  In these six studies that offered exposure

16   metrics, those studies did not provide milligram per

17   kilogram body weight per day measurements, but,

18   rather, the Ericsson study used eight-hour Swedish

19   working days, and the other studies used exposure

20   days as a day when the product was used, not

21   necessarily for eight hours.

22        So I'm following the generally accepted

23   methodology for calculating dose using exposure

24   days.  That still represents a dose, just as benzene

25   exposure years is a dose.  A dose does not have to

William Sawyer, Ph.D.

1    be only in milligram per kilogram per day, and it

2    would be useless to make that measurement unless one

3    were to apply it and compare it to the AOEL level

4    for an applicator, because the studies, the human

5    studies, provide no information on milligram per

6    kilogram per day exposure dose.

7        Q.   So, Doctor, again, my question is very

8    simple.  You calculated exposure days rather than

9    exposure dose for Mr. Cervantes, right?

10       A.   Yes, in keeping and being consistent with

11   the methodology used in the human studies, that's

12   exactly what I did.

13       Q.   So, Doctor, if you go to page 87 of your

14   report, do you see the section entitled "Systemic

15   Dose"?

16       A.   Yes.

17       Q.   Okay.  What you say there under Systemic

18   Dose is, quote:  When a person is exposed to a

19   chemical such as glyphosate, the dose physically

20   contacting the body is referred to as the exposure

21   dose.  This is different from the systemic dose

22   which enters the bloodstream and reaches various

23   organs within the body.  End quote.

24            Did I read that correctly?

25       A.   Yes, and that's what I said a few moments

1    ago, if you look back at the transcript.  I talked

2    about systemic dose in milligram per kilogram per

3    day.

4         Q.   So to be clear, Doctor, there can be

5    exposure in the sense of use of Roundup which may or

6    may not result in Roundup contacting the skin,

7    right?

8         A.   Yes, that is theoretically possible;

9    however, there is a wealth of studies, including

10   considerable in-house Monsanto data, showing the

11   exposure dose for a typical applicator, and there

12   are also studies published that I've referenced that

13   show how much of this actually reaches the

14   bloodstream through dermal absorption.

15        So --

16        Q.   Sorry.  I didn't mean to cut you off.

17        A.   Okay.  So this has been well studied with

18   respect to glyphosate and Roundup, and we know that

19   applicators sustain a measurable dose, a systemic

20   dose, through the exposure dose application of the

21   product.  I mean, that's well established.  It's not

22   reasonable to try to trick a jury and tell them that

23   a person can go out there and spray with a backpack

24   sprayer and not experience a systemic dose.  It's

25   not possible.

William Sawyer, Ph.D.

1      Q.   Now, you agree that exposure in that sense

2  is an opportunity for the product to contact the

3  person's skin, right?

4      MS. FREDONA:   Objection; form.

5      A.   Yes, and this fellow was using a backpack

6  sprayer with a standard dispersal aerosol sprayer

7  which produces a drift which contacts the lower

8  legs, primarily, and the rest of the body, as per

9  the studies have documented, and I have documented a

10  number of studies that quantitatively show what this

11  exposure dose is versus the systemic dose, that is

12  how much actually mixes with the skin.

13      Q.   Right.  And my point is you didn't calculate

14  either an exposure dose or a systemic dose for

15  Mr. Cervantes, did you?

16      A.   No.  That would be an improper methodology

17  in trying to compare it to the human dose metric

18  studies which are based on exposure days.

19  Calculating the milligram per kilogram body weight

20  per day systemic dose would not be something I could

21  use to compare to the human epidemiological studies.

22      Q.   So, Doctor, exposure dose requires you to

23  assess how much glyphosate actually contacted a

24  person's body, right?

25      A.   Right.

William Sawyer, Ph.D.

1    Q.   And systemic dose then requires you to take

2    an additional step and figure out from the exposure

3    dose how much penetrated the skin to get into the

4    bloodstream's -- into the bloodstream, right?

5    A.   Yes, and I have documented that in my report

6    and will explain the process to the jury.

7    Q.   And you would agree that Roundup or any of

8    its ingredients are not harmful to a person unless

9    they actually get into the person's body, correct?

10        MS. FREDONA:  Objection; form.

11   A.   Can you repeat that?  I don't follow.

12   Q.   Sure.  Roundup is not harmful unless it

13   actually gets into a person's body, right?

14        MS. FREDONA:  Same objection.

15   A.   Correct.  It's harmful if it gets on the

16   body, actually, because we know what the dermal

17   absorption rates are.  So I have to correct that.  I

18   disagree.  It is harmful if it make its way onto the

19   body.

20   Q.   Once it gets onto the body, it then has to

21   be absorbed, right?

22   A.   Yes, but that's not a mystery.  We know that

23   that does occur.

24   Q.   Right.  But if you get glyphosate on your

25   body and immediately wash it off, right, the amount

William Sawyer, Ph.D.

1    penetrating the skin is negligible, if any, correct?

2        A.   If washed quickly with soap and water, it

3    greatly diminishes the dermal absorbed dose, yes.

4        Q.   Now, Doctor, would you go to page 176 of

5    your report?  There is a bullet point -- the second

6    bullet point there is "Prolonged Acute Exposure and

7    Absorption," right?

8        A.   Yes.

9        Q.   And there you say:  Mr. Cervantes testified

10   that he regularly contacted Roundup on his skin.

11           And then at the end you say:  The deposition

12   testimony and interview reveal a quantifiable

13   pattern of exposure indicative of episodic,

14   prolonged, acute dermal exposure and absorption over

15   a period of approximately 22 years.

16           Is that what you intend to tell the jury?

17       A.   Well, I read the portion you read on

18   prolonged acute exposure.  His deposition testimony

19   and interview reveal a quant -- 22 years.  Let me

20   check that.

21           Yeah, 22 years is correct.  Yeah.

22       Q.   But, once again, when it comes to absorption

23   and exposed dose, you never actually calculated

24   those for Mr. Cervantes specifically, did you?

25       A.   That's already been calculated and generally

1    accepted in the literature.

2       Q.   It's not specific --

3       A.   It's inconceivable he could have it on his

4    hands, not washing his hands because of availability

5    of no water, wiping his hands on his clothing or

6    other surfaces, and not absorb it.  I mean, we know

7    what the absorption rates are.  We know from other

8    studies how much aerosol reaches the legs and the

9    torso.  In fact, we even know from Monsanto's

10   in-house study how much is deposited on the skin on

11   the back from leakage of the backpack sprayers.

12          This has all been published and documented,

13   so it's not necessary to specifically measure his

14   blood level while he's spraying, before and after

15   his spray time.  Enough studies have already been

16   published on the dermal absorption rates and time,

17   and the deposition onto the clothing and the

18   penetration through the clothing, to result in a

19   significant exposure.

20          And more importantly, the human

21   epidemiologic studies are not based upon milligram

22   per kilogram per day dose.

23      Q.   Doctor, what did Mr. Cervantes tell you

24   about why he stopped using Roundup?

25          Doctor, can you answer my question, please?

William Sawyer, Ph.D.

1     A.   I'm looking in the report because I don't
2     want to mix him up with someone else.
3     Q.   Doctor, can you answer my question?  You've
4     been looking for about three -- three, four minutes
5     now.
6     A.   That's right.  I don't remember but I am
7     just checking to see if I made a note in my report.
8     Hmm.
9     Q.   I think you've answered the question.  If
10    you don't remember anything else other than what you
11    put in your report, that's fine.
12    A.   Okay.
13    Q.   Doctor, when did the first malignant cell
14    appear in Mr. Cervantes' body?
15    A.   Yeah, we went through this before in I think
16    it might have been your deposition.
17    Q.   It probably was.  So when did the first
18    malignant cell appear in Mr. Cervantes' body?
19    A.   This is like some kind of old-fashioned
20    parlor game.
21    Q.   Can you just answer the question, Doctor.
22    Do you know?
23    A.   No one knows.
24    Q.   Do you know how long any malignant cells
25    were present before Mr. Cervantes was diagnosed with

William Sawyer, Ph.D.

1    DLBCL?

2        A.    No.

3        Q.    According to your report and what

4    Mr. Cervantes told you, he used Roundup between

5    April and November each year that he used it; is

6    that correct?  And if you need a reference, it's on

7    page 16 of your report.

8        A.    Yes.  And on page 13 he also stated that he

9    purchased Roundup concentrate weekly from April

10   through November, typically two to three containers

11   per week.

12       Q.    Okay.  So do you have any different

13   information to suggest that Mr. Cervantes used

14   Roundup at all during the period December, January,

15   February, or March of the years in which he used it?

16       A.    No.

17       Q.    So approximately five months a year he was

18   not using Roundup, right?

19       A.    That's correct.

20       Q.    Can you say to a reasonable degree of

21   scientific certainty that any amount of Roundup, any

22   ingredient from Roundup, was still present in

23   Mr. Cervantes' body when a malignant cell first

24   appeared?

25       A.    No.

William Sawyer, Ph.D.

1    Q.   Can you say to a reasonable degree of

2    scientific certainty that any amount of glyphosate

3    or any ingredient from Roundup whatsoever was

4    actually present in Mr. Cervantes' body when a

5    premalignant lesion first appeared in his body?

6    A.   No.   That's an unreasonable question.

7    Q.   Mr. Cervantes' non-Hodgkin lymphoma has been

8    successfully treated, hasn't it?

9    A.   I will defer that to the treating

10   physicians.

11   Q.   Now, people in this country are diagnosed

12   with non-Hodgkin lymphoma, including DLBCL, every

13   day whether they've used Roundup or not, correct?

14   A.   Correct.

15   MS. FREDONA:   Objection, argumentative.

16   A.   And the correct -- it's correct but in this

17   case we're dealing with someone with more than a

18   twofold risk that they never bought into and were

19   unaware of when that person bought the product.

20   Q.   Doctor, is there any way you or anyone else

21   you can think of can say that Mr. Cervantes would

22   have avoided non-Hodgkin lymphoma altogether if he

23   had simply never used Roundup?

24   MS. FREDONA:   Objection; speculation,

25   incomplete hypothetical, form.

William Sawyer, Ph.D.

1    A.   No.  In fact, what we know is that if he had

2    not used the product, his risk level would have been

3    twofold or more less likely to contract the

4    malignancy.

5    Q.   As we've established, Doctor, people develop

6    non-Hodgkin lymphoma and DLBCL without ever having

7    been exposed to Roundup, right?

8    A.   Yes, that is what the studies use as a

9    control or background rate.

10   Q.   So it's not possible for you to say that

11   Mr. Cervantes would have avoided non-Hodgkin

12   lymphoma if he simply had never used Roundup, is it?

13   He may have developed it anyway, right?

14        MS. FREDONA:  Objection.

15   A.   Correct, except he was in the extreme upper

16   quartile or tertiles of exposure in the studies and

17   his risk level was greatly enhanced, so it's more

18   likely than not and more probable that he would have

19   contracted the non-Hodgkin's lymphoma.

20   Q.   Dr. Sawyer, bear with me just a second.  I

21   think I'm done with my questions.  I'm just looking

22   back through my notes to make sure I covered what I

23   needed to.

24        Dr. Sawyer, I think those are all the

25   questions I've got today.  Thanks again for joining

William Sawyer, Ph.D.

1    with me and I appreciate you bearing with me and

2    answering my questions today.  Have you understood

3    my questions or asked me to repeat it if you didn't?

4        A.   Yes.

5             MR. PAINE:  All right.  I think we're done,

6        unless I have some additional questions if

7        Plaintiff's counsel has any questions for you.

8             MS. FREDONA:  I only have a couple.

9                     CROSS-EXAMINATION

10   BY MS. FREDONA:

11       Q.   Good afternoon, Dr. Sawyer.  How are you

12   again?

13       A.   Tired out.  This is the second deposition

14   today, so...

15       Q.   Oh, me too.  I had three yesterday, so...

16       A.   You don't sleep.

17       Q.   Yeah, I don't sleep anymore.

18       A.   I have three on Thursday.  I have one at

19   8:00 a.m.

20       Q.   And that is all with the Moll Law Group?

21       A.   No.

22       Q.   Okay.  Cool.

23            All right.  So, Dr. Sawyer, can you tell me,

24   does body mass index distinguish between body fat

25   and muscle?

William Sawyer, Ph.D.

1      A.   No, it really doesn't.  There is a

2   variation, especially with athletes or body builders

3   versus the sedentary person.  That is quite

4   variable.

5      Q.   Okay.  And does muscle weigh more than fat?

6      A.   Yes, considerably.

7      Q.   Okay.  So a BMI of 30, does that

8   definitively mean that somebody is obese?

9           MR. PAINE:  Objection.

10      A.   No.  No.  That's a very good point in this

11   case, because for those several years that

12   Mr. Cervantes was near the BMI of 30, he was also

13   very active and he told me he was of a muscular

14   build, which makes sense because he's very active in

15   his occupation.

16      Q.   And he's a laborer?

17      A.   Yes.

18      Q.   All right.  One more question:  In your

19   expert opinion, to a reasonable degree of

20   toxicological certainty, was Roundup a significant

21   factor contributing to Mr. Cervantes' development of

22   non-Hodgkin's lymphoma?

23      A.   Yes.  His exposure, eight-hour time-weighted

24   exposure day measurement, was off scale, was very

25   high, beyond anything I have ever come across in the

William Sawyer, Ph.D.

1    reported literature, so clearly he met the

2    requirement of exceeding the thresholds of the human

3    epidemiological studies that show a more than

4    doubling increase of risk of non-Hodgkin's lymphoma.

5            MS. FREDONA:  I have no more questions.

6            MR. PAINE:  Nope, we're done.

7            THE VIDEOGRAPHER:  Okay.  Everyone, please

8        stand by for just a moment.

9            This concludes the deposition of Dr. William

10       Sawyer.  We are going off the record 4:21 p.m.

11           (Whereupon, the deposition concluded at

12   4:21 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

William Sawyer, Ph.D.

```
 1              C E R T I F I C A T E

 2          I, Susan D. Wasilewski, Registered

 3     Professional Reporter, Certified Realtime Reporter,

 4     Certified Manager of Reporting Services, Certified

 5     Realtime Captioner, and Florida Professional

 6     Reporter, hereby certify that the witness named

 7     herein appeared via Remote Counsel/Zoom technology

 8     on Tuesday, February 16, 2021, and was duly sworn.

 9          I FURTHER CERTIFY that I was authorized to

10     and did stenographically report the examination of

11     the witness named herein; that a review of the

12     transcript was not requested; and that the foregoing

13     transcript is a true record of my stenographic

14     notes.

15          I FURTHER CERTIFY that I am not related to

16     or an employee of any of the parties, nor am I

17     related to or an employee of any of the parties'

18     attorneys or counsel connected with this action, nor

19     am I financially interested in the outcome of this

20     action.

21          WITNESS my hand this 17th of February, 2021.

22

23     _____

24     Susan D. Wasilewski, RPR, CRR, CMRS, CRC, FPR

25
```

William Sawyer, Ph.D.

```
 1                        LAWYER'S NOTES

 2    PAGE    LINE

 3    _____   _____    _____

 4    _____   _____    _____

 5    _____   _____    _____

 6    _____   _____    _____

 7    _____   _____    _____

 8    _____   _____    _____

 9    _____   _____    _____

10    _____   _____    _____

11    _____   _____    _____

12    _____   _____    _____

13    _____   _____    _____

14    _____   _____    _____

15    _____   _____    _____

16    _____   _____    _____

17    _____   _____    _____

18    _____   _____    _____

19    _____   _____    _____

20    _____   _____    _____

21    _____   _____    _____

22    _____   _____    _____

23    _____   _____    _____

24    _____   _____    _____

25
```