# EXHIBIT 12

William Sawyer, Ph.D.

```
 1              UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

 2

 3   IN RE:  ROUNDUP PRODUCTS         MDL No. 2741

 4   LIABILITY LITIGATION

 5   ----------------------------|

     This document relates to:    |  Case No. MDL

 6                                |

     James Peterson               |  No. 3:16-md-02741-VC

 7   v. Monsanto Company          |

     Case No. 3:18-cv-07271       |

 8                                |

     ----------------------------|

 9

10                      - - -

11            Monday, February 15, 2021

12                      - - -

13

14        This is the Remote Videotaped Deposition of

15   WILLIAM SAWYER, PhD, commencing at 1:37 p.m., on the

16   above date, before Susan D. Wasilewski, Registered

17   Professional Reporter, Certified Realtime Reporter,

18   Certified Manager of Reporting Services, Certified

19   Realtime Captioner, and Florida Professional

20   Reporter.

21                      - - -

22            GOLKOW LITIGATION SERVICES

23        877.370.3377 ph | 917.591.5672 fax

24                 deps@golkow.com

25
```

William Sawyer, Ph.D.

```
 1    APPEARANCES VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:
 2    MOLL LAW GROUP
      BY:  KEN MOLL, ESQUIRE
 3         kmoll@molllawgroup.com
           REBECCA FREDONA, ESQUIRE
 4         rfredona@molllawgroup.com
      22 West Washington Street, 15th Floor
 5    Chicago, Illinois 60602
      Phone: (312) 462-1700
 6    Representing the Plaintiff
 7
 8    DENTONS
      BY:  FREDERIC NORRIS, ESQUIRE
 9         rick.norris@dentons.com
      601 South Figueroa Street, Suite 2500
10    Los Angeles, California 90017
      Phone:  (213) 623-9300
11    Representing Defendant Monsanto Company
12
13    DENTONS
      BY:  JOHN R. VALES, ESQUIRE
14         john.vales@dentons.com
      101 JFK Parkway
15    Short Hills, New Jersey 07078
      Phone:  (973) 912-7100
16    Representing Defendant Monsanto Company
17
18   ALSO PRESENT VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:
19    NANCY HOLMSTOCK, Videographer
20    WILLIAM HOGUE, Nelson Mullins
21
22
23
24
25
```

William Sawyer, Ph.D.

```
 1                        - - -
 2                   I N D E X
 3                        - - -
 4   Testimony of:  WILLIAM SAWYER, PhD            PAGE
 5      DIRECT EXAMINATION BY MR. NORRIS.............. 6
 6      CROSS-EXAMINATION BY MS. FREDONA.............. 82
 7
 8
 9
10                  E X H I B I T S
11       (Attached to transcript except where noted)
12   WILLIAM SAWYER, PhD, DEPOSITION EXHIBITS        PAGE
13   Exhibit 1   Defendant Monsanto Company's Notice    9
                 of Remote Video Conference
14               Deposition of William Sawyer, Ph.D.
15   Exhibit 2   Expert Report                         10
16   Exhibit 3   Curriculum Vitae                      11
                 William R. Sawyer, Ph.D.
17
     Exhibit 4   Trials and Depositions - Past Three   11
18               Years
19   Exhibit 5   Invoice                               13
                 * To be produced by Plaintiff's
20               counsel
21   Exhibit 6   Deposition Exhibits 1 through 11      17
                 from Mr. Peterson's Deposition
22               * To be produced by Plaintiff's
                 counsel
23
24
25
```

William Sawyer, Ph.D.

```
 1                E X H I B I T S
 2             (Attached to transcript)
 3     WILLIAM SAWYER, PhD, DEPOSITION EXHIBITS        PAGE
 4   Exhibit 7    Advocate Medical Group Medical         19
                  Records
 5                * To be produced by Plaintiff's
                  counsel
 6
     Exhibit 8    Medical Summary                        20
 7                * To be produced by Plaintiff's
                  counsel
 8
     Exhibit 9    NorthShore Medical Records             21
 9                * To be produced by Plaintiff's
                  counsel
10
     Exhibit 10   Northwest Community Medical Records    23
11                * To be produced by Plaintiff's
                  counsel
12
     Exhibit 11   Pathology Report                       23
13                * To be produced by Plaintiff's
                  counsel
14
     Exhibit 12   Article: Cancer Epidemiology,          36
15                Biomarkers & Prevention
                  Non-Hodgkin's Lymphoma and Specific
16                Pesticide Exposures in Men:
                  Cross-Canada Study of Pesticides and
17                Health
                  Helen H. McDuffie, et al.
18
     Exhibit 13   Article - Glyphosate use and           41
19                associations with non-Hodgkin
                  lymphoma major histological
20                sub-types:  Findings from the North
                  American Pooled Project
21                Pahwa, M, et al.
22   Exhibit 14   Article - Exposure to                  64
                  glyphosate-based herbicides and risk
23                for non-Hodgkin lymphoma: A
                  meta-analysis and supporting
24                evidence
                  Luoping Zhang, et al.
25
```

William Sawyer, Ph.D.

```
1                          - - -
2              THE VIDEOGRAPHER:  We are now on the record.
3        My name is Nancy Holmstock.  I'm a videographer
4        for Golkow Litigation Services.
5              Today's date is February 15th, 2021, and the
6        time on the monitor is 1:37 p.m., Eastern Time.
7              This remote video deposition is being held
8        in the matter of In Re:  Roundup Products
9        Liability Litigation, MDL Number 2741, as it
10       relates to James Peterson vs. Monsanto Company,
11       Case Number 3:18-cv-07271, for the United States
12       District Court, Northern District of California.
13             The deponent is Dr. William Sawyer.
14             All parties to this deposition are appearing
15       remotely and have agreed to the witness being
16       sworn in remotely.
17             Due to the nature of the remote reporting,
18       please pause briefly before speaking, to ensure
19       all parties are heard completely.
20             Will counsel please identify yourselves, for
21       the record, starting with the taking attorney.
22             MR. NORRIS:  Good morning.  My name is Rick
23       Norris for Monsanto.
24             MR. VALES:  Good afternoon.  My name is Jack
25       Vales, from the Dentons Law Firm, on behalf of
```

William Sawyer, Ph.D.

1    Monsanto.

2         MR. HOGUE:  Michael Hogue, from Nelson

3    Mullins, representing Monsanto.

4         MS. FREDONA:  Rebecca Fredona, on behalf of

5    Plaintiff, Moll Law Group.

6         MR. MOLL:  Ken Moll, on behalf of Plaintiff,

7    Moll Law Group.

8         THE VIDEOGRAPHER:  The court reporter today

9    is Susan Wasilewski, and will now swear in the

10   witness.

11        THE COURT REPORTER:  Would you raise your

12   right hand?

13        Do you solemnly swear or affirm the

14   testimony you're about to give will be the truth,

15   the whole truth, and nothing but the truth?

16        THE WITNESS:  I do.

17        THE COURT REPORTER:  Thank you.

18        WILLIAM SAWYER, PhD, called as a witness by

19   the Defendant, having been duly sworn, testified as

20   follows:

21                  DIRECT EXAMINATION

22   BY MR. NORRIS:

23   Q.   All right.  Dr. Sawyer, how are you doing

24   today?

25   A.   Good.  How are you?

William Sawyer, Ph.D.

1     Q.   Doing fine.

2     A.   Great.

3     Q.   You understand that we are here in a

4    deposition relating to a Mr. James Peterson,

5    correct?

6     A.   I do.

7     Q.   Are you sufficiently familiar with the

8    admonition process that you feel comfortable

9    dispensing with those today?

10    A.   I do.

11    Q.   My only comment is that we are on Zoom.  We

12   are dealing with technology.  If for any reason

13   things cut out or you don't understand a question or

14   you're not hearing me correctly, please make sure

15   that you ask me to repeat the question.  If you

16   answer the question as asked, we'll assume you

17   understood what I've asked.  Do you understand that?

18    A.   Yes.

19    Q.   I also understand that you received some

20   pretraining on how to use the Golkow deposition

21   software program, and that you have now access to at

22   least the first four exhibits for this deposition

23   via a remote platform; is that correct?

24    A.   Yes.

25    Q.   All right.  Where are you today for this

William Sawyer, Ph.D.

```
 1    deposition?

 2      A.   In my office at ████████████████████

 3    ████████

 4      Q.   Is anyone with you today?

 5      A.   Yes.

 6      Q.   In the room?

 7      A.   I have with me, under my desk, Bella, who is

 8    a Golden Retriever assistant, and also Mr. Teddy

 9    Sawyer, who is a Sheltie, and they will remain quiet

10    and probably won't say a word.

11      Q.   Thank you.  I kicked my dog out of my room,

12    so -- well, she would not remain quiet.

13           Do you have any physical documents with you

14    today that relate to the Mr. Peterson case?

15      A.   No.  Everything I have is the electronic

16    file as cited in my report.

17      Q.   Do you have any access -- do you have access

18    to any computers or tablets other than the device

19    that you are using for this deposition?

20      A.   I do have an iPhone on my desk, but it's not

21    something I plan on using.

22      Q.   If for any reason you need to consult it or

23    get any text messages or anything like that during

24    this deposition, please let us know, related to this

25    case, obviously.
```

William Sawyer, Ph.D.

```
 1      A.   Correct.

 2      Q.   And also, if at any point during this

 3   deposition you need to look at or refer to a

 4   document, please let us know, and just let us know

 5   what it is that you're looking at, okay, because we

 6   are remote.

 7      A.   Understood.

 8      Q.   Okay.  I put in the Golkow remote exhibit

 9   software the Notice of Deposition for this case.

10           (Sawyer Exhibit 1 was marked for

11   identification.)

12   BY MR. NORRIS:

13      Q.   Have you seen that document before?  It's

14   Exhibit 1.

15      A.   Yes.

16      Q.   And just for purposes of the record, I've

17   premarked as Exhibit 1 the Notice of Deposition of

18   Dr. William Sawyer in the James Peterson vs.

19   Monsanto Company case.

20           Did you bring any documents in response to

21   the notice?

22      A.   No.  All I have are what's referenced in my

23   report.  There was nothing further.

24      Q.   I have premarked as Exhibit 2 to this

25   deposition your expert report in this matter.
```

William Sawyer, Ph.D.

```
 1              (Sawyer Exhibit 2 was marked for
 2      identification.)
 3      BY MR. NORRIS:
 4         Q.   Dr. Sawyer, can you take a look at that?  I
 5      show it's a 202-page document, including the
 6      appendixes.  Does that appear to be a true and
 7      accurate copy of your expert report in this matter?
 8         A.   Yeah, let me check.  I just opened up my
 9      version, which I submitted, and now I will open up
10      Exhibit 2, if I find it here.  What happened to
11      Exhibit 2?
12         Q.   You may have to hit the "back" button.
13         A.   For some reason, the Zoom image is a tiny
14      little box in the bottom of the screen now.  I'm
15      trying to figure out how to enlarge it back.  Exit
16      minimize video.  There we go.  Okay.  So it looks --
17      I'll reopen here the link to Exhibit 2, which is my
18      report.
19              Now, what I will do, it will take just a
20      moment here, I'm going to do a side-by-side version.
21      It's the only version I ever sent to Attorney Moll,
22      so it should be correct.  But, let's see.
23              And, yeah, they're both identical.  So,
24      correct.
25         Q.   Thank you.
```

William Sawyer, Ph.D.

1         For purposes of -- just for the record,

2    maybe we won't have to do this for every deposition

3    this week and next week, but I'm going to share my

4    screen.  I've premarked in this deposition a copy of

5    your CV as Exhibit 3.

6         (Sawyer Exhibit 3 was marked for

7    identification.)

8    BY MR. NORRIS:

9         Q.   I am showing that to you now, Dr. Sawyer.

10   Do you see that?

11        A.   Yes.

12        Q.   If I go to the second page, it is dated in

13   the upper left-hand corner here it's dated August,

14   2020.

15        A.   Correct.

16        Q.   Is that the most current copy of your CV?

17        A.   Yes.

18        (Sawyer Exhibit 4 was marked for

19   identification.)

20   BY MR. NORRIS:

21        Q.   Lastly, for purposes of the record, I had

22   premarked as Exhibit 4, which I'm showing you now, a

23   document titled, William R. Sawyer, PhD, Trials and

24   Depositions For the Past Three Years, with the most

25   recent deposition appearing from December 8th of

William Sawyer, Ph.D.

1    2020.  Is that the most up-to-date copy of your past

2    trials and depositions for the past three years?

3       A.   I would have to check by opening up my list

4    of recent depositions to be certain that Jenn sent

5    the most current version.

6            All right.  Let's see.  December 9th is what

7    I'm showing as my newest.  The last deposition was

8    on December 9th.

9       Q.   Okay.  So you have an updated -- that

10   deposition on December 9th, can you give us the case

11   title?

12      A.   Yeah.  I just closed it.  So hold on.  Let

13   me reopen it.

14      Q.   How about we do this, Dr. Sawyer, since

15   we've got -- to not avoid time.  Can you give --

16   send that most recent document to counsel for

17   plaintiffs today?  We can then mark it tomorrow,

18   among the depositions tomorrow.

19      A.   Yeah, yeah.  So the -- the only thing is --

20   let me just check.  Because I sent -- I was looking

21   at the date that I -- it says, date saved, which

22   means Jenn could have sent it to me at an earlier

23   date and I saved it later.  Let me just check again

24   because it may be the same.  I should not have

25   closed it.

William Sawyer, Ph.D.

1          Okay.  I actually opened it.  The last

2     deposition was Bennett vs. Lifeline, November 12th,

3     2020.

4          Q.  Do you see that on this document that I am

5     showing you on the share screen there's a deposition

6     of Bishop vs. Polo Grill on November 8th, 2020?

7          A.  Yeah, that's a -- yeah.  So you actually

8     have a newer version than I have.  So Jenn sent you

9     the newest version, but not to me.  So I think we're

10    good.

11         Q.  Okay, perfect.

12         All right.  Have you sent any bill -- have

13    you sent a bill for your time to the Moll Law Group

14    for this case?

15         A.  I did, on Thursday of last week.

16         Q.  I'd like to attach that as Exhibit 5 to this

17    deposition.  We'll figure out a way to get that too.

18         (Sawyer Exhibit 5 was marked for

19    identification.)

20    BY MR. NORRIS:

21         Q.  Was that bill for just the Peterson case or

22    was that a bill for all of the cases that you worked

23    on for the Moll Law Group?

24         A.  That was a separate invoice specific to the

25    Peterson case.

William Sawyer, Ph.D.

```
 1        Q.   Do you recall the amount of that invoice?
 2        A.   I can call it up.  I have it right here, I
 3   think.  Let's see.  I don't see it on my list.  I
 4   can -- I can say that it was in the vicinity of --
 5             MR. MOLL:  Well, don't guess, Doctor.
 6        A.   Okay, yeah.  I don't know why it's not in my
 7   invoice folder here.  Odd.
 8        Q.   Was the bill that you sent to the Moll Law
 9   Group, did that complete all of your time up through
10   the completion of your report?
11        A.   Yes, along with the initial retainer and
12   then the amount due.  I think I know where it is.  I
13   can find it.
14        Q.   All right.  Well, let's move.  We can get
15   that from Exhibit 5 and -- all right.
16             I have pulled up on the screen, Dr. Sawyer,
17   your report, and in particular I'm going to page 202
18   of your report and I want to ask you some questions
19   about the materials that you reviewed in this case
20   as it relates to Mr. Peterson.  Okay?
21        A.   Okay.
22        Q.   I had my understanding -- well, strike that.
23             Did you review Mr. Peterson's deposition in
24   this case?
25        A.   No, I don't believe he was deposed yet,
```

 1    based on my new materials reviewed list.  Let me

 2    check the report.  So...

 3            He has not been deposed.

 4    Q.   Okay.  Is a deposition something that you

 5    normally like to review in cases that you're working

 6    on, of the plaintiff?

 7    A.   Yes.

 8    Q.   There were two doctors deposed in this case,

 9    a Dr. William Moran, Moran, I don't know if I'm

10    pronouncing that correctly, and a Dr. Keith

11    Schulman.  Is it correct that you did not review

12    either of those depositions?

13    A.   Correct.

14    Q.   On -- if you look at what I'm showing you

15    here on the screen, number 541, you reference a

16    photograph of a Roundup spray applicator.  Is that

17    the spray applicator that is depicted on page 16 of

18    your report?  And I can go to it if it's easier for

19    you.

20    A.   Yeah, I have it called up on my report.

21    Page 16, that's the spray applicator used by

22    Mr. Peterson.

23    Q.   Did you review any other photographs of a

24    spray applicator for Mr. Peterson?

25    A.   I'm looking at the 11 exhibits.  Exhibit 3

William Sawyer, Ph.D.

1    is, I believe, the one that's in my report.

2    Exhibit 4 is the patio.  Exhibit 5 is corner of the

3    house.  Exhibit 6, patio with a picnic table.

4    Exhibit 7 is simply the plaintiff's fact sheet.

5    Exhibit 8 is plaintiff fact sheet.  Exhibit 9 is the

6    first amended plaintiff's fact sheet.  And then

7    Exhibit 10 is the complaint.  And then the final

8    exhibit I have is Number 11, which is a

9    gastroenterology group record.

10           So the answer is, no, I don't have anything

11   beyond that.

12       Q.   When you are -- do you have that

13   gastroenterology document still pulled up?

14       A.   Yes.

15       Q.   When you referenced that there is an exhibit

16   number, you're referring to the fact that on the

17   page itself it has an exhibit tab, Exhibit Peterson

18   11, 11-14-19?

19       A.   Correct.

20       Q.   Okay.  And all of the documents that you

21   referred to just now as Exhibits 3 through 11 had a

22   similar exhibit tab?

23       A.   Yes.

24       Q.   I would like to mark, for the record

25   collectively, as -- so it's my -- strike that.  Let

William Sawyer, Ph.D.

1   me start over.

2           It's my understanding then, Dr. Sawyer, that

3   you have received documents titled Exhibit 3 through

4   Exhibit 11; is that correct?

5       A.   It's actually Exhibit 1 through 11.

6       Q.   And Exhibit 1 is the Notice of Taking the

7   Oral Deposition of James Peterson?

8       A.   Yes, it is.

9       Q.   Exhibit 2 is a receipt?

10      A.   Yes, Walmart.

11      Q.   I want to collectively attach as Exhibit 6

12  to the deposition the exhibits that were received by

13  Dr. Sawyer as Exhibit 1 to Exhibit 11, which I

14  believe were -- came from the deposition of

15  Mr. Peterson.

16          MR. NORRIS:  Mr. Moll, we'll figure out a

17      way to get that to the court reporter.

18          MR. MOLL:  That's fine.

19          (Sawyer Exhibit 6 was marked for

20      identification.)

21  BY MR. NORRIS:

22      Q.   So going back to those exhibits then,

23  Dr. Sawyer, the documents that are listed on your

24  report as photographs of areas in which Roundup was

25  Sprayed, Number 452, those are documents that you

William Sawyer, Ph.D.

1    have as Exhibits 4 through 6, correct?

2        A.   Yes.

3        Q.   And those are depicted on pages 17 and 18 of

4    your report?

5        A.   Correct.  Well, 16 through page 18.

6        Q.   16 is the sprayer and then 17 and 18 are the

7    areas.

8        A.   Right.

9        Q.   Thank you, sir.

10            You note at page 202 of your report that you

11   received plaintiff's fact sheet?

12       A.   I did.

13       Q.   But it appears now, as we've gone through

14   your -- the documents that you received, that you in

15   fact received three separate versions of that fact

16   sheet; is that correct?

17       A.   At least two.  I know one was amended, and

18   the other was marked plaintiff's fact sheet.  So I

19   don't want to guess at it.  It's possible that there

20   are three different ones.  It's possible that the

21   first two are duplicates.  I'd have to check that.

22       Q.   Let me ask it a different way.  It's correct

23   that the fact sheets that you received are labeled

24   Exhibits 7 through Exhibit 9.

25       A.   Yes.

William Sawyer, Ph.D.

1    Q.   Okay.  What is the document that you have

2    listed on your report and I'm showing you here, 454,

3    James Peterson advocate medical records?  Can you

4    please describe for me what that document is?

5    A.   Sure.  It is a 114-page PDF of medical

6    records.  The first page in the left-hand top corner

7    reads, Advocate Medical Group, Peterson, James E.

8    And the date of that document -- well, it states on

9    the bottom, printed June 13th, 2020.  And if I

10   scroll through that document, all the way to the

11   last page, on page 114, it still contains medical

12   records.  It's -- oh, it looks like all of the

13   medical records throughout are from Advocate Medical

14   Group.

15   Q.   I don't think that I have a copy of that.

16   Can we -- let's go ahead and mark that as Exhibit 7,

17   and we will find a way to get that to the court

18   reporter.

19   A.   Yeah.  Any time you need me to, I can, of

20   course, e-mail it directly to the court reporter.

21   Q.   Okay, perfect.  We'll figure it out.  We

22   won't spend time on the record right now figuring

23   that out.  We'll figure out a way to get that to

24   her.

25        (Sawyer Exhibit 7 was marked for

William Sawyer, Ph.D.

```
 1    identification.)

 2    BY MR. NORRIS:

 3        Q.   And then Number 455 on your materials

 4    reviewed list is a medical summary.  What is that

 5    document?

 6        A.   That is a two-page document which at the top

 7    says, James Peterson, date of birth, September 26th,

 8    1943?  And then it has several paragraphs.  One is

 9    marked "exposure" and another is marked

10    "preexisting," and then a section on diagnosis, and

11    then a final paragraph on treatment.  And this was

12    provided to me from the law firm.  I didn't rely on

13    it.  Rather, as you can see in my report, I've

14    relied on medical records and included footnotes to

15    that fact.

16        Q.   Did you understand that this document was

17    prepared by the law firm?

18        A.   I never asked, so I don't know.

19        Q.   I'd like to attach that document as

20    Exhibit 8 to this deposition.

21             (Sawyer Exhibit 8 was marked for

22    identification.)

23    BY MR. NORRIS:

24        Q.   Okay.  Number 456, how many pages of medical

25    records did you review from NorthShore Medical
```

William Sawyer, Ph.D.

1    records?

2        A.    41.  Assuming that's the only PDF file, let

3    me verify, because there could have been more than

4    one PDF from NorthShore.  Yeah, it looks like there

5    is.  There's another PDF from -- no, it's the same

6    one, 41.  It's a duplicate.  Let's see if there are

7    any others.  That looks like the only medical record

8    file I have from NorthShore.

9            MR. NORRIS:  Okay.  I'd like to attach those

10        41 pages as Exhibit 9 for the deposition.

11            (Sawyer Exhibit 9 was marked for

12    identification.)

13    BY MR. NORRIS:

14        Q.    How about from Northwest Community Medical

15    records.  How many medical records do you have from

16    Northwest Community?

17        A.    Just one.

18        Q.    Just one page?

19        A.    No, no.  One file.  It's a lengthy file.

20    It's 1,021 pages long.

21        Q.    Is there a date printed on that document?

22        A.    Well, it's a generated date, if that's of

23    any help.

24        Q.    What does that say?

25        A.    Generated February 14th, 2019, 9:14 a.m.

William Sawyer, Ph.D.

1    And that's on the bottom left corner.

2    Q.   All right.  And then number 458.  Did you

3    actually review the pathology or is that just a

4    pathology report?

5    A.   I reviewed the pathology records, and the

6    name of those records are -- actually, the pathology

7    records are from Northwest Community Healthcare, and

8    I have two pages.  The two pages that I have, if

9    this helps any, were generated at the same date and

10   time as I mentioned a moment ago.  And on the

11   right-hand bottom corner it's marked page 277 to

12   page 278.

13        MR. NORRIS:  Let's mark those two

14        documents -- those two pages of documents as

15        Exhibit 10.

16        MR. MOLL:  You mean 11?

17        MR. NORRIS:  I haven't marked the Northwest

18        Community thousand pages yet.

19        MR. MOLL:  Okay.

20        MR. NORRIS:  And then, all right.  You know

21        what?  I'm sorry.  Let me start over.  Let's mark

22        the Northwest Community 1,021 pages as

23        Exhibit 10.  We'll mark the pathology documents,

24        just the two pages, 277 and 278, as Exhibit 11,

25        just for completeness.

William Sawyer, Ph.D.

```
 1              (Sawyer Exhibit 10 was marked for
 2      identification.)
 3              (Sawyer Exhibit 11 was marked for
 4      identification.)
 5      BY MR. NORRIS:
 6         Q.   Am I correct that you -- you're not making
 7      an independent diagnosis of DLBCL in this case,
 8      Dr. Sawyer, you're relying upon the pathologist for
 9      that?
10         A.   Absolutely.
11         Q.   Let me just walk through a series of
12      documents relating to Mr. Peterson.
13              Are there any other documents specific to
14      Mr. Peterson that you reviewed, relied on or
15      considered in this case that we have not yet
16      discussed?
17         A.   I'm just opening up folders here.  Let me
18      see if there's anything else.  Well, not folders,
19      actually PDF files.
20              I have plaintiff fact sheets.  I made an
21      error, and this error is that I do have the
22      deposition of Mr. Patterson [sic] from November
23      14th, 2019, and I also have the deposition of
24      Dr. Schulman from March 5th, 2020.
25         Q.   I did not see either of those referenced in
```

William Sawyer, Ph.D.

1    your report.  Did you review those in preparation

2    for your report in this case?

3       A.   No.  It appears I overlooked them somehow.

4    So I did not.

5       Q.   Anything else in your PDF files that we have

6    not yet discussed that you reviewed related to

7    Mr. Peterson?

8            MR. MOLL:  Objection as to form.

9       A.   No.

10      Q.   Just to confirm -- well, strike that.

11           Have you reviewed the report of a Brian

12   Daily, Monsanto's expert industrial hygienist in

13   this case?

14      A.   No.  That's the first I've heard of that

15   expert.

16      Q.   It's my understanding that you conducted an

17   interview of Mr. Peterson, correct?

18      A.   Yes.

19      Q.   Did you record the interview with

20   Mr. Peterson?

21      A.   No.

22      Q.   Did you take notes of the interview with

23   Mr. Peterson, other than -- other than what has been

24   generated in your report?

25      A.   No.  My practice is to prepare and extract

William Sawyer, Ph.D.

```
 1    as much information as possible, and then I
 2    highlight areas in my draft report in yellow.  I
 3    also add in questions that are highly specific.  And
 4    then during the interview I enter information into
 5    my report as the -- also Jenn Clark, my office
 6    assistant, takes down information into the draft
 7    report.  She takes the majority of the information
 8    down in the draft report, which is the actual
 9    working copy, which ultimately is the report that I
10    have submitted.
11        Q.   So it's my understanding then that Jenn
12    Clark was on the phone with you with Mr. Peterson;
13    is that correct?
14        A.   Yes.
15        Q.   Other than yourself, Ms. Clark, and
16    Mr. Peterson, was anyone else on the telephone with
17    you for that interview?
18        A.   No.
19        Q.   Since the generation of your report -- or
20    strike that.
21             Was that interview conducted over the phone
22    or over a web platform like Zoom?
23        A.   This one was over -- let me just check
24    because the ones that I've done over Zoom I mark
25    them Zoom.  So I just need to look at the footnote
```

William Sawyer, Ph.D.

1    toward the beginning of it.

2           Okay.  I interviewed Mr. Peterson on January

3    7th, 2021.  This was by telephone.

4    Q.   Okay.  Since the generation of your report

5    on January 22nd, 2021, have you reviewed or

6    considered any new or additional studies as it

7    relates to glyphosate or glyphosate-based

8    herbicides?

9    A.   No.

10   Q.   You have not performed a medical exam on

11   Mr. Peterson; is that correct?

12   A.   No.  I'm not a treating physician.

13   Q.   You noted that, based on your interview with

14   Mr. Peterson, that he used Roundup approximately

15   four to five times per year, correct?

16   A.   That is correct.

17   Q.   You also noted that in total he estimated

18   that he spent eight to 10 hours per year mixing and

19   spraying Roundup.

20          Were those his exact words or did you glean

21   that from other information?  And that's on page 13

22   of your report.

23   A.   This is what he told me on page 13, the

24   paragraph under Roundup use history.

25   Q.   So essentially he used Roundup, based on

William Sawyer, Ph.D.

1    your interview with him, he used Roundup

2    approximately two hours per occasion of use?

3        A.   Yes.

4        Q.   Do you agree that based on your interview

5    with Mr. Peterson, that he did not exceed two

6    exposure per -- he did not exceed two exposure days

7    per year of use?

8            MR. MOLL:  Objection; form.

9        Q.   Dr. Sawyer, I apologize.  I don't know if

10   you answered that.  I don't want to step on you but

11   I also wasn't sure.

12       A.   I'm just looking at my Table 3 to make sure

13   I answer the question correctly.

14           So total hours per year range from 8 to 10

15   hours per year.  So that would be a little over one

16   exposure day per year, for four years.

17       Q.   Is it correct that you did not see any

18   indication that he exceeded two exposure days per

19   year in any of those years; is that correct?

20           MR. MOLL:  Objection; form.

21       A.   Yeah, his total hours per year ranged from

22   eight to 10.  So based on the information I have,

23   no.

24       Q.   I think there was a double negative in that

25   answer, so I just want to make sure we've got it

William Sawyer, Ph.D.

1    clear.

2           Based on the information that you reviewed,

3    did he ever exceed two exposure days per year?

4           MR. MOLL:  Objection; form.

5       A.   No.

6       Q.   You note in your report that based on your

7    interview with Mr. Peterson that he wore long pants

8    and sometimes used wool nitrile gloves when handling

9    Roundup.  Are you there?  Let me know.

10      A.   At page 19, blue nitrile gloves that were

11   occasionally used while mixing.

12      Q.   Is there any difference in exposure

13   potential between nitrile gloves and vinyl or a

14   latex glove, in your opinion?

15          MR. MOLL:  Objection; form.

16      A.   Well, there are some mechanical issues.  The

17   latex gloves have a tendency to break open and leak.

18   Nitrile gloves tend to be sturdier and, depending on

19   the organic solvent, has a higher degree of

20   protection.

21      Q.   With respect to glyphosate or

22   glyphosate-based herbicides, are you able to tell me

23   how much greater level protection a nitrile glove

24   would have over a latex glove?

25          MR. MOLL:  Objection; form.

William Sawyer, Ph.D.

```
 1      A.   No, there is not any studies that I'm aware
 2   of that give any actual percentiles.  I do know from
 3   my general training and experience that the nitrile
 4   gloves provide reasonable protection from organic
 5   solvents and lipophilic substances.
 6      Q.   You also note in your report that
 7   Mr. Peterson acknowledged that when mixing and
 8   applying diluted Roundup concentrate he would
 9   regularly get some of the product on his hands and
10   ankles.
11           Did you ask him at all in your interview
12   about his practices for washing off or for washing
13   or showering after use of Roundup?
14           MR. MOLL:  Objection; form.
15      A.   No.
16      Q.   If Mr. Peterson testified that if he -- if
17   when using the concentrate, if he ever got it on his
18   hands or skin he would wash it off immediately,
19   would that in any way impact his level of exposure
20   from the product?
21           MR. MOLL:  Objection; form.  Incomplete
22       hypothetical.
23      A.   It depends upon what areas of the body were
24   washed.  If the hands were washed, certainly that
25   would make a difference; however, I -- based on your
```

William Sawyer, Ph.D.

1    question, I don't know what other parts of the body

2    you're referring to.

3        Q.   If Mr. Peterson testified that he would wash

4    the portions of the body where he got -- to which he

5    concentrates -- strike that.  That's a very bad

6    question.

7            If Mr. Peterson testified that to the extent

8    he got it on his hands, he would wash his hands,

9    would that impact his level of exposure?

10           MR. MOLL:  Objection; form.  Incomplete

11       hypothetical.

12       A.   I'm not real clear on the question actually.

13       Q.   Okay.  If Mr. Peterson testified that if he

14   were to get the concentrate on his hands he would

15   immediately wash his hands with soap and water,

16   would that in any way impact the level of exposure

17   that he would have as a result of using the product?

18           MR. MOLL:  Objection; form.  Incomplete

19       hypothetical.

20       A.   Under the hypothetical and -- rather than me

21   rewording it, I'd rather if you asked it directly,

22   because I think I know what you're asking me, but

23   it's not quite clear.

24       Q.   Do you agree that if he washed his hands

25   immediately after getting the product on his hands,

William Sawyer, Ph.D.

1    that that would lower his exposure potential?

2    A.   Yes.

3         MR. MOLL:  Object to the form.

4    Q.   I want to talk with you briefly about

5    smoking.  You note that Mr. Peterson did not smoke,

6    correct?

7    A.   That's right.

8    Q.   But his mother did, correct?

9    A.   Yes.

10   Q.   And he lived with his mother for his entire

11   life until her passing, correct?

12   A.   Yes, Mr. Peterson has lived in the same home

13   ever since, yes.

14   Q.   Do you agree that he would have had

15   secondary exposure to benzene from his mother's

16   smoking?

17        MR. MOLL:  Objection; form.

18   A.   I agree that he would have exposure to

19   passive smoke, that is passive inhalation.  With

20   respect to benzene from passive inhalation, studies

21   have not shown levels above what's normally found in

22   background homes; that is, in the number of

23   microgram of benzene per cubic meter of air is not

24   substantially elevated in the air.

25        But what the studies do reveal is that there

William Sawyer, Ph.D.

```
 1    is some level of health risk from passive smoking.
 2    And if I were to hypothetically, which I did in this
 3    case, I had wrote in my report he was exposed to his
 4    mother's smoke, I made a note of that under family
 5    history.  And if I were to hypothetically assume
 6    that his passive inhalation of the smoke was rather
 7    heavy or excessive, it still would have no impact on
 8    this case as cigarette smoking is associated with
 9    follicular lymphoma, which is not the focus in this
10    case.  This is a DLBCL case.
11         So I -- from a toxicological standpoint, I
12    don't believe there was any connection between the
13    potential of passive inhalation cigarette smoke and
14    the development of his NHL.
15    Q.   All right.  I want to talk with you about
16    the exposure threshold opinions that you have in
17    your report, Dr. Sawyer.
18    A.   Okay.
19    Q.   If you go to page 5 of your report, you note
20    that the objectives of your toxicological assessment
21    is to provide a scientifically accurate and reliable
22    time rate of exposure dose for Mr. Peterson based on
23    an eight-hour time rate of exposure days for
24    comparison with the human epidemiological studies of
25    applicators.
```

William Sawyer, Ph.D.

```
 1              That's -- so my question is, after reading

 2    that, the studies that you rely upon for time rated

 3    exposure days and you use as a benchmark for these

 4    exposure days are Eriksson, Andreotti, McDuffie and

 5    Pahwa, correct?

 6         A.   Yes.

 7         Q.   You identify four thresholds of exposure for

 8    Mr. Peterson that you believe that he exceeded.  The

 9    ever use threshold, the greater than zero and less

10    than or equal to two days threshold, the greater

11    than two days per year threshold, and the greater

12    than one day less than 10 days threshold, correct?

13         A.   Yes.

14         Q.   I want to talk with you right now about the

15    greater than zero but less than or equal to two-day

16    threshold.

17              According to your interview, Mr. Peterson

18    falls within this threshold, correct?

19         A.   Yes.  I think you're referring to the

20    McDuffie dose metric.

21         Q.   Also Pahwa, correct?

22         A.   Two days per year, correct.

23         Q.   Any other studies that you rely upon for the

24    dose metric other than McDuffie and Pahwa?

25         A.   Well, I did list in table 5 the meta
```

William Sawyer, Ph.D.

1    analysis by Zhang, et al., 2019, as well as Leon, et

2    al., 2019.  That's the study of the Pooled

3    agricultural worker cohorts.

4            And, of course, Ericsson in 2008.

5    Q.   Do either Ericsson, Zhang or Leon address

6    this threshold of greater than zero less than or

7    equal to two day per year threshold?

8            MR. MOLL:  Objection; form.

9    A.   I'm not sure I understand the question.

10   Q.   I guess for -- you have -- you have set

11   forth a threshold of greater than zero or less than

12   or equal to two days per year, correct?

13   A.   I missed a word.  I'm sorry.  Say it again.

14   Q.   Yeah, no, that's fine.

15           In your report, one of the thresholds that

16   you identify is a threshold of greater than zero

17   days per year and less than or equal to two days per

18   year, correct?

19   A.   Yes.

20           MR. MOLL:  Objection; form.

21           MR. NORRIS:  Madam Court Reporter, did you

22       get that answer?

23           THE COURT REPORTER:  (Indicating.)

24   Q.   Okay.  As it relates to studies that look at

25   this exposure threshold, is it correct that the only

William Sawyer, Ph.D.

1    two that evaluate increased risk as a result of that

2    exposure threshold are Pahwa and McDuffie?

3        A.   Not exactly.  I mean, the Ericsson study of

4    2008 also uses a equal to or greater than one day

5    but less than or equal than 10 days.

6        Q.   Which you set forth separately as a

7    different threshold in your report, correct?

8        A.   Yes.  But it overlaps.

9        Q.   Other than Ericsson, McDuffie and Pahwa,

10   anything else that addresses this exposure threshold

11   of greater than -- let me start over.

12            Other than -- for purposes of the exposure

13   threshold that you have set out in your report as

14   greater than zero, less than or equal to two days

15   per year, any other studies that you rely upon for

16   that threshold other than Ericsson, McDuffie and

17   Pahwa?

18            MR. MOLL:  Objection; form.

19       A.   Yes.  I still consider, of course, the other

20   use threshold of Leon 2019 and Zang, 2019.  I don't

21   ignore those studies.  They're still a

22   consideration.

23       Q.   We'll talk about those two studies in just a

24   bit.

25            On the -- with respect to McDuffie, do you

William Sawyer, Ph.D.

1    agree that the McDuffie study does not support a

2    finding that there is an increased risk of Non-

3    Hodgkin's Lymphoma for individuals who are exposed

4    to greater than zero, less than or equal to two days

5    per year of exposure?

6         MR. MOLL:  Objection; form.

7      Q.   Doctor, are you looking at McDuffie?

8      A.   No, I was looking at table 20 in my report,

9    but I'm going to look at McDuffie in a moment.

10         Yeah, what I relied on in McDuffie on page

11   1160 in the end of the second full paragraph was

12   that glyphosate, which was not significant for

13   exposure, but for which we did demonstrate a dose

14   response relationship.

15         So at that lower exposure level, there was

16   an elevated risk, but it was not statistically

17   significant; however, the study using the greater

18   than 10 day end of the lower exposure level revealed

19   a dose response relationship according to McDuffie

20   on page 1160, end of the first full paragraph.

21      Q.   Give me one second.

22         (Sawyer Exhibit 12 was marked for

23   identification.)

24   BY MR. NORRIS:

25      Q.   I'm going to mark, for the record, as

1    Exhibit 12 the McDuffie from 2001.

2         Dr. Sawyer, is this the -- I have drawn a

3    purple circle around the text that I believe you

4    were just referring to, is that correct, on the

5    shared screen, page 1160, paragraph starting with

6    table 8?

7    A.   Yes.

8    Q.   Does this paragraph say that there was an

9    increased risk for exposures from greater than zero

10   days per year and less than or equal to two days per

11   year of exposure?

12   A.   No.  As I stated on the record a moment ago,

13   there was not a statistically significant case

14   control difference in the odds ratio at the lower

15   exposure day dosage; however, based upon frequency

16   of use, the study did find a dose response

17   relationship, which is an important factor in the

18   Bradford Hill criteria in determination of

19   causation.

20   Q.   Would you agree that this study does not

21   support a statistically significant increased risk

22   of Non Hodgkin's lymphoma for individuals who are

23   exposed to greater than zero or less than two days

24   per year of exposure to glyphosate?

25        MR. MOLL:  Objection; form.

William Sawyer, Ph.D.

1    A.   No, I would not agree to that because you're

2    oversimplifying the nature of the epidemiological

3    study.  The study shows a dose response relationship

4    within that range that you've just referenced.  Now,

5    if that were the only statistic in the study, then I

6    would agree it did not show any significant finding.

7         What it did -- that range of exposure, in

8    itself, did not show a statistically different case

9    control difference; however, the study itself on

10   frequency of exposure showed a dose response

11   relationship.

12   Q.   I want to talk to you about Pahwa.  Do you

13   agree that the Pahwa study does not demonstrate a

14   significantly increased risk with individuals --

15   strike that.

16        Would you agree that the Pahwa study does

17   not support a significantly increased risk of

18   Non-Hodgkin's lymphoma for individuals who used

19   glyphosate or glyphosate-based products for greater

20   than zero or less than or equal to two days per

21   year?

22        MR. MOLL:  Objection; form.

23   A.   Could you read back or ask that question

24   again, please?

25        MR. NORRIS:  Madam Court Reporter, can you

1       please reread my question?

2            (The question was read by the reporter.)

3            MR. MOLL:  Same objection.

4       A.   No, I don't agree with that, because the

5    Pahwa study indicated that subjects who had ever

6    used glyphosate had an excessive NHL overall with an

7    odds ratio of 1.43, at a 95-confidence interval of

8    1.11 to 1.83.

9            So that is a significant finding.  The

10   author has also stated that after adjustments for

11   other pesticides, the OR for NHL overall with ever

12   use drops to 1.13, which was not statistically

13   significant; however, they state with a

14   statistically significant association for handling

15   glyphosate more than two days per year, there was

16   not again a statistical -- a statistically

17   significant difference.

18      Q.   Are you done with your answer, Doctor?

19      A.   Yes.

20      Q.   So just to go back through that a little

21   bit, do you agree that when the Pahwa authors

22   adjusted for other pesticides, they did not find a

23   statistically increased risk for ever use of

24   glyphosate; is that correct?

25           MR. MOLL:  Objection; form.

William Sawyer, Ph.D.

1    A.   Yes.  As I stated, the odds ratio dropped

2    from a 1.43, which was statistically significant at

3    the 95-percent confidence interval, and it decreased

4    to an odds ratio of 1.13, which is still an elevated

5    odds ratio; however, it became nonstatistically

6    significant.

7         But again, there was also a statistically

8    significant association for handling glyphosate more

9    than two days per year.  That odds ratio was up at

10   1.73 and there was also an important finding of a P

11   trend, which is suggestive of a dose response

12   relationship.

13   Q.   Do you agree that when -- that they --

14   regardless of whether they adjusted for other

15   pesticides or not, that for exposures of greater

16   than zero or less than or equal to two -- two times

17   per year, they did not -- the authors of Pahwa did

18   not find a statistically significant increased risk

19   of Non-Hodgkin's lymphoma overall?

20        MR. MOLL:  Objection; form.

21   A.   I'm going to have to ask you to repeat the

22   question.  It was rather lengthy and I'm not sure I

23   totally understood it.

24   Q.   Fair enough.  Let me do something right

25   quick and hopefully it will help this out.

William Sawyer, Ph.D.

1          I'm going to mark as Exhibit 13 the Pahwa

2    paper from 2019.

3          (Sawyer Exhibit 13 was marked for

4    identification.)

5    BY MR. NORRIS:

6      Q.   Dr. Sawyer, you just read an odds ratio

7    that -- there was, in your opinion, a statistically

8    increased risk, even adjusting for other pesticides,

9    of 1.73 with a confidence interval of 1.02 to 2.94

10   in Pahwa, correct?

11     A.   Yes.

12     Q.   And that comes from -- I've circled here

13   table 4 of the report.  That comes from table 4 of

14   the study, correct?

15     A.   No.  The part you circled is the frequency

16   of handling, which I stated a moment ago, subjects

17   that handled glyphosate more than two days per year

18   had an excess of DLBCL, and an odds ratio of 2.14,

19   which was statistically significant, and that is

20   within the bottom part of your circle.

21          So I hope that answers the question.

22     Q.   I -- you're looking at right here, where

23   I've put a purple square around, correct?

24     A.   Yes.

25     Q.   Okay.  For DLBCL, do you agree that these

William Sawyer, Ph.D.

1    authors did not find a statistically significant

2    increased risk for individuals who handled

3    glyphosate greater than zero days per year but less

4    than or equal to two days per year?

5         MR. MOLL:  Objection; form.

6    A.   Yeah, that would be accurate.  However, I do

7    want to make it clear that in the Swedish Ericsson

8    study, I researched and contacted the health

9    department in Sweden and verified the term a Swedish

10   working day, which is eight hours.

11        That's not the case in the current study

12   that we're discussing.  There was no reference in

13   this study that this study was considering a less or

14   equal to two days per year as 16 hours of exposure.

15        In the current matter, Mr. Patterson [sic]

16   was exposed four or five times per year, he handled

17   it four or five times per year, so he would be in

18   the greater than two category in this particular

19   study.

20   Q.   So it's your understanding that this study

21   is not looking at exposure days, it's looking solely

22   at the number of times per use -- times of use per

23   year?

24   A.   That's what the study states, yes.

25   Q.   How many years does somebody need to use it

William Sawyer, Ph.D.

1    at greater than two times per year to fall within

2    that greater than two times per year category?

3        A.   That was not defined in this study.

4        Q.   Do you have an opinion on that?

5        A.   No.  I'm a toxicologist and a scientist.  I

6    use the data as is.  I don't try to read into or

7    guess at what was implied.

8        Q.   What -- under that box that I have circled

9    there, there's an ordinal of five days per where the

10   OR adjusted for other pesticides was 1.14, with a

11   confidence interval of .96 to 1.35.

12            What do you understand that to mean?

13            MR. MOLL:  Objection; form.

14       A.   Well, as per footnote D, that is stated that

15   the P value derived from treating duration variables

16   as continuous and statistical analysis, I would have

17   to refer that to Dr. Ritz.  I've been trained in

18   using epidemiological studies as a toxicologist for

19   34 years.  I've even taught a portion of the

20   epidemiology course at the State University of New

21   York, Upstate Medical Center.  However, I'm not an

22   epidemiologist.  So when it comes to the intricate

23   design of studies, I would refer that -- defer that

24   to Dr. Ritz, or Dr. Weisenburger, or Dr. Portier,

25   who also has great expertise in biostatistics.

William Sawyer, Ph.D.

1      Q.   Do you agree that someone who -- that falls
2   within the greater than two days per year of use as
3   reported in the study could mean somebody who uses
4   glyphosate three days per year?
5           MR. MOLL:  Objection; form.
6      A.   I do.  In fact, it could even include
7   someone who uses it four to five times per year.
8      Q.   And it could include someone who uses it
9   four to five times per week, correct?
10     A.   That is possible.
11     Q.   There's no -- there's no high-end range
12  identified in this study, correct?
13     A.   Correct.  These were lower range threshold
14  statistics.
15     Q.   Do you understand that ordinal value to mean
16  at five days per year that they could not find a
17  statistically significant increased risk for
18  individuals who use glyphosate purely five days per
19  year?
20     A.   Well, again, that's because there was a P
21  value derived from treating duration variables as
22  continuous and statistical analysis, where
23  the earlier statistic of greater than two was
24  derived from a P trend derived in a different
25  matter.  In other words, the P trend value, there

William Sawyer, Ph.D.

1    was a difference in terms of the continuous

2    analysis.

3        Q.    I'm not sure I understood that question,

4    that last answer, but let me ask another question.

5             Can you say to a reasonable degree of

6    scientific certainty that an individual who has used

7    glyphosate for exactly four days a year is at a

8    statistically increased risk for developing

9    Non-Hodgkin's lymphoma based on this study?

10            MR. MOLL:  Sorry.  Objection; form and

11        incomplete hypothetical.

12       A.    Better repeat the question because it was a

13    little confusing.

14       Q.    Yeah.

15            Can you say to a reasonable degree of

16    scientific certainty that an individual who was

17    exposed to glyphosate or glyphosate-based herbicides

18    exactly four times per year is at a statistically

19    significantly increased risk for developing DLBCL

20    based solely on this study alone?

21            MR. MOLL:  Objection; form, incomplete

22        hypothetical.

23       A.    I would certainly use this study in

24    combination with other human epidemiological

25    studies.  It would be inappropriate for me to only

William Sawyer, Ph.D.

1    use this study and ignore all the others.

2         The strength in this study is that with a

3    greater than two-day statistic, that statistic was

4    adjusted for other considerations, such as -- well,

5    I'm not sure it was.  I can't -- I think this study,

6    as I recall, was adjusted for first generation

7    family cancer and first-degree relatives, I'm not

8    sure.  I'd have to look at the study closely.

9         But, in general, I use the results of

10   epidemiological studies as a trained toxicologist as

11   a whole.  I don't depend on just one study.  It's

12   important to value all of the studies, especially

13   the meta-analysis studies in making a determination

14   of whether there's sufficient human evidence.

15   Q.   I understand.  But my question was just

16   based on this study alone.  I understand your

17   whole -- your opinion as a whole.

18        Based on this study alone, can you say that

19   an individual who used glyphosate exactly four times

20   per year, that this study would demonstrate a

21   statistically significant increased risk from that

22   use?

23        MR. MOLL:  Objection, form; incomplete

24        hypothetical; asked and answered.

25   A.   I don't quite understand the question.  I

1    think you're asking me if I would draw a conclusion

2    based on this study only, and that would not be an

3    appropriate use of the epidemiological studies under

4    the Bradford Hill methodology criteria, which I

5    adhere to.

6         I looked at all of the studies, looked at

7    the strength and weaknesses, the consistency, the

8    coherence, the dose response relationship, and the

9    animal studies, and I formulate these factors

10   together and then, using the weight of evidence,

11   make a determination.

12        And even then, that determination I would

13   not stand on if it were not generally accepted in

14   the scientific community.

15        So I just don't know how to answer your

16   question.  It's kind of a strange, oddball question.

17   Q.   I will ask it again because I don't think

18   I've gotten an answer.

19        Does this study alone support that someone

20   who used glyphosate exactly four days per year is at

21   a statistically significant increased risk of

22   developing DLBCL?

23        MR. MOLL:  Yeah, I think he's answered this

24        twice.  Objection, form; incomplete hypothetical;

25        asked and answered.

William Sawyer, Ph.D.

1       A.   Again, I would not base an opinion just on

2    one study.  That would be improper methodology.

3    Maybe your experts are doing that, I don't know, but

4    I use the -- all of the available human

5    epidemiologic evidence.

6            And in this case, if we took someone such as

7    Mr. Peterson, with four-and-a-half days of exposure

8    per year, and examined this statistic for DLBCL,

9    certainly he would be in the range of a

10   statistically significant odds ratio of 2.83, which

11   is generally triple the risk, at a highly

12   statistically significant confidence interval,

13   greater than 95 percent.

14           But I would not use this study only, I'd

15   look at all of the studies and the weaknesses and

16   strengths of each study and apply the weight of

17   evidence and the Bradford Hill factors in making

18   that determination.  I mean, that's what I've done

19   in this case and now you're trying to take me down

20   some path that I didn't follow.  I didn't follow

21   just using one study to make a determination.

22       Q.   You agree that the Pahwa study includes

23   individuals who were evaluated as part of the

24   McDuffie study, correct?

25           MR. MOLL:  Objection; form.

William Sawyer, Ph.D.

1      A.    Well, I used the North American Pooled

2   Project, NAPP.  There were several studies included.

3      Q.    Including -- including McDuffie?

4      A.    Yes.  And again I should point out, only

5   Ericsson has actually made a clear definition of 8

6   hours, which is the Swedish working day.  That is in

7   the study, the term working day, Swedish working

8   day.  McDuffie doesn't make that definition.

9      Q.    Let me talk to you briefly about Ericsson.

10   Where are you pulling your threshold of greater than

11   one day and less than 10 days of exposure to

12   glyphosate?

13          MR. MOLL:  Objection; form.

14      Q.    I apologize, Doctor.  Have you answered or

15   are you still looking at something?

16      A.    I am looking at the Ericsson study.

17          On page 1658 of the Ericsson study, the

18   second full paragraph from the bottom, the very last

19   sentence reads:  As in our previous lymphoma

20   studies, we use a minimum criterion of one full day

21   exposure to be categorized as exposed.

22      Q.    Were you done with your answer?

23      A.    Yes.

24      Q.    Okay.  So you have -- on page 26 of your

25   report you have noted that Mr. Peterson was --

William Sawyer, Ph.D.

1    exceeded the threshold of greater than one day and

2    less than or equal to 10 day total threshold,

3    correct?

4         A.   Yes.

5         Q.   And he exceeded greater than one day

6    because, based on your calculations, he had

7    four-and-a-half total exposure days.

8         A.   Yes.  Yes, that's accurate.

9         Q.   Okay.  And do you agree that of the six

10   studies that you have cites, the only study that

11   addresses exposure days, as far as for purposes of

12   their analysis, is the Ericsson study?

13        A.   I don't understand the question.

14        Q.   Is there any other study that you've cited

15   that breaks down someone's -- that addresses

16   someone's exposure at greater than one day or less

17   than or equal to 10 days?

18             MR. MOLL:  Objection; form.

19        Q.   Other than Ericsson.

20        A.   No.

21        Q.   Would you agree that in Ericsson, within the

22   threshold of greater than one day and less than or

23   equal to 10 exposure days, the Ericsson authors did

24   not find a statistically significant increased risk

25   of Non-Hodgkin's lymphoma as a result of glyphosate?

1          MR. MOLL:  Objection, form; incomplete

2     hypothetical.

3     A.   Yes, there is evidence.  Refer back to page

4     1658 of the Ericsson study.  And what we find in the

5     paragraph under herbicides in the right-hand column,

6     about halfway through that paragraph, is that

7     exposure to other herbicides, regardless if they

8     also could have been exposed to phenoxy acid,

9     phenoxy acetic acids or not, also gave a

10    statistically significant OR of 1.82.  In this

11    category the dominating agent was glyphosate, which

12    was reported by 29 cases in 18 controls, which

13    reduced an OR of 2.02, 95 percent confidence

14    interval of 1.10 to 3.71.

15         So that's the combination of the range of

16    one day up to and equal to 10 days, and also include

17    is the category of greater than 10 days.  So what

18    you have there is -- in this statistic in table 2 on

19    page 1659, and as we just read, 29 cases versus 18

20    in the control with a doubling of risk of 2.02.

21         If you break it down individually to less

22    than equal 10 days or greater than 10 days, then the

23    statistic is not significant for the less than or

24    equal to 10 days.

25         So what I gather as a toxicologist in

William Sawyer, Ph.D.

1    reading this is that this relationship was

2    predominated by glyphosate, that's what was driving

3    it, and it was statistically significant for the

4    combination of all of the glyphosate cases, that is,

5    the 29 cases versus 18 in the controls.

6         So I -- you can't -- I can't eliminate that.

7    That is still a finding of interest in weighing of

8    the evidence.

9    Q.   But specifically for the threshold of

10   greater than 1, less than or equal to 10 days, able

11   to demonstrates -- does not demonstrate a

12   statistically significant risk; is that correct?

13        MR. MOLL:  Objection to form.

14   A.   But you're forgetting, and this is very

15   important, from a toxicological and epidemiological

16   standpoint, that the odds ratio in that range that

17   we're speaking of, less than one day, greater than

18   or equal to 10 days, that odds ratio was still

19   elevated at 1.69.  And when more statistics are

20   combined, the power to determine whether or not a

21   change is present is strengthened.

22        In other words, in that less than equal to

23   one day statistic, you only have a total of 12 cases

24   and in the greater than 10 day you have 17 cases.

25   If you combine those together, you have 29 cases,

William Sawyer, Ph.D.

1    versus 18 in the control, and that's exactly what

2    the study referred to in that paragraph I read a

3    moment ago about the 29 cases and 18 controls

4    dominating the statistics which that of glyphosate,

5    and that combined odds ratio was statistically

6    significant.

7              So, yeah, if you break it apart into smaller

8    increments, it's still an elevated odds ratio, but

9    it lost its statistical power at the 95-percent

10   confidence interval.  So this is something that

11   toxicologists and epidemiologists pay close

12   attention to.  We don't just poo-poo it because the

13   less than 10 day one in itself was not at the

14   95-percent confidence interval.  The odds ratio is

15   still elevated at 1.69, and the authors have made a

16   point of explaining that one should not consider

17   only the individual analyses, but the sum of the

18   analyses.

19   Q.   You have chosen these thresholds in page 26

20   of your report, and I'm going to talk about ever use

21   here in a second.  But with respect to the greater

22   than zero or less than or equal to two days

23   threshold, would you agree that individuals in

24   Andreotti in 2018, that they study individuals who

25   would have fallen within that threshold?

William Sawyer, Ph.D.

```
1            MR. MOLL:  Objection; form.

2       A.   Yes.  In terms of the durations, yes.

3       Q.   And do you agree in that study they did not

4  find significantly -- they didn't find any increased

5  risk for individuals with greater than zero or less

6  than or equal to two days threshold?

7       A.   Yes.  And in prior depositions by your

8  colleagues representing Monsanto, I gave some

9  explanations for that in terms of the missing data

10  and artificial data points being computer generated,

11  and there are weaknesses in that study that are

12  generally accepted in the literature.

13            But yet I included that study in my report.

14  Even though it's a negative study, I certainly

15  included it and I certainly carefully evaluated it.

16  But, yeah, you're right, there was not a

17  statistically significant finding of DLBCL in that

18  tertile or quartile of exposure.

19       Q.   Would your answer be the same for the

20  quartile or tertile exposure of greater than two

21  days per year?

22       A.   Yes.  For the Andreotti study?  Yes.

23       Q.   Yes.  And would you give the same answer for

24  the individuals with an exposure of greater than one

25  day, less than or equal to 10 days per year?  Those
```

William Sawyer, Ph.D.

1    were also captured by Andreotti and showed no

2    increased risk; is that correct?

3         MR. MOLL:  Objection; form.

4    A.    That's right, the Andreotti study was

5    negative.

6    Q.    I'm going to take you to your report on page

7    22, end of 23, where you're talking about Leon.

8    A.    Okay.

9    Q.    Do you agree Leon did not find a

10   statistically significant increased risk for NHL

11   overall, correct?

12   A.    Yeah.  We're splitting hairs.  I mean, the

13   confidence interval was exactly right on 95 percent.

14   It didn't -- it did not exceed the 95th percentile.

15   It was at the 95 percentile.  In other words, the

16   confidence interval ranged from 1 to 1.85 at the

17   95th percentile.  So we're splitting hairs.  It's

18   certainly a study of significance in that it

19   included about 300 -- 300,000 farmers.  It was a

20   very expansive analysis.

21   Q.    I think you're getting a little bit ahead of

22   me and I think you might have answered a different

23   question, so let me make sure you heard my question

24   correctly.

25         You just answer -- the confidence interval

William Sawyer, Ph.D.

1    you just read for me was for DLBCL, correct?

2       A.   Yes.

3       Q.   All right.  It does not find a statistically

4    elevated -- statistically elevated risk for NHL

5    overall.  Am I correct?

6            MR. MOLL:  Objection; form.

7       A.   That's correct.

8       Q.   And the confidence interval of OR of 1.36,

9    confidence interval of 1.0 to 1.85, is not

10   statistically relevant because, as you said, it was

11   right at the 95 percentile for 1.0; is that correct?

12      A.   No, no.  The way you worded that question is

13   not -- doesn't follow correct scientific

14   methodology.

15      Q.   Okay.  Let me -- then let me strike it and

16   I'll ask it again.

17           Do you agree that for DLBCL, the -- (garbled

18   audio) -- the DLBCL was not significantly

19   significant, correct?

20           MR. MOLL:  Objection; form.

21      A.   As I said, it included the 95th percent

22   border of the -- in other words, it was -- we can't

23   say that the confidence interval, the 95th

24   percentile confidence interval was exceeded, but

25   rather it was right at 95 percent, .00, right on the

William Sawyer, Ph.D.

1    nose.  So from an encyclopedia-type definition, it

2    did not exceed the confidence interval, but the

3    current scientific methodology recognizes that the

4    risk is what we call in statistics borderline, and

5    that should not be ignored.  It would be improper

6    methodology to just disregard the study when it is

7    right on the 95th percentile.  It is still of

8    consideration, let's put it that way.

9        Q.   Do you agree that Leon, although it included

10   information from the agricultural health study, it

11   did not include all of information that was included

12   in Andreotti, all of the participants?

13       A.   I remember discussing that in an earlier

14   deposition with your colleagues some time ago, and

15   that is correct, and there were some reasons for

16   that, and I don't remember what they were at this

17   point without again reviewing the study.  And

18   probably -- well, not probably, but certainly it

19   would be more appropriate to address the internal

20   design aspects of the study to Dr. Ritz.

21       Q.   All right.  But do you -- why do you find

22   this study important?

23       A.   Well, in this case we're dealing with DLBCL

24   and the odds ratio appears to be elevated, and the

25   statistical testing, in terms of the reliability of

William Sawyer, Ph.D.

1    that figure, is right at the 95 percent confidence

2    interval.

3         Now, if this were -- let's say that the

4    confidence interval was from .6 to 1.4, I wouldn't

5    be able to put much weight on it.  But because it

6    was from 1.00 on up to 1.85, that is the 95 percent

7    confidence range in which this study fell, it

8    becomes more interesting in terms of the science and

9    the reliability of the science in this study.

10   Q.   Do you agree that this study only tracked

11   cancer rates from the AHS through 2011 in Iowa,

12   correct?

13   A.   I believe that's the case.  I'd have to -- I

14   really want to check that.  I don't recall.  I know

15   it was later, but I don't know that it was really

16   2011.

17   Q.   I'm going to try to short-case this a little

18   bit.  Do you agree that the Andreotti did not find

19   an elevated risk for DLBCL, correct?

20   A.   That's correct.

21   Q.   And you say -- can you say -- do you agree

22   that without getting into the specifics of it, that

23   Andreotti tracked farmers -- tracked cancer rates

24   through later dates than Leon?

25   A.   Well, it looks like in the abstract of the

1    paper that the follow-up questionnaire was from 1999

2    to 2005.  Now, I would have to compare that.  You

3    were asking me to compare it to which study?

4        Q.   Andreotti, 2018.

5        A.   No, no.  Andreotti used follow-up

6    questionnaires from 1999 to 2005.

7        Q.   But they tracked cancer incidence through

8    2013 in Iowa and 2012 in North Carolina, correct?

9        A.   Yeah, yeah, that's right.  The cancer

10   incidence was followed up to that point, which

11   actually would be more recent than the McDuffie or

12   the Ericsson study.

13       Q.   It's also more recent than the Leon study

14   which was also using AHS data, because Leon only

15   tracked cancer rates in 2011 and in 2000 -- 2011 in

16   Iowa and 2010 in North Carolina, correct?

17       A.   Yes.

18       Q.   Okay.  And you say that if Leon tracked

19   cancer rates throughout the entire time that

20   Andreotti did, that it would not have impacted the

21   DLBCL numbers and, in fact, you say it would not

22   have impacted it towards the null?

23       A.   I'm going to defer that to Dr. Ritz or

24   Dr. Portier.  That question really requires a closer

25   look at the internal design of the study and some

William Sawyer, Ph.D.

1    other factors that I'm not going to attempt, as a

2    toxicologist.

3        Q.   Either way, you are not the person that's

4    going to tell this jury how that difference would

5    have impacted the results; is that correct?

6        A.   For that specific question you just asked,

7    that's correct.

8        Q.   Okay.  You also agree that in Leon, that the

9    AHS cohort used questionnaires to determine

10   pesticide use, pesticide and herbicide use, whereas

11   the other two cohorts derove those estimates based

12   on crop exposure matrixes; is that correct?

13           MR. MOLL:  Objection; form.

14       A.   Well, I figure as well questionnaires and/or

15   telephonic information gathered, as opposed to only

16   looking at acreage.  So I'll have to defer that

17   question because I -- without taking the time right

18   now to analyze the methodology section, I'm not

19   really prepared to answer that question, just off

20   the top of the cuff.  I think that would be sloppy

21   and a bad approach.

22           If you would like me to take some time right

23   now and compare the two methodologies, I will do

24   that, but I just don't recall exactly.  I do think

25   there was telephonic interviews involved.

William Sawyer, Ph.D.

```
1        Q.   What is the importance, in your analysis of
2   Mr. Peterson's case, what's the importance of Zhang
3   in Mr. Peterson's case?
4           MR. MOLL:  Objection; form.
5        A.   The important of bang?
6        Q.   Zhang, the Zhang paper.  Sorry.  Z-h-a-n-g.
7   I may be pronouncing it wrong.
8        A.   I'm sorry.  I'm not sure what study you're
9   referring to right now.  Oh, you're referring to
10   Zhang, Z-h.
11        Q.   Zhang, yes.
12        A.   I'm sorry.  I --
13        Q.   That's okay.
14        A.   Referring to something I've never heard of.
15        Q.   Let me ask a different question just since
16   we've now had time.  How does the Zhang paper
17   support your opinion that the levels of exposure
18   that Mr. Peterson had to Roundup increased his risk
19   of the development of DLBCL as a result of his use?
20           MR. MOLL:  Objection; form.
21        A.   Simply that this was a very large
22   meta-analysis of six studies, one cohort study and
23   five case-control studies, and it used the metric of
24   ever use, and in the current matter we are in the
25   category of ever use by Mr. Peterson.  And the study
```

William Sawyer, Ph.D.

1    did find, through that meta-analysis, a

2    statistically significant increased rate of NHL,

3    although not a very high ratio.  I think it was only

4    about 1.4 -- no.  Let me think.  I will look and

5    tell you exactly.

6         Yeah, odds ratio overall was 1.43,

7    95-percent confidence interval was statistically

8    significant, after adjustment for other pesticides

9    the OR for ever use was 1.13, which was not

10   statistically significant.  However, for handling

11   glyphosate more than two days per year, the odds

12   ratio was 1.73 and it was statistically significant

13   with a P trend of .2.

14        So, I mean, this is a study that is very

15   relevant to the current matter in that Mr. Peterson

16   falls into that statistically significant odds ratio

17   from this 2019 study of -- which included cancer

18   registration in four states, as well as six Canadian

19   provinces.

20   Q.   Were you just reading from Pahwa?

21   A.   Yeah.

22   Q.   I was asking about Zhang.

23   A.   Oh, yeah, that's right.  You wanted Zhang.

24        But I initially said that the meta-analysis

25   was about a 1.4, it was 1.41, with a statistically

William Sawyer, Ph.D.

1    significant confidence interval.  And in that Zhang

2    study, the metric was ever use, and we fit that in

3    the current matter.  Mr. Patterson [sic] did use it.

4    I understand it's a fairly broad term, never use or

5    ever use.  But that's what the study was designed

6    and it did show a meta-analysis of a statistically

7    significant increased rate.

8         Q.   The 1.41 number that you just read, do you

9    agree that that number was derived from their --

10   from the use of only the highest exposure data from

11   Ericsson, McDuffie, and the NHS study?

12             MR. MOLL:  Objection; form.

13        Q.   I will note for purposes of time, if you

14   will look at page 197, I think there's a different

15   number used for ever use.

16             MR. MOLL:  That will speed things up.

17        A.   Well, there was -- okay.  There was a meta

18   RR of 1.41 that was statistically significant, and

19   then for comparison, a secondary meta-analysis using

20   the high exposure group at an earlier age has

21   determined a meta RR of 1.45, which was also

22   statistically significant.

23             So I -- you know, I think the study is very

24   consistent in showing a statistically significant

25   increased meta-analysis of risk ratio in that region

1    of 1.4.

2        Q.   All right.  I'm going to mark as Exhibit 14

3    the Zhang study.  This is Zhang, Exposure to

4    Glyphosate-Based Herbicides and Risk For

5    Non-Hodgkin's Lymphoma.  As I said, it's from 2019,

6    and I've marked it as Exhibit 14.

7            (Sawyer Exhibit 14 was marked for

8    identification.)

9    BY MR. NORRIS:

10       Q.   Doctor, I'm going to share my screen with

11   you.

12       A.   I already have the study open, so that's

13   okay.

14       Q.   Just so we're all on the same page.

15       A.   Yeah, that's true.  Because my copy is the

16   early accepted manuscript which may have different

17   page numbering.  Yes.

18       Q.   The numbers that you just read, were that --

19   is that from this paragraph?

20       A.   Can you zoom up a bit?

21       Q.   One second.

22       A.   3.1.  3.01.

23       Q.   Can you see 3.1 better now, Dr. Sawyer?

24       A.   Yeah, that's better.  Yeah, I mean,

25   that's -- that's what I just explained on the

William Sawyer, Ph.D.

1    record, that paragraph starting under item 3.1,

2    Increased Meta Relative Risk of NHL.  Those are the

3    same numbers I just stated.  I don't know --

4    understand what the problem is.  I mean, if you're

5    not happy with the numbers, that's fine, but this is

6    not --

7        Q.   This paragraph suggests that's an ever/never

8    use; is that correct?

9        A.   Yeah, that's what I said.  I made it real

10   clear.  It's not a very -- much of a breakdown as to

11   ever or never, and Mr. Peterson clearly fits the

12   ever.

13       Q.   So he's not -- I want to show you something

14   else here, Doctor.  You don't -- it's not your

15   opinion that the ever/never was 1.30, 1.03 to 2.64

16   as the confidence interval, as stated on this

17   paragraph that I'm showing you.

18            MR. MOLL:  Objection; form.

19       A.   I don't see those numbers in table 5.  Oh, I

20   see, you're looking at the box.  Okay.

21            You know, all those numbers are

22   statistically significant.  I think you're just

23   splitting hairs.  Whether it's a 1.41 or a 1.30, the

24   fact is that the study is rather consistent with

25   respect to the findings.

William Sawyer, Ph.D.

1      Q.   I just want to make sure that we're all on

2    the same page as to what the study is saying, but I

3    will move on.

4           Do you agree that the high priority

5    hypothesis was that the highest exposures to GBHs,

6    for example, higher levels, longer durations and/or

7    with sufficient lag in latency will lead to an

8    increased risk of NHL in humans?

9           MR. MOLL:  Objection:  Form.

10     A.   It may just be my small brain.  I didn't

11   really comprehend everything you just said.  It was

12   probably a great question, but I -- I would have to

13   hear it again.

14     Q.   You'd agree that they had a a priori

15   hypothesis in this paper?

16     A.   Yes.

17     Q.   And that their hypothesis was the highest

18   exposure to GBHs, i.e. higher levels, longer

19   durations, and/or with sufficient lag in latency

20   would lead to the increased risk of NHL in humans.

21          MR. MOLL:  Same objection.

22     A.   Read that last part.  With increased --

23     Q.   Will -- will lead to increased risk of NHL

24   in humans.

25     A.   No, no, the part about the lag in the

William Sawyer, Ph.D.

1    latency.

2        Q.    That the highest exposures to GBHs, i.e.

3    higher levels, longer durations, and/or with

4    sufficient lag in latency, will lead to increased

5    risk of NHL in humans.

6        A.    Yes.

7        Q.    That as a result of their hypothesis, where

8    there were studies that attempted to measure

9    durations or levels of exposure, they only included

10   those with the highest levels of exposure in their

11   calculations.

12       A.    In one of the calculations, as I read to you

13   a moment ago, right out of the study, that the --

14   the lower exposure group also showed a statistically

15   significant relationship, and that's where I said to

16   you that you're splitting hairs here.  You have a

17   1.30 and a 1.40.  They're so darn close it's not

18   even reasonable to say that the inverse of the a

19   priori hypothesis occurred.

20              Where in the paper does it show that the

21   finding of RR 1.40 was actually significantly

22   different than the 1.30?  They're not significantly

23   different, those two numbers, so we can't say that

24   the a priori hypothesis failed.

25              MR. MOLL:  Could I just, for the record, put

William Sawyer, Ph.D.

```
 1      on there that we're referring to page I believe
 2      it's 198?  It doesn't show on the screen.  Is
 3      that right, Rick?
 4          MR. NORRIS:  I have 197.
 5          MR. MOLL:  197 was what you were referring
 6      to before.  Is this page 198 that we're looking
 7      at right now?  Oh, it's still 197?
 8          MR. NORRIS:  It's still 197.
 9          MR. MOLL:  What was 1.3, that was 196?
10          MR. NORRIS:  Yes.
11          MR. MOLL:  Okay.  Thank you.
12          MR. NORRIS:  Yes.  Thank you for that.
13  BY MR. NORRIS:
14      Q.  Do you agree -- Dr. Sawyer, this is really
15  where I was going with this.  Do you agree that for
16  the ever-never calculation, that they did not --
17  that the authors of Zhang did not include AHS 2018,
18  which is Andreotti, because Andreotti did not
19  provide an ever exposure calculation?
20          MR. MOLL:  Objection; form.
21      A.  Well, the study does state that AHS 2018 did
22  not provide ever exposure, so AHS 2005 was used to
23  calculate the statistic and ever exposure above.
24  So, yeah, they did have data from the later analysis
25  because there was -- it simply wasn't collected.
```

William Sawyer, Ph.D.

1      Q.   Have you seen any studies that have

2   attempted to incorporate that -- strike that.

3           Have you seen any studies that have

4   incorporated AHS 2018 into the ever-never

5   calculation done by Zhang and what those results

6   were?

7      A.   I don't believe so.

8      Q.   Do you know if AHS 2018 was used in an ever-

9   never calculation if it was -- if ever-never would

10   still be statistically significant?

11      A.   Are you asking me if ever never ever never

12   did you ever include those --

13      Q.   Let me rephrase.

14           Do you know -- if -- do you have any reason

15   to dispute that when AHS 2018 is included in the

16   calculations in place of AHS 2005 that the ever-

17   never calculation is no longer statistically

18   significant?

19           MR. MOLL:   Objection; form.

20      A.   No.

21      Q.   Okay.  Dr. Sawyer, I'm going to ask you

22   about some papers right now.  I'm going to ask if

23   you've read, reviewed or considered them, okay?  And

24   if you don't know, if you need me to show them to

25   you, let me know and I can do that, but I'm just

William Sawyer, Ph.D.

```
 1    going to run through some papers, okay?
 2          Have you read, reviewed or considered the US
 3    EPA memorandum from David J. Miller on Glyphosate:
 4    Epidemiology Review of Zhang, et al., 2019, and
 5    Leon, et al., 2019 publications for response to
 6    comments on the proposed interim decision to
 7    Christine Olinger on or about January 16th, 2020?
 8    A.    No.  I'm checking my list as well.  I don't
 9    recall it, but let me just check my list here.
10    Let's see.
11          No.
12    Q.    Have you read, reviewed or considered US EPA
13    memorandum from Danna L. Freedman on Response from
14    the Pesticide Reevaluation Division to comments on
15    the glyphosate proposed interim decision on or about
16    January 16th, 2020?
17    A.    No.
18    Q.    Have you read, reviewed or considered the US
19    EPA memorandum from Monique Perron, P-e-r-r-o-n, on
20    Glyphosate:  Response to Comments on the Proposed
21    Interim Decision Regarding the Human Health Risk
22    Assessment to Steven Peterson, on or about January
23    13th, 2020?
24          MR. MOLL:  Objection to all these questions
25       as to form.
```

William Sawyer, Ph.D.

```
1       A.   No.

2       Q.   Have you read, reviewed or considered Health

3   Canada -- Statement from Health Canada on

4   Glyphosate, Health Canada Pest Management Regulatory

5   Agency, January 2019?

6       A.   No.

7       Q.   Okay.  An article published by Reardon

8   titled Evaluation of Glyphosate Use and

9   Non-Hodgkin's Lymphoma, a Preliminary Trend

10  Assessment, for the American Industrial Hygiene

11  Association, 2020?

12      A.   No.

13      Q.   How about Andreotti, Response to Sheppard

14  and Shaffer, from the Journal of National Cancer

15  Institute, 2019?

16      A.   No.

17      Q.   How about the ATSDR Toxicological Profile

18  for Glyphosate, US Department of Health & Human

19  Services from August 2020?

20      A.   No.

21      Q.   How about Connolly, sensitive and selective

22  quantification of glyphosate and

23  aminomethylphosphonic acid, AMPA, in urine of the

24  general population by gas chromatography-tandem mass

25  spectrometry, dated 2020?
```

William Sawyer, Ph.D.

```
1        A.   No.

2        Q.   US EPA glyphosate proposed interim

3    registration review decision case number from --

4    decision case number 0178, from January of 2020?

5        A.   No.

6        Q.   An article by Gillezeau, G-i-l-l-e-z-e-a-u,

7    titled, Update on Human Exposure to Glyphosate With

8    a Complete Review of Exposure in Children, from

9    Environmental Health, 2020?

10       A.   No.

11       Q.   Same author, Gillezeau, The Evidence of

12   Human Exposure to glyphosate, a review from

13   Environmental Health, 2019?

14       A.   No.

15       Q.   A paper by Kabat, On recent meta-analysis of

16   exposure to glyphosate and risk of Non-Hodgkin's

17   Lymphoma in humans, cancer causes and controls, from

18   2021?

19       A.   No.

20       Q.   A paper by Korchevskiy, that's spelled

21   K-o-r-c-h-e-v-s-k-i-y, Using benchmark dose modeling

22   for the quantitative risk assessment:  Carbon

23   nanotubes, asbestos, glyphosate, General Applied

24   Toxicology from 2020?

25       A.   No.  It sounds like an animal extrapolation
```

William Sawyer, Ph.D.

1    to humans which has something that was used from the

2    human epidemiological standpoint.

3        Q.   Three more to go.  Almost done.

4            A paper by Kougias, K-o-u-g-i-a-s, Risk

5    Assessment of Glyphosate Exposures From Pilot Study

6    With Simulated Heavy Residential Consumer

7    Application of Roundup using a Margin of Safety

8    Approach in Risk Analysis, 2020.

9        A.   No.

10       Q.   How about an article by Perry, Historical

11   evidence of glyphosate exposure from a US

12   agricultural cohort, from Environmental Health,

13   2019.

14       A.   No.

15       Q.   Last paper, by Solomon, Estimated exposure

16   to glyphosate in humans via environmental,

17   occupational and dietary pathways:  An updated

18   review of the scientific literature, from 2020.

19       A.   Well, of course, I'm familiar with his

20   earlier work.  2020, I'm just looking.  I know he

21   worked rather closely with Bill Heydens and ran into

22   some trouble for Bill who was accused of

23   ghostwriting.  But, no, a 2016 paper of course, and

24   work he did in 2017 and '18, and I don't think I

25   have seen anything from 2020 written by Solomon.

William Sawyer, Ph.D.

1      Q.   In looking at your former testimony list,

2    which I can pull up here, it's my understanding the

3    last time that you testified in a case involving

4    Roundup was in a deposition in the Whitby case,

5    Correct, Number 11?

6      A.   Yeah, January 22nd.  Yeah, right at the

7    borderline of when all this COVID hit and shut

8    everything down.  Yeah, I remember that.

9      Q.   Without being precise, but is it correct

10   that the reports that you served in the most recent

11   Moll Law Firm cases in January was the first report

12   that you've updated since approximately January of

13   2020?

14     A.   Well, if you look at page 178 of my report,

15   it's under appendix A, documents, I stated

16   previously-disclosed documents, Jimenez report and

17   prior.

18          So I submitted a draft report in the Jimenez

19   case after the Whitby case.

20     Q.   I'll -- go ahead.

21     A.   But it probably hasn't been turned over to

22   the defendants' law firms yet, so...

23     Q.   Do you have an estimate as to when you

24   prepared the Jimenez report?

25     A.   Well, the draft was -- I think I sent a

William Sawyer, Ph.D.

1    draft over to the law firm, to the client, probably

2    six weeks ago.  But I'm about to send the final

3    version.

4        Q.   When you sit down to do a report, do you do

5    any PubMed searches for updates on glyphosate and

6    glyphosate-based herbicides?

7        A.   Yes.  And, in fact, I have included some --

8    on page 178 of my report I have a list of about --

9    well, no, it's not on that page.  It's near the end.

10       Q.   I'll get you there.  One second.

11       A.   It looks like page 201 I have a list of

12   newer -- not all new but mostly newer studies that

13   are relevant.  There's probably about 24 of them

14   that I've added since the Jimenez report, and

15   actually since the Whitby report.

16       Q.   So how do you do -- please walk me through

17   how you go about doing a search for new literature

18   when you have to write a new report.

19       A.   Well, I'm always reviewing the literature.

20   I do that on a daily basis.  In terms of search

21   terms, is that what you're asking?

22       Q.   Yes.

23       A.   Well, it depends on the nature.  If I were

24   looking at respirable dust-containing herbicides, I

25   would search glyphosate inhalation or glyphosate

William Sawyer, Ph.D.

1    soil or dust inhalation; or if I was looking at

2    urine levels, I might try the search term of

3    biomonitoring of glyphosate in urine.  If I were

4    looking at human NHL incidence studies and

5    applicators, I would type in glyphosate and

6    Non-Hodgkin's Lymphoma.  That would probably give me

7    the most broad search.  But there's many, many ways

8    of searching and...

9        Q.   You could also search glyphosate and just

10   any publications in 2020 with the name glyphosate?

11       A.   I don't -- I don't recall.  Probably.  I

12   know that I probably did not search a lot of EPA

13   studies, because EPA has deviated from their own

14   methodology with respect to the animal studies, such

15   as Wood, et al., 2000B.  And EPA has, to my

16   knowledge and work over the years, has really not

17   put much focus on the human studies but rather just

18   the animal studies.  So I haven't really dug into

19   any new EPA stuff.  I think that's why there were so

20   many EPA documents you named that I wasn't familiar

21   with, simply because of the lack of relevance to

22   human NHL in which the EPA has consistently ignored.

23       Q.   It's your opinion that the EPA has ignored

24   the human epidemiological literature as it relates

25   to glyphosate?

William Sawyer, Ph.D.

1        A.   Well, I can't say ignored.  I'll say

2   discounted.

3        Q.   What do you mean by "discounted"?

4        A.   Discounted.  Not elaborated on the human

5   evidence to a great deal.  Most of the work that EPA

6   has published has been on the animal studies.

7   That's far more prevalent in the EPA studies than

8   any human studies, so...

9        Q.   You went through in your report and

10  attempted to divide Mr. Peterson's exposure into

11  exposure days and years per use, and we've talked

12  about that.  How would you, as a toxicologist,

13  qualitatively describe Mr. Peterson's exposure to

14  glyphosate-based -- to Roundup?

15       A.   Well, I would refer to my report.

16            MR. MOLL:  Rebecca, you're taking over?

17            MS. FREDONA:  Yes, sir.

18            MR. NORRIS:  I think he was mid answer, so

19       why don't you keep --

20       A.   I would refer to Table 3 in my report.

21       Q.   And Table 3 provides the events per year and

22  the exposure days, correct?

23       A.   Yeah.

24       Q.   Okay.  I was asking more as a qualitative

25  analysis as a toxicologist.  Would you describe

William Sawyer, Ph.D.

1    Mr. Peterson's exposures as heavy, moderate, light?

2    Could you provide those -- such an opinion?

3          MS. FREDONA:   Objection; form.

4    A.   Well, I would describe it -- as a

5    toxicologist I could make a number of comparisons

6    here to the various studies.  I could even make a

7    comparison as I did in my report to the agricultural

8    health study, lifetime days, glyphosate use in

9    quartiles ranging from 1 to 13 days would be the

10   lowest quartile, and 1 to 19.9 days in the

11   agricultural study would be the lowest tertile.  I

12   mean, that's the comparison that is evident in my

13   report.

14          In -- I have written some reports in this

15   matter of other plaintiffs who exceeded all of the

16   metrics, including the highest quartile values in

17   the tertiles in the agricultural health study, and

18   someone in that position I would consider at the --

19   as I stated in my reports before, as at the upper

20   end or exceeding the upper end.  I mean, the term

21   heavy or light is not a wise term to use because

22   it's not very descriptive.

23   Q.   Do you have any expert opinions on the

24   prognosis of Mr. Peterson?

25   A.   No.  I defer that to the oncologist.

William Sawyer, Ph.D.

```
 1        Q.   You're not going to offer any expert

 2   opinions on the treatment of Mr. Peterson, correct?

 3        A.   None.  No, my interest is evaluating

 4   Mr. Peterson's past pharmacological regimens, his

 5   doses of radiation he's received from his CT scans,

 6   for example, environmental occupational chemical

 7   exposures, other factors such as alcohol

 8   consumption, et cetera.  I'm not the expert who

 9   determines the prognosis or treatment.

10        Q.   Again, you're not going to opine on

11   Mr. Peterson, whether he currently has a reduced

12   life expectancy, correct?

13        A.   No, that's not my area.

14             MR. NORRIS:  Why don't we take a quick break

15        so I can look at my notes, and we are very near

16        the end of the day.

17             THE WITNESS:  Before we do that, I'm going

18        to walk out of the office for a minute.  Do you

19        think it will be one minute or five minutes or --

20             MR. NORRIS:  Five.

21             THE WITNESS:  Okay.  I'll see you in five.

22             THE VIDEOGRAPHER:  The time now is 4:18 p.m.

23        Going off the record.

24             (Recess from 4:18 p.m. until 4:24 p.m.)

25             THE VIDEOGRAPHER:  We are back on the
```

1          record.  The time is now 4:24 p.m.

2     BY MR. NORRIS:

3          Q.   I'm just pulling up a document real quick.

4     I want to take you to table 2 of your report,

5     Dr. Sawyer.

6          A.   Okay.  I have that open.

7          Q.   In particular, we know that he used

8     malathion on a -- I can't speak -- on a cherry tree

9     twice.  Have you ruled that out as a potential cause

10    of his Non-Hodgkin's lymphoma?

11         A.   Based on his description, yes.

12         Q.   Why?  Dr. Sawyer, just so you know, you're

13    on mute if you didn't otherwise know that.

14         A.   Oh, okay.  There we go.  Sorry.

15         Q.   Did you answer my question?  I don't -- I

16    apologize.  I just noticed you were on mute.

17         A.   I did not.  I was looking to find in my

18    report something.

19              I'm not finding the details.  Apparently I

20    didn't take it down.  I remember there was an app --

21    he explained how he applied it and the lack of

22    exposure, and the quantity used, but I don't have

23    any details in my notes on it to explain.

24         Q.   Are you of the opinion that malathion can

25    increase the -- the use of malathion can increase

William Sawyer, Ph.D.

1    someone's risk of Non-Hodgkin's Lymphoma?

2        A.   It can, yes.

3        Q.   What level of exposure to malathion you

4    think is necessary to increase someone's risk of

5    Non-Hodgkin's Lymphoma?

6            MS. FREDONA:  Objection.

7        A.   I don't have -- sometimes, in some of my

8    reports I included specific tables on specific

9    chemicals, but I don't have it in the Peterson

10   report.  I think, though, that it was covered in

11   McDuffie or Ericsson, so I might be able to answer

12   it through that study.

13       Q.   Yes.  Let me take you there, McDuffie.

14       A.   Yeah, I think McDuffie covers it, actually.

15   Let's see.  Malathion.  Malathion in the McDuffie

16   study was the only individual organophosphate

17   exposures statistically significant when associated

18   with NHL.

19       Q.   Can you agree, based on table 8 which I have

20   up on the screen, that the authors found a

21   statistically significant increased risk based on

22   both the greater than zero and less than or equal to

23   two-day exposure group as well as the greater than

24   two times per year exposure group; is that correct?

25       A.   That's right.

William Sawyer, Ph.D.

1    Q.   And Mr. Peterson, based on your interview

2    with him, would have fallen into the greater than

3    zero and less than or equal to two-day exposure per

4    year group, correct?

5    A.   Yes.  Right.  But what I recall, and I don't

6    have it in detail in my report, was his exposure was

7    negligible.  The one or two times he used it, it was

8    very limited, and there were some specifics he

9    explained, which I don't recall, which just didn't

10   compare with the amount of exposure that he had to

11   the glyphosate.

12   Q.   Those are all the questions I have on

13   malathion.

14        Are there any other opinions that you intend

15   to offer in this case that are not encompassed in

16   your report or in your testimony here today?

17   A.   No.

18        MR. NORRIS:  Those are all the questions I

19   have.

20        Ms. Fredona, do you have any questions?

21        MS. FREDONA:  Only a couple.

22                 CROSS-EXAMINATION

23   BY MS. FREDONA:

24   Q.   Good afternoon, Doctor.

25        Dr. Sawyer, earlier you said something along

William Sawyer, Ph.D.

1    the lines that EPA studies are more focused on

2    animals.  Does that sound about right?

3        A.   Yes.  Historically with respect to

4    glyphosate, they have been heavily weighted on

5    animal evidence.

6        Q.   Okay.  And why is it more important to focus

7    on human studies rather than animal studies in

8    regards to glyphosate?

9        A.   Well, in causation, under the Bradford Hill

10   criteria in weighing evidence, which I use, animal

11   studies are considered one of the prongs of evidence

12   known as experimental evidence.  Most of the prongs

13   of evidence, such as strength in association,

14   consistency, coherency, dose response and so on, are

15   derived from human studies.

16           The animal studies in themselves are really

17   not adequate to determine if a substance is a

18   carcinogen in a human.  Ultimately, there has to be

19   some level of human evidence in regards to a

20   chemical or substance or pharmaceutical being

21   carcinogenic.  And EPA has, for some reason with

22   glyphosate, really focused on animal studies.

23           And in my original Johnson report I wrote an

24   entire section upon the error made by EPA with

25   respect to the Wood 2000B study, this is an animal

William Sawyer, Ph.D.

1    study, and how the oversight group also deemed that

2    it was an error by applying a new and additional

3    level of statistical requirements to that study.

4         I just don't have much faith in the EPA's

5    assessment of glyphosate.  It is problematic in a

6    number of ways, and I don't plan on offering the

7    opinions on that in this trial.  I believe

8    Dr. Portia is going to be discussing that.

9         I answered the question because I was asked

10   by Attorney Norris about the EPA and so forth, but

11   that's really not what I'm going to be discussing.

12   I'm going to be discussing ADME, a number of other

13   factors that do involve animal studies but not --

14   not the bioassays.  I think Dr. Portia is handling

15   that.

16   Q.   Okay.  Just one more question:  In your

17   expert opinion, to a reasonable degree of scientific

18   certainty, was Roundup exposure a significant factor

19   contributing to Mr. Peterson's development of

20   Non-Hodgkin's Lymphoma?

21   A.   Yes, I am, to a reasonable degree of

22   toxicological certainty.  And I should point out

23   that he really has no underlying risk factors that

24   would support a DLBCL diagnosis.

25        MS. FREDONA:  Okay, perfect.  I have no more

William Sawyer, Ph.D.

1        questions.

2            MR. NORRIS:  I have no further questions.

3            THE VIDEOGRAPHER:  Are there any other

4        questions?

5                    (No response.)

6            THE VIDEOGRAPHER:  Okay.  It is --

7            MR. NORRIS:  Before you leave though,

8        Dr. Sawyer, when we go off the video record we

9        need to clear up some housekeeping.

10           THE WITNESS:  Oh, yes.

11           THE VIDEOGRAPHER:  Okay.  Did you say you

12       want us to go off the video record?

13           MR. NORRIS:  We can go off the video record.

14       If we need to put something on the written

15       record, it will be all housekeeping in nature.

16           THE VIDEOGRAPHER:  Okay.  It is February

17       15th, 2021.  The time is now 4:39 p.m.,

18       completing today's deposition.  We are off the

19       record.

20           (Whereupon, the deposition concluded at

21       4:39 p.m.)

22

23

24

25

William Sawyer, Ph.D.

```
 1              C E R T I F I C A T E

 2           I, Susan D. Wasilewski, Registered

 3    Professional Reporter, Certified Realtime Reporter,

 4    Certified Manager of Reporting Services, Certified

 5    Realtime Captioner, and Florida Professional

 6    Reporter, hereby certify that the witness named

 7    herein appeared via Remote Counsel/Zoom technology

 8    on Monday, February 15, 2021, and was duly sworn.

 9           I FURTHER CERTIFY that I was authorized to

10    and did stenographically report the examination of

11    the witness named herein; that a review of the

12    transcript was not requested; and that the foregoing

13    transcript is a true record of my stenographic

14    notes.

15           I FURTHER CERTIFY that I am not related to

16    or an employee of any of the parties, nor am I

17    related to or an employee of any of the parties'

18    attorneys or counsel connected with this action, nor

19    am I financially interested in the outcome of this

20    action.

21           WITNESS my hand this 17th of February, 2021.

22

23    _____

24    Susan D. Wasilewski, RPR, CRR, CMRS, CRC, FPR

25
```

William Sawyer, Ph.D.

```
 1                        LAWYER'S NOTES

 2     PAGE    LINE

 3     _____   _____    _____

 4     _____   _____    _____

 5     _____   _____    _____

 6     _____   _____    _____

 7     _____   _____    _____

 8     _____   _____    _____

 9     _____   _____    _____

10     _____   _____    _____

11     _____   _____    _____

12     _____   _____    _____

13     _____   _____    _____

14     _____   _____    _____

15     _____   _____    _____

16     _____   _____    _____

17     _____   _____    _____

18     _____   _____    _____

19     _____   _____    _____

20     _____   _____    _____

21     _____   _____    _____

22     _____   _____    _____

23     _____   _____    _____

24     _____   _____    _____

25
```