# EXHIBIT 13

```
 1                 UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
 2
 3   IN RE:  ROUNDUP PRODUCTS         | MDL No. 2741
                                      |
 4   LIABILITY LITIGATION             |
                                      |
 5   --------------------------------|
                                      |
 6   This document relates to:        |
                                      |
 7   Mark Pecorelli, Individually and |
     as Representative of the Estate  |
 8   of Michael Pecorelli, deceased,  |
     v. Monsanto Co.                  |
 9   Case No. 3:19-cv-06936           |
                                      |
10   --------------------------------|
11
12                      - - -
13              Thursday, February 18, 2021
14                      - - -
15          This is the Remote Videotaped Deposition of
16   WILLIAM SAWYER, Ph.D., commencing at 10:01 a.m., on
17   the above date, before Susan D. Wasilewski,
18   Registered Professional Reporter, Certified Realtime
19   Reporter, Certified Manager of Reporting Services,
20   Certified Realtime Captioner, and Florida
21   Professional Reporter.
22                      - - -
23              GOLKOW LITIGATION SERVICES
24          877.370.3377 ph | 917.591.5672 fax
25                  deps@golkow.com
```

```
 1    APPEARANCES VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:

 2       MOLL LAW GROUP
         BY:  FATIMA ABUZERR, ESQUIRE
 3             fabuzerr@molllawgroup.com
         22 West Washington Street, 15th Floor
 4       Chicago, Illinois 60602
         Phone: (312) 462-1700
 5       Representing the Plaintiff

 6

 7

 8       WILKINSON STEKLOFF LLP
         BY:  CALI COPE-KASTEN, ESQUIRE
 9             ccope-kasten@wilkinsonstekloff.com
         2001 M Street, NW
10       10th Floor
         Washington, DC 20036
11       Phone: (202) 847-4000
         Representing Defendant Monsanto Company

12

13

14

         NELSON MULLINS RILEY & SCARBOROUGH LLP
15       BY:  MICHAEL W. HOGUE, ESQUIRE
               michael.hogue@nelsonmullins.com
16       1320 Main Street, 17th Floor
         Columbia, South Carolina 29201
17       Phone:  (803) 799-2000
         Representing Defendant Monsanto Company

18

19

20
      ALSO PRESENT VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:
21
         NANCY HOLMSTOCK, Videographer
22

23

24

25
```

```
 1                    - - -
 2               I N D E X
 3                    - - -
 4   Testimony of:  WILLIAM SAWYER, Ph.D.          PAGE
 5       DIRECT EXAMINATION BY MS. COPE-KASTEN.......   6
 6       CROSS-EXAMINATION BY MS. ABUZERR...........  103
 7
 8
 9
10                E X H I B I T S
11             (Attached to transcript)
12   WILLIAM SAWYER, Ph.D., DEPOSITION EXHIBITS      PAGE
13   Exhibit 1   Invoice dated February 11, 2021         9
14   Exhibit 2   Expert Report                          13
                 Toxicology Consultants & Assessment
15               Specialists, LLC
16   Exhibit 3   Article - Glyphosate Use and Cancer    23
                 Incidence in the Agricultural Health
17               Study
                 Gabriella Andreotti, et al.
18
     Exhibit 4   Article - Pesticide exposure as risk   34
19               factor for non-Hodgkin lymphoma
                 including histopathological subgroup
20               analysis
                 Mikael Eriksson, et al.
21
     Exhibit 5   Article - Soft-Tissue Sarcoma and      41
22               Pesticides Exposure in Men
                 Results of a Canadian Case-Control
23               Study
                 Punam Pahwa, PhD, et al.
24
25
```

William Sawyer, Ph.D.

```
 1                    E X H I B I T S

 2                (Attached to transcript)

 3   WILLIAM SAWYER, Ph.D., DEPOSITION EXHIBITS      PAGE

 4   Exhibit 6   Transcript of Videotaped Deposition    52

                 of Mark A. Pecorelli

 5               November 12, 2019

 6   Exhibit 7   Article - Cancer Epidemiology,         84

                 Biomarkers & Prevention

 7               Non-Hodgkin's Lymphoma and Specific

                 Pesticide Exposures in Men:

 8               Cross-Canada Study of Pesticides and

                 Health

 9               Helen H. McDuffie, et al.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                   - - -
 2         THE VIDEOGRAPHER:  We are now on the record.
 3    My name is Nancy Holmstock.  I'm the videographer
 4    for Golkow Litigation Services.  Today's date is
 5    February 18, 2021, and the time is 10:01 a.m.
 6    Eastern Time.
 7         This remote video deposition is being held
 8    in the matter of In Re:  Roundup Products
 9    Liability Litigation, MDL Number 2741, as it
10    relates to Mark Pecorelli, individually and as
11    representative of the Estate of Michael
12    Pecorelli, deceased, vs. Monsanto Company, Case
13    Number 3:18-cv-06936, for the United States
14    District Court, Northern District of California.
15         The deponent is Dr. William Sawyer.
16         All parties to this deposition are appearing
17    remotely and have agreed to the witness being
18    sworn in remotely.  Due to the nature of remote
19    reporting, please pause briefly before speaking
20    to ensure all parties are heard completely.
21         Will counsel please identify yourselves for
22    the record starting with the taking attorney.
23         MS. COPE-KASTEN:  Cali Cope-Kasten on behalf
24    of Monsanto.
25         MR. HOGUE:  Michael Hogue also on behalf of
```

William Sawyer, Ph.D.

```
 1        Monsanto.
 2            MS. ABUZERR:  Fatima Abuzerr on behalf of
 3        the Plaintiff.
 4            THE VIDEOGRAPHER:  The court reporter is
 5        Susan Wasilewski and will now swear in the
 6        witness.
 7            THE COURT REPORTER:  Would you raise your
 8        right hand?
 9            Do you solemnly swear or affirm the
10        testimony you're about to give will be the truth,
11        the whole truth, and nothing but the truth?
12            THE WITNESS:  I do.
13            THE COURT REPORTER:  Thank you.
14            WILLIAM SAWYER, Ph.D., called as a witness
15    by the Defendant, having been duly sworn, testified
16    as follows:
17                    DIRECT EXAMINATION
18    BY MS. COPE-KASTEN:
19        Q.  Good morning, Dr. Sawyer.
20        A.  Good morning.  We've met before.
21        Q.  We have met before.  I'm sad that we are by
22    Zoom this time instead of both being in Sanibel, but
23    nice to -- nice to see you again remotely.
24            So you're a veteran of the deposition
25    process, so I'm not going to go through all the
```

William Sawyer, Ph.D.

1    rules on how we're going to proceed today, but I

2    just want to emphasize at the outset that if at any

3    point today you don't understand a question that I

4    ask you, I need you to ask me to clarify it.  Okay?

5         A.   Certainly, and you are coming in loud and

6    clear there.

7         Q.   All right.  Great.  The first question that

8    I want to ask is just to start with some

9    preliminaries.  When did you first get involved in

10   Mr. Pecorelli's case?

11        A.   I was first contacted by Attorney Moll I

12   think in May of 2020, but I don't believe I received

13   any records -- and I can give you the exact date --

14   until it looks like July 15th, 2020.

15        Q.   Do you know what accounted for the

16   difference between May and July in terms of when you

17   got the records?

18        A.   I'm sorry.  I didn't understand.

19        Q.   Do you know why you didn't get records for a

20   couple of months after initially talking with

21   Mr. Moll?

22        A.   No, not a clue.

23        Q.   You are it looks like maybe consulting notes

24   that you have on a computer.  Is that accurate?

25        A.   Yeah.  I have three files open.  I have my

William Sawyer, Ph.D.

1    report dated January 22nd, 2021, which has a

2    carryover typo on page 5, line 4.  I just want to

3    make you aware of that.

4            I also have open the notice of deposition,

5    and I also have the file open called Monsanto Moll

6    Law Group, Pecorelli, Michael, which is my entire

7    file in this matter, which is reflected upon in the

8    MCL list at the end of the report.

9        Q.   Is that file something that you have

10   produced to us or does it contain materials that we

11   haven't seen before?

12       A.   To the best of my knowledge, you have all of

13   this because I've referenced this in the Materials

14   Considered List at the end of my report.

15       Q.   Okay.

16       A.   But if you wish, I could go through them

17   individually.  There is a lot of repetition in terms

18   of generalizations at the end of my report with

19   respect to medical records.  I didn't specifically

20   give the -- for example, I have three different sets

21   of records from Edwards -- Edward Hines Hospital,

22   and in my materials considered list I think I only

23   entered that as one item.

24       Q.   So what you have in this file is what's

25   listed in that MCL at the end of your report and

William Sawyer, Ph.D.

1    there's no other additional notes that are reflected

2    in that file?

3        A.   Correct.

4        Q.   Okay.  How much time have you spent working

5    on Mr. Pecorelli's case so far?

6        A.   Well, I can open up the invoice.  I sent all

7    of the invoices to the Moll Law firm.

8            MS. COPE-KASTEN:  Okay.  I don't think that

9        we've seen an invoice for this case yet, so I'm

10       just going to ask Fatima if we can please get the

11       invoice from Dr. Sawyer's work on the Pecorelli

12       case.

13       Q.   And you have access to that today,

14   Dr. Sawyer?

15       A.   Oh, yeah, I can open it right now, yeah.

16   Okay.  It's opening.  Okay.  It's open.

17       Q.   Okay.  Can we mark this as Exhibit 1 to your

18   deposition, the invoice?

19       A.   Sure.

20           (Sawyer Exhibit 1 was marked for

21       identification.)

22   BY MS. COPE-KASTEN:

23       Q.   Are you able to share that on your screen,

24   Dr. Sawyer?

25       A.   I think so.  I can give it a try.  I can

William Sawyer, Ph.D.

1     click share screen and figure out where the invoice

2     is.  There it is.  Double click on it.  Let me know

3     if that worked.

4          Q.   It did.

5          A.   All right.  I'm on page 1 of the invoice.

6          Q.   Okay.

7               MS. ABUZERR:  This looks like this is a

8          total of four pages, Dr. Sawyer; is that correct?

9               THE WITNESS:  Yes.

10              MS. ABUZERR:  Okay.  Just making sure so I

11         can send this over later.

12     BY MS. COPE-KASTEN:

13         Q.   So the date at the top of the invoices is

14     February 11th, 2021.  Have you done any work on this

15     case -- and by this case I specifically mean

16     Mr. Pecorelli's case -- since February 11th?

17         A.   Very minimal, only about 45 minutes of

18     review time this morning, early this morning.

19         Q.   Okay.  Do you have a total on maybe page 4

20     that lists how much time you spent on this case so

21     far?

22         A.   Page 3, actually.

23         Q.   All right.  So 32.21 hours for a total of

24     $24,162.91?

25         A.   Yes.

William Sawyer, Ph.D.

```
 1      Q.   And then that's obviously roughly now 33
 2  hours, give or take, adding the 45 minutes?
 3      A.   Yes.
 4      Q.   Have you had any conversations -- you can
 5  stop screen sharing now with respect to this
 6  document and we'll just get a copy of that, which
 7  has been marked as Exhibit 1 to this deposition.
 8           Have you had any conversations with any of
 9  Mr. Pecorelli's other expert witnesses?
10      A.   Not regarding this case, no.
11      Q.   Have you had any conversations with any of
12  his expert witnesses regarding other cases?
13      A.   Yes.
14      Q.   Which individuals have you spoken with?
15      A.   They're not cases handled by this law firm.
16      Q.   Okay.  So what I -- can you give me the
17  names of the expert witnesses that you have spoken
18  to in connection with any Roundup litigation?
19      A.   Not without contacting the attorneys
20  handling those other cases to make sure it's legal
21  for me to do so.
22      Q.   So you're going to not give me the names of
23  those individuals today because you think that it
24  might be confidential who you've spoken with --
25      A.   That's --
```

1    Q.    -- regarding other cases?

2    A.    That's possible and I'm not going to guess

3    at it and break the law, but I can assure you that I

4    have not spoken with any other experts regarding the

5    Moll cases.

6    Q.    Got it.

7    A.    Well, take that back.  No, no, I'm right,

8    because the oncologist is not on this case, so, no,

9    I have not.

10    Q.    Who is the oncologist that you're referring

11    to?

12    A.    He's not on this case, so I'm not offering

13    that.

14    Q.    Okay.  Have you spoken with any of

15    Mr. Pecorelli's treating physicians?

16    A.    No.

17    Q.    Have you spoken with any of Mr. Pecorelli's

18    family members other than his son, Mark Pecorelli?

19    A.    No.

20    Q.    Do you have any other materials with you

21    today other than the three files that we've already

22    discussed that you have opened and the invoices that

23    have been marked as Exhibit 1 to your deposition?

24    A.    Studies but they are all referenced in my

25    MCL list.

William Sawyer, Ph.D.

```
 1      Q.   Let's go ahead and mark your report as

 2   Exhibit 2.

 3           (Sawyer Exhibit 2 was marked for

 4   identification.)

 5           MS. COPE-KASTEN:  Can we go of the record

 6      for one second?

 7           THE VIDEOGRAPHER:  The time is now

 8      10:12 a.m., going off the record.

 9        (Recess from 10:12 a.m. until 10:12 a.m.)

10           THE VIDEOGRAPHER:  We're back on the record.

11      The time is now 10:12 a.m.

12   BY MS. COPE-KASTEN:

13      Q.   All right.  Dr. Sawyer, I have marked as

14   Exhibit 2 to your deposition your expert report in

15   this case, and you have a copy of that report on

16   your computer, correct?

17      A.   I do.

18      Q.   Does this report contain all of the opinions

19   you intend to offer regarding Mr. Pecorelli's case?

20      A.   Yes.

21      Q.   What type of non-Hodgkin's lymphoma did

22   Mr. Pecorelli have?

23      A.   He was diagnosed with a stage 4 splenic

24   marginal zone lymphoma, and I should point out that,

25   as I said on page 5, line 4, there's a carryover
```

William Sawyer, Ph.D.

```
 1    typographical error in my report.
 2           And the splenic marginal zone lymphoma,
 3    which we can call SMZL if you wish, it is a
 4    low-grade B-cell non-Hodgkin's lymphoma and it is
 5    not a DLBCL as stated on page 5.
 6    Q.   So the second sentence of your report should
 7    correctly read:  Mr. Pecorelli was diagnosed with
 8    splenic marginal zone lymphoma (non-Hodgkin's
 9    lymphoma or "NHL") allegedly as a result of repeated
10    exposures to this product.
11           Is that correct?
12    A.   Yes.  And as you can see in the later
13    section of the report, on the pathology section, I
14    made it very clear.  I have quite an extensive
15    write-up on his SMZL.
16    Q.   You're aware that Mr. Pecorelli also had
17    undifferentiated pleomorphic sarcoma?
18    A.   Yes.  That occurred a number of years later.
19    Q.   Undifferentiated pleomorphic sarcoma is
20    sometimes referred to as malignant fibrous
21    histiocytoma, or MFH; is that correct?
22    A.   Yes.
23    Q.   If I refer to that cancer as either MFH or
24    Mr. Pecorelli's sarcoma, will you understand that I
25    am referring to that cancer and not his
```

1    non-Hodgkin's lymphoma?

2        A.   Yes.

3        Q.   What was Mr. Pecorelli's official cause of

4    death?

5        A.   It was really the malignant fibrosis

6    histiocytoma which was the ultimate cause of his

7    death; however, I would defer to the oncologist

8    whether his treatment for the splenic marginal zone

9    lymphoma, that is the CVP-R therapy, had any bearing

10   upon the development and promotion of the MSH.  I'm

11   not going to opine on that but I am directing you to

12   the oncologist or pathologist to further refine that

13   information.

14       Q.   All right.  I want to take those one at a

15   time.  So Mr. Pecorelli's official cause of death

16   was MFH as listed on his death certificate, correct?

17       A.   Correct, but what I'm stating is that the

18   medical experts in this case will be able to tell

19   you whether or not that is secondary and related in

20   any fashion to the primary malignancy, which was the

21   NHL.

22       Q.   His death certificate did not list NHL

23   anywhere on it, correct?

24       A.   Correct.

25       Q.   When you say that you are deferring to the

William Sawyer, Ph.D.

1    oncologists or his primary care physicians as to

2    what impact the treatment may have had on his

3    development of his sarcoma, can you elaborate for me

4    what you mean by that?

5        A.    Whether or not the immuno abnormalities and

6    immuno dysfunction from the B-cell lymphoma and, of

7    course, from the CVP-R therapy, in any way resulted

8    through a number of different mechanisms the onset

9    or promotion of the MSH.

10       Q.    And when you're saying MSH, you're referring

11   to the subsequent sarcoma that he had?

12       A.    Correct.

13       Q.    I'll come back to that in just a second, but

14   for right now let me just clarify.  You're not

15   intending to offer any opinions in this case with

16   respect to whether any of Mr. Pecorelli's treatments

17   for his splenic marginal zone lymphoma contributed

18   to his development subsequently of MFH, correct?

19       A.    Yes.

20       Q.    You are not intending to offer any opinion

21   in this case disputing the cause of death that

22   Mr. Pecorelli's treating physician listed on the

23   death certificate as MFH, correct?

24       A.    Correct.  What I'm getting at, as a

25   toxicologist, and I'm not going to opine on the

William Sawyer, Ph.D.

```
1    cause, but I am going to opine on the fact that the
2    regimen, the chemotherapy he received, contains
3    cyclophosphamide, and cyclophosphamide has
4    historically been very well documented and generally
5    accepted in the toxicological and pharmacological
6    literature to sometimes cause a malignancy worse
7    than the original.  That's one of the risks of using
8    that drug.  It certainly has the ability to cause a
9    different type of malignancy.
10        And as a toxicologist, that's as far as I'm
11   going with it.  I am not opining in any way that it
12   causes his second malignancy in this case.  I think
13   that would be best answered by the oncologist or
14   pathologist in this matter.
15   Q.   Can you spell the substance or chemical that
16   you are identifying as being part of the regimen?
17   A.   Sure.  Cyclophosphamide,
18   c-y-c-l-o-p-h-o-s-p-h-a-m-i-d-e.
19   Q.   Does your report contain an opinion that
20   cyclophosphamide is something that Mr. Pecorelli was
21   exposed to?
22   A.   Yeah.  I made reference to it on -- in the
23   report.  I can direct you to that page.
24        It's on page 9, line 3, six cycles of CVP-R
25   therapy for splenic marginal zone lymphoma with good
```

William Sawyer, Ph.D.

1    response, and I directed that to a footnote, page

2    938 of 3358 in the medical records from Edward Hines

3    VA Hospital.

4        Q.   Is that the totality of your discussion of

5    cyclophosphamide in this report?

6        A.   It is.  As I said, I am not going to infer

7    into a treatment area or diagnostic area which I

8    defer to the oncologist.

9        Q.   But you do intend to inform the jury that

10   this is sometimes a chemical that can subsequently

11   cause later cancers?

12       A.   Yeah.  For example, in my report, if you

13   were to look at page 5, second paragraph,

14   approximately at line -- looks like about line 12,

15   somewhere in there, the statement reads:  Smoking

16   history (pack-years of cessation duration, if any),

17   family medical history, alcohol consumption, drugs

18   of abuse, prior diagnoses with respect to any

19   immunosuppressive diseases, prior malignancies (if

20   any) and prior pharmacological intervention which

21   may present increased toxicological risks of NHL

22   (such as cyclophosphamide, et cetera)...

23            I have identified that cyclophosphamide can

24   cause NHL.

25       Q.   You're not an oncologist, are you?

William Sawyer, Ph.D.

```
 1      A.   No.  I don't think we need to even go there.
 2   I said I am deferring the diagnostic issues to the
 3   oncologist and pathologist.
 4      Q.   So you don't have any actual evidence that
 5   Mr. Pecorelli's cyclophosphamide exposure did cause
 6   his subsequent MFH?
 7      A.   That's correct.  As I've been stating for
 8   the last five minutes, I defer that to the proper
 9   oncologist and pathologist.
10      Q.   Do you know how much cyclophosphamide
11   exposure an individual needs to be exposed to before
12   it causes a subsequent cancer?
13      A.   Yes, I do, from my training early on.  In
14   fact, I -- my -- one of my professors in medical
15   pharmacology was responsible for basically inventing
16   that drug, and -- a German fellow, actually.  That
17   dose that is used in treating cancer is sufficient
18   to induce a second malignancy.  It's textbook
19   generally accepted.
20      Q.   But you don't know whether it did in
21   Mr. Pecorelli's case?
22           MS. ABUZERR:  Objection.
23      A.   I may know but I'm not offering an opinion
24   on that.  I'm deferring it.  I think we're going in
25   circles at this point.
```

William Sawyer, Ph.D.

1        Q.   No, I'm just trying to clarify exactly what

2   it is you're going to tell the jury here,

3   Dr. Sawyer.

4        A.   I made it perfectly clear that I will not be

5   determining whether or not that drug caused the

6   second malignancy.  I'm deferring that to the

7   oncologist and pathologist to decide.  My role is,

8   if asked how does cyclophosphamide work, can it

9   cause second malignancies in general, from a general

10  causation standpoint, certainly, but not to the

11  degree you're asking me.  I'm going to defer that.

12       Q.   Are you aware that Mr. Pecorelli's treating

13  oncologist believed his MFH was, quote, unrelated,

14  end quote, to his non-Hodgkin's lymphoma?

15       A.   Certainly.  That's very possible.  I haven't

16  spoken to the oncologist in this case.

17       Q.   You've reviewed Mr. Pecorelli's medical

18  records, correct?

19       A.   Yes.

20       Q.   So you're aware that in his medical records

21  Mr. Pecorelli's treating oncologist said that he

22  believed Mr. Pecorelli's splenic marginal zone

23  lymphoma was unrelated to his lung symptoms that he

24  was having later on in connection with MFH?

25       A.   Very possible, but I should point out,

William Sawyer, Ph.D.

1    without reading the entire record that you're

2    referring to, you're using the term "not related to

3    the NHL."  I don't know that the oncologist has

4    ruled out the cyclophosphamide.  That's a different

5    issue than being caused by NHL.

6        Q.   Are you aware that Mr. Pecorelli's treating

7    oncologist believed that Mr. Pecorelli's splenic

8    marginal zone lymphoma was in remission at the time

9    that he was diagnosed with MFH?

10       A.   Yeah, but that's irrelevant with respect to

11   whether it was not -- or whether it was or was not

12   caused from the cyclophosphamide, what does that

13   have to do with NHL being in remission?

14       Q.   I'm not asking for your opinion on whether

15   it's relevant, Dr. Sawyer.  I'm asking if you're

16   aware whether Mr. Pecorelli's treating physician

17   indicated that his marginal zone lymphoma was in

18   remission at the time that he was diagnosed with

19   MFH?

20            MS. ABUZERR:  Objection; asked and answered.

21       A.   Yes, but that was after he received the

22   cyclophosphamide.

23       Q.   Do you recall seeing any indication in any

24   of the records you reviewed for Mr. Pecorelli that

25   any of his treating physicians believed that

William Sawyer, Ph.D.

1    exposure to cyclophosphamide was a potential cause

2    of his subsequent MFH?

3        A.   I don't recall.  I really don't recall

4    either way.

5        Q.   You are aware that Mr. Pecorelli was a heavy

6    smoker throughout his lifetime, correct?

7        A.   Yes.  I included his smoking history, all of

8    the different accounts that were available in the

9    medical records, the son's deposition, and other

10   documents on page 13, and there are a variety of

11   scenarios with respect to his smoking history, but

12   it varied somewhere between, I think, 35 pack-year

13   to 70 pack-year, depending on what record one relies

14   upon.

15       Q.   You would agree that either way, that's a

16   significant smoking exposure?

17       A.   It is.

18       Q.   Are cigarettes carcinogenic?

19       A.   Yes, and are very well studied.  There has

20   been decades of studies on smoking and smoking has

21   been associated with follicular lymphoma but not

22   MZL.

23       Q.   Are you aware of any studies finding that

24   glyphosate is associated with MZL specifically?

25       A.   No.  The glyphosate studies really don't

William Sawyer, Ph.D.

1    carry enough individuals to detect it since MZL is

2    actually a very -- I should call it a rare

3    malignancy.  The occurrence is about one percent of

4    the NHL cases or less, and to be able to study that

5    among glyphosate applicators would require literally

6    millions of applicators in the study pool to have

7    enough cases to have statistical power to measure

8    the phenomenon, that is the malignancy rate.

9         Q.   So the answer is no, you're not aware of any

10   study finding that glyphosate is associated with MZL

11   specifically?

12        A.   Correct.

13        Q.   You're familiar with the Agricultural Health

14   Study?

15        A.   Certainly.

16        Q.   You've reviewed Dr. Andreotti's 2018

17   publication on the Agricultural Health Study?

18        A.   Yeah.

19        Q.   I'm going to mark that publication as

20   Exhibit 3 to your deposition.

21             (Sawyer Exhibit 3 was marked for

22   identification.)

23   BY MS. COPE-KASTEN:

24        Q.   Are you opening a copy of it on your own

25   screen or do -- here, I'm just going to open it over

William Sawyer, Ph.D.

```
 1    here.

 2    A.   I'm opening it, yeah.  I need to be able to

 3    see more than just one paragraph.

 4    Q.   All right.  Let me know when you've got it

 5    open.

 6    A.   Okay.  Open and I'm on page 6 of 8.

 7    Q.   Why are you on page 6 of 8?

 8    A.   Marginal zone lymphoma.

 9    Q.   Okay.  This is one of -- I'm going to -- we

10    can start here and then we'll go up to Table 2 in

11    just a second.

12         So Table 3 is assessing the cancer incidence

13    in relation to lagged intensity weighted lifetime

14    days of glyphosate used in the Agricultural Health

15    Study, correct?

16    A.   Yes.

17    Q.   And Table 3 is breaking down different

18    subtypes of non-Hodgkin's lymphoma in connection

19    with glyphosate exposure?

20    A.   Correct.

21    Q.   One of the subtypes that they break down is

22    marginal zone lymphoma, right?

23    A.   Yes, but only six cases in one level and

24    five cases at M2 level, and even the most

25    rudimentary basic statistician course would tell you
```

William Sawyer, Ph.D.

1    that you're not going to have enough power to detect

2    any change with only five subjects in one group and

3    six in the other and four in another.  It's an

4    insufficient number of subjects to generate a

5    statistically reliable analysis.

6        Q.   Right.  15 individuals is not enough to have

7    a statistically reliable analysis?

8        A.   No, five in one group, six in another, and

9    four in another.  That would require some very large

10   differences to measure.  For example, look at the M1

11   confidence interval.  It's .1 to 2.0.  That's a

12   20-fold range.  It's an extremely wide range of

13   variability or error and it's just insufficient to

14   reliably use the study to say that marginal zone

15   lymphoma does not occur.  With a confidence interval

16   of .1 to 2.0, it's just meaningless.

17       Q.   So I want to make sure that I understand

18   exactly what you're saying here.  So what you're

19   referring to is the confidence interval in the group

20   for M1?

21       A.   Yes.  That is what toxicologists look at, is

22   the -- not just the actual odds ratio or risk ratio

23   but the confidence interval and it --

24       Q.   Why do you look at the confidence interval?

25       A.   To determine if something is statistically

William Sawyer, Ph.D.

1    significant and also to determine the rate of P1 or

2    type 1, I should say, type 1 or type 2 error.  In

3    this case we have a very high type 2 error.  You

4    have a small number of subjects and a very wide

5    confidence interval.

6        Q.   So the fact that the confidence interval

7    goes from .11 to 2.01, you consider to be a very

8    wide confidence interval?

9        A.   Well, that's a factor of 20, of course.

10   That's obvious upon direct inspection.

11       Q.   Why is statistical significance important to

12   you?

13       A.   I'm sorry.  I didn't understand the word you

14   just used.

15       Q.   Sorry.  Why is statistical significance

16   important to you?

17       A.   As a toxicologist, I've been trained in

18   biostatistics and epidemiology and I use it every

19   day throughout my work for the past 34 years as an

20   important piece of evaluating the toxicity of

21   chemicals, pharmaceuticals, or other agents in

22   humans.  Well, and in laboratory animals as well,

23   the same thing holds true in terms of the confidence

24   interval.

25       Q.   What is statistical significance?

William Sawyer, Ph.D.

1    A.   Well, it's somewhat arbitrary.  Generally,
2    we use a 95 percent level of confidence.  In some
3    studies 90 percent confidence intervals are used,
4    but generally 95 percent.
5    Q.   And in this instance, there's no statistical
6    significance in terms of the findings of marginal
7    zone lymphoma?
8    A.   Correct.
9    Q.   But the odds ratios that the study found
10   were well below 1.0 for both M1 and M2 in the
11   marginal zone lymphoma group; is that right?
12   A.   Yeah, at the shorter five-year lag, but if
13   you look at the 20-year lag, the marginal zone NHL
14   in the M2 group, but again, only three subjects, not
15   enough statistical power, we see that the number of
16   cases was greater than the control at 1.16, but it
17   only appears that way.  We can't say that with any
18   level of confidence because the error rate is so
19   wide, in that case .29 at the lowest and at the
20   upper end, 4.65 risk ratio.
21   Q.   So you don't consider the 1.16 in this
22   instance to be a significant finding that marginal
23   zone lymphoma can be caused by non -- by exposure to
24   Roundup?
25   A.   No, it's not significant.  The only thing I

William Sawyer, Ph.D.

1   can say as a toxicologist, what does interest me in

2   that dataset is for the 20-year lag we see a -- let

3   me just look here.

4          Yeah.  We see a 1.0 reference, then a 1.1

5   reference in the -- wait a minute.  Yeah.  A 0.77

6   ratio in the M1 group, and in the M2 group a 1.16.

7          So, again, this gives the appearance of a

8   dose-response but I don't believe it was tested.  I

9   don't recall any statistical test in this study

10   stating that it was a statistically significant

11   dose-response relationship.  So, again, I can't --

12   it doesn't hold any water from a statistical

13   standpoint, to my knowledge.

14   Q.   So given that there were two subjects in the

15   20-year lag group for marginal zone lymphoma in M1,

16   and three subjects in the 20-year lag group for M2

17   marginal zone lymphoma, you can't attribute any

18   significance to the 1.16 from a statistical

19   standpoint?

20   A.   Correct.  What this really shows -- what I

21   can conclude, and any biostatistician or

22   epidemiologists would also conclude, is that two

23   subjects in M1 and three subjects in M2 is

24   insufficient to generate a reasonable level of type

25   2 error.  The type 2 error is just way too high to

 1    be able to use this data to say that there is no

 2    effect.

 3        Q.   By the same token, the data cannot be used

 4    to say that there is an effect, correct?

 5        A.   Yes.

 6        Q.   Do you know how high the numbers would need

 7    to be in this case to have a statistically

 8    significant finding one way or the other?

 9        A.   Yes.  There is a formula, a mathematical

10    formula that can be applied to determine the number

11    of subjects to provide a reasonable ability to see

12    the change if present, that is the type 2 error, as

13    well as type 1 error, and that formula and those

14    calculations I would defer to the epidemiologist and

15    biostatistician.

16        Q.   Let's go up to Table 2 in the same paper, so

17    that's on page 5 of 8 in this article, or page 513

18    if you're using the pagination for the journal.

19        A.   Okay.

20        Q.   Table 2 is looking at cancer incidence in

21    relation to intensity-weighted lifetime days of

22    glyphosate use in the Agricultural Health Study,

23    right?

24        A.   Yes.

25        Q.   And here again they've broken out individual

William Sawyer, Ph.D.

1    subtypes of non-Hodgkin's lymphoma?

2        A.    Yes.

3        Q.    One of which, again, is marginal zone

4    lymphoma?

5        A.    Correct.

6        Q.    And if we look on page 5 of 8 of the article

7    where marginal zone lymphoma is identified, we see

8    just like with Table 3, that the odds ratios are

9    well below 1 but that the findings are not

10   statistically significant, correct?

11       A.    Yes.  I have my calculator, though.  I want

12   to point out to you that if you look at marginal

13   zone lymphoma in the -- oh, let's take the M1 group,

14   with the six subjects, the highest number of

15   subjects in the group.  That the range is 2.45 at

16   the higher end, and only .06 at the lower end,

17   that's a 40-fold range of error.  I mean, that --

18   it's saying that the true value is somewhere between

19   0.06 and as high as 2.45, but that's a 40-fold --

20   40-fold range of error, and I think you need to

21   appreciate that.

22           If you are an impartial bias person, as an

23   attorney you should appreciate that range of error

24   negates the information of being able to say that

25   this is not showing any increase in marginal zone

William Sawyer, Ph.D.

1    lymphoma when it could be as low as .06 and as high

2    as 2.45.  It just doesn't provide us any information

3    that we can rely on.

4         And if you and your experts wish to rely on

5    that and show that to the jury and say, "Well, this

6    proves that it does not," that would be incorrect.

7    It would be a fallacy and I think it's very

8    important for me to point that out to the court.

9    Q.   Did you understand my question to be asking

10   you whether this data proves that glyphosate does

11   not have a relationship to marginal zone lymphoma?

12   A.   Yes, and I explained that it can't prove it

13   either way because of that wide range of error based

14   on the small number of subjects.  I think that there

15   is some kind of communication problem here between

16   you and I because you keep asking the same thing.

17   It doesn't make any sense.

18   Q.   No, I actually think you're reading

19   something into my question that isn't there,

20   Dr. Sawyer, so let me try again.

21        What I'm trying to figure out is whether the

22   odds ratios listed here in Table 2 of Andreotti 2018

23   for marginal zone lymphoma are below 1, but if those

24   findings are not statistically significant.

25        Would you agree with that?

William Sawyer, Ph.D.

1    A.   Yes.   That's what the data shows.   That's

2    correct.

3    Q.   You've made reference a couple of times to

4    24-fold or 40-fold with respect to these confidence

5    intervals.   How many fold is too many fold for it to

6    be reliable data?

7    A.   I can't answer that with a threshold number.

8    I would have to defer that to the epidemiologist or

9    biostatistician.   I'm not familiar with any

10   particular threshold number for the confidence

11   interval.

12   Q.   If, for instance, the confidence interval

13   here were a three-fold confidence interval, would

14   that be something that you thought had a high risk

15   of error?

16   A.   Again, a biostatistician or epidemiologist

17   could calculate the P2 or the type 1 error rate, and

18   the type 1 error rate and answer that for you.   I'm

19   not prepared to make that calculation.

20   Q.   So you are relying on the breadth of the

21   confidence interval in this case, but you don't know

22   how narrow the confidence interval would need to be

23   for it to be reliable data?

24        MS. ABUZERR:   Objection.

25   A.   I don't understand the question.

William Sawyer, Ph.D.

```
1        Q.   One of the things that is important to you

2   about Table 2 and Table 3 is that there is what you

3   call a wide confidence interval for the marginal

4   zone lymphoma numbers, right?

5        A.   Yes.  It's a very wide rate of type 2 error.

6   The error rate is very wide, huge wide, 40-fold in

7   one case.  That's unusual.  That's not something --

8   it just tells me we can't rely on that data, and

9   it's obvious anyway due to the low number of

10  subjects, but you asked me about some kind of

11  magical threshold number where you can rely, and I

12  don't know if there is such a magical threshold

13  number.  I'm not familiar with one.  I would defer

14  that to the epidemiologist and biostatistician,

15  because I think normally what's done is type 2 error

16  and type 1 error calculations are made and that is

17  the methodology generally employed.

18       Q.   Let me ask you, because you look at

19  confidence intervals as a toxicologist in making

20  these assessments, right?

21       A.   Yeah.  I look to see how wide they are.  If

22  they are ridiculously wide, that tells me there is a

23  lot of type 2 error going on.

24       Q.   What would not be ridiculously wide?

25       A.   Well, we typically saw a confidence interval
```

William Sawyer, Ph.D.

1    from 1.1 to 3.0, that would be a reasonably narrow

2    margin of error.

3        Q.   If you had to conduct an assessment of the

4    data for marginal zone lymphoma, would it need to be

5    as narrow as something like 1.1 to 3.0 for you to

6    say that the confidence interval was meaningful?

7        A.   No.  No.  There's not an exact threshold, to

8    my knowledge, and again, I defer you to the

9    epidemiologist and biostatistician for further

10   information regarding cut-offs for type 2/type 1

11   error.

12       Q.   You're familiar with Ericsson 2008, right?

13       A.   Certainly.

14       Q.   I'm going to mark Ericsson 2008 as Exhibit 4

15   to your deposition.

16            (Sawyer Exhibit 4 was marked for

17   identification.)

18            THE WITNESS:  Can we take a, like, just

19       one-minute break so I can roll my phone over to

20       the other office?

21            MS. COPE-KASTEN:  Absolutely.

22            THE VIDEOGRAPHER:  The time is now

23       10:50 a.m., going off the record.

24         (Recess from 10:50 a.m. until 10:51 a.m.)

25            THE VIDEOGRAPHER:  We're back on the record.

William Sawyer, Ph.D.

1        The time is 10:51 a.m.

2   BY MS. COPE-KASTEN:

3        Q.   All right.  Dr. Sawyer, we just marked

4   Ericsson 2008 as Exhibit 4 to your deposition and

5   I've got it pulled up here on the screen.

6        A.   Okay.  I have a copy open as well.

7        Q.   Perfect.  I'd like you to go to page 1659

8   with the journal pagination which is page 3 of 7 in

9   the PDF.

10       A.   Okay.

11       Q.   If you look at the top of the second column

12   on that page, the sentence that starts "The

13   category..." are you with me?

14       A.   Second sentence at the top of the page of

15   the --

16       Q.   Second column, first sentence at the top of

17   that.

18       A.   Oh, yeah.  The category other than specified

19   B-cell, yeah.

20       Q.   Okay.  So you see there that the authors

21   have grouped marginal zone lymphoma along with

22   mantle cell lymphoma into other specified B-cell

23   lymphoma for the purposes of this article, right?

24       A.   Yes.

25       Q.   Let's scroll down to the bottom of that same

William Sawyer, Ph.D.

```
 1    page, Table 3.  Table 3 is looking at various
 2    herbicides and whether exposure to those herbicides
 3    increased the risk of different types of
 4    non-Hodgkin's lymphoma, correct?
 5        A.   Yes.
 6        Q.   And you see here the -- one, two, three,
 7    four -- fifth one down is otherwise -- "Other
 8    specified B-cell lymphoma"?
 9        A.   Yes.
10        Q.   And that's the group that includes marginal
11    zone lymphoma, right?
12        A.   Yes, but as I said earlier, the incident
13    rate of marginal cell lymphoma is only about one
14    percent of total lymphomas, so it's not a -- it
15    would be a mis -- a falsification, I guess I would
16    call it, to try to tell the jury that the "Other
17    specified B-cell lymphoma" was mostly MZLs.  That
18    would not be the case.  There is MZ and others, over
19    100 types of lymphoma, and MZL is one of the more
20    rarest of the lymphomas.
21        Q.   You're jumping ahead of me, Dr. Sawyer, so
22    let me -- let me just try this question again.
23             The category "Other specified B-cell
24    lymphoma," which is the fifth category down in
25    Table 3, is that category that we would find
```

1    marginal zone lymphoma under if we wanted to look at

2    this table, right?

3        A.    Yes.  Again, though, it would be a minor

4    portion of that particular group because MZL only

5    represents one percent of the different lymphomas.

6        Q.    Absolutely.  So what I want to look at are

7    the numbers for glyphosate here, which is the second

8    from the right in looking at the table.  The odds

9    ratio here is 1.63 but the confidence interval looks

10   like it's 0.53 to 4.96.

11        Do you agree with those -- that I have

12   repeated those numbers correctly?

13        A.    Yes, and that represents a nine-fold range

14   of error, and an odds ratio that is suggesting that

15   something is happening, but the range of error is

16   too wide to be certain.

17        Q.    So the nine-fold range of error is too wide

18   for it to be a reliable odds ratio?

19        A.    Well, no, I can't say that it makes it

20   unreliable, that would be incorrect, but it means

21   that there is a wide range of error and a wide --

22   and a high possibility of type 2 error, that is

23   misclassifying and saying that it's -- that nothing

24   is going on when in fact there really is an effect.

25   That's what type 2 error is.  Okay?  It's claiming

William Sawyer, Ph.D.

1    that there is no effect, no difference, when in fact

2    there is, and that is the definition of type 2

3    error.

4         And because that we have a nine-fold range

5    here, it means that there is a possibility of type 2

6    error going on.  As you can see, it's as low as .53

7    and as high as almost five times the background

8    rate, so there is suggestive evidence that there is

9    a relationship here between these other specified

10   B-cell lymphomas, but it's -- there's a lot of

11   variability in this particular analysis.

12   Q.   As a toxicologist, would you agree that the

13   1.63 odds ratio here is not a statistically

14   significant finding for the other specified B-cell

15   lymphoma group?

16   A.   Yes.  It's not -- it doesn't meet the 95

17   percent confidence interval threshold.

18   Q.   So if I were looking only at Table 3, I

19   would not be able to determine from this table

20   whether exposure to glyphosate or Roundup increases

21   the risk of developing splenic marginal zone

22   lymphoma?

23   A.   Could you repeat the question, please?

24   Q.   By looking at Table 3, I would not be able

25   to determine whether exposure to glyphosate

William Sawyer, Ph.D.

1    increases -- I would not be able to say that the

2    exposure to glyphosate increases the risk of

3    developing splenic marginal zone lymphoma, that's

4    not something I could tell from Table 3?

5        A.   I don't know why, I just don't clearly

6    understand your question.

7        Q.   Let me try reframing it this way.

8             Take a look at Table 3 in Ericsson 2008.

9    There is no figure in Table 3 that would be able to

10   tell you that exposure to glyphosate significantly

11   increases the risk of developing splenic marginal

12   zone lymphoma, right?

13       A.   Not exactly.

14       Q.   What's not right about it?

15       A.   That there is an increased odds ratio but it

16   is not statistically significant, but in keeping

17   with general methodology and weight of evidence

18   methodology, a toxicologist or an epidemiologist

19   would still look at the 1.63 and keep in mind that

20   it is not statistically significant, and the reason

21   may be because the type 2 error is high, that is a

22   wide degree of variability, and look at the entire

23   study in terms of, for example, Table 2, grouping of

24   NHL as a class, or looking at other types of

25   lymphoma data in Table 3 that we're looking at now.

William Sawyer, Ph.D.

1    For example, unspecified non-Hodgkin's lymphoma

2    shows a exceptionally high odds ratio, 5.63, which

3    was statistically significant.

4         One has to look at all of the data as a

5    whole, and under lymphocytic lymphoma/B-cell, CLL,

6    there is a lot of data here, and picking out the

7    MZL, which occurs so rarely, it's clear that there

8    is not sufficient statistical power to determine

9    whether MZL is, by itself, specifically linked to

10   glyphosate because there is too few cases to make

11   that determination with a reasonable level of type 2

12   error.

13        So one has to look at all of the lymphoma

14   data, and in looking at the other specified B-cell

15   data, which includes other types other than just

16   MZL, we still see that there appears to be an

17   elevated odds ratio but it's not statistically

18   significant, and weigh all that evidence together.

19   To just rely only upon this one measurement that

20   you're pointing out would be inappropriate

21   methodology.

22   Q.   You raised a good point, Dr. Sawyer, which

23   is that we know that the n for other specified

24   B-cell lymphoma is 131 but we don't know how many of

25   those are marginal zone lymphoma cases, right?

William Sawyer, Ph.D.

1      A.   That's right.

2      Q.   So the 1.63 odds ratio may be driven

3   entirely by something that is not marginal zone

4   lymphoma at all, correct?

5      A.   Yes.  That's why I pointed out one has to

6   look at all the statistical data in this study, not

7   just that one line of data that you pointed me to.

8      Q.   Are you aware of any study finding that

9   glyphosate is associated with the development of

10   MFH?

11      A.   No.

12      Q.   You're aware that MFH is a soft tissue

13   sarcoma?

14      A.   Yes.

15      Q.   Are you familiar with Dr. Pahwa from the

16   North America Pool Project?

17      A.   Yes.  Well, no, I don't know him personally.

18      Q.   But you're -- that name is familiar to you?

19      A.   Of course.  I'm aware of his study.

20      Q.   I'm going to mark as Exhibit 5 to your

21   deposition an article that Dr. Pahwa published in

22   2011 that is called "Soft-Tissue Sarcoma and

23   Pesticides Exposure in Men, Results of a Canadian

24   Case-Control Study."

25           (Sawyer Exhibit 5 was marked for

William Sawyer, Ph.D.

```
 1    identification.)

 2    BY MS. COPE-KASTEN:

 3        Q.   Have you ever seen this article before?

 4        A.   I believe so, but I don't have it in my -- I

 5    don't think I have it in my MCL list because it

 6    didn't provide a dose metric, which is my focus in

 7    calculating dose-response in humans.

 8        Q.   Tell me more about what you mean by it

 9    doesn't provide a dose metric.

10        A.   I don't believe this provided either a

11    systemic dose in milligram per kilogram per day, or

12    measurements in exposure days.

13        Q.   I'm going to take you down to Table 2, which

14    is on page 1281 of the journal pagination of this

15    study.  This is looking at an ever/never assessment

16    of the odds ratios that exposure to any of these

17    chemical classes increases the risk of soft tissue

18    sarcoma.  Do you see that?

19        A.   Yes.

20        Q.   And if you look here maybe a third of the

21    way down the table, there is a line where they look

22    at glyphosate.  Do you see that?

23        A.   Yes.

24        Q.   The odds ratio that they found as an

25    unadjusted odds ratio for whether glyphosate or
```

William Sawyer, Ph.D.

1    Roundup increases the risk of soft tissue sarcoma

2    was 0.93 with a confidence interval of 0.60 to 1.42.

3         Right?

4    A.   Yes, it is.

5    Q.   And the adjusted odds ratio is 0.90 with a

6    confidence interval of 0.58 to 1.40.

7         Do you see that?

8    A.   Yes.

9    Q.   I'm going to take you down to the bottom

10   of -- let me get my tables straight here -- yeah,

11   take you down to Table 3, which is on the next page.

12   This is looking at the same thing, it's just

13   additional chemical classes.  Do you see that?

14   A.   Yeah.

15   Q.   This is insecticides.  If you look at the

16   very bottom row of Table 3, diazinon is indicated

17   there.  Do you see that?

18   A.   Yes.

19   Q.   This article found that there was a 2.99

20   odds ratio that the article found was statistically

21   significant as an unadjusted odds ratio that

22   diazinon increased the risk of developing soft

23   tissue sarcoma, correct?

24   A.   Yes.

25   Q.   And the adjusted odds ratio is 3.31, again,

William Sawyer, Ph.D.

1    statistically significant based on this author's

2    finding, right?

3        A.   Yes.

4        Q.   Do you intend to offer any opinions in this

5    case about Mr. Pecorelli's exposure to radiation as

6    part of his cancer treatment?

7        A.   Yes.  I evaluated -- well, let me explain it

8    this way.  I evaluated radiologic exposures prior to

9    the NHL, not post-NHL treatments.

10       Q.   Right.  So the NHL treatments from the time

11   of NHL diagnosis forward, you're not intending to

12   offer any opinions about radiation exposure for

13   Mr. Pecorelli during that time, right?

14       A.   No.  I'm deferring that to the oncologist

15   and pathologist.

16       Q.   I want to look back at your report, which is

17   Exhibit 2 to this deposition, and can you turn with

18   me to the very last page of your report, which is on

19   your materials considered list for Mr. Pecorelli's

20   case-specific materials?

21       A.   Yes, I have it open.

22       Q.   I just want to confirm.  I don't see listed

23   there, and I think this is probably just an

24   inadvertent omission, but I don't see listed there

25   Mark Pecorelli's deposition transcript.  Am I -- do

William Sawyer, Ph.D.

1    you agree with me that it's not there?

2        A.   Yes.  Yeah, that's an oversight.

3        Q.   Okay.  But you -- that should be on there

4    because you did in fact review Mark Pecorelli's

5    deposition?

6        A.   Yes, in detail.

7        Q.   Do me a favor and take another look at that

8    list for just a second and let me know if there is

9    anything else that should be on there that you think

10   of that's missing from that list.

11       A.   All right.  What I'm going to do is I'm

12   going to prepare a side-by-side comparison with my

13   file on this case.  So I'm opening up that file, the

14   documents, and what I have is -- if you can read

15   along with me, if you look at the report and I look

16   at my list, I think this will go faster.

17       Q.   All right.

18       A.   I have in my list the NOD.

19       Q.   Yes.

20       A.   I have my report.  I have Pec -- I'm not

21   going to say Pecorelli each time.  It wastes too

22   much time.

23       Q.   That's fine.

24       A.   I have the Edwards Hines VA medical records;

25   pathology; Elk Grove Village Fire Department

William Sawyer, Ph.D.

1    Ambulance; John Hopkins Reference Lab, Amita Health

2    Alexian Brothers; Suburban Lung Associates; Loyola

3    University; Northwest Oncology; Edward Hines VA;

4    Edward Hines VA; Edward Hines VA; deposition

5    transcripts of Mark Pecorelli; deposition of

6    Dr. Kanovsky; deposition of Dr. Lakhani, Hines

7    medical records; PFS; Hines medical records; medical

8    summary, which was given to me by the law firm.

9    It's just a two-page thingy that I did not rely on.

10        Death certificate; PFS; Pecorelli studies,

11   that is the new studies that I've added to the

12   report since the prior MCL list.

13        Dr. Kanovsky exhibits; Dr. Lakhani exhibits;

14   Pecorelli exhibits; and then a folder called Michael

15   Pecorelli which has in it the same redundant medical

16   records, all redundant material; and then I have

17   another subfolder called Pecorelli proof of product

18   exhibits, which includes Pecorelli02.PDF which is a

19   Roundup Pro herbicide label.

20        And finally, Pecorelli property exhibits,

21   which includes Pecorelli 5, 6, 8 and 9, which I

22   believe are exhibit numbers.

23        MS. COPE-KASTEN:  So just one bit of

24   housekeeping.  Fatima, I'm going to request that

25   we have the medical summary of Mr. Pecorelli that

1       was provided to Dr. Sawyer be produced to us.

2            MS. ABUZERR:  Yes.  I'm -- (garbled

3       audio) --

4            MS. COPE-KASTEN:  Okay.  Thank you.

5    BY MS. COPE-KASTEN:

6       Q.   Dr. Sawyer, I think the only things we're

7    missing here then are those deposition transcripts

8    and the exhibits.  I think everything else that you

9    listed I see on the MCL.  So you reviewed the

10   depositions of a couple of Mr. Pecorelli's treating

11   physicians in addition to Mark Pecorelli's

12   deposition; is that right?

13      A.   Yes.

14      Q.   If you jump up to page 184 of your report,

15   the first category under evidential considerations

16   that you have there is diagnosis.  Are you with me?

17      A.   Hold on.  Page 184.  Okay, I have it.

18      Q.   Okay.  Under diagnosis you state that

19   Mr. Pecorelli's pathology reports provide clinical

20   diagnoses of chronic lymphocytic leukemia CLL, a

21   form of NHL, and marginal zone NHL.

22           Do you see that?

23      A.   Yes.

24      Q.   Do you agree with me that CLL was a

25   tentative diagnosis of Mr. Pecorelli's non-Hodgkin's

William Sawyer, Ph.D.

1    lymphoma that was later changed to splenic marginal

2    zone lymphoma?

3        A.   Yes, and I believe I have that documented in

4    my pathology section of the report.

5        Q.   Okay.  So just to be clear, you're not

6    offering any opinions in this case that

7    Mr. Pecorelli in fact had CLL, are you?

8        A.   No.

9        Q.   In forming your conclusions about

10   Mr. Pecorelli's case, you interviewed

11   Mr. Pecorelli's son; is that right?

12       A.   Yes.  His son is a real talker.  He's very

13   verbose.

14       Q.   When did you interview him?

15       A.   January 12th, 2021.

16       Q.   Since he's a verbose guy, maybe the

17   interview was longer than some of your interviews

18   might otherwise be with some of these folks, but how

19   long did you spend interviewing him?

20       A.   As I recall on my invoice, it shows that, I

21   think, it was about one hour, which is not -- you

22   know, it's not significantly longer than most

23   interviews.  I just had to try really hard to keep

24   him focused on the questions.

25       Q.   Was anyone else present during the

William Sawyer, Ph.D.

1    interview?

2        A.   I don't believe anyone was present at his

3    end.  Now, at my end, I believe Jenn was taking down

4    information into my draft report.

5        Q.   And who is Jenn?

6        A.   Jenn Clark is my office manager, and she's

7    also very, very capable of taking information down

8    and typing very rapidly and I rely on her for that;

9    otherwise it's what Jenn refers to as "Bill's

10   scribbles," if I handwrite the notes, and Bill's

11   scribbles, if you ever saw them, are not very

12   comfortable to read.

13       Q.   Let's hope that she was there then for this

14   one.

15            Is the information that Mark Pecorelli

16   provided to you during your interview, in

17   combination with the other materials you reviewed

18   for this case, sufficient, in your opinion, to form

19   your conclusions in Mr. Pecorelli's case?

20       A.   Yes.  Mark Pecorelli was, as I say, very

21   verbose, but had a good recall of everything and

22   stated that he worked with his dad from a very early

23   age.  I probably have that in my summary here at

24   what age, but in his teens.

25       Q.   Is all of the information from your

William Sawyer, Ph.D.

1    interview with Mark Pecorelli that you are relying

2    on in this case contained in some format within your

3    report?

4        A.   Yes, everything that was taken down.  There

5    may be some information that Jenn didn't take down

6    but not much.  I mean, it's pretty thorough.

7        Q.   And you're not intending to rely on anything

8    that Jenn did not take down or that is not in your

9    report from that interview, right?

10       A.   Not that I can think of, no.

11       Q.   One of the things that Mark Pecorelli told

12   you during your interview with him was that there

13   was no running water at Mr. Pecorelli's nursery.  Do

14   you recall that?

15       A.   I do, and I questioned him on that, because

16   there was some information in the deposition or from

17   my interview regarding a well, and again, we're --

18   I'm referring to the property that was, I think,

19   from 1978 to -- well, let me just check the report.

20            At page 19 I have an entry from the

21   deposition that states:  His father rinsed the tank

22   at the well when he was finished spraying.

23            And I need to make it clear which property

24   that was since there were two properties.

25            Yeah.  On -- this is what I ascertained in

William Sawyer, Ph.D.

1    deposition.  On page 22, and I think this answer is

2    the mystery:  Mark reported that there was no

3    running water at the nursery for his father to wash

4    his hands after handling Roundup.  His father had

5    remarked on occasion while eating lunch at the

6    nursery that he was eating Roundup, and they lived

7    about an hour's drive from the nursery, so unless

8    they stopped for dinner on the way home, they didn't

9    wash their hands with soap and running water until

10   they got home.

11        So at the nursery they did not have running

12   water.  I think that's the key.  I think there was

13   water but not running water.  It was not a developed

14   property.

15   Q.   You believe that the water that was on that

16   property was from what?

17   A.   I'm looking.  I don't have it in my report.

18   There was water on the property but not running

19   water, and I recall he said there was a -- was

20   either a stream or a well.

21   Q.   So you think that all of the water on the

22   property came from either a stream or a well?

23   A.   Or carried in, but he -- his father mixed

24   Roundup with water at the nursery in a 55-gallon

25   drum.

William Sawyer, Ph.D.

1    Q.   So he had access to water at the property?

2    A.   My understanding was there was either a well

3    or a stream there which was used.

4    Q.   Which provided access to water?

5    A.   Yes.

6    Q.   Do you recall reading in Mark Pecorelli's

7    deposition that his father washed his hands with

8    soap and water every time after mixing Roundup?

9    A.   Not at the nursery, I don't believe that

10   that was at the nursery, that reference you found in

11   the deposition.

12   Q.   Okay.  Well, let's take a quick look.  I'm

13   going to mark as Exhibit 6 to your deposition Mark

14   Pecorelli's deposition transcript.

15        (Sawyer Exhibit 6 was marked for

16   identification.)

17   BY MS. COPE-KASTEN:

18   Q.   Okay.  On page 231 they are talking about

19   his father mixing the Roundup product.  Do you see

20   that?  Are you with me?

21   A.   Yeah.  As I said, he mixed 20 gallons at a

22   time in a 55-gallon drum at the nursery.

23   Q.   Right, at the nursery, yeah.

24   A.   Yeah.

25   Q.   And if you look at page 231 at line 18,

William Sawyer, Ph.D.

1    question:  Did your father wash his hands with soap

2    and water after mixing the product?

3            Answer:  Yes.

4            Question:  Every time?

5            Answer:  Every time.

6            Do you see that?

7       A.   Yes.

8       Q.   Did you ask Mark Pecorelli about the

9    difference in his information to you in the

10   interview, that his father did not wash his hands

11   until the end of the day, and that testimony under

12   oath that his father washed his hands every time

13   after mixing Roundup?

14      A.   Yes, and the discrepancy -- and I pointed

15   this out in my report -- is that that was at the

16   nursery property that was not developed.

17      Q.   What was at the nursery property that was

18   not developed?

19      A.   Running water.  It's in my report.  He used

20   the term "running water," it wasn't there, did not

21   have a faucet with running water.

22      Q.   Right.  He did have the ability to wash his

23   hands with soap and water, though, because there was

24   access to water at the property?

25      A.   He told me that he didn't, they didn't do it

William Sawyer, Ph.D.

1    until they got home and they -- he had made the

2    comment about eating glyphosate or eating Roundup.

3        Q.   Are you relying on that statement from

4    Mr. Pecorelli in your interview with him as opposed

5    to his sworn testimony under oath that he saw his

6    father wash his hands with soap and water every time

7    after mixing the product?

8        A.   No.  That's impossible to answer that

9    question because the document, the deposition, is

10   not in disagreement with what he told me.  He

11   explained that at the property, it was undeveloped,

12   there was no running water, and his father did not

13   wash his hands with soap and water at all until they

14   got home.

15        But later, when they had the developed

16   property, he washed his hands with soap and water.

17   That's what he told me, that's my understanding, and

18   I don't see where that's in conflict with the

19   deposition.  I don't see --

20        Q.   When did they --

21        A.   Where in the deposition does it say that he

22   washed his hands with soap and water every time at

23   the nursery property?

24        Q.   What are you referring to as the developed

25   property?

William Sawyer, Ph.D.

```
 1       A.   The later property.

 2       Q.   What is the later property?

 3       A.   Let me check my report and get the

 4  terminology right.

 5            Yeah, the nursery was the earlier property

 6  versus the garden center.

 7       Q.   The garden center is a property that they

 8  had for three years before they bought the nursery.

 9       A.   Oh, maybe I have it backwards then.  Let me

10  see.  I have to read my report.  He expanded his

11  landscape business to include plant sales in the mid

12  1970s.  Then in 1978 he opened Windy City

13  Landscaping and Nursery where he raised mature

14  nursery stock.

15       Q.   Why don't you go to page 30 of your report.

16  I think this chart will help you with the years.

17       A.   All right.  Yeah.  The first three years,

18  Retail Garden Center, '75 to '78; and then '78 to

19  2000 is Windy City Landscaping and Nursery, nursery

20  property; and then '78 to 2000 also Windy City

21  Landscaping and Nursery.

22            My understanding was the earlier property

23  was completely undeveloped and had no running water.

24       Q.   Is it your understanding that the Windy City

25  Nursery that Mr. Pecorelli owned and operated from
```

William Sawyer, Ph.D.

1    1978 to 2000 did not have running water?

2        A.   No.

3        Q.   You believe that that property did have

4    running water?

5        A.   I have to refresh my memory.  I'm confused.

6        Q.   Okay.  Why don't we go off the record and we

7    can take a five-minute break for everyone and you

8    can refresh your memory on that and then we'll come

9    back on the record.

10            THE VIDEOGRAPHER:  Okay.  The time now is

11       11:29 a.m., going off the record.

12        (Recess from 11:29 a.m. until 11:35 a.m.)

13            THE VIDEOGRAPHER:  We are back on the

14       record.  The time is now 11:35 a.m.

15   BY MS. COPE-KASTEN:

16       A.   Yes, to answer your question.

17       Q.   Got it.

18       A.   Do you want to reask it?

19       Q.   Is it your understanding that there was

20   running water at the Windy City Nursery property

21   that Mr. Pecorelli operated from 1978 to 2000?

22       A.   Yes.  It's my understanding there was no

23   running water at the nursery, the 29-acre or

24   20-some-acre property that he bought in 1978.

25       Q.   But there was no running water at the

William Sawyer, Ph.D.

1    property from 1978 to 2000?

2        A.    Yeah, and I base that on Mark Pecorelli

3    telling and stating to me that -- he reported there

4    was no water running water at the nursery for his

5    father to wash his hands after handling Roundup, and

6    the rest of that paragraph on page 22 in my report.

7        Q.    Your interview with Mark Pecorelli is the

8    full basis for why you believe there was no running

9    water at that property?

10       A.    That's what he stated in a fair amount of

11   detail on page 22 of my report, second paragraph

12   from the bottom.

13       Q.    Did you ask Mark Pecorelli how they watered

14   the plants at the nursery if they didn't have

15   running water?

16       A.    I did not.  I asked him how they obtained

17   water and I believe he told me either through a

18   stream or a well.

19       Q.    You would agree with me that if they had

20   access to water in order to mix Roundup concentrate,

21   they also had access to water to wash their hands?

22       A.    Yes.  Yes, but again, I have to work as a

23   toxicologist off facts in the case, that is

24   testimony in the deposition, which doesn't answer

25   the question of the running water, and the running

William Sawyer, Ph.D.

1   water which he explained in interview is not in

2   conflict with the deposition, but even if it were,

3   I'm not a person who is going to be judging the

4   accuracy or the truthfulness of the plaintiff.

5   Okay?  I'm not a judge, I'm not a jury, I only have

6   facts in the case to work from, and if Mr. Mark

7   Pecorelli was incorrect in what he told me, I have

8   no way of judging that, and by asking how they've

9   managed to water plants, it's sort of leading me

10  into being a judge and a jury and determining

11  whether he was accurate or not, and I just can't do

12  it.  I have facts in the case and that's what I have

13  to work with.

14      Q.   Do you need to have running water in order

15  to wash your hands?

16      A.   No.

17      Q.   So you would agree with me that

18  Mr. Pecorelli had the ability to wash his hands with

19  soap and water because he had access to water at the

20  nursery from 1978 to 2000?

21      A.   Well, certainly it's possible, but it's not

22  what Mr. Mark Pecorelli stated in interview.  He

23  stated that there was no running water and his

24  father did not wash his hands and he made the

25  comment about, quote, eating Roundup, the Roundup at

William Sawyer, Ph.D.

```
 1    lunch time, and they lived an hour's drive from the
 2    nursery, so unless they stopped for dinner on the
 3    way home, they didn't wash their hands with soap and
 4    running water until they got home.  That's what he
 5    stated.  I mean, I can't change that.
 6        Q.  All right.  I'm just going to, one more
 7    time, bring up Exhibit 6, which is Mark Pecorelli's
 8    deposition.  I'm looking at page 231, starting at
 9    line 18, where he is asked:  Did your father wash
10    his hand with soap and water after mixing the
11    product?
12            He said:  Yes.
13            When he was asked:  Every time?
14            He answered:  Every time.
15        A.  Okay.  But it doesn't state which location.
16    That's the problem here.  You're assuming and just
17    guessing that that's at the nursery location
18    post-1978, and we don't know that from that
19    statement you just read.
20        Q.  Does Mark Pecorelli qualify what property it
21    is here?
22        A.  No.
23        Q.  Based on what are you assuming that it was
24    not potentially the nursery?
25        A.  I'm not speculating on anything.  I'm
```

William Sawyer, Ph.D.

1    referring to page 22 in my report, second paragraph

2    from the bottom, of what he stated in interview, and

3    I can't alter that by speculation or guessing or

4    intuition.

5         I have to take it at face value, and if you

6    cross-examine him and find out that he's wrong,

7    great, but I can't do that.  I mean, how am I going

8    to judge, be the judge and jury?  It's -- what

9    you're asking me is unfair.

10   Q.   Did you ask Mark Pecorelli what property he

11   was referring to when -- let me step back and strike

12   that.

13        Did you read Mr. Pecorelli's deposition

14   transcript before or after you interviewed him?

15   A.   I believe before.

16   Q.   Did you ask Mark Pecorelli what property

17   that statement was referring to when you interviewed

18   him?

19   A.   Yes, and he said no running water at the

20   nursery.

21   Q.   So what property did he tell you this was

22   at?

23   A.   My understanding --

24   Q.   Where his father washed his hands with soap

25   and water every time after mixing Roundup?

William Sawyer, Ph.D.

1      A.   My understanding, his reference to the

2   nursery is the post-1978 property, not the

3   garden center.

4      Q.   What I'm saying is in his deposition, we've

5   just looked at it a couple of times, there was a

6   point where Mr. Pecorelli was washing his hands with

7   soap and water after mixing the product every time.

8   You're telling me that we don't know what property

9   that was at.

10          I'm asking you did you ask Mr. Pec -- Mark

11   Pecorelli, when you deposed him, what property that

12   was at?

13          MS. ABUZERR:   Objection; asked and answered.

14      A.   I asked him specifically whether his dad

15   washed his hands with soap and water when, where,

16   and I also asked about showering, if he knew,

17   showering and bathing with soap and water.   That

18   were -- that were my questions specifically.

19      Q.   Okay.   So you did not ask him what property

20   he was referring to when he said that his dad washed

21   his hands with soap and water after mixing the

22   product every time?

23      A.   I did not ask that specific question.   I

24   asked the standard questions in my interview, and

25   that is about the use of soap and water, washing

William Sawyer, Ph.D.

1    hands after mixing, after spraying, before eating,

2    and when bathing occurred with soap and water,

3    whether it be my shower and bath.  That is the

4    questions I asked.  This is the information I

5    received.

6        Q.    Does washing hands with soap and water

7    matter to your exposure analysis for whether Roundup

8    increases the risk of developing non-Hodgkin's

9    lymphoma?

10       A.    It would certainly decrease the dermal

11   absorption rate on the hands if soap and water were

12   used to wash hands after mixing.

13       Q.    Do you agree that at some property at some

14   point Mr. Pecorelli was washing his hands with soap

15   and water after mixing the product every time?

16       A.    Yes.

17       Q.    How did you factor Mr. Pecorelli's exposure

18   to Roundup if you don't know where that occurred?

19            MS. ABUZERR:  Objection.

20       A.    Well, based on the interview, it did not

21   occur at the nursery.  That's all I can do with it.

22   I mean, I -- by process of elimination, it would be

23   the garden center where he washed his hands, but he

24   -- I didn't ask him that specifically.

25       Q.    Could it have also been at his home?

William Sawyer, Ph.D.

1    A.   I don't believe so.  We -- I questioned him
2    regarding his resident -- the dad's residential
3    exposure in a separate section, which you will see
4    on page -- oh, I -- on page -- page somewhere.
5    Yeah, here we go, on page 21.
6    Q.   So for the purposes of your opinions in
7    Mr. Pecorelli's case, you are assuming that he did
8    not ever wash his hands with soap and water at the
9    nursery property, correct?
10   A.   No, I'm not assuming it.  That's what he
11   said on page 22 of my report, so please don't use
12   such words as "assuming" when I'm relying on what he
13   said in interview.
14   Q.   For the purposes of your analysis, you
15   relied on the fact that Mark Pecorelli told you his
16   father did not wash his hands with soap and water
17   you believe at the nursery property?
18   A.   Correct.
19   Q.   You read for me a short time ago a statement
20   about Mr. Pecorelli saying that he felt like he was
21   eating glyphosate when he was having his lunch at
22   the nursery property.  Do you recall that?
23   A.   Yes.
24   Q.   Do you intend to offer any opinion if called
25   at trial in Mr. Pecorelli's case about

William Sawyer, Ph.D.

1    Mr. Pecorelli's exposure to Roundup or glyphosate

2    from food residues?

3        A.   No, just I'm going to state that he

4    certainly had oral contact by blowing the clogged

5    nozzle with his mouth, but I -- you know, that's the

6    direct oral contact, but as far as consumption of

7    food, you know, the -- probably not.  I haven't made

8    any calculations as to the transfer from hands to

9    food, so probable -- I don't believe I will be.

10       Q.   Just so I'm clear, is the answer --

11            (Telephone ringing.)

12       A.   It's on rollover, so it's gone.

13       Q.   Okay.  Just so I'm clear, is the answer to

14   the food residue is probably not, or is it no, you

15   will not be offering opinions about food residues?

16       A.   No, I haven't really looked at any studies

17   on the transfer rate of Roundup from contaminated

18   hands and holding a sandwich, for example, no, I'm

19   not prepared to do that.

20       Q.   With respect to Mr. Pecorelli blowing with

21   his mouth on the nozzle of the Roundup wand, what is

22   your basis for concluding that he did that?

23       A.   On page -- yeah, here we go.  On page 184,

24   under "Prolonged Acute Exposure and Absorption,"

25   line 4, I wrote:  He also observed his father using

William Sawyer, Ph.D.

1    a pin (without gloves) to routinely unclog sprayer

2    heads as well as blowing on the nozzle with his

3    mouth.

4        Q.   So your basis for stating that Mr. Pecorelli

5    blew on the nozzle with his mouth is your interview

6    with Mark Pecorelli?

7        A.   Yes, his observation, yes.

8        Q.   Do you recall seeing anything about his

9    observation of seeing his father blow on the nozzle

10   with his mouth in his deposition?

11       A.   No.  I don't believe it was asked.

12       Q.   Do you know how many times Mr. Pecorelli

13   blew on the nozzle with his mouth?

14       A.   On page 22, second paragraph:  All of the

15   spraying around the plantings at the nursery was

16   done with a backpack sprayer.  Mark reported that

17   the nozzle would clog frequently.  His father

18   carried a pin with him to clear it out as he

19   sprayed.

20           Frequently, that's the information I

21   received.  It was not a one-time event, it occurred

22   frequently.

23       Q.   But based on that sentence, you're saying

24   that at least some of the times that the nozzle

25   would clog, he cleaned it out with a pin, not blew

William Sawyer, Ph.D.

1    it out with his mouth, correct?

2        A.   My understanding, he had to do both.

3        Q.   Did you make any attempt to quantify how

4    often he blew on the nozzle with his mouth?

5        A.   No.  It wouldn't be useful in dose metric

6    calculations since the studies that offer dose

7    metrics do not include how many times a person

8    unclogged the nozzle with a pin and blew it on their

9    mouth.  In fact, it's -- it simply is a opportunity

10   for direct liquid exposure to the oral mucosa and GI

11   tract, avoiding the dermal absorption factor.

12       Q.   Have you made any attempt in Mr. Pecorelli's

13   case to quantify how significant that opportunity

14   would have been?

15       A.   Yes.  He stated frequently.

16       Q.   What information does frequently give you

17   when you're talking about how much Roundup or

18   glyphosate exposure Mr. Pecorelli had through the

19   oral rate of exposure?

20       A.   It is a exposure route that is not included

21   in studies I've cited in my report, such as

22   Monsanto's in-house study of patch testing of

23   backpack sprayers which showed the highest exposure

24   occurred on the back due to leakage, second exposure

25   was hands, and so forth.

William Sawyer, Ph.D.

 1              And the direct mouth contact with the liquid

 2     on a nozzle is beyond what has been calculated in

 3     the literature, so it represents a more potent and

 4     an unusual form of exposure route.

 5         Q.   But you don't know how much Roundup

 6     Mr. Pecorelli may have been exposed to through the

 7     oral route of exposure?

 8         A.   I'm sorry.  I didn't catch the question.

 9         Q.   But you don't know how much Roundup

10     Mr. Pecorelli may have been exposed to through the

11     oral route of exposure?

12         A.   Yes, I know that it is a quantity of dosage

13     that is not accounted for in the various applicator

14     assessment studies included in my report.

15         Q.   Do you know how close Mr. Pecorelli's mouth

16     was to the nozzle when he blew on it?

17         A.   In contact with it.

18         Q.   Is that something that I can find anywhere

19     in your report?

20         A.   Page 22, paragraph 2, he blew out the nozzle

21     with his mouth.

22         Q.   And you understand blowing to not mean one

23     or two inches away from the nozzle, but actually

24     directly in contact with the nozzle?

25         A.   Yes.  He said that his dad put it on his

William Sawyer, Ph.D.

1    mouth and pressure -- you know, blew pressure

2    through it.

3        Q.   So that, again, is based on your interview

4    with Mark Pecorelli, Mark told you that his dad put

5    the nozzle to his lips and blew on it?

6        A.   He did.

7        Q.   Mark Pecorelli also told you that Roundup

8    solution dripped on his father's hands and down his

9    arms while he worked to unclog the nozzles on the

10   spray bar of his tractor.  Do you recall that?

11       A.   I do but I'm going to turn to it.

12       Q.   It's on page 22.

13       A.   Okay.

14       Q.   And then if you go down to page 184 of your

15   report, you indicate that Mr. Pecorelli's son stated

16   that during use, Mr. Pecorelli contacted Roundup on

17   his hands and forearms along with spray drift.  Do

18   you see that?

19       A.   Yes.

20       Q.   We've talked before about you reading Mark

21   Pecorelli's deposition before you interviewed him.

22   I'm going to show you his deposition again, and this

23   is Exhibit 6 to your deposition.

24           If you look at line 23, it states:  Did your

25   father ever spill the product on himself while

William Sawyer, Ph.D.

1    mixing it?

2         Mark Pecorelli's answer was:  Not to my

3    knowledge.

4         Did I read that correctly?

5    A.   Yes.

6    Q.   Okay.  Then if we go down to page 256 of the

7    same transcript, starting at line 15, Mark Pecorelli

8    was asked:  Did your father ever spray or spill

9    Roundup on his skin while he was applying it?

10        Mark Pecorelli's answer was:  I can't answer

11   that.  I don't know.

12        Did I read that correctly?

13   A.   Yes.  Yes.

14   Q.   Did you ask --

15   A.   Let me answer the question.

16   Q.   Well, my question was just whether I read it

17   correctly, so let me ask you another question and

18   then you can give me an answer here.

19        Did you ask Mark Pecorelli why he stated in

20   his deposition that he does not know whether Roundup

21   ever came into contact with his father's skin but

22   later told you during the interview that his dad had

23   Roundup on his arms and hands?

24   A.   Yes, because in the deposition he's

25   referring to -- the words exactly were "while

William Sawyer, Ph.D.

1    spraying," and the examples that Mr. Pecorelli gave

2    me were not while spraying but while working on the

3    clogged nozzles either on the sprayer or on the --

4    backpack sprayer or the bar sprayer, and that was

5    exposures not during spraying but during repair.

6         So the problem here is whoever took that

7    deposition failed to ask all of the questions.

8    Q.   Well, let's look at page 184 of your report

9    for just a second here.  Do you see the section that

10   says "Prolonged Acute Exposure and Absorption"?

11   A.   I will when I get to it.

12   Q.   All right.  Let me know when you're there.

13   A.   Yes.

14   Q.   All right.  The second sentence there

15   states:  His son explained that during use

16   Mr. Pecorelli contacted Roundup on his hands and

17   forearms along with spray drift.

18        Are you telling me that that refers to when

19   he was unclogging the nozzle from the backpack

20   sprayer?

21   A.   No.  No, that is my question asking about

22   spray drift, did the wind -- did you see your dad

23   contacting spray drift from the wind, and he said

24   yes, on his hands and forearms, and he specifically

25   said that because his dad wore long pants and

William Sawyer, Ph.D.

1    generally a long-sleeved shirt or short-sleeved if

2    it was warm out.

3        Q.   Where -- where in your report does it say

4    anything about him wearing a short-sleeved shirt?

5        A.   Nowhere.

6        Q.   Did you ask Mr. Pecorelli in connection with

7    his statement that when there was spray drift when

8    Mr. Pecorelli was using Roundup in actually applying

9    the product, not just in cleaning out the nozzles,

10   why he told you during the interview that that had

11   occurred when he had previously testified during his

12   deposition that he did not know if Roundup had ever

13   come into contact with his father's skin when

14   applying the product?

15       A.   No, I did not, and I don't recall

16   remembering that statement either, about the

17   noncontact while spraying.  I would have questioned

18   him further if I had recalled that.

19       Q.   Let's do it this way.  The question

20   specifically from the deposition was:  Did your

21   father ever spray or spill Roundup on his skin while

22   he was applying it?

23            Answer:  I can't answer that.  I don't know.

24            When you later asked him about his use of

25   Roundup and he said that there was spray drift, you

William Sawyer, Ph.D.

1    were interpreting that to be different than his

2    answer to his deposition transcript question about

3    spraying Roundup on his skin?

4        A.   No.  No.  What I said is that I don't recall

5    the question on line 15 and the answer on line 17.

6        Q.   Looking at it now --

7        A.   I should have been aware of that but I don't

8    remember being aware of that when I questioned him.

9    I would have gone deeper into my questioning if I

10   was aware of that conflicting statement.

11       Q.   Looking at it now, and agreeing that it is a

12   conflicting statement, which statement do you intend

13   to rely on for the purposes of your assessment of

14   Mr. Pecorelli's exposure to Roundup?

15       A.   That certainly he was impacted with drift.

16   All applicators are impacted by drift unless they

17   use and fabricate a different nozzle that only

18   shoots out a straight stream of liquid.  The aerosol

19   applicators produce a known quantity of drift which

20   has been very well documented in the literature by

21   patch testing on different parts of the body.

22       Q.   To make sure that I understand completely

23   then, you are crediting his son's statement during

24   the interview that his father contacted Roundup on

25   his hands and forearms along with spray drift while

William Sawyer, Ph.D.

1    wearing a long-sleeved denim jumpsuit, and you are

2    not instead crediting his statement that he did not

3    know whether Roundup ever was sprayed on

4    Mr. Pecorelli?

5        A.   No.  In my assessment, I'm relying on him

6    wearing the zippered suit, leather steel-toed boots,

7    eyeglasses, and the generally accepted studies, both

8    the Monsanto in-house study I referred to and I

9    think Connolly and others, who have measured with

10   patch testing the amount of spray drift that occurs

11   during the use of the aerosol sprayer.

12        Now, whether or not he is correct about his

13   statement of not seeing his dad impacted by spray

14   drift doesn't impact my findings at all.  I'm

15   relying on the studies that show it definitely

16   occurs to a known amount of quantity and a known

17   rate of error, and the fact that Mr. Pecorelli

18   testified that he does not recall seeing his dad

19   impacted by spray drift doesn't change that opinion.

20       Q.   If the statement that his son explained that

21   during use Mr. Pecorelli contacted Roundup on his

22   hands and forearms along with spray drift doesn't

23   impact your assessment of Mr. Pecorelli's exposure

24   to Roundup, why is it included in your report?

25       A.   That's not what I said.  I said specifically

William Sawyer, Ph.D.

1    spray drift is what is at conflict.  Clearly, his

2    handling the nozzle, the wet nozzle in his bare

3    hands, mixing the product, those are clearly

4    exposure routes that are confirmed, and we know that

5    when a person mixes the product, based on numerous

6    studies, I've cited a good number of studies, a

7    certain level of materials contacted the skin on the

8    average and is absorbed.  So to eliminate any

9    absorption from his ungloved skin and his hands

10   would be inappropriate.

11       Q.   This sentence of your report that I just

12   read starting with "his son explained" on page 184,

13   when you say Mr. Pecorelli contacted Roundup on his

14   hands and forearms along with spray drift, the only

15   exposure that you are intending to convey is

16   whatever may have gotten on Mr. Pecorelli's hands

17   and forearms while unclogging the nozzle and then

18   separately the spray drift?

19       A.   No.  I'm treating him as a worker with a zip

20   suit, long sleeves, and what has been generally

21   accepted in the literature to penetrate through the

22   sleeves, through the pants, onto the body and

23   absorbed systemically through the skin.  The --

24   (garbled audio) --

25       Q.   No, I understand that.  I think -- I think

William Sawyer, Ph.D.

 1    that that's actually a little bit different than

 2    what I'm asking you.

 3          What I'm trying to figure out is this

 4    sentence in particular, what you are referring to

 5    when you say Mr. Pecorelli contacted Roundup on his

 6    hands and forearms along with spray drift, and I

 7    want to take those two separately because the word

 8    "along with" suggests that we have two different

 9    things.

10          So when we just look at Mr. Pecorelli

11    contacted Roundup on his hands and forearms, what

12    are you referring to when you say that?

13    A.    Contacted the material on his hands while

14    mixing and repairing equipment, because --

15    Q.    What is your basis that he got Roundup on

16    his hands while mixing equipment -- while mixing

17    Roundup?

18    A.    The generally accepted studies on mixing

19    Roundup.

20    Q.    So you don't have any direct evidence that

21    Mr. Pecorelli in fact did contact Roundup on his

22    hands while mixing?

23    A.    The methodology used in the literature is

24    mix or no mix.  Did you buy prepackaged?  Did

25    somebody mix it for you or did you mix it?  And if

William Sawyer, Ph.D.

1    the person mixed it, there is a known amount that is

2    available for systemic absorption during mixing.

3    That's been well studied, and to imply, because of

4    some issue here on questions, that he never absorbed

5    it on his hands is impossible.  It's just a -- not a

6    reasonable scientific hypothesis.

7        Q.   Would it make a difference if he was wearing

8    gloves or not wearing gloves as to how much he would

9    have gotten on his hands while mixing?

10       A.   Yes.

11       Q.   So you would agree with me that it is

12   possible to absorb different amounts or come into

13   contact with different amounts on your hands while

14   mixing depending on conditions?

15       A.   Yes, and I've also documented that in the

16   report -- in my report, based on a number of studies

17   that support and document the POEM method, how much

18   is absorbed on the hands with gloves on versus no

19   gloves.

20       Q.   So to be clear, it's not just mixing is

21   mixing, there are different conditions that can

22   affect how much Roundup someone actually gets on

23   their hands when mixing, you would agree with that?

24       A.   Yes.  It's either gloves or no gloves, that

25   is the criteria.

William Sawyer, Ph.D.

```
1        Q.   If someone mixes Roundup with an agitator as

2    opposed to having water that is sprayed into a drum

3    that the water that fell from the churn from the

4    water mixes the Roundup concentrate, does that

5    change how much Roundup someone gets on their hands?

6        A.   It can worsen it if there is foaming and

7    overflows the container, the backpack, and then

8    drips onto the back.  That can happen.

9        Q.   You would agree with me that Roundup is not

10   the only chemical that Mr. Pecorelli came into

11   contact with during his work as a landscaper, right?

12       A.   Well, certainly.  If you read my report, I

13   document a number of chemicals.

14       Q.   We'll talk about a couple of them.

15   Mr. Pecorelli started working as a landscaper in

16   1953.  Do you recall that?

17       A.   Yes.

18       Q.   Do you recall what year Mr. Pecorelli first

19   used Roundup?

20       A.   Approximately 1975.

21       Q.   You would agree with me that Roundup did not

22   come on the market commercially in the United States

23   until 1974?

24       A.   Yes.

25       Q.   In the roughly 22 years, from 1953 to 1975,
```

William Sawyer, Ph.D.

1    do you know which products Mr. Pecorelli used to

2    eliminate weeds as part of his landscaping work?

3        A.   Not beyond what's in my report, no.

4        Q.   Were there herbicides on the market in the

5    United States between 1953 and 1975?

6        A.   Yes.

7        Q.   Can you name any of them sitting here today?

8        A.   Monsanto 2,4-D would be one.  I'm not sure

9    on some of the others, when they were registered.

10       Q.   Okay.  Let me just ask you as a more general

11   question.  Do you believe that there were herbicides

12   on the market in the United States between 1953 and

13   1975 that were not manufactured by Monsanto?

14       A.   Possibly, but again, I -- for example,

15   paraquat, that could be Monsanto, may not, I don't

16   know, but I'm not sure when paraquat was registered.

17       Q.   You don't know if it was before or after

18   1975?

19       A.   No.

20       Q.   Your information about Mr. Pecorelli's

21   exposure to chemicals in the course of his

22   landscaping business starts in 1975 with his use of

23   Roundup; is that right?

24       A.   Yes.

25       Q.   One of the chemicals that Mr. Pecorelli used

William Sawyer, Ph.D.

```
1    as part of his landscaping business was diazinon.
2    Do you recall that?
3        A.   I do.  That's in my report.
4        Q.   Is diazinon a human carcinogen?
5        A.   Yes.
6        Q.   Did you make any attempt to determine how
7    much diazinon may have contributed to or caused
8    Mr. Pecorelli's non-Hodgkin's lymphoma as compared
9    to Roundup?
10       A.   To the best I could in a relative manner.
11       Q.   Can you elaborate on that?
12       A.   Yes.  I included in my report, in Table 3,
13   first of all, a summary that --
14       Q.   Sorry.  Can you give me -- can you give me a
15   page number, Doctor?
16       A.   Page 28.
17       Q.   Okay.
18       A.   That diazinon is associated with limited
19   evidence of carcinogenicity in humans for
20   non-Hodgkin's lymphoma and lung cancer; evidence in
21   humans is from studies of agricultural exposures in
22   the US and Canada, et cetera; the classification of
23   diazinon is group 2A; was also based on strong
24   evidence that diazinon induced DNA or chromosomal
25   damage, IARC.
```

William Sawyer, Ph.D.

1        So because of that, I certainly did question

2    Mr. Mark Pecorelli with respect to the use of

3    diazinon by his father, and what I learned was that

4    he used it for -- let me turn to the right page.

5    Page 20, actually starting at the end of page 21.

6    He refer --

7        Q.   Page 19?

8        A.   I'm sorry?

9        Q.   Page 19?

10       A.   Yeah, yeah, I mean 19.  I wrote in the last

11   sentence:  For example, two coffee cans, about four

12   pounds, per year after a truck dug a large shade

13   tree out of the ground --

14       Well, that's actually referring to the

15   Surflan and Treflan.

16       Okay.  The next sentence reads:  Mark also

17   recalled that his father used diazinon in pellet

18   form for grubs.  He thought it might be the same

19   thing as Sevin.  It's to kill the bug so it doesn't

20   kill the plant.  His father used Goop hand cleaner

21   and that is what he referred to as a solvent on the

22   Plaintiff Fact Sheet.

23       Okay.  So from this first entry, he stated

24   that his father used it in the pellet form, not in

25   an aerosol spray, and on a later entry, on page 23,

William Sawyer, Ph.D.

1    second paragraph, Mark reported that he himself was

2    usually the one who applied the malathion and

3    diazinon, which were used for bagworms, but he

4    didn't use it very often.  Mark was also the Surflan

5    applicator.  His father did not handle Surflan.  His

6    father used Sevin occasionally for roses.

7              So what else I found is in the deposition on

8    page 27 in my report.  Question:  Okay.  Any other

9    herbicides that you recall using?

10             Answer:  Not that I recall.  He used some

11   for grubs, diazinon, pellet form, it comes out of a

12   spreader.

13             And based upon the deposition of

14   Mr. Pecorelli, he seems to have conflated diazinon

15   with Sevin, which is a little confusing.  In the

16   next paragraph on page 27, question:  Well, I just

17   want to make sure.  When you referenced diazinon

18   earlier, were you thinking of two separate things,

19   diazinon and Sevin insect killer, or were you --

20             Answer:  I think they're together.  This is

21   called diazinon Sevin.

22             And in the next paragraph:  Mark Pecorelli

23   reported personally using diazinon which was for

24   bagworms and he stated that he was the primary user

25   of it as opposed to his father.  He also used it

William Sawyer, Ph.D.

1    infrequently.  More importantly, the use of pellets

2    and a spreader minimizes potential inhalation and

3    dermal exposures compared to an aerosol spray.

4         So that is my assessment, that he did use

5    diazinon but in a relative sense because it was in

6    pellet form, compared to the large volume and

7    frequency of the glyphosate.  Certainly the diazinon

8    was a far lesser agent of exposure compared to the

9    glyphosate primarily because it was in pellet form

10   and there was really no confirmed pathway of

11   exposure from the diazinon other than if he handled

12   it with his bare hands.

13   Q.   Can you quantify for me how much the

14   reduction is from an aerosol spray to pellet form

15   for diazinon specifically?

16   A.   I addressed that in an earlier report and

17   deposition in this matter in the past.  I would have

18   to try to remember which report and deposition but I

19   did reference it with some study evidence, that the

20   pellet form is far less likely to make systemic

21   circulation versus an aerosol of a liquid.

22   Q.   For diazinon specifically?

23   A.   I don't recall if it was specifically

24   diazinon.  It may have been, but the important thing

25   is that -- also is that the diazinon usage he

William Sawyer, Ph.D.

1    testified or -- I don't know if he testified to that

2    in the deposition.

3         Q.   That his father used diazinon?

4         A.   On a -- that his father used it but the part

5    about it being primarily applied by Mark as opposed

6    to his father, and, of course, the frequency being

7    much less than the glyphosate, which was by far the

8    primary chemical used over the years.

9         Q.   I'm happy to pull it up for you if it's

10   helpful to take a look at it.  I will represent to

11   you that Mark Pecorelli did not, in the deposition,

12   clarify the way that you do in your report that he

13   was the one who applied it primarily opposed to his

14   father.

15        A.   I -- I agree with that then.  I think that's

16   right.

17        Q.   So I want to ask you about your statement

18   that Mark reported that he himself was usually the

19   one who applied it as opposed to Mr. Pecorelli.  Did

20   you ask Mark how often usually was?

21        A.   Yes.  He said infrequently, that they didn't

22   use it that often.

23        Q.   Did you ask him how many times they applied

24   diazinon?

25        A.   Yes.  He didn't -- he was not able to give

William Sawyer, Ph.D.

```
 1   me a number.  He --

 2       Q.   Would it --

 3       A.   -- not often, infrequently is what his words

 4   were.

 5       Q.   Do you know how much diazinon exposure an

 6   individual has to have to be at an increased risk

 7   for developing non-Hodgkin's lymphoma?

 8       A.   I'm turning to a study, that is the McDuffie

 9   study.

10       Q.   From 2001?

11       A.   Yes.

12       Q.   All right.  Let's go ahead and mark McDuffie

13   2001 as Exhibit 7 to your deposition, and I'll pull

14   it up here so we can all be looking at it.

15            (Sawyer Exhibit 7 was marked for

16   identification.)

17       A.   If you look at Table 3 on page 1159, for

18   diazinon you will see that the odds ratio with --

19   calculated with strata for the variable of age and

20   province of residence shows an increased odds ratio

21   of 1.72 that was not statistically significant, and

22   a odds ratio under conditions adjusted for

23   statistically significant medical variables of 1.69

24   that was not statistically significant.

25            And then if we look -- well, I would like to
```

William Sawyer, Ph.D.

1    take you to Table 2 but I don't think diazinon is in

2    Table 2.

3        Q.   I don't -- I think Table 3 is insecticides

4    and Table 2 is herbicides.

5        A.   Yeah.

6        Q.   I think diazinon is just in Table 3.

7        A.   Yeah, you're right.  Yeah.

8             Now, I can also take you to the -- we gain a

9    little more information from, I think, the Ericsson

10   study, but let me --

11       Q.   Okay.  Hold on.  Before you take me

12   anywhere, I want to talk about these diazinon

13   numbers.

14       A.   Okay.

15       Q.   What is your conclusion from the fact that

16   there is an unadjusted odds ratio of 1.72 with a

17   confidence interval of 0.92 to 3.19 for diazinon in

18   the McDuffie 2001 study with respect to

19   non-Hodgkin's lymphoma development?

20       A.   Well, the fact that both odd ratios of the

21   adjusted for strata and the adjusted for

22   statistically significant medical variables both

23   show a similar increased odds ratio of 1.72 and

24   1.69, even though they are not statistically

25   significant, that still leads me to consider that in

William Sawyer, Ph.D.

```
 1    the weight of evidence process, along with other
 2    studies.
 3            So I'm not excluding the numbers, as you
 4    would, just because they're not at the 95 percent
 5    level.  I still consider them and --
 6       Q.   I'm going to move to strike your statement
 7    that I would exclude those numbers.
 8       A.   Okay.  I'm sure you would.  They were
 9    glyphosate.  Come on.  You're biased, I'm not.
10            MS. COPE-KASTEN:  Move to strike that answer
11       as well.
12       Q.   With respect to the diazinon here, you would
13    agree with me that there is no quantification, this
14    is just a never/ever use table, right?
15       A.   Yes.  Yes, and so an important point is when
16    the dose goes up, for example, the greater than
17    10-days exposure in Ericsson, that
18    would be an important number to look at because your
19    question -- I think we're in agreement that diazinon
20    can cause NHL.  I think what you're asking me is how
21    potent is it.  That was the question I think you
22    raised.
23       Q.   I'm asking you, first and foremost, in this
24    chart is Table 3 a never/ever use chart that does
25    not attempt to quantify how much exposure to
```

William Sawyer, Ph.D.

1    diazinon the participants had?

2        A.   Correct.   It's a never/ever value and -- but

3    I think your original question was comparing the

4    dosage of glyphosate which he encountered versus

5    diazinon.   I mean, that was the heart of your

6    question, as I understood it.

7        Q.   Yeah.   Maybe we can do this separating

8    diazinon and glyphosate out of this.   Can you name

9    for me two substances that you believe to be known

10   human carcinogens, not glyphosate, not diazinon, two

11   other known human carcinogens?

12       A.   That cause what?

13       Q.   Non-Hodgkin's lymphoma.

14       A.   Oh.   2,3,7,8-TCDB.   That is

15   2,3,7,8-tetrachlorodibenzo para dioxin.

16            And another good example would be ionizing

17   radiation.

18       Q.   Okay.   So if I take an individual who

19   develops non-Hodgkin's lymphoma, and five years

20   prior to developing non-Hodgkin's lymphoma that

21   individual had exposure to ionizing radiation on one

22   occasion, and --

23       A.   On one occasion, it would have to be a

24   Hiroshima radiological exposure.   Normally the

25   radiological exposures are measured in units of over

1    time as opposed to a single dose.

2        Q.   Help me understand that better.

3        A.   Well, you said a one-time exposure to

4    radiation.  In --

5        Q.   I see.  I see.  Let's say they're exposed to

6    radiation for one week.  Is that fair?

7        A.   Okay.  Or 10 years if you want.

8        Q.   Mostly what I'm trying to understand here is

9    if you take two substances that you both believe are

10   capable of causing non-Hodgkin's lymphoma, is it

11   automatically the case that the one to which the

12   person had greater exposure is what you believe

13   could be determined to be the cause of that person's

14   non-Hodgkin's lymphoma?

15       A.   No.  Rather, I look at the study evidence.

16   For example, in the studies I've referenced that

17   offered dose metrics, the studies show thresholds at

18   which the non-Hodgkin's lymphoma occurs at a 95

19   percent level of confidence in the -- by the use of

20   the odds ratio in the confidence interval.

21            I also look at the odds ratio.  For example,

22   McDuffie showed a dose-response effect at control

23   versus greater than one day, less than 10 days, or

24   greater than 10 days, a dose-response was shown.

25   That is the odds ratio increased to, I think in

 1    McDuffie, to, like, 2.36 with a greater than 10-day

 2    exposure.

 3         And in McDuffie, the exposures were based on

 4    the Swedish workday, which is an eight-hour workday.

 5    Q.   In McDuffie they were based on the Swedish

 6    workday?

 7    A.   I'm sorry, Ericsson.  I have that backwards.

 8    In Ericsson it was the eight-hour Swedish workday.

 9         But -- so a dose metric can be used based on

10    those thresholds in the various studies at which

11    statistical significant -- statistically significant

12    odd -- increased odd ratios occurred.

13         And the same would hold true for diazinon,

14    and one can compare the odds ratio for diazinon to

15    that of glyphosate, and also determine the durations

16    of exposure needed to reach those increased odds

17    ratios, and in this case, what I recall from my

18    review of the studies is a reasonably similar

19    potency.

20    Q.   You said one could compare the odds ratios

21    and the duration needed to reach those odds ratios.

22         Did you attempt to do that in

23    Mr. Pecorelli's case specifically with respect to

24    diazinon and glyphosate?

25    A.   I reviewed the studies that are in my report

William Sawyer, Ph.D.

1    that I've referenced, and noted the odds ratios that

2    were for diazinon that are reasonably similar to

3    that of glyphosate given the length of exposure.

4        Q.   Are you able to rule out that diazinon may

5    have caused Mr. Pecorelli's non-Hodgkin's lymphoma

6    as opposed to Roundup?

7        A.   Only in the sense that -- let me open the

8    report.

9             Only in the sense that when we compare

10   Mr. Michael Senior Pecorelli's exposure days using

11   an eight-hour per day metric, he had 492 exposure

12   days, which is about 500 times higher -- well, no,

13   50 times higher than the highest exposure metric in

14   the studies, for example, the greater than 10-day

15   metric in Ericsson or McDuffie.

16            And with respect to diazinon, he used it

17   less frequently, considerably less frequency based

18   upon my interview with Mark Pecorelli.

19            So I am not ruling out diazinon as a

20   contributing factor, it could have been, but

21   certainly at a much lesser risk level than that of

22   the glyphosate simply because of the enormous use of

23   glyphosate.

24       Q.   You're not ruling out that diazinon may have

25   been a contributing factor to Mr. Pecorelli's

William Sawyer, Ph.D.

1    non-Hodgkin's lymphoma?

2        A.    Correct.  It's certainly a minor factor

3    compared to his enormous use of the glyphosate, but

4    there still could be some -- possibly some

5    contribution.

6        Q.    Are you able to rule out that diazinon was

7    the actual cause of Mr. Pecorelli's non-Hodgkin's

8    lymphoma?

9        A.    Based on the statistically significant

10   evidence in the studies, and the calculation of

11   Mr. Pecorelli's eight-hour time-weighted exposure

12   days, certainly his glyphosate exposures very much

13   outweighed his diazinon exposures for two reasons:

14   One, the frequency; and number two, the pellet form

15   which markedly reduced the likelihood of systemic

16   exposure, unless he were to eat the pellets.

17          The pellets are not releasing an aerosol or

18   a gaseous inhalation.  It's in a fairly nonfriable

19   matrix that is spread with a spreader machine, and

20   to try to tell the jury that the diazinon was of

21   anywhere near the caliber of exposure of the liquid

22   Roundup, which he used 50 times more than the value

23   in the highest exposure metric study, would be

24   false, false information.

25       Q.    Oh, absolutely.  I'm not suggesting that he

William Sawyer, Ph.D.

```
 1   used the same amount of diazinon that he used

 2   Roundup.  My question to you is are you able to rule

 3   out that diazinon caused Mr. Pecorelli's

 4   non-Hodgkin's lymphoma?

 5       A.   Well, it's certainly far less likely than

 6   that of the glyphosate.

 7       Q.   Can you rule it out?

 8       A.   Not 100 percent, no.

 9           MS. ABUZERR:  Objection.

10       Q.   You're aware that Mr. Pecorelli also used

11   2,4-D as part of his nursery business?

12       A.   Yes, on Table 2, in my questioning of

13   potential confounding factors, the answer is yes.

14       Q.   I'm sorry, Doctor.  I closed your report

15   again.  What page is Table 2 on?

16       A.   Table 2 is on page 26.

17       Q.   The 2,4-D that Mr. Pecorelli applied in this

18   case was in a liquid form, right?

19       A.   Yes, and it was -- he believes that it was

20   added to the Roundup that was used at the hedge line

21   at the nursery where there were no plants.

22       Q.   Is 2,4-D a human carcinogen?

23       A.   Well, I'll read from you -- page 182 in my

24   report:  Monsanto denies that 2,4-D is

25   carcinogenetic.  Footnote reference 458, Monsanto
```

William Sawyer, Ph.D.

```
 1    states the scientific evidence does not demonstrate

 2    that 2,4-D is carcinogenic in humans.

 3        Q.   I appreciate that.  I'm asking what you

 4    think, Doctor.  Do you think that 2,4-D is a human

 5    carcinogen?

 6        A.   Oh, are you asking me if I think Monsanto is

 7    untruthful in that statement?

 8        Q.   I'm asking you whether you believe that

 9    2,4-D is a human carcinogen?

10        A.   It's not a matter of my belief.  It's a

11    matter of analyzing the available animal studies,

12    human epidemiological studies, mechanistic data,

13    dose-response relationship, coherence between the

14    studies, consistency between the studies, and the

15    postulated or known mechanism of action.  That's how

16    we determine if a chemical causes cancer, as I've

17    done in this case.

18        Q.   Based on your review of all of that for

19    2,4-D, is it your professional opinion as a

20    toxicologist that 2,4-D is a human carcinogen?

21        A.   It is possible at a 2B criteria, that is

22    sufficient information in animals, uncertain in

23    humans.

24        Q.   So your professional opinion is that 2,4-D

25    is a possible human carcinogen?
```

William Sawyer, Ph.D.

1       A.   Yes.  It's an IARC 2B classification.

2       Q.   We were looking at McDuffie 2001 just a

3   moment ago and I'm going to pull it back up again

4   right now.  This is Exhibit 7 to your deposition,

5   and I'm going to take you to Table 2 which we were

6   talking about earlier.  That's the herbicides that

7   are in Table 2, right?  Let me know when you're

8   there.

9       A.   Okay.  I'm in Table 2.

10      Q.   Okay.  Table 2 is showing the relationship

11   between herbicides and non-Hodgkin's lymphoma,

12   right?

13      A.   Yes.

14      Q.   Okay.  Up at the top here, one of the very

15   first ones that's listed, it's the second thing

16   down, is 2,4-D.  Do you see that?

17      A.   I do.

18      Q.   And the authors in the McDuffie paper found

19   that there was a 1.26 odds ratio with a confidence

20   interval of 0.97 to 1.64 for an unadjusted value,

21   and for an adjusted odds ratio they found a 1.32

22   statistically significant result as to whether

23   exposure to 2,4-D increases the risk of

24   non-Hodgkin's lymphoma.

25           Do you see that?

William Sawyer, Ph.D.

1     A.   Yes.

2     Q.   Is this information significant to you in

3   any way?

4     A.   Yes.

5     Q.   How so?

6     A.   It provides evidence from one study that

7   2,4-D may be carcinogenic in humans; but according

8   to Monsanto, it's not.  I'm a little confused.  The

9   manufacturer said it's not carcinogenic.

10         MS. COPE-KASTEN:  Move to strike -- move to

11      strike all testimony after the word "Monsanto."

12     Q.   Is it your opinion that if a manufacturer

13   says something is not carcinogenic, it is not

14   carcinogenic?

15     A.   Well, in the case of Monsanto, I have found

16   their analyses to be untruthful.

17     Q.   Is it your opinion that if something is not

18   carcinogenic according to a manufacturer, that the

19   substance is in fact not noncarcinogenic?

20         MS. ABUZERR:  Objection.

21     A.   In an ideal world where people are honest,

22   you should be able to rely on the manufacturer's

23   assessment.

24     Q.   Did you perform any attempt to quantify

25   Mr. Pecorelli's exposure to 2,4-D?

William Sawyer, Ph.D.

1      A.   The only information I was able to gain was

2   that it was used only periodically when mixed for

3   the fence line border spraying.  It was not commonly

4   used.

5      Q.   You don't know, for instance, during the 24

6   years that he had that product, if he used it 10

7   days a year, you don't know?

8      A.   I don't, and I'm not that concerned about it

9   because it's a 2B classification, and my opinion is

10   it is a possible human carcinogen but it didn't meet

11   the criteria of that of glyphosate as a probable

12   human carcinogen.

13      Q.   That's according to IARC specifically,

14   correct, Doctor?

15      A.   Yes, but it's also consistent with the

16   generally accepted studies and I believe other

17   agencies.

18           MS. COPE-KASTEN:  Could we go off the

19   record, please?

20           THE VIDEOGRAPHER:  The time is now

21   12:41 p.m.  Going off the record.

22       (Recess from 12:41 p.m. until 12:48 p.m.)

23           THE VIDEOGRAPHER:  We're back on the record.

24   The time is 12:48 p.m.

25   BY MS. COPE-KASTEN:

William Sawyer, Ph.D.

1    Q.   Dr. Sawyer, what Roundup products do you

2    understand Mr. Pecorelli to have used?

3    A.   Pro and another -- let me open the file.

4    Page 23, under the paragraph Roundup Products Used:

5    Mark testified that his father always used brand

6    name Roundup.  He used Roundup Pro which does not

7    require a sticker or a surfactant.  Mark Pecorelli

8    found a Roundup Pro label in the trailer at the

9    nursery about a year prior to his deposition and

10   saved it.  He believes that his father removed the

11   label from the container before disposing of it

12   because it had instructions and phone numbers on it.

13   Prior to using the Roundup Pro, they used regular

14   Roundup to which they added a surfactant.  Michael

15   Pecorelli purchased Roundup from the farm service in

16   Woodstock and later from Shermin's Landscaping or

17   Landscape Supplies in Addison.

18        And on page 24 is the Roundup Pro label.

19   Q.   Okay.  I want to start with the, quote,

20   regular Roundup that Mark Pecorelli says his father

21   used.  Do you know what product specifically that

22   was?

23   A.   No.  The best I can do on that is to provide

24   Table 13 on page 56, which provides some of the

25   registration -- EPA registration of products,

William Sawyer, Ph.D.

```
1    Roundup products by date, so I really can't specify

2    with any certainty which one it was.

3        Q.   Okay.  It looks like the EPA registrations

4    for all of these, the earliest one is 1992, which is

5    Roundup Ready-To-Use Weed & Grass Killer.  Do you

6    see that?

7        A.   I do.

8        Q.   And he wasn't -- you don't understand the

9    Roundup regular to have been Ready-To-Use Weed &

10   Grass Killer, do you?

11       A.   Correct.

12       Q.   So aside from those formulations that are

13   listed in Table 13, you don't know which Roundup

14   product Mr. Pecorelli may have used prior to using

15   Roundup Pro?

16       A.   No.

17       Q.   Are you aware of any Roundup brand

18   formulation that does not contain a surfactant?

19       A.   Yes.  The Roundup product that is used along

20   waterways does not contain tallow amine or other

21   surfactants, I don't believe, but I forget the name

22   of the Roundup product.

23       Q.   Do you know when it was registered?

24       A.   No.

25       Q.   Is it a concentrate or a ready-to-use
```

1    product?

2        A.    Concentrate.

3        Q.    Do you know if that's what Mr. Pecorelli was

4    using prior to using Roundup Pro?

5        A.    No, and -- not based on his description

6    of -- no, I don't know for sure, but based on his

7    description of regular leads me to believe it was

8    not the specialized Roundup to be used in wetlands

9    along waterways.

10       Q.    Are you familiar with any product other than

11   that specialized Roundup product to be used in

12   wetlands along waterways that does not contain a

13   surfactant?

14       A.    I'm looking but I don't think I have that in

15   my report.

16             No, I really can't find anything.

17       Q.    Are you relying, for your conclusions in

18   this case, on Mark Pecorelli's statement that his

19   father used a Roundup product that did not contain a

20   surfactant between 1975 and whenever he began using

21   Roundup Pro?

22       A.    Well, I don't believe that the products

23   registered for treating weeds and around water were

24   available back then.  I'm thinking -- it might have

25   been Roundup Provantage or Roundup Bio, and those

William Sawyer, Ph.D.

1    are -- those are newer products.  I don't -- I'm

2    pretty certain they were not in existence prior to

3    that date.

4         The original Roundup contained the

5    surfactants.  I think it's highly -- you know, I

6    don't want to -- I don't want to speculate but I am

7    pretty certain that the Roundup Pro Biactive and so

8    forth were not around, hadn't been registered yet,

9    so I would have to say almost certainly he was using

10   the product with the surfactant in it.

11   Q.   Are you aware of any Roundup product other

12   than the original Roundup that would have been on

13   the market in 1975?

14   A.   No.

15   Q.   Did you ask Mark Pecorelli why his father

16   added a surfactant to the product if there was

17   already a surfactant in it?

18   A.   Maybe.  Let me check.  I know I didn't ask

19   him that question, but I think he may have offered

20   some information.

21        All right.  On page 16:  Mark Pecorelli

22   stated that the original Roundup concentrate that

23   his father used was for industrial use and could

24   only be purchased from the farm service.  The

25   product did not contain surfactant, so his father

William Sawyer, Ph.D.

1    added the sticker, in quotes, (not specified).

2         So according to this statement, then he did

3    use a product without the surfactant and his dad

4    added a surfactant.  So I don't know what that

5    product could be, the name of it, but I agree, based

6    on this, he did use for a period of time, until the

7    Roundup Pro, a nonsurfactant product.

8    Q.   Do you know when Roundup Pro first came on

9    the market?

10   A.   Yeah, I've researched that in the past.  Let

11   me see if I have it in the report.  I think I have

12   one of the earlier labels.

13        I don't have it in my report.  I would have

14   to look back at some of my earlier reports on

15   plaintiffs who used Roundup Pro because I did

16   research the Roundup Pro labels at one time.  In

17   fact, I think I used them in a deposition with one

18   of your colleagues, but I don't remember the year.

19        The other thing that is possible is that the

20   label -- well, this wouldn't tell us the earliest

21   date, but the label that was provided by

22   Mr. Pecorelli could have a date on it.

23   Q.   The date on that one is 2003.

24   A.   Okay.  Well, yeah, and that, of course, is

25   not answering the question really.  So I'm just not

William Sawyer, Ph.D.

1    prepared to answer that question.  I think I have in

2    prior deposition used the earlier Roundup Pro labels

3    that have dates but I just don't have them in this

4    report.

5        Q.   Did you attempt to make any assessment of

6    how long Mr. Pecorelli used Roundup Pro as compared

7    to the other product he was using?

8        A.   No.

9        Q.   But in forming your conclusions in this

10   case, from 1975 until Mr. Pecorelli started using

11   Roundup Pro, he was using a product that did not

12   contain a surfactant?

13       A.   No, not exactly.  He -- he used a product

14   that didn't originally contain a surfactant, but his

15   dad added surfactant to it.

16       Q.   Let me reask the question.

17            From 1975 until Mr. Pecorelli started using

18   Roundup Pro, Mr. Pec -- your understanding is that

19   Mr. Pecorelli used a product that did not contain a

20   surfactant without one being separately added to it

21   by Mr. Pecorelli?

22       A.   Yes.

23            MS. COPE-KASTEN:  I'm going to stop there

24       and turn it over to you, Fatima, if you have any

25       questions for now.

William Sawyer, Ph.D.

```
 1              MS. ABUZERR:  I think I just have one.

 2                      CROSS-EXAMINATION

 3    BY MS. ABUZERR:

 4       Q.   First of all, Dr. Sawyer, it's nice to meet

 5    you.  We haven't formally met.  I'm stepping in for

 6    Rebecca today, so if you thought I looked

 7    unfamiliar.

 8              But, Dr. Sawyer, in your expert opinion to a

 9    reasonable toxicological certainty, was

10    Mr. Pecorelli's exposure to Roundup a significant

11    factor in contributing to his development of

12    non-Hodgkin lymphoma?

13       A.   Yes.  Based upon his nearly 500 eight-hour

14    time-weighted exposure days, he exceeds the

15    thresholds of all of the dose metric studies by a

16    factor of at least 50.  Certainly his many years of

17    heavy Roundup exposure contributed or caused his

18    NHL.  The smoking history is not significant with

19    respect to the NHL based upon studies I've

20    referenced, rather, the cigarette smoking is

21    strongly associated as a cause of follicular

22    lymphoma, which he did not have.

23              He did have some level of exposure to

24    diazinon; however, it was in pelletized, nonfriable

25    form, used infrequently, and did not serve as a
```

William Sawyer, Ph.D.

```
 1    substantial contributing factor, only the glyphosate

 2    did in this matter.

 3            MS. ABUZERR:  Okay.  Thank you, Dr. Sawyer.

 4            THE WITNESS:  Okay.

 5            MS. ABUZERR:  That's the only question I

 6       had, Cali.

 7            THE VIDEOGRAPHER:  Are there any other

 8       questions?

 9            MS. COPE-KASTEN:  Can we go off the record

10       for one moment?

11            THE VIDEOGRAPHER:  Are you completing

12       today's deposition, Cali?

13            MS. COPE-KASTEN:  I'm not sure.  I think the

14       answer is yes but I want to make sure that I

15       don't have any more questions, so just give me

16       one moment, please.

17            THE VIDEOGRAPHER:  Sure.  The time is now

18       1:05 p.m.  Going off the record.

19            (Recess from 1:05 p.m. until 1:06 p.m.)

20            MS. COPE-KASTEN:  Dr. Sawyer, I don't have

21       any further questions for you today.  Thank you

22       very much for your time.

23            THE WITNESS:  Okay.  Always a pleasure.

24            THE VIDEOGRAPHER:  The time is now 1:06 p.m.

25       On the record.  Go ahead, sir.  Sorry.
```

William Sawyer, Ph.D.

1          THE WITNESS:  We're all set.  I just said to

2     Cali that she's great to work with.  I appreciate

3     your professionalism and good attitude.

4          MS. COPE-KASTEN:  Same to you, Doctor.

5     Thank you.

6          THE VIDEOGRAPHER:  The time is now

7     1:06 p.m., February 18, 2021, completing today's

8     deposition.

9          (Whereupon, the deposition concluded at

10    1:06 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

William Sawyer, Ph.D.

```
 1              C E R T I F I C A T E

 2           I, Susan D. Wasilewski, Registered

 3   Professional Reporter, Certified Realtime Reporter,

 4   Certified Manager of Reporting Services, Certified

 5   Realtime Captioner, and Florida Professional

 6   Reporter, hereby certify that the witness named

 7   herein appeared via Remote Counsel/Zoom technology

 8   on Thursday, February 18, 2021, and was duly sworn.

 9           I FURTHER CERTIFY that I was authorized to

10   and did stenographically report the examination of

11   the witness named herein; that a review of the

12   transcript was not requested; and that the foregoing

13   transcript is a true record of my stenographic

14   notes.

15           I FURTHER CERTIFY that I am not related to

16   or an employee of any of the parties, nor am I

17   related to or an employee of any of the parties'

18   attorneys or counsel connected with this action, nor

19   am I financially interested in the outcome of this

20   action.

21           WITNESS my hand this 21st of February, 2021.

22

23   _____

24   Susan D. Wasilewski, RPR, CRR, CMRS, CRC, FPR

25
```

William Sawyer, Ph.D.

```
 1                      LAWYER'S NOTES

 2    PAGE    LINE

 3    _____   _____   _____

 4    _____   _____   _____

 5    _____   _____   _____

 6    _____   _____   _____

 7    _____   _____   _____

 8    _____   _____   _____

 9    _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____

25
```