# EXHIBIT 14

```
 1                UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3

 4   IN RE:  ROUNDUP PRODUCTS         | MDL No. 2741

                                      |

 5   LIABILITY LITIGATION             |

                                      |

 6   ----------------------------------|

     This document relates to:        |

 7                                     |

     Randall Dean Seidl v. Monsanto Co. |

 8                                     |

     Case No. 3:17-cv-00519           |

 9                                     |

     ----------------------------------|

10

11                      -  -  -

12               Monday, March 8, 2021

13                      -  -  -

14

15        This is the Remote Videotaped Deposition of

16   WILLIAM SAWYER, Ph.D., commencing at 9:03 a.m.

17   Eastern Time, on the above date, before Susan D.

18   Wasilewski, Registered Professional Reporter,

19   Certified Realtime Reporter, Certified Manager of

20   Reporting Services, Certified Realtime Captioner,

21   and Florida Professional Reporter.

22                      -  -  -

23            GOLKOW LITIGATION SERVICES

24       877.370.3377 ph | 917.591.5672 fax

25                 deps@golkow.com
```

```
 1    APPEARANCES VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:

 2

 3       BEASLEY ALLEN LAW FIRM

 4       BY:  WILLIAM SUTTON, ESQUIRE

 5            william.sutton@beasleyallen.com

 6       218 Commerce Street

 7       Montgomery, Alabama 36104

 8       Phone: (334) 269-2343

 9       Representing the Plaintiff

10

11

12       WILKINSON STEKLOFF LLP

13       BY:  CALI COPE-KASTEN, ESQUIRE

14            ccope-kasten@wilkinsonstekloff.com

15            CAITLIN CALLAHAN, ESQUIRE

16            ccallahan@wilkinsonstekloff.com

17       2001 M Street, NW, 10th Floor

18       Washington, DC 20036

19       Phone:  (202) 847-4000

20       Representing Defendant Monsanto Company

21

22

23    ALSO PRESENT VIA REMOTE COUNSEL/ZOOM TECHNOLOGY:

24       GABRIEL ARROWWOOD, Videographer

25
```

William Sawyer, Ph.D.

```
 1                     - - -
 2                 I N D E X
 3                     - - -
 4  Testimony of:  WILLIAM SAWYER, Ph.D.          PAGE
 5      DIRECT EXAMINATION BY MS. COPE-KASTEN.......   5
 6
 7
 8
 9
10                E X H I B I T S
11             (Attached to transcript)
12
13   WILLIAM SAWYER, Ph.D., DEPOSITION EXHIBITS      PAGE
14   Exhibit 1   Expert Report                        9
                 Toxicology Consultants & Assessment
15               Specialists, LLC
16   Exhibit 2   Invoice - August 30, 2020           10
                 Professional Services - Seidl vs.
17               Monsanto
18   Exhibit 3   Follow-up Interview with Mr. Randall  18
                 Seidl, March 4, 2021
19
     Exhibit 4   Sawyer Notes (3-4-2021)              45
20
     Exhibit 5   Occidental Chemical Corporation, Inc. 46
21               Facility, Wichita, Sedgwick County,
                 Kansas
22               Fact Sheet, June 2018
23
24
25
```

William Sawyer, Ph.D.

```
 1                        - - -

 2            THE VIDEOGRAPHER:  We are now on the record.

 3       My name is Gabriel Arrowwood.  I'm a videographer

 4       for Golkow Litigation Services.  Today's date is

 5       March 8th, 2021, and the time is 9:03 a.m.

 6            This remote video deposition is being held

 7       in the matter of Roundup, Randall Seidl vs.

 8       Monsanto Company, for the United States District

 9       Court, Northern District of California, MDL

10       Number 2741.

11            The deponent is William Sawyer, Ph.D.

12            All parties to this deposition are appearing

13       remotely and have agreed to the witness being

14       sworn in remotely.  Due to the nature of remote

15       reporting, please pause briefly before speaking

16       to ensure all parties are heard completely.

17            Will counsel please identify themselves.

18            MS. COPE-KASTEN:  Cali Cope-Kasten on behalf

19       of Monsanto.

20            MS. CALLIHAN:  Caitlin Callahan on behalf of

21       Monsanto.

22            MR. SUTTON:  Will Sutton on behalf of the

23       Plaintiff.

24            THE VIDEOGRAPHER:  The court reporter is

25       Susan Wasilewski and will now swear in the
```

William Sawyer, Ph.D.

1      witness.

2          THE COURT REPORTER:  Would you raise your

3      right hand?

4          Do you solemnly swear or affirm the

5      testimony you're about to give will be the truth,

6      the whole truth, and nothing but the truth?

7          THE WITNESS:  I do.

8          THE COURT REPORTER:  Thank you.

9          WILLIAM SAWYER, Ph.D., called as a witness

10     by the Defendant, having been duly sworn, testified

11     as follows:

12                    DIRECT EXAMINATION

13     BY MS. COPE-KASTEN:

14     Q.   Good morning, Dr. Sawyer.  Nice to see you

15     again.

16     A.   Yeah, a short interval here, but yes.

17     Q.   Indeed.  I'll just start out by asking is

18     there anything since the last time that you have

19     been deposed in connection with a Roundup case that

20     you want to change or amend from any of your prior

21     testimony?

22     A.   That's -- that's too difficult of a question

23     without reviewing materials.  I don't know.  I mean,

24     I can't even remember all the depositions in the

25     past two weeks.  I mean, there was about six --

William Sawyer, Ph.D.

```
1      Q.   Fair to say there's nothing -- nothing
2  sitting here today that comes to mind that you are
3  thinking that you would like to change right now?
4      A.   No.
5      Q.   When did you first become involved in
6  Mr. Seidl's case?
7      A.   I will look at my Seidl folder.  It appears
8  that I received some documents on December 2nd,
9  2019.
10     Q.   Was your receipt of documents in December
11 2019 the first time that you were aware of
12 Mr. Seidl's case?
13     A.   Approximately, yes.
14     Q.   Who first contacted you about working on
15 Mr. Seidl's case?
16     A.   Attorney Tomlinson.
17     Q.   Did you know Mr. Tomlinson prior to him
18 contacting you in approximately December 2019?
19     A.   Possibly.  I know -- I worked on a case for
20 Beasley Allen law firm in Alabama.  I'm not certain,
21 though, that I worked with Attorney Tomlinson on the
22 prior case.
23     Q.   Did you work with Mr. Sutton on that case?
24     A.   No, I don't believe so.
25     Q.   Let me back up for a second before I get
```

William Sawyer, Ph.D.

1    into additional questions on substance.  You noted

2    that you were referring to your file for this case.

3    I assume you have with you today the standard file

4    that you normally have with articles and a copy of

5    your report, that kind of thing?

6        A.    Yes.

7        Q.    What materials do you have with you today

8    that are unique for Mr. Seidl's case?

9        A.    Well, I have the Levine Cancer Institute

10   records; Plaintiff Fact Sheet, third amended; I have

11   a study called the "Impact of Glyphosate, Its

12   Metabolites and Impurities," et cetera, by -- the

13   author's name is K-w-i-a-t-k-o-w-s-k-a, et al., from

14   2016; and let's see what else I have in the folder.

15           I have the Robert Jenkins folder, which

16   contains 22 files.  I'm not sure that file belongs

17   in there.  Let's see.  No, I don't even know why

18   that file is in there.  Hmm.  So scratch that.

19       Q.    Is Robert Jenkins a plaintiff in a different

20   matter?

21       A.    Yeah.  The name is familiar and I don't know

22   what the status is on that case.  If that's a Wave 1

23   case, it's gone.  I don't really know.  It's

24   possible something that Attorney Tomlinson sent to

25   me to look at.  I would have to see if I have the

William Sawyer, Ph.D.

1    full file and worked up a report.  It's possible.

2         Let's see what else.  In that folder I also

3    have Robert Helms, who is another plaintiff, and

4    Lloyd Martin.  So I think these are other cases I've

5    worked up.  Jenkins definitely comes to mind.

6         And then I have the deposition of Randall

7    Dean Seidl, and the deposition of Laurinda K. Seidl;

8    OxyChem location.PDF; Federal scheduling order

9    revised; a Seidl vs. Monsanto Sawyer report; invoice

10   for professional services, Seidl vs. Monsanto;

11   Randall Seidl deposition testimony; Occidental

12   Chemical Corporation facility, Wichita, Sedgwick

13   County, Kansas, Fact Sheet, June 2018; Oxy

14   groundwater potential VOCs IARC carcinogen

15   classification; and I have IARC carcinogen

16   classification for our US EPA rating; and then

17   follow-up interview of Mr. Seidl from March 4th,

18   2021.

19       Q.   You conducted multiple interviews of

20   Mr. Seidl in connection with this case, right?

21       A.   It looks like two.

22       Q.   The second was on March 4th, 2021?

23       A.   Yes.

24       Q.   Correct?

25       A.   Right.

William Sawyer, Ph.D.

```
1        Q.   When was the first?

2        A.   I have to look at the report.

3        Q.   While we're looking, I'm going to go ahead

4   and mark your report as Exhibit 1 to this case.

5             (Sawyer Exhibit 1 was marked for

6   identification.)

7        A.   The interview was on January 30th, 2020.

8        Q.   I'm just going to pull this up here so that

9   I make sure that we've got the right thing.  This

10  is -- this is the report that you are referring to

11  when you say you're looking at your report in this

12  case?

13       A.   Let me check what I have.  I can't check

14  mine because that's taking up the full screen.

15  Maybe I can -- okay.  All right.  Let's try that

16  again, that overlay.

17       Q.   Okay.  One second.

18       A.   All right.  Now, back up to the beginning.

19  The only thing is, I wanted to see side-by-side.

20  I'm trying to reduce the size of the image.  View

21  options, let's try that.  Exit full screen.  Okay.

22  There you go.  Now I can arrange that.

23            All right.  So if I put yours here, and mine

24  next to it, yeah, that's it.

25       Q.   Perfect.  You did not amend or update your
```

1    report after your March 4th, 2021 interview of

2    Mr. Seidl; is that correct?

3        A.   No, but I do have some new documents.  I did

4    a follow-up interview with him.

5        Q.   Yeah, we'll take a look at the notes that

6    you made in connection with that and mark those as

7    an exhibit at some point today.

8            (Sawyer Exhibit 2 was marked for

9    identification.)

10   BY MS. COPE-KASTEN:

11       Q.   I'm going to mark as Exhibit 2 to the

12   deposition the invoice that I have received from

13   Mr. Sutton's office in connection with the Seidl

14   matter.  You can see this is from Toxicology

15   Consultants & Assessment Specialists, LLC, invoice

16   dated August 30th, 2020, in connection with Seidl

17   vs. Monsanto.  Are you familiar with this?

18       A.   Yes.

19       Q.   Is this the only invoice that you have

20   submitted to the Beasley Allen firm in connection

21   with your work on the Seidl matter?

22       A.   No.  I have, I think, an invoice submitted

23   for the deposition and I haven't prepared my final

24   invoice for work I did since December 5th -- or not

25   December 5th, whatever the date was.

William Sawyer, Ph.D.

1      Q.    So between August 30th, 2020, and today,

2  March 8th, 2021, you have performed additional work

3  on the Seidl matter that you have not yet invoiced

4  Beasley Allen for?

5      A.    Right.

6      Q.    Do you have an estimate as to how much time

7  you spent during that window?

8      A.    I'm not sure.  Let me look and see.  This

9  invoice, I need to be able to turn pages or open my

10  own version.

11      Q.    Do you have a copy of this with you today in

12  your file?

13      A.    I think so.  I just mentioned one when I

14  looked at it.  Let's see.

15      Q.    Why don't you go ahead and open that one and

16  if it looks materially different to what we just

17  looked at, we'll figure out what to do, but if that

18  looks the same as the date that we were just looking

19  at for this one, feel free to refer to your own

20  copy.

21      A.    All right.  I don't know what's going on.

22  Everything is full screen now and I can't seem to

23  reduce it.  There we go.  I reduced it.  Okay.

24          So go back to the file.  Okay.  And Invoice

25  2/17 -- actually, it's dated February 16th, 2021.

1    Yeah, that's just for the deposition fee.  Yeah, I

2    haven't prepared a final invoice yet.

3         Q.   Even though you have not prepared the final

4    invoice yet, do you have at least a ballpark of how

5    much time you've spent between the end of August

6    2020 and today working on the Seidl matter?

7         A.   I would have to estimate probably 10 or 12

8    hours.

9         Q.   Part of that time was spent talking to

10   Mr. Seidl on March 4th, 2021?

11        A.   Yes.

12        Q.   How long did you spend speaking with him on

13   March 4th?

14        A.   Oh, 10 or 15 minutes, very brief.  I just

15   had a few follow-up questions.

16        Q.   Is any additional time that you've spent

17   working on this matter between the end of August

18   2020 and today, setting aside the deposition fee,

19   work that you are intending to bill at your standard

20   rate?

21        A.   Yes.

22             MS. COPE-KASTEN:  Will, I'm just going to

23        request that whenever Dr. Sawyer does invoice

24        your office for that additional time, that we

25        receive a copy of the invoice, please.

William Sawyer, Ph.D.

```
 1          MR. SUTTON:  Certainly.

 2   BY MS. COPE-KASTEN:

 3      Q.   Have you, Dr. Sawyer, at any point during

 4   your work on the Seidl matter, spoken with Dr. Boyd,

 5   Dr. Barry Boyd in connection with this case?

 6      A.   Yes.

 7      Q.   When did you speak with Dr. Boyd in

 8   connection with the Seidl matter?

 9      A.   Last week.

10      Q.   Was there an attorney present?

11      A.   Unless I'm confusing it with another case.

12   I did speak with him last week and I believe we had

13   some discussions regarding this case.

14      Q.   Do you recall what you talked with Dr. Boyd

15   about?

16      A.   I believe I talked to him about my research

17   and review of the Vulcan site where Mr. Seidl was

18   employed for about a year-and-a-half.  He had some

19   questions and wished to speak with me and so I gave

20   him a call, and I needed to talk to him anyway on

21   another matter.

22      Q.   What was the nature of his questions about

23   the Vulcan site?

24      A.   Well, he asked questions about what type of

25   plant it was, what materials were released, where
```

William Sawyer, Ph.D.

1    Mr. Seidl was located in the plant.  He had some

2    questions regarding his facility he worked in and

3    whether he was near the production facility, and

4    what chemicals were released by the plant into the

5    environment.

6        Q.   Were you able to answer all of the questions

7    that he had for you?

8        A.   Yes.

9        Q.   Do you recall about how long you spent

10   speaking to him?

11       A.   I think on that call we talked about two

12   different cases, so, no, I can't really distinguish

13   how much of the call was attributed to the Seidl

14   matter versus the other matter.  Total length of the

15   call was probably 20 minutes.

16       Q.   Is that the only time that you've talked to

17   Dr. Boyd in connection with Mr. Seidl's case?

18       A.   Yes.

19       Q.   Have you spoken with Mr. Petty in connection

20   with Mr. Seidl's case?

21       A.   No.

22       Q.   Have you reviewed Mr. Petty's report in the

23   Seidl matter?

24       A.   No.

25       Q.   Have you reviewed Dr. Boyd's report in the

William Sawyer, Ph.D.

1    Seidl matter?

2        A.   No.

3        Q.   Have you spoken with any other expert

4    witness for the plaintiffs other than your

5    conversation with Dr. Boyd last week in connection

6    with the Seidl matter?

7        A.   Not in connection with the Seidl matter, no.

8        Q.   When you spoke with Dr. Boyd and answered

9    his questions about the Vulcan site, did you give

10   him your opinion as to how any potential exposures

11   at that site affected or did not affect Mr. Seidl's

12   risk of developing cancer?

13       A.   Yes.  I think I explained to him in summary

14   that there was groundwater plume contamination and I

15   had segregated out what we call the VOCs, that's V

16   as in Victor, OC, meaning volatile organic

17   chemicals, and explained to him that the research

18   data showed that there was a plume; however, the --

19   what we call the permeation and penetration of

20   volatiles inside the building structures occurred at

21   the production area.  There was no evidence of any

22   infiltration of volatiles in the office building up

23   near South Ridge Road, and that the volatile

24   chemicals, I think I may have briefly listed what

25   they were, and I explained that there are also

William Sawyer, Ph.D.

1    nonvolatile or semi-volatiles compounds, such as

2    2,4-D and 2,6-D, and other chemicals that did not

3    have the propensity of forming a vapor atmosphere

4    inside building structures that were, hence, slab

5    built on groundwater; and I think I may have went as

6    far as even explaining that VOCs have the propensity

7    of finding cracks in concrete floors or holes that

8    are drilled through pipes and so on, and there can

9    be some release of volatile VOCs, but in this case

10   it's been well studied by the EPA and other

11   contractors that the concern was that of buildings

12   in the production area.

13        I think I also explained that I did a Google

14   map quantitation and that the office building which

15   Mr. Seidl worked was about a quarter mile from the

16   production facility, and also explained that he

17   worked entirely inside the office building, not the

18   production area, and that he estimates he only went

19   outside perhaps 20 times during his year-and-a-half

20   career and those were for very brief moments, and it

21   was the habit of the way his operation worked that

22   if someone came from the production area, they came

23   to his office as opposed to him going to the

24   production area, as his job entailed ordering

25   supplies and handling the paperwork.

William Sawyer, Ph.D.

1    Q.    Did Dr. Boyd express any opinion back to you

2    about the information that you had shared regarding

3    the VOCs in that area?

4    A.    Well, I think we briefly, very briefly

5    talked about what the VOCs in the groundwater were,

6    and I pointed out that there are some in the

7    groundwater associated with NHL, but the exposures

8    in the surrounding office buildings were not

9    considered as at risk by EPA, that the work that was

10   done to prevent VOC intrusion were in the production

11   area and I think EPA had documented that there was

12   still one building in the production area that could

13   have a VOC penetration problem.

14   Q.    When you interviewed --

15   A.    I think I also gave him an example in terms

16   of quantifying dose, and I used the example of

17   benzene, and I stated to him that even if benzene

18   was at the OSHA limit in his office, which there's

19   absolutely no evidence of any benzene in his office,

20   but even if it had been at the OSHA standard of

21   1 ppm, knowing that the literature requires about

22   19 ppm exposure-years, and that Mr. Seidl did not

23   work for 19 years but, rather, only 1.5 years, that

24   his exposure would have to be 10 or 15 times above

25   the OSHA standard to reach that 19 ppm threshold

William Sawyer, Ph.D.

1    that is associated with a statistically significant

2    increase of hematopoietic malignancies, and I told

3    him based on my assessment, there is no significant

4    risk evident for Mr. Seidl and any such discussions

5    of that would be mere speculation.

6        Q.   Aside from the example you used with

7    Dr. Boyd of benzene, were there any chemicals at the

8    production facility that you felt were present at a

9    high enough level that they could have presented a

10   risk for Mr. Seidl given the duration of his

11   potential exposure, if any?

12       A.   Not in his workplace, no.  If he worked in

13   the production area, then there are increased risks

14   because there is documentation that the VOCs made it

15   inside to the buildings, and then each chemical

16   would have to be assessed, and the potency of these

17   chemicals vary.  Vinyl chloride has a higher potency

18   than benzene, for example.

19            (Sawyer Exhibit 3 was marked for

20   identification.)

21   BY MS. COPE-KASTEN:

22       Q.   I'm going to mark as Exhibit 3 to your

23   deposition your notes from your follow-up

24   conversation with Mr. Seidl on March 4th, 2021.

25       A.   All right.  I have that open.

William Sawyer, Ph.D.

```
 1        Q.    Okay.  What prompted you to talk to

 2    Mr. Seidl again on March 4th?

 3        A.    I had some questions.  One of my questions

 4    had to deal with whether or not he was on public

 5    water throughout his residency, which dates back to

 6    I think about age 10, or earlier, actually, and also

 7    some other minor questions about his workplace.

 8        Q.    What was the significance to you of whether

 9    he was on public water as opposed to well water?

10             (Telephone ringing.)

11             THE WITNESS:  That should have been put on

12         rollover.

13             To prevent such interruptions, I'm going to

14         take just one minute, if even, and put this on

15         rollover.

16             MS. COPE-KASTEN:  That's fine.  We can go

17         off the record.

18             THE VIDEOGRAPHER:  The time is 9:33 a.m.,

19         off the record.

20             (Recess from 9:33 a.m. until 9:34 a.m.)

21             THE VIDEOGRAPHER:  The time is 9:34 a.m., on

22         the record.

23    BY MS. COPE-KASTEN:

24        Q.    Dr. Sawyer, what was the significance to you

25    of whether Mr. Seidl was on public water versus well
```

William Sawyer, Ph.D.

```
 1    water when he was living in Kansas?
 2        A.   My research indicated that Wichita, the city
 3    of Wichita, has a tetrachloroethylene plume
 4    underneath it from several dry cleaning operations,
 5    and that the public water was free of trichloro --
 6    or tetrachloroethylene; however, well water in some
 7    cases contained, depending on the depth of the well,
 8    low levels of tetrachloroethylene and what I learned
 9    was that from age 10, approximately 1966, they were
10    on well water at ████████████████████, and at
11    that time he believes ever since that time he's been
12    on public water.
13        Q.   Could his exposure to whatever chemicals
14    were in well water between the ages of zero and 10
15    have impacted his risk of developing cancer
16    subsequently?
17        A.   There's no evidence of any groundwater
18    contamination between ages zero and 10.
19        Q.   When did the groundwater contamination issue
20    start in this area?
21        A.   Much later.  I don't know the exact year,
22    but much later, from what I read.
23        Q.   You also asked Mr. Seidl about his physical
24    location at the plant that he was working at when he
25    was working for the Occidental Chemical Corporation,
```

William Sawyer, Ph.D.

1    right?

2        A.    Yes.   I had previously interviewed him and

3    established where his office was and I used, after

4    that interview, Google's map to locate his office

5    and the production plant area, and I wanted to talk

6    to him about that and lay out some landmarks, for

7    example, how many feet from the road, because what I

8    believe he described to me is the building that is

9    right along South Ridge Road, and he confirmed to me

10   that it is, and he described the parking lot, which

11   also fit the Google Earth image, and he explained

12   walking to the main office, no matter where he

13   parked in the lot, would be under 100 feet away.

14       Q.    What was the importance of that information

15   to your assessment of Mr. Seidl's risk of developing

16   non-Hodgkin's lymphoma?

17       A.    Simply the distance of his office from the

18   production plant.   I wanted to make sure my

19   measurement was accurate.

20       Q.    Why was that measurement important to you?

21       A.    Well, if he worked in the production plant,

22   or if his office was at the production plant, he

23   would have had exposures to volatile organic

24   contaminants.

25       Q.    You noted that Mr. Seidl was not aware of

1    whether the facility was on well water or public

2    water, correct?

3        A.    Yes.   That's what I stated, yes.

4        Q.    Did you attempt to do any further

5    investigation into whether the facility was on well

6    water or public water?

7        A.    Through just general searches I've prepared

8    on the matter, EPA data and so on.  I could not find

9    any information on that.

10       Q.    Would it have mattered to you if Mr. Seidl

11   was on well water at the facility rather than public

12   water?

13       A.    It depends on the concentration of

14   carcinogens within the well water.

15       Q.    Do you know what that concentration was for

16   any well water that would have been in that area?

17       A.    My review showed there was no known potable

18   water wells in that area, just test wells,

19   monitoring wells.  Also, the depth of the wells were

20   critical, too, in terms of if there had been --

21   let's just speculate and say there was a drinking

22   water well.  The depth of that well is critical in

23   determining whether or not it would have picked up

24   any contaminants from the upper aquifer.

25       Q.    Why did you ask Mr. Seidl whether he knew if

William Sawyer, Ph.D.

1    the facility was on well water and then conduct

2    subsequent searches about whether there were levels

3    of carcinogens in the well water if your belief was

4    that there were no potable wells in the area?

5       A.   Well, because I didn't know that for sure.

6    I asked him questions and then I performed

7    additional research looking for any evidence of

8    potable wells or testing of potable water wells by

9    EPA or other agencies, and there is just no evidence

10   of such.

11          Remember, my job is a toxicologist.  I'm not

12   an advocate as you are.  My job is to find out what

13   he was exposed to and whether or not what he was

14   exposed to had any association with his NHL, and

15   well water can be a source of contamination causing

16   NHL, so I, of course, researched that.

17          MS. COPE-KASTEN:  Move to strike "as you

18      are" from that answer.

19      A.   Well, all attorneys are advocates.

20      Q.   Why --

21          MS. COPE-KASTEN:  Move to strike that as

22      well.

23      Q.   Why did you not include this information

24   when you originally prepared your report for

25   Mr. Seidl's case?

```
 1      A.   I performed additional research since that

 2   time.

 3      Q.   What caused you to perform additional

 4   research into this particular topic?

 5      A.   Just looking, digging through EPA websites

 6   trying to characterize -- further characterize the

 7   nature of the Vulcan operation, its history, when it

 8   opened, what chemicals it processed over the years

 9   and so on.

10      Q.   Is that research that you could have done

11   prior to preparing your report in August 2020 for

12   the Seidl case?

13      A.   It's possible.

14      Q.   Why did you begin looking further into

15   information about the Vulcan facility after

16   submitting your final report in this matter to

17   Mr. Tomlinson and the Beasley Allen firm?

18      A.   Well, back in August, when I prepared my

19   report, I was not finding much on the Vulcan plant,

20   and I just continued digging and looking and finding

21   what I could.

22      Q.   But you have not prepared any changes to

23   your report based on that further information that

24   you looked at?

25      A.   That's right.
```

William Sawyer, Ph.D.

```
 1      Q.   When you interviewed Mr. Seidl in January

 2  2020, how long did you speak to him?

 3      A.   If you could call up my invoice, that

 4  probably would show it.

 5      Q.   Give me one moment.

 6           I appreciate your precision.  It looks like

 7  you spent .76 hours speaking with him?

 8      A.   Well -- oh, there it is.  Yes.

 9      Q.   What did you talk with Mr. Seidl about

10  during that occasion?

11      A.   Well, I can try to refresh my memory by

12  opening my report.  Let's see.

13           Well, I remember going through his

14  residential history and determining whether the --

15  well, asking him whether any of the properties were

16  adjacent to gasoline service stations, if he knew if

17  some of -- if there was any knowledge of any tank

18  removals or under -- leaking underground storage

19  tanks, asked him if he lived near any industrial

20  sites, toxic waste sites or Superfund sites.  I --

21      Q.   Did he tell you -- let me stop you just

22  there for one moment.  Did he tell you at that time

23  that he lived near a Superfund site when he was in

24  Kansas?

25      A.   No.  He said he did not live near one.
```

1    Q.   Okay.  Please continue with what else you

2    talked to him about.

3    A.   I discussed with him his history of using

4    any type of tobacco products, smoking.  He admitted

5    he used marijuana in college, and not since; that he

6    drinks around five alcoholic beverages per week for

7    the past 15 years.  I asked him to give me a full

8    alcohol history from college days on forward, and he

9    said he drank a bit more when he was in South

10   Africa, I think seven drinks a week.

11        He's never been diagnosed with obesity.  His

12   maximum weight was 194 pounds.  There are many

13   questions on my Table 2 and I went through those

14   questions with him in detail.  In other words, I

15   don't just ask what is your family medical history.

16   I ask specifically what the medical history is

17   regarding any type of malignancies, especially in

18   the first generation relatives, and, of course, the

19   alcohol history, smoking history, drugs of abuse.

20        I asked him his weight over time, what it

21   was from college days on forward, the maximum

22   weight, to determine if he was obese at any time and

23   for how long.  We spoke about prior pharmacologic

24   regimens, and all of those things on Table 2.

25        And then there are things beyond that I

William Sawyer, Ph.D.

1    spoke to him about in deposition, such as his use of

2    products for gardens or lawns or outdoor products

3    that -- other than Roundup, and he did use

4    MiracleGro, which is actually a harmless product but

5    I include it in my list as a dummy question.

6          And he used Amdro, which is a common ant

7    killer for fire ants.  He used a lawn service but

8    does not know what chemicals they used.  His

9    grandfather had a farm.  I asked if he was exposed

10   to any products, any chemicals, whether or not the

11   farm had a pesticide rope that the animals would

12   walk under releasing pesticide on the back of the

13   animal, and he said he wasn't aware of such and he

14   never worked on the farm but he just visited there.

15         I talked to him about his early days as the

16   body shop cleanup guy, and he gave me some details

17   on that information, and we went forward with his

18   occupational history.  That's where I learned he

19   worked as a purchasing agent for Vulcan in 1979 for

20   about a year-and-a-half, and he stated he was never

21   exposed to the chemicals as he worked in the office

22   with the majority of his time spent on the phone,

23   and that his office building was a quarter mile from

24   the plant.

25         And I questioned him about the respirator

William Sawyer, Ph.D.

```
 1    and I also asked him more about the respirator on
 2    the follow-up interview, and clearly he stated it
 3    was a requirement to have it with you outdoors in
 4    case there had been an excursion, explosion or some
 5    type of release of chlorine gas, which he said never
 6    occurred during his employment.
 7         Q.   Can I ask you a quick question about that?
 8         A.   Yes.
 9         Q.   Would there be any risk at all to him of
10    getting exposure to even low levels of chlorinated
11    chemicals in the air around the plant short of an
12    emergency that would require him to wear a
13    respirator?
14         A.   Well, if the air levels were high enough and
15    he worked for maybe 10, 20, 40 years, but remember,
16    the assessment of carcinogen he -- what I learned in
17    the follow-up interview, one of the questions I
18    asked him, specifically for that reason you're
19    asking me now, he did say he had gone outside about
20    20 times.  So I asked him why did you go outside and
21    for how long, and his time outside was generally
22    five minutes or less.
23              So 20 times 5, that's about 100 minutes
24    total exposure in the entire time he worked there.
25    It would -- again, if you use benzene as an example,
```

William Sawyer, Ph.D.

```
1    to reach 19 part per million benzene-years in one
2    hour, that would be an explosive limit of benzene.
3    His air would have had to have been saturated with
4    it.  There is just no evidence of any air emissions
5    in his area of the plant up near Ridge Road that I
6    could find in the EPA assessment.
7         So, again, it would be pure speculation.
8    Q.   When you talked with Mr. Seidl about whether
9    he lived near any Superfund sites, and he told you
10   that he did not live near any that he was aware of,
11   did you know that there were Superfund sites near
12   any of his residences?
13   A.   I was aware that there were Superfund sites
14   around Wichita, but he was very clear that he lived
15   in a residential area, not near any Superfund sites,
16   and, you know, when I was the toxicologist in New
17   York State, in Onondaga County, that's Syracuse, New
18   York, we had 23 Superfund sites in that county.  The
19   county residents in Syracuse numbered about half a
20   million.  That half million people did not have
21   exposure to Superfund sites.
22        I worked on cases in New York State where
23   there were kids riding mini bikes and motorcycles on
24   top of the Superfund site, stirring up the dust
25   containing the PCB's.  Those kids had exposure.
```

William Sawyer, Ph.D.

1          So just the near presence of a Superfund

2     site near a city, that does not equal exposure, and

3     if you lived in close proximity to it, I would have

4     carried out a further assessment, but he did not

5     live adjacent to or close by to a Superfund site.

6          Q.   Did you do a separate assessment of whether

7     each of his residences in Overland Park, in Olathe,

8     in San Antonio, and in Charlotte, to determine

9     whether they were near Superfund sites?

10         A.   No, but I did ask Mr. Seidl, Seidl.

11         Q.   Have you spoken with any of Mr. Seidl's

12    family members?

13         A.   I'm looking to see if I have any notes

14    regarding Laurinda being on the call.  I don't

15    believe she was but I'm checking.

16         No, there was -- no, that was the

17    deposition, actually.  I don't recall her being on

18    the call.

19         Q.   So the answer is no, to the best of your

20    recollection, you've not spoken with any of

21    Mr. Seidl's family members in connection with this

22    case?

23         A.   Correct.

24         Q.   Have you spoken with any of Mr. Seidl's

25    treating physicians in connection with his case?

William Sawyer, Ph.D.

1       A.   No.

2       Q.   Have you reviewed the deposition transcripts

3   of any of his treating physicians?

4       A.   No.

5       Q.   I didn't see them on your Materials

6   Considered List but I just wanted to confirm.  Did

7   you say no?

8       A.   No, I have not.

9            MS. COPE-KASTEN:  Why don't we go ahead and

10       take about a three-minute break and come back at

11       the top of the hour.

12            THE WITNESS:  Okay.

13            THE VIDEOGRAPHER:  The time is 9:57 a.m.,

14       off the record.

15         (Recess from 9:57 a.m. until 10:02 a.m.)

16            THE VIDEOGRAPHER:  The time is 10:02 a.m.,

17       on the record.

18   BY MS. COPE-KASTEN:

19       Q.   Dr. Sawyer, I want to ask you a couple of

20   questions about some specific pieces of your report.

21   I'm going to put it up on the screen here but you

22   should feel free to go to your own copy if that's

23   easier for you to navigate around.

24            The first question that I want to ask you is

25   on page 7, and I think that this is just a typo but

William Sawyer, Ph.D.

```
1     I want to make sure that we're on the same page.
2            Looking at the top of page 7, the first
3     paragraph, are you there?
4     A.   Yes.
5     Q.   The sentence that starts "By
6     immunohistochemistry," am I correct that that should
7     read:  The large atypical lymphoid cells were
8     positive for CD20, BCL-2, BCL-6, CD10, CD5, and
9     showed an approximate 60 percent proliferation by
10    Ki-67 tumor cells negative for cyclin D1 and p53?
11    A.   Yeah, that should be CD20 and CD20.
12    Q.   And also cyclin D1?
13    A.   Let's see.  Cyclin D1, yes.
14    Q.   On the top of page 15 of your report, you're
15    talking about the deposition transcript of Laurinda
16    Seidl, do you see that?
17    A.   Yes.
18    Q.   One of the things that you report that she
19    indicated was that when Mr. Seidl got his NHL
20    diagnosis, he lost a lot of weight and became very
21    frail and thin.
22           Do you see that?
23    A.   Yes.
24    Q.   Do you intend to convey that information to
25    the jury?
```

William Sawyer, Ph.D.

1    A.   No.  My concern was whether or not he was

2    severely obese as a potential risk factor.

3    Q.   We can agree that Mr. Seidl was overweight

4    by virtue of his BMI but was not obese at the time

5    of his diagnosis, correct?

6    A.   That's right.

7    Q.   Do you know that Mr. Seidl had follicular

8    lymphoma specifically as a subtype of non-Hodgkin's

9    lymphoma?

10    A.   Yes.

11    Q.   Are you aware of any study showing a

12    statistically significant association between

13    glyphosate or Roundup and follicular lymphoma

14    specifically?

15    A.   Only to the extent that there is a study

16    that shows an apparent increased risk but it was not

17    statistically significant, and if I were to go to

18    that study, I think I recall that it was close to

19    significance but it didn't make the cutoff at P .05,

20    that it's a 95 percent confidence limit, and I

21    should point out --

22    Q.   Is that --

23    A.   -- point out that follicular lymphoma occurs

24    at a much lower frequency than DLBCL and, thus, the

25    type 2 error within those epidemiological studies is

William Sawyer, Ph.D.

1    rather high simply because of the lower number of

2    cases in the background population.  There isn't as

3    many cases to statistically analyze and their type 2

4    error is increased.

5         Q.   What's the study that you were referring to

6    just now?

7         A.   Well, one of the studies reported in my

8    report.  I don't remember exactly.  I'd have to open

9    them up if you want to take the time.  It's a study

10   that I've spoken about at least on two other

11   Monsanto depositions, where we went through the

12   study, looked at the odds ratio and the statistical

13   value.  I don't recall.  I think it may have been

14   within possibly one of the meta-analysis studies,

15   but I'm not sure.

16        Q.   Does Pahwa or the North American Pooled

17   Project sound right to you for that?

18        A.   That's what I was thinking, yeah.  Yeah.

19        Q.   I want to ask you about the sprayer that

20   Mr. Seidl used when he was living in San Antonio,

21   Texas.  Is it the one-gallon hand-pump sprayer?

22        A.   That's what he stated, yes.

23        Q.   Have you seen the sprayer or photos of the

24   sprayer that he used?

25        A.   No.

William Sawyer, Ph.D.

1    Q.   Are you familiar with the type of sprayer

2    that he's talking about, a one-gallon hand-pump

3    sprayer?

4    A.   Not to the degree I can tell you whether it

5    was the circular shape versus the cylindrical.  I

6    don't know.

7    Q.   With a sprayer like that, an individual has

8    to pump up the sprayer and then the pressure that's

9    built up from pumping causes it to discharge

10   whatever is inside the sprayer, right?

11   A.   Yeah, that's the general design.

12   Q.   Does the shape of the sprayer make a

13   difference, whether it is cylindrical or circular,

14   as to how quickly a substance will be discharged

15   from inside the sprayer?

16   A.   I would have to defer that to a hydraulics

17   expert, because a cylinder, a round sphere, as it

18   discharges, may have a higher headspace of air

19   versus liquid volume, versus a cylinder, so I think

20   that requires a physicist or hydraulic engineer

21   expert to answer that.  There could be some minor

22   slight difference as the amount of liquid

23   diminishes, but I can't answer that for sure.

24   Q.   Would you also defer to a hydraulics expert

25   on what the general rate is of discharge from a

William Sawyer, Ph.D.

1    sprayer like that, or are you familiar with that

2    independently from your own work?

3        A.   Well, as far as the rate, I can answer that.

4    As the pressure decreases, as long as you are not

5    asking the question what if he only pumped it up at

6    the beginning, which type would last longer, that's

7    a -- really a hydraulics question, but the way these

8    things actually work in the real world, as the

9    pressure decreases, as the spray comes out of the

10   wand at a slower pace, one usually takes a moment

11   and pumps it up again.  In fact, I'm not sure those

12   sprayers can even go all the way to empty without

13   some additional pumping.

14       Q.   When you say that you're not sure that they

15   can go all the way to empty without some additional

16   pumping, are we talking, like, they might need to be

17   pumped up one to two additional times, or they might

18   need to be pumped up 10 additional times for a

19   one-gallon size?

20       A.   Based on my own experience, at least -- at

21   least one or two more times.

22       Q.   How long does it take, if the only stops

23   that you're making are to repump the sprayer, how

24   long does it take to completely discharge a

25   one-gallon spray container spraying continuously?

William Sawyer, Ph.D.

```
 1            MR. SUTTON:  Object to form.
 2       A.   It really depends on the nozzle, whether the
 3   nozzle is set for wide dispersion or whether it's a
 4   modified nozzle that shoots more in a straight
 5   liquid line.  There is variabilities.  I can't
 6   really speculate on that time.  It depends on the
 7   pressure.
 8       Q.   If it was a wide --
 9       A.   It depends on the pressure in the unit as
10   well, what pressure it's operating at.
11       Q.   Did you make any attempt to determine what
12   type of nozzle Mr. Seidl was using on the pump
13   sprayer that he had in San Antonio?
14       A.   I don't recall I asked him.  I don't see it
15   in my notes but I usually do ask about the nozzle,
16   whether it leaked, whether it was adjustable,
17   whether it had to be cleaned.  I don't see any
18   information on that.  Let's see.
19            No, I just -- I don't have any information.
20       Q.   Did you ask him any questions about what the
21   pressure was set to for that pump sprayer that he
22   was using?
23       A.   No.  I didn't find it all that relevant
24   because his real problem was walking through sprayed
25   weeds and having direct contact with the liquid onto
```

William Sawyer, Ph.D.

1    his pants or skin to the degree that his skin felt

2    moist, so I wasn't all that concerned about the

3    nozzle performance per se.

4        Q.   How long after weeds are sprayed is there a

5    risk to individuals from walking through them?

6            MR. SUTTON:  Object to form.

7        Q.   In your opinion?

8        A.   Well, to answer it correctly, I have been

9    through all of the reentry documentation produced by

10   Monsanto, including the submissions to Sweden on

11   reentry, and other countries, that have values

12   within those documents for transfer of deposited

13   Roundup, that is specifically glyphosate, versus the

14   amount of contact one can achieve over time, and I

15   would need to pull up the reentry registration

16   information submitted to the various agencies by

17   Monsanto to give you an exact number, but what might

18   expedite this is if I explain to you that when he

19   reentered, he was in the active process of spraying

20   and the plants that he walked through were still wet

21   with liquid.  It wasn't a type of thing where he

22   went back an hour or two later, but this was during

23   his spraying he was walking through weeds to a

24   degree that he had skin contact with material that

25   was just sprayed onto the weeds.

William Sawyer, Ph.D.

1          I don't know if that helps any.

2     Q.   If I spray one gallon of Roundup and it

3   takes me one hour to spray that one gallon, is my

4   exposure higher, lower, or the same as if I spray

5   the same amount, one gallon, over the course of two

6   hours?

7     A.   It's highly variable.  It depends on whether

8   you're spot spraying, walking through weeds that

9   were wiping liquid onto your calfs and lower legs as

10   in the current matter.  He wore shorts quite often.

11   He could feel that his skin were -- was wet from

12   contact with plants and from spray drift mist.

13          And if he only operated the trigger every --

14   let's say he used it -- turned the trigger on every

15   five minutes over that period of an hour, he could

16   still obtain the same amount of exposure one would

17   get with the continuous spraying over an hour,

18   depending on the contact of the direct liquid onto

19   the skin.  It's highly variable.  It depends on the

20   wind, depends on the topography, whether there is

21   buildings causing wind funneling, or an example I

22   cited in the past was that of a sugar cane

23   applicator walking between the tall rows of sugar

24   cane and the wind was funneling down through those

25   rows, blowing it back and drenching an operator.

William Sawyer, Ph.D.

1       So there is just so many variables.  It's

2  not really possible to answer that question without

3  a very specific scenario.

4       Q.   Is it your opinion that the sugar cane

5  operator scenario is analogous to the type of

6  spraying that Mr. Seidl has done with Roundup?

7       A.   No.  His was not sugar cane on each side of

8  him, towering over his head, but, rather, in some

9  cases spraying poison ivy that was not on the ground

10 but rather elevated and having to hold the gun

11 straight out in front of him producing an aerosol at

12 head level; also walking, as I said, through wet

13 weeds.  So no, it's a slightly different scenario.

14      And the scenario -- these application

15 scenarios are highly available depending on the yard

16 and the structures and the height of the weeds,

17 whether they are climbing up fences.  There is many,

18 many variables and that's why it's difficult to

19 answer your general question.

20      Q.   When you say he had to hold the gun out in

21 front of him, are you referring to the wand with

22 which he sprayed Roundup?

23      A.   Yes.  He had a solid fence in his backyard

24 with poison ivy climbing up it.  He sprayed the

25 Roundup up and down the vines.  It would bounce off

William Sawyer, Ph.D.

1    the wall onto his skin.

2         Q.   Do you know how long it would take poison

3    ivy to regrow after having been sprayed with

4    Roundup?

5         A.   Well, it depends where you are.  If you're

6    in Sanibel Island, Florida, in the jungle in July, I

7    can actually see growth of poison ivy, where I had

8    my other house, I could -- I noted poison ivy growth

9    within a week that had climbed higher.  So it really

10   depends on the amount of moisture, whether you are

11   getting 17 inches of rain a month or one inch of

12   rain a month, and temperature and humidity.  There

13   is a lot of variables with that.

14          So all I can tell you is that poison ivy can

15   grow very quickly in the right environment.  I

16   actually had what I called a poison ivy tree.  It

17   was horrible.  The vines climbed up the palm tree

18   right up to the top of the tree.

19        Q.   Do you know whether San Antonio is a high

20   moisture or low moisture environment?

21        A.   I know seasonally it can be very dry.

22   During hurricane season I think it can be flooded

23   and wet, so it really varies.

24        Q.   One of the things that Mr. Seidl did as an

25   occupation for a summer when he was younger was

William Sawyer, Ph.D.

1    pumping gasoline at a gas station.  Do you recall

2    that?

3        A.   Yes.

4        Q.   Did you include any potential exposure at

5    that gas station in your assessment of potential

6    risk factors for developing non-Hodgkin's lymphoma

7    with respect to Mr. Seidl?

8        A.   Yes.  In the past I have completed risk

9    assessment analyses of service station attendants

10   and referenced many studies in the past, and what

11   the studies consistently and coherently show is that

12   a full-time worker with sufficient years, for

13   example, 30 or 40 years of pumping gasoline, can

14   receive some measurable increased risk; however, in

15   this case we're dealing with one summer of part-time

16   exposure, and the studies do not indicate and do not

17   show any AML, that's acute myelogenous leukemia, or

18   other hematopoietic malignancy increases based on

19   one summer of part-time pumping.  It's just an

20   insufficient exposure, and that's based upon these

21   gasoline service station attendant studies which

22   show the air levels of benzene only in the --

23   typically in the 30, 40 part per billion range, and

24   to achieve a, you know, a 19 part per million

25   year-exposure, one would have to be exposed to one

William Sawyer, Ph.D.

```
 1    part per million for 19 consecutive years 40 hours a
 2    week.
 3         The bottom line is that the studies are very
 4    clear that a part-time one-summer exposure would be
 5    insufficient of a dose to result in an increased
 6    risk of benzene-related hematopoietic malignancy as
 7    cited in the peer-reviewed studies.
 8    Q.   If Mr. Seidl got gasoline on his skin during
 9    the course of his job as a pump operator, would that
10    have changed his exposure level to carcinogenic
11    chemicals in the course of that job?
12    A.   Not in that short time period, and the
13    studies on gasoline service station attendants
14    include both inhalation and dermal exposure, and
15    again, there is no significantly increased rate of
16    cancer in those studies with a one-time part-time
17    exposure.  It's just not there.
18    Q.   I'm just going to ask you a quick clarifying
19    question about a table in your report, which is
20    Table 3 on page 21.  Can you see that?
21    A.   Yes.
22    Q.   Table 3 is listing the carcinogenicity of
23    substances to which Mr. Seidl reported potential
24    exposure, right?
25    A.   Yes.
```

William Sawyer, Ph.D.

1       Q.   And in this table you have listed the Amdro

2    ant bait granules that he used, wasp spray,

3    MiracleGro, latex paint and motor oil, correct?

4       A.   Yes.

5       Q.   It is your view that none of those

6    substances have a known risk of causing

7    non-Hodgkin's lymphoma?

8       A.   Yes, that's very clear.

9       Q.   The same is true with respect to whether

10   they are probable human carcinogens?

11      A.   Correct.

12      Q.   Is there a reason that you didn't list

13   gasoline or the chemicals such as benzene that could

14   be associated with exposure to gasoline in this

15   table?

16      A.   Yes.  I covered that in Footnote 80 in Table

17   2.

18      Q.   So Footnote 80 for Table 2 also applied to

19   Table 3?

20      A.   Yeah, and actually Table -- Footnote 79 and

21   80, yeah.

22      Q.   Another one of the part-time occupations or

23   full-time for a short period of time occupations

24   that Mr. Seidl participated in was cutting pine

25   boards for a trim carpenter.  Do you recall that?

William Sawyer, Ph.D.

```
 1       A.   Yeah, and I'm very familiar with the types
 2  of wood with respirable sawdust that cause primarily
 3  nasopharyngeal malignancies, and pine is not one of
 4  them.
 5       Q.   Is that the reason that you don't have pine
 6  or wood dust exposure listed in Table 3?
 7       A.   That's correct.  It's not the correct type
 8  of wood dust.
 9       Q.   What would be the right type of wood dust?
10       A.   I don't recall but it's not pine.
11            MS. COPE-KASTEN:  Let's go off the record
12       for a couple minutes.
13            MR. SUTTON:  Okay.
14            THE VIDEOGRAPHER:  The time is 10:28 a.m.,
15       off the record.
16          (Recess from 10:28 a.m. until 10:35 a.m.)
17            THE VIDEOGRAPHER:  The time is 10:35 a.m.,
18       on the record.
19            (Sawyer Exhibit 4 was marked for
20       identification.)
21  BY MS. COPE-KASTEN:
22       Q.   I want to talk just quickly about a list of
23  chemicals that you produced in connection with
24  Mr. Seidl and the Kansas location.  This is
25  Exhibit 4 to your deposition.  These are notes that
```

William Sawyer, Ph.D.

1    you made with respect to potential VOCs at the

2    Vulcan plant in Kansas?

3        A.   Yes.

4            (Sawyer Exhibit 5 was marked for

5    identification.)

6    BY MS. COPE-KASTEN:

7        Q.   I'm going to switch documents very quickly

8    now and mark as Exhibit 5 to your deposition where I

9    think you are pulling those from, which is a report

10   from EPA as to chemicals at the Occidental Chemical

11   Corporation facility.  Do you see that?

12       A.   Yes.

13       Q.   In the copy of this EPA document that we

14   received from Mr. Seidl's office -- or Mr. Sutton's

15   office, on the third page at the top is highlighted

16   a paragraph about groundwater.  Do you see that?

17       A.   I do.

18       Q.   Is that your highlighting?

19       A.   Yes.

20       Q.   Why is groundwater highlighted but not any

21   of the other potentially contaminated areas?

22       A.   Well, groundwater has the propensity of

23   moving further away from the spill site and, thus,

24   soils at the production plant itself, so some are

25   mobile, some aren't.

William Sawyer, Ph.D.

```
1        Q.   Is groundwater the only potential source of

2   contamination at this site that you thought could

3   even maybe be a risk to Mr. Seidl?

4        A.   Yes.

5        Q.   Looking at the substances that are listed

6   here, do you have in hard copy paper form in front

7   of you what I just marked as Exhibit 4, your notes

8   on the VOCs?

9        A.   Yes.

10        Q.   The first substance that is listed in this

11   EPA document as a COPC, which the EPA has called

12   chemicals of potential concern, do you see that?

13        A.   Yes.

14        Q.   Is 2,4-D?

15        A.   That's correct.

16        Q.   Are you with me?

17        A.   Yes.

18             (Discussion off the record.)

19        Q.   As to 2,4-D, that's not listed in Exhibit 4,

20   your list of potential VOCs, right?

21        A.   Yeah, it's not a VOC.  It's a semi-volatile.

22   It doesn't have the propensity to produce a

23   measurable air level from soil vapor release carried

24   by groundwater.  It doesn't travel -- it doesn't

25   volatilize out from soil vapor, groundwater soil
```

William Sawyer, Ph.D.

1    vapor in the same fashion as vinyl chloride or

2    methylene chloride or benzene or other highly

3    volatile substances.  2,4-D has a very different

4    vapor pressure and is not considered a VOC.

5        Q.   If Mr. Seidl drank well water at the

6    facility, and I understand that your opinion is that

7    he likely did not, would 2,4-D present a different

8    risk in the form of drinking water than it would in

9    the form of soil vapor?

10         MR. SUTTON:  Object to form.

11       A.   It could.  What type of risk are you

12   speaking of, a health risk of some type?

13       Q.   A risk of increasing an individual's

14   potential to develop non-Hodgkin's lymphoma or other

15   cancer.

16         MR. SUTTON:  Object to form.

17       A.   How could it do that when my report around

18   page -- well, it's not in this report, actually, but

19   how can it do that when Monsanto has already sworn

20   under oath that it doesn't cause cancer in an

21   interrogatory response?  I don't understand.

22       Q.   You and I have been over this before,

23   Dr. Sawyer, and I'm not going to cover it again

24   today, but do you understand that IARC has

25   classified 2,4-D as a group 2B possible human

William Sawyer, Ph.D.

1    carcinogen?

2          MR. SUTTON:  Object to form.

3      A.   Correct, but the confusion is when you look

4    at my tables, I list the IARC classification, I have

5    it -- I don't know what exhibit it is but in my

6    table I do list the IARC classifications and I'm

7    well aware and I've testified previously that 2,4-D

8    is a 2B classified possible carcinogen, but my

9    concern is that there is a conflict here with your

10   client who claims it doesn't cause cancer, so there

11   is an element of confusion.

12         MS. COPE-KASTEN:  Move to strike everything

13      after "correct."

14     A.   Okay.

15     Q.   With respect to pentachlorophenol, which is

16   listed in the EPA document that is Exhibit 5 to this

17   deposition, what is the reason that that is not

18   listed in your list of possible VOCs?

19     A.   Well, specifically, pentachlorophenol is not

20   a VOC.  It's a semi-volatile.

21     Q.   Similar situation to 2,4-D in that it can't

22   vaporize in the same way that some of these other

23   chemicals can?

24     A.   It can vaporize but it's classified as a

25   semi-volatile due to its vapor pressure.  Now, if

William Sawyer, Ph.D.

```
1      you were sitting in a puddle of it, sitting in a

2      chair with your feet out of the water, or sitting

3      literally in pentachlorophenol, yes, then one might

4      reach a vapor pressure of harm, but part per billion

5      level of pentachlorophenol in water, the vapor

6      pressure that is used in the modeling for

7      calculating vapor intrusion requires volatile

8      organic compounds, not semi-volatiles.  They just

9      don't have enough vapor pressure to create a

10     measurable air level in an indoor environment based

11     upon part per billion groundwater levels.

12           Now, that's not true for a compound such as

13     vinyl chloride or trichloroethylene or other

14     volatiles.  They can produce a measurable

15     concentration in indoor air through vapor intrusion,

16     and there is a number of EPA models that are used

17     and the definitions require a certain level of vapor

18     pressure, and that is the definition for a volatile

19     organic chemical versus a semi-volatile, and the

20     2,4-D and pentachlorophenol are semi-volatiles.

21           Q.   Is 2,4,6-trichlorophenol also a

22     semi-volatile?

23           A.   Yes, it is, and has very similar volatility

24     constraints based on its vapor pressure.

25           Q.   Same thing with respect to 3/4-chlorophenol?
```

William Sawyer, Ph.D.

1      A.   Yes.

2      Q.   Is that also a semi-volatile?

3      A.   It is.

4      Q.   For pentachlorophenol, would there be a

5   different risk of potential carcinogenicity from

6   well water contamination than there would be from

7   potential vaporization from the soil?

8      A.   Yes.  The vaporization from soil would be

9   negligible in an indoor environment; however,

10   drinking it in water would produce a measurable

11   dosage that could be quantitatively assessed.

12      Q.   Same question with respect to

13   2,4,6-trichlorophenol?

14      A.   Same answer.

15      Q.   Same answer with respect to

16   3/4-chlorophenol?

17      A.   Yes.  Also, I should point out in the US EPA

18   methodology, water solubility is also a factor, as

19   well as soil binding.  So there is several aspects

20   in the calculations but, in general, the volatile

21   organic contaminants are amenable to indoor air

22   intrusion and that's why I listed those in my

23   Exhibit something.  I'm not sure what number.

24      Q.   4.

25      A.   Okay.  Thank you.  I'm going to mark that 4

William Sawyer, Ph.D.

1    so I know.

2        Q.   I'll pull it up here so everybody can see

3    it.

4        A.   Yeah.  Okay.  That's it.

5        Q.   For the substances that are listed in

6    Exhibit 4, did you perform any independent

7    assessment of water solubility with respect to these

8    chemicals?

9        A.   No.  The EPA report indicates that there was

10   no vapor intrusion except at the plant, production

11   plant itself.

12            MS. COPE-KASTEN:  That's all I've got for

13       you today, Dr. Sawyer.  I don't have any further

14       questions at this point.

15            THE WITNESS:  Okay.  Well, thank you for

16       your professionalism, as always, and your smile.

17       I like that.

18            MS. COPE-KASTEN:  Thank you for your time,

19       Dr. Sawyer.

20            THE WITNESS:  You're welcome.

21            MR. SUTTON:  Thanks.  No questions here.

22            THE VIDEOGRAPHER:  All right.  Are we ready

23       to go off record?

24            MS. COPE-KASTEN:  Yes.

25            THE VIDEOGRAPHER:  The time is 10:49 a.m.,

William Sawyer, Ph.D.

1        off the record.

2             (Whereupon, the deposition concluded at

3      10:49 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

William Sawyer, Ph.D.

```
 1              C E R T I F I C A T E

 2         I, Susan D. Wasilewski, Registered

 3    Professional Reporter, Certified Realtime Reporter,

 4    Certified Manager of Reporting Services, Certified

 5    Realtime Captioner, and Florida Professional

 6    Reporter, hereby certify that the witness named

 7    herein appeared via Remote Counsel/Zoom technology

 8    on Monday, March 8, 2021, and was duly sworn.

 9         I FURTHER CERTIFY that I was authorized to

10    and did stenographically report the examination of

11    the witness named herein; that a review of the

12    transcript was not requested; and that the foregoing

13    transcript is a true record of my stenographic

14    notes.

15         I FURTHER CERTIFY that I am not related to

16    or an employee of any of the parties, nor am I

17    related to or an employee of any of the parties'

18    attorneys or counsel connected with this action, nor

19    am I financially interested in the outcome of this

20    action.

21         WITNESS my hand this 10th of March, 2021.

22

23    _____            _____

24    Susan D. Wasilewski, RPR, CRR, CMRS, CRC, FPR

25
```

William Sawyer, Ph.D.

```
 1                    LAWYER'S NOTES

 2     PAGE   LINE

 3     _____  _____  _____

 4     _____  _____  _____

 5     _____  _____  _____

 6     _____  _____  _____

 7     _____  _____  _____

 8     _____  _____  _____

 9     _____  _____  _____

10     _____  _____  _____

11     _____  _____  _____

12     _____  _____  _____

13     _____  _____  _____

14     _____  _____  _____

15     _____  _____  _____

16     _____  _____  _____

17     _____  _____  _____

18     _____  _____  _____

19     _____  _____  _____

20     _____  _____  _____

21     _____  _____  _____

22     _____  _____  _____

23     _____  _____  _____

24     _____  _____  _____

25
```