# EXHIBIT 29

Confidential - Pursuant to Protective Order

```
 1            UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
 2

 3    IN RE: ROUNDUP          )
      PRODUCTS LIABILITY      )   MDL No. 2741
 4    LITIGATION              )
      _____    )   Case No.
 5    THIS DOCUMENT RELATES   )   16-md-02741-VC
      TO ALL CASES            )
 6

 7            THURSDAY, FEBRUARY 21, 2019
 8    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
 9                    - - -
10            Videotaped deposition of
11    Christopher J. Portier, Ph.D., held at the
12    Crowne Plaza Melbourne, 1-5 Spencer Street,
13    Melbourne, Australia, commencing at
14    8:10 a.m., on the above date, before Carrie
15    A. Campbell, Registered Diplomate Reporter,
16    Certified Realtime Reporter, Illinois,
17    California & Texas Certified Shorthand
18    Reporter, Missouri & Kansas Certified Court
19    Reporter.
20                    - - -
21

            GOLKOW LITIGATION SERVICES
22       877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
23

24

25
```

Confidential - Pursuant to Protective Order

```
 1              A P P E A R A N C E S :
 2
       BAUM HEDLUND ARISTEI & GOLDMAN, P.C.
 3     BY:  R. BRENT WISNER, ESQUIRE
               rbwisner@baumhedlund.com
 4     12100 Wilshire Boulevard, Suite 950
       Los Angeles, California 90025
 5     (310) 207-3233
 6     and
 7     BY:  MICHAEL L. BAUM, ESQUIRE
               (VIA TELECONFERENCE)
 8             mbaum@baumhedlund.com
       12100 Wilshire Boulevard, Suite 950
 9     Los Angeles, California 90025
       (310) 207-3233
10
11     WEITZ & LUXENBERG, P.C.
       BY:  ROBIN L. GREENWALD, ESQUIRE
12             rgreenwald@weitzlux.com
       700 Broadway
13     New York, New York 10003
       (212) 558-5547
14
15     ANDRUS WAGSTAFF, PC
       BY:  AIMEE H. WAGSTAFF, ESQUIRE
16             aimee.wagstaff@andruswagstaff.com
               DAVID J. WOOL, ESQUIRE
17             david.wool@andruswagstaff.com
               (VIA TELECONFERENCE)
18     7171 West Alaska Drive
       Lakewood, Colorado  80226
19     (303) 376-6360
20
       LUNDY, LUNDY, SOILEAU & SOUTH, LLP
21     BY:  BERNARD THEUNISSEN, ESQUIRE
               btheunissen@lundylawllp.com
22             (VIA TELECONFERENCE)
       501 Broad Street
23     Lake Charles, Louisiana 70601
       (337) 439-0707
24     Counsel for Plaintiffs
25
```

Confidential - Pursuant to Protective Order

```
 1      COVINGTON & BURLING LLP
        BY:   PAUL W. SCHMIDT, ESQUIRE
 2            pschmidt@cov.com
              MICHAEL X. IMBROSCIO, ESQUIRE
 3            mimbroscio@cov.com
        850 Tenth Street, NW
 4      Washington, D.C. 20001-4956
        (202) 662-5694
 5
 6      WILKINSON WALSH + ESKOVITZ
        BY:   CALI COPE-KASTEN, ESQUIRE
 7            ccope-kasten@wilkinsonwalsh.com
        2001 M Street, NW, 10th Floor
 8      Washington, DC 20036
        (202) 847-4000
 9
10      HOLLINGSWORTH LLP
        BY:   JOHN M. KALAS, ESQUIRE
11            jkalas@hollingsworthllp.com
        1350 I Street, N.W.
12      Washington, D.C. 20005
        (202) 898-5800
13      Counsel for Defendant Monsanto
14
15   ALSO PRESENT:
        BRIAN BEAM, Baum Hedlund
16      JIM SOTO
17
     V I D E O G R A P H E R S:
18      DAN LAWLOR & VINCENT ROSICA,
        Golkow Litigation Services
19
                      - - -
20
21
22
23
24
25
```

Confidential - Pursuant to Protective Order

```
 1                        INDEX

 2                                         PAGE

 3    APPEARANCES..................................   2

 4  EXAMINATIONS

 5    BY MR. WISNER..............................   6

 6

 7

 8    CERTIFICATE................................255

 9  ACKNOWLEDGMENT OF DEPONENT...................257

10    ERRATA.....................................258

11    LAWYER'S NOTES.............................259

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Confidential - Pursuant to Protective Order

1   through chemical exposures.

2        Q.    Okay.  So --

3        A.    And when that oxygen, that free

4   oxygen, is running around and not bound to

5   things it should bind to, it binds to things

6   it shouldn't bind to, like DNA.  And when it

7   binds to DNA or parts of the -- to the

8   machinery that works with DNA, it can affect

9   the whole system and mess it up.

10       Q.    Okay.  We're going to talk a

11  lot more about oxidative stress and DNA

12  damage later, but for now, how does this

13  relate to that -- where we started,

14  initiation and promotion studies?

15       A.    So that's what I wanted to get

16  to.  In toxicology chemical parlance, if a

17  chemical causes an increase in mutations,

18  it's called an initiator.  So it is starting

19  the chemical process.  It's ini -- the cancer

20  process.  It is initiating the process.

21            If the chemical comes in and

22  enhances the process, so it takes something

23  that's already started and makes it go

24  faster, then it's called a promoter.  It's

25  promoting something that's already going on.

Confidential - Pursuant to Protective Order

1           So an initiator causes this

2    mutation.  A promoter enhances that mutation

3    and makes it even come out more later to get

4    more cancers.

5           So an initiation/promotion

6    study is one where you take a chemical that's

7    an initiator, you give it to the animal for a

8    short period of time, hopefully causing

9    startup mutations in the animals, and then

10   you come with another chemical, a promoter,

11   and you give it for a longer period of time,

12   and that enhances that mutation and you begin

13   to see the cancer.

14          So a classical

15   initiation/promoter study is used to try to

16   understand some basic mechanisms of chemicals

17   in causing cancer.  If I have a chemical that

18   I think might be an initiator, then I do a

19   study where I give the animal that chemical

20   for a short period of time, and then I --

21   there are known promoters that we already

22   know exist, and so then I give those same

23   animals a promoter for a period of time and

24   look to see if I see more cancers.

25              If I do, then this was probably

Confidential - Pursuant to Protective Order

1    an initiator, the chemical I'm looking at.

2    If I don't, then it's probably not an

3    initiator.  In this system at least.

4              If I think the chemical is a

5    promoter, then I give a classic initiator,

6    something I already know will cause

7    mutations, and then I follow it with this new

8    chemical for a period of time and look to see

9    if I see cancers.

10             Okay.  If you don't know

11   anything about the chemical, you do both.

12   You give it as an initiator with a classic

13   promoter, you give it as a promoter with a

14   classic initiator, and you see what happens.

15             The George study, the one

16   remaining study, is an initiation/promotion

17   study with glyphosate.

18        Q.    Okay.  Stop right there.  Let

19   me ask you some questions.

20        A.    Okay.

21        Q.    All right.  Let's talk about

22   the George study.  If you turn to your binder

23   to 559.

24        A.    Okay.

25        Q.    Is that a fair and accurate

Confidential - Pursuant to Protective Order

1    copy of the George study?

2        A.      Yes, it is.

3        Q.      Okay.  Great.

4                So now it's up on the screen,

5    and I just want to walk through a little bit

6    what this says and ask you what it means.

7                So the title of the document is

8    "Studies on Glyphosate-Induced

9    Carcinogenicity in Mouse Skin:  A Proteomic

10   Approach."

11               What does that mean?

12       A.      It's proteomic.

13       Q.      Okay.

14       A.      So the key words here, it's

15   glyphosate.  They're looking for

16   carcinogenicity.  The study is not being done

17   like the ones we looked at.  This is done on

18   mouse skin.  So instead of the mouse eating

19   the glyphosate, it's painted onto their skin.

20               A proteomic approach means that

21   they're going to look at changes in proteins

22   in the skin at the end of the study.

23       Q.      Okay.  Great.

24               And in this study it reads,

25   "Glyphosate is a widely used, broad spectrum

1  herbicide reported to induce various toxic

2  effects in nontarget species, but its

3  carcinogenic potential is still unknown.

4  Here we showed the carcinogenic effects of

5  glyphosate using two-stage mouse skin

6  carcinogenesis model and proteomic analysis.

7  Carcinogenicity study revealed that

8  glyphosate has a tumor-promoting activity."

9           Can you translate what I just

10  read into English?

11       A.    The first sentence is obvious

12  in their opinion.

13           The second sentence deals with

14  what they call a two-stage mouse skin

15  carcinogenesis model.  That is

16  initiation/promotion.  First stage is

17  initiation.

18       Q.    I see.

19       A.    Second stage is promotion.

20  It's in the mouse skin, so they call that a

21  two-stage mouse carcinogenicity study.

22           Proteomic analysis is --

23       Q.    The protein?

24       A.    -- much more complicated.

25       Q.    Okay.  And then it says,

Confidential - Pursuant to Protective Order

1   "Carcinogenicity study revealed that

2   glyphosate has tumor-promoting activity."

3                What does that mean?

4        A.     It means in this two-stage

5   model where you give a known initiator and

6   follow it with glyphosate for a fixed period

7   of time, you see more skin tumors -- in this

8   case they are skin papillomas -- than you

9   would normally see, and so the glyphosate is

10  promoting out the tumors that were started

11  with the initiator.

12       Q.     All right.  Now, I just want to

13  turn to the second page here.  This is -- it

14  says, "Materials and Methods."

15               Do you see that?

16       A.     Yes.

17       Q.     It says, "The commercial

18  formulation of the herbicide glyphosate,

19  Roundup original, copyright glyphosate

20  41 percent, POEA, 15 percent, Monsanto

21  Company, St. Louis, Missouri, was used."

22               Is that your understanding in

23  this study?

24       A.     Yes, that's -- that's the

25  compound that was being painted on the

Confidential - Pursuant to Protective Order

```
 1    animals.

 2         Q.     So this -- is this different

 3    than pure technical glyphosate?

 4         A.     Yes, this is different than

 5    pure technical glyphosate.

 6         Q.     They're actually using the

 7    stuff that you can buy in a hardware store?

 8              MR. SCHMIDT:  Objection.

 9         Leading.

10              THE WITNESS:  I would guess

11         that's what that means.

12    QUESTIONS BY MR. WISNER:

13         Q.     Okay.  And then we have here

14    all these different treatment groups.  And I

15    don't want to spend too much time on it, but

16    you see Group 1, Group 2, Group 3.

17              Do you see that?

18         A.     Yes.

19         Q.     And the one that I'm interested

20    in is this Group 7 -- or Group 8, I'm sorry.

21    It says, "DMBA plus glyphosate.  Single

22    topical application of DMBA followed one week

23    later by topical treatment of glyphosate."

24              Do you see that?

25         A.     Correct.
```

Confidential - Pursuant to Protective Order

1          Q.     What is that referring to?

2          A.     DMBA is a chemical.  It's a

3    known initiator.  So they're initiating the

4    skin with DMBA and following it with

5    glyphosate applications three times per week,

6    25 milligrams per kilogram body weight on the

7    backs of the mice.

8          Q.     And if we go to the results,

9    it's on Table 1.  And we see here that that

10   group, Group 8, the DMBA plus glyphosate,

11   what percentage of the animals had tumors on

12   their skin?

13         A.     8 out of 20 animals had

14   papillomas on their backs.

15         Q.     And what percentage is that?

16         A.     Let's see.  40 percent.

17         Q.     Okay.  And if you look at the

18   rest of the results, the only other one that

19   had tumors in the skin was Group 3.

20              What does that reflect?

21              MR. SCHMIDT:  Objection.

22         Leading.

23              THE WITNESS:  Group 3 is the --

24         what's called a positive control in

25         this study.  DMBA, the same initiator

Confidential - Pursuant to Protective Order

1          as they used with glyphosate, plus

2          TPA.  TPA is a known promoter, very

3          strong promoter, so that you would

4          expect to see lots of tumors.  And

5          there they're seeing tumors in all the

6          animals.

7     QUESTIONS BY MR. WISNER:

8          Q.    Okay.  And if you look down

9     here, there's an asterisk on the Group 8, the

10    glyphosate group.

11               Do you see that?

12         A.    Yes.

13         Q.    And then it says, "P value less

14    than .5."

15               Do you see that?

16         A.    Yes.

17         Q.    "Versus untreated group"?

18         A.    Yes.

19         Q.    You mentioned P values earlier.

20    And in as simple terms as you can, what is a

21    P value?

22         A.    It's the probability that the

23    observation you're seeing agrees with no

24    effect.  So in this case it's the probability

25    that there's no increase in tumors from

Confidential - Pursuant to Protective Order

 1   glyphosate being used as a promoter in this

 2   study.

 3            If that probability is very

 4   small, you reject the hypothesis that there's

 5   no increase in favor of an alternative that

 6   there in fact is an increase.

 7       Q.    So with this being a

 8   statistically significant result, what does

 9   that show you as a scientist?

10       A.    That it's possible glyphosate

11   is a promoter of carcinogenesis.

12       Q.    And in this context we're

13   talking about commercial Roundup?

14       A.    Correct.

15            MR. SCHMIDT:  Objection.

16       Leading.

17   QUESTIONS BY MR. WISNER:

18       Q.    All right.  So let's -- let's

19   go back -- well, let's go back to this rat

20   study, if you go back to the document camera.

21            You know, in this rat study we

22   have these repeated findings of skin tumors.

23            Do you see that?

24       A.    Yes.

25            MR. SCHMIDT:  Objection.

Confidential - Pursuant to Protective Order

 1        Leading.

 2   QUESTIONS BY MR. WISNER:

 3        Q.     What, if anything, does this

 4   indicate to you as a scientist?

 5        A.     In terms of the relationship to

 6   the skin painting study that was done, it

 7   would be far too speculative for me to go

 8   there.

 9        Q.     Okay.

10        A.     In one case they're papillomas.

11   These are skin keratoacanthomas.  They're

12   different mouse strains.  The other study is

13   very tailored for -- the initiation/promotion

14   study is very tailored for a very fixed

15   result.

16             It would be too speculative for

17   me to say they're related in any way.

18        Q.     Okay.  Well, then let me ask

19   you this question.  The George study, this

20   positive finding there, what -- what -- is

21   that consistent with what you're seeing in

22   the rodent data for glyphosate?

23        A.     Partially.  Obviously it's --

24   it's addressing the question of promotion,

25   which means that you already have these

Confidential - Pursuant to Protective Order

1    initiated cells.  Living can cause mutations

2    to occur.  And so it's conceivable that

3    glyphosate, all of these tumor findings we

4    are seeing here, are glyphosate promoting out

5    already effects.  I don't think it's likely,

6    but it's conceivable that's the case.

7              The initiation/promotion study

8    is simply showing you that in one system, the

9    skin, glyphosate has this ability to promote

10   out cancer.  That's all it really means.

11        Q.    Well, let's -- hypothetically

12   speaking, let's say an individual has a

13   mutated cell caused by, like you said, life,

14   or like a viral infection or something.  Does

15   the George study -- I don't know.  You tell

16   me.  Does it have any influence on whether or

17   not it could promote a mutation to lead to

18   cancer?

19        A.    It certainly increases the

20   chances that that might be the case because

21   now you have evidence to suggest glyphosate

22   can do that -- this.  But I'd want to see a

23   lot more evidence before I'd go there and

24   start thinking about that.

25              There are initiation/promotion

Confidential - Pursuant to Protective Order

1    studies you can do in the liver.  There are

2    initiation/promotion studies you can do in

3    the brain.  I'd like to see a little more

4    work along those lines.

5              And then looking at the other

6    mechanistic evidence, I'd have to conclude

7    that even though it wasn't an initiator in

8    the skin, I'd want to look more closely at

9    why it didn't come out as an initiator in the

10   skin because theoretically it probably should

11   have.

12   Q.    Okay.  You mentioned that you'd

13   like to see more initiation and promotion

14   studies in other sort of organs.

15             Have any of those been done?

16   A.    Not that I'm aware of.  I would

17   have hopefully picked them up in my search of

18   the literature, and I haven't seen any.

19   Q.    Okay.  All right.  So going

20   back to our causation stool here, we spent

21   some time on animal studies.  And we talked

22   about the initiation and promotion study, and

23   that kind of got us into this next section,

24   which is the mechanism studies.

25             What do you mean by mechanism?