# EXHIBIT 4

```
 1     IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
 2               STATE OF MISSOURI
 3   ------------------------------x
     WALTER WINSTON et al.,          :
 4            Plaintiffs            :
       vs                          : Case No.
 5   MONSANTO COMPANY,               : 1822-CC00515
              Defendant            :
 6   ------------------------------x
     TIMOTHY KANE et al.,            :
 7            Plaintiffs            :
       vs                          : Case No.
 8   MONSANTO COMPANY,               : 1622-CC10172
              Defendant            :
 9   ------------------------------x
10
        IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
11
                 STATE OF MISSOURI
12
     ------------------------------x
13   BURRELL LAMB et al.,            :
              Plaintiffs            :
14     vs                          : Case No.
     MONSANTO COMPANY,               : 17SL-CC03681
15            Defendant            :
     ------------------------------x
16
17           Videotaped deposition of
18         CHRISTOPHER J. PORTIER, Ph.D.
19
20   LOCATION:  RADISSON BLU HOTEL AMSTERDAM AIRPORT
21             Boeing Ave. 2, 1119 PB Schiphol-Rijk
22             The Netherlands
23   DATE/TIME: Wednesday, June 5, 2019 / 9:13 a.m.
24   REPORTER:  Lisa V. Feissner, RDR, CRR
```

Christopher J. Portier, Ph.D

```
 1   A P P E A R A N C E S:

 2   ON BEHALF OF PLAINTIFFS:

 3       ROBIN L. GREENWALD, ESQUIRE

 4       WEITZ & LUXENBERG

 5       700 Broadway

 6       New York, New York 10003

 7       212-558-5500

 8       rgreenwald@weitzlux.com

 9          and

10       MATTHEW E. LUNDY, ESQUIRE

11       LUNDY, LUNDY, SOILEAU & SOUTH, LLP

12       501 Broad Street

13       Lake Charles, Louisiana 70601

14       337-439-0707

15       mlundy@lundylawllp.com

16

17

18

19

20

21

22

23

24
```

Christopher J. Portier, Ph.D

1    A P P E A R A N C E S (Continued)

2

3    ON BEHALF OF DEFENDANT MONSANTO CO.:

4        BRIAN L. STEKLOFF, ESQUIRE

5        CALI COPE-KASTEN, ESQUIRE

6        WILKINSON WALSH & ESKOVITZ

7        2001 M Street, NW, 10th Floor

8        Washington, D.C. 20036

9        202-847-4000

10       bstekloff@wilkinsonwalsh.com

11       ccope-kasten@wilkinsonwalsh.com

12

13   A L S O   P R E S E N T:

14       THOMAS K. FEISSNER, CLVS, Videographer

15

16

17

18

19

20

21

22

23

24

Christopher J. Portier, Ph.D

1    trivial.

2          Q.    And I would need to have your Excel

3    sheets to be able to do that; is that right?

4          A.    No.  No.

5          Q.    What would I need to be able to do

6    it?

7          A.    Just what's in the expert report.

8    The number of animals with the tumor, the

9    number of animals that were examined, and the

10   doses used.  Given that information, you can

11   replicate everything I did.

12         Q.    Okay.  But you don't know if what

13   you actually did at the time in the computer

14   program itself was saved?  Understanding that

15   the spreadsheets were saved and that the final

16   output number was saved.

17         A.    Certainly they have undergone some

18   changes over time since that expert report.  As

19   I pointed out, I found some minor errors in

20   some of the counts.  We've -- I've added data

21   because it's turned out to be significant, and

22   I've added it to the -- so it's changed over

23   time.

24               I certainly don't have the original

Christopher J. Portier, Ph.D

1  set of programs that gave me the expert report,

2  but I have something very close to it.

3          Q.   All right.  Shifting topics.  I

4  actually want to talk to you about the Leon

5  paper.  You're familiar with that paper, the

6  meta-analysis that came out recently?

7          A.   Meta or pooled?

8          Q.   You'll correct me if I'm wrong.  I

9  thought it was meta.  But maybe it's pooled.

10         A.   This is the European cohorts with

11 the AHS?

12         Q.   Yeah.  I think it's pooled.  Yep.

13         A.   It's pooled.

14         Q.   But you're familiar with it?

15         A.   Yes, I am.

16              MR. STEKLOFF:  So I'm going to mark

17         this as Exhibit 2.

18              (Exhibit Portier-2 marked for

19         identification and attached to the

20         transcript.)

21              MR. STEKLOFF:  Do you want a copy,

22         Robin?

23              MS. GREENWALD:  I do, if you don't

24         mind.

Christopher J. Portier, Ph.D

1           MR. STEKLOFF:  Of course.  We have

2      lots of copies.  We don't help the trees

3      in this litigation.

4           MS. GREENWALD:  I know.  At least

5      you did it two-sided.  I appreciate

6      that.

7           MR. STEKLOFF:  The one time -- if

8      we didn't print everything, then, you

9      know, we would be criticized as well.

10  BY MR. STEKLOFF:

11      Q.   Dr. Portier, you've reviewed this

12  paper before?

13      A.   Yes, I have.

14      Q.   Okay.

15      A.   Well, I've read it.

16      Q.   Read it.  Okay.  Do you have any

17  opinions about the quality of the paper?

18           MS. GREENWALD:  Objection, form.

19      A.   As a paper, it's fine.  It's a

20  well-written piece of work.

21      Q.   What about the methodology, do you

22  have any criticisms of the methodology?

23      A.   This is three different cohorts,

24  and the three different cohorts all have three

Christopher J. Portier, Ph.D

1    different methodologies associated with them.

2             My concerns about the Agricultural

3    Health Study have already been made quite

4    clear.  And that still holds here because

5    they're still using the imputed exposures and

6    all the other things that I have said -- have

7    concerns about the Agricultural Health Study.

8             The AGRICOH study, I think that's

9    the French study -- I have to look at it.  Oh,

10   no, that's the consortium itself.  The French

11   study is AGRICAN?

12        Q.    AGRICAN is the French study.

13        A.    Yeah.

14        Q.    CNAP is the Norwegian study.

15        A.    The AGRICAN study is small relative

16   to the other two in terms of person-years at

17   risk.  It skips over dates.  You know, it's got

18   a little bit of data here and a little bit of

19   data here, and it really probably didn't play

20   much of a role in their overall conclusions

21   here because of its size.  But it certainly has

22   some limitations by itself.

23             The biggest piece of this is the

24   CNAP study, which is the Norwegian cohort

Christopher J. Portier, Ph.D

1 study, and I did spend some time looking into

2 the methodology used in the Norwegian study.

3 There's a number of publications on the

4 exposure methods they've used and other things.

5 I think we've included all of that in my

6 reliance list.

7 It's not an exposure study. Let's

8 be clear what the Norwegian study is. The

9 Norwegian study is a study of what farmers

10 grow. And the actual relationship they get

11 from that is a relationship to what they grow

12 and cancer.

13 The fact that the "what they grow,"

14 they then associate it with this official list

15 of which pesticides can be used on which crops

16 in Norway, is the way they create an exposure

17 metric. And that has some concern for exposure

18 misclassification, potentially differential,

19 but I can't tell you either way. But it

20 clearly raises concerns about exposure

21 misclassification in this study because just

22 because a farmer grows a specific crop doesn't

23 mean they use that -- a specific pesticide

24 that's allowed for that crop. And so that

Christopher J. Portier, Ph.D

1    could create some problems in that dataset.

2              Pulling them all together was a

3    massive amount of work, and I certainly salute

4    them for doing that.  I look forward to getting

5    more detail into how they did it and pulled it

6    together.  It's not all in here.  But that's

7    most I have to say about it.

8         Q.   Okay.  Within the world of

9    epidemiology, have you ever heard the phrase,

10   garbage in, garbage out?

11        A.   That's used in everything.  GIGO.

12   That's quite common.  I do not believe this is

13   a garbage in, garbage out paper.

14        Q.   Okay.

15        A.   The Norwegian cohort has to be

16   looked at more carefully before you can say

17   anything about how much influence this paper

18   should have on your understanding of the

19   epidemiology.

20              I'm satisfied enough with the paper

21   that it's as good as the cohort -- the case

22   control studies.  It probably brings in about

23   the same level of information.  It's not like

24   the last version of the Agricultural Health

Christopher J. Portier, Ph.D

1    Study, which I'm not sure was of any use.  But

2    it is -- it does bring some weight.

3          Q.   Does it change your -- I know

4    you've been asked ad nauseam about your views

5    of epidemiology.  Does this paper in any way

6    change your opinions about the epidemiology

7    relating to glyphosate?

8          A.   I would still call the

9    epidemiology -- an association exists.

10   Causality is credible, but I can't rule out

11   bias, confounding, or other issues that keep me

12   from going full causation with the epidemiology

13   data.

14         Q.   Does this paper make it, based

15   on -- and we can look in a moment at the hazard

16   ratio for glyphosate and NHL, but does this

17   paper, in your opinion, draw more into question

18   whether there's an association between

19   glyphosate and NHL?

20              MS. GREENWALD:  Objection, form.

21         A.   No.

22         Q.   Why not?

23         A.   Partially, because I haven't seen

24   it -- so there's NHL, and then there's DBL --

Christopher J. Portier, Ph.D

1      Q.   DOBCL [sic].

2      A.   DOBCL [sic].  I have some questions

3  about this paper with regard to that.  DLBCL --

4  I can never remember those letters -- is the

5  substantial portion of NHL.  It's the biggest

6  piece of NHL.

7           I find the numbers unusual, that

8  they see no increased relative risk with NHL

9  but they see a significant increased relative

10 risk with DLBCL.  It's a concern I don't

11 under -- it's something I don't understand from

12 the paper.  And that's something I would like

13 to know more about.

14          So it doesn't subtract; it adds

15 maybe some power to the statement.  But it

16 certainly doesn't change my mind at all about

17 the epidemiology evidence.

18     Q.   If a patient had a non-Hodgkin's

19 lymphoma other than DLBCL, would you -- with

20 respect to -- I know you're not offering

21 specific causation opinions, but with respect

22 to non-DLBCL cases of non-Hodgkin's lymphoma,

23 would it -- does this paper cause you to

24 further question whether there's an association

Christopher J. Portier, Ph.D

1    between those forms of NHL and glyphosate?

2              MS. GREENWALD:  Objection to form.

3         A.    So to be fair, I always question

4    whether there's an association.  Every time

5    there's a new paper coming out, that's the only

6    way to approach it in an objective fashion.

7              My conclusion from seeing this

8    paper is that it doesn't change my opinion

9    about NHL, nor does it change my opinion about

10   DLBCL in terms of whether I believe that's

11   stronger than NHL as a total category or not.

12   I think it's still exactly where it was before.

13   There's clearly an association; it's clearly

14   credibly causal.

15             But there's not enough evidence

16   here for me to ignore all the animal data and

17   everything else, just ignore it and say, from

18   the epidemiology, I believe this clearly causes

19   NHL.  I'm not there with the epi, and this

20   hasn't changed that.  But it certainly hasn't

21   moved me to the point where I'm saying, I think

22   the epi is inadequate, or, I just don't see

23   anything there.  I'm certainly not there.  I'm

24   clearly where I've stated it all along, there

Christopher J. Portier, Ph.D

1    is clearly an association.

2        Q.   So you've testified previously that

3    the epidemiology alone is insufficient for you

4    to say there's association between NHL and

5    glyphosate.  Is that fair?

6        A.   No, that's not fair.  It's not

7    enough to say there is a causal association

8    between glyphosate and NHL all on its own.

9        Q.   Thank you for that clarification.

10            This paper, one way or the other,

11    doesn't change your view that the epidemiology

12    alone is not enough to say that there is a

13    causal association between NHL and glyphosate?

14            MS. GREENWALD:  Objection, form.

15        Q.   I can ask it again.  How about I

16    ask a different question.

17        A.   Okay.

18        Q.   The video will demonstrate that

19    that question was a poor one.

20            Your opinion that the epidemiology

21    alone is not enough to say there is a causal

22    association between NHL and glyphosate is not

23    changed by the Leon paper.  Is that fair?

24        A.   That is correct.  I have to find my

Christopher J. Portier, Ph.D

1    opinion in there.  It's -- it was hard to find

2    it.

3         Q.   That's fair enough.  I could have

4    tried it a third -- I don't mind trying it

5    three times.  It's helpful for you to have the

6    realtime.

7              Now, with respect to this Leon

8    paper, which we're almost done with -- and I

9    know you have criticisms of the Andreotti paper

10   that you just mentioned, but did you assess how

11   the Leon authors excluded some of the AHS

12   patients from this paper?

13        A.   Just in what they've written.

14        Q.   Right.  And so if you turn to page

15   12 of the paper.

16        A.   Okay.

17        Q.   Sorry.  If you look at the bottom

18   column on the left, continuing up to the top of

19   the right, I don't need to read all of it, but

20   do you recall reviewing that discussion of

21   excluding certain patients that were studied in

22   the AHS publication, the 2000 -- we're talking

23   about the latter, the Andreotti -- AHS

24   publication?

Christopher J. Portier, Ph.D

1      A.   Yes, I remember reading this.

2      Q.   And do you -- I know it would be

3   some speculation, but do you agree that had all

4   of the patients from the AHS publication been

5   included in the Leon paper, the DLBCL and,

6   frankly, the NHL results may have been

7   different?

8           MS. GREENWALD:  Objection, form.

9      A.   No basis for me to draw that

10  conclusion.

11     Q.   You just don't know one way or the

12  other?

13     A.   Don't know one way or the other.

14     Q.   Okay.  It's certainly possible that

15  the DLBCL results would have either been lower

16  or not statistically significant had all of the

17  AHS patients been included?

18          MS. GREENWALD:  Objection, form.

19     A.   Or higher'd [sic] or unchanged --

20  or higher or unchanged.  It could be anything.

21     Q.   Now, your -- when I asked you for

22  criticisms of the methodology in Leon, you --

23  understanding you don't think this is garbage

24  in, garbage out -- talked about a few things.

Christopher J. Portier, Ph.D

1  One was that the three studies that were pooled

2  together here had different methodologies.  Is

3  that a limitation of this paper?

4       A.   Yes.

5       Q.   Is that -- would that be a

6  limitation of any meta -- pooled analysis where

7  studies with different methodologies are pooled

8  together?

9       A.   Usually you would be concerned

10  about it.  You would spend time thinking about

11  the implications of it.

12       Q.   And also, if, you know, any other

13  study, say Zhang, that included AHS data, at

14  least in part, your concerns about the

15  underlying flaws of AHS would apply equally

16  there.  Is that fair?

17       A.   Zhang's a special case.  It's a

18  very good question, and it's one I'm surprised

19  I wasn't asked by you guys before.  But Zhang

20  is a very special case.

21       Q.   Just -- are we talking about Chang

22  or Zhang?

23       A.   Zhang.  It's Zhang.  I always say

24  "chaing."

Christopher J. Portier, Ph.D

1            They used, if I remember correctly,

2    20-year lag data.  And by using 20-year lag

3    data, the problem that occurs with the making

4    up of the doses, the exposures, isn't a

5    problem, okay?  So it's an interesting

6    quandary.  They used the only part of the data

7    that is extraordinarily clear in terms of how

8    you got it because that's basically the

9    original exposure information they asked

10   people, and that's all they're using, and just

11   looking into the future.  And that's a common

12   thing in epidemiology.

13            Now, what that doesn't give you is

14   all the other cases that occurred later on that

15   might be very important in this.  It requires

16   the concept that it's at least 20 years before

17   you see the cancers, and any other cancer that

18   occurs in less than 20 years of exposure is not

19   due to glyphosate.  That's an assumption of

20   that analysis.  So that would be a criticism.

21            But the other criticism I have from

22   the Andreotti study about the exposures and

23   about other issues like that don't apply in

24   that case.  Because they're the original

Christopher J. Portier, Ph.D

1  exposures, you're not -- you don't have to

2  guess at what people were exposed to; you're

3  using what they told you from the original

4  questionnaire.

5       Q.   And so you don't have any -- your

6  misclassification criticism of AHS isn't based

7  on what people reported when they originally

8  filled out the questionnaire.  Is that --

9       A.   That's -- I mean, there's still

10  some possibility of misclassification there,

11  but it's not going to be differential.  The

12  problem is -- with the permuted data is that it

13  appears to be differential because when they

14  test it against the 20 percent holdouts where

15  they went back and tried to predict, they

16  predicted a whole bunch of people who said they

17  were exposed as being non-exposed.  So that

18  moves people from the exposed category to the

19  non-exposed category.

20            And if that includes people who

21  have NHL in making that move, you've now caused

22  a differential exposure misclassification and

23  you've pushed down the relative risk.  And

24  that's a serious concern with that study, and

Christopher J. Portier, Ph.D

```
 1              C E R T I F I C A T E

 2         I, Lisa V. Feissner, RDR, CRR, CLR,

 3   Notary Public, certify that the foregoing is a

 4   true and accurate transcript of the deposition

 5   of said witness, who was first duly sworn by me

 6   pursuant to stipulation of counsel on the date

 7   and place hereinbefore set forth.

 8         I further certify that the foregoing

 9   transcript is a true and correct record of the

10   proceedings; that reading and signing was

11   requested; that I am neither attorney nor

12   counsel for, nor related to or employed by, any

13   of the parties to the action in which this

14   deposition was taken; and that I have no

15   interest, financial or otherwise, in this case.

16

17         IN WITNESS WHEREOF, I have hereunto set

18   my hand this 13th day of June, 2019.

19

20

21   Lisa V. Feissner, RDR, CRR, CLR

22

           (The foregoing certification of this

23   transcript does not apply to any reproduction

     of the same by any means, unless under the

24   direct control and/or supervision of the
```

Christopher J. Portier, Ph.D

1                INSTRUCTIONS TO WITNESS

2

3          Please read your deposition over

4    carefully and make any necessary corrections.

5    You should state the reason in the appropriate

6    column on the errata sheet for any change made.

7          After doing so, please sign the errata

8    sheet and date it.

9          You are signing it subject to the

10   changes you have noted on the errata sheet,

11   which will be attached to your deposition.  You

12   must sign in the space provided.  The witness

13   need not be a notary public.  Any competent

14   adult may witness your signature.

15         It is imperative that you return the

16   original errata sheet to the deposing attorney

17   within thirty (30) days of receipt of the

18   deposition transcript by you.  If you fail to

19   do so, the deposition may be deemed to be

20   accurate and may be used in court.

21

22

23

24

Christopher J. Portier, Ph.D

```
1    WITNESS NAME:     CHRISTOPHER J. PORTIER, Ph.D.

     DEPOSITION DATE:  JUNE 5, 2019

2

3                        ERRATA

4    PAGE LINE  CHANGE                    REASON

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Christopher J. Portier, Ph.D

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3         I hereby acknowledge that I have read

 4    the foregoing deposition dated JUNE 5, 2019,

 5    and that the same is a true and correct

 6    transcription of the answers given by me to the

 7    questions propounded, except for the changes,

 8    if any, noted on the attached Errata.

 9

10

11    SIGNATURE:

                CHRISTOPHER J. PORTIER, Ph.D.

12

13    DATE:

14

15

16

17    WITNESSED BY:

18

19    DATE:

20

21

22

23

24
```

Christopher J. Portier, Ph.D

```
 1                       LAWYER'S NOTES

 2      PAGE   LINE

 3      _____  _____   _____

 4      _____  _____   _____

 5      _____  _____   _____

 6      _____  _____   _____

 7      _____  _____   _____

 8      _____  _____   _____

 9      _____  _____   _____

10      _____  _____   _____

11      _____  _____   _____

12      _____  _____   _____

13      _____  _____   _____

14      _____  _____   _____

15      _____  _____   _____

16      _____  _____   _____

17      _____  _____   _____

18      _____  _____   _____

19      _____  _____   _____

20      _____  _____   _____

21      _____  _____   _____

22      _____  _____   _____

23      _____  _____   _____

24      _____  _____   _____
```