# EXHIBIT 9

## AFFIDAVIT OF EXPERT TOXICOLOGIST DR. WILLIAM R. SAWYER

STATE OF FLORIDA

COUNTY OF LEE

Before me, the undersigned notary, on this day personally appeared WILLIAM R. SAWYER, a person whose identity is known to me. After I administered an oath to him, upon his oath, he said:

## A.  Identification

### Name and Purpose

1.  My name is William R. Sawyer, Ph.D. I have been retained as an expert toxicologist by attorneys for the plaintiff(s) in this matter to review and assess the various facts in the case surrounding the use of and exposure to glyphosate, an herbicide. This includes review and assessment of the available toxicological study evidence and any toxic etiology aspects (including dose-response) with respect to the plaintiff(s) claim of subsequent non-Hodgkin lymphoma diagnoses at issue in this matter.

### Qualifications and Training

2.  I am a professional toxicologist with a doctorate in toxicology from the Indiana University School of Medicine. I earned an associate degree from the State University of New York Agricultural and Technical College at Morrisville in 1976. I earned a bachelor of science degree in biology from the State University of New York at Geneseo in 1978. I earned a master's degree in cellular and molecular biology, also from the State University of New York at Geneseo, in 1982. I subsequently earned a doctorate in toxicology from the Indiana University School of Medicine in 1988. This required three years of medical school curriculum with three years of course work in toxicology as well as training in the State Department of Toxicology and original, peer-reviewed and published toxicological research.

3.  During my training at the Indiana University School of Medicine Department of Toxicology and Pharmacology, I studied under the late Robert B. Forney, Sr., Ph.D. Dr. Forney was the department chairman, the director of the State Department of Toxicology and one of the top researchers in his field and gained international

1

recognition. I received considerable training with respect to toxic exposure evaluations of alcohol, numerous pharmaceuticals, petroleum and petroleum products, benzene, natural products and toxic chemicals. I also received forensic training and worked in the State Department of Toxicology laboratory facility at the medical center in Indianapolis, Indiana, performing forensic analyses for poisons, pharmaceuticals, drugs of abuse and alcohol.

4.  I have been previously certified by the State of New York Department of Health as a clinical laboratory director in forensic toxicology (License No. SAWYW1) and as a licensed environmental laboratory director by the states of New York, New Jersey, California and South Carolina. I have previously been trained and certified under OSHA 29 CFR1910.120 for Hazardous Waste Operations and Emergency Response.

5.  I am an active member of various professional societies including the Sigma Xi, the Scientific Research Society, the American Academy of Forensic Sciences and the International Association of Forensic Toxicologists.

6.  I am presently chief toxicologist at Toxicology Consultants and Assessment Specialists, LLC, in Sanibel, Florida, (also registered and operating in New York). I have previously served as a peer-reviewer for the journal "*The Forensic Examiner*" and as a member of its editorial board. I was previously an adjunct assistant professor at the Upstate Medical Center in the Department of Medicine at S.U.N.Y. Health Science Center in Syracuse, New York.

7.  Subsequent to my training, I served full time in public health as the toxicologist for the Onondaga County Department of Health, Syracuse, New York, from 1988 through 1993. My previous work experience included considerable municipal and civil risk assessment, evaluation of environmental toxic exposures including petroleum products, design and execution of environmental monitoring, health assessment studies, methods to identify and effectively reduce community toxic exposures and assessment of public health matters. During my employment as toxicologist for the health department, I assisted the medical examiner's office with investigations of accidental and intentional poisonings.

8.  I have studied the toxicological effects and conducted toxicological assessments of petroleum and petroleum products, pharmaceuticals, hazardous chemicals, herbal

products, pesticides, herbicides and alcohol for more than 34 years as part of my training in toxicology and daily work experience as a toxicologist.

9.  With regard to qualifications specific to the current matter, I have studied the pharmacokinetics (drug absorption, distribution and metabolism) and toxicological effects of a wide range of manufactured substances as well as performed risk and causation assessments as part of my training and daily work experience. I have been recognized as an expert in the field of toxicology by courts in more than 30 states and have routinely consulted and testified in federal, state and international courts on both civil and criminal matters.

10. I have attached hereto as **Attachment A** my curriculum vitae which accurately reflects my professional standing and experience in the field of toxicology.

11. I am writing this affidavit to reply to the inaccurate representations directed at myself and my toxicological assessment in Monsanto's motion to exclude my testimony.

## B. Introduction

12. Defendant's motion to exclude my testimony presents a wide range of criticisms. These include the toxicological methodology employed, the manner in which I conducted my toxicological assessment, the nature and scope of my causal findings and criticisms of my qualifications and competency. In the interests of brevity, I have elected to address the substance of defendant's motion rather than its turgid content. There are essentially five (5) objections raised in defendant's motion as follows:

   C. *"The court should exclude Dr. Sawyer's general causation opinions."*

   D. *"The court should exclude Dr. Sawyer's specific causation opinions."*

   E. *"The court should exclude Dr. Sawyer's opinions regarding the George study."*

   F. *"The court should exclude Dr. Sawyer's opinions regarding trace chemicals."*

   G. *"The court should exclude Dr. Sawyer's opinions on Monsanto company documents and regulatory duties."*

13. Throughout this rebuttal, I have focused upon the scientific underpinnings of my findings and conclusions. My sole concern in the present matter is the concise and factual disclosure of objective scientific evidence and interpretation of the toxicological aspects of the case, in a manner consistent with generally-accepted methodology.

3

## C. General Causation

14. Defendant stated in its motion that *"Dr. Sawyer's general causation opinion should be excluded because it does not follow any valid or recognizable methodology."*

15. Defendant's assertion is erroneous and scientifically invalid. I have consistently employed the Bradford Hill methodology[1] and weight-of-evidence methodology throughout. On page 8 of the Dickey, et al., v. Monsanto Co. report, I stated:[2]

   "My toxicological opinions are based, in part, on six (6) primary epidemiological studies that provide objective data with respect to several prongs of the Bradford Hill criteria. My toxicological opinion is grounded in animal experimental evidence, *in vitro* human studies and human epidemiological studies as summarized within this report. Specifically, I have assessed dose response, temporality, latency period, biological plausibility (toxicological mechanisms), coherence (demonstrated by molecular-based studies) and animal studies as well as the strength of association and consistency.

   The six primary epidemiological studies include Eriksson, et al., 2008,[3] McDuffie, et al., 2001,[4] Andreotti, et al., 2018,[5] Leon, et al., 2019[6], Zhang, et al., 2019[7] and Pahwa, et al., 2019.[8] My toxicological focus on these studies is on study design, statistical power and exposure thresholds at different odds ratios, etc. I am using these study results in my toxicological assessment in conjunction with generally-accepted, peer-reviewed studies on genotoxicity (including direct human studies) mechanisms of action (promotion, etc.), absorption, distribution, metabolism and excretion (ADME), etc. In general, I have relied on studies that have documented the various aspects of the Bradford Hill criteria at or in excess of the 95% confidence

[1] Sir Austin Bradford Hill, "The Environment and Disease: Association or Causation?," 1965, Proceedings of the Royal Society of Medicine.

[2] Sawyer expert report, Dickey, et al., v. Monsanto, pg. 8.

[3] Eriksson, M., et al., "Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis," 2008, International Journal Cancer, Vol.123, pp. 1657 – 1663.

[4] McDuffie H., et al., "Non-Hodgkin's lymphoma and specific pesticide exposures in men: Cross-Canada study of pesticides and health," 2001, Cancer Epidemiology, Biomarkers & Prevention, Vol.10, pp. 1155 – 1163.

[5] Andreotti, G., et al., "Glyphosate Use and Cancer Incidence in the Agricultural Health Study," 2018, JNCI J Natl Cancer Inst., Vol.110 (5), doi: 10.1093/jnci/djx233.

[6] Leon, Maria, et al., "Pesticide use and risk of non-Hodgkin lymphoid malignancies in agricultural cohorts from France, Norway and the USA," 2019, International Journal of Epidemiology, pp. 1–17.

[7] Zhang, L., et al., "Exposure to Glyphosate Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence," July-September 2019, Mutation Research/Reviews in Mutation Research, Volume 781, pp. 186-206. https://doi.org/10.1016/j.mrrev.2019.02.001.

[8] Pahwa, M., et al., "Glyphosate use and associations with non-Hodgkin lymphoma major histological sub-types: findings from the North American Pooled Project," 2019, June 27, Scand J Work Environ Health, pii: 3830. doi:10.5271/sjweh.3830

threshold. However, as stated above, I am deferring to the epidemiologist with respect to the internal statistical designs and meta-analysis bio-statistical methodologies employed within each study."

16. I have included (later in this affidavit) examples from my reports and depositions as to my adherence to the generally-accepted Bradford Hill methodology.

17. Defendant also states that I considered only the *"dose aspects of the epidemiology and whether or not the plaintiff fits in the dose brackets within the epidemiology"* and that I *"did not consider any other aspects of the epidemiology or animal or cell studies for purposes of determining general causation."*

18. To be clear, I have deferred the "*internal statistical designs and meta-analysis bio-statistical methodologies employed within each study*" to Dr. Beate Ritz, an epidemiology expert.

19. However, it is critical to understand why I choose the six human epidemiological studies listed above. These six human epidemiological studies are the only peer-reviewed and published studies that provide a dose-metric. I did not "cherry pick," as stated by defendant, as there are no other human studies on glyphosate that provide a dose-metric. In fact, I included a "negative" study (Agricultural Health Study or AHS) as one of the six even though the findings were null.

20. I have relied on Dr. Beate Ritz for a more thorough assessment of these six epidemiological studies with respect to their strengths and weaknesses and overall reliability. I have carefully reviewed and assessed the six studies. I even went as far as researching the meaning of a "Swedish working day" between 1999-2002 as used in the Eriksson (2008) study. During deposition, I explained that Sweden officially used a 6-hour work day experimentally and returned to an 8-hour work day during the duration of the study. I even attempted communicating with Dr. Eriksson (who could not be reached). Defendant is fully aware of my in-depth analyses of these six studies. As a toxicologist, I do have training in biostatistics and epidemiology. In fact, for many years, I taught a minor section of medical epidemiology when I served as an adjunct assistant professor in the Department of Medicine (and the Department of Preventive Medicine) for nearly 20 years at the State University of New York Upstate Medical University in Syracuse, NY (teaching from 1988 to approximately 2012). I served under the prior chairman, Dr. Richard P. Oates, teaching a section of medical epidemiology using U.S. CDC disease causation methodologies. (For example, excessive caffeine and hip fracture causation.) I also taught a section of the 4th year clerkship course of toxicology lectures.

21.  Defendant is incorrect to state that I am incapable of relying on these six human epidemiological studies. Furthermore, defendant states that I have "not evaluated" [9] these six studies. As discussed in the above paragraph, this is fundamentally incorrect. I evaluated them to the extent that is appropriate for a toxicologist. Generally, toxicologists work with and rely upon medical epidemiologists to provide in-depth assessments of such studies, and that is what I have done in the current matter. With respect to evidence of my knowledge of these studies, defendant questioned me on July 16, 2019, from pages 120-217 (approximately ½ day of the full-day deposition). On that date, I was not yet familiar with the new Pahwa, M. et al., 2019 glyphosate (North American Pooled Project) epidemiological study which I did include in the current Dickey, et al., reports.

22.  As a toxicologist, I have been specifically trained to perform bio-statistical analyses and review and rely upon epidemiological data especially with respect to dose-response assessments. I have published toxicological studies, including bio-statistical calculations, which underwent peer-review and publication. In the current matter, I have relied on the above cited six human epidemiological studies as they provide the only dose-metrics available in the current peer-reviewed human epidemiological literature. My "specific causation" assessment is limited to assessment of toxic etiology factors and exposure metric aspects of these studies. Whether or not glyphosate, from a general causation aspect, causes NHL has already been addressed by Dr. Portier, Dr. Ritz and other experts in this matter. That is not what I am assessing. I have restricted my specific causation assessments to the assessment of the plaintiffs' specific exposure events, spray dispersion, mixing procedure, personal protective equipment (PPE), dermal exposure events, frequency, duration, potential of systemic absorption, distribution, metabolism, excretion and potential toxic etiology from other substances (chemical, radiological, pharmacological, alcohol history and drugs of abuse) using differential diagnostic methodology[10] to determine whether or not plaintiffs have exceeded the exposure day thresholds in the studies noted herein. In conclusion, I have opined with respect

---

[9] Sawyer, W.R., Ritter, E. and Faloon, W.W., "The Morphological Effects of Chenodeoxycholic Acid on Human Gastric Mucosa," 1984, The American Journal of Gastroenterology, Vol. 79, No. 5, pg. 348-353.
Sawyer, W.R., Forney, R.B., "Postmortem Disposition of Morphine in Rats," Oct. 1988, Forensic Science International, Vol. 38, pg. 259-273.

Sawyer, W.R., Steup, D.R., Martin, B.S. and Forney, R.B., "Cardiac Blood pH as a Possible Indicator of Postmortem Interval," Nov. 1988, Journal of Forensic Sciences, Vol. 33, No. 6, pg. 1439-1444.

[10] Of the 12 Plaintiffs, nine with differential diagnoses, three general causation only; however, I did ascertain Mr. Hernandez's specific exposure information, PPE, use of the product, etc.

to whether or not  the risk of developing NHL was or was not substantially increased (for the nine plaintiffs which I assessed by 8-hour, time-weighted exposure days).

23. To be clear: I have not attempted to repeat the work already performed by Dr. Ritz and Dr. Portier, et al., in the previously decided general causation assessments.[11] I am a toxicologist and my focus is on differential toxic etiology and dose-response as well as characteristics of the various chemicals in Roundup, its dermal absorption into systemic circulation, genotoxic effects and mechanistic effects.

24. My reliance on these six studies, which relied on dose-response metrics, only includes results that were statistically significant at the 95% confidence interval. The AHS did not reveal increased odds ratios at the 95% confidence interval; however, I used the results of that study to demonstrate the various exposure tertials and quartiles among applicators as provided in the study as they were termed "exposure days" as in the other five studies. This key metric is generally recognized in the prevailing toxicological literature. Assessing the 8-hour, time-weighted exposure days of each plaintiff provides a dose-responses measurement consistent with the Bradford Hill causation criteria.

25. Defendant claims that in many of the reports, I did not calculate dose based on mg/kg/day of glyphosate. There are no glyphosate human exposure metrics published in the human epidemiological studies with respect to mg/kg/day of glyphosate. The defendant (in deposition questions) alienated the exposure-day calculations and referred to them as *"your methodology"* – when, in fact, it is the prescribed toxicological dose-metric methodology within the human studies and is based upon calculation of exposure days, not mg/kg/day dose.

26. In summary, the methodology of exposure-days is a valid and "recognizable" methodology. It is important to note that animal studies are based upon mg/kg/day doses but cannot be directly used to determine causation. This is because there simply are not any human epidemiological studies based on mg/kg/day dose. Yet, defendant asked in deposition, "*Am I correct that your exposure assessment in this case is based on calculating a figure that you call exposure days?*"[12] (As if I had just "made it up.")

---

[11] July 10, 2018 Daubert hearings and decision by United States Federal District Judge Vince Chhabria
[12] Sawyer deposition, July 16, 2019, pg. 120, lines 7-10.

27. Defendant has stated in the motion, *"Dr. Sawyer has admitted that his dose calculations do not support his opinions on specific causation."* I have prepared dose calculations in units of mg/kg/day in two of the cases (Giglio and Russo) using the POEM methodology; however, such calculations are only useful in gauging whether or not the plaintiffs' dose is near the acceptable operator exposure level (AOEL).

28. Defendant also erroneously claims that the POEM method is unreliable. This assertion is false. In the Russo vs. Monsanto report, I referenced specific studies that have evaluated the POEM methodology and found it to be reasonably accurate and reliable.[13]

29. The AOEL is not a human cancer-effect threshold. Dose thresholds with respect to statistically significant increased rates of NHL can only be derived from the current human epidemiological studies in units of exposure-days. That is the reason this metric was applied throughout my written reports (and was correspondingly disclosed in deposition when questioned on this point). There was no "cherry picking" as there are only six human epidemiological studies that provide dose metrics.

30. With respect to methodology, my report documented it as summarized on page 124 in the Dickey v. Monsanto report (and the other plaintiff reports):

"My toxicological assessment of the current matter includes assessment of the human epidemiological studies discussed above, the dose/response (biological gradient), strength of association, consistency and coherence of the six primary

---

[13] Abukari, Wumbei, "Pesticides Applicator Exposure Assessment: A Comparison between Modeling and Actual Measurement," 2015, Journal of Environment and Earth Science ISSN 2224-3216 (Paper) ISSN 2225-0948 (Online) Vol.5, No.11.

U.K. Health and Safety Executive, HSE, "Operator Exposure," 2016, Data requirements handbook, Retrieved from: http://www.hse.gov.uk/pesticides/topics/pesticide-approvals/pesticides-registration/data-requirements-handbook/operator-exposure.htm

"Operator exposure assessment for MON 2139 UK – Case" MONGLY06509236

"UK POEM calculations in preparation of meeting Spanish competent authorities." MONGLY01275627

Lawson, A., et al., "Three Methods to Assess Levels of Farmers' Exposure to Pesticides in the Urban and Peri-urban Areas of Northern Benin," 2017, Tunisian Plant Protection Journal, Vol.12, pp. 91–108.

Illyassou, K., et al., "Risk Assessment for Small Farmers Exposed to Plant Protection Products in the Niger River Valley," 2017, Comm. Appl. Biol. Sci.

EPA, "Risk Assessment Methodology for Hazardous Substances: How to assess the risk, cost and benefit of new hazardous substances for use in New Zealand," 2018, Environmental Protection Authority.

studies, various chemical formulants and additives found in the Roundup product as well as experimental evidence including absorption, distribution [*i.e.,* measurement in bone marrow], metabolism and excretion (ADME) and the various mechanisms of carcinogenesis (including genotoxicity, impairment of DNA repair mechanisms and promotion). Additionally, I have focused on dermal absorption, the manner and degree to which Roundup penetrates the skin, the lack of adequate PPE, and additive toxicological effects of POEA and POEA-derivatives used in the product."

31. More specifically, in assessing underlying toxicological mechanisms and ADME, the mechanisms underlying the carcinogenicity and the impact of POEA and POEA derivatives used in the glyphosate products, I have cited the following in my report:

   a. Relevant experimental mechanistic studies including animal studies (in some cases converted to human equivalent doses using the generally-accepted HED methodology)

   b. Toxicological assessment of biological plausibility of the causal connection

   c. Human *in vitro* studies of genotoxicity and/or promotion

   d. Direct human studies on genotoxicity

   e. Assessment of consistency and coherence of the genotoxicity studies

   f. Human *in vitro* dermal absorption studies

   g. Direct primate dermal absorption studies

   h. Human epidemiological dose-response studies using exposure-day thresholds

   i. Human epidemiological strength of association studies at various "exposure day" metrics.

   j. Human epidemiological temporality studies with respect to latency

32. Defendant stated in pg. 5, 1st full paragraph, lines 10-11:

   "*And he did not attempt to consider—much less reliably analyze and rule out—many other possible causes of Plaintiffs' NHL.*"

33. This is an erroneous accusation. I reviewed the plaintiffs' fact sheets (PFS), depositions of the plaintiffs and witnesses, photographs and/or lists of chemical products present at the plaintiffs' proprieties and interviewed each plaintiff.[14] My line of questioning, as documented in my reports, included questions regarding prior use

---

[14] I was not asked to ascertain and assess any aspects of specific causation with respect to plaintiffs Harris, Hernandez or Perkins (general causation only).

of other pesticides, insecticides, radiation, CT scans, chemical products, paint removers, potential occupational chemical exposures, etc. In some reports where such products were used occupationally, I prepared lengthy assessments of such products to determine whether carcinogenic potential existed. In most cases, only janitorial products, "Raid" and other common products were reported by non-occupational applicators which I have fully assessed per the product's safety data sheets (SDSs), ingredients and potential carcinogenic hazards for numerous products in reports of previous plaintiffs in the Monsanto glyphosate matters and did not repeat them in the MDL reports.

34. For example, I provided a detailed assessment of Mr. Giglio who is an MDL plaintiff as he was occupationally-exposed to Roundup and other chemicals (see below).

**Figure 1 – Page 38 from the Giglio v. Monsanto report authored by Dr. Sawyer (It should be noted that this table is actually 8 pages long.)**

Giglio v. Monsanto Co., et al.
August 20, 2019
Page 38

Table 6

Carcinogenicity of Substances to which Mr. Giglio Reported Potential Exposures

| Name | Ingredients (per MSDS) | Known to Cause NHL? | Probable Human Carcinogen? | Comments |
|---|---|---|---|---|
| | Ethene, chloro-, homopolymer, chloride; PVC; 12-20% | No | No | |
| | Cyclohexanone 10-20% | No | No | |
| | Fumed silica 1-5% | No | No | |
| Red Devil Duratex Exterior/Interior Enamel | | No | No | Non-carcinogenic |
| Savogran TSP Trisodium Phosphate | | No | No | Non-carcinogenic |
| Shoe MGK Water and Stain Repellant | | No | No | Non-carcinogenic |
| Varathane Liquid Plastic Interior Wood Finish | Naphtha | No | No | MSDS indicates no carcinogens.[93] |
| | Toluene 7.2% | No | No | |
| | Acetone 14.4% | No | No | |
| | N-Butyl Alcohol 3.0% | No | No | |
| | Aliphatic & Halogenated Aliphatic Hydrocarbons 39.5% | No | No | |
| WD-40 | | No | No | Non-carcinogenic |
| Equipment | | | | |
| 900 AC/DC Auto Charger | n/a | n/a | n/a | |
| Mold Armor DIY Mold Test Kit | n/a | n/a | n/a | |
| Supercrank Motorcycle Battery | n/a | n/a | n/a | |
| Wagner Furno 500 Heat Gun | n/a | n/a | n/a | |

35. In the Dickey matter, I provided and assessed 14 SDS's of products Mr. Robert Dickey and Mr. Frank Pollard used occupationally in their farming activities. In the Domina matter, I identified and assessed chemicals used by Mr. Domina in farming including 2,4-D, Keystone, Callisto, Harness Xtra, Halex GT and, Flexstar GT.[15] I also reported and assessed products used by Mr. Royce Janzen in his prior farm work.[16]

---

[15] Sawyer report, Domina, et al., vs. Monsanto, October 9, 2019, page 5.

[16] Table A in Sawyer report, Janzen, et. al. vs. Monsanto, October 9, 2019, page 6.

36. Plaintiff Yolanda Mendoza stated that she worked as a schoolteacher and as a security officer from the late 1990s until about 2001 and was not exposed to any chemicals other than Windex and household products. Plaintiff John D. Sanders used multiple types of Roundup/glyphosate products and janitorial products (there are no known janitorial products associated with NHL). The last of the 12 MDL plaintiffs, Mr. Frank Tanner, is a licensed pesticide applicator and primarily used Roundup as well as Ronstar® pre-emergent products (non-carcinogenic), nitrogen/pot ash fertilizers and agricultural horticultural oils (harmless).

37. Defendant's claim that I *"did not even attempt to consider—much less reliably analyze and rule out—many other possible causes of Plaintiffs' development of NHL"* is incorrect. Defendant references examples from my testimony in the Giglio August 20, 2019, deposition. In the Giglio report, I covered potential issues including his statement of never using steroids in his body-building workouts, non-smoker status, no pre-NHL history of long-term prescribed steroids and no excess alcohol (one alcoholic drink per week except when playing out with the band, maximum of 2-3 drinks). I learned (from my direct interview) that Mr. Giglio played guitar, enjoys woodworking and gardening hobbies. No known excessive exposures to benzene or solvents were noted. There was evidence of a bottle of paint remover at his home; however, during a second interview with him, I learned that this was in a box of paints given to him to use by his church (for painting props) and which he never opened. I also questioned Mr. Giglio regarding any X-rays prior to his NHL diagnosis (none); however, he recalled that he may have had a CT scan around 2005 (prior to his NHL diagnosis). Defendant's statement of not even attempting to consider or ascertain other toxic etiology causes of Mr. Giglio's NHL is apparently based on my proper deferral of medical-related issues to the medical oncologist. My role as a toxicologist is limited and I am not about to opine beyond my level of training and experience.

38. Of the 12 MDL cases, I was not asked to assess any aspects of specific causation with respect to plaintiffs Mr. Anthony Michael Harris or Ms. Goldie Perkins (general causation only). However, I performed limited specific causation analyses with respect to Mr. Ines Hernandez's specific exposures, PPE, equipment, mixing and dermal exposures. Of the other nine plaintiffs, I did ascertain through similar documents as discussed above, medical records and direct interview information on plaintiffs' history of tobacco, alcohol, chemical products, pharmaceuticals, drug abuse, etc. In cases where information was not available within the medical records, depositions or PFSs, I inquired during interview with respect to alcohol use, prior

12

use of immunosuppressive pharmaceuticals, carcinogenic pharmaceuticals such as cyclophosphamide (which causes NHL) and exposures to radiation and/or CT scans as well as other potential toxic etiology related to NHL.

39. Defendant stated, "*Instead in those cases [Dickey, et al.], Dr. Sawyer relied exclusively on the alleged dose determinations of either M. Petty or Dr. Schiff.*" This statement is inaccurate as I chiefly reviewed the Plaintiff's (or decedent's widow's) deposition or PFS and conducted direct interviews. I also relied on the exposure assessment prepared by Stephen Petty, CIH, as it is general practice for a toxicologist to rely on the exposure assessments of certified industrial hygienists. Defendant's claim that an exposure assessment is something a jury could do is incorrect. In most cases, the exposures were complex with various frequencies of transferring liquid, mixing and spraying with various frequencies and durations over certain months and years.

40. In summary, my role as a toxicologist with respect to "general causation" is limited to specific toxicological parameters such as PPE, dermal absorption, systemic distribution, metabolism and excretion (ADME) and toxicological mechanisms, etc. ADME provides an understanding as to how certain chemicals make entry into the body, where it distributes to, its residency time and (mechanistically) what toxicological endpoints have been documented in the peer-reviewed literature. Additionally, whether such mechanistic studies meet the various Bradford Hill criteria of statistical significance, strength, dose-response, consistency, coherency, temporality and are biologically-plausible and generally-accepted in the peer-reviewed literature.

41. With respect to genotoxic mechanisms, I have evaluated the available study evidence with respect to the relevant experimental data, strength of the associations and relied on studies with confidence limits $p<0.05$, with coherence across different genotoxicity studies in mice, *in vitro* and *in vivo* human studies and at dose levels within a reasonable range of applicators. For example, I relied on the Prasad, et al., study (2009) with respect to the genotoxic effects of glyphosate as formulated in Roundup.™ With respect to the Prasad study, animals dosed at only 25 mg/kg body weight revealed a 4.3-fold increase in chromosomal aberrations at the 95% level of confidence ($p<0.05$). I applied generally-accepted interspecies allometric scaling for dose conversion from animal-to-human and the dose was in a reasonable range to that of applicators at 2.0 mg/kg/day.

13

42. To be clear: I have factually reported the underlying toxicological mechanisms of Roundup with respect to glyphosate-induced genotoxicity and promotion at dose-response levels in several studies that are within a reasonable range as those encountered by applicators (as opposed to animal studies 50, 100 or 1,000 times above actual applicator exposures). I have assessed and presented animal and human *in vitro* and *in vivo* evidence. Additionally, I have assessed and reported on the toxicity of the POEA surfactant additives to which plaintiffs were exposed (POEA is used in all Roundup products, except Rodeo, for aquatic weed control).

43. Additionally, I have reported on the specificity of the genetic damage, consistency of the association in additional studies, the plausibility of the reported mechanism, dose-responses demonstrated in the controlled animal studies and temporality of the relationship. I have also noted in deposition that IARC (2017) concluded that there is strong evidence for the genotoxicity of glyphosate.

## D. Specific Causation

44. My role as a toxicologist with respect to "specific causation" included assessment of prior use of insecticides, radiation, CT scans, chemical products, paint removers, potential occupational chemical exposures, excessive alcohol consumption, drugs of abuse, chemical herbicides, pesticide products and carcinogenic chemicals capable of inducing NHL (such as certain paint strippers, benzene, formaldehyde, and or immunosuppressive pharmaceuticals or carcinogenic pharmaceuticals such as cyclophosphamide previously prescribed to plaintiffs prior to their NHL diagnoses). Using differential diagnostic methodology, I prepared lengthy assessments of such products to determine whether other NHL carcinogenic potential existed. In most cases, only janitorial products, "Raid," and other common products were reported by non-occupational applicators. I have fully assessed product safety data sheets (SDSs), ingredients and potential carcinogenic hazards for numerous products in this matter.

45. Additionally, as a part of specific causation, I have assessed the plaintiffs' glyphosate exposures based on 8-hour time-weighted, exposure days consistent with the six dose-metric epidemiological studies (Eriksson, et al., 2008,[17] McDuffie,

---

[17] Eriksson, M., et al., "Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis," 2008, International Journal Cancer, Vol.123, pp. 1657 – 1663.

et al., 2001,[18] Andreotti, et al., 2018,[19] Leon, et al., 2019[20], Zhang, et al., 2019[21] and Pahwa, et al., 2019[22]). The purpose was to determine where the exposure-day thresholds at various odds ratios (ORs) were exceeded.

46. Although I have ascertained smoking histories and pack-year doses for plaintiffs, I have stated repetitively in deposition that I defer the smoking opinions to the medical oncologist and medical epidemiologist as I have not fully evaluated all of the latest available human study data specific to NHL. (For example, the specific NHL Taborelli, et al., 2017, study which I only recently examined and thus it is not in my report.[23]) I have also appropriately deferred potential hereditary genetic profiles and family cancer history to the oncologist. Additionally, I have deferred assessment of the potential increased risks of NHL related to underlying diabetes, obesity or pre-existing immunological dysfunction to the oncologist.

47. Throughout this process, I have applied a differential diagnosis methodology (a generally-accepted toxicological and medical assessment methodology) with respect to potential confounding exposures to other chemicals, pharmaceuticals, chemical agents, etc. and have assessed dosage consistent with the existing exposure day methodology.

48. In the current matter, a clinical differential diagnosis has already been performed with respect to the specific type of NHL as established by plaintiffs' treating physicians and based largely upon the objective pathology diagnoses. Differential diagnosis provides the toxicologist a framework in which to review and consider the significance of potentially causative factors. With respect to my opinions regarding Roundup as a "substantial contributing factor," in the nine cases where I assessed

---

[18] McDuffie H., et al., "Non-Hodgkin's lymphoma and specific pesticide exposures in men: Cross-Canada study of pesticides and health," 2001, Cancer Epidemiology, Biomarkers & Prevention, Vol.10, pp. 1155 – 1163.

[19] Andreotti, G., et al., "Glyphosate Use and Cancer Incidence in the Agricultural Health Study," 2018, JNCI J Natl Cancer Inst., Vol.110 (5), doi: 10.1093/jnci/djx233.

[20] Leon, Maria, et al., "Pesticide use and risk of non-Hodgkin lymphoid malignancies in agricultural cohorts from France, Norway and the USA, "2019, International Journal of Epidemiology, pp. 1–17.

[21] Zhang, L., et al., "Exposure to Glyphosate Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence," July-September 2019, Mutation Research/Reviews in Mutation Research, Volume 781, pp. 186-206. https://doi.org/10.1016/j.mrrev.2019.02.001.

[22] Pahwa, M. et al., "Glyphosate use and associations with non-Hodgkin lymphoma major histological sub-types: findings from the North American Pooled Project," Scand J Work Environ Health, 2019 Jun 27. pii: 3830. doi:10.5271/sjweh.3830

[23] Taborelli, et al., "The dose-response relationship between tobacco smoking and the risk of lymphomas: a case-control study," BMC Cancer, (2017) Vol. 17: pgs. 421-430.

15

8-hour, time-weighted exposure metrics and performed a full differential diagnostic assessment of confounding factors, I opined with respect to causation. I also relied on the prior work of Dr. Portier and Dr. Ritz, et al., with respect to the general causation evidence that glyphosate is carcinogenic with respect to NHL.

49. My differential assessment was done, in part, based on Dr. Schiff's examination of hereditary/medical factors such as prior diabetes, obesity, etc. As the toxicologist, I examined numerous other potential confounding factors such as pesticides, insecticides, radiation, CT scans, chemical products, paint removers, potential occupational chemical exposures, etc. As shown in paragraph 33, "Figure 1," I prepared detailed assessments of such potential confounding factors.

50. Defendant insists that I should have covered all facets of the causation assessment – this is incorrect. When I worked as the toxicologist in the health department (1988-1993), I was involved in very significant causation analyses (i.e., Syracuse, NY, fire fighters repetitively exposed to PCB-tainted donated oil burned in the practice fire tower; leukemia cancer cluster near a benzene-contaminated waste pit and other examples), I worked with our in-house epidemiologist (Dr. E. Waltz), the Health Commissioner (Dr. James Miller) and the chief medical examiner. Proper methodology involves experts from different disciplines working in tandem.

## E. George Study

51. Defendant's Motion states that my opinions "*are based on data that is universally considered to be unreliable. Specifically, Dr. Sawyer's conclusion that the George study demonstrates Roundup is a cancer 'promoter' is inconsistent with the conclusions of all scientific panels and regulators that have reviewed it including the EPA and IARC. Indeed, IARC concluded that the George study is "inadequate" for evaluation of glyphosate.*"

52. The statement by IARC is consistent with the fact that the George, et al., study was not the appropriate methodology used in the standard animal bioassay methodology for carcinogenesis determination; rather, the methodology was that of generally-accepted tumor promotion methodology using a very low dose of a known carcinogen (DMBA) with and without glyphosate.[24]

---

[24] "For more than 60 years, the chemical induction of tumors in mouse skin has been used to study mechanisms of epithelial carcinogenesis and evaluate modifying factors. In the traditional two-stage skin carcinogenesis model, initiation is accomplished by the application of a subcarcinogenic dose of a

53. The study was also criticized for its short duration of treatment (32 weeks). This is not consistent with standard animal bioassay methods which include dosing and observation for a longer duration. Thus, the shorter study design decreases the ability to detect tumor promotion. This criticism does not weaken the positive findings of the study.

54. The study was also criticized for "no solvent control animals." While it is standard practice to include a solvent-only treatment group in experimental design, the ethanol/acetone was the solvent and was present in five other treatment groups (100 mice). Those five groups did not show any papillomas. Ethanol/acetone compounds are well studied and commonly and generally used in similar study designs and have not been demonstrated to induce papillomas.  Upon careful review of the study design:

   ❖ Zero of 20 mice in the glyphosate group developed papillomas (the glyphosate in this group was applied using the carrier solvent).

   ❖ Zero of 20 mice in the glyphosate (s) single application group developed papillomas (the glyphosate (s) in this group was applied using the carrier solvent).

   ❖ Zero of 20 mice in the glyphosate (t) three times per week application group developed papillomas (the glyphosate (t) in this group was applied using the carrier solvent).

   ❖ Zero of 20 mice in the DMBA (s) single application group developed papillomas (the DMBA in this group was applied using the carrier solvent).

   ❖ Zero of 20 mice in the t-phorbol acetate (TPA) group developed papillomas (the t-phorbol acetate (TPA) in this group was applied using the carrier solvent).

55. Thus, in total, 100 mice that received solvent (ethanol/acetone) - groups II, IV, V, VI, VII - were without any evidence of papillomas. Thus, the reliability of this study with respect to the missing control group is not at issue.

carcinogen. Subsequently, tumor development is elicited by repeated treatment with a tumor promoting agent." DMBA is typically used in such studies. DMBA produces "highly reproducible papilloma burden [which] is expected within 10–20 weeks with progression of a portion of the tumors to squamous cell carcinomas within 20–50 weeks." Abel, et al., "Multi-stage chemical carcinogenesis in mouse skin: Fundamentals and applications", 2009, Nature Protocols, Vol. 4(9): 1350–1362.

17

56. The George study revealed that the Roundup product (41% glyphosate, POEA 15%) increased the incidence of tumors when combined with DBMA. The study demonstrated that glyphosate is capable of promoting tumors induced by an initiating chemical (DBMA). It is certain that Roundup, at a dose reasonably equivalent to that received by applicators, is a tumor promoter. In the George study, the well-known Group 1 carcinogen DMBA was administered to the mice.

57. To be clear: The George study was not designed to determine whether glyphosate itself is a carcinogen. This was not the objective of the study design. The George, et al., study was designed to determine whether Roundup promoted tumors.

58. The George study has been cited in at least 86 related scientific, peer-reviewed articles. There are no editorials or adverse criticisms within the peer-reviewed literature that I have found that are critical of this study as being "unreliable." Defendant's assertions in this regard are not supported by factual evidence.

59. The study revealed that when glyphosate was combined with DMBA (a powerful carcinogen found in cigarette smoke[25]) and applied to the skin, 40% of the mice developed tumors with an average of 2.8 tumors per mouse. Conversely, when the mice were dosed only with DMBA, none developed tumors. The study demonstrated, *to 95% statistical certainty*, the carcinogenic potential of glyphosate as a powerful tumor promoter in a 2-stage promotion model.

60. Thus, Defendant's attempt to criticize this study and my reliance upon it by asserting that determining whether or not glyphosate is a carcinogen was the focal point of the study is not accurate. Also, the criticism that the study was "flawed" due to no-solvent group is not accurate and is misleading. There were actually 100 solvent carrier animals without a single papilloma.

61. Further, my report shows the transformation of the George study mouse dosage to a human equivalent dose (using the generally-recognized and accepted HDE methodology) is reasonable. The HED transformation shows that the dose in the George study was both reasonable and consistent with the documented dosage range of glyphosate applicators (AOEL). The animals received patch coverage of only 2 cm$^2$. Human applicators receive a substantially larger percentage of dermal

---

[25] Lee, et al., "Polycyclic aromatic hydrocarbons present in cigarette smoke cause bone loss in an ovariectomized rat model," 2002, Bone, Jun.30(6):917-923.

impact than that of the mice in the George study. It should be noted that this is not the only promotion study I relied on.

## F. Trace Chemicals

62. Defendant's Motion further states that," *Dr. Sawyer's opinion that trace chemicals in Roundup caused or contributed to plaintiffs' cancer is based merely on assertions that those chemicals (at much higher doses) have been associated with cancer. But there is no scientific evidence of causation linking them to NHL at doses remotely comparable to those at issue here, and Dr. Sawyer does not even calculate the doses of these chemicals to which plaintiffs were allegedly exposed. Nor is there any scientific evidence suggesting that exposure to Roundup is a cancer risk because of these trace chemicals.*"

63. Defendant's statement that I have not calculated the doses of these chemicals (formaldehyde and ethylene oxide) to which plaintiffs were exposed is, in part, correct.

64. Although I have not calculated the potential formaldehyde dosage, Monsanto performed an acute dose calculation in 1985. A document entitled "Potential formaldehyde exposure from wetcake, MON-0139 and Roundup® herbicide" was prepared by J.W. Worley on May 30th 1985.[26] In this study, Dr. Worley refers to the calculation and states that he used some "completely arbitrary assumptions" with only 1% of the formaldehyde assumed as escaping from the drum container when opened over a 15 minute period and "only 1% of that is assumed to be inhaled by the worker." With respect to the Roundup® herbicide, the "calculated formaldehyde concentration in air was **2.8 PPM**." The study stated that the result was "in the neighborhood of the allowed limits" but also stated "the ACGIH threshold limit value (TLV) is a **2 PPM ceiling**, a concentration that should not be exceeded even instantaneously."

65. It is also noteworthy that in 1995 a "glyphosate centrifuge feed" MSDS was created by Monsanto that revealed "glyphosate centrifuge feed contains up to 1.3% formaldehyde."[27] This is equivalent to 13,000 PPM.

---

[26] MONGLY04267028-33.

[27] MONGLY00052410-13

66. Formaldehyde (a Group 1 human carcinogen) has been demonstrated within human epidemiological studies to induce NHL.[28] Monsanto's material data safety sheet states, *"Formaldehyde is listed as a substance that 'may reasonably be anticipated to be' carcinogenic by the National Toxicology Program (NTP) in their Seventh Annual Report on Carcinogens. It is classified by the International Agency for Research on Cancer (IARC Monographs, Vol. 29). It is regulated by OSHA as a carcinogen (29 CFR 1910.1048)."*[29] The NIOSH 15-minute exposure ceiling limit is **0.1 PPM**. Formaldehyde is highly volatile with a boiling point of −2 °F and a vapor pressure < 1 atmosphere.

67. Ethylene oxide (sterilization gas) is also a Group 1 human carcinogen shown in occupational human epidemiological studies to induce NHL.[30] The National Cancer Institute (NCI) states, *"Lymphoma and leukemia are the cancers most frequently reported to be associated with occupational exposure to ethylene oxide."*[31] The Monsanto material safety data sheet for MON 59112 (surfactant) fails to provide a concentration for ethylene oxide but states,

> *"Ethylene oxide may be found in trace amounts in this product. Ethylene oxide may accumulate in the <u>head space</u> of drum and bulk containers. However, the concentration of ethylene oxide in the head space should not cause the OSHA 0.5 ppm action level for ethylene oxide exposure to be exceeded. Ethylene oxide is listed as a potential carcinogen by OSHA, National Toxicology Program (NTP) and International Agency for Research on Cancer (IARC)."*[32]

68. Defendant has failed to provide sufficient information regarding the content of ethylene oxide to prepare a reasonable dose estimate or air level. It should be noted that ethylene oxide is highly volatile with a boiling point of 50.7° F, a flash point of −4° F and a vapor pressure of 1.46 atm (68° F). The U.S. OSHA permissible exposure limit calculated as a TWA (time-weighted average) over 8 hours is 1 ppm,

---

[28] Wang, et al., "Occupational Exposure to Solvents and Risk of Non-Hodgkin Lymphoma in Connecticut Women," American Journal of Epidemiology, 2009 Jan 15; 169(2): 176–185.

[29] MONGLY00029022.

[30] National Center for Biotechnology Information Search database "Ethylene oxide is mutagenic in humans and chronic exposure is associated with an increased risk of leukemia, stomach cancer, pancreatic cancer and <u>non-Hodgkin lymphoma</u>." (NCI05), U.S. NIH. https://pubchem.ncbi.nlm.nih.gov/compound/Ethylene-oxide

[31] NIH, National Cancer Institute, "Ethylene Oxide," Sawyer deposition, Exhibit 26, October 16, 2018.

[32] MONGLY03133018.

and the short-term exposure limit (excursion limit) over 15 minutes is 5 ppm. The short-term recommended exposure limit set by NIOSH is also 5 ppm.

69. Defendant acknowledges that ethylene oxide has the propensity to accumulate in the head space of the container but fails to provide any dose calculations (as they did for formaldehyde) or reveal what the concentration range was in the Roundup® product. Thus, it is not reasonable based on the highly volatile properties of ethylene oxide to simply "assume" that exposures were less than 5 PPM in the breathing zone of a freshly-opened container and during pouring of the liquid within the breathing zone. If Defendant had at least disclosed the concentration range of ethylene oxide in the product, air level calculations could be made. However, the Monsanto document states, "*Ethylene oxide may be found in trace amounts in this product. Ethylene oxide may accumulate in the head space of drum and bulk containers.*" Thus, the toxicological properties of this chemical are additive to that of glyphosate.

70. Generally-recognized carcinogens with similar target endpoints of NHL include formaldehyde and ethylene oxide and are, by definition, additive and should be considered in the overall carcinogenic assessment of a product (such as Roundup®).

71. These two confirmed human carcinogenic substances are known to be present in trace amounts in the Roundup® product (as noted in Defendant's own documents) and require toxicological consideration. It is also noteworthy that these substances are not disclosed in the Roundup® product label and no warning exists with respect to these volatile substances being potentially inhaled from the container's head space.

73. Defendant's internal document states,

> "Any impurity capable of creating an adverse effect, above or beyond that of the active ingredient, is potentially relevant and may therefore have to be controlled by the specification. The adverse effect may reflect toxic or non-toxic hazards (see definition of relevant impurity in the glossary of terms, Appendix C). However, relevance is not determined only by the hazards presented by the impurity. A potentially relevant impurity may be designated as non-relevant if the available scientific evidence indicates no significant likelihood of its hazard being manifested in practice."[33]

74. Defendant, however, has not demonstrated that there is not a measurable additive hazard since *defendant fails to even recognize glyphosate as a carcinogen*. Defendant only addresses the chemical in a "non-additive" approach. This is a misleading methodology as it suggests that concern is misplaced.

75. As a final note with regard to additive carcinogenic effects of chemical substances, the U.S. EPA provides guidance on this issue as noted in the excerpt below from a generally-recognized toxicological U.S. EPA publication:[34]

> Epidemiologic studies, by their nature, are limited in the extent to which they can control for effects due to exposures from other agents. In some cases, the agent can have discernible interactive effects with another agent, making it possible to estimate the contribution of each agent as a risk factor for the effects of the other. For example, competing risks in a study population can limit the observed occurrence of cancer while additive effects may lead to an increase occurrence of cancer.

The U.S. EPA also offers guidance on the manner in which additive effects are required to be assessed:

> There may also be instances where the agent of interest is a risk factor in conjunction with another agent. For instance, interaction as well as effect-measure modification are sometimes construed to be confounding, but they are different than confounding. Interaction is described as a situation in which two or more risk factors modify the effect of each other with regard to the occurrence of a given effect. This phenomenon is sometimes described as effect-measure modification or heterogeneity of effect (Szklo and Nieto, 2000). ... When the effect of the exposure of interest is accentuated by another variable, it is said to be synergistic interaction. Synergistic interaction can be additive (e.g., hepatitis virus B and aflatoxin in hepatic cancer) or multiplicative (e.g., asbestos and smoking in lung cancer). ...

---

[33] MONGLY00982101.

[34] U.S. EPA, "Guidelines for Carcinogen Risk Assessment," U.S. Environmental Protection Agency Washington, DC, March 2005, EPA/630/P-03/001F

76. It is noteworthy that this is not a new or otherwise "novel" methodology. The "Health Effects of Toxic Substances"[35] reflects this view as a standard toxicological method:

> Additive effects imply that exposure to chemical carcinogens are additive over the lifespan of the organism. Carcinogenic substances are subject to the same bioaccumulation, transformation and excretion principles previously discussed. However, if there exists no threshold and a risk is assumed for any absorbed dose, then the probability of cancer induction would be additive.

77. It is known that there are additives within Roundup formulations which further increase dermal absorption of glyphosate and also enhance genotoxicity (for example, POEA derivatives).

78. Generally-accepted, peer-reviewed studies have demonstrated Roundup® to be of greater toxicity than glyphosate alone. I have referenced generally-accepted peer reviewed studies with respect to this fact.

79. Defendant stated, "*At the most recent trial, Dr. Sawyer implied, without any scientific evidence, that trace ingredients in Roundup could kill a person upon opening the Roundup bottle.*" This statement is inaccurate. I never used the word "kill." In paragraph 66 (above) the Monsanto MSDS stated, "*Ethylene oxide may accumulate in the head space of drum and bulk containers.*" However, the MSDS provides no quantitative values for dose assessment. The ethylene oxide is a human carcinogen (causes NHL). The quantity, although undisclosed, is additive to the glyphosate.

## G. Monsanto Company Documents

80. Defendant's assertions in this regard are erroneous and without foundation. Nowhere in my report or depositions of the 12 MDL plaintiffs do I seek to testify on interpreting, commenting or *"reading into"* Monsanto company documents.

81. I can only presume that defendant is referring to my Johnson vs. Monsanto report. Such language has long since been removed and is not present in the current MDL.

82. To be clear: I will not be testifying regarding regulatory duties. I hereby stipulate not to testify on these subjects (regulatory duties, intent or interpretation of Monsanto company documents). I have previously stated this position on multiple occasions. I do not understand why defendant keeps raising this point "as if" I had failed to make my position on the matter clear and extant to the court.

---

[35] M.J. Malachowski, "Health Effects of Toxic Substances," 1999, Second Edition, 0-86587-649-5.

William R. Sawyer, Ph.D.


SWORN TO and subscribed before me this

_____ day of December 2019.

LORI A FANNING
Notary Public - State of Florida
Commission # GG 243136
My Comm. Expires Jul 30, 2022
Bonded through National Notary Assn.

NOTARY PUBLIC

My commission expires July 30, 2022

24

**William R. Sawyer, Ph.D.**
Forensic Toxicologist

Curriculum Vitae

## Introduction

Dr. William Sawyer is a professional toxicologist with a doctorate in toxicology from Indiana University School of Medicine. He is a diplomate of the American Board of Forensic Medicine with 31 years of experience in public health and forensic toxicology including five years of governmental service. His specialized areas of expertise include causation analyses (defendant, plaintiff or criminal), dioxins, solvents, heavy metals, petroleum, crude oil, radionuclides/NORM, alcohol toxicology, drugs-of-abuse, pharmaceuticals, herbal products and other substances.

## Contact Information

Toxicology Consultants & Assessment Specialists, LLC (*TCAS, LLC*)
6450 Pine Avenue
Sanibel, Florida 33957

Toxicology Consultants & Assessment Specialists, LLC (*TCAS, LLC*)
29 Fennell Street
Skaneateles, New York 13152

Telephone:  800-308-0080
                     239-472-2436 (FL)
                     315-685-2345 (NY)

E-mail**:**      toxdoc1@comcast.net

## Education

Indiana University School of Medicine                          1983 - 1988
Indianapolis, Indiana
Robert B. Forney, Ph.D., Committee Chairman
Ph.D., Toxicology, 1988

State University of New York at Geneseo                     1979 -1982
Edward Ritter, Ph.D., Committee Chairman
Master of Science degree, Cellular & Molecular Biology, 1982

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

| | |
|---|---|
| State University of New York at Geneseo<br>Bachelor of Science degree, Biology, 1978 | 1976 -1978 |
| State University of New York Agricultural<br>and Technical College at Morrisville<br>Associate degree, 1976 | 1974 -1976 |

## Experience

As a scientist and communicator in forensic toxicology, Dr. Sawyer provides services to governmental agencies, corporations, investigators and select defendants or plaintiffs. Dr. Sawyer currently serves as chief toxicologist for Toxicology Consulting and Assessment Specialists, LLC. He has served for 23 years as an assistant professor (adjunct) with the Department of Medicine, Upstate Medical University, Syracuse, New York. Dr. Sawyer also has approximately 14 years of experience as a licensed clinical and environmental laboratory director in several states.

Additionally, Dr. Sawyer has received extensive training in alcohol toxicology at Indiana University School of Medicine (IU) in the Department of Pharmacology and Toxicology. This department is known for its development of the "Drunkometer" which is now known as the breathalyzer.  This device was invented by Rolla N. Harger, MD, at IU. Later blood to breath ratios and other original alcohol work was published by the late Dr. Robert. B. Forney (an internationally-respected expert in alcohol toxicology) whom Dr. Sawyer trained under. As part of his training requirements, Dr. Sawyer assisted in training Indiana State Police members who elected to be certified in breathalyzer testing, alcohol toxicology and sobriety screening.

Dr. Sawyer routinely provides impartial toxicological evaluations involving chemical exposures, alcohol ingestion, intentional poisonings, carcinogens, pharmaceuticals, pyrolysis products, heavy metals, organic chemicals and drugs-of-abuse in civil and criminal litigation. Toxic exposure investigations include analytical protocol, referral of autopsy material for analyses, environmental and occupational health risk assessments, site assessment and causation determination. Final work products that include scientific methods and validation, forensic documentation and written reports used in both forensic and routine (non-judicial) assessments are provided to multiple, nationwide clients.

William R. Sawyer, Ph.D.
Curriculum Vitae
August 2019

## Forensic Environmental and Laboratory Analyses

Through education, training and experience, Dr. Sawyer has gained extensive expertise in forensic petroleum analyses as well as environmental and clinical forensic analyses. With more than 23 years of laboratory experience, Dr. Sawyer has directed laboratory analyses, sampling protocol and chain-of-custody documentation in criminal and civil matters. He has also provided petroleum spill assessments to multiple clients including governmental environmental agencies (NYSDEC), various state attorney general offices (New York), defense and plaintiff law firms and industry. Petroleum spill and exposure assessment reports have provided objective evidence of characterization, age and source within reasonable scientific certainty.

## Professional Experience

**Toxicologist**                                              1988-1993
Onondaga County Department of Health
Syracuse, New York

Responsible for municipal and civil risk assessment, evaluation of environmental exposures and design and execution of environmental monitoring studies.  Advise and communicate with the Office of the Environment/County Executive and legislative subcommittees with respect to public health and environmental health issues. Established a clinical and environmental toxicology laboratory licensed under the NYS DOH and NYS ELAP agencies (NYSDOH #SAWYW1 and NY ELAP license #10183)

**Assistant Professor** (adjunct)                          1988-2012
SUNY Upstate Medical University
Department of Medicine
Syracuse, New York

**Chief Toxicologist**                                        1990-Present
Toxicology Consultants & Assessment Specialists, LLC
Sanibel, Florida
Registered DBA, 1990
Incorporated, January, 1994 (New York)
Limited liability corporation, January 2009 (Florida)

**Peer Reviewer**                                             1998-2017
Editorial Advisory Board for the "The Forensic Examiner"

3

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

**Laboratory Director**                                          1993-2002
EXPRESSLAB, Inc. (Lozier Laboratories)
Middlesex, New York

- NYSDOH Clinical License #SAWYW1 (1988-2000)
- NYS Environmental License (ELAP) #11369
- National Environmental Laboratory Accreditation Program (NELAP) #11369
- New Jersey DEPE License #73744
- South Carolina License #9101100
- California Environmental License

**Associate Editor**                                            1997-2000
Practical Reviews in Forensic Medicine & Sciences
Published by Oakstone Medical Publishing, Inc.
Jointly sponsored by Albert Einstein College of Medicine
and Montefiore Medical Center; CME
(continuing medical education) accredited

**Licensed Laboratory Director**                               1988-1993
Onondaga County Department of Health
Syracuse, New York
Licensed clinical laboratory, chlorinated hydrocarbons (NYS CLEU)
NYS License #SAWYW1 Drug Analysis /Qualitative & Forensic Toxicology
(License expired 9-26-2000),
NYS ELAP License #10183

**Analytical Toxicologist** (part-time)                        1983-1988
State Department of Toxicology
Indianapolis, Indiana

**Laboratory Technician** (part-time)                          1979-1983
Clinical Research Center
(National Institute of Health)
Strong Memorial Hospital
Rochester, New York

**Laboratory Technician** (part-time)                          1979-1983
Highland Hospital
Special Determinations Laboratory, Rochester, New York

4

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

## Certifications

| | |
|---|---|
| **OSHA 29 CFR1910.120** | Re-certified |
| Hazardous Waste Operations & Emergency Response | December 2004 |
| 40 hour certified | |

| | |
|---|---|
| **Clinical Laboratory Director** | Inactive |
| New York State Department of Health | |
| Certificate of Qualification | |
| License Code #SAWYW1 | |

| | |
|---|---|
| **Environmental Laboratory Director** | Inactive |
| New York State Department of Health | |
| ELAP License #11369 | |
| ELAP License #10183 | |

| | |
|---|---|
| **South Carolina Department of Health** | Inactive |
| Environmental Laboratory Director | |
| ELAP License #9101100 | |

| | |
|---|---|
| **New Jersey DEPE Laboratory Director** | Inactive |
| License #73744 | |

| | |
|---|---|
| **Asbestos Inspector** | Inactive |
| EPA Certificate #10-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 | |

## Societies and Honors

| | |
|---|---|
| American Academy of Forensic Sciences | 1985-Present |
| Member, promoted to member, 1990 | |

| | |
|---|---|
| Sigma Xi, The Scientific Research Society | 1986- Present |
| Associate Member | |

| | |
|---|---|
| National Myositis Association | 1995-1997 |
| Medical Advisory Board Member | |

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

| | |
|---|---|
| Society of Automotive Engineering<br>Member | 1986-Present |
| International Association of Forensic Toxicologists<br>Member | 1985-Present |
| Sigma Xi Research Competition<br>Fifth place | 1987 |
| Sigma Pi Alpha Scholastic Honor Society<br>Academic Award | 1984 |

## Professional Presentations

Sawyer, W.R. and Rigle, D.A., Featured continuing medical education credit workshop (2.00 credit hours) entitled, "Fundamentals of Medical Toxicology," Annual Scientific Meeting of The American College of Forensic Examiners, American Board of Forensic Medicine, Las Vegas, Nevada, October 24 – October 27, 2000.

Sawyer, W.R. and Rigle, D.A., Featured continuing medical education credit workshop (3.75 credit hours) entitled, "Forensic Medicine Toxicology," and "Reactive Airways Dysfunction Syndrome (RADS)," Annual Scientific Meeting of The American College of Forensic Examiners for the American Board of Forensic Medicine, New York, New York, October 29 - November 1, 1999.

Sawyer, W.R. and Rigle, D.A., "The Medical Aspects of Toxic Exposure Assessments," Annual Scientific Meeting of The American Board of Forensic Medicine and The American College of Forensic Examiners, Naples, Florida, October 12-14, 1998.

Sawyer, W.R. and Rigle, D.A., "Evaluating Toxic Exposures after Daubert," Featured presentation at the 4th Annual National Expert Witness & Litigation Seminar, Hyannis, Massachusetts, June 23, 1995.

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

## Articles, Abstracts, Treatises and Editorial Publications

Sawyer, W.R. *"Alcohol Content of Beer and Malt Beverages: Forensic Considerations,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 2., No. 6, February 2000, Oakstone Medical Publishing, Inc. from Logan, B.K., et al., Journal of Forensic Sciences, November 1999, Vol. 44, No. 6, pg. 1292-1295.

Sawyer, W.R. *"Fulminant Liver Failure in a Young Child Following Repeated Acetaminophen Overdosing,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 2., No. 6, February 2000, Oakstone Medical Publishing, Inc. from Bauer, M, et al., Journal of Forensic Sciences, November 1999, Vol. 44, No. 6, pg. 1299-1303.

Sawyer, W.R. *"Exposure to Contaminated Milk Presents 'Difficult Case' for Application of Daubert Reliability Standard,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 2., No. 4, December 1999, Oakstone Medical Publishing, Inc. published in Expert Testimony, Evidence, & Trial Consultants, October 1999, Vol. 7, Issue 10, pg. 3.

Sawyer, W.R. *"The Extent of Postmortem Drug Redistribution in a Rat Model,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 2., No. 4, December 1999, Oakstone Medical Publishing, Inc. from Hilberg, M.D., et al., Journal of Forensic Sciences, September 1999, Vol. 44 No. 5, pg. 956-62.

Sawyer, W.R. *"Potassium Nitrite Reaction with 11-Nor-Delta9-Tetrahydrocannabinol-9-Carboxylic Acid in Urine in Relation to the Drug Screening Analysis,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 2., No. 3, November 1999, Oakstone Medical Publishing, Inc. from Lewis, S.A., Journal of Forensic Sciences, September 1999, Vol. 44 No. 5, pg. 951-55.

Sawyer, W.R. *"GC/Mass Spectrometry Data from Fire Debris Samples: Interpretation and Application,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 2., No. 3, November 1999, Oakstone Medical Publishing, Inc. from Wallace, J.R., Journal of Forensic Sciences, September 1999, Vol. 44, No. 5, pg. 996-1012.

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

Sawyer, W.R. *"Toluene Diisocyanate Colocalizes with Tubulin on Cilia of Differentiated Human Airway Epithelial Cells,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 12, August 1999, Oakstone Medical Publishing, Inc. from Lange, R.W., et al., Toxicological Sciences, July 1999, Vol. 50, No. 1, pg. 64-71.

Sawyer, W.R. *"Differential Diagnosis Methodology Accepted by U.S. Circuit Court of Appeals,"* Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 12, August 1999, Oakstone Medical Publishing, Inc. Referenced Literature: The Testifying Expert, July 1999, Vol. 7, Issue 7, pg. 9 and Vol. 7, Issue 6, pg. 2.

Sawyer, W.R. *"The Enigma of Arsenic Carcinogenesis: Role of Metabolism,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 11, July 1999, Oakstone Medical Publishing, Inc. from Goering, P.L., et al., Toxicological Sciences, May 1999, Vol. 49, No. 1, pg. 5-14.

Sawyer, W.R. *"Blood Alcohol Content Testimony,"* Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 11, July 1999, Oakstone Medical Publishing, Inc. Referenced Literature: The Testifying Expert, June 1999, Vol. 7, Issue 6, pg. 9 and Goldfrank's Toxicologic Emergencies.

Sawyer, W.R. *"Forensic Evaluation of Pulmonary Toxicity Attributed to Amiodarone,"* (Special Presentation), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 10, June 1999, Oakstone Medical Publishing, Inc. Literature Review Backer, et al., American Heart, Vol. 123 (6), June, 1992, PDR, 1999, et al.

Sawyer, W. R. *"Fatal Ingestion of Paroxetine (Deroxatt TM),"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 10, June 1999, Oakstone Medical Publishing, Inc. from Tracqui, P., et al., Bulletin of The International Association of Forensic Toxicologists, January 1999, Vol. 27, No. 1, pg. 9-10.

Sawyer, W.R. *"A New Drug-of-Abuse 4-Methylthioamphetamine (Flatliners) & Toxic Related Fatality,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 10, June 1999, Oakstone Medical Publishing, Inc. from Groombridge, C., et al., Bulletin of The International Association of Forensic Toxicologists, April 1999, Vol. 24, No. 2, pg. 5-9.

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

Sawyer, W.R. *"The Response of the Intoxilyzer 5000 to Five Potential Interfering Substances,"* Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 9, May 1999, Oakstone Medical Publishing, Inc. from Caldwell, J.P. and Kim, N.D., Journal of Forensic Science, 1997, Vol. 42, No. 6, pg. 1080-87.

Sawyer, W.R. *"Nitrites Adulteration in Urine Drug Testing,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 8, April 1999, Oakstone Medical Publishing, Inc. from Spiehler, V., Bulletin of The International Association of Forensic Toxicologists, Spring 1999, Vol. 24, No. 1, pg. 17-18.

Sawyer, W.R. *"A Case of Ballistic Toxicology,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1., No. 8, April 1999, Oakstone Medical Publishing, Inc. from Kerkoff, W., Bulletin of The International Association of Forensic Toxicologists, Spring 1999, Vol. 24, No. 1, pg. 4-5.

Sawyer, W.R. *"Postmortem Drug Redistribution - Human Cases Related to Results in Experimental Animals,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 7, March 1999, Oakstone Medical Publishing, Inc. from Hilberg, T., et al., Journal of Forensic Sciences, January 1999, Vol. 44, No. 1, pg. 3-9.

Sawyer, W.R. *"Special Publication – Forensic Source Identification of Lead,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 6, February 1999, Oakstone Medical Publishing, Inc.

Sawyer, W.R. and Rigle D.A. Original Article/Special Presentation, *"Toxicology of Aromatic Hydrocarbons,"* Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 5, January 1999, Oakstone Medical Publishing, Inc.

Sawyer, W.R. *"Controlled Ethyl tert-Butyl Ether (ETBE) Exposure of Male Volunteers,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 6, February 1999, Oakstone Medical Publishing, Inc. from Nihlen, A, et al,. Toxicological Sciences, Vol. 46, No. 1, pg. 143-150, November 1998.

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

Sawyer, W.R. *"Vitamin B2 Interference with TDx Drugs-of-Abuse Assays,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 5, January 1999, Oakstone Medical Publishing, Inc. from Kunsman, SW., et al., Journal of Forensic Sciences, November 1998, Vol. 43, No.6, pg. 1225-27.

Sawyer, W.R., *"A Fatal Case of Benzene Poisoning & Special Discussion by Drs. Sawyer & Rigle,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 5, January 1999, Oakstone Medical Publishing, Inc. from Barbera, N, Bulla, G. & Romano, G. Journal of Forensic Sciences, November 1998, Vol. 43, No. 6, pg. 1250-1.

Sawyer, W.R., *"Biological and Chemical Hazards of Forensic Skeletal Analyses,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences , Vol. 1., No. 4, December 1998, Educational Reviews, LLC from Galloway, A. and Snodgrass, BA., Journal of Forensic Sciences, September 1998, Vol. 43, No. 5 pg. 940-48.

Rigle, D.A., Sawyer, W.R., Original Article/Special Presentation: *"Carbon Monoxide Toxicity versus Carbon Dioxide Toxicity and their Relationship in Attempted Suicide,"* Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 3, November 1998, Educational Reviews, LLC.

Sawyer, W.R., *"2,3,7,8-tetrachlorodibenzo-p-dioxin in Pregnant Long Evans Rats: Disposition to Maternal and Embryo/Fetal Tissues,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 4, December 1998, Educational Reviews, LLC from Hurst, CH, et al., Toxicological Sciences, October 1998, Vol. 45, No. 2, pg. 129-36.

Sawyer, W.R., *"Burns from undisclosed acids in a liquid used by temporary workers. A recent problem in occupational medicine caused by lack of information,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, September 1998, Educational Reviews, LLC. Vol. 1, No. 3, November 1998, from Fischer, M., Hellmann, A., et al., Deutche Medizinische Wochenschrift, February 6, 1998, Vol. 123, No. 6, pg. 151-54.

Sawyer, W.R., *"Automobile Exhaust as a means of Suicide: An Experimental Study with a Proposed Model,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 3,

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

November,1998, Educational Reviews, LLC from Morgen, C., Schramm, J., et al., Journal of Forensic Sciences, Vol. 43, No. 4, July 1998, pg. 827-36.

Sawyer, W.R. *"Beyond Rohypnol: Use of Gamma-Hydroxybutyrate and Burundanga in Rape,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 3, November 1998, Educational Reviews, LLC from Hollinger, MA, The Forensic Examiner, Vol. 7, Nos. 3 & 4, March/April,1998, pg. 5-27.

Sawyer, W. R., *"The Absorption, Blood Levels, and Excretion of Mercury after a Single Dose of Mercury Vapor in Humans,"* (Special Article Review Presentation, Critical Assessment and Original Abstract) Practical Reviews in Forensic Medicine and Sciences, Vol. 1, No. 1, September 1998, Educational Reviews, LLC from Sandborgh, G, et al., Toxicology and Applied Pharmacology, May 1997, Vol. 150, pg. 146-153.

Sawyer, W.R., *"The Effect of Glutaraldehyde Adulteration of Urine Specimens on Behring Syva Emit II Drugs of Abuse Assays,"* (Special Article Review Presentation, Critical Assessment and Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol.1, No. 2 October 1998, Educational Reviews, LLC. from George, Bulletin of The International Association of Forensic Toxicologists, Vol. 27, No. 2, January 1997, pg. 10-11.

Sawyer, W.R., *"Identification of Unique Cocaine Metabolites and Smoking By-Products in Postmortem Blood and Urine Specimens,"* (Special Article Review Presentation, Critical Assessment an Original Abstract), Practical Reviews in Forensic Medicine and Sciences, Vol.1, No. 1, September 1998, Educational Reviews, LLC. from Jenkins, AJ and Goldberger, BA , Journal of Forensic Science, 1997, Vol. 42, No. 5, September, pg. 824-827.

Miller, F.W., Sawyer, W.R., *"What Causes Myositis,"* National Myositis Association Newsletter, No. 16, pg. 2, December, 1995.

Rigle, D.A., Sawyer, W.R., *"Evaluation of Toxic Exposures After Daubert,"* S.E.A.K. Expert Witness Handbook, S.E.A.K., 1995 edition.

Sawyer, W.R. and Rigle, D.A., *"Toxic Etiology of Multiple Chemical Sensitivities: Review of Case Histories with Documented Toxic Exposure,"* Published in the Society of Toxicology, The Toxicologist, Volume 15, No. 1, 1995, pg. 228 - 229.

William R. Sawyer, Ph.D.
Curriculum Vitae
August 2019

Sawyer, W.R., *"Analysis of Volatile Organic Contaminants from Biological Matrices by Purge and Trap Gas Chromatography and Mass Spectrometry,"* Presented at the 44th Annual American Academy of Forensic Sciences Meeting, February 20, 1992, Abstract No. K45, pg. 197.

Sawyer, W.R., Doedens, D.J., Authors Response to Discussion of *"Heroin, Morphine and Hydromorphone Determination in Postmortem Material by High Performance Liquid Chromatography,"* Journal of Forensic Sciences, Vol. 35, No. 3, May, 1990, pg. 522-523.

Sawyer, W.R., Steup, D.R., Martin, B.S. and Forney, R.B., *"Cardiac Blood pH as a Possible Indicator of Postmortem Interval,"* Presented at the 40th Annual American Academy of Forensic Sciences Meeting, February 19, 1988, Abstract No. K65, pg. 141.

Carfagna, M.A., Sawyer, W.R. and Forney, R.B., *"Postmortem Distribution of Ethanol in Rats,"* The International Association of Forensic Toxicologists, Abstracts, 1987, pg. 13.

Sawyer, W.R., Forney, R.B., *"Postmortem Disposition of Morphine in the Rat,"* Presented at the 24th International Meeting, Banff, Canada, The International Association of Forensic Toxicologists, Abstracts, 1987, pg. 12.

Sawyer, W.R., Doedens, D.J. and Forney, R.B., *"Heroin, Morphine, and Hydromorphone Determination in Postmortem Material by High Performance Liquid Chromatography,"* American Academy of Forensic Sciences 38th annual meeting, Abstract K13, 1986, pg. 114.

Sawyer, W.R., Steup, D.R., Martin, B.S. and Forney, R.B., *"Cardiac Blood pH as a Possible Indicator of Postmortem Interval,"* Journal of Forensic Sciences, Vol. 33, No. 6, Nov. 1988, pg. 1439-1444.

Sawyer, W.R., Forney, R.B., *"Postmortem Disposition of Morphine in Rats,"* Forensic Science International, Vol. 38, Oct. 1988, pg. 259-273.
Sawyer, W.R., Waterhouse, G.A.W., Doedens, D.J. and Forney, R.B., *"Heroin, Morphine and Hydromorphone Determination in Postmortem Material by High Performance Liquid Chromatography,"* Journal of Forensic Sciences, Vol. 33, No. 5, Sept. 1988, pg. 1146-1155.

**William R. Sawyer, Ph.D.**
**Curriculum Vitae**
**August 2019**

Carfagna, M.A., Sawyer, W.R. and Forney, R.B., *"Postmortem Distribution of Ethanol in Rats,"* The International Association of Forensic Toxicologists, Proceedings of the 24th International Meeting, July 28-31, 1987, pg. 87-93.

Sawyer, W.R., Ritter, E. and Faloon, W.W., *"The Morphological Effects of Chenodeoxycholic Acid on Human Gastric Mucosa,"* The American Journal of Gastroenterology, Vol. 79, No. 5, 1984, pg. 348-353.

## Personal Information

Dr. Sawyer is a member of the Gulf Coast Swim Team as a distance swimmer and completed several "*Swim Around Key West*" 12.5 mile ocean swim races in under six hours. He is also a triathlete with the distinction of being a four-time Ironman. He loves to fish and SCUBA dive in northern New York State and the Gulf of Mexico.

| | |
|---|---|
| **Place of Birth:** | Webster, New York |
| **Citizenship:** | United States |
| **Marital Status:** | Married, 1989 |