# EXHIBIT 11

Page 126

1    were times where it would blow back onto her hand and
2    onto her body.
3       Q.  How do we know that, sir?
4       A.  It's in her testimony.
5       Q.  She said that she got glyphosate on her hands
6    approximately 20 times due to carelessness, wind,
7    and/or mist?
8       A.  There you go.
9       Q.  Okay.  So how many -- what portion of that
10   was due to wind and/or mist and which portion was due
11   to carelessness?
12      A.  39.356 percent -- I don't know.  What kind of
13   question is that?
14      Q.  And she says that that happened 20 times,
15   right?
16      A.  Right.
17      Q.  And she applied Roundup for 30 years, right?
18      A.  Yes.
19      Q.  So less than one time per year, she got
20   Roundup on her hands, right?
21         MR. TRAVERS:  Objection.  Form.
22         THE WITNESS:  No, that's not true.  Every
23   time she used it, she received a -- an amount of
24   Roundup on her hand, as per the peer-reviewed
25   generally accepted studies that actually assessed

Page 127

1    exposure by individuals wearing neoprene gloves
2    with cotton gauze on their gloves and measuring
3    on the average how many mills per hour impacted
4    those patches.
5       So to say no is incorrect.
6       Now, if you were to ask me that same question
7    and say -- and say that, due to carelessness,
8    wind, or mist received an amount that she was
9    aware of as being wet, I would say you're right.
10   BY MR. KALAS:
11      Q.  All right.  So let me ask it this way:
12   According to Mrs. Pilliod, she got Roundup spray on
13   her hands less than one time per year from her
14   Roundup use, according to her own testimony, true?
15         MR. TRAVERS:  Objection.  Asked and answered.
16         THE WITNESS:  Yes, that she was aware of
17   because it was visible or wet.
18   BY MR. KALAS:
19      Q.  Okay.
20      A.  But the insidious part is that users of
21   Roundup accumulate aerosol droplets on their skin
22   that they are not aware of.  And if you do laboratory
23   testing by putting gauze patches on the various parts
24   of the body and then send the applicator out and then
25   take those gauze patches to the lab, they give

Page 128

1    reliable estimates of how much what we call dermal
2    exposure occurs.
3       Now, that's not the amount that makes it
4    through the clothing and into the blood, but it is a
5    measure of how much impacts the surfaces of the body,
6    whether it be the trunk or the lower legs, hands, and
7    so on.
8       And that's -- and the Monsanto documents.  I
9    have Monsanto documents with me that show that as
10   well.
11      Q.  Okay.
12      A.  As the published studies do too.
13      Q.  So -- so I'm also correct that those
14   published studies on passive dose imagery, on
15   biomonitoring, were not able to detect Roundup
16   residues in many of the test subjects, right?
17      A.  In the biomonitoring studies, but there are
18   several reasons why those studies are unreliable.
19      Q.  What does it mean to be below the limit of
20   detection in a biomonitoring study?
21      A.  Well, for example, in a Monsanto study, for
22   example, with the detection limit of .07 PPM with
23   measurements up to 800 times higher than that, it
24   gives a range of from the highest recorded value to
25   the limit of detection at which the laboratory

Page 129

1    instruments simply can't see anything below.
2       Q.  So if I understand correctly, what limited
3    detection means in a biomonitoring study is that
4    there is a lower threshold below which the laboratory
5    instruments cannot detect the test compound?
6       A.  Yes.  And I could state that as being a
7    licensed laboratory director for many years.  It's
8    not an undetected -- it's not a nonpresent amount.
9    It means simply that that is the cutoff point where
10   the instrument can no longer determine whether the
11   compound is there or not.
12      Q.  I understand.
13      So -- so what a limit -- so what it means
14   when you have a test subject below the limit of
15   detection in a biomonitoring study is that the level
16   of the test compound in the fluid you're evaluating
17   is either below that -- below the limit of detection
18   but greater than zero, or perhaps zero?
19      A.  Yeah.  It could be anywhere between zero and
20   up to that limit of detection.
21      Q.  Okay.  And there are many test subjects in
22   the glyphosate biomonitoring below the limit of
23   detection, right?
24      A.  That's right.
25         MR. TRAVERS:  Objection.  Vague.

Page 238

1  apply glyphosate once a month, but he could apply
2  dozens of gallons of Roundup in one full-day
3  application over a field, right?
4      A.  Right.
5      Q.  And those applicators, this hypothetical
6  farmer I mentioned, would have applied for a matter
7  of hours continuously as opposed to spot spraying for
8  a single hour, right?
9      A.  That's right.
10     Q.  And they would be -- potentially be exposed
11 to a much greater volume of Roundup than the
12 plaintiffs in this matter, right?
13         MR. TRAVERS:  Objection to form.
14         THE WITNESS:  No.  Actually, that's not true,
15     and I can pull out the studies right now and show
16     you.  The tractor-mounted sprayer, farmers
17     putting down 150 gallons covering 500 acres or
18     whatever, their daily dose is not much different
19     than that of a backpack sprayer.
20 BY MR. KALAS:
21     Q.  Okay.  So how about a backpack sprayer and a
22 amenity horticulture, somebody working in a amenity
23 horticulture setting where they're walking around a
24 city park, something like that, using a backpack
25 sprayer.

Page 239

1         They might apply for hours, right?
2      A.  Well, they may apply for seven hours, sure.
3      Q.  Right.
4         And that would be longer than the Pilliods,
5  right?
6      A.  Yeah.  But keep in mind, rather than greater
7  than 10 days, we're 100 to 500 times above that.
8         So the little discrepancy between a backpack
9  sprayer, home gardener, and a tractor-mounted
10 sprayer, the magnitude of difference between those
11 application processes is very minimal.  And the
12 exposure in this case is so far beyond ten days that
13 that becomes irrelevant.
14     Q.  Well, I guess what I'm trying to get at, sir,
15 and -- and perhaps we can come to a point of
16 agreement -- is that an exposure day in and of itself
17 only tells us that that person was exposed to
18 glyphosate in that day.  It does not tell us how much
19 glyphosate they were exposed to in that day, right?
20     A.  That's true.
21     Q.  And a farmer, depending on the method of
22 application, could be exposed to much more glyphosate
23 in a day than a residential applicator like the
24 Pilliods'?
25     A.  Not much.  I can show you the data.  There is

Page 240

1  a difference, but it's not much more than -- it's way
2  under an order of magnitude.  Way under.
3         Usually two times more or five times more,
4  but not enough that could impact that.
5      Q.  And a professional applicator working in a
6  right-of-way, working in amenity horticulture could
7  be exposed to much more glyphosate in a day than
8  somebody like the Pilliods, correct?
9         MR. TRAVERS:  Objection to form.
10        THE WITNESS:  No.  Actually, a backpack
11    sprayer without personal protective gear has an
12    exposure much higher than a tractor-mounted
13    sprayer who sprays all day.
14 BY MR. KALAS:
15     Q.  Right.  I'm asking to compare a backpack
16 sprayer to the Pilliods, a professional backpack
17 sprayer who has a -- who is a professional pesticide
18 applicator could potentially have much more exposure
19 in a day than somebody like the Pilliods, right?
20        MR. TRAVERS:  Objection.  Form.  Vague.
21        THE WITNESS:  Not -- not above a factor of
22    ten.
23 BY MR. KALAS:
24     Q.  So ten is 1,000 percent more, right?
25     A.  Yes.  But here we're dealing with a factor of

Page 241

1  at least 1,000 days versus ten days.  It's a hundred
2  times higher.
3      Q.  Yes, sir.
4         I'm just trying to understand the limits and
5  the -- what an exposure day can tell us and what an
6  exposure day cannot tell us.
7         So you would agree with me that an exposure
8  day can tell us somebody was exposed to glyphosate in
9  that day, right?
10     A.  Yes.  McDuffie used a ten-hour per year,
11 which is defined a little better.
12     Q.  Right.
13        But an exposure date cannot tell us, as a --
14 as a volume amount how much glyphosate somebody used
15 in a particular day, right?
16     A.  No.  But we know in this case, in the Pilliod
17 case, they were at least an hour.  And if we went to
18 the extreme end of that of an applicator at seven
19 hours, that's still under a difference of tenfold.
20     Q.  Right.
21        But under your calculations, amenity
22 horticulture is people who are using backpack
23 sprayers are exposed to approximately an order of
24 magnitude more glyphosate in a typical exposure day
25 than a home garden user, right?

|  | Page 242 |
|---|---|
| 1 | MR. TRAVERS: Objection to form. Misstates |
| 2 | his testimony. |
| 3 | THE WITNESS: No, that's not exactly what I |
| 4 | said. What I said was there's a huge difference. |
| 5 | You could actually have a professional applicator |
| 6 | working seven hours -- and I could show the |
| 7 | tables -- with lower exposure than that of a -- |
| 8 | that is, if that person is wearing PPE -- a lower |
| 9 | exposure than a home gardener working for one |
| 10 | hour. |
| 11 | BY MR. KALAS: |
| 12 | Q. Okay. |
| 13 | A. Because of the difference in PPE. |
| 14 | Q. Okay. Sir, what tables are you relying on |
| 15 | for that? |
| 16 | A. Oh, a bunch of stuff. |
| 17 | Q. Okay. |
| 18 | A. It's all studies from -- that Phalen relied |
| 19 | on. |
| 20 | Q. So what studies are you relying on, sir? Can |
| 21 | you just read the names out. |
| 22 | A. Okay. The first one is I already mentioned |
| 23 | this, Machado-Nato 2000. |
| 24 | Q. Okay. |
| 25 | A. Then that's a dup. |

|  | Page 243 |
|---|---|
| 1 | Then the next one is the Health and Safety |
| 2 | Report, Worker Health and Safety Branch, Exposure of |
| 3 | Herbicide Handlers in the Caltrans Vegetation Control |
| 4 | Program. |
| 5 | Q. Okay. |
| 6 | A. April 27th, 1995. |
| 7 | Q. Sir, are these all the studies that were |
| 8 | cited in the Solomon report -- |
| 9 | MR. TRAVERS: I think he's still going. |
| 10 | MR. KALAS: -- that you're using? |
| 11 | MR. TRAVERS: Do you want -- |
| 12 | MR. KALAS: Well, he's reading out loud the |
| 13 | studies cited in the Solomon article. |
| 14 | MR. TRAVERS: No, he's answering your |
| 15 | question. You asked him what studies he relied |
| 16 | on, so let him finish. |
| 17 | If you want to retract the question, fine. |
| 18 | But if you are not going to retract it, then let |
| 19 | him finish. |
| 20 | MR. KALAS: Well, maybe he could have |
| 21 | produced this on his materials considered list. |
| 22 | THE WITNESS: Whoa, whoa, I just got the |
| 23 | report from you from Phalen. |
| 24 | MR. KALAS: My question is -- |
| 25 | THE WITNESS: I just finished reading this |

|  | Page 244 |
|---|---|
| 1 | last night. |
| 2 | MR. TRAVERS: You've got to either retract |
| 3 | the question or let him finish. |
| 4 | MR. KALAS: Don't tell me how to ask my |
| 5 | questions, Jeff. |
| 6 | MR. TRAVERS: But you are cutting him off. |
| 7 | That's not appropriate. |
| 8 | BY MR. KALAS: |
| 9 | Q. Dr. Sawyer, are you just relying on the -- |
| 10 | MR. TRAVERS: You are cutting him off. He is |
| 11 | in the middle of answering and you just cut him |
| 12 | off because you don't like his answers. |
| 13 | MR. KALAS: I don't have any problem with his |
| 14 | answers. |
| 15 | MR. TRAVERS: Then let him answer. Let him |
| 16 | continue. |
| 17 | BY MR. KALAS: |
| 18 | Q. Dr. Sawyer, can you hand me that Redwell, |
| 19 | please. I will withdraw the question. Can you hand |
| 20 | me the Redwell -- |
| 21 | A. As -- as usual, please try to keep it in the |
| 22 | same order. |
| 23 | Q. Yes, sir. |
| 24 | A. Thank you. |
| 25 | Q. So are the studies you're relying on for your |

|  | Page 245 |
|---|---|
| 1 | opinion that professional applicators and farmers are |
| 2 | exposed to similar amounts as home garden users in |
| 3 | the manilla folder labeled Dermal Exposure Rates, |
| 4 | Body Areas, and Penetration? |
| 5 | A. I think some are. |
| 6 | Q. Okay. The studies in this are Machado-Neto, |
| 7 | correct? |
| 8 | A. Yes. |
| 9 | Q. Edmiston, which is the Caltrans study, |
| 10 | correct? |
| 11 | A. Yes. |
| 12 | Q. And Johnson 2005, correct? |
| 13 | A. Yes. |
| 14 | Q. And Layvi, 1992, correct? |
| 15 | A. Yes. |
| 16 | Q. Okay. |
| 17 | A. And I may have other studies in these two |
| 18 | folders. |
| 19 | Q. We'll look at those other studies on the next |
| 20 | break. |
| 21 | And those studies you rely on for your |
| 22 | epidemiologic exposure opinions to the McDuffie |
| 23 | study, right? |
| 24 | A. Yes. |
| 25 | Q. What are you going to tell the jury about the |