# Exhibit 1

Christine Karman

```
1              IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
2
   IN RE:                        )   MDL No. 2741
3  ROUNDUP PRODUCTS               )   Case No.
   LIABILITY LITIGATION           )   3:16-md-02741 VC
4  _____)
                                  )
5  This document relates to:      )
                                  )
6  Christine Karman, Individually )
   and as Representative of the   )
7  Estate of Robert Karman,       )
   v. Monsanto Co.                )
8                                 )
   Case No. 3:19-cv-01183-VC      )
9  _____)
10
11            The video-recorded deposition of
12  CHRISTINE KARMAN, taken pursuant to the Federal
13  Rules of Civil Procedure of the United States
14  District Courts pertaining to the taking of
15  depositions, before Pauline M. Vargo, an Illinois
16  Certified Shorthand Reporter, C.S.R. No. 84-1573,
17  at the offices of Shook, Hardy & Bacon, Suite 4700,
18  111 South Wacker Drive, Chicago, Illinois, on
19  November 13, 2019, commencing at 9:13 a.m.
20
21
22
23             GOLKOW LITIGATION SERVICES
                   877.370.3377 ph
24                 deps@golkow.com
```

Christine Karman

```
 1              A P P E A R A N C E S
       Present on Behalf of the Plaintiff:
 2          MOLL LAW GROUP
            22 West Washington Street, 15th Floor
 3          Chicago, Illinois 60602
            312.462.1700
 4          BY:  STEPHEN CADY, ESQ.
                 scady@molllawgroup.com
 5
 6     Present on Behalf of the Defendant:
 7          SHOOK, HARDY & BACON, LLP
            2555 Grand Boulevard
 8          Kansas City, Missouri 64108.2613
            816.474.6550
 9          BY:  ROBERT D. HOMOLKA, ESQ.
                 rhomolka@shb.com
10
11     VIDEOGRAPHER:
12          CARY DAVIDOW
            Golkow Litigation Services
13
14     REPORTED BY:
15          PAULINE M. VARGO, RPR, CRR
            Illinois CSR No. 84-1573
16
17
18
19
20
21
22
23
24
```

Christine Karman

```
1                    I N D E X

2              Wednesday, November 13, 2019

3  WITNESS                          EXAMINATION

4  CHRISTINE KARMAN

5       By Mr. Homolka..................Page 6

6       By Mr. Cady.....................Page 258

7       By Mr. Homolka..................Page 276

8       By Mr. Cady.....................Page 301

9

10       Afternoon Session Commenced......Page 160

11

12

13

14

15                  E X H I B I T S

16  DEPOSITION EXHIBIT              MARKED FOR ID

17   Exhibit 1   Notice of Deposition        12

18   Exhibit 2   8/3/15 Email                37

19   Exhibit 3   Yard/chicken shed depiction 66

20   Exhibit 4   Plat of Survey              97

21   Exhibit 5   2015 Second Installment     98

                 Property Tax Bill

22

     Exhibit 6   Nationwide Home Insurance   100

23               Homeowner Policy Declarations

24
```

Christine Karman

```
 1                    E X H I B I T S
 2                       Continued
 3     DEPOSITION EXHIBIT                    MARKED FOR ID
 4      Exhibit 7    Nationwide Title Clearing      102
                     Correspondence re release of
 5                   Mortgage
 6      Exhibit 8    Residential assessment notice  102
                     for      , Elgin
 7
        Exhibit 9    Correspondence re satisfaction 104
 8                   of mortgage
 9      Exhibit 10   State Farm Auto Insurance policy 105
10      Exhibit 11   Depiction of Mr. Karman's      106
                     handwritten journal
11
        Exhibit 12   2 Depictions of house under    129
12                   construction
13      Exhibit 13   2 Depictions of house under    131
                     construction
14
        Exhibit 14   2 Landscape/yard depictions    145
15
        Exhibit 15   2 Depictions of house exterior 149
16
        Exhibit 16   Birthday Celebration depiction 154
17
        Exhibit 17   Father and daughters depiction 156
18
        Exhibit 18   Family depiction               157
19
        Exhibit 19   Depiction of Mr. and Mrs. Karman 158
20
        Exhibit 20   Google Maps depiction of       194
21                   Robin Hood house and property
22      Exhibit 21   Plaintiff's Fact Sheet         226
                     CONFIDENTIAL-KARMAN-RKARMAN-
23                   PFS-000001 through 000028
24
```

Christine Karman

```
 1              THE VIDEOGRAPHER:  Good morning.  We
 2       are going on the video record at 9:13 a.m.
 3              My name is Cary Davidow.  I'm the
 4       videographer in association with Golkow
 5       Litigation Services.  The court reporter
 6       today is Pauline Vargo of Golkow Litigation
 7       Services.
 8              Here begins the videotaped
 9       deposition of Christine Karman taking place at
10       111 South Wacker Drive, Suite 4700, Chicago,
11       Illinois.  Today's date is November 13th,
12       2019.
13              This deposition is being held in
14       the matter of Christine Karman versus Monsanto
15       Corporation, filed in the United States
16       District Court, Northern District of
17       California, Case No. 3:19-cv-01183 VC.  This
18       deposition is being taken on behalf of the
19       Defendants.  The party at whose instance this
20       deposition is being recorded on an audiovisual
21       recording device are the Defendants.
22              Will counsel please identify
23       themselves for the video record and the
24       parties which they represent.
```

Christine Karman

```
1              MR. CADY:  Stephen Cady from Moll Law
2       Group for Plaintiff.
3              MR. HOMOLKA:  Robert Homolka from
4       Shook Hardy & Bacon for the Defendant.
5              THE VIDEOGRAPHER:  Will the court
6       reporter swear in the witness, please.
7              THE REPORTER:  Will you raise your
8       right hand, please, to be sworn.
9              (The witness was duly sworn.)
10             CHRISTINE KARMAN,
11      called as a witness herein, having been first duly
12      sworn, was examined and testified as follows:
13                    EXAMINATION
14      BY MR. HOMOLKA:
15        Q.    Good morning.
16        A.    Good morning.
17        Q.    How are you doing today?
18        A.    I -- cold.
19        Q.    Okay.  I will be asking most of the
20      questions today.  My name is Bobby Homolka.  I
21      represent the Defendant in this lawsuit.
22        A.    Okay.
23        Q.    And you understand you are here today
24      related to a lawsuit that you have filed on behalf
```

Christine Karman

1    of your husband's death and his alleged exposure to

2    Roundup?

3         A.    Yes.

4         Q.    Now, before we get started, let me go

5    through just a few things.  Have you ever had your

6    deposition taken before?

7         A.    No.

8         Q.    So what's really important are some

9    ground rules for all three of us today, and I just

10   want to hit a few of them.

11              Verbal responses are required because if

12   we shake our heads at each other or nod, Pauline

13   doesn't pick that up, and she is typing a whole

14   record of everything that's said today.

15        A.    Okay.

16        Q.    So can you try to do that for me?

17        A.    Okay.

18        Q.    I will try to do my best too.

19              Another thing, probably the most

20   important thing is that we don't talk over one

21   another.  I will ask some questions that you know

22   where I'm going before I finish asking the

23   question.

24        A.    Okay.

Christine Karman

1      Q.    And sometimes in normal conversation we

2   cut each other off or we want to answer and move

3   on, but it's important today that you let me finish

4   the question and pause for a couple reasons.

5           First, again, Pauline needs to get

6   everything down.  Then, number two, your attorney

7   at times today is going to make an objection.  So

8   he will object to some of my questions and he will

9   make a record.  He will instruct you whether you

10  should answer or not.  If he says objection, you

11  can go ahead and answer, then you go ahead and

12  answer the question.  If he says objection but

13  don't answer, then he and I will talk about it.

14  But that's why it is important to pause.  We need

15  Pauline to get everything down and we need your

16  attorney to be able to object, then we need you to

17  be able to give an answer that we have the complete

18  answer for.  Does that make sense?

19      A.    It does.

20      Q.    Here is my problem:  I try to go fast,

21  so I will try my best not to cut off your answers,

22  and if I do at any time cut off your answers, I

23  apologize for that now, but then, more importantly,

24  tell me "I'm not finished" so we can get you

Christine Karman

```
1    finished.  Okay?

2              I don't mean to restrict what you say

3    today.  I'm here today to let you say and answer

4    these questions.  It's my one chance to really

5    spend a lot of time with you and find out

6    everything.  So I want you to give as complete of

7    answers as you can and say as many things as you

8    need to say in response to them.  Okay?

9         A.   Okay.

10        Q.   Take a break at any time today.  All you

11   need to do is just let us know, hey, I need a

12   break.

13             The only caveat to that is if there is a

14   question pending, if I have asked a question, I

15   will ask you to answer that question before you go

16   on the break, but you can take a break whenever you

17   want.  Okay?

18        A.   Okay.

19        Q.   I think that's about it.  You know what?

20   There is one other one, and I don't know how to

21   best describe this, but we don't want you to guess

22   today.  So we don't want you to just guess about

23   something you don't have any knowledge about or any

24   memory about.  Okay?  We will be talking about
```

Christine Karman

```
 1    things from 30 years ago or more, and so sometimes
 2    memories fade, sometimes you have good memories,
 3    but what we don't want you to do, any of us to do
 4    is guess about an answer.  Okay?
 5         A.    Okay.
 6         Q.    You can estimate, though, all right, and
 7    there is a difference between estimating and
 8    guessing; and the way I like to explain it, as bad
 9    as this sounds, is that you could estimate how long
10    this table is in this room.  You've seen it, right,
11    you're looking at it, you could make an estimate
12    probably how long this is; fair?
13         A.    Yeah, yes, I could do that.
14         Q.    If I asked you to estimate how or tell
15    me how long the table is in my office, could you do
16    that?
17         A.    No, I can't.
18         Q.    Because you would be guessing, right?
19    You would have no knowledge of kind of seeing it
20    ever before or being able to put it in any kind
21    of -- any kind of estimate, okay.  That's the
22    difference.  It's okay to estimate, but we just
23    don't want you guessing if it is something you
24    don't really have any memory or knowledge about.
```

Christine Karman

```
 1    Okay?

 2         A.    Okay.

 3         Q.    I think that's about it, so let's get

 4    started.  I'm going to try today to move kind of

 5    logically through some things.  I'm going to find

 6    out a little bit about your background, a little

 7    bit about you, so you have an opportunity to talk

 8    about yourself a little bit, as uncomfortable as

 9    that makes you feel.  And then we will talk about

10    your husband some --

11         A.    Okay.

12         Q.    -- and talk about your kids, just find

13    out who they are, his work, and then talk about why

14    we are here today.  That's kind of what I'm going

15    to try to do, and then at the end kind of talk

16    about some medical issues that he had throughout

17    his life.

18         A.    Okay.

19         Q.    And I know especially that will be hard

20    for you.  I know you are going to have, you know,

21    some times today where you are going to be talking

22    about a man you loved and spent a lot of your life

23    with; and I don't mean to be offensive or

24    insensitive to you when I'm asking these questions
```

Christine Karman

1    when we get to kind of the medical part.  I just

2    need to find out as much as I possibly can, and so

3    that will be a particularly difficult time and any

4    breaks you need at that time, please take, but I'm

5    going to try to save that until the end so we can

6    take our time with it.  Okay?

7         A.    Okay.

8         Q.    Now, you brought some things for the

9    deposition, and I am having some copies made, but

10   let me just mark for the record the Exhibit 1,

11   which is the notice.

12              (Deposition Exhibit 1 was marked

13               for identification.)

14   BY MR. HOMOLKA:

15        Q.    You can just skim through that.

16        A.    Okay.

17        Q.    But I will state for the record that

18   this is the notice to take this deposition that was

19   filed in this case, served in this case.

20              Did you see something like this document

21   or does this -- that looked like this at any time?

22        A.    Yes, I did.

23        Q.    And I assumed you looked -- did you look

24   through the document?  Starting on page 3 there is

Christine Karman

1    an attachment and pages 3, 4 and 5, they list some

2    categories of documents that we had asked you to

3    look for.  Do you see that?

4         A.    Yes.

5         Q.    And were you able to look for documents

6    prior to this deposition?

7         A.    I was.

8         Q.    And you brought some today that we will

9    mark; is that right?

10        A.    Yes.

11        Q.    Are there any documents when you were

12   looking through this list that you thought you may

13   have but you just couldn't locate them?  Does that

14   make any sense?

15        A.    I think I have everything.

16        Q.    You think you had found everything?

17   Like I saw you brought some photos --

18        A.    Yes.

19        Q.    -- you brought some medical records that

20   I know you gave to Mr. Cady that he is going to

21   look at.

22             MR. CADY:  Yeah, and I will stipulate

23        for the record, I believe we did produce a

24        bunch of medical records before, some time

Christine Karman

```
 1          back then as well as earlier this week on
 2          Monday which defense counsel has.  So to the
 3          extent that there is any requests in here for
 4          medical records, I think we have produced all
 5          of those.
 6                    MR. HOMOLKA:  And just I guess for the
 7          record, with the records, I have not had a
 8          chance to look at the most recent production.
 9          I don't know what's in there or what's not.
10                    I just want to I guess preserve for
11          the record that if at any point something
12          earth-shattering or something in those medical
13          records I needed to ask the witness about that
14          I just reserve my right to have the
15          opportunity for limited questioning if there
16          is anything in those records that I think I
17          needed that I didn't know about.
18                    MR. CADY:  Yeah.  If we get to that
19          bridge, we will cross it.
20                    MR. HOMOLKA:  Yeah.  I just want to
21          put it on the record, of course.
22     BY MR. HOMOLKA:
23          Q.   Okay.  So we will go through the
24     documents you brought, each one of them, and at
```

Christine Karman

```
1    that time I will maybe ask you some more questions

2    about that, but the documents you did find, did

3    anybody else -- did you ask anybody else to look

4    for documents, like any of your kids, anybody else?

5         A.   Yes.

6         Q.   Can you just tell me a little bit about

7    that, who you asked, what you thought they may

8    have, those types of things.

9         A.   My daughter Nancy, she had written an

10   email when he first found out he had cancer.

11        Q.   You said her name was Nancy?

12        A.   Yes.

13        Q.   Did you find that email?

14        A.   We did.

15        Q.   Perfect.  Anybody else that you asked

16   about to help you look for any documents other than

17   your attorneys?  These would be just --

18        A.   No.

19        Q.   -- your family or friends.

20        A.   No.

21        Q.   Do you have social media or are you on

22   social media?

23        A.   Facebook.

24        Q.   Facebook?
```

1          A.      Facebook.

2          Q.      Do you ever recall posting anything

3     about your husband's non-Hodgkin's lymphoma or

4     anything about -- well, let me just start with

5     that.  Anything about his cancer?

6          A.      No, no, I did not post anything.

7          Q.      Do you remember posting anything about

8     Roundup, including whether or not people should use

9     Roundup or that you believed it was a cause of his

10    cancer, anything like that?

11         A.      No, I did not.

12         Q.      Do you know if any of your daughters

13    have and have included you on any post or tagged

14    you on any post on that subject of Roundup and its

15    potential to cause cancer?

16         A.      I'm unsure about that.

17         Q.      We will get back to that.  You can set

18    that to the side.  I will wait for the documents to

19    come in and mark them.

20              Is there any reason today -- for

21    example, are you on any medications or do you have

22    any health concerns that you think will prevent you

23    from giving your best, honest, truthful testimony

24    today?

Christine Karman

```
 1        A.     No.
 2        Q.     Have you had any alcohol within the last
 3   24 hours that you think could affect your ability
 4   to testify today?
 5        A.     Yes.
 6        Q.     Listen to the whole question.  Have you
 7   had -- have you consumed alcohol in the last 24
 8   hours?
 9        A.     Yes.
10        Q.     Just what did you have?
11        A.     You said tobacco, correct?
12        Q.     Alcohol.
13        A.     Oh.  About two ounces of wine.
14        Q.     There we go.  And was that last night?
15        A.     Yes.
16        Q.     And fair to say that you don't think
17   that is going to impair your ability to testify
18   today truthfully?
19        A.     No, I don't.
20        Q.     All right.  And the couple ounces of
21   wine, is it just something you do in the evenings,
22   enjoy a glass of wine before you go to bed?  Is
23   that something you do, standard practice these
24   days?
```

Christine Karman

```
 1          A.    Yes.

 2          Q.    Okay.  You said tobacco maybe.  Are you

 3     a cigarette smoker?

 4          A.    Yes.

 5          Q.    And is that -- how long have you smoked

 6     cigarettes?  I'm not going to go too in-depth here.

 7          A.    60 years.

 8          Q.    60 years.  And are you more or less than

 9     a pack-per-day smoker?

10          A.    Yes, pack per day.

11          Q.    Pack per day.  Do you have any health

12     issues that -- do you have any current health

13     issues?

14          A.    Yes.

15          Q.    Can you just tell me briefly what those

16     are?  And I just want ones that you would consider

17     serious health issues.

18          A.    High blood pressure, high cholesterol.

19          Q.    And are you treating those with

20     medication?

21          A.    Yes.

22          Q.    Do you have any form of cancer?

23          A.    Yes.

24          Q.    What do you have?
```

Christine Karman

```
1          A.     I had bladder cancer.

2          Q.     Are you cured?

3          A.     Yes.

4          Q.     And how long ago, just approximately?

5   How long ago did you have bladder cancer?

6          A.     11 years ago.

7          Q.     And did you have surgery to --

8          A.     No.

9          Q.     Can you just tell me, was it

10   chemotherapy, radiation?

11          A.     Nothing, nothing.  I have a cystoscopy

12   and a ureteroscopy once a year.  I was very

13   fortunate.

14          Q.     You were.  And any other forms of cancer

15   that you have had?

16          A.     No.

17          Q.     Do you have any emphysema or chronic

18   obstructive pulmonary disease?

19          A.     No.

20          Q.     Are you on oxygen for any reasons?

21          A.     No.

22          Q.     The bladder cancer, did anybody ever

23   tell you what caused that or do you have any idea

24   how that came about?
```

Christine Karman

```
 1        A.    No.

 2        Q.    Have you ever had any conditions that

 3   you relate to your smoking?

 4        A.    No.

 5        Q.    Ever any relations that you relate to

 6   any chemical exposures, either household chemicals,

 7   indoor or outdoor?

 8        A.    Not to my knowledge.

 9        Q.    Any other more serious I guess health

10   issues that you have or currently have other than

11   the high blood pressure, the cholesterol issue, the

12   past bladder cancer?

13        A.    No.

14        Q.    Have you ever been a plaintiff or a

15   defendant in a lawsuit before other than this one?

16        A.    Unsure.

17        Q.    Can you remember what it was about or

18   anything about it?

19        A.    We were being taken to court for

20   nonpayment of property owner's dues on property we

21   owned.

22        Q.    Nonpayment.  Was it like neighborhood

23   dues or something?

24        A.    We had a lot in South Carolina.
```

Christine Karman

```
 1          Q.    Did you ever live in South Carolina?

 2          A.    No.

 3          Q.    Was it a vacation lot or something you

 4    guys were --

 5          A.    It was going to be our retirement.

 6          Q.    Ever build a house on it?

 7          A.    No, we did not.

 8          Q.    So when you say "we," are you talking

 9    about your husband, Robert Karman?

10          A.    Yes, yes.

11          Q.    So you and Robert had this lot at some

12    point.  Do you remember who sued you or tried to

13    collect?

14          A.    Callawassie Island.  Oh.  The

15    individuals who tried to collect?

16          Q.    Yeah.  So where was it in South

17    Carolina?  Was it Hilton head or something?

18          A.    It was near Bluffton.

19          Q.    And how did that lawsuit end up?

20          A.    I had to pay them.  They settled for an

21    amount of the property owners.

22          Q.    Was this when your husband was alive?

23          A.    I paid it after he died.

24          Q.    Were either of you deposed in that
```

Christine Karman

```
1    lawsuit, like questions kind of like we are doing

2    today?

3         A.    No.

4         Q.    And it never went to trial?

5         A.    I don't believe.  I had a lawyer here in

6    Chicago and...

7         Q.    Was your husband -- did he have to fill

8    out any questions or answers or do anything like

9    that that you recall?

10        A.    Not that I'm aware of.

11        Q.    Do you remember what your attorney's

12   names were in Chicago that you had?

13        A.    Yes.

14        Q.    Can you just let me know who it was.

15        A.    Lawrence Siewert.

16        Q.    Can you spell the last name.

17        A.    S-i-e-w-e-r-t.

18        Q.    Any other lawsuit that you recall being

19   a part of or involved in?

20        A.    No.

21        Q.    Same question for your husband.  Do you

22   recall him being involved in any kind of lawsuit as

23   a plaintiff or a defendant?

24        A.    No.
```

Christine Karman

```
1          Q.     Have you ever filed for bankruptcy?

2          A.     No.

3          Q.     All right.  What did -- or did you do

4     anything to prepare for this deposition?

5          A.     Yes, I did.  I went through all this

6     paperwork, tried to remember as much as I could and

7     met with my lawyers.

8          Q.     There we go.  The last part of it.  So

9     let me ask you a couple questions about that, and

10    understand for these questions, do not -- you don't

11    need to disclose the specifics of what you talked

12    about with your lawyers.  I'm just going to ask you

13    some general questions about it and then we will

14    move on.  Okay?

15         A.     Okay.

16         Q.     When did you meet with your attorneys to

17    discuss or prepare for the deposition?

18         A.     It was on the 4th or the 5th of this

19    month.

20         Q.     Where did you meet?

21         A.     At their offices.

22         Q.     And was there anybody present or in the

23    meeting with you other than yourself and your

24    attorney?  In other words, did any of your family
```

Christine Karman

```
1    members attend?

2         A.    Yes.

3         Q.    And who else attended?

4         A.    My daughter and son-in-law.

5         Q.    And what are their names?

6         A.    Nancy and Andy Kolinsky.

7         Q.    And do you know if they are represented

8    by Mr. Cady or his law firm?

9         A.    No, I do not.

10        Q.    Are they a part of this lawsuit as

11   plaintiffs, if you recall?

12        A.    I don't know how to answer that.

13        Q.    That's fine.  It's a kind of legal

14   question.  I totally understand that.

15              So how long was that meeting that you

16   had on the 4th or the 5th?

17        A.    About an hour and a half, maybe.

18        Q.    During the meeting did you look at any

19   documents?  Like did you look at any documents to

20   help you kind of prepare for the deposition or help

21   your memory about any certain topics or anything

22   like that?

23        A.    You know, that day was a blank for me.

24   I was very nervous.  I don't remember.  We brought
```

Christine Karman

1    documents home.

2         Q.    Do you remember a fact sheet maybe or

3    some document that had questions and answers about

4    doctors and those types of things?

5         A.    Yes, I do.

6         Q.    I will get that out later.

7               Do you remember any photos that you

8    looked at, or did you look at any photos?

9         A.    No.

10        Q.    Did you look at any advertisements for

11   Roundup --

12        A.    No.

13        Q.    -- that you can recall?

14              And did you meet with anyone other than

15   your attorneys on that day?  I guess you said about

16   an hour and a half.  Did you have any other

17   meetings to prepare for this deposition?

18        A.    No.

19        Q.    You met with Mr. Cady, just to be

20   complete, for a few minutes outside here before you

21   came in, right?

22        A.    Right.

23        Q.    Maybe five minutes and then came in and

24   you are ready to go, right?

Christine Karman

1          A.      Right.

2          Q.      All right.  Have you talked to anybody

3    else about your deposition?  And now I want --

4    exclude your attorneys or their assistants or folks

5    that may have called you and said, hey, this is the

6    time and place.  Now I'm talking about family

7    members, your daughters, anybody.

8          A.      Only my immediate family members.

9          Q.      And what immediate family members have

10   you spoke with about the deposition?

11         A.      I'm sorry.  I didn't hear that.

12         Q.      Which, who specifically have you talked

13   with?

14         A.      That would be my daughter, Nancy and her

15   husband.

16         Q.      What's his name again?

17         A.      Andy.

18         Q.      Who else, if anyone?

19         A.      My daughter -- I'm trying to go in

20   order.  My daughter Ann, her last name is Weaver.

21         Q.      Okay.

22         A.      My daughter Catherine.  Her last name is

23   Karman.

24         Q.      All right.

Christine Karman

```
 1          A.    My daughter Roberta.  Oh, I'm sorry.
 2    Yeah, Roberta.
 3          Q.    Is that Bobby Lang?
 4          A.    Yes, Bobby Lang.  And my son Michael.
 5    That should total five.  There's five children with
 6    one spouse or two.
 7          Q.    So you had conversations.  Let me start
 8    with Nancy.  What did you talk -- did you talk with
 9    Nancy about this deposition today?
10          A.    Yes, I did.
11          Q.    Can you just tell me when that was?
12          A.    Briefly today.
13          Q.    And what did y'all talk about?
14          A.    For me to calm down.
15          Q.    Relax?
16          A.    Relax, relax.
17          Q.    Anything else?  Did you talk about any
18    specifics about your husband Robert?
19          A.    No, I did not.
20          Q.    Did you talk about Roundup with her?
21          A.    No.
22          Q.    What about Andy?  You said you spoke
23    with Andy a little bit?
24          A.    Yes.
```

Christine Karman

```
1          Q.     When was that?

2          A.     That would have been on the 4th or the

3     5th.

4          Q.     And do you remember anything you said to

5     Andy specifically or generally?

6          A.     Not really.  He came on his lunch break,

7     so I didn't -- I wasn't aware he was going to be

8     there.  No, I did not remember what I said to him

9     or he said to me.

10         Q.     What about your daughter Ann?  When did

11    you have a conversation with her about the

12    deposition?

13         A.     I had a conversation with Ann last week

14    Thursday.

15         Q.     In person or on the phone?

16         A.     In person.

17         Q.     Where were you?

18         A.     At my house.

19         Q.     And can you just tell me how long that

20    was?  How long was she over that day?

21         A.     About an hour or so.

22         Q.     And what did you guys talk about?

23         A.     Children, her looking for a job.

24    Basically we didn't talk about anything other than
```

Christine Karman

1    that.

2         Q.    Oh, I misunderstood.  I'm sorry.  Did

3    you talk about this deposition or the lawsuit?

4         A.    I did at one time with her, but I don't

5    remember exactly when.

6         Q.    Can you tell me what you shared with her

7    or talked with her about in regards to your

8    deposition or this lawsuit?

9         A.    No, I don't remember that.

10        Q.    Did you talk about Roundup?

11        A.    Yes, probably.

12        Q.    Are you guessing there or are you

13   just --

14        A.    No.  We talked with all of our children

15   about Roundup.

16        Q.    And can you just tell me what you have

17   talked about with them?

18        A.    That not to use it any more.

19        Q.    And when was the first time you told

20   them not to use Roundup, your children?

21        A.    Probably the first time we saw an ad

22   blasted over TV.

23        Q.    Do you remember when that was or what

24   year, what decade or anything?

Christine Karman

```
1          A.     I would have guessed around 2015.

2          Q.     So just so I'm clear, after you saw an

3   ad blasted over TV, since that time you have told

4   your children not to use Roundup; fair?

5          A.     Right.

6          Q.     Do you remember anything about that ad

7   specifically?

8          A.     Not really, other than it was a typical

9   warning.

10          Q.     Can you tell me what you mean by "a

11   typical warning"?

12          A.     Not to use it; if you used it, call this

13   lawyer; that type of thing.

14          Q.     And is that how you ended up I guess

15   contacting your lawyer?  Did you see an ad like

16   that and call them?

17          A.     No.

18          Q.     Can you just tell me how you came across

19   Mr. Cady and his law firm.

20          A.     We -- because my husband was told in the

21   initial on stage by his urologist -- neurologist --

22   urologist -- no -- oncologist that he had cancer

23   and that it was lymphoma and that it was caused

24   mainly by pesticides.
```

Christine Karman

1          Q.     That your oncologist said that?

2          A.     Yes, yes.  My daughter questioned him,

3     the oncologist, because we both smoke, and she said

4     "It's smoking?"  And he said "No," and that's in

5     her email.

6          Q.     Which doctor or oncologist told -- were

7     you present, were you there --

8          A.     Yes, yes.

9          Q.     -- when the doctor said this?

10          Let me go back to the rules real quick

11     since it's early in the day.  You are doing a

12     wonderful job with every rule except one, and I'm

13     not doing so well with it either, so we are both to

14     blame.  We have got to make sure we don't talk over

15     each other.

16          A.     Yes.

17          Q.     Because I see Pauline here, and she is

18     not getting very happy with me, and you are doing a

19     great job.  It's just let me just finish that to

20     the end of the question and I will try not to

21     interrupt you any more.

22          A.     Okay.

23          Q.     How's that?

24          A.     That works.

```
1        Q.    Let me ask you a few questions about it.
2    So do you remember when this conversation that you
3    have referenced with the oncologist occurred as it
4    relates to his diagnosis and his treatment of
5    lymphoma?  Was it early in the process, was it
6    late?  Can you give me any details about kind of
7    when it was?
8        A.    It was I believe in July, early July.
9        Q.    2015?
10       A.    2015.
11       Q.    And who was the oncologist?
12       A.    Stanley Nabrinsky.
13       Q.    Can you spell the name?
14       A.    N-a-b-r-o-n-s-k-y.
15       Q.    And where were you when this
16   conversation occurred?
17       A.    In his office.
18       Q.    Do you remember where his office is?
19       A.    It's on -- right off of Randall Road in
20   Elgin.
21       Q.    Was it at a hospital or just his --
22       A.    His office.
23       Q.    Who was in this -- in the room with you
24   when this conversation occurred that you referenced
```

Christine Karman

```
 1    about pesticides causing his lymphoma?

 2         A.    My husband, Robert, and my daughter,

 3    Nancy Kolinsky.

 4         Q.    So we had you, Nancy, Mr. Karman --

 5         A.    Right.

 6         Q.    -- and the doctor?

 7         A.    Yes.

 8         Q.    He obviously had to be there, right?

 9               Anybody else that you recall being in

10    the room?

11         A.    No.

12         Q.    So tell me, you said your daughter was

13    questioning him about something; is that right?

14         A.    Yes.

15         Q.    What was Nancy questioning Dr. Nabrinsky

16    about that day?

17         A.    Did smoking cause cancer, this cancer.

18         Q.    And Dr. Nabrinsky says no in some sort

19    of way?

20         A.    He said no, it was pesticides.

21               MR. HOMOLKA:  Could we go off the

22         record for a second.

23               THE VIDEOGRAPHER:  Going off the video

24         record at 9:40 a.m.
```

Christine Karman

```
 1                    (Discussion was had off the

 2                     record.)

 3                    THE VIDEOGRAPHER:  Going back on the

 4           video record at 9:40 a.m.

 5    BY MR. HOMOLKA:

 6           Q.   All right.  I'm back on the record.

 7    Your attorney is just going to look through that.

 8           A.   Okay.

 9           Q.   He is very talented.  He can listen to

10    these questions and come back while he is looking

11    at those, I'm sure.

12                    MR. CADY:  Overestimating already,

13           okay.

14    BY MR. HOMOLKA:

15           Q.   Okay.  We were having a conversation --

16    I was asking you about this conversation that

17    sounds like Nancy asked Dr. Nabrinsky, Hey, did

18    this smoking have something to do with the

19    lymphoma?

20           A.   Right.

21           Q.   It sounds to me like Dr. Nabrinsky says

22    no, and then can you just tell me what you best

23    remember about what he said after that "no"?

24           A.   That it was pesticides.
```

Christine Karman

```
 1        Q.    Do you recall anything else he said
 2   other than it was pesticides?
 3        A.    No, I don't.  I sort of went numb at
 4   that point.
 5        Q.    Do you remember any other followup
 6   questions that either Nancy or your husband or
 7   yourself asked him?
 8        A.    No.
 9        Q.    Other than the word "pesticides," do you
10   remember anything else that came out of that
11   doctor's mouth other than what you have shared with
12   me?
13        A.    No, I don't.
14        Q.    And when he said the word "pesticides,"
15   you said you went numb?
16        A.    I think it was a carryover from the fact
17   that he had the cancer, and it was something.
18        Q.    It was an emotional time, clearly?
19        A.    Correct.
20        Q.    So you recall the word "no," I know
21   that, with regards to the smoking, correct?
22        A.    Correct.
23        Q.    And you recall the word "pesticides," it
24   sounds like, for sure?
```

Christine Karman

1        A.      Right.

2        Q.      Then other than that, there were words

3    that pieced it together, but we just can't think of

4    probably the specific words that were used; is that

5    fair?

6        A.      That's correct.

7                MR. CADY:  Counsel, if you want this

8        copied, they are both the same, so we are

9        good.

10               THE WITNESS:  I read the email this

11       morning and I can't remember it.

12               MR. HOMOLKA:  You know what?  Let's

13       just grab that email.  You know what?  Do you

14       want to hand her her stack?

15               MR. CADY:  The original, yeah.

16               MR. HOMOLKA:  Maybe it will be more

17       familiar to her.

18   BY MR. HOMOLKA:

19       Q.      If you can just find the email that

20   you've now referred to a couple times in regards to

21   this conversation.

22       A.      This (indicating)?

23               MR. CADY:  Check in that pile, though,

24       Chris.

Christine Karman

```
1                    MR. HOMOLKA:  And then we will mark
2          one of these so you can keep the original.
3                    MR. CADY:  Okay.  So they copied it
4          front to back, I guess, is what it looks like.
5          This is the two pages here, which is front to
6          back to, to one page, right?
7                    MR. HOMOLKA:  Yes.
8                    MR. CADY:  Because there is two copies
9          of this email, but...
10                   MR. HOMOLKA:  That's what I have.
11                   MR. CADY:  And I'm not sure if there
12         were -- are there two copies of this email in
13         that stack?
14                   MR. HOMOLKA:  I thought I saw another
15         stapled-together email.  Let's make sure that
16         that's it.  Same date, same time, same thing.
17                   MR. CADY:  Okay.
18                   MR. HOMOLKA:  That explains it.
19                   MR. CADY:  Yes.
20                   MR. HOMOLKA:  Let me mark that as
21         Exhibit 2 since you have two copies.
22                   MR. CADY:  Okay.
23                       (Deposition Exhibit 2 was marked
24                        for identification.)
```

Christine Karman

```
1    BY MR. HOMOLKA:

2         Q.    All right.  I have marked for Exhibit 2

3    an email that you kind of mentioned when we were

4    talking about the doctor's conversation.

5         A.    Yes.

6         Q.    I'm just going to put this face down

7    over here so we don't intermix mix it with anything

8    because it's --

9         A.    Can I put this here?

10        Q.    I might ask you a few questions about

11   it.

12             MR. CADY:  Yeah, keep it in front of

13        you, Chris.  He is going to talk to you a

14        little bit about that.

15             THE WITNESS:  Okay.

16             MR. CADY:  And I will take this stack

17        right here for the minute.  Thanks.

18   BY MR. HOMOLKA:

19        Q.    So when I was asking you about the

20   conversation with Dr. Nabrinsky --

21        A.    Nabrinsky.

22        Q.    -- you referenced an email that you

23   reviewed.  Was this email -- or who sent this

24   email?
```

Christine Karman

```
 1          A.     My daughter Nancy.

 2          Q.     And it was sent in, it says here,

 3     August 3 of 2015?

 4          A.     Okay.

 5          Q.     Is that right?  Do you see it in the top

 6     right-hand corner?

 7          A.     Yes.

 8          Q.     And when I was asking you about the

 9     conversation where y'all were in his office, you

10     said something in July, you thought?

11          A.     I thought.

12          Q.     How does this email, I guess, relate to

13     that conversation?

14                 MR. CADY:  Do you need to read it over

15          first, Chris?

16                 MR. HOMOLKA:  Yeah.

17                 MR. CADY:  Review the email first,

18          please.  You marked this as 2?

19                 MR. HOMOLKA:  Yes.

20                 MR. CADY:  All right.  Thank you.  And

21          let us know when you are ready to answer

22          questions about it as well.

23                 THE WITNESS:  I'm done reading.

24                 MR. HOMOLKA:  I'm just going to go
```

Christine Karman

```
1          over it myself real quick myself so I can do

2          it one time.

3     BY MR. HOMOLKA:

4          Q.    All right.  Exhibit 2, when was -- were

5     you with Nancy I guess when she typed this up?

6          A.    Not when she typed it up.  She took hand

7     notes at the doctor's office.

8          Q.    Do you know if she still has the hand

9     notes she took?

10         A.    I don't know.

11         Q.    And then were you with her when she

12    typed this thing out, this email?

13         A.    No, I was not.

14         Q.    Who were the folks listed?  Let's start

15    with that.  It says to JST.  Can you tell me who

16    the folks are listed on this email?

17         A.    That's my daughter Ann.

18         Q.    And then the second one is --

19         A.    My daughter Cathy.

20         Q.    The third one?

21         A.    My daughter Bobbie.

22         Q.    Then who the is cc'd?  Yourself?

23         A.    Yes.

24         Q.    And your husband?
```

Christine Karman

```
 1        A.    Yes.

 2        Q.    Do you still -- did you have a copy of

 3   this or did somebody else have the copy?

 4        A.    My daughter Bobbie had the copy.

 5        Q.    And did you ask some of your kids, I

 6   guess, when you got Exhibit 1 that asked for

 7   information, did you ask some of your kids if they

 8   had emails, or kind of how did this come about your

 9   getting your hands on this email?

10        A.    I knew about it, I knew about it.

11        Q.    Just go from there.  You knew about it,

12   but did you have a copy of it to print off?

13        A.    I did at one point, but I couldn't find

14   it.  I believe it was in some of the paperwork I

15   gave her.

16        Q.    Some of the paperwork you gave who?

17        A.    My daughter Bobbie.

18        Q.    So Bobbie says -- found this email or

19   had this?

20        A.    Yes.

21        Q.    Do you know what else she has in that

22   paperwork?  You said she has some paperwork?

23        A.    I believe she has given it all to me

24   now.
```

Christine Karman

```
 1          Q.     And have you shared that with your
 2     attorneys, to your knowledge?
 3          A.     Yes.
 4          Q.     Do you know when you gave this email to
 5     your attorneys?
 6          A.     I'm not sure did I give it -- when I
 7     gave it to them.
 8          Q.     Well, it sounds to me like your daughter
 9     Bobbie had some materials --
10          A.     Yes.
11          Q.     -- some notes and stuff.
12                 Is this stack that you brought today the
13     only stuff that Bobbie had?
14          A.     No.
15          Q.     Okay.  What I'm trying to figure out is
16     how this stack of stuff Bobbie had that included
17     this email, Exhibit 2, how that got from you to
18     your attorneys and when.
19          A.     I -- I'm not sure if I gave it to them
20     today, or Bobbie is -- my daughter Bobbie is the
21     one who was doing any initial paperwork with my
22     attorneys.
23          Q.     Fair enough.  Does she have any legal
24     background --
```

Christine Karman

```
 1        A.    No.

 2        Q.    -- medical background?

 3        A.    No.

 4        Q.    What does she do for a living?

 5        A.    School teacher.

 6        Q.    The only reason I'm asking is, I'm

 7   trying to figure out if Bobbie -- if your attorneys

 8   had this before, because I think as a courtesy I

 9   probably should have had it.

10             MR. CADY:  I will just stipulate we

11        just received this email today.

12             MR. HOMOLKA:  Okay.

13             MR. CADY:  I didn't want to ruin your

14        line of questioning, but yeah, we just

15        received this stuff today.

16             MR. HOMOLKA:  I take you at your word,

17        and I appreciate it.

18             MR. CADY:  Of course.

19             MR. HOMOLKA:  It's a lot easier than

20        me asking questions about it.

21             MR. CADY:  Sure.

22   BY MR. HOMOLKA:

23        Q.    All right.  So this email, Exhibit 2,

24   says it was caused by exposure to fertilizer,
```

Christine Karman

```
 1    pesticides and asbestos, correct?

 2         A.    Yes.

 3         Q.    It doesn't say any kind of brands,

 4    right?

 5         A.    No.

 6         Q.    Did the doctor mention any brands when

 7    he said it?

 8         A.    No, I don't believe he did.

 9         Q.    And did you try to find out after the

10    doctor said this whether or not your husband could

11    be exposed to asbestos?

12         A.    Can you repeat that, please?

13         Q.    After -- after the doctor said that this

14    kind of a cancer is caused by exposure to asbestos,

15    is one of the things.  He lists three.  I'm just

16    starting with asbestos.

17         A.    Right.

18         Q.    Did you try to figure out if your

19    husband was ever exposed to asbestos?

20         A.    I believe we talked about it and

21    determined that he was never exposed to asbestos.

22         Q.    Ever do any housework, your husband?

23    Did your husband ever do any housework, like

24    framing, adding on to a room, any kind of --
```

Christine Karman

```
 1         A.     Yes.

 2         Q.     Did he ever build a house?

 3         A.     Yes.

 4         Q.     What did he do to build a house?  What

 5    house did he build?

 6         A.     The current one I'm living in.

 7         Q.     And how big of a house is that, square

 8    footage?

 9         A.     2800 feet.

10         Q.     Is that on Robin Hood?

11         A.     Yes.

12         Q.     You've brought a picture today, right?

13         A.     Yes, I did.

14         Q.     And I saw a picture of framing going on

15    and that kind of stuff.

16         A.     Yes.

17         Q.     Was your husband involved in building

18    that house from start to finish?

19         A.     Yes.

20         Q.     Did he actually do some of the work with

21    his own hands?

22         A.     Some.

23         Q.     Tell me what kind of work he did.

24         A.     He did probably some framing.
```

Christine Karman

```
 1        Q.    Were you there with him while he was

 2   doing work on that house?

 3        A.    I may have been.  Can I elaborate on

 4   this?

 5        Q.    Fair, yeah.  Go ahead.

 6        A.    My son is a carpenter.  He built the

 7   house.

 8        Q.    Your son Michael?

 9        A.    Yes.

10        Q.    Does he have a business?

11        A.    No.

12        Q.    So Michael would have been, for lack of

13   a better word, kind of the general contractor doing

14   most -- doing -- overseeing project?

15        A.    No.  My husband was the general

16   contractor.

17        Q.    Of course he was.

18             MR. CADY:  I will just object to the

19        form of the question.

20   BY MR. HOMOLKA:

21        Q.    So Robert -- so your son Michael helped

22   build the house, correct?

23        A.    He built the house.

24        Q.    Your husband helped your son build the
```

Christine Karman

```
1    house?

2        A.    Yes.

3        Q.    Were you ever present when he was doing

4    framing?

5        A.    I -- uncertain.

6        Q.    Ever present when they were working with

7    sheetrock?

8        A.    I wasn't.  He was.

9        Q.    Your husband was?

10       A.    Yes.

11       Q.    What year was he building this house?

12       A.    1989.

13       Q.    Do you know what type of joint compound

14   they used?

15       A.    No, I have no idea.

16       Q.    Do you know what kind of spackling they

17   used?

18       A.    No.

19       Q.    Did you try to look in to see if the

20   joint compound and other products contained

21   asbestos?

22       A.    I don't know.  I don't believe so.

23       Q.    You never tried to look into that?

24       A.    I never did.
```

Christine Karman

1          Q.    Do you know if Bobbie Lee [sic] did?

2    Since she was kind of the point person with this

3    lawsuit, do you know if she looked into whether or

4    not any of the products that were used on that home

5    that was built in the 1980s contained asbestos?

6          A.    I don't believe so.

7          Q.    You don't believe she did?

8          A.    I don't believe she did.

9          Q.    Are you aware that there were a number

10   of joint compounds that actually contained asbestos

11   back in the '80s?

12         A.    No, I wasn't.

13         Q.    Were you aware there were a number of

14   products that went into -- did you have tile in

15   that house?

16         A.    Tile?

17         Q.    Yeah.

18         A.    Yes.

19         Q.    Did you have grout?

20         A.    Yes.

21         Q.    Did you know there were a number of

22   products used in the tiling and the grout that

23   contained asbestos back in the '80s?

24         A.    No, I didn't.

```
1        Q.    What kind of -- do you know what kind of
2   sheetrock was used?
3        A.    No, I don't.
4        Q.    Do you know what kind of insulation was
5   used?
6        A.    No, I don't.
7        Q.    Do you know what kind of paint was used?
8        A.    Brand name, no, I don't.
9        Q.    Do you know what kind of roofing
10  material was used?
11       A.    No.
12       Q.    What kind of roof did it have initially?
13       A.    The shape of it?
14       Q.    Was it shingle?
15       A.    Shingle, yes.
16       Q.    What kind of shingles?
17       A.    I can't -- I don't know anything about
18  roofs.
19       Q.    Okay.  Do you know whether -- have you
20  had new shingles put on since 1989?
21       A.    Yes.
22       Q.    Do you know what kind of shingle -- when
23  did that occur?
24       A.    I'm not sure about that.  We put on a
```

Christine Karman

```
 1    room addition.

 2         Q.    Okay.  When did you put on a room

 3    addition?

 4         A.    About 15 years ago.

 5         Q.    So give or take early 2000s?

 6         A.    Yeah.

 7         Q.    So about 10, 12, 13 years after it was

 8    built --

 9         A.    Right.

10         Q.    -- or finished.

11               Who put on that room addition?

12         A.    My son.

13         Q.    Did your husband help?

14         A.    Yes.

15         Q.    What kind of room was it, or can you

16    describe it?

17         A.    A sunroom.

18         Q.    Let's go back to the original roof.  Do

19    you know that there is a lot, there were a number

20    of roofing products, including the tar and the

21    actual shingles, in the '80s that contained

22    asbestos?

23         A.    No, I didn't.

24         Q.    And you have done nothing to try to
```

Christine Karman

1   confirm what products were originally used on that

2   roof?

3       A.    No.  I would have to look at what -- I

4   still have all the purchase orders.

5       Q.    That was my next question.  Do you have

6   purchase orders and paper related to the products,

7   the materials that were used to build that house

8   back in the '80s?

9       A.    Yes.

10      Q.    And where are those materials?

11      A.    At my house.

12      Q.    Where specifically?

13      A.    In my closet.

14      Q.    Are they in a box or in some other...

15      A.    They are in folders.

16      Q.    Would you mind just keeping those in

17  case at any point your attorneys or -- you know, if

18  at any point your attorneys ask you for those

19  documents, would you be able to give them to him?

20      A.    Absolutely.

21      Q.    Have you ever filed or anyone ever filed

22  any claims with any asbestos bankruptcy trust on

23  behalf of these injuries that your husband

24  sustained?

Christine Karman

```
1        A.    No, no.

2        Q.    Did you know there is asbestos

3   bankruptcy trusts out there with millions of

4   dollars in them that they pay to people that were

5   diagnosed with the asbestos containing -- or

6   asbestos -- or diseases caused by asbestos?

7        A.    No.

8        Q.    So it sounds to me like your doctor said

9   there is really three things that in his mind could

10  have caused exposure.  Did he ever say that more

11  than -- more than 50 percent of these NHLs or

12  non-Hodgkin's lymphomas are idiopathic?

13       A.    I don't know what that means.

14       Q.    Do you know what the word "idiopathic"

15  means?

16       A.    No, I don't.

17       Q.    It means unknown cause in medical.

18       A.    Okay.

19       Q.    So this Dr. Nabrinsky that had this

20  conversation with you, he didn't -- he didn't say

21  anything about there are also a certain percentage

22  of these that are -- they don't know the cause?

23       A.    No, he didn't.

24       Q.    Did any other doctor tell you that this
```

Christine Karman

```
 1    non-Hodgkin's lymphoma was caused by fertilizers,

 2    pesticides or asbestos?

 3         A.    Not me directly.

 4         Q.    Who did they -- did a doctor tell

 5    somebody?

 6         A.    I don't know.

 7         Q.    Are you aware of a doctor telling any of

 8    your family members, your husband or your

 9    daughters, other than Nabrinsky, that he -- that

10    that doctor felt the lymphoma was caused by

11    fertilizer, pesticides or asbestos?

12         A.    I don't recall any doctors telling them

13    that.

14         Q.    Other than Nabrinsky?

15         A.    Right.

16         Q.    So he gives you three in his mind

17    purported substances that cause -- let's start with

18    asbestos.  It sounds to me like you didn't look

19    into asbestos.

20         A.    I have not looked into asbestos.

21         Q.    It sounds like nobody in your family

22    looked into asbestos as a cause for this lymphoma;

23    is that fair?

24         A.    I'm not sure.
```

Christine Karman

1        Q.    Are you aware of anybody in your family,

2   whether it be Nancy, Andy, Ann, Catherine, Roberta

3   or Michael, aware of any of them, have they ever

4   told you or have you learned from any other source

5   that they looked into asbestos potentially causing

6   this lymphoma?

7        A.    None of them have ever said that to me.

8        Q.    What about fertilizer?  Have they looked

9   into any potential exposures to fertilizer that

10  they believed caused -- could have caused this

11  lymphoma?

12       A.    The only one would have been Roundup

13  because that was what dad used.

14       Q.    Well, Roundup isn't a fertilizer, right?

15       A.    I'm sorry.  You are right.

16       Q.    That's okay.  What kind of fertilizer

17  did dad use?

18       A.    A multitude.  Mainly -- I can't think of

19  the name -- Scott's.

20       Q.    Scott's fertilizer, did anyone look into

21  Scott's fertilizer since the doctor said fertilizer

22  can be a cause?

23       A.    No.

24       Q.    Where did he purchase the Scott's

1    fertilizer he used?

2        A.   I would believe any local hardware

3    store, big box store.

4        Q.   Well, did you ever purchase fertilizer

5    for your husband?

6        A.   I probably did.

7        Q.   When did you first purchase fertilizer

8    for your husband?

9        A.   It would have been Home Depot or

10   Menards.

11       Q.   Okay.  When?

12       A.   Oh, probably since we -- prior to moving

13   into our house we're at.

14       Q.   When did you move in there on Round Hood

15   -- or Robin Hood?

16       A.   1989.

17       Q.   So you said prior to that time you

18   bought fertilizer --

19       A.   Yes.

20       Q.   -- at Home Depot or Menards?

21       A.   At Home Depot probably.  There was

22   another store, I know.  Handy Andy, I think it was.

23       Q.   And how many times did you buy

24   fertilizer for your husband or for your home?

Christine Karman

1          A.     I have no idea.

2          Q.     But sitting here today, you know you

3     bought it prior to 1989, it sounds like --

4          A.     Yes.

5          Q.     -- at either Handy Andy.  What street?

6          A.     That would have been Irving Park.

7          Q.     And what town?

8          A.     Hanover Park.

9          Q.     Hanover Park, is that a street or a

10    town?

11         A.     That's a town.

12         Q.     Sorry.  What street?

13         A.     I have no idea.  Off of Irving Park.

14         Q.     Is that a street, Irving Park?

15         A.     Irving Park is a street.

16         Q.     So there is a handy Andy in Hanover Park

17    town around Irving Street or on Irving?

18         A.     No longer.

19         Q.     Where is the Home Depot that you are

20    referring to that you may have bought fertilizer

21    at?

22         A.     On -- let me get this straight.

23    Bartlett Road and Highway 59 in Bartlett, Illinois.

24    Bartlett, Illinois.

Christine Karman

```
 1        Q.    How far that is from your house,

 2   Bartlett, Illinois, on Robin Hood?

 3        A.    About four, five miles.

 4        Q.    All right.  The Menards, where was the

 5   Menards where you said you might have bought

 6   fertilizer?

 7        A.    The Menards is about four or five miles

 8   -- no -- about three miles.

 9        Q.    What town?  You said the Home Depot is

10   in Bartlett.  It sounds like handy Andy was in

11   Hanover Park.  Where is the Menards?

12        A.    Hanover Park.

13        Q.    Do you remember any streets that it is

14   by or anything?

15        A.    Irving Park and Barrington Road.

16        Q.    So just so I'm clear, you recall buying

17   fertilizer at one of these three places prior to

18   1989, and it was for your home on Robin Hood Road?

19        A.    It would have been for our home in

20   Hanover Park.

21        Q.    What was the address in Hanover Park?

22        A.       , Hanover Park, Illinois. Q.

23   Did you bring a picture of that home? A.

24        No, I did not.
```

Christine Karman

```
1          Q.    So tell me about the fertilizer.  How
2     did you select Scotts?  What did you do when you
3     went in there on one of these occasions to buy
4     fertilizer?
5          A.    Oh, I don't remember.
6          Q.    Did you see any brands or more than one
7     brand?
8          A.    There were other brands.  My husband may
9     have said get Scotts; if you are going, get a bag
10    of Scotts, not -- I don't recall.
11         Q.    Do you recall prior to 1989, this time
12    that you can recall going in to buy fertilizer,
13    your husband telling you he wanted Scotts?
14         A.    I don't recall him saying those exact
15    words.
16         Q.    And were you typically the person that
17    would go to Home Depot, Menards or Handy Andy's and
18    buy fertilizer and other products?
19         A.    No.  50 percent him, 50 percent me.
20         Q.    Tell me about where the fertilizer was
21    that you recall, whatever you can recall about the
22    bag, anything that day in 19- -- prior to 1989.
23         A.    What I can recall about the bag?  It was
24    green, I remember that, the Scotts.  I don't
```

Christine Karman

```
1    remember other fertilizers that he may have bought.
2         Q.    I'm talking about fertilizers you may
3    have bought.  You said you -- that you remember
4    this time prior to 1989 buying --
5         A.    Buying --
6         Q.    -- Scotts or buying fertilizer?
7         A.    Buying Scotts, buying fertilizer, yes.
8    Scotts would have been one of them.  It could have
9    been any other ones.  I think Spectracide was one.
10   That sounds familiar, but...
11        Q.    Did you look at the label of the
12   fertilizer to see what was -- what the ingredients
13   were in the fertilizer?
14        A.    No.
15        Q.    Did you look at any warnings on the bag?
16        A.    Generally I looked on the warnings.
17        Q.    Okay.  Tell me, do you remember looking
18   on the warnings on the fertilizer bags?
19        A.    No, I don't remember.
20        Q.    Did your husband look at the fertilizer
21   bag warnings?
22        A.    I don't know.
23        Q.    Can you tell me anything that he told
24   you about the warnings on the bags of fertilizer?
```

Christine Karman

```
 1        A.    No.

 2        Q.    We are going to take a break about every

 3   hour.  It's about there.  Let me, though, ask you

 4   to go back to this home you were building on Robin

 5   Hood --

 6        A.    Yes.

 7        Q.    -- that your son Michael was building

 8   and that your husband helped out some.

 9              Was there a period of -- a certain time

10   of the day or certain days that your husband would

11   go over and help Michael with that house?  Does

12   that make any sense?  I mean, he was working a

13   full-time job at the same time or not?

14        A.    My son was.

15        Q.    Your husband.

16        A.    My husband?  Yes, he was working.  He

17   was self-employed working out of the house.

18   Probably early evening, mainly Saturday or Sunday

19   he would go there.

20        Q.    So help out on the weekends mainly?

21        A.    Yes.

22        Q.    Do you remember how long it took

23   for your -- when I say "you all," I understand

24   Michael was the primary home builder.
```

Christine Karman

1      A.      Right.

2      Q.      But how long did it take to build that

3   house on Robin Hood, if you can recall?

4      A.      The foundation was put in in December of

5   1988.  We moved into the house June 23rd of 1989.

6   Six months.

7      Q.      That's not bad.  That's really good.

8      A.      Yes.

9      Q.      All right, very good.  And so during

10   that six-month time, the best you can recall is

11   your husband would help Michael out, it sounds

12   like, primarily on the weekends.

13      A.      Um-hmm.

14      Q.      Do you remember any of the specific task

15   or any of the specific things that your husband did

16   or that you saw him doing or that he told you he

17   did?

18      A.      I can remember one task for sure.

19      Q.      Just tell me what that was.

20      A.      Sweeping the floor.

21      Q.      Okay.  Were you ever there when he was

22   sweeping the floor?

23      A.      Yes.

24      Q.      Dusty?

Christine Karman

```
1          A.     Oh, yes.

2          Q.     What color was the dust?

3          A.     I don't remember.  There was --

4          Q.     Was he wearing a mask?

5          A.     I believe he was, now that I think of

6     it.  I believe he was.  I can't be certain on that.

7          Q.     All right.  You believe he was but you

8     can't be certain?

9          A.     Right.

10         Q.     Do you recall sitting here today that he

11    was wearing a mask?  And how many days did you see

12    him sweeping the floor?

13         A.     I have no idea.

14         Q.     Was it more than once?

15         A.     Yes.

16         Q.     More than twice?

17         A.     Yes.  Probably once a week.

18         Q.     Fair enough.  So it sounds like one of

19    his jobs was sweeping up the mess.

20         A.     Yes.

21         Q.     Can you sitting here today say that

22    every time he swept up that mess you saw him with a

23    mask on?

24         A.     No, I cannot say that.
```

Christine Karman

```
 1          Q.    Fair enough.  It sounds to me like you
 2   may or may not remember seeing him with a mask on;
 3   is that fair?
 4          A.    That's fair.
 5          Q.    Did you ever purchase a mask for him?
 6          A.    Yes.
 7          Q.    Where did you purchase the mask?
 8          A.    I don't remember.
 9          Q.    Well, why did you -- why did you
10   purchase masks for him?
11          A.    It had something to do with what we were
12   doing after the house was built.  I believe -- I
13   believe he was sanding and varnishing something.
14          Q.    Makes total sense.  So you don't
15   remember purchasing a mask while the house was
16   being built; true?
17          A.    True.
18          Q.    Do you remember -- it sounds to me like
19   maybe I asked a bad question, it was so broad --
20   another time where you purchased a mask for him?
21          A.    Yes, I personally purchased it.
22          Q.    And you all moved into that house, it
23   sounds like, on Robin Hood in June of '89?
24          A.    Yes.
```

Christine Karman

```
 1              MR. HOMOLKA:  Why don't we take a
 2      break, and I will look over my notes and see
 3      which direction I'm going now.  Okay?
 4              THE WITNESS:  Okay.
 5              THE VIDEOGRAPHER:  Going off the video
 6      record at 10:09 a.m.
 7              (Recess taken, 10:09 - 10:21 a.m.)
 8              THE VIDEOGRAPHER:  Going back on the
 9      video record at 10:21 a.m.
10              MR. HOMOLKA:  What I want to do now --
11      I'm sorry this is kind of disjoined now.  I
12      just want to mark what you brought today and
13      we will get those in the record at least, and
14      then we will continue to plow ahead.  I might
15      have some questions about these just to get it
16      out of the way.
17              THE WITNESS:  Okay.
18              MR. HOMOLKA:  So let's do this.  I
19      think Steve and I will try to figure out what
20      the easiest thing to do is.  Maybe it's for
21      you to look at your --
22              MR. CADY:  Sure.
23              MR. HOMOLKA:  -- original stack and
24      Steve and/or I will just label one of these
```

Christine Karman

```
 1          copies with each thing.  We will try to just

 2          find what you are looking it, if that makes

 3          sense to you.

 4                  MR. CADY:  So we will go through and

 5          match it up.

 6                  MR. HOMOLKA:  Yes.

 7                  MR. CADE:  And then we will mark it

 8          into the exhibits.

 9                  THE WITNESS:  Okay.

10  BY MR. HOMOLKA:

11      Q.    And why don't you set those to the side

12  just because we've put more than one picture on a

13  page and it might be easier for us to do the other

14  stuff first.

15      A.    Okay.

16                  MR. CADY:  Just set the photos aside.

17  BY MR. HOMOLKA:

18      Q.    That one is fine, though.

19              So what do you have on top there?  We

20  will find that one and mark it.

21      A.    This one here (indicating)?

22      Q.    Yes.  I'm going to mark that.

23      A.    A view from the back of our house

24  looking towards a chicken shed.
```

Christine Karman

```
 1              MR. HOMOLKA:  This is Exhibit 3, I
 2         will note for the record.  I will mark mine
 3         here so you can keep your originals.  I'm
 4         going to mark it on the front in the grass
 5         there.
 6              (Deposition Exhibit 3 was marked
 7               for identification.)
 8    BY MR. HOMOLKA:
 9         Q.    So when you say -- this is your home on
10    Robin Hood that was built, finished in June of --
11    June of '89?
12         A.    Correct.
13         Q.    And what we are looking at here, it
14    looks like, is in the far back is a chicken shed?
15         A.    Yes.
16         Q.    Did you guys have chickens there?
17         A.    No, we didn't.  I'm standing at the back
18    of our house, like here, taking the picture
19    forward.
20         Q.    Okay.  Let me ask you this:  What house
21    is on the right side there?  Is that your Robin
22    Hood house or someone else's?
23         A.    That's a neighbor's.
24         Q.    Fair enough.  So you are standing at the
```

Christine Karman

 1    back of your home taking a picture of what appears

 2    to be your backyard?

 3           A.    Yes.

 4           Q.    And your backyard includes those bushes

 5    that we see about -- two, four, six, seven, eight,

 6    nine, ten -- eleven bushes or shrubs?

 7           A.    Actually, those belong to the neighbor.

 8           Q.    Where does your property end in this

 9    picture?

10           A.    Five feet in front of the shrubs.

11                 MR. HOMOLKA:  I think I'm following

12           it.  Are you, Steve?

13                 MR. CADY:  Yes.  Yeah, I've got it,

14           yeah.  It took me a minute to get there, but I

15           know.

16    BY MR. HOMOLKA:

17           Q.    So the shrubs -- those shrubs are -- let

18    me just ask you this:  Were the shrubs an area that

19    your husband would have been treating with Roundup,

20    or would that have been the neighbor's stuff?

21           A.    He might have treated up there.  He, you

22    know -- it's --

23           Q.    Did you ever see your husband physically

24    treating your neighbor's shrubs that are in this

Christine Karman

1    picture with a pesticide?

2         A.    No.

3         Q.    Now, you said that chicken shed -- is

4    that your chicken shed?

5         A.    No.

6         Q.    That's your neighbor's?

7         A.    That is my neighbor's, and that's what I

8    was capturing a picture of.

9         Q.    Why did you want a picture of that

10   chicken shed?   Did you guys use it or go to it?

11        A.    I was wondering what it was, and they

12   don't speak English, so I sent the picture to my

13   children and said what is that.

14        Q.    Did you ever see your husband, I guess,

15   out at the chicken shed or in that area --

16        A.    No.

17        Q.    Let me finish the question.

18        A.    I'm sorry.

19        Q.    Just for the record.

20             Did you ever see your husband using

21   Roundup or what you believed to be Roundup out

22   there around that red chicken shed?

23        A.    Never.

24        Q.    The picture that we are looking at now

Christine Karman

```
 1    as Exhibit 3, is there anywhere in this picture

 2    where you physically saw your husband using Roundup

 3    on this picture?

 4         A.    Up here, see these brown spots?

 5         Q.    I'm going to let you mark on this.

 6    I think it will be easiest since this is on the

 7    record.

 8               MR. CADY:  Yeah.

 9    BY MR. HOMOLKA:

10         Q.    And I'm going to give you a yellow

11    highlighter, if there is no objection.

12         A.    Okay.

13         Q.    And I will represent for the record that

14    what you are doing is highlighting areas, and we're

15    not -- I'm not saying that it's the exact, it's not

16    -- here.  Why don't we to this:  Would you

17    highlight in yellow the areas where you physically

18    saw your husband use what you believe to be

19    Roundup.  Let's see if that comes through.  If

20    doesn't, we will do something else.

21         A.    Why isn't that coming up?

22               MR. CADY:  Yeah, we've got a blue pen.

23         That might be easier.

24               MR. HOMOLKA:  Why don't you give her
```

Christine Karman

```
1          your blue pen, if yo don't mind.
2     BY MR. HOMOLKA:
3          Q.     And you can just mark in any way with an
4     "X" or a scribble.
5          A.     How about that?  Always weeds in there.
6          Q.     So what you are trying to highlight, it
7     looks to me, are some brown patches you referenced?
8          A.     Correct.
9          Q.     Is that right?
10         A.     Correct.
11         Q.     And are those areas within the grass, it
12    looks like?
13         A.     Yes.
14         Q.     And what you are saying is there would
15    be some weeds that would come in those areas and he
16    would use Roundup on it?
17         A.     Yes, or I would.
18         Q.     When you did it, would you try to be
19    careful to not kill all the grass around the weeds?
20         A.     Yes.
21         Q.     So was it a direct stream on the weed
22    that you were covering?
23         A.     Yes.
24         Q.     Do you know what kind of weeds you used
```

Christine Karman

```
 1    it on?

 2         A.    Crabgrass.  A multitude of names, hen,

 3    were these?  I don't know.

 4         Q.    Let me just say for the record too, I

 5    asked kind of a broad question.  I'm trying to just

 6    talk about Exhibit 3 right now just so --

 7         A.    Okay.

 8         Q.    -- the record is clear.  I'm not asking

 9    all the weeds that you or your husband used it on.

10    I'm just trying to figure out for Exhibit 3, the

11    few areas you marked on Exhibit 3, these brown

12    patches; and you said you recalled seeing your

13    husband use it there also?

14         A.    Yes.

15         Q.    Would you or your husband, just as refer

16    -- just as we refer to Exhibit 3 and these little

17    brown -- the brown patches that appear to be

18    throughout the grass, would you or your husband use

19    the Roundup more?  Which one of you used it more,

20    to your knowledge, for these little patches that

21    you would hit the weeds and the grass on Exhibit 3?

22    Does that question make sense?

23         A.     It does make sense, but I'm -- I'm going

24    to say him.
```

Christine Karman

```
 1          Q.    Do you recall how many times your
 2    husband would have used Roundup to treat the brown
 3    patch areas that we have on Exhibit 3?  Do you
 4    remember how many times you saw him treat the brown
 5    patches in that area of Exhibit 3?
 6                    MR. CADY:  Are you asking about a
 7          specific time period, counsel?
 8                    MR. HOMOLKA:  No.  I'm just asking her
 9          how many times she recalls him treating the
10          brown patches in the backyard here.
11                    MR. CADY:  Just generally?
12                    MR. HOMOLKA:  Yeah, of Exhibit 3.
13                    MR. CADY:  You can answer if you know.
14    BY THE WITNESS:
15          A.    I don't know.
16    BY MR. HOMOLKA:
17          Q.    It sounds to me like you do recall him,
18    though, treating --
19          A.    Yes.
20          Q.    -- what I've referred to the brown
21    patches in the backyard --
22          A.    Yes.
23          Q.    -- that are shown in Exhibit 3.
24                    Do you recall him treating those areas,
```

Christine Karman

```
1    just these specific kind of brown patch areas in
2    the backyard of Exhibit 3, do you recall him
3    treating those with Roundup more than one time?
4         A.    Yes.
5         Q.    Do you recall him doing it more than
6    twice?
7         A.    Yes.
8         Q.    More than three times?
9         A.    Yes.
10        Q.    More than four?
11        A.    Yes.
12        Q.    And we're referring to the brown patches
13   in Exhibit 3.  More than five?
14        A.    Yes.
15        Q.    Do you recall yourself treating those
16   areas?
17        A.    Yes.
18        Q.    Do you recall yourself treating them
19   more than five?
20        A.    Yes.
21        Q.    What about your husband?  More than ten
22   times just as we refer to these brown patches?
23        A.    I would say yes.
24        Q.    More than 20 times?  Now are we
```

Christine Karman

1    getting --

2         A.    I don't know.

3         Q.    Okay.  So it sounds to me like -- what

4    about yourself?  More than ten times where you were

5    treating these areas that are kind of the specific

6    areas in Exhibit 3 in the backyard?

7         A.    I would probably say around ten times.

8         Q.    So for you around ten, it sounds like.

9    For your husband, it sounds to me like more than

10   ten but you just can't say how much more than ten?

11        A.    Right.

12        Q.    The times that you treated the brown

13   patches in Exhibit 3, each time did you use Roundup

14   as the treatment method?

15        A.    No.

16        Q.    What else did you use to treat those

17   areas in Exhibit 3?

18        A.    Spectracide.

19        Q.    Any other one that -- any other chemical

20   that you recall?

21        A.    I can't -- a homemade chemical.

22        Q.    And what was that?

23        A.    Vinegar and hot water.

24        Q.    So -- and Roundup, I assume?

1          A.     I did use Roundup.

2          Q.     Let's start with the homemade vinegar.

3     When did you use the vinegar kind of solution to

4     treat?

5                 And again, I'm -- we're just -- I'm

6     trying to make it as clear as possible.  I'm

7     talking about the brown patches in the backyard

8     that are kind of marked in Exhibit 3, those kind of

9     areas that are within the grass where weeds would

10    be coming up in the grass.  Are we on the -- are

11    you with me?

12         A.     Right.

13         Q.     How many times or when did you start

14    using the vinegar kind of solution yourself for

15    that area?

16         A.     Probably about -- it was four years ago.

17    It was after he died.

18         Q.     That's what I was trying to figure out.

19    So some time after his death?

20         A.     Yes.

21         Q.     When I say "him" or "his," I'm trying to

22    refer to his husband, and I apologize right now for

23    you --

24         A.     That's okay.

Christine Karman

1              Q.      -- if I call him by his first name.

2      It's no disrespect.

3              A.      No.

4              Q.      I'm going to try to refer to him as

5      Mr. Karman.

6              A.      "Bob" would be better.

7              Q.      I'm going to stick with "Mr. Karman"

8      just out of total respect here and not overstepping

9      any bounds, but --

10             A.      Okay.

11             Q.      -- if I refer to him as Bob, that's who

12     I am referring to.

13             A.      Okay.

14             Q.      So after his death, it sounds to me like

15     you used this vinegar kind of solution to treat

16     that area?

17             A.      Yes.

18             Q.      Is it also true that you would treat

19     other weeds around your house at least after he

20     passed away with homemade solutions?  Was that

21     your --

22             A.      I did try homemade solutions.

23             Q.      Did they work as well as the other ones?

24             A.      Not as well.

Christine Karman

1        Q.    Why did you go to the vinegar solution

2   after he died?

3        A.    Because I found it on internet.

4        Q.    Were you concerned at that point because

5   of the conversation either you had with the doctor

6   or some other way that you wanted to get away from

7   the pre-made pesticides that you were using?

8        A.    Yes.

9        Q.    All right.  So you used some vinegar

10  there.  Let's go to the Spectracide.  As we

11  talked -- as related to the Spectracide and the

12  Roundup, those two products, you said that you can

13  recall around ten times treating kind of the area

14  we marked in Exhibit 3.  Can you say which one you

15  used more or less out of those two products prior

16  to -- it sounds like prior to 2015?

17       A.    Prior to 2015, probably the Roundup.

18       Q.    You used the Roundup more often than the

19  Spectracide?

20       A.    Yes, yes.

21       Q.    What about after 2015, did you ever use

22  Roundup in those areas?

23       A.    No.

24       Q.    Did you ever use Spectracide?

Christine Karman

```
 1        A.    No.
 2        Q.    So let's talk about the Roundup that
 3   you, yourself, used to the treat this area that we
 4   are talking about.  What kind of container did it
 5   come in?
 6        A.    It came in a spray bottle.
 7        Q.    Do you remember what color the bottle
 8   was?
 9        A.    I believe white.
10        Q.    Do you remember anything else about the
11   bottle?  In other words, any writing or any colors,
12   those types of things?
13        A.    No, no.  I probably didn't read it.
14        Q.    Do you remember any writing on the
15   bottle, any words?
16        A.    Yeah.
17        Q.    What words do you remember?
18        A.    Spectracide, weeds.
19        Q.    I'm just talking about the Roundup.
20        A.    Oh, the Roundup.
21        Q.    Yeah. I'm sorry.
22        A.    Roundup.
23        Q.    There we go.  Let me try to summarize
24   it.  You remember a white bottle that was a spray
```

Christine Karman

1    bottle that said "Roundup" on it?

2         A.    No.   That was I was referring to the

3    Spectracide.

4         Q.    Tell me what you believed the Roundup

5    product that you used in the area -- we're talking

6    about Exhibit 3, and I'm talking about that you

7    used.

8         A.    Yes.

9         Q.    What kind of substance or product was

10   it?

11        A.    It was a liquid.

12        Q.    And what did it come in?

13        A.    It came in a spray bottle.

14        Q.    What color was the bottle?

15        A.    I don't remember.

16        Q.    Do you remember any writing on the

17   bottle?

18        A.    Other than "Roundup," no.

19        Q.    And do you remember about how large it

20   was?  And what I will ask you to do here, we have a

21   video camera, and if your attorney doesn't mind, I

22   think the easiest thing would be for you just to

23   give your best kind of estimate with your hands,

24   maybe, instead of describing it.

Christine Karman

```
 1                    MR. CADY:  Yeah, we don't have an
 2         objection to that.  That's okay.
 3    BY MR. HOMOLKA:
 4         Q.    Okay.  If you could just kind of
 5    describe for us your best memory.
 6         A.    It was about a gallon.
 7         Q.    And how wide was it, about?  You are
 8    kind of doing the height.  It looks to me to be
 9    maybe a foot or so.
10         A.    I guess.
11         Q.    What about how wide was that?
12         A.    About that wide.
13         Q.    Did it have a spray bottle?
14         A.    Yes, and a spray attachment.
15         Q.    Do you remember the color of the
16    attachment?
17         A.    No.
18         Q.    Do you remember if it was a wand or some
19    other kind of spray nozzle?
20         A.    It would have been a wand.
21         Q.    Do you know what I mean by a wand?
22         A.    Yes, a hose and...
23         Q.    How long was the wand?  I imagine there
24    was some -- do you remember a tube?
```

Christine Karman

1          A.     A tube that went into the bottle, yes.

2          Q.     And then on the other end of the tube

3     was where this product would come out?

4          A.     Yes.

5          Q.     And how long was whatever it was, the

6     wand or spray nozzle, whatever it was on the end

7     that the product would come out?

8          A.     Ten inches, maybe.

9          Q.     Do you remember the color of it?

10         A.     I don't remember, but I'm thinking

11    black.

12         Q.     And do you remember how you were able to

13    get the product out of that spray wand, the device

14    you are talking about?

15         A.     You turned something.  I don't remember

16    what you had to turn.  Was it the nozzle on the end

17    of the spray?  I'm not sure of that.

18         Q.     Do you recall how you would -- would you

19    have to push something, pull something, pump

20    something to get actual product to come out the

21    nozzle?  Do you recall?

22         A.     I don't recall.

23         Q.     Do you remember any other words, like do

24    you remember the word "glyphosate" on the bottle

Christine Karman

1    that you've described?

2         A.    No, I don't.

3         Q.    It sounds to me like you remember the

4    word "Roundup"?

5         A.    Yes.

6         Q.    Do you know what color it was in, by any

7    chance?

8         A.    No.

9         Q.    That bottle that you used -- and we've

10   talked about for the uses that you were using or

11   doing on Exhibit 3, and I'll acknowledge there are

12   some brown patches.  I'm just talking about those

13   still.  Okay?

14              When you would use that bottle to apply

15   it, the liquid, would it be a direct stream that

16   you would spray or some of it would spray onto the

17   weed?

18        A.    I believe you could do either.  There

19   was you could do a direct spray or a fan spray.

20        Q.    When you were trying to get the weeds

21   out of the grass, kind of the areas you were

22   talking about on Exhibit 3, would you try to be

23   careful not to kill the grass around them?

24        A.    Absolutely.

Christine Karman

```
 1          Q.    And so for those at least areas, were
 2    you trying to use more of a direct spray so you
 3    didn't get it on the grass?
 4          A.    Correct.
 5          Q.    And would you point the wand -- I think
 6    you said it was a wand?
 7          A.    Wand.
 8          Q.    Would you point the wand towards the
 9    weeds when you used it?
10          A.    Into the middle of the weed.
11          Q.    Tried to get as close to the weed as
12    possible?
13          A.    Right.
14          Q.    And did you ever spray it up in your
15    face --
16          A.    Never.
17          Q.    -- or up in the air?
18          A.    Never.
19          Q.    Why not?
20          A.    I didn't want to.
21          Q.    Fair enough.  Ever windy when you were
22    doing it to treat this area in Exhibit 3?
23          A.    I'm sorry.  Can you?
24          Q.    Was it ever windy?
```

Christine Karman

```
 1          A.    No, no.  For some reason I knew to avoid

 2    spraying in wind.

 3          Q.    And at least when you were using it to

 4    treat areas in Exhibit 3, did you ever recall

 5    getting the product on yourself?

 6          A.    No.

 7          Q.    Like spraying it on yourself on

 8    accident, those types of things?

 9          A.    No.

10          Q.    What would you wear when you were

11    applying it?

12          A.    I wore gloves.

13          Q.    Did you ever wear a mask?

14          A.    No.

15          Q.    Did you ever wear -- were you wearing

16    shoes?

17          A.    Yes.

18          Q.    In other words, were you out there in

19    bare feet spraying this?

20          A.    Never.

21          Q.    What would you wear?  Would you wear

22    pants, shorts?

23          A.    I would wear -- I would wear generally

24    pants and a short-sleeve shirt, unless it was
```

Christine Karman

1   really cold and I would wear a long-sleeve shirt

2   and gloves.  Occasionally I had a hat on.

3        Q.    When you were done doing this yard work,

4   specific to Exhibit 3, would you go in, take those

5   clothes off generally?

6        A.    It depended on how dirty I was.  If it

7   was at the end of my workday outside, yes.

8        Q.    Would you shower if you got dirty?

9        A.    No, not immediately.  I would wash my

10  hands and, you know, take my shoes off.  I always

11  had garden shoes I wore, so...

12       Q.    When you used the Roundup for this area

13  that we are kind of talking about on Exhibit 3 or

14  trying to talk about, do you ever recall spilling

15  it on you?

16       A.    No.

17       Q.    Let me ask you about your -- oh.  You

18  used Spectracide also?

19       A.    Yes, I did.

20       Q.    Would the same be true for the

21  Spectracide?  Was it in -- do you know what kind of

22  container it was in?

23       A.    It was a smaller container, I believe,

24  that I bought.  It was like a trigger spray, I

Christine Karman

1    think.  I didn't -- I don't think the Spectracide

2    was working as good as the Roundup, so I probably

3    didn't buy as much.

4         Q.    The time you used the Spectracide, would

5    you try to be careful spraying it also?

6         A.    Yes.

7         Q.    In other words, try to just get it on

8    the weed or as close to the weed as possible?

9         A.    Yes.

10        Q.    Did you ever spill it on yourself?

11        A.    Never.

12        Q.    Can you tell me the reason why you would

13   either go back and forth or from one to the other,

14   the Spectracide as opposed to the Roundup or the

15   Roundup as opposed to the Spectracide?

16        A.    Price.

17        Q.    Which one was cheaper?

18        A.    It depended what Menards or Home Depot

19   had on sale.  I'm sorry.

20        Q.    I think I understand this.  So is it

21   fair to say that you would choose either

22   Spectracide or Roundup based on the time or based

23   on when you went into the store if they had one or

24   another on sale?

Christine Karman

1      A.      Yes, unless my husband sent me for

2   Roundup.

3      Q.      Unless he specifically asked you to get

4   one or the other, you would purchase them just

5   based on price?

6      A.      Yes.  He would purchase them on Roundup.

7      Q.      Fair enough.  Now let me ask you about

8   your husband.  The times that you saw him using

9   Roundup for the areas we are talking about in

10  Exhibit 3, and when I say "those areas," I mean the

11  brown patches that appear to be weeds that were

12  coming up within your lawn.  Is that fair?

13     A.      That particular case, I think the

14  chemicals, because it's on a slope, and I think it

15  was just being killed by the tires being on an

16  angle.  I don't know.  We always had trouble up

17  there, always, lack of something.

18     Q.      The times that your husband was using --

19  would you be outside with him, I guess, or did you

20  just see him using it?

21     A.      I would see him use it.  Sometimes I

22  would be outside, we would both be working

23  together.  I did see him use it and there were

24  times I didn't see him use it.

Christine Karman

1        Q.    The times you saw him using Roundup in

2    the areas described or in Exhibit 3 are the brown

3    patches, was he using a product that was similar to

4    what you've described as the Roundup you were

5    using, or was it something different?

6        A.    It was Roundup that I was using.

7        Q.    So the same thing that you explained, so

8    I don't need to go through all that again.  What

9    you described is that bottle with the wand?

10       A.    Yes.

11       Q.    What -- and when you watched him apply

12   the Roundup to the areas in Exhibit 3, was it

13   similar to what you explained for you in that he

14   would use a direct stream and try to get it as

15   close to the ground as possible to not kill the

16   grass?

17       A.    Yes.

18       Q.    And during the times you saw him using

19   the Roundup in those areas in Exhibit 3, did you

20   ever see him spraying it up in the air?

21       A.    Never.

22       Q.    Did you ever see him spraying it on his

23   face?

24       A.    Never.

Christine Karman

1    Q.    Did you ever see him spill it on

2    himself?

3    A.    No.

4    Q.    And did he appear to be being careful

5    when he was using it and not to kill the grass?

6    A.    Yes.

7    Q.    And I'm talking about Exhibit 3.

8    A.    Yes.

9    Q.    The times you saw him using the Roundup

10   in Exhibit 3, what would he wear?  Or do you recall

11   what he would wear when he tried to use it or when

12   he used it in that, those areas?

13   A.    Jeans, never barefoot, shoes, socks and

14   a shirt.

15   Q.    T-shirt or long sleeve?

16   A.    A short-sleeve shirt, a short-sleeve

17   cotton shirt, not a T-shirt, never a T-shirt,

18   and/or flannel, long sleeve.

19   Q.    Would he wear gloves?

20   A.    No.

21   Q.    Did you ever see him wear gloves?

22   A.    When it was cold out.

23   Q.    So as the weather changed, he may have

24   gloves on while he was doing it?

Christine Karman

1      A.    Yes.

2      Q.    What about a mask?  Ever see him wear a

3   mask when he was doing this area that we are

4   talking about in Exhibit 3?

5      A.    No.

6      Q.    Let me just ask generally for all the

7   times you saw him use Roundup with that question.

8   Did you ever see him wear a mask when he was doing

9   that?

10      A.    Yes, I did.

11      Q.    In what areas would you see him wear a

12   mask when he was using the Roundup?

13      A.    If he had -- he wore it if he had a bad

14   cold, a cough or a cold.

15      Q.    And would that be true for him going

16   outside to do all the yard work he was doing if he

17   had a cold or --

18      A.    If he -- yeah.  If he had a cold he

19   would try to wear a mask.  He had trouble using it

20   on the lawn mower.  I don't know why.  But when he

21   was spraying, if he had a cold, he would use a

22   mask.

23      Q.    What about gloves?  In other areas other

24   than Exhibit 3 did you see him wearing gloves when

Christine Karman

1    he applied the Roundup?

2        A.    I can't be sure of that.  The gloves

3    were always in the garage.

4        Q.    So he may or may not have used it, you

5    just --

6        A.    Right, right.

7        Q.    -- can't recall?

8              You know where my questions is going.

9    You've got to hesitate a little bit.  Pauline is --

10   really, we are putting her through a lot here.

11       A.    Oh, okay.

12       Q.    I'm trying to slow down too.

13             What about the Spectracide?  Did you see

14   him use Spectracide in the area that we marked as

15   Exhibit 3?

16       A.    My guess is if there was Roundup, he

17   would use the Roundup.

18             MR. CADY:  You don't want to guess,

19        Chris.

20             THE WITNESS:  Oh, I'm sorry.

21             MR. CADY:  Just don't forget that when

22        you answering these questions.

23   BY THE WITNESS:

24       A.    He would use the Roundup.

Christine Karman

1    BY MR. HOMOLKA:

2        Q.    It sounds to me from your testimony is

3    that you were the one that may or may not choose a

4    different pesticide like Spectracide based on

5    price?

6        A.    Right.

7        Q.    It sounds to me like your husband, on

8    the other hand, preferred or primarily used the

9    Roundup and he wasn't as concerned with the price

10   of one versus the other?

11       A.    That's correct.

12       Q.    And do you know why he preferred the

13   Roundup?

14       A.    Because it worked.

15       Q.    As far as Exhibit 3 goes, you moved into

16   this house in 1989?

17       A.    Yes.

18       Q.    When was the first time you saw him

19   using Roundup to treat the areas marked in

20   Exhibit 3?

21       A.    Probably, I would say, '91 or '92.  We

22   didn't have grass initially when we moved in.

23       Q.    Did you just have a dirt lot?

24       A.    We did for almost a year, believe it or

Christine Karman

```
 1    not.  Weather conditions were not good.

 2         Q.    You moved in in the hot summer months,

 3    it sounds like?

 4         A.    Um-hmm.

 5         Q.    Then you had the winter?

 6         A.    Had this kind of weather.

 7         Q.    When was the last time you saw him use

 8    Roundup to treat the areas that we have talked

 9    about in Exhibit 3, which were the areas --

10         A.    Oh, I -- I'm jumping.

11         Q.    -- the areas contained within the grass,

12    these kind of brown patches?

13         A.    Probably -- how do I -- when was the

14    last time I saw him?  If I say ten years ago, it

15    was five years before he died, okay.  Do I count

16    from when he died?

17         Q.    I'm just trying to figure out the last

18    time you saw him, whether it was --

19         A.    Okay, okay.  I will say six years ago,

20    so that would be -- yeah, about six years ago.

21         Q.    Just so now we are all on the same page

22    and I can get one clean question and answer for it,

23    it sounds to me like you saw your husband between

24    the years 1991 or 1992 up until approximately 2013
```

1    use Roundup to treat the areas that we have marked

2    in Exhibit 3?

3         A.    Yes.

4         Q.    Can you tell me how often he would have

5    to use Roundup throughout those years to treat

6    those areas?

7         A.    No, I can't, because, as you can see,

8    they are still not growing.  There is weeds growing

9    there, but nothing else.

10        Q.    Would he use the Roundup out there as

11   needed when he saw weeds?

12        A.    Yeah, yes, he would.  Yes, he would.

13        Q.    Were there times when he went out to do

14   yard work in that area, whether it was mowing or

15   something else, where he wasn't -- where he didn't

16   have to use Roundup in that area?

17        A.    Yes.

18        Q.    Then it sounds like there were times

19   when he did because he would find weeds?

20        A.    Right.

21        Q.    Is there any way for you to estimate for

22   us how often and on a yearly basis he would use

23   Roundup to treat the areas in Exhibit 3?

24        A.    I'd say -- you are asking me not to

Christine Karman

1   guess -- probably 16 times for sure.

2        Q.    Throughout those years or is that per

3   year?

4        A.    Per year.  About eight months.

5        Q.    I'm trying to figure out how you arrived

6   at 16 times per year, if there is a mechanism or,

7   you know, if you are trying to estimate based on a

8   certain amount of times per month or something.

9        A.    Twice a month.

10       Q.    And you are taking out the winter

11  months, it sounds like?

12       A.    Yes, I am.

13       Q.    So it's fair to say there were about

14  four months out of the year where y'all were not

15  using pesticides?

16       A.    Correct.

17       Q.    And so you are estimating that the other

18  eight months he would use it a couple times a month

19  to treat the areas in Exhibit 3?

20       A.    Right.

21       Q.    And when he would treat the areas that

22  we marked in Exhibit 3, would that be, you know, a

23  10- to 15-minute thing or would it be longer?

24       A.    When he was treating them?

Christine Karman

1     Q.     Yeah.

2     A.     Shorter.

3     Q.     How long would it take him to treat

4     those areas each time on Exhibit 3?

5     A.     Three, four minutes.

6     Q.     So we are going to move on from this

7     exhibit now after I tie it all together, I think.

8     So you recall your husband using Roundup in the

9     brown patches within the grass on Exhibit 3 about

10    twice a month from 1991, '92 to 2013, about twice a

11    month to treat those areas, and it would take him

12    about three or four minutes each time?

13    A.     Maybe, yes.

14    Q.     He would wear a mask sometimes, but

15    those would be instances where he had a cold?

16    A.     Correct.

17    Q.     He didn't wear gloves?

18    A.     Correct.

19    Q.     And during all the times you saw him

20    during the entire time that he treated those areas,

21    it sounds to me like he used a direct spray,

22    correct?

23    A.     Yes.

24    Q.     He would get as low to the ground as

Christine Karman

```
 1    possible?

 2         A.    Yes.

 3         Q.    You never saw him get it on himself?

 4         A.    No, I didn't.

 5         Q.    Did he ever tell you he got it on

 6    himself?

 7         A.    He would have told me.  No, he never

 8    told me.

 9         Q.    Let's move on from that.  You can set

10    that to the side to your attorney.  Let him keep

11    track of the originals.

12               The next thing you have I'm going to

13    mark it as Exhibit 4.

14                    (Deposition Exhibit 4 was marked

15                     for identification.)

16    BY MR. HOMOLKA:

17         Q.    Can you just tell us what you brought

18    today, what that is?

19         A.    What this is?  It's a plat of survey of

20    our property on Sherwood Drive -- Robin Hood Drive,

21    rather, sorry.

22         Q.    This is the home he lived at from 1989

23    until his death?

24         A.    Yes.
```

Christine Karman

```
1          Q.    Do you still live there?

2          A.    Yes.

3          Q.    All I'm trying to figure out is if there

4    is an easy place on here where it says how big of a

5    lot this is acre-wise.  Do you know how large of a

6    lot it was acre-wise?

7          A.    Acre-wise, all I can tell you, it's not

8    quite one acre.  I thought it said that in here.

9          Q.    That will do.  It sounds like about an

10   acre lot with a home that was how many square feet,

11   do you recall?

12         A.    I told you 2600.  I believe that's what

13   it is.

14         Q.    Let's go to your next document.

15         A.    Okay.

16               THE WITNESS:  This is yours.  Did you

17         give me this one?

18               MR. CADY:  That's the original, I

19         think.

20               MR. HOMOLKA:  Yes.

21               (Deposition Exhibit 5 was marked

22                 for identification.)

23   BY MR. HOMOLKA:

24         Q.    What do you have next?
```

Christine Karman

```
 1        A.    I have property taxes for 2015.

 2        Q.    Can you just describe what you brought

 3   for us today.

 4        A.    My second installment of property taxes

 5   payable in 2016 for taxes incurred in 2015.

 6              MR. HOMOLKA:  And this is Exhibit 5,

 7         for the record.

 8   BY MR. HOMOLKA:

 9        Q.    And this is for Robin Hood?

10        A.    Yes.

11              THE WITNESS:  Do I need to do anything

12         with that?

13              MR. CADY:  I will keep the originals

14         right here.

15   BY MR. HOMOLKA:

16        Q.    What do you have next?

17        A.    I'm showing Nationwide Insurance.

18        Q.    And tell me what you brought to us

19   there.

20        A.    This is my latest policy that I have

21   with Nationwide.  I just changed to them on the

22   house.

23        Q.    And you say policy.  I assume it's an

24   insurance --
```

Christine Karman

```
 1        A.      Insurance policy.

 2                MR. CADY:  Which one is that, counsel?

 3        I just want to make sure I have the right one.

 4        Okay.  Thank you.

 5                THE WITNESS:  Mine is different.

 6                MR. CADY:  Okay, okay.

 7                   (Deposition Exhibit 6 was marked

 8                    for identification.)

 9    BY MR. HOMOLKA:

10        Q.    I have marked as Exhibit 6 what you are

11    looking at with your Nationwide policy.

12        A.      Okay, okay.

13        Q.      It identifies on here kind of what you

14    already shared with us in that it was built in

15    1989?

16        A.      Yes.

17        Q.      It says composite shingle on there,

18    doesn't it?

19                MR. CADY:  Where are you looking at,

20        counselor?

21                MR. HOMOLKA:  Looking on the front

22        page, composite.

23    BY MR. HOMOLKA:

24        Q.    Do you know if it was a composite
```

Christine Karman

```
 1    shingle originally or if you had the roof done into

 2    a composite?

 3         A.    I don't know what a composite sheet is.

 4         Q.    Shingle.

 5         A.    Shingle.

 6         Q.    I was trying to see.  This is in 2019?

 7         A.    Yes.

 8         Q.    What do they value the house at?

 9         A.    Did you ask me a question?

10         Q.    I'm asking, yeah, do you know what they

11    valued the house at most recently, the appraisal or

12    anything?

13         A.    I --

14         Q.    I'm looking at this one, page 2 of

15    Exhibit 6, and it says at least your coverage for

16    your dwelling is $465,000.

17         A.    Yes.

18         Q.    I assume that's to replace it, but I'm

19    not even going to assume today.  You can move that

20    to the side.

21              MR. CADY:  We are done with that one,

22         Chris.  I will take it.

23              THE WITNESS:  I'm lost with that one.

24    BY MR. HOMOLKA:
```

Christine Karman

```
 1          Q.    Grab that other Nationwide there.

 2          A.    This one?  This one.

 3                   (Deposition Exhibit 7 was marked

 4                     for identification.)

 5    BY MR. HOMOLKA:

 6          Q.    Exhibit 7 is that one.  What is that

 7    one?

 8          A.    "Enclosed is your recorded satisfaction

 9    of release of mortgage."  When we paid the house

10    off.

11          Q.    It looks like it was paid off in about

12    2005?

13          A.    Yes.

14          Q.    Which would be about a 15-year mortgage

15    or so?

16          A.    Yes.

17          Q.    What do you have next?

18          A.    I have this, okay.  That's my

19    assessment.

20          Q.    Tell us what you brought there.

21          A.    My residential assessment for Robin

22    Hood, for property.

23                   (Deposition Exhibit 8 was marked for

24                     identification.)
```

Christine Karman

1     BY MR. HOMOLKA:

2          Q.     And we are at No. 8.  Let me look here.

3     It looks like this is your Robin Hood home,

4     correct?

5          A.     Yes.

6          Q.     The square footage is just north of

7     2500, correct?

8          A.     Yes.

9          Q.     The square footage of the land, 34,153?

10              MR. CADY:  55 or 53?

11    BY MR. HOMOLKA:

12         Q.     55, correct?

13         A.     Yes.

14         Q.     It says exterior construction, masonry.

15    What was your outside walls?  Were they bricks?

16         A.     They were brick and frame.  There was

17    some brick, some frame.

18         Q.     And it looks like in 2019 the estimated

19    fair market value of the home is 381,910.  Is that

20    correct?

21         A.     That's what they are showing, yes.

22         Q.     It looks like they got you with a big

23    jump between '18 and '19?

24         A.     Yes, they did.

Christine Karman

```
 1          Q.    Property taxes.  You don't need to look
 2     at that one any more.
 3                What else did you bring with us -- or
 4     bring with you?
 5          A.    What is this?  Oh, this was the
 6     satisfaction of mortgage.  We already did that,
 7     didn't we?
 8          Q.    We might have had two copies, but let me
 9     see.
10          A.    Yeah.
11          Q.    Let's mark it.
12          A.    We didn't mark it previously, did we?
13     No.
14                     (Deposition Exhibit 9 was marked
15                      for identification.)
16     BY MR. HOMOLKA:
17          Q.    Exhibit 9 looks to be a satisfaction of
18     mortgage for your home on Robin Hood, correct?
19          A.    Correct.
20          Q.    You can put that to the side.
21          A.    And the last thing I have is, yes, that.
22          Q.    What do we have here?  Why did you bring
23     this with you?
24          A.    I have no idea.
```

Christine Karman

```
 1          Q.     This looks like a State Farm policy?

 2          A.     It's a State Farm policy for my Jeep.

 3          Q.     What kind of Jeep is it?

 4          A.     A Jeep Cherokee.

 5          Q.     It looks like a Jeep Liberty.

 6          A.     Oh, this could be the -- oh, you know

 7    what this is?

 8                 MR. CADY:  This one might have just

 9          been a mistake, thrown in the pile.

10    BY THE WITNESS:

11          A.     It was a mistake, but I think what it

12    was is -- I bet this is from 2015.  These policies

13    are a little difficult to read.  Yes, policy

14    period, and I think I brought it because it's the

15    only policy I could find under Bob's name.

16          Q.     Kind of out there in his name?

17          A.     Right.

18                 (Deposition Exhibit 10 was marked

19                  for identification.)

20    BY MR. HOMOLKA:

21          Q.     I've marked it as Exhibit 10.  I'm just

22    going to leave it in the record.

23          A.     Okay.

24          Q.     I'm not going to ask you any questions.
```

Christine Karman

1          A.     When I saw Jeep, I thought why did I

2     bring that.

3          Q.     We have marked your gmail.  Did you get

4     your journal back?  I think he has it over there.

5                 MR. CADY:  Yes.

6                 MR. HOMOLKA:  Why don't we hand her

7          the journal and identify these pages.

8     BY MR. HOMOLKA:

9          Q.     What I would like for you to do is just

10    I want you to thumb through and count to yourself,

11    and I'm going to tell you how many pages we have

12    copied just to make sure we had the right amount of

13    pages.

14         A.     Okay.

15         Q.     I have 12 pages.  You let me know if I

16    have counted correctly.

17         A.     That's what I have, 12 pages.

18                (Deposition Exhibit 11 was marked

19                  for identification.)

20    BY MR. HOMOLKA:

21         Q.     For the record, Exhibit 11 is going to

22    be 12 pages of what appears to be, for lack of a

23    better word, a small little journal with a

24    calculator that Miss Karman has brought today.  At

Christine Karman

1    the top it has what appears to be a Social Security

2    number or a phone number?

3         A.    It must be a phone number.  It's not his

4    Social Security; it's not mine.

5         Q.    And it says "Erica," correct?

6         A.    Yes, it does.

7         Q.    Can you recall who the Erica was that

8    you were referencing there?

9         A.    No, I do not.

10        Q.    I'm not going to put the phone number

11   into the record.  We have it if we need to do

12   anything.

13             Can you just tell me why it is you

14   brought this today?

15        A.    Because in the documents I had, any

16   cards written, diaries were requested, and I had

17   this.

18        Q.    The actual handwriting has some dates?

19        A.    Yes.

20        Q.    Were these notes that you took on the

21   dates that you have represented in the journal, or

22   is this something you wrote down later and were

23   thinking back about conversations?

24        A.    This is Bob's printing on that date.

Christine Karman

```
1         Q.    So this is your husband's journal?

2         A.    This is my husband's diary.

3         Q.    Did you ever talk to him about it?

4         A.    Yes.

5         Q.    Can you tell me what -- do you know what

6    he was trying to accomplish or what he was trying

7    to do with this?

8         A.    He was just trying to log it.  He

9    believed in logs, and he was a mechanical engineer,

10   so he had a numerical mind, but he -- I've never --

11   I'd never seen anything like this before.

12        Q.    Did you find this after he had passed?

13        A.    No.  I knew he was doing it.  I knew he

14   was doing it because I had to go buy this to fit

15   this, which...

16        Q.    Let me jump away from Exhibit 11 for a

17   second.  Did you find any other documents that were

18   handwritten by Mr. Karman that related to

19   purchasing or use of Roundup?

20        A.    No.

21        Q.    In other words, did you find any

22   calendar where he had logged the dates he would do

23   yard work or used pesticides, anything like that?

24        A.    No, no, I didn't.
```

Christine Karman

```
1            Q.    Going back to Exhibit 11, it looks to

2      me, and I want you to tell me if I'm completely

3      wrong on this, but it looks to me like he started

4      on June 22nd, 2015?

5            A.    Correct.

6            Q.    It looks to be a medical appointment he

7      had with his primary care?

8            A.    Primary care.

9            Q.    And I've skimmed through it, but the

10     best I can tell, this looks to be a journal dating

11     some medical appointments and treatments that he

12     then had related to his condition, medical

13     condition?

14           A.    Correct.

15           Q.    I'm not going to represent that he wrote

16     down every visit he had by any means, but it looks

17     to me like he for some reason would have picked

18     some of these dates out and then he is writing down

19     either the treatment he received, things his

20     doctors have told him, those types of things?

21           A.    Yes.

22           Q.    Let's skip through it.  It looks like on

23     page 1 the first visit or entry is regarding his

24     primary care, Dr. Myrda?
```

Christine Karman

1      A.      Yes.

2      Q.      And that was a normal six-month visit?

3      A.      Yes, it was.

4      Q.      And it looks like there was a order to

5  get some C-scans or CAT scans?

6      A.      Yes.

7      Q.      Then we have July 1st of '15, correct?

8      A.      Correct.

9      Q.      And he talks about having a CAT scan?

10     A.      Yes.

11     Q.      And he has noted some -- that he's

12  noticed some swelling on his left leg --

13     A.      Yes.

14     Q.      -- on July 1st.  Is that consistent with

15  your memory kind of how this went?

16     A.      I don't quite remember the swelling of

17  the leg, but I remember the first CAT scan.

18     Q.      Were you with him at like the visit, I'm

19  going to say the visit in June here that he noted,

20  where it looks like it triggered and they were

21  concerned enough with his condition or health to

22  say, you know what, let's get a CAT scan and try to

23  figure out what's going on?

24     A.      Yes, I was.

Christine Karman

1      Q.    Do you recall them talking generally

2  about any conditions they were concerned about at

3  that time or they thought may be affecting him?

4      A.    No, I don't.  We had -- we had -- we had

5  separate appointments on the same day, so he would

6  go first, I would go second and we were done, and

7  he said he had to go for this CAT scan.

8      Q.    And it looks like July 6, '15, Debbie

9  called him?

10     A.    Debbie?

11     Q.    Debbie.

12     A.    Yes, yes.

13     Q.    Do you know who Debbie is?

14     A.    Debbie is a nurse in Dr. Myrda's office.

15     Q.    Did you ever have conversations with

16  Debbie about Roundup or exposure to pesticides?

17     A.    No.

18     Q.    All right.  If you continue over, it

19  sounds to me like they wanted him to come in, do a

20  biopsy because they had some concern maybe with

21  some lymph nodes from that CAT scan?

22     A.    Yes.

23     Q.    July 9th, he references, "Chris and I

24  went to Dr. Myrda to get more info."  Is that you?

Christine Karman

```
1              A.      That would be me.

2              Q.      Didn't get much other than need a

3      biopsy, correct?

4              A.      Correct.

5              Q.      July 23rd, you go to Dr. Aron?

6              A.      Right.

7              Q.      And it looked to me from the medical

8      records he performed the biopsy?

9              A.      Yes, he did.

10             Q.      Then we move on to July 27th, correct?

11             A.      Yes.

12             Q.      Correct me if I'm wrong, looking at the

13     medical records, it looked like July 27 was really

14     a rough day and the day that you got confirmed

15     news?

16             A.      Yeah.

17             Q.      And that was the confirmation of the

18     lymphoma?

19             A.      Yes.

20             Q.      July 30th, you went to Dr. Aron's office

21     and saw Dr. -- I can't even pronounce that name.

22             A.      Dholakia.

23             Q.      Who is that doctor, do you know?

24             A.      I have no idea.
```

Christine Karman

1          Q.    Was that doctor, to your knowledge,

2    involved with much of his treatment?

3          A.    I don't believe so.

4          Q.    Then you move on to see Dr. Myrda again,

5    or he did?

6          A.    Right.

7          Q.    And it looks like let's get the

8    oncologist appointment, and that's when you saw or

9    he saw Dr. Nabrinsky?

10         A.    Right.

11         Q.    Just for the record, he spelled it with

12   an "I," N-a-b-r-i-n-s-k-i.  Earlier -- earlier we

13   talked and you mentioned a Nabrinsky and you

14   spelled it with an "O."  This is the same doctor,

15   though, right --

16         A.    Yes.

17         Q.    -- that you had the conversation with.

18   I just want the record to be clear that whether

19   it's spelled --

20         A.    Right.  There were a small package of

21   cards here.  I thought they were in here somewhere.

22         Q.    Hold on.  I think your attorney has

23   those.  We will look at them.  I think they were

24   doctor cards just to make sure we have all those

Christine Karman

1    doctors?

2         A.    Okay.

3         Q.    So Dr. Nabrinsky was the first

4    oncologist, it looks like, he saw?

5         A.    Yes.

6         Q.    He referenced a bone marrow test on

7    August 3rd.  Do you recall him having a bone marrow

8    test done?   I think he is referring to he may need

9    one here.  I just --

10        A.    Vaguely, vaguely, yes.  I'm going to say

11   yes.  I'm not guessing.  Yes, because I questioned

12   I think why he needed a bone marrow.

13        Q.    And why did you question that?

14        A.    Pardon?

15        Q.    Why did you question that?

16        A.    I just didn't see -- it didn't seem to

17   me that it needed something to be done, not knowing

18   anything about cancer.

19        Q.    It says like you thought it's a little

20   early in the process?

21        A.    Yeah, yes, I did; yes, I did.

22        Q.    Let's do the chemotherapy, see what

23   happens?

24        A.    Yes.

Christine Karman

```
 1          Q.    Can you turn back to -- I'm sorry to

 2    jump around -- on August 3rd.

 3          A.    Yes.

 4          Q.    It says a $40 co-pay.

 5          A.    Yes, yes, it does.

 6          Q.    Do you remember who your insurance was

 7    during his diagnosis and treatment?

 8          A.    Well, Medicare and a Humana Advantage

 9    plan.

10          Q.    Do you have any of the bills from his

11    treatments?

12          A.    Yes, I do.

13          Q.    I think that those are probably the most

14    recent productions.

15                Did you pay anything out of pocket for

16    the lymphoma treatment?

17          A.    Yes, we did.

18          Q.    Do you know how much?  Do you have a

19    idea how much you spent out-of-pocket?

20          A.    $6,700.

21          Q.    Were those in co-payments?

22          A.    Co-payments, what Medicare didn't cover.

23          Q.    Do you remember the percentage?  Was it

24    like 90/10 or something?
```

Christine Karman

```
 1        A.     I don't remember.

 2        Q.     But it sounds to me like during his

 3   treatment you spent just south of $7,000

 4   out-of-pocket for his medical care?

 5        A.     Correct.

 6        Q.     Did you have to spend any money on

 7   travel, those types of things?

 8        A.     No.

 9        Q.     Like staying in a hotel room?

10        A.     No.

11        Q.     Do you remember how much you spent on

12   his funeral?

13        A.     Yes.

14        Q.     How much was that?

15        A.     9,000.

16        Q.     Do you have this stuff written down

17   somewhere?

18        A.     I have a receipt for his funeral I think

19   in there.

20        Q.     It may have been produced already.  I'm

21   just -- you do have a receipt for it?

22        A.     Yes, yes, yes.

23        Q.     Did you have a life insurance policy for

24   your husband?
```

Christine Karman

```
1        A.     No, I did not.

2        Q.     Any kind of pension or anything like

3    that you continue to receive for him?

4        A.     An annuity.

5        Q.     And is that a monthly payment?

6        A.     Yes.

7        Q.     How much --

8        A.     Oh, I'm sorry.  No, it is not a monthly

9    payment.  It's yearly.

10       Q.     How much is the annuity that you get?

11       A.     Yearly?

12       Q.     Yeah.

13       A.     It depends on what the market does.

14       Q.     Can you give me a low, from a low to a

15   high that you have received over the last four

16   years or so?

17       A.     I'm guessing at this.  23,000.

18       Q.     I don't want you to guess, but --

19       A.     Okay.  23,000.

20       Q.     We will say approximately $20,000.  How

21   does that sound?

22       A.     That sounds good, in addition to his

23   Social Security.

24       Q.     How much do you get a month in that?
```

Christine Karman

```
 1          A.    2300.

 2          Q.    Did you have to borrow any money for any

 3    expenses during the time that your husband was

 4    being treated for his lymphoma?

 5          A.    No, I did not.

 6          Q.    I'm going back to Exhibit 11, trying to

 7    get through it the best I can.

 8          A.    Oh, this?  Okay.

 9          Q.    August 8th of '15, it notes hepatitis

10    blood test.

11          A.    Yes.

12          Q.    Do you remember that?

13          A.    Yes, I do.

14          Q.    Can you just tell me about that.

15          A.    It was just a test, a normal test that

16    they take just to make sure there is -- this is

17    what I was told -- there is no hepatitis.

18          Q.    And who told you that?

19          A.    One of the doctors.  Maybe -- maybe

20    Dr. Aron.  Yeah, maybe Dr. Aron because he had to

21    have a port put in.

22          Q.    And when you say a port, he had to have

23    a port put in for the chemotherapy treatment?

24          A.    Correct.
```

Christine Karman

1          Q.     And the treatment that he did receive

2     for chemo, was that through the port in an IV?

3          A.     Yes.

4          Q.     Did he ever, to your knowledge, have

5     hepatitis throughout his life?

6          A.     No.

7          Q.     Let's go on.  If you turn the page, it

8     looks to me like according to his notes, and I

9     think it lines up pretty well with the records I've

10    seen, he had a chemo port put in on or around

11    August 11th --

12         A.     Yes.

13         Q.     -- at St. Joe's?

14                Then if you go to August 13th, they had

15    a sample or he notes that there was a sample of the

16    bone marrow and it was looking okay, Stage 3

17    lymphoma, and that they were hoping to start chemo

18    on August 20th of '15.

19         A.     Yes.

20         Q.     Is that kind of consistent with your

21    memory?

22         A.     Yes, it is.

23         Q.     Then if you go on, according to his

24    notes there is a first chemo treatment on

Christine Karman

```
 1      August 20th.

 2           A.     Yes.

 3           Q.     Do you recall his first chemo treatment?

 4           A.     I was not with him.

 5           Q.     Was anybody with him, to your knowledge?

 6           A.     No.

 7           Q.     Did you go to any of his chemo

 8      treatments?

 9           A.     Yes.

10           Q.     The first one, do you know how long it

11      lasted?

12           A.     Six hours from him leaving the house to

13      coming home.

14           Q.     Were you at home when he came back from

15      his treatment?

16           A.     Yes.

17           Q.     Can you tell me, did he have any side

18      effects from it?

19           A.     No.

20           Q.     Was he able to get around the house

21      after he came home?

22           A.     Yes.

23           Q.     Was he stubborn?

24           A.     Do I have to answer that?
```

Christine Karman

```
 1        Q.    I will strike it.

 2              Did he -- he was already retired,

 3   correct?

 4        A.    Yes.

 5        Q.    Was he able to continue to do any yard

 6   work or go outside with you during the chemo

 7   treatments?

 8        A.    He was told by Dr. Nabrinsky not to do

 9   any more outside work, so my son took over the lawn

10   mowing.

11        Q.    Were you guys able to take walks once

12   his chemo started?

13        A.    No.  He didn't want to walk.

14        Q.    Who did the cooking at your house?

15        A.    I did.

16        Q.    Who cleaned the dishes?

17        A.    I did.

18        Q.    What kind of things did he enjoy doing

19   after he retired?

20        A.    After he retired he golfed.  He met with

21   friends for breakfast or lunch.  He -- we liked to

22   take cruises; visited with our kids a lot.

23        Q.    When was the last cruise or vacation you

24   all took?  Let me ask you this:  Was it before his
```

Christine Karman

1    diagnosis?

2        A.    Yes, it was.

3        Q.    Golfing, was he able to golf after his

4    diagnosis?

5        A.    He had stopped golfing a couple of years

6    prior to.

7        Q.    What about meeting his buddies for

8    breakfast or lunch?

9        A.    He still met them.

10       Q.    So the first treatment was on

11   August 20th of '15.  He was at least still able to

12   go out and spend some time with his buddies?

13       A.    He -- it was less and less even prior to

14   his diagnosis.

15       Q.    Why was it less and less prior to his

16   diagnosis?  Was there a point where he just wasn't

17   feeling very well or...

18       A.    No, I don't believe so.  I think it was

19   just six old guys getting crabby with each other.

20   I have to be honest.

21       Q.    I can see it.

22       A.    Six old guys getting crabby with each

23   other.  So it was nothing other than he wasn't

24   golfing.  He couldn't see golfing when his golf

Christine Karman

```
 1    game wasn't that good.

 2        Q.    Let me rephrase things then.

 3              So it sounds to me like he enjoyed

 4    golfing after retirement, but at some point even

 5    prior to his diagnosis he had quit golfing as much

 6    because he just wasn't playing as well as he used

 7    to?

 8        A.    Correct.

 9        Q.    And it sounds like during his retirement

10    he enjoyed having breakfast and lunch with his

11    buddies?

12        A.    Correct.

13        Q.    But at some point even prior to his

14    diagnosis, that had gotten less and less because --

15        A.    Correct.

16        Q.    -- different interests?

17        A.    Yes.

18        Q.    What about spending time with his

19    grandkids?

20        A.    He still spent an equal amount of time

21    with the grandkids.  We had grandchildren from 30

22    years old down to three years old.

23        Q.    So at least during his chemo treatments

24    he was still able to enjoy his grandkids?
```

Christine Karman

```
1         A.    Yes.

2         Q.    He wasn't doing that yard work, though?

3         A.    He was not.

4         Q.    Let's go back to Exhibit 11 and finish

5    it up here.  It looks like after that chemo

6    treatment on the 20th, and I think by my review of

7    the records he was having it, the cycle was every

8    two weeks.

9         A.    Every two weeks, yes.

10        Q.    It looks like in between he was getting

11   some blood work done?

12        A.    Yes.  He -- I think it's a standard

13   cancer blood test they take.

14        Q.    September 10th of '15, he had a second

15   chemo treatment?

16        A.    Right.

17        Q.    Did you attend that one with him?

18        A.    I believe I came in the morning and

19   stayed to the afternoon.

20        Q.    And these were all kind of the same

21   where it would take a few hours there, travel back

22   and forth; he would end up back at home --

23        A.    Yes.

24        Q.    -- same day?
```

Christine Karman

```
 1        A.      Right.

 2        Q.      Do you remember any side effects during

 3   these chemo treatments that he had?

 4        A.      During the second one?

 5        Q.      Yeah.

 6        A.      He started coughing.

 7        Q.      Do you remember any vomiting --

 8        A.      No.

 9        Q.      -- or nausea?

10        A.      No.

11        Q.      Then there is some more blood test, and

12   then it looks like on September 24th he writes down

13   "Have pneumonia."  Do you remember that?

14        A.      Yes.

15        Q.      Do you remember him coming down with

16   pneumonia at or around the times of his second or

17   third chemo test?

18        A.      Yes.

19        Q.      And did that cause him some issues?

20        A.      He had to be hospitalized.

21        Q.      Do you remember how long he was

22   hospitalized?

23        A.      A day.

24        Q.      Did it impact his chemo treatment, do
```

Christine Karman

1    you know?

2         A.    I don't remember if it did this one, but

3    normally one day will move it out, but I don't know

4    if it did this one.

5         Q.    Chemo 3 is noted on October 8th,

6    correct?

7         A.    Yes.

8         Q.    It goes on with some blood work?

9         A.    Yes.

10        Q.    It looks like on October 26 he had some

11   trouble breathing?

12        A.    Yes.

13        Q.    On the bottom of that page, on October

14   30th did he write -- is that "All," a-l-l, "COPD,"

15   the last words down there?

16        A.    I believe so.

17        Q.    He had chronic obstructive pulmonary

18   disease; is that right?

19        A.    That's what it looks like.

20        Q.    Were you aware that he did?

21        A.    I didn't, not until this point.

22        Q.    Do you know when he was first diagnosed

23   with it?

24        A.    No.

Christine Karman

1      Q.    Do you know if he was diagnosed with it

2   prior to his lymphoma?

3      A.    Yes.

4      Q.    You just don't recall how long before?

5      A.    Maybe a year.

6      Q.    Was he ever on oxygen?

7      A.    No.

8      Q.    I have only got a couple minutes left,

9   so let's just finish up Exhibit 11.  He has his

10   fourth chemo on November 5th, if you keep going.

11      A.    Yes.

12      Q.    And I'm not trying to minimize any of

13   this treatment, by the way.

14      A.    I know, I know you are not.

15      Q.    He is in the hospital off and on.  I see

16   that stuff, and I'm not trying to race through and

17   make it sound like this was easy.  Please don't

18   take it as that.  I know there is a lot more to it

19   than chemo treatments.  Okay?

20      A.    Okay.

21      Q.    And I will give you an opportunity to

22   talk about some of that when we are done with this.

23   I wanted to get through the exhibit.

24            It looks to me like the plan was to do a

Christine Karman

```
1    couple cycles of this chemo and they ended up only
2    being able to do one --
3         A.    Yes.
4         Q.    -- right?
5         A.    Yes.
6               MR. HOMOLKA:  Let's go off the record
7         and take a break.
8               THE VIDEOGRAPHER:  Going off the video
9         record at 11:23 a.m. the end of Media 1.
10              (Recess taken, 11:23 - 11:34 a.m.)
11              THE VIDEOGRAPHER:  Going back on the
12        video record at 11:34 a.m. at the beginning of
13        Media 2.
14   BY MR. HOMOLKA:
15        Q.    Are you okay to continue?
16        A.    I'm good.  Thank you for asking.
17        Q.    You are welcome.
18              I'm going to go through some more things
19   that you brought.  You brought some photos today?
20        A.    There they are, yes.
21        Q.     And the first thing I'm going to mark,
22   I will show your attorney.  I'm just going to mark
23   these two.
24        A.    Oh, okay.  You are going with the
```

Christine Karman

1    structural ones.

2              MR. CADY:  Got it.  Okay, 12.

3                 (Deposition Exhibit 12 was marked

4                  for identification.)

5    BY MR. HOMOLKA:

6         Q.    So Exhibit 12, I'm going to hand you

7    Exhibit 12.  Can you pull those out?

8         A.    Okay.  That's these two.

9              MR. CADY:  You can just use the actual

10   exhibit --

11             THE WITNESS:  Okay.

12             MR. CADY:  -- Chris, and we will hang

13   on to the originals over here for the minute.

14             THE WITNESS:  Okay.

15             MR. CADY:  Because that's all that's

16   out.  I will take those.

17             THE WITNESS:  Okay, okay.  These two

18   we use, okay.

19   BY MR. HOMOLKA:

20        Q.    Exhibit 12, did you bring a couple

21   photos that look like that?

22        A.    Yes.

23        Q.    Can you just explain or tell us why you

24   brought those.

Christine Karman

```
1          A.     Just to try and get the depth.  I
2     couldn't find anything else where it had the full
3     depth of the lot, so like this is the front of the
4     house, here is the street.  The other house you
5     can't see, which is the chicken coop house way back
6     here.  So, you know, it didn't show much, but I
7     thought, well, it's something.
8          Q.     Yeah, they are great pictures, they are.
9     Just for the record, it looks to me like this is
10    the home on Robin Hood.
11         A.     Yes.
12         Q.     And it looks like it's during
13    construction and this would have been in the winter
14    months.
15         A.     Yes.
16         Q.     And you talked about how the
17    construction had started thereabouts in the winter
18    months.
19         A.     Yes.
20         Q.     Is there anything in this picture that
21    you want to tell me about use of Roundup, or should
22    we wait maybe until maybe another photo?
23         A.     There is nothing in there; there is
24    nothing in there.
```

Christine Karman

```
 1           Q.     This is more or less to show the about

 2    one acre lot that you are living on?

 3           A.     Right.

 4                  MR. HOMOLKA:  Very good.  The next one

 5           I want to mark as Exhibit 13 I will show your

 6           attorney.

 7                  MR. CADY:  Got it.  Thank you.

 8                  (Deposition Exhibit 13 was marked

 9                    for identification.)

10    BY MR. HOMOLKA:

11           Q.     They are two more photos, and again, it

12    looks to me like this is Robin Hood.

13           A.     Yes, it is.

14           Q.     It looks to me as though the picture on

15    the bottom is again kind of an overview during the

16    construction process.

17           A.     Yes, it is.

18           Q.     Except from a little different angle

19    maybe, but it shows your lot, it looks like some of

20    the drywall is up at this point.

21           A.     Actually, it looks like the house is

22    complete.

23           Q.     Oh.  The top picture?

24           A.     This one (indicating).
```

Christine Karman

```
1          Q.    Sorry.  I was looking at the bottom
2    picture.
3          A.    Oh, yes.
4          Q.    The top picture I included because it
5    looks to me like there is some lumber out there,
6    and it's dang near getting done and ready to move
7    in.  Is that right, the top picture?
8          A.    I think we're moved in.  I think we're
9    moved in on that one, the reason being is this
10   lumber I believe is for the deck; and you see that
11   little horse sitting there, little tiny plastic
12   horse, it belonged to my grandson and he was there,
13   so I'm thinking we are already in.
14         Q.    Did he live with you for a while?
15         A.    No.  He just came with his father, with
16   his horse.
17         Q.    There is the front of the car.  Whose
18   car is that, can you tell?
19         A.    The car?
20         Q.    Yeah.
21         A.    I have no idea.  Some kind of station
22   wagon, isn't it?
23         Q.    It looks like the family truckster.
24         A.    Yeah, I don't know.  But I'm sure this
```

Christine Karman

1    is -- because like I say, I believe this is the

2    base of the deck.

3         Q.    Both photos are Robin Hood, correct?

4         A.    Yes.

5         Q.    Focusing on the top picture, let me ask

6    you, is there anything in the top picture that you

7    can show me that would relate to his Roundup use?

8         A.    Probably -- well, no.  All of the grass

9    had just been seeded, so I think he was cautious

10   about putting anything on.  I recall some

11   landscaper telling us don't do anything until that

12   grass is fully in, because you will kill the grass.

13   So at that point I don't think we -- we had

14   anything on with Roundup.

15        Q.    You guys moved in in June of '90?

16        A.    June of '89.

17        Q.    June of '89, okay.  When did that grass

18   go in?  You said it took a little while.  Is that

19   like...

20        A.    That would have been June of '89.  We

21   didn't have --

22        Q.    Let me re-ask the question.

23              Do you know approximately what year that

24   picture would have been taken?

Christine Karman

1        A.      Probably September of 1990.

2        Q.      Which may help us then understand.  It

3    sounds to me like earlier when we talked about

4    Exhibit 3 you approximated he had started using

5    Roundup in those areas in '91 or '92.  Do you

6    remember that?

7        A.      Yeah.

8        Q.      Then it sounds to me like if this is

9    September of '90, you waited a little time to let

10   the grass come in, you get through the winter

11   months.  So is -- I don't know -- summer of '91 the

12   first time you recall or the earliest time you

13   recall him ever using Roundup anywhere in that

14   house?

15       A.      I don't remember.

16       Q.      Do you recall him using Roundup on Robin

17   Hood any time prior to the summer of '91?

18       A.      No.

19       Q.      Are there any -- are there any areas in

20   this picture, the top picture?  I know you said at

21   this time in '90 he wasn't using it, but later on,

22   are there any areas of the house in this picture

23   where you saw him use Roundup, the product?

24       A.      This is a gravel driveway.

Christine Karman

1    Q.    You can just put an "X" on it.

2    A.    Try again.  This is a gravel driveway.

3    Q.    And for the record we are on exhibit --

4    A.    For sure on the gravel driveway.

5    Q.    For the record, we are on Exhibit 13,

6    and Ms. Karman is marking a gravel driveway as an

7    area that she would have seen Mr. Karman use

8    Roundup at some point?

9    A.    Yes.

10    Q.    And you've put an "X" on the gravel

11    driveway.  Did that driveway ever become concrete

12    or did it remain gravel?

13    A.    It remained gravel for six years, and

14    it's now asphalt.

15    Q.    During the time it was gravel, that

16    driveway ran out to what street?  Was it Sherman or

17    Robin Hood?

18    A.    Sherwood.

19    Q.    Sherwood.  Do you remember how long that

20    was?  And maybe we can look at another picture.

21    A.    The driveway, I don't remember how long

22    the driveway is long.

23    Q.    Would his use of Roundup on the gravel

24    driveway -- did you see him using it from up near

Christine Karman

```
1    the garage there all the way down to the street?
2         A.    Yes.
3         Q.    And was it -- his use in those, in that
4    area, the gravel driveway, was it to kind of a
5    targeted use, when he would see weeds coming up
6    through the gravel he would use it and spray?
7         A.    Yes.
8         Q.    Do you remember how many times earlier
9    you were able to take eight months, do some math
10   for the brown patches in the backyard that were in
11   Exhibit 3?
12        A.    Correct.
13        Q.    For the gravel driveway, are you able to
14   estimate how many times you saw him use Roundup on
15   the gravel driveway that went from, it looks like,
16   your garage to Sherwood and was there for those six
17   years?
18        A.    I don't remember.  I truly don't
19   remember.
20        Q.    Did you see him using it on the gravel
21   driveway?
22        A.    I did.
23        Q.    Did you see him using it more than
24   once --
```

Christine Karman

```
 1        A.    Yes.

 2        Q.    -- in that area?  Can you say more than

 3   twice?

 4        A.    Yes.

 5        Q.    More than three times?

 6        A.    I don't know.

 7        Q.    So it sounds to me like you physically

 8   saw it at least two times?

 9        A.    Yes.

10        Q.    And it's your memory -- and you tell me

11   if I'm wrong.  Your memory is his use would be to

12   spray weeds that, as they came up in the gravel

13   when he saw them, he would use Roundup to kill

14   them?

15        A.    Yes.

16        Q.    Did you ever see him use Spectracide?

17        A.    No, I did not.

18        Q.    Did you ever use Roundup on the gravel

19   driveway?

20        A.    I did.

21        Q.    Do you remember how many times you did

22   it?

23        A.    I don't know.

24        Q.    More than twice?
```

Christine Karman

```
1          A.    One weed at a time.  I'm sorry.

2          Q.    You don't have to be sorry.

3          A.    I -- I don't know.  I -- yes, I did use

4    it.  The weeds drove me nuts.

5          Q.    Let me just ask this general question.

6          A.    Yes.

7          Q.    It sounds to me -- now we have talked

8    about two areas that we know, and we will get

9    through more, of using Roundup.  You've talked

10   about Exhibit 3 and the backyard by that hill and

11   now the gravel driveway, and you both used Roundup.

12   When I say "you both," I mean you and your

13   husband both used --

14         A.    Yes.

15         Q.    -- both used Roundup in both those areas

16   that we've talked about so far.

17         A.    Yes.

18         Q.    Is there a specific reason why you would

19   use it, use Roundup or do some of that work as

20   opposed to your husband or he would do it as

21   opposed to you?  Does that make any sense?  Is

22   there --

23         A.    Yes.

24         Q.    Can you just kind of tell me why it is
```

Christine Karman

```
 1    that sometimes you would use it, sometimes he would

 2    use it?  Is there any way you can elaborate on

 3    that?

 4              MR. CADY:  I'm just going to object to

 5         the form of the question.  You can answer, if

 6         you know.

 7         A.   I was more weed fanatic than he was,

 8    simple.

 9         Q.   Weeds bothered you more than they

10    bothered him?

11         A.   Yes, they did.

12         Q.   So would you use Roundup no matter where

13    the area was to kill weeds when you would see

14    weeds?

15         A.   Yes.

16         Q.   Were you retired before he was or living

17    at home and just being a housewife before he

18    retired?

19         A.   I was living at home.  He had not yet

20    retired.

21         Q.   So before he retired, is it fair to say

22    that you were doing yard work or specifically

23    killing weeds with whether it was Roundup or

24    Spectracide or trying to kill them more often than
```

Christine Karman

```
1     he was before he retired?

2          A.    Yes.

3          Q.    Then after he retired, is it something

4     you guys would both do, or would it stay the same

5     where you were doing it a little more often than he

6     would?

7          A.    He did it more than me because I had a

8     problem walking.

9          Q.    When did he retire?

10         A.    2003.

11         Q.    So just to put some years on it, from

12    1991, '92, earlier you testified that's the first

13    time you kind of recall or can first say you were

14    using Roundup on Robin Hood.  Do you remember that?

15         A.    Yes.

16         Q.    From that period, '91/'92, until 2003

17    when he retired, you were using Roundup or

18    Spectracide or other methods to kill weeds more

19    often than he was; fair?

20         A.    Yes.

21         Q.    And one of those areas we have marked on

22    Exhibit 13 is the gravel drive?

23         A.    Yes, it was.

24         Q.    And do you remember when I was asking
```

Christine Karman

1    you questions about Exhibit 3 and you described the

2    container of Roundup?

3         A.    Yes.

4         Q.    Was the container that you all used --

5    and when I say "you all," sorry -- you and your

6    husband used for the area you marked in Exhibit 13,

7    which we all acknowledge is a larger area but

8    you've marked it gravel, that gravel drive, was it

9    the same product or a different product?

10        A.    I don't know.  I don't remember.

11        Q.    You don't recall if it was any different

12   than that?

13        A.    No, I don't.

14        Q.    Do you recall, the times you saw him

15   using it, was he wearing the same thing that you

16   have already described for me?

17        A.    Excuse me?

18        Q.    Was he wearing the same things that you

19   already described for us?

20        A.    Yes.

21        Q.    Jeans, correct?

22        A.    Yes.

23        Q.    T-shirt?

24        A.    Never a T-shirt.  I've got to correct

Christine Karman

1    him.

2         Q.    The cotton shirt?

3         A.    Cotton shirt.

4         Q.    Or a flannel shirt if it was cool?

5         A.    Yes.

6         Q.    And when you did it, you would use your

7    gloves?

8         A.    Yes.

9         Q.    And when he had a cold, he would wear a

10   mask?

11        A.    Yes.

12        Q.    That would be true for the gravel drive

13   as well?

14        A.    Yes, it would.

15        Q.    As far as the times you saw him using a

16   pesticide, including Roundup, would the same -- the

17   same thing we talked about earlier be true in that

18   he would get as close down to the gravel and to the

19   weeds as possible to spray them?

20        A.    Can you repeat that, please?

21        Q.    Absolutely.  When you saw him using the

22   Roundup on the gravel drive, would it be similar to

23   what you said earlier in that he would try to get

24   the end of the sprayer or the nozzle or the wand as

Christine Karman

```
1    close to the weed as possible?

2         A.    No.

3         Q.    What would he do on the gravel drive?

4         A.    I believe he held it at arm's length

5    until he got close to the side grass along the

6    driveway.

7         Q.    Arm's length, pointing down still,

8    though?

9         A.    Pointing down, yes.

10        Q.    So he would do more of a -- was it a

11   direct spray in the middle of the gravel?

12        A.    I don't remember.

13        Q.    But he would be -- would he be spraying

14   more, I guess more often than he did in the grass

15   on the gravel?

16        A.    Only where there was weeds.

17        Q.    So still where there was weeds, still

18   pointed it down, correct?

19        A.    Right.

20        Q.    He would get near the grass and be more

21   careful?

22        A.    As he got near the grass, yes.

23        Q.    At any time on the gravel drive did you

24   ever see him spraying it up in the air, straight up
```

Christine Karman

```
1    in the air --

2         A.    Never.

3         Q.    -- or in his face?

4         A.    Never.

5         Q.    Did you ever see him spill it on

6    himself?

7         A.    No.

8         Q.    Did he ever come inside from doing work

9    on the gravel drive and tell you that he had got

10   Roundup all over his body --

11        A.    No.

12        Q.    -- or on his body?

13        A.    No, he did not.

14        Q.    Earlier you talked about the times that

15   he would spray the back area in Exhibit 3, it would

16   take three to four minutes.  Can you estimate how

17   long it would take the times he would spray the

18   gravel drive?

19        A.    No, I can't.

20        Q.    Did you ever see him wearing a mask when

21   he was spraying the gravel drive?

22        A.    No, I did not.

23        Q.    And is it true at least with the gravel

24   drive as well -- strike that.
```

Christine Karman

```
1              With the gravel drive, is it the same as
2      earlier in that this would have occurred in the,
3      give or take, eight months when the weather allowed
4      it?
5         A.    Yes.
6         Q.    In other words, you didn't see him
7      spraying the gravel drive at any time in those
8      three or four winter months?
9         A.    No, I did not.
10              (Deposition Exhibit 14 was marked
11                for identification.)
12              MR. HOMOLKA:  Exhibit 14.
13              MR. CADY:  Got it, thank you.
14      BY MR. HOMOLKA:
15         Q.    Two more photos that I have put
16      together.   Are those photos you brought today?
17         A.    Yes.
18         Q.    And is that on Robin Hood?
19         A.    Yes, it is.
20         Q.    The bottom photo looks to me to be kind
21      of, for lack of better words, a landscaped area on
22      the property?
23         A.    Yes, it is.
24              MR. HOMOLKA:  Do you mind handing me
```

Christine Karman

```
 1          the photo if I'm asking her questions.

 2                   MR. CADY:  This one?  Oh, the actual

 3          original?

 4                   MR. HOMOLKA:  Yes.  I will just look

 5          at it.

 6      BY MR. HOMOLKA:

 7          Q.    Is this in your back, side or front

 8      yard?

 9                   MR. CADY:  I think that's the only

10          one, counsel.

11          A.    My backyard.

12          Q.    Do you remember when this photo was

13      taken, or can you approximate for us?

14          A.    No, I can't.  I can't approximate.

15      I don't remember.

16          Q.    It looks to be a area that you have

17      stones around the grass, correct?

18          A.    Correct.

19          Q.    And is there mulch in there too?

20          A.    No.

21          Q.    What is that?  Is there dirt in there?

22      What is that?

23          A.    It's our dirt.

24          Q.    You have some flowers in there?
```

Christine Karman

```
1         A.    Yes, I do.
2         Q.    Correct?  And I see a couple weeds in
3    there.
4         A.    Yes, you do.
5         Q.    Is this an area where you and your
6    husband applied Roundup throughout your life?
7         A.    No.
8         Q.    Let me rephrase it then.  Is it an area
9    where you ever recalled seeing your husband apply
10   Roundup?
11        A.    No.
12        Q.    Did you ever use Roundup?
13        A.    No.
14        Q.    What did you do to control the weeds in
15   that area?
16        A.    Pulled them by hand.
17        Q.    And why did you pull the weeds by hand
18   in this area as opposed to using a pesticide?
19        A.    I didn't want to damage my plants.
20        Q.    Going back to the Roundup that you and
21   your husband used on the gravel, okay --
22        A.    Yes.
23        Q.    -- and on Exhibit 3, that back hill area
24   where the brown patches were.
```

Christine Karman

```
 1        A.    Yes.

 2        Q.    After you would spray the weeds, did you

 3   guys -- did you ever see your husband pulling them

 4   in those areas?

 5        A.    No, never.

 6        Q.    Going to the bottom picture -- or the

 7   top picture.

 8              MR. CADY:  Top picture.

 9   BY MR. HOMOLKA:

10        Q.    Is this also your house on Robin Hood?

11        A.    Yes, it is.

12        Q.    Is this a picture from Robin Hood or the

13   other street?

14        A.     This is a picture -- the street here is

15   Sherwood.  Robin Hood is here.  Tree limbs down, I

16   believe that's what the picture was of, of the tree

17   limbs that are down.

18        Q.    Are there areas on this picture that's

19   part of Exhibit --

20              MR. CADY:  14.

21        Q.    -- 14, can you see areas on this picture

22   where your husband -- where you saw your husband

23   use Roundup?

24        A.    Not in particular.  These brown areas
```

Christine Karman

```
 1    here, nothing grows there.
 2         Q.    Not even weeds?
 3         A.    No, sir, not even weeds.
 4         Q.    All right.  Let's move that one aside.
 5               (Deposition Exhibit 15 was marked
 6                 for identification.)
 7    BY MR. HOMOLKA:
 8         Q.    We are now on Exhibit 15, which I think
 9    are your last two pictures.
10         A.    Yes, they are.
11         Q.    And can you just describe for me, start
12    with the top picture and describe what it is of and
13    then the bottom picture.
14         A.    The top picture is a picture of our
15    house standing from a little hill on the back of
16    the lot.
17         Q.    And that's on Robin Hood?
18         A.    That's on Robin Hood.
19         Q.    I see that deck there.  Is that the deck
20    you were talking about --
21         A.    Yes, it is.
22         Q.    -- from the other angle?
23         A.    Yes, it is.
24               MR. CADY:  Let him finish the question
```

Christine Karman

1           Chris, just for a clean record, please.

2     BY MR. HOMOLKA:

3           Q.    Can you approximate when this picture

4     was taken?

5           A.    No, I can't.

6           Q.    Looking at this top picture, are there

7     areas that you could see in this picture where you

8     saw your husband use Roundup at any point?

9           A.    No.

10          Q.    What about you?  Are there any areas

11    where you can see that you used Roundup at any

12    point?

13          A.    No.

14          Q.    And I will note for the record I think

15    that I see a car on the left-hand side.  Is that

16    right?

17          A.    Yes.

18          Q.    And it's on the driveway.  I think, for

19    a clean record, that would have been for six years

20    the gravel drive that went down; we've already

21    talked about it?

22          A.    Yes.

23          Q.    Once that gravel drive was paved in or

24    around 1995, it sounds like, '96 time period, did

1    your husband -- did you see your husband use

2    Roundup after it was asphalt?

3        A.    No.

4        Q.    Let's go to the bottom picture, and it

5    looks to me like that's a picture just from the

6    other angle of your deck and home, right?

7        A.    Yes.

8        Q.    So the driveway would be on our left,

9    the left side of the picture if you are looking

10   at --

11       A.    Yes.  I'm sorry.  Yes, it would.

12       Q.    Are there any areas in this picture

13   where you can see that -- I will start with your

14   husband -- where your husband, you recall seeing

15   him use Roundup?

16       A.    Along the driveway here.

17            MR. CADY:  You have your pen Chris,

18       right here.  This is for you.

19   BY MR. HOMOLKA:

20       Q.    Do you mind just marking in some way so

21   Steve and I can kind of --

22       A.    I will just put a big "X" above it.

23            MR. CADY:  And, counsel, you are

24       asking her to mark areas where her husband

Christine Karman

```
 1            would have sprayed; is that correct?
 2                 MR. HOMOLKA:  Yes.
 3                 MR. CADY:  Okay.  Thank you.  Sprayed
 4            Roundup, I should say.  I think that was your
 5            question.
 6      BY MR. HOMOLKA:
 7            Q.    We are on Exhibit 15, and you have
 8      marked on the bottom picture above what appears to
 9      be a walkway.
10            A.    Yes.
11            Q.    Is that right?
12            A.    This is a walkway, a space and flowers
13      in there.
14            Q.    Let's start with the flower bed, the
15      flowers.
16            A.    Okay.
17            Q.    Were there -- was there mulch in there
18      or just dirt?
19            A.    I'm not sure.
20            Q.    Earlier you talked about on the exhibit
21      that had your 14 with the fountain and all that
22      stuff --
23            A.    Yes.
24            Q.    -- you said you would pull weeds in that
```

Christine Karman

 1    area; correct?

 2         A.    Yes, I did.

 3         Q.    On Exhibit 15, did you pull weeds where

 4    those flowers are along your house there?

 5         A.    I don't remember.

 6         Q.    Did you use Roundup in that area where

 7    the flowers are?

 8         A.    That I can't recall.  It's a very old

 9    picture.

10         Q.    At any time?

11         A.    I have in the past used Roundup when

12    fall came and I pulled the flowers out.

13         Q.    And we are talking about that area that

14    you have marked the X's where those flowers go

15    around the house?

16         A.    Right, correct.

17         Q.    Did you ever see your husband use

18    Roundup in that area that you marked?

19         A.    No.

20         Q.    What about on that little walkway?  Did

21    you ever see your husband use Roundup on that

22    little walkway beside the flowers?

23         A.    No.

24         Q.    So have you marked that picture because

Christine Karman

```
 1      it's an area where you used Roundup?

 2      A.    Yes.

 3      Q.    But not where your husband used Roundup?

 4      A.    No, it was not.

 5      Q.    Did you use the same type of product you

 6   described earlier, to your knowledge, Roundup?

 7      A.    Yes.

 8      Q.    The same type of container you've

 9   explained?

10      A.    Yes.

11      Q.    I think we are good with Exhibit 15.

12            MR. CADY:  Okay.  Thank you.

13            MR. HOMOLKA:  We are going to take a

14      break, but what I want to do real quick is I

15      brought a few pictures.  I don't have copies.

16      I just wanted to identify the people and let

17      us look at it.

18            MR. CADY:  We don't have an objection

19      to that.  That's fine.

20            (Deposition Exhibit 16 was marked

21             for identification.)

22   BY MR. HOMOLKA:

23      Q.    I'm going to hand you Exhibit 16, and if

24   you could, tell us who the folks are in this
```

Christine Karman

1    picture?

2        A.    Okay.  It's my husband.

3        Q.    Just say the names.

4        A.    Bob, Ann.

5        Q.    So your daughter Ann, is she on the

6    right?

7        A.    Ann is on the right.

8        Q.    Who is the gentleman in between?

9        A.    Bill.

10       Q.    Who is Bill?

11       A.    Ann's husband.

12       Q.    And then who is the other lady?

13       A.    That's me, Chris.  And this little girl,

14   I'm going to guess.

15       Q.    Don't guess.

16       A.    I'm not sure which granddaughter that

17   is.

18       Q.    And just for the record, I will disclose

19   to you, I got this off of Facebook, one of the

20   kids, I think, maybe; and I just wanted to figure

21   out, do you know approximately when that picture

22   was taken as it relates to your husband's lymphoma

23   diagnosis?

24       A.    There is a birthday cake in front.  Let

Christine Karman

1    me see that.

2            No, I don't.

3        Q.    Do you remember whose birthday you all

4    were celebrating?

5        A.    It says -- the cake says "Happy Birthday

6    Dad."

7        Q.    So it looks to be like maybe one of your

8    husband's birthdays?

9        A.    Yes.  Which one, I don't -- I'm trying

10   to put two and two together.  I don't know.

11       Q.    I appreciate you --

12       A.    I haven't seen that picture.

13               (Deposition Exhibit 17 was marked

14                 for identification.)

15   BY MR. HOMOLKA:

16       Q.    Here is an Instagram one.  I will just

17   show it to your attorney first, and I'm trying to

18   figure out who the folks are in it.  Same thing, if

19   you could start like left to right and just

20   identify it for the record.

21       A.    Okay.  Left to right, Roberta, Cathy.

22       Q.    Your daughter Cathy?

23       A.    My daughter Cathy, Bob, Nancy, Ann.

24       Q.    So this is the four daughters?

Christine Karman

```
 1        A.     These four daughters.

 2        Q.     No Michael?

 3        A.     No Michael, no mom.

 4        Q.     And no mom.  By looking at the picture

 5   is there any way for you to identify where it was

 6   taken or approximately what year it would have been

 7   or anything?

 8        A.     Yes.  I know where it was taken.  It was

 9   taken in Green Bay, Wisconsin, and May 31st, 2014,

10   and it was our granddaughter's Holly's graduation

11   from University of Wisconsin.

12        Q.     In Madison?

13        A.     Yes -- no.  Green Bay.

14        Q.     So to kind of time this up, this is

15   about, give or take, about one year before Bob,

16   your husband, was diagnosed with his lymphoma?

17        A.     Yes.

18                    (Deposition Exhibit 18 was marked

19                     for identification.)

20   BY MR. HOMOLKA:

21        Q.     That was Exhibit 17.  Exhibit 18 again

22   is a photograph, and if you could start and go left

23   to right and just identify who the folks are for me.

24                    Take your time.  We are going to take a
```

Christine Karman

```
 1    lunch.  I only have one more.

 2         A.    Aside, I'm just trying to figure out.

 3    It was our 50th anniversary and it was taken in

 4      , so I guess  .  Okay.  Michael, my son, our

 5 son; Ann; Cathy; Bob; Chris.

 6         Q.    That's you?

 7         A.    That's me.  Bobbie, Nancy.

 8         Q.    This is a picture of you, your husband

 9    and all of your children?

10         A.    Right.

11         Q.    And do you recall what year, when that

12    picture was taken?

13         A.    2012.

14         Q.    It was before his --

15         A.    Before his death, yes.  It was our 50th

16    anniversary.

17         Q.    Do you know where you guys were in that

18    picture?

19         A.    We were at a restaurant in Schaumburg.

20               (Deposition Exhibit 19 was marked

21                for identification.)

22    BY MR. HOMOLKA:

23         Q.    Last one, then we will take a lunch.

24               Exhibit 19, I think maybe Bobbie Lang
```

Christine Karman

1    posted this one.

2         A.    Bobbie Lang.

3         Q.    Your daughter.

4         A.    Yes.

5         Q.    Let me ask you a question.  It appears

6    to be you and your husband.

7         A.    Yes, it is.

8         Q.    By looking at the picture, are you able

9    to identify either who took it or when it was

10   taken?

11        A.    I have no idea who took this picture.

12        Q.    Have you ever seen it?

13        A.    I don't believe so.

14        Q.    Can you tell by looking at it whether it

15   was before or after his diagnosis with lymphoma?

16        A.    My guess would be -- I don't want to

17   guess.  Before.  This is my son.

18        Q.    You are pointing to the gentleman,

19   looking at the picture, to the right of your

20   husband?

21        A.    Yes.

22              MR. HOMOLKA:  That's all I have.

23        Let's take a lunch break, and by the way, if

24        you want any of these pictures, I'm happy to

Christine Karman

```
 1          have a copy made.  I just didn't have any

 2          copies.

 3                  THE WITNESS:  Somebody has those

 4          pictures.

 5                  THE VIDEOGRAPHER:  Off the record?

 6          Going off the video record at 12:06 p.m.

 7                  (Lunch recess taken,

 8                   12:06 - 12:58 p.m.)

 9             A F T E R N O O N   S E S S I O N

10                  THE VIDEOGRAPHER:  Going back on the

11          video record at 12:57 p.m.

12     BY MR. HOMOLKA:

13          Q.    Okay.  Are you okay to continue?

14          A.    I'm good.

15          Q.    I didn't get to some basic information

16     I just want to go through quickly.

17          A.    Okay.

18          Q.    What is your date of birth?

19          A.         .

20          Q.    And did you graduate from high school?

21          A.    I did.

22          Q.    Where did you graduate?

23          A.    Good Counsel High School.

24          Q.    Where is that?
```

Christine Karman

```
1          A.    Chicago.

2          Q.    You grew up in Chicago?

3          A.    Yes, I did.

4          Q.    Did you attend college?

5          A.    No, I did not.

6          Q.    Any kind of certifications post high

7    school?

8          A.    No.

9          Q.    Did you work outside the home?

10         A.    Yes, I did.

11         Q.    And can you just tell me what you did.

12         A.    When I graduated from high school I

13   worked for a lawyer for a union.

14         Q.    Worked for an attorney?

15         A.    Attorney for a union.  I got married,

16   had five children, and then went to work for a

17   company called Alpha Metals as a sales coordinator.

18         Q.    Let me go back to the attorney or union

19   attorney.  How long did you work for that person?

20         A.    About a year.

21         Q.    And what was his or her name?

22         A.    His name was David Lowenberg.

23         Q.    What kind of things did you do?

24         A.    Basically just fill out forms for union
```

Christine Karman

```
1    members for change of address, that type of thing,

2    nothing real legalese.

3         Q.    Alpha Metals, what years approximately

4    did you work for Alpha Metals?

5         A.    '59 to '62.

6         Q.    Did you work outside the home after

7    1962?

8         A.    No, I did not.  Oh, excuse me.  I did.

9    Sorry.  Worked for a company called Alpha Metals.

10        Q.    That's what I just asked you about.  I'm

11   sorry.

12        A.    Oh, okay.  So you've got Alpha Metals.

13        Q.    Tell me what years you worked there.

14        A.    For Alpha Metals, 19- -- I worked there

15   23 years, and I don't remember the years.

16        Q.    Did you retire from there?

17        A.    I retired in 2003, so 23 years, 2040,

18   right?  2080 -- 1980, 1980.

19        Q.    We will clean that up, I think.  I think

20   you worked at Alpha Metals, it sounds like, from

21   about 1980 to 2003.

22        A.    2003, yes.

23        Q.    Is that the same time your husband

24   retired?
```

Christine Karman

1          A.      Yes.

2          Q.      The years you gave me before that it

3     sounds to me like were probably when you worked for

4     the union attorney would have been right after high

5     school for a year or two?

6          A.      Yes.

7          Q.      And for the metal place you were

8     primarily working in sales?

9          A.      Yes.

10         Q.      Did you work around any metals or

11    chemicals or anything like that that you would have

12    brought home on your clothes?

13         A.      Yes.

14         Q.      Anything that you believe dangerous or

15    could cause harm to yourself or your husband?

16         A.      Yes.

17         Q.      What kind of things did you work around?

18         A.      I can't remember the names of them, but

19    we sold mass gallons of chemicals to the

20    electronics industry for printed circuit board

21    design.

22         Q.      And these chemicals, do you know anybody

23    who was ever -- became sick or ill as a result of

24    being exposed to the chemicals?

Christine Karman

```
 1         A.    No.  Very controlled.

 2         Q.    Did you ever get the chemicals on your

 3   clothes?

 4         A.    No.

 5         Q.    Did your husband ever visit you at Alpha

 6   Metals?

 7         A.    He did.  Oh, and I worked strictly in

 8   the office, away office.  When I worked with the

 9   chemical group, no.

10         Q.    So he was never -- you never saw him on

11   the floor in the manufact- --

12         A.    No, never.  He wouldn't have been

13   allowed.

14         Q.    Let me finish.  I'm sorry.

15               You never saw him around the chemicals

16   that you've referenced as being potentially

17   dangerous?

18         A.    No, I never did.

19         Q.    When did you meet Mr. Karman?

20         A.    November of 1959.

21         Q.    When were you all married?

22         A.    September of 1961.

23         Q.    Do you remember the day, like the date?

24         A.    September 23rd.
```

Christine Karman

1    Q.    Only marriage for you and Mr. Karman?

2    A.    Yes.

3    Q.    How would you describe your marriage?

4    A.    Good.

5    Q.    Ever separated?

6    A.    Never.

7    Q.    Supportive of one another?

8    A.    Yes.

9    Q.    Had five children?

10   A.    Yes, we did.

11   Q.    I've got their names.  Do you mind

12   putting a birthday or birth year with each one of

13   them?

14        A.    Okay.  Michael, '60- -- this is what?

15        He is    years -- hold on, hold on.  '.

16   Q.    Is he your oldest?

17   A.    Yes.  Ann, .  Cathy,   .  Here is

18   the two we come in problems with always.

19  Nancy,     ; Bobbie, .

20   Q.    Any of your children adopted?

21   A.    No.

22   Q.    Do you have hobbies today?

23   A.    Yes.

24   Q.    What kind of things do you enjoy doing?

Christine Karman

```
 1        A.     I enjoy cooking.  I enjoy playing cards.

 2   I enjoy gardening.  That's about it.

 3        Q.     Any particular card games you enjoy

 4   playing?

 5        A.     Gin, poker, solo card games, solitaire,

 6   et cetera.

 7        Q.     Do you belong to any clubs,

 8   organizations --

 9        A.     No.

10        Q.     -- church groups or anything?

11        A.     No.

12        Q.     Let me ask you a few questions about

13   Mr. Karman.  Okay?

14        A.     Okay.

15        Q.     Did he graduate college?

16        A.     No, he did not.

17        Q.     Did he graduate high school?

18        A.     Yes, he did.

19        Q.     Do you know what high school he

20   attended?

21        A.     Tuley in Chicago, Illinois.

22        Q.     Can you tell me -- let's start with his

23   last job, and what I have is he was an engineer at

24   Associated Design Services?
```

Christine Karman

```
 1        A.    He -- he was self-employed.  He was

 2   Associated Design Services.  That was his business

 3   name.

 4        Q.    That's his company?

 5        A.    Yes.

 6        Q.    And did he work -- did he have a home

 7   office or work out of the home office?

 8        A.    He worked out of the home office for

 9   from 2003 on, and prior to that he worked strictly

10   for Motorola as a contractor.

11        Q.    Let me break that up a little bit.  So

12   he retired in 2003?

13        A.    Yes.

14        Q.    Where did retire from?

15        A.    It would have been Associated Design

16   Services.

17        Q.    Did he work, though -- I guess I'm

18   trying to figure out -- I think you said he worked

19   there after '03.  Did he work a full-time job after

20   '03?

21        A.    No.

22        Q.    Did he consult after '03?

23        A.    Not to my knowledge.

24        Q.    So the last job he held was he was
```

Christine Karman

1    self-employed, had his own company at this place

2    called Associated Design Services?

3        A.    Correct.

4        Q.    How long was he on his own under that

5    company name, if you can recall?  I will tell you,

6    you filled out a fact sheet, and just trying to

7    help you out, I had 1990 to 2003.

8        A.    No, no.  It was longer than that that he

9    was self-employed.  I would say --

10       Q.    Let me just note for the record, I think

11   you probably did that because it asked for 25 years

12   prior.  I was trying to piece it all together,

13   but --

14       A.    Okay.  I -- I would say -- I would say

15   at least 35 years to 40 years that he was

16   self-employed.

17       Q.    Fair enough.  He was working

18   self-employed when you moved into the home on Robin

19   Hood?

20       A.    No -- yes, yes, he was; yes, he was.

21       Q.    What do you recall his first job once

22   you guys got married was?  Where did he work?

23       A.    Automatic Electric in Northlake,

24   Illinois.

Christine Karman

```
1          Q.    And was that right at around the time
2   you got married?
3          A.    Yes.
4          Q.    Northlake, Illinois?
5          A.    Yes, Automatic Electric.
6          Q.    What did he do for them?
7          A.    He was a -- I don't recall the name.  A
8   draftsman.
9          Q.    He worked in a office?
10         A.    Yes.
11         Q.    He didn't work around any chemicals that
12  you are aware of that could cause health problems?
13         A.    I'm not aware of anything there, no.
14         Q.    Do you know how long he worked at
15  Automatic Electric?
16         A.    I would say two years, maybe three
17  years.
18         Q.    Early '60s?
19         A.    Early '60s, yes.
20         Q.    And why did he leave that job, do you
21  know?
22         A.    For a better job.
23         Q.    Tell me the next better job.
24         A.    Motorola.
```

Christine Karman

1        Q.      And what did he do for Motorola?

2        A.      Draftsman.

3        Q.      How long did he work at Motorola,

4    approximately?

5        A.      Maybe eight years.

6        Q.      So it looks to me like that would have

7    got him sometime in the '70s, maybe.  Do you recall

8    if he was working for Motorola when Nancy and/or

9 Bobbie were born in  or  , kind of those time

10 frames?

11       A.      I don't remember.  I really have to

12 chase all that down.

13       Q.      Do you have any documents that show his

14 work history?

15       A.      You know, I don't, I don't.

16       Q.      That's okay.  You are doing fine for

17   what we need to know.

18               So he is at Motorola.  Was he always a

19   draftsman when he was at Motorola?

20       A.      They promoted him to printed circuit

21   board designer.

22       Q.      Tell me what he did as a circuit board

23   designer, if you know.

24       A.      He designed printed circuit boards.

Christine Karman

1    They were in all of our electronics.  They are

2    little tiny things, and he designed them to fit

3    into your telephone, whatever.  It was new

4    technology that they took him into at Motorola, and

5    that's what he's done for the rest of his life.

6         Q.    And you estimate that he was at Motorola

7    for seven or eight years?

8         A.    Seven or eight years, yes.

9         Q.    So sometime, it looks like to me then,

10   in the early '70s or mid '70s he went to another

11   job?

12        A.    Yes.  I can't remember the name.  I

13   can't remember the name.

14        Q.    Did he work somewhere else before he

15   started Associated Design Services?

16        A.    Yes, he did, and I'm trying to remember

17   the name.  I can't remember the name.  It was a

18   printed circuit board, another place.  I can't

19   remember.

20        Q.    Do you know where it was?

21        A.    I believe it was in Elk Grove Village.

22        Q.    Illinois?

23        A.    Yes.

24        Q.    Was he there very long?

Christine Karman

```
 1          A.    Two years, maybe.

 2          Q.    Did the same types of things he did --

 3          A.    Yes, he did.

 4          Q.    -- at Motorola?

 5          A.    Yes.

 6          Q.    Then after he left that, did he start

 7    his own company?

 8          A.    I think he went to another company.

 9          Q.    For a short time?

10          A.    For a very short time.

11          Q.    Doing the same type of work?

12          A.    Same type of work.

13          Q.    Working at an office away from the

14    house?

15          A.    Yes.

16          Q.    And then after that one did he start his

17    own company?

18          A.    Nope.  One more that I know of.  One

19    more small job away from home.

20          Q.    Do you remember the name of it?

21          A.    Nope.

22          Q.    Do you remember where it was?

23          A.    Carol Stream, Illinois.

24          Q.    A couple years?
```

Christine Karman

1          A.     Yes, a couple of years.

2          Q.     Why did he bounce -- I'm not trying to

3     be derogatory in the term "bounce around."  Why did

4     he I guess go from these -- it sounds like he had

5     three jobs that were circuit design after Motorola,

6     all for fairly short periods of time.  What was the

7     reason he made those switches, do you know?

8          A.     I don't know.  More, more knowledge,

9     more money.

10         Q.     Was he ever fired?

11         A.     No.

12         Q.     After these three short stays at these

13    places doing circuit boards, did he then start his

14    own company?

15         A.     No.

16         Q.     What was next?

17         A.     Nicholas Carpenters.

18         Q.     What did he do for them?

19         A.     He was a carpenter.

20         Q.     Why did he get out of I guess the

21    circuit board and do that?

22         A.     Economy; economy drove him out.  That

23    had to be early 1980s, maybe.

24         Q.     How long was he a carpenter?

Christine Karman

```
 1          A.     Six months.

 2          Q.     Building houses, or what was he doing?

 3          A.     Building houses.

 4          Q.     Did he have a specific trade he did for

 5    the house?

 6          A.     No.

 7          Q.     Framing, that type of thing?

 8          A.     He was outside mostly, so framing

 9    probably.

10          Q.     Did you ever visit him at work?

11          A.     No.

12          Q.     Did you ever hear of any of the products

13    or the name brand products he worked around or

14    with?

15          A.     No.

16          Q.     After giving the carpenter job a try,

17    did he then start his own company?

18          A.     Not quite.

19          Q.     Tell me what was next.

20          A.     He became a job shopper.

21          Q.     What's that?

22          A.     A job shopper is a company that -- or a

23    person that works for a -- that works for a company

24    that sources out to other companies their talent.
```

Christine Karman

```
1                    So he was a job shopper.  I don't
2    remember the name of the company, and very, very --
3    I mean, the economy was just bad in electronics, so
4    you could work at a job for two weeks and then
5    maybe not work for a month.  He was fortunate and
6    then all of a study he said, "I'm done, I'm
7    starting my own business," and he did.
8         Q.    And it was in this engineering-type
9    field?
10        A.    Yes.  He always stayed in the
11   engineering part, but that was it.
12        Q.    Was he successful at his own company?
13        A.    Yes.
14        Q.    He was financially successful?
15        A.    Yes.
16        Q.    And he stayed doing that, it sounds
17   like, for 30 -- 20, 30 years or so?
18        A.    Yes, yes.
19        Q.    Did he work long hours when he started
20   his own company or did he have standard hours he
21   worked?
22        A.    He worked long hours.
23        Q.    Can you just explain that to me.
24        A.    Well, his normal was a 40-hour week, but
```

Christine Karman

```
1    there were times when he had to work a Saturday, so
2    he would work a Saturday, not often.
3         Q.    Throughout your marriage I think you
4    said that you basically handled the more or less
5    indoor chores?
6         A.    Yes, I did.
7         Q.    The cooking, the inside cleaning?
8         A.    Yes.
9         Q.    Did you ever have to hire anyone to help
10   you with indoor?
11        A.    No.
12        Q.    The outdoor, it sounds to me, was a
13   little different in that you both did some of the
14   outdoor work.
15        A.    Correct.
16        Q.    Is that right?  You did some gardening,
17   some weed pulling.  You have talked a little bit
18   about some use of the Roundup --
19        A.    Right.
20        Q.    -- yourself, and it sounds like he also
21   did some of those tasks, right?
22        A.    He didn't do my gardens.  He didn't do
23   manual weed pulling.
24        Q.    Did he mow?
```

Christine Karman

```
 1          A.    Did he what?

 2          Q.    Mow the lawn.

 3          A.    Yes, he did.

 4          Q.    How long did it take for him to mow the

 5   lawn at the Robin Hood house?

 6          A.    Maybe two hours.

 7          Q.    Did he have a rider?

 8          A.    Yes.

 9          Q.    Did he trim hedges, that type of thing?

10          A.    No.

11          Q.    Or trim bushes, that type of thing?

12          A.    We didn't really have bushes.

13          Q.    What about did you ever have any pest or

14   rodents that you needed to control or spray?

15          A.    The what?

16          Q.    Any pests or rodents or anything on the

17   property --

18          A.    Yes.

19          Q.    -- that you had to treat, like spray?

20          A.    Yes.

21          Q.    What types of things would you have to

22   treat or spray to try to get rid of?

23          A.    Skunks, rabbits, squirrels, chipmunks.

24   I think that's it.  That's about it.
```

Christine Karman

1      Q.    What did you do or use to try to get rid
2   of these?
3      A.    There is a product, I don't remember the
4   name of it, that you can buy; and it's -- this is
5   terrible -- somebody's urine, some animal's urine
6   that they are afraid of.  So I just put that
7   around.
8      Q.    Where would you get that product?
9      A.    Home Depot.
10     Q.    And was that -- you don't remember the
11  name of it?
12     A.    Animal Aware, Animal Off, something like
13  that.
14     Q.    Did you buy it or did he buy it?
15     A.    I bought it.
16     Q.    Who applied it?
17     A.    I did.
18     Q.    Were you careful when you applied that?
19     A.    I was.
20     Q.    In that to make sure you didn't get it
21  on yourself?
22     A.    Oh, it wasn't coming anywhere near me.
23  No, I did not get it on myself.
24     Q.    Did you wear the gloves?

Christine Karman

```
 1         A.    I did.
 2         Q.    Did you ever have to hire anybody to do
 3    work for you all outside, like whether it be with
 4    taking care of the lawn, fertilizing, anything like
 5    that.
 6         A.    After he died I did.
 7         Q.    Other than when they were growing up,
 8    did any of your children live with you as adults?
 9         A.    Yes.
10         Q.    Did any of them live with you at your
11    home on Robin Hood?
12         A.    Yes.
13         Q.    Which ones?
14         A.    Cathy and her daughter.
15         Q.    How long were they with you?
16         A.    A year and a half, maybe; year and a
17    half.
18         Q.    Anybody else?
19         A.    The girls, after they moved out of
20    college or graduated from college, rented their
21    apartments, came back home each for six, eight
22    months, Bobbie and Nancy going.
23         Q.    Kind of between their jobs and stuff?
24         A.    Right.
```

Christine Karman

```
 1          Q.    Was your husband ever arrested, to your
 2     knowledge --
 3          A.    No.
 4          Q.    -- for any kind of criminal activity?
 5          A.    No.
 6          Q.    What about you?  Were you ever arrested
 7     for criminal activity?
 8          A.    No.
 9          Q.    Do you have any bills, documents,
10     anything like that for any of the yard work and
11     outdoor work that you've had to hire out?
12          A.    From current?
13          Q.    Yeah.
14          A.    Yes, I do.
15          Q.    Do you know the name of the company that
16     you use currently?
17          A.    Jose Sanchez Company.
18          Q.    What's he do?  Does he take care of the
19     lawn?
20          A.    He mows it, and if I need it sprayed or
21     fertilized -- I mean, I just get it fertilized.  He
22     takes care of that.
23          Q.    Did your husband fertilize the lawn when
24     you needed it before he got sick?
```

Christine Karman

```
 1        A.    Yes.

 2        Q.    How would he have fertilized the lawn?

 3        A.    On a -- with a spreader.

 4        Q.    One of those green things?

 5        A.    Yeah.

 6        Q.    Do you know what the brand name of the

 7   fertilizer was that he used?

 8        A.    No, I don't.

 9        Q.    Have you met with any doctors or other

10   experts that have been hired in your case?

11        A.    No.

12        Q.    We talked about -- let me just check

13   some stuff off, okay.

14              Did your husband ever have to file for a

15   workers' comp or anything like that --

16        A.    No.

17        Q.    -- any disability while he was working?

18        A.    No.

19        Q.    Did he serve in the military?

20        A.    Yes, he did.

21        Q.    What branch?

22        A.    Marine Corps Reserves.

23        Q.    How long?

24        A.    Five years.
```

Christine Karman

```
 1          Q.    What years did he serve?

 2          A.    '58 to '63.

 3          Q.    Did he ever serve in battle?

 4          A.    No.

 5          Q.    Did he serve overseas?

 6          A.    No.

 7          Q.    Did he have a specific job while he was

 8   in the Marine Corps?

 9          A.    He worked on helicopters.  No, not

10   helicopters; jets.

11          Q.    What type of work did he do on jets?

12          A.    I don't know.  Mechanical or something.

13          Q.    Do you know if he ever worked around jet

14   fuel?

15          A.    I'm not sure.

16          Q.    Do you have any records from his time

17   serving in the Marines, as a marine?

18          A.    No, I don't.

19          Q.    Was he honorably discharged of his

20   duties?

21          A.    He was honor -- did you say honorably?

22          Q.    Honorably.

23          A.    Yes, he was.

24          Q.    Thank you.  Do you watch TV?
```

Christine Karman

1      A.     Yes, I do.

2      Q.     Do you enjoy any specific types of shows

3   or anything like that?

4      A.     Oh.  Reality TV.

5      Q.     Do you watch the news?

6      A.     I do on occasion.

7      Q.     Have you had a relationship more than

8   friendship with any person since your husband

9   passed away?

10     A.     No.

11     Q.     In other words, go on any dates or

12  movies or things like that?

13     A.     No.

14     Q.     You obviously have talked today about

15  some of the exposure that you believe your husband

16  has had to Roundup --

17     A.     Yes.

18     Q.     -- in some of the yard work he's done.

19            Is there anybody else that I could talk

20  with in a situation like this or visit with about

21  that you think would have knowledge, firsthand

22  knowledge about his use of Roundup?

23     A.     Any one of my children -- no, not any

24  one of my children.  Two, three of my children,

Christine Karman

1    maybe.

2        Q.    In other words, did any of your children

3    ever do the lawn work with him, around him when he

4    was using Roundup, those types of things?

5        A.    Not really, no.

6        Q.    Any close neighbors he had that would

7    have been outside with him or helped him with yard

8    work?

9        A.    No.

10       Q.    Do you know anybody else personally that

11   has suffered from non-Hodgkin's lymphoma?

12       A.    No, I do not.

13       Q.    Let me go back.  We talked a little bit,

14   we talked about a couple areas on Robin Hood --

15       A.    Yes.

16       Q.    -- that you can remember seeing your

17   husband use Roundup.  One of the areas was in the

18   backyard, kind of near that hill, and there is a

19   bunch of brown patches you said where it was hard

20   to get grass but there would sure be weeds.  Do you

21   remember that?

22       A.    I do.

23       Q.    I think it was Exhibit 3.

24             Another area we talked about, your drive

Christine Karman

1    that ran from the garage all the way down to the

2    street.  What street was it?

3         A.    Sherwood.

4         Q.    Sherwood.  And we talked about how for

5    six years that was gravel and your husband as

6    needed and yourself when weeds came up would use

7    Roundup.  Do you remember that?

8         A.    Yes.

9         Q.    Are there other places around that

10   property on Robin Hood Street where you recall

11   seeing your husband -- I know you talked about kind

12   of this one flower bed in the fall when you pulled

13   up the flowers, but are there any other places

14   where you recall seeing your husband use Roundup on

15   that property?

16        A.    Yes.

17        Q.    Can you just tell me another place.

18        A.    Completely around the whole house at

19   given times wherever there was a weed.

20        Q.    So there is no specific area, but as he

21   saw weeds?

22        A.    Right.

23        Q.    And when you say around the whole house,

24   you mean the structure of the house or the land?

Christine Karman

1       A.      The land.

2       Q.      Can you specifically tell me any areas,

3   because earlier I showed you a picture of the front

4   of the house, and you talked about a hill that was

5   patchy but said weeds didn't even grow there.  Do

6   you remember that?

7       A.      Right.

8       Q.      So obviously not there, right?

9       A.      Right.

10      Q.      So were there just other areas in the

11  lawn where he would see weeds and have to use it?

12      A.      Yeah.  They were all over.  We had a

13  real problem initially.

14      Q.      How long did you have a real problem?

15      A.      Oh, I would say -- I don't know.  A long

16  time.  We always had weeds in there.

17      Q.      Well, we talked about time, so I want to

18  go back and talk more about this.  What other areas

19  of the house, of the lawn do you specifically

20  recall seeing him, like either being with him or

21  watching him use Roundup?

22      A.      Okay.  Around the culverts on Sherwood.

23      Q.      The what?

24      A.      Around the culverts on Sherwood, and

Christine Karman

1   then the street turns into Robin Hood.  That was,

2   is still a constant menace.

3          Q.    That's one area, okay.  What's another

4   area?

5          A.    Another area would be up around the shed

6   at the back of the house.  There is always weeds up

7   there, and then just all around, I mean, occasional

8   weeds.  We get patches of weeds, an assorted.  So

9   that's about it.  I mean, I have seen him all over

10  the house.

11         Q.    And we talked earlier about his use of

12  Roundup on Robin Hood.

13         A.    Yes.

14         Q.    And you tell me if I'm wrong, okay.  My

15  understanding from your earlier testimony was that

16  you first saw him using Roundup on that property in

17  around 1991 or 1992?

18         A.    Yes.

19         Q.    And that you recall the last time you

20  saw him using it was a couple years, you said,

21  before his diagnosis, so we kind of estimated in

22  2013.

23         A.    Um-hmm.

24         Q.    Does that still sound right?

Christine Karman

```
 1        A.     That sounds right.

 2        Q.     Let me ask you about the culverts --

 3    culverts?

 4        A.     Culverts, yeah.

 5        Q.     -- around on Sherwood --

 6        A.     Okay.

 7        Q.     -- that run around to Robin Hood.

 8        A.     Okay.

 9        Q.     How big of an area is that?

10        A.     Well, I don't have that tracked.  Do we

11    have that, that orange --

12        Q.     Oh, I don't mean it detailed like that.

13    I was just trying to figure out --

14        A.     Oh, there.  See, if you give me that, I

15    can show you.  No, not that, because you are not

16    going to see it.

17               Here is a culvert.  Let's see.  Our

18    house ran like that, so the culvert is like from

19    here.

20        Q.     Highlight.

21        A.     This is the culvert, from here to here.

22        Q.     Is it like a little ditch?

23        A.     Here's -- yeah.  A little pipe goes

24    under here so drainage can go in there, and this
```

Christine Karman

1  would be the driveway, and this is very heavily

2  weeded.

3       Q.    So we have marked on Exhibit 4 a

4  highlighted area on Sherwood that kind of turns

5  around onto Robin Hood Drive?

6       A.    Right.

7       Q.    Is there grass there as well?

8       A.    It's very difficult to grow grass

9  because it's rainy and wet and stones come in there

10  and pea gravel from under the sidewalk, so...

11       Q.    Well, when the weeds would die, what

12  would be left?

13       A.    Mud.  So we would try and plant grass,

14  and that would take for a while; and then winter

15  would come, and we have very good township snow

16  clearance, I have to say that, and salt would get

17  in all of that culvert.

18       Q.    So did you ever use Roundup yourself in

19  that area?

20       A.    I did.

21       Q.    And would this be -- can you estimate

22  for me how often you would see your husband out

23  there doing work just in that area that we have

24  marked on Exhibit 4?

Christine Karman

```
 1           A.     That's very hard to say.  I don't know.

 2      I don't have an answer.

 3           Q.     Would he do it more or less than once a

 4      month?

 5           A.     I don't know.

 6           Q.     Would he use -- would you use both

 7      Roundup and Spectracide when you did the work

 8      around the culverts?

 9           A.     Yes.

10           Q.     When you saw him working out there, did

11      he use Spectracide, Roundup or both?

12           A.     You know, I don't know.  I don't know

13      that I ever paid attention to what he was using, to

14      be honest.

15           Q.     Were you ever out there in that area

16      with him when he was doing work?

17           A.     On occasion, yes.

18           Q.     The times that you weren't with him, is

19      it fair to say that you know he did some work out

20      there, trying to work on the weeds?

21           A.     Yes.

22           Q.     But you just can't say for certain

23      whether it was Roundup, Spectracide or a

24      combination of both?
```

Christine Karman

```
 1        A.    That's true.  He would come in the house

 2    to tell me he worked outside.

 3        Q.    How long would he work the times you

 4    remember him working around the culvert?  Would

 5    that be -- we estimated earlier the patches would

 6    take three or four minutes a time.  I think you

 7    said the gravel driveway would take a little

 8    longer, would take longer than that.

 9        A.    Right.

10        Q.    The culverts, are you able to estimate

11    me how long it would take you when you were out

12    there trying to do weed control, how long it would

13    take you to work on that area?

14        A.    I have no idea because there is gravel

15    and dirt and garbage to clean up.

16        Q.    So it sounds to me like the work in the

17    culvert, whether it was you or your husband doing

18    it, there were a number of things you did out

19    there?

20        A.    Right.

21        Q.    Picking up trash?

22        A.    Yes.

23        Q.    Dealing with the mud and the rocks?

24        A.    Right.
```

Christine Karman

1      Q.    Dealing with the weeds?

2      A.    Right.

3      Q.    And the best you can do today is I guess

4    testify that your husband did the work around the

5    culvert as needed?

6      A.    Yes.

7      Q.    When he did the weed control

8    specifically in the area, you didn't see what

9    product he was using?

10      A.    That's true.

11      Q.    During that time when you were doing the

12    work, was the Roundup product you would use in

13    there yourself, was it any different than what you

14    explained to us earlier?

15      A.    No, it wasn't.  The same.

16      Q.    I'm sorry.  In other words, it was the

17    same kind of size container with the wand that you

18    described earlier?

19      A.    Yes.

20      Q.    Did your husband ever come in after

21    working in the culvert and tell you that he had

22    spilled Roundup specifically on him --

23      A.    Never.

24      Q.    -- or got it on his person?

Christine Karman

1        A.      Never.

2        Q.      Am I right that sitting here today,

3    although you know he did some work out there, you

4    just -- you don't have a specific memory of

5    watching him actually do the weed control out

6    there?

7        A.      No, I don't.

8        Q.      The shed we talked about --

9        A.      Yes.

10       Q.      -- or you just mentioned, I'm sorry,

11   where was the shed located that you said he did

12   some work around?  And I'm going to hand you this,

13   actually.  If one of the pictures gives us an idea,

14   that would be helpful.

15       A.      I thought it did.

16               You're not going to see it, but

17   basically this picture.

18       Q.      Hold on for a second.  Here is what I'm

19   going to do.  I printed off some maps of your

20   property.  I'm going to hand them to you.  We will

21   mark one if it looks like it is something that

22   would be helpful.  How is that?

23       A.      Okay.

24       Q.      I just want you to look at them.  Just

Christine Karman

```
1    so you know, these are the same.  I stapled them.
2         A.    They are all current.
3         Q.    There is three copies, but if you just
4    look at the top one and tell me if you can see a
5    better area of where the shed would be, if that's
6    okay, and we will mark it.
7               MR. CADY:  We don't have an objection
8         to that.
9               MR. HOMOLKA:  I wish they were
10        colored, but...
11   BY THE WITNESS:
12        A.    Not here, definitely not there.  That's
13   it, huh?
14   BY MR. HOMOLKA:
15        Q.    There is one more down there.
16        A.    Is there?
17        Q.    Yeah.
18              Here, just for the record, let's just
19   mark that since you are going to do something on
20   it.
21        A.    You're not going to see it in full.
22   You're going to have to...
23              (Deposition Exhibit 20 was marked
24                for identification.)
```

Christine Karman

```
 1    BY MR. HOMOLKA:

 2         Q.    I'm marking Exhibit 20, which is a

 3    Google Maps I brought of the property on Robin

 4    Hood, and the witness is going to try to mark an

 5    area where the shed was.

 6         A.    Is.

 7         Q.    Or is.

 8              MR. CADY:  Do you have a copy of that,

 9         counselor?

10              MR. HOMOLKA:  Yeah.

11              MR. CADY:  Thank you.

12    BY THE WITNESS:

13         A.    Do you see it?

14    BY MR. HOMOLKA:

15         Q.    Oh, my goodness, I do, I do.

16         A.    Two little windows.

17              MR. CADY:  I'm trying to see where she

18         marked it here, if you don't mind.  I see it.

19         Okay.  Thank you.

20    BY MR. HOMOLKA:

21         Q.    How big was that shed?

22         A.    That shed is probably 12 by 12.

23         Q.    Your eyesight is way better than mine.

24         A.    I know what's there.
```

Christine Karman

1      Q.    12 by 12, okay.  And what did you guys
2   use it for?
3      A.    It was used for horses originally by the
4   previous owner.  He owned the house back here.  We
5   used it for -- it was a great place to put the lawn
6   mower, the snow blower, odd and assorted stuff,
7   more odd and assorted stuff.  So we used it as --
8   it has a -- it was just convenient for us to use it
9   and we left it, and it's been there since forever.
10      Q.    Let me ask you about that shed.  So you
11   mentioned that was another area where you believe
12   your husband would do weed control?
13      A.    Yes, he would.
14      Q.    Did you see him out there around the
15   shed?
16      A.    Yes, I did.
17      Q.    Did you also do weed control out there?
18      A.    Yes, I did.
19      Q.    And when you did the weed control out
20   there, did you use Roundup and Spectracide and then
21   the natural stuff you talked about?
22      A.    I only used Roundup.  I don't know what
23   my husband used.  I don't know.
24      Q.    So you know your husband did some work

Christine Karman

1    back there, but you can't say, you can't testify

2    under oath that he specifically used Roundup there?

3        A.    Correct.

4        Q.    The times you used Roundup there, was it

5    the same type of container you described for us

6    earlier?

7        A.    Yes, it was.

8        Q.    And did your husband ever tell you, even

9    though you didn't see it, see what product he was

10   using, did he ever tell you what product he used

11   back there specifically around the shed?

12       A.    No, he didn't.

13       Q.    Then you said he would just use it

14   around the house or lawn as needed?

15       A.    As needed.

16       Q.    Is that fair?

17       A.    That's fair.

18       Q.    I'm not going to assume something.  Can

19   you tell me how many times you saw him use it

20   around the house as needed?

21       A.    I can't, I just can't.  I could be

22   standing outside and see him walk by.  I could be

23   standing in the back and see him walk by.  I can't

24   tell you.

Christine Karman

```
 1         Q.    And so you couldn't tell me how many

 2    times he specifically used Roundup in this last

 3    kind of area we are talking about which is more

 4    globally just around the lawn when weeds came up;

 5    is that fair?

 6         A.    No, I can't, because we didn't go up

 7    there, that region.  No, I can't.

 8         Q.    Would he primarily do his lawn work on

 9    the weekends?

10         A.    No.

11         Q.    When would he primarily do the lawn

12    work?

13         A.    Tuesdays.

14         Q.    And is that when he would mow the lawn?

15         A.    Yes.

16         Q.    And then he would -- let me finish.  And

17    then he would also do kind of what we've talked

18    about today.  Would he also be on Tuesday -- would

19    it also be Tuesdays when he would do the gravel

20    driveway if it needed it?

21         A.    That I can't answer because I don't know

22    the answer to.  I don't know when he did it.

23         Q.    What about the area on that hill that we

24    started today with on Exhibit 3?  Would that be
```

Christine Karman

 1    primarily on Tuesdays or some other time during the

 2    week?

 3              MR. CADY:  I'm just going to object to

 4         the form of the question.  Sure, you can

 5         answer it, if you know.

 6    BY THE WITNESS:

 7         A.   Okay.  Again, it would depend on when do

 8    the weeds come up.

 9    BY MR. HOMOLKA:

10         Q.   Fair enough.  So this last category I'm

11    trying to ask you about and not doing a very good

12    job where it was just where weeds came up as

13    necessary?

14         A.   Yes.

15         Q.   Are you with me on that, kind of?

16         A.   I'm with you on that.

17         Q.   Let me make sure I understand it.

18              You couldn't tell me if he would do it

19    on Tuesdays or any other day.  It's just you would

20    see him using weed control as needed around the

21    lawn?

22         A.   Yes.

23         Q.   And you can't tell me whether it was

24    10 times or 100 times?

Christine Karman

```
 1        A.    No, I can't.

 2        Q.    Is that right?

 3        A.    No, I can't.

 4        Q.    Do you recall seeing him, though, using

 5   Roundup in other places of the grass that we

 6   haven't talked about?

 7        A.    Yes.

 8        Q.    And when you saw him using it, would it

 9   be the same product that you mentioned earlier and

10   you described earlier?

11        A.    Yes.

12        Q.    Would he be doing it in the same method

13   that we talked about earlier, specifically holding

14   the wand as close to the weed or the ground as

15   possible to be careful not to kill grass --

16        A.    Yes.

17        Q.    -- and directly spray the weed?

18        A.    Yes.

19        Q.    And you never saw him spraying it up in

20   the air --

21        A.    Never.

22        Q.    -- or on its face?

23        A.    Never.

24        Q.    You never saw it spilled on him?
```

Christine Karman

```
 1        A.    No.

 2        Q.    He never told you he spilled it on him,

 3   right?

 4        A.    Never.

 5        Q.    He never told you that any of the

 6   bottles were defective and for some reason leaking

 7   all the way down his arm --

 8        A.    No.

 9        Q.    -- or on his body?

10        A.    No.

11        Q.    And all the times you saw him use

12   Roundup on Robin Hood he wore some sort of shoes

13   and jeans?

14        A.    Yes.

15        Q.    And then a cotton shirt, correct?

16        A.    Correct.

17        Q.    Or a flannel shirt?

18        A.    Correct.

19        Q.    And a mask when he had a cold?

20        A.    When he had a cold, yes.

21        Q.    And sometimes a hat?

22        A.    Sometimes a hat.

23        Q.    And I believe you said earlier when he

24   got dirty doing lawn work he would -- or let me ask
```

Christine Karman

1    you this:  When he got dirty doing the lawn work,

2    would he shower or do something else?

3         A.    He would sit out on the back porch and

4    relax and have a beer or two.

5         Q.    Who did the laundry for y'all?  Did he

6    do the laundry or did you?

7         A.    I did.

8         Q.    Would you launder his clothes that he

9    wore on Tuesdays to do yard work?  Would you

10   launder them after each time so that they were

11   clean for his next -- I guess next Tuesday night

12   lawn work?

13        A.    Yes.

14        Q.    We talked about earlier there were three

15   locations you had mentioned to me where you

16   recalled yourself buying Roundup.

17        A.    Um-hmm.

18        Q.    Menards, and you gave me the street.

19   You already did.

20        A.    Okay.

21        Q.    Or the town.  Home Depot?

22        A.    Yes.

23        Q.    Handy Andy?

24        A.    Yes.

Christine Karman

```
 1        Q.    And let me just make sure I have it
 2   right.  You personally recall buying Roundup at all
 3   three of those locations?
 4        A.    I do at Menards and Home Depot.  I don't
 5   recall Handy Andy.
 6        Q.    Did you have a loyalty program or
 7   anything like that at Menards or Home Depot?
 8        A.    No.
 9        Q.    How would you purchase the Roundup and
10   other products at those locations?
11        A.    Generally cash.
12        Q.    Can you tell me how many times you
13   purchased Roundup at either of those locations
14   throughout your life?
15        A.    No, I can't.
16        Q.    Can you tell me how often you would need
17   to purchase Roundup, like how long a container of
18   it would last?
19        A.    Again, I can't tell you that.
20        Q.    Just to be clear, you would purchase
21   Roundup?
22        A.    Yes.
23        Q.    And you did it really based on two
24   things, I think: the price as compared to
```

Christine Karman

```
1     Spectracide, correct?

2          A.    Correct.

3          Q.    And then the other time would be your

4     husband just told you to get Roundup?

5          A.    That's true.

6          Q.    Any other -- do I have it accurate,

7     there is really two situations to which you would

8     buy Roundup?

9          A.    No.

10         Q.    Is that right?

11         A.    That's exactly how it went.

12         Q.    Let me ask you about your husband.

13         A.    Yes.

14         Q.    We talked about him.  Did he also

15    purchase Roundup?

16         A.    Yes, he did.

17         Q.    Would he purchase it more often or less

18    often than you?

19         A.    I don't know.

20         Q.    Do you know where he would purchase it?

21    In other words, did he purchase it at the same

22    Menards and Home Depot that you would?

23         A.    Probably Home Depot, but not Menards.

24         Q.    And why is that?  Did he prefer Home
```

Christine Karman

1    Depot?

2        A.    He just preferred Home Depot.  Travel

3    was easier for him.

4        Q.    Can you tell me the first time that you

5    recall your husband ever purchasing Roundup, what

6    year it would have been?

7        A.    No, I can't.  Sorry.

8        Q.    Can you tell me why -- do you know why

9    he chose Roundup over all the other options?

10       A.    I don't know.

11       Q.    You told me earlier that he continued to

12   use it, I think you said, because it worked.

13       A.    Yes, it did.

14       Q.    Is that right?

15       A.    Yes, he did.

16       Q.    In other words, you don't know why he

17   made the decision the first time to buy Roundup?

18       A.    No.

19       Q.    Is that right?

20       A.    That's correct.

21       Q.    Okay.  We've talked about the Robin Hood

22   location.  Any other areas?  And I will just

23   summarize it all and we will move on.  As needed

24   around the lawn, the entire lawn, correct?

Christine Karman

```
 1          A.    Correct.

 2          Q.    Exhibit 3 was kind of the back area or

 3   hill area?

 4          A.    Correct.

 5          Q.    Driveway we talked about?

 6          A.    Yes.

 7          Q.    I'm going to butcher it.  The calvert

 8   [as pronounced]?

 9          A.    Culvert.

10          Q.    Culvert?

11          A.    In there, yes.

12          Q.    And the shed?

13          A.    The shed.

14          Q.    Do we have all the areas covered where

15   you all would use a product to kill weeds?

16          A.    If -- the entire grass.  Weeds there --

17          Q.    I think we got that.

18          A.    Okay.

19          Q.    And I meant to get that, and that was,

20   you tell me if I'm wrong --

21          A.    Okay.

22          Q.    -- that you couldn't estimate for me how

23   often, it was kind of as-needed, and that there

24   were times where you just saw him out there killing
```

Christine Karman

```
 1    weeds?

 2         A.    Right.

 3         Q.    Is it safe to say that when you saw him

 4    in the yard using the weed -- the spray, the weed

 5    control product, that sometimes it would take a

 6    short time and sometimes longer?  I mean, did it

 7    vary, I mean, how long he would be out there doing

 8    it?

 9         A.    Yes, that's fair.

10         Q.    Can you give me like a low end time and

11    a high end time that it would take for him to do

12    the -- specifically killing the weeds when he was

13    just going around the grass doing it?

14         A.    That's hard to say.  That's really hard

15    to say.  I know I can't give you a specific time.

16         Q.    What we can say, I think, is that you

17    believe you used Roundup more than your husband up

18    until 2003 when he retired?

19         A.    Yes.

20         Q.    After 2003 he used it, I think you

21    estimated, more than you?

22         A.    Yes.

23         Q.    Was it close to 50/50 or was it -- did

24    he use it a lot more than you?
```

Christine Karman

1          A.    I would say -- I don't know an answer to

2      that.  I worked and he worked out at home, so I

3      didn't see what he did on Tuesdays.

4          Q.    That's fair, that's fair.  Any other

5      details that you can tell me about the bottle of

6      the product, the Roundup that you remember him

7      using and you used other than what you have shared

8      with me?

9          A.    No.

10         Q.    Any other stores throughout your life

11     that you can identify you and your husband

12     purchasing it other than what we have already

13     talked about?

14         A.    Not that I can mention.

15         Q.    You just can't --

16         A.    I can't mention.  I just know where they

17     are at.

18         Q.    On Robin Hood where did you store or

19     keep that bottle of Roundup and the Spectracide?

20         A.    In the garage.

21         Q.    The garage that was connected to the

22     house and not the shed?

23         A.    Yes.

24         Q.    Other things, was it kept beside other

Christine Karman

1    products?

2         A.    It was kept on a shelf in the garage.

3         Q.    What else was on the shelf?

4         A.    Plant food, fertilizer, some of my

5    outside pots.  That's about it.

6         Q.    So on the shelf, the fertilizer, you

7    don't remember the name of the fertilizer, correct?

8         A.    The fertilizer that we used, no, I

9    don't.

10        Q.    And plant food, what was it named?

11        A.    Plant food, I used -- I don't remember

12   what I used for plant food.

13        Q.    If you had Spectracide at the same time,

14   was it also on the shelf?

15        A.    Yes.

16        Q.    Did you ever read the label that was on

17   that Roundup bottle?

18        A.    That I don't remember.

19        Q.    Do you recall seeing your husband

20   specifically reading the label that was on the

21   Roundup bottle?

22        A.    No.

23        Q.    Did he ever tell you he read the label?

24        A.    I don't remember.

Christine Karman

```
1          Q.    Is there anything, any notes, anything
2     that you could go refer to that would help you
3     remember whether or not he read the label?
4          A.    No.
5          Q.    We have talked about Robin Hood.  Where
6     did you live before Robin Hood?
7          A.    In Hanover Park.
8          Q.    What was the address?
9          A.         .
10         Q.    How long did you live there?
11         A.    24 years.
12         Q.    What type of house was it?
13         A.    It was a raised ranch.
14         Q.    How many square foot was that one?
15         A.    Oh, wow.  I don't remember.  A thousand.
16         Q.    So much smaller?
17         A.    Yes, much smaller.
18         Q.    We have -- we've talked about obviously
19    Robin Hood Road.  Is there anywhere else that you
20    recall your husband using Roundup other than Robin
21    Hood?
22         A.    I don't know that he -- I don't know.
23         Q.    You just can't say?
24         A.    No, I don't know.
```

Christine Karman

```
 1        Q.    Is that fair?  Okay.

 2        A.    I don't know.

 3        Q.    So this lawsuit, you are alleging

 4   exposure to Roundup, but we talked about the extent

 5   of the use of Roundup that you can testify and be

 6   certain of as it relates to this lawsuit already?

 7        A.    Correct.

 8        Q.    Is that right?

 9        A.    Correct.

10        Q.    Do you know if the Roundup was -- was it

11   ready to use when you bought it?

12        A.    Yes, a premixed.

13        Q.    Thank you.  In other words, it wasn't

14   some concentrate that you guys had to mix up?

15        A.    No.

16        Q.    Did you ever see your husband use a

17   backpack sprayer --

18        A.    No.

19        Q.    -- or a tank sprayer, a big tank?

20        A.    No.

21        Q.    Sorry.  I'm trying to short circuit some

22   stuff.  Have you ever spoken with anyone at

23   Monsanto about how to use Roundup or anything like

24   that?
```

Christine Karman

```
 1          A.     No, I have not.

 2          Q.     Do you know if your husband ever spoke

 3   to a representative or anybody that worked at

 4   Monsanto?

 5          A.     No, he did not.

 6          Q.     Did you ever see your husband or did he

 7   ever tell you that he had adverse reaction on his

 8   skin after he used the Roundup?

 9          A.     No.

10          Q.     You mentioned the Spectracide.  I'm just

11   going to name a few other products, and let me know

12   if you ever recall using it or your husband.

13          A.     Okay.

14          Q.     Eraser?

15          A.     No.

16          Q.     Buccaneer?

17          A.     No.

18          Q.     Envy?

19          A.     No.

20          Q.     Halex?

21          A.     No.

22          Q.     Flexstar?

23          A.     No.

24                 MR. CADY:  And those questions were
```

Christine Karman

```
1              for both the witness and her husband?

2                    MR. HOMOLKA:  I'm sorry, yes.

3                    MR. CADY:  Okay.

4    BY MR. HOMOLKA:

5         Q.   Do you ever recall your husband

6    mentioning any of those products?

7         A.   No.

8                    MR. HOMOLKA:  Thank you for clearing

9         that up.

10   BY MR. HOMOLKA:

11        Q.   Did your husband do his own servicing of

12   your cars?

13        A.   Yes.

14        Q.   Like changing the oil?

15        A.   Yes.

16        Q.   Did he change your brakes?

17        A.   Yes.

18        Q.   Did you ever see him change brakes or

19   brake pads?

20        A.   No.

21        Q.   Did he do that, though?

22        A.   Yes.

23        Q.   Do you know what brands of brake pads or

24   brakes that he would purchase?
```

Christine Karman

```
 1          A.     No, I don't.

 2          Q.     Do you know whether or not he would use

 3   a mask?

 4          A.     I don't know.

 5          Q.     Have you ever heard that some brakes and

 6   brake pads contained asbestos?

 7          A.     No, I didn't know that.

 8          Q.     Ever look into that?

 9          A.     Pardon?

10          Q.     Ever look into that?

11          A.     No.

12          Q.     All right.  I've got a little bit more.

13   Are you okay to continue?

14          A.     Yes.

15          Q.     We will go another 10 or 15 minutes and

16   then we will take a break, and I will look at this

17   stuff again and hopefully finish up.  Okay?

18          A.     Okay.

19          Q.     When did your husband first suspect that

20   Roundup specifically might have caused his

21   non-Hodgkin's lymphoma?

22                 MR. CADY:  Objection, calls for

23          speculation.  You can answer if you know.

24          A.     I don't know.
```

Christine Karman

```
 1          Q.    When did you first expect -- I think

 2     earlier -- well, let me rephrase that question.

 3                Earlier, and I don't want to

 4     misrepresent this, you said you -- we talked about

 5     Dr. Nabrinsky.

 6          A.    Yes.

 7          Q.    Remember that?

 8          A.    Yes.

 9          Q.    And the email spoke for itself.  The

10     recitation by your daughter was that he mentioned

11     three things, and they were generic.

12          A.    Yes.

13          Q.    Right?

14          A.    Yes.

15          Q.    And I think I'm right that you don't

16     recall Mr. Nabrinsky saying any specific products,

17     manufacturers of pesticides or the fertilizer or

18     the asbestosis; is that right?

19          A.    Yes.

20          Q.    He just generally said, hey, here are

21     three things?

22          A.    Yes.

23          Q.    Then I think you said sometime after

24     your husband had passed you saw an advertisement
```

Christine Karman

1    about non-Hodgkin's lymphoma; is that right?  If

2    I'm wrong, tell me.

3         A.    I thought -- I thought I said shortly

4    before he passed.

5         Q.    Fair enough.  So sometime in or around

6    2015 you remember seeing a television advertisement?

7         A.    Yes.

8         Q.    Is that right?

9         A.    Yes.

10        Q.    Do you remember anything specific about

11   that advertisement other than it talked about

12   lymphoma?

13        A.    It talked about lymphoma.  It talked

14   about death from lymphoma.  Yes, that's what I

15   remember.

16        Q.    Did it talk about Roundup or any other

17   product?

18        A.    It was for Roundup.

19        Q.    Do you remember the attorneys, who it

20   was or anything like that?

21        A.    No, I don't.

22        Q.    And when did you first -- you, yourself,

23   when did you think that Roundup specifically -- we

24   have talked about the general stuff, but when did

Christine Karman

1    you think Roundup might be the cause of his

2    non-Hodgkin's lymphoma?

3         A.    I don't remember exactly when, but -- I

4    don't remember exactly when.

5         Q.    Can you say whether -- can you say

6    whether it was before or after your husband had

7    passed away?

8         A.    It was after my husband passed away.

9         Q.    And do you believe sitting here today

10   that Roundup was a cause of that non-Hodgkin's

11   lymphoma?

12        A.    Yes.

13        Q.    And is there anything you can tell me,

14   or why do you think that?

15        A.    Because he used it, he lived by it.

16        Q.    Have you done any research, internet

17   research, that type of thing, on Roundup?

18        A.    No.

19        Q.    Do you suffer from non-Hodgkin's

20   lymphoma?

21        A.    No, I do not.

22        Q.    Have you ever suffered from it?

23        A.    No.

24        Q.    And to be clear, you never wore a mask

Christine Karman

```
 1    all those times you used Spectracide or Roundup,

 2    correct?

 3         A.    That's correct.

 4              MR. CADY:  Are you okay to continue?

 5              THE WITNESS:  I'm okay, I'm fine.

 6              MR. CADY:  Do you need a tissue or

 7         anything?

 8              THE WITNESS:  I have a tissue.

 9              MR. CADY:  Okay.  Good.

10              MR. HOMOLKA:  We will take a break

11         here in a second, and you tell me.  If you

12         want a break now, we will do it.

13              THE WITNESS:  No, that's okay.

14    BY MR. HOMOLKA:

15         Q.    What type of household cleaning products

16    did you use during your marriage?

17         A.    Oh, Lord.  During our marriage?

18         Q.    Yeah.

19         A.    Linco Bleach, various brands of laundry

20    soap, various brands of dish soap.  I had no

21    favorites.

22         Q.    That's what I was going to ask.  Did you

23    have a favorite brand of dish soap that you used?

24         A.    I used ammonia on the windows because it
```

Christine Karman

1    works better than anything else.  I washed my

2    floors with various products.

3          Q.    I want to -- let me just look at

4    something.  I want you to take a break because I

5    have a couple -- I have more than a couple, but the

6    last thing I need to do is talk more about his

7    medical condition and get a few things, and I think

8    that's going to be rough.

9          A.    Okay.

10          Q.    And I'm just seeing if I have something

11    else I could ask you before we take the break so we

12    kind of save that for one push-through.  Okay?  I

13    think I'm good.

14                Whose idea -- I wanted to ask you that.

15    You mentioned earlier your daughter Bobbie Lang had

16    done some help with this lawsuit?

17          A.    Yes.

18          Q.    Whose idea was it to file this lawsuit?

19          A.    It was a joint between my children and

20    myself.

21          Q.    All your children?

22          A.    Yes.

23          Q.    Is one of your children -- is that

24    right?  Is one of your children more involved in

Christine Karman

1    the lawsuit?

2         A.    I don't understand.

3         Q.    It's a really broad question.  Has one

4    of your children done more work or provided more

5    help in the lawsuit?

6         A.    Yes.

7         Q.    And who is that?

8         A.    That's Bobbie.

9         Q.    What does she do for a living?

10        A.    School teacher.

11        Q.    That's right.  What's her husband do?

12        A.    Her husband?  He is a trader, a trader,

13   stock trader.

14        Q.    I was going to say, like a traitor or a

15   trader?  What's he do?  Stock trader?

16        A.    Stock trader.  There has got to be

17   another name.

18        Q.    No.  I just watched Game of Thrones and

19   they talked about traitors, so I was like -- okay.

20             To your knowledge, have any of your

21   children researched or done research out on the

22   internet or other places about Roundup or Monsanto?

23        A.    I don't know that they have done

24   research on it.

Christine Karman

```
 1        Q.    A couple more and we are done with this
 2   area and we will take our break and end with some
 3   medical stuff.
 4              What are you hoping -- what are you
 5   hoping to get or obtain out of this lawsuit?
 6        A.    Guarantee that none of my grandchildren
 7   or my children will get the same thing as my
 8   husband.  It's heartbreaking to watch them.
 9        Q.    It's -- I'm sorry?
10        A.    It's heartbreaking to watch my two
11   youngest daughters worrying about their children.
12        Q.    Do they worry about their children
13   specific --
14        A.    Yes, they do.
15        Q.    I'm sorry.  Specifically as it relates
16   to Roundup?
17        A.    It's one of the things; that there is so
18   many things out there, you know, but it's an added
19   attraction.
20        Q.    They don't use Roundup now?
21        A.    No, they don't.
22        Q.    What, if anything, could have Monsanto
23   done, my client, what could they have done, if
24   anything -- or strike that.
```

Christine Karman

```
1              What do you believe my client did,

2     Monsanto, what do you believe they did that has --

3     that has not forced you but has led to you filing

4     this lawsuit?

5              MR. CADY:  I object to the form of the

6         question.  You can answer if you have an

7         answer.

8     A.    I -- I --

9     Q.    That's fine.  Do you believe that my

10    client should have done something differently?

11    A.    Absolutely.

12    Q.    Tell me what you think that is.

13              MR. CADY:  I object to the form of the

14        question.  You can answer if you know.

15    A.    Put the skeleton back on the labels.

16    Everybody understands the skeleton.

17    Q.    So I understand what you just said.

18    When you say "skeleton," do you mean they could

19    have provided a different warning on the product?

20    A.    A skeleton.

21    Q.    An actual skeleton?

22    A.    I think everybody understands what that

23    skeleton was.

24    Q.    Anything else other than that?  And I'm
```

Christine Karman

```
 1      sorry I chuckled, but it's visual to me.

 2           A.    I know, I know, but I thought of --

 3           Q.    It's visual.

 4           A.    I -- I don't know that there is anything

 5      else they could have done.  I don't know.

 6           Q.     Your husband is a cigarette smoker,

 7      correct, or was a cigarette smoker?

 8           A.    Yes, he was.

 9           Q.    For more than 50 -- more than 55 years;

10      is that right?

11           A.    He did stop three times for about a

12      total of 12 years or so.

13           Q.    So he smoked over a 50-year period with

14      some quits in between?

15           A.    Yes.

16           Q.    And why did he stop the times he

17      stopped?

18           A.    He just wanted to stop.

19           Q.    And he was aware that smoking could

20      cause lung cancer, COPD, those types of things, at

21      some point in his life?

22           A.    Yes.

23           Q.    And he continued to smoke, correct?

24           A.    Yes, he did.
```

Christine Karman

1        Q.    And there was a warning on every one of

2    those cigarettes after 1966, every one of those

3    packs.  Do you recall that?

4        A.    Yes.

5        Q.    And it was right on the side to read

6    things like "May cause lung cancer"?

7        A.    Yes.

8        Q.    Then it changed to "Can cause lung

9    cancer, emphysema," all that stuff.  Do you

10   remember?  I mean, you are a smoker.  Do you

11   remember seeing the labels?

12       A.    Yes, yes.

13       Q.    And those warnings labels that were on

14   those packs of cigarettes that you have to pick up

15   20 times to empty that pack, every time that he

16   looked at that warning label he was warned about

17   using those cigarettes, wasn't he?

18       A.    Yes, he was.

19       Q.    And he continued to smoke, right?

20       A.    Correct.

21              MR. CADY:  I object to the form of the

22       question.

23   BY MR. HOMOLKA:

24       Q.    And those warnings really didn't impact

Christine Karman

1    his decision whether or not to smoke, did it?

2              MR. CADY:  Objection, calls for

3         speculation.

4              THE WITNESS:  I don't have to answer?

5              MR. CADY:  You can answer the

6         question.

7              THE WITNESS:  I -- do I have to answer

8         the question?

9              MR. CADY:  You have to give a response

10        to this question, yes.

11   BY THE WITNESS:

12        A.   Yes.  You asked if he ignored them.

13   Yes, he did.

14              MR. HOMOLKA:  Let's take a break, and

15        then I do want to just forewarn you.  I tried

16        to save some sensitive medical stuff until the

17        end, and I think I've done that, and I would

18        jump away from it.  I've got to ask a few.  So

19        we will talk about some stuff, so get yourself

20        something to drink.

21              THE WITNESS:  Okay.  Stronger than

22        Coke and coffee?

23              MR. HOMOLKA:  Let's go off the record.

24              THE VIDEOGRAPHER:  Going off the video

Christine Karman

 1          record 2:04 p.m.

 2                    (Recess taken, 2:04 - 2:17 p.m.)

 3                    THE VIDEOGRAPHER:  Going back on the

 4          video record at 2:17 p.m. at the beginning of

 5          Media 3.

 6     BY MR. HOMOLKA:

 7          Q.    Okay.  We will finish up.  All right?

 8          A.    Okay.

 9          Q.    Let me know if you need a break, though.

10     Okay?

11          A.    I will.

12          Q.    I promise you I will find what I'm

13     looking for.  Oh, there it is.

14                Okay.  Let me ask you about, first of

15     all, any prior medical conditions.  I don't have a

16     lot of records that predate the diagnosis.  I have

17     a couple from 2014, but let me just go through a

18     list of things, and I want you to let me know if to

19     your knowledge your husband was ever diagnosed or

20     suffered from it.  Okay?

21          A.    Okay.

22          Q.    Any other cancers?

23          A.    No.

24          Q.    Rheumatoid arthritis?

Christine Karman

```
 1        A.    No.

 2        Q.    Ulcers?

 3        A.    No.

 4        Q.    Did he have any other -- or any organ

 5    transplants, anything like that?

 6        A.    No.

 7        Q.    Any hepatitis B or C?

 8        A.    No.

 9        Q.    Did you ever hear of him having

10    Epstein-Barr virus?

11        A.    No.

12        Q.    Diabetes?

13        A.    No.

14        Q.    Any kind of immuno disorder?

15        A.    No.

16        Q.    Any extended hospital stays prior to

17    his --

18        A.    No.

19        Q.    -- lymphoma?

20        A.    No.

21        Q.    Before he was diagnosed did he exercise

22    regularly?

23        A.    No.

24        Q.    Was his weight fine throughout your
```

Christine Karman

```
1    marriage?

2        A.    Yes.

3        Q.    In other words, did it fluctuate but he

4    never -- was he ever diagnosed as obese?

5        A.    No, he was never.

6        Q.    Did the doctor or anyone ever tell him

7    or medical professional ever recommend or tell him

8    to change his diet?

9        A.    No.

10       Q.    Did he -- did your husband drink

11   alcohol?

12       A.    Yes.

13       Q.    And can you tell me, did he drink daily?

14       A.    Yes.

15       Q.    And what would he drink?

16       A.    Beer.

17       Q.    How many beers approximately would he

18   drink each day?

19       A.    Two or three.

20       Q.    Ever a time where he saw medical

21   professionals or sought professional treatment for

22   his use of alcohol?

23       A.    No.

24       Q.    To your knowledge, did he have any
```

Christine Karman

1    health conditions that medical professionals had
2    concluded were related to his alcohol use?
3         A.    No.
4         Q.    Did the level of alcohol use, this two
5    to three beers per day, did it change at any time,
6    go up or down throughout your marriage?
7         A.    If we were vacationing it went up, but
8    during the -- during the normal run of the -- no.
9         Q.    I will re-ask it.  So during vacation or
10   weekends you may have social events where he would
11   consume more alcohol than that?
12        A.    Correct.
13        Q.    His regular practice was to have a
14   couple, two or three beers a night throughout your
15   marriage?
16        A.    Correct.
17        Q.    Would the same be true for you?
18        A.    Would the same be true for me?
19        Q.    Did you also drink alcohol?
20        A.    I did.
21        Q.    About the same as he did, less?
22        A.    Less.
23        Q.    Would you drink beer or something else?
24        A.    I would drink something else.

Christine Karman

```
1          Q.     What did you drink, if it was regular?

2          A.     If it was regular?

3          Q.     Yeah, like if you had an evening drink.

4          A.     Cosmopolitan.

5          Q.     Did you ever know your husband to use

6    any type of elicit drugs?

7          A.     No.

8          Q.     Did you ever know of him to have any

9    kind of infections, problems with infections?

10         A.     No.

11         Q.     Okay.  So sometime in -- or when do you

12   recall him first having symptoms that you associate

13   with his lymphoma?

14         A.     When do I recall?

15         Q.     Yeah.

16         A.     I -- I --

17         Q.     Let me go back.  Okay?

18         A.     Can you rephrase that somehow?

19         Q.     Absolutely.  We looked at his notes, so

20   let me use some of those in my mind.

21                On June 22nd of 2015, if you recall --

22   and he had wrote notes about this -- the doctor saw

23   something concerning in his left groin area --

24         A.     Yes.
```

Christine Karman

1          Q.       -- and said we need to get some scans

2     done and come back, and they scheduled some CT

3     scans.

4          A.       Yes.

5          Q.       Do you recall that?

6          A.       Yes.

7          Q.       That was June 22nd.  Do you recall him

8     having symptoms prior to that, symptoms, medical

9     issues, anything prior to that?

10          A.       Just that he was concerned about that --

11     that lump he had.

12          Q.       And that lump surfaced around that time

13     in June, to your knowledge?

14          A.       I think a little earlier.

15          Q.       So June 22nd, so sometime prior to

16     June 22nd --

17          A.       Yes.

18          Q.       -- he started to notice this lump?

19          A.       Right.

20          Q.       And is the lump what led him to the

21     doctor on that specific instance?

22          A.       Yes.

23          Q.       In other words, was he experiencing any

24     night sweats?

Christine Karman

```
 1        A.     No, nothing.

 2        Q.     Any fever?

 3        A.     Nothing.

 4        Q.     Any other symptom that you can recall

 5    other than the fact that he had this lump in his

 6    left groin?

 7        A.     No.

 8        Q.     And where did you guys go that first

 9    time in June?  You went to see Dr. --

10        A.     We went to see Dr. Myrda.

11        Q.     Who was his PCP?

12        A.     Yeah, and that was for his six-month

13    checkup.

14        Q.     Then in July he went to who for the CT

15    scan?  Nabrinsky?

16        A.     Nabrinsky.

17        Q.     Do you remember who ended up -- the

18    pathologist was?  Do you remember who the

19    pathologist was that looked at the pathology?

20        A.     I don't know if that was Dr. Aron.

21        Q.     I'm going to say a name.  Do you

22    remember Dr. Liu, L-i-u, a woman pathologist?

23        A.     No, I don't.

24        Q.     Lanting (phonetic spelling), Ameripath,
```

Christine Karman

1    who reviewed the pathology in July 27th.  It's not

2    uncommon you wouldn't know her.  She would review

3    the pathology and share it, so...

4         A.    Right.

5         Q.    Do you remember a Dr. Gloria Ma, M-a --

6         A.    No.

7         Q.    -- that was at Advocate Sherman

8    Hospital?

9         A.    No.

10        Q.    She is the one who did the record on

11   July 27th that diagnosed this lymphoma as a diffuse

12   large B cell.  Have you ever heard that term?

13        A.    I've heard that term.

14        Q.    If you don't remember her, do you

15   remember who you first heard that from, either the

16   diagnosis of lymphoma or diffuse large B cell

17   lymphoma?

18        A.    I believe I first heard it from

19   Dr. Nabrinsky.

20        Q.    I'm going to try to nail down something

21   here for myself and actually Steve.

22              What medical doctor did you have the

23   most contact with, the most discussions with at the

24   time that this suspicious lump appeared and to when

Christine Karman

1    you found out this is lymphoma?

2        A.    Dr. Nabrinsky.

3        Q.    Nabrinsky, okay.  Once you found out

4    that this was a lymphoma, what doctor was the most

5    involved from your view with his chemo treatment

6    and monitoring his course after the diagnosis?

7        A.    Dr. Nabrinsky.

8        Q.    Other than Dr. Nabrinsky, what doctor

9    would you say would be the next doctor that had the

10   most contact with your husband and you?

11       A.    I don't remember his name.

12       Q.    What about Dr. Aron, A-r-o-n?

13       A.    No.

14       Q.    What about Hassad Al Shah --

15       A.    No.

16       Q.    -- internal medicine?

17             Well, what about Dr. -- well, Dr. Myrda?

18       A.    We did not see Dr. Myrda during this

19   period of time.

20       Q.    What about Steven Grossman from --

21       A.    No.  I can tell you he was a

22   cardiologist.

23       Q.    How about Diana Solis?  Do you remember

24   her?

```
 1        A.    I saw that.  I have seen that name, but
 2   I don't know.
 3        Q.    We'll figure it out.
 4              Did you bring some cards of doctors with
 5   you?  Is that what you brought?
 6        A.    Yeah.  What did we do with them?  Did I
 7   throw them in here?
 8        Q.    I don't know if that would help.
 9        A.    The doctor cards.  I don't see them in
10   here.  Remember the little package of doctor cards?
11   I thought we threw them in here.
12              MR. HOMOLKA:  They were with that disk
13        you grabbed from her.
14              MR. CADY:  Right.  It would have been
15        with the journal.
16              THE WITNESS:  I don't have the
17        journal.
18              MR. CADY:  Right, because we have the
19        journal over here.  It's not with the journal,
20        I don't believe.  Actually, that stuff is all
21        with you.
22   BY MR. HOMOLKA:
23        Q.    I think you brought some doctors' cards.
24   I'm just interested if that would help us get a --
```

Christine Karman

```
 1          A.    I did, I did, but I don't know where
 2     they are at?
 3                MR. CADY:  Do we want to go off the
 4          record for a second?  Let's go off the record
 5          for a second.
 6                THE VIDEOGRAPHER:  Going off the video
 7          record 2:28 p.m.
 8                (Recess taken, 2:28 - 2:30 p.m.)
 9                THE VIDEOGRAPHER:  Going back on the
10          video record at 2:30 p.m.
11     BY MR. HOMOLKA:
12          Q.    I'm going to name some doctors, and just
13     let me know if they treated your husband and, if
14     so, if you recall what they did.
15          A.    Okay.
16          Q.    He obviously went to Advocate Sherman
17     Hospital, correct?
18          A.    Either there or St. Joe's.
19          Q.    Do you remember a Dr. Qadir Q-a-d-i-r?
20          A.    No.
21          Q.    What about a Dr. Matthew Ivonovich?
22          A.    Yes, I remember, a pulmonologist.
23          Q.    Do you know what he specifically was
24     treating him for?
```

Christine Karman

```
 1          A.     His lungs.

 2          Q.     Was he treating him for his COPD?

 3          A.     I believe so, yes.

 4          Q.     Then we have Dr. Myrda, which is his

 5   primary care physician?

 6          A.     Correct.

 7          Q.     And there was a woman named Diana Solis

 8   that worked at his office.  Do you remember seeing

 9   her?

10          A.     I remember seeing her, yes.

11          Q.     Erica Asbell, A-s-b-e-l-l, actually, is

12   Humana?

13          A.     Oh, that's Humana.  She probably was a

14   visiting nurse or something.

15          Q.     Can you open up that journal?

16          A.     Here.  Erica, and she is from Humana.

17          Q.     Would you look at that name and the

18   number and confirm it's the same phone number.

19          A.     342, yeah.  Post discharge -- discharge

20   nurse.

21          Q.     It appears to me that this Erica Asbell

22   at Humana may have been helping your husband with

23   working through the insurance because it's the same

24   phone number and the name "Erica" is at the top of
```

Christine Karman

1    his journal.

2          A.    Okay.  Now we know who Erica is.

3                MR. CADY:  We are referring to

4          Exhibit 11, the journal, correct?  Okay.

5                THE WITNESS:  I don't have to spend

6          sleepless nights worrying about it.

7    BY MR. HOMOLKA:

8          Q.    Stan Nabrinsky?

9          A.    Yes.

10         Q.    He sounds very involved.

11         A.    He was very involved.

12         Q.    Emily Adams, do you remember Emily

13   Adams?

14         A.    I don't remember that name.

15         Q.    I have got four cards from Stan

16   Nabrinsky.  Maybe that means something.

17         A.    I think what that means is I was trying

18   to get one card for each one of my family and I

19   probably had so many of them.

20               THE WITNESS:  Here is the rubber band.

21               MR. CADY:  Thank you.

22   BY MR. HOMOLKA:

23         Q.    You've brought some stuff with you

24   today.  I know that.  We've gone through it all.

Christine Karman

```
 1    Did you bring a bag also, or is that your bag?  I

 2    don't know whose bag is over there.

 3         A.    That's my bag.

 4         Q.    What else did you bring?

 5         A.    Oh, that bag?  No.  That back is mine,

 6    the two black bags.

 7         Q.    Did you bring other materials today that

 8    you thought may be related to the lawsuit?

 9         A.    Yes.

10         Q.    And are they in the bags?

11         A.    They are in the bag, the big black bag.

12         Q.    Are you going to disclose them or have

13    you looked at them or what --

14              MR. CADY:  Right.  I would stipulate

15         -- this is the first I'm seeing of those

16         things, I believe, so I did want to take a

17         look at them before we disclosed them because

18         there was quite a bit of material there.

19    BY MR. HOMOLKA:

20         Q.    Can you generally -- and don't tell me

21    about specifics as your attorney needs to look at

22    them -- what other things you've brought that we

23    haven't marked today?

24         A.    Okay.  One of the things that was asked
```

1    for were any cards that he received.  I brought

2    cards.

3         Q.    So like get well or sympathy?

4         A.    Get well, sympathy.  I went through them

5    yesterday.  They are standard, you know, get well

6    wishes, et cetera.  That's it.  There is a bag of

7    them.

8         Q.    Were there other things that you brought

9    other than get well cards that your attorneys need

10   to take a look at?

11        A.    Okay.  There is some stuff from Humana,

12   how he was paid from Humana.  There is some bills

13   in there.  There is stuff from hospice.  There is

14   some -- I think there is one or two reports on when

15   he was hospitalized that we kept.  There was

16   information on his port, his drugs.  We didn't have

17   drug coverage, so he paid our own drug coverage.

18        Q.    Do you know how much you paid

19   out-of-pocket for drug coverage?

20        A.    I never added that, I never added that.

21   It wasn't as much as I thought it would be.

22        Q.    Anything else that you brought just

23   generally, general categories?

24        A.    Did you look at that at all?  I don't

Christine Karman

     1    know.   Just a lot of --

     2       Q.   Did you -- is it stuff that you had

     3    turned over to your attorneys prior, or is this all

     4    new stuff that you got?

     5       A.   This is all -- as my daughter was

     6    handling it, I took everything, I took all this to

     7    her, and I said take whatever they need, and she

     8    did.  You know, she didn't think that was -- and

     9    this last night, I said I want that bag, I want

    10    that bag.

    11            MR. CADY:  Yeah, and I will stipulate

    12         they might be duplicates, they might not.  But

    13         to the extent that any of this is related to

    14         this lawsuit, we do plan on disclosing those

    15         things.

    16            MR. HOMOLKA:  Just amending and

    17         disclosing or whatever.

    18            MR. CADY:  Yes.

    19            THE WITNESS:  Okay.

    20            MR. HOMOLKA:  That's good.

    21    BY MR. HOMOLKA:

    22       Q.   So after he was diagnosed -- so he goes

    23    in, the groin was large, they did a CAT scan?

    24       A.   Correct.

Christine Karman

```
 1          Q.    Then he was diagnosed on or around

 2    July 27th of 2000- --

 3          A.    Yes.

 4          Q.    -- 15?

 5          A.    Yes.

 6          Q.    He went through -- you spent time with

 7    him at different doctors' visits, correct?

 8          A.    Correct.

 9          Q.    Did anyone else go to doctors' visits

10    with you?

11          A.    Yes.

12          Q.    Who else went?

13          A.    Bobbie did.  Ann took him one of the

14    last times he was at Dr. Nabrinsky's.  I don't know

15    that Nancy did, and at the time Cathy was living

16    out of town, so it was me and the girls.

17          Q.    And what did they -- what do you

18    remember about what they said about what treatment

19    would be best and the prognosis of that treatment,

20    if anything?

21          A.    What who said?

22          Q.    The doctors.

23          A.    The doctors -- Dr. Nabrinsky was

24    explicit.  I mean, he did chemo in his office,
```

Christine Karman

1    which he had a full set of nurse staff and whatnot

2    rather than go to the hospital.  He thought that

3    would be best for Bob.  Bob thought it would be

4    best for him, and it seemed to work out.

5              Other doctors, a lot of times I wasn't

6    there because I would spent as much time as I could

7    at the hospital, and they didn't show up until 7, 8

8    o'clock at night, and -- but they pretty much told

9    him what they thought he should be doing or

10   shouldn't be doing.  Did I hear all of it?  I don't

11   know.

12        Q.    To your knowledge, was he following the

13   doctor's advice?

14        A.    He -- yes, for the most part.

15        Q.    Do you remember anything that they

16   recommended treatment-wise that your husband

17   refused?

18        A.    Well, one of the things was the food

19   port, because they couldn't get it down.

20   Absolutely refused it.

21        Q.    Any chemo, surgery or radiation that he,

22   to your knowledge, refused?

23        A.    No.

24        Q.    My understanding is that he was

Christine Karman

1    recommended for what's called R-CHOP.  Is that --

2        A.    Yes, I seen that.

3        Q.    And it's a regimen of chemotherapy.

4        A.    Okay.

5        Q.    And do you recall him then receiving

6    three or four cycles of chemotherapy after his

7    diagnosis?

8        A.    Yes.

9        Q.    We talked about that earlier, right?

10       A.    Yes.

11       Q.    So we don't need to talk about that

12   again.

13       A.    Okay.

14       Q.    And then do you recall -- let me ask you

15   this:  Do you recall at any time hearing from a

16   doctor or a nurse or a medical professional that

17   they had some limitations on what they could do

18   with the chemotherapy because of concerns with his

19   heart or cardiac concerns?  Do you remember that at

20   all?

21       A.    There was one issue where he went in and

22   I believe his heart was racing fast and they had to

23   put it off for a day.  That's the only one.

24       Q.    In one of the cycles?

Christine Karman

```
 1        A.    Right.

 2        Q.    Does that kind of ring a bell?

 3        A.    Yes.

 4        Q.    I have basically it was in early October

 5   after he had done three cycles there were some

 6   cardiac concerns, and then he was able to later

 7   take the fourth cycle --

 8        A.    Right.

 9        Q.    -- and that was his last cycle?

10        A.    Right.

11        Q.    Does that kind of ring a bell or sound

12   familiar?

13        A.    Yes, yes.

14        Q.    Do you remember when they -- when and

15   why they put the chemotherapy on hold, anything

16   about that?

17        A.    No.

18        Q.    Did he have any side effects -- I asked

19   you earlier -- that you believe resulted from that

20   chemotherapy treatment?

21        A.    He was starting to get some bad side

22   effects.

23        Q.    What do you recall?

24        A.    He was not cognizant.  He was not a
```

Christine Karman

    1    happy person.

    2        Q.    I'm just going to ask you about a few

    3    things.  This is my summary of the medical records

    4    to make it easier for me.  I'm going to ask you

    5    about a few things, and you either will recall it,

    6    don't recall it, have knowledge about it or don't.

    7        A.    Okay.

    8        Q.    So just tell me if you heard it, knew

    9    about it.

   10        A.    Okay.

   11        Q.    In September of '14 there is a record

   12    that just discussed him having some shortness of

   13    breath, chest discomfort and he goes into his

   14    primary care physician.  So the September 14th time

   15    period, do you remember any treatment or anything

   16    he went to see his primary care physician about at

   17    that time?

   18        A.    September 14th, I believe that he did go

   19    in to see him.  It may have been that that was the

   20    time that Dr. Myrda suggested using a nebulizer.

   21        Q.    And did he use that nebulizer?

   22        A.    He did.

   23        Q.    I'm just going to name some medications

   24    that I saw in the records, and just let me know if

Christine Karman

```
1      you remember him on it.

2           A.    Okay.

3           Q.    ProAir?

4           A.    What is it?

5           Q.    ProAir.

6           A.    No, I don't.

7           Q.    Like an inhaler, do you ever remember

8      him ever having an inhaler?

9           A.    He had inhalers.  It could have been

10     ProAir.

11          Q.    And what did he have those for?

12          A.    For his COPD.

13          Q.    Naproxen, do you remember him taking

14     naproxen?

15          A.    Yes.

16          Q.    What do you remember him taking that

17     for?

18          A.    He was taking naproxen I believe for

19     pain in his hands and his legs.

20          Q.    Do you know if that was both before and

21     after or just after his --

22          A.    He was taking it before.

23          Q.    His lymphoma?

24          A.    Yes.
```

Christine Karman

 1          Q.    Do you know what was causing that pain?

 2          A.    No.

 3          Q.    Augmentin, do you remember anything

 4     about -- was that maybe for his pneumonia

 5     antibiotic?

 6          A.    I have heard that, but I don't know that

 7     he was taking it.

 8          Q.    To your knowledge, was he ever diagnosed

 9     as being -- having non-dependent tobacco use

10     disorder?

11          A.    No.

12          Q.    Did you ever hear a doctor strongly

13     recommend that he stop smoking?

14          A.    No.

15          Q.    Did you ever hear a doctor offer him

16     Chantix and encourage him to take Chantix and he

17     declined?

18          A.    I never heard a doctor recommend that,

19     but I know he was recommended.

20          Q.    Did he tell you about that?

21          A.    He did.

22          Q.    Did he tell you he declined or took it?

23          A.    He just didn't take it.

24          Q.    Do you know why he didn't?

Christine Karman

```
 1        A.    No.

 2        Q.    All right.  Here is a medical condition

 3   in a record, was hypertension.  We talked about

 4   that.

 5        A.    Yes.

 6        Q.    And do you know how long he had

 7   hypertension?

 8        A.    Hypertension being --

 9        Q.    Heart.

10        A.    -- heart.  I don't know, I don't know.

11        Q.    There is a record that indicates COPD as

12   early as 2010.  Does that sound right or not right

13   to you?

14        A.    Did not sound right to me.

15        Q.    Do you think he had it maybe later?

16        A.    I don't know.  I don't know that.

17        Q.    Do you know what caused his mother's

18   death?

19        A.    Heart attack.

20        Q.    Heart attack, what about his father?

21        A.    Kidney failure.

22        Q.    You told me you smoked a pack of day,

23   right?

24        A.    Yes.
```

Christine Karman

```
 1          Q.    What did he smoke a day?

 2          A.    About the same.

 3          Q.    What about a hemorrhoidectomy?  Did he

 4    have that back in '03?

 5          A.    Yes, but it wasn't '03.

 6          Q.    When do you recall that happening?

 7          A.    I would say 1980.

 8          Q.    Were you married?  You were married when

 9    it happened?

10          A.    We were married, yes.

11          Q.    And what was -- was that procedure

12    outpatient?

13          A.    No.

14          Q.    He was in the hospital?

15          A.    Oh, yeah.

16          Q.    How long?

17          A.    Five days.

18          Q.    Do you know what caused that?

19          A.    The hemorrhoidectomy?

20          Q.    Yeah.  I mean --

21          A.    No, don't know what caused it.  Yeah,

22    five days.

23          Q.    I'm just trying to see if I had another

24    doctor in here as I'm going, but I'm not finding
```

Christine Karman

1    it.  He never had any stem cell treatment, right?

2         A.    No.

3         Q.    Ventricular arrhythmia, do you ever

4    recall that diagnosis?

5         A.    I believe that was what he had in

6    Dr. Nabrinsky's office.

7         Q.    When they had to delay his chemo?

8         A.    Correct.

9         Q.    Does that sound right?

10               Albuterol, do you remember him taking

11    that?

12         A.    Albuterol, I believe that was for the

13    nebulizer.  Yes, I remember him taking that.

14         Q.    I'm almost done.  Gina Massey?

15         A.    I don't know.

16         Q.    Do you remember doctors -- did you ever

17    hear a doctor tell him that his shortness of breath

18    was related to his smoking?

19         A.    No, I didn't hear that.

20         Q.    That he was coughing up white phlegm as

21    a part of that continued smoking?

22         A.    I didn't hear that.

23         Q.    At some point at the end of October he

24    had his fourth cycle of R-CHOP --

Christine Karman

1          A.     Yes.

2          Q.     -- and then there was a delay.  Do you

3    remember any doctors telling you or telling him

4    that the treatment had to be delayed because of his

5    COPD exacerbations?

6          A.     I don't remember that.  I know it was

7    delayed because -- I thought it was because of

8    the -- well, but it might be part of COPD, the

9    heart arrhythmia or whatever.

10         Q.     What about the pneumonia?  Do you

11   remember that playing a role or possibly playing a

12   role?

13         A.     Possibly playing a role.  I'm not exact

14   on that.  I can't.

15         Q.     Regardless of the reason, do you recall

16   the doctors having to put that second cycle, that

17   second round of chemo on hold?

18         A.     I don't remember why.

19         Q.     But do you remember them having to do

20   it?

21         A.     Yes.

22         Q.     You just don't remember the specific

23   reason?

24         A.     Right.

Christine Karman

1          Q.    And then what happened just that you

2     recall after that once you got to November?  Did he

3     respond in any positive way to that first round of

4     chemo?

5          A.    No.

6          Q.    You eventually ended up taking him --

7     Robert Mandel?  Sorry.  I'm throwing another name

8     out at you out of the blue.

9          A.    I don't know who he is.

10         Q.    That's fine.  Zubair Ahmad?

11         A.    I don't know him or her.

12         Q.    Okay.  Do you remember that he was

13    discharged after they put it on hold the second

14    round and he went back home at the end of October,

15    early November?

16         A.    Yes.

17         Q.    And at some point in November he

18    deteriorated?

19         A.    Yes.

20         Q.    You took him back to the hospital?

21         A.    Yes.

22         Q.    And among other things, he was

23    experiencing coughing, shortness of breath --

24         A.    Yes.

Christine Karman

```
1        Q.     -- chest tightness, chest discomfort,
2    all that?
3        A.     Yes.
4        Q.     Anything else you recall him suffering
5    from at that time specifically, or did I get it
6    about right?
7        A.     I don't remember anything else.  I think
8    they've got it all.
9        Q.     And then he is seen back in the hospital
10   on or around November 20th to the 25th, and he was
11   going to be discharged home with hospice in
12   December.  Do you recall that at one point?
13       A.     Yes.
14       Q.     But then did hospice just come to the
15   hospital?
16       A.     No.
17       Q.     Did he go home?
18       A.     Yes, we went home.
19       Q.     For a brief period of time?
20       A.     Yes.
21       Q.     And were you with him when he passed --
22       A.     Yes.
23       Q.     -- on the   ?
24       A.     Yes.
```

Christine Karman

```
1          Q.    Anyone else in the room with you?

2          A.    My daughter, Catherine.

3          Q.    Now, take a deep breath.

4          A.    I'm good.

5                MR. CADY:  Do you need anything,

6          Christine?  Do you need a tissue or anything?

7                THE WITNESS:  No.  I just get

8          emotional when I hear that particular time.

9                MR. CADY:  Of course.

10               MR. HOMOLKA:  I think that's

11         understandable.

12               MR. CADY:  Didn't mean to interrupt

13         you.

14               MR. HOMOLKA:  No, that's fine.  I just

15         want to make sure I have the questions done.

16    BY MR. HOMOLKA:

17         Q.    After he passed --

18         A.    Yes.

19         Q.    -- you moved on being a grandma and a

20    mother?

21         A.    Yes.

22         Q.    Plowing ahead the best you could?

23         A.    Yes.

24         Q.    Did you need to seek any medical
```

Christine Karman

```
 1    treatment?

 2        A.    I did -- I did go to the -- have Mike

 3    take me to the hospital one time in January because

 4    I was trying to put some things in order and I was

 5    sitting up all night, and Bobbie called me and she

 6    said, "How are you doing?"  And I said, "Fine."  I

 7    said, "I'm not fine."  She said, "I will be right

 8    there," and Mike took me.  Mike came and got me.

 9    I was just suffering from anxiety and high blood

10    pressure.

11        Q.    And that was your son Mike?

12        A.    Yeah.

13        Q.    So Mike -- that was in January when --

14        A.    That was in January, like towards the

15    end of January.

16        Q.    Of '16?

17        A.    '16, yes.

18        Q.    Other than Mike coming to get you that

19    day for some anxiety --

20        A.    Right.

21        Q.    -- and other things you described --

22        A.    Right.

23        Q.    -- did you have to get any medical

24    treatment?
```

Christine Karman

```
 1        A.    No.

 2        Q.    In other words, did you go see any

 3   counseling or mental health professional?

 4        A.    No, I did not.

 5        Q.    Were you ever diagnosed with depression

 6   after he passed?

 7        A.    No.

 8        Q.    I get having anxiety, so I understand

 9   that, but did any medical doctor diagnose you with

10   any condition after your husband passed?

11        A.    No.

12        Q.    Excluding other things we've talked

13   about today, I know you have some health issues

14   that you have shared with us.

15        A.    Right.

16        Q.    But I was just meaning health issues

17   that you attribute to the -- obviously to the loss

18   of your husband?

19        A.    No, nothing, nothing.

20              MR. HOMOLKA:  Can we do this, can you

21        go ahead and start and just to speed this up?

22        I don't know if I have another question.  I

23        doubt I do, but rather than looking for four

24        or five minutes, I will just let you go.
```

Christine Karman

1          MR. CADY:  Yeah, that's totally cool.

2          MR. HOMOLKA:  And I will still have a

3     right to ask a question if I find something.

4          MR. CADY:  Of course, yes.

5          MR. HOMOLKA:  Thank you.

6          THE WITNESS:  Thank you.

7                    EXAMINATION

8     BY MR. CADY:

9     Q.    All right.  Christine, I will just ask

10    you a few things here.

11    A.    Okay.

12    Q.    And I might be skipping around a bit, so

13    I apologize.  I want to cover some bases from the

14    entirety of what you have already given us today.

15         THE REPORTER:  I have to plug this in.

16         MR. CADY:  Let's go off the record for

17    a second, actually.

18         THE VIDEOGRAPHER:  Going off the

19    record at 2:52 p.m.

20         (A short interruption.)

21         THE VIDEOGRAPHER:  Going back on the

22    video record at 2:53 p.m.

23    BY MR. CADY:

24    Q.    We took a break for a second just so we

Christine Karman

1    could get some power on our computer for our typist

2    over there.  I wanted to ask you a few things.

3         A.    Okay.

4         Q.    So you were asked some questions earlier

5    regarding your husband's smoking or his nicotine

6    use?

7         A.    Yes.

8         Q.    Do you remember those?

9         A.    Yes.

10        Q.    Okay.  Now, are you generally aware,

11   smoking is -- nicotine, is that addictive?

12        A.    Yes, it is.

13              MR. HOMOLKA:  Can you just do me a

14        favor.  I'm going to object to a few of these

15        just for the record, okay, so just pause real

16        quick when he asks you.

17              Objection to form.

18   BY MR. CADY:

19        Q.    Okay.  And your husband had been smoking

20   for a good deal of his life.  Do you recall that?

21        A.    Yes.

22        Q.    And you were asked whether your husband

23   was aware that cigarettes could cause cancer.  Do

24   you remember that question?

Christine Karman

```
 1        A.    Yes.

 2        Q.    And you answered that you were aware

 3   that your husband -- I'm sorry -- strike that.

 4              You answered that you believed your

 5   husband was aware that smoking could cause cancer;

 6   is that correct?

 7        A.    That's correct.

 8        Q.    Do you think that has anything -- his

 9   continued use of cigarettes, do you think that has

10   anything to do with the fact that they were

11   addictive?

12              MR. HOMOLKA:  Object to form.

13   BY THE WITNESS:

14        A.    Yes.

15   BY MR. CADY:

16        Q.    So again, just to clarify, you think

17   that he continued to smoke even though he knew that

18   smoking could cause cancer because he was addicted

19   to cigarettes; is that correct?

20        A.    That's correct.

21              MR. HOMOLKA:  Same objection.

22   BY MR. CADY:

23        Q.    And is there any -- are you aware

24   whether Roundup has an addictive quality to it?
```

Christine Karman

```
 1                    MR. HOMOLKA:  Object to I will just
 2         say form and outside.  Go ahead.
 3         A.    I don't know how to answer that.  I
 4    don't have an answer for that.
 5         Q.    Do you think your husband was addicted
 6    to using Roundup, the product?
 7                    MR. HOMOLKA:  Object to form.
 8         A.    Yes, I do.  It was a product he loved.
 9         Q.    But did he have any compulsion to use
10    it, is what I'm trying to get at?
11         A.    No, no.
12                    MR. HOMOLKA:  I'm going to object to
13         form.
14    BY MR. CADY:
15         Q.    Okay.  Thank you.  And just to go back
16    even further to way earlier this morning, you were
17    asked some questions about whether your husband had
18    any part in building your home on Robin Hood.  Do
19    you remember those questions?
20         A.    I do.
21         Q.    Okay.  And I think you testified -- and
22    you can correct me, please, if I'm wrong -- that he
23    was around for that house being built at that time;
24    is that correct?
```

Christine Karman

```
 1            A.    That's correct.

 2            Q.    What type of things was he doing to help

 3    build that house?

 4            A.    He did some wood handling, you know,

 5    maybe bringing lumber up to the kids -- not kids --

 6    journeymen, hiring people to do the plumbing,

 7    talking with inspectors, sweeping, burning garbage.

 8                  I don't think he did anything with like

 9    the painters and the drywallers and the roofers and

10    the guys who put in the insulation.  I don't

11    believe he did any of that.  His forte was "I want

12    to be a carpenter," which he could maybe nail a few

13    things.

14            Q.    So were there other people who were

15    undertaking tasks such as roofing?

16            A.    Yeah, there were roofers.

17            Q.    Painting?

18            A.    Painters.

19            Q.    Anyone laying wood or other flooring?

20            A.    Flooring, yes.

21            Q.    Those were other people?

22            A.    Those were other, I will use the term

23    "professionals."

24            Q.    Okay.  Would you consider your husband a
```

Christine Karman

 1    professional in that sense?

 2         A.    No.

 3         Q.    And then we went over a bunch of

 4    questions about your husband's use of Roundup

 5    around your property at Robin Hood.  Do you

 6    remember those questions?

 7         A.    Yes, yes.

 8         Q.    Okay.  And we talked about there was an

 9    area in your backyard, I think it was a brown spot

10    as we described it where your husband, you do

11    specifically recollect him using Roundup on that

12    spot; is that correct?

13         A.    That's correct.

14         Q.    And then just to be fair, I know we were

15    also talking about a culvert in the front of the

16    house, is that correct, or on the side of the

17    house?

18         A.    Correct, correct.

19         Q.    Okay.  And I do believe you testified

20    you could not say for certain whether he had used

21    Roundup in that culvert or not; is that correct?

22         A.    That's correct.

23         Q.    Do you have any reason to believe that

24    he would have used a different chemical on that

Christine Karman

1    culvert that he would not have used on the back

2    spot that we -- that you had testified about

3    earlier?

4         A.    No.

5              MR. HOMOLKA:  Object to form.  You can

6         answer.

7         A.    No, I don't believe.  No, I don't.

8         Q.    So you think that he would have been

9    using the same products on the culvert, in the side

10   and the front that he would have used at the back

11   on those brown spots?

12             MR. HOMOLKA:  Object to form.

13        A.    Yes.

14        Q.    And we are talking about a period

15   anywhere between 1990 to 2014 or 2013 to 2014, that

16   would have been your husband's use of Roundup; is

17   that correct?

18        A.    Correct.  I think, to be honest, he used

19   it in Hanover Park, which was prior 1989.

20        Q.    So he had used it at a location other

21   than the Robin Hood property?

22        A.    I think in Hanover Park he did.

23        Q.    Okay.  And what was in Hanover Park that

24   he --

Christine Karman

1          A.     Our house.

2          Q.     I'm sorry.  Let me finish these

3    questions, Christine.

4                 So what was in Hanover Park that you

5    believe your husband would have used Roundup for?

6          A.     Weeds, he would have used it for weeds.

7    We had a house there.

8          Q.     You had a house there?

9          A.     Yes.

10         Q.     So it would have been residential use

11   around the lawn and the yard --

12         A.     Right.

13         Q.     -- for weed control?

14         A.     Yes.

15         Q.     Do you specifically recall him using

16   Roundup at the Hanover house property before Robin

17   Hood?

18         A.     No, I don't.

19                MR. HOMOLKA:  That's fine.  I mean, I

20         was going to say it was asked and answered.

21         That's what I thought she told me.

22                MR. CADY:  Okay.  Sorry.

23   BY MR. CADY:

24         Q.     Yeah, let him object before you --

Christine Karman

```
 1          A.     Okay.

 2          Q.     -- answer these questions or respond.

 3                 Okay.  My original question was just

 4    going to be, do you have a perfect recollection of

 5    every single day and every single event that has

 6    taken place between 1989 and 2014?

 7                     MR. HOMOLKA:  Object to form.  Go

 8        ahead.

 9    BY THE WITNESS:

10          A.     Can I answer?

11    BY MR. CADY:

12          Q.     Yeah.

13          A.     No, I do not.

14          Q.     So it's possible that when we are

15    talking about your husband's use of Roundup during

16    those times that you may not perfectly recollect

17    every single time he used that product; is that

18    correct?

19          A.     That's correct.

20          Q.     And you were also asked some questions

21    earlier about, you know, your husband's hobbies and

22    things that he had done just throughout his life

23    generally, and I know you had spoken about

24    vacations you and he used to take prior to his NHL
```

Christine Karman

```
 1    diagnosis.  Is that correct, you guys used to take

 2    vacations before he was diagnosed with NHL?

 3         A.    Yes.

 4         Q.    Okay.  Did you take any vacations after

 5    he was diagnosed with NHL?

 6         A.    No.

 7         Q.    And why did you stop traveling or why

 8    did you stop vacationing after his cancer

 9    diagnosis?

10              MR. HOMOLKA:  Object to form.  You can

11         answer.

12              THE WITNESS:  I can answer?

13              MR. HOMOLKA:  Yes.

14    BY THE WITNESS:

15         A.    Because of his health issues, because he

16    was beginning to get very weak.

17    BY MR. CADY:

18         Q.    And do you recall the last time that he

19    would have planned a vacation for the two of you

20    before his passing?

21         A.    Yes.

22         Q.    Could you tell us a little bit about

23    that.

24         A.    I don't remember the exact date, but I
```

Christine Karman

1    woke up and he was in the office on the computer.

2    It was late at night and I went into the bedroom

3    and asked what he was doing and he said, "You

4    spoiled the surprise."  He knew I wanted to go back

5    to the Panama Canal, and he had just booked a

6    vacation for the two of us for my birthday in

7    February, and I knew he was not going to make it at

8    that point.

9         Q.    I didn't mean to interrupt you.

10        A.    That's okay.  I knew he wasn't going to

11   make it.  He was just deteriorating so rapidly.

12   And as I was standing and talking to him, here

13   comes the acknowledgment off the printer.  I just

14   could have died.  But that picture of him, that

15   little square on his pictures that I gave to

16   everybody, that was his -- he had to renew his

17   passport and that was his picture.

18        Q.    And just for the record, were you two

19   ever to take -- were you ever able to take that

20   vacation that he was planning?

21        A.    I would never take it again.

22        Q.    Okay.  And why?  Why would you not --

23        A.    Too many memories, too many memories.

24        Q.    Was he -- did he pass before you two

Christine Karman

1    would have taken that vacation?

2         A.    Yes.  He passed, I believe it was like

3    three weeks after that.

4         Q.    And did he drive before he was diagnosed

5    with cancer in 2015?

6         A.    Yes, he did.

7         Q.    Was he able to drive after he was

8    diagnosed with cancer --

9         A.    Not at the end, not at the end.  I did

10   it again.

11        Q.    You are okay.  Just let me ask the

12   questions for a clean record.

13        A.    Okay.

14        Q.    So was he ever able to drive again after

15   he was diagnosed with cancer in 2015?

16        A.    Yes, he was.

17        Q.    Okay.  The same amount that he was able

18   to drive before his cancer diagnosis?

19        A.    Initially, yes.

20        Q.    Could you elaborate?  You said

21   initially.  Did it change at some point?

22        A.    It changed as he got more chemo

23   treatment and whatnot, and sometime towards the end

24   of November, I believe it was, he wasn't -- he just

1  couldn't drive any more.

2      Q.    And did his cognitive function change at
3  all between getting -- before he was diagnosed with
4  cancer in 2015 and after he was diagnosed with
5  cancer in 2015?

6      A.    Yes, it did.

7      Q.    Okay.  Could you elaborate on how his
8  cognitive function changed?

9            MR. HOMOLKA:  I object to the form of
10       the question.  You can answer.

11     A.    He was getting forgetful.  He was
12  getting angry.  He was -- he didn't want to talk to
13  anybody, didn't want to go to the doctor.  He was
14  getting belligerent.

15     Q.    And do you have any theory of why his
16  cognitive function was declining after his cancer
17  diagnosis in 2015?

18            MR. HOMOLKA:  Object to form.  You can
19       answer.  You can answer.

20     A.    I -- I would think all the chemo and
21  everything else.

22     Q.    I apologize.  I'm not trying to stir up.
23  I know this is hard.

24     A.    No, that's okay.

Christine Karman

1        Q.    Now, you were also asked some questions

2    I think about an hour ago regarding what you think

3    Monsanto should have done differently, if anything,

4    with regards to their Roundup product, and please

5    tell me if I have this incorrectly.  I believe you

6    mentioned something about putting a skeleton on the

7    label.  Do you recall that?

8        A.    Yes, I did.

9        Q.    Okay.  Could you elaborate for us what

10   you mean by put a skeleton on the label.

11       A.    I think the label should be boldly

12   marked, not tiny, little letters.  All labeling

13   should be boldly marked.  It should be the first

14   thing you see when you -- if you are going to read

15   a label.  Before you read directions, it should be

16   in bold letters.

17       Q.    And what do you think should be in bold

18   letters on that label?

19       A.    A warning as to what -- what it could

20   cause, what it could do to you.

21       Q.    And just in relation to the questions

22   you were asked about whether Monsanto should have

23   done anything different with that label, I just

24   want to ask you, do you have any scientific

Christine Karman

```
1    background as it relate to chemicals?

2         A.    No.

3         Q.    Have you done any research or do you

4    have any training on herbicides, pesticides?

5         A.    None.

6         Q.    Do you have any training or other

7    professional knowledge about the regulatory

8    framework of how chemicals are labeled?

9         A.    No.

10        Q.    And I also believe you testified earlier

11   that you do not have a specific recollection of

12   your husband reading any label for Roundup; is that

13   correct?

14        A.    That's correct.

15        Q.    Do you specifically recall, did he ever

16   read chemical labels before he would use those

17   products?

18             MR. HOMOLKA:  Object to form.  You can

19        answer.

20        A.    He did, he did.  If it was something

21   that perhaps needed a certain type of application

22   that he basically knew about, he would read that,

23   and I believe that's as far as he went, reading a

24   label.
```

Christine Karman

```
1          Q.    But what you are trying to say, I
2    believe -- and I don't want to put words in your
3    mouth, so correct me if I'm wrong -- is you just do
4    not specifically remember looking at him while he
5    was looking at a Roundup label and reading it; is
6    that correct?
7          A.    That's correct.
8          Q.    Now, do you believe if Monsanto had put
9    a warning on the Roundup label that it could cause
10   cancer, do you think your husband would have still
11   used that product?
12               MR. HOMOLKA:  Object to form.  You can
13        go ahead.
14         A.    No, I don't.
15         Q.    Do you believe if your husband had any
16   idea that Roundup could cause cancer when he was
17   using that product for your home on Robin Hood and
18   anywhere else, do you think he would have still
19   used that product?
20               MR. HOMOLKA:  Objection to form.  You
21        can answer.
22   BY THE WITNESS:
23         A.    No.
24               MR. CADY:  And counselor, do you
```

Christine Karman

1          remember what that -- what exhibit you marked

2          that email as?

3                    MR. HOMOLKA:  Two.

4                    MR. CADY:  Was that two?  Can I look

5          through these really quick to see?

6     BY MR. CADY:

7          Q.    So, Christine, I'm handing you back

8     Exhibit 2 that you looked at and were asked some

9     questions earlier.

10         A.    Okay.

11         Q.    Do you remember that exhibit?

12         A.    Yes, I do.

13         Q.    Okay.  And just to reiterate, what is

14    that again?

15                   MR. HOMOLKA:  Objection to form.  It

16         speaks for itself.  You can answer.

17                   THE WITNESS:  Oh, what?  I'm sorry.

18                   MR. HOMOLKA:  You can answer.

19                   THE WITNESS:  I didn't hear the

20         question.

21    BY MR. CADY:

22         Q.    No, you are okay.  I was asking, do you

23    know, can you just refresh yourself and tell us

24    what this exhibit is.

Christine Karman

1        A.     This is notes my daughter Nancy took

2    when we went to Dr. Nabrinsky's office the first

3    time, and she took her notes and then just put them

4    on paper for us so we could all be on the same

5    page.  It was one of his requests: "I don't want to

6    talk to each of them separately.  I want them to

7    get the same document so that they all see the same

8    thing."  And she came with us and she typed it up

9    and sent everybody a copy of it.  Nobody else but

10   the family did get copies of these.

11       Q.     Okay.  So then I believe you answered

12   earlier when you were asked some questions about

13   it, but who is this email from?

14       A.     Nancy, Nancy Kolinsky, my daughter.

15       Q.     Okay.  So do you believe that this

16   specific email is from any doctor?

17       A.     This is what she --

18              MR. HOMOLKA:  Object to form.  Go

19       ahead.

20       A.     -- she in standing with us in

21   Dr. Nabrinsky's office took down.

22       Q.     So, again, I'm not sure you answered it.

23   Is this email from a doctor or is this email from

24   someone else?

Christine Karman

```
 1          A.     This email is from Nancy.

 2          Q.     Okay.  Nancy as in your daughter?

 3          A.     Yes.

 4          Q.     Okay.  And you believe -- correct me if

 5   I'm wrong.  Do you believe this email is just a

 6   reiteration of things that she would have

 7   remembered from a doctor's appointment?

 8                 MR. HOMOLKA:  Object to form.

 9   BY THE WITNESS:

10          A.     That she wrote down from a doctor.  She

11   has handwritten notes of this.

12                 MR. CADY:  Okay.  I think that's all

13          I have, counselor, if you have anything

14          further.

15                 MR. HOMOLKA:  Yeah, do I have some.

16                 MR. CADY:  Okay.  You can put that

17          back with the exhibits.

18                 MR. HOMOLKA:  Can you look up the word

19          "     Avenue."

20                    (Discussion was had off the

21                     record.)

22                    FURTHER EXAMINATION

23   BY MR. HOMOLKA:

24          Q.     Okay.  Can you hear me?
```

Christine Karman

```
 1          A.    I can hear you.

 2          Q.    I was asking you some questions earlier.

 3    Mr. Cady asked you about your house on Hanover.  Do

 4    you remember me asking you specific questions about

 5  the house in Hanover on      Road?

 6          A.    Honestly, no.

 7          Q.    Well, I asked you questions about that,

 8    and then I asked you this question and I'm going to

 9    read your answer.  "We have talked about obviously

10    Robin Hood Road.  Is there anywhere else that you

11    recall your husband using Roundup other than Robin

12    Hood Road?

13                Your answer:  "I don't know that he -- I

14    don't know.

15                "You just can't say, can you?

16                "No, I don't know.

17                "Is it fair to say?

18                "I don't know.

19                "So this lawsuit" -- this was my

20    question:  "So this lawsuit, you are alleging

21    exposure to Roundup.  We talked about the extent of

22    the use of Roundup that you can testify and be

23    certain of as it relates to this lawsuit already.

24                "Correct.
```

Christine Karman

1                  "Is that right?

2                  You say, "Correct."

3                  During all my questioning of you today,

4        you never said he was exposed on -- in Hanover

5        Park, did you?

6           A.    I don't think so.

7           Q.    And I asked you when I was done, I was

8        very clear with my question, Have we talked about

9        everything?  We talked about Robin Hood Road.  I

10       said, Is this it?  Then after that there is a break

11       and your attorney asked you a question and you said

12       that you think he was exposed on Hanover Park.

13                  MR. CADY:  I will just object to the

14           timing of what we are discussing here.

15       BY MR. HOMOLKA:

16          Q.    Is it your testimony now after I asked

17       questions for five hours that your husband was

18 exposed to Roundup in Hanover Park on       Road?    Is

19 that your testimony?

20          A.    I don't know how to answer it.

21          Q.    Well, I asked you earlier and you

22       answered it one way.  I'm just seeing if you are

23       going to answer it the same way now.

24          A.    I don't know.

Christine Karman

```
 1          Q.    Is it fair to say that you can't say

 2     sitting here today, you can't say that he was

 3  exposed to Roundup on      Road, can you?

 4                 MR. CADY:  I object to the form of the

 5          question.  You can answer.

 6          A.    I can't say definitely.

 7          Q.    You never saw him -- you told me you

 8     never saw him exposed there, right?  Right?

 9                 MR. CADY:  Object, mischaracterizes

10          prior testimony.  You can answer.

11          A.    I visually, mentally cannot see him

12     using Roundup.

13          Q.    I asked you if you ever saw that product

14  at    Road, and you said you never saw it,

15  couldn't say you saw it?

16                 MR. CADY:  Same objection.  You can

17          answer.

18     BY MR. HOMOLKA:

19          Q.    I mean, sitting here today can you say

20  for certain under oath that you saw Roundup on

21  Road?

22          A.    Can you -- can you say that again to me.

23          Q.    Sitting here today under oath, can you

24  say for certain that you saw Roundup on
```

Christine Karman

```
 1   Road?

 2        A.    No, I cannot.

 3        Q.    Who has the handwritten notes that Nancy

 4   took in the doctor's office?

 5        A.    I don't have them.  I believe Nancy

 6   still has them.

 7        Q.    Could you try to get those and give them

 8   to your attorney, please?

 9        A.    Okay.

10        Q.    I believe they are highly relevant to

11   this lawsuit.

12        A.    Okay.  Now, I believe she has them.

13        Q.    I totally understand.

14        A.    Okay.

15        Q.    You said that your husband would read

16   chemical labels.  Do you remember testifying to

17   that with Mr. Cady?

18        A.    Yes.

19        Q.    What chemical labels, what specific

20   product?

21        A.    Oh, I think we were sitting at the table

22   one day and he was outside and he was going to

23   spray it, and he read a table of lacquer spray.  He

24   read a product label.  Oh, excuse me.
```

Christine Karman

```
 1          Q.    What was the brand name?

 2          A.    My guess would be Rust-Oleum.

 3          Q.    Is that a guess, or are you certain

 4     seeing Rust-Oleum on that container?

 5          A.    Pardon?

 6          Q.    Are you certain you saw Rust-Oleum on

 7     that container?

 8          A.    No, I'm not.  I'm just saying that I was

 9     sitting outside with him and he was reading the

10     label.

11          Q.    To be clear, he never told you he read a

12     Roundup label, right?

13          A.    I -- no, he never did.

14          Q.    You said that you don't think he would

15     have used Roundup if it said on the container it

16     caused cancer?

17          A.    I don't think he would have.

18          Q.    Correct.  Whether it's addiction or not,

19     the fact is he continued to smoke cigarettes after

20     he knew they could cause cancer, right?

21          A.    Yes.

22          Q.    And after he knew he had a disease

23     called COPD that was caused by those very

24     cigarettes, correct?
```

Christine Karman

1        A.      Yes, correct.

2        Q.      You said that he got weaker, obviously,

3    after his diagnosis of lymphoma, correct?

4        A.      Correct.

5        Q.      Isn't it also true he got weaker because

6    his COPD progressively got worse throughout his

7    life?

8        A.      Before he was diagnosed with lymphoma, I

9    didn't see -- I didn't realize he had COPD.  I was

10   not aware of that, but I didn't see any change in

11   his health.  It wasn't until after he started,

12   after he got his first chemo treatment.

13       Q.      Well, in 2014 he went to see doctor, his

14   primary care physician because of chest tightness

15   and shortness of breath?

16       A.      Yes.

17       Q.      Do you remember that?

18       A.      I do.  I think that was a six-month -- a

19   six-month visit.

20       Q.      He also had hypertension, correct?

21       A.      Yes, he did.

22       Q.      Cardiac arrhythmia, correct?  Or do you

23   know that?

24       A.      The cardiac arrhythmia showed up after,

Christine Karman

1    in the doctor's office when he went for a chemo.

2        Q.    What about lupus, when did it show up?

3        A.    Pardon?

4        Q.    Lupus.

5        A.    I never heard of that.  I know what

6    lupus is, but I never heard him talk about lupus.

7        Q.    What about rheumatoid arthritis?

8        A.    No.

9        Q.    Immunosuppressive medicines that he was

10   taking?

11       A.    No.

12       Q.    Hepatitis, no?

13       A.    No.

14       Q.    Exhibit 2, where was that?  That email

15   we talked about, right?  Can you pull that out for

16   a second, please.

17            MR. CADY:  There you go, Chris.

18   BY MR. HOMOLKA:

19       Q.    Let's start at the top of that.  Do you

20   see where your sister says -- or your daughter

21   says, "It is curable."  Do you see that?

22       A.    Yes.

23       Q.    Two lines down it says, "75 percent of

24   patients are cancer-free after their six rounds of

1    chemo."  Did I read that correctly?

2        A.    You did.

3        Q.    Your husband was not able to take all

4    his rounds of chemo, correct?

5        A.    Correct.

6        Q.    And if a medical record says that it had

7    to do with COPD exacerbations, would that have --

8    would you have any reason to disagree with it?

9        A.    I don't understand that.  Can you repeat

10   that for me?

11       Q.    Are you aware that medical records

12   identify COPD and its exacerbations as one of the

13   reasons chemo was put on hold?

14       A.    I wasn't aware of that.

15       Q.    Needless to say, his chemo was put on

16   hold and he was never able to complete those rounds

17   of chemo, correct?

18       A.    Correct.

19       Q.    And it was because of other health

20   conditions, correct?

21       A.    Correct.

22       Q.    It says, "Dad does not need surgery or

23   radiation," correct?

24       A.    Correct.

Christine Karman

```
 1          Q.    That's what the doctors determined?

 2          A.    Correct.

 3                MR. CADY:  Object to the form of the

 4          question.

 5     BY MR. HOMOLKA:

 6          Q.    It says at the bottom here that he can

 7     travel and go about his regular activities during

 8     his treatment, meaning his chemotherapy treatment,

 9     correct?

10          A.    Yes, it does say that.

11          Q.    It says, "It is obviously recommended

12     that dad quit smoking as the chemo will make him

13     tired and breathing more difficult."

14                Did I read that right?

15          A.    Yes.

16          Q.    He didn't quite smoking, did he?

17          A.    No, he didn't.

18                (Deposition Exhibit 21 was marked

19                  for identification.)

20     BY MR. HOMOLKA:

21          Q.    Okay.  I read some of these diseases or

22     this lupus, rheumatoid arthritis.  Let's take a

23     look at Exhibit 21.  Have you seen this document or

24     something that looks like it before?  Take your
```

Christine Karman

```
 1    time to look through it.

 2         A.    What am I looking for here?

 3         Q.    I'm just looking for you to look through

 4    it.  Did you see -- have you ever seen something

 5    similar to that that you helped fill out or that

 6    you provided the answers?

 7         A.    That my -- I seen something that my

 8    daughter filled out.

 9         Q.    So, all right.  Did you help her fill it

10    out?

11         A.    No, I didn't.

12         Q.    Let's go to the last page.  Do you see

13    at the bottom there it has a signature and it has

14    your name, not your daughter's name?

15         A.    Yes.

16         Q.    Below it, it has your name printed, not

17    your daughter's, correct?

18         A.    Correct.

19         Q.    Did you look at this and attest to its

20    accuracy under penalty of perjury or did your

21    daughter do it?

22         A.    My daughter read it to me over the

23    phone, I believe.

24         Q.    And do you have the original that your
```

Christine Karman

```
 1   daughter -- your daughter completed?  Have you seen
 2   it?
 3        A.   Yes, I have.
 4        Q.   Did you bring it today?
 5        A.   Yes.
 6        Q.   I don't want it.  That's fine.  I don't
 7   want it.  It's for your attorney.  You brought it.
 8   You have the original and you brought it?
 9        A.   Yes.
10        Q.   And how was this answered?
11        A.   How is what answered?
12        Q.   This document that I marked as Exhibit
13   21.  Did your daughter ask you questions over the
14   phone or did she read answers to you over the
15   phone?
16        A.   I think she asked me a few questions
17   over the phone.
18        Q.   So you would provide her some answers;
19   she would write it down, or someone?
20        A.   Yes, yes.
21        Q.   Do you know if your daughter answered
22   any of these questions without your input?
23        A.   I don't believe so.  She had
24   documentation, because she had all these papers.
```

Christine Karman

```
 1        Q.    So she had some medical records, that
 2   kind of stuff?
 3        A.    Yes.
 4        Q.    Fair enough.  Let me just ask you about
 5   a few of these.  On page -- let's go to page 5 --
 6   I'm sorry -- 7.
 7               MR. CADY:  Are you using the Bates
 8         stamps, counselor?  I think they might
 9         actually be the same.
10               MR. HOMOLKA:  They are the same.
11               MR. CADY:  Okay.  Page 7?
12               MR. HOMOLKA:  Yeah.
13               THE WITNESS: 7 or 5?
14   BY MR. HOMOLKA:
15        Q.    7.  This question asked for primary care
16   physicians, correct?
17        A.    Yes.
18        Q.    Is that Dr. Jerry Myrda?
19        A.    Myrda.
20        Q.    That's correct, right?
21        A.    Yes.
22        Q.    That was his primary care doctor for
23   most of his life?
24        A.    Yes.
```

Christine Karman

```
 1            Q.    Let's go to page 12 -- or page 11.

 2     Okay.  This says, "Please indicate whether your

 3     medical history includes any of the following

 4     conditions, procedures or medications."

 5            Did I read that correctly?

 6     A.    Yes.

 7            Q.    And if you go down it says hepatitis C,

 8     yes.  Do you see that?

 9     A.    I do.

10            Q.    Ischemia, it says yes.  Do you know what

11     that is?

12     A.    No, I don't.

13            Q.    Radiation, it says yes, correct?

14     A.    Correct.

15            Q.    And he didn't get radiation for

16     treatment of lymphoma, did he?

17     A.    No.

18            Q.    Do you know where he was exposed to

19     radiation?

20     A.    I have no idea.

21            Q.    It says lupus, correct?

22     A.    Correct.

23            Q.    It says rheumatoid arthritis, correct?

24     A.    Correct.
```

Christine Karman

```
1          Q.    Organ stem cell or other transplant, do

2    you know what we are talking about there?

3          A.    Yes.

4          Q.    What?

5          A.    Organ transplants.

6          Q.    Has he had one?

7          A.    No.

8          Q.    It says yes, though, here.

9          A.    I understand that.

10          Q.    And then you see immunosuppressive

11    medications?  What's it say there?

12          A.    It also says yes.

13          Q.    Do you know what immunosuppressant

14    medications?

15          A.    No.

16          Q.    Go up.  It says smoking, and it says --

17    what does it say for smoking?

18          A.    It says no.

19          Q.    Do you know why that's checked no?

20          A.    No, I don't.

21          Q.    If your daughter was on the phone asking

22    you questions, would you have told him yes or no

23    that he was a smoker?

24          A.    I would have said yes.
```

Christine Karman

```
 1          Q.    Would you have said yes to organ
 2   transplants?
 3          A.    No, I would not have.
 4          Q.    Lupus?
 5          A.    No, I would not have.
 6          Q.    Okay.  Do we know where this came from?
 7          A.    I don't know.  I have the original and I
 8   did note these, that they were incorrect, and I
 9   marked them.
10          Q.    You noted what was incorrect?
11          A.    That this was incorrect.
12          Q.    Okay.
13          A.    I don't know where that came from.  This
14   is the one I noted that his Social Security is
15   incorrect.
16          Q.    This is the one I got.  That's why I'm
17   asking.
18          A.    I don't know.  She pulled it up
19   yesterday on her computer, and I don't know how it
20   got like this.  I don't know.
21          Q.    Were you with her when she pulled it up
22   on her computer?
23          A.    I was sitting across from her, and she
24   just said I don't know what happened here.
```

Christine Karman

```
1          Q.     Why did she pull it up yesterday on her
2    computer?
3          A.     Because I wanted copies of it.
4          Q.     To kind of get ready for the depo?
5          A.     Yes.
6          Q.     Is it your -- do you think she typed
7    this stuff in here, do you know?
8          A.     It was on her computer.  She had to.
9          Q.     Whose computer is it?  Bobbie's?
10         A.     Yes.
11         Q.     Okay.  Go to the next page.  Do you see
12   all these doctors?
13              MR. CADY:  What page are you on,
14         counselor?
15              MR. HOMOLKA:  12.
16   BY MR. HOMOLKA:
17         Q.     These doctors, the only one I haven't
18   asked you about is Dr. David Bromet, B-r-o-m-e-t.
19   Do you remember that doctor?
20         A.     I think that's the one I was looking for
21   for the heart issue.
22         Q.     That explains it.
23              Move to page 16.  For "D" it says the
24   doctor who diagnosed first and it says Dr. Hassad
```

Christine Karman

```
 1    Shah.  I think I read that name earlier and you

 2    didn't -- it didn't sound familiar, did it?

 3         A.   No, it didn't.

 4         Q.   In the medical records it says Gloria Ma

 5    did.  Does that name sound familiar?

 6         A.   No.

 7         Q.   Go on.  Page 21, is your current house

 8    in -- how do I pronounce it?  Elgin?

 9         A.   Yes.

10         Q.   Or Elgin?

11         A.   Elgin.

12         Q.   Elgin?

13         A.   Elgin.

14         Q.   That's where your house on

15    is?

16         A.   Yes.

17         Q.   Before you lived there, you lived on

18    for how many years?  24?

19         A.   24 years.

20         Q.   So that would have been 1960- --

21         A.   '3.

22         Q.   And that's not in Elgin, right?

23         A.   No.  That's in Hanover Park, is the town

24    that's in.
```

Christine Karman

1      Q.    This answer, this is asking for where

2   have you been exposed to Roundup.  Okay?

3      A.    Yes.

4      Q.    And you put on there, "Once per week

5   during 40 weeks per year."  We talked today, and I

6   think you arrived at about eight months --

7      A.    Yes.

8      Q.    -- about 32 weeks --

9      A.    Yes.

10     Q.    -- give or take.

11           Spraying, correct?

12     A.    Yes.

13     Q.    I asked you if there was any other

14   substance that was used that you associated with

15   Roundup, and you said you couldn't remember

16   anything else.  Well, on this, though, it says you

17   scattered powder in the yard, Roundup powder.  Do

18   you know where that came from?

19     A.    Once a week I [inaudible reading]

20           THE REPORTER:  I can't hear her

21     reading.

22   BY MR. HOMOLKA:

23     Q.    Okay.  Let me go through it.  The top is

24   just an example for you.

Christine Karman

```
 1        A.    Oh, okay, okay.

 2        Q.    Yours is the second.

 3        A.    Okay.

 4              Okay.  They are saying that he scattered

 5    powder around in the yard.

 6        Q.    We have been here all day, and I have

 7    never heard about this.  Do you know where that

 8    came from?

 9        A.    I believe that came from me.

10        Q.    From you?

11        A.    I think it came from me.  I think I told

12    her he at one time used powdered liquid -- or

13    powder.

14        Q.    For every question that I've asked you

15    today, I was really careful.

16        A.    Yes, you were.

17        Q.    We would talk about each area and I

18    would ask you for each area was it that same

19    container that was this big --

20        A.    Yes, you did.

21        Q.    -- and had a wand.

22              MR. CADY:  Let him finish.

23              THE WITNESS:  I'm sorry.

24
```

Christine Karman

```
 1    BY MR. HOMOLKA:

 2         Q.    And you never, ever -- every one of

 3    those questions you said same thing, same thing,

 4    same thing.  And there has been some other things

 5    we've noticed that you think are wrong in this,

 6    like lupus, organ transplants.  If it's wrong, it's

 7    fine.  You could amended it, but if it's -- if you

 8    have a memory of him scattering powder, Roundup

 9    powder, then I'm going to need to know what it

10    looked like, where it was and all that stuff and

11    kind of all that because I asked you each time and

12    I've never heard of it.

13         A.    Yes, you did.

14         Q.    See, here, too it says dates of use, it

15    says 1980, and we had it at like 1991 forward, and

16    I don't know -- and then at the end it says the

17    location is in Elgin, Illinois, right?

18         A.    Yes.

19         Q.    You didn't live in Elgin, Illinois, in

20    1980 or '85 or '86 --

21         A.    No, I didn't.  I lived in Hanover Park.

22         Q.    -- or '87 or '88; and the 2015, you told

23    me today it wasn't 2015, it's 2013.

24         A.    Right.  He stopped using it, I think --
```

Christine Karman

```
1          Q.    A couple years before?

2          A.    He just stopped working on the garden as

3    such.

4          Q.    It's fine.  I'm just trying to make

5    sure, because this is my last time I have to ask

6    you questions; and if this needs to be tweaked,

7    then you just need to say it or get with your

8    attorney and you can file an amended one, and

9    that's fine.

10         A.    Can I do that?

11         Q.    Absolutely you can do it.  It's totally

12   up to -- I mean, we have seen them before, and like

13   I said, I don't -- I will be honest with you, I see

14   this lupus stuff; I don't see any history of that.

15         A.    I don't know where that came from.

16         Q.    It could have been your daughter

17   checking a box and it being a different.  I'm not

18   saying there is anything nefarious.  I'm just

19   trying to say we have talked today, and I got about

20   done and I forgot to look at this and then I look

21   at it; and it's whatever you want to do.  If you

22   want to say, hey --

23         A.    I need it corrected.

24         Q.    Let's do that then.
```

Christine Karman

```
 1        A.    Okay.

 2        Q.    And I think that I've asked you

 3   questions and I'm good.  If you were to correct

 4   anything, would you at least correct page 21 to

 5   reflect kind of what you talked about with us

 6   today?  Is that something?  If not then --

 7        A.    Yes.

 8        Q.    And would it reflect maybe -- would it

 9   still reflect powder or would it just be the spray?

10        A.    Well, in Elgin he just used the spray.

11        Q.    Okay.  And here it says the only use was

12   in Elgin and it would have been from after you

13   moved in sometime around '91.

14        A.    Okay, but it's saying 1980, which in

15   1980 I still lived in Hanover Park.

16        Q.    Yeah, but you told me today -- I asked

17   you if there is any other places you can say for

18   certain he was exposed.

19        A.    Okay.  So if we to -- just eliminate

20   the -- put in 32 weeks a year.

21        Q.    32 to 40 is fine.  I'm just more

22   concerned about if there is another house we have

23   to talk about.

24        A.    No, we don't have to.
```

Christine Karman

```
1        Q.   You know what?  You get with your
2   attorney and amended that and take a look at the
3   medical things.
4        A.   The medical things I definitely want to
5   look at because he did not have lupus, he did not
6   have stem cell.  I don't know where that came from.
7        Q.   I can say on the record I don't think he
8   had either one of those two things either.  I see
9   it in there, and I didn't see those in the records.
10  I saw some indication of some other stuff maybe.
11  Why don't we do that.
12            So why don't we do this:  I'm done with
13  my questions.  I can represent and your attorney
14  can represent that there is people that amend these
15  all the time, and the first amended one, that's
16  fine.  I just want you to do that and I'm sure he
17  does too.
18            As far as your damages in this case, we
19  talked about some medical bills.  Is there any
20  other damages that you are claiming in this
21  lawsuit?  We talked about some funeral expenses,
22  some medical bills, some out-of-pocket.
23       A.   Drug.
24       Q.   Drug charges.  He had already retired,
```