Ken Moll
Rebecca Fredona
Fatima Abuzerr
**MOLL LAW GROUP**
22 W Washington St
15th Floor
Chicago, IL 60602
T: 312.462.1700
F: 312.756.0045
rfredona@molllawgroup.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 16-md-02741-VC |
| This document relates to: | **PLAINTIFFS' RESPONSE TO MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS** |
| *Cervantes v. Monsanto Co.*, 3:19-cv-03015-VC *Karman v. Monsanto Co.*, 3:19-cv-01183-VC *Pecorelli v. Monsanto Co.*, 3:19-cv-06936-VC *Peterson v. Monsanto Co.*, 3:19-cv-07271-VC *Schafer v. Monsanto Co.*, 3:19-cv-02169 | |

# PLAINTIFFS' RESPONSE TO MOTION TO EXCLUDE TESTIMONY OF DR. WILLIAM SAWYER ON *DAUBERT* GROUNDS

### **TABLE OF CONTENTS**

I.   INTRODUCTION .................................................................1

II.  LEGAL STANDARD............................................................4

III. ARGUMENT .....................................................................6

A.  Dr. Sawyer is not Offering Any General Causation Opinions...........................6

B.  Dr. Sawyer's Case Specific Opinions on Plaintiffs' are Reliable
     and Admissible..................................................................7

     i.   Dr. Sawyer Used Proper Methodology in Assessing Specific
          Causation ...............................................................7

     ii.  Dr. Sawyer Makes Proper Use of Epidemiology Studies to Form his
          Opinions.................................................................8

     iii. Dr. Sawyer's Opinions Regarding the Plaintiffs' Exposure to Roundup
          are Reliable and Admissible ..............................................9

C.  Dr. Sawyer May Rely on the George Study  ....................................13

D.  Dr. Sawyer's Testimony Regarding Other Carcinogens in Roundup is
     Admissible ..................................................................15

E.  Dr. Sawyer May Rely on and Explain Technical Details Contained in
     Internal Monsanto Documents................................................16

IV. CONCLUSION.....................................................................18

# TABLE OF AUTHORITIES

**Cases:**

*Asad v. Cont'l Airlines, Inc.*,
   314 F. Supp. 2d 726, 741 (N.D. Ohio 2004)....................................5, 9

*Avila v. Willits Envtl. Remediation Tr.*,
    633 F.3d 828, 836 (9th Cir. 2011) ...........................................6

*Beck v. Koppers, Inc.*,
   No. 3:03 CV 60 P D, 2006 WL 270260, at *10 (N.D. Miss. Feb. 2, 2006).........5, 9

*Clausen v. M/V NEW CARISSA*,
   339 F.3d 1049, 1057 (9th Cir. 2003) ...................................7, 12, 13

*Fleming v. Nicholls-Wilcox, Inc.*,
   No. 02-1-7632-42, 2005 WL 5419258 (Ga. Super., May 10, 2005). .....................1

*In re Roundup Prod. Liab. Litig.*,
   No. 16-MD-02741-VC, 2018 WL 3368534, at *5 (N.D. Cal. July 10, 2018).........6

*In re Roundup Products Liability Litig.*,
   No. 16-CV-0525-VC (N.D. Cal., July 12, 2019)....................................... 2

*In re Seroquel Prod. Liab. Litig.*,
   No. 6:06-MD-1769-ORL-22D, 2009 WL 3806436, at *4 (M.D. Fla. July 20, 2009)
       ...................................................................16

*In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.*,
   2011 WL 6302287, at *18 (S.D. Ill. Dec. 16, 2011) ............................16

*Johnson v. Monsanto Co.*, 2018.,
   WL 2324413 (Cal. Super. May 17, 2018)  ......................................1, 8

*Johnson v. Monsanto Co.*,
   WL 5246323 (Cal. Super. Oct. 22, 2018) ....................................1, 3, 4

*Messick v. Novartis Pharmaceuticals Corp.*,
   747 F.3d 1193, 1196 (9th Cir. 2014) ....................................4

*People v. Campos*,
   32 Cal. App. 4th 304, 308 (1995) ..........................................5

*Pilliod v Monsanto Co.*,
   2019 WL 2158266 (Cal.Super. Mar. 18, 2019) ...........................................1, 10, 11

*Primiano v. Cook*,
   598 F.3d 558, 563, as amended (Apr. 27, 2010)  (9th Cir. 2010) ......................3, 4

*Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., LLC.*,
   858 F. Supp. 2d 505, 512 (D. Md. 2012). ...........................................................5, 9

*Pyramid Technologies, Inc. v. Hartford Cas. Ins. Co.*,
   752 F.3d 807, 816  (9th Cir. 2014)  ...................................................................4, 5

*Whitloxk v. Pepsi Americas*,
   527 Fed. Appx. 660, 661-662 (9th Cir. 2013) .................................................3, 4, 5

iii

## I.    Introduction

William Sawyer, Ph.D. "is a highly qualified toxicologist - currently chief toxicologist of Toxicology Consultants and Assessment in New York. He is Board Certified in forensic medicine, toxicology and pharmacology and is well published." *Fleming v. Nicholls-Wilcox, Inc.*, No. 02-1-7632-42, 2005 WL 5419258 (Ga. Super., May 10, 2005). Dr. Sawyer has more than 31 years of experience in public health and forensic toxicology including five years of governmental service. Fredona Decl., Ex. 1, Dr. Sawyer CV. He has a Ph.D. in toxicology and a Master's degree in cellular and molecular biology and has consulted for numerous governmental agencies including "the United States Attorney's Office, US Navy, various prosecutors, Attorney State General of Montana, New York, New Jersey and other states." Fredona Decl., Ex. 2, *Johnson v. Monsanto* Trial Transcript ("Johnson Tr.")  at 3586-3588. In fact, Dr. Sawyer has previously served as an expert witness for law firms representing Monsanto. Fredona Decl., Ex. 3, *Pilliod v. Monsanto* Trial Transcript ("Pilliod Tr.") at 3079:7-3080:19.

To date, Dr. Sawyer has given many dozens of hours of testimony in the Roundup® litigation through over 15 days of deposition and two days of testimony in the *Johnson* and *Pilliod* trials. He has spent hundreds of hours reviewing published studies, medical records and internal documents written by Monsanto scientists. Monsanto has repeatedly tried and failed to exclude or strike Dr. Sawyer's opinions. *See Pilliod v Monsanto Co.*, 2019 WL 2158266 (Cal.Super. Mar. 18, 2019); *Johnson v Monsanto Co.*, 2018 WL 2324413 (Cal.Super. May 17, 2018) (denying pre-trial preclusion); *Johnson v Monsanto Co.*, 2018 WL 5246323 (Cal.Super. Oct. 22, 2018) (denying Monsanto's post-trial motion to set aside the verdict).

Dr. Sawyer's core role at trial is to explain how Roundup® travels from the bottle to the bones of Roundup® users. Fredona Decl., Ex. 3, Pilliod Tr. at 3183:15-3184:3. ("The bone is a preferential point of distribution...  That's where the [lymphoma] malignancy starts."). In toxicological terminology, this area of study is called Absorption, Distribution, Metabolism, Excretion ("ADME"). Attached to Monsanto's Motion to Exclude Dr. Sawyer, ECF 12793, Ex. 1 *Cervantes* Report, at 88.; *see also* 1/13/2011 Monsanto Email ("Our glyphosate rat ADME study also shows that levels in bone are significantly higher than those in any other tissue/organ.").

- 1 -

Fredona Decl., Ex. 4.  Dr. Sawyer will offer testimony as to the effect of various types of clothing, protective gear and equipment on increasing or decreasing exposure to Roundup®; and how the instructions on the Roundup® label affect the exposure of Plaintiffs. Fredona Decl., Ex. 5-8, *Karman* Report. at 7-19, 176-177; *Pecorelli* Report. at 24-25, 184; *Schafer* Report. at 27, 188-189; *Peterson* Report. at 19, 174-175 *also see,* Monsanto's Ex. 1, Cervantes *Report*. at 5-42 Dr. Sawyer will testify as to the mechanism of carcinogenicity including the relative genotoxicity and promotion activity of both glyphosate and the formulated product (including adjuvants and impurities). Fredona Decl. Ex. 5-8; *Karman* Report. at 177; *Pecorelli* Report. at 28, 185; *Schafer* Report. at 189; *Peterson* Report. at 175; *also see,* Monsanto's Ex. 1, *Cervantes* Report. at 47, 174.

As noted in Plaintiffs' Expert Specific Causation Disclosures, Dr. Sawyer is being offered (in all cases) to:

> ...testify on issues concerning the mechanism of absorption of glyphosate-based formulations through the skin and other exposure pathways, the role of surfactants on dermal absorption, toxicology and animal studies on dermal absorption, including his analysis of the data and the interpretation and methodology related to that data; human exposure studies and data relating to glyphosate-based formulations, and the effect of wearing personal protective equipment on the exposure levels.

Attached to Monsanto's Motion, Ex. 8, Specific Causation Expert Disclosures, in *Cervantes*.

Dr. Sawyer is offering case specific opinions for Gerard Cervantes, John Schafer, James Peterson, Mark Pecorelli, individually and as Representative of the Estate of Michael Pecorelli, deceased and Christine Karman, Individually and as Representative of the Estate of Robert Karman, deceased.  Dr. Sawyer is being offered to  testify regarding Plaintiffs' total exposure to Roundup®, including the comparability of Plaintiff's exposure with the exposure data from applicators in studies on glyphosate-based formulations. For those opinions, he relies either on the exposure calculations of other experts or his own calculations.  The calculations of Roundup® exposure he relies on allows Dr. Sawyer to compare the specific Plaintiff's days of Roundup® use to the epidemiological data showing an increased risk of Non-Hodgkin Lymphoma (NHL).  *In re Roundup Products Liability Litigation* (N.D. Cal., July 12, 2019, No. 16-CV-0525-VC) 2019 WL 3219360, at *1 (Dr. Weisenburger's testimony admissible where he testified that Hardeman's "...exposure levels still far exceeded the threshold used in most of the epidemiological literature,

and specifically the McDuffie and Eriksson studies."). Dr. Sawyer also explains how each Plaintiff is exposed to Roundup® based on the manner in which they spray and the personal protective gear they wear. Fredona Decl., Ex. 5-8 *Karman* Report. at 8; *Pecorelli* Report. at 18; *Schafer* Report. at 22-23; *Peterson* Report. at 13. Monsanto's Ex. 1, *Cervantes* Report. at 15.

Dr. Sawyer's same type of testimony was deemed admissible in *Johnson, Pilliod* and deemed admissible by the Ninth Circuit. In *Whitlock*, the Court held:

> The district court exceeded its gatekeeping function in excluding Dr. Sawyer's testimony that the alleged TCE and chromium exposure levels were "within [a] reasonable range of that known [from several studies] to induce" the alleged injuries. Plaintiffs' alleged exposures were not so low that the occupational studies were irrelevant. Dr. Sawyer's consideration of the heightened sensitivity of children and Plaintiffs' probable ingestion of TCE-contaminated groundwater does not render his opinion inadmissible. Furthermore, Appendix G to the 2004 Public Health Assessment states that "hexavalent chromium releases from 1975–1995[ ] were likely orders of magnitude higher than estimates produced by the air model." Finally, the district court rested its decision in part on an erroneous interpretation of Dr. Sawyer's deposition testimony: He identified 50 µg/m 3, not 300 µg/m 3, as a threshold TCE exposure associated with the effects observed in the Byers study. Because Dr. Sawyer's opinion "rests on a reliable foundation and is relevant to the task at hand," *662 *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786, it is admissible. Whether it proves causation is not a question of admissibility. *See Primiano*, 598 F.3d at 564 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attendtion to the burden of proof, not exclusion.").

*Whitlock v. Pepsi Americas*, 527 Fed. Appx. 660, 661-662 (9th Cir. 2013).

Likewise, here, Dr. Sawyer's opinion that Roundup® exposure was sufficient to cause Plaintiffs' cancer may not satisfy Plaintiffs' burden of proof (in the absence of a full differential etiology), but it is admissible and helpful testimony, particularly where their other experts that have also reviewed Plaintiffs' medical records.

Monsanto's motion should be denied in full, and the jury should be allowed to consider Dr. Sawyer's testimony before reaching its conclusions, as have juries in other Roundup® trials. *See, e.g., Johnson*, 2018 WL 5246323 at *1 (noting that "this case required the jury to resolve the complex scientific question of whether Plaintiff's exposure to GBHs caused his NHL," which it

- 3 -

did with the help of "Dr. Sawyer, a toxicologist, [who] testif[ied] about various aspects of the science underlying GBHs.").

Monsanto is focused almost entirely on opinions that Dr. Sawyer will not be offering. Dr. Sawyer is not being offered as a general causation expert on epidemiology, nor is Dr. Sawyer being offered to conduct a full differential etiology. Where he does provide case-specific opinions, he does so based primarily on the above exposure metric calculations and will offer the opinion that the Plaintiffs' exposure to Roundup® was sufficient to cause NHL. Fredona Decl., Ex. 3, *Pilliod Tr.* at 3241:16-20. ("...I compared their days of exposure to those three studies to determine whether they were in reasonable range -- of those who were studied in the human epidemiology database that showed an increased risk of non-Hodgkin's lymphoma.").

Further, Monsanto makes the same arguments in its Motion regarding Dr. Sawyer in Plaintiffs Gerard Cervantes, John Schafer, James Peterson, Mark Pecorelli, individually and as Representative of the Estate of Michael Pecorelli, deceased and Christine Karman, Individually and as Representative of the Estate of Robert Karman, deceased cases as Monsanto made in motions regarding Dr. Sawyer in Wave One cases and in the Stevick case. Because the germane facts, issues and law are essentially the same in all of Monsanto's motions regarding Dr. Sawyer, Plaintiffs here adopt the Wave One Plaintiffs' Response to Monsanto's Motion to Exclude Testimony of William Sawyer on Daubert Grounds and exhibits thereto (MDL No. 2741 Document 8342), and Plaintiff Stevick's Opposition to Motion to Exclude Testimony of Dr. William Sawyer on Daubert Grounds and exhibits thereto (MDL No. 2741 Document 8692) as his Opposition to Monsanto's Motion in the instant matter.

## II.   Legal Standard

Under Rule 702, reliable Expert opinion testimony has to " 'assist the trier of fact' either 'to understand the evidence' or 'to determine a fact in issue'"; and "the witness has to be sufficiently qualified to render the opinion" *Primiano v. Cook* (9th Cir. 2010) 598 F.3d 558, 563, *as amended (Apr. 27, 2010)*. However, "Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible." *Id.; Pyramid Technologies, Inc. v. Hartford Cas. Ins. Co.* (9th Cir. 2014) 752 F.3d 807, 816. *Whitlock*

- 4 -

*v. Pepsi Americas* (9th Cir. 2013) 527 Fed.Appx. 660, 661–662 ("Because Dr. [William] Sawyer's opinion rests on a reliable foundation and is relevant to the task at hand it is admissible. Whether it proves causation is not a question of admissibility.").

"The relevancy bar is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'" <u>Messick v. Novartis Pharmaceuticals Corp.</u> (9th Cir. 2014) 747 F.3d 1193, 1196; *In re Roundup Products Liability Litigation* (N.D. Cal. 2018) 390 F.Supp.3d 1102, 1152 ("...opinions may be bolstered by Dr. Jameson's narrower opinions regarding glyphosate's ability to cause cancer in animals.") Under California law, one expert is not required to "expressly link together the evidence of substantial factor causation." *Hernandez v. Amcord, Inc.* (2013) 215 Cal.App.4th 659, 675.

It is entirely proper for an expert witness to rely on reports and opinions of other experts, particularly experts as qualified as Dr. Ritz, Dr. Weisenburger and Dr. Portier. *In re Roundup Products Liability Litigation* (N.D. Cal. 2019) 358 F.Supp.3d 956, 959 (...the important point is that these experts will not be repeating the analysis of the general causation experts, but rather relying on them to rule in glyphosate."); *Beck v. Koppers, Inc.,* (N.D. Miss. Feb. 2, 2006) No. 3:03 CV 60 P D, 2006 WL 270260, at *10  ("[Dr. William] Sawyer's dosage and risk assessment testimony (as long as the latter is based on Dahlgren's general causation testimony) meets the threshold requirements of Rule 702. It is undisputed that Sawyer is qualified by his knowledge and education to render his dosage and risk assessment testimony."); *People v. Campos*, (1995) 32 Cal. App. 4th 304, 308, ("the expert witness may state the reasons for his or her opinion, and testify that reports prepared by other experts were a basis for that opinion."); *Asad v. Cont'l Airlines, Inc*., (N.D. Ohio 2004) 314 F. Supp. 2d 726, 741  ("an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts.").; *Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., LLC*, (D. Md. 2012) 858 F. Supp. 2d 505, 512 ("Courts in this circuit and across the country have consistently held that an expert may rely on the work of others when preparing an expert report, particularly when it is the sort of work that is reasonably relied upon by experts in the relevant area of expertise")

- 5 -

1

2

**III. Argument**

    **A.  Dr. Sawyer is not Offering Any General Causation Opinions.**

    During the general causation phase of this litigation the Court held that "plaintiffs need not Establish any particular level of exposure."  *In re Roundup Prod. Liab. Litig*., No. 16-MD-02741-VC, 2018 WL 3368534, at *5 (N.D. Cal. July 10, 2018).  Now that plaintiffs have gotten past the general causation phase, it will be helpful for the jury to understand how various factors such as lack of protective gear; the spraying equipment and the type of surfactant in the Plaintiff's specific formulation affect the exposure routes of glyphosate into the body.

    Even without a general causation opinion, Dr. Sawyer's exposure testimony is proper. Rule 702 "provides that expert testimony is admissible "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." *Avila v. Willits Envtl. Remediation Tr*., 633 F.3d 828, 836 (9th Cir. 2011). The absorption of glyphosate is a fact in issue.  Dr. Sawyer will assist the jury in understanding how GBFs are absorbed through the skin; how much glyphosate is absorbed through the skin; how protective clothing can help limit the exposure to GBFs; and how different equipment can affect exposure. Attached to Monsanto's Motion to Exclude Dr. Sawyer, ECF 12793, as Ex.11 *Cervantes* Dep. at 99:20-102:22. Dr. Sawyer goes over these factors as they apply to all users in great detail in his report. Monsanto's Ex. 1 *Cervantes* Report. at 35. ("Farmers who did not use rubber gloves had five times more glyphosate in their urine than those wearing protective gloves").  This all useful information for the jury to determine how GBFs actually get into the body and how exposure can increase or decrease based on various factors.

    Monsanto makes absurd contentions that Dr. Sawyer did not analyze genotoxicity studies of Roundup® or consider any aspects of animal or cell studies for purposes of determining general causation. Monsanto's Motion to Exclude Dr. Sawyer, ECF 12793, pp. 5, 6.  Monsanto either does not cite to the record for these fabrications (pp.6-7) or completely misleads the Court as to what the citation represents (pp.6-7).  For example, Monsanto cites Sawyer's deposition on Schafer (admitting that he looked at the six epidemiology studies referenced in his report "primarily with respect to dose assessment…I defer to other experts in this case… as I focused primarily on the

- 6 -

dose aspects as opposed to the review of the entire body of animal and human epidemiological studies with respect to general causation.")  (Attached to Monsanto's Motion to Exclude Dr. Sawyer, ECF 12793, Ex. 10. at 21:17-22:1;97:5-12) for the false assertion that Dr. Sawyer didn't evaluate epidemiological studies for purposes of determining causation and not considering animal and mechanistic studies. However, Dr. Sawyer, makes clear that he considers such data as "a prong of Bradford Hill. It's called experimental data. It is one of the many prongs of Bradford Hill, but it is not in itself a standalone means of determining causation." Monsanto's Ex. 1, *Cervantes* Report. at 23; *In re Roundup Products Liability Litigation* (N.D. Cal. 2018) 390 F.Supp.3d 1102, 1127 (animal and mechanistic data are relevant to "the biological plausibility criterion that is part of the Bradford Hill analysis."). Dr. Sawyer specifically states in his report that "[g]enotoxicity is the ability of a chemical to cause damage to genetic information, i.e., the DNA in cells, thereby causing genetic mutations that may lead to cancer" and proceeds to analyze the genotoxicity data for purposes of causation. Monsanto's Ex. 1, *Cervantes* Report. at 59.

### B.  Dr. Sawyer's Case Specific Opinions on Plaintiffs' are Reliable and Admissible.

### i.  Dr. Sawyer Used Proper Methodology in Assessing Specific Causation.

The words "differential diagnosis" are not magic words. *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003), as amended on denial of reh'g (Sept. 25, 2003). What is important is the scientific technique used to form an opinion. Id. at 1058.  While Dr. Sawyer did not use the words "differential diagnosis" in his report, he did confirm that he utilized this methodology reaching his specific opinion on Karman:

> Q. Okay. And, Dr. Sawyer, in your expert opinion, to a reasonable toxicological certainty, was Mr. Karman's exposure to Roundup a significant factor in contributing to his development of non-Hodgkin's lymphoma? A. Yes. Q. And can you explain why? A. The only confounding factor I found was a very slight, at the most 7 percent, increase in risk from the BMI measurement, and his exposure to Roundup placed him, based on the study evidence, in at least a 2.3-fold risk, 200— over 200 percent increase, as opposed to a 7 percent increase from the slightly increased BMI.

Attached to Monsanto's Motion to Exclude Dr. Sawyer, ECF 12793, Ex. 2, Sawyer

*Karman* Dep. at 58:19-59:7. Dr. Sawyer provides similar analysis for all Plaintiffs (stating many years of heavy Roundup® exposure contributed or caused Pecorelli's NHL and ruled out his smoking history and exposure to diazinon. Monsanto's Ex. 13, Sawyer *Pecorelli* Dep. 103:8-104:2; carefully explored to see if any other possible cause for his NHL and was not able to find one; Monsanto's Ex. 11, Sawyer *Cervantes* Dep. 24:4-25:9; opined that Roundup® contributed to his NHL after conducting an interview focused heavily on potential alternative toxicological etiological factors. Monsanto's Ex. 10, Sawyer *Schafer* Dep. 14:10-21; opining Roundup® was a significant contributing factor because Peterson had no other underlying risk factors. Monsanto's Ex. 12, Sawyer *Peterson* Dep. 84:16-24. Based on these differential diagnoses, Dr. Sawyer will opine that Plaintiffs' exposure to Roundup® was sufficient to cause NHL.

Furthermore, Dr. Sawyer reviewed all relevant medical records of all Plaintiffs. Fredona Decl., Ex. 5-8, *Karman* Report. at 11; *Pecorelli* Report. at 13; *Schafer* Report. at 11; *Peterson* Report. at 11. Monsanto's Ex. 1, *Cervantes* Report. at 204. Dr. Sawyer conducted interviews with Plaintiffs (Monsanto's Ex. 1, *Cervantes* Report. at 15; Fredona Decl., Ex 5-8, *Karman* Report. at 17. *Pecorelli* Report. at 20. *Peterson* Report. at 11. *Schafer* Report. at 22.) to get details on their exposure to Roundup® and other carcinogens. Dr. Sawyer also read deposition testimonies. Monsanto's Ex. 1, *Cervantes* Report. at 6. *Karman* Report. at 12. *Pecorelli* Report. at. 13. *Schafer* Report. at 11.

### ii. Dr. Sawyer makes Proper use of Epidemiology Studies to Form his Opinions.

Dr. Sawyer has been trained in epidemiology and he uses epidemiology in his everyday practice. Fredona. Decl., Sawyer CV Ex. 1, 15. In addition, Dr. Sawyer has been qualified to offer epidemiology opinions in the Johnson case and other cases. As noted by Judge Karnow in allowing Dr. Sawyer to testify, "Dr. Sawyer's conclusion was based on Johnson's exposure to glyphosate, the absence of other risk factors in his medical history, animal studies pertaining to glyphosate, and human epidemiological studies pertaining to glyphosate." (*Johnson v Monsanto Co.*, No. CGC-16-550128, 2018 WL 2324413, at *15 (Cal.Super. May 17, 2018)) (emphasis added).

- 8 -

However, here, Dr. Sawyer will only make use of the epidemiology studies as a means of comparing Plaintiffs' dose to the dose in the epidemiology studies. Monsanto's Ex. 10, 12, Sawyer *Schafer* Dep. 31:13-32:14; Sawyer *Peterson* Dep. 32:15-33:6. He will be deferring detailed opinions on the epidemiology studies to epidemiologists. Monsanto's Ex. 10, 12, Sawyer *Schafer* Dep. 43:6-19; Sawyer *Peterson* Dep. 43:8-25.

It is entirely proper for an expert witness to rely on reports and opinions of other experts, particularly experts as qualified as Dr. Riz and Dr. Portier. *Asad v. Cont'l Airlines, Inc*., 314 F. Supp. 2d 726, 741 (N.D. Ohio 2004) ("an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts."). *Beck v. Koppers, Inc.*, No. 3:03 CV 60 P D, 2006 WL 270260, at *10 (N.D. Miss. Feb. 2, 2006) ("[Dr. William] Sawyer's dosage and risk assessment testimony (as long as the latter is based on Dahlgren's general causation testimony) meets the threshold requirements of Rule 702."); *Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs*., LLC, 858 F. Supp. 2d 505, 512 (D. Md. 2012) ("Courts in this circuit and across the country have consistently held that an expert may rely on the work of others when preparing an expert report").

### iii.   Dr. Sawyer's Opinions regarding the Plaintiffs' Exposure to Roundup are Reliable and Admissible.

Dr. Sawyer "will not be repeating the analysis of the general causation experts" at trial. *In re Roundup Products Liability Litigation* (N.D. Cal. 2019) 358 F.Supp.3d 956, 959. However, relying upon the detailed assessment of the epidemiology by Drs. Ritz, Portier and Weisenburger, Dr. Sawyer is qualified to and will testify that the Roundup® exposure of the Plaintiffs is sufficient to cause NHL[1] consistent with the epidemiological literature. In *Pilliod*, Judge Smith held that "Sawyer may provide testimony on specific causation, including rates of absorption, the effects of

---

[1] Dr. Sawyer is also qualified to discuss latency. He does more than simply list studies and his opinion was thoroughly explored in the Johnson trial. Johnson Tr. at 3675-3678 (Fredona Decl. Ex. 2 ) ("Yeah. I have -- for many years, have searched the literature and have kept track of latencies for different cancers."); *Id.* at 3764-3781

protective gear, and the estimated doses received by the Pilliods. ... Sawyer may testify even if he does not analyze other potential causes of NHL." *Pilliod v. Monsanto Co.*, 2019 WL 2158266, at *4 (Cal.Super.)

Defendants' conflate the issues of admissibility of evidence with the Plaintiffs' burden of proof. Expert opinions are admissible even if it goes to only one aspect of the evidence that the jury must consider in coming to a verdict.   In *Hernandez v. Amcord, Inc.*, a trial court excluded an expert who testified that a Plaintiffs' exposure to asbestos was sufficient to cause his case without making the ultimate conclusion that it was a legal cause of his cancer, where another medical expert did provide that opinion. 215 Cal. App. 4th 659, 674 (2013).  The Appeals Court reversed holding that there is no requirement "that a medical doctor must expressly link together the evidence of substantial factor causation." *Id*.

Dr. Sawyer's same type of testimony was deemed admissible in *Johnson, Pilliod* and deemed admissible by the Ninth Circuit. In *Whitlock,* the Court held:

> [T]he district court exceeded its gatekeeping function in excluding Dr. Sawyer's testimony that the alleged TCE and chromium exposure levels were "within [a] reasonable range of that known [from several studies] to induce" the alleged injuries. Plaintiffs' alleged exposures were not so low that the occupational studies were irrelevant. Because Dr. Sawyer's opinion "rests on a reliable foundation and is relevant to the task at hand,.., it is admissible. Whether it proves causation is not a question of admissibility.

527 F. App'x at 661. Likewise, here, Dr. Sawyer's opinion that Roundup® exposure is sufficient to cause Plaintiffs' cancer may not satisfy Plaintiffs' burden of proof (in the absence of a full differential etiology), but it is admissible and helpful testimony, particularly where other experts have reviewed the medical records.

It is appropriate for Dr. Sawyer to rely upon the detailed assessment of epidemiology by Drs. Ritz, Portier and Weisenburger particularly where he has his own experience in biostatics and epidemiology.  As Dr. Sawyer notes, "I've been trained in using epidemiological studies as a toxicologist for 34 years. I've even taught a portion of the epidemiology course at the State University of New York, Upstate Medical Center" Monsanto's Ex. 12, Sawyer *Peterson* Dep. 42:25-43:25 In *Pilliod*, Sawyer was permitted to "rely on epidemiology studies even if he is not

- 10 -

an epidemiologist." 2019 WL 2158266, at *4.

Although Sawyer is not conducting a full differential etiology in the Wave 2 cases, he is qualified to testify as to whether other potential chemical exposures may have contributed to the Plaintiffs' NHL where he has conducted that analysis. Dr. Sawyer is a very experienced toxicologist and has testified extensively in toxic exposure cases. Fredona Decl., Ex.10, *Stevick Dep.* 106:7-108:21 ("... these are chemicals I'm familiar with. I've testified on a WD-40 case. I know the ingredients in it. I know the ingredients in GUNK...  I identified nothing that contained any significant concentration of benzene that could raise the air level to even a measurable level..."); Fredona Decl., Ex. 9,  Sawyer Aff. at ¶¶ 33-37. Dr. Sawyer's testimony will assist the jury where Monsanto tries to shift blame to other products for the Plaintiffs' NHL.

In arguing that Dr. Sawyer cannot testify about the Plaintiffs' exposure days, Defendants conflate the concept of "a factual basis" with the concept of an "expert opinion".  The number of days and hours that the Pilliods was exposed to GBHs does not constitute an opinion, but rather constitutes a factual basis to support Dr. Sawyer's opinions.  Although the jury can count up the days and hours the Pilliods used GBHs, it is still incumbent upon Dr. Sawyer to relate this factual basis to the jury and explain how it supports his opinions.  *Owens v. Republic of Sudan*, 864 F.3d 751, 790 (D.C. Cir. 2017)  ("For their conclusions to be admissible and credible, the plaintiffs' experts needed to disclose the factual basis for their opinions.").

The epidemiological studies are not consistent nor well-described in their methodology when using days of exposure and expert testimony will be helpful to explain how to compare the Plaintiffs' exposure to the epidemiological studies. Having Dr. Sawyer guide the jury through the nuances inherent in the different epidemiology studies will only aid the jury in understanding each study's characteristics. The following line of questioning reveals that certain studies may not be what they appear at first glance:

> Q. And when we're comparing apples to apples, we need to compare the exposure dates of the Pilliods to the exposure days in epidemiology studies, correct?
> A. Yes.
> Q. But it is true that the Eriksson study does not give us any information on the actual amount applied by the individuals who were studied in the Eriksson study, right?

- 11 -

A. That's right.

Q. Okay. And so a farmer, for instance, could apply glyphosate once a month, but he could apply dozens of gallons of Roundup in one full-day application over a field, right?

A. Right.

Q. And those applicators, this hypothetical farmer I mentioned, would have applied for a matter of hours continuously as opposed to spot spraying for a single hour, right?

A. That's right.

Q. And they would be -- potentially be exposed to a much greater volume of Roundup than the plaintiffs in this matter, right?

A. No. Actually, that's not true, and I can pull out the studies right now and show you. The tractor-mounted sprayer, farmers putting down 150 gallons covering 500 acres or whatever, their daily dose is not much different than that of a backpack sprayer.

Fredona Decl., Ex. 11, *Pilliod* Dep. at 238. In fact, Dr. Sawyer explained that "[y]ou could actually have a professional applicator working seven hours -- and I could show the tables -- with lower exposure than that of a --that is, if that person is wearing PPE -- a lower exposure than a home gardener working for one hour." *Id.* at 242. At trial, Dr. Sawyer will explain how the studies generally apply exposure days; and as illustrated at Dr. Sawyer's last deposition (for a different plaintiff) he explained how the epidemiology assesses exposure days. *Id.*

Monsanto criticizes Dr. Sawyer for not calculating a numerical dose of glyphosate exposure for most Plaintiffs in terms of mg/kg of glyphosate circulating in the body. However, a dose calculation is not really helpful because there is no threshold dose identified in human studies where Roundup® is shown to cause cancer. Fredona Decl., Ex. 10, *Stevick* Dep. at 231:7-233:10. (Explaining that calculating exposure days is more reliable because "[t]here's no -- no such dose calculations performed in the human studies in a -- in a milligram per kilogram body weight per day on -- on a day of exposure". Furthermore, it is well-recognized that "While 'precise information concerning the exposure necessary to cause specific harm [is] beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic ... and need not invariably provide the basis for an expert's opinion on causation.'" *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1060 (9th Cir. 2003), as amended on denial of reh'g (Sept. 25, 2003) (quoting *Westberry v. Gislaved Gummi AB,* (4th Cir. 1999)178 F.3d 257, 264; *Wright v. Willamette Indus., Inc.*, (8th Cir. 1996) 91 F.3d 1105, 1107 ("We do not require a mathematically precise table equating levels of exposure with levels of harm, but there must be evidence from which a

- 12 -

reasonable person could conclude that a defendant's emission has probably caused a particular plaintiff the kind of harm of which he or she complains..."); *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 157 (3d Cir. 1999) ("...even absent hard evidence of the level of exposure to the chemical in question, a medical expert could offer an opinion that the chemical caused plaintiff's illness.").

While Dr. Sawyer has calculated doses in mg/kg for previous cases, those doses were not presented to the jury.  The parties even stipulated that such dose calculations were unnecessary in the Johnson trial agreeing to the following:

1. Dr. Sawyer will not reference the California No Significant Risk Level or utilize the cancer slope factor in support of his opinions;
2. Neither party will reference argue, or offer testimony about reference doses derived from or used by domestic or foreign regulatory agencies;
3. Neither party will reference, argue or offer testimony that Mr. Johnson's dose/exposure is below or above any threshold reference dose derived from animal studies or regulatory agencies;
4. Plaintiff may question Dr. Sawyer regarding the meaning of the U.S. EPA's reference dose of 2 mg/kg/day as referenced in Dr. Farmer's testimony to explain it addresses toxicity and not carcinogenicity

Fredona Decl., Ex. 12, *Johnson* trial stipulation.   The only use for calculating mg/kg doses is to conduct comparative analyses of how various protective gear, equipment, and spraying methods affect the dose.

**C.  Dr. Sawyer May Rely on the George Study.**

Monsanto additionally argues that Dr. Sawyer should be precluded from testifying about the George tumor promotion study. Monsanto's Ex. 15, George, J., et al. "Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach," 2010, Journal of Proteomics, Vol. 73, pg. 951 - 964. Monsanto made identical arguments in *Johnson* when seeking to overturn the jury's verdict and secure a new trial, to no avail. *See Johnson v. Monsanto*, Memorandum of Points and Authorities in Support of Defendant Monsanto Company's Motion for New Trial, 2018 WL 4904750, at *15 (Cal.Super., Sept. 18, 2018); 2018 WL 4904751, at *7 (Cal.Super., Sept. 18, 2018) (both citing the plaintiff's reliance on the George study as a basis for disturbing the jury's finding,

- 13 -

1

2   which the court ultimately rejected when upholding the verdict).   Dr. Sawyer's report explains the relevance of the George study in detail, specifically:

3

4

5   > In the carcinogenicity study, George, J., et al., (2010), glyphosate was demonstrated to have strong tumor-promoting activity. The study documented carcinogenic effects of glyphosate using a 2-stage mouse skin carcinogenesis model and proteomic analysis. The commercial formulation of Roundup Original (glyphosate 41%, POEA = 5%, Monsanto Company, St. Louis, MO, USA) was topically applied to the skin of mice with a body weight of 12-15 g. The glyphosate dose was 25 mg/kg body weight and was applied either two or three times per week . . . .

6

7

8   > The study demonstrated, to within 95% certainty, the carcinogenic potential of glyphosate as a powerful promoter in a 2-stage promotion model. The authors concluded in their results section that "These results clearly indicate significant tumor promoting potential of glyphosate in mouse skin model of carcinogenesis."

9

10  Monsanto's Ex.1, *Cervantes* Report. at 52-53. Dr. Sawyer goes on to apply an allometric

11  scaling method to convert the dose from the animals studies in George to humans. *Id.*, which

12  establishes that "the relatively low dermal exposure doses in mice[,] when converted to human doses,

13  are reasonably similar to that sustained by applicators (when applying the HED factor and dermal

14  absorption rate of 3%)," such as the Plaintiffs. *Id.* at 36.

15      Dr. Portier also relies upon the George study and explained why IARC would not generally

16  consider an initiator promotor study in the animal carcinogenicity section. Fredona Decl. Ex. 2,

17  *Johnson* Tr. at 1858:22-1865:9 ("they typically don't use initiation promotion studies, especially if

18  they have good two-year cancer studies because a two-year cancer study is more definitive.") Dr.

19  Portier further discussed where he disagreed with IARC's analysis of the study and confirmed that

20  IARC did consider George to show that Roundup® can act as a tumor promotor.  *Id.* at 1865:13-16.

21  Dr. Sawyer also explained that this was not a study that would be used by IARC in the animal

22  carcinogenicity section because it looks at tumor promotion not initiation. Fredona Decl., Ex. 3,

23  *Pilliod* Tr. at 3285:9-21.  IARC specifically points out in its summary of the glyphosate evaluation

24  that "A glyphosate formulation promoted skin tumours in an initiation-promotion study in mice."

25  Fredona. Decl., Ex. 13. The ATSDR likewise concluded that the George study "indicate[s] that the

26  glyphosate formulation functioned as a tumor promoter, but not a tumor initiator or complete

27  carcinogen."  Fredona Decl., Ex. 14. The CLH analysis (like the EPA) cited by Monsanto evaluated

28

- 14 -

only pure glyphosate and thus could not consider the George study because it "was performed with a commercial product that most likely contains irritating co-formulants." Monsanto's Ex. 23, p. 66.  Dr. Sawyer disagrees that there was inadequate control groups treated with solvent. Fredona Decl., Ex. 9, Sawyer Aff. at ¶¶ 51-61 (explaining that five groups which included solvent showed no tumors). Furthermore, the solvent in George is used commonly in toxicology studies and is not a tumor promoter.  *Id.* at ¶ 51.  Dr. Portier concurs stating "I think their controls were adequate in the study." Fredona Decl., Ex. 2, *Johnson* Tr. at 1864:11-13

### D.  Dr. Sawyer's Testimony Regarding Other Carcinogens in Roundup is Admissible.

Monsanto asks the court to preclude Dr. Sawyer from testifying that Roundup® contained "trace" chemicals that may have contributed to Plaintiffs' NHL. Monsanto's request is unavailing. Dr. Sawyer's consideration of Roundup® and other GBHs' entire chemical makeup is not only appropriate, but necessary in evaluating whether Plaintiffs were exposed to known or suspected carcinogens. Such an analysis may also explain the greater carcinogenicity shown in studies of the completed Roundup® product than in studies of glyphosate alone. To that end, Dr. Sawyer lists and describes the chemicals known to be present in Roundup® in various years of use, *Cervantes Report. at. 49-51*, including several known carcinogens: formaldehyde, ethylene oxide, and n-nitroso. *Id..* Dr. Sawyer will testify that while these carcinogens may not be sufficient alone to cause cancer, "the rule is in toxicology and even under EPA policy, that regardless of the concentration of the carcinogen, they are all additive in terms of their effect." Ex. 3 *Pilliod* Tr. at 3133:3-11.

"[G]enerally recognized carcinogens with similar target endpoints (hematopoietic cancers) are, by definition, additive and should be considered in the overall carcinogen assessment of a product." Monsanto's Ex. 1, *Cervantes* Rep. at 50-51. The presence of known carcinogens in Roundup® – despite Monsanto's failure to list these substances in its labeling, *id.* – "*requires* toxicological consideration." *Id.* (emphasis added). Dr. Sawyer's consideration of trace chemicals follows the EPA's "well-defined guidance on the manner in which additive effects are required to be assessed," *id.* which, far from being a "novel" theory, falls well within "established [] carcinogenic assessment methodology." *Id.* His analysis is thus relevant, reliable, and will assist the jury in evaluating causation.

- 15 -

Dr. Sawyer obviously did not tell the jury in *Pilliod* "that trace ingredients in Roundup could kill a person upon opening the Roundup bottle." However, ethylene oxide is a serious and dangerous impurity in the Roundup® surfactants. IARC labels it a class 1 carcinogen[2] capable of causing NHL. As noted by Dr. Sawyer:

> Ethylene Oxide is a carcinogenic and mutagenic gas. It is classified by both U.S. EPA and by IARC as a human carcinogen by inhalation. Studies show that exposures to ethylene oxide are associated with an increased risk of cancers of white blood cells. Ethylene oxide was identified by Monsanto as being present in Roundup as long ago as 2000 (per Safety Data Sheet) noting that ethylene oxide accumulates in the top ("headspace") of product containers and can be inhaled when the lid is removed.
> s

Fredona Decl., Ex. 9, Sawyer Aff. at ¶¶ 67-69.

### E. Dr. Sawyer May Rely on and Explain Technical Details Contained in Internal Monsanto Documents.

Plaintiff agrees that Dr. Sawyer will not testify about the intent or state of mind of Monsanto, but Dr. Sawyer will rely upon and discuss the scientific findings, opinions and data contained in internal Monsanto documents. Experts may rely and discuss corporate documents if the documents are relevant to their opinions. *In re Seroquel Prod. Liab. Litig.*, (M.D. Fla. July 20, 2009)No. 6:06-MD-1769-ORL-22D, 2009 WL 3806436, at \*4 ("The Court determines that [experts] may appropriately rely on and discuss AstraZeneca's internal corporate documents for the specific purposes identified by Plaintiffs in their response to the motion."). Also, there is "nothing particularly unusual, or incorrect, in a procedure of letting a witness relate pertinent information in a narrative form as long as it stays within the bounds of pertinency and materiality." *In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Prod. Liab. Litig.,* 2011 WL 6302287, at \*18 (S.D. Ill. Dec. 16, 2011) (internal citations omitted) (rejecting argument that regulatory experts review of corporate emails "does not require the "specialized knowledge"

---

[2] https://monographs.iarc
.fr/wp-content/uploads/2018/06/mono100F-28.pdf.

- 16 -

contemplated by Rule 702, but rather is mere advocacy on plaintiff's behalf."). Unfortunately, Monsanto has a corporate policy not to publish or publicize unfavorable data or scientific opinions on glyphosate.  Therefore, much of the scientific data and opinions of Monsanto scientists and consultants are contained only in internal Monsanto documents and emails.  It is also entirely proper to apply one's expertise in a field to provide proper context to corporate emails and memoranda.  *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir.1998) ("He could give an opinion as an engineer that reducing the padding saved a particular amount of money; he might testify as an engineer that GM's explanation for the decision was not sound (from which the jury might infer that money was the real reason); but he could not testify as an expert that GM had a particular motive.").*See,* e.g., *United Food & v. Teikoku Pharma* USA, (N.D. Cal. Nov. 3, 2017) 2017 WL 5068533, at *25 (expert could opine as to what a reasonable company in the defendant's position would have done based on his understanding of the facts and in light of the record evidence he reviewed).

The emails cited by Dr. Sawyer are filled with technical knowledge that would not be easily comprehended by a lay juror.  For example, the following email would not be easily understood without an understanding of the terms: uncertainty factors, risk assessment, biomonitoring, pharmacokinetics, IV experiment, and topical in vivo:

> "Even though we can absorb additional 'uncertainty factors' in our risk assessment based on our biomonitoring results, I feel uncomfortable with this discussion. This approach by Spain sets a precedent and contradicts the fact that we always claimed to fully understand the glyphosate pharmacokinetics…" *Cervantes* Report. at 44. "The Wester IV experiment suggests that almost the entire 'systemically' available dose was excreted in urine. The low dose topical in vivo experiment suggests that almost the entire dose (82%) that was absorbed through the skin was excreted in feces ..." *Id.* at 146.

 Fredona Decl., Ex. 4, Monsanto Email;  Fredona Decl., Ex. 3, *Pilliod* Tr. at 3212-3220.

Furthermore, Dr. Sawyer will not be offering regulatory opinions or opine about labeling requirements. However, he can testify how the instructions on the label for protective gear increase or decrease exposure. Ex. 3, *Pilliod* Tr. at 3093-3104.  As noted by Judge Smith, Dr. Sawyer's

- 17 -

reference to the Roundup® label was relevant and admissible because "to the extent that the label is an issue, it's that it did not tell them to wear protective gear and they didn't wear protective gear...And therefore they were exposed to the Roundup® when they were spraying and they absorbed here, there, and other..." *Id.* at 3093-3094.

**IV. Conclusion**

      For the aforementioned reason, Monsanto's Motion to Exclude Dr. Sawyer should be denied.

Dated:  April 2, 2021

Respectfully Submitted,

By:    /s/Rebecca Fredona
          Ken Moll
          Rebecca Fredona
          Fatima Abuzerr
          **MOLL LAW GROUP**
          22 W Washington St
          15th Floor
          Chicago, IL 60602
          T: 312.462.1700
          F: 312.756.0045
          rfredona@molllawgroup.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 2nd day of April, 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.


*/s/Rebecca Fredona*