# Exhibit 7

Schafer v. Monsanto
January 22, 2021
Page 11

**Family Medical History**

Mr. Schafer's sister was diagnosed with breast cancer in 2017.[15] An extensive family history of hypothyroidism is noted.[16] His mother and father were reported to have had cardiac disorders.[17]

**History of Tobacco, Alcohol and Drug Use**

Mr. Schafer denies alcohol use following 1997[18] and seldom drank prior to that. He has no history of illicit drug use and denies ever having so engaged.

He does not use tobacco.[19] However, one medical record lists him as only smoking *"on occasion"*[20] but this notation appears in only one record; no other entries in similar records repeat this remark.

In deposition, Mr. Schafer clarified that he might puff on a cigar presented to him by a colleague after the birth of a baby or similar occasions of this sort, but he did not personally enjoy smoking and never engaged in it.[21] He further noted in deposition that he smoked a cigar *"*Maybe once every couple of years, twice.*"*[22] The balance of his medical records lists him as a *"*never smoker.*"* During interview, Mr. Schafer confirmed that he smoked far less than 100 cigars during his lifetime. (The CDC definition of a lifetime non-smoker is 100).

**Employment History**

Early in his life, Mr. Schafer worked from approximately 1973 to 1974 in the Merchant Marine as a *"coal passer."* This job entailed shoveling coal into a four-door furnace, cleaning up, swabbing decks and eliminating chipped paint. Although episodically exposed to coal fumes, he reported no ill effects. He stated in deposition that, to the best of his knowledge, he had not been exposed to other potentially confounding substances.[23]

---

[15] Plaintiff Fact Sheet, p. 3.
[16] Antelope Valley Medical Center, p. 42 of 275.
[17] Dupage Medical Center, p. 25 of 396.
[18] Deposition of John Schafer, November 19, 2019, p. 230.
[19] Dupage Medical Center, p. 5 of 396.
[20] Antelope Valley Medical Center, p. 47 of 275.
[21] Deposition of John Schafer, November 19, 2019, p. 111.
[22] Id., p. 230.
[23] Deposition of John Schafer, November 19, 2019, pp. 102-107.

Schafer v. Monsanto
January 22, 2021
Page 22

chemicals or hazardous substances capable of inducing toxic exposures. His answers were consistently "no."

Regarding past medical history, Mr. Schafer stated in interview that he had one episode of atrial fibrillation prior to his NHL diagnosis. This occurred approximately five years ago when he changed from brand name natural Synthroid (treats hypothyroidism) to a synthetic generic version. Mr. Schafer stated that his chemotherapy treatments have since exacerbated his atrial fibrillation.

Mr. Schafer stated in interview that during his high school years up until about age 45, he weighed approximately 160 pounds. After age 45, his weight increased to between 185 and 190 pounds and in 2005, his weight was up to between 230 and 240 pounds. He now exercises regularly and weighs approximately 223 pounds. His height is approximately 6'1.

With respect to his alcohol consumption history, Mr. Schafer stated that up until 1997, he drank socially. In 1997, he encountered the horse riding accident and suffered a severe, closed head injury. He was instructed not to consume any alcohol due to the pharmaceuticals he was placed on. Now he only occasionally drinks a beer or glass of wine. He has never used any drugs-of-abuse and although he attempted cigarettes in high school, he did not tolerate the odor or continue. He stated that he may have smoked a cigar if offered on special occasions but stated that he definitely has smoked less than 100 cigarettes/cigars in his lifetime. (*Note that this is the definition of a non-smoker per U.S. CDC guidelines.*).

Mr. Schafer stated in interview that during his time in the Merchant Marine, he worked on iron ore ships crossing the Great Lakes. On the last ship upon which he worked, he shoveled anthracite coal into the ship's boiler. He also once had to clean a heat exchanger using an air gun. Although he wore no masks or respirators, Mr. Schafer reported no ill effects or toxic exposures.

As Mr. Schafer typically bathed in the mornings, he had 12+ hours of dermal exposure from the use of Roundup before cleaning up with soap and water. At times, his wife even told him that she could smell the Roundup on him. In 2016, however, his neighbor told him that Roundup was a dangerous chemical and after that, he wore rubber gloves and would wash his hands with soap after spraying. Mr. Schafer reported that he typically wore shorts, a t-shirt and sandals and often walked through the weeds as he sprayed. After his neighbor told him about Roundup's potential danger in 2016, he started wearing

yellow Playtex gloves, gym shoes with ankle socks, long sleeves and pants when spraying.

Mr. Schafer provided the following application details according to each property:

1.           **, Illinois** (1985)

    He applied Roundup twice in 1985: once in April/May and again in September/October around the time of the last lawn cutting. It took him 1.5-2 hours to spray each time. He also spot-sprayed once or twice per month as needed during the summer for short five minute bursts.

2.           **, AZ** (Spring 1986 until 8/1988)

    The growing season here was June through August. As at the Westmont property, he sprayed twice per year (May and September) for 1.5-2 hours. He also spot-sprayed once or twice per month for 10-15 minutes at a time. There was also a ravine at this property that he sprayed twice a year for approximately 30 minutes.

3.           **, CA** (6/1989 through fall 1994)

    He sprayed here in March and September/October for 1.5-2 hours and again spot-sprayed once or twice per month for 5 to 10 minutes each time.

4.           **, CA** (1995 through fall 1998)

    During 1995 and 1996, Mr. Schafer sprayed this 2.5-acre property for 2.5-3 hours each spring and fall (March and October) and spot-sprayed once per month in between. He sprayed 1/4 of the property for 1.5 hours each week during the months of April through September. In 1997, he sustained a head injury, and he does not recall having sprayed Roundup in 1997-1999. His wife reported that he did spray sporadically during this time period "because he was bored," but since it cannot be quantified, it is not included in his exposure. He reported that it was especially windy in Antelope Valley; he experienced constant wind in California.

5.           **, CA** (1999 through 2005 and 2010)

    He spot-sprayed once or twice per month, March through September, for 5 minutes each time. They had a gardener here.

6.           **, IL** (2007 through 2017)

    He sprayed twice in 2007, spring and fall, for 3 to 4 hours each time. He also spot-sprayed twice a month March through September for 2 hours each time. From

> 2008 through 2011, it took him 2.5-3 hours for the spring and fall sprayings and he spot sprayed 1-2 times per month for 30 minutes to an hour.

In a follow-up telephone interview on January 20, 2021, Mr. Schafer confirmed the aforementioned details regarding the frequency and duration of his Roundup spraying. This information is summarized herein in the exposure day calculation section.

In his deposition, Mr. Schafer testified that he used one "extended use" Roundup product in the spring and fall, and another "regular" Roundup product for spot spraying during the summertime.[57] Although he referred to these as two different products (weed killer, weed and grass killer), Mr. Schafer and his wife clarified during interview that they were the same product but were sold in different spray containers. He started using the Extended Control Roundup, which was a different product that lasted longer, in approximately 2007 at the Roseville property.

**Roundup Product Applied**

Mr. Schafer always purchased and applied the Roundup® "Ready-to-Use" products.[58] He did not purchase or use concentrates and thus, did not engage in mixing. He especially preferred the "Pump 'N Go 2" product package after "they put … an extended wand sprayer…" on it.[59] This product is still available as shown in **Figure 10;** he last purchased the product, shown in **Figure 11,** in September 2017. Monsanto's list of *"Active Ingredients"* as it appears on the product label is highlighted in **Figure 12**. He typically used this product for his twice-per-year applications – once in the spring and once in the fall.

---

[57] Deposition of John Schafer, November 19, 2019, pp. 152, 156-157.
[58] Id., p. 153.
[59] Id., p. 163.

Schafer v. Monsanto
January 22, 2021
Page 25

 

**Figure 10: Roundup® "Pump 'N Go 2"**[60]     **Figure 11: Mr. Schafer's last Roundup® purchase**

```
ACTIVE INGREDIENTS:
Glyphosate, isopropylamine salt†..................... 2.0%
Pelargonic acid and related fatty acids.............. 2.0%
OTHER INGREDIENTS ................................... 96.0%
TOTAL ............................................... 100.0%
†Contains 0.1 lbs. glyphosate acid equivalent per US gallon.
```

**Figure 12: Chemical Composition of Roundup® "Pump 'N Go 2"**

---

[60] As presented by Walmart Corp., Dec 12, 2020, https://www.walmart.com/ip/Roundup-Ready-To-Use-Weed-amp-Grass-Killer-III-with-Pump-N-Go-2-Sprayer-1-33-gal/16911856

Schafer v. Monsanto
January 22, 2021
Page 26

For spot-spraying throughout the summer, Mr. Schafer generally used premixed Roundup[61] that he purchased in a Windex-type spray bottle.[62] In approximately 2007,[63] he began using Extended Control Roundup®, which is pictured in its current packaging below in **Figure 13**. The Extended Control Roundup kept the weeds down for about six months so he didn't need to spray as often.[64]



**Figure 13.**

**Figure 14.**

---

[61] He reported in his interview on January 20, 2021 that it was the same Roundup weed killer, but it came in a smaller container.

[62] Telephone interview of January 20, 2021.

[63] Deposition of John Schafer, November 19, 2019, p. 193.

[64] Telephone interview on January 20, 2021.

Schafer v. Monsanto
January 22, 2021
Page 27

**Personal Protective Equipment (PPE)**

Mr. Schafer stated that until about 2015-16, he did not wear any personal protective equipment (PPE) during his Roundup® applications. "I didn't wear any protective equipment because the commercials showed all of the people using the product; they were in their shorts, they didn't have any protective gloves, any protective gear at all, so I assumed it was safe based on the depiction in the commercial."[65]

Mr. Schafer reported in deposition that in approximately 2015-16, he began wearing rubber gloves during his spray applications. He did this because a local farmer advised him to do so. He also attended a Monsanto presentation during the same interval and testified in deposition that the Monsanto presentation conveyed the impression that the Roundup® product was safe and that he should not be concerned.[66]

Nevertheless, he continued to wear rubber gloves thereafter as he remained concerned about the potential causal relationships as noted in some online news articles.

Mrs. Schafer also insisted that, following his spray applications, he begin scrupulously washing himself and his clothing. Mr. Schafer further noted in deposition that he was somewhat reassured that Roundup® may not be a causative factor in inducing renal carcinoma when the U.S. EPA disclosed a statement to the effect that glyphosate was not deemed to be carcinogenic.[67]

As noted, all of these statements regarding his PPE were provided by Mr. Schafer in deposition testimony. All of these aforementioned facts were individually confirmed during Mr. Schafer's personal interview of December 14, 2020. Mrs. Schafer further noted that she made it a point to remind her husband to wash himself and his clothing immediately after spraying.

Mr. Schafer further clarified in his interview that he typically wore shorts, a t-shirt and sandals and often walked through the weeds as he sprayed. After the farmer told him about Roundup's potential danger in 2016, he started wearing yellow Playtex gloves, gym shoes with ankle socks, long sleeves and pants when spraying.

---

[65] Deposition of John Schafer, November 19, 2019, p. 175.
[66] Id., pp. 196-199.
[67] Id., pp. 276-277.

Schafer v. Monsanto
January 22, 2021
Page 188

**Evidential Considerations**

The following evidential factors are useful in formulating an objective toxicological assessment of Mr. Schafer with regard to his Roundup® exposures and subsequent NHL diagnosis:

- **Diagnosis:** Mr. Schafer's pathology report provides a clinical diagnosis, "pathology showed high grade follicular lymphoma (Grade 3A) with transformation to diffuse large B-cell lymphoma (DBLCL) as of March 2019. DLBCL is an aggressive, fast-growing form of NHL (non-Hodgkin's lymphoma). The disease affects B-lymphocytes, a white blood cell that manufactures antibodies to fight infections (an important part of the lymphatic system). DLBCL is the most prevalent form of NHL and also is the most common form of NHL associated with Roundup exposures.

- **Prolonged Acute Exposure and Absorption:** For approximately 33 years Mr. Schafer applied ready-to-use containers of Roundup with built-in sprayers that sometimes dripped Roundup on his hands. He was also exposed to drift from winds. He clarified in interview that he typically wore shorts, a t-shirt and sandals and often walked through the weeds as he sprayed.  Mr. Schafer typically bathed in the mornings, he had 12+ hours of dermal exposure before bathing with soap and water. After his farmer/neighbor told him about Roundup's potential danger in 2016, he started wearing yellow Playtex gloves, gym shoes with ankle socks, long sleeves and pants when spraying.

- **Chronic Glyphosate Exposure:** While applying Roundup®, Mr. Schafer wore only a t-shirt or tank top, shorts, webbed or permeable cloth tennis shoes and ankle socks. He stated in deposition, "I didn't wear any protective equipment because the commercials showed all of the people using the product, they were in their shorts, they didn't have any protective gloves, any protective gear at all, so I assumed it was safe based on the depiction in the commercial."[416]

- **Dermal Absorption Rates Higher than Presented by Monsanto**:  As previously discussed in great detail, the correct dermal absorption rate for glyphosate ranges between 3% and greater (as opposed to the defective values recently issued by Monsanto's contractor, DTL Laboratory). Additionally, numerous other factors are known to increase skin absorption of glyphosate including (but not limited to) elevated temperatures, continuing to wear herbicide-soaked clothing and gloves, sweating (which contributes to increased skin absorption) and cracked skin as well as the

---

[416] Deposition of John Schafer, November 19, 2019, pg. 175.

Schafer v. Monsanto
January 22, 2021
Page 189

various surfactants formulated in the actual Roundup products (as most of the dermal absorption studies were performed on pure glyphosate without the additives).

**Lack of Personal Protective Equipment (PPE):** Mr. Schafer was not instructed via the product label to wear personal protective equipment such as impermeable pants, boots, mask, long sleeve shirt, face shield, *chemically-resistant* gloves, etc. He believed Roundup® was "safe" to use for many reasons and proceeded accordingly. Notably, Monsanto employees (in the previously referenced study) were protected with PPE on all exposed body areas during their own dermal exposure testing procedures, but consumers are not protected because the product label provides no such instructions.[417] (Even though the Monsanto research study and report recommended multiple warnings with respect to PPE.)

- **Mechanism of Carcinogenicity:** Mr. Schafer's exposures are to Roundup® product, not to glyphosate alone. Roundup® and glyphosate have been demonstrated in several studies to repeatedly cause DNA damage with promotion by Roundup® being more damaging than glyphosate alone. Genotoxicity is the <u>first stage</u> in cancer formation. Wozniak, et al.,[418] and other studies as referenced in this report further demonstrated that Roundup®, at a higher dose, was even able to impede the natural repair of damaged DNA.

The George, et al., study[419] documented cancer promotion at relatively low dermal exposure doses in mice. The dose levels, when converted to human doses, are reasonably similar to that sustained by applicators (when applying the HED factor and dermal absorption rate of 3%). More importantly, the test model employed DMBA (as found in cigarette smoke/tar). This primary carcinogen was dermally applied at low doses on the shaved skin of mice with no tumors produced unless glyphosate was also applied to the skin in which case 40% of the animals developed tumors (2.8 tumors per animal). The mechanism of glyphosate carcinogenesis is important with respect to tumor promotion among smokers prior to the onset of NHL. The George study reveals substantial promotion (40% of the mice with tumors) with realistic concentrations of glyphosate as compared to that of applicators using HED methodology.

---

[417] Some later labels included recommendation of gloves during mixing.

[418] Wozniak, E., et al., "The mechanism of DNA damage induced by Roundup 360 PLUS, glyphosate and AMPA in human peripheral blood mononuclear cells – genotoxic risk assessment," 2018, Food and Chemical Toxicology, doi: 10.1016/j.fct.2018.07.035

[419] George, J., et al., "Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach," 2010, Journal of Proteomics, Vol. 73, pp. 951 – 964.