# EXHIBIT 5

Estate of Robert Karman v. Monsanto
January 22, 2021
Page 7

The POEM methodology has been peer-reviewed, generally-accepted, used internationally, and tested with a known rate of error as published within the seven studies footnoted below.[2]

Hence, this toxicological assessment has four fundamental objectives: (1) to arrive at a scientifically-reliable exposure dose estimation for Mr. Karman (*in units of 8-hour time-weighted exposure days*) based upon the available objective evidence, (2) to assess the potential of toxicological confounding risk factors contributing to his NHL onset, (3) to provide a general causation assessment of personal protective gear (PPE), product formulation, toxicological factors such as absorption, distribution, metabolism and excretion (ADME) and mechanism of action of Roundup® and (4) to render a scientifically-supported and reliable opinion as to whether Mr. Karman's Roundup® exposures (dose) were sufficiently above the thresholds within the peer-reviewed studies to substantially contribute to the development of his NHL.

## 2. Plaintiff Background Summary

### Introduction

Robert Karman was born              1938 in Chicago, Illinois, and died              2015 at the age of 77 from non-Hodgkin lymphoma (DLBCL).[3] He is survived by his wife, Christine Stanley Karman who is the administrator of his estate, and their five children.

Mr. Karman began using Roundup® in 1980 at                         in Hanover Park, Illinois, where he lived with his family. In 1989, he and his wife moved to

---

[2] Abukari, Wumbei, "Pesticides Applicator Exposure Assessment: A Comparison between Modeling and Actual Measurement," 2015, Journal of Environment and Earth Science ISSN 2224-3216 (Paper) ISSN 2225-0948 (Online) Vol.5, No.11.

U.K. Health and Safety Executive, HSE, "Operator Exposure," 2016, Data requirements handbook, Retrieved from: http://www.hse.gov.uk/pesticides/topics/pesticide-approvals/pesticides-registration/data-requirements-handbook/operator-exposure.htm

"Operator exposure assessment for MON 2139 UK – Case" MONGLY06509236

"UK POEM calculations in preparation of meeting Spanish competent authorities." MONGLY01275627

Lawson, A., et al., "Three Methods to Assess Levels of Farmers' Exposure to Pesticides in the Urban and Peri-urban Areas of Northern Benin," 2017, Tunisian Plant Protection Journal, Vol.12, pp. 91–108.

Illyassou, K., et al., "Risk Assessment for Small Farmers Exposed to Plant Protection Products in the Niger River Valley," 2017, Comm. Appl. Biol. Sci.

EPA, "Risk Assessment Methodology for Hazardous Substances: How to assess the risk, cost and benefit of new hazardous substances for use in New Zealand," 2018, Environmental Protection Authority.

[3] Death certificate stated "lymphoma" as cause of death.

Estate of Robert Karman v. Monsanto
January 22, 2021
Page 8

in Elgin, Illinois, and he lived there until his death. He applied Roundup® Weed and Grass Killer from 1989 to 2015 on this property.

Mr. Karman's wife (who testified in deposition following his passing) recalled that applications may have initiated as early as 1980 at their prior home. Mr. Karman used a hand-held sprayer to apply liquid Roundup®. He also maintained powdered (dry, granulated) Roundup® in his garage.[4]

Mr. Karman did not wear any personal protective equipment (PPE) in the course of his Roundup® applications. According to the Plaintiff's Fact Sheet, he applied Roundup® once per week during 40 weeks of the year.[5]

**NHL Diagnosis and Pathology**

Mr. Karman was diagnosed with diffuse large B-cell lymphoma (DLBCL) in July 2015. A left axillary lymph node biopsy performed on July 27, 2015, revealed findings consistent with diffuse large B-cell lymphoma. The anatomic pathology report states, "*The diffuse cellular infiltrate consists of sheets of large, atypical cells intermixed with scattered smaller lymphocytes and a few eosinophils. The large, atypical cells are large in size and have prominent nucleoli. Immunohistochemically, the large, atypical cells are positive for LCA and CD20 and negative for AE1/AE3, CD3, CD5, CD10, S100, CD30, CD15, Bcl-2 and CD138; rare cells are weakly positive for cyclin D1.*"[6]

Mr. Karman was not deposed as he had passed away on                    2015, prior to the start of litigation. Mrs. Karman brought Mr. Karman's diary along to her deposition which revealed the following: Mr. Karman had a regular six month visit on June 22, 2015, with his primary care physician, Dr. Myrda. Due to a lump in his left groin, he underwent CT scans on July 1st. On July 9th, he saw Dr. Myrda again who referred him to Dr. Aron for a biopsy of concerning lymph nodes. The biopsy was carried out July 23rd. On July 27th, the lymphoma was confirmed. He had a bone marrow test on August 3rd. His first chemo treatment was on August 20, 2015.

---

[4] Deposition of Christine Karman, November 13, 2019, p. 294.

[5] Plaintiff Fact Sheet completed by Christine Karman,  p. 21 of 28.

[6] Sherman Hospital Oncological Medical Records, p. 41 of 36.

Estate of Robert Karman v. Monsanto
January 22, 2021
Page 9

The available medical records state that Mr. Karman's enlarged lymph nodes became more pronounced in the latter part of the summer as noted by his oncologist.[7] The records reveal on-going pathology highly consistent with diffuse large B-cell lymphoma.

## Medical History

Mr. Karman had been diagnosed with hypertension in 2003 and chronic obstructive pulmonary disease (COPD) in 2010. He had a surgical hemorrhoidectomy in 1970.[8] He displayed tardive dyskinesia[9] on July 12, 2007. He was "allergic" to codeine.[10] It was noted on July 23, 2015, that he had a history of transfusion.[11] His body mass index (BMI) on July 9, 2015, was 31.20.[12] His medications at the time of his NHL diagnosis were Proair inhaler, losartan potassium, labetalol and naproxen.[13]

**Table 1**

**Summary of Mr. Karman's Medical History**

| Date | Procedure | Results/Diagnosis | Reference |
|------|-----------|-------------------|-----------|
| 9/3/14 | Office visit for chest discomfort and shortness of breath | Height: 66.75 inches; weight: 193 lbs.<br>Current Medications: Proair inhaler, Z-pak, losartan potassium,[14] labetalol,[15] naproxen | p. 15-17 |
| 9/3/14 | Chest x-ray for cough/chest pain | Small left effusion with mild increase left lower lobe subsegmental atelectasis compared to 5/22/2012 | p. 21 |
| 9/18/14 | Follow-up | Had pneumonia; evidence of chronic bronchitis. Weight 199 lbs.<br>Start Dulera inhaler.[16] | p. 12/81 |
| 2/2/15 | Chest CT | Ground-glass infiltrates in right lobes, a few mildly enlarged mediastinal lymph nodes and atherosclerosis including coronary arteries. Indeterminate liver hypodensities. | p. 28-29/81 |

---

[7] Fox Valley Hematology Oncology, August 3, 2015, p. 1 of 4.

[8] Sherman Hospital Oncological medical records, p. 37of 360. Winters Family Practice medical records, p. 62 of 81.

[9] Tardive dyskinesia includes obvious uncontrolled, involuntary movement often associated with certain disease states or pharmaceutical adverse toxicological effects.

[10] Sherman Hospital Oncological Medical Records, p. 47 of 360.

[11] Id., p. 37 of 360.

[12] Winters Family Practice medical records, p. 4 of 81. (Note: His BMI was less than 30 throughout most of his NHL pre-diagnostic years).

[13] Id., p. 8 of 81.

[14] For hypertension.

[15] For hypertension.

[16] Corticosteroid.

Estate of Robert Karman v. Monsanto
January 22, 2021
Page 176

**Evidential Considerations**

The following evidential factors are useful in formulating an objective toxicological assessment of Mr. Karman with regard to his Roundup® exposures and subsequent NHL diagnosis:

- **Diagnosis:** Mr. Karman's pathology records reveal a diagnosis of diffuse large B-cell lymphoma (DLBCL) in July 2015. His disease was aggressive and he passed away from the disease only five months later on                       2015. The medical records reveal an on-going pathology consistent with diffuse large B-cell lymphoma.

- **Prolonged Acute Exposure and Absorption:** Mr. Karman's belief that Roundup® was not harmful to him resulted in him not using any form of personal protective equipment (PPE). Mr. Karman typically wore jeans, shoes with socks, and a short-sleeved, cotton shirt and/or a flannel, long-sleeved shirt.[385] He did not wear gloves, and only wore a mask if he had a cold.[386] He had no pragmatic reason to believe that it was necessary to wear protective equipment and thus, he did not do so.

- **Chronic Glyphosate Exposure:** Per Mrs. Karman's deposition testimony, Mr. Karman sprayed Roundup® initially weekly, then twice a month for 8 months of the year for a total of approximately 35 years of applications. Pursuant to Mrs. Karman's deposition testimony, this pattern repeated without variance for the duration of the two exposure interval scenarios. Additional Roundup® exposures, spills, accidents, etc. may have occurred and are not included in this total.

- **Dermal Absorption Rates Higher than Presented by Monsanto**:  As previously discussed in great detail, the correct dermal absorption rate for glyphosate ranges between 3% and greater (as opposed to the defective values recently issued by Monsanto's contractor, DTL Laboratory). Additionally, numerous other factors are known to increase skin absorption of glyphosate including (but not limited to) elevated temperatures, continuing to wear herbicide-soaked clothing and gloves, sweating (which contributes to increased skin absorption) and cracked skin as well as the various surfactants formulated in the actual Roundup® products (as most of the dermal absorption studies were performed on pure glyphosate without the additives).

---

[385] Deposition of Christine Karman, November 13, 2019, p. 89.

[386] Id., p. 90.

Estate of Robert Karman v. Monsanto
January 22, 2021
Page 177

**Lack of Personal Protective Equipment (PPE):** Mr. Karman was not instructed via the product label to wear personal protective equipment such as impermeable pants, boots, mask, long sleeve shirt, face shield, *chemically-resistant* gloves, etc. He believed Roundup® was "safe" to use for many reasons and proceeded accordingly. Notably, Monsanto employees (in the previously referenced study) were protected with PPE on all exposed body areas during their own dermal exposure testing procedures, but consumers are not protected because the product label provides no such instructions.[387] (Even though the Monsanto research study and report recommended multiple warnings with respect to PPE.)

- **Mechanism of Carcinogenicity:** Mr. Karman's exposures are to Roundup® product, not to glyphosate alone. Roundup® and glyphosate have been demonstrated in several studies to repeatedly cause DNA damage with promotion by Roundup® being more damaging than glyphosate alone. Genotoxicity is the <u>first stage</u> in cancer formation. Wozniak, et al.,[388] and other studies as referenced in this report further demonstrated that Roundup®, at a higher dose, was even able to impede the natural repair of damaged DNA.

The George, et al., study[389] documented cancer promotion at relatively low dermal exposure doses in mice. The dose levels, when converted to human doses, are reasonably similar to that sustained by applicators (when applying the HED factor and dermal absorption rate of 3%). More importantly, the test model employed DMBA (as found in cigarette smoke/tar). This primary carcinogen was dermally applied at low doses on the shaved skin of mice with no tumors produced unless glyphosate was also applied to the skin in which case 40% of the animals developed tumors (2.8 tumors per animal). The mechanism of glyphosate carcinogenesis is important with respect to tumor promotion among smokers prior to the onset of NHL. The George study reveals substantial promotion (40% of the mice with tumors) with realistic concentrations of glyphosate as compared to that of applicators using HED methodology.

---

[387] Some later labels included recommendation of gloves during mixing.

[388] Wozniak, E., et al., "The mechanism of DNA damage induced by Roundup® 360 PLUS, glyphosate and AMPA in human peripheral blood mononuclear cells – genotoxic risk assessment," 2018, Food and Chemical Toxicology, doi: 10.1016/j.fct.2018.07.035

[389] George, J., et al., "Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach," 2010, Journal of Proteomics, Vol. 73, pp. 951 – 964.

Estate of Robert Karman v. Monsanto
January 22, 2021
Page 10

**Table 1**

**Summary of Mr. Karman's Medical History**

| Date | Procedure | Results/Diagnosis | Reference |
|------|-----------|-------------------|-----------|
| 6/15/15 | Clinical laboratory results | Creatinine 1.3, ALT 7, hemoglobin 12.0 g/dL, hematocrit 38.7%, monocytes 19% | p. 34/81 |
| 6/22/15 | Routine follow-up | Presented with 2.5 cm lump in left groin. Remains unchanged over a few months. CT of chest "*showed some lymphadenopathy but nothing terribly significant.*" <br><br> 3 beers per day; 15 cigarettes per day. | p. 6/81 |
| 7/1/15 | CT chest, abdomen and pelvis. Follow-up for abnormal chest CT of 2/2/15. | Multiple masses/lymphadenopathy in the chest, abdomen and pelvis. Lungs demonstrate no gross masses or effusion, but multiple scattered ground glass opacities are noted. | p. 26/81 |
| 7/27/15 | Excisional biopsy of deep left axillary lymph node | Diffuse large B-cell lymphoma. Cells are positive for LCA & CD20; rare cells are weakly positive for cyclin D1. Fifty % lymphocytes are positive for Ki-67. Dr. Aron | p. 40/81 |
| 8/20/2015 | Chemotherapy start date | Dr. Nabrinsky – oncologist | |
| 9/2015 | Admitted to St. Joseph's Hospital | Pneumonia treated with antibiotics <br> (No medical records) | p. 176/360 |
| 10/26/15 to 10/30/15 | ED visit for shortness of breath; hospitalization | Admitted to hospital for COPD exacerbation which improved with steroids, bronchodilators and antibiotics. He was discharged on 10/30/15. | p. 163 |
| 10/26/15 | CT pulmonary angiogram | Emphysematous changes present throughout the lungs. Prominent bilateral nodular-appearing infiltrates. Likely related to an acute infectious process. | p. 24-25 |
| 11/16/15 | Admitted to St. Joseph's Hospital | No medical records | Per attorney summary |
| 11/25/15 | PET scan | Lymphoma progression as evidenced by development of 2.5 x 3.0 x 2.5 cm paratracheal mass with increased metabolic activity. | p. 348 |
| 12/7/15 | Admitted to Presence St. Joseph | Decided on hospice. No medical records | Per attorney summary |
| 12/15/15 | | Mr. Karman passed away at home. | |

**Family Medical History**

According to his medical records, Mr. Karman's mother suffered from a myocardial infarction and his father had kidney disease. Mr. Karman had no siblings, and all of his

Estate of Robert Karman v. Monsanto
January 22, 2021
Page 11

children are healthy with no occurrences of cancer per Mrs. Karmen during our interview of January 11, 2021.

## History of Tobacco, Alcohol and Drug Use

Mr. Karman began smoking in 1954 and quit briefly (for 4 weeks) in 2015[17] but resumed smoking in late October 2015 just prior to his death.[18] His medical records dated May 8, 2003, reported him smoking approximately 1.5 packs per day;  records dated September 18, 2014, reported 16 cigarettes per day.[19] According to his wife, Mr. Karman had smoked from about 1954[20] to 2015, stopping once for about five years and on two or three other occasions for up to six months at a time. He rolled his own cigarettes and smoked about one pack per day.[21] Thus, he had over a 50 pack-year history.

At an office visit at Winters Family Practice on September 3, 2014,  Mr. Karman reported that he drank 4+ beers per day.[22] On May 8, 2003, he was drinking 30 beers weekly (4.2 beers per day).[23] Mrs. Karman testified that he drank two or three beers every day.[24] No illicit drug use or history was reported in any of the available medical records.

## Employment History

Mr. Karman served in the U.S. Armed Forces.[25] He worked as a jet mechanic but never served overseas or in battle.[26] He served in the Marine Corps Reserve for five years from 1958 to 1963.

Mr. Karman worked for Automatic Electric in Northlake, Illinois, as a draftsman for a couple of years in the early 1960s. He then obtained a draftsman job with Motorola and was promoted to a circuit board designer during his eight year tenure there. He then worked as a circuit board designer at three different companies before working as a carpenter for about six months in the early 1980s.

---

[17] Winters Family Practice medical records, p. 56 of 81.
[18] Sherman Hospital Oncological medical records, p. 178 of 360.
[19] Winters Family Practice medical records, pp. 7, 12 of 81.
[20] They met in 1958.
[21] Telephone interview of Christine Karman, January 11, 2021.
[22] Winters Family Practice medical records, p. 9 of 81.
[23] Winters Family Practice medical records, p. 71 of 81.
[24] Deposition of Christine Karman, November 13, 2019, p. 228.
[25] Certificate of death.
[26] Deposition of Christine Karman, November 13, 2019, pp. 181-182.

Estate of Robert Karman v. Monsanto
January 22, 2021
Page 12

In approximately 1990, he started his own business, Associated Design Services, in which he designed circuit boards as a contractor for Motorola. He retired in 2003.[27] Mr. Karman never applied Roundup® occupationally in any manner.

**Deposition of Christine Karman, November 13, 2019**

Christine Karman was married to Robert Karman for 54 years from                    1961, until his death in 2015.[28] They have four daughters, Nancy, Ann, Roberta and Catherine and one son, Michael. Christine has smoked a pack of cigarettes per day for 60 years.[29] She had bladder cancer 11 years ago that resolved without special treatment.

She recalled that in July 2015, her husband's oncologist, Stanley Nabrinsky, told them[30] that Mr. Karmen had lymphoma and that lymphoma is caused primarily by pesticides.[31] Their daughter Nancy had asked if it was caused by cigarette smoking.[32]

In an email written on August 3, 2015, by daughter Nancy from notes she had prepared at the physician's office, Nancy wrote that the physician stated that the lymphoma was caused by exposure to "fertilizer, pesticides and asbestos."

Mr. Karman assisted his carpenter son (Michael) to build their new home on Robinhood Drive in 1989 - a 2,500 square foot house on a 0.75-acre lot.[33,34] Mrs. Karman testified that her husband helped carry lumber, hired plumbers, talked with inspectors, swept and burned the garbage. He did not do any work with the painters. No toxic exposures were reported.

Prior to the Robinhood Drive residence, Mr. & Mrs. Karman lived at
in Hanover Park for 24 years.

---

[27] Plaintiff Fact Sheet, p. 3 of 28; Deposition of Christine Karmen, p. 140.

[28] Deposition of Christine Karman, November 13, 2019, p. 164.

[29] Id., p. 18.

[30] Christine, Robert and Nancy.

[31] Deposition of Christine Karmen, November 13, 2019, p. 30.

[32] Id., p. 33.

[33] Id., p. 103.

[34] Id., pp. 46 and 61.

Estate of Robert Karman v. Monsanto
January 22, 2021
Page 13

Mrs. Karman recalled that her husband used fertilizers, mainly Scott's.[35] She believes she purchased Scott's fertilizer for him to use at the                        residence where they lived prior to 1989.[36] Mr. Karman fertilized the lawn with a spreader.[37]

## Roundup® Applications

Mrs. Karman recalled that she and her husband both used Roundup® to spot-treat weeds in the yard of their Robinhood Drive residence from 1991/1992 to about 2013.[38] She would purchase Spectracide[39] if it was on sale, but her husband purchased and used Roundup® because he believed that it *"worked better."*[40]

When using Roundup® in their yard, Mr. Karman typically wore jeans, shoes with socks and a short-sleeved, cotton shirt and/or a flannel, long-sleeved shirt.[41] He did not wear gloves and only wore a mask if he had a cold.[42] He sprayed Roundup® for 3-4 minutes per discrete area, twice a month for eight months of the year, per deposition as noted: [43]

```
Q. And when he would treat the areas that we marked in Exhibit 3, would that
   be, you know, a 10- to 15-minute thing or would it be longer?
A. When he was treating them?
Q. Yeah.
A. Shorter.
Q. How long would it take him to treat those areas each time on Exhibit 3?
A. Three, four minutes.
```

Mrs. Karman testified that her husband used a direct stream to spot-spray weeds in the lawn and always sprayed as close to the ground as possible to avoid killing surrounding grass. He did not spray the Roundup® up in the air or on his face, and she never saw him

---

[35] Id., p. 54.

[36] Id., p. 57.

[37] Id., p. 181.

[38] Id., pp. 92-93.

[39] Contains diquat dibromide rather than glyphosate as an active ingredient.

[40] Deposition of Christine Karman, November 13, 2019, pp. 87 and 92.

[41] Id., p. 89.

[42] Id., p. 90.

[43] Id., pp. 95-96.

Estate of Robert Karman v. Monsanto
January 22, 2021
Page 14

spill it on himself.[44] It was always pre-mixed Roundup[®][45] and she recalled that the Roundup[®] container was a 1 gallon spray bottle with a hose and a 10 inch wand.[46]

Significantly, Mrs. Karman testified that Mr. Karman sprayed Roundup[®] *"…completely around the whole house at given times wherever there was a weed."* She testified that they had a real problem with weeds; "They were all over."[47]

Mr. Karman also used Roundup[®] on the gravel driveway for six years, from the garage to the street. He held the sprayer *"…at arm's length until he got close to the side grass along the driveway."*[48] He sprayed only where there were weeds. He wore the same clothing and sprayed during the same eight months as previously described. She could not estimate how long it took him to spray the driveway each time, but it took longer than it did to spray the patches.[49]

He sprayed around the culverts on Sherwood and where the street turns into Robinhood Drive. "That was, is still, a constant menace.*"[50]* He also sprayed around the shed at the back of the house and in the patches of assorted weeds that grew all over the property.[51]

Mrs. Karman testified that her husband would sit on the back porch and relax after doing the yard work; he didn't shower immediately after spraying Roundup[®].[52] She laundered his dirty clothes.[53]

Mrs. Karman estimated that until her husband retired in 2003, she used Roundup[®] more frequently than he did.[54]

According to Mrs. Karman, her husband did not suffer from other malignancies, rheumatoid arthritis, ulcers, diabetes, obesity, Epstein-Barr virus, lupus, Hepatitis B or C

---

[44] Deposition of Christine Karman, November 13, 2019, pp. 88-89; pp. 96-97.

[45] Id., p. 211.

[46] Id., pp. 80-81.

[47] Id., p. 186.

[48] Id., p. 143.

[49] Id., p. 144.

[50] Id., pp. 186-187.

[51] Id., p. 187.

[52] Id., p. 202.

[53] Id., p. 202.

[54] Id., p. 207.

Estate of Robert Karman v. Monsanto
January 22, 2021
Page 15

or any immunologic disorder.[55] Additionally, Mrs. Karman testified that the only symptom her husband initially experienced was the lump (noticed in May 2015). He experienced no fevers, night sweats or other pre-diagnostic symptomatic conditions.[56]

**Note**: Mrs. Karman advised during deposition that some of the medical information in Mr. Karman's PFS (as originally completed by herself) required updating.

## Residential Properties

The following images were provided by Mrs. Karman showing some of the areas at their Robinhood Drive residence where she and Mr. Karman regularly applied Roundup®.



**Figure 1: Google image of the Karman property
where Mr. Karman regularly sprayed Roundup® from 1989 to 2015.**

---

[55] Deposition of Christine Karman, November 13, 2019, pp. 226-227
[56] Id. pp. 231-232

Estate of Robert Karman v. Monsanto
January 22, 2021
Page 16



**Figure 2: Photo of Karman property where Roundup® was regularly sprayed.**



**Figure 3: Photo of Karman property where Roundup® was regularly sprayed. The arrows point to the pen lines drawn by Mrs. Karmen during deposition marking where she saw Mr. Karman spray Roundup.**

Estate of Robert Karman v. Monsanto
January 22, 2021
Page 17



**Figure 4: Photo of Karman property where Roundup® was regularly sprayed.**

## Telephone Interview with Christine Karman, January 11, 2021

I interviewed Mrs. Christine Karman by telephone and questioned her on specific aspects of her husband's medical history, exposure to other chemicals and Roundup® use.

Regarding Mr. Karman's family history, Mrs. Karman reported that he was an only child and neither of his parents ever developed any malignancies. None of their children has ever been diagnosed with cancer.

Mrs. Karman stated that of all her family members, she has the most knowledge of Mr. Karman's Roundup® use. He began using Roundup® in 1980 at their home property at                    in Hanover Park, IL. This was, at most, a ¼ acre property. They lived there until June 1989 when their newly built home on Robinhood Drive was ready. She estimated that for eight months of the year, Mr. Karman sprayed Roundup® at the Spruce Avenue property once per week for about 30 minutes, primarily along the curb and driveway.

The Karmans moved into their new home at                    in Elgin, IL, in June 1989. The yard of their 1 acre property had only been rough-graded when they moved in so she recalled that Mr. Karman began using Roundup® in the spring of 1990. The driveway to their home was gravel for about 6 years before it was paved.

Estate of Robert Karman v. Monsanto
January 22, 2021
Page 174

## Carcinogenicity of Other Herbicides & Pesticides According to Monsanto**

On June 17, 2019, in the matter of Adams v. Monsanto, the company submitted an *"Amended Responses to Plaintiff's First Set of Requests for Admission."* This 70 page document presents a series of formal denials regarding carcinogenicity of Monsanto's non-glyphosate herbicides and pesticides. Applicable substances noted therein include 2,4-D, alachlor, atrazine, carbaryl and DDT as follows:

- Monsanto <u>denies</u> that 2,4-D is carcinogenic.[377] Monsanto states, *"the scientific evidence does not demonstrate that 2,4-D is carcinogenic in humans."*[378]

- Monsanto <u>denies</u> that alachlor is carcinogenic. Monsanto states, *"the scientific evidence does not demonstrate that alachlor is carcinogenic in humans."*[379]

- Monsanto <u>denies</u> that atrazine is carcinogenic. Monsanto states, *"the scientific evidence does not demonstrate that atrazine is carcinogenic in humans."*[380]

- Monsanto <u>objects</u> to the request to admit that the commercial carbaryl formulations are carcinogenic as this calls for an expert opinion which is "not a proper inquiry" for the Request for Admission.[381] Monsanto states, *"it does not have requisite scientific knowledge to affirm or deny that carbaryl is carcinogenic in humans."*[382]

- Monsanto <u>objects</u> to the request to admit that commercial DDT formulations are carcinogenic as this calls for an expert opinion which is "not a proper inquiry" for the Request for Admission.[383] Monsanto states, *"it does not have requisite scientific knowledge to affirm or deny that DDT is carcinogenic to humans."*[384]

---

[377] Monsanto Company's Amended Responses to Plaintiff's First Set of Requests for Admission (Adams, James, et al., v Monsanto)

[378] Monsanto Company's Amended Responses to Plaintiff's First Set of Requests for Admission, James Adams, et al., Plaintiffs, v. Monsanto Company, Defendant., Case No. 17SL-CC02721, pp. 4-5, 9 of 65.

[379] Id., p. 19.

[380] Id., p. 22.

[381] Id., p. 33.

[382] Id., pp. 32-33.

[383] Id., p. 43.

[384] Id., p. 43.

Estate of Robert Karman v. Monsanto
January 22, 2021
Page 175

**Summary of Objective Toxicological Factors**

The generally-accepted, peer-reviewed toxicological literature is not based on unsubstantiated, subjective opinions, but rather statistically significant data at the 95% level of confidence. The various 8 prongs of the well-established Braford Hill criteria have been evaluated in my assessment by considering the strength of various associations within genotoxicity and other mechanistic studies, the specificity of the adverse effect(s) as well as their consistencies among different studies.

Additionally, dose-responsiveness has been evaluated among the various genotoxicity and other mechanistic studies as referenced within this report (in some cases using human equivalent dosing (HED methodology). Also, coherence of studies among different study designs has been considered along with latency (temporality) and experimental studies in which animal dose equivalency comparisons to human dosage were assessed.

Expert opinions must always be based on objective, reliable evidence without deviation from the generally accepted methodology. Using the weight-of-evidence methodology of significant findings within the human epidemiological studies that employ dose-metrics, coupled with a scientific understanding of the genotoxic mechanisms, bone distribution/ADME and the mechanisms in which the Roundup® mixtures are absorbed, distributed to bone marrow and other locations, retention time in such tissues prior to metabolism and excretion, reliable toxicological opinions are provided.

The evidence of glyphosate potency when applied as a chemical mixture has also been evaluated from both mechanistic findings and dose-response evidence. Mr. Karman's exposure histories have been compared to the dose-metrics in human epidemiological studies with respect to determining whether 8-hour time-weighted exposure day thresholds were exceeded.