# EXHIBIT 8

Peterson v. Monsanto
January 22, 2021
Page 11

**History of Tobacco, Alcohol and Drug Use**

Mr. Peterson is a lifetime non-smoker. The available medical records report that he has never used illicit drugs and that he does not consume alcohol.[11] Further information is detailed in the interview section below.

**Interview with James Peterson, January 7, 2021**

I interviewed Mr. Peterson on January 7, 2021. His interview was most informative as he provided detailed information regarding his residential and employment history as well as his Roundup applications and exposures.

Mr. Peterson was born in Chicago and lived there until the age of 2. His parents divorced at that time and he moved to Palatine, Illinois, with his mother. They subsequently moved back to Chicago when Mr. Peterson was approximately five years old. The family lived in apartments in a mixed residential/commercial neighborhood. In 1956, they moved to Norridge, IL. In 1959, when Mr. Peterson was a freshman in high school, they moved to                in Hoffman Estates, Illinois. Mr. Peterson has lived in this home ever since.

Mr. Peterson reported that there were no gasoline service stations, toxic waste sites or superfund sites near any of his homes. While living in Chicago, there were gasoline stations a few blocks from his apartment and an area where several large tanks were stored, but he has no knowledge of what was in the tanks. However, they were not adjacent to his residential location.

After graduating high school, Mr. Peterson started college at Northern Illinois University where he eventually received a bachelor's degree in geology. During his college years, he would take time off to work[12] and save money for his tuition.

**Employment History**

Mr. Peterson was drafted into the U.S. Army in the spring of 1965 after completing his third year of college. He was trained in radio teletype duties and sent to South Korea

---

[11] Northwest Community Healthcare, page 133.

[12] Mr. Peterson performed various jobs including working in a school cafeteria and packing and shipping at a book company (also headed up the freight department at this job). He worked at Echo Containers which made aluminum pans. He reported no significant toxic exposures at any of these jobs.

Peterson v. Monsanto
January 22, 2021
Page 12

where he served a 14-month tour of duty. He was not involved in active military operations or skirmishes. He returned to the U.S. to finish his last year of college in 1968.

After receiving his degree, Mr. Peterson could not find employment using his knowledge of geology. Instead he obtained a job at "Nuclear-Chicago Corporation" performing inventory and product control. This company developed and produced scanners for use in hospitals. Mr. Peterson worked at a desk, not on radiological equipment; thus, he stated that he did not experience any radiological exposures at his place of employment.

In 1969, Mr. Peterson obtained employment at Motorola (manufacturer of radios) where he again was responsible for inventory and product control. He again reported no toxic exposures. He worked at Motorola until 1976.

From 1976-1985, he worked at Baxter Labs in Wisconsin where he again held a position in product planning and inventory control. From there, he worked at a printing company in Elk Grove, Illinois, as the manager for the estimation department until 1992. He reported a one-time exposure to a chemical coating that was being applied to glass, but he had no ill effects.

Ultimately, Mr. Peterson obtained employment with the U.S. Postal Service as a mail carrier. He continued working for the Postal Service until February of 2011 when he retired. He reported a short exposure to an oil-based paint which was being applied on metal doors in the apartments to which he delivered mail. The exposure via inhalation lasted for 10-15 minutes which he characterized as "odiferous."

Mr. Peterson has never consumed excessive alcohol ("hardly any alcohol"), smoked cigarettes or used any drugs-of abuse. In his 40s, his weight was somewhere in the 170s at 5'6" which he stated was considered overweight but not obese. His weight when he was working at Motorola increased to about 185 pounds; however, he lost weight before beginning his job for the postal service.

**Family Medical History**

Mr. Peterson's mother smoked cigarettes for 43 years and died of lung cancer at the age of 66. He does not know anything about his father's medical history as his parents divorced when he was 2 years of age. His sister has never developed any malignancies. Mr. Peterson has no children of his own.

**Roundup Use History**

Regarding his use of Roundup, Mr. Peterson used it at the
in Hoffman Estates beginning in 2013. He would spray every 1-2 months depending on the weather. Thus, he estimated that he made 4-5 Roundup applications per year during the spring and summer months to irradicate weeds and moss on his two patios. In total, he estimated that he spent 8 to 10 hours per year mixing and spraying Roundup. He continued to use Roundup up through the fall of 2016.

Mr. Peterson wore long pants and sometimes used blue nitrile gloves when handling Roundup. He acknowledged that when mixing and applying diluted Roundup concentrate, he would regularly get some of the product on his hands or ankles. He initially used a Roundup container with a hose attached but doing so often took more than one day to spray. In 2013/2014, he switched to a "multi-use" sprayer which sped up the job.

**Personal Protective Equipment (PPE)**

Other than long pants and (occasionally) blue nitrile gloves while mixing, Mr. Peterson did not wear any personal protective equipment.

**Summary of Exposure Factors**

Mr. Peterson began using Roundup Weed Killer every 1-2 months depending on the weather for a total of 4-5 applications per year during the spring and summer from 2013 through the fall of 2016 (4 years). He applied Roundup residentially to control weeds and moss on his personal property.[15]

**Scope of Exposures and Exposure-Day Calculations**

This section assesses Mr. Peterson's exposure history to arrive at a scientifically-accurate toxicological value representing *8-hour time-weighted exposure-days*. **Table 3** presents a compilation of Mr. Peterson's episodic Roundup® exposures as obtained from his interview.

**Table 3**

**Calculation of Mr. Peterson's 8-Hour Time-Weighted Roundup® Exposure-Days**

| Date | Years | Events Per Year | Total Hours/Yr. | | | Total Hours | | | Exposure Days (8 hours/day) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Min | Mid | Max | Min | Mid | Max | Min | Mid | Max |
| 2013-2016 | 4 | 4.5 | 8 | 9 | 10 | 32 | 36 | 40 | 4 | 4.5 | 5 |
| | | | | | Totals: | 32 | 36 | 40 | 4 | 4.5 | 5 |

The information compiled in **Table 3** reveals that Mr. Peterson sustained a minimum of 4 exposure-days [32 ÷ 8 hrs./day], a maximum of 5 exposure-days [40 ÷ 8 hrs./day], and a midpoint of ***4.5 exposure-days*** [36 ÷ 8 hrs./day] over the time period from 2013 through 2016.

**NHL Latency Interval**

Based on his first reported exposure to Roundup®, Mr. Peterson's latency interval to date of diagnosis was approximately **4 years** (2013-2017).

---

[15] Plaintiff Fact Sheet, page 21.

Peterson v. Monsanto
January 22, 2021
Page 20

**Glyphosate Human NHL Studies**

My toxicological opinions with respect to dose are based, in part, on six (6) primary epidemiological studies that provide objective data with respect to several prongs of the Bradford Hill criteria. My toxicological opinion is grounded in animal experimental evidence, *in vitro* human studies and human epidemiological studies as summarized within this report and previously provided by Dr. Portier, et al., in the Federal Daubert motion proceedings. Specifically, I have assessed dose response, temporality, latency period, biological plausibility (toxicological mechanisms), coherence (demonstrated by molecular-based studies) and animal studies as well as the strength of association and consistency with the toxicological mechanisms of Roundup formulation ingredients. I have used the six primary epidemiological studies which include Eriksson, et al., 2008,[16] McDuffie, et al., 2001,[17] Andreotti, et al., 2018,[18] Leon, et al., 2019,[19] Zhang, et al., 2019[20] and Pahwa, et al., 2019,[21] primarily with respect to <u>dose assessment</u>.

My toxicological focus on these studies is on study design, statistical power and exposure thresholds at different odds ratios, etc. I am using these study results in my toxicological assessment in conjunction with generally-accepted, peer-reviewed studies on genotoxicity (including direct human studies) mechanisms of action (promotion, etc.) absorption, distribution, metabolism and excretion (ADME), etc. In general, I have relied on studies that have documented the various aspects of the Bradford Hill criteria at or in excess of the 95% confidence threshold. However, I am deferring to the epidemiologist with respect to the internal statistical designs and meta-analysis bio-statistical methodologies employed within each study. Summaries of these six studies are provided below:

---

[16] Eriksson, M., et al., "Pesticide exposure as risk factor for non-Hodgkin lymphoma including histopathological subgroup analysis," 2008, International Journal Cancer, Vol.123, pp. 1657 – 1663.

[17] McDuffie H., et al., "Non-Hodgkin's lymphoma and specific pesticide exposures in men: Cross-Canada study of pesticides and health," 2001, Cancer Epidemiology, Biomarkers & Prevention, Vol.10, pp. 1155 – 1163.

[18] Andreotti, G., et al., "Glyphosate Use and Cancer Incidence in the Agricultural Health Study," 2018, JNCI J Natl Cancer Inst., Vol.110 (5), doi: 10.1093/jnci/djx233.

[19] Leon, Maria, et al., "Pesticide use and risk of non-Hodgkin lymphoid malignancies in agricultural cohorts from France, Norway and the USA," 2019, International Journal of Epidemiology, pp. 1–17.

[20] Zhang, L., et al., "Exposure to Glyphosate Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence," July-September 2019, Mutation Research/Reviews in Mutation Research, Volume 781, pp. 186-206. https://doi.org/10.1016/j.mrrev.2019.02.001

[21] Pahwa, M. et al., "Glyphosate use and associations with non-Hodgkin lymphoma major histological sub-types: findings from the North American Pooled Project," 2019 Jun 27, Scand J Work Environ Health. pii: 3830. doi:10.5271/sjweh.3830

Peterson v. Monsanto
January 22, 2021
Page 174

**Evidential Considerations**

The following evidential factors are useful in formulating an objective toxicological assessment of Mr. Peterson with regard to his Roundup® exposures and subsequent NHL diagnosis:

- **Diagnosis:** Mr. Peterson's pathology report provides a clinical diagnosis of diffuse large B-cell lymphoma. DLBCL is an aggressive, fast-growing form of NHL (non-Hodgkin's lymphoma). The disease affects B-lymphocytes, a white blood cell that manufactures antibodies to fight infections (an important part of the lymphatic system). DLBCL is the most prevalent form of NHL and is also the *most common form of NHL associated with Roundup® exposures*.

- **Prolonged Acute Exposure and Absorption:** Mr. Peterson reported in interview that his hands or ankles regularly came into contact with liquid Roundup when mixing and while applying diluted Roundup concentrate. He did not immediately wash after such direct exposures. Thus, there were multiple instances of prolonged dermal exposures of indeterminant durations.

- **Chronic Glyphosate Exposure:** Beginning in 2013, Mr. Peterson sprayed every 1-2 months depending on weather, resulting in 4-5 Roundup applications per year. In total, he estimated that he spent 8 to 10 hours per year mixing and spraying Roundup. He continued to use Roundup through the fall of 2016. Other than long pants and (occasionally) blue nitrile gloves while mixing, Mr. Peterson did not wear any personal protective equipment.

- **Dermal Absorption Rates Higher than Presented by Monsanto**: As previously discussed in great detail, the correct dermal absorption rate for glyphosate ranges between <u>3%</u> and greater (as opposed to the defective values recently issued by Monsanto's contractor, DTL Laboratory). Additionally, numerous other factors are known to increase skin absorption of glyphosate including (but not limited to) elevated temperatures, continuing to wear herbicide-soaked clothing and gloves, sweating (which contributes to increased skin absorption) and cracked skin as well as the various surfactants formulated in the actual Roundup products (as most of the dermal absorption studies were performed on pure glyphosate without the additives).

- **Lack of Personal Protective Equipment (PPE):** Mr. Peterson was not instructed via the product label to wear personal protective equipment such as impermeable pants, boots, mask, long sleeve shirt, face shield, etc. He believed Roundup® was "safe" to use for many reasons and proceeded accordingly. Notably, Monsanto employees (in

the previously referenced study) were protected with PPE on all exposed body areas during their own dermal exposure testing procedures, but consumers are not protected because the product label provides no such instructions.[336] (Even though the Monsanto research study and report recommended multiple warnings with respect to PPE).

- **Mechanism of Carcinogenicity:** Mr. Peterson's exposures are to Roundup® product, not to glyphosate alone. Roundup® and glyphosate have been demonstrated in several studies to repeatedly cause DNA damage with promotion by Roundup® being more damaging than glyphosate alone. Genotoxicity is the <u>first stage</u> in cancer formation. Wozniak, et al.,[337] and other studies as referenced in this report further demonstrated that Roundup®, at a higher dose, was even able to impede the natural repair of damaged DNA.

    The George, et al., study[338] documented cancer promotion at relatively low dermal exposure doses in mice. The dose levels, when converted to human doses, are reasonably similar to that sustained by applicators (when applying the HED factor and dermal absorption rate of 3%). More importantly, the test model employed DMBA (as found in cigarette smoke/tar). This primary carcinogen was dermally applied at low doses on the shaved skin of mice with no tumors produced unless glyphosate was also applied to the skin in which case 40% of the animals developed tumors (2.8 tumors per animal). The mechanism of glyphosate carcinogenesis is important with respect to tumor promotion among smokers prior to the onset of NHL. The George study reveals substantial promotion (40% of the mice with tumors) with realistic concentrations of glyphosate as compared to that of applicators using HED methodology.

- **Latency of non-Hodgkin's Lymphoma**: The compilation of peer-reviewed latency estimates presented herein (see **Table 20**) demonstrates latency intervals within a typical range of 2 to 25 years. Based upon the study findings, the weight of available evidence indicates that a minimum latency interval of 2 to 25 years is required and is scientifically reliable. Mr. Peterson's clinical diagnosis and latency of 4 years meets the minimal latency requirement within the generally-accepted NHL latency range.

---

[336] Some later labels included recommendation of gloves during mixing.

[337] Wozniak, E., et al., "The mechanism of DNA damage induced by Roundup 360 PLUS, glyphosate and AMPA in human peripheral blood mononuclear cells – genotoxic risk assessment," 2018, Food and Chemical Toxicology, doi: 10.1016/j.fct.2018.07.035

[338] George, J., et al., "Studies on glyphosate-induced carcinogenicity in mouse skin: A proteomic approach," 2010, Journal of Proteomics, Vol. 73, pp. 951 – 964.