# EXHIBIT 2

1    A.  It was conducted in -- well, it was published

2  this 2010.  The lead author was George.

3    Q.  All right.  I want to get into what a promotion

4  study is, but before I do that I think it would be

5  helpful to sort of talk about the mechanisms of cancer;

6  is that okay, Doctor?

7    A.  Certainly.

8    Q.  I understand you prepared a demonstrative to

9  help explain this phenomenon; is that right?

10    A.  That's correct.

11    MR. WISNER:  Permission to publish the

12  demonstrative, your Honor.

13    THE COURT:  What is the exhibit number?

14    MR. WISNER:  It is Exhibit 1024.

15    THE COURT:  Any objection?

16    MR. GRIFFIS:  No, your Honor.

17    THE COURT:  All right.  Very well.  You may

18  proceed, Mr. Wisner.

19    MR. WISNER:  All right.  We're going to do this

20  digitally.

21    Q.  What are we looking at here, Doctor?

22    A.  You're missing a line.  But what you're looking

23  at here is a theoretical picture of how skin -- how cells

24  go from being normal to being cancer cells.

25    And then you have some information -- oh, we

1   don't have other information.

2       Q.   It's on the next slide.  We'll get there in a

3   second.

4       A.   Okay, good.  Basically you start with normal

5   cells in the body, and in some way, shape or form the DNA

6   in the cell gets damaged.  So you end up with at least

7   one cell in that collection of cells that has genetic

8   damage on it.

9            Now, the cellular machinery can repair damage.

10  It has great capacity for protecting us from these types

11  of things.  And that can occur in one of two ways.

12  Sometimes the cell spontaneously repairs it when it

13  occurs, but most of the repair occurs when the cell

14  divides to make new cells and they break into two cells

15  from one cell.  During that process, there's quite a bit

16  of repair machinery that comes in.

17           So if that DNA damage is repaired, you end up

18  with normal cells again.  So that's what that bottom

19  arrow is for.  DNA repair takes you back.

20           If that damaged cell is not repaired and the

21  cell undergoes replication, then it duplicates DNA to

22  make the new cell, and when it does that, that damage is

23  fixed in the cell.  So from that point onward, it's no

24  longer repairable.  It's now called a mutation.

25           Now, there are lots of mutated cells in our

1  body, but certain specific mutated cells don't have

2  growth control.  They start losing the control of keeping

3  the tissue down in size and they replicate too often.

4        And as they replicate, you can get more

5  mutations and more mutations, and so you go from an early

6  group of cells that are mutated to a benign tumor to a

7  precursor tumor, benign tumor, and finally to a malignant

8  tumor, and that's additional stages in this process.  You

9  can get additional mutations that lead you on to cancer.

10      Q.  So if a chemical compound affects any one of

11  these boxes in these stages, can that help promote or

12  reduce cancer?

13      A.  Yes.

14      Q.  So let's look at the next chart, which is I

15  think what you're trying to show us.  Show us what this

16  demonstrative -- explain to us what this demonstrative

17  tells us.

18      A.  Well, this is the same picture, a progression,

19  but what I've now done is put some of the mechanisms of

20  course in the genesis, some of the ways in which

21  chemicals can alter this normal process that increases

22  the chance of getting cancers.

23      Q.  And what is the difference -- using this

24  diagram, what is the difference between an initiator and

25  a promoter of a cancer?

1    A.  So a chemical that goes in and directly damages

2  DNA, or even indirectly damages DNA, would be an

3  initiator.  It would be the thing that starts the process

4  from normal cells.  All the cells are normal, and it goes

5  and it causes that initial damage.

6    Q.  And then a promoter, what would that be?

7    A.  Pretty much everything else.  The tumor comes

8  in, the early progression of the tumor begins, and this

9  chemical comes in and says we're going to take these

10  cells and give them an advantage to grow and provide a

11  variety of different mechanisms.  And so you get the

12  tumor faster.  That is promotion.  It's promoting a

13  cancer that is already started on its way.

14    Q.  Now, Doctor, have you ever -- has there been

15  any -- a carcinogenicity study designed specifically to

16  look at whether or not glyphosate is an initiator or a

17  promoter?

18    A.  Yes, there's a classic protocol used for that.

19    Q.  And what does that protocol usually entail?

20    A.  I'll just talk about this one.  It's general

21  like any other.  You take instead of 50 animals per

22  group, you choose 20 animals per group.  And usually

23  these are hairless animals or you shave the hair off the

24  animal because you're going to paint the glyphosate on

25  the skin.  So it's a skin painting study.  You're trying

1   to induce skin tumors in these animals.

2            An initiation promotion protocol, you take a

3   known chemical that's an initiator.  In this case,

4   they're using -- what is the initiator?  I think it's

5   DNBA.

6        Q.  Do you have the exhibit in front of you?

7        A.  Yes.  No, I have my notes.

8            Anyway, they take a chemical that's known to

9   attack that first said cell to cause that DNA damage, and

10  they put that on the skin of the animal in one shot

11  usually.  And then for the following weeks, they put

12  glyphosate on at a -- at a particular rate, and that

13  tells you if glyphosate is promoting the cancer effect.

14           Then what they do also in the same type of study

15  is they'll put glyphosate on first, and then they'll take

16  a chemical that's known to promote cancer from previous

17  studies, and they'll put that on top and see if you get

18  more cancers from that.  That test where the glyphosate

19  is an initiator.

20           And then you have appropriate controls which

21  have just DNBA or just TPA or et cetera.

22       Q.  And those different chemicals, those are

23  referring to things that are known promoters or known

24  initiators?

25       A.  Correct.  The classic design of this is with

1   TPA, which is a chemical, and DNBA, which is another

2   chemical, and then the one you wish to study.

3       Q.  And the study that looked at this from

4   glyphosate, is that the George study from 2010?

5       A.  It is, yes.

6       Q.  And what did that study show?

7       A.  If you put glyphosate on first and follow by a

8   promoter, there's no change.  If you put glyphosate on by

9   itself, there's no change.  If you put the initiator down

10  and then follow up with glyphosate, there was a

11  significant increase in the number of skin papillomas on

12  these animals.  A skin papilloma is a benign tumor.

13       And there was an increase in the -- both the

14  number of animals -- number of tumors per animal and the

15  number of animals with papillomas.  So both of those were

16  increased.

17      Q.  What does that, the results of that study,

18  indicate to you?

19      A.  That -- that glyphosate has the potential to be

20  a promoter of carcinogenesis.

21      Q.  Now, Doctor, isn't it true that IARC in its

22  analysis didn't use that study to evaluate the

23  carcinogenicity of glyphosate?

24      A.  They -- they reviewed it.  I don't believe they

25  used it.

1       Q.  And why is that?

2       A.  One, they typically don't use initiation

3  promotion studies, especially if they have good two-year

4  cancer studies because a two-year cancer study is more

5  definitive.  You've -- you've not got anything else in

6  there, and sometimes initiation promotion studies don't

7  exactly tell you what will happen in chronic exposure to

8  just the chemical.

9       But also they had concerns with the study.

10      Q.  What were those concerns?

11      A.  First, they felt that they didn't use an

12  adequate untreated control.  I disagree with that.  I

13  think their controls were adequate in the study.

14      The other thing they argued was that the -- they

15  didn't do pathology on the papillomas that appeared on

16  the backs of the animals.  You could have either these

17  papillomas or it could be a carcinoma, which would be a

18  more important finding.

19      I disagree with them there.  The classic skin

20  painting studies, not all of them do pathology.  Because

21  if you see a bump, it had to have started as a papilloma,

22  not as a carcinoma.

23      So if they're interpreting the study as only

24  papillomas, then they're perfectly correct.  If they want

25  to interpret the study as papillomas and carcinomas, then

1  they needed to do the histopathology to get a pathologist

2  involved.

3      Q.  Now, were there any papillomas in the control

4  group?

5      A.  None.  None at all.

6      Q.  How many of the animals in the glyphosate

7  exposed groups has papillomas?

8      A.  About 40 percent.  So with 20 animals, that

9  would -- and in the high dose group.  With 20 -- I think

10 that's the only dose group.  Let me be correct.  They

11 didn't do multiple dose groups.  They did one.  With 20

12 animals, that's, what, 8 of the 20.

13     Q.  And that -- although IARC didn't consider it as

14 part of its carcinogenicity weighting, did they conclude

15 that it was a study showing a promotional factor?

16     A.  Oh, yes, they did.

17     Q.  Why is it okay for you to consider it even

18 though IARC didn't?

19     A.  I'm interpreting it, I think appropriately.  I'm

20 not interpreting it as a carcinogenic finding; I'm

21 interpreting it as a papilloma finding, which is a benign

22 region, not really a carcinoma.  And all I'm using it for

23 is to give me an indication of some of the mechanistic

24 underpinnings of this particular chemical.

25     Q.  All right, Doctor.  I'd like to move off of --

1            SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                    COUNTY OF SAN FRANCISCO

3

4   DEWAYNE JOHNSON,

5                  Plaintiff,

6         vs.                    Case No. CGC-16-550128

7   MONSANTO COMPANY, et al.,

8                  Defendants.
    _____/
9

10

11

12       Proceedings held on Thursday, July 26, 2018,

13       Volume 17, Morning Session, before the Honorable

14       Suzanne R. Bolanos, at 9:08 a.m.

15

16

17

18

19

20

21  REPORTED BY:

22  LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

23  Job No. 2965331A

24

25  Pages 3553 - 3666

```
 1  APPEARANCES:

 2

 3  FOR THE PLAINTIFF:

 4       R. BRENT WISNER, ESQ.

 5       BAUM, HEDLUND, ARISTEI, GOLDMAN PC

 6       12100 Wilshire Boulevard, Suite 950

 7       Los Angeles, California 90025

 8       310-207-3233

 9

10       DAVID DICKENS, ESQ.

11       THE MILLER FIRM, LLC

12       108 Railroad Avenue

13       Orange, Virginia 22960

14       540-672-4224

15

16  FOR THE DEFENDANT:

17       SANDRA A. EDWARDS, ESQ.

18       FARELLA BRAUN + MARTEL LLP

19       235 Montgomery Street

20       San Francisco, California 94104

21       415-954-4400

22

23

24

25
```

```
 1  APPEARANCES (Continued):

 2

 3  FOR THE DEFENDANT:

 4      GEORGE C. LOMBARDI, ESQ.

 5      JAMES M. HILMERT, ESQ.

 6      WINSTON & STRAWN LLP

 7      35 West Wacker Drive

 8      Chicago, Illinois 60601

 9      312-558-5969

10

11      KIRBY T. GRIFFIS, ESQ.

12      HOLLINGSWORTH LLP

13      1350 I Street, N.W.

14      Washington, D.C. 20005

15      202-898-5800

16

17

18

19

20

21

22

23

24

25
```

```
1                    INDEX OF PROCEEDINGS

2

3  WITNESS                  DIRECT   CROSS   REDIRECT   RECROSS

4  WILLIAM ROBERT SAWYER      3585

5

6

7

8                    EXHIBITS ADMITTED

9                       (None.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
 1                  Thursday, July 26, 2018

 2                      9:08 a.m.

 3                      Volume 17

 4                   Morning Session

 5               San Francisco, California

 6                   Department 504

 7             Judge Suzanne Ramos Bolanos

 8

 9                    PROCEEDINGS

10

11          THE COURT:  Good morning, Counsel.

12          MR. WISNER:  Good morning, your Honor.

13          THE COURT:  I understand that you wish to

14 discuss Dr. Sawyer's testimony.

15          MR. WISNER:  Yes.  Before that, though, I wanted

16 to address one thing that came up last night that I think

17 is important.  It might affect Sawyer or Benbrook or

18 whoever else goes up.

19          May I use the Elmo, your Honor?

20          THE COURT:  Yes.

21          MR. WISNER:  So yesterday, obviously, I was very

22 upset and frustrated, but the Court ruled, and here's

23 what the Court said, "All right.  So here's what we'll do

24 on this:  I'm going to ask Counsel to please craft a

25 limiting instruction -- a proposed limiting instruction
</pre>

09:07:21
09:08:34
09:08:46
09:09:00

3557

1  for the purposes of admitting those two documents only,

2  the OPP 2016 and the OPP 2017 document, with the limiting

3  instruction to the jury that they may only be considered

4  with regard on the issue of Monsanto's state of mind

09:09:18  5  regarding the state of science at the time in question."

6  And then you reiterate that in the next portion.

7  So, your Honor, last night, I -- you know, was

8  looking at your ruling, and I was trying to craft an

9  appropriate limiting instruction, and then something

09:09:34  10  occurred to me that we didn't raise yesterday, and it's,

11  kind of, really important.

12  Both of the reports that we're talking about,

13  one's dated September 2016 and the other one's dated

14  December 2017, and Mr. Johnson stopped spraying in

09:09:52  15  January of 2016.  So any of these documents reflecting

16  the state of mind of Monsanto would reflect Monsanto's

17  state of mind long after the tort has been completed

18  that's at issue in this case.

19  And he started spraying in 2012, and that's

09:10:09  20  where the failure to warn ultimately occurred, and so the

21  state of mind of Monsanto many months after he's stopped

22  even using it at all seems a bit tenuous.  And then I

23  went back and looked at some of the rulings about this

24  issue, and I was taken aback a little bit.

09:10:27  25  So here's Monsanto's Motion *in Limine* Number 5,

1 and this is what they told the Court, they said,

2 "Monsanto's knowledge and conduct after plaintiff stopped

3 using its product cannot have influenced plaintiff's

4 injury.  Any Monsanto or corporate conduct that

09:10:45   5 postdate's plaintiff's last use of Ranger Pro in

6 January 2016 could have no bearing on plaintiff's

7 decision to use these products in 2012-2015."  That's

8 what they wrote.

9         And then Judge Karnow agreed.  Right?  He

09:11:00  10 excluded a whole bunch of evidence that we wanted to

11 offer because of this, because it was after he stopped

12 using it.  He said here at argument, "Plaintiff's counsel

13 have suggested that he had no intention of getting into

14 the details of the event.  In any event, responding to

09:11:14  15 these sorts of arguments will be an undue consumption of

16 time and risk serious prejudice.  First, the parties will

17 wrangle on whether Monsanto's actions were, in fact, in

18 bad faith or motivated by a desire to cover up truth, and

19 then the jury will be asked to infer from that to

09:11:32  20 Monsanto's pre-2016 actions, which assertedly caused

21 plaintiff's injuries."

22         And so, your Honor, I -- we didn't really get

23 into this yesterday, and it's being offered for the

24 limited purpose of Monsanto's state of mind starting in

09:11:49  25 September of 2016 and 2017, and by the Court's order and

3559

1 by their own arguments, it cannot be relevant to this

2 case.

3        THE COURT:  Who's responding for Monsanto?

4 Mr. Griffis?

09:12:02   5        MR. GRIFFIS:  Yes, your Honor.  Of course, you

6 know that we originally submitted the whole EPA

7 regulatory history from the start.  And what the 2016 and

8 2017 OPP reports reflects -- and this was a compromise

9 solution that we proposed rather than putting in all that

09:12:21  10 stuff and -- it was a compromise.  It reflects the same

11 views that EPA has had consistently.  There is perfect

12 continuity between what's expressed in 2016 and 2017 and

13 what went before, with the single exception that EPA

14 considered the IARC report, and that we don't agree with

09:12:44  15 that, and also considered, you know, such science as had

16 occurred since their last comprehensive review, so that's

17 always in there.

18        One easy solution to reflect that would be to

19 add the last final EPA report preceding this, which I

09:13:02  20 believe is 1993 -- 1993 -- the 1993 RED, and then that

21 would give not the whole regulatory history, but it would

22 give a complete picture bracketing Mr. Johnson's

23 exposure.  So it would show the last report previous to

24 that, and then the two reports saying, "Yes.  We still

09:13:21  25 believe this.  IARC didn't change anything."

1            Since IARC is being put forward as something

2 that should have changed Monsanto's views.  The EPA's

3 rejection of that is certainly relevant to Monsanto's

4 state of mind.  Monsanto believed IARC was incorrect,

09:13:36   5 believed that EPA was -- believed that IARC was

6 incorrect, and was correct on that, and was, in fact,

7 relying on all of that throughout this time period.

8            The review that is reflected in the 2016 and

9 2017 reports was ongoing throughout this entire time

09:13:52  10 period.  So it reflects regulatory decisions and

11 thinkings that were occurring during that time period.

12 But to put in a complete perspective, we could just put

13 in the 1993 RED as well, your Honor.

14            THE COURT:  What year was the IARC Monograph

09:14:09  15 issued?

16            MR. GRIFFIS:  2015.

17            MR. WISNER:  March of 2015.

18            THE COURT:  March of 2015.

19            All right.  I think there's some compromise here

09:14:18  20 that can be crafted, either using an earlier document

21 or -- you know, I'm not certain yet, but what I would ask

22 is that Counsel meet and confer so that Monsanto can just

23 put in whatever EPA documents show Monsanto's state of

24 mind at the time -- at the relevant time that's in

09:14:41  25 question in this case.

```
 1              MR. GRIFFIS:  Yes, your Honor.
 2              THE COURT:  All right.  But I would expect --
 3    none of this is going to come up with Dr. Sawyer; right?
 4              MR. WISNER:  I don't know.  I know -- not on
 5    direct, but maybe on cross.  I don't know.  Now that they
 6    have it in evidence, they might attempt to show it.  I
 7    don't know.
 8              THE COURT:  Is there any reason any of this will
 9    come up with Dr. Sawyer?
10              MR. LOMBARDI:  It's possible, your Honor, but we
11    would handle it the same way we've handled it with
12    Dr. Portier and others, which is until you rule that we
13    can get it into evidence -- I believe Dr. Sawyer's seen
14    them, and so we could read to him and do it that, but if
15    that -- I think we would wait for your ruling before we
16    would show, is what we would do.
17              THE COURT:  Okay.  So as long as you proceed the
18    way that you've been handling it up until now, which is
19    to say you've been questioning the experts based on their
20    review of the documents and reading whatever relevant
21    portions you need to, then that's fine.  And then we'll
22    work out a compromise on this issue.
23              And then was there anything else we needed to
24    discuss before Dr. Sawyer?
25              MR. GRIFFIS:  We do have some issues with
```

09:14:50

09:14:59

09:15:18

09:15:32

09:15:46

1  Dr. Sawyer.  We were sent a lengthy list of documents to

2  be used with Dr. Sawyer, including many internal emails,

3  memos, documents, et cetera, about which he would

4  comment.  We have a pending Motion *in Limine* Number 21 to

09:16:05   5  limit him on the same basis as the rulings on

6  Dr. Benbrook, and that is something that the Court said

7  in the rulings on Dr. Sawyer in the Sargon on page 31,

8  that, "Dr. Sawyer's opinions concerning non-compliance

9  with ethical obligation owed by toxicologists may be

09:16:30  10  irrelevant for the same reasons Johnson agreed that

11  Dr. Benbrook's opinions on industry standards and

12  stewardship obligations are irrelevant," and it says,

13  "The relevancy issue is reserved for the trial Judge."

14          So that's not something that's been ruled on.

09:16:46  15  But the very same logic as the rulings by Judge Karnow on

16  Dr. Benbrook apply.  Dr. Sawyer's no more qualified than

17  Dr. Benbrook is to opine about Monsanto's motive, intent,

18  interpret the documents, nor to gild the case.  That was

19  language that Judge Karnow was using, saying, "You can't

09:17:07  20  just march through a bunch of documents or put them up

21  and gild your case with that."

22          And when Judge Karnow was talking about gilding

23  the case, of course he was talking about documents that

24  were in evidence, that came in through corporate

09:17:19  25  depositions, and then the plaintiffs want to tell their

3563

1    story by having a witness march through it.  That's not

2    the case with the proposed documents from Dr. Sawyer.

3              Of the about a dozen, 15 documents that they --

4    that are internal Monsanto documents, mostly emails, only

09:17:40   5    one of them is in evidence, Exhibit 209, the rest would

6    be seen for the first time through Dr. Sawyer, who cannot

7    be an appropriate sponsor or lay an appropriate

8    foundation for these.  He didn't even read the

9    depositions of the Monsanto employees who authored them,

09:17:58   10   as he said at his deposition on page 304:  "Have you read

11   the depositions of any Monsanto employees who authored

12   those memos?"

13             "Answer:  No."

14             I mean, not that reading the depositions would

09:18:08   15   enable you to step into their shoes and authenticate the

16   documents and talk about what they mean, but he didn't

17   even do that.

18             So as to most of these documents that they've

19   offered, they aren't -- they haven't even been put into

09:18:23   20   evidence in this case at all.  As to the one, 209 --

21   Exhibit 209, that is a PowerPoint presentation by

22   Dr. Martens, and our objection there is that Dr. Sawyer

23   didn't disclose that document.  It's not on his materials

24   considered list or in his expert report as something

09:18:41   25   about which he has an opinion.  So our objection to 209

1    is lack of exposure.

2          So those objections apply to 209, with the

3    caveat I just said, also 438, 439, 479.  These are all

4    exhibits.  I'm saying the numbers, but I'm talking about

09:19:00    5    exhibits.  And 439 and 479, he's also not disclosed on.

6    534, Exhibit 545, Exhibit 548, Exhibit 577, Exhibit 578,

7    Exhibit 606, Exhibit 610, Exhibit 915, Exhibit 918,

8    Exhibit 925, Exhibit 932, also not disclosed on that.

9    Exhibit 935.  As to Exhibit 934, which is the report of

09:19:33    10   TNO, an organization that was performing a study on

11   Monsanto's behalf, that is a hearsay document.  It's not

12   a Monsanto document.  It's a TNO document, so it's also

13   hearsay and has not previously been introduced.

14         We raised with plaintiff's counsel Exhibits 974

09:19:54    15   and 979, which are studies, and they agreed that they

16   wouldn't use them.  The issue there is that they're about

17   endocrine disruption.

18         And finally, I have an objection to 255 on

19   different grounds than we've discussed.  That is a

09:20:10    20   document about bans for POEA, and we believe that bans

21   should not be discussed during Dr. Sawyer's testimony,

22   your Honor.

23         THE COURT:  All right.  So who's responding for

24   Mr. Johnson.

09:20:22    25         MR. DICKENS:  I can, your Honor.

3565

1       THE COURT:  Good morning, Mr. Dickens.

2       MR. DICKENS:  Good morning.  Mr. Griffis started

3  off by reading Judge Karnow's order.  He left off the

4  first sentence of that, which says, "On the basis

09:20:33    5  presented, I do not exclude Dr. Sawyer's opinions

6  concerning non-compliance with ethical obligations owed

7  by toxicologists," and then he went on.

8       I mean, I can probably, you know, advance this

9  issue by saying much of the documents -- the documents

09:20:49   10  that are not in evidence now, we would do exactly what

11  defendants have been doing, and we don't necessarily need

12  to publish those to the jury, but they are documents he

13  relied on, and we'll ask him about them and his opinions

14  with respect to them.

09:21:03   15       It's impossible to rule on this in a vacuum at

16  this stage.  You know, we don't intend to have him say,

17  you know, what the intent of Monsanto was with doing

18  anything that they can, but these are complex issues he's

19  talking about, about dermal absorption in animal studies,

09:21:21   20  and so the explanation of exactly what occurred is

21  absolutely relevant, because these are not -- these are

22  issues relevant to his opinion and absolutely necessary

23  for him to explain what is the basis of the opinion that

24  he's reached.

09:21:38   25       And so it forms, kind of, the basis as to why

3566

1  additional studies have not been done, why there's not

2  more dermal absorption studies showing the true percent

3  that is absorbed into the skin, which is then used by

4  Monsanto to say what is relevant to humans.  You know,

09:21:54  5  one of the biggest issues in this case is did Mr. Johnson

6  have adequate -- enough exposure to the Roundup and

7  Ranger Pro formulation in order to have developed

8  non-Hodgkin's lymphoma.

9          And so these dermal absorption studies are

09:22:09  10  essentially what was the basis for making those

11  determination, and so we're going to just walk him

12  through it.  If they're not in evidence and they're

13  Monsanto documents, we're just going to ask him about it.

14  We'll have him turn to the page and ask him questions

09:22:24  15  with respect to it.  We don't need to publish or move to

16  admit those exhibits into evidence.

17          With respect to 209, that PowerPoint, you know,

18  has -- it's not a new opinion.  Page 77 of his report,

19  he's talking about surfactants can be expected to

09:22:39  20  interact with and perturb the structure of physical

21  properties and function of membranes.  This actual -- we

22  essentially use the last page of this particular -- I

23  believe you have that actually in front of the binder, so

24  page 209, the last page, is about surfactant toxicology,

09:23:00  25  and this is just, essentially, a Monsanto document that

3567

1  is already in evidence and comports exactly with it --

2  what his opinions were, what he reached after his review

3  of all of the materials in this case.

4           Monsanto agrees with it.  So it's not a new

09:23:14  5  opinion.  It's just completely supportive of the opinion

6  he's giving, and because of that, we can ask him those

7  questions.  We can put it on the screen, and say, "We've

8  just talked about" -- you know, we will form the

9  foundation of what his opinions are on surfactants and

09:23:28  10  then show him and say, "In fact, Monsanto agrees with you

11  that -- of all of the those points that you just made."

12           THE COURT:  Okay.  So let's start first with the

13  internal Monsanto emails of which there are several.  And

14  you would agree, then, that Dr. Sawyer cannot lay a

09:23:48  15  foundation for any of those documents?  They're all

16  internal Monsanto emails; right?

17           MR. DICKENS:  They're all internal Monsanto

18  documents.

19           THE COURT:  And so you're not proposing to move

09:23:57  20  them into evidence through Dr. Sawyer?

21           MR. DICKENS:  That's correct.

22           THE COURT:  Okay.  But you're saying that he

23  relied on them.  He reviewed these documents before

24  reaching his expert opinion?

09:24:05  25           MR. DICKENS:  That's absolutely correct, your

1  Honor.

2          THE COURT:  All right.  And that was disclosed?

3          MR. DICKENS:  That was disclosed.

4          THE COURT:  That he relied on these documents?

09:24:12  5          MR. DICKENS:  That's right.

6          THE COURT:  Okay.  So he can be questioned about

7  them, but until the document is in evidence, you can't

8  read from the document itself.

9          Now on cross, it's permissible for the opposing

09:24:30  10  party to read from the document on cross, and then that

11  may open the door on redirect for further, you know,

12  examination by you.

13          But if these documents -- if he can't lay a

14  foundation for them -- and they're not in evidence, he

09:24:44  15  can't lay a foundation, and you're not moving them

16  through him, you can certainly question him about his

17  opinion and the bases for his opinion, but you can't read

18  from documents that are not in evidence.

19          MR. DICKENS:  And that's fine, your Honor.  We

09:25:01  20  can have him just turn to -- to, you know, a particular

21  page.  And I won't read from it.  We won't, you know,

22  read anything that's asked with respect to his opinions

23  and how it supports that.  We don't need to read the

24  document in evidence.

09:25:11  25          THE COURT:  All right.  Now, there are other

3569

1  documents that are not internal Monsanto emails.  Some of

2  them appear to be studies, so to speak, written by

3  outside scientists.  And the same applies there.  If he's

4  not laying a foundation for the study but he's referring

09:25:34  5  to it as something that he relied on in forming his

6  opinion, he can express his opinion and say that he

7  relied on this study, but you can't read from the study

8  until the study is in evidence.

9        MR. DICKENS:  We have an agreement -- or had an

09:25:47  10  agreement with respect to scientific studies to publish

11  and to be able to read from them.

12        THE COURT:  Okay.

13        MR. DICKENS:  Now, the fact that -- that -- you

14  know, I presume their basis is, "Well, this isn't a

09:25:56  15  published study."  But we should not be prejudice by the

16  fact that Monsanto received the study and elected not to

17  publish the results from that.  The same standard

18  applies.  I mean, it's an actual scientific study.  We've

19  been doing it since the beginning of the trial, based on

09:26:12  20  our agreement that we can publish and read from the

21  results of those.

22        So we intend to do the same, even though it's an

23  internal, you know, non-published study.  But it is a

24  study that was conducted by an outside third party.  It's

09:26:25  25  completely the same exact thing as the studies we've been

3570

1 using since the beginning of the trial.  So with respect

2 to that, we intend to do the same thing.

3          THE COURT:  Let me ask the plaintiff

4 clarification.

09:26:34    5          The study that's at issue here is the TNO study;

6 is that correct?

7          MR. DICKENS:  That's correct.  It's Plaintiff's

8 Exhibit 934.

9          THE COURT:  934.  And so your agreement between

09:26:50   10 counsel at the outset was that you would allow -- that

11 neither side would object to studies -- scientific

12 studies being published and read from during the course

13 of the examination, so long as the expert has relied on

14 the study?  Is that -- was that your agreement?

09:27:08   15          MR. WISNER:  Let me clarify that, your Honor,

16 because I made the agreement.  I actually don't think it

17 applies to unpublished studies.

18          MR. GRIFFIS:  That's correct.

19          MR. WISNER:  That's what we agreed to.  I don't

09:27:17   20 want to misquote our agreement.

21          MR. GRIFFIS:  We were trying to parallel the

22 general federal practice that -- published studies and

23 somebody relies on them.  We kind of extended it to

24 published studies that we don't have great disagreements

09:27:31   25 about can be displayed but don't go into evidence and

3571

don't go to the jury.

As to unpublished studies, the same safeguards that are behind the federal default practice don't apply, and we would object to, you know, the study being displayed or going to the jury on hearsay grounds, your Honor.

MR. DICKENS:  With respect to the TNO study, I -- I anticipate we'll be able to do it the same way and just ask him his opinions with respect to the TNO study. He relied -- he reviewed it, he relied upon it.  What are the results?  And move from there.

So, you know, we can elicit his testimony, you know, certainly if an issue comes up.  And, you know, we can -- if absolutely necessarily, we can raise that with the Court at that time.

MR. GRIFFIS:  And, your Honor, a number of these documents are technical.  Dr. Sawyer will be giving technical opinions.  So I can see a number of ways that they can -- that he can look at information on the page and then give a technical opinion that are appropriate, but there would also be some ways that aren't.

And I just want to flag that the ruling with regard to Dr. Benbrook, which we think should apply to Dr. Sawyer as well, is that Dr. Benbrook, and we believe Dr. Sawyer, may not relate case-specific facts asserted

3572

1  in hearsay statements unless they're independently Proven

2  by competent evidence or covered by a hearsay exception,

3  which is not the case with regard to these documents,

4  because they haven't come into evidence.

09:28:58    5         So it's a delicate line.  And the way that it's

6  done, we have to be careful with that.  And we may have

7  some objections depending on whether the document --

8  whether the content of the document is being revealed to

9  the jury or any critiques that he has about it are being

09:29:15   10  revealed to the jury.

11         But with that said, I think we're on the same

12  page now with regard to the internal documents.  And we

13  have the bans issue to address.

14         MR. DICKENS:  Yeah, I will just say that that

09:29:26   15  was specific to Dr. Benbrook based on the evaluation and

16  then Judge Karnow's determination that -- you know, of

17  his familiarity with the EPA documents.  So, you know,

18  interpreting what could have, should have been done.  You

19  know, it's specific to Dr. Benbrook.  It has no relation

09:29:42   20  to Dr. Sawyer.

21         Once again, you know, we're not going to say

22  what Monsanto intended to do, but he can certainly review

23  and, you know, express how it relates to his particular

24  opinion.  And nothing in Dr. Benbrook's opinion's,

09:29:59   25  specific to him, necessarily relates to Dr. Sawyer in any

3573

1 way.

2          You know, this is kind of in a vacuum.  We can

3 deal with those issues as they come up.  But, you know, I

4 can't say, you know, based on what Mr. Griffis has said,

09:30:10  5 you know, that there can be any type of agreement or

6 blanket, you know, exclusion of the opinions that

7 Dr. Sawyer is going to give.

8          THE COURT:  All right.  Well, it's difficult for

9 me to make rulings in the abstract.  So I think you both

09:30:25  10 understand the parameters of the testimony that's

11 permissible.

12          MR. DICKENS:  That's right.

13          THE COURT:  And then, finally, with regard to

14 209, this is Dr. Martens' PowerPoint that is in evidence;

09:30:37  15 is that right?

16          MR. DICKENS:  That's correct.

17          MR. GRIFFIS:  Yes, your Honor.

18          THE COURT:  And what do you intend to do with

19 regard to examining Dr. Sawyer on this PowerPoint?  Is

09:30:48  20 this something he relied on in reaching his opinion?

21          MR. DICKENS:  It is not, your Honor.  It wasn't

22 on his reliance list.  But essentially we would, you

23 know, obtain his opinions on surfactant and surfactant

24 toxicology that he reached and reviewed.  And then, you

09:31:02  25 know, essentially, we would be using the final page here

3574

1  and just that, you know, nothing more than, "Here's what

2  it says.  Those are consistent -- is Monsanto's documents

3  consistent with the opinions you gave and reached on

4  surfactant toxicology?"

09:31:13    5        Essentially nothing more than that, other than

6  saying, you know, "You've reached these agreements.

7  Monsanto agrees with you based on this document that's

8  already in evidence."

9        MR. GRIFFIS:  We'd say that's a closing argument

09:31:26   10  thing to do, not a thing to do with the witness who

11  hasn't disclosed the document, your Honor.

12        THE COURT:  Yeah.  What would be the purpose?  I

13  mean, I suppose you could -- you could question him about

14  opinions that Monsanto employees, including Dr. Martens,

09:31:46   15  have given about surfactants and then ask him if he

16  agrees.  I guess I'm not understanding why you need to

17  show him this PowerPoint.

18        MR. DICKENS:  Your Honor, if you look at that

19  actual -- you know, that final page, I mean, it's

09:32:00   20  extremely technical with respect to exactly what they're

21  saying.  Surfactant toxicology is using skin

22  sensitization, oestrogenicity, toxicology of surfactants.

23  You know, the jury isn't going to be able to necessarily

24  understand this document without a -- you know, an actual

09:32:18   25  explanation as to what those meanings are.

1                And so it's absolutely essential.  You know, he

2    says it's for a closing statement, but what we say in

3    closing is not going to be evidence.  And at the end of

4    the day, you know, reading this, the average juror isn't

09:32:33   5    going to understand what these actual meanings are.

6                I mean, it's essentially a document that's

7    absolutely appropriate for an expert such as Dr. Sawyer,

8    who's familiar with these actual terms, to put this into

9    context in the over-arching understanding of surfactants

09:32:48   10   and how those play a part in exposure.  And Mr. Johnson's

11   exposure specifically.

12               MR. GRIFFIS:  For a witness who hasn't been

13   disclosed on this, I suppose it could be done -- he

14   could -- Mr. Dickens could read to him, without saying

09:33:03   15   this is coming from a Monsanto document or Exhibit 209,

16   "Do you agree that part of the toxicity of surfactants is

17   related to the surfactant action, which destabilizes cell

18   membranes," or whatever sentence he wishes to point to on

19   this page, get his agreement, and then tie all of that

09:33:24   20   together in closing.

21               If this is too technical for the jury to

22   comprehend without that explanation, he can get the

23   explanation without putting up the document, calling it a

24   Monsanto document, and securing the testimony that he is

09:33:36   25   in agreement with Monsanto for this multi-page technical

3576

1 document.

2          MR. DICKENS:  Your Honor, it's already in

3 evidence.  I mean, there's no reason we should need to

4 go, kind of, through that process.  And we have a

09:33:47   5 document in evidence that -- you know, that we can use.

6          I mean, Mr. Griffis seems to indicate yes.  I

7 mean, we understand that an explanation of this is

8 relevant.  There's no reason we shouldn't be able to show

9 the actual document that is in evidence in order to do

09:34:04   10 so.

11          It would just be far simpler and, you know,

12 expedite this whole process, rather than reading it and

13 leaving it without context.

14          THE COURT:  What is the purpose of this line of

09:34:14   15 questioning?  You're just trying to get into the

16 record -- or get him to explain to the jury that he

17 agrees with Dr. Martens, the Monsanto employ, he agrees

18 with Dr. Martens' conclusions on surfactant toxicology?

19 I mean, that's really the evidence that you want?

09:34:29   20          MR. DICKENS:  I'm explaining what this actually

21 means.  It is, you know, a basis for it.

22          So, you know, once again there's, you know, five

23 highly specific technical bullet points here.  And so Dr.

24 Sawyer -- the basis of the testimony would be to kind of

09:34:45   25 explain these points, what these conclusions are that

3577

were made.  Yes, those conclusions were made by Monsanto
after reviewing the surfactant toxicology, but he put
that into context as to what that actually means with
respect to surfactants and how that plays a part in
exposure.

09:35:01

And so, really, the basis is putting this into
context.  Because, you know, you read this now to a lay
person, it's essentially, you know, meaningless.  It's
hard to put this -- you know, know how this fits into the
overall scheme.  And the fact finder needs to be able to
understand that to understand the exposure aspect of this
case, how the surfactants play a role in the dermal
exposure in Mr. Johnson's exposure.

09:35:11

So these bullet points -- the real basis is to
put those into context, what Monsanto's conclusions were,
but to put some basis to that so the fact finder can
understand.

09:35:28

THE COURT:  All right.  And at what point -- at
what point in his testimony is it that you intend to go
through this with him?

09:35:41

MR. DICKENS:  You know, I intend to, kind of,
lay the foundation:  Here's what surfactants are.  Go
through, you know, what the actual surfactants are in the
Ranger Pro that Mr. Johnson used, explain how those work,
explain how it fits into, you know, absorption into the

09:35:54

1 skin, talk about the toxicology generally and then, you

2 know, use it at that point in time.  It would be, you

3 know, fairly early on in the testimony.

4        Yeah.  And -- right, exactly.  And so after that

09:36:09  5 process, then, you know, we'd show him the document.  You

6 know, we'd put up this last slide.  We'd go through, "And

7 what does this mean," essentially is the type of

8 testimony we'd get.

9        THE COURT:  All right.  I think you need to -- I

09:36:21  10 mean, the document is in evidence.  I'll allow you to

11 show it to him first, ask him if he agrees with these

12 conclusions that were arrived at by Dr. Martens.

13        And then if he says he agrees, then you can show

14 it and have him explain it.  All right?

09:36:37  15        MR. DICKENS:  Thank you, your Honor.

16        MR. GRIFFIS:  The last issue is about bans.

17 That's Exhibit 254.  But it's also about eliciting

18 testimony about bans in general.

19        This is an issue that came up some weeks ago in

09:36:53  20 chambers, your Honor.  We discussed the issue of bans.

21 Mr. Wisner actually argued that bans should be okay

22 because they're not -- as opposed to foreign regulatory

23 documents, which he was arguing for the exclusion of.

24 Because, whereas foreign regulatory documents were based

09:37:11  25 on scientific decisions, bans were political.  So they

1    were different.

2           Well, that's why we don't think the bans are

3    relevant.  On this document, on the third page, it has

4    the mention of bans, "What could be done in particular as

09:37:28    5    regards to co-formulants?"  And then underneath, it says,

6    "The Commission" -- in bold, "The Commission has proposed

7    to member states to ban POE-tallow amine as a

8    co-formulant in glyphosate-based products."

9           And you will recall the testimony from

09:37:50    10   Dr. Portier on the structure of the European regulatory

11   regime.  He testified that EFSA, "EFSA," and ECHA,

12   "ECHA," were scientific organizations.  And they did

13   scientific reviews.  And then they referred things up to

14   the European Commission, which is a political body, and

09:38:10    15   made political decisions based on those scientific

16   reviews.

17          This is not based on a scientific review by one

18   of these agencies.  And if it were based on a scientific

19   review, we haven't had testimony about that process or

09:38:24    20   the relevance of that process to this case.  It's purely

21   an inflammatory statement that, "Look, Europe has banned

22   this, therefore, you should fear it."

23          These -- this has happened for purely political

24   reasons.  And whatever the reasons were, whatever went

09:38:44    25   into that decision, it's not something about which

1  there's been testimony.  So it's a big sideshow, and it's

2  very likely to confuse and distract the jury.  There's no

3  need for it.

4         If there are toxicological reasons based on

09:38:57  5  science that POEA is dangerous, then Dr. Sawyer, who is a

6  toxicologist, can give those scientific reasons without

7  referring to political bans taking place in Europe.

8         MR. DICKENS:  Your Honor, the POEA issue's

9  already into evidence.  We already have testimony about

09:39:16  10  it, the one from Dr. Portier.  Dr. Heydens has already

11  discussed the ban of the POEAs.

12         The POEA is the surfactant, actually, in the

13  Ranger Pro used by Mr. Johnson in this case.  There's a

14  document in evidence saying POEA is a hazard.  And so the

09:39:34  15  idea that POEA should not come into evidence is --

16         THE COURT:  Well, it's that the POEA ban should

17  not come in.  That is what Mr. Griffis is saying.

18         MR. DICKENS:  Right.  And that's already come

19  into evidence.  I mean, we already have testimony about

09:39:50  20  that ban that has been introduced to this jury.

21         I don't need to actually use this particular

22  document.  You know, we can just discuss that -- you

23  know, once again, I mentioned we're going to talk

24  about -- a lot about surfactants today.  That fits right

09:40:02  25  into Dr. Sawyer's wheelhouse as to the testimony he'll be

1   giving here.

2          And so the POEA is actually the surfactant used

3   in the Ranger Pro used by Mr. Johnson.  And one of the

4   big arguments that we've heard throughout is that the

09:40:16   5   European agencies have said that glyphosate is safe and

6   safe for use.  But the reality is that the Ranger Pro

7   being used by Mr. Johnson cannot be sold in Europe.

8          And, you know, we don't need to get into -- I

9   mean, if they want to go into the -- you know, and ask

09:40:30   10   him, "Well, is that a political process," they can ask

11   him that question.

12          But the fact that POEA -- the ban should not

13   come into evidence, it's already in evidence.  And so --

14          THE COURT:  I don't recall.  Did any of the

09:40:43   15   prior witnesses discuss the POEA ban, Mr. Griffis?

16          MR. GRIFFIS:  There were brief mentions in a

17   couple of places for the ban.  We feel those were

18   prejudicial, and they should have been halted, but we

19   didn't actually have a ruling from your Honor at that

09:41:00   20   point in time.  We raised this previously, but it was in

21   the context of foreign regulatory documents.  And we

22   haven't had the opportunity to raise every single issue

23   we would like to.

24          We don't think there should be any further

09:41:13   25   testimony about it.  I think it's not accurate, for

1    example, that Ranger Pro can't be sold in Europe.  What
2    this says is the Commission has proposed to member states
3    to ban these.  I don't believe that opinion is in
4    effect and entirely affects everywhere in Europe.  And if
09:41:28    5    it is, then we would need a lot of testimony about that,
6    which we don't -- there's no proposal that we have.

7            And the origin of them is not from the
8    scientific agencies.  The scientific agencies that make
9    scientific decisions did not make this decision.  This is
09:41:44    10    caused by green EU members, other political action,
11    et cetera, about which we really don't need to go.

12            MR. DICKENS:  Your Honor, this document is
13    actually dated 2012.  Before Mr. Johnson ever used the
14    product.  And so, you know, without state of mind -- this
09:42:01    15    goes to state of mind with respect to whether or not the
16    safety of Roundup or glyphosate formulations -- you know,
17    the state of mind of Monsanto with respect to continuing
18    to sell these products here in the United States, when
19    POEA had been banned in other foreign regulatory systems.
09:42:20    20            MR. GRIFFIS:  It's a June 29th, 2016, document,
21    on page 1.

22            THE COURT:  Yes.  I see the date.

23            MR. DICKENS:  I apologize for that.

24            MR. GRIFFIS:  I see where you're looking.

09:42:31    25            MR. DICKENS:  Yeah, on the third page.  That's

                                                                    3583

1   what I was looking at.  I apologize, your Honor.

2           THE COURT:  Okay.  So I'm going to exclude any

3   reference to Plaintiff's Exhibit 24, the European

4   Commission fact sheet, and exclude any reference to

09:42:45   5   the -- any further reference to the POEA-tallow amine

6   proposed ban in Europe as unduly confusing, undue

7   consumption of time, not relevant to the issues here and

8   more prejudicial than probative.

9           MR. GRIFFIS:  Thank you, your Honor.

09:43:03   10           THE COURT:  Okay.  All right.  So anything else

11   with regard to Dr. Sawyer before we can get started?

12           MR. DICKENS:  Nothing, your Honor.  If I could

13   just have two minutes to let Dr. Sawyer know of the

14   rulings here, so that we're not violating anything, that

09:43:15   15   would be helpful.

16           THE COURT:  Yes.  That's fine.  Okay.  Great.

17   So we'll let the jury in in just a minute.

18           (Interruption in proceedings.)

19           THE COURT:  Good morning, Ladies and Gentlemen.

09:50:55   20   Welcome back.

21           Mr. Dickens, you may call your next witness.

22           MR. DICKENS:  Thank you, your Honor.  At this

23   time, plaintiff's call Dr. William Sawyer.

24           THE COURT:  Good morning, Dr. Sawyer.  Please

09:51:24   25   step up here to the witness stand and remain standing

3584

1  while the clerk swears you in.

2          THE WITNESS:  Good morning, your Honor.

3          THE COURT:  Good morning.  Please remaining

4  standing, and the clerk will swear you in.

5

6                    WILLIAM ROBERT SAWYER,

7          having been first duly sworn, was examined

8          and testified as follows:

9

09:52:02  10        THE CLERK:  Would you please state and spell

11  your name for the record.

12          THE WITNESS:  William Robert Sawyer,

13  S-A-W-Y-E-R.

14          THE COURT:  Thank you.

09:52:15  15        You may proceed, Mr. Dickens.

16          MR. DICKENS:  Thank you, your Honor.

17

18                    DIRECT EXAMINATION

19  BY MR. DICKENS:

09:52:18  20    Q.  Good morning, Dr. Sawyer.

21    A.  Good morning.

22    Q.  Can you please introduce yourself to the jury,

23  and tell them something about yourself?

24    A.  Yes.  You heard my name.  I am a toxicologist.

09:52:28  25  My training is from a medical school in -- specifically

3585

1  in toxicology.  I've been practicing nearly 30 years.

2      Q.  And you mentioned medical school.  Where did you

3  go to medical school?

4      A.  Indiana University School of Medicine with a

09:52:46  5  Ph.D. in toxicology.  And I trained under the late

6  Dr. Forney.

7      Q.  When did you graduate from medical school?

8      A.  I graduated from IU in 1988.

9      Q.  And prior to graduating medical school, you

09:53:01  10  actually obtained a Master's; is that correct?

11      A.  Yes.  I have a Master's degree in cellular and

12  molecular biology from State University of New York,

13  Geneseo.

14      Q.  And after graduating medical school, you said

09:53:16  15  you got a Ph.D. in toxicology; is that right?

16      A.  That's what I -- I went through a Ph.D. program

17  through the medical school in -- specifically in

18  toxicology, which included the first three years of

19  medical school course curriculum, along with specific

09:53:31  20  training in toxicology.  It was also training in the

21  State Department of Toxicology, as we handled all the

22  autopsies and deaths for the State of Indiana.

23      Q.  We've talked a lot about this case and heard

24  from witnesses who are toxicologists.  Can you explain to

09:53:47  25  us what is toxicology?

3586

1    A.   It's a very specific field.   We are the ones who

2  determine causation, what chemicals, pharmaceuticals,

3  environmental substances can do to the body.   And

4  physiologically and mechanistically how they operate.

09:54:03
5    Q.   After graduating with your Ph.D. in toxicology,

6  what did you do next in your career?

7    A.   I worked for five years as a governmental

8  toxicologist in Syracuse, New York.   I was responsible

9  for assessing the environmental exposures, forensic

09:54:21
10  matters, in general Public Health.   Everything from lead

11  in water to hazardous chemicals from, I think, almost 18

12  different Superfund sites in the area.

13    Q.   You said that was through the Department of

14  Health?

09:54:39
15    A.   Yes.

16    Q.   After -- how long were you with the Department

17  of Health?

18    A.   Five years.   And during that time, I started

19  consulting and developed my own consulting business in, I

09:54:48
20  think, 1990, which I am still with today.

21    Q.   Okay.   And what's the name of that consulting

22  business?

23    A.   Toxicology Consultants and Assessment

24  Specialists, LLC.   And I do work throughout the US and

09:55:02
25  also internationally.

1    Q.  And from 1990 to the present, you've had that

2  sole business as a toxicology or consulting toxicologist;

3  is that right?

4    A.  Correct.

09:55:12    5    Q.  And you said "consulting."  Who do you consult

6  with in that role for your actual business?

7    A.  Civil matters, which about -- 60 percent are

8  plaintiff, about 40 percent defendant.  Also a number of

9  governmental agencies, the United States Attorney's

09:55:29    10  Office, US Navy, various prosecutors, Attorney State

11  General of Montana, New York, New Jersey and other

12  states.

13    Q.  So you said both plaintiffs' and defendants'

14  side.  Have you ever served as an expert for a

09:55:44    15  manufacturer?

16    A.  Many times.  And currently.

17    Q.  So it's not just on the plaintiff's side of

18  claiming a chemical caused an injury.  You've also served

19  as an expert for the defendant saying it didn't?

09:55:58    20    A.  Oh, yes.  I have some very good defense experts

21  who have true, good defense cases.  I'm very selective in

22  what cases I take.

23    Q.  Now, there's a term "forensic toxicologist."

24  Are you a forensic toxicologist?

09:56:11    25    A.  Yes, I am.

3588

1      Q.  Can you explain what a forensic toxicologist is?

2      A.  My training was in forensic toxicology.

3  Forensic toxicology is simply application of science to

4  the law.  The word "forensic," the Latin root stems from

09:56:25   5  debate, as we are debating today.  This is a forensic

6  matter.

7      Q.  And so, you know, based on that, you're involved

8  in a lot of cases, both civil and criminal; is that fair?

9      A.  That's correct.

09:56:37   10      Q.  And so you've probably done this a lot,

11  depositions and trial testimony.  Is that fair?

12      A.  Yes.  When I looked at my list of cases and

13  trials, I testify in court, in trials, about six times

14  per year on the average.

09:56:50   15      Q.  And, once again, that's both for plaintiff and

16  defense side?

17      A.  That's correct.

18      Q.  Other than your work for the Department of

19  Health that we talked about and your own company as a

09:57:00   20  forensic toxicologist, what else have you done in the

21  field of toxicology?

22      A.  I've served as a peer-reviewer for the Forensic

23  Examiner, which is a peer-reviewed journal.  In the past,

24  I've directed various laboratories as a licensed lab

09:57:20   25  director in multiple states, including clinical, forensic

3589

1 and environmental analyses.  And probably other things,

2 but I don't have my CV in front of me.

3    Q.  That fine.  You mentioned a laboratory director.

4 Who were you a laboratory director for?

09:57:33  5    A.  Oh, for Express Laboratories in Rochester,

6 New York, Public Health Laboratory in Syracuse, New York,

7 Lozier Laboratory in Rochester, New York.  Possibly

8 others.

9    Q.  Are you Board-certified in anything?

09:57:52  10    A.  Yes.  American Board of Forensic Medicine in

11 1996, I believe.

12    Q.  Do you also teach in the field of toxicology?

13    A.  Yes.  I've taught medical students at the State

14 University of New York, Upstate Medical Center in

09:58:09  15 Syracuse for, I think, 22 years, as an adjunct assistant

16 professor in the Department of Medicine.

17       I specifically taught a portion of the clerkship

18 toxicology course, as well as a portion of the

19 second-year students in Public Health.

09:58:31  20    Q.  With respect to -- you mentioned in your work,

21 you know, both in your actual business and otherwise,

22 you've worked for government agencies.  What have you

23 been doing for those government agencies?

24    A.  Oh, a wide variety of cases.  I've worked in

09:58:49  25 criminal cases, in terms of cause of death from

3590

1  intentional poisoning with arsenic thallium.  In fact,

2  the movie was produced on my original work in 1993 called

3  "The Black Widow."

4        I've worked on prosecution cases involving drugs

09:59:13  5  and alcohol, which are quite common.  I've worked on

6  large chemical case matters, worked on the BP Oil

7  release.  There's just numerous cases.

8        Q.  Have you, in the cases you've worked on,

9  established causation analysis for chemicals or

09:59:28  10  pesticides?

11        A.  Yes.

12        Q.  How often have you done a chemical analysis with

13  respect to causation for chemicals?

14        A.  Really, continuously since the last -- about the

09:59:44  15  last 30 years.  That's how I started in the Health

16  Department.

17        Q.  Have you ever published in any peer-reviewed

18  journals?

19        A.  Yes.

09:59:53  20        Q.  How many?

21        A.  Not a lot.  Maybe -- probably about 8 or 10

22  original articles.  And then probably about 25 review

23  articles.

24        Q.  With respect to those articles, those are in the

10:00:11  25  field of toxicology?

3591

1       A.  Yes.

2       Q.  In some of the cases you've worked on, have you

3  ever done anything with respect to 911 and the World

4  Trade Center?

10:00:18   5       A.  Oh, yes.  I was called on that shortly after it

6  occurred and wrote a report, which was very extensive,

7  including all of the chemicals that were released,

8  including volatiles, such as benzene, even dioxin.  And

9  probably nuclear aromatic hydrocarbons and other

10:00:45  10  carcinogens, which led to a much broader investigation

11  ultimately.

12       Q.  In your work, have you ever been involved in

13  preparing product labeling or material safety data

14  sheets?

10:01:01  15       A.  I'm sorry, I didn't quite hear that.

16       Q.  Yeah, no.  I'm sorry.  I'll be louder for you.

17           Have you ever been involved in -- in product

18  labeling or material safety data sheets?

19       A.  Oh, yes.  I have prepared material safety data

10:01:11  20  sheets for corporations, yes.  And product labels as

21  well.

22       Q.  And can you tell us a little bit about that?

23  You know, what type of corporations were these?

24       A.  Well, one -- the first one I ever did was a --

10:01:25  25  actually, a corporation that made a bookbinding spray for

3592

1 libraries.  And, unfortunately, their original spray had

2 carbon tetrachloride in it, which is a very dangerous

3 liver carcinogen.  And then they had switched to a

4 chemical, which was highly volatile.  And I actually

10:01:47  5 remember doing a flame test with it.  I could shoot a

6 flame about 10 feet with it.  And they reformulated.  And

7 then I wrote a material data safety sheet and label for

8 that product, which is still in use.

9      Q.  And --

10:02:01  10      A.  Using a non-flammable propellant.  Because it

11 was designed for use in close quarters, in offices and

12 closets.

13      Q.  And what was your particular role in that

14 process?

10:02:17  15      A.  Safety.  I had to be certain that a number of

16 characteristics were met, that the international

17 guidelines for safety were met in terms of warnings for

18 each of the chemicals in the product.

19          And, also, with respect to the label -- labels

10:02:37  20 are interesting.  You actually have to have labels in a

21 certain format of certain size, letters and displays that

22 are easily understood and read.  And there's actually

23 standards for this.  There's a big volume of documents

24 which we use to write labels and material safety data

10:02:55  25 sheets that follow strict guidelines.

1     Q.  And who ultimately is responsible for the

2  warnings in the product labeling?

3     A.  Well, the manufacturer.

4         MR. DICKENS:  At this time, your Honor, we'll

10:03:05   5  tender Dr. Sawyer as an expert in toxicology, forensic

6  toxicology and exposure assessments.

7         THE COURT:  Any *voir dire*?

8         MR. LOMBARDI:  No objection, your Honor.

9         THE COURT:  All right.  Very well.  Then I will

10:03:16   10  accept Dr. Sawyer as an expert in toxicology and forensic

11  toxicology and related assessments.

12         You may proceed.

13     Q.  BY MR. DICKENS:  Okay.  Doctor, you're here

14  today in your role as an expert; is that right?

10:03:27   15     A.  Yes.

16     Q.  And you've reached some opinions in this case?

17     A.  Yes, I have.

18     Q.  And the opinions that you're going to be

19  expressing here today, do you hold those to a reasonable

10:03:39   20  degree of scientific certainty?

21     A.  Yes.

22     Q.  And did you review your role in this case from

23  the experience of a toxicologist?

24     A.  Yes.

10:03:49   25     Q.  And did you reach an opinion to a reasonable

3594

1  degree of scientific certainty that Roundup and Ranger

2  Pro can cause non-Hodgkin's lymphoma?

3      A.  Yes.  I have been following the peer-reviewed

4  literature on glyphosate since mid-1990s.

10:04:06  5      Q.  And what is the opinion you've reached,

6  generally?

7      A.  That, clearly, glyphosate and with its

8  combinations of adjuvants, is a known carcinogen.

9      Q.  You just used the word "adjuvants."  Can you

10:04:23  10  tell us what that word means?

11      A.  Well, glyphosate is the -- the primary -- the

12  principal ingredient in Roundup and Ranger Pro.  And

13  glyphosate is roughly 41 percent of the product in

14  Roundup and about 51 percent, I believe, in Ranger Pro.

10:04:46  15          However, there are additional chemicals and

16  chemical -- what we call reactants, by-products, within

17  the Roundup and Ranger Pro.  It's not just glyphosate and

18  water.

19      Q.  There is water in Roundup and Ranger Pro; right?

10:05:06  20      A.  Right.  But there's more than just water in

21  glyphosate.

22      Q.  And we'll get to some of those in just a little

23  bit.  But did you also reach an opinion, to a reasonable

24  degree of scientific certainty, that glyphosate

10:05:19  25  formulations have a greater potential to cause cancer

1  than glyphosate alone?

2          A.  Yes, I did.  Yes.

3          Q.  And what is that opinion?

4          A.  That glyphosate, based on animal test data, is

10:05:43   5  carcinogenic by itself.  However, there are additives to

6  the product which increase and enhance its

7  carcinogenicity by several mechanisms.

8          Q.  And one of those that we'll talk about is

9  surfactants; is that correct?

10:05:56   10          A.  That's correct.

11          Q.  Okay.  And those are your general opinions.  Did

12  you also look at Mr. Johnson's case specifically?

13          A.  Yes, I did.  In fact, I early on interviewed

14  Mr. Johnson by telephone.

10:06:08   15          Q.  And did you reach an opinion, after your review

16  of this case, as to whether or not Mr. Johnson's Roundup

17  and Ranger Pro exposures substantially contributed to his

18  diagnosis of non-Hodgkin's lymphoma?

19          A.  Yes.

10:06:22   20          Q.  And what is that opinion?

21          A.  That Mr. Johnson, and I'll explain in detail

22  when asked, was heavily exposed, far more than the

23  individuals in the Monsanto UK POEM studies, for example.

24  He was heavily exposed.  He had a wet face.  He had

10:06:48   25  exposures in which he was notably damp or wet with the

3596

1 material.  And his --

2      Q.  And based -- I'm sorry.

3      A.  -- and his use of the product was

4 extraordinarily heavy, approximately 50 gallons per hour.

10:07:04    5      Q.  And is that a lot?

6      A.  Yes.  Backpack sprayers put out between 4 and 24

7 gallons per hour, on the average about -- about

8 16 gallons per hour, and he was spraying at 50 gallons

9 per hour through a rigged system, which operated at an

10:07:23   10 uncontrolled pressure.  It was either on or off.

11      Q.  And you know, based on Mr. Johnson's testimony,

12 you understand, you know, he had roughly a 50-gallon tank

13 he'd been spraying out of, is that what you're basing

14 that 50-gallon number on?

10:07:43   15      A.  Right.  And that he -- he actually would go

16 through as much as 150 gallons of this stuff in one day.

17      Q.  Can you -- you mentioned Mr. Johnson and

18 speaking to him, can you tell us what types of materials

19 you reviewed before reaching your opinions in this case?

10:07:56   20      A.  Certainly.  I initially reviewed a very large

21 quantity of medical records on Mr. Johnson from -- some

22 records dating prior to his diagnosis and then up at his

23 diagnosis, including pathology results in August of 2014,

24 and then his treatment records.

10:08:27   25          I also reviewed several of his depositions.

1  When I say "several," there was a Worker Comp deposition,

2  and I believe there were two depositions following that.

3  I also reviewed -- I had a file box, a full file box, of

4  studies that I reviewed, which would be approximately

10:08:48  5  5,000 pages.  I brought with me today what I could handle

6  on the airplane, which is a good amount of material, but

7  just a variety of documents also from Monsanto, in fact,

8  memorandums, emails, official documents, including

9  reports that were issued by Monsanto.

10:09:15  10      Q.  You mentioned studies, were those both published

11  studies and internal Monsanto studies?

12      A.  Yes.  When I say "studies," my large file box is

13  primarily published studies from the generally accepted

14  period of the literature, but I also have a large volume

10:09:31  15  of inhouse studies from Monsanto, many of which were

16  never provided to the EPA or any regulatory agency.

17      Q.  Those studies, were those both epidemiological

18  studies and the animal studies that you reviewed?

19      A.  Primarily the animal studies or the -- what we

10:09:51  20  call the *in vitro* studies.

21      Q.  And -- did what did those studies entail?  Did

22  you review any studies with respect to exposure of

23  individuals or animals to Roundup and how that affects

24  carcinogenicity?

10:10:07  25      A.  I certainly did.  The key studies that I

3598

1 reviewed with respect to exposure were actually

2 Monsanto-published studies.

3     Q.  You mentioned some internal correspondence,

4 emails, other types of documents with Monsanto.  Are

10:10:27  5 those documents you reviewed and relied upon in reaching

6 your opinions?

7     A.  Yes.

8     Q.  And these documents that you reviewed, the

9 internal documents for Monsanto, are those types of

10:10:45  10 documents that are reasonably relied upon by experts in

11 your field as a toxicologist?

12     A.  Yes.  All the time, yeah.

13     Q.  And what do you mean all the time?  How do

14 toxicologists rely on that information?

10:10:56  15     A.  Well, a toxicologist is sort of like a

16 detective.  Okay.  We look hard and deep to try to find

17 all the evidence we can, whether it is helpful for the

18 client or adverse to the client.  It doesn't matter.  The

19 objective is to look at every possible piece of evidence

10:11:14  20 and then assemble it into a conclusion based on the merit

21 of that evidence.

22     Q.  And is that what you did in this case?

23     A.  Yes.

24     Q.  And what in particular were you investigating?

10:11:27  25     A.  A number of factors.  To start with, the

3599

1 exposure dose, which was very thoroughly calculated by

2 Monsanto in their operator exposure studies.

3      Q.  And can I just stop you right there.  Can you

4 define what "exposure dose" means?

10:11:50  5      A.  Yeah.  Okay.  Exposure is, in this case, how

6 much material gets on the body.  Okay.  The dose,

7 however, is how much gets into the body, in the systemic

8 circulation or into the tissue target, so there's a big

9 difference.  If, for example, the dermal absorption was

10:12:12  10 only 1 percent, only 1 percent of that material would

11 make its way to the target organ, whether it be the

12 dermis, the skin or the liver or internal organs, that's

13 what we call the internal dose.

14      Q.  Is that also referred to as systemic dose?

10:12:26  15      A.  Yes.

16      Q.  So systemic or internal, it means the same

17 thing?

18      A.  Yes, yeah.  It means -- the bottom line is the

19 target organ.

10:12:35  20      Q.  And so you were discussing what you were

21 investigating in this case, and so one of the first

22 things you did was investigate all of the materials to

23 try to figure out exposure and internal dose; is that

24 fair?

10:12:47  25      A.  Yes.  The first step was to determine whether

1    Mr. Johnson was significantly exposed, that is, did the

2    exposure at work actually make it into his systemic

3    circulation?  Did it make it into the blood and impact

4    any of the stem cells that ultimately developed into a

10:13:13    5    T-cell lymphoma?  So really the question for Mr. Johnson

6    was:  Was he significantly exposed, and if so, was that

7    exposure dose substantial and significant enough to cause

8    damage to his stem cells.

9         Q.  And based on your experience, education, review

10:13:36   10    of all of the materials, you reached an opinion that, in

11    fact, it was enough of an exposure dose to cause his

12    non-Hodgkin's lymphoma?

13         A.  Much so.

14         Q.  Now, to be clear, Doctor, you don't believe that

10:13:56   15    Roundup or Ranger Pro needs to be taken off the market

16    for all purposes; correct?

17         A.  No.  If there were proper warnings, if an

18    individual knew that they were dealing with a carcinogen

19    and it was used in a limited fashion without producing

10:14:11   20    what we call aerosol, that is aerosol that drifts and

21    gets all over the body, it could be used.

22         Q.  And, in fact, like many people here in this

23    room, you've used Roundup; correct?

24         A.  I believe it is fairly popular.

10:14:27   25         Q.  And what do you mean by that?

3601

1        A.   Well, I think it's used both over the shelf.

2   You can buy it at Walmart or Home Depot.  I buy it at the

3   Bailey's Hardware Store in Sanibel, Florida.

4        Q.   And so you believe that Roundup and Ranger Pro

10:14:44   5   could potentially be used properly; correct?

6        A.   Yeah.  There is a proper way of using it, yes.

7        Q.   Okay.  And so do you take any precautions in

8   your use of the Roundup?

9        A.   Yes.  I've used it several times per year.  The

10:14:56  10   first time I ever used it was about 20 years ago, and I

11   was absolutely disgusted, because I had bought a

12   backpack, and I used it on spot weeds, and the wind blew

13   it all over my legs.  I immediately washed with soap, and

14   I actually went into my swimming pool after that and --

10:15:16  15        Q.   And why did you do that?

16        A.   Well, because it produced an aerosol mist that

17   the wind would uncontrollably blow back on the body.

18        Q.   Did you try to prevent that drift?

19        A.   I sure did.

10:15:27  20        Q.   Okay.  But you weren't able to?

21        A.   No, I did.  I drilled with about a

22   30-thousandths drill into my orifice in my workshop and

23   turned it into, basically, a squirt gun, where I can

24   directly squirt weeds.  I have mulch.  I don't have

10:15:45  25   grass, and I have -- occasionally I have weeds shoot up

3602

1  in that mulch, and I can direct it right on those weeds

2  with no aerosol production, and I wear heavy rubber

3  gloves, and I have zero exposure.

4      Q.  Okay.

10:15:59  5      A.  So, I mean, the -- I think that -- I don't think

6  that the material necessarily needs to be completely

7  banned, but there are a lot of things we use that are

8  dangerous, but it's a matter of how you handle it and the

9  warnings.

10:16:09  10      Q.  Okay.  And so you -- you made that modification

11  to the actual hose.  Was that after your first time of

12  spraying?

13      A.  Yes.

14      Q.  And was that because of your first experience

10:16:18  15  with the drift?

16      A.  Yes.  And I knew at that time it had

17  carcinogenic potential.

18      Q.  So you had already known that?

19      A.  Yes.

10:16:27  20      Q.  And did you take that into consideration in your

21  choice to use it?

22      A.  I did.

23      Q.  So you actually made the choice, you had the

24  choice whether or not to use the product?

10:16:36  25      A.  Yes.

1      Q.  How much -- you mentioned your use.  How large

2  of an area are you actually spraying?

3      A.  Well, I have nearly an acre, but as I say, it's

4  almost 100 percent mulch.  I don't have grass, but I do

10:16:56   5  get occasional weeds.

6      Q.  How does your exposure, when you do that, how

7  does that compare to Mr. Johnson?

8      A.  Mr. Johnson was using a higher pressure system,

9  which was on or off.  He had no controls to reduce it,

10:17:16   10  and he was, based on his testimony, as I understand,

11  about 50 gallons in an hour, which is several times what

12  would normally come out of a --

13          MR. LOMBARDI:  Your Honor, may we approach?

14          THE COURT:  Yes.

10:17:37   15          (Sidebar.)

16          MR. LOMBARDI:  He had no nothing in his expert

17  report about Mr. Johnson's use of this -- I don't know

18  what the right term is -- the 50-gallon pump and the

19  details of how that worked or a comparison between that

10:17:57   20  and the way that he used the product, so this is beyond

21  the scope of his opinions.

22          MR. DICKENS:  Your Honor, they're the ones that

23  brought it up.  We weren't going to get into how he uses

24  it.

10:18:09   25          THE COURT:  I know.  Was there anything -- did

3604

1 he review any materials that indicated how Mr. Johnson

2 used it?

3          MR. DICKENS:  Absolutely.  He knew he used his

4 truck sprayer.

10:18:19 5          THE COURT:  He knew all of that and that was --

6 whatever reports he read about Mr. Johnson was all

7 disclosed?

8          MR. DICKENS:  Absolutely.  He went into detail

9 about how he used that, how he used the truck sprayer --

10:18:36 10 67-page report that goes -- that all the details -- all

11 of the evidence Mr. Johnson has given (inaudible).

12          THE COURT:  So what is it that's new?

13          MR. LOMBARDI:  What's new is that he -- I don't

14 dispute that he talked about he used a backpack sprayer

10:18:51 15 or that he used the pump in the back of the truck.  I

16 don't dispute that, but now we've had discussion about

17 it's an unregulated pump.  It was out of control, the way

18 it sprayed, you couldn't control the way it's spraying.

19 That stuff I don't believe was in his report.  And there

10:19:09 20 certainly wasn't any comparison between the way

21 Mr. Johnson did it and the way Mr. -- Dr. Sawyer did it.

22 And this did come up at his deposition.  Dr. Sawyer's use

23 of Ranger Pro did come up at his deposition.  There was

24 no comparison of that at all.  But no detail other than

10:19:26 25 he used the pump in the back of the truck, is my

3605

1  recollection.

2        MR. DICKENS:  We wouldn't -- he can include any

3  use by Dr. Sawyer.  We have to explain how his exposure

4  compares to Mr. Johnson.

10:19:44   5        THE COURT:  I'll allow it.

6        (End sidebar.)

7        THE COURT:  You may continue, Mr. Dickens.

8     Q.  BY MR. DICKENS:  Okay.  Dr. Sawyer, we were just

9  discussing how your exposure compared to the exposure of

10:20:04  10  Mr. Johnson.  Can you explain to us, again, how that --

11  your exposure in your one-acre yard compared to

12  Mr. Johnson?

13     A.  Well, what I explained was I experienced what we

14  call drift.  That's aerosol droplets that the wind blows

10:20:18  15  back onto the body.  Now, I never experienced any drift

16  above my knees, but Mr. Johnson experienced drift that --

17  in fact, to his entire body, including even face.  And he

18  was using an application rate about three times above

19  that which is that which was used in the Monsanto

10:20:43  20  operator exposure assessment study.  Thus, his exposure

21  from the standpoint of the dose I relied on from the

22  Monsanto study was severalfold higher than that.

23     Q.  And so, you know, based on that, once again, you

24  believe that there's appropriate uses for Roundup or

10:21:10  25  Ranger Pro, if used in small quantities?

3606

1    A.  Yes, with appropriate warnings and the proper

2 equipment.

3    Q.  And because you were aware of the

4 carcinogenicity potential of Roundup and Ranger -- or

10:21:24    5 Roundup when you used it, you were able to take that into

6 consideration?

7    A.  Yes.  I'm an extreme outlier.  I mean, I've been

8 following -- I looked at the original hairy cell leukemia

9 studies back in the '90s.  I've been following it for

10:21:38   10 years.  I know what it does.  That's why I was rather

11 disgusted when I got it on my lower legs.

12    Q.  And that's why you immediately stopped, went,

13 washed it all off and got in the swimming pool?

14    A.  Yeah.

10:21:53   15    Q.  Now, what type of glyphosate products did

16 Mr. Johnson spray, based on your understanding?

17    A.  Primarily, he initially worked with what we call

18 Roundup, which is 41-percent glyphosate, with a number of

19 other chemicals in it, and then later, he worked more

10:22:15   20 often with Roundup, which is basically the same mixture,

21 but simply a higher concentration, 51 percent -- or

22 52 percent versus 41 percent in the Roundup.

23    Q.  Other than the concentration, is there any

24 difference between Roundup that you can buy in stores

10:22:35   25 that ordinary consumers like us and the Ranger Pro that

3607

1  Mr. Johnson used?

2      A.  No.  The concentration is the difference.  Now,

3  if you were to go to Home Depot or Lowe's, you would find

4  that there's Roundup and -- which they call Roundup

10:22:55   5  Concentrate, and there's also a Roundup Super

6  Concentrate, which is 51 percent, and the instructions

7  simply -- state simply dilute it more when you buy the

8  Super Concentrate, so it's basically the same material.

9      Q.  Does Monsanto sell glyphosate by itself?

10:23:20   10     A.  No.  However, they license it to other

11  corporations, such as Syngenta and a number of other

12  corporations, but they don't sell it to consumers as pure

13  glyphosate, no.

14     Q.  Monsanto -- is Monsanto the manufacturer of both

10:23:39   15  Roundup and Ranger Pro?

16     A.  Yes.

17     Q.  Did Mr. Johnson use any glyphosate formulations

18  by any other manufacturer?

19     A.  Not that I found in the records or his

10:23:50   20  deposition.

21     Q.  And was Mr. Johnson ever exposed to any other

22  chemicals, pesticides or herbicides that had been

23  associated with non-Hodgkin's lymphoma?

24     A.  Not to my knowledge, no.

10:24:02   25     Q.  And you reviewed that, his chemical exposure;

1 correct?

2      A.  That's correct.

3      Q.  You mentioned, kind of, the makeup of Roundup

4 and Ranger Pro, and you said water and glyphosate and

10:24:14  5 some other stuff.  What are some of those other

6 chemicals?

7      A.  Well, propylene glycol.  Propylene glycol is

8 used to help emulsify the material.  Remember, the

9 product works by gaining entry into the plant leaf, and

10:24:36  10 the absorption of that chemical into the plant leaf is

11 very critical in terms of operating and knocking out the

12 ES -- or the EPSP enzyme, which permits plant growth in

13 light.

14           So some of these additives, propylene glycol,

10:25:01  15 dipropylene glycol, tallow amine, which is what we call a

16 POEA, a polyethoxylated ethyl amine, are all used to help

17 the penetration of the product either spread onto the

18 leaf or penetrate into the leaf and work more

19 efficiently.  It's a very clever design, really, in terms

10:25:30  20 of how this product works.

21           And so there are also what we call

22 co-contaminants that -- for example, when the POEA is

23 made, whether it's tallow amine or another POEA, there's

24 oxidation reactions in preparing that, which result in

10:25:50  25 ethylene oxide, 1, 4-Dioxane, and those two chemicals are

1 known confirmed Class A human carcinogens.  In fact,

2 ethylene oxide is one of the most potent carcinogens

3 known to man, and it's highly volatile, so when it is

4 used -- whenever ethylene oxide is present, it's volatile

10:26:12  5 as it's inhaled.

6        So there are co-contaminants.  There's even some

7 additional co-contaminants that form during the

8 production process, called N-nitroso compounds, which are

9 also known human carcinogens, which generally cause

10:26:30  10 cancer in humans, so --

11       Q.  And, Doctor -- I'm sorry.

12       A.  Yeah, I mean, it's a mixture of adjuvants,

13 surfactants, glyphosate, and then trace quantities of

14 these other carcinogens, which act in an additive and in

10:26:51  15 some cases synergistic effect to cause cancer, along with

16 glyphosate.

17       Q.  You just mentioned surfactant.  We've heard some

18 of that here in this case so far.  What is a surfactant?

19       A.  Well, a surfactant is -- think of -- think of

10:27:10  20 water on a freshly waxed car and the water droplets bead

21 up.  If you were to add surfactant to that rain water, it

22 would spread out over that waxed car, and a surfactant

23 is -- in a sense, it's a detergent.  It's a soap.  But in

24 this case, they generally use what we call non-ionic

10:27:35  25 surfactants, but the fact is the surfactant is simply

1  allowing a reduction of the hydrophobic to hydrophilic

2  repellant and allows the material to spread out evenly

3  over the leaf or the human tissue.

4      Q.  It's a fairly complicated explanation, but I

10:28:00  5  think you just said it there.  It helps, you know, spread

6  out those droplets; correct?

7      A.  Yes.

8      Q.  And so for Roundup or Ranger Pro, those

9  surfactants help it spread across the surface of the

10:28:15  10  leaf?

11     A.  It does.  And at the same time, it also enhances

12  permeability through the epidermis of the skin or the

13  leaf cuticle.

14     Q.  And so if you get it on your skin, how does --

10:28:25  15  what does the surfactant do?

16     A.  Well, a number of things.  There --

17     Q.  And I believe -- to help us out here, I believe

18  you have an -- or helped prepare a demonstrative with

19  respect to what a surfactant does in a herbicide such as

10:28:44  20  Roundup -- or in Ranger Pro.

21         MR. DICKENS:  Permission to publish Plaintiff's

22  Exhibit 36, your Honor?

23         THE COURT:  Any objection?

24         MR. DICKENS:  That's what I've given you.

10:28:56  25         MR. LOMBARDI:  Is it the board?

```
 1            MR. DICKENS:  It's --

 2            MR. LOMBARDI:  I'm sure I don't.  I trust

 3  Mr. Dickens.

 4            MR. DICKENS:  That's what I handed you earlier.

 5            THE COURT:  All right.  Thank you.  You may

 6  proceed.

 7     Q.  BY MR. DICKENS:  And so this demonstrative,

 8  Dr. Sawyer, says, "Surfactants are able to increase

 9  glyphosate absorption through the skin by," and number

10  one is:  "Removal of lipids from the epidermal surface

11  due to surfactant action."

12            What is that?

13     A.  That's a critical step.  This is a detergent

14  soap-type effect.  A lipid is a hydrophobic -- let's make

15  it simpler.  A greasy, oily material.  It doesn't mix

16  with water.  So if you have a greasy pot or pan, and you

17  add a little soap to it, you can -- and remove that

18  greasy, oily film.  That's what a surfactant does.

19            And on our skin, on our epidermal surface, we

20  have fatty acids, a number of them, and other what we

21  call hydrophobic lipid material, which is resistant to

22  letting aqueous material enter our epidermis.  So that

23  surfactant breaks that surface tension, emulsifies some

24  of that material, so there's a higher likelihood of the

25  water soluble drug, in this case glyphosate, to enter.
```

10:29:03 (line 5)
10:29:22 (line 10)
10:29:40 (line 15)
10:30:03 (line 20)
10:30:26 (line 25)

3612

1    Q.  You just mentioned soap, and some Monsanto

2  witnesses have essentially said surfactants are soaps or

3  liquid detergents or laundry detergents.  Is that your

4  understanding as well?

10:30:44  5    A.  That's -- that's true.  It's a little bit of a

6  crude definition, but yes.

7    Q.  Okay.  And so, you know, just like that soap,

8  you know, can help, kind of, with the actual epidermis,

9  can you explain how does the surfactant in Roundup

10:31:04  10  compare to what's in soap?  Is it the same thing?

11    A.  It's a non-ionic surfactant, largely.  There are

12  several surfactants used.

13    Q.  And that's in Roundup?

14    A.  Oh, yeah.  In Roundup primarily is tallow amine,

10:31:18  15  which is a POEA.  That is a very powerful surfactant, and

16  it also has some very serious toxicological consequences

17  associated with it.

18    Q.  Are POEAs used in soap or laundry detergent?

19    A.  Not to my knowledge.  Used for industrial

10:31:39  20  cleaning of tanks, I know.

21    Q.  Okay.  And so for the POEA, you said it has some

22  toxicological consequences.  What are some of those

23  toxicological consequences of POEA?

24    A.  Primarily, once it becomes systemic, it has been

10:31:57  25  shown to induce what we call DNA adducts, that is the

DNA, the molecular code material in our body, in our

cells, which determine whether we produce normal skin or

carcinogenic skin.  That DNA can be damaged by what we

call these adducts, that is the binding of the POEA, the

10:32:22   tallow amine, to the DNA, and when the DNA is read, it is

misread and becomes corrupted.  There's also oxidative

damage done to the DNA from tallow amine and other POEAs.

Q.  Has Monsanto ever conducted any carcinogenicity

studies on the surfactant such as POEA?

10:32:43   A.  No, they have not.

Q.  Has the EPA ever reviewed the carcinogenicity of

surfactants?

A.  No.  No.  I've researched that.  The only thing

EPA has done is what's called an SAR, a structural

10:32:58   activity relationship by computer.

Q.  And what is that?  Can you explain it?  You say

by computer.  How do they test that?  How does that

related in any way to carcinogenicity?

A.  Well, there are certain classes of compounds

10:33:11   that are generally carcinogenic.  For example, let's take

chlorinated hydrocarbons, such as trichloroethylene, TCE,

or DDT or dioxins or PCBs.  They're all chlorinated

hydrocarbons, and they have certain chemical

configurations with chlorine that are very often

10:33:34   carcinogenic.

1          So by performing an SAR analysis, one is simply

2     looking at the configuration of the chemical.  In this

3     case, it's an organic phosphate.  It's not a neurotoxic

4     organic phosphate, but it is an organic phosphate, and

10:33:55   5     the SAR did not find that chemical to be -- likely to be

6     carcinogenic.  That is the EPA position.

7          Q.  Okay.  And so that's based on a computer model,

8     but they haven't actually looked at any testing as to

9     carcinogenicity?

10:34:09  10          A.  No, it's never been tested.

11          Q.  And has Monsanto ever submitted any testing at

12     all with respect to the carcinogenicity of their

13     surfactants?

14          A.  No.  However, Monsanto has documented and

10:34:24  15     recommended that such evaluations be performed.  That's

16     very clear.

17          Q.  And did they ever perform them?

18          A.  No.  What has been performed are university

19     studies showing, you know, the DNA adduct formation and

10:34:43  20     DNA oxidative damage.  That's been published in the

21     peer-reviewed scientific literature.

22          Q.  Okay.  And so Monsanto themselves never

23     conducted any testing, but you mentioned universities.

24     So those are third parties?

10:34:54  25          A.  Correct.

3615

1        Q.   And those third parties have tested the

2   carcinogenicity of surfactants?

3        A.   Only the DNA aspects.

4        Q.   And going back to our demonstrative, increase

10:35:18   5   the hydration state of the skin under closed exposure

6   conditions, what do you mean there, Doctor?

7        A.   That is simply the effect, for example, that

8   skin cream would have by keeping the skin moist, less apt

9   to dry out and become less permeable.

10:35:36   10        Q.   Number three, I think we've already talked

11   about.   It increases the skin contact; correct?

12        A.   Correct.

13        Q.   And then number four, what do you mean by number

14   four?

10:35:43   15        A.   This -- this is very important to plants, not as

16   important to humans.

17        Q.   Okay.   And let's move on to number 5.   How does

18   number 5 apply to humans?

19        A.   Very critical.

10:36:02   20        Q.   And how?

21        A.   Well, glyphosate is generally accepted, widely

22   known, and even as per Material Safety Data Sheets

23   produced by Monsanto, is a skin irritant.   I don't think

24   there's any debate about that from Monsanto or anyone.

10:36:20   25   It does irritate the skin.   It can cause redness of skin,

3616

1 and that redness of skin, that's an irritant effect.

2 Whenever skin is irritated, inflammation occurs and

3 there's dilation of the dermal capillaries and blood

4 vasculature.  That's what causes red skin.  It's just a

10:36:35 5 simple fact.  It's a skin irritant.

6      Q.  And once the skin then becomes irritated in any

7 way, does that affect the amount of absorption into the

8 skin of the product?

9      A.  Heavily.  When vasodilation occurs in the dermal

10:36:53 10 layers, dermal absorption is increased.

11      Q.  So if you have any damaged skin at all, you said

12 dermal absorption of the actual Roundup or Ranger Pro

13 increases for a human?

14      A.  Yes.

10:37:06 15      Q.  And what role does that play in non-Hodgkin's

16 lymphoma?

17      A.  Well, it increases the dosage.  In other words,

18 if a person is chronologically being exposed and has skin

19 irritation developing from the use of it, certainly that

10:37:27 20 would increase dermal absorption in those specific areas

21 of irritation.

22      Q.  And is some of that what you're discussing in

23 number six here?

24      A.  That's simply an inflammation process.  That

10:37:45 25 does occur as well.  That is not necessarily significant

3617

1  with respect to increased dermal absorption.

2      Q.  Based on your review of all the materials you

3  saw in this case, is it your understanding that Monsanto

4  agrees that the increase of -- or surfactants can

10:38:06    5  increase subepidermal blood flow due to irritant action

6  of the surfactant?

7      A.  Yes.

8      Q.  So do you also know whether or not Monsanto

9  agrees that Roundup and Ranger Pro can irritate the skin?

10:38:24    10     A.  Yes.

11     Q.  And that can increase the amount of dermal

12  absorption?

13     A.  Yes.

14     Q.  Doctor, if you can turn to Exhibit 209 in your

10:38:42    15  binder.

16     A.  Okay.

17     Q.  It's a document already in evidence.  It's

18  surfactant toxicology.  And if you can turn to that last

19  page of this particular document.  Let me know when you

10:39:02    20  get there.

21     A.  All right.

22     Q.  Can you please read the general conclusions

23  included here and let me know when you're ready.

24     A.  Yes.  Simply that surfactants are biologically

10:39:16    25  not inert.

3618

1        Q.   Okay.  And before you go on, after reading this,

2   do you agree with the statements made in this particular

3   exhibit?

4        A.   I do.

10:39:25    5        MR. DICKENS:  Permission to publish Plaintiff's

6   Exhibit 209, your Honor.

7        THE COURT:  Very well.

8        MR. LOMBARDI:  No objection.

9        Q.   BY MR. DICKENS:  And is it your understanding

10:39:39   10   that this is a document prepared by Monsanto?

11       A.   Yes, it is a Monsanto document that was prepared

12   as a slide presentation.

13       Q.   And that's based on your review of, you know,

14   the first document, I guess, or the first page?

10:39:55   15       A.   That is correct.  I reviewed that and even

16   researched who the ex-employee was.

17       Q.   And who was that employee?

18       A.   That was Mark Martens.

19       Q.   Thank you, Doctor.  I want to go through and

10:40:12   20   have you explain what some of these conclusions mean for

21   us.

22            It says, "Surfactants are biologically not

23   inert."  First of all, what is "inert"?

24       A.   Inert is what Monsanto publishes on their label

10:40:25   25   of the bottle.

1          Q.  And what does it mean?

2          A.  They list the surfactants as an inert ingredient

3      meaning that that ingredient is not the primary

4      ingredient that kills the weed.  So they're calling it

10:40:43  5      inert.

6               However, by definition toxicologists consider

7      inert materials such as hydrogen, water.  Harmless things

8      are inert, okay?  Inert has, from a toxicological

9      standpoint, means harmless.  And what this slide states

10:41:06  10     that surfactants are biologically not inert.  I agree

11     with that.  That is true.  They can be toxic, and this

12     must be addressed.

13         Q.  And with respect to POEA, that's once again the

14     surfactant used in the Roundup and Ranger Pro used by

10:41:21  15     Mr. Johnson?

16         A.  Yes.

17         Q.  Is the POEA, is that not inert and toxic, in

18     your opinion?

19         A.  It's very toxic, yes.  And it's not inert.

10:41:34  20     That's why Monsanto's toxicologists put this together and

21     stated it must be addressed, and over the last 15 years

22     or so, it has not been addressed.

23         Q.  And that's based on your review, the toxicity of

24     the surfactants has not been addressed by Monsanto?

10:41:55  25         A.  That's correct.

1      Q.  The second bullet point I want you to explain to

2  us, it says, "Part of the toxicity of surfactants is

3  related to the surfactant action which destabilizes cell

4  membranes."

10:42:09    5          What is -- can you describe the process of

6  destabilizing cell membranes?  What does that mean?

7      A.  Yes, I have an epidermal layer of the human skin

8  demonstrative that might help.  But if you want to get to

9  that later, that's fine.

10:42:28   10      Q.  Yeah, that's fine.  We can get to that later.

11          We'll go to the third one.  "Part of the

12  toxicity of surfactants can be specific skin

13  sensitization oestrogenicity.  I probably pronounced that

14  incorrectly, but can you tell us what that means and

10:42:44   15  whether you agree with it?

16      A.  Yeah.  The -- some of the surfactants can

17  immunologically sensitize the skin.  Some of the

18  surfactants act in an estrogenetic capacity.  In other

19  words, as the tail of the molecule metabolizes, that

10:43:07   20  specific molecule is close enough to the structure of

21  estrogen that it has a certain level of estrogenicity.

22          This is spelled with an "O" because it's

23  British.  It's estrogenicity.

24          But the problem with estrogenetic chemicals is

10:43:23   25  they can cause a number of developmental abnormalities

3621

1  and can even stimulate estrogen positive breast cancer.

2        So -- and I want to be careful about this

3  because the non-oil compounds are clearly estrogenetic,

4  and that's not what's in Roundup and Ranger Pro.  Tallow

10:43:49  5  amine is in Ranger Pro and Roundup, and I don't believe

6  that tallow amine is estrogenetic.  I'm pretty sure of

7  that.

8        So in this slide with respect to the toxicity

9  being estrogenetic, I don't think that applies in this

10:44:11  10  case.

11        Q.  Okay.

12        A.  But in terms of skin sensitization, yes.

13        Q.  And that's helpful.

14        Now the fourth bullet point, "Toxicity of

10:44:20  15  surfactants depends on their concentration in the

16  formulation."

17        Do you agree with that?

18        A.  Absolutely.  Dose makes a difference.

19        Q.  And the more concentration of surfactant in the

10:44:34  20  formula, the higher the toxicity?

21        A.  Yes.

22        Q.  And then the last bullet point, "The high added

23  value of herbicide formulations containing surfactants

24  resides in the optimal compromise between efficacy and

10:44:48  25  safety for man and the environment."

3622

1           Once again, do you agree with that statement?

2       A.  Absolutely, yeah.

3       Q.  We talked some about the POEA and the toxicity

4  of POEA.  Did Monsanto ever consider whether or not to

10:45:05  5  change the surfactant used in Roundup or Ranger Pro?

6           MR. LOMBARDI:  Objection, your Honor.  With this

7  witness relating facts not in evidence and facts that

8  this witness is not able to relay pursuant to our

9  discussions this morning.

10:45:16  10           THE COURT:  Can you approach, please, Counsel.

11           (Sidebar.)

12           THE COURT:  Are you asking did Monsanto ever

13  consider changing the formula, essentially?

14           MR. DICKENS:  Essentially, yes.

10:45:39  15           THE COURT:  And how would he know that?

16           MR. DICKENS:  Based on all of his review of the

17  materials, he's aware of the considerations as to the

18  toxicity of the POEA.  We're not going to get into bans

19  or anything along those lines, but there's plenty of

10:45:52  20  materials with respect to the toxicity.

21           MR. LOMBARDI:  That's not the objection.  The

22  ban is not the objection to this.  This is using this

23  witness to convey facts that are hearsay to the jury from

24  documents that are hearsay.  He can't do that.  That's

10:46:05  25  what we talked about this morning.

3623

1          THE COURT:  All right.  Let me sustain your

2     objection.

3          (End sidebar.)

4          THE COURT:  The objection is sustained.  You may

10:46:21     5     ask another question, Mr. Dickens.

6          MR. DICKENS:  Sure.

7          Q.  Doctor, can you tell us what are the routes of

8     exposure of Roundup and Ranger Pro to humans?

9          A.  Most significantly, dermal to a slight extent,

10:46:38     10    inhalation.  And really that's the only two significant

11    routes.

12         Q.  And when you say "dermal," that means through

13    the skin?

14         A.  Yes.  Yes.

10:46:52     15    Q.  And inhalation is essentially breathing in the

16    Roundup or the Ranger Pro?

17         A.  Yeah, depending on the aerosol droplet size.

18    And in this case, it's not very significant at all as

19    Mr. Johnson wore a dust mask which should have captured

10:47:12     20    much of the droplets.

21         Q.  You say that a dust mask.  It's your

22    understanding Mr. Johnson wore a mask over his nose and

23    mouth?

24         A.  Yes.

10:47:22     25    Q.  And when you say -- are you talking with respect

3624

1    to inhalation, and that should have provided protection

2    from inhaling the Ranger Pro or Roundup?

3         A.   That's correct.   The operator exposure studies

4    have demonstrated that even without a dust mask,

10:47:46    5    inhalation is a very minimal, very minimal portion of the

6    overall systemic dose.

7         Q.   And is there any other route of -- you mentioned

8    inhalation and dermal.   Those are the significant routes;

9    is that correct?

10:48:02    10        A.   Yeah, the hand-mouth activity has not been

11   officially evaluated.   It is possible among some

12   applicators who smoke cigarettes, for example, or have a

13   habit of touching their mouth, there could be some

14   hand-to-mouth exposure, but that has not really been

10:48:25    15   verified in the literature.

16        Q.   So the overwhelming concern for applicators of

17   Roundup and Ranger Pro is having Roundup get onto the

18   skin; is that right?

19        A.   Yes.

10:48:37    20        Q.   And that's true with respect to Mr. Johnson?

21        A.   Yes, it is.

22        Q.   Now there's a term.   Do you understand the term

23   "AD and E"?

24        A.   Yes.

10:48:51    25        Q.   What is that?

3625

1          A.   Absorption of the drug.  That is, how much of it

2     makes its way into systemic circulation.  The

3     distribution of the drug, whether it goes to the liver or

4     kidney or bone or whether it accumulates in the fat, and

10:49:10     5     the excretion, "E" is for excretion, how it is removed

6     from the body, whether it goes through the urine or the

7     feces or out in the breath.  And then metabolism.  That

8     is, is the drug or the chemical altered in any way after

9     it gets into the body.  Does the liver change it into

10:49:32    10    metabolites or does it all just go out unchanged in the

11    urine.  That's the metabolism aspect of it.

12          Those are the four very important points that

13    toxicologists study to determine the mechanism of how a

14    drug causes potential adverse effects or injury.

10:49:49    15         Q.   Why don't I take a step back.

16          With respect to the POEAs or surfactants that we

17    discussed, generally are there safer, less toxic

18    alternatives than POEA for herbicides such as Roundup or

19    Ranger Pro?

10:50:03    20         A.   Yes.

21         Q.   And were those safer, less toxic surfactants

22    available to Monsanto?

23         A.   Sure.  I mean, there's -- I wear contacts.

24    Contact lens solution has non-ionic surfactants in it

10:50:25    25    that are harmless.  I mean, there's many non-ionic

1  surfactants that are harmless that are used in medicine,

2  in ophthalmology and so on.  So certainly there are

3  alternatives.

4          Now I can't speak on the cost on that.  There

10:50:47  5  may be cost factors.  There may be, you know, other

6  engineering reasons, but I can't speak on that aspect.

7      Q.  Those alternatives for the surfactant, were

8  those available in 2012, when Mr. Johnson began spraying

9  Roundup and Ranger Pro?

10:51:00  10     A.  Yes.

11     Q.  Did Monsanto have other glyphosate formulations

12  that used other types of surfactants other than POEA?

13     A.  I'm sorry, I didn't --

14     Q.  Did Monsanto have any other glyphosate

10:51:17  15  formulations that used surfactants other than POEA?

16     A.  Oh, absolutely, yeah.  In other parts of the

17  world, they had to.

18     Q.  I understand you have a demonstrative to help

19  explain how Roundup and Ranger Pro can get into the skin;

10:51:33  20  is that right?

21     A.  Yes.

22          MR. DICKENS:  Permission to publish Plaintiff's

23  Exhibit --

24          THE COURT:  Mr. Dickens, perhaps before we get

10:51:44  25  into this next demonstrative we can take the morning

3627

```
 1  recess.

 2          MR. DICKENS:  That's perfect.

 3          THE COURT:  All right.  So we'll be in recess,

 4  Ladies and Gentlemen, for 15 minutes.  And we'll resume

 5  again at five after 11:00.

 6          Please remember do not discuss the case nor do

 7  any research.  Thank you.

 8          MR. LOMBARDI:  Your Honor, may we approach for

 9  just one second?

10          THE COURT:  Yes.

11          (Sidebar.)

12          MR. LOMBARDI:  Your Honor, the last question and

13  answer was a direct violation of what this witness was

14  not supposed to do.  He was asked are there -- does

15  Monsanto sell products without POEA, and he says, "Yes of

16  course, they do.  They're required to in other parts of

17  the world."  That's the bans.

18          And so he was told not to do it, we raised it

19  this morning not to do it, and now he puts it on the

20  record.  There's nothing for me to object to because I

21  couldn't have objected before he blurted it out.

22          And so it's improper, it shouldn't happen again,

23  and I want to confer about whether there's anything we

24  can do about it, but it shouldn't have happened.

25          THE COURT:  You can't mention the bans.
```

10:51:55 (line 5)
10:52:04 (line 10)
10:52:20 (line 15)
10:52:35 (line 20)
10:52:54 (line 25)

3628

```
 1              MR. DICKENS:  The question didn't have to do
 2  with bans (inaudible) -- instruction, that's fine.  But
 3  the question itself and the first part of the answer was
 4  completely fine.
 5              MR. LOMBARDI:  She can't hear us.
 6              I feel the question in the first part of the
 7  answer isn't violative of any instruction by the Court.
 8  You know, there was one sentence there.  It didn't
 9  mention the ban in Europe.  Obviously, I didn't know what
10  he was going to say.  However, I don't think there's any
11  issue here, you know.  We moved on as quickly as
12  possible, AND I didn't follow it up with any additional
13  questions based on it.
14              THE COURT:  Remind him during the break that he
15  can't get into that.  I don't know if you want a motion
16  to strike that, but it brings more attention to it.
17              MR. LOMBARDI:  That's what I wanted to confer
18  about, your Honor.  Thank you.
19              (End sidebar.)
20              (Recess.)
21              THE COURT:  Welcome back, Ladies and Gentlemen.
22              Ladies and Gentlemen, Dr. Sawyer remains under
23  oath.  And Mr. Dickens, when you're ready, you may
24  proceed.
25              MR. DICKENS:  Thank you, your Honor.
```

10:53:19 (line 5)
10:53:37 (line 10)
10:53:50 (line 15)
11:06:22 (line 20)
11:06:52 (line 25)

3629

1        I can actually have Dr. Sawyer step down.  And

2  permission to publish Plaintiff's Exhibit 1042.

3        THE COURT:  Any objection?

4        MR. LOMBARDI:  No objection, your Honor.

11:07:05    5        THE COURT:  Very well.  You may step into the

6  well, Dr. Sawyer.

7        Q.  BY MR. DICKENS:  Okay.  Dr. Sawyer, what are we

8  looking at?

9        A.  Is it possible, can I use the pointer?

11:07:30   10        I wanted to explain -- I was asked to explain

11  aspects of dermal absorption, that is, how does a drug or

12  chemical, specifically glyphosate, make its way through

13  the skin.

14        What this is, is the epidermal layers of the

11:07:45   15  skin.  We are constantly producing new skin.

16        Q.  And Doctor, can you step to the side to the rest

17  of the jurors can see.

18        A.  All right.

19        We're constantly renewing our skin.  It's not a

11:08:00   20  long-term tissue.  And what we have are what we call

21  keratocytes that -- this is the dermal layer, the dermis.

22  And these cells differentiate into what we call --

23        Q.  Just so I can just -- so this is human skin.  Is

24  this essentially like the top, like if this were an arm?

11:08:24   25        A.  This is the external layer, yeah.

3630

1        So we have these keratinocytes and they

2   differentiate into the -- as they basically move towards

3   the outside of the skin, into a differentiated brick and

4   mortar or layered pattern, a very tight pattern.

11:08:43    5        Q.  And what is the significance of that pattern?

6        A.  Well, as they -- as these cells develop and move

7   forward, they become filled with keratin, cholesterol,

8   ceramides, and other substances that are very lipo --

9   hydrophobic.  In other words, chemicals that do not

11:09:10    10  absorb water, and they're very resistant.  They're

11  basically designed to block substances from coming in.

12        And they can be modified.  For example, organic

13  solvents defat these cells.

14        Q.  What do you mean by that, Doctor?

11:09:27    15        A.  It empties them from the cholesterol, the fatty

16  acids, and the ceramides in these cells are depleted and

17  removed.  And then chemicals absorb very rapidly down

18  into the dermis where the blood and circulatory system

19  picks up the chemical.

11:09:47    20        Q.  I thought skin was supposed to protect us

21  from --

22        A.  It is, but it can be damaged in several ways.

23  Okay?  Surfactants, these -- this layer of keratin into

24  the stratum granulosum, this layer has protein in it as

11:10:04    25  well.  It also has hair follicles.

3631

1          And the proteins especially that are involved in

2    this matrix have three-dimensional configurations.  Okay?

3    These configurations are designed to not allow substances

4    in and yet hold the integrity of the skin together.

11:10:27    5          Now, if that protein is denatured with heat, for

6    example, it can form a complete block, a complete cement

7    barrier.  If the outside of this tissue is hit with a

8    surfactant such as tallow amine, the tallow amine can

9    basically dampen or release the hydrophobic nature.

11:11:02   10          Remember I told you about putting a drop of

11    water on the waxed surface of a car and it beads up.  The

12    surfactant can allow water-soluble material to penetrate

13    through this hydrophobic barrier, and that's the

14    principle of using the surfactants, is to increase the

11:11:22   15    permeability into a vegetable leaf.

16          However, the same thing holds true with the

17    human skin, and it's well proven that the surfactants

18    increase dermal absorption of glyphosate.  Monsanto's own

19    documents admit that.

11:11:37   20    Q.  So the dermal absorption, does it ever -- does

21    it ever get blocked at any level as it moves down into

22    the skin?

23    A.  Depends on the chemical.  A chemical such as

24    trichloroethylene, which is an organic solvent, can pass

11:11:54   25    through this very readily and destroy the matrix, empty

3632

1  out these keratinocytes.  And other chemicals such as

2  surfactants can simply increase the ability of a watery

3  substance, like glyphosate, which is water soluble, can

4  increase that permeability.

11:12:13  5       So there are several things to keep in mind.  If

6  this protein structure that holds this matrix together is

7  altered, that can either increase or decrease

8  permeability depending on what it does to the protein.

9  Surfactants can increase the permeability of a

11:12:31  10  hydrophilic substance such as glyphosate.

11       Q.  So the POEA, which is the tallow amine in this

12  case, actually helps glyphosate get into the skin and

13  down into -- as you were saying, down into the sensory

14  neuron and the Merkel cell; is that right?

11:12:53  15       A.  Yeah, mainly blood vasculature, which is within

16  this dermal area.

17       But the other thing that glyphosate does, which

18  has been well documented, it changes the cytokines, which

19  are structures that hold this together.  And glyphosate

11:13:11  20  changes the structure of the epidermis over time.

21       So a person who's chronologically using

22  glyphosate ends up with a more permeable skin.

23       Q.  And Mr. Johnson's exposure to the Roundup and

24  the Ranger Pro, would that have occurred with him?  Would

11:13:29  25  it have changed the permeability of his skin?

3633

1     A.   Yes.   That's been well documented in the

2 peer-reviewed literature, and it's in my report.

3     Q.   And so it's actually the Roundup formulation

4 with the surfactant which allows that to happen; correct?

11:13:41   5 It becomes more permeable.

6     A.   Yes, but the glyphosate itself changes the

7 cytokine structure that holds the integrity of the

8 epidermis together.

9     Q.   But without the surfactant, it wouldn't as

11:13:53   10 readily pass through the skin.

11     A.   Well, there's two factors.   The surfactant and

12 the glyphosate itself increases permeability over time.

13     Q.   So the combination of the two.   The Roundup

14 formulation actually would have more permeability than

11:14:08   15 glyphosate itself?

16     A.   Correct.

17     Q.   Thank you, Doctor.

18          Doctor, before the break you had mentioned your

19 role in the Material Safety Data Sheets.   Does IARC,

11:14:39   20 which we've heard about in this case, does IARC play any

21 role in information that's included within a Material

22 Safety Data Sheet?

23          MR. LOMBARDI:   Your Honor, beyond the scope of

24 the report.

11:14:55   25          THE COURT:   Can you approach, Counsel.

3634

1              (Sidebar.)

2          THE COURT:  Did he offer this opinion at his

3  deposition?

4          MR. DICKENS:  He did at his deposition.  He

11:15:21   5  specifically stated that IARC is used in Material Safety

6  Data Sheets with respect to carcinogenicity.  I'll accept

7  their representation.

8          THE COURT:  All right.  Thank you.

9          (End sidebar.)

11:15:44   10         THE COURT:  All right.  Very well.  You may

11  proceed, Mr. Dickens.

12         MR. DICKENS:  May I approach to hand the witness

13  some water, your Honor?

14         THE COURT:  Yes.

11:15:58   15    Q.  BY MR. DICKENS:  Okay, Doctor, I was asking you,

16  does IARC play any role in the information within the

17  Material Safety Data Sheets?

18    A.  Yes.

19    Q.  And how is that considered for a manufacturer in

11:16:13   20  the information included in the Material Safety Data

21  Sheets?

22    A.  Well, under US governmental guidelines, and even

23  international guidelines such as OECD, the IARC

24  classification is required to be stated with respect to

11:16:31   25  carcinogenicity -- carcinogenicity level in the MSDS.

3635

1          MR. LOMBARDI:  Your Honor, I'm going to have to

2  renew my objection.  This is beyond the scope, I believe.

3          MR. WISNER:  I believe he stated it in his

4  deposition.  It's not beyond the scope.

11:16:49   5          THE COURT:  Counsel, can you approach, please.

6          (Sidebar.)

7          THE COURT:  Okay.  So was this in his deposition

8  or --

9          MR. LOMBARDI:  It was not in his report.

11:17:03  10          THE COURT:  Well, but did he offer it at

11  deposition?

12          MR. DICKENS:  So they're talking about the SD

13  isn't and they asked you don't have any firsthand

14  knowledge why they used -- they're referring to their

11:17:21  15  SDS.  This was used in the field for an evaluation of

16  chemicals and preparation of labels and Material Safety

17  Data Sheet.  IARC is very commonly used.  Sometimes we

18  see on OSHA or in the NIOSH as well.  Were you ever

19  involved in it?  Yes, I explained that in detail

11:17:40  20  yesterday.

21          (End sidebar.)

22          THE COURT:  All right.  Objection overruled.

23          You may proceed, Mr. Dickens.

24      Q.  BY MR. DICKENS:  Okay.  Doctor, can you explain

11:17:58  25  to us how IARC is used in the preparation of Material

3636

1 Safety Data Sheets?

2     A.  Yes.  All MSDSes -- that stands for Material

3 Safety Data Sheet -- are required to provide the IARC

4 classification of carcinogenicity, as IARC has been for

11:18:17     5 many years the key agency internationally that determines

6 whether or not a chemical is carcinogenic, and they have

7 several classes of what we call a confirmed known human

8 carcinogen, a probable carcinogen, a possible carcinogen,

9 and even a class for those of questionable possibilities

11:18:40     10 of carcinogenicity, and then a lowest class, which is

11 non-carcinogenic.

12     Q.  I want to turn back to the skin and your

13 discussion there.  You used some terms, and I'm not sure

14 we defined those, really.  You were talking about

11:18:55     15 hydrophilic and lipophilic.

16         Can you explain what that means and how it

17 applies to Roundup and Ranger Pro.

18     A.  That is the -- really the key basis of dermal

19 absorption of glyphosate.  That is, if it is hydrophobic

11:19:15     20 tissue, that is a fatty acid cholesterol ceramide-based

21 keratin cell -- that's what on the very outer portion of

22 our skin -- that's what we call hydrophobic.  It repels

23 water.

24         And between those cells in the integrity of that

11:19:37     25 brick-and-mortar structure, which I showed you, are

1 proteins and cytokines that hold the matrix together, and

2 water-soluble molecules can pass through that with

3 surfactant.  Even without it, small amounts can get

4 through.

11:19:59   5          But surfactant breaks the tension, allows the

6 chemicals that are water soluble to make its way through

7 the matrix.

8          Q.  And you mentioned hair follicles as well.  So

9 someone who has more hair on their arm, would that

11:20:17   10 actually prevent more glyphosate and surfactant to get

11 into the skin?

12          A.  No.  The greater the number of hair follicles

13 usually enhances dermal absorption.  It's an easy path

14 for a water-soluble molecule to take.

11:20:29   15          Q.  So somebody who may have more hair on the skin

16 or the chest or the back, that actually increases dermal

17 absorption?

18          A.  It does.

19          Q.  Would someone in a profession like Mr. Johnson,

11:20:46   20 an integrated pest manager, would they tend to have more

21 dermal absorption than someone like me who stands up here

22 and asks you questions?

23          A.  Yeah.  So I examined that in my report, as you

24 know, and cited numerous studies.  Farmers, for example,

11:21:03   25 have a higher propensity of what we call skin cracks and

1  fissures, and it's from working with dry soils,

2  materials, farm equipment, their hands tend to have a

3  higher of permeability from cracking of the skin.  That's

4  been very well documented.

11:21:21   5      Q.  How do you go about testing the actual dermal

6  absorption of a chemical like Roundup or Ranger Pro?

7      A.  There are several ways.  One is a simple patch

8  test on the skin of an animal in which a known quantity

9  of material over a square centimeter of tissue is placed

11:21:46   10  for a particular length of time, and then the amount of

11  material that is left on the patch or on the outside of

12  the skin is measured.  The amount that's absorbed in the

13  body is measured through the urine and feces.  And one

14  can then determine how much made it in.

11:22:09   15          Another method is an *in vitro* method.  That

16  means a laboratory bench method where a Franz diffusion

17  disk is used.  The Franz diffusion disk if I had a cup,

18  okay, and on this cup I took human cadaver skin, fresh

19  human cadaver skin that's been recently removed and

11:22:37   20  refrigerated under careful control, and that human

21  cadaver skin is then stretched over this round surface,

22  and then another cylinder placed on the other side of it,

23  and then the fluid in this cup I'm holding would contain

24  glyphosate and -- a known amount of it.

11:22:56   25          And then the other side of the cup would include

3639

1  saline at physiological pH, with a stirring mechanism so

2  the fluid is moving, and then after a number of hours the

3  amount of glyphosate on this side of the cup is measured

4  versus on the other side of the cup.  And that tells us

11:23:19   5  how much went through the skin.

6          Another aspect to that, though, is the skin is

7  then removed and the skin itself is tested to see how

8  much remained in the skin.

9          And then under the official international rules,

11:23:38   10  the amount of glyphosate that passed through the membrane

11  into that other fluid and the amount that's still

12  retained in the skin is added together, and that gives

13  you the amount of dermal absorption that occurred.

14          So it's really critical to understanding -- this

11:23:55   15  is called a Frazier diffusion cell.  It's simply, like I

16  say, two cups with fluid, with a membrane, either rat or

17  human skin membrane, stretched across it.

18      Q.  And so if any of the thing on the skin, if any

19  of that was -- essentially you couldn't account for it,

11:24:14   20  does that happen sometimes where you just can't account

21  for what you put on the skin?

22      A.  Yes.  That's called the percent recovery.  So

23  when we take what's in the cup and what's in the skin and

24  what's on the other side of the cup, and let's say we

11:24:29   25  started with 100 micrograms, when we add those three

3640

1    numbers up we should end up with 100 micrograms.

2         Q.  Does that always happen?

3         A.  No.

4         Q.  And so what do you do when you're trying to

11:24:43    5    figure out how much dermal absorption, what do you do

6    with that part you don't get back?

7         A.  Well, what happens on many of the studies,

8    what's measured in the cup where you put the glyphosate

9    in is measured on the other side but the tissue itself is

11:24:59   10    not tested.

11              So under the Federal -- well, really under EPA

12    and even under the OECD rules -- OECD rules are an

13    international agency that make the rules for this

14    particular test -- if it doesn't equal 100, then it's

11:25:16   15    assumed that the rest of it is stuck in the skin, and

16    that has to be considered as absorbed.

17         Q.  We've heard Monsanto witnesses state that the

18    total dermal absorption of glyphosate is less than

19    1 percent.  Do you agree with that?

11:25:35   20         A.  No.  I have carefully examined all of the

21    studies that Monsanto has used from, you know, the 1980s

22    on up to the current dates.

23         Q.  And you reviewed those and relied on those in

24    reaching your opinions in this case?

11:25:52   25         A.  Absolutely.

3641

1    Q.  And you mentioned back from the 1980s.  Has

2 Monsanto been performing dermal absorption studies all

3 the way back into the 1980s?

4         MR. LOMBARDI:  Your Honor, this is hearsay for

11:26:05    5 this witness, and pursuant to the rulings this morning,

6 he's not able to talk about that.

7         MR. DICKENS:  Your Honor, I simply asked whether

8 or not they have performed these studies.

9         THE COURT:  All right.  He may answer that

11:26:15   10 question.

11         THE WITNESS:  Yes, yes.  Monsanto's performed

12 one, two -- at least eight studies.

13         MR. LOMBARDI:  Your Honor, this is going beyond

14 the answer to the question.

11:26:30   15         THE COURT:  So do you have another question for

16 the witness, Mr. Dickens?

17         MR. DICKENS:  Yes.

18    Q.  Did you rely on those studies back from the

19 1980s in reaching your opinion as to what the dermal

11:26:39   20 absorption of Roundup or Ranger Pro is?

21    A.  Yeah.  As my primary role as a toxicologist,

22 that's what I do, is I assess the study data and

23 determine what the dermal absorption is.  That's what

24 I -- that's what toxicologists do.

11:26:59   25    Q.  And would -- and based on your review of those

3642

1 studies, you did reach an opinion with respect to what

2 the dermal absorption for Roundup and Ranger Pro was;

3 correct?

4          A.  Yes.

11:27:09    5          Q.  And would reviewing those studies assist the

6 jury in explaining what your opinions are with respect to

7 your opinion on dermal absorption rates?

8          A.  I missed the last two words.

9          Q.  Yes.  Would reviewing those studies with the

11:27:23   10 jury -- or assist the jury in understanding what your

11 opinion is as to the dermal absorption rates for Roundup

12 and Ranger Pro?

13          A.  Absolutely.  It's a critical portion of this

14 assessment as to how much was systemically absorbed into

11:27:39   15 Mr. Johnson's body.

16          Q.  And are you aware of a study back in the 1980s

17 performed by Dr. Maibach?

18          A.  Certainly.

19          Q.  And you reviewed that in preparation for your

11:27:53   20 opinions in this case?

21          A.  Yes, I have reviewed it extensively over the

22 past year.

23          Q.  And you relied upon the Maibach study in forming

24 your opinions as to what the dermal absorption rate is;

11:28:09   25 correct?

3643

1      A.  That's correct.

2      Q.  And it's one of the key factors that you

3  analyzed?

4      A.  Yes.

11:28:14   5      Q.  The Maibach study, was that a study conducted by

6  Monsanto?

7      A.  Yes.

8      Q.  And what was it studying?

9      A.  Well, there were two aspects of the study.

11:28:24   10      MR. LOMBARDI:  It's not otherwise in evidence,

11  your Honor.

12      THE COURT:  Objection sustained.

13      MR. WISNER:  Your Honor, could we have a

14  sidebar?

11:28:32   15      THE COURT:  Yes.

16      (Sidebar.)

17      THE COURT:  Is the Maibach study the TVO?

18      MR. WISNER:  No, that's different.  So he has to

19  explain to the jury the basis of his opinion; right?  The

11:28:56   20  scientific basis.  And he's not going into any hearsay or

21  out-of-court statements, and if they want a limiting

22  instruction to limit his discussion of these studies to

23  his understanding, that's fine.

24      But to give a divorced opinion without

11:29:16   25  explaining the basis of it, that accounts for exclusion

3644

1  of his opinion in a post-trial motion, and he has to be

2  able to lay the foundation as to why he has the opinion

3  he has.  And he's testified that these are the studies he

4  looked at, and so we're not publishing anything, we're

11:29:33  5  not getting into courtroom misconduct or anything of that

6  stuff.  He's literally talking about the studies he

7  looked at to form his opinion, and that's fair game.

8          MR. LOMBARDI:  The Maibach study was performed

9  and submitted to the EPA, and the EPA reviewed it, and

11:29:50  10  he's going to be talking about it in that context.  If

11  you exclude the Maibach study, you have to exclude

12  everything he admitted to the -- (inaudible) -- the

13  Maibach has not been admitted at trial.

14          MR. WISNER:  That's not the standard.  You don't

11:30:06  15  have admitted evidence for him to perform a basis for

16  submitting it.

17          THE COURT:  So he can say he has, that he relied

18  on this study in reaching his opinion.  And what is the

19  question that you have for him?

11:30:19  20          MR. DICKENS:  He has to discuss the basis as to

21  what the findings were, what the findings on the actual

22  studies were in reaching his conclusion, as to whether or

23  not the 1 percent or 3 percent or 10 percent, but you

24  know, without that foundation as to exactly what he

11:30:34  25  reviewed to reach his opinion, it's completely divorced.

1  It's divorced from what he reviewed and irrelevant.

2        THE COURT:  The problem is it's not in evidence.

3  So if he's just repeating what the study says, then

4  that's hearsay.

11:30:49  5        MR. WISNER:  But your Honor, that's correct, but

6  experts are specifically allowed to rely on hearsay.

7        THE COURT:  Yes, they are.

8        MR. WISNER:  Let me finish my point.  And I

9  understand it can't be published for sure.  Got that

11:31:03  10  we're not publishing anything here.  But for him to give

11  his opinion without discussing the factual basis of it

12  and it's his beliefs of the facts, they can impeach him

13  and say you got it wrong.  That's fine.  That's what

14  cross-examination is for.

11:31:17  15        But for him to say my opinion is dermal

16  absorption is 10 percent, and for him not to say the

17  basis of that, which is these studies that he reviewed,

18  the question that was objected to is what did that study

19  look at.

11:31:30  20        I mean, I'm not entirely sure what the issue is.

21  The rule is not it has to be in evidence before you can

22  discuss it as an expert.  That's never been the rule.

23        MR. DICKENS:  Your Honor, I believe that the way

24  that -- with the study that's not in evidence, the way

11:31:45  25  this should go is he's asked for his opinion on dermal

1  absorption.  He's asked what's his basis.  He can say I

2  looked at the Maibach study, looked at that study, my

3  conclusion IS, and then you say my conclusions.  But he's

4  got to have a study that's not in evidence.

11:32:02   5       This witness can't convey to the jury the

6  hearsay evidence of that study.  He can tell the jury I

7  relied on the Maibach study to come to my conclusion, but

8  he cannot disclose the hearsay statements.

9       THE COURT:  That's correct.  So.

11:32:17  10       MR. WISNER:  Well, your Honor, respectfully --

11       THE COURT:  They may open the door on cross, I

12  don't know, and they're permitted on cross to read from

13  the study and say, well, isn't it true that this study

14  said, you know, the dermal absorption is five and you

11:32:33  15  just said it was ten and whatever, and that may open the

16  door to your further probing about the study.  I don't

17  know, but for right now, he can't just repeat what was in

18  the study unless you have an agreement, on some witnesses

19  you have agreement to allow each other to do that.

11:32:49  20       MR. WISNER:  We didn't hear.

21       THE COURT:  If you don't have that agreement,

22  then you can't just repeat the contents of the study

23  because that's hearsay.

24       MR. LOMBARDI:  So I'm anticipating on cross they

11:33:02  25  may bring up different dermal absorption.  That goes for

3647

1  them as well.  They can't bring up different dermal

2  absorption.

3          THE COURT:  It's different on cross, first of

4  all -- I don't know.

11:33:13   5          MR. WISNER:  Your Honor, one issue, though, and

6  I think this is important, is you know they're admitting,

7  for example, EPA document; right?  To the state of mind

8  of Monsanto, and we'll talk about those issues later, but

9  how this affects his understanding, is it admissible for

11:33:34  10  that purpose as well?  We'd be happy to have a curative

11  instruction, Ladies and Gentlemen, he's going to talk

12  about some stuff.  You aren't to assume any statements

13  made by him are factually true.  They just go to his

14  opinion.

11:33:48  15          THE COURT:  I think that's different because his

16  state of mind isn't at issue with regard to the issue of

17  the failure to warn.  I mean, it's different.

18          MR. WISNER:  Okay.

19          THE COURT:  All right.

11:33:59  20          (End sidebar.)

21          THE COURT:  All right.  Mr. Dickens, you may

22  proceed.

23          MR. DICKENS:  Thank you, your Honor.

24      Q.  Dr. Sawyer, we're not allowed to discuss each of

11:34:28  25  the studies you reviewed, but you have reviewed dermal

3648

1  absorption studies conducted by Monsanto and others in

2  reaching your opinion as to the dermal absorption rate;

3  correct?

4       A.  Yes.

11:34:38   5       Q.  And you reached an opinion as to what the dermal

6  absorption rate for Ranger Pro and Roundup is; correct?

7       A.  That's correct.

8       Q.  And what is your opinion with respect to the

9  percentage of dermal absorption of Roundup and Ranger Pro

11:34:50  10  in the human skin?

11       A.  Based upon the studies conducted by Monsanto or

12  their contractors, 10 percent.  10 percent of the dose is

13  absorbed systemically.

14       Q.  Okay.  And can you put that in context?  What

11:35:05  15  does that mean, 10 percent?

16       A.  Well, it mean that 90 percent of it can be

17  washed off after a sustained period of time.  It does

18  not -- or 90 percent of it does not penetrate through the

19  epidermis into the dermal area, but 10 percent does make

11:35:28  20  it into the skin, into the body.

21       Q.  And what is the significance of that?

22       A.  It's important in calculating the dose.  The

23  dose for a worker handling either a backpack sprayer or a

24  hose, hydraulic hose unit as Mr. Johnson did, has been

11:35:50  25  carefully assessed in the Monsanto operator exposure

1 studies, and this -- when I say "carefully assessed,"

2 this is where the operators actually wear patches on

3 their body, basically a gauze patch, different locations,

4 back, neck, legs, shins, chest, hands, and after they've

11:36:15    5 worked for six hours, these pads are removed.

6          MR. LOMBARDI:  Your Honor, this is what we just

7 spoke about.  It's an improper --

8          THE COURT:  Okay.  Counsel, can you move on to a

9 different question.

11:36:30   10          MR. DICKENS:  Absolutely.

11     Q.  So the 10 percent, without getting into

12 specifics of actual studies, can you -- can you explain

13 what -- if there's 10 percent left in the skin, does that

14 eventually get washed off at some point in time?  What

11:36:47   15 happens to that 10 percent?

16     A.  It is available for -- it's been assimilated by

17 the body, and it's available as a harmful material.

18     Q.  Once again, without getting into specific

19 studies, are there other studies that found a smaller

11:37:10   20 percentage of dermal absorption than 10 percent?

21     A.  Yes.

22     Q.  And you took those into consideration as well?

23     A.  I did.

24     Q.  And were you able to -- in consideration of all

11:37:21   25 those studies, you still were able to reach your opinion

3650

1  that it was 10 percent of dermal absorption?

2     A.  Yes.  I relied primarily on primate studies,

3  which are most close to humans, and in primate studies

4  that were -- had actual dermal application to the body,

11:37:40  5  as opposed to the rat or human studies that were

6  performed using the Franz diffusion tube with cadaver

7  skin.

8     Q.  Why did you rely more on the monkey or primate

9  studies rather than the other one?

11:37:57  10     A.  More relevant to humans, and they were live

11  animals, and in the live organs, we have circulating

12  capillaries blood through the capillaries, we have a live

13  vascular system.  That's certainly more realistic than

14  using cadaver skin.

11:38:19  15     Q.  Without talking about specifics, were all the

16  studies on dermal absorption that you reviewed, were all

17  of those submitted to the EPA?

18     A.  No.  They were not.  Only select studies were

19  submitted to the EPA for consideration on licensing.

11:38:33  20     Q.  You said "only select studies."  Who made those

21  selections?

22     A.  Monsanto.

23     Q.  Are you aware of something known as the farm

24  family exposure study?

11:38:51  25     A.  Yes.

3651

1    Q.  And you reviewed that in reaching your opinions

2 in this case?

3    A.  Yes.

4        MR. DICKENS:  If I can publish, your Honor,

11:39:02    5 Plaintiff's Exhibit 977?

6        THE COURT:  Any objection?

7        MR. LOMBARDI:  No objection, your Honor.

8        THE COURT:  Very well.  You may proceed.

9    Q.  BY MR. DICKENS:  And, Doctor, this is the

11:39:16   10 glyphosate biomonitoring for farmers and their families.

11 Results from the farm family exposure study; is that

12 right?

13    A.  Yes.

14    Q.  And there's a John Acquavella.

11:39:27   15        Do you see that?

16    A.  Yes.

17    Q.  And where does he work?

18    A.  Monsanto Corporation.

19    Q.  And do you know what year this was published?

11:39:39   20    A.  I believe it was 2004.

21    Q.  And so this was approximately eight years prior

22 to Mr. Johnson using Roundup or Ranger Pro?

23    A.  Yes.

24    Q.  And if I can turn your attention to the first

11:39:59   25 page, Doctor.  It says, "The purpose of this," and I

3652

1  believe that's, "farm family exposure study."

2          Do you see that?

3      A.  Yes.

4      Q.  And it says, "Quantify real-world pesticide

11:40:13   5  exposures immediately before, during and after a

6  pesticide application and to identify significant

7  exposure determinants."  Did I read that --

8      A.  Yes.

9      Q.  And that is your understanding as to the purpose

11:40:25   10  that Monsanto conducted this study?

11     A.  That's correct.

12     Q.  I want to turn your attention.  As we heard

13  previously in Dr. Farmer's testimony, it states:  "None

14  of the systemic doses estimated in this study approached

11:40:43   15  the US Environmental Protection Agency reference dose for

16  glyphosate of 2 milligrams per kilogram per day."

17          MR. LOMBARDI:  Your Honor, we had a lengthy

18  discussion on this point yesterday.

19          THE COURT:  Counsel, can you approach?

11:41:09   20          (Sidebar.)

21          MR. LOMBARDI:  Your Honor, we've been through

22  the NSRL and all kinds of things.  We entered a

23  stipulation that we gave to the Court that specifically

24  said that nobody was going to get into any comparison

11:41:21   25  with any reference doses.  Counsel could have asked

3653

1 questions about this document that did not go to that.

2 Instead, the second thing he highlighted went directly to

3 the EPA reference dose, which is an absolute direct

4 violation of what this Court ordered, what we agreed to.

11:41:38   5         MR. DICKENS:  This stipulation specifically

6 allowed us to ask two or three limited questions on this.

7         MR. LOMBARDI:  If that's what it is, then it's

8 my --

9         MR. DICKENS:  I asked two questions.

11:41:49  10         MR. LOMBARDI:  Okay.  That's okay, then.  That's

11 fine.  Got it.

12         (End sidebar.)

13         THE COURT:  You may proceed, Mr. Dickens.

14         MR. DICKENS:  Thank you, your Honor.

11:42:09  15     Q.  Can I ask you, Doctor, what is the reference

16 dose that's being referenced in this particular sentence?

17     A.  This is a what we call RFD, risk reference dose,

18 established by EPA to be protective specifically and only

19 for non-carcinogenic effects, in this case birth defects.

11:42:34  20 It is not designed and can never be used as a safe level

21 for cancer.  That's not what that value is designed to be

22 protective against.

23     Q.  Okay.  So it has nothing to do with

24 carcinogenicity at all?

11:42:46  25     A.  That's correct.

1    Q.  How did they measure real-world glyphosate or

2   glyphosate formulation exposure in this study?

3    A.  They had urine samples.

4    Q.  Was it, in your opinion, an appropriate way to

11:43:06    5   measure real-life exposure?

6    A.  No.  There's a horrible error, very serious

7   error, with respect to measuring urine for glyphosate,

8   that is, that when one is dermally absorbing glyphosate,

9   it largely comes out of the feces.  And by measuring

11:43:28   10   urine and assuming that it all comes out in the urine

11   gives a very erroneous result.

12    Q.  Was the glyphosate in the feces measured in this

13   study?

14    A.  No.

11:43:43   15   Q.  Why would more glyphosate be excreted in the

16   feces rather than the urine?

17    A.  Well, there are two types of studies.  One study

18   to determine the excretion route of urine is to inject an

19   animal, IV bolus injection of glyphosate, and when that

11:44:04   20   is done, about 89 percent of it comes out in urine.

21       However, one -- one takes a primate, such as a

22   monkey, and doses that monkey dermally with the same

23   amount of glyphosate, but rather than giving an IV push,

24   lets it absorb over a period of hours.  It comes out in

11:44:30   25   the feces, largely in the feces, and that is because the

3655

1    liver -- when it is being slowly absorbed, the liver

2    continually metabolizes it and sends it out the bile

3    deduct into the feces, but when it's injected

4    intravenously, the liver is saturated.  It's overloaded,

11:44:49    5    and it spills out and comes out in the urine.

6             So there are two types of routes of exposure

7    that have been used to study how glyphosate is excreted,

8    and this study is assuming that it all comes out in

9    urine, and it's dead wrong.  It's an erroneous study.

11:45:08    10    Q.  BY MR. DICKENS:  Which of the two types of

11   exposure would be more relevant for Mr. Johnson, the IV

12   or the dermal exposure?

13        A.  Certainly the dermal.

14        Q.  Now --

11:45:17    15        A.  The dermal excretion through the feces.

16        Q.  And so, once again, if you're not measuring in

17   feces in a study, you're not getting an actual real-world

18   estimate as to exposure to applicator?

19        A.  Correct.  And in this study, assuming that

11:45:37    20   90 percent of it is coming out in the urine when, in

21   fact, only 10 or 20 percent goes out in the urine, the

22   numbers in this study are off by a factor of 5.

23        Q.  Grossly underestimated?

24        A.  Grossly underestimated.  Yes.  Much so.

11:45:52    25        Q.  I want to turn your attention to page 3.  And I

3656

1  can highlight it for us.

2       In this study, it's -- it states:  "All the

3  farmers used tractors and boom sprayers."

4       First of all, what's a boom sprayer?

11:46:09  5       A.  That sits behind the tractor, and it has

6  multiple nozzles that sprays out in the direction from

7  the tractor.  So it's leaving a trail of aerosol behind

8  the tractor.

9       Q.  So I also want to turn your attention here:

11:46:27  10  "Most of the farmers reported having tractors with

11  enclosed cabins."

12       Do you see that as well, Doctor?

13       A.  Yes, I do.

14       Q.  So what is your understanding of how the

11:46:39  15  glyphosate was being sprayed by the farmers involved in

16  this study?

17       A.  Well, in a much safer manner for the applicator,

18  as opposed to Mr. Johnson who was continually -- not

19  continually, but very commonly impacted with heavy mist

11:46:58  20  exposure from the hose sprayer and the various wind

21  currents causing the drift material to directly impact

22  his entire body.

23       Q.  Would you expect farmers spraying from tractors

24  in enclosed cabins to have more or less exposure than

11:47:19  25  Mr. Johnson?

3657

1      A.  Far less.  And as proven in Monsanto's operator

2  exposure risk assessment study, which I relied on in my

3  dose calculations.

4      Q.  Are there other factors for an applicator that

11:47:54  5  would affect how much exposure they had to Roundup or

6  Ranger Pro, other than the method of spraying?

7      A.  Yes.

8      Q.  And what are some of those other factors?

9      A.  The amount of protective gear.  For example, in

11:48:16  10  the Monsanto operator exposure studies, where the

11  individuals wore patches for testing, in that study a

12  full faceplate was recommended.  A faceplate is a shield

13  that -- I actually have one I use with my chain saw.

14  It's a faceplate that goes way down even below the jaw, a

11:48:39  15  solid plastic faceplate.  They also use water

16  impermeable, waterproof jackets and waterproof coveralls.

17          So the protection that was used in that study

18  was beyond that of Mr. Johnson, who wore impermeable

19  clothing.

11:48:59  20      Q.  And --

21      A.  And no full faceplate.

22      Q.  You say "impermeable clothing."  But we've heard

23  testimony he wore a Tyvek suit.  Isn't that impermeable?

24      A.  He wore a Tyvek 400 dust suit.

25      Q.  Okay.

3658

1      A.  It's a dust suit.  It keeps out particulate

2  dust.  It has open sleeves, open legs.  It's not designed

3  for aerosol, organic solvents or any type of liquids.

4      Q.  And do you have any personal experience with the

11:49:32   5  Tyvek 400 suit worn by Mr. Johnson?

6      A.  Yes.  I've used an OSHA-certified, OSHA 40-hour

7  HAZMAT, several times for my own use, to be able to go on

8  to Superfund sites, extremely dangerous sites.  And I'm

9  very familiar with the various classes of suits made by

11:49:54  10  Tyvek.

11      I -- I've worn the dust suit in situations where

12  I was being protected from heavy metals, from dust.  But

13  I would never wear a suit like that in an instance where

14  organic chemicals were in the air.  It's not designed for

11:50:12  15  that.  It's a dust suit.

16      Q.  Did you specifically do anything to research the

17  Tyvek 400 in reaching your opinion that Roundup or Ranger

18  Pro could permeate that?

19      A.  I did.  I looked at the various Tyvek literature

11:50:26  20  and specifications specific to the 400.  It is a

21  breathable -- it's called a breathable suit.  It's

22  designed for comfort, but yet designed to keep dust out.

23      Q.  And where specifically did you go to find those

24  specifications?

11:50:39  25      A.  I looked at Tyvek's own literature.

3659

1    Q.  And you reviewed and relied on those in reaching

2  your opinions in this case?

3    A.  Yes.  And my experience 30 years using Tyvek

4  suits.

11:50:51    5        MR. DICKENS:  Your Honor, at this time I'll move

6  to publish Plaintiff's Exhibit 118.

7            THE COURT:  Any objection?

8            MR. LOMBARDI:  No objection, your Honor.

9            THE COURT:  Okay.  You may proceeded.

11:51:09   10    Q.  BY MR. DICKENS:  Now, Doctor, is this the

11  document that you reviewed with respect to the DuPont

12  safety specifications for the Tyvek 400?

13    A.  Yes.

14    Q.  And, once again, you pulled this directly from

11:51:21   15  DuPont themselves?

16    A.  Yes.

17    Q.  Is it your understanding that DuPont's the

18  manufacturer of this particular suit?

19    A.  That's correct.

11:51:30   20    Q.  Doctor, it says, "Tyvek 400 fabric offers

21  inherent barrier against particles down to 1.0 micron in

22  size."

23            Do you see that?

24    A.  Yeah, that's correct.  It's designed to keep out

11:51:47   25  dust particulate.  But yet designed for comfort.  As we

1   see here, "Comfort fit design based on the wearer input

2   to provide our most comfortable garment."

3          It allows moisture to go in and out.  So you --

4   so you don't basically turn into a horrible, overheated,

11:52:05   5   sweaty mess, which happens when one wears the more

6   sophisticated suits, which I've worn many times.

7          Q.  So there's different types of Tyvek?

8          A.  Yes.

9          Q.  And you wear them in different situations?

11:52:19   10          A.  Correct.

11          Q.  This one you referenced as a dust suit.  Are

12   there some that wouldn't be permeable to liquids?

13          A.  There are suits that are completely impermeable

14   to organic solvents, liquids, glyphosate, water, yes.

11:52:35   15          Q.  Well, which suit does the Roundup or Ranger Pro

16   product labeling instruct its -- its users to use?

17          A.  The actual label from Roundup and Ranger Pro

18   does not require any suit.  It's rather strange.  When

19   they ran their own operator exposure study, they

11:52:54   20   recommended waterproof jacket, pants, faceplate,

21   et cetera.  But none of that is on the warning of Roundup

22   that was used by Mr. Johnson.

23          Q.  Well, it protects against particles down to

24   1.0 micron in size.  With the Roundup and Ranger Pro

11:53:11   25   Mr. Johnson was spraying, was that -- would that have

3661

1 permeated?  Is it of the sufficient size?

2    A.  No.  It's not designed as a water or

3 solvent-proof suit.  It's the wrong suit for the -- it's

4 not the right suit for the job.  Let's put it that way.

11:53:31  5       This is the suit that's designed -- for example,

6 spreading the talc material on the baseball field.  This

7 would be a great suit for keeping the talc dust off

8 Mr. Johnson.  But it's not the right suit for spraying

9 Roundup.

11:53:47  10    Q.  Okay.  I'm going to turn your attention to

11 page 3 of this document.  And it actually has

12 "Herbicides."  And it says, "General."  Then it says,

13 "Solid form."

14       Do you see that?

11:54:00  15    A.  Certainly.  In a solid form, it would be

16 acceptable.  The solid form means particles.  And

17 particles of herbicide are generally greater than

18 1 micron in size, and they would not make it through the

19 pores.

11:54:13  20    Q.  Okay.  And there is solid herbicides sold out

21 there?

22    A.  Oh, absolutely.  Yeah.  You can put them in

23 these lawn spreaders, for example, that you push.

24    Q.  Now, some of these other examples actually say

11:54:28  25 it's, you know, suitable for use for liquid.

1          Do you see that, Doctor?

2     A.   Yes, I see that.

3     Q.   But there's no mention of it being suitable for

4 herbicides that are liquid like Roundup or Ranger Pro; is

11:54:46   5 that right?

6     A.   Correct.

7     Q.   And, once again, Monsanto's labeling doesn't

8 warn you or tell you to wear any type of Tyvek or other

9 permeable suit, does it?

11:54:57   10     A.   That's correct.

11     Q.   And so Mr. Johnson, even though he was wearing,

12 you know, this Tyvek suit, that was above and beyond the

13 labeling requirements?

14     A.   That's correct.

11:55:08   15     Q.   But, you know, it wasn't keeping him completely

16 protected from the Roundup and Ranger Pro that he was

17 spraying?

18     A.   No.  It did very little.

19     Q.   With respect to Mr. Johnson's spraying, do you

11:55:34   20 have an understanding how he was spraying the Roundup and

21 Ranger Pro?

22     A.   Yes.

23     Q.   Okay.  And what is your understanding of the

24 different manners in which he would spray?

11:55:45   25     A.   Primarily he was using a large hydraulic nozzle

3663

hose, which was connected to a hose reel, which was

connected to a pressurized pump, and then a 50-gallon

reservoir tank on the truck.

          And he was able to reel out the hose line and

walk around and spray with it.  It was an uncontrolled

pressure.  In other words, he couldn't turn the pressure

down or up.  It was either on or off.

     Q.  And you mentioned aerosol earlier today.  Was

his type of spraying, would that create an aerosol?

     A.  Yes.  He was using a -- interchangeable colored

spray heads consistent with that used in pressure

washers.

     Q.  Have you ever used spray heads similar to that?

     A.  Yes.  I have a pressure washer I use on my boat.

     Q.  Okay.  So Mr. Johnson, unlike the way you did it

with a long hose that you modified, was actually using a

pressure hose gun, essentially?

     A.  Yes.

     Q.  Is that a type of spray that you would expect to

be smaller or greater than the way in which you do it?

     A.  Well, a pressure washer nozzle produces a huge

aerosol.  If you've ever used one, just one trigger would

literally fill this courtroom with mist.  I mean, it's

not -- not the right nozzle for application by any means.

     Q.  Based on your review of the materials, was

3664

1  Monsanto aware that Roundup or Ranger Pro was being

2  sprayed in this manner?

3          MR. LOMBARDI:  Objection, your Honor.  Same

4  objection we've discussed before.

11:57:34  5          THE COURT:  Sustained.  Sustained.

6          Please ask a different question.

7      Q.  BY MR. DICKENS:  Was there anything in the

8  product labeling for Roundup or Ranger Pro that suggested

9  that you should not spray in the manner Mr. Johnson was

11:57:49  10  for his job at Benicia School District?

11      A.  No.

12      Q.  Are you aware of any warnings from Monsanto

13  whatsoever suggesting that this was an inappropriate way

14  to spray Roundup or Ranger Pro?

11:58:02  15      A.  No.

16          THE COURT:  Mr. Dickens, is this a good time to

17  break for the lunch recess?

18          MR. DICKENS:  It is, your Honor.

19          THE COURT:  Okay.  Ladies and Gentlemen, we're

11:58:23  20  going to break now for the lunch recess.  We'll be in

21  recess until 1:30.  Please remember:  Do not discuss the

22  case, do not do any research.  And we'll resume again at

23  1:30.

24          (Time Noted:  11:58 p.m.)

11:58:39  25

3665

```
1                    REPORTER'S CERTIFICATE

2

3          I certify that the proceedings in the

4  within-titled cause were taken at the time and place

5  herein named; that the proceedings were reported by

6  me, a duly Certified Shorthand Reporter of the State of

7  California authorized to administer oaths and

8  affirmations, and said proceedings were thereafter

9  transcribed into typewriting.

10         I further certify that I am not of counsel or

11 Attorney for either or any of the parties to said

12 Proceedings, not in any way interested in the outcome of

13 the cause named in said proceedings.

14         IN WITNESS WHEREOF, I have hereunto set my hand:

15 July 26th, 2018.

16

17

18

19                         <%signature%>
                           Leslie Rockwood Rosas
20                         Certified Shorthand Reporter
                           State of California
21                         Certificate No. 3462

22

23

24

25
```

3666

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                   COUNTY OF SAN FRANCISCO

3

4   DEWAYNE JOHNSON,

5                Plaintiff,

6          vs.                    Case No. CGC-16-550128

7   MONSANTO COMPANY, et al.,

8                Defendants.
    _____/

9

10

11

12       Proceedings held on Thursday, July 26, 2018,

13       Volume 17, Afternoon Session, before the Honorable

14       Suzanne R. Bolanos, at 1:31 p.m.

15

16

17

18

19

20

21  REPORTED BY:

22  LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

23  Job No. 2965331B

24

25  Pages 3667 - 3811

```
 1  APPEARANCES:

 2

 3  FOR THE PLAINTIFF:

 4       R. BRENT WISNER, ESQ.

 5       BAUM, HEDLUND, ARISTEI, GOLDMAN PC

 6       12100 Wilshire Boulevard, Suite 950

 7       Los Angeles, California 90025

 8       310-207-3233

 9

10       DAVID DICKENS, ESQ.

11       THE MILLER FIRM, LLC

12       108 Railroad Avenue

13       Orange, Virginia 22960

14       540-672-4224

15

16  FOR THE DEFENDANT:

17       SANDRA A. EDWARDS, ESQ.

18       FARELLA BRAUN + MARTEL LLP

19       235 Montgomery Street

20       San Francisco, California 94104

21       415-954-4400

22

23

24

25
```

3668

```
 1  APPEARANCES (Continued):

 2

 3  FOR THE DEFENDANT:

 4       GEORGE C. LOMBARDI, ESQ.

 5       JAMES M. HILMERT, ESQ.

 6       WINSTON & STRAWN LLP

 7       35 West Wacker Drive

 8       Chicago, Illinois 60601

 9       312-558-5969

10

11       KIRBY T. GRIFFIS, ESQ.

12       HOLLINGSWORTH LLP

13       1350 I Street, N.W.

14       Washington, D.C. 20005

15       202-898-5800

16

17

18

19

20

21

22

23

24

25
```

3669

1                    INDEX OF PROCEEDINGS

2

3  WITNESS                DIRECT   CROSS   REDIRECT   RECROSS

4  WILLIAM ROBERT SAWYER    3671    3679      3777      3794

5

6

7

8                    EXHIBITS ADMITTED

9                        (None.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    Thursday, July 26, 2018

 2                        1:31 p.m.

 3                        Volume 17

 4                    Afternoon Session

 5                 San Francisco, California

 6                     Department 504

 7               Judge Suzanne Ramos Bolanos

 8

 9                       PROCEEDINGS

12:54:53  10

11          THE COURT:  Welcome back, Ladies and Gentlemen.

12  Good afternoon, Counsel.

13          MR. DICKENS:  Thank you.

14          THE COURT:  Do you wish to recall Dr. Sawyer?

13:31:15  15          MR. DICKENS:  I do, your Honor.  We will recall

16  Dr. William Sawyer.

17          THE COURT:  Good afternoon, Dr. Sawyer.

18          THE WITNESS:  Thank you.

19          THE COURT:  Ladies and gentlemen, Dr. Sawyer

13:32:42  20  remains under oath, and, Mr. Dickens, you may proceed.

21

22              DIRECT EXAMINATION (Continued)

23  BY MR. DICKENS:

24      Q.  Good afternoon, Doctor.

13:32:50  25      A.  Good afternoon.
</pre>

3671

1          Q.   I want to go back to the Tyvek for a second.

2    Would the drift from Mr. Johnson's truck sprayer have

3    passed through his Tyvek suit?

4          A.   The size of the aerosol droplets would have been

13:33:03   5    greater than 1 micron, so no, not the droplets.  However,

6    the moisture film that accumulates on the fabric will go

7    through, because that's at the molecular level.  It's

8    simply the glyphosate liquid and the other liquids that

9    are in the chemical would definitely pass through the

13:33:23   10   pores.  However, the actual droplets would not fit

11   through the pore.  In other words, it has to become a

12   moist surface, a wet surface, to penetrate --

13         Q.   And would that moist surface -- based on his

14   description of the spray, would a moist surface have

13:33:40   15   developed on the Tyvek suit?

16         A.   Yes.

17         Q.   And --

18         A.   The same way it did on his face and other areas,

19   yes.

13:33:45   20        Q.   And based on kind of the description you gave us

21   with respect to the dermal absorption, that same

22   absorption would apply to the Tyvek suit?  Once that mist

23   is on there, it would start to seep through?

24         A.   Actually, it's worse.  Mr. Johnson testified --

13:34:03   25   and I can tell you from wearing the darn things -- that

3672

1 you sweat, sometimes sweat profusely.

2     Q.  How does sweat affect --

3     A.  It means that the undergarments, the shirt,

4 pants and so on, are moist.  So when that glyphosate and

13:34:19  5 surfactants, adjuvants, contact the moist clothing, it

6 has an immediate diffusion pathway to the skin.  Because

7 you have damp skin against damp clothes against a damp

8 Tyvek suit, so you have an immediate pathway.  So it

9 actually enhances the sweating, enhance -- plus it opens

13:34:38  10 the pores, plus there's vasodilation when a person is hot

11 and sweaty.

12     Q.  Do you have an understanding as to whether or

13 not Mr. Johnson was able to shower immediately after he

14 got it on himself?  "It," Ranger Pro?

13:34:54  15     A.  Based on my review of his depositions, in most

16 cases, he did not immediately shower.  Rather, he would

17 go back to work and finish his functions, and then shower

18 at home.

19     Q.  And do you have an understanding -- did he do

13:35:17  20 anything to try to wash it off after being exposed to the

21 Ranger Pro?

22     A.  Well, I know he talked about washing his hands

23 and arms and forearms, and I believe he even wiped

24 himself at times.

13:35:32  25     Q.  Would that have gotten all the Ranger Pro off of

1 him so that there wouldn't be any more absorption?

2     A.  No.  And the other thing to remember is that the

3 studies have shown that the first hour of exposure shows

4 the greatest degree of absorption, and then it falls off

13:35:52  5 each hour -- less absorbed, less absorbed, and so on --

6 so that the first couple hours are critical.

7     Q.  What facts did you consider in determining the

8 total amount of Mr. Johnson's exposure?

9     A.  Well, as I said, I compared him to what's in the

13:36:08  10 literature, in terms of workers who were wearing patches

11 that were measured.  But I also compared him in terms of

12 his gallon per hour.  You know, he's testified that he's

13 used up to 150 gallons a day, and even 50 gallons in an

14 hour, which is 3 times above the rate.  Even if he used

13:36:30  15 the backpack sprayer and held it on non-stop, it would

16 only be about 16 or 15 gallons per hour, and he was

17 running 50 gallons per hour with a spray head that

18 produces a horrible aerosol.

19          So based on his testimony description in terms

13:36:47  20 of the drift, the fact that his face actually was wet,

21 based on the quantity used, he is an outlier.  He's --

22 beyond the worst case that I've found in the literature

23 which I used as my basis of calculations.  So my dose

24 calculation's actually another underestimate.

13:37:04  25     Q.  Based on his exposure and the 10-percent dermal

3674

1 absorption rate that you testified to, is that enough to

2 cause a carcinogenic response?

3       A.  Yes, absolutely.  He is -- I can say that

4 emphatically, and base it on the peer-reviewed

13:37:21   5 literature, in that his exposure -- his levels of

6 exposure were far higher than that in the literature, but

7 its duration of 2.25 years of exposure, or three seasons

8 of exposure, was less than the average in the

9 peer-reviewed epidemiologic studies who developed T-cell

13:37:43   10 lymphoma.  So it puts him approximately in the middle of

11 the human epidemiologic studies that show human cancer.

12 He falls in the middle of the exposure categories, not at

13 the extreme low end, not at the extreme high end.  And I

14 say it again, because his exposure days were far less

13:38:03   15 than that in the human literature.  However, his

16 intensity of exposure was actually higher.

17       Q.  So did you consider the total number of days

18 that he sprayed in consideration of your opinions in this

19 case?

13:38:16   20       A.  I did.  I calculated ninety, based on his

21 testimony.  Ninety days of spraying.

22       Q.  And that was based on 20 to 30 times of spraying

23 per each year?

24       A.  Twenty to thirty, although he did testify that

13:38:30   25 perhaps it was more.  It could have been as high as

3675

1  forty.

2      Q.  And you mentioned three spraying seasons.

3  That's from the date of his first use until the date of

4  when?  Was that date of diagnosis?

13:38:44  5      A.  August of 2014.  The date of diagnosis was when

6  the pathology was taken and he was diagnosed with

7  lymphoma.

8      Q.  Did you consider whether or not 2.25 years, as

9  you state, was long enough for non-Hodgkin's lymphoma to

13:39:02  10  form?

11      A.  Yeah.  I have -- for many years, have searched

12  the literature and have kept track of latencies for

13  different cancers.  Different cancers have different --

14  very different latencies.  You know, mesothelioma has the

13:39:18  15  longest latency of any.  Lymphoma has the shortest

16  latency period of any known human cancer, as short as

17  eight weeks.  When a drug called Cyclosporin A -- some of

18  you may have heard of it.  That's a drug used for tissue

19  transplant recipients.  For example, if I were to have a

13:39:43  20  kidney transplant, I would have to have Cyclosporin A to

21  suppress the immune system to not reject that organ.  In

22  that case, that particular drug has a side effect of

23  non-Hodgkin's lymphoma developing in as short as eight

24  weeks.

13:39:56  25          Now, that's not the case here.  We're not

3676

1 dealing with Cyclosporin A.  We're dealing with another

2 chemical, and, therefore, I've used other literature

3 studies to determine the shortest latency period.

4       Q.  In studies, how is latency looked at?  How is it

13:40:13   5 considered?

6       A.  Very specifically.  The rule is -- it's a

7 standard worldwide international rule:  It's from the

8 time of first exposure until the time of diagnosis.  When

9 that pathology sample is collected, that person is

13:40:28   10 diagnosed.  That is how all the studies in the

11 epidemiologic literature work.  It's from time of first

12 exposure to time of diagnosis.

13       Q.  So if Mr. Johnson was considered in that study,

14 his latency would have been that 2.25 years that you

13:40:44   15 mentioned previously?

16       A.  That's correct.

17       Q.  I want to turn your attention to one exhibit.

18       MR. DICKENS:  Permission to publish Plaintiff's

19 Exhibit 880?

13:40:52   20       THE COURT:  Any objection?

21       MR. LOMBARDI:  No objection, your Honor.

22       THE COURT:  Very well.  You may proceed.

23       Q.  BY MR. DICKENS:  Doctor, I'll point this out:

24 This is an article by Dennis Weisenburger, "Pathological

13:41:05   25 Classification of Non-Hodgkin's Lymphoma For

1 Epidemiologic Studies."

2          Have you reviewed this previously, Dr. Sawyer?

3      A.  Yes.

4      Q.  And I want to turn your attention to a chart on

13:41:20   5 page 6 of this study.  Do you see that there?

6      A.  Yes.

7      Q.  And this has -- it says "latency curve."  Can

8 you explain what a latency curve is?

9      A.  Yes.  Latency is generally found to exhibit what

13:41:39  10 we call a bell-shaped curve.  We'll have some individuals

11 who develop it very early, and then a mean peak value,

12 which typically, for lymphomas, is about a ten-year mean,

13 and then some people that don't develop it for 20 or

14 25 years, and they're at the other end, at what we call

13:42:00  15 the tail.  So this diagram, Figure 4, shows two latency

16 curves for non-Hodgkin's lymphoma, based upon a high

17 acute exposure versus a steady, long-term, low exposure,

18 and it makes a difference on the latency curve.

19      Q.  And so the A, the first one we see there, that

13:42:21  20 is the short-term high dose; is that right?

21      A.  That's correct.

22      Q.  And what's your reading of this particular

23 latency curve with respect to short-term high dose versus

24 the long-term low dose?

13:42:35  25      A.  Well, this is typical for most chemicals with

3678

1  respect to chemical carcinogenesis, that if the person is

2  receiving the sustained high dose, the latency is

3  generally much shorter.  And that's what we have in this

4  case.  We have a person who received very high dosage but

13:42:53   5  for a shorter period of time, only 2.25 years, prior to

6  the diagnosis.

7          MR. DICKENS:  Thank you, Doctor.  I have no

8  further questions.  If I may pass the witness.

9          THE COURT:  Thank you.

13:43:04   10          MR. DICKENS:  Can I approach?  Dr. Sawyer left

11  his binder behind.

12          THE COURT:  Yes, of course.

13          THE WITNESS:  Thank you very much.

14          THE COURT:  Counsel, Mr. Dickens, would you mind

13:43:31   15  getting some water for Dr. Sawyer?

16          MR. DICKENS:  Not a problem.

17          MR. LOMBARDI:  May I approach?

18          THE COURT:  Yes.

19

20                    CROSS-EXAMINATION

21  BY MR. LOMBARDI:

22      Q.  Good afternoon, Doctor.  I'm going to try to

23  moderate my voice to fit the room and move the podium

24  also.  If you have any trouble understanding me or

13:44:18   25  hearing me, you'll let me know; right?

3679

1    A.  I will.  I don't hear real well, so it's

2 possible I may have to.

3    Q.  All right.  Well, you just go like this if you

4 need me to (indicating), and I'll know what you mean.

13:44:29  5    A.  Thank you.

6    Q.  Can you hear me right now?  Is that working?

7    A.  Very good.  Thank you.

8    Q.  Okay.

9    We haven't met.  My name is George Lombardi.  I

13:44:35  10 represent Monsanto in this matter.

11    A.  Very good.

12    Q.  All right.  So, Doctor, you -- I think you

13 testified on your direct that you -- I think -- would you

14 characterize your full-time job now as your toxicology

13:44:51  15 consulting; is that right?

16    A.  Yes, since approximately 1993.

17    Q.  Okay.  And in that job, primarily what you do is

18 get retained in lawsuits; is that right?

19    A.  Not always.  There's criminal matters which are

13:45:13  20 fairly common, probably about -- this year, probably 15

21 or 20 percent of my work is criminal-related --

22    Q.  And I -- go ahead and finish.  I didn't mean to

23 interrupt you.

24    A.  -- and the remainder are governmental agencies

13:45:26  25 and civil litigation.

1      Q.   Okay.   So 85 percent or so has to do with civil

2    litigation of some sort or another; is that right?

3      A.   Yeah.   That's reasonable.

4      Q.   Okay.   And in the last three years or so, you've

13:45:40   5    testified in excess of 40 times in depositions or

6    hearings or trials or so forth; is that right?

7      A.   In depositions.   But as far as trials, only

8    probably -- maybe 20 times in the past 4 years at the

9    most.

13:45:55   10      Q.   Okay.   So you're not nervous sitting there.

11    You're very experienced at this; is that right?

12      A.   Well --

13      Q.   I'll withdraw the question.   I'll make sure it's

14    clear.   You're very experienced at what we're doing here

13:46:12   15    today; is that right?

16      A.   Yes.

17      Q.   Okay.   And you're experienced enough that you

18    have actually spoken to others -- other toxicologists --

19    who want to get into the business of testifying in

13:46:26   20    litigation; is that right?

21      A.   I don't know about that.   I've spoken to other

22    forensic toxicologists in a couple of national meetings

23    that I've presented a couple of papers.

24      Q.   And you've presented on how best to act or to

13:46:42   25    present yourself as a toxicologist in an expert situation

3681

1  at a trial; right?

2      A.  In terms of gathering and obtaining studies and

3  evidence, yes.

4      Q.  Okay.  And one of the things that you have

13:46:59  5  talked about is the interaction between epidemiology and

6  toxicology; is that right?

7      A.  Yes.

8      Q.  Now, in this particular case, you made very

9  clear in your report that you're deferring on the

13:47:14  10  epidemiology to users on plaintiff's side of the case; is

11  that right?

12      A.  That's correct.  Dr. Portier and others have

13  handled the epidemiological aspects of this case.  It

14  would be --

15      Q.  And is your -- oh, I'm sorry.  I didn't mean to

16  interrupt you.  Go ahead.

17      A.  It would be overburdensome for me to try and

18  handle everything in this case.

19      Q.  Understood.  Understood.  But just so it's clear

13:47:35  20  to the jury, the epidemiologist on your list that they

21  have already heard from was Dr. Neugut.  At least you

22  know who Dr. Neugut is; is that right?

23      A.  Certainly.

24      Q.  And that's one of the people that you're

13:47:47  25  deferring to for epidemiological analysis; is that right?

3682

1        A.  That's correct.

2        Q.  But you do know -- you do have some knowledge of

3   epidemiology generally; is that right?

4        A.  Yes.

13:48:04    5        Q.  And you understand, for instance, that -- and

6   you agree that association between, say, a chemical agent

7   and a disease alone does not constitute causation;

8   correct?

9        A.  That is correct.  One has to look at the

13:48:18   10   mechanism, the animal studies and other plausible factors

11   and differential diagnosis and rule out other

12   possibilities.

13        Q.  And you would never -- well, you advise others

14   to never rely solely on animal study data without human

13:48:38   15   epidemiological data in support of your opinion as well?

16        A.  With respect to cancer causation, that's

17   correct.

18        Q.  Okay.

19        A.  I do not rely just on animal data.

13:48:48   20        Q.  And in order for you to conclude, and this is

21   what you advise others, that something has been proven to

22   be a carcinogen, there would have to be a human

23   epidemiological -- there has to be human epidemiological

24   data to support that; is that right?

13:49:04   25        A.  Yes, as in this case.  Correct.

3683

1    Q.  And it's critical when you consider the

2  epidemiological data -- well, one of the reasons why it's

3  critical to consider the epidemiological data is that

4  that's data that actually deals with humans; correct?

13:49:23   5    A.  Yes.

6    Q.  And it deals with humans who are exposed to

7  whatever the chemical might be you're studying as it's

8  used out there in the real world; right?

9    A.  Yes.

13:49:35   10    Q.  So when we talk about epidemiological data in

11  this case, relating to Roundup, we're not talking about

12  epidemiological data that studies glyphosate in

13  isolation; is that right?

14    A.  For the most part, correct.

13:49:50   15    Q.  And so when we're talking about the

16  epidemiological data here, we're talking about data that

17  includes -- it considers exposure to Roundup or other

18  products that are actually on the market; is that right?

19    A.  Yes.

13:50:09   20    Q.  Now, one of the critical things in epidemiology

21  to keep in mind is that you have to deal with all

22  potential confounding factors; isn't that right?

23    A.  Yes.

24    Q.  And confounding factors -- one of the ways or

13:50:27   25  one of the terms that epidemiologists use to refer to

1 dealing with confounding factors is "adjustment"; is that

2 right?  You've seen that phrase -- that term before; is

3 that right?

4     A.  Of course.

13:50:39     5     Q.  And we're not -- I'm not going to get into the

6 details here, sir, but in the literature relevant to this

7 case, you've seen reference to the phrase "adjustment for

8 other pesticides"; is that right?

9     A.  Yes.

13:50:51    10     Q.  Okay.  Now, let me turn to some of your other

11 opinions, if I could.  I wanted to talk to you a little

12 bit about Mr. Johnson's exposure.  You did testify about

13 that this morning and even a little bit after lunch;

14 right?

13:51:32    15     A.  Of course.

16     Q.  Now, in your expert report, you refer to,

17 Doctor, the steps that Mr. Johnson took to protect

18 himself as "limited"; is that right?

19     A.  Yes.

13:51:43    20     Q.  Okay.  But actually, Mr. Johnson took more steps

21 than most to protect himself from Roundup or Ranger Pro,

22 whichever it was he was using; isn't that right?

23     A.  I'm not sure I understand the term "most."

24     Q.  Most people.  Most people who use it.

13:52:05    25     A.  No.  The people in the Monsanto study were

1  afforded waterproof clothing, jackets, face shield, et

2  cetera.

3      Q.  Okay.

4      A.  If you're a Monsanto person, you get better

13:52:16   5  protection.

6      Q.  Well, it wasn't -- certainly, you'd agree that

7  based on the steps he took, Mr. Johnson was concerned

8  about protecting himself from Roundup or Ranger Pro,

9  whichever one it was he would be using?

13:52:29   10      A.  Absolutely.

11      Q.  And he took a number of steps that you would

12  consider effective steps; correct?

13      A.  He did.

14      Q.  And he took -- for instance, one of the things

13:52:41   15  that he did was he wore chemically-resistant gloves; is

16  that right?

17      A.  Yes.  And rubber boots as well.

18      Q.  I'm going to get to that.  But the gloves, as

19  you understand it, came up his forearm; is that right?

13:52:55   20      A.  Yes.

21      Q.  And when we say "chemically resistant," those

22  are the kinds of gloves that people who work with

23  hazardous chemicals would wear because the -- what is it,

24  a rubberized glove that prevents that?

13:53:07   25      A.  Yes, I use those.  It's a neoprene mixture which

3686

1  is solvent-resistant.

2      Q.  And actually, you know from your studies and

3  your review of the literature that the hands are

4  particularly important to protect; right?

13:53:23    5      A.  Absolutely.

6      Q.  Because the hands, when you're talking about

7  dermal absorption, are, what the studies show, the

8  location where, if there's going to be dermal absorption,

9  most of it happens; right?

13:53:36   10      A.  Yes.

11      Q.  So it was a good thing for Mr. Johnson to wear

12  the chemically-resistant gloves; is that right?

13      A.  I'm sorry.  I made a slight error.

14      Q.  Okay.  Correct your error, please.

13:53:48   15      A.  The studies show that the back, just below the

16  neck area, is 3 to 33 times more impacted than anywhere

17  else on the body when wearing a backpack sprayer.  Now,

18  if a person is not wearing a backpack sprayer, the

19  second -- then the most effected area are the hands, but

13:54:11   20  if you're wearing a backpack, it's this area --

21      Q.  What study is it you're referring to for the

22  backpack sprayer, sir?

23      A.  Monsanto's own study.

24      Q.  Okay.  Now, the gloves, they were the gloves

13:54:20   25  that were chemically resistant, and then he had boots

3687

1  that were also chemically resistant; is that right?

2       A.  That's what I said, yeah.

3       Q.  Yeah.  Okay.  And so -- actually, when you do

4  your spraying, you don't wear chemically-resistant boots,

13:54:34   5  do you?

6       A.  No, but I don't have any weeds or anything to

7  walk through.  I have mulch.

8       Q.  Right.  But you wear, what did you say, leather,

9  kind of, work boots when you do that?

13:54:45   10      A.  Yes, yes.

11      Q.  And that's not as good to repel something like a

12  chemical as a chemically-resident boot; right?

13      A.  Correct.  But I'm not walking through grass, wet

14  weeds.  I have no drift, so it's --

13:55:00   15      Q.  Well, it concerns you enough that as soon as you

16  take off your boots, you wash your hands and your feet;

17  right?

18      A.  I do as a precaution.

19      Q.  Yeah.  And you actually are of the opinion,

13:55:13   20  Doctor, with all your study of glyphosate and so forth

21  and Roundup and Ranger Pro, that washing off an exposed

22  area is a very effective way of preventing dermal

23  absorption from happening; isn't that right?

24      A.  Only if conducted very rapidly after exposure,

13:55:37   25  because that first hour or two, nearly 50 percent of the

3688

1 dermal absorption takes place, so the washing has to be

2 rather immediate.

3     Q.  Okay.  But if you -- assuming you do an

4 immediate washing, that's an effective way of preventing

13:55:53   5 dermal absorption of Roundup or Ranger Pro?

6     A.  Well, it's not going to prevent it, but it's

7 certainly going to reduce it.

8     Q.  Okay.  Substantially; is that correct?

9     A.  Yes.

13:56:01  10     Q.  And that's why you do it?

11     A.  Well, I have.

12     Q.  Yeah.

13     A.  You know, I -- there was one exception where I

14 had to scrub my legs, the first time I ever used the darn

13:56:11  15 stuff.

16     Q.  Yeah.  And you scrubbed your legs, I assume,

17 with soap and water; is that right?

18     A.  That's correct.

19     Q.  All right.  Now, you did not yourself, Doctor,

13:56:20  20 perform any calculation of the amount of glyphosate that

21 penetrated Mr. Johnson's clothing; is that right?

22     A.  I relied on the Monsanto official studies that

23 show how much the impact is on an average worker.

24     Q.  Yep.  And --

13:56:36  25     A.  And realizing that that underestimates his

3689

1  exposure.

2         Now, I had no way to go back and re-spray

3  Mr. Johnson with pads on his body that I could send to

4  the laboratory.  That couldn't be done.  It would be

13:56:50  5  unethical anyway.

6       Q.  Yeah.  Understood.  Understood.  And nobody's

7  suggesting you should have done that.  I'm just asking, I

8  hope, a simple question.

9         You didn't perform any calculation of the amount

13:57:00  10  of glyphosate that actually penetrated Mr. Johnson's

11  clothing?

12       A.  No.  I used the 40-percent level, which is the

13  Monsanto figure.

14       Q.  Okay.  You didn't perform any calculation of the

13:57:11  15  amount that penetrated his gloves?

16       A.  I used the Monsanto figure of 0 percent.

17       Q.  Sir, I --

18         MR. LOMBARDI:  Your Honor, I just asked him a

19  very straightforward question.

13:57:23  20       Q.  You didn't perform yourself a calculation of the

21  amount that penetrated Mr. Johnson's gloves; is that

22  right, sir?

23       A.  Same answer as before.  I couldn't re-spray the

24  guy.

13:57:33  25       Q.  Okay.  So you did not; is that right?

1          A.  Of course not.

2          Q.  Okay.  Thank you.  You didn't do any calculation

3     of the amount that penetrated Mr. Johnson's

4     chemically-resistant boots; is that correct, sir?

13:57:47    5          A.  No.  I used the Monsanto figure for boots --

6          Q.  You didn't --

7          A.  -- rubber boots, which is 0.

8          Q.  I apologize.  Did you finish your answer?

9          A.  Yes, sir.

13:57:55   10          Q.  You didn't calculate the amount that penetrated

11     Mr. Johnson's mask; is that correct?  You know he wore a

12     mask; right?

13          A.  Yeah, I -- I actually did, in terms of I used

14     the 100 percent value.  I did not -- I did it two ways,

13:58:17   15     actually, in our report.  I did one with a zero

16     inhalation, assuming 100 percent was captured by the

17     mask, and I did it a second measure using the Monsanto

18     figure of inhalation.  So I did it two different ways,

19     and it had hardly any impact on the dose level at all.

20          Q.  Okay.

21          A.  And per page -- Table 26, 27 of my report.

22          Q.  But my question, again, sir, is:  Did you do any

23     calculation of the penetration of Mr. Johnson himself of

24     his mask by glyphosate?

13:58:44   25          A.  Of course not.  That could not be replicated for

3691

1  Mr. Johnson.

2       Q.  Thank you.

3            And you didn't do any calculation yourself of

4  the amount of drift that Mr. Johnson was exposed to;

13:58:56    5  correct?

6       A.  Of course not.  There was no way to go back in

7  time and measure that.

8       Q.  Okay.  Thank you.

9            Now, you have said, Doctor, that it's important

13:59:11   10  also -- in addition to protect equipment, exposure is

11  also determined in part by the way you spray; correct?

12       A.  Yes.

13       Q.  All right.  And you told us about the way you

14  spray at home, and you've studied Mr. Johnson's testimony

13:59:26   15  and the records about the way Mr. Johnson sprayed;

16  correct?

17       A.  Yes.

18       Q.  And Mr. Johnson indicated that he was very aware

19  of the problem of drift; is that right?

13:59:36   20       A.  Yes.

21       Q.  And you don't want -- he indicated you don't

22  want to spray when the wind is too great; correct?

23       A.  Are you asking me about his testimony?

24       Q.  Yes.

13:59:48   25       A.  He testified that it was unpredictable on any

3692

1 given day.

2     Q.  Right.  But he made an effort not to spray if

3 the wind was too great, didn't he say that?

4     A.  Yes.

13:59:59  5     Q.  Okay.  And that's -- and you agree with that,

6 you shouldn't try to spray when the wind is too great?

7     A.  Correct.

8     Q.  And one of the things you should do when you

9 spray, is you should, for instance, not spray into the

14:00:11  10 wind; right?

11     A.  Of course.

12     Q.  Because that would just bring the spray right

13 back at you?

14     A.  Correct.

14:00:19  15     Q.  And Mr. Johnson understood that as well?

16     A.  I don't remember his exact testimony, so I'd

17 rather not --

18     Q.  Okay.  That's fine.  And if you have that

19 situation, please just tell me, and we'll move on.  But I

14:00:36  20 understand you don't remember that specifically; is that

21 right?

22     A.  Not exactly.

23     Q.  Okay.  Thank you.

24     And do you recall that Mr. Johnson knew that

14:00:43  25 it's better to spray in a way that the wind was going to

3693

1 blow the aerosol away from you?

2      A.  I believe so.  But I know he also testified that

3 it was very unpredictable.  The wind could be moving one

4 way and then switch to the other, depending on what

14:01:05   5 buildings were, you know, in the area.

6      Q.  Sure.  Okay.  Sir, and you understand that

7 Mr. Johnson used a wand when he sprayed; correct?

8      A.  Yes.

9      Q.  Whether it was with the backpack or the -- I'm

14:01:18  10 not sure what we call it -- the pump or -- the pump that

11 he had on the back of the truck, both -- in both

12 instances, he would use a wand; is that right?

13      A.  Yeah, it's got -- termed a hydraulic nozzle,

14 yes.

14:01:31  15      Q.  Okay.  And the wand -- or I should call it a

16 hydraulic nozzle; is that --

17      A.  Correct.

18      Q.  Okay.  The hydraulic nozzle, that's a good idea

19 to help control your exposure; is that right?

14:01:42  20      A.  No.  It's a terrible idea.  I drilled a hole in

21 mine.  I wouldn't use it again.  That creates a dangerous

22 aerosol.

23      Q.  Okay.  So -- and -- so by using a wand, he

24 actually was doing the wrong thing, as far as you're

14:01:58  25 concerned?

3694

1        A.  Well, he didn't know any better.

2        Q.  I'm not blaming Mr. Johnson.  I'm just -- it was

3   not helpful, I guess, to avoiding exposure?

4        A.  Certainly not.

14:02:06    5        Q.  Okay.  So -- but the wand at least -- it helps

6   extend the spray away from your body?  That's the idea of

7   using a wand; correct?

8        A.  Yeah, it moves it approximately 30 inches.

9        Q.  Okay.  And is that the length of your wand.

14:02:23   10        A.  I have several wands.  I have pressure washer

11  wands, which I use with water only, of course, and I have

12  my backpack wand, which measures about 30 inches.

13        Q.  Okay.  So the wand that you use for -- you use

14  Roundup when you use a herbicide, not Ranger Pro; is that

14:02:44   15  right?

16        A.  That's right.

17        Q.  So when you use Roundup, you use about the same

18  wand that Mr. Johnson was using; is that right?

19        A.  Yes, except mine has a hole drilled in it, and

14:02:53   20  it shoots out like a squirt gun, not an aerosol.

21        Q.  Okay.  Yeah.  Understood.

22            Now, the other thing that Mr. Johnson wore --

23  we've talked about the boots and the gloves and the mask.

24  I forgot -- he also wore goggles; is that right?

14:03:10   25        A.  Yes -- well, not --

3695

1    Q.  Okay.

2    A.  -- I don't want to say he always wore them, but

3 yes.

4    Q.  Okay.  At least as you recall it, he at least

14:03:17    5 from time to time wore goggles.  You don't remember how

6 often; is that fair?

7    A.  That's correct.

8    Q.  Now, the -- and did you know that at some point

9 he changed from, kind of, the soft paper mask to a mask

14:03:32   10 with cannisters on it?

11    A.  Yes, that's correct.

12    Q.  All right.  And do you believe that the mask

13 with cannisters, as you understand it, that does help to

14 protect you from exposure?

14:03:45   15    A.  Well, both, the dust mask will catch much of the

16 aerosol as well.

17    Q.  Okay.

18    A.  That's why I said I did not opine in this case

19 that his inhalation exposure was very significant at all.

14:04:00   20 It was primarily dermal.

21    Q.  Okay.  Now, one of the things that you -- then,

22 again, I guess the last thing we haven't talked about yet

23 is the Tyvek suit.  Do you remember that?

24    A.  Yes.

14:04:11   25    Q.  And he did wear a Tyvek suit?

3696

1        A.  Yes.

2        Q.  And you told us your opinions about the Tyvek

3   suit that he wore; correct?

4        A.  That's correct.

14:04:17   5        MR. LOMBARDI:  All right.  So let's put up on

6   the screen Plaintiff's Exhibit 118, which is just the

7   website.

8        THE COURT:  Any objection?

9        MR. DICKENS:  No objection.

14:04:28  10        THE COURT:  Very well.  You may proceed.

11        Q.  BY MR. LOMBARDI:  This is what was on the screen

12   before, Doctor.  And we'll look at it a little more

13   closely.  I just want to get you oriented.  You can

14   look -- it should be on your screen, if that works for

14:04:37  15   you, or you're welcome to look in your notebook,

16   whichever works better for you.

17        Are you okay there, Doctor?

18        A.  Very good.

19        Q.  All right.  So this is the Tyvek 400.  That's

14:04:48  20   the brand name, I guess, and you understand this is the

21   one that Mr. Johnson actually used; is that right?

22        A.  Yes.

23        Q.  All right.  And so you read us some from the

24   features and benefits section.  Let's go down to where it

14:05:05  25   says, "Applications include."

1           MR. LOMBARDI:  And if we could highlight that.

2 Let me show you where that is.

3      Q.  Do you see that, Doctor, "The applications

4 include"?

14:05:25    5      A.  Yes.

6      Q.  And so this is -- as you understand it, this is

7 what DuPont is telling us about what you can use the

8 Tyvek suit with, what kind of materials you might be

9 handling that would be appropriate to use this particular

14:05:42   10 Tyvek suit; is that right?

11      A.  That's right.

12      Q.  All right.  And it says, "Lead and asbestos

13 abatement remediation."

14           Do you see that?

14:05:50   15      A.  Yes.

16      Q.  "General maintenance operations."

17           Do you see that?

18      A.  Yes.

19      Q.  "Spray painting."

14:05:54   20      A.  Correct.

21      Q.  "And general clean up."

22           Do you see that?

23      A.  Yes.

24      Q.  Okay.  Now is -- spray painting, does that have

14:06:02   25 some aerosol?

1    A.  It does.  In fact, I -- when I restored my '57

2 Buick, I wore a Tyvek 400 --

3    Q.  Okay.

4    A.  -- to keep the paint off me.

14:06:13    5    Q.  All right.  So let's go to the next page.  And I

6 want to go to -- there was a table -- actually, I think

7 it's the third page.  Is it -- the third page where --

8 the table that you -- you showed us some examples from, I

9 believe.

14:06:25    10    A.  That's right.

11    Q.  Does that look right to you, Doctor?

12    A.  It does.

13    Q.  All right.  So I just want to go through some of

14 the things that they say might be suitable for use, but

14:06:35    15 there are a lot of liquids on this list, aren't there,

16 Doctor?

17    A.  Yes.

18    Q.  Okay.  All right.  And so if we go down to the

19 fourth one, it says, "Biological fluids with potentially

14:06:48    20 infectious diseases."

21        Do you see that?

22    A.  Yes.

23    Q.  That's one of the things they say it's suitable

24 for use with; right?  Correct?

14:06:56    25    A.  It does.

3699

1        Q.  And then it says, "Blood"; right?

2        A.  Yes.

3        Q.  "Blood with potentially infectious diseases."

4        A.  Yes.

14:07:10    5        Q.  "Bodily fluids."

6        A.  Yes.

7        Q.  "Bodily fluids with infectious diseases."  And

8    let's just skip down to the bottom here.  I'll show you

9    one other thing.

14:07:27   10        "Radioactive particles, sewage"; right?

11        A.  Yes.

12        Q.  Okay.  Now, Doctor, this you just -- you got

13    from the DuPont website, I assume; right?

14        A.  I don't remember.  I'd have to check my report

14:07:46   15    and look at the footnotes.

16        MR. LOMBARDI:  Well, if you could just go to the

17    front page, and we can just show the doctor.

18        Q.  Does that look like the DuPont website to you,

19    Doctor?

14:08:01   20        Well, let me just ask you:  Did you find this

21    information yourself?

22        A.  Yes.

23        Q.  Okay.  So did you go to the DuPont website to

24    find it?

14:08:08   25        A.  I went to a number of different searches through

3700

1 Medline and the DuPont website and others.

2     Q.  Okay.  Well, do you see the -- you see the

3 DuPont logo; right?

4     A.  I do.

14:08:20    5     Q.  So does that refresh your recollection it was

6 the DuPont website that you went to look at; right?

7     A.  Well, let me check my report and I'll tell you

8 for sure.

9     Q.  Okay.

14:08:35    10       (Interruption in proceedings.)

11       THE COURT:  Let's take, Ladies and Gentlemen,

12 just a five-minute recess.  We'll resume again in five

13 minutes, at 2:15.

14       (Recess.)

14:13:29    15       MR. DICKENS:  He seems to wander off, your

16 Honor, I apologize.

17       MR. WISNER:  We really are looking for him.  I

18 think he went to the restroom.

19       THE COURT:  We'll just remain seated until we

14:14:22    20 can find Dr. Sawyer.

21       Welcome back, Dr. Sawyer.

22       THE WITNESS:  I went to the bathroom.

23       THE COURT:  Ladies and Gentlemen, Dr. Sawyer

24 remains under oath, and, Mr. Lombardi, when you're ready,

14:15:32    25 you may proceed.

3701

1           MR. LOMBARDI:  Thank you, your Honor.

2      Q.  I think all I wanted to confirm, Doctor, was the

3  document that you put up was from the DuPont website?

4      A.  Yes.

14:15:42  5      Q.  The one about the Tyvek 400?

6      A.  Yes, sir.  Thank you.  It is.

7      Q.  Okay.  Thank you.

8           And there was other information about the Tyvek

9  400 elsewhere on this same website; is that right?

14:15:56  10      A.  Yes.  I have two different references to the

11  DuPont website in my report.

12      Q.  Okay.  Let me ask you to look at Defendant's

13  Exhibit 3140, and it should be in that huge binder that

14  we'll never go all the way through, Doctor.  But you can

14:16:18  15  take a look there.

16      A.  Okay.

17      Q.  I'll wait until you've had a chance to wrestle

18  that into submission.  There you go.

19           Do you have that -- do you have Defendant's

14:16:44  20  Exhibit 3140, Doctor?

21      A.  I do.

22      Q.  Okay.

23      A.  I think I need a bigger binder.

24      Q.  And do you see -- I think that's about as big as

14:16:52  25  we can get them, Doctor.

1          But do you see the reference there -- there's a

2   DuPont emblem in the upper-left, same place as we saw in

3   the other excerpt from the website?

4          A.   Yes.

14:17:08    5     Q.   And do you see that this is a page relating to

6   the Tyvek 400 suit as well?

7          A.   Yes.

8          Q.   Okay.  And -- and this is the type of

9   information that you consider reliable in evaluating the

14:17:28   10   Tyvek 400 and how it performed in this case; is that

11   right?

12         A.   Correct.

13              MR. LOMBARDI:  Okay.  Your Honor, I'd ask to

14   publish it?

14:17:36   15              THE COURT:  Any objection?

16              MR. DICKENS:  Objection.  Foundation, your

17   Honor.

18              MR. LOMBARDI:  Your Honor, he just said that

19   it's the type --

14:17:46   20              THE COURT:  Overruled.  It may be published.

21              MR. DICKENS:  Your Honor, he's never seen it

22   before.

23              THE COURT:  All right.  Counsel, approach.

24              (Sidebar.)

14:18:13   25              MR. LOMBARDI:  This is what user (inaudible).

3703

1    It's just another page of the same website.  He just said

2    that's the kind of information he considers reliable, and

3    I just have one question for him on it.

4           MR. DICKENS:  Your Honor, he cites to specific

14:18:29   5    Tyvek specifications in his report.  This is all we know

6    he actually reviewed.  It doesn't appear that this actual

7    document is one of the two that he reviewed.  If

8    Mr. Lombardi asked him that, "Have you seen this before,"

9    we have no problem with that, but we just don't know

14:18:46  10    whether he's reviewed it or not.  I don't know one way or

11    the other.  He cites two specific websites here, none of

12    which appear to be that one.

13           MR. LOMBARDI:  I don't have -- have to use

14    something in his report if he considers it reliable --

14:18:59  15           THE COURT:  Okay.  Well, I'm going to overrule

16    the objection, and let him proceed.  Okay.

17           (End sidebar.)

18           THE COURT:  All right.  Mr. Lombardi, you may

19    proceed.

14:19:16  20       Q.  BY MR. LOMBARDI:  Okay.  Doctor, back to the

21    same place.

22           Do you see that?

23       A.  Yes.

24       Q.  It's -- for the record, we're at Defendant's

14:19:22  25    Exhibit 3140; right?  It will be in the bottom right-hand

3704

1  corner of the page there.

2       A.  Yep, yep.  That's what we have.

3            MR. LOMBARDI:  And, your Honor, permission to

4  publish?

14:19:34   5            THE WITNESS:  Yes.

6            MR. WISNER:  Your Honor, I believe they can ask

7  him about it, but publishing is a different -- the Code

8  doesn't allow that.

9            MR. LOMBARDI:  And for the record, I'm not

14:19:42   10  asking to admit it.  I'm just asking to publish it

11  because it's deemed a reliable source.

12            THE COURT:  That's fine.  The objection's

13  overruled.

14       Q.  BY MR. LOMBARDI:  Doctor, just so that everybody

14:19:53   15  knows what we're looking at here, up in the upper-left,

16  do you see it says "DuPont" again?

17       A.  Yes.

18       Q.  And you recognize that as the same DuPont

19  emblem, logo, whatever, that was on the other part of the

14:20:09   20  website that you displayed; correct?

21       A.  Yes.

22       Q.  All right.  And if we go down a little bit, it

23  says, "The DuPont Tyvek 400 engineered with safety in

24  mind."

14:20:21   25            Do you see that?

3705

1    A.  Yes.

2    Q.  All right.  And then it provides some

3 information down below.  Down around here (indicating),

4 some information about its use.

14:20:34    5    Do you see that?

6    A.  Yes.

7    Q.  And the first one says that it provides

8 lightweight inherent barrier protection against hazardous

9 dry particles and aerosols; correct, Doctor?

14:20:48    10    A.  Yes.

11    Q.  Thank you, Doctor.

12    A.  And I'd state to the jury that aerosols would be

13 blocked.  It's the liquid containing the glyphosate that

14 is able to go through the pores, not the particles.

14:21:09    15    Q.  Okay.  Doctor, let me ask you a little bit about

16 surfactants.

17    A.  Should I put this --

18    Q.  You can or you -- whatever is easiest for you.

19    A.  I'll move it to the edge over here.  There we

20 go.

21    Q.  That's fine.

22    You talked about surfactants for a fair amount

23 of time during your direct examination; correct?

24    A.  Yes.

14:21:36    25    Q.  And surfactants are -- it's something that plays

3706

1 a role in Roundup or Ranger Pro; correct?

2     A.  Definitely.

3     Q.  Yeah.  And it plays a role that helps make it

4 more efficacious overall; is that -- that's what you

14:21:53   5 said, I think, this morning; isn't that right?

6     A.  Yeah, I even used the word "clever."  It's a

7 very --

8     Q.  I'm sorry?

9     A.  Clever.  It's a very well-thought-out

14:22:03   10 methodology to enhance the permeability into the plant.

11     Q.  Okay.  Now, you talked a little bit about

12 surfactants and testing the surfactants.  Now,

13 surfactants are inherently studied when you study

14 epidemiology; isn't that right?

14:22:21   15     A.  Yes.

16     Q.  Because when you study epidemiology, any of

17 those studies that studies Roundup or Ranger Pro or a

18 glyphosate-based product, you're studying the product as

19 it's actually sold on the market; is that right?

14:22:39   20     A.  In the epidemiologic literature, yes.

21     Q.  Okay.  And that's what I'm talking about right

22 now, is the epidemiologic literature, so when you have an

23 epidemiology study of glyphosate-based products, you have

24 a study that is looking at the effect of glyphosate as

14:22:55   25 it's formulated and sold to the public; is that right?

3707

1    A.  Yes.  That's fairly clear.

2    Q.  And it's very clear that, therefore, the

3 epidemiology studies and their calculation of risk takes

4 into account the presence of surfactants, for instance?

14:23:16   5    A.  Yes.

6    Q.  And anything else that's included in the

7 formulation; correct?

8    A.  Right.  The things such as ethylene oxide and

9 other trace-level carcinogens, yes.

14:23:28   10    Q.  It considers all of those things together as the

11 product, as it's actually formulated to determine whether

12 there is an increase in risk; correct?

13    A.  Yes.

14    Q.  Now, we know, Doctor, that surfactants are

14:23:44   15 actually tested and approved by the regulators; is that

16 right?

17    A.  No.  The surfactant POEA -- the only testing

18 that's ever been done is *in vitro* work by Monsanto.

19 There's been no animal carcinogenic studies ever run on

14:24:08   20 it anywhere, by Monsanto or the government?

21    Q.  And you know the government requires -- has

22 specific requirements for animal studies; right?

23    A.  Yes.  Long-term assays, yes.  They're very

24 specific.

14:24:23   25    Q.  And they're very specific that they want you to

3708

1   test glyphosate in those studies; correct?

2        A.  Yes.

3        Q.  And you're aware that Monsanto did some of the

4   animal studies that exist on glyphosate, but not all of

14:24:39   5   them; is that right?

6        A.  Correct.

7        Q.  And when we're talking about this, I've said

8   animal.  It's really rodent studies; is that fair,

9   Doctor?

14:24:48   10        A.  Yes.

11        Q.  And most of those studies were done by people

12   other than Monsanto; correct?

13        A.  In some cases universities.  In some cases

14   Monsanto or Monsanto contractors.

14:25:01   15        Q.  Correct.  Or other manufacturers as well;

16   correct?

17        A.  True.

18        Q.  Other -- and when I say "other manufacturers," I

19   mean other manufacturers of glyphosate-based products;

14:25:10   20   correct?

21        A.  Correct.

22        Q.  And all of those studies are done just of

23   glyphosate with the animals; correct?

24        A.  That's right.

14:25:17   25        Q.  That's the way the regulators want it done;

1  correct?

2       A.  Yes.

3       Q.  All right.  So when we talk about testing that's

4  done of surfactants -- let me just get a basic point

14:25:31  5  here.  There's -- we've talked a lot in this case about

6  carcinogenicity.  And you did as well; correct, Doctor?

7       A.  Yes.

8       Q.  And carcinogenicity talks about cancer

9  causing -- it means cancer causing; is that right?

14:25:43  10      A.  Yes.

11      Q.  Or you're at least measuring the extent to which

12  something is cancer causing; is that right, when you

13  measure carcinogenicity?

14      A.  Yes.

14:25:51  15      Q.  And toxicity is actually something different

16  than carcinogenicity; right?

17      A.  Yes.

18      Q.  What is toxicity, Doctor?

19      A.  Well, toxicity in the -- let's talk about animal

14:26:04  20  studies.  Used in bioassays for cancer, toxicity is a

21  point where adverse effects from the treatment are

22  evident.

23          For example, if the animals are dosed at 1,000

24  milligrams per kilogram valuate, and they start wasting

14:26:26  25  away, losing weight, that's considered a treatment

1  related to toxicity.

2      Q.  I apologize.  I had to clear my throat.  Did I

3  interrupt you?

4      A.  Not at all.

14:26:35   5      Q.  Okay.  All right.  So toxicity is different than

6  carcinogenicity; is that right?

7      A.  Yes.

8      Q.  And there are lots of toxicity tests that are

9  done on the ingredients of every herbicide that's sold;

14:26:48  10  is that right?

11      A.  Yes.

12      Q.  And I think you mentioned this morning, but just

13  to refresh your recollection here, when you talk about

14  glyphosate, that is called the active ingredient; is that

14:27:02  15  right?

16      A.  Yes.

17      Q.  And that's because it's the ingredient that is

18  active to kill the weed; is that right?

19      A.  Exactly.

14:27:10  20      Q.  All right.  And then inert ingredients mean

21  ingredients that essentially aren't active; is that

22  right?

23      A.  For that purpose.

24      Q.  Right.

14:27:21  25      A.  Now -- and, again, I gave the scientific

3711

1  definition, which is different.  Inert means has the

2  capacity to cause no harm.

3         I gave some examples.  It would be like nitrogen

4  in the air.  It's -- inert means an ingredient that --

14:27:40  5  from a scientific standpoint, means an ingredient that

6  has no harmful adverse effects associated with it.

7         In the definition used in the product

8  manufacturing arena, the word "inert" means that it's not

9  designed in itself to kill the weed.

14:28:00  10     Q.  Okay.  Fine fair enough, Doctor.

11        And obviously we know the regulators require

12  testing on the active ingredient; correct?

13     A.  Yes.

14     Q.  And they also require testing on the inert

14:28:11  15  ingredients; is that right?

16     A.  Yes.

17     Q.  And, actually, anything that is included in an

18  herbicide formulation has to be approved by the EPA; is

19  that right?

14:28:34  20     A.  Yes.

21     Q.  Okay.  So the EPA will look at and consider all

22  of the ingredients in Ranger Pro or Roundup; isn't that

23  right, Doctor?

24     A.  Yes.  And I spoke on that this morning, that

14:28:51  25  that was actually done using the computerized system to,

sort of, screen -- you might say screen or do a

preliminary test to see if tallow amine, for example, had

a structural chemical predictable relationship to cause

cancer.  And the EPA said it did not.

14:29:23    Q.  Okay.  Sir, but I'm going to get to

carcinogenicity in just a minute.  I want to focus on

toxicity for a few minutes.  Okay?  Is that all right?

Do you know where I am?

    A.  Certainly.

14:29:33    Q.  Okay.  So what -- the jury has heard testimony

from witnesses, and I just want to see if you agree.  Do

you agree that the EPA looks for acute toxicity in

ingredients?

    A.  That's number one, yes.

14:29:46    Q.  Okay.  And acute toxicity -- would you tell the

jury what acute toxicity means?

    A.  Well, it's simply a bioassay, usually mice or

rats, in which an LD50 is determined, a lethal dose, in

50 percent of the animals.

14:30:03        So the animals are grouped, and each group of

animals gets an increasingly higher dose.  And -- and

then the LD50 is measured.  Or LC50, also a lethal

concentration 50.

    Q.  The EPA -- again, just to ask you if you agree

14:30:23 with some things the jury has heard about.  They look

3713

1    for -- they look at subchronic studies.

2        A.   Yes.

3        Q.   The EPA looks at genotoxicity studies of these

4    other ingredients?

14:30:35    5        A.   Yeah.   Primarily *in vitro*.

6        Q.   Okay.   But genotoxicity studies?

7        A.   Yes.

8        Q.   And the EPA looks at the environmental fate of

9    the other ingredients; isn't that true?

14:30:47    10       A.   Yes.

11       Q.   And environmental fate means that the EPA is

12   looking at what happens to these other ingredients after

13   the product is used; correct?

14       A.   Yes.

14:30:59    15       Q.   All right.   So the EPA requires those kinds of

16   testing.   They also require something called -- have you

17   ever heard of the term "six pack"?   Not in the context of

18   beer.   Six pack in this context, Doctor.

19       A.   I've heard the term, but I actually don't recall

14:31:18    20   what it stands for.

21       Q.   Does six pack stand for a group of tests that

22   the EPA requires be done on the entire product?

23       A.   I believe so.

24       Q.   Okay.   And among the tests that the EPA requires

14:31:33    25   to be done on the entire product are toxicity tests

3714

1 studying acute oral toxicity; right?

2     A.  Yes.

3     Q.  And acute dermal toxicity; correct?

4     A.  Yes.

14:31:44   5     Q.  And acute inhalation toxicity; correct?

6     A.  Correct.

7     Q.  Skin irritation; correct?

8     A.  Yes.

9     Q.  Eye irritation; correct?

14:31:53   10     A.  Yes.

11     Q.  And skin sensitization; correct?

12     A.  Yes.

13     Q.  Does that refresh your recollection that's the

14 six pack?

14:32:02   15     A.  Yeah.

16     Q.  Okay.  That's the six pack of testing on

17 toxicity that the EPA requires; right?

18     A.  Correct.

19     Q.  And are you aware that that six pack of testing

14:32:12   20 shows that Roundup is of low acute toxicity?

21     A.  That's true --

22     Q.  And Roundup --

23     A.  But that doesn't include long-term bioassay.

24     Q.  I'm just taking it a step at a time, Doctor.

14:32:28   25 But that's fine.

1        Roundup has low dermal toxicity?

2        A.   That's correct.   It's a skin irritant, but it's

3   not a high rated -- for example, it's not a sensitizer.

4        Q.   Roundup has low inhalation toxicity?

14:32:42   5        A.   That's correct.   Because of its very low vapor

6   pressure, it's sort of like pouring -- unlike pouring

7   gasoline on the floor and smelling that vapor in the air,

8   it would be more like pouring lamp oil on the floor.   You

9   know, you're -- it just has very little volatility.   So

14:33:02  10   it doesn't vaporize.   And thus it's very difficult to

11   inhale glyphosate vapor.

12        Q.   Okay.   And Roundup has low eye irritation?

13        A.   Correct.   It's an irritant, but it's not -- not

14   a high rating.

14:33:18  15        Q.   And Roundup has low skin irritation?

16        A.   That's correct.

17        Q.   And, actually, there are published articles

18   about the toxicity of Roundup, Ranger Pro,

19   glyphosate-based products, aren't there?

14:33:32  20        A.   Yes.

21        Q.   And in those tests; correct?

22        A.   Yes.

23        Q.   Out there for the public to see; correct?

24        A.   That's correct.

14:33:39  25        Q.   And there actually have been genotoxicity

1    studies done on the whole product; isn't that right?

2         A.  Yes.  Both on animals and humans.  And there are

3    a number of possible genotoxic studies.

4         Q.  Okay.  And do you know how many genotoxicity

14:33:58    5    studies the EPA has seen?

6         A.  No.  But I know how many I've presented in my

7    report and at deposition.

8         Q.  Okay.  Let me ask you, Doctor, a little bit

9    about -- I think you mentioned something called ADME;

14:34:17   10    right?

11        A.  Yes.

12        Q.  Which is an acronym.  And remind the jury of

13    what ADME is, as you used it.

14        A.  Distribution, metabolism and excretion --

14:34:35   15    absorption, distribution, metabolism and excretion.

16        Q.  It's generally studying all of those

17    characteristics of an ingredient or a product or what

18    have you; is that right?

19        A.  Yeah.  This is what toxicologists routinely look

14:34:52   20    at.

21        Q.  Okay.  So if you said ADME in a room full of

22    toxicologists, there would be no doubt what you meant;

23    correct?

24        A.  Correct.

14:34:59   25        Q.  All right.  Now, you talked a lot about the

3717

1  dermal absorption of pesticides -- or of Roundup in

2  humans; is that right?

3       A.  Yes.

4       Q.  You have no -- you have done no original

14:35:11   5  research on dermal absorption of pesticides in humans;

6  correct?

7       A.  No.  But I have reviewed, I believe, just about

8  everything that's ever been published.  Including all of

9  the inhouse Monsanto documents, syngernsita,

14:35:32  10  S-Y-N-G-E-R-N-S-I-T-A, corporation documents and other

11  manufacturer documents.

12       Q.  Sir, you have done no original studies regarding

13  the translatability of dermal findings that are made in

14  rodents to humans; correct?

14:35:45  15       A.  I'm sorry, I didn't quite hear all of that.

16       Q.  Okay.  That's fine.

17            You have done no original studies regarding the

18  translatability of dermal findings in rodents to humans;

19  is that right?

14:35:58  20       A.  No.  But I've looked at the studies on rat skin

21  permeability and monkey versus human.  I've reviewed all

22  of the different animals and primate studies and human

23  cadaver studies.

24       Q.  Now, there's a phrase -- I'm not going to use

14:36:18  25  the Latin.  I bet you can.  But a phrase in toxicology

3718

1  that essentially means the dose makes the poison?

2      A.  Yes.

3      Q.  Okay.  And what that means is that it's the

4  amount of the substance that, say, a person gets that

14:36:35  5  will determine whether it's toxic, poisonous or whatever;

6  is that right?

7      A.  Exactly.  And I explained that to the jury this

8  morning, the difference between exposure versus dose.

9  What makes it to the target organ and what is

14:36:51  10  systemically absorbed.

11      Q.  And you said -- I think you said at one point

12  early in your career, you worked on a murder case where

13  the weapon was table salt; is that right?

14      A.  That's correct.

14:37:01  15      Q.  And water can also be something that, at

16  excessive amounts, is harmful; is that right?

17      A.  It can.

18      Q.  But that's the basic idea of the dose makes the

19  poison.  Otherwise, things that are otherwise safe can be

14:37:18  20  unsafe depending on the amounts that their -- the

21  person's exposed to; correct?

22      A.  Yes.

23      Q.  Now -- and I think you just said this, but just

24  to make sure it's perfectly clear, when you say "dose,"

14:37:35  25  it's the amount that actually gets to the organ of

3719

1  interest that is the dose; right?

2       A.  Yes.

3       Q.  The dose is not the amount that you, say, get on

4  your skin.  It's the amount that actually gets to the

14:37:52  5  organ of interest; is that right?

6       A.  Yeah.  For example, lymphatic stem cells.

7       Q.  And so when you talk about dose, that's what you

8  mean; right?

9       A.  Yes.

14:38:03  10      Q.  Now, one thing you know from your study of

11  glyphosate is that when it's absorbed by the body, it's

12  excreted quickly; isn't that right?

13      A.  Depends on the mode of administration.  Whether

14  it's dermally absorbed and excreted slower through

14:38:29  15  lymphatic metabolism into the feces through the bile duct

16  or whether it's injected as a high-level bolus through

17  the syringe and needle, which then is excreted rather

18  quickly out the urine.

19      Q.  Well, sir, if it's excreted out the urine,

14:38:44  20  that's an indication it's being excreted quickly; is that

21  fair?

22      A.  In -- with respect to glyphosate, it -- it

23  depends on the mode of administration.  It's been well

24  proven.

14:38:56  25      Q.  Well, that's what I was just asking.

3720

1            But if -- if you assume that the glyphosate is

2 excreted through the urine, that means that it's been

3 excreted quickly; isn't that right?

4        A.  No.  Because you could also have five times that

14:39:12    5 level going out at a slower rate, out of the hepatic

6 metabolism system into the bio and feces.

7        Q.  And I'm trying to focus on excretion through

8 urine right now, Doctor, but -- so if you just focus on

9 what's excreted through the urine, that glyphosate is

14:39:31   10 excreted quickly; isn't that right?

11        A.  If injected IV, yes.

12        Q.  Okay.  And, Doctor, one other thing that you

13 consider as a toxicologist when evaluating something, a

14 chemical, an agent, is whether the agent bioaccumulates

14:39:52   15 in the body; right?

16        A.  Yes.

17        Q.  And that means basically it accumulates

18 somewhere in the body; right?

19        A.  Correct.

14:39:59   20        Q.  And if it accumulates in the body, that's not a

21 good thing; right?

22        A.  Not at all.

23        Q.  Okay.  Glyphosate does not bioaccumulate;

24 correct, Doctor?

14:40:11   25        A.  With one exception it does bioaccumulate.  As

1 proven in the Monsanto studies, it accumulates as a,

2 quote, "tissue reservoir in the skin."

3      Q.  I'm sorry.  I didn't quite -- are you -- does --

4 does glyphosate bioaccumulate in the body, Doctor?

14:40:30  5      A.  Yes.  In the skin as a, quote, "tissue

6 reservoir," end quote, as per Monsanto.

7      Q.  Okay.  Let's look at your deposition at

8 page 426.  It should be in your binder.  Or I think I may

9 have to get you another binder, Doctor.

14:40:57  10          MR. LOMBARDI:  May I approach the witness?

11          THE COURT:  Yes.

12          THE WITNESS:  Ah, a little one.  Thank you.

13      Q.  BY MR. LOMBARDI:  Tell me when you've got to

14 page 426, which is the number that is associated with the

14:41:26  15 four pages.  Not the one at the bottom.

16      A.  Okay.  I have it.

17      Q.  All right.  426, line 5.  Doctor, you were asked

18 the same question at your deposition, and you gave an

19 answer under oath; isn't that right?

14:41:41  20      A.  I'm sorry?

21      Q.  You were asked the same question I just asked

22 you under oath at your deposition?

23      A.  Yes.

24      Q.  And you gave a different answer; right?

14:41:50  25      A.  That's right.

1          MR. LOMBARDI:  Let's publish the deposition,

2 please.

3          THE COURT:  Yes.  Those lines.

4          MR. LOMBARDI:  426, lines 5 to 9.

14:42:00   5     Q.  "Does glyphosate bioaccumulate?

6          "No.  I already said it does not accumulate.  It

7 does not bioaccumulate.  No.  At least in the body.  In

8 the environment, I'm not prepared to opine on."

9          Did you give that answer to that question at

14:42:16  10 your deposition under oath, Doctor?

11     A.  I did.

12     Q.  Thank you.

13          Now, Doctor, when you talk about dermal

14 exposure, that means cutaneous absorption of a chemical

14:42:31  15 through the skin; isn't that right?

16     A.  Yes.

17     Q.  Generally speaking, to be absorbed -- well,

18 let's step back a second.

19          When we get to the absorption that Mr. Johnson

14:42:42  20 experienced, we have to consider several steps; isn't

21 take right?

22     A.  Yes.

23     Q.  First we have to consider what he was wearing;

24 is that right?

14:42:51  25     A.  Yes.

3723

1      Q.  And you have to consider the extent to which

2 that protected him; is that right?

3      A.  Yes.

4      Q.  And then you have to consider what happens when

14:43:01   5 the skin and the formulation interact; is that right?

6      A.  Yes.

7      Q.  And the skin is actually -- is this -- the skin

8 is actually a protective barrier; right?

9      A.  Yes, it is.

14:43:15   10      Q.  And the skin is -- is designed, really, to help

11 protect us from absorbing things that we shouldn't be

12 absorbing; right?

13      A.  Yes.

14      Q.  So the skin is a protective barrier.  Some

14:43:33   15 chemicals are more easily absorbed across the skin than

16 others; is that right?

17      A.  Yes.

18      Q.  And you -- I think you used this phrase this

19 morning, hydrophilic?

14:43:46   20      A.  Yes.

21      Q.  What does hydrophilic mean?

22      A.  Water soluble, water loving.

23      Q.  Okay.  And what's the significance of something

24 being hydrophilic or water soluble, water loving in terms

14:43:58   25 of skin absorption?

1        A.   That under a normal condition with a normal

2   epidermis containing cholesterol, fatty acids, the

3   keratin of the skin is hydrophobic and would tend to

4   repel the absorption of the hydrophilic glyphosate.

14:44:28    5   However, a certain amount can still get through because

6   the brick and mortar area layer, I showed you on the

7   exhibit, has passages.  And there are cytokines and

8   proteins in those passages that are hydrophilic.

9        And so there is still room for hydrophilic

14:44:49    10   substances to travel.  And unlike, as I said this

11   morning, trichloroethylene or benzene or some other

12   organic solvents that have a very high ability to

13   dissolve that barrier and zip right through, glyphosate

14   has a harder time getting through.

14:45:04    15        Q.   That's what I was -- I apologize, Doctor.

16   That's what I was getting to.

17        If you're hydrophilic, it's harder for the

18   substance to get through the skin; correct?

19        A.   That's -- that's exactly right.

14:45:17    20        Q.   All right.  And so then the -- kind of the

21   opposite, at least in this realm, is something called

22   lipophilic; correct?

23        A.   Yes.

24        Q.   What does lipophilic mean?

14:45:27    25        A.   That would be the benzene or trichloroethylene,

3725

1 organic solvents that are very soluble in organic

2 material and -- and solvents and has the capacity to go

3 through the lipid bilayer of the skin.

4      Q.   Okay.  And so it's -- something that's

14:45:48   5 lipophilic would be expected to have an easier time

6 penetrating the protective layers of the skin; is that

7 right?

8      A.   Yes.

9      Q.   Whereas something that is hydrophilic, like

14:45:57   10 glyphosate, would be expected to have a low ability to

11 penetrate the skin; is that right?

12      A.   Yes.  However, that can be tremendously

13 increased with the use of various surfactants.

14 Especially tallow amine.

14:46:16   15      Q.   Now, Doctor, surfactants, I think you

16 referenced, have been studied by the EPA; is that right?

17      A.   As I said, they've never run any long-term

18 animal cancer assays or carried out other studies.  The

19 only thing I'm aware of that's been done at all is some

14:46:47   20 very rudimentary testing by Monsanto.

21      Q.   Well, sir, let's look at Exhibit 2436.  It

22 should be in the big -- big binder.

23           MR. DICKENS:  Your Honor, can we have a sidebar

24 on this?

14:47:20   25           THE COURT:  Yes.

3726

```
 1              (Sidebar.)

 2         MR. DICKENS:  I don't believe Dr. Sawyer's ever

 3 seen this report or deposition, as far as I know.  So the

 4 question would be inappropriate.

 5         MR. LOMBARDI:  I had actually thought that this

 6 is exactly the document he referred to this morning.  I

 7 thought he said he had seen an EPA document.

 8         But I'll tell you what:  I will ask him if he's

 9 seen it.  And if he's seen it, do I have permission to

10 publish it?

11         THE COURT:  Yes, if he's seen it.

12         MR. LOMBARDI:  And if he doesn't, I would intend

13 to read him a few minutes from it.

14         MR. DICKENS:  If he hasn't seen it, it would be

15 inappropriate.

16         MR. LOMBARDI:  I was just going to ask him if he

17 agrees with it.

18         THE COURT:  If he's never seen it before, what

19 is the basis to read or cross-examine him about it?

20         MR. LOMBARDI:  I will read to him, but I will

21 not identify the document.  I'm reading from (inaudible)

22 he can ask him questions.

23         THE COURT:  You can ask him questions generally.

24         MR. DICKENS:  I think it's inappropriate without

25 the context.  Obviously I don't know what those questions
```

14:47:45 (line 5)
14:48:02 (line 10)
14:48:13 (line 15)
14:48:25 (line 20)
14:48:36 (line 25)

1  are.  We may have an objection if it's based on some type

2  of regulatory statement that he's just not aware of.  So

3  obviously to just read him quotes from a document he's

4  never seen without allowing him to actually review it --

14:48:54   5       THE COURT:  Well, except that he's allowed to

6  ask him general questions about his area of expertise;

7  right?

8       MR. DICKENS:  I understand.  And I'm not

9  saying -- it's obviously how the question's going to be

14:49:05  10  phrased.  But we may have an objection.

11       THE COURT:  Okay.  Well, let's just see what the

12  question is.

13       (End sidebar.)

14       THE COURT:  All right.  You may proceed,

14:49:18  15  Mr. Lombardi.

16       MR. LOMBARDI:  Thank you, your Honor.

17    Q.  Doctor, you told us you were aware of certain

18  EPA work with respect to surfactants; is that right?

19    A.  Yeah.  I specifically said tallow amine.  And

14:49:29  20  that's not what this article's about.

21    Q.  Okay.  Well, let me just ask you a couple

22  questions, then, just to get your response, Doctor.

23       Isn't it true that tallow amine falls within a

24  category called AAPs?

14:49:48  25    A.  Yes.

1    Q.  And, actually, if you look at the article, isn't

2  the article about AAPs?

3          MR. DICKENS:  Objection, your Honor.  This is

4  what we just talked about.

14:50:00    5          MR. LOMBARDI:  I'm laying a foundation.

6          THE COURT:  Objection is sustained.

7    Q.  BY MR. LOMBARDI:  Okay.  Let me just make sure

8  I've got it right, Doctor.

9          AAPs is a category that includes POEA?

14:50:16   10    A.  Yes.

11    Q.  Okay.  And isn't it true, Doctor, that it has

12  been shown that there's no evidence that AAPs, including

13  POEA, are neurotoxic?

14    A.  I'm sorry, say it again.

14:50:26   15    Q.  Isn't it true that it has been shown there is no

16  evidence that AAPs, including POEA, are neurotoxic?

17    A.  Okay.  So --

18    Q.  Do you agree?

19    A.  Yeah.

14:50:41   20    Q.  Okay.  Do you agree that there's no evidence

21  that AAPs, including POEA, are mutagenic?

22    A.  Do I agree that --

23    Q.  There's no evidence that AAPs, including POEA,

24  are mutagenic?

14:51:03   25    A.  No, there is evidence.

3729

1    Q.  Okay.  So you disagree with the assertion that

2  there's no evidence that AAPs are mutagenic, just so we

3  have that clear on the record?

4    A.  As of nine years ago, I think that may be true,

14:51:16   5  but --

6    Q.  Why are you referring to nine years ago?

7       MR. DICKENS:  Objection, your Honor.  I mean,

8  he's asking specifically.  He directed him to review

9  something.  This is exactly what we talked about.

14:51:27   10      THE COURT:  Well, he may answer the question.

11      Without referencing the article, Doctor.  I'm

12  assume you have not seen that article before; is that

13  right?

14      THE WITNESS:  I have actually seen pieces of it.

14:51:37   15  Not the whole thing.  I saw one paragraph of it.

16      THE COURT:  All right.  Well, you may answer the

17  question, if you know the answer.

18    Q.  BY MR. LOMBARDI:  Should I reframe it for you,

19  Doctor?  Would it be easier?

14:51:49   20    A.  Yes, please.

21    Q.  You are aware that there's no evidence that

22  AAPs, including POEA, the surfactant you talked about

23  this morning, are mutagenic?

24    A.  I'm aware of studies that show that they clearly

14:52:09   25  can cause DNA adduct formation or oxidative damage to

3730

1  DNA.  And they've shown mutagenic properties.

2      Q.  Okay.  And let me ask you one more.  What's

3  clastogenic mean?

4      A.  Basically damage to the actual -- physical

14:52:35  5  damage to the DNA material.

6      Q.  Okay.  And you're aware that there's no evidence

7  that the AAPs, including POEA, are clastogenic; isn't

8  that correct?

9      A.  Yes.

14:52:53  10     Q.  And, Doctor, I think you testified to this this

11  morning, but just confirming, you're aware that the EPA

12  has concluded that there's no evidence that AAPs,

13  including POEA, are carcinogenic?  You're aware of that?

14     A.  I'm aware of that conclusion, but it's based on

14:53:15  15  structural activity relationship by a computer program.

16  There's never been any actual long-term bioassays on

17  animals performing.

18     Q.  Well, let's just break that down, though.

19         First, you're aware that that's the conclusion

14:53:28  20  of the EPA; isn't that right?

21     A.  It's a very conditional conclusion by EPA that

22  they clearly state that the studies have not been run.

23  And the only thing they offered is a structural activity

24  relationship best guess.  So I would not frame that in

14:53:52  25  terms of some type of unequivocal answer by EPA.

```
 1           EPA is basically saying, "Look, we don't really
 2  have any data on this, but we've plugged in the structure
 3  activity relationship, and it doesn't show any red
 4  flags," so --
```
14:54:04
```
 5      Q.  Doctor, I just want to make sure just -- just so
 6  that we have it right here for the record that I have
 7  your answer cleanly:  Do you disagree that the EPA has
 8  concluded that there's no evidence that the AAPs,
 9  including POEA, are carcinogenic?  Do you disagree with
```
14:54:20
```
10  that?
11           MR. DICKENS:  Objection, your Honor.  That's the
12  exact question he just answered.
13           THE COURT:  Overruled.  You may answer.
14           THE WITNESS:  I agree with that, but I also have
```
14:54:29
```
15  to include my clause that it could be misleadingly
16  interpreted, because they made it clear in that paragraph
17  that they really didn't have the data to make the
18  decision.  All they had was the structural activity
19  relationship computer projection.  That's it.  It's very,
```
14:54:48
```
20  very, very weak.
21      Q.  BY MR. LOMBARDI:  I'm sorry.  Did you finish
22  your answer?
23      A.  Yes, but it's just a weak conclusion.
24      Q.  Okay.  That -- in your opinion, it's a weak
```
14:54:55
```
25  conclusion; is that right?
```

1      A.  Well, they pretty much say the same thing,

2  too --

3      Q.  Well --

4      A.  -- that it's a weak conclusion.

14:55:02   5      Q.  I guess when we get a chance to look -- I'll

6  strike that.

7          So -- but, Doctor, you don't mean to suggest

8  that structure-activity relationships aren't useful to

9  study; right?

14:55:14   10      A.  They're the most crude and rudimentary approach

11  toxicologists have.  That's what we use when a new

12  chemical is created or -- or a new chemical is

13  discovered, and we look at that relationship and say,

14  huh, it's a cautionary mean.  It could be immunogenic or,

14:55:35   15  as I said this morning, it could be a chlorinated

16  hydrocarbon.  It could be a carcinogen.  I mean, it's a

17  very crude process.  It's the first thing we do when we

18  come across a new chemical.

19      Q.  It's useful information, isn't it, Doctor?

14:55:50   20      A.  Yes.

21      Q.  And structure-activity results are very helpful

22  in determining how a chemical agent acts; isn't that

23  right?

24      A.  Yes, but it's really -- it's like a crude screen

14:56:03   25  test.  It isn't a confirmatory test.  It doesn't tell us

3733

1  anything for sure.

2       Q.  Now, Doctor, I want to talk -- you talked about

3  some testing relating to dermal absorption.

4       Do you remember that, Doctor?

14:56:15
5       A.  Yes.

6       Q.  Okay.  And what the testing -- I think you said

7  that you came to a conclusion that dermal absorption of

8  glyphosate was 10 percent, I think is what you said?

9       A.  Yes.  Based on the range in the published

14:56:31
10  studies that range up to 26 percent, typically in the 5

11  to 10 percent range when the unaccounted for material

12  that's found in the tissue reservoir is added, as per the

13  EOCD requirements.

14       Q.  I think you said that when doing these tests you

14:56:58
15  have a choice --

16       A.  I'm sorry.  OECD.

17       Q.  Okay.  All set?

18       A.  Yeah.

19       Q.  I think you said that when doing these kinds of

14:57:07
20  tests, scientists look -- they induce some kind of

21  absorption on the skin of the animal or whatever is being

22  studied, and then they look at either feces or urine to

23  determine the amount of glyphosate that was absorbed;

24  right?

14:57:25
25       A.  To do the job right, you look at both.

3734

1      Q.  But those are the options; right?

2      A.  Right.  You have to look at both, and they have

3  to total together.

4      Q.  And you said looking at urine is a, I think you

14:57:38  5  said, horrible error; is that right?

6      A.  Very serious error, yes.

7      Q.  And the published literature actually, Doctor,

8  says to look at the urine in those kind of tests; right?

9      A.  Right.  And that's because the studies performed

14:57:54  10  by Monsanto injected the glyphosate intravenously into

11  the animals, so most of it came out rapidly in the urine

12  and ignored the feces.

13      Q.  Sir, I'm talking about published literature.

14      A.  Published literature has relied upon studies

14:58:13  15  such as Wester or TNO and other studies that have been

16  published that --

17      Q.  Sir, the Wester study was published; correct?

18      A.  Yes.

19      Q.  What other published studies do you rely on to

14:58:34  20  show that urine -- relying on urine was a horrible error.

21  Wester was one published study.  What's another?  And,

22  Doctor, I'm being very clear.  I'm asking for published

23  studies.

24      A.  Most of these studies -- I guess all the rest of

14:59:04  25  the studies are either Monsanto or Monsanto's

3735

1  subcontractors or, in one case, another glyphosate

2  producer.

3      Q.  Sir, in the Wester study, which was a published

4  study; is that right?

14:59:16   5      A.  Yes.

6      Q.  Now, you've actually never done a dermal

7  absorption study yourself; right?

8      A.  Not in my laboratories, no.

9      Q.  Right.  And you've never directed a dermal

14:59:27  10  absorption study; is that right?

11      A.  Correct.

12      Q.  And you've never -- Wester involved rhesus

13  monkeys; is that right?

14          Do you remember, Doctor?

14:59:41  15      A.  Yes.

16      Q.  And you've never done any work with rhesus

17  monkeys; is that right?

18      A.  No.  I've used rats and mice, but not primates.

19      Q.  Okay.  And rhesus -- you haven't directed a

14:59:57  20  rhesus monkey study; correct?

21      A.  No.  No.  I have not worked with primates.

22      Q.  And just so it's clear, the Wester study was a

23  dermal absorption study of the kind that you've never

24  personally done; is that right?

15:00:12  25      A.  Correct.

1    Q.  And it was done with rhesus monkeys, an animal

2  you've never worked with; is that correct?

3    A.  Yes.

4    Q.  And the -- and you know -- did you know

15:00:23    5  Dr. Wester by reputation?

6    A.  No.

7    Q.  Were you aware that he had published something

8  on the order of over 400 dermal absorption studies in his

9  time?

15:00:35    10    A.  No.

11    Q.  That would be -- if that's true, that would be

12  more than you've published, certainly; is that right?

13    A.  Yes.

14    Q.  And Dr. Wester in his study -- he actually did a

15:00:46    15  study; isn't that right?

16    A.  He did.

17    Q.  And in that study, he came to the conclusion

18  that most of glyphosate absorbed in rhesus monkeys

19  were -- was absorbed and excreted in the urine; isn't

15:01:06    20  that right, sir?

21        Doctor, may I ask what you're looking at?

22    A.  Well, the answer is no.  You're incorrect.

23    Q.  May I ask what you're looking at?

24    A.  My report, page 59 --

15:01:21    25    Q.  Okay.  Thank you.

3737

1      A.  -- showing that the monkeys, when they received

2  an IV dose -- intravenous bolus dose, then yes, much of

3  it came out through the urine.

4      Q.  Okay.  And actually, Doctor, you are aware that

15:01:40   5  IARC -- and you've reviewed IARC's report; is that right?

6      A.  I'm sorry.  I couldn't hear.

7      Q.  You've reviewed IARC's report on glyphosate; is

8  that right?

9      A.  Certainly.

15:01:53  10      Q.  And IARC's report on glyphosate actually cites

11  to the Wester article; is that right?

12      A.  Yes.

13      Q.  All right.  And IARC actually says that

14  Wester -- concludes that Wester is a valid study; isn't

15:02:14  15  that right?

16      A.  Yes.  However, I'd like to point out the dermal

17  absorption was 22.6 percent and 26 percent when the

18  unaccounted material bound in the tissue reservoir was

19  included.

15:02:31  20      Q.  Let me get IARC out for you, Doctor.

21      A.  I don't think that's necessary.  It's not in

22  IARC.  I'm referring to the actual --

23      Q.  The Wester study?

24      A.  -- Wester study which actually shows the values.

15:02:45  25      Q.  You don't think the Wester study is in IARC?

```
                 1     A.  No.  No.  I said that IARC -- okay.  What I'm
                 2 stating in response to your question --
                 3     Q.  I just misunderstood you.
                 4     A.  Yes.
15:02:57         5     Q.  Are you saying that it's not in IARC?
                 6     A.  No, no.  It is in IARC, but not the figures of
                 7 26 percent absorption and 22.  Those are taken from the
                 8 Wester study when the tissue bound material was added to
                 9 the total.
15:03:18        10         THE COURT:  Mr. Lombardi, is this a good time to
                11 take the afternoon recess?
                12         MR. LOMBARDI:  Sure, your Honor.  That would be
                13 just fine.
                14         THE COURT:  Ladies and Gentlemen, let's take the
15:03:28        15 afternoon recess now.  We'll be in recess till 3:20 on
                16 the wall clock.  Please do not discuss the case.  We'll
                17 resume at 3:20.  Thank you.
                18         (Recess.)
                19         (Sidebar.)
15:21:16        20         MR. LOMBARDI:  Your Honor, this witness a
                21 professional witness, obviously, and so he's quite
                22 skilled at slipping things in that he shouldn't be.  He
                23 has made continued reference to Monsanto studies that you
                24 ruled out.  It doesn't matter how I frame the question,
15:21:32        25 that's what he's done.  I've asked Counsel to talk to the
```

3739

15:21:46

1  witness about that -- and I'm sure Counsel did -- but I

2  believe we're going to be asking for a curative

3  instruction at some point to indicate that the jury

4  should disregard his comments about studies that aren't

5  in evidence.

6        MR. DICKENS:  And, your Honor, first, I'd argue

7  that he's a professional witness.  He's a toxicologist.

8  Yes, he does this for a living.  Yes, he's experienced.

9  But when he's asked what types of studies, he's

15:22:00

10 anticipated the types of studies.  Mr. Lombardi may want

11 to limit that to what's being published.  He's answered

12 and then given an explanation.  There's nothing improper

13 about the types of answers he's given.

14       THE COURT:  Right before the break, Mr. Lombardi

15:22:14

15 was asking him.  He was very specific about present

16 studies, and then he came back with Monsanto studies.

17       MR. DICKENS:  There are some that are published,

18 so the question --

19       MR. LOMBARDI:  I believe the Wester study that

15:22:28

20 they're discussing is, essentially, a Monsanto study that

21 was used and submitted, you know, for their actual

22 regulatory review in the 1980s.  So, you know, this idea

23 of Monsanto study, you know, there is the one -- the TNO.

24 That's not what he's referring to, as far as I know.  He

15:22:49

25 literally referenced that in one of the answers.

3740

1        MR. DICKENS:  I agree, but the published studies

2  aren't Monsanto studies.  Just because it's published

3  doesn't mean it's a Monsanto study.  Once again, there's

4  lots and lots of Monsanto studies that are published, so

15:23:04    5  he's just referring to the particular studies where

6  the -- in the last study what -- specifically referring

7  to the Wester case that he was being asked about

8  (inaudible) any problem with that.  We can ask him not to

9  answer with respect to the one TNO study.  We can't limit

15:23:21   10  him from answering the question if he's asking what

11  studies show to what it is.  There are so many studies

12  out there.

13        MR. LOMBARDI:  Your Honor, I would ask on

14  redirect, if they go into this area, that Counsel be very

15:23:35   15  specific about asking about published studies where a

16  specific study, and not studies, that we have already

17  ruled he is not entitled to talk about.

18        MR. DICKENS:  I can ask if there's any

19  unpublished studies out there that say something

15:23:50   20  different than what the published studies say.  I'm not

21  going to go into any details whose studies they are, if

22  there are unpublished studies that contradict what the

23  published studies say.  I should at least be able to get

24  that question out.

15:24:05   25        THE COURT:  Are those part of his reliance

1  materials?

2            MR. DICKENS:  They are.  Absolutely.

3            MR. LOMBARDI:  But, Judge, this is the ruling

4  this morning.  They are hearsay.  They're not in evidence

15:24:15   5  in this case.  Then they would be using an expert to get

6  into the factual record hearsay that should not -- that's

7  not in the case.

8            MR. DICKENS:  I wouldn't ask any specifics about

9  the study other than:  Are there unpublished studies out

15:24:28  10  there that contradict what the --

11            THE COURT:  Well, if he hasn't been asked, he

12  can't talk about them on direct.  He hasn't been asked

13  about them on cross, so what basis do you have for him to

14  discuss?

15:24:43  15            MR. DICKENS:  His opinion is made on the

16  entirety of the dermal absorption studies out there.

17  He's reviewed all the unpublished studies as well.

18            MR. LOMBARDI:  And he's reached an opinion.

19            THE COURT:  He can talk about his opinion, but

15:24:55  20  he can't talk about the specific studies and cite the

21  content of those studies.

22            MR. DICKENS:  I don't want to do that.  Just the

23  fact he's only being asked about published studies.  I

24  can say:  Are there other studies out there that haven't

15:25:09  25  been published that contradict -- or, you know, that show

3742

1  that there's excretion in the feces?  As simple as that.

2        MR. LOMBARDI:  Objection.

3        MR. DICKENS:  It's a completely proper question.

4        MR. LOMBARDI:  And actually, factually, there

15:25:23  5  aren't any studies -- Monsanto studies that get into the

6  feces or something.  This is just an attempt to make the

7  jury believe -- they've already heard the guy say a

8  hundred times that they're Monsanto studies that say

9  stuff that he should not have disclosed to the jury.

15:25:39  10  This is attempt to build on that, and I think he should

11  be required to stick with the studies that are

12  legitimately in the factual record and direct him, for

13  instance, to Wester or to whatever the study may be that

14  he's going to talk about.  That's the only chance we have

15:25:54  15  of controlling this witness.

16        MR. DICKENS:  What they're trying to do is to

17  limit the basis of Dr. Sawyer's opinion, and I can do it

18  without going into any specific studies.  Just asking a

19  simple question:  Are there unpublished studies out there

15:26:11  20  that you relied on and considered in reaching your

21  opinions?  And if he says that -- you know, support your

22  opinion as to the dermal absorption for humans.

23        MR. LOMBARDI:  I wouldn't say right now, your

24  Honor, that's enough.  He has said it enough times that

15:26:24  25  there's no need to redo it.

3743

```
1              THE COURT:  So to the extent that those studies
2  are on his reliance list --
3              MR. DICKENS:  They all are.
4              THE COURT:  -- he can say that he's relied on
5  them, but he can't discuss the content of them.
6              MR. LOMBARDI:  And I don't think he should be
7  permitted talk about them.  What he should be permitted
8  to do is say based on all the studies he's seen, he has
9  X, Y and Z opinion.  He's already made comments about
10 unpublished studies.  But if we do it again, it's just
11 bringing emphasis to what he should not have done before.
12             MR. DICKENS:  He's specifically been asked about
13 the studies, and his opinion -- he's answering the
14 question with respect to the studies that support his
15 opinion.  The fact that they may be unpublished -- once
16 again, he's specifically being asked about the basis for
17 the opinion as to what it says.  You know, they're trying
18 to limit it to the published, but his opinion goes far
19 beyond that, and we can't just limit his opinion.
20             THE COURT:  Okay.  So what's the pending
21 question now?
22             MR. LOMBARDI:  There's not right now.  I just
23 don't want to have to object on redirect when he gets up
24 and he says I want you to take into account all the
25 unpublished studies that you've already referred to
```

15:26:41
15:26:57
15:27:12
15:27:29
15:27:42

3744

```
 1  improperly.  He should just be able to say:  In
 2  considering all of the evidence, the conclusion I've come
 3  to is as follows.  But if he does the unpublished thing,
 4  that's pointing a finger directly at Monsanto on stuff
 5  that is not in evidence at the moment.
 6          THE COURT:  So just don't go there.
 7          MR. DICKENS:  I understand.
 8          (End sidebar.)
 9          THE COURT:  Welcome back, Ladies and Gentlemen.
10  Dr. Sawyer remains under oath, and Mr. Lombardi, when
11  you're ready, you may continue.
12          MR. LOMBARDI:  Thank you.
13          Sorry about that, Doctor.
14     Q.  Doctor, I think you've made some comment about
15  how you couldn't go back and spray Mr. Johnson to
16  determine his dose because that would be unethical.
17          Do you remember that?
18     A.  Yes.
19     Q.  Now, you have been an expert toxicologist in
20  many, many cases; isn't that right?
21     A.  Yes.
22     Q.  And on many occasions, you have calculated a
23  dose for somebody without re-exposing them to the agent
24  of interest?
25     A.  Correct.
```

15:28:01 (line 5)
15:28:16 (line 10)
15:28:27 (line 15)
15:28:41 (line 20)
15:28:52 (line 25)

1          Q.   Thank you.

2          A.   For example, like a dust sample and then

3    calculated from that dust how much chemical was in it and

4    knowing how much dust a person takes in each day.

15:29:01     5          Q.   And you've done that calculation many times?

6          A.   Certainly.

7          Q.   All right.   Thank you.   Now, in addition,

8    Doctor, just to confirm, I think you said this, but I

9    just want to make sure I had it clear.   You didn't

15:29:15    10   compute an actual dose for Mr. Johnson in this case; is

11   that right?

12         A.   I did compute it using the literature values,

13   and I substituted a higher dermal absorption rate of 10

14   percent and made the computation.

15:29:31    15         Q.   But, Doctor, I'm asking you specifically

16   about -- specific to Mr. Johnson, you didn't calculate --

17   we went through this before, I think.   You didn't

18   calculate the drift that he was exposed to, how much got

19   in through his gloves?

15:29:46    20         A.   No, I did.   I can take you to the actual page

21   for his hands, the actual page for his back.   I could

22   show you all that data, if you wish.   I used the

23   published data for those skin sites for a 60 kilogram

24   individual using a hydraulic nozzle, wearing a waterproof

15:30:09    25   jacket, waterproof pants, rubber boots, impermeable

3746

1 gloves and a face shield.

2       Q.  Doctor, what you used to calculate dose here was

3 days of exposure.  Isn't that what you just told us on

4 direct?

15:30:28   5       A.  No.  I actually calculated the dose in

6 milligrams per kilogram per day as well.

7       Q.  You calculated a dose based on a generic model;

8 isn't that right, Doctor?

9       A.  Oh, I wouldn't call it generic.  It's a tested

15:30:41  10 model.

11       Q.  But it's a model; isn't that right?

12       A.  It's the best model, yes, available.

13       Q.  What you didn't do was sit down and compute an

14 actual drift based on Mr. Johnson himself and based on

15:30:54  15 exactly what he was wearing, exactly what he was doing;

16 isn't that true, Doctor?

17       A.  I did.  I just erred in the direction of

18 assuming that he was wearing more protective gear than he

19 had on, so my dose is an underestimate.

15:31:14  20       Q.  Doctor, would you refer to page 293 of your

21 deposition.  Tell me when you have that, Doctor.

22       A.  Okay.

23       Q.  And, Doctor, it's a fact that you did not

24 perform any calculation of the amount of glyphosate that

15:32:04  25 penetrated Mr. Johnson's clothes, isn't it?

3747

1      A.  I used the 40 percent value as published in the

2 literature.

3           MR. LOMBARDI:  Your Honor, I ask to publish page

4 293.

15:32:17   5           THE COURT:  Yes.  You may proceed.

6           MR. LOMBARDI:  And let's put that up -- put

7 slide 51 up on the screen, please.

8      Q.  Sir, did you give this answer to this question

9 under oath at your deposition:

15:32:42   10           "In your report, did you perform any calculation

11 of the amount of glyphosate that penetrated Mr. Johnson's

12 clothing?

13           "No.  That's already been done in table -- I

14 think in Table 25 in the report.  Those calculations have

15:32:54   15 already been performed, and I didn't see any reason to

16 repeat them."

17           Did you give that answer to that question --

18      A.  That is correct.

19      Q.  -- under oath?

15:33:01   20      A.  That's what I'm trying to explain.  I used the

21 published values for all of the various conditions of

22 gloves and coveralls and boots, et cetera.

23      Q.  And no calculation of the amount of glyphosate

24 that penetrated Mr. Johnson's clothing; correct?

15:33:17   25      A.  Yes, I did.  I used the 40 percent --

3748

1    Q.  Sir, did you give that answer under oath?

2    A.  That's what I'm telling you right now.

3    Q.  Sir, it does say "No"; right?

4    A.  It's already been done.  I didn't --

5    Q.  In your report --

6    A.  -- didn't re-spray the poor guy and do a study

7  of his skin penetration, no.

8    Q.  Are you telling the jury the only way to

9  determine -- to do a calculation of Mr. Johnson's

15:33:38  10  exposure is by spraying him, Doctor?  Is that what you're

11  telling the jury?

12    A.  That's what you're asking me.

13    Q.  I'm asking you:  Are you telling the jury that

14  that's the only way to determine Mr. Johnson's dose?

15:33:47  15    A.  The only way to do it is by looking at what's

16  been published in the literature of other workers who

17  wore patches that were analyzed by the laboratory.  That

18  tells you how much went on various aspects of the body.

19  And what you're asking me is -- doesn't even make any

15:34:05  20  sense.

21    Q.  Okay, Doctor.  We'll -- we'll keep working on

22  that.

23        Doctor, let's look at the Wester study that we

24  talked about right before the break.

15:34:16  25        Do you recall that?

3749

1      A.  Yes.

2      Q.  Okay.  That's Exhibit 3099.

3      A.  Okay.

4      Q.  And this is the Wester document we were

15:34:40   5  referring to earlier; is that correct?

6      A.  The study from 1991?

7      Q.  Correct.

8      A.  Okay.

9      Q.  That's what you're referring to; right?

15:34:50  10  A.  Yes.

11      Q.  And this is something that's in your report and

12  you relied on; is that right?

13      A.  Yes.

14      MR. LOMBARDI:  Permission to publish, your

15:34:57  15  Honor?

16      THE COURT:  Any objection?

17      MR. DICKENS:  No objection, your Honor.

18      THE COURT:  Very well.  You may proceed.

19      Q.  BY MR. LOMBARDI:  Let's put it up.  It's titled

15:35:06  20  "Glyphosate Skin Binding, Absorption, Residual Tissue

21  Distribution, and Skin Decontamination."

22          Do you see that?

23      A.  Yes.

24      Q.  And as you noted, up at the top, it says 1991

15:35:19  25  was the date of publication; is that right, Doctor?

3750

1          A.  Yes.

2          Q.  And basically what was done her was a studies of

3     dermal absorption of glyphosate; is that right?

4          A.  Yes.

15:35:29    5          Q.  And some of the studies were done *in vitro*;

6     correct?

7          A.  Yes.

8          Q.  And some of the studies were done with rhesus

9     monkeys; correct?

15:35:36    10          A.  Yes.

11          Q.  And let's go to page 728.  One of the first

12     things they did was to determine where glyphosate is

13     excreted if the glyphosate is administered

14     percutaneously; isn't that right?

15:35:59    15          A.  As well as IV, using a syringe and needle.  Both

16     ways.

17          Q.  And here's what at page 728 -- if you look --

18     I'm going to show you where we're going here.  Do you see

19     down there at the bottom of the page "since all"?

15:36:21    20              Do you see that?

21          A.  Yes.

22          Q.  It says, "Since all of the IV-administered doses

23     (Table 3) were excreted in urine, the percu- -- it's

24     going to say percutaneous, I believe -- the percutaneous

15:36:36    25     absorption of glyphosate is estimated to be 0.8 to

3751

1  2.2 percent of applied dose."

2         Do you see that?  Do you see that, Doctor?

3      A.  Yes.

4      Q.  Okay.  And that's the conclusion that Wester and

5  co-authors came to in this study; is that right?

6      A.  No.  There was more.

7      Q.  I'm going -- I'm going -- but they at least came

8  to that conclusion so far; isn't that right?

9      A.  Yes.

10     Q.  All right.  And then they note that, "The

11  majority of the applied dose was recovered in surface

12  washes," "approximately 75 percent," "(most of which was

13  the skin surface wash)."

14        Do you remember that?

15     A.  Yes.

16     Q.  Okay.  So that's -- most of the glyphosate

17  stayed on the skin; is that right?

18     A.  Yes.

19     Q.  All right and then let's go to --

20     A.  Wait a minute.  You forgot the next sentence

21  which is critical.

22     Q.  Sure.  Let's read it, "The majority of the

23  applied dose was recovered" -- I'm sorry.  I lost my

24  place, Doctor.  "Accountability was 75 to 80 percent of

25  administered doses"; right?

15:36:51
15:37:03
15:37:16
15:37:24
15:37:39

1      A.  Okay.  So what does the international rules,

2  OECD, say about that?

3      Q.  Well, Doctor, let's see what -- Dr. Wester --

4      A.  No, no.  Let's go with the rules, rather than

15:37:54  5  this author.  The rules say you have to take --

6      Q.  Doctor --

7      A.  -- that 20 percent that's unaccounted for that's

8  stuck in the skin reservoir and count it as absorbed.

9  That's the rule.

15:38:04  10      Q.  Well, you didn't present us with any article

11  that said anything to the contrary this morning; right,

12  Doctor.  I'm going with the article you referenced.

13          MR. DICKENS:  Objection, your Honor.  Can we

14  have a sidebar?

15:38:23  15          (Sidebar.)

16          MR. DICKENS:  This is exactly what we were

17  ordered about.  Mr. Lombardi just said you haven't

18  presented us with any studies to the contrary, but then

19  we're prevented from presenting any other studies of

15:38:42  20  Monsanto that have been unpublished.  If he's going to

21  request you cannot present any other studies, we need to

22  be able to present the studies that could rebut exactly

23  what he's talking about and -- regardless of whether

24  they're published or not published.

15:38:57  25          MR. LOMBARDI:  I asked him -- I asked him a

3753

```
 1  question and then he went off on OECD and didn't answer

 2  the question.  Okay?

 3          THE COURT:  I'll ask him right now to just

 4  listen to Mr. Lombardi's questions and answer the

 5  questions.  He did embark on his own questioning.

 6          MR. LOMBARDI:  Which he shouldn't have done.

 7          MR. DICKENS:  I understand.

 8          THE COURT:  He should just be answering the

 9  questions.

10          MR. DICKENS:  But the follow-up question was:

11  You did not present any other studies that essentially

12  contradict this?  But we can't then be prevented from

13  presenting those other studies.  So I understand if the

14  question's raised in a way that you did not present any

15  on studies.  We'd be fine with that.

16          MR. LOMBARDI:  Okay.  I wouldn't ask that

17  question.

18          (End sidebar.)

19          THE COURT:  So Dr. Sawyer, please, just listen

20  carefully to the questions that Mr. Lombardi is asking

21  you.  Please, answer his questions and then other issues,

22  if relevant, Mr. Dickens will raise on redirect.  Okay?

23          THE WITNESS:  Okay.

24      Q.  BY MR. LOMBARDI:  So Doctor, you just read the

25  accountability language.
```

15:39:11

15:39:22

15:39:39

15:39:55

15:40:10

1             Do you see that?

2        A.   Yes.

3        Q.   Okay.  Let's go to the next column -- because

4   what they did in this study was they didn't just

15:40:21   5   measure -- they used the urine; right?  Wester used the

6   urine.  That's what we just saw; right?

7        A.   Yes.  In monkeys, they used urine and feces.

8        Q.   He used urine, though; isn't that correct?

9        A.   Well, he did urine and feces as well; correct?

15:40:41   10        Q.   But he came to the conclusion that since all of

11   the IV-administered doses were excreted in urine, the

12   percutaneous absorption is estimated to be .8 to

13   2.2 percent.

14             Do you see that?

15:40:55   15        A.   Yes.

16        Q.   And he actually went beyond just looking at the

17   urine to determine how much glyphosate was absorbed,

18   didn't he, Doctor?

19        A.   Yes.

15:41:03   20        Q.   He actually euthanized a couple of monkeys;

21   isn't that right?

22        A.   Yes.

23        Q.   And he had actually radiolabeled glyphosate so

24   that you could determine where glyphosate went in the

15:41:17   25   monkey's organs; isn't that right?

3755

1        A.  Yes.

2        Q.  And the way these radiolabeling tests work is

3   that if glyphosate gets into the organs, there will be a

4   radio signal -- a radiolabeled signal and you can tell

15:41:33   5   that it got there; right?

6        A.  It's counted.  It was C14, and it's counted with

7   a scintillation counter.

8        Q.  And let's go to -- it's the next column, Doctor,

9   on page 729.  Here's where he talks about the monkeys

15:41:52   10  being euthanized.

11            Do you see that?

12       A.  Yes.

13       Q.  All right.  "Two monkeys from each topical dose

14  level (a total of four monkeys)" -- so I was wrong it was

15:42:00   15  four, not two, Doctor -- "were euthanatized after the

16  seven-day excretion period."

17            That's the period when they tracked the urine of

18  the monkeys; is that right?

19       A.  Yes.

15:42:10   20       Q.  "And tissues were assayed for 14C content."

21            That's the radio label that you refer to; right

22  Doctor?

23       A.  Yes.

24       Q.  And then here's what they found, "No radio

15:42:21   25  activity was depicted in spleen, ovaries, kidney, brain,

3756

1 liver, abdominal fat, bone marrow, upper spinal column or

2 central nervous system fluid."

3          Do you see that?

4     A.  Yes.

15:42:36     5     Q.  So they didn't find any glyphosate in any organs

6 of the monkeys after the seven-day excretion period

7 passed; is that right?

8     A.  At this point.  Later, he does talk briefly

9 about bone.

15:42:54    10     Q.  Okay.  And then if we go to the last

11 paragraph -- what was concluded here?  Very last page,

12 732, please.

13          "The percutaneous absorption" --

14          That's absorption through the skin; right,

15:43:18    15 Doctor?

16     A.  Yes.

17     Q.  -- "of glyphosate in the rhesus monkey is low

18 (0.8 to 2.2 percent)."

19          Do you see that?

15:43:23    20     A.  Yes.

21     Q.  "Since the rhesus monkey is a good animal model

22 for percutaneous absorption relevant to humans..., we can

23 assume that the potential for glyphosate dermal toxicity

24 in humans is also low."

15:43:37    25          That's what Doctor Wester and his co-authors

3757

1 concluded in this article; is that right?

2       A.  Yes.  However, they also when they had the urine

3 and feces output together, instead of 2.2 they get --

4 and/or the high-dose group, 2.9 percent and 4.4 percent

15:44:01  5 in the low-dose group.  You failed to mention that.

6       Q.  Sir, I'm talking about percutaneous absorption.

7 That's dermal absorption; right?

8       A.  Yeah, yeah.  But it comes out in urine and

9 feces.  In fact, in Dose D, they found four and a half

15:44:16 10 times more in the feces than they did in the urine.

11       Q.  They actually didn't conclude that it came out

12 in the feces.

13       A.  They left that out of their conclusion, but

14 other published studies have published that finding from

15:44:28 15 their study.

16       Q.  Let's see what IARC said about it, Okay.

17 Because you know that IARC cited to the Wester article;

18 correct?

19       A.  Right.

15:44:34 20       Q.  And so that is -- I'm going to put it up on the

21 screen, Doctor, but if you want to look at it yourself,

22 IARC is Exhibit 2624.  We'll have it on the screen, if

23 you prefer that.

24       A.  Okay.

15:45:07 25       Q.  And do you have 2624, Doctor?

1          A.  Yeah.

2          Q.  It's page 41 to 42 of the document you're

3 looking at.

4          A.  Okay.

15:45:24   5          Q.  All right.  And do you see there's a reference

6 to the Wester article there?

7          A.  Yes.

8          Q.  And the paragraph starts, "Small amounts of

9 glyphosate."  Do you see that?

15:45:42   10          A.  Yes.

11          Q.  Okay.

12          MR. LOMBARDI:  Okay.  Let's publish that if we

13 can, your Honor.

14          THE COURT:  Any objection?

15:45:47   15          MR. DICKENS:  No objection?

16          THE WITNESS:  No.

17          THE COURT:  Very well.  You may proceed.

18          MR. LOMBARDI:  Slide 102, please.

19          Q.  Okay.  Doctor, I've put on the screen that

15:46:02   20 paragraph from the IARC Monograph.

21              Do you see that?

22          A.  Yes.

23          Q.  Okay.  And it's specifically talking about the

24 Wester study and the absorption of dermal exposures in

15:46:15   25 humans.

3759

```
 1              Do you see that?
 2        A.  Yes.
 3        Q.  "Small amounts of glyphosate can be absorbed
 4   after dermal exposures in humans *in vitro*"; right?
 5        A.  Yes.
 6        Q.  "For example, when an aqueous solution of 1
 7   percent glyphosate was applied in an *in-vitro* human skin
 8   model, only 1.4 percent of the applied dose was absorbed
 9   through the skin."
10              Do you see that?
11        A.  Yes.
12        Q.  That's referring to one of the findings of the
13   Wester study; correct?
14        A.  Yes.
15        Q.  "Glyphosate is typically formulated as an
16   isoprophylamine salt and is dissolved in a water-based
17   vehicle" --
18              Do you see that?
19        A.  Yes.
20        Q.  -- "while the stratum corneum is a lipid-rich
21   tissue."
22              Do you see that?
23        A.  Yes.
24        Q.  And that's what we talked about before, the
25   hydrophilicity versus the --
```

15:46:24
15:46:36
15:46:44
15:46:55
15:47:09

3760

```
 1              What's the other one -- I'm getting the words
 2    confused, Doctor.
 3              -- lipophilicity and --
 4              What's the word for water loving?
 5         A.  Hydrophilic.
 6         Q.  -- hydrophilic; right?  That's what it's
 7    referring to there, lipophilic and hydrophilic?
 8         A.  Yes.
 9         Q.  Okay.  Thank you.  And then it says, "In-vitro
10    studies using human skin show that percutaneous
11    absorption of a glyphosate-based formulation was no more
12    than 2 percent of the administered dose."
13              Do you see that?
14         A.  Yes.
15         Q.  So that means that when they did studies with
16    human skin, they again found absorption of 2 percent;
17    correct?
18         A.  Right.
19         Q.  "Over a concentration range of 0.5 to 154
20    micrograms to centimeters squared and a topical volume
21    range of 0.014 to 0.14 milliliters to centimeters
22    squared"?
23         A.  Yes.
24         Q.  "In addition, very little glyphosate...was
25    sequestered in the stratum corneum after dermal
```

15:47:22 (line 5)
15:47:35 (line 10)
15:47:46 (line 15)
15:48:01 (line 20)
15:48:19 (line 25)

1  application."

2          Do you see that?

3      A.  Yes.

4      Q.  So the -- IARC cited to the Wester study; is

15:48:27   5  that right?

6      A.  Right.  They didn't actually look at the raw

7  data which shows that it also came out in the feces, and

8  Wester didn't add that.  I mean, how do you think it got

9  into the feces?  It wasn't magic.  It was dermally

15:48:43   10 absorbed and came out in the feces.

11      Q.  Doctor, you know that when you do mouse -- when

12 you do rhesus monkey studies that what happens is that

13 monkeys will touch their skin and then put it in their

14 mouth, and that's how it comes out the feces; isn't it,

15:48:54   15 Doctor?

16      A.  These patches were inaccessible.

17      Q.  Isn't that true?

18      A.  That's not what happened.

19      Q.  It was on their stomachs, wasn't it, Doctor?

15:49:04   20      A.  That's not what happened.

21      Q.  Well, Doctor, at least you figured this all

22 out -- you figured out this urine versus feces things,

23 but the folks at IARC apparently did not; is that right?

24      A.  They just took the study as written.

15:49:17   25      Q.  Well, they accept- -- they could read the study

3762

1 just as well as you could; right?

2      A.  This is not the only document.  The Spanish

3 government --

4           MR. LOMBARDI:  Your Honor.

15:49:30    5           THE COURT:  Objection.  Sustained.

6      Q.  BY MR. LOMBARDI:  Doctor, IARC -- we've heard

7 for weeks now, 17 independent scientists from around the

8 world, they're capable of reading studies, aren't they?

9      A.  Yes.

15:49:43   10      Q.  And they came to a different conclusion than you

11 did, didn't they, Doctor?

12      A.  IARC just did not make any new conclusions.

13 They just took the information from the paper and put it

14 in theirs.

15:49:56   15      Q.  And they said nothing about your incredible

16 feces error you talked about; isn't that right, Doctor?

17           MR. DICKENS:  Objection.  Argumentative.

18           THE COURT:  Overruled.

19           THE WITNESS:  There are many documents --

15:50:11   20      Q.  BY MR. LOMBARDI:  Doctor --

21      A.  And papers --

22      Q.  Doctor --

23      A.  -- that say.

24           MR. LOMBARDI:  Your Honor, this is --

15:50:15   25           THE COURT:  Dr. Sawyer, please just listen to

3763

1  Mr. Lombardi's questions and do the best you can to

2  answer his questions directly, please.

3      Q.  BY MR. LOMBARDI:  Doctor, I'm talking about

4  IARC; right?

15:50:26   5      A.  So the question is what?

6      Q.  The question is:  IARC disagrees with your

7  reading of the Wester article; isn't that correct?

8      A.  It's different, yes.

9      Q.  Thank you.  Doctor, you talked about latency

15:50:42  10  towards the end of your testimony.

11      Do you remember that, your direct testimony?

12      A.  Yes.

13      Q.  Latency; right?

14      A.  Yes.

15:50:48  15      Q.  And latency, in a general sense, relates to the

16  period of time between initial exposure and the time you

17  start to show -- you start to manifest the disease; is

18  that right?

19      A.  No.  It's the time of diagnosis.

15:51:06  20      Q.  Okay.  It's from initial exposure, at least.  We

21  agree on that; is that right?

22      A.  Yes.

23      Q.  So we're talking about initial exposure.  And

24  when we say that, in this case, it would be from the time

15:51:20  25  of initial exposure to glyphosate until -- what's the

1 time you like to use for latency, Doctor?

2      A.  The definition itself, until the disease is

3 diagnosed.

4      Q.  And from that -- from the time of initial

15:51:31   5 exposure to -- in your definition, which I'll use for

6 today -- until the time the disease is diagnosed; right?

7      A.  Correct.

8      Q.  It's called latency because, in some respects,

9 it's hidden; right?  You don't know you have the disease

15:51:47   10 during the latency period; right?

11      A.  Yeah.  There can be some coughing with lung

12 cancer before it's diagnosed or many other precursors

13 depending on the type of malignancy.

14      Q.  And you could have cancerous cells without

15:52:04   15 having it show in any way physically on your person;

16 right?

17      A.  Certainly.

18      Q.  What happens during latency is the cancer slowly

19 grows until such time as it manifests itself and it can

15:52:16   20 be diagnosed; right?

21      A.  Right.  And that's how the epidemiologic studies

22 measure it, from the time of first exposure to the

23 diagnosis.

24      Q.  And you have never published on latency; is that

15:52:28   25 right?

1       A.  No.

2       Q.  And you gave us some testimony about latency.  I

3  think you talked about some studies of -- I tried to

4  write this down is it Cyclosporin A?

15:52:39    5       A.  Yes.

6       Q.  That's what you referenced?

7           And so if I understood you what you said, that's

8  something used during transplants; right?

9       A.  It's a immunosuppressant to prevent tissue

15:52:50   10  rejection.

11       Q.  During transplants; right?

12       A.  Yes.

13       Q.  And you talked about a latency period related to

14  Cyclosporin A and non-Hodgkin's lymphoma; is that right?

15:52:58   15       A.  Yes.  It occurs very rapidly.

16       Q.  And that's obviously a different kind of

17  exposure than an environmental exposure would be?

18       A.  Entirely different drug.

19       Q.  Okay.  Thank you.  And Doctor, you showed us --

15:53:11   20  well, let me just ask you this:  In your expert report,

21  you make reference to a statement made by Dr. Portier

22  about latency, don't you?

23       A.  What page?

24       Q.  Well, do you recall referring to Dr. Portier --

15:53:31   25  an article written by Dr. Portier and others related to

1  latency?  Let me show you the article, Doctor.  If you

2  just look at 2927.

3        A.  Yeah.  I see it in my report on page 161, yes.

4        Q.  Okay.  So if you could look at page 2927,

15:53:59  5  please.

6             THE COURT:  Mr. Lombardi, do you mean

7  Exhibit 2927?

8             MR. LOMBARDI:  I apologize.  Yes, I do, your

9  Honor.

15:54:23  10            THE WITNESS:  Okay.  I've got it.

11        Q.  BY MR. LOMBARDI:  And what you referred to

12  there was at the second page of the article, and the

13  first -- the carryover paragraph, is that right, the last

14  sentence there?  On page 2.  With Bates Number, Doctor,

15:54:44  15  it's page 742 of the article itself.

16        A.  All right.  I have the page.

17        Q.  Oh, I'm sorry.  And what you referred to is the

18  last sentence of that first paragraph; is that right?

19        A.  "Median follow-up time in the AHS was 6.7 years,

15:55:03  20  which is unlikely to be long enough to account for cancer

21  latency."  I see that.

22        Q.  That's what you referred to?

23        A.  Yes.

24        Q.  Okay.  Let's --

15:55:11  25            MR. LOMBARDI:  Your Honor, I'd ask permission to

```
 1  publish that.

 2            THE COURT:  Any objection?

 3            MR. DICKENS:  No objection.

 4            THE COURT:  All right.  Very well.  You may

 5  proceed.

 6            MR. LOMBARDI:  And this is Defendant's

 7  Exhibit 2927.  Let's go to the first page, just so that

 8  folks --

 9       Q.  This was, I think, displayed earlier in the

10  case, Doctor.  You wouldn't know that, but it starts --

11  the title starts, "Differences in the carcinogenic

12  evaluation of glyphosate between IARC and EFSA."

13            Do you see that?

14       A.  Yes.

15       Q.  And then -- and you see Dr. Portier is there,

16  right, as one of the -- not as the lead author, but one

17  of the authors; correct?

18       A.  Yes.

19       Q.  All right.  So let's go to that second page

20  where he talks about latency.  He's specifically talking

21  about glyphosate here; right?

22       A.  Correct.

23       Q.  And he's talking about glyphosate and

24  non-Hodgkin's lymphoma; right?

25       A.  Yes.
```

15:55:18
15:55:26
15:55:37
15:55:49
15:55:58

3768

1       Q.  And what he says is, "In addition, the median

2  follow-up time in the AHS" -- the AHS is the Agricultural

3  Health Study; is that right?

4       A.  That's right.

15:56:10    5       Q.  And so this is an epidemiological study; right?

6       A.  Yes.

7       Q.  And at this time -- this was at a time that he's

8  referring to a study that was published by De Roos in

9  2005; isn't that right?

15:56:25    10      A.  Yes.

11      Q.  And so it says, "In addition, the median

12  follow-up time in the AHS was 6.7 years."

13          Do you see that?

14      A.  Yes.  I reference that in my report.

15:56:35    15      Q.  Yeah.  And it says, "Which is unlikely to be

16  long enough to account for cancer latency"; right?

17      A.  I said that in my report as well.

18      Q.  Okay.  And that's what -- that's what

19  Dr. Portier said; right?

15:56:46    20      A.  Yes.  What's the point?

21      Q.  All right.  Now, let's -- you showed another --

22          MR. LOMBARDI:  Can we go to the Elmo?  May I use

23  the Elmo, your Honor?

24          THE COURT:  Yes.

15:57:02    25      Q.  BY MR. LOMBARDI:  Okay.  Your Honor -- I mean,

1  Doctor, it says, "First exposure there."

2         Do you see that?

3      A.  Yeah.

4      Q.  And so we have -- Portier says 6.7 years not

15:57:18  5  likely enough; right?

6         MR. DICKENS:  Your Honor, that's a

7  misrepresentation as to what's in the actual article.

8         MR. LOMBARDI:  I think I just read the -- just

9  said what's in the sentence, your Honor.

15:57:34  10         THE COURT:  Overruled.  You can return to it on

11  redirect if you'd like, Mr. Dickens.

12      Q.  BY MR. LOMBARDI:  Okay.  So let's look now at --

13  you talked about another article, Doctor, and that's the

14  Weisenburger article.  This was right at the end of your

15:57:45  15  direct examination.  Do you remember that one?

16      A.  Certainly.

17      Q.  Okay.  All right.  Let's look at the

18  Weisenburger article that's Plaintiff's Exhibit 880.  And

19  I want to go to the section of it that you were talking

15:58:00  20  about this morning.  That's on -- of the article itself,

21  it's -- I think it's page 5460, Doctor.  It's Plaintiff's

22  Exhibit 880, so it will be in your Plaintiff's binder,

23  the one that you used this morning.

24      A.  880?

15:58:18  25      Q.  880.

```
 1        A.  Okay.

 2            THE COURT:  I don't know if 880 is in the

 3   Plaintiff's binder.

 4            MR. LOMBARDI:  Oh, was it not in your binder.

 5            MR. DICKENS:  That's correct.

 6            (Interruption in proceedings.)

 7            MR. LOMBARDI:  I don't mind using the Elmo, if

 8   you're okay with that.  How about in our binder it's

 9   3094 -- Exhibit 3094.

10            THE WITNESS:  Okay.  Ready.

11        Q.  BY MR. LOMBARDI:  All right.  And I believe,

12   Doctor, you started -- the section you were referring to

13   started at page 5460.

14            Do you see that?  It's about --

15        A.  Yes.

16        Q.  Okay.  Do you have -- it's the one that says,

17   "Latency period of non-Hodgkin's lymphoma."

18            Do you see that?

19        A.  Yes.

20            MR. LOMBARDI:  And, your Honor, I'd ask to

21   publish that.

22            THE COURT:  Any objection?

23            MR. DICKENS:  No objection, your Honor.

24            THE COURT:  Very well.  You may proceed.

25            MR. LOMBARDI:  Okay.  And if we can put that up,
```

15:58:36 (line 5)
15:59:22 (line 10)
15:59:45 (line 15)
15:59:51 (line 20)
15:59:59 (line 25)

3771

1 please, and go -- it's -- at the bottom it's 5460.  There

2 you go.

3      Q.  All right.  Now, this is written back in 1991 or

4 so; is that right, Doctor?

16:00:16      5      A.  Yes.

6      Q.  All right.  And it says, "The latency period for

7 the development of non-Hodgkin's lymphoma following an

8 environmental exposure is largely unknown."

9           Do you see that?

16:00:25     10      A.  Yes.

11      Q.  Okay.  And it says, "One valid source of

12 information on the latency period of NHL can be found in

13 the literature on NHL developing after the treatment of

14 Hodgkin's disease with chemotherapy and/or radiotherapy."

16:00:42     15           Do you see that?

16      A.  Yes.

17      Q.  Okay.  Now, those are obviously very different

18 situations from environmental exposure; right?

19      A.  Yes.

16:00:50     20      Q.  All right.  "In such studies, the median latency

21 period for NHL is about five to six years."

22           Do you see that?

23      A.  Yes.

24      Q.  Okay.  So what that's saying is that for studies

16:01:02     25 involving people with -- undergoing chemotherapy or

3772

1 radiotherapy, the median time to develop Hodgkin's

2 lymphoma is five to six years; is that right?

3      A.  Yes.

4      Q.  All right.  Let's go to the next page.  Let's

16:01:25  5 just keep reading.  "In these studies" -- I think I might

6 have skipped -- I think there are studies that involve

7 the carryover.  Doctor, are you able to read the

8 carryover?  I'll read it to you from here so we don't

9 have to go back:  "In such studies" -- we started on the

16:01:41  10 other page -- "the median latency period for NHL is about

11 five to six years, not unlike that for secondary acute

12 leukemia."

13          Do you see that?

14      A.  Yes.

16:01:52  15      Q.  All right.  "In these studies, the latency of

16 NHL in some cases was as short as two years, but it also

17 may be as long as 15 -- greater than or equal to

18 15 years."

19          Do you see that?

16:02:05  20      A.  Yes.

21      Q.  All right.  Then it's going to talk about

22 latency periods for atomic bomb survivors; right?

23      A.  Yes.

24      Q.  All right.  And for atomic bomb survivors, the

16:02:15  25 latency period for the younger ones, under 25 years, was

1 about 9 years -- 9 years latency period?

2     A.  Yes.

3     Q.  And for those who were older, it was 14 years.

4 Do you see that in the next sentence?

16:02:31   5     A.  I do.

6     Q.  All right.  "In contrast" -- so let's go to the

7 last line there.  "In contrast, the median latency period

8 for acute leukemia associated with chronic low-dose

9 exposure to benzene is 15 to 20 years."

16:02:48   10         Do you see that?

11    A.  Yes.

12    Q.  So benzene, that would be an environmental

13 exposure?

14    A.  It's a different chemical, but yeah.

16:02:57   15    Q.  And -- but benzene, they're referring to an

16 exposure that was obtained environmentally; right?

17    A.  Yes.

18    Q.  And the median latency period in that instance

19 for acute leukemia -- different disease -- right, but 15

16:03:11   20 to 20 years?

21    A.  Correct.

22    Q.  And the latency in similar situations, would you

23 expect it'd be similar for non-Hodgkin's lymphoma; right?

24    A.  That's what it states, yes.

16:03:23   25    Q.  And, Doctor, your aware that Dr. Weisenburger

3774

1  has expressed further opinions on latency in more recent

2  years; isn't that right?

3       A.  I don't know.

4       Q.  You don't know one way or the other?

16:03:40  5       A.  I don't.

6       Q.  Are you aware that Dr. Weisenburger has said --

7            MR. DICKENS:  Objection.  Your Honor, he just

8  answered he doesn't know.

9            THE COURT:  All right.  You may ask a different

16:03:50  10  question.

11            MR. LOMBARDI:  Okay.

12       Q.  So, Doctor, there are -- and also in the

13  epidemiology studies, one of the studies you referred

14  to -- well, let me just -- let's go back to the Elmo

16:04:01  15  here, if we could, for just a second.

16            So here for environmental exposures, low-dose

17  exposure to benzene was 15 to 20 years, and this is in

18  the Weisenburger article; right?  "Yes," sir?

19       A.  It is.

16:04:27  20       Q.  Thank you.

21            And in the Eriksson epidemiology article, which

22  you've referred to, do you remember that one?

23       A.  Yes.  Yes.

24       Q.  To the extent you considered that a valid

16:04:42  25  epidemiological study, it had -- it showed a latency

3775

1   period for glyphosate of at least ten years; isn't that

2   right?

3       A.  Yes.

4       Q.  Okay.  And those are all latency related to

16:05:08   5   non-Hodgkin's lymphoma; isn't that right?  And

6   environmental exposure?

7       A.  Yes.  But keep in mind were -- these are the

8   mean or median times, not the extent of the range.  And I

9   remind you on prior page -- or the same in the

16:05:23   10   Weisenburger article, was the two different bell curves,

11   one --

12       Q.  Sure.

13       A.  -- for high acute exposure versus low chronic.

14       Q.  Sure, Doctor.  And Dr. Portier, when he made his

16:05:33   15   statement, was talking about glyphosate and NHL

16   specifically; right?

17       A.  Yes.

18       Q.  Eriksson was studying glyphosate and NHL

19   specifically; is that right?

16:05:42   20       A.  Yes.

21       Q.  And Weisenburger was talking about environmental

22   exposures generally, not glyphosate and NHL; isn't that

23   right?

24       A.  Yes.  And one has to be careful with that,

16:05:53   25   because different chemicals have tremendously different

1 latencies depending on the mechanism of induction.

2      Q.  But that was the article that you referred the

3 jury to; isn't that right?  The Weisenburger article?

4      A.  Not for the purpose of benzene.  I didn't

16:06:08  5 mention anything in my report about benzene.

6      Q.  Well, I think this is an easy question, but you

7 were the one that put Weisenburger up when you talked

8 about latency; isn't that right?  On your direct?

9      A.  I put it in my report, and I quoted the same

16:06:22  10 thing that you told the jury, that the latency period

11 following environmental exposures is relatively unknown

12 and has been estimated between 1 and 25 years.

13      Q.  Thank you, Doctor.

14           MR. LOMBARDI:  No further questions, your Honor.

16:06:39  15           THE COURT:  Mr. Dickens, do you have further

16 questions?

17           MR. DICKENS:  Thank you, your Honor.

18

19                    REDIRECT EXAMINATION

20 BY MR. DICKENS:

21      Q.  Dr. Sawyer, I want to start where you just ended

22 off.  You just said something about the latency period.

23 I believe you said latency is 1 to 25 years; is that

24 right?

16:07:03  25      A.  Actually, even a little less.  The World Trade

1  Center was .4.

2       Q.  And you mentioned you actually did some work

3  with the World Trade Center; correct?

4       A.  I did early on.

16:07:15  5       Q.  And so the .4 that you're referencing, what is

6  that with respect to?

7       A.  That's a -- actually, a value that is derived

8  and published by a governmental agency.

9       Q.  And that's something you reviewed in the

16:07:34  10  preparation of your opinions in this case?

11       A.  Yes.

12       Q.  And you reviewed it to reach your opinions with

13  respect to latency?

14       A.  Correct.

16:07:40  15       Q.  And you say .4 years or .4.  What is the .4

16  referencing?

17       A.  That is actually referencing for -- specific to

18  leukemia, lymphoma or lymphatic hemapoietic malignancies.

19  In other words, the World Trade Center health program

16:08:07  20  determined that the threshold cutoff for non-Hodgkin's

21  lymphoma latency was .4 years to 2 years.  That is their

22  window for the minimum latency period by definition.

23       Q.  Okay.  And the jury has seen that document

24  before, but is that Exhibit -- Plaintiff's Exhibit 820 in

16:08:28  25  your binder?

3778

1    A.  Yes.

2         MR. DICKENS:  Permission to publish Plaintiff's

3 Exhibit 820, your Honor?

4         THE COURT:  Any objection?

16:08:41    5         MR. LOMBARDI:  No objection.

6         THE COURT:  You may proceed.

7    Q.  BY MR. DICKENS:  And once again, is this the

8 specific section for lymphoproliferative cancers that

9 you're referring to, Doctor?

16:09:05   10    A.  Yes, yes.  And hematopoietic cancers, yes.

11    Q.  And so the .04, that means they actually found

12 that non-Hodgkin's lymphoma can develop from exposure to

13 diagnosis in 146 days; is that not correct?

14    A.  That's correct.  That's the minimum.  And they

16:09:24   15 refer to the minimum window as .4 to 2 years, so there's

16 some variability there.

17    Q.  Okay.  And if we can now turn to that

18 Dr. Weisenburger article we were just looking at, which

19 is Plaintiff's Exhibit 880.

16:09:40   20         MR. DICKENS:  Permission to publish, your Honor?

21         THE COURT:  Any objection?

22         MR. LOMBARDI:  No objection, your Honor.

23         THE COURT:  Very well.  You may proceed.

24    Q.  BY MR. DICKENS:  With respect to the actual

16:09:51   25 latency periods that you were shown, Doctor, for benzene,

1  which Mr. Lombardi wrote on his sheet, that was actually

2  chronic low-dose exposures; is that right?

3       A.  That is correct.

4       Q.  And did Mr. Johnson have chronic low-dose

16:10:08  5  exposure, or was his more consistent with the short-term

6  high dose?

7       A.  Consistent with the bell curve and designated as

8  A in Figure 4.

9       Q.  Okay.  And so with respect to Bell Curve A, the

16:10:21  10  actual median that was being discussed, that's right

11  where that A is; correct?

12       A.  Yes.

13       Q.  And so when you say the bell curve, just because

14  the median is six years or five years, that means that's

16:10:34  15  the middle; right?

16       A.  That's right.

17       Q.  And so there's going to be people who develop

18  cancer in less time and people that develop cancer in

19  more time?

16:10:42  20       A.  That's correct.

21       Q.  And in any of your opinions that you've -- or in

22  any of the opinions of these authors, do you have an

23  understanding that they're saying, "It's impossible to

24  develop non-Hodgkin's lymphoma or other types of cancer

16:10:51  25  in as short a period as two years"?

3780

1      A.  It can be developed much shorter than two years,

2 actually.

3      Q.  Okay.  And the same is true with respect to the

4 other document that you were shown in the Portier

16:11:06   5 documents; correct?

6      A.  Yes.

7      Q.  And that was a median of 6.7 years?

8      A.  Right.  That was a median.  Not a -- it's either

9 an early or late extreme.

16:11:15  10      Q.  So nothing in that article says, "You have to

11 have 6.7 years from exposure to diagnosis"?

12      A.  That's correct.

13      Q.  And nothing you saw in that article or from

14 Dr. Portier's opinion suggests that you cannot develop

16:11:30  15 non-Hodgkin's lymphoma from glyphosate or Roundup

16 exposure in two years or less?

17      A.  Correct.

18      Q.  And your opinion in this case is that

19 Mr. Johnson's non-Hodgkin's lymphoma was caused by his

16:11:42  20 exposure to Roundup or Roundup formulations; correct?

21      A.  Yes.

22      Q.  And that's despite the fact that it developed in

23 2.25 years --

24      A.  That's correct.

16:11:50  25      Q.  -- from exposure to diagnosis?

1        Now, you were asked some questions with respect

2 to the Wester study.  Do you recall that?

3        A.  Yes.

4        Q.  And I believe in your book it's referred to --

16:12:08  5 or I'll do Plaintiff's Exhibit 558.

6            MR. DICKENS:  Permission to publish, your Honor?

7            THE COURT:  Any objection?

8            MR. LOMBARDI:  No objection.

9            THE COURT:  Very well.  You may proceed.

16:12:24  10       Q.  BY MR. DICKENS:  And this is the Wester study,

11 correct, Doctor, that you're referring to?

12       A.  Yes.

13       Q.  And you actually cite to this Wester study in

14 page 58 to 59 of your report; correct?

16:12:34  15       A.  As well as page 60 and 61, yeah.

16       Q.  So this is a study that you did review and

17 factor into your consideration and the opinions that you

18 reached?

19       A.  That's correct.

16:12:47  20       Q.  And was this the only study that you considered?

21       A.  No.

22       Q.  The IARC document that you were shown there had

23 one source there; correct?

24       A.  Yes.

16:12:57  25       Q.  And what was that?

3782

1    A.  It simply took some sentences -- excuse me --

2 from the Wester study and adopted them into their text.

3    Q.  Okay.  But you reviewed far more than just the

4 Wester study correct?

16:13:14    5    A.  Yeah, there have been studies published that

6 discuss the Wester study, and I don't think -- there's

7 other things, but I can't talk about them.

8    Q.  Okay.  And --

9    A.  I'm not allowed to.

16:13:30   10    Q.  Understood.  If we can turn to --

11    All right.  In the materials and methods

12 section.

13    MR. LOMBARDI:  Can you give me a -- before we go

14 too much further, I'd just like to know what document

16:14:08   15 this is.

16    MR. DICKENS:  It is 558.

17    MR. LOMBARDI:  This is Wester?  You have

18 something different on the screen, I think.

19    MR. DICKENS:  I don't believe so.

16:14:26   20    MR. LOMBARDI:  You have the Wester study on the

21 screen?

22    MR. DICKENS:  I do.

23    MR. LOMBARDI:  Oh, okay.  Got it.  Confusion,

24 but no objection.

16:14:33   25    MR. DICKENS:  It's probably my fault.

3783

1          MR. LOMBARDI:  It's not.

2          MR. DICKENS:  No, it's not?

3      Q.  All right.  Turning to the second column under

4  the materials and methods, I'm going to direct your

16:14:46    5  attention to something, Doctor.  Specifically, it says,

6  "The animals were placed in metabolic chairs."  What are

7  metabolic chairs?

8      A.  Well, when dealing with primates --

9          MR. DICKENS:  I apologize.  There we go.

16:15:07   10          MR. LOMBARDI:  That was your fault.

11          MR. DICKENS:  That is my fault.

12      Q.  What are metabolic chairs?

13      A.  These are devices that have been designed for

14  primate studies in which -- I hate to say it.  It's not

16:15:26   15  something I would use -- it maintains the animal in a

16  chair for a prolonged period, basically strapped into a

17  potty chair.

18      Q.  Okay.  And when you say "strapped," are there

19  arm straps as well?

16:15:40   20      A.  They're restrained.

21      Q.  So Mr. Lombardi's suggestion that somehow they

22  were touching their chests and then touching their mouths

23  and that's how they got the feces --

24      A.  No.  They're in a very controlled, very inhumane

16:15:55   25  environment.

3784

1          Q.   So that simply was incorrect?

2          A.   Yes.

3          Q.   Let's turn now to Table 4, Doctor.

4               And you reference the chart -- this is the

16:16:06   5    disposition of glyphosate following topical

6    administration to rhesus monkeys.

7               Do you see that?

8          A.   I do.

9          Q.   And what is topical administration referring to?

16:16:17   10       A.   Dermal.

11         Q.   Okay.  So how was this particular study done

12   with the rhesus monkeys?

13         A.   The dose was applied -- there are two doses, a

14   low dose, which is Dose C, and Dose D, which is a -- even

16:16:45   15   a lower dose, and that was applied to the monkeys

16   dermally using patches over a period of -- the size of 20

17   square meters -- centimeters -- I'm sorry -- 20

18   centimeters, not meters.

19         Q.   Okay.  And --

16:17:09   20       A.   Roughly 20 centimeters is like about, you know,

21   2 or 3 inches square, sort of like the size of a gauze

22   pad, and that's taped down, and then that's covered with

23   a shield fabric, and it's fully protected from any

24   exogenous contamination or touching.

16:17:27   25       Q.   Okay.  And there's actually the doses, which is

1  listed under this chart.

2         Do you see that?

3     A.  Yes.

4     Q.  Which one of these doses, Dose C or D, would be

16:17:40  5  more applicable to applicators such as Mr. Johnson?

6     A.  Dose D.

7     Q.  So Dose D is more relevant to humans that are

8  out there spraying Roundup or Ranger Pro; correct?

9     A.  Correct.  And this is also performed in a

16:17:57  10  primate, which is the closest specie to a human.

11     Q.  So when you're actually doing these type of

12  dermal absorption studies, once again, the monkey is the

13  closest to humans that you can get; right?

14     A.  Yes.

16:18:13  15     Q.  And in this study, what had more excretion out

16  of the urine or the feces?

17     A.  Well, the urine is .8, and the feces was 3.6,

18  and the total of those two together adds up to

19  4.4 percent, and --

20     Q.  So --

21     A.  -- 3.6 is four-and-a-half times higher than .8.

22         In other words, four-and-a-half times more went

23  out of the feces than in the urine, and that's because

24  these animals were slowly dosed through a dermal

16:18:46  25  absorption patch, as opposed to hitting them with a

1  syringe.

2      Q.  Okay.  And that is -- you know, the dermal

3  patch, that's more consistent than an IV in bolus to a

4  human; correct?

16:18:57  5      A.  Yeah, IV bolus is completely incorrect, and it

6  distorts the excretion pattern in such a way that it

7  makes it appear that it all comes out in the urine.

8      Q.  And that's what we see here.  That's just simply

9  not true.

16:19:12  10      A.  Yeah, we see in this time study that when they

11  gave the monkeys IV doses, that 95 to 99 percent of the

12  IV-administered dose was recovered in the urine.  And --

13  but when they'd give it with the topical patch, that's

14  not the case.

16:19:33  15      Q.  When you do it with the topical patch, you're

16  actually getting more in the feces than the urine?

17      A.  That's correct.

18      Q.  And why would that be?

19      A.  Because at a low dose, the liver is able to

16:19:44  20  metabolize the dose.  If you overdose the animal, as in

21  Dose C in Table 4 here, we see that the urine was

22  actually higher than the feces at 2.2 and .7 in the

23  feces, but at a lower dose, the liver is taking and

24  metabolizing that material, because the material of --

16:20:10  25  the liver has what we call a saturation point.  For

3787

1  example, if we were all to go out at 5 o'clock and have a

2  drink, we would be metabolizing alcohol at roughly 100 or

3  120 milligrams per kilogram of our body weight per hour.

4          Now, if we all went out at 5:00 and we drank

16:20:34   5  three drinks the same, in one hour, three drinks now,

6  we're still metabolizing that alcohol at that same

7  capacity.  The liver can only handle 100 or 120

8  milligrams of alcohol per kilogram per hour.  It's the

9  saturation of that.

16:20:48  10          And so if you give the animal a smaller steady

11  dose of the glyphosate, they're able to metabolize it and

12  flush it out in their feces, through the bile, but if you

13  overdose the animal, giving it all at once with a syringe

14  or putting a really high dose on the patch, then you get

16:21:08  15  spillover to the urine, and that's exactly what happened

16  in this study.  And there's been a lot published on this.

17  I'm not permitted to tell you where or why, but it's been

18  heavily published or criticized with respect to --

19          MR. LOMBARDI:  Your Honor, there's absolutely no

16:21:19  20  restriction on him presenting us with whatever published

21  articles he has on this.

22          THE COURT:  Thank you, Mr. Lombardi.

23          THE WITNESS:  When I say "published," I mean by

24  industry.  In their own documents.

16:21:34  25      Q.  BY MR. DICKENS:  And IARC -- you mentioned you

1 looked at that.  IARC, you know, they only actually

2 looked at published data; correct?

3      A.  A peer-reviewed -- in the peer-reviewed

4 journals, yes.

16:21:48  5      Q.  Based on your review of IARC and everything, is

6 it -- have you reviewed more studies than IARC has?

7      A.  Yes.

8      Q.  There's a column here I want to ask you about,

9 Doctor, with respect to the total for Dose D.  That's

16:22:08  10 89.8 percent, plus or minus 6.9.  What's the significance

11 of this number?

12      A.  That is the -- out of the C14 labeled

13 glyphosate, they recovered 82 percent of it.  In other

14 words, 18 percent of it was unaccounted for.  It was not

16:22:25  15 found in organs.  It was, you know, uncertain what

16 happened to it.

17      Q.  And so is this what you were referring to

18 earlier with respect to there's a portion of the dose

19 that just wasn't recovered?

16:22:42  20      A.  That's right.

21      Q.  And you mentioned OECD guidelines.  What do

22 those standard guidelines say you're supposed to do with

23 the portion that's not recovered?

24      A.  Well, the guideline is very specific.  It reads

16:22:55  25 that it has to be added to the absorbed dose unless --

3789

1  and they use the word "extraordinarily" or "exceedingly"

2  definitive data can demonstrate otherwise.

3         And in this and other studies on glyphosate,

4  almost always there's some unaccounted for material.  And

16:23:21  5  it should be added into the absorbed dose.  Because there

6  are studies that show that glyphosate forms a reservoir

7  in the skin over time and it builds up in the skin.

8      Q.  Now, you mentioned that -- or you were asked

9  whether or not you did a specific analysis of

16:23:49  10  Mr. Johnson's exposure.  Do you recall that?

11      A.  Yes.

12      Q.  And would it be possible to come up with an

13  exact amount of Mr. Johnson's exposure to Roundup or

14  Ranger Pro?

16:24:02  15      A.  Yes, it is possible if we use that original

16  equipment under similar environmental conditions and set

17  up monitoring patches on his clothing and let him

18  re-expose himself.

19      Q.  And rather than exposing Mr. Johnson to that

16:24:17  20  again, you indicated that you -- there was another study

21  that you used to generate the information; correct?

22      A.  Yes.  Where actual laboratory testing was done

23  of the collection patches placed on various parts of the

24  body among applicators using what we call the nozzle,

16:24:44  25  which is used in field work as opposed to pulling a

1 tractor.

2      Q.   Okay.   Now, Mr. Johnson -- well, first of all,

3 in that study, the comparison you made were to workers

4 who were actually using nonpermeable or impermeable

16:25:06   5 clothing; correct?

6      A.   Well, as the document stated, waterproof.

7 Waterproof jacket, waterproof pants, rubber boots, gloves

8 and a face shield.

9      Q.   And Mr. Johnson wasn't wearing a face shield or

16:25:18   10 waterproof clothing, was he?

11      A.   No.

12      Q.   And so Mr. Johnson's exposure would actually be

13 greater than those applicators that you used in your

14 comparison to come up with the exposure now?

16:25:23   15      A.   Much so.   And also remember that the amount used

16 in the applicator studies was approximately a third of

17 what he was using per hour.

18      Q.   So, in fact, your exposure estimate or analysis

19 was underestimated for what Mr. Johnson's exposure truly

16:25:40   20 was?

21      A.   It was.

22      Q.   And that's a conservative number.   But still

23 based on that, you found that it was sufficient to cause

24 cancer in Mr. Johnson?

16:25:49   25      A.   Yes.

3791

1      Q.  Mr. Lombardi asked you some questions about

2 toxicity findings and a six pack.  Do you remember that?

3      A.  Yes.

4      Q.  Do the findings in the six pack mean that

16:26:01   5 glyphosate does not cause cancer?

6      A.  No.  And I tried to explain that the long-term

7 animal bioassays for cancer are not part of the six pack.

8      Q.  And if -- you were asked some questions about

9 being inert.  If something's inert, does that mean that

16:26:18   10 it will not have a synergistic effect with other

11 chemicals in a product?

12      A.  Inert from a biological standpoint, it should

13 not have any effect.  But from a scientific standpoint --

14 I mean, from a -- in the capacity that the word is used

16:26:33   15 by Monsanto, inert -- they're saying it's not the

16 specific ingredient that kills the weeds.

17           As good Attorney Lombardi pointed out, we're in

18 full agreement with that, that inert, under Monsanto's

19 label, means simply it doesn't kill weeds.

16:26:53   20           But from a toxicological standpoint, inert means

21 it's not harmful.  It's not reactive.  It doesn't cause

22 any problems.  So what we're left with are ingredients in

23 the product that are -- from a toxicological standpoint,

24 they're not inert.  They're actually active, they're

16:27:07   25 additive and some of them are carcinogenic.

3792

1      Q.  How would -- Mr. Johnson's Tyvek suit, how would

2  that, kind of, block spray paint, blood and sewage but

3  allow Roundup or Ranger Pro to get through?

4      A.  It is ports.  It has 1 micron ports.  So

16:27:28    5  anything that's in the molecular state, in a fluid, can

6  slowly go through those pores.

7      Q.  So the fact that there were other things on

8  there that were liquid, that means nothing with respect

9  to Roundup or Ranger Pro?

16:27:40    10     A.  Solids won't get through.  Sewage with the

11  particulate and so on, the particularity's not going to

12  make it through 1 micron.

13     Q.  Mr. Lombardi also referred to what Mr. Johnson

14  was using as a wand.  Would you refer to what he was

16:27:53    15  using for the truck sprayer as a wand?

16     A.  No.  It had interchangeable pressure washer

17  heads.

18     Q.  And would those interchangeable pressure washer

19  heads create higher pressure and more aerosol and mist

16:28:09    20  than a typical wand?

21     A.  It was massive aerosol.

22         MR. DICKENS:  I have no further questions, your

23  Honor.

24         THE COURT:  All right.  Ladies and Gentlemen --

16:28:17    25         MR. WISNER:  Your Honor, if we could finish the

```
 1  recross, so he can go.
 2          THE COURT:  Well, counsel can approach.
 3          Do you have any further questions?
 4          MR. LOMBARDI:  I can try to limit it to two
 5  quick ones, your Honor, but I don't want to be the one
 6  that's standing between everybody and the door.
 7          THE COURT:  Okay.  If you only have two
 8  questions, that's fine.
 9          You may proceed.
10
11                 RECROSS-EXAMINATION
12  BY MR. LOMBARDI:
13      Q.  Doctor, when you talked about the World Trade
14  Center study, that did not involve an environmental
15  exposure like glyphosate; isn't that right, for the
16  latency period?
17      A.  No.  But other --
18      Q.  We're trying to get everybody -- if you'd just
19  answer my question.
20      A.  No, it did not.  No, no.
21      Q.  It dealt with ionizing radiation?
22      A.  A number of chemicals that cause NHL.
23      Q.  Ionizing radiation is what it specifically says
24  in this study; isn't that right, the portion that you
25  referred to?
```

16:28:31

16:28:46

16:28:55

16:29:07

```
 1        A.  Oh, you're referring to the latency document?

 2        Q.  Yes, yes.

 3        A.  That was based on ionizing radiation, correct.

 4        Q.  Thank you.

 5             Which is different than environmental exposure

 6   like glyphosate; isn't that right?

 7        A.  That's correct.

 8        Q.  And, Doctor, you went into a lengthy discussion

 9   of Wester.  But just so it's clear to everybody here, you

10   disagree with what the people who did the studies in

11   Wester concluded, don't you?

12        A.  I do.  And keep in mind that's a Monsanto-funded

13   study.

14        Q.  But they said -- actually -- well, let me just

15   ask you this:  It says, "The percutaneous absorption of

16   glyphosate is estimated to be 0.8 to 2.2 percent."

17             That's what the conclusion was; isn't that

18   right?

19        A.  Yes.  But it's wrong.

20        Q.  And that's different than your conclusion?

21        A.  And other published studies disagree.

22        Q.  And IARC accepted this study as a valid study

23   and a valid conclusion; isn't that right?

24        A.  Yes.  They took it as is.

25             MR. LOMBARDI:  No further questions, your Honor.
```

16:29:15  (line 5)
16:29:24  (line 10)
16:29:39  (line 15)
16:29:51  (line 20)
16:30:04  (line 25)

3795

1          THE COURT:  All right.  Thank you.

2          All right, Ladies and Gentlemen.  Then we're

3 going to -- we're going to conclude now for today.

4 Please remember:  Do not discuss the case, and we'll

16:30:15    5 resume again tomorrow morning at 9:30.  All right?

6          Oh, and I did receive a question from one of the

7 jurors about the end date.  Yes, our goal is to finish by

8 August 10th.  And I believe we will meet that deadline.

9 Thank you.

16:30:34   10          (Jury leaves courtroom.)

11          THE COURT:  Counsel, can you please remain?

12          All right.  So --

13          MR. LOMBARDI:  Your Honor, may I address

14 something?  I can wait until Dr. Sawyer's gone or --

16:31:50   15          (Interruption in proceedings.)

16          MR. LOMBARDI:  Your Honor, Dr. Sawyer and that

17 performance made an absolute mockery of the rulings on

18 motions *in limine* on what should come in.

19          He is an expert.  He knows exactly what he's

16:32:12   20 doing.  He threw in extraneous reference to studies that

21 he had no business referring to and was informed he

22 shouldn't have referred to.  Over and over again.  And

23 they weren't provoked by questions.  He went beyond the

24 questions to make statements that shouldn't have been

16:32:30   25 made.

1        It's improper.  And something has to be done

2  about it, because now the jury has in its head reference

3  to all kinds of -- this whole performance he acts like,

4  "Oh, gee, I didn't know."  I'm going to say out loud,

16:32:43   5  "I'm not supposed to talk to you about it."  This is a

6  guy who testifies all the time, Judge.  Nothing, nothing

7  was an accident here.

8        And I'm not accusing Counsel of causing him to

9  do it.  But, look, he's their witness.  Their job was to

16:32:58  10  tell him not to do those things.  It is -- it is all over

11  this record.  All over this record.  Completely improper.

12  I haven't -- I actually haven't seen a witness violate --

13  assuming that Counsel -- and I totally accept that

14  counsel talked to him.  Assuming that Counsel talked to

16:33:16  15  him the way they were supposed to, total -- just totally

16  ignored the Court's directive.

17        And we can go through and count up the times he

18  did it.  It's going to be a big number.  It's going to be

19  a big number.  So I don't know exactly what to do with

16:33:31  20  it, as we stand here right now.

21        At a minimum, I think we're going to go back and

22  think about a cautionary instruction that instructs the

23  jury to not consider -- because -- because the witness

24  referred to things that were not in evidence and that he

16:33:51  25  shouldn't have referred to or something like that.  But

3797

1  we're going to think about it overnight, your Honor.

2          But something like this can't go unaddressed.

3  It was blatant.  It was repeated.  It went right up until

4  the last answer to the last question.  Shouldn't happen.

16:34:09  5          MR. WISNER:  Your Honor, I'd just like to say

6  it's refreshing to have the aspersions not cast at me for

7  the first time in a while or my colleague, Mr. Kennedy.

8          I disagree entirely with basically everything

9  that Mr. Lombardi said.  And the real issue here is his

16:34:27  10  reliance on Monsanto studies is written very clearly.

11  And clearly in his report.

12          They deposed him for 14 hours, and he repeatedly

13  told them that he's not relying just on the published

14  literature, that he's relying on their studies and he's

16:34:44  15  happy to talk to them about it.

16          Mr. Lombardi's questions were specifically

17  designed to suggest that Dr. Sawyer was incapable of

18  showing this jury studies that support his opinion.  And

19  going down that road, he's inviting the question of what

16:35:00  20  he relied upon.  And that's what he was doing.

21          At one point, he even said, "You didn't even

22  present a study to this jury that contradicts the Wester

23  study."  And he couldn't.  I mean, he has a study.  It's

24  theirs.  And it's, actually, technically, a party

16:35:16  25  admission.  It's written by a Monsanto employee.  But we

3798

1  couldn't show it, and we didn't.

2      We got his opinions.  We got that it was based

3  on published and unpublished studies.  And they could

4  have questioned him about the published studies and not

16:35:27    5  try to bring in the other stuff.  But when you try to

6  impeach somebody in front of a jury, suggesting that he's

7  not giving the full story to the jury, and the witness

8  says, "Oh, actually, I can give you the full story, if

9  you'd like me to," that is 100 percent his own doing.

16:35:42   10      And you do not have the right to cross-examine

11  an expert and complain about the fact that he's talking

12  about the basis of his opinions in response to challenges

13  to that basis.

14      I mean, that's exactly the problem.  You can't

16:35:55   15  instruct an expert to say, "Do not mention the things

16  that you based your opinion on during cross-examination."

17  That's just not proper.

18      And so Mr. Lombardi had every opportunity to not

19  go there; right?  He could have said, "Sir, in the

16:36:08   20  published literature, there is no statement that it's

21  10 percent; isn't that correct?"  "Correct."  And then be

22  done with it.

23      But he didn't do that.  He asked questions

24  trying to suggest that there is no study that supports

16:36:21   25  his opinion.  And he has every right to defend himself.

1    And so you can't use it as a weapon and a
2    shield; right?  If you're going to strenuously oppose any
3    introduction of any basis of his opinion, "Is it in
4    published literature," which is what they did, then they
16:36:37    5    have to live by that ruling in cross.
6    And then when they get an answer to a question
7    that they knew the answer to -- I mean, he asked
8    questions that they asked him at deposition, and he gave
9    them the same answer.  So they can't say they didn't know
10    what answer he was going to give.
11    And then if he didn't give them the same answer,
12    he would have been impeached, because he didn't give the
13    exact same answer.
14    So at some point common sense has to reign here.
16:37:01    15    And while Mr. Lombardi is upset that his
16    cross-examination was not very effective on this witness,
17    there's no warranting of a curative instruction.
18    That said, I would be happy to meet and confer
19    with him about it and see if we can work something out.
16:37:15    20    MR. LOMBARDI:  Can I just say -- just one thing
21    about that.  That was all very interesting.  But the fact
22    is that your Honor directed him not to do it and directed
23    Counsel to direct him not to do it.
24    So he is in the position of having violated your
16:37:29    25    Honor's direction.

16:37:39

1     THE COURT:  All right.  So I'm going to ask
2  Counsel to please meet and confer.  And perhaps there is
3  some curative instruction or other direction that can be
4  given to the jury that might resolve the dispute so that
5  we can move on.

6     MR. WISNER:  Sure.

7     THE COURT:  We got a couple of questions from
8  the jury for this witness, which are now somewhat of a
9  moot point.  But I'll ask Madam Clerk to give you the

16:37:49

10  questions and perhaps they can be addressed by another
11  witness.  Or perhaps they have been addressed already by
12  another witness.

13     MR. WISNER:  And maybe if there's a question, he
14  can come back for a minute tomorrow morning just to

16:37:58

15  answer them.  We'll see.  We'll take a look.  He doesn't
16  leave until tomorrow at 11:00, so he could conceivably
17  come in.

18     THE COURT:  All right.  So then tomorrow,
19  Mr. Wisner, you're calling Dr. Benbrook; is that right?

16:38:09

20     MR. WISNER:  Yes, your Honor.

21     THE COURT:  All right.  And that's about how
22  long?

23     MR. WISNER:  His direct?

24     I'm doing the complicated equation in my head,

16:38:24

25  your Honor, about the fact that I always underestimate

3801

1 and the fact that he's a bit longwinded sometimes on

2 answers.  And so I think my anticipation is an hour for

3 his direct.  But it might go an hour and a half, an hour

4 45.

16:38:38    5         THE COURT:  Okay.  And how much will your cross

6 be, Mr. Griffis?

7         MR. GRIFFIS:  I'm having a difficult time

8 conceiving how Dr. Benbrook could legitimately testify on

9 direct for an hour and a half.  So I'm going to

16:38:51   10 anticipate a comparable amount of time.  If he testifies

11 to what I believe the scope of his testimony to be, it

12 would be more like 15 minutes.

13         THE COURT:  Okay.  All right.  Is there any --

14         MR. WISNER:  Do you want to direct him for me?

16:39:05   15         MR. GRIFFIS:  Sure.

16         THE COURT:  All right.  Is there anything we

17 need to talk about before Dr. Benbrook testifies

18 tomorrow?

19         MR. WISNER:  No.  The only thing that we

16:39:12   20 probably do need to have a quick conversation about

21 tomorrow morning is the deposition of John Acquavella.

22 I believe we've narrowed it down to two, sort of,

23 discovery -- two documents and issues related to the

24 testimony and documents.  If we could just address that

16:39:26   25 in the morning.

3802

1          It's not going to be too complicated.  I think

2 it's pretty straightforward.  It shouldn't be a long

3 argument either way.  And just to know what the rules are

4 of the Court.

16:39:35    5          I think the rulings of the Court, you know, will

6 affect a couple of things, because it will give us time

7 to cut it while Dr. Benbrook is up, as well as, you know,

8 potentially we don't call Dr. Acquavella.  I don't know.

9          So we'd like to just brief the Court first thing

16:39:52   10 tomorrow morning.  It shouldn't take more than

11 10 minutes.  So we don't need to get here at 9:00 or

12 anything.

13          After that, I actually think, your Honor, after

14 Dr. Benbrook and potentially that video, we have two

16:40:02   15 other videos, both of which are about 20 minutes.  Pretty

16 short.  Then we have the final stipulation.  And then we

17 do need to work out how we want to take judicial notice

18 of those prior complaints.  That was something that we're

19 working on, to figure out how we want to actually, like,

16:40:18   20 mechanically do that.  Then we're going to rest.

21          THE COURT:  Okay.

22          MR. WISNER:  So I think we're done tomorrow,

23 unless something weird happens, which you never know with

24 Dr. Benbrook.  Although he's been instructed with the

16:40:30   25 ground rules, so --

3803

```
 1              THE COURT:  All right.  So it sound like,
 2  though, you have -- you're telling me you have three
 3  videos to play tomorrow after Dr. Benbrook?
 4              MR. WISNER:  Potentially, yes.
 5              THE COURT:  Okay.
 6              MR. WISNER:  Like, Dr. Acquavella is two hours.
 7  So that's the longer one.  But the other two are just
 8  about -- you know, we're talking max 40 minutes total.
 9              So if we end up calling Dr. Benbrook and it ends
10  up going 15 minutes and the cross goes 5, and we play the
11  videos, we could be done by, you know, 10:30.  I mean,
12  I'm not saying that's going to happen, but that could
13  conceivably happen pretty quickly.
14              So I just -- you know, we're going to rest on
15  Friday, I think, in all likelihood is what I'm saying.
16              And I think there was some discussion about what
17  witnesses they're going to call.  We still haven't gotten
18  told, I believe -- I haven't checked my email in the last
19  few minutes, but we don't know who they're calling first
20  for their defense.
21              I think they're going to file a motion, and I
22  don't know what the Court's procedure is for this.  I
23  think it would make sense to continue taking evidence,
24  keep it along, and argue the motion when we've had a
25  chance to review it and respond to it.
```

16:40:39 (line 5)
16:40:54 (line 10)
16:41:07 (line 15)
16:41:21 (line 20)
16:41:33 (line 25)

1           Unless there's a procedural problem with that,

2    it seems like it would be better not to delay the

3    evidentiary -- I mean, if you grant it, obviously then

4    all that would be moved.  But I think it's helpful to

16:41:46    5    keep it going, since we have that August 10th deadline.

6    So that's my proposal, your Honor.

7           THE COURT:  Well, I'm wondering if it would make

8    sense to end a bit early tomorrow, as far as the jury's

9    concerned, in order to hear Monsanto's motion.

16:42:01    10          But now I'm also wondering if, in fact, we are

11   going to be able to end early, if you've got

12   Dr. Benbrook, a two-hour video and then two shorter

13   videos.  That sounds like a full day to me.

14          MR. WISNER:  If all that happens, you're right,

16:42:16    15   it will be a full day.  But I don't believe it will.

16          On the motion, your Honor, maybe I can get

17   clarity.  Is it going to be a written motion or is it an

18   oral motion?  Because I want to be able to respond to it,

19   but I -- well, I need to obviously prepare for that.  And

16:42:27    20   if this is going to be a 30-minute oral motion saying

21   that we haven't established certain things, I think I

22   need a little time to prepare a response.  Unless -- I

23   don't know what you're thinking.

24          MR. GRIFFIS:  I don't think -- our vision for

16:42:42    25   Friday, your Honor, was that we would get through the

3805

1  remaining things.  And it's been -- you know, these are

2  ones we've been discussing, more or less, for a little

3  while now.  But that would take us less than the entire

4  day, but a -- but all morning and into the afternoon most

16:43:00  5  likely, weighing all the averages, the way they usually

6  go.

7        And then we would argue our motion.  The

8  motion -- the contents the motion I think will not be

9  a surprise.  It is that plaintiffs have not met their

16:43:13  10  burden of proof as to the elements that they need to meet

11  their burden of proof on, and they presumably have

12  already been, and could go do now if they haven't been,

13  mustering the evidence to show that they have.

14        We expect to submit a portion of that in writing

16:43:28  15  with regard to evidence that comes in -- you know, with

16  regard to evidence that can't make it into a motion in

17  time to file, we'll present that orally.

18        The way we've handled this sort of thing in the

19  past is that we hand up a written motion, take a break

16:43:45  20  to -- for everyone to read it and digest it, and then

21  have oral argument with your Honor about it, present that

22  orally.

23        Plaintiffs, for the record, then file a written

24  motion at a later time to preserve the record on that.

16:43:59  25  But we'll present the evidence orally to you.

1          And Friday afternoon, if there's enough time,

2    would be a great time to do that, so that we can get

3    going with the presentation of evidence on Monday.

4          THE COURT:  All right.  So let's plan on the

16:44:11    5    following:  If we end early tomorrow with plaintiff's

6    case, then we'll use -- we'll let the jury go early, and

7    we'll use whatever time we can to hear the motion, if

8    that makes sense.  Or if plaintiff needs time to brief

9    it, I can hear it first thing Monday.

16:44:30    10          And so that in any event, Monsanto won't have to

11    begin the defense case until Monday.

12          MR. GRIFFIS:  That's fine.

13          MR. WISNER:  That's fine.

14          THE COURT:  Okay.  And then -- with regard,

16:44:43    15    then, to next week, just roughly, Mr. Lombardi, do you

16    expect that you'll be able to put in your case in four

17    days -- in one week, in next week, or do you expect to go

18    into the following week?

19          MR. LOMBARDI:  I would -- we're obviously

16:45:03    20    working to make this as short as possible, your Honor.  I

21    would expect we'd probably go to the beginning of the

22    following week.

23          THE COURT:  I see.  Okay.  So you'll still be --

24    we'll still be hearing evidence the week of August 6th,

16:45:14    25    do you think?

3807

1           MR. LOMBARDI:  Yes.  For some part of that week.

2    But hopefully the very beginning of the week.

3           THE COURT:  Okay.

4           MR. WISNER:  Shall we just, sort of, in our

16:45:22    5    heads, schedule a closing date?  Because I know we have

6    to move the court and the cameras and the media and all

7    that stuff.

8           I mean, George, if you can't --

9           Can I talk to Counsel --

16:45:33   10    THE COURT:  Perhaps you should meet and confer

11   about that.  But we should definitely schedule a jury

12   instruction conference, then, for Wednesday, August 1st.

13          So in anticipation of a jury instruction

14   conference, I've received your separate proposed jury

16:45:54   15   instructions.  What I'd like for you to do is between now

16   and August 1st, meet and confer on the jury instructions.

17   There's a lot of overlap for the standard claims and the

18   standard CACI instructions.

19          So that by Wednesday, August 1st, submit one

16:46:09   20   package of the joint jury instructions.  One package that

21   everybody should agree on.  And that should be the

22   majority.

23          And then separately submit whatever instructions

24   you can't agree on.  And the reason I ask you to do that

16:46:26   25   is so then at our jury instruction conference we can just

3808

1 focus on the disputed instructions.

2          MR. WISNER:  That makes a lot of sense.

3          Your Honor, for that Wednesday, I would request

4 an afternoon hearing, even if it's early afternoon.  I

16:46:39    5 have a hearing in front of Judge Petro in Alameda for a

6 different case.  We actually got her to change it to

7 Wednesday, because it's our dark day, so she's doing it

8 at 10:00 a.m. that morning.

9          THE COURT:  That's fine.  So we can plan on

16:46:52   10 meeting Wednesday, August 1st, at 2:00 p.m. to go over

11 the jury instructions.

12          MS. EDWARDS:  And do you use that time to also

13 go over the verdict form, your Honor?

14          THE COURT:  Yes.  Yes.  Oh, yes.  Also meet and

16:47:03   15 confer the verdict form.  Okay.

16          All right.  Anything else we need to talk about

17 now or --

18          MR. WISNER:  Nothing from us, your Honor.

19          MR. LOMBARDI:  Not here, your Honor.

16:47:10   20          THE COURT:  Okay.  So if -- I have your time

21 breakdowns now.  If you'll just give me a minute, I can

22 give that to you in a minute.

23          Okay.  So for plaintiffs, I have -- including

24 today, I have a total of 32 hours and 34 minutes.  And

16:49:19   25 for defendants, I have 25 hours and 40, 4-0, minutes.  So

1 let me know if you have anything different.

2 　　　And otherwise, let's just plan on meeting

3 tomorrow morning at 9:00 to go over the Acquavella and

4 anything that comes up with Dr. Benbrook.

16:49:44　5 　　　MR. WISNER:  Thank you, your Honor.

6 　　　MR. DICKENS:  Thank you.

7 　　　MS. EDWARDS:  Thank you.

8 　　　THE COURT:  Thank you.

9 　　　(Time noted:  4:49 p.m.)

10 　　　　　　　--oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        REPORTER'S CERTIFICATE

2

3            I certify that the proceedings in the

4   within-titled cause were taken at the time and place

5   herein named; that the proceedings were reported by

6   me, a duly Certified Shorthand Reporter of the State of

7   California authorized to administer oaths and

8   affirmations, and said proceedings were thereafter

9   transcribed into typewriting.

10           I further certify that I am not of counsel or

11  Attorney for either or any of the parties to said

12  Proceedings, not in any way interested in the outcome of

13  the cause named in said proceedings.

14           IN WITNESS WHEREOF, I have hereunto set my hand:

15  July 26th, 2018.

16

17

18

19                         <%signature%>
                           Leslie Rockwood Rosas
20                         Certified Shorthand Reporter
                           State of California
21                         Certificate No. 3462

22

23

24

25
```