# EXHIBIT 3

RON D. SCHIFF, M.D., Ph.D.

Schiff Biomedical Consulting
6625 Stonington Drive
Tampa, Florida 33647

813-978-8327

Florida Medical License ME0066534

Certified by the American Board of Internal Medicine
in Internal Medicine, Medical Oncology,
and Hematology

December 24, 2020

Ken Moll, Esq.
Moll Law Group
22 West Washington Street, 15th Floor
Chicago, IL   60602

Re: Lorraine Rehak *v.* Monsanto

Dear Mr. Moll,

The following summarizes my background, qualifications to serve as an expert witness, methodology, factual review, and opinions in the above-referenced case:

BIOGRAPHICAL

I attended college at Northwestern University in Evanston, Illinois between 1970 and 1973, graduating with a B.A. in Biological Sciences and Psychology.  I attended medical school and graduate school at Saint Louis University in St. Louis, Missouri from 1973 until 1980, graduating with a Ph.D. in Molecular and Cellular Biology in 1979 and an M.D. in 1980.  During my final year of medical school, I completed a one-year post-doctoral fellowship in Molecular and Cellular Biology.  I then completed an internship and residency in Internal Medicine at Northwestern University Medical Center in Chicago between 1980 and 1983.  I also completed a subspecialty fellowship in Medical Oncology and Hematology at Memorial Sloan-Kettering Cancer Center in New York from 1983 until 1986.

Once my training was completed, I served as a faculty member in the Department of Medicine, Division of Hematology/Oncology, at the Medical University of South Carolina in Charleston from 1986 until 1992. Subsequently, I was in private practice in Medical Oncology and Hematology in Charleston from 1992 until 1994. In July 1994, I relocated to Tampa, Florida, where I was in private practice in Medical Oncology and Hematology until I retired in May 2015. During my time in Tampa, I served as the Chair of the Cancer Committee at University Community Hospital and its successor, Florida Hospital Tampa, from January 1995 until April 2014.

I am Board-certified by the American Board of Internal Medicine in Internal Medicine (1983), Medical Oncology (1985), and Hematology (1988).

I established Schiff Biomedical Consulting for continuation of my medicolegal work in early 2011, and serve as its principal.

Additional biographical information is provided in my curriculum vitae.

## EXPERT QUALIFICATIONS

Based on my background, training, and experience, I present myself as an expert in medical oncology and hematology, and in related applications of molecular and cellular biology, in which I have also earned a doctoral degree. Medical oncology and hematology, which are subspecialties of internal medicine, encompass the causes, disease mechanisms, diagnosis, staging, treatment, and prognosis of the various forms of cancer and of the disorders of the blood and bone marrow, respectively. Expertise in the causes and disease mechanisms of cancer and hematologic disorders applies not only to knowledge of the relevant biology, but also to the concept of causation in legal settings.

Medical oncologists and hematologists are trained in the biological (for example, genetic mutations), chemical (carcinogens), and physical (radiation) causes of cancer involving solid organs, the bone marrow, the blood, and the lymphatic system. Epidemiology, which is the study of the distribution and determinants of diseases in populations, is an important component of training in cancer causation. Medical oncologists and hematologists must also have a detailed understanding of the molecular and cellular pathways by which a cancer develops, progresses, invades nearby tissues, and spreads via the lymphatic system to nearby lymph nodes and through the blood circulation to distant metastatic sites.

With respect to the present legal matter, my 29 years of clinical practice included the diagnosis and treatment of the full range of hematopoietic and lymphoid neoplasms, including non-Hodgkin lymphoma. I am being compensated in this matter, although my compensation is not dependent upon the outcome. In reaching my conclusions, I have reviewed and relied upon a number of sources of information, including textbooks and published research articles, as well as upon my background, training, and experience in medical oncology, hematology, and molecular and cellular biology. My biographical information and professional qualifications are summarized in the first section of the present report as well as in my curriculum vitae. As an

adult medical oncologist and hematologist with an additional doctoral degree in molecular and cellular biology, I submit that my educational background, training, experience in the management of patients with non-Hodgkin lymphoma, and familiarity with the medical literature substantiate my ability to serve as an expert witness in the Lorraine Rehak legal matter.

## METHODOLOGY

The procedures that I utilize in determining whether a causal relationship exists between exposure to an environmental agent and a disease, condition, or illness are the generally accepted scientific methods utilized by regulatory agencies and reported in peer-reviewed medical and scientific journals. This methodology is based upon established and accepted rules of scientific evidence, including assessment of the Hill criteria (1) as they apply to evaluation of causation, and the weight-of-evidence approach recommended by the National Research Counsel of the National Academy of Sciences and by the International Agency for Research on Cancer. I have also employed these methods when assessing disease causation in the clinical practice of medical oncology and hematology.

In reaching my opinions about general causation between exposure to a chemical agent and the development of a disease, I apply the generally accepted Hill criteria (1) for analyzing causation, including strength and consistency of association, dose (or exposure)-response, temporality, biological plausibility, specificity, coherence, availability of animal or other experimental models, and analogy to previously unexplained exposure-outcome findings in different clinical and experimental systems. In reaching my opinions about specific causation, I consider the relevant exposure, or "dose," of the chemical agent, and whether or not that dose has been associated with the disease in the medical and scientific literature. As part of this process I perform a differential etiological analysis, considering evidence for alternative or competing causes.

## FACTUAL REVIEW

At your request, I have reviewed all of the medical records provided to me concerning Ms. Lorraine Rehak, date of birth          and the diagnosis and treatment of her lymphoma, along with her deposition. All of these documents were sent to me by your office. I have formed opinions regarding the information disclosed therein.

Ms. Rehak was 54 years old when she was admitted to Presence Saint Joseph Medical Center in Joliet, Illinois on June 15, 2014 for evaluation and management of gradually progressive swelling of the left thigh over a period of a few weeks. Medical records from that hospitalization are the earliest documentation available for her case. Admission CBC and comprehensive metabolic panel (CMP) revealed no significant abnormalities. The CEA tumor marker for colorectal cancer and other adenocarcinomas was 3.4 (normal range up to 3.8). A duplex venous ultrasound examination of the left lower extremity revealed a 5.52 x 5.35-cm vascularized mass in the left groin, which appeared to be compressing the distal left external iliac vein; there was no evidence of a deep venous thrombosis. Medical Oncology and Hematology consultation was provided by Dr. Arvind Kumar for evaluation and management of a large

retroperitoneal mass.  At that time, it was recorded that Ms. Rehak was allergic to penicillin and that her past medical history was significant only for having undergone an appendectomy.  She denied decreased energy, fever, night sweats, chest pain, shortness of breath, cough, hemoptysis, dizziness, palpitations, back pain, bone pain, flank or abdominal pain, urinary frequency, dysuria, hematuria, change in bowel habits, rectal bleeding, left lower extremity pain, headache, numbness, tingling, decreased appetite, or weight loss.  There was no history of a fall or injury.  Ms. Rehak's family history was positive for pancreatic cancer in her father, breast cancer in one aunt, and colon cancer in another aunt.  Ms. Rehak was single, worked as a restaurant cook, and smoked one pack of cigarettes and consumed one or two alcoholic beverages per day.  The physical examination recorded by Dr. Kumar was normal except for a finding of non-pitting left lower extremity edema.  According to Dr. Kumar's consultation report, a CT scan of the abdomen and pelvis without contrast administration and a CT angiogram of the left lower extremity, both also obtained on the day of admission, had demonstrated a large left-sided retroperitoneal mass causing hydronephrosis and atrophy of the left kidney and compression of the iliac vessels.  On June 16, 2014, another CBC, a PT and PTT, and another CMP revealed no significant abnormalities.  However, the LDH was elevated at 302 (normal range 100 to 190).  A CT scan of the chest, abdomen, and pelvis with oral and intravenous contrast administration demonstrated marked left-sided hydronephrosis; a 13.3 x 10.5 x 20.0-cm or larger heterogeneously enhancing conglomerate retroperitoneal mass surrounding and extrinsically compressing the left ureter and surrounding the aorta, left common iliac artery, and left internal and external iliac arterial branches; an intraluminal filling defect within the left external iliac vein, concerning for deep venous thrombosis; numerous mildly enlarged left inguinal lymph nodes; and diverticulosis without evidence of acute diverticulitis.  The left-sided retroperitoneal mass abutted and grossly approximated the adjacent sigmoid and descending colon, with questionable associated colonic mural thickening, as well as possible involvement or direct wall invasion of the colon at this level.  Mild mass effect on the dome and left lateral margin of the bladder and rightward displacement of the uterus and ovaries were also noted.  Fine-needle aspiration and core biopsy, presumably CT-guided, of the left retroperitoneal mass yielded a diagnosis of grade I-II/III follicular lymphoma.  Flow cytometric analysis confirmed the presence of a CD10-positive B-cell lymphoproliferative disorder with lambda immunoglobulin light-chain restriction demonstrating monoclonality of the B-lymphocyte population.

At the time of Ms. Rehak's first outpatient follow-up visit to Dr. Kumar's office, it was noted that one of Ms. Rehak's grandmothers had a history of gastric and/or pancreatic cancer.

On June 30, 2014, CBC values included hemoglobin 13.1, hematocrit 40.8, MCV 92.1, WBC 4.2 with 81.0 % neutrophils, and platelets 255.  A bone marrow aspirate and biopsy were normocellular (40 to 50%), with trilineage hematopoiesis; relative erythroid hyperplasia with an M:E ratio of 2:1; mild non-specific erythroid dysplasia (nuclear-to-cytoplasmic dyssynchrony or megaloblastoid maturation); adequate iron stores; and no evidence of excess blasts, reticulin fibrosis, or infiltration by lymphoma.  Immunohistochemical staining of the biopsy specimen for CD3 and for CD20 revealed no evidence of an abnormal cell population.  Flow cytometric analysis of the bone marrow aspirate also revealed no evidence of an abnormal cell population.  Cytogenetic analysis of the bone marrow aspirate revealed a normal female karyotype.

On July 1, 2014, a PET-CT scan revealed a huge hypermetabolic mass with maximum SUV 8.5 occupying most of the left hemipelvis and infiltrating cephalad into the left retroperitoneal space to the level of the kidneys; an additional 3.0 x 1.7-cm similarly hypermetabolic lesion in the right hemipelvis anteriorly; metabolically active proximal right iliac lymph nodes; an additional hypermetabolic lymph node adjacent to the right pelvic sidewall; mildly hypermetabolic left inguinal lymph nodes; and an apparently non-functioning atrophic, hydronephrotic left kidney.

On July 14, 2014, Dr. Kumar began to use the terms "nodular" and "low-grade" as well as "follicular" to describe Ms. Rehak's lymphoma. He concluded that the stage of the lymphoma was IIA. Allopurinol was prescribed at a daily dose of 300 mg beginning on July 17, 2014, in an effort to prevent the development of tumor lysis syndrome.

On July 21, 2014, Ms. Rehak complained of intermittent brief, vague, very mild left lower quadrant abdominal discomfort at the lymph node biopsy site.

Following insertion of a central venous access port, Ms. Rehak was treated with six cycles of chemoimmunotherapy consisting of bendamustine (Treanda), which is a chemotherapeutic agent, and rituximab (Rituxan), which is a monoclonal antibody active in B-cell lymphoma, at intervals of four weeks between July 21 and December 9, 2014 (with cycles 2-6 beginning on August 18, September 15, October 13, November 10, and December 8, 2014, respectively). Pegfilgrastim (Neulasta) was administered with each cycle to reduce the risk of infectious complications of chemotherapy-induced leukopenia and neutropenia. The initiation of rituximab administration on July 21, 2014 was complicated by the development of a hot sensation, sinus congestion, throat tightness, tachycardia, and recurrent left lower quadrant abdominal pain. The infusion had to be discontinued, and Ms. Rehak was treated with intravenous hydration fluids, diphenhydramine (Benadryl), and hydrocortisone (Solu-Cortef), with resolution of symptoms; the rituximab infusion had to be completed on the following day. Ms. Rehak's treatment was also complicated by the development of fatigue; nausea and vomiting, requiring anti-emetic administration both before and after chemotherapy; indigestion, relieved by ranitidine (Zantac); widespread and apparently severe bone pain after pegfilgrastim injections, requiring the administration of loratadine (Claritin) and hydrodone and acetaminophen (Norco); nocturia and associated difficulty sleeping; and diarrhea.

On August 11, 2014, Ms. Rehak reported near-resolution of the left lower extremity edema.

By August 18, 2014, the abdominal discomfort as well as the left lower extremity edema had completely resolved.

On September 29, 2014, a CT scan of the chest, abdomen, and pelvis revealed interval insertion since the previous CT scan of the chest, abdomen, and pelvis on June 16, 2014 and PET-CT on July 1, 2014 of a right-sided central venous access port and marked regression of the left-sided retroperitoneal mass to 5.9 x 4.6 cm, although with continued encasement of the left internal and external iliac arteries and veins; diffuse hepatic low density, a superimposed 0.5-cm

low-density lesion in hepatic segment 7 possibly representing a flash-filling hemangioma or focal fatty sparing, a small amount of stranding of the left-sided para-aortic fat, and stable but severe left renal atrophy were also reported.

On December 16, 2014, Ms. Rehak complained of generalized weakness, chills, aching discomfort, nausea, vomiting, and diarrhea during the preceding three days. She was hypotensive in the office. Screening mammograms revealed no findings suspicious for malignancy.

By January 12, 2015, the LDH had normalized to 139. A CT scan of the chest, abdomen, and pelvis revealed a stable appearance of the left-sided retroperitoneal mass extending from the aortoiliac bifurcation into the left hemipelvis and encasing the left iliac arteries and veins since the most recent prior CT scan on September 29, 2014, although now measuring 4.5 x 5.6 x 10.0 cm and with poorly defined margins suggesting a post-therapeutic change; a previously unreported but stable low-density lesion in the dome of the right liver lobe; a stable 0.5-cm probable hemangioma in hepatic segment 7; persistent severe left renal atrophy; and atherosclerotic calcification of the abdominal aorta.

On January 20, 2015, Ms. Rehak complained of itching, redness, swelling, tenderness, central ulceration, and purulent drainage involving the left mid-thigh. The physical examination recorded by Dr. Kumar confirmed the presence of erythema, tenderness, swelling, induration, and central ulceration of the left mid-thigh anteriorly. The symptoms and physical signs were attributed to cellulitis and a possible associated abscess. The antibiotic doxycycline was prescribed.

On January 27, 2015, a PET-CT scan revealed interval marked regression since the previous PET-CT scan on July 1, 2014 of the retroperitoneal soft-tissue mass extending from the aortic bifurcation to the left iliac region to 7.2 x 4.8 cm, although with a suspected artifactual increase in the maximum SUV associated with the mass; left renal atrophy and diminished radionuclide uptake were again noted. The retroperitoneal mass and associated minimal infiltration of the retroperitoneal soft tissue in the aortocaval region appeared unchanged since the most recent prior CT scan of the chest, abdomen, and pelvis on January 12, 2015.

Because of the residual large retroperitoneal mass, Ms. Rehak was referred to Dr. Ommar Hla, a radiation oncologist, on February 5, 2015 for consideration of consolidative radiation therapy. At that time, Ms. Rehak reported that she had undergone a tonsillectomy in 1973, an appendectomy and removal of a growth from the small intestine in 1974, and insertion of the central venous access port on July 7, 2014. Review of systems was significant for night sweats; hot flashes; heartburn and/or indigestion; arthritis involving the upper extremities and knees, including joint pain in the hands; mood swings; and difficulty sleeping. Clarification of Ms. Rehak's family history indicated that one of her sisters had a history of thyroid cancer, her paternal grandmother had gastric cancer, a paternal aunt had a history of breast cancer, a maternal aunt had small intestinal rather than colon cancer, and a paternal cousin had a history of kidney cancer. Ms. Rehak's smoking history was 36 pack-years, and she was continuing to smoke one pack of cigarettes per day. EtOH consumption was two drinks per day three days per week. The physical examination recorded by Dr. Hla was significant for findings of induration in the left

inguinal region and trace edema in the left lower extremity. A recommendation was made for Ms. Rehak to undergo consolidative radiation therapy to the residual retroperitoneal and left-sided pelvic mass in the amount of 3000 cGy with a boost to 3540 cGy.

By March 23, 2015, Ms. Rehak had completed her radiation therapy, although a completion note containing the precise anatomic field, dose, number of fractions, and initiation and completion dates is not available. Ms. Rehak had also recently received her first dose of maintenance rituximab immunotherapy, with a plan for administration once every three months for two years. Dr. Kumar's outpatient progress note on March 23, 2015 indicates that Ms. Rehak had tolerated radiation therapy well except for intermittent mild diarrhea. However, she also reported recent treatment with doxycycline for nodular eruptions in the left axillary area, evidently reflecting folliculitis, with improvement. Mildly tender subcutaneous left axillary nodules were noted on physical examination.

On May 20, 2015, a CT scan of the chest, abdomen, and pelvis revealed a right-sided central venous access device; left renal atrophy; non-enlarged aortocaval lymph nodes; an irregular left-sided retroperitoneal mass encasing the left common iliac, internal iliac, and external iliac vessels and extending to the left inguinal canal, now measured at 6.6 x 3.7 cm; and diverticulosis, all considered stable since the most recent prior CT scan of the chest, abdomen, and pelvis on January 12, 2015 and PET-CT scan on January 27, 2015.

On May 27, 2015, a PET-CT scan revealed interval regression since the most recent prior PET-CT scan on January 27, 2015 of the left retroperitoneal and internal iliac lymph node mass from 7.2 x 4.8 cm to 6.4 x 4.0 cm, with an accompanying marked decrease in the maximum SUV from 14.1 to 2.2. Left renal atrophy and hypometabolism were stable. Compensatory right renal hypertrophy and diffuse mildly hypermetabolic bone marrow activity most likely representing post-treatment effect were reported for the first time.

On June 23, 2015, Ms. Rehak received her second dose of maintenance rituximab immunotherapy.

On September 14, 2015, a chest x-ray revealed a right subclavian central venous access device, but was otherwise normal.

The third dose of maintenance rituximab immunotherapy was administered on September 15, 2015.

On December 4, 2015, a chest x-ray was unchanged from the previous study on September 14, 2015.

On December 8, 2015, Ms. Rehak complained of three episodes of right frontal and maxillary sinus headaches, each lasting three to four days, since the previous June. A CT scan of the paranasal sinuses revealed moderate leftward deviation of the nasal septum, a left-directed nasal septal spur, a patent right concha bullosa of the middle nasal turbinate, and periapical lucency around a severely eroded left mandibular tooth, but no evidence of sinusitis. The fourth

dose of maintenance rituximab immunotherapy was administered.

On January 7, 2016, screening mammograms again revealed no findings suspicious for malignancy.

On March 1, 2016, Ms. Rehak complained of intermittent hot flashes for six years. The fifth dose of maintenance rituximab immunotherapy was administered.

On March 8, 2016, a CT scan of the chest, abdomen, and pelvis revealed interval further regression since the most recent prior CT scan of the chest, abdomen, and pelvis on May 20, 2015 and PET-CT on May 27, 2015 of the mass in the left iliac region surrounding the left iliac vessels from 4.3 x 4.3 cm to 3.1 x 3.5 cm, now causing leftward deviation of the bladder. A right-sided central venous access port and severe left renal atrophy were unchanged. Stable mild thickening of the left adrenal gland was reported for the first time.

On May 4, 2016, an EKG showed normal sinus rhythm with no significant changes since a prior tracing from July 7, 2014.

On May 10, 2016, Ms. Rehak underwent an upper gastrointestinal endoscopy as part of an evaluation for chronic heartburn, which had evidently been treated with omeprazole (Prilosec), revealing an irregular Z-line at the gastroesophageal junction, mildly erosive distal reflux esophagitis, mild gastritis, a small hiatal hernia, and mild bulbar duodenitis. Biopsies obtained from the gastroesophageal junction demonstrated chronic carditis with no evidence of H. pylori on immunohistochemical staining. Gastric biopsies revealed mild inactive gastritis with no evidence of H. pylori on immunohistochemical staining. Biopsies of the duodenum showed mild chronic non-specific duodenitis. Screening colonoscopy demonstrated a 0.8-cm sessile polyp in the sigmoid colon at 15 cm and small internal hemorrhoids. An excisional biopsy of the colon polyp revealed only hyperplasia. Ms. Rehak was instructed to continue taking omeprazole.

By May 24, 2016, the occasional sinus headaches had resolved. The sixth dose of maintenance rituximab immunotherapy was administered.

The seventh dose of maintenance rituximab immunotherapy was administered on August 18, 2016.

On November 4, 2016, a chest x-ray reported mild scarring throughout the lung fields, but was considered unchanged compared with the most recent prior chest x-ray on December 4, 2015; the right-sided central venous access device was again noted.

The eighth and final planned cycle of maintenance rituximab immunotherapy was administered on November 10, 2016.

On January 30, 2017, a CT scan of the chest, abdomen, and pelvis revealed a right-sided central venous access port; left renal atrophy; compensatory right renal hypertrophy; and an ill-

defined soft-tissue mass surrounding the left iliac vessels, now measured at 3.1 x 2.9 cm (actually slightly smaller than the measurements reported on March 8, 2016), all unchanged compared with the most recent prior CT scan of the chest, abdomen, and pelvis on March 8, 2016. A stable retrotracheal left thyroid lobe nodule and atherosclerotic calcification of the iliac arteries as well as the aorta were reported for the first time.

On February 13, 2017, it was concluded by Dr. Kumar that the residual intra-abdominal mass most likely represented fibrotic tissue.

On February 21, 2017, screening mammograms once again revealed no findings suspicious for malignancy.

On June 1, 2017, a chest x-ray once again demonstrated a right-sided central venous access port, but was otherwise normal. The films were unchanged compared with the most recent prior chest x-ray on November 4, 2016, although diffuse mild pulmonary scarring was no longer reported.

On June 5, 2017, Ms. Rehak complained of heartburn and an intermittent dry cough, the latter of which was attributed to reflux esophagitis. Omeprazole was again prescribed.

On September 14, 2017, CBC values included hemoglobin 13.4, hematocrit 43.8, MCV 96.1, WBC 4.8 with 67.0% neutrophils, and platelets 297. A chest x-ray again revealed a right-sided central venous access device. Mild scarring throughout the lung fields was again reported. The films were described as unchanged since the most recent study from June 1, 2017.

Another chest x-ray was obtained on December 12, 2017, this time as part of an evaluation for a cough, and showed a right-sided central venous access port and non-specific mild bilateral hilar fullness; prior films were not available for comparison.

On February 6, 2018, CBC values included hemoglobin 11.9, hematocrit 38.1, MCV 93.1, WBC 4.3 with 64.7% neutrophils, and platelets 264.

On February 13, 2018, Ms. Rehak reported having been treated with an antibiotic in late December 2017 or early January 2018 for a urinary tract infection with associated fevers of up to 102.0°, with resolution. The intermittent cough had also resolved.

On February 26, 2018, screening mammograms again demonstrated no findings suspicious for malignancy, and were unchanged compared with the prior mammograms from December 16, 2014, January 7, 2016, and February 21, 2017.

On March 27, 2018, CBC values included hemoglobin 11.2, hematocrit 36.4, MCV 98.0, WBC 6.2 with 75.1% neutrophils, and platelets 233. The reticulocyte count was 0.99%. Iron studies included serum iron 40, TIBC 259, transferrin saturation 15%, and ferritin 32. A chest x-ray again showed the right-sided central venous access port, and was unchanged compared with the films obtained on September 14, 2017.

On April 3, 2018, Ms. Rehak reported that her heartburn had resolved. An intravenous iron infusion was ordered as treatment for iron-deficiency anemia.

On May 30, 2018, CBC values included hemoglobin 15.0, hematocrit 47.5, MCV 96.1, WBC 5.7 with 72.6% neutrophils, and platelets 265. The reticulocyte count was 0.92%. Iron studies included serum iron 91, TIBC 306, transferrin saturation 30%, and ferritin 187.

On June 12, 2018, Ms. Rehak reported improvement in her energy level since the intravenous iron infusion.

On November 27, 2018, CBC values included hemoglobin 12.4, hematocrit 40.7, MCV 97.0, WBC 6.0 with 77.9% neutrophils, and platelets 253. Iron studies included serum iron 74, TIBC 286, transferrin saturation 26%, and ferritin 89. A CT scan of the chest, abdomen, and pelvis revealed a right-sided central venous access port; severe left renal atrophy; and a focus of residual soft-tissue density and perivascular adipose tissue stranding along the left external iliac vessels, now measured at 2.7 x 2.5 cm. All of these findings were stable since the most recent prior CT scan of the chest, abdomen, and pelvis on January 30, 2017, although the residual mass actually had regressed slightly further from the 3.1 x 2.9-cm measurement reported on January 30, 2017. The residual mass was considered consistent with treated lymphoma and residual fibrosis.

On December 6, 2018, Ms. Rehak reported an intentional 30-pound weight loss.

The most recent blood test results available for Ms. Rehak were obtained on May 28, 2019. On that date, CBC values included hemoglobin 11.6, hematocrit 37.3, MCV 94.8, WBC 6.6 with 73.2% neutrophils, and platelets 303. A comprehensive metabolic panel revealed no significant abnormalities. The LDH remained normal at 168. A chest x-ray revealed a right-sided central venous access device, but was otherwise normal. The images were described as unchanged compared with the most recent prior study on March 27, 2018.

The most recent progress note available from Dr. Kumar's office is dated June 24, 2019. Ms. Rehak was asymptomatic at that time.

Ms. Rehak's most recent medical record of any type is a report of a CT scan of the chest, abdomen, and pelvis on June 15, 2020. The images demonstrated interval development since the most recent prior CT scan of the chest, abdomen, and pelvis on November 27, 2018 of mild stranding of the adipose tissue around the bladder, possibly resulting from the previous radiation therapy; a 0.9-cm low-density nodule in the right thyroid lobe, a right-sided central venous access port, left renal atrophy, compensatory right renal hypertrophy, and a residual soft-tissue mass now measuring 2.7 x 2.4 cm in the left hemipelvis along the left external iliac vessels were unchanged.

According to Ms. Rehak's deposition testimony from November 22, 2019, the progressive swelling of her left lower extremity began one and one-half to two years before she sought medical attention on June 15, 2014 (194:21-195:6). Ms. Rehak acknowledged

experiencing depression or anxiety related to her diagnosis of non-Hodgkin lymphoma, beginning at the time of diagnosis and persisting until a beneficial response to treatment was established (252:10-16). Her radiation therapy was delivered in a total of 17 fractions (71:2-7). Radiation therapy was complicated not only by diarrhea, but also by the development of frequent urination, which persisted for three to four years after the radiation therapy had been completed (171:19-22, 209:11-210:2). Active symptoms at the time of Ms. Rehak's deposition included heat-related illness characterized by episodes of severe fatigue, severely decreased energy, nausea, and vomiting, which began only after her diagnosis of her lymphoma (79:18-81:24). During her deposition, Ms. Rehak indicated that she was currently undergoing a series of vitamin B12 injections (3:10-4:7, 236:10-13, 237:3-6); there is no reference in the available medical records to vitamin B12 injections or why Ms. Rehak may have required them. Concerning Ms. Rehak's family history, she stated during her deposition that the sister with a history of thyroid cancer subsequently also developed malignant melanoma (219:14-24).

## OPINIONS

1. <u>Diagnosis and staging</u>. Ms. Rehak's diagnosis is grade I to II follicular lymphoma. The stage of her lymphoma is stage IIA with a bulky retroperitoneal and pelvic lymph node mass. The diagnosis was established by a fine-needle aspiration and core biopsy, presumably CT-guided, of a left retroperitoneal mass on June 16, 2014. The stage was established by a CT scan of the chest, abdomen, and pelvis on the same date; bone marrow aspiration and biopsy on June 30, 2014; and a PET-CT scan on July 1, 2014, with the bone marrow examination demonstrating no evidence of bone marrow involvement at that time. Additionally, the stage of Ms. Rehak's lymphoma has been continuously reevaluated by serial PET-CT scans and plain CT scans, although bone marrow examinations have not been repeated.

Grade I to II follicular lymphoma is a low-grade non-Hodgkin lymphoma arising in the B-lymphocytes of the immune system. The terminology designating this subtype of non-Hodgkin lymphoma, and its diagnostic criteria, reflect the 2016 World Health Organization (WHO) classification of hematopoietic and lymphoid neoplasms (2, 3). Follicular lymphoma is the second most common type of non-Hodgkin lymphoma, representing 22% of all cases (3, 4). References to "nodular" lymphoma in Ms. Rehak's medical records reflect terminology associated with older classification systems for non-Hodgkin lymphoma which are no longer in general use, such as the Rappaport classification. The designation "low-grade" distinguishes grade I and grade II follicular lymphomas from so-called "intermediate-grade" and "high-grade" non-Hodgkin lymphomas, which tend to be characterized by increasingly rapid growth rates and increasingly aggressive clinical courses.

The stage of any malignancy provides important information about the extent of disease within the body and thus helps to determine optimal treatment, estimate prognosis, and correlate results among treatment groups in different clinical trials. Stage II refers to the presence of lymphoma in two or more lymph node regions on just one side of the diaphragm (3, 4). Substages "A" and "B" denote the absence or presence, respectively, of the prognostically adverse symptoms of otherwise unexplained fever in excess of 38.0° C (100.4° F), night sweats, or unintentional loss of more than 10% of body weight during the previous six months (3, 4).

The term "bulky" is sometimes used to describe malignant lymph node masses larger than 10 cm in maximum diameter.

    2. Treatment. Some patients with low-grade follicular lymphoma do not require treatment for their lymphoma immediately after diagnosis. This approach, often described as "observation," but more accurately known as "watch and wait" or "watchful waiting," may be appropriate in patients with stage III or stage IV follicular lymphoma whose lymphoma is indolent (that is, not growing rapidly) and who are not experiencing pain, obstruction of vital structures, cosmetic consequences of visible bulky lymph nodes, or any of myriad other complications (3, 4). Advanced age and/or coexisting serious medical illness are other recognized indications for the watchful waiting approach (3, 4).

    In contrast, Ms. Rehak's lymphoma presented as symptomatic, bulky, and localized. Ms. Rehak was symptomatic upon presentation, with progressive swelling of the left thigh due to compression of the left iliac veins by a huge retroperitoneal and left-sided pelvic lymph node mass. At 20.0 cm in maximum diameter according to the CT scan of the chest, abdomen, and pelvis on June 16, 2014, Ms. Rehak's lymphoma was indisputably bulky under any definition. However, as a stage II non-Hodgkin lymphoma, Ms. Rehak's disease, like stage I lymphomas, in which involvement is confined to a single lymph node region, is regarded as localized. Such localized non-Hodgkin lymphomas are distinguished from the higher-stage lymphomas, stages III and IV, which are considered indicative of advanced disease. The practical importance of this distinction is that localized follicular lymphomas, unlike advanced-stage follicular lymphomas, are potentially curable with a combination of chemotherapy and radiation therapy. For these reasons, it was recommended that Ms. Rehak begin treatment for her lymphoma as soon as her diagnostic evaluation was complete.

    Therefore, following insertion of a central venous access port on July 7, 2014, Ms. Rehak's initial treatment consisted of six cycles of chemoimmunotherapy with the combination of bendamustine (Treanda) and rituximab (Rituxan) at intervals of four weeks between July 21 and December 9, 2014. Pegfilgrastim (Neulasta) was administered with each cycle to reduce the risk of infectious complications of chemotherapy-induced leukopenia and neutropenia. This treatment produced marked regression, although not resolution, of the enormous retroperitoneal and pelvic lymphadenopathy, as documented by restaging CT scans of the chest, abdomen, and pelvis on September 29, 2014 and January 12, 2015 and a restaging PET-CT scan on January 27, 2015. Because a residual large retroperitoneal mass was evident on these restaging studies, Ms. Rehak underwent consolidative radiation therapy to the residual retroperitoneal and left-sided pelvic mass, evidently in the amount of 3000 cGy with a boost to 3540 cGy during February and March 2015. Unfortunately, a radiation therapy completion note documenting the precise anatomic field, dose, number of fractions (17, according to Ms. Rehak's deposition testimony at 71:2-7), and initiation and completion dates has not been available. Further regression of the retroperitoneal and left-sided pelvic mass and virtual normalization of the associated hypermetabolic activity were documented by a restaging PET-CT scan on May 27, 2015 and serial CT scans of the chest, abdomen, and pelvis.

    In an effort to prevent or delay progression of the lymphoma after the achievement of a

partial response to her initial combined-modality treatment, Ms. Rehak subsequently received eight intravenous infusions of maintenance rituximab immunotherapy at intervals of three months between March 2015 and November 10, 2016.

First-line chemoimmunotherapy with the combination of bendamustine and rituximab, followed by consolidative radiation therapy and then maintenance immunotherapy with single-agent rituximab, constitutes a standard, and relatively intensive, therapeutic approach for patients with follicular lymphoma who require treatment (3, 4).

This treatment approach and the supportive care and close clinical, laboratory, and radiographic monitoring which Ms. Rehak has been undergoing have been appropriate, entirely justified, and medically necessary.

3. Disease status and prognosis. Serial imaging studies, enumerated above, have demonstrated marked regression of Ms. Rehak's enlarged lymph nodes and virtual resolution (on PET-CT scan) of the associated hypermetabolic activity. However, the regression has stopped short of permanent disappearance of the bulky retroperitoneal and left-sided pelvic lymph node mass. As such, in the absence of a biopsy of the residual soft-tissue mass in the left hemipelvis demonstrating exclusively fibrotic (scar) tissue with no evidence of persistent disease, Ms. Rehak must be regarded as having achieved a partial rather than complete response.

A number of prognostic factor indices have been developed to estimate the disease-free and overall survival for patients with non-Hodgkin lymphoma (3, 4). Prognostic models developed specifically from data for patients with follicular lymphoma have identified age over 60 years, stage III or IV, presence of bone marrow involvement, hemoglobin less than 12.0, elevated LDH, elevated beta-2-microglobulin, involvement of more than four lymph node sites, and largest lymph node diameter greater than 6 cm as unfavorable prognostic factors (3, 4). According to such models, Ms. Rehak's lymphoma would be classified as having an intermediate prognosis. More favorably, Ms. Rehak has now survived with a partial response for more than six years since the initiation of her treatment on July 21, 2014.

However, the prognosis for patients with follicular lymphoma has several dimensions (3, 4). Up to 90% of patients have advanced-stage disease (III or IV) at the time of diagnosis. While the median survival time for patients with follicular lymphoma, even for those with stage III or IV disease, now exceeds 10 years, the clinical course of patients with follicular lymphoma is characterized by repeated relapses. The response to initial treatment typically lasts for as little as one to three years, although patients with stage I or minimal stage II follicular lymphoma may be cured with radiation therapy alone; with her bulky retroperitoneal and pelvic lymph node involvement, this definitely does not apply to Ms. Rehak. There are an increasing number of therapeutic options for patients with relapsed disease, but the response durations tend to become progressively shorter with successive courses of treatment. Some newer, non-traditional therapies, such as immunotherapy with monoclonal antibodies other than rituximab, autologous hematopoietic stem cell transplantation, and CAR-T cell therapy, offer more prolonged response durations than older "salvage" therapies, although their potential for cure has not been established. Additionally, 30% to 50% of follicular lymphomas eventually undergo

transformation to a more aggressive type of non-Hodgkin lymphoma, most often diffuse large B-cell lymphoma; this transformation occurs at a rate of 3% to 6% per year. In general, stage III or IV follicular lymphoma is not considered curable, except perhaps in some of the few patients able to undergo high-dose chemotherapy and allogeneic bone marrow transplantation (in which the bone marrow is donated by another individual). The same is true for patients with bulky stage II disease, such as Ms. Rehak.

It is a matter of common sense that a median survival in the range of 10 years does not represent a desirable outcome for a patient diagnosed with stage IIA follicular lymphoma at age 54, as was the case for Ms. Rehak.

4. <u>Complications of Ms. Rehak's lymphoma and its treatment</u>. Both follicular lymphoma and, separately, its treatment commonly produce complications which may be severe, producing symptoms, potentially compromising the survival and/or quality of life of the patient, and causing distress for the patient and family. In lieu of a general catalog of such complications, only those specifically experienced by Ms. Rehak, all of which have been discussed above, will be listed.

Progressive swelling of the left thigh due to compression of the left iliac veins by a huge retroperitoneal and left-sided pelvic lymph node mass was the presenting manifestation which led to the diagnosis of Ms. Rehak's lymphoma in June 2014. On July 21, 2014, three days prior to the initiation of treatment for her lymphoma, Ms. Rehak complained of intermittent brief, vague, very mild left lower quadrant abdominal discomfort at the lymph node biopsy site from June 16, 2014.

Ms. Rehak required the insertion of a central venous access port on July 7, 2014, in anticipation of intravenous treatment for her lymphoma. The port remains in place until this writing. Central venous access devices require continuous maintenance. They must be flushed to prevent blood clotting, and the overlying dressing must be changed regularly. Besides local pain with insertion, the insertion and maintenance of a central venous access port or catheter are associated with risks of infection and bleeding as long as the device remains present, particularly in patients with low white blood cell and neutrophil counts or a low platelet count, respectively, whether due to disease or chemotherapy. Conversely, central venous access devices are also susceptible to clotting, which may progress to deep venous thrombosis of an upper extremity. Most important, the risk of infection of a central venous access device should be regarded as elevated in anyone who is immunocompromised, a condition which may be due to lymphoma itself, chemotherapy, or even non-chemotherapeutic treatment for lymphoma.

Complications during the period of time that Ms. Rehak was undergoing the initial treatment for her lymphoma with the combination of bendamustine and rituximab (July 21 until December 9, 2014) included an acute hypersensitivity (allergic) reaction characterized by the development of a hot sensation, sinus congestion, throat tightness, tachycardia, and recurrent left lower quadrant abdominal pain at the time of the initiation of rituximab administration on July 21, 2014; fatigue; nausea and vomiting; indigestion; widespread and apparently severe bone pain after the administration of pegfilgrastim to support the white blood cell and neutrophil counts and

thereby reduce the risk of infectious complications of chemotherapy-induced leukopenia and neutropenia; nocturia and associated difficulty sleeping; and diarrhea.

On December 16, 2014, just one week after the completion of her initial treatment with bendamustine and rituximab, Ms. Rehak complained of generalized weakness, chills, aching discomfort, nausea, vomiting, and diarrhea during the preceding three days.  She was hypotensive in the office.

Ms. Rehak required an antibiotic prescription on January 20, 2015 for cellulitis and a possible associated abscess involving the left mid-thigh anteriorly, manifested by itching, redness, swelling, tenderness, central ulceration, and purulent drainage.

Consolidative radiation therapy to the residual retroperitoneal and left-sided pelvic mass in February and March 2015 was complicated by intermittent mild diarrhea and, according to Ms. Rehak's deposition testimony (171:19-22, 209:11-210:2), by the development of frequent urination, which persisted for three to four years after the radiation therapy had been completed.

Ms. Rehak required an additional course of antibiotic treatment in March 2015 for an apparent episode of left axillary folliculitis, manifested by mildly tender subcutaneous left axillary nodules.

In late December 2017 or early January 2018, Ms. Rehak required antibiotic treatment for a febrile urinary tract infection.

At the time of her deposition on November 22, 2019, Ms. Rehak reported having developed episodes of heat-related illness characterized by severe fatigue, severely decreased energy, nausea, and vomiting, which began only after her diagnosis of her lymphoma (79:18-81:24).

5. <u>Psychological effects</u>.  It is another matter of common sense, as well as personal and professional experience, that the diagnosis and treatment of cancer, and the complications of cancer and its treatment, are among the most stressful experiences that a person can undergo during his or her lifetime.  In her deposition testimony, Ms. Rehak acknowledged having experienced depression or anxiety related to her diagnosis of non-Hodgkin lymphoma (252:10-16).  Whether the prognosis is good, poor, or, as in Ms. Rehak's case, somewhere in between, any new finding after a cancer has been diagnosed raises the serious concern in a patient, the patient's family, and the medical team alike of recurrence or progression of the malignancy.  The potentially devastating significance of each new or persistent symptom, change in a pre-existing symptom, new physical finding, new laboratory or imaging abnormality--and every new medical encounter related to the cancer--are lifelong sources of fear and anxiety in virtually every person who has had cancer.

6. <u>Exposure</u>.  I have reviewed Ms. Rehak's deposition testimony regarding the frequency, duration, and circumstances of her Roundup exposure and her use of personal protective equipment while spraying Roundup or when passively exposed to it.

From 1983 until 1989, Ms. Rehak worked at ChemLawn, a lawn care business focused on chemical treatment, in Hickory Hills, Illinois (145:24-146:3, 147:9-12, 177:11-178:2). During her employment at ChemLawn, Ms. Rehak's office was located less than 100 feet away from the warehouse where other employees mixed Roundup (178:3-14). Multiple times each day, her duties would require her to enter the warehouse while those employees were mixing Roundup (153:7-13, 178:15-179:7). Roundup being mixed in the warehouse could enter the office area if the employees mixing it spilled it on their clothing or boots or contaminated common desks, telephones, or paperwork (180:18-182:18). Two or three times during each growing season, February through November or December (148:13-149:10), Ms. Rehak would also ride along on ChemLawn trucks for an entire workday (148:5-12, 149:15-150:17), in conjunction with which she personally sprayed lawns on the route with Roundup mixed from concentrate (97:18-23, 151:16-152:4, 155:4-157:16). Ms. Rehak wore rubber boots on those occasions, but no other protective equipment (157:21-158:8, 158:24-159:1), and indicated that Roundup often dripped onto her hands from the bottle (159:11-160:6).

From approximately 1980 until 1989, Ms. Rehak lived with her partner at the time, another ChemLawn employee, at a rental property                                      (98:10-17, 102:3-8). On an approximately weekly basis during the growing season, March through November (104:4-6, 106:20-23, 116:1-117:16), Ms. Rehak's partner would apply commercial-grade Roundup concentrate to the rental property for approximately thirty minutes (141:16-22) while Ms. Rehak performed yardwork nearby (98:10-100:10, 104:4-107:9, 110:22-111:6, 111:12-14, 111:24-112:8, 141:23-142:21), and the liquid frequently came into contact with her hands and feet as it was being sprayed (111:15-21, 112:17-18, 112:14-113:20, 115:18-24, 142:22-143:2).

From 2010 until 2018, Ms. Rehak lived on                                  where her landlord or landlady purchased and sprayed Roundup (97:14-17, 102:20-24) at least twice monthly during the growing season (119:14-7, 128:7-17), occasionally while Ms. Rehak was nearby (118:16-119:3). The freshly sprayed Roundup would come into contact with Ms. Rehak's feet when she walked in the area (119:4-9, 125:24-126:8, 128:12-23).

Ms. Rehak's exposure to Roundup therefore has been both inhalational and transdermal. With six years of occupational exposure and a total of seventeen years of exposure at least twice monthly to approximately once per week at her residences, it is therefore my opinion that Ms. Rehak's exposure to Roundup has been extensive.

7. Etiology: risk factors for the development of non-Hodgkin lymphomas. Recognized risk factors for the development of non-Hodgkin lymphomas include aging, male gender, white ethnicity, geographic location, inherited or acquired immunodeficiency, certain autoimmune disorders, specific types of infection, previous treatment for Hodgkin lymphoma, a rather short list of drugs, occupational and environmental exposures, and a family history of malignancies of the blood or bone marrow. Implicated occupational and environmental exposures include herbicides, organic solvents, other organic chemicals, hair dyes, and smoking (3, 4). It is worth noting that the only individuals for whom smoking has been shown to be a risk factor for the development of follicular non-Hodgkin lymphoma are women, not males (5). Some of the

recognize risk factors, such as immunosuppressive drugs, infection with human T-lymphotrophic virus type I, or occupational and environmental exposures, are true causative factors or etiologic agents. Other risk factors, such as advanced age and male gender, are associated with an increased likelihood of developing non-Hodgkin lymphoma but are not directly causative. For example, the increased risk of developing non-Hodgkin lymphoma with advancing age may, at least in some cases, reflect the acquisition and accumulation of predisposing mutations in hematopoietic stem cells or other cells in the bone marrow, or the natural decline in immune system function which accompanies aging.

   8. Lymphoma caused by Roundup. I have reviewed all of the reliance materials provided to me by attorneys who have retained me in Roundup litigation or independently identified by me regarding the reported association between Roundup exposure and the development of non-Hodgkin lymphoma. I am deferring a detailed discussion of general causation regarding the association between Roundup and non-Hodgkin lymphoma to Plaintiffs' present or past general causation experts. I will highlight only those aspects which would be of interest to clinicians, especially medical oncologists and hematologists, caring for patients with non-Hodgkin lymphoma.

   The carcinogenicity of glyphosate, the active herbicidal ingredient in Roundup, has been comprehensively evaluated by the International Agency for Research on Cancer (IARC) (6, 7). In 2015, IARC, which is a division of the World Health Organization, noted that "Glyphosate is a broad-spectrum herbicide, currently with the highest production volumes of all herbicides. It is used in more than 750 different products for agriculture, forestry, urban, and home applications. Its use has increased sharply with the development of genetically modified glyphosate-resistant crop varieties. Glyphosate has been detected in air during spraying, in water, and in food...Glyphosate has been detected in the blood and urine of agricultural workers, indicating absorption." At that time, IARC classified glyphosate as "probably carcinogenic to humans"--a Group 2A carcinogen, according to the IARC classification. The Group 2A classification of glyphosate as a human carcinogen reflects "limited evidence" for carcinogenicity in humans, based on a positive association with non-Hodgkin lymphoma, plus "sufficient evidence" of carcinogenicity in animals and identification of genotoxicity and oxidative stress as the carcinogenic mechanisms of glyphosate. "Limited evidence" and "sufficient evidence" are part of the terminology used by IARC to summarize and communicate the results of its weight-of-the-evidence analyses of known or suspected carcinogens.

   In 2019, Zhang et al. published an independent analysis of the risk of developing non-Hodgkin lymphoma in individuals exposed to glyphosate-based herbicides (8). The analysis included a meta-analysis of the available human epidemiologic data as well as an evaluation of available animal and mechanistic studies. The meta-analysis demonstrated a statistically significant 41% to 45% increase (compared to relevant control subjects) in the risk of developing non-Hodgkin lymphoma for individuals with high cumulative exposures to glyphosate-based herbicides. The magnitude of this increase is closely comparable to that reported for the development of non-Hodgkin lymphoma in individuals with high serum levels of polychlorinated biphenyls (PCBs) (9), which are considered persistent organochlorine pollutants and collectively have been classified as an IARC Group I (strongest evidence) human carcinogen (10, 11).

Similar to IARC, Zhang *et al*. (8) concluded that the animal and mechanistic data provide supporting evidence for the carcinogenic potential of this group of herbicides.

9. <u>Differential etiology: other risk factors</u>. It has often been said that most cases of non-Hodgkin lymphoma are idiopathic--that is, the cause is unknown (3). However, diseases don't just happen. Every disease has one or more causes, even if not yet discovered by scientific research. This applies to the causes of disease in individuals as well as populations. Regarding causation, "idiopathic" means "not yet known" or "not known in this case," not "there is no cause."

Other than Roundup exposure and smoking, no risk factors for the development of lymphoma, such as predisposing medical conditions (including immunocompromised states, autoimmune disorders, and specific infections), a family history of malignancies of the blood or bone marrow, or other candidate carcinogenic exposures, are identified in Ms. Rehak's medical records. Further, Ms. Rehak is, of course, a female, and she was only 54 years old at the time of diagnosis of her non-Hodgkin lymphoma.

Ms. Rehak's deposition testimony indicates that her pertinent environmental exposures are limited to Roundup and, as documented in her medical records, smoking. During the late 1970s or early 1980s, Ms. Rehak was employed part-time at a Shell gas station Lockport (55:13-14, 69:7-14). However, she worked there exclusively as a cashier, and did not handle the gasoline tanks or gasoline pumps (67:22-69:22). Concerning other possible chemical exposures about which she was questioned during her deposition, Ms. Rehak recalled ever using wasp spray only once (136:23-137:5), her only pesticide use other than Roundup. She had no contact with diazinon, used as an insecticide by ChemLawn during her employment there (164:3-165:8).

10. <u>Conclusion</u>. Ms. Rehak is now 60 years old. She was diagnosed with stage IIA grade I-II/III follicular lymphoma between between June 16 and July 1, 2014. Ms. Rehak has received combined-modality treatment for the lymphoma, consisting of six cycles of chemoimmunotherapy with the combination of bendamustine (Treanda) and rituximab (Rituxan) at intervals of four weeks between July 21 and December 9, 2014, followed by consolidative radiation therapy to the abdomen and pelvis in February and March 2015 and eight intravenous infusions of maintenance rituximab immunotherapy at intervals of three months between March 2015 and November 2016. Based on radiographic criteria, Ms. Rehak's treatment produced a partial rather than a complete response. Ms. Rehak has experienced a number of complications of her lymphoma and its treatment, among which the acute hypersensitivity (allergic) reaction to her initial dose of rituximab was severe and even life-threatening. Ms. Rehak remains at risk for progression of her lymphoma or transformation to a more aggressive non-Hodgkin lymphoma subtype, which would require additional treatment if she is medically able to tolerate it. Either of these outcomes--progression or transformation--would be expected to compromise her survival. Lifelong psychological consequences of the diagnosis and treatment of cancer, and of the complications of the cancer and its treatment, are near-universal experiences in patients who have been treated for cancer. Ms. Rehak has reported extensive exposure to Roundup, which has been implicated in the causation of non-Hodgkin lymphoma on the basis of human epidemiologic data and animal and mechanistic studies.

It is my conclusion that, to a reasonable degree of scientific and medical certainty, exposure to Roundup was a substantial factor in causing or contributing to cause Ms. Rehak's non-Hodgkin lymphoma.

All of these opinions are expressed to a reasonable degree of scientific and medical certainty. Please note that I reserve the right to amend the opinions contained in this report and to offer additional opinions should new information become available to me about Ms. Rehak's case.

Thank you for allowing me the opportunity to review this interesting case. Please let me know if I may be of further assistance.

Sincerely,

*Ron D. Schiff, M.D., Ph.D.*

Ron D. Schiff, M.D., Ph.D.

## REFERENCES:

1. Hill, A.B., 1965. The environment and disease: association or causation? Proc Royal Soc Med 58:295-300.

2. Swerdlow, S.H., E. Campo, N.L. Harris, *et al.*, 2017. *WHO Classification of Tumours of Hematopoietic and Lymphoid Tissues*. International Agency for Research on Cancer, Lyon, France.

3. Bierman, P.J. and J.O. Armitage, 2020. Non-Hodgkin lymphomas. In Goldman, L. and A.I. Schafer, 2020. *Goldman-Cecil Medicine*, 26th edition. Elsevier Saunders, Philadelphia, pp 1229-40.

4. Evens, A.M., J. N. Winter, L.I. Gordon, *et al.*, 2010. Non-Hodgkin lymphoma. In Pazdur, R., L.D. Wagman, K.A. Camphausen, and W.J. Hoskins, 2010. *Cancer Management*: *A Multidisciplinary Approach*, 13th edition. UBM Medica, London, pp 739-94.

5. Linet, M.S., C.M. Vajdic, L.M. Morton, *et al.*, 2014. Medical history, lifestyle, family history, and occupational risk factors for follicular lymphoma: The InterLymph non-Hodgkin lymphoma subtypes project. J Natl Cancer Inst Monogr 48:26-40.

6. Guyton, K.Z., D. Loomis, Y. Grosse, *et al.*, 2015. Carcinogenicity of tetrachlorvinphos, parathion, malathion, diazinon, and glyphosate. Lancet Oncology 16:490-1.

7.  International Agency for Research on Cancer, 2015.  *IARC Monogr Eval Carcinog Risk Chem Hum Volume 112.  Some organophosphate insecticides and herbicides, tetrachlorvinphos, parathion, malathion, diazinon and glyphosate*.  IARC Working Group, Lyon, France.

8.  Zhang, L., I. Rana, R.M. Shaffer, *et al*., 2019.  Exposure to glyphosate-based herbicides and risk for non-Hodgkin lymphoma: A meta-analysis and supporting evidence.  Mutat Res/Rev Mutat Res 781:186-206.

9.  Freeman, M.D. and S.S. Kohles, 2012.  Plasma levels of polychlorinated biphenyls, non-Hodgkin lymphoma, and causation.  J Environ Public Health 2012, Volume 2012, Article ID 258981, 15 pages, doi:10.1155/2012/258981.

10. Lauby-Secretan, B., D. Loomis, Y. Grosse, *et al*., 2013.  Carcinogenicity of polychlorinated biphenyls and polybrominated biphenyls.  Lancet Oncology 14:287-8.

11. International Agency for Research on Cancer, 2016.  *IARC Monogr Eval Carcinog Risk Chem Hum Volume 107.  Polychlorinated biphenyls and polybrominated biphenyls*.  IARC Working Group, Lyon, France.