Ken Moll
Rebecca Fredona
Fatima Abuzerr
**MOLL LAW GROUP**
22 W Washington St
15th Floor
Chicago, IL 60602
T: 312.462.1700
F: 312.756.0045
rfredona@molllawgroup.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 16-md-02741-VC |
| This document relates to: | **PLAINTIFFS' OPPOSITION TO MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERTS DR. LAUREN PINTER-BROWN AND DR. RON SCHIFF ON *DAUBERT* GROUNDS** |
| *Cervantes v. Monsanto Co.*, 3:19-cv-03015-VC *Karman v. Monsanto Co.*, 3:19-cv-01183-VC *Pecorelli v. Monsanto Co.*, 3:19-cv-06936-VC *Peterson v. Monsanto Co.*, 3:19-cv-07271-VC *Rehak v. Monsanto Co.*, 3:19-cv-01719-VC *Schafer v. Monsanto Co.*, 3:19-cv-02169 | |

## PLAINTIFFS' OPPOSITION TO MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERTS DR. LAUREN PINTER-BROWN AND DR. RON SCHIFF ON *DAUBERT* GROUNDS

i

# **TABLE OF CONTENTS**

I. INTRODUCTION ..........................................................................................1

II. LEGAL STANDARD .................................................................................4

III. ARGUMENT ............................................................................................5

    A.  This Court Has Previously Ruled That Plaintiffs' Experts Properly
        Ruled Roundup As the Cause of Plaintiffs' Non-Hodgkin's Lymphoma ...5

    B.  Dr. Schiff Properly Assessed Potential Alternative Causes For
        Plaintiffs' Non-Hodgkin's Lymphoma .........................................................6

    C.  Dr. Pinter-Brown Properly Assessed Potential Alternative Causes For
        Plaintiffs' Non-Hodgkin's Lymphoma .......................................................10

    D.  Dr. Schiff and Dr. Pinter-Brown Addressed The Idiopathy
        Argument Monsanto Raises Again .............................................................14

IV. CONCLUSION............................................................................................16

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases:**

3

*Cooper v. Takeda Pharmaceuticals America, Inc.*,
 239 Cal. App. 4th 555 (2014)..............................................................4, 10, 11, 12

4

5

*In re Roundup Products Liability Litigation*,
 2018 WL 3368534, at *9-10.................................................................15

6

7

*Johnson v. Mead Johnson & Co., LLC*,
 754 F.3d 557, 563 (8th Cir. 2014)  .......................................................4

8

9

*Messick v. Novartis Pharm. Corp.*,
 747 F3d 1193, 1196 (9th Cir. 2014)  .....................................................4, 14

10

11

*Primiano v. Cook*,
 598 F.3d 558, 565 (9th Cir. 2010) )  ......................................................4

12

13

*Schultz v. Akzo Nobel paints, LLC*, 721
 F.3d 426, 434 (7th Cir. 2013)  .............................................................4

14

*Wendell v. GlaxoSmithKline, LLC*,
 858 F.3d 1227, 1237 (2017).................................................................4, 12, 14, 15

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' OPPOSITION TO MONSANTO'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS'
EXPERTS DR. LAUREN PINTER-BROWN AND DR. RON SCHIFF ON *DAUBERT* GROUNDS**

**I. Introduction**

Plaintiffs James Peterson ("Mr. Peterson") and Mark Pecorelli, individually and as Representative of the Estate of Michael Pecorelli deceased ("Mr. Pecorelli") all proffered the expert opinions of Dr. Lauren Pinter-Brown for purposes of specific-causation in their respective areas. Dr. Pinter-Brown is a triple board-certified veteran oncologist/hematologist, former Director of the Lymphoma Program at UCLA (where she initiated the program) and USC, with some 40 years in clinical practice, currently treating and consulting at least 70 NHL patients per week at the University of California, Irvine. Attached to Monsanto's Motion to Exclude Ex. 2, *Peterson* Rpt. ("*Peterson* Rpt.") at 1-2; see also, Monsanto's Ex. 1 Pecorelli Rpt. ("*Pecorelli* Rpt.") at 1-2. In addition to treating patients, Dr. Pinter-Brown instructs medical residents and fellows in the departments of medicine and dermatology, conducts studies, serves as principal investigator on clinical trials for developing chemotherapy and related drugs. Attached to Monsanto's Motion to Exclude Ex. 3, Pinter-Brown *Peterson* Dep. ("LPB *Peterson* Dep.") at 11:5-25- 12:2, 84:20. As a result of such work, Dr. Pinter-Brown is well qualified to interpret human epidemiological and genotoxicity data. Dr. Pinter-Brown is also a prolific author and speaker on lymphoma. Attached to Monsanto's Motion to Exclude, Ex. 1, *Pecorelli* Rpt. At 2 and Ex. 2, *Peterson* Rpt. At 2.

Dr. Pinter-Brown applied the same methodology in performing a differential diagnosis in the two respective cases as she employs in her clinical practice (albeit she testified that a different term is used in practice, "differential etiology"), which consists of identifying risk factors for NHL, determining whether a Plaintiff is susceptible to a risk factor, and arriving at a conclusion of the specific risk factor(s) that contributed to the Plaintiff's NHL. *See* Monsanto's Ex. 1, *Peterson* Rpt. At 2-7; *See also*, Monsanto's Ex. 2, *Pecorelli* Rpt. At 2-7. In identifying exposure to GBFs as a risk factor, Dr. Pinter-Brown conducted an independent analysis of the existing epidemiological,

genotoxicity, and toxicological data on GBFs, reviewed the opinions of Plaintiffs' general causation experts, and relied on her own clinical experience. Monsanto's Ex. 1, *Pecorelli* Rpt. At 2-3; Ex. 2 *Peterson* Rpt. At 2-3.

Monsanto's arguments for excluding the opinions of Dr. Pinter-Brown are riddled with misrepresentations of the record, a warped view of her testimony, and go to the weight of Dr. Pinter-Brown's opinions as opposed to admissibility.  For example, Monsanto urges this Court to exclude Dr. Pinter-Brown merely because she does not lend as much weight to certain NHL risk factors as Monsanto or does not perceive certain medical conditions or exposures to be true risk factors, based on her more than forty (40) years of clinical experience.  What is important is that Dr. Pinter-Brown considered what she perceived to be the applicable risk factors in each Plaintiff's case and provided a reasoned explanation, based on the record, her expertise, and review of the scientific data, for ruling in or ruling out factors in performing a differential diagnosis.  Monsanto is free to argue with Dr. Pinter-Brown on cross examination as to the proper weight to be afforded to certain risk factors compared to others, but such disagreements do not render Dr. Pinter-Brown's opinions unreliable under Daubert.

Dr. Schiff is Board Certified in internal medicine, medical oncology, and hematology. He graduated from St. Louis University with a Ph.D. in molecular and cellular biology in 1979 and an M.D. in 1980.  He also completed a one-year post-doctoral fellowship in molecular and cellular biology, as well as a sub-specialty fellowship in medical oncology and hematology at Memorial Sloan-Kettering Cancer Center from 1983 – 1986.  He served as a faculty member in the Department of Medicine, Division of Hematology/Oncology at the Medical University of South Carolina in Charleston from 1986 – 1992 and was in private practice in medical oncology from 1992 until his retirement from active practice in May 2015.  He served as the Chair of the Cancer

2

Committee at the University Community Hospital and its successor, Florida Hospital Tampa, from January 1985 until April 2014.  He began reviewing cases as an expert witness almost 30 years ago in 1990.  Fredona Decl., Ex.1, Schiff *Cervantes* Rpt.  At 1-3. Dr. Schiff prepared extensive and detailed reports for Plaintiffs Gerard Cervantes, Lorraine Rehak, John Schafer, and Christine Karman, Individually and as Representative of the Estate of Robert Karman, deceased.   All Schiff's reports review in great detail the medical histories of these Plaintiffs.  The reports then provide detailed opinions on diagnosis and staging, treatment, disease status and prognosis, complications, psychological effects, lymphoma caused by Roundup, evaluation of other risk factors, and a conclusion.  In each report, Dr. Schiff concludes, "to a reasonable degree of scientific and medical certainty, [that] exposure to Roundup was a substantial factor" in causing the Plaintiffs' non-Hodgkin's Lymphoma. Fredona Decl., Ex.1, Schiff *Cervantes* Rpt. At 14.

        Although criticized for failing to do so, Dr. Schiff in fact discusses in all his reports that other risk factors including potential idiopathic causes and opines "other than Roundup exposure, no risk factors for the development of lymphoma, such as predisposing medical conditions, a positive family history, or other candidate carcinogenic exposures, are identified . . ." Fredona Decl., Ex. 1, Schiff *Cervantes* Rpt. At 11-12. Dr. Schiff reached his opinions after reviewing each Plaintiffs' comprehensive medical records, the depositions of the parties and various treating health care provider depositions. Ex. 1, Schiff *Cervantes* Rpt. At 2-3.

        As can be seen from expert reports and deposition testimony, both Dr. Schiff and Dr. Pinter-Brown followed guidelines in pretrial order No. 85 for ruling in and ruling out various factors in arriving at their opinions.

3

## II. <u>LEGAL STANDARD</u>

The Ninth Circuit has mandated that "Rule 702 should be applied with a 'liberal thrust' favoring admission." *Wendell*, 858 F.3d at 1232 (quoting *Messick v. Novartis Pharm. Corp.*, 747 F3d 1193, 1196 (9th Cir. 2014)). Expert testimony is admissible under Rule 702 when based on a reliable differential diagnosis. *See id.* at 1235 ("Nothing in *Daubert,* or its progeny, properly understood, suggests that the most experienced and credentialed doctors [specifically referencing Dr. Weisenburger and Dr. Shustov] in a given field should be barred from testifying based on a differential diagnosis."). In conducting a differential diagnosis,[1] an expert considers the "pertinence of all potential causes, then rules out the ones as to which there is no plausible evidence of causation, and then determines the most likely cause among those that cannot be excluded." *Id.* at 1234 (approving Dr. Shustov's methodology). The Ninth Circuit also "consistently recognize[s] the difficulties in establishing certainty in the medical sciences." *Messick v. Novertis Pharm. Corp.*, 747 F.3d 1193, 1197-98 (9th Cir. 2010) (citing *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)). Therefore, it is not necessary that "an expert be able to identify the sole cause of a medical condition in order for his or her testimony to be reliable. It is enough that medical condition be a substantial causative factor." *Id.* at 1199; *see also Schultz v. Akzo Nobel paints, LLC,* 721 F.3d 426, 434 (7th Cir. 2013) ("[A] reliable expert should consider alternative causes, they do not require an expert to rule out every alternative cause."); *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 563 (8th Cir. 2014) ("However, we have consistently ruled that experts are not required to rule to all possible causes when performing the differential etiology analysis.")(internal citations omitted).

---

[1] *See Wendell,* 858 F.3d at 1234 ("When performing a differential diagnosis, [Dr. Shustov] first assumes the pertinence of all potential causes, then rules out the ones as to which there is no plausible evidence of causation, and then determines the most likely cause among those that cannot be excluded. We have recognized that this method of conducting a differential diagnosis is scientifically sound." (citing *Clausen*, 339 F.3d at 1057-58).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The relevancy of an expert opinion is governed by California law. *Messick* 747 F.3d at 1196-97. Under California law, "[t]he plaintiff must offer an expert opinion that contains a reasoned explanation illuminating why the facts have convinced the expert, and therefore convince the jury, that is more probable that not the negligent act was a cause-in-fact of the plaintiffs injury." *Cooper v. Takeda Pharm. Am., Inc.*, 239 Cal. App. 4th 555, 578 (2015) (quoting *Jennings v. Palomar Pomerado Health Sys., Inc.*, 114 Cal. App. 4th 1108, 1118 (2003)). "Under the applicable substantial factor test, it is not necessary for a plaintiff to establish the negligence of the defendant as the proximate cause of injury with absolute certainty so as to exclude every other possible cause of a plaintff's illness, even if the expert's opinion was reached by performance of a differential diagnosis." *Id*. "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm." *Id.* at 595 (quoting CACI 430) (holding that tit was unnecessary for expert to rule out smoking as contributing cause to Plaintiff's injury).

## III. Argument

### A. This Court Has Previously Ruled That Plaintiff's Experts Properly Ruled Roundup as The Cause of Plaintiffs' Non-Hodgkin's Lymphoma.

In response to this argument, Plaintiffs' state that this Court has already considered and rejected this argument in PTO 85, calling it "off point". PTO 85 at 2, see also PTO 45. This Court has also considered and denied Monsanto's Motion for Directed Verdict in PTO 113. Additionally, consistent with the Court's direction not to re-litigate issues previously ruled upon by the Court, but in order to fully preserve the appellate record, Plaintiffs hereby incorporate the following pleadings that were filed on the MDL docket addressing this issue:

- Plaintiffs' Response in Opposition to Monsanto's Specific Causation *Daubert* and Summary Judgment Motion and *Daubert* Motion to Strike Certain Opinions of Monsanto Company Company's Expert Witnesses (ECF #2478);

5

- Plaintiffs' Response in Opposition to Monsanto's Motion for Judgment as a matter of Law and for a New Trial (ECF # 4135).

### B.  Dr. Schiff Properly Assessed Potential Alternative Causes for Plaintiffs' Non-Hodgkin's Lymphoma.

Despite Dr. Schiff's impressive credentials and substantial review of the actual evidence in the case, Monsanto claims that his opinions should be excluded for failure to address other unknown, unquantifiable and conjectural alternative causes.

<u>Gerard Cervantes</u>

On page 12 of its brief, Monsanto asserts that Dr. Schiff "does not even profess to say the Mr. Cervantes has no other significant risk factors. He simply says they do not matter to him and brushes them aside because they stand in the way of his litigation-driven desired outcome." Monsanto's Motion to Exclude, (ECF 12789), at 12. Monsanto attempts to discredit Plaintiffs' testimony by making statements that are not true. In fact, Dr. Schiff did consider other potential causation factors in his report. Fredona Decl., Ex.1, Schiff *Cervantes* Rpt. at. p 11 ¶ 9- 12¶ 10. Additionally, Dr. Schiff relies on medical literature and epidemiological studies to support his findings that other risk factors are not as much of a significant contributing factor as Roundup is to causing NHL.

> "IARC has also found a positive epidemiologic association between benzene exposure and the development of non-Hodgkin lymphoma, although the data are less consistent…IARC, which uses the term 'excess body fatness" to encompass overweight and obesity, has concluded that there is limited evidence for an association with the development of diffuse large B-cell lymphoma". *Id.* "

Dr. Schiff also testified that although family history is a risk factor it is not a causative one. *Id.* at 10 ¶ 7; Schiff *Cervantes* Dep. at 31:5-22. In an attempt to discredit and criticize Dr. Schiff's testimony, Monsanto provided Dr. Schiff with decade old studies, to review, during his deposition.

> Q: …So have you seen the Linet paper, which is reference 3?
> A: I have seen more recent Linet papers from 2008 and 2014 dealing with this, and I would defer to them for an assessment of the relative risk.
> Q:… Have you seen the reference No. 4, Zhu, z-h-u, that paper?
> A: From 1998. No, Have not.
> Q: And did you see the Paltiel, paper cited as Reference 5?

6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> A: That from 2000, which is 21 years ago…
> Q:…Familial Cancers Associated with Subtype of leukemia and non-Hodgkin's lymphoma, Did you see that?
> A: That's a 30-year-old paper…

Schiff *Cervantes* Dep: 115:23-116:25. Dr. Schiff not only thoroughly assessed several potential risk factors for Mr. Cervantes but he has also proven that his methodology is reliable by relying on the most recent studies in his field.

**Robert Karman**

Monsanto again erroneously asserts Dr. Schiff does "not offer any explanation, either in his report or at his deposition, for how he concluded that Roundup was a substantial causative factor as opposed to other admitted risk factors." Monsanto's Motion to Exclude, ECF 12789 at 12. However, it is both clear and obvious that Dr. Schiff has in fact provided explanation as to how he came to his opinions. Dr. Schiff assessed Mr. Karman's smoking history and testified that although it can increase your risk for non-Hodgkin's lymphoma, "the strongest data there are actually for follicular non-Hodgkin lymphomas, rather than for diffuse large B-cell," which Mr. Karman has. Attached to Monsanto's Motion to Exclude Ex. 11, Schiff *Karman* Dep. at 112:1-13. Therefore, not only has Dr. Schiff considered smoking as a potential causative risk factor, but he ruled it out due to the lack of statistical data, which makes his testimony even more reliable than if he did rule it as causative. Further, Dr. Schiff thoroughly explains, in both deposition and his report, why age is not directly causative. Fredona Decl., Ex. 2, Schiff *Karman* Rpt. at 20 ¶ 7, 21 ¶ 9; Monsanto's Ex. 11, Schiff *Karman* Dep. at 115:12-116:23. Dr. Schiff explains that

> "increased likelihood of developing non-Hodgkin lymphoma with advancing age may, at least in some cases, reflect the acquisition and accumulation of predisposing mutations in hematopoietic stem cells or other cells in the bone marrow, or the natural decline in immune system function which accompanies aging."

7

*Id.* at 22. Dr. Schiff further explains how other risk factors, such as those listed above, were identified in Mr. Karman's medical records, other than Roundup and smoking. *Id.* Thus, Dr. Schiff has established he thoroughly assessed Mr. Karman's alternative risk factors.

**Lorraine Rehak**

In its Motion, Monsanto attempts to belittle Ms. Rehak's exposure to glyphosate. Dr. Schiff specifically states on page 16 of his report that "she personally sprayed lawns on the route with Roundup mixed from concentrate (Attached to Monsanto's Motion to Exclude, Ex. 18, *Rehak* Dep. at 97:18-23, 151:16-152:4, 144:4-157:16), wore rubber boots, but no other protective equipment (*.Id.* at 157:21-158:8, 158:24-159:1), and indicated that Roundup often dripped onto her hands from the bottle (*Id.* at. 159:11-160:6); Fredona Decl., Ex. 3 *Rehak* Rpt at 16. Dr. Schiff concluded, "Ms. Rehak's exposure to Roundup therefore has been both inhalational and transdermal. With six years of occupational exposure and a total of seventeen years of exposure at least twice monthly to approximately once per week at her residences." *Id.* Thus, Dr. Schiff's opinion does not lack foundation.

In addition to assessing Ms. Rehak's exposure, Dr. Schiff assessed other risk factors for NHL. In regard to Ms. Rehak's smoking history, Dr. Schiff relied upon the most recent studies and medical literature that are relevant to Ms. Rehak's case. In Dr. Schiff's deposition, Monsanto attempted to discredit Dr. Schiff with studies that were either not updated or applicable to Ms. Rehak's case. "This appears to not be broken down by gender, so that has limited applicability… some of these comparisons do not reach statistical significance…" Attached to Monsanto's Motion to exclude, ECF 12789, Ex. 6, Schiff *Rehak* Dep. at 29:12-30:3. "The trend for women is statistically significant. However, the individual breakdown by category is only significant for women who have smoked more than 50 years, which does not apply to Ms. Rehak" *.Id.* at 31:3-

17. "The *Diver* paper…does not break down by lymphoma subtype but only non-Hodgkin lymphoma overall…" .*Id.* at 44:13-24. "This paper was written 10 years ago and this is expressed as a hypothesis, including speculation about the mechanism." .*Id*. at 48:3-49:7.

Further, Dr. Schiff elaborates on his assessment of Ms. Rehak's family history of cancer. Dr. Schiff stated in his deposition:

> **Q:** What did you do, if anything, Dr. Schiff, to rule out an inherited or genetic predisposition to Ms. Rehak's cancer?
> **A:** Well, I'm aware that she does not have a documented family history of a hematopoietic or lymphoid malignancy, and looking at the family history date that you have brought to my attention, all of which is older than the Interlymph project, Interlymph did not see fit to include data about other cancers in their family history analysis of lymphoma risk factors. So the answer to that is that all of that has not been examined to the same extent that a positive family history of hematologic malignancy is, but as I'm aware, positive family history of hematologic malignancy is the main family history risk factor for the development of non-Hodgkin lymphoma…

Schiff *Rehak* Dep. at 60:21-61:12. *See* Ex. 3 Schiff *Rehak* Rpt. at 18. Additionally, Dr. Schiff testifies that although a family history of cancer increases NHL risk, studies have shown there is only a "borderline statistical significance" which are based on a "small number of cases." Schiff *Rehak* Dep. at 62:4-64:16. Therefore, not only has Dr. Schiff once again shown his assessments of other risk factors are proper, but his methodology and reliance on scientific medical literature are reliable.

## John Schafer

In another unsuccessful attempt to discredit Dr. Schiff, Monsanto, asserts that Dr. Schiff is misstating the very articles, he relies on. However, that is not true. In fact, Dr. Schiff explains in his deposition that the article he relies on has a subsection entitled "Immune System Abnormalities" which provides the additionally information that the risk is confined to lymphomas of the thyroid. Attached to Monsanto's Motion to Exclude, Ex. 4, Schiff *Schafer* Dep. at 84:1-18.

Additionally, Monsanto wants this Court to believe that Dr. Schiff's methodology is "always Roundup." Monsanto's Motion to Exclude, ECF 12789, p 14. However, that is not the case, in fact, Dr. Schiff thoroughly explains when he *would* exclude Roundup.

> **Q:** Is there anything else that you would look at that would allow you to exclude Roundup as a substantial contributing factor?
> **A:** …If the lymphoma manifested and was diagnosed before the Roundup exposure, or very early after the onset of Roundup exposure, that would be an argument against a causative association…

Schiff *Schafer* Dep. 38:11-39:3. Therefore, Dr. Schiff has properly addressed other possible risk factors.

### C. Dr. Pinter-Brown Properly Assessed Potential Alternative Causes for Plaintiffs' Non-Hodgkin's Lymphoma.

Monsanto claims that Dr. Pinter-Brown's opinions should be excluded for failure to address other unknown, unquantifiable and conjectural alternative causes, despite her exhaustive review of Plaintiffs' medical records and medical literature.

**James Peterson**

Monsanto asserts that Dr. Pinter-Brown failed to account for Mr. Peterson's age, weight and exposure to other chemicals for possible risks posed. However, Dr. Pinter-Brown specifically mentions in her section of "Analysis of Patient's Risk for Developing DLBCL," the following:

> 1) Mr. Peterson was not exposed to ionizing radiation; 2) is not known to have any infection known to be associated with increased risk for lymphoma; his hepatitis B serologies pre-treatment were negative; 3) does not have a family history of lymphoma or lymphoproliferative disorder; 4)does not have a history of known immunodeficiency; 5) does not have a history of any autoimmune disease that is associated with the development of lymphoma; 6) was over the age of 60 when diagnosed with DLBCL; 7) had significant exposure to Roundup…"

Attached to Monsanto's Motion to Exclude Ex. 2, *Peterson* Rpt. at 5-6. Further, Monsanto argues that Dr. Pinter-Brown failed to consider Mr. Peterson's exposure to chemicals used to develop film. Monsanto's Motion to Exclude, ECF 12789, at 16. However, Dr. Pinter- Brown not only

10

---

considered it, but elaborated the process of developing film due to her own personal experience with developing film.

> **Q**: Did you assume that he was exposed to certain chemicals in the course of developing his own film?
> **A:** … the way he described it, he used tongs as most…And so your exposure is really pretty minimal. the tongs that I used to use…are probably almost a foot long... You pour the chemicals into a—some basins. You don't inhale them. You don't get close to them. You don't put your hands in the chemicals."

Attached to Monsanto's Motion to Exclude Ex. 3, LPB *Peterson* Dep. at 16:3-25. By no means has Dr. Pinter-Brown fail to account for other risk factors. Dr. Pinter-Brown conducted a thorough assessment risk factors by relying on Mr. Peterson's medical records, other general expert reports, her personal experience, clinical experience and an extensive list of scientific medical literature to form her opinions.

## Michael Pecorelli

Dr. Pinter-Brown reported her analysis after considering the following risk factors in coming to her opinions:

> 1)Mr. Pecorelli was not exposed to ionizing radiation prior to his diagnosis; 2) is not known to have any infection known to be associated with increased risk for lymphoma; his hepatitis C serology was negative; 3) does not have a family history of lymphoma or lymphoproliferative disorder; 4) does not have a history of known immunodeficiency; 5) does not have a history of any autoimmune disease that is associated with the development of lymphoma; 6) had a significant exposure to Roundup…

Attached to Monsanto's Motion to Exclude, Ex. 1, *Pecorelli* Rpt. at 5. Monsanto attempts to discredit Dr. Pinter-Brown for its own failure to question Dr. Pinter-Brown on why she opined smoking was not a significant contributing factor to Mr. Pecorelli's NHL. Rather than questioning her on it, Monsanto focuses on questioning Dr. Pinter-Brown about smoking and its correlation to lung cancer in an attempt to use it interchangeably with NHL. However, lung cancer and NHL are not one in the same. (**Q:**… and he had cancer in his lungs, right? **A:** No. He did not have lung

11

cancer. **Q:** Did he have a cancer in his lungs? **A:** He had a cancer in his lungs, yes, but it wasn't

lung cancer.) Monsanto's Ex. 4, LPB *Pecorelli* Dep. 68:2-18. In regard to Mr. Pecorelli's exposure

to other chemicals the Dr. Pinter-Brown states:

> **Q:** So is it your testimony that with respect to 2, 4-D, carbaryl and diazinon you're
> aware that there, in some studies, is an association with them and non-Hodgkin
> lymphoma, you just have not dug in as deep on those to find out as much on those
> chemicals and their association with non-Hodgkin lymphoma.
> **A:** No, that's not really true… in many of these studies it's extraordinarily difficult
> to sort out all the different exposures that people have had and the accuracy of the
> reports. In this particular individual, it appears that though he was exposed to these
> other chemicals, it was not to the same degree…

*Id.* at 95:22-96:13. Thus, Monsanto's arguments are a far reach. Dr. Pinter-Brown has provided in

both her reports and deposition testimony that she considered other risk factors in Mr. Pecorelli's

case.

\* \* \*

Controlling law in the 9th Circuit and the Cooper case both make clear that Monsanto's

request for an exhaustive quest into speculative factors is not needed and does not disqualify an

expert from testifying.  Furthermore, Monsanto does not proffer an expert to testify that any of the

above speculative exposures were a substantial factor in causing either Plaintiffs' non-Hodgkin's

lymphoma.

In *Wendell v. GlaxoSmithKline, LLC,* 858 F.3d 1227, 1237 (2017), the 9th Circuit made

clear that

> "We do not require experts to eliminate all other possible causes of a
> condition for the expert's testimony to be reliable. It is enough that the
> proposed cause "be a substantial causative factor."  This is true in patients
> with multiple risk factors, and analogously, in cases where there is a high
> rate of idiopathy."

Noting that Dr. Shustov employed sound methodologies and based his opinions on medical

12

records as well as his education training and experience, knowledge of the pertinent medical literature and his knowledge of the epidemiology, diagnosis and natural history of the disease, (hepatosplenic T-cell lymphoma) the 9th Circuit reversed the trial court's grant of summary judgment on the basis that Plaintiff did not present admissible expert testimony of causation. Id. at 1234.

Likewise, in _Cooper v. Takeda Pharmaceuticals America, Inc.,_ 239 Cal. App. 4th 555 (2014), the California Court of Appeals reversed the trial court's determination that the expert, Dr. Smith, was required to rule out all other possible causes for plaintiff's bladder cancer, even where there was no substantial evidence that other such causes might be relevant.

In _Cooper_ the defendant argued that the plaintiff was subject to environmental and occupational exposures, including exposure to second hand smoke at work and potential exposure to "anything" during his army service and therefore the expert's opinion should be excluded for failure to track down and investigate these multiple potential causative factors of Plaintiff's bladder cancer.

The Court concluded that

> Thus, because California has rejected the notion that a plaintiff must definitively exclude all possibilities other than the defendant's conduct or product as the cause of the plaintiff's harm, clearly an expert, in reaching a specific causation opinion, need not exclude all other possibilities before he or she can express an opinion that the defendant's conduct or product caused the plaintiff's harm. Id. at 580.
>
> * * *
>
> Under the applicable substantial factor test, it is not necessary for a plaintiff to establish the negligence of the defendant as the proximate cause of injury with absolute certainty so as to exclude every other possible cause of a plaintiff's illness, even if the expert's opinion was reached by performance of a differential diagnosis. The jury here was required to determine whether there was any substantial evidence that other known risk factors for bladder cancer acted on plaintiff and provided an alternative explanation for his disease. But only if the existence of an alternative explanation, supported

13

by substantial evidence and not mere speculation, as a matter of law defeated the explanation proffered by Cooper (i.e., Actos®) would JNOV be appropriate.  (emphasis original).  Id. at 578.

As demonstrated above, both Dr. Schiff and Dr. Pinter-Brown conducted a proper differential diagnosis as required under Daubert, Wendell and Cooper and PTO 85.  Monsanto's argument that there may have been a conceivable cause that could also account for a particular Plaintiff's NHL and requiring each expert to track down all of those potential remote unsubstantiated causes does not make the experts' testimony inadmissible.

### D. Dr. Schiff and Dr. Pinter-Brown Addressed the Idiopathy Argument Monsanto Now Raises Again.

Monsanto asserts that Dr. Pinter-Brown has in fact addressed idiopathy in her reports (Monsanto's Ex. 2, Peterson Rpt. at 4; Ex. 13 Pecorelli Rpt. at 4), however, Monsanto's opinion is it was "not addressed in a meaningful way." Monsanto's Motion to Exclude, ECF 12789, at 18-19. Monsanto had the opportunity to depose Dr. Pinter-Brown not once, but twice in Mr. Pecorelli's and Mr. Peterson's case and failed to address whatever concerns it still had about Dr. Pinter-Brown's reports. Monsanto also asserts that Dr. Schiff failed to explain the contrast between his testimony that eighty percent of the patients he treated had no known cause for their NHL and his conclusion now that Roundup was the cause of every Plaintiffs' NHL. Id. at 19. However, Dr. Schiff made clear that one of the reasons why the majority of his patients had no known cause of NHL at the time he treated them was because his awareness of the association between glyphosate and Roundup did not occur until after he retired in the Spring of 2015. Monsanto's Ex. 11, Schiff Karman Dep. at 26:23-28:11.

Additionally, Monsanto's "idiopathy" argument is similarly a rehash of the argument this Court also rejected in PTO 85. The Court wrote:

14

Recognizing that "[m]edicine partakes of art as well as science," the Ninth Circuit's recent decisions reflect a view that district courts should typically admit specific causation opinions that lean strongly toward the "art" side of the spectrum. *Messick*, 747 F.3d at 1198; *see also Wendell*, 858 F.3d at 1237 ("The first several victims of a new toxic tort should not be barred from having their day in court simply because the medical literature, which will eventually show the connection between the victims' condition and the toxic substance, has not yet been completed." (*quoting Clausen*, 339 F.3d at 1060)).

* * *

Under Ninth Circuit caselaw, doctors enjoy wide latitude in how they practice their art when offering causation opinions. *See Wendell*, 858 F.3d at 1237 ("Where, as here, two doctors who stand at or near the top of their field and have extensive clinical experience with the rare disease or class of disease at issue, are prepared to give expert opinions supporting causation, we conclude that *Daubert* poses no bar based on their principles and methodology."). It is sufficient for a qualified expert, in reliance on his clinical experience, review of a plaintiffs' medical records, and evaluation of the general causation evidence, to conclude that an "obvious and known risk factor[]" is the cause of that plaintiff's disease. *See Wendell*, 858 F.3d at 1235. Here, the specific causation experts did that. Relying on the plaintiffs' admissible general causation opinions – which assert a robust connection between glyphosate and NHL – the experts concluded that glyphosate was a substantial factor in causing the plaintiffs' NHL.

* * *

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

Moreover, the experts relied heavily on the plaintiffs' exposure levels in drawing their conclusions. All three experts noted the plaintiffs' extensive Roundup usage, and further explained – as did the plaintiffs' general causation opinions – that both the McDuffie (2001) and Eriksson (2008) studies showed a dose-response relationship between glyphosate and NHL. *See generally In re Roundup Products Liability Litigation*, 2018 WL 3368534, at *9-10. Thus, consistent with Ninth Circuit caselaw, the experts provided a basis for their conclusion that these plaintiffs fall into the category of Roundup users who developed NHL. The Court may be skeptical of their conclusions, and in particular of the assumption built into their opinions from the general causation phase about the strength of the epidemiological evidence. But their core opinions – that the plaintiffs had no other significant risk factors and were exposed to enough glyphosate to conclude that it was a substantial factor in causing their NHL – are admissible.

PTO 85 at pp. 5-6 (footnotes omitted).

Thus, because the experts here followed the same methodology as those previously addressed by the Plaintiffs' Bellwether experts, Monsanto's Motion should be denied.

**IV**. **Conclusion**

For the foregoing reasons, the Court should deny Monsanto's Motion to Exclude Dr. Schiff and Dr. Pinter-Brown.

Dated:  April 2, 2021

Respectfully Submitted,


By:     /s/Rebecca Fredona
Ken Moll
Rebecca Fredona
Fatima Abuzerr
**MOLL LAW GROUP**
22 W Washington St
15th Floor
Chicago, IL 60602
T: 312.462.1700
F: 312.756.0045
rfredona@molllawgroup.com

16

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on this 2nd day of April, 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

                                            */s/Rebecca Fredona*

17