# Exhibit 2

# Expert Report of

# Matthew Call, MS, CIH, CSP

in the matter of
Gerard Cervantes v. Monsanto Company

**February 12, 2021**



## Contents

Statement of Qualifications ............................................................................................................ 3

Scope of Analysis ............................................................................................................................ 5

Documents Reviewed and Background Data for Glyphosate .......................................................... 5

    Chemical Properties of Glyphosate ............................................................................................ 5

    Potential Routes of Entry ........................................................................................................... 6

    Dermal studies ........................................................................................................................... 9

    Toxicokinetics .......................................................................................................................... 12

    Passive Dosimetry and Biomonitoring .................................................................................... 14

    Human Epidemiological Studies ............................................................................................... 16

    Regulatory Levels ..................................................................................................................... 19

    Label and SDS reviews ............................................................................................................. 20

Exposure and Dose Risk Assessment Methodology ..................................................................... 22

    Interpretation of Risk Assessment Results .............................................................................. 24

Description of Gerard Cervantes' use of Glyphosate-Based Herbicides ....................................... 25

Dermal Exposure Estimation Using ADD ...................................................................................... 27

    Confounding factors ................................................................................................................ 31

Site visits ...................................................................................................................................... 31

Rebuttal ........................................................................................................................................ 32

Opinions ....................................................................................................................................... 35

Conclusion .................................................................................................................................... 36

## Statement of Qualifications

I am the owner and President of Industrial Hygiene Resources, Ltd. (IHR), an independent industrial hygiene consulting firm based in Boise, ID. My consultation practice focuses on the protection of worker health, including exposure assessments, risk assessments, application of toxicity data, review of applicable regulations and standards, and recommendation of actions designed to reduce exposures and risks, where applicable. My educational background includes a Bachelor of Science degree in Public Health with an emphasis on Industrial Hygiene from Utah State University and a Master of Science degree in Environmental Science with an emphasis in environmental toxicology from Washington State University. I am also a Certified Industrial Hygienist (a diplomat of the American Board of Industrial Hygiene [ABIH]) and Certified Safety Professional by the Board of Certified Safety Professionals. I am an active member of the American Industrial Hygiene Association (AIHA). I am a past-president and current treasurer of the Idaho Section of the AIHA. I have been practicing industrial hygiene for over 15 years.

My current duties at IHR involve consulting for a variety of companies and government agencies, many of which do not have the resources to have a full-time industrial hygienist (small to medium sized businesses, school districts, etc.). My duties to clients include protection of employees (or other individuals potentially exposed to occupational hazards) by using scientific methods to provide an objective assessment of potential workplace exposures to identified hazards associated with specific job tasks or work environments. Exposure and risk assessments are interpreted using toxicity data, regulatory requirements, and consensus standards with the goal of developing recommendations for ensuring a safe, healthful, and productive workplace.

I am experienced in studying the known mechanisms of toxicity of chemical and biological compounds such as particles (metals, silica, asbestos), volatile organic compounds (VOCs), herbicide/pesticides, bacterial and mold, and toxic gases such as carbon monoxide or hydrogen sulfide. I have personally conducted dozens of industrial hygiene exposure assessment projects each year for over 10 years with IHR and have planned and directed many more from the office. I have also performed retroactive exposure assessments as necessary (not part of a litigation) to estimate past potential employee exposures to compounds including asbestos and respirable crystalline silica. I have been retained in this case as an expert in industrial hygiene.

My previous work with herbicides and pesticides includes airborne exposure assessments for 2,4-D, chlordane, lindane, aldrin, dieldrin, endrin, thiram, imidacloprid, thiamethoxam, azoxystrobin,

fludioxonil, spinosad, and others. I also have experience working directly with herbicides and pesticides. I worked briefly as a mixer/loader for a crop-dusting company in Twin Falls, Idaho after graduating from high school.

Industrial hygiene is the science of protecting and enhancing the health and safety of people at work and within their communities. Anticipation, recognition, evaluation, and control of hazards, including chemical hazards, is the principal goal of the profession. The evaluation of chemical exposures is not limited to estimating exposure. Industrial hygienists also work with exposure limits and biological exposure markers that are based on the dose, route(s) of entry, target organ(s), metabolites, metabolic pathways, and excretion of the chemical compounds of interest. A Certified Industrial Hygienist (CIH) is an individual who has met the minimum requirements for education and experience, and through examination, has demonstrated a minimum level of knowledge and skills in the following rubric (subject matter) areas: air sampling & instrumentation, analytical chemistry, basic science, biohazards, biostatistics & epidemiology, community exposure, engineering controls and ventilation, ergonomics, health risk analysis & hazard communication, industrial hygiene program management, noise, non-engineering Controls, radiation – ionizing and non-ionizing, thermal stressors, toxicology, and work environments & industrial processes.

During my career as an independent Certified Industrial Hygienist, I have gained extensive experience with worker and community exposure to a wide range of chemical products that includes herbicides/pesticides, corrosive products (acids and bases), cleaning products such as organic solvents, chlorinated compounds, oxidizers, building product with asbestos, lead, or silica, and various others. My experience in assessing exposures to chemical products includes exposure quantification methods, exposure and dose modeling methods, review of toxicokinetic data, and review of toxicology data. My experience also includes both hazard communication, using product data, safety data sheets, and product labels; and risk communication, using exposure data and work practice observations.

I also conduct training courses for industry personnel and professionals about the hazards and risks of their work, and how workers who are potentially exposed to hazardous agents can minimize the risk of adverse health effects. My teaching experience may range from formal classroom training to informal discussions with small groups or individual workers.

A copy of my curriculum vitae is attached in Appendix A of this report. The opinions in this report are based on currently available research and information and are stated with a reasonable degree of scientific certainty. I reserve the right to amend my opinions should new information become available. I have not been deposed or testified in trial in the past four years. My hourly rate for expert witness services is $450.00 per hour.

## Scope of Analysis

I have been retained as an expert in toxicology and industrial hygiene. I have been asked to conduct an assessment of the available literature and data regarding the absorption, distribution, metabolism, and excretion of glyphosate in individuals using glyphosate-based herbicides. I have also been asked to conduct a retroactive assessment of Mr. Cervantes' exposure to glyphosate and internal dose of glyphosate and then to compare these to established regulatory risk levels and dosing published in carcinogenicity studies.

## Documents Reviewed and Background Data for Glyphosate

I have reviewed scientific literature concerning the chemical properties and toxicology of glyphosate and glyphosate salts, including dermal studies (in vitro and in vivo), toxicokinetic studies, biomonitoring and passive dosimetry studies, and epidemiological studies. I have reviewed materials from government agencies regarding occupational exposure assessments as well as the safety data sheets (SDSs) and labels for products containing glyphosate salts. I have also reviewed the complaint and depositions of Mr. and Mrs. Cervantes. I have also reviewed the reports of plaintiff's experts, including Dr Sawyer. A list of case-specific documents I have reviewed is presented in the Materials Considered List.

### Chemical Properties of Glyphosate

A review of chemical properties is essential in any exposure assessment to determine which routes of entry into the body are relevant when glyphosate-based herbicides are used. There are four major routes of entry for any chemical to enter the body: inhalation, absorption (through skin or eyes), ingestion, and injection. The chemical properties of a substance heavily influence how it is transported through the environment and which entry route(s) is available into the body. I reviewed the chemical properties of glyphosate acid (Chemical Abstract Service [CAS] #1071-83-6) and glyphosate-isopropylamine salt (CAS #38641-94-0) as it is one of the most common active ingredients in consumer Roundup formulations. The chemical properties reviewed are summarized in Table I.

Glyphosate acid (referred to as simply glyphosate) has the molecular formula $C_3H_8NO_5P$. Glyphosate contains carbon and phosphorus, and is technically classified as an organophosphonate compound (O'Brien [1967]). It is sometimes referred to as an "organophosphate that is not a cholinesterase inhibitor" (NCBI 2019a) and it should not be confused with the organophosphate insecticides that do inhibit cholinesterase. Pure glyphosate is a crystalline solid or powder with a molecular weight of is 169.1 grams per mole (g/mol). Glyphosate is moderately soluble in water at standard ambient temperature at 10.5 g/L at 25°C (Turner 2018). The vapor pressure of glyphosate is extremely low at $9.83 \times 10^{-8}$ Torr. The octanol/water partition coefficient indicates how hydrophilic (water-loving) or how hydrophobic (water-fearing) a chemical substance is, and is expressed as log $K_{ow}$. A positive log $K_{ow}$ generally indicates that a compound is lipophilic (fat-loving) and can dissolved into lipids, while a negative log $K_{ow}$ shows that the compound is water soluble. The log $K_{ow}$ for glyphosate is less than -3.2 (Turner 2018). These chemical properties help to define how glyphosate will behave upon contact with a semi-permeable membrane, such as the skin.

Glyphosate isopropylamine salt is also a crystalline solid or powder. It has the molecular formula $C_6H_{17}N_2O_5P$ and has a molecular weight of 228.18 g/mol (NCBI 2019b). Importantly, glyphosate amine salts are readily soluble in water at 1,050 g/L at 25°C (NCBI 2019b). The vapor pressure of glyphosate isopropylamine salt is even lower than that of the acid at $1.58 \times 10^{-8}$. The $K_{ow}$ is also lower for the isopropylamine salt at -5.4, which is congruent with the higher water solubility.

**Table I.** Chemical properties of glyphosate acid and glyphosate isopropylamine salt (Turner 2018; NCBI 2019 a&b)

|  | Glyphosate acid | Glyphosate isopropylamine salt |
|---|---|---|
| Chemical formula | $C_3H_8NO_5P$ | $C_6H_{17}N_2O_5P$ |
| Molecular weight | 169.07 g/mol | 228.18 g/mol |
| Solubility | 10.5 g/L (at 25°C) | 1,050 g/L (at 25°C) |
| Vapor Pressure | $9.83 \times 10^{-8}$ Torr (at 25°C) | $1.58 \times 10^{-8}$ Torr (at 25°C) |
| Log $K_{ow}$ | <-3.2 | -5.4 |

## Potential Routes of Entry

The above chemical properties, as well as the method of application, are major factors in determining potential exposure pathways and potential routes of entry during normal use of glyphosate-based products.

*Inhalation*

Due to its extremely low vapor pressure, glyphosate does not become airborne through evaporation in a normal range of ambient temperatures and pressures. Therefore, the only way glyphosate would be available for inhalation is through an aerosolization of liquid droplets (spray). Because the droplet size is typically large during normal spray application and the spray is directed towards the ground, inhalation should not be a significant exposure pathway for glyphosate. Several studies have confirmed that airborne concentrations from spray applications do not present a significant exposure potential.  Edmiston 1995 studied CalTrans workers and found that their potential inhalation exposure was less than 1% of their potential dermal exposure while applying glyphosate. Chang 2011 studied airborne glyphosate concentrations during two growing seasons in Mississippi and Iowa and found a range of only <0.01 – 9.1 ng/m$^3$ (Non-detectable to ~1 ppt). Solomon 2016 used the airborne concentrations reported by Chang 2011 and estimates of respiratory volume and absorption to calculate an estimated internal dose from inhalation of only 1.04 x 10$^{-6}$ mg/kg bw/day. Solomon reported the dose from skin absorption (90[th] centile dose) to be 0.0014 mg/kg bw/day. Therefore, the dose from inhalation was less than 1/1000[th] of measured biomonitoring dose. Jauhianen 1991 studied air concentrations of glyphosate in the breathing zone of applicators using a relatively high concentration (8%) of glyphosate. During spraying activities that lasted between one and six hours, Jauhianen 1991 reports low airborne concentrations of glyphosate that ranged from non-detectable to 15.7 micrograms per cubic meter (μg/m$^3$). Because the recommended product concentrations for residential use are much lower than 8% (typically 1-2%), the airborne concentration that Jauhianen 1991 reported represents a much higher exposure potential than would be expected from typical residential use. Acquavella 2004 also cites Jauhianen 1991 to support the fact that the assertion that inhalation is not a likely route of exposure. Pierce 2020 reported air concentrations present in each of the breathing zones of 12 applicators during mixing and continuous spraying of 16.3 gallons of a 0.96% glyphosate solution. The airborne concentrations ranged from 3 μg/m$^3$ to 7.5 μg/m$^3$, less than half of the low concentrations reported by Jauhianen 1991.

*Absorption (dermal)*

The relatively high solubility and negative log $K_{ow}$ of both glyphosate and its salt indicate that neither compound will quickly or efficiently pass through skin. However, both compounds can slowly permeate skin in small amounts. Even with its slow permeation through skin, several studies have shown this to be the primary exposure route, accounting for up to 99.9% of total exposure (Lavy et al. 1992, Flack et al. 2008, Vitali et al. 2009).  Small amounts of glyphosate can

be absorbed through the skin (from 0 to ~2% of the amount applied to the skin over the testing time period) as shown by Wester 1991, Smith 2014a, b, 2015, Ward 2010a, b, c, Davies 2015a, 2015b, 2016, and 2017, Franz 1983, and Nielsen 2007 & 2009. These in vitro studies confirm that small amounts of glyphosate can be absorbed through the skin (<~2%). These studies are discussed later in further detail.

The available research involving herbicide applicators confirms that dermal absorption is the principal route of exposure while demonstrating the slow rates of permeation. The Farm Family Exposure Study (Acquavella et al. 2004) conducted biomonitoring for farmers and their spouses and children. The systemic dose of those farmers that did not use gloves was well below the EPA reference dose (due to the slow permeation rate); however, those that did wear gloves had far lower systemic doses, indicating that dermal absorption is the primary exposure route. Edmiston 1995, mentioned in the previous section, had similar results regarding dermal exposures. The absorbed doses of the CalTrans workers were all well below the reference dose, and the vast majority of those small doses were shown to be from dermal absorption.

*Ingestion*

Commercial products containing formulations of glyphosate isopropylamine salt are most commonly in the liquid form, making ingestion a possible, but unlikely, route of exposure. Intentional ingestion is rare and has little relevance to incidental exposures. Inadvertent ingestion would typically involve small amounts of glyphosate (Connolly 2019). However, as unlikely as ingestion is as a potential exposure route, I will discuss the available data regarding distribution, metabolism, and elimination of glyphosate after ingestion. The data available from ingestion studies is useful when comparing internal doses from other exposure routes.

*Injection*

To my knowledge, glyphosate-containing products are not sprayed with high enough pressure to break through intact skin. Therefore, inadvertent injection through the skin is not a reasonable route of exposure. Intentional IV dosing in animal studies is relevant in the study of toxicokinetics because these studies indicate what happens to the small amount of glyphosate that may get past the skin barrier, and these studies can achieve very good mass balance (near 100%). However, injection is not a significant route of exposure to users of glyphosate-based herbicides and will not be discussed further.

Dermal studies

The following dermal studies involve testing how glyphosate-based herbicides are absorbed through the skin. It is relevant to briefly discuss the structure of the skin.

The skin is the largest organ in the human body and is the barrier that both protects the body from substances in the environment and limits the loss of fluids from the body. It is made up of several parts: the epidermis (including the stratum corneum), dermis, hypodermis, and hair, hair follicles, sebaceous and sweat glands, and other skin structures (See figure 1). The stratum corneum (SC) is described as a brick and mortar structure: multiple layers of flattened, dead cells act as the bricks and the lipids act as the mortar. The main protective barrier against external chemicals is provided by the lipid matrix in the SC.



**Figure 1.** Sketch of the structure of human skin layers. From Lu 2018

The lipids in the skin resist absorption and penetration of external chemicals, particularly water-based chemicals (as opposed to lipophilic solvents that may be more readily absorbed). Because the outer layer of skin (stratum corneum) is comprised of non-viable (dead) cells, human skin may be excised and used for *in vitro*[1] laboratory tests. The Organization for Economic Cooperation and Development (OECD) has published testing guidelines for skin permeation to facilitate the selection of appropriate *in vitro* procedures to ensure reliable test results.

---

[1] Taking place in a test tube, or elsewhere outside of a living organism

Most of the studies discussed here were performed with formulated glyphosate products that contained both active ingredients (glyphosate) and inactive ingredients, including surfactants such as polyoxyethyleneamine (POEA- CAS No. 61791-26-2). In general, surfactants are added to break the natural surface tension of water to allow water to better coat the surfaces it is applied to.

The Wester 1991 study used formulated Roundup and human thigh skin in glass penetration cells to perform both *in vitro* and *in vivo* percutaneous absorption tests. The *in vitro* tests reported a percentage range of glyphosate that permeated the skin from zero to about 2 percent over 16 hours. Further testing showed that vast majority of the applied glyphosate was recovered from the top of the penetration cell (i.e., the glyphosate was not absorbed). From the percent absorption reported, I calculated the absorption rate as flux to compare to other studies that report flux. The flux is the amount of glyphosate that penetrates a square centimeter of skin in one hour. The flux measured in this study ranged from 0.000 to 0.077 $\mu g/cm^2/hr$, with an average of 0.012 $\mu g/cm^2/hr$.

The Smith 2014a, 2014b, and 2015 studies used three different initial concentrations of formulated glyphosate and two dilutions to simulate an applicator's exposure. The herbicide was applied to the skin and left for six hours. The investigators then washed the skin and continued to measure absorption of glyphosate for a total of 24 hours. The reported flux measurements ranged from 0.001 to 0.056 $\mu g/cm^2/hr$, with an average of 0.016 $\mu g/cm^2/hr$.

The Ward 2010a, b, and c studies used three different initial concentrations of formulated glyphosate and six additional dilutions to simulate an applicator's exposure. The herbicide was applied to the skin and left for six hours. The investigators then washed the skin and continued to measure absorption of glyphosate for a total of 24 hours. The reported flux measurements ranged from 0.001 to 0.027 $\mu g/cm^2/hr$, with an average of 0.011 $\mu g/cm^2/hr$.

The Davies 2015a, 2015b, 2016, and 2017 studies used four different initial concentrations of formulated glyphosate and two additional dilutions to simulate an applicator's exposure. The herbicide was applied to the skin and left for six hours. The investigators then washed the skin and continued to measure absorption of glyphosate for a total of 24 hours. The reported flux measurements ranged from 0.001 to 0.027 $\mu g/cm^2/hr$, with an average of 0.012 $\mu g/cm^2/hr$.

The Franz 1983 study used three different initial concentrations of glyphosate, including two formulated product concentrations similar to a concentrate and a spray mix that would normally be used by consumers. The herbicide was applied to the skin and left for up to 48 hours. The flux measurements were calculated from the percent absorbed data and ranged from 0.004 to 0.094 $\mu g/cm^2/hr$, with an average of 0.055 $\mu g/cm^2/hr$.

In the Nielsen 2007 study, the authors used a glyphosate solution to test *in vitro* skin absorption over 48 hours in both intact and damaged skin. The flux measured for the intact skin was 0.016 $\mu g/cm^2/hr$, well within to range of the previous tests performed with formulated products.

In the Nielsen 2009 study, the authors investigated the effect that the physiochemical properties of glyphosate had on lag time, skin deposition, and skin penetration in tests with human skin. The highest flux reported for glyphosate was 0.0236 $\mu g/cm^2/hr$. The lag time was close to 8 hours, the deposition after 48 hours totaled 0.7% of the applied amount, and only 0.4% had penetrated the skin into the receptor chamber.

One *in vitro* study with rat skin (van Bergsteden 2003) reported as high as 10% absorption. This study was problematic for several reasons. Firstly, and perhaps obviously, rat skin does not approximate human skin nearly as well as human skin does. But more importantly, the authors themselves found the data to be unreliable. They stated, "The results of the autoradiography show too much variation to draw any conclusions." They went on to say "Due to the high variation in dermal penetration within the test groups and the poor recoveries, the data presented in this report are not acceptable for regulatory use and risk assessment." Finally, in the conclusion section of the study, the authors repeated, "In general, the poor recoveries combined with the high variation within the glyphosate test groups make the data generated in this study unsuitable for risk assessment." There also appeared to be several errors and inconsistencies within the data reported, such as the initial concentrations of formulated product, amount applied, and flux values.

I will use the flux values from the above human skin studies later in this report to compare to the flux values I calculate as part of my risk assessment. I will calculate the expected flux values from information given in the plaintiff's deposition to estimate the dose associated with his use of glyphosate-based herbicides. The expected flux values should fall within the same general range as the values reported in the literature.

When exposure conditions allow for a small portion of the glyphosate-based herbicide that comes into contact with skin to penetrate through the skin, that portion enters into the blood stream. Once the herbicide enters into the blood stream, it will behave the same regardless of how it got in the blood stream. The following section on toxicokinetics addresses the distribution, metabolism, and elimination of glyphosate in the blood, which applicable to internal doses of glyphosate from any route of entry.

<u>Toxicokinetics</u>

As discussed above, very little glyphosate is absorbed through the skin. However small the amount that passes through the skin, the glyphosate will enter the blood stream. The same is true for other routes of exposure: whether glyphosate is absorbed through the lungs, the GI tract, or the skin, it will pass into the blood. Once in the blood stream, glyphosate can be distributed to other body tissues or metabolized into other compounds. Notably, absorbed glyphosate is almost all (96-99%) eliminated in the urine without being metabolized (Wester 1991). In the Wester 1991 study, 96-99% of two intravenous doses in monkeys (Doses A and B) of a formulated Roundup product were recovered in the urine. These doses show that formulated product in the blood stream is eliminated in the urine. In addition, two topical applications of formulated product were applied (Doses C and D) and only 2.2% and 0.8%, respectively, of the applied doses were recovered in the urine. These doses show that only 2.2% and 0.8% of the applied doses may have absorbed through the skin, respectively. A portion of the topical dose D (3.6%) was recovered from the feces of the monkey. Based on the data from the previous three doses (A-C), this portion of the applied product never entered the blood stream, but was likely ingested by the monkey and then recovered in the feces (see next paragraph). Doses A and B show that when formulated glyphosate product enters the blood stream, it is almost all excreted in the urine. This observation is consistent with the expectation that chemicals with high water solubility such as glyphosate will be excreted from the blood almost exclusively in the urine.

In the case of an oral dose, studies relied upon by regulators have reported that a range of 7-40% of an oral dose of glyphosate is absorbed from the gastrointestinal (GI) tract into the blood. In the Brewster 1991 study, a range of 35-40% of an oral dose of glyphosate in rats was absorbed from the gastrointestinal (GI) tract into the blood and tested in the urine. The NTP[2] 1992 study estimated approximately 30-34% of a single oral dose of glyphosate was absorbed from the GI

---

[2] National Toxicology Program (U.S.)



tract in rats (as tested in urine). The ATSDR[3] toxicological profile for glyphosate 2019 reports a range of 7-36% from several unpublished studies. These studies can determine the percent of an oral dose that is absorbed from the GI tract into the blood by testing urine because almost all the glyphosate in blood (99%) is excreted in the urine, regardless of how it entered the blood (i.e., through skin absorption or GI absorption).

The Brewster 1991 study reported that after 7 days, virtually all of the large doses given to test animals (approximately 99%) had been eliminated, without being metabolized. This is supported by The Pesticide Manual, published by the British Crop Production Council, which states that glyphosate does not bioaccumulate in the body (Turner, 2018). These results are supported by the Connolly 2018b study that determined an average half-life of glyphosate in the body of 7.25 hours. The Brewster 1991 study also reported that the primary environmental metabolite (AMPA) was tested and was not present except in a few rats at less than 0.1% of the dose, indicating that glyphosate is excreted unchanged. In a case of intentional ingestion (suicide attempt), the total urinary excretion included a glyphosate to AMPA ratio of 148:1, further demonstrating that glyphosate does not undergo significant metabolism (ATSDR 2019). The ATSDR also summarized a study where small amounts of AMPA (0.2-0.4% of the administered oral dose of pure glyphosate) were present in urine and feces and no AMPA was present following IV injection. These studies all confirm that glyphosate is not metabolized in significant amounts after a dermal, oral, or IV dose.

The Wester 1991 study also confirms that glyphosate is not stored in body organs (no bioaccumulation). No traces of the radiolabel $C^{14}$ glyphosate was present in the spleen, ovaries, kidney, brain, liver, abdominal fat, bone marrow, upper spinal column, or nervous system fluid after the 7-day excretion period. The McEwen study published in the German BfR 2015 also tested distribution into organs (in rats) after 6 hours, 18 hours, and 7 days of an oral dose. Only 0.3% of the original dose was still present in the carcass. Notably, only a maximum of 0.12% of the original dose was present in the bone after 6 hours, which decreased to 0.02% after 7 days. In bone marrow, only a maximum of 0.01% of the original dose was present in the bone after 6 hours, which decreased to <0.01% (not detectable) after 7 days. These studies show that glyphosate does not remain in body tissues such as skin, bone, or bone marrow and they confirm that any glyphosate that may be absorbed into the blood stream is eliminated in the urine.

---

[3] Agency for Toxic Substances and Disease Registry



## Passive Dosimetry and Biomonitoring

Scientists have used both passive dosimetry (gauze patches attached to the outside of the body or clothing) and biomonitoring (urine analysis) to measure the exposure and dose of potential glyphosate exposure during use of herbicides. Passive dosimetry studies have been useful in defining the if and how exposure occurs.

Passive dosimetry studies conducted for applicators using glyphosate in similar ways to many consumers (application with a wand sprayer) indicate that the main location for dermal exposure is, not surprisingly, the legs, especially the lower legs/ankles. Lavy 1992 showed that among applicators using hand sprayer and tractor sprayers (nursery workers), the vast majority (>98%) of the exposure was to the ankles (77%) and thighs (21%). Johnson 2005 studied municipal roadside weed control workers and found that approximately 85% of potential dermal exposure was on the upper (~20%) and lower legs (~65%), with ~12% of exposure to the back (from use of backpack sprayers).

Passive dosimetry was also used to measure how normal work clothing affected potential skin exposure to glyphosate. Lavy 1992 used passive dosimetry inside and outside of clothing to conclude that clothing played a protective role, observing that only about 23% of the exposure penetrated the clothing. Johnson 2005 found that, of formulated product found on the outside of the workers' clothing, only approximately 11% had passed through the clothing to the skin. These results were consistent with the Oltmanns 2016 conclusion that normal clothing provided a 70.5% protection factor. Espanhol-Soares 2013 studied both 100% cotton and 61/39 Cotton-polyester blend garments over time. The 100% cotton garment provided over a 90% protection factor after 30 washes and the blended garment provided over a 70% protection factor after 30 washes. Between these four studies, normal work clothing provided a protection factor range between about ~70-90%.

Passive dosimetry is limited, however, when studying health effects or toxicokinetics in that it does not directly measure an individual's internal dose. Biomonitoring, on the other hand, does directly measure a marker of an individual's internal dose. In the case of glyphosate, biomonitoring using urinalysis is an effect measure of dose given that more than 96% of glyphosate that enters the bloodstream is excreted in the urine within days of the exposure (Wester 1991). The Cowell 1990a study tested forestry nursery workers using both passive dosimetry and biomonitoring. The passive dosimetry indicated that there was exposure to glyphosate, but the biomonitoring showed no detectable dose. The authors concluded that doses

of glyphosate in urine were unmeasurable[4] due to clothing protection and low dermal penetration. Passive dosimetry alone does not directly measure either of these factors.

Solomon 2016 and the updated Solomon 2019 noted that studies that use biomonitoring (vs. passive dosimetry alone) for glyphosate provide the most useful data to assess the risk of adverse health outcomes. He stated, "For compounds, such as glyphosate, where the excretion kinetics is well understood, biological monitoring provides a measure of the actual amount of the chemical in the body. For this reason, data from these studies are most appropriate for risk assessment." I agree with Solomon that biomonitoring data is the best indicator of dose and is the most appropriate for risk assessment. Solomon goes on to say that passive dosimetry can be used in conjunction with absorption data, body surface area data, and clothing protection data for the assessment of systemic dose.

It is important to note that Acquavella 2004 reported in his study of farmers that some of the applicators did not have glyphosate in their urine despite applying the product to over 100 acres. On the day of application, ~60% of farmers had some detectable level of glyphosate in urine, and this percentage went down in subsequent days after application. From this data, we can infer that at least 40% of the farmers who used glyphosate to treat very large areas (10 to >400 acres) did not receive any measurable dose of glyphosate, demonstrating that a person may use glyphosate without receiving an exposure or measurable internal dose. This information clearly indicates that the use of glyphosate-based herbicides is not of itself a measure of exposure or dose.

In addition, Acquavella 2004 estimated systemic doses from the biomonitoring data in the Farm Family study. The distribution of systemic doses was highly skewed: >90% of the estimated doses were below 0.001 mg/kg/d. The mean systemic dose was 0.0001 mg/kg/d and the maximum dose was 0.004 mg/kg/d. The herbicide use associated with this maximum dose included:
1) Applying herbicide to a farm between 45 and 124 acres
2) Spills were observed during both mixing/loading and application
3) No use of rubber gloves was observed
4) Skin contact with the herbicide was observed
5) Contaminated equipment was repaired during the observation period
6) No closed system or cab was used to mix, load, or apply

---

[4] Below limits of detection. Later studies have since achieved lower limits of detection.



Based on this highest recorded dose, it is clear that the resulting dose is well below regulatory levels. A similar conclusion was reached in Kougias 2020 where the highest dose (from both inhalation and dermal) following a 100-minute application with a backpack sprayer while wearing shorts and a t-shirt and multiple mixing/loading procedures was $5.9 \times 10^{-3}$ mg/kg.

## Human Epidemiological Studies

I have reviewed several studies used in carcinogenicity assessments performed by the International Agency for Research on Cancer (IARC), the Environmental Protection Agency (EPA), the Joint FAO/WHO Meeting on Pesticide Residues (JMPR), and the Australian Pesticides and Veterinary Medicine Authority (APVMA). The IARC 2015 Monograph classified glyphosate as Group 2A, meaning probably carcinogenic to humans, based on "limited" evidence of cancer in humans and "sufficient" evidence of cancer in animals. The EPA concluded that glyphosate is "not likely to be carcinogenic to humans". The JMPR concluded that glyphosate is unlikely to pose a carcinogenic risk to humans from exposure through the diet. The APVMA initially reviewed glyphosate in 1997, and re-reviewed it in 2016 (after the IARC assessment). APVMA 2017 concluded that glyphosate does not pose a carcinogenic risk to humans and that there were no grounds to place it under formal reconsideration.

In my practice as an industrial hygienist, I review epidemiological studies in order to assess the potential hazards of a substance as they relate to exposure and risk. To an industrial hygienist, a hazard is defined as a source of *potential* harm. In other words, a hazard is something that *can* cause damage, even if only in extreme situations. A risk is defined as the chance or probability that a person will be harmed in a specific exposure scenario. That is to say risk is the likelihood that something *does* cause damage in an actual situation. However, it is important to note that being at risk from a hazard is not to say that the hazard has caused or will cause damage.

My assessment of the risks of exposure to individual Roundup users is centered around an established dose limit, such as the EPA reference dose. The methods used to derive such dose limits depend on the accepted toxicological endpoints for a specific chemical. The method used to derive dose limits for carcinogens is very different from the method used to derive dose limits for non-carcinogens. The purpose of my review of the relevant literature was to determine the appropriate methodology for my risk assessment of individual Roundup users.

The Agricultural Health Study (AHS) is the largest and highest quality study of glyphosate-based herbicides and cancer (including NHL) to date. Data from the Agricultural Health Study (AHS) was

published by De Roos 2005 and updated by Andreotti 2018. The updated study was not considered by IARC (the monogram preceded the update). The AHS included 44,932 subjects who used glyphosate. The study categorized cases into quartiles based on intensity-weighted lifetime days of use of glyphosate-based herbicides. The intensity weighting was based on what application method was used and whether the person had mixed concentrated herbicide, sprayed diluted herbicide, repaired potentially-contaminated equipment, or used personal protective equipment. The intensity weighting helped to approximate the likely dose range of the participant. The results were adjusted for adjusted for age, smoking, alcohol use, family history, and use of other pesticides. The AHS found that the use of glyphosate-based products was not associated with total cancer or NHL specifically. None of the individual exposure quartiles were associated with total cancer or NHL. The third quartile (2nd to the highest exposure) showed the highest risk estimate at 0.88 (CI: 0.65, 1.19), showing no association with NHL. The 4th and highest exposure group resulted in a technically lower risk estimate (RR: 0.87; CI: 0.64, 1.19), though both of these higher exposure quartiles had an almost identical relative risk, both showing no association with NHL.

From the perspective of an industrial hygienist, the excellent quality of the AHS is due not only to its size, but also because it considers dose by measuring intensity-weighted lifetime days of glyphosate use. The classification of subjects into quartiles using intensity weighting allows the authors to accurately estimate exposure levels to glyphosate and to then determine a dose-response based on NHL cases within that exposure quartile. Dosemeci 2002 showed that exposures could be estimated if the intensity of the glyphosate use is understood. Coble 2011 later refined the intensity weighting methods to more accurately estimate doses from the AHS. This approach differs from that of studies that only differentiates between someone who has ever used glyphosate and someone who has never used it (ever/never data), or those that only measure total lifetime days of use. As established previously in this report, the fact that glyphosate was used (with no other data about the intensity of the use) does not correlate with dose.

The Eriksson 2008 study claims to find an association between glyphosate use and NHL. However, the study is a case-control study, where individuals with cancer (cases) and individuals without cancer (controls) were asked about past exposures to glyphosate. This questionnaire-based study introduces both recall and selection bias. Recall bias is a well-known problem for case-control studies. This recall bias was likely exacerbated by selection bias, where cases and controls are either included or excluded from the study based on their answers to the questionnaire. The

selection bias augmented the recall bias in Eriksson 2008 and caused the reported risk level to artificially high, as shown by Crump 2019. Also, the metric studied by Eriksson 2008 was lifetime days of use, and did not consider the intensity of use or attempt to estimate dose. Finally, the Eriksson 2008 study does not initially adjust for common confounders, most notably smoking or the use of other pesticides. Within the study, the authors perform a multivariate analysis that adjusts for the use of other pesticides, as well as age, sex and year of diagnosis or enrollment. When the study accounts for the use of other pesticides, it finds no statistically significant association between glyphosate and NHL.

The Hardell 2002 study performed a pooled analysis of two case-control studies. This study was very similar to the Eriksson 2008 study in that the same recall and selection bias as discussed above were present as shown by Crump 2019. Also, it did not initially adjust for the use of other pesticides. When the results are properly adjusted to account for confounding factors, there is no statistically significant increase in the risk estimate.

I also reviewed the McDuffie 2001 study. As a small case-control study, it likely overestimated the risk of NHL from exposure to glyphosate due to the presence of recall and selection bias (Crump 2019). The data collected from cases and control was initially ever/never use data, followed up with the total time per year of exposure. No estimation of dose was attempted. Also, the results were not adjusted for common confounding variables, such as the use of other pesticides. No statistically significant increase in risk was reported in this study, after controlling for other variables.

There have been several meta-analyses conducted on glyphosate and NHL. It is important to remember that the results of a meta-analysis are only as good as the data used as input into the analysis. Many meta-analyses used studies like McDuffie and Eriksson without taking into account the methodological issues in those studies (discussed above). I give low weight to such meta-analyses. That said, the most recently published meta-analyses, which have acknowledged the potential for bias in the case-control studies, have not shown a statistically-significant relationship between glyphosate exposure and NHL (Donato 2020, Kabat 2021).

Based on my review of data from the available literature, the weight of evidence shows no association between the use of glyphosate-based herbicides and NHL.

Regulatory Levels

Industrial hygienists commonly refer to regulatory or consensus standards to help interpret exposure data and determine relative risk. These standards establish exposure limits, typically for airborne concentrations or biological exposure indicators of dose (e.g., metabolites in urine). These limits can be compared to measured values of exposure or dose to help make decisions that minimize risk in potentially exposed populations.

For glyphosate, there are no established airborne exposure limits or limits of biological exposure indicators (e.g. ACGIH TLV® or OSHA PEL). There are, however, relevant regulatory limits on glyphosate dose (i.e., the amount that enters the body). My exposure and dose reconstruction, detailed in the following sections, will use the available exposure data to model the dose. The estimated dose will then be compared with the relevant dose limits published by both U.S. and international agencies.

I reviewed the relevant regulatory dose limits for glyphosate published by the US EPA, as well as other limits established globally, including the World Health Organization (WHO), the European Food Safety Authority (EFSA), and the California Office of Environmental Health Hazard Assessment (OEHHA). Table II shows the regulatory dose limits published by five agencies. These limits may not be enforceable outside the agencies' jurisdictions, but all five are listed for reference.

These dose limits vary due to the methods used to derive them and the studies considered during each risk assessment. Neither the EPA, JMPR/WHO, nor EFSA found sufficient evidence of carcinogenicity, and therefore, all three of these agencies based their dose limits on the lowest No Observable Adverse Effect Level (NOAEL) among the group of studies considered, with an applied uncertainty factor of 100 to account for inter- and intraspecies differences. The EFSA limits for operators applied an additional factor of 20% to account for limited oral absorption. OEHHA was required to adopt the IARC conclusions and listed glyphosate as a carcinogen for Prop 65 purposes, while the others performed their own assessment and concluded that glyphosate was not a human carcinogen (or not likely to be). Because OEHHA listed glyphosate as carcinogenic under the Prop 65 requirements, the Ca NSRL was extrapolated from a linearized multistage model. Starting with animal data from existing studies that involve very high doses, the model was used to extrapolate what low doses everyday over the course of a lifetime would produce a potential risk of 1 excess cancer case in 100,000.

**Table II**.  Published dose limits in the United States and Europe.

| Agency | Published dose limit (mg/kg bw/day) | Calculated limits based on 70 kg body weight (mg/kg) |
|---|---|---|
| EPA Chronic RfD | 1* | 70 |
| JMPR/WHO ADI | 1 | 70 |
| EFSA (operators) | 0.1 | 7 |
| EFSA (consumers) | 0.5 | 35 |
| Ca NSRL | - | 1.1 |

*In January 2020, the EPA released the interim decision finalizing the 2017 Glyphosate Draft Human Health Risk Assessment for Registration Review, with an RfD of 1 mg/kg bw/day
ADI = Acceptable daily intake
NSRL = No Significant Risk Level

## Label and SDS reviews

Product labels and (material) safety data sheets (SDSs, or previously MSDSs) are two distinct ways of communicating information about a chemical product to different types of end users. For example, pesticide labels affixed to retail chemical products are written for consumer users. The information required on these labels is determined by the EPA and the directions given on the label should be read and followed by the consumer. The information required on an SDS, however, is determined by OSHA, and must accompany chemicals only in an occupational setting. There are no directions for use on an SDS, but employees should be familiar with the information on an SDS as they use a product as directed by their employer.

I have reviewed the labels and SDSs for the Roundup products that are believed to be used by the plaintiff. In my private industrial hygiene consulting practice, reviewing the labels and SDSs is an essential part of all projects that involve potential exposure to chemical products. I frequently review safety data sheets to gather information about potential hazards associated with a chemical product and I use this information to perform an exposure/risk assessment.

Pesticide labels are required and regulated by the EPA under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). Labels are the authoritative document and must be affixed to the product. They contain safety and use information intended for both occupational and non-occupational end users. For non-occupational use, product labels are the only source of safety and use information required to be provided to the user.

In contrast, SDSs are only required to be made available to employees by their employers. They are intended for occupational users, and include more detailed information regarding hazard classification, composition, first-aid measures, fire-fighting measures, accidental release measures, handling and storage, appropriate exposure control and personal protection, physical and chemical properties, toxicological information, ecological information, disposal considerations, transportation information, regulatory information, and other information. SDSs do not provide directions for use of the products. In the case of pesticides, labels and safety data sheets often have differing information. The following paragraphs describe the differences between the two and what the basis is for those differences.

Through its Hazard Communication Standard, the U.S. Occupational Health and Safety Administration (OSHA) requires that 1) manufacturers and importers classify the hazards of chemicals they produce or import, and 2) employers provide information to employees about the hazards of chemicals to which they are potentially exposed. These regulatory requirements must be carried out by manufacturers/importers and employers by means of a Hazard Communication Program which includes: labels and other forms of warning, safety data sheets (SDSs), and information and training.

Prior to 2012, SDSs were known as Material Safety Data Sheets (MSDSs). They are a portion of a larger program meant to ensure that employees have access to information about the hazards of a chemical they may be exposed to while performing their job duties. They are not meant to communicate risk of exposure or disease. They are not meant to dictate handling procedures or personal protective equipment (PPE) requirements, though they do provide information about handling procedures and PPE that would be effective, if needed. There is no requirement to provide SDSs to consumers who may purchase chemical products in retail.

Pesticides are specifically exempt from the labeling requirements of the OSHA Hazard Communication standard, because they are subject to the label requirements of the EPA under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). Label requirements for consumer herbicide products under EPA/FIFRA are intended for consumers. The labels reflect the information about the risks associated with use of the product. The label requirements related to exposure risk typically include such qualifying statements as "when used according to label directions".

With pesticides especially, the SDS and the label are written for different audiences to communicate different information. For this reason, the information contained in each may differ. For non-occupational consumer use, the product label is the authoritative document. The instructions and warnings on the product label are the most relevant and accessible information. The SDS is not intended for the non-occupational end user; however, SDSs are commonly available online to consumers via a simple web search.

## Exposure and Dose Risk Assessment Methodology

The assessment of exposure risk involves two parts; 1) the estimation of the internal dose that may have potentially resulted from the exposure, and 2) the comparison that estimated internal dose to established dose limits discussed above. I have conducted a scientific analysis of estimated dose based on the available exposure information to evaluate the allegations of risk associated with cancer in relation to the use of glyphosate.

The purpose of my analysis is to provide an assessment of the risk associated with potential exposures to glyphosate while using glyphosate-based herbicides. Simply put, a hazard is something that *can* cause harm or disease, while a risk is the likelihood that a hazard will cause harm or disease. For example, the IARC monograph focused on the potential hazards of glyphosate, but per their mandate, no evaluation of risks or characterization of exposure was performed. The exposure and internal dose of glyphosate must be at least estimated for the completion of a valid risk assessment. Without risk assessment, toxicity and hazard data cannot be used to assess the relevance of those hazards to humans.

As an industrial hygienist, my assessment focuses on reconstructing a reasonable estimation of the dermal exposure from the available data on the use of glyphosate-based herbicides. The exposure data, such as the product used, frequency and duration of use, clothing worn, etc., can be used to model the dose. Exposure is the amount of a chemical that is available to be absorbed by the body, and the dose is the amount that actually is absorbed into the body. This determination of dose using well-established models is calculated from the reported exposure to Roundup (from plaintiff's deposition) and used to determine whether the dose is of a sufficient magnitude to produce adverse health effects.

One specific method for estimating exposure and dermal absorbed dose is the Absorbed Daily Dose (ADD) model for dermal absorption. This model was published in Mathematical Models for Estimating Occupational Exposure to Chemical (AIHA press) and in the U.S. EPA Risk Assessment Guidance for Superfund (RAGS) in 2004. The model is based on Fick's law of diffusion, which describes the concentration of a chemical within the skin as functions of both the distance traveled into the skin and time. In the model, Fick's law is used to predict the absorption rate of chemical into the body through the skin.

Inputs into the ADD model include data gathered about an individual's use of Roundup (or any other glyphosate-containing herbicide), the chemical properties, reported use of the product, body weight, and clothing worn during use of the herbicide. In order to determine highest reasonable estimate of what the internal dose might have been, the high end of any reported data ranges was entered into the model. For example, if an herbicide user reports spraying for 15-20 minutes a day, 2-3 times per month, then the input to the model would be 20 minutes a day, 3 times per month. Other conservative assumptions are also made when using this model, such as the assumption that half of exposed and unexposed skin that contacts the herbicide is uniformly (50%) covered. The Lavy 1992 study showed that skin exposure was highly varied, even between samples locations in close proximity to each other on the same body part. Therefore, even a 50% coverage scenario is not realistic in actual exposure situations; however, I will use this scenario to both simplify and reasonably overestimate exposures.

The ADD model also requires an estimation of the surface area of skin exposed during a given exposure event. The skin surface area is determined by the type of use (e.g. mixing vs. spraying with handheld container and wand vs. backpack sprayer vs. ATV with front mounted spray nozzle) and the clothing worn during application. From the plaintiff's deposition and from the information published in the passive dosimetry studies from Lavy 1992, Johnson 2005, Solomon 2016, and Acquavella 2004, the body surfaces that were potentially exposed above a de minimis level were identified. The skin surface area from these potentially exposed body parts was determined using average skin surface areas reported in EPA studies (see Figure 2). Any skin surface that was reported to be covered (clothed) was still counted, with the surface area of such body parts multiplied by a factor of 0.1 (90% protection for cotton per Espanhol-Soares 2013) to account for the protection given by the clothing itself.

| Body Part | Percentile | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | 5th | 10th | 15th | 25th | 50th | 75th | 85th | 90th | 95th |
| Adult Males | | | | | | | | | | |
| Total | 2.06 | 1.73 | 1.80 | 1.84 | 1.93 | 2.07 | 2.23 | 2.34 | 2.41 | 2.52 |
| Head | 0.136 | 0.123 | 0.126 | 0.128 | 0.131 | 0.136 | 0.143 | 0.147 | 0.149 | 0.154 |
| Trunk[a] | 0.827 | 0.636 | 0.672 | 0.701 | 0.74 | 0.820 | 0.918 | 0.984 | 1.02 | 1.10 |
| Upper Extremities | 0.393 | 0.332 | 0.346 | 0.354 | 0.369 | 0.395 | 0.425 | 0.442 | 0.456 | 0.474 |
| Arms | 0.314 | 0.253 | 0.265 | 0.274 | 0.289 | 0.316 | 0.346 | 0.364 | 0.379 | 0.399 |
| Upper arms | 0.172 | 0.139 | 0.145 | 0.149 | 0.156 | 0.169 | 0.185 | 0.196 | 0.205 | 0.220 |
| Forearms | 0.148 | 0.115 | 0.121 | 0.125 | 0.132 | 0.146 | 0.163 | 0.173 | 0.181 | 0.197 |
| Hands | 0.107 | 0.090 | 0.093 | 0.096 | 0.100 | 0.107 | 0.115 | 0.121 | 0.124 | 0.131 |
| Lower Extremities | 0.802 | 0.673 | 0.703 | 0.721 | 0.752 | 0.808 | 0.868 | 0.903 | 0.936 | 0.972 |
| Legs | 0.682 | 0.560 | 0.587 | 0.603 | 0.634 | 0.686 | 0.746 | 0.780 | 0.811 | 0.847 |
| Thighs | 0.412 | 0.334 | 0.349 | 0.360 | 0.379 | 0.4113 | 0.452 | 0.478 | 0.495 | 0.523 |
| Lower Legs | 0.268 | 0.225 | 0.234 | 0.241 | 0.252 | 0.271 | 0.292 | 0.302 | 0.312 | 0.324 |
| Feet | 0.137 | 0.118 | 0.123 | 0.125 | 0.130 | 0.138 | 0.147 | 0.152 | 0.156 | 0.161 |

[a]    Trunk includes neck.

Source: Based on U.S. EPA (1985) and NHANES 2005–2006.

**Figure 2.** Surface area of adult males (21 years and older) in square meters. From EPA 2011.

Interpretation of Risk Assessment Results

Once the dose from glyphosate exposure has been estimated, it is compared to acceptable dose limits that have been established by regulatory agencies. Agencies such as the U.S. EPA, the World Health Organization (WHO), and European Food Safety Agency (EFSA) have established dose limits based on studies that evaluate exposure in the context of risk. The relevant dose limits were presented previously in this report (Table II).

**Description of Gerard Cervantes' use of Glyphosate-Based Herbicides**

From the deposition of Mr. Gerard Cervantes, glyphosate use information (frequency and duration) was collected and used to calculate a reasonably conservative estimate of dose. Table III summarizes the duration of potential exposure (spraying duration), the frequency of exposure, and the reported clothing worn during spraying.

**Table III.** Herbicide use information reported in the deposition of Gerard Cervantes

| Property | Years of use | Duration per use (min) | Number of times used | | | Clothing worn during use |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Per day | Per month | Per year | |
| Residential only Spruce Street Merrill New Rd. | 16 | Not given* (Est. 60 min) | Not given* (Est. 1) | Not given* (Est. 1) | Not given* (Est. 7) | Long pants, shoes, socks, shirt |
| Commercial and Residential Various properties Merrill New Rd. | 7 | 120 | 1 | ~5 | ~42 | Long pants, shoes, socks, shirt |

* The frequency and duration of residential glyphosate use was estimated based on the size of the property and spray area given in the deposition.

The parameters for duration and frequency of residential use were not reported in the deposition. For both the Spruce Street and Merrill New Rd. properties, it was reasonably estimated that glyphosate was used once per month for seven months, and that each spraying event was ~60 minutes in duration. Mr. Cervantes mentioned that he first used Roundup in 1982 (G. Cervantes Depo Pg. 104). He reported spraying for 14 years (1982-1996) at the Spruce St. property (Pg. 25) and 2 years (1996-1998) at the Merrill New Rd. property before starting his landscaping business (Pg. 24, 61). Therefore, 16 years was used as the parameter for years of residential-only exposure.

Mr. Cervantes also reported commercial and residential use of Roundup from 1998 to 2004 (p. 61, 64). Mr. Cervantes testified he used glyphosate weekly during the growing season for up to two hours per spray event. He testified that he used Roundup weekly for as many as 35 weeks during the growing season (p. 136-137). By adding seven residential use events to the 31 commercial use events, a total of 42 use events per year represents both commercial and residential used from 1998-2004. Mr. Cervantes also reported spot spraying as opposed to continuous spraying, so the actual time the product was sprayed from the container would have been some time less than what was reported.

Mr. Cervantes testified that he used a ready-to-use (RTU) Roundup product (~1% glyphosate) for all residential only spraying events from 1982-1998. After 1998, Mr. Cervantes mixed Roundup from concentrate (~41% glyphosate). After mixing per the label instructions, the final glyphosate concentration was reasonably estimated to be approximately 2%. Mr. Cervantes reported that there may have been a few incidences where he spilled the concentrate on his hands; in these cases, he reported washing his hands immediately afterwards (p.143).

Mr. Cervantes' body weight was reported to be about 215 lbs (~98 kg) prior to his cancer diagnosis (p. 242). Mr. Cervantes reported that, when spraying, he always wore long pants, and leather work boots (p.141). He sometimes worn a long-sleeved shirt and gloves (p. 130). Estimates for exposed and clothed surface areas were taken from average surface areas of individual body regions from EPA 2009, based on EPA 1985 and NHANES data. The average value for skin surface area was estimated as follows:

*Parameters*
- All spraying events completed with long pants and leather boots
- Spray was towards the ground (no mention of weeds above waist level in deposition). The entire front half of the legs were included to account for any drift.
- Half of the hands will also be included to account for any leaks around the sprayer handle. Hands are also included with the occasional spill of concentrate on hands.

*Calculations*
- The surface area of clothed skin for all spraying events is (values in $m^2$ from Figure 2 above):
  - Front half of legs = 0.682/2 = 0.341
  - 90% protection factor for clothed surface areas = 0.341 x 0.1 = 0.0341
- The surface area of bare skin for all spraying activities is (values from Figure 2 above):
  - Half of hands = 0.107/2 = 0.0535
- Total surface area during spraying activities = 0.0341 + 0.0535 = 0.0876 $m^2$ = **876 cm²**
- Total surface area for mixing activities = 0.0535 $m^2$ = **535 cm²** (half the hand)

**Dermal Exposure Estimation Using ADD**

The ADD model consists of the main conceptual equation shown below, where the dose rate is averaged over the period of exposure and the daily dose rate is expressed as mass per unit of body weight per day.

$$ADD = \frac{DA_{event} \times EV \times ED \times EF \times SA}{BW \times AT}$$

where,

   ADD = average daily dose, mg/kg-day
$DA_{event}$ = absorbed dose per event, mg/cm$^2$-event
     EV = exposure frequency, events/day
     ED = exposure duration, years
      EF = days/year
      SA = skin surface area available for contact, cm$^2$
   BW = body weight, kg
     AT = averaging time, days

The absorbed dose per event ($DA_{event}$) used in the above model is calculated using the equation:

$$DA_{event} = K_p \times C_w \times T_{event}$$

where,

$DA_{event}$ = absorbed dose per event, mg/cm$^2$-event
     $K_p$ = appropriate permeability coefficient in water, cm/hr
    $C_w$ = concentration of the substance in water, mg/cm$^3$
   $t_{event}$ = duration of event, hr/event

As a summary, Table IV describes the information that was input into the model.

**Table IV**. Parameters used to calculate the average daily dose of glyphosate from Mr. Cervantes' reported use.

| Parameter | Value | Comments |
|---|---|---|
| $K_p$ | $4.0 \times 10^{-6}$ cm/hr | From scientific literature: Nielsen 2007 |
| $C_{res}$ | 11.7 mg/cc (1%) | Conservative estimate of concentration of the product sprayed |
| $C_{comm + res}$ | 23.4 mg/cc (2%) | Conservative estimate of concentration of the product sprayed |
| $C_{mixing}$ | 480 mg/cc (41%) | Concentration of the Roundup Pro formulation (undiluted) |
| $t_{event\text{-}res\ only}$ | 1 hrs/event | The estimated average duration of residential use |
| $t_{event\text{-}comm + res}$ | 8 hrs/event | Time between spraying and showering during commercial use |
| $t_{event\text{-}spills}$ | 10 min (0.166 hr) | The estimated time between spill and hand washing |
| EV | 1 event/day | Presumed |
| $EF_{res\ only}$ | 7 days/yr | Reasonable estimate |
| $EF_{comm + res}$ | 42 days/yr | Calculated from information in deposition (p. 136-137) |
| $EF_{spill}$ | 2 days/yr | Estimated (deposition reference occasional spills on hands; p. 143) |
| $ED_{res\ only}$ | 16 years | From deposition (p. 24,25,61) |
| $ED_{comm + res}$ | 7 years | From deposition (p. 61, 64) |
| $ED_{spills}$ | 7 years | From depostition (p. 61, 64) |
| SA | 876 cm$^2$ | From Tables 7.12-7.13 EPA 2011 |
| $SA_{hands\ only}$ | 535 cm$^2$ | From Tables 7.12-7.13 EPA 2011 |
| BW | 98 kg | From deposition (p.242) |
| $AT_{res}$ | 5840 days | $ED_{res} \times 365$ day/yr |
| $AT_{comm}$ | 2555 days | $ED_{comm} \times 365$ day/yr |

With the parameters from Table IV, the ADD model results are as follows, in milligrams of glyphosate per kilogram body weight per day (mg/kg BW/d):

$$\text{ADD}_{res\ only} = \frac{(K_p \times C_{res} \times t_{res\ only}) \times EV \times ED_{res\ only} \times EF_{res\ only} \times SA}{BW \times AT_{res}}$$

$$= \frac{(4.0 \times 10^{-6}\ cm/hr \times 11.7\ mg/cc \times 1\ hr/event) \times 1\ event/day \times 16\ yr \times 7\ days/yr \times 876\ cm^2}{98\ kg \times 5840\ days}$$

$$= 8.02 \times 10^{-6} \text{ mg/kg BW/d}$$

$$\text{ADD}_{comm + res} = \frac{(K_p \times C_{comm+res} \times t_{comm+res}) \times EV \times ED_{comm+res} \times EF_{comm+res} \times SA}{BW \times AT_{comm+res}}$$

$$= \frac{(4.0 \times 10^{-6}\ cm/hr \times 23.4\ mg/cc \times 8\ hr/event) \times 1\ event/day \times 7\ yr \times 42\ days/yr \times 876\ cm^2}{98\ kg \times 2555\ days}$$

$$= 7.70 \times 10^{-4} \text{ mg/kg/BW/d}$$

$$\text{ADD}_{spills} = \frac{(K_p \times C_{use} \times t_{spills}) \times EV \times ED_{spills} \times EF_{spills} \times SA}{BW \times AT_{spills}}$$

$$= \frac{(4.0 \times 10^{-6}\ cm/hr \times 480\ mg/cc \times 0.166\ hr/event) \times 1\ event/day \times 7\ yr \times 2\ days/yr \times 535\ cm^2}{98\ kg \times 2555\ days}$$

$$= 9.56 \times 10^{-6} \text{ mg/kg/BW/d}$$

The ADDs from the three periods were then combined as a weighted average to determine a single average daily dose during the total period of Roundup use from 1982 to 2004, as follows:

Combined average daily dose:

$$= \frac{(\text{ADD}_{res} \text{ from } 1982-1998 \times 16 \text{ years}) + (\text{ADD}_{comm} \text{ from } 1998-2004 \times 7 \text{ years}) + (\text{ADD}_{spills} \text{ from mixing x 7 years})}{23 \text{ years}}$$

$$= \frac{(8.02 \times 10^{-6} \times 16) + (7.70 \times 10^{-4} \times 7) + (9.56 \times 10^{-6} \times 7)}{23}$$

$$= \frac{(1.28 \times 10^{-4}) + (5.39 \times 10^{-3}) + (6.69 \times 10^{-5})}{23} = 2.43 \times 10^{-4}$$

This combined ADD is for the 23-year period of glyphosate use. Incorporating all years where glyphosate was not used would dramatically decrease the average daily dose.

The final ADD and Event Doses were calculated to be:

Combined Average daily dose (ADD) rate =                                         $2.43 \times 10^{-4}$ mg/kg BW/d

Event dose (highest dose per single day: from commercial + residential use) =   0.656 mg/d

Event dose (highest does per kilogram body weight per single day) =             0.006 mg/kg BW/d

The average daily dose rate is approximately 0.023% of the newly released EPA Reference Dose (RfD), the most relevant dose limit based on location. However, the dose is also well below the JMPR/WHO and EFSA (for operators) dose limits, 0.023% and 0.23%, respectively. Based on the average body weight of 98 kg, Mr. Cervantes' daily dose estimate (ADD x 98 kg) is also well below (2.2%) the California No Significant Risk Level (NSRL).

Data Quality Verification

The results of the ADD model are dependent on the permeability of the chemical (defined by $K_p$), the chemical concentration, and how the chemical was used (duration of use and exposure skin surface area). The specific duration of use and exposed skin surface area during   Roundup use varies with each applicator. However, the flux (amount of glyphosate that permeates a given skin area per hour) is only dependent on the concentration of Roundup used and should not vary greatly from empirically derived flux values reported in the literature. In order to verify the quality of the data from the ADD model, the following Table V compares the range of flux values in the cited literature to the flux value calculated from the ADD model.

**Table V.** Average flux values either reported in the literature or derived from the reported concentration and $K_p$ values.

| Reference | Number of studies | Flux (μg/cm/hr) | Range (μg/cm/hr) |
|---|---|---|---|
| Ward 2010 a, b, c | 9 | 0.0112 | 0.0006 – 0.0270 |
| Wester 1991 | 25 | 0.0123 | 0.0000 – 0.0770 |
| Smith 2014, 2015 | 5 | 0.0161 | 0.0007 – 0.0560 |
| Davies 2015-2017 | 6 | 0.0116 | 0.0002 – 0.0340 |
| Franz 1983 | 3 | 0.0552 | 0.0043 – 0.0942 |
| Nielsen 2007 | 1 | 0.0160 | n/a |
| Nielsen 2009 | 1 | 0.0236 | n/a |
| | **Average:** | **0.0209** | |
| Cervantes ADD model$_{res}$ | | 0.0468 | n/a |
| Cervantes ADD model$_{comm + res}$ | | 0.0939 | n/a |

*Calculated flux values from the literature were derived using the equation Flux = $K_p$ x Concentration

With flux values very similar to those in the dermal absorption literature, the results of the ADD model are consistent with the published literature. The flux values from my ADD model are on the high end of the published range, and this is consistent with my goal of a conservatively high estimate. The basic assumptions about glyphosate permeability within the ADD model are supported by the scientific research and therefore, indicating that the ADD model produces reasonable estimates of internal dose.

In addition, the systemic dose resulting from the ADD model in this case is consistent with estimated and measured exposure ranges found in the scientific literature. Solomon 2016 used two different methods to determine the range of systemic doses that could be expected from operator exposure to glyphosate-based herbicides. Solomon estimated the systemic dose range from passive dosimetry and also measured the dose range from biomonitoring data. My conservatively high estimation of dose using the ADD model falls near the high end of these ranges (Table VI), further demonstrating that the ADD model produces reasonable data.

**Table VI.** Comparison of systemic doses of glyphosate from use of glyphosate-based herbicides.

| Reference | Result |
|---|---|
| Solomon 2016 from passive dosimetry | 0.000001 – 0.064 mg/kg BW/d |
| Solomon 2016 from biomonitoring | 0.000013 – 0.0046 mg/kg BW/d |
| Event dose from ADD model | 0.006 mg/kg BW/d |

The event dose represents the highest amount of glyphosate that may have entered the body on any given day the product was used. The estimated event dose of $1.74 \times 10^{-2}$ mg/kg BW/d was insignificant compared to the doses used in the EPA animal studies, ranging up to ~34 mg/kg BW/d for up to 26 months. Another EPA study administered doses of up to 940 mg/kg BW/d for up to 24 months (ATSDR 2019). The estimated event dose was also within the ranges reported in the literature. Bleeke 2007 reported doses for applicators between 0.000013 and 0.00207 mg/kg BW/d and Acquavella 2004 reported a mean of 0.0001 mg/kg/d and a maximum of 0.004 mg/kg/d.  The range of internal doses calculated from the Pierce 2020 data (reported in Kougias 2020) was from 0.000353 to 0.006 mg/kg/d. My estimated event dose was near the high end of the ranges found in the literature, consistent with a conservatively high estimate.

<u>Confounding factors</u>

While the purpose of this report was to reconstruct the exposure potential and assess the risk of that potential exposure, it is within my purview as an industrial hygienist to be familiar with the evidence in the scientific literature regarding both the hazards of glyphosate and the known and suspected causes of non-Hodgkin Lymphoma (NHL).

It was noted that Mr. Cervantes was potentially exposed to confirmed human carcinogens such as benzene, welding fumes, and asbestos during his ~30-year career with the Northern Illinois (now Nicor) Gas company. Dr. Sawyer briefly discusses the risk of benzene exposure and leukemia, but does not address the many studies in the published literature that discuss benzene exposure and NHL. Furthermore, Dr. Sawyer does not rule out benzene or other known carcinogens as potential causes or contributing factors in Mr. Cervantes' case. I am not attributing a cause to Mr. Cervantes' NHL as that is outside of my expertise and I have not been asked to do so. However, if attempting to attribute a cause to Mr. Cervantes' NHL (as Dr. Sawyer does in this case), then exposure and scientific data relating to all hazards Mr. Cervantes was exposed to must be considered objectively.

**Site visits**

Due to COVID-19, a site visit has not been performed. I reserve the right to conduct a site visit in the future and revise my opinions, if necessary, based on that visit.

**Rebuttal**

I have reviewed the plaintiff expert reports of Dr. William R. Sawyer, Dr. Ron D. Schiff MD, and Dr. Dennis D. Weisenburger, MD. In this section, I will summarize a few of the key problems that I identified in their claims. This is not an exhaustive list of every point of disagreement in these reports.

Dr. Sawyer Report

1) Throughout Dr. Sawyer's report, he discusses the concepts of glyphosate application, exposure, and dose as if they were one single concept. On page 7 of his report, Dr. Sawyer lists his objectives: "(1) to arrive at a scientifically-reliable exposure dose estimation for Mr. Cervantes (*in units of 8-hour time-weighted exposure days*)". As discussed above based on Acquavella 2004, the number of days a glyphosate product was used is not a measurement of exposure (amount available for bodily intake), neither is it a measure of dose (amount actually taken into the body). What Dr. Sawyer does is calculate a duration of potential exposure, which is very different from an estimation of exposure or dose. Thus Dr. Sawyer does not achieve his first objective.

The exposure days calculated seems to be incorrect. The calculation includes time spent at two Spruce St. address, 707 & 807. In Mr. Cervantes' deposition, he testified to living at 906 Spruce St. from 1982 to 1996 (pg. 25). Regardless of what the house number really is, there was only one property mentioned in his testimony. The time at these two properties overlap from 1991-1996; therefore, if Mr. Cervantes truly applied Roundup at only one Spruce St. property from 1982-1996 as he testified, then Dr. Sawyer's calculation of exposure days is incorrect. Regardless, "exposure days" does not take into account the intensity of exposure and is not a measure of exposure or dose.

Using his calculation of exposure days, Dr. Sawyer compares Mr. Cervantes' exposure time to epidemiological studies in the scientific literature that also conflate exposure time with exposure quantity, notably Erickson 2008 and McDuffie 2001. In addition, these studies did not adjust for confounding factors and they suffer from recall bias (see discussion on Pg. 17-18 of this report).  Dr. Sawyer makes no estimation or assessment of actual exposure or dose. This method resulted in an unacceptably high overestimate of risk.

2) Dr. Sawyer opines that a surfactant (POEA) "significantly increases penetration in plant cells as well as in animal cells". He supports his claim using a skin penetration study using rat skin that had very poor mass balance and recovery values. When the percent recovered was too low, Dr. Sawyer claims that the "missing" product should be added to the amount that penetrated the rat skin. However, when the percent recovered was too high, Dr. Sawyer does not suggest that the "additional" product should be subtracted from the amount that penetrated the rat skin. He is inconsistent in his interpretation of a study that was a poor study to use in the first place.

Several studies (see Dermal Studies section, pg. 9-12 of this report) have used formulated Roundup products with surfactants to test skin penetration using <u>human</u> skin. None of the studies showed that surfactants caused increased skin penetration. The Franz 1983 study compared high and low concentration of formulated product on human skin samples from the same donor and showed that the concentration of the formulated product was the greatest factor in determining the rate of skin absorption.

3) Dr. Sawyer opines that "Since dermal glyphosate exposure is the primary route of exposure contributing to systemic exposure in agricultural users, the assumption that distribution, metabolism, and excretion are identical by IV and dermal routes of exposure leads to egregious errors in systemic dose calculations". To support this opinion, Dr. Sawyer refers to the Brewster 1991 study where 1% of an oral dose remained in bone tissue. He seems to imply that absorption, distribution, metabolism, and excretion (ADME) after a dermal exposure would be more similar to ADME after an oral dose.

Brewster 1991 determined that the half-life of glyphosate after an <u>oral</u> dose was approximately 2 days. The study showed that glyphosate was eliminated quickly from all body parts except bone, where elimination from bone was slower than from blood. This observation is not surprising given the low vascularization of bone. However, Connolly 2018b studied the half-life of glyphosate in humans after applying glyphosate-based pesticide products using a backpack sprayer (a <u>dermal</u> dose). The study revealed a half-life of 7.25 hours using the urinary excretion rates (UER) measurement method. This shorter half-life suggests that glyphosate does not persist in the human body. This half-life is based on human data after applying glyphosate-based products and is therefore much more relevant than rat studies.

The Ridley 1988 study found that >97.5% of glyphosate is excreted in the urine and feces following both oral and IV doses. The Wester 1991 study showed that glyphosate did not significantly bind to powdered stratum corneum, and once in the blood 96.4-99.8% was excreted in the urine and feces following an IV dose. These studies show that the vast majority of oral, IV, and dermal doses are excreted in the urine and feces, and are not significantly retained in body tissues.

Wester 1991 and McEwen 1995 also studied the deposition of glyphosate in bone marrow from dermal and oral doses, respectively. Neither found significant amounts of glyphosate in the bone marrow. These results contrast the deposition and slow elimination of glyphosate from bone that Brewster 1991 identified and the lack of any deposition of glyphosate in bone marrow observed by Wester 1991 and McEwen 1995.

It is important to note the difference between bone and bone marrow because Dr. Sawyer uses the evidence of slow elimination from bone to support his opinion that glyphosate is distributed to bone marrow.

Dr. Sawyer claims that assuming that the ADME is identical from IV and dermal doses leads to egregious errors, but then makes similarly incorrect assumptions. He assumes that the ADME from dermal and oral doses are identical and that slow elimination from bone and deposition in bone marrow are identical. He then uses these incorrect assumptions to suggest that glyphosate persists in the body.

4) Dr. Sawyer criticizes several studies from the Dermal Technology Laboratory (DTL). See above discussion of Davies 2015a, 2015b, 2016, 2017 and Ward 2010a, 2010b, and 2010c. These studies from the DTL follow the OECD methodology requirements and are both internally consistent and consistent with other studies. One of Dr. Sawyer's principal criticisms is that the dermal absorption rates found in these studies are lower than the dermal absorption found in one experiment in the Wester 1991 study that produced the highest total dermal absorption (4.4%). The 4.4% total absorption was driven by a suspiciously high glyphosate value found in the feces of a rhesus monkey. Because other studies, such as Ridley 1988 and Wester 1991 itself, have shown that the vast majority of glyphosate is excreted in the urine after a dermal or IV dose, it is this fecal excretion result that should treated as an outlier. Instead, Dr. Sawyer treats the one Wester 1991 excretion results as the true results and any results that do not agree as outliers.

5) Dr. Sawyer references the TNO Study, van Burgsteden 2003 to claim that skin absorption of glyphosate may be as high as ~10%. However, this study used rat skin instead of human skin. The results were so varied and the recoveries so poor that the authors of the study stated that "The results of the autoradiography show too much variation to draw any conclusions." They went on to say "Due to the high variation in dermal penetration within the test groups and the poor recoveries, the data presented in this report are not acceptable for regulatory use and risk assessment." Finally, in the conclusion section of the study, the authors repeated, "In general, the poor recoveries combined with the high variation within the glyphosate test groups make the data generated in this study unsuitable for risk assessment." This study should not be used to draw any conclusions or used in any part of a risk assessment.

**Opinions**

Based on the analysis above, I have reached the following opinions in this case to reasonable degree of scientific certainty.

1. My evaluation of the available information regarding this case leads to the conclusion that Mr. Cervantes' use of glyphosate-based herbicides is not of itself a measure of exposure or dose.
2. I have conducted a risk assessment, including a reconstruction of exposure and dose from a model, using reasonable conservative assumptions of exposure parameters. The estimated dose using these parameters was much lower than all established and recognized safe dose limits.
3. Mr. Cervantes' exposure to glyphosate-based herbicides, and the associated dose estimation, was so low that it is unlikely to be a contributing factor to his non-Hodgkin Lymphoma, especially where other confounding risk factors, including potential exposures to benzene, welding fumes, and asbestos, may be involved and cannot be reliably ruled out.

**Conclusion**

In conclusion, my assessment indicates that Mr. Cervantes' exposure to and associated dose of glyphosate-based herbicides presented no risk of adverse health effects, including non-Hodgkin Lymphoma. I specifically reserve the right to modify and supplement these opinions based on additional information that my become available through further discovery or by any other means.

Respectfully submitted,

Matthew Call, CIH, CSP
President
Industrial Hygiene Resources
2/12/2021

# Appendix A

# Matthew C. Call, MS, CIH, CSP
President- Industrial Hygiene Resources



www.industrialhygieneresources.com
M. Call- LinkedIn Profile

Areas of Expertise
Comprehensive Industrial Hygiene Consulting
Expert Witness Services- Occupational Health and Safety
Product Stewardship and Quality
Safety Data Sheet and Label Authoring
Environmental Monitoring- Air, water, soil
Indoor Air Quality and EnviroMicrobiology Assessement

Education and Certification
M.S. Environmental Science, Washington State University, Richland, WA
B.S. Public Health- Major: Industrial Hygiene, Minor: Chemistry, Utah State University, Logan, UT
Certified Industrial Hygienist (ABIH), #9591
Certified Safety Professional (BCSP), #21179
EPA AHERA Asbestos Project Designer, Inspector, Supervisor
OSHA Construction Safety (30 hr)
EPA Lead Risk Assessor

Qualifications and Experience
Mr. Call has spent fifteen years in the field of industrial hygiene and safety with experience in private industry, government/military, and consulting.  He is a certified industrial hygienist (CIH®) with the American Board of Industrial Hygiene (ABIH) and certified safety professional (CSP) since 2009.  He is an active member of the American Industrial Hygiene Association (AIHA) since 2008 and served on the AIHA Finance Committee (2017-2020). He has also served as President of the Idaho Local Section of AIHA (2014-2017).

Mr. Call works to protect employee health while ensuring the successful operation of business processes. provides worker exposure assessment design, management, and field oversight meets a wide range of clients' needs through field work, management, and expert witness services.

*Professional Experience*

**President**
Industrial Hygiene Resources, Ltd., Boise, ID
05/2010 – Present

Directed industrial hygiene and safety projects for large, medium, and small business clients.

*By health hazard…*
- Particulate matter- dusts, mists, fumes, and fibers - asbestos, lead, silica, arsenic, cadmium, hexavalent chromium, wood dusts, welding fumes, paint spray mists, and bioaerosols.
- Gases and vapors – acids, benzene, total and individual hydrocarbons, 4-phenyl cyclohexene, formaldehyde, hydrogen sulfide, carbon monoxide, waste anesthetics, nitrous oxide, and mercury.
- Other hazardous materials, such as fungicides/herbicides/insecticides, di-isocyanates, and PCBs.
- Biological hazards – Fungal spores, Legionella assessments, water quality
- Physical hazards – Noise (exposure assessments, control, HCP), heat stress, ergonomics

*By industry type…*
- Agricultural chemicals and products
- Analytical laboratories
- Auto repair and auto body shops
- Building maintenance and air quality
- Construction and demolition
- Electrical generation (Hydro, WTE, NG)
- Environmental remediation
- Food processing and production
- Health care
- Manufacturing
- Mining and exploration
- Nuclear waste TSD facilities
- Oil and gas refining
- Semiconductor Manufacturing

*Other experience using industrial hygiene expertise…*
- Product stewardship- sampling and analysis of air, surfaces, or materials to protect the health of the end users of manufactured products
- Product quality- sampling and analysis of air, surfaces, or materials to identify flaws, defects, or process contaminants that affect product or work quality
- Safety data sheet (SDS) and label authoring
- Environmental- Air, soil, and water sampling and analysis

Health and Safety Leadership Experience

In his current position as a consultant, Mr. Call guides clients through identification, characterization, and ultimately resolution of health, safety, and environmental issues.  Mr. Call instructs, encourages, and supports clients in their efforts to develop and maintain a workplace culture of protecting employee health and safety.  Mr. Call promotes the highest quality protection of worker health and safety through the use of standardized industrial hygiene methods and sound scientific principles.

Mr. Call is an active leader in the industrial hygiene profession and has given technical presentations at both local and national conferences of AIHA, and has served as the President of the Teton Local Section of AIHA and the President of the Idaho Local Section.  He has also served on the finance committee, the aerosol technology committee, and health care working group of AIHA.

During his previous employment at WRPS, Mr. Call worked to shift the safety culture from a Behavior Based Safety program to a safety culture based on Human Performance Improvement (using the context of human errors to improve safety).  Mr. Call supervised 15 industrial hygiene technicians in technical aspects of industrial hygiene to help assess and maintain a controlled work environment.  He also served as a team leader for internal health and safety program assessments.

Communication

Communicating technical information in a way that can be understood by employees and employers is critical for the protection of worker safety and health.  Mr. Call is an experienced trainer for numerous health and safety topics.  He has also had many speaking engagements for national organizations such as the American Industrial Hygiene Association (AIHA), local sections of both AIHA and the American Society of Safety Engineers (ASSE), and other organizations both governmental and private.

Mr. Call also works as an expert witness to help resolve legal issues for both plaintiffs and defendants.  He has worked on numerous cases involving such issues as welding fume and metal exposures, noise complaints, and various chemical exposures such as hydrofluoric acid (HF), MDI, carbon monoxide, hydrogen sulfide and mercaptans (sulfur-bearing organics).

# Appendix B

**Mr. Matthew Call's Materials Considered List (*Cervantes v. Monsanto Co.*)**

1.  Abdelghani, A., *Assessment of the Exposure of Workers Applying Herbicide Mixtures (2,4-D + Roundup, Garlon-3A + Roundup), Toxicity and Fate of These Mixtures in the Environment* (June 30, 1995) [MONGLY00296949 – MONGLY00296997].

2.  Acquavella, J. et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112 Envtl. Health Persp. 321 (2004).

3.  Anadon, A., *Toxicokinetics of Glyphosate and its Metabolite Aminometyhl Phosphonic Acid in Rats*, 190 Toxicology Letters 91 (2009).

4.  Andreotti, G. et al., *Glyphosate Use and Cancer Incidence in the Agricultural Health Study*, 110(5) J. Nat'l Cancer Inst. 509 (2018).

5.  Andreotti, G. et al., *Response to Sheppard and Shaffer*. 111(2) J. Nat'l Cancer Inst. 216 (2019).

6.  APVMA (Australian Pesticides and Veterinary Medicines Authority), *Regulatory Position: Consideration of the Evidence for a Formal Reconsideration of Glyphosate*, Australian Government (2016).

7.  APVMA, *Final Regulatory Position: Consideration of the Evidence for a Formal Reconsideration of Glyphosate*, Australian Government (2017).

8.  ATSDR (Agency for Toxic Substances and Disease Registry), *Toxicological Profile for Glyphosate – Draft for Public Comment*, US Dep't of Health and Human Services (Mar. 2019).

9.  Babu, R. et al., *The Influence of Various Methods of Cold Storage of Skin on the Permeation of Melatonin and Nimesulide*, 86 J. Controlled Release 49 (2003).

10. Benson, B., *21-Day Dermal Toxicity Study in Rabbits* (Mar. 10, 1982) [MONGLY02020607 – MONGLY02020798].

11. BfR (Bundesinstitut für Risikobewertung) Press Release, *Glyphosate assessment: BfR rejects plagiarism accusations* (Sept. 20,  2017).

12. BfR (Bundesinstitut für Risikobewertung), *Assessment of IARC Monographies Volume 112 (2015); Glyphosate, Renewal Assessment Report: Glyphosate Addendum I to RAR* (2015).

13. BfR, *Toxicology and Metabolism, Renewal Assessment Report: Glyphosate*, Volume 3 Annex B.6 (2015).

14. Bleeke, M., *MON 78294: An Applicator Exposure Study Conducted in Spain (Autumn 2005) Using Biomonitoring*, Charles River Laboratories (Oct. 11, 2007) [MONGLY00668430 – MONGLY00668967].

15. Brewster, D. et al., *Metabolism of Glyphosate in Sprague-Dawley Rats: Tissue Distribution, Identification, and Quantification of Glyphosate-Derived Materials following a Single Oral Dose*, 17 Fundamental and Applied Toxicology 43 (1991).

16. BROWSE, *Bystanders, Residents, Operators and Workers Exposure Models for Plant Protection Products* (2013).

17. Cartwright, R. et al., *The Increasing Incidence of Non-Hodgkin's Lymphoma (NHL):*

*the Possible Role of Sunlight*, 14(5-6) Leukemia & Lymphoma 387 (1994).

18. Chan, P. & J. Mahler, *NTP Technical Report on Toxicity Studies of Glyphosate Administered in Dosed Feed to F344/N Rats and B6C3F Mice*, US Dep't of Health and Human Services, Public Health Service, Nat'l Inst. of Health (July 1992).

19. Chang, F. et al., *Occurrence and Fate of the Herbicide Glyphosate and its Degradate Aminomethylphosphonic Acid in the Atmosphere*, 30(3) Envtl. Toxicology and Chemistry 548 (2011).

20. Coble, J. et al., *An Updated Algorithm for Estimation of Pesticide Exposure Intensity in the Agricultural Health Study*, 8 Int'l J. Envtl. Res. Pub. Health 4608 (2011).

21. Colvin, J., *Final Report on CP 67573 Residue and Metabolism: The Dynamics of Accumulation and Depletion of Orally Ingested N-Phosphonomethylglycine-14C*, Monsanto Company (Sept.-Oct., 1973) [MONGLY00432084 – MONGLY00432090].

22. Comerford, C., *Evaluation of Urinary Glyphosate Levels Following Simulated Consumer Application of Roundup®*, American Industrial Hygiene Advancing Worker Health & Safety Expo (2020) (Abstract).

23. Connolly, A. et al., *Characterising Glyphosate Exposures among Amenity Horticulturists Using Multiple Spot Urine Samples*, 221 Int'l J. Hygiene & Envtl. Health 1012 (2018).

24. Connolly, A. et al., *Evaluating Glyphosate Exposure Routes and Their Contribution to Total Body Burden: A Study among Amenity Horticulturalists*, 63(2) Annals of Work Exposures and Health 133 (2019).

25. Connolly, A. et al., *Exploring the Half-Life of Glyphosate in Human Urine Samples*, 222(2) Int'l J. Hygiene & Envtl. Health 205 (2018).

26. Connolly, A. et al., *Exposure Assessment Using Human Biomonitoring for Glyphosate and Fluroxypyr Users in Amenity Horticulture*, 220 Int'l J. Hygiene & Envtl. Health 1064 (2017).

27. Connolly, A. et al., *Glyphosate in Irish Adults-A Pilot Study in 2017*, 165 Int'l J. Hygiene & Envtl. Health 235 (2017).

28. Connolly, A. et al., *Sensitive and Selective Quantification of Glyphosate and Aminomethylphosphonic Acid (AMPA) in Urine of the General Population by Gas Chromatography Tandem Mass Spectrometry*, 1158 J. Chromatography B 122348 (2020).

29. Cowell, J. & J. Steinmetz, *Assessment of Forest Worker Exposures to Glyphosate during Backpack Foliar Applications of Roundup® Herbicide* (Mar. 1990) [MONGLY00155787 – MONGLY00155805].

30. Cowell, J. & J. Steinmetz, *Assessment of Forestry Nursery Workers Exposure to Glyphosate during Normal Operations* (Feb. 1990) [MONGLY00155594 – MONGLY00155613].

31. Crump, K., *The Potential Effects of Recall Bias and Selection Bias on the Epidemiological Evidence for the Carcinogenicity of Glyphosate*, 40(4) Risk Analysis 696 (2019).

32. Curwin, B. et al., *Urinary and Hand Wipe Pesticide Levels Among Farmers and Non-Farmers in Iowa*, 15 J. Exposure Analysis & Envtl. Epidemiology 500 (2005).

33. Curwin, B. et al., *Urinary Pesticide Concentrations Among Children, Mothers and Fathers Living in Farm and Non-Farm Households in Iowa*, 51 Annals of Occupational Hygiene 53 (2007).

34. Davies, D., *360 g/L Glyphosate SL Formulation (MON 76879) – In Vitro Absorption through Human Dermatomed Skin using [14C]-Glyphosate* (Aug. 8, 2017) [MONGLY08731728 – MONGLY08731783].

35. Davies, D., *500 g/L Glyphosate SL Formulation (MON 76952) – In Vitro Absorption through Human Dermatomed Skin using [14C]-Glyphosate* (Aug. 2, 2016) [MONGLY08731670 – MONGLY08731727].

36. Davies, D., *7.2g/L Glyphosate Gel Formulation (MON 76258) – In Vitro Absorption through Human Dermatomed Skin using [14C]-Glyphosate* (Apr. 27, 2015) [MONGLY08731571 – MONGLY08731681].

37. Davies, D., *72g/L Glyphosate Gel Formulation (MON 76829) – In Vitro Absorption through Human Dermatomed Skin using [14C]-Glyphosate* (Apr. 16, 2015) [MONGLY08731524 – MONGLY08731570].

38. Deposition of Daniel Bucks, Ph.D., *Winston v. Monsanto Co.*, No. 1822-CC00515 (Mo. Cir. Ct. St. Louis City Sept. 17, 2019) (only pages 107-108, 187-194).

39. Deposition of Elizabeth Cervantes, *Cervantes v. Monsanto Co.*, No. 3:19-cv-03015-VC (N.D. Cal. July 16, 2020) (with exhibits).

40. Deposition of Gerard Cervantes, *Cervantes v. Monsanto Co.*, No. 3:19-cv-03015-VC (N.D. Cal. June 23, 2020) (with exhibits).

41. Deposition of William Sawyer, *Bognar v. Monsanto Co.*, No. 18SL-CC02199 (Mo. Cir. Ct. St. Louis Cty. Jan, 10, 2020).

42. Deposition of William Sawyer, *Kane v. Monsanto Co.*, No. 1622-CC10172 (Mo. Cir. Ct. St. Louis City Jan. 11-12, 2020).

43. Deposition of William Sawyer, Ph.D., *Cazier v. Monsanto Co.,* No. DC-17-883C (Mont. Dist. Ct. Gallatin Cty. April 30, 2019).

44. Deposition of William Sawyer, Ph.D., *Johnson v. Monsanto Co.*, No. CGC-16-550128 (Cal. Super. Ct. S.F. Cty. Feb. 26-27, 2018).

45. Deposition of William Sawyer, Ph.D., *Peterson v. Monsanto Co.*, No. 1622-CC01071 (Mo. Cir. Ct. St. Louis City Aug. 23, 2018).

46. Deposition of William Sawyer, Ph.D., *Peterson v. Monsanto Co.*, No. 1622-CC01071 (Mo. Cir. Ct. St. Louis City Oct. 16, 2018).

47. Deposition of William Sawyer, Ph.D., *Pilliod v. Monsanto Co.,* No. RG-17-862702 (Cal. Super. Ct. Almeda Cnty. Feb. 6, 2019).

48. Deposition of William Sawyer, Ph.D., *Stevick v. Monsanto Co.,* No. 3:16-cv-02341-VC (N.D. Cal. Dec. 20, 2018).

49. Deposition of William Sawyer, *Seitz v. Monsanto Co.*, No. 1722-CC11325 (Mo. Cir. Ct. St. Louis City Jan. 14-15, 2020).

50. Deposition of William Sawyer, *Whitby v. Monsanto Co.*, No. 19SL-CC04020 (Mo. Cir. Ct. St. Louis Cty. Jan. 22, 2020).

51. Donato, F. et al., *Exposure to Glyphosate and Risk of Non-Hodgkin Lymphoma and Multiple Myeloma: An Updated Meta-Analysis*, 111 La Medicina Del Lavoro 63 (2020).

52. Dosemeci, M. et al., *A Quantitative Approach for Estimating Exposure to Pesticides in the Agricultural Health Study*, 46 Annals of Occupational Hygiene 245 (2002).

53. Durkin, P., *Glyphosate – Human Health and Ecological Risk Assessment Final Report*, Syracuse Environmental Research Associates, Inc. (May 25, 2011) [MONGLY00310942 – MONGLY00311277].

54. ECHA (European Chemicals Agency), *Opinion: Proposing Harmonized Classification and Labelling at EU Level of Glyphosate (ISO); N-(phosphonomethyl)glycine*, Committee for Risk Assessment RAC (Mar. 15, 2017).

55. Edmiston, S. et al., *Exposure of Herbicide Handlers in the Caltrans Vegetation Control Program*, Cal. EPA (Apr. 27, 1995) [MONGLY00311960 – MONGLY00312005].

56. EFSA (European Food Safety Authority), *Conclusion on the Peer Review of the Pesticide Risk Assessment of the Active Substance Glyphosate*, 13 EFSA J. 4302 (2015).

57. EFSA, *Guidance on Dermal Absorption*, 15(6) EFSA Journal 4873 (2017).

58. EFSA, *Guidance on Dermal Absorption*, EFSA Panel on Plant Protection Products and their Residues (2012).

59. EFSA, *Guidance on the Assessment of Exposure of Operators, Workers, Residents and Bystanders in Risk Assessment for Plant Protection Products* (2014).

60. Engels, E., *Infectious Agents as Causes of Non-Hodgkin Lymphoma*, 16(3) Cancer Epidemiology Biomarkers & Prevention 401 (2007).

61. EPA (Environmental Protection Agency), *Dermal Exposure Assessment: A Summary of EPA Approaches*, Nat'l Ctr. for Envtl. Off. of Res. and Dev. (Sept. 2007).

62. EPA, FIFRA SAP, *Meeting Minutes and Final Report No. 2017-01: EPA's Evaluation of the Carcinogenic Potential of Glyphosate,* (Mar. 16, 2017).

63. EPA, *Glyphosate – Interim Registration Review Decision Case Number 0178* (Jan. 2020).

64. EPA, *Glyphosate – Proposed Interim Registration Review Decision Case Number 0178* (Apr. 2019).

65. EPA, *Integrated Risk Information System (IRIS), Chemical Assessment Summary of Glyphosate; CASRN 1071-83-6* (1993).

66. EPA, *Label Review Manual Chapter 10: Worker Protection Label* (Feb. 2016).

67. EPA, *Label Review Manual Chapter 10: Worker Protection Label* (Feb. 2016).

68. EPA, Memorandum from Dana L. Friedman on *Response from the Pesticide Re-Evaluation Division (PRD) to Comments on the Glyphosate Proposed Interim Decision* (Jan. 16, 2020).

69. EPA, Memorandum from David J. Miller on *Glyphosate: Epidemiology Review of Zhang et al. (2019) and Leon et al. (2019) Publications for Response to Comments on the Proposed*

*Interim Decision* to Christine Olinger (Jan. 16, 2020).

70. EPA, Memorandum from Donna Davis, Risk Assessor, RAB VII, Health Effects Division (7509P) on *Alkyl Alcohol Alkoxylate Phosphate and Sulfate Derivatives (AAAPDs and AAASDs – JITF CST 2 Inert Ingredients) Human Health Risk Assessment to Support Proposed Exemption from the Requirements of a Tolerance When Used as Inert Ingredients in Pesticide Formulations* to Kerry Leifer, Team Leader, Inert Ingredient Assessment Branch, Registration Division (7505P) (June 8, 2009).

71. EPA, Memorandum from Donna Davis, Risk Assessor, RAB VII, Health Effects Division (7509P) on *Alkyl Alcohol Alkoxylates (AAA – JITF CST 1 Inert Ingredient) Human Health Risk Assessment to Support Proposed Exemption from the Requirement of a Tolerance When Used as an Inert Ingredient in Pesticide Formulations* to Kerry Leifer, Team Leader, Inert Ingredient Assessment Branch, Registration Division (7505P) (July 14, 2009).

72. EPA, Memorandum from Donna Davis, Risk Assessor, RAB VII, Health Effects Division (7509P) on *Alykl Amine Polyalkoxylates (JITF CST 4 Inert Ingredients) Human Health Risk Assessment to Support Proposed Exemption from the Requirement of a Tolerance When Used as Inert Ingredients in Pesticide Formulations* to Kerry Leifer, Team Leader, Inert Ingredient Assessment Branch, Registration Division (7505P) (April 3, 2009).

73. EPA, Memorandum from Donna Davis, Risk Assessor, RAB VII, Health Effects Division (7509P) on *Methyl Poly(Oxyethylene) $C_8 – C_{14}$ Alkylammonium Chlorides (MPOACs – JITF CST 7 Inert Ingredients) Human Health Risk Assessment to Support Proposed Exemption from the Requirements of a Tolerance When Used as Inert Ingredients in Pesticide Formulations* to Kerry Leifer, Team Leader, Inert Ingredient Assessment Branch, Registration Division (7505P) (June 2, 2009).

74. EPA, Memorandum from Donna Davis, Risk Assessor, RAB VII, Health Effects Division (7509P) on *Sodium and Ammonium Naphthalensulfonae Formaldehyde Condensates (SANFCs – JITF CST 11 Inert Ingredients) Human Health Risk Assessment to Support Proposed Exemption from the Requirement of a Tolerance When Used as Inert Ingredients in Pesticide Formulations* to Kerry Leifer, Team Leader, Inert Ingredient Assessment Branch, Registration Division (7505P) (May 28, 2009).

75. EPA, Memorandum from Gregory Akerman on *Response to the Final Report of the Federal Insecticide, Fungicide, and Rodenticide Act Scientific Advisory Panel (FIFRA SAP) on the Evaluation of the Human Carcinogenic Potential of Glyphosate* to Caitlin Newcamp (Dec. 12, 2017).

76. EPA, Memorandum from Lata Venkateshwara on *Glyphosate: Amended Residential Exposure Assessment for a Registration Review* to Caitlin Newcamp (Dec. 12, 2017).

77. EPA, Memorandum from Monique M. Perron on *Glyphosate: Response to Comments on the Proposed Interim Decision Regarding the Human Health Risk Assessment* to Steven Peterson (Jan. 13, 2020).

*78.* EPA, Memorandum from Monique Perron on *Glyphosate: Draft Human Health Risk Assessment in Support of Registration Review* to Caitlin Newcamp (Dec. 12, 2017).

79. EPA, Office of Chemical Safety and Pollution Prevention, Letter from Michael L. Goodis, Director of Registration Division, EPA Office of Chemical Safety and Pollution Prevention,

on Labeling Requirements for Products that Contain Glyphosate to Registrant (Aug. 7, 2019).

80. EPA, Office of Pesticide Programs, *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Sept. 12, 2016).

81. EPA, Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Dec. 12, 2017).

82. EPA, Office of Prevention, Pesticides and Toxic Substances, *Health Effects Test Guidelines: OPPTS 870.7600 Dermal Penetration* (August 1998).

83. EPA, *Reregistration Eligibility Decision (RED) – Glyphosate* (Sept. 1993).

84. EPA, *Risk Assessment Guidance for Superfund (RAGS) Volume I: Human Health Evaluation Manual (Part E, Supplemental Guidance for Dermal Risk Assessment)* (July 2004).

85. Eriksson, M. et al., *Pesticide Exposure as Risk Factor for Non-Hodgkin Lymphoma Including Histopathological Subgroup Analysis*, 123 Int'l J. Cancer 1657 (2008).

86. Espanhol-Soares, M. et al., *Procedures to Evaluate the Efficiency of Protective Clothing Worn by Operators Applying Pesticide*, 57(8) Annals of Occupational Hygiene 1041 (2013).

87. Expert Report of Dennis D. Weisenburger, M.D., *Cervantes v. Monsanto Co.*, No. 3:19-cv-03105 (N.D. Cal. Jan. 18, 2021).

88. Expert Report of Dr. William Sawyer, M.D., *Pilliod et al. v. Monsanto Co*., No. RG17862702 (Cal. Super. Ct. Alameda Cty Jan. 14, 2019).

89. Expert Report of Ron D. Schiff, M.D., Ph.D., *Cervantes v. Monsanto Co.*, No. 3:19-cv-03105 (N.D. Cal. Jan. 21, 2021).

90. Expert Report of William Sawyer regarding Plaintiff Larry Jenkins, *Seitz v. Monsanto Co.*, No. 1722-CC11325 (Mo. Cir. Ct. St. Louis City Jan. 13, 2020).

91. Expert Report of William Sawyer, *Caballero v. Monsanto Co.*, No. MSC 19-01821 (Cal. Super. Ct. Contra Costa Cty. Oct. 31, 2019).

92. Expert Report of William Sawyer, Ph.D., *Cervantes v. Monsanto Co.*, No. 3:19-cv-03105 (N.D. Cal. Jan. 22, 2021).

93. Faniband, M. et al., *Human Experimental Exposure to Glyphosate and Biomonitoring of Young Swedish Adults*, 231 Int'l J. Hygiene Env't Health 113657 (2021).

94. Flack, S. et al., *Development and Application of Quantitative Methods for Monitoring Dermal and Inhalation Exposure to Propiconazole*, 10(3) J. Envtl. Monitoring 336 (2008).

95. Franz, T., *Evaluation of the Percutaneous Absorption of Roundup Formulations in Man Using an In-Vitro Technique* (Aug. 30, 1983) [MONGLY00135633 – MONGLY00135646].

96. Franz, T., *Percutaneous Absorption: On the Relevance of In Vitro Data*, 64 J. Investigative Dermatology 190 (1975).

97. Gillezeau, C. et al., *The Evidence of Human Exposure to Glyphosate: A Review*, 18 Envtl.

Health 2 (2019).

98. Gillezeau, C. et al., *Update on Human Exposure to Glyphosate with A Complete Review of Exposure in Children,* 19 Env't Health 115 (2020).

99. Guyton, K. et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon, and Glyphosate*, 16 Lancet Oncology 490 (2015).

100. Guzelian, P. et al., *Evidence-based Toxicology: a Comprehensive Framework for Causation*, 24(4) Hum. Experimental Toxicology 161 (2005).

101. Hadfield, N., *Glyphosate Acid – In Vitro Absorption Through Abraded Rabbit Skin Using [14C]-Glyphosate* (Apr. 18, 2012) [MONGLY01284534 – MONGLY01284570].

102. Health and Safety Executive, *Operator Exposure*, http://www.hse.gov.uk/pesticides/topics/pesticide-approvals/pesticides-registration/data-requirements-handbook/operator-exposure.htm.

103. Health Canada, *Re-evaluation Decision RVD2017-01 Glyphosate*, Health Canada Pest Management Regulatory Agency (Apr. 28, 2017).

104. Health Canada, *Statement from Health Canada on Glyphosate*, Health Canada Pest Management Regulatory Agency (Jan. 11, 2019).

105. Hobbs, T. et al., *Measurement of Blood Volume in Adult Rhesus Macaques (Macaca Mulatta)*, 54 J. Am. Ass'n for Lab. Animal Sci. 687 (2015).

106. Holmgaard, R. & J. Nielsen, *Dermal Absorption of Pesticides – Evaluation of Variability and Prevention*, Danish Ministry of the Environment (2009).

107. Hoppe, H., *Determination of Glyphosate Residues in Human Urine Samples from 18 European Countries*, Medical Laboratory Bremen (June 6, 2013).

108. Howe, R. et al., *Metabolism of Glyphosate in Sprague-Dawley Rats. Part II. Identification, Characterization, and Quantification of Glyphosate and its Metabolites after Intravenous and Oral Administration*, Monsanto Report No. MSL-7206 (Feb. 1988) [MONGLY06062970 – MONGLY06063128].

109. IARC (International Agency for Research on Cancer), *Preamble: IARC Monographs on the Identification of Carcinogenic Hazards to Humans* (Amended Jan. 2019).

110. IARC, *IARC Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans, Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos* (2015).

111. Inter-Organization Programme for the Sound Management of Chemicals (IOMC), International Programme on Chemical Safety (IPCS), *Environmental Health Criteria 242: Dermal Absorption* (2014).

112. Japan Food Safety Commission, *Glyphosate Summary*, 4 Food Safety 93 (2016).

113. Jauhiainen, A. et al., *Occupational Exposure of Forest Workers to Glyphosate During Brush Saw Spraying Work*, 52 Am. Indus. Hygiene Ass'n J. 61 (1991).

114. JMPR (Joint Meeting on Pesticide Residues), *Pesticide residues in food – 2016: Evaluations 2016 – Part II – Toxicological*, Special Session of the Joint Meeting of the

FAO Panel of Experts on Pesticide Residues in Food and the Environment and the WHO Core Assessment Group on Pesticide Residues (May 9-13, 2016).

115. JMPR, *Pesticide Residues in Food – Report of the 1994 Joint FAO/WHO Meeting of Experts* (1994).

116. John B. Sullivan, *Toxic Exposure and Medical Causation*, in *Hazardous Materials Toxicology* 309, 309-319 (Gary R. Krieger ed., 1992).

117. Johnson, P. et al., *Operator Exposure When Applying Amenity Herbicides by All-Terrain Vehicles and Controlled Droplet Applicators*, 49 Annals of Occupational Hygiene 25 (2005).

118. Kabat, G. et al., *On Recent Meta-Analyses of Exposure to Glyphosate and Risk of Non-Hodgkin's Lymphoma in Humans*, Cancer Causes & Control (2021).

119. Kasting, G. & L. Bowman, *Electrical Analysis of Fresh, Excised Human Skin: A Comparison with Frozen Skin*, 7 Pharm. Res. 1141 (1990).

120. Keil, C. et al., *Mathematical Models for Estimating Occupational Exposure to Chemicals* (2nd ed. 2009).

121. Kielhorn, J. et al., International Programme on Chemical Safety (IPCS), *Environmental Health Criteria 235: Dermal Absorption* (2006).

122. Korchevskiy, A., *Using Benchmark Dose Modeling for the Quantitative Risk Assessment: Carbon Nanotubes, Asbestos, Glyphosate,* 41 J. Applied Toxicology 148 (2020).

123. Kougias, D. et al., *Risk Assessment of Glyphosate Exposures from Pilot Study with Simulated Heavy Residential Consumer Application of Roundup® using a Margin of Safety (MOS) Approach*, Risk Analysis (2020).

124. Kramer, R., *Herbicide Applicator Exposure to N-Nitroso-Glyphosate during Application of Roundup Herbicide and Field Re-Entry* (Apr. 1978) [MONGLY01313767 – MONGLY01313816].

125. Kruger, M. et al., *Detection of Glyphosate Residues in Animals and Humans*, 4(2) J. Envtl. Analytical Toxicology 1000210 (2014).

126. Lake, R., *Health Risk Assessment: Glyphosate, Report FW14022*, Institute of Environmental Science and Research Limited for the Ministry of Health (2014).

127. Lavy, T. et al., *Conifer Seedling Nursery Worker Exposure to Glyphosate*, 22 Archives Envtl. Contamination & Toxicology 6 (1992).

128. Leon, M. et al., *Pesticide Use and Risk of Non-Hodgkin Lymphoid Malignancies in Agricultural Cohorts from France, Norway and the USA: A Pooled Analysis from the AGRICOH Consortium*, Int'l J. Epidemiology (2019).

129. Lesmes-Fabian, C. et al., *Dermal Exposure Assessments of Pesticide Use: The Case of Sprayers in Potato Farms in the Columbia Highlands*, 430 Science of the Total Environment 202 (2012).

130. Lu, F. et al., *Review of Stratum Corneum Impedance Measurement in Non-Invasive Penetration Application*, 8(2) Biosensors (Basel) 31 (2018).

131. Lunchick, C. et al., *Operator and Field Worker Occupational Exposure Databases and Modeling*, in Hayes' Handbook of Pesticide Toxicology 1139, 1139-1155 (2010).

132. Machado-Neto, J. et al., *Safety of Working Conditions of Glyphosate Applicators on Eucalyptus Forests Using Knapsack and Tractor Powered Sprayers*, 64 Bulletin of Envtl. Contamination and Toxicology 309 (2000).

133. Maibach, H., *Summary: Elimination of 14C-Glyphosate in Rhesus Monkeys Following a Single Dose, & Percutaneous Absorption of 14C-Glyphosate in Roundup® Formulation in Rhesus Monkeys Following a Single Topical Dose*, University of California School of Medicine (Apr. 1, 1983) [MONGLY02142251 – MONGLY02142265].

134. Mandel, J. et al., *Biomonitoring for Farm Families in the Farm Family Exposure Study*, 31(Suppl. 1) Scandinavian J. Work Env't Health 98 (2005).

135. Manning, M., *Assessment of Worker Exposure to Glyphosate during Mist Blower Application of Roundup Herbicide* (Nov. 1991) [MONGLY01299836 – MONGLY01299849].

136. McDuffie, H. et al., *Non-Hodgkin's Lymphoma and Specific Pesticide Exposures in Men: Cross-Canada Study of Pesticides and Health*, 10 Cancer Epidemiology, Biomarkers & Prevention 1155 (2001).

137. Medical Records of Gerard Cervantes.

138. Mesnage, R. et al., *Glyphosate Exposure in a Farmer's Family*, 3 J. Envtl. Protection 1001 (2012).

139. Monsanto Company, Label for Roundup Pro® Herbicide (2007) (Exhibit 5 to the Deposition of Gerard Cervantes).

140. Monsanto Company, Label for Roundup® L&G Ready-to-Use Grass & Weed Killer (1991) Exhibit 4 to the Deposition of Gerard Cervantes).

141. Monsanto Company, Label for Roundup® Weed & Grass Killer 1 (2002) [MONGLY10529758 – MONGLY10529759].

142. Monsanto Company, Safety Data Sheet for Roundup Pro® Herbicide (2015).

143. National Center for Biotechnology Information (NCBI), *PubChem Database Compound Summary: Glyphosate*, https://pubchem.ncbi.nlm.nih.gov/compound/3496.

144. NCBI, *PubChem Database Compound Summary: Glyphosate-isopropylammonium*, https://pubchem.ncbi.nlm.nih.gov/compound/38078.

145. New Zealand Environmental Protection Authority, *Risk Assessment Methodology for Hazardous Substances* (May 2018) (draft).

146. Ngo, M. et al., *Percutaneous Absorption and Exposure Assessment of Pesticides*, 30 J. Applied Toxicology 91 (2010).

147. Nielsen, J. et al., *Storage Conditions of Skin Affect Tissue Structure and Subsequent In Vitro Percutaneous Penetration*, 24 Skin Pharmacology & Physiology 93 (2011).

148. Nielsen, J. et al., *The Usual Suspects – Influence of Physicochemical Properties on Lag Time, Skin Deposition, and Percutaneous Penetration of Nine Model Compounds*, 72 J.

Toxicology Envtl. Health, Part A 315 (2009).

149. Nielsen, J., *Defense against Dermal Exposures is Only Skin Deep: Significantly Increased Penetration through Slightly Damaged Skin*, 299 Archives of Dermatological Res. 423 (2007).

150. Niemann, L. et al., *A Critical Review of Glyphosate Findings in Human Urine Samples and Comparison with the Exposure of Operators and Consumers*, 10 J. Consumer Protection & Food Safety 3 (2015).

151. OECD (Organisation for Economic Cooperation and Development), *Guidance Document for the Conduct of Skin Absorption Studies* (Mar. 5, 2004).

152. OECD, *Guidance Notes on Dermal Absorption* (Aug. 18, 2011).

153. OECD, *Guideline for the Testing of Chemicals - Skin Absorption: In Vitro Method* (Apr. 13, 2004).

154. OEHHA (Office of Environmental Health Hazard Assessment), *Proposition 65 No Significant Risk Levels (NSRLs) for Carcinogens and Maximum Allowable Dose Levels (MADLS) for Chemicals Causing Reproductive Toxicity*, Cal. EPA (Oct. 2018).

155. OEHHA (Office of Environmental Health Hazard Assessment), *Statement Regarding US EPA's Press Release and Registrant Letter on Glyphosate*, Cal. EPA (Aug. 12, 2019).

156. Oltmanns, J. et al., *Effectiveness of Personal Protective Equipment against Dermal Exposure – A Comparative Study*, Federal Institute for Occupational Safety and Health (2016).

157. Pahwa, M. et al., *Glyphosate Use and Associations with Non-Hodgkin Lymphoma Major Histological Sub-Types: Findings from the North American Pooled Project*, Scandinavian J. Work Env't Health (2019).

158. Peach, H. & N. Barnett, *Critical Review of Epidemiological Studies of the Association Between Smoking and Non-Hodgkin's Lymphoma*, 46 Hematological Oncology 67 (2001).

159. Perry, M. et al., *Historical Evidence of Glyphosate Exposure from a U.S. Agricultural Cohort*, 18 Envtl. Health 42 (2019).

160. Pierce, J. et al., *Pilot Study Evaluating Inhalation and Dermal Glyphosate Exposure Resulting from Simulated Heavy Residential Consumer Application of Roundup®*, 32 Inhalation Toxicology 354 (2020).

161. Plaintiff Fact Sheet of Gerard Cervantes.

162. R. D. O'Brien, *Organophosphates: Chemistry and Inhibitory Activity*, in *Insecticides: Action and Metabolism* 32, 32-54 (1967).

163. Ridley, W. & K. Mirly, *Volume 1: The Metabolism of Glyphosate in Sprague Dawley Rats – Part 1. Excretion and Tissue Distribution of Glyphosate and Its Metabolites following Intravenous and Oral Administration*, Monsanto Company (Mar. 23, 1988) [MONGLY00148193-MONGLY00148787].

164. Riordan, A., *Evaluation of Glyphosate Use and Non-Hodgkin's Lymphoma – A Preliminary Trend Assessment*, American Industrial Hygiene Association (2020).

10

165. Smith, S., *240 g/L Glyphosate SL Formulation (MON 79546) – In Vitro Absorption through Human Dermatomed Skin Using [14C]-Glyphosate* (Feb. 12, 2014) [MONGLY08731410 – MONGLY08731464].

166. Smith, S., *7.2 g/L Glyphosate Gel Formulation (MON 76904) – In Vitro Absorption through Human Dermatomed Skin using [14C]-Glyphosate* (July 23, 2015) [MONGLY08731619 – MONGLY08731699].

167. Smith, S., *720 g/kg Glyphosate SG Formulation (MON 79991) – In Vitro Absorption through Human Dermatomed Skin Using [14C]-Glyphosate* (Feb. 12, 2014) [MONGLY08731465 – MONGLY08731523].

168. Solomon, K., *Estimated Exposure to Glyphosate in Humans via Environmental, Occupational, and Dietary Pathways: An Updated Review of the Scientific Literature*, Pest Mgmt. Sci. (2020).

169. Solomon, K., *Glyphosate in the General Population and In Applicators: A Critical Review of Studies on Exposures*, 46 Critical Revs. Toxicology 21 (2016).

170. Tarazona, J. et al., *Glyphosate Toxicity and Carcinogenicity: A Review of the Scientific Basis of the European Union Assessment and its Differences with IARC*, 91 Archives of Toxicology 2723 (2017).

171. Temple, W., *Review of the Evidence Relating to Glyphosate and Carcinogenicity*, New Zealand Environmental Protection Authority (Aug. 2016).

172. *The Pesticide Manual: A World Compendium* (J. A. Turner ed., 18th ed. 2018).

173. Thomas, K. et al., *Assessment of a Pesticide Exposure Intensity Algorithm in the Agricultural Health Study*, 20 J. Exposure Sci. and Envtl. Epidemiology 559 (2010).

174. Thongsinthusak, T. et al., *Guidance for the Preparation of Human Pesticide Exposure Assessment Documents*, Cal. EPA (May 4, 1993).

175. Transcript of Proceedings, *Johnson v. Monsanto Co.*, No. CGC-16-550128 (Cal. Super. Ct. S.F. Cty. July 26, 2018 p.m.) (testimony of Dr. William Sawyer).

176. Transcript of Proceedings, *Pilliod v. Monsanto Co.*, No. RG17862702 (Cal. Super. Ct. Alameda Cty Apr. 11, 2019) (testimony of Dr. William Sawyer).

177. Van Burgsteden, J., *In Vitro Percutaneous Absorption Study with [14C]glyphosate using Viable Rat Skin Membranes*, TNO Nutrition and Food Research (Jul. 29, 2003) [MONGLY01285806 – MONGLY01285848].

178. Vitali, M. et al., *Operative Modalities and Exposure to Pesticides During Open Field Treatments Among a Group of Agricultural Subcontractors*, 57 Archives Envtl. Contamination & Toxicology 193 (2009).

179. Ward, R., *360g/L Glyphosate SL Formulation (MON 52276) In Vitro Absorption of Glyphosate through Human Epidermis* (Feb. 12, 2010) [MONGLY00698737 – MONGLY00698789].

180. Ward, R., *450 g/L Glyphosate SL Formulation (MON 79545) In Vitro Absorption of Glyphosate through Human Epidermis, DLT-09-093* (Feb. 12, 2010) [MONGLY00698684 – MONGLY00698736].

181. Ward, R., *480 g/L Glyphosate SL Formulation (MON 79351) In Vitro Absorption of Glyphosate through Human Epidermis* (Feb. 12, 2010) [MONGLY00698790 – MONGLY00698842].

182. Wester, R., et al., *Glyphosate Skin Binding, Absorption, Residual Tissue Distribution, and Skin Decontamination*, 16 Fundamental and Applied Toxicology 725 (1991).

183. Wester, R., et al., *In Vitro Percutaneous Absorption of Model Compounds Glyphosate and Malathion from Cotton Fabric into and through Human Skin*, 34 Food and Chemical Toxicology 731 (1996).

184. Zhai, H., et al., *Skin Decontamination of Glyphosate from Human Skin In Vitro*, 45 Food and Chemical Toxicology 2258 (2008).

185. Zhang, L. et al., *Exposure to Glyphosate-Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence*, 781 Mutation Research/Reviews in Mutation Research 186 (2019).

186. Zoller, O. et al., *Urine Glyphosate Level as a Quantitative Biomarker of Oral Exposure*, 228 Int'l J. Hygiene Env't Health 113526 (2020).