# EXHIBIT 7



Hygiene Technologies International, Inc.

3625 Del Amo Boulevard, Suite 180
Torrance, California 90503-1643
(310) 370-8370
(310) 370-2474 FAX
www.hygienetech.com

February 12, 2021

Dentons US LLP
601 South Figueroa Street, 25ʰ Floor
Los Angeles, California 90017

Document No. 92007035

Attention:     Frederic W. Norris, Esq.

Regarding:     Primary Industrial Hygiene Expert Opinions of Brian P. Daly, CIH, PE
                        James Peterson v. Monsanto Company

Dear Mr. Norris:

In the enclosed report, I have expressed my primary expert opinions that I have formulated regarding the above-referenced case, along with references, other supporting documents, and information that I used in developing those opinions. Be advised that my primary opinions appear in Section 14.0 of this report; however, other supporting opinions do appear in most all of the other sections of the document, and all opinions, regardless of where they appear in the report under this cover letter, apply to my findings in the case. I offer each of those opinions to a reasonable degree of scientific probability or scientific certainty.

Also be advised that if I receive other documents, such as reports of Plaintiff or Defense experts, or additional statements, declarations, affidavits, or depositions of the Plaintiffs, Plaintiffs' experts, Defense experts, or others, I would anticipate that upon review of any such documents, and/or if I conduct a site visit, I may develop additional opinions and/or I may revise existing opinions.

If you have any comments or questions, please do not hesitate to contact me directly at (310) 370-8370 or by cellular phone at ████████████.

Sincerely,

**HYGIENE TECHNOLOGIES INTERNATIONAL, INC.**

Brian P. Daly, CIH, PE
President



**HYGIENETECH**

Hygiene Technologies International, Inc.

3625 Del Amo Boulevard, Suite 180
Torrance, California 90503-1643
(310) 370-8370
(310) 370-2474 FAX
www.hygienetech.com

**EXPERT OPINIONS
BRIAN P. DALY, CIH, PE**

**JAMES PETERSON
V.
MONSANTO COMPANY**

**PREPARED FOR:**

**DENTONS US LLP
601 SOUTH FIGUEROA STREET, 25TH FLOOR
LOS ANGELES, CALIFORNIA**

**PREPARED BY:**

**HYGIENE TECHNOLOGIES INTERNATIONAL, INC.
3625 DEL AMO BOULEVARD, SUITE 180
TORRANCE, CALIFORNIA**

**FEBRUARY 12, 2021**

Los Angeles · Ontario · Sacramento · Santa Clarita · Torrance
Chicago · Cleveland · Norfolk · New York

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 1



# 1.0   BACKGROUND

From my standpoint, the subject matter is concerned with the potential *Roundup*® exposures of James Peterson, who is the primary focus of this case, since he reportedly first acquired that herbicide for use at his home in 2013 until February 2017, when he was diagnosed with "non-small cell, Type B non-Hodgkin lymphoma" (NHL).  Note that Mr. Peterson was born in Chicago, Illinois               and, to the degree possible, I will also attempt to assess possible risk factors and/or exposures that may be relevant to this case from the time of his birth until the time of his diagnosis in early 2017.  Mr. Peterson has reportedly lived in Hoffman Estates, Illinois from January 1959 to the present.  Regarding his employment, Mr. Peterson was most recently a *Letter Carrier* for the United States Postal Service (USPS) in Schaumburg, Illinois, where he worked from May 1992 until he retired in February 2011.  While at USPS, his job responsibilities included sorting, delivering, and collecting mail and parcels, with much of his on-the-job work hours spent out-of-doors.

Mr. Peterson graduated with a Bachelor of Science in Geology in 1968, after which he had multiple desk jobs, beginning with two years at Nuclear Chicago (a division of G.D. Searle), followed by an estimated seven years at Motorola, followed by nine years at Baxter Travenol.  After leaving Baxter, and after approximately two years of unemployment (during which he did freelance photography), Mr. Peterson worked as an *Estimator* at Sun Process, a job he had until 1992, and then he was employed as a *Letter Carrier* with USPS.  Mr. Peterson also taught photography at Harper College during the evenings for 30 years.  And finally, during his college years, Mr. Peterson served in the U.S. Army for nearly 24 months, during which he reported for duty at Fort Knox; he was eventually trained in radio communication; and he was deployed on one tour to Korea.

In the Complaint and Jury Demand filed in this case, James Peterson, "[P]laintiff brings this action for personal injuries sustained by Plaintiff's exposure to Roundup® ("Roundup") containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA").  As a direct and proximate result of being exposed to Roundup, Plaintiff's decedent (sic) developed Non-Hodgkin's Lymphoma."

Be advised that NHL is a term used for many different types of lymphoma, which is a malignancy of the white blood cells, also called lymphocytes, or lymph-node cells, all of which are part of the body's immune system.  In the case of lymphoma, lymphocytes multiply uncontrollably; they do not function as normal, healthy white blood cells; and those cancerous cells have the abnormal capacity to invade other tissues throughout the body.  Lymphomas can start in any part of the body where lymph tissue exists, the major sites of which include the lymph nodes, spleen, bone marrow, thymus, adenoids and tonsils, and the digestive tract.  Over 60 subtypes of NHL have been identified by the World Health Organization and, collectively, NHL is the seventh or eighth most common cause of cancer-related deaths in the United States.  The precise causes of NHL diseases are unknown, but age is certainly a risk factor that is profoundly relevant to most NHL subtypes (as it is with many cancers).  In addition, though, be advised that some medical conditions are also associated with an increased risk of NHL diseases, including inherited immune deficiencies; a family history of lymphoma; genetic syndromes, such as Down or Klinefelter's syndrome; some immune disorders, such as rheumatoid arthritis or systemic lupus erythematosus; inflammatory bowel disease, particularly Crohn's disease; psoriasis; and exposures to certain bacteria, such as *Helicobacter pylori*, *Borrelia burgdorferi* (the latter associated with Lyme disease), *Campylobacter jejuni*, and *Chalmydia psittaci*; along with exposures to certain viruses, such as HIV, SV-40, Epstein Barr virus, and hepatitis virus; and exposures to some chemicals or physical agents, such as ultraviolet (UV) radiation, ionizing radiation, and chemotherapy compounds.  And finally, some studies have suggested that exposures to high levels of

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 2



# 1.0   BACKGROUND (CONTINUED)

nitrates in drinking water or high fat diets, or excessive consumption of ethyl alcohol, being overweight, and/or exposures to chemicals, such as those associated with farming, cosmetology, spray painting, the use of solvent cleaners, carpentry, metal machining, and textile production, may be associated with a higher incidence of NHL.  Those latter issues, along with NHL disease trends associated with gender and race, will be addressed in some detail in this report.

Mr. Peterson denied performing work (either professionally or otherwise) that may have put him at higher risk of NHL disease; and he denied having other possible risk factors such as diabetes, obesity, autoimmune diseases, Epstein Barr virus, cigarette smoking, or any significant ethyl alcohol consumption. Mr. Peterson alleged in a document identified as a Plaintiff Fact Sheet that he used Roundup® Weed Killer two to three times per week in order to control weeds on his personal property in Hoffman Estates, Illinois from 2013 to 2016.  He claimed to have used a pressurized sprayer when applying Roundup® while wearing vinyl/latex gloves, long-sleeved shirts, and long pants that were either corduroy or "chinos," and when it was colder, a jacket.  Be advised that according to his deposition testimony and his answers to interrogatories, he was quite clear that he wore vinyl/latex gloves when he sprayed or diluted weed killers, and he was always very careful when dispensing Roundup® concentrate because he was aware intuitively that he should not get that concentrate material on his skin.  And after each application exercise, he would dispose of the gloves.  He also testified that he actually only used Roundup® once or twice per month, not two to three times per week (Plaintiff deposition, Page 147, Lines 5 through 7) and he stated that he would use the Roundup® sprayer for about 40 minutes per application (Plaintiff's deposition, Page 155, Lines 17 through 22), after which he would "get washed up" (Plaintiff's deposition, Page 172, Line 17).  He did testify that he did not recall ever getting Roundup® concentrate on his skin (Plaintiff's deposition, Page 173, Lines 5 through 12).  Reportedly, he initially used pre-mixed Roundup® products in containers equipped with a pump trigger, and then later in July 2015 (verified by a receipt), he purchased a two-gallon pressurized pump apparatus that he used with Roundup® concentrate.  He claimed to have preferred using the two-gallon pressurized pump equipment.

Roundup® is a brand name of a systemic, broad-spectrum glyphosate-based herbicide that was originally produced commercially and first sold in 1974 by Monsanto and, since then, glyphosate-based products have become the most widely used herbicides globally.  The Plaintiffs' Complaint cited the "World Health Organization's March 24, 2015 finding that glyphosate is a 'probable carcinogen' as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals." The Plaintiff's Complaint also indicated that the "IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans.  According to the authors of that monograph, glyphosate demonstrated sufficient mechanistic (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals….The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides."  Be advised that Roundup® was a regulated herbicide that by 2015 was used commonly in agricultural communities worldwide (and on residential properties by typical domestic consumers) for decades and no agency before IARC had claimed that use of that product would potentially lead to an increased risk of developing cancer.

Be advised that in 1991, based on animal studies, the United States Environmental Protection Agency (U.S. EPA) classified glyphosate with the language "evidence of non-carcinogenicity in humans (Group E)."  And, following the development of evidence, the U.S. EPA reaffirmed on April 30, 2019 that glyphosate was not a carcinogen.  On that day, Reuters, one of the largest news organizations in the world, reported that the "'EPA continues to find that there are no risks to public health when glyphosate is used in accordance with

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 3



# 1.0    BACKGROUND (CONTINUED)

its current label and that glyphosate is not a carcinogen,' the agency said in a statement."  Leading up to that reaffirmation, the U.S. EPA had continued to state that glyphosate use as directed did not pose health issues.  In January 2020, after receiving and considering public comments, "the EPA continues to find that there are no risks of concern to human health when glyphosate is used in accordance with its current label.  The EPA also found that glyphosate is unlikely to be a human carcinogen" (U.S. EPA website on Glyphosate).

Also, in August 2020, the U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry (ATSDR) published a document entitled *Toxicological Profile for Glyphosate*, and that toxicological profile, like all such ATSDR's profiles, succinctly characterized the toxicologic and adverse health effects information for the named compound.  In my opinion, the essential findings of ATSDR concerning glyphosate that may be potentially relevant to this case were the following.

- The lowest acute Minimal Risk Level (MRL) for glyphosate was 175 milligrams per kilogram of body weight per day (mg/kg/day), based on the acute oral administration and gastrointestinal effects observed (in animal studies).

- An *acute* oral exposure No Observable Adverse Effect Level (NOAEL) was established at 1 mg/kg/day, which represents a safety (or uncertainty) factor of 100 (Reference: U.S. EPA).  A *chronic* oral NOAEL was also set at 1 mg/kg/day (Reference: U.S. EPA).

In reviewing the National Cancer Institute (NCI) Surveillance, Epidemiology, and End Results (SEER) Program data from 1992 to 2017 in the United States, I know that during that time period, NCI has recorded no essential change in the incidence rates of leukemia or NHL (regardless of subtype and/or suspected or alleged etiology).  Note that, based on data published by the United States Geological Survey (USGS), in 1992, the use of glyphosate in the U.S. was most certainly under 25 million pounds countrywide, and its use agriculturally by 2012 had increased to well over 250 million pounds annually in the U.S., and the U.S. EPA estimates that agricultural use of glyphosate is currently about 280 million pounds annually in the U.S.  Therefore, given the dramatic increase in use of glyphosate as an herbicide in the U.S. after 1992, and particularly after its exponential increase in use after 1996 when Roundup®-Ready crops were introduced into the marketplace and use of glyphosate in the agricultural community increased by nearly 15-fold, health professionals cannot without additional compelling evidence reasonably conclude that exposures to glyphosate during farming or domestic use of herbicides with that active ingredient have increased the incidence of NHL in U.S. residents.  Simply speaking, the SEER NHL incidence rate data and the USGS glyphosate use statistics from 1992 to 2017 do not support a conclusion that glyphosate exposures under those circumstances leads to an increased risk of NHL in humans.

In 2004, Kato, et al. in a paper entitled *Pesticide Product Use and Risk of Non-Hodgkin Lymphoma in Women* wrote that, "A population-based, incidence case-control study was conducted among women in upstate New York to determine whether pesticide exposure is associated with an increase in risk of non-Hodgkin lymphoma (NHL) among women."  Those researchers noted a "particularly elevated" increased incidence of NHL in the study population when pesticide exposure began in the 1950 to 1969 era, years before Roundup® and other glyphosate-based herbicides were available for use.  Also, in 2004, David J. Tenenbaum in his paper entitled *The Monster in the Closet: Mothballs' Link to Non-Hodgkin Lymphoma*, wrote that the, "The incidence of NHL has roughly doubled since the 1970s, a few decades after a marked rise in the U.S. household and agricultural pesticide use…."  Both the Kato, et al. team and Tenenbaum indicated that a marked increase in NHL incidence appeared a few decades after the



# 1.0   BACKGROUND (CONTINUED)

increased use of pesticides during the 1950 to 1969 era (and, according to Tannenbaum, perhaps also due, in part, to the popular use of mothballs in closets of homes during that time).   A point those researchers did not make was that decades after the introduction of glyphosate-based herbicides, which occurred in 1974, the U.S. has not seen an increased incidence of NHL countrywide; and, while discrete regions of the U.S. have shown higher rates of NHL than other areas, those regions with higher rates do not match well with the parts of the U.S. where the greatest volumes of glyphosate were used during the same time period.

I reviewed the deposition transcript of James Peterson dated November 14, 2019 at which time I learned that he described his disease as non-small cell, Type B NHL, which is more commonly referred to as diffuse large B-cell lymphoma (DLBCL).   According to the American Cancer Society, B-cell lymphomas comprise about 85 percent of the NHL cases in the United States, with the most common type being DLBCL, which statistically occurs in about one-third of the lymphoma cases.   Be advised that DLBCL can affect people of any age, but it is primarily diagnosed in older people (average age in the mid-60s).   In most cases, the suspect etiology of the disease is undetermined; however, having an autoimmune condition, like rheumatoid arthritis or lupus, or having



HIV are known to potentially increase a person's risk.   Having a family member who has had lymphoma or having the hepatitis C virus, and/or being overweight may introduce an increased risk of the diseases. Studies have shown that other risk factors may be relevant to an increased risk of NHL, which will be addressed later in the report.   DLBCL tends to be a fast-growing, aggressive lymphoma, but according to the American Cancer Society, the disease often responds well to treatment, with about three out of four affected patients having no signs of disease after the initial treatment.   Mr. Peterson testified that, as of the time of his deposition, he no longer had signs of cancer.   Mr. Peterson also testified that he had not heard from a medical doctor that his NHL was caused by his use of Roundup®; rather, he deduced an association between glyphosate and his disease from other sources.

Regarding his use of weed killers in general, Mr. Peterson provided additional details during his deposition. He only used Roundup® in a "jug with a sprayer thing on it" (Plaintiff's Deposition, Page 88, Lines 18 and 19) and, as I indicated previously, he testified that he later used a pressurized pump apparatus, which he bought in July 2015 (as verified by a receipt).   When using the pressurized pump, which Mr. Peterson stated he preferred, he would dilute the Roundup® concentrate formula with water.   He testified that he only used Roundup® on his pavers at his side yard and backyard at his home in Hoffman Estates, Illinois, but not on the grass and never on flower beds.   During application of weed killers, he would point the wand attachment/sprayer down toward the pavers (and never upwards toward his face or other body parts). He recalled using other weed killers, such a Weed-B-Gon and Weed and Feed, the latter of which was a granule product that was literally not a liquid.   The Weed and Feed product he would use (or have a contractor use for him) just once per year.   As indicated previously, he would use Roundup® perhaps just once or twice per month during the months in which there was no snow on the ground (spring, summer, and fall).   He stated that, when he was mixing the Roundup® concentrate, he "would either be extremely careful that none got on me" or he "would wear the (vinyl/latex) gloves" (Plaintiff deposition, Page 137,



## 1.0   BACKGROUND (CONTINUED)

Lines 19 through 21).  He added that if any got on his skin, he would "wash it off immediately.  I mean, I would go in the house and get soap and water and wash it off" (Plaintiff deposition, Page 138, Lines 1 through 3).  Later during that same deposition, Mr. Peterson testified that "I was careful, very careful, but if I had gotten any on…my hands, I'd wash it off right away" (Plaintiff deposition, Page 149, Lines 12 through 14).  Regarding his clothing that he wore when he applied herbicides, Mr. Peterson testified that he wore "old clothes" that he implied were not his everyday clothes, and after the application exercise, he would change his clothes before he would "go out to a store or something."  On such matters, Mr. Peterson testified that he actually never remembered getting Roundup® on his skin or clothes and, while he testified that he would not refuse to apply Roundup® on a windy day, he did not ever recall applying Roundup® on a day when wind speed would be expected to be an exposure potential factor (Plaintiff deposition, Page 173).

Regarding Mr. Peterson's personal or family medical histories, his mother, Harriet Neier, died of small cell lung cancer in mid-2012.  Mr. Peterson had colon polyps, which are risk factors for cancer; and he had two small adenomas (benign tumors that have a low potential to become malignant) removed in the past, along with chronic fatigue syndrome, ataxia, and diverticular disease; and he had a history of being obese or borderline obese (despite the fact that he denied obesity on multiple Plaintiff Fact Sheet documents).  At the time of his deposition, he was regularly taking medications to control cholesterol, high blood pressure, and gastroesophageal reflux disease (GERD).  And, both he and his sister have arthritis, but he denied that either was considered rheumatoid arthritis.  I provide this medical information simply for completeness sake, given I am not suggesting that all such facts are necessarily relevant to Mr. Peterson's NHL.  Besides his age, gender, and race, other potentially relevant NHL risk factors that apply to James Peterson include his first-generation family cancer history (his mother died of lung cancer); his benzene exposure due to secondhand and side stream cigarette smoke (from his mother who was a heavy cigarette smoker for 43 years); obesity (a reported fact based on review of his medical records); his UV exposure (estimated at six days per week, for nearly 19 years as a *Letter Carrier*); his rheumatoid arthritis (an autoimmune disease); and his personal medical history of cancer (basal cell carcinoma of the skin on his ear)—the latter two risk factors of which I learned by reading the report of William R. Sawyer, Ph.D. of Toxicology Consultants & Assessment Specialists, LLC dated January 22, 2021.  Dr. Sawyer is an expert in this case.

## 2.0   PERSONAL GENERAL QUALIFICATIONS

I am an industrial hygienist with and President of Hygiene Technologies International, Inc. (HygieneTech).  I am certified by the American Board of Industrial Hygiene in the comprehensive practice of industrial hygiene.  I am also registered as a Professional Engineer with the State of California.  Industrial hygiene, which is a multidisciplinary profession that incorporates principles of toxicology, epidemiology, chemistry, microbiology, physiology, and other physical sciences and engineering, is defined as the art and science devoted to the anticipation, recognition, evaluation, and control of health and safety hazards posed by a wide range of chemical, physical, biological, and ergonomic stressors.  I have approximately 40 years of experience assessing and evaluating health hazards, including those posed by pesticides and other particulate and aerosols, benzene and other aromatic hydrocarbons, chlorinated and non-chlorinated solvent vapors and oils, isocyanates and other sensitizers, welding fume and other metals, acids and other corrosives, chemical and simple asphyxiants, and a wide variety of other physical and chemical exposures in industrial workplaces, hazardous waste sites, out-of-doors at chemical spill sites, in



## 2.0   PERSONAL GENERAL QUALIFICATIONS (CONTINUED)

chemical fire and brushfire areas, at sensitive receptor sites in urban, suburban, and rural neighborhoods; as well as in non-industrial settings, such as homes, office buildings, schools, theaters, airports, courtrooms, and other private, governmental, and commercial buildings to which the general public and/or workers have access.  My Curriculum Vitae is included in Attachment A and I have provided a testimony list of cases with which I have been involved as Attachment B.  I charge $475 per hour for document review/report preparation and $600 per hour for deposition and trial testimony.

## 3.0   DOCUMENTS REVIEWED/RELIANCE LIST

I have reviewed the following relevant documents prior to preparation of this report.  Note that I anticipate that I may review additional documents, such as additional expert reports or deposition transcripts of defendants' and plaintiffs' experts, if such documents become available.

3.1   Case-Specific Documents

- Complaint and Jury Demand, United States District Court, Northern District of Illinois, James Peterson, Plaintiff, v. Monsanto Company, Defendant, Case No.3:18-cv-07271-VC, filed on October 26, 2018
- Defendant Monsanto Company's Notice to take Oral and Videotaped Deposition of Plaintiff James Peterson, Case No. 3:18-cv-07271, under the case name: James Peterson v. Monsanto Company
- Plaintiff Fact Sheet, United States District Court, Northern District of California, regarding Roundup Products Liability Litigation, MDL No. 2741, Case No. 16-md-02741-VC dated February 26, 2019
- First Amended Plaintiff Fact Sheet, United States District Court, Northern District of California, regarding Roundup Products Liability Litigation, MDL No. 2741, Case No. 16-md-02741-VC May 8, 2019
- Plaintiff Fact Sheet, United States District Court, Northern District of California, regarding Roundup Products Liability Litigation, MDL No. 2741, Case No. 16-md-02741-VC dated May 13, 2019
- Deposition transcript of James Peterson dated November 14, 2019 (and exhibits)
- Walmart receipt dated July 16, 2015 for, among other items, a two-gallon sprayer
- A photograph of a Roundup® sprayer and packaging container for such a sprayer
- Two photographs of what appeared to have been a garage and a portion of a yard having concrete pavers and a lawn; one photograph also showing a small boat on a trailer and bags of material (presumably for gardening); and the other photograph showing a garden hose reel
- A photograph of what appeared to have been a domestic yard area with an uncovered patio having brick/stone pavers and a picnic table
- Illinois Gastroenterology Group medical records involving James Peterson
- Expert report of Lauren Pinter-Brown, MD, FACP dated January 21, 2021 (and reliance list)
- Expert report by William R. Sawyer, Ph.D. of Toxicology Consultants & Assessment Specialists, LLC dated January 22, 2021
- Expert report by Dennis D. Weisenburger, MD dated January 8, 2021
- Roundup® Ready-to-Use Weed & Grass Killer III (Net 1 Gallon) container label, 2014
- Roundup® Ready-to-Use Weed & Grass Killer III Safety Data Sheet, October 15, 2015

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 7



# 3.0   DOCUMENTS REVIEWED/RELIANCE LIST (CONTINUED)

3.2    Expert Reports and Testimony Transcripts on Glyphosate

- Deposition transcript of William Sawyer, Ph.D., *Johnson v. Monsanto Co.*, No. CGC-18-550128, February 26 and 27, 2018
- Transcript of Proceedings, *Johnson v. Monsanto Co.*, No. CGC-18-550128, July 26, 2018
- Deposition transcript of William Sawyer, Ph.D., *Peterson v. Monsanto Co.*, No. 1622-CC01071, August 23, 2018
- Deposition transcript of William Sawyer, Ph.D., *Peterson v. Monsanto Co.*, No. 1622-CC01071, October 16, 2018
- Deposition transcript of William Sawyer, Ph.D., *Pilliod v. Monsanto Co.,* No. RG-17-862702, February 6, 2019
- Transcript of Proceedings, *Pilliod v. Monsanto Co.*, No. RG17862702, April 11, 2019
- Deposition transcript of Daniel Bucks, Ph.D., *Winston v. Monsanto Co.*, No. 1822-CC00515 (Pages 107-108, 187-194), September 17, 2019
- Expert Report of William Sawyer, *Caballero v. Monsanto Co.*, No. MSC 19-01821, October 31, 2019
- Expert Report of William Sawyer regarding Plaintiff Darren Marshall in *Bognar v. Monsanto Co.*, No. 18SL-CC02199, January 9, 2020
- Expert Report of William Sawyer regarding Plaintiff Joseph Bauhs in *Bognar v. Monsanto Co.*, No. 18SL-CC02199, January 9, 2020
- Deposition transcript of William Sawyer, *Bognar v. Monsanto Co.*, No. 18SL-CC02199, January 10, 2020
- Deposition transcript of William Sawyer, *Kane v. Monsanto Co.*, No. 1622-CC10172, January 11 and 12, 2020
- Expert Report of William Sawyer regarding Plaintiff Larry Jenkins, *Seitz v. Monsanto Co.*, No. 1722-CC11325, January 13, 2020
- Deposition transcript of William Sawyer, *Seitz v. Monsanto Co.*, No. 1722-CC11325, January 14 and 15, 2020
- Deposition transcript of William Sawyer, *Whitby v. Monsanto Co.*, No. 19SL-CC04020, January 22, 2020
- Declaration of Martha Sandy, Ph.D. in Support of Defendant's Motion for Summary Judgment and Defendant's Cross-Motion for Summary Judgment; United States District Court, Eastern District of California, Case No. 2:17-cv-02401-WBS-EFB, dated March 23, 2020

3.3    General Library Documents on non-Hodgkin Lymphoma

- *A Death-Certificate Case-Control Study of non-Hodgkin's Lymphoma and Occupation in Men in North Carolina*, Schumacher and Delzell, 1988
- *Non-Hodgkin's Lymphoma in a Cohort of Vietnam Veterans*, O'Brien, et al.,1991
- *Pesticides and Other Agricultural Risk Factors for Non-Hodgkin's Lymphomas Among Men in Iowa and Minnesota*, Cantor, et al., 1992
- National Cancer Institute (NCI) Surveillance, Epidemiology, and End Results (SEER) Program data from 1992 to 2017 in the United States
- *Twenty-Year Trends in the Reported Incidence of Mycosis Fungoides and Associated Mortality*, Weinstock and Gardstein, 1999

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 8



# 3.0   DOCUMENTS REVIEWED/RELIANCE LIST (CONTINUED)

3.3   <u>General Library Documents on non-Hodgkin Lymphoma</u> (Continued)

- *Non-Hodgkin's Lymphoma and Specific Pesticide Exposures in Men: Cross-Canada Study of Pesticides and Health*, McDuffie, et al., 2001
- *The Monster in the Closet: Mothballs' Link to Non-Hodgkin Lymphoma*, David J. Tanenbaum, 2004
- *Pesticide Product Use and Risk of Non-Hodgkin Lymphoma in Women*, Kato, et al., 2004
- *Non-Hodgkin's Lymphoma and Type of Tobacco Smoke*, Stagnaro, et al., 2004
- *Tobacco Use and non-Hodgkin Lymphoma: Results from a Population-Based Case-Control Study in the San Francisco Bay Area, California*, Bracci and Holly, 2005
- *Cancer Epidemiology and Prevention, 3rd Edition*, Schottenfield and Fraumeni, 2006
- *Occupational Trichloroethylene Exposure and Non-Hodgkin's Lymphoma: A Meta-Analysis and Review*, Mandel, et al., 2006
- *Occupational Sun Exposure and Mycosis Fungoides: A European Multicenter Case-Control Study*, Morales-Suárez-Varela, et al., 2006
- *High Risk Occupations for Non-Hodgkin's Lymphoma in New Zealand: A Case-Control Study*, 't Mannetje, et al., 2008
- *Personal Use of Hair Dye and the Risk of Certain Subtypes of Non-Hodgkin Lymphoma*, Zhang, Yawei, et al., 2008
- *Diabetes and Risk of Non-Hodgkin's Lymphoma*, Mitri, et al., 2008
- *Occupational Exposure to Solvent and Risk of Non-Hodgkin Lymphoma in Connecticut Women*, Wang, et al., 2009
- *Occupation/Industry and Risk of Non Hodgkin Lymphoma in the United States*, Schenk, et al., 2009
- *Cutaneous Lymphoma Incidence Patterns in the United States: A Population-Based Study of 3884 Cases*, Bradford, et al. 2009
- *Obesity, Diet and Risk of Non-Hodgkin Lymphoma*, Christine F. Skibola, 2010
- *Spatial-Temporal Analysis of non-Hodgkin Lymphoma in the NCI-SEER NHL Case-Control Study*, Wheeler, et al., 2011
- *Lymphoma Risk and Occupational Exposure to Pesticides: Results of the EPILYMPH Study*, Cocco, et al., 2013
- *Occupational Exposure to Trichloroethylene and Risk of non-Hodgkin Lymphoma and Its Major Subtypes: A Pooled InterLymph Analysis*, Cocco, et al., 2013
- *Non-Hodgkin Lymphoma and Occupational Exposure to Agricultural Pesticide Chemical Groups and Active Ingredients: A Systematic Review and Meta-Analysis*, Schinasi and Leon, 2014
- *Non-Hodgkin Lymphoma Risk and Insecticide, Fungicide and Fumigant Use in the Agricultural Health Study*, Alavanja, et al., 2014
- *Occupation and Risk of Non-Hodgkin Lymphoma and Its Subtypes: A Pooled Analysis from the InterLymph Consortium*, 't Mannetje, et al., 2016
- American Cancer Society *Key Statistics for Non-Hodgkin Lymphoma*; 2020
- *Cancer, ALK Negative Anaplastic Large Cell Lymphoma*, Kao, et al., last updated June 2, 2020

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 9



## 3.0   DOCUMENTS REVIEWED/RELIANCE LIST (CONTINUED)

3.4   General Library Documents on Glyphosate and Roundup®

- *Rapid Inactivation of Glyphosate in Soil*, Sprankle, et al., 1975
- *Metabolism and Degradation of Glyphosate in Soil and Water*, Rueppel, et al., 1977
- *Herbicide Applicator Exposure to N-Nitroso-Glyphosate during Application of Roundup Herbicide and Field Re-Entry*, Kramer, 1978
- *21-Day Dermal Toxicity Study in Rabbits*, Benson, B., March 10, 1982
- *Summary: Elimination of $^{14}$C-Glyphosate in Rhesus Monkeys Following a Single Dose, & Percutaneous Absorption of $^{14}$C-Glyphosate in Roundup® Formulation in Rhesus Monkeys Following a Single Topical Dose*, Maibach, 1983.
- *Evaluation of the Percutaneous Absorption of Roundup Formulations in Man Using an In-Vitro Technique*, Thomas J. Franz, MD, 1983
- *Probable Toxicity of Surface-Active Agent in Commercial Herbicide using Glyphosate* (letter), Sawada, Ueyama, and Yamamoto, 1988
- *The Metabolism of Glyphosate in Sprague-Dawley Rats – Part I, Excretion and Tissue Distribution of Glyphosate and Its Metabolite Following Intravenous and Oral Administration*, Ridley, 1988
- *Metabolism of Glyphosate in Sprague-Dawley Rats. Part II. Identification, Characterization, and Quantification of Glyphosate and its Metabolites after Intravenous and Oral Administration*, Howe, et al., 1988
- *Assessment of Forestry Nursery Workers Exposure to Glyphosate During Normal Operations*, Cowell and Steinmetz, 1990
- *Assessment of Forest Worker Exposures to Glyphosate During Backpack Foliar Applications of Roundup® Herbicide*, Cowell and Steinmetz, 1990
- *Glyphosate Skin Binding, Absorption, Residual Tissue Distribution, and Skin Decontamination*, Wester, et al., 1990
- *Assessment of Worker Exposure to Glyphosate During Mist Blower Application of Roundup® Herbicide*, M.J. Manning, 1991
- *Occupational Exposure of Forest Workers to Glyphosate During Brush Saw Spraying Work*, Jauhiainen, et al., 1991
- *Metabolism of Glyphosate in Sprague-Dawley Rats: Tissue Distribution, Identification, and Quantitation of Glyphosate-Derived Materials Following a Single Oral Dose*, Brewster, et al., 1991
- *Conifer Seedling Nursery Worker Exposure to Glyphosate*, Lavy, et al., 1992
- *Elimination and Dermal Penetration in Monkeys, Roundup® Formulation: Monsanto Final Report MA-81-349, MRID Number MA 00137139*, R.C. Dirks, 1992
- *The Biological Activity of Glyphosate to Plants and Animals: A Literature Review*, Smith and Oehme, 1992
- *Assessment of Exposures to Workers Applying Herbicide Mixtures (2,4-D + Roundup and Garlon 3A + Roundup).  Toxicity and Fate of These Mixtures in the Environment*, Abdelghani, 1995
- *Metabolism in the Rat*, McEwen, A.B., 1995
- Roundup Pro® Material Safety Data Sheet, Monsanto Company, 1995
- Roundup Ultra® ingredients summary sheet, Monsanto Company, 1996
- *In Vitro Percutaneous Absorption of Model Compounds Glyphosate and Malathion from Cotton Fabric into and through Human Skin*, Wester, et al., 1996

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 10



## 3.0   DOCUMENTS REVIEWED/RELIANCE LIST (CONTINUED)

3.4   <u>General Library Documents on Glyphosate and Roundup®</u> (Continued)

- *Glyphosate: A Unique Global Herbicide*, American Chemical Society Monograph 189, Franz, et al., 1997
- *Effects of Surfactants on the Toxicity of Glyphosate, with Specific Reference to Rodeo*, Diamond and Durkin, 1997
- *Analysis and Degradation Study of Glyphosate and of Aminomethylphosphonic Acid in Natural Waters by Means of Polymeric and Ion-Exchange Solid Phase Extraction Columns Followed by Ion Chromatography Post-Column Derivatization with Fluorescence Detection*, Mallat and Barcelo, 1998
- *Ecotoxicological Risk Assessments for Roundup® Herbicide*, Glesy, et al., 2000
- *Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its Active Ingredient, Glyphosate, for Humans*, Williams, et al., April 2000
- *Safety of Working Conditions of Glyphosate Applicators on Eucalyptus Forests Using Knapsack and Tractor Powered Sprayers*, Machado-Neto, et al., 2000
- *Evaluation of Urinary Glyphosate Levels Following Simulated Consumer Application of Roundup®*, Christopher Comerford, 2001
- *In Vitro Percutaneous Absorption Study with [14C]glyphosate using Viable Rat Skin Membranes*, Johan van Burgsteden, 2003
- *Glyphosate Poisoning*, Toxicology review, Bradbury and Proudfoot, 2004
- *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, Acquavella, et al., 2004
- *Glyphosate, Other Herbicides, and Transformation Products in Midwestern Streams*, Battaglin, Kolpin, Scribner, Kuivila, and Sandstrom, 2005
- *Mobility and Leaching of Glyphosate: A Review*, Vereecken, H., 2005
- *Cancer Incidence among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, DeRoos, et al., 2005
- *Urinary Pesticide Concentrations Among Children, Mothers and Fathers Living in Farm and Non-Farm Households in Iowa*, Curwin, et al., 2007
- *MON 78294: An Applicator Exposure Study Conducted in Spain (Autumn 2005) Using Biomonitoring*, Bleeke, et al., 2007
- *Levels of Glyphosate in Surface Waters, Sediments and Soils Associated with Direct Sowing Soybeans Cultivation in North Pampasic Region of Argentina*, Peruzzo, et al., 2008
- *Skin Decontamination of Glyphosate from Human Skin In Vitro*, Zhai, et al., 2008
- *Effects of Aerial Applications of the Herbicide Glyphosate and Insecticides on Human Health*, Varona, et al., 2009
- *Toxicokinetics of Glyphosate and its Metabolite Aminomethylphosphonic Acid in Rats*, Anadón, et al., 2009
- *Occurrence and Fate of the Herbicide Glyphosate and Its Degradate Aminomethylphosphonic Acid in the Atmosphere*, Chang, et al., 2010
- *450 g/L Glyphosate SL Formulation (MON 79545) In Vitro Absorption of Glyphosate through Human Epidermis, DLT-09-093*, Ward, 2010
- *480 g/L Glyphosate SL Formulation (MON 79351) In Vitro Absorption of Glyphosate through Human Epidermis*, Ward, 2010
- *360g/L Glyphosate SL Formulation (MON 52276) In Vitro Absorption of Glyphosate through Human Epidermis* [MONGLY00698737 – MONGLY00698789], Ward, R., February 12, 2010

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 11



# 3.0   DOCUMENTS REVIEWED/RELIANCE LIST (CONTINUED)

3.4   <u>General Library Documents on Glyphosate and Roundup®</u> (Continued)

- *Glyphosate – Human Health and Ecological Risk Assessment Final Report*, Durkin, 2011
- *Glyphosate Poisoning*, Bradberry, et al., 2012
- *Glyphosate Acid – In Vitro Absorption Through Abraded Rabbit Skin Using [$^{14}$C]-Glyphosate*, Hadfield, 2012
- *Glyphosate Exposure in a Farmer's Family*, Mesnage, et al., 2012
- *Determination of Glyphosate Residues in Human Urine Samples from 18 European Countries*, Hans-Wolfgang Hoppe, 2013
- *Glyphosate and its Degradation Product AMPA Occur Frequently and Widely in U.S. Soils, Surface Water, Groundwater, and Precipitation*, Battaglin, Meyer, and Kuivila, 2014
- *Detection of Glyphosate Residues in Animals and Humans*, Krüger, et al., 2014
- *Occurrence of Glyphosate in Water Bodies Derived from Intensive Agriculture in a Tropical Region of Southern Mexico*, Ruiz-Toledo, et al., 2014
- *240 g/L Glyphosate SL Formulation (MON 79546) – In Vitro Absorption through Human Dermatomed Skin Using [$^{14}$C]-Glyphosate*, Smith, 2014
- *720 g/kg Glyphosate SG Formulation (MON 79991) – In Vitro Absorption through Human Dermatomed Skin Using [$^{14}$C]-Glyphosate*, Smith, 2014
- *7.2 g/L Glyphosate Gel Formulation (MON 76904) – In Vitro Absorption through Human Dermatomed Skin using [$^{14}$C]-Glyphosate*, Smith, 2015
- *7.2g/L Glyphosate Gel Formulation (MON 76258) – In Vitro Absorption through Human Dermatomed Skin using [$^{14}$C]-Glyphosate [MONGLY08731571 – MONGLY08731681]*, Davies, D., April 27, 2015
- *72g/L Glyphosate Gel Formulation (MON 76829) – In Vitro Absorption through Human Dermatomed Skin using [$^{14}$C]-Glyphosate [MONGLY08731524 – MONGLY08731570]*, Davies, D., April 16, 2015
- *Simultaneous Exposure to Multiple Heavy Metals and Glyphosate may Contribute to Sri Lankan Agricultural Nephropathy*, Jayasumana, et al., 2015
- *A Critical Review of Glyphosate Findings in Human Urine Samples and Comparison with the Exposure of Operators and Consumers*, Niemann, et al., 2015
- *Evaluation of Carcinogenic Potential of the Herbicide Glyphosate, Drawing on Tumor Incidence Data from Fourteen Chronic/Carcinogenicity Rodent Studies*, Greim, et al., 2015
- *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon, and Glyphosate*, Guyton, K., et al., 2015
- *500 g/L Glyphosate SL Formulation (MON 76952) – In Vitro Absorption through Human Dermatomed Skin using [$^{14}$C]-Glyphosate [MONGLY08731670 – MONGLY08731727]*, Davies, D., August 2, 2016
- *Glyphosate and Aminomethylphosphonic Acid are not Detectable in Human Milk*, McGuire, et al., 2016
- *Trends in Glyphosate Herbicide Use in the United States and Globally*, Charles M. Benbrook, 2016
- *Systematic Review and Meta-Analysis of Glyphosate Exposure and Risk of Lymphohemato-poietic Cancers*, Chang and Delzell, 2016
- *Glyphosate in the General Population and in Applicators: A Critical Review of Studies on Exposures*, Keith R. Solomon, 2016

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 12



## 3.0   DOCUMENTS REVIEWED/RELIANCE LIST (CONTINUED)

3.4   <u>General Library Documents on Glyphosate and Roundup®</u> (Continued)

- *The Effect of Glyphosate-Based Herbicide Roundup and its Co-formulant, POEA, on the Motor Activity of Rat Intestine – In Vitro Study*, Chłopecka, et al., 2016
- *360 g/L Glyphosate SL Formulation (MON 76879) – In Vitro Absorption through Human Dermatomed Skin using [$^{14}$C]-Glyphosate* [MONGLY08731728 – MONGLY08731783], Davies, D., August 8, 2017
- *Glyphosate Toxicity and Carcinogenicity: A Review of the Scientific Basis of the European Union Assessment and Its Differences with IARC*, Tarazona, et al., 2017
- *Glyphosate in German Adults – Time Trend (2001 to 2015) of Human Exposure to a Widely Used Herbicide*, Conrad, et al., 2017
- *Glyphosate Residues in Groundwater, Drinking Water, and Urine of Subsistence Farmers from Intensive Agriculture Localities: A Survey in Hopelchén, Campeche, Mexico*, Rendón-von Osten and Dzul-Caamal, 2017
- *Biomonitoring of Danish School Children and Mothers Including Biomarkers of PBDE and Glyphosate*, Knudsen, et al., 2017
- *Glyphosate and Paraquat in Maternal and Fetal Serums in Thai Women*, Kongtip, et al., 2017
- *Exposure Assessment using Human Biomonitoring for Glyphosate and Fluroxypyr Users in Amenity Horticulture*, Connolly, et al., 2017
- *Characterising Glyphosate Exposures Among Amenity Horticulturists Using Multiple Spot Urine Samples*, Connolly, et al., 2018
- *Exploring the Half-Life of Glyphosate in Human Urine Samples*, Connolly, et al., 2018
- *Glyphosate in Irish Adults – A Pilot Study in 2017*, Connolly, et al., 2018
- *Evaluating Glyphosate Exposure Routes and Their Contribution to Total Body Burden: A Study Among Amenity Horticulturalists*, Connolly, et al., 2018
- *Glyphosate Exposure in Pregnancy and Shortened Gestational Length: A Prospective Indiana Birth Cohort Study*, Parvez, et al., 2018
- *Exposure to Glyphosate-Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence*, Zhang, Luoping, et al., 2018
- *Glyphosate Use and Cancer Incidence in the Agricultural Health Study*, Andreotti, et al., 2018
- *The Ramazzini Institute 13-Week Study on Glyphosate-Based Herbicides at Human-Equivalent Dose in Sprague Dawley Rats: Study Design and First Life Endpoints Evaluation*, Panzacchi, et al., 2018
- *Historical Evidence of Glyphosate Exposure from a US Agricultural Cohort*, Perry, et al., 2019
- *Evaluating Glyphosate Exposure Routes and Their Contributing to Total Body Burden: A Study Among Amenity Horticulturalists*, Connolly, et al., 2019
- *The Evidence of Human Exposure to Glyphosate: A Review*, Gillezeau, et al., 2019
- *How Did the US EPA and IARC Reach Diametrically Opposed Conclusions on the Genotoxicity of Glyphosate-Based Herbicides?* Charles M. Benbrook, 2019
- *The Potential Effects of Recall Bias and Selection Bias on the Epidemiological Evidence for the Carcinogenicity of Glyphosate, 40(4) Risk Analysis 696*, Crump, K., 2019
- *Glyphosate Use and Associations with non-Hodgkin Lymphoma Major Histological Sub-types: Findings from the North American Pooled Project, Scandinavian J. Work Env't Health (2019)* with supplementary materials, Pahwa, M. et al., 2019
- *Urine Glyphosate Level as a Quantitative Biomarker of Oral Exposure*, Zoller, et al., 2020

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 13



## 3.0   DOCUMENTS REVIEWED/RELIANCE LIST (CONTINUED)

3.4   <u>General Library Documents on Glyphosate and Roundup®</u> (Continued)

- *Pilot Study Evaluating Inhalation and Dermal Glyphosate Exposure Resulting from Simulated Heavy Residential Consumer Application of Roundup®*, Pierce, et al., 2020
- *Evaluation of Glyphosate Use and Non-Hodgkin's Lymphoma – A Preliminary Trend Assessment*, Riordan, 2020.
- *Risk Assessment of Glyphosate Exposures from Pilot Study with Simulated Heavy Residential Consumer Application of Roundup® using a Margin of Safety (MOS) Approach*, Kougias, et al., 2020
- *Update on Human Exposure to Glyphosate, with a Complete Review of Exposure in Children*, Gillezeau, et al., 2020
- *Human Experimental Exposure to Glyphosate and Biomonitoring of Young Swedish Adults*, Faniband, et al., 2020
- *Sensitive and Selective Quantification of Glyphosate and Aminomethylphosphonic Acid (AMPA) in Urine of the General Population by Gas Chromatography-Tandem Mass Spectrometry*, Connolly, et al., 2020
- *Weeding Out Inaccurate Information on Glyphosate-Based Herbicides and Risk of non-Hodgkin Lymphoma*, Rana, et al., 2020
- *Exposure to Glyphosate and Risk of non-Hodgkin Lymphoma and Multiple Myeloma: An Updated Meta-Analysis*, Donato, et al., 2020
- *On Recent Meta-Analysis of Exposure to Glyphosate and Risk of non-Hodgkin's Lymphoma in Humans*, Kabat, et al., 2021

3.5   <u>General Library Documents</u>

- *Percutaneous Absorption on the Relevance of In Vitro Data*, Thomas J. Franz, MD, 1975
- *Dermal Exposure Related to Pesticide Use—Discussion of Risk Assessment*, Honeycutt, et al., 1986
- *Exposure to Benzene and Other Volatile Compounds from Active and Passive Smoking*, Wallace, et al., 1987
- *Pesticide Exposures and Other Agricultural Risk Factors for Leukemia Among Men in Iowa and Minnesota*, Brown, et al., 1990
- *Electrical Analysis of Fresh, Excised Human Skin: A Comparison with Frozen Skin*, Kasting and Bowman, 1990
- *Is Cigarette Smoking a Risk Factor for non-Hodgkin's Lymphoma or Multiple Myeloma? results From the Lutheran Brotherhood Cohort Study*, Linet, et al., 1992
- *Pesticide Exposures and Multiple Myeloma in Iowa Men*, Brown, et al., 1993
- *Benzene and the Dose-Related Incidence of Hematologic Neoplasms in China*, Hayes, et al., 1997
- *Hematopoietic Cancer and peptic Ulcer: A Multicenter Case-Control Study*, Vineis, et al., 1999
- *A Quantitative Approach for Estimating Exposure to Pesticides in the Agricultural Health Study*, Dosemeci, et al., 2001
- *Benzene Exposure and Hematopoietic Mortality: A Long-Term Epidemiologic Risk Assessment*, Rinsky R.A., Hornung R.W., Silver S.R., Tseng C.Y., American Journal of Industrial Medicine, 2002

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 14



## 3.0   DOCUMENTS REVIEWED/RELIANCE LIST (CONTINUED)

3.5   <u>General Library Documents</u> (Continued)

- *The Influence of Various Methods of Cold Storage of Skin on the Permeation of Melatonin and Nimesulide*, Babu, et al., 2002
- *Exposure to pesticides as Risk Factor for Non-Hodgkin's Lymphoma and Hairy Cell Leukemia: Pooled Analysis of Two Swedish Case-control Studies*, Hardell, et al., 2002
- *Potential Exposure to Pesticides in Nordic Greenhouse*, Tuomainen, et al., 2002
- *Operator Exposure When Applying Amenity Herbicides by All-Terrain Vehicles and Controlled Droplet Applicators*, Johnson, et al., 2004
- *Pesticides in Rainwater in Flanders, Belgium: Results from the Monitoring Program 1997-2001*, Quaghebeur, et al., 2004
- *Urinary and Hand Wipe Pesticide Levels Among Farmers and Nonfarmers in Iowa*, Curwin, et al., 2005
- *Biomonitoring for Farm Families in the Farm Family Exposure Study*, Mandel, et al., 2005
- *Evaluation of Skin and Respiratory Doses and Urinary Excretion of Alkylphosphates in Workers Exposed to Dimethoate During Treatment of Olive Trees*, Aprea, et al., 2005
- *Occupation and Malignant Lymphoma: A Population Based Case Control Study in Germany*, Mester, et al., 2006
- *Urinary Pesticide Concentrations Among Children, Mothers and Fathers Living in Farm and Non-Farm Households in Iowa*, Curwin, et al., 2006
- *Environmental Health Criteria 235: Dermal Absorption*, International Programme on Chemical Safety (IPCS), Kielhorn, J. et al., 2006
- *Defense Against Dermal Exposures is Only Skin Deep: Significantly Increased Penetration Through Slightly Damaged Skin*, Nielsen, et al., 2007
- *Pesticide Exposure as Risk Factor for Non-Hodgkin Lymphoma including Histopathological Subgroup Analysis*, Eriksson, et al., 2008
- *Development and Application of Quantitative Methods for Monitoring Dermal and Inhalation Exposure to Propiconazole*, Flack, et al., 2008
- *Meta-Analysis of Benzene Exposure and non-Hodgkin Lymphoma: Biases Could Mask an Important Association*, Steinmaus, et al., 2008
- *The Usual Suspects—Influence of Physiochemical Properties on Lag Time, Skin Deposition, and Percutaneous Penetration of Nine Model Compounds*, Nielsen, et al., 2009
- *Operative Modalities and Exposure to Pesticides During Open Field Treatments Among a Group of Agricultural Subcontractors*, Vitali, et al., 2009
- *Occupational Exposure to Pesticides and Lymphoid Neoplasms Among Men: Results of a French Case-Control Study*, Orsi, et al., 2009
- *Percutaneous Absorption and Exposure Assessment of Pesticides*, Ngo, et al., 2009
- Mathematical Models for Estimating Occupational Exposure to Chemicals, Keil, C. et al., 2nd ed., 2009
- *Assessment of a Pesticide Exposure Intensity Algorithm in the Agricultural Health Study*, Thomas, K. et al., 2010
- *Operator and Field Worker Occupational Exposure Databases and Modeling*, in Hayes' Handbook of Pesticide Toxicology, Lunchick, Curt, et al., 2010
- *Storage Conditions of Skin Affect Tissue Structure and Subsequent in vitro Percutaneous Penetration*, Nielsen, et al., 2010
- *Occupation and Multiple Myeloma: An Occupational and Industry Analysis*, Gold, et al., 2010

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 15



# 3.0   DOCUMENTS REVIEWED/RELIANCE LIST (CONTINUED)

3.5   <u>General Library Documents</u> (Continued)

- *Toxicity Ranking and Toxic Mode of Action Evaluation of Commonly Used Agricultural Adjuvants on the Basis of Bacterial Gene Expression Profiles*, Nobels, et al., 2011
- *Body Mass Index and Risk of non-Hodgkin's and Hodgkin's Lymphoma: A Meta-Analysis of Prospective Studies*, Larsson and Wolk, 2011
- *Maternal and Fetal Exposure to Pesticides Associated to Genetically Modified Foods in Eastern Townships of Quebec, Canada*, Aris, et al., 2011
- *Preliminary Study of Pesticide Drift into the Maya Mountain Protected Areas of Belize*, Kristine Kaiser, 2011
- *An Updated Algorithm for Estimation of Pesticide Exposure Intensity in the Agricultural Health Study*, Coble, et al., 2011
- *Multiple Myeloma and Lifetime Occupation: Results from the EPILYMPH Study*, Perrotta, et al., 2012
- *Dermal Exposure Assessment of Pesticide Use: The Case of Sprayers in Potato Farms in the Colombian Highlands*, Lesmes-Fabian, et al., 2012
- *A New Model for the Prediction of Agricultural Operator Exposure during Professional Application of Plant Protection Products in Outdoor Crops*, Großkopf, et al., 2013
- *Procedures to Evaluate the Efficiency of Protective Clothing Worn by Operators Applying Pesticide*, Espanhol-Soares, M., et al., 2013
- *Effects of the Surfactant Polyoxyethylene Amine (POEA) on Genotoxic, Biochemical and Physiological Parameters of the Freshwater Teleost Prochilodus lineatus*, Navarro and Martinez, 2014
- *A Retrospective Cohort Study of Cause-Specific Mortality and Incidence of Hematopoietic Malignancies in Chinese Benzene-Exposed Workers,* Linet, et al., 2014
- *Risk of Lymphoma and Occupational Exposure to Organic Dust*, D'Andrea, et al., 2014
- *Measurement of Blood Volume in Adult Rhesus Macaques (Macaca mulatta)*, Hobbs, et al., 2015
- *Re-Evaluation of the WHO (2010) Formaldehyde Indoor Air Quality Guideline for Cancer Risk Assessment*, Nielsen, et al., Archives of Toxicology, 2017
- *Pesticide Use and Risk of non-Hodgkin Lymphoid Malignancies in Agricultural Cohorts from France, Norway, and the USA: A Pooled Analysis from the AGRICOH Consortium*, Leon, et al., 2019
- *Using Benchmark Dose Modeling for the Quantitative Risk Assessment: Carbon nanotubes, Asbestos, Glyphosate*, Andrey Korchevskiy, 2020
- *Patient Education: Diffuse Large B Cell Lymphoma in Adults (beyond the Basics)*, Freedman and Friedberg, 2020

3.6   <u>Agency-Related Documents</u>

- U.S. EPA memorandum by D. Stephen Saunders, Jr., Ph.D. on or about February 28, 1986
- U.S. EPA Integrated Risk Information System (IRIS) Chemical Assessment Summary on Glyphosate; CASRN 1071-83-6, 1987
- U.S. EPA *Reference Dose (RfD): Description and Use in Health Risk Assessments*, Background Document 1A, March 15, 1993

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 16



## 3.0   DOCUMENTS REVIEWED/RELIANCE LIST (CONTINUED)

3.6   <u>Agency-Related Documents</u> (Continued)

- U.S. EPA, Reregistration Eligibility Decision (RED) – Glyphosate, September 1993
- U.S. EPA *Health Effects Test Guidelines, OPPTS 870.7600, Dermal Penetration*, 1998
- U.S. EPA, Office of Prevention, Pesticides and Toxic Substances, Health Effects Test Guidelines: OPPTS 870.7600 Dermal Penetration, August 1998
- U.S. EPA Integrated Risk Information System (IRIS) Chemical Assessment Summary on Glyphosate; CASRN 1071-83-6, 2004
- U.S. EPA, Memorandum from Donna Davis, Risk Assessor, RAB VII, Health Effects Division on Alykl Amine Poly Alkoxylates (JITF CST 4 Inert Ingredients) Human Health Risk Assessment to Support Proposed Exemption from the Requirement of a Tolerance When Used as Inert Ingredients in Pesticide Formulations to Kerry Leifer, Team Leader, Inert Ingredient Assessment Branch, Registration Division, on or about April 3, 2009
- U.S. EPA, Memorandum from Donna Davis, Risk Assessor, RAB VII, Health Effects Division on Sodium and Ammonium Naphthalene Sulfonate Formaldehyde Condensates (SANFCs – JITF CST 11 Inert Ingredients) Human Health Risk Assessment to Support Proposed Exemption from the Requirement of a Tolerance When Used as Inert Ingredients in Pesticide Formulations to Kerry Leifer, Team Leader, Inert Ingredient Assessment Branch, Registration Division, on or about May 28, 2009
- U.S. EPA, Memorandum from Donna Davis, Risk Assessor, RAB VII, Health Effects Division on Alkyl Alcohol Alkoxylate Phosphate and Sulfate Derivatives (AAAPDs and AAASDs – JITF CST 2 Inert Ingredients) Human Health Risk Assessment to Support Proposed Exemption from the Requirements of a Tolerance When Used as Inert Ingredients in Pesticide Formulations to Kerry Leifer, Team Leader, Inert Ingredient Assessment Branch, Registration Division, on or about June 8, 2009
- U.S. EPA, Memorandum from Donna Davis, Risk Assessor, RAB VII, Health Effects Division on Methyl Poly(Oxyethylene) $C_8 – C_{14}$ Alkylammonium Chlorides (MPOACs – JITF CST 7 Inert Ingredients) Human Health Risk Assessment to Support Proposed Exemption from the Requirements of a Tolerance When Used as Inert Ingredients in Pesticide Formulations to Kerry Leifer, Team Leader, Inert Ingredient Assessment Branch, Registration Division, on or about June 2, 2009
- US EPA CARC (2015). Cancer Assessment Document, *Evaluation of the Carcinogenic Potential of Glyphosate*, Cancer Assessment Review Committee (CARC), Final Report, October 1, 2015
- U.S. EPA, Label Review Manual Chapter 10: Worker Protection Label, February 2016
- U.S. EPA, Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of Carcinogenic Potential, September 2016
- U.S. EPA OPP (2016) *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* EPA's Office of Pesticide Program, September 12, 2016
- U.S. EPA, Office of Pesticide Programs, Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential, December 2017
- U.S. EPA, Memorandum from Lata Venkateshwara on Glyphosate: Amended Residential Exposure Assessment for a Registration Review to Caitlin Newcamp, on or about December 12, 2017
- U.S. EPA, Memorandum from Monique Perron on Glyphosate: Draft Human Risk Assessment in Support of Registration Review to Caitlin Newcamp, on or about December 12, 2017

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 17



## 3.0   DOCUMENTS REVIEWED/RELIANCE LIST (CONTINUED)

3.6    <u>Agency-Related Documents</u> (Continued)

- U.S. EPA, Glyphosate – Proposed Interim Registration Review Decision Case Number 0178, April 2019
- U.S. EPA, Memorandum from Donna Davis, Risk Assessor, RAB VII, Health Effects Division on Alkyl Alcohol Alkoxylates (AAA – JITF CST 1 Inert Ingredient) Human Health Risk Assessment to Support Proposed Exemption from the Requirement of a Tolerance When Used as an Inert Ingredient in Pesticide Formulations to Kerry Leifer, Team Leader, Inert Ingredient Assessment Branch, Registration Division, on or about July 14, 2019
- U.S. EPA, Office of Chemical Safety and Pollution Prevention, Letter from Michael L. Goodis, Director of Registration Division, EPA Office of Chemical Safety and Pollution Prevention, on Labeling Requirements for Products that Contain Glyphosate to Registrant, on or about August 7, 2019
- U.S. EPA, Glyphosate – Interim Registration Review Decision Case Number 0178, January 2020
- U.S. EPA, Memorandum from Monique M. Perron on Glyphosate: Response to Comments on the Proposed Interim Decision Regarding the Human Health Risk Assessment to Steven Peterson, on or about January 13, 2020
- U.S. EPA, Memorandum from Dana L. Friedman on Response from the Pesticide Re-Evaluation Division (PRD) to Comments on the Glyphosate Proposed Interim Decision, on or about January 16, 2020
- U.S. EPA, Memorandum from David J. Miller on Glyphosate: Epidemiology Review of Zhang et al. (2019) and Leon et al. (2019) Publications for Response to Comments on the Proposed Interim Decision to Christine Olinger, on or about January 16, 2020
- U.S. OSHA Analytical Method for Glyphosate, Method No. PV2067, November 1989
- U.S. National Toxicology Program *NTP Technical Report on the Toxicity Studies of Glyphosate Administered in Dosed Feed to Rats and Mice*, Chan and Mahler, July 1992
- U.S. EPA *Dermal Exposure Assessment: A Summary of EPA Approaches*, 2007
- U.S. Department of the Interior, U.S. Geological Survey (USGS) Scientific Investigations, *Concentrations of Glyphosate, Its Degradation Product, Aminomethylphosphonic Acid, and Glufosinate in Ground- and Surface-Water, Rainfall, and Soil Samples Collected in the United States, 2001-06*, Report 2007-5122
- U.S. Department of Agriculture, National Agriculture Statistics Service, Acreage, 2009
- CDC, *Malignant Mesothelioma (All Sites): Number of Deaths, Death Rates (per Million Population), and Years of Potential Life Lost (YPLL) by State, U.S. Residents Age 15 and Over, 2001 – 2010*, 2014
- *Effectiveness of personal protective equipment against dermal exposure – a comparative study*, National Institute for Occupational Safety and Health, Oltmanns, J. et al., 2016
- USGA National Water Quality Assessment (NAWQA) Project, 2017
- USGS *Measuring POEA, a Surfactant Mixture in Herbicide Formulations*, 2018
- USGS *Glyphosate Found in Wastewater Discharge to Streams*, 2018
- Agency for Toxic Substances and Disease Registry (ATSDR), U.S. Department of Health and Human Services, *Toxicological Profile for Glyphosate, Draft for Public Comment*, April 2019 and August 2020
- National Institutes of Health, National Cancer Institute, Cancer Stat Facts: NHL – Diffuse Large B-Cell Lymphoma (DLBCL), 2020

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 18



## 3.0 DOCUMENTS REVIEWED/RELIANCE LIST (CONTINUED)

3.6 <u>Agency-Related Documents</u> (Continued)

- Cal-EPA, Department of Pesticide Regulation, Worker Health and Safety Branch, Guidance for the Preparation of Human Pesticide Exposure Assessment Documents, Tian Thongsinthusak, 1993
- *Measurement of Breathing Rate and Volume Routinely Performed Daily Activities*, California Air Resources Board, Adams, W.C., June 1993
- Cal-EPA, Department of Pesticide Regulation, *Exposure of Herbicide Handlers in the Caltrans Vegetation Control Program -1993-1994*, 1995
- California Department of Pesticide Regulation, *Interim Report of the Pesticide Chemistry Database*, Kollman, et al., 1995
- State of California Environmental Protection Agency (Cal-EPA) Office of Environmental Health Hazard Assessment (OEHHA), *Proposed Amendment to: Section 25705(b) Specific Regulatory Levels Posing No Significant Risk, Glyphosate*, Safe Drinking Water and Toxic Enforcement Act of 1986, Proposition 65, 2017
- OEHHA *Proposition 65 No Significant Risk Levels (NSRLs) for Carcinogens and Maximum Allowable Dose Levels (MADLS) for Chemicals Causing Reproductive Toxicity*, Cal-EPA, October 2018
- OEHHA *Statement Regarding U.S. EPA's Press Release and Registrant Letter on Glyphosate*, Cal-EPA, August 12, 2019
- Louisiana Department of Transportation and Development, *Assessment of the Exposure of Workers Applying Herbicide Mixtures (2,4-D)+Roundup, Garlon-3A+Roundup), Toxicity and Fate of these Mixtures in the Environment, Summary Report*, 1995
- WHO, International Programme on Chemical Safety (IPCS), Environmental Health Criteria 159, Glyphosate, Geneva, 1994
- Joint FAO/WHO Meeting on Pesticide Residues (JMPR), *Pesticide Residues in Food – Report of the 1994 Joint FAO/WHO Meeting of Experts*, 1994
- JMPR, *Pesticide Residues in Food – 2004*, Rome, Italy, September 20-29, 2004
- OECD, Guidance Document for the Conduct of Skin Absorption Studies, March 2004
- OECD, Guideline for the Testing of Chemicals - Skin Absorption: In Vitro Method, April 2004
- Danish Ministry of the Environment, *Dermal Absorption of Pesticides – Evaluation of Variability and Prevention*, Holmgaard and Nielsen, 2009
- OECD, Guidance Notes on Dermal Absorption, August 2011
- *Guidance on Dermal Absorption, EFSA Panel on Plant Protection Products and their Residues (PPR)*, European Food Safety Authority (EFSA), Parma, Italy, 2012
- *Guidance on Dermal Absorption*, European Food Safety Authority, 2012
- European Food Safety Authority, Journal 2013, 11(5):3220
- Medizinisches Labor Bremen, Determination of Glyphosate Residues in Human Urine Samples from 18 European Countries, 2013
- European Food Safety Authority *Guidance on the Assessment of Exposure of Operators, Workers, Residents, and Bystanders in Risk Assessment for Plant Protection Products*, 2014
- Inter-Organization Programme for the Sound Management of Chemicals (IOMC), International Programme on Chemical Safety (IPCS), Environmental Health Criteria 242: Dermal Absorption, 2014
- Institute of Environmental Science and Research Limited for the Ministry of Health, *Health Risk Assessment: Glyphosate*, Report FW14022, Lake, R., 2014

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 19



# 3.0   DOCUMENTS REVIEWED/RELIANCE LIST (CONTINUED)

3.6   <u>Agency-Related Documents</u> (Continued)

- Report of the Advisory Group to Recommend Priorities for *IARC Monographs* during 2015-2019, *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Internal Report 14/002*, Lyon, France, April 7-9, 2014
- IARC Monographs Volume 112, 2015
- IARC Working Group, IARC Monograph 112, *Some organophosphate insecticides and herbicides: diazinon, glyphosate, malathion, parathion, tetrachlorovinphos*, March 3-10, 2015
- European Commission Final addendum to the Renewal Assessment Report - public version - *Risk assessment provided by the rapporteur Member State Germany and co-rapporteur Member State Slovakia for the active substance GLYPHOSATE according to the procedure for the renewal of the inclusion of a second group of active substances in Annex I to Council Directive 91/414/EEC*, Commission Regulation (EU) No. 1141/2010, October 2015
- European Food Safety Authority *Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate*, EFSA Journal 13(11), 2015
- New Zealand Environmental Protection Authority, Review of the Evidence Relating to Glyphosate and Carcinogenicity, August 2016
- Japan Food Safety Commission, Glyphosate Summary, 2016
- Joint FAO/WHO Meeting on Pesticide Residues on Glyphosate, Pesticide Residues in Food 2016, special session of the Joint FAO/WHO Meeting on Pesticide Residues, Food and Agriculture Organization of the United Nations (FAO) and the World Health Organization (WHO), 2016
- New Zealand Environmental Protection Authority*, Review of the Evidence Relating to Glyphosate and Carcinogenicity*, August 2016
- Environmental Protection Authority, Te Mana Rauhī Taiao, *Review of the Evidence Relating to Glyphosate and Carcinogenicity*, August 2016
- EFSA, *Guidance on Dermal Absorption*, 15(6) EFSA Journal 4873, 2017
-
- Health Canada, Re-evaluation Decision RVD2017-01 Glyphosate, Health Canada Pest Management Regulatory Agency, April 2017
- ECHA, Opinion: Proposing Harmonized Classification and Labelling at EU Level of Glyphosate (ISO); N-(phosphonomethyl)glycine, Committee for Risk Assessment, March 2017
- New Zealand Environmental Protection Authority, Risk Assessment Methodology for Hazardous Substances, May 2018 (draft)
- Health Canada, Statement from Health Canada on Glyphosate, Health Canada Pest Management Regulatory Agency, January 2019
- IARC (International Agency for Research on Cancer), *Preamble: IARC Monographs on the Identification of Carcinogenic Hazards to Humans*, Amended January 2019
- Health and Safety Executive, *Operator Exposure*, http://www.hse.gov.uk/pesticides/topics/pesticide-approvals/pesticides-registration/data-requirements-handbook/operator-exposure.htm



Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 20

## 4.0   GENERAL DISCUSSION OF NON-HODGKIN LYMPHOMA

NHL is a group of cancers that generally originate in the lymphatic system, which is the disease-fighting network of the body—specifically, tumors develop from lymphocytes, a type of white blood cell—which in the cases of NHL, begin to multiply uncontrollably, producing cancerous cells that have the abnormal capacity to invade other tissues throughout the body. NHL is not a single disease but in fact has over 60 different subtypes and, according to the World Health Organization, may be a group of cancers with as many as 80 subtypes. NHL typically involves clonal tumors of mature and immature B lymphocytes (B-cells) or T lymphocytes (T-cells) that originate in the lymphatic system, which then can travel to the lymph nodes, spleen, blood, bone marrow, and/or other organs.



Some types of NHL are slow-growing (low-grade lymphomas) while other types grow at a more rapid rate (high-grade lymphomas). In adults, the most common types of NHL are diffuse large B-cell lymphomas (DLBCL), a high-grade lymphoma; and follicular lymphoma, a low-grade B-cell lymphoma. In children, the most common NHL type is Burkitt lymphoma, a high-grade B-cell lymphoma. NHL is the most common type of lymphoma and the seventh (or perhaps eighth) most common cause of cancer-related deaths in the United States. While NHL can occur at essentially any age, advancing age is unquestionably a major risk factor for lymphomas in general, as it is for most cancers (Schottenfield and Fraumeni, 2006). NHL is diagnosed far more commonly in adults over the age of 55 and most particularly in persons whose ages range from 65 to 85. Studies have shown that men are more likely to develop NHL than women NHL, generally by a 3 to 2 margin, although certainly both genders can develop those diseases. Caucasian men have higher rates of NHL than African American men and Caucasian women have higher rates of NHL than African American women. NHL incidence has historically been lowest among American Indians, while intermediate rates were found among Hispanics, African Americans, and Asian/Pacific Islanders. Worldwide, North Americans have one of the highest incidences of NHL, and approximately 77 to 80 thousand people are diagnosed with those diseases each year in the United States.

Geographic variation in lymphoma rates may suggest the potential importance of environmental factors, such as exposures to selected viruses, including HIV, and perhaps chemicals that for varying reasons may be in use more prominently in one or more discrete areas of the world due to regional, cultural, or other factors (as opposed to widespread use of those chemicals), but be advised that most suspect environmental chemical-based etiologies of NHL subtypes remain unknown, or at least unproven. Numerous studies have been completed that attempt to evaluate a possible association between occupations, regional factors, potential chemical exposures, and/or other theorized risk factors associated with NHL; and published papers often include odds ratios (ORs) or meta-relative risk (meta-RR) data that are in conflict with other seemingly competently-designed studies.

The American Cancer Society reports that the age-adjusted NHL incidence rate from 2012 to 2016 in the United States was estimated at 19.2 per 100,000 persons (23.2 per 100,000 males and 16 per 100,000 females), and that those annual age-adjusted incidence rates have been essentially comparable since 1992 (as have the NCI SEER Program data cited previously in this report). Wheeler, et al. in their 2011 paper entitled *Spatial-Temporal Analysis of non-Hodgkin Lymphoma in the NCI-SEER NHL Case-Control Study* wrote that "[L]ittle is known about the etiology of non-Hodgkin lymphoma (NHL), or the latency period that

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 21



## 4.0    GENERAL DISCUSSION OF NON-HODGKIN LYMPHOMA (CONTINUED)

might be relevant for environmental exposures, and there are no published spatial-temporal cluster studies of NHL."  Wheeler, et al. studied the NCI SEER Program data and determined that in 1975 the annual age-adjusted incidence rate of NHL was 11.1 per 100,000 person-years.  Those authors agreed that the incidence rate had leveled "to 19.6 per 100,000 person-years between 2003-2007," which is generally consistent with the NCI SEER citation above.

I will emphasize that while the incidence rates of NHL in the United States for the past three decades have been generally quite consistent—with essentially no consequential increase in the *new case* NHL incidence rate recorded in 2017 over the rate recorded in 1992—the U.S. population in that time has been "getting older," and residents have been "living longer" (the life expectancy in the U.S. has increased from 75.62 years to 78.54 years in that time), and that would indicate (if all other factors were to remain equal) that the NHL incidence rates in the U.S. should be increasing, because the size of the most affected segment of the population has been increasing.   But such a trend demonstrating a steady increase in NHL incidence rates commensurate with the aging population in the U.S. has not been seen, even though clearly NHL preferentially affects the elderly.   So certainly, I can agree that other factors in this complicated metric are involved, and those factors would likely include improved diagnostic tools, improved reporting methods, and progressively improving access that U.S. residents have to medical care.   But I also recognize that NHL incidence rates for other demographics in the aging U.S. population must be in decline.  Refer to the *NHL Incidence by County* map of the U.S. (at above right),



**Figure 5: NHL Incidence by County**



which is based on the NCI SEER Program NHL statistics from 2014/2015. Those regional data are substantially aligned with the *Distribution of Population Aged 65 and Over: 2013-2017* map shown (at below right), the latter of which is based on the U.S Census Bureau data.  This association is predictable given that NHL is, far more often than not, a group of diseases that affects older people.

During my work on the case involving James Peterson, I have reviewed studies in which researchers have evaluated other possible factors that may increase the risk of NHL subtypes, particularly with respect to environmental chemical exposures. Unfortunately, many of the studies that are purported to

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 22



## 4.0   GENERAL DISCUSSION OF NON-HODGKIN LYMPHOMA (CONTINUED)

define odds ratios for risks of lymphohematopoietic disease have inherent (and often unavoidable) design limitations, such as an *ever/never use* criterion, which can be highly limiting if additional supporting information is not known, and/or potential confounding variables, along with *self-reported* use information and/or unverified historic exposure potential and information on signs and symptoms. And often after those researchers evaluate exposure data and develop odds ratios, the final analysis of many such studies show only weak associations to specific diseases (and those results are often in conflict with the findings of other studies). Simply said, with respect to NHL, many of the environmental chemical and/or physical agent-based etiological theories have not been convincingly and repeatedly confirmed based on valid and verifiable studies and, therefore, the theory that exposures to one or more classes of chemicals increases the risk of NHL or other cancers in many cases remains unproven. And, while industrial hygienists, toxicologists, and epidemiologists can essentially agree that excessive exposure to some chemicals *may* increase the risk of some NHL subtypes, health scientists certainly do not have clear and convincing evidence that glyphosate-based herbicides (GBHs) have been confirmed to increase the risk of one or more NHL subtypes in humans.

## 5.0   GENERAL DISCUSSION OF GLYPHOSATE

Glyphosate is an organic acid composed of a phosphonomethyl and a glycine component, which is a non-selective herbicide that was first registered for use by the U.S. EPA in 1974. The compound is typically manufactured for commercial use as an isopropylamine salt (white powder) in soluble liquid formulations that generally range from ready-to-use concentrations of 0.96 percent to concentrate formulas that have up to approximately 94 percent (w/w) glyphosate. Roundup® has product formulations of from 0.96 percent to 71 percent. Pure glyphosate is a white crystalline solid with high water solubility (12 grams per liter) with a very low vapor pressure (non-volatile). Both glyphosate and the glyphosate isopropylamine salt are odorless. Glyphosate is highly polar, non-residual, and has a low potential for environmental persistence, in part due to microbial degradation, so it is unlikely to bioaccumulate.

Glyphosate solutions have low vapor pressure and, therefore, volatilization of the active ingredient compound is not of concern during or after application of the herbicide. During application of glyphosate-based herbicides, however, aerosols can predictably be created to some extent and can potentially be transported through the air; the degree of which is dependent on the application technique, meteorological conditions, and other factors. For these reasons, the greatest potential for exposure can be expected to involve people using glyphosate-based herbicides and/or who are in close proximity to others that are dispensing the herbicide, and that exposure would primarily be as dermal. *Applicators* would predictably be more prone to exposed to glyphosate via skin contact, ocular contact, and, to a much lesser degree, via inhalation, with some possible, but negligible ingestion that would be unintentional (due mostly to hand-to-mouth contact). During use of glyphosate-containing products, dermal contact is expected to pose the greatest exposure potential under the most predictable circumstances due primarily to accidental spillage or unintentional application to skin, and/or skin exposure of the hands and lower legs because of close-proximity *spray drift* or to the lower back due to backpack leakage.

Studies have clearly shown that the predominating exposure pathway for applicators during mixing and dispensing a glyphosate-based herbicide (GBH) is because of dermal contact, rather than by the inhalation route of entry into the body and most certainly well above the oral route of entry. And be

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 23



## 5.0    GENERAL DISCUSSION OF GLYPHOSATE (CONTINUED)

advised that the toxicokinetics—discussed in more detail later in this report—is quite different between oral absorption and dermal absorption.  Dermally absorbed glyphosate is distributed in the body and is excreted primarily via the urine, which occurs quite rapidly.  In contrast, glyphosate absorbed orally is poorly absorbed and is excreted mainly via the feces in a rapid manner.  And for these and other reasons, conflating oral and dermal absorption with this herbicide is improper.

At this time, glyphosate is the most widely-used herbicide in the world.  Also note that globally, glyphosate use has increased an estimated 15-fold since "Roundup® Ready" genetically engineered (Roundup®-tolerant) crops were introduced in 1996.  Be advised that the National Cancer Institute SEER Program *new case* incidence rate for all NHL subtypes in 1996 was 19.4 per 100,000 persons and in 2017 statistics showed a *new case* incidence rate for all NHL subtypes of 18.6 per 100,000 persons, which is a clear decline in the overall NHL incidence rate during a time when Roundup® use in this country increased exponentially.  These facts plus the U.S. age-adjusted NHL incidence rate by county map presented (at right) shows little comparability to the estimated agricultural use of glyphosate in this country, particularly with higher incidence rates of NHL being recorded in Maine and most all of New England, Pennsylvania, West Virginia, upper and eastern Michigan, upper Wisconsin, north-western Montana, Idaho, central Oregon, the state of Washington, northwestern California, and selected areas of Oklahoma, Texas, New Mexico, and southeastern Louisiana—all regions of the U.S. in which low or no estimated agricultural use of glyphosate was recorded.  Not surprisingly, aging populations are known to reside in each of those areas, most dramatically in the states of Maine, Vermont, New Hampshire, West Virginia, Pennsylvania, and Montana.  Be advised that as of 2016, seniors (defined as persons 65 years of age or older) comprised from 17 to 19.3 percent



Figure 4: Glyphosate Use in the U.S. (2000)



Figure 5: NHL Incidence by County

of the residents in those six states, and those statistics are considerably greater than the national average of seniors residing in the U.S., which as of that year was just 12.4 percent (U.S. Census Bureau).  Also be advised that the only states that seemed to show a consequential agricultural use of glyphosate *and* a higher incidence of NHL in multiple counties were the states of Iowa and North Dakota.  And, both of those states also have biased-high elderly populations, with seniors comprising 16.4 percent of the residents in Iowa (and 34 percent of the population is over the age of 50) and 14.6 percent of the residents in North Dakota are seniors.  The actual reasons for NHL incidence rates in those two states are beyond the scope of this report, given that James Peterson is neither a farmer nor a resident of Iowa



## 5.0   GENERAL DISCUSSION OF GLYPHOSATE (CONTINUED)

or North Dakota.  In any case, in consideration of these data, the plausibility of a causal relationship between agricultural glyphosate use and an increased risk of NHL in the farming communities of this country is simply not supported by the facts displayed on those maps.

## 6.0   NO EEFECT HEALTH GUIDELINES FOR GLYPHOSATE

The principal audiences for the toxicological profiles are health professionals at the Federal, State, and local levels; interested private sector organizations and groups; and members of the public.  Regarding the potential health effects to humans, be advised that the toxicity of glyphosate was primarily compiled from oral studies involving laboratory animals that were exposed to glyphosate technical.  The noncancer health effects found in animals following oral exposure to glyphosate technical showed depressed body weight and death at acute exposures ranging from 3,000 to 3,500 milligrams per kilogram of body weight (mg/kg) per day.  And at exposure ranging from 175 to 2,200 mg/kg per day, a wide variety of gastrointestinal effects (from diarrhea, to changes in salivary glands, to increased liver weight) were seen in those study animals.  Depressed body weight was seen in laboratory animals at oral exposures of greater than or equal to about 1,200 mg/kg per day.  Increased liver weight and other hepatic effects were seen after 13 weeks after oral administration of glyphosate technical at about 1,700 mg/kg per day and necrosis of the liver was observed following administration of glyphosate technical at about 5,000 mg/kg per day for two years.  Renal effects in laboratory animals were seen after two years during which glyphosate technical was administered at levels ranging from about 940 to over 6,000 mg/kg per day.

The lowest acute Minimal Risk Level (MRL) for glyphosate was set at 175 milligrams per kilogram of body weight per day (mg/kg/day), based on the acute oral administration and gastrointestinal effects observed in animal studies.  And, in part, based on the findings from those studies, an acute oral and chronic oral exposure **No Observable Adverse Effect Level (NOAEL) was established at 1 mg/kg/day**, which represents a safety (or uncertainty) factor of 100 (Reference: U.S. EPA).

The State of California Office of Environmental Health Hazard Assessment (OEHHA), Proposition 65 Implementation Office listed glyphosate on the Proposition 65 List in 2017 based on the determination by IARC that that compound was, as of 2015, a "probably human carcinogen."  The OEHHA, which is within the State of California, Environmental Protection Agency (Cal-EPA), is the lead state agency charged with the responsibility for implementation of Proposition 65, the Safe Drinking Water and Toxic Enforcement Act of 1986 (codified in Title 27 of the California Code of Regulations, Section 25705(b)).  The State of California OEHHA proposed a **"No Significant Risk Level" (NSRL) for glyphosate of 1,100 micrograms per day** (µg/day), based on a carcinogenicity studies involving rodents and that value was derived using the methods described in Section 25703 of the Code.  The OEHHA Proposition 65 no-significant-risk value is "one excess cancer per 100,000 people exposed," and that value is expressed as $10^{-5}$.  The NSRL, like other such levels established by OEHHA, are "safe harbor" values at and below which no significant risk to health is known to occur as a result of acute, moderate, or chronic exposures.

The U.S. EPA chronic **Acceptable Daily Intake (ADI)** for glyphosate and certain metabolites (AMPA< N-acetyl glyphosate, and N-Acetyl AMP) for humans is **1.0 mg/kg of body weight/day**, which is defined as the **chronic Reference Dose (cRfD)**.

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 25



# 7.0   GLYPHOSATE EXPOSURES DURING APPLICATION

## 7.1   Dermal Exposures

In 2020, Pierce, et al. published a paper entitled *Pilot Study Evaluating Inhalation and Dermal Glyphosate Exposure resulting from Simulated Heavy Residential Consumer Application of Roundup*® in which the researchers evaluated individual contributions of inhalation and dermal exposure relative to urinary glyphosate levels.  In this study, participants mixed and continuously sprayed a 0.96 percent glyphosate solution non-stop over a 100-minute period using a backpack sprayer.  Note that the 100-minute spray time period was selected based strictly on the minimum sample duration specified in the OSHA Method PV2067 (and was not based on the perception that that time period would best simulate domestic use of an herbicide spray).  Each participant sprayed a 677-foot perimeter of a gravel and asphalt yard at an approximate pace of one foot per second, covering a total distance of more than 5,000 feet (1,524 meters), which was estimated as being equivalent to spraying the perimeter of a one square acre parcel of land six times consecutively, which would clearly exceed the domestic use of an herbicide on a typical residential property.  Each participant added to ten fluid ounces of Roundup® Concentrate (50.2 percent glyphosate) four gallons of water in order to create a 0.96 percent glyphosate solution; and each participant mixed and sprayed the herbicide four times without a break during the study.  Researchers saw that during application the body areas most affected by contact were the right shin (the front of the right leg below the knee), the left shin (front of the left leg below the knee), the dorsal side of the forearm of the applicator's spraying arm, and the proximal portion of anterior thigh that was contralateral to the applicator's spraying arm.  The dermal patch data showed an arithmetic mean of $0.1539 \ \mu g/mm^2$ on the right shin, a mean of $0.1443 \ \mu g/mm^2$ on the left shin, a mean of $0.0848 \ \mu g/mm^2$ on the dorsal forearm, and a mean of $0.1044 \ \mu g/mm^2$ on the thigh.  The maximum glyphosate level overall was found on the left shin at $0.4294 \ \mu g/mm^2$, followed by the right shin, which had a maximum value of $0.3789 \ \mu g/mm^2$.

In 2019, Connolly, et al. published a paper entitled *Evaluating Glyphosate Exposure Routes and Their Contributing to Total Body Burden: A Study Among Amenity Horticulturalists* in which the authors stated that the objectives of their study were to determine dermal and inadvertent ingestion exposures in agricultural workers and assess their impact to the total body burden.  Wipe samples were collected from the perioral area and from both hands of 20 workers involved in 29 work tasks.  The subjects used manual knapsacks, controlled droplet applicators and pressurized applicators.  All showed compliance with appropriate personal protective equipment use.  Following sample analysis, glyphosate geometric mean data were recorded at 0.01, 0.04, and $0.05 \ \mu g/cm^2$ from the subjects' perioral area, the left, and right hands, respectively.  Disposal gloves had a geometric mean glyphosate level of $0.43 \ \mu g/cm^2$ while those persons wearing reusable gloves had a geometric mean glyphosate level of $7.99 \ \mu g/cm^2$.

In 2004, Johnson et al. published a paper entitled *Operator Exposure When Applying Amenity Herbicides by All-Terrain Vehicles and Controlled Droplet Applicators* in which the authors stated that glyphosate was the named herbicide used during the study and during ATV applications, the potential dermal exposures to spray fluid ranged between 0.7 and 6.8 milliliters per hour (ml/h), with the median level at 2.0 ml/h.  Exposure to hands for the ATV applicators was between 0.6 and 13.6 ml/h, with the median value at 3.0 ml/h.  The researchers also evaluated dermal exposures for controlled droplet applicators, and their potential dermal exposures overall ranged between 0.003 and 0.826 ml/h, a median value of 0.133 ml/h.  Their exposures to hands (samples collected on cotton gloves inside of protective gloves) showed data ranging up to 0.06

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 26



# 7.0   GLYPHOSATE EXPOSURES DURING APPLICATION (CONTINUED)

7.1   <u>Dermal Exposures</u> (Continued)

ml/h, with a median value of 0.004 ml/h.  Dermal data on the applicator's socks ranged up to 0.05 ml/h, with a median value of 0.001 ml/h.

In 1992, Lavy, et al. published a paper entitled *Conifer Seedling Nursery Worker Exposure to Glyphosate* in which the authors determined average dermal exposure potentials for *Applicators*, *Weeders*, and *Scouts* equaling 7.2 x 10[-4], 2.0 x 10[-4], and 1.6 x 10[-6] mg per kg per hour (mg/kg/h), respectively.

7.2   <u>Inhalation Exposures</u>

As a result of the same study cited above by Pierce, et al. (2020), the authors published a paper entitled *Pilot Study Evaluating Inhalation and Dermal Glyphosate Exposure resulting from Simulated Heavy Residential Consumer Application of Roundup*[®] in which they showed that the mean airborne glyphosate exposure potential data ranged from 0.0030 milligrams per cubic meter (mg/M[3]) to 0.0075 mg/M[3], with an arithmetic mean value of 0.0047 mg/M[3].

In 1991, in a study by Jauhiainen, et al., airborne glyphosate was detected at levels ranging from <1.3 micrograms per cubic meter (µg/M[3]) to 15.7 µg/M[3] (0.0157 mg/M[3]) in the breathing zones of forestry workers spray-applying glyphosate in an area having an estimated 350 trees.

In 2004, Johnson et al. published a paper entitled *Operator Exposure When Applying Amenity Herbicides by All-Terrain Vehicles and Controlled Droplet Applicators* in which the authors stated that glyphosate was the named herbicide used during the study and during ATV applications, the inhalation exposure potential ranged from 7 to 37 mg/M[3], with glyphosate detected in 85 percent of the samples and among those data having quantifiable results, the median glyphosate level was 16 mg/M[3].   During controlled droplet application work, inhalation exposures were low, ranging from 0.02 to 0.61 mg/M[3], with just 33 percent of those samples showing quantifiable data, and when quantified, the median value was 0.12 mg/M[3].

# 8.0   HUMAN BIOLOGICAL MONITORING DATA

There are a number of exposure assessment studies that have been conducted in conjunction with biomonitoring assessment that researchers have used to develop exposure data relative to internal dose data following use of GBHs during a variety of mixing and application scenarios.  I have reviewed all such studies that are available to me.  Those study results consistently show low internal dose data, with the maximum biomonitoring dose figure at 0.007 mg/kg.  I have summarized some of that literature below for illustrative purposes.

As a result of the same study cited above by Pierce, et al. (2020), the authors published a paper entitled *Pilot Study Evaluating Inhalation and Dermal Glyphosate Exposure resulting from Simulated Heavy Residential Consumer Application of Roundup*[®] in which they presented urinary glyphosate concentration values for both the inhalation group and the dermal exposure group.  Regarding the *inhalation* group, an arithmetic mean (average) urinary glyphosate level of 11.48 micrograms per liter (µg/l) was recorded, which is equivalent to nanograms per milliliter, and that was detected 3-hours post application.  The

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 27



## 8.0   HUMAN BIOLOGICAL MONITORING DATA (CONTINUED)

*inhalation* group had a mean urinary glyphosate level of 6.09 µg/l at 6-hours post application, 2.11 µg/l at 12-hours post application, and 0.91 µg/l at 24-hours post application, the lattermost result being equivalent to the baseline arithmetic mean value of 0.94 µg/l.  Regarding the *dermal* group, an arithmetic average urinary glyphosate level of 63.87 µg/l was detected 3-hours post application, while that mean urinary glyphosate levels declined to 24.46 µg/l, 11.94 µg/l, 3.08 µg/l, and 2.68 µg/l at the 6-hour, 12-hour, 24-hour, and 36-hour post application intervals, respectively.  The researchers concluded that the "study results…are consistent with previous studies, showing the glyphosate is quickly eliminated from the body, typically with 24 hr following application."

In 2020, Kougias, et al. published a paper entitled *Risk Assessment of Glyphosate Exposure from a Pilot Study with Simulated Heavy Residential Consumer Application of Roundup® using a Margin of Safety(MOS) Approach* in which they characterized exposures to consumers (rather than occupational exposures during herbicide application) following "heavy residential application of a glyphosate-based herbicide in a residential yard and garden setting."  Those researchers, who were clearly using the Pierce, et al. (2020) data, showed that during three 100-minute application sessions, the peak urinary output of glyphosate, AMPA, and effective glyphosate concentrations were found at three to six hours after the application sessions and within 24 hours post-application, those urinary analytes were at pre-application values.  Based on their biological monitoring, the study group found that the total internal dose sustained by the subjects via inhalation and skin absorption averaged 19.982 µg (8.030 to 33.491 µg) and 97.280 µg (12.325 to 397.828 µg), respectively.  The mean internal doses calculated on a "per kilogram of bodyweight basis" via inhalation was 0.290 µg/kg (0.118 to 0.615 µg/kg).  The mean internal doses calculated on a "per kilogram of body- weight basis" via a dermal route of entry into the body was 1.045 µg/kg (0.170 to 3.732 µg/kg).  None of these data approached the U.S. EPA chronic acceptable daily intake (ADI) for glyphosate is 1.0 mg/kg of body weight per day.  The researchers concluded that the "study demonstrates that glyphosate exposure from even heavy consumer application of commercially available glyphosate-containing herbicide does not appear to be a health concern."

In 2004, Acquavella, et al. in their paper entitled *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, stated that they randomly selected licensed pesticide applicators in South Carolina and Minnesota to participate in a study during which the researchers evaluated urinary glyphosate concentrations for 48 farmers, their spouses, and their 79 children (age four to 18 years) following application of glyphosate-containing herbicide products.  They evaluated 24-hour composite urine samples for each family member the day before, the day of, and for three days after glyphosate application.  Sixty percent of the farmers had detectable urine concentrations on the day of application.  The geometric mean concentration was 3 µg/l and the maximum value was 233 µg/l, with the highest estimated systemic dose at 0.004 mg/kg.  For spouses, just four percent had discernable glyphosate in their urine, and their maximum value was recorded at 3 µg/l.  In the children, 12 percent had detectable urine glyphosate on the day of application, with a maximum concentration of 29 µg/l.  Note that all but one of the children had assisted in the application process.  None of the systemic doses in the study approached the U.S. EPA RfD of 1.0 mg/kg/day.

In 2019, Connolly, et al. published a paper entitled *Evaluating Glyphosate Exposure Routes and Their Contributing to Total Body Burden: A Study Among Amenity Horticulturalists* in which the authors found good correlation between higher dermal glyphosate levels and the higher urinalysis glyphosate data.

In the one study by Jauhiainen, et al. (1991) in which airborne glyphosate was detected at levels ranging from <1.3 µg/M$^3$ to 15.7 µg/M$^3$ in the breathing zones of forestry workers spray-applying glyphosate in an

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 28



## 8.0   HUMAN BIOLOGICAL MONITORING DATA (CONTINUED)

area having an estimated 350 trees, glyphosate urinalysis was performed involving those forestry workers and no glyphosate was found at or above the analytical limit of detection of 0.1 nanogram per microliter.

In 1992, Lavy, et al. published a paper entitled *Conifer Seedling Nursery Worker Exposure to Glyphosate* in which the authors determined average dermal exposure potentials for *Applicators*, *Weeders*, and *Scouts* equaling $7.2 \times 10^{-4}$, $2.0 \times 10^{-4}$, and $1.6 \times 10^{-6}$ mg per kg per hour (mg/kg/h), respectively. That Lavy, et al. team also collected a total of 335 urine samples from the 14 study subjects over a total of 1,138 worker-days, and none of those urine samples revealed any detectable glyphosate.

In 2017, Connolly, et al. published a paper entitled *Exposure Assessment using Human Biomonitoring for Glyphosate and Fluroxypyr Users in Amenity Horticulture* in which the authors reported urine biomonitoring data following, among other methods, herbicide spraying operations using pressurized sprayers, each with a handheld lance, filled with Roundup® Biactive XL (360 g/l). The geometric mean urinary glyphosate was recorded at 0.31 µg/l involving those participants dispensing glyphosate with a pressurized sprayer.

In 2019, Perry, et al. published a paper entitled *Historical Evidence of Glyphosate Exposure from a US Agricultural Cohort* in which the authors reported glyphosate biomonitoring data involving Wisconsin farmers urine samples that were stored at a repository since 1997 and 1998. The study team compared the sample data from farmers that self-reported glyphosate use during the previous eight hours before the urine samples were collected against the sample data from farmers that did not use glyphosate. Of the 18 glyphosate applicator samples tested, 39 percent showed detectable glyphosate levels, which when found showed a mean concentration of 4.04 µg/l. And of the 17 non-glyphosate applicator samples analyzed, none contained detectable glyphosate. While these data clearly demonstrate a historic exposure potential for farmers, they also indicate that of the farmers that claimed to have used glyphosate at the time, not more than 40 percent of that farmer population showed a biomarker for glyphosate.

In 2005, Marian S. Bleeke led a team of Monsanto researchers who conducted a field observation study involving individuals mixing/loading glyphosate solutions and individuals applying those glyphosate solutions using Spanish backpacks. Other test subjects applied the herbicide using a shielded PURO® controlled droplet applicator and unshielded PURO® controlled droplet applicator. Varying levels of personal protective equipment were worn by operators, and spill and skin contact events were noted. Following application, the authors stated that the median systemic dose for backpack mixer/loaders was 0.0000595 milligrams of glyphosate acid per kilogram of body weight (mg/kg). The median glyphosate systemic dose data were 0.000288 mg/kg for backpack applicators, 0.000514 mg/kg for unshielded PURO® controlled droplet applicators, and 0.000212 mg/kg for PURO® controlled droplet applicators.

In 2020, Solomon, who found that the highest dose was 0.004 mg/kg (Acquavella, et al., 2004), stated in conclusion that for applicators, 90th percentiles for systemic exposures based on biomonitoring and dosimetry (normalized for penetration through skin) were 0.0014 and 0.012 mg/kg b.m./d, respectively. All of these exposures are less than the reference dose and the acceptable daily intakes proposed by several regulatory agencies, thus supporting a conclusion that even for these highly exposed populations the exposures were within regulatory limits.

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 29



## 8.0   HUMAN BIOLOGICAL MONITORING DATA (CONTINUED)

In 2019, Keith Solomon in his paper entitled *Glyphosate in the General Population and in Applicators: A Critical review of Studies and Exposures*, cited glyphosate systemic dose data recorded during historic studies under a wide variety of circumstances, and based on the apparent facts that are relevant to the James Peterson case, I selected the following systemic dose data that I believed most represented the herbicide use pattern matching that of the Plaintiff.

| Systemic Dose (mg/kg/d) | Event | Method | Study Author (year) |
|---|---|---|---|
| $1.51 \times 10^{-5}$ | Handheld handgun | Patch | Kramer (1978) |
| $4.25 \times 10^{-4}$ | Mixer | Patch | Kramer (1978) |
| $1.34 \times 10^{-3}$ | Weeder | Patch | Cowell and Steinmetz (1990) |
| $1.43 \times 10^{-3}$ | Weeder | Patch | Tan, et al. (1987) |
| $3.74 \times 10^{-4}$ | Mixer | Urine | Cowell and Steinmetz (1990) |
| $6.16 \times 10^{-4}$ | Spray application | Urine | Abdelghani (1995) |
| $6.82 \times 10^{-4}$ | Mixer | Urine | Cowell and Steinmetz (1990) |

## 9.0   TOXICOKINETIC FACTORS INVOLVING GLYPHOSATE

Toxicokinetics refers to the study of absorption, distribution, metabolism/biotransformation, and excretion (ADME) of toxicants from the body in relation to time.  With respect to glyphosate, some of the more relevant toxicokinetic factor studies include the following.

### 9.1   Animal Testing

Anadón, et al. (2009) in their paper entitled *Toxicokinetics of Glyphosate and its Metabolite Aminomethylphosphonic Acid in Rats* showed that the content of AMPA in plasma was positively correlated with the concentration of glyphosate administered orally in rats.  The concentration on glyphosate and AMPA in plasma peaked at approximately 4.5 hours after administration (of 100 mg/kg and 400 mg/kg) after which the concentrations decreased markedly.  The plasma half-lives of glyphosate and AMPA in plasma were calculated at 14.38 hours and 15.08 hours, respectively; but be advised that the glyphosate and AMPA in plasma half-life data were affected by species, dosage, and route of administration.  Animal experiments showed that only approximately two percent of the glyphosate administered in a single dose of 1,100 mg/kg per day was metabolized to AMPA, and an estimated 10 to 20 percent of that metabolized material was excreted via the urine with the remaining 80 to 90 percent eliminated in the feces.  The only metabolite that was excreted in the urine within 12 hours after administration was AMPA, and after stopping administration, the concentration of glyphosate in the urine dropped sharply and was comprised mostly of unmetabolized glyphosate.  Anadón et al. reported an absorption half-life of 2.29 hours following administration of an oral dose of 400 mg glyphosate/kg to rats, and they reported an estimated peak plasma level of glyphosate of 4.62 µg per milliliter of serum, which was reached at 5.16 hours after administration.  The Anadón team suggested that an oral absorption rate of about 20 percent would apply to rats.  And, that research team observed that glyphosate does not undergo significant metabolism in mammals, given less than 1 percent is metabolized to aminomethylphosphonic acid (AMPA), the most common metabolite of glyphosate.



Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 30

# 9.0   TOXICOKINETIC FACTORS INVOLVING GLYPHOSATE (CONTINUED)

9.1   <u>Animal Testing</u> (Continued)

Brewster, et al. (1991) in their paper entitled *Metabolism of Glyphosate in Sprague-Dawley Rats: Tissue Distribution, Identification, and Quantitation of Glyphosate-Derived Materials following a Single Oral Dose* stated that "Results from a previous study (Duerson and Sipes, 1987) indicated that glyphosate is rapidly eliminated from the body and that the total body burden is less than 2% of the administered dose 24 hr after administration." That research team stated that after two hours after administration of a single oral dose of $^{14}$C-radiolabeled glyphosate, 85 percent of the glyphosate was contained within the gastrointestinal tract and small intestine and, at 6.3 hours after administration, bone contained about 5 percent glyphosate while the colon and kidney contained less than 1.5 percent each. In an experiment to determine which Sprague-Dawley rat body tissues contained more than one percent glyphosate at varying times following administration of a single oral dose of $^{14}$C-radiolabeled glyphosate, data indicated that, at 28 hours, only bone, gastrointestinal contents, and carcass contained over one percent glyphosate. At 96 hours following administration, only bone and carcass contained over one percent glyphosate, and after 168 hours (seven days) after administration, only bone contained essentially at (or marginally above) one percent glyphosate (1.06 ± 0.04 percent), and with time, that glyphosate level in bone will continue to decline. Brewster, et al. stated that "[B]ased upon the metabolite profile from other tissues it would be expected that this material (at the bone) is non-metabolized parent glyphosate which has complexed with $Ca^{2+}$ ions in the bone matrix." And finally, that research team stated that "No toxic metabolites were produced from glyphosate…and the vast majority of the body burden was unmetabolized parent glyphosate."

McEwen (1995) in his paper entitled *Metabolism in the Rat* reported about toxicokinetics of glyphosate following oral dosing of rats. Like other studies, absorbed glyphosate was widely distributed throughout the body; the glyphosate did not bioaccumulate; and low amounts were detected in varying tissues. Similar to the findings of Brewster, et al., McEwen noted that excretion from the bone was slower than other tissues, but most notably, deposits of glyphosate in the bone marrow were scant (just at the detection limit of the analysis) at six and 18 hours after dosing, and glyphosate left the bone marrow rapidly, with no detectable amounts at 168 hours after dosing. This fact is an important consideration when evaluating possible chemical etiologies of certain subtypes of NHL, given that B-cell lymphocytes mature in bone marrow (and not at the outer portion of the bone). With respect to glyphosate absorbed after oral dosing, glyphosate was barely detectable in bone marrow at any time after administration of a substantial amount (10 mg/kg) and, again, that compound is known to vacate that portion of the bone rapidly.

Chan and Mahler (1992) in their *NTP Technical Report on Glyphosate*, indicated that, "[W]ithin 72 hours after glyphosate oral dosing (involving male F344/N rats), 20-30% of the administered radioactivity was eliminated via urine, 70-80% via feces, and about 1% of the radioactivity remained in tissues." The authors added that over 70 percent of the administered dose was eliminated within the first 24 hours, and that their study "demonstrated that glyphosate was incompletely absorbed from the gastrointestinal tract and excreted in the urine after oral administration."

Wester, et al. (1991) conducted a toxicokinetic study with rhesus monkeys that had intravenous doses of $^{14}$C-radiolabeled glyphosate and that study team was able to recover 95 percent of the administered glyphosate. Those researchers stated that "[A]lmost all of each dose (of

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 31



# 9.0   TOXICOKINETIC FACTORS INVOLVING GLYPHOSATE (CONTINUED)

9.1   <u>Animal Testing</u> (Continued)

glyphosate) was excreted into urine within the 7-day urine collection period.  The majority of the $^{14}C$ urinary excretion was in the first 24 hr."  Data showed that approximately 82 percent of the glyphosate administered was recovered via the urine within the first 24 hours.  Wester, et al. reported "No radioactivity was detected in the spleen, ovaries, kidney, brain, liver, abdominal fat, bone marrow, upper spinal column, or central nervous system fluid (of the four rhesus monkeys that were euthanized following experimentation with glyphosate)."

The U.S. EPA reported that male and female Sprague-Dawley rats were administered $^{14}C$-radiolabeled glyphosate via intraperitoneal injection at 1,150 mg/kg, and that the half-life elimination from the bone marrow was estimated at 7.6 hours and 4.2 hours for the males and females, respectively.  A half-life for elimination of radioactivity from plasma was approximately one hour for both genders.  These results indicate that glyphosate reaching the blood was rapidly eliminated and that the small fraction reaching the bone marrow was rapidly eliminated.

9.2   <u>Human Evaluations</u>

According to IARC (2016), glyphosate is mostly not metabolized in the human body and has an estimated half-life of 33 hours in humans (based on animal toxicological extrapolations).  However, actual human studies have shown a more rapid half-life phase.

Connolly, et al. (2018) published a paper entitled *Exploring the Half-Life of Glyphosate in Human Urine Samples* in which the authors reported, based on urine biomonitoring data following herbicide spraying operations, the glyphosate half-life in urine data ranged from 5.5 to 9 hours, with a mean half-life time period of 7.25 hours.

In 2020, Faniband, et al. published a paper entitled *Human Experimentation Exposure to Glyphosate and Biomonitoring of Young Swedish Adults* in which the authors explained that they studied the kinetics of glyphosate by measuring the parent compound and AMPA in urine samples of three volunteers after an experimental oral exposure to glyphosate.  They also examined glyphosate exposure by performing the same analyses of spot urine samples of 197 young adults in Scania, southern Sweden.  The three healthy individuals were administered an oral dose equivalent to 50 percent of the ADI (1.75 mg/kg) and urinary samples were collected up to 100 hours after exposure.  The excretion of glyphosate via the urine seemed to follow "first order kinetics" and a "two-phase excretion" pattern.  The excretion half-life was from six to nine hours in the rapid phase and from 18 to 33 hours in the slower phase.  "The total dose recovered as unchanged glyphosate in the urine samples was 1 to 6 percent; the AMPA metabolite was found at 0.01 to 0.04 percent of the total glyphosate dose administered."

In 2020, Pierce, et al. published a paper entitled *Pilot Study Evaluating Inhalation and Dermal Glyphosate Exposure resulting from Simulated Heavy Residential Consumer Application of Roundup*® in which they showed that the mean airborne glyphosate exposure potential datum was 0.0047 mg/M³ and the mean skin patch concentration ranged from 0.04 μg/mm² to 0.25 μg/mm².  The authors stated that "[I]n general urinary glyphosate, AMPA, and total effective glyphosate levels were higher in the dermal exposure group than the inhalation exposure group,



# 9.0   TOXICOKINETIC FACTORS INVOLVING GLYPHOSATE (CONTINUED)

9.2   <u>Human Evaluations</u> (Continued)

(which) peaked within 6 hours following application and were statistically indistinguishable from background at 24-hr post application."

In 2020, ATSDR reported that the toxicokinetics of glyphosate following exposures by inhalation, skin contact, and ingestion indicate that the absorbed glyphosate undergoes little metabolism (less than one percent) to AMPA; the absorbed glyphosate is primarily confined to blood and does not appear to accumulate within specific tissues; and that glyphosate is renally eliminated from the body with a half-life of about three to four hours (EFSA, 2015; JMPR, 2004; and Roberts, et al., 2010).

Regulatory authorities agree that the dermal route is the most important route of absorption for users of glyphosate, and scientific studies support this proposition as well (Lavy, et al., 1992; Tuomainen, et al., 2002; Aprea, et al., 2005; Flack, et al., 2008; and Vitali, et al., 2009). An estimated ~1 percent of exposure is expected to result from inhalation of the pesticide (Honeycutt, et al., 1986). Dermal absorption of glyphosate through human skin is low, which is consistent with expectations, given that glyphosate is hydrophilic and thus the stratum corneum (the outer layer of the epidermis) is highly *protective* against absorption of glyphosate through the skin.  Dermal absorption studies using human skin have consistently demonstrated that the absorption of glyphosate is two percent or less over a 24 hour period.  Of course, in a *real world* scenario, applicators will not generally have glyphosate remain undisturbed on their skin for 24 hours after a dermal exposure, because predictably, those applicators will wash their skin—an effective way to remove glyphosate—and/or dermally exposed glyphosate will slough off passively with activity (Wester, et al., 1991).  Note also that after a certain period of time, the absorption of glyphosate will slow and stop (depending on the initial concentration of exposure) and this usually occurs within eight to 24 hours (Davies, Smith, Ward, various dates between 2010 and 2017).  In order to account for the fact that all absorption periods are not uniform, scientists will often use a *flux* rate to report the rate of absorption.  All of the flux rates measured for glyphosate are quite low and the rate of absorption does not appear dependent on the presence of surfactants—that is, surfactants do not enhance absorption (Nielsen, et al. 2009; and Franz, 1983).

Following dermal absorption, glyphosate is readily distributed throughout the body and excreted quickly via the urine (Brewster, et al. 1991; NTP, 1992; ATSDR, 2020).  Glyphosate does not bio-accumulate in humans and is largely excreted without being metabolized (ATSDR, 2020).   In 2018, Connolly, et al. published a paper entitled *Exploring the Half-Life of Glyphosate in Human Urine Samples* in which the authors reported, based on urine biomonitoring data following herbicide spraying operations, the glyphosate half-life in urine data ranged from 5.5 to 9 hours, with a mean half-life time period of 7.25 hours.  This dictates that at about two days after glyphosate application, nearly all of the absorbed glyphosate will have been excreted via the urine.

# 10.0   BRIEF DISCUSSIONS OF SELECTED STUDIES

I have reviewed epidemiology literature available on glyphosate and glyphosate-based herbicides in the context of cancer incidence, specifically with respect to NHL; and I have found that many of the studies



# 10.0  BRIEF DISCUSSIONS OF SELECTED STUDIES (CONTINUED)

available have inherent (and often unavoidable) design limitations, including confounding variables and recall bias (Crump, et al., 2020).  Moreover, from *exposure* and *cumulative dose* points-of-view, many of the research teams are compelled to only examine *ever-never* exposures (e.g., DeRoos, et al., 2003), presumably because that is the only essential historic information that is readily available.  Be advised, though, that *ever-never* exposure criteria can be quite limiting during research, unless the study team can develop dose-response paradigms with such data.  In some cases, *ever-never* statistics can lead to data interpretation that is potentially compromised by confounding variables—such as other chemical exposures—that are nested in the study design, thereby making an evaluation of a true *cause and effect* relationship concerning the use of individual pesticides difficult.  In my opinion, some *ever-never* inquiries are better suited for *hypothesis generation*, particularly in circumstances when the researchers cannot determine a focused (and unbiased) dose-response relationship because of their limited viewpoint.

Two case control studies—one by McDuffie, et al. in 2001 and another by Eriksson, et al. in 2008—look at *hours per year* of exposure (to glyphosate, among other pesticides) and *days of exposure in a lifetime* (to glyphosate, among other pesticides), respectively.  Unfortunately, neither exposure criterion would allow an analyst to reconstruct a dose-response model, nor interpret the study data in terms of cumulative dose over a lifetime (or any time interval).  During both of those studies, retrospective information was gathered by written questionnaire, some with follow-up interviews by telephone, which are data-gathering techniques that would potentially introduce confounding variables to be overlooked (or uncontrolled for) and/or for recall bias to be at issue.  Also, those studies did not appear to take into account issues concerning the use of personal protective equipment by applicators, the amounts of pesticides used, the methods of application, or the actual hours of exposure (rather than just the number of days during which some degree of exposure occurred).  In any case, concerning use of Roundup®, McDuffie, et al. reported an *ever-never* NHL adjusted OR of 1.2, with a CI ranging from 0.83 to 1.74, which was not statistically significant.  McDuffie, et al. showed other ORs for varying herbicides based on the "average number of days per year of exposure;" however, the *days per year* criterion does not define the number of exposure hours per application day, or per month, per year, or the number of exposure hours in a lifetime.  In any case, McDuffie, et al. reported a >0 days to ≤2 days glyphosate exposure NHL OR of 1.00 (CI: 0.63 to 1.57), which clearly is also not statistically significant.  The McDuffie, et al. data support the conclusion that use of glyphosate-based herbicides do not lead to an increased incidence of NHL.

Eriksson, et al. attempted to take exposure time periods into account and they found that, regarding an exposure period of between one and ten years, glyphosate had an NHL OR of 1.11 (CI: 0.24 to 5.08), which quite obviously is not significant.  This study group would agree with that conclusion, given they stated that "[L]atency period calculations and multivariate analyses included agents with statistically significant OR, or with an OR > 1.5 and at least 10 exposed subjects."  In contrast to the one-to-ten year-related OR for glyphosate, the Eriksson, et al. team identified a >10-year glyphosate-related NHL OR of 2.26 (CI: 1.16 to 4.40), and I believe that that time period would undoubtedly have included exposures to glyphosate and a number of other herbicides, including 2-methyl-4-chlorophenoxyacetic acid (MCPA), 2,4,5-T, and 2,4-D by the subjects studied.  And, the >10-year ORs for those latter herbicides were reasonably comparable to that cited for glyphosate.  The authors acknowledged that glyphosate "has succeeded MCPA as one of the most used herbicides in agriculture, and many individuals (in their study) that used MCPA earlier are now also exposed to glyphosate.  This probably explains why the multivariate analysis does not show any significant ORs for these compounds."  Simply said, if the univariate OR appears to be statistically significant, but the multivariate OR for the same compound over the same time period does not reach significance, that then strongly suggests that one or more confounding variables



# 10.0  BRIEF DISCUSSIONS OF SELECTED STUDIES (CONTINUED)

exist in the analysis.  The Eriksson team identified weaknesses in their study.  Specifically, the authors admitted that "no registries exist in Sweden on such individual (pesticide) use, which is a weakness in the assessment of exposure.  Exposure to pesticides may be difficult to assess, and some misclassification regarding quantity of exposure has probably occurred, but such misclassification would most probably be nondependent of case/control status, and therefore only weaken any true risks.  Use of protective equipment was not asked for which might have been a disadvantage of the study…."  In consideration of all these factors, I guardedly assign little weight to the *dose* data related to the longer latency periods in the Eriksson, et al. study.

In 2005, DeRoos, et al. evaluated associations between glyphosate exposure and cancer incidence in an Agricultural Health Study in which a cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina were studied from 1993 to 1997.  Note that Iowa is one of two states of this country in which county-by-county incidence of NHL seemed to be above-background and those statistics were not necessarily accounted for by aging communities.  A total of 75.5 percent of the participants reported *ever* having used glyphosate, and of those *ever* potentially exposed, all cancers had a relative risk (RR) of 1.0, CL: 0.9 to 1.1; NHL had a RR of 1.1, CI: 0.7 to 1.9; and leukemia had a RR of 1.0, CI: 0.5 to 1.9— none of which are statistically significant.  The authors concluded that "[N]o association was observed between NHL and glyphosate exposure in any analysis, including an analysis comparing the highest with the lowest quintile of exposure."

In 2018, Andreotti, et al. in their paper entitled *Glyphosate Use and Cancer Incidence in the Agricultural Health Study* stated that they too evaluated pesticide applicators in North Carolina and Iowa with respect to glyphosate use and incidences of varying cancers.  This study team evaluated the possible association between glyphosate use with cancer incidence from registry linkages through 2012 in North Carolina and through 2013 in Iowa.  Lifetime days and intensity-weighted lifetime days of glyphosate use were based on self-reported information from enrollment from 1993 to 1997 (clearly overlapping with the same group evaluated by the DeRoos, et al. team), with follow-up questionnaires generated for the 1999 to 2005 time period.  Comparable to the findings of the earlier team, the authors stated that "[A]mong 54,251 applicators, 44,932 (82.8%) used glyphosate, including 5,779 incident cancer cases…glyphosate was not statistically significantly associated with cancer at any site."  The authors concluded that "[I]n this large, prospective cohort study, no association was apparent between glyphosate and any solid tumors or lymphoid malignancies overall, including NHL and its subtypes."

In 2019, Zhang, et al. indicated in their paper entitled *Exposure to Glyphosate-Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence* that they focused on "an *a priori* hypothesis targeting exposure magnitude and by including newly updated AHS (Agriculture Health Study) study…" with the understanding "that higher and longer cumulative exposures are likely to yield higher risk estimates, given the nature of cancer development.  Hence, when cumulative exposure is higher, either due to higher level or longer duration exposures, an elevated association with the cancer of interest is more likely to be revealed if a true association exists."  Zhang, et al. cited a meta-RR of 1.41 using their "novel *a priori* hypothesis;" however, the authors cited that "[T]here are several weaknesses of our analysis that should be noted…First, there were only limited published data available for inclusion…we cannot exclude the potential for publication bias…there was imbalance in study design…(the) NHL findings from the cohort study was consistent with a wide range of risks…and because no statistical tests can confirm elimination of publication bias or heterogenicity in a meta-analysis, our results should be interpreted with caution."

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 35



# 10.0  BRIEF DISCUSSIONS OF SELECTED STUDIES (CONTINUED)

Two recent meta-analyses have found no association between glyphosate use and NHL; namely the studies by Donato, et al. (2020) and Kabat, et al. (2021).  In their paper entitled *Exposure to Glyphosate and Risk of non-Hodgkin Lymphoma and Multiple Myeloma: An Updated Meta-Analysis*, Donato, et al. stated that, after a systematic search of the literature, they "performed random-effects meta-analyses for ever-exposure to glyphosate, dose-response, and risk of specific NHL subtypes," with results showing a meta-relative risk of NHL of 1.03 (CI: 0.86 to 1.21).  Their meta-analysis showed no overall evidence of an increased risk of NHL in occupationally exposed subjects.  Kabat, et al. in their paper entitled *On Recent Meta-Analysis of Exposure to Glyphosate and Risk of non-Hodgkin's Lymphoma in Humans*, stated that their meta-analysis of ever-exposure subjects showed a relative risk of 1.05 (95% CI: 0.87 to 1.28) and they developed conclusions consistent with Donato, et al.  Kabat, et al. also cited some apparent criticisms of the Zhang, et al. study (2019).

In 2013, Cocco, et al. published a paper entitled *Lymphoma Risk and Occupational Exposure to Pesticides: Results of the EPILYMPH Study* in which the researchers investigated the role of occupational exposure to specific groups of agrochemicals as potential etiologies of lymphoma overall and B-cell lymphoma and its most prevalent subtypes.  The researchers focused on the years from 1998 to 2003, during which a total of 2,348 incident lymphoma cases were evaluated along with 2,462 controls in six European countries.  The results showed that the risk of lymphoma overall and B-cell lymphoma was not elevated.  Note that these data are quite consistent with the Brown, et al. 1990 study results given they do not, strictly speaking, show an association between NHL and glyphosate use, which highlights the odds ratios of 1.2 or less cited by various authors as essentially a *null association* with respect to glyphosate exposure and NHL.  Consider that farmers, depending on the specific tasks they perform on-the-job, may be at marginally higher risk of developing NHL due to their cumulative occupational exposures; however, the body of evidence does not support the model in which glyphosate specifically is named as an etiological agent of NHL, because the odds ratio and meta-RR data from glyphosate studies are simply too low and/or the potential for study bias (systematic error) and/or confounding variables call into question any such so-called associations marginally above unity.

In 2019, Leon, et al. published a paper entitled *Pesticide Use and Risk of non-Hodgkin Lymphoid Malignancies in Agricultural Cohorts from France, Norway, and the USA: A Pooled Analysis from the AGRICOH Consortium* in which the authors investigated the relationship of *ever use* of 14 selected pesticides and 33 active chemical ingredients with the incidence of NHL overall and the major subtypes. AGRICOH is a consortium of agricultural cohort studies that the study team used to investigate potential health effects of a wide variety of occupational and environmental exposures that are expected to be relevant to the agriculture industry.  During this study, self-reported information gathering was done and most meta hazard ratios showed no association between farmer pesticide exposures and NHL.  The meta-analysis did show a weak association between DLBCL and glyphosate (OR = 1.36, CI: 1.00 to 1.85); however, this study did not reportedly include an evaluation of all of the Andreotti, et al. data and, therefore, not all AHS participants were included in that analysis, which I believe was a drawback of the study.

In 2002, Hardell, et al. wrote in a paper entitled *Exposure to pesticides as Risk Factor for Non-Hodgkin's Lymphoma and Hairy Cell Leukemia: Pooled Analysis of Two Swedish Case-control Studies* that the pooled analysis from two case controlled studies showed an association between glyphosate use and NHL, with an OR of 3.04, CI: 1.08 to 8.52.  Note, however, that that OR was based on an extremely small population of just eight individuals and, therefore the univariate OR of 3.04 and the multivariate glyphosate



# 10.0  BRIEF DISCUSSIONS OF SELECTED STUDIES (CONTINUED)

NHL OR of 1.85 (CI: 0.55 to 6.20) would be subject to wide variation and error.  For this reason, I assign little weight to this study.

In 2008, Schenk, et al. wrote in a paper entitled *Occupation/Industry and Risk of Non-Hodgkin Lymphoma in the United States*, that "[R]isk of NHL was increased for a few occupations and industries.  Several white collar occupations, with no obvious hazardous exposures, had elevated risks, including purchasing agents and buyers, religious workers, physical therapists, and information clerks.  Occupations with excesses that may have exposures of interest include launderers and ironers, service occupations, food/beverage preparations supervisors, hand packers and packagers, roof and siding (contractors), leather and leather product (manufacturers), transportation by air (personnel), nursing and personal care facilities, and specialty outpatient clinics," all of which I found interesting, along with the authors' admission that "[S]ignificantly decreased risks of NHL were found for a number of occupations and industries including post secondary teachers and (employees in the) chemical and allied products (industries)."  Other occupations (apart from farming and agricultural work) have been associated with increased incidence of NHL, including funeral directors, embalmers, medical professionals, teachers, painters and construction workers, printers, transport workers, secretaries, electrical workers, glass formers, and post office employees.  The authors stated that "[A] recent study observed an increased risk of diffuse large B-cell lymphoma (DLBCL) in metal processors and….To date, no workplace exposures have been conclusively identified as risk factors for NHL."

Again, the prospective cohort Agricultural Health Study that I cited above employed a validated intensity-weighted algorithm in examining a potential etiological relationship between glyphosate and NHL over the course of about two decades.  That algorithm considered issues such as the use of personal protective equipment, along with the methods of herbicide application, and that study represents a more comprehensive attempt to account for internal dose (Dosemeci, et al., 2002; and Coble, et al., 2011).  Lastly, let me say that in my opinion the Andreotti, et al. 2018 study represents the best epidemiological study of its kind concerning glyphosate use and a potential association with cancer incidence in an Agricultural Health Study.  That study team incorporated potential risk factors, such as age, gender, race, applicator job classification, body mass index, cigarette smoking history, family history of cancer, cancer type developed, lag times, and cumulative lifetime exposures, among other factors; and the Andreotti, et al. study did not find an etiological association between glyphosate exposures and NHL, even in the highest exposure groups.

# 11.0  OPINIONS OF HEALTH ORGANIZATIONS/AGENCIES

11.1   <u>U.S. EPA</u>

Regarding glyphosate, the U.S. EPA stated in 2016 that "The overall weight of evidence indicates that there is no convincing evidence that glyphosate induces mutations *in vivo* via the oral route.  In fact, the U.S. EPA has concluded repeatedly over the past 30 years that glyphosate does not cause cancer in humans.  Beginning in 1991, and then again in 1993, 2015, 2016, 2017, 2019, and most recently in 2020, the U.S. EPA has publicly stated that glyphosate exposure during the use of GBH products does not pose an increased risk of cancer in humans.

The U.S. EPA believes, as does most all other regulatory bodies worldwide that glyphosate may under some circumstances (like virtually all chemicals) pose systemic toxicity to humans.  The U.S. acceptable daily intake (ADI) for glyphosate is 1.0 mg/kg of body weight per day, which is



Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 37

# 11.0  OPINIONS OF HEALTH ORGANIZATIONS/AGENCIES (CONTINUED)

11.1   <u>U.S. EPA</u> (Continued)

defined as the chronic Reference Dose (cRfD) determined by the U.S. EPA.  Note that these and other historic findings and opinions of the agency have been reaffirmed in 2017 and 2020.

11.2   <u>JMPR</u>

In 2016, the Joint FAO/WHO Meeting on Pesticide Residues (JMPR) stated, "The overall weight of evidence indicates that administration of glyphosate and its formulation products at doses as high as 2,000 mg/kg body weight by the oral route, the route most relevant to human dietary exposure, was not associated with genotoxic effects in an overwhelming majority of studies conducted in mammals, a model considered to be appropriate for assessing genotoxic risks to humans."  And, as early as 2006, JMPR stated that glyphosate had "no genotoxic potential."

11.3   <u>IARC</u>

On July 29, 2015, the International Agency for Research on Cancer (IARC) released Monograph 112 on glyphosate and in that document IARC concluded that the herbicide should be classified as a carcinogenic substance in Group 2A (probably carcinogenic to humans).  This classification was reportedly based on "limited evidence" from human data regarding NHL and "sufficient evidence" based on animal study results.  The rationale identified mechanistic and other relevant data in support of the conclusion, in particular the so-called "strong evidence" that glyphosate can operate by two key characteristics of known human carcinogens; namely, "genotoxicity" and "oxidative stress."

11.4   <u>EC</u>

In 2015, the European Commission (EC) stated, "Glyphosate has been tested in a broad spectrum of mutagenicity and genotoxicity tests *in vitro* and *in vivo*.  Taking into account all available data and using a weight of evidence approach, it is concluded that glyphosate does not induce mutations *in vivo* and no hazard classification for mutagenicity is warranted…."

11.5   <u>EFSA</u>

In 2015, the European Food Safety Authority (EFSA) stated that, "Glyphosate did not present genotoxic potential."  "EFSA has previously established an acute reference dose (ARfD) and an acceptable daily intake (ADI) of 0.5 mg per kg of body weight for GLY (glyphosate) (EFSA, 2015)" (Faniband, et al., 2020).  EFSA has accepted an Acceptable Operator Exposure Level (AOEL) of 0.1 mg/kg of body weight/day (EFSA, 2015).

11.6   <u>ECHA</u>

The European Chemicals Agency (ECHA), Committee for Risk Assessment has determined that glyphosate is not classified as a carcinogen (ECHA, Helsinki, 15 March 2017).



# 11.0  OPINIONS OF HEALTH ORGANIZATIONS/AGENCIES (CONTINUED)

### 11.7    OSHA, NIOSH, ACGIH, and Cal-EPA

The U.S. Occupational Safety and Health Administration (OSHA) lists all occupational 8-hour or other permissible exposure limits in Title 29 of the Code of Federal Regulations, Part 1910.1000 (or other section); however, no permissible exposure limit has been established for glyphosate at any time, and consistent with that, no occupational threshold limit value has been established by the American Conference of Governmental Industrial Hygienists (ACGIH) and no recommended exposure limit has been established by the National Institute for Occupational Safety and Health (NIOSH).  OSHA has devised an analytical method (No. PV2067) to determine occupational exposures to airborne glyphosate in worker breathing zones and in order to establish a basis to validate such a method, OSHA named an arbitrary target level of 1 mg/M$^3$.  Be advised that this analytical procedure, which was established in November 1989 by the Carcinogen and Pesticide Branch of the OSHA Analytical Laboratory in Salt Lake City, Utah, is considered a "stopgap method" designed to quantify the isopropylamine salt of glyphosate using high performance liquid chromatography (HPLC) with ultraviolet (UV) detection that was based, in part, on the analytical procedures used to determine glyphosate in soil and water.

The State of California Office of Environmental Health Hazard Assessment (OEHHA), Proposition 65 Implementation Office listed glyphosate on the Proposition 65 List in 2017 based on the determination by IARC that that compound was, as of 2015, a "probably human carcinogen." IARC had concluded that "Overall, the mechanistic data provide strong evidence for genotoxicity and oxidative stress.  There is evidence that these effects can operate in humans."  The OEHHA, which is within the State of California, Environmental Protection Agency (Cal-EPA), is the lead state agency charged with the responsibility for implementation of Proposition 65, the Safe Drinking Water and Toxic Enforcement Act of 1986 (codified in Title 27 of the California Code of Regulations, Section 25705(b)).  The OEHHA proposed a "No Significant Risk Level" (NSRL) for glyphosate of 1,100 micrograms per day (µg/day), based on a carcinogenicity studies involving rodents and that value was derived using the methods described in Section 25703 of the Code.

A review of the vast majority of position statements of regulatory agencies or quasi-governmental organizations (both foreign and domestic) on glyphosate indicate that GBHs can be used safely, and that glyphosate does not cause cancer in humans.  Besides the U.S. EPA, this viewpoint is shared by the Health Canada, the EFSA, ECHA, and the leading health authorities in Germany, Australia, Korea, New Zealand, and Japan.  In short, IARC—and those other entities that are compelled to follow IARC's conclusions on glyphosate (based on the information provided in Monograph 112)—essentially *stand alone* in their view that glyphosate exposures can ultimately lead to an increased risk of cancer in humans.

# 12.0  CRITQUE OF PLAINTIFF'S EXPERT'S REPORTS

### 12.1    Lauren C. Pinter-Brown, MD, FACP

Dr. Pinter-Brown produced a report concerning the Plaintiff dated January 21, 2021, and in that report, she acknowledged that "The cause of DLBCL is unknown in most patients, however numerous environmental factors such as exposure to industrial, agricultural, household and some medicinal chemical agents, immunodeficiency states, autoimmune conditions, ionizing radiation

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 39



# 12.0  CRITQUE OF PLAINTIFF'S EXPERT'S REPORTS (CONTINUED)

## 12.1  <u>Lauren C. Pinter-Brown, MD, FACP</u> (Continued)

and some infections are known to increase the individual's risk of developing and potentially causing non Hodgkin lymphomas." Dr. Pinter-Brown then analyzed Mr. Peterson's personal risk of developing DLBCL; and she eliminated various risk factors, such as ionizing radiation, certain infections, a family history of lymphoma, immunodeficiency, and a known history of any autoimmune disease. She did acknowledge that Mr. Peterson was over the age of 60 (in fact, he was 73 years old) when he was diagnosed with DLBCL, admitting also that "the disease is more common in people over the age of 60 years." Dr. Pinter-Brown did not appear to acknowledge that men are more likely to develop NHL than women in the United States and Caucasians are more likely to develop lymphoma than people of Asian or African-American descent. Those are potential risk factors that should not be ignored outright.

Dr. Pinter-Brown did indicate that "Mr. Peterson had a significant exposure to Roundup." She concluded that "Mr. Peterson's exposure to GBFs (glyphosate-based formulations) is not only sufficient, but exceeds the exposure that is reported to either cause or significantly increase one's risk of developing Non-Hodgkin lymphoma and that his exposure to GBFs is a substantial contributing factor in the development of his non-Hodgkin lymphoma." She based her conclusions on, in part, the studies by DeRoos (2003 and 2005), Hardell (2002), Eriksson (2008), McDuffie (2001), Orsi (2009), the North American Pooled Project (2019), Andreotti (2018), and Leon, et al. (2019), and she admitted that the Agricultural Health Study, along with DeRoos (2005) and the Andreotti (2018), did not report an increased risk ratio between use of GBFs and an increased incidence of NHL and its subtypes. Dr. Pinter-Brown indicated that all of those other studies "consistently report an elevated increase in odds and risk ratios for exposure to GBFs and NHL and its subtypes…." She did cite IARC's 2015 classification of glyphosate as a 2A probable human carcinogen, adding that when data are combined in the most recent comprehensive meta-analysis by Zhang (2019), a "strong association between exposure to GBFs and the development of NHL" was demonstrated. Note that I reviewed the studies cited by Dr. Pinter-Brown and I know that either a null association was found between glyphosate use and a higher incidence of NHL, or the results published in those other papers were based on inherent study design limitations and/or design flaws, which in the case of Zhang (2019), were cited by Kabat, et al. (2021). Therefore, none of those study results confirm a strong association between GBH exposure and a higher incidence of NHL in humans.

Also note that the NIH states that the rate of new cases of DLBCL in 2014 was 5.52 per 100,000 persons, which is comparable to the new case DLBCL rate of 5.24 per 100,000 persons in 1992. Over that same time period, use of glyphosate climbed from less than 25 million pounds per year (in 1992) to 250 million pounds per year (in 2014), with no overall appreciable climb in DLBCL new case incidence. These data contraindicate an association between DLBCL and glyphosate use.

Dr. Pinter-Brown essentially cited the basic Roundup® use information claimed by Mr. Peterson; however, I had the impression that she over-emphasized the frequency factor (of "1-2 times per month"), the "windy conditions" factor, the individual use periods of "one hour," and her understanding that he "sometimes wore vinyl or latex gloves." Another expert that is supporting the Plaintiff in this case, William Sawyer, Ph.D., was of the opinion that Mr. Peterson used Roundup® once every month or two, not once or twice per month (and I would not disagree with

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 40



# 12.0  CRITQUE OF PLAINTIFF'S EXPERT'S REPORTS (CONTINUED)

## 12.1  <u>Lauren C. Pinter-Brown, MD, FACP</u> (Continued)

Dr. Sawyer's assessment on this point).  Also note that Mr. Peterson reportedly used Roundup® in all weather conditions, including perhaps when wind may have been a potential exposure risk factor, but he cited no statistics as to how often he sprayed the herbicide when wind may have been such a factor, or even if he ever used herbicides during "windy" weather.  Mr. Peterson did say that he used Roundup® over a period of 40 minutes per application (not an hour as stated by Dr. Pinter-Brown) and, based on his testimony, I had the impression that Mr. Peterson regularly used vinyl or latex gloves when he sprayed herbicides and that, most certainly, he used those gloves when he diluted the concentrate formula.

Regardless of these potential discrepancies, and more importantly with respect to her work on this case, Dr. Pinter-Brown did not appear to calculate a glyphosate exposure or cumulative dose value for Mr. Peterson, nor did she calculate a carcinogenic risk factor.  Rather, she appeared to simply state that GBFs cause NHL; Mr. Peterson developed DLBCL, one NHL subtype; Mr. Peterson's use of Roundup® was "intensive;" and, therefore, his use of that GBF was "a substantial contributing factor to the development of his non-Hodgkin lymphoma." For multiple reasons that I have explained in this report, I disagree with this ultimate conclusion of Dr. Pinter-Brown.

## 12.2  <u>William R. Sawyer, Ph.D.</u>

Dr. Sawyer acknowledged that Mr. Peterson used Roundup® once every month or two, which calculates to four to five times per year based on the apparent fact that Mr. Peterson did not dispense herbicide during the winter months.  On this point, I cannot disagree.  Dr. Sawyer stated that Mr. Peterson estimated that he spent eight to ten hours per year mixing and spraying Roundup®, which clearly is an overestimate given that applying Roundup® 4.5 times per year at 40 minutes per application period would calculate to not more than three hours per year.

Dr. Sawyer indicated that Mr. Peterson "would regularly get some of the product on his hands or ankles" when he was mixing and applying diluted Roundup®.  That statement is inconsistent with Mr. Peterson's testimony, given Mr. Peterson claimed that he was very careful not to get herbicides on his skin at anytime when he used Roundup®.

Dr. Sawyer also acknowledged other potential NHL risk factors concerning Mr. Peterson that were not cited by Dr. Pinter-Brown, including Mr. Peterson's mother's lung cancer, his personal basal cell carcinoma of the skin on his ear, and the fact that he was diagnosed with rheumatoid arthritis, the latter of which is an autoimmune disease.

Dr. Sawyer also stated that Mr. Peterson had used other pesticides in the past, including insecticides, herbicides other than Roundup® including Weed & Feed, Sevin, and malathion.

On Page 19 of his report, Dr. Sawyer presented his *exposure-day* calculations.  I initially noticed that he used "4 years" as the target time period in which Mr. Peterson used Roundup®.  That is likely an error (but arguably just a minor one), given Mr. Peterson started using that herbicide in 2013 and he stopped using it in 2016, which is three years, or perhaps three years and some months—but is not likely four years.  In any case, Dr. Sawyer then used his eight to ten hours per



# 12.0   CRITQUE OF PLAINTIFF'S EXPERT'S REPORTS (CONTINUED)

## 12.2   <u>William R. Sawyer, Ph.D.</u> (Continued)

year estimates to calculate that Mr. Peterson would have had between 32 and 40 overall hours of Roundup® exposure during his life.  The arithmetic total time of Roundup® use at three hours per year for three or four years equals nine to 12 hours over Mr. Peterson's lifetime, however, not between 32 and 40 hours.  Then Dr. Sawyer converted his totals into *exposure-days* by dividing his mid-point total hours by eight hours per day, and he highlighted his result at 4.5 exposure-days.  In fact, using all of the assumptions that I used to calculate an overall cumulative dose factor, a figure of 0.5 exposure-day would not be inappropriate (as an absolute maximum), based on the following formula.

$$\frac{40 \text{ min.}}{\text{event}} \times \frac{4.5 \text{ events}}{\text{year}} \times \frac{1 \text{ hour}}{60 \text{ min.}} \times \frac{1 \text{ day}}{24 \text{ hr.}} \times 4^* \text{ years} = 0.5 \text{ exposure-day}$$

   \* As a *worst-case* scenario

Dr. Sawyer identified four years as the latency period that would apply to Mr. Peterson, based on the theory that Roundup® can cause DLBCL, Mr. Peterson was diagnosed with DLBCL in 2017, and he reportedly began using Roundup® in 2013.  On Page 164 of his report, Dr. Sawyer cited that "There is no single peer-reviewed, generally-recognized latency "threshold" for the more than 60 subtypes of lymphoma (Morton, et al., 2014).[315]  Various sources cite latency intervals ranging from as high as 25 years or more.  Most estimates are based upon absence of information as opposed to hard evidence."   Dr. Sawyer added that "the latency period for NHL following environmental exposures is relatively unknown and estimates have ranged from 1-25 years (Fontana, et al., 1998; Kato et al., 2005; Weisenburger, 1992)."  Note that that so-called latency estimate of from one to 25 years is based on ambiguous evidence that was based on theorized environmental exposures of all kinds and, therefore, that latency range is of no value to this case.  Also note that with the presumption that glyphosate exposures can lead to an increased incidence of NHL, Eriksson, et al. (2008) estimated latency at ten years, as did McDuffie, et al. (2001).  Moreover, Eriksson, et al. took latency periods into account during their study and they found that regarding a latency period between one and ten years, glyphosate had an NHL OR of 1.11 (CI: 0.24 to 5.08), which is not statistically significant.  Therefore, with respect to this case, these latter latency period estimates exceed Mr. Peterson's theoretical four year latency period by 2.5 times.  In other words, a latency period of four years is too short, even for the researchers that believe that glyphosate exposures may lead to a higher incidence of NHL.

Much of the remaining portion of his report appears to be essentially an encyclopedic-like reference of studies related to glyphosate and other hydrocarbon compounds and a perceived increased incidence of one or more of the 60+ subtypes of NHL (and leukemia-related cancers)— some studies potentially relevant to the Peterson case, others less so.  While I am not necessarily critical of his inclusion of all of the numerous studies in his report, I do offer brief summaries of some of those citations below.

On Page 87 of his report, Dr. Sawyer quoted the Brewster, et al. (1991) paper in which those authors stated that urine and feces were equally important route of elimination of glyphosate. The flaw of that citation with respect to this case is that Mr. Peterson would have predictably been primarily exposed to glyphosate via skin absorption and the Brewster study evaluated metabolism

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 42



# 12.0  CRITQUE OF PLAINTIFF'S EXPERT'S REPORTS (CONTINUED)

## 12.2   William R. Sawyer, Ph.D. (Continued)

of glyphosate in rats that had that herbicide administered orally.  Be advised that that would have put the compound into the animal's gastrointestinal tract, rather than into the animal's blood stream via the intact skin.  Metabolism of glyphosate via skin absorption vs. oral administration is markedly different, as are the dose figures, particularly given two percent or less of glyphosate in contact with skin is expected to be absorbed into the blood stream (after an estimated eight hours of contact time).  Regarding the Brewster, et al. (1991) study, Dr. Sawyer acknowledged that about one percent of the glyphosate orally administered during the rat study was detected in bone 168 hours after dosing.  That was true and the Brewster, et al. team stated that that material was expected to be the unmetabolized parent compound that complexed with the $Ca^{2+}$ ions in the bone matrix at a time when up to 98.34 percent of the administered dose had been excreted from the test rats.  The authors stated that previous "studies indicate no evidence of adverse effects to either bone structure or function after prolonged exposures to glyphosate."  More importantly, excretion of glyphosate continues after that 168th hour post-administration, and glyphosate's residency time in bone marrow is exceedingly short.

Starting on Page 166 of his report, Dr. Sawyer provided information concerning the potential association between benzene and an increased incidence of NHL.  Even if I presume that such an association is valid, consider that benzene is known to exist in cigarette smoke.  Benzene emissions from cigarette smoking range from 430 to 590 micrograms per cigarette and environmental exposures from tobacco smoke readily reach 16 micrograms per cubic meter of air.  The daily inhalation dose of benzene from environmental tobacco smoke (ETS) and other indoor sources (such as a motor vehicle parked in an attached garage to a home) can be as high as 480 to 580 micrograms per day.  A typical smoker inhales 2 milligrams of benzene daily.  Indoor airborne benzene data averaged 3.6 micrograms per cubic meter in homes with smokers (Wallace, et al., 1987).  Note that while Mr. Peterson did not smoke tobacco, but his mother, who reportedly died of small cell lung carcinoma and who I believe, based on his deposition testimony, Mr. Peterson lived with until he was 69 years of age, was a heavy smoker for 43 years.  This would be another risk factor not thoroughly evaluated by Dr. Sawyer and one that was not cited at all by Dr. Pinter-Brown.

Starting of Page 174 of his report, Dr. Sawyer cites *Evidential Considerations* that in this case he evaluated.  Regarding each of those, I offer the following comments.

- Under his subheading **Diagnosis**, he indicated that DLBCL is "the *most common form of NHL associated with Roundup® exposures*."  In truth, DLBCL is not associated with Roundup® exposures, but DLBCL is the most common subtype of NHL.

- Under his subheading **Prolonged Acute Exposure and Absorption**, he claimed that Mr. Peterson stated, "that his hands and ankles regularly came into contact with liquid Roundup…" and that he "did not immediately wash after such direct exposures."  Those statements are, in fact, in direct contradiction to the testimony of Mr. Peterson.

- Under his subheading **Dermal Absorption Rates Higher than Presented by Monsanto**, Dr. Sawyer cited between "3% and greater."  For the purposes of my calculations, I used a skin absorption factor of two percent.



Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 43

## 12.0  CRITQUE OF PLAINTIFF'S EXPERT'S REPORTS (CONTINUED)

12.2  <u>William R. Sawyer, Ph.D.</u> (Continued)

- Under his subheading **Lack of Personal Protective Equipment (PPE)**, Dr. Sawyer cited that Mr. Peterson was not instructed via product labels to wear PPE and that Mr. Peterson felt that Roundup® was safe.  Regarding what Mr. Peterson did or did not read, or did or did not believe, Mr. Peterson mixed and dispensed herbicides while wearing long pants, long-sleeved shirts, and gloves—all of which would have greatly reduced his dermal exposure potentials, and any insinuation to the contrary is false.

- Under his subheading **Chronic Glyphosate Exposure**, he stated that Mr. Peterson "spent 8 to 10 hours per year mixing and spraying Roundup."  That alone would not constitute a chronic exposure by any standard with which I am familiar in the fields of toxicology, epidemiology, or industrial hygiene.  Based on information gathered from his deposition transcript, the total time that Mr. Peterson mixed and sprayed Roundup® was calculated at just three hours per year.  Of course, that too does not constitute a chronic exposure.

- Under his subheading **Mechanism of Carcinogenicity**, Dr. Sawyer stated that genotoxicity "is the <u>first stage</u> in cancer formation," but he offered no confirmation that genotoxicity issues were specifically relevant to Mr. Peterson.

- Under his subheading **Latency of non-Hodgkin's Lymphoma**, Dr. Sawyer cited a latency interval of two to 25 years, in an obvious effort to indicate that Mr. Peterson's so-called latency period of four years "meets the minimal latency requirement."  In fact, though, by his own admission, "the latency period for NHL following environmental exposures is relatively unknown" and of those few research teams that have committed to a theoretical latency period estimate, which are Eriksson, et al. (2008) and McDuffie, et al. (2001), both estimated latency at ten years.  And a ten-year latency period is 2.5 times longer than the supposed four year period between Mr. Peterson's first use of glyphosate and his diagnosis of DLBCL.

- And under his subheading **Scope of Exposure in Comparison to Epidemiological Studies**, Dr. Sawyer cited six studies; ones by Eriksson, et al., McDuffie, et al., Leon, et al., Agricultural Health Study, Pahwa, et al., and Zhang, et al.  Each study involved evaluations of farmers and agricultural workers, and Mr. Peterson was neither a farmer nor an agricultural worker.  Dr. Sawyer also cited a cumulative dose of 4.5 exposure-days over a four-year period, when, in fact, based strictly of the deposition testimony of Mr. Peterson, his cumulative exposure would have been no more than 0.5 exposure-days over just 27 months.  My individual calculations do not represent acute exposures and the theoretical cumulative exposure does not qualify as a chronic exposure, yet Dr. Sawyer claimed that Mr. Peterson's "episodic acute and chronic Roundup exposures served to measurably increase his NHL risk level."

On Page 177, under his heading **Summary and Conclusions**, Dr. Sawyer stated that he "carefully examined Mr. Peterson's history for potential confounding toxicological factors and have found none other than 1st generation family history positive (mother smoked cigarettes for 43 years and died of lung cancer)."  Be advised that that citation alone is a potential confounding

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 44



# 12.0  CRITQUE OF PLAINTIFF'S EXPERT'S REPORTS (CONTINUED)

12.2    William R. Sawyer, Ph.D. (Continued)

risk factor due to Mr. Peterson's long-term exposure to benzene, benzo[a]pyrene, and other known carcinogens in second-hand and side-stream cigarette smoke.  Other NHL risk factors that apply to James Peterson include his age, his gender and race, his autoimmune disease, his basal skin cancer, and perhaps his BMI.  Yet, while ignoring each of the latter risk factors, Dr. Sawyer chose to focus on Mr. Peterson's infrequent use of Roundup® for 40 minutes, 4.5 times a year, for four years, which amounted to about three hours per year (or 0.5 exposure-day over that four-year period) during which Mr. Peterson wore long pants, long-sleeved shirts, and vinyl/latex gloves, and he was reportedly very careful not to get the herbicide on his skin.  And, in the unlikely event that dermal exposure did occur, which during his deposition he never recalled, he would have immediately washed the skin of the potentially affected area.  In light of these factors, and the exceedingly short theoretical latency period involved with this case (estimated at four years), and the numerous studies that do not show an association between glyphosate use and NHL, Dr. Sawyer has no scientific justification to say "to a reasonable toxicological certainty…these exposures were a significant factor contributing to a substantially-increased risk of development of diffuse large B-cell lymphoma" in James Peterson.

12.3    Report of Dennis D. Weisenburger, MD dated January 8, 2021

Dr Weisenburger made several assumptions, I believe based on the Complaint document filed in this case, that Mr. Peterson used Roundup® once or twice a month, over a period of nine months per year, each year for four years, and that each such operation required two hours per application during the earlier two years and just 40 to 60 minutes per application during the latter two years. These assumptions overstate the actual use articulated by the Plaintiff in this matter. Dr. Weisenburger presumed that Mr. Peterson's use of Roundup® amounted to 42 days overall, which equated to over ten days per year.  As indicated previously in this report, based strictly on the testimony of James Peterson, his overall use of Roundup® amounted to just 40 minutes per application, on an average of just 4.5 days per year, which equates to three hours per year, for just three to four years, which calculates to nine to 12 exposure hours (or a maximum of 0.5 exposure-day) over his lifetime.  Dr. Weisenburger's overall glyphosate use estimate (in the number of days when Roundup® was allegedly used), which was even greater than William Sawyer's estimate, is actually more than twice as high as Mr. Peterson's actual use of Roundup®.

Dr. Weisenburger, therefore, reasoned that given Mr. Peterson's overall Roundup® use exceeded 10 days per year, "[T]his would place him in the increased risk category for the development of NHL…with an approximate two-fold increased risk for NHL."  Dr. Weisenburg cited the Eriksson, et al. in support of his theory, adding that he knew of no alternative chemical exposures that would increase his risk of NHL.  Dr. Weisenburg knew of no confounding variables, other than perhaps Mr. Peterson's BMI, and he seemed satisfied that a latency period of four years was consistent with a chemical etiology.

Simply stated, the flaws in Dr. Weisenburger's theories are consistent with the unsupported theories of Drs. Sawyer and Pinter-Brown.

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 45



# 13.0   CASE-BASED THEORETICAL DOSE VALUES

Using whenever possible the study-based data described in the above texts, along with the information provided by the Plaintiff during this litigation, I have developed periodic glyphosate exposure dose data under varying circumstances for Mr. Peterson, and I have expressed those individual dose estimates in milligrams per kilogram per day (mg/kg/day) so that they may be compared to, when those data exist, No Observable Adverse Effect Levels (NOAELs) and Lowest Observable Adverse Effect Levels (LOAELs) for glyphosate, along with the ATSDR cited Minimal Risk Level (MRL) for glyphosate of 1.0 mg/kg/day, and the Cal-EPA OEHHA proposed "No Significant Risk Level" (NSRL) for glyphosate of 1,100 µg/day; and in estimating a theoretical *worst-case* maximum airborne exposure, I compared an exposure datum from one study (as if it were an 8-hour time-weighted average exposure datum that would apply in this case) to the OSHA arbitrary target level of 1 mg/M$^3$.

13.1   <u>Dermal Dose Only Model</u>

Based on the information provided in this report, I presumed that James Peterson applied Roundup® once every one to two months during the spring, summer, and fall months starting in 2013 and ending in 2016, for an estimated 40 minutes during every application.

As referenced in Section 7.1 of this report, Pierce, et al. (2020) and Connolly, et al. (2019) published data in units of µg/mm$^2$ or µg/cm$^2$ concerning glyphosate dermal exposures, and I used those data, along with the following assumptions, in order to estimate dermal exposures of glyphosate involving Mr. Peterson on each day in which he spray-applied Roundup® in his side and backyards.

You will note that I primarily used the Pierce, et al. data below, which I believe was the most appropriate given that that study team evaluated "dermal glyphosate exposure resulting from simulated heavy residential consumer application of Roundup®," which undoubtedly would not have undervalued the actual exposure potentials theoretically sustained by Mr. Peterson. Using this *worst-case* scenario, I calculated that dermal dose model as follows.

Assumptions:   Glyphosate level at 0.1539 µg/mm$^2$ on the right shin (Pierce, et al., 2020)
Glyphosate level at 0.1443 µg/mm$^2$ on the left shin (Pierce, et al., 2020)
Surface area of a male shin equals 103,500 mm$^2$ (U.S. EPA, 1985)

Glyphosate level at 0.0848 µg/mm$^2$ on the dorsal forearm (Pierce, et al., 2020)
Surface area of a male dorsal forearm equals 57,000 mm$^2$ (U.S. EPA, 1985)

Assume exposures to both thighs
Glyphosate level at 0.1044 µg/mm$^2$ on the thigh (Pierce, et al., 2020)
Surface area of proximal portion of a male thigh equals 99,000 mm$^2$ (U.S. EPA, 1985)

Assume exposures to both hands
Assume use of latex or vinyl gloves on both hands
Glyphosate level at 0.04 µg/cm$^2$ on left hand (Connolly, et al., 2019)
Glyphosate level at 0.05 µg/cm$^2$ on right hand (Connolly, et al., 2019)
Surface area of a male hand equals 448 cm$^2$ (U.S. EPA, 1985)

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 46



# 13.0  CASE-BASED THEORETICAL DOSE VALUES (CONTINUED)

13.1  <u>Dermal Dose Only Model</u> (Continued)

Assume a protection factor of 0.1 for cotton clothing (Connolly, et al., 2019)

Assume a skin absorption rate of two percent (over an 8-hour contact period)

Assume that Mr. Peterson's use of the Roundup® Ready-to-Use product and his dilution and use of the Roundup® concentrate formula yielded a two percent glyphosate solution.  Note that during the Pierce, et al. (2020) study, a 0.96 percent glyphosate solution was used and, therefore, for the purposes of estimating potential dermal exposures that would theoretically apply to Mr. Peterson, all Pierce, et al. study-based dermal dose data were doubled in value in my calculations below.

Absorption of glyphosate at the right shin:

$$\frac{0.3078 \text{ µg}}{\text{mm}^2} \times \frac{40 \text{ min.}}{100 \text{ min.}} \times \frac{103,500 \text{ mm}^2}{\text{shin}} \times 0.1 \times 0.02 = 25.49 \text{ µg of glyphosate}$$

Absorption of glyphosate at the left shin:

$$\frac{0.2886 \text{ µg}}{\text{mm}^2} \times \frac{40 \text{ min.}}{100 \text{ min.}} \times \frac{103,500 \text{ mm}^2}{\text{shin}} \times 0.1 \times 0.02 = 23.90 \text{ µg of glyphosate}$$

Absorption of glyphosate at the dorsal forearm:

$$\frac{0.1696 \text{ µg}}{\text{mm}^2} \times \frac{40 \text{ min.}}{100 \text{ min.}} \times \frac{57,000 \text{ mm}^2}{\text{forearm}} \times 0.1 \times 0.02 = 7.73 \text{ µg of glyphosate}$$

Absorption of glyphosate at the proximal portion of both thighs:

$$\frac{0.2088 \text{ µg}}{\text{mm}^2} \times \frac{40 \text{ min.}}{100 \text{ min.}} \times \frac{198,000 \text{ mm}^2}{\text{thighs}} \times 0.1 \times 0.02 = 33.07 \text{ µg of glyphosate}$$

Absorption of glyphosate on the left hand:

$$\frac{0.04 \text{ µg}}{\text{cm}^2} \times \frac{40 \text{ min.}}{100 \text{ min.}} \times \frac{448 \text{ cm}^2}{\text{hand}} \times 0.02 = 0.14 \text{ µg of glyphosate}$$

Absorption of glyphosate on the right hand:

$$\frac{0.05 \text{ µg}}{\text{cm}^2} \times \frac{40 \text{ min.}}{100 \text{ min.}} \times \frac{448 \text{ cm}^2}{\text{hand}} \times 0.02 = 0.18 \text{ µg of glyphosate}$$

Using these figures, the overall *worst-case* dermal-related absorbed glyphosate dose sustained by Mr. Peterson per 40-minute Roundup® application event (plus a post-application skin contact period of 8 hours) was estimated at **90.51 µg**.

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 47



# 13.0   CASE-BASED THEORETICAL DOSE VALUES (CONTINUED)

13.1   <u>Dermal Dose Only Model</u> (Continued)

This datum is more than ten times lower than the Cal-EPA OEHHA proposed "No Significant Risk Level" (NSRL) for glyphosate of 1,100 µg/day.

ATSDR cited a Minimal Risk Level (MRL) for glyphosate of 1.0 mg/kg/day, and if I presume that Mr. Peterson weighed an estimated 82 kilograms (~180 pounds) at the time, then his daily glyphosate intake via dermal contact on each day in which he applied Roundup® would equal 0.0011 mg/kg/day.  That figure is 900 times below the ATSDR MRL.

13.2   <u>Inhalation Dose Only Model</u>

Again, based on the information provided in this report, I presumed that James Peterson applied Roundup® once every one to two months during the spring, summer, and fall months starting in 2013 and ending in 2016, for an estimated 40 minutes during every application.

As referenced in Section 7.2 of this report, in the study by Pierce, et al. (2020), the arithmetic mean airborne glyphosate exposure potential value was 0.0047 mg/M³. Based on the assumption that Mr. Peterson likely used a Roundup® product having a glyphosate concentration of 2.0 percent and based on the fact that the Pierce, et al. team conducted an industrial hygiene survey using a GBH with a glyphosate concentration of 0.96 percent, I doubled the potential inhalation exposure datum for this model.  I believe that would represent a *worst-case* scenario for Mr. Peterson, particularly due to the fact that the Pierce, et al. study team evaluated "inhalation glyphosate exposure resulting from simulated heavy residential consumer application of Roundup®," which undoubtedly would not have undervalued the actual exposure potentials via inhalation theoretically sustained by Mr. Peterson.  Using this *worst-case* scenario, I calculated that inhalation dose model as follows.

Assumptions:  Non-stop exposure estimated at 0.0094 mg/M³ (Pierce, et al., 2020)
100 percent of exposure equals absorbed dose
Application operation required 40 minutes of time
Assume "moderate" level of activity (field protocols) of 1.8 M³ inhaled per hour
Average inhaled air volume during each operation equaled 1.2 M³ (Adams, 1993)

Based on these assumptions, I calculated the task-related cumulative glyphosate dose in units of µg per event at:

$$\frac{9.4 \text{ µg}}{M^3} \text{ x } \frac{0.66 \text{ hr.}}{\text{event}} \text{ x } \frac{1.8 \text{ M}^3}{\text{hour}} = 11.17 \text{ µg of glyphosate}$$

This datum is nearly 100 times lower than the Cal-EPA OEHHA proposed "No Significant Risk Level" (NSRL) for glyphosate of 1,100 µg/day.

Using the formula that appears below, this theoretical *worst-case* maximum airborne exposure of 9.4 µg/M³ (0.0094 mg/M³) for 40 minutes on each day in which Roundup® was sprayed would equal an 8-hour time-weighted average exposure datum of 0.0008 mg/M³.  That level of exposure is an estimated 1,250 times lower that the OSHA arbitrary target level of 1 mg/M³.

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 48



# 13.0  CASE-BASED THEORETICAL DOSE VALUES (CONTINUED)

13.2  <u>Inhalation Dose Only Model</u> (Continued)

$$\text{8-hour TWA} = \frac{C_1T_1 + C_2T_2 + \ldots C_nT_n}{480 \text{ minutes}}$$

Where: C = Concentration$_{ave}$ in (mg/M$^3$)
        T = Time (in minutes)

Again, ATSDR cited a Minimal Risk Level (MRL) for glyphosate of 1.0 mg/kg/day, and if I presume that Mr. Peterson weighed an estimated 82 kilograms (~180 pounds) at the time, then his daily glyphosate intake via inhalation on each day in which he applied Roundup® would equal 0.00014 mg/kg/day.  That figure is over 7,000 times below the ATSDR MRL.

13.3  <u>Carcinogenic Risk Model</u>

With respect to carcinogens, conventional thinking dictates that a small number of molecular events may trigger mutations that can lead to uncontrolled proliferation of cells, which can eventually lead to a diagnosis of cancer.  Such toxicity of known carcinogens is often referred to as a "non-threshold" effect because of the belief that essentially no threshold of exposure exists that does not pose some degree of risk of cancer development.  Regarding cancer toxicity, I will briefly note two issues: first, the "non-threshold" paradigm does not apply to all carcinogens; and secondly, when evaluating cancer risks of genotoxic carcinogens, an effect threshold cannot theoretically be estimated with precision.  Therefore, if I presume that glyphosate is carcinogenic, then in this scenario, I will use the following formula to calculate the cancer risk with respect to dermal contact and inhalation related dose potentials at all times when James Peterson reportedly used Roundup®.  Be advised that the calculations provided immediately below are strictly theoretical because, in part, they were made based on assumptions for which there is no convincing validated human data and because this calculation was made based on the hypothetical that glyphosate exposure can cause cancer in humans.

Cancer risk shall be in this case defined as follows:

Cancer risk  = LADI  x  CSF

Where: LADI = Lifetime average daily intake (mg/kg-day)
        CSF = Cancer slope factor (mg/kg-day)$^{-1}$

$$\text{LADI} = \frac{C_{surface} \ x \ CR \ x \ EF \ x \ ED}{BW \ x \ AT_{lifetime} \ x \ 365 \ d/yr}$$

Where: C$_{surface}$ = Surface concentration (mg/M$^2$)
        CR = Exposure pathway specific contact rate (M$^2$/day)
        EF = Exposure frequency (days/year)
        ED = Exposure duration (years)
        BW = Body weight (kg)
        AT = Carcinogenic averaging time (lifetime in years)

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 49



# 13.0  CASE-BASED THEORETICAL DOSE VALUES (CONTINUED)

13.3    <u>Carcinogenic Risk Model</u> (Continued)

$$\text{LADI} = \frac{0.102 \text{ mg/day* } \times \text{ 4.5 days/year } \times \text{ 4 years}}{82 \text{ kg } \times \text{ 70 years } \times \text{ 365 days/year}}$$

Cancer risk    = 0.00000087 (mg/kg-day) $\times$ 0.00062 (mg/kg-day)$^{-1}$ (Source: OEHHA)

**= 5.4 x 10$^{-10}$**

* The $C_{surface}$ x CR value was calculated based strictly on the dermal and inhalation model data presented in Sections 13.1 and 13.2 of this report

The State of California, OEHHA Proposition 65 no-significant-risk value is "one excess cancer per 100,000 people exposed," and that value is expressed as 10$^{-5}$.  The case-related theoretical cancer risk value calculated above, which was based on the reported glyphosate use figures for James Peterson at all times during his life, is orders of magnitude below the Proposition 65 standard.  For comparison, I offer the following statistics:

Lifetime chance of developing cancer for men in U.S. is currently: 1 in 2
Lifetime chance of developing cancer for women in U.S. is currently: 1 in 3

Deaths from motor vehicle accidents in U.S. in 2013: 1 in 10,000 (US News & World Report)

Thus Mr. Peterson would be about a million times more likely to die in an auto accident than to develop DLBCL due to his Roundup® use—that is, if we presume the hypothetical that use of a glyphosate-based herbicide can cause DLBCL.  The risk of death by a lightning strike in Indiana, a state where thunderstorms are not rare, is 1.3 in 100,000 (Indiana Department of Environmental Management).  Thus, Mr. Peterson would be about 10,000 times more likely to die due to a lightning strike (if he lived in Indiana) than to develop DLBCL from his use of Roundup®, again if we presume that use of Roundup® is associated with an increased incidence of DLBCL.

The calculated theoretical cancer risk concerning Mr. Peterson's use of Roundup® was calculated at 5.4 in 10,000,000,000 (ten billion), a risk that is unimaginatively small and that cannot by any reasonable standard be comparable to the cancer risk for men in the U.S., motor vehicle accident deaths in this country, or even lightning strike deaths (in a state of the union in which thunderstorms are not rare).

# 14.0  EXPERT OPINIONS

I have described the essential expert opinions that I have formulated regarding James Peterson. Be advised that while my primary opinions appear in this section of the report, other supporting opinions do appear in most all of the other sections of this document, and all opinions, regardless of where they appear in the report, apply to my findings in this case.  I offer all opinions to a reasonable degree of scientific probability or scientific certainty.

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 50



# 14.0  EXPERT OPINIONS (CONTINUED)

14.1    The facts that a dramatic increase in the annual use of glyphosate as an herbicide in the U.S. has occurred since 1992, particularly after the introduction of Roundup® Ready crops in 1996, from less than 25 million pounds (in 1992) to more than 250 million pounds (in 2017), yet the National Cancer Institute (NCI) SEER Program data from 1992 to 2017 in the United States show that the overall incidence rate of NHL (regardless of subtype and/or suspected or alleged etiology) was essentially unchanged in the United States between 1992 and 2017 (rates of 18.5 and 18.6 per 100,000 persons for those two years, respectively) is compelling evidence that Roundup® exposures do not pose an increased risk of NHL.  I believe that these facts show unequivocally that use of glyphosate in the U.S. cannot be shown to actually increase the risk of NHL in human populations.

14.2    Moreover, the fact that the glyphosate use map of the U.S. does not match the county-by-county NHL incidence rates in the U.S. also shows quite unequivocally that use of glyphosate in the U.S. does not increase the risk of NHL.  This information is additional evidence to disbelieve the theory that Mr. Peterson's use of Roundup® was in any way related to the development of his NHL, specifically his DLBCL, which was diagnosed in early 2017 when Mr. Peterson was 73 years of age.  Age is clearly a risk factor for NHL, among others that apply to Mr. Peterson, including a first-generation family cancer history (his mother), his personal medical history of cancer (basal cell carcinoma), and his rheumatoid arthritis (an autoimmune disease).

14.3    While in 2015 IARC classified glyphosate as a *probable human carcinogen*, the interpretations of the results of those studies are in remarkable contrast with the statistics cited above.  The IARC classification of glyphosate is also in conflict with the position statements of numerous other agencies and expert scientific bodies, including the U.S. EPA, the Joint Food and Agriculture Organization/WHO Meeting on Pesticide Residues (JMPR), Health Canada, EFSA, ECHA, and the leading health authorities in Germany, Australia, Korea, New Zealand, and Japan—all of which have concluded that glyphosate is not mutagenic, genotoxic, or carcinogenic at concentrations relevant to human exposures.  The latter conclusions, which are based on the results of numerous studies, are completely consistent with the statistics cited above and are wholly inconsistent with the position of IARC concerning glyphosate.

14.4    Based on the understanding that Roundup® use has increased exponentially without an increase in NHL incidence in the U.S., and based on the assumption that very low level glyphosate exposures occur in the general population due to the ingestion of foods (and possibly drink), then if I am compelled to theorize that a glyphosate cumulative dose can lead to an increased incidence of disease, then I am compelled to accept that a No Observable Adverse Effect Level (NOAEL) or an equivalent *no health effect guideline* can be established for glyphosate.  Be advised that Cal-EPA OEHHA proposed a "No Significant Risk Level" (NSRL) for glyphosate of 1,100 micrograms per day (µg/day); EFSA established an acute reference dose (ARfD) and an acceptable daily intake (ADI) of 0.5 mg per kg of body weight for glyphosate; the U.S. EPA established an ADI for glyphosate is 1.0 mg/kg of body weight per day (also defined as the chronic Reference Dose or cRfD); the ATSDR lowest acute Minimal Risk Level (MRL) for glyphosate has been established at 1.0 milligrams per kilogram of body weight per day (mg/kg/day), which was based, in part, on the acute oral administration and gastrointestinal effects observed (in animal studies); and the ATSDR acute oral exposure NOAEL was established at 1 mg/kg/day, which represents a safety (or uncertainty) factor of 100 (Reference: U.S. EPA).

Industrial Hygiene Expert Opinions – Brian P. Daly, CIH, PE
James Peterson v. Monsanto Company
Page 51



## 14.0 EXPERT OPINIONS (CONTINUED)

14.5    Any claim that Mr. Peterson developed NHL, specifically DLBCL, and that that disease was in any way attributable to his use of Roundup® is not reasonable from an industrial hygiene standpoint. Experts agree that percutaneous exposures are believed to result in the highest glyphosate dose potentials for *Applicators* using glyphosate-based herbicides; and on this point, calculations that I presented in Section 13.1 of this report indicate that Mr. Peterson's percutaneous glyphosate dose that would be related to his use of Roundup® (in a *worst-case* scenario) would not exceed 90.51 µg per Roundup® spraying event—and that dose figure exceeds no established NOAEL, NSRL, ARfD, cRfD, ADI, MRL, or other such *no health effect guideline* level known to me.  And, as presented in Section 13.2 of this report, Mr. Peterson's inhalation-related glyphosate dose that would have been sustained during his use of Roundup® (in a *worst-case* scenario) would not be expected to have exceeded 11.17 µg per Roundup® spraying event—and that dose figure also does not exceed or approach those *no health effect guideline* citations.

14.6    The State of California, OEHHA Proposition 65 no-significant-risk value is "one excess cancer per 100,000 people exposed," and that value is expressed as $10^{-5}$.  If I presume hypothetically that glyphosate can cause cancer in humans, then based on Mr. Peterson's lifetime use of Roundup®, I calculated his theoretical glyphosate-related cancer risk at 5.4 in 10,000,000,000 (ten billion), a risk that is unimaginatively small and that cannot by any reasonable standard be considered a plausible etiological cause of his DLBCL.

**HYGIENE TECHNOLOGIES INTERNATIONAL, INC.**

Date:   February 12, 2021

Brian P. Daly, CIH, PE
President

# ATTACHMENT A

# HYGIENETECH

Hygiene Technologies International, Inc.

3625 Del Amo Boulevard, Suite 180
Torrance, California 90503-1643
(310) 370-8370
(310) 370-2474 FAX
www.hygienetech.com

## BRIAN P. DALY, CIH, PE

I am an industrial hygienist, safety engineer, and environmental health scientist, with degrees in Health Science, Environmental and Occupational Health. I have experience in the areas of occupational hygiene, industrial safety, chemical hazard assessment, microbial growth and exposure assessment, noise exposure evaluation and control, indoor air quality, injury and illness prevention, health and safety training, and emergency response coordination. My professional responsibilities include the anticipation, recognition, evaluation, and control of chemical, physical, and biological stressors, and identification and control of safety hazards in varied indoor and outdoor occupational, residential, and commercial building environments.

## EDUCATION AND TRAINING

- Master of Science, Health Science, Environmental and Occupational Health, California State University, Northridge, California, 1983
- Bachelor of Science, Health Science, Environmental and Occupational Health, California State University, Northridge, California, 1978
- Hazardous Waste Operations and Emergency Response Training pursuant to Title 29, Code of Federal Regulations, Part 1910, Section 120, Environmental Training Associates, Costa Mesa, California, 1988

## CERTIFICATIONS AND REGISTRATIONS

- Certified Industrial Hygienist, Comprehensive Practice, Board for Global EHS Credentialing/American Board of Industrial Hygiene, Number 3373, 1986
- Registered Professional Engineer, Safety, State of California, Number SF 3380, 1997

## EXPERIENCE AND BACKGROUND

**1998 - Present**      **Hygiene Technologies International, Inc., Los Angeles, California**
                        <u>President</u>

Since forming the firm in 1998, I have managed a staff of industrial hygienists, safety professionals, engineers, environmental assessors, asbestos consultants, and environmental and public health specialists. I provide technical direction during projects involving industrial hygiene; indoor air quality; microbial growth assessment and abatement; soot, char, and ash assessment; safety engineering; environmental health issues; OSHA regulations; injury and illness prevention; accident investigation; hazard communication; asbestos hazard and abatement consulting; lead hazard assessment and abatement consulting, noise

**BRIAN P. DALY, CIH, PE**
**PAGE 2**



## EXPERIENCE AND BACKGROUND (CONTINUED)

**1998 - Present**          **Hygiene Technologies International, Inc., Los Angeles, California**
(Continued)                  <u>President</u>

exposure and control; confined space entry; tunnel and underground shaft gas testing; health and safety program and policy development; waste analysis; evaluation of ventilation systems and other engineering controls; assignment of personal protective equipment including respiratory protection; drinking water quality assessment; material safety data sheet (MSDS) development; emergency response coordination and emergency preparedness; and international occupational health and safety regulations.

I provide training on a variety of employee health and safety topics, such as accident investigation, air-supplied and air-purifying respirators, air monitoring and sampling techniques, asbestos health hazards, bacteria- and mold-related health hazards, bloodborne pathogens, chemical hazards, chemical hygiene plans, cold stress, confined space entry, decontamination, drilling safety hazards, drum sampling and handling, excavation safety, exposure guidelines, flammability hazards, fungal growth assessment and abatement, brushfire emission exposure, hazard recognition, hazard categorization, worker right-to-know (hazard communication), hearing conservation, heat stress, indoor air quality, lead health hazards, injury and illness prevention programs, medical surveillance and biological monitoring, noise and noise control, care and use of personal protective equipment, regulatory overview, safe work practices, self-contained breathing apparatus care and use, site characterization, site control, site emergencies and action plans, site health and safety plans, spill control, toxicology, CPR guidelines, and hazardous waste operations.

I provide assistance to clients in developing cost-effective engineering controls that will reduce the potential for injury and/or loss of property. I prepare Infection Control Risk Assessments (ICRA) in hospitals prior to construction and abatement work projects. I review and assist in drafting company policies, bid specifications, and site health and safety plans concerning geotechnical activities, soil excavation, and hazardous material/waste handling activities. I conduct medical center-specific training programs involving varied topics, such as the health hazards associated with exposures to allergens, specific molds and bacteria, irritants, carcinogens, corrosives, noise and ionizing radiation, and to specific chemicals such as asbestos, benzene, lead, PCBs (and dioxins and furans); indoor air quality; soot, char, and ash; and hazardous waste operations and emergency response.

I conduct and supervise fungal and bacterial growth assessment and exposure surveys, primarily in buildings that have had known water intrusion events, such as those caused by window or roof leaks, groundwater seepage, plumbing failures, or sewage spills. I use direct-reading instruments to determine moisture content data in varying building materials. I collect surface samples from building materials to assess fungal and bacterial growth potentials, and air samples to determine concentrations of both viable and nonviable fungi, and viable bacteria. I identify microbes and assess health hazard potentials, identify the sources of water that are potentially attributable to the biological growth, develop abatement strategies, and establish appropriate engineering and personal protective equipment controls during any anticipated remediation work. I provide general consulting during abatement projects, and perform site surveillance, air

**BRIAN P. DALY, CIH, PE**
**PAGE 3**



## EXPERIENCE AND BACKGROUND (CONTINUED)

**1998 - Present**            **Hygiene Technologies International, Inc., Los Angeles, California**
(Continued)                  <u>President</u>

monitoring, and surface sampling on such sites.  When appropriate, bulk and/or surface samples are collected of food, drinking water, soil, and other matrices in order to determine concentrations of fungal, bacterial, protozoan contamination, or soot, char, and ash.  Target microbes have included *Stachybotrys chartarum*, along with species of *Chaetomium*, *Aspergillus*, and *Penicillium* genera; *Cryptococcus neoformans*, an encapsulated yeast; *Escherichia coli* (*E. coli*) and *Legionella pneumophila* bacteria; and *Entamoeba histolytica.*

I consult on health and safety issues as they relate to hazardous waste handling, packaging, minimization, treatment and transportation; and I provide health and safety coordination for emergency response teams involved in hazardous waste spill remediation on land and waterways.

I provide expert witness consultation, along with deposition and trial testimony, in connection with claims of industrial accidents and injuries; reported exposures to chemicals, microbes, invertebrates, and allergens, and noise and other physical agents; claims of occupationally-related illnesses and injuries, including leukemia, mesothelioma, interstitial pulmonary fibrosis, mycotoxin effects, allergic sensitization, and hearing loss; fungal and bacterial growth assessment; soot, char, and ash assessment; as well as claims of chemical contamination in air, in liquids, and on solid surfaces.  Cases have involved issues concerning asbestos, benzene, fungal and bacterial growth, hazardous waste operations and emergency response, lead and welding fume, methylene chloride and other hydrocarbons, pesticides, oxygen-deficient and oxygen-enriched atmospheres, ventilation systems, use of personal protective equipment, as well as amputations, confined space entry, work at elevated platforms, indoor air quality, lock out/tag out procedures, OSHA and EPA regulation compliance, MSDS requirements, employers' general duty to warn, accident reconstruction, fire incidents, and habitability issues.

**1987 - 1998**            **EnviroHealth, Inc., Long Beach, California**
                          <u>Technical Director</u>

I performed environmental air monitoring and occupational health and safety surveys for the purposes of anticipating, identifying, evaluating and controlling hazards in the workplace.  Services included industrial hygiene evaluations, indoor air quality surveys, hazardous material/waste handling consulting, health and safety training, preparation of site health and safety plans, building hazard assessments, asbestos-containing building material identification surveys, asbestos abatement site surveillance and consulting, and hazardous material/waste emergency response coordination.  I provided interpretations of exposures in light of OSHA, EPA, and other environmental and occupational health regulations and guidelines. I conducted training programs on varied topics including hazardous waste operations and emergency response, hearing conservation, hazard communication, asbestos health hazards, respiratory protection,

**BRIAN P. DALY, CIH, PE**
**PAGE 4**



## EXPERIENCE AND BACKGROUND (CONTINUED)

**1987 - 1998**        **EnviroHealth, Inc., Long Beach, California**
(Continued)        Technical Director

and confined space entry.  I provided assistance in developing cost-effective engineering controls that reduced the potential for injury and/or loss of property.  I conducted fungal and bacterial growth assessment and exposure surveys in buildings that had known water intrusion events, such as those caused by window or roof leaks, groundwater seepage, plumbing failures, or sewage spills.  I developed fungal growth and bacterial growth abatement strategies and established appropriate engineering and personal protective equipment use protocols during anticipated remediation work.  I provided project design and general consulting during asbestos, lead-based paint, and biological growth abatement projects, and I performed site surveillance, air monitoring, and surface clearance sampling on such sites.

**1984 - 1987**        **IT Corporation, Cerritos, California**
        Senior Industrial Hygienist

I provided industrial hygiene services on a consulting basis to clientele in varying industries.  I conducted surveys designed to identify employee exposures to chemical substances such as welding fume, petroleum hydrocarbons, lead, inorganic acids, and asbestos.  I also conducted surveys to determine worker exposures to noise, heat and other physical agents; assisted clients in interpreting data in light of current OSHA, EPA, and other regulatory standards; and recommended control measures and conducted related health and safety training programs.  I provided health and safety assistance to operating divisions of IT Corporation and I conducted industrial hygiene and safety surveys on sites associated with hazardous waste management.  I provided on-site health and safety supervision and technical assistance for emergency response operations, including sites at which spills and/or fires occurred involving PCBs, methyl mercaptan, fuels, and other hydrocarbons; acids and other corrosives; oxidizers; and unidentified particulate.  I made recommendations concerning administrative and engineering controls based on employee exposure potentials, and I established personal protective equipment use protocols during abatement operations and during emergency response remediation.  Responsibilities also included technical research, health and safety training instruction, and accident investigation and reconstruction.

**1982 - 1984**        **Argonaut Insurance Companies, Los Angeles, California**
        Senior Loss Control Consultant

I assisted policyholders in developing and implementing continuing health and safety programs.  Loss control activities included conducting industrial hygiene and safety surveys as well as presenting loss statistics and experience modification ratings to management in industry, labor unions, and employee groups.  I consulted on Cal-OSHA regulations, hazardous material handling and storage, health hazards,

**BRIAN P. DALY, CIH, PE**
**PAGE 5**



## EXPERIENCE AND BACKGROUND (CONTINUED)

**1982 - 1984**          **Argonaut Insurance Companies, Los Angeles, California**
(Continued)               <u>Senior Loss Control Consultant</u>

and respiratory protection.  I conducted health and safety training presentations on hazard communication, personal protective equipment, confined space entry, emergency action plans, fire protection equipment, accident investigation, and hearing conservation.

**1980 - 1982**          **Safety Engineering Laboratories, Chatsworth, California**
                         <u>Safety Engineer</u>

I consulted regarding a variety of health and safety matters including accident investigations involving machine guarding, consumer product design, structural fires, chemical exposures, and use of personal protective equipment.  I calculated coefficient of friction data during slip and fall investigations, and I conducted vehicular accident investigations during which closing speeds were estimated, and yaw marks and other physical evidence were used to determine causes of collisions.  I conducted failure analysis experiments designed to evaluate product safety; I conducted OSHA-like audits in industrial facilities; and I consulted on matters concerning plant layout and emergency action plans and procedures. I conducted surveys designed to identify employee exposures to chemical substances such as carbon monoxide, particulate (including soot, char, and ash), petroleum hydrocarbons, inorganic acids, welding fume, lead, and asbestos.  I also conducted surveys designed to determine worker exposures to noise, heat, and flammable atmospheres.  I assisted clients in interpreting data in light of current Cal-OSHA regulatory standards and ACGIH threshold limit values, and I recommended administrative engineering control measures designed to reduce exposure potentials and eliminate fire hazard potentials.  I reviewed pertinent data in order to develop and draft comprehensive health and safety policies and programs for industrial clients, and I trained personnel regarding hazardous material/waste handling and storage, care and use of personal protective equipment, machine operation and guarding, site inspection techniques, and accident prevention and investigation procedures.

## PAPERS AND PRESENTATIONS

- "Fungal Growth: Hazard and Assessment," panel speaker, presented at the Orange County Bar Association, Construction Law Section, Newport Beach, California, January 2011
- "Occupational Health and Safety Qualitative Assessment during Oil Refining," presented at the China International Petroleum and Chemical Industry-sponsored Safety and Occupational Health Forum, Nanjing, China, October 2008
- Fundamentals of Industrial Hygiene Course, AIHA faculty, Shanghai, China, October 2008
- "Recognizing and Evaluating Workplace Exposures," workshop panel speaker, presented at the AIHA-Sponsored Sino-U.S. Occupational Health Summit Forum, Beijing, China, September 2007

**BRIAN P. DALY, CIH, PE**
**PAGE 6**



## PAPERS AND PRESENTATIONS (CONTINUED)

- "AIHA International Affairs: An Overview," presented to the American Industrial Hygiene Association Northern California local section, San Francisco, California, March 2007
- "Industrial/Occupational Hygiene: Going Global," presented to the American Industrial Hygiene Association Orange County local section, Irvine, California, August 2006
- "Mold Litigation," panel speaker, California, NBI, Los Angeles, California, August 2006
- "Reducing Workers' Compensation Claims and Costs in Your Company," panel speaker, National Business Institute, Irvine, California, January 2006
- "Industrial Hygiene in the United States: An Overview," HygieneTech-Ministry of Health Occupational Health Forum, Beijing, China, November 2003
- "The Mold Challenge in California," panel speaker, National Business Institute, Los Angeles and Anaheim, California, August 2003
- "Fungal Growth: Assessment Strategies and Remedies," Los Angeles, Sacramento, and Fresno, California, May 2002
- "Diesel Exhaust Exposure Potentials in Santa Ana Fire Stations," presented to Public Agency Safety Management Association (PASMA), Palm Springs, California, 1999
- "Fungal Growth: Is There a Problem?" Los Angeles, San Francisco, and Sacramento, California, 1998, 1999, 2000, and 2001
- "Health and Safety Activities at Hazardous Waste Sites: An Overview," presented at the Department of Occupational Health, School of Public Health, Shanghai Medical University, Shanghai China; and at the Guangzhou Occupational Disease Prevention and Treatment Center, Guangzhou Industrial Hygiene Monitoring Station, Guangzhou, China, June 1994
- "Health and Safety Programs at Selected Industrial Sites in Poland, Hungary, and Czech Republic," American Industrial Hygiene Association Orange County local section in Irvine, California, June 1993
- "Evaluation of the Krajska Hygienicka Stanice Stredoceskeho Krase Regional Hygienic Station of Central Bohemia," presented in association with a People-to-People delegation, Prague, Czech Republic, September 1992
- "Noise and Noise Control" presented at Comprehensive Industrial Hygiene Certification Review Course, MBA, Inc., 1989 through 1994

## PROFESSIONAL AFFILIATIONS

- American Industrial Hygiene Association, National and Southern California Section
- American Industrial Hygiene Association, International Affairs Committee, Past Chair
- American Industrial Hygiene Foundation, formerly on the Board of Directors and Past President
- American Academy of Industrial Hygiene
- International Occupational Hygiene Association
- American Conference of Governmental Industrial Hygienists
- American Society of Safety Professionals, Long Beach Chapter

# ATTACHMENT B

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Rushfeldt, Shelley & Drake
Case:  Albertos O. Rivera, et al. v. **Cedars-Sinai Medical Center**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    C 715797
Re:    Oxygen enrichment, deposition (10/27/1991)\*

Client: Cannon & Nelms
Case:  Murray v. **Cal Farm Insurance Company**
Court: County of San Diego Superior Court of the State of California
No:    GIN002661
Re:    Fungal growth, deposition and trial

Client: Schimmel, Hillshafer & Loewenthal
Case:  **Wilshire Borgata Owners Association** v. Wilshire Borgata, Inc.
Court: County of Los Angeles Superior Court of the State of California
No:    SC055523
Re:    Fungal growth, deposition

Client: Law Offices of Steven L. Zelig
Case:  **Greene** v. Century National Insurance Co.
Court: County of Los Angeles Superior Court of the State of California
No:    BC155935
Re:    Asbestos, deposition and trial

Client: Doherty & Catlow
Case:  MacKenzie v. **Riverside Medical Center**
Court: County of Los Angeles Superior Court of the State of California
No:    BC183673
Re:    Fungal growth, deposition

Client: Loeb & Loeb
Case:  **Queen Anne Associates** v. Pacific Bell
Court: County of Los Angeles Superior Court of the State of California
No:    BC168187
Re:    Fungal growth, deposition

Client: Schimmel, Hillshafer & Loewenthal
Case:  **Studio Village HOA** v. Swinerton & Walberg Co.
Court: County of Los Angeles Superior Court of the State of California
No:    ES007789
Re:    Fungal growth and construction defect, deposition

\* This list is as complete as my records show; no case in which my expert witness
testimony was provided has been intentionally omitted.  Note that information
concerning only one deposition of mine was available from 1988 (when I began
offering expert testimony) to September 1, 1998.  Also note that I do not recall the
specifics of any trial testimony of mine during that earlier time period (although some
such testimony was provided).  I testified on behalf of the parties shown in **boldface**.

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
SEPTEMBER 1998* THROUGH FEBRUARY 2021**



Client: California Federal Bank
Case:  **California Federal Bank** v. Stultz
Court: County of Marin Superior Court of the State of California
No:     13012
Re:     Fungal growth, trial

Client: Lewis Brisbois Bisgaard & Smith, LLP
Case:  Rothmel v. **Allstate Insurance Company**
Court: County of Los Angeles Superior Court of the State of California
No:     BC227072
Re:     Fungal growth, deposition

Client: Bistline & Cohoon
Case:  Ashcraft v. **Lupo**
Court: County of Los Angeles Superior Court of the State of California
No:     YC035421
Re:     Fungal growth, deposition

Client: Schimmel, Hillshafer & Loewenthal
Case:  **Meadowgate** v. Renaissance
Court: County of Los Angeles Superior Court of the State of California
No:     PC024063Y
Re:     Fungal growth and construction defect, deposition

Client: Schimmel, Hillshafer & Loewenthal
Case:  **Camelot HOA** v. Steve Jones Construction
Court: County of Ventura Superior Court of the State of California
No:     SC031595
Re:     Fungal growth and construction defect, deposition

Client: Murchison & Cumming
Case:  Villaescusa v. **Envirocheck, Inc.**
Court: County of Los Angeles Superior Court of the State of California
No:     VC032471
Re:     Asbestos, deposition

Client: Beach, Procter, McCarthy & Slaughter, LLP
Case:  Wich v. **Studio Village HOA**
Court: County of Los Angeles Superior Court of the State of California
No:     EC 029939
Re:     Fungal growth, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998* THROUGH FEBRUARY 2021**



Client: Cannon & Nelms
Case:  John Flynn v. **TIG Insurance Company**
Court: County of Los Angeles Superior Court of the State of California
No:    SC 070733
Re:    Fungal growth, deposition

Client: Garrotto & Garrotto
Case:  **Alexander Kahn** v. City of Los Angeles
Court: County of Los Angeles Superior Court of the State of California
No:    BC 251878
Re:    Fungal and bacterial growth, deposition

Client: Veatch, Carlson, Grogan & Nelson
Case:  Edirisingha v. **Top Properties, SWV Group Ltd** and **Robert Behar**
Court: County of Los Angeles Superior Court of the State of California
No:    LC 061479
Re:    Fungal growth, deposition

Client: Beach, Procter, McCarthy & Slaughter, LLP
Case:  Galbreath v. **Belford Park Apartments**
Court: County of Los Angeles Superior Court of the State of California
No:    YC 041888
Re:    Fungal growth, deposition

Client: Cummins & White
Case:  **Allen H. Ginsburg** v. Revere Financial
Court: County of Orange Superior Court of the State of California
No:    OCSC 68 59 13
Re:    Asbestos, deposition and trial

Client: MacGregor & Berthel
Case:  Smith v. JP Enterprises, Inc., et al. (**Allstate Insurance Company**)
Court: County of Orange Superior Court of the State of California
No:    02 CC 05625
Re:    Fungal growth, deposition

Client: Nelson Griffin
Case:  Underwood v. Anderson, **ESR**, et al.
Court: County of San Diego Superior Court of the State of California
No:    GIE005376
Re:    Gypsum board dust exposure, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Manly & McGuire
Case:  **William T. Berry, III** v. Greystone Homes, Inc., et al.
Court: County of Orange Superior Court of the State of California
No:    02CC11290
Re:    Fungal growth, deposition

Client: Manly & McGuire
Case:  Christine Byrne v. **Nobel Court, Ltd.**, et al.
Court: County of San Diego Superior Court of the State of California
No:    GIC 780948
Re:    Fungal growth, deposition

Client: Gibbs, Giden, Locher & Turner, LLP
Case:  Chandler v. Russworm, et al. (**Artesia Garden Homeowner's Association)**
Court: County of Los Angeles Superior Court of the State of California
No:    YC 044349
Re:    Fungal growth, deposition

Client: Morris, Polich & Purdy, LLP
Case:  Patricia Small, et al. v. **Gary Cox**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    VC 036601
Re:    Fungal growth, deposition

Client: Aleccia, Conner & Socha
Case:  Smith v. **Metropolitan Stevedore**
Court: U.S. Department of Labor Office of Administrative Law Judges
No:    2003-LHC-0526
Re:    Hearing loss/Noise exposure, trial

Client: Law Offices of Kabateck & Kropff
Case:  **Spiers** v. Coldwell Banker Residential Brokerage, Inc.
Court: County of Los Angeles Superior Court of the State of California
No:    BC266494
Re:    Fungal growth, deposition

Client: Schimmel, Hillshafer & Loewenthal
Case:  **Dunbar** and **Nelson** v. KB Construction, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    KC040124R
Re:    Fungal growth, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Law Office of Steven Zelig
Case: **Greco** v. Yeh, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC251059
Re:    Fungal growth, deposition

Client: Century Law Group
Case: **Sundar** v. State Farm Insurance Company
Court: County of Los Angeles Superior Court of the State of California
No:    BC286020
Re:    Fungal growth, deposition

Client: Kern & Gonzalez
Case: April Rose Dance v. **Archstone Communities**
Court: County of Ventura, East District, Simi Valley, Superior Court of the State of
       California
No:    SC033885
Re:    Fungal growth, deposition

Client: Waters, McCluskey & Boehle
Case: Meza v. IPS Corporation, et al. (**Joe's Plastics, Inc.** and **Talco Plastics,
       Inc.**)
Court: County of Los Angeles Superior Court of the State of California
No:    VC035026
Re:    Polymer combustion products, deposition

Client: Goldberg & Goldberg
Case: **Sabrina** and **Jonathan Balter** v. 1245 McClellan, LLC, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    SC 073076
Re:    Fungal growth, deposition

Client: Beach, Procter, McCarthy & Slaughter, LLP
Case: Geffcken v. **D'Andrea**, et al.
Court: County of Santa Barbara Superior Court of the State of California
No:    01044044
Re:    Fungal growth, 402 hearing consultation

Client: Kabateck & Garris
Case: **Sergio** and **Phyllis Arguello** v. State Farm General Insurance Company
Court: County of Orange Superior Court of the State of California
No:    03CC01712
Re:    Fungal growth, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
SEPTEMBER 1998* THROUGH FEBRUARY 2021**



Client: Lewis Brisbois Bisgaard & Smith, LLP
Case:  Dawn Wormer v. **Nationwide Insurance Company**
Court: County of Orange Superior Court of the State of California
No:    02CC14352
Re:    Fungal growth (*Meruliporia incrassata*), deposition and trial

Client: Law Office of Wendy Reed
Case:  Laskey, **Singh** and **Yoo**, et al. v. Boulevard Developers, Inc. et al.
Court: County of Orange Superior Court of the State of California
Nos:   02CC00033 and 03CC04661
Re:    Fungal growth, deposition

Client: MacGregor & Berthel
Case:  Harold Hawley, et al. v. **Howard** and **Corazon Lowry**
Court: County of Los Angeles Superior Court of the State of California
No:    BC 281703
Re:    Fungal growth, trial

Client: Kabateck & Garris
Case:  **Ferrigno** v. Mercury Casualty Company
Court: County of Los Angeles Superior Court of the State of California
No:    BC 288783
Re:    Fungal growth, deposition

Client: Waldron & Olson, LLP
Case:  **Giacopuzzi, Pomo, Unruh** v. Albertsons, Inc.
Court: County of Los Angeles Superior Court of the State of California
No:    BC 293375
Re:    Fungal growth, deposition and trial

Client: Willoughby, Stuart & Bening
Case:  Kodash, Inc. v. **American Employers Insurance Company**, et al.
Court: United States District Court
No:    CV03-2327 CAS
Re:    Fungal growth, deposition and binding arbitration

Client: Reuben & Novicoff
Case:  **Soudry** v. Allstate Insurance Company
Court: United States District Court, Central District of California
No:    CV03-2415 AHM
Re:    Fungal growth, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Procter, McCarthy & Slaughter, LLP
Case:  Demetra Eaton, et al. v. **Hoag Property Management, Inc.**
Court: County of Los Angeles Superior Court of the State of California
No:    BC 290966
Re:    Fungal growth, deposition

Client: Procter, McCarthy & Slaughter, LLP
Case:  Sprowl v. **Bainotti**, et al.
Court: County of Ventura Superior Court of the State of California
No:    SC 031711
Re:    Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case:  Reginald ShapiroHolland v. Vista Del Lago Apartments, **Equity Residential Properties Management**, et al.
Court: County of Orange Superior Court of the State of California
No:    03CC03767
Re:    Fungal growth, trial

Client: Wood, Smith, Henning & Berman, LLP
Case:  Hurd v. **Richmond American Homes**, et al.
Court: County of Orange Superior Court of the State of California
No:    02CC00235
Re:    Fungal growth, deposition

Client: Sundt Construction, Inc.
Case:  **Sundt Construction, Inc.** v. Liberty Security Services, et al.
Court: County of San Diego Superior Court of the State of California
No:    GIC 810581
Re:    Fungal growth, deposition

Client: Steven L. Zelig & Associates, LLP
Case:  **Joseph** and **Jill Tabera**, et al. v. Farmers Insurance Company, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC 292617
Re:    Fungal growth, deposition

Client: Morris, Polich & Purdy, LLP
Case:  Kevin Rix and Christine Steffen v. **James Dimitroff** and **David Kendall**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    SC 077026
Re:    Fungal growth, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Forgey & Hurrell, LLP and Haight, Brown & Bonesteel, LLP
Case:  Loring v. **Walgren**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC 257026 and BC 250973
Re:    Fungal growth, deposition and trial

Client: Carl R. Stevens & Associates
Case:  **Lex Handel, et al.** v. Grandview Crest, et al.
Court: County of Orange Superior Court of the State of California
No:    02CC13362
Re:    Fungal growth, deposition

Client: Zimmerman, Walker & Monitz
Case:  Barth and Leatherbarrow v. **Blakemore,** et al.
Court: County of Los Angeles, West District, Superior Court of the State of California
No:    SC 080879
Re:    Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case:  Yount v. Automobile Club of Southern California, **P. W. Stephens**, et al.
Court: County of San Diego Superior Court of the State of California
No:    GIC 812500
Re:    Fungal growth, deposition

Client: Law Office of Odion Okojie
Case:  **Sanchez** v. S. Chow
Court: County of Los Angeles Superior Court of the State of California
No:    BC 308391
Re:    Habitability, deposition

Client: Marcin, Barrera & O'Connor
Case:  **Deanna Burton** v. Mercury Casualty Company, et al.
Court: County of Orange Superior Court of the State of California
No:    03CC11998
Re:    Fungal growth, trial

Client: Law Offices of Scott B. Whitenack
Case:  Darcee Dee v. **PCS Property Management**
Court: County of Los Angeles Superior Court of the State of California
No:    LC 057 263
Re:    Fungal growth, trial

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Cannon & Nelms
Case:  Miles v. **Denault**
Court: County of Los Angeles Superior Court of the State of California
No:    YC 048 956
Re:    Fungal growth, deposition

Client: MacGregor & Berthel
Case:  Truex v. **Allstate Insurance Company**
Court: United State District Court
No:    CV 03-6587-TJH (AJWx)
Re:    Fungal growth, deposition

Client: Shaffer, Lax, McNaughton & Chen and Wood, Smith, Henning & Berman, LLP
Case:  Sannette Gite v. **Fine Finish Sash & Door, Inc.**
Court: County of Los Angeles Superior Court of the State of California
No:    SC 079245
Re:    Fungal growth, deposition and trial

Client: Yates Law Firm
Case:  **Regency Hotel Management Company**, Inc. v. Evanston Insurance Company
Court: United States District Court, District of Colorado
No:    04-M-181
Re:    Fungal growth, deposition and trial

Client: Douglas & Cox, LLP
Case:  Tavilla v. **Employers Mutual Casualty Insurance Company**, et al.
Court: Superior Court of Arizona, County of Maricopa
No:    CV 2001-019327
Re:    Fungal growth, deposition and trial

Client: Wood, Smith, Henning & Berman, LLP and MacGregor & Berthel
Case:  McMahon v. **American Technologies, Inc., Allstate Insurance Company**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC317785
Re:    Fungal growth, deposition and arbitration

Client: Law Offices of Craig J. Silver
Case:  **Cucinotti** v. State Farm General Insurance Company, et al.
Court: County of Orange Superior Court of the State of California
No:    04CC06180
Re:    Fungal growth, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Procter, McCarthy & Slaughter, LLP
Case:  Gribble, et al. v. **Park Overall**
Court: County of Los Angeles Superior Court of the State of California
No:    BC 304686
Re:    Fungal growth, deposition

Client: Law Offices of Thomas O'Hagan
Case:  Sobieski v. **California School of Culinary Arts**
Court: County of Los Angeles Superior Court of the State of California
No:    BC 316831
Re:    Smoke inhalation, deposition

Client: Procter, McCarthy & Slaughter, LLP
Case:  Rickley v. **Goodfriend**
Court: County of Los Angeles Superior Court of the State of California
No:    SC081696
Re:    Hazardous waste/asbestos exposure claim, deposition and trial

Client: Bruce J. Guttman, Attorney at Law
Case:  Courtney E. Miller v. Park La Brea Management, et al. (**CMC Painting**)
Court: County of Los Angeles Superior Court of the State of California
No:    BC302047
Re:    Fungal growth, deposition

Client: Procter, McCarthy & Slaughter, LLP
Case:  Botwin v. Westerman, **Bentley Oaks HOA**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    SC082383
Re:    Fungal growth, deposition

Client: Stanton T. Mathews & Associates
Case:  **Simon** v. City of Santa Monica, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    SC082142
Re:    Hydrochloric acid exposure, two depositions and trial testimony

Client: Bacalski, Koska & Ottosen
Case:  Susan McClister, et al. v. **Childtime Childcare, Inc.**, et al.
Court: County of Orange Superior Court of the State of California
No:    03CC03554
Re:    Fungal growth, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Wesierski & Zurek, LLP
Case:  Leach, et al. v. **Marci Cohen**
Court: County of Los Angeles Superior Court of the State of California
No:     BC322115
Re:     Fungal growth, deposition

Client: Law Offices of Anthony Egbase
Case:  **Palma** v. Murrillo
Court: County of Los Angeles Superior Court of the State of California
No:     VC044297
Re:     Fungal growth, deposition

Client: Loewenthal, Hillshafer & Rosen, LLP
Case:  **Ondriezek, et al.** v. Shaver
Court: County of Los Angeles Superior Court of the State of California
No:     PC 031736 V
Re:     Fungal growth, deposition and arbitration

Client: Wood, Smith, Henning & Berman, LLP
Case:  Ditto, et al. v. **Newcrest Homes**, et al.
Court: County of Orange Superior Court of the State of California
No:     03CC00279
Re:     Fungal growth, deposition

Client: Hughes & Nunn
Case:  Gage v. **State Farm General Insurance Company**, et al.
Court: County of San Bernardino Superior Court of the State of California
No:     SCVSS 116384
Re:     Fungal growth, deposition

Client: Watson Law Group
Case:  Len Steckler v. **Carolyn Holstein-Mintzer**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:     BC 332264
Re:     Fungal growth, deposition

Client: Stanton T. Mathews & Associates
Case:  **Denise Stewart** v. City of Laguna Beach, et al.
Court: County of Orange Superior Court of the State of California
No:     05CC04569
Re:     Slip and fall, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Law Offices of Craig J. Silver and Haight, Brown & Bonesteel
Case:  Michael and Linda Hall v. **Eckenroth, et al.**
Court: County of San Bernardino Superior Court of the State of California
No:    MCVMS 06800
Re:    Fungal growth, deposition

Client: Ghormley & Associates
Case:  Kristine Adams v. **Newport Crest HOA, et al.**
Court: County of Orange Superior Court of the State of California
No:    05CC05516
Re:    Fungal growth, deposition

Client: Lightfoot Vandevelde Sadowski Crouchley Rutherford Levine LLP
Case:  State of California v. **Jonathan Herz**
Court: U.S. District Court, Central District of California
No:    CR 06-224-MMM
Re:    Asbestos, trial

Client: Marks, Golia & Finch, LLP
Case : Race, et al. v. **Sierra Window Concepts, et al.**
Court: County of San Diego Superior Court of the State of California
No:    GIC853757
Re:    Fungal growth, deposition

Client: MacGregor & Berthel
Case:  Walker v. **Allstate Insurance Company**
Court: County of Los Angeles Superior Court of the State of California
No:    BC 263882
Re:    Fungal growth, deposition

Client: Quintilone & Associates
Case:  **Hetman** v. Santa Ana Unified School District
Court: County of Orange Superior Court of the State of California
No:    04CC06534
Re:    Fungal growth, deposition

Client: Morris, Polich & Purdy, LLP
Case:  Rodriguez v. **Nizynski,** et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC 333536
Re:    Fungal growth, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Loewenthal, Hillshafer & Rosen, LLP
Case: **Abrams** v. Las Brisas Condominium Association, et al.
Court: County of San Diego Superior Court of the State of California
No:     GIN 043105
Re:     Fungal growth, deposition

Client: Flynn, William & Hall, LLP
Case: Sacramento Suncreek Apartments, LLC v. **Suncreek 268, Ltd.**
Court: Sacramento Superior Court of the State of California
No:     05AS02621
Re:     Fungal growth, mediation

Client: Lee & Tran, APLC
Case: Douglas Emmett Realty Fund v. **The Mirisch Agency, Lawrence Mirisch**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:     BC326189
Re:     Fungal growth, deposition

Client: Bistline & Cohoon
Case: FIDM Properties, Inc. v. **Red Point Builders, Inc.**, et al.
Court: County of Orange Superior Court of the State of California
No:     05CC07075
Re:     Fungal growth, deposition and trial

Client: Wilson, Elser, Moskowitz, Edelman, & Dicker LLP
Case: Richmond v. Wolseley PLC, et al. (**Kohler Company**)
Court: County of Los Angeles Superior Court of the State of California
No:     BC320588
Re:     Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case: Hall, et al. v. **UDC Universal Development**, et al.
Court: County of Orange Superior Court of the State of California
No:     04 CC00020
Re:     Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case: Maryam Seyedhosseini v. **Haven Hills, Inc.**
Court: County of Los Angeles Superior Court of the State of California
No:     BC348181
Re:     Fungal growth, deposition and trial

# BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
## SEPTEMBER 1998* THROUGH FEBRUARY 2021



Client: Calendo, Puckett, Sheedy & DiCorrado, LLP
Case:  Anderson, et al. v. **Friedman**
Court: County of Los Angeles Superior Court of the State of California
No:    YC052492
Re:    Fungal growth, deposition

Client: Robie & Mathai
Case:  **State Farm General Insurance Company** v. Culver City Roofing Company,
       Inc., Ari-Thane Foam Products, Inc., et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC349329
Re:    Fungal growth, deposition

Client: Law Offices of Robert E. Muir
Case:  **Alexis Cohen** v. Van Craig Abbott, et al.
Court: County of San Diego Superior Court of the State of California
No:    GIN 051791
Re:    Fungal growth, deposition

Client: MacGregor & Berthel
Case:  George Myers and Kimberly Larson v. **Allstate Insurance Company**, et al.
Court: County of Orange Superior Court of the State of California
No:    04CC06982
Re:    Fungal growth, deposition

Client: Law Office of Odion Okojie
Case:  **Daniel Maher** v. RTI Properties, Inc.
Court: County of Los Angeles Superior Court of the State of California
No:    BC351880
Re:    Habitability, deposition

Client: Lewis, Brisbois, Bisgaard & Smith, LLP
Case:  Dean, et al. v. **Vedanta Society of Southern California**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC 345004
Re:    Fungal growth, deposition and trial

Client: Harrington, Foxx, Dubrow & Canter, LLP
Case:  Mary Ann Taylor v. **Nikal, Ltd.**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    EC042106
Re:    Fungal growth, deposition and trial

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Procter, McCarthy & Slaughter, LLP
Case:  Pamela Beaty and Kandis Leigh v. **Harold** and **Harriet Raasch**
Court: County of Los Angeles Superior Court of the State of California
No:     BC 318638
Re:     Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case:  Bunch v. **Beazer**
Court: County of Riverside Superior Court of the State of California
No:     RIC 443086
Re:     Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case:  Richards v. **Beazer**
Court: County of Riverside Superior Court of the State of California
No:     RIC 445329
Re:     Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case:  Brogren v. **Plueger**
Court: County of Orange Superior Court of the State of California
No:     05CC09153
Re:     Fungal growth; deposition, 402 hearing, and trial

Client: Wood, Smith, Henning & Berman, LLP
Case:  Roland Jene Johnson Trust v. **Evanston Insurance Company**
Court: County of Los Angeles Superior Court of the State of California
No:     BC 348030
Re:     Fungal growth, deposition

Client: Procter, McCarthy & Slaughter, LLP
Case:  Clemens and Young v. **Green Meadows Estates HOA**, et al.
Court: County of Ventura Superior Court of the State of California
No:     SC 043270
Re:     Fungal growth, deposition

Client: Foley & Mansfield
Case:  Peter Daniels, et al. v. Albay Construction**,** et al. (**Ameron International Corp.**)
Court: County of Alameda Superior Court of the State of California
No:     RG 07-320730
Re:     Crocidolite asbestos/mesothelioma, deposition (12/04/2007)

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Dicks & Workman
Case:  **Alexis Cohen** v. Republic Van Lines, et al.
Court: County of San Diego Superior Court of the State of California
No:    GIN 051791
Re:    Fungal growth, deposition and trial

Client: Inglis, Ledbetter & Gower, LLP
Case:  Zaks v. **Chang**
Court: County of Los Angeles Superior Court of the State of California
No:    BC365849
Re:    Noise exposure, deposition and trial

Client: Procter, McCarthy & Slaughter, LLP
Case:  Thaler v. **Boskovich Farms, Inc., et al.**
Court: County of Ventura Superior Court of the State of California
No:    SC 045325
Re:    Pesticide exposure, deposition

Client: Hodges and Thomas
Case:  Willenberg v. **More**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    YC055117
Re:    Fungal growth, deposition

Client: Rudloff, Wood, & Barros, LLP
Case:  Steven Hergenroeder, et al. v. **Travelers Property Insurance Company, et al.**
Court: USDC ED CAL (Fresno)
No:    1:06-CV-01232-OWW-SMS
Re:    Black water/*E. coli*, trial

Client: Wendel, Rosen, Black & Dean
Case:  Henrik Plumbing, Inc. v. **Essex Management Corporation, et al.**
Court: Los Angeles County Superior Court of the State of California
No:    BC0337985
Re:    Asbestos, deposition

Client: Morris, Polich & Purdy, LLP
Case:  Hamza v. **Rivero**
Court: Los Angeles County Superior Court of the State of California
No:    EC044490
Re:    Fungal growth, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998* THROUGH FEBRUARY 2021**



Client: Hollins Schechter and Wood Smith Henning & Berman, LLP
Case:  Blessley v. **Fire Insurance Exchange**, et al.
Court: Orange County Superior Court of the State of California
No:    07CC09154
Re:    Fungal growth, deposition and trial

Client: Wood Smith Henning & Berman, LLP
Case:  Hampton Bay Court Townhomes v. **Storm/Western Development**
Court: Los Angeles County Superior Court of the State of California
No:    YC048199
Re:    Fungal growth, deposition

Client: Poole & Shaffery, LLP
Case:  Veda Marie Garcia v. Allied Diagnostic Imaging, (**I.C. Compounds** and **Litho-Chem**), et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC 310867
Re:    Benzene and other hydrocarbon exposure related to non-Hodgkin's lymphoma, deposition

Client: Veatch Carlson
Case:  Stillwell v. **Mavroudis**, et al.
Court: Los Angeles County Superior Court of the State of California
No:    EC 043225
Re:    Fungal growth, deposition

Client: Yunker & Schneider
Case:  Marshall v. **D.R. Horton**
Court: Los Angeles County Superior Court of the State of California
No:    BC 354426
Re:    Fungal growth, arbitration

Client: Harrington, Foxx, Dubrow & Canter, LLP
Case:  Barragan, et al. v. **Parkin Garden Apartments**, et al.
Court: County of Orange Superior Court of the State of California
No:    30-2007 00100867
Re:    Habitability, depositions (2)

Client: Horton, Oberrecht, Kirkpatrick & Martha
Case:  Motschenbacher v. **Burlingham**, et al.
Court: County of Orange Superior Court of the State of California
No:    07CC10892
Re:    Fungal growth (*Meruliporia incrassata*), deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Bremer Whyte Brown & O'Meara, LLP
Case:  Wallick v. **City of Morro Bay, et al.**
Court: County of San Luis Obispo Superior Court of the State of California
No:    CV 060199
Re:    Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case:  Marton and Dickinson v. **Dung**
Court: County of Los Angeles Superior Court of the State of California
No:    BC 380262
Re:    Fungal growth, hearing testimony

Client: Wood, Smith, Henning & Berman, LLP
Case:  Gersten v. Asbestos Corporation Limited, et al. (**Gibson & Hill**)
Court: County of Alameda Superior Court of the State of California
No:    RG08402343
Re:    Asbestos, 402 hearing consulting and attendance

Client: Hollins + Schechter
Case:  Hawkins v. Richmond American Homes, et al. (**Fire Insurance Exchange**)
Court: County of San Diego, North County Division Superior Court of the State of California
No:    37-2007-00055121-CU-PO-NC
Re:    Fungal growth, deposition

Client: Cumberland, Coates & Duenow, LLP
Case:  Marksman Range and Threads v. **Fisher**, et al.
Court: County of San Luis Obispo Superior Court of the State of California
No:    CV 070495
Re:    Inorganic lead, deposition

Client: Landsberg Margulies
Case:  Charalambous v. **Ridgegate**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC380995
Re:    Fungal growth, deposition

Client: Petit, Kohn, Ingrassia & Lutz
Case:  **Advanced Honeycomb Technologies, Inc.** v. Western Farms Services, et al.
Court: County of San Diego Superior Court of the State of California
No:    37-2007-00055814-CU-PO-NC
Re:    Resin emission exposure, deposition and trial

-18-

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Luce, Forward, Hamilton & Scripps LLC
Case:  Peterman Lumber v. **Robinson & Robinson** and Leathertrend, LLC
Court: County of San Diego Superior Court of the State of California
No:    37-2008-00081154
Re:    Lead-based paint in a consumer product, trial

Client: Hornberger & Brewer, LLP
Case:  **Chan** v. Bridge Residential Advisors, LLC, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    07-1761-AH04563
Re:    Fungal growth assessment, deposition and arbitration

Client: Procter, Slaughter & Reagan, LLP and Ryan, Mercaldo & Worthington, LLP
Case:  Sprague v. **L.E. Medrano, Inc., et al.**
Court: County of San Diego Superior Court of the State of California
No:    GIC 871123
Re:    Asbestos, silica, and char, trial

Client: Spolin, Silverman & Cohn, LLP
Case:  **Yale-Wilshire, Ltd.** v. Lisa Chan-Flagg, DDS
Court: County of Los Angeles Superior Court of the State of California
No:    BC 382446 (SC096480)
Re:    Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case:  Thomas Wayne Reese v. Gans Ink & Supply Company, (**Van Son Holland**
       and **Weiman Products**), et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC 332936
Re:    Benzene, toluene, xylenes, kerosene, and other hydrocarbon exposure
       related to non-Hodgkin's lymphoma, deposition

Client: Law Offices of Robert A. Walker
Case:  Whitacre v. **Smith**
Court: County of Los Angeles Superior Court of the State of California
No:    NC051733
Re:    Fungal growth, depositions (2)

Client: Cassidy Warner & Associates
Case:  Solano, et al. v. **Brandon, LLC**, et al.
Court: County of Orange Superior Court of the State of California
No:    30-2008 00108779
Re:    Habitability, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Wood, Smith, Henning & Berman, LLP
Case:  Steven White v. **Los Angeles Indian Oaks**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    SC 090246
Re:    Fungal growth, deposition (10/19/2009) and trial

Client: Archer Norris
Case:  Neutz v. **Fire Insurance Exchange** (**Farmers Group of Insurance**), et al.
Court: County of Orange Superior Court of the State of California
No:    07CC11499
Re:    Fungal growth, deposition

Client: Poole & Shaffery
Case:  David and Pilar Vanderhyde v. Expo Industries, Inc., et al. (**TFI Building Materials, Inc.** and **San Diego Pipe and Supply**)
Court: County of San Diego Superior Court of the State of California
No:    2008-00094992-CU-AS-CTL
Re:    Asbestos/mesothelioma, depositions (2)

Client: Hanger, Steinberg, Shapiro & Ash
Case:  Ramirez v. **Estrada**
Court: County of Los Angeles Superior Court of the State of California
No:    KC054526
Re:    Fungal growth, deposition

Client: Burrell & Seletos
Case:  Lane v. **DRW Properties III, LLC**
Court: Maricopa County Superior Court of the State of California - OCH
No:    CV2008-014301
Re:    Fungal growth, trial

Client: Wesierski & Zurek LLP
Case:  Lauren Fetzer, et al. v. **Sadiq Saferzadeh**
Court: County of Orange Superior Court of the State of California
No:    30-2009 00117812
Re:    Fungal growth, deposition (12/17/2009) and trial (02/22/2010)

Client: Wood, Smith, Henning & Berman, LLP
Case:  Clara Labrenz v. Johns-Manville, et al. (**F.L. Smidth, Inc.**)
Court: County of Los Angeles Superior Court of the State of California
No:    BC414132
Re:    Asbestos, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
SEPTEMBER 1998* THROUGH FEBRUARY 2021**



Client: Procter, Slaughter & Reagan, LLP
Case:  Paul Wagner v. **3711 Ocean Front Condominiums**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    SC095382
Re:    Fungal growth, deposition

Client: Hurrell & Cantrall, LLP
Case:  Sundquist v. BP West Coast Products, et al. (**PPG Industries, Inc.**)
Court: County of Los Angeles Superior Court of the State of California
No:    BC362023
Re:    Benzene/multiple myeloma, deposition

Client: Ezer & Williamson
Case:  **Tobias** v. Sarno
Court: County of Los Angeles Superior Court of the State of California
No:    SC101733
Re:    Fungal growth/dust mites, depositions (2)

Client: Loewenthal, Hillshafer & Rosen, LLP
Case:  **Traviatta** v. Deerot Rexford, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC389829
Re:    Fungal growth, deposition

Client: Flynn / Williams, LLP
Case:  **Sacramento Suncreek Apartment, LLC** v. The Randall Group Inc., et al.
Court: County of Sacramento Superior Court of the State of California
No:    05AS02621
Re:    Fungal growth, deposition

Client: MacGregor & Berthel
Case:  Breton v. **Allstate Insurance Company,** et al.
Court: County of Los Angeles Superior Court of the State of California
No:    SC 100604
Re:    Fungal growth, deposition

Client: Ghormley & Associates
Case:  Vassilios Zachos, et al. v. **Gary L. Hendricks, et al.**
Court: County of Riverside Superior Court of the State of California
No:    RIC 466 779
Re:    Fungal growth, deposition (10/15/2010) and trial



**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
SEPTEMBER 1998* THROUGH FEBRUARY 2021**

Client: Gordon & Rees and Lewis, Brisbois, Bisgaard & Smith
Case:  Susie and David Maya v. Applied Waterproofing Technology, Inc., **PM Realty
       Group, L.P.,** and **Hillcrest MOB, LP**
Court: County of San Diego Superior Court of the State of California
No:    37-2009-0083254-CU-PO-CTL
Re:    Hydrocarbon exposure, deposition

Client: Martin & Bonnett
Case:  **Sinan Fazlovic** v. Maricopa County, et al.
Court: U.S. District Court for the District of Arizona
No:    CIV-09-1151-PHX-DKD
Re:    Self-contained breathing apparatus (SCBA)/respirator selection/fit-test
       Requirements/OSHA regulations, deposition (10/28/2010) and trial

Client: Wood, Smith, Henning & Berman, LLP
Case:  La-Sheresa Fleming, et al. v. **Lynda White, Syreeka White, Lloyd White,** et
       al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC420814
Re:    Habitability, deposition

Client: Hurrell Cantrall, LLP; Sedwick, Detert, Moran & Arnold; and Dickie, McCamey
       & Chilcote
Case:  Marquez v. **Sherwin-Williams, et al.**
Court: County of Los Angeles Superior Court of the State of California
No:    BC393173
Re:    Solvents/welding fume/silica, deposition

Client: Sedgwick, Detert, Moran & Arnold, LLP
Case:  **Kemper Insurance** v. Servpro, et al.
Court: County of San Diego Superior Court of the State of California
No:    37-2009-00057966-CU-CL-NC
Re:    Chlorinated hydrocarbon chemicals, deposition (04/28/2011)

Client: Kaye, McLane & Bednarski and Law Offices of Dale M. Rubin
Case:  United States of America v. **Yi** and **Bostick**
Court: U.S. District Court for the Central District of California
No:    CR10-00793-PA
Re:    Asbestos toxicology, sentencing hearing

Client: Procter, Slaughter & Reagan, LLP
Case:  Galloway, et al. v. **Villa Velletri Homeowners Association**, et al.
Court: County of Los Angeles, West District, Superior Court of the State of California
No:    SC105565
Re:    Fungal growth, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: MacGregor & Berthel
Case: Verniero, et al. v. **Allstate Insurance Company**, et al.
Court: County of Los Angeles, Central District, Superior Court of the State of
      California
No: BC388553
Re: Fungal growth, deposition and trial

Client: Felman & El Dabe
Case: **Indigo, et al.** v. Carrillo
Court: County of Los Angeles, Central District, Superior Court of the State of
      California
No: 11U05548
Re: Bedbug infestation, trial

Client: Wilson, Elser, Moskowitz, Edelman & Dicker LLP
Case: Bebawy v. **Van Peebles**
Court: County of Los Angeles Superior Court of the State of California
No: BC410034
Re: Fungal growth, deposition and trial

Client: Hanger, Steinberg, Shapiro & Ash, LLP
Case: Woo, et al. v. **Mediterranean Chateau HOA, et al.**
Court: County of Los Angeles Superior Court of the State of California
No: BC416704
Re: Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case: Gayner v. **Harper Keys Allan**
Court: County of San Diego Superior Court of the State of California
No: 37-2010-0009177-CU-BC-CTL
Re: Fungal growth, deposition (09/06/2011) and trial

Client: Wood, Smith, Henning & Berman, LLP
Case: Robert Contreras, et al. v. **Calsol**, **Safety-Kleen**, et al.
Court: County of Los Angeles, Central Civil West Superior Court of the State of
      California
No: Judicial Council Coordination Proceeding No. 4601
Re: Benzene, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case: Crehan v. **Seraji**, et al.
Court: County of Los Angeles Superior Court of the State of California
No: EC050267
Re: Habitability, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Gordon & Rees, LLP
Case:  Lionello v. Amcord, Inc., et al. (**Oxnard Building Materials**)
Court: County of Orange Superior Court of the State of California
No:     30-2009-00312582
Re:     Asbestos, deposition

Client: Gordon & Rees, LLP
Case:  Kish-Sahm v. Various Asbestos Defendants (**Master and Sons, Inc.**)
Court: County of Los Angeles Superior Court of the State of California
No:     PC046655
Re:     Asbestos, deposition

Client: Holland & Knight
Case:  Ortiz, et al. v. Flavor and Extract Manufacturers Association of the United
         States, (**Chr. Hansen**), et al.
Court: County of Los Angeles Superior Court of the State of California
No:     BC364831
Re:     Diacetyl, deposition

Client: Gordon & Rees, LLP
Case:  Valdivia v. Various Asbestos Defendants (**Oxnard Building Materials**)
Court: County of San Francisco Superior Court of the State of California
No:     CGC-09-275311
Re:     Asbestos, deposition

Client: Law offices of Robert A. Walker
Case:  Schechtman v. D'Azur Villas, Inc., et al. (**Hiebert**)
Court: County of Los Angeles Superior Court of the State of California
No:     YC061810
Re:     Fungal growth, deposition

Client: Daniels Fine Israel Schonbuch & Lebovits, LLP
Case:  Bardack v. **Tomjanovich**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:     SC101085
Re:     Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case:  Koudriatseva v. **Versailles Lake Investors, et al.**
Court: County of Orange Superior Court of the State of California
No:     30-2010-00362027
Re:     Fungal growth/habitability, trial

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Swanson Law Firm
Case:   **Kostenly** v. Wells Fargo Bank, et al.
Court:  County of Los Angeles Superior Court of the State of California
No:     GC043421
Re:     Fungal growth, deposition

Client: Hurrell Cantrall, LLP
Case:  Nikolai Jakymyshyn v. **DAP, Inc.**, et al.
Court: County of Los Angeles Superior Court
No:    BC418823
Re:    Toluene/methyl ethyl ketone health hazards, deposition (03/08/2012) and trial

Client: Sayre & Levitt, LLP
Case:  **Kim Garrett** v. St. Joseph's Hospital, et al.
Court: County of Orange Superior Court of the State of California
No:    30-2010-00404179
Re:    Biocide health hazards, deposition

Client: Law offices of Robert A. Walker
Case:  Mazen v. **Toluca Village Townhomes Association**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    EC054691
Re:    Fungal growth, deposition and trial

Client: Wood, Smith, Henning & Berman, LLP
Case:  2156 Stratford Circle LLC v. **Hastings Tile and Bath, et al.**
Court: County of Los Angeles Superior Court of the State of California
No:    BC385913
Re:    Fungal growth, deposition

Client: Green, Bryant & French
Case:  **McAdams** v. MRO Elliott Management, Inc., et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC410391
Re:    Fungal growth and other allergen exposure potential, deposition (04/17/2012)

Client: Kaloogian & Fuselier, LLP
Case:  **Esparza** v. Centex, et al.
Court: County of San Diego Superior Court of the State of California
No:    37-2007-00055233-CU-BC-NC
Re:    Fungal growth and other allergen exposure potential, deposition and trial

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Wood, Smith, Henning & Berman, LLP
Case:  Marline and Joseph Petitpas v. Amcord, Inc., et al. (**Shea Homes**)
Court: County of Los Angeles Superior Court of the State of California
No:    BC473216
Re:    Asbestos, deposition

Client: Calendo, Puckett, Sheedy & DiCorrado, LLP
Case:  **Jacob** v. Super King Market**,** et al.
Court: County of Los Angeles Superior Court of the State of California
No:    75-M600-666
Re:    *Streptococcus pyogenes*/necrotizing fasciitis, deposition

Client: Morris Polich & Purdy LLP
Case:  Hunter v. **Nakamura,** et al.
Court: County of Los Angeles Superior Court of the State of California
No:    YC064602
Re:    Fungal growth and other potential allergens, deposition (07/25/2012)

Client: Gordon & Rees, LLP
Case:  Johnson v. Aqua-Chem, Inc., et al. (**Baxter Healthcare**)
Court: County of Los Angeles Superior Court of the State of California
No:    JCCP 4674/BC470843
Re:    Asbestos/mesothelioma, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case:  Budke v. **Housing Authority of Santa Barbara**
Court: County of Santa Barbara Superior Court of the State of California
No:    1383047
Re:    Fungal growth/asbestos, 402 hearing and trial

Client: Slaughter & Reagan, LLP
Case:  Nagel, et al. v. **Western**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    JAMS Reference No. 1210030090
Re:    Fungal growth, deposition, binding arbitration

Client: Murtaugh, Meyer, Nelson & Treglia, LLP and Law Office of Christopher P. Ruiz
Case:  Alem, et al. v. Owens, et al. (**Halton Corporation**)
Court: County of Orange Superior Court of the State of California
No:    30-2011-00451590
Re:    Fungal growth, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Hanger, Steinberg, Shapiro & Ash
Case:  Mohler, et al. v. **Stein**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC 479923
Re:    Methamphetamine, deposition (03/27/2013)

Client: Chulak & Perez
Case:  **Lucera HOA** v. Pacific Lucera, L.P., et al.
Court: County of San Diego Superior Court of the State of California
No:    37-2008-00096543-CU-CD-CTL
Re:    Fungal growth, deposition (05/22/2013) and trial

Client: Wisotsky, Procter & Shyer
Case:  Clark v. **Broan-Nutone LLC, et al.**
Court: County of Ventura Superior Court
No:    56-2012-00414110-CU-PL-VTA
Re:    Asbestos, trial

Client: Poole & Shaffery, LLP
Case:  Horton v. **Skye Partners 2, Inc., et al.**
Court: County of Los Angeles Superior Court of the State of California
No:    BC424669
Re:    Isocyanate exposure, deposition

Client: Gordon & Rees, LLP; Bonne Bridges Mueller O'Keefe & Nichols; Walsworth
       Franklin Bevins & McCall, LLP; Morris, Polich & Purdy, LLP; and Katz &
       Associates
Case:  Vellios v. **Marmar Properties, L.P., et al.**
Court: County of Los Angeles Superior Court of the State of California
No:    BC434872
Re:    Manganese exposure, deposition

Client: Wisotsky, Procter & Shyer
Case:  Oller v. **Kirakosian**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC468058
Re:    Fungal growth, deposition

Client: Wood, Smith, Henning & Berman, LLP
Case:  Laurelwood at Palomares Hills Association v. **Shappell Industries**, et al.
Court: County of Alameda Superior Court of the State of California
No:    RG10511306
Re:    Fungal growth, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Fidone & Motooka, LLP
Case:  Hassid v. **Princess Apartments, et al.**
Court: Los Angeles Housing + Community Investment Department
No:     4360 011 025
Re:     Fungal growth/asbestos/inorganic lead exposures, hearing attendance

Client: Holland & Knight
Case:  Rosas, et al. v. Flavorchem Corporation, et al. (**Chr. Hansen**)
Court: County of Los Angeles Superior Court of the State of California
No:     BC 400974
Re:     Diacetyl, deposition

Client: McKenna, Long & Aldridge
Case:  Ali Ahmad v. **Fireman's Fund Insurance Company**, et al.
Court: County of Ventura Superior Court of the State of California
No:     56-2011-00398331-CU-IC-SIM
Re:     Mold growth, depositions (2) and trial

Client: Morris, Polich & Purdy, LLP
Case:  Schlidt, et al. v. **Newton**, **Pulos**, et al.
Court: County of Ventura Superior Court of the State of California
No:     Claim 0252254065
Re:     Asbestos/fungal growth, mediation

Client: Poole & Shaffery, LLP
Case:  Johnson, et al. v. Armored Autogroup, et al. (**Turtle Wax, Inc.**)
Court: County of Alameda Superior Court of the State of California
No:     RG13669270
Re:     Benzene, deposition

Client: Lewis, Brisbois, Bisgaard & Smith, LLP
Case:  Mary Ann Durning v. **The Wilshire-Westholme HOA**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:     SC120887
Re:     Fungal growth/bacterial growth, deposition (04/14/2014)

Client: Nelsen, Thompson, Pegue & Thornton
Case:  Houshang Peyman v. **Mid-Century Insurance Company**, et al.
Court: County of Los Angeles Superior Court of the State of California – Central
        District
No:     BC493305
Re:     Fungal growth, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998* THROUGH FEBRUARY 2021**



Client: Daniels, Fine, Israel, Schonbuch & Lebovitz, LLP
Case:  Peggy Wintermute v. **Isadore Wendel, et al.**
Court: County of Los Angeles Superior Court of the State of California
No:     SC 114546
Re:     Carbon monoxide exposure, deposition (06/14/2014) and trial

Client: Gordon & Rees, LLP
Case:  Bokkes, et al. v. **Plotkin**
Court: County of Orange Superior Court
No:     30-2011 005225362
Re:     Fungal growth; deposition and 402 hearing

Client: Grant, Genovese & Baratta, LLP
Case:  Perez v. **Park Estates Investors, Inc.**
Court: Arbitration
No:     ADRS Case 14-1487-DSC
Re:     Fungal growth; arbitration

Client: McClaugherty & Associates
Case:  Ghafyar, et al. v. **Matern, et al.**
Court: County of Los Angeles Superior Court of the State of California
No:     BC526268
Re:     Fungal growth, deposition

Client: Bremer, Whyte, Brown & O'Meara and Bohl, Nixon & Schoneman
Case:  Maxim Tselevich, et al. v. **City of Los Angeles, et al.**
Court: County of Los Angeles Superior Court of the State of California
No:     BC475621
Re:     Sewage/mold growth; depositions (2)

Client: Wisotsky, Procter & Shyer
Case:  Boxer v. **Buteyn**
Court: County of Los Angeles Superior Court of the State of California
No:     BC522433
Re:     Carbon monoxide exposure, deposition and trial

Client: Gates, O'Doherty, Gonter & Guy, LLP
Case:  McKeehan Construction, Inc. v. **Vintage Wine Cellars, Inc.**
Court: County of Orange Superior Court of the State of California
No:     30-2014-00725477
Re:     Fungal growth, deposition

Client: Slaughter, Reagan & Cole, LLP

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
SEPTEMBER 1998* THROUGH FEBRUARY 2021**



Case:  Surjue v. **555 Evergreen Townhomes HOA**
Court:  County of Los Angeles Superior Court of the State of California
No:  YC068409
Re:  Fungal growth, deposition and trial

Client:  Horton, Oberrecht, Kirkpatrick & Martha
Case:  Bee, et al. v. **Hawken, et al.**
Court:  County of San Diego Superior Court of the State of California
No:  37-2014-0038147-CU-PO-CTL
Re:  Fungal growth, deposition

Client:  L/O of David S. Baumwohl and Myers, Widders, Gibson, Jones & Feingold, LLP
Case:  Bakas, et al. v. **Mountainback HOA, et al.**
Court:  Mono County Superior Court of the State of California
No:  CV110005
Re:  Fungal growth, deposition and trial

Client:  Kutak Rock, LLP
Case:  Jennifer Thompson, et al. v. **Manouc Simsian, et al.**
Court:  Los Angeles County Superior Court of the State of California
No:  BC509561
Re:  Fungal growth/asbestos/lead-containing material exposures, deposition (10/01/2015)

Client:  Wisotsky, Procter & Shyer
Case:  Veronica Alvarado, et al. v. **Perez**, et al.
Court:  County of Los Angeles Superior Court of the State of California
No:  BC547620
Re:  Habitability, deposition (10/14/2015)

Client:  Adelson, Testan, Brundo, Novell & Jimenez
Case:  Carl Wagner, et al. v. **Blue Ribbon Plumbing**, et al.
Court:  Workers' Compensation Appeals Board
No:  ADJ7045384
Re:  Asbestos, deposition (12/14/2015)

Client:  Wood, Smith, Henning & Berman, LLP; Bremer, Whyte, Brown & O'Meara, LLP; Gordon & Rees, LLP; and Raimondo & Associates
Case:  Erik Joe Morales v. **Well-Pict Berries, Anacapa Foods, Anacapa Berry Farms, Westside Strawberry Farms, T.T. Miyasaka, RAMCO Enterprises,** and **Soilfume, Inc., et al.**
Court:  County of Ventura Superior Court of the State of California
No:  56-2016-00481672-CU-TT-VTA
Re:  Industrial hygiene/pesticides and fumigants, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: MacGregor & Berthel
Case:  Neda Raschkovsky, et al. v. **Allstate Insurance Company,** et al.
Court:  United States District Court, Central District of California
No:     2:15-cv-00216-RGK-JPRx
Re:     Fungal growth, deposition

Client: Gibbs, Giden, Locher, Turner, Senet & Wittbrodt, LLP
Case:  Byron Hontas v. **The Stratford Collection**, et al.
Court:  County of Los Angeles Superior Court of the State of California
No:     PC056007
Re:     Habitability/vector control (rats), deposition

Client: Yang Professional Law Corporation
Case:  Lopez v. AGFA, et al. (**Van Son Holland**)
Court:  County of Los Angeles Superior Court of the State of California
No:     BC515732
Re:     Benzene, deposition and trial

Client: Slaughter, Reagan & Cole, LLP
Case:  Denise Kurtzer v. **1239 23rd Street Homeowners Association**, et al.
Court:  County of Los Angeles Superior Court of the State of California
No:     SC120602
Re:     Fungal growth, deposition (03/17/2016)

Client: Gilbert, Harrell, Sumerford & Martin
Case:  XTRA Lease, LLC v. **Repipe-California, Inc.**
Court:  County of St. Louis Circuit Court of the State of Missouri
No:     Cause 14SL-CC03401
Re:     Styrene contamination and exposure, deposition

Client: Wood, Smith, Henning & Berman, LLP and Manfredi, Levine, Eccles, Miller & Lanson
Case:  Olen, et al. v. **Doctorow, et al.**
Court:  County of Ventura Superior Court of the State of California
No:     56-2013-00442696-CU-TT-VTA
Re:     Fungal growth, 402 hearing

Client: Sedgwick LLP
Case:  Comey v. **State Farm Insurance Company**
Court:  County of Orange Superior Court of the State of California
No:     30-2014-00745930
Re:     Fungal growth, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Grant, Genovese & Baratta
Case:  Adams v. **Newport Crest HOA, et al.**
Court: County of Orange Superior Court of the State of California
No:    07CC01390
Re:    Fungal growth, trial

Client: James P. O'Neill, Attorney at Law
Case:  Bowen, et al. v. **Cheng, et al.**
Court: County of Los Angeles Superior Court of the State of California
No:    BC 553296
Re:    Fungal growth, trial

Client: Kutak Rock, LLP
Case:  Wheat v. **Hagy, et al.**
Court: County of Los Angeles Superior Court of the State of California
No:    BC 442604
Re:    Fungal growth, deposition

Client: Gates, O'Doherty, Gonter & Guy, LLP
Case:  **Sunset Riviera HOA** v. Srenco
Court: County of Los Angeles Superior Court of the State of California
No:    BC 546209
Re:    Fungal growth, deposition and trial

Client: Hurrell & Cantrall, LLP
Case:  Dominguez v. **PPG, PRC DeSoto International, Inc.** et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC 533123
Re:    Hexavalent chromium, deposition

Client: Gibbs, Giden, Locher, Turner, Senet & Wittbrodt, LLP
Case:  Osama Sidaros v. **B & B Hardware,** et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC610591
Re:    Asbestos, deposition

Client: Kennedy & Souza, APC
Case:  Dabney, et al. v. H. N. and Frances C. Berger Foundation, et al. (**John Payne**
       and **Ambient Environmental, Inc.)**
Court: County of Riverside Superior Court of the State of California
No:    PSC 1301804
Re:    Fungal growth, deposition

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Slaughter, Reagan & Cole, LLP
Case:  **Celine Burke, Behrendt Celine Enterprises, LP** v. Michael Conner
Court: County of Santa Barbara Superior Court of the State of California
No:     16CV04503
Re:     Fungal growth, trial

Client: Prindle Law
Case:  Martine Sweedler v. **Avalon Bay, et al.**
Court: County of Los Angeles Superior Court of the State of California
No:     BC533811
Re:     Fungal growth, deposition

Client: Lewis, Brisbois, Bisgaard & Smith, LLP
Case:  Balaoing, et al. v. **Alliance Communities, Inc.**, et al.
Court: County of San Diego Superior Court of the State of California
No:     37-2015-00034173-CU-PO-CTL
Re:     Fungal growth, deposition

Client: Yang Professional Law Corporation
Case:  Delta Dawgs Construction Corporation, Express Restoration v. Defeng Lu
            (**Copperfit Industries, Inc.** as a Cross-defendant)
Court: County of Los Angeles Superior Court of the State of California
No:     EC064849
Re:     Fungal growth, deposition

Client: Adelson, Testan, Brundo, Novell & Jimenez
Case:  Shields v. Commercial Casualty Insurance Co., et al. (**Bug & Hare Repair**)
Court: Workers' Compensation
No:     ADJ8709640
Re:     Asbestos, deposition

Client: Yang Professional Law Corporation
Case:  William Ramsey, et al. v. **Aline Cam Van Tran**
Court: County of Los Angeles Superior Court of the State of California
No:     BC547099
Re:     Habitability/bedbugs, arbitration

Client: MacGregor & Berthel
Case:  Yanikian v. **Allstate Insurance Company,** et al.
Court: United States District Court, Central District of California
No:     2:16-cv-03030-BRO-PJW
Re:     Sewage contamination, trial

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Weston & McElvain
Case:  Duitch v. **Travelers Insurance Company,** et al.
Court: United States District Court, Central District of California
No:    2:16-cv-05625-PSG-JC
Re:    Building damage related to fungal growth and other so-called contamination, deposition

Client: Morrow & White
Case:  **Restec Contractors** v. Cleveland Wrecking Company, et al.
Court: County of Kern Superior Court of the State of California
No:    S-1500-CV-280305 LHB
Re:    Asbestos and related debris field contamination, deposition

Client: Stocker & Lancaster
Case:  Tao v. **Moodie, et al.**
Court: County of Orange Superior Court of the State of California
No:    30-2015-00820497-CU-MC-CJC
Re:    Fungal growth and failure to disclose during real estate transaction; deposition (09/06/2017) and trial

Client: Turner Law Firm
Case:  **Murray** v. 916 Benedict, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC507780
Re:    Fungal growth, deposition

Client: Norton & Melnik
Case:  Hardison, et al. v. **38700 10th Street East LLC**
Court: County of Los Angeles Superior Court of the State of California
No:    BC655507
Re:    Habitability, deposition

Client: Yang Professional Law Corporation
Case:  Knohl-Trider, et al. v. **Foster, Soriano, et al.**
Court: County of Orange Superior Court of the State of California
No:    30-2016-00874402-CU-PO-CJC
Re:    Phantom odor, deposition and trial

Client: Santana, Vierra & Symonds
       Employees of Liberty Mutual Group, Inc.
Case:  Michael Belding v. JSG Trucking and Sedwick Claims Management Services, et al. (**Liberty Mutual Insurance Company**)
Court: Workers' Compensation Appeals Board, State of California
No:    ADJ9371916
Re:    Asbestos, deposition (01/23/2018)

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Domine Law
Case:  Marci Fine v. **Suntree Townhomes Owners' Association**
Court: County of Los Angeles Superior Court of the State of California
No:    17VESC07983
Re:    Fungal growth, trial

Client: Harris & Associates
Case:  April Shannon-Vance v. **Los Angeles County Metropolitan Transportation Authority**
Court: County of Los Angeles Superior Court of the State of California
No:    BC595048
Re:    Industrial hygiene/indoor air quality/fungal growth; deposition (02/28/2018)

Client: Jeffery & Grosfeld
Case:  Lawrence, Steven and Yulia v. Sunnyside Ridge Partnership, Tom Bashe, **Eddy Fernando Gonzalez (dba Hammer Construction)**
Court: County of Los Angeles Superior Court of the State of California
No:    BC615767
Re:    Fungal growth, deposition (03/06/2018)

Client: Hibbitt, Tarbell & Koehler
Case:  **Prinz** v. Campus Commons East Ranch Homeowners Association, et al.
Court: County of Sacramento Superior Court of the State of California
No:    34-2013-00147479
Re:    Fungal growth, deposition (03/14/2018)

Client: Daniels, Fine, Israel, Schonbuch & Lebovitz
Case:  Larin, et al. v. **Inken Corporation, Bee Investment, et al.**
Court: County of Los Angeles Superior Court of the State of California
No:    BC668182
Re:    Lead-based paint/learning disabilities/habitability; deposition (04/03/2018)

Client: Everett & Dorey
Case:  Chen v. **The Irvine Company, LLC**, et al.
Court: County of Orange Superior Court of the State of California
No:    30-2016-00832531 CU-BC-CJC
Re:    Fungal growth, trial (04/18/2018)

Client: Hanger, Steinberg, Shapiro & Ash
Case:  Sager, et al. v. **J-Mar Investment Company**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC617543
Re:    Fungal growth, deposition (05/08/2018) and trial

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
SEPTEMBER 1998* THROUGH FEBRUARY 2021**



Client: Hanger, Steinberg, Shapiro & Ash and The Safarian Firm
Case:  Hae Yun Kim, et al. v. **Moonkyu Park**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC620244
Re:    Fungal growth, deposition (06/14/2018)

Client: Slaughter, Reagan & Cole, LLP
Case:  Olshansky, et al. v. **Dassof, et al.**
Court: County of Los Angeles Superior Court of the State of California
No:    BC659568
Re:    Fungal growth, deposition and trial

Client: Hanger, Steinberg, Shapiro & Ash, LLP
Case:  Eastman, et al. v. **Ellis,** et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC656803
Re:    Fungal growth, deposition (09/18/2018)

Client: Alston & Bird, Dentons U.S. LLP, and Kirkland & Ellis, LLP
Case:  Carla Allen v. Brenntag North America, Inc.**,** et al. (**Imerys Talc America** and **Johnson & Johnson**)
Court: County of Humboldt Superior Court of the State of California
No:    DR180132
Re:    Asbestos/talc, deposition (09/19/2018) and trial (11/05/2018 and 11/06/2018)

Client: Miller Law Associates
Case:  Moore and McGilvray v. **AmGuard Insurance Company**, et al.
Court: County of Santa Barbara Superior Court of the State of California
No:    17CV01780
Re:    Asbestos/lead-based paint/sewage/fungal growth, deposition (10/31/2018) and trial (05/01/2019 and 05/02/2019)

Client: Hansen, Kohls, Sommer, & Jacob, LLP
Case:  Ali, et al. v. **Mid-Century Insurance**, et al.
Court: County of Alameda Superior Court of the State of California
No:    RG16838714
Re:    Asbestos, deposition (11/07/2018)

Client: Hartsuyker, Stratman & Williams-Abrego
Case:  Gilbreth v. **Sigel**
Court: County of Santa Barbara Superior Court of the State of California
No:    01-18-0000-6175
Re:    Char and ash, arbitration

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
SEPTEMBER 1998* THROUGH FEBRUARY 2021**



Client: Alston & Bird, Dentons U.S. LLP, and Orrick, Herrington & Sutcliffe, LLP
Case:  Teresa Elizabeth Leavitt and Dean J. McElroy v. **Johnson & Johnson**, et al. (**Cyprus Mines Corporation** and **its predecessors**)
Court: County of Alameda Superior Court of the State of California
No:    RG17882401
Re:    Asbestos/talc, deposition (11/19/2018 and 11/29/2018) and trial (02/27/2019 and 03/04/2019)

Client: Procter, Shyer & Winter and Hartsuyker, Stratman & Williams-Abrego
Case:  Navarro v. **Gonzales**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC663855
Re:    Habitability, deposition (11/27/2018)

Client: Wood, Smith, Henning & Berman, LLP and Taylor/Anderson, LLP
Case:  Cullinane v. RCEA, Inc., et al. (**Jones Lang LaSalle, Inc.** and **Cushman & Wakefield**)
Court: County of Orange Superior Court of the State of California
No:    30-2015-00796929-CU-PO-CJC
Re:    Fungal growth, trial (12/04-05/2018)

Client: Alston & Bird and Dentons U.S. LLP
Case:  Dianne Henson v. Colgate-Palmolive Company, et al. (**Imerys Talc America** and **its predecessors**)
Court: County of Los Angeles Superior Court of the State of California
No:    BC702253
Re:    Asbestos/talc, deposition (12/13/2018)

Client: Alston & Bird, Dentons U.S. LLP, and King & Spalding, LLC
Case:  Joseph Woon-Shing Lee and Marina Lai-Kuen Lee v. A.W. Chesterton Company, et al. (**Imerys Talc America** and **its predecessors,** and **Johnson & Johnson**)
Court: County of Solano Superior Court of the State of California
No:    FCS050176
Re:    Asbestos/talc, deposition (01/04/2019)

Client: Alston & Bird and Dentons U.S. LLP
Case:  Robert Blinkinsop and Karen Blinkinsop v. Albertsons Companies, Inc., et al. (**Imerys Talc America** and **its predecessors**)
Court: County of Los Angeles Superior Court of the State of California
No:    JCCP 4674 / BC677764
Re:    Asbestos/talc, deposition (01/09/2019)

Client: Gates, Gonter, Guy, Proudfoot & Muench, LLP
Case:  Taddeo-Bates v. **Villa San Remo Homeowners Association**, et al.
Court: County of Los Angeles Superior Court of the State of California
No:    BC615636
Re:    THC/marijuana smoke odor, deposition (01/10/2019)
Client: Alston & Bird and Gallagher Sharp LLP

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Case: Dean Rininger, Individually and as Special Administrator of the Estate of JoAnne Rininger v. Hollingsworth & Vose Company, et al. (**Imerys Talc America** and **its predecessors**)
Court: Court of Common Pleas, County of Summit, Ohio
No:    AC-2014-11-5256
Re:    Asbestos/talc, deposition (01/11/2019)

Client: Gibbs, Giden, Locher, Turner, Senet & Wittbrodt, LLP
Case:  Revel v. **Fromm**, et al.
Court: County of Orange Superior Court of the State of California
No:    30-2017-00962706-CU-BC-CJC
Re:    Fungal growth, deposition (01/15/2019) and trial (02/05/2020)

Client: Alston & Bird, Dentons U.S. LLP, and Kirkland & Ellis, LLP
Case:  Pui Fong and Thai Wong v. **Johnson & Johnson**, et al. (**Imerys Talc America** and **its predecessors**)
Court: County of Los Angeles Superior Court of the State of California
No:    BC675449
Re:    Asbestos/talc, deposition (01/21/2019) and trial (12/06/2019 and 12/09/2019)

Client: Slaughter, Reagan & Cole, LLP
Case:  Moorehead v. **Huang, et al.**
Court: County of Ventura Superior Court of the State of California
No:    56-2017-00494146-CU-PO-VTA
Re:    Fungal growth, deposition (01/28/2019)

Client: Alston & Bird, Dentons U.S. LLP, and King & Spalding, LLP
Case:  Gail Koretoff by and through her Guardian ad Litem, Allen Koretoff and Anneilia Koretoff v. Arkema, Inc., et al. (**Johnson & Johnson**, and **Imerys Talc America** and **its predecessors**)
Court: County of Los Angeles Superior Court of the State of California
No:    BC656506
Re:    Asbestos/talc, deposition (01/29/2019)

Client: Everett Dorey, LLP
Case:  Chino-Pacific Warehouse Corporation v. **Leslie's Poolmart, Inc.**, et al.
Court: County of San Bernardino Superior Court of the State of California
No:    CIVDS1610810
Re:    Industrial hygiene/property damage (chlorine), deposition (01/30/2019)

Client: Alston & Bird and Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
Case:  Moore v. Certainteed Corporation, Deere & Company, Guardline, Inc., et al. (**Imerys Talc America** and **its predecessors**)
Court: Harris County, Texas Superior Court
No:    2015-37493-ASB
Re:    Asbestos/talc, deposition (02/11/2019)
Client: Dentons U.S. LLP

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Case:  Patricia Schmitz v. Johnson & Johnson, et al. (**Cyprus Mines Corporation**)
Court:  County of Alameda Superior Court of the State of California
No:  RG18923615
Re:  Asbestos/talc, deposition (03/27/2019)

Client:  Hanger, Steinberg, Shapiro & Ash, LLP
Case:  **Benjamin, et al.** v. Soleimani, et al.
Court:  County of Los Angeles Superior Court of the State of California
No:  SC124566
Re:  Fungal growth/sewage, deposition (04/18/2019)

Client:  Law Offices of John J. Thyne, III
Case:  Polk v. **Gerrity**, et al.
Court:  County of Santa Barbara Superior Court of the State of California
No:  18CV00938
Re:  Fungal growth/mycotoxins, deposition (05/30/2019) and trial (11/19/2019)

Client:  Gordon Rees Scully Mansukhani, LLP; Bowman and Brooke, LLP; and Clark Hill
Case:  Jimmy H. Thomas and Sonya Thomas v. Akzo Nobel, et al. (**The Savogran Company**, **W.M. Barr**, and **Berg Lacquer**)
Court:  County of Alameda Superior Court of the State of California
No:  RG17882514
Re:  Benzene/myelodysplastic syndrome (MDS), deposition (06/19/2019)

Client:  Kirkland & Ellis, LLP and Orrick, Herrington & Sutcliffe, LLP
Case:  Cabibi v. Avon Products, et al. (**Johnson & Johnson**)
Court:  County of Los Angeles Superior Court of the State of California
No:  BC665257
Re:  Asbestos/talc, deposition (06/21/2019) and trial (09/16/2019 and 09/17/2019)

Client:  Jackson Lewis, P.C.
Case:  Stephanie Van de Motter and Sally Tillotson v. **The Irvine Company, LLC**, **The Irvine Company Apartment Community, Inc.**, and **Irvine Community Development Company, LLC**, et al.
Court:  County of Los Angeles Superior Court of the State of California – Santa Monica
No:  SC126761
Re:  Fungal growth, deposition (08/15/2019) and mediation (09/24/2019)

Client:  Slaughter, Reagan & Cole, LLP
Case:  Addison Marchese, et al. v. **Barry Farbenbloom, et al.**
Court:  County of Los Angeles Superior Court of the State of California
No:  BC671426
Re:  Fungal growth/mycotoxins, deposition (09/09/2019)

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST
SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Client: Weston & McElvain, LLP
Case:  Health Pro Dental Corporation, et al. v. **Travelers Property Casualty
       Company of America, et al.**
Court: County of Los Angeles Superior Court of the State of California
No:    BC645118
Re:    Fungal growth/mycotoxins, deposition (12/18/2019)

Client: Cozen O'Connor
Case:  Doherty v. **State Farm General Insurance Company,** et al.
Court: United States District Court – Central District of California
No:    2:19-cv-01963 JFW (PLAx)
Re:    Soot, char, and ash, depositions (12/20/2019 and 03/04/2020)

Client: Gordon Rees Scully Mansukhani, LLP
Case:  Bruce Rhyne and Janice Rhyne v. United States Steel Corporation, et al.
       (**The Savogran Company**)
Court: United States District Court – Western District of North Carolina, Charlotte
       Division
No:    3:18-cv-00197-RJC-DSC
Re:    Benzene/acute myeloid leukemia (AML), deposition (01/17/2020)

Client: Phillips, Spallas & Angstadt, LLP
Case:  Alejandra Garcia-Aguilar, et al. v. **Broad 26 Enterprises, et al.**
Court: County of Los Angeles Superior Court of the State of California – Central
       District
No:    BC703738
Re:    Habitability/mold growth/vector control, deposition (01/23/2020)

Client: Gordon Rees Scully Mansukhani, LLP
Case:  Teresa Wade, individually and as Personal Representative of the Estate of
       Robert Wade v. United States Steel Corporation, et al. (**The Savogran
       Company**)
Court: Court of Common Pleas, State of South Carolina, County of Charleston
No:    2018-CP-10-01583
Re:    Benzene/acute myeloid leukemia (AML), deposition (01/31/2020)

Client: Dorenfeld Law, Inc.
Case:  Christina Beck v. **The Estate of William Merzbach, Nina Merzbach** and
       **Ralph Merzbach**, Pacific Realtors and Does 1 through 30, inclusive
Court: County of Los Angeles Superior Court of the State of California – Central
       District
No:    BC706293
Re:    Habitability/mold growth, deposition (02/03/2020)

Client: Yang Professional Law Corporation

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998\* THROUGH FEBRUARY 2021**



Case:  Kathy O'Connor v. Gary Vedovitch, et al. and Gary Vedovitch, et al. v. Kathy O'Connor, et al. (**Triton Air, Inc.**)
Court:  County of Orange Superior Court of the State of California
No:  30-2017-00899728-CU-OR-CJC
Re:  Fungal growth, deposition (02/18/2020 and 03/09/2020)

Client:  Sheppard Mullin
Case:  John Veneziano and Elizabeth Veneziano v. **Allstate Insurance Company**, et al.
Court:  County of San Diego Superior Court of the State of California
No:  37-2018-00021507-CU-IC-CTL
Re:  Fungal growth, deposition (02/24/2020)

Client:  Murchison & Cumming, LLP and Clouse Spaniac Attorneys
Case:  Dina B. Chernick, Nina Chernick, et al. v. **Two Eleven Spalding Condominium Association**, **Bonnie Sugar** aka **Benita Sugar** by and through her Guardian Ad Litem, **Michael Sugar**, et al.
Court:  County of Los Angeles Superior Court of the State of California
No:  BC625917
Re:  Asbestos/fungal growth, deposition (02/25/2020)

Client:  Wesierski & Zurek, LLP
Case:  Brooke Coldren and Robert Coldren v. **Mercury Casualty Company**, et al.
Court:  County of Orange Superior Court of the State of California
No:  30-2018-01001440-CU-IC-CXC
Re:  Fungal growth, deposition (02/28/2020)

Client:  Gibbs Giden Locher Turner Senet & Wittbrodt, LLP and Hanger, Steinberg, Shapiro & Ash
Case:  Stuart McClave v. **7555 Delongpre, LLC** and **Ali Habibi**, et al.
Court:  County of Los Angeles Superior Court of the State of California
No:  BC705635
Re:  Fungal growth, deposition (09/15/2020)

Client:  Yang Professional Law Firm
Case:  Souvannavong, et al. v. **Cao**, et al.
Court:  County of Alameda Superior Court of the State of California
No:  RG19023432
Re:  Carbon monoxide, deposition (10/06/2020)

Client:  Law Office of Jason E. Turner
Case:  **Michael Patrick** v. Noise Group, LLC, et al.
Court:  County of Orange Superior Court of the State of California
No:  30-2016-00850671-CU-PO-CJC
Re:  Noise exposure, tinnitus; deposition (10/28/2020)

**BRIAN P. DALY, CIH, PE EXPERT WITNESS TESTIMONY LIST**
**SEPTEMBER 1998* THROUGH FEBRUARY 2021**



Client: Cozen O'Connor
Case:  Wilshire Manor Apartments, LLC v. **State Farm General Insurance Company**, et al.
Court: United States District Court, Central District of California
No:    2:16-cv-04363-SVW-GJS
Re:    Soot, char, and ash assessment; deposition (12/17/2020)

Client: Hurrell Cantrall
Case:  Kim Madril and Richard Madril v. 3M Company, et al. (**Los Angeles Unified School District**)
Court: County of Los Angeles Superior Court of the State of California
No:    19STCV40425
Re:    Asbestos, talc assessment; deposition (01/28/2021)

Client: Slaughter, Reagan & Cole, LLP
Case:  Fazli v. **Action Property Management, et al.**
Court: County of Los Angeles Superior Court of the State of California
No:    NC061566
Re:    Fungal growth, habitability; deposition (02/01/2021)