# EXHIBIT 10

Expert Report

Alex LeBeau, PhD, MPH, CIH

Rehak v. Monsanto Company

Case No. 3:16-md-02741-VC

United States District Court

Northern District of California

My Name is Alex Lance LeBeau. I am a certified industrial hygienist (CIH), a board certification issued by the American Board of Industrial Hygiene (ABIH), and I am licensed by the State of Florida, Department of Business and Professional Regulation as a Mold Assessor.  I possess a Master of Public Health (MPH) degree and a Doctor of Philosophy (PhD) degree in toxicology and risk assessment from the University of South Florida (USF) College of Public Health. I also hold a certificate in clinical epidemiology from the USF College of Public Health. My doctoral dissertation research involved an evaluation of pesticide biomarkers in a sample of the U.S. population and the assessment of risk from exposure to prevalent insecticides.

I am currently the owner of Exposure Assessment Consulting, LLC in Orlando, FL, where I offer toxicology, industrial hygiene, and public health consulting services. During my thirteen-year career, I have evaluated exposures to a number of chemicals and performed various toxicological evaluations of substances. I have assessed the safety of novel antimicrobial pesticide products for Canadian registration purposes and evaluated the efficacy of registering products that were considered antimicrobial pesticides by the U.S. Environmental Protection Agency (U.S. EPA). I have assessed occupational and environmental exposure to various chemicals, substances, biological agents, and physical stressors.  I have also served as an adjunct professor at USF, serving as a guest lecturer in toxicology and risk assessment classes.

The U.S. Department of Labor, Occupational Safety and Health Administration (OSHA) recognizes industrial hygienists as occupational safety and health professionals who focus on recognizing, evaluating, and controlling chemical or biological health hazards or stressors that may cause sickness, impaired health and wellbeing, or significant discomfort and inefficiency in workers or in the community. As recognized/defined by OSHA, an industrial hygienist can provide expert insight in a variety of areas, including the "magnitude of chemical, biological, or physical exposure, and the degree of associated risk" (OSHA 3160, 1999).

A CIH is an individual that has passed a rigorous qualifying examination (OSHA 3160, 1999). For examination eligibility, the ABIH requires several years of experience.  The exam tests an individual's broad-spectrum practical knowledge across many areas of industrial hygiene. The ABIH has minimum rubrics established for examination question categorizations, including analytical chemistry, biohazards, community exposure, thermal stressors, toxicology, work environments and industrial processes, engineering controls, industrial ventilation, and health risk analysis (ABIH Rubrics, 2011).  Epidemiology is also an area where a CIH must have practical

knowledge. The ABIH requires that applicants complete an ethics course before sitting for the examination and requires the completion of an ethics refresher before certification renewal. As a CIH, I am bound by the Code of Ethics to protect the public from conditions where injury and damage are reasonably foreseeable (ABIH Code of Ethics, 2007).

Industrial hygienists with toxicological training are often asked to evaluate how, if at all, chemicals, biological agents, or other substances impact living organisms and determine the safety of those substances. Toxicological evaluations of substances can be performed using assay methods, animal studies, or reviewing epidemiological data. Training in toxicology is helpful to an industrial hygienist when evaluating exposure and identifying potential adverse health effects.   Industrial hygienists may apply their toxicological training in evaluating the effect of a given dose on a health outcome. Additionally, toxicologists evaluate the absorption, distribution, metabolism, and excretion (ADME) of a substance to understand how it interacts with biological systems.

Elements of industrial hygiene and toxicology evaluations are necessary components of a causal analysis.  Sir Austin Bradford Hill is often credited with establishing the first organized structure for evaluating a causal link between an alleged exposure and a potential disease outcome (Bradford Hill, 1965). Often referred to as the Bradford Hill Analysis or Hill's Causal Criteria, these criteria are used to establish causal inferences between a claimed exposure and a potential disease outcome.  In my current opinion, I have applied these criteria when appropriate, and I have especially focused on the dose evaluation aspect of the criteria.

A core principle of risk assessment is understanding the difference between hazard and risk. Hazard is a potential source of harm from a substance before taking into account the concepts of exposure and dose. Risk is the probability of potential adverse effects resulting from exposure to a hazard. It is important to understand that exposure to a hazard does not mean in and of itself that a person is at realistic risk of an associated health outcome. Moreover, the fact that someone has been exposed to a realistic risk threshold does not mean that the health outcome is a result of that exposure.

I have performed risk assessments on contaminated sites in the U.S. using U.S. EPA and state and local regulatory guidelines. Risk assessments utilize combinations of exposure factors and toxicological data to model both potential exposure and dose under realistic exposure pathway scenarios. The critical elements of a risk assessment are hazard identification, exposure assessment, toxicity assessment, and risk characterization. Performing a risk assessment requires the understanding of how individuals may be exposed (e.g., inhalation, dermal, and ingestion), the exposure routes (e.g., air, water, or soil), the conditions that will allow someone to become exposed to those elements (i.e., complete exposure pathways), how toxic the substances are (including the bioavailability of the substances), and a characterization of the aggregate risks to determine if exposures to contaminants of concern will result in excess risks. These prospective exposure assessments are conservative to allow for the evaluation of risk for sensitive subgroups.

I have also performed safety assessments of food ingredients per U.S. Food and Drug Administration (FDA) requirements to determine the generally recognized as safe (GRAS) status of an ingredient using scientific procedures. Exposure and dose modeling of these ingredients under the specified conditions of use is performed to establish a safe average daily consumption

amount (i.e., dose) for U.S. consumers eating the ingredient in final food products. Safety studies are typically performed to support the establishment of safe use levels. These safety studies usually include a combination of *in vitro* (genotoxicity and mutagenicity) and *in vivo* (subchronic 90-day rat study) assays to show that the estimated consumption level (i.e., dose) would be safe for consumers in the U.S. population.

A list of publications and presentations is provided on my curriculum vitae in Appendix A.

In preparation for my opinion, I was asked to review regulatory publications, guidance documents, manufacturer-sponsored studies, and peer-reviewed research publications relating to the background, exposure and dose assessment, toxicology, epidemiology, and potential adverse health outcomes associated with glyphosate and glyphosate-containing products. I also performed an independent search of the publicly available literature in conjunction with my work on this report. Finally, I was asked to perform a glyphosate retrospective dose assessment for Ms. Lorraine Rehak, where feasible.  In performing this assessment, I reviewed Ms. Rehak's deposition transcripts, plaintiff fact sheets (PFS), and assessed other relevant information as appropriate. All opinions expressed in this report are to a reasonable degree of scientific certainty unless otherwise stated. A full list of documents I reviewed in preparation for this opinion is in Appendix B.  I have testified once in the previous four years, in Giglio v. Monsanto. I was compensated at a rate of $340 per hour.  My rate for deposition or trial testimony is $510 per hour.

**Chemical Properties**

Glyphosate (CAS # 1071-83-6) is a non-selective, broad-spectrum herbicide used in residential, commercial, and agricultural settings to kill or suppress targeted broadleaf and grassy weeds. Glyphosate is an organophosphonate (not the same compound as an organophosphate) and is comprised of a glycine and phosphonomethyl compound. The herbicide targets the shikimate acid pathway unique to plants, binding to the enzyme 5-enolpyruvylshikimate-3-phosphate synthase and inhibiting the synthesis of aromatic amino acids necessary for plant growth and function. This amino acid synthesis pathway is not found in mammalian systems.

Pure glyphosate is an organic acid and is a white, solid crystalline substance. Glyphosate is often available as a white powdery salt form, which is used in formulated products to increase glyphosate's solubility in water. The isopropylamine salt is the most common formulation, although it can also exist in other salt forms (IARC, 2015). See Figure 1 for the structure of Glyphosate isopropylamine salt.



[Figure 1; ATSDR, 2019]

Glyphosate delivery to the target plant species is typically in an aqueous form, which means the solubility in water is essential for efficient mixing and delivery. The solubility of glyphosate in water

at 25°C is 12,000 mg/L and the isopropylamine salt solubility is 1,050,000 mg/L (ATSDR, 2019). The high solubility indicates that glyphosate prefers to remain in an aqueous suspension, which is characteristic of the hydrophilic nature of the compound. The hydrophilic nature of the compound will limit the ability of glyphosate to enter the body, as will be evaluated later.

Liquid suspensions of pure technical-grade glyphosate acid are not commercially available. Commercial formulations are manufactured using the glyphosate in a salt form to ensure that thorough mixing achieves uniform distribution within a solution.  Other chemicals are included in these commercial formulations to aid in emulsification of the mixture. Polyethoxylated tallow amines (POEA) are one of the types of surfactants used in glyphosate formulations. This class of tallow amines can also be found in household products like Lysol and hair coloring products (NIH HPDB, 2019).

**Exposure and Dose Assessment**

The EPA defines exposure assessment as the "determination or estimation (qualitative or quantitative) of the magnitude, frequency, duration, and route of exposure" to a chemical, substance, or biological agent (RAGS A, 1989).  Exposure and dose are related but they are not the same thing.  Exposure is the opportunity to contact a substance at an outer boundary of an organism and the opportunity to absorb a dose. A dose is the amount of exposure actually absorbed and available for interacting with biological processes once the substance has crossed an outer boundary of an organism. An exposure must occur before a dose is received (Harbison et al., 2015). If there is no exposure, then there is no dose. If there is an exposure, the exposed concentration to absorbed dose ratio is rarely one-to-one (1:1).  That is, exposure at a high concentration can still result in a low internalized dose. For nearly every case, the dose rather than the exposure is the critical measurement when evaluating potential adverse health effects because the studied compound must enter the body for an adverse health effect to occur.

In the case of glyphosate, an individual's exposure to a glyphosate-based herbicide must be assessed prior to determining the dose of glyphosate that he or she may have received. In general, an exposure can be determined by 1) measuring or estimating the amount of a substance at an outer boundary of an organism and 2) determining the duration of the exposure. In general, a dose can be determined by measuring the amount of substance that is in the body, or it can be estimated by applying knowledge about the potential bioavailability of a substance to exposure data. Understanding the dynamic between exposure and dose is critical for evaluating potential health effects following an encounter with a substance.

Quantifying an individual's contact with a chemical, substance, or physical agent is the primary method for characterizing the nature and magnitude of an exposure and determining whether the exposure is considered hazardous under the specified use condition.  Quantifying an exposure is typically done using active monitoring methods, when the technique is feasible and available.  In the case of glyphosate and the nature of the application methods, passive dosimetry sampling techniques were sometimes used, involving the use of absorptive material and wiping of skin surfaces. Dermal contact is the most common exposure route identified in the literature when evaluating mixing, loading, application, and bystander contact with glyphosate. Use of patches affixed to likely glyphosate exposure points was identified in the literature as an effective method

for quantifying exposure. Some exposure monitoring studies also evaluated potential inhalation exposure; exposure via this route was found to be minimal.

In addition to quantifying exposure using passive dosimetry, some studies have quantified dose by use of biological monitoring. In general, biological monitoring is preferred to passive dosimetry because it does not rely on incorporating information on bioavailability and is instead a direct measurement of the amount of the substance within the body. In the case of glyphosate, biomonitoring is performed via urinalysis, which is considered by researchers and regulators as a reliable method for establishing a dose.

**Biomonitoring and Passive Dosimetry Studies**

There are numerous studies available using passive dosimetry and/or biological monitoring of exposed individuals to quantify a dose.  A small sample of studies representative of the full dataset is summarized below.  The full list of available studies reviewed is available in Appendix B.

Edmiston et al. (1995) evaluated California Department of Transportation employees to assess exposure to glyphosate under normal work conditions. Full body dosimetry was performed using 100% cotton shirts and 100% cotton long johns worn under the normal work clothes and PPE. Hand, face, and neck exposures were evaluated with wipe samples at various times throughout the day.  The average dermal exposure for exposed individuals was 2.460 mg/person. The calculated absorbed average dose was 8.96 x$10^{-4}$ mg/kg. This calculated dose considered both dermal and inhalation exposures.

Lavy et al. (1992) affixed cotton patches to nine locations across the body of USDA Forest Service field workers as they applied RoundUp formulations at two nurseries in the United States. In addition to exposure monitoring, the investigators evaluated urine for concentrations of glyphosate to assess the dose received by the applicators and weeders, which were applying the glyphosate formulations. Patch data revealed that the ankles and thighs were the body parts that received the highest amount of glyphosate for the exposed workers. Applicator passive dosimetry data revealed an average of 7.2 x $10^{-4}$ mg/kg/hr (equivalent to 5.8 x $10^{-3}$ mg/kg adjusted for an 8-hour workday). Weeder passive dosimetry data revealed an average of 2.0 x $10^{-4}$ mg/kg/hr (1.6 x $10^{-3}$ mg/kg adjusted for an 8-hour workday). Estimated urinary glyphosate concentrations were approximately one order of magnitude lower than passive dosimetry data for both applicators and weeders. Other studies have seen a similar disparity between passive dosimetry and biological monitoring data (see Cowell and Steinmetz, 1990).   Investigators failed to detect glyphosate in any urine sample collected from the workers. Because of this data gap, the investigators used ½ the lower limit of the method validation for urine glyphosate concentration to postulate a dose for the applicators.

Acquavella et al. (2004) evaluated glyphosate concentrations in the urine of farmers, their spouses, and their children in South Carolina and Minnesota using 24-hour composite urine samples.  The measured absorbed doses ranged from non-detect to 0.004 mg/kg body weight. The farmer applicator with the highest dose was observed repairing a boom sprayer without gloves, applying glyphosate without gloves, and smoking during application (suggesting oral exposure in addition to dermal). Despite engaging in activities that would be expected to increase

the absorbed dose, the actual measured absorbed dose of the farmer was 0.28 mg, assuming a weight of 70 kg for the farmer.

Pierce et al. (2020) performed a study to evaluate dermal and inhalation glyphosate exposure routes using a simulated residential application. Twelve (12) study participants were divided into two groups of six (6), where inhalation exposure would be evaluated in one group and dermal exposure evaluated in the second group. Both exposure groups mixed a 0.96% glyphosate formulation from RoundUp Weed and Grass Super Concentrate and applied using a backpack sprayer.  Each applicator continuously sprayed until the backpack was empty, when Roundup was again mixed from concentrate and applied for a total of four (4) mixing/spraying events totaling 100 minutes of spraying. Each participant applied approximately 16 gallons of formulated RoundUp for approximately 1.14 linear miles.  Air samples were collected from inhalation exposure group breathing zones and urine samples were collected from all study participants across both exposure groups. Urinary collection was performed up to 36-hours post experimental exposure. Peak urinary concentrations in the inhalation exposure group ranged from 3.79 ng/mL to 17.23 ng/mL and in the dermal exposure group ranged from 5.55 ng/mL to 310.91 ng/mL.[1] Peak urinary glyphosate concentrations were observed a 3-hours and 6-hours post application and urinary glyphosate levels returned to baseline within 24 hours of application.

Kougias et al. (2020) used all data generated from Pierce et al. (2020) to calculate an internal dose using two different methods and assessed risk using a margin of safety (MOS) approach. Using the worst-case data from both the inhalation and dermal exposure, the highest bodyweight-adjusted internal dose was 0.0059 mg/kg.

Other biomonitoring studies performed by researchers worldwide have found low glyphosate levels in urine samples collected from both the general population and from applicators and their family members. Many of these studies have undergone peer-review and have been reviewed and relied upon by regulators. These data demonstrate that exposures during routine and atypical glyphosate application situations do not result in a high glyphosate body burden and do not suggest evidence of bioaccumulation.

The data from the available studies establish that passive dosimetry data can be used to estimate exposures and potential exposures to glyphosate and that evaluation of urine samples for the glyphosate biomarker can be used to calculate dose.  The data also suggest that passive dosimetry data overestimates dose by approximately an order of magnitude.[2]

**Dermal Bioavailability**

---

[1] While there is no question as to the highest urinary glyphosate concentration of 310.91 ng/ml, it was determined to be an outlier for statistical analysis for the geometric mean in Pierce et al. (2020).
[2] Some studies have evaluated the effectiveness of protective barriers in preventing and/or delaying glyphosate exposure to the skin. Those studies indicate that clothing is effective in preventing exposure to glyphosate. See Lavy et al. (1992), Wester et al. (1996), and Manning (1991).

Estimating the absorbed dose of glyphosate from passive dosimetry studies is dependent upon absorption data. Because studies evaluating agricultural and commercial applications of glyphosate have identified the dermal pathway as the main contributory exposure pathway when applying to target plant species, the bioavailability of glyphosate following incidental dermal contact must be determined. Data available in both the peer-reviewed literature and from manufacturer-sponsored studies can be used to determine the dose of glyphosate entering the body following dermal contact with a liquid formulation. The absorbed amount is usually reported as flux, which is the amount of substance penetrating the skin over a specified surface area and for a certain time period at equilibrium (i.e., $mg/cm^2/hr$) (OECD, 2004).

The water solubility of glyphosate is important when evaluating the permeability of the compound across the skin.  The skin consists of an outer layer called the epidermis, and a lower layer called the dermis.  The epidermis serves as a physical barrier to hydrophilic compounds. Because glyphosate is so highly hydrophilic, the epidermis serves as a natural protective barrier to prevent absorption of water-based formulations.  The human dermal permeability studies are discussed below.

A small sample of studies representative of the full dataset on the dermal permeability of glyphosate is summarized below.  The full list of available studies reviewed is available in Appendix B.

Franz (1983) evaluated three formulations of glyphosate to determine their percutaneous absorption and potential for systemic toxicity. One of the formulations was without a surfactant, while the other two formulations contained surfactant (one concentrated and one diluted).  Using cadaver skin, Franz showed that dermal application for up to 24 hours resulted in a less than 0.2% dermal absorption in all formulations. The fact that the absorption percentage of glyphosate increased each time the amount of active ingredient was diluted (whether or not surfactants were present) suggests that diluting glyphosate formulations may result in increased penetration over time (as a percentage), but that surfactants did not play a role in increased penetration. If they had, the absorption rate percentage for the concentrated formulation would have been higher than the diluted. The fact that diluted glyphosate-based herbicides have increased absorption percentages compared to concentrated glyphosate-based herbicides is expected given the decreased loading on the skin. One should note, however, that the absolute amount of glyphosate absorbed will typically be much lower.

Nielsen et al. (2009) evaluated nine compounds to evaluate dermal penetration using human skin samples. Of those nine, glyphosate was the most hydrophilic compound. This means that it was the compound of those studied that was most attracted to water and, thus, had the most difficult time passing into and through the stratum corneum (the outer layer of the epidermis). The measured dermal penetration resulted in a flux very similar to that of Franz (1983) and in studies conducted by Wester et al. (1991), Ward, Smith, and Davies (See Appendix B).

Overall, the well-performed dermal permeability studies demonstrate that the epidermis is an effective barrier to glyphosate absorption due in large part to glyphosate's highly hydrophilic properties, and that dermal glyphosate absorption is low. Additionally, the surfactants do not appreciably affect the absorption of glyphosate.

**Toxicokinetics**

Evaluating the toxicokinetics of a substance involves the determination and quantification of the process or events involved in the absorption, distribution, metabolism, and excretion of a dose (EPA IRIS, 2011). It is the process of evaluating a substance at the point where a dose is internalized after crossing an outer boundary, through biological interaction within the body during metabolism, and the elimination/excretion of the substance from the body. The route of exposure (e.g., oral versus dermal) will often result in different toxicokinetic mechanisms. Examples include different bioavailability, different absorption and metabolism, and different routes of excretion (e.g., urine versus feces).

Absorption will depend on the exposure concentration and bioavailability of the substance. Once internalized into the body, the distribution to body compartments will follow certain toxicodynamic properties, with potential metabolism occurring at different points along the distribution system. Excretion is the ultimate elimination of the substance from the body via either urine, feces, or exhaled breath.

A critical determination in the absorbed dose of a substance is the half-life, which is an indication of how long the substance will be in the body before elimination.  For example, 7 half-lives will result in eliminating approximately 99% of the substance from the body. Dermally absorbed glyphosate is expected to be systemically distributed throughout the body. Laboratory studies have been performed to evaluate the half-life of glyphosate in both animal models and humans following systemic distribution. These studies show that glyphosate is excreted rapidly and mostly as the parent compound, as it is not well metabolized in mammals.

A small sample of the studies representative of the full dataset on glyphosate toxicokinetics is summarized below.  The full list of available studies reviewed is available in Appendix B.

Connolly et al. (2018) evaluated glyphosate's half-life in human spot urine samples using urinary excretion rates. Based on multiple analyses, the investigators estimated the mean human half-life of glyphosate at 5.5 to 10.0 hours.  Using the average half-lives determined by Connolly et al. (2018), 99% of the glyphosate in the body will be eliminated in approximately 1.5-3 days.

Pierce et al. (2020) used spot urine sample glyphosate concentrations following inhalation and dermal exposure to evaluate half-life in humans. The authors found that the results in the study "…generally support that the biological half-life for glyphosate is roughly between 3 and 6 hr."[3]

The National Institute of Environmental Health Sciences (NIEHS) National Toxicology Program (NTP) also evaluated the half-life of glyphosate administered intravenously (i.v.) to a rat model. The results of the experiment indicated that 98% of the administered glyphosate was excreted via the urine after 24 hours (NTP, 1992).

**Epidemiology**

---

[3] For reference, the half-life of caffeine if 4 to 6 hours. https://www.fda.gov/consumers/consumer-updates/spilling-beans-how-much-caffeine-too-much

Epidemiology is the study of distribution and determinants of health status in specified human populations (EPA IRIS, 2011).  In the case of glyphosate, certain epidemiological studies have attempted to discern if glyphosate use is associated with non-Hodgkin's Lymphoma (NHL). During my review of the available data, I evaluated the reliability and usefulness of the various dose assessment methodologies used in glyphosate epidemiology studies.

McDuffie et al. (2001) and Eriksson et al. (2008) evaluated whether being ever exposed to glyphosate is associated with an increased incidence of NHL vs. never being exposed to glyphosate.  However, these studies also attempt to evaluate the effect of dose on the potential relationship of glyphosate and NHL by stratifying the data into days of use.  This stratification technique is a rudimentary methodology for assessing dose, as it does not take into account application methods or PPE use. Additionally, both of these studies used only a univariate analysis for statistical evaluation for their dose response statistical evaluation. A univariate analysis only looks at one dependent variable.[4] A more robust way of identifying any potential association between an exposure and any alleged disease outcome would be to use a multivariate methodology for comparing multiple variables.  Without controlling for confounding, it is difficult to draw causal associations in epidemiological studies.[5]

Review articles have evaluated the potential of bias in the case-control studies investigating an association of glyphosate and NHL.  EPA defines bias as "A systematic error inherent in a method or caused by some artifact or idiosyncrasy of the measurement system."[6] Donato et al. (2020) identified publication bias and other potential forms of bias in small studies included in previously published meta-analyses (e.g., studies evaluating exposure in days/year). The conclusions in Kabat et al. (2020) confirm the presence of bias in the case control studies. After performing an updated meta-analysis and finding no statistically significant increase in meta-analysis relative risk, Donato et al. (2020) conclude that there is no overall evidence of an increased risk for NHL and multiple myeloma from occupational exposure to glyphosate.[7]

Crump (2019) took this bias evaluation further and investigated the possibility of recall and selection biases in both case-control and cohort studies that have been published evaluating the association between glyphosate and NHL.  Using data from case-control and cohort studies in the glyphosate dataset in a simulation, the author investigated the idea that, if all pesticide exposures had elevated odds ratios (OR) above 1.0, then bias may be the cause of the elevated ratios. Crump found that OR were statistically elevated in every pesticide category, with little difference between the ratios calculated with or without glyphosate included.   The author

---

[4] It is worth noting that when the authors of Eriksson et al. (2008) performed a multivariate analysis on their ever/never use data, they found no statistically significant relationship between exposure and NHL.
[5] Combined analyses that use univariate figures suffer from the same deficiencies as McDuffie et al. (2001) or Eriksson et al. (2008). See Zhang et al. (2019).  Pahwa et al. (2019) evaluated a study population and determined that there was no statistically significant association between the highest use metric (>7; numbers of years used X number of days/year handled) and NHL overall when adjusting for exposures to other pesticides (Table S1).
[6] https://www.epa.gov/esam/glossary
[7] A January 2020 revised/updated EPA meta-analysis found no statistically significant increase in the incidence of NHL after exposure to glyphosate.  The agency continues to classify glyphosate as "not likely to be carcinogenic to humans" (EPA, 2020).

concluded that statistical bias (e.g., recall bias) contaminated the case-control group of studies (including McDuffie et al., 2001 and Eriksson et al., 2008), the finding of which suggests that these studies "are not reliable for determining whether glyphosate is carcinogenic", per Crump.

Other studies like Andreotti et al. (2018) used a validated intensity weighting metric available in the peer-reviewed literature (See Dosemeci et al., 2002, and Coble et al., 2011). The metric takes into account other factors associated with dose (e.g., PPE use and method of application). The Andreotti et al. (2018) study, which is a well-powered cohort study supported by the NIEHS, EPA, and other governmental agencies, observed no relationship between glyphosate exposure and NHL at any of the dose levels evaluated.

It is my opinion that the AHS contains a more robust dose evaluation metric. As Kabat et al. (2020) note, "[t]he results of the AHS provide the most reliable and precise information regarding the risk of NHL following glyphosate exposure…" and that "great caution" should be used when including the AHS study in a meta-analysis. Because of the AHS study's strength, analyzing it in a meta-analysis with the case control studies may result in diminishing the impact of the reliable AHS study (Kabat et al. (2020). It is also my opinion that the increased odds ratios observed in the reviewed case-control studies using days per year as a dose metric are a result of a less sophisticated methodology for dose evaluation and are likely the product of recall bias and confounding.  Furthermore, the increased odds ratios have not been shown to be statistically significant once controlling for other exposures.  See Eriksson et al. (2008).

**Animal Carcinogenicity Studies**

Long-term animal carcinogenicity bioassays are performed on active ingredients (AI) to evaluate the carcinogenic potential of the AI.  These rodent bioassays are typically performed on either mice and/or rats over an 18- or 24-month period, respectively. Mouse carcinogenicity assays will sometimes extend for 24 months. When following the applicable guidance documents, these studies are designed using intentionally high AI doses with the intent to answer the regulatory question of whether or not internalizing high doses of the AI can cause cancer in rodents and if the AI is a potential risk for humans at a dose that humans would encounter.

Typically, there is a methodology for performing a cancer hazard assessment, with the goal of evaluating available biological data and the implications for human hazard and dose (EPA, 2005). One way to initially screen substances is to determine if there is an existing structure-activity relationship (SAR) with other carcinogens. However, data specific to the AI can be generated using rodent cancer bioassays. Bioassays of this nature typically generate a vast amount of data for evaluation, including clinical observations of animals, clinical chemistry values, average daily test article intake, urinalysis, organ weights, hematology, mortality, and gross and histopathological evaluations of animal organs and tissues.

The design of a rodent cancer bioassay during protocol development is as important as the data generated from the carcinogenicity study itself. Designing these studies must take into consideration the toxicokinetics and dose of the test article. The protocol, which is developed before the conduct of the study to minimize any risk of bias in the interpretation of results, typically includes but is not limited to: setting dose levels for the treatment groups, identifying specimens

to collect and evaluate, the time points for the investigators to collect specimens and physical evaluations of the animals, and how to perform statistical evaluations of the data generated during the study, including levels of significance. Dose verification in the delivery vehicle is also important and the protocol typically outlines how often the vehicle (e.g., feed) is analyzed and sets tolerance levels for the test article in the feed. Investigators constantly monitor the studies and appropriately correct any issues that are outside the thresholds established in the protocol to ensure that the data generated at the end of the study are reliable.

Following the completion of the study, all data is summarized in tables and statistical comparisons made according to the previously established protocol. One of the first things to evaluate is the identification of any statistically significant differences between dose groups. These statistical evaluations are typically either a trend test (e.g., Cochran-Armitage test) to evaluate if the incidence in all groups increases as dose increases, or a pairwise comparison (e.g., Fisher exact test) to identify a significant increase in one dose group over the control group (EPA, 2005). Statistical tests are typically selected based on the normality and variance of the data in the study. If a significant finding for one of these tests is observed, it will trigger an additional evaluation. The goal is to determine if the findings are due to chance; due to the species, strain, or sex used in the study; and/or if the findings are biologically significant and plausible.

When reviewing the data from any animal study, I review all of the available data, but typically focus my detailed evaluation on any findings that were determined to be statistically significantly different in the study. One way of determining if observed statistically significant differences in incidence (e.g., tumor development) are related to the test article is to evaluate the findings in the context of historical control data. These historical controls can aid in establishing if the tumor incidence was a true effect or if the species and strain of rodent may be susceptible to developing tumors. It is normal to observe neoplasms, including ones that may be statistically significant as compared to controls, in animals tested for long periods. These can be caused by a number of factors, including but not limited to: age of the animal, species, strain, genetic drift, genetic predisposition, and random chance. This is one reason historical control data are used as part of the evaluation into the cause of any neoplasms observed.

Bioassay data are evaluated further in an attempt to establish that any tumor observations are true effects of the test article and not attributed to adaptive changes or other reasons. One way to do this is to determine if the maximum tolerated dose (MTD) has been exceeded in the highest dose group. Typically, animals are dosed at a concentration far higher than human doses in an attempt to elicit a response at the MTD. If a response is seen, scientists may mathematically normalize the dose; however, this normalization cannot account for all differences between species. Observations in doses higher than the MTD may be a toxicity issue rather than a true cancer outcome. Doses that are in excess may not be representative of a true physiological condition. Another way to evaluate any significant findings for a tumor is to determine if any pre-neoplastic lesions existed in any dose groups. The toxicity data, organ weights, and physical observations may be considered when evaluating data to determine if any observed tumors are a true test article effect or are a result of a non-carcinogenic or adaptive effect.

Other data to evaluate in rodent cancer bioassays include but are not limited to (in no particular order)[8]:

- Nature of any toxicological findings
- Clinical chemistry and hematology results
- Urinalysis data
- Macroscopic observations
- Latency
- Signs of lesion progression

- Sex differences in observations
- Mortality and survival rates
- Organ weight differences
- Colony overall health
- Historical controls

There have been GLP compliant studies required for glyphosate, by both the U.S. EPA and by regulatory agencies in other countries, where the agency has completed a holistic review of the available data following submission by the registrant. The regulators reviewed the studies that evaluated both toxicity and carcinogenicity outcomes following dosing with glyphosate. Overall, it is important to note that no rodent carcinogenicity studies have found a test article related association between glyphosate and any cancer outcome.

When evaluating these data from a toxicological standpoint, it is important to consider them from both a singular and holistic standpoint using Hill's Causal criteria. Not only should a dose-response be clear in the study data, but any statistically significant and true outcome should be consistent among the studies performed using the same species. Additionally, the outcome should be specific to that exposure. Regarding specificity, compounds that cause cancer in rodents and humans can cause cancer at the same biological site, although this does not always hold true. However, a compound that does cause cancer in rodents should consistently result in cancer at a specific site in other rodent studies.

Given plaintiff's claims that glyphosate exposure caused her NHL, a discussion of the lymphoma findings in the rodent bioassays follows.

<u>Mouse Carcinogenicity Studies</u>

There have been five (5) mouse carcinogenicity studies performed for regulatory purposes using glyphosate as the test article that have been relied upon by regulators and for which I had sufficient data to review.  Those studies are Atkinson et al. (1993), Knezevich and Hogan (1983), Kumar (2001), Sugimoto (1997), and Wood et al. (2009). These studies looked at many carcinogenicity endpoints. Some of these studies evaluated glyphosate in high dose groups that exceeded the OECD guidelines of 1,000 mg/kg. For carcinogenic effects, these studies evaluated macroscopic and microscopic changes, including evaluation of any pre-neoplastic lesions (if present), the possibility of lesion progression, and comparison of any identified tumors to historical controls.  No compound related carcinogenic effects were identified by regulators or myself in any of the five (5) mouse studies performed using glyphosate as the test article.

Atkinson et al. (1993) performed a 24-month carcinogenicity feeding study on CD-1 mice. Glyphosate was administered via the diet to male and female mice at doses up to 1,000 mg/kg

---

[8] EPA, 2005; Hayes and Kruger, 2014.

bw/day. The study authors did not observe a statistically significant finding with lymphoma within the study using Fisher's exact test.   The lymphomas observed did not demonstrate a dose response, with approximately 31% of the lymphoma incidence in the control male mice and approximately 29% of the lymphoma incidence in the female control mice. The incidence of lymphomas in this study was consistent with historical controls.

A 24-month mouse study by Knezevich and Hogan was completed in 1983 as part of the U.S. EPA re-evaluation and re-registration of older pesticides.  Male and female CD-1 mice were dosed glyphosate at concentrations up to 30,000 ppm in the diet.  Daily mean doses for males in the high dose group was 4,841 mg/kg bw/day and female mean daily intake was 5,874 mg/kg bw/day (Knezevich and Hogan, 1983).[9]  The study authors did not identify a statistically significant finding with total lymphoreticular neoplasms within the study.   That is, there was no dose-response relationship observed for total lymphoreticular neoplasms. The same incidence of lymphoreticular neoplasms was observed in both the control and high dose male mice.  Like other studies, the incidence of lymphomas in this study was consistent with historical controls.

Kumar performed an 18-month carcinogenicity feeding study on Swiss albino mice for registration purposes outside the United States. Glyphosate was dosed via the diet in the high dose group an average of 1,454 mg/kg bw/day for males and 1,467 mg/kg bw/day for females.  The study authors did not associate glyphosate with carcinogenic effects in the study animals. The validity of these study results in total are often questioned because of reported biological contamination of the colony.  Within the study, there are numerous references to parasites across the study groups. EFSA determined the study to be "not acceptable" due to a viral infection (EFSA, 2015). EPA came to the same conclusion on viral infection in the colony (EPA, 2017).

Sugimoto (1997) performed an 18-month carcinogenicity feeding study on CD-1 mice for registration purposes outside the United States. Glyphosate was dosed via the diet in the high dose group an average of 4,348 mg/kg bw/day for males and 4,116 mg/kg bw/day for females.[10] This dose exceeds the OECD guideline of 1,000 mg/kg bw for this type of study. The author found that "… there were neither increases in incidence nor earlier occurrences of particular neoplastic lesions in the treated groups of both sexes" (EFSADOC0001191).   The author did identify a statistically significant decrease for malignant lymphoma in low dose female mice at terminal kill when compared to respective controls. The study author did not find a similar statistically significant malignant lymphoma finding in male or female mice when taking into account all animals examined in the study. Though a statistically significant relationship was observed by Dr. Portier using the Cochran-Armitage test for male lymphomas, the incidences of malignant lymphoma in all mice at the end of the study show a lack of dose-response in both sexes for this tumor type.  Like other CD-1 mouse studies, the incidence of lymphoma was within the range of historical controls.

---

[9] For context, the highest average female CD-1 mouse dose applied to a human would mean that a 70 kg individual would need to ingest approximately 0.9 pounds (411 g) of glyphosate per day to receive the same dose.

[10] For context, the highest average male CD-1 mouse dose applied to a human would mean that a 70 kg individual would need to ingest approximately 0.7 pounds (304 g) of glyphosate per day to receive the same dose.

Wood et al. (2009) performed an 18-month carcinogenicity feeding study on CD-1 mice for registration purposes outside the United States. Glyphosate was dosed via the diet in the high dose group an average of 810 mg/kg bw/day for males and 1081.2 mg/kg bw/day for females. The authors identified eight (8) incidences of malignant lymphoma in male mice and forty (40) in female mice across all dose groups. Wood et al. observed that the female lymphoma distribution was viewed as a uniform distribution throughout the dose groups whereas the male mice had a higher incidence in the highest dose groups. There was no dose-response seen in the female mice in this study due to the occurrence of malignant lymphoma in control female mice.  There was no incidence of malignant lymphoma in male control group mice within the study. However, the concurrent control value is exceptionally low as evidenced by the incidence of malignant lymphomas in a concurrent control mouse study performed at the same facility (an incidence of 12% for each male and female mice) (Wood, 2008).  Because the incidence of malignant lymphoma in the glyphosate study control male mice was far lower than the typical background incidence, the incidence in the dosing groups gives the appearance of a dose-response relationship. However, evaluating the study data with the incidence of malignant lymphoma in the concurrent control study illustrates the lack of dose-response to glyphosate administration (e.g., 6 out of 50). The study authors observed that, following a review of all data, "the incidence of the condition among high dose male mice is not sufficiently great to suggest a relationship to [glyphosate] treatment" (EFSADOC00013840). During re-evaluation of Wood et al. (2009) data, EPA identified a statistically significant trend and incidence in the high dose group when compared with study controls with unadjusted p-values. When adjusting for multiple comparisons, the increase in the high dose males was no longer statistically significant.  The incidence of male mice lymphomas observed in this study was within the range of historical controls, including the incidence in the high dose group.

Lymphoma is one of the most common tumors occurring in mice (Ward, 2006).  In all of the evaluated studies of sufficient quality, no dose-response relationship was observed between glyphosate administration and lymphoma that exceeded historical controls. Overall, the data do not support a causal relationship between glyphosate and malignant lymphoma due to a lack a dose-response, lack of consistency, the occurrences of lymphoma in control animals across a number of studies, and a lack of strength in the association.

EPA performed a holistic review of the dataset available to them, including primary data for the above referenced studies.  Relating to the studies above, EPA identified other tumor types during re-evaluation of the primary data (e.g., hemangiosarcoma and hemangioma). However, EPA determined that the effects observed "lack of pairwise statistical significance, lack of a monotonic dose response, absence of preneoplastic or related non-neoplastic lesions, no evidence of tumor progression, and/or historical control information…" (EPA OPP, 2017). I have evaluated these data and agree with the EPA conclusions.

Rat Carcinogenicity Studies

There have been seven (7) rat carcinogenicity studies performed for regulatory purposes using glyphosate as the test article that have been relied upon by regulators and for which I had sufficient data to review. These studies looked at many endpoints, including lymphoma (like the

mouse studies). Some of these studies evaluated glyphosate in high dose groups that exceeded the OECD guidelines of 1,000 mg/kg dose. For carcinogenic effects, these studies evaluated macroscopic and microscopic changes, including evaluation of any pre-neoplastic lesions (if present), the possibility of lesion progression, and comparison of any identified tumors to historical controls. No compound related carcinogenic effects were identified by regulators or myself in any of the seven (7) rat studies performed using glyphosate as the test article.

Atkinson et al. (1993) performed a 24-month carcinogenicity feeding study on Sprague-Dawley rats for registration purposes outside the United States. Mean high-dose group glyphosate doses were 1,007 mg/kg bw/day for males and 1,018 mg/kg bw/day for females. The authors did not find a dose-relationship between glyphosate and the incidence of lymphoma in the rats.

Brammer (2001) performed a 24-month carcinogenicity feeding study on Wister rats for registration purposes outside the United States. Mean high-dose group glyphosate doses were 1,214 mg/kg bw/day for males and 1,498 mg/kg bw/day for females. The EPA observed that these doses exceed the OECD guideline of 1,000 mg/kg bw for this type of study. The author did not find a dose-response relationship between glyphosate and the incidence of malignant lymphosarcoma.

Enemoto (1997) performed a 24-month carcinogenicity feeding study on Sprague-Dawley rats for registration purposes outside the United States. Mean high-dose group glyphosate doses were 1,127 mg/kg bw/day for males and 1,247 mg/kg bw/day for females. The EPA observed that these doses exceed the OECD guideline of 1,000 mg/kg bw for this type of study.  The author did not identify a dose-response relationship between glyphosate and the incidence of malignant lymphoma.

Lankas (1981) performed a 26-month carcinogenicity feeding study on Sprague-Dawley rats. Mean high-dose group glyphosate doses were 31.49 mg/kg bw/day for males and 34.02 mg/kg bw/day for females. The design of this study did not result in the MTD being reached, which was a product of the standard at the time. The author did not identify a statistically significant dose-response between glyphosate administration and malignant lymphoma.

Stout and Ruecker (1990) performed a 24-month carcinogenicity feeding study on Sprague-Dawley rats. Mean high-dose group glyphosate doses were 940 mg/kg bw/day for males and 1,183 mg/kg bw/day for females. The EPA observed that these doses are at or exceed the OECD guideline of 1,000 mg/kg bw for this type of study. The authors did not identify a statistically significant dose-response between glyphosate administration and malignant lymphoma.

Suresh (1996) performed a 24-month carcinogenicity feeding study on Wistar rats. Mean high-dose group glyphosate doses were 595.2 mg/kg bw/day for males and 886 mg/kg bw/day for females. The authors did not identify a statistically significant dose-response between glyphosate administration and malignant lymphoma and found that "the test compound at the doses tested does not cause treatment or dose related gross and histopathological changes and it is not carcinogenic under the testing conditions" (EFSADOC00013216).

Wood et al. (2009) performed a 24-month carcinogenicity feeding study on Wistar rats for registration purposes outside the United States. Mean high-dose group glyphosate doses were 1,077.4 mg/kg bw/day for males and 1,381.9 mg/kg bw/day for females. The EPA observed that these doses exceed the OECD guideline of 1,000 mg/kg bw for this type of study. The authors found that there were "[n]o treatment related effects on the incidence or malignancy of tumours was seen at any dose level" (EFSADOC00015040). Regarding lymphoma, the authors state "Malignant lymphoma was observed relatively rarely in this investigation with just two male rats and three female rats being affected. There was no indication that the development of lymphoid or lymph node neoplasia was influenced by treatment with the test material in this investigation" (EFSADOC00015069). There was no dose-response relationship observed for malignant lymphoma within the study.

Historically, rats have a low incidence of lymphoma and this is consistently demonstrated in control and dosed rats among the seven (7) rat carcinogenicity studies.[11] No lymphoma was associated with glyphosate in any of the rat studies and any observed low lymphoma incidence was not in a dose dependent manner. Because of the low lymphoma incidence in rats, these studies experimentally establish that there is no association between glyphosate and lymphoma in rats.

<u>Animal Study Summary</u>

Based on the weight of the evidence, it is clear that the lymphomas observed in these studies were not compound related. In general, toxicologists and regulators rely on the primary animal data and evaluation of all study parameters (as discussed above). Identification of a statistically significant finding is only the starting point when evaluating a dose-response relationship between test article administration and an outcome, including evaluating historical control data and the biological significance of the statistically significant finding.  Only one mouse study identified an apparent monotonic dose-response relationship in male CD-1 mice (but not female mice) (Wood et al., 2009). However, the incidence in that study for all groups was within historical controls. This study highlights the usefulness of historical control data when evaluating rodent carcinogenic studies.  A concurrent control study at the facility established that the incidence of lymphoma in the glyphosate study control male mice (zero) was artificially low and by taking into account the incidence of malignant lymphoma in the concurrent study male control animals at the facility, the observed dose response was no longer monotonic, suggesting that the distribution was a product of random chance. Given the historically higher lymphoma incidence in control mice, spurious lymphoma findings in the above mouse studies are not unexpected.

The historical incidence of lymphoma in rats is low. This is evident in the rat studies summarized above.  However, if the incidence of lymphoma in the above rat studies would have been elevated in a dose-dependent manner, there would be more confidence in the strength of the association between glyphosate administration and lymphoma because it would be unusual to see lymphoma

---

[11]   A study performed by Takahashi (1997) cannot be evaluated in the context of the other studies because a study report is not available for review, nor are original pathology tables or detailed study design disclosures available.  While Dr. Portier discusses this study, the limited available information cannot be used to support a causation option.

in rats. However, because no dose-response relationship was observed in the rat studies, there is no reliable evidence that lymphoma is related to the administration of glyphosate in animal bioassays.

Animal Study Evaluation

Full datasets from animal studies have been reviewed by regulatory agencies (e.g., EPA, EFSA). The studies summarized above were included in regulatory evaluation documents, where the carcinogenic potential of glyphosate was evaluated. During EPA review, the regulators did identify additional tumor types of interest other than lymphoma. In mice, EPA identified renal tubular adenomas (males), hemangiosarcomas (males), lung tumors (males), and hemangiomas (females) for further evaluation. In rats, EPA identified testicular interstitial cell tumors (males), pancreatic islet cell tumors (males), hepatocellular tumors (males), thyroid c-cell tumors (males and females), liver adenomas (males), and mammary gland tumors (females) for further evaluation. Following a review of all the available study data, EPA determined that the tumors in the rat and mouse carcinogenicity studies are not related to glyphosate administration "due to lack of pairwise statistical significance, lack of a monotonic dose response, absence of preneoplastic or related non-neoplastic lesions, no evidence of tumor progression, and/or historical control information…" (EPA OPP, 2017).

Worldwide, regulators have not identified any compound-related carcinogenic effects from glyphosate in these studies. Further, the regulators did not identify any concerns with the final findings of the animal studies submitted for glyphosate registration purposes.

Portier[12] attempts to retrospectively re-analyze data from all available studies. During his evaluation, he pooled the data and conducted non-guideline statistical evaluations of the data. In some instances, Dr. Portier selectively applied portions of the available historical control information to the findings and, identifying a significant trend, contradicted the actual study data determined at the time of the bioassay. He pooled tumor data together to strengthen the effects of the tumor incidences, thus muddying the consistency and specificity arms of Hill's criteria. As a toxicologist who has evaluated rodent bioassay data for much of my career, I would note that Dr. Portier's evaluation techniques are not standard or mainstream.

Portier's evaluation is primarily based on observing statistically significant outcomes. Identifying statistically significant findings is a starting point for identifying outcomes that require additional evaluation when establishing a biologically plausible dose-response relationship. Before moving on to further evaluate the biological significance of the findings, it is also important to determine if the statistical findings are due to chance, bias, or confounding (EFSA, 2016). To this point, an article by Crump et al. (2020) evaluated data from ten (10) carcinogenicity bioassays (including many of the studies reviewed by regulators, Dr. Portier, and myself) to evaluate the possibility of false positives in tumor incidences found to be statistically significant. The authors found that the large number of statistical tests performed has not been accounted for and that there is an

---

[12] This applies to his expert report and his 2020 publication, where he discloses that he has been paid for expert testimony in glyphosate litigation.

increased likelihood that observations would "show statistical significance simply by chance" (Crump et al., 2020). Greim et al. (2015) evaluated data from the available animal carcinogenicity studies and failed to identify a carcinogenic effect related to glyphosate dosing.

I have also evaluated the rodent carcinogenicity data for other potential tumors of interest. In all cases, I have not seen findings that suggest to me that glyphosate led to an increase in tumors in either rats or mice. In reaching this conclusion, I have taken into account the same factors that toxicologists and regulators typically take into account in evaluating this sort of data (e.g., historical controls, monotonic dose-response, etc.). I have also failed to observe consistent replication of statistically significant results, even before controlling for multiple comparisons, across studies.  Thus, it is my opinion that the wealth of animal data available does not show glyphosate to be a rodent carcinogen.

In summary, these animal data have been reviewed by EPA and other regulatory agencies and show a consistent lack of compound-related findings for carcinogenic outcomes following daily glyphosate dosing in long term rodent cancer bioassays (i.e., rats and mice). The lack of consistent findings across the studies on tumor types and sex (i.e., few significant findings in female mice), the lack of a specific outcome from daily glyphosate dosing, the statistical significance that was normalized when controlling for multiple comparisons, the high likelihood that any statistically significant tumor incidences were false positives due to the large number of studies in the dataset, the findings even at very high doses, and the overall lack of a dose-response across all studies show that the findings are not compound related. In other words, no statistically significant findings in the data have biological relevance. EPA and other regulatory bodies agree with these conclusions.

**Genetic Toxicity Studies**

Genotoxicity studies are performed on an active ingredient (AI) or formulated product to determine the potential for it to damage the genetic material of cells. In general, damage to the genetic material (e.g., DNA) of cells happens naturally in all of us, but it may also result from external exposures.  The vast majority of DNA damage may be reversible via cellular repair mechanism, a process that occurs daily. Therefore, the fact that genotoxicity occurs (i.e., damage to the genetic material of a cell) does not automatically mean cancer will occur. If damaged genetic material is passed to the next generation of the cell (i.e., daughter cells), this transfer is known as mutagenicity.  Replication errors can and do occur and are also passed to daughter cells naturally, but this does not mean that a tumor will occur.  Mutagenic effects must take place on a portion of the DNA that can develop into cancer. Even when mutagenic events occur, the body has a natural defense mechanism to prevent tumor formation.

Genotoxicity assays to assess mutagenicity on an AI are typically conducted using a battery of assays to evaluate the potential for mutations at different points along the cellular replication process. EPA focused on assays evaluating the genotoxic potential of both glyphosate technical and formulated product in both *in vitro* and *in vivo* assays (EPA, 2017).  The agency evaluated a number of test systems and genetic endpoints in a weight of evidence approach when determining the potential genetic toxicity of glyphosate. EPA placed higher weight on the most reliable study designs, an approach that is both appropriate and called for in the literature (Eastmond, 2017).

One of the studies for evaluating genetic toxicity is the bacterial reverse mutation test (sometimes referred to as the Ames test). This test evaluates substances that can cause point mutations in genes, resulting in base pair substitutions and frameshift mutations. These tests are performed using at least one strain of Salmonella (e.g., *Salmonella typhmurium*) and typically *Escherichia coli*, with and without metabolic activation.  I have had the opportunity to review the bacterial reverse mutation assay data made available to me on assays that have been performed on both glyphosate technical and on glyphosate-based formulations. These data encompass studies that are available in the peer reviewed literature as well as those studies that have been submitted by sponsors to regulatory agencies for registration purposes.   I did not identify a positive finding on the bacterial reverse mutation test data in the studies available to me. There is an overall consistency among the assay data that glyphosate technical and glyphosate formulations are negative in the bacterial reverse mutation test. Likewise, EPA found that glyphosate technical was negative in the presence and absence of metabolic activation in the studies they reviewed and found the same for formulated products. Other regulators that evaluated the data agreed with EPA.

EPA also performed reviews of gene mutations, and *in vitro* and *in vivo* chromosomal abnormalities. EPA gave more weight to assays evaluating mutagenicity directly and indirectly when using *in vivo* assays and less weight to *in vitro* assays (other than the Ames assays). They conclude that "[t]he overall weight of evidence indicates that there is no convincing evidence that glyphosate induces mutations *in vivo* via the oral route." (EPA, 2017). I also come to the same conclusion based on my reviews of regulatory summaries of these data.

Of note, the genetic toxicity testing categories described above are accepted by scientists and regulatory agencies worldwide and are performed using very detailed and stringent guidelines (e.g., OECD guidelines) to ensure results are reliable and replicable.  Studies that do not follow these guidelines are appropriately given little to no weight in the review process. Further, studies assessing primary DNA damage (e.g., the comet assay) are viewed as less relevant because they do not detect the normal cellular repair mechanism (Eastmond, 2017).[13]

**Regulatory**

Regulatory and governmental organizations were tasked with evaluating the potential risk associated with glyphosate use. Most industrialized countries require the registrant to submit a safety dossier for regulatory review before introducing pesticides into the marketplace. Glyphosate is classified as a pesticide and registration approval of the herbicide is required before use. As a part of these safety assessments, these registration eligibility decisions typically evaluate several different exposure scenarios, including exposure from residential use (i.e., handling and post-application), non-occupational bystander indirect exposure, and operator/applicator exposure. These modeled exposures are overly conservative both due to the

---

[13] There have been a handful of genotoxicity studies conducted in the glyphosate-exposed populations in South America (See Paz-y-Mino, 2007, 2011; Bolognesi, 2009). The results of these studies are mixed. However, all of these studies suffer from methodological issues, including unmatched controls, poor study quality, and no internal dose information. Based on these issues, I do not think conclusions can be drawn from their findings and assign them no weight in my evaluation-an assessment also shared by many regulatory authorities.

need to capture sensitive populations and because the models used are often based on characteristics of surrogate chemicals with higher potential exposure due to different reference chemical characteristics. These regulatory models often overestimate both potential exposure and estimated quantitative dose because they are developed to ensure a margin of safety; the purpose of the model is not to quantify exposures or internal doses to a particular individual applying a chemical.

Regulatory authorities also require sponsor-supplied data to support pesticide safety before receiving approval on an eligibility decision.  These types of studies can include toxicological and exposure/dose studies. The Organisation for Economic Co-operation and Development (OECD) publishes guidelines for performing studies according to Good Laboratory Practices (GLP). OECD member countries accept studies performed by these guidelines for regulatory purposes because they harmonize methodologies. These data are used by the regulatory authority to determine safety, evaluate exposure, and calculate risk if the authority determines that a realistic human health hazard exists.

Glyphosate was introduced to the U.S. market in 1974 and was consistently recognized as having no carcinogenic risk to humans by various world-wide health organizations for 40 years. In 2015, the World Health Organization (WHO) International Agency for Research on Cancer (IARC) performed a hazard assessment of glyphosate and determined that glyphosate is probably carcinogenic to humans.  Following this conclusion, other regulatory bodies initiated a re-review of the glyphosate data used to support registration as well as data published in the peer-reviewed literature and performed independent assessments as to the carcinogenic potential of the herbicide. According to the re-evaluations of organizations such as the U.S. EPA, the European Food Safety Authority (EFSA), the European Chemicals Agency (ECHA), the United Nations Joint meeting on Pesticide Residues, Health Canada, The Australian Pesticide and Veterinary Medicine Authority, the New Zealand Environmental Protection Authority, and Japan's Food Safety Commission, no carcinogenic risk for glyphosate was found in humans.

It is important to understand that the assessment performed by IARC and those performed by the various regulatory agencies differed in the endpoints that were evaluated. IARC performed a hazard assessment (i.e., determining whether glyphosate could be carcinogenic at some hypothetical dose), whereas the regulatory agencies performed a hazard assessment in addition to a risk assessment (i.e., evaluating whether or not glyphosate was a human health risk at some dose). Overwhelmingly the regulatory agencies have determined that glyphosate does not represent a carcinogenic risk to humans; however, the regulatory agencies identified other health endpoints for glyphosate. Those agencies have issued requirements that human exposures to glyphosate be held under thresholds established for where non-carcinogenic health effects were observed; these thresholds are subject to a margin of safety. The lowest of the dose thresholds set by a regulatory agency who performed a risk assessment on glyphosate is the European Union Acceptable Operator Exposure Level AOEL (at 0.1 mg/kg/day) (Tarazona et al., 2017). Health Canada PMRA established an ADI of 0.3 mg/kg bw/day and, accounting for 20% oral absorption as identified by EFSA, is normalized to 0.06 mg/kg bw/day (Solomon, 2020). No study was identified with reported biomonitoring data that suggests measured human doses in a variety of exposure scenarios have exceeded the 0.06 mg/kg/day threshold (Solomon, 2020).

**Ms. Lorraine Rehak**

The current case involves Ms. Lorraine Rehak, a resident of the State of Illinois.  Ms. Rehak claims that exposure to RoundUp resulted in her non-Hodgkin's lymphoma (follicular) diagnosed in 2014. Ms. Rehak claims that she was exposed to glyphosate from alleged RoundUp application during occupational use and as a bystander during residential use.

**Retrospective Dose Modeling**

Models can be used to estimate dose following an alleged RoundUp exposure. The models used in this dose reconstruction are from the American Industrial Hygiene Association text Mathematical Models for Estimating Occupational Exposure to Chemicals, 2nd edition. These daily dose model equations are established methods for modeling dermal exposures to substances and have been accepted by industrial hygienists.

The following equations can be used to estimate dermal dose per use when mixing/loading or applying.

Calculating dermal dose per use:

$$Dose\left(\frac{mg}{kg}\right) = \frac{SA * T * Kp * C}{BW} \qquad (Equation\ 1)$$

Where:

- Dose = dose of glyphosate in mg/kg
- SA = Skin surface area exposed during RoundUp Application in cm$^2$
- T = Duration of exposure in hours
- C[14] = Concentration of glyphosate in liquid formulation in mg/cm$^3$
- K$_p$ = Dermal permeability of glyphosate over surface area in cm/hr
- BW = Body weight in kg

**Application of Exposure Variables to Average Daily Dose**

In addition to calculating a daily dose, one can also calculate an average daily dose by multiplying the daily dose by the number of days applied and dividing that figure by the number of days over the application period. See Equation 2.

Calculating an average daily dose:

$$ADD\left(\frac{mg}{kg-day}\right) = \frac{DAevent * EV * ED * EF * SA}{BW * AT} \qquad (Equation\ 2)$$

---

[14] Note: 1 cm$^3$ = 1 mL

Where:

- ADD = Average daily dermal absorbed dose of glyphosate in mg/kg-day
- $DA_{event}$ = Absorbed dose per event in mg/cm$^2$-event
- EV = Event frequency in events per day
- ED = Exposure duration in years
- EF = Exposure frequency in days/year
- SA = Skin surface area exposed during RoundUp Application in cm$^2$
- AT = Averaging time in days
- BW = Body weight in kg

$DA_{event}$ is the dermal absorbed dose rate per event for an aqueous vehicle. It requires the concentration of the chemical in water, the dermal permeability of the chemical over a skin surface area (experimentally derived), and the amount of contact time with the substance. This equation can be used with highly ionized organic chemicals (RAGS E, 2007).

$$DA\ event = Kp * C * \text{Tevent} \hspace{2cm} (Equation\ 3)$$

Where:

- $DA_{event}$ = Absorbed dose per event in mg/cm$^2$-event
- C = Concentration of glyphosate in liquid formulation in mg/mL
- $K_p$ = Dermal permeability of glyphosate over surface area in cm/hr
- $T_{event}$ = Duration of exposure in hours

For Ms. Rehak, a conservative number of days and hours reported, and surface area for each type of handling event (e.g., occupational application) will be used as inputs to calculate dose.

**RoundUp Product**

At deposition, Ms. Rehak claims that she applied a formulated product made by a technician at ChemLawn (Depo. Pg. 153, 1-6). Because Ms. Rehak was not personally mixing the product, there is uncertainty as to the actual product that she applied and if what she applied was actually a Roundup product. Similarly, she was unsure how often she applied what she believed was a RoundUp product.

The RoundUp original concentrate formulation was available for commercial use during the time Ms. Rehak claims that she was exposed during occasional occupational use. RoundUp concentrate is a 41% glyphosate isopropylamine salt formulation, containing 356 grams (g) of glyphosate acid (GA) per liter (L). One (1) gram per liter (g/L) is equal to one (1) milligram per milliliter (mg/mL), therefore 356 g/L = 356 mg/mL.

Ms. Rehak does not know the exact mixing ratio used by her employer during formulation. I will conservatively assume that they made a 5% solution.[15] A 5% formulation is prepared by adding 6.5 ounces of RoundUp concentrate to one (1) gallon of water. One (1) ounce is approximately 29.5 mL, so 6.5 ounces is 191.75 mL. Equation 4 shows the conversion of the weight of the GA in one mL of concentrate times 191.75 mL, the number of mL in 6.5 ounces.

$$\frac{356 \ mg \ GA}{1 \ mL} \times 191.75 \ mL \ = \ \mathbf{68,263 \ mg} \ of \ GA \ in \ 6.5 \ ounces \ of \ concentrate \qquad (Equation \ 4)$$

There are 3,785 mL in one gallon (i.e., 128 ounces). To determine the amount of milligrams of GA per mL of formulation, the total weight of the GA (in mg) is divided by the total number of mL in one gallon of water (i.e., 3,785 mL). See Equation 5.

$$\frac{38,263 \ mg}{3,785 \ mL \ water} \ \cong \ \frac{18 \ mg \ GA}{1 \ milliliter \ water} \qquad (Equation \ 5)$$

The conversion for Ms. Rehak calculates to 18 milligrams of glyphosate acid per milliliter of formulation.

<u>Ms. Rehak's Occupation</u>

Ms. Rehak alleges that she had RoundUp exposure at the following employer:

- ChemLawn (1983-1989) (Depo. Pg. 55, 14-17)[16]

She worked customer service and sales at ChemLawn (Depo. Pg. 144, 13-16). She testified to working at a number of other employers, including in accounts payable at Spiegel, an office manager at Development Identities, a cashier at a Shell gas station, a sales representative at Victoria Beauty systems, and at Greater Suburban Acceptance Corporation finance company (Depo. Pgs. 55, 10-17; 62, 1-5). She does not believe that she was exposed to chemicals in any other jobs (Depo. Pg. 67, 18-21).

**Rehak Occupational Use**

From 1983-1989, Ms. Rehak alleged that she was exposed to RoundUp while accompanying ChemLawn residential applicators during a ride-along.  However, based on testimony, there is information lacking for her alleged application. For example, she does not provide a mixing ratio for the product she applied and there are no details for the exact product she applied during a ride-along.

Ms. Rehak was required to accompany an applicator two (2) to three (3) times during the season (February to November or December) so that she understood the business (Depo. Pgs. 148, 7-17; 150, 10-13).  A ChemLawn technician would mix the product before it was used during the day (Depo. Pg. 153, 1-6).  Because she did not personally prepare the product, it is not clear that RoundUp was actually used and/or the ratio of active ingredients for any products she used during

---

[15] The RoundUp concentrate label allows for formulation for a spray solution ranging from 0.5% to 10%.
[16] Unless otherwise stated, all deposition (depo.) references in this report are to Ms. Lorraine Rehak's November 22, 2019 deposition.

her ride-along with an applicator/driver. The applicator/driver reportedly prepared the RoundUp with concentrate that was stored on the ChemLawn site and the applicator/driver filled one gallon hand pumps for use during the application day (Depo. Pgs. 151, 11-24; 152, 1-4; 153, 22-24; 154, 1-2). For residential applications during her ride-along, she would sometimes apply fertilizer whereas others she would spot spray the weeds (Depo. Pg. 155, 7-13).

<u>Protective Barriers</u>

Ms. Rehak wore long pants and shoes when applying product during a ride-along (Depo. Pg. 160, 14-16). She denied wearing coveralls, rubber boots, gloves, and goggles (Depo. Pgs. 158, 3-24; 159, 1).

<u>Application</u>

According to Ms. Rehak, a ride-along would typically last at least eight (8) hours and each yard application was an average of twenty (20) minutes (Depo. Pgs. 157, 11-16; 161, 9-15). She claims that the applicator-accompanied ride-along was the only time she sprayed RoundUp during her ChemLawn employment (Depo. Pg. 157, 17-20). At one point Ms. Rehak testified that RoundUp did not spill on her during the ride-along, but then later contradicted herself and claimed that the product would get on her hands in the form of drips on the bottle, over drip, and drips on the wand (Depo. Pgs. 155, 4-6; 160, 2-6). Her residential property application would depend on the number of weeds, where they were (e.g., cement area), and if any weeds were actually present (Depo. Pg. 161, 16-24).

**Rehak Residential Exposure**

Ms. Rehak alleges that she had RoundUp exposure at the following places of residence (including the years she lived at those locations):

-                                             (approximately 1980 to 1990) (Depo. Pg. 13).
-                                             (2010 to 2019) (Depo. Pg. 17)

She has lived at other addresses in Illinois but claims that she was not exposed to RoundUp at those locations. Ms. Rehak testified that she never applied RoundUp to a residential property outside of her work for ChemLawn (Depo. Pg. 98, 6-9).

<u>509 McCarthy Road</u>

Ms. Rehak testified that she did not apply RoundUp at this location.  She alleges that she was indirectly exposed to RoundUp at the location during the times her boyfriend (Mr. Lyle McGinn) applied at this residence. She testified that Mr. McGinn also worked for ChemLawn and would use the commercial grade concentrate product for the residence (Depo. Pg. 100, 5-10).  She does not know if he used full strength or diluted RoundUp and does not know the formulation mixing ratio he made (Depo. Pgs. 118, 2-6; 143, 3-7).

Ms. Rehak claims that Mr. McGinn applied weekly during the growing season (March through November) and that he sprayed along the alley, the cement areas where weeds would come through, in the front of the house near railroad ties, and spot spray weeds in the lawn (Depo. Pgs.

104, 4-6; 106, 8-23). RoundUp application would be via a one-gallon hand pump sprayer with an attached wand (Depo. Pgs. 99, 16-24; 100, 1). The application frequency would slow in the fall (after September) (Depo. Pg. 116, 1-9).  Because she did not personally apply, she did not know how many gallon containers of RoundUp Mr. McGinn used on a monthly or yearly basis (Depo. Pgs. 104, 22-24; 105, 1-2). See Photo 1 for a representative depiction of                    in the month of April.



Photo #1: Google earth image of                    in April 2013.

Ms. Rehak was very clear that she herself did not spray Roundup at any point at any residences. Ms. Rehak testified that it would take Mr. McGinn one half hour to spray at the residence, sometimes less and sometimes more than one-half hour (Depo. Pg. 141, 16-22). During application she claims that she was within a 50-foot radius of Mr. McGinn's RoundUp application and was as close as ten (10) feet away (Depo. Pg. 111, 12-14). She estimated that she was present in the yard 85% of the time when Mr. McGinn was applying RoundUp (Depo. Pgs. 110, 22-24; 111, 1-2), although she did not indicate how often she was near his application area.

Her testimony as to how close Mr. McGinn was to her was contradictory. At one point she testified that Mr. McGinn was as close as (10) feet to her. However, she testified later on that Mr. McGinn was right next to her (Depo. Pgs. 111, 12-14; 112, 5-8). She would wear shorts with no shoes in her back yard during the growing season. She claims that RoundUp was on her hands, legs, and feet from bystander exposure during Mr. McGinn's application (Depo. Pg. 115). She testified that she could feel spray on her hands or feet when Mr. McGinn was applying (Depo. Pg. 112, 14-18). She did not provide a frequency for which she was exposed to the spray.

Ms. Rehak clearly stated that she did not spray RoundUp at this location. Her claim is that she was indirectly exposed to RoundUp at the location during the times her landlord or her landlord's husband (Teri and John Frattini) applied. She claims that she was in the vicinity when application occurred at this residence during the times she was either swimming or sunbathing (Depo. Pgs. 118, 16-24; 119, 1-3). She claims that they applied RoundUp at this location at least monthly (Depo. Pg. 119, 14-17).  Because she was barefoot, she may have walked on weeds that had been sprayed, but that she did not contact any mist from application (Depo. Pg. 119, 4-17; 126, 4-15).

RoundUp was applied to the gravel driveway, targeted cement areas in the back yard (e.g., crack and crevice), and a mulch area (Depo. Pgs. 121, 23-24; 122, 1; 125, 2-11; 127, 24; 131, 3-5). She claims that the property was sprayed during the growing season and that she believes she stepped on wet RoundUp twice per month (Depo. Pg. 128, 9-17).  See Photos 2 and 3 for the appearance of the property in March 2013 and July 2012, during the times Ms. Rehak testified to living at the residence.



Photo #2: Google Earth image of                          April 2, 2013.



Photo #3: Google street view image of                    July 2012.

## Assessment of Ms. Rehak's Other Exposures

Ms. Rehak testified that Mr. McGinn used fertilizer at the                    residence, but that she did not know what type (Depo. Pg. 110, 17-21). She has previously used wasp spray (Depo. Pgs. 136, 23-24; 137, 1). She testified that ChemLawn used diazinon and that, to her recollection, she was not in the presence of anyone at ChemLawn applying it (Depo. Pgs. 134, 7-10; 165, 6-8). Diazinon is an EPA restricted use pesticide and is classified as an IARC Group 2A carcinogen.

Ms. Rehak is currently a smoker and has been since she was 18 (i.e., 40 years) and smokes 10 cigarettes to one pack of cigarettes a day, but she does not smoke more than one pack a day (Depo. Pgs. 11, 17; 199,1-6; 200, 11-14). She rolls her own cigarettes using a pipe tobacco named "The Good Stuff" (Depo. Pg. 200, 15-21). She also testified to marijuana use within the last five (5) years (Depo. Pg. 214, 5-7).[17]

---

[17] She also testified to trying and using cocaine in the 1980s (Depo. Pg. 214, 18-24).

Because Ms. Rehak is a smoker, it is important to note that cigarette smoke contains carcinogens, including aldehydes, aromatic amines, benzene, 1,3-butadiene, ethylene oxide, N-nitrosamines, and polycyclic aromatic hydrocarbons (PAHs).[18]   These exposures to carcinogens are relevant when evaluating the dose arm of Hill's causal criteria.

My opinion on the cause of Ms. Rehak's cancer is limited to noting that it does not appear based on the evidence available to me that glyphosate can cause cancer in humans. With regard to Ms. Rehak's glyphosate exposure, a full evaluation of other potential co-exposures would be necessary.  Failure to account for potential doses of other chemicals associated with NHL or other cancers would represent an incomplete toxicological evaluation as to the specific cause of Ms. Rehak's cancer.

<u>Ms. Rehak's Family Health history</u>

Below is a summary of Ms. Rehak's maternal, paternal, sibling, and family history of cancer.

- Father: Liver and pancreatic cancer (Depo. Pg. 201, 16-18)
  - Aunt: Breast cancer (Depo. Pg. 222, 22)
  - Grandmother: stomach cancer (Depo. Pg. 223, 1)
- Mother: Alive, no reported cancer history
  - Aunt: Colon cancer (Depo. Pg. 222, 21)
- Sister: Graves' disease and thyroid cancer (Depo. Pg. 219, 4-7)

<u>Rehak Dose Modeling</u>

Ms. Rehak testified that she directly applied RoundUp on occasion as part of her position with ChemLawn.  She provided information on the protective barriers she was wearing (e.g., long pants) and the typical duration of application. She allegedly applied a formulated product prepared at the ChemLawn facility by a technician using a RoundUp concentrate.  An uncertainty exists in the fact that she did not know the concentration of the product she applied or how often she actually applied RoundUp.  I will conservatively estimate that she applied a 5% formulation for her occupational dose modeling.[19] I will also assume for modeling that her RoundUp application was continuous spray, which likely is an overestimate of her exposure. Her occupational dermal exposure dose assessment will factor in a clothing protection factor for potential areas of exposed skin, based on testimony.  Data from observational studies will be used to factor in clothing protection factors.

Ms. Rehak also claims that she was exposed to RoundUp at two residences (                               ,                                             Based on her provided exposure scenario, she would be classified as a bystander and her exposure, if any, would be indirect and secondary to the actual application, including any potential inhalation.  There are a number of uncertainties that

---

[18] How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A Report of the Surgeon General.
https://www.ncbi.nlm.nih.gov/books/NBK53010/#targetText=In%20summary%2C%20cigarette%20smoke%20contains,and%20levels%20in%20cigarette%20smoke.
[19] Typically, preformulated products are a 2% glyphosate solution.

accompany bystander exposure. One would be the concentration of the glyphosate in the product used. Ms. Rehak testified that she did not know whether or not Mr. McGinn used a full strength or diluted product at the                                   Another unknown is the potential amount of time Ms. Rehak contacted any material through an indirect exposure and the surface area of the skin that may have been impacted. Another unknown is whether she was upwind or downwind of the RoundUp application.

Because her occupational exposure was direct, it would have been a more consistent exposure scenario. Any dose that she may have received from residential indirect, secondary exposure would have been less than the dose she may have received from primary exposure (i.e., applying herself). Therefore, only her occupational dose will be modeled.

Ms. Rehak Equation 1 inputs- Table 1 (Appendix C)

| Use Condition | Skin Surface Area (cm$^2$) | Dermal Permeability (cm/hr)[B] | Concentration in Solution (mg/cm$^{3)}$ | Time per Event (hours) | Body Weight (kg)[E] |
|---|---|---|---|---|---|
| Occupational | | | | | |
| Application | 380[A] | 5.90x10$^{-6}$ | 18[C] | 0.33[D] | 55 |

- A = The surface area that will be included in the application dose assessment is the front half of the lower legs, ¼ of the thighs (front lower halves), and the top half of the feet. One quarter of one hand will also be included because Ms. Rehak testified to getting formulated product on her hand during application. The lower legs are areas that have been shown to receive the majority of exposure when applying (see Lavy 1992 and Johnson 2005). A clothing protection factor of 90% was used for exposure reduction on the feet and legs (See Johnson et al., 2005; EFSA, 2014, Espahnol-Soares et al., 2013). The mean surface areas of these body parts were obtained from the U. S. EPA Exposure Factors Handbook (2011) for females, Table 7-13.
- B = Dermal permeability experimentally derived from Nielsen et al., 2009.
- C = Based on the concentration of a formulated mixture made with RoundUp concentrate, conservatively assuming a 5% solution. See Equation 5.
- D = Ms. Rehak reportedly used the product at ChemLawn and that she spent 20 minutes applying (20 min/60 min=0.33 hour).
- E = Ms. Rehak's weight in kilograms during time of employment with ChemLawn from her deposition.

<u>Rehak Application of Exposure Variables to Dose per Use</u>

Applying these variables in Equation 1, it is estimated that Ms. Rehak absorbed the following:

- 0.00024 mg/kg during each occupational RoundUp application[20]

<u>Rehak Dermal Dose per Use</u>

Based on the calculations in Table 1 (Appendix C), the dose of glyphosate acid that Ms. Rehak encountered when using the RoundUp during occupational use was **0.0029 mg/kg (0.16 mg/day)**. This estimated exposure falls within the range of previously reported studies for similar activities (See Solomon, 2016 and Acquavella et al., 2004).

Ms. Rehak Equation 2 and 3 inputs-Table 2 (Appendix C)

---

[20] Assuming that she applied Roundup at 12 houses in one day (see Table 2 inputs below), her aggregate dose per use would be 0.00024 mg/kg X 12 houses = 0.0029 mg/kg (0.16 mg/day).

| Use Condition | Event Frequency (event/day)[A] | Exposure Frequency (days/year) | Exposure Duration (Years)[C] | Averaging time (days)[D] | DA$_{event}$[E] |
|---|---|---|---|---|---|
| Residential | | | | | |
| Application | 12 | 3[B] | 7 | 2,557 | 3.5E-05 |

- A = Ms. Rehak testified to spending at least 8 hours (480 minutes) per ride-along (Depo. Pg. 157, 11-16) for an average of 20 minutes applying per residence (Depo. Pg. 161, 9-15). Assuming that no time was spent driving between locations for a maximum number of locations, 480 minutes/20 minutes = 24 residences. I will conservatively assume she applied RoundUp to half the yards (i.e., 12).[21]
- B = Ms. Rehak did a ride-along two (2) to three (3) times per year.
- C = Ms. Rehak testified to applying from 1983 to 1989 (i.e., her time at ChemLawn).
- D = Number of days in 7 years, including leap years.
- E = DAevent calculated using Equation 3.

Rehak Application of Exposure Variables to Average Daily Dose

Applying these variables in Equations 2 and 3 in Table 2 (Appendix C), it is estimated that Ms. Rehak's average daily dose (ADD) was **0.000024 mg/kg-day (0.0013 mg/day).**

**Comparison to Regulatory Dose Levels**

There are established thresholds for doses which can be used to evaluate Ms. Rehak's doses. The European Food Safety Authority (EFSA) established an acceptable operator exposure level (AOEL) of 0.1 mg/kg and an acceptable daily intake (ADI) of 0.5 mg/kg (EFSA, 2015). The U.S. EPA has proposed a chronic daily glyphosate reference dose (R$_f$D) of 1.0 mg/kg bw/day (Solomon, 2020). California has established a no significant risk level (NSRL) of 1.1 mg/day. Ms. Rehak's aggregate dose per use was calculated at 0.0029 mg/kg (0.16 mg/day). Her average daily dose was calculated at 0.000024 mg/kg/day (0.0013 mg/day). All calculated values are well below the ADI, the AOEL, the R$_f$D, the normalized Health Canada ADI, and the Cal NSRL respectively. For context, the maximum dose administered in the chronic rodent feeding studies of glyphosate was approximately 5,000 mg/kg/day. Using a 20% absorption via the GI tract as determined by EFSA and others, the dose administered to rodents in the high dose study was over one million times higher (See EFSA, 2015; Colvin, 1973). Those rodents received that dose every day of their lives (EPA, 2017; Solomon, 2016).

Because of the COVID-19 pandemic, I have been unable to perform a site assessment at Ms. Rehak's former residences. I reserve the right to amend this report based on additional information provided to me and/or new information made available.

---

[21] Ms. Rehak testified that some lawns would have no weeds at all (Depo. Pg. 155, 14-19). Based on the information she supplied, I am conservatively estimating that she applied at half the lawns she treated on a day.

**Response to Plaintiff Experts**

**Quantification of Exposure**

Dr. Schiff provides a basic summary of Ms. Rehak's exposure information and, based on her testimony, concludes that she had extensive exposure to RoundUp. As discuss earlier, exposure and dose are not the same thing. Here, Dr. Schiff fails to quantify a retrospective dose for Ms. Rehak.  Without such a calculation one cannot argue that the dose for Ms. Rehak ever reached a level of toxicological significance and fails to meet the dose-response prong of Hill's Causal Criteria. No other expert has submitted an exposure opinion in this case.

Alex LeBeau, PhD, MPH, CIH

# Appendix A



# Alex Lance LeBeau, PhD, MPH, CIH

Exposure Assessment Consulting, LLC

## EDUCATION

PhD, Toxicology and Risk Assessment, Univ. of South Florida, Tampa, Florida, 2012
MPH, Master of Public Health, Toxicology and Risk Assessment, Univ. of South Florida, Tampa, Florida, 2007
BS, Animal Science, Univ. of Florida, Gainesville, Florida, 2001

## CERTIFICATIONS & LICENSES

- Certified Industrial Hygienist, American Board of Industrial Hygiene, Certification No. CP 11576
- Licensed Mold Assessor, Florida Department of Business and Professional Regulation, No. MRSA2697

## PROFESSIONAL EXPERIENCE

I am the owner of Exposure Assessment Consulting, LLC in Orlando, FL, where I offer toxicology, industrial hygiene, risk assessment, and public health consulting services. During my thirteen-year career, I have evaluated environmental and occupational exposures and have performed toxicological evaluations of chemicals and biological agents. I have performed human health risk assessments of contaminated sites using U.S. EPA and state regulatory guidelines and have monitored remediation activities at those sites. In order to evaluate exposure impacts on building occupants, I have performed indoor environmental quality assessments, including *Legionella* and water quality assessments, at healthcare, residential, commercial, and industrial facilities. I have been retained as an expert witness and have provided consultation on several occupational and environmental exposure claims. Finally, I have authored safety assessments on consumer products, including antimicrobial pesticide registration dossiers, Generally Recognized as Safe (GRAS) determinations for food ingredients following U.S. FDA regulations for scientific procedures, and submitted a health claim petition to the FDA that was successfully accepted by the agency.

## INDUSTRIAL HYGIENE & TOXICOLOGY

- Evaluation of glyphosate-containing herbicide exposure claims from alleged historical use resulting in the development of cancer. Assessment included calculation of a retrospective dose for the active ingredient, evaluation of the passive dosimetry and biomonitoring dataset, and review of regulatory documents and thresholds in order to evaluate risk.
- Assessment of Legionnaires' Disease claims involving alleged exposures at various types of facilities (e.g., hotels, healthcare facilities, multifamily residences, wellness centers, and government facilities). Facility water risk assessments, evaluation of water quality, and identification of potential sources of exposure were performed.
- Evaluation of SARS-CoV-2 and associated COVID-19 impacts on buildings occupants and on the indoor environment.
- Consulting on exposure claims involving the following substances and biological agents: carbon monoxide, sulfur gases, polyvinyl chloride, dietary supplement ingredients, fracking chemicals and constituents, polyurethane spray foam insulation, industrial cleaning chemicals, coal ash, mold, and heavy metals.

- Toxicological reviews of various substances including methanol, para-tertiary-octylphenol, total petroleum hydrocarbons, volatile organic carbons (VOCs), polychlorinated biphenys (PCBs), polycyclic aromatic hydrocarbons (PAHs), creosote, proprietary industrial solvents, pesticides, silica, taconite, and particulate matter.
- Toxicology evaluation and support related to methyl cyclohexanone (MCH), 4 methylcyclohexanemethanol (MCHM), and co-occurring chemicals following a substantial release into a river used as a drinking water source in Charleston, WV. Additionally, calculated a site-specific drinking water standard for the methanol that was reported to have been released in the mixture. Assisted with making recommendations to relevant stakeholders and provided follow-up risk assessment and toxicology support.
- United States Environmental Protection Agency (USEPA) Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) regulatory compliance and registration support to companies with products that were making unsupported antimicrobial claims on product labels. Evaluated each company's liability in such a circumstance. Compliance support included working directly with agency regulators to resolve compliance and registration issues.
- Health Canada Pesticide Management Regulatory Agency (PMRA) regulatory compliance and registration support for a novel antimicrobial product distributed by an international client. Performed an extensive toxicological review of the active ingredients and break-down products and provided a written review of the potential health concerns associated with exposure. Prepared a registration application for submission to the regulatory agency and had direct interaction with the regulator during follow-up discussions.
- Composiiton of Generally Recognized as Safe (GRAS) safety dossiers for food ingredients and animal feed ingredients following FDA scienitific procedures rules.
- Indoor air quality evaluations at single family and multi-family residential buildings constructed with defective, imported drywall (i.e., Chinese drywall) across the southern united States. Indoor air of homes constructed with defective drywall was sampled and analyzed for reduced sulfur gases. Analytical results were evaluated to determine residential receptor exposures to gases released from the drywall and any risk associated with potential overexposures to reduced sulfur gases. Reports were composed for property owners explaining the results from sampling in their homes.
- Ambient air quality monitoring at former manufacturing facility that used beryllium to create precision machine parts in Sarasota, FL. During demolition of the facility, ambient air was monitored for beryllium, particulate matter, VOCs (using both photoionization detectors [PIDs] and summa canisters), and asbestos. Employee monitoring using personal sampling pumps and passive dosimeters was also performed. Data were evaluated to determine occupational and community exposures. Weekly reports were prepared for the client summarizing the monitoring activities and evaluated any potential negative impacts to a receptor's health.
- Bioaerosol indoor air quality assessments at health care facilities and commercial facilities across the United States. Evaluation of patient and employee exposures, risk mitigation, and remediation oversight.
- Occupational exposure monitoring at commercial and industrial facilities, including breathing zone sampling for exposures to chemicals and substances, evaluation of particulates, indoor air quality evaluations, noise monitoring and dosimetry, and evaluation of the impacts of the exposures.
- Composition and submission of an oleic acid health claim petition to FDA and successful qualified health claim status determined by the agency establishing that consumption of oleic acid reduces the risk of coronary heart disease.

- Extensive review of relevant toxicity information for an analysis of livestock exposures to xylenes related to a petroleum condensate release in Texas. This included evaluation of groundwater sample data collected from the site and the derivation of a safe exposure level that would be protective of livestock receptors.
- Model occupational and residential receptor exposures using environmental exposure data in relevant media for sites in the midwestern United States. This ultimately allowed for hazard analysis and facilitated the ability to communicate potential risks to stakeholders.
- Toxicity studies oversight at contract research organizations (CROs) to evaluate the safety of food ingredients.
- Evaluate client provided data and publicly available information to evaluate the safety of chemical constituents used in food contact surfaces.

## RISK ASSESSMENT

- Risk-based exposure/clean-up limits for occupational/industrial and residential receptors using site-specific exposure parameters and performed subsequent risk assessments following federal and state methodologies. Recommended risk management conclusions and safe practices to be implemented during remediation activities at former industrial facilities.
- Lead exposure limit derivation for residential receptors in close proximity to former industrial facilities. Analysis included determining site-specific lead bioavailability and calculating an exposure limit using biokinetic modeling.
- Hazard analysis to evaluate the potential for health effects associated with creosote and particulate matter originating from a railroad tunnel fire as it related to worker and residential exposures.
- Vapor intrusion assessment at a diesel spill near a commercial building. Modeling was performed to determine the indoor air concentrations that may be associated with residual product under the building. Additionally, occupant exposures were subsequently assessed via air sampling to validate the model's results.
- Air monitoring data evaluation from a crude oil pipeline release. Benzene and other volatile organic compounds (VOCs) were the constituents of concern (COCs) at the site. Continuous ambient air monitoring ensured the safety and health of both workers conducting remediation activities and residents in a nearby community were not adversely impacted. Data were analyzed and risks were communicated daily to stakeholders.
- Human health risk assessment for a Superfund site impacted with polychlorinated biphenyls (PCBs). The assessment was performed in accordance with USEPA guidance and augmented with state-specific exposure parameters.
- Assessed the risk associated with residual mercury found in the soles of select imported sneakers. This included a human health risk assessment and an evaluation of impacts to a landfill's total mercury content following used sneaker disposal.
- Composed a risk assessment for contaminated food products and evaluated the impact that the product may have on potential consumers, including evaluation of the product recall threshold.
- Evaluated adverse event reports in publicly available literature and determined the impact these reports may have on a food manufacturer.

## WORK HISTORY

| | |
|---|---|
| Current | Exposure Assessment Consulting, LLC, Orlando, FL |
| 2017-2019 | Forensic Analytical Consulting Services, Orlando, FL |
| 2015-2017 | Burdock Group Consultants, Orlando, FL |
| 2013-2015 | Conestoga-Rovers and Associates (now GHD), Dallas, TX |
| 2008-2013 | ENVIRON International Corporation (now Ramboll), Tampa, FL |
| 2007-2008 | Independent Consultant, Tampa, FL |

## PROFESSIONAL AFFILIATIONS & HONORS

American Industrial Hygiene Association (AIHA):  Member
- 2020 Secretary: AIHA Indoor Environmental Quality Committee
- AIHA Legionella Body of Knowledge Committee
- 2014 AIHA Future Leaders Institute, AIHA, Washington, D.C

American Industrial Hygiene Association, Florida Chapter: Member (2009-2012, 2017-Present)
- 2009-2012:   Professional Development Coordinator

Society of Toxicology: Member

American Board of Industrial Hygiene (ABIH): Member

Roundtable of Toxicology Consultints: Member

American Conference of Governmental Industrial Hygienists (ACGIH): Member
- Bioaerosol Committee: Member candidate

## UNIVERSITY AFFILIATION

University of South Florida College of Public Health: Affiliate Assistant Professor

## PUBLICATIONS

Burton, N., Clancy, J., Esswein, E., Greeson, N., Jaeger, D., Krause, D., Lamson, G., LeBeau, A., Rice, J., Rottersman, R., Springston, J. Technical Framework: Legionella. AIHA, 2020.

LeBeau, A. Sutherland, D., Bourgeois, M., Driver, J., Harbison, R. Examination of Urinary Chlorpyrifos Biomarker Concentrations and Heart Rate in a Sample of US Children and Adolescents. *Occupational Diseases and Environmental Medicine*, 2020 (8): 163-174.

LeBeau, A. Nonahood Businesses and COVID-19: Practical Methods for Addressing Employee and Customer Safety. *Nonahood News*, October 2020.

LeBeau, A.  Addressing SARS-CoV-2 (COVID-19) Exposure Risk Using Engineering Controls. EHS Daily Advisor: https://ehsdailyadvisor.blr.com/2020/08/addressing-sars-cov-2-covid-19-exposure-risk-using-engineering-controls/ Published August 5, 2020.

AIHA Guidance Docunet: Effective and Safe  Practices, Guidance for  Custodians, Cleaning, and Maintenance Staff (Co-Author). https://aiha-assets.sfo2.digitaloceanspaces.com/AIHA/resources/Guidance-Documents/Effective-and-Safe-Practices-Guidance-for-Custodians-Cleaning-and-Maintenance-Staff-Guidance-Document.pdf  AIHA, 2020.

Krause, D., Marcham, C.,  Springston, J., LeBeau, A., Rottersman, R., Froehlig, T., McCaslin, G. Guidance Document: Workplace cleaning for COVID-19. AIHA, 2020. https://aiha-assets.sfo2.digitaloceanspaces.com/AIHA/resources/Guidance-Documents/Workplace-Cleaning-for-COVID-19-Guidance-Document_FINAL.pdf

Krause, D., Marcham, C.,  Springston, J., LeBeau, A., Rottersman, R., Froehlig, T., Ashley, B. Guidance Document: Recovering from COVID-19 Building Closures. AIHA, 2020. https://aiha-assets.sfo2.digitaloceanspaces.com/AIHA/resources/Public-Resources/RecoveringFromCOVID-19BuildingClosures_GuidanceDocument.FINAL.pdf

Bourgeois, M., S Saji, S Jones, G Johnson, A LeBeau, and R Harbison. Serum Levels of Per- and Polyfluoroalkyl Compounds among the General Population. *Toxicologist*, 2020

LeBeau, A., Matulka, R., Comstock, B. Safety evaluation of a milk-based protein powder produced by a novel manufacturing technique. *Food Chem Toxicol*, 2017 (103): 86-101. Corrigendum: Food ChemToxicol .2017 Oct;108(Pt A):351.

Dolan, L.C., Matulka, R.A., LeBeau, A.L., Boulet, J.M. Two new nontoxic, non-pathogenic strains of *Sphingomonas elodea* for gellan gum production. *Regul Toxicol Pharmacol*, 2016 (78):37-44.

LeBeau, A. L. Insects as protein replacements. *Nutraceutical Business Review*, 2016. http://www.nutraceuticalbusinessreview.com/news/article_page/Insects_as_protein_replacements/114705

LeBeau, A.L., Matulka, R. A. Ingredient Identification in the Time of FSMA. *Nutritional Outlook*. November 2015. http://www.nutritionaloutlook.com/trends-business/FSMA/1511

LeBeau, A.  A Comparison of Ambient Air BTEX Concentrations between Two Counties with Active Petroleum Wells. *Toxicologist*, 2015.

LeBeau, A., Pawlisz, A., Public Health Concerns Surrounding Fine Particulate Matter Generated from Hydraulic Fracturing. *Toxicologist*, 2014

LeBeau, A.L., Johnson, G.T., McCluskey, J.D., Harbison, R.D. Evaluation of Urinary Pesticide Biomarkers among a Sample of the Population in the United States. *J Clinic Toxicol*, 2012: S5:003.

LeBeau, A., Johnson, G., McCluskey, J., and Harbison, R. Evaluation of Urinary Pesticide Biomarkers among Children and Adolescents. *Toxicologist*, 2012

LeBeau, A., Johnson, G., McCluskey, J., and Harbison, R. Evaluation of Urinary Pesticide Biomarkers among Residents of the United States. *Toxicologist*, 2010

LeBeau, A., Gauthier, T., Poole, J., and DeMott, R. Determination of Reduced Sulfur Gases in Construction Materials. Technical Symposium on Corrosive Imported Drywall, 2009 http://www.drywallsymposium.com/blind/posters.html

## BOOK CHAPTERS

LeBeau, A. Manganese.  *Hamilton and Hardy's Industrial Toxicology* (Harbison, R.D., Bourgeois, M.M., and Johnson, G.T. Eds.), Sixth Edition. John Wiley and Sons, Inc., New Jersey, 2015: pp 149-156.

LeBeau, A. Platinum Group Elements.  *Hamilton and Hardy's Industrial Toxicology* (Harbison, R.D., Bourgeois, M.M., and Johnson, G.T. Eds.), Sixth Edition. John Wiley and Sons, Inc., New Jersey, 2015: pp 187-192.

LeBeau, A. Platinum.  *Hamilton and Hardy's Industrial Toxicology* (Harbison, R.D., Bourgeois, M.M., and Johnson, G.T. Eds.), Sixth Edition. John Wiley and Sons, Inc., New Jersey, 2015: pp 193-198.

## PRESENTATIONS

Furnaces North America 2020: COVID-19: An Update on Transmission, Control Methods, and Risk Communication. September 30, 2020.

Furnaces North America 2020:  Plant Cleanliness and Facility Risk Mitigation from Closure due to COVID-19. September 30, 2020.

Safeopedia Webinar: Indoor Work Environment and Exposure Assessment. August 26, 2020

Florida Section American Water Works Association (AWWA) Fall Conference. Platform presentation: <u>Legionella Building Water Management and the Local Water Utility: Proactive Approaches that can Reduce End-User Risk.</u> Orlando, FL, 2019.

American Industrial Hygiene Conference and Exposition (AIHce). Platform presentation: <u>Legionella and Secondary Treatment Systems – An Evaluation of Cumulative Risk From Exposure to Disinfectants and Byproducts.</u> Minneapolis, MN, 2019.

American Industrial Hygiene Conference and Exposition (AIHce). <u>The Wide World of Lead Exposure – A Look Beyond the Workplace.</u> Minneapolis, MN, 2019.

Florida American Industrial Hygiene Association (FL AIHA) Spring Conference. Platform Presentation: <u>Legionella in 2019: The current standard of care and how to minimize risk</u>. Altamonte Springs, FL, 2019

American Industrial Hygiene Conference and Exposition (AIHce). Platform presentation: <u>Disinfection Byproducts Risk Management</u>. Philadelphia, PA, 2018.

Florida Water Resources Conference. Platform Presentation: <u>Building Water Management and the Local Water District: How a Proactive Approach Can Reduce End-User Risk.</u> Daytona Beach, FL, 2018.

Institute of Food Technologists. Platform presentation: <u>Generally Recognized as Safe (GRAS) in the New Millennium of Technology and Food Science</u>.  Chicago, IL, 2016.

Institute of Food Technologists. Platform presentation: <u>FDA's Guidelines on Nanotechnology</u>. Chicago, IL, 2016.

Society of Toxicology Annual Meeting. Poster Presentation: <u>A Comparison of Ambient Air BTEX Concentrations between Two Counties with Active Petroleum Wells</u>. San Diego, CA, 2015.

Society of Toxicology Annual Meeting. Poster Presentation: <u>Public Health Concerns Surrounding Fine Particulate Matter Generated from Hydraulic Fracturing.</u>  Phoenix, AZ, 2014.

Society of Toxicology Annual Meeting. Poster Presentation: <u>Evaluation of Urinary Pesticide Biomarkers Among Children and Adolescents.</u> San Francisco, CA, 2012.

Society of Toxicology Annual Meeting. Poster Presentation: <u>Evaluation of Urinary Pesticide Biomarkers Among Residents of the United States</u>. Salt Lake City, UT, 2010.

Technical Symposium on Corrosive Imported Drywall. Poster Presentation: <u>Reduced Sulfur Gases in Construction Materials</u>. Tampa, FL, 2009.

# Appendix B

### Dr. Alex LeBeau's Materials Considered List (*Rehak v. Monsanto Co.*)

1. Abdelghani, A., *Assessment of the Exposure of Workers Applying Herbicide Mixtures (2,4-D + Roundup, Garlon-3A + Roundup), Toxicity and Fate of These Mixtures in the Environment* (June 30, 1995) [MONGLY00296949 – MONGLY00296997].

2. ABIH (American Board of Industrial Hygiene), *American Board of Industrial Hygiene Code of Ethics* (May 25, 2007).

3. ABIH, *Rubric Definitions* (Sept. 2011).

4. Acquavella, J. et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112 Envtl. Health Persp. 321 (2004).

5. All Prior Reports and Depositions Offered by Alex LeBeau, Ph.D. in the Roundup® Litigation.

6. Amer, S. et al., *In Vitro and In Vivo Evaluation of the Genotoxicity of the Herbicide Glyphosate in Mice*, 31 Bull. Nat'l Res. Center Egypt 427 (2006).

7. Anadon, A., *Toxicokinetics of Glyphosate and its Metabolite Aminometyhl Phosphonic Acid in Rats*, 190 Toxicology Letters 91 (2009).

8. Andreotti, G. et al., *Glyphosate Use and Cancer Incidence in the Agricultural Health Study*, 110(5) J. Nat'l Cancer Inst. 509 (2018).

9. Andreotti, G. et al., *Response to Sheppard and Shaffer*. 111(2) J. Nat'l Cancer Inst. 216 (2019).

10. APVMA (Australian Pesticides and Veterinary Medicines Authority), *Final Regulatory Position: Consideration of the Evidence for a Formal Reconsideration of Glyphosate*, Australian Government (2017).

11. APVMA, *Regulatory Position: Consideration of the Evidence for a Formal Reconsideration of Glyphosate*, Australian Government (2016).

12. Atkinson, C. et al., *104-Week Chronic Feeding/Oncogenicity Study in Rats with 52-Week Interim Kill* (1993) [EFSADOC00000001-EFSADOC00001511].

13. Atkinson, C. et al., *Glyphosate: 104 Week Dietary Carcinogenicity Study in Mice* (Apr. 7, 1993) [EFSADOC00017495-EFSADOC00018243].

14. ATSDR (Agency for Toxic Substances and Disease Registry), *Toxicological Profile for Glyphosate – Draft for Public Comment*, US Dep't of Health and Human Services (Mar. 2019).

15. Babu, R. et al., *The Influence of Various Methods of Cold Storage of Skin on the Permeation of Melatonin and Nimesulide*, 86 J. Controlled Release 49 (2003).

16. Baldrick, P. & L. Reeve, *Carcinogenicity Evaluation: Comparison of Tumor Data from Dual Control Groups in the CD-1 Mouse*, 35 Toxicologic Pathology 562 (2007).

17. Baldrick, P., *Carcinogenicity Evaluation: Comparison of Tumor Data from Dual Control Groups in the Sprague-Dawley Rat*, 33 Toxicologic Pathology 283 (2005).

18. Benson, B., *21-Day Dermal Toxicity Study in Rabbits* (Mar. 10, 1982) [MONGLY02020607 – MONGLY02020798].

19. BfR (Bundesinstitut für Risikobewertung), *Assessment of IARC Monographies Volume 112 (2015); Glyphosate, Renewal Assessment Report: Glyphosate Addendum I to RAR* (2015).

20. BfR Press Release, *Glyphosate assessment: BfR rejects plagiarism accusations* (Sept. 20, 2017).

21. BfR, *Toxicology and Metabolism, Renewal Assessment Report: Glyphosate*, Volume 3 Annex B.6 (2015).

22. Bleeke, M., *MON 78294: An Applicator Exposure Study Conducted in Spain (Autumn 2005) Using Biomonitoring*, Charles River Laboratories (Oct. 11, 2007) [MONGLY00668430 – MONGLY00668967].

23. Bolognesi, C. et al., *Genotoxic Activity of Glyphosate and Its Technical Formulation Roundup*, 45 J. Agric. & Food Chemistry 1957 (1997).

24. Bradford Hill, A., *The Environment and Disease: Association or Causation?*, 58(5) Proc. Royal Soc'y Med. 295 (1965).

25. Brammer, *Glyphosate Acid: Two Year Dietary Toxicity and Oncogenicity Study in Wistar Rats* (2001) [EFSADOC00001512-EFSADOC00005621].

26. Brewster, D. et al., *Metabolism of Glyphosate in Sprague-Dawley Rats: Tissue Distribution, Identification, and Quantification of Glyphosate-Derived Materials following a Single Oral Dose*, 17 Fundamental and Applied Toxicology 43 (1991).

27. BROWSE, *Bystanders, Residents, Operators and WorkerS Exposure Models for Plant Protection Products* (2013).

28. Camolesi, M., *MON 77280 Bacterial Reverse Mutation Test (Ames Test) Final Report* (Apr. 8, 2010) [MONGLY00979251-MONGLY00979276].

29. Catoyra, J., *Reverse Mutation Assay of Roundup Full II M in Salmonella Typhimurium* (July 30, 2009; translated to English Aug. 29, 2012) [MONGLY08733066-MONGLY08733082].

30. Chan, P. & J. Mahler, *NTP Technical Report on Toxicity Studies of Glyphosate Administered in Dosed Feed to F344/N Rats and B6C3F Mice*, United States Department of Health and Human Services, Public Health Service, National Institutes of Health (July 1992).

31. Chandra, M. & C. Frith, *Spontaneous Neoplasms in Aged CD-1 Mice*, 61 Toxicology Letters 67 (1992).

32. Chandra, M. et al., *Spontaneous Neoplasms in Aged Sprague-Dawley Rats*, 66 Archives of Toxicology 496 (1992).

33. Chang, T. & E. Delzell, *Systematic Review and Meta-Analysis of Glyphosate Exposure and Risk of Lymphohematopoietic Cancers*, 51(6) J. Envtl. Sci. & Health 402 (2016).

34. Chruścielska, K. et al., *Glyphosate Evaluation of Chronic Activity and Possible Far – Reaching Effects: Part 1. Studies on Chronic Toxicity*, (3-4) Pestycydy 11 (2000).

35. Chruścielska, K. et al., *Glyphosate Evaluation of Chronic Activity and Possible Far – Reaching Effects: Part 2. Studies on Mutagenic Activity*, (3-4) Pestycydy 21 (2000).

36.  Claro, F., *MON 8709 Mammalian Erythrocyte Micronucleus Test Final Report* (Aug. 31, 2011) [MONGLY03255006-MONGLY03255073].

37.  Coble, J. et al., *An Updated Algorithm for Estimation of Pesticide Exposure Intensity in the Agricultural Health Study*, 8 Int'l J. Envtl. Res. Pub. Health 4608 (2011).

38.  Colvin, J., *Final Report on CP 67573 Residue and Metabolism: The Dynamics of Accumulation and Depletion of Orally Ingested N-Phosphonomethylglycine-14C*, Monsanto Company (Sept.-Oct., 1973) [MONGLY00432084 – MONGLY00432090].

39.  Colvin, L. & J. Miller, *Roundup Information to Support Temporary Tolerances and Experimental Permit for the Use of Roundup as a Preplant Treatment on Corn (All), Cotton, Soybeans and Wheat*, Monsanto Company (Nov. 12, 1973) [MONGLY00262815 – MONGLY00262984].

40.  Connolly, A. et al., *Characterising Glyphosate Exposures among Amenity Horticulturists Using Multiple Spot Urine Samples*, 221 Int'l J. Hygiene & Envtl. Health 1012 (2018).

41.  Connolly, A. et al., *Evaluating Glyphosate Exposure Routes and Their Contribution to Total Body Burden: A Study among Amenity Horticulturalists*, 63(2) Annals of Work Exposures and Health 133 (2019).

42.  Connolly, A. et al., *Exploring the Half-Life of Glyphosate in Human Urine Samples*, 222(2) Int'l J. Hygiene & Envtl. Health 205 (2018).

43.  Connolly, A. et al., *Exposure Assessment Using Human Biomonitoring for Glyphosate and Fluroxypyr Users in Amenity Horticulture*, 220 Int'l J. Hygiene & Envtl. Health 1064 (2017).

44.  Connolly, A. et al., *Glyphosate in Irish Adults-A Pilot Study in 2017*, 165 Int'l J. Hygiene & Envtl. Health 235 (2018).

45.  Connolly, A. et al., *Sensitive and Selective Quantification of Glyphosate and Aminomethylphosphonic Acid (AMPA) in Urine of the General Population by Gas Chromatography Tandem Mass Spectrometry*, 1158 J. Chromatography B 122348 (2020).

46.  Cowell, J. & J. Steinmetz, *Assessment of Forest Worker Exposures to Glyphosate during Backpack Foliar Applications of Roundup® Herbicide* (Mar. 1990) [MONGLY00155787 – MONGLY00155805].

47.  Cowell, J. & J. Steinmetz, *Assessment of Forestry Nursery Workers Exposure to Glyphosate during Normal Operations* (Feb. 1990) [MONGLY00155594 – MONGLY00155613].

48.  Crump, K. et al, *Correcting for Multiple Comparisons in Statistical Analysis of Animal Bioassay Data*, Toxicological Sci. (2020).

49.  Crump, K., *The Potential Effects of Recall Bias and Selection Bias on the Epidemiological Evidence for the Carcinogenicity of Glyphosate*, 40(4) Risk Analysis 696 (2019).

50.  Curwin, B. et al., *Urinary and Hand Wipe Pesticide Levels Among Farmers and Non-Farmers in Iowa*, 15 J. Exposure Analysis & Envtl. Epidemiology 500 (2005).

51.  Curwin, B. et al., *Urinary Pesticide Concentrations Among Children, Mothers and Fathers Living in Farm and Non-Farm Households in Iowa*, 51 Annals of Occupational Hygiene 53

(2007).

52. Dakoulas, E. (BioReliance Corp.), *Bacterial Reverse Mutation Assay (MON 119151)* (Oct. 19, 2016) [MONGLY08730177 – MONGLY08730226].

53. Dakoulas, E. (BioReliance Corp.), *Bacterial Reverse Mutation Assay (MON 52276)* (Oct. 10, 2016) [MONGLY08728723 – MONGLY08728769].

54. Dakoulas, E. (BioReliance Corp.), *Bacterial Reverse Mutation Assay (MON 76610)* (Oct. 17, 2016) [MONGLY08728770 – MONGLY08728816].

55. Dakoulas, E. (BioReliance Corp.), *Bacterial Reverse Mutation Assay (MON 76857)* (Mar. 1, 2018) [MONGLY08730499 – MONGLY08730542].

56. Dakoulas, E. (BioReliance Corp.), *Bacterial Reverse Mutation Assay (MON 76879)* (June 29, 2017) [MONGLY08730410 – MONGLY08730458].

57. Dakoulas, E. (BioReliance Corp.), *Bacterial Reverse Mutation Assay (MON 76886)* (Oct. 11, 2016) [MONGLY08728817 – MONGLY08728863].

58. Dakoulas, E. (BioReliance Corp.), *Bacterial Reverse Mutation Assay (MON 76952)* (Oct. 20, 2016) [MONGLY08730264 – MONGLY08730313].

59. Dakoulas, E. (BioReliance Corp.), *Bacterial Reverse Mutation Assay (MON 78239)* (Sept. 20, 2017) [MONGLY08730358 – MONGLY08730409].

60. Dakoulas, E. (BioReliance Corp.), *Bacterial Reverse Mutation Assay (MON 79346)* (Oct. 11, 2016) [MONGLY08728864 – MONGLY08728910].

61. Dakoulas, E. (BioReliance Corp.), *Bacterial Reverse Mutation Assay (MON 79351)* (Oct. 10, 2016) [MONGLY08728911 – MONGLY08728957].

62. Davies, D., *360 g/L Glyphosate SL Formulation (MON 76879) – In Vitro Absorption through Human Dermatomed Skin using [14C]-Glyphosate* (Aug. 8, 2017) [MONGLY08731728 – MONGLY08731783].

63. Davies, D., *500 g/L Glyphosate SL Formulation (MON 76952) – In Vitro Absorption through Human Dermatomed Skin using [14C]-Glyphosate* (Aug. 2, 2016) [MONGLY08731670 – MONGLY08731727].

64. Davies, D., *7.2g/L Glyphosate Gel Formulation (MON 76258) – In Vitro Absorption through Human Dermatomed Skin using [14C]-Glyphosate* (Apr. 27, 2015) [MONGLY08731571 – MONGLY08731681].

65. Davies, D., *72g/L Glyphosate Gel Formulation (MON 76829) – In Vitro Absorption through Human Dermatomed Skin using [14C]-Glyphosate* (Apr. 16, 2015) [MONGLY08731524 – MONGLY08731570].

66. Davis, R. et al., *Tumor Incidence in Normal Sprague-Dawley Female Rats*, 16 Cancer Res. 194 (1956).

67. Deposition of Arvind Kumar, M.D., *Rehak v. Monsanto Co.*, No. 3:19-cv-01719 (N.D. Cal. June 17, 2020) (with exhibits).

68. Deposition of Daniel Bucks, Ph.D., *Winston v. Monsanto Co.*, No. 1822-CC00515 (Mo. Cir. Ct. St. Louis City Sept. 17, 2019) (only pages 107-108, 187-194).

69.   Deposition of Ignacio Orellana, M.D., *Rehak v. Monsanto Co.*, No. 3:19-cv-01719 (N.D. Cal. May 28, 2020) (with exhibits).

70.   Deposition of Lorraine Rehak, *Rehak v. Monsanto Co.*, No. 3:19-cv-01719 (N.D. Cal. Nov. 22, 2019) (with exhibits).

71.   Dias Monma, M., *A Micronucleus Study in Mice for MON 77280* (Feb. 20, 1998) [MONGLY04287995-MONGLY04288025].

72.   Dimitrov, B., et al., *Comparative Genotoxicity of the Herbicides Roundup, Stomp and Reglone in Plant and Mammalian Test Systems,* 21 Mutagenesis 375 (2006).

73.   Donato, F. et al., *Exposure to Glyphosate and Risk of Non-Hodgkin Lymphoma and Multiple Myeloma: An Updated Meta-Analysis*, 111 La Medicina Del Lavoro 63 (2020).

74.   Dosemeci, M. et al., *A Quantitative Approach for Estimating Exposure to Pesticides in the Agricultural Health Study*, 46 Annals of Occupational Hygiene 245 (2002).

75.   Durkin, P., *Glyphosate – Human Health and Ecological Risk Assessment Final Report*, Syracuse Environmental Research Associates, Inc. (May 25, 2011) [MONGLY00310942 – MONGLY00311277].

76.   Dutta, A., *In Vitro Mammalian Cell Micronucleus Assay in Human Peripheral Blood Lymphocytes (HPBL) (MON 76879)* (June 23, 2017) [MONGLY08730459-MONGLY08730498].

77.   ECHA (European Chemicals Agency), *Opinion: Proposing Harmonized Classification and Labelling at EU Level of Glyphosate (ISO); N-(phosphonomethyl)glycine*, Committee for Risk Assessment (Mar. 15, 2017).

78.   Edmiston, S. et al., *Exposure of Herbicide Handlers in the Caltrans Vegetation Control Program*, Cal. EPA (Apr. 27, 1995) [MONGLY00311960 – MONGLY00312005].

79.   EFSA (European Food Safety Authority), *Guidance on Dermal Absorption*, EFSA Panel on Plant Protection Products and their Residues (2012).

80.   EFSA, *Conclusion on the Peer Review of the Pesticide Risk Assessment of the Active Substance Glyphosate*, 13 EFSA J. 4302 (2015).

81.   EFSA, *Guidance on Dermal Absorption*, 15(6) EFSA Journal 4873 (2017).

82.   EFSA, *Guidance on the Assessment of Exposure of Operators, Workers, Residents and Bystanders in Risk Assessment for Plant Protection Products* (2014).

83.   Enemoto, K., *24-Month Oral Chronic Toxicity and Oncogenicity Study in Rats, Vol. 1* (1997) [EFSADOC00005622-EFSADOC00006121].

84.   EPA (Environmental Protection Agency), *Dermal Exposure Assessment: A Summary of EPA Approaches*, Nat'l Ctr. for Envtl. Off. of Res. and Dev. (Sept. 2007).

85.   EPA, *Exposure Factors Handbook 2011 Edition (Final Report)* (2011).

86.   EPA, FIFRA SAP, *Meeting Minutes and Final Report No. 2017-01: EPA's Evaluation of the Carcinogenic Potential of Glyphosate,* (Mar. 16, 2017).

87.   EPA, *Glyphosate – Interim Registration Review Decision Case Number 0178* (Jan. 2020).

88.   EPA, *Glyphosate – Proposed Interim Registration Review Decision Case Number 0178* (Apr. 2019).

89.   EPA, *Integrated Risk Information System (IRIS) Glossary* (Aug. 31, 2011).

90.   EPA, *Integrated Risk Information System (IRIS), Chemical Assessment Summary of Glyphosate; CASRN 1071-83-6* (1993).

91.   EPA, *Label Review Manual Chapter 10: Worker Protection Label* (Feb. 2016).

92.   EPA, Memorandum from Dana L. Friedman on *Response from the Pesticide Re-Evaluation Division (PRD) to Comments on the Glyphosate Proposed Interim Decision* (Jan. 16, 2020).

93.   EPA, Memorandum from David J. Miller on *Glyphosate: Epidemiology Review of Zhang et al. (2019) and Leon et al. (2019) Publications for Response to Comments on the Proposed Interim Decision* to Christine Olinger (Jan. 16, 2020).

94.   EPA, Memorandum from Donna Davis, Risk Assessor, RAB VII, Health Effects Division (7509P) on *Alkyl Alcohol Alkoxylate Phosphate and Sulfate Derivatives (AAAPDs and AAASDs – JITF CST 2 Inert Ingredients) Human Health Risk Assessment to Support Proposed Exemption from the Requirements of a Tolerance When Used as Inert Ingredients in Pesticide Formulations* to Kerry Leifer, Team Leader, Inert Ingredient Assessment Branch, Registration Division (7505P) (June 8, 2009).

95.   EPA, Memorandum from Donna Davis, Risk Assessor, RAB VII, Health Effects Division (7509P) on *Alkyl Alcohol Alkoxylates (AAA – JITF CST 1 Inert Ingredient) Human Health Risk Assessment to Support Proposed Exemption from the Requirement of a Tolerance When Used as an Inert Ingredient in Pesticide Formulations* to Kerry Leifer, Team Leader, Inert Ingredient Assessment Branch, Registration Division (7505P) (July 14, 2009).

96.   EPA, Memorandum from Donna Davis, Risk Assessor, RAB VII, Health Effects Division (7509P) on *Alykl Amine Polyalkoxylates (JITF CST 4 Inert Ingredients) Human Health Risk Assessment to Support Proposed Exemption from the Requirement of a Tolerance When Used as Inert Ingredients in Pesticide Formulations* to Kerry Leifer, Team Leader, Inert Ingredient Assessment Branch, Registration Division (7505P) (April 3, 2009).

97.   EPA, Memorandum from Donna Davis, Risk Assessor, RAB VII, Health Effects Division (7509P) on *Methyl Poly(Oxyethylene) $C_8 – C_{14}$ Alkylammonium Chlorides (MPOACs – JITF CST 7 Inert Ingredients) Human Health Risk Assessment to Support Proposed Exemption from the Requirements of a Tolerance When Used as Inert Ingredients in Pesticide Formulations* to Kerry Leifer, Team Leader, Inert Ingredient Assessment Branch, Registration Division (7505P) (June 2, 2009).

98.   EPA, Memorandum from Donna Davis, Risk Assessor, RAB VII, Health Effects Division (7509P) on *Sodium and Ammonium Naphthalensulfonae Formaldehyde Condensates (SANFCs – JITF CST 11 Inert Ingredients) Human Health Risk Assessment to Support Proposed Exemption from the Requirement of a Tolerance When Used as Inert Ingredients in Pesticide Formulations* to Kerry Leifer, Team Leader, Inert Ingredient Assessment Branch, Registration Division (7505P) (May 28, 2009).

99.   EPA, Memorandum from Gregory Akerman on *Response to the Final Report of the Federal Insecticide, Fungicide, and Rodenticide Act Scientific Advisory Panel (FIFRA SAP) on the Evaluation of the Human Carcinogenic Potential of Glyphosate* to Caitlin Newcamp (Dec.

12, 2017).

100. EPA, Memorandum from Herbert Lacayo, Statistician, Scientific Mission Support Staff TOX/HED/OPP on *Use of Historical Data in Determining the Weight of Evidence from Kidney Tumor Incidence in the Glyphosate Two-Year Feeding Study; and Some Remarks on False Positives* to Reto Engler, Chief, Scientific Mission Support Staff TOX/HED/OPP (Feb. 26, 1985).

101. EPA, Memorandum from Lata Venkateshwara on *Glyphosate: Amended Residential Exposure Assessment for a Registration Review* to Caitlin Newcamp (Dec. 12, 2017).

102. EPA, Memorandum from Louis Kasza, D.V.M., Ph.D., Pathologist, Toxicology Branch, TS-769, EPA on *Glyphosate – Evaluation of Kidney Tumors in Male Mice. Chronic Feeding Study* to William Dykstra, Ph.D., Reviewer, Toxicology Branch, TS-769, EPA (Dec. 4, 1985).

103. EPA, Memorandum from Monique M. Perron on *Glyphosate: Response to Comments on the Proposed Interim Decision Regarding the Human Health Risk Assessment* to Steven Peterson (Jan. 13, 2020).

104. EPA, Memorandum from Monique Perron on *Glyphosate: Draft Human Health Risk Assessment in Support of Registration Review* to Caitlin Newcamp (Dec. 12, 2017).

105. EPA, Memorandum from Stephen L. Johnson, Executive Secretary, FIFRA Scientific Advisory Panel on *Transmittal of the Final FIFRA Scientific Advisory Panel Reports on the February 11-12, 1986 Meeting* to Steven Schatzow, Director, Office of Pesticide Programs (Feb. 24, 1986).

106. EPA, Memorandum from William Dykstra, Reviewer, Review Section I, Toxicology Branch I – Insecticide, Rodenticide Support, Health Effects Division on *Glyphosate – EPA Registration Nos. 524-318 and 524-333 – Historical Control Data for Mouse Kidney Tumors* to Robert J. Taylor, Fungicide-Herbicide Branch, Registration Division (June 19, 1989) (with memorandum regarding Nov. 10, 1988 EPA Meeting with Monsanto attached).

107. EPA, Memorandum from William Dykstra, Toxicology Branch, Hazard Evaluation Division on *Glyphosate; Oncogenicity Study in the Mouse; PP #3E2845; Caswell No.: 661A* to Hoyt Jamerson, Registration Division (Feb. 10, 1984).

108. EPA, Memorandum from William Dykstra, Toxicology Branch, Hazard Evaluation Division on *Glyphosate; EPA Reg.#: 524-308; Mouse Oncogenicity Study, Caswell #: 661A, Accession #: 251007-014* to Robert Taylor, Product Manager, Registration Division (Apr. 3, 1985).

109. EPA, Memorandum from William Dykstra, Toxicology Branch, Hazard Evaluation Division on *EPA Reg. #: 524-308; Roundup; Glyphosate; Pathology, Report on Additional Kidney Sections, Caswell No. 661A, Accession No. 259621* to Robert Taylor, Product Manager, Registration Division (Dec. 12, 1985).

110. EPA, Memorandum from William Dykstra, Toxicology Branch, Hazard Evaluation Division on *Glyphosate; EPA Registration No. 524-308; Roundup; Additional Histopathological Evaluations of Kidneys in the Chronic Feeding Study of Glyphosate in Mice* to Robert Taylor, Product Manager, Fungicide-Herbicide Branch, Registration Division (Mar. 11, 1986).

111. EPA, Memorandum from William Dykstra, Toxicology Branch, Health Effects Division and George Z. Ghali, Science Analysis and Coordination Branch, Health Effects Division on *Second Peer Review of Glyphosate* to Robert Taylor, Fungicide-Herbicide Branch, Registration Division and Lois Rossi, Chief, Reregistration Branch, Special Review and Reregistration Division (Oct. 30, 1991).

112. EPA, Memorandum to Robert Taylor, Product Manager, Herbicide – Fungicide Branch, Registration Division on *Consensus Review of Glyphosate, Caswell No. 661A* (Mar. 4, 1985).

113. EPA, Office of Chemical Safety and Pollution Prevention, *EPA Takes Action to Provide Accurate Risk Information to Consumers, Stop False Labeling on Products* (Aug. 8, 2019).

114. EPA, Office of Chemical Safety and Pollution Prevention, Letter from Michael L. Goodis, Director of Registration Division, EPA Office of Chemical Safety and Pollution Prevention, on Labeling Requirements for Products that Contain Glyphosate to Registrant (Aug. 7, 2019).

115. EPA, Office of Emergency and Remedial Response, *Risk Assessment Guidance for Superfund Volume I Human Health Evaluation Manual (Part A) – Interim Final* (Dec. 1989).

116. EPA, Office of Emergency and Remedial Response, *Risk Assessment Guidance for Superfund Volume I: Human Health Evaluation Manual (Part E, Supplemental Guidance for Dermal Risk Assessment) – Final* (July 2004).

117. EPA, Office of Pesticide Programs, *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Sept. 12, 2016).

118. EPA, Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Dec. 12, 2017).

119. EPA, Office of Prevention, Pesticides and Toxic Substances, *Health Effects Test Guidelines: OPPTS 870.7600 Dermal Penetration* (August 1998).

120. EPA, *Pesticide Poisoning Handbook – Chapter 5 – Organophosphate Insecticides* (2013).

121. EPA, *Regional Screening Levels (RSLs) – Generic Tables* (May 2019).

122. EPA, *Reregistration Eligibility Decision (RED) – Glyphosate* (Sept. 1993).

123. EPA, Risk Assessment Forum, *Guidelines for Carcinogen Risk Assessment* (Mar. 2005).

124. EPA, Transcript of Scientific Advisory Panel Open Meeting (Feb. 11, 1986).

125. Erexson, Gregory L. (Covance Labs, Inc.), *In Vivo Mouse Micronucleus Assay with MON 78239*, Monsanto Co. (Apr. 24, 2003) [MONGLY00603199-MONGLY00603219].

126. Erexson, Gregory L. (Covance Labs, Inc.), *In Vivo Mouse Micronucleus Assay with MON 78634*, Monsanto Co. (Apr. 24, 2003) [MONGLY00603253-MONGLY00603273].

127. Erexson, Gregory L. (Covance Labs., Inc.), *In Vivo Mouse Bone Marrow Micronucleus Assay, MON 78910*, Monsanto Co. (Mar. 1, 2006) [MONGLY00675898-MONGLY00675923].

128. Eriksson, M. et al., *Pesticide Exposure as Risk Factor for Non-Hodgkin Lymphoma*

*Including Histopathological Subgroup Analysis*, 123 Int'l J. Cancer 1657 (2008).

129. Espanhol-Soares, M. et al., *Procedures to Evaluate the Efficiency of Protective Clothing Worn by Operators Applying Pesticide*, 57(8) Annals of Occupational Hygiene 1041 (2013).

130. Expert Report (Supplemental) of Charles W. Jameson, Ph.D., Pursuant to PTO No. 34 and In Support of General Causation on Behalf of Plaintiffs, *In re: Roundup Products Liability Litigation*, No. 3:16-md-02741 (N.D. Cal. Dec. 21, 2017).

131. Expert Report of Barry S. Levy, M.D., M.P.H., *Panichi v. Monsanto Co.*, No. 3:19-cv-02763 (N.D. Cal. Jan. 22, 2021).

132. Expert Report of Charles M. Benbrook, Ph.D., *Karman v. Monsanto Co.*, No. 3:19-cv 01183 (N.D. Cal. Jan. 20, 2021).

133. Expert Report of Christopher J. Portier, Ph.D., *In re: Roundup Products Liability Litigation*, No. 3:16-md-02741 (N.D. Cal. Jan. 22, 2021).

134. Expert Report of Kathleen M. Burns, Ph.D., *Underwood v. Monsanto Co.*, No. 3:18-cv-06805 (N.D. Cal. Jan. 22, 2021).

135. Expert Report of Kevin B. Knopf, M.D., M.P.H., *Panichi v. Monsanto Co.*, No. 3:19-cv-02763 (N.D. Cal. Jan. 22, 2021).

136. Expert Report of Michael R. Harbut, M.D., M.P.H., F.C.C.P., *Panichi v. Monsanto Co.*, No. 3:19-cv-02763 (N.D. Cal. Jan. 22, 2021).

137. Expert Report of Ron D. Schiff, M.D., Ph.D., *Rehak v. Monsanto Co.*, No. 3:19-cv-01719 (N.D. Cal. Dec. 24, 2020).

138. Expert Report of Shane W. Rogers, Ph.D., *Panichi v. Monsanto Co.*, No. 3:19-cv-02763 (N.D. Cal. Jan. 22, 2021).

139. Expert Report of Stephen Petty, P.E., C.I.H.. C.S.P., *Seidl v. Monsanto Co.*, No. 3:17-cv-00519 (N.D. Cal. Jan. 12, 2021).

140. Faniband, M. et al., *Human Experimental Exposure to Glyphosate and Biomonitoring of Young Swedish Adults*, 231 Int'l J. Hygiene Env't Health 113657 (2021).

141. Farabaugh, C. (Covance Labs., Inc.), *Bacterial Reverse Mutation Assay with a Confirmatory Assay MON 51803* (Aug. 21, 2009) [MONGLY00603608 – MONGLY00603645].

142. Flowers L. & L. Kier, *Final Report on Salmonella Mutagenicity Assay of Glyphosate,* Monsanto Company Environmental Health Laboratory (June 16, 1978) [MONGLY04287675 – MONGLY04287687].

143. Flowers, L., *Ames/Salmonella Mutagenicity Assay of MON 8080, MSL 1538, ML-80-294/800281*, Monsanto Co. (Mar. 3, 1981) {MONGLY01318663 – MONGLY01318683].

144. Franz, T., *Evaluation of the Percutaneous Absorption of Roundup Formulations in Man Using an In-Vitro Technique* (Aug. 30, 1983) [MONGLY00135633 – MONGLY00135646].

145. Franz, T., *Percutaneous Absorption: On the Relevance of In Vitro Data*, 64 J. Investigative Dermatology 190 (1975).

146. Gava, M., *The Salmonella Typhimurium Reverse Mutation by ROUNDUP WG* (Apr. 2, 1998) [MONGLY04287897-MONGLY04287930].

147. Giknis, M & C. Clifford, *Compilation of Spontaneous Neoplastic Lesions and Survival in Crl:CD® (SD) Rats from Control Groups*, Charles River Laboratories (Mar. 2004).

148. Giknis, M. & C. Clifford, *Spontaneous Neoplastic Lesions in the Crl:CD-l (ICR)BR Mouse*, Charles River Laboratories (Mar. 2000).

149. Giknis, M. & C. Clifford, *Spontaneous Neoplastic Lesions in the Crl:CD-l (ICR) Mouse in Control Groups from 18 Month to 2 Year Studies*, Charles River Laboratories (Mar. 2005).

150. Giknis, M. & C. Clifford, *Spontaneous Neoplastic Lesions in the Crl:CD-l (ICR) Mouse in Control Groups from 18 Month to 2 Year Studies*, Charles River Laboratories (Mar. 2010).

151. Gillezeau, C. et al., *The Evidence of Human Exposure to Glyphosate: A Review*, 18 Envtl. Health 2 (2019) with supplementary tables.

152. Gillezeau, C. et al., *Update on Human Exposure to Glyphosate with A Complete Review of Exposure in Children,* 19 Env't Health 115 (2020).

153. Google Earth Image (aerial and street view) of 1429 East Cass Street Joliet, IL 60432.

154. Google Earth Images of 509 McCarthy Road Lemont, IL 60439.

155. Greim, H. et al., *Evaluation of Carcinogenic Potential of the Herbicide Glyphosate, Drawing on Tumor Incidence Data from Fourteen Chronic/Carcinogenicity Rodent Studies*, 45 Critical Revs. Toxicology 185 (2015) with study summary tables.

156. Grisolia, C., *A Comparison between Mouse and Fish Micronucleus Test Using Cyclophosphamide, Mitomycin C and Various Pesticides*, 518 Mutation Res. 145 (2002).

157. Guyton, K. et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon, and Glyphosate*, 16 Lancet Oncology 490 (2015).

158. Hadfield, N., *Glyphosate Acid – In Vitro Absorption Through Abraded Rabbit Skin Using [14C]-Glyphosate* (Apr. 18, 2012) [MONGLY01284534 – MONGLY01284570].

159. Harbison, R. et al., *Hamilton & Hardy's Industrial Toxicology* (Raymond D. Harbison et al. eds., 6th ed. 2015).

160. Haseman, J. et al., *Spontaneous Neoplasm Incidences in Fischer 344 Rats and b6c3f1 Mice in Two-Year Carcinogenicity Studies: A National Toxicology Program Update*, 26 Toxicologic Pathology 428 (1998).

161. Hayes' Principles and Methods of Toxicology (A. Wallace Hayes et al. eds., 6th ed. 2014).

162. Health and Safety Executive, *Operator Exposure*, http://www.hse.gov.uk/pesticides/topics/pesticide-approvals/pesticides-registration/data-requirements-handbook/operator-exposure.htm.

163. Health Canada, *Re-evaluation Decision RVD2017-01 Glyphosate*, Health Canada Pest Management Regulatory Agency (Apr. 28, 2017).

164. Health Canada, *Statement from Health Canada on Glyphosate*, Health Canada Pest Management Regulatory Agency (Jan. 11, 2019).

165. Helal, A. & H. Moussa, *Chromosomal Aberrations Induced by Glyphosate Isopropylamine Herbicide and Trials for Diminuting its Toxicity Using Some Chemical Inactivators and Antioxidant*, 53 Veterinary Med. J. Giza 169 (2005).

166. Hobbs, T. et al., *Measurement of Blood Volume in Adult Rhesus Macaques (Macaca Mulatta)*, 54 J. Am. Ass'n for Lab. Animal Sci. 687 (2015).

167. Holečková, B., *Evaluation of the In Vitro Effect of Glyphosate-Based Herbicide on Bovine Lymphocytes Using Chromosome Painting*, 50 Bulletin of the Veterinary Inst. in Pulawy 533 (2006).

168. Holmgaard, R. & J. Nielsen, *Dermal Absorption of Pesticides – Evaluation of Variability and Prevention*, Danish Ministry of the Environment (2009).

169. Hoppe, H., *Determination of Glyphosate Residues in Human Urine Samples from 18 European Countries*, Medical Laboratory Bremen (June 6, 2013).

170. Howe, R. et al., *Metabolism of Glyphosate in Sprague-Dawley Rats. Part II. Identification, Characterization, and Quantification of Glyphosate and its Metabolites after Intravenous and Oral Administration*, Monsanto Report No. MSL-7206 (Feb. 1988) [MONGLY06062970 – MONGLY06063128].

171. IARC (International Agency for Research on Cancer), *Preamble: IARC Monographs on the Identification of Carcinogenic Hazards to Humans* (Amended Jan. 2019).

172. IARC, *IARC Monograph Vol. 112 on the Evaluation of Carcinogenic Risks to Humans, Some Organophosphate Insecticides and Herbicides: Diazinon, Glyphosate, Malathion, Parathion, and Tetrachlorvinphos* (2015).

173. Inter-Organization Programme for the Sound Management of Chemicals (IOMC), International Programme on Chemical Safety (IPCS), *Environmental Health Criteria 242: Dermal Absorption* (2014).

174. Japan Food Safety Commission, *Glyphosate Summary*, 4 Food Safety 93 (2016).

175. Jauhiainen, A. et al., *Occupational Exposure of Forest Workers to Glyphosate During Brush Saw Spraying Work*, 52 Am. Indus. Hygiene Ass'n J. 61 (1991).

176. JMPR (Joint Meeting on Pesticide Residues), *Pesticide residues in food – 2016: Evaluations 2016 – Part II – Toxicological*, Special Session of the Joint Meeting of the FAO Panel of Experts on Pesticide Residues in Food and the Environment and the WHO Core Assessment Group on Pesticide Residues (May 9-13, 2016).

177. JMPR, *Pesticide Residues in Food – Report of the 1994 Joint FAO/WHO Meeting of Experts* (1994).

178. Johnson, P. et al., *Operator Exposure When Applying Amenity Herbicides by All-Terrain Vehicles and Controlled Droplet Applicators*, 49 Annals of Occupational Hygiene 25 (2005).

179. Kabat, G. et al., *On Recent Meta-Analyses of Exposure to Glyphosate and Risk of Non-Hodgkin's Lymphoma in Humans*, Cancer Causes & Control (2021).

180. Kasting, G. & L. Bowman, *Electrical Analysis of Fresh, Excised Human Skin: A Comparison with Frozen Skin*, 7 Pharm. Res. 1141 (1990).

181. Keil, C. et al., *Mathematical Models for Estimating Occupational Exposure to Chemicals* (2nd ed. 2009).

182. Kielhorn, J. et al., International Programme on Chemical Safety (IPCS), *Environmental Health Criteria 235: Dermal Absorption* (2006).

183. Kier, L. & D. Kirkland, *Review of Genotoxicity Studies of Glyphosate and Glyphosate-Based Formulations*, 43(4) Critical Revs. Toxicology 283 (2013) with supplementary materials.

184. Kier, L. & S. Stegeman, *Mouse Micronucleus Study of AMPA, MSL-13243, EHL-90170/ML-90-404* (Dec. 8, 1993) [MONGLY00604088-MONGLY00604145].

185. Kier, L. et al., *Ames/Salmonella Mutagenicity Assay of MON 14445 (DIRECT® Herbicide Formulation), MSL-11731, EHL 91185/ML-91-442* (Feb. 7, 1992) [MONGLY00604381-MONGLY00604404].

186. Kier, L., *Ames/Salmonella Mutagenicity Assay of MON 2139 (ROUNDUP® Herbicide Formulation), MSL-11729, EHL 91183/ML-91-440* (Feb. 7, 1992) [MONGLY00604330-MONGLY00604356].

187. Kier, L., *Ames/S*almonella Mutagenicity Assay of RODEO®, MSL-11730, EHL 91184/ML-91-441 (Feb. 7, 1992) [MONGLY00604357-MONGLY00604380].

188. Kier, L*., Mouse Micronucleus Study of DIRECT® Herbicide* Formulation, MSL-11773, EHL – 91202/91206, ML-91-436/ML-91-439 (Feb. 25, 1992) [MONGLY00604211-MONGLY00604259].

189. Kier, L., *Mouse Micronucleus Study of RODEO® Herbicide Formulation, MSL-11772, EHL – 91201/91205, ML-91-435/ML-91-438* (Feb. 25, 1992) [MONGLY00604164-MONGLY00604210].

190. Kier, L., *Mouse Rangefinding Toxicity Study of Roundup ML-91-434 and ML-91-437* (Mar. 20, 1992) [MONGLY00604146-MONGLY00604163].

191. Knezevich, A. & G. Hogan, *A Chronic Feeding Study of Glyphosate (Roundup® Technical) In Mice* (July 21, 1983) [MONGLY00253810-MONGLY00257323].

192. Koller, V. et al., *Cytotoxic and DNA-Damaging Properties of Glyphosate and Roundup in Human-Derived Buccal Epithelial Cells*, 86 Archives Toxicology 805 (2012).

193. Korchevskiy, A., *Using Benchmark Dose Modeling for the Quantitative Risk Assessment: Carbon Nanotubes, Asbestos, Glyphosate,* 41 J. Applied Toxicology 148 (2020).

194. Kougias, D. et al., *Risk Assessment of Glyphosate Exposures from Pilot Study with Simulated Heavy Residential Consumer Application of Roundup® using a Margin of Safety (MOS) Approach*, Risk Analysis (2020).

195. Kramer, R., *Herbicide Applicator Exposure to N-Nitroso-Glyphosate during Application of Roundup Herbicide and Field Re-Entry* (Apr. 1978) [MONGLY01313767 – MONGLY01313816].

196. Kruger, M. et al., *Detection of Glyphosate Residues in Animals and Humans*, 4(2) J. Envtl. Analytical Toxicology 1000210 (2014).

197. Kulkarni, R. (BioReliance Corp.), *In Vivo Mammalian Erythrocyte Micronucleus Assay in Mice on MON 76245* (June 26, 2015) [MONGLY00603043-MONGLY00603076].

198. Kulkarni, R. (BioReliance Corp.), *In Vivo Micronucleus Assay in Mice on MON 76857* (Jan. 21, 2015) [MONGLY00602963-MONGLY00602995].

199. Kulkarni, R. (BioReliance Corp.), *In Vivo Micronucleus Assay in Mice on MON 76865* (May 23, 2014) [MONGLY00602931-MONGLY00602962].

200. Kumar, D., *Carcinogenicity Study with Glyphosate Technical in Swiss Albino Mice* (2001) [EFSADOC00006122-EFSADOC00006808].

201. Lake, R., *Health Risk Assessment: Glyphosate, Report FW14022*, Institute of Environmental Science and Research Limited for the Ministry of Health (2014).

202. Lankas, G. & G. Hogan, *A Lifetime Feeding Study of Glyphosate (Roundup® Technical) in Rats, BDN-77-416* (Sept. 18, 1981) [EFSADOC00006809-EFSADOC00009758].

203. Lavy, T. et al., *Conifer Seedling Nursery Worker Exposure to Glyphosate*, 22 Archives Envtl. Contamination & Toxicology 6 (1992).

204. Lawlor, T. (Covance Labs., Inc.), *Mutagenicity Test with MON 59112 in the Salmonella – Escherichia Coli/Mammalian-Microsome Reverse Mutation Assay with a Confirmatory Assay* (May 22, 2000) [MONGLY00603769-MONGLY00603810].

205. Leon, M. et al., *Pesticide Use and Risk of Non-Hodgkin Lymphoid Malignancies in Agricultural Cohorts from France, Norway and the USA: A Pooled Analysis from the AGRICOH Consortium*, Int'l J. Epidemiology (2019).

206. Lesmes-Fabian, C. et al., *Dermal Exposure Assessments of Pesticide Use: The Case of Sprayers in Potato Farms in the Columbia Highlands*, 430 Science of the Total Environment 202 (2012).

207. Letter from Bernhard Url, Exec. Dir., EFSA, on Open Letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR to Christopher Portier, Sr. Contributing Scientist, Environmental Defense Fund (Jan. 13, 2016).

208. Letter from Eric Wood on Summary Histopathology Data for 18 Month Control Study Safepharm Laboratories Internal Project 0041-0216 to Envigo Research Limited (July 24, 2008) [MONGLY07070096 – MONGLY07070099].

209. Letter from Frank S. Serdy, Manager, Federal and State Registration Affairs, Monsanto Co. on Roundup® Herbicide EPA Reg Nos. 524-308, 524-330, 524-332, 524-339, 524-343. Chronic Mouse Study with Glyphosate to the Director, Registration Division, Office of Pesticide Programs, U.S. EPA (May 21, 1985) [MONGLY00253801 – MONGLY00253809].

210. Letter from George B. Fuller, U.S. and International Registration Director, Monsanto Co. on Glyphosate Registration Standard: Request for Meeting with EPA to the Director, Registration Division, Office of Pesticide Programs, U.S. EPA (Oct. 5, 1988) [MONGLY12373641 – MONGLY12373642].

211. Letter from Thomas F. Armstrong, Registration Manager, Monsanto Co. on Roundup® Herbicide EPA Reg. Nos. 524-308, 524-330, 524-332, 524-339, 524-343, 524-351 Addendum to Chronic Mouse Study with Glyphosate: Additional Evaluations to the Director, Registration Division, Office of Pesticide Programs, U.S. EPA (Oct. 28, 1985) [MONGLY00506887 – MONGLY00506888].

212. Li, A., & Long, T., *An Evaluation of the Genotoxic Potential of Glyphosate,* 10 Fundamental & Applied Toxicology 537 (1988).

213. Li, A., *CHO/HGPRT Gene Mutation Assay with Glyphosate* (Oct. 20, 1983) [MONGLY00603911-MONGLY00603938].

214. Li, A., *In Vivo Bone Marrow Cytogenetics Study of Glyphosate in Sprague-Dawley Rats* (Oct. 20, 1983) [MONGLY00603953-MONGLY00603972].

215. Lioi, M. et al., *Cytogenetic Damage and Induction of Pro-Oxidant State in Human Lymphocytes Exposed In Vitro to Gliphosate (sic), Vinclozolin, Atrazine, and DPX-E9636*, 32 Envtl. & Molecular Mutagenesis 39 (1998).

216. Lioi, M. et al., *Genotoxicity and Oxidative Stress Induced by Pesticide Exposure in Bovine Lymphocyte Cultures In Vitro*, 403 Mutation Res. 13 (1998).

217. Lope, N., *Reverse Mutation Assay of Roundup Ultramax (MON 79672) in Salmonella Typhimurium* (Aug. 20, 2008) [MONGLY08732839-MONGLY08732857].

218. Lunchick, C. et al., *Operator and Field Worker Occupational Exposure Databases and Modeling*, in Hayes' Handbook of Pesticide Toxicology 1139, 1139-1155 (2010).

219. Machado-Neto, J. et al., *Safety of Working Conditions of Glyphosate Applicators on Eucalyptus Forests Using Knapsack and Tractor Powered Sprayers*, 64 Bulletin of Envtl. Contamination and Toxicology 309 (2000).

220. Maibach, H., *Summary: Elimination of 14C-Glyphosate in Rhesus Monkeys Following a Single Dose, & Percutaneous Absorption of 14C-Glyphosate in Roundup® Formulation in Rhesus Monkeys Following a Single Topical Dose*, University of California School of Medicine (Apr. 1, 1983) [MONGLY02142251 – MONGLY02142265].

221. Majeed, S., *Studies of the Incidence of Spontaneous Pancreatic Tumours in Ageing CD Rats*, 47 Arzneimittelforschung 879 (1997).

222. Makhteshim Agan of North America, Inc. (d/b/a ADAMA), Material Safety Data Sheet for Diazinon AG 500 (Aug. 2013).

223. Manas, F. et al., *Genotoxicity of AMPA, the Environmental Metabolite of Glyphosate, Assessed by the Comet Assay and Cytogenetic Tests*, 72 Ecotoxicology Envtl. Safety 834 (2009).

224. Mandel, J. et al., *Biomonitoring for Farm Families in the Farm Family Exposure Study*, 31(Suppl. 1) Scandinavian J. Work Env't Health 98 (2005).

225. Manning, M., *Assessment of Worker Exposure to Glyphosate during Mist Blower Application of Roundup Herbicide* (Nov. 1991) [MONGLY01299836 – MONGLY01299849].

226. Marques, M., *[Reverse Gene Mutation in Salmonella Typhimurium for MON 14420 (Ames Test)]* (in Portuguese) (June 8, 1999) [MONGLY03254658-MONGLY03254696].

227. Marques, M., *[Reverse Gene Mutation in Salmonella Typhimurium for MON 78091 (Ames Test)]* (in Portuguese) (June 8, 1999) [MONGLY03254769-MONGLY03254807].

228. Marques, M., *[Reverse Gene Mutation in Salmonella Typhimurium for MON 77391]* (in Portuguese) (Jan. 29, 1999) [MONGLY03254887-MONGLY03254920].

229. Marques, M., *[Reverse Gene Mutation in Salmonella Typhimurium for MON 77063]* (in Portuguese) (Jan. 29, 1999) [MONGLY08729394-MONGLY08729427].

230. Marques, M., *A Micronucleus Study in Mice for MON 77391* (May 11, 1999) [MONGLY08729139-MONGLY08729161].

231. Marques, M., *A Micronucleus Study in Mice for MON 78036* (May 12, 1999) [MONGLY08729162-MONGLY08729184].

232. Marques, M., *A Micronucleus Study in Mice for MON 78091* (Sept. 1, 1999) [MONGLY08729185-MONGLY08729217].

233. Marques, M., *Micronucleus Test for MON 77063 in Mice* (May 7, 1999) [MONGLY05755492-MONGLY05755514].

234. McConnell, R., *A Chronic Feeding Study of Glyphosate (Roundup® Technical in Mice): Pathology Report on Additional Kidney Sections Addendum to Final Report Dated July 21, 1983* (Sept. 26, 1985) [MONGLY00138911-MONGLY00138920].

235. McDuffie, H. et al., *Non-Hodgkin's Lymphoma and Specific Pesticide Exposures in Men: Cross-Canada Study of Pesticides and Health*, 10 Cancer Epidemiology, Biomarkers & Prevention 1155 (2001).

236. Mecchi, M. (Covance Labs., Inc.), *Bacterial Reverse Mutation Assay with a Confirmatory Assay MON 79864* (Sept. 9, 2008) [MONGLY00603532-MONGLY00603570].

237. Mecchi, M. (Covance Labs., Inc.), *Bacterial Reverse Mutation Assay with a Confirmatory Assay MON 76313* (Nov. 24, 2008) [MONGLY02277810-MONGLY02277846].

238. Mecchi, M. (Covance Labs., Inc.), *Mutagenicity Test with MON 59117 in the Salmonella – Escherichia Coli/Mammalian-Microsome Reverse Mutation Assay with a Confirmatory Assay* (June 23, 2000) [MONGLY00603108-MONGLY00603145].

239. Mecchi, M. (Covance Labs., Inc.), *Salmonella – Escherichia coli/Mammalian Microsome Reverse Mutation Assay with a Confirmatory Assay MON 78634* (Apr. 16, 2003) [MONGLY00603220-MONGLY00603252].

240. Mecchi, M. (Covance Labs., Inc.), *Salmonella – Escherichia coli/Mammalian-Microsome Reverse Mutation Assay with a Confirmatory Assay MON 78239* (Apr. 16, 2003) [MONGLY00603166-MONGLY00603198].

241. Mecchi, M. (Covance Labs., Inc.), *Salmonella-Escherichia coli/Mammalian-Microsome Reverse Mutation Assay with a Confirmatory Assay with MON 76171* (Dec. 8, 2008) [MONGLY00603464-MONGLY00603501].

242. Mecchi, M. (Covance Labs., Inc.), *Salmonella-Escherichia coli/Mammalian-Microsome Reverse Mutation Assay with a Confirmatory Assay MON 79991* (Jan 30, 2009) [MONGLY00603333-MONGLY00603366].

243. Mecchi, M. (Covance Labs., Inc.), *Salmonella-Escherichia coli/Mammalian-Microsome Reverse Mutation Assay with a Confirmatory Assay with MON 76138* (Jan. 30, 2009) [MONGLY00603399-MONGLY00603433].

244. Mesnage, R. et al., *Glyphosate Exposure in a Farmer's Family*, 3 J. Envtl. Protection 1001 (2012).

245. Mladinic, M. et al., *Characterization of Chromatin Instabilities Induced by Glyphosate, Terbythylazine and Carbofuren Using Cytome FISH Assay*, 189 Toxicology Letters 130 (2009).

246. Mladinic, M. et al., *Evaluation of Genome Damage and Its Relation to Oxidative Stress Induced by Glyphosate in Human Lymphocytes In Vitro*, 50 Envtl. & Molecular Mutagenesis 800 (2009).

247. Monsanto Company, Label for Roundup® Herbicide (1985) [MONGLY15269062].

248. Monsanto Company, Label for Roundup® Weed & Grass Killer III (2012).

249. Monsanto Company, Material Safety Data Sheet for Roundup® Weed & Grass Killer III (Jan. 2012) [MONGLY00028976-MONGLY00028987].

250. Moriya, M., et al., *Further Mutagenicity Studies on Pesticides in Bacterial Reversion Assay Systems,* 116 Mutation Res. 185 (1983).

251. Murli, H. (Covance Labs., Inc.), *Chromosomal Aberrations in Cultured Human Peripheral Blood Lymphocytes with MON 59117* (Apr. 28, 2000) [MONGLY00603077-MONGLY00603107].

252. Murli, H. (Covance Labs., Inc.), *Measuring Chromosome Aberrations in Human Whole Blood Lymphocytes with and Without Exogenous Metabolic Activation with a Confirmatory Assay With Multiple Harvests With MON 58121* (Sept. 3, 1997) [MONGLY00603709-MONGLY00603768].

253. Myhr, B. (Covance Labs., Inc.), *In Vivo Mouse Micronucleus Assay with MON 59117* (May 31, 2000) [MONGLY00603146-MONGLY00603165].

254. Myhr, B. (Covance Labs., Inc.), *Mutagenicity Test on MON 59112 in the In Vivo Mouse Micronucleus Assay* (May 31, 2000) [MONGLY00603811-MONGLY00603840].

255. New Zealand Environmental Protection Authority, *Risk Assessment Methodology for Hazardous Substances* (May 2018) (draft).

256. Ngo, M. et al., *Percutaneous Absorption and Exposure Assessment of Pesticides*, 30 J. Applied Toxicology 91 (2010).

257. Nielsen, J. et al., *Storage Conditions of Skin Affect Tissue Structure and Subsequent In Vitro Percutaneous Penetration*, 24 Skin Pharmacology & Physiology 93 (2011).

258. Nielsen, J. et al., *The Usual Suspects – Influence of Physicochemical Properties on Lag Time, Skin Deposition, and Percutaneous Penetration of Nine Model Compounds*, 72 J. Toxicology Envtl. Health, Part A 315 (2009).

259. Nielsen, J., *Defense against Dermal Exposures is Only Skin Deep: Significantly Increased Penetration through Slightly Damaged Skin*, 299 Archives of Dermatological Res. 423 (2007).

260. Niemann, L. et al., *A Critical Review of Glyphosate Findings in Human Urine Samples and Comparison with the Exposure of Operators and Consumers*, 10 J. Consumer Protection & Food Safety 3 (2015).

261. NIH (National Institutes of Health), *Household Products Database* (Apr. 2019).

262. OECD (Organisation for Economic Cooperation and Development), *Guidance Document for the Conduct of Skin Absorption Studies* (Mar. 5, 2004).

263. OECD, *Guidance Document on Revisions to OECD Genetic Toxicology Test Guidelines* (Aug. 31, 2015).

264. OECD, *Guidance Notes on Dermal Absorption* (Aug. 18, 2011).

265. OECD, *Guideline for the Testing of Chemicals - Skin Absorption: In Vitro Method* (Apr. 13, 2004).

266. OEHHA (Office of Environmental Health Hazard Assessment), *OEHHA Statement Regarding US EPA's Press Release and Registrant Letter on Glyphosate*, Cal. EPA (Aug. 12, 2019).

267. OEHHA, *Proposition 65 No Significant Risk Levels (NSRLs) for Carcinogens and Maximum Allowable Dose Levels (MADLS) for Chemicals Causing Reproductive Toxicity*, Cal. EPA (Oct. 2018).

268. Oltmanns, J. et al., *Effectiveness of Personal Protective Equipment against Dermal Exposure – A Comparative Study*, Federal Institute for Occupational Safety and Health (2016).

269. Pahwa, M. et al., *Glyphosate Use and Associations with Non-Hodgkin Lymphoma Major Histological Sub-Types: Findings from the North American Pooled Project*, Scandinavian J. Work Env't Health (2019) with supplementary materials.

270. Pant, K., *In Vivo Mammalian Erythrocyte Micronucleus Assay in Mice (MON 119151)* (Nov. 11, 2016) [MONGLY08730227-MONGLY08730263].

271. Perina, V. & R. Bonetti, *The Salmonella Typhimurium Reverse Mutation by MON 77280* (Mar. 5, 1998) [MONGLY02638195-MONGLY02638235].

272. Perina, V., *The Salmonella Typhimurium Reverse Mutation by MON 78036* (Nov. 12, 1999) [MONGLY08729284-MONGLY08729315].

273. Perry, M. et al., *Historical Evidence of Glyphosate Exposure from a U.S. Agricultural Cohort*, 18 Envtl. Health 42 (2019).

274. Pierce, J. et al., *Pilot Study Evaluating Inhalation and Dermal Glyphosate Exposure Resulting from Simulated Heavy Residential Consumer Application of Roundup®*, 32 Inhalation Toxicology 354 (2020).

275. Piesova, E., *The Effects of Glyphosate on the Frequency of Micronuclei in Bovine Lymphocytes In Vitro*, 55 Acta Veterinaria 101 (2005).

276. Piesova, E., *The Influence of Different Treatment Length On the Induction of Micronuclei In Bovine Lymphocytes After Exposure to Glyphosate,* 48 Foli Veterinaria 130 (2004).

277. Plaintiff Fact Sheet of Lorraine Rehak.

278. Portier, C., *A Comprehensive Analysis of the Animal Carcinogenicity Data for Glyphosate from Chronic Exposure Rodent Carcinogenicity Studies*, 19 Envtl. Health 18 (2020) with supplementary material.

279. Prasad, S., et al., *Clastogenic Effects of Glyphosate in Bone Marrow Cells of Swiss Albino Mice*, 2009 J. Toxicology 308985 (2009).

280. Prejean, J. et al., *Spontaneous Tumors in Sprague-Dawley Rats and Swiss Mice*, 33 Cancer Res. 2768 (1973).

281. Rages, D., *Accelerated Aging Data to Support the Registration of MON 79991 Herbicide Formulation*, Monsanto Co. (Nov. 16, 2012) [MONGLY01210670-MONGLY01210742].

282. Rank, J., et al., *Genotoxicity Testing of the Herbicide Roundup and its Active Ingredient Glyphosate Isopropylamine Using the Mouse Bone Marrow Micronucleus Test, Salmonella Mutagenicity Test, and Allium Anaphase-Telophase Test,* 300 Mutation Res. 29 (1993).

283. Ridley, W. & K. Mirly, *Volume 1: The Metabolism of Glyphosate in Sprague Dawley Rats – Part 1. Excretion and Tissue Distribution of Glyphosate and Its Metabolites following Intravenous and Oral Administration*, Monsanto Company (Mar. 23, 1988) [MONGLY00148193 – MONGLY00148787].

284. Riordan, A., *Evaluation of Glyphosate Use and Non-Hodgkin's Lymphoma – A Preliminary Trend Assessment*, American Industrial Hygiene Association (2020).

285. Roustan, A. et al., *Genotoxicity of Mixtures of Glyphosate and Atrazine and their Environmental Transformation Products Before and After Photoactivation*, 108 Chemosphere 93 (2014).

286. Roy, S. (BioReliance Corp.), *In Vitro Mammalian Cell Micronucleus Assay in Human Peripheral Blood Lymphocytes (HPBL) (MON 52276)* (Oct. 12, 2016) [MONGLY08729956-MONGLY08729999].

287. Roy, S. (BioReliance Corp.), *In Vitro Mammalian Cell Micronucleus Assay in Human Peripheral Blood Lymphocytes (HPBL) (MON 76610)* (Oct. 12, 2016) [MONGLY08730000-MONGLY08730044].

288. Roy, S. (BioReliance Corp.), *In Vitro Mammalian Cell Micronucleus Assay in Human Peripheral Blood Lymphocytes (HPBL) (MON 76886)* (Oct. 7, 2016) [MONGLY08730045-MONGLY08730088].

289. Roy, S. (BioReliance Corp.), *In Vitro Mammalian Cell Micronucleus Assay in Human Peripheral Blood Lymphocytes (HPBL) (MON 79346)* (Oct. 12, 2016) [MONGLY08730089-MONGLY08730132].

290. Roy, S. (BioReliance Corp.), *In Vitro Mammalian Cell Micronucleus Assay in Human Peripheral Blood Lymphocytes (HPBL) (MON 79351)* (Oct. 12, 2016) [MONGLY08730133-MONGLY08730176].

291. Roy, S. (BioReliance Corp.), *In Vitro Mammalian Cell Micronucleus Assay in Human Peripheral Blood Lymphocytes (HPBL) (MON 76952)* (Oct. 28, 2016) [MONGLY08730314-MONGLY08730357].

292. Sauer, R., *Pathology Working Group Report on Glyphosate in CD-1 Mice* (Oct. 10, 1985) [MONGLY00139358-MONGLY00139370].

293. Shirasu, Y. et al., *The Report of Mutagenic Study with Bacteria for CP67573* (July 20, 1978) [MONGLY00603683-MONGLY00603698].

294. Shirasu, Y., *CP50435: Microbial Mutagenicity Study* (Nov. 1980) [MONGLY00603699-MONGLY00603708].

295. Silvino, R., *MON 76313 Bacterial Reverse Mutation Test (Ames Test) Final Report* (Mar. 01, 2012) [MONGLY03255174-MONGLY03255235].

296. Silvino, R., *MON 8709 Bacterial Reverse Mutation Test (Ames Test) Final Report* (Aug. 8, 2011) [MONGLY02277858-MONGLY02277896].

297. Sivikova, K., et al., *Cytogenetic Effect of Technical Glyphosate on Cultivated Bovine Peripheral Lymphocytes,* 209 Int'l J. Hygiene & Envtl. Health 15 (2006).

298. Smith, S., *240 g/L Glyphosate SL Formulation (MON 79546) – In Vitro Absorption through Human Dermatomed Skin Using [14C]-Glyphosate* (Feb. 12, 2014) [MONGLY08731410 – MONGLY08731464].

299. Smith, S., *7.2 g/L Glyphosate Gel Formulation (MON 76904) – In Vitro Absorption through Human Dermatomed Skin using [14C]-Glyphosate* (July 23, 2015) [MONGLY08731619 – MONGLY08731699].

300. Smith, S., *720 g/kg Glyphosate SG Formulation (MON 79991) – In Vitro Absorption through Human Dermatomed Skin using [14C]-Glyphosate* (Feb. 12, 2014) [MONGLY08731465 – MONGLY08731523].

301. Solomon, K., *Estimated Exposure to Glyphosate in Humans via Environmental, Occupational, and Dietary Pathways: An Updated Review of the Scientific Literature*, Pest Mgmt. Sci. (2020).

302. Solomon, K., *Glyphosate in the General Population and In Applicators: A Critical Review of Studies on Exposures*, 46 Critical Revs. Toxicology 21 (2016).

303. Stammberger, I., *Dodigen 4022 Chromosome Aberrations In Vitro in V79 Chinese Hamster Cells* (Dec. 16, 1992) [MONGLY05745644-MONGLY05745679].

304. Stammberger, I., *Dodigen 4022 Study of the Mutagenic Potential in Strains of Salmonella Typhimurium (Ames Test) and Escherichia Coli* (July 10, 1992) [MONGLY05745612-MONGLY05745643].

305. Stankowski, L., *Ames/Salmonella-E. Coli Reverse Mutation Assay on Test Article 6933-22-20* (July 2, 1996) [MONGLY00604462-MONGLY00604527].

306. Stegeman, S. & A. Li, *Ames/Salmonella Mutagenicity Assay of MON 0818* (Oct. 26, 1990) [MONGLY00603978-MONGLY00604019].

307. Stegeman, S. & L. Kier, *Mouse Micronucleus Screening Assay of MON-0818* (Mar. 26, 1998) [MONGLY00604020-MONGLY00604051].

308. Stout, L. & F. Ruecker, *Chronic Study of Glyphosate Administered in Feed to Albino Rats*, Environmental Health Laboratory (Sept. 26, 1990) [EFSADOC00009760-EFSADOC00011943].

309. Sugimoto, K., *18-Month Oral Oncogenicity Study in Mice, Vol. 1 and 2* (1997) [EFSADOC00011944-EFSADOC00013188].

310. Suresh, T., *Combined Chronic Toxicity and Carcinogenicity Study with Glyphosate Technical in Wistar Rats* (1996) [EFSADOC00013189-EFSADOC00013802].

311. Tarazona, J. et al., *Glyphosate Toxicity and Carcinogenicity: A Review of the Scientific Basis of the European Union Assessment and its Differences with IARC*, 91 Archives of Toxicology 2723 (2017).

312. Tavares, C., *A Micronucleus Study in Mice for ROUNDUP WG*, BioAgri Laboratories (Aug. 22, 1998) [MONGLY04287931-MONGLY04287953].

313. Temple, W., *Review of the Evidence Relating to Glyphosate and Carcinogenicity*, New Zealand Environmental Protection Authority (Aug. 2016).

314. Thomas, K. et al., *Assessment of a Pesticide Exposure Intensity Algorithm in the Agricultural Health Study*, 20 J. Exposure Sci. and Envtl. Epidemiology 559 (2010).

315. Thongsinthusak, T. et al., *Guidance for the Preparation of Human Pesticide Exposure Assessment Documents*, Cal. EPA (May 4, 1993).

316. Transcript of Proceedings, *Pilliod v. Monsanto Co.*, No. RG17862702 (Cal. Super. Ct. Alameda Cty. Apr. 2, 2019) (testimony of Dr. Christopher Portier).

317. Transcript of Proceedings, *Pilliod v. Monsanto Co.*, No. RG17862702 (Cal. Super. Ct. Alameda Cty. Apr. 3, 2019) (testimony of Dr. Christopher Portier).

318. Transcript of Proceedings, *Pilliod v. Monsanto Co*., No. RG17862702 (Cal. Super. Ct. Alameda Cty Apr. 11, 2019) (testimony of Dr. William Sawyer).

319. Transcript of Proceedings, Volume 17, *Johnson v. Monsanto Co.*, No. CGC-18-550128 (Cal. Super. Ct. S.F. Cty. July 26, 2018) (testimony of Dr. William Sawyer).

320. U.S. Department of Health and Human Services, *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease*, A Report of the Surgeon General (2010).

321. U.S. Department of Labor, Occupational Safety and Health Administration (OSHA), *The Occupational Health Professional's Services and Qualifications: Questions and Answers, OSHA 3160* (1999).

322. Van Burgsteden, J., *In Vitro Percutaneous Absorption Study with [$^{14}$C]glyphosate using Viable Rat Skin Membranes*, TNO Nutrition and Food Research (Jul. 29, 2003) [MONGLY01285806 – MONGLY01285848].

323. van de Waart, Ing. E. (NOTOX), *Evaluation of the Ability of Glyfosaat to Induce Chromosome Aberrations in Cultured Peripheral Human Lymphocytes (with Independent Repeat)* (June 30, 1995) [MONGLY00604555-MONGLY00604583].

324. Wagner, V., *Bacterial Reverse Mutation Assay MON 76245* (July 13, 2015) [MONGLY00602996-MONGLY00603042].

325. Wagner, V., *Bacterial Reverse Mutation Assay MON 76855,* Bio Reliance Corp., (Sept. 26, 2013) [MONGLY00602784-MONGLY00602836].

326. Wagner, V., *Bacterial Reverse Mutation Assay MON 76857,* BioReliance Corp., (Sept. 26, 2013) [MONGLY00602837-MONGLY00602885].

327. Wagner, V., *Bacterial Reverse Mutation Assay MON 76865* (May 5, 2014) [MONGLY00602886-MONGLY00602940].

328. Ward, J. *Lymphomas and Leukemias in Mice*, 57 Experimental & Toxicologic Pathology 377 (2006).

329. Ward, R., *360g/L Glyphosate SL Formulation (MON 52276) In Vitro Absorption of Glyphosate through Human Epidermis* (Feb. 12, 2010) [MONGLY00698737 – MONGLY00698789].

330. Ward, R., *450 g/L Glyphosate SL Formulation (MON 79545) In Vitro Absorption of Glyphosate through Human Epidermis, DLT-09-093* (Feb. 12, 2010) [MONGLY00698684 – MONGLY00698736].

331. Ward, R., *480 g/L Glyphosate SL Formulation (MON 79351) In Vitro Absorption of Glyphosate through Human Epidermis* (Feb. 12, 2010) [MONGLY00698790 – MONGLY00698842].

332. Wester, R., et al., *Glyphosate Skin Binding, Absorption, Residual Tissue Distribution, and Skin Decontamination*, 16 Fundamental and Applied Toxicology 725 (1991).

333. Wester, R., et al., *In Vitro Percutaneous Absorption of Model Compounds Glyphosate and Malathion from Cotton Fabric into and through Human Skin*, 34 Food and Chemical Toxicology 731 (1996).

334. Wildeman, A., et al., *Significance of Plant Metabolism in the Mutagenicity and Toxicity of Pesticides,* 24 Canadian J. Genetics & Cytology 437 (1982).

335. Wood, E. et al., *Glyphosate Technical: Dietary Carcinogenicity Study in the Mouse* (Apr. 22, 2009) [EFSADOC00013803-EFSADOC00015023].

336. Wood, E. et al., *Glyphosate Technical: Dietary Combined Chronic Toxity/Carcinogenicity Study in the Rat* (Apr. 23, 2009) [EFSADOC00015024-EFSADOC00017494].

337. Xu, Y. (Covance Labs., Inc.), *In Vivo Mouse Bone Marrow Micronucleus Assay MON 51803* (Aug. 13, 2009) [MONGLY00603646-MONGLY00603682].

338. Xu, Y. (Covance Labs., Inc.), *In Vivo Mouse Bone Marrow Micronucleus Assay MON 76313* (May 5, 2009) [MONGLY01629935-MONGLY01629970].

339. Xu, Y. (Covance Labs., Inc.), *In Vivo Mouse Bone Marrow Micronucleus Assay MON 79864* (Oct. 7, 2008) [MONGLY00603571-MONGLY00603607].

340. Xu, Y. (Covance Labs., Inc.), *In Vivo Mouse Bone Marrow Micronucleus Assay with MON 76171* (Dec. 30, 2008) [MONGLY00603502-MONGLY00603531].

341. Xu, Y. (Covance Labs., Inc.), *In Vivo Mouse Bone Marrow Micronucleus Assay with MON 76138* (Feb. 9, 2009) [MONGLY00603434-MONGLY00603463].

342. Xu, Y. (Covance Labs., Inc.), *In Vivo Mouse Bone Marrow Micronucleus Assay with MON 79991* (Jan. 23, 2009) [MONGLY00603367-MONGLY00603398].

343. Xu, Y. (Covance Labs., Inc.), *Salmonella-Escherichia coli/Mammalian-Microsome Reverse Mutation Assay with a Confirmatory Assay with MON 78910* (Mar. 1, 2006) [MONGLY00603274-MONGLY00603300].

344. Young, M., *In Vivo Mammalian Erythrocyte Micronucleus Assay in Mice* (MON 76857) (Apr. 16, 2018) [MONGLY08730543-MONGLY08730579].

345. Zhai, H., et al., *Skin Decontamination of Glyphosate from Human Skin In Vitro*, 45 Food and Chemical Toxicology 2258 (2008).

346. Zhang, L. et al., *Exposure to Glyphosate-Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence*, 781 Mutation Research/Reviews in Mutation Research 186 (2019).

347. Zoller, O. et al., *Urine Glyphosate Level as a Quantitative Biomarker of Oral Exposure*, 228 Int'l J. Hygiene Env't Health 113526 (2020).

# Appendix C

Table 1: Ms. Rehak Occupational Daily Glyphosate Dermal Dose per Use from Applying Formulated RoundUp

**Equation 1**

$$\text{Dose per Use (mg/kg)} = \frac{SA*T*K_p*C}{BW}$$

| Skin Surface Area (cm²) | Time per Event (hr) | $K_p$ (cm/hr) | C (mg/cm³) | BW (kg) | Dose (mg/kg) |
|---|---|---|---|---|---|
| 380 | 0.33 | 5.90E-06 | 18 | 55 | 2.4E-04 |

| Abbreviation | Parameters | Value | Units | Reference |
|---|---|---|---|---|
| SA | Skin Surface Area | 380 | cm² | EFH, 2011, Assumption 1 |
| T | Time per event | 0.33 | hr | Rehak Deposition |
| $K_p$ | Dermal Permeability | 5.9E-06 | cm/hr | Nielsen et al. (2009) |
| C | Concentration in solution | 18 | mg/cm³ | Calculated; RoundUp Concentrate |
| BW | Body Weight | 55 | kg | Rehak Deposition; Assumption 2 |

Assumptions:

1. Skin surface area

   Average Lower leg skin surface area 2330 cm² (total area) ÷ 2 (front half of lower leg) = 1165 cm²

   Average Upper leg/thigh skin surface area 3640 cm² (total area) ÷ 4 (front lower half of thigh) = 910 cm²

   Average feet surface area 1220 cm² (total area) ÷ 2 (top half of feet) = 610 cm²

   **Total** 2685 cm²

   **X 10 (90% clothing protection factor)** = 269 cm²

   +

   Average hand skin surface area 890 cm² (total area) ÷ 8 (one quarter of one hand) = ~111 cm²

   **380 cm2**

2. Ms. Rehak weight from deposition

   120 lbs. * .454 kg/1 lb.= **55 kg**

   References:   EPA Exposure Factors Handbook (2011)
   Johnson et al. (2005)
   EFSA (2014)
   Espahnol-Soares et al. (2013)
   Rehak Deposition, Exhibits, and Production
   Nielsen et al. (2009)
   Edmiston et al. (1995)

Table 2: Ms. Rehak Average Daily Glyphosate Dermal Dose from Roundup Occupational Formulation Application

Equation 2

Average Daily Dose= $\dfrac{DA_{event}*EV*ED*EF*SA}{BW*AT}$

| | DA_event mg/cm²-event | Skin Surface Area (cm²) | Event Frequency (event per day) | Exposure Frequency (days/year) | Exposure Duration (Years) | BW (kg) | Averaging Time (days) | Aver Dose |
|---|---|---|---|---|---|---|---|---|
| Occupational Application | 3.5E-05 | 380 | 12 | 3 | 7 | 55 | 2557 | 2 |

| Abbreviation | Parameters | Value | Units | Reference |
|---|---|---|---|---|
| SA | Skin Surface Area-Occupational Applying | 380 | cm² | EFH, 2011, Assumption 1 |
| EV | Event Frequency | 12 | Event/day | Rehak Deposition, Assumption 2 |
| EF | Exposure Frequency-Occupational Applying | 3 | Days/year | Amount of times accompanying Chemlawn technician/applicator |
| ED | Exposure Duration | 7 | years | Rehak Deposition |
| T | Time per event-Occupational Applying | 0.33 | hr | Rehak Deposition, Assumption 4 |
| Kp | Dermal Permeability | 5.9E-06 | cm/hr | Nielsen et al. (2009) |
| C | Concentration in mixed formulation | 18 | mg/cm³ | Calculated; Roundup Pro Concentrate |
| BW | Body Weight | 55 | kg | Rehak Deposition |
| AT | Averaging Time | 2557 | days | Rehak Deposition |

Assumptions:

1. Skin surface area

   Average lower leg skin surface area 2330 cm² (total area) ÷ 2 (front half of lower leg) =   1165 cm²

   Average Upper leg/thigh skin surface area 3640 cm² (total area) ÷ 4 (front lower half of thigh) =   910 cm²

   Average feet surface area 1220 cm² (total area) ÷ 2 (top half of feet) =   610 cm²

   Total   3055 cm²

   X .10 (90% clothing protection factor)

   = 269 cm²

   +

   ~111 cm²

   380 cm2

   Average hand skin surface area 890 cm² (total area) ÷ 8 (one quarter of one hand) =   ~111 cm²

2. Number of applications per day. Ms. Rehak testified to spending at least 8 hours (480 minutes) per ride-along and 20 minutes per residence

   Assuming that no time was spent driving between locations for a maximum number of locations:

   480 minutes/20 minutes = 24 residences.

   24 residences / 2 = 12 Residences          Conservatively assuming she applied Roundup to half the yards=   12

3. Ms. Rehak weight from deposition          120 lbs. * .454 kg/1 lb.= 55 kg

Equation 3

$DA_{event}= Kp*C*T_{event}$

$DA_{event}=$ 3.5E-05          Occupational Application

References:
EPA Exposure Factors Handbook (2011)
Johnson et al. (2005)
EFSA (2014)
Espahnol-Soares et al. (2013)
Rehak Depositions, Exhibits, and Production
Nielsen et al. (2009)
Edmiston et al. (1995)