Elizabeth J. Cabraser (SBN 083151)
Robert L. Lieff (SBN 037568)
Steven E. Fineman (SBN 140335)
Andrew R. Kaufman
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: 415.956.1000
ecabraser@lchb.com

William M. Audet (SBN 117456)
AUDET & PARTNERS, LLP
711 Van Ness, Suite 500
San Francisco, CA 94102-3229
Telephone: 415.568.2555

*Counsel for Plaintiffs and the Proposed Class*
*(additional counsel listed below)*

James R. Dugan, II
TerriAnne Benedetto
THE DUGAN LAW FIRM, APLC
One Canal Place
365 Canal Street, Suite 1000
New Orleans, LA 70130
Telephone: 504.648.0180

Samuel Issacharoff
40 Washington Square South
Suite 411J
New York, NY 10012
Telephone: 212.998.6580

Elizabeth A. Fegan
Melissa Ryan Clark
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Fl.
Chicago, IL 60606
Telephone: 312.741.1019

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL NO. 2741 |
| | Case No. 3:16-md-02741-VC |
| THIS DOCUMENT RELATES TO: | **REPLY IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS SETTLEMENT, APPOINTMENT OF INTERIM CLASS AND SUBCLASS COUNSEL, DIRECTION OF NOTICE UNDER FED. R. CIV P. 23(e), SCHEDULING OF A FAIRNESS HEARING, AND STAY OF THE FILING AND PROSECUTION OF ROUNDUP-RELATED ACTIONS BY SETTLEMENT CLASS MEMBERS** |
| *Ramirez, et al. v. Monsanto Co.,* Case No. 3:19-cv-02224 | |
| | Date: May 12, 2021 Time: 10:00 AM Place: Courtroom 4, 17th Floor (Videoconference) Judge: Honorable Vince Chhabria |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

CHANGES TO THE SETTLEMENT.....................................................................10

ARGUMENT .........................................................................................................14

I.      The Settlement Class Satisfies Rule 23 and Due Process.................................14

        A.      This case is not *Amchem.* ....................................................................16

        B.      The settlement's real parallel is *Diet Drugs*, not *Amchem*......................21

        C.      The class notice satisfies Rule 23 and due process requirements. .........26

        D.      The central common questions of conduct, causation, and preemption
                predominate over individual issues....................................................30

        E.      The settlement class comports with Article III, and is reasonably defined
                to satisfy due process and respect existing attorney-client relationships...............36

        F.      The class representatives are adequate representatives of the class and
                subclasses. ........................................................................................38

                1.      There are no fundamental conflicts requiring additional subclasses. ........38

                2.      The adequacy of subclass representation is sufficiently
                        documented. .........................................................................42

                3.      The settlement does not give the class representatives
                        disproportionate treatment. .................................................44

        G.      A class action is a superior mechanism for achieving the proposed
                settlement's objectives. ......................................................................45

II.     The Settlement is a Fair, Reasonable, and Adequate Alternative to the Tort
        System.....................................................................................................46

        A.      The settlement offers substantial benefits to the class. .........................51

                1.      The compensation program offers meaningful relief through
                        reasonable and transparent processes.....................................51

                        a.      The amount of the compensation awards is reasonable.................52

                        b.      The process for obtaining compensation awards is
                                reasonable. .......................................................54

                        c.      The tier criteria are sensible and reasonable. ................55

                        d.      The proof-of-exposure requirement is reasonable. ...........57

                        e.      The compensation fund will be adequate to pay all claims. ..........58

# TABLE OF CONTENTS
## (continued)

Page

f.    The Accelerated Payment Award option is an extra benefit to the class. ...................................................................... 58

g.    The other objections to the compensation program should be rejected. ............................................................... 59

2.    Objections that the settlement benefits do not go far enough should be rejected. ........................................................................ 60

a.    The settlement is fair to Subclass 1 members diagnosed before 2015. ............................................................... 60

b.    The settlement is fair to derivative claimants. .............................. 61

c.    The compensation program being subject to renegotiation and approval after four years is reasonable ................................... 62

d.    The labeling change is a significant benefit to the class. .............. 63

3.    The Legal Services Program will assist class members throughout the notice, approval, and compensation process in navigating the settlement without reducing settlement benefits in any way. ................... 65

4.    The DAGP provides meaningful benefits to millions of individuals who, without this settlement, may be left entirely unaware of their risk of developing NHL and deprived of life-saving early detection. ................................................................................ 66

a.    The DAGP is crafted to maximize the efficacy and reach of the settlement's benefits and make a lasting impact. .................... 66

b.    The DAGP will provide widespread diagnostic evaluation and direct benefits to class members. ........................................... 69

B.    The Advisory Science Panel, punitive damages waiver, and litigation stay are fair and reasonable in the context of the overall settlement. ........................... 71

1.    The non-binding Advisory Science Panel is reasonable. ........................... 71

a.    The Panel's determination is not binding on judges or juries in form or effect. ........................................................... 73

b.    The Panel is not "secret," and its determination is subject to discovery and challenge. .............................................. 75

c.    The Panel selection process is appropriate. ................................. 76

d.    The Panel inquiry is appropriately formulated. ............................ 77

e.    The Panel does not offend jury trial rights. ................................... 79

**TABLE OF CONTENTS**
**(continued)**

Page

f.      The Panel is fully consistent with Article III. ...............................81

2.      The release of punitive damages is reasonable. .........................................82

3.      The temporary litigation stay is reasonable. ...............................................86

C.      The remaining objections to the settlement provide no basis for denying preliminary approval. ..............................................................................................88

CONCLUSION ...................................................................................................................89

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acosta v. Trans Union, LLC,*
  243 F.R.D. 377 (C.D. Cal. 2007) ............................................................ 42

*Am. Int'l Grp., Inc. v. Ace INA Holdings, Inc.,*
  No. 07-2898, 2012 WL 651727N.D. Ill. Feb. 28, 2012) ........................ 57

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997) ...................................................................... passim

*BMW of N. Am., Inc. v. Gore,*
  517 U.S. 559 (1996) ................................................................... 84, 85

*Briseno v. ConAgra Foods, Inc.,*
  844 F.3d 1121 (9th Cir. 2017) ................................................................ 28

*Burgess v. Williams,*
  302 F.2d 91 (4th Cir. 1962) ................................................................ 80

*Carson v. Monsanto Co.,*
  No. 17-237, 2020 WL 7497385 (S.D. Ga., Dec. 21, 2020) ....................... 6

*Cimino v. Raymark Indus., Inc.,*
  751 F. Supp. 649 (E.D. Tex. 1990) ........................................................ 31

*Clark v. Cantrell,*
  529 S.E.2d 528 (S.C. 2000) ................................................................ 84

*Cooper Indus. v. Leatherman Tool Grp., Inc.,*
  532 U.S. 424 (2001) ................................................................ 84

*Cotter v. Lyft, Inc.,*
  193 F. Supp. 3d 1030 (N.D. Cal. 2016) ................................................ 10

*Crateo, Inc. v. Intermark, Inc.,*
  536 F.2d 862 (9th Cir. 1976) ................................................................ 80

*Daigle v. Maine Med. Ctr., Inc.,*
  14 F.3d 684 (1st Cir. 1994) ................................................................ 80

*Daubert v. Merrell Dow Pharm., Inc.,*
  509 U.S. 579 (1993) ........................................................ 5, 6, 56, 76

*Douglas v. The W. Union Co.,*
  955 F.3d 662 (7th Cir. 2020) ................................................................ 88

*Edelson v. Soricelli,*
  610 F.2d 131 (3d Cir. 1979) ................................................................ 80

- iv -

# TABLE OF AUTHORITIES
## (continued)

Page

*Ferrington v. McAfee, Inc.*,
No. 10-1455, 2012 WL 1156399 (N.D. Cal. Apr. 6, 2012) .................................................... 42

*Graffis v. Woodward*,
96 F.2d 329 (7th Cir. 1938) ................................................................................................ 80

*Gronne v. Abrams*,
793 F.2d 74 (2d Cir. 1986) ................................................................................................. 80

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ............................................................................... 18, 48, 52

*In re Anthem, Inc. Data Breach Litig.*,
327 F.R.D. 299 (N.D. Cal. 2018) ....................................................................................... 52

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) ............................................................................................. 38

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*,
No. 99-20593, 2004 WL 1793225 (E.D. Pa. Aug. 11, 2004) ............................................. 51

*In re Diet Drugs Prods. Liab. Litig.*,
431 F.3d 141 (3d Cir. 2005) ........................................................................................ 22, 29

*In re Diet Drugs*,
275 F.3d 34 (3d Cir. 2001) ................................................................................................. 22

*In re Diet Drugs*,
282 F.3d 220 (3d Cir. 2002) ............................................................................................... 22

*In re Diet Drugs*,
369 F.3d 293 (3d Cir. 2004) ................................................................................... 22, 23, 82

*In re Diet Drugs*,
MDL No. 1203, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000) ................................... passim

*In re Hyundai & Kia Fuel Economy Litig.*,
926 F.3d 539 (9th Cir. 2019) ................................................................................... 33, 34, 36

*In re Inter-Op Hip Prosthesis Liab. Litig.*,
204 F.R.D. 330 (N.D. Ohio 2001) ................................................................................ 15, 32

*In re Literary Works in Electronic Databases Copyright Litig.*,
654 F.3d 242 (2d Cir. 2011) ............................................................................................... 42

*In re Mex. Money Transfer Litig.*,
267 F.3d 743 (7th Cir. 2001) .............................................................................................. 34

*In re Nat'l Football League Players Concussion Injury Litig.*,
821 F.3d 410 (3d Cir. 2016) ...................................................................................... passim

## TABLE OF AUTHORITIES
### (continued)

Page

*In re NCAA Student-Athlete Concussion Injury Litig.*,
314 F.R.D. 580 (N.D. Ill. 2016)................................................................. 27, 39, 67, 70

*In re NCAA Student-Athlete Concussion Injury Litig.*,
332 F.R.D. 202, 2016 (N.D. Ill. 2019), *aff'd*, No. 19-2638, 2019 WL 8058082 (7th Cir. Oct.
25, 2019)............................................................................................................. 36

*In re Netflix Privacy Litig.*,
No. 11-379, 2013 WL 6173772 (N.D. Cal. Nov. 25, 2013) .................................... 88

*In re NFL Players' Concussion Injury Litig.*,
307 F.R.D. 351 (E.D. Pa. 2015)....................................................................... 56, 67

*In re Oil Spill by Oil Rig Deepwater Horizon*,
295 F.R.D. 112 (E.D. La. 2013) ................................................................... passim

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 934 (9th Cir. 2015) .................................................................................. 38

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
827 F.3d 223 (2d Cir. 2016) ................................................................................... 41

*In re Pet Foods Prods. Liab. Litig.*,
629 F.3d 333 (3d Cir. 2010) ................................................................................... 60

*In re Peterson*,
253 U.S. 300 (1920)................................................................................................ 79

*In re Phenypropanolamine (PPA) Prods. Liab. Litig.*,
227 F.R.D. 553 (W.D. Wash. 2004) ................................................................. 38, 61

*In re Prudential Ins. of Am. Sales Practices Litig.*,
261 F.3d 355 (3d Cir. 2001) ................................................................................... 82

*In re USC Student Health Center Litig.*,
No. 18-4258, 2019 WL 3315281 (C.D. Cal. June 12, 2019).................................. 55

*In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prod. Liab. Litig.*,
895 F.3d 597 (9th Cir. 2018) ........................................................................... 48, 52

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
MDL No. 2672, 2017 WL 2212783 (N.D. Cal. May 17 2017) .............................. 84

*In re Yahoo Mail Litig.*,
No. 13-4980, 2016 WL 4474612 (N.D. Cal. Aug. 25, 2016) ................................. 88

*In re: Nat'l Football League Players' Concussion Injury Litig.*,
No. 12-2323, Doc. 10255 (E.D. Pa. Sept. 12, 2018) ............................................. 60

# TABLE OF AUTHORITIES
## (continued)

Page

*In re: Roundup Prods Liab. Litig.*,
   390 F. Supp. 3d 1102 (N.D. Cal. 2018) ...................................................................... 78

*In re: Roundup Prods. Liab. Litig.*,
   358 F. Supp. 3d 956 (N.D. Cal. 2019) ...................................................................... 5

*Jabbari v. Farmer*,
   965 F.3d 1001 (9th Cir. 2020) .......................................................................... 33, 35

*Juris v. Inamed Corp.*,
   685 F.3d 1294 (11th Cir. 2012) ........................................................................ 15, 36

*Mirfasihi v. Fleet Mortg. Corp.*,
   356 F.3d 781 (7th Cir. 2004) .......................................................................... 42

*Molski v. Gleich*,
   318 F.3d 937 (9th Cir. 2003) .......................................................................... 42

*Mullane v. Central Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) .......................................................................... 28

*Muskrat v. United States*,
   219 U.S. 346 (1911) .......................................................................... 37

*Nat'l Ass'n of Wheat Growers v. Becerra*,
   468 F. Supp. 3d 1247 (E.D. Cal. 2020) .......................................................................... 5

*Philip Morris USA v. Williams*,
   549 U.S. 346 (2007) .......................................................................... 85

*Rollins v. Dignity Health*,
   336 F.R.D. 456 (N.D. Cal. 2020) .......................................................................... 42

*Seoane v. Ortho Pharm., Inc.*,
   660 F.2d 146 (5th Cir. 1981) .......................................................................... 80, 81

*Silber v. Mabon*,
   18 F.3d 1449 (9th Cir. 1994) .......................................................................... 28

*Six (6) Mexican Workers v. Ariz. Citrus Growers*
   904 F.2d 1301 (9th Cir. 1990) .......................................................................... 69

*Specter v. Tex. Turbine Conversions, Inc.*,
   No. 17-194, 2020 WL 7133847 (D. Alaska Dec. 4, 2020) .......................................................................... 76

*Stern v. Marshall*,
   564 U.S. 462 (2011) .......................................................................... 81

*Sullivan v. DB Invs., Inc.*,
   667 F.3d 273 (3d Cir. 2011) .......................................................................... 34

# TABLE OF AUTHORITIES
## (continued)

Page

*Tyson Foods, Inc. v. Bouaphakeo,*
  136 S. Ct. 1036 (2016) ..................................................................... 34

*UAW v. GMC,*
  497 F.3d 615 (6th Cir. 2007) ........................................................... 57

*Uhl v. Thoroughbred Tech. & Telecommc'ns, Inc.,*
  309 F.3d 978 (7th Cir. 2002) ...................................................... 40, 62

*Waggoner v. R.J. Reynolds Tobacco Co.,*
  No. 09-10367, 2012 WL 12898850 (M.D. Fla. Feb. 7, 2012) .............. 74

*Walker v. R.J. Reynolds Tobacco Co.,*
  734 F.3d 1278 (11th Cir. 2013) ....................................................... 74

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338 (2011) ....................................................................... 32

*Williams v. BASF Catalysts LLC,*
  No. 11-1754, Doc. 623 (D.N.J. Sept. 3, 2020) .................................. 59

*Williams v. Rohm & Haas Pension Plan,*
  658 F.3d 629 (7th Cir. 2011) ........................................................... 38

*Woods v. Holy Cross Hosp.,*
  591 F.2d 1164 (5th Cir. 1979) ......................................................... 80

**Statutes**

Cal. Code Civ. P. § 36 ......................................................................... 87

**Rules**

Fed R. Evid. 706(b) ............................................................................. 72

Fed R. Evid. 706(b)(1)-(2) .................................................................. 72

Fed R. Evid. 706(d) ............................................................................. 72

Fed R. Evid. 706(e) ............................................................................. 72

Fed. R. Civ. P. 1 ................................................................................. 46

Fed. R. Civ. P. 23(b)(2) ...................................................................... 41

Fed. R. Civ. P. 23(b)(3) ...................................................................... 45

Fed. R. Civ. P. 23(b)(3)(A) ................................................................. 45

Fed. R. Civ. P. 23(b)(3)(D) ................................................................. 33

Fed. R. Civ. P. 23(e)(2)(C)(i) .............................................................. 53

## TABLE OF AUTHORITIES
### (continued)

**Page**

Fed. R. Civ. P. 26(2)(C) .......................................................................... 89

Fed. R. Civ. P. 26(b)(1) ........................................................................... 89

Fed. R. Civ. P. 32(a)(1) ............................................................................ 79

Fed. R. Evid. 706(a) .................................................................................. 72

**Treatises**

1 Rubenstein et al., *Newberg on Class Actions* (5th ed. 2011) ..................... 38

2 *McLaughlin on Class Actions* (10th ed. 2013) .......................................... 34

**Other Authorities**

Amicus Curiae Brief of United States, *Monsanto Co. v. Hardeman*, Ninth Cir. No. 19-16636, 2019 WL 7494588 (Dec. 20, 2019) ............................................................ 64

Francis E. McGovern, *Toward a Functional Approach for Managing Complex Litigation*, 53 U. Chi. L. Rev. 440 (1986) ................................................................. 31

John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action* (1995) ................. 2

OEHHA, Initial Statement of Reasons, Proposed Amendment to Section 25705(b) Specific Regulatory Levels Posing No Significant Risk:  Glyphosate (Mar. 28, 2017) ........................ 78

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97 (2009) ...................................................................... 32

S. Gibson et al., *Trial Court Caseload Overview – Incoming Trends, 2012-19* (Dec. 9, 2020) ... 83

Tobacco Control Legal Consortium, *What is the "Engle Progeny" Litigation?* (2015) .............. 74

U.S. Courts, *Judicial Business – 2019 Tables*, Table T-1 (Sept. 30, 2019) ................................. 83

## <u>INTRODUCTION</u>

This settlement will save lives. It will deliver notice, outreach, and information, including on the product label itself, to Roundup users—among them those overlooked by the tort system to date—that they may be at risk and should take action. It will alert them to be evaluated for NHL, and provide them diagnostic assistance to do so, through the largest medical-monitoring program ($210 million) in legal history. It will give them an option for significant and speedy compensation if they get NHL. It will give them access to free legal services, both during the class notice and opt-out period and during the operation of the settlement's programs, to advise them on their rights and help them secure compensation, while preserving their right to hire other lawyers if they choose. It will fund research into treatment and diagnosis of NHL. It provides a total package of up to $2 billion, including more than $1.3 billion in the compensation fund. And most importantly, it will do all of this without requiring a class member to give up his or her right to sue Monsanto for compensatory damages in the tort system if that class member so prefers, and will not require a single class member to make that choice until after he or she is diagnosed with NHL.

Our opening brief showed that this class settlement merits preliminary approval under Rule 23 and that the Court should direct notice to the class of this proposed settlement so that the class members themselves may make their choices and voice their views. Professor John C. Coffee, Jr. of Columbia Law School agrees. Professor Coffee was the leading academic opponent of the *Amchem* settlement on which the objectors so heavily rely.[1] Indeed, the Supreme Court itself specifically relied on and cited his article criticizing that settlement.[2] Professor Coffee has

---

[1] References to "objectors" refer to objections filed on behalf of law firms, objections filed on behalf of purported class members, and amicus briefs.

[2] *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621 (1997) (citing John C. Coffee, Jr.,

*Footnote continued on next page*

reached the opposite conclusion here: that the "settlement is one specially (and perhaps uniquely) designed to address one of the nation's most prevalent forms of cancer, Non-Hodgkin's Lymphoma (NHL) …. Simply put, this is a settlement that will save lives as well as award compensation." Coffee Decl. at ¶ 4.

Professor Coffee and Professor Arthur R. Miller further explain why the objectors' attempts to equate this settlement with *Amchem* are flatly wrong. Professor Coffee's accompanying Declaration focuses on the four questions this Court raised last July, details the benefits of this settlement to the class (including the health and educational programmatic benefits the *Amchem* settlement lacked), and explains the fundamental differences between the *Amchem* settlement and class and this one:

> Although some objectors seek to equate this settlement with *Amchem Products*, that is a gross mischaracterization; this settlement does not truly resemble the settlement rejected in *Amchem*, for several key reasons, which go both to the propriety of class certification and the fairness of the settlement. The class here has always been divided into subclasses for the diagnosed and undiagnosed, each with its own representation at the bargaining table. Every class member who does not receive compensation in the settlement retains compensatory rights, even after receiving other benefits. Even more importantly, class members covered by this settlement can re-enter the tort system without opting out, subject only to modest restrictions. Unlike in *Amchem*, the class here is unified by its need to resolve two important, live, and predominating common issues, regardless of the various states' tort laws under which the claims arise. These two issues are present in, and dispositive of, every case: the fact issue of general causation and the legal issue of federal preemption. These are the issues on appeal right now from the MDL bellwether trial verdict, and these same issues will likely be challenged in every Roundup exposure case. Finally, of vital importance, this settlement features unique and important health-related benefits that *Amchem* lacked.

*Id.* at ¶ 36. Professor Miller's declaration describes the history of Rule 23 (a subject with which he is intimately familiar) and explains why this settlement's "structure is consistent with the requirements of Rule 23 and the Constitution for settlements of mass-tort litigation and avoids

---

*Footnote continued from previous page*
*Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L. Rev. 1343, 1379-80 (1995)).

the structural deficiencies the Supreme Court identified in *Amchem*." Miller Decl. at ¶ 6.

An array of objectors and amici has opposed preliminary approval, objecting to almost every provision of the settlement. The parties utilized the extensions granted by the Court to consider constructive objections and negotiate amendments to the settlement addressing the class definition, outreach and legal services to class members, transparency and flexibility in the compensation program, the operation of the science panel, and other features. Below, we describe those amendments, and address objectors' arguments point-by-point.

At the most general level, the question before the Court is this: what best serves class members here? Our proposed class consists of people who have been exposed to Roundup, but have not yet sued or retained a lawyer to do so. Many of them have NHL already; many more will develop it going forward. Given the history of this litigation and the stage it has reached, these class members need two things.

*First*, they need information and education about the connection between Roundup and NHL, and about their potential rights against Monsanto. The overwhelming majority of the plaintiffs who have sued and settled to date—approximately 90% of the tens of thousands of Roundup claims for which plaintiffs provided information—are consumers who purchased Roundup for personal use, at Walmart, Home Depot, or garden stores, and whose exposure arose from use at home.[3] The migrant farmworkers whom the objectors claim to be worried about (and whom the settlement's design well serves) have not appeared in settlements to date. Why? It's not because they weren't exposed to Roundup, and it's not because they haven't developed NHL or aren't at risk of doing so. It's because they don't know of their rights. *See* Coffee Decl. at ¶ 11 ("[T]he private litigation system has not provided access to a feasible remedy for migrant

---

[3] *See* Declaration of Jeremy J. Wieck.

workers, landscaping crews, or others whose engagement with Roundup was professional rather than personal."). They need to know, if the law is to serve them.

The settlement will correct that information gap. It begins with an unprecedented notice campaign and, following approval, an ongoing outreach campaign, each specifically designed to reach migrant workers and other class members who have been left behind. Once this outreach and education occurs, the settlement gets them medical assistance through the Diagnostic Assistance Grant Program (DAGP) and provides them with legal assistance through the free Legal Services Program (LSP) during both the notice and opt-out period and the operation of the DAGP and compensation programs. And the settlement then gives these class members options for compensation if they have or develop NHL—while preserving their rights to sue Monsanto for compensation if, after that education and with the available free legal advice, they prefer the tort system instead. *See* Coffee Decl. at ¶¶ 30-36. The objectors' claims that the settlement forecloses these class members' rights ignores a fundamental fact: the settlement enables them to come forward and assert rights they would otherwise never exercise. The objectors' insistence that this Court must stop the settlement in its tracks, without even letting the notice campaign begin, to protect rights these class members would likely never exercise absent the settlement is simply a paradox.

*Second*, the class members need protection because of the particular stage this litigation has reached. The class members are not included in the inventory settlements that Monsanto concluded in the last year. If they sue now, they will be at the back of a very long line. Those class members who have not yet been diagnosed with NHL can't even get in the line now, and if and when they do get sick, the line will be even longer. Perhaps, years from now, Monsanto might agree to another round of inventory settlements that might include these plaintiffs. If that

- 4 -

were to happen, they would eventually get some compensation, albeit after many years (the first round of settlements has taken five years), without vital medical assistance or an assured compensation program in the interim, and with a sizable portion of their compensation necessarily going to attorneys' fees and costs. *See* Coffee Decl. at ¶¶ 20-26.

But that also might not happen. Objectors simply assume the Roundup litigation will necessarily continue on a course that completely favors plaintiffs. But what if instead, as this litigation proceeds in appellate courts and others around the country, Monsanto were to prevail on preemption or its other common legal defenses? What if instead, to plaintiffs' ongoing frustration, the EPA continues in its current view that glyphosate does not cause NHL and that view affects the litigation? What if instead Monsanto were to conclude it makes no sense to pay repeated individual settlements with no end and opt for another course, whether scorched-earth litigation or otherwise. If any of this were to happen, most or all class members would get little to nothing—not soon, and potentially not ever.

The risks described above are unfortunately real. For example, another federal judge in this State has recently determined that it would be "false and misleading" to warn that glyphosate causes NHL "given the weight of authority showing that glyphosate was not known to cause cancer and did not cause cancer." *Nat'l Ass'n of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247, 1259 (E.D. Cal. 2020). This Court remarked in ruling in the plaintiffs' favor on *Daubert* that the Ninth Circuit permits "a wider range of expert opinions (arguably much wider)" than other Circuits. *In re: Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d 956, 960 (N.D. Cal. 2019). And in the pending *Hardeman* appeal, Monsanto argues both that the claims are preempted (as does the EPA) and that the ability of plaintiffs' claims to get to trial is dependent on what

- 5 -

Monsanto characterizes as the Ninth Circuit's "outlier" status on *Daubert*.[4]

Regulatory risks are real too. We are not aware of any other mass tort where, following plaintiffs' impressive jury verdicts, a U.S. regulatory agency issued a letter reaffirming its view that the product does not cause the disease in question, and filed a brief supporting the defendant's preemption position on appeal.

The settlement protects class members against the aforementioned risks, while preserving their individual rights to choose to seek compensation in the tort system. It gives class members with NHL an option for speedy and substantial compensation if any of these risks materialize—or if class members are simply satisfied with the amount offered and want to take it instead of enduring the tort system's delays and uncertainties. It also allows class members to reject their individual settlement offers and sue Monsanto for compensation in the tort system if their risk/reward analysis leads them to choose the tort system route. And it lets class members make that choice individually after they develop NHL, while providing them with free legal services to guide them in that decision, a diagnostic assistance program to facilitate earlier diagnosis, and research funding to develop better treatment for NHL.

The objectors would have this Court deny class members these protections and the other settlement benefits and force them to bear all the risks above. They ask the Court to scuttle the settlement at this preliminary stage without even allowing notice to class members, offering assurances that the class members have nothing to worry about. The science is indisputable. The jurisprudence will always favor the plaintiffs, in every court. We share that hope, but no one can guarantee it. Objectors make other express or implicit assumptions as well: Monsanto is guaranteed to agree to endless rounds of inventory settlements. A mythical alternative deal

---

[4] Another federal court recently sided largely with Monsanto on preemption, albeit in a non-NHL case. *See Carson v. Monsanto Co.*, No. 17-237, 2020 WL 7497385 (S.D. Ga., Dec. 21, 2020).

exists, in which the class gets everything and gives up nothing. The tort system is an ideal world in which all the many thousands of class members will get to trial quickly, win, and keep huge punitive damages. In Prof. Coffee's analysis, choosing this unrealized utopia over the real benefits and protections of the settlement would be a tragedy. Coffee Decl. at ¶¶ 30-35.

The objectors proceed from a misplaced equation of this settlement with the *Amchem* "futures" settlement that (*unlike* this one) actually did foreclose class members' rights to seek compensation in the tort system. The objectors assert that this settlement is no different from the *Amchem* settlement, which—unlike this settlement—limited all future plaintiffs to a capped compensation fund and did not allow them to sue in the tort system if they did not ultimately like the amount offered. But the objectors fail to address the fundamental differences between this settlement and *Amchem*, which both Professors Miller and Coffee do address in their respective declarations. Nor do the objectors meaningfully address the post-*Amchem* settlements that this settlement actually *does* parallel (and improve upon, in material respects): the *Diet Drugs* and *BP Medical* settlements that courts approved over similarly-misplaced objections. *See* Miller Decl. at ¶¶ 20-32 (explaining the crucial role of "back-end rights"). Unlike *Amchem*, but like *Diet Drugs* and *BP Medical*, this settlement gives plaintiffs compensation *options* that they can accept or reject after they become sick. The objectors' claim that, because plaintiffs cannot meaningfully assess their compensation options before they get sick, they must be denied a settlement that allows them to make that choice after they get sick, is a complete non-sequitur.

The objectors would have this Court deny class members a right even to consider the settlement by derogating the settlement's real (and otherwise unavailable) benefits, including notice, outreach, legal services, research, compensation option, and a label change. Some objectors assert that this settlement is simply a carbon copy of the "Plan A" settlement submitted

- 7 -

last June and then withdrawn. Of course, it is not. Plaintiffs took the Court's concerns seriously; contrary to what objectors say, this is a dramatically different settlement. *See* Coffee Decl. at ¶ 5 ("[T]he new settlement looks entirely different from the former one that this Court viewed skeptically."). There is no preclusion of any sort or any way a class member can lose his or her right to sue for compensatory damages other than an individual decision to accept a compensation award. There is an entirely new $1.3 billion compensation program. There is a new and unprecedented free Legal Services Program providing lawyers experienced in Roundup litigation to advise class members at all stages. There is an enhanced diagnostic program. There is a provision for renewal after the initial settlement period.

Some objectors brush off the $1.3 billion-plus compensation program with predictions that the average compensation offer under the settlement would be lower than the per-case average of the inventory settlements. But they do this without acknowledging that up to 40% or more of inventory settlement amounts go to fees and costs, whereas *all* of the compensation amounts under this settlement can go to class members who use the free Legal Services Program the settlement makes available to all. *See* Coffee Decl. at ¶ 24. They likewise ignore that the compensation offers under the settlement are totally optional: if, as the litigation develops, class members think it would be better to pursue tort system suits, they can do so. And some objectors scoff at the settlement's Diagnostic Grant Assistance Program, contending that this largest medical-monitoring-type program in history is somehow of little value, and wrongly asserting that NHL cannot be detected early through diagnostic evaluation and that the Program is limited to certain "benighted" areas. Doc. 12677 at 28; Doc. 12682 at 41-42. The accompanying Coffee and Mehta Declarations refute these assertions, as did the Garretson DAGP Declaration filed with our opening papers (detailing the diagnostic program at length).

- 8 -

The objectors would have this Court deprive class members of the ability to consider the protection of a compensation option by exaggerating the settlement's limited trade-offs in return for that option, such as scare tactics about the Advisory Science Panel. The objectors crop off quotes to claim that the Panel cannot consider new scientific evidence (it can) and misreads provisions to assert that juries and courts would be bound by the Panel's conclusions (they would not). The objectors pretend the Panel is "secret," when in reality it is fully transparent. The objectors portray the Panel as somehow a stacked deck before which the plaintiffs cannot win, but never explain why independent scientists, working in a strict process that insulates them from influence by Monsanto, will nonetheless side with Monsanto in the face of what the objectors present as conclusive scientific evidence to the contrary. In any event, the parties are filing amendments to the settlement agreement regarding the Panel's selection and operation that we believe put the objectors' complaints to rest.

Finally, and of most concern given the settlement's objectives, objectors ask this Court to deny class members the benefits of the settlement without giving them a voice in the matter. In the name of their own idealized concept of class members' individual rights, objectors would deprive class members of any ability to decide what is best for themselves, or even to receive information and assistance that would help them protect their health in the face of Roundup risks. Coffee Decl. at ¶¶ 30-35. In effect, the objectors contend that they are entitled to impose their own views on all: that future plaintiffs cannot have the benefit of a settlement that gives them a choice whether to take compensation or run the risks described above, and that the settlement's provisions for prevention, diagnosis, and treatment are worthless or useless and must be subordinated to the objectors' unrealistic view of the tort system.

The objectors' claim that class members' own individual rights bar them from receiving

notice and making choices for themselves is a contradiction in terms. We fully recognize that preliminary approval is a significant step requiring a searching assessment of the likelihood of settlement class certification and approval. *See* Doc. 11182 at 2 (citing *Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1036-37 (N.D. Cal. 2016)). At the same time, it is preliminary in the sense that it is the necessary precursor to notifying the class and giving them an opportunity to make choices of their own. The objectors' contentions that the Court should block the settlement at the very outset are wrong. Wrong legally, wrong practically, and wrong in terms of what best serves the class members for whom the objectors purport to speak.

## CHANGES TO THE SETTLEMENT

Since the motion for preliminary approval was filed, the parties have agreed to several changes to the settlement. Some were memorialized in an agreement filed at Doc. 12665-1. Others are incorporated in the class action settlement agreement (as amended April 7, 2021), attached to this brief as **Exhibit A**. Citations to "Settlement §" refer to this document. A redline comparing the revised settlement to the version submitted at Doc. 12531-2 is attached as **Exhibit B.** The class notices (Exhibit 2 to the settlement) have not yet been updated to reflect the amendments and otherwise respond to objections. This work is in progress. Plaintiffs will submit revised notices in advance of the preliminary approval hearing.

The following is a summary of the most significant settlement changes, with citations to the exact terms as set forth in Exhibit A:

1.      **Class Definition**. The class definition is refined to exclude pure bystanders, such as golfers, and focus on known and ascertainable exposure from the application of Roundup in home, agricultural, and occupational settings. The revised class definition is:

(i) those individuals who are either citizens or Residents of the United States as of February 3, 2021 or who claim exposure to Roundup Products through the application of Roundup Products in the United States and who as of February 3, 2021 both (1) have been exposed to Roundup Products through the application of Roundup Products as a result of either occupational exposure as an agricultural, industrial, turf, or ornamental worker, or residential or other exposure where the exposed individual purchased, prepared, used, or applied the Roundup Products, or paid for, directed, participated in, saw, or was told of the purchase, preparation, use, or application of the products and (2) have not commenced an individual, non-class lawsuit or retained counsel for the pursuit of any individual, non-class personal injury or false advertising claims arising from, resulting from, in any way relating to or in connection with such exposure; and (ii) all Derivative Claimants.  "Application" includes application, mixing, and any other steps associated with application, whether or not the individual performed the application, mixing, or other steps associated with application himself or herself.

Settlement § 1.1. In accordance with the revised definition, Plaintiffs will submit revised forms of class notice that will provide examples and descriptions of the application of Roundup in the specified occupations and contexts to assist class members in determining and confirming whether they have been exposed to Roundup. Notice will also direct and alert people who know of their exposure to weed-killers, lawn treatment, or similar products to investigate whether the products were Roundup products.

2.      **Advisory Science Panel.** The parties have agreed to several changes to the Advisory Science Panel: (1) the Court will have the power to approve Panel members selected by the parties, *id.* § 12.1(b)(iii); (2) the number of Panel members has been increased from five to seven, *id.* 12.1(b); (3) two members—one selected by Class Counsel and one selected by Monsanto—may be scientists who have previously expressed a view on the relevant issues, *id.* § 12.1(c); (4) the Panel is not limited to the evidence described in the settlement, but can also consider any additional peer-reviewed studies if at least five members agree, *id.* § 12.2(e); (5) if the Panel does not agree that the weight of the scientific evidence supports the proposed methodology for determining a "threshold internal dose," it may use another established methodology for calculating a threshold internal dose level, *id.* § 12.2(c)(ii); (6) following

issuance of the Science Panel Determination, Monsanto and the settlement class may depose

each member of the Panel, with that testimony admissible in follow-on tort cases, *id.* § 12.3(d);

(7) the time period before the Panel's determination can be challenged under *Daubert*/*Frye* on

the basis of new evidence has been reduced from three years to two, *id.* § 12.5(b); and (8) the

Panel determination and depositions of Panel members will be posted on the settlement website.

*Id.* § 30.20. The amendments also emphasize what we believe was clear to begin with: that the

Panel determination has *no* issue-preclusive effect and does not limit judges or juries from

considering competing or contradictory expert opinions or evidence. *Id.* § 12.3(c).

3.      **Free Legal Services Program**. The LSP will begin after preliminary rather than

final approval. As such, it will be available to provide free legal services to class members during

the notice and opt-out period and thus advise them regarding their participation or

opt-out decisions. *Id.* § 11.2. As provided for in the amended settlement, Plaintiffs will file a

preliminary plan for operation of the LSP seven days before the preliminary approval hearing.

Settlement § 11.3(a).

4.      **Compensation Program**. The parties have agreed to three changes to the

compensation program: (1) a class member in any tier may, upon a showing of extraordinary

circumstances, receive an award in excess of the maximum for that tier, *id.* § 6.2(a)(ii)(1); (2) a

rejected compensation award will no longer constitute an offer of judgment, *id.* § 7.13(e); and (3)

Monsanto will certify that any appeal it takes of any compensation determination is made in

good faith, *id.* § 7.10(b).

5.      **Individual Release**. The form of individual release, which an individual class

member must execute to receive a compensation award, has been clarified to (1) assure that the

release encompasses *only* claims related to NHL, and does not extend to any other conditions;

and (2) remove the non-disparagement clause. *See id.*, Ex. 6.

6.      **Litigation Stay**. The parties have agreed to add an exception to the litigation stay: a class member who was diagnosed with NHL after the end of the opt-out period and applies for and rejects a compensation award may petition the Settlement Administrator on a showing of exceptional hardship and certain other conditions to return to the tort system early. *Id.* §§ 7.13(e), 18.2(b)(iv), In addition, if a class member passes away during the period of the stay, Monsanto has agreed not to assert any limitation on their survivors' recovery for pain and suffering that state law might otherwise impose by reason of the class member's death. *Id.* § 7.13(f).

7.      **Claims Deadline**. The deadline to make a claim with the compensation fund has been extended from 180 days after diagnosis to one year after diagnosis. *Id.* § 7.3(a). The remaining elements protecting the right to make a claim, including the tolling of the deadline until the Effective Date and for diagnoses late in the claims period, as well as the authority of the Claims Administrator to excuse tardiness for good cause or excusable neglect, are unaffected.

8.      **Scope of Medical Monitoring Release**. The release has been clarified to make clear that compensatory damages that were increased because of the absence of medical monitoring are not released and to limit the release of medical monitoring claims in ways tied to the reasonable availability of DAGP services to the class member at issue. *Id.* § 17.1(b).

9.      **Additional Community Involvement in DAGP**. The DAGP Administrator shall receive input from and consult with organizations representing historically-disadvantaged minority farmers and with unique knowledge of those populations to assure effective outreach and inclusion. *Id.* § 8.2(b).

10.     **Posting Information and Resources for Class Members**. The settlement website will include, among its ongoing resources for class members, publicly available

materials for use by class members who sue for compensatory damages in the tort system, including trial transcripts, court rulings, any trial preparation materials made available by MDL leadership, and transcripts of the depositions of Science Panel members. *Id.* § 30.20.

*      *      *

Other, less significant changes are documented in the amended agreement. In addition, the parties are working to amend the class notices and notice program to account for these changes, and to respond to constructive notice-related suggestions in the objections. The parties will file revised notices well in advance of the preliminary approval hearing.

## **ARGUMENT**

This brief is divided into two parts. Part I responds to the arguments that the Court cannot certify the settlement class irrespective of the terms of the settlement. These arguments largely consist of the objectors' inaccurate attempts to paint the settlement and class as a carbon copy of *Amchem*, and the notice, predominance, adequacy, and other class certification issues that flow from that. The accompanying declarations of Professors John C. Coffee, Jr., Arthur R. Miller, Andrew D. Bradt, and Scott Dodson also address these issues. Part II addresses the fairness of the settlement's terms and the objections to those terms. In addition to the Coffee, Miller, and Dodson Declarations, Plaintiffs submit a supplemental declaration from Dr. Amit R. Mehta, a declaration by Jeremy J. Wieck, and declarations of Class and Subclass 1 Representative Ramirez, and Class and Subclass 2 Representatives Sheller and Cain.

## I.     **The Settlement Class Satisfies Rule 23 and Due Process.**

The objectors' primary argument is the proposed settlement and class are supposedly the "striking" equivalent of the class settlement the Supreme Court rejected in *Amchem*. *E.g.*, Doc. 12677 at 7; Doc. 12678 at 5. While the two settlements both involve large classes that include

- 14 -

"exposure-only" class members who are not yet sick, the comparison ends there.

Contrary to the objectors' depiction, *Amchem* does not invalidate all mass-tort class settlements that include class members with latent injuries. That is clear from its actual holding: that such settlements should employ subclass representation for "exposure-only" class members, as was done here. Had the Court meant to invalidate all such settlements, it would have said so, instead of providing a procedural roadmap for how they could be structured. *See* 521 U.S. at 626-27; Miller Decl. at ¶ 19. Indeed, in the years since *Amchem*, the courts have consistently approved so-called "futures" class settlements that followed the Supreme Court's guidance. *See*, *e.g., In re Diet Drugs*, MDL No. 1203, 2000 WL 1222042, at *21, *49 & n.22 (E.D. Pa. Aug. 28, 2000) (class settlement including undiagnosed injuries and injuries that could "progress" over the next 15 years with back-end opt out for compensatory damages only and waiver of punitive damages); *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 125, 140 (E.D. La. 2013) (*BP Medical*) (class settlement including claims based on injuries developed in the future ["Later-Manifested Physical Conditions"] with back-end opt out for compensatory damages only and waiver of punitive damages); *In re Nat'l Football League Players Concussion Injury Litig*., 821 F.3d 410, 431-34 (3d Cir. 2016); *Juris v. Inamed Corp.*, 685 F.3d 1294, 1305-09, 1323-25 (11th Cir. 2012) (describing and rejecting collateral attack on class settlement including "future" claimants with latent injuries); *In re Inter-Op Hip Prosthesis Liab. Litig*., 204 F.R.D. 330, 338-39, 343 (N.D. Ohio 2001).

Instead, *Amchem* rested on the specific deficiencies of the settlement at issue there, all of which have been avoided and corrected here. As we show in Sections A-B, the settlement and class here avoid *Amchem* pitfalls and instead parallel the subsequent court-endorsed models, in particular the *Diet Drugs* class settlement. Sections C-F then show why, as a result, the

objectors' notice, predominance, adequacy, and other class certification arguments lack merit.

A.      **This case is not *Amchem*.**

*Amchem* involved an attempt to shoehorn into a single class settlement all future claims for a variety of diseases against 20 different defendants arising from exposure to any of a host of asbestos products. *See* 521 U.S. at 597, 603-04. The settlement bound all class members to pre-set, fixed compensation amounts "in perpetuity," without an option for them to reject the amounts and sue for compensation in the tort system after they became sick: only "[a] small number of class members—only a few per year—[could] reject the settlement and pursue their claims in court." *Id.* at 604-05. The Supreme Court rejected the settlement class because the absence of such an option raised adequacy and notice concerns, because the parties had not included structural protections for "exposure-only" class members (notably, subclasses) before binding them to fixed compensation amounts forever, and because the class members had little in common other than that they were included in the settlement. *Id.* at 622-28. The proposed settlement and class here are different on every level.

1.      Unlike *Amchem*, the settlement here does not force class members to relinquish their compensatory damages claims in return for fixed amounts, with "only a few claimants per year [allowed to] opt out at the back end." *Id.* at 627. Here, the compensation program is purely optional for every single class member. Class members don't even have to submit claims to it, much less accept the amount offered. All class members retain the right to sue for compensation in the tort system. And no class member needs to decide which road to take until after he or she gets NHL, and after he or she can see the specific amount offered under the program.

Far from being an *Amchem*-style cram-down of pre-set mandatory compensation amounts, this settlement gives class members with NHL the best of both worlds by allowing

them to make their choice individually on a fully informed basis. As post-*Amchem* courts have noted, this type of structure obviates the central adequacy and notice concerns that marked the *Amchem* settlement. *See*, *e.g.*, *Diet Drugs*, 2000 WL 1222042, at *21, *49 & n.22 (approving settlement that allowed class members whose injuries develop later to opt out at the "back end" and sue for compensatory damages, but not punitive damages); *BP Medical*, 295 F.R.D. at 125, 140, 155, 158 (same); Miller Decl. at ¶ 22 ("[T]his feature greatly alleviates concerns that mass-tort class actions could unfairly foreclose individual claims and individual decision-making about those claims. …. In a very realistic sense, a class settlement with this feature actually *enhances* individual rights by giving class members additional options from which they can choose on an individual basis, and by educating them so they can make their choices with much more information.").

Moreover, by providing this compensation option, the settlement here addresses what all class members face in common without resolving matters that apply to them individually. Having not been included in the inventory settlements, all class members face the risk that developments in the ongoing litigation before they can get their day in court (or before they can even file claims) could limit or eliminate their claims. All class members thus benefit from an option for compensation, one they can take or leave if and when they develop NHL.

Further unlike *Amchem*, the settlement here addresses only one disease: NHL. In *Amchem*, the settlement specified compensation for eight classes of diseases, allowed only limited "exceptional" compensation for others, and resolved still others without compensation at all (such as "pleural" claims) "even if otherwise applicable state law recognizes such claims." 521 U.S. at 603-04. By contrast, the settlement here applies only to NHL. It does not apply to claims arising from other diseases at all, much less limit compensation for them to exceptional

circumstances or resolve them without compensation. The objectors' claim that the settlement does apply to non-NHL claims (Doc. 12678 at 28-29; Doc. 12682 at 31-32, 38) is simply wrong. *See* Settlement §§ 2.1(7), 17.1 (release tied to NHL only).

Finally, the trade-offs for the compensation option and the other settlement benefits are far more limited than in *Amchem*. Here, class members do not give up their compensatory damages claims or access to the courts of their choosing. In return for the compensation option and other settlement benefits, class members agree to a temporary litigation stay while the settlement's compensation and other programs operate (a delay they would largely experience anyway), a waiver of punitive damages (which courts have uniformly held is a "fair and wholly appropriate trade-off" for a settlement providing a substantial compensation option and medical monitoring benefits);[5] and a Rule 706-type Advisory Science Panel on general causation (whose views will be purely advisory, can be tested at deposition and contested through any evidence, and which will be of substantial *benefit* to the class if general causation is found).

2.      The settlement builds in the structural protections missing in *Amchem*. At "the heart of *Amchem* was concern" that subclasses were not employed for separate representation of currently injured and exposure-only class members. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020-21 (9th Cir. 1998); *see also Amchem*, 521 U.S. at 626-27 ("discrete subclasses" should have been used). Here, the parties followed *Amchem*'s direction and employed those subclasses. As the Third Circuit held in approving a settlement that likewise used those subclasses, this is a "most important distinction" from *Amchem* and provides "a significant structural protection for the class that weighs in favor of finding adequacy." *NFL*, 821 F.3d at 432.

That structural protection, as the Supreme Court foresaw, resulted in further differences

---

[5] *Diet Drugs*, 2000 WL 1222042, at *49 n.22; *see also BP Medical*, 295 F.R.D. at 155, 158.

from the *Amchem* settlement. *First*, the compensation awards will start after final approval by

this Court, with $250 million made available for compensation even during the pendency of any

appeals (and not subject to reversion to Monsanto in the event of appellate reversal). This

provision to "start paying out claims immediately" protects the interests of "those currently

living with injuries." *Id.* at 433.

Second, unlike *Amchem*, "exposure-only" class members (Subclass 2) are not required to

release their compensatory damages claims in return for pre-set payment amounts that remain

fixed forever without adjustment for inflation. Here, class members are not required to release

their compensatory damages claims at all, and do so only if they individually choose to after they

get NHL and see what they are offered. *See Diet Drugs*, 2000 WL 1222042, at *49 (terming

similar provision the "[m]ost important" structural protection missing in *Amchem*); Miller Decl.

at ¶ 24 ("A back-end opt out right also substantially reduces concerns about adequacy of

representation in terms of the settlement's design [and,][w]hen combined with the use of

subclasses … is exactly the kind of 'structural assurance' the Supreme Court found lacking in

*Amchem*.").

Third, "exposure-only" Subclass 2 class members get the benefit of remedies totally

absent from the *Amchem* settlement, including the largest monitoring/diagnostic class settlement

program on record and research funding to improve treatment options if and when they get NHL.

*See, e.g.*, *NFL*, 821 F.3d at 432 (stressing the importance of monitoring remedies to class

members with latent disease); Coffee Decl. at ¶¶ 14-19; Miller Decl. at ¶ 33. As the Third Circuit

put it in approving the NFL settlement, "the terms of the settlement reflect that the interests of

current and future claimants were represented in the negotiations." *NFL*, 821 F.3d at 433.

3.      Last, this class is completely different from *Amchem*. The Court's opinion in *Amchem* cited the lack of "cohesion" of the "class" there. 521 U.S. at 616. That was principally because the *Amchem* "class" swept in all future claims against 20 different asbestos defendants. Class members' claims thus arose not from one common course of conduct, but 20 different ones. The claims arose from exposure not to one product, but the myriad different "asbestos products manufactured by one of more of 20 companies" that were then incorporated into an exponentially larger number of other products or buildings. *Id.* at 597. And as noted above, the claims included not one, but a host of different diseases, with the settlement providing compensation for eight disease types, limiting compensation for others, and denying compensation to others still. *Id.* at 603-04. The Supreme Court deemed it the most "sprawling" class in history; indeed, the main thing class members had in common was the circular point that they were included in the settlement. *Id.* at 622-24.

Moreover, the insufficient class cohesion in *Amchem* was compounded because the products at issue were not self-identifying, and virtually none of the class members' exposure to them stemmed from their own use. Unlike branded products (which people knowingly buy and use), the 20 defendants' asbestos products were incorporated into other products, often lurking unseen and unknowable in houses and other buildings across the country. Asbestos was hiding anywhere, not in plain sight, and most people's exposure did not arise from their own use of it. Class "cohesion" was thus undermined because class members were exposed "in different ways" and the vast majority of the *Amchem* class would have no reason to know whether or how they were exposed to the defendants' particular products absent individual investigation. *Id.* at 609.

This reverse is true here in every respect. The class is limited to claims against a single defendant (Monsanto), for a single disease (NHL), arising from a single class of products (the

Roundup brand and associated glyphosate-containing products) and a single course of conduct (Monsanto's). *See* Doc., 12507 (SAC) at ¶¶ 1-6. And the class's exposure to the product is fundamentally different. Unlike asbestos, which is used in many products, Roundup is used for one thing: to kill weeds. And class members were exposed in basically three ways: they bought it, they applied it, or they (lived or) worked where it was applied. Anyone exposed to weed killers in the fields, grounds or farms where they work or garden knows about such use, and can easily verify that Roundup (by far the most popular weed killer) was the product used. You can show someone a picture of Roundup and they can understand what it is and figure out if they fall into one of those three groups. You cannot show someone a "picture" of asbestos. And as noted above, the amendment to the settlement agreement amends the class definition here to exclude pure bystanders with no reason to know of or inquire about their exposure, such as golfers.

### B.    The settlement's real parallel is *Diet Drugs*, not *Amchem*.

While no two major successful class action settlements are identical (and this settlement is likewise not a clone of any other), contrary to the objectors' contention, the most applicable precedent here is *Diet Drugs*, not *Amchem*.

1.    Like the settlement here, *Diet Drugs* involved a class of millions, but a single defendant, a single type of disease, a limited class of products, and a single course of conduct. The class included at least six million people who took either of two drugs found to cause different forms of valvular heart disease. 2000 WL 1222042, at *1. Like the settlement here, the class included both people already diagnosed, but also many class members who did not know of their injuries at the time of the settlement. In fact, most of the *Diet Drugs* class members' injuries were not yet diagnosed at the time of settlement and/or could "progress" over the next 15 years. *Id*. at *16.

The *Diet Drugs* settlement contained numerous innovations designed to conform to the Supreme Court's guidance in *Amchem*. Like the settlement here, it employed subclasses for diagnosed and undiagnosed class members. Like the settlement here, it provided not only a compensation fund, but also medical monitoring for "exposure-only" class members. Like the settlement here, it addressed the Supreme Court's notice and adequacy concerns by giving undiagnosed class members a so-called "back-end opt out right" after their diagnosis or disease progression, through which class members could reject the settlement's compensation amount and sue for compensatory damages in the tort system, but *not* punitive damages. *Id.* at *20.

The district court held that the class satisfied the predominance requirement for settlement purposes, that the back-end opt out rights to reject the compensation offer and sue for compensatory damages provided the "[m]ost important" "structural protection[]" missing from the *Amchem* settlement and resolved notice concerns, and that the permanent waiver of punitive damages was a "fair and wholly appropriate trade-off" for the optional compensation program and medical monitoring benefits. *Id.* at *45 & 49 n.22. The Third Circuit affirmed and has repeatedly enforced the settlement. *See In re Diet Drugs*, 275 F.3d 34 (3d Cir. 2001); *In re Diet Drugs*, 282 F.3d 220 (3d Cir. 2002); *In re Diet Drugs*, 369 F.3d 293 (3d Cir. 2004); *In re Diet Drugs Prods. Liab. Litig.*, 431 F.3d 141 (3d Cir. 2005).

Following *Diet Drugs*, the *BP Medical* class settlement employed a similar approach, and the district court similarly approved it. *See BP Medical*, 295 F.R.D. at 125, 140, 155, 158 (approving settlement under which class members exposed to toxic chemicals in the course of doing oil clean-up work on the Gulf beaches received medical monitoring and a compensation fund, and any who were subsequently diagnosed with a "Later-Manifested Physical Condition" were given a "Back-End Litigation Option" to sue for compensatory damages, but not punitive

damages); *see also NFL,* 821 F.3d at 431-32 (upholding "futures" settlement using a variant of this structure, including subclasses for currently injured and exposure-only class members).

  2.  The settlement here closely parallels the structure of the *Diet Drugs* and *BP Medical* settlements. Indeed, the settlement here provides broader rights to class members and raises fewer *Amchem*-type concerns. *See* Miller Decl. at ¶¶ 30-33. The courts' approvals of the *Diet Drugs* and *BP Medical* settlements thus apply *a fortiori* here.

  *First*, in the *Diet Drugs* settlement, the "back-end opt out right" was a limited one. *See In re Diet Drugs*, 369 F.3d at 296 (recognizing that the "downstream opt-out rights were not absolute"). Class members had to take affirmative steps to preserve and invoke it, and forfeited their back-end opt out rights if they did not get specified medical tests and then register with the settlement program within approximately 16 months. *Diet Drugs*, 2000 WL 1222042, at *20, *26. Moreover, those class members who did preserve back-end opt-out rights were subject to a hyper-limitations period of one year to sue, were subject to express exclusions of certain evidence relevant to compensation claims, and were not permitted to pursue consumer fraud claims. *Id*. at *26.

  None of those things is true here. There is no procedural-default trap for the unwary or unaware by which a class member can forfeit the right to sue at the back end. Indeed, here, there is no need to affirmatively opt out at the back end after an NHL diagnosis. Tort system rights to sue for compensatory damages are automatically preserved, such that *every* class member who has not individually chosen to accept an individual compensation offer can sue for compensation in the tort system following the end of the standstill period. And here, class members who do choose to sue in the tort system remain governed by the ordinarily applicable limitations period (which the settlement provides is tolled during the standstill period), are not restricted in the kind

- 23 -

of evidence they can introduce relevant to their compensation claims, and can sue for compensation on any legal theory (including consumer fraud). Miller Decl. at ¶¶ 30-32; Dodson Decl. at ¶ 46 (explaining how the back-end right protects due process).

*Second*, in key respects, the class here is more cohesive than in *Diet Drugs*. *Diet Drugs* did not have the live, central general causation issue that is common to all class members here. To the contrary, the FDA had already determined that the drugs could cause the heart-valve damage at issue, and the general causation issue was not largely contested by that point in the litigation. 2000 WL 1222042, at *2, *16-17. Instead, the major causation issue in Diet Drugs litigation was specific causation: whether the drugs, or something else, was the cause of individual class members' claimed injuries. *Id*. at *42. The *Diet Drugs* court, of course, held that this individual issue did not defeat class certification for settlement in that case. *Id*. at *43. But here, the centrality of the major, *common* general causation issue in Roundup litigation shows that *Amchem*-style concerns are even less present here.

*Third*, the class here has an overriding common interest not present in *Diet Drugs*. Diet drugs plaintiffs did not face the prospect of their claims being devalued or eliminated by rulings on overarching, common legal issues being litigated in other courts, such as general causation and preemption, or by the uncertain impact of a federal government statement opining that the drugs were safe. To the contrary, courts around the country were allowing diet drugs cases to proceed and the FDA had found in the plaintiffs' favor. *Id*. at *2-5. So while the *Diet Drugs* class members had an interest in a compensation option in the sense that any option is a valuable one and any trial is a risk, they did not share the common need to try to lock in a compensation and medical monitoring program as protection in case their litigation position eroded before they could get to court on their individual claims. The opposite is true for Roundup plaintiffs.

3.      Most of the objectors simply ignore *Diet Drugs* (and *BP Medical*) in their quest to depict this case as a replay of *Amchem*. Some, however, maintain that *Diet Drugs* is different because it allegedly did not involve "futures." Doc. 12677 at 22. They argue principally that the district court found that the injuries of *Diet Drugs* class members were "detectable" or "diagnosable" at the time of the settlement. *Id.* But that the heart valve damage may have been diagnos*able* does not mean the class members knew of their injuries (the signature heart valve defect at issue was largely asymptomatic). Just the opposite: the settlement's medical monitoring program was designed to first alert class members to their injuries *after* the settlement took effect and the class members were bound to it because the initial opt-out period had passed. *Diet Drugs*, 2000 WL 1222042, at *19-22, *46. Moreover, the district court further found that diagnosable current injuries could "progress over time," and so explicitly held that the class *did* include members who "can be characterized as 'futures.'" *Id.* at *49. For both reasons, the conclusion that the back-end opt-out right for class members to opt to sue for compensatory damages, but not punitive damages, obviated *Amchem*-type concerns, is fully applicable here.

The objectors also claim that *Diet Drugs* was different because it involved prescription drugs that, they posit, all six million-plus class members consciously ingested. Doc. 12677 at 9; Doc. 12678 at 18-19. This distinction does not hold up factually for several reasons, including that *Diet Drugs* plaintiffs may not have been aware of the specific drug names they took, but instead could readily find out. Here, Roundup is a heavily-promoted branded product: the best-selling weedkiller. Those who buy and use it know what they are using. Those who work where it is used can readily find out. Moreover, any basis for the alleged distinction is obviated by the amended class definition, which places class members on direct or inquiry notice as to their inclusion.

More fundamentally, the purported distinction misunderstands the legal problem in
*Amchem*. The *Amchem*-type "futures" concerns arise because "futures" are unaware of their
*injuries*, not their exposure. *See Amchem*, 521 U.S. at 626-28 ("exposure-only" class members
"with no perceptible disease" or "without current afflictions may not have the information or
foresight" to "intelligently" make opt-out decisions). That was clearly the case in *Diet Drugs*.
Here, as in *Diet Drugs*, the back-end right to retain the right to sue for compensatory damages (a
key feature lacking in *Amchem*) addresses that concern. *See* Miller Decl. at ¶¶ 20-32. And, of
course, this settlement has features designed to increase awareness and information, which
*Amchem* and *Diet Drugs* did not, and a diagnostic program, which *Amchem* lacked.

### C.   The class notice satisfies Rule 23 and due process requirements.

Our opening brief demonstrated that the proposed notice and notice plan satisfy Rule 23
and due process. Mot. at 58-61. The objectors' contentions otherwise are unavailing.

1.      The objectors offer a variety of complaints about the scope and details of the
notice plan. All are misplaced. The notice plan is not just comprehensive. It is built specifically
to reach the segments of the class who typically do *not* get notice and are not reachable through
standard attorney advertising channels. The plan was not pulled off the shelf, but was designed
after extensive survey and interview research to figure out *how* to get notice to the agricultural
workers who can go unreached. *See* Doc. 12531-5 (Wheatman Decl.) at ¶¶ 5-6; Doc. 12531-10
(Messina Decl.) at ¶¶ 12-35 & Ex. B (key research findings). The plan uses information sources
that reliably reach the target populations (such as Hispanic radio, and advertising in gas stations,
supermarkets, and bus shelters) paired with direct outreach to trusted voices amplified in the
relevant communities, including advocacy organizations and employers. Doc. 12531-5 at ¶¶ 40,
48, 52, 56. And the Notice Agents were selected not because they offered the cheapest way of

satisfying Rule 23, but because of their specific and demonstrated experience in providing notice to "classes that must be reached through creative and unconventional means" using innovative methods. Doc. 12531-5 at ¶¶ 10-12, 17; Doc. 12531-10 at ¶ 8-11.

In particular, the notice program includes both traditional elements for those that know they purchased Roundup products and community-outreach elements to reach agricultural workers who are fundamentally aware of the use of pesticides and weed-killers but who may not realize the extent of their risk. *See* Doc. 12531-10 (Messina Decl.) at ¶¶ 12-35 (describing extensive study of how to reach this population) & Ex. B (key research findings). Notice here will reach the class, will educate them about their risk and their options, and will enable meaningful choice. That is both what a class notice is supposed to do, and a central benefit it provides. *See In re NCAA Student-Athlete Concussion Injury Litig.*, 314 F.R.D. 580, 605 (N.D. Ill. 2016) ("The benefit of the Medical Monitoring Program is the streamlining of a highly specialized and multi-step process necessary to obtain a medical evaluation designed to determine whether a class member is suffering from PCS or CTE. Many class members may not have any idea that they are experiencing symptoms caused by prior head injuries and, thus, may not seek an evaluation or the appropriate treatments required to ease their symptoms.").[6]

2.      The objectors' argument that "individual notice"—direct notice to all individual class members—is required (Doc. 12677 at 2-3) is flat wrong. Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B). This includes "individual notice to all members who can be identified through reasonable effort," but

---

[6] A few objectors contend that the proposed form of notice attached to the original settlement did not detail certain provisions clearly enough, e.g., the release of punitive damages. Doc. 12677 at 9-13. Although we disagree with that contention, we will submit an amended form of notice well in advance of the preliminary approval hearing that adds the requested detail along with updating the notice to address the amendments to the settlement discussed above.

on its face does not require individual notice to class members who cannot be specifically identified by name now. *Id.*

The due process requirements are no broader. The Supreme Court's seminal decision on due process notice requirements, *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950), likewise rejected an individual notice requirement, holding that the "best notice practicable" is all that is needed because the constitutional requirements have "due regard for the practicalities and peculiarities of the case." *Id.* at 314-15, 317. And that, the Court held, permits use of "publication" or other general forms of notice in the case of "unknown" persons, because "where it is not reasonably possible or practicable to give" individual notice, "[t]he Court has not hesitated to approve of resort to" such more general forms. *Id.* at 317.

Accordingly, the Ninth Circuit has held that "neither Rule 23 nor the Due Process Clause requires actual notice to each individual class member." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017). As the court explained, "the rule does not insist on actual notice to all class members in all cases and recognizes it might be *impossible* to identify some class members for purposes of actual notice," and "[l]ikewise, the Due Process Clause does not require actual, individual notice in all cases." *Id.* at 1129. Accordingly, "[c]ourts have routinely held that notice by publication in a periodical, on a website, or even at an appropriate physical location is sufficient to satisfy due process." *Id.* The same standard applies in the class settlement context. *See, e.g.*, *Silber v. Mabon*, 18 F.3d 1449, 1453-54 (9th Cir. 1994) (in Rule 23(b)(3) settlement context, "best notice practicable" standard, not an "actual notice" requirement, applies and is sufficient "to afford an absent class member the opportunity to opt out").

3.      Objectors also argue that adequate notice cannot be given to "exposure-only" class members here. *E.g.*, Doc. 12677 at 7-9; Doc. 12678 at 4-10. They draw on the *Amchem*

dicta that "exposure-only" class members "may not" be able to "intelligently" make opt-out decisions. *See Amchem*, 521 U.S. at 628.

The settlement's back-end tort-system right is a complete answer to these objections. *See* Miller Decl. at ¶¶ 20-32. As the *Diet Drugs* and *BP Medical* courts held, a "back-end opt out right" resolves the *Amchem* "futures" notice concern by allowing exposure-only or undiagnosed class members to reclaim tort-system access after they get diagnosed or their diseases develop. *Diet Drugs*, 2000 WL 1222042, at *39; *In re Diet Drugs*, 431 F.3d at 147 (rejecting collateral attack asserting that back-end opt-outs received inadequate notice); *BP Medical*, 295 F.R.D. at 140; *see also Amchem*, 521 U.S. at 627 (problem with that settlement was "only a few claimants per year can opt out at the back end").

Indeed, as detailed above, the settlement here is actually *better* on this score than *Diet Drugs* or *BP Medical*. The "back-end opt-outs" in those settlements required affirmative acts by class members; here, any class member who does not individually choose to accept a compensation award after he or she gets sick automatically retains the right to seek compensatory damages in the tort system. Settlement § 7.13. And the "back-end opt-out" in *Diet Drugs* was a limited one that class members could forfeit through procedural default and that limited their compensation rights if they did sue. Similarly, in *BP Medical*, back-end opt-outs could sue only in federal court in Louisiana and had to waive workers' compensation and certain federal claims. 295 F.R.D. at 125, 158. The courts' holdings that the back-end opt-out rights in those settlements adequately addressed the *Amchem* concern thus apply with even more force here. *See* Miller Decl. at ¶ 31 (this settlement offers "significantly greater" protections than the "back-end opt out" right in *Diet Drugs* or *BP Medical* because "the compensation features of th[is] settlement are effectively "opt *in*").

The objectors' claims that *Diet Drugs* is distinguishable because class members' injuries were "detectable" at the time of settlement and because the case involved prescription drugs (Doc. 12677 at 22.) are wrong for the reasons given in Section I.B above. As to the objectors' complaint that class members could not seek punitive damages if they reject the compensation offer and sue in the tort system (Doc. 12678 at 26-30), that is not a distinction of *Diet Drugs* or *BP Medical* at all; as noted above, each of those settlements included the same waiver.

Finally, the objectors' complaints about other limits on tort-system suits under the proposed settlement fall flat, once one discounts their mischaracterizations of the Advisory Science Panel (on that, *see* Section II.B.1). The "limits" consist solely of a temporary litigation stay while the compensation program operates (a delay that class members would largely face anyway, and that has little or no effect at all on class members who get NHL late in or after that period), and admissibility of the Advisory Science Panel determination (which could be good for the class members, and which they retain full right to contest on the merits if it is not). These are appropriate, acceptable limits on back-end litigation rights. *See* Coffee Decl. at ¶¶ 31-32; Miller Decl. at ¶ 32. Here again, the limits were far more onerous in *Diet Drugs* and *BP Medical*. *See Diet Drugs*, 2000 WL 1222042, at *20, 26, 32 (multiple limitations on back-end opt-out rights, including forfeiture through procedural missteps, waiver of consumer fraud claims, bar on introduction of certain evidence relevant to compensation, short limitations period for suit); *BP Medical*, 295 F.R.D. at 125, 158 (back-end opt-outs could only sue in federal court in Louisiana instead of their home states, and waived workers' compensation and certain federal claims).

### D.    The central common questions of conduct, causation, and preemption predominate over individual issues.

As detailed in our opening brief, the proposed class satisfies Rule 23(b)(3)'s predominance requirement for settlement purposes. The objectors, once again, rely on

comparisons to *Amchem* in contending otherwise. Doc. 12677 at 14-15. Once again, the comparison is wrong.

1. In *Amchem*, the Supreme Court rejected the argument that the existence of a settlement alone could satisfy Rule 23's predominance requirement. *See* 521 U.S. at 622-23. There were two reasons the settlement's proponents rested primarily on that argument. The first was legal: some courts at that time held that view. *Id.* at 618-19 (citing cases). The second, and main, reason was necessity: the putative members of that "sprawling" class had little in common other than their inclusion in the settlement. In part, that was because the class swept in 20 defendants, multiple diseases, and a panoply of different products and the host of different exposure circumstances arising from them. But it was also because there were no central common issues in the litigation. By the time of *Amchem*, there was no real dispute that asbestos could cause the diseases at issue; general causation was hardly a contested issue in the litigation, let alone a predominant one.[7] The common legal issue of federal preemption was also absent.

Because the class members' claims were not linked by central common issues of law or fact, the Supreme Court held that predominance was not met. *Amchem*, 521 U.S. at 622-24. The Court stressed that "mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement," but that the "sprawling" class there did not. *Id*. at 624-25. Instead, as the Supreme Court observed, individual issues "peculiar to the several categories of class members, and to individuals within each category,"

---

[7] *See, e.g.*, *Cimino v. Raymark Indus., Inc.*, 751 F. Supp. 649, 652 (E.D. Tex. 1990) ("The scientific community agrees that: … Asbestos is a competent producing cause of the diseases of mesothelioma, asbestosis, lung cancer, and pleural disease."); Francis E. McGovern, *Toward a Functional Approach for Managing Complex Litigation*, 53 U. Chi. L. Rev. 440, 480 (1986) ("The high settlement rates in asbestos disease cases can be explained in part by the medical consensus that asbestos does cause certain diseases—asbestosis, mesothelioma, and certain other cancers.").

- 31 -

overwhelmingly predominated, including to which asbestos product an individual plaintiff was exposed (was it even one of the defendants' products?), which disease the plaintiff had, specific causation (e.g., did an individual's lung cancer arise from asbestos or smoking history), and individual histories and damages. *Id.* at 623-24.

2.    Here, the reverse is true. The Roundup class is limited to a single product class, single defendant, single course of conduct, and single disease. *See* Doc., 12507 (SAC) at ¶¶ 1-6. More fundamentally, as detailed in our opening brief, the central issue in Roundup litigation is the common one of general causation—whether exposure to Roundup can cause NHL—along with other common fact questions about Monsanto's conduct, knowledge and representations. Each is a common question with a common answer. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("What matters to class certification is … the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation.") (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131-32 (2009)). All bind the class into a coherent group whose cases could rise or fall together, and thus can be joined together in the settlement here.

The post-*Amchem* cases have repeatedly held that predominance is satisfied for settlement purposes in the above circumstances. *See, e.g.*, *Diet Drugs*, 2000 WL 1222042, at *41-42 ("single product," "single manufacturer defendant," "common course of conduct," "single type of injury," "one scientific theory of causation"); *NFL*, 821 F.3d at 434 ("common scientific questions regarding causation" and "factual questions regarding [a single defendant's] knowledge and conduct"); *BP Medical*, 295 F.R.D. at 141 (predominance met where "the defendant allegedly caused all of the plaintiff's harms through a course of conduct common to all class members"); *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. at 345-49 ("single

manufacturer," "single product," "common type of injury," focus on defendant's "conduct and knowledge in developing and marketing" the product); *see also In re Hyundai & Kia Fuel Economy Litig.*, 926 F.3d 539, 559 (9th Cir. 2019) (en banc) (issues that "turn on a common course of conduct by the defendant[] can establish predominance in nationwide class actions").

3.      The objectors contend that variations in state laws and individual issues that would arise if class members' claims were litigated nonetheless defeat predominance here. Doc. 12677 at 16-20. We have no doubt that Monsanto would invoke those issues in attempting to contest predominance if class certification were sought for litigation purposes. But as shown in our opening brief and as further detailed below, those issues are not part of the predominance balance for settlement class certification. As the Ninth Circuit has made clear, post-*Amchem*: "'the criteria for class certification are applied differently in litigation classes and settlement classes,'" and therefore "predominance is easier to satisfy in the settlement context." *Jabbari v. Farmer*, 965 F.3d 1001, 1006 (9th Cir. 2020) (quoting *Hyundai*, 926 F.3d at 556).

Take variations in state law. Where state-law differences defeat predominance, they do so generally because they make a class trial unmanageable under Rule 23(b)(3)(D). *See Jabbari*, 965 F.3d at 1006-07. But as *Amchem* itself expressly held, issues going to manageability are not relevant to predominance for certification of a settlement class: "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is there be no trial." *Amchem*, 521 U.S. at 620 (citing Fed. R. Civ. P. 23(b)(3)(D)). Accordingly, the Ninth Circuit and other courts have repeatedly ruled that variations in state law do not generally affect predominance for settlement class certification, much less defeat it. *See, e.g., Jabbari*, 965 F.3d at 1007 ("For purposes of a settlement class, differences in state law do not necessarily, or even often, make a

class unmanageable."); *Hyundai*, 926 F.3d at 563-64.[8]

The list of potential individual issues certain objectors cite, *see e.g.*, Doc. 12677 at 16-17, do not by sheer number or repetition tip the scale away from predominance here. As the Ninth Circuit has explained, predominance is not "a matter of nose-counting" the number of common vs. individual issues. *Hyundai*, 926 F.3d at 557 (citation omitted). Instead, the "more important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Id.* (citation omitted). Accordingly, "when *one* or more of the central issues in the action are common to the class … , the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (emphasis added). Here, the common issues of general causation, and Monsanto's conduct, knowledge, representations, and preemption defense are clearly more "central" to and "apt to drive" the Roundup litigation than issues like whether a particular "plaintiff would have heeded an instruction or warning had Monsanto supplied one" or "did not take the recommended safety precautions." Doc. 12677 at 17.

But beyond that, class certification here is for settlement purposes. Accordingly, those kind of individual issues take a further backseat in the predominance assessment: "when taking the settlement into consideration for purposes of determining class certification, individual issues

---

[8] *See also, e.g.*, *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 303 (3d Cir. 2011) ("Because we are presented with a settlement class certification, we are not concerned with formulating some prediction as to how variances in state law would play out at trial, for the proposal is that there be no trial.") (citation and alteration omitted); *In re Mex. Money Transfer Litig.*, 267 F.3d 743, 746-47 (7th Cir. 2001) (upholding certification of nationwide settlement class; settlement eliminated need to "draw fine lines among state-law theories of relief"); 2 *McLaughlin on Class Actions* § 6.3 (10th ed. 2013) ("[C]ourts have consistently held that such variations [in state laws] are no impediment to certification of a class for settlement purposes only.").

which are normally present in personal injury litigation become irrelevant, allowing the common issues to predominate." *Diet Drugs*, 2000 WL 1222042, at *43. For example, "individual issues relating to causation, injury and damage … disappear because the settlement's objective criteria provide for an objective scheme of compensation." *Id.*; *see also, e.g.*, *Jabbari*, 965 F.3d at 1005-06 ("Settlement may obviate the need to litigate individual issues that would make a trial unmanageable, making common questions more important in the relative analysis.").

That is particularly true for the proposed settlement here. In contrast to other class settlements that would resolve individual issues by setting mandatory compensation amounts for individual class members, to the extent there are individual issues of injury or causation that matter to class members here, this settlement resolves none of them. All are reserved for individual resolution in the tort system under whatever state law is applicable, or for individual settlement through acceptance of a compensation offer. This settlement addresses class members' common need for protection against adverse developments on the central common issues like preemption and causation, while preserving class members' rights to settle or litigate their compensation claims individually if they want. *See* Miller Decl. at ¶ 25 ("A back-end opt out right … reduces the weight of individual issues in the balance; those issues are resolved on a class-wide basis only to the extent individual class members choose that outcome.").

4.      Contrary to the objectors' claim, this is not an argument for "predominance lite" or an attempt to use the settlement to *supply* the predominant issue. Doc. 12677 at 14. The common issues of general causation, preemption, and those concerning Monsanto's conduct are, in *Amchem*'s words, "questions that preexist [the] settlement." *Amchem*, 521 U.S. at 623. The point is the settlement context here removes from the equation and/or reduces the importance of variations in state law or individual issues that might be argued to outweigh those common ones

if this were a litigation class. That is exactly the way in which *Amchem* stressed that

"[s]ettlement is relevant to a class certification." *Id.* at 619. Exactly how the Ninth Circuit

explains it:

> [S]ettlement *benefits* cannot form part of a Rule 23(b)(3) analysis. …. But whether a
> proposed class is sufficiently cohesive to satisfy Rule 23(b)(3) is informed by whether
> certification is for litigation or settlement. A class that is certifiable for settlement may
> not be certifiable for litigation if the settlement obviates the need to litigate individualized
> issues that would make a trial unmanageable.

*Hyundai*, 926 F.3d at 558. And exactly how the court in *Diet Drugs*, the appropriate analog here,

understood it:

> [T]his is not the same as finding that the benefits of the settlement itself provide a
> common issue which satisfies the predominance requirement. Rather, the court finds that
> common issues that preexisted this settlement—involving a common product, defendant
> and course of conduct—when considered in light of the proposed settlement, predominate
> over any individual issues between class members.

*Diet Drugs*, 2000 WL 1222042, *43. The same is true here.

E.     **The settlement class comports with Article III, and is reasonably defined to**
       **satisfy due process and respect existing attorney-client relationships.**

Some objectors posit that any class settlement involving persons with latent injuries runs

afoul of Article III. *See* Doc. 12673 at 7; Doc. 12682 at 3-4. Under that reasoning, no plaintiff

would ever have standing to assert a claim for medical monitoring, and no class settlement could

ever include persons whose injuries had not yet manifested. That is not correct, as the existence

of numerous settlements involving latent injuries attest. *See, e.g.*, *NFL*, 821 F.3d at 430-31; *Juris*,

685 F.3d at 1305; *In re NCAA Student-Athlete Concussion Injury Litig.*, 332 F.R.D. 202, 2016

(N.D. Ill. 2019), *aff'd*, No. 19-2638, 2019 WL 8058082 (7th Cir. Oct. 25, 2019).[9]

---

[9] The Gee objection also asserts that Article III requires, as a prerequisite to approval of a class
settlement, that the Court determine that the case is a "real lawsuit" and not a "contrived
proceeding." Doc. 12673 at 5-6. What that means is never said. The only citation for this new
test is *Muskrat v. United States*, a case that held invalid a statute granting a private right of action

*Footnote continued on next page*

The attacks on the class definition itself fare no better. *See* Doc. 12673 at 5-6; Doc. 12677 at 31. The Gee objection wonders why the class does not "include everyone who will be exposed to Roundup in the future," Doc. 12673 at 5. It does not for the same reasons that no other class settlement has ever included people first exposed in the future: doing that would present real notice and other due process concerns, as well as the difficulties of forecasting compensation and diagnostic needs given the unknowable future. And the exclusion of persons who "either filed suit or had retained a lawyer" to file a "non-class suit" (challenged in both the Gee and Engstrom objections) is not sinister, but rather reflects an appropriate desire to avoid interfering with existing attorney-client relationships, to respect the decisions of claimants already seeking compensation via individual tort suits, and to acknowledge the reality that those persons are likely already eligible for inventory settlements. *Cf.* Docs. 12657 at 2, 12664 at 2 (objecting on the mistaken premise that the class includes the objecting law firms' clients). This definition does not mean that "only the named plaintiffs had the right to obtain a lawyer before February 3, 2021." Doc. 12673 at 6. Everyone had (and has) the right to obtain a lawyer; the settlement respects those rights.[10]

---

*Footnote continued from previous page*

against the government to challenge "the constitutional validity of an act of Congress," with the prevailing challenger to be reimbursed for his attorneys' fees from the Treasury. 219 U.S. 346, 359-61 (1911). The comparison to this case, involving actual people actually exposed to Roundup, actual people with actual NHL diagnoses, and an actual defendant who manufactured and sold the offending products, is farcical. Moreover, the objection also ignores that the initial class action complaint in this action was originally brought for litigation purposes in April 2019, long before any settlement negotiations began.

[10] Citing long-forgotten dissenting opinions, the Gee objection asserts that the inclusion of derivative claimants in a settlement creates an Article III problem. Doc. 12673 at 7. This argument confuses claims brought by individuals based on their own use of Roundup and derivative claims that arise from the activity of a class member. As to the latter, the exposure and resulting NHL are clearly part of the same case or controversy, and no court has ever found an Article III barrier to the resolution of derivative claims, including courts approving mass tort settlements containing derivative claimants. *See, e.g.*, *In re Phenypropanolamine (PPA) Prods.*

*Footnote continued on next page*

F.   **The class representatives are adequate representatives of the class and subclasses.**

    1.   **There are no fundamental conflicts requiring additional subclasses.**

As described in the motion, the settlement class here followed the model suggested in *Amchem*: separate representation and counsel for active and latent diseases. Mot. at 27-28. This model was adopted out of an abundance of caution even though the settlement here does not have the inherent conflicts present in *Amchem*. *Id.* According to objectors, that was not enough. Instead, according to them, subclasses were required for any group receiving any different "allocation" of any of the settlement benefits. *See* Doc. 12677 at 28 (geographic foci of DAGP grants); Doc. 12681-1 at 16 (same).

That is not what Rule 23 requires. Rather, "[o]nly conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015) (quoting 1 Rubenstein et al., *Newberg on Class Actions* § 3:58 (5th ed. 2011)). Although "the creation of subclasses is sometimes necessary under Rule 23(a)(4) to avoid a fundamental conflict, there is no need to create subclasses to accommodate every instance of differently weighted interests." *In re Deepwater Horizon*, 739 F.3d 790, 813 (5th Cir. 2014) (internal quotation marks omitted).

A requirement that each variation in injury, damages, or relief necessitates separate representation would doom any attempt at resolution of mass torts, as well as other types of conventional cases, through the class mechanism (as one objection candidly admits, *see* Doc. 12677 at 30). *See Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011) ("If

---

*Footnote continued from previous page*
*Liab. Litig.*, 227 F.R.D. 553, 564 (W.D. Wash. 2004) (rejecting similar objection to mass-tort class settlement's inclusion and release of derivative claims).

subclassing is required for each material legal or economic difference that distinguishes class members, the Balkanization of the class action is threatened.") (citation omitted). Similar arguments were rejected in *NFL*, with the court explaining that "[a] recurring fundamental conflict is the divide between present and future injury plaintiffs identified in *Amchem*," and rejecting arguments that separate subclasses were required for each type of disease or condition present among the retired players. 821 F.3d at 431. And that is why *Amchem* required subclasses based only on the fundamental distinction between class members already sick and merely exposed—and did not even hint that additional subclasses were required based on any of the myriad differences in injuries among class members (*e.g.*, the many different diseases covered by that settlement) or the different levels of relief imposed by that settlement.

The particular conflicts claimed by objectors here illustrate the point. Objectors assert that separate representation was needed as between Subclass 2 members living in areas receiving DAGP grants and those living in other areas. Doc. 12677 at 28; Doc. 12681-1 at 16. In the first place, this objection's premise is wrong: a significant portion of DAGP funds may go to grants outside the list of targeted service areas. Settlement § 8.3(b)(iii). In any event, it is no basis for complaint that most DAGP grants are targeted at areas of greatest need, as identified by expert analysis by the DAGP Administrator. *See* Settlement, Ex. 7; Doc. 12531-13 (Garretson DAGP Decl.) at ¶ 7. This is standard in medical-monitoring programs. *See, e.g.*, *NCAA*, 314 F.R.D. at 606 (granting preliminary approval of nationwide medical monitoring program with 33 program locations, noting that "the costs of adding more Program Locations at the present time would far outweigh any benefits, and the Court finds this conclusion reasonable."). The settlement here also provides flexibility to reach those areas where there might not be a grant recipient up front by funding telehealth services and by providing the administrator with flexibility to add

additional Service Areas based on where class members seek diagnosis in the future. Settlement, §§ 8.1, 8.3(b). Moreover, every Subclass 2 member benefits from the labeling change, research funding, and opportunity for compensation if they become sick. And, as the amendment clarifies, any class members for whom DAGP services are not reasonably available do not release medical-monitoring claims if they reject the settlement programs' compensation offer or simply do not participate in the claims program.

One amicus complains that the Subclass 2 representatives "live in areas where the settling parties believe that large numbers of subclass 2 members may live, and thus where diagnostic testing grants may be focused." Doc. 12681-1 at 16. It's a strange objection to complain that landscapers and farmers spread out nationwide aren't adequate Subclass 2 representatives because they need the benefits of the DAGP and happen to live in areas where agriculture is a predominant industry.[11] Contrary to the objector's argument, this alignment of interests is exactly what Rule 23 requires.

Objectors also see conflict because some Subclass 2 members will develop NHL within the initial four-year period, and some will not. *See* Doc. 12677 at 28; Doc. 12681-1 at 15-16. The possibility that the settlement will not continue after the initial four-year period does not present a conflict within Subclass 2 or require additional subclassing. In this respect, every member of Subclass 2 is identically situated. Sitting here today, they do not know whether they will develop NHL within the four-year period, or within any agreed-upon and Court-approved extension of the compensation program. *See Uhl v. Thoroughbred Tech. & Telecommc'ns, Inc.*, 309 F.3d 978, 986 (7th Cir. 2002) (rejecting the "idea that the class must be viewed solely from an *ex post*

---

[11] The Subclass 2 representatives live in Washington, California, South Carolina, Indiana, and Georgia. The Cooney objection requests that this Court "take notice of the substantial agricultural economy of the midwestern states," Doc. 12657 at 3, but the settlement does exactly that. *See* Settlement, Ex. 7.

perspective"). The Subclass 2 representatives are thus in exactly in the same position as all of their fellow Subclass 2 members: they might, or might not, develop NHL during the first four years (or for that matter, ever). Indeed, because no Subclass 2 member can know today *when* he or she will get sick, it would be impossible even to identify a subclass representative for the notional "will be diagnosed much later" group. The compensation program is valuable to each and every one of them as insurance. There is no conflict.

Additionally, amicus Public Citizen asserts that derivative claimants—those whose legal rights exist only by virtue of their relationship to another class member—require separate representation. Doc. 12681-1 at 17-19. It is common for settlements to include derivative claimants without subclassing, reflecting the legal reality that those claims exist only by virtue of their relationships to the primary class members, and the factual reality that individual settlements include a full release of such claims as a matter of course. *See NFL*, 821 F.3d at 432 n.9 ("Amicus Public Citizen, Inc. argues that the District Court should have created additional subclasses to represent each of the five Qualifying Diagnoses, the mood and behavior symptoms associated with CTE, and spouses of retired players with consortium claims. We agree with the District Court that additional subclasses were unnecessary and risked slowing or even halting the settlement negotiations."); *Diet Drugs*, 2000 WL 1222042, at *19, 69.

The cases that some objectors cite are radically different from this settlement. One amicus cites *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 238 (2d Cir. 2016), but that case involved a mandatory class under Fed. R. Civ. P. 23(b)(2) in which there was no right to opt out. There, the problem was that the 23(b)(3) damages class was represented by counsel, could opt out of the deal if it was unacceptable, and stood to divide a settlement potentially worth billions of dollars. On the other hand, the non-opt-out (b)(2) class

- 41 -

comprising the vast majority of class members would have their potential claims for damages foreclosed in exchange for generally worthless injunctive relief. *Id.* at 229-30. The Second Circuit understandably found that *Interchange* was a horrible deal that took more than it gave, and gave no procedural protections at all to absent class members. As Judge Leval aptly summarized, "[t]his is not a settlement; it is a confiscation." *Id.* at 241 (Leval, J., concurring). Here, in contrast, all class members can opt out, and all will be eligible for compensation if they get sick (and if they don't, or if they get sick but don't accept the compensation offered, they retain their claims for compensatory damages). Finally, in *In re Literary Works in Electronic Databases Copyright Litig.*, 654 F.3d 242, 251 (2d Cir. 2011), the settlement included future claimants with no separate representation at all, a clear violation of *Amchem*.[12]

## 2. **The adequacy of subclass representation is sufficiently documented.**

Some objectors assert inadequate representation because subclass counsel was drawn from the team of lawyers already negotiating with Monsanto. *See, e.g.*, Doc. 12677 at 26-27. First, there is no precedent requiring anything different. *See NFL*, 821 F.3d at 429 ("[O]bjectors point us to no precedent requiring such a procedure."). Second, objectors ignore that Subclass 2 counsel Elizabeth A. Fegan, who had on file the *Sheller* medical-monitoring class action,

---

[12] The cases cited by the Engstrom objection, Doc. 12677 at 29, are also distinguishable, mostly because the objection proceeds from the erroneous premise that the settlement offers no benefits to large groups of class members. *See Rollins v. Dignity Health*, 336 F.R.D. 456, 465 (N.D. Cal. 2020) (involving the ERISA equivalent of *Amchem*, where the currently-injured did not have separate representation); *Ferrington v. McAfee, Inc.*, No. 10-1455, 2012 WL 1156399, at *4 (N.D. Cal. Apr. 6, 2012) (class counsel decided that one group of class members was "not actually harmed" by the defendants' conduct and so did not receive any compensation under the settlement); *Molski v. Gleich*, 318 F.3d 937, 955 (9th Cir. 2003) (settlement "released almost all of the absent class members' claims with little or no compensation"); *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 783 (7th Cir. 2004) (damages attributable to misconduct against all class members reserved for one subclass, and counsel argued that other subclass benefited by "the emotional satisfaction of knowing that [the defendant] had been forced to give up its profits"); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 385 (C.D. Cal. 2007) (class appropriately divided into subclasses, but without separate representation).

advocated for exactly the structural protections in place here, Doc. 11611, and participated in the negotiations resulting in the proposed settlement after the Court determined that formal appointment was unnecessary. *See* Doc. 10587 at 2. Some objectors speculate whether subclass counsel were sufficiently involved and adversarial in negotiations. *See, e.g.*, Doc. 12676 at 30; Doc. 12677 at 27. They offer no standard of involvement and pugnacity these subclass counsel were supposed to prove they met, for there is none: "Nothing in Rule 23 requires that subclass counsel fight among one another or attend every negotiation in attempting to work out a global resolution." *Diet Drugs*, 2000 WL 1222042, at *51. All subclass counsel were actively involved in the preparation and filing of the *Ramirez* Second Amended Class Action Complaint and the negotiations that resulted in the proposed settlement, and all are signatories to the settlement agreement, its amendments, and the briefs in support of its approval.

Objectors complain that subclass counsel's fees are not tied to subclass recoveries, that only Ramirez appeared on the initial complaint in his action, and that some members of Class Counsel also represented individual claimants. *See, e.g.*, Doc. 12676 at 32; Doc. 12677 at 27. These arguments fail. No one's fees have been "tied" to anything because no fees have been requested, and "it is the court that controls the award of attorneys' fees." *See Diet Drugs*, 2000 WL 1222042, at *53. There is no rule that subclass representatives must appear on the class complaint during negotiations to "count" for adequacy; in any event, Subclass 2 Representative Sheller at all relevant times *did* appear on the medical monitoring complaint in his own case. *See* Sheller Decl. at ¶ 8 ("I was aware of and support the purpose of the lawsuit in seeking medical monitoring on my behalf and on behalf of other individuals exposed to Roundup."). And Class Counsel have no knowledge of any inventory settlements being tied to the class deal.[13]

---

[13] Of course, other objectors say it's a problem that Class Counsel are not "in the trenches" of the

*Footnote continued on next page*

Finally, the Gee objection makes out a lengthy assault on the adequacy of Subclass 1 representative Ramirez. Doc. 12673 at 8-12. The objection demands evidence of why Mr. Ramirez decided—nearly two years ago—to file a class case seeking centralized determination of the general causation question. *See Ramirez* Doc. 1. The objection cites no case requiring such an exploration before finding adequacy and offers no reason to engage in such a sideshow here.[14] Indeed, Mr. Ramirez filed his original class action complaint seeking a *litigated* class-wide determination of general causation, and did so well before any settlement negotiations began. *See* Ramirez Decl. at ¶ 2 ("I filed the class action complaint with my Attorneys with the hope that a class action type case would potentially assist others with NHL and reduce the burdens of every single person in my position with having to hire an attorney and to then file a case."). That is exactly what the Gee objection earlier in its brief contends was required.

### 3.     The settlement does not give the class representatives disproportionate treatment.

The Gee objection argues that the incentive awards are too high and so demonstrate that the class representatives are inadequate. Of course, the requested incentive awards are not a feature of the settlement itself, and the Court has the authority to reduce or deny incentive awards without questioning the representatives' adequacy, or affecting the settlement itself, as the cases cited in the Gee objection confirm. *See* Doc. 12673 at 13 & n.2. The Gee objection also argues that the settlement provides "special rules of proof applicable to" the class representatives, *id.* at 13 n.3 & 25, but that contention is based on misreading a settlement provision that refers to "Representative Claimants"; that term means the authorized

---

*Footnote continued from previous page*

ongoing individual litigation and inventory settlements. Doc. 12682 at 1. So, which is it?

[14] The Gee objection's attempt to make something out of the fact that the subsequent *Ramirez* complaints added the conjunctive "and" to the caption is mystifying. Doc. 12673 at 9-10. From its inception, *Ramirez* has always been a class action lawsuit.

representatives of deceased or incompetent class members, not the "Class Representatives." *See* Settlement, Ex. 5, Part (3)(c)(1).

      **G.**      **A class action is a superior mechanism for achieving the proposed settlement's objectives.**

As our opening brief explained (at 33-36), a class action for settlement purposes is "superior to other available methods for fairly and efficiently adjudicating the controversy" considering the four factors specified by the Rule. Fed. R. Civ. P. 23(b)(3). One objection asserts that "individual adjudication" is superior and that "doing nothing special at all would have worked just fine." Doc. 12678 at 42-45. The argument is not really a superiority argument, but instead about whether the settlement is fair. *See, e.g.*, *id.* at 43-44 (asserting that the settlement "would only serve to help Monsanto escape liability for their proven wrongful behavior"); *id.* at 44 (denigrating the settlement benefits as "relative peanuts").

The reality is that, in this context, the choice is not between a class action and the individual tort system. Rather, the class settlement provides relief that the tort system could never provide, including notice, outreach, diagnostic evaluation, research, and a label change. As Professor Coffee explains, the individual tort system is poorly-situated to "conduct any significant outreach program or to engage in health education that would lead those in the 'most at-risk' community to seek diagnostic evaluation." Coffee Decl. at ¶¶ 17-19. But the settlement provides this relief while preserving individual tort litigation as an *option* to those who want it. *See* Miller Decl. at ¶¶ 31, 33.

Accordingly, the settlement provides both the programmatic relief only a class can confer, while preserving "the class members' interests in individually controlling the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A). This is the definition of "superiority." As Professor Bradt explains, "the superiority requirement does not demand endless

litigation if, thanks to the MDL, a beneficial settlement is on the table—particularly one that provides class members the opportunity to opt out on the back end and enter the tort system if they are dissatisfied with the settlement." Bradt Decl. at ¶ 12. The objection simply ignores the optional nature of the compensation program, as well as the interests of class members in notice, diagnosis, and prompt compensation. Instead, it blithely asserts that waiting to get sick, then finding a lawyer, then filing a tort suit, then waiting for either a trial (unlikely) or yet another round of inventory settlements (possible, but quite uncertain) is preferable without analyzing—or even acknowledging—the delay, risks, and human costs of that approach or the actual terms of this settlement. *See* Coffee Decl. at ¶¶ 17-19.

## II.     __The Settlement is a Fair, Reasonable, and Adequate Alternative to the Tort System.__

Class Counsel respect the sanctity of the right to jury trial. As plaintiffs' lawyers, our firms try cases: for classes, for groups, and for individuals. We defend those verdicts on appeal, sometimes for decades. We are proud of the verdicts we have won, and kept. We dream of, and fight for, the day on which the mission of the Federal Rules, "to secure the just, speedy, and inexpensive determination of every action and proceeding", Fed. R. Civ. P. 1, is a reality for all. But that day is not here. The fact is that most plaintiffs cannot afford to wait years for trial, and we know the court system does not have the capacity to try every case. Most cases settle. That necessity is the mother of invention, and various mass settlement structures have been developed to deliver compensation to the many, instead of trials for the few. This class settlement builds on those that have preceded it, borrowing particular innovations and procedures from cases like *Diet Drugs*, *BP Medical*, and *NFL*, but it is not a clone because Roundup litigation is not identical to earlier controversies. This settlement provides for the circumstances of this case and this class, adapting and expanding features and techniques of prior settlements, while providing rights and options unique to this case.

Class settlements can provide benefits that a few trial victories cannot. This settlement provides notice, diagnostic services, research, legal services, and label reform that trial victories—and inventory settlements—cannot, in addition to the compensation that such mechanisms do. Those class members who prefer the trial road may take it, by opting out during the five-month window for doing so, or entering the tort system later. To reject the settlement and consign all class members to the trial road is to consign them to a mirage. To do so in the name of due process is to exalt the nonexistent perfect as the enemy of the actual good on offer.

The tort system is a backwards-looking model: get sick, incur damages, find a lawyer, sue, watch your condition worsen, try or settle. (This is true of derivative claimants living with sick family members, or carrying on after they pass, as well.) Wait until the damage is done, at which point the only question is how much money the defendant must pay. Sometimes, that's the best the legal system can offer. The animating ambition of this settlement is that, here, there is another way. *See* Coffee Decl. at ¶ 35 ("Candidly, it is hard to think of a more perverse rule of law than one that effectively discourages outreach and leaves claimants with only a hope for compensation [but not medical evaluations, early diagnosis, and, if necessary, treatment] and only once their illness reaches a more advanced stage.").The settlement offers compensation, but it also offers a forward-looking approach with additional remedies not available through the traditional compensation-only model. The aim is to give notice, outreach, and education *before* class members get sick. If they are already sick, to give early diagnosis, which is the key to saving lives. *See* Supp. Mehta Decl. at ¶¶ 4-10. And then, the settlement offers meaningful, speedy compensation that the class member can take or leave.

Importantly, moreover, this settlement comes at a critical stage in this litigation making it of particular benefit to the class. As discussed above, the common legal issues in this litigation

are now moving to appellate and other courts, including preemption, *Daubert*, and the effect of the EPA's position on causation. Having missed the recent inventory settlements, the class members here are at serious risk that their eventual claims will be eroded or doomed before they can ever get their day in court—or even get to file cases. These people have a particular need, and derive particular benefits from, a settlement that provides them with a compensation *option* as insurance against these risks, and with expansive diagnostic, outreach, research, and legal assistance along the way. Whatever one may think of this type of settlement in other settings or at other stages of mass-tort litigation, it is of enormous benefit here—and the objectors' pretense otherwise is without basis.

*     *     *

Objectors collectively attack virtually every element of the $2 billion settlement, with one even making the extraordinary claim that "this proposed settlement will not benefit injured Roundup victims." Doc. 12700-1 at 4. The objections are chock-full of suggestions and hopes that the deal might be "prettier, smarter, or snazzier." *Hanlon*, 150 F.3d at 1027. The parties have agreed to amendments to address constructive criticisms. But regardless, the Court's task here is not to determine whether any particular element of the settlement "could have been better," *id.*, but instead to "make sure … the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prod. Liab. Litig.*, 895 F.3d 597, 617 (9th Cir. 2018) (citation omitted); *see also Hanlon*, 150 F.3d at 1026 ("It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness.").

That rule is particularly apt here where the attacks on the specific settlement provisions are often of the theme that the settlement is an underhanded attempt to circumvent the

Constitution and Rule 23 to rip off the class. These are not good-faith attempts to improve the deal (in contrast to the class-member-specific objections the Court might expect to see at final approval), and so should be viewed with a healthy degree of skepticism.

The proposed settlement secures up to $2 billion (or more, if the settlement is extended) and obtains unprecedented benefits for the class. These include: notice and outreach (including on the product label itself); the largest medical monitoring/diagnostic assistance program ever obtained in a class settlement; funding for research into new treatments for NHL; funding to provide free legal services to class members to help them understand their options and guide them through the process; and over $1.3 billion in funding for a completely optional compensation program. This compensation program improves upon *Diet Drugs* in terms of flexibility, choice, and rights reservations. It provides, beginning upon final approval by this Court, options for significant, transparent, predictable, and speedy compensation as both (1) an alternative that individual class members can *elect* to avoid the delays and risks of the tort system, and (2) a backstop against adverse developments in the Roundup litigation. It secures these benefits to the class without compromising any class member's right to sue Monsanto for compensatory damages in the tort system if that class member so prefers.

For $2 billion, Monsanto does not get a release of compensatory damages from a single class member, except those individuals who affirmatively decide to accept compensation from the settlement fund. This is a key difference from—and improvement on—other class settlements. Miller Decl. ¶¶ 30-33. If the compensation program is as bad as the objectors maintain, and few class members (or only those with more marginal claims) decide to accept offers from it, Monsanto does not get its money back—the fund would instead continue in place as an ongoing backstop for class members into the future.

Some objections assert that Monsanto "does not need a class settlement" to make settlement offers, pay for diagnosis and research, or change its label—essentially, that Class Counsel should have gotten Monsanto to pay $2 billion for nothing. Doc. 12673 at 18 (Monsanto should do this on its own); Doc. 12678 at 41-42 (Counsel should have gotten Monsanto to agree that class members have an ongoing right to withdraw from the entire settlement). Sure, Monsanto could do those things. But it has not volunteered; and even such voluntary efforts, if advanced, could disappear or be withdrawn absent a class judgment to enforce them. The $2 billion, the compensation option, the comprehensive notice plan, the largest medical monitoring program in history, unprecedented outreach, free legal services, and a labeling change all are available *because of the class settlement*.

Put simply, no one is going to be able to get Monsanto to agree to pay $2 billion without it getting *something* in return. *See* Miller Decl. at ¶ 27 ("[I]t is appropriate for class members to give up something in exchange for the settlement's programmatic benefits and the compensation option made available to them."). It is a victory for the class that the "something" here does not include a single required release of any class member's right to sue Monsanto for compensatory damages. It is a victory for the class that the compensation program is completely optional and left entirely to each class member's election after he or she gets sick—a provision to which no prior defendant has ever agreed in a class settlement, and that is far more favorable than even the encumbered back-end opt-out right in the *Diet Drugs* and *BP Medical* settlements. *See id.* at ¶¶ 30-32 ("The preservation of individual rights is thus significantly greater than in the earlier cases.").

The objectors' complaints about the limited trade-offs the settlement does contain need to be viewed in that light. The few alternative suggestions some objectors do make—essentially,

- 50 -

that counsel should have gotten Monsanto to pay $2 billion for nothing—are sheer flights of fancy. *See* Coffee Decl. at ¶ 32 ("The benefit is well worth the price, and the class has received a bargain. One simply cannot expect defendants to fund an expensive outreach program … if defendants were thereby paying for class members to obtain diagnoses that both substantially increase the value of their claims and enable them to sue for punitive damages. It would be irrational for defendants to enter into such a deal, but the actual deal reflected in the Settlement Agreement is nearly as good and saves the lives of class members, while reducing the value of their claims only marginally.").

### A.   The settlement offers substantial benefits to the class.

#### 1.   The compensation program offers meaningful relief through reasonable and transparent processes.

The compensation program makes meaningful settlement offers available to those class members who become sick. The awards are optional. If a class member does not want an award, then he or she retains full rights to seek compensatory damages in the tort system without lifting a finger. In this sense, the settlement is different, but better, than the deals in *Diet Drugs* and *BP Medical* against which objectors compare it. *See* Doc. 12678 at 41 (requesting "full, back-end opt-out right"); Doc. 12677 at 35 n.29 (contrasting with *Diet Drugs*' "multiple intermediate and back-end opt-out opportunities"). Both *Diet Drugs* and *BP Medical* required *affirmative acts* of class members to retain compensatory damages rights, hence the use of the term "opt-out." *See In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, No. 99-20593, 2004 WL 1793225, at *2 (E.D. Pa. Aug. 11, 2004) ("Furthermore, in order to exercise a back-end opt-out, plaintiffs must have registered or be deemed to have registered for settlement benefits by May 3, 2003."); *BP Medical*, 295 F.R.D. at 125 (requiring timely notice and mediation as prerequisites to right to sue for compensatory damages for later-manifested physical

conditions). In this settlement, class members retain their rights to seek compensatory damages automatically, and forfeit those rights only upon affirmative individual choice and action.

          **a.**       <u>**The amount of the compensation awards is reasonable.**</u>

Some objectors think the compensation awards are not big enough. *See* Doc. 12673 at 27-29. To start, second-guessing the amounts negotiated is generally not a basis to reject a settlement, *see Volkswagen*, 895 F.3d at 610-11; *Hanlon*, 150 F.3d at 1027, for "at the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes." *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 321-22 (N.D. Cal. 2018) (citation omitted). This principle of class settlements is especially applicable where, as here, accepting the amount offered is a matter of individual class member choice.

Even putting that general principle aside, objectors fail to create any doubt that the compensation awards are a good deal for the class, particularly given the amendment providing for awards to exceed the tier levels upon a showing of extraordinary circumstances. Settlement § 6.2(a)(ii)(1). For example, the Gee objection compares the amounts to the cost of NHL treatment, which objectors peg between $100,000 and $150,000 for the first year. Doc. 12673 at 27-28. But the same objection assumes that the aggregate numbers of the inventory settlements (as announced by Bayer) suggest an average settlement amount of $76,000 (another objection calculates $71,000), showing that objectors' visions of the reasonable value of a Roundup claim are speculation and fantasy. *Id*; Doc. 12676 at 26 n.14. Absent from any objection or amicus, moreover, is any acknowledgement that individual inventory settlement amounts are reduced for attorneys' fees, presumably between 25% and 40%, plus expenses. *See* Coffee Decl. at ¶ 24. In contrast, the settlement compensation awards not only face zero reduction for attorneys' fees, but come with the free Legal Services Program to assist class members in navigating the settlement. *See id.* at ¶¶ 20-26. For this reason, the comparison is simply apples to oranges. For other reasons

as well: the speed, ease and lack of risk of the settlement's compensation process are worlds apart from the multi-year wait for inventory settlements and the risk that they will never occur.

Some objectors compare the settlement's individual compensation award amounts to the sizable verdicts achieved by the three plaintiffs whose cases have gone to trial. *See* Doc. 12682 at 11-12; Doc. 12676 at 25. These trial victories are impressive, to be sure. But the comparison does not account for any of the "costs, risks, and delay of trial and appeal," Fed. R. Civ. P. 23(e)(2)(C)(i), that any other plaintiff would face before getting to that point, nor even the risks that two of the three *still* face on appeal. *See* Coffee Decl. at ¶ 21 ("[T]he great fallacy here would be to focus on the average recovery received by those who submit claims under the Settlement Agreement in comparison to the awards to those who sue in the tort system. …. [T]his court should focus on the best interests of all the class members, as a group, and not be persuaded simply by what the highest recovery is to the fortunate plaintiff who wins the tournament and obtains the highest jury award."). And, of course, none acknowledges the obvious: no class member is forced to accept a compensation award. If a class member thinks the tort system is the better bet, he or she can take it.

Some objections complain that Plaintiffs should have submitted information about the inventory settlements, to forecast how many class members will qualify for each level of award, Doc. 12673 at 27-28, or to compare the compensation awards against the inventory deals, Doc. 12676 at 26-27 & n.14; Doc. 12657 at 9. The former simply ignores the confidentiality of the inventory settlements and, more to the point, expert analysis submitted using NCI data regarding NHL diagnoses. Doc. 12531-15 (Eveland Decl.) at ¶¶ 17-20 (forecasting claims sufficient to consume 91.1% of the fund in the initial period); Doc. 12531-20 (Horewitz Decl.) at ¶¶ 6-17 (independently determining that "Mr. Eveland's analysis is robust"). The latter disregard all the

other features of the class settlement, including free legal assistance, reduced transaction costs, comprehensive support for resolving liens, diagnostic evaluation, research, and labeling changes, that would undermine the utility of such a comparison.[15]

> **b.**     **The process for obtaining compensation awards is reasonable.**

Some objectors complain that the compensation program is "complex." *E.g.*, Doc. 12673 at 22-23; Doc. 12682 at 8-12. It is true that a settlement compensating physical injuries will generally require a degree of complexity different from, say, a consumer settlement where simply giving every class member a check for $50 might be reasonable. The *BP Medical* settlement, for example, was undeniably "complex." *See BP Medical*, 295 F.R.D. at 155 (settlement terms "included, for example, the conditions to be included in the Matrix, standards of proof, and level of compensation and enhancers for overnight hospitalization, as well as the components, duration, and frequency of the Periodic Medical Consultation Program, the specifics of the Back-End Litigation Option, the Outreach Program, and many other negotiated terms."); *see also* Deepwater Horizon Medical Benefits, Specified Physical Condition Matrix.[16] If class members have questions about the compensation program, they have access to dedicated and free legal support in the form of the Legal Services Program, an element not present in *NFL*, *Diet Drugs*, or *BP Medical*, in addition to the assistance of the Claims Administrator and Class Counsel. As noted above, the amendment makes clear that the Legal Services Program will

---

[15] The Cooney objection faults Plaintiffs for not providing information "regarding Monsanto's assets, insurance coverage, [and] financial status." Doc. 12657 at 9. The settlement is not based on Monsanto's inability to pay, so Monsanto's finances are not relevant (though, to ensure class compensation, Plaintiffs did secure a financial guarantee from Bayer). The Sloviter objection complains that the settlement amounts may be reduced by liens, Doc. 12682 at 15-16, without acknowledging either that this same problem exists for individual settlements or that the class settlement includes retention of an experienced Lien Administrator to help organize and maize liens. *See* Settlement § 14.4.

[16] https://deepwaterhorizonmedicalsettlement.com/Portals/23/Exhibit%2008%20-%20SPECIFIED%20PHYSICAL%20CONDITIONS%20MATRIX_(EAST_56627832_1).pdf.

commence immediately, shortly after preliminary approval.

Beyond that, it's hard to know what to make of the objections to the tier structure. Designing such a program always requires balancing values of predictability and efficiency (served by fixed criteria) and flexibility (promoted by discretion to adjust awards for individual circumstances). *Compare, e.g.*, *NFL*, 821 F.3d at 424 (offering fixed awards for six conditions, with 3 types of offsets), *with In re USC Student Health Center Litig.*, No. 18-4258, 2019 WL 3315281 (C.D. Cal. June 12, 2019) (sex-abuse settlement in which top tier awards ranged from $7,500 to $250,000 based on individualized determination after interview of class member). Some objectors think the criteria are too rigid, *see* Doc. 12673 at 22-23 (complaining about "the rigidity … and the all or nothing character of these Tiers"), while others claim they are too loose, *see* Doc. 12676 at 22-23 & n.11 (upset that the Claims Administrator will determine individualized awards within the applicable tier and has discretion to exceed the tier upon a finding of extraordinary circumstances). One objection thinks that it is bad for the Claims Administrator to have discretion to exceed a tier, but then also complains that "the payment structure does not take into account" individualized severity of injury. Doc. 12682 at 11 n.11 & 12. The tier system strikes a balance, one that was negotiated carefully over many months. Objectors, by disagreeing so passionately even amongst themselves, only confirm that any system will have critics. And once again, any class member who does not like the outcome of the tier structure can reject the amount and sue.

### c.     <u>The tier criteria are sensible and reasonable.</u>

The complexity of the compensation system is dramatically overstated. The core concepts are neither difficult to comprehend nor unusual. At its heart, classification into tiers consists of three elements standard in mass tort compensation: age (an established proxy for economic damages and other elements of harm), severity of exposure, and the presence/absence of other

contributing causes. *See In re NFL Players' Concussion Injury Litig.*, 307 F.R.D. 351, 367 (E.D. Pa. 2015) (accounting for severity of condition, age, number of seasons played as a "proxy for exposure to concussive hits," and other medical conditions constituting risk factors); *Diet Drugs*, 2000 WL 1222042, at *22 ("Generally, the amount of compensation provided by the matrices decreases with age both because younger individuals have a longer damage period and because, as discussed above, age increasingly confounds the effects of diet drugs in producing valvular regurgitation."); *BP Medical*, 295 F.R.D. at 120-22 (considering severity and level of exposure).

Objectors take particular umbrage with the consideration of Group A and B conditions. Doc. 12676 at 23-24; Doc. 12682 at 9-11. Group A conditions, for example a stem cell transplant, are associated with a significant increased risk of NHL. Group B conditions, for example diabetes, are associated with moderate risks for NHL. These criteria are supported by two expert declarations. *See* Doc. 12531-18 (Mehta Decl.); Doc. 12511 (Grossbard Decl.). It is fair to account for confounding factors. And, notably, no class member is required to prove that exposure to Roundup caused their NHL.

No objector questions whether any of the Group A or Group B conditions carry increased risk of NHL. Instead, one objector questions the qualifications and reliability of the two experts, but without asserting that any of their conclusions are wrong. The challenge to Dr. Mehta is that his opinions allegedly fall short of the standard set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). To start, *Daubert* does not apply to Dr. Mehta, for his opinions are not offered to support "class certification," as the objector incorrectly asserts. Doc. 12682 at 13. Dr. Mehta's opinions show that the Group A/B criteria are well-considered, not that the class should be certified. *See, e.g.*, *NFL*, 821 F.3d at 443 ("[W]e have never held that district courts considering the fairness of a class action settlement should consider the admissibility of expert

evidence under *Daubert*."); *UAW v. GMC*, 497 F.3d 615, 636-37 (6th Cir. 2007); *Am. Int'l Grp., Inc. v. Ace INA Holdings, Inc.*, No. 07-2898, 2012 WL 651727, at *1 (N.D. Ill. Feb. 28, 2012).

Regardless, Dr. Mehta is well-qualified to render opinions on the Group A/B conditions. He is a physician board-certified in hematology and medical oncology with ten years in practice, 50% of which currently consists of treating patients with NHL. Doc. 12531-18 at ¶¶ 2-8. Dr. Mehta is qualified to opine on factors that increase of patient's risk of contracting NHL, based upon his observations from treating NHL patients, regular reviews of medical literature and studies to keep abreast of developments in his field, and the specific review of literature in connection with this case. *See* Doc. 12531-18 at 5-6; Supp. Mehta Decl. at ¶ 11.

The objectors' request that the Court disregard the opinions of Dr. Grossbard should also be denied. Testifying for Monsanto does not render an expert incapable of opining on risk factors for NHL. Again—not a single objector disagrees in substance with anything Dr. Grossbard writes in his declaration. Objectors simply misunderstand the role of the Group A and Group B conditions: they do not "attenuate or contribute to" Roundup-NHL causation, Doc. 12682 at 15; rather, they are independent risk factors for NHL.

### d.      The proof-of-exposure requirement is reasonable.

The Gee objection, while not disputing that duration-of-exposure is a relevant and reasonable criterion for a compensation award, asserts that the proof required is too onerous. Doc. 12673 at 23-24. The burden is grossly overstated. There is no absolute requirement that claimants provide documents proving proximity and duration of exposure. Rather, the settlement asks that claimants provide details of each location where exposure occurred "to the extent the Settlement Class Member can recall or verify from available records." Settlement, Ex. 5, Part 4(a). And, if "employment records … are not available," the class member can submit "an

explanation of why it is not possible to supply such records." *Id.*

### e. The compensation fund will be adequate to pay all claims.

As set out in the Eveland and Horewitz declarations, reasoned analyses by seasoned mass tort experts show that the compensation fund is expected to be solvent through the initial four-year period. Doc. 12531-15 (Eveland Decl.) at ¶¶ 12-22; Doc. 12531-20 (Horewitz Decl.) at ¶¶ 6-18. Two objections challenge those analyses, but each assumes that claims programs are essentially rubber-stamp operations, and that every claim filed will be valid. *See* Doc. 12673 at 27; Doc. 12676 at 26-27 & n.14. That is simply not the case in the Claims Administrator's long experience with asbestos trusts. Doc. 12531-15 (Eveland Decl.) at ¶ 17. Objectors submit no competing evidence. The NBFA objection and Public Citizen amicus repeat the argument, but neither even acknowledges the declarations. Doc. 12678 at 38; Doc. 12681-1 at 19-20.

### f. The Accelerated Payment Award option is an extra benefit to the class.

Objectors and amici have an aversion to class members making individual choices. This is most apparent in certain objectors' hostility to the Accelerated Payment Awards, which provide prompt compensation (on an accelerated timeline before even final approval) to those who want it and prefer to submit more limited documentation. Doc. 12673 at 21; Doc. 12681 at 23-27; Doc. 12682 at 8-9. Class members may speak to attorneys through the free Legal Services Program, the Claims Administrator, and Class Counsel about their options. Indeed, the settlement specifically provides that "[t]o assist Settlement Class Members in deciding whether to apply for an Accelerated Payment Award or a Claims Program Award, Class Counsel may advise Settlement Class Members regarding the two types of Compensation Awards." Settlement § 6.2(b). And the LSP will be available immediately after preliminary approval to assist as well. And recall that the larger Claims Program Awards will be made available right after final

approval by this court, so potential delay should not be a significant factor in a class member's choice of which award to pursue.

> **g.      The other objections to the compensation program should be rejected.**

Two sets of objectors do not like that a rejected compensation award will be treated as an offer of judgment in any subsequent tort suit. *See* Doc. 12682 at 25-26; Doc. 12677 at 36 n.29. The parties have agreed to remove that provision, and the amendment does so. Settlement § 7.13(e).

The Gee objection does not like the requirement that a class member must file a claim within 180 days of diagnosis (or 180 days after the Effective Date, whichever is later). Doc. 12673 at 19-20. The amendment extends this deadline to one year. Settlement § 7.3(a). In addition, the deadline is tolled in the event claimants are diagnosed late in the four-year period, and the Claims Administrator may excuse tardiness for "good cause or excusable neglect." *Id.* Regardless, deadlines are common in class settlements, and reflect reasonable interests in prompting submission of claims, avoiding administrative backlog, and allowing the parties to monitor the settlement. *See, e.g.*, *Williams v. BASF Catalysts LLC*, No. 11-1754, Doc. 623 (D.N.J. Sept. 3, 2020) (granting preliminary approval to settlement with talc supplier involving complex proof requirements, a 120-day claims deadline, and free legal assistance). Claimants will have the assistance of the Legal Services Program to gather the required documents. And, of course, any claimant who does not file a claim for whatever reason retains tort-system rights.

The Gee objection (Doc. 12673 at 26) says that Monsanto should not have a right to appeal any compensation awards. The appeal right (a standard feature in class settlements) reflects reasonable concerns over fraud in the claims process (although this is rare) and is not grounds for rejection of the settlement. *See, e.g.*, *In re: Nat'l Football League Players'*

*Concussion Injury Litig.*, No. 12-2323, Doc. 10255 (E.D. Pa. Sept. 12, 2018) (appointing Special Investigator due to allegations of fraud). To assure the appellate right is not abused, the amended settlement requires Monsanto to certify that any appeals are taken in good faith.

> **2.     Objections that the settlement benefits do not go far enough should be rejected.**

> **a.     The settlement is fair to Subclass 1 members diagnosed before 2015.**

One objection asserts the settlement is unfair to Subclass 1 members who were diagnosed with NHL before January 1, 2015. Doc. 12682 at 35-36. Such class members, whose claims likely accrued more than six years ago, are eligible for compensation awards of $10,000 (or more for extraordinary circumstances), but must first show that their claims are not barred by the applicable statutes of limitations and repose, just as they would in a tort lawsuit. Settlement § 6.1(a)(iv), Ex. 5 Part 3(b). The settlement does not require any particular documentation for this showing.

Rule 23(e) requires that different groups be treated equitably, not equally. *See, e.g.*, *In re Pet Foods Prods. Liab. Litig.*, 629 F.3d 333, 346 (3d Cir. 2010) ("[V]aried relief among class members with differing claims in class settlements is not unusual. …. [D]ifferences in settlement value do not, without more, demonstrate conflicting or antagonistic interests within the class.") (citations omitted). The claims at issue are likely barred by the statute of limitations. Moreover, the potential that any individual claim was time-barred would affect its settlement value. In other words, the claims are objectively less valuable and so it is reasonable for the settlement to treat them differently. It bears emphasis, however, that the settlement does not "strip victims of cancer of the right to legal redress and a jury trial for failing to opt out." Doc. 12682 at 36. If a class member is not eligible for a compensation award, then he or she retains the right to seek

compensatory damages in the tort system, and statutes of limitations, to the extent they have not

already run, are tolled throughout the settlement's operation.

**b.**      **The settlement is fair to derivative claimants.**

One objection and one amicus assert that derivative claimants "are exclude[d] … from

any compensation" and so are treated unfairly under the settlement. Doc. 12681-1, at 17-19; Doc.

12682 at 36-37. The contention ignores the obvious fact that a spouse or child benefits when

their partner or parent receives notice of the risks of Roundup, early evaluation for NHL, and a

compensation award. To be blunt: if this settlement saves a class member's life or improves their

quality of life, their spouse is unlikely to focus on the settlement's impact on loss-of-consortium

damages.

That is why similar settlements either exclude derivative claims from compensation or

compensate such claims at significantly lower levels. In *BP Medical*, for example, while the

settlement did not include derivative claimants as part of the class definition, it did include "all

residents" of a particular geographic area (which by definition swept in many spouses and

children), but compensated only for manifested diseases, not for loss of consortium. *See BP

Medical*, 295 F.R.D. at 119-22. In *Diet Drugs*, derivative claimants were eligible for only

dramatically-reduced compensation awards. *See* Official Notice of Final Judicial Approval, AHP

Diet Drug Settlement, at 13 (for example, under one category, awards up to $1.5 million for drug

recipients and up to $15,000 for derivative claimants).[17] And in *PPA*, derivative claims got no

separate compensation because the settlement matrix payments "encompass all damages

stemming from one injury, direct or derivative," and the court "overrule[d] this objection." *PPA*,

227 F.R.D. at 564.

---

[17] *Available at* http://www.settlementdietdrugs.com/pdfs/notice_fja.pdf.

In addition, derivative claimants, while bound by the limited class-wide release, retain the right to seek loss-of-consortium damages in the tort system, unless they (along with their spouse) agree to surrender those rights by accepting a compensation award for the primary class members' injuries. Moreover, if a derivative claimant is also a class member as a result of their own exposure to Roundup, they enjoy all rights under the settlement.

<strong>c.      The compensation program being subject to renegotiation and approval after four years is reasonable.</strong>

The compensation program initially lasts for four years, with any extension subject to party negotiation and Court approval. The reason for this is obvious: to avoid locking in settlement terms forever where both the science and the governing law continue to evolve. Objectors who do not like the settlement at all but who argue that the compensation fund should last *longer* are talking out of both sides of their mouths and fail to appreciate the actual interests of class members. *See* Doc. 12678 at 38-39. If, for example, new science emerges providing further evidence that exposure to Roundup causes cancer, or appellate courts reject Monsanto's legal defenses, then it may be in the interest of both class members and Monsanto to increase the compensation awards. Class members will have leverage in such a negotiation both because the Settlement provides an incentive to Monsanto to reach a deal (the $200 million "End Payment"), and because compensation awards must always be high enough that class members will reasonably consider taking them rather than pursuing tort remedies. And any agreed extension terms would be subject to judicial approval for fairness.

The charge that class members who do not get NHL within the initial four-year period get burdens but not benefits from the settlement is wrong. What people receive from the settlement must be assessed as of the time of the settlement. *See Uhl*, 309 F.3d at 985-86. No class member who is not sick yet can know *if* or *when* they will develop NHL. The settlement programs are of

great (and equal) value to all of them. The notion that someone who, in hindsight, had the good fortune not to get NHL in the first four years received nothing of value is baseless—for the same reason why people pay for insurance that they may not, and hope they will not, use during the insurance's term. No one whose house didn't burn down during the period for which they purchased fire insurance can say they got nothing of value in return for the premium they paid.

In reality, people who are not yet sick benefit in multiple ways from this settlement. They get (1) a compensation program to cover them if they get sick in the first four years; (2) the mandatory negotiations for, and judicial review of, any agreed continuation terms, with a strong incentive (the End Payment) for Monsanto to agree; (3) the DAGP, which could save their lives; (4) notice of the potential risks of Roundup, which could prompt them to protect themselves; and (5) the benefit of millions of dollars into research funding to improve NHL detection and treatment. It also bears emphasis that many of these people also benefit from the outreach and educational program: notably the migrant workers and other underprivileged communities who have not appeared significantly in the litigation to date, do not know of their rights and risks, and by virtue of the settlement, will for the first time be educated and advised about their legal, diagnostic, and treatment options.

At the same time, the objectors are again speaking out of both sides of their mouths. The people who don't get sick during the first four years are not aggrieved at all by the four-year litigation standstill about which the objectors loudly complain. The objectors seek to view the benefits in hindsight, but the burdens as of the time of the settlement.

### d.    The labeling change is a significant benefit to the class.

Objectors downplay the settlement's label reform feature linking buyers and users to information on the connection between Roundup and NHL, but this class settlement does what

inventory settlements, or other non-class settlement structures, are simply not designed to do: it replaces ongoing regulatory uncertainty and frustration with direct-to-purchaser/user information on the exposure/NHL risk issues, so that these buyers/users, and the public, may make informed decisions and take protective actions. The addition of a reference to the NHL controversy on all Roundup products labels will alert class members that they may be at risk and should take action, whether seeking diagnostic services through the settlement, no longer using the product, or wearing protective gear. Such relief could never be achieved through individual tort lawsuits.

Some objectors say that the label change is inadequate because it does not require a cancer warning. *See* Doc. 12673 at 40; Doc. 12682 at 42-43. The reality is that the EPA would not likely approve a cancer warning, given that the agency appeared as amicus in the Ninth Circuit contending that the personal-injury claims are preempted as a result of the agency's label approval. *See* Amicus Curiae Brief of United States, *Monsanto Co. v. Hardeman*, Ninth Cir. No. 19-16636, 2019 WL 7494588, at *26 (Dec. 20, 2019) ("EPA clearly expressed its position that a strong glyphosate cancer warning on a pesticide label is misbranding."). The labeling reference, conversely, is factual and informative and so likely to be approved by the regulator.

The Gee objection asserts that "[b]ecause all class members have already been exposed to Roundup, it is hard to understand how future labeling changes can benefit them." Doc. 12673 at 40. Duration and intensity of exposure matter. *See* Doc. 12693-1 at 18-19 (noting that the three plaintiff victories involved "long-term exposure"). As such, the label, in addition to alerting class members of their legal rights, may dissuade them from purchasing and using Roundup in the future, or at least persuade them to wear protective gear, two decisions that reduce their exposure and their exposure-related risks.

### 3. **The Legal Services Program will assist class members throughout the notice, approval, and compensation process in navigating the settlement without reducing settlement benefits in any way.**

Perhaps nowhere is objectors' disregard for the interests of class members more apparent than in their treatment of the settlement's provision for free legal advice through the Legal Services Program (LSP). Most ignore it entirely. Two have the temerity to attack it. Doc. 12673 at 30 n.12; Doc. 12682 at 18-19. Those attacks should be rejected.

The objections contend that LSP counsel, because they "will be chosen by class counsel" and "will be paid from the Settlement Fund," will not give "disinterested advice as to whether a class member should take a compensation offer or go to court." Doc. 12673 at 30 n.12; Doc. 12682 at 18. This is not true—the LSP has no conflict of interest. The LSP is not paid on a contingency basis from the settlement fund. *See* Settlement § 11.5. The LSP has no incentive to encourage or discourage claims; counsel will be paid on lodestar basis. *Id.* § 11.4. Most critically, there will exist an attorney-client relationship between LSP counsel and any class member who elects to use the LSP services, with the full set of ethical obligations that relationship imposes. *Id.* § 11.3(a). LSP counsel will be able to answer any questions from class members that are in their competence to answer. And the provision precluding LSP counsel from representing claimants in subsequent tort suits *avoids* any conflict of interest.

Finally, the LSP in no way precludes class members from hiring independent counsel if they so choose. The settlement caps fees from settlement compensation awards at 7.5%, reflecting the limited services necessary to apply for an award, as well as the availability of the LSP. *Id.* § 6.2(d). There is no cap on fees from any judgments or settlements in cases filed by class members who choose not to accept settlement compensation awards, and opt for the tort system. They may negotiate fees with counsel of their choosing under private contract.

- 65 -

**4.      The DAGP provides meaningful benefits to millions of individuals who, without this settlement, may be left entirely unaware of their risk of developing NHL and deprived of life-saving early detection.**

The DAGP provides class members with access to free diagnostic evaluations through grants to qualified medical providers. Some objectors criticize the program, arguing that it does not warrant the release of the medical monitoring relief sought by Subclass 2. *See* Doc. 12677 at 35; Doc. 12678 at 37-38; Doc. 12682 at 41-42; Doc. 12687-1 at 3, 15-18; Doc. 12681-1 at 13. The DAGP's benefits, however, are expertly tailored and far-reaching. As Professor Coffee explains, the DAGP can and will save or extend lives, given the importance of early diagnosis. Coffee Decl. at ¶¶ 7-16 ("What will the Settlement Agreement do for this core population? To be blunt, it will save or extend lives—and in large numbers."). And as the amendment makes clear, the class medical monitoring release is tied to the reasonable availability of services of the DAGP to the class member at issue.

**a.      The DAGP is crafted to maximize the efficacy and reach of the settlement's benefits and make a lasting impact.**

Objectors contend, for example, that the four-year program is too short or its services too narrow. *See* Doc. 12681 at 13; Doc. 12682 at 34-35; Doc. 12678 at 37-38. But the DAGP's benefits extend beyond its diagnostic services and outlast its four-year duration.

The program educates class members about the NHL-related risk associated with Roundup exposure, the importance of early discovery and diagnosis, and how to conduct self-evaluation for NHL indicators, which can lead to life-saving early detection; these benefits are infinite. *See* Doc. 12531-13 (Garretson DAGP Decl.) at ¶ 6(a)-(f); *see also* Supp. Mehta Decl. at ¶¶ 4-10; Coffee Decl. at ¶ 14 ("Determining their medical status is the initial and foundational benefit that these class members receive."). The program's emphasis on increased capacity and capability allows for the immediate expansion of diagnostic services; and that focus creates

lasting benefits within the medical community, leaving grant recipients better able to provide NHL diagnostic evaluation in the long run. *See* Doc. 12531-13 at ¶¶ 6(c), 8. The program also leverages relationships with service providers that can maximize continued outreach and education. *Id.* at ¶¶ 6(d).

Indeed, by design, the DAGP supports and empowers the providers most apt to serve class members. Objectors' criticisms that class members will not have their choice of physician (*e.g.*, Doc. 12687 at 17 and Doc. 12681 at 13) fail to recognize that the DAGP sets forth a rigorous selection process designed to maximize DAGP benefits and distribute grants to well-qualified providers. *See e.g.*, Settlement § 8.3(d) (grantees will be vetted and supervised to maximize capability and capacity; the DAGP will focus on Federally Qualified Health Centers which have established community-based outreach, disease-prevention, and patient education services). This pre-selected, pre-vetted provider approach benefits class members and has been implemented in other settlements.[18] And nothing prevents class members from seeking diagnostic services from their physician of choice; rather, the program is intended to assist class members who choose to use the programs for any reason, whether they do not have a doctor or

---

[18] *See, e.g.*, *NFL*, 307 F.R.D. at 413, 416 (explaining that the requirement that only pre-selected, qualified providers may administer baseline assessment examinations was "reasonable," for such providers "must be well-trained and credentialed," and class members' primary care physicians will not necessarily have the requisite training); *BP Medical*, 295 F.R.D. at 122-23, 144-45 ("Claims Administrator will establish a network of medical service providers … selected in part based on geographic proximity to Class Members and their ability to provide the consultation services offered."); *NCAA*, 314 F.R.D. at 605-606 ("Here, medical experts with specializing expertise in the diagnosis, care, and management of concussions in sport, as well as mid- to late-life neurodegenerative diseases" created a screening questionnaire and a battery of neurological and neurophysiological tests, from which results "will be collectively evaluated by a physician skilled in the diagnosis, treatment, and management of concussions, and the results will be communicated to the class member. Armed with the results, the Settlement Class Member will then be in a position to seek treatment appropriate to the diagnosis and be knowledgeable about the effects, if any, of concussions or subconcussive hits he or she experienced while in college. Such a comprehensive assessment program has substantial value to the class.") (internal citations omitted).

cannot easily access one, whether they lack insurance or cannot afford their deductible or co-pay, or whether they just prefer to participate in a program specifically designed to detect NHL.

One objection, citing the American Cancer Society (ACS), calls the DAGP benefits "illusory" because there are no standard NHL screening tests. Doc. 12682 at 41-42; *see also* Doc. 12676 at 32. But according to the ACS: "Careful, regular medical check-ups are important for people with known risk factors for NHL …. [T]hey and their doctors should be aware of possible symptoms and signs of lymphoma." American Cancer Society, *Survival Rates and Factors that Affect Prognosis (Outlook) for Non-Hodgkins Lymphoma*.[19] And early diagnoses improve five-year survival rates. *Id.*; *see also* Supp. Mehta Decl. at ¶¶ 4-10. Moreover, the DAGP provides for the very diagnostic services the objection claims are "necessary," like biopsies and scans, when provider-recommended. *See* Settlement § 8.1 ("evaluation of an individual for NHL using methodologies that are generally accepted as appropriate among the medical community for the individual in question in view of that individual's profile and characteristics").[20]

Other objections assert that the DAGP should be expanded to include additional, even unknown conditions that may (or may not) one day be linked to Roundup. *E.g.*, Doc. 12678 at 40. This makes no sense. This litigation is about NHL. The releases—both the class release and the optional individual release—are only about NHL. *See* Settlement § 17.1. Class members who develop some other disease—which potential at this point is pure speculation—give up nothing.

---

[19] https://www.cancer.org/cancer/non-hodgkin-lymphoma/detection-diagnosis-staging/factors-prognosis.html (last visited Mar. 7, 2021).

[20] *See also* Doc. 12531-13 (Garretson DAGP Decl.) at ¶¶ 10-12 ("Grantees may provide diagnostic evaluations through methodologies based upon their clinical determination of what is appropriate . . . and to sequence the process through which discovery of NHL may be facilitated. . . . [A] DAGP Eligible Settlement Class Member . . . could receive a physical examination and certain blood tests that could indicate signs of NHL (Phase 1). . . . [T]he physician may order additional tests, including imaging and / or biopsies, to make a diagnosis . . . (Phase 2).").

### b.   The DAGP will provide widespread diagnostic evaluation and direct benefits to class members.

One amicus complains that the DAGP does not guarantee diagnostic monitoring to all class members. Doc. 12687-1 at 17-18. In reality, the initial List of Service Areas encompasses approximately 97% of the estimated at-risk population of farmworkers and landscapers/ groundskeepers. Doc. 12531-13 (Garretson Decl.) at ¶ 13(b). The settlement further allows for up to 17.5% of DAGP funds to be used for NHL Diagnostic Evaluations *outside* the List of Service Areas. Settlement § 8.3(b)(iii). It allows telehealth providers to recommend that class members seek diagnostic evaluation at local hospitals. *Id.* § 8.3 (b)(iv)(3)(C). And it provides a mechanism to extend the reach of the DAGP to maximize class members served. *See id.*, Ex. 7, Part 3 (permitting the DAGP Administrator to modify the List of Service areas and allowing Settlement Class Members or Class Counsel to petition the DAGP Administrator to add additional service areas.).

One objector derides the DAGP as "cy-pres-like." Doc. 12677 at 35. The DAGP is not cy-pres-like, but instead provides targeted and direct benefits to class members themselves. *See* Doc. 12531-13 (Garretson DAGP Decl.). The fact that those benefits are delivered through well-qualified providers does not liken them to cy pres awards distributed for the benefit of class members' communities generally. That distinction is made clear by the objector's own authority. The court in *Six (6) Mexican Workers v. Ariz. Citrus Growers* did not reject a cy pres distribution simply because of the geographic distribution of the class; rather, it did so because the community organization recipient lacked a substantial record of service, the distribution did not adequately target the class, and the plan failed to provide supervision over distribution. 904 F.2d 1301, 1308-09 (9th Cir. 1990). There was no "reasonable certainty that *any* member will be benefited." *Id.* at 1308 (emphasis added). The DAGP could not be more different: it sets forth a

robust process for determining well-qualified grant recipients, involves an unprecedented analysis to target and maximize benefits to class members, provides ongoing grantee supervision, and funds grants for services that will be provided directly to class members themselves.[21]

Moreover, whether an individual class member has health insurance, *see* Doc. 12681-1 at 15-16, is not relevant to whether the DAGP provides valuable benefits. The settlement does not require that a class member first seek coverage from their private health insurer for their diagnostic services. *See NCAA*, 314 F.R.D. at 605-06 (rejecting objector's argument that the medical monitoring program had no value if a class member had health insurance and finding that the program had "substantial value to the class" where the class member did not need to use their private insurance "to obtain a medical evaluation designed to determine whether a class member is suffering from" brain injuries).

The objections to the DAGP disregard what the program *does* provide and the benefits scores would lose without it. Beyond diagnostic evaluation services, the program offers notice, educational outreach, and screening tools. And Subclass 2 members benefit via the compensation fund (providing an option should they be diagnosed with NHL during its pendency), the research funding, and the labeling change. The value of these benefits is evident—but their importance is paramount when compared to the risk associated with continued litigation. Multiple objectors implicitly recognize the perils associated with pursuing medical monitoring benefits through litigation. *See, e.g.*, Doc. 12678 at 38 n.11 (noting that courts have found common issues do not

---

[21] *See* Settlement §§ 8.3(a) (grant amounts are based upon the estimated number of eligible class members within the provider's service who would not otherwise have access to NHL Diagnostic Evaluation services), 8.3(e) ("funds may only be applied to increase the availability of NHL Diagnostic Evaluation to DAGP Eligible Settlement Class Members or for telehealth services"), 8.3(a)(viii) (ongoing grants will be based upon the provider's effectiveness in applying funding from any prior grant to the NHL Diagnostic Evaluation of eligible class members), 8.3(e)(iii) (audits of grantees' compliance).

predominate with regard to medical monitoring and differing state laws control); Doc. 12687 at

15 (recognizing that fewer than half of the states permit medical monitoring remedies and that

they do so only in "some cases"); Doc. 12681-1 at 13 (framing its arguments "[f]or those

individuals who have claims under the laws of states that recognize medical monitoring.").

Achieving medical monitoring through litigation would likely take years, if successful at all. *See*

Mot. at 47-48. The DAGP instead provides immediate, potentially life-saving benefits. *See* Supp.

Mehta Decl. at ¶¶ 4-10; Coffee Decl. at ¶¶ 7-16.

      **B.**      **The Advisory Science Panel, punitive damages waiver, and litigation stay are fair and reasonable in the context of the overall settlement.**

              **1.**      **The non-binding Advisory Science Panel is reasonable.**

      The purpose of the Advisory Science Panel is to give an impartial opinion (the Panel's

"determination") on the question of general causation to assist the parties in negotiating the terms

of an extension of the settlement, and to provide an item of evidence on the causation question in

future trials involving class members. If general causation is found by the Panel, then this

exercise will be an undeniable benefit to the class. If general causation is not found by the Panel,

class members will be free to attack and challenge the determination. Whatever the outcome, it

will inform, not bind, the parties' future negotiations over an extension of the compensation

program.[22]

      Indeed, in all relevant respects, the Advisory Science Panel is similar to an expert panel

under Federal Rule of Evidence 706. It consists of experts selected by the parties, but confirmed

---

[22] *See* Dodson Decl. at ¶ 65 ("It is hard to see any unfairness or unreasonableness here. The science panel is structurally neutral. The relative advantages that its conclusion will confer in litigation are equally weighted between class members (if the panel finds general causation) and the defendant (if the panel does not). Either way, the Panel supplies useful information—at the defendant's cost—to the parties and to the courts for settling or litigating cases beyond the settlement period.").

by the Court: the amendment makes clear that the Court can reject any Panel member and require the parties to select a substitute. *See* Fed. R. Evid. 706(a) ("The Court may appoint any expert that the parties agree on . . . ."). The Panel is asked to consider and answer specific scientific questions, and is permitted to look at any peer-reviewed evidence it deems appropriate. *See* Fed R. Evid. 706(b). The Panel's answers are disclosed publicly, and the Panel members may be deposed by the settlement class and Monsanto. *See* Fed R. Evid. 706(b)(1)-(2). The Panel's answers are advisory; they are a factor in future negotiations between the parties and are admissible in future court cases. *See* Fed R. Evid. 706(d) (findings of a Rule 706 panel are admissible and "the court may authorize disclosure to the jury that the court appointed the expert"). But the Panel's findings bind no one—not a plaintiff, not a jury, not a court—and all parties remain free to call their own experts to rebut the Panel's views. *See* Fed R. Evid. 706(e) ("This rule does not limit a party in calling its own experts.").

Given the close parallel with Rule 706, it is frankly difficult to understand the majority of the objections. If Rule 706 doesn't violate the Seventh Amendment, Article III, or due process, how does the Advisory Science Panel? And if Rule 706 doesn't offend basic fairness when employed in return for no consideration to the plaintiffs, how does the Advisory Science Panel when it is part of an agreement through which the plaintiffs get nearly $2 billion?

The truth is there are no answers to these questions. Instead, the attacks on the Advisory Science Panel are based largely on misapprehensions of how it works. The Panel's determination is not binding in any way. The Panel is not "secret," but instead is fully transparent. The Panel's inquiry is appropriately formulated to permit a finding for or against causation. And the Panel does not improperly interfere with the role of judge or jury.

a. **The Panel's determination is not binding on judges or juries in form or effect.**

Some objectors claim that the "stipulation the settlement makes admissible in every case is virtually indistinguishable in terms of its practical effect from the binding effect of the science panel's rulings under the prior settlement." Doc. 12673 at 31.[23] That is just wrong. The settlement could not be clearer: "No Issue-Preclusive Effect." Settlement § 12.3(c). The Panel does not bind anyone. Its determination, in addition to helping the parties negotiate any extension to the settlement, will be admissible as a stipulated piece of evidence—not a stipulated fact.[24] It would contend, at trial, with all of the other evidence, including live testimony from the parties' own experts, on the causation question. The parties can submit their own expert witnesses to testify that the Panel should have considered other evidence, that it embraced a flawed methodology, or simply that it reached the wrong conclusion. This does not raise any constitutional or Rule 23 issues. *See* Miller Decl. at ¶ 32 & n.4 ("the required admissibility of the panel's determination, subject to the right to contest that determination on the merits . . . is not an inappropriate encumbrance on the back-end litigation right or one that raises *Amchem* issues").

The objectors' complaints about the stipulation the settlement makes admissible regarding the Panel's determination are unfounded. The stipulation (Settlement, Ex. 9) specifies only that the Panel made its determination, not any agreement that determination is correct or

---

[23] *See also* Doc. 12676 at 4 ("makes the purported exit to the tort system illusory"); Doc. 12677 at 40 ("the use of its outputs at trial will carry something approaching issue-preclusive effects"); *id.* at 41 ("practically binding").

[24] *See* Dodson Decl. at ¶ 67 ("[A] stipulation of admissibility is not a stipulation to the veracity, credibility, or weight of the conclusion itself. Whoever disagrees with the panel's conclusions can (and surely will) dispute its findings and their weight vigorously, just as would ordinarily happen with any independent expert witness. Those who disagree with the panel can introduce their own experts. They can argue that the science panel considered the wrong data or should have considered different or more tailored data. They can challenge the methodology the panel used.").

incorrect. It is simply false to claim, as some objectors do, that "the Science Panel's findings will constitute stipulated facts." Doc. 12677 at 40 (misleadingly adding the phrase "the Science Panel's findings" before quoting the settlement agreement); *see also* Doc. 12700-1 at 3 (falsely claiming that the Panel's "conclusions will be presented to juries as 'stipulated facts'"). Rather, the stipulation is purely factual, including who was on the Panel, what the Panel reviewed, and that "the parties have agreed that the Science Panel's determination should be considered as that of an independent expert and its determination should be given the same weight given to the testimony of any other independent expert witness." Settlement, Ex. 9 ¶ 10. Nothing about the stipulation states or implies any agreement that the Panel's determination itself is right or wrong or that it must be taken as having conclusively proved anything. *Cf.* Ninth Cir. Model Civil Jury Instruction 2.1, cmt. ("There is a difference between stipulating that a witness would give certain testimony and stipulating that the facts to which a witness might testify are true.").

Objectors' claim that this single piece of evidence will be "practically binding" is absurd. Doc. 12677 at 41. For example, in the *Engle* Florida tobacco litigation, after a class trial on common issues, class members were armed with *preclusive* findings on ten key liability issues, including *all* the conduct elements of their claims—juries were instructed that smoking causes cancer, the defendants acted fraudulently, that their products were defective, etc. *See Walker v. R.J. Reynolds Tobacco Co.*, 734 F.3d 1278, 1285 (11th Cir. 2013). And yet the tobacco companies still win around a third of the follow-on cases. *See* Tobacco Control Legal Consortium, *What is the "Engle Progeny" Litigation?* 4 (2015).[25] The idea that a piece of *evidence* with stipulated admissibility would be the trump card that *preclusive findings of*

[25] *Available at* https://www.publichealthlawcenter.org/sites/default/files/resources/tclc-fs-engle-progeny-2015.pdf; *see also Waggoner v. R.J. Reynolds Tobacco Co.*, No. 09-10367, 2012 WL 12898850, at *22 n.37 (M.D. Fla. Feb. 7, 2012).

*liability* were not must be rejected.

Objectors complain that even if the Panel finds in plaintiffs' favor, it is unfair because plaintiffs still have to prove specific causation. Doc. 12682 at 24. That's just the rules of the road in tort cases: typically, plaintiffs have to prevail on all elements of their claims at trial to collect judgment, while defendants need prevail on only one to avoid it. The Advisory Science Panel does nothing to change the order of proof required.[26]

      **b.**      <u>**The Panel is not "secret," and its determination is subject to discovery and challenge.**</u>

Several objections deride the Panel as "cloistered," a "black box process," and "secret." Doc. 12677 at 43; Doc. 12673 at 15, 34-36; Doc. 12676 at 1-2. None of this is true.

The process for selecting Panel members is set out in the settlement agreement, and the composition of the Panel will be public. Settlement § 12.1(b). The body of evidence the Panel will consider is set out in the settlement agreement. *Id.* § 12.2(d). Some objectors critique the body of scientific literature and data included in the Panel's purview, but do not suggest anything else that the Panel should review. Doc. 12673 at 33-34; Doc. 12676 at 6-7. Nor could they: the body effectively amounts to the entire universe of conceivably relevant studies and data that have anything to do with glyphosate. *See* Settlement § 12.2(d).

It is simply not true that that the Panel will have "virtually no opportunity to consider new evidence." Doc. 12673 at 33-34. The settlement previously permitted the Panel to do so upon petition to the Settlement Administrator. The parties have now agreed that the Panel may, on its own initiative, consider any additional peer-reviewed evidence whenever 5 of the 7 Panel

---

[26] The Panel does not "determine causation and liability" or any other element of a claim for any plaintiff. Doc. 12657 at 2-3. And whether Monsanto might "deploy" the Panel determination in non-class-member cases is speculative and irrelevant. Doc. 12673 at 33, 36. Nothing about the agreed admissibility applies in any non-class-member cases, nor could it. Settlement § 12.3(f).

- 75 -

members agree to do so. Settlement § 12.2(e). And, if new evidence emerges two years (formerly three years) after the Panel concludes, then any party can move to exclude the Panel Determination under *Daubert*/*Frye*. *Id.* § 12.5(b). Whether or not such a motion is permitted or granted, any party can present contrary evidence and expert opinions, and argue to the jury that the Panel's decision has been undermined by new evidence.[27]

And the Panel's findings will be public. The Panel will provide "a written report documenting its findings," including the Science Panel Determination Form attached as Exhibit 8 to the Settlement. *Id.* § 12.3(a). Under the amendment to the settlement, Monsanto and the class will be permitted to depose each member of the Panel to explore the Panel's decision-making process and determination. *Id.* §§ 12.3(d)(iii)-(iv), 12.6(d). The deposition transcript, which will be publicly available, shall be admissible.

The only thing that is confidential about the Panel is that it "shall conduct [its] work in private." Settlement § 12.6(a). Objectors, whose briefs are replete with disdain for the defendant, claim not to understand why it would be in plaintiffs' interest to prohibit "ex parte contacts" with the Panel. Doc. 12677 at 43. The obvious answer is to prevent *Monsanto* from influencing the Panel.

### c.      The Panel selection process is appropriate.

Some objectors complain that the settlement agreement excluded scientists who have previously expressed a view on the general causation issue. Doc. 12676 at 5-6. The reason it did so should be clear: the Panel should be composed of scientists who will take a fresh look at the

---

[27] One amicus claims that the right to challenge is "illusory" because "contrary scientific evidence" cannot support a challenge under *Daubert*. Doc. 12687-1 at 11-12. Not true—experts can be excluded where their analysis rested on incomplete information. *See, e.g.*, *Specter v. Tex. Turbine Conversions, Inc.*, No. 17-194, 2020 WL 7133847, at *13 (D. Alaska Dec. 4, 2020) (precluding expert from testifying about "inherently incomplete" data).

evidence. In any event, the parties have agreed to modify the agreement to expand the number of

Panel members from five to seven, and to allow two of the members (one selected by each side)

to be scientists who have previously expressed a view on the issue, but have not served as

experts or consultants in this litigation. Settlement § 12.(b). And to remove any possible further

concern about the Panel selection, the Panel members are subject to Court approval: the parties

have agreed that the Court may veto any Panel member selected by the parties and require the

parties to select a substitute. *Id.* § 12.1(b)(iii). Both changes are reflected in the amendment.

### d.      <u>The Panel inquiry is appropriately formulated.</u>

The settlement agreement directs the Panel to follow basic principles of epidemiology to

determine general causation based on three steps. First, is there a positive association between

exposure to Roundup and NHL in humans. Second, if a positive association exists, does it

account for chance, confounding, or bias. Third, applying the Bradford Hill Guidelines, is it

possible to "pass from [the] observed association to a verdict of causation." Settlement § 12.2(b).

This embrace of standard epidemiology should not be controversial. Nevertheless, some

objectors take issue with two elements of the Panel inquiry.

*First*, several objectors assert that the settlement requires the Panel to do the impossible

and "definitively rule out 'chance, bias, or confounding' causes." Doc. 12682 at 20; *see also*

Doc. 12693-1 at 12 ("definitive determination"). That is not what the settlement says. The Panel

originally was required to find that any association is "not due to chance, confounding, or bias,"

not to "definitively" rule out such factors or find them "totally absent," Doc. 12682 at 20-21. The

amendment makes this clear by stating that the Panel must find only that a positive association

"accounts for chance, confounding, or bias." Settlement § 12.2(b). This aligns with the Court's

treatment of "chance, confounding, or bias" in the *Hardeman* case. The Court admitted the

testimony of Dr. Christopher Portier, noting that he "considered the possible roles that chance,

confounding, small sample sizes, and recall bias might have played in explaining the observed results." *In re: Roundup Prods Liab. Litig.*, 390 F. Supp. 3d 1102, 1131 (N.D. Cal. 2018); *see also id.* at 1117 ("When assessing whether an epidemiological study can form a reliable basis for an expert's opinion, a court must determine whether the study adequately considered confounding variables and possible sources of bias."). If the Panel finds exactly as Dr. Portier did, then it can find general causation.

*Second*, objectors say it is inappropriate for the Settlement to require the Panel, if it reaches a finding of general causation, to determine "the threshold internal dose level at which such causation has been established." Settlement § 12.2(c); *see* Doc. 12676 at 8 & n.5; Doc. 12682 at 23-25; Doc. 12693 at 13-14. But it is important for any causation opinion to account for "[t]he distinction between glyphosate's capacity to cause NHL at any hypothetical dose and its capacity to cause NHL at a human-relevant dose." *Roundup*, 390 F. Supp. 3d at 1113. And objectors acknowledge that "[w]hen dose calculations are made by regulators, they are generally made by an extrapolation from experimental, non-epidemiological data" and "epidemiological studies … routinely rely on exposure estimates as surrogates for dose." Doc. 12682 at 23.

The approach identified in the settlement is the one taken by the State of California in establishing a no-significant-risk-level for glyphosate under Proposition 65—hardly a Monsanto-friendly body. *See* OEHHA, Initial Statement of Reasons, Proposed Amendment to Section 25705(b) Specific Regulatory Levels Posing No Significant Risk: Glyphosate (Mar. 28, 2017). However, to assuage concerns, the parties have agreed that the Panel may adopt a different published and peer-reviewed methodology to determine threshold internal dose if the Panel deems it appropriate to do so. Settlement § 12.2(c)(ii). Any party in a follow-on tort lawsuit may challenge the Panel's finding, including its formulation, through its own experts and evidence.

Finally, it is simply false to claim that if the Panel finds general causation, but does not reach a determination on threshold internal dose, the jury will be misled. *See* Doc. 12687-1 at 2, 10. The jury will be shown the Science Panel Determination Form, which sets out the answers to both "Question 1"—causation—and "Question 2"—dose. Settlement, Ex. 8. Any party will have every opportunity to explain to the jury what the Panel found and did not find (and such topics are appropriately raised in the depositions of the Panel members). If anyone thinks that the Panel answered the "wrong question," then nothing in the settlement precludes making exactly that argument to the jury.

### e.     The Panel does not offend jury trial rights.

Some objectors claim that the admissibility of the Panel's determination "constitute[s] an abrogation of the right to jury trial afforded by the Seventh Amendment." Doc. 12676 at 4; *see also* Doc. 12687-1 at 3, 8-9. It is unclear how an agreement that certain evidence is admissible could possibly infringe, let alone abrogate, the jury right, when juries have no say in admissibility. The argument seems to be that Seventh Amendment rights are infringed whenever evidence is admitted without live in-court cross-examination. That bold claim does not stand up to scrutiny. Under the amended settlement, deposition of Panel members by the settlement class and Monsanto, including cross-examination, will be permitted. Unavailable witnesses routinely testify by deposition. *See* Fed. R. Civ. P. 32(a)(1).

There is a well-established practice of federal courts utilizing outside-independent experts to help resolve complex, technical issues for juries, without necessarily subjecting those experts to live testimony at trial. *See, e.g.*, *In re Peterson*, 253 U.S. 300, 304, 310-11 (1920) (upholding a court's appointment of an auditor to issue a written report, rejecting the argument that the order "unduly interfer[ed] with the jury's determination of issues of fact[] because it directs the auditor to form and express an opinion upon facts and items in dispute," and explaining that the

appointment did not offend the jury trial right because he would not "finally determine any of the issues in the action, the final determination of all issues of fact to be made by the jury on the trial," and the parties "remain as free to call, examine, and cross-examine witnesses as if the report had not been made"); *Meeker v. Lehigh Valley R.R. Co.*, 236 U.S. 412, 426, 430 (1915) (same, as to statute requiring ICC findings to be admitted as "prima facie evidence of the facts therein stated," and explaining that "[i]t cuts off no defense, interposes no obstacle to a full contestation of all the issues, and takes no question of fact from either court or jury"); *Crateo, Inc. v. Intermark, Inc.*, 536 F.2d 862, 868 (9th Cir. 1976) (affirming appointment in a bankruptcy proceeding of a special master to examine a company's insolvency and admission of the master's report to be read to the jury, and explaining that the complaining party "was given a full opportunity to introduce evidence that would contradict the findings of the special master and argue to the jury that the findings were incorrect.").[28]

---

[28] *See also Burgess v. Williams*, 302 F.2d 91, 94 (4th Cir. 1962) (affirming appointment of special master in complex bankruptcy proceeding and submission to jury of report, which was "given prima facie effect," where party retained "opportunity to present testimony and make arguments to the jury"); *Graffis v. Woodward*, 96 F.2d 329, 330 (7th Cir. 1938) (applying *Peterson* and affirming district court's appointment of auditor in patent case to make preliminary report on, among other things, "validity; infringement; … alleged reasonable royalty including facts as to licenses; prior discovery and prior publication; invalidity due to patentee's wrongful obtaining of invention of others; [and] nonpatentability of device on account of aggregation"; report's presentation to jury did not violate Seventh Amendment). Courts have also repeatedly upheld state laws that required presentation of certain medical malpractice claims to expert panels, usually comprised of a mixture of judges, lawyers, and physicians, that rendered a decision on the injured party's claims and permitted use of their findings at trial. *See, e.g., Woods v. Holy Cross Hosp.*, 591 F.2d 1164 (5th Cir. 1979); *Seoane v. Ortho Pharm., Inc.*, 660 F.2d 146, 149 (5th Cir. 1981); *Daigle v. Maine Med. Ctr., Inc.*, 14 F.3d 684, 688 (1st Cir. 1994); *Edelson v. Soricelli*, 610 F.2d 131 (3d Cir. 1979); *Gronne v. Abrams*, 793 F.2d 74, 78 (2d Cir. 1986). These courts rejected arguments that "presentation of the panel's findings to the jury as evidence … will predispose the jury and thus usurp its fact finding power," *Edelson*, 610 F.2d at 139, noting that the juries remained "the final arbiter of factual questions," *Gronne*, 793 F.2d at 78, and, in some instances, likening presentation of the panel's findings to "an expert opinion which is to be evaluated by the jury in the same manner as it would evaluate any other expert opinion," *id.*; *see*

*Footnote continued on next page*

The facts and details of the expert appointments vary across cases, but one theme is constant: Courts find no infringement of the jury trial right where outside expert evidence is offered to assist the jury rather than decide disputed issues. The Science Panel, like the experts previously approved, and like Rule 706, does not displace the jury's role at all.

### f.     <u>The Panel is fully consistent with Article III.</u>

Finally, some objectors assert that the Advisory Science Panel violates Article III because it "exercises attributes of judicial power." Doc. 12676 at 14-19; *see also* Doc. 12673 at 37-39. In support of this claim, objectors cite cases involving statutes assigning the adjudication of core common-law claims to non-Article III bodies. *See, e.g.*, *Stern v. Marshall*, 564 U.S. 462, 485-87 (2011) (Article III precluded bankruptcy court deciding tortious interference claim). What a series of separation-of-powers cases have to do with *stipulated evidence* is never said, or even suggested. These objections also seem to be under the misimpression that the Panel will decide general causation "independently of the Court." Doc. 12676 at 17. The Panel will create an item of evidence; it will not decide any issues for the court or for the jury.

Objectors assert an interference with the judicial role in the provision that the parties agree that "the court shall … not instruct or otherwise tell the jury it is not bound by any of the stipulated facts in the Science Panel Stipulation." Settlement § 12.3(d)(3); *see* Doc. 12676 at 19-20; 12693-1 at 14. Again this argument relies on the misconception that the term "stipulated facts" refers to the correctness or erroneousness of the Science Panel's determination—it does not. *See* Settlement, Ex. 9. The "stipulated facts," once again, concern merely what the Panel was and what it determined—not whether it was right in that determination. The aim of the provision

---

*Footnote continued from previous page*
*also Seoane*, 660 F.2d at 149 (noting that "fact finder is not bound by the panel's opinion" and that it is "no more than expert opinion evidence").

is thus nothing controversial, but merely to ensure that the Science Panel Determination is admitted into evidence before the jury as "the parties have agreed." Settlement, Ex. 9 ¶ 10. In other words, the point of this provision is to prevent the parties or courts from undermining the agreement that the Panel determination is fully admissible, not to convey either that a court endorses the Science Panel determination. This is fully consistent with Article III and the Court's authority to approve and enforce class settlements. *See, e.g.*, *In re Diet Drugs*, 369 F.3d at 305-07; *In re Prudential Ins. of Am. Sales Practices Litig.*, 261 F.3d 355, 366-67 (3d Cir. 2001).

## 2.    <u>The release of punitive damages is reasonable.</u>

The class releases claims for punitive damages, a reasonable concession for the settlement benefits. *See* Dodson Decl. at ¶ 55 ("Class members who exercise the delayed opt out have already received substantial benefits of the Settlement during the period between the initial opt out and the delayed opt out, including the diagnostic program, the legal assistance program, and the ability to receive expedited compensation, all at the expense of the defendant. Giving up punitive damages is the price class members pay for regaining their right to sue for a second bite at the apple despite receiving those free settlement benefits in the interim.").

As our opening brief (at 48-50) explained, such a release is an oft-seen feature of mass tort class settlements. *See, e.g.*, *Diet Drugs*, 369 F.3d at 296; *BP Medical*, 295 F.R.D. at 155-56. A key reason for this is that, for an individual class member, punitive damages are virtually impossible to obtain. To start, the majority of class members will not develop NHL, and so will never have a tort lawsuit that could result in punitive damages. For them, the release gives up nothing. For the unfortunate class members who do develop NHL, the objectors' valuation of their real-world opportunity to recover punitive damages is based on a utopian ideal of a tort system that does not exist. *See* Coffee Decl. at ¶¶ 16, 20-21.

Here is the reality. More than five years of Roundup litigation have resulted in three trials

and one verdict affirmed on appeal. This is the result of efficient case management, and a reasonably brisk schedule. Moreover, those trials catalyzed thousands of individual settlements. This is a success story for mass torts; but it does not enlarge the capacity of the system for, or accelerate the rate of, additional individual trials. Even without COVID, what would the numbers be? Six trials? Seven? Most litigants will never see a courtroom, let alone collect a punitive damages award. In 2019, there were approximately 1,400 civil jury trials in the federal courts, and 20,000 in state courts. *See* U.S. Courts, *Judicial Business – 2019 Tables*, Table T-1 (Sept. 30, 2019);[29] S. Gibson et al., *Trial Court Caseload Overview – Incoming Trends, 2012-19* (Dec. 9, 2020).[30] Here, there are expected to be more than 134,000 class members eligible for compensation awards between 2021 and 2025. Eveland Decl. (Doc. 12531-15) ¶¶ 13-16. So even if the entire civil trial capacity of the federal and state judicial systems were committed solely to Roundup claims, it would take more than six years for each class member to receive a trial.[31]

This is not to say that punitive damages are not an important component of an individual tort case. Rather, for any given individual claimant, the odds of actually recovering punitive damages are low. To be sure, class members should be aware that they are giving up even this slight chance if they stay in the class—we will enhance that aspect of the notice to further highlight this point. Plaintiffs do not argue that "there is [a] barrier to this Court's consideration of the proposed settlement's release of punitive damages," Doc. 12677 at 40, only that exalting punitive damages onto a pedestal does not reflect the actual value of those potential damages to an actual class member. That is why, both in and outside of the mass tort context, courts

---

[29] *Available at* https://www.uscourts.gov/sites/default/files/data_tables/jb_t1_0930.2019.pdf.

[30] *Available at* https://ncfsc-web.squiz.cloud/courtstatistics/dataviewer2.

[31] The Cooney objection (Doc. 12657 at 8-9) cites a 2009 Cook County order setting out a trial schedule for asbestos cases. The relevance of that order for 2021 Roundup litigation is unclear.

regularly approve *aggregate* settlements that do not account for the potential of punitive damages. *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, MDL No. 2672, 2017 WL 2212783, at *24 (N.D. Cal. May 17 2017). ("Given that any award of punitive damages is inherently speculative and discretionary, courts regularly approve settlements that offer no or little compensation representing the risk of a punitive damages award.") (citation omitted); *Diet Drugs*, 2000 WL 1222042, at *49 n.22.[32]

The unlikelihood of any given individual class member recovering punitive damages is only one of the reasons why punitive damages waivers are by now a standard part of mass-tort class settlements. Punitive damages protect societal interests, *see BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996), and are excluded from Seventh Amendment protection, *see Cooper Indus. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 437 (2001).[33] That the successful plaintiff keeps the award rather than turning it over to society or spreading it among all those similarly-situated is a side-effect, tolerated as a practical incentive to private enforcement.[34] But the

---

[32] One amicus states that cases like *Volkswagen* "did not actually waive any rights to seek punitive damages." Doc. 12693-1 at 22 n.9. *Volkswagen* involved admitted allegations of lying to government agencies and cheating consumers, and mandated *full releases* from all class members. Yet the court explained that the recovery of punitive damages, being "inherently speculative and discretionary," did not play a significant role in evaluating the adequacy of compensation. 2017 WL 2212783, at *2 (quoting *BP Medical*, 295 F.R.D. at 155).

[33] The Arnold & Itkin objection asserts that "some states explicitly frame punitive damages as individual rights." Doc. 12677 at 38. But of the two cases from a single state cited for that proposition, one was decided in 1901, and the other rejected the argument that "a compensatory aspect to punitive damages" required reduction of such damages under comparative negligence principles because "allowing such a reduction would nullify the punishment and deterrence goals underlying punitive damages." *Clark v. Cantrell*, 529 S.E.2d 528, 530-34 (S.C. 2000).

[34] The Arnold & Itkin objection states that "[p]unitive damages are a reward for a plaintiff who has been harmed by the defendant's reprehensible conduct," which is why the Supreme Court requires courts to consider the relationship between the harm to the plaintiff and the amount of the penalty. Doc. 12677 at 39. The point is academic, but also wrong: the Supreme Court has explained that the ratio is a means of "cabin[ing] the jury's discretionary authority" to "avoid an arbitrary determination of an award's amount," *Philip Morris USA v. Williams*, 549 U.S. 346,

*Footnote continued on next page*

punitive award is not meant to compensate the plaintiff, and is not necessary to do so. That is why punitive damages stand on a different footing from compensatory damages in assessment of class settlements, and that is why the *Diet Drugs* and *BP Medical* courts specifically concluded that the release of punitive damages was a "fair and wholly appropriate" trade-off for the settlement benefits and the back-end opt out right to seek compensatory damages. *Diet Drugs*, 2000 WL 1222042, *49 n.22; *see also* Miller Decl. at ¶ 28 ("The waiver of punitive damage claims as part of a class settlement that itself serves societal interests through public therapeutics, compensation of injured citizens, and efficient dispute resolution thus does not present the same concerns about intruding on the rights of individuals; it is simply a negotiated trade-off that promotes the settlement.").

Some objectors say that the release of punitive damages is inappropriate because Monsanto has not pulled Roundup from the market, or added a cancer warning. *See* Doc. 12673 at 40; Doc. 12682 at 41; Doc. 12693-1 at 18-19. But no punitive damages award actually recovered has ever come close to the $11 billion and counting of verdicts and settlements, along with the massive jury awards pending on appeal. Yet Monsanto continues to sell Roundup, in large part because the EPA and other government regulators adhere to their views that the product does not cause cancer. As explained above, it is also unlikely that the EPA would approve a cancer warning. And the settlement does provide the addition to the label of a reference to the NHL controversy, a factual addition likely to be approved by the regulator, and one that will warn Roundup users they may be at risk.

This is not to say that no penalty would ever force Roundup from the market, or that the

---

*Footnote continued from previous page*
352-54 (2007), as well as respecting "principles of state sovereignty and comity" that preclude a State from punishing out-of-state conduct, *Gore*, 517 U.S. at 572.

EPA would never change its mind, only that this type of speculative public-interest consideration is a slender reed on which to deprive actual class members of concrete settlement benefits. Moreover, this settlement and the inventory settlements are not the end of Roundup litigation for Monsanto and, in particular, do not "constitute a 'get out of jail free' card for future misconduct," such as "ghost-writ[ing] new studies." Doc. 12687-1 at 24. The settlement covers only those who were exposed as of February 3, 2021 and does not include those first exposed in the future. If Monsanto commits future misconduct, the tort system exists to hold it accountable.

### 3.      The temporary litigation stay is reasonable.

Several objections and amici assert that the four-year litigation stay requires disapproval of the settlement. Doc. 12673 at 30-31; Doc. 12677 at 36-37; Doc. 12682 at 26-30. As part of the settlement, class members agree to a stay on the filing of Roundup lawsuits, beginning at preliminary approval and ending approximately four years after final approval (or one year after the Effective Date, whichever is later). Settlement § 18.2(b). During the stay, class members' claims are tolled. *Id.* § 18.2(b)(ii). This period coincides with the operation of the compensation program and allows it and the other settlement programs to operate. The overwrought objections fail to appreciate how the stay affects class members in the real world. In reality, the stay is well-justified by the settlement benefits.

For Subclass 1 members, the stay is virtually meaningless. None has filed a case, so no case is being delayed. The settlement offers Subclass 1 members a choice they did not have before: get compensation quickly, or, if the notice triggers a desire on their part to file a lawsuit they have thus far not filed, they can opt out during the five-month window for doing so and thus exclude themselves from the stay and the settlement. Settlement § 4.2(a).

For those in Subclass 2, the first point to recognize is that none has been diagnosed with NHL. For them, the stay is by definition shorter or non-existent. By the time a person in Subclass

2 is diagnosed (through the DAGP or otherwise), makes a claim under the compensation

program, goes through the appeals process, and decides to reject the offer, there will be far less

than four years remaining before they can go into the tort system. For Subclass 2 members who

are not diagnosed until late in the period or after it ends, the stay hardly affects them or does not

do so at all. Even for the relatively few who are earliest diagnosed—say, shortly after the opt-out

period closes and the settlement takes effect—the amount of time is not significant compared to

the time it takes a case to get to trial or to be aggregated in a next-generation inventory

settlement. Cases were filed in this MDL beginning in 2016, and, other than Mr. Hardeman's,

none has been tried. Few saw a settlement offer until 2020. And, as revealed in the common

benefit holdback hearing, none has been paid a dime to date. All despite herculean efforts by the

parties and the Court. No one deems those delays a due process violation or otherwise

unconscionable; these are the realities of the tort system. Yes, the four-year stay gives Monsanto

a way to predict and plan for the claims it will face from within the class; however, the entire

class (and society) gains benefits from the bargain: notice, diagnosis (with the improved health

outcomes that come with it), dedicated research into diagnosis and treatment, free legal

assistance, a label change, and an expedited compensation system without litigation.[35]

The parties have also agreed to further recourse for individuals for whom the stay

imposes exceptional hardship. Settlement § 18.2(b)(iv). Under the amendment, early relief from

the stay can be sought for exceptional hardship, to be determined by the Settlement

---

[35] One objection cites a California Rule of Civil Procedure permitting speedier trials for plaintiffs with terminal illnesses. Doc. 12682 at 28 (discussing Cal. Code Civ. P. § 36). But the many Roundup cases grouped in a California JCCP have produced the same number of trials as this MDL: one. Similarly fantastical is the Cooney's objection's insistence that in Cook County, every "asbestos and mass exposure" case goes to trial within 270 days. Doc. 12657 at 8 n.2. There is no evidence that the Illinois state court system has processed Roundup lawsuits any faster than anywhere else.

Administrator, by class members who were diagnosed after the end of the opt-out period and who have gone through the compensation program and rejected a final offer. *Id.*

Objectors note that some states limit recovery where the tort victim has died before his claim was adjudicated to judgment. *See* Doc. 12673 at 30-3; Doc. 12677 at 36-37; Doc. 12682 at 28. No doubt, as a result of those legislative policy decisions, some tort claimants' survivors see reduced relief because their family member passes away before his tort claim reaches a jury verdict. That is unfair in some cases. But that is not the fault of the settlement. Nevertheless, Monsanto has agreed in the amendment to waive any rights it might have under those and analogous state laws against the survivors of a class member who passes away during the litigation stay.[36] Settlement § 7.13(f).

### C.   The remaining objections to the settlement provide no basis for denying preliminary approval.

*First*, the requirement that objectors submit "written evidence" of class membership is standard. *See, e.g.*, *In re Yahoo Mail Litig.*, No. 13-4980, 2016 WL 4474612, at *8 (N.D. Cal. Aug. 25, 2016) ("The burden is on the objector to prove he has standing to object.") (internal quotation marks omitted). Although objector standing is somewhat academic at preliminary approval (as demonstrated by the objections filed by law firms rather than class members), at final approval it is critical, for it determines who has the power to appeal. *See, e.g.*, *Douglas v. The W. Union Co.*, 955 F.3d 662, 665 (7th Cir. 2020). Also unobjectionable is the provision permitting discovery of objectors. *See In re Netflix Privacy Litig.*, No. 11-379, 2013 WL 6173772, at *2 (N.D. Cal. Nov. 25, 2013) ("Discovery regarding objections to a settlement agreement may be used to seek information regarding the objector's standing, the basis for the

---

[36] One objection criticizes that the litigation stay is "subject to extension." Doc. 12682 at 26, 28-29. Any extension of the compensation program (which may or may not include a litigation stay) would be subject to judicial determination of continued fairness at that time. Settlement § 13.4.

objections, his role in objecting to this and other settlement, and his relationships with the counsel that may affect the merits of the objection."). Any such discovery is of course subject to relevance, proportionality, and burden limits. *See* Fed. R. Civ. P. 26(b)(1), (2)(C).

*Second*, the Cooney objection objects to the "lack of transparency as to Class Counsel fees" and "the jurisdiction of this court over common benefit fees in post certification state court cases." Doc. 12657 at 9. Class Counsel will seek fees through the mandatory and fully-transparent Rule 23(h) process, under which the class members will have advance notice of the fees application and the opportunity to object; and nothing about this settlement implicates the common-benefit issues before the Court.

*Third*, one objection asserts that "those suffering from multiple myeloma should not be included." Doc. 12682 at 37. They are not. The settlement involves only "Roundup Claims," which are limited to those relating to "Roundup Products and NHL." Settlement § 2.1(70).

*Fourth*, the challenges to the individual release (Doc. 12682 at 17-18; Doc. 12681-1 at 25-27) are mooted by the clarification to that form of release: it is NHL-only.

## CONCLUSION

Preliminary approval is important. It is also the first step, not the last. The Court has now heard from law firms, amici, and a few putative class members. The notice process will permit the Court to hear from many more. Plaintiffs respectfully request that the Court (1) grant preliminary approval to the settlement; (2) appoint Interim Class Counsel and Subclass Counsel; (3) direct notice to the class; (4) schedule a Fairness Hearing; (5) stay the filing and prosecution of Roundup-related actions by settlement class members; and (6) enter the proposed Preliminary Approval Order attached as Exhibit 10 to the settlement agreement.

Dated: April 7, 2021                    Respectfully submitted,

*/s/ Elizabeth J. Cabraser*
Robert L. Lieff (of counsel) (SBN 037568)
Elizabeth J. Cabraser (SBN 083151)
Kevin R. Budner (SBN 287271)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008
rlieff@lchb.com
ecabraser@lchb.com
kbudner@lchb.com

Steven E. Fineman (SBN 140335)
Wendy R. Fleishman
Rhea Ghosh
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: 212.355.9500
sfineman@lchb.com
wfleishman@lchb.com
rghosh@lchb.com

Andrew R. Kaufman
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 2nd Avenue South, Suite 1640
Nashville, TN 37201
Telephone: 615.313.9000
akaufman@lchb.com

REPLY ISO MOTION FOR PRELIMINARY
APPROVAL OF CLASS ACTION SETTLEMENT
MDL NO. 2741, CASE NO. 3:16-MD-02741

Elizabeth A Fegan
*Proposed Subclass 2 Counsel*
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Telephone: 312.741.1019
beth@feganscott.com

Melissa Ryan Clark
FEGAN SCOTT LLC
140 Broadway, 46th Floor
New York, NY 10005
Telephone: 347.353.1150
melissa@feganscott.com

James R. Dugan, II
TerriAnne Benedetto
*Proposed Subclass 2 Counsel*
David S. Scalia
THE DUGAN LAW FIRM, APLC
One Canal Place
365 Canal Street, Suite 1000
New Orleans, LA 70130
Telephone: 504.648.0180
jdugan@dugan-lawfirm.com
tbenedetto@dugan-lawfirm.com
dscalia@dugan-lawfirm.com

William M. Audet (SBN 117456)
*Proposed Subclass 1 Counsel*
Ling Y. Kuang (SBN 296873)
AUDET & PARTNERS, LLP
711 Van Ness, Suite 500
San Francisco, CA 94102-3229
Telephone: 415.568.2555
waudet@audetlaw.com
lkuang@audetlaw.com

Samuel Issacharoff
40 Washington Square South
Suite 411J
New York, NY 10012
Telephone: 212.998.6580
si13@nyu.edu

*Counsel for Plaintiffs and the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on April 7, 2021, service of this document was accomplished pursuant to the Court's electronic filing procedures by filing this document through the ECF system.


                                      /s/ *Elizabeth J. Cabraser*
                                      Elizabeth J. Cabraser