# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2471 |
|  | Case No. 3:16-md-02741-VC |
| THIS DOCUMENT RELATES TO: | **DECLARATION OF JOHN C. COFFEE, JR. REGARDING CLASS CERTIFICATION AND THE BENEFITS TO CLASS MEMBERS** |
| *Ramirez, et al. v. Monsanto Co.*, Case No. 3:19-cv-02224 | |

I, John C. Coffee, Jr., do hereby depose and declare as follows:

1.      I am the Adolf A. Berle Professor of Law at Columbia University Law School, and one of my principal scholarly interests has long been the field of class actions and complex litigation. My overall views are largely summarized in John C. Coffee, Jr., ENTREPRENEURIAL LITIGATION: Its Rise, Fall, and Future (Harvard University Press, 2015). A summary of my professional experience with class actions and my Curriculum Vitae are attached hereto as Exhibits A and B. I have testified by declaration and in-court testimony in numerous class action cases, generally on class certification and settlement issues, including in *Amchem Products*,[1] *Deepwater Horizon*,[2] and *Diet Drugs*.[3] If called and sworn as a witness, I believe I could testify competently as to the basis for my conclusions.

2.      I have written at length about mass tort litigation and have generally taken a position that is skeptical of the use of the class action device to resolve the often intractable

---

[1] *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997).
[2] *In re Oil Spill by Oil Rig "Deepwater Horizon"*, 295 F.R.D. 112 (E.D. La. 2013).
[3] *In re Diet Drugs Prods. Liab. Litig.*, 431 F.3d 141 (3d Cir. 2005).

2137824.2

problems at issue in mass torts cases. In fact, in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), where I testified in opposition to class certification, Justice Ginsburg later cited me in her majority decision for the proposition that:

> "[I]f a fairness inquiry under Rule 23(e) controlled certification,...both class counsel and the court would be disarmed. Class counsel confined to settlement negotiation could not use the threat of litigation to press for a better offer, see Coffee, Class Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L. Rev. 1343, 1379-1380 (1995)…"

3.       Thus, in light of my doubts about the broad use of class actions in mass tort litigation, I read with great interest this Court's opinion in its Pretrial Order No. 214 in this action where it expressed its doubts about whether the proposed settlement "would benefit a class of Roundup users who either have cancer but have not yet sued Monsanto or have not yet developed cancer." (Case 3:16-md-02741-VC Document 11182, filed 07/06/2020 at p.3). Specifically, this Court posed four questions that in my view go to the heart of the matter.

4.       Although class counsel and others will focus on the requirements for class certification under specific subsections of Rule 23, this declaration will instead concentrate on this Court's four questions. In my judgment, these were the most important questions to ask, but they can now be answered in this case with very different responses that effectively address this Court's concerns—indeed, these answers could not be given in the vast majority of proposed mass tort class actions. This is because the revised settlement is one specially (and perhaps uniquely) designed to address one of the nation's most prevalent forms of cancer, Non-Hodgkin's Lymphoma ("NHL") and to meet a continuing public health crisis that has escaped any serious or comprehensive response. Simply put, this is a settlement that will save lives as well as award compensation.

- 2 -

5.      Class actions often resemble the kaleidoscope in that, when one twists the dial, an entirely new pattern emerges. That has happened in these negotiations, and the new settlement looks entirely different from the former one that this Court viewed skeptically. To understand how these differences relate to this Court's four questions in its July 6, 2020 opinion, it is first necessary to understand some basic and largely non-controversial facts about NHL and how this settlement addresses it.

## I.      A Brief Overview of NHL and this Settlement

6.      NHL "is one of the most common cancers in the United States, accounting for about 4% of all cancers."[4] The American Cancer Society estimates that, in 2021, about 81,560 persons will be diagnosed with NHL and about 20,720 people will die from this cancer.[5] Unlike mass torts that emanate from a single event or disaster (e.g., an airplane crash, an oil rig explosion, or a forest fire), NHL must be recognized and treated as both a serious, potentially lethal disease and a continuing public health crisis that has not yet been successfully addressed by existing means. As this declaration recognizes, successful outcomes depend on early intervention and diagnosis. Thus, more is necessary than simply awarding financial compensation to victims.

7.      Let's begin with some good news. According to the American Cancer Society, NHL has an "overall 5-year relative survival rate" of 72%.[6] This is well above the rate for many other cancers, but it must also be noted that survival rates "vary widely for different types and

---

[4] Because I am not a doctor or medical expert, I will cite an official source (generally, the American Cancer Society) for any statistical or other scientific claim. This 4% figure comes from American Cancer Society, "Key Statistics for Non-Hodgkin Lymphoma" (downloaded 2/19/2021).

[5] *Id.*

[6] See American Cancer Society, "Survival Rates and Factors that Affect Prognosis (Outlook) for Non-Hodgkin Lymphoma at p.18 (downloaded 2/20/21).

stages of lymphoma."[7] Lymphoma is usually divided into three stages: "localized," "regional,"

and "distant" (with localized being the earliest stage). Set forth below is the 5-year Relative

Survival Rate for Follicular Lymphoma[8]:

### Follicular Lymphoma

| SEER STAGE | Survival Rate |
|---|---|
| Localized | 96% |
| Regional | 90% |
| Distant | 85% |
| All SEER Stages combined | 89% |

In contrast, the survival rates for Diffuse Large B-cell lymphoma are less encouraging:

### Diffuse Large B-cell Lymphoma

| SEER STAGE | 5-year Survival Rates |
|---|---|
| Localized | 73% |
| Regional | 73% |
| Distant | 57% |
| All SEER Stages combined | 64% |

Although these rates differ sharply, there is a common denominator here: the earlier that NHL is

detected, the better the 5-year relative survival rate.[9] From a policy-perspective then, early

detection matters greatly. Accordingly, this proposed settlement pivots around encouraging early

detection through extraordinary efforts at outreach.

8. This outreach program is more fully described in the Declaration of Matthew L.

Garretson, but, in brief overview, this effort began with the identification of 28 geographic areas

that encompass 97% of the estimated at-risk population of farmworkers and

---

[7] *Id.* at p.19.

[8] *Id.*

[9] This point is made in more detail and at greater length by Dr. Amit R. Mehta in his Supplemental Declaration, dated March 26, 2021, which emphasizes (at paragraph 7) that "those who are diagnosed at an earlier stage (which corresponds to less lymphoma in the body) have a better prognosis, including superior survival outcomes with proper treatment." This point is further discussed infra at n. 12.

landscaper/groundskeepers. (See Table 1 to Exhibit 7 in the Settlement Agreement).
Approximately 1,408,204 farmworkers and landscapers/groundskeepers are estimated to live and
work in those areas.

9.      As Shannon R. Wheatman explains in her Declaration (at paragraph 23), the
Settlement Class has three key characteristics: (1) it is diffuse; (2) a large segment of the class is
non-English speaking; and (3) migrant workers represent a large percentage of the farmworkers
who are the core population of this class and many of them are not currently in the U.S., either
because of COVID-19 or strict immigration policies. As she further recognizes, migrant workers,
many of whom are undocumented and may be subject to (or at least fear) deportation, may avoid
governmental officials and public agencies out of a concern that such encounters could lead to
their deportation.

10.     One last fact is critical to the design of the outreach program. As explained by
Shannon Wheatman (at paragraph 22 of her Declaration), 84% of glyphosate (the alleged
carcinogenic ingredient in Roundup) was "applied in agricultural settings on field crops." It thus
follows that the Settlement Class is heavily composed of field workers who were exposed to
glyphosate applied to crops through Roundup Products; many of these class members are likely
to be Spanish-speaking and hesitant about directly approaching governmental authorities.

11.     This Settlement Class is very different from (and harder to reach than) a class
composed primarily of suburban homeowners who used Roundup on the weeds in their backyard
gardens. That description accurately characterizes the vast majority of the plaintiffs who have
filed individual actions against Monsanto with respect to Roundup Products to this point.
According to the Declaration of Jeremy J. Wieck, one of the attorneys representing Monsanto, as
of February 26, 2021, "88.4% plaintiffs who allege the circumstances of their exposure to

Roundup have alleged residential exposure" and "90.5% of claimants who have submitted a plaintiff information sheet have alleged residential exposure."[10] The term "residential exposure" is defined to mean "at home," or "for personal use," or for "personal purposes." Thus, the Wieck Declaration essentially shows the inability of the tort system to reach persons who were exposed through agricultural employment or landscaping services. In short, to date, the private litigation system has not provided access to a feasible remedy for migrant workers, landscaping crews, or others whose engagement with Roundup was professional rather than personal. I, of course, recognize that a class composed overwhelmingly of persons who used Roundup at home is much easier to reach, would have better access to healthcare, and would likely accept diagnostic testing with little persuasion. But this class was designed to reach more than such persons and to include non-English-speaking workers who may be fearful of deportation and who cannot be expected to participate in this settlement, unless they are diligently pursued and persuaded. Reaching them is the challenge that this class action addresses (and private civil litigation has largely ignored).

12.     Of course, this challenge of reaching those who have been ignored explains the elaborate and painstaking efforts to give notice and establish contact with farmworkers (and others) in this class action. It also explains the reliance on telephonic consultations (as many class members may be outside the U.S. or, even if not, reluctant to approach governmental agencies or hospitals). In addition, these factors also explain why, in a public health crisis, more must be done than simply award compensation to eligible claimants. On this score, as next explained, this settlement is close to unique.

---

[10] See Declaration of Jeremy J. Wieck, dated as of March 9, 2021, at paragraphs 4 and 7.

II.     **Answering this Court's Questions**

13.     In possibly this Court's most provocative question in its July 6th opinion, it effectively asked what did the prior Settlement do that made class members better off than they would have been under a standard tort law procedure Specifically, this Court wrote that:

> "[I]t's unclear how the delegation proposed here would benefit a
> class of Roundup users who either have cancer but have not yet
> sued Monsanto or have not yet developed cancer."

The Court next pointed out that "thus far" courts and juries had been "awarding significant compensatory and punitive damages." Then, it pointedly asked:

> "Why would a potential class member want to replace a jury trial
> and the right to seek punitive damages with the process
> contemplated by the settlement agreement?"

A.     **Public Health Benefits and Saved Lives**

14.     That is an incisive question, but the facts have now changed with the new Settlement Agreement. First, let us recall that the Settlement Class consists of those persons who have been exposed to Roundup in the United States on or before February 3, 2021. Thus, the Settlement Class before this Court consists of persons who have been exposed to Roundup but who do not necessarily have NHL (or even know their status). Determining their medical status is the initial and foundational benefit that these class members receive. They may gain peace of mind that they are not ill, or they may learn that they need immediate treatment. Learning the truth—good or bad—helps them. At the core of this "at risk" population are approximately 1.4 million farmworkers and landscapers/grounds-keepers, 97% of whom reside or work in the 28 geographic areas that will be specially serviced by the Diagnostic Assistance Grant Program ("DAGP"). Because we know that roughly 84% of glyphosate is applied in agricultural settings on field crops, we can logically infer that farmworkers constitute the bulk of the population exposed to glyphosate and covered by this settlement.

- 7 -

15.     What will the Settlement Agreement do for this core population? To be blunt, it will save or extend lives—and in large numbers. As earlier noted, this 1.4 million core population is a diffuse, hard-to-reach population, many of whom speak little or no English and may be suspicious of the U.S. government. Yet, as Garretson opines, this population is "the most at-risk (from Roundup exposure) and medically underserved" (Garretson Declaration at paragraph 13(b)). The benefits to this population are comprehensively covered in the Garretson Declaration, which opines that the DAGP is sufficiently budgeted (1) to alert this full 1.4 million population as to the need for early discovery and detection of NHL, and (2) to give them the means and knowledge to conduct an initial self-evaluation for NHL indicators. Even more importantly, Garretson concludes that the $20 million budgeted for telehealth consultations is sufficient to make such consultations available to 40% to 50% of this 1.4 million "most at-risk" population.

16.     Now, consider what would happen in the absence of this Settlement Agreement. There would be no outreach program and no reason to believe that the number of diagnostic evaluations currently conducted on this 1.4 million "most at-risk" community would increase. Cases might still be brought by the plaintiff's bar (but one cannot predict the future volume or outcome of such cases based on the small number of the cases that so far have reached a trial outcome). Appellate reversals of existing decisions (always a possibility) would likely chill the plaintiff's bar's incentive to litigate new cases, and settlement values could decline. Possibly, there might be additional large awards of punitive damages, but this is a very speculative prediction. Punitive damages awards are like lightning; they strike unpredictably and fairly rarely. The empirical data show this.[11]

---

[11] One careful estimate is that punitive damages are awarded in around 3% of state tort trials. See Thomas H. Cohen & Kyle Harbacek, U.S. Dep't of Justice Bureau of Justice Statistics, *Punitive*

17.     What is virtually certain, however, is that the plaintiffs' bar is not in a position to conduct any significant outreach program or to engage in health education that would lead those in the "most at-risk" community to seek diagnostic evaluations. No doubt, the plaintiff's bar does search for cases, but their search is predictably limited and will not match the DAGP effort, for at least three distinct reasons: First, the plaintiffs' bar wants fully developed, mature cases where a diagnosis of NHL has already been made (and thus are not interested in, or capable of funding, a $210 million program simply to encourage diagnostic evaluations). Second, individual plaintiffs' attorneys are in competition with each other and thus are not positioned to take collective action to seek, screen, interview or advertise for NHL cases. At most, they might seek mature, diagnosed cases (and that implies delayed intervention and diagnosis). Third and finally, the plaintiffs' bar has little contact or credibility with the "most at risk" population, which is highly mobile, non-English speaking, and tends to keep a low profile. Even if plaintiffs' attorneys are ready to take an attractive case to trial, they may not see migrant workers as the optimal type of plaintiff most likely to induce a jury to award high damages. This is not intended

---

*Damage Awards in State Courts, 2005* (March 2011), https://www.bjs.gov/content/pub/pdf/pdasc05.pdf (punitive damages awarded in only 3% of 8,519 state tort trials in which plaintiff prevailed, and the median punitive damage award was $64,0000); Catherine M. Sharkey, *Economic Analysis of Punitive Damages: Theory, Empirics, and Doctrine*, Research Handbook on the Economics of Torts 486, 500 (Jennifer Arlen ed., 2012) (describing punitive damages as "a very extraordinary, rarely imposed remedy"); Theodore Eisenberg, Neil LaFountain, Brian Ostrom, David Rottman & Martin T. Wells, *Juries, Judges, and Punitive Damages: An Empirical Study*, 87 Cornell L. Rev. 743, 745 (2002) (finding that "juries rarely award [punitive] damages"); Anthony J. Sebok, *From Myth to Theory in Punitive Damages*, 92 Iowa L. Rev. 957 (2007) (reviewing major empirical studies of punitive damages and concluding that popular perception of punitive damages as commonly awarded in large amounts is incorrect; punitive awards are infrequent and generally track amount of compensatory damages); William Haltom & Michael McCann, Distorting the Law: Politics, Media, and the Litigation Crisis 97 (2004) ("finding after finding has revealed that punitive damages have rarely been awarded and even more rarely collected"); Ronen Perry & Elena Kantorowicz-Reznichenko, *Income-Dependent Punitive Damages*, 95 Wash. U.L. Rev. 835, 836 n.2 (2018) (noting that "[a]ll empirical studies found that punitive damages are very rarely awarded.").

- 9 -

as a criticism of plaintiffs' attorneys, but simply as a recognition that the plaintiffs' bar and those persons "most at risk" for NHL are like two ships passing in the night.

18.    The bottom line then is that, from a public health perspective, there is little reason to believe that the private tort law system will encourage or bring about earlier detection of NHL or increased diagnostic evaluations; or that the plaintiffs' bar will subsidize new research. Indeed, the more the plaintiffs' bar achieves noteworthy verdicts, the less that defendants may favor increased screening for NHL, as they may view such screening as simply producing more eligible plaintiffs.

19.    From a public policy perspective, saving lives and extending lives are more important goals than securing the highest recoveries in the few cases that do go to trial. As the Supplemental Declaration of Dr. Amit R. Mehta shows, early diagnosis enables patients to receive increased treatment options and improved outcomes.[12] In addition, early diagnosis reduces adverse side effects and can vastly improve the patient's quality of life. As he shows, the connection between early diagnosis and saved and extended lives is real. In this light, the Settlement Agreement charts a path to material benefits for the Settlement Class, while the

---

[12] See Supplemental Declaration of Dr. Amit R. Mehta at paragraphs 7 to 10. Dr. Mehta observes at paragraph 8 that:

> "The early diagnosis of NHL is particularly important due to the often rapidly progressive nature of this group of cancers. A delay of even a few months can have the consequence of a diagnosis made at a more advanced stage of disease or one with more symptoms, which confers worse prognosis with greater difficulty of successful treatment."

As an illustration, Dr. Mehta notes that:

> "[T]hose diagnosed at an earlier point (in terms of stage of cancer along with other prognostic risk factors) have a 4 year survival rate of 92% with the aggressive NHL subtype known as diffuse large B-cell lymphoma. In contrast, those diagnosed at a more advanced point of lymphoma have a 4 year survival rate of only 58%." (Mehta Declaration at paragraph 8).

This an over 30% difference in survival rates and shows again that early diagnosis means saved lives.

private tort law system offers no similar measurable benefit likely to increase access to medical services, to reduce the number of likely fatalities or extend life, or to improve the class members' quality of life. Rather, the private tort bar's preference is to take mature cases with clear symptoms to trial (and decline "negative value" early stage cases until they mature). Of course, this delay is contrary to the best interest of the patient/claimant.

B. **A Financial Comparison**

20.     Even if one were to look only at the financial recovery to class members, a strong case exists that class members will do better under the Settlement Agreement than under the private tort system. Yes, it is true, under the private tort system, that plaintiffs can potentially receive punitive damages and that juries may award higher recoveries in those cases that go to trial. Reaching trial or the eve of trial is possible, but not certain, and it can take years. Although, the goal of the private tort bar may be to provide jury trials for all, this is a Quixotic quest. The reality is that, across the entire federal court system in the last year for which there is data— 2019—, a total of under 1,400 civil jury trials occurred.[13] As noted earlier in paragraph 6, the American Cancer Society reports that over 81,000 persons are annually diagnosed with NHL. Of course, only a small portion of that number are likely to sue, but the number of persons seeking a jury trial could go up significantly (possibly by thousands, as legal uncertainties are resolved).[14]

---

[13] The "vanishing civil jury trial" is a long-running trend. Whatever its causes, even if this trend slows or reverses, and trials become more available and inexpensive to reach and conduct, the trial capacity of both the federal and state court systems will remain limited. In 2019, the federal system reported 1377 trials, and even in the much larger state courts system, the estimate was approximately 20,000. Federal: Judicial Business - 2019 Tables: Table T-1, U.S. District Courts––Civil and Criminal Trials Completed, by District, During the 12-Month Period Ending September 30, 2019, https://www.uscourts.gov/sites/default/files/data_tables/jb_t1_0930.2019.pdf (last visited 2/26/2021) State: S. Gibson, B. Harris, N. Waters, K. Genthon, A. Fisher Boyd, & D. Robinson, eds., Trial Court Caseload Overview - Incoming Trends, 2012-19, www.courtstatistics.org (last visited 2/26/2021).

[14] As noted infra in paragraph 22, Mark Eveland estimates that there will be over 134,000 claims

- 11 -

Accordingly, it would be difficult to infeasible to accommodate a substantially enhanced number of plaintiffs with a jury trial, and the likely consequence of any significant increase in the number of plaintiffs suing in court would be a longer queue at the courthouse door and greater delay before plaintiffs received compensation. In contrast, the class settlement could begin paying compensation claims shortly after approval by the Court. What is very likely then, is that, under the Settlement Agreement, far more persons exposed to Roundup Products will participate and submit claims (because of the greater outreach effort) than would assert private tort actions in court. This point is addressed in Mark Eveland's Declaration and cross-checked and confirmed in Jessica Horewitz's Declaration. Put simply, both predict a significant increase in the claiming rate of class members, both as the result of settlement notices "specifically designed to include extensive outreach to underserved communities" and the DAGP effort, which will result in increased diagnoses of NHL.

21.     In this light, the great fallacy here would be to focus only on the average recovery received by those who submit claims under the Settlement Agreement in comparison to the awards to those who sue in the tort system. Conceivably, recoveries in private tort actions (including inventory settlements) might be higher than recoveries under the Settlement Agreement. But this does not end the analysis. For example, if over the same time period, 500 private tort actions were brought to trial versus 50,000 claims resolved under the Settlement Agreement, it would be highly likely that the class members, as a group, would receive more total compensation under the Settlement Agreement. Put differently, this implies that this Court

---

for compensation made under the Settlement Agreement by 2025. If such an increase occurred in the absence of the Settlement Agreement, it would be almost certain to overwhelm the capacity of federal and state courts to provide jury trials to these plaintiffs. Plaintiffs would instead be forced to wait lengthy periods for a trial and might in consequence settle cheaply on defendants' terms.

2137824.2

should focus on the best interests of all the class members, as a group, and not be persuaded simply by what the highest recovery is to the fortunate plaintiff who wins the tournament and obtains the highest jury award. To sum up, simply in terms of compensation, the two critical criteria for evaluating different legal roads to settlement should be: (1) Which option results in greater total compensation to those exposed to glyphosate?, and (2) Which option will lessen the time period before those eligible receive compensation?

22.     Mark Eveland, who has had substantial experience in mass torts cases, estimates that for the diagnosis years 2021 through 2025, the "Participation Rate" among settlement class members under the Settlement Agreement will increase to 27.7% for 2021 to 2025 (in effect, nearly quadrupling). Eveland estimates a total of 964,025 NHL cases from 2013 through 2025 under the Settlement Agreement. He then projects that these cases will result in 134,819 claims for compensation awards under the Settlement Agreement by 2025. Finally, he estimates that 35% of the filed claims will be approved, thus yielding 47,187 approved claims, which he estimates will result in $1,207,372,500 being paid to class members.

23.     I do not claim the statistical sophistication to appraise Mr. Eveland's computations and estimates, but Jessica Horewitz has submitted her own Declaration largely confirming his analysis. While Eveland predicts a 27.7% participation rate, Ms. Horewitz estimates a highly similar and overlapping 25-30% participation rate. She also notes that:

> "If the information about the possible compensation is readily
> available, participation increases."

Of course, the notice program under the Settlement Agreement will do exactly that and broadly communicate information about this settlement in Mexico and other places where much of the Class may reside.

24.     In any attempt to assess comparative recoveries, we ultimately need to focus on net compensation to class members and not simply on the gross compensation that individual plaintiffs receive in the tort system. I do not know what the median recoveries have been under the inventory settlements relating to Roundup into which Monsanto has recently entered. But my past experience with asbestos and other mass tort settlements leads me to believe that the plaintiffs' attorneys often charge contingent fees ranging from at least 25 to 40%. The 40% figure has already been mentioned by some counsel in connection with the recent common benefit motion.  An assumed 33⅓ % contingent fee strikes me as a conservative assumption for the fees of plaintiffs' attorneys. In sharp contrast, under the Settlement Agreement, the attorney's fees and costs of class counsel will be paid by Monsanto and do not reduce the settlement benefit to the class. Also, class counsel's fees and costs will be limited to a total of at most $170 million (which limitation implies that Monsanto is able to pay more to the class than if counsel had insisted on a higher, but customary, fee). The bottom line here is that the inventory settlements would need to be reduced by at least one third (my conservative estimate of the typical contingent fee being deducted from the inventory settlements) before they can be meaningfully compared to the claims paid under the Settlement Agreement.

25.     Another legitimate way to compare the outcomes between the private tort law system and this Settlement Agreement is to focus on the positions of the claimants with the strongest claims versus those with more marginal claims. Both sets of claims—strong and marginal—may wish to avoid the inevitable fact in private litigation that some plaintiffs lose. For example, even those with strong claims may desperately need a recovery to support their families in the future. To be sure, others with strong claims may be prepared to gamble. But both groups can elect their preference under the Settlement Agreement, with some strong claimants opting

out and others accepting the Settlement Agreement because they are risk-averse. In contrast, plaintiffs with more marginal claims or lesser damages may not be able to secure counsel to represent them in the private tort system. That all have a choice (to opt out or not) is an advantage of the Settlement Agreement. Also, as more claimants elect to proceed under the Settlement Agreement, it becomes more feasible to allow those who do opt out to obtain a trial date and at an earlier point.

26.     Taking this comparison one step further, we need to recognize that most outcomes under the private tort system (at least in mass tort cases) come not from individual trials, but from inventory settlements. In the mass tort marketplace, the value of an inventory of claims may depend heavily on how the defendant perceives the professional competence of the opposing plaintiff's counsel and on the financial resources that the defense counsel believes plaintiffs have to carry on extended litigation. Also, it is possible that defendants may view some claimants as more likely to attract a higher award from a sympathetic jury because their demographics resemble those of the jury (conceivably, a jury of middle class suburbanites may award higher amounts to middle class plaintiffs). This potential for disparate (and arguably discriminatory) outcomes is mitigated under the Settlement Agreement, which specifies a range of outcomes and limits the discretion of the fact finders. My point is that some factors, such as counsel's competence or resources or the subjective attractiveness of a plaintiff to the jury, are random factors whose impact we should want to minimize to achieve just and equitable outcomes. Inevitably, the private tort system implies more disparate and variable results that sometimes reflect illegitimate factors that we do not want to determine the compensation awarded.

C.     **The Role of the Science Panel.**

27.     This Court expressed grave doubts in its July 6 opinion as to delegating the

decision on general causation to a panel of experts. Frankly, this question has now become

academic, as the Settlement Agreement greatly minimizes the role of this panel. If they wish to,

plaintiff's attorneys could seek to staff their own science panel, and neither panel would receive

any required weight or deference from the factfinder. The Settlement Agreement enables either

side to depose the panel members, to challenge the panel determination at the trial through their

own experts or evidence, and to challenge even admissibility under *Daubert* or *Frye* after 3

years, to account for evolving science.

28.     Thus, this Court's third question—whether "in an area where the science may be

evolving, how could it be appropriate to lock in a decision from a panel of scientists for all future

cases?"—can be answered in the same way: the revised Settlement Agreement "locks in"

nothing. If the science changes (as well it might), plaintiffs have complete freedom to point this

out, and defendants will only hurt their own case if they attempt to offer out-of-date scientific

arguments. Although several objectors claim that class members who sue would find it very

difficult to challenge any conclusions reached by the science panel, they failed to explain why

plaintiff's counsel cannot simply ask their own expert to explain why it's reasoning and analysis

is superior and more current than that of the science panel.

D.     **Educating and Assisting the Class**

29.     Lastly, this Court properly pointed out that:

> "Given the diffuse, contingent, and indeterminate nature of the
> proposed class, it seems unlikely that most class members would
> have an opportunity to consider in a meaningful way (if at all)
> whether it is in their best interest to join the class."

True enough! But the new settlement offers the class something more concrete and

valuable: compensation. Even more unique is the procedure specially designed for this case to inform and advise the class: namely, the provision of free legal services to class members with respect to this settlement, including assistance in filing a claim and evaluating their rights and options. The Settlement Agreement's Legal Services Program section provides free legal assistance for class members in navigating the claims and compensation process. This program will be staffed by lawyers with Roundup–specific and other tort claims experience, and will operate under the auspices of class counsel, and thus accountable to the Court. It is noteworthy that the Legal Services Program helps insure that class members' compensation awards will be net payments, unreduced by attorneys' fees. In fact, the Settlement Agreement dedicates 40% of the court-awarded fee in this case to this program, meaning that class counsel are subsidizing much of the cost of outreach to their own clients (this also does not happen, to my knowledge, in the private tort system).

E.      **The Objectors' Response**

30.     To save this Court's time, I will respond only to those objectors who take positions that in my judgment would preclude the certification of a settlement class that responds to the urgent public health crisis posed by this case. Perhaps without realizing it, however, several objectors do precisely that and would leave much of the class unprotected in the face of a serious risk of NHL. In effect, their rigid defense of the traditional tort system leaves class members facing a higher risk of fatalities, shortened life expectancies, and a reduced quality of life. Objectors also repeatedly mischaracterize the Settlement Agreement, which does not deny class members the right to sue and minimizes any intrusion on the rights of class members, much more so than did earlier settlements, such as *Deepwater Horizon* and *Diet Drugs*.

31.     In common, several of the objectors argue that notice cannot be given in a constitutionally adequate manner until a person has been diagnosed with NHL (because

- 17 -

otherwise the individual, in their view, would not be motivated to respond).[15] Although I know

of no case standing for this broad proposition, I would agree that if a failure to respond to notice

cost the class members the right to sue in the private tort system, this design would be

undesirable. But that is not the design of the Settlement Agreement. First, class members are not

making an uninformed choice as they will be assisted by legal counsel provided by the

Settlement Agreement, and they may contact class counsel telephonically as part of the outreach

program. Even if they fail to opt out, class members can still re-enter the tort system and sue the

defendants at only a modest cost. All that class members sacrifice if they fail to opt out is: (1) an

ability to sue for punitive damages (which, as explained below, is probably illusory in this case),

and (2) a delay before they can sue (which will probably amount to a number of months and

seldom near its upper boundary of four years[16]). To draw the obvious parallel, if a private

plaintiff today sought to sue the defendants in an NHL-related case, it is likely that such a

plaintiff would have to wait a comparable period before they could obtain a jury trial.

      32.     Objectors will presumably reply that the loss of punitive damages and the possible

delay is still an unacceptable price. But this was the price paid in an intensely negotiated

settlement in return for an elaborate and probably unparalleled outreach program that the private

tort system cannot offer in any form. This benefit is well worth that price, and the class has

received a bargain. One simply cannot expect defendants to fund an expensive outreach program

---

[15] ECF 12673 at 15-18; ECF 12677 at 2-13; ECF 12678 at 4-42; ECF 12682 at 5-8; ECF 12679 at 2-3; ECF 12681-1 at 7-15; ECF 12693-1 at 9-10.

[16] For example, only class members already diagnosed with NHL today, who make their claims immediately upon the start of the compensation program, and who immediately reject their claims offer, would have to wait anything close to four years to file suit. Given the fact that the compensation ranges are transparent and will be disseminated in the notice, someone who already knows they would not accept the compensation amount for their age and condition, and who prefers to gamble in the tort system, would be most likely to decide to opt out immediately, file a lawsuit and begin their indefinite wait in the tort queue for trial or settlement.

(including the DAGP and its associated teleconferencing system) if defendants were thereby paying for class members to obtain diagnoses that both substantially increase the value of their claims and enable them to sue for punitive damages. It would be irrational for defendants to enter such a deal, but the actual deal reflected in the Settlement Agreement is nearly as good and saves the lives of class members, while reducing the value of their claims only marginally.

33.     Sadly, the position of objectors has tragic costs. If notice cannot be adequately given to undiagnosed claimants, these claimants will likely remain undiagnosed and face an increased risk of complications and mortality. Any similar settlement that seeks to provide early medical assistance, diagnosis, and outreach will also be infeasible if the outreach cannot begin until the point at which objectors would view the claimant as being sufficiently informed to respond to notice. No rational defendant will commit the $210,000,000 (which is the cost simply of the first stage of the DAGP) if every person hereby diagnosed was entitled to seek punitive damages. Thus, the real cost to claimants of objectors' strict theory of notice is that claimants are denied early screening and treatment. This will be a death sentence for some. As Dr. Amit R. Mehta explains in his Supplemental Declaration, treatment options are available for those detected at an early stage that reduce the risk of mortality; adverse side effects can also be minimized through early intervention; and the patients' quality of life can be vastly improved. Dr. Mehta concludes that "the difference in survival rates can be over 30% when measured at 4 years from the time of treatment."[17] These non-financial benefits outweigh all others and simply cannot be realized through the private tort system.

34.     In his Declaration, Mark Eveland estimates that a broad outreach program will result in well over 900,000 NHL cases being diagnosed between 2013 and 2025, and this will

---

[17] See Supplemental Declaration of Dr. Amit R. Mehta at paragraph 8.

2137824.2

lead to over 134,000 claims for compensation being filed under the Settlement Agreement. Many of these claims will be "immature claims" (or, in economic parlance, "negative value" claims) that the private tort system cannot handle. As a result, many claimants will suffer greater injury or not survive in the absence of an outreach program that only this settlement can fund.

35.     Worse yet, not only do objectors seek to preclude any such outreach program (perhaps unintentionally), but they are also selfishly favoring their own interests at the same time. Under the form of notice they would mandate (i.e., post-diagnosis notice), the private tort system is spared the challenge of a class action aimed at achieving public health benefits. Such an action could be a formidable competitor to a private tort system that can only handle mature claims and that has little interest in "negative value" claims. Candidly, it is hard to think of a more perverse rule of law than one that effective discourages outreach and leaves claimants with only a hope for compensation (but not medical evaluations, early diagnosis, and, if necessary, treatment) and only once their illness reaches a more advanced stage.

36.     Although some objectors seek to equate this settlement with Amchem Products, that is a gross mischaracterization; this settlement does not truly resemble the settlement rejected in Amchem, for several key reasons, which go both to the propriety of class certification and the fairness of the settlement. The class here has always been divided into subclasses for the diagnoses and undiagnosed, each with its own representation at the bargaining table. Every class member who does not receive compensation in the settlement retains compensatory rights, even after receiving other benefits. Even more importantly, class members covered by this settlement can re-enter the tort system without opting out, subject only to modest restrictions. Unlike in Amchem, the class here is unified by its need to resolve two important, live, and predominating common issues, regardless of the various states' tort laws under which the claims arise. These

- 20 -

2137824.2

two issues are present in, and dispositive of, every case: the fact issue of general causation and the legal issue of federal preemption. These are the issues on appeal right now from the MDL bellwether trial verdict, and these same issues will likely be challenged in every Roundup exposure case. Finally, of vital importance, this settlement features unique and important health-related benefits that <u>Amchem</u> lacked.

## **CONCLUSION**

37.     Above all, this settlement will save and extend lives, as well as award significant financial compensation (which will not cost class members any attorney's fees). Although objectors assert that the Settlement Agreement binds "future claimants," this is another mischaracterization. The Settlement Agreement does not apply to persons who had not been exposed as of February 3, 2021, and it allows all class members to re-enter the tort system and sue defendants (deprived of only their claim for punitive damages and delayed for some period that cannot exceed four years). It thus avoids the overreaching of <u>Amchem Products</u> (which released all future claims under its settlement) and similar cases in which courts have rejected the settlement. Also, the Settlement Agreement not only seeks outreach, but it provides the means to educate the class so that they can make an informed choice either way (to stay in the class or to opt out). To be sure, it does deny class members the ability to seek punitive damages (unless they opt out during the five months of the class notice period), but, as objectors constantly ignore, there is no right to punitive damages.[18] Even if available, such damages might be much harder

---

[18] The issues surrounding punitive damages are particularly complex in a case where potentially large numbers of plaintiffs are all seeking punitive damages in overlapping cases that may be tried over a period of years. In *Cooper Indus. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001), the Court recognized that punitive damages are not a form of compensation but rather a "private fine" that is levied by the jury for deterrent purposes, and, as such, punitive damages are subject to the Eighth Amendment's prohibition on "excessive fines." In a chain of multiple and overlapping trials, the point could easily come at which the total fines imposed would exceed the limits under the Eighth Amendment. This could mean that the last in line for a jury trial will be

2137824.2

than usual to obtain in this case where the scientific evidence remains a subject of controversy (thus arguably undercutting any inference of deliberate misconduct). Finally, this case is the first step and not the last step. Class counsel hopes and anticipates that this settlement will be extended after the initial settlement period to continue its public health and compensation campaign.

38.     If certified, this case will be a historic landmark in the development of litigation intended to realize public health goals; if not certified, this outcome will imply that private civil litigation is not be able to assist the vast majority of the likely claimants that this action is intended to reach. If private litigation remedies can only reach those who used Roundup Products in a "residential" setting and not the less well-off claimants who encountered Roundup Products in an agricultural setting, that result would be profoundly inequitable.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed on March 31, 2021 in Maplewood, New Jersey.

_John C. Coffee Jr._

John C. Coffee, Jr.

**EXHIBIT A**

**Statement of Professor Coffee's Experience with Respect to Complex Litigation and Class Actions.**

---

unable to obtain punitive damages because the Eighth Amendment ceiling has been passed. Alternatively, courts might seek to pool and allocate the punitive damages awarded among all the eligible claimants. Whatever choice is made, appeals and lengthy litigation on this issue are foreseeable, and the recovery to claimants is likely to be delayed.

I have been involved in the litigation, settlement, and defense of class actions for over fifty years, sometimes as a litigator, but more typically as an expert witness. As a skeptic of mass tort class actions, I testified against the certification and approval of the settlement in *Amchem Products* (on a pro bono basis). However, when the relevant facts of a case change, so also may my conclusions. Thus, in both *Diet Drugs* and *Deepwater Horizon* (which were very different mass tort cases), I testified in support of the settlement and class certification because I believed both settlements were in the interests of the class. Neither of those settlements, however, involved the same extraordinary outreach as is proposed in this case.

I have also testified in many securities class actions, again usually on certification and settlement issues. Sometimes, the court has thanked me for my research (as the court did in the Enron case—see *Newby v. Enron Corp.*, 586 F.Supp 2d 732, 773-778 (S.D. Tex. 2008)). In other cases (many more in fact), my work has gone unnoticed by the court, but such cases have kept me close to the real world of litigation practice.

In the 22 odd years that the ABA has sponsored an annual National Institute on Class Actions, I have given the session on "Class Action Developments" at 21 of these conferences (missing one because of illness in the family).

I am a Fellow of the American Academy of Arts and Sciences, and my reputation as a scholar rests at least in part on my extensive writings on class actions. Among the law review articles by me on this topic, the following have some relevance to the issues in this case: Coffee, *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L. Rev. 1343 (1995); Coffee, *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum. L. Rev. 669 (1986); Coffee, *The Regulation of Entrepreneurial Litigation:  Balancing Fairness and Efficiency in the*

- 23 -

*Large Class Action*, 54 U. Chi. L. Rev. 877 (1987); Coffee, *Rethinking the Class Action: A Policy Primer on Reform*, 62 Ind. L. Rev. 625 (1987); Coffee, *Litigation and Corporate Governance: An Essay on Steering Between Scylla and Charybdis*, 52 Geo. Wash. L.  Rev. 789 (1984); Coffee, *The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation*, 48 Law and Contemporary Problems 5 (1985); Coffee, *Class Action Accountability: Reconciling Exit, Voice and Loyalty in Representative Litigation*, 100 Colum. L. Rev.370 (2000); Coffee, *The Future of the Private Securities Litigation Reform Act of 1995: or Why the Fat Lady Has Not Yet Sung*, 51 Bus. Law. 975 (1996); Coffee, *Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation*, 106 Colum. L. Rev. 1534 (2006); and *The Globalization of Entrepreneurial Litigation: Law, Culture, and Incentives*, 165 U. Pa. L. Rev. 1895 (2017).

Finally, my overall assessment of class actions is set forth in my book on this topic: John C. Coffee, Jr., ENTREPRENEURIAL LITIGATION: Its Rise, Fall, and Future (Harvard University Press 2015).

2137824.2

## EXHIBIT B

**John Collins Coffee, Jr.**
**320 Wyoming Avenue**
**Maplewood, New Jersey 07040**

**POSITION**:  Adolf A. Berle Professor of Law, Columbia University Law School
Director, Center on Corporate Governance, Columbia University Law School

**EDUCATION**:  Amherst College 1966 B.A. (*magna cum laude*) Bond Fifteen (highest fifteen ranking seniors); Phi Beta Kappa

**LAW SCHOOLS**:  Yale Law School 1969, LL.B; New York University Law School, 1976 LL.M (in Taxation).

**OCCUPATIONAL**
**HISTORY**:  Columbia Law School 1980 - present; Berle Chair since 1986

Harvard Law School 2001 -- Joseph H. Flom Visiting Professor of Law, Fall 2001

Stanford Law School - Visiting Professor, Spring 1987

Virginia Law School - Visiting Professor, Fall 1979

Michigan Law School - Visiting Professor, Summer 1979

Georgetown University Law School - Professor and Associate Professor, 1976-1980

Cravath, Swaine and Moore - Associate, 1970-1976

Reginald Heber Smith Fellowship, 1969-1970

**SPECIALIZATIONS:**
My academic and teaching specialties include corporate and securities law, corporate governance, class actions and complex litigation, criminal law, and white collar crime.

**OTHER ACTIVITIES**
**and HONORS**:

1.   Fellow, American Academy of Arts and Sciences

2.   Fellow, American College of Governance Counsel

3.      Fellow, European Corporate Governance Institute

4.      Life Fellow, American Bar Foundation

5.      Order of the Coif Visiting Lecturer for 2005 (each year Order of the Coif selects one visiting lecturer to speak at a series of law schools)

6.      Reporter (for Litigation Remedies), American Law Institute, PRINCIPLES OF CORPORATE GOVERNANCE AND STRUCTURE (1980-1993: Final Draft 1993)

7.      Donald Cressey Award for Lifetime Achievement (awarded by the ACFE in 2011)

8.      Member, Strategic Advisory Board, Public Company Accounting Oversight Board (PCAOB) (2007-  )

9.      Fellow, European Corporate Governance Institute

10.     Clarendon Lectures (Oxford University 2006)

11.     Anton Phillips Chair, University of Tilburg (2005-2006)

12.     Reporter, American Bar Association, MINIMUM STANDARDS FOR CRIMINAL JUSTICE (2nd ed. 1980)

13.     Member, Advisory Committee on Capital Formation and Regulatory Processes, Securities and Exchange Commission (1995-1996)

14.     Member, Legal Advisory Committee to the Board of Directors, New York Stock Exchange (1992-1995) (currently, emeritus member)

15.     Member, Legal Advisory Board, National Association of Securities Dealers (NASD) (1996-2000)

16.     Member, Economic Advisory Board, Nasdaq (2001-2004)

- 26 -

17.     Member, Market Practices Committee, NASD Regulation, Inc.
        (1997-2000)

18.     Member, Subcouncil on Capital Allocation, United States
        Competitiveness Policy Council (created by Omnibus Trade and
        Competitiveness Act of 1988) (1993-1995)

19.     Member, Standing Committee on Law and Justice, Commission on
        Behavioral and Social Sciences and Education, National Research
        Council (elected to 1990-1994 term)

20.     Member, National Academy of Sciences Panel on Research on
        Sentencing (1979-1982)

21.     General Counsel, American Economic Association (1992-1998)

22.     Life Member, American Law Institute

23.     Chairperson, Section on Business Associations, Association of
        American Law Schools (AALS) (1981-1982)

24.     Chairperson, Audit and Investment Policy Committee, AALS
        (1992-1994) and former member, Nominating Committee, AALS
        (1990-1991)

25.     Chairperson, Committee on Sections, AALS (1984-1985)

26.     Board of Editors, M&A and Corporate Governance Law Reporter

27.     Board of Contributing Editors, American Lawyer Newspaper
        Group

28.     Columnist on Corporate and Securities Law, New York Law
        Journal

29.     Businesswatch Columnist, National Law Journal

30. Member, Special Committee on Mergers, Acquisitions and Corporate Control, Contests (1996-   ), and former member, Committee on Corporate Laws (1994-1995), Committee on Securities Regulation (1991-1994) and Committee on Corporate Laws (1983-1985), Association of the Bar of the City of New York

31. Member, Executive Committee, Securities Regulation Institute (1992-2002) (currently, member, Board of Advisors).

32. Chairperson, Appointments Committee, Columbia Law School (1987-1990)

33. Chair, ALI-ABA National Institute on Corporate Governance (1995-2005)

34. Frequent Panelist at PLI, ABA,, ALI-ABA, SEC and other Seminars and Institutes and have testified before Congress on approximately eight occasions.

35. In 1998, in 2001, and again in 2006, Professor Coffee was listed by the National Law Journal as one of its "100 Most Influential Lawyers" in the United States.

## BOOKS, AND CASEBOOKS

1. Coffee, CORPORATE CRIME AND PUNISHMENT: The Crisis of Underenforcement (Berrett-Koehler Publishers 2020)

2. Coffee, ENTREPRENEURIAL LITIGATION: Its Rise, Fall and Future (Harvard University Press, 2015)

3. Coffee, GATEKEEPERS: The Professions and Corporate Governance (Oxford University Press 2006)

4. Choper, Coffee and Gilson, CASES AND MATERIALS ON CORPORATIONS, (Little Brown & Co.) (8th ed. 2013)

5. Coffee, Sale and Whitehead, SECURITES REGULATION: CASES AND MATERIALS (14th ed. 2020) (formerly, Jennings, Marsh, Coffee and Seligman)

- 28 -

6. Reporter, ABA MINIMUM STANDARDS FOR CRIMINAL JUSTICE (2d ed. 1980) (Chapter 18)

7. Klein, Coffee and Partnoy, BUSINESS ORGANIZATION AND FINANCE (11th ed. 2010)

8. Coffee, Lowenstein and Rose-Ackerman, KNIGHTS RAIDERS AND TARGETS:  The Impact of The Hostile Takeover (Oxford University Press, 1988)

9. Ferran, Maloney, Hall and Coffee THE REGULATORY AFTERMATH OF THE GLOBAL FINANCIAL CRISIS (2012 Cambridge University Press)

**LAW REVIEW ARTICLES:** (in reverse chronological order)

1. Coffee, Why Do Auditors Fail?: What Might Work? What Won't?, 49 Accounting And Business Research 540 (2019).

2. Coffee, The Globalization of Entrepreneurial Litigation: Law, Culture, and Incentives, 165 U. Pa. L. Rev. 1895 (2017).

3. Coffee, The Wolf at the Door: The Impact of Hedge Fund Activism on Corporate Governance, 41 J. Corp. L. 545 (2016).

4. Coffee, Extraterritorial Financial Regulation: Why E.T. Cannot Come Home, 99 Cornell L. Rev. 1259 (2014).

5. Coffee, Mapping the Future of Insider Trading Law:  Of Boundaries, Gaps and Strategies, 2013 Columbia Business Law Review 281 (2013).

6. Coffee, The Political Economy of Dodd-Frank:  Why Financial Reform Tends to Be Frustrated and Systemic Risk Perpetuated, 97 Cornell L. Rev. 1019 (2012).

7. Coffee, Systemic Risk After Dodd-Frank:  Contingent Capital And the Need for Regulatory Strategies, 111 Colum. L. Rev. 795 (2011).

8. Coffee, Ratings Reform:  The Good, The Bad, and The Ugly, 1 Harv. Bus. L. Rev. 231 (2011).

9.      Coffee, <u>Litigation Governance:  Taking Accountability Seriously</u>, 110 Colum. L. Rev. 288 (2010).

10.     Coffee and Sale, <u>Redesigning the SEC:  Does the Treasury Have A Better Idea?</u>, 95 Va. L. Rev. 707 (2009).

11.     Coffee, <u>Law and the Market: The Impact of Enforcement</u>, 156 U. Penn. L. Rev. 299 (2007).

12.     Coffee, <u>Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation</u>, 106 Colum. L. Rev. 1534 (2006).

13.      Coffee, <u>Can Lawyers Wear Blinders?: Gatekeepers and Third Party Opinions</u>, 84 Texas L. Rev. 59 (2005).

14.     Coffee, <u>A Theory of Corporate Scandals: Why the U.S. and Europe are Different</u>, 21 Oxford Review of Economic Policy 198 (2005).

15.     Coffee, <u>Causation by Presumption? Why the Supreme Court Should Reject Phantom Losses and Reverse Broudo</u>, 60 Bus. Law. 533 (2005).

16.     Coffee, <u>Gatekeeper Failure and Reform:  The Challenge of Fashioning Relevant Reforms</u>, 84 B.U. L. Rev. 301 (2004).

17.     Coffee, <u>What Caused Enron?: A Capsule Social and Economic History of the 1990s</u>, 89 Cornell L. Rev. 269 (2004).

18.     Coffee, <u>The Attorney As Gatekeeper: An Agenda for the SEC</u>, 103 Colum. L. Rev. 1293 (2003).

19.     Coffee, <u>Racing Towards the Top?: The Impact of Cross-Listings and Stock Market Competition on International Corporate Governance</u>, 102 Colum  L. Rev. 1757 (2002).

20.     Coffee, <u>Understanding Enron: "It's About the Gatekeepers, Stupid"</u>, 57 Bus. Law. 1403 (2002).

21.     Coffee, <u>Law and Regulatory Competition: Can They Co-Exist</u>? 80 Texas L. Rev. 1657 (2002).

22.    Coffee, <u>The Rise of Dispersed Ownership: The Roles of Law and the State in the Separation of Ownership and Control</u>, 111 Yale L. J. 1 (2001).

23.    Coffee, <u>Do Norms Matter? A Cross-Country Evaluation</u>, 149 U. Pa. L. Rev. 2151 (2001).

24.    Coffee, <u>Class Action Accountability: Reconciling Exit, Voice and Loyalty in Representative Litigation</u>, 100 Colum. L. Rev.370 (2000).

25.    Coffee, <u>Privatization and Corporate Governance: The Lessons from Securities Market Failure</u>, 25 J. Corp. L. 1 (1999).

26.    Coffee, <u>The Future as History: The Prospects for Global Convergence in Corporate Governance and its Implications</u>, 93 Nw. U. L. Rev. 641 (1999).

27.    Coffee, <u>Modern Mail Fraud: The Restoration of the Public/Private Distinction</u>, 35 Amer. Crim. L. Rev. 427 (1998).

28.    Coffee, <u>Brave New World?: The Impact(s) of the Internet on Modern Securities Regulation</u>, 52 Bus. Law. 1195 (1997).

29.    Coffee, <u>The Bylaw, Battlefield: Can Institutions Change the Outcome of Corporate Control Contests</u>, 51 U. Miami L. Rev. 605 (1997).

30.    Coffee, <u>Transfers of Corporate Control and the Triggering Thesis: Can Delaware Law Encourage Efficient Transactions While Chilling Inefficient Ones</u>?, 21 Del. J. Corp. L. 359 (1996).

31.    Coffee, <u>The Future of the Private Securities Litigation Reform Act of 1995:  or Why the Fat Lady Has Not Yet Sung</u>, 51 Bus. Law. 975 (1996).

32.    Coffee, <u>Class Wars:  The Dilemma of the Mass Tort Class Action</u>, 95 Colum. L. Rev. 1343 (1995).

33.    Coffee, <u>Competition versus Consolidation: The Significance of Organizational Structure in Financial and Securities Regulation</u>, 50 Bus. Law. 447 (1995).

34.  Black and Coffee, <u>Hail Britannia?: Institutional Investor Behavior Under Limited Regulation</u>, 92 Mich. L. Rev. 1997 (1994) (with Bernard Black).

35.  Coffee, <u>The SEC and the Institutional Investor:  A Half-Time Report</u>, 15 Cardozo Law Review 837 (1994).

36.  Coffee, <u>New Myths and Old Realities:  The American Law Institute Faces the Derivative Action</u>, 48 Bus. Law. 1407 (1993).

37.  Coffee, <u>Paradigms Lost:  The Blurring of the Criminal and Civil Law Models--And What Can Be Done About It</u>, 101 Yale L.J. 1875 (1992).

38.  Coffee, <u>Liquidity Versus Control</u>:  <u>The Institutional Investor as Corporate Monitor</u>, 91 Colum. L. Rev. 1277 (1991).

39.  Coffee and Klein, <u>Bondholder Coercion:  The Problem of Constrained Choice in Debt Tender Offers and Recapitalizations</u>, 58 U. Chi. L. Rev. 1207 (1991).

40.  Coffee, <u>Does "Unlawful" Mean "Criminal"?  Reflections on the Disappearing Tort/Crime Distinction in American Law</u>, 71 B.U.L. Rev. 193 (1991).

41.  Coffee, <u>Unstable Coalitions:  Corporate Governance as a Multi-Player Game</u>, 78 Geo. L.J. 1495 (1990).

42.  Coffee, <u>The Mandatory/Enabling Balance in Corporate Law: An Essay on the Judicial Role</u>, 89 Columbia. L. Rev. 1618 (1989).

43.  Coffee, <u>Hush!: The Criminal Law Status of Confidential Business Information After McNally and Carpenter and the Enduring Problem of Overcriminalization</u>, 26 Amer. Crim. L. Rev. 121 (1989).

44.  Coffee, <u>The Uncertain Case for Takeover Reform:  An Essay on Stockholders Stakeholders and Bust-ups</u>, 1988 Wisc. L. Rev. 435.

45.  Coffee, <u>The Regulation of Entrepreneurial Litigation:  Balancing Fairness and Efficiency in the Large Class Action</u>, 54 U. Chi. L. Rev. 877 (1987).

46.  Coffee, <u>Rethinking the Class Action:  A Policy Primer on Reform</u>, 62 Ind. L. Rev. 625 (1987).

47.    Coffee, <u>Shareholders Versus Managers:  The Strain in the Corporate Web</u>, 85 Michigan L. Rev. 1 (1986).

48.    Coffee, <u>Understanding the Plaintiff's Attorney:  The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions</u>, 86 Colum. L. Rev. 669 (1986).

49.    Coffee, <u>The Future of Corporate Federalism</u>, 8 Cardozo L. Rev. 759 (1987).

50.    Coffee, <u>The Unfaithful Champion:  The Plaintiff as Monitor in Shareholder Litigation</u>, 48 Law and Contemporary Problems 5 (1985).

51.    Coffee, <u>Partial Justice:  Balancing Fairness and Efficiency in Partial Bids</u>, 3 Companies and Securities Law Review 216 (Australian Law Review).

52.    Coffee, <u>Litigation and Corporate Governance:  An Essay on Steering Between Scylla and Charybdis</u>, 52 Geo. Wash. L.  Rev. 789 (1984).

53.    Coffee, <u>Market Failure and the Economic Case for a Mandatory Disclosure System</u>, 70 Va. L. Rev. 717 (1984).

54.    Coffee, <u>Regulating the Market for Corporate Control:  A Critical Assessment of the Tender Offer's Role in Corporate Governance</u>, 84 Colum. L. Rev. 1145 (1984).

55.    Coffee, <u>Rescuing the Private Attorney General:  Why the Model of the Lawyer As Bounty Hunter is Not Working</u>, 42 Maryland Law Review 215 (1983).

56.    Coffee, <u>The Metastasis of Mail Fraud: The Continuing Story of the Evolution of a White Collar Crime</u>, 21 Am. Crim. L. Rev. 1 (1983).

57.    Coffee and Schwartz, <u>The Survival of the Derivative Suit:  An Evaluation and a Proposal Legislative Reform</u>, 81 Colum. L. Rev. 261 (1981).

58.    Coffee, <u>"No Soul To Damn; No Body Kick," An Unscandalized Inquiry into the Problem of Corporate Punishment</u>, 79 Mich. L. Rev. 386 (1981).

59.   Coffee, "Twisting Slowly In the Wind":  A Search for Constitutional Limits on Coercion of the Criminal Defendant, 1980 Supreme Court Review 211 (1981).

60.   Coffee, From Tort to Crime: Some Reflections on the Criminalization of Fiduciary Breaches and the Problematic Line Between Law and Ethics, 19 Am. Crim. L. Rev. 117 (1981).

61.   Coffee, Beyond the Shut-Eyed Sentry: Toward a Theoretical View of Corporate Misconduct and an Effective Legal Response, 62 Va. L. Rev. 1099 (1977).

62.   Coffee, The Repressed Issues in Sentencing:  Accountability, Predictability and Equality in the Era of the Sentencing Commission, 66 Geo. L.J. 975 (1978).

63.   Coffee, The Future of Sentencing Reform, 73 Mich. L. Rev.  1361 (1975).

64.   Coffee, Making the Punishment Fit the Corporation:  The Problems of Finding an Optimal Corporate Criminal Sanction, 1 N. Ill. L. Rev. 1 (1980).

65.   Coffee, Privacy versus Parens Patriae, 57 Cornell L.  Review 571 (1972).

**ENDOWED LECTURES**

Professor Coffee served as the Order of the Coif Visiting Lecturer in 2005 and has delivered annual endowed lectures at numerous American and foreign law schools. He has also served as a Distinguished Visiting Scholar at the University of Toronto Law School and Osgoode Hall Law School and in a similar capacity at the University of British Columbia, and has taught as a visiting professor at the University of Tokyo and the University of Sydney.  He has also lectured at Oxford, Cambridge, the University of Amsterdam and a variety of other law schools in the United States, Europe and Asia.

2137824.2