UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| | : | |
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | : | MDL NO. 2741 |
| | : | |
| | : | Case No. 3:16-md-02741-VC |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| *Ramirez, et al. v. Monsanto Co.*, Case No. 3:19-cv-02224 | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

**DECLARATION OF ARTHUR R. MILLER**

**I.      Background and Qualifications**

1.      I am a Professor at the New York University School of Law.  I graduated from Harvard Law School magna cum laude in 1958, and practiced law in New York City until 1962. Since then, I have taught full time at the University of Minnesota, the University of Michigan, Harvard Law School (where I was the Bruce Bromley Professor of Law) and, since 2007, New York University School of Law (where I am a University Professor and the Warren E. Burger Professor of Constitutional Law and the Courts).  I have taught the basic first year course in Civil Procedure for more than 55 years and upper level courses and seminars in advanced procedure and complex litigation, as well as copyright and sports law.

2.      I am the author or co-author of more than 40 books and treatises, including Federal Practice and Procedure, the leading multi-volume treatise on practice in the federal courts, and New York Civil Practice (with Judge Jack Weinstein and the late Professor Harold

Korn), a leading multi-volume treatise on New York practice.  I also am the author or co-author of at least 30 law review and other articles and monographs on a range of court related issues including United States constitutional law, federal court litigation, civil procedure, sealing orders, confidentiality, class actions, attorney's fees, and transnational litigation.  I also served as a member of the Special Advisory Group to the Chief Justice of the United States Supreme Court (Chief Justice Burger) on Federal Civil Litigation; as the Reporter and then as a Member of the Advisory Committee on Civil Rules of the Judicial Conference of the United States (by appointment of Chief Justice Burger and reappointment by Chief Justice Rehnquist); as a special consultant to the drafting of the original Manual for Complex Litigation; as a member of the American Bar Association Special Committee on Complex and Multidistrict Litigation; and as a member of numerous other professional committees and organizations.  I also served as the Reporter for the American Law Institute's Complex Litigation Project, which led to the adoption and publication by the Institute of Complex Litigation: Statutory Recommendations and Analysis with Reporter's Study (1994), then as an Advisor to the American Law Institute's Principles of Aggregate Litigation, and was one of the draftsmen of the Uniform Interstate and International Procedure Act.  I have testified before numerous United States Senate and House of Representatives subcommittees on constitutional, procedural, privacy, and other issues.

3.     Throughout my years in academe, I have maintained my contacts with the Bench and the practicing bar in order to understand the actual operation and functioning of the civil justice system. Thus, I have participated in countless judicial conferences in the various United States Courts of Appeal, and in educational programs conducted by the Federal Judicial Center and several state judicial education programs as a lecturer or a discussion leader on a wide variety of subjects, including many on aspects of jurisdiction, class actions, and complex

litigation, as well as professional matters. In addition, I have appeared as a lawyer or as an expert witness in numerous class actions and complex litigation cases, on behalf of both plaintiffs and defendants, with regard to issues such as the propriety of class certification; the fairness, reasonableness, and adequacy of settlements and attorneys' fees; subject matter and personal jurisdiction; discovery; privileges and confidentiality; choice of law; preemption; jury trial; and appealability. Those cases have involved a wide range of substantive contexts, including mass disasters, product defects, toxic substances, invasions of personal rights, antitrust, security frauds, consumer deception, consumer financing, RICO, mail fraud, wire fraud, Holocaust claims, and professional responsibility.  These experiences include oral argument before the United States Supreme Court, every United States Court of Appeals, numerous United States District Courts, and a number of state trial and appellate courts.

4.     I have hosted several national television programs that have received a variety of American Bar Association and Emmy awards from the Academy of Television Arts and Sciences for promoting public understanding of the law.  In addition, I have been named a Commander of the Order of the British Empire (CBE) by Queen Elizabeth II, for my charitable, media, and public service activities in the United Kingdom.

5.     Attached is my résumé, listing all significant publications.

6.     I have been retained in my individual capacity by the settlement's proponents to comment on the structure of the proposed class settlement in *In re: Roundup Products Liability Litigation*, to which I will refer as the "Roundup settlement."  It is my opinion that the Roundup settlement's structure is consistent with the requirements of Rule 23 and the Constitution for class settlements of mass-tort litigation, and avoids the structural deficiencies the Supreme Court identified in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997).  I have not reviewed and

thus express no view whether the terms of the Roundup settlement are substantively fair, reasonable, or adequate.

## II.     The Promise and Problems of Mass-Tort Class Actions.

### A.     <u>The competing considerations</u>

7.     Use of a class action in a mass-tort setting presents both an opportunity and an occasion for caution.  The class device offers substantial potential benefits to the parties, the judicial system, and society that are not available through individual litigation.  These include, of course, the additional benefits class members can achieve through collective action.  Collective action can provide a more level litigation environment on which to confront the defendant, thus giving rise to a settlement on more favorable terms to the class members.  It also often produces a single decree that provides consistent treatment of class members eliminating the risk of different courts reaching different results, and binds the defendant universally and does not allow it to relitigate issues against each plaintiff, something that mass-tort defendants can still generally do in individual litigation notwithstanding *Parklane Hosiery, Inc. v. Shore*, 439 U.S. 322 (1979).

8.     More fundamentally, class resolution of mass torts opens the door to remedies that simply are not available through individual litigation.  This is particularly true when a class *settlement* is achieved.  Class settlements allow the parties to work together, subject to the safeguard of the required court approval, to design and implement programmatic remedies that are of immense benefit to the plaintiff class and often promote public policies such as health and product safety, but that individual litigation would not or could not produce.  Examples include many of the features of the Roundup settlement before the Court:  a defendant-funded program for sustained outreach to and education of class members — for example migrant workers who ordinarily would not be able to exercise their rights through individual litigation; a broad-scale,

nationwide medical monitoring assistance program to promote early diagnosis and awareness that could save class members' lives; a program for medical research into new treatments for the cancer at issue; and a defendant-funded program for free legal services to class members to guide them through the legal process and allow them to retain the full compensation they are awarded instead of paying 33-50% of it to lawyers.  In a world in which the focus is increasingly oriented toward maximizing the individual recovery of those plaintiffs who happen to be the first to litigate, it is important to take a step back.  In mass torts, people's lives are at stake, and the availability of remedies available to all class members that can save lives represents the true mark of justice.  Not only does aggregate litigation hold the promise of remedies consistent with public health and safety, but it does so with a process that provides consistent and equal treatment for all.

9.      At the same time, mass-tort class actions present significant potential concerns about intruding on individual freedom of action.  Mass tort claims usually are not "negative value cases," meaning cases that as an economic matter would never be litigated individually. And they can involve claimants with varied circumstances and different levels of physical injuries that may develop over time — unlike, for example, securities cases, in which the claims are more homogenous and the damages are often essentially a matter of mathematical calculation.  Mass-tort plaintiffs thus may have more reason to want to proceed individually than plaintiffs in other contexts.  For these reasons, collective decision-making and resolution of individual tort compensation claims can present significant questions of both process and fairness.  These questions are all the more significant when the class includes people who were exposed to the product at issue, but whose diseases have not yet become manifest or been diagnosed.

B.      **The 1966 revisions to Rule 23 and mass torts**

10.     I was a special assistant to Professor Benjamin Kaplan in connection with his service as the Reporter to the Advisory Committee on Civil Rules in the early-to-mid 1960s.  In that capacity, I was one of approximately fifteen people present for the creation and drafting of the 1966 amendments to Federal Rule 23, which to this day forms the basic shape and content of the Rule.  As someone who participated in all the Committee's meetings on Rule 23, I can speak with personal knowledge as to the Committee's deliberations with respect to those amendments and the Advisory Committee Notes issued in conjunction with it.

11.     Although mass-tort litigation was in its nascency in the years preceding the 1966 promulgation of the amended Rule 23, the Advisory Committee did discuss the possibility that the new Rule could be used in mass-tort settings, particularly the new Rule 23(b)(3) class action.  The Committee decided to strike a balance that recognized both the potential promise of the proper use of this inventive class action provision and the problems that overuse or misuse of it could create.  The Committee specifically declined to rule out mass-tort class litigation, but it also cautioned about use that might be inappropriate because it would unfairly affect individual rights.

12.     In particular, the Committee resisted considerable pressure to exclude mass torts, or "mass accidents" as they were called, from Rule 23 entirely that certain members believed was coming from the insurance industry and other corporate interests.  The Committee was repeatedly warned that, unless the Rule expressly excluded mass torts, there would be huge opposition from the business community that would kill the entire amended Rule.  There was even a representation that, unless mass accidents were excluded, certain members of the Supreme Court might oppose promulgation of the Rule.

13. Nonetheless, the Committee refused to put such an exclusion in the Rule and declined to address mass torts in the Rule's text at all. Because the Committee members knew they could not foresee the future of society in general or litigation in particular, they chose to preserve the possibility of the Rule's use in any appropriate setting to meet the needs of litigation however those needs might develop. Recognizing the concerns about individual rights, the Committee did observe in the Advisory Committee Notes that "mass accident" cases are likely to involve "significant questions, not only of damages but of liability and defenses to liability" that would "affect the individuals in different ways," and therefore would not be appropriate for class litigation in the "ordinar[y]" case.[1] But apart from that cautionary though non-absolute observation, the Committee determined to give the federal courts latitude to employ the class action when appropriate and properly structured. It trusted federal judges to strike the right balance through application of the Rule's general requirements that are designed to safeguard individual rights against misuse of the Rule 23(b)(3) class action — notice and opportunity to opt out, adequacy of representation, predominance of common issues over individual ones, and judicial superintendency over the propriety of class certification and proposed settlements. As now seems evident, there has been an extraordinary growth of mass phenomena and injury in our society since 1966 that challenges our civil justice system. Fortunately, the flexibility and protections of the Rule have been employed effectively by federal judges and thoughtful lawyers to serve the needs of contemporary litigation well.

III. *Amchem*: **All the Problems, Little of the Promise.**

14. Over three decades passed before the Supreme Court took up the intersection of mass torts and the 1966 amendments to Rule 23. The case providing that occasion, *Amchem*

---

[1] Advisory Committee's Notes on Fed. Rule Civ. Proc. 23, 28 U.S.C.App., p. 697.

*Products, Inc. v. Windsor*, *supra*, was in many ways a poster child for concerns about mass-tort class proceedings. The proposed settlement in that case presented virtually all of the problems of intruding on rights of individual class members, while offering only some of the benefits that class treatment can provide.

15.    The *Amchem* settlement prescribed a rigid schedule of fixed compensation amounts for a large number of different asbestos-related diseases suffered by class members exposed to the asbestos products of one or more of twenty defendants. For some disease categories, compensation was available only in exceptional circumstances; for other categories, the "compensation" was fixed at zero in every circumstance. Class members were bound to these amounts in perpetuity, and the amounts were not even adjustable for inflation. By contrast, defendants could choose to withdraw from the settlement after ten years. The settlement further imposed "case flow maximums" capping the number of claims payable for each category of disease in a given year — as a result, class members might have to wait even to receive the fixed compensation they had been assigned by the settlement. *See* 521 U.S. at 604-05.

16.    Moreover, a significant portion of the class consisted of people who had been exposed to asbestos, but with no symptomatic illness that had yet manifested itself. These class members were lumped in the same class as people who were currently sick, but no separate representation was afforded the two groups in the settlement negotiations. The only opportunity given to "exposure only" class members to preserve their access to the tort system and their right to litigate their compensation claims individually was to opt out at the outset, which meant before they became symptomatic and in many cases before they had any reason to know about their exposure to any of the defendants' products or the health risks that created. Almost everyone who failed to opt out initially was required to relinquish their individual compensation

claims in return for the rigid amounts mandated by the settlement; "only a few claimants per year [could] opt out at the back end."  *Id.* at 626-27.

17.     Finally, the settlement lacked any creative programmatic relief to counterbalance the class members' loss of individual rights.  There was no medical monitoring program, even though a large portion of the class was exposed but not yet ill.  There was no research funding to help develop disease treatments.  There was no outreach program to educate people about their potential exposure, the need to take medical precautions, or the rights available to them, or to assist them in navigating the legal process.

18.     The Supreme Court concluded that this settlement did not meet the Rule's requirements for safeguarding individual rights.  *First*, it failed the Rule 23(b)(3) predominance requirement.  The Court explained that the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" as a substitute for individual litigation.  *Id.* at 623.  In *Amchem*, the one commonality — exposure to the defendants' asbestos products — was dwarfed by individual differences that flowed from different diseases, different products, different exposure histories, and different issues of specific causation (notably, smoking histories).  *Id.* at 623-24.  *Second*, the class failed the constitutionally footed adequacy of representation requirement because no structural protection was provided to the "exposure only" class members, such as separate representation and counsel through subclasses that would advance their different interests in the settlement's design and terms.  *Id.* at 626-27.  *Third*, the Court stated in dicta that it had serious concerns whether adequate notice and an adequate opportunity to opt out had been provided to "exposure only" class members who had no manifest afflictions and might not have reason to be aware of their exposure and the potential health risks.  *Id.* at 628.

19.     The Court was sharply critical of the proposed *Amchem* class resolution.  But like the Advisory Committee that drafted the 1966 Rule revision, the Court was careful not to rule out the use of properly structured and supervised class actions in mass-tort cases, including classes that encompass "exposure only" members with latent diseases.  In fact, the Court took pains to do this with respect to each of the three requirements it held or suggested (in the case of notice) the proposed *Amchem* class had failed to satisfy.  The Court's discussion of predominance thus noted that "[e]ven mass tort cases arising from a common cause or disaster may, depending on the circumstances, satisfy the predominance requirement." *Id.* at 625.  Its discussion of adequacy of representation made clear that a mass-tort class could include both currently injured and "exposure only" members if "discrete subclasses" were employed as "structural assurance of fair and adequate representation" for both groups. *Id.* at 626-27.  And the Court emphasized that its brief discussion of notice was not a definitive ruling even as applied to that case. *Id.* at 628.

**IV.    The "Back-End" Opt Out as a Solution.**

20.     In the aftermath of *Amchem*, practitioners and academics have sought to develop a mass-tort class settlement structure that would allow such settlements to fulfill their promise in appropriate circumstances in the increasingly complex litigation world that has emerged, without either the unfair compromise of individual autonomy or engaging in unacceptable procedural shortcomings of the kind that marked the *Amchem* settlement.  The first concept, naturally enough, was to make sure that mass-tort settlements include the types of programmatic relief absent in *Amchem.*  Thus, subsequent settlements such as *Diet Drugs*, *Deepwater Horizon*, and *NFL* have devoted major attention and settlement funding to medical monitoring programs for

class members to diagnose injuries, increase awareness, and advance treatment, as does the Roundup settlement.

21.     But the most significant innovation has been the so-called "back-end opt out" right.  This procedure draws its inspiration — and indeed, its name — from the Supreme Court's criticism of the *Amchem* settlement as providing that "only a few claimants per year can opt out at the back end."  *Amchem*, 521 U.S. at 627.  A back-end opt out right allows individual class members to decide, after they become sick and presumably are more informed and attentive, to reject the compensation amount provided them in the settlement, to reclaim access to the tort-system, and to litigate their compensation claims individually.

22.     Broadly speaking, this feature greatly alleviates concerns that mass-tort class actions could unfairly foreclose individual claims and individual decision-making about those claims.  The back-end opt out right does so by transforming a collective resolution into what is essentially a series of individual options:  each class member has an option to take the compensation under the settlement, and can decide for himself or herself whether to exercise that option or litigate individually after he or she becomes ill and after he or she is educated through the settlement's programmatic relief.  In a very realistic sense, a class settlement with this feature actually *enhances* individual rights by giving class members additional options from which they can choose on an individual basis, and by educating them so they can make their choices with much more information.

23.     As a result, a back-end opt out right resolves, or at least substantially addresses, issues under each of the Rule 23 requirements that the *Amchem* settlement failed to satisfy. There is no longer an issue about providing adequate notice and an opportunity to opt out.  The *Amchem* Court's concern was that class members "may not even know of their exposure, or

realize the extent of the harm they may incur," and "[e]ven if they fully appreciate the significance of the class notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out." 521 U.S. at 628.  In sum, a back-end opt out right allows people to decide after they become sick whether to reject the settlement amount and pursue their claims individually in court, and to decide how to do so intelligently.

24.     A back-end opt out right also substantially reduces concerns about adequacy of representation in terms of the settlement's design.  By converting a settlement's compensation scheme that provides a mandatory limit for class members who do not opt out initially into an individual option for them going forward, it greatly diminishes *Amchem*-type worries about a cram-down that is unfair to particular groups within the class.  When combined with the use of subclasses to ensure that the option's terms fairly reflect the separate interests of both currently injured and "exposure-only" class members, that is exactly the kind of "structural assurance" the Supreme Court found lacking in *Amchem*.

25.     Finally, although a back-end opt out right does not itself satisfy the predominance requirement or obviate predominance concerns, it can substantially affect the predominance inquiry, as well as the inquiry regarding the reasonableness, adequacy, and fairness of a proposed settlement.  The Rule 23(b)(3) predominance requirement calls for a comparative weighing of the common issues and individualized issues that must be resolved, with the former required to outweigh the latter in terms of importance and centrality to justify the case proceeding on a class basis.  A back-end opt out right allows class members to choose to resolve their individual issues individually, rather than requiring them to accept a collective class settlement of issues that vary based on each member's particular circumstances.  It thus reduces the weight of the individual

issues in the balance; those issues are resolved on a class-wide basis only to the extent individual class members choose that outcome.  I should stress that this does not allow a settlement to *provide* the predominant common issues, something the Supreme Court appropriately rejected in *Amchem*.  Rather, the availability of a back-end opt out right goes to the relative weight of common and individual issues that preexisted the settlement.  When a settlement does not require class members to accept a collective resolution of individual issues, the importance assigned to those issues in striking the predominance balance is reduced.

**V.     *Diet Drugs* and *Deepwater Horizon*:  The Back-End Opt Out Approved.**

26.     Both the *Diet Drugs* and *Deepwater Horizon* medical settlements included a back-end opt out right for class members whose injuries were not diagnosed or fully developed at the time of the initial opt-out period.  The supervising courts approved those settlements, holding that the back-end opt out provision satisfactorily addressed *Amchem*-type concerns for the reasons I outlined above.[2]

27.     Importantly, the *Diet Drugs* and *Deepwater Horizon* courts also recognized that the back-end opt out right does not have to be absolute.  It can have appropriately tailored limits and restrictions.  In part, this recognized that, in a settlement, it is appropriate for class members to give up something in exchange for the settlement's programmatic benefits and the compensation option made available to them.  It also recognized the reality that, to achieve a settlement, a defendant needs to secure something of benefit or it will not agree to pay what can

---

[2] *See In re Diet Drugs*, MDL No. 1203, 2000 WL 1222042, at *21, *49 & n.22 (E.D. Pa. 2000), *aff'd* 275 F.3d 34 (3d Cir. 2001); *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 125, 140 (E.D. La. 2013).  In addition to affirming the district court's approval of the *Diet Drugs* settlement initially, the Third Circuit also repeatedly upheld it against collateral and other attack.  *See In re Diet Drugs*, 282 F.3d 220 (3d Cir. 2002); *In re Diet Drugs*, 369 F.3d 293 (3d Cir. 2004); *In re Diet Drugs Prods. Liab. Litig.*, 431 F.3d 141 (3d Cir. 2005).  As is well-known, the *Diet Drugs* settlement was plagued by problems in its implementation.  Those problems, however, arose not from the back-end opt out right, but from issues arising from more-marginal diagnoses of the heart-valve injuries covered by the settlement, which led to far more claims than forecasted.

amount to billions of dollars to fund programs that benefit class members and an optional compensation fund.

28.     One appropriate limit on the back-end opt out right is a waiver of punitive damages.  The *Diet Drugs* court termed that a "fair and wholly appropriate trade-off" for the settlement's optional compensation program and medical monitoring benefits.  2000 WL 1222042, at *45 & 49 n.22.  The *Deepwater Horizon* court reached the same conclusion.  See 295 F.R.D. at 155, 158.  These decisions also reflect the different nature of punitive damages. Punitive damages are intended to serve societal interests, not to compensate individuals for their injuries.  The waiver of punitive damage claims as part of a class settlement that itself serves societal interests through public therapeutics, compensation of injured citizens, and efficient dispute resolution thus does not present the same concerns about intruding on the rights of individuals; it is simply a negotiated trade-off that promotes the settlement.

29.     Other limits approved in those cases included:  (1) the back-end opt out right was limited to class members whose injuries were not fully manifest during the initial opt-out period, on the theory that class members with fully developed injuries should be required to make their opt out decision at the outset; (2) steps class members were required to take to preserve and act on a back-end opt out right, including certain medical tests, registration requirements, and other affirmative actions to opt out; (3) certain limits on the types of claims a class member could pursue at the back end, including a bar on consumer fraud claims (*Diet Drugs*) and workers compensation and certain federal claims (*Deepwater Horizon*); (4) a shortened limitations period for asserting back-end claims; and (5) restrictions on the use of certain evidence relevant to compensation claims (*Diet Drugs*) or the court in which back-end claims could be brought

(*Deepwater Horizon*).  These were similarly accepted as appropriate trade-offs for the settlement benefits that did not unduly compromise class members' individual rights.[3]

**VI.     The Roundup Settlement Contains Broader Back-End Rights.**

30.     I have reviewed the structure of the Roundup settlement.  In my opinion, it contains back-end opt out rights that are more than sufficient to obviate *Amchem*-type concerns and, indeed, are broader than the rights included in both the *Diet Drugs* and *Deepwater Horizon* settlements.

31.     First and foremost, in the Roundup settlement the preservation of class members' rights to individual litigation is automatic.  They do not have to opt out affirmatively at the back end.  Nor do class members have to take steps to preserve their back-end rights or even submit their claims to the settlement's compensation fund.  Indeed, no one can lose her right to litigate her compensation claim individually unless she, first, affirmatively chooses after getting sick to submit her claim to the settlement's compensation fund *and*, second, affirmatively chooses to accept the amount offered once she sees its precise dollar value.  Also, unlike *Diet Drugs* or *Deepwater Horizon*, this back-end litigation right is available to all class members, including those with current disease.  In reality, as applied to the Roundup settlement, the term "back-end opt *out*" is a bit of a misnomer; the compensation features of the settlement are effectively "opt *in*," with all class members automatically retaining their right to individual litigation after a four-year period unless they affirmatively choose otherwise.  The preservation of individual rights is thus significantly greater than in the earlier cases.

32.     Nor does the Roundup settlement contain other limitations exceeding those approved in the *Diet Drugs* or *Deepwater Horizon* settlements — to the contrary, on balance the

---

[3]  *See Diet Drugs*, 2000 WL 1222042, *20, 26; *Deepwater Horizon*, 295 F.R.D. at 125, 158.

limitations in this case are less.  There is a waiver of punitive damages, just as was true in *Diet Drugs* and *Deepwater Horizon*.  The sole restriction on the types of claims that class members may pursue at the back end is a limited release of medical monitoring claims reasonably tied to the settlement's expansive medical monitoring diagnostic program.  Nor is there a shortened limitations period; the applicable limitations period under state law is preserved, with Monsanto agreeing it is tolled during a four-year standstill period.  There are no negative restrictions on the evidence that can be used in back-end litigation; instead, there is only a requirement that an Evidence Rule 706-type advisory expert science panel's general causation determination can be used affirmatively by either party at trial, subject to the other party's full rights to contest that determination on the merits before the court or a jury by presenting any contrary evidence.[4] Finally, there is a four-year period before back-end litigation can be brought, a period that, for most class members, realistically is in fact much shorter (for class members who get NHL during that period) or inapplicable entirely (for class members who do not get NHL until after that period ends).  In my opinion, these provisions are significantly less restrictive than the provisions in *Diet Drugs* or *Deepwater Horizon* and are not encumbrances on back-end rights that raise Rule 23 or *Amchem* issues.

33.      Finally, it is important to view these issues in the overall context of the settlement of this action.  The Roundup settlement contains very substantial benefits for class members.  These include multiple forms of programmatic relief that are available only through a class settlement:  the extensive program for diagnostic assistance, the educational outreach program,

---

[4]  I understand that certain objectors have raised questions about the composition of and process to be employed by this advisory panel.  I have not reviewed those matters and express no view on them.  My opinion is limited to the structural point about the required admissibility of the panel's determination, subject to the right to contest that determination on the merits.  In my opinion, that is not an inappropriate encumbrance on the back-end litigation right or one that raises *Amchem* issues.

the research program for new disease treatments, and the free legal services program to guide members in navigating the settlement benefits and in deciding whether to apply for and accept compensation offers.  Beyond that, the settlement secures over $1.3 billion for a non-litigated resolution of compensation claims without imposing any further litigation burden on class members.  Few cases have yielded such sums, and I am not aware of any that have done so on terms establishing that not a single class member will lose his or her right to litigate against the defendant individually unless he or she freely chooses to accept a specific compensation offer pursuant to the settlement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated:  April 6, 2021

Arthur R. Miller

**RÉSUMÉ OF ARTHUR R. MILLER CBE**
*University Professor*
New York University

Office Addresses:

New York University School of Law       New York University School of Professional Studies
40 Washington Square South              7 East 12th Street
Vanderbilt Hall 430F
New York, NY  10012                     New York, NY  10003
Phone: (212) 992-8147                   Phone: (212) 998-7202
Fax: (212) 995-4341
Email: arthur.r.miller@nyu.edu

College Education:  University of Rochester
                    A.B. 1955, with high honors
                    Phi Beta Kappa

Professional Education:  Harvard Law School
                         LL.B. 1958, magna cum laude
                         Articles Editor, Harvard Law Review

**Employment (Academic)**

9/2014 – *Present*, Associate Dean of the NYUSPS Sports and Society Program

9/2014 – 2016, Associate Dean and Director of the NYU Tisch Institute for Sports Management, Media, and Business

2007 – *Present*, Chairman and Founder of the NYU Sports & Society Program

2007 – *Present*, University Professor, New York University

2001-2002, 2006-2007 Visiting Professor of Law, New York University School of Law

1987-2007, Bruce Bromley Professor of Law, Harvard Law School

1972-2007, Professor, Harvard Law School

1971-1972, Visiting Professor, Harvard Law School

1965-1972, Professor, University of Michigan Law School

1962-1965, Associate Professor, University of Minnesota Law School

1961-1962, Lecturer, Columbia Law School

1961-1962, Associate Director, Columbia Law School Project on International Procedure

## Employment (Firm-Related)

2013– *Present,* Of Counsel, The Lanier Law Firm, LLP, New York, New York

1989-1991, affiliated with Mayer, Brown & Platt, Chicago, Illinois

1958-1961, associated with Cleary, Gottlieb, Steen & Hamilton, New York, New York

Home Address:  350 West 22nd Street
                        New York, NY  10011-2604

Telephone:   (212) 367-7017   Fax (212) 367-7015

Born: June 22, 1934, Brooklyn, New York

## Publications relating to Civil Procedure, Copyright, and Other

### Books

*Federal Practice and Procedure*, more than forty-five volumes, with C.A. Wright, some with E.H. Cooper, M.K. Kane, and R. Marcus

*Cases and Materials on Equitable Remedies*, 532 pages (mimeographed)

*Civil Procedure: Cases and Materials*, 1,389 pages, with J.J. Cound, J.H. Friedenthal, and J. Sexton (eleven editions and one revised edition)

*Civil Procedure* (Hornbook), 880 pages, with J.H. Friedenthal and M K. Kane (four editions)

*Civil Procedure Supplement*, 513 pages, with J.J. Cound and J.H. Friedenthal (twenty-five editions)

*Intellectual Property: Patents,Trademarks and Copyright in a Nutshell*, 437 pages, with M.H. Davis (four editions)

*Manual -- CPLR*, 1,050 pages, with J.B. Weinstein and H.L. Korn

*Miller's Court*, 302 pages, Houghton Mifflin; paperback, New American Library (Plume)

*New York Civil Practice*, eight volumes, with J.B. Weinstein and H.L. Korn

*Pleading, Joinder and Discovery -- Cases and Materials*, 643 pages, with J.J. Cound and J.H. Friedenthal

Sum and Substance of Civil Procedure, 417 pages, with J.H. Friedenthal (five editions)

*Articles*

What Are Courts For? Have We Forsaken the Procedural Gold Standard?, 78 La. L. Rev 739 (2018)

Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure, 88 NYU Law. Rev. 286 (2013).

Some Very Personal Reflections on the Rules, Rulemaking, and Reporters, 46 Mich. J. L. Ref. 651 (2013).

McIntyre in Context: A Very Personal Perspective, 63 S.C. L. Rev. 465 (2012)

In Memoriam: Benjamin Kaplan, 124 Harv. L. Rev. 135 (2011).

"*From* Conley *to* Twombly *to* Iqbal: *A Double Play on the Federal Rules of Civil Procedure*," 60 Duke Law Journal 1 (2010).

"Reliving and Reflecting on *Shutts*," 74 University of Missouri at Kansas City Law Review (2006).

"Common Law Protection for Products of the Mind; An 'Idea" Whose Time Has Come," 119 Harvard Law Review 703 (2006)

"Copyright Term Extension: Boon for American Creators and the American Economy," 45 *Journal of the Copyright Society of the USA* 319 (1998)

"Artful Pleading: A Doctrine in Search of Definition," 76 *Texas Law Review* 1781 (1998)

"Copyright Protection for Computer Programs, Databases, and Computer-Generated Works: Is Anything New Since CONTU?," 106 *Harvard Law Review* 1977 (1993)

"Confidentiality, Protective Orders, and Public Access to the Courts," 105 *Harvard Law Review* 428 (1991)

"Private Lives or Public Access: The Debate over Courthouse Confidentiality," *ABA Journal*, August 1991.

"Resolving the Asbestos Personal-Injury Litigation Crisis," 10 *Review of Litigation* 419 (1991), with P. Ainsworth

"The New Certification Standard Under Rule 11," 130 *Federal Rules Decisions* 479 (1990)

"Jurisdiction and Choice of Law in Multistate Class Actions After Phillips Petroleum Co. v. Shutts," 96 *Yale Law Journal* 1 (November 1986), with D. Crump

"Ancillary and Pendent Jurisdiction," 26 *South Texas Law Journal* 1 (Spring 1985)

"The Adversary System: Dinosaur or Phoenix," 69 *Minnesota Law Review* 1-37 (October 1984) (Lockhart Lecture)

"Of Frankenstein Monsters and Shining Knights: Myth, Reality and the 'Class Action Problem,'" 92 Harvard Law Review 664-94 (1979)

"Problems of Giving Notice in Class Actions," 58 Federal Rules Decisions 313-34 (1973)

"Problems in Administering Judicial Relief in Class Actions under Federal Rule 23(b)(3)," 54 Federal Rules Decisions 501-13 (1972)

"Service of Process Under Rule 4 -- Some Unfinished Business for the Rulemakers," 46 *Federal Rules Decisions* 101-40 (1969)

"Computers, Copyrights, and Medicine," *Visual Medicine*, June/July 1967, 32-36

"Computers and Copyright Law," 46 *Michigan State Bar* Journal 11-18 (April 1967)
"Federal Rule 44.1 and the 'Fact' Approach to Determining Foreign Law: Death Knell for a Die-Hard Doctrine," 65 *Michigan Law Review* 613-750 (February 1967)

"International Cooperation in Litigation Between the United States and Switzerland: Unilateral Procedural Accommodation in a Test Tube," 49 *Minnesota Law Review* 1069-1132 (May 1965)

## Monographs and Chapters

"The August 1983 Amendments to the Federal Rules of Civil Procedure -- Promoting Effective Case Management and Lawyer Responsibility," Federal Judicial Center, 41pages (1984)

"The Class Action -- American Style," Chapter 17, 192-205, *The Cambridge Lectures* (1983)

"Attorneys' Fees in Class Actions," Federal Judicial Center, 430 paqes (1980)

"An Overview of Federal Class Actions: Past, Present and Future," Federal Judicial Center, 68 pages (1977)

"International Co-operation in Litigation: Switzerland," in *International Co-operation in Litigation: Europe* 358-81(1965), with M. Guldener

"International Co-operation in Litigation: Belgium," in *International Co-operation in Litigation: Europe* 30-51(1965) with F. Rigaux

"International Co-operation in Civil Litigation -- A Report on Practices and Procedures Prevailing in the United States." 103 pages (1961), with H. Smit

"Problems in the Transfer of Interest in a Copyright," in *Copyright Law Symposium*, Number 10, 131-193 (1959)

Publications relating to Privacy, Information, and Computer Technology

"The Assault on Privacy: Computers, Data Banks and Dossiers," 320 pages, University of Michigan Press (1971); paperback edition, New American Library (Signet) (1972)

"Computers, Data Banks and Individual Privacy: An Overview," *Columbia Human Law Review* Volume 4, Number 1, Winter 1972, pp. 1-12

"The Credit Networks: Detour to 1984," *Nation*, June 1, 1970, pp. 648-51, 669

"The Dossier Society," *University of Illinois Law Forum*, Volume 1971, Number 2, pp. 154-67

"The National Data Center and Personal Privacy," *Atlantic*, November 1967, p. 557

"On Proposals and Requirements for Solutions, Symposium: Computers, Data Banks, and Individual Privacy," 53 *Minnesota Law Review* 224-41 (December 1968)

"Personal Privacy in the Computer Age: The Challenge of a New Technology in an Information-Oriented Society," 67 *Michigan Law Review* 1089-1246 (April 1969)

"The Privacy Implications of Instructional Technology," paper prepared for the Commission on Instructional Technology (March 1969)

"The Privacy Revolution: A Report from the Barricades," 19 *Washburn Law Journal* 1-22 (Fall 1979)

"Psychological Testing and Privacy," *Think*, May-June 1969.

"The Right of Privacy -- A Look Through the Kaleidoscope," *SMU Law Review*, Volume 46, Number 1, Summer 1992.

## Professional Memberships

*Life Member, American Law Institute*

Member, Massachusetts and New York State Bars

Member, United States Supreme Court Bar, the Bars of all of the United States Courts of Appeal, various District Court Bars and the Bar of the United States Tax Court

## Board Memberships

Director, Center on Civil Justice, New York University School of Law

*Board of Directors, Fred Friendly Seminars*

*Strategic Advisory Board, H5 Technologies*

*National Policy Board, Infilaw Corp*.


## Other Professional Activities

Has argued cases in the United States Courts of Appeal in all thirteen Circuits and several cases before the United States Supreme Court.

Adviser to the American Law Institute's current project on Principles of the Law of Aggregate Litigation

Former member, Advisory Committee on Civil Rules of the Judicial Conference of the United States (by appointment of Chief Justices Burger and Rehnquist)

Former reporter, Advisory Committee on Civil Rules of the Judicial Conference of the United States (by appointment of Chief Justices Burger and Rehnquist)

Reporter, Task Force to Study Court Awarded Attorneys' Fees, U. S. Court of Appeals for the Third Circuit

Reporter, Study on Complex Litigation, American Law Institute

Reporter, Complex Litigation Project, American Law Institute

Member, Special Advisory Committee on Aggregation in Litigation, American Law Institute

Reporter, Civil Justice Advisory Group, U.S. District Court, District of Massachusetts

Member, Special Advisory Group to the Chief Justice of the United States Supreme Court on Federal Civil Litigation

Member, American Bar Association Special Committee on Complex and Multidistrict Litigation

Special Advisor, Board of Editors, Manual on Complex Litigation

Faculty, Federal Judicial Center

Member, American Bar Association Committee on Scientific and Economic Proof

Draftsman, Uniform Interstate and International Procedure Act

Rapporteur, Study on Taking Evidence Abroad, Secretary of State's Advisory Committee on Private International Law

Member of Council, ABA Section on Science and Technology

Member, Institute of Judicial Administration

Listed in *Who's Who in America*

## Public and Professional Activities relating to Privacy, Information, and Computer Technology

Chairman, Massachusetts Security and Privacy Council

Member, National Commission on New Technological Uses of Copyrighted Works (CONTU)(by appointment of President Ford)

Member, Special Committee on Automated Personal Data Systems, U.S. Department of Health, Education and Welfare

Member, Special Legislative Commission on Privacy (Commonwealth of Massachusetts)

Member, Governor's Special Commission on Privacy and Personal Data (Commonwealth of Massachusetts)

Member, Panel on Legal Aspects of Information Systems, Committee on Scientific and Technical Information, Federal Council for Science and Technology

Member, Special Decennial Census Review Committee, U.S. Department of Commerce

Member, National Advisory Panel of the Project on Computer Data Banks, National Academy of Sciences

Chairman, Panel on External Affairs, Interuniversity Communications Council (EDUCOM)

Advisor, Special Committee on Computer Research, State Bar of Michigan

Director, American Association of Law Schools Projects on Computer-Assisted Instruction

Member, American Bar Association Committee on Scientific and Economic Proof

Numerous speaking and radio and television appearances on subjects including individual privacy, the census, computer technology, the National Data Center, and computers and the law

## Senate Testimony relating to Privacy, Information, and Computer Technology (in each case at the request of the Subcommittee involved)

United States Senate Subcommittee on Technology and the Law, August 1, 1990 (caller ID)

United States Senate Subcommittee on Banking, Housing, and Urban Affairs, October 4,

1973 (consumer credit)

United States Senate Subcommittee on Financial Institutions, August 14, 1972 (amendments to Bank Secrecy Act)

United States Senate Subcommittee on Constitutional Rights, February, 1971 (governmental data banks)

United States Senate Subcommittee on Antitrust and Monopoly, December 11, 1968 (credit bureaus)

United States Senate Subcommittee on Administrative Practice and Procedure (the computer and individual privacy)

**Media Activities**

Former Legal Editor, WCVB-TV Channel 5, Boston

Former Legal Editor, "Good Morning America," ABC-TV

Former Host, "Miller's Law" and "In Context", Courtroom Television Network (Court TV)

Former Host, "Miller's Court," WCVB-TV Channel 5, Boston

Former Host, "Headlines on Trial," WRC-TV Channel 4, Washington, DC, New York, NY

Moderator, numerous public television programs
***Commentator, "The Justice Files," Discovery Network***

Occasional Columnist, Boston *Globe*, *USA Today*, *ABA Journal*, Los Angeles *Times*

Honors and Awards

Honorary Degree, Doctor of Laws, University of Rochester

Honorary Degree, Doctor of Education, Merrimack College

Honorary Degree, Doctor of Laws, Fitchburg State College

Honorary Degree, Doctor of Laws, Framingham State College

Honorary Degree, Doctor of Laws, University of the Pacific

Honorary Degree, Doctor of Laws, Thomas M. Cooley Law School

Honorary Degree, Doctor of Laws, Concord Law School

Honorary Degree, Doctor of Laws, Western State University College of Law

Hutchinson Medal for Distinguished Public Service, University of Rochester

National Academy of Television Arts and Sciences Award (Emmy) for hosting
"The Constitution: That Delicate Balance" on PBS

National Academy of Television Arts and Sciences Award (Emmy) for hosting
(group Emmy) for public information

Six New England Regional Academy of Television Arts and Sciences Awards
for "Miller's Court," hosting, and "The Law Works"

Three American Bar Association Gavel Awards for promoting public understanding
of the law

Special Recognition Gavel from the American Bar Association for twenty years service
in promoting public understanding of the law

Commander of the Order of the British Empire (CBE), (2011) by order of Queen Elizabeth II

Presidential Medal from the University of Oregon for distinguished public service.

Award for Patient Advocacy, American Psychiatric Association

Iris Award for outstanding television

Charles Dickens Society Award for the Preservation of Literacy from the National
Court Reporters Association

Lifetime Achievement Award, Appleseed Foundation for Justice

Dedicatee, New York University Annual Survey of American Law, Volume 67

Albert Podell Distinguished Teaching Award (May, 2010)

The Brandeis Medal, University of Louisville, Louis D. Brandeis School of Law (April 2015)

Robert H. Jackson Award, Pepperdine University School of Law (April 2015)

Academic Fellow, Pound Civil Justice Institute

Chevalier-Sabreur