UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | : | MDL NO. 2741 |
| | : | Case No. 3:16-md-02741-VC |
| THIS DOCUMENT RELATES TO: | : | |
| *Ramirez, et al. v. Monsanto Co.*, Case No. 3:19-cv-02224 | : | **EXPERT DECLARATION OF PROFESSOR SCOTT DODSON** |

## Affirmation

1. My name is Scott Dodson. I make this declaration based on my personal knowledge and expertise.

## Expertise

2. I am the James Edgar Hervey Chair in Litigation and Geoffrey C. Hazard Jr. Distinguished Professor of Law at UC Hastings College of the Law in San Francisco, California. I also have been a permanent or visiting faculty member at Duke Law School, William & Mary College of the Law, McGeorge School of Law, and the University of Arkansas School of Law. My CV is attached as Exhibit A.

3. I have taught Civil Procedure (which includes the subject of class actions) since 2006. I am the author of the casebook *The Red Book of Civil Procedure*, which I update annually, and which covers the topic of class actions. I currently serve, and have served since 2014, as the Advisor for the Civil Litigation and Dispute Resolution Concentration at UC Hastings Law, which is a certificate program for law students interested in careers in civil litigation. In that capacity, I also teach the Litigation Concentration Seminar.

4. I am the founding director of the nonpartisan Center for Litigation and Courts at UC Hastings Law. The Center's mission is to expand the knowledge of civil litigation, alternative dispute resolution, and the courts; to disseminate that knowledge to the bench, bar, legal academy, and lay public; and to supply resources and guidance to members of the UC Hastings Law community interested in civil litigation.

5. My research and scholarship focus on federal civil litigation and jurisdiction. I have written more than 100 articles, essays, chapters, and shorter works, published in *Stanford Law Review*, *N.Y.U. Law Review*, *University of Pennsylvania Law Review*, *Michigan Law Review*, *California Law Review*, *Virginia Law Review*, *Duke Law Journal*, *Northwestern University Law Review*, and several leading peer-reviewed journals, among others. I am the author or editor of seven book titles, including *The Legacy of Ruth Bader Ginsburg* (Cambridge 2015) and *New Pleading in the Twenty-First Century* (Oxford 2013).

6. My writings have been cited by more than 30 court opinions and, according to Google Scholar, by more than 1,250 articles, books, and other writings. In a recent ranking, I was listed as the ninth most-cited scholar of civil procedure, and one of only two scholars in the top 10 under the age of 55. Based on my expertise in procedure, I have been invited to make more than 100 speaking appearances at scholarly events and media events.

7. Many of my scholarly works address class actions, including, just within the last five years, "Personal Jurisdiction and Aggregation," *Northwestern University Law Review* (2018), "A Negative Retrospective of Rule 23," *New York University Law Review* (2017), and "An Opt-In Option for Class Actions," *Michigan Law Review* (2016).

8. My scholarly speeches, writings, and public testimony tend to seek neutral solutions that balance defense interests, plaintiff interests, and public interests. For example, in my *Michigan Law Review* article "An Opt-In Option for Class Actions," I argued that class representatives should be able to choose to proceed as either an opt-in or an opt-out class action. Why would a class ever choose to proceed on an opt-in basis? Because, like all class-action rules, and like all litigation rules, there is a tradeoff. Opt-in mechanisms result in classes with fewer notice concerns, greater cohesion, and stronger representational quality. Accordingly, opt-in classes, by their very nature, more easily satisfy the strictures of Rule 23 class certification. Some classes fit the tradeoffs of this opt-in model well, and some do not. I therefore argued that classes should be able to choose to proceed on the model that allows them to take advantage of the tradeoffs best suited for their claims. That article has been widely cited in the academic literature, as well as by the Second Circuit, the Third Circuit, and the District Court for the District of Columbia.

### Retention and Scope of Work

9. I have been retained in this case to offer an expert opinion on whether the Settlement is structurally fair, reasonable, and adequate under Rule 23 and the Constitution. I have not been asked to express a view on whether the terms of the Settlement are substantively fair, reasonable, or adequate in light of the injuries sustained or of the hurdles to establishing tort liability and recovery.

## **Materials Reviewed**

10. I have reviewed the following materials in formulating my expert opinions:

    a.  Motion for Preliminary Approval of Proposed Class Settlement, filed in this case on Feb. 3, 2021 ("Settlement");

    b.  Notice of Filing of Amendment to the Settlement Agreement, filed in this case on Mar. 3, 2021;

    c.  Pretrial Order No. 214: Denying Motions to Alter Schedule on Motion for Preliminary Approval, entered in this case on July 6, 2020;

    d.  Motion for Preliminary Approval of Class Settlement, filed in this case on June 24, 2020;

    e.  Memorandum of Law in Opposition to Motion, filed in this case on Mar. 4, 2021, by David Engstrom, which includes the Declaration of Professor Howard M. Erichson;

    f.  Objections and Opposition Brief filed in this case on Mar. 3, 2021, by the Cooney & Conway Law Firm;

    g.  Brief in Opposition to Motion for Preliminary Approval by Objecting Class Member Melinda Sloviter, filed in this case on Mar. 4, 2021;

    h.  Memorandum of Amici Curiae filed in this case on Mar. 4, 2021;

    i.  Opposition to Motion, filed in this case on Mar. 4, 2021, by Thomas Goldstein;

    j.  Brief in Opposition, filed Mar. 4, 2021, by Arati Furness; and

    k.  Caselaw, rulemaking, and commentator research regarding class settlements.

## **Expert Opinions**

11. This case presents two questions:

    A.  Can Rule 23 *ever* be used to settle a mass-tort class of future-injury plaintiffs?
    B.  Is the Settlement structurally fair, reasonable, and adequate?

The answer to both questions is yes.

**A. Rule 23 Can Be Used to Settle Mass-Tort Classes of Future-Injury Plaintiffs.**

12. The Ninth Circuit has repeatedly reaffirmed its commitment to a strong judicial policy favoring class-action settlements. *E.g.*, *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015). "[V]oluntary conciliation and settlement are the preferred means of dispute resolution," which "is especially true in complex class action litigation." *Officers for Justice v. Civ. Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). Class settlements are favored because, in complex litigation, the parties can craft creative and nuanced resolutions that best suit their respective risk-reward tolerances.

13. Class settlements do present serious risks. Because settlement tends to align the parties and their lawyers, class representatives and class counsel may fail to adequately represent and protect the interests of certain absent class members bound by the settlement. To guard against this risk, class-action settlements "demand undiluted, even heightened, attention" to the strictures of Rule 23 to ensure that the settlement is fair and reasonable for the class as a whole. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). It is the difficult task of the district court to balance the strong policy in favor of party-driven class settlement with the need to ensure that the settlement is fair to the class as a whole.

*Special Problems of Adequacy and Notice in Settling Futures*

14. As my former colleague Geoff Hazard keenly noted, future-injury claims present special problems in class-action settlements. *See* Geoffrey C. Hazard Jr., *The Futures Problem*, 148 U. Pa. L. Rev. 1901 (2000); *see also* John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L. Rev. 1343, 1464 (1995) ("Future claimants are uniquely exposed in class actions.").

15. One problem is adequate representation. In *Amchem*, the Court noted the conflict of interest in representing both inventory claims and future claims, because the injured plaintiffs would favor generous immediate payments, while the exposure-only plaintiffs would favor ensuring sufficient funds for the future. Without subclasses providing separate representation of future interests, the Amchem settlement offered no structural assurance of adequate representation for the two groups. *Amchem*, 521 U.S. at 626-28.

16. Another problem with futures classes is adequate notice, because claimants without known current illness can be hard for the parties and the court to identify, and because they themselves may not know or understand their exposure or the risks of their exposure. *Id.* at 628.

*Settlement of Futures Can Be Proper if the Problems are Solved*

17. These problems of representation and notice present hurdles to both class certification and class settlement. If they can be solved, however, then Rule 23 allows settlement of a futures class. As my colleague Rick Marcus, a longtime reporter of the Civil Rules Advisory Committee, which has repeatedly considered and proposed amendments to Rule 23 during his tenure, has written:

> To deny the court the power to affect future claims would run counter to the handling of other class action issues and would threaten to disrupt an important segment of class action litigation.

Richard L. Marcus, *They Can't Do That, Can They? Tort Reform Via Rule 23*, 80 Cornell L. Rev. 858, 887 (1995). Professor Marcus continues:

> [The Rule 23 settlement] process provides some assurance that class members with future (and present) claims are treated fairly. . . . In sum, an absolute bar on including in a class action exposed persons who have not manifested serious medical consequences of their exposure would not only prevent these cases from achieving their objective but would also run counter to the handling of other types of class actions.

*Id.*

18. Other commentators and treatises agree. *E.g.*, 1 McLaughlin on Class Actions § 4:4 (17th ed. 2020) ("There is no per se prohibition against certifying a single class including both presently injured and future claimants."); Deborah R. Hensler, *Bringing* Shutts *into the Future: Rethinking Protection of Future Claimants in Mass Tort Class Actions*, 74 UMKC L. Rev. 585, 588-89 (2006) (recognizing the special problem of futures but supporting futures settlements).

### Solving Problems of Adequacy

19. How then to solve the problems of futures classes? The accepted solution to adequacy problems involving intraclass conflicts is the use of subclasses, vigorously represented by competent and independent counsel, to safeguard future interests. *See* 1 McLaughlin on Class Actions § 4:4. *See also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) ("[I]t is obvious after *Amchem* that a class divided between holders of present and future claims . . . requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel.").

20. An additional adequacy safeguard is the presence of a neutral and experienced class-settlement mediator to facilitate and oversee arms-length, adversarial settlement negotiations. *See Chambers v. Whirlpool Corp.*, 980 F.3d 645, 669 (9th Cir. 2020) (approving the finding that "the parties settled via arm's length negotiations before an experienced mediator" weighed against the existence of collusion in the settlement); *In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prod. Liab. Litig.*, 2017 WL 2212783, at *16 (N.D. Cal. May 17, 2017) (Breyer, J.) (noting that "the parties negotiated the Settlement under the supervision of a court-appointed Settlement Master").

21. In line with these principles, courts have upheld futures settlements against adequacy challenges. In the NFL concussion case, for example, the Third Circuit wrote:

The proposed class contains two subclasses based on a retired player's injuries as of the preliminary approval date. Subclass 1 consists of retired players who were not diagnosed with a Qualifying Diagnosis prior to July 7, 2014, and their representative and derivative claimants. Put another way, subclass 1 includes retired players who have no currently known injuries that would be compensated under the settlement.

Subclass 2 consists of retired players who were diagnosed with a Qualifying Diagnosis prior to July 7, 2014, and their representative claimants and derivative claimants. Translated, subclass 2 includes retired players who are currently injured and will receive an immediate monetary award under the settlement. . . .

The District Court found no fundamental conflict of interest in this class. It explained the incentives of class members were aligned because they "allegedly were injured by the same scheme: the NFL . . . negligently and fraudulently de-emphasized the medical effects of concussions to keep [r]etired [p]layers in games." Moreover, the two subclasses of players guarded against any *Amchem* conflict of interest. . . . The District Court also cited other structural protections, including uncapped and inflation-adjusted monetary awards, the guarantee of a baseline assessment examination, and the presence of a mediator and special master.

The Court's analysis was on point. Some objectors argue that this class action suffers from a conflict of interest between present and future injury plaintiffs. But simply put, this case is not *Amchem.* The most important distinction is that class counsel here took *Amchem* into account by using the subclass structure to protect the sometimes divergent interests of the retired players. The subclasses were represented in the negotiations by separate class representatives with separate counsel, and, as discussed, each was an adequate representative. This alone is a significant structural protection for the class that weighs in favor of finding adequacy.

*In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 423-33 (3d Cir. 2016).

### *Solving Problems of Notice*

22. There is no one accepted or conventional way to solve the notice problem for futures classes. However, it is clear that, despite *Amchem*'s misgivings, notice consistent with Rule 23 and the Constitution can be given to futures classes.

23. The Constitution does not require actual notice. Rather, it requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). The Supreme Court has explained:

> This Court has not hesitated to approve of resort to publication as a
> customary substitute in another class of cases where it is not reasonably
> possible or practicable to give more adequate warning. Thus it has been
> recognized that, in the case of persons missing or unknown, employment of
> an indirect and even a probably futile means of notification is all that the
> situation permits and creates no constitutional bar to a final decree
> foreclosing their rights.

*Id.* at 317. In *Mullane* itself, the Court upheld notice by publication to beneficiaries whose
interests were conjectural or future, to contingent beneficiaries, and to those "whose
interests or addresses [we]re unknown to the trustee." *Id.* at 318.

24. The *Mullane* standard applies to class-action notice, *Eisen v. Carlisle & Jacquelin*, 417
    U.S. 156 (1974), and courts have recognized that neither the Constitution nor Rule 23
    requires actual, perfect notice to all class members, *see Low v. Trump Univ.*, 881 F.3d 1111,
    1120-21 (9th Cir. 2018). *Cf.* Samuel Issacharoff, *Governance and Legitimacy in the Law
    of Class Actions*, 1999 Sup. Ct. Rev. 337, 370 ("[A]ny requirement that the consent of all
    the governed is the prerequisite to judicial approval of the maintenance or settlement of a
    class action threatens the viability of this aggregative tool.").

25. Rule 23(c) requires only "the best notice that is practicable under the circumstances." The
    circumstances vary, of course, and future claimants demand special solicitude when it
    comes to notice. *See* Marcus, *supra*, at 894 ("For those who have not manifested any
    substantial injury, however, there must be a more serious effort [to provide notice] than for
    those who have.").

26. Using these principles, courts have approved of notice used in future-injury classes. As the
    Second Circuit wrote in the Agent Orange case:

> The portion of the order that dealt with notice, set out in full in the appendix,
> adopted a creative approach appropriate to this unique case. It required that
> letter notice be sent to the 92,275 veterans listed in the Agent Orange
> Registry established by the Veterans' Administration in 1978 to identify
> potential victims as well as to the 11,256 persons who had filed or
> intervened in lawsuits or had counsel affiliated with the PMC. The court
> concluded that these were the only class members who could be identified
> and located through reasonable effort. The court also required various forms
> of substitute notice, including announcements in various servicepersons'
> and national publications and on radio and television. In addition, the court
> directed that a letter be sent to every governor requesting that notice of the
> lawsuit be provided to any state agencies that might have lists of veterans. .
> . .
>
> Rule 23(c)(2) requires only that members of a Rule 23(b)(3) class be given
> "the best notice practicable under the circumstances, including individual
> notice to all members who can be identified through reasonable effort."

> Relying principally upon *Mullane*, appellants nonetheless contend that actual notice to each and every class member was essential. We disagree. . . .
>
> Appellants offer no feasible alternative to the notice plan adopted by the district court for identifying and contacting persons actually exposed to Agent Orange. In this regard, we are informed by the statement of our late colleague Judge Friendly that it is inappropriate to second-guess a district court's class notice procedure, particularly where no alternative method of ascertaining class members' identities has been suggested to us. In sum, the notice plan adopted by Chief Judge Weinstein was fully adequate under the circumstances.

*In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 167-69 (2d Cir. 1987) (citation cleaned up).

### *Delayed Opt Out*

27. A delayed opt-out right can offer an additional safeguard of future-injury claimants' due-process rights. As Professor Coffee concluded more than 25 years ago:

> A delayed right to opt out, triggered by the discovery of a previously latent mass tort injury or illness, would solve many of the problems of both future claimants and settlement classes.

Coffee, *supra*, at 1465; *see also* Peter H. Schuck, *Mass Torts: An Institutional Evolutionist Perspective*, 80 Cornell L. Rev. 941, 964 (1995) ("The addition of intermediate and back-end opt-out opportunities constitutes a highly desirable and important innovation for the emergent mass tort system despite the increased uncertainty that these opportunities create in the short term."); Note, *Who Can Tell the Futures? Protecting Settlement Class Action Members Without Notice*, 85 Va. L. Rev. 531, 566 (1999) ("Allowing futures to opt-out after an injury manifests itself answers many of the fundamental fairness questions that are left open when unknowing futures who receive no notice are bound by a settlement class.").

28. Delayed opt outs are supported by major treatises, *e.g.*, Manual for Complex Litigation § 21.612 (4th 2004) (supporting "'back-end opt-out' rights that permit individuals to decide whether to remain in the class after they become aware that they are injured, may have a claim, and understand the severity of their injury"), and have been incorporated in landmark futures settlements, *e.g.*, *In re Diet Drugs Prods. Liab. Litig.*, 2000 WL 1222042, at *21 (E.D. Pa. Aug. 28, 2000) (approving a second opt-out opportunity to pursue individual claims for compensatory but not punitive damages).

*The Superiority of Futures Settlements*

29. When adequacy and notice problems of class settlement are solved, class settlement of futures can be the superior method of dispute resolution, for reasons that include the following:

- Avoiding the costs and delays of a multitude—sometimes projected into the millions—of individual trials, which affect all the parties and the courts;

- Equalizing treatment of future-injury claimants by preventing those from happening to develop their injury first from racing to the courthouse, recovering huge compensatory and punitive awards, and reducing the compensation available to exposed class members who happen to have injuries slower to develop;

- Offering additional medical benefits to class members pending discovery of their injury; and

- Offering immediate, nearly costless recovery to class members who face risks that may jeopardize future compensation, such as circumstances that prohibit the claimant's suit (like a claimant's unrelated death), circumstances that limit relief (like the claimant's exposure-related death), changes in law or developments in science that adversely affect recovery, the uncertainties of obtaining individual victory at trial (either though a finding of no liability or an award of an insufficient amount of damages), and the potential inability to collect on any judgment won (perhaps due to the dissolution or bankruptcy of the defendant).

30. The alternatives to class settlement have their own significant downsides. Deborah Hensler has written:

> Excluding future claimants from mass tort class actions does not ensure that they will receive due process, but instead consigns them to the less regulated world of non-class aggregate litigation or to the diminished remedies afforded in bankruptcy.

Hensler, *supra*, at 608. Stephen Yeazell has put it this way:

> Without the mass tort, the defendant's predictable strategy is to await individual claims, trying some to get a sense of the way they will play to juries, settling others and refining its strategy as it awaits the long haul of a large number of cases. Its position will be defensive and its strategy attritional. In part, that stance will be a matter of tactics: an organized institution can often out-wait large numbers of scattered individuals. . . .

> Provided the numbers are right, plaintiffs gain much in the certain collectability of a judgment. Indeed, the settlement may increase collectability because the business future of the defendant is more

> predictable, and credit thrives on predictability. In some cases the ready availability of payments may make possible medical treatments otherwise deferred or foregone. Enormous social costs have also been saved.

Stephen C. Yeazell, *The Past and Future of Defendant and Settlement Classes in Collective Litigation*, 39 Ariz. L. Rev. 687, 700-01 (1997).

31. These views are informed by the lessons of the mass-tort asbestos crisis. For detailed histories, see Patrick M. Hanlon, *An Experiment in Law Reform:* Amchem Products v. Windsor, 46 U. Mich. J.L. Reform 1279 (2013); Deborah R. Hensler et al., Asbestos in the Courts: The Challenge of Mass Toxic Torts (1985); Edward F. Sherman, *The Evolution of Asbestos Litigation*, 88 Tul. L. Rev. 1021 (2014).

32. The "high transaction costs" of individual asbestos cases "caused a crisis in the courts from the 1980s on, contributing to the backlogs in court dockets." Sherman, *supra*, at 1027. *See also* Hanlon, *supra*, at 1289 ("Asbestos cases in the 1980s were costly and slow."). A 1984 RAND study showed that asbestos plaintiffs received only thirty-nine cents of every dollar spent by defendants and their insurers on asbestos cases. *See* James Kakalik et al., Variation in Asbestos Litigation Compensation and Expenses, xviii fig. S1 (1984). Twenty-five percent of each dollar spent went to plaintiffs' legal fees and other expenses, and the rest went to defense costs. *See* Hanlon, *supra*, at 1289. Claimants could wait five years or more for their claims to be resolved. Hensler, *supra*, at 86-89.

33. The great hope for all asbestos stakeholders—claimants, defendants, and courts—was a global class settlement. That hope was scuttled by the Supreme Court in *Amchem* and *Ortiz*. *See* Hazard, *supra*.

34. Congress considered legislative solutions, like the Fairness in Asbestos Injury Resolution Act of 2004, but those efforts failed, in part because of negative lobbying by both plaintiff and defendant interest groups. *See* Sherman, *supra*, at 1033-34. (Bills also had been proposed—and had always faltered—in every Congress from 1979 to 1986. *See* Hanlon, *supra*, at 1295 n.93.)

35. With no other good option, claimants turned to individual litigation in the tort system, to devastating results:

> In the five years following the *Amchem* decision, the asbestos litigation system fell apart. . . . From 1998 through 2002, the median number of claims was 55,100 per year, peaking at 94,840 in 2001. The median number of filings in 1987-1994 was only 25,500. Moreover, with the emergence in 1998-2002 of eye-popping verdicts from new venues, claim values shot up. Asbestos defendants marched over the cliff in serried ranks. Between 1998 and 2004, there were forty-two asbestos bankruptcies. Each bankruptcy sucked resources from the system, which increased demands on other defendants, which led to more bankruptcies.

Hanlon, *supra*, at 1305.

36. Some plaintiffs recovered significant amounts in individual litigation, but many others were shortchanged by transaction costs, new liability laws, and bankruptcy limits. States passed "medical criteria" statutes "requiring plaintiffs to provide substantial evidence of a current physical harm that is asbestos related." Sherman, *supra*, at 1027-28. In the unregulated world of MDL, judges imposed strict evidentiary proofs, leading to concerns that meritorious cases were being dismissed. *Id.* at 1032.

37. Meanwhile, bankruptcy trusts usually paid only "small amounts because the trusts have had to pay only a portion of claims due to money shortages." *Id.* at 1027; *see also* Hensler, *supra*, at 596 ("In asbestos cases, most bankruptcy reorganization plans have offered claimants just a small fraction of their liquidated damages, and in several instances, that fraction has dropped over time as the trustees struggle to assure that enough money will remain to compensate all future claimants.").

38. For all these reasons, and as the leading federal-procedure treatise reports, courts "have been willing to consider settlement proposals on behalf of future claimants." 7B Wright & Miller's Fed. Prac. & Proc. § 1797.3 (3d ed. 2020 update). They are right to do so. The question then becomes whether the particular settlement proposal satisfies constitutional due process and Rule 23.

### B. The Settlement Is Structurally Adequate, Fair, and Reasonable.

39. In my opinion, the Settlement in this case is structurally fair, reasonable, and adequate under Rule 23 and the Constitution. It solves the adequacy and notice problems that so concerned the Court in *Amchem*. Further, particular features of the Settlement do not undermine its structural adequacy or fairness.

*Adequacy of Representation and Notice*

40. The Settlement and the process leading to it satisfy concerns of adequate representation of future interests by giving those interests separate representation and voice. It excludes the trickiest category of futures—future-exposure claimants—by including only those who have been exposed as of Feb. 3, 2021. It creates subclasses for present-injury and future-injury claimants, as required by *Amchem*. Those subclasses are independently represented by separate class representatives and class counsel.

41. On my read, no objector has identified any instance of actual collusion or self-dealing here. Class and subclass counsel are experienced plaintiff-side litigators with substantial experience in toxic-tort actions. There is no evidence that this is the kind of case in which the defendant has held a reverse auction for class counsel most favorably disposed toward defense interests. Further, the settlement terms were negotiated and overseen by a neutral, experienced, court-appointed mediator, Ken Feinberg. I see no compelling reason to infer that class or subclass counsel has behaved in any self-dealing in negotiating the Settlement.

42. The notice plan also satisfies due process. This detailed, thoughtful, and widespread notice program is expertly designed, comprehensive, and thorough. It exceeds the notice plans approved in other futures class settlements. Further, the labeling provisions of the Settlement will enhance notice. Especially with the media attention this case has garnered, the notice plan is reasonably calculated to give actual and effective notice to class members.

43. Lest there be any doubt about the Settlement's solutions to adequacy and notice, the Settlement goes further to protect the due-process interests of future claimants by offering them both an initial opt out and a delayed opt out.

44. The initial opt out is at the outset of the settlement administration. Class members who exercise this initial opt out retain their rights to sue at any time, including for punitive damages and medical monitoring, and without regard to the Settlement stay.

45. A delayed opt out occurs during the settlement administration in one of two ways. In the first, a class member diagnosed with NHL who participates in the compensation program and rejects the administrator's award determination opts out of the remainder of the Settlement. In the second, all class members who have not participated in the compensation program by the conclusion of the settlement period are considered to have opted out of the Settlement. Under either mechanism, the class member opts out of administrative compensation and any future benefits of the Settlement for a return of the individual right to sue in court (except for punitive damages and medical monitoring) upon termination of the settlement period. The Settlement provides that the limitations period for opt-out class members is tolled during the pendency of the settlement period.

46. The delayed opt out means that even if some class members do not receive actual notice, or if some class members believe that their interests were not adequately represented, they will still, at the end of the day, be eligible for all of the non-compensatory benefits of the Settlement without ever giving up their individual right to sue for compensation. With the exception of punitive damages, medical monitoring, the admissibility of the science panel, and the temporary stay of litigation (which I address more fully below), the Settlement is essentially a no-lose, free deal for all class members.

47. In conclusion, the Settlement in this case solves the adequacy and notice problems that tend to plague futures classes.

*Tradeoffs*

48. Class settlement is a tradeoff between the benefits of settlement (for both parties) and the risks of individual litigation (for both parties). Naturally, the class members—and their prospective attorneys in future individual litigation—would prefer to reap all of the free benefits of the Settlement without giving up *anything*. But that is not the way bargaining works. Nor is that the way it works for class settlement—whose very design is to burden future individual litigation. Adequacy and fairness do not require a class settlement to offer the claimants their full benefits or to protect them from all risks. Rather, one can expect

both plaintiffs and defendants to give up rights or other things of value in exchange for settlement benefits.

49. In this Settlement, for example, the defendant is assuming the following nonexclusive list of burdens and risks:

- Funding settlement benefits at a value of approximately \$2 billion, with no opportunity to get those funds back;

- Waiving its rights to a jury trial, to put on evidence, and to assert legal defenses with respect to any claimant participating in the compensatory scheme; and

- Paying for settlement administration, making the provision and administration of settlement benefits essentially costless for the class.

50. The Settlement features three main burdens on class members: the release of punitive damages, the creation of the science panel, and the litigation stay. The class representatives and their counsel—who are adequate representatives, as indicated above—accepted these burdens as worthwhile tradeoffs for the class as a whole in exchange for the benefits of class settlement. The question is whether these tradeoffs nevertheless render the Settlement so unfair to the class as a whole that the Settlement should not be approved under Rule 23.

51. In assessing the tradeoffs struck in a class-settlement bargain, "the question whether a settlement is fundamentally fair within the meaning Rule 23(e) is different from the question whether the settlement is perfect in the estimation of the reviewing court." *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012).

52. In addition, the question is not whether settlement tradeoffs are acceptable to each individual class member based on that class member's particular (or possible future) circumstances; the question is whether the settlement tradeoffs are acceptable, from a pre-trial assessment, to the class *as a whole*. As the Ninth Circuit recently reasoned:

> Objectors are no doubt correct that the VPPA claims of some class members might prove valuable if successful at trial, but that does not cast doubt on the district court's conclusion as to the fairness and adequacy of the overall settlement amount to the class *as a whole*. It is an inherent feature of the class-action device that individual class members will often claim differing amounts of damages . . . . But a class-action *settlement* necessarily reflects the parties' pre-trial assessment as to the potential recovery of the entire class, with all of its class members' varying claims. So even if some of the class members in this case would have successful claims for \$2,500 in statutory damages under the VPPA, those individuals represent, to use the candid phrasing of Objectors, "only a fraction of the 3.6 million-person class." Their presence does not in itself render the settlement unfair . . . .

*Id.* at 824 (emphasis in original). *See also Allen*, 787 F.3d at 1223 ("And it is the nature of a settlement, as a highly negotiated compromise—here the parties submitted to mediation three times before reaching an acceptable proposal—that it may be unavoidable that some class members will always be happier with a given result than others." (quotation cleaned up)); *Mendoza v. Hyundai Motor Co.*, 2017 WL 342059, at \*10 (N.D. Cal. 2017) ("It would not be fair to the class as a whole to set aside an otherwise fair settlement because it does not address unique and difficult to prove hardships suffered by only a few members of the class.").

*Punitive Damages*

53. As explained above, the Settlement gives class members two opportunities to opt out. Class members who exercise the initial opt out at the outset of the settlement period are not subject to any of the Settlement terms and retain their right to sue at any time, including for punitive damages.

54. Class members who exercise a delayed opt out regain the individual right to sue in court, upon termination of the stay, but relinquish the ability to seek punitive damages.

55. Class members who exercise the delayed opt out have already received substantial benefits of the Settlement during the period between the initial opt out and the delayed opt out, including the diagnostic program, the legal assistance program, and the ability to receive expedited compensation, all at the expense of the defendant. Giving up punitive damages is the price class members pay for regaining their right to sue for a second bite at the apple despite receiving those free settlement benefits in the interim.

56. Extracting that price should not raise substantial fairness concerns because punitive damages are not an individual right but rather vindicate the governmental interest in punishing and deterring wrongdoers. Punitive damages are *not* compensation. *See O'Gilvie v. United States*, 519 U.S. 79, 89 (1996); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974) (calling punitives "not compensation for injury" but "private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence"). They "are never awarded as of right, no matter how egregious the defendant's conduct." *Smith v. Wade*, 461 U.S. 30, 52 (1983).

57. Only those class members who exercise the *delayed* opt out are barred from seeking punitives. Class members who exercise the *initial* opt out retain their ability to seek punitive damages. No doubt some will do so. Further, many existing plaintiffs, who therefore are not within the Settlement's class definition, are seeking—or have already recovered—large punitive awards. Thus, nonclass plaintiffs and initial opt-out class members will be available to vindicate the social and governmental (and classwide) interests in punishment and deterrence that punitives serve. Those interests do not require that *every* available claimant retain the ability to seek punitive damages.

58. The price of releasing punitive damages is further justified by the need to discourage excessive delayed opt outs that would undermine the global peace contemplated by the Settlement. As Professor Coffee put it,

> [F]or a delayed opt out right to be feasible, there must be some disincentive to discourage excessive, "opportunistic" opting out. Often, the plaintiffs' attorney has an incentive to opt out in order to obtain a higher contingent fee than the same attorney would receive under the settlement.

Coffee, *supra*, at 1452; *see also* Note, *supra*, at 566 ("Although delayed opt-outs may simplify satisfaction of the adequacy requirement necessary for settlement class certification, they may also discourage defendants from seeking settlement and encourage opportunistic opting-out.").

59. For these reasons, punitive-damage releases are standard in many class-action settlements. *E.g.*, *Volkswagen "Clean Diesel,"* 2017 WL 2212783, at *24 (finding the release of punitive damages "does not warrant a denial of final approval of the Settlement"); *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 155 (E.D. La. 2013) ("Given that any award of punitive damages is inherently speculative and discretionary, courts regularly approve settlements that offer no or little compensation representing the risk of a punitive damages award.").

60. The Third Circuit's description of the release of punitive damages for future claimants in the fen-phen class action is illustrative:

> As part of the complicated settlement agreement, class members were entitled to opt out at various stages. Those who chose to opt out initially were freed to pursue their remedies elsewhere. Those who did not opt out at the beginning were afforded opportunities to opt out "downstream" at an intermediate stage or at the "back-end." But those downstream opt-out rights were not absolute. Rather, members who elected to delay an opt-out beyond the initial stage were informed that they would not have unfettered ability to litigate all claims elsewhere. Instead, among other things, these so-called intermediate and back-end class "opt-outs" were precluded under the settlement agreement from pursuing punitive, exemplary, or multiple damages. . . .
>
> In return for intermediate opt-outs' acceptance of the limitation on punitive and multiple damages, Wyeth agreed not to assert any statute of limitations, laches, or claims-splitting defenses against allowed individual claims.
>
> In approving the settlement, the District Court expressly relied in part on the finding that "class members had an opportunity to preserve their punitive damages claims by exercising the initial opt out." The District Court also observed that the waiver of punitive damages was not an inappropriate "trade-off," since "punitive damage claims are often illusory"

and subject to judicial limitation or reduction as a matter of fairness to the defendant. This Court affirmed [the settlement] without opinion.

*In re Diet Drugs Prods. Liab. Litig.*, 369 F.3d 293, 296-99 (3d Cir. 2004).

61. The relinquishment of punitives as a price of exercising the delayed opt out is neither unreasonable nor unfair.

### The Science Panel

62. Science panels have been used in other litigation contexts. For example, courts have appointed science panels in MDL actions to help resolve common questions like general causation. *See, e.g.*, Laural L. Hooper et al., Neutral Science Panels: Two Examples of Panels of Court-Appointed Experts in the Breast Implants Product Liability Litigation (FJC 2001).

63. I know of one instance in which a state-court class settlement resulted in an agreement by the class members not to file any personal-injury action until a settlement-created science panel rendered a finding on general causation. *See In re E.I. du Pont de Nemours & Co. C-8 Personal Injury Litig.*, 2017 WL 237778, at *1-3 (S.D. Ohio 2017) (reporting on the state-court history of the dispute). A federal court later implied that the tradeoffs involved in the science-panel and stay agreements were bilateral and reasonable. *Id.*[1]

64. The Settlement in this case creates a panel of independent scientists to reach a conclusion on the issue of general causation. I understand that the rationale for including the science panel is that more evidence on the issue of general causation will (a) aid negotiations to extend or renegotiate the settlement period and (b) supply a useful source of evidence for individual trials brought by class members who opt out of the Settlement. The science panel's conclusions are neither binding nor preclusive in court. However, the Settlement makes its conclusions admissible in court by stipulation of the parties. That stipulation can be set aside if new scientific evidence arises after the panel issues its conclusion. Further, under the March amendments to the Settlement, any party can depose members of the science panel and introduce that deposition testimony in litigation to support or challenge the panel's findings.

65. It is hard to see any unfairness or unreasonableness here. The science panel is structurally neutral. The relative advantages that its conclusion will confer in litigation are equally weighted between class members (if the panel finds general causation) and the defendant (if the panel does not). Either way, the panel supplies useful information—at the defendant's cost—to the parties and to the courts for settling or litigating cases beyond the settlement period. I suspect that the defendant, the court, or even a claimant could

---

[1] The settlement in that case made the science panel's findings preclusive on the issue of general causation in subsequent litigation. *Id.* After seven years, the science panel in that case found causation regarding six serious diseases but no causation regarding other diseases. *Id.* Sometime later, a federal MDL court enforced the settlement by excluding expert testimony challenging the science panel's findings on general causation. *Id.* at *18-19.

unilaterally arrange for a panel setup similar to that provided in the Settlement, without any agreement or consent from any other party.

66. Thus, the only downside to the class members is the Settlement's restriction on their ability to challenge the admissibility of the panel's conclusions if the panel finds no general causation. That downside seems a fair trade for the restriction on the defendant's ability to challenge the admissibility of the panel's conclusions if the panel *does* find general causation.

67. And any downside to the class is not much of a downside anyway. As far as I can tell, no objector argues that the panel's conclusions would somehow be inadmissible except by stipulation. Further, a stipulation of admissibility is not a stipulation to the veracity, credibility, or weight of the conclusion itself. Whoever disagrees with the panel's conclusions can (and surely will) dispute its findings and their weight vigorously, just as would ordinarily happen with any independent expert witness. Those who disagree with the panel can introduce their own experts. They can argue that the science panel considered the wrong data or should have considered different or more tailored data. They can challenge the methodology the panel used.

68. The upside is that the panel will, at the defendant's cost, supply a useful piece of information and evidence on general causation. That is an upside no matter the result, and it will end up being a significant upside for the class if the panel finds general causation. Because the panel is neutral as to the parties (except for costs borne by the defendant), that upside is a fair tradeoff for the minor limitation on the ability to challenge its admissibility.

### The Litigation Stay

69. The Settlement also mandates a stay of litigation during the settlement period. I understand the rationale for this stay to be to provide a period of time for settlement administration to work and for a grace period to allow the science panel to reach a conclusion that is likely to be useful for adjudicating individual lawsuits. The stay does not apply to class members excluded by the Settlement's class description. Nor does the stay apply to class members who exercise their initial opt out. Nor does it, functionally, apply to any class member who exercises a delayed opt out at the conclusion of the settlement period. It does, however, purport to prohibit certain class members who exercise a delayed opt out *within* the settlement period from bringing suit during the remainder of the settlement period. To safeguard those opt-out rights, the Settlement tolls the limitations period on those class members' claims during the period of the stay.

70. District judges have power under the All Writs Act to enjoin class members from pursuing relief prohibited by a binding federal class settlement. *See* Hanlon v. Chrysler Corp., 150 F.3d 1011, 1025 (9th Cir. 1998). That power can apply to class members who exercise a delayed opt out but then seek relief released prior to the opt out. *See Diet Drugs*, 369 F.3d at 297-306 (upholding a district court's injunction barring claimants' punitive-damages claims released prior to the exercise of a delayed opt out).

71. The stay contemplated by the Settlement in this case, however, is different. This stay does not attempt to enforce the waiver of any rights or claims released by the class members. Rather, it attempts to force class members who exercise their delayed opt out to wait before pursuing the individual litigation rights they *regained* by opting out. The stay effectively imposes a reverse statute of limitations.

72. In some ways, the stay contemplated by the Settlement is analogous to temporary stays of individual litigation used in a variety of related contexts, such as during the pendency of a mediation, to enforce private arbitration, or to permit time to convene science panels that will assist with agency rulemaking. *See* Kenneth R. Feinberg, *A Procedure for the Voluntary Mediation of Disputes*, SF16 ALI-ABA 393, 397 (2000) ("If the dispute is already the subject of litigation between the parties, the mediator may recommend a temporary stay of litigation so all efforts can be focused on the mediation process. Such a stay not only gives the parties time to focus exclusively on the mediation itself, but can have additional benefits as well—the parties can temporarily set aside the adversarial posture that is an inevitable part of litigation and which is often a severe impediment to constructive efforts to resolve the dispute."); 9 U.S.C. § 3 (providing that a federal court "shall . . . stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement"); *Coalition for a Sustainable Delta v. McCamman*, 2011 WL 1332196 (E.D. Cal. 2011) (enforcing a settlement agreement containing a stay of litigation challenging enforcement of a California Department of Fish and Game's fishing regulation to give the agency time to convene a science panel and consider other information in promulgating a new regulation that could moot the challenges).

73. Despite these rough analogues, I am not aware of any other class settlement containing this kind of stay provision. Nevertheless, the stay should be evaluated based not on its uniqueness but on whether it is so unfair and unreasonable as to undermine the Settlement as a whole.

74. The stay offers some advantage to class members, who get the chance to explore the benefits of the Settlement and seek settlement compensation without any pressure to opt out in order to file an individual lawsuit. Further, the stay is accompanied by a tolling of any applicable limitations period, so any class member subject to the stay will not be barred from filing an individual lawsuit at or near the conclusion of the settlement period.

75. The stay does prevent those who exercise the delayed opt out from getting *started* on an individual lawsuit until the settlement period is complete. But the stay applies only to those class members, most of whom are undiagnosed, who have not yet retained a lawyer or initiated a lawsuit; they are unlikely to be ready to exercise the delayed opt out and file an individual lawsuit very early in the 4-year settlement period anyway.

76. The stay could impose more unusual burdens in individualized circumstances, such as if a class member were diagnosed with low-life-expectancy NHL early in the settlement period. Depending upon applicable state law, the stay might prevent such a class member's successors from recovering certain state remedies if the class member dies between the

time the class member's individual lawsuit would have reached final judgment without the stay and the time the individual lawsuit would reach final judgment with the stay.

77. At this individualized level, it may be that the class member received the diagnosis early because of the diagnostic and other settlement benefits. Further, a class member for whom time is of the essence is likely to benefit most from the settlement compensation scheme— which offers immediate and certain compensation—rather than under the state tort system—which imposes costs, delays, and uncertainties. So even from the retrospective, individualized perspective of the hypothetical claimant most harmed by the stay, the stay may still have been a fair tradeoff for the other benefits of the Settlement. In addition, I understand that new amendments being considered to the Settlement would allow the settlement administrator to lift the stay for claimants diagnosed with NHL after the initial opt-out period who demonstrate that the stay would impose substantial burdens.

78. But, more fundamentally, focusing on such unpredictable, hypothetical, and contingent individualized circumstances is not the way to assess the fairness of the Settlement. There always will be individual winners and losers in a class settlement because no settlement can anticipate how future circumstances will affect each individual class member. *See* Coffee, *supra*, at 1431. The question is not whether the Settlement will fairly treat each individual class member based on all future possibilities. Rather, the question is whether the Settlement is presently fair to the class as a whole.

79. On that question, the risk that the stay will affect a particular class member negatively is spread relatively evenly across the class. That risk is surely a tradeoff element of negotiation that the class must consider, but it is not an unreasonable or unfair one for the class to accept in exchange for the other benefits the Settlement offers.

### Conclusion

80. For the foregoing reasons, I conclude that the Settlement is structurally fair, adequate, and reasonable under the Constitution and Rule 23.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  April 6, 2021

Scott Dodson

# Scott Dodson

James Edgar Hervey Chair in Litigation
Geoffrey C. Hazard Jr. Distinguished Professor of Law
Founding Director, Center for Litigation and Courts
UC Hastings College of the Law ● 200 McAllister ● San Francisco, CA 94102

| | | |
|---|---|---|
| **ACADEMIC APPOINTMENTS** | UC HASTINGS COLLEGE OF THE LAW | 2012 – Present |
| | *Geoffrey C. Hazard Jr. Distinguished Professor of Law* | 2018 – Present |
| | *James Edgar Hervey Chair in Litigation* (senior chairholder) | 2020 – Present |
| | *Founding Director, Center for Litigation and Courts* | 2021 – Present |
| | *Associate Dean for Research* | 2016 – 2020 (two terms) |
| | *James Edgar Hervey Chair in Litigation* (junior chairholder) | 2017 – 2018 |
| | *Harry & Lillian Hastings Research Chair* | 2014 – 2017 |
| | *Professor of Law* | 2012 – 2018 |
| | WILLIAM & MARY LAW SCHOOL, *Associate Professor of Law* | 2009 – 2012 |
| | UNIVERSITY OF ARKANSAS SCHOOL OF LAW, *Assistant Professor of Law* | 2006 – 2009 |
| | MCGEORGE LAW SCHOOL, *Visiting Professor of Law* | Spring 2015 |
| | DUKE LAW SCHOOL, *Visiting Associate Professor of Law* | Fall 2008 |
| | LEWIS & CLARK LAW SCHOOL, *Visiting Scholar* | Summer 2008 |

---

**EXPERTISE**    Civil Procedure, Federal Courts, Comparative Civil Procedure, Conflict of Laws

---

**REPRESENTATIVE PUBLICATIONS**

*Article III and the Political-Question Doctrine*
116 NORTHWESTERN UNIVERSITY LAW REVIEW (forthcoming 2021)

*Personal Jurisdiction in Comparative Context*
68 AMERICAN JOURNAL OF COMPARATIVE LAW (2020) (refereed)

*Plaintiff Personal Jurisdiction and Venue Transfer*
117 MICHIGAN LAW REVIEW 1463 (2019)

*Beyond Bias in Diversity Jurisdiction*
69 DUKE LAW JOURNAL 267 (2019)

*Should the Rules Committees Have an Amicus Role?*
104 VIRGINIA LAW REVIEW 1 (2018)

*Personal Jurisdiction and Aliens*
116 MICHIGAN LAW REVIEW 1205 (2018) (with Bill Dodge)

*Personal Jurisdiction and Aggregation*
113 NORTHWESTERN UNIVERSITY LAW REVIEW 1 (2018)

*A Negative Retrospective of Rule 23*
92 NEW YORK UNIVERSITY LAW REVIEW 917 (2017) (symposium)

*Jurisdiction and Its Effects*
105 GEORGETOWN LAW JOURNAL 619 (2017)

*An Opt-In Option for Class Actions*
115 MICHIGAN LAW REVIEW 171 (2016)

*The Gravitational Force of Federal Law*
164 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 703 (2016)

*Joint and Several Jurisdiction*
65 DUKE LAW JOURNAL 1323 (2016) (with Phil Pucillo)

THE LEGACY OF RUTH BADER GINSBURG
Cambridge University Press (Scott Dodson ed. 2015) (edited volume)

*Party Subordinance in Federal Litigation*
83 GEORGE WASHINGTON LAW REVIEW 1 (2014)

NEW PLEADING IN THE 21ST CENTURY: SLAMMING THE FEDERAL COURTHOUSE DOORS?
Oxford University Press (2013) (monograph)

*Rethinking Extraordinary Circumstances*
106 NORTHWESTERN UNIVERSITY LAW REVIEW 377 (2012)

*Hybridizing Jurisdiction*
99 CALIFORNIA LAW REVIEW 1439 (2011)

*The Complexity of Jurisdictional Clarity*
97 VIRGINIA LAW REVIEW 1 (2011)

*New Pleading, New Discovery*
109 MICHIGAN LAW REVIEW 53 (2010)

*Comparative Convergences in Pleading Standards*
158 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 441 (2010)

*Mandatory Rules*
61 STANFORD LAW REVIEW 1 (2008)

*In Search of Removal Jurisdiction*
102 NORTHWESTERN UNIVERSITY LAW REVIEW 55 (2008)

*A Darwinist View of the Living Constitution*
61 VANDERBILT LAW REVIEW 1319 (2008)

---

**BOOKS**
**[7 titles, 17 editions]**

THE RED BOOK OF CIVIL PROCEDURE
KDP (2 annual editions from 2019 – Present) (casebook)

THE ORANGE BOOK OF CIVIL PROCEDURE: A STUDENT GUIDE
KDP (2 annual editions from 2019 – Present) (coursebook)

THE BLACK BOOK OF FEDERAL COURTS
KDP (3 annual editions from 2018 – Present) (casebook)

THE JUDGES' BOOK, VOLUMES 1-5
UC Hastings (Scott Dodson ed. 2017 – Present) (edited series)

THE LEGACY OF RUTH BADER GINSBURG
Cambridge University Press (Scott Dodson ed. 2015, 2d ed. 2021) (edited volume)

NEW PLEADING IN THE 21ST CENTURY: SLAMMING THE FEDERAL COURTHOUSE DOORS?
Oxford University Press (2013) (monograph)

CIVIL PROCEDURE: MODEL PROBLEMS AND OUTSTANDING ANSWERS
Oxford University Press (2011 & 2d ed. 2012) (coursebook)

**ARTICLES AND CHAPTERS [63]**

*In-State Plaintiff Invocation of Diversity Jurisdiction: Theories*
ACADEMIA LETTERS (forthcoming 2021) (refereed)

*Article III and the Political-Question Doctrine*
116 NORTHWESTERN UNIVERSITY LAW REVIEW (forthcoming 2021)

*Texas v. Pennsylvania and the Political-Question Doctrine*
UNIVERSITY OF ILLINOIS LAW REVIEW ONLINE (forthcoming 2021)

*Personal Jurisdiction in Comparative Context*
68 AMERICAN JOURNAL OF COMPARATIVE LAW (2020) (refereed)

*A Critique of Jurisdictionality*
39 REVIEW OF LITIGATION 355 (2020)

*The Zooming of Federal Civil Litigation*
104:3 JUDICATURE 13 (2020) (peer reviewed) (with Lee Rosenthal & Chris Dodson)

*Book Review: The Conservative Case for Class Actions*
54 LAW & SOCIETY REVIEW 522 (2020) (peer-reviewed book review)

*Accountability and Transparency in U.S. Courts*
ACCOUNTABILITY AND TRANSPARENCY IN CIVIL JUSTICE 273 (Thomson Reuters 2019)

*Plaintiff Personal Jurisdiction and Venue Transfer*
117 MICHIGAN LAW REVIEW 1463 (2019)

*Beyond Bias in Diversity Jurisdiction*
69 DUKE LAW JOURNAL 267 (2019)

*The Irrelevance of Jurisdictionality in Fort Bend County v. Davis*
1 COURTS & JUSTICE LAW JOURNAL 16 (2019) (peer reviewed)

*Jam v. International Finance Corp.*
113 AMERICAN JOURNAL INTERNATIONAL LAW 805 (2019) (peer reviewed) (w/ C. Keitner)

*Personal Jurisdiction and Aggregation*
113 NORTHWESTERN UNIVERSITY LAW REVIEW 1 (2018)

*Personal Jurisdiction and Aliens*
116 MICHIGAN LAW REVIEW 1205 (2018) (with Bill Dodge)

*Should the Rules Committees Have an Amicus Role?*
104 VIRGINIA LAW REVIEW 1 (2018)

*Jurisdiction in the Trump Era*
87 FORDHAM LAW REVIEW 73 (2018) (symposium)

*Defending Jurisdiction*
59 WILLIAM & MARY LAW REVIEW ONLINE 85 (2018)

*A Model Code of Conduct for Student-Edited Law Journal Submissions*
67 JOURNAL OF LEGAL EDUCATION 734 (2018) (refereed) (with Jacob Hirsch)

*A Negative Retrospective of Rule 23*
92 NEW YORK UNIVERSITY LAW REVIEW 917 (2017) (symposium)

*Jurisdiction and Its Effects*
105 GEORGETOWN LAW JOURNAL 619 (2017)

*The 2016 Presidential Election: The Next Four Years and Beyond*
44 HASTINGS CONSTITUTIONAL LAW QUARTERLY 255 (2017) (symposium) (with others)

*An Opt-In Option for Class Actions*
115 MICHIGAN LAW REVIEW 171 (2016)

*The Gravitational Force of Federal Law*
164 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 703 (2016)

*Joint and Several Jurisdiction*
65 DUKE LAW JOURNAL 1323 (2016) (with Phil Pucillo)

*Pleading and the Litigation Marketplace*
99:2 JUDICATURE 11 (Autumn 2015) (refereed)

*Atlantic Marine and the Future of Party Preference*
66 HASTINGS LAW JOURNAL 675 (2015) (symposium)

*A Revolution in Jurisdiction*
THE LEGACY OF RUTH BADER GINSBURG 137 (Cambridge University Press 2015)

*Ginsburg, Optimism, and Conflict Management*
THE LEGACY OF RUTH BADER GINSBURG 233 (Cambridge University Press 2015)

*Literary Justice*
18 GREEN BAG 2D 429 (2015) (peer-reviewed symposium) (with Ami Dodson)

*Party Subordinance in Federal Litigation*
83 GEORGE WASHINGTON LAW REVIEW 1 (2014)

*Mapping Supreme Court Doctrine: Civil Pleading*
7 FEDERAL COURTS LAW REVIEW 275 (2014) (peer reviewed) (with Colin Starger)

*The Short Paper*
63 JOURNAL OF LEGAL EDUCATION 667 (2014) (peer reviewed)

*Mapping Supreme Court Doctrine: Civil Pleading*
VIMEO (March 2014) (with Colin Starger)

*Parsing Judicial Activism*
16 GREEN BAG 2D 457 (2013) (peer-reviewed symposium)

*Rethinking Extraordinary Circumstances*
106 NORTHWESTERN UNIVERSITY LAW REVIEW 377 (2012)

*A New Look at Dismissal Rates in Federal Civil Cases*
96 JUDICATURE 127 (2012) (refereed)

*Presuit Discovery in a Comparative Context*
6:2 JOURNAL OF COMPARATIVE LAW 51 (2012) (refereed)

*Structuring Jurisdictional Rules and Standards*
65 VANDERBILT LAW REVIEW EN BANC 31 (2012) (with Elizabeth McCuskey)

*Hybridizing Jurisdiction*
99 CALIFORNIA LAW REVIEW 1439 (2011)

*The Complexity of Jurisdictional Clarity*
97 VIRGINIA LAW REVIEW 1 (2011)

*Global Civil Procedure Trends in the Twenty-First Century*
34 B.C. INTERNATIONAL & COMPARATIVE LAW REVIEW 1 (2011) (with Jim Klebba)

*New Pleading, New Discovery*
109 MICHIGAN LAW REVIEW 53 (2010)

*Comparative Convergences in Pleading Standards*
158 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 441 (2010)

*Justice Souter and the Civil Rules*
88 WASHINGTON UNIVERSITY LAW REVIEW 289 (2010)

*Federal Pleading and State Presuit Discovery*
14 LEWIS & CLARK LAW REVIEW 43 (2010) (invited symposium contribution)

*Mandatory Rules*
61 STANFORD LAW REVIEW 1 (2008)

*In Search of Removal Jurisdiction*
102 NORTHWESTERN UNIVERSITY LAW REVIEW 55 (2008)

*A Darwinist View of the Living Constitution*
61 VANDERBILT LAW REVIEW 1319 (2008)

*The Challenge of Comparative Civil Procedure*
60 ALABAMA LAW REVIEW 133 (2008) (solicited review essay)

*A History of the Eighth Circuit*
67 ARKANSAS HISTORICAL QUARTERLY 310 (2008) (invited peer-reviewed book review)

*The Failure of Bowes v. Russell*
43 TULSA LAW REVIEW 631 (2008) (symposium contribution)

*Appreciating Mandatory Rules: A Reply to Critics*
102 NORTHWESTERN UNIVERSITY LAW REVIEW COLLOQUY 228 (2008)

*The Forum Defendant Rule in Arkansas*
2007 ARKANSAS LAW NOTES 73 (peer reviewed)

*Jurisdictionality and Bowles v. Russell*
102 NORTHWESTERN UNIVERSITY LAW REVIEW COLLOQUY 42 (2007)

*Pleading Standards after Bell Atlantic Corp. v. Twombly*
93 VIRGINIA LAW REVIEW IN BRIEF 135 (2007)

*Subclassing*
27 CARDOZO LAW REVIEW 2351 (2006)

*Constitutional Thematics and the Peculiar Federal Marriage Amendment*
20 B.Y.U. JOURNAL OF PUBLIC LAW 223 (2006) (invited symposium contribution)

*The Peculiar Federal Marriage Amendment*
36 ARIZONA STATE LAW JOURNAL 783 (2004)

*Dignity: The New Frontier of State Sovereignty*
56 OKLAHOMA LAW REVIEW 777 (2003)

*Vectoral Federalism*
20 GEORGIA STATE UNIVERSITY LAW REVIEW 393 (2003)

*The Metes and Bounds of State Sovereign Immunity*
29 HASTINGS CONSTITUTIONAL LAW QUARTERLY 721 (2002)

*Habeas Review of Perfunctory State Court Decisions on the Merits*
29 AMERICAN JOURNAL OF CRIMINAL LAW 223 (2002)

*Assessing the Practicality & Constitutionality of Alaska's Split-Recovery Punitive Damages Statute*
49 DUKE LAW JOURNAL 1335 (2000) (student note)

| | |
|---|---|
| **OTHER PUBLICATIONS [40]** | *The Zooming of Federal Civil Litigation*<br>5 JUDGES' BOOK (expected 2021) |
| | *A Critique of Jurisdictionality*<br>5 JUDGES' BOOK (expected 2021) |
| | *The Zooming of Federal Legal Practice*<br>_ TEXAS BAR JOURNAL _ (expected May 2021) |
| | *Leading Cases*<br>11 INTERNATIONAL JOURNAL OF PROCEDURAL LAW (forthcoming 2021) |
| | *Beyond Bias in Diversity Jurisdiction*<br>4 JUDGES' BOOK 15 (2020) |
| | *Plaintiff Personal Jurisdiction and Venue Transfer*<br>4 JUDGES' BOOK 23 (2020) |
| | *Leading Cases, Legislation*<br>10 INTERNATIONAL JOURNAL OF PROCEDURAL LAW 106 (2020) |
| | *Personal Jurisdiction and Aliens*<br>3 JUDGES' BOOK 29 (2019) |
| | *Personal Jurisdiction and Aggregation*<br>3 JUDGES' BOOK 21 (2019) |
| | *Leading Cases*<br>9 INTERNATIONAL JOURNAL OF PROCEDURAL LAW 358 (2019) |
| | *Leading Cases, Legislation*<br>9 INTERNATIONAL JOURNAL OF PROCEDURAL LAW 146 (2019) |
| | *Jurisdiction and Its Effects*<br>2 JUDGES' BOOK 15 (2018) |
| | *Plaintiff Personal Jurisdiction and Venue Transfer*<br>S.F. DAILY JOURNAL 5 (Aug. 15, 2018) |

*Leading Cases, Legislation*
8 INTERNATIONAL JOURNAL OF PROCEDURAL LAW 314, 352 (2018)

*Leading Cases*
8 INTERNATIONAL JOURNAL OF PROCEDURAL LAW 165 (2018)

*The Supreme Court, the Rules Committees, and amicus practice*
SCOTUSBLOG (May 16, 2018) (invited academic highlight)

*Forum-Selection Clauses After* Atlantic Marine
78 THE ADVOCATE 21 (2017)

*Certifying an Op-In Class under Rule 23*
1 JUDGES' BOOK 21 (2017)

*How to Apply Diversity Jurisdiction in a Multiparty Case*
1 JUDGES' BOOK 25 (2017)

*California's View of "Related To" Specific Jurisdiction*
2016 CALIFORNIA LITIGATION REVIEW 91 (2017)

*Leading Cases*
7 INTERNATIONAL JOURNAL OF PROCEDURAL LAW 322 (2017)

*Certifying an Op-In Class under Rule 23*
DAILY JOURNAL 24 (Nov. 8, 2017)

*Jurisdiction*
3 ENCYCLOPEDIA OF AMERICAN GOVERNANCE 153 (Stephen L. Schechter ed. 2016)

*Preface*
5 JOURNAL OF LAW (2 NEW VOICES) 17 (2015)

*The Tolling Effect of the Federal Supplemental-Jurisdiction Statute*
SCOCABLOG (Oct. 8, 2014)

*When Does a Legal Malpractice Action "Arise Under" Federal Patent Law?*
40 ABA SUPREME COURT PREVIEW 165 (2013)

*The* Ackermann *Rule in California Federal Courts*
THE RECORDER (Nov. 9, 2012)

*Squeezing Class Actions*
SCOTUSBLOG (Aug. 30, 2011) (symposium)

*What Kinds of Appellate Deadlines are Jurisdictional?*
38 ABA SUPREME COURT PREVIEW 107 (2010)

*What Kinds of Statutory Restrictions are Jurisdictional?*
37 ABA SUPREME COURT PREVIEW 34 (2009)

*Temporary Restraining Order*
2 ENCYCLOPEDIA OF THE U.S. CONSTITUTION 726 (David Schultz ed. 2009)

*Adequate and Independent State Grounds*
1 ENCYCLOPEDIA OF THE U.S. SUPREME COURT 26 (David Tanenhaus ed. 2008)

*Abstention*
1 ENCYCLOPEDIA OF THE U.S. SUPREME COURT 11 (David Tanenhaus ed. 2008)

*The Importance of E-Discovery*
43 ARKANSAS LAWYER 14 (2008)

*Appellate Jurisdiction*
1 ENCYCLOPEDIA OF THE U.S. SUPREME COURT 83 (David Tanenhaus ed. 2008)

*Judicial Activism*
29 NATIONAL LAW JOURNAL 19 (2004) (op-ed)

*Extending the* Robertson *Presumption to Leased Vehicles*
64 TEXAS BAR JOURNAL 966 (2002)

---

**CITATION METRICS**   Westlaw JLR: TE("scott dodson") = 654 hits, >78 above the line (as of Jan. 1, 2021)

Google Scholar: 1,215 citations, h-index = 20 (as of Jan. 1, 2021)

Ranked #9 (tied) on Brian Leiter's Top-10 Most-Cited Civil Procedure Scholars 2010-14

33 court opinions (as of Jan. 1, 2021) citing my non-treatise/non-textbook works, including the Second, Third, Fourth, Fifth, Seventh, Ninth, Tenth, and Eleventh Circuits and the Alabama, Pennsylvania, Nebraska, Texas, and Wisconsin supreme courts.

More than 47,000 downloads on SSRN and BE Press (as of Jan. 1, 2021)

---

**GRANTS AND**        Robert L. Habush Endowment, American Association for Justice (2020) ($15,000 grant)
**FELLOWSHIPS**            "The Making of the Supreme Court Rules"

---

**AWARDS / HONORS**   UC Hastings Leadership Award (2020)

Adolph A. Tiscornia Scholarship Award (2019)

R.W. Harrison Summer Scholarship Stipend (2013)

---

**SELECT SPEAKING**   Keynote Lecture: *Cooperativism and Adversarialism in Federal Civil Litigation*
**ENGAGEMENTS**           Japan Association of the Law of Civil Procedure, Japan (2021)

Symposium Presentation: *Comparative Personal Jurisdiction After* Ford
    *Stetson Law Review* Symposium on Procedure in the Roberts Court (2021)

Presenter: *Constitutional Allocations of Cases in Comparative Context*
    Civil Procedural Law and Justice Conference, Luxembourg (2021)

Presenter: *Bias and Diversity Jurisdiction*
    Civil Procedure Unavailability Workshop (2020)

Podcast Guest: *Beyond Bias in Diversity Jurisdiction*
    Ipse Dixit #154 (Feb. 16, 2019)

Podcast Guest: *Notorious RBG and Her Incredible Legacy*
    Good Law / Bad Law #164 (Dec. 6, 2019)

Discussant: *Reforming the Federal Judiciary*
    Berkeley Judicial Institute Symposium (2019)

Keynote Speaker: *Personal Jurisdiction in Comparative Context*
    International Conference on Civil Procedure, Brazil (2019)

Reporter: *Accountability and Transparency in U.S. Civil Courts*
International Association of Procedural Law World Congress, Japan (2019)

Symposium Presenter: *Defense-Centric Jurisdiction*
*Fordham Law Review* Symposium on Civil Procedure in the Trump Era (2018)

Podcast Guest: *A Model Code for Law-Review Submissions*
Oral Argument #182 (Oct. 19, 2018)

Senior Commentator
Tenth Annual Junior Faculty Federal Courts Workshop (2018)

Podcast Guest: *The Legacy of Ruth Bader Ginsburg*
*L.A. Daily Journal* Appellate Podcast Series (2016)

Symposium Presenter: *A Negative Retrospective of Rule 23*
N.Y.U. Civil Justice Center Symposium (2016)

Colloquium Presenter: *A Negative Retrospective of Rule 23*
Bay Area Civil Procedure Forum (2016)

Senior Commentator
First Annual Civil Procedure Workshop, Seattle University School of Law (2015)

Lecture: *The Legacy of Ruth Bader Ginsburg*
Commonwealth Club, San Francisco (2015)
Rice University (2015)

Presenter: *Party Subordinance in Federal Litigation*
Branstetter New Voices in Civil Justice Workshop (2014) (blind peer selection)

Lecture: *Pleading and the Litigation Marketplace*
University of Genoa Faculty of Law, Italy (2013)

Panelist: *On the Importance of Being Comparative*
Law & Society Annual Conference (2012)

Panel Presenter: *Twombly and Iqbal: Two Years On*
Searle Center Judicial Symposium on Civil Justice Issues (2011)

Presenter: *The Complexity of Jurisdictional Clarity*
Junior/Senior Scholars Federal Courts Workshop (2010)

Debater (as Devil's Advocate) and Winner: *The Raft Debate*
The College of William & Mary (2010)

Panel Presenter: *Comparative Convergences in Pleading Standards*
AALS Annual Conference, Section on Civil Procedure (2009)

Keynote Address: *Darwin's "Living" Constitution*
Law, Ethics & The Life Sciences Conference (2007)

Symposium Presenter: *Constitutional Thematics and the FMA*
B.Y.U. Law School Symposium: A Federal Marriage Amendment (2005)

*A full list of more than 100 speaking engagements is available upon request.*

| | |
|---|---|
| **EDITORIAL POSITIONS** | U.S. Editor, INTERNATIONAL JOURNAL OF PROCEDURAL LAW (2016 – Present)<br>Editor in Chief, THE JUDGES' BOOK (2017 – Present) |
| **BLOGGING** | Managing Editor, UC HASTINGS FACULTY SCHOLARSHIP BLOG (2017 – 2020)<br>Guest Blogger, SCOTUSBLOG (2010, 2011, 2012, 2013, 2018); SCOCABLOG (2014, 2015); PRAWFSBLAWG (2008); CIVIL PROCEDURE PROF BLOG (2007, 2011) |
| **PODCASTS & NEWSLETTERS** | Producer and Director, *Litigation Briefs* Podcast (2021 – Present) |
| **MEMBERSHIPS & AFFILIATIONS** | Academic Fellow, Pound Civil Justice Institute (2019 – Present)<br>Member, International Association of Procedural Law (2016 – Present) |
| **RULEMAKING ACTIVITIES** | VIRGINIA ADVISORY COMMITTEE ON RULES OF COURT<br>*Member*, 2009 – 2012 |
| **SELECT MEDIA APPEARANCES** | KTVU Channel 2, *The 10:00 Nightly News*<br>KQED Radio, *The To Do List*<br>KPFA Radio, *Letters and Politics*<br>KCBS Radio<br>Bloomberg Radio<br>CNN Radio<br><br>*A full list of more than 100 media quotes and appearances is available upon request.* |
| **BRIEFS & TESTIMONY** | Brief of Professor Scott Dodson, <u>Fort Bend County v. Davis</u>, No. 18-525 (S. Ct. 2019) (amicus curiae and counsel of record)<br><br><u>Aetna Inc. v. Whatley Kallas LLP</u>, No. BC707386 (Cal. Super. Ct. 2018) (testifying expert)<br><br>*Brief of Professor Scott Dodson*, <u>Hamer v. Neighborhood Housing Serv. of Chi. & Fannie Mae</u>, No. 16-658 (S. Ct. 2017) (amicus curiae and counsel of record)<br><br>*Brief of Civil Procedure and Tort Law Professors*, <u>Ramona Two Shields v. Wilkinson</u>, No. 15-475 (S. Ct. 2015) (counsel of record for amici curiae)<br><br>*Brief of Professor Scott Dodson*, <u>Sebelius v. Auburn Reg. Med. Ctr.</u>, No. 11-1231 (S. Ct. 2012) (amicus curiae and counsel of record)<br><br>*Brief of Federal Jurisdiction Professors*, <u>O'Connell v. Chapman Univ.</u>, No. 10-810 (S. Ct. 2011) (counsel of record for amici curiae)<br><br><u>Feely v. Allstate Mut. Ins. Co.</u>, No. 2004-294-3A (Ark. Cir. Ct. 2010) (testifying expert)<br><br><u>In re Death of Lloyd Koch</u> (Feb. 2008) (testifying expert)<br><br><u>Ark. State Bd. of Dental Examiners v. Solera</u> (Ark. Dental Bd. 2007) (testifying expert)<br><br>*Petition for a Writ of Certiorari* and *Reply Brief*, <u>Lively v. Wild Oats Markets, Inc.</u>, No. 06-748 (S. Ct. 2006-07) (co-counsel with Stanford Litigation Clinic and Howe & Russell) |
| **EDUCATION** | DUKE UNIVERSITY SCHOOL OF LAW, Juris Doctor, *cum laude*, 2000<br>Editor, *Duke Law Journal*<br><br>RICE UNIVERSITY, B.A. Biology, *cum laude*, 1996 |

| | |
|---|---|
| **PROFESSIONAL EXPERIENCE** | GIBSON, DUNN & CRUTCHER LLP, Washington, DC<br>*Associate, Litigation and Appellate Groups*, 2004 – 2006 |
| | UNITED STATES DEPARTMENT OF COMMERCE, Washington, DC<br>*Attorney, Complex Litigation Unit*, 2002 – 2004 |
| | GARDERE WYNNE SEWELL LLP, Houston, TX<br>*Associate, Civil Litigation and Employment Law*, 2001 – 2002 |
| | THE HONORABLE NICHOLAS G. GARAUFIS, Eastern District of New York<br>*Judicial Clerk*, 2000 – 2001 |

| | |
|---|---|
| **BAR ADMISSIONS** | Texas (2001)<br>Supreme Court of the United States (2004) |