Paul J. Napoli (NY 2513141)
Hunter J. Shkolnik (NY 2031458)
NS PR LAW SERVICES, LLC
270 Muñoz Rivera, Suite 201
Hato Rey, Puerto Rico 00918
pnapoli@nsprlaw.com
hunter@napolilaw.com
Phone: (212) 397-1000
Fax: (312) 610-5680

Thomas C. Goldstein (MD 9512120307)
Eric F. Citron (MD 1608240002)
Daniel Woofter (MD 1812120199)
Goldstein & Russell, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20815
tg@goldsteinrussell.com
Phone: (202) 362-0636
Fax: (866) 574-2033

Christopher L. Schnieders (KS 22434)
NAPOLI SHKOLNIK, PLLC
6731 W. 121st Street, Suite 201
Overland Park, KS 66209
cschnieders@napolilaw.com
Phone: (212) 397-1000
Fax: (312) 610-5680

*Counsel for Objector-Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL NO. 2741<br>Case No. 3:16-md-02741-VC |
| THIS DOCUMENT RELATES TO:<br><br>*Ramirez, et al. v. Monsanto Co.*,<br>Case No. 3:19-cv-02224 | **MOTION TO WITHDRAW OBJECTIONS TO MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS SETTLEMENT, APPOINTMENT OF INTERIM CLASS AND SUBCLASS COUNSEL, DIRECTION OF NOTICE UNDER FED. R. CIV P. 23(e), SCHEDULING OF A FAIRNESS HEARING, AND STAY OF THE FILING AND PROSECUTION OF ROUNDUP-RELATED ACTIONS BY SETTLEMENT CLASS MEMBERS** |

## MOTION TO WITHDRAW OBJECTIONS

Movants—clients of the Napoli Shkolnik law firm[*]—respectfully move to withdraw their objections to preliminary approval of the proposed class action settlement, MDL Doc. 12678. In sum, extensive negotiations between counsel for movants and counsel for the proponents produced an array of important revisions to the proposed settlement. Movants have agreed to withdraw their objections based on those revisions. Movants support preliminary approval of the revised proposed settlement for the reasons that follow.

Movants' principal objection to the previous iteration of the class-action settlement proposed in this matter was that it did not adequately protect the constitutional due process rights of absent class members. In particular, our concern was that the "exposure-only" class members—being presently uninjured—would not have reason to attend to class-action notice and so would not have a meaningful opportunity to opt out of the settlement. And the apparently broad definition of this exposure-only class suggested that the rights of innumerable unnamed class members might be at stake. We focused on these issues because, in our view, well-structured process protections are the best means of vindicating class members' rights: Even where we or a court might have doubts about how much benefit a settlement confers on certain class members, we should be less concerned if those class members have a truly effective opportunity to decide whether or not to accept the deal for themselves.

To that end, a laudable feature of this settlement agreement has always been its inclusion of a unique provision designed to at least partially protect the opt-out rights of absent, exposure-

---

[*] The Napoli Shkolnik firm submitted objections on behalf of three categories of objectors, all of whom are encompassed by this Motion: (1) the National Black Farmers Association; (2) four members of Subclass 1 (Sabrina Jo Benham, Andrea Coomer, Rick Free, and Gary Hosford); and (3) four members of Subclass 2 (Margaret Lower, David Smoker, Lynette Waliany, and Roger Wilmot).

only class members—namely, its allowance for such class members to (essentially) opt out on the back end of the process, whenever they become aware that they have in fact developed non-Hodgkin's lymphoma. The more fulsome that back-end opt-out right is, the more it can be said that—whatever the benefits and burdens of the proposed deal—exposure-only class members are knowingly choosing to stick with it of their own free will. But our concerns at the time of our objection were that the tort claim the settlement preserved for these class members was not in fact the full entitlement to compensatory damages that currently belongs to them as their property right, and that their ability to monetize their claims might be compromised by other features of the settlement. *See* MDL Doc. 12678 (Objections) at 1. Moreover, we did not believe that the settling parties could show that the class device was "obviously superior" to individual lawsuits. *Id.* at 2.

After we filed our objections, we negotiated seven substantial revisions to the proposal that, taken together, sufficiently address these concerns. We also had our first opportunity to reflect on a change that was made to the science-panel provisions of the settlement on the eve of our previous objection. We now believe that, from the perspective of the absent, exposure-only class members we had in mind when we objected, the settlement offers potential benefits coupled with a minimal incursion on their ability to simply opt out in the final analysis and go it alone in the tort system. Meanwhile, we believe that our concerns have been ameliorated in general by a more circumscribed definition of which absent class members the settlement purports to bind and how. Movants accordingly ask now to withdraw their objections and submit that the proposed settlement agreement should be approved.

The improved elements of the settlement agreement that we negotiated with the defendant and class counsel are as follows:

*First*, the revised agreement substantially narrows the class definition.

"On its face," the prior proposal's class definition was "broad enough to encompass almost every living casual golfer, school child, teacher, park user, or produce eater, since each was exposed to some amount of Roundup because they or someone else applied it." Objections 13. And even reading the definition the way Movants *assumed* the settling parties had intended, it "still [seemed to] reach[] tens and possibly hundreds of thousands of individuals who are unlikely to have a meaningful chance to opt out." *Id.* at 14.

Section 1.1(a) of the new proposal now only binds individuals who were exposed to Roundup either in (a) specified "occupational" roles, or (b) circumstances where the individual was almost certainly aware of their exposure. Thus, the proposal no longer "dangerous[ly] leave[s] so much ambiguity surrounding such a critical detail" as to its reach, Objections 13, nor attempts to bind difficult to quantify numbers of individuals who will not have a meaningful chance to attend to the class notice.

*Second*, the revised agreement eliminates a limitation on the back-end right to litigate one's tort claim that had unconstitutionally circumscribed class members' right to be "made whole." Put differently, the new proposal no longer attempts to terminate any aspect of a class member's constitutional right to full compensatory damages.

As originally proposed, the agreement would "have taken away the property right to be 'made whole' by limiting damages for those diagnosed in the future to the harm that would have existed had the disease been caught by a medical monitoring program early on, even if the disease is in fact diagnosed much later and causes much more harm." Objections 29. This was accomplished by defining the "compensatory damages" that the prior proposal purported to preserve as *excluding* "any damages that were increased because of the absence of medical monitoring for any injuries." *Ibid.* (quoting MDL Doc. 12531-2, at 5).

3

In the new proposal, Section 2.1(16) eliminates that exclusion from the prior Compensatory Damages definition by deleting the line "any damages that were increased because of the absence of medical monitoring for any injuries." This change is huge—and combined with the much narrower and clearer class definition, gets us most of the way to eliminating Movants' original constitutional concern with binding exposure-only class members to giving away their property rights.

*Third*, the revised agreement substantially narrows the release as it relates to medical monitoring claims.

As originally proposed, the agreement would have ended the Diagnostic Accessibility Grant Program (DAGP) outreach campaign and medical-monitoring grant program at the very moment that class members would have been bound never again to seek medical monitoring for themselves. Objections 37-38.

Section 17.1(b) eliminates the release for "any and all Claims, including unknown Claims, that [the Class Member's] injuries or damages arising from, resulting from, in any way related to or in connection with Roundup Products and NHL were increased because of the absence of a medical monitoring program." And the release of medical monitoring claims now extends only insofar as "the services of the Diagnostic Accessibility Grant Program are or were reasonably available to the Class Member at issue."

This language has two benefits. First, there is no longer any ambiguity as to whether a class member may seek medical monitoring related to potential injuries *other* than NHL that may be caused by Roundup. And, second, it is now clear that the settlement does not purport to terminate claims for medical monitoring by class members who are unable reasonably to access the services provided by the DAGP. Put otherwise, class members remain unable to seek their

own medical monitoring in lieu of what the DAGP provides. But, conversely, when and where the services of the DAGP are not reasonably available to provide a class member with medical monitoring, that class member will retain the right to seek such services for themselves through the tort system.

*Fourth*, the revised agreement provides for the focused delivery of information to minority farmers. This change bolsters the medical monitoring provided by the DAGP by ensuring that large segments of the vulnerable populations who had been unconsidered are no longer left out of the outreach campaign.

The revised settlement directs that DAGP Administrator to "cooperate with" and potentially retain "organizations representing historically disadvantaged minority, seasonal or migratory farmworkers and certain other non-farmworkers (such as landscapers and groundskeepers) to ensure that such Settlement Class Members receive complete and equitable access to information regarding the Diagnostic Accessibility Grant Program and its services."

*Fifth*, the revised agreement substantially expands the right of class members to monetize their claims.

The prior proposal proscribed any "assignment of claims" at all and forever. MDL Doc. 12531-2, at 108-09. But as Movants noted in their objections, the "chose in action" has, since "the founding," been "viewed as property that could be assigned for compensation." Objections 30. That is why the right to full compensatory damages, as noted above, is a "personal property right governed by the due process clause." *Ibid.*

Section 30.3 now prohibits the assignment of claims only "until the stay pursuant to Section 18.2(b)(i) expires." In other words, the new proposal now gives class members back the right to

5

assign, for example, their compensatory damages claim at the same time that they would have the right to bring it by opting out on the back end.

*Sixth*, the revised agreement specifies that the release of claims for those who participate in the compensation scheme applies only to NHL claims.

As originally proposed, the class definition on its face seemed to forever bar or at least severely limit *non*-NHL Roundup claims that might arise as the science develops. *See* Objections 29, 31, 40-41, 44. Paragraph 2 of the proposed release now limits its scope to claims for "Non-Hodgkin's Lymphoma ('NHL')." Further, paragraphs 8(a), 8(b), 9, 10, 11, 15, 16, 25, and 40 specify that each class member's release applies only to claims for "their NHL." Paragraph 8 concludes: "For avoidance of doubt, the term 'Released Claims and Liabilities' does not apply to Claims and Liabilities unless they arise from, result from, in any way relate to or are in connection with a Product User's use of or exposure to any Roundup Product and NHL."

Thus, it is now abundantly clear that even those who participate in the compensation fund can, if they later develop a *non*-NHL claim related to their exposure to Roundup, bring an action against Monsanto for recovery from such claim.

*Seventh*, the revised agreement provides an important mechanism for the settlement to assist class members in pursuing their Roundup claims in the ordinary tort system, should they so choose.

Although Movants' objections were primarily related to the constitutional infirmities with the prior proposal, Movants also noted that the settling parties had not shown that the class device would be superior to individual litigation—particularly given the successes that Roundup plaintiffs have had in every suit that has gone to trial, and the inventory settlements obtained by plaintiffs' firms. Objections 42-45.

The new proposal substantially changes that calculus by providing a meaningful benefit even to those who choose to opt out on the back end and seek relief through the tort system. New Section 30.20 provides for class counsel to make available an array of materials that will assist in litigating Roundup claims, even for those class members who choose to exercise their back-end opt out. Those materials should substantially reduce the cost of litigating those claims, and could well serve to reduce the costs associated with retaining counsel to bring a tort claim. Most important, these will include "trial preparation materials," akin to a case-in-a-box, including expert testimony and the like. Class counsel will also publish trial transcripts, key pretrial rulings, appellate rulings, and deposition transcripts from prior Roundup litigation.

Finally, although this change was made prior to our objection, we also note that the settlement was substantially improved for absent class-members by the change to the science panel provisions permitting a deposition of each science panel member. This change was made too close to our previous filing for us to consider it; our brief therefore noted the alteration without either approving or criticizing the result. *See* Objections 36 n.8. In our view, however, these depositions are likely to permit class members to effectively litigate the meaning of the science panel's determination, particularly if the panel members agree that Roundup can cause NHL but are unable to agree on a threshold dose level. In our view, this change brings the right to litigate one's tort claim individually at the time one develops the disease much closer to a full back-end opt-out right.

As should be clear from the description of the seven negotiated changes, the new proposal has not only addressed Movants' core constitutional concerns, but also substantially changed the Rule 23 calculus. Movants are now satisfied that the proposal can pass constitutional muster and also provides an option to absent, exposure-only class members that they have an effective choice to take or leave and that they could not have obtained through individual litigation alone. Movants

thus respectfully request that the Court grant the motion to withdraw and approve the revised settlement.

<table>
<tr><td>

Dated: April 13, 2021

</td><td>

Respectfully submitted,

/s/ Thomas C. Goldstein
</td></tr>
</table>

<table>
<tr><td>

Paul J. Napoli (NY 2513141)
Hunter J. Shkolnik (NY 2031458)
NS PR LAW SERVICES, LLC
270 Muñoz Rivera, Suite 201
Hato Rey, Puerto Rico 00918
pnapoli@nsprlaw.com
hunter@napolilaw.com
Phone: (212) 397-1000
Fax: (312) 610-5680

Christopher L. Schnieders (KS 22434)
NAPOLI SHKOLNIK, PLLC
6731 W. 121st Street, Suite 201
Overland Park, KS 66209
cschnieders@napolilaw.com
Phone: (212) 397-1000
Fax: (312) 610-5680

</td><td>

Thomas C. Goldstein (MD 9512120307)
Eric F. Citron (MD 1608240002)
Daniel Woofter (MD 1812120199)
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave., Suite 850
Bethesda, MD 20815
tg@goldsteinrussell.com
Phone: (202) 362-0636
Fax: (866) 574-2033

</td></tr>
</table>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of April, 2021, a copy of the forgoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

*/s/ Thomas C. Goldstein*