# EXHIBIT 2

Bruce A. Woda, M.D.

```
 1      IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
 2                   STATE OF MISSOURI
 3  LEROY SEITZ, et al.,
 4                 Plaintiff,
 5      vs.                       NO:  1722-CC11325
 6  MONSANTO COMPANY,
 7                 Defendant.
 8
 9
10
11
12      VIDEOTAPED DEPOSITION OF BRUCE A. WODA, MD
                     February 4, 2020
13                     9:39 a.m.
                 119 E. Marcy, Suite 110
14             Santa Fe, New Mexico  87501
15
16      PURSUANT TO THE NEW MEXICO RULES OF CIVIL
    PROCEDURE, this deposition was:
17
18  TAKEN BY:  WILLIAM A. WALSH
               Attorney for the Plaintiffs
19
20
21  REPORTED BY:  Robin A. Brazil, RPR, NM CCR #154

22

23
24
25
```

Bruce A. Woda, M.D.

```
 1                 A P P E A R A N C E S
 2    For the Plaintiffs:
 3          WILLIAM A. WALSH, ESQ.
            WEITZ & LUXENBERG, PC
 4          700 Broadway
            New York, New York  10003
 5          (212) 558-5836
            wwalsh@weitzlux.com
 6
      For the Defendant:
 7
            NEIL S. BROMBERG, ESQ.
 8          SEAN J. STEIN, ESQ.
            HOLLINGSWORTH, LLP
 9          1350 I Street, Northwest
            Washington, D.C.  20005
10          (202) 898-5805
            nbromberg@hollingsworthllp.com
11
      Also Present:
12
            Brian Padilla, videographer
13          Kyler Padilla, videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

Bruce A. Woda, M.D.

1               I N D E X
2                               PAGE
3    EXAMINATION OF BRUCE A. WODA, MD
4        By Mr. Walsh                    5
5    CERTIFICATE OF COMPLETION OF DEPOSITION      178
6    WITNESS SIGNATURE/CORRECTION PAGE        180
7

         EXHIBITS MARKED OR FORMALLY IDENTIFIED
8
     NUMBER
9
     1    Article notes                28
10
     2    Notes on Cannon                28
11
     3    Notes on Jenkins              28
12
     4    Notes on Pinnon              28
13
     5    Letter and invoices          37
14
     6    Materials considered list        55
15
     7    Amended Notice              56
16
     8    Designation of Experts        56
17
     9    2008 Ericsson study          156

18
19
20
21
22
23
24
25

Bruce A. Woda, M.D.

1              THE VIDEOGRAPHER:  Today is Tuesday, the

2      4th of February, 2020.  The time is 9:39 a.m.  We

3      are on the record.  My name is Kyler Padilla with

4      Bean & Associates.

5              The court reporter is Robin Brazil with

6      Bean & Associates.

7              We are here for the deposition of

8      Dr. Bruce Woda, MD, in the case of Leroy Seitz, et

9      al. versus Monsanto Company.

10              This deposition is being held at Bean &

11      Associates in Santa Fe, New Mexico.

12              Counsel will please state their

13      appearances.

14              MR. WALSH:  William Walsh with Weitz &

15      Luxenberg on behalf of the Plaintiffs.

16              MR. BROMBERG:  Neil Bromberg with

17      Hollingsworth, LLP, on behalf of Monsanto.

18              MR. STEIN:  Sean Stein on behalf of

19      Monsanto, with Hollingsworth, LLP.

20              THE VIDEOGRAPHER:  The court reporter,

21      will you now please swear in the witness.

22

23

24

25

Bruce A. Woda, M.D.

1                BRUCE A. WODA, MD,

2          after having been first duly sworn under oath,

3          was questioned and testified as follows:

4                       EXAMINATION

5      BY MR. WALSH:

6          Q.   Morning, Dr. Woda, how are you doing?

7          A.   Fine.

8          Q.   We'll start with --

9          A.   Thank you.

10         Q.   -- would you please state your full name

11     and business address for the record?

12         A.   So my name is Bruce A. Woda.  My business

13     address is 1 Innovation Drive, Worcester,

14     Massachusetts, 01605.

15         Q.   Dr. Woda, I'm sure you've met with

16     counsel, and they've prepared you to some degree, so

17     just a couple of basic understandings as we move

18     forward in the deposition.

19             The first is that the court reporter is

20     taking down what you say, taking down what I say, so

21     the goal is to try and avoid talking over each other

22     at any point.  It can be complicated, because we're

23     used to back and forth, but with any luck, you know,

24     let's try to do that, and do you have any problem

25     with that?

Bruce A. Woda, M.D.

1       A.   No, I don't have a problem with that.

2   Hopefully I can keep to it.

3       Q.   And the second thing is if you don't

4   understand a question that I ask of you, please ask

5   for a clarification.  This is your field, so it is

6   entirely probable that I will ask one or two or even

7   1,400 questions that are a little off base, and I

8   can guarantee you pronunciations will be off at

9   various times, which may confuse you.  But again, if

10  you have any confusion on a question, please ask for

11  clarification.

12      A.   I certainly will.

13      Q.   Other than that, you may hear, at

14  different times, counsel voicing an objection.

15  That's his cue to me that he believes that I could

16  ask a question in a better format.  It's his

17  opportunity to preserve that objection for the

18  record.  Absent an instruction from him at that

19  point to not answer the question, you should feel

20  free to give me a moment, see if I will agree with

21  him.  Otherwise, answer the question as presented to

22  you.  Is that all right?

23      A.   Sounds good.

24      Q.   All right.  Let's dig in, then.  Do you

25  agree that perchloroethylene is a probable

Bruce A. Woda, M.D.

1    carcinogen?

2        A.   So I've been retained in this case to

3    comment about the risk factors and Non-Hodgkin's

4    lymphoma, and more specifically Roundup and

5    glyphosate.  I have no expert opinion on that

6    compound.

7        Q.   Are you familiar with perchloroethylene or

8    PCE?

9        A.   No, I'm not.

10       Q.   Are you aware that IARC has identified it

11   as a probable carcinogen?

12       A.   As I said, I've been retained in this case

13   to give my opinion about Roundup and glyphosate.  I

14   don't have opinions about many of the other

15   compounds that IARC has listed.

16       Q.   Fair enough.  Sitting here today, you have

17   no basis to challenge IARC's determination with

18   regard to perchloroethylene?

19       A.   For that specific IARC determination, I

20   wouldn't have a basis one way or the other, because

21   I have no knowledge of that.  So I can't say whether

22   it's true or not true.

23       Q.   Fair enough.  Do you agree that DDT is a

24   probable carcinogen?

25       A.   Again, something I have not studied, I've

Bruce A. Woda, M.D.

1    not been asked to study.  I have no real opinion

2    about it.

3         Q.   And then presumably the same, you have no

4    basis for challenging IARC's determination that it's

5    a probable carcinogen?

6         A.   So if IARC has made a determination about

7    that, I have no way to know whether it's right, not

8    right.  I have no expertise or knowledge in that

9    area.

10        Q.   Similarly, do you agree that hydrazine is

11   a probable carcinogen?

12        A.   I'll sound like a broken record, but

13   again, I have no knowledge about whether it is or

14   isn't, and I have no basis to make a judgment about

15   that.

16        Q.   Fair enough.  Do you agree that glyphosate

17   is a probable carcinogen?

18        A.   No, I don't.

19        Q.   All right.  You are aware that IARC has

20   identified it as a probable carcinogen?

21        A.   So I'm certainly aware that IARC has

22   identified it, but I don't agree with IARC's opinion

23   about it.

24        Q.   Understood.  Can we agree that herbicides

25   and insecticides are basically designed to kill?

Bruce A. Woda, M.D.

1           MR. BROMBERG: Objection to form.

2       A.  So to kill what?

3       Q.  It's the objection, basically, for

4   herbicide or insecticide to kill, for herbicides the

5   plants they're sprayed on, for insecticides the

6   insects that either laid out for or sprayed toward.

7           MR. BROMBERG: Object to form.

8       A.  So could you repeat the question?

9       Q.  Sure.  Would you agree that herbicides are

10  designed to kill?

11          MR. BROMBERG: Same objection to form.

12      A.  So herbicides are designed to be active

13  compounds, to be -- I guess my -- and I know I'm not

14  supposed to ask you questions, but kill is a very --

15  a very broad term.  I'm not sure I understand what

16  you mean with respect to kill.

17      Q.  Well, if you spray a herbicide on a weed,

18  it'll kill the weed, correct?

19          MR. BROMBERG: Objection to form.

20  Overbroad.

21      A.  I think it would have an effect on the

22  weed if the weed is sensitive to that compound;

23  otherwise, it may not have an effect.

24      Q.  Fair enough.  The basic design or purpose

25  for herbicide is to kill, you know, its target -- in

Bruce A. Woda, M.D.

1    essence, its target audience.

2        MR. BROMBERG: Objection to form.

3        A.  So I think herbicides are designed to kill

4    a weed that might be sensitive to it, yes.

5        Q.  Fair enough.  When did counsel for

6    Monsanto first contact you to see if you would be

7    interested in serving as an expert for the company?

8        A.  To the best of my recollection was

9    mid-September of 2019.

10        Q.  One month prior to that date, had you read

11    IARC's report on Glyphosate Monograph 112?

12        A.  No, I had not read IARC's report.

13        Q.  Prior to that date -- or one month prior

14    to that date had you reached an opinion whether or

15    not glyphosate was a probable carcinogen?

16        A.  Okay.  So one month prior to what date?

17        Q.  Sure.  I'm sorry.  Let me --

18        MR. BROMBERG: Do you mean prior to that

19    date?  Any time prior?

20        Q.  As of August 2019, to make it easier.  You

21    said --

22        A.  As of August 2019?

23        Q.  Yes, sir, as of August 2019 did you reach

24    an opinion whether or not glyphosate was a probable

25    carcinogen?

Bruce A. Woda, M.D.

1      A.  Not as of August 2019.

2      Q.  And as of -- August 2019, did you have any

3  basis for challenging IARC's determination as

4  reflected in Monograph 112?

5      A.  So since I had no knowledge of IARC's

6  opinion on that, it's not an issue that I looked at.

7  You know, prior to August of 2019, I had no way to

8  say whether it's true, not true.  Something I just

9  never considered.

10      Q.  Okay.  When counsel -- or -- strike that.

11  Following when counsel first contacted you or at

12  that time, did you immediately agree to serve as an

13  expert, or was there a couple of days or couple of

14  weeks of in between their requesting and your

15  decision to appear as an expert?

16      MR. BROMBERG:  I'm going to -- I'm going

17  to object to the extent that there's an agreement

18  between the parties in this case.  The

19  communications between our experts and counsel are

20  privileged, so asking when he made a decision to be

21  retained as an expert and our -- to the extent that

22  you're covering our discussions on that topic, I

23  would object.

24      Q.  You can answer.

25      MR. BROMBERG:  You can answer without --

Bruce A. Woda, M.D.

1    you can answer, but you are not to disclose

2    communications that we've had.  I think you can

3    answer when, after September, we first contacted

4    you.  We retained you or -- as an expert in the

5    Seitz case.

6        Q.   And to clarify, Doctor, this is -- and I'm

7    really not trying to be complicated on this one.  By

8    way of example, if they called you on a Monday, did

9    you say -- tell them on that Monday, yes, I'll be an

10   expert, or did you wait until Wednesday and get back

11   to them or the following Thursday or something?  I'm

12   just trying to find out if there was --

13       MR. BROMBERG:  Hold on for a second.

14       Q.   -- a period in between the two.

15       MR. BROMBERG:  I'm going to raise the same

16   objection here to the extent that you're inquiring

17   about conversations between counsel and Monsanto, I

18   don't think that's appropriate.  You can ask him

19   when he was retained for the Seitz case, a

20   particular date, but with respect to communications

21   between counsel and Dr. Woda, those would be

22   privileged under the parties' agreement.

23       Q.   You may answer.

24       MR. BROMBERG:  You can answer within those

25   parameters.

Bruce A. Woda, M.D.

1       A.  So there were communications prior to, you

2  know, a mutual decision to become an expert in this

3  case.

4       Q.  Okay.  And do you recall approximately how

5  long, what period of time there was between the

6  initial call and when you --

7       A.  I don't have an exact recollection.

8       Q.  Okay.  Did you -- during that period of

9  time, did you review any literature?

10      A.  I don't have a great recollection, and I

11 don't want to speculate too much, and to the best of

12 my recollection I would think I did review -- I

13 think that that question is too much speculation.

14 I'm not sure I can answer it accurately.

15      Q.  And that's fine.  I'm not going asking you

16 to guess.  If you don't recall, you don't recall.

17 That's fine.  During that period of time, other than

18 speaking with counsel, did you speak with anyone

19 else?

20      A.  No.

21      Q.  During that period of time, did you, I

22 guess, consult --

23      A.  Anyone else.  My wife, but that's --

24      Q.  That's fine.  Happy to recognize her.

25 Other than -- did you speak to any colleague

Bruce A. Woda, M.D.

1    during --

2        A.   No.

3            MR. BROMBERG:  You're talking about with

4    respect to what?  The question's a bit broad.  I

5    mean, obviously he spoke to people, but about what

6    topic?

7            MR. WALSH:  Fair enough.

8        Q.   With regard to glyphosate or serving as an

9    expert in this case?

10       A.   No.  Besides my wife, I did not discuss

11   this with anyone else.

12       Q.   After the Hollingsworth firm retained you

13   on behalf of Monsanto, it appeared, based on the

14   records that you provided, you conducted some

15   literature review in October of last year.  Do you

16   recall what literature you reviewed?

17           MR. BROMBERG:  Objection to form.

18   Misstates his prior testimony.  He didn't say he

19   didn't review literature before he was retained as

20   an expert.

21           But you can answer.

22       A.   Okay.  So can you just clarify what date

23   we're talking about?

24       Q.   Sure.  Following your retention to serve

25   as an expert, based on what has been produced to us,

Bruce A. Woda, M.D.

1    and we'll probably mark as an exhibit shortly, it

2    appears that during the month of October of 2019 you

3    conducted a literature review, both during the week

4    of October 8th, and I believe it's during the week

5    of October 28th. During the week of October 8th, do

6    you recall what literature you reviewed?

7         A.  So I can't say during specific dates what

8    specific literature I might have reviewed. I've

9    reviewed a great deal of literature.

10        Q.  Okay. Along -- when we're talking

11   literature, what were you reviewing?

12        A.  Okay. So my literature review is, I

13   think, quite extensive and is still ongoing. As you

14   know, the literature in this area is voluminous, and

15   it's somewhat difficult to, you know, delve into it

16   and to find, I think, meaningful results, but -- and

17   this is not meant to be all-inclusive, because I

18   can't recall every paper I've read.

19             So I did review the IARC document on

20   glyphosate. I did, at that time, review the EPA

21   document on glyphosate. I reviewed a number of

22   epidemiologic studies. I reviewed a number of

23   summaries of genotoxic data, some primary literature

24   on genotoxicity, some -- I did go back and look at

25   the WHO book on classification of lymphomas to see

Bruce A. Woda, M.D.

1    how they dealt with an issue of herbicides and

2    lymphomas. What else did I review?

3          MR. BROMBERG: I would just state for the

4    record that all the literature that Dr. Woda has

5    reviewed was identified prior to the deposition in

6    the materials-considered list.

7          MR. WALSH: Respectfully, Counsel, you are

8    not testifying, and you have no way of knowing

9    whether that's accurate or not.

10        Q.   Dr. Woda, did you speak with anyone -- any

11   colleague other than counsel for suggestions of

12   literature or studies to review?

13        A.   No.

14        Q.   Other than what you've identified, were

15   there other types of documents that you reviewed?

16        A.   So my review was restricted to -- as I

17   said, restricted is a -- I think a very limiting

18   term, but certainly I reviewed the documents we've

19   just discussed and probably other literature that I

20   reviewed just by doing computer searches to clarify

21   any questions I had, but I couldn't, you know,

22   identify specific pieces of literature that might

23   have shown up.

24        Q.   Fair enough. I also reviewed the -- you

25   just jogged my memory a bit.

Bruce A. Woda, M.D.

1          A.  I reviewed some of the SEER data on

2    lymphoma and leukemia incidents.

3          Q.  And where did you find the SEER data?

4          A.  On the SEER website.

5          Q.  And the original question I asked was

6    whether other than literature there was anything you

7    looked at.  What I'm specifically -- were there

8    transcripts, letters, anything else that you looked

9    at during -- and we'll break it down, during that

10   October 8th week that you were doing an initial

11   review.

12         A.  No.

13         Q.  With regard to the IARC --

14         A.  And the things that we've -- that I've

15   mentioned are not restricted to October 8th.

16         Q.  Okay.  Fair enough.

17         A.  The dates when I reviewed this and that, I

18   can't be specific about what I reviewed and what

19   timeframe.

20         Q.  All right.  Because you mentioned both

21   the -- the amount of information and sort of

22   tracking things down, for example, when you reviewed

23   the IARC monograph, did you then track through the

24   footnotes and look for the studies that were

25   specifically identified within the IARC monograph?

Bruce A. Woda, M.D.

1        A.  I don't have a specific recollection of,

2    based upon their literature citations, whether I

3    looked at any additional information or not.  I may

4    have, but I may not have.

5        Q.  By way of example, when you reviewed a

6    genotox study or article, how did you handle that?

7    What did your review entail?

8            MR. BROMBERG:  Objection to form.

9        A.  So if I review a paper, I look at the

10   publication.  I look at where it's published, who

11   the authors are, what the data is, what I think of

12   the data.  I may take notes on some of the articles.

13   I may underline certain things, so I try to do a --

14   you know, as rigorous an evaluation as I can.

15       Q.  So starting with that, when you're taking

16   notes, are you taking handwritten notes?

17       A.  Yes.

18       Q.  Are you printing out the article and then,

19   you know -- I'm sorry, just trying to get a

20   specification.  Are you printing out the article and

21   writing on the article?  Are you taking notes on a

22   pad?

23       A.  It varies.  So sometimes I print it out

24   and write on the article.  Sometimes I read it

25   online and write on a pad.  Sometimes I just write

Bruce A. Woda, M.D.

1    it on pad and don't write it on an article.

2        Q.  Fair enough.

3        A.  So, you know, I'm from the last generation

4    that we still like handwritten notes.

5        Q.  When you're dealing with the data within a

6    genotoxicity article, for example, what -- what

7    were -- are you tracking the data?  Are you, you

8    know -- what would your work be involving that?

9            MR. BROMBERG:  Objection to form.

10       A.  Clarify what you mean by tracking the

11   data.

12       Q.  Sure.  I'm sorry, you specified that you

13   would review the data.  What would your review of

14   the data entail?

15       A.  So I think one of the things one looks at

16   first is, you know, what's the hypothesis.  What

17   are -- what's the experimental model being used to

18   address the hypothesis, what the experimental

19   endpoints are, are they statistically significant,

20   is the model relevant to the issue of Roundup and

21   carcinogens.  I think those are the basic elements.

22       Q.  Okay.  And what steps are you using to

23   assess the model used within a paper?  Start with

24   that.

25       A.  So publications usually will give you a

Bruce A. Woda, M.D.

1    justification for using the model that they're going

2    to use, and that justification is usually based

3    upon, you know, precedent or previous literature

4    that if one is trying to measure some -- some event

5    that this is a way that you might do it. So one has

6    to see if they think that's reasonable or not.

7           And then there are some methodologic

8    issues which I think are very much more difficult to

9    delve into, you know, and some publications deal

10   with it, and some don't deal with it, about how the

11   scoring is actually done, who does the scoring, but

12   that being said, you know, a piece of data is

13   generated, and then the authors will see if they

14   think it's a meaningful piece of data or not. You

15   know, I would have to make a judgment about that

16   also.

17      Q.  Sure. And you actually mentioned that as

18   far as an assessment on the relevancy of the model.

19   What steps would you -- with that in mind, let's

20   take a step back. You also mentioned that the

21   article would reference prior publications or prior

22   testing.

23      A.  Usually -- usually they do. Sorry for

24   speaking over you.

25      Q.  That's all right. Just by the model they

Bruce A. Woda, M.D.

1    were using, would you go back and check those prior

2    models, or would you just take note of that and move

3    on?

4         A.  I don't think I looked at if someone

5    decided they were going to do S-A-X, the original

6    data showing that S-A-X was a reasonable assay.

7         Q.  What steps would you, you know -- having

8    completed your review of the article, what steps

9    would you take yourself to assess the relevancy of

10   the model on the paper?

11        MR. BROMBERG: Objection. Overbroad.

12        A.  So I think it would be -- I can answer it

13   best if I knew what -- what is meant by relevance.

14        Q.  Sure.  Well, you -- you mentioned the

15   relevance of the model, and so I -- if you're, for

16   example, reviewing studies, I suspect you, you know,

17   reviewed hearsay, McDuffie or Ericsson, you're

18   reading that paper, what are -- what steps are you

19   taking in order to assess the relevance of the model

20   within that paper?

21        A.  Okay.  So I think you're asking a question

22   about -- you mentioned McDuffie, which is a

23   case-controlled study for development or

24   nondevelopment -- or association or nonassociation

25   of herbicides with Non-Hodgkin's lymphoma so the

Bruce A. Woda, M.D.

1    question is, is that a relevant study?  I think it's

2    relevant.  I think the conclusions, you know, show

3    that glyphosate is not associated with Non-Hodgkin's

4    lymphoma.

5        Q.  You mentioned earlier also examining the

6    data.  Did you actually -- were there -- were there

7    pieces of literature where you would actually go and

8    examine the underlying data that was referenced

9    within the article?

10        MR. BROMBERG:  Objection to form.

11    Overbroad.

12        A.  Could you be more specific?

13        Q.  Yeah, I'm trying to -- I apologize.  I'm

14    trying to think.  We may get there, but let's move

15    on.  For all the work you were doing in October in

16    reviewing the literature, did you bill Monsanto for

17    all that time?

18        A.  I don't bill Monsanto.

19        Q.  Okay.  Did you bill Monsanto's counsel for

20    all that time?

21        A.  I billed Hollingsworth for my time, yes.

22        Q.  Okay.  And at -- any time you spent doing

23    work was billed to them?

24        A.  Yes.  My time on this case in evaluating

25    the issues in this case were billed to

Bruce A. Woda, M.D.

1    Hollingsworth.

2        Q.  Okay.  Other than speaking to Monsanto's

3    counsel, after you completed reading some or, you

4    know, all the literature you read in October, did

5    you speak with any colleagues concerning the content

6    of those articles?

7        A.  So I think we've gone over this before,

8    but I haven't spoken to anyone about this, except my

9    wife.

10       Q.  And I apologize.  The --

11       A.  That's also through February 4th of 2020.

12       Q.  Fair enough.  And, Doctor, I apologize.

13   This is a -- something of a stop-and-start process

14   where every T needs to get crossed and, you know --

15       A.  I understand.

16       Q.  Were it left to me, we would have a

17   90-minute conversation, and we'd be done, and it

18   would be off the record, but it doesn't work that

19   way.

20           MR. BROMBERG:  I would agree with you.

21       Q.  Okay.  Following your review of literature

22   in October of 2019, did you reach a conclusion or

23   opinion as to whether or not glyphosate was a

24   probable carcinogen?

25       A.  Yes, I did.  And based upon my review of

Bruce A. Woda, M.D.

1    the literature, my conclusion is glyphosate is not a

2    carcinogen.

3        Q.   And what articles did you find

4    particularly informative in aiding you in reaching

5    that opinion?

6        A.   So the articles are really, I think,

7    inclusive on --

8        Q.   Actually, Doctor, if you mind, at the

9    moment your notes are not in evidence, so if you

10   could just flip those over because -- there you go.

11       MR. BROMBERG:  No, no, no.  He can refer

12   to his notes.

13       MR. WALSH:  No, Counsel, he cannot.  Until

14   they're admitted into evidence, presuming this isn't

15   used at trial, if he needs his memory refreshed, he

16   can ask.

17       MR. BROMBERG:  Counsel, I disagree.  He

18   brought his notes to his deposition.  He can refer

19   to his notes.

20       MR. WALSH:  If he needs his notes to

21   refresh his memory, that's fine.

22       MR. BROMBERG:  He can have his notes.

23   Witnesses bring things to depositions.  He's allowed

24   to refer to whatever he wants to.  This is not a

25   trial.  He can refer to his notes.

Bruce A. Woda, M.D.

1              You can flip those back over, and you can

2       refer to them.

3              MR. WALSH:  I'm sorry, Doctor, no.

4              MR. BROMBERG:  Well, then we're going to

5       go off the record, Counsel.  Okay?  All right?

6              MR. WALSH:  Fine.

7              MR. BROMBERG:  We can go to the court on

8       it, because he brought them to his deposition.  He

9       can refer to them.  The rules of a deposition are

10      not the rules of a trial.  Whether it's used at a

11      trial or not, he's allowed to refer to his notes

12      that he's brought with him.

13             MR. WALSH:  Counsel, he can ask -- if he

14      needs to refresh his memory or check them, I'm happy

15      to mark them as an exhibit.

16             MR. BROMBERG:  Well, why don't you go

17      ahead.  He'd like to be able to refer to his notes.

18             MR. WALSH:  Let's go on the record -- stay

19      on the record.

20             MR. BROMBERG:  We're on the record.  We're

21      not going to proceed if you're not going to allow

22      him to refer to the materials that he brought with

23      him.

24         Q.   (By Mr. Walsh) Doctor, do you recall what

25      articles you --

Bruce A. Woda, M.D.

1          MR. BROMBERG:  No, we're going to go off

2     the record.  We're going to have a conversation

3     about this off the record.  We're not going to

4     proceed unless you allow him to refer to materials

5     that he brought.

6          MR. WALSH:  Counsel, we're staying on the

7     record.

8          MR. BROMBERG:  No, we not.  We're going

9     off the record.  We're off the record.  I'm

10    instructing the witness not to answer any further

11    questions.  So you can keep asking him questions.

12    This is improper deposition procedure, and you know

13    it.  So we're not going to continue and play this

14    game.

15      Q.   (By Mr. Walsh) Dr. Woda, do you recall

16    what literature you reviewed that assisted you in

17    forming your opinion?

18         MR. BROMBERG:  I'm instructing the witness

19    not to answer.

20         MR. WALSH:  It's a simple yes or no,

21    Counsel.

22         MR. BROMBERG:  I'm instructing the witness

23    not to answer, because you're establishing a

24    deposition procedure which is improper, and I'm not

25    going to allow it.  Okay?  We can end the deposition

Bruce A. Woda, M.D.

1     right now.

2          MR. WALSH:  No.  We can call the judge on

3     that if you really want to.

4          MR. BROMBERG:  Okay.  Well, I will confer

5     with my client, and maybe we will -- maybe we can --

6     you and I can talk off the record.

7          MR. WALSH:  Fair enough.

8          THE VIDEOGRAPHER:  Going off the record.

9     Time is 10:11.

10         (Recess was taken from 10:11 to 10:17.)

11         THE VIDEOGRAPHER:  We are going back on

12    the record.  Time is 10:17.

13     Q.  Dr. Woda, quick question going back to

14    where we were before.  What articles were of

15    particular importance to you in reaching your

16    opinion?

17     A.  Okay.  So let's start where we, I guess,

18    ended off during this deposition.  I would like to

19    have access to these notes.

20     Q.  Okay.  If you don't mind, let's mark the

21    one that you have in front of you as Exhibit 1.

22    Your counsel provided to me initially three

23    different sets of notes, one which is a three-page

24    breakdown of ten different articles, and then there

25    are, looks like -- I'm sorry, there are four.  Three

Bruce A. Woda, M.D.

1  separate pages specific to each Plaintiff; is that

2  correct?

3      A.  Correct, sir.  There are very are brief

4  clinical summaries and very brief notes on some of

5  the relevant papers.

6      MR. WALSH:  So let's mark the one with

7  regard to articles as Exhibit 1, and we'll mark the

8  other three as Exhibits 2, 3, and 4, please.

9      (Exhibits 1, 2, 3, and 4 marked.)

10     (Off-the-record discussion.)

11     MR. BROMBERG:  2 is Cannon?

12     MR. WALSH:  2 is Cannon.  3 is Larry

13  Jenkins -- Scott Jenkins, actually.  Goes by his

14  middle name.  And 4 is Pinnon.

15     A.  Very good.

16     Q.  First looking quickly at Exhibit 1, Dr.

17  Woda, when did you -- did you type this up?

18     A.  I certainly did.

19     Q.  And when did you draft this?

20     A.  My recollection is the first draft was

21  done -- today is Tuesday.  I believe on Sunday.

22     Q.  Fair enough.  Were you working off of the

23  handwritten notes that you referenced earlier?

24     A.  So this was prepared after work, looking

25  at the documents, specifically publications, looking

Bruce A. Woda, M.D.

1    at my handwritten notes, and any other data that I

2    thought was relevant within the publications

3    themselves. So it's a combination of things.

4        Q.  Specific to the article -- each article,

5    correct?

6        A.  Correct.

7        Q.  Are there elements of your handwritten

8    notes that are, say, in McDuffie, which is the first

9    article reference there, that do not appear on this

10   list or on Exhibit 1?

11       A.  So you're asking me if I wrote things on

12   the papers that aren't here.

13       Q.  Correct. Did you edit down what you

14   reviewed as relevant for today?

15       A.  I think if you look at Exhibit 1, you'll

16   see this is a very brief distillation of, you know,

17   one or two pertinent points. It's not -- this is

18   not meant to be a complete review of those papers,

19   so the review of those papers was certainly much

20   more extensive than what appears here, and I think

21   we've discussed that this is really just to make

22   sure that my memory is good, because I didn't want

23   this to be a memory test.

24       Q.  Fair enough, Doctor. And I -- this is one

25   of those sort of inside baseball things. I'm

Bruce A. Woda, M.D.

1    wondering if you have more extensive written notes

2    at home with regard to, say, these ten articles

3    listed in Exhibit 1.

4        A.  Certainly I have more extensive notes.

5        Q.  Thank you.  If you'd take a moment, then,

6    to review or look at Exhibit 1 and see if that will

7    help you refresh your memory with regard to the

8    articles that may have been pertinent for the

9    reaching of the opinion.

10       A.  Okay.  So repeat the original question.

11   What are you asking me?

12       Q.  Sure.  Were there -- were there articles

13   that were of particular importance to you in

14   reaching the opinion that glyphosate is not a

15   probable carcinogen?

16       A.  So there's a large body of literature

17   which I reviewed which is on the materials, I guess,

18   reviewed or submitted list, whatever the appropriate

19   term is, and certainly was considerably more

20   extensive what appears on this list.

21       Q.  I understand that.

22       A.  So those documents, I think, we've

23   discussed them, are quite a few epidemiological

24   articles, articles relating to potential mechanisms

25   of carcinogenesis, a number of EPA documents dealing

Bruce A. Woda, M.D.

1    with the issue of glyphosate as a human health

2    hazard, the IARC document. There are a number of

3    studies, epidemiologic studies which aren't on this

4    list and I didn't think really added too much to

5    this, I think, abbreviated list.

6         Q.  Fair enough.

7         A.  So certainly the review of the literature

8    was more extensive than this.

9         Q.  Understand that, Doctor, and we'll --

10   let's -- my question was a little different. Let's

11   see if we can work down to it. Your material

12   consideration list has, if I recall, 99, and I'm

13   making a slight presumption here, peer-reviewed

14   documents or articles that are on it. Exhibit 1 has

15   ten.

16        A.  Correct.

17        Q.  Is there a reason why you selected and put

18   notes for those ten as opposed to the other 89 and

19   included them on your notes for today?

20        A.  So I think if we go through the

21   literature, sort of a repetitive pattern of a number

22   of analyses of epidemiologic data as applicable to

23   human health hazards of glyphosate, and they tend to

24   be the same articles, and the question is why is

25   that.

Bruce A. Woda, M.D.

1          So I think if you go through the -- and I

2    know the EPA document, I think, went through, I

3    don't know, some number above 50 articles and

4    thought that, you know, a handful met the criteria

5    for being able to interpret the data appropriately.

6          I think there are a number of analyses

7    which have gone through the same iteration and have

8    honed in on these few papers as being the most

9    relevant for the, you know, question in

10   consideration.

11       Q.  Fair enough.

12       A.   And that's why the list is relatively

13   brief, because I think the literature has shown that

14   these are the studies, one, a cohort study, which

15   is, I believe, the most compelling study, the

16   agricultural health study, and then there are a

17   number of case-control studies, and this is another

18   cohort study which I think, you know, it's my belief

19   that the community is looking to these studies, you

20   know, for, you know, answers to the question that

21   we're considering.

22       Q.   Fair enough.  So my understanding, then,

23   is the ten you've identified in Exhibit 1 are after

24   your review of literature that you've reviewed,

25   those are the ten that you consider the most

Bruce A. Woda, M.D.

1    relevant on the issue?

2        A.   Most relevant based upon the

3    epidemiological studies.  I think the EPA paper or

4    review of not only the epidemiology studies but

5    other issues, human health issues, you know, it's

6    certainly very additive to this.  This is just

7    looking at, I think, a number of the epidemiologic

8    studies that I think the community is evaluating for

9    its relevancy.

10       Q.   So are there separate studies that you --

11   going to genotoxicity that you believe are relevant

12   to the question?

13       A.   So what do you mean by genotoxicity?

14       Q.   Are there a number of genotoxicity studies

15   that have been conducted with regard to glyphosate?

16       A.   So that's a very -- I think a very broad

17   term.  Can we narrow it a bit?

18       Q.   Well, first on that, is there a -- have

19   there been genotoxicity studies conducted with

20   regard to glyphosate?

21       A.   Yes, there have been a number of

22   genotoxicity studies that have been performed.  Some

23   of them are relevant, I think, to the question.

24   Relevant meaning showing that it's a human health

25   hazard.

Bruce A. Woda, M.D.

1      Q.  Correct.

2      A.  And some aren't.

3      Q.  Does the IARC monograph identify a series

4   of genotoxicity studies that the individuals

5   involved with that assessment of glyphosate consider

6   relevant to their assessment on whether or not

7   glyphosate is a probable carcinogen?

8      A.  So in my review of the IARC document, they

9   have reviewed a large -- you know, it's a large

10   number of studies with various assays and various

11   model systems and in various species, so mammalian

12   species, not mammalian species.

13         So as I said, there are a large number of

14   articles there, and I guess I've lost my train of

15   thought a little bit.  And your question about those

16   studies was?

17      Q.  It was a simple question initially, but

18   we'll break it down.  Did the IARC review group find

19   that there was strong evidence of genotoxicity with

20   regard to glyphosate?

21      A.  So IARC, in their review of the data,

22   which I don't agree with, but in their review of the

23   data they thought that there were some positive

24   assays, meaning that there was some effect of -- on

25   the genome of some species, but what they didn't

Bruce A. Woda, M.D.

1    show is that it's relevant to human carcinogenesis,

2    which I think is the issue, again, at hand.

3            So if you're doing a genotoxicity study in

4    frog tadpoles with very high doses of glyphosate, I

5    don't think that contributes anything to our

6    understanding of the potential of glyphosate to be a

7    human hazard.

8            When the EPA looked at the same data, they

9    didn't think that any of the nonmammalian studies

10   were important or contributory.  And my recollection

11   is greater than 95 percent of the studies -- or

12   maybe it was 99 percent; I'm not precise here --

13   were negative studies.

14           So I don't think there's good evidence

15   that IARC used -- you know, in a full evaluation, I

16   think what they really needed to do was to show are

17   these genotoxicity studies relevant to development

18   of human cancer, which they didn't do.

19       Q.   Quickly on Exhibit 1, are the ten studies

20   that you have identified solely EPA studies?

21       A.   These ten studies are either original

22   epidemiologic studies or meta-analysis of those

23   studies.

24       Q.   There's no toxicological studies within

25   the ten?

Bruce A. Woda, M.D.

1        A.  I don't think so.

2        Q.   All right.  Other than counsel, again --

3    and I understand -- I believe I know your answer to

4    this, but have you spoken -- following your review

5    of the literature, have you spoken with anyone

6    associated with Bayer or Monsanto with regard to

7    glyphosate?

8        A.   No, I have no -- have had no discussions

9    with Monsanto or Bayer.

10       Q.   Okay.  You conducted some additional

11   research in December specific to the three

12   individual Plaintiffs; is that correct?

13       A.   So I am very fuzzy on the dates.

14       Q.   Sure.

15       A.   So I've -- over the last -- October,

16   November, December -- so I've spent approximately

17   four months dealing with this, and I reviewed

18   Plaintiff medical records, and I can't recall the

19   date that they were actually sent to me.  It was

20   probably sometime in, best of my recollection,

21   January.

22       Q.   Fair enough.

23       A.   It could have been December.  I'm not -- I

24   can't remember the date that the boxes arrived at my

25   house.

Bruce A. Woda, M.D.

1      Q.   Again, all the time that you've spent on

2   this process, at least through the end of 2019, you

3   have billed all of that time to Hollingsworth?

4      A.   I believe my billing goes through the end

5   of 2019.

6           (Exhibit 5 marked.)

7           MR. WALSH:  Would mark as Exhibit 5 -- and

8   I apologize for the format that this is coming in,

9   but it was photocopied both sides -- is what was

10   produced in response to request number seven

11   associated with the Notice of Deposition and request

12   for documents.

13           The first document within that is a

14   September 19 letter from Robert Johnson at

15   Hollingsworth, LLP, to Dr. Woda, and after that

16   there are one, two, three pages which appear to be

17   invoices from Dr. Woda to Hollingsworth, LLP.

18      Q.   Doctor, if you'd look at the back of

19   Exhibit 5, actually the back three pages -- no, back

20   page. I'm sorry. Back page is right.

21      A.   Yeah.

22      Q.   Does that refresh your memory when you

23   reviewed the literature?

24           MR. BROMBERG:  Let him ask his question

25   first before you answer.

Bruce A. Woda, M.D.

1      Q.   Does that refresh your memory as to when

2   reviewed the medical records?

3      A.   Yes, this is very helpful.

4      Q.   All right.  And what -- with regard to the

5   three Plaintiffs, Mr. Cannon, Pinnon, and Jenkins,

6   what did you review?

7      A.   So I certainly reviewed the medical

8   records and specifically portions of them which I

9   thought were important to analyze these patients and

10  what their disease was.

11       If you looked at the medical record of

12  Mr. Cannon, it runs into many thousands of pages,

13  and I think the Plaintiffs' expert pathologist, I

14  think, billed $30,000 for review of that record.

15     Q.   For reviewing --

16     A.   I did not, yes.

17     Q.   And I'm sure Monsanto appreciates that.

18  For reviewing the records, for review --

19     A.   I think it's my time that appreciates it.

20     Q.   That's probably true, too.  For

21  reviewing --

22     A.   Or my sanity.

23     Q.   For reviewing medical records, what were

24  you looking for specifically to identify as

25  relevant?

Bruce A. Woda, M.D.

1       A.   Okay.  So I'd like to understand, you

2    know, how this disease presented, what the disease

3    was, and as a pathologist, you know, we're involved

4    in diagnosing medical diseases, and pathologists

5    provide, you know, I think, essential guidance to

6    clinicians for treatment of patients.  No patient

7    with cancer can get treated unless there's a

8    pathology report, and the pathology report has

9    information -- enough information so that the

10   treatment decision can be made.

11       So as a pathologist, I first focused on

12   that, what diseases these people have, were the

13   reports -- were they complete, were they

14   understandable, did they look at the issues which

15   were important in evaluating these patients' cases?

16   How were the patients treated, what happened to them

17   since their presentation.  One patient wasn't

18   treated in this case.

19       It's important to look at, you know, their

20   histories, you know, how did the disease develop,

21   what time course, how was it recognized.  Did they

22   have any underlying risk factors which could

23   contribute to their disease.

24       I think that's something that we look at.

25   And most times we don't find such kinds of relevant

Bruce A. Woda, M.D.

1    information, but there are some clues that one can

2    use, although that has nothing to do with your

3    diagnosis except for, you know, specific instances.

4    So if you're a woman who's had a breast implant,

5    it's important to know whether that woman had a

6    smooth capsule implant or rough capsule implant,

7    because we know that the rough capsule implants are

8    associated with a very rare form of lymphoma,

9    aplastic large-cell lymphoma.

10         If you have a patient that might have a

11   very unusual presentation of a disease such as --

12   I'm going to put some jargon out there -- a

13   plasmablastic lymphoma, which is a very uncommon

14   disease, but it has a high frequency in patients

15   with HIV.  So that's something that if I see a

16   plasmablastic lymphoma, I think it's important to

17   know whether it's known or not this patient has HIV.

18         There are occasional cases of

19   plasmablastic lymphoma which occur sporadically, and

20   that could be due to immunosenescence of aging.

21   Plasmablastic lymphoma is an EBV associated disease,

22   Epstein-Barr virus, which plays an important role in

23   transforming B cells.

24         So there are some clues in a patient's

25   history which, you know, can help either confirm or

Bruce A. Woda, M.D.

1    further define a diagnosis. So those are things

2    that I look at.

3        Q.  Okay. And I appreciate that, Doctor, but

4    looking at the history, kind of, for Mr. Cannon

5    involving all those hundreds of pages, and you

6    initially indicated you were looking for the

7    relevant documents, so for clarification, were you,

8    for example, looking at the -- the initial pathology

9    report?

10       A.  So the things I honed in on were his

11   initial, you know, history, physical examination,

12   laboratory data, and pathology reports.

13       Q.  Okay. And when you're saying --

14       A.  I spent a little less time looking at the

15   radiology reports. He has thousands of, you know,

16   imaging studies.

17       Q.  When you're looking at history, were you

18   looking at typically the oncologist's initial

19   records from his initial meeting --

20       A.  Right, the oncologist assessment.

21       Q.  Yeah. Would there be -- along with that

22   were you then looking at the subsequent oncologist

23   reports following treatment for the two of the three

24   Plaintiffs?

25       A.  I looked at a number of them, not all of

Bruce A. Woda, M.D.

1    them.  You know, Mr. Cannon probably has had, you

2    know -- he hasn't had a large number of follow-up

3    visits, and I did try to follow as many as I could,

4    and I thought it was important to try and look at

5    the -- you know, the last visit that was documented

6    in the medical record, which I think I managed to

7    do, although it's -- if you've gone through the

8    medical records, it's hard.  It's hard.  And, you

9    know, the indexing that that company provides is a

10   little bit useful, but it's still, I think, a little

11   difficult to figure out what date something happened

12   on.

13       Q.   And trust me, I appreciate it, because I'm

14   sure you review these a lot faster than it takes me

15   to get through them.

16            Question, though.  In your invoice to

17   Hollingsworth, you reference record review -- you

18   define it as record review.  I presume record is

19   medical record?

20       A.   Medical record, yes.

21       Q.   There is also interview review.  What is

22   that in reference to?

23       A.   I think that was -- must have been the

24   interview he gave, and I don't recall -- I think it

25   was at his deposition.

Bruce A. Woda, M.D.

1      Q.   Would it be -- did you read his deposition

2    transcript as well, or was there a separate document

3    or interview notes?

4      A.   I read the deposition transcripts.

5      Q.   Okay.  Good cure for sleep.  There's also

6    a reference there for literature review.  Specific

7    to these three Plaintiffs, what literature were you

8    reviewing?

9          MR. BROMBERG:  Just ask the witness to

10   face -- face the camera when you're testifying, not

11   Plaintiffs' counsel.

12         THE WITNESS:  Okay.

13         MR. BROMBERG:  You have a very nice side

14   view, but I'm sure the jury would like it straight

15   on.

16         THE WITNESS:  Sorry.  We're trying to have

17   a conversation.

18         MR. BROMBERG:  Sure.

19     A.   So I don't have a clear recollection, and

20   I could speculate, which I probably shouldn't

21   speculate.

22     Q.   Fair.

23     A.   So this prompted me to do, obviously, some

24   literature review on 12/22, which took me a total of

25   ten minutes.

Bruce A. Woda, M.D.

1        Q.  Well, above you have also an interview

2    reviewed and literature review for 35 minutes.

3        A.  Correct.

4        Q.  Is that a -- both a literature and trial

5    transcript or deposition transcript?

6        A.  So inter- -- I think my term of interview

7    review I think is imprecise.  I think it should be

8    deposition review.

9        Q.  Did you also review interview notes from

10   Stephen Petty for each of the three Plaintiffs?

11       A.  I looked at them exceedingly briefly and

12   spent very little time on them.

13       Q.  All right.  Going to the three Plaintiffs,

14   have you examined any of the three men?

15       A.  No, I have not examined any of the

16   individuals.

17       Q.  Okay.  Have you spoken to any of the three

18   men?

19       A.  I have not spoken to them.

20       Q.  Have you seen photographs of any of the

21   three men?

22       A.  No, I have not.

23       Q.  Have you reviewed pathology slides for any

24   of the three?

25       A.  Yes, I have.  I've seen pathology slides

Bruce A. Woda, M.D.

1    for all of the individuals.

2        Q.  Okay.

3        A.  Though I did not have an opportunity to

4    look at the original diagnostic biopsy of

5    Mr. Cannon's inguinal lymph node.

6            MR. BROMBERG:  I would just state for the

7    record that obviously some of the pathology is no

8    longer available, and we're still trying to obtain

9    certain pathology slides.

10       Q.  For Mr. Cannon, do you concur with the

11   doctor's diagnosis of follicular lymphoma?

12       A.  So for Mr. Cannon the original biopsy, and

13   thank you for letting me refer to my notes, which

14   was done in 2008, I thought the report that was

15   rendered was -- was good.  I have no reason to

16   question it.  And that case was reviewed also at the

17   Mayo Clinic and at Barnes-Jewish Hospital.  I think

18   there was good concurrence that he had follicular

19   lymphoma, and follicular lymphoma is graded grade

20   one, grade two, grade three.  It was thought that

21   his lymphoma was a grade one.

22           The grades have to do with the number of

23   large cells and are loosely correlated with outcome

24   if you're in the US.  If you're in Europe, they

25   don't pay any attention to the grades of follicular

Bruce A. Woda, M.D.

1    lymphoma.  They consider them interchangeable.  And

2    I'm not going to digress and tell you how the

3    scoring system came about, which you'd be amazed if

4    I told you.

5         So -- and he also had ancillary studies

6    done on that lymph node, and he had flow cytometry

7    which showed his lymphoma had characteristics of a

8    follicular lymphoma.

9         Q.  Okay.  So do you agree with the diagnosis?

10        A.  Yes.

11        Q.  Okay.  Do you agree with the course of

12   treatment that his doctors followed for him?

13        A.  So treatment is not an area of my

14   expertise, so I can't comment on the specific issues

15   regarding this patient and his treatment.

16        Q.  All right.  Do you agree that his exposure

17   to Roundup was a substantial contributing factor to

18   his development of Non-Hodgkin's lymphoma?

19        MR. BROMBERG:  Object to the extent it

20   calls for a legal conclusion.

21        You can answer.

22        A.  So in evaluating this patient and his

23   history, I do not think Roundup was the cause of his

24   lymphoma.  I don't -- in my review of the

25   literature, I don't think there's evidence that

Bruce A. Woda, M.D.

1    Roundup is a contributing factor for his lymphoma.

2        Q.  Fair enough.  For Mr. Pinnon, do you

3    concur with the doctor's NHL diagnosis of -- I was

4    cutting myself off.  But his diagnosis of chronic

5    lymphatic leukemia -- lymphocytic, I apologize.

6        A.  Yes, in reviewing this patient's history,

7    I agree with the diagnosis of chronic lymphocytic

8    leukemia.

9        Q.  Do you agree with the treatment that was

10   initiated or followed for Mr. Pinnon?

11       A.  Okay.  So to the best of my knowledge,

12   Mr. Pinnon has not received treatment, and I think

13   treatment issues are not in my area of expertise, so

14   I'm not going to comment on them.

15       Q.  All right.  Do you agree that his exposure

16   to Roundup was a substantial contributing factor to

17   his Non-Hodgkin's lymphoma?

18       A.  I do not agree that Roundup was a

19   contributing factor, and I don't think there's

20   evidence to suggest that it could be.

21       Q.  For Mr. Jenkins, do you concur with the

22   doctor's diagnosis of follicular lymphoma?

23       A.  Yes, for Mr. Jenkins, I've looked at his

24   slide, and I agree with his diagnosis of a low-grade

25   or a follicular lymphoma.

Bruce A. Woda, M.D.

1    Q.  Okay.  Do you agree with the course of

2    treatment recommended and followed for Mr. Jenkins?

3    A.  Again, treatment issues are beyond my area

4    of expertise, so not going to comment on that.

5    Q.  Do you agree that his exposure to Roundup

6    was a substantial contributing factor to his

7    development of Non-Hodgkin's lymphoma?

8    A.  No, I do not agree that Roundup was a

9    contributing factor to the development of his

10   lymphoma.

11   Q.  Do you agree that evidence exists that

12   glyphosate may cause various forms of Non-Hodgkin's

13   lymphoma?

14   A.  I do not agree with that, and I think

15   there are a number of organizations, both

16   internationally and in the US, that don't agree with

17   it.

18   Q.  Is there evidence that glyphosate is

19   genotoxic?

20   A.  And in this setting, by genotoxic --

21   Q.  Damaging the gene within the cell, human

22   gene, if you prefer.

23   A.  So your question was -- is -- if I can

24   just rephrase it, is Roundup genotoxic to human

25   cells.  I don't think there's evidence that Roundup

Bruce A. Woda, M.D.

1    is genotoxic to human cells.

2        Q.  Is there evidence that glyphosate is

3    genotoxic?

4        A.  To human cells or any cells?

5        Q.  To human cells.

6        A.  I don't believe that that evidence exists.

7        Q.  Okay.  Is there evidence that glyphosate

8    is genotoxic to animal cells?

9        A.  My recollection of the animal studies were

10   mammalian.

11       Q.  Fair enough.

12       A.  And in restricted mammalian studies

13   there's a greater than 90-plus percent or -- it's --

14   greater than 95 or 98 percent are considered to be

15   negative, and the question is are they looking at

16   the right endpoint.

17           So the term genotoxicity is exceedingly

18   broad, and we know that while we're sitting here our

19   cells are busily replicating their DNA, and our DNA

20   polymerase is trying to keep up with it but is

21   making errors, and those errors are, you know,

22   irrelevant.

23           So the important issue is are -- if

24   there's any alteration in our DNA, is it something

25   which affects the life of the cell or the life of

Bruce A. Woda, M.D.

1    the individual, and I think that's -- that's an

2    important issue.

3         So I don't think there are any studies

4    that show that there is a relevant alteration in

5    DNA, certainly not in human cells, and I think the

6    cells with the studies that might suggest that there

7    is some alteration in DNA in mammalian species, none

8    of them have shown that actually has an effect on

9    the species involved, meaning that it's an

10   inheritable change in DNA which is deleterious to

11   the life of the animal.

12       Q.  You're unaware, then, of genotoxicity

13   studies, and we'll take it broader for mammalian

14   cells, where glyphosate is impacting the DNA string

15   by causing breaks within the DNA string?

16       A.  So I think there are -- do you have a

17   specific study in mind?

18       Q.  I can get to them later.  I actually do

19   have specific studies to ask you about later.  Do

20   you recall reading any specific studies dealing with

21   genotoxicity and the fracturing and breaking of DNA

22   strands in the course of this litigation?  I

23   understand it's entirely possible you read something

24   five years ago.

25       A.  So to the best of my recollection, if such

Bruce A. Woda, M.D.

1    a study exists, when the EPA reviewed those studies,

2    they did not consider them compelling or convincing

3    evidence that these would be important alterations

4    in the cell's DNA.  We discussed, I think, the

5    important alterations are the ones which change the

6    nature of the cell in terms of changing their growth

7    potential.

8          We know that -- you know, we've discussed

9    that right now we have DNA mutations going on all

10   the time, but the way that, you know, we're

11   constructed is that we have a set of redundant

12   systems to eliminate those kinds of cells if they do

13   occur.  So if you have a cell which has an

14   alteration which -- the body will try to repair it

15   if it's important or will try to kill the cell.

16         We know that each of us has what we call

17   polymorphisms in our DNA, which are not important,

18   so these are single nucleotide changes which are not

19   really relevant to human health.

20     Q.  All right.  Just want to --

21         MR. BROMBERG:  Were you finished with your

22   answer?

23         THE WITNESS:  Yeah.

24     Q.  Sorry, I read it as a break.  Apologize

25   if --

Bruce A. Woda, M.D.

1      A.  No problem.

2      Q.  Just want to finish up on the invoices.  I

3  presume, based on this, you have not billed

4  Hollingsworth yet for your time in January.

5  Approximately how much time have you spent in

6  January on this litigation?

7      A.  I haven't added it up yet.  Just a

8  ballpark figure, prior to today, 30 hours or so.

9  Maybe a little more.  Probably not less.

10     Q.  In this month?

11     A.  Yes.

12         MR. BROMBERG:  In January?

13     Q.  I'm sorry, yeah, January, early February.

14  So probably double what you spent in 2019?

15     A.  Double or triple.

16     Q.  Fair enough.  What was the division of the

17  time you spent in January and February?  And if

18  that's unclear between deposition transcripts versus

19  literature versus medical records or the like.

20     A.  So I think there are a combination of

21  activities.  One is reviewing the medical records as

22  necessary.

23     Q.  Okay.  Some of the slides that have come

24  to -- I think one of the slides came just last week,

25  which I reviewed.

Bruce A. Woda, M.D.

1          I'm continuing to review literature.

2     Preparation for our conversation today.

3          MR. BROMBERG:  Deposition.  Not a

4     conversation.

5     Q.   All right.  Let's see if we can break it

6     down.  During January do you have a ballpark number

7     for how many hours you spent on continued literature

8     review?

9     A.   You know, I haven't looked at it.  It

10    would require considerable speculation to see how it

11    broke down between those three areas.  I think

12    review of the patient records in January was

13    certainly a more minor component.  Reviewing

14    literature and preparation for deposition was a more

15    major component.

16    Q.   Okay.  How much time did you spend

17    preparing for this deposition?

18    A.   I haven't looked at, you know, my count up

19    of the hours yet.  I think it's considerable.

20    Q.   Two, three full days?  Five days?

21    A.   Again, this is asking for some

22    speculation.  I'm sure it's been -- you know, if a

23    day is eight hours, I'm sure it's somewhere around

24    three, four days, something like that.

25    Q.   Okay.  Have you also been reading

Bruce A. Woda, M.D.

1    transcripts from depositions conducted in this or

2    other glyphosate-related cases?

3        A.  Thanks for reminding me.  I did read a

4    number of depositions.

5        Q.  And were those depositions of experts in

6    this case?

7        A.  Yes, I read the depositions of two

8    oncologists and a pathologist.

9        Q.  All right.  Do you recall their names?

10        A.  The oncologists were Dr. Lacasce and

11    Dr. Jacobson, and I believe the pathologist's name

12    was Dr. Staggers.

13        Q.  So roughly ballpark outside of today,

14    you've spent approximately 45 hours on work involved

15    in this litigation?

16        A.  I wouldn't want to be asked to give a

17    specific timeframe, because I haven't added up the

18    number of hours yet, but it's been a considerable

19    amount of time.

20        Q.  And along with prepping for today's

21    deposition, that time includes reading and reviewing

22    132 pieces of literature, deposition transcripts,

23    and the like?

24        A.  I can't give you a specific number of how

25    many things I've reviewed and not reviewed.

Bruce A. Woda, M.D.

1          (Exhibit 6 marked.)

2          Q.  Fortunately, I can.  We'll mark as

3     Exhibit 6 Dr. Woda's materials considered list.

4     This is the list that we received last week.  I

5     apologize.  I know you sent an amended one last

6     night, which I did not have a chance to make copies

7     of.  My review of comparing the two is there's a

8     difference.  The only difference between that and

9     the amended version and the one being marked as

10    Exhibit 6 is a single deposition for the doctor of

11    Mr. Cannon.

12         A.  Oh, yes, I did review that, Dr. Riordan's

13    deposition.

14         MR. BROMBERG:  We've been going for about

15    an hour.  Can we --

16         MR. WALSH:  I was just about to suggest a

17    break.  Two more questions?

18         MR. BROMBERG:  Sure.

19         Q.  Dr. Woda, for the time you spent, I just

20    want an idea based on Exhibit 5, you're receiving

21    compensation of $400 an hour?

22         A.  Correct.

23         Q.  And my understanding is for your

24    appearance today you will receive $550 an hour.

25         A.  That's correct.

Bruce A. Woda, M.D.

1           MR. WALSH: Let's take a break and go off

2    the record.

3           THE VIDEOGRAPHER: Going off the record.

4    Time is 11:03.

5           (Recess was taken from 11:03 to 11:10.)

6           THE VIDEOGRAPHER: We are back on the

7    record. Time is 11:10.

8           (Exhibits 7 and 8 marked.)

9       Q.  (By Mr. Walsh) Okay. Dr. Woda, just so

10   you know, and for the reference on the record, I'm

11   not going to refer you to them now, but we've marked

12   as Exhibit 7 the amended notice of your deposition

13   for today so that we get to -- we'll all autograph

14   it, and you can remember it fondly in the future if

15   you'd like. Exhibit 8 is the single page specific

16   to you out of Defendant's designation of experts in

17   this case. And actually I will allow you just to

18   look at that if you want.

19      A.  Okay.

20      Q.  Have you seen that description of your

21   areas for which you're being -- you may be offered

22   as an expert in this case before?

23      A.  So this is the first time I've seen the

24   document. I was aware of the contents of the

25   document.

Bruce A. Woda, M.D.

1       Q.   Fair enough.  And we're going to move on

2    from there.

3            Doctor, so you know, we're moving forward

4    from now.  Basically divide the deposition in three

5    parts.  The first is going to look at questions that

6    I would lump into specific causation.  They're

7    generally going to be specific to the three

8    Plaintiffs.

9            Second portion will be a general causation

10   question of whether or not glyphosate is a probable

11   carcinogen related to that.

12           And the third and closing, and with any

13   luck we can do that quickly, will be your background

14   and information, general knowledge, your experience

15   at the University of Massachusetts Medical Center,

16   and things like that.

17      A.   Okay.

18      Q.   And I'm hoping, initially, as we move into

19   this, that the questions as this enters your areas

20   of expertise we can go through it a little quickly.

21   Mostly I have questions going to sort of initially

22   to questions that go to foundation.  I'd be correct

23   that lymphoma is essentially a cancer of the

24   lymphatic system?

25      A.   Lymphatic system, that's a very broad

Bruce A. Woda, M.D.

1    term. It also includes the lymphatics themselves,

2    which are vascular channels that contain fluid.

3    Lymphoma does not include neoplasms of lymphatics.

4    Lymphatic system in general is believed to include

5    components of the immune system, and usually that

6    would not be the extranodal immune system, so -- but

7    in general, the broad term is lymphomas are a

8    neoplasm of the lymphoid system or lymphatic system,

9    so I think that's reasonable.

10       Q.  And in general, then, the lymphatic system

11    is the body's way of fighting germs or essentially

12    our immune system?

13       A.  Right. So the immune system is a major

14    component of the lymphoid system. It occurs in all

15    of our tissues, and it's really evolved over time to

16    do several things. One is to help us fight against

17    external pathogens, viruses, bacteria. There's a

18    control over ability to detect autoantigens. I

19    mean, reacting against self, and there is some

20    evidence that chronic lymphocytic leukemia may be

21    one of these diseases, which is an interesting

22    issue. And it's become very evident in the last

23    half a dozen years that the immune system is very

24    active in fighting against cancer.

25         And I just might say, and this is really

Bruce A. Woda, M.D.

1   not really relevant to this issue, is that I

2   published a paper, I think, in 1980 or 1981 showing

3   that we could kill off tumors in rats with isolated

4   T-cells, and that was the first time that was ever

5   done. I wish I would have pursued that more.

6      Q.   Looking for a trip to Stockholm on that?

7      A.   That's been done, yes.

8      Q.   And you sort of have gotten down to where

9   we're starting to branch. The cancer in the system

10  is initially typically divided betweens Hodkin's and

11  Non-Hodgkin's lymphoma?

12     A.   Correct. So there is a major division

13  into Hodkin's lymphoma and Non-Hodgkin's lymphoma.

14  They have different clinical courses and different

15  pathological features. There is a category of

16  lymphoma, which is overlap between Hodkin's and

17  Non-Hodgkin's, and that's a term gray-zone lymphoma,

18  and that's because it's in an unclear or --

19     Q.   And with regard to Non-Hodgkin's lymphoma,

20  a few sort of minor peripheral categories aside,

21  that then is further divided between B-cell and

22  T-cell?

23     A.   So the major categories would be B-cell

24  and T, or T or T and K-cell lymphomas. I think

25  there's probably at least approximately 60

Bruce A. Woda, M.D.

1    subcategories in those lymphomas, and they have

2    different pathologic characteristics, different

3    clinical characteristics, different molecular

4    characteristics, so pathologists have done a good

5    job of subdividing lymphomas into numerous types.

6        Q.   Follicular lymphoma is a form of B-cell

7    NHL?

8        A.   Follicular lymphoma is certainly a form of

9    B-cell Non-Hodgkin's lymphoma. It's one of the more

10   common lymphomas. So B-cell Non-Hodgkin's lymphoma,

11   probably constitutes, you know, approximately 25 to

12   30 percent of B-cell Non-Hodgkin's lymphoma.

13       Q.   As far as a point of -- I may get this

14   wrong, point of origination, is there a

15   distinction -- or what is the distinction between

16   lymphoma and leukemia?

17       A.   Okay. So leukemia we refer to as a

18   neoplasm, which is present predominantly in blood

19   and bone marrow; lymphoma predominantly in a tissue

20   or a lymph node. There are a number of diseases

21   which this becomes a semantic issue, and one of them

22   being, you know, T lymphoblastic lymphoma, which

23   often has -- which can have tissue involved and can

24   have blood and bone marrow involved.

25            Chronic lymphocytic leukemia is another

Bruce A. Woda, M.D.

1   one, and that's why the nomenclature is actually

2   chronic lymphocytic leukemia, you know, backslash

3   small lymphocytic lymphoma, because patients

4   usually -- almost usually have blood, bone marrow,

5   and tissue involvement.

6       Q.   For Non-Hodgkin's lymphoma, ultimately

7   there are going to be multiple mutations within the

8   body first?

9       A.   So I think that -- that, I think, varies

10  from scenario to scenario.  So there are certain

11  mutations which are highly associated with one kind

12  of lymphoma or leukemia and another.  Regretfully,

13  the data on Non-Hodgkin's lymphoma is not as

14  extensive as the data we have on acute myeloid

15  leukemia, where the classification of acute myeloid

16  leukemia is based on genotypic findings.

17          In Non-Hodgkin's lymphoma, we tend to work

18  at a more basic level.  So for instance, in diffuse

19  large B-cell lymphoma, it's common for those

20  patients to have a translocation of BCL6 gene.  So

21  there are certain types of lymphoma which have

22  characteristic chromosomal findings generally.

23      Q.   And you carried over, I think, into my

24  next question.  Or -- is there understood a minimum

25  latency period before the development of

Bruce A. Woda, M.D.

1    Non-Hodgkin's lymphoma?

2       A.   So latency is something which I think we

3    wish we understood a lot better.  And the data I

4    look to -- and again, I think it's not as defined as

5    well as we'd like.  I think the relevant data -- or

6    I think the data we have, whether it's relevant in

7    the general population, we don't know -- so if you

8    had an organ transplant, and you happen to be

9    Epstein-Barr virus seronegative, meaning you've

10   never been infected with EBV before, and we know

11   that virtually all of us have experienced EBV

12   infections, and some of them have been symptomatic,

13   most of them are not symptomatic, but we have

14   immunity to EBV.

15        So if you give an EBV seronegative

16   individual a tissue transplant from an EBV positive

17   individual, they can develop a lymphoma relatively

18   rapidly.  You know, I think in the range of six

19   months, a year.  And this is, I think, highly

20   concentrated in the pediatric age group or in the US

21   the infection with EBV usually doesn't occur until

22   later in age, usually the early teen years.

23        If you look at adults who have had

24   transplants and then developed lymphomas, I think

25   the median timeframe is several years, but again, I

Bruce A. Woda, M.D.

1    think this is a special category.  In those

2    individuals, Epstein-Barr virus plays a very strong

3    role in the proliferation of those cells.

4         So without a fast driver like that, you

5    know, it's not clear what the latency would be.

6         So for instance, in chronic lymphocytic

7    leukemia, someone of my age, probably has a 20 to

8    30 percent chance of having chronic lymphocytic

9    leukemia cells circulating in my blood.

10        Literature will tell us, after following

11   these people, that they developed CLL at a rate of

12   one percent per year.  So based upon my expected

13   lifespan, and if I had those cells, you know, I'm

14   still not likely to get CLL, but the latency in

15   someone like that is in decades.

16   Q.  Okay.

17   A.  If -- if -- similar thing is true of, you

18   know, follicular lymphoma.  And the data is not as

19   good there, but there's a minor population of us

20   which has cells with (14;18) translocation, which is

21   specific -- or characteristic of follicular

22   lymphoma, and we don't develop lymphoma.

23        So latency, you know, that may or may not

24   be relevant to the patient's health that they'll

25   never develop lymphoma, but they have these cells.

Bruce A. Woda, M.D.

1    Q.   And there's another mutation --

2         MR. BROMBERG:  Were you done with your

3    answer, Doctor?

4    A.   No.  I think I had something else to say.

5    Q.   I apologize.

6    A.   So the other issue which you have to, I

7    think, take into account with latency is how fast do

8    cells grow so you actually can detect a tumor?  And

9    that depends on cell growth rate and where the tumor

10   is located.

11        So we know that tumors start from the

12   single cell.  There's one cell that goes bad.  It's

13   called -- it's a clone, but for a tumor to be

14   detectable, you have to have trillions of cells.

15   And just for comparison, one centimeter cube, so if

16   you have a one-centimeter lymph node, it's lymphoma,

17   you have a billion cells there.

18        So how long does it take for the one cell

19   to become a billion cells?  And I don't have a clear

20   idea, and I haven't seen clear studies to say that

21   if the tumor started with one cell become relevant

22   that it grew into trillions of cells, or it became,

23   you know, infected or became detectable what that

24   timeframe is.  And that timeframe depends on the

25   doubling rate of the cells.  And we don't know that

Bruce A. Woda, M.D.

1    precisely enough.

2          Sometimes -- you know, I think you asked a

3    very complicated question. Depends on what kind of

4    lymphoma, what the cell growth rate is, where it's

5    located. You know, if you happen to have a lesion

6    in the brain, you might detect that right away. If

7    you happen to have a lesion in the spleen, it may go

8    undetected for years.

9      Q.  Couple of things as a follow-up. First,

10   prior to that single cell, there will be, in all

11   likelihood, a series of mutations prior to that

12   until it gets to that initial cancerous cell,

13   correct?

14         MR. BROMBERG: Objection to form.

15   Overbroad.

16     A.  Okay. So I think the question you're

17   asking is how many mutations does it take for cells

18   to become a cancerous cell. If you're talking about

19   chronic myelogenous leukemia, it may only take one.

20   So there's a specific transmutation associated with

21   that.

22         If you're talking about follicular

23   lymphoma, there is a potential it could only take

24   one, (14;18) translocation.

25         I don't think we've studied the sequence

Bruce A. Woda, M.D.

1   well enough of follicular lymphoma cells to see how

2   many mutations are actually present and of the ones

3   present what are actually necessary and sufficient.

4       Q.  Is there -- and I think you just went to

5   this.  Is there anything that has specifically

6   addressed within medical or scientific literature

7   that proves the actual cause of the mutation in the

8   first place?

9       A.  Okay.  That's a -- my phone is buzzing, so

10  it's tickling me.  So -- sorry.  If you just repeat

11  the question, sir, and I apologize.

12      Q.  Sure.  Does the -- within medical or

13  scientific literature, has it been proven that there

14  can be an actual single cause for the mutation to

15  occur?

16          MR. BROMBERG:  Objection.  Form.

17      Q.  Too broad a question?

18      A.  Yeah.  I think a single cause is a very

19  broad question.

20      Q.  Fair enough.  Can the actual cause be

21  something internal, such as caused by a virus?

22          MR. BROMBERG:  Cause of the mutation?

23          MR. WALSH:  Yes.

24      A.  So there certainly is a virus, a human

25  T-cell leukemia lymphoma virus, which is associated

Bruce A. Woda, M.D.

1    with a diseased T-cell leukemia lymphoma. So the

2    virus is definitely involved in the pathogenesis of

3    that disease.

4        Q.  Okay. Can the actual cause be external,

5    such as exposure to either a chemical or radiation?

6        MR. BROMBERG: Objection to form.

7    Compound.

8        A.  So my understanding of the question you're

9    asking, if you can have an external cause, which

10   eventuates in alterations of DNA.

11       Q.  Correct.

12       A.  So I certainly think if someone receives

13   cytotoxin chemotherapy -- and the way that cytotoxin

14   chemotherapy works is through, you know, either

15   interfere with DNA synthesis or induce errors in DNA

16   synthesis. That's certainly an external substance

17   that affects our DNA. So in that case, yes, there's

18   a connection between the external substance and the

19   DNA alteration.

20       Q.  How about more, you know, general

21   chemicals such as exposure to benzine?

22       A.  I think there is literature that benzine

23   is associated with acute leukemia, and there is

24   literature suggesting that benzine might be

25   associated with Non-Hodgkin's lymphoma.

Bruce A. Woda, M.D.

1        Q.   Within the setting of Non-Hodgkin's

2   lymphoma, what does idiopathic mean?

3        A.   The way I use idiopathic is no known

4   cause.

5        Q.   Does that rule out a cause or just the

6   reality that the doctors, pathologists, oncologists

7   does not know the cause?

8        A.   So by saying that we don't know the cause,

9   I think certainly couldn't mean that we -- that

10  there couldn't be a cause, right?  Just we don't

11  know.

12       Q.   Fair enough.  Are -- do you believe that

13  the majority of diffuse large B-cell lymphomas are

14  idiopathic?

15       A.   Yes, I believe that the majority of

16  diffuse large B-cell lymphomas are idiopathic or no

17  known cause.

18       Q.   Okay.  When we're discussing cause, and

19  this is trying to clarify, are we talking the actual

20  cause or just an enhanced risk?

21            MR. BROMBERG:  Objection to form.  Vague.

22  Can you read back the question?

23            (Record read by the reporter.)

24       A.   So I think that's -- if I understand the

25  question correctly, it's really a two-part question.

Bruce A. Woda, M.D.

1      Q.  Okay.

2      A.  So the cause, the way -- is the way I

3  understand it, would be an alteration in the cell

4  which would allow it to proliferate, not die, and to

5  grow in an area that it's going to grow in to form a

6  tumor.

7          And the question is what's -- is there a

8  risk that that cell actually will undergo

9  transformation.  And I think there are external

10  risks which we can look at.  One of the paradigms of

11  this -- you know, we discussed the Epstein-Barr

12  virus a little bit, but certainly with the

13  immunosenescence of aging, a number of lymphomas are

14  associated with Epstein-Barr virus.

15          If you have, let's say, autoimmune

16  disease, which increases the cellular proliferation

17  of your lymphoid system, you might be at enhanced

18  risk.  There are other exposures which may be

19  enhanced risks, such as, potentially, hydrocarbons,

20  obesity, family history.  So there are a number of,

21  I think, factors which can influence this, but it is

22  my belief that a majority of -- I think we were

23  talking about diffuse large B-cell lymphoma.  We

24  don't have a proximate cause right now to determine

25  idiopathic.

Bruce A. Woda, M.D.

1          And I think the immune system is a very

2     special system, and it is different than other cells

3     in the body.  So we only have 23 pairs of

4     chromosomes, and the immunoglobulin gene is present

5     on chromosome 14, and there's a short region which

6     encodes it, but we have to make immune responses

7     against infinite number of antigens.  Question is

8     how do we do that.

9          So without increasing, you know, the size

10    of that chromosome or increasing the number of

11    chromosomes we have, how do we generate enough

12    diversity in the immune system that we can react

13    with an infinite number of inciting agents?

14          And the immune system evolved to be able

15    to do that in terms of repiecing various fragments

16    of those genes together.  And to repiece those

17    fragments of genes together, the chromosome has to

18    naturally break, and then it has to rejoin, and that

19    can go awry.  And approximately 99 percent of the

20    cells in our follicle centers where B-cell diversity

21    is developed and where we think diffuse large B-cell

22    lymphoma, one of the types may arise from

23    follicle-center cell, derived cell.  So those genes

24    have to reanneal, and that can go wrong, and

25    99 percent of those cells die because it goes wrong.

Bruce A. Woda, M.D.

1              If, by chance, and I think it's chance,

2      that you have a translocation of the BCL6 gene into

3      that locus, then there is a potential, and that cell

4      may not survive.  And as I said, we know that 99

5      percent don't, but that can go on to form a tumor.

6      In that case, that would be the cause.

7              And the risk here is increased cell

8      proliferation.  One example I gave, someone has an

9      autoimmune disease.  So it's well-known that the

10     incidence of -- bring up the term Burkitt lymphoma

11     in Africa, which is endemic, occurs in children, is

12     also associated with malarial infection, and the

13     question of why -- what's the association.

14             So it's thought that the malaria increases

15     the proliferation rate of those cells, leading to an

16     enhanced chance that the recombination of the

17     chromosomes will not occur properly and can

18     eventuate in a neoplasm.

19             So the immune system is set up to do this

20     and certainly have control mechanisms, but if you

21     perturb the immune system, you would be at increased

22     risk of developing a lymphoma.

23         Q.  Okay.  So as I understand what you're

24     saying, using the last example, but we'll go through

25     a couple of them, malaria serves as enhancing the

Bruce A. Woda, M.D.

1    risk of developing Burkitt's as a form of

2    Non-Hodgkin's lymphoma?

3         A.   Right.  And it's thought to do that by

4    increasing the proliferation of those leukocytes.

5         Q.   And equally you've referenced Epstein-Barr

6    virus, and actually we'll take a tangent there,

7    approximately by middle age isn't the -- don't the

8    vast majority of adults in the United States have

9    the Epstein-Barr virus present?  And what I mean

10   vast majority, it's in excess of 85 percent.

11        A.   Right.  Virtually all of us have been

12   exposed to Epstein-Barr virus.

13        Q.   And when you're using the reference again,

14   it was a matter of EBV enhances the risk or may

15   impact the risk of developing Non-Hodgkin's lymphoma

16   as opposed to being the cause of Non-Hodgkin's

17   lymphoma?

18        A.   Okay.  That's a -- another interesting

19   question.  EBV here is a double-edged sword.  So in

20   the setting of a posttransplant lymphogranular

21   disorder, EBV may be the inciting agent to cause

22   increased lymphoid proliferation, or it actually may

23   be involved in transforming the cell.  So -- and

24   this has been debated for a very -- you know,

25   considerable amount of time.  EBV transforming the

Bruce A. Woda, M.D.

1    cell which just happened to be present in the cell,

2    or is it a cofactor for stimulating the immune

3    system.

4            So when this has been studied.  It's been

5    shown that the EBV is clonally integrated, and this

6    is not in all -- all cells that are EBV positive,

7    but in Hodgkin lymphoma, which is EBV positive or in

8    a number of B-cell lymphomas, the EBV is clonally

9    integrated, meaning that the EBV is likely to have

10   played a transforming role in that cell.

11           Many years ago I published a paper on

12   this, looking at LMP1 alterations and EBV and then

13   throw in the pathogenesis of diffuse large B-cell.

14   So I believe that EBV, in the right circumstances,

15   can be transforming by itself.

16      Q.  And that's typically in an organ

17   transplant situation?

18      A.  The one I discussed about the LMP

19   alterations was a -- not organ-transplant related,

20   so EBV in organ-transplant-related cases, I'm unsure

21   of the literature that -- of what proportion of

22   cases the EBV is clonal versus not clonal.  This

23   isn't very often studied, but there is, I think,

24   evidence in a number of studies, especially in

25   Hodgkin lymphoma, that show that EBV is a clonal

Bruce A. Woda, M.D.

1    entity.

2        Q.   Just as a final sort of example for what

3    you're discussing, immunodeficiency would also be

4    something that's not necessarily -- is not a cause

5    of Non-Hodgkin's lymphoma but rather something that

6    enhances the risk of developing Non-Hodgkin's

7    lymphoma?

8        A.   Correct.  I would see it as a risk factor

9    for Non-Hodgkin's lymphoma.

10       Q.   Okay.  And that -- we've sort of moved

11   around it and danced with them a little bit.  What

12   risk factors are you aware of that apply for

13   Non-Hodgkin's lymphoma, for the development of

14   Non-Hodgkin's lymphoma?

15       A.   Okay.

16           MR. BROMBERG:  Objection to form.  Are you

17   asking him for every type of Non-Hodgkin's lymphoma?

18           MR. WALSH:  That he's aware of.

19       A.   Okay.  So there are certainly a number of

20   which have been identified that we wonder about, and

21   I'm sure my list is not going to be as complete as I

22   might like, so I think we've discussed

23   immunodeficiency; autoimmune diseases; human

24   immunodeficiency virus, or HIV; human T-cell

25   leukemia lymphoma virus, or HTLV1; chronic

Bruce A. Woda, M.D.

1    inflammation, and there are some pleural-based

2    lymphomas that chronic inflammation plays a role;

3    anaplastic large cell lymphoma we've discussed

4    associated with breast implants. So those go into

5    the area of sort of chronic immune stimulation.

6         Other risk factors we think about are

7    certainly family history, exposures to hydrocarbons,

8    obesity, and my guess is I'm probably missing some.

9    I think senescence of the immune system, which we

10   all will experience. So I don't mean this to be a

11   complete list, but it's a list which I --

12       Q.  And, Doctor, I just want to -- we're

13   working off these. Would you agree that Hepatitis C

14   presents as a risk factor?

15       A.  Thank you for reminding me, sir. So we

16   have hepatitis C, and then we get to the other

17   infectious causes like helicobacter pylori,

18   chlamydia with ocular lymphomas.

19       Q.  I know you didn't mention it. You

20   previously mentioned EBV in organ transplants?

21       A.  Yeah.

22       Q.  Anything else that comes to mind?

23       A.  No.

24       Q.  Generally are risk factors cumulative?

25           MR. BROMBERG: Objection to form.

Bruce A. Woda, M.D.

1      A.   Cumulative in -- for which diseases?

2      Q.   For developing Non-Hodgkin's lymphoma.

3      A.   Okay.  So again we're talking about the

4    very broad category of the 60 types of Non-Hodgkin's

5    lymphoma.

6      Q.   If you -- I mean, if it makes it -- we can

7    focus on follicular lymphoma which is two of the

8    three Plaintiffs.  I really am -- the hope is to

9    move generally and just work through this relatively

10   quickly, and we're getting stuck.

11     A.   Well, these are complex issues --

12     Q.   I understand.

13     A.   -- which are hard to -- I think some of

14   them are hard to work through quickly, and I think

15   if we -- okay.  So the issue is if someone had a --

16   so I've talked about some risk factors, and if an

17   individual had a number of them, would the

18   likelihood that they would be additive, is there a

19   likelihood of that?

20     Q.   Well, the question is, are they

21   cumulative.

22     A.   Cumulative --

23          MR. BROMBERG:  Objection to form.

24     A.   -- meaning increased risk?

25     Q.   Yeah, your probability of developing

Bruce A. Woda, M.D.

1   Non-Hodgkin's lymphoma develops or increases with

2   additional risk factors.

3       A.   So if you're asking me if the circumstance

4   was I had an immunodeficiency, and I got an

5   Epstein-Barr virus infection, would that increase my

6   potential to develop Non-Hodgkin's lymphoma?  I

7   would say yes.

8       Q.   As much as it's a focus for us here, would

9   you agree that for the average resident in the

10  United States the probability of developing

11  Non-Hodgkin's lymphoma is relatively small?

12          MR. BROMBERG:  Objection to form.

13  Overbroad.

14      A.   So I guess one of the questions is what's

15  the definition of small.

16      Q.   What are -- percentagewise, what are the

17  incidents of Non-Hodgkin's lymphoma being diagnosed

18  in the United States on an annual basis?

19      A.   I think the current SEER data shows

20  lifetime risks of about two percent for us.  Whether

21  you consider that small, large, that depends upon

22  the eye of the beholder.

23      Q.   Fair enough.  And it's possible for an

24  individual to have multiple risk factors and not

25  develop Non-Hodgkin's lymphoma?

Bruce A. Woda, M.D.

1     A.  I would certainly, yeah, say that is true.

2     Q.  Okay.

3     A.  Lets me know that there are many more risk

4  factors than that two percent.

5     Q.  Can risk factors be modified?  Are there

6  modifiable risk factors?

7        MR. BROMBERG:  Objection to form.

8     Q.  For Non-Hodgkin's lymphoma, specifically.

9        MR. BROMBERG:  Same objection.

10     A.  So if you had a risk and knew what the

11  risk was, could you change the risk.  So if you

12  happen to have severe combined immunodeficiency,

13  which is a risk, or another innate immunodeficiency

14  and had a stem cell transplant, would you decrease

15  the risk of Non-Hodgkin's lymphoma?  Yes.

16     Q.  All right.  And you've answered the

17  question.  I was thinking more on a generic or human

18  level, and yeah, using as an example smoking.  To

19  the extent that someone goes from a pack a day to

20  stops smoking, that's, for lung cancer, a modifiable

21  risk factor?

22     A.  So in the case of lung cancer, if your

23  smoking history was sufficient to put you at risk,

24  and you modified that behavior, it should decrease

25  your risk, assuming you modified the behavior in

Bruce A. Woda, M.D.

1    sufficient time.

2        Q.   Fair enough.

3        A.   Because it may take -- you know, latency

4    for smoking -- for carcinoma after smoking, may be

5    20, 30 years. So depends when you -- have you

6    modified the behavior in time.

7        Q.   Sure. And this is going, then, to the

8    three individual Plaintiffs who you've reviewed, for

9    instance, specific records for. Have any of them

10   been diagnosed with HIV?

11       A.   None of them have been diagnosed with HIV.

12       Q.   Have any of them -- I'm sorry?

13       A.   So I'm basing on the medical records that

14   I've reviewed, and it's not reflected in their

15   medical records.

16       Q.   Has any been diagnosed with hepatitis C?

17       A.   Not that I saw in the medical record.

18       Q.   Did you see any medical records reflecting

19   the presence of Epstein-Barr for any of the three

20   Plaintiffs?

21       A.   So the only Plaintiff I believe that I saw

22   a test for EBV, and this was a serologic test, not a

23   test of the tumor, was Mr. Cannon, who his serology,

24   he was positive for IgG and negative for IgM. IgM

25   is the first antibody we make. You see that in

Bruce A. Woda, M.D.

1     acute infection.  IgG is evidence of past infection.

2     So he did have that, and I think that's not

3     surprising.  As we know, most adults in the US have

4     been exposed to EBV.

5         Q.  You --

6         A.  I don't -- I didn't see evidence of

7     testing in the medical records of the other two

8     individuals.

9         Q.  You referenced, previously, obesity as a

10    risk factor.  Is that a modifiable risk factor?

11        A.  So as we discussed, risk factors, if

12    they're modified in sufficient time, should reduce

13    the risk.

14        Q.  All right.  If an individual --

15        A.  The interesting thing about -- thing about

16    obesity and Non-Hodgkin's lymphoma, there is some, I

17    think, data that being obese at a younger age is

18    associated with an increased risk.  And it's not

19    clear to me from his papers if individuals then went

20    on to reduce their weight whether it modified the

21    increased risks seen in younger individuals with

22    obesity.  I think that's an open question.

23        Q.  Okay.  And just is this a reference to

24    literature that you've previously read that you're

25    recalling or something that's on your considered

Bruce A. Woda, M.D.

1    literature -- list of considered literature?

2        A.  I'm sure it's on the list of considered

3    literature.

4        Q.  All right.  Obesity is largely driven, in

5    essence, by BMI measurement, correct?

6        A.  Correct.

7        Q.  If an individual drops ten pounds and goes

8    just below the dividing line, is that going to then

9    modify the risk involved?

10        MR. BROMBERG:  Objection to form.

11        A.  I don't think we know, and I don't think

12    there's data saying what reduction -- how a

13    reduction in weight per pound modifies that risk.

14        Q.  Okay.  You mentioned --

15        A.  I mean, people tend to use, you know,

16    obesity in very general terms.  We know the US has

17    an obesity epidemic, and obesity is tied to

18    diabetes, and I'm not an expert here, but for

19    instance, in diabetes, light reduction in weight is

20    coupled with decreased incidence of Type 2 diabetes,

21    I don't know.

22        Q.  You mentioned earlier family history as a

23    potential -- or as a risk factor.  Is that a strong

24    risk factor for NHL?

25        MR. BROMBERG:  Objection to form.

Bruce A. Woda, M.D.

1      A.   So NHL in general or specific form of NHL?

2      Q.   I was thinking in terms of -- and the

3   purpose of the question was in general for NHL.

4         MR. BROMBERG:  Same objection.

5      A.   I think that's too broad of a term.

6      Q.   Okay.

7      A.   So in CLL, the risk factor appears to be

8   six-fold.  So you have a first-degree relative who

9   has chronic lymphocemia.  In follicular lymphoma,

10   risk factor was certainly less than CLL, but I think

11   it's in the range of 1.7 to 2.

12         And I think those are probably the most

13   widely studied examples.

14      Q.   For the risk factor for follicular

15   lymphoma, what literature is coming to mind that

16   identifies the 1.7 to 2 increase in risk factor?

17      A.   So it's certainly on the list of materials

18   reviewed.  Which paper that is, I can't recall the

19   exact citation.

20      Q.   For -- do you recall whether or not that

21   is specific to a genetic predisposition to

22   follicular lymphoma?

23         MR. BROMBERG:  Objection to form.

24      A.   So it's my view that these are genetic

25   predispositions.

Bruce A. Woda, M.D.

1      Q.   All right.  Families, a fair number of

2   them anyway, as a typical -- share environments,

3   correct?

4      A.   Yes, families share environments.

5      Q.   There are going to be environmental

6   aspects that each member of a family is exposed to

7   during -- at a certain period of time, correct?

8          MR. BROMBERG:  Objection to form.

9      A.   So certainly we share an environment with

10   our family members.

11      Q.   If family members are exposed to the same

12   chemical, how are you, in your assessment,

13   distinguishing between a pre- -- genetic

14   predisposition versus an external environmental

15   factor with regard to the element of follicular

16   lymphoma?

17          MR. BROMBERG:  Objection.  Form.

18   Overbroad.

19      A.   So when I look at human tumor formation or

20   carcinogenesis, I think there are a number of

21   components.  There is an endogenous -- a proportion

22   of chance that, you know, you have mutations going

23   on all the time, and if you have enough mutations

24   that affect a driver gene or a number of driver

25   genes, that by itself may be sufficient to form a

Bruce A. Woda, M.D.

1    tumor.

2            And then there are a couple of other

3    factors which go in there, so there's an

4    environmental component and a genetic component.

5    And this is, you know, not settled science to know

6    whether idiopathic or chance, what that component

7    is, what the environmental component is and what the

8    genetic component is in any one individual.

9            So in a population, you know, in any one

10   individual it's going to be different.  I mean, for

11   instance, if I had a -- a cancer, and I had an

12   identical twin, and the identical twin also had

13   cancer, then we would say there's a very large

14   genetic component sharing the same genome, and one

15   could argue that well, you're also sharing the same

16   environment, but I think concordance of diseases in

17   identical twins is taken as a strong genetic

18   component.

19           But for other individuals, you know, it's

20   not so clearly defined how you put those components

21   together.

22       Q.  Okay.

23       A.  So, you know, it's too broad.  They -- at

24   the end of the day, they all add up to 100 percent,

25   but it's -- I think the science isn't settled on how

Bruce A. Woda, M.D.

1    to do that.  And there are certainly theories on

2    this, and the theories are quite interesting to read

3    about, and they're a little bit complex, but this is

4    a -- certainly a debate in the literature.  And you

5    go from, you know, cancer which, I think, is very

6    good evidence it's environmentally induced, such as

7    lung cancer in smokers to most other tumors which we

8    just don't know.

9        Q.  Okay.  So I would presume at this point,

10   based on the lack of knowledge, there's no known

11   genetic marker right now where if you got the DNA

12   strand, you could pull out, sit there and say,

13   brother and sister, these two have the same strand

14   of DNA that's responsible --

15       A.  No, that's actually not true.  Sorry to

16   interrupt.

17       Q.  Okay.  Why is that --

18          MR. BROMBERG:  You got to let him ask his

19   whole question before you answer.

20       Q.  But is there an ability to look for with

21   regard to follicular lymphoma and sit there and say,

22   this DNA strand is genetic -- sharing of genetic

23   history is what is causing your follicular lymphoma?

24       A.  I should have answered the first question,

25   which was broader.  So in chronic lymphocytic

Bruce A. Woda, M.D.

1  leukemia, which has a very high familial risk, there

2  is evidence that the B-cell receptor is shared, and

3  that's a very special case. So one can link the two

4  diseases. And follicular lymphoma, I don't believe

5  there's evidence to show that -- we would call these

6  idiotypes. Specific rearrangement of the

7  immunoglobulin gene is shared between individuals of

8  the same family. If there's data there, I haven't

9  run into it.

10      Q.  Working through the individual Plaintiffs,

11  for Jerry Pinnon, is there any risk factors that

12  you've identified?

13      A.  If I can just take a second to look at my

14  notes.

15      Q.  Sure.

16      A.  Looking at his history, potential risk

17  factors, he had a history of obesity, he's a smoker,

18  and he may have had exposure to paints, automobile

19  fuels. Those are potential risk factors.

20      Q.  Okay. You've added -- so smoke -- you

21  consider smoking a risk factor for the development

22  of Non-Hodgkin's lymphoma?

23      A.  I think there is literature -- again, I

24  can't quote the exact citation. I think it's --

25  would be considered a weaker risk factor. I don't

Bruce A. Woda, M.D.

1    think the evidence for smoking is as good as

2    obesity.

3        Q.  Okay.  With regard to obesity, and I

4    understand you're working off your notes here, which

5    are a little -- do you recall what his weight was at

6    the time of diagnosis?

7        A.  I believe at one point his weight went up

8    to 360.  What was the time of diagnosis?  Sorry.

9    Strike that.  I misspoke.  That wasn't him.  I don't

10   recall, and I think he's -- the records I saw

11   considered him borderline obese.  I don't recall

12   what his weight was or what his BMI was.

13       Q.  Okay.  Do you intend to offer at trial the

14   opinion that these risk factors contributed to his

15   development of Non-Hodgkin's lymphoma?

16       A.  Yes.

17       Q.  And will you provide that testimony with

18   regard to all of them or just some of the risk

19   factors you've identified?

20       A.  I think all of them are potential risk

21   factors.  I think some stronger than others, but all

22   of them are potential risk factors.

23       Q.  Setting aside Roundup for the moment, and

24   you've identified paint/gasoline on the exhibit, are

25   there any other chemicals that you recall Mr. Pinnon

Bruce A. Woda, M.D.

1    identifying being exposed to that would represent a

2    risk factor?

3        A.   At this point I don't recall any other

4    exposures.  Let me just think about that for a

5    second.  Mr. Pinnon -- I think we'll stop there.

6        Q.   Okay.  Do you recall what personal

7    protective equipment, if any, Mr. Pinnon wore while

8    being exposed to gasoline or paint?

9        A.   I don't recall or believe he used any

10   personal protective equipment.

11       Q.   Did you consider Mr. Pinnon's exposure to

12   Roundup in assessing risk factors?

13       A.   So I certainly read the history of Mr.

14   Pinnon and that he had worked as a landscaper for a

15   brief period of time and then spent considerable

16   time in home-use of Roundup, and based upon the

17   existing literature that I reviewed and the opinion

18   I derive from reviewing that literature, and from

19   reviewing the opinions of our environmental

20   protection agency and a number of agencies present

21   throughout the world, I didn't consider Roundup as a

22   risk factor for Mr. Pinnon.

23       Q.   All right.  So in assessing whether or not

24   Roundup -- strike that.  In viewing Roundup as not

25   being a risk factor, it would not have made a

Bruce A. Woda, M.D.

1    difference with regard to Mr. Pinnon whether his

2    exposure was for 40 hours during his life or 4,000

3    hours?

4        A.   Since Roundup has not been shown to be

5    deleterious to human health, I don't believe it

6    would matter.

7        Q.   All right.  Do you intend to offer an

8    opinion at trial or in support of a motion for

9    summary judgment concerning the cause or causes of

10   Mr. Pinnon's chronic lymphocytic leukemia?

11       MR. BROMBERG:  Objection to the form with

12   respect to motion for summary judgment.

13       MR. WALSH:  Fair enough.

14       MR. BROMBERG:  You can answer.

15       A.   So it's my view that the major component

16   of his reason to develop chronic lymphocytic

17   leukemia was a number of mutations he has which

18   eventuate in this disease, which the preponderance

19   of would be idiopathic.  No known cause.

20       Q.   No known cause for his CLL?

21       A.   I believe that's what the Plaintiffs'

22   experts also opined, that it was more than

23   70 percent chance that the disease was idiopathic.

24       Q.   Do you intend to offer an opinion as far

25   as the risk factors being substantial or a

Bruce A. Woda, M.D.

1    contributing factor to his development of CLL?

2        A.  I think the potential contributing

3    factors, I think the major factor would be

4    idiopathic.

5        Q.  All right.  Do you intend to offer

6    testimony with regard to the diagnosis of his CLL?

7        MR. BROMBERG:  Objection to form.

8        A.  Okay.  So if I understand the question, is

9    it just that he had CLL or an opinion about the

10   ancillary studies he's had as part of -- in my

11   ancillary settings, cytogenetics mutation analysis?

12       Q.  Let me see if I can help.  The exhibit

13   that identifies what -- the areas that you've been

14   identified as an expert for.  States that you'll

15   provide testimony with regard to Plaintiffs Mario

16   Cannon, Larry S. Jenkins, Jerry R. Pinnon, including

17   the cause or causes, if any, for their lymphoma,

18   risk factors for their lymphoma, their clinical

19   course through diagnosis, treatment, and related

20   issues.

21           And so I'm trying to find out, I

22   understand obviously addressing whether or not

23   glyphosate is a cause, that's why you brought that

24   in as a risk factor, but are you intending to offer

25   an opinion with regard to these three individuals

Bruce A. Woda, M.D.

1   with regard to their diagnosis, course of treatment,

2   and related issues?

3        A.   Certainly I would render an opinion about

4   the diagnosis, how their cases were evaluated.

5             Regarding treatment, I think I have a good

6   understanding, but treatment decisions are made

7   between treating physician and the patient, and

8   since I don't treat patients, I would be hesitant to

9   talk about their specific treatments.  I might look

10  at it.  It's pretty standard of care that the

11  patients have had.

12       Q.   For Mr. Pinnon, do you have an opinion

13  with regard to the diagnosis of a CLL?

14       A.   My opinion is that Mr. Pinnon has CLL.

15       Q.   All right.  But with regard to the

16  diagnosis, was it a proper diagnosis or an improper

17  one?

18       A.   I think the diagnosis of Mr. Pinnon's CLL

19  was correct.

20       Q.   With regard to Scott Jenkins, are there

21  any risk factors for Non-Hodgkin's lymphoma that you

22  identified specific to him?

23       A.   So Mr. Jenkins has a somewhat complex

24  history.  He certainly has a number of family

25  members that have had neoplasms of the hematocritic

Bruce A. Woda, M.D.

1    system, specifically his grandmother, died of, I

2    think, relatively old age of leukemia.  What kind of

3    leukemia wasn't evident to me in the medical chart.

4          His father developed a Non-Hodgkin's

5    lymphoma, which, according to the chart, was

6    classified as a large cell lymphoma, which is

7    certainly one of the common subtypes of lymphoma.

8    And his sister also developed large cell

9    Non-Hodgkin's lymphoma, so one would raise an issue

10   about a genetic component to his disease.

11         He also has other potential risk issues

12   such as obesity, exposure to other issues in the

13   environment, and the one I wonder about is, you

14   know, working in a father's landscaping business and

15   then also using, you know -- maintaining his own

16   landscaping at home is -- what other substances he

17   might have used.  That's not evident to me in any of

18   the records.

19       Q.  You did review Mr. Jenkins' deposition

20   transcript?

21       A.  Yes.

22       Q.  Do you recall how much time you spent

23   reading that transcript?

24       A.  I think it's in one of the exhibits, so if

25   we looked at it, I guess I could recall.

Bruce A. Woda, M.D.

1        Q.  If you look at the back of what has been

2   marked as Exhibit 5, perhaps that will help you

3   recall.

4        A.  This is probably not his -- I'm not sure

5   this is his deposition versus the interview he had

6   with the industrial toxicologist.  The depositions,

7   I think, came after this.

8        Q.  You believe you reviewed his deposition

9   during January?

10       A.  I think so.

11       Q.  Trying to recall.  His deposition, I

12  recall, is --

13       A.  I don't remember the date of his

14  deposition.  I think it was sent to me in January.

15       Q.  Fair enough.  So you -- that was one of

16  the deposition transcripts you've reviewed in the

17  last five weeks?

18       A.  I believe so.

19       Q.  Do you recall any other chemicals being

20  identified as chemicals that were used in the

21  landscaping work that he did with his father?

22       A.  No.  There was no reference to any other

23  chemicals.

24       Q.  Was he asked whether or not he was exposed

25  to -- any other chemicals were used?

Bruce A. Woda, M.D.

1        A.  I don't recall.

2        Q.  Do you recall the testimony he offered at

3    his deposition that he and his sister essentially

4    performed the same work for their father in the

5    landscaping business?

6        A.  Yes, I do recall that.

7        Q.  And that their exposure to Roundup was

8    relatively comparable during that period of time?

9        A.  My recollection is that they both used

10   Roundup.  I don't recall if their exposures were

11   similar or dissimilar.

12       Q.  Okay.  Do you recall his testimony that

13   one house he would do the spraying; his sister would

14   handle the next house?

15       A.  I don't recall the depositions in that

16   detail.

17       Q.  Fair enough.  Would the family exposure in

18   the landscaping business suggest to you that there

19   was an external environmental impact rather than a

20   family matter that was causing the risk factor for

21   their development of Non-Hodgkin's lymphoma?

22       A.  So I think we've discussed that

23   development of a lymphoma or tumor would have three

24   components, environment, family, and idiopathic, or

25   we don't know.

Bruce A. Woda, M.D.

1          So in weighing this history, there may be

2    a higher weight to a strong family history.

3    Certainly they all lived in a similar environment,

4    but to understand the environment, I think we have

5    to understand if the environment was an important

6    issue, whether -- were there exposures in the

7    environment which increased their risk.  And based

8    upon deposition where there was -- I'm not sure

9    whether the question was asked or not, but there was

10   no documentation of other exposures, and there was

11   documentation of exposure -- or use of Roundup, but

12   Roundup is not a carcinogen, so it's hard to see an

13   environmental factor which plays a role.

14       Q.  You're -- because of your view, your

15   opinion, you're ruling out any possibility that

16   Roundup played a role in his Non-Hodgkin's lymphoma?

17       A.  So that's certainly my opinion, and I

18   think the weight of evidence would show that's true,

19   and I'm sure we've all seen the updated EPA

20   documents generated in January of this year which

21   says that Roundup has -- poses no human health

22   risks.

23       Q.  You identified as a potential exposure the

24   offshore work that Mr. Jenkins does.  Do you recall

25   reading his testimony with regard to that work?

Bruce A. Woda, M.D.

1        A.   Yes, I recall it.

2        Q.   And do you recall whether he was asked if

3   he was identified to any chemicals?

4        A.   My recollection is that -- sorry for

5   interrupting.

6        Q.   That's okay. Go ahead. Do you recall

7   whether he was asked if he was identified to any

8   chemicals while working on the rig?

9        A.   My recollection of his deposition is he

10  did not identify any other chemical exposures.

11       Q.   Are you aware of -- putting aside for the

12  moment Roundup -- exposure on the oil rig any other

13  chemicals that he may have been exposed to that

14  present a risk factor for his development of

15  Non-Hodgkin's lymphoma?

16       A.   So I think we've discussed this point.

17  There's not documentation of other exposures.

18       Q.   Okay.

19       A.   If he had them, they're not documented.

20       Q.   Fair enough. Do you intend to offer

21  opinion testimony at trial concerning the cause or

22  causes of Scott Jenkins' follicular lymphoma?

23       A.   Yes.

24       Q.   And what is that opinion?

25       A.   So of the three components involved in

Bruce A. Woda, M.D.

1    tumor genesis, the environment, genetics, and

2    spontaneous mutation, I think he has two factors

3    which I would weigh. He has -- he has a number of

4    factors. And I think it's not possible with the

5    state of science now to give a percent for each

6    factor. I think the factors here would be certainly

7    family history, I think there's some evidence that

8    obesity could play a role, and certainly spontaneous

9    mutations, I think, are an important factor.

10        Q.  Okay. You referenced obesity. Do you

11   recall what Scott Jenkins' weight was at the time of

12   diagnosis?

13        A.  I do not.

14        Q.  Do you recall --

15        A.  I recall his top body weight. I can't

16   recall his history well enough to say what his body

17   weight was from his teen years to currently. I

18   believe -- I don't want to speculate. I'd have to

19   look back in the record.

20        Q.  Do you recall what the time period was

21   between his top body weight and his Type 2

22   diagnosis?

23        A.  I do not recall.

24        Q.  Do you recall any surgery that Mr. Jenkins

25   underwent in order to address his weight issues?

Bruce A. Woda, M.D.

1        A.  I know he has a history of gastric bypass

2   surgery.

3        Q.  Do you recall when that was?

4        A.  No.

5        Q.  If the gastric bypass surgery was seven

6   years prior to his date of diagnosis, would that

7   have worked to mitigate against any risk that was

8   addressed or associated with his obesity?

9        A.  So one of the things that I think we don't

10  understand well enough is if an individual is obese

11  and has an increased risk factor, and that's an

12  increased risk factor to development of lymphoma,

13  and there is some evidence that presence of obesity

14  in younger age exhibits a stronger association, if

15  you intervened later in life, is that a meaningful

16  intervention, and I don't know of data that

17  addresses that issue.

18       Q.  Okay. Fair enough. You've just used, and

19  you've used previously, obesity at a younger age.

20  When you're referencing a younger age, are you -- do

21  you have an age bracket for that?

22       A.  My recollection is the teens, and I don't

23  know what his weight was as a teenager.

24       Q.  Fair enough. And that's -- if someone is,

25  say, athletic and a football player through high

Bruce A. Woda, M.D.

1    school, goes a little soft in his 20s, is that going

2    to have a different impact as far as a risk

3    assessment from someone who is obese in their early

4    teens?

5         A.  I don't recollect well enough what the age

6    brackets were, so the question is if at some age

7    does obesity not become an important risk factor.  I

8    can't recall.

9         Q.  Fair enough.  Are you intending to offer

10   an opinion with regard to the diagnosis of Mr.

11   Jenkins' Non-Hodgkin's lymphoma?

12        A.  I'm certainly going to render opinion on

13   that.

14        Q.  All right.  And with regard to that, do

15   you view the diagnosis as correct?

16        A.  Yes, I reviewed the diagnosis as correct.

17        Q.  Okay.  Is your opinion going to go beyond

18   the appropriateness of the diagnosis?

19            MR. BROMBERG:  Objection.  Form.

20        A.  If you could clarify what beyond the

21   appropriate diagnosis is.

22        Q.  Sure.  You've indicated that you're going

23   to provide an opinion with regard to his diagnosis.

24   What is that opinion going to be?

25        A.  So my opinion is that his diagnosis is

Bruce A. Woda, M.D.

1    correct.

2        Q.   Okay.  Is it anything beyond that?

3            MR. BROMBERG:  Objection to form.

4        A.   I don't know what beyond means, but --

5        Q.   Fair enough.  And again, you're not

6    intending to offer an opinion with regard to his

7    treatment or the course of treatment that Mr.

8    Jenkins had?

9        A.   I reviewed his treatment, and there are

10   some -- I think the treatment is between the patient

11   and the treating physician.  He's had standard

12   treatment with some variation, I think, depending

13   upon coordinating his treatment with his work.  But

14   at the end of the day, it appears he's had complete

15   remission, so he's been -- it seems he's been

16   treated adequately.

17       Q.   And when you reference correlating his

18   treatment with work, you're referencing the fact

19   that because of his time on the rig where he's on

20   for four weeks and off for four weeks, his treatment

21   was centered around the four weeks where he was not

22   working on the rig?

23       A.   Correct.

24       Q.   All right.  Did you identify any risk

25   factors for Non-Hodgkin's lymphoma with regard to

Bruce A. Woda, M.D.

1    Mario Cannon?

2        A.   So potential risk factors, potential --

3    again, his body weight, and I have no recollection

4    of his body weight through the years.  There's a

5    potential for other chemical exposures.  And I did

6    list something which probably doesn't belong under

7    my list of potential risk factors, a latency issue,

8    the time between how long it takes to develop

9    Non-Hodgkin's lymphoma until it becomes clinically

10   evident, what that time period is.

11       Q.   Okay.  And why did you list the latency

12   issue?

13       A.   If one hypothesized that exposure to

14   Roundup during his employment at Tri Rinse was a

15   contributing factor, which I don't think it was, but

16   assuming you hypothesize that, is the timeframe

17   between that employment and his development of

18   disease consistent with the biology of the disease.

19            And the timeframe looks to be relatively

20   short, and he presented with extensive disease,

21   meaning trillions of cells, so how long does it take

22   to go from one cell to trillions of cells, and we

23   can't answer that precisely.

24            My opinion is that it would take some

25   years that he went through a presymptomatic phase to

Bruce A. Woda, M.D.

1    present with such -- it appears from the medical

2    records, such, you know, considerable amount of

3    lymphoma for a slow-growing lymphoma.

4         So if he had a fast-growing lymphoma, you

5    would think that would be clinically evident

6    relatively soon. They make big masses, and they

7    make you sick, and he presented with a lot of

8    disease, and certainly he was symptomatic when he

9    finally presented, but it's my opinion that would

10   take some years.

11        Q.  Fair enough. Is there a -- does -- strike

12   that. Let me see if I can get this question

13   correct. Does the risk factor alter if one is

14   exposed to an acute level of a chemical as opposed

15   to a chronic chemical exposure?

16        MR. BROMBERG: Objection to form.

17        A.  So my thinking about that question, it's

18   almost not answerable. The best evidence that we

19   have is someone who gets cytotoxic chemotherapy,

20   which is a very acute exposure to a substance which

21   directly interferes with DNA synthesis and directly

22   alters DNA chromatin, and those patients are at

23   increased lifetime risk to get acute leukemia.

24        Those leukemias tend to arise, and

25   certainly there are exceptions, in the two- to four-

Bruce A. Woda, M.D.

1    or five-year timeframe post a tremendous incident.

2    I don't know of any other chemical insult that would

3    be to that extent that's directly toxic to DNA that

4    could -- that would do that.

5          So if that's the index case that nothing's

6    going to be faster than that, and that takes two to

7    four years, I would have an opinion that other

8    things must be much slower.

9      Q.  So in essence, using that as the bookmark

10   and going to the question asked before, you would

11   view the latency period associated with

12   Non-Hodgkin's lymphoma being at least two years

13   between whatever exposure is developing that first

14   cell and --

15     A.  No, I wouldn't.  I would disagree with

16   that.

17     Q.  Okay.

18     A.  So the --

19         MR. BROMBERG:  Before you answer, let me

20   just -- objection to form of the question.

21         But you can answer.

22     A.  The example I gave was somebody developing

23   acute myeloid leukemia after receiving cytotoxic

24   chemotherapy, which basically kills all of your

25   cells, and the cells have to regenerate, and that

Bruce A. Woda, M.D.

1     cytotoxic chemotherapy damages the stem cells.

2          But my opinion that for other kinds of

3     exposures, the latency would be appreciably longer.

4     I wish I could be more precise.  Smoking, which --

5     you know, latency is, you know, many, many years,

6     and there's good evidence if you look at the human

7     tumor genome atlas that there are specific

8     alterations associated with smoking.  So if I did

9     whole genome sequencing on someone with lung cancer,

10    I could tell you whether they're a smoker or not.

11          There's few other diseases that we can do

12    that, so if the question does a -- can a chemical

13    induce cancer, and what's the shortest period it can

14    do it, I would say two years.

15    Q.   Okay.

16    A.   For other chemicals which are not insults

17    to that degree, it would be my opinion it would be

18    much longer.  How much longer, I can't be precise.

19    Whether it's ten times longer or five times longer

20    or two times longer, but it would be longer.

21    Q.   Is there literature that you're thinking

22    of when you're specifying that, or is this based on

23    your experience, 40-plus -- well, 50 -- well, yeah,

24    almost 50 years in the medical field.

25    A.   I've looked into this issue, and there's

Bruce A. Woda, M.D.

1    no clear data.  I don't think anybody knows, and the

2    best we can do is look for examples where you can

3    look at a -- initiating a factor and see how long it

4    takes, and initiating factors that we mentioned are

5    organ transplant and cytotoxic chemotherapy, which

6    are special things that -- I mean, we sort of have

7    reasonable data so we know when the insult starts,

8    and we know when the -- what the expected time of

9    development of the cancer would be.

10        Q.  But otherwise, that initial point is

11   generally unknown, so it becomes hard to provide a

12   chronological measure?

13        A.  We can have an estimate, but those

14   estimates, I think, are rough estimates.

15        Q.  Okay.  Presume, for Mr. Cannon, your

16   previous testimony with regard to Mr. Jenkins'

17   opinion carry on with regard to glyphosate or

18   Roundup not being a contributing factor in

19   Non-Hodgkin's lymphoma.  Are there any other risk

20   factors for which you intend to identify or offer an

21   opinion as to contributing to his development of

22   Non-Hodgkin's lymphoma?

23        A.  Specifically we're talking about Mr.

24   Cannon?

25        Q.  Yes.

Bruce A. Woda, M.D.

1          A.   So based upon his work history, there's a

2    potential for other chemical exposures, and I don't

3    have, I think, a strong enough timeline of his body

4    weight versus age to be precise, and if I was going

5    to offer testimony on that, I would certainly try to

6    glean from his records, but I don't think it's

7    there.

8          Q.   Fair enough.  Do you intend to offer any

9    opinion testimony concerning the cause or causes of

10   Mr. Cannon's follicular lymphoma?

11         A.   So my opinion of his follicular lymphoma,

12   the cause in his case would be idiopathic.

13         Q.   And what is the basis of that opinion?

14         A.   So we've talked about the three

15   components.  I don't see a genetic component in his

16   disease.  I'm not sure how strong his other

17   potential risk factors are, so environment might be

18   a more minor component, although I wouldn't rule

19   that out.  So that leaves us with idiopathic.

20         Q.   Fair enough.  Do you intend to offer any

21   opinion testimony concerning the diagnosis of his

22   Non-Hodgkin's lymphoma?

23         A.   So my opinion of his diagnosis is correct.

24         Q.   All right.

25              MR. WALSH:  Break now, Counsel?

Bruce A. Woda, M.D.

1          MR. BROMBERG: Yeah.

2          THE VIDEOGRAPHER: Going off the record.

3    Time is 12:43.

4          (Recess was taken from 12:43 to 1:25.)

5          THE VIDEOGRAPHER: We are going back on

6    the record. Time is 1:25.

7     Q.  Welcome back, Doctor.

8     A.  Thank you.

9     Q.  Try to finish through specific causation

10   fairly quickly.

11         You referenced earlier having reviewed

12   certain specimen slides for the three Plaintiffs.

13   Do you recall for which Plaintiffs you've seen the

14   slides?

15    A.  I've seen slides for all of the Plaintiffs

16   with the exception of the original diagnostic biopsy

17   from Mr. Cannon.

18    Q.  Fair enough. And in reviewing those

19   slides, what did you do?

20    A.  I looked at the identification of the

21   slide. I put it on my microscope. I looked at the

22   findings on the slides, and I came to a diagnosis.

23    Q.  And does the diagnosis confirm the

24   original diagnosis from each Plaintiff's doctor?

25    A.  The two cases of follicular lymphoma, the

Bruce A. Woda, M.D.

1    morphology was certainly consistent with that.  The

2    case of CLL, the cytology of the cells certainly

3    were consistent with CLL cells, but I think in CLL

4    one has to confirm your morphologic opinion with the

5    phenotype.  Sorry, I'm getting a little bit hoarse.

6    There's a certain set of proteins on the membranes

7    of those cells, and those are detected by

8    technological flow cytometry.  In this case, the

9    flow cytometric report was diagnosed CLL.

10        Q.  All right.  And when you say the

11   diagnostic, that was the one done originally?  You

12   did not conduct a second diagnosis to check these

13   cells?

14        A.  So I don't have a recollection of the

15   exact date on the slide I was sent, and my

16   recollection from the medical record, Mr. Pinnon, I

17   don't believe he -- I didn't see it if he had a

18   follow-up flow cytometric study.  There's really no

19   reason to do so.

20        Q.  All right.  Fair enough.  You've provided

21   testimony, in essence, looking at a triumvirate of

22   considerations for identifying causation.  Is there

23   anything else in your -- in the methodology you used

24   in assessing the possible causes of each of the

25   Plaintiff's Non-Hodgkin's lymphoma?

Bruce A. Woda, M.D.

1      A.  In my analysis of cases, I do use that, I

2  guess, tri-part or triumvirate of factors, looking

3  at genetics, familial causes, environmental causes.

4      Q.  And the random fate of nature, I guess?

5      A.  Correct.

6      Q.  All right.

7      A.  Randomness of nature.

8      Q.  Do you hold yourself out as a forensic

9  epidemiologist?

10         MR. BROMBERG:  Objection to form.

11      A.  So I'm not familiar with the term forensic

12  epidemiologist.

13      Q.  Do you hold yourself out as an

14  epidemiologist?

15      A.  So through my medical training and through

16  my role at my practice of medicine, and in the

17  course of writing 188 papers and 15 book chapters

18  and directing a morphology core laboratory at the

19  University of Massachusetts, which basically

20  supports all of our animal studies, and in reviewing

21  literature and in helping with mentoring many of our

22  faculty and residents and what it takes to have a

23  high-quality manuscript, including a paper in The

24  Lancet Oncology, which was published, I think, in

25  2006, which we measured out common patients with

Bruce A. Woda, M.D.

1   renal cancer, I've -- have a good working knowledge

2   of epidemiology and statistical analysis. So that's

3   my background.

4       Q.   But no master's or PhD in statistics, I

5   presume?

6       A.   Correct, no advanced degree in statistics.

7       Q.   No advanced degree -- separate advanced

8   degree in epidemiology?

9       A.   So certainly the experiences I've had I

10  think I'm knowledgeable, but I have no advanced

11  degree in epidemiology.

12      Q.   Is there a medical procedure that allows

13  physicians to diagnose the cause of NHL?

14      A.   So medical procedure is a -- I think a

15  very broad term. Could you be more specific?

16      Q.   I'm not sure. I hope that this helps. Is

17  there a medical protocol that is established in

18  order to identify the cause of an individual's

19  Non-Hodgkin's lymphoma?

20          MR. BROMBERG: Objection to form.

21      A.   So in patients who develop Non-Hodgkin's

22  lymphoma, which is a group of 60-plus diseases --

23      Q.   Understood.

24      A.   -- if they have immunodeficiency

25  posttransplant, lymphoproliferative disorders, I

Bruce A. Woda, M.D.

1    think it's reasonable to connect cause to that.

2    Certainly because we know that approximately 75,000

3    people a year will develop Non-Hodgkin's lymphoma,

4    there is some potential that even though you have

5    immunodeficiency and lymphoma that it might not be

6    causal, but we know that the risk of Non-Hodgkin's

7    lymphoma, some -- HIV and talking about primary

8    lymphoma in central nervous system might be

9    increased 10,000 fold. So it's reasonable that

10   that's the causes and effect.

11       Q.   Again, and we discussed this earlier, is

12   that a cause or an enhancement of the risk of

13   developing Non-Hodgkin's lymphoma?

14       A.   In the example I presented would be

15   increased risk.

16       Q.   Okay. Can we -- or strike that. Can

17   exposure to Roundup be ruled out as a contributing

18   factor of Non-Hodgkin's lymphoma?

19       MR. BROMBERG: Objection to form and also

20   asked and answered.

21       A.   Roundup has been well-studied, and not

22   knowing, I guess -- just speculating, it's probably

23   the best study, but I may be wrong, agent -- and I

24   think there's no good evidence or no evidence that

25   Roundup is a cause of Non-Hodgkin's lymphoma. And I

Bruce A. Woda, M.D.

1    think the basis of my opinion is the weight of

2    evidence I've gathered through a literature review,

3    through the review of the Environmental Protection

4    Agency, and the review of a number of other

5    international agencies have concurred with this

6    opinion.

7        Q.  Okay.  Shifting focus a little bit, and

8    you somewhat segued into it with your writing, and I

9    will say your record is impressive on you're

10   authorships.  I would like to say I'd aim for that,

11   but I don't think I can hit the 180 number that you

12   have.

13       In a peer-reviewed study, do you believe

14   it's acceptable for the inclusion of paragraphs

15   where the work is not attributed to the author?

16       MR. BROMBERG:  Objection to form.

17       A.  In peer-reviewed studies, the work -- I

18   think it's essential it's attributed to the authors.

19       Q.  And for the work that you have been listed

20   as the author, would you accept the inclusion of

21   paragraphs or sections where the work -- where the

22   author goes unattributed?

23       MR. BROMBERG:  Objection to form.

24       A.  So in a manuscript, when you submit the

25   manuscript, the authors are responsible for every

Bruce A. Woda, M.D.

1    word that's in the manuscript.  There are sections

2    which one can say I'm not responsible for, and in

3    fact, if you think you're not responsible for or

4    don't agree with something, you should take your

5    name off the manuscript.

6         This is a -- I think publications are

7    very -- I take it very seriously.  I was lucky

8    enough to have one of my mentors be the editor of

9    the Journal of Immunology.  He was very influential

10   in my approach to this issue.

11      Q.  Okay.  Are you familiar with the term

12   ghostwriting?

13      A.  Yes.

14      Q.  Do you view ghostwriting as an acceptable

15   practice?

16         MR. BROMBERG:  Objection to form.

17   Ambiguous.

18      A.  So I just want -- before I answer, just --

19   and I said I knew what ghostwriting was, but I just

20   want to make sure we have the same understanding.

21   What's your definition?

22      Q.  Well, actually, I'll -- I apologize.  I'll

23   flip that.  What is your understanding so we're

24   using -- as you're the witness testifying, what

25   is -- or individual providing testimony, what's your

Bruce A. Woda, M.D.

1    understanding of ghostwriting?

2        A.   My understanding of ghostwriting is a

3    third party would write a manuscript, and the

4    manuscript would be submitted by other authors who

5    actually did not write the manuscript.

6        Q.   Actually, I'm going to ask for a

7    clarification.  When you're saying the manuscript

8    would be submitted for publication, the individuals

9    submitting it would be the individuals identified as

10   authors of the paper?

11       A.   It would be identified as authors but

12   didn't actually write the paper.

13       Q.   Did not write the paper, would that be the

14   entirety of the paper, or could there be just

15   sections in there that go unattributed?

16       A.   So I can say ghostwriting is something

17   that I certainly don't do and don't condone, and I'm

18   not sure what the spectrum of issues are in

19   ghostwriting.

20           I think the authors of a paper which

21   undergoes peer review are responsible for the text

22   of the paper.

23       Q.   There's a difference, however, Doctor,

24   between being responsible for it and whether they

25   authored it in themselves.  By way of example, would

Bruce A. Woda, M.D.

1    you accept in a paper paragraphs written by a

2    corporation where the three named authors on the

3    paper simply are -- you know, accept that conclusion

4    even though they did not write it, and the

5    corporation goes unidentified?

6         MR. BROMBERG: Objection. Form. And I'd

7    also raise an objection that Dr. Woda is not

8    retained in this case on -- as an expert on

9    corporate ethics or corporate conduct. He's here to

10   talk about these particular Plaintiffs and whether

11   or not Roundup is a cause of NHL generally or with

12   respect to these patients, not an expert on

13   ghostwriting or corporate conduct issues.

14        You can answer.

15     A.  So why don't we just repeat the question.

16     Q.  Sure. And it'll be a little different

17   from originally presented. Your statement was that

18   the authors need to be responsible for what is in

19   the paper; however, cannot ghostwriting involve

20   where a corporation drafts a section of the paper,

21   it is included even though the corporation or the

22   individual within the corporation is not identified,

23   authors are happy to accept responsibility, I

24   assume, for it, but they have not written it, and it

25   is not, you know, their work.

Bruce A. Woda, M.D.

1          MR. BROMBERG:  Same objection as I just

2    raised before.

3          A.  So for me to answer that question, I would

4    have to look at the instructions to authors for the

5    journals we're talking about to see what the

6    obligations of the authors are and determine whether

7    those obligations are consistent with what's

8    actually in the publication.

9          Q.  Do most journals have authorship

10   guidelines?

11         A.  Yes, they do.

12         Q.  And what are the reasons for the

13   guidelines?

14         A.  So the guidelines include formats of

15   paper, include word limitations, include how the

16   data should be presented, what the figures should

17   look like, and what the responsibilities of the

18   authors are.

19         Q.  Okay.  But what is the reason for

20   including those guidelines?

21         MR. BROMBERG: Objection.  Form.

22         A.  So you're asking me to determine what a

23   journal wants.  I think the journals would have to

24   tell you what -- why they have those guidelines.

25         Q.  That would be reasonable, Doctor, but

Bruce A. Woda, M.D.

1    you've published in excess of 180 times, so I'm sure

2    you have a -- just as you've expressed, with respect

3    to epidemiology, a general understanding of the

4    reason behind the guidelines the journals are using.

5         MR. BROMBERG: Objection to form.

6       A.  So journals develop guidelines to assure a

7    reader that the publication meets the compliance and

8    reputation of the journal.

9       Q.  There's an aspect of integrity for the

10   reason for the guidelines, then?

11        MR. BROMBERG: I'm going to raise the same

12   objection I raised before with respect to the scope

13   of the questioning, which is beyond what Dr. Woda

14   has been designated as an expert on.

15        You can answer.

16      A.  So the reasons for the guidelines are to

17   deal with the integrity of the literature.

18      Q.  Equally, journals have a typically

19   conflict-of-interest statement that goes with the

20   article?

21      A.  Yes, they do.

22      Q.  And what is the reason for the

23   conflict-of-interest statement to attach with each

24   article?

25        MR. BROMBERG: Same objection that I

Bruce A. Woda, M.D.

1  raised before, beyond the scope of this witness'

2  designation as an expert in this case.

3      A.  So the reason to disclose conflicts of

4  interest is to let the audience or readership know

5  if there's any potential bias in the study.

6      Q.  And in your role for this litigation,

7  would you want to know if an article is one that the

8  study was financed by Monsanto and have that

9  disclosed within an aspect of the text of the

10  article?

11      MR. BROMBERG:  Same objection that I

12  raised before, that Dr. Woda is not offered as an

13  expert in this case on -- on this area.

14      A.  So I'm being asked to give an opinion

15  about an issue which I think I don't have sufficient

16  expertise to answer about what Monsanto did or

17  didn't do.  I just don't know.

18      Q.  All right.  Previously you referenced a

19  belief that Roundup, you think, may have been the

20  most tested herbicide.  You made a passing

21  reference.

22      A.  That was a surmise.  Whether that's true

23  or not I can't testify to.

24      Q.  Fair enough.  Would you have expected

25  Monsanto prior to a marketing Roundup to conduct an

Bruce A. Woda, M.D.

1    epidemiological study of its product?

2        A.  I would expect Monsanto to have met the

3    requirements of Environmental Protection Agency for

4    the approval of the introduction of that product

5    into the marketplace.

6        Q.  Would you expect them, however, to have

7    gone a step more and have conducted an

8    epidemiological study of the product?

9        MR. BROMBERG:  Objection.  Asked and

10   answered.

11       A.  I would expect them to meet the guidelines

12   of the appropriate regulatory agencies.

13       Q.  Okay.  Would you have expected Monsanto,

14   prior to marketing Roundup, to conduct an animal

15   study of the product?

16       A.  I would expect them to have done the

17   studies requested by the regulatory agencies which

18   approve the products.

19       Q.  Would you have expected Monsanto, prior to

20   marketing Roundup, to conduct a genotoxicity study

21   of Roundup?

22       A.  I would have expected them to do the

23   studies required by regulatory agencies for approval

24   of the product.

25       Q.  Beyond regulatory agency requirements, do

Bruce A. Woda, M.D.

1    you find it unusual that they've never tested their

2    manufactured product for the possible toxicity or

3    danger to human health?

4           MR. BROMBERG: Objection. Misstates

5    facts. You can answer.

6           A.   So I have no knowledge of what Monsanto

7    did or didn't do. It's my belief that they did what

8    was required of them. Whether they did more or

9    less, I can't say.

10          Q.   Fair enough. Moving on to general

11    causation, are you familiar -- I take it from your

12    answer that you are familiar with IARC Monograph

13    112, correct?

14          A.   Yeah.

15          Q.   And to be clear, you're -- IARC stands for

16    the International Agency for the Research on Cancer?

17          A.   Yes.

18          Q.   And it is an interdepartmental agency

19    within WHO, the World Health Organization?

20          A.   Yes, I believe IARC is an agency of the

21    World Health Organization.

22          Q.   Are you familiar with IARC's review

23    process?

24          A.   I have a vague familiarity with that.

25          Q.   All right. Are you familiar

Bruce A. Woda, M.D.

1    with -- strike that.  What is the scope of your

2    familiarity with or what is your understanding of

3    the review process?

4         A.  As I said, it's very vague.  I think they

5    impanel a panel of individuals that they invite to

6    review data, and they try to reach a consensus about

7    what that data shows.

8         Q.  Do you know how many --

9         A.  I also don't believe that they open their

10   findings or recommendations to external review or

11   comment, which I think is -- might improve their

12   process.

13        Q.  When you state that it's not open to

14   external review or comment, at which point are you

15   referring?

16        A.  Once a guideline is issued, it's my

17   understanding that external comment is not invited

18   about the guideline.

19        Q.  Are you aware that the chemical that is

20   going to be subject to review is identified

21   approximately a year in advance of the -- the

22   conducting of that review?

23        A.  So I don't have a good understanding of

24   how IARC identifies issues to review, so I don't

25   have an understanding of that or what their timeline

Bruce A. Woda, M.D.

1    is.

2        Q.   All right.  Do you have any reason to

3    believe that the time period before the announcement

4    of what chemical is being reviewed and when that

5    review panel meets, whether or not outside comment

6    or information can be provided to the panel?

7        A.   I don't have knowledge of the internal

8    workings of IARC at that level.

9        Q.   Okay.  Do you have any knowledge with

10   regard to the process between their initial

11   announcement and when the monograph is eventually

12   published?

13       A.   No, I don't.

14       Q.   Do you have any reason to believe that

15   comment is not of people -- or individuals are not

16   able to comment during that period of time?

17       A.   No, I don't have a good understanding of

18   the IARC processes in preformulating their opinion

19   and the process after formulating their opinion and

20   the process that goes to final publication.

21       Q.   Are you aware that the panel will review

22   available published material?

23       A.   Yes, I am aware they review available

24   published material.

25       Q.   With regard to glyphosate, do you know how

Bruce A. Woda, M.D.

1    many published articles the panel reviewed?

2         MR. BROMBERG:  If you're going to ask him

3    that question to that level of detail, do you have a

4    copy of that monograph to show him?

5         MR. WALSH:  Probably do.

6      Q.   Would that help you, Doctor?

7      A.   Probably help to give a more precise

8    answer.

9      Q.   I don't have a clean copy, now that I

10   think about it.  We'll continue.  Will you accept

11   that the panel reviewed approximately 1,000

12   published articles in conducting their review of

13   glyphosate?

14     A.   I have no way to know whether that's

15   accurate or not.

16     Q.   Okay.  Are you familiar that the panel

17   found that glyphosate causes DNA and chromosomal

18   damage in human cells?

19     A.   So I believe the panel did find that, but

20   what they didn't find was whether those were

21   permanent changes in the size, meaning would they be

22   pathogenic.

23     Q.   Is your lack of awareness because you

24   don't know whether it was found or not, or you just

25   don't recall from the review of the pamphlet?

Bruce A. Woda, M.D.

1      A.  I think it's a limitation of the study to

2  know whether it's applicable to human disease.  And

3  I think then we would need to get into the details

4  of the study, so just saying that they showed this,

5  I -- it would be useful to look at the exact models

6  they used, the exact doses of glyphosate.  So I

7  don't think I have enough information to comment

8  specifically, but I know what they didn't show, is

9  that anything they found would be relevant to the

10  disease.

11      Q.  I'm sorry, would not be relevant to --

12      A.  To prove that they would be relevant to

13  disease.

14      Q.  Let's take --

15      A.  The other issue we get into there is what

16  portion of the studies show that, how reproducible

17  they were, and again, to look at the exact models

18  that were used.

19      Q.  For the exact models, you're referring to

20  the models used in the underlying studies that were

21  reviewed?

22      A.  Correct.

23      Q.  And that would be detailed within each of

24  the studies, the articles dealing with those studies

25  specifically, correct?

1      A.  Correct.

2      Q.  And you can identify those studies by

3  reading the list of papers reviewed by the panel,

4  correct?

5      A.  So that data should be in the IARC

6  documents.  I think it is, to show what study they

7  reviewed and how they interpreted them.

8      Q.  So all that information is then available

9  either through the pamphlet 112 or the review of the

10  underlying details, correct?

11     A.  That information is available in the

12  document.  It was available to the -- EPA also

13  looked at that document, and I believe I reviewed a

14  number of the underlying publications and had a

15  different opinion about the relevance or importance

16  of those findings.

17     Q.  How familiar are you with the EPA's review

18  process?

19         MR. BROMBERG:  Objection to form.

20     A.  So the EPA being a -- sort of a

21  governmental agency, requires review of substances

22  which you could be exposed to, requires a number of

23  tests before compounds can be used, evaluates the

24  data, formulates an opinion, has a public comment

25  period, and then would render a position statement

Bruce A. Woda, M.D.

1    or a regulatory rule on their findings.

2        Q.   Okay.  But, Doctor, the question was your

3    familiarity with the EPA review other than basic

4    guidelines, how -- for example, how many papers

5    specific to glyphosate did the EPA review versus

6    those that IARC reviewed?

7        A.   In some areas I think it was more, because

8    the EPA also looks at unpublished studies, which I

9    think are useful in their evaluation.  I don't

10   believe that the EPA looked at studies in

11   nonmammalian species, which I believe IARC did look

12   at, and I can't speak for the EPA, but I think their

13   rationale was that studies in nonmammalian species

14   may not be relevant to human disease.

15       Q.   How many individuals at the EPA are

16   involved in the review of glyphosate?

17       A.   I don't know what the EPA deems as a

18   sufficient number of individuals to review a study.

19       Q.   Is it one -- or is it more than one, to

20   the best of your knowledge?

21       A.   I can't speculate on the number of

22   individuals that review any individual study.

23       Q.   As opposed to IARC, which identifies

24   exactly who the individuals are that conducted the

25   review?

Bruce A. Woda, M.D.

1          MR. BROMBERG: Objection to form. Assumes

2     facts not in evidence.

3          Q.  I'm just -- which process -- strike that.

4     You indicated before that IARC did not address how

5     their findings were relevant to prove human disease.

6     What did you mean by that?

7          MR. BROMBERG: Objection to the extent it

8     misstates his testimony, but you can answer.

9          A.  In my review, there are two issues I like

10    to discuss. One, which I think is a very important

11    issue, I believe that IARC said that there was

12    limited evidence of human carcinogenicity for

13    glyphosate. They thought that there was sufficient

14    evidence in a number of animal models -- animal

15    models with the endpoint being development of tumors

16    and in in vitro analysis, and I don't think they got

17    that right, based upon my review of the literature.

18         Q.  Let's break that --

19         A.  The things that I think that -- sorry to

20    interrupt.

21         Q.  My apologies. Go ahead.

22         A.  I think the issues that they didn't get

23    right, was there a reproducible outcome in the

24    animal models to suggest that glyphosate played a

25    role in carcinogenicity. And the issues to be

Bruce A. Woda, M.D.

1    thought about are were the animal models evaluated

2    appropriately, did the findings exceed

3    carcinogenicity in a control group of animals,

4    statistical factors. And I believe that IARC made a

5    statement that exceeding the -- tumors exceeding the

6    proportion and controls was not an important issue

7    for them, that historical controls were actually not

8    that important.

9            And I think we can't really interpret data

10   unless we know what the controls show. Otherwise,

11   potentially we're looking at noise.

12           It also seemed that there was not a

13   consistent pattern of neoplasia in the various

14   animal models. There were almost, like, random

15   events. There was also some inconsistency between

16   the sexes of the models, and one can argue sex that

17   hormones played a role, and that's why there are so

18   many inconsistencies. Male rat's not going to get

19   ovarian cancer.

20           But I think for, you know, causation,

21   there should be an excess number of tumors versus

22   historical controls. There should be some

23   reproducibility. There should be some dose-response

24   relationship. You might want to see progression

25   from a benign tumor to a malignant tumor.

Bruce A. Woda, M.D.

1          The other thing that I didn't see in the

2   studies is whether they did the studies in specific

3   pathogen-free animals or not.  And many of these

4   studies were done 30 years ago.  I don't think

5   people paid that much attention to that then.  Now

6   we would, and that can be a real confounder.  I

7   don't know if there were, you know, viral

8   contamination of their colonies, so I think all that

9   together makes these studies very hard to draw

10  conclusions on except if you review the sum of the

11  data tables.  I'm not sure that the instance of

12  tumors was beyond that, historical controls.

13       Q.  When you're using the term historical

14  controls, how are you defining that term?

15       A.  There are two kinds of controls in these

16  studies.  One is treatment versus no treatment.

17  Now, usually these studies are done in relatively

18  small numbers of animals, which I think are way too

19  small, in my opinion.

20          The other control is if you know that --

21  something about the history of a colony of mice or

22  rats and know what the background incidence of

23  tumors is, and you have a very large amount, so you

24  have hundreds and thousands of animals, does that

25  give you a better understanding of the instance of

Bruce A. Woda, M.D.

1    neoplasia versus a smaller number actually present

2    in the study.

3        And it's my understanding that IARC paid

4    much less attention to that than the EPA did.  I

5    think, looking at the much -- that historical

6    background of a colony, that strain of animal we

7    know, provides important data.  It helps one

8    understand is this really different; is it occurring

9    by chance?

10        Q.  So what you'd be looking for, for example,

11   is if a certain type of rat -- and I'm sorry, I

12   don't deal with them enough to have the name off --

13   on the tip of my tongue.  If exposure results in

14   tumors growing in that specific group of rat seven

15   times or nine times, that would be a frequency of

16   demonstrating carcinogenicity in the animal to

17   support a concern for that chemical?

18        MR. BROMBERG:  Objection to form.

19        A.  So one would have to show if one wanted to

20   demonstrate the effect of that chemical in that rat

21   strain, is it different than a control group, is it

22   different than the historical controls in the same

23   rat strain.  I think if that condition is true, one

24   could draw a more robust conclusion.

25        Q.  And there you're using a statistical

Bruce A. Woda, M.D.

1    analysis.  You're looking at 95 percent confidence

2    interval and seeing a high-enough incident over what

3    the control group would show?

4        A.  Right.  So one wants to make sure that

5    your interpretation is not based on chance, and so

6    one has to understand what chance -- you know, what

7    the possibility of chance influencing the result

8    might be.

9        Q.  And is your understanding that the studies

10   in IARC that were finding cancer in animals based on

11   exposure was not sufficient to demonstrate the link?

12       MR. BROMBERG:  Objection.  Form.

13       A.  So my opinion would be that they didn't

14   demonstrate a definitive link between a chemical

15   exposure and the development of a neoplasm in those

16   animal models.

17       Q.  Now, these are -- when you're looking at

18   these models, you're looking specifically at the epi

19   models?  Are you -- I'm sorry, are you drawing a

20   distinction between epidemiological models, the

21   genotoxicity studies that were conducted, and the

22   toxicological models?  Really tough to do those

23   words with a dry tongue.

24       MR. BROMBERG:  I think we were talking

25   about animal studies; weren't we?

Bruce A. Woda, M.D.

1       A.  Right, we're talking about -- we're

2   referring to animal studies.

3       Q.  Fair enough.  So with regard to the

4   toxicological studies that were conducted that IARC

5   then reviewed, do you accept their conclusion with

6   regard to the link between glyphosate and cancer on

7   a toxicological basis?

8       MR. BROMBERG:  Objection to form.

9   Toxicological.  Are you referring to the genotox?

10      MR. WALSH:  No, different.  The genotox is

11  a separate group.

12      A.  Okay.  What's the -- I guess I need more

13  information on toxicological association with

14  cancer.

15      Q.  I've wandered from my approach a little

16  bit, so let's -- take counsel's approach.  Were

17  there genotox studies involved in IARC's review?

18      A.  Yes, there were genotoxicity studies in

19  IARC's review.

20      Q.  And those studies are looking at impact on

21  DNA strands within the cell or an impact on the gene

22  from exposure to glyphosate, correct?

23      A.  They did a number of studies looking at

24  potential effects of glyphosate and DNA on a number

25  of models.

Bruce A. Woda, M.D.

1        Q.  And IARC found a strong association

2   between -- within the genotox studies, correct?

3        A.  So when IARC rendered its opinion, it's my

4   understanding, as I said, that it was limited

5   evidence of human carcinogenicity based upon

6   epidem- -- human epidemiological studies.  They felt

7   that there was evidence in the animal studies for

8   tumor genesis, which I don't think there was

9   compelling evidence for that, and they did find a

10  number of genotoxicity studies which they scored as

11  positive effects, which also were important in their

12  reaching the conclusion that they reached.

13          And there were -- and I would say I don't

14  remember them all.  There were a number of studies

15  done, nonmammalian species, which I did not review

16  in great detail.

17          The studies done in mammalian species,

18  which they scored as positive, the issue to be

19  considered is are those permanent genetic

20  alterations, or are they transient issues, toxicity

21  issues, to the cells?  By toxicity, I mean they just

22  kill the cells and the DNA fragments.  Are they

23  permanent changes?

24          And I believe that the animal studies

25  which looked at, you know, both body weight in the

Bruce A. Woda, M.D.

1    animals, longevity of the animals, and fetal demise

2    in the animals, which is a reasonable thing to look

3    at, so if I'm giving you a chemical, and your fetus

4    doesn't survive, that might be important.

5        Q.  Uh-huh.

6        A.  Because that shows, you know, a permanent

7    deleterious effect in the genome.  I don't believe

8    the fetal-to-mice studies were positive.  I don't

9    think there was any increased fetal demise in their

10   studies.  So the in vitro studies, I'm not sure that

11   they provide good evidence of permanent or

12   pathogenetic mechanisms of disease.  They show

13   something, but the question is, is it important?

14       Q.  So if I understand what you're doing is

15   you're essentially linking the genotoxicity with

16   determinations with the animal tests, so you're

17   recognizing that's a DNA break, is occurring as the

18   genotox studies reflect, but in the animal testing,

19   because there may not have been a sufficient body

20   weight loss, or there may not have been a fetus loss

21   at a sufficiently high number you're associating the

22   break with a temporary impact as opposed to a

23   permanent impact?

24           MR. BROMBERG:  Objection.  Misstates his

25   testimony.  Objection.  Form.

Bruce A. Woda, M.D.

1          A.  So initially in genotoxicity studies is if

2     there is a positive study, does that study prove or

3     demonstrate that in a living organism, an animal or

4     human, is that an important issue?  Are those cells

5     damaged, meaning is the substance toxic at the

6     levels used?  Is any finding that was found a

7     transitory finding, meaning that those cells would

8     go on to repair anything that was found.  Would the

9     cells go on to die?

10          And the reason I brought up the

11     fetal-demise issue is if you hypothesize that these

12     findings are important, then show me that you have a

13     deleterious effect in a model which would confirm

14     that study, and that has not been shown.

15          Q.  My --

16          A.  And my understanding when -- in the EPA

17     scoring of the studies, they found -- it was their

18     opinion -- I think they rated 99 percent of them as

19     being negative.

20          And I haven't -- I'd have to review the

21     details to see if they look -- you know, they do

22     have the table of references in both publications,

23     and I haven't matched them up to show whether

24     they're concordant to 100 percent or what the

25     portion the EPA used or what portion IARC used or

Bruce A. Woda, M.D.

1   what the overlap was, but I know what I think the

2   defect is in the IARC studies, and I know what the

3   EPA opinion is on the in vitro studies, and I would

4   think if someone thought it was so important or the

5   findings were so compelling that, you know, they

6   would do the fetal-demise studies, and yes, it's

7   true, or no, it's not true, or they would go ahead

8   and repeat the animal studies.  You know, if I'm --

9   if I'm investigator X, and I think I have an

10  important finding, why stop there?  I mean, it's

11  crazy.  I mean, this -- you know, this would be a

12  breakthrough for somebody.  Why not go the extra

13  step?  Why couldn't they do that?

14      Q.  With regard to genotox studies, you've

15  been discussing a problem you see.

16      A.  I mean, I see the -- sorry to interrupt.

17          MR. BROMBERG:  Let him ask a question.

18      Q.  You need to take two steps back.  How is a

19  genotoxicity test typically performed?

20      A.  There are multiple --

21          MR. BROMBERG:  Object to form.

22      A.  -- genotoxicity tests.

23      Q.  Typically, and I may be completely wrong

24  on this, but typically performed on cells, correct?

25      A.  Correct.

Bruce A. Woda, M.D.

1      Q.  It is not -- you are not taking a live

2   rabbit or rat for purposes, typically, for doing

3   genotoxicity tests, correct?

4      A.  That is correct.  And I want to go back to

5   the point I made, and I think it's such a tremendous

6   omission.  If people are really -- really want to

7   show a change in outcome, they need to do the

8   studies.  They haven't done them.  So we're talking

9   about studies which were done and individuals, you

10  know, advocating one point to the other, and I would

11  think there would be a tremendous benefit for

12  someone to do the studies, and they haven't done

13  them.

14     Q.  Your position, standing alone, though, for

15  genotoxic studies, essentially renders them

16  meaningless; doesn't it?  I mean, if you're looking

17  for what is the long-term outcome, there is no way

18  of knowing that when the test is being performed on

19  the cells?

20         MR. BROMBERG:  Objection.

21     A.  I think it gives you --

22         MR. BROMBERG:  Let me get my objection

23  out, please.  Objection to form.  Argumentative.

24     A.  I think it gives you a clue.  Okay.  So

25  you have a clue.  You have a finding.  If you want

Bruce A. Woda, M.D.

1 to get that finding, I think to change the practice

2 of medicine, to change your understanding of

3 biology, do the study.

4  Q. With --

5  A. Why -- you know, and I would keep on going

6 over this point, because I guess it's -- you know,

7 just sitting here and going through this for months

8 and months, it's such an important issue, and I

9 think if someone felt strongly about this, they

10 would try and prove the point, and my guess is they

11 have tried to prove the point, and it's negative.

12  Q. When glyphosate is exposed to a

13 lymphocyte, causing a DNA break within the DNA

14 strand itself, what is -- from a genotox

15 perspective, what is the value of that study?

16   MR. BROMBERG: Objection to form.

17  A. I'd like to know what dose of glyphosate

18 was used. I'd like to know the test system that was

19 used. I'd like to know how the cells were handled.

20 I'd like to know how the cells were scored. So I

21 think I can't answer that question.

22  Q. Okay.

23  A. Or I can't -- based upon the parameters

24 you gave me, I can't formulate a full answer to you.

25  Q. Okay. And presuming -- because I did not

Bruce A. Woda, M.D.

1    see it on your list of reviewed materials, you have

2    not reviewed the Mladnic -- Mladnic study from 2009,

3    which did apply glyphosate to lymphocytes and

4    observe the DNA breaks?

5        A.  If it's not on my list, it's not likely I

6    reviewed it.  Do you have a copy of the publication?

7        Q.  I can provide, through counsel, names, and

8    you'll see the transcript.  The first name -- the

9    last name on the lead author is M-l-a-d-n-i-c.  And

10   I've got the -- over on the side.  I can do it at

11   the end.

12       A.  Again, I think these studies are

13   insufficient.

14       Q.  Equally, you have not reviewed the 2012

15   Koller study where glyphosate exposure induced DNA

16   damage in TR146 cells?

17       A.  Correct, I have not reviewed it.

18       Q.  You have not --

19           MR. BROMBERG:  You mean the actual study

20   as opposed to a summary of the study?

21           MR. WALSH:  Right.  No, he's not reviewed

22   the study.

23       Q.  Or obviously the article concerning the

24   study?

25       A.  I have the same issue with all of these

Bruce A. Woda, M.D.

1    studies in terms of, one, valuing the methodology

2    and, two, the outcome, whether it's a permanent

3    change in the genome or a transitory change.

4        And going back to the issue about

5    causation -- so I'm still not sure why someone

6    hasn't done a study looking at whole genome

7    sequencing in patients exposed or not exposed to

8    Roundup to see if there's a mutational pattern or

9    increased mutational rate. That has not been done.

10       The data is just not sufficient, you know,

11   to render a positive view of causation, and I think

12   in 2020 these studies all could be done.

13       Q.  How high does the bar need to be for test

14   results in order for you to be satisfied for the

15   demonstration of the carcinogen in Roundup?

16       A.  I'd have to see --

17       MR. BROMBERG: Let him finish his

18   question. Let me get my objection out. Can you

19   repeat the question, please?

20       Q.  Good God.

21       MR. BROMBERG: Sorry. He cut you off.

22       Q.  How high does the bar need to be in order

23   for you to believe that exposure to glyphosate is

24   linked with a -- or causes/enhances the risk of

25   developing Non-Hodgkin's lymphoma?

Bruce A. Woda, M.D.

1          MR. BROMBERG: Objection to form. You can

2    answer if you understand the question.

3       A.  Please repeat the question. Sorry.

4       Q.  Sure. Animal studies have demonstrated

5    that there is a -- have resulted in cancer being

6    developed in animals from exposure to glyphosate.

7       A.  Right.

8       Q.  Genotox studies have --

9          MR. BROMBERG: Wait.

10      A.  Wait. Sorry. I'm going to ask you to

11   repeat once more. My train of thought got lost.

12         MR. BROMBERG: Listen to the question. I

13   don't know if you were finished with the question.

14         MR. WALSH: No, still rolling through the

15   streets there.

16         MR. BROMBERG: Let him ask the question,

17   and wait, give me a chance to object, and then

18   answer. Okay?

19         THE WITNESS: Okay.

20      Q.  You previously were referencing you don't

21   understand why certain tests haven't been

22   conducted -- you believe that they could be -- that

23   prior to those tests being conducted and prior to

24   positive results being received -- or achieved or

25   witnessed, I guess, in those tests, there is no

Bruce A. Woda, M.D.

1    reason to link a chemical, in this case glyphosate,

2    but, really, any chemical, as a probable carcinogen;

3    is that correct?

4        MR. BROMBERG: Objection to form.

5    Misstates his testimony.

6        A.  The evidence I would like to see is that

7    an alteration in DNA leads to a change in the

8    permanent phenotype of a cell.  And that can be done

9    also.  So a relatively common assay that has been

10   used is to transform in vitro cell cultures, whether

11   they be fibroblasts or lymphocytes, to show that you

12   can generate internal growth in those things, that

13   those cells adopt cancer like capabilities

14   phenotype.

15       Q.  All right.

16       A.  And I think for me, besides the studies

17   that I've talked about, which are a little more

18   involved and difficult to do, although they could be

19   done, that kind of study is a relatively classical

20   study, which I believe also hasn't been done, to

21   show you can transform a cell in vitro into a tumor

22   cell.  That is a relatively simple study.  Why

23   hasn't anyone done that?

24          So just showing -- you can take those same

25   cells, show you have DNA -- some alteration DNA,

Bruce A. Woda, M.D.

1    which may or may not be.  You could prove this

2    point.  And my guess, again, is that people have

3    tried, but the studies are negative, because it's a

4    relatively simple thing to do.

5        Q.  With regard to that form of test,

6    accepting, typically, a need for a cell to go

7    through multiple mutations before it becomes a

8    cancer cell, how frequently has that type of test

9    been used by IARC or the EPA in order to determine

10   that a chemical is an actual or probable carcinogen?

11       MR. BROMBERG:  Objection to form.

12       A.  So -- you know, I'm giving my opinions

13   about where I think this field is ripe to go to

14   prove or disprove a point.  I don't believe those

15   assays are a requirement of EPA, and I don't believe

16   those assays are part of -- were a part of the IARC

17   review process, so we have no data on it.

18       Q.  Fair enough.  For review or assessment of

19   whether a chemical causes cancer, I'll defer to you

20   if there's someone else, but typically the two

21   leaders in that field are either the NTP with the

22   United States or IARC with WHO, correct?

23       MR. BROMBERG:  Objection to form.

24       A.  That's beyond my -- why don't you ask the

25   question again.  Sorry.

Bruce A. Woda, M.D.

1      Q.   Fair enough.  And I'll break it down.  Are

2   you aware of the NTP ever conducting that assay, as

3   you described it, in order to assess whether or not

4   a chemical is a possible or probable or actual

5   carcinogen?

6      A.   Forgive my ignorance, the NTP is what?

7         MR. BROMBERG:  National Toxicology

8   Program.

9      Q.   Yeah, that's -- I couldn't remember the P,

10   but I believe that's right.

11      A.   It's not -- so I'm not familiar with the

12   National Toxicology Program.

13      Q.   Okay.  That won't work, then.  Fair

14   enough.  Are you familiar with any agency that

15   you -- within the United States in assessing whether

16   or not a chemical is a carcinogen, possible,

17   probable, or actual, that uses that assay or has

18   used that approach up to this point in order to

19   assess the chemical?

20      A.   No, I'm not.

21      Q.   Okay.

22      A.   I think my point was that could be done.

23   It's possible I've taken this deposition, you know,

24   off its focus, but I'm giving you my own views about

25   what I think could be done to an agent remaining

Bruce A. Woda, M.D.

1    under active study to provide more proof of its

2    action or inaction.

3          And getting back to where -- I think where

4    we started, if there is an in vitro assay which

5    shows some alteration in DNA, that may give one a

6    hint that it's worthwhile further studying, but I

7    think it's hard to make a conclusion and just stop

8    there and saying, this is proof of X or Y, because I

9    don't think it's proof of X or Y.

10          MR. BROMBERG:  Can we take a quick

11    bathroom break?

12          MR. WALSH:  Sure.

13          THE VIDEOGRAPHER:  Going off the record.

14    Time is 2:35.

15          (Recess was taken from 2:35 to 2:44.)

16          THE VIDEOGRAPHER:  We are back on the

17    record.  Time is 2:44.

18      Q.  Try and regain the track, Dr. Woda.  Are

19    you familiar with Dr. Chris Portier?

20      A.  No.

21      Q.  All right.  Are you aware that he is the

22    former associate director of the NTP?

23      A.  Nope.

24      Q.  Did you see him listed as the invited

25    participant for IARC on the issue of glyphosate?

Bruce A. Woda, M.D.

1       A.  I did not.

2       Q.  Were you made aware that he has appeared

3   as an expert for the plaintiffs in the various

4   Roundup litigations?

5       A.  I don't recall his name being mentioned.

6   It may have.  I just don't recall.

7       Q.  Have you sought all of the expert reports

8   and/or testimony from the various Roundup cases on

9   general causation?

10      A.  I have not sought nor have I reviewed any

11  issues in other cases.

12      Q.  Just want to confirm.  You don't have any

13  basis to disagree that IARC, on its review of

14  glyphosate, spent approximately -- or announced a

15  year in advance that it would be reviewing the

16  background material and conducting its review of

17  glyphosate, correct?

18      A.  I have no knowledge, so I can't say

19  whether it's true or not true.

20      Q.  Fair enough.  And there were 17

21  participants in the IARC review of glyphosate?

22          MR. BROMBERG:  Objection.  Asked and

23  answered.

24      A.  I don't have knowledge.

25      Q.  Okay.

Bruce A. Woda, M.D.

1      A.  Recollection of how many individuals were

2  involved in the review.

3      Q.  And your -- you -- your review of

4  published information and material was approximately

5  one-tenth of what IARC reviewed for its

6  determination on glyphosate?

7          MR. BROMBERG:  Objection to form.

8      A.  Not knowing how -- exactly how many

9  publications are reviewed, I can't comment on that.

10  I think we know what I reviewed.  I'm not certain of

11  the exact number of publications IARC reviewed.

12      Q.  Fair enough.  And you've listed 99

13  articles in your materials consideration list.  IARC

14  considered approximately 1,000.  That's where the

15  one-tenth comes from.

16          Do you know how many studies the EPA has

17  access to that IARC did not have access to?

18      A.  I don't know the exact number.  I know the

19  EPA included a number of unpublished results in

20  their evaluation.

21      Q.  Are there potential biases inherent to an

22  unpublished study?

23          MR. BROMBERG:  Objection to form.

24      A.  So that's an interesting question.  So

25  there's a potential for anything.  The question is,

Bruce A. Woda, M.D.

1    was there a bias. And I think the real answer to

2    that is how rigorous the review process is from

3    looking at those studies to say that they meet the

4    regulatory criteria. And it's my belief that those

5    studies were accepted by EPA as valid studies, so I

6    think in that sense it would be reasonable for them

7    to conclude it.

8        Q.  You just said consistent with the

9    regulatory requirements. What are the -- what are

10   the regulatory requirements, for example, to the

11   agricultural health study?

12       MR. BROMBERG: Objection to form.

13       A.  I'm not sure I understand the question.

14       Q.  Sure. You reference regulatory

15   requirements. I'm just trying to find out what

16   requirements you were referencing with regard to

17   unpublished studies. And I apologize. I used the

18   agricultural health study as an example. I assumed

19   that was the one that you were focused on.

20       MR. BROMBERG: I don't recall agricultural

21   health publishing a study.

22       MR. WALSH: Well --

23       A.  It was my interpretation of the question,

24   correct me if I'm wrong, is that the regulatory

25   studies that I was referring to was for the approval

Bruce A. Woda, M.D.

1    of a compound by EPA that would require a variety of

2    studies to show that the compound was safe.

3        Q.  Okay.  So for unpublished studies, you're

4    referring to something that the manufacturer has

5    submitted for glyphosate to the EPA for evaluation?

6        A.  Yes.  It's my understanding that the EPA

7    used a number of those studies.

8        Q.  And that those manufacturer studies are

9    consistent with whatever the applicable federal

10   regulatory requirements are?

11       MR. BROMBERG:  Objection to form.

12       A.  So understanding the role of the EPA, it's

13   my understanding that they do have requirements that

14   companies must go through for approval of a

15   compound, and those kinds of studies are described

16   by the regulatory agency.

17       Q.  And those are the only studies that, to

18   the best of your knowledge, are the unpublished ones

19   that the EPA was reviewing for --

20       A.  I'm not sure what other unpublished

21   studies they used.

22       Q.  Fair enough.  Just a slight backtrack,

23   work through the IARC report to some degree.  Are

24   there any other exceptions or disagreements that you

25   have with the glyphosate portions -- the

Bruce A. Woda, M.D.

1    glyphosate-specific portion within Monograph 112?

2        A.   So the disagreement I would have is with

3    the conclusion that they made that glyphosate should

4    be considered a human carcinogen.  I think the

5    weight of the evidence is that's not true, and I

6    think there are a number of international bodies

7    which have come to agreement or -- they have done

8    their own evaluation and disagree with IARC's

9    opinion.  Certainly the EPA disagrees with IARC's

10   opinion, and I think epidemiologic studies such as

11   the agricultural health study have shown no

12   association of glyphosate with human cancer.

13       Q.   Did IARC actually determine that

14   glyphosate should be considered a carcinogen?

15       A.   I think it went to the category of

16   possible or likely.  I don't think it was in the

17   definitive category.

18       Q.   I agree that was what you just said, so I

19   was looking for a clarification.  Correct that they

20   identified it as a probable carcinogen?

21       A.   Correct.

22           MR. BROMBERG:  You need to answer

23   verbally.

24       A.   Correct.

25       Q.   And in IARC's report they did identify and

Bruce A. Woda, M.D.

1    acknowledge that their epi evidence for their

2    position was limited?

3        A.  Correct.  They said the epidemiological

4    evidence was limited.  They gave more weight to

5    other studies that they did.

6        Q.  For the studies that you've looked at

7    to -- and that the EPA has looked at but

8    specifically you looked at in reaching a

9    counterposition, are you aware that Monsanto funded

10   some of those studies?

11       A.  Yes, I am aware that Monsanto supported

12   the authors in some of those settings.  Yes.

13       Q.  And are you aware that Monsanto employees

14   have written portions of those studies?

15           MR. BROMBERG:  Objection.  Assumes facts

16   not in evidence.

17       A.  So which study are we talking about?

18       Q.  I'm drawing a blank on which the -- I'll

19   need to -- I'll get a name and get back to you on

20   that.  We'll go back to that.

21           You've referenced and cited, several

22   times, the EPA.  The EPA does not conduct any

23   independent tests itself, correct?

24       A.  I believe they rely on tests done

25   externally.

Bruce A. Woda, M.D.

1       Q.   They're just reviewing the material

2    presented to them, correct?

3       A.   That's my understanding.

4       Q.   Okay.  Do you believe that the EPA has

5    acted consistent within some guidelines in

6    conducting its review of material on glyphosate?

7       A.   So not having a complete understanding of

8    the inner workings of EPA, it's my assumption,

9    rightly or wrongly, they are paying attention to

10   their own rules.

11      Q.   If it's shown that EPA has failed to

12   follow its own guidelines, would that change your

13   opinion?

14          MR. BROMBERG:  Objection to form.  States

15   facts not in evidence.

16      A.   I think to answer that question one would

17   have to understand if there were deviations or not,

18   what those deviations were, are they important.

19   Were they important if there were deviations.  I

20   think it doesn't change what other regulatory

21   agencies in other parts of the world have concluded.

22      Q.   So if a significant breach of the EPA's

23   guidelines is identified for you, would that

24   potentially change your opinion as to whether or not

25   glyphosate is a probable carcinogen?

Bruce A. Woda, M.D.

1           MR. BROMBERG:  Objection.  Assumes facts

2     not in evidence.

3           MR. WALSH:  It's a hypothetical, Counsel.

4        A.   So my first response is I certainly

5     haven't seen data that glyphosate is a carcinogen,

6     and I base that on looking at -- the epidemiologic

7     data that's published are the ones I've reviewed,

8     the opinions of other regulatory agencies, and gets

9     back to the issue of whether there was or wasn't a

10    deviation in policy, and is that deviation material

11    or not.  So it's not something I think I can answer.

12    I don't know the facts, if there are facts that

13    you're referring to.  I can't evaluate it.

14       Q.   Fair enough.  That's fine.  You've

15    referenced several times other international

16    agencies.  What other international agencies are you

17    referencing?

18       A.   So it's my belief that the European Union

19    Agency has looked at this, and I can't remember

20    their exact name.  I think this has been looked at

21    in Japan, England, Australia, Canada.  Those are the

22    ones that I recollect.

23       Q.   Okay.  It's your belief that the agencies

24    of each of those nations plus the EU have looked at

25    glyphosate and made an assessment?

Bruce A. Woda, M.D.

1       A.   Yes.

2       Q.   Have you reviewed those assessments?

3       A.   I did take a look at the EU assessment.  I

4   have not looked at the exact documents in the

5   other -- from the other countries.

6       Q.   Okay.  For the EU's assessment, is that

7   identified within your review of materials of

8   consideration -- considered list?

9       A.   I don't recall.

10      Q.   Okay.

11          MR. BROMBERG:  You have it here.  Why

12  don't you take a look?

13          MR. WALSH:  That's fair.

14          MR. BROMBERG:  It's right here.

15      A.   I think it's in material 47.

16      Q.   Okay.  Any other documents?

17      A.   I don't believe so.

18          MR. BROMBERG:  Any other documents

19  relating to the European Union?

20          MR. WALSH:  That's he's reviewed -- well,

21  either the EU or any -- well, no, concerning the EU

22  since that's the only one he referenced that he

23  reviewed.

24      A.   So certainly references 66 and 67 would be

25  pertinent.  I must say I didn't review them in

Bruce A. Woda, M.D.

1    detail.

2        Q.   Okay.  So with regard to Canada, you

3    actually did review, to some degree?

4        A.   My recollection is I clicked on them

5    and -- but didn't review them in detail, no.

6        Q.   With regard to the EFSA, what information

7    did that agency review?

8        A.   I didn't review that document in enough

9    detail to say how they came to their conclusion.

10       Q.   You indicated before -- a little before

11   our break that you would expect a dose response

12   within the testing.  What were you referring to?

13       A.   So in an experimental model, one would

14   expect that a response that's being measured is

15   proportional to a dose being administered if one

16   stays below a toxic dose.  It should be in the

17   physiologic range.

18       Q.   So an increased dose would result in some

19   form of increased response or adverse response

20   within the animal?

21       A.   Response could be a good response or an

22   adverse response, but you'd expect, you know, in

23   biologic systems, most of them you'd expect an

24   increasing -- what should I say?  A relationship

25   between the outcome and the dose evolved until you

Bruce A. Woda, M.D.

1    reach a maximum dose.

2         Q.   And it's your belief that an increase

3    response, measuring increased dose, has not been

4    seen within the studies conducted?

5         MR. BROMBERG:   Objection to form.   What

6    studies?

7         Q.   Epi studies, those that IARC review in the

8    context in which they arose.

9         A.   Okay.   So the -- I think the best

10   epidemiologic study is the agricultural health

11   study, and I think their methodology, and they came

12   up with an intensity score or scale for exposure to

13   Roundup, and they also looked at longevity, so they

14   were both in intense reviews and time between use of

15   the measuring outcome, and basically I found that

16   all doses and all outcomes they didn't find any

17   evidence of human carcinogenicity.

18        Other studies have used, you know, varying

19   methodologies to try and measure intensity of

20   exposure.   It's my opinion none of them shows, you

21   know, real-dose-response relationship.

22        Q.   Okay.

23        (Exhibit 9 marked.)

24        Q.   Mark as Exhibit 9 the 2008 Ericsson study,

25   which is marked as Pesticide Exposure for Risk

Bruce A. Woda, M.D.

1    Factors in Non-Hodgkin's Lymphoma, Including

2    Histopathological Subgroup Analysis. Have you had a

3    chance to review the paper?

4        A.  Yes. Thanks for the refresher. I haven't

5    gone through it in detail right now, but --

6        Q.  All right. I'm just going to --

7        A.  -- I see some --

8        Q.  And I'm just going to quickly address one.

9    If you look at table two which is on page 1659.

10   Have the authors here broken down the exposure to

11   glyphosate to between less than ten days -- or less

12   than equal to ten days or greater than ten days?

13       A.  Yes. That's what table two reflects.

14       Q.  And would that involve an increased

15   exposure dose?

16           MR. BROMBERG: Objection to form.

17       A.  So the question I have about this is how

18   do we know how much glyphosate was used per day

19   here, so is this really intensity -- I mean, for

20   somebody who used this less than ten days, they

21   spray three gallons or four gallons in greater than

22   ten days, sprayed one gallon -- it's hard -- it's

23   hard for me to know, you know, what calculated total

24   exposure is.

25       Q.  So your concern is, in essence, this

Bruce A. Woda, M.D.

1    person at ten days might have been spraying five

2    gallons a day, and the person with ten days or more

3    might have been a pint a day?

4         A.   So yeah, I think we need to know the

5    intensity of exposure.

6         Q.   Would that -- or does the information with

7    regard to the amount of spraying done with

8    glyphosate or exposure to glyphosate appear within

9    the study?

10        A.   There is a sentence that they looked at.

11   Length of exposure per day, but I don't see that as

12   a data point in here.

13        Q.   Fair enough.  However, in table two there

14   is a -- if, for the moment, we presume that exposure

15   is relatively consistent within the first ten days

16   or ten plus on or 11 plus on, there is an increase

17   in the odds ratio after ten days, correct?

18        A.   So the paper does show increase in the

19   enlarged ratio, but I don't believe this was

20   adjusted for exposure to other pesticides, and I

21   think the only multivariate analysis I see is in

22   their table seven.  And when they do a multivariate

23   analysis, they generate nonstatistically significant

24   data.  I would think that to really interpret the

25   study, one has to do a multivariate analysis.

Bruce A. Woda, M.D.

1    Q.   Presuming for the moment that the

2    univariate analysis is applicable, that there were

3    no other chemicals at issue at the time of the --

4    for this, is that the type of dose response that you

5    would be looking for when you indicated before

6    that -- for -- in criticizing IARC that you would be

7    looking for an increased dose response?

8         MR. BROMBERG: Objection to form. Assumes

9    facts not in evidence.

10    A.   I think we can't really look at the data

11    in isolation, so if their data shows multivariate

12    analysis, it's not significant. I'm not sure we can

13    accept, you know, a data generated by univariate

14    analysis.

15    Q.   We've talked about the various types of

16    studies, genotox, epi, animal studies, relevant.

17    How do you, I guess, weigh or balance the importance

18    of each of those studies in forming your opinion?

19         MR. BROMBERG: Objection. Form.

20    A.   So in forming my opinion, I think the

21    endpoint of human disease is the most important

22    endpoint.

23    Q.   So does that result in placing a priority

24    or deference to any one of the -- any one of the

25    study approaches?

Bruce A. Woda, M.D.

1             MR. BROMBERG: Objection. Form.

2         A.  So it's my opinion if we're trying to find

3     an effect of a substance, human health, then while

4     animal studies can be important, we should measure

5     human health.

6             So I would put, you know, more weight on

7     studies which actually measure human health.

8         Q.  However, it isn't -- is that placing some

9     form of limitation on the testing, though, because

10    scientists effectively can't go and provide dose

11    challenges for individuals moving forward and seeing

12    how things turn out?

13            MR. BROMBERG: Objection. Argumentative.

14        A.  Outside of a clinical trial and testing a

15    new pharmacologic agent, we certainly don't

16    administer substances which don't have potential

17    or -- we don't -- we don't do that kind of study.

18        Q.  Correct. So the question, if you want to

19    give a priority to a focus on human health, but we

20    cannot necessarily take glyphosate and select a

21    control group and select another group of 5,000

22    people in each group, how are you placing a

23    priority, or are you placing a priority on any of

24    the studies that are being used in order to reach

25    that goal?

Bruce A. Woda, M.D.

1          MR. BROMBERG: Objection to form.

2          A.   So this is a difficult issue, and, you

3    know, if you read through the Ericsson study, you

4    can appreciate some of the difficulties.

5    Individuals are reporting what they're using or not

6    using, how long that might be, and authors are

7    trying to measure an outcome.  And when they try to

8    evaluate all the variables, which is, I think, a

9    challenge here, you know, they have done so and have

10   come up with a negative or null result.

11          And so this work is hard.  It's my opinion

12   that's why the agricultural health study is

13   considered to be an important study.  It's, I think,

14   not likely to be repeated because of the scope of it

15   where a cohort of people enter a study and report

16   what they're doing.  They were followed for a very

17   long time to see what the effect on their health is,

18   if any.

19          And that study showed no effect on their

20   health by being engaged or using glyphosate at

21   various doses after various periods of time.

22          I think the good part of that study was

23   that they had very high numbers of people, so you

24   can make a statistical analysis.

25          This study, Ericsson, I think, and we

Bruce A. Woda, M.D.

1    could look at their table two, had 29 cases in 18

2    controls, so I think it's hard to make a statistical

3    evaluation.

4        Q.  If your priorities are --

5        A.  The number of cases in the NHS for

6    lymphoma -- again, sorry for interrupting.

7        Q.  That's all right.

8        A.  I think approximately 350, something like

9    that.

10       Q.  If your priority ultimately is on human

11   health, absent the ability to run tests on actual

12   humans, is there not an advantage, then, for

13   providing sufficient identification to individuals

14   that there is a potential issue associated with the

15   product?

16       MR. BROMBERG:  Objection to form.  Assumes

17   facts not in evidence.

18       A.  So I think the issue we get into is

19   there -- has it been shown that there's an adverse

20   effect on human health, and no, that's my opinion,

21   no, that's not been shown.  So then there will be no

22   reason to warn someone if there's no adverse effect

23   of an agent on your health.

24       Q.  If the genotoxicity tests have

25   demonstrated that glyphosate does break DNA strands,

Bruce A. Woda, M.D.

1    if the animal testing does demonstrate that exposure

2    of glyphosate results in tumors in animals -- in

3    mammals --

4        A.  I'm not sure.

5            MR. BROMBERG:  Let him ask his whole

6    question.  He's just laying out his hypothetical.

7            THE WITNESS:  Okay.

8        Q.  -- is that a sufficient basis in order to

9    justify providing information to the consumer of the

10   possibility that the product may cause cancer?

11           MR. BROMBERG:  Objection to the extent

12   that Dr. Woda is not being offered as a warnings

13   expert.  You can answer.

14       A.  Certainly not a warnings expert, but I

15   disagree with the premise that it's been shown in

16   animal studies that glyphosate is a carcinogen.

17       Q.  Let's move to the one area that we haven't

18   really tapped.  Toxicology studies are essentially

19   studying the impact of a chemical substance on

20   ordinances, correct?

21       A.  Yes, that's my understanding.

22       Q.  What factors within a tox study tend to

23   support a finding of cancer in animals?

24           MR. BROMBERG:  Objection to form.

25           You can answer.

Bruce A. Woda, M.D.

1      A.  So in an animal study, I think the

2   important criteria are determining whether a

3   substance that is given to the animals in

4   physiologic doses, not toxic doses but physiologic

5   doses, would exhibit a -- one, reproducibility,

6   meaning if you did the study ten times you'd come up

7   with the same answer.  That would be a pattern of

8   neoplasia induced, and it would be different from

9   the historical controls in that animal commune.

10     Q.  Okay.

11     A.  There should be dose response,

12  reproducibility, pattern of disease.  Those are the

13  things I would put forward.

14     Q.  And just to break down, the dose gradient

15  is a factor that you consider important in looking

16  at?

17     A.  I think dose gradient is important, yes.

18     Q.  Temporal relationship an important factor

19  in consideration?

20        MR. BROMBERG:  In animal study?

21        MR. WALSH:  Yes, in animals.

22     A.  So bitemporal relationship, the outcome

23  should occur after administration of the substance.

24  An issue in animal studies is, you know, how long a

25  latency might be, and I think the best we can do is

Bruce A. Woda, M.D.

1    measure it, you know, through the normal lifespan of

2    the animal. So if a rat or a mouse lives two years,

3    that's the time we have to look.

4           In fact, I still have nightmares about a

5    paper I wrote 40 years ago, looking at tumor

6    incidents, colonies of Brown Norway and Lewis rats,

7    and I had to go evaluate these very heavy, smelly

8    rats every week and determine their outcomes. It

9    was an interesting study.

10   Q.  The price of academia there. You, a

11   moment ago, referenced repetition of results and use

12   of ten times. Is it -- would your expectation under

13   tox study be that you conduct the same test ten

14   times on one specific form of rat, and you get the

15   same result each time with regard to a chemical that

16   may be linked with Non-Hodgkin's lymphoma?

17   A.  I think there are two ways to approach

18   that. So one could have a large enough N --

19          MR. BROMBERG: Could have a what?

20   A.  Large enough N --

21   Q.  Number of.

22   A.  -- meaning animals in a study, so you

23   could make a statistical calculation whether it's

24   different than a control group. One could also

25   repeat a study. So you have an outcome, want to

Bruce A. Woda, M.D.

1    know if you can do it again. So there are, I think,

2    a few ways to handle this.

3        Q. Sure. But based on the progress that --

4    of cancer genetically and how -- what it takes to

5    develop, if you're in -- in the study is --

6    unfortunately, I avoided this in college -- 25 or

7    50 -- say it's 25. Are you going to get the same

8    incidence of tumors if you run ten studies with an N

9    of 25 with the same dose of glyphosate to those

10   rats?

11       MR. BROMBERG: Can you read back the

12   question, please.

13       (Record read by the reporter.)

14       MR. BROMBERG: Objection to form.

15       A. So my answer would be there would be

16   variation between the studies.

17       Q. All right. How wide -- given the instance

18   of tumors in rats, what would the scope of that

19   variation be?

20       MR. BROMBERG: Objection. Form.

21       A. I'm not sure it's -- I can't give you an

22   accurate answer about the expected variation in a

23   study like that if you did it twice.

24       Q. You were looking for reputation, and as I

25   recall, your reference was ten out of ten. Would

Bruce A. Woda, M.D.

1    there be a significant -- if you conducted a -- the

2    experiment ten times with an N of 25, would there be

3    a substantial variation between results?

4         MR. BROMBERG: Objection. Form. Asked

5    and answered.

6         A.  I think to decrease the variation in

7    results, the larger the study is should decrease the

8    variation and increase the statistical significance.

9         Q.  Okay. And that makes sense. What is

10   going to be, then, for testing a chemical whether or

11   not it causes Non-Hodgkin's lymphoma? How large

12   does the N have to be in order to meet the

13   consistency and results that you were referencing

14   before where you got the same result ten out of ten

15   times?

16        MR. BROMBERG: Objection. Form.

17        A.  I haven't explored this issue in detail,

18   so I'm -- I can't really give an accurate answer.

19        Q.  Okay. I just --

20        A.  Yeah.

21        Q.  Wondering and following where you were

22   leading, I believe. Your notes that you came with

23   today listed ten studies, and I apologize. I looked

24   at it briefly, and I may not have caught one. Is

25   there any tox study on that list?

Bruce A. Woda, M.D.

1      A.  No, there's not.

2      Q.  Are there any tox studies that you found

3  relevant in forming your opinion that -- or

4  particularly relevant in forming your opinion that

5  glyphosate does not -- is not a carcinogen?

6      A.  What's included --

7          MR. BROMBERG:  Objection to the term tox

8  study?

9      A.  What's included in the term tox study?

10     Q.  I guess I would -- it's more your

11  bailiwick than mine.  What is your understanding of

12  toxicological studies?

13     A.  Are you referring to the animal studies?

14     Q.  Typically.  I -- we'll use that.

15     A.  I reviewed the results of the animal

16  studies present in the EPA document and went through

17  the animal strains, the tumor types, the tables that

18  compare tumor incidents to historical controls.  No

19  one study stood out in my mind.  My interpretation

20  of them is that there was not a trend that one could

21  follow in reproducibility, and there wasn't a

22  demonstration of difference in tumor incidents from

23  historical controls.

24     Q.  How detailed was your analysis of the

25  tables and the numbers that were within those animal

Bruce A. Woda, M.D.

1    studies?

2        MR. BROMBERG: Objection to form.

3        A.  Detailed enough to interpret them and

4    understand them.

5        Q.  Okay. How much -- strike that. Moving

6    back first. Within the 99 articles that are

7    identified on your material considered list, how

8    many tox studies are listed, approximately, on

9    there?

10        A.  I wouldn't estimate how many tox studies

11    are there.

12        Q.  There are approximately 25, at least?

13        A.  Not having categorized them like that, I

14    can't answer the question.

15        Q.  Okay.

16        A.  Or I can't answer accurately.

17        Q.  With regard to an animal study, on

18    average, how much time did you spend reviewing each

19    article?

20        MR. BROMBERG: Objection to form.

21    Misstates his testimony.

22        MR. WALSH: That was a different question.

23        MR. BROMBERG: You still misstated his

24    testimony about what he reviewed.

25        A.  So I reviewed the EPA document,

Bruce A. Woda, M.D.

1     summarizing the animal studies that they considered.

2        Q.   Did you review any published articles on

3     animal studies?

4        A.   I reviewed the Greim article, which was

5     also review, looking at animal studies.  I did not

6     review the individual studies.

7        Q.   You're aware that the Greim study is a

8     study that Monsanto funded?

9           MR. BROMBERG:  Objection to form.  If

10    you're going to ask him a question about a specific

11    study, can you show him the study?

12          MR. WALSH:  Not with me.

13       Q.   Are you aware that the Greim study is one

14    that Monsanto funded?

15       A.   I would like to see the study to see the

16    acknowledgments in the paper.

17       Q.   All right.  Do you have an opinion on

18    whether glyphosate causes tumors in rodents?

19       A.   It's my opinion it has not been shown that

20    glyphosate produces tumors in rodents above that of

21    the historical controls, so one can't attribute the

22    outcome to glyphosate.

23       Q.   Do you have an opinion on whether

24    glyphosate causes oxidate stress -- oxidative

25    stress?

Bruce A. Woda, M.D.

1      A.   There is some evidence, based upon

2   published literature, that has found evidence of

3   oxidated stress.

4      Q.   Do you have an opinion on whether

5   glyphosate causes DNA damage in cells?

6         MR. BROMBERG: Objection to form.  Object

7   to the term DNA damage.

8      A.   There is literature to measure alterations

9   in DNA, but again, we don't know whether those are

10   physiologically important or not.

11      Q.   Okay.

12      A.   So the cell might have damage.  We don't

13   know whether the cell will live, die.  So the issue

14   is what the significance of the finding is.

15      Q.   Are you familiar with Bradford Hill

16   considerations?

17      A.   I've certainly heard that paper which I

18   believe is from the 19 -- mid-1960s, and I can't

19   recall all the parameters, but I recall some of

20   them.

21      Q.   All right.  Did you use those parameters

22   in your assessment on whether or not glyphosate is a

23   probable carcinogen?

24      A.   I believe the parameters there are

25   basically common sense things, and if I can recall

Bruce A. Woda, M.D.

1    some of the parameters, you know, one is

2    plausibility. Is there a mechanism where you think

3    this substance can cause an action that you're

4    looking at. Is it temporally related? Is there

5    some time that's associated with the administration

6    of the substance. I think they have an issue there

7    about reproducibility. Is this a real finding that

8    can be reproduced? And I think there are two more

9    criteria, which I guess I can't remember right now.

10        Q.  Okay. So presumably you did not utilize

11   those criteria for your assessment or analysis?

12        A.  I would say I utilized common sense

13   criteria or things I thought were meaningful, and I

14   believe most of them were incorporated into the

15   Bradford Hill criteria.

16        Q.  So did you -- I apologize. Did you look

17   at things like dose-response relationship?

18        A.  Yes, I think dose response is an important

19   issue.

20        Q.  Did you look at effect size or strength?

21           MR. BROMBERG: Strength of association?

22        Q.  No --

23        A.  Not sure what they meant by that.

24        Q.  Well, they used it as strength, which is,

25   you know, the effect size. And let's see if I've

Bruce A. Woda, M.D.

1    got a definition out of the article.

2         MR. BROMBERG:  Oh, strength of

3    association.

4         Q.  It's more a matter of looking at

5    necessarily -- a small association does not

6    necessarily mean that there's no causal link between

7    the two, so I will actually accept counsel's looking

8    at strength of association.  Was that a

9    consideration in your review?

10        A.  So the statement was that a small

11   association --

12        Q.  Does not --

13        A.  Could eventuate in causality?

14        Q.  Does not mean there's no effect?

15        A.  Does not mean there's no effect.  In

16   analyzing that statement, one would have to look at

17   whether that association met statistical

18   significance so it could be interpreted, and I can't

19   read into -- I don't have the -- all the Bradford

20   Hill paper here, but I'm sure they talk about how to

21   analyze whether that small association is important

22   or not.

23        Q.  Okay.  You've talked about -- is

24   consistency an important consideration?

25        A.  I would consider consistency an important

Bruce A. Woda, M.D.

1    consideration.

2        Q.  How do you define consistency?

3        A.  Similar results if one repeated a study.

4        Q.  Conducted by different individuals?

5        A.  That would depend upon the study design.

6    Is the study design comparable.  Is the system that

7    they're studying similar.  So I think one would have

8    to look into the details of it.

9        Q.  Okay.  In reviewing the literature that

10   you reviewed, was there a -- and we'll use the

11   epidemiological studies, because that provided a

12   focus.  Was there a method to which you approached

13   those studies -- your review of those studies?

14           MR. BROMBERG:  Objection.  Asked and

15   answered.

16       A.  So epidemiologic studies, you know, as

17   we've discussed, are, I think, difficult to perform,

18   and certainly difficult to perform well.  There

19   are -- I think are criteria for evaluating such

20   studies to determine whether they can be evaluated.

21           Regretfully, a very small number of

22   studies have been deemed to be evaluable.  And it's

23   my understanding that the issues in evaluating a

24   study have to do with the selection of the group of

25   individuals to be studied, the parameters to be

Bruce A. Woda, M.D.

1    studied, are there enough individuals in a study to

2    interpret the study, is it powered well enough, is

3    the data that individuals supply when they enter

4    into a study meaningful.

5         Do the study individuals -- are the cases

6    and controls selected appropriately. Is the

7    statistical analysis performed well.

8         So there are a number of parameters to

9    look at, and I think very few studies have exceeded

10   the bar for us to consider them.

11   Q.  This -- six items you just listed after

12   mentioning criteria for evaluating, are those the

13   criteria you were using for assessing the

14   epidemiological studies that you reviewed?

15   A.  I would say that they are some of the

16   criteria. I may have forgotten things I've used,

17   but I think that's the basic principles.

18   Q.  Okay. When you reference parameters as a

19   criteria, what parameters -- or what type of

20   parameters do you have in mind or were you

21   considering in reviewing this literature?

22   A.  That refers to study design. And the

23   basic principle is this a case control study, if so,

24   how are the cases and controls selected? Did the

25   case -- how do you determine whether the reporting

Bruce A. Woda, M.D.

1      is -- of exposure to a substance is accurate or not.

2      Is there any recall, bias there. Were the cases,

3      the actual individuals, exposed, or were they

4      someone speaking for the individual?

5             Then had one measure -- how does one

6      validate that, and I think some of the studies, I

7      think, try to validate it. I think that's, you

8      know, a necessity.

9             The other format, which is a bit, I think,

10     harder to do, because it's like Framingham Heart

11     Study. They will -- what is it, 100,000 nurses or

12     something, and they follow them forever, and you can

13     get very strong data from that.

14            So similar to the Framingham Heart Study,

15     the study tried to enroll a large number of

16     agricultural health workers and then follow them for

17     life as best as they could. That might get rid of

18     some of the issues about accurate reporting, what

19     substances one is exposed to. It gets rid of the

20     issues with proxy respondents, and was designed long

21     enough so they can analyze the data. Of course

22     there was lots of individuals involved.

23            So I think those are the two kinds of

24     models, and I hope I've answered your question.

25     That's sort of my thinking when I think through

Bruce A. Woda, M.D.

1    these issues about, you know, what's potentially a

2    good study and what studies may be less informative.

3        Q.   Okay.  Within this --

4            MR. WALSH:  You want to take a break?

5            MR. BROMBERG:  Yeah.  I want to talk to

6    you.

7            THE VIDEOGRAPHER:  Going off the record.

8    Time is 3:47.

9            (Recess was taken from 3:47 to 3:54.)

10           THE VIDEOGRAPHER:  We're back on the

11   record.  Time is 3:54.

12           MR. WALSH:  After consulting with counsel,

13   and Dr. Woda, in order to accommodate schedules,

14   we're going to close down the deposition now,

15   adjourn it for it to be resumed ideally a week from

16   this coming Sunday in Boston.  The doctor's offered

17   his time, which is greatly appreciated.  With any

18   luck, we will not have snowstorms, which will cause

19   other issues.  And anything to add?

20           MR. BROMBERG:  No.

21           MR. WALSH:  Otherwise, we will adjourn for

22   the day and continue when we can reschedule.

23           THE VIDEOGRAPHER:  We're going off the

24   record.  Time is 3:55.

25           (Deposition concluded at 3:55 p.m.)

Bruce A. Woda, M.D.

```
 1          IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
 2                  STATE OF MISSOURI
 3   LEROY SEITZ, et al.,
 4           Plaintiff,
 5       vs.        NO:  1722-CC11325
 6   MONSANTO COMPANY,
 7           Defendant.
 8
 9
10       CERTIFICATE OF COMPLETION OF DEPOSITION
11       I, ROBIN A. BRAZIL, New Mexico CCR #154, DO
     HEREBY CERTIFY that on February 4, 2020, the
12   deposition of BRUCE A. WODA, MD, was taken before me
     at the request of, and sealed original thereof
13   retained by:
14       WILLIAM A. WALSH
         WEITZ & LUXENBERG, PC
15       700 Broadway
         New York, New York  10003
16       (212) 558-5836
         wwalsh@weitzlux.com
17
         I FURTHER CERTIFY that copies of this
18   certificate have been mailed or delivered to all
     Counsel, and parties to the proceedings not
19   represented by counsel, appearing at the taking of
     the deposition.
20
         I FURTHER CERTIFY that examination of this
21   transcript and signature of the witness was required
     by the witness and all parties present.
22
         On _____, a letter was mailed or
23   delivered to NEIL S. BROMBERG regarding obtaining
     signature of the witness, and corrections, if any,
24   were appended to the original and each copy of the
     Deposition.
25
```

Bruce A. Woda, M.D.

```
 1        I FURTHER CERTIFY that the recoverable cost of
     the original and one copy of the deposition,
 2   including exhibits, to WILLIAM A. WALSH is
     $_____.

 3

 4        I FURTHER CERTIFY that I did administer the
     oath to the witness herein prior to the taking of
 5   this deposition; that I did thereafter report in
     stenographic shorthand the questions and answers set
 6   forth herein, and the foregoing is a true and
     correct transcript of the proceeding had upon the
 7   taking of this deposition to the best of my ability.
 8        I FURTHER CERTIFY that I am neither employed by
     nor related to nor contracted with (unless excepted
 9   by the rules) any of the parties or attorneys in
     this case, and that I have no interest whatsoever in
10   the final disposition of this case in any court.
11

12             _____    _____
               Robin A. Brazil, RPR
13             Certified Court Reporter NM CCR #154
               License Expires: 12/31/2020
14


15

16

17   (3488N) RAB
     Date Taken:  February 4, 2020
18

19

20

21

22

23

24

25
```

Bruce A. Woda, M.D.

1   Seitz vs. Monsanto

2        WITNESS SIGNATURE/CORRECTION PAGE

3    If there are any typographical errors to your

     deposition, indicate them below:

4

5   PAGE  LINE

6   _____ Change to_____

7   _____ Change to _____

8   _____ Change to_____

9   _____ Change to _____

10    Any other changes to your deposition are to be

    listed below with a statement as to the reason for

11   such change.

12  PAGE  LINE  CORRECTION        REASON FOR CHANGE

13  _____

14  _____

15  _____

16  _____

17  _____

18    I, BRUCE A. WODA, MD, do hereby certify that I

    have read the foregoing pages of my testimony as

19  transcribed and that the same is a true and correct

    transcript of the testimony given by me in this

20  deposition on February 4, 2020, except for the

    changes made.

21

22    _____

      BRUCE A. WODA, MD

23

24  (3488N) RAB

    Date Taken: February 4, 2020

25  Proofed by:  AB