# EXHIBIT 3

```
 1            UNITED STATES DISTRICT COURT

 2          NORTHERN DISTRICT OF CALIFORNIA

 3

 4   IN RE: ROUNDUP PRODUCTS      ) MDL No. 2741

 5   LIABILITY LITIGATION         ) Case No.16-MD-02741-VC

 6                                )

 7   THIS DOCUMENT RELATES TO:    )

 8   GIGLIO v. MONSANTO           )

 9   COMPANY,                     )

10   Case No. 3:16-cv-05658-VC    )

11   -----------------------------

12

13                    - - -

14          Monday, October 21, 2019

15                    - - -

16        VIDEOTAPED DEPOSITION of ALEX LeBEAU, PhD,

17   MPH, CIH, held at Ron Fleming Video Productions,

18   Inc., 1512 E. Concord Street, Orlando, Florida

19   32803, commencing at 8:08 a.m., on the above date,

20   before Karen Schmieder, Certified Shorthand

21   Reporter.

22                    - - -

23          GOLKOW LITIGATION SERVICES

24     877.370.3377 ph  |  917.591.5672 fax

25              deps@golkow.com
```

1    APPEARANCES:

2

3    For the Plaintiff:

4        GOMEZ TRIAL ATTORNEYS

5        BY: JESSICA T. SIZEMORE-WETZEL, ESQ.

6        655 West Broadway, Suite 1700

7        San Diego, California 92101

8        Jessica@thegomezfirm.com

9        Ph. 619.237.3490

10

11   For the Defendant:

12       HOLLINGSWORTH LLP

13       BY: JOHN M. KALAS, ESQ.

14       1350 I Street, N.W.

15       Washington, D.C. 20005

16       Kkalas@hollingsworthllp.com

17       Ph. 202.898.5848

18

19   ALSO PRESENT:

20       JENNIFER ROPER, Videographer

21       Golkow Litigation Services

22

23                        - - -

24

25

Alex LeBeau, PhD, MPH, CIH

```
 1                    I N D E X

 2                       - - -

 3   Testimony of:   ALEX LeBEAU, PhD, MPH, CIH

 4                                            PAGE

 5      Direct Examination by Ms. Sizemore        5

 6      Cross-Examination by Mr. Kalas          246

 7      Redirect Examination by Ms. Sizemore    251

 8

 9                  E X H I B I T S

10   No. 1, Defense Response to the             9

11         Document requests

12   No. 2, LeBeau report and attachments      15

13   No. 3, Supplemental Materials Considered  15

14         List

15   No. 4, Retention letter and agreement for 20

16         services/retention of Exposure

17         Assessment Consulting LLC

18   No. 5, Labor rate schedule and invoicing  20

19   No. 6, Acquavella study                   105

20

21   No. 7, McDuffie study                     145

22

23

24

25                       - - -
```

Alex LeBeau, PhD, MPH, CIH

1              THE VIDEOGRAPHER:  We are now on

2     the record.  My name is Jennifer Roper.  I am a

3     videographer for Golkow Litigation Services.

4     Today's date is October 21st, 2019, and the time is

5     approximately 8:09 a.m.

6              This video deposition is being

7     held in Orlando, Florida, at 1512 Concord Street,

8     in the matter of Giglio v. Monsanto Company in

9     reference to Roundup, case 3:16-CV-05658-VC for the

10    United States District Court, Northern District of

11    California.

12             The deponent is Alex LeBeau,

13    Ph.D., MPH, CIH.

14             Will counsel please introduce

15    themselves for the record.

16             MS. SIZEMORE:  Good morning.

17    Jessica Sizemore on behalf of the plaintiff.

18             MR. KALAS:  Good morning, John

19    Kalas on behalf of the defendant Monsanto.

20             THE VIDEOGRAPHER:  The court

21    reporter is Karen Schmieder, and she will now swear

22    in the witness.

23

24

25

Alex LeBeau, PhD, MPH, CIH

```
 1   Whereupon,

 2                    ALEX LE BEAU,

 3      having been first duly sworn by the notary

 4   public, was examined and testified as follows:

 5                    * * * * *

 6                    DIRECT EXAMINATION

 7   BY MS. SIZEMORE:

 8        Q.   Good morning, Dr. LeBeau.

 9        A.   Good morning.

10        Q.   Am I pronouncing that correctly?

11        A.   Yes, ma'am.

12        Q.   Perfect.  I understand that, at least

13   according to your report, you have not been deposed

14   in quite some time, is that accurate?

15        A.   That is accurate.

16        Q.   Have you ever been deposed before?

17        A.   No, ma'am.

18        Q.   Okay.  I am going to go over some ground

19   rules.  You may have discussed these with counsel.

20   We call them admonitions; basically just some

21   things to keep in mind, if that's okay with you?

22        A.   Yes, ma'am.

23        Q.   First, you understand that you're under

24   oath, and it's the same oath that you would take in

25   a court of law?
```

Alex LeBeau, PhD, MPH, CIH

1      A.   Yes, ma'am.

2      Q.   I'll do my best to ask questions

3  throughout the deposition that make sense, but if

4  for any reason they don't, please just let me --

5  ask me to rephrase them.  I want to make sure that

6  you understand my questions.  If you don't ask me

7  to rephrase a question, I'm going to assume that

8  you understood it.  Is that fair?

9      A.   Yes, ma'am.

10      Q.   We have the video here, but we do often

11  rely on the written transcript, so a couple of

12  things to keep in mind just so we don't have a

13  really messy transcript.

14           First being that it's important

15  that only one of us talk at any given time.  We are

16  going to run into speech patterns where you're

17  going to anticipate exactly where my question is

18  going and you're going to want to jump in.  Human

19  nature.  Everybody does it.

20           I'd ask that you try to do your

21  best to let me get my full question out, and I'll

22  try to do the same and not trample on your answers.

23  Okay?

24      A.   Yes, ma'am.

25      Q.   For the same reason, it's important that

Alex LeBeau, PhD, MPH, CIH

1    we don't get nods of the heads or shake of the
2    heads or "um-hmms," or "uh-huhs." Those can be kind
3    of difficult to interpret on a written transcript.
4    So if you do that, I might prompt you is that a
5    "yes," is that a "no."  I'm not trying to be rude.
6    It's just so we have a clear transcript.  Okay?
7         A.   Yes, ma'am.
8         Q.   Is there any reason that your deposition
9    can't go forward today?
10         A.   No, ma'am.
11         Q.   There's things that I might ask you about
12    today that call for you to give me your best
13    estimate of things.  I don't expect we're going to
14    have that many questions on that, but we don't want
15    you to guess or speculate as to anything here.
16              Do you understand the difference
17    between a guess and an estimate?
18         A.   Yes.
19         Q.   Okay.  What I want to do is go through
20    the documents that were produced last night in
21    response to the request for production of
22    documents.  And so I'm going to go ahead and just
23    mark the defense response to the document requests
24    as Exhibit 1 to the deposition, without the
25    accompanying documents.  I'll give that to the

Alex LeBeau, PhD, MPH, CIH

1  witness.

2                    MR. KALAS:  Okay, so you're

3  marking just the response, not the attachments

4  there?

5                    MS. SIZEMORE:  Correct.

6                    MR. KALAS:  Okay.

7                    (Exhibit 1 was marked for

8  identification.)

9  MS. SIZEMORE:

10      Q.   There's a copy for you, Doctor.

11                   Did you have an opportunity to

12  review the document requests that were served on

13  counsel?

14      A.   Yes, ma'am.

15      Q.   And based on that review is it your

16  recollection that you've produced everything that

17  you have that's responsive, absent any sort of

18  objection?

19      A.   Yes, ma'am.

20      Q.   I'll go through just a few of them.  I

21  won't take -- go through all of them.

22                   But looking at request No. 1:

23  It's all documents that you rely upon to support

24  your opinions.

25                   Is it accurate to say that all the

Alex LeBeau, PhD, MPH, CIH

1    documents that you've relied upon to support your

2    opinions are contained within your materials

3    considered list or the supplemental materials

4    considered list received yesterday?

5         A.   Yes.

6         Q.   Looking at request No. 3, which is on

7    page three, talks about all photographs and videos

8    that you've taken and relied upon in this case.

9              In review of your expert report

10   there were some photographs taken from the site

11   inspection that you attached to them.  Are those

12   all of the photographs that you've taken that

13   you've relied upon in forming your opinions in this

14   case?

15        A.   Yes.

16        Q.   And they were all attached to the report?

17        A.   Yes, they appear to be.

18        Q.   And did you take any video or audio

19   recordings in connection with your work on this

20   case?

21        A.   No.

22        Q.   No. 4 requests your entire file.  What we

23   were provided in relation to this was your report

24   along with all the photographs that were attached

25   to your report and your materials considered list.

Alex LeBeau, PhD, MPH, CIH

```
 1    Does that encompass your entire file related to

 2    this action?

 3         A.   Can you ask the question again, please?

 4         Q.   Sure.  In front of you, you have a copy

 5    of what was produced to us, which is your expert

 6    report with all of the attachments, correct?

 7         A.   Yes.

 8         Q.   Is that your entire file related to the

 9    action, other than the documents that we were

10    produced last night?

11         A.   Yes.

12         Q.   Do you have any handwritten notes

13    regarding this case?

14              MR. KALAS:  I am just going to

15    note for the record there is an agreement among the

16    parties that notes are privileged and not to be

17    produced.  But you can ask that question and you

18    can answer it.

19         A.   I have one note or two, but nothing

20    specific related to this.

21    MS. SIZEMORE:

22         Q.   And the materials you reviewed in

23    connection with this matter, including any of the

24    articles or any of the depositions, is it your

25    practice to make notes on those?
```

Alex LeBeau, PhD, MPH, CIH

```
 1        A.    No.

 2        Q.    No. 5 requests a report summary of

 3   opinions and/or conclusions or outline.

 4                    Is that -- the report that is in

 5   front of you, is that the only report you've

 6   created in connection with this case?

 7        A.    Yes.

 8        Q.    Have you created any other summaries of

 9   your opinions or outlines of your opinions?

10        A.    No.

11        Q.    No. 6 requests all documents, data or

12   other material supplied to you in connection with

13   this case.

14                    Would those all be listed on your

15   materials considered list?

16        A.    Yes.

17        Q.    Is there anything that was supplied to

18   you that you did not put on your materials

19   considered list?

20        A.    No.

21        Q.    Billing records, engagement letters and

22   invoices is request No. 7.  Is it your

23   understanding that all of those were produced to us

24   last night?

25        A.    Yes.
```

Alex LeBeau, PhD, MPH, CIH

1      Q.   Do you have any outstanding work, other

2  than today, that has not been in the list?

3           MR. KALAS:   I object to vague as

4  to which case you're referring to.

5  BY MS. SIZEMORE:

6      Q.   Just in relation to this matter?

7      A.   There may be an outstanding invoice for

8  this month related to what is going on today.

9      Q.   Are all of the materials that you

10  obtained through your research of these issues

11  contained with within your materials considered

12  list, regardless of whether you ultimately found

13  them helpful or not?

14      A.   Do you have a number on that?

15      Q.   Sure.  If you look at request No. 10,

16  which is on page seven, it asks for all documents

17  generated from any research, review and/or

18  evaluation that you've undertaken concerning

19  glyphosate, glyphosate-based herbicides, Roundup,

20  pesticides, insecticides, herbicides and causes for

21  risk factors for the development of non-Hodgkin's

22  lymphoma, whether you found the research helpful or

23  not?

24      A.   I believe so.

25      Q.   And so the question essentially would be:

Alex LeBeau, PhD, MPH, CIH

1    Are there any materials that you found during your

2    research that you opted not to include in your

3    materials considered list?

4         A.   No.

5         Q.   No. 13 on page eight asks for a list of

6    deposition or trial testimony in the last five

7    years.

8              Is it accurate that you have not

9    testified either in deposition or in trial within

10   the past five years?

11        A.   Correct.

12        Q.   And I know we covered depositions, but

13   have you ever testified in trial?

14        A.   No, ma'am.

15        Q.   Okay, I'll get to the remainder of them

16   throughout the questioning.  So I can move on from

17   there.

18              Okay, Doctor --

19              MR. KALAS:  Are we putting exhibit

20   stickers on it, just so they can -- sorry, just

21   trying to keep the record.

22   BY MS. SIZEMORE:

23        Q.   I would like to mark as Exhibit 2 a copy

24   of what was produced to us, which I understand to

25   be your report along with the attachments to the

Alex LeBeau, PhD, MPH, CIH

1    report.  I understand you have a copy of it in front

2    of you, but just for the record I want to mark what

3    was produced, in case there's any differences.

4                    (Exhibit 2 was marked for

5    identification.)

6                    MS. SIZEMORE:  Thank you.

7    BY MS. SIZEMORE:

8        Q.   If I could just have you take a look at

9    Exhibit 2 and confirm that that is the report you

10   produced in connection with this case, along with

11   all attachments?

12       A.   (Witness examining document.)  It appears

13   to be, yes.

14       Q.   And contained within Exhibit 2 is a copy

15   of the original materials considered list in

16   connection with this matter, is that correct?

17       A.   It appears that way, yes.

18       Q.   And last night we received a supplemental

19   materials considered list that I would like to mark

20   as Exhibit 3.

21                    (Exhibit 3 was marked for

22   identification.)

23       Q.   So does Exhibit 3 -- strike that.  Is

24   Exhibit 3 your current materials considered list

25   for this matter?

Alex LeBeau, PhD, MPH, CIH

1      A.    (Witness examining documents.)  Yes.

2      Q.    And my review of the supplemental list,

3  that there's an additional five entries, does that

4  seem accurate to you?

5      A.    Approximate number, yes.

6      Q.    Do you recall, sitting here today, which

7  five entries were added since the production of the

8  materials considered list?

9      A.    I don't remember the exact ones in here.

10      Q.    Do you recall why you added additional

11  materials to the materials considered list?

12      A.    Give me additional information in support

13  of my opinion.

14      Q.    Based on my review, it looks like two of

15  the things that were added were the supplemental

16  deposition of Mr. Giglio on August 29th, 2019, as

17  well as the deposition of Dr. Sawyer in this

18  matter.  Is that correct?

19      A.    (Witness examining documents.)  I have

20  Mr. Giglio in my previous material considered list.

21      Q.    Did you have all three volumes of his

22  deposition?

23      A.    Yes.

24      Q.    Okay.  Dr. Sawyer's deposition was added?

25      A.    Yes.

Alex LeBeau, PhD, MPH, CIH

```
 1         Q.    Okay.  And let's see, looking at entry
 2   197 on your supplemental list, it's an article by
 3   Rages I think.  I'm not sure if I'm pronouncing
 4   that correctly, R-A-G-E-S?
 5         A.    Yes.
 6         Q.    Was that document added?
 7         A.    (Witness examining documents.)  Yes.
 8         Q.    Why was that added?
 9         A.    To give me additional information on
10   formulated products.
11         Q.    And what do you mean additional
12   information on formulated products?
13         A.    On evaluation of -- to show the low
14   levels of impurities in those products.
15         Q.    And when did you review that document, to
16   the best of your recollection?
17         A.    Within the last few weeks approximately.
18               MR. KALAS:  Counsel, can I just
19   make a statement for the record real quick.
20               One thing that's going on here,
21   and I know you're not casting any aspersions, is
22   that he's reviewing other cases for the MDL, and we
23   just want you to have all that information.
24               MS. SIZEMORE:  Sure.
25               MR. KALAS:  So that's what's going
```

Alex LeBeau, PhD, MPH, CIH

1    on here, yeah.

2                MS. SIZEMORE:  No problem.  I'm

3    just trying to ascertain what's specific --

4                MR. KALAS:  Sure.  No, I got it.

5                MS. SIZEMORE:  Okay.

6    BY MS. SIZEMORE:

7         Q.   And looking at entry 205, the Solomon

8    entry, was that also added?

9         A.   Yes.

10        Q.   And was that added in response to this

11   matter?

12        A.   That was added for some additional

13   updates that were identified.

14        Q.   When you say additional updates, what do

15   you mean by that?

16        A.   From the original Solomon article.

17        Q.   Okay, is that the entry right below it,

18   entry 206?

19        A.   Yes.

20        Q.   Okay.  And so entry 205 is an update to

21   entry 206?

22        A.   Some additional information.  I don't

23   want to say an update to the publication, but

24   presenting additional information on what was

25   contained in the original publication.

Alex LeBeau, PhD, MPH, CIH

1    Q.   Did anything in the Solomon 205, the

2    entry for 205 change your opinions in this matter

3    in any way?

4    A.   No, ma'am.

5    Q.   Okay.  Same with regard to entry 197, the

6    Rages article, was there anything in that that

7    changed your opinion in this matter in any way?

8    A.   No, ma'am.

9    Q.   Is there an -- and as you sit here today

10   you don't recall what the other three -- or sorry,

11   the other two additional entries were, is that

12   accurate?

13   A.   I don't specifically recall.

14   Q.   I think I have that, so I'll come back to

15   that later so that I don't waste more time.  Okay.

16           Going back to the documents that

17   were produced to us, it looks like the next

18   document was a retention letter and agreement for

19   services/retention of Exposure Assessment

20   Consulting LLC, is that correct?

21   A.   Do you have that document so I can --

22   Q.   I do.  It should be -- oh, I didn't mark

23   it.  I apologize.

24   A.   That's all right.

25           MS. SIZEMORE:  I'll mark that as

Alex LeBeau, PhD, MPH, CIH

1    Exhibit 4.

2              (Exhibit 4 was marked for

3    identification.)

4         A.    Thank you.

5         Q.    And Doctor, is this your retention letter

6    in relation to this matter and -- and retention

7    agreement in relation to this matter?

8         A.    (Witness examining document.)  Yes.

9         Q.    And that's dated May 1st, 2019, is that

10   correct?

11        A.    Yes.

12        Q.    Is it -- is it your best recollection

13   that you were retained in this matter in

14   approximately the beginning of May 2019?

15        A.    Yes.

16              MS. SIZEMORE:  Okay.  I'll mark

17   the last set of documents that were produced to us

18   as Exhibit 5.

19              (Exhibit 5 marked for

20   identification.)

21   BY MS. SIZEMORE:

22        Q.    It looks like a labor rate schedule and

23   invoicing for this matter.  If you could just

24   review it, and let me know if that's all of the

25   invoices that you currently have prepared in

Alex LeBeau, PhD, MPH, CIH

1    relation to this matter.

2                    MR. KALAS:  Just one thing so the

3    record is clean.  This was attached to that.

4                    MS. SIZEMORE:  Okay, thank you.

5    BY MS. SIZEMORE:

6        Q.   And so page one of Exhibit 5 is actually

7    the last page of the consultancy agreement, is that

8    correct?

9        A.   That is correct.

10       Q.   Okay, and then following that would be

11   all of your invoices in relation to this matter

12   thus far?

13       A.   (Witness examining document.)  It appears

14   that way.

15       Q.   In all of the documents that we have

16   marked today, does that encompass the entirety of

17   the documents you've produced in relation to this

18   matter?

19       A.   Yes.

20       Q.   Okay.  All right, have you had any

21   communications about this case with any other

22   experts retained by Monsanto?

23       A.   Can you be more specific?

24       Q.   Are you familiar with any of the other

25   experts that have been retained to provide opinions

Alex LeBeau, PhD, MPH, CIH

1    on behalf of the defense in this matter?

2         A.   I have gone on a site visit with one

3    other expert.

4         Q.   Which expert was that?

5         A.   Dr. DiTomaso.

6         Q.   During the site visit did you have any

7    discussions about Roundup or glyphosate in its

8    relation to non-Hodgkin's lymphoma?

9                   MR. KALAS:  I am just going to ask

10   you not to answer any discussions that took place

11   in the presence of counsel.  But outside the

12   presence of counsel, you can answer.

13   BY MS. SIZEMORE:

14        Q.   And that's a good point I should have

15   clarified at the beginning.  Anything that you

16   discuss with your counsel -- and I am not looking

17   for any of those answers.  So if I call for

18   something and you can't answer it without

19   disclosing that, just let me know.  And that's not

20   what I'm seeking to get.

21                   So this would be just between you

22   and Dr. DiTomaso?

23        A.   For this, no.

24        Q.   Did you have any discussions with Dr.

25   DiTomaso regarding Mr. Giglio's exposure during the

Alex LeBeau, PhD, MPH, CIH

1    site inspection?

2                    MR. KALAS:   Same instruction.

3         A.   I'm -- same response as before.

4    BY MS. SIZEMORE:

5         Q.   Other than at the site inspection itself,

6    did you have any conversations with Dr. DiTomaso

7    about this -- any matter related to this case?

8         A.   Not that I can recall.

9         Q.   Other than Dr. DiTomaso, have you had any

10   conversations with or communications with any other

11   expert retained by Defendants in this case?

12        A.   No, ma'am.

13        Q.   Have you had any communication with any

14   employee of Monsanto about this case?

15        A.   No, ma'am.

16        Q.   Have you had any communication with any

17   employee about -- strike that.

18                    Have you had any communication

19   with any employee of Monsanto about glyphosate or

20   Roundup?

21        A.   No, ma'am.

22        Q.   Have you had any communications about

23   Roundup or glyphosate with any colleagues of yours

24   since you've been retained on this matter?

25        A.   No, ma'am.

Alex LeBeau, PhD, MPH, CIH

1        Q.    Okay, Doctor, I want to go take a look at

2    your C.V., which I think is contained within

3    Exhibit 2, under Appendix A.

4                  Is this the most current version

5    of your C.V.?

6        A.    Yes.

7        Q.    As you sit here today, are there any

8    substantive updates that need to be made to it?

9        A.    No, ma'am.

10       Q.    Okay.  And Doctor, you have a Ph.D.

11   in toxicology and risk assessment, is that

12   accurate?

13       A.    Yes, ma'am.

14       Q.    And you received that in 2012?

15       A.    Yes, ma'am.

16       Q.    And you also have a master's in public

17   health?

18       A.    Yes, ma'am.

19       Q.    And a Bachelor of Sciences in animal

20   science, correct?

21       A.    Yes, ma'am.

22       Q.    In terms of what you classify yourself,

23   do you classify yourself as a toxicologist, an

24   industrial hygienist, both?  How would you refer to

25   yourself?

Alex LeBeau, PhD, MPH, CIH

1        A.   Well, I have toxicology training.  I have

2   experience in toxicology, but I also have

3   experience in industrial hygiene.

4        Q.   So would you consider yourself both a

5   toxicologist and an industrial hygienist?

6        A.   Again, I have that training.  As far as

7   what I'm using that training for here, I'm using

8   that training as it's related to dose for what I'm

9   doing here.

10       Q.   And as an industrial hygienist you are

11   certified, is that correct?

12       A.   Yes, ma'am.

13       Q.   When did you obtain that certification?

14       A.   2018.

15       Q.   Is that something that needs to be

16   renewed?

17       A.   It does.

18       Q.   How often?

19       A.   I actually can't remember the number of

20   years right now.

21       Q.   Okay.  Outside of what's in your C.V., do

22   you have any additional training in the field of

23   toxicology?

24       A.   Only the experience and education that I

25   have in my C.V.

Alex LeBeau, PhD, MPH, CIH

1    Q.   Outside of what's listed in your C.V., do

2    you have any other trainings or certifications in

3    industrial hygiene?

4    A.   No, the training and education is in my

5    C.V.

6    Q.   Are there industrial hygienists that do

7    not have toxicological training?

8    A.   I don't know training or what other

9    industrial hygienists do or don't have as far as

10   their training.

11   Q.   As in the field of industrial hygiene, is

12   there a particular path that you would take to

13   specialize in that?

14            MR. KALAS:   Objection, vague.

15   A.   I need more information, please.

16   BY MS. SIZEMORE:

17   Q.   Sure.  Is there a particular type of

18   schooling that is necessary to enter that field?

19   A.   Can you be more clear, please?

20   Q.   Sure.  You consider yourself an

21   industrial hygienist, correct?

22   A.   I'm a certified industrial hygienist.

23   Q.   And you're certified by the American

24   Board of Industrial Hygiene, correct?

25   A.   Correct.

Alex LeBeau, PhD, MPH, CIH

1      Q.   So let's go this way.  With regard to
2   certification by the American Board of Industrial
3   Hygiene, are there specific educational
4   requirements that you're aware of to get that
5   certification?
6      A.   The American Board -- it's not speaking
7   as someone who is a representative of the ABIH and
8   the requirements, but they do have a specific set
9   of guidance and requirements that they require for
10  becoming eligible for being a Certified Industrial
11  Hygienist.
12     Q.   Are you familiar with what educational
13  requirements are required?
14     A.   I know they have educational
15  requirements.  I don't know the specifics of those.
16     Q.   In terms of evaluating how chemicals
17  and substances impact living organisms, do you
18  believe that toxicological training is required?
19     A.   Can you clarify please?
20     Q.   Sure.  For an -- in order for an
21  industrial hygienist to evaluate how chemicals and
22  substances impact living organisms, do you believe
23  that toxicological training would be necessary?
24               MR. KALAS:  I'm going to object
25  that that is an overbroad and vague question.

Alex LeBeau, PhD, MPH, CIH

```
 1                    But you can answer it if you
 2   understood it.
 3        A.   No, I need more clarification, please.
 4   BY MS. SIZEMORE:
 5        Q.   Sure.  In this case you evaluated how
 6   glyphosate impacts living organisms, correct;
 7   that's one of the things you evaluated?
 8        A.   For evaluation of dose.
 9        Q.   And in order to do that do you think some
10   level of toxicological training would be necessary?
11        A.   I guess I'm just -- I'm not sure on
12   exactly what you're meaning.
13        Q.   Do you believe as a Certified Industrial
14   Hygienist you would be able to evaluate the
15   potential health -- adverse health effects of a
16   substance without any training in toxicology?
17                    MR. KALAS:  Same objection from
18   two questions ago, overbroad and vague.
19                    You can answer if you understand.
20        A.   I don't.  I'm losing you on some words,
21   so I just want to make sure we're clear.  If you
22   could ask one more time.
23   BY MS. SIZEMORE:
24        Q.   Sure.  Which words are you losing me on,
25   because maybe I can rephrase that?
```

Alex LeBeau, PhD, MPH, CIH

1        A.     Necessary, some, et cetera.

2        Q.     Do you believe that your training in

3   toxicology assists you in performing this type of

4   analysis?

5        A.     I do believe that training assists, yes.

6        Q.     You own a company currently called

7   Exposure Assessment Consulting, is that correct?

8        A.     Correct.

9        Q.     Is that company just you, or do you have

10  staff?

11       A.     Currently it is just me.

12       Q.     And do you ever bring on any consultants

13  to work with you?

14       A.     Not currently.  I'm just starting out.

15       Q.     When did -- when was that company

16  started?

17       A.     Earlier this year.

18       Q.     And that company, are you acting as a

19  forensic industrial hygienist?

20       A.     I need more clarification.

21       Q.     Sure.  Let me ask it this way:  The

22  company Exposure Assessment Consulting Inc. --

23  LLC, what services does it provide?

24       A.     Currently it's providing services in

25  toxicology, industrial hygiene, public health

Alex LeBeau, PhD, MPH, CIH

1   issues.

2        Q.   And who do you typically provide those

3   services to; is it regulatory agencies, companies?

4        A.   Different clients.

5        Q.   Does also -- does that include regulatory

6   agencies?

7        A.   It has not yet.

8        Q.   Have you ever provided consulting

9   services to regulatory agencies in any of your

10   prior positions?

11        A.   Not that I can recall.

12        Q.   And your current company, the consulting

13   services that you provide, are they in connection

14   with lawsuits?

15        A.   Currently, since I'm just starting out, I

16   have a very small client base.  So while I do

17   provide consulting to -- able to provide consulting

18   and have done it in the past, currently lawsuits

19   are matters I'm currently handling.

20        Q.   And that would be similar to what you're

21   doing in this case, correct, these types of

22   services?

23        A.   Clarify for me?

24        Q.   Sure.  Your current client base, is it

25   conducting services similar to what you're doing in

Alex LeBeau, PhD, MPH, CIH

1    this case, meaning providing consulting services in

2    relation to a litigation matter?

3        A.   Currently, since I am just starting out

4    and building my client base, yes.

5        Q.   Looking at your work history, you were

6    last at Forensic Analytical Consulting Services, is

7    that correct?

8        A.   Yes.

9        Q.   You did not own that company?

10       A.   I did not.

11       Q.   Okay.  And did they also provide forensic

12   consulting?  Or strike that.

13              Let me ask it this way:  The

14   services you provided there, were they in relation

15   to forensic matters or consulting matters or both?

16       A.   I guess I need clarification.

17       Q.   Sure.  What were you doing at Forensic

18   Analytical Consulting Services?

19       A.   Providing consulting to different

20   organizations.

21       Q.   And did those consulting services deal

22   with matters that were involved in lawsuits?

23       A.   Some of those were, yes.

24       Q.   And some of them did not, I would take

25   it?

Alex LeBeau, PhD, MPH, CIH

1        A.    Correct.

2        Q.    And would those consulting services that

3    did not involve lawsuits, were they things like

4    compliance and how to follow regulations, things

5    like that?

6        A.    Yes.

7        Q.    With regard to Burdock Group Consultants,

8    were you doing a similar type of job there?

9        A.    Consulting, yes.

10       Q.    And that would be on both litigation and

11   non-litigation matters?

12       A.    No, ma'am, no litigation at Burdock.

13       Q.    So Burdock was all consulting services in

14   nonlitigation matters, is that correct?

15       A.    Yes.

16       Q.    What about Conestoga-Rovers & Associates,

17   what types of services were you providing there?

18       A.    Majority consulting services.

19       Q.    Did you do some litigation matters?

20       A.    I think we did one, if I recall.

21       Q.    Okay.  Same question with regard to

22   Environ, E-N-V-I-R-O-N, was that consulting and

23   litigation matters?

24       A.    Yes, that was both.

25       Q.    And then going back to your first

Alex LeBeau, PhD, MPH, CIH

1    position as an independent consultant, what types

2    of consulting were you doing then?

3         A.   Both.

4         Q.   Okay.  And so you, at least periodically,

5    provided forensic consulting in litigation matters

6    since 2007?

7         A.   I guess I'm -- the problem -- I'll tell

8    you the problem I'm having is you said the word

9    "forensic," and I want to understand how we're

10   using that word.

11        Q.   Okay.  And when I say "forensic," I am

12   talking about being retained to provide consulting

13   services in a matter that involves a lawsuit.

14        A.   And only that definition?

15        Q.   Correct.

16        A.   Then yes, in some form or fashion.

17        Q.   During the time period since 2007, all

18   the way up until May of 2019, were you ever

19   retained as an expert witness in connection with

20   your consulting?

21             MR. KALAS:  I would object to

22   vague.

23             You can answer if you understand.

24        A.   Can you be more specific, please?

25   BY MS. SIZEMORE:

Alex LeBeau, PhD, MPH, CIH

1      Q.   Sure.  You understand in this case you've

2  been designated by Defendants as an expert to

3  testify at trial, correct?

4      A.   Yes.

5      Q.   Have you ever been designated by one of

6  your clients to testify on their behalf in any

7  other matter?

8      A.   Yes.

9      Q.   Prior to May of 2019, sorry?

10     A.   Yes.

11     Q.   But you never actually testified in any

12  of those cases, is that correct?

13     A.   Correct.

14     Q.   In any of those matters where you were

15  retained by one of your clients to provide expert

16  services, did you ever prepare affidavits or expert

17  reports in connection with those matters?

18               MR. KALAS:  I'm just going to

19  instruct you not to answer anything that may still

20  be privileged between you and counsel in those

21  cases, but beyond that, you can answer.

22     A.   Can you clarify for me, please, just so

23  we're clear.

24  BY MS. SIZEMORE:

25     Q.   Sure.  And I think you said prior to May

Alex LeBeau, PhD, MPH, CIH

1    of 2019 you had been hired by at least some of your

2    clients to serve as an expert witness, is that

3    correct?

4         A.   Yes.

5         Q.   Okay.  Did you ever prepare either a

6    declaration or an affidavit or a report about your

7    opinions in any of those matters?

8         A.   Yes.

9         Q.   Going back to your certification as

10   an industrial hygienist, that was obtained in 2018,

11   correct?

12        A.   Yes.

13        Q.   Prior to that time were you considered

14   an industrial hygienist, or is it that

15   certification that allows you to call yourself

16   that?

17        A.   Can you clarify for me?

18        Q.   Sure and bear with me.  This is just me

19   trying to understand the field a little bit.

20             It's my understanding that you got

21   your certification as an industrial hygienist in

22   2018.  Prior to that time were you an industrial

23   hygienist?

24        A.   I did industrial hygiene type work.

25        Q.   But would you have called yourself an

Alex LeBeau, PhD, MPH, CIH

1    industrial hygienist?

2       A.    I was a member of the American Industrial

3    Hygiene Association.

4       Q.    And so how long have you done industrial

5    hygiene work; has it been the entirety of your

6    career?

7       A.    I'd say approximately; there's aspects

8    during my career which would be industrial hygiene

9    type work.

10      Q.    And other than industrial hygiene in

11   terms of the consulting work we just talked about,

12   have you worked in any other field or discipline?

13               MR. KALAS:  Objection.  Overbroad.

14      A.    Can you be more specific for me?

15   BY MS. SIZEMORE:

16      Q.    Sure.  The consulting services we were

17   just talking about that you've provided to your

18   clients since 2007, have those ever been in any

19   other field other than industrial hygiene?

20      A.    Yes.

21      Q.    What fields?

22      A.    Toxicology.

23      Q.    Anything else?

24      A.    Again, the services that I offered:

25   Toxicology, industrial hygiene and public health.

Alex LeBeau, PhD, MPH, CIH

1              Do you mind if we take a short

2    break?

3              MS. SIZEMORE:  Of course.

4              THE VIDEOGRAPHER:  It's 8:59, and

5    we're off the record.

6              (Recess in the proceedings.)

7              THE VIDEOGRAPHER:  It's 9:04, and

8    we're on the record.

9    BY MS. SIZEMORE:

10       Q.   All right, Doctor, we were talking about

11   your background and C.V. before we went off the

12   record.  Do you recall that?

13       A.   Yes, ma'am.

14       Q.   Okay.  I want to talk to you a little bit

15   about your doctoral dissertation research.  What

16   was that in; what field was that in?

17       A.   Can you be more specific?

18       Q.   Sure.  Did your doctoral dissertation

19   have to do with pesticide exposure?

20       A.   It did.

21       Q.   Okay.  And what specifically were you

22   looking at with regard to pesticide exposure?

23       A.   Levels of urinary biomarker

24   concentrations.

25       Q.   And that was in relation to three

Alex LeBeau, PhD, MPH, CIH

1    pesticides, is that correct?

2        A.   Yes.

3        Q.   What were the three different pesticides,

4    if you can recall?

5        A.   Chlorpyrifos, methyl parathion and

6    pyrethroids.

7        Q.   And two of those are organophosphates, is

8    that right?

9        A.   Yes.

10       Q.   And with regard to the research that you

11   conducted for your dissertation related to urinary

12   biomarkers, did you do any of that actual research

13   yourself?

14       A.   Can you clarify for me?

15       Q.   Sure.  Was there any testing done in

16   relation to that or studies performed?

17               MR. KALAS:  Objection, vague.

18       A.   I need you to clarify for me.

19   BY MS. SIZEMORE:

20       Q.   Sure.  Can you just give me a broad

21   overview of what you did in connection with urinary

22   biomarkers for your dissertation?

23       A.   Yes.  I looked at secondary data for

24   biomarker levels in a sample of the population in

25   the United States.

Alex LeBeau, PhD, MPH, CIH

1       Q.   When you say you looked at "secondary

2   data," what do you mean by that?

3       A.   Data that was collected by other sources.

4       Q.   And so the actual collection of the data

5   was done by other sources, correct?

6       A.   Done by governmental organizations, from

7   my understanding.

8       Q.   And then you collect that data from other

9   sources and you put it together for presentation,

10   is that accurate?

11       A.   That data is made available for

12   evaluation.

13       Q.   In terms of actually collecting the data

14   from the individuals, that would have been done by

15   government sources, if you know?

16       A.   I -- I -- I --

17            MR. KALAS:   Excuse me.

18       A.   I don't know who did the collecting.   It

19   was -- the data is made available by the

20   government.   Whatever agreements or employees they

21   had doing the collecting and reporting or

22   inputting, I don't know.

23   BY MS. SIZEMORE:

24       Q.   And what were you looking for in terms of

25   the biomarkers; what ultimately were you trying to

Alex LeBeau, PhD, MPH, CIH

1    conclude or prove?

2       A.   As far as my hypothesis in my research I

3    was looking at which biomarkers were prevalent in

4    the sample of data that I had, which ones those

5    were, how often they occurred in a certain

6    percentage of the population, and if they were

7    prevalent, what those levels were and what those

8    biomarker levels meant.

9       Q.   When you say, "in a certain percentage of

10   the population," was there a particular population

11   or segment of the population that you were looking

12   at?

13      A.   No, let me -- I'll clarify on that.  So I

14   was looking at the number -- the biomarkers in this

15   data that I had that occurred in more than 50

16   percent of those that samples were collected from.

17   So looking at the higher -- which ones occurred in

18   the higher percentage of the dataset that I had,

19   including all the individuals that were evaluated.

20      Q.   And I see some publications on your C.V.

21   that deal with urinary biomarkers.  Were those

22   three publications done in connection with your

23   dissertation or the research for your dissertation?

24      A.   Clarify for me, please.

25      Q.   Sure.  Looking at the first one is

Alex LeBeau, PhD, MPH, CIH

1    Evaluation of Urinary Pesticide Biomarkers Among a

2    Sample of the Population in the United States.

3    That is a article that you published, correct?

4         A.   Yes.

5         Q.   And was the underlying research for that

6    article the research that you conducted in

7    connection with your dissertation?

8         A.   Yes.

9         Q.   With regard to the following one,

10   Evaluation of Urinary Pesticide Biomarkers Among

11   Children and Adolescents, was that also the

12   research in connection with your dissertation?

13        A.   Yes, that was a portion of it.

14        Q.   And then the last one, Evaluation of

15   Urinary Pesticide Biomarkers Among Residents of the

16   United States, was that also in connection with

17   your dissertation?

18        A.   Yes, a portion.

19        Q.   Okay.  And looking back to the first one,

20   this was published in the Journal of Clinical

21   Toxicology?

22        A.   Yes, ma'am.

23        Q.   And is it a peer-reviewed article?

24        A.   I believe it was.  I cannot recall, but I

25   believe it was.

Alex LeBeau, PhD, MPH, CIH

1      Q.   What about the next two, the Children and

2    Adolescents and Residents of the United States,

3    were those peer-reviewed?

4      A.   No, those were poster publications at a

5    conference but appeared in the conference general

6    publication.

7      Q.   Okay.  And so would those be duplicative

8    of the presentations that are listed on page five

9    of the C.V.?

10      A.   Can you be specific, please?

11      Q.   Sure.  There's Society of Toxicological

12    annual -- I'm sorry Society of Toxicology Annual

13    Meeting, poster presentation, Evaluation of Urinary

14    Pesticide Biomarkers Among Children and Adolescents

15    in San Francisco in 2012.  Was that the poster

16    presentation that was done in connection with this

17    article?

18      A.   Yes.

19      Q.   Same with regard to Residents of the

20    United States, that presentation was in connection

21    with this article that was later published,

22    correct?

23      A.   Clarify for me.

24      Q.   Sure.  The second one is Evaluation of

25    Urinary Pesticide Biomarkers Among Residents of the

Alex LeBeau, PhD, MPH, CIH

```
 1    United States --

 2         A.    Um-hmm.

 3         Q.    -- that was done in Salt Lake City, Utah

 4    in 2010.  Is that the same as the poster

 5    publication that's listed in your publications of

 6    the same title?

 7         A.    Yes.

 8         Q.    And so essentially you gave publications

 9    on these two topics, and the -- I'm sorry, the

10    presentations on these two topics and the materials

11    from the presentations were then later published in

12    these journals, is that accurate?

13         A.    No.

14         Q.    Okay, explain to me how that happens?

15         A.    For -- during this time for the Society

16    of Toxicology, which this meeting was at, they had

17    a publication called The Toxicologist where they

18    published your abstracts before the conference.

19    And it's available as a publication, not a thin

20    publication.  Then you have your poster

21    presentation at the conference.

22         Q.    Other than the three publications we just

23    talked about that dealt with urinary biomarkers, do

24    any of your other publications deal with

25    pesticides?
```

Alex LeBeau, PhD, MPH, CIH

1              MR. KALAS:  Objection, vague,

2    overbroad.

3        A.   Can you be more specific?

4    BY MS. SIZEMORE:

5        Q.   Sure.  Have you ever published on

6    pesticide exposure?

7              MR. KALAS:  Objection, asked and

8    answered.

9        A.   Other than the publications that I

10   already have?

11   BY MS. SIZEMORE:

12       Q.   Correct.

13       A.   Specifically related to pesticides, other

14   than those that are on here, no.

15       Q.   With regard to your doctoral dissertation

16   research, did you ultimately conclude that no

17   negative health risks were resulting from exposure

18   to the pesticides that you researched?

19       A.   I can't remember my specific findings.  I

20   believe the data that I identified in there fit

21   within the dataset for other exposures, where there

22   are no effects seen.  But I'd have to read that

23   document again to refresh my memory.

24       Q.   Have you ever conducted any research that

25   found a public --  a health risk associated with

Alex LeBeau, PhD, MPH, CIH

1   exposure to a pesticide?

2        A.   Can you be more specific for me?

3        Q.   Sure.  Have you ever conducted any

4   research on any pesticide where you found a health

5   risk associated with that pesticide?

6        A.   I need clarity there, if you could.

7        Q.   I'm just talking about research that

8   you've conducted.  Have you ever researched a

9   pesticide and concluded that there was a negative

10  health risk associated with it?

11              MR. KALAS:  Objection, vague as to

12  negative.

13       A.   I guess I'm -- I want clarity on research

14  and publication.  That's...that are really relating

15  to publication or -- so I just want some clarity if

16  you could.

17  BY MS. SIZEMORE:

18       Q.   Sure.  Other than glyphosate and the

19  three pesticides that you researched in connection

20  with your dissertation, have you ever researched

21  any other pesticides to determine the health risks

22  associated with them?

23       A.   I've done consulting work on other

24  pesticide products.

25       Q.   And in your consulting work on other

Alex LeBeau, PhD, MPH, CIH

1  pesticide products have you ever found an

2  association between exposure to those pesticide

3  products and any adverse health effect?

4              MR. KALAS:  I'm just going to

5  instruct you not to -- or only answer to the extent

6  that what you've concluded is not protected by some

7  work product with an attorney or something like

8  that.

9      A.   No.  For the products that we were

10 evaluating at the use levels that they were

11 intending, I don't recall identifying any health

12 effects at those levels.

13 BY MS. SIZEMORE:

14     Q.   Looking at your C.V. on page two, the

15 first bullet under "Toxicology and Product Safety"?

16     A.   On page two of or under that whole

17 section?

18     Q.   I'm sorry, on page one of your C.V.  No,

19 I was right, on page two.

20     A.   Okay.

21     Q.   There's a bullet point, the third one

22 down, "provided toxicological reviews of various

23 substances," do you see that?

24     A.   Yes.

25     Q.   This -- these reviews of these

Alex LeBeau, PhD, MPH, CIH

```
 1    substances, was this for a company?
 2         A.   It was for different companies.
 3         Q.   And were those companies manufacturers of
 4    these products?
 5         A.   Can you provide some clarity on that,
 6    please?
 7         Q.   Sure.  The companies that retained you to
 8    provide toxicological reviews of these substances,
 9    was it because they either manufactured these
10    substances or these substances were a product of
11    their manufacturing?
12         A.   I'd say some of them were the product of
13    their manufacturing.
14         Q.   Did -- were you ever hired to review --
15    to provide toxicological reviews of these
16    substances by a company that didn't either
17    manufacture these substances or -- or their
18    manufacturing created these substances?
19         A.   Yes.
20         Q.   And in that circumstance, do you recall
21    what you were hired -- why you were hired to
22    evaluate those substances?
23         A.   They were contaminants, or they had been
24    involved in industrial incidents where there were
25    exposures of concern from someone exposed to those
```

Alex LeBeau, PhD, MPH, CIH

1    materials.

2         Q.   In connection with your consulting

3    services where you've been retained to provide

4    opinions related to a lawsuit, have you ever been

5    retained by a plaintiff in a case?

6         A.   No, but I've done consulting work on

7    plaintiff cases.

8         Q.   In terms of just consulting work,

9    unrelated to litigation -- or no, strike that.

10                  In terms of just consulting work,

11   are you more often hired by plaintiffs or

12   defendants?

13        A.   Can you provide some clarity?

14        Q.   Sure.  When you have been hired in

15   relation to matters involving a lawsuit, are you

16   more often retained by the plaintiff or the

17   defendant?

18        A.   I guess I just want some more

19   specification just so I'm clear.

20        Q.   Okay.  You had just said that you've been

21   retained by plaintiff to perform consulting work,

22   correct?

23        A.   At previous positions.

24        Q.   Okay.  Through the course of your -- or

25   strike that.

Alex LeBeau, PhD, MPH, CIH

1                    When were you retained by

2    plaintiff in a case, at what -- during which time

3    period?

4         A.   In previous positions.  I don't recall

5    which -- which particular jobs.

6         Q.   Do you have an estimate as to how many

7    times you've been retained by a plaintiff to

8    provide consulting work?

9         A.   Let me take that back.  I've not been

10   retained; I've done consulting work.

11        Q.   Thank you for that clarification.  Do you

12   have an estimate as to how many times you've been

13   asked to provide consulting services for a

14   plaintiff in a lawsuit?

15        A.   I could only provide a rough estimate.

16        Q.   Okay.  What's your rough estimate?

17        A.   I'd say approximately 30 percent.  Again,

18   a very rough estimate.

19        Q.   And that 30 percent would all be in

20   connection with previous positions, correct?

21        A.   Correct.

22        Q.   Outside of this lawsuit, have you ever

23   been retained by Monsanto in the past?

24        A.   No.

25        Q.   Have you ever provided consulting

Alex LeBeau, PhD, MPH, CIH

1    services for Monsanto in the past?

2        A.   No, not that I recall.

3        Q.   In terms of the research that you

4    conducted for your dissertation, is that something

5    that you're provided funding for?

6        A.   Can you clarify?

7        Q.   Sure.  Were you provided any funding in

8    connection with the publication of your

9    dissertation research?

10       A.   No.

11       Q.   Were you provided any funding in

12   conducting the research for your dissertation?

13       A.   No.

14       Q.   Prior to your retention in this matter,

15   had you ever done any research on either Roundup or

16   glyphosate?

17              MR. KALAS:  Objection, compound.

18              You can answer if you understand.

19   In the interest of efficiency, you can answer.

20       A.   Can you clarify?

21   BY MS. SIZEMORE:

22       Q.   Sure.  Prior to being retained in this

23   matter, had you ever done any research with

24   relation to glyphosate?

25       A.   Clarify on research, just so we're clear.

Alex LeBeau, PhD, MPH, CIH

1      Q.    Sure.   Have you ever researched it for

2   any purpose prior to this lawsuit?

3      A.    Prior to this, the only time I had

4   opportunity to look at it was for a job interview a

5   few years ago.

6      Q.    And that was a job interview with who?

7      A.    An organization called NCASI, National

8   Council of Air and Stream Improvement.

9      Q.    And why did you look at glyphosate in

10  connection with that job interview?

11     A.    It was a question that they had at

12  interview.

13     Q.    Same question with regard to Roundup.

14  Prior to involvement in this case, had you ever

15  researched Roundup in any way?

16     A.    Not that I recall.

17     Q.    Fair to say that you had never conducted

18  an exposure assessment related to either Roundup or

19  glyphosate prior to this case?

20     A.    Prior to this case I had not.

21     Q.    And prior to this case had you ever

22  conducted any absorption studies related to Roundup

23  or glyphosate?

24     A.    Prior to this case I have not.

25     Q.    And have you ever conducted your own

Alex LeBeau, PhD, MPH, CIH

1    absorption studies with regard to any pesticide?

2        A.   Can you clarify?

3        Q.   Sure.  Have you ever performed an

4    absorption study?

5                 MR. KALAS:  Objection, vague.

6        A.   Can you clarify?

7    BY MS. SIZEMORE:

8        Q.   Sure.  Have you ever done any in-lab work

9    related to absorption?

10       A.   No.

11       Q.   Have you ever researched absorption on

12   any other pesticide prior to your work in this

13   case?

14                MR. KALAS:  Object again as vague.

15                You can answer.

16       A.   Just so we're clear, I would like you to

17   clarify a little more for me.

18   BY MS. SIZEMORE:

19       Q.   Sure.  In -- let's go back to your

20   studies with regard to your dissertation.  Was any

21   aspect of that researching the absorption rates of

22   those pesticides?

23       A.   I believe I looked at the bioavailability

24   of those pesticides.

25       Q.   Other than in connection with your

Alex LeBeau, PhD, MPH, CIH

1   dissertation, have you researched the

2   bioavailability of any other pesticide, other than

3   glyphosate or Roundup?

4        A.   I believe in the consulting that I have

5   done I have looked at the bioavailability of other

6   pesticide products in relation to the work that I

7   was doing.

8        Q.   Do you recall which products as you sit

9   here today?

10       A.   They were products that were considered

11   antimicrobial pesticide products.

12       Q.   Any other products you can think of?

13       A.   Some of the products I've used may have

14   had antimicrobial properties, even though that

15   wasn't their major intent.  So not other than the

16   specific antimicrobial products that I looked at, I

17   can't recall.

18       Q.   Okay.  When you said they may have had

19   antimicrobial properties, are you saying -- did you

20   mean that they had pesticide properties?

21            My question is really with regard

22   to pesticide products and whether you have

23   conducted any research about the bioavailability of

24   any other pesticide products, other than the

25   antimicrobial products you mentioned and

Alex LeBeau, PhD, MPH, CIH

```
 1   glyphosate?

 2        A.   Specifically for pesticides, no, I don't

 3   recall.

 4        Q.   Have you ever conducted any lab research

 5   on dermal absorption of any pesticide?

 6        A.   No.

 7        Q.   So is it fair to say you've never

 8   conducted any lab research with regard to dermal

 9   absorption of Roundup or glyphosate, correct?

10        A.   Correct.

11        Q.   Have you ever personally used either

12   Roundup or any glyphosate-based products?

13        A.   I have.

14        Q.   Outside of connection with this case,

15   have you ever used those products?

16        A.   Yes.

17        Q.   Did you use any PPE while you were using

18   those products?

19        A.   Can you clarify for me?

20        Q.   Sure.  Did you take any precautions in

21   use of either Roundup or any glyphosate-based

22   products in terms of personal protective equipment?

23        A.   Can you clarify a little more for me?

24        Q.   Sure.  When is the last time that you've

25   used either Roundup or a glyphosate-based product?
```

Alex LeBeau, PhD, MPH, CIH

1        A.    It's been a few years.

2        Q.    And was it with regard to personal use?

3        A.    Yes.

4        Q.    And during that time period did you --

5    strike that.

6              When you used glyphosate -- I'll

7    say it over.  Strike that.

8              Did you use Roundup or a

9    glyphosate-based product?

10       A.    I believe it was Roundup.

11       Q.    Okay.  And when you used Roundup did you

12   take any precautions in terms of personal

13   protective equipment?

14             MR. KALAS:  Objection, vague.

15       A.    Can you clarify for me?

16   BY MS. SIZEMORE:

17       Q.    Sure.  Did you use gloves while you

18   sprayed Roundup?

19       A.    No.

20       Q.    Did you wear any kind of protective mask?

21       A.    No.

22       Q.    Did you spray in -- what type of clothing

23   did you wear when you sprayed?

24       A.    Typically shorts and T-shirts, yeah,

25   typically.

1      Q.   And what type of shoes did you typically

2   wear?

3      A.   I'd say typically my yard sneakers.

4      Q.   And I think you said it's been a few

5   years, but what would you typically spray Roundup

6   for?

7      A.   I think mainly -- mainly weeds in the

8   driveway.

9      Q.   Prior to being contacted in this case did

10   you have any information about an association

11   between glyphosate and non-Hodgkin's lymphoma?

12      A.   Clarify for me, please.

13      Q.   Sure.  Prior to being contacted in

14   relation to this case, had you ever heard of any

15   association between glyphosate and non-Hodgkin's

16   lymphoma?

17      A.   I heard of the IARC finding or document.

18      Q.   Anything else you heard about prior to

19   your involvement in this case?

20      A.   Not that I can recall.

21      Q.   And would that be the same answer in

22   relation to any association between formulated

23   Roundup and non-Hodgkin's lymphoma?

24      A.   Yes, I don't recall any.

25      Q.   How were you made available of the IARC

Alex LeBeau, PhD, MPH, CIH

1    findings?

2                    I'm sorry.  How were you made

3    aware of the IARC findings?

4         A.   I don't recall.

5         Q.   Did you -- at the time you were first

6    made aware of the IR findings, did you make any

7    attempt to assess the credibility of those

8    findings?

9         A.   No, not that I can recall.

10        Q.   I know you said you don't currently have

11   anyone in your office, but because that may have

12   been different during the time period you've worked

13   on this, has anyone else from your office or have

14   you hired anyone else to do work on this case in

15   connection with your opinions?

16        A.   No.

17        Q.   What is your understanding of what you

18   were retained to assess in this case?

19        A.   To generally look at the data that was

20   available related to specifically for dose and

21   specifically relating to Mr. Giglio.

22                    MR. KALAS:  And it's -- it's

23   Jil'-lio, right?

24                    MS. SIZEMORE:  Jil'-lio, right.

25                    MR. KALAS:  Like that Affleck

Alex LeBeau, PhD, MPH, CIH

 1    movie with an O on the end.

 2    BY MS. SIZEMORE:

 3         Q.   Have you conducted an analysis related to

 4    dose for any plaintiff, other than Mr. Giglio, as

 5    of today?

 6                   MR. KALAS:  I'm going to just

 7    instruct you not to answer any questions regarding

 8    unserved expert reports or drafts of expert reports

 9    and that sort of thing.  So if you can answer that

10    question with that instruction, please do.

11         A.   No.

12    BY MS. SIZEMORE:

13         Q.   Has all of your work to date on this

14    matter related to Mr. Giglio?

15                   MR. KALAS:  Objection, vague.

16         A.   Can you clarify for me, please?

17    BY MS. SIZEMORE:

18         Q.   Sure.  Have you conducted an analysis of

19    dose or exposure to anyone other than Mr. Giglio

20    with relation to glyphosate or Roundup?

21                   MR. KALAS:  Same instruction, not

22    to answer any questions regarding unserved expert

23    reports or drafts.

24         A.   No.

25    BY MS. SIZEMORE:

Alex LeBeau, PhD, MPH, CIH

1      Q.   Okay.  Doctor, I want to go and start

2   taking a look at your report, which I think we've

3   marked as Exhibit 2, correct?

4      A.   Yes, ma'am.

5      Q.   Okay.  The first page of your report is

6   mostly background about you, is that right?

7      A.   Background and what my training has

8   entailed.

9      Q.   Does page one essentially summarize the

10   training and background that you have in relation

11   to your qualifications to opine in this matter?

12      A.   It has the training and background of --

13   all my training and background.  There are certain

14   areas of my background which I'm going to be

15   focusing on this matter.

16      Q.   Moving onto page two, it's your opinion

17   that training in toxicology is helpful to an

18   industrial hygienist when evaluating exposure and

19   identifying potential adverse health effects,

20   correct?

21      A.   Yes.

22      Q.   Moving onto page three, and I guess the

23   third paragraph down talks about essentially what

24   you did in connection with preparing your opinions,

25   correct?

Alex LeBeau, PhD, MPH, CIH

1          A.    Yes.

2          Q.    Okay.  And you state that you were asked

3     to review regulatory publications, guidance,

4     documents, manufacturer-sponsored studies and

5     peer-reviewed research publications, and then you

6     said you also performed an independent search of

7     the publicly available literature?

8          A.    Yes.

9          Q.    Okay.  With regard to the materials you

10    considered in this case, what were you given to

11    review versus what was a product of your

12    independent search?

13         A.    I don't think I can put a quantity on

14    what I identified versus what was given to me.

15         Q.    If you'd look at your materials

16    considered list, are you able to identify what you

17    obtained via your own independent search?

18         A.    I don't know if I am able to.  Because a

19    lot of -- it's publicly available, so I saw a lot

20    of that information out there.  So it's hard to

21    say.

22         Q.    Do you keep track in any way of what

23    information you're given to -- given by an attorney

24    as opposed to what you find on your own?

25         A.    No, I don't keep track.

Alex LeBeau, PhD, MPH, CIH

1       Q.   In this case were you able to form an

2   opinion about the potential adverse health outcomes

3   associated with glyphosate and

4   glyphosate-containing products?

5                   MR. KALAS:  Objection, vague,

6   overbroad.

7       A.   Can you clarify -- excuse me -- for me?

8   BY MS. SIZEMORE:

9       Q.   Sure.  You were asked to review

10  publications and things related to one of the

11  things you quote as "potential adverse health

12  outcomes associated with glyphosate and

13  glyphosate-containing products."  That's one of the

14  things that you were asked to review, is that

15  correct?

16      A.   Yes.

17      Q.   Did you form any opinions about any

18  potential adverse health outcomes associated with

19  glyphosate and glyphosate-containing products?

20                  MR. KALAS:  Withdraw my objection.

21      A.   The opinions that I have are contained

22  within the body of my report.

23  BY MS. SIZEMORE:

24      Q.   And does that include opinions about the

25  potential adverse health outcomes associated with

Alex LeBeau, PhD, MPH, CIH

```
1    glyphosate and glyphosate-containing products?

2        A.   Again, my opinions are contained within

3    my report.

4        Q.   As you sit here today do you know if any

5    of those opinions found any adverse health outcomes

6    associated with glyphosate and

7    glyphosate-containing products?

8        A.   Again, my opinions for this case are in

9    this report.

10       Q.   Other than cancer risk, did you -- did

11   you research any other potential health -- sorry,

12   strike that.

13            Other than cancer risk, did you

14   look at any other potential adverse health outcomes

15   associated with glyphosate and

16   glyphosate-containing products?

17       A.   There are other health outcomes that are

18   associated with those identified by -- in the

19   regulatory literature.

20       Q.   Okay.  And did you evaluate any of those

21   potential health risks --

22            MR. KALAS:  Objection, vague.

23   BY MS. SIZEMORE:

24       Q.   -- other than cancer risk?

25       A.   Can you be more specific, please?
```

Alex LeBeau, PhD, MPH, CIH

1       Q.  One of the things that you were retained

2    to do in this case was to look at cancer risk

3    associated with glyphosate and

4    glyphosate-containing products, is that correct?

5                   MR. KALAS:  Objection, assumes

6    facts not in the record.

7       A.  I'm going to need you to clarify that for

8    me, please.

9    BY MS. SIZEMORE:

10      Q.  I'll withdraw the question.

11                  You -- one of the things you said

12   was in the regulatory documents and studies that

13   you reviewed that there were potential adverse

14   health outcomes associated with glyphosate and

15   glyphosate-containing products, correct?

16      A.  There have been threshold levels that

17   have been established based on health outcomes that

18   are identified in the regulatory publications.

19      Q.  Other than noting that there were

20   potential adverse health outcomes in some of the

21   literature that you reviewed, did you actually

22   conduct any research as to any of those other

23   potential health outcomes, other than a cancer

24   risk?

25                  MR. KALAS:  Same objection.

Alex LeBeau, PhD, MPH, CIH

1   Assumes facts not in the record.

2       A.   Can you be more specific for me?

3   BY MS. SIZEMORE:

4       Q.   Sure.  You had mentioned that some of the

5   potential adverse health outcomes were listed in

6   the regulatory documents that you reviewed,

7   correct?

8       A.   Yes.

9       Q.   Other than noting that they were listed

10  in the documents, did you actually conduct any

11  research into those health outcomes to see whether

12  they could be substantiated or not?

13      A.   Those health outcomes were reported in

14  those regulatory documents based on research that

15  they had reviewed.

16              While I'm able from my training to

17  review those documents, I didn't -- I defer to

18  other experts as far as reviewing those particular

19  studies and details.

20      Q.   Fair enough.  And one of the things we

21  are doing here today is I'm trying to just kind of

22  get the boundaries of what you did review and what

23  you analyzed and what your opinions are.  So if you

24  don't have an opinion on a topic or you haven't

25  analyzed something, it's perfectly acceptable just

Alex LeBeau, PhD, MPH, CIH

1    to tell me you didn't review it.  Okay?

2                    So in preparation for your opinion

3    you reviewed research, publications and guidance,

4    that's one of the steps you took, correct?

5        A.   Yes.

6        Q.   Okay.  Then you also performed an

7    independent search of the research and available

8    literature, is that right?

9        A.   Yes.

10       Q.   And then you did a retrospective dose

11   assessment, is that correct?

12       A.   Yes.

13       Q.   Are those the three steps that you took

14   in order to come to your opinions in this case,

15   generally?

16       A.   Well, I also took additional steps that

17   are outlined here, reviewing Mr. Giglio's

18   depositions, fact sheets and performing a site

19   visit.

20       Q.   Okay.  And so in terms of coming to your

21   opinions in this case, you were provided literature

22   to review, and you reviewed that.  You then did

23   your own search about literature.  You conducted a

24   retrospective dose assessment.  You reviewed the

25   available legal documents, such as plaintiff's fact

Alex LeBeau, PhD, MPH, CIH

 1    sheets and depositions, and then you also did a

 2    site inspection.

 3                   Were there any other steps to your

 4    analysis that I'm missing?

 5        A.   Generally, that's what I did.  Can we

 6    take a break?

 7                   MS. SIZEMORE:  Of course.

 8                   THE WITNESS:  Thank you.

 9                   THE VIDEOGRAPHER:  It's 9:49, and

10    we're off the record.

11                   (Recess in the proceeding.)

12                   THE VIDEOGRAPHER:  It's 9:57, and

13    we're on the record.

14    BY MS. SIZEMORE:

15        Q.   All right, Doctor, we are talking about

16    the kind of steps you took in preparing your

17    opinions, as outlined on page three of your report.

18                   I noted in one part you say you

19    performed a site visit and assessed other relevant

20    information as appropriate.  Do you see that?

21        A.   Yes.

22        Q.   Do you recall what you meant by that at

23    the time you wrote the report, what other relevant

24    information you had reviewed?

25        A.   Any relevant information related to any

Alex LeBeau, PhD, MPH, CIH

1  of the research or site visit that I performed.

2      Q.   Any other relevant information that's

3  listed in here, would that be contained within your

4  materials considered list?

5      A.   Yes.

6      Q.   Okay.  Did you personally review every

7  item on your materials considered list?

8      A.   Yes.

9      Q.   Were you provided any summaries of any of

10  the materials on the list?

11      A.   No.

12      Q.   And was there anything that you requested

13  to review that you weren't provided?

14      A.   Not that I can recall.

15      Q.   The report that we've marked as Exhibit

16  2, does it contain the entirety of the opinions you

17  intend to offer in the Giglio matter?

18              MR. KALAS:  Objection, asked and

19  answered.

20              You can answer again.

21      A.   Yes, it contains my opinions, unless Dr.

22  Sawyer has any other additional opinions.

23  BY MS. SIZEMORE:

24      Q.   Do you have any opinion as to whether or

25  not Roundup or glyphosate causes non-Hodgkin's

Alex LeBeau, PhD, MPH, CIH

1    lymphoma that you intend to offer in this case?

2         A.   As far as cause in relation -- to cancer

3    and the exposure -- or cancer, I'm going to leave

4    that up to other experts.

5         Q.   So fair to say that you do not intend to

6    opine at the time of trial about whether or not

7    Roundup or glyphosate caused non-Hodgkin's

8    lymphoma?

9         A.   Again, I said I'm going to leave it up to

10   other experts.  But as far as if I'm asked on

11   direct, I am going to say I've looked at the data

12   related to dose and that I don't believe that the

13   exposures relate to cancer outcomes.  And the

14   regulatory agencies agree with me.

15        Q.   And so your opinions about the connection

16   between Roundup or glyphosate and non-Hodgkin's

17   lymphoma, are they limited to dose?

18        A.   Can you clarify for me?

19        Q.   Sure.  In terms of an opinion about a

20   connection between Roundup or glyphosate and

21   non-Hodgkin's lymphoma, do you have any opinions as

22   to anything other than dose?

23        A.   For risk factors, again I am going to

24   leave that up to other experts.

25                   As relation to what's discussed

Alex LeBeau, PhD, MPH, CIH

1   within my report and the information that I have

2   reviewed if asked at trial in direct I'm going to

3   say I don't think that there's a cancer risk here.

4   And the other regulatory agencies agree with me.

5        Q.   Have you formed any opinions about

6   whether exposure to Roundup or glyphosate can cause

7   NHL, and when I say NHL, you understand I am

8   referring to non-Hodgkin's lymphoma?

9        A.   Can you repeat the question?

10       Q.   Sure.  If I use the term NHL, do you

11  understand I am talking about non-Hodgkin's

12  lymphoma?

13       A.   Yes.

14       Q.   Okay.  And so have you formed any

15  opinions about whether exposure to Roundup or

16  glyphosate can cause NHL at any dose?

17       A.   Based on my evaluation of dose and the

18  dataset that is available for glyphosate, myself

19  and other regulatory agencies found it is not a

20  carcinogenic risk in humans.

21       Q.   At any dose?

22       A.   At any identified dose within the

23  dataset.

24       Q.   And so do you have an opinion that

25  glyphosate is not carcinogenic at any dose?

Alex LeBeau, PhD, MPH, CIH

1      A.   My opinions are contained within the body

2   of this report.

3      Q.   I don't recall seeing anything with

4   relation to that.  So if I didn't see anything in

5   relation to whether glyphosate is carcinogenic at

6   any dose, is it fair to say that you did not form

7   that opinion?

8           MR. KALAS:  Objection, asked and

9   answered.  Well, strike that.

10          Not asked and answered, but vague

11  as to the species you're talking about here.

12     A.   Yeah, please clarify for me.

13  BY MS. SIZEMORE:

14     Q.   Sure.  Okay, so I think you said:  Based

15  on my evaluation of dose and the dataset that's

16  available for glyphosate, that myself and other

17  regulatory agencies found it's not carcinogenic in

18  humans.  That's correct; did you say that?

19     A.   Yes.

20     Q.   And that's your opinion?

21     A.   Yes.

22     Q.   And so is it your opinion that glyphosate

23  is not carcinogenic at any dose?

24          MR. KALAS:  Same objection on

25  vagueness.

Alex LeBeau, PhD, MPH, CIH

```
 1        A.   I'm going to need more clarification.
 2   BY MS. SIZEMORE:
 3        Q.   Did you form an opinion, and you can let
 4   me know if you haven't -- have you formed any
 5   opinion about whether glyphosate can be
 6   carcinogenic at any dose?
 7        A.   I'm going to need more information.
 8        Q.   So if you need more information, does
 9   that mean that you have not yet formed an opinion
10   about that?
11        A.   No.  I just need more information related
12   to what exactly we're talking about.
13        Q.   Is there -- in your opinion, is there any
14   dose at which glyphosate is a carcinogen?
15                  MR. KALAS:  Same objection, vague.
16        A.   I'm having trouble answering that.
17   BY MS. SIZEMORE:
18        Q.   In your opinion is there any dose at
19   which glyphosate can cause non-Hodgkin's lymphoma?
20                  MR. KALAS:  Same objection, vague.
21        A.   Again, I'm having trouble answering that.
22   BY MS. SIZEMORE:
23        Q.   And so at this time have you evaluated
24   whether there is any dose at which glyphosate can
25   cause non-Hodgkin's lymphoma?
```

Alex LeBeau, PhD, MPH, CIH

```
 1                    MR. KALAS:  Objection, asked and
 2    answered.
 3                    You can answer it again.
 4         A.   I'm having trouble answering or
 5    responding to that.
 6    BY MS. SIZEMORE:
 7         Q.   Why are you having trouble responding to
 8    that?
 9         A.   I just need more clarification and more
10    clarity on the question.
11         Q.   Clarity about what?
12         A.   Clarity on what are -- what the subject
13    of the dosing is, what the dose is, et cetera.
14         Q.   You had testified that your opinions
15    about non-Hodgkin's lymphoma and the association
16    with glyphosate were based on regulatory levels,
17    correct?
18                    MR. KALAS:  Objection,
19    mischaracterizes the testimony.  Incomplete.
20                    You can answer.
21         A.   Yeah, can you clarify that for me,
22    please?
23    BY MS. SIZEMORE:
24         Q.   Sure.  Your opinions about the
25    association between non-Hodgkin's lymphoma and
```

Alex LeBeau, PhD, MPH, CIH

1    glyphosate were based on the regulatory levels and

2    the dose, correct?

3                   MR. KALAS:  Same objection.

4        A.   I guess I -- I need to understand which

5    regulatory levels you're referring to.

6    BY MS. SIZEMORE:

7        Q.   Sure.  I think -- I thought it was your

8    opinion that based on your review of the regulatory

9    levels, that at the doses Mr. Giglio was exposed

10   to, there was no risk of non-Hodgkin's lymphoma, is

11   that correct?

12       A.   Yes, within the data within the dataset,

13   correct.

14       Q.   And so those regulatory levels max out at

15   a certain dose, is that correct?

16                   MR. KALAS:  Objection, vague.

17                   You can answer.

18       A.   I don't know what you mean.

19   BY MS. SIZEMORE:

20       Q.   Sure.  Those regulatory levels only

21   explore dose up to a certain level, is that right?

22                   MR. KALAS:  Same objection.

23       A.   I'm still not sure what you mean.

24   BY MS. SIZEMORE:

25       Q.   What is the highest regulatory level that

Alex LeBeau, PhD, MPH, CIH

1    you analyzed?

2         A.   I'm not -- I'm having trouble answering,

3    and it's, you know -- I don't know what you mean by

4    "regulatory level" or "highest" or -- or where

5    you're talking about within the dataset, so.

6         Q.   Did you perform an analysis as to whether

7    or not glyphosate can cause non-Hodgkin's lymphoma

8    at a dose above any of the regulatory levels that

9    you researched?

10        A.   I'm still -- I'm still having a problem

11   with "regulatory levels."

12        Q.   In your analysis of whether Mr. Giglio

13   had an increased risk of non-Hodgkin's lymphoma,

14   you utilized regulatory levels, correct?

15        A.   I utilized data within the dataset for

16   that evaluation.

17        Q.   And that dataset came from regulatory

18   levels?

19        A.   That dataset came --

20             MR. KALAS:  Sorry.  Objection,

21   mischaracterizes his report.

22             You can answer.

23        A.   It came from regulatory documents and

24   other publications.

25   BY MS. SIZEMORE:

Alex LeBeau, PhD, MPH, CIH

1      Q.   Okay.  And did you make any analysis of

2  whether there's an increased risk of non-Hodgkin's

3  lymphoma at any dose of glyphosate or Roundup?

4               MR. KALAS:  Asked and answered.

5  Vague.

6      A.   I looked at the -- I evaluated dose here.

7  I looked at it in relation to the dataset and

8  didn't see any carcinogenic risk, in line with the

9  other regulatory agencies.

10  BY MS. SIZEMORE:

11     Q.   And so my question is:  Did you make any

12  kind of evaluation about risk for dose outside of

13  the dataset that you relied upon?

14     A.   The dataset, including the evaluation I

15  performed here, is what I used for determining the

16  carcinogenic risk.

17     Q.   And you did not conduct any independent

18  analysis outside of that dataset, is that fair?

19               MR. KALAS:  Objection, vague.

20               You can answer.

21     A.   Can you clarify for me?

22  BY MS. SIZEMORE:

23     Q.   Sure.  Did you -- okay, you said:  The

24  dataset, including the evaluation you performed

25  here, is what you used for determining the

Alex LeBeau, PhD, MPH, CIH

1    carcinogenic risk, correct?

2         A.   Yes.

3         Q.   Did you perform any independent research

4    or analysis outside of that dataset about

5    carcinogenic risks?

6                   MR. KALAS:  Objection, assumes

7    facts not in the record.

8                   You can answer.

9         A.   I -- can you clarify carcinogenic risks?

10   BY MS. SIZEMORE:

11        Q.   Did you look to see or perform any

12   analysis about whether there was a carcinogenic

13   risk for glyphosate for exposures or dose outside

14   of the dataset that you relied upon?

15        A.   No, I think the dataset is pretty robust

16   in the evaluations that were done, and it includes

17   exposures that were higher than Mr. Giglio's.  And

18   I think that the dataset is robust enough for what

19   was needed for evaluating carcinogenic risk.

20        Q.   In terms of whether or not Roundup caused

21   Mr. Giglio's non-Hodgkin's lymphoma, would you

22   defer that assessment to other experts?

23        A.   As far as what caused his specific, yes,

24   I would defer that.

25                   MS. SIZEMORE:  You can go ahead --

Alex LeBeau, PhD, MPH, CIH

```
 1   I'm going to change topics, so we can change the
 2   tape.
 3                   THE VIDEOGRAPHER:  It's 10:14, and
 4   we're off the record.
 5                   (Recess in the proceeding.)
 6                   THE VIDEOGRAPHER:  It's 10:17, and
 7   we're on the record.
 8   BY MS. SIZEMORE:
 9        Q.   Okay, I'm going to -- Doctor, I'm going
10   to ask you some specific questions about your
11   report.  I apologize if it seems like I am skipping
12   around.  Okay?
13        A.   Okay.
14        Q.   In regard to the chemical properties of
15   glyphosate, you talk about the -- I am probably
16   going to butcher this but the shikimic acid
17   pathway?
18                   MR. KALAS:  Shikimate.
19                   MS. SIZEMORE:  Shikimate.
20        A.   Shikimate.
21   BY MS. SIZEMORE:
22        Q.   And you say it's unique to plants,
23   correct?
24        A.   Yes, that's my understanding.
25        Q.   Is that pathway present in any other
```

Alex LeBeau, PhD, MPH, CIH

1    living organisms, other than plants?

2       A.   As far as any other living organisms

3    beyond mammals, I'm going to defer to other

4    experts. Beyond mammals, I'm going to have to refer

5    to other experts.

6       Q.   Would you agree that POEA are one of the

7    commonly used surfactants in Roundup?

8       A.   Can you clarify for me?

9       Q.   Sure.  You talk about POEAs, correct, in

10   your report?

11      A.   I do.

12      Q.   And that's a surfactant, is that right?

13      A.   Yes.

14      Q.   Is that one of the -- is it your

15   understanding that POEAs are one of the commonly

16   used surfactants used in Roundup formulations?

17      A.   It's my understanding that it has been

18   one of those, yes.

19      Q.   Is it your opinion that a POEA's function

20   is for emulsification?

21      A.   My understanding is the POEA is used to

22   spread the material over the leaf surface of the

23   plant from -- leaf surface of the plant.

24      Q.   You'd agree that surfactants reduce the

25   surface tension of water?

Alex LeBeau, PhD, MPH, CIH

```
 1                    MR. KALAS:  Objection, overbroad,
 2     vague.
 3                    You can answer.
 4          A.   Can you clarify for me?
 5     BY MS. SIZEMORE:
 6          Q.   Sure.  Do surfactants work to reduce the
 7     surface tension of water?
 8                    MR. KALAS:  Same objection.
 9          A.   Can you be a little more specific?
10     BY MS. SIZEMORE:
11          Q.   Sure.  Let's limit it to POEAs.  Is it
12     your understanding that POEAs reduce the surface
13     tension of water?
14          A.   From my understanding it reduces surface
15     tension on the plant surface.
16          Q.   And is the purpose of having a surfactant
17     in a herbicide is to keep the spray on the targeted
18     weed?
19                    MR. KALAS:  I'm going to object as
20     outside the scope.
21                    But if you'd rather answer, you
22     can answer.
23          A.   Can you -- can you ask that again,
24     please?
25     BY MS. SIZEMORE:
```

Alex LeBeau, PhD, MPH, CIH

1    Q.   Sure.  Do you know what the purpose is of

2    having a surfactant in a herbicide?

3                    MR. KALAS:  Same objection.

4    A.   Clarify for me, please.

5    BY MS. SIZEMORE:

6    Q.   You can let me know --

7    A.   Okay.

8    Q.   -- if you know one way or the other.

9             I am just asking, do you know what

10   the purpose is for having a surfactant within a

11   herbicide formulation?

12                   MR. KALAS:  Same objection.

13   A.   I need to know if we are talking general

14   formulations or in particular.

15   BY MS. SIZEMORE:

16   Q.   Let's limit it to POEAs then?

17   A.   Okay.

18   Q.   Is it -- what is your understanding of

19   why the POEAs are included within an herbicide

20   formulation?

21   A.   To ensure further contact with the

22   surface of the target plant.

23   Q.   And would -- in terms of a herbicide

24   formulation that has POEAs contained within it,

25   would that also mean that the inclusion of a POEA

Alex LeBeau, PhD, MPH, CIH

1  would increase the duration that the material is on

2  skin for skin contact?

3              MR. KALAS:  I would object.  Calls

4  for speculation.

5              You can answer.

6      A.   I don't know anymore information.

7  BY MS. SIZEMORE:

8      Q.   Do POEAs increase absorption in the skin?

9              MR. KALAS:  Objection, vague,

10 overbroad.

11             You can answer.

12     A.   I need more clarity, please.

13 BY MS. SIZEMORE:

14     Q.   Sure.  Does the inclusion of a POEA in a

15 herbicide increase absorption if that herbicide

16 is -- makes contact with skin?

17     A.   I'm still going to need a little more

18 clarity there, please.

19     Q.   In conducting your analysis in this case

20 did you factor in the surfactants that are

21 contained within formulated Roundup as opposed to

22 just glyphosate on its own?

23     A.   Yes, those are one of the evaluations

24 that's been looked at in the dataset.

25     Q.   And did you factor in whether the --

Alex LeBeau, PhD, MPH, CIH

 1   whether inclusion of surfactants increases

 2   absorption in the skin?

 3       A.   The dataset that contains a number of

 4   different evaluations of formulated products show

 5   that it does not increase permeation of the skin.

 6       Q.   Well, we'll get into that in a little

 7   bit.

 8                With regard to cytotoxicity, have

 9   POEAs been shown to be more cytotoxic than

10   glyphosate alone?

11                MR. KALAS:  Objection, Outside the

12   scope.

13                You can answer.

14       A.   While I have training to evaluate that

15   information, I have not done so for this particular

16   circumstance, and I am going to defer to other

17   experts.

18       Q.   The -- you talk about -- in your

19   discussion of POEAs you talk about them being found

20   in household products, like Lysol and hair coloring

21   products.  Do you recall that?

22       A.   Yes, I identified that, this class of

23   tallow amines, yes.

24       Q.   What was the purpose of that statement?

25       A.   Just to show that there are other

Alex LeBeau, PhD, MPH, CIH

1    surfactants in products besides formulated

2    herbicides.

3         Q.   The studies that you just referred to in

4    determining whether or not POEAs increase

5    absorption in the skin, were those studies

6    sponsored by Monsanto?

7         A.   I don't recall all the associations for

8    those studies.  I believe some of them were for

9    regulatory filings, whereas others were not.

10        Q.   In your review of the literature to

11   support your opinions did you take into account

12   whether -- who was sponsoring the studies?

13        A.   No, I was looking at the data associated

14   with the studies.

15        Q.   Do you believe that who sponsors the

16   studies is relevant in determining whether or not

17   the studies can be relied upon?

18        A.   No, I look at the science and the data

19   and the methodology behind it.

20        Q.   Would you agree that there are impurities

21   that are contained within formulated products, such

22   as Roundup?

23             MR. KALAS:  Objection, overbroad,

24   vague.

25        A.   Can you be more specific, please?

Alex LeBeau, PhD, MPH, CIH

1    BY MS. SIZEMORE:

2         Q.   Sure.  In your report on page four, the

3    third paragraph down you say:  Formulated products

4    often contain incidental impurity products, which

5    are byproducts of the manufacturing process and

6    formulation.  Is that your opinion?

7         A.   Yes, including the two that I had

8    mentioned in the report.

9         Q.   Okay.  And so with relation to Roundup,

10   one of the impurities that's made is formaldehyde,

11   is that correct?

12        A.   Yeah, that's my understanding.

13        Q.   And you would agree that formaldehyde is

14   carcinogenic?

15                  MR. KALAS:  Objection, vague,

16   overbroad.

17        A.   Can you be more specific, please?

18   BY MS. SIZEMORE:

19        Q.   Sure.  Are you aware of literature

20   suggesting that formaldehyde has carcinogenic

21   properties?

22                  MR. KALAS:  Same objection.

23        A.   I need you to be more specific, please.

24   BY MS. SIZEMORE:

25        Q.   Are you aware of the link between

Alex LeBeau, PhD, MPH, CIH

 1   formaldehyde and cancer?

 2              MR. KALAS:  Same objection.

 3        A.   I -- more clarity, please.

 4   BY MS. SIZEMORE:

 5        Q.   Have you researched whether or not

 6   formaldehyde is carcinogenic?

 7              MR. KALAS:  Same objection.

 8        A.   Still more information, please.

 9   BY MS. SIZEMORE:

10        Q.   The question is whether you've researched

11   it or not.  It's a yes or no question.

12              Have you researched whether or not

13   formaldehyde is -- is a carcinogen?

14              MR. KALAS:  Same objection.

15        A.   I need more information there.

16   BY MS. SIZEMORE:

17        Q.   Okay, so that's not something you can

18   answer?

19        A.   I can't.

20        Q.   Okay.  Another impurity in Roundup is

21   N-nitroso?

22        A.   N-nitroso glyphosate.

23        Q.   Have you done any research as to whether

24   or not N-nitroso is carcinogenic?

25              MR. KALAS:  Objection, vague,

Alex LeBeau, PhD, MPH, CIH

1    overbroad.

2                    You can answer.

3         A.   I need more information, please.

4    BY MS. SIZEMORE:

5         Q.   Have you undertaken any research about

6    whether N-nitroso is carcinogenic at all?

7                    MR. KALAS:  Same objection.

8         A.   I am going to need more info.

9    BY MS. SIZEMORE:

10        Q.   Okay, so you can't answer that question

11   as you sit here?

12        A.   I can't answer the question.

13        Q.   In looking at whether or not -- strike

14   that.

15                   In your assessment in this case

16   did you research whether or not there was a link

17   between cancer and any other substance or chemical

18   contained within formulated Roundup, other than

19   glyphosate?

20                   MR. KALAS:  Objection.  Vague,

21   overbroad.

22                   You can answer.

23        A.   I need clarity on that or more

24   information, please.

25   BY MS. SIZEMORE:

Alex LeBeau, PhD, MPH, CIH

```
 1        Q.   You would agree that Roundup is not pure
 2   glyphosate, correct?
 3        A.   Glyphosate is a component in the
 4   formulated product.
 5        Q.   Okay.  And the formulated product
 6   contains things like water, is that right?
 7        A.   From my understanding, yes.
 8        Q.   Okay.  And it also contains other
 9   chemicals, correct?
10        A.   Other chemicals.
11        Q.   Okay.  Did you evaluate whether any of
12   those other chemicals have a link to cancer?
13             MR. KALAS:  Objection, vague,
14   overbroad.
15             You can answer.
16        A.   I need -- I need more info.
17   BY MS. SIZEMORE:
18        Q.   Did you could conduct an evaluation as to
19   any other chemical in the formulated product, other
20   than glyphosate?
21        A.   I looked at glyphosate.  I looked at the
22   data behind low-level potential impurities that
23   were in the product.
24        Q.   Okay.  And so what low-level potential
25   impurities did you look at?
```

Alex LeBeau, PhD, MPH, CIH

1          A.    The presence of those, formaldehyde and

2    N-nitroso glyphosphate.

3          Q.    Are those the only two chemicals, other

4    than glyphosate, in the Roundup formulated product

5    that you looked at data regarding?

6          A.    Can you be more specific?

7          Q.    You had said you looked at the data

8    behind low-level potential impurities that were in

9    the product, and you named N-nitroso and

10   formaldehyde, correct?

11         A.    I named N-nitroso glyphosphate and

12   formaldehyde.

13         Q.    Did you look at the data behind any other

14   chemicals or additives to the Roundup formulated

15   product, other than N-nitroso glyphosphate,

16   formaldehyde and glyphosate itself?

17         A.    I looked at information that any

18   potential impurities are regulated in those

19   products.

20         Q.    Okay.  In terms of the data about

21   exposure to any of those other products -- I'm

22   sorry, of those other chemicals, did you look

23   specifically at data for anything other than

24   formaldehyde and N-nitroso glyphosphate?

25                    MR. KALAS:  Objection, asked and

Alex LeBeau, PhD, MPH, CIH

1  answered.  You can answer again.

2      A.   Again, I looked at the regulatory

3  requirements for thresholds for potential

4  impurities in those products.

5  BY MS. SIZEMORE:

6      Q.   When you say you looked at the data

7  behind N-nitroso glyphosphate and formaldehyde, is

8  it limited to the regulatory requirements for

9  thresholds for potential impurities?

10     A.   Regulatory requirements and evaluations

11  for regulatory purposes.

12     Q.   When you say evaluation for regulatory

13  purposes, what type of evaluation are you referring

14  to?

15     A.   Determination on the concentration of

16  those products by a filing agency.

17     Q.   Okay.  Did you research anything else in

18  relation to those two products, other than

19  regulatory requirements and thresholds for

20  potential impurities?

21              MR. KALAS:  Object as

22  mischaracterizes his testimony.

23              But you can answer.

24     A.   I need more clarification, please.

25  BY MS. SIZEMORE:

Alex LeBeau, PhD, MPH, CIH

1      Q.   I think you had testified you looked at

2  regulatory requirements for the thresholds for

3  potential impurities in those products, is that

4  correct?

5      A.   Yes.

6      Q.   Did you look at any other information

7  about those two products, other than regulatory

8  requirements for thresholds of potential

9  impurities?

10              MR. KALAS:  Objection, incomplete

11  hypothetical, mischaracterizes previous testimony.

12              You can answer.

13      A.   Ask the question again, please.

14  BY MS. SIZEMORE:

15      Q.   Sure.  Other than regulatory requirements

16  for threshold of potential impurity, did you look

17  at any other data for N-nitroso glyphosate or

18  formaldehyde?

19      A.   Again, I looked at the regulatory data

20  and evaluations that were done for regulatory

21  purposes.

22      Q.   Any other data about those two chemicals?

23      A.   I'm having a problem with the wording of

24  any.  So there's been -- I've looked at other

25  information that's mentioned those, but it depends

Alex LeBeau, PhD, MPH, CIH

1   on how much detail.  So I have seen other

2   information that mentions those.  But related to

3   thresholds that are available in regulatory

4   documents or studies that were done in support of

5   regulatory findings, that's where I'm focusing my

6   attention.

7        Q.   Did you conduct any analysis as to what

8   levels of N-nitroso glyphosphate or formaldehyde

9   are present in the formulated product of Roundup?

10       A.   I relied on the regulatory documents for

11  that.

12       Q.   Did the regulatory documents discuss the

13  concentration or amount of N-nitros oglyphosphate

14  or formaldehyde present in the formulated Roundup?

15       A.   Can you ask that again, please?

16       Q.   Sure.  The regulatory documents that you

17  reviewed, did they discuss what the concentration

18  or amount of these two chemicals is present in

19  formulated Roundup?

20       A.   I believe the document that was done in

21  support of a regulatory information was.

22       Q.   And do you recall which document that

23  was?

24       A.   I believe it was the Rages document.

25       Q.   And that's a document that you added to

Alex LeBeau, PhD, MPH, CIH

1    your materials considered list after you authored

2    your report, is that correct?

3        A.   Yes.

4        Q.   In conducting your analysis in this case

5    you looked at dose, is that right?

6        A.   Yes.

7        Q.   As opposed to exposure?  Or you looked at

8    both, correct?

9             MR. KALAS:  Objection, two

10   questions pending.

11       A.   Clarify -- clarify for me, please.

12   BY MS. SIZEMORE:

13       Q.   In conducting your analysis about what

14   Mr. Giglio was exposed to and then comparing that

15   to the regulatory levels, did you look at dose, or

16   did you look at exposure, or both?

17       A.   Clarify a little more for me, please.

18       Q.   Sure.  In your analysis -- you would

19   agree that dose and exposure are two different

20   things?

21       A.   Yes.

22       Q.   Okay.  In conducting your analysis of

23   Mr. Giglio's -- strike that.

24             In conducting your analysis in

25   this case did, you look at Mr. Giglio's dose, his

Alex LeBeau, PhD, MPH, CIH

1    exposure or both?

2        A.   Just so we're clear, I want you to

3    clarify a little more for me.

4        Q.   You understand what exposure is?

5        A.   Yes.

6        Q.   Okay.  And you understand what dose are?

7        A.   Yes.

8        Q.   Did you analyze what Mr. Giglio's

9    exposure was?

10       A.   To glyphosate, yes.

11       Q.   And did you analyze what Mr. Giglio's

12   dose was to glyphosate?

13       A.   Yes.

14       Q.   Okay.  In terms of what you compared to

15   regulatory thresholds, did you compare dose or

16   exposure?

17       A.   I did look at his exposure as it related

18   to inputs for determining dose, but I also looked

19   at dose within the dataset.

20       Q.   The dose is the ultimate endpoint you

21   calculated, is that right?

22       A.   I did calculate a dose.

23       Q.   All right.  And one of the things that

24   you evaluated in determining dose was the amount of

25   glyphosate that Mr. Giglio was exposed to, correct?

Alex LeBeau, PhD, MPH, CIH

1      A.   Can you state that again?  I am sorry.

2      Q.   Sure.  One of the things you evaluated in

3  determining dose is the amount of glyphosate that

4  Mr. Giglio was exposed to, correct?

5      A.   Yes.

6      Q.   In terms of assessing exposure, did you

7  rely on biomonitoring and passive dosimetry

8  studies?

9               MR. KALAS:  Objection, incomplete

10  hypothetical.

11               You can answer.

12               MS. SIZEMORE:  All right, strike

13  that.  I'll withdraw the question.

14      Q.   How did you assess exposure?

15      A.   I assessed Mr. Giglio's exposure based on

16  the information that he provided at testimony in

17  his deposition and in addition to information that

18  was available in the dataset.

19      Q.   Did you -- the information that was

20  available in the dataset, was that publications

21  related to biomonitoring and passive dosimetry?

22               MR. KALAS:  Same objection,

23  incomplete hypothetical.

24               You can answer.

25      A.   Be more clear for me, please.

Alex LeBeau, PhD, MPH, CIH

```
1    BY MS. SIZEMORE:

2        Q.   Sure.  Did you assess any literature in

3    determining exposure?

4        A.   Be a little more clear for me.

5        Q.   In forming your opinion about

6    Mr. Giglio's exposure, did you take into account

7    any published publications?

8        A.   Yes.

9        Q.   And what were those publications in

10   relation to?

11       A.   Potential exposures.

12       Q.   And there's studies available using

13   passive dosimetry and/or biological monitoring of

14   exposed individuals to quantify dose, is that

15   correct?

16       A.   Can you break that question up for me?

17       Q.   Sure.  In your report on page five, under

18   biomonitoring and passive dosimetry studies, you

19   state:  There are numerous studies available using

20   passive dosimetry and/or biological monitoring of

21   exposed individuals to quantify a dose?

22       A.   Yes.

23       Q.   Is that accurate?

24       A.   Yes.

25       Q.   Okay.  And how do you -- those studies --
```

Alex LeBeau, PhD, MPH, CIH

1    strike that.

2                    These studies that you relied upon

3    as to biomonitoring and passive dosimetry are

4    Edmiston, Lavy and Acquavella, is that right?

5                    MR. KALAS:  Objection,

6    mischaracterizes his report.

7                    You can answer.

8        A.    Those are some of the studies that I

9    relied upon.  The rest are in my MCL.

10   BY MS. SIZEMORE:

11       Q.    Other than the three we just listed,

12   Edmiston, Lavy and Acquavella, what other studies

13   did you rely on the issues of biomonitoring and

14   passive dosimetry?

15       A.    It's going to be hard, I mean, because

16   there are a number of studies in the MCL that are

17   done for that.

18       Q.    So as you sit here today are you able to

19   discern which studies you relied upon for what

20   information?

21                   MR. KALAS:  Objection, vague.

22       A.    Can you clarify for me, please?

23   BY MS. SIZEMORE:

24       Q.    Sure.  Other than the studies that are

25   particularly stated in your report, are you able to

Alex LeBeau, PhD, MPH, CIH

 1    look at your MCL, your materials considered list,

 2    and state what you utilized each publication for?

 3         A.   As far as specifics, there are a lot in

 4    the MCL.  I just -- I know I used that word, what

 5    was available in the MCL for making that

 6    determination.

 7         Q.   And so as you sit here today, other than

 8    Edmiston, Lavy and Acquavella, do you recall any

 9    other studies you relied upon in assessing

10    biomonitoring and passive dosimetry?

11         A.   Again, there are a number of them in the

12    dataset and the MCL that I relied upon.

13         Q.   But as you sit here today can you

14    identify any of the other ones?

15              MR. KALAS:  Are you asking him to

16    go to his MCL and do that?

17              MS. SIZEMORE:  Yes.  I'm asking

18    him if he can.

19         A.   You know, I may be leaving some out if I

20    do that, so I don't want to -- I don't want to do

21    that to myself.  Because I -- I don't want to limit

22    myself, because I may be leaving some out if I do

23    that.

24    BY MS. SIZEMORE:

25         Q.   Is it your conclusion that the data from

Alex LeBeau, PhD, MPH, CIH

 1    the available studies establish that passive

 2    dosimetry data can be used to estimate exposures

 3    and potential exposures to glyphosate?

 4         A.   Can you tell me where you're reading that

 5    in my --

 6         Q.   It's on page six.

 7         A.   Thank you.

 8         Q.   In the third paragraph.

 9         A.   Yes.  An evaluation of urine samples and

10    glyphosate can be used to calculate those.

11         Q.   So is it your opinion that passive

12    dosimetry is the proper method to estimate

13    exposure, and biomonitoring is the proper method to

14    evaluate dose?

15         A.   Can you clarify for me or -- for me,

16    please?

17         Q.   Sure.  Evaluation of urine samples for

18    glyphosate biomarker would be a form of

19    biomonitoring, correct?

20         A.   Yes.

21         Q.   Okay.  And is it your opinion that that

22    is the appropriate measure or the appropriate

23    method to evaluate dose?

24                   MR. KALAS:  Objection, overbroad.

25                   But you can answer.

Alex LeBeau, PhD, MPH, CIH

1        A.   I need more clarity there.

2   BY MS. SIZEMORE:

3        Q.   Do you believe that it's appropriate to

4   use passive dosimetry to calculate dose?

5             MR. KALAS:  Are we talking

6   specifically about glyphosate here?

7             MS. SIZEMORE:  Yes.

8             MR. KALAS:  Okay.

9        A.   I'm not trying to be a pain.  I just need

10  to understand and get very specifics on this, so.

11  BY MS. SIZEMORE:

12       Q.   Do you have any concern with using

13  passive dosimetry to calculate dose of glyphosate?

14       A.   I don't know what you mean by 'concern'.

15       Q.   Would you utilize passive dosimetry

16  studies to calculate dose of glyphosate?

17             MR. KALAS:  Objection, overbroad.

18  Vague.

19       A.   I need more specifics, please.

20  BY MS. SIZEMORE:

21       Q.   Did you utilize any passive dosimetry

22  studies to calculate Mr. Giglio's dose of

23  glyphosate?

24       A.   I used inputs from passive dosimetry

25  studies to -- as inputs for determining

Alex LeBeau, PhD, MPH, CIH

1   Mr. Giglio's dose.

2       Q.   So is it your opinion that both passive

3   dosimetry studies and biomonitoring studies can be

4   helpful to determining dose?

5       A.   Can you give me more clarity, please?

6       Q.   Did you utilize both passive dosimetry

7   studies and biomonitoring studies to calculate

8   Mr. Giglio's dose?

9       A.   Yes, I used information from passive

10  dosimetry studies on -- from the dataset from

11  different exposure scenarios of -- from use of

12  glyphosate and used biomonitoring information

13  within the dataset to calculate and determine

14  Mr. Giglio's dose.

15      Q.   So you believe that both these types of

16  studies are appropriate to use to calculate dose,

17  correct?

18              MR. KALAS:  Objection,

19  mischaracterizes his testimony.

20      A.   I need more information.

21  BY MS. SIZEMORE:

22      Q.   Are you going to testify that it's

23  inappropriate to use passive dosimetry studies to

24  calculate dose?

25      A.   I can't -- I can't answer the question as

Alex LeBeau, PhD, MPH, CIH

1    it's asked.

2        Q.   Do you have an opinion that it's

3    inappropriate to use passive dosimetry studies to

4    calculate dose?

5                 MR. KALAS:   Of glyphosate?

6    BY MS. SIZEMORE:

7        Q.   Of glyphosate?

8        A.   Passive dosimetry data from exposures

9    from people using this can be used as inputs to

10   calculate dose.

11       Q.   Edmiston, that was a passive dosimetry

12   study, correct?

13       A.   I believe they looked at passive and

14   biomonitoring.

15       Q.   And so it's your recollection that it

16   utilized both?

17       A.   That's my recollection.  If you have it

18   for me to review, I can look at it a little

19   further.

20       Q.   And in Edmiston you recall that the

21   workers wore cotton underneath their work clothing

22   and PPE?

23       A.   Yes, they used cotton shirts and cotton

24   long johns.

25       Q.   And was there exposure to glyphosate

Alex LeBeau, PhD, MPH, CIH

1    despite the use of clothing and PPE?

2         A.   Clarify just a little for me, please.

3         Q.   Did the study find exposure to glyphosate

4    even though all of the workers were wearing

5    clothing and PPE?

6         A.   They identified potential dermal

7    exposures based on what was found on the cotton

8    shirts and long johns.

9         Q.   And the cotton shirts and long johns were

10   worn underneath the workers' clothing and personal

11   protective equipment, is that correct?

12        A.   I don't recall specifically what was worn

13   under.  If you have the study, I'd be happy to look

14   at it and evaluate it further.

15        Q.   Sure.  And you did a summary of the

16   Edmiston study in your report on page five,

17   correct?

18        A.   Yes.

19        Q.   And you state that:  Full body dosimetry

20   was performed using 100 percent cotton shirts and

21   100 percent long johns worn under the normal work

22   clothes and PPE.

23        A.   Yes.

24        Q.   Is that your recollection of the study?

25        A.   Yes.  Can we take a break?

Alex LeBeau, PhD, MPH, CIH

```
 1                    MS. SIZEMORE:  Of course.

 2                    THE VIDEOGRAPHER:  It's 10:55, and

 3     we're off the record.

 4                    (Recess in the proceeding.

 5                    THE VIDEOGRAPHER:  It's 10:57, and

 6     we're on the record.

 7     BY MS. SIZEMORE:

 8          Q.   Okay, I want to look at the Lavy study,

 9     which is another one you looked at in relation to

10     exposure and dose, is that correct?

11          A.   Yes.

12          Q.   Okay.  And in the Lavy study that was

13     both passive dosimetry and biomonitoring, correct?

14          A.   Yes.

15          Q.   And the workers in that particular study

16     wore protective suits, rubber gloves and boots, is

17     that right?

18                    MR. KALAS:  Objection,

19     mischaracterizes the study.  You can answer.

20          A.   No, I can't recall.  If you have the

21     study for me to --

22     BY MS. SIZEMORE:

23          Q.   I do.

24          A.   Okay, thank you.

25          Q.   Here you go.  Here's a copy of it.  I
```

Alex LeBeau, PhD, MPH, CIH

1    think it's right at the beginning of the abstract.

2    It states:  The applicators, weeders and scouts

3    monitored all wore normal work clothing, which for

4    applicators was protective suits, rubber gloves and

5    boots.  Do you see that?

6         A.   Yes.

7         Q.   And with regard to the applicators, the

8    highest -- strike that.

9              The patches for the dosimetry

10   found that body portions receiving the highest

11   exposure were the ankles and thighs, correct?

12        A.   Yes.

13        Q.   To your knowledge was Monsanto involved

14   in this study at all?

15        A.   They are listed as one of the

16   affiliations.

17        Q.   I want to talk about the Acquavella

18   study.  You also relied upon that one, is that

19   correct?

20        A.   Yes.

21              MR. KALAS:  Can we mark this as an

22   exhibit?

23              MS. SIZEMORE:  Sure.

24              MR. KALAS:  Are you marking it?  I

25   don't care, but.

Alex LeBeau, PhD, MPH, CIH

```
 1                  MS. SIZEMORE:  We can.

 2                  MR. KALAS:  Okay.  It will be 6.

 3                  MS. SIZEMORE:  We'll mark it as 6.

 4                  (Exhibit 6 was marked for

 5       identification.)

 6       BY MS. SIZEMORE:

 7            Q.   To your knowledge was the Acquavella

 8       study also affiliated with Monsanto?

 9            A.   I don't want to guess.  I want to make

10       sure.  Do you have that document in front of you?

11            Q.   As you sit here today, do you know one

12       way or the other?

13            A.   I believe there was an association, but.

14            Q.   And the Acquavella study, the exposure,

15       they were using tractors with boom sprayers, is

16       that right?

17            A.   That is my recollection.

18            Q.   And do you recall the applicators

19       reporting having closed cabins in the tractors?

20                  MR. KALAS:  Objection,

21       mischaracterizes the study.

22            A.   Do you have the study for me to look at?

23       BY MS. SIZEMORE:

24            Q.   I am asking for your recollection as you

25       sit here?
```

Alex LeBeau, PhD, MPH, CIH

```
 1         A.   My recollection is that -- you know,
 2    without the study, I'm -- I want to be accurate,
 3    and without the study it's hard to state one way or
 4    the other what was -- the information that you're
 5    looking for.
 6         Q.   Sure.  In reviewing the studies that you
 7    rely upon, did you review the methods utilized by
 8    the studies?
 9         A.   Yes.
10         Q.   Do you feel that it was -- it's important
11    to review the methods utilized to make sure they
12    follow proper methods in conducting their study?
13         A.   I think it's important to review the
14    methods.
15         Q.   And what's the purpose of reviewing the
16    methods?
17         A.   To understand what they did within the
18    study.
19         Q.   And Acquavella was a biomonitoring study,
20    is that right?
21         A.   Yes, that is my recollection.
22         Q.   Are you aware of any human biomonitoring
23    studies for glyphosate that measure anything other
24    than urine?
25         A.   Can you be more specific?
```

Alex LeBeau, PhD, MPH, CIH

```
 1        Q.   Sure.  I'm asking if in the biomonitoring
 2   studies that you reviewed any of them were human
 3   biomonitoring studies that measured any -- anything
 4   other than urine?
 5        A.   In the studies that I reviewed, not that
 6   I recall.
 7        Q.   And is it your opinion that glyphosate is
 8   excreted in urine?
 9             MR. KALAS:  Objection, vague.
10        A.   I need more information, please.
11   BY MS. SIZEMORE:
12        Q.   In forming your opinions in this case did
13   you make an assumption that the -- that glyphosate
14   is excreted in urine?
15             MR. KALAS:  Same objection.
16        A.   I need more clarity, please.
17   BY MS. SIZEMORE:
18        Q.   In conducting your analysis did you do
19   any research as to how excretion occurs after
20   exposure to glyphosate?
21             MR. KALAS:  Same objection.
22   Overbroad as well.
23        A.   I'm going to need more information,
24   please.
25   BY MS. SIZEMORE:
```

Alex LeBeau, PhD, MPH, CIH

```
1        Q.   Was one of the things that you analyzed
2   in determining exposure and dose how glyphosate is
3   excreted in the body?
4               MR. KALAS:  Same objection.
5        A.   Clarify for me, please.
6               MR. KALAS:  Can I clarify my
7   objection?
8               MS. SIZEMORE:  Sure.
9               MR. KALAS:  Because I think it may
10  move this along.  I'm objecting because you're not
11  specifying the exposure pathway as oral or dermal
12  or what have you.
13  BY MS. SIZEMORE:
14       Q.   Exposure to glyphosate is primarily
15  dermal, is that correct, for humans?
16       A.   Clarify a little on that.
17       Q.   Sure.  Would you agree that for human
18  exposure the pathway is typically dermal?
19               MR. KALAS:  Object as overbroad
20  again.
21       A.   I need clarity on that.
22  BY MS. SIZEMORE:
23       Q.   In making your assessments about exposure
24  and dose, do you have to analyze how the body
25  excretes the chemical?
```

Alex LeBeau, PhD, MPH, CIH

1        A.    Are we talking any chemical or --

2        Q.    I'm talking generally, is that something

3    you would take into account?

4        A.    Take into account where?  Ask the

5    question again for me, please.

6        Q.    Sure.  When conducting an analysis about

7    exposure and dose, is one of the things you would

8    take into account how the body excretes the

9    chemical?

10       A.    Yes.

11       Q.    And with regard to exposure and dose of

12   glyphosate, did you take into account how humans

13   excrete the chemical?

14       A.    Yes.

15       Q.    Other than excretion through urine, did

16   you analyze any other form of excretion of

17   glyphosate?

18       A.    Clarify for me, please.

19       Q.    Do you have an opinion as to the method

20   of excretion for humans of glyphosate based on

21   dermal exposure?

22       A.    Yes.  The dermal exposure, the

23   pharmacokinetics from systemic circulation is well

24   characterized, and the majority of that is excreted

25   in the urine.

Alex LeBeau, PhD, MPH, CIH

1      Q.   And so is it your opinion that glyphosate

2   is excreted in the urine when exposure is dermal?

3      A.   Yes.

4      Q.   Is it your opinion that glyphosate is 100

5   percent excreted in the urine when exposure is

6   dermal?

7      A.   Based on the well-characterized

8   pharmacokinetic studies, the majority of the

9   excretion from systemic circulation, including

10  dermal contact, is urine.

11     Q.   And what do you mean by majority?

12     A.   I'll use the NTP study that was

13  administering in the rat model where 98 percent of

14  the administered glyphosate was excreted via the

15  urine after 24 hours.

16     Q.   Is that the study that you utilized in

17  forming that opinion?

18     A.   That is one study that I utilized.

19     Q.   You also utilized Connolly?

20     A.   I did.

21     Q.   Any other studies that you utilized to

22  determine that the majority of glyphosate is

23  excreted in the urine when exposure is dermal?

24     A.   There are other studies in my MCL that I

25  relied upon for that.

Alex LeBeau, PhD, MPH, CIH

```
 1        Q.   The two that you cited in your report
 2   were Connolly and the NTP study, it is that
 3   correct?
 4                 MR. KALAS:  Just for
 5   clarification, counsel, do you mean the body of the
 6   report?
 7                 MS. SIZEMORE:  I'm sorry, what?
 8                 MR. KALAS:  Do you mean the body
 9   of the report, the text of the report?
10                 MS. SIZEMORE:  Yes.
11                 MR. KALAS:  Okay.
12        A.   Yeah, in the text of my opinion, yes.
13   BY MS. SIZEMORE:
14        Q.   And Connolly found -- what was the
15   percentage found in Connolly for excretion via
16   urine?
17        A.   Based on what I have in my report, 99
18   percent of the glyphosate within the body was
19   eliminated in 1.5 to 3 days.
20        Q.   Did you review any literature that
21   concluded that less than 90 percent of the
22   glyphosate in the body is eliminated via urine?
23                 MR. KALAS:  Objection.  Vague and
24   overbroad.  You can answer.
25        A.   I need more information, please.
```

Alex LeBeau, PhD, MPH, CIH

1    BY MS. SIZEMORE:

2        Q.   Sure.  In your review of the literature

3    did you see any studies where less than 90 percent

4    of the glyphosate in the body was eliminated via

5    urine based on dermal exposure?

6        A.   Based on dermal exposure there is one

7    data point that suggests that, but the rest of the

8    well-characterized pharmacokinetic studies don't

9    support that.

10       Q.   And what is the one data point that

11   suggests that?

12       A.   One data point in the Wester '91 study

13   for one of the two doses where the other dose found

14   urine was the major excretion pathway.

15       Q.   In the other dose where they found the

16   urine was the major excretion pathway, do you

17   recall what the percentage was?

18       A.   I do not.  If you have that study, I can

19   look at it.

20       Q.   Do you believe it was more than 98

21   percent?

22       A.   I don't recall specifically.

23            I hate to take another break.  I'm

24   sorry.

25            MS. SIZEMORE:  That's fine.

Alex LeBeau, PhD, MPH, CIH

```
 1                    THE VIDEOGRAPHER:  It's 11:13, and
 2   we're off the record.
 3                    (Recess in the proceeding.)
 4                    THE VIDEOGRAPHER:  It's 11:14 and
 5   we're on the record.
 6   BY MS. SIZEMORE:
 7        Q.   Is it your understanding that studies
 8   evaluating agricultural and commercial applications
 9   of glyphosate have identified the dermal pathway as
10   the main contributory exposure pathway when
11   applying to target plant species?
12        A.   Can you ask that one more time, please?
13        Q.   Sure.  Is it your opinion that the
14   agricultural and commercial applications of
15   glyphosate have identified the dermal pathway as
16   the main contributory exposure pathway when
17   applying to target plant species?
18        A.   Yes.
19        Q.   And so based on that, is it important to
20   determine the dose of glyphosate entering the body
21   following dermal contact with a liquid formulation?
22                    MR. KALAS:  Objection, vague,
23   overbroad.
24                    You can answer.
25        A.   I need more clarity.  I don't understand.
```

Alex LeBeau, PhD, MPH, CIH

 1    BY MS. SIZEMORE:

 2         Q.   Is it your opinion that because the

 3    agricultural and commercial studies have found the

 4    dermal pathway to be the main contributory

 5    exposure, the bioavailability of glyphosate

 6    following incidental dermal contact must be

 7    determined?

 8         A.   State that again, please?

 9         Q.   Sure.  I'm reading from your report --

10         A.   Right, that's what I am trying --

11         Q.   Page six?

12         A.   Yes, thank you.

13         Q.   You state that:  Because studies

14    evaluating agricultural and commercial applications

15    of glyphosate have identified the dermal pathway as

16    the main contributory exposure pathway when

17    applying to target plant species, the

18    bioavailability of glyphosate following incidental

19    dermal contact must be determined.

20         A.   Yes.

21         Q.   In lay terms does that mean that it's

22    important to evaluate the dose of glyphosate

23    entering the body following contact with the skin?

24         A.   Clarify for me, please.

25         Q.   Sure.  What do you mean by the

Alex LeBeau, PhD, MPH, CIH

1    bioavailability of glyphosate following incidental

2    dermal contact must be determined?

3        A.   That you have to know how much or how

4    little of the material is entering the body

5    following dermal contact.

6        Q.   In looking at dermal permeability, dermal

7    permeability, is that essentially how much or how

8    much of the chemical is able to permeate or get

9    into the skin?

10               MR. KALAS:  Objection, vague.

11               You can answer.

12       A.   Clarify for me, please.

13   BY MS. SIZEMORE:

14       Q.   Sure.  What do you mean by dermal

15   permeability?

16       A.   The permeability of the material across

17   the epidermis or upper layer of the skin.

18       Q.   Okay.  And permeability in lay terms

19   means what?

20       A.   Permeation or -- umm, getting through.

21       Q.   And in assessing this for glyphosate you

22   looked at -- or you cited in your report two

23   studies, correct?

24               MR. KALAS:  Again, you mean the

25   body of the report?

Alex LeBeau, PhD, MPH, CIH

1           MS. SIZEMORE:  Correct.

2      A.   I discuss two studies, but I mention

3  others as well in the body.

4  BY MS. SIZEMORE:

5      Q.   Okay.  And Franz 1983 is one of the

6  studies that you cited?

7      A.   Yes.

8      Q.   And in that case what -- I'm sorry, in

9  that study were the authors using frozen abdominal

10 skin?

11          MR. KALAS:  Objection,

12 mischaracterizes the study.

13              You can answer.

14     A.   I don't recall exactly the treatment.  If

15 you have the study, I can review it.

16 BY MS. SIZEMORE:

17     Q.   This was an in vitro human study?

18     A.   Yes.

19     Q.   Using cadaver skin?

20     A.   Yes.

21     Q.   Do you recall what portion of the body

22 the skin was taken from?

23     A.   I don't recall.  Again, if you have the

24 study, I can look at it.

25     Q.   Would that be relevant to you in

Alex LeBeau, PhD, MPH, CIH

```
 1   determining whether the dermal absorption from the

 2   study is accurate?

 3                  MR. KALAS:  Objection, vague.

 4        A.   I need more clarification, please.

 5   BY MS. SIZEMORE:

 6        Q.   Sure.  Does the part of the body that the

 7   skin is taken from affect the dermal absorption?

 8        A.   A little more clarity, please.

 9        Q.   Sure.  In an in vitro human cadaver

10   study, like this one, that is attempting to assess

11   dermal absorption, does it matter where the -- the

12   skin is taken from on the body, in your opinion?

13        A.   Yes, I believe that's one of the relevant

14   pieces of information I would want to know in the

15   study.

16        Q.   Do you recall in this study, the Franz

17   1983 study, a greater finding of retention of

18   glyphosate on the Roundup spray mix?

19                  MR. KALAS:  Objection, vague.

20   Mischaracterizes the study.

21                  You can answer.

22        A.   Can you clarify for me, please?

23   BY MS. SIZEMORE:

24        Q.   Sure.  Do you recall whether there were

25   differences in the absorption of glyphosate based
```

Alex LeBeau, PhD, MPH, CIH

1    on the formulation of the product?

2         A.   If I recall, there were differences in

3    the percent absorption.  However, in the flux they

4    were all approximately the same values for the

5    different formulations.

6         Q.   And the .2 percent dermal absorption that

7    you quote, do you recall what formulation that was?

8         A.   I believe it was based on the flux across

9    all different formulations.

10        Q.   You also relied upon Nielsen 2009 as to

11   this issue of dermal absorption?

12        A.   Clarify.

13        Q.   Sure.  Is Nielsen 2009 one of the other

14   studies you relied upon on the issue of dermal

15   absorption?

16        A.   I relied on Nielsen for dermal

17   penetration information.

18        Q.   Other than Franz and Nielsen, do you

19   recall as you sit here any other studies you relied

20   upon for dermal permeability?

21        A.   Yeah, in here I mention Wester '91 and

22   some other studies by Ward, Smith and Davies.

23        Q.   Any others that you can recall as you sit

24   here today?

25        A.   Not specifically.

Alex LeBeau, PhD, MPH, CIH

1     Q.   And did you rely on flux values for all

2   of those studies?

3     A.   I relied on -- I relied on flux when

4   making my evaluation of dose.  I relied on

5   information in Wester as far as retention and

6   powdered stratum corneum.

7     Q.   Why did you not rely on Wester for

8   evaluation of dose?

9              MR. KALAS:  Objection,

10  mischaracterizes his testimony.

11             But you can answer.

12    A.   Can you give me more information?

13  BY MS. SIZEMORE:

14    Q.   Sure.  I think you said you relied on

15  Wester for deposit in the stratus corneum, is that

16  correct?

17    A.   For permeation into the powdered stratum

18  corneum.

19    Q.   Okay.  Did you also rely upon it -- upon

20  that for the flux calculation?

21    A.   I looked at the flux that was in -- well,

22  let me think on that.  I believe I relied on flux

23  for that study.  But again, if you have it for me

24  to review, I can give you a better answer.

25    Q.   So is it your recollection that you

Alex LeBeau, PhD, MPH, CIH

```
 1    relied on flux in both Wester, Ward, Smith and

 2    Davies and Franz and Nielsen?

 3         A.   Yes, I looked at flux as it related to

 4    dose and permeation of skin.

 5         Q.   And were all of these studies looking at

 6    in vitro permeation of human skin?

 7         A.   Clarify for me.

 8         Q.   Sure.  All of the studies we just listed

 9    that you relied upon for dermal permeability, were

10    they all in vitro studies using human skin?

11         A.   Yes, but specifically in Wester for the

12    powdered stratum corneum.

13         Q.   Would you agree that the chemical and

14    physical properties of a substance are important in

15    assessing permeability to human skin?

16         A.   Can you state that question again,

17    please?

18         Q.   Sure.  If you are making an assessment of

19    permeability to human skin, would you agree that it

20    is important to look at the chemical and physical

21    properties of the substance?

22         A.   Yes.  Those are the areas that I would

23    look at.

24         Q.   Would you agree it would be preferable to

25    have data regarding a formulated product and not
```

Alex LeBeau, PhD, MPH, CIH

1    just the active ingredient?

2              MR. KALAS:  Objection, vague,

3    overbroad.

4        A.   Can you clarify for me, please?

5    BY MS. SIZEMORE:

6        Q.   Sure.  So in assessing the dermal

7    permeability of Roundup, would you agree that it

8    would be preferable to have data regarding the

9    formulated product and not just the active

10   ingredient of glyphosate?

11             MR. KALAS:  Objection, incomplete

12   hypothetical.

13             You can answer.

14       A.   Ask again with some clarity, please?

15   BY MS. SIZEMORE:

16       Q.   In making an assessment of dermal

17   permeation or permeability of a formulated product,

18   would you prefer -- would it be preferable to have

19   data regarding testing of the formulated product

20   and not just the active ingredient?

21             MR. KALAS:  Objection, incomplete

22   hypothetical.

23             You can answer.

24       A.   I want to be specific, so I would like

25   you to just make sure we're on the same page.

Alex LeBeau, PhD, MPH, CIH

1  BY MS. SIZEMORE:

2       Q.   You'd agree that at least for Roundup,

3  the formulated product and glyphosate have

4  differences; there's more in Roundup than just

5  glyphosate, correct?

6       A.   There is more in Roundup than

7  glyphosate -- just glyphosate, yes.

8       Q.   And so in assessing dermal permeability

9  of glyphosate -- I'm sorry, of Roundup, would it be

10  preferable to have studies that assess the

11  formulated product and not just glyphosate?

12                 MR. KALAS:  Same objection,

13  incomplete hypothetical.

14                 You can answer.

15       A.   Clarify a little more for me, please?

16  BY MS. SIZEMORE:

17       Q.   Did you look at studies assessing dermal

18  permeability of the formulated product or

19  glyphosate?

20       A.   Of both.

21       Q.   Okay.  And would you agree that studies

22  assessing the dermal permeability of the formulated

23  product would be more relevant to assessing the

24  dermal permeability of Roundup than studies only

25  looking at the dermal permeability of glyphosate?

Alex LeBeau, PhD, MPH, CIH

1             MR. KALAS:  Same objection.

2  Incomplete hypothetical.  You can answer.

3       A.   Within the dataset there are studies that

4  look at formulated products, so I think the

5  information within the dataset is sufficient.

6  BY MS. SIZEMORE:

7       Q.   When you're looking to assess dermal

8  permeability of a chemical would you prefer to have

9  data about all the components of the chemical and

10  not just an active ingredient?

11       A.   Ask one more time for me, please.

12       Q.   If you're looking at dermal permeability

13  studies for a substance, is it preferable to have

14  data regarding the formulated product as opposed to

15  only the active ingredient?

16             MR. KALAS:  I'm going to object as

17  to an incomplete hypothetical.

18             You can answer.

19       A.   I have -- I'm -- I'm having issue with

20  the word preference.  But again, formulated

21  products were looked at within the dataset for this

22  already.

23  BY MS. SIZEMORE:

24       Q.   And you'd agree it's helpful to look at

25  data from the formulated product?

Alex LeBeau, PhD, MPH, CIH

```
 1        A.   Clarify.

 2        Q.   Would you agree that there are materials

 3   or substances in Roundup that are not present in

 4   pure glyphosate?

 5                   MR. KALAS:  Objection, asked and

 6   answered.

 7                   You could answer again.

 8        A.   Yes, there are other products in the

 9   formulation.

10   BY MS. SIZEMORE:

11        Q.   Is it possible that some of those

12   materials and substances could affect dermal

13   permeability?

14                   MR. KALAS:  Objection, vague,

15   overbroad.

16                   You can answer.

17        A.   Clarify for me, please.

18   BY MS. SIZEMORE:

19        Q.   Sure.  If you assume that there are

20   materials and substances in Roundup other than

21   glyphosate, can some of those materials and

22   substances affect the dermal permeability?

23                   MR. KALAS:  Same objection, vague,

24   overbroad, incomplete hypothetical.

25                   You can answer.
```

Alex LeBeau, PhD, MPH, CIH

```
 1        A.   Clarify for me a little more, please.
 2   BY MS. SIZEMORE:
 3        Q.   I am going to move on.  I think I've
 4   asked the question several times.
 5                  MR. KALAS:  Can I  -- do you want
 6   to know why I think it's an incomplete hypothetical
 7   or not?
 8                  MS. SIZEMORE:  Okay, sure.
 9                  MR. KALAS:  The reason it's an
10   incomplete hypothetical is because it assumes the
11   study design is the same in both of them.  And so
12   that's the reason it's an incomplete hypothetical.
13                  MS. SIZEMORE:  All right.
14   BY MS. SIZEMORE:
15        Q.   Would you agree that parts of the body
16   with more hair are more permeable to glyphosate
17   than areas of the body with less hair?
18                  MR. KALAS:  Objection, vague,
19   overbroad.
20                  You can answer.
21        A.   Ask it again with some clarity, please.
22   BY MS. SIZEMORE:
23        Q.   Does hair, the presence of hair follicles
24   affect the dermal permeability of glyphosate?
25        A.   For glyphosate, no.
```

Alex LeBeau, PhD, MPH, CIH

1    Q.   Is it your opinion that Roundup does not

2  bind to the skin?

3    A.   Based on studies of powdered human

4  stratum corneum, essentially zero glyphosate was

5  found retained in those samples.

6    Q.   And is this true regardless of the

7  formulation of Roundup?

8    A.   Studies on formulated products have shown

9  that dermal permeability is very low.

10   Q.   And that's true regardless of different

11 surfactants being present?

12             MR. KALAS:  Objection, overbroad.

13             You can answer.

14   A.   Can you clarify for me, please?

15 BY MS. SIZEMORE:

16   Q.   Sure.  You said that formulated products

17 -- studies on formulated products have shown that

18 dermal permeability is very low, correct?

19   A.   Yes.

20   Q.   Okay.  And those studies on formulated

21 products, did they analyze formulated products with

22 different types of surfactants?

23   A.   Clarify a little more for me.

24   Q.   Do you have knowledge about what

25 surfactants or what other ingredients, other than

Alex LeBeau, PhD, MPH, CIH

1  glyphosate, were in the formulated products that

2  were analyzed that showed dermal permeability is

3  low?

4      A.   There were some surfactants presumably in

5  formulated products that were evaluated in the

6  dataset.

7      Q.   And is it your understanding that dermal

8  permeability remains the same regardless of the

9  type of surfactants or other chemicals in the

10  formulated product?

11      A.   Yes, whether or not in the formulation

12  the surfactants were there, dermal permeability was

13  approximately the same within other studies in the

14  dataset.

15      Q.   Did you also look at the toxicokinetics

16  of glyphosate and Roundup?

17      A.   Clarify for me, please.

18      Q.   Sure.  Is one of the things that you

19  evaluated with regard to glyphosate and Roundup the

20  toxicokinetics?

21      A.   I evaluated toxicokinetics within the

22  dataset.

23      Q.   Okay.  That's a portion of your report,

24  right?

25      A.   Yes.

Alex LeBeau, PhD, MPH, CIH

1      Q.   Okay.  And the toxicokinetics, one of the

2   things you looked at is the ADME, the absorption,

3   distribution, metabolism and excretion, is that

4   correct?

5      A.   Yes.

6      Q.   And would you agree that in order to

7   properly evaluate biomonitoring data, the

8   toxicokinetics of the chemical must be understood?

9      A.   I think it's important to understand

10  that, yes.

11     Q.   Would you agree that if you have an

12  incorrect assumption about one of these elements,

13  your biomonitoring data will be inaccurate?

14          MR. KALAS:  Objection, overbroad.

15          You can answer.

16     A.   Clarify for me, please.

17  BY MS. SIZEMORE:

18     Q.   Sure.  If you have an incorrect

19  assumption about absorption, distribution,

20  metabolism or excretion, would you agree that your

21  biomonitoring data can be inaccurate?

22     A.   Clarify a little more for me.

23     Q.   Sure.  In evaluating the toxicokinetics I

24  think you just said it's important for

25  biomonitoring data to understand the

Alex LeBeau, PhD, MPH, CIH

1    toxicokinetics, is that right?

2         A.   Yes.

3         Q.   And if you make an incorrect assumption

4    about one of the elements of the toxicokinetics,

5    would you agree that your ultimate conclusion about

6    biomonitoring could be inaccurate?

7         A.   If you do not have well-characterized

8    studies, it's potential that there could be

9    biomonitoring data that is not comprehensive.

10        Q.   And so for example, you state that:

11   "Excretion is the ultimate elimination of the

12   substance from the body via either urine, feces or

13   exhaled breath," correct?

14        A.   Yes.

15        Q.   And so if you have an incorrect

16   assumption about excretion, could it affect your

17   biomonitoring -- the accuracy of your biomonitoring

18   data?

19        A.   Be more specific for me, please.

20        Q.   Sure.  As an example, if you assume that

21   a chemical is excreted solely through urine, and

22   that's inaccurate, would that affect your analysis

23   about dose?

24                  MR. KALAS:  Objection, incomplete

25   hypothetical.

Alex LeBeau, PhD, MPH, CIH

```
1                   You can answer.
2       A.    Potentially.
3  BY MS. SIZEMORE:
4       Q.    Okay.  Looking at the studies that you
5  considered under toxicokinetics, we talked about
6  this a little bit, you have Connolly and the NTP
7  study, correct?
8       A.    Yes.
9       Q.    Okay.  In Connolly the ultimate
10 conclusion is that 99 percent of glyphosate in the
11 body will be eliminated in approximately 1.5 to 3
12 days, is that correct?
13      A.    Yeah, using the average half-life
14 determined in that study.
15      Q.    So does that mean after exposure to
16 glyphosate it takes 1.5 to 3 days to leave your
17 system?
18                   MR. KALAS:  Objection, overbroad,
19 mischaracterizes the conclusion.
20                   But you can answer if you
21 understand it.
22      A.    I need more information, please.
23 BY MS. SIZEMORE:
24      Q.    Sure.  What does it mean when it says 99
25 percent of the glyphosate in the body will be
```

Alex LeBeau, PhD, MPH, CIH

1   eliminated in approximately 1.5 to 3 days?

2       A.   Based on the dosing in the study, the

3   average half lives that were determined shows that

4   99 percent of the glyphosate in the body will be

5   eliminated in 1.5 to 3 days.

6       Q.   And so does that mean before those 1.5 to

7   3 days there is a concentration of glyphosate

8   within the body?

9            MR. KALAS:  Objection, vague.

10           You can answer.

11      A.   Based on what was done in the study, they

12  did identify biomarker concentrations.

13  BY MS. SIZEMORE:

14      Q.   And glyphosate was found in the urine of

15  the participants of the Connolly study, is that

16  correct?

17      A.   Yes.

18      Q.   Do you recall the statement of the

19  purpose of the Connolly study and that it was due

20  to lack of data about human absorption of

21  glyphosate?

22      A.   I don't recall that specifically.  If you

23  have that for me to take a look at, I can.

24      Q.   And that study was published in 2018,

25  correct?

Alex LeBeau, PhD, MPH, CIH

1      A.   Yes.

2      Q.   That was after the Lavy study?

3      A.   Yes.

4      Q.   The NTP study, was that a rat study?

5      A.   It was a rat study.

6      Q.   And Connolly was a human study, is that

7   right?

8      A.   Yes, let me clarify.  The NTP for this

9   particular area was the rat model.

10     Q.   What does that mean?

11     A.   Just that this is -- this is the rat

12   portion of this NTP study.  But, yes.

13     Q.   And the exposure on the rat study was IV,

14   correct; it was given intravenously?

15     A.   Yes, for this portion.

16     Q.   The exposure on Connolly, do you recall

17   how that was done?

18     A.   I don't recall.

19     Q.   Okay.  The next section of your report

20   you're talking about regulatory limits for

21   glyphosate and Roundup, is that correct?

22     A.   Yes.

23     Q.   Is it your opinion that regulatory models

24   do not have the purpose of quantifying exposures to

25   a particular individual applying a chemical?

Alex LeBeau, PhD, MPH, CIH

1      A.    Yes.

2      Q.    You state, I think on page nine, that

3   "glyphosate was introduced to the U.S. market in

4   1974 and was consistently recognized as having no

5   carcinogenic risk to humans" by various world

6   health organizations for 40 years. Do you see that?

7      A.    Yes.

8      Q.    Is the EPA considered a health

9   organization?

10     A.    Clarify, please.

11     Q.    Sure.  When you state that there had been

12  no carcinogenic risk stated by any world health

13  organization for the 40 years, does that include

14  the EPA?

15     A.    Yes, that organization is one that I

16  evaluated in my assessment.

17     Q.    Is it your understanding that the EPA

18  consistently recognized glyphosate as having no

19  carcinogenic risk from 1974 to present?

20     A.    In their final determinations on -- from

21  my understanding, I'm not a regulatory and as far

22  as regulatory I defer to other experts, but it's my

23  understanding that their final reviews did not

24  identify that.

25     Q.    What do you mean by final reviews?

Alex LeBeau, PhD, MPH, CIH

1     A.   It was their final -- their eligibility

2     decisions.

3         Q.   And so when you say that glyphosate has

4     been consistently recognized as having no

5     carcinogenic risks, you're talking about final

6     eligibility decisions, is that right?

7         A.   Clarify, please.

8         Q.   Sure.  Your statement that glyphosate was

9     introduced to the U.S. market in 1974 and was

10    consistently recognized as having no carcinogenic

11    risk to humans by various worldwide health

12    organizations for 40 years.  The portion that says

13    'consistently recognized as having no carcinogenic

14    risk,' is that talking about final eligibility

15    decisions of these health organizations?

16        A.   I'd say consistently during their

17    evaluations and final decisions they determined

18    that there was no carcinogenic risk to humans.

19        Q.   And so is it your understanding that no

20    health organization found a carcinogenic risk with

21    glyphosate during their evaluations?

22        A.   Clarify for me, please.

23        Q.   Sure.  You said:  "I'd say consistently

24    during their evaluations and final decisions they

25    determined that there was no carcinogenic risk to

Alex LeBeau, PhD, MPH, CIH

1    humans."  Do you recall that?

2        A.    Yes.

3        Q.    Okay.  And when you say 'during their

4    evaluations and their final decisions,' those are

5    two separate things, right?

6        A.    I'd say one is part of the other.

7        Q.    And a final decision can be different

8    than the data that comes up during an evaluation,

9    correct?

10                   MR. KALAS:  Objection, vague,

11   overbroad.

12                   You can answer.

13       A.    Clarify for me.

14   BY MS. SIZEMORE:

15       Q.    Sure.  Is it possible that during the

16   evaluations a decision could be different than the

17   ultimate final decision about carcinogenic risk?

18                   MR. KALAS:  Objection, calls for

19   speculation.

20                   You can answer.

21       A.    I don't -- I'm going to defer to a

22   regulatory expert on what may happen during their

23   determinations.

24   BY MS. SIZEMORE:

25       Q.    Okay.  Is it your understanding that no

Alex LeBeau, PhD, MPH, CIH

1    worldwide health organization found a carcinogenic

2    risk to glyphosate during their evaluation process?

3         A.   My understanding is that they did not

4    identify a carcinogenic risk to humans during their

5    evaluation.

6         Q.   Okay.  You talk about IARC's findings

7    that glyphosate is probably carcinogenic to humans.

8    Do you recall that?

9         A.   Yes.

10        Q.   And in the second paragraph you state:

11   "It's important to understand that the assessment

12   performed by IARC and those performed by various

13   regulatory agencies differed in the endpoints that

14   were evaluated"?

15        A.   Yes.

16        Q.   And so in assessing studies, is it

17   important to look at any differences in the

18   endpoints that is being evaluated?

19        A.   I need more clarity on that, please.

20        Q.   Sure.  You state that for assessment of

21   the IARC findings it's important to note that the

22   various regulatory agencies differed in the

23   endpoints that were evaluated.  Do you recall that?

24        A.   Yes.

25        Q.   Okay.  And so would you agree that in

Alex LeBeau, PhD, MPH, CIH

1    comparing studies or findings between agencies,

2    it's important to look at what the end points are

3    that were being evaluated?

4         A.   In evaluating findings between agencies,

5    yes.

6                   I hope we may be able to break

7    soon, by the way.

8                   MS. SIZEMORE:  We can break right

9    now.

10                   THE VIDEOGRAPHER:  It's 11:53, and

11    we're off the record.

12                   (Recess in the proceeding.)

13                   THE VIDEOGRAPHER:  It's 12:03, and

14    we're on the record.

15    BY MS. SIZEMORE:

16         Q.   All right, Doctor, we were discussing the

17    regulatory portion of your report before the break.

18    Do you recall that?

19         A.   Yes.

20         Q.   Okay.  I want to talk about the

21    thresholds for exposures to glyphosate.  And you

22    found that overwhelmingly the regulatory agencies

23    have determined that glyphosate does not represent

24    a carcinogenic risk to humans, correct?

25         A.   Yes.

Alex LeBeau, PhD, MPH, CIH

```
1        Q.    Okay.  You found that the regulatory

2   agencies did identify other health endpoints for

3   glyphosate?

4        A.    Yes.

5        Q.    And have established thresholds based on

6   those other health endpoints, is that accurate?

7        A.    Yes.

8        Q.    Okay.  And one of the thresholds that you

9   cite specifically is the European Union Acceptable

10  Operator Exposure Level or the AOEL, is that

11  correct?

12       A.    Yes.

13       Q.    And you state the lowest dose of -- the

14  lowest of the dose thresholds is this European

15  Union AOEL, is that right?

16       A.    Clarify again for me, please.

17       Q.    Sure.  You state in your report that the

18  lowest of these thresholds, these dose thresholds

19  set by a regulatory agency who performed a risk

20  assessment on glyphosate is the European Union

21  Acceptable Operator Exposure Level, AOEL, is that

22  correct?

23       A.    Yes.

24       Q.    And AOEL, is that what you utilized in

25  your comparison to Mr. Giglio's dose?
```

Alex LeBeau, PhD, MPH, CIH

```
 1        A.    That was one of the levels, yes.

 2        Q.    Okay.  And what is the health endpoint

 3   that the AOEL is intended for?

 4        A.    I don't recall the specific threshold for

 5   that.

 6        Q.    You would agree that the purpose of the

 7   AOEL was not exposure to cancer risk, is that

 8   correct?

 9        A.    Clarify for me, please.

10        Q.    Sure.  The AOEL, is that intended to be a

11   cancer endpoint?

12              MR. KALAS:  Objection, calls for a

13   regulatory conclusion.

14              But you can answer if you

15   understand.

16        A.    No, I don't understand.

17   BY MS. SIZEMORE:

18        Q.    The AOEL, as set by the European Union

19   and utilized by you in your analysis of dose, is it

20   for the purpose of assessing cancer risk?

21        A.    From what I recall it's based on other

22   health endpoints.

23        Q.    Noncancer health endpoints, correct?

24        A.    Noncancer health endpoints that are low

25   in the dataset.
```

Alex LeBeau, PhD, MPH, CIH

1      Q.   Would you agree that in determining

2   whether a chemical or substance creates a health

3   risk, it's important to know whether the reference

4   dose was calculated with a particular health risk

5   in mind?

6                MR. KALAS:  Objection, overbroad.

7      A.   I need some more information on that,

8   please.

9   BY MS. SIZEMORE:

10     Q.   Sure.  So if you were making an

11  assessment as to whether a particular chemical or

12  substance creates a particular health risk and

13  you're comparing it to a regulatory level, wouldn't

14  you want to know what that regulatory level was

15  created for?

16               MR. KALAS:  Same objection.

17     A.   I guess I need some more clarity on that

18  because I'm having some trouble.

19  BY MS. SIZEMORE:

20     Q.   Sure.  In this case you compared

21  Mr. Giglio's dose to the AOEL level, correct?

22     A.   Yes.

23     Q.   But you don't know what particular health

24  risk the AOE level -- the AOEL level was intended

25  to assess, is that right?

Alex LeBeau, PhD, MPH, CIH

1                    MR. KALAS:  Objection, asked and

2      answered.

3                    You can answer again.

4          A.    It includes a number of health effects,

5      but I don't remember the specific one for this --

6      establishing this level.

7      BY MS. SIZEMORE:

8          Q.    Okay.  So do you think it's important to

9      know what the health risks are that set the level

10     when you're using that level to determine a

11     particular health risk?

12                   MR. KALAS:  Objection, overbroad.

13                   You can answer.

14         A.    I need -- I need some more clarity,

15     please.

16     BY MS. SIZEMORE:

17         Q.    Did you take into account what health

18     risks the AOEL was intended to analyze when you

19     used it in your analysis in the Giglio case?

20         A.    I looked at studies that were used for

21     evaluating, establishing that level; however I

22     can't recall those particular ones at the moment.

23         Q.    Okay.  And the studies that you used --

24     that you looked at for evaluating and establishing

25     that level, did they discuss how they calculated

Alex LeBeau, PhD, MPH, CIH

1   that level?

2       A.   At the moment I don't recall exactly how

3   they calculated that level.

4       Q.   All right.  I want to move on to the

5   epidemiology portion of your report.

6               Up until this point we've been

7   talking about glyphosate exposure nonspecific to

8   non-Hodgkin's lymphoma, is that right?

9       A.   Can you state that again, please?

10      Q.   Sure.  During your review of the data,

11  did you evaluate the reliability and usefulness of

12  the various dose assessment methodologies used in

13  glyphosate epidemiology studies?

14      A.   Clarify a little more.

15      Q.   Sure.  I'm going to read from your

16  report.  It's on the first paragraph -- the end of

17  the first paragraph under epidemiology.  You state:

18  "During my review of the available data I evaluated

19  the reliability and usefulness of the various dose

20  assessment methodologies used in glyphosate

21  epidemiology studies."  Do you recall that?

22      A.   Yes.

23      Q.   And did you do that in connection with

24  this case?

25      A.   Yes, from a dose standpoint.

Alex LeBeau, PhD, MPH, CIH

1      Q.   Okay.  Is your opinion on these

2  epidemiology studies limited to the dose assessment

3  methodologies contained within them?

4      A.   Yes.  While I'm capable in other areas

5  looking at epidemiology studies, I'm focusing

6  specifically on the dose in these studies, and the

7  other areas I'm deferring to epidemiology experts.

8      Q.   And would you agree that McDuffie --

9  well, McDuffie is one of the studies that you

10  looked at, correct, McDuffie 2001?

11      A.   Yes.

12      Q.   And did McDuffie 2001 find an association

13  between glyphosate exposure and non-Hodgkin's

14  lymphoma?

15           MR. KALAS:  Objection, overbroad.

16      A.   Can you ask the question again, please?

17  BY MS. SIZEMORE:

18      Q.   Sure.

19      A.   More clarity.

20      Q.   Did the McDuffie study find an

21  association between glyphosate exposure and

22  non-Hodgkin's lymphoma?

23           MR. KALAS:  Vague and overbroad.

24      A.   Yeah, I need some more clarity, please.

25  BY MS. SIZEMORE:

Alex LeBeau, PhD, MPH, CIH

1      Q.    Sure.  You reviewed this study in

2   connection with your opinions, is that right?

3      A.    Yes.

4      Q.    Was there a conclusion in McDuffie that

5   there was an association between glyphosate

6   exposure and non-Hodgkin's lymphoma?

7                   MR. KALAS:  Same objection.

8      A.    I need a little more clarity, please.

9   BY MS. SIZEMORE:

10     Q.    Do you recall what the McDuffie study

11   looked at?

12     A.    I believe they looked at being ever or

13   never exposed to glyphosate.  But if you have a

14   study for me to look at in more detail, I'd be

15   happy to.

16     Q.    Would you agree that McDuffie assessed

17   the association of specific pesticides and

18   non-Hodgkin's lymphoma?

19     A.    I would like the study before I'm able to

20   give any more answers.

21     Q.    I'll hand you a copy of McDuffie.

22     A.    Thank you.

23                  MS. SIZEMORE:  And go ahead and

24   mark it if you like.  We'll mark it as Exhibit 7.

25   Do you need a copy?

Alex LeBeau, PhD, MPH, CIH

1                    MR. KALAS:  Sure.  Thanks.

2                    (Exhibit 7 was marked for

3     identification.)

4          Q.   In looking at the abstract, the very

5     first sentence says:  Our objection -- I'm sorry,

6     "our objective in the study was to investigate the

7     putative associations of specific pesticides with

8     non-Hodgkin's lymphoma."  Is that accurate?

9          A.   Yes.

10         Q.   Okay.  And so does that refresh your

11    memory that the McDuffie study was looking at

12    pesticides and correlation between non-Hodgkin's

13    lymphoma?

14         A.   Yes, McDuffie looked at a number of

15    pesticides.

16         Q.   Okay.  And McDuffie found -- looked at

17    dose response levels based on days per year of

18    personally mixing or applying herbicides, is that

19    correct?

20         A.   Can you ask that question again, please?

21         Q.   McDuffie looked at dose response levels

22    based on days per year of personally mixing or

23    applying herbicides, is that right?

24         A.   Can you point that to me in here?

25         Q.   Okay, on page 1156.

Alex LeBeau, PhD, MPH, CIH

```
 1        A.    Um-hmm.

 2        Q.    It says:  "We classified exposure by the

 3   number of herbicides, insecticides, fungicides

 4   and fumigants reported by cases and controls" --

 5        A.    I am sorry, which column, which

 6   paragraph?

 7        Q.    The right column, the second paragraph.

 8        A.    Okay.

 9        Q.    -- reported by cases and control as well

10   as by numbers of days per year of exposure to

11   individual compounds?

12        A.    I see that.

13        Q.    Would you agree that McDuffie assessed

14   exposure by days per year, exposure days per year?

15        A.    Yes, I see that they used days per year.

16        Q.    And based on that found exposures greater

17   than two days per year have an NHL odds ratio of

18   2.12.

19        A.    Can you clarify for me, please?

20        Q.    Sure.  Do you recall there being a

21   finding in McDuffie that there was an increased

22   risk of non-Hodgkin's lymphoma with more than two

23   exposure days per year?

24             MR. KALAS:  Objection,

25   mischaracterizes the study.
```

Alex LeBeau, PhD, MPH, CIH

```
 1                    You can answer.
 2         A.   I need more information.
 3   BY MS. SIZEMORE:
 4         Q.   Do you recall reading this study?
 5         A.   Yes.  I need more specific information.
 6         Q.   Okay.  You don't recall the conclusions
 7   of the study as you sit here?
 8         A.   They evaluated multiple pesticides in
 9   this study, and I need more clarity.
10         Q.   Okay.  And did -- based on their
11   evaluation, do you have an understanding as to
12   whether they found an increased risk of
13   non-Hodgkin's lymphoma for any pesticide?
14         A.   Yes, they identified higher exposures for
15   certain pesticides in non-Hodgkin's lymphoma for
16   odds ratios.
17         Q.   And was there an increased risk of
18   non-Hodgkin's lymphoma as a result of exposure to
19   glyphosate?
20                    MR. KALAS:  Objection, overbroad.
21         A.   I need more clarity, please.
22   BY MS. SIZEMORE:
23         Q.   I'm asking if the study found an
24   increased risk of non-Hodgkin's lymphoma based on
25   exposure to glyphosate?
```

Alex LeBeau, PhD, MPH, CIH

1           MR. KALAS:  Same objection.

2      A.   I just need some more clarity, please.

3  Otherwise I can't answer.

4  BY MS. SIZEMORE:

5      Q.   You can't answer that question?

6      A.   I cannot answer that question.

7      Q.   When you reviewed McDuffie, did you make

8  any attempt to ascertain whether there was an

9  increased risk of non-Hodgkin's lymphoma as a

10  result of glyphosate exposure?

11      A.   Yes, I looked at the exposure metric that

12  was used.

13      Q.   For what purpose?

14      A.   For seeing how they used exposure in

15  determining outcome.

16      Q.   Okay.  And so your review of McDuffie was

17  limited to looking at the exposure methods, is that

18  correct?

19      A.   The exposure and the outcome.

20      Q.   And given that McDuffie used exposure

21  days to calculate, did you come to the conclusion

22  that exposure days was an appropriate way to

23  calculate exposure to glyphosate?

24      A.   It's a rudimentary method for showing

25  exposure and for evaluating or assessing dose.

Alex LeBeau, PhD, MPH, CIH

```
 1        Q.   Have you reviewed any studies that assess
 2   exposure to glyphosate for the purpose of looking
 3   at correlation with non-Hodgkin's lymphoma that use
 4   a measure other than exposure days?
 5        A.   Yes.
 6        Q.   And what study was that?
 7        A.   The Andreotti study uses an intensity
 8   weighting metric scale for other factors for
 9   evaluating dose.
10        Q.   And what does the intensity weighted
11   metric scale utilize?
12        A.   It evaluates how pesticides were exposed
13   and what kind of protective gear, protective
14   barriers was used.
15        Q.   And the intensity weighted metric scale,
16   how is that expressed in that study?
17        A.   It's -- again, I am not -- the design on
18   epidemiology, I'm going to defer to them on design
19   and how it's expressed.  But they report odds
20   ratios as the findings for that study.  I take that
21   back.  Let me correct.  I believe they report
22   relative risk, but I don't have that in front of me
23   to verify.
24        Q.   Does the Andreotti study take into
25   account exposure days at all?
```

Alex LeBeau, PhD, MPH, CIH

1      A.   I believe they do look at exposure days;

2   however, I don't have that study in front of me to

3   verify.  I think that's one of the metrics that

4   they evaluate.

5      Q.   Did you review any studies to evaluate

6   risk of non-Hodgkin's lymphoma from exposure to

7   glyphosate that did not utilize an exposure day

8   metric at all?

9      A.   Ask that again, please?

10      Q.   Sure.  Did you review any studies, any

11   epidemiological studies that evaluate the link

12   between glyphosate and non-Hodgkin's lymphoma that

13   use an exposure metric that does not include

14   exposure days?

15              MR. KALAS:  Objection, assumes

16   facts not in the record.

17              You can answer it.

18      A.   I need more information, please.

19   BY MS. SIZEMORE:

20      Q.   We just established that Andreotti used

21   exposure days along with other factors, correct?

22      A.   I believe they did.

23      Q.   Are you aware of any studies that you

24   looked at that did not take into account exposure

25   days at all?

Alex LeBeau, PhD, MPH, CIH

1          A.   Clarify that just a little more for me.

2          Q.   Okay.  You used -- your exposure

3     calculations were based on -- what is it --

4     regulatory thresholds, correct --

5               MR. KALAS:  Objection,

6     mischaracterizes.

7     BY MS. SIZEMORE:

8          Q.   -- a calculation?

9               MS. SIZEMORE:  Go ahead.

10              MR. KALAS:  Objection,

11    mischaracterizes the report.

12              You can answer.

13         A.   Clarify for me.

14    BY MS. SIZEMORE:

15         Q.   Your exposure calculations in this case

16    were expressed as milligrams per kilograms per day,

17    correct?

18         A.   That was one of my doses, yes.

19         Q.   Okay, and you used those to compare them

20    to regulatory levels?

21              MS. SIZEMORE:  We have to go off

22    for a second to change the tape.

23              THE VIDEOGRAPHER:  It's 12:26, and

24    we're off the record.

25              (Recess in the proceeding.)

Alex LeBeau, PhD, MPH, CIH

```
 1                    THE VIDEOGRAPHER:  It's 12:27, and
 2   we're on the record.
 3   BY MS. SIZEMORE:
 4        Q.   Okay, Doctor, we were talking about the
 5   epidemiological studies that you reviewed to look
 6   at the valuation of exposure, is that right?
 7        A.   Yes.
 8        Q.   And McDuffie, we determined, uses a
 9   metric of exposure days, is that right?
10        A.   Yes.
11        Q.   Okay.  And Eriksson also uses exposure
12   days, is that right?
13        A.   I believe they use ever/never.  If you
14   have that study for me to look at, just to verify.
15        Q.   And ever/never would utilize whether a
16   person was exposed to glyphosate or not exposed to
17   glyphosate, is that correct?
18        A.   That's my understanding.
19        Q.   And Andreotti uses exposure days combined
20   with some other information, adjusted for PPE and
21   things like that, is that right?
22        A.   It's a lifetime intensity weighted scale,
23   yes.
24        Q.   In your evaluation of whether Mr. Giglio
25   was at an increased risk of non-Hodgkin's lymphoma
```

Alex LeBeau, PhD, MPH, CIH

1    you utilized a dose calculation and compared it to

2    various regulatory levels, including the -- I keep

3    forgetting this --

4                MR. KALAS:  AOEL?

5    BY MS. SIZEMORE:

6        Q.   -- AOEL, is that right?

7        A.   Yes.

8        Q.   Did you find any published literature

9    that used that method, meaning calculating a dose

10   and comparing it to regulatory levels to determine

11   whether there was an increased risk of

12   non-Hodgkin's lymphoma as a result of exposure to

13   glyphosate?

14       A.   Data within the dataset, the various data

15   that's in there show that even the highest values

16   that were in there are below regulatory thresholds

17   of concern.

18       Q.   And I appreciate that, but it did not

19   quite answer my question.  My question was whether

20   you had found any published literature in using the

21   methodology that you've utilized in this case?

22       A.   Can you clarify for me, please?

23       Q.   Sure.  Your calculation of exposure --

24   I'm sorry, of dose for Mr. Giglio was then compared

25   to regulatory limits in order for you to come to

Alex LeBeau, PhD, MPH, CIH

1    your conclusions, is that right?

2              MR. KALAS:  Objection,

3    mischaracterizes his report.

4              You can answer.

5       A.   Clarify for me a little bit, please.

6    BY MS. SIZEMORE:

7       Q.   Sure.  You've made a calculation of

8    Mr. Giglio's dose in this case, right?

9       A.   I did.

10      Q.   Okay.  And then you utilized that

11   calculation to compare it to regulatory levels set

12   by, for example, the AOEL, is that right?

13      A.   Yes.

14      Q.   Okay.  Have you seen any published

15   literature perform an analysis similar to that

16   where a dose is calculated and then compared to a

17   regulatory level?

18      A.   There have been studies that evaluate

19   doses across the dataset and compare them to

20   regulatory levels.

21      Q.   And were any of those studies specific to

22   risk of non-Hodgkin's lymphoma?

23      A.   I think the studies that were evaluated

24   include health thresholds that include a number of

25   health outcomes for comparison.

Alex LeBeau, PhD, MPH, CIH

1        Q.    Cancer outcomes?

2        A.    All health outcomes.

3        Q.    Is it your understanding that the health

4   thresholds included in these regulatory levels

5   included cancer endpoints?

6        A.    I need you to clarify that.

7        Q.    Sure.  The regulatory levels that you

8   compared Mr. Giglio's dose to, is it your

9   understanding that those utilized cancer endpoints?

10                MR. KALAS:  Object as asked and

11   answered.

12                You can answer again.

13        A.    The health thresholds that I evaluated or

14   looked at included all health outcomes and

15   endpoints.

16   BY MS. SIZEMORE:

17        Q.    Okay.  Have you seen any published

18   literature that assessed risk, increased risk of

19   non-Hodgkin's lymphoma by exposure to glyphosate

20   through comparing a dose calculation to a

21   regulatory level?

22        A.    The dataset includes comparison of

23   biomonitoring data that have been determined that

24   show that even the highest levels are below

25   regulatory thresholds of concern, which encompass

Alex LeBeau, PhD, MPH, CIH

1    all health outcomes.

2         Q.   My question is specific to published

3    literature assessing whether there's an increased

4    risk of non-Hodgkin's lymphoma specifically.  Have

5    you seen any published literature that assesses

6    that based on a dose calculation compared to a

7    regulatory level?

8               MR. KALAS:  Objection, asked and

9    answered.

10        A.   The dataset includes a number of

11   biomonitoring data points, and even the highest

12   levels show that the levels are below thresholds of

13   concern that are established for health outcomes,

14   which encompass all health outcomes.

15   BY MS. SIZEMORE:

16        Q.   Including non-Hodgkin's lymphoma?

17        A.   All health outcomes.

18        Q.   And which dataset is this?

19        A.   The glyphosate dataset.

20        Q.   What's the glyphosate dataset?

21        A.   Biomonitoring data that's been evaluated.

22        Q.   The studies that are listed in your

23   report under the biomonitoring section?

24        A.   The studies that are listed in my MCL.

25        Q.   Okay.  Including the studies listed in

Alex LeBeau, PhD, MPH, CIH

1    the biomonitoring section?

2        A.    Yes.

3        Q.    Okay.  And so is it your opinion that

4    Edmiston and Lavy compare a dose calculation for an

5    individual to a threshold that is intended to show

6    risk for non-Hodgkin's lymphoma?

7        A.    No.  Data from these studies are in the

8    dataset which show that biomonitoring data are

9    below regulatory thresholds of concern, which

10   encompass all health outcomes.

11       Q.    Okay.  And these regulatory thresholds of

12   concern which encompass all health outcomes, where

13   do those come from?

14       A.    Including the AOEL.

15       Q.    Okay.  And we've established that the

16   AOEL was a noncancer endpoint, is that right?

17       A.    It's a noncancer endpoint that is

18   determined based on the entire -- entirety of the

19   available data.

20       Q.    Is it your opinion that the AOEL includes

21   risk for cancers?

22       A.    It includes all health outcomes.

23       Q.    And what is that based on; where did you

24   get that information?

25       A.    The evaluations that were done to

Alex LeBeau, PhD, MPH, CIH

```
 1   evaluate studies that are out there for determining

 2   health outcomes.

 3        Q.   Other than the AOEL, what other

 4   regulatory outcome did you compare to?

 5        A.   The ADI.

 6        Q.   And is it your opinion that the ADI

 7   includes cancer endpoints?

 8        A.   My understanding that it includes all

 9   health outcomes.

10        Q.   Including cancer?

11        A.   All health outcomes.

12        Q.   Okay.  What else, other than the ADI and

13   the AOEL?

14        A.   The State of California No Significant

15   Risk State Harbor Level.

16        Q.   Anything else, any other level that you

17   compared?

18        A.   I also looked at the chronic daily

19   reference dose.

20        Q.   Any other measure?

21        A.   No.

22        Q.   Okay.  With regard to the epidemiological

23   studies that you reviewed, did any of them utilize

24   a calculated dose?

25                MR. KALAS:  Objection, vague.
```

1      A.   Can you be more specific, please?

2  BY MS. SIZEMORE:

3      Q.   Sure.  The epidemiological studies that

4  you looked at in forming your opinions, did any of

5  them calculate a dose for the exposure of the

6  participants?

7            MR. KALAS:  Same objection.

8      A.   Be a little more clear, please.

9  BY MS. SIZEMORE:

10     Q.   Did all of the epidemiological studies

11  either use exposure days or never/ever exposure in

12  their analysis?

13     A.   Re-ask that, I'm sorry.

14     Q.   Sure.  Did all of the epidemiological

15  studies that you considered either use exposure

16  days or never/ever exposure in their analysis?

17     A.    In some of the studies I looked at those

18  are some of the metrics that were used.

19     Q.   Okay.  Did any of them -- were any of the

20  metrics used to assess non-Hodgkin's lymphoma risk

21  a calculation of dose, such as you did for

22  Mr. Giglio?

23            MR. KALAS:  Objection, vague.

24            You can answer.

25     A.   Clarify for me, please.

Alex LeBeau, PhD, MPH, CIH

1    BY MS. SIZEMORE:

2        Q.   Sure.  The calculation that you prepared

3    for Mr. Giglio in this case, did any of the

4    epidemiological studies that you reviewed do a

5    similar calculation?

6                    MR. KALAS:  Same objection.

7        A.   Be a little more clear for me.

8    BY MS. SIZEMORE:

9        Q.   Did you read any epidemiological studies

10   that calculated a dose for the participants?

11       A.   I -- I really need clarity there, please.

12       Q.   I don't know if I could be much more

13   clear than that.

14                    MR. KALAS:  I think --

15   BY MS. SIZEMORE:

16       Q.   In the studies that you reviewed under

17   the epidemiological study section of your report,

18   did any of those studies actually make a

19   calculation of dose in their analysis?

20       A.   Those -- those studies attempted to use

21   exposure to establish dose.

22       Q.   And by exposure they used either exposure

23   days or ever/never exposure?

24       A.   Those are some of the metrics that were

25   used.

Alex LeBeau, PhD, MPH, CIH

```
 1          Q.   Do you recall any other metrics that were

 2   used?

 3          A.   Yes, in Andreotti using the intensity

 4   weighting metric.

 5          Q.   And that takes into account exposure

 6   days, is that right?

 7          A.   I believe, but also a lifetime intensity

 8   weighting score using other exposure metrics,

 9   method of application and PPE used.

10          Q.   Any other measures in the epidemiologic

11   studies that you reviewed?

12          A.   Can you clarify that question, please?

13          Q.   Sure.  Were there any other ways of

14   calculating exposure utilized in the epidemiologic

15   literature that you reviewed in connection with

16   your report, other than the ones we just discussed?

17          A.   For evaluating exposure, I don't recall.

18               We are at a nose blowing point,

19   sorry.  Break.

20               MS. SIZEMORE:  That's fine.

21               THE VIDEOGRAPHER:  It's 12:43.

22   We're off the record.

23               (Recess in the proceeding).

24               THE VIDEOGRAPHER:  It's 12:45.

25   We're on the record.
```

Alex LeBeau, PhD, MPH, CIH

```
 1    BY MS. SIZEMORE:

 2        Q.   I want to talk about your evaluation of

 3    Mr. Giglio, that starts on page ten of your report.

 4             Do you have any dispute that he

 5    does not have non-Hodgkin's lymphoma?

 6        A.   I'm not an oncologist.  I am not his

 7    oncologist, so I am going to defer and rely on the

 8    testimony that he provided.

 9        Q.   Okay.  And so in terms of his medical

10    history and diagnosis, you would defer that to

11    other experts, correct?

12        A.   Correct.

13        Q.   Okay.  Did you review any of his medical

14    records?

15        A.   No.

16        Q.   You have a discussion about the personal

17    protective equipment that Mr. Giglio utilized when

18    spraying Roundup.  Do you recall that?

19        A.   Yes.

20        Q.   Do you agree that personal protective

21    equipment is relevant to a person's exposure and

22    dose?

23             MR. KALAS:  Objection, overbroad.

24             You can answer.

25        A.   I need more clarity, please.
```

Alex LeBeau, PhD, MPH, CIH

```
 1   BY MS. SIZEMORE:
 2       Q.   Would you agree that if you have the
 3   information it's beneficial to take into account
 4   any personal protective equipment that a person
 5   uses while spraying?
 6       A.   Ask that one -- re-ask that, please.
 7       Q.   Would you agree that if you have the
 8   information, it's beneficial to take into account
 9   any personal protective equipment that a person
10   uses while spraying a pesticide?
11       A.   If that information is available, yes.
12       Q.   Okay.  And so in this case did you take
13   into account the personal protective equipment that
14   Mr. Giglio used?
15       A.   Yes, I looked at the equipment that he
16   used, or reportedly used.
17       Q.   Okay.  And so for example, to know
18   whether footwear would prevent exposure you would
19   want to know what the footwear was and what it was
20   made of, right?
21               MR. KALAS:   Objection, compound.
22       A.   Please re-ask.
23   BY MS. SIZEMORE:
24       Q.   Sure.  In order to make a determination
25   of whether let's say footwear would impact exposure
```

Alex LeBeau, PhD, MPH, CIH

1    and dose, you'd want to know what type of footwear

2    and what it was made of, ideally?

3                MR. KALAS:  Same objection,

4    compound.

5         A.   Knowing what type of footwear would be

6    helpful.

7    BY MS. SIZEMORE:

8         Q.   Okay.  And so in this case you took into

9    account Mr. Giglio's testimony that he wore work

10   boots, correct?

11        A.   Yes.

12        Q.   Okay.  And did you have any information

13   about what type of work boots or what material they

14   were made of?

15        A.   No, I used his testimony that he wore

16   work boots.

17        Q.   And so in using that testimony that he

18   wore work boots, did you make an assumption that

19   the work boots completely blocked any exposure to

20   his feet and ankles?

21        A.   No.  The conservative calculations that I

22   did for him would take into account any potential

23   incidental contact with other areas.

24        Q.   You did not specifically utilize any

25   calculation of exposure to the feet and ankles, is

Alex LeBeau, PhD, MPH, CIH

1    that right?

2        A.   Clarify, please.

3        Q.   Sure.  One of the things you assess in

4    your exposure and dose calculations is the skin

5    surface area, correct?

6        A.   Correct.

7        Q.   Did you account for any skin surface area

8    for Mr. Giglio's feet and ankles for his

9    occupational use?

10       A.   For his ankles it would have been

11   included in the lower portion of his legs.  His

12   feet were reportedly, as he testified to, were

13   covered with work boots.

14       Q.   And so with regard to the feet at least

15   you make an assumption that there is no exposure or

16   dose as it relates to the feet, is that right?

17       A.   No.

18              MR. KALAS:  Objection.  Objection,

19   mischaracterizes his prior testimony and asked and

20   answered.

21              You can answer again.

22       A.   My conservative estimate of Mr. Giglio's

23   exposure and subsequent dose took into account any

24   incidental exposures on other areas.

25   BY MS. SIZEMORE:

Alex LeBeau, PhD, MPH, CIH

1        Q.   Are you essentially saying that because

2   you used a conservative estimate, it would take

3   into account any error, if there was an error

4   there?

5                   MR. KALAS:  Objection,

6   mischaracterizes.

7                   You can answer.

8        A.   It would take into consideration any

9   potential incidental contact in other areas.

10  BY MS. SIZEMORE:

11       Q.   Would you agree that if Mr. Giglio was

12  wearing shoes that allowed absorption of the

13  glyphosate, it could affect his ultimate dose

14  calculation?

15                  MR. KALAS:  Objection, incomplete

16  hypothetical, assumes facts not in the record.

17                  You can answer.

18       A.   Please provide more clarity.

19  BY MS. SIZEMORE:

20       Q.   Sure.  If you include a calculation that

21  has skin surface area involving the feet, as

22  opposed to one that does not involve the feet, it

23  could change your dose calculation, is that right?

24       A.   As I said before, the conservative

25  estimate that I used for calculating his

Alex LeBeau, PhD, MPH, CIH

1    occupational dose would take into account any other

2    incidental exposures.  Those small potential

3    incidental exposures would increase his potential

4    dose perhaps one percent.  But by being

5    conservative, I encapsulated any other potential

6    incidental exposures.

7         Q.   Did you take into account Mr. Giglio's

8    testimony that he did not recall taking steps to

9    clean off the Roundup off his skin unless it was

10   direct liquid exposure?

11        A.   And clarify for that -- that question for

12   me, please.

13        Q.   Did you take into account any testimony

14   from Mr. Giglio as to whether or not he wiped the

15   Roundup off his skin when there was no direct

16   liquid exposure?

17        A.   I just need some more clarity.

18        Q.   Sure.  When you're making an assessment

19   about a person's exposure, is it important to take

20   into account whether they wash off any exposure on

21   their skin and when?

22        A.   It's important to understand what

23   procedures someone may have taken.

24        Q.   And is it possible to get Roundup on the

25   skin while spraying due to things like drift?

Alex LeBeau, PhD, MPH, CIH

1          MR. KALAS:  Objection, incomplete

2  hypothetical.  It calls for speculation.

3          You can answer.

4     A.   Those kind of scenarios are possible, but

5  again, I took into consideration potential

6  exposures of that nature.

7  BY MS. SIZEMORE:

8     Q.   Do you recall testimony from Mr. Giglio

9  that when he was spraying, the spray would

10 sometimes blow back on him?

11    A.   I just need some additional clarity,

12 please.

13    Q.   Did you take into account any testimony

14 from Mr. Giglio that when he would spray, the spray

15 would blow back on him?

16    A.   I took into account what he wore during

17 application, both occupational and residential, and

18 what procedures -- I looked at what procedures he

19 said he did after application.

20    Q.   And did those procedures include the

21 potential for Roundup to spray back at Mr. Giglio

22 when he was applying it?

23          MR. KALAS:  Objection, assumes

24 facts not in the record.

25          You can answer.

Alex LeBeau, PhD, MPH, CIH

1      A.   I just want some clarity on what we are

2   discussing -- what we're discussing.

3   BY MS. SIZEMORE:

4      Q.   Did your calculations take into account

5   any potential blow-back experienced by Mr. Giglio

6   as he was spraying?

7      A.   My calculations took into account a

8   conservative estimate that Mr. Giglio's -- the skin

9   surface areas that I calculated for Mr. Giglio for

10  his occupational and residential exposure scenarios

11  that his -- the lower half of his legs for

12  occupational and upper thighs and for his

13  residential the top part of his feet in addition to

14  those other areas were completely saturated for the

15  certain amount of time that he was applying.

16     Q.   And in terms of the areas that would be

17  saturated on Mr. Giglio when he was spraying, you

18  did not include any skin surface area for his arms,

19  is that right?

20             MR. KALAS:  Objection,

21  mischaracterizes his testimony.

22             You can answer.

23     A.   By being conservative on what I was

24  calculating for his exposures at those levels for

25  the duration that I did, it would account for any

Alex LeBeau, PhD, MPH, CIH

1   incidental exposures on other areas.

2   BY MS. SIZEMORE:

3       Q.   And so the arms would be included in that

4   incidental exposure, is that right?

5       A.   Other areas where there could have

6   incidental an exposure would be captured by my

7   conservative estimates of calculating his dose.

8       Q.   And did you calculate any exposure to

9   Mr. Giglio's face?

10      A.   What I said before was that the

11  calculation that was done for his -- the

12  conservative nature of my calculation would capture

13  any other incidental potential exposures on other

14  areas.

15      Q.   That would include his arms, his face.

16  What about the backs of his legs?

17      A.   Can you clarify for me?

18      Q.   Sure.  Do you believe that the

19  conservative estimate that you conducted also would

20  take into account any incidental exposure to

21  Mr. Giglio's face?

22              MR. KALAS:  Objection, asked and

23  answered.

24  BY MS. SIZEMORE:

25      Q.   I'm sorry, to the back of his legs?

Alex LeBeau, PhD, MPH, CIH

1        A.    The conservative nature would capture

2   potential incidental exposures.

3        Q.    And so the conservative estimate that you

4   make you believe that the incidental exposures

5   would capture any exposure to his face, his feet,

6   his upper body and the backs of his legs, is that

7   correct?

8        A.    Clarify for me.

9        Q.    Sure.  Do you believe that any

10  incidental -- the strike that.

11             Do you believe that what you've

12  classified as a conservative exposure or

13  conservative estimate takes into account any

14  incidental exposure to Mr. Giglio's face, his feet,

15  his upper body and the backs of his legs?

16       A.    Well, using data that's available in the

17  dataset for applicators like Mr. Giglio was doing,

18  applications like Mr. Giglio was doing, the lower

19  body or the lower portions of the body are the ones

20  that are going to receive the majority of the

21  exposure.  So I calculated a conservative estimate

22  using the lower portions of his body, including the

23  front half of his legs and upper thighs, to

24  conservatively account for any potential incidental

25  exposures in those other areas, which for the data

```
 1    that's available from other exposure studies is

 2    very minimal.

 3                    THE VIDEOGRAPHER:  It's 12:59, and

 4    we're off the record.

 5                    (Recess in the proceeding.)

 6                    THE VIDEOGRAPHER:  It's 1:06 p.m.,

 7    and we're on the record.

 8    BY MS. SIZEMORE:

 9        Q.    Okay.  You make a reference under PPE in

10    your report on page 11 that Mr. Giglio reported

11    using a long-sleeved shirt when using a sterilant

12    when it was needed.  Do you recall that?

13        A.    Yes.

14        Q.    Did you make any -- did you form any

15    opinions about the sterilant and what that meant in

16    terms of Mr. Giglio's exposure?

17        A.    I did not.  There was no information --

18    additional information provided on what the

19    sterilant was.  So it was hard to narrow down what

20    exactly what it was.

21        Q.    So was the purpose of including it here

22    essentially because that's the only time he

23    mentioned wearing a long-sleeved shirt?

24        A.    Yeah, that was one piece of equipment

25    that he mentioned using during his process.
```

1    Q.   Any other relevance to including it in

2    your report, other than that?

3    A.   No, just a piece of fact that he

4    supplied.

5    Q.   You also mention on page 12, in the end

6    of the third paragraph, that Mr. Giglio testified

7    to using Ortho and Spectracide to control weeds at

8    his business from 2015 to 2017, do you recall that?

9    A.   Yes.

10   Q.   This time period, from 2015 to 2017, that

11   was after he was diagnosed with non-Hodgkin's

12   lymphoma, correct?

13   A.   Yes.

14   Q.   Have you formed any -- strike that.

15   Have you formed any opinions about

16   whether Ortho or Spectracide exposure caused or

17   contributed to his cancer?

18   A.   I'm going to defer to other experts on

19   what the cause of his cancer was.

20   Q.   And the purpose of putting -- what was

21   the purpose of mentioning the fact of the Ortho and

22   Spectracide in your report?

23   A.   Just other pesticides that he reported

24   using in his business.

25   Q.   When calculating the exposure to

Alex LeBeau, PhD, MPH, CIH

1   Mr. Giglio's legs, the front of his legs, did you

2   take into account that he would often kneel in the

3   product while he was using it?

4               MR. KALAS:  Objection, assumes

5   facts not in the record.

6               You can answer.

7       A.   I don't have any information that he

8   kneeled during the -- that I identified in his

9   testimony.

10  BY MS. SIZEMORE:

11      Q.   If you assume that Mr. Giglio kneeled in

12  the Roundup product while applying it, as opposed

13  to just spraying it and there being a back spray on

14  his legs, would that affect his ultimate exposure

15  and dose?

16              MR. KALAS:  Objection, incomplete

17  hypothetical.

18              You can answer.

19      A.   I don't know.  I don't have any testimony

20  that he did that, so I -- I can only go on what he

21  supplied during his depositions.

22  BY MS. SIZEMORE:

23      Q.   To your knowledge, would direct contact

24  with the chemical result in a higher dose than

25  contact as a result of spraying?

Alex LeBeau, PhD, MPH, CIH

1                    MR. KALAS:  Objection, incomplete

2    hypothetical.  Overbroad, vague.

3                    You can answer.

4        A.   I need more clarification, please.

5    BY MS. SIZEMORE:

6        Q.   Sure.  To your knowledge is there a

7    highest dose that's absorbed of glyphosate as a

8    result of direct contact to the skin of the liquid

9    as opposed to back-spray from a sprayer?

10                   MR. KALAS:  Same objection.

11       A.   I need more specifics, please.

12   BY MS. SIZEMORE:

13       Q.   Okay.  Did you form any -- did you review

14   any literature regarding differences in absorption

15   related to direct contact of glyphosate as opposed

16   to mist that's blown back from a sprayer?

17       A.   I don't know how to answer.  I'm unsure

18   of what the difference is.

19       Q.   Just from what you know about exposure to

20   chemicals, would you agree that if a person is

21   kneeling in a liquid, they're going to have more

22   exposure than if they're spraying the liquid and

23   some of the liquid sprays back on them?

24                   MR. KALAS:  Objection, incomplete

25   hypothetical.

Alex LeBeau, PhD, MPH, CIH

 1        A.    That's going to be context specific.

 2   BY MS. SIZEMORE:

 3        Q.    What context could you think of that a

 4   person would have less exposure by kneeling in a

 5   liquid than by spraying the liquid and having some

 6   of it blow back on their legs?

 7        A.    It's hard -- it's hard to say.  I'd --

 8   it's -- it's context specific for what I think

 9   you're trying to ask me.

10        Q.    Can you think of any context as you sit

11   here today that the exposure would be greater as a

12   result of spraying and having blow-back as opposed

13   to kneeling in the product?

14        A.    I think there are a number of different

15   variables that may impact that exposure which

16   would -- again, it's context specific in what

17   you're trying to ask me.

18        Q.    Generally with the dermal absorption

19   studies that you reviewed, was there more

20   absorption of glyphosate with direct contact of the

21   liquid as opposed to spray?

22              MR. KALAS:  Objection, vague.

23        A.    I'm trying to get there, but I'm just --

24   I'm having trouble getting things right.  So I just

25   want to clarify here.

Alex LeBeau, PhD, MPH, CIH

1    BY MS. SIZEMORE:

2        Q.    Sure.   Did you read any studies that

3    talked about the difference in absorption from

4    let's say mixing versus spraying?

5        A.    I'd say different exposures, mixing

6    versus spraying.

7        Q.    Would you agree that if exposed to the

8    same amount of liquid, a person is going to have a

9    higher absorption of glyphosate from mixing and

10   spilling it on themselves, as opposed to spraying

11   that liquid and blowing back on them?

12                  MR. KALAS:   Objection, incomplete

13   hypothetical.

14       A.    It's going to be context specific.

15   BY MS. SIZEMORE:

16       Q.    Do you agree that the studies talk about

17   higher exposure as a result mixing than spraying?

18                  MR. KALAS:   Objection, overbroad.

19   Incomplete hypothetical.

20                  You can answer.

21       A.    It's going to be context specific.

22   BY MS. SIZEMORE:

23       Q.    You don't have any opinion one way or the

24   other about whether a person would have a higher

25   exposure as a result of direct contact with the

Alex LeBeau, PhD, MPH, CIH

1    liquid as opposed to spraying?

2                    MR. KALAS:  Objection,

3    mischaracterizes his testimony.

4         A.    It's going to be context specific.

5    BY MS. SIZEMORE:

6         Q.    With regard to the studies that discuss

7    applicators mixing, was one of the stated reasons

8    for higher exposure that they would sometimes spill

9    on themselves?

10                   MR. KALAS:  I'm going to object

11   that it assumes facts not in the record.  Well,

12   strike that.  Withdraw the objection.

13                   You can answer.

14        A.    I don't know.  If you have a study that

15   you'd like me to look at that says that, I'd be

16   happy to.

17   BY MS. SIZEMORE:

18        Q.    Do you recall any of the studies you

19   reviewed discussing higher exposures for mixing the

20   chemicals as opposed to spraying the chemicals?

21        A.    I remember studies discussing mixing and

22   spraying applications.  I don't remember any

23   specifics of those studies.

24        Q.    The absorption rates that you utilized

25   for Mr. Giglio, were those all for spraying?

Alex LeBeau, PhD, MPH, CIH

```
 1                  MR. KALAS:  Objection, vague.

 2        A.   I need more clarity, please.

 3   BY MS. SIZEMORE:

 4        Q.   Sure.  One of the calculations you make

 5   is for dermal permeability of glyphosate, is that

 6   correct?

 7        A.   Can you show me where, or tell me which

 8   page?

 9        Q.   Sure.  On page 13, when you're

10   calculating dermal dose, one of the variables is

11   dermal permeability, is that right?

12        A.   Yes.

13        Q.   Okay.  Dermal permeability, does that

14   take into account how the exposure occurs?

15        A.   That dermal permeability was

16   experimentally derived from Nielsen 2009.

17        Q.   And was Nielsen 2009 a result of dermal

18   absorption from spraying or from direct contact or

19   both, if you know?

20        A.   From my understanding it was direct

21   contact on skin experimentally over a certain

22   amount of time to determine the permeability.

23        Q.   So the exposure rate -- I'm sorry, the

24   dermal permeability rate that you used is from

25   Nielsen as to all of your calculations, is that
```

Alex LeBeau, PhD, MPH, CIH

1    right?

2        A.    Clarify, please.

3        Q.    Did you use a dermal permeability rate

4    from any source, other than the Nielsen study?

5        A.    For a determining dose, no.

6        Q.    And that -- you used that rate for both

7    occupational exposure and for residential exposure,

8    correct?

9        A.    Yes.

10       Q.    In utilizing the dermal permeability rate

11   from the Nielsen study, did you review the

12   Organization For Economic Cooperation and

13   Development's methodology for that rate?

14                MR. KALAS:  Objection, vague.

15       A.    I need some clarification, please.

16   BY MS. SIZEMORE:

17       Q.    Sure.  Did you review any methodology

18   suggestions for use of that Nielsen dermal

19   permeability coefficient?

20                MR. KALAS:  Objection, still

21   vague.

22       A.    I'm not understanding what you're trying

23   to ask.

24   BY MS. SIZEMORE:

25       Q.    Sure.  Did you do any research into the

Alex LeBeau, PhD, MPH, CIH

```
1   Nielsen permeability -- dermal permeability rate
2   that you used to see if there were any published
3   guidelines as to that use?
4                  MR. KALAS:  Same objection.
5        A.   I'm still not clear.
6   BY MS. SIZEMORE:
7        Q.   When you selected the Nielsen dermal
8   permeability rate, did you do any research to
9   determine whether there were guidelines published
10  as to when it's appropriate to use that?
11                 MR. KALAS:  Same objection.
12       A.   Provide me a little more clarity, please.
13  BY MS. SIZEMORE:
14       Q.   I'm just asking when you selected that
15  rate, did you do any research to determine whether
16  it is appropriate to use that under certain
17  scenarios?
18                 MR. KALAS:  Same objection.
19       A.   I want to answer.  I just need it to be
20  clear for me.
21  BY MS. SIZEMORE:
22       Q.   When you selected -- you selected the
23  Nielsen permeability rate to utilize in your
24  calculations, correct?
25       A.   Yes.
```

Alex LeBeau, PhD, MPH, CIH

1    Q.   Okay.  When you did that, did you do any

2    research as to whether there were published

3    guidelines for using that?

4    A.   Clarify 'that'.

5    Q.   When you selected the Nielsen

6    permeability rate, did you do any research as to

7    whether there were published guidelines for using

8    that permeability rate in a dose calculation?

9    A.   Dermal permeability is an accepted

10   methodology for using dermal dosing, both in the

11   model that I used, which is published by the

12   American Industrial Hygiene Association.  The

13   Environmental Protection Agency actually uses it in

14   their risk assessment guides for determining dermal

15   dose using dermal permeability.

16   Q.   Are you aware of any guidelines that

17   state that the dermal permeability rate in Nielsen

18   is of limited value in evaluating risks from real

19   world exposures?

20             MR. KALAS:  Objection, assumes

21   facts not in the record.

22             You can answer.

23   A.   I don't know what you're asking.

24   BY MS. SIZEMORE:

25   Q.   Sure.  Do you -- did you encounter any

Alex LeBeau, PhD, MPH, CIH

```
 1    criticism of -- in the research of using a dermal

 2    permeability rate for real-world exposure analysis?

 3         A.   No, because it's an accepted methodology

 4    both by the AIHA and by EPA.

 5         Q.   And the AIHA and the EPA, do they use

 6    dermal permeability rates for real-world individual

 7    exposures, to your knowledge?

 8                   MR. KALAS:  Objection, vague.

 9         A.   Yeah, I need more clarity, please.

10    BY MS. SIZEMORE:

11         Q.   Sure.  You stated that it's an accepted

12    methodology both by the AIHA and the EPA, correct?

13         A.   Reclarify for me.

14         Q.   You stated that the dermal permeability

15    rates in the Nielsen study were accepted

16    methodology both by the AIHA and the EPA, is that

17    right?

18         A.   No, use of dermal permeability levels is

19    an accepted methodology.  I didn't say Nielsen

20    specifically.

21         Q.   Okay.  And so dermal -- are you aware --

22    strike that.

23                   The dermal permeability rates, as

24    accepted by the AIHA and EPA, are those for

25    individual exposures?
```

Alex LeBeau, PhD, MPH, CIH

1      A.   I think that's context specific.

2      Q.   In conducting your analysis did you

3   evaluate the dermal permeability rate from any

4   study, other than Nielsen?

5      A.   Clarify for me, please.

6      Q.   Sure.  When you conducted your analysis

7   did you look at dermal permeability rates from any

8   studies other than Nielsen?

9      A.   Other studies in the dataset that

10   evaluated dermal absorption, but I thought the

11   Nielsen dermal permeability, since it was

12   experimentally derived, I thought it was

13   appropriate to use in the model.

14      Q.   What other studies in the dataset

15   evaluated dermal absorption?

16      A.   Well, when evaluating dermal

17   bioavailability, the ones previously mentioned and

18   the others in the MCL.

19      Q.   And did they have calculations of dermal

20   permeability?

21      A.   They did not.  But I could have

22   calculated them based on -- most likely calculated

23   them based on the information that they provided.

24   However, again, Nielsen had a study that was of a

25   sufficient time to determine the average of the

Alex LeBeau, PhD, MPH, CIH

1    dosing and dermal permeability.

2        Q.   Did you make any attempt to calculate the

3    dermal permeability of any of the other studies to

4    see if it was similar to the dermal permeability

5    rate in the Nielsen study?

6        A.   No, because the dermal uptake was similar

7    to other studies.

8        Q.   Okay.  I want to talk about your

9    retrospective dose modeling.

10                   What are you attempting to

11   calculate with this?

12       A.   Can you clarify, please?

13       Q.   Well, on page 13 of your report you have

14   a section called retrospective dose modeling.

15       A.   Yes.

16       Q.   Is one of the things that you did in this

17   case is to calculate a retrospective dose?

18       A.   Yes.

19       Q.   Okay.  And what is the retrospective dose

20   intended to represent?

21       A.   First calculating the dermal dose per use

22   for Mr. Giglio under residential and occupational

23   use.

24       Q.   So the first step would be calculating

25   dermal dose per use, correct?

Alex LeBeau, PhD, MPH, CIH

1      A.   Yes.

2      Q.   And the formula that you used for dermal

3  dose per use comes from the American Industrial

4  Hygiene Association, is that correct?

5      A.   Yes, that is included as a part of the

6  equations that are in there.

7      Q.   And the skin surface area that you

8  utilized came from where?

9      A.   The Environmental Protection Agency's

10  Exposure Factors Handbook.

11      Q.   And you used an exposure of 350 days for

12  occupational use?

13      A.   Can you clarify for me, please?

14      Q.   Sure.  Under -- on page 14, when you're

15  trying to figure out the days of exposure, did you

16  use the figure of 350?

17      A.   Yes.

18      Q.   Okay.  And then you break that -- do you

19  break that down into hours when you put it into the

20  calculation of dermal dose per use?

21      A.   I need you to clarify that, please.

22      Q.   When looking at the formula on page 13, P

23  equals duration of exposure in hours, correct?

24      A.   Yes.

25      Q.   Okay.  So I'm just curious how you go

Alex LeBeau, PhD, MPH, CIH

1    from the days of exposure to the duration of

2    exposure in hours?

3        A.   The duration of exposure and days is

4    related to his aggregated average daily dose, not

5    to the dose per use.

6        Q.   So duration of exposure and hours for

7    dermal dose per use, what figure did you utilize?

8        A.   For his duration, is that what you're

9    asking?

10       Q.   Duration of exposure in hours for

11   calculating dermal dose per use?

12       A.   Sure.  In testimony Mr. Giglio stated

13   that he used half a gallon per week for his work,

14   and I did a dose -- excuse me.  I did an

15   application recreation to determine the amount of

16   it time it took to evacuate a 1.33 gallon container

17   using the same -- similar model application pump

18   that he used.

19       Q.   When did you conduct this experiment?

20       A.   I don't have the exact day, but over the

21   summer.

22       Q.   And when you were performing this

23   experiment -- or strike that.

24            With the type of applicator you

25   utilized for the experiment, are there different

Alex LeBeau, PhD, MPH, CIH

1   settings for the spray?

2       A.   Yes.

3       Q.   And you used the stream setting, is that

4   right?

5       A.   Yes.

6       Q.   What were the other settings, other than

7   stream?

8       A.   There were pictograms showing different

9   -- different applications, I presume droplet size.

10      Q.   How did you choose which stream setting

11  to utilize?

12      A.   For this application I believe I selected

13  the default one that was on the pump itself.

14      Q.   And in terms of the spectrum of the

15  application, the stream setting that you choose,

16  was that the setting that would come out the most

17  quickly, the least quickly, somewhere in between?

18      A.   Whether the duration or the rate that it

19  came out would be primarily dependent on the pump.

20      Q.   So is it your understanding that

21  regardless of the spray setting, the liquid comes

22  out at the same rate?

23      A.   That -- there might have been minor

24  variations between the two.  But I used two

25  different -- two different containers and two

Alex LeBeau, PhD, MPH, CIH

1    different pumps to show that there was a maximum of

2    one hour to completely evacuate the container.

3        Q.   Did you use different stream settings for

4    the two times that you emptied it?

5        A.   I don't recall.

6        Q.   In terms of the amount of glyphosate that

7    Mr. Giglio would be exposed to as a result of

8    spraying, did you take into account any exposure

9    through clothing?

10       A.   Yes, because of the amount of time that

11   he used clothing can be a protective barrier to

12   exposure, and any exposure would have been low

13   based on that.

14       Q.   In your review of the literature about

15   exposure, did you see studies to indicate that

16   there is a penetration of Roundup or glyphosate

17   through clothing?

18            MR. KALAS:  Objection, overbroad.

19       A.   Clarify, please.

20   BY MS. SIZEMORE:

21       Q.   Did you see any studies that indicated

22   that there's exposure to Roundup or glyphosate even

23   in areas protected by clothing?

24       A.   I know the studies have shown that

25   clothing can be an effective barrier from exposure.

Alex LeBeau, PhD, MPH, CIH

1        Q.   And so in your analysis did you make an

2   assumption that in any area covered by clothing

3   there would be no exposure?

4               MR. KALAS:  Objection,

5   mischaracterizes his testimony.

6               You can answer.

7        A.   My conservative estimate of Mr. Giglio's

8   dose, including his lower legs and upper portion,

9   the front of his lower legs and the upper -- bottom

10  portion of his front thigh, conservatively estimate

11  that his skin would be painted for the amount of

12  time that he was applying glyphosate, completely

13  covered, which would capture any other incidental

14  exposures that could have been on other areas of

15  him.

16  BY MS. SIZEMORE:

17       Q.   And that would include exposures in areas

18  covered by clothing?

19       A.   It could include any potential

20  breakthrough that may occur.

21       Q.   Would you agree that the time -- the

22  amount of time that an individual is exposed is an

23  important component of evaluating their dose?

24       A.   Can you be more specific?

25       Q.   Sure.  When evaluating the dose that a

Alex LeBeau, PhD, MPH, CIH

1   person is exposed to of glyphosate is it important

2   to take into account the exposure time?

3        A.   Yes, which I did in these calculations.

4        Q.   With the experiment we were just

5   discussing, did you make an assumption that

6   Mr. Giglio had his finger on the trigger

7   continuously while he was spraying?

8        A.   Can you clarify for me?

9        Q.   When you did your experiment to analyze

10  the amount of time that it takes to empty the

11  bottle, did you have your finger on the trigger

12  continuously while emptying it?

13       A.   Yes, to determine the amount of time

14  necessary to evacuate the 1.33 gallon container.

15       Q.   Do you have any information as to whether

16  or not Mr. Giglio had his finger continuously on

17  the trigger while he was spraying?

18       A.   Clarify for me, please.

19       Q.   Do you have any information as to whether

20  or not Mr. Giglio was continuously spraying with

21  his finger down on the trigger in the manner that

22  you did in your experiment?

23       A.   For his residential use he testified to

24  both spot spraying and continuous spraying.

25       Q.   What about with regard to his

Alex LeBeau, PhD, MPH, CIH

1    occupational use?

2        A.   I don't recall him testifying the manner

3    that he used it, but I do recall him testifying

4    that he used one half gallon per week.

5        Q.   And in terms of how quickly you could

6    empty the 1.33 gallon bottle, would you agree that

7    whether you have your finger continuously on the

8    trigger would affect how quickly you can empty it?

9        A.   Yes, having your trigger on the finger

10   will impact how it is emptied.

11       Q.   And so the one-hour calculation that you

12   have, would that be the fastest that you could

13   empty that 1.33 gallon container?

14       A.   That's hard to -- actually, that may be

15   the slowest, because the second container took me

16   less than one hour.

17       Q.   And what was the difference with the

18   second container?

19       A.   I'm not an expert on design of

20   containers.  All I know there is a difference in

21   the application time.

22       Q.   What was the difference?

23       A.   I can't recall.  A period of fifteen

24   minutes potentially.

25       Q.   You would agree that if you were doing

Alex LeBeau, PhD, MPH, CIH

1    spot -- if you were alternating between spot

2    spraying and continuous spraying, it would take

3    more than an hour to empty that bottle?

4        A.   It would have taken longer to empty that

5    bottle.  It would have taken longer than an hour if

6    he was spot spraying.  But again, his exposure

7    would not be continuous.  I accounted for

8    conservatively a continuous exposure for the amount

9    of time for the amount of bottle that he claims he

10   used.

11       Q.   I'm not talking about exposure, just

12   simply in terms of how long it would take to empty

13   the bottle.  You'd agree that how long it takes the

14   empty the bottle is dependent on whether you are

15   spot spraying or continuously spraying?

16             MR. KALAS:  Objection, asked and

17   answered.

18       A.   The amount of time that it takes to empty

19   the bottle is dependent on how it's used.  And I

20   accounted for conservative estimate of continuous

21   spray for that duration in his exposure and contact

22   on skin for my calculation.

23   BY MS. SIZEMORE:

24       Q.   With regard to your experiments in

25   emptying the bottle, who took the photographs that

Alex LeBeau, PhD, MPH, CIH

1    are within your report?

2         A.   I had a remote camera.

3         Q.   Was anyone there when you did that?

4         A.   No.

5         Q.   Did you ever take any video to show the

6    amount of time that it took to empty that?

7         A.   Not that I recall.

8         Q.   Okay.  When you did your analysis on the

9    concentration of glyphosate, you used the 2

10   percent, correct?

11        A.   I did.

12        Q.   And you stated that it is -- that

13   realistic but more conservative exposure estimate,

14   do you recall that?  That's in footnote 16 on page

15   15.

16        A.   Page -- as compared to the other

17   formulations that he claimed to have used.

18        Q.   When you say the realistic exposure

19   estimate, what do you mean by that?

20        A.   That I'm not sure how often he used the 2

21   percent versus the other formulation, the extended

22   weed control, which was 1 percent.  So it gives an

23   idea of a -- the conservative estimate for exposure

24   using something that we presume that he used more

25   often than the other.

Alex LeBeau, PhD, MPH, CIH

```
 1        Q.   And so you made a presumption that he
 2   used the 2 percent more than the 1 percent, is that
 3   fair?
 4        A.   As a conservative estimate.
 5                  Can I take a break?
 6                  MS. SIZEMORE:  Um-hmm.
 7                  THE VIDEOGRAPHER:  It's 1:46.
 8   We're off the record.
 9                  (Recess in the proceeding.)
10                  THE VIDEOGRAPHER:  It's 1:51 and
11   we're on the record.
12   BY MS. SIZEMORE:
13        Q.   Okay, in assessing occupational dermal
14   dose per use, where did that formula come from?
15                  It's on page 17.
16        A.   Equation five, I'm sorry, is that what
17   you're asking?
18        Q.   Um-hmm.
19        A.   Sure, that's the dose per use, times
20   Mr. -- a weight for Mr. Giglio that was derived by
21   his reported weights in deposition.
22        Q.   I just want to know where the formula
23   came from?
24        A.   It's just a way of converting milligrams
25   to kilograms per body weight for determining just
```

Alex LeBeau, PhD, MPH, CIH

1    milligrams total.

2        Q.   Okay.  And so this is purely you

3    converting milligrams to milligrams per kilograms

4    in terms of body weight, is that right?

5        A.   This is -- this is his dose per use in

6    milligrams per kilogram time his body weight to

7    eliminate the kilogram aspect to show the dose per

8    use in milligrams.

9        Q.   Okay.  Got it.  And that would be the

10   total dose that Mr. Giglio was exposed to each time

11   he used Roundup occupationally?

12            MR. KALAS:  Objection,

13   mischaracterizes the document.

14       A.   This is his dose per use based on his

15   weight for his occupational.

16   BY MS. SIZEMORE:

17       Q.   And then you analyzed Mr. Giglio's

18   residential use, correct?

19       A.   Yes.

20       Q.   And do you use the same formula that you

21   used for occupational use with different endpoints

22   or different variables?

23       A.   For his residential dermal dose per use,

24   yes, for different inputs into the equation.

25       Q.   Thank you.  The dermal permeability rate

Alex LeBeau, PhD, MPH, CIH

1  is the same for occupational and residential,

2  correct?

3      A.   The rate that's used for both doses per

4  use for dermal permeability is the same.

5      Q.   Okay.  And you included a skin surface

6  area that was increased in residential use due to

7  testimony that he was wearing sneakers as opposed

8  to work boots, is that right?

9      A.   Yes, to be conserve concluded that that

10  portion of his skin because he reportedly in a

11  subsequent deposition reported wearing sneakers

12  with no socks.

13      Q.   Okay.  And starting on page 20 you then

14  conducted an analysis of application of the

15  exposure variables to the average daily dose,

16  correct?

17      A.   Yes.

18      Q.   And so what are you attempting to do

19  here?

20      A.   This is showing his -- over the amount of

21  years for his use, both residentially and

22  occupationally, accounting for his average daily

23  dose.

24      Q.   And the average daily dose equation,

25  where does that come from?

Alex LeBeau, PhD, MPH, CIH

1      A.    That's included in the AIHA reference

2   manual and the EPA risk assessment guide.

3      Q.    Okay.  And is the average daily dose what

4   you ultimately compare to the regulatory thresholds

5   in this case?

6      A.    I looked at his daily dose and his

7   average daily dose, both for comparison.

8      Q.    And then those were compared to the EFCA

9   Acceptable Operator Exposure Level, which we've

10   already discussed, correct?

11      A.    We have discussed it.

12      Q.    Okay, the US EPA Chronic Daily Glyphosate

13   Reference Dose?

14      A.    Yes.

15      Q.    And the State of California No

16   Significant Risk Safe Harbor Level, correct?

17      A.    Yes.

18      Q.    And it's your conclusion that his dose,

19   his average daily dose is below the limits for all

20   three of these regulatory limits?

21      A.    That they're lower than the thresholds of

22   concern.

23      Q.    And so given that, based on your

24   calculation they are lower than the thresholds of

25   concern, what does that tell you ultimately?

Alex LeBeau, PhD, MPH, CIH

1      A.   Based on that, that Mr. Giglio is --

2  since he's below these thresholds of concern, that

3  there's no health risk based on the doses that were

4  calculated for him.

5      Q.   Okay.  And other exposures, did you also

6  take into account other potential exposures of

7  Mr. Giglio?

8      A.   Clarify, please.

9      Q.   Sure.  The section in your report, other

10  exposures, on page 23, what were you attempting to

11  do there?

12      A.   I was showing other potential exposures

13  that Mr. Giglio had, whether residentially or

14  occupationally.

15      Q.   For what purpose?

16      A.   To show that other products that he -- to

17  show that products that he used had a California

18  Proposition 65 warning on them.

19      Q.   And what's the relevance of other

20  products he used having a Prop 65 warning?

21      A.   Just the understanding from his testimony

22  that he would not have used some products if they

23  had a warning on them, but he did use, for example,

24  this Blast-Off product, sandblasting sand.

25      Q.   Okay.  And you say, for example, this

1  sandblasting sand, other than the sandblasting

2  sand, did you encounter any other products that

3  Mr. Giglio used that had a cancer warning on them?

4      A.  Clarify for me, please.

5      Q.  Sure.  You conducted an inspection of

6  Mr. Giglio's garage, correct?

7      A.  Of his garage and the exterior of his

8  home.

9      Q.  Okay.  And there were various chemicals

10  and substances contained within it, correct?

11      A.  Clarify.

12      Q.  Sure.  When you went to inspect the

13  garage and the outdoor area, you found certain

14  chemicals and products that presumably Mr. Giglio

15  had used, correct?

16      A.  Correct, I did encounter products in his

17  garage.

18      Q.  And one of them was this Blast-Off

19  sandblasting sand?

20      A.  No, ma'am.

21      Q.  Okay.  Where did you encounter the

22  sandblasting sand?

23      A.  It was provided that he used this in one

24  of his exhibits at his deposition that he -- this

25  is one of the products that he uses as far as his

Alex LeBeau, PhD, MPH, CIH

1    work.

2        Q.   Okay.  And so in terms of your inspection

3    and review of the various products at Mr. Giglio's

4    home, did you encounter any products that carried a

5    cancer warning on them?

6        A.   I know he had a large amount of spray

7    paint there, and those typically have Proposition

8    65 warnings on them.

9        Q.   Did you specifically conduct an analysis

10   as to whether any of those products had a Prop 65

11   warning on them?

12       A.   I did not see a Prop 65 warning at the

13   time of my assessment; however, I believe in some

14   exhibits that were provided for Dr. Sawyer's report

15   that there were Prop 65 warnings visible.

16       Q.   I just want to talk about what you saw on

17   your inspection.  And is it accurate that nothing

18   you saw on your inspection had a Prop 65 warning?

19       A.   As far as identifying that in any of my

20   photos, no.

21       Q.   And this Blast-Off sandblasting sand that

22   you evaluated, do you have information about what

23   type of cancer this particular product is

24   associated with?

25       A.   It typically -- typically exposure to

Alex LeBeau, PhD, MPH, CIH

1   silica is associated with silicosis-type disease.

2        Q.   Are you aware of any connection to

3   non-Hodgkin's lymphoma as a result of silica?

4        A.   No.

5        Q.   And with regard to the silica products,

6   do you have information as to how Mr. Giglio was

7   using them or whether he used any kind of

8   protection?

9        A.   Well, based on testimony, Mr. Giglio

10  testified that the sand would be placed on top of

11  the installed turf and a power broom be used to

12  work the sand into the turf.

13       Q.   And do you have any information about any

14  potential PPE that Mr. Giglio used while

15  administering this product?

16       A.   I do not.

17       Q.   Have you formed any -- have you conducted

18  any analysis as to whether the use of the silica

19  product contributed to his cancer in any way?

20       A.   No, only from the side that there's --

21  and I'm not an expert on warnings, but only that

22  there was a warning contained on this, and

23  Mr. Giglio did use this product in the process of

24  his work.

25       Q.   On page 24 of your report is a summary of

Alex LeBeau, PhD, MPH, CIH

1    your opinions, is that correct?

2         A.   Yes, ma'am.

3         Q.   Have we discussed all these opinions

4    today?

5         A.   Some of them we have discussed more than

6    others we have somewhat touched, but not discussed

7    in detail.

8         Q.   Let me put it this way.  All of these

9    opinions that are contained within your summary on

10   page 13 of your report -- I'm sorry, on page 25 of

11   your report, are those all either things we've

12   discussed today or that are contained within your

13   report itself?

14        A.   Yeah, I'll clarify, on page 24 of my

15   report.

16        Q.   Oh.  Oh, you're right.  Thank you.

17                  Is your answer to that yes?

18        A.   Yes.

19        Q.   Okay.  All right, and then on page 25 you

20   have a response to plaintiff's experts, correct?

21        A.   Yes.

22        Q.   And that is specifically with relation to

23   Dr. Sawyer?

24        A.   Those are the sections that are covered,

25   responding to those, yes.

Alex LeBeau, PhD, MPH, CIH

1    Q.   Did you review the opinions of any of

2   plaintiff's other experts in an attempt to respond

3   to them?

4    A.   Can you clarify that please?

5    Q.   Have you reviewed the testimony or

6   reports of any of plaintiff's other experts?

7    A.   Yes, included in my MCL.

8    Q.   Okay.  And what other experts?

9    A.   Take a look at the portions of Dr. Ben

10  Burke and Portier reports.

11   Q.   And do you make an attempt to respond to

12  any of the opinions of Dr. Ben Burke or Dr.

13  Portier?

14   A.   Not that I can recall.

15   Q.   And so with regard to your opinions in

16  this case, are they -- in response to plaintiff's

17  experts, are they limited to Dr. Sawyer?

18   A.    In as far as what's reported here;

19  however, there may be some areas where protective

20  barriers or personal protective equipment is

21  touched upon in other reports that may encompass

22  those responses.

23   Q.   And so your first response to Dr. Sawyer

24  was that glyphosate does not bioaccumulate, is that

25  correct?

Alex LeBeau, PhD, MPH, CIH

```
 1        A.    Yes.

 2        Q.    And that's a disagreement with Dr.

 3   Sawyer, is that right?

 4        A.    I think it's a -- in agreement with a

 5   number of studies that have been done in regulatory

 6   agencies.

 7        Q.    The Renewal Assessment Report that you

 8   cite in this section, can you just tell me what

 9   number that is on your MCL?

10        A.    Under number 13 or 15, since they're both

11   titled in a similar manner, in the same year.

12        Q.    Thank you.

13                   THE WITNESS:  Can we take a break?

14                   MS. SIZEMORE:  Yes.

15                   THE WITNESS:  Sorry.

16                   THE VIDEOGRAPHER:  It's 2:13, and

17   we're off the record.

18                   (Recess in the proceeding.)

19                   THE VIDEOGRAPHER:  It's 2:15, and

20   we're on the record.

21   BY MS. SIZEMORE:

22        Q.    When -- with regard to your opinion that

23   glyphosate does not bioaccumulate, is it your

24   opinion that there is no scientific support that

25   glyphosate is excreted via feces?
```

Alex LeBeau, PhD, MPH, CIH

1      A.    Clarify, please?

2      Q.    Sure.  Is it your opinion that there's no

3  support that for the proposition that glyphosate is

4  excreted via feces?

5                MR. KALAS:  Objection, overbroad.

6      A.    I need more specifics, please.

7  BY MS. SIZEMORE:

8      Q.    In your review of the literature, did you

9  encounter any studies that suggested that

10  glyphosate is excreted through feces?

11                MR. KALAS:  Same objection.

12      A.    I need more specific, please.

13  BY MS. SIZEMORE:

14      Q.    I'm just asking if you reviewed any

15  literature to suggest that glyphosate was excreted

16  through feces?

17      A.    I need a little more specific, please.

18      Q.    Okay, I'll move on.

19                Are you aware of any support -- or

20  strike that.

21                Are you aware of any literature

22  suggesting that glyphosate is excreted in any way

23  other than urine?

24                MR. KALAS:  Same objection.

25      A.    I need more specifics, please.

Alex LeBeau, PhD, MPH, CIH

```
 1   BY MS. SIZEMORE:

 2        Q.   You addressed in your report Dr. Sawyer's

 3   opinions that glyphosate is excreted in ways other

 4   than urine, correct?

 5        A.   Yes.

 6        Q.   Okay.  And in order to analyze that issue

 7   did you look at any studies about alternate routes

 8   of excretion, other than urine, for glyphosate?

 9               MR. KALAS:  Objection, overbroad.

10        A.   I need more specific, please.

11   BY MS. SIZEMORE:

12        Q.   In conducting your response to Dr.

13   Sawyer's opinion that glyphosate bioaccumulates,

14   how did you analyze that issue?

15        A.   Taking a look at the clearance from the

16   body, which is relatively quick based on the data

17   that is available.

18        Q.   And when you say the data that is

19   available, did you review any additional studies

20   after reviewing Dr. Sawyer's report to address this

21   issue?

22        A.   I'm a little confused by your question.

23        Q.   In response to Dr. Sawyer's contentions,

24   did you do any additional research?

25        A.   I think the data that I already had based
```

Alex LeBeau, PhD, MPH, CIH

1    on the dataset was all encompassing of what I

2    needed to make that determination.

3         Q.   And so in response to Dr. Sawyer's

4    contentions about bioaccumulation of glyphosate,

5    you utilized the research that you had already

6    undertaken, is that correct?

7         A.   Yes, I used the information that I

8    already had for my evaluation.

9         Q.   Is it your opinion that the Maibach study

10   from 1983 does not suggest a chemical reservoir for

11   glyphosate in the skin?

12        A.   Based on the number of studies that have

13   been done, including the Maibach and other

14   studies -- Maibach -- skin washing is important for

15   making that determination.  And Wester '91 '91

16   shows again that powdered stratum corneum does not

17   really uptake the glyphosate, and it was

18   essentially zero.  So it supports that it's a --

19   washing techniques are important in making that

20   determination.

21        Q.   What do you mean by washing techniques

22   are important to make that determination?  Can you

23   explain what you mean by that?

24        A.   Yeah.  For after this -- the dermal

25   application of the test substance for washing that

1    away on skin after the period of time has been

2    elapsed.

3         Q.   So is it your opinion that the Maibach

4    study findings with regard to glyphosate in the

5    skin are a result of deficiencies with skin

6    washing?

7         A.   As far as addressing it from the

8    discussion of the chemical reservoir.  Other

9    studies have looked at skin washing and determined

10   that to be an important aspect of recovering

11   dermally applied glyphosate.  And again, Wester '91

12   '91 found essentially zero in the powdered human

13   stratum corneum that they evaluated in their test

14   model.

15        Q.   You move on to say:  Lack of credible

16   scientific support, when arguing systematically --

17   or systemically versus absorbed glyphosate is

18   excreted via the feces.  Is it your opinion that

19   the Wester '91 study does not support the notion

20   that glyphosate is excreted in feces?

21        A.   I may need some clarification.

22        Q.   You understand that Dr. Sawyer cites the

23   Wester '911991 study as support for glyphosate

24   being excreted via feces, correct?

25        A.   That's my understanding, yes.

Alex LeBeau, PhD, MPH, CIH

1       Q.   And you disagree with that, is that

2   right?

3       A.   I need it to be more specific, please.

4       Q.   Do you disagree that glyphosate is

5   excreted via feces?

6       A.   I need more specific information.

7       Q.   Do you have any opinion about whether

8   glyphosate is excreted via feces?

9       A.   Yes.

10       Q.   And what's your opinion?

11       A.   That it depend on the route of exposure.

12       Q.   Okay.  With regard to dermal exposure, do

13   you have any opinion about whether glyphosate is

14   excreted via feces?

15       A.   Yes.  For systemic absorption, which

16   would be similar to what dermal absorption would

17   be, the dataset shows that urine is the primary

18   excretion pathway, and that there is one data point

19   within the Wester '91 study that shows that -- a

20   higher number for feces.  But the authors even

21   discuss the urine when they evaluate excretion from

22   that dosing.

23       Q.   The data point in the Wester '91 study

24   that suggests a higher number for feces, how do you

25   explain that?

Alex LeBeau, PhD, MPH, CIH

1      A.   Based on what's described in the study

2    and some additional information that's supplied --

3    based on what's supplied in the study and on the

4    well-established toxicokinetic information, it's

5    possible or likely that the monkeys may have

6    touched their dermally applied area and put their

7    hands in their mouths.

8      Q.   Does the Wester '91 study discuss how the

9    animals were kept and whether they were able to

10   touch the areas where the glyphosate was applied?

11            MR. KALAS:  Objection, compound.

12            But you can answer if you

13   understand.

14     A.   Can you please break that up?

15   BY MS. SIZEMORE:

16     Q.   Sure.  In the Wester '91 study is there a

17   discussion about how the animals were restrained?

18     A.   There is a discussion in there.

19     Q.   Okay.  And what's your understanding of

20   how they were restrained?

21     A.   They were in restraint chairs.

22     Q.   And based on the information in the

23   study, would the restraint chairs allow the animals

24   to touch the areas that had been applied with

25   glyphosate?

Alex LeBeau, PhD, MPH, CIH

 1        A.    It's possible, because there's no mention

 2   of a breast plate while they are being confined in

 3   the study.

 4        Q.    Did you do any research about the --

 5   about the way that these animals are restrained in

 6   these chairs?

 7        A.    Can you clarify, please?

 8        Q.    Sure.  Did you conduct any research about

 9   how monkeys are restrained when conducting studies

10   such as this?

11        A.    Clarify for me.

12        Q.    Did you do any research to determine how

13   they were restrained in this study?

14        A.    By reading the study and understanding --

15   in looking at how they described in their method

16   section.

17        Q.    And based on that were you able to tell

18   whether contamination -- well, whether the monkeys

19   were able to touch the areas that were applied

20   glyphosate?

21        A.    There's lack of mention of a breast plate

22   in here, but also a -- an except of deposition from

23   a Dr. Bucks who was present at the study indicated

24   that he observed monkeys contaminating their hands

25   and touching their mouth.

Alex LeBeau, PhD, MPH, CIH

1      Q.   Okay.  And so is your opinion with regard

2   to the likelihood that the feces data point that

3   the monkeys were able to touch the areas

4   contaminated with glyphosate based on Dr. Bucks'

5   deposition testimony?

6               MR. KALAS:  Objection,

7   mischaracterizes his testimony.

8               You can answer.

9      A.   It's based on the fact that there was no

10   breast plate mentioned.  The fact that Dr. Bucks

11   testified to that.  And the rest of the dataset

12   involving toxicokinetics support the fact that

13   dermally applied glyphosate is primarily or

14   systemically is primarily excreted in the urine.

15   BY MS. SIZEMORE:

16      Q.   When you prepared your report did you

17   have Dr. Bucks' deposition testimony?

18      A.   When I prepared this report, no.  I had

19   the information from other toxicokinetic data,

20   information for systemic application, and I noted

21   the lack of a breast plate being used.  Dr. Bucks

22   just supported this conclusion.

23      Q.   So you had already formed the conclusion

24   before you received Dr. Bucks' deposition, is that

25   fair?

Alex LeBeau, PhD, MPH, CIH

1      A.   I concluded that there's a potential for

2 contamination for that, yes.

3      Q.   Your opinion that the formulated product

4 does not damage the skin, which is your next

5 rebuttal opinion, what is that based on?

6      A.   The studies that were in the dataset for

7 evaluating formulations that show that there's no

8 increased penetration over time for the products,

9 significant increased penetration over time.

10      Q.   Do you recall which studies specifically

11 as you sit here?

12      A.   Another Franz study looked at different

13 formulations and saw that the flux was

14 approximately relative across the different

15 formulations.  As far as the others, I don't recall

16 the exact studies.

17      Q.   Okay.  And so when you're talking about

18 increased penetration over time, are you looking at

19 flux?

20      A.   Yes, penetration over a specified surface

21 area in certain period of time.

22      Q.   Are there warnings, to your knowledge, on

23 Roundup about skin irritation?

24           MR. KALAS:  Objection, vague as to

25 the type of Roundup formulation.

Alex LeBeau, PhD, MPH, CIH

1                    You can answer if you understand.

2        A.   I need more information.

3   BY MS. SIZEMORE:

4        Q.   Did you encounter any -- in your analysis

5   of this case have you encountered any Roundup

6   formulations that included warnings for skin

7   irritation?

8        A.   I may have.  I can't recall specifics.

9        Q.   Generally, if a product causes skin

10  irritation, would it be a result of damage to the

11  skin?

12                    MR. KALAS:  Objection, vague,

13  overbroad.  It calls for speculation.

14                    You can answer.

15       A.   I'm going to need more information.

16  BY MS. SIZEMORE:

17       Q.   If a product causes skin irritation, can

18  that be a result of damage to the skin?

19                    MR. KALAS:  Objection, overbroad.

20                    You can answer.

21       A.   Clarify for me a little more, please.

22  BY MS. SIZEMORE:

23       Q.   Is one of the causes of skin irritation

24  damage to the skin?

25       A.   It's potential.

Alex LeBeau, PhD, MPH, CIH

 1                  MS. SIZEMORE:  We have to change

 2     again, so just one minute.

 3                  THE VIDEOGRAPHER:  It's 2:34, and

 4     we're off the record.

 5                  (Recess in the proceeding.)

 6                  THE VIDEOGRAPHER:  It's 2:38, and

 7     we're on the record.

 8     BY MS. SIZEMORE:

 9        Q.   Okay, we're talking about continued

10     discussion of your rebuttal to Dr. Sawyer.  And I'm

11     going to move onto the misrepresentation of OECD

12     guidelines on page 26 of your report, okay?

13        A.   Yes, ma'am.

14        Q.   The TNO studies that you reference -- oh,

15     sorry, strike that.

16                  The DTL studies that are

17     referenced in there, is it your opinion that the

18     DTL studies can be relied upon, despite the fact

19     that there was freezing and heating of the skin of

20     the in vitro samples?

21        A.   Clarify for me, please.

22        Q.   Okay.  With regard to the DTL studies, is

23     it your understanding that there was both heating

24     and freezing of the in vitro skin samples?

25        A.   From what I recall.

Alex LeBeau, PhD, MPH, CIH

1      Q.   And in your opinion does that alter the
2  results in any way?
3              MR. KALAS:  Objection, vague.
4      A.   Provide more information, please.
5  BY MS. SIZEMORE:
6      Q.   The heating and freezing of the skin
7  samples, does that affect the results of the dermal
8  absorption in the studies?
9              MR. KALAS:  Same objection.
10     A.   Clarify a little more for me, please.
11  BY MS. SIZEMORE:
12     Q.   Do you believe that heating or freezing
13  skin samples can affect the dermal absorption for a
14  in vitro skin study?
15             MR. KALAS:  I'm going to object to
16  that question as overbroad.
17             But you can answer.
18     A.   I'm having trouble with that question.
19  BY MS. SIZEMORE:
20     Q.   I'm going straight out of your report.
21  And if I read the last paragraph on page 26, it
22  appears to me that you come to the conclusion that,
23  despite the heat separation and freezing techniques
24  in the DTL studies, that the results can be relied
25  upon.  Is that accurate?

Alex LeBeau, PhD, MPH, CIH

1    A.   The DTL studies following OEC guidelines,

2    for what they were performed for regulatory

3    purposes, I don't see any reason to doubt those

4    results.

5    Q.   And even if it complies with an OEC

6    guideline, do you have any opinion about whether or

7    not freezing or heating a skin sample, an in vitro

8    skin sample for the purpose of a dermal absorption

9    study would affect the results?

10              MR. KALAS:  Objection, overbroad.

11   A.   Be more specific, please.

12   BY MS. SIZEMORE:

13   Q.   Do you think that there's any impact on

14   the study results as a result of freezing or

15   heating the skin samples?

16              MR. KALAS:  The DTL study results?

17              MS. SIZEMORE:  Correct.

18   A.   Based on what was done per OECD

19   guidelines, I don't think there was any impact.

20   BY MS. SIZEMORE:

21   Q.   And is that because it complied with the

22   OECD guidelines?

23   A.   Because it has complied with OECD

24   guidelines, which they, my understanding, have

25   evaluated the integrity of skin samples doing this

Alex LeBeau, PhD, MPH, CIH

1    kind of technique, yes, I rely on them for

2    making -- I rely on that determination, saying that

3    those -- those processes for that evaluation are

4    valid.

5         Q.   And the DTL studies, did they look at in

6    vivo rat samples?

7         A.   I am confused by your question.

8         Q.   Okay.  We know that in the DTL studies,

9    looking at this, they looked at in vitro human

10   samples, was that right?

11        A.   From my recollection.

12        Q.   Did they evaluate in vitro or in vivo rat

13   samples as well?

14        A.   Clarify, within these studies?

15        Q.   Within those studies, yes?

16        A.   Not -- for the DTL studies, not to my

17   recollection.

18        Q.   With regard to studies of dermal

19   absorption, is it generally recommended that all

20   three be evaluated, meaning in vivo and in vitro

21   rat and in vitro human studies?

22             MR. KALAS:  Objection, vague.

23             You can answer.

24        A.   Can you be more specific for me, please?

25   BY MS. SIZEMORE:

Alex LeBeau, PhD, MPH, CIH

1       Q.   Sure.  With regard to dermal absorption

2   studies, is it best if both in vivo and in vitro

3   rat studies as well as in vitro human studies are

4   conducted?

5                    MR. KALAS:  Objection, vague,

6   overbroad.

7                    You can answer.

8       A.   Can you be more specific, please?

9   BY MS. SIZEMORE:

10      Q.   Sure.  Have you heard of the Triple Pack

11  method?

12      A.   I saw triple pack mentioned in Dr.

13  Sawyer's report.

14      Q.   And with regard to Dr. Sawyer's report,

15  he mentions Triple Pack method as being generally

16  accepted to validate any laboratory results for

17  dermal absorption.  Do you agree with that?

18      A.   I don't have an opinion on validating lab

19  results based on that.

20      Q.   Have you reviewed literature that

21  suggests a generally accepted 3 percent dermal

22  absorption rate?

23                    MR. KALAS:  Objection, vague.

24      A.   I need more information.

25  BY MS. SIZEMORE:

Alex LeBeau, PhD, MPH, CIH

1      Q.   Did any of the literature you reviewed

2  with regard to dermal absorption discuss a 3

3  percent dermal absorption value?

4                MR. KALAS:  As to glyphosate?

5                MS. SIZEMORE:  As to glyphosate.

6      A.   Perhaps.  I don't remember all the

7  different studies, but they're upper bound.

8  BY MS. SIZEMORE:

9      Q.   And the absorption rate that you utilized

10  in your calculations was less than 3 percent, is

11  that correct?

12                MR. KALAS:  Objection,

13  mischaracterizes his calculations.

14                You can answer.

15      A.   I didn't use an absorption percent in my

16  calculations.

17  BY MS. SIZEMORE:

18      Q.   If you converted your absorption rate to

19  a percentage, would it be less than 3 percent?

20                MR. KALAS:  Objection, incomplete

21  hypothetical.

22      A.   I need more information, please.

23  BY MS. SIZEMORE:

24      Q.   Are you able to convert the absorption

25  rate that you utilized in your calculations to a

Alex LeBeau, PhD, MPH, CIH

1    percentage?

2        A.   Because absorption rate is dependent on

3    time, it's easier to -- to convert the percent

4    absorption into flux by using the time.

5        Q.   I understand that that's the rate that

6    you utilized and why.  Are you able to convert the

7    absorption rate that you utilized into a

8    percentage?

9            MR. KALAS:  Objection, asked and

10   answered.

11           You can answer.

12       A.   Again, it's easier to look at the percent

13   and determine the amount of time it took and to

14   evaluate and calculate flux.

15   BY MS. SIZEMORE:

16       Q.   Okay.  I understand it may be easier.  I

17   am asking is it possible to compute the absorption

18   rate that you utilized into a percentage?

19           MR. KALAS:  Same objection.

20           You can answer.

21       A.   It's easier to look at the percent and

22   divide that by the amount of time that was in the

23   study and determine the amount of flux for that.

24   BY MS. SIZEMORE:

25       Q.   All right, so are you saying that it's

Alex LeBeau, PhD, MPH, CIH

1   not possible?

2        A.   Not -- clarify.

3        Q.   Are you saying that it's not possible to

4   convert the absorption rate that you utilized into

5   a percentage?

6        A.   I'm saying that that conversion would

7   depend upon the time and amount applied to

8   determine the percentage.

9        Q.   So it could be done.  You would need

10   those factors, is that fair?

11        A.   It's fair to say that it's more

12   appropriate to calculate a flux based on the

13   percent divided by the amount of time it took

14   for -- in the study.

15        Q.   And I understand that that's your opinion

16   and that's the methodology that you used.  I am

17   just asking is it possible?

18        A.   It's possible, but less accurate.

19        Q.   With regard to the EPA Exposure Factors

20   Handbook, that's what you utilized to get surface

21   area of the skin, is that right?

22        A.   For average surface area.

23        Q.   Okay.  And the average surface area for

24   the face, are you familiar with what that is?

25        A.   I am confused by your question.

Alex LeBeau, PhD, MPH, CIH

1       Q.   Sure.  Are you familiar with what the

2  average surface area of the skin is under the US

3  EPA Exposure Factors Handbook for exposure to the

4  face?

5       A.   I'm still confused.

6       Q.   With regard to the US EPA Exposure

7  Factors Handbook, it breaks down average surface

8  area by parts of the body, is that right?

9       A.   Yes.

10      Q.   Is there an average surface area exposure

11 to the face?

12      A.   I don't recall if it's the face

13 specifically or for the head region.

14      Q.   Is there one for the forearms?

15      A.   I don't recall.

16      Q.   Are you familiar with the value of it,

17 whether it be the head or the face?

18      A.   I am confused.

19      Q.   Okay.  So with regard to average surface

20 area under the EPA Exposure Factors Handbook, you

21 said there is a value for either the head or the

22 face; you're not sure which one, is that right?

23      A.   That's correct.

24      Q.   Do you know generally what that surface

25 area is?

Alex LeBeau, PhD, MPH, CIH

1      A.    No, not off the top of my head.

2      Q.    All right.  The next section of your

3   report deals with the TNO study in rat skin does

4   not support arguments regarding human skin

5   permeability.  Do you see that?

6      A.    Yes.

7      Q.    And is it your opinion that the TNO rat

8   study does not present reliable data with regard to

9   human skin permeability?

10     A.    My opinion is that it's preferable to

11  have the data from the human skin studies as

12  opposed to the rat studies.

13     Q.    Based on that, would you not utilize the

14  data from the TNO study in an evaluation?

15     A.    Based on the well-characterized nature of

16  this in human skin studies and the limitations that

17  the authors pointed out in the TNO study, I'd say

18  that the data in this study doesn't outweigh the

19  other well-characterized dermal permeability

20  studies for glyphosate.

21     Q.    Your next section on failing to quantify

22  impurity levels in Roundup products sold to

23  consumers.  You have a criticism of Dr. Sawyer for

24  failing to quantify the impurity levels of Roundup

25  products sold to consumers.

Alex LeBeau, PhD, MPH, CIH

1          A.   I'm sorry, can you clarify?  Was that a

2     question, I'm sorry?

3          Q.   Yes.

4          A.   Can you restate that?

5          Q.   Do you have a criticism of Dr. Sawyer

6     for failing to quantify the impurity levels within

7     the Roundup products sold to consumers?

8          A.   Yes, I note that he does not quantify the

9     concentrations of the impurities.

10          Q.   Okay.  With regard to the impurities that

11     are contained within different formulations of

12     Roundup, is that access that is available to the

13     general public, to your knowledge?

14          A.   Can you be more specific, please?

15          Q.   Are you aware of trade secret protections

16     that Monsanto has asserted with regard to the

17     formulation of specific types of Roundup?

18          A.   I'm not the regulatory person or

19     knowledgeable on what Monsanto has or has not done

20     as far as trade secret claims.

21               MR. KALAS:  Excuse me.

22                MS. SIZEMORE:  Bless you.

23               MR. KALAS:  Thank you.

24     BY MS. SIZEMORE:

25          Q.   In your analysis of the Roundup product,

Alex LeBeau, PhD, MPH, CIH

1    were you able to gain access to all of the

2    different types of substances contained within

3    every version of Roundup that Mr. Giglio was

4    exposed to?

5         A.   My understanding of what impurities are

6    claimed to be in there are from Dr. Sawyer, but I

7    know that other -- the impurities that are

8    identified are regulated by different regular --

9    the regulatory agencies with thresholds that are

10   for allowable concentrations within the material

11   formulated product.

12        Q.   One of your criticisms of Dr. Sawyer in

13   this section is that he's engaging in a potential

14   hazard spotting exercise without taking actual

15   exposure and dose into account, correct?

16        A.   Yes.

17        Q.   And in order for him to evaluate exposure

18   and dose, he would need to know what percentage and

19   what concentration of these impurities is contained

20   within the Roundup product, is that right?

21        A.   I don't know what Dr. Sawyer would or

22   would not need to know for whatever exercise he was

23   partaking here.

24        Q.   In order for you to evaluate the exposure

25   or dose of any impurities within the Roundup

Alex LeBeau, PhD, MPH, CIH

1    product, you would need to know what concentration

2    of those impurities is contained within the

3    product, is that right?

4         A.   Clarify, please.

5         Q.   If you were to do an assessment of the

6    exposure and dose of impurities within the Roundup

7    product, you'd need to know how much or what

8    concentration of those impurities is contained

9    within the product, right?

10        A.   While -- well, because there are

11   thresholds for those values in products or for some

12   impurities in the products, that -- those

13   thresholds can be used for evaluating potential

14   exposures for those.

15        Q.   To compare the amount in these products

16   to those thresholds, you'd need to know the amount

17   in the product, right?

18        A.   Since I'm not the regulatory person as

19   far as regulatory information for thresholds, I'll

20   defer to other experts.  But there are regulatory

21   determined thresholds for impurities in these

22   formulations, and those thresholds can be used to

23   compare for exposures.

24        Q.   Okay.  But to determine whether the

25   impurities meet those thresholds, you would need to

Alex LeBeau, PhD, MPH, CIH

1   know how much of the impurity is contained within

2   the product, wouldn't you?

3       A.   Again, because there are thresholds that

4   are established, those can be used for comparison

5   purposes.

6       Q.   And you believe that you can compare

7   those without any information about how much of

8   that impurity or what that impurity is that's

9   contained within the product?

10               MR. KALAS:  Objection,

11  mischaracterizes his testimony and compound.

12               You can answer.

13      A.   Clarify, please.

14  BY MS. SIZEMORE:

15      Q.   Do you believe that you can compare to

16  those thresholds, those regulatory thresholds

17  without any information about how much of the

18  impurity is contained within the product?

19               MR. KALAS:  Again mischaracterizes

20  his testimony.

21               But you can answer.

22      A.   There are thresholds that are available

23  in regulatory documents for comparison to other

24  exposure levels.

25  BY MS. SIZEMORE:

Alex LeBeau, PhD, MPH, CIH

```
 1        Q.   But to compare the exposure level to the

 2   threshold, wouldn't you need to know what the

 3   exposure is?

 4                  MR. KALAS:  I am going to object

 5   as asked and answered on that one.

 6        A.   There are thresholds that are

 7   established, and those levels can be used for

 8   comparison.

 9   BY MS. SIZEMORE:

10        Q.   Without regard to what the amount of the

11   exposure is?

12                  MR. KALAS:  Objection, asked and

13   answered.

14                  You can answer again.

15        A.   There are thresholds and those can be

16   compared, regulatory thresholds and they can be

17   compared to other levels.

18   BY MS. SIZEMORE:

19        Q.   So you can't answer that as you sit here,

20   is that correct?

21                  MR. KALAS:  Objection,

22   mischaracterizes his testimony.

23                  You can answer.

24        A.   Again, the threshold -- the regulatory

25   thresholds that are established, they can be used
```

Alex LeBeau, PhD, MPH, CIH

1   for comparison purposes.

2   BY MS. SIZEMORE:

3       Q.   If you assume that Dr. Sawyer does not

4   have access to the levels of impurities or types of

5   impurities contained within all of the Roundup

6   products that Mr. Giglio was exposed to, do you

7   still have a criticism of him for not evaluating

8   the exposure and dose?

9       A.   Can you ask that again, please?

10      Q.   If you assume that Dr. Sawyer does not

11  have access to the levels of impurities or types of

12  impurities contained within all of the Roundup

13  products that Mr. Giglio was exposed to, do you

14  still have criticism of him for not evaluating the

15  exposure and dose?

16                  MR. KALAS:  Objection, assumes

17  facts not in the record.  Incomplete hypothetical.

18                  You can answer.

19      A.   I'm having trouble responding to that.

20  BY MS. SIZEMORE:

21      Q.   One of your criticisms of Dr. Sawyer is

22  that he did not conduct a dose or exposure analysis

23  on these impurities, is that right?

24      A.   I said he did -- I won't say analysis,

25  but he did -- exposure and dose was not taken into

Alex LeBeau, PhD, MPH, CIH

1    account.

2        Q.   Okay.  And in order for him to take into

3    account exposure and dose, he would need to know

4    what the exposure and dose are, is that right?

5        A.   If there are regulatory thresholds that

6    are established that he -- that can be used, those

7    can be compared to established threshold levels.

8        Q.   Well, I'll move on.  I don't think I got

9    an answer.

10            Do you agree that you are not

11   offering an opinion as to the cause of Mr. Giglio's

12   non-Hodgkin's lymphoma, correct?

13       A.   I agree that any opinion on the cause of

14   his or any risk factors, I'll defer to other

15   experts.

16       Q.   In page 27 of your report, the second to

17   last sentence says:  "Though I am not offering an

18   opinion as to the cause of Mr. Giglio's NHL."  That

19   is accurate, right?

20       A.   It's accurate in the fact of the cause of

21   his NHL.

22       Q.   In your section on "Applicators who do

23   not wear PPE do not exceed regulatory limits," you

24   state that the biomonitoring and passive dosimetry

25   dataset, along with my retrospective dose

Alex LeBeau, PhD, MPH, CIH

1  assessment of Mr. Giglio, consider applicators

2  using minimal protective barriers."  Do you see

3  that?

4       A.   Yes.

5       Q.   Which of these studies considered

6  applicators using minimal protective barriers?

7       A.   There's different protective barriers

8  that were used across the studies that were in the

9  dataset for biomonitoring and passive dosimetry.

10      Q.   Okay.  And so the examples you gave were

11 short-sleeved shirts and no gloves.  Do you recall

12 as you sit here today any of those that utilized

13 short-sleeved shirts and no gloves?

14      A.   I don't recall short sleeves or any --

15 which particular studies mention short sleeves.  I

16 know Acquavella 2004 they did use -- they did have

17 individuals applying without gloves.

18      Q.   Do you agree generally that personal

19 protective equipment may reduce your exposure to

20 glyphosate?

21      A.   Can you be more specific, please?

22      Q.   Would wearing PPE -- or strike that.  Can

23 wearing PPE reduce exposure to glyphosate?

24      A.   PPE can reduce exposure to glyphosate,

25 but the biomonitoring data show that whether it's

Alex LeBeau, PhD, MPH, CIH

```
 1   used or not, no levels exceed any regulatory
 2   threshold of concern.
 3       Q.   Given that PPE can reduce exposure to
 4   glyphosate, is there any harm in advising
 5   applicators to wear PPE?
 6       A.   I'm going --
 7            MR. KALAS:  Objection.  Hold on.
 8   Objection, calls for -- I am not sure what it's
 9   calling for.  Does not call for an expert opinion.
10            You can answer if you understand.
11       A.   I'm going to need more information.
12   BY MS. SIZEMORE:
13       Q.   Do you believe there's any harm in
14   Monsanto putting advice up for PPE on the Roundup
15   label?
16            MR. KALAS:  Objection, vague as to
17   harm, and calls for opinions outside the scope.
18            You can answer if you understand.
19       A.   I'm going to defer to other experts on
20   that.
21   BY MS. SIZEMORE:
22       Q.   With regard to the chemical inventory you
23   state that because you couldn't go inside, you did
24   not perform a co-exposure assessment.  Do you
25   recall that?
```

Alex LeBeau, PhD, MPH, CIH

```
 1        A.    Adequately, yes.

 2        Q.    Okay.  Did you review what the inspection

 3   request that led to your site inspection actually

 4   asked for?

 5        A.    I did see it, but I don't recall the

 6   specifics of it for the moment.

 7        Q.    Do you recall any request in that

 8   inspection request to go inside the home?

 9              MR. KALAS:  I'm going to object.

10   Asking him for a legal conclusion, but he can

11   answer if he understands.

12        A.    I don't recall specifics.

13   BY MS. SIZEMORE:

14        Q.    Did you ever ask that you be allowed to

15   go inside the home prior to the date of the

16   inspection itself?

17              MR. KALAS:  Objection.  Well, not

18   an objection, but I'm just going to instruct you

19   not to discuss any conversations you had with any

20   attorneys.

21        A.    Okay, I'm going to have no opinion on

22   that.

23   BY MS. SIZEMORE:

24        Q.    You point out one of the chemicals called

25   Zip-Strip and its association as a carcinogen, do
```

Alex LeBeau, PhD, MPH, CIH

```
1    you recall that?

2         A.    I do.

3         Q.    Are you aware that the SDS for that

4    particular product changed fairly recently?

5         A.    I'm going to need more clarification,

6    please.

7         Q.    You note that the -- when you pulled the

8    SDS, you were unable to find it, is that right?

9         A.    That's correct.

10        Q.    Okay.  And that when you pulled up the

11   SDS it was now classified as an IARC group 2A

12   probable human carcinogen, is that accurate?

13        A.    Based on going to the manufacturer's

14   website, yes.

15        Q.    With regard to this Zip-Strip product, is

16   the relevance of whether it's carcinogenic only

17   applicable to Mr. Giglio if he was exposed to it?

18                   MR. KALAS:  Objection.  Calls for

19   a legal conclusion.  Do you mean -- well --

20                   MS. SIZEMORE:  I'll rephrase it.

21                   MR. KALAS:  Yeah.

22   BY MS. SIZEMORE:

23        Q.    With regard to your analysis of other

24   chemicals that Mr. Giglio was exposed to, would the

25   Zip-Strip only be relevant if he was exposed to it?
```

Alex LeBeau, PhD, MPH, CIH

1      A.   It would be relevant in the fact that he

2  had this on his property and it had a -- it had a

3  health hazard information on there.

4      Q.   With regard to exposure to other

5  chemicals or in terms of whether they increased his

6  risk for any adverse health effect, it requires

7  that he be exposed to it, is that right?

8      A.   Can you clarify?

9      Q.   With regard to whether any chemical in

10  Mr. Giglio's garage increases his risk of cancer,

11  it would only be relevant if he was exposed to it,

12  is that accurate?

13      A.   With regard to any -- with regard to any

14  causation of NHL, I am going to defer to other

15  experts.

16            But from an exposure standpoint,

17  there would -- exposure would be needed.  But

18  again, it goes -- points out that there were other

19  chemicals in his -- on his property that had

20  warnings on there.

21      Q.   If you make an assumption that that

22  chemical had been given to Mr. Giglio in a box of

23  other chemicals and that he had never used it or

24  reviewed any of the warnings on it, would it be

25  relevant to your assessment at all?

Alex LeBeau, PhD, MPH, CIH

1        A.    That information I don't know.  And

2   again, I'm just pointing out the fact that there is

3   a product on his property that had these health

4   warnings associated with it.

5                  MR. KALAS:  I'm going to object to

6   that last question and indicate it as an incomplete

7   hypothetical.

8                  But your answer stands.

9   BY MS. SIZEMORE:

10       Q.    In regards to the Zip-Strip carcinogenic

11  properties, you actually reference the IARC

12  classification, is that right?

13       A.    I included the IARC classification

14  because that was what was included on the SDS

15  sheet.  And I also referenced the NTP.

16       Q.    I'm going to go back to your time sheets,

17  and I can't recall what exhibit we marked it.  I

18  think 4.

19                  MR. KALAS:  5.

20                  MS. SIZEMORE:  No. 5.

21  BY MS. SIZEMORE:

22       Q.    All right, when did you prepare your

23  report?

24       A.    I prepared it over a number of days this

25  summer.

Alex LeBeau, PhD, MPH, CIH

1      Q.   Is there anything on your invoices that

2   would indicate when you either prepared or

3   finalized your report?

4      A.   There's some information for composition

5   that goes along with it.

6      Q.   Okay.  And it looks like your -- you

7   conducted an expert report review on September

8   10th, 2019?

9      A.   Yes.

10      Q.   Would that have been your final review of

11   the report prior to submission?

12      A.   No, I think that may have been a portion

13   review of Dr. Sawyer's report.

14      Q.   Okay.  And so the two entries for

15   September 2nd and September 3rd that say

16   composition, review, is it your recollection that

17   those are in connection with preparing your report?

18      A.   Probably.

19      Q.   Are you able to look at these invoices

20   and tell me how much time you actually spent

21   preparing your report itself?

22      A.   Not specifically, no.

23      Q.   Did anybody assist you in preparing your

24   report?

25      A.   No, these are my opinions contained

Alex LeBeau, PhD, MPH, CIH

1    within this report.

2        Q.   And if we assume that these dates in the

3    beginning of September are when you were preparing

4    and finalizing your report, would all of the dates

5    previous to that that say document review encompass

6    all of the time that you had spent reviewing all of

7    the materials on your materials considered list?

8        A.   Probably a portion of that time.

9        Q.   Is there -- are there hours for document

10   review that you spent reviewing materials on your

11   materials considered list that you did not invoice

12   for?

13       A.   No.

14       Q.   Okay.  And so all of the document review

15   portions that are prior to the date of your report,

16   would that include all of the time that you've

17   spent reviewing the materials in your materials

18   considered list?

19                MR. KALAS:  Objection, asked and

20   answered.

21                You can answer again.

22       A.   Probably so.

23   BY MS. SIZEMORE:

24       Q.   When you have in your portion of your

25   report document inventory, do you see that?  What

Alex LeBeau, PhD, MPH, CIH

1    does that mean?

2         A.   Identifying some documents that I had.

3         Q.   Identifying them where?

4         A.   Within the information -- or within my

5    files.

6         Q.   Okay.  So do you keep a list of the

7    documents that you -- or an inventory of the

8    documents you review?

9              MR. KALAS:  Objection, that was

10   asked and answered earlier.

11             But you can answer it again.

12        A.   There's the document inventory that I

13   keep in my files.

14   BY MS. SIZEMORE:

15        Q.   Okay.  The travel in -- on June 11, 2019,

16   do you recall where you traveled?

17        A.   To a meeting.

18        Q.   To a meeting in relation to this case?

19        A.   In relation to this project, yes.

20        Q.   Okay.  And do you know where you

21   traveled, do you recall?

22        A.   Can you be more specific?

23        Q.   Do you remember where you went for this

24   meeting?

25        A.   Yes.

Alex LeBeau, PhD, MPH, CIH

1    Q.   Where was that?

2    A.   To a hotel for a meeting.

3    Q.   Was the hotel out of town?

4    A.   No, it's in Orlando, downtown.

5    Q.   Okay.  Cause I see a total of ten hours

6    between these two days.  That was all within

7    Orlando?

8    A.   Yes.

9    Q.   Okay.  The -- on July 18th, 2019, you

10   have an entry for document composition and another

11   one on July 22nd, 2019.  Do you recall what

12   document you were composing on those dates?

13   A.   Probably the initiation or start of my

14   report.

15   Q.   Okay.  And so all of these invoices that

16   we've marked collectively as Exhibit 5 I believe,

17   does this represent the total amount that you have

18   billed in relation to forming your opinions in

19   Mr. Giglio's case?

20   A.   Yes, with the exception of any additional

21   opinions Dr. Sawyer may have.

22   Q.   And given that your last invoice was in

23   September or for work done in September, do you

24   have an estimate as to how many additional hours

25   you've spent on this case since that time?

Alex LeBeau, PhD, MPH, CIH

1      A.   I don't currently know.

2      Q.   Do you know how many hours you've spent

3  preparing for this deposition?

4      A.   I don't off the top of my head.

5      Q.   Other than preparing for this deposition,

6  have you conducted any additional work on this

7  matter since the end of September 2019?

8            MR. KALAS:   Do you mean specific

9  to Giglio?

10           MS. SIZEMORE:   Correct.

11     A.   No, not that I can recall.

12           MS. SIZEMORE:   Can we go off the

13  record?

14           THE VIDEOGRAPHER:   It's 3:21, and

15  we're off the record.

16           (Recess in the proceeding.)

17           THE VIDEOGRAPHER:   It's 3:29, and

18  we're on the record.

19  BY MS. SIZEMORE:

20     Q.   Doctor, do you have an estimate as to how

21  many hours you've spent preparing your report?

22     A.   I don't have an estimate.  I have an

23  approximation.

24     Q.   What's your approximation?

25     A.   Approximately between 40 and 60, just a

Alex LeBeau, PhD, MPH, CIH

1    rough approximation.

2         Q.   Do you have an estimate as to how many

3    hours you've spent determining the metabolism of

4    Roundup and glyphosate?

5                   MR. KALAS:  Objection, overbroad,

6    vague.

7         A.   Can you clarify?

8    BY MS. SIZEMORE:

9         Q.   One of the things you did in your

10   assessment was to look at the metabolism of Roundup

11   or glyphosate, is that right?

12        A.   During my review, yes.

13        Q.   As to that particular opinion, do you

14   have an estimate as to how many hours you spent?

15        A.   I don't.

16        Q.   Other than the portion of your report in

17   rebuttal to Dr. Sawyer where you talk about

18   applicators who do not wear PPE do not exceed

19   regulatory limits, do you have any other opinions

20   that deal with the sufficiency or insufficiency of

21   warnings or labeling on Roundup?

22        A.   As far as warnings or labeling, I'm

23   going to defer to other experts.

24        Q.   Did you review or rereview any additional

25   documents in preparation for your deposition?

Alex LeBeau, PhD, MPH, CIH

```
1        A.   I reviewed some of the documents
2   within -- within the past few weeks.
3        Q.   Do you recall which ones you
4   rereviewed -- or strike that.
5              Did you review any new documents,
6   or were these rereview of documents you had already
7   considered?
8        A.   Rereview.
9        Q.   And do you remember which ones you
10  rereviewed?
11       A.   I don't.
12       Q.   In the intro to your report you talk
13  about epidemiology.  Do you recall that?  Let me
14  point you to a page.
15              Okay, and you state that
16  epidemiology is an "area where a CIH must have
17  practical knowledge," do you see that?
18       A.   Yes.
19       Q.   Okay.  And so is it your opinion that you
20  have practical knowledge as it relates to
21  epidemiology?
22       A.   Yes, practical knowledge.  Not expertise
23  in epidemiology.  I defer to those experts.  But as
24  far as an evaluation, practical knowledge.
25       Q.   Okay.  And I think you anticipated
```

Alex LeBeau, PhD, MPH, CIH

1    exactly where I was going.

2              You do not consider yourself an

3    expert in epidemiology, is that fair?

4         A.   I do not.  I have training in

5    epidemiology and understand concepts, but as far as

6    expertise, I am deferring to other experts beyond

7    the dose aspect of epidemiology.

8         Q.   Okay.  Do you have any additional

9    opinions that you hold as of now that we have not

10   either discussed or not contained within your

11   expert report?

12        A.   As of now, no.  But again, if any other

13   opinions open up.

14        Q.   And understanding that you may still

15   review data as it comes in or additional

16   depositions as they come in, other than that, do

17   you have any plans to do any additional work on the

18   file prior to trial?

19        A.   Again, not unless any other opinions are

20   offered before then.

21        Q.   Other than the visuals contained within

22   your report, have you prepared any visual aids for

23   trial?

24              MR. KALAS:  I'm going to tell you

25   not to answer that question at this point.

Alex LeBeau, PhD, MPH, CIH

1    BY MS. SIZEMORE:

2       Q.   Other than anything that's been asked of

3    you by counsel, have you prepared any visual aids

4    for use at trial?

5       A.   No.

6                MS. SIZEMORE:  Okay, I don't have

7    anything further, any further questions.

8                Do you have any questions?

9                MR. KALAS:  I have a few.

10                CROSS-EXAMINATION

11   BY MR. KALAS:

12      Q.   Doctor, thank you for bearing with me

13   here.

14                You were asked a few question

15   about -- questions about some materials that were

16   added to your materials considered list, including

17   the Rages study, R-A-G-E-S.  Do you remember that?

18      A.   Yes.

19      Q.   Okay, your opinions regarding

20   impurity levels in Roundup products, did you hold

21   those before you reviewed the Rages study?

22      A.   Yes.

23      Q.   Okay.  And what did you base that on?

24      A.   The eligibility decision for thresholds

25   that are available.

Alex LeBeau, PhD, MPH, CIH

1      Q.   Okay.  And specifically, what is the

2   eligibility decision for thresholds that are

3   available?

4      A.   EPA reregistration eligibility decision.

5      Q.   And what year is that, sir?

6      A.   1993.

7      Q.   Okay, thank you.

8              You were asked a few questions

9   about the Nielsen study and your use of it in your

10  dose calculations, at least the flux level in the

11  Nielsen study in your dose calculations, do you

12  recall those questions?

13     A.   Yes.

14     Q.   Okay.  Is the Nielsen study the only

15  study you looked at involving dermal absorption of

16  glyphosate?

17     A.   No.

18     Q.   Okay.  Were there other studies you also

19  looked at that contained surfactants or did not

20  contain surfactants?

21     A.   Yes.

22     Q.   Okay.  And how did the Nielsen study

23  compare to those studies as far as dermal

24  absorption rates?

25     A.   They're -- all the studies are very

Alex LeBeau, PhD, MPH, CIH

1    similar.

2         Q.   Okay.  You were asked some questions

3    earlier about cancer endpoints and noncancer

4    endpoints, and I think that things might have got

5    lost in the wash there.  Do you remember those

6    questions?

7         A.   I do.

8         Q.   Okay.  Did you look at regulatory

9    evaluations of glyphosate?

10        A.   Yes.

11        Q.   Okay.  And did those regulatory

12   evaluations that you looked at look at potential

13   carcinogenic effects?

14        A.   Yes.

15        Q.   Okay.  And did they look as well at

16   potential noncarcinogenic effects?

17        A.   Yes, they did.

18        Q.   Okay.  Did those regulatory agencies

19   whose evaluations you reviewed determine that there

20   were any carcinogenic effects of glyphosate in

21   humans?

22        A.   No.

23        Q.   Okay. Did those regulatory agencies whose

24   evaluations you looked at determine that there were

25   potential noncarcinogenic effects in humans?

Alex LeBeau, PhD, MPH, CIH

1      A.    Yes.

2      Q.    Did they set any regulatory dose level

3   for potential carcinogenic effects in those

4   regulatory reviews?

5      A.    No.

6      Q.    What's your understanding about why they

7   did not set a dose level for carcinogenic effects?

8      A.    Because the --

9            MS. SIZEMORE:  Just insert an

10   objection.  Calls for speculation.

11           Go ahead.

12      A.    The noncarcinogenic endpoints that they

13   evaluated, doses used in those studies were lower

14   than the doses used in the cancer bioassay studies.

15   BY MR. KALAS:

16      Q.    Okay.  Well my question wasn't about

17   noncarcinogenic endpoints.  It was about the

18   carcinogenic endpoint.

19           What is your understanding, based

20   on your experience working in the field of

21   toxicology and risk assessment, about why a

22   regulator who does not see a carcinogenic effect

23   would not set a carcinogenic dose?

24      A.    Because there's no concern.

25           MS. SIZEMORE:  Just I'll object it

Alex LeBeau, PhD, MPH, CIH

1    may be outside the scope of this witness's

2    designation.  Go ahead.

3        A.   Because there's no concern.

4        Q.   Okay.  And did those regulators set a

5    dose for noncarcinogenic effects?

6        A.   Yes.

7        Q.   Or potential effects?

8        A.   Potential.

9        Q.   And how did that dose compare to where

10   the rodent bioassays on glyphosate were dosed in

11   the carcinogenicity studies?

12       A.   Sure.  They were  -- those doses in the

13   noncarcinogenic effects were lower than the

14   carcinogenicity bioassays studies.

15       Q.   Okay.  So when you said that your

16   evaluation of noncarcinogenic dose levels evaluated

17   all health effects, what did you mean there?

18       A.   I meant that the levels that were set for

19   noncarcinogenic thresholds were based on doses that

20   were lower and saw health outcomes, those doses

21   were lower than the doses that were used in the

22   carcinogenicity assays.

23            MR. KALAS:  Okay, thank you sir.

24   I don't have any further questions, unless counsel

25   does.

Alex LeBeau, PhD, MPH, CIH

```
 1                  REDIRECT EXAMINATION
 2   BY MS. SIZEMORE:
 3       Q.   Are you aware of any published literature
 4   evaluating the risk of non-Hodgkin's lymphoma as a
 5   result of glyphosate that utilizes the regulatory
 6   levels you were just discussing?
 7                  MR. KALAS:  I'm going to object to
 8   that.  It assumes facts not in the record.
 9                  You can answer.
10       A.   Can you clarify, I'm sorry, or re-ask.
11   BY MS. SIZEMORE:
12       Q.   Are you aware of any published literature
13   that evaluates the risk or correlation between
14   non-Hodgkin's lymphoma as a result of glyphosate
15   exposure that utilizes the regulatory levels you
16   were just discussing with counsel?
17       A.   No, the published literature evaluates
18   thresholds that were based on health outcomes from
19   doses that were below what was used in cancer
20   bioassay studies.
21       Q.   In all of the published literature that
22   you reviewed that was specific to risk of
23   non-Hodgkin's lymphoma as a result of glyphosate
24   exposure utilized either never/ever exposure or
25   exposure days or exposure days with other factors,
```

Alex LeBeau, PhD, MPH, CIH

 1    is that fair?

 2        A.   Re-ask the question, please.

 3        Q.   Sure.  All of the published literature

 4    that you reviewed that was specific to a risk of

 5    non-Hodgkin's lymphoma as a result of glyphosate

 6    exposure utilized exposure on the basis of either

 7    never/ever exposure days or exposure days with

 8    added factors, is that right?

 9        A.   The literature evaluated those metrics

10    for exposures.

11                  MS. SIZEMORE:  I don't have

12    anything further.

13                  MR. KALAS:  Okay, I think we're

14    done.

15                  We are going to designate it as

16    confidential, but only because his address is on

17    these.  If you agree to redact them right now, then

18    I don't think we need to designate it as

19    confidential.

20                  MS. SIZEMORE:  We can redact the

21    address.

22                  MR. KALAS:  Okay.

23                  THE VIDEOGRAPHER:  This completes

24    the deposition.  It's 3:41 p.m., and we are off the

25    record.

Alex LeBeau, PhD, MPH, CIH

1                    (Whereupon, the deposition of ALEX

2   LeBEAU concluded at 3:41 p.m.)

3                         *  *  *  *  *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Alex LeBeau, PhD, MPH, CIH

```
 1           C E R T I F I C A T E

 2

 3           I, KAREN SCHMIEDER, a Certified Shorthand

 4    Reporter, do hereby certify that, pursuant to

 5    notice, the deposition of ALEX LeBEAU was duly

 6    taken on October 21, 2019 at 8:08 a.m. before me.

 7           The said ALEX LeBEAU was duly sworn by me

 8    according to law to tell the truth, the whole

 9    truth, and nothing but the truth, and thereupon did

10    testify as set forth in the above transcript of

11    testimony.  The testimony was taken down

12    stenographically by me.  I do further certify that

13    the above deposition is full, complete and a true

14    record of all the testimony given by the said

15    witness.

16

17                          _____

18                          KAREN SCHMIEDER

19                          Certified Shorthand Reporter

20

21

22

23

24

25
```

Alex LeBeau, PhD, MPH, CIH

1                INSTRUCTIONS TO WITNESS

2

3

4        Please read your deposition over carefully

5   and make any necessary corrections.  You should

6   state the reason in the appropriate space on the

7   errata sheet for any corrections that are made.

8

9        After doing so, please sign the errata

10  sheet and date it.  It will be attached to your

11  deposition.

12

13       It is imperative that you return the

14  original errata sheet to the depositing attorney

15  within thirty (30) days of receipt of the

16  deposition transcript by you.  If you fail to do

17  so, the deposition transcript may be deemed to be

18  accurate and may be used in court.

19

20

21

22

23

24

25

Alex LeBeau, PhD, MPH, CIH

1                          ERRATA SHEET

2      DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

3

4       PAGE   LINE   CHANGE

5      _____  _____  _____

6         REASON:_____

7      _____  _____  _____

8         REASON:_____

9      _____  _____  _____

10         REASON:_____

11      _____  _____  _____

12         REASON:_____

13      _____  _____  _____

14         REASON:_____

15      _____  _____  _____

16         REASON:_____

17      _____  _____  _____

18         REASON:_____

19      _____  _____  _____

20         REASON:_____

21      _____  _____  _____

22         REASON:_____

23      _____  _____  _____

24         REASON:_____

25

Alex LeBeau, PhD, MPH, CIH

1                ACKNOWLEDGEMENT OF DEPONENT

2

3         I, _____, do hereby

4    acknowledge that I have read the foregoing pages [1

5    - 253] and that the same is a correct transcription

6     of the answers given by me to the questions therein

7    propounded, except for the corrections or changes

8      in form or substance, if any, noted in the attached

9    Errata Sheet.

10

11

12    _____       _____

13    ALEX LeBEAU

14

15

16

17

18    Subscribed and sworn to before me this

19    _____ day of _____, 20____.

20    My Commission expires: _____

21

22    _____

23    Notary Public

24

25