Alan B. Morrison
George Washington University Law School
2000 H Street NW
Washington D.C. 20052
Tel. 202.994.7120
abmorrison@law.gwu.edu

Eric Policastro, CA Bar No. 264605
N. Majed Nachawati
S. Ann Saucer
FEARS NACHAWATI, PLLC
5473 Blair Road
Dallas, Texas 75231
Tel. 214.890.0711 / Fax 214.890.0712
epolicastro@fnlawfirm.com
mn@fnlawfirm.com
asaucer@fnlawfirm.com

[Additional counsel listed on signature page]

***Counsel for Objectors Howard Gee, Jr.,
Arleen Ward, Noel Alvarez, and William
Lawrence Craven***

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br>Case No. 16-md-02741-VC |
| This document relates to: | **OBJECTING CLASS MEMBERS GEE *ET AL.*'S  SUR-REPLY TO PLAINTIFFS' REPLY BRIEF AND AMENDED SETTLEMENT AGREEMENT** |
| Ramirez, et al. v. Monsanto Co. | |
| Case No. 3:19-cv-02224 | Re: Dkt. No. 12911 |
| | Date: May 19, 2021<br>Time: 10:00 AM<br>Place: Courtroom 4, 17th floor<br>Judge: Honorable Vince Chhabria |

## TABLE OF CONTENTS

I.    THE OPT OUT VIOLATES THE DUE PROCESS RIGHTS OF CLASS MEMBERS WITH NO NHL DIAGNOSIS ............................................................................. 2

II.   THE PROPOSED CLASS DOES NOT MEET THE REQUIREMENTS OF RULE 23 .... 11

III.  THE RECENT AMENDMENTS HAVE NOT CURED THE FUNDAMENTAL FLAWS IN THE SETTLEMENT. ................................................................................. 16

CONCLUSION ..................................................................................................... 20

Gee  Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)........................................................................ *passim*

*In re Deepwater Horizon*,
    739 F.3d 790 (5th Cir. 2014) ...............................................................12

*In re Diet Drugs Products Liability Litigation*,
    Nos. 1203, 99-20593, 2000 WL 1222042 (E. D. Pa. Aug. 28, 2000), *aff'd*
    *without opinion,* 275 F.3d 34 (3d. Cir. 2001) ...........................................6, 7, 8, 11

*Georgine v Amchem Products, Inc.*,
    83 F.3d 610 (3d Cir. 1996), *aff'd*, 521 U.S. 591 (1997) ..........................................12

*Lewis v. Casey*,
    518 U.S. 343 (1996)......................................................................................12

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950)......................................................................................14

*In re Nat'l Football League Players Concussion Injury Litig.*,
    821 F.3d 410 (3d Cir. 2016)...........................................................................8, 9

*Robert Ramirez v. Monsanto Co.*,
    No. 3:19-cv-02224-VC (N.D. Cal. April 24, 2019)...................................................13

*Trans Union LLC v. Ramirez*,
    No. 20-297 (Feb. 1, 2021)...............................................................................13

*Trans Union LLC v. Ramirez*,
    No. 20-297 (U.S., argued March 1, 2021) ...............................................12, 13, 15

**Other Authorities**

FED. R. CIV. P. 23 ............................................................................................*passim*

FED. R. CIV. P.  23(a)(3) & (4) ..............................................................................13

FED. R. CIV. P. 23(e)(5)(B)....................................................................................20

FED. R. CIV. P. 23(e)(1)(B)....................................................................................11

MODEL RULES OF PROF'L CONDUCT r. 1.8(f) (AM. BAR ASS'N 1983) ............................6

There's an old saying that if you put lipstick on a pig, the pig is still a pig.  The same is true of bad settlements. Even though plaintiffs tinkered around the edges, even though the result is a 90 page redline, and even though this is the third set of changes, the bad deal from the June 2020 settlement is still a legally unsupportable bad deal, even if a few of its flaws have been painted over.

In their Reply, plaintiffs expend many words extolling the virtues of their deal with Monsanto, in an effort to persuade the Court to overlook the legal rules that it must apply.  But the Supreme Court in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 622 (1997) made clear that federal courts "lack authority to substitute for Rule 23's certification criteria a standard never adopted—that if a settlement is 'fair,' then certification is proper."  Thus, this Sur-Reply focuses on the two main legal arguments that preclude preliminary approval of the settlement, even if it were fair, which it is not.

First, the Constitution cannot be read to permit Monsanto to require hundreds of thousands of unknown class members to opt out before the Court acts on the motion to approve. That is because there is no possible way for them to make an informed opt-out decision, yet if they fail to exclude themselves, they will: (a) lose their rights to sue for punitive damages; (b) have to wait more than four years to be able to sue at all; and (c) have to surmount the verdict of a science panel designed by Monsanto to create a substantial barrier to recovery by class members.  Second, the named unexposed class members lack standing to sue and cannot satisfy the Rule 23 requirements of typicality and adequacy of representation.

Third, a few days after plaintiffs filed their Reply, counsel for objectors the National Black Farmers Association and eight class members (the "Farmer objectors") filed a motion to withdraw their objection and at the same time dismissed their Roundup case against Monsanto.

Gee  Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

Instead of simply submitting a one-page statement saying that the objection was being withdrawn, they filed a seven-page motion setting forth the reasons why the latest changes to the settlement answered the points raised in their objection, and why the settlement should be approved by the Court.  However, as shown in Section III below, none of those changes are responsive to the arguments that the Farmer parties made in their objection, nor do the amendments come close to answering the other objections made by the Gee and other objectors.

## I.   THE OPT OUT VIOLATES THE DUE PROCESS RIGHTS OF CLASS MEMBERS WITH NO NHL DIAGNOSIS.

Under the proposed settlement, class members must exercise their right to opt out within 150 days of the dissemination of the notice of the final-approval hearing or suffer three significant losses if they later decide to sue Monsanto: (a) no punitive damages; (b) at least a four-year delay before being able to file their lawsuit; and (c) having to surmount the hurdle of Monsanto's science panel.  It is undisputed that no other case has all three of these burdens for those who do not opt out, and in fact no other case has a science panel remotely like this one.  Only someone blinded by reality could refer to these as "modest restrictions."  Reply, Doc. 12911, at 2. Even more remarkable is that class counsel approved the new form of notice that will be sent to the entire class which contains the following clearly misleading statement: "Any science panel determination will not affect class members' rights."  Doc. 12975-1, Page 2 of 3.

Equally important to the analysis of why the opt out here is unconstitutional is that no member of subclass 2, by far the larger of the two subclasses, has NHL, and many may not even be aware of their exposure to Roundup.  In order to exercise their right to opt out, they must first receive the notice that class counsel proposes to disseminate.  As the Russell Post (Doc. 12677, at 3-10) and the Farmer objections (Doc. 12678, at 8-10) demonstrated, there is a very remote possibility that the vast majority of this subclass will ever see or hear of the case and of the

opportunity to exclude themselves from the settlement.  Nothing in the most recent settlement

amendments makes it possible to do the near impossible: assure that the class as a whole

becomes aware that there is a settlement and that their rights will be affected unless they take

action by the opt out date.

Even if every class member received a notice, that is only the beginning of the problem.

As the Court described the problem in *Amchem,* reiterating what the Third Circuit had

recognized:

> Many persons in the exposure-only category, the Court of Appeals stressed, may
> not even know of their exposure, or realize the extent of the harm they may incur.
> Even if they fully appreciate the significance of class notice, those without current
> afflictions may not have the information or foresight needed to decide,
> intelligently, whether to stay in or opt out.

521 U.S. at 628.  The problems identified in *Amchem* are at least as daunting, if not more so,

here. Assuming that all members of the exposure-only class can read in one of the languages in

which the notice will be given, and they can understand the meaning of the words, the much

bigger problem is trying to figure out what to do. By definition, none of these class members

have NHL, let alone do they have any idea how ill they will be, or what their circumstances will

be, if they are diagnosed with NHL.   The seriousness of their disease would surely affect

whether the alternative compensation system might be a reasonable alternative, but they cannot

know that key fact when they have to make the opt out decision.  Even this assumes that

farmworkers and others like them will actually be able to comprehend how the compensation

system will work.  And to know how valuable a claim for punitive damages might be, class

members would have to know how serious their illness would be, which of course they cannot

know.  Similarly, the harm from the four-year stay would be very different for someone who was

Gee  Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

diagnosed in the first six months of that period rather than in the last, but again the timing is unknowable.[1]

Then there is the need to calculate the impact of the science panel – a difficult task for even experienced toxic tort lawyers.  Monsanto and class counsel attempt to assure the Court that the panel is impartial and will render a fair verdict.  But then one should ask, why does Monsanto want to take the issue of Roundup's safety out of the tort system where it has been decided in three prior cases unless it is to give Monsanto a significant advantage in subsequent litigation?  To be sure, we cannot precisely measure how much of an advantage the panel will provide, but we know for certain, as other objections make clear, that Monsanto would not have insisted on it if it did not believe that this was the ultimate get out-of-jail almost free card, at a cost of no more than $2 billion.  Moreover, the debate about how much the science panel will actually harm class members and benefit Monsanto further underscores how impossible it is for anyone to make an informed decision, especially for this exposure-only subclass.[2]

Not to worry, assures class counsel, the attorneys in its Legal Services Program will come to the rescue under their newly granted power to advise class members on whether to opt out.

---

[1] The stay is almost certain to be much longer than four years.  It begins once a class member has failed to opt out, which is before the Court hearing on final approval and "shall remain in effect until 90 days following the conclusion of the Initial Settlement Period," Section 18.2(b)(ii).  The Initial Settlement Period starts no sooner than the date of final approval in this Court and can run as long as any appeals are pending, including in the Supreme Court (Section 2.1(27), 2.1(41)), hardly a "temporary litigation stay" as characterized by class counsel (Reply at 18).  As for class counsel's assertion that this is a "delay that class members would largely face anyway" (Reply at 30), that conveniently overlooks the fact that if class members can only opt out in four years, they would go to the back of the litigation line.

[2] Another amendment will permit class members to opt out before the four-year stay expires, but only in cases of "Exceptional Hardship."  Section 18.2(b)(iv).  Assuming a class member was aware of this exception, no sensible person would rely on that very circumscribed possibility in assessing the pros and cons of opting out immediately, and, if anything, the exception may make the choice even more complicated.

Gee  Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

On April 27th, class counsel filed their "preliminary plan" to provide legal services during the opt out period, although the settlement agreement has not been amended and many details, such as how many lawyers there will be and how their compensation will be determined, are left open. There is one conclusion that is clear from this new plan: class counsel has effectively conceded that, left to their own devices, there is no way that exposure-only class members can make the kind of intelligent decision required by *Amchem*, which is why these lawyers are necessary. Furthermore, it is also clear that nothing proposed under this program is capable of curing the three major problems precluding exposure-only class members from making an informed choice about whether to opt out.

First, as the Farmer objectors and others have shown, it will be incredibly difficult if not impossible for notice to actually reach the exposure-only class. Because the legal services assistance depends on class members contacting the lawyers, not the other way around, unless class members receive the notice and reach out to the program's lawyers, all the lawyers in the world cannot possibly help.

Second, if a program lawyer is contacted by class members, there will be a very short time until the opt-out date by which they must make a very complex decision that almost certainly differs from person to person. To provide proper advice, any lawyer would have to interview the class member thoroughly, gather other relevant information, and then analyze that person's circumstances in light of the settlement options.  Even assuming that the program's lawyers are able to help some class members make informed decisions, they surely cannot do that for more than a tiny percentage of the class.

Third, these LSP lawyers will be appointed by, regularly supervised by, and have their pay approved by class counsel, from the funds coming from Monsanto as part of the $170

Gee  Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

million allocated to class counsel.  Nonetheless, class counsel assures the Court that these lawyers will be absolutely neutral in their opt out recommendations.  However, there is a good reason why Rule 1.8(f) of the Rules of Professional Conduct forbids lawyers from having third parties pay their fees, instead of their clients, unless the client gives "informed consent" and there is "no interference with the lawyer's independence of professional judgment." MODEL RULES OF PROF'L CONDUCT r. 1.8(f) (AM. BAR ASS'N 1983). The reason for the Rule is that third party payments create the temptation to the lawyer to prefer the interest of the one who is paying the bills over that of the client.  Even assuming that the LSP program is useful for those who are trying to navigate the compensation system under the settlement, it surely does not provide appropriate protection for unexposed class members regarding their vital front end opt out decision.

In their Reply, plaintiffs rely very heavily on *In re Diet Drugs Products Liability Litigation,* Nos. 1203, 99-20593, 2000 WL 1222042 (E. D. Pa. Aug. 28, 2000), *aff'd without opinion,* 275 F.3d 34 (3d. Cir. 2001), which they claim is much more like this case than *Amchem.* To be sure, this settlement appears to have cured one of the *Amchem* flaws by creating sub-classes as did *Diet Drugs*.  But that cure is an illusion here because both the NHL diagnosed sub-class and the exposure-only class are subject to exactly the same onerous opt-out restrictions: they both must make an opt out choice before the fairness hearing, and they are both stuck with the adverse consequences from staying in the settlement.  Arguable differences with *Amchem* that favor the class here do not solve the Due Process violation caused by the fact that the exposure-only subclass members are highly unlikely to receive the notice, and are almost certainly incapable of comprehending the choice that they must make to avoid losing valuable

litigation rights, a choice that the District Court in *Diet Drugs* recognized was mandated by *Amchem. Id*. at *39.

Objectors do not concede that *Diet Drugs* was correctly decided, but in any event, there are significant differences between the two cases that show why the members of the exposure-only subclass here cannot make the kind of intelligent choice that Due Process and *Amchem* require. The factual distinctions from *Diet Drugs* essentially fall into two related and partially overlapping categories that bear directly on the Due Process issue: the likelihood that class members will receive the notice, and the likelihood that they will be in a position to make the kind of choice needed to satisfy Due Process.

### RECEIPT OF NOTICE IN *DIET DRUGS*

- The harmful products were two prescription drugs, making it relatively easy to identify and notify the class;

- Because all of the class knowingly took these diet drugs, *id*. at *46, class members would certainly be alerted to any notice about the settlement;

- The drugs had been withdrawn from the market by the FDA two years before the settlement, "accompanied by an unprecedented amount of publicity which effectively warned diet drug users that they may have developed valvular lesions which could be detected through non-invasive echocardiograms." *Id*. at *18; and

- "Also, these lesions are not latent. If they are going to occur, they are going to occur during drug use (or shortly thereafter) and be demonstrable on echocardiogram" increasing the likelihood that class members will react to a notice for a known condition. *Id*.

### LIKELIHOOD OF COMPREHENSION IN *DIET DRUGS*

- Class members were generally English speaking, United States residents, reasonably well-educated, with enough resources and/or access to medical care to be able to obtain these prescription drugs, in contrast to the class composition here, consisting of widely dispersed laborers and others who may not understand our legal system, let alone class actions and the importance of the opt-out decision;

- Many of the class members had attorneys (there were 18,000 individuals in the class who had filed lawsuits) whom they had retained and were loyal to them and not paid by class counsel. *Id*. at *3;

Gee  Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

- There were four different opt outs, keyed to events relevant to each class member. *Id*. at *25-26;

- Much if not most of the harms that class members suffered had already occurred, making the opt-out choice much clearer;

- There were no automatic delays, let alone a delay of four years, and no science panel further complicating the choice.

Like this case, there was a waiver of punitive damages in *Diet Drugs* for those who did not opt out initially, but the punitive damages waiver there came with one huge difference:  a punitive damages claim was much less valuable because those drugs were off the market, and so there would be very little deterrence from a jury awarding punitive damages in addition to compensatory damages. By way of contrast, Monsanto will continue to sell and reap great profits from Roundup, with no change in its label other than providing a link to studies that discuss its risks, assuming that class members see the label, follow the link, and can read and understand what is there. With no threat from punitive damages unless class members opt out, Monsanto's major risk is gone at a cost of $2 billion.  Moreover, none of the *Diet Drugs* cases had gone to verdicts when the settlement was reached, let alone were there multi-million verdicts, each with an award of punitive damages.[3]

Just as the opinion in *Diet Drugs* is not applicable to the present matter, the NFL concussion opt-out choice also bears no relation to this one.  *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410 (3d Cir. 2016). Consider the following distinctions:

- The class size was only about 21,000. *Id.* at 425;

---

[3] If a class member exercised a back-end opt out there, the defendant could not "raise a defense based on a statute of limitations or repose or a defense based on improper splitting of a cause of action." *Diet Drugs*, 2000 WL 1222042 at *20. On the other hand, there was no mention of any preemption defense, which Monsanto continues to raise in every Roundup case.

Gee  Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

- The class consisted of retired NFL players, *id.*, almost all of whom the defendant could easily contact, making notice a non-issue;

- Every class member knew both whether he had suffered a concussion while playing in the NFL, and that a concussion could cause various diseases in the future;

- Almost all class members had an attorney (there were 5000 individual cases filed) or would have no trouble locating one to represent them. *Id.* at 421;

- The settlement grid was easy to understand, if not always easy to apply, and provided million-dollar recoveries for those unfortunate enough to contract one of the covered diseases, thereby simplifying the opt out choice. *Id.* at 423-24;

- No concussion case had gone to trial or been settled, in contrast to here, where there have been the three plaintiff victories, with multi-million-dollar verdicts (including punitive damages), followed by billions of dollars of Roundup inventory settlements.

- There was no science panel whose possible judgments had to be factored into the opt-out decision.

As these facts show, there was no issue of notice, and indeed no one claimed that the opt-out choice was unfair, let alone violated Due Process, which is the essence of objectors' argument here.  To be sure, the timing of the opt out in *NFL Players Concussion Injury Litig.* was similar to this case, and there was no back-end opt, even one with restrictions.  And like this case, a failure to opt out precluded any claim for punitive damages, although the settlement awards were already very large, and the likelihood of persuading a jury to award punitive damages in those circumstances would be very small.  But the opt-out situations and choices for the retired NFL players were simply not in the same universe of problems as those that the broad class of exposure-only farmworkers and other victims will encounter here. Accordingly, the lack of a Due Process violation in the NFL concussion case does not support the constitutionality of the front-end opt out that the settling parties seek to require here.

The most remarkable statement in plaintiffs' Reply is on page 58: "Objectors and amici have an aversion to class members making individual choices."  That charge was leveled in connection with objections to the accelerated payment option based on the short time within which it must be exercised, and the high likelihood that the lure of quick cash, without proper legal advice, will stand in the way of a thoughtful decision.  But it is more than a little ironic that class counsel are standing up for individual choice on accelerated payments when they have embraced the settlement's requirement of an inevitably ill-informed front-end opt out, where the failure to exercise it will cost class members the opportunity to seek punitive damages and will burden any future litigation by a four-year delay and the determinations of a Monsanto-created science panel.[4]

***

Class counsel have argued that the Court should approve the notice and not "stop the settlement in its tracks" or "deny class members a right even to consider the settlement," Reply, Doc. 12911, at 4, 8, on the apparent theory that objectors will have another opportunity in six months to persuade the Court not to give final approval.  There are two major flaws with that approach.  First, this opt-out-based objection is constitutional, and all the relevant facts are established now.  Unlike other objections, such as that the compensation program is unreasonable or that additional flaws in the science panel need correction, this defect is not one on which the views of class members, or further tinkering with the settlement, can provide a

---

[4] Even focusing on the accelerated payment option, it is class counsel who has agreed to a lock-in provision for anyone who applies for that option: "You cannot reject an award through the Accelerated Payment Program. By [even] applying, you agree that you will give up your right to sue Monsanto for damages related to Roundup and NHL in exchange for the $5,000 payment." Revised Notice, Question 52, at Doc. 12975-2, p. 19.

Gee  Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

cure.  Monsanto has never wavered in its insistence on the science panel and a complete waiver of punitive damages.  As long as they are part of the settlement, the front-end opt out is unconstitutional under *Amchem,* and is not saved by *Diet Drugs.* There is no reason to defer that constitutional ruling until the fairness hearing.

Second, the former "it's just a preliminary approval" approach was thoroughly rejected by the 2018 amendments to Rule 23(e).  Those amendments require district judges to be satisfied that approval of the proposed settlement is "likely,"[5] which at least means concluding that there are no constitutional problems and that the requirements of Rule 23 have been met.  The new Rule recognizes the momentum that builds after preliminary approval, and it mandates that judges do much more upfront than in the past.

## II.     THE PROPOSED CLASS DOES NOT MEET THE REQUIREMENTS OF RULE 23.

The proposed class is divided into two subclasses, the first consisting of those who have been exposed to Roundup and have been diagnosed with NHL, and the second of those with exposure only and no NHL diagnosis.  Objectors have doubts that the first subclass is a proper class but will not dwell on it because it is obvious that the only reason that Monsanto wants to do this settlement is to bind the exposure-only subclass.  Therefore, unless that subclass is proper, which it is not, the settlement cannot go forward even if the presently-injured subclass could be maintained on its own.

As plaintiffs effectively concede by creating two subclasses, the NHL-diagnosed class representative, plaintiff Ramirez, cannot represent the exposure-only subclass, which is in reality a separate class.  A necessary element of a class is that its members have standing to sue.  But

---

[5] FED. R. CIV. P. 23(e)(1)(B).

plaintiffs have never explained how exposure-only plaintiffs have standing to sue for money damages when they have suffered no injury that currently entitles them to that relief. It is irrelevant whether they have standing to sue on a claim for medical monitoring because the settlement and the release is for the claims for money damages. *Compare In re Deepwater Horizon*, 739 F.3d 790, 802 (5th Cir. 2014) ("[B]oth the named plaintiffs and the absent class members contemplated by the class definition include only persons and entities who can allege causation and injury in accordance with Article III."). As the Supreme Court made clear in *Lewis v. Casey,* 518 U.S. 343, 357-58 (1996), each claim in a class action must be examined separately, which precludes the use of medical monitoring claims to support a damages class. Moreover, while the Court in *Amchem* did not reach the question of whether a separately represented exposure-only class had standing to sue for possible future damages, Justice Ginsburg's opinion recognized the seriousness of that issue, citing the concurring opinion of Judge Wellford in the Third Circuit who concluded that exposure-only class members did not have standing to sue for the future monetary relief provided in the settlement. 521 U.S. at 611-612.[6]

Also of potential significance is the forthcoming decision in *Trans Union LLC v. Ramirez*, No. 20-297 (U.S., argued March 1, 2021) in which co-lead counsel for plaintiffs here represent the class there. A large part of the class there had not suffered actual injuries, but nonetheless were awarded statutory damages at trial. One argument that the defendant is making in the Supreme Court is that those class members had no standing even to assert statutory

---

[6] The Wellford concurrence quoted from testimony of several exposure-only class representatives that made it clear that they had no present claim for money damages and were never offered an opportunity to bring an individual suit based on such a claim. *Georgine v Amchem Products, Inc.,* 83 F.3d 610, 636-38 (3d Cir. 1996) (Wellford, J., concurring), *aff'd*, 521 U.S. 591 (1997). Should class counsel dispute that the same answers would be given by the exposure-only class representatives here, objectors will seek leave to depose them.

Gee  Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

damages.[7]  If that position is sustained, and objectors take no position on that issue, it would surely mean that the exposure-only subclass here has no standing to "sue for money damages" now, which is the claim that the subclass makes to support the settlement.

Even if standing is overcome, there are serious typicality and adequacy-of-representation issues under Rules 23(a)(3) & (4) that preclude certification, which plaintiffs' Reply largely left unrebutted.  Indeed, the declarations of the subclass representatives submitted with their Reply raise additional problems under both provisions.  Reading plaintiffs' briefs, one would think that the exposure-only subclass mainly consists of farmworkers and others in similar circumstances. However, the declarations from the subclass representatives do not support that picture.  Aaron Sheller is a farm owner, and Kabe Cain owns a farm equipment dealership.  *See* Decl. Sheller ¶2, Doc. 12911-10; Decl. Cain ¶2, Doc. 12911-11. Indeed, even the NHL-diagnosed class representative Robert Ramirez is not an agricultural worker, but instead worked for Roto-Rooter in Salinas, California from 1999 to 2013 where he utilized a concentrated mix of Roundup in the maintenance yard.  Complaint ¶ 6, *Robert Ramirez v. Monsanto Co.,* No. 3:19-cv-02224-VC (N.D. Cal. April 24, 2019) [Doc. 1, Page 3 of 86].  As far as the record shows, none of the class

---

[7] These are the headings of Argument I in the merits brief of petitioner, taken from the table of contents:

   I.  Ramirez Failed To Prove That Any, Let Alone All, Absent Class Members
       Suffered An Article III Injury.
      A.  Concrete Injury For Every Class Member In A Damages Class Is Non-
          Negotiable.
      B.  Concrete Injury Is Lacking Here.

Brief for Petitioner, *Trans Union LLC v. Ramirez*, No. 20-297 (Feb. 1, 2021), available at https://www.supremecourt.gov/DocketPDF/20/20-297/167775/20210201120011675_2021-02-01%20TU%20merits%20opening%20brief%20Final.pdf (last accessed May 2, 2021) ("Petitioner *Trans Union* Brief").  The named plaintiff in *Trans Union* and in this case have the same last name, but are not, to our knowledge, related.

Gee  Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

representatives were exposed as a farmworker nor are they currently engaged in that occupation. In addition, the declaration of Jeremy J. Wieck raises additional questions about the composition of this subclass.  He has concluded, using two different methods, that approximately 90% of those who have settled Roundup cases are residential users, who may include individuals like plaintiff Ramirez who was exposed at an in-town job under circumstances far different from those of a typical farmworker. *See* Dec. Wieck, Doc. 12911-8.

To be clear, the differing circumstances under which farmworkers and the proposed class representatives were exposed to Roundup would not be relevant if they all had an NHL diagnosis. Thus, if this class were composed solely of NHL diagnosed individuals, that would not be a problem, because the notice and understanding-of-their-rights problems discussed above would be much reduced.  But the lack of typicality, which also raises adequacy of representation issues, is troublesome for two reasons applicable to this case.

First, if the subclass consists of people like Sheller and Cain, the problem in trying to reach individuals in their situations would be quite different from having to reach hundreds of thousands of Roundup-exposed farmworkers, many of whom are migrants and no longer reside in the United States.  Moreover, the class representatives are expected to exercise their judgment in assessing the likelihood that notice will reach – and be understood by – the subclass as a whole.  But in making that judgment, the chosen representatives will certainly be influenced by the relative ease with which they can be located, in contrast with the bulk of the subclass who, according to plaintiffs, are comprised of farmworkers.  Thus, these class representatives are plainly not typical of the subclass for the purpose of assuring that most class members are given reasonable notice and a meaningful opportunity to participate in the opt out decision as Due Process requires.  *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313-14 (1950).

Second, the very different circumstances of these subclass representatives, as compared to the typical farmworker, means that their appraisals of the strengths and weaknesses of the settlement, including the pros and cons of opting out, are almost certain to be quite different. Moreover, the likelihood that persons like the class representatives will be able to obtain pre-opt-out advice, whether from the Legal Services Program or private attorneys, will again be much different from the farmworkers whose interests they are supposed to protect.  Again, the second argument in the *Trans Union* case presents this typicality in a posture such that its resolution is likely to be of assistance to this Court on this motion, because the second argument in the defendant's brief raises the question of the necessary relation between the claims of the named plaintiff and the remainder of the class: "Ramirez Was Demonstrably Not Typical Of The Class He Sought To Represent." Petitioner *Trans Union* Brief, p. 43.

There are additional grounds for questioning whether these subclass representatives are typical and/or can adequately represent their subclass.  First, objectors questioned whether the class representatives were ever given the opportunity to have any class counsel represent them in an individual suit against Monsanto, especially since plaintiff Ramirez has NHL and thus a clearly ripe claim for litigation. *See* note 6 *supra* where the same issue was raised in Judge Wellford's concurrence.  If the proposed class representatives did not have such an offer, then they would not be typical of the remainder of the class who would be faced with the opt-out choice that class representatives did not have. Noticeably absent from the recent declarations of any class representative is a statement that they were given the opportunity to have their lawyers bring an individual case on their behalf.  There is an obvious reason that the exposure-only class representatives were not given that choice, but it hurts rather than helps class counsel: exposure-

Gee  Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

only individuals had no claim for money damages that would permit them to sue, which is precisely the standing problem discussed above.

Finally, the typicality and adequacy of representation defects are magnified by class counsel's promise to seek $25,000 in incentive payments for each of them, to be paid from class counsel's requested $170 million fee.  With that offer in hand, how could these individuals ever be expected to say a negative word about the notice program or the settlement, and of course they have not.  Equally significant is that none of the reply declarations of class representatives denied that the promise was made or suggested that it was subject to any conditions that would cure the obvious conflict-of-interest situation in which they are found.

As in *Amchem*, where there were both constitutional and Rule 23 objections to class certification, this Court may appropriately reject the proposed class certification under Rule 23, without having to reach either the standing or Due Process objections.  *See Amchem*, 521 U.S. at 628.

### III.    THE RECENT AMENDMENTS HAVE NOT CURED THE FUNDAMENTAL FLAWS IN THE SETTLEMENT.

Several days after plaintiffs filed their Reply, the National Black Farmers Association and the eight individuals who joined in the Farmer objection filed a motion seeking leave to withdraw their objection.  Supporting that motion were seven pages of reasons why the changes that plaintiffs discussed in the Reply Brief and in the redline of the settlement agreement were so significant that they justified the Farmers' 180 degree change of position from vocal opposition to strong support.  The effect of that motion is that plaintiffs now have an additional amicus brief to support their motion. What is most significant about that filing is that it is presumably the best efforts of those former objectors to support the settlement, and yet, as we now show, it fails to rebut the objections made by the Gee objectors (as discussed above), and perhaps even more

16

significant, does not justify the abandonment by the Farmer objectors of their prior reasons for

opposing the settlement.

The relevant portion of the table of contents to the Farmer objection, Doc. 12678, p. i,

makes the basis of their concerns abundantly clear:

ARGUMENT ...........................................................................................................4

I.   The Constitution Prohibits Binding The Exposure-Only Class To The Proposed
     Settlement ........................................................................................................ 4

     A.   The kind of notice proposed here is never sufficient to bind an absent exposure-
          only class member ............................................................................................ 4

     B.   Binding an exposure-only class is only permissible, if at all, with certain special
          factors that are absent here ............................................................................. 11

     C.   It is assuredly unconstitutional to bind those who do not know they've been
          exposed, which the proponents admit this settlement does ........... .................. 21

II.  The Settlement's Quasi Back-End Opt-Out Right Does Not Excuse This
     Constitutional Failure ................................................................................... 26

The most significant aspect of the motion to withdraw is what it does not say.  The

principal authorities in the Farmer objection were *Amchem* and Rule 23, which were both listed

in their table of authorities as being cited *passim*. Doc. 12678, pp. ii, v. However, their motion to

withdraw does not mention *Amchen*, and the only reference to Rule 23 is on page 7 where the

motion simply observed that the amendments to the settlement "substantially changed the Rule

23 calculus."  Doc. 12927. It is not just the failure to cite either authority that is so revealing.

There is no explanation why their 22-page attack in Point I of the objection, regarding the

inadequacy of the notice and the difficulties there will be in locating class members who do not

have NHL, has suddenly vanished, and all the problems they pointed out have evaporated – even

though there is no basic change in the notice program. Indeed, the term "notice" appears only

twice in their motion to withdraw, both times referring to whether class members will have a

Gee  Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

meaningful chance to "attend to the class notice," not whether they will receive the notice at all.[8] Doc. 12927, pp. 1,3.

Despite their prior arguments, the motion to withdraw stated that their principal concerns would be resolved "if those class members have a truly effective opportunity to decide whether or not to accept the deal for themselves." *Id*., p. 1.  Those concerns are very significant and are at the heart of the objections made by the Gee objectors discussed above.  But those concerns matter only if the class has a reasonable opportunity to receive the notice which, as the Farmer objectors discussed at length, is seriously in doubt.  Thus, even if the Farmers are correct in their claim that the back-end opt out right may be "more fulsome," *id*., p. 2, that does not cure the fact that, as the Farmer objectors argued, most class members will never get the notice, let alone be able to understand it and act intelligently based on that understanding.

The Farmer motion to withdraw next listed the seven (and presumably the most significant) changes that they had negotiated with Monsanto, with the most prominent being "a change that was made to the science-panel provisions of the settlement on the eve of our previous objection." *Id*.  Quite aside from the fact there still is a science panel to which all non-opt-out class members are subject, a less-bad science panel has *nothing to do* with whether class members will receive notice or be able to make intelligent decisions based on any notice they do receive.  If anything, the change made the impact of the science panel more uncertain, but it did not eliminate its central role for Monsanto or do anything to offset the permanent loss of the right to seek punitive damages or the four-year stay.

---

[8] Plaintiffs had not delivered their promised changes in the notice when the motion to withdraw was filed, and so they cannot have been a basis for the about face.

Gee  Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

Nor were the other reasons given by the Farmer objectors in their motion to withdraw sufficient to justify overriding their prior objections or approving the settlement. "*First*, the revised agreement substantially narrows the class definition."  *Id*.  They note that the class definition no longer includes (if it were ever sensibly read to include) "almost every living casual golfer, school child, teacher, park user, or produce eater." *Id*., p. 3.  There are, of course, no Roundup suits by anyone in those groups, but more important, excluding them does nothing to assure that actual class members who do not have NHL get notice or are reasonably able to make meaningful choices as to whether to opt out.

"*Second*, the revised agreement eliminates a limitation on the back-end right . . . of a class member's constitutional right to full compensatory damages." *Id*.  Again, a modest improvement, but one that is totally irrelevant to the notice problems so persuasively argued by the Farmer objectors before they changed their mind and dismissed their lawsuit against Monsanto.

"*Third*, the revised agreement substantially narrows the release as it relates to medical monitoring claims." *Id*., p. 4. This has even less to do with notice than do the prior changes because releases are given at the end of a case and do not touch on the constitutionality of the front-end opt out or whether Rule 23 was satisfied.

"*Fourth*, the revised agreement provides for the focused delivery of information to minority farmers," *id*., p. 5, which is fine, but does nothing for the majority of exposure-only class members who are not in that group. Moreover, there is no indication that the additional information is being provided at the front end, or that it will reach any substantial number of class members.  In fact, this and the next paragraphs suggest that this improvement primarily relates to the DAG program which starts only after the opt-out period has ended.

Gee  Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

The other changes are equally irrelevant to curing the fundamental upfront constitutional flaws in this settlement or removing the Rule 23 impediments to class certification. They are the allowance of assignment of claims, *id*., p 5; limiting the release to injuries from NHL, *id*., p. 6; and making available all Roundup related materials for future litigants - if the delay, the science panel, and the inability to seek punitive damages do not make suing Monsanto no longer worth a lawyer's time and money to handle.

There is one other matter related to the motion to withdraw that we wish to call to the Court's attention. The Farmer objection was filed on behalf of the National Black Farmers Association, which had a pending lawsuit against Monsanto, mainly for medical monitoring. That lawsuit was dismissed about the same time as the motion to withdraw was filed. In addition, the Farmer objection was filed on behalf of four individuals who had been diagnosed with NHL and four others who had not been so diagnosed. *Id*., p. 1, n.*. There is nothing in the motion to withdraw indicating whether Monsanto settled any claims of the Farmer objectors, but the timing of these events suggests that some or all of the claims of the objectors may have been settled by Monsanto, with whom the Farmer objectors stated that they had been negotiating. *Id*., p. 1). If so, the Court may wish to inquire as to the application of Rule 23(e)(5)(B), which provides as follows:

> Unless approved by the court after a hearing, no payment or other consideration may be provided in connection with: (i) forgoing or withdrawing an objection.

## CONCLUSION

The latest amendments to this class action cannot cure its Due Process and Rule 23 defects.

Dated: May 3, 2021                                    Respectfully Submitted,

                                                         */s/ Eric Policastro*

Eric Policastro, CA Bar No. 264605
N. Majed Nachawati
S. Ann Saucer
FEARS NACHAWATI, PLLC
5473 Blair Road
Dallas, Texas 75231
Tel. 214.890.0711 / Fax 214.890.0712
epolicastro@fnlawfirm.com
mn@fnlawfirm.com
asaucer@fnlawfirm.com

Alan B. Morrison
George Washington University Law School
2000 H Street NW
Washington D.C. 20052
Tel. 202.994.7120
abmorrison@law.gwu.edu

Gerald Singleton, Esq.
SINGLETON LAW FIRM, APC
450 A Street, 5th Floor
San Diego, CA 92101
Tel.  619.771.3473 / Fax 619.255.1515
gerald@SLFfirm.com

Amy Carter
Heather V. Davis
CARTER LAW GROUP, P.C.
5473 Blair Road
Dallas, TX 75231
Tel. 214.390.4173
amy@clgtrial.com
hdavis@clgtrial.com

James G. Onder
W. Wylie Blair
Mark E. Berns
ONDER LAW, LLC
110 E. Lockwood, 2nd Floor
St. Louis, MO 63119
Tel. (314) 963-9000/Fax. (314) 963-1700
blair@onderlaw.com
onder@onderlaw.com
berns@onderlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of May 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

/s/ Eric Policastro
Eric Policastro
FEARS NACHAWATI, PLLC
5473 Blair Road
Dallas, Texas 75231
Tel. (214) 890-0711
Fax (214) 890-0712
epolicastro@fnlawfirm.com

Gee  Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC