Russell Post
BECK REDDEN LLP
1221 McKinney Street, Suite 4500
Houston, TX 77010
Telephone: (713) 951-3700
Fax: (713) 951-3720
rpost@beckredden.com

David F. Engstrom (SBN 314688)
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: (650) 721-5859
Fax: (650) 725-0253
dfengstrom@law.stanford.edu

*Counsel for Objectors Arnold & Itkin LLP and Kline & Specter, P.C.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL NO. 2741 |
|  | Case No. 3:16-md-02741-VC |
| THIS DOCUMENT RELATES TO: | **Sur-Reply in Opposition to Motion for Preliminary Approval of Proposed Class Settlement, Appointment of Interim Class and SubClass Counsel, Direction of Notice under Fed. R. Civ. P. 23(e), Scheduling of a Fairness Hearing, and Stay of the Filing and Prosecution of Roundup-Related Actions by Settlement Class Members** |
| Ramirez, et al. v. Monsanto Co., | |
| Case No. 3:19-cv-02224 | |
|  | Re:     Dkt. No. 12531 |
|  | Date:   May 19, 2021 |
|  | Time:   10:00am |
|  | Place:  Courtroom 4, 17th Floor |
|  | Judge:  Honorable Vince Chhabria |

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Sur-Reply in Opposition to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS..............................................................................................................i

TABLE OF AUTHORITIES .......................................................................................................ii

INTRODUCTION ........................................................................................................................1

ARGUMENT ...............................................................................................................................3

I.    Due Process Prohibits Binding Absent, Exposure-Only Class Members to the Proposed Settlement..................................................................................3

II.   Settlement 3.0's Opt-Out Right Remains Illusory and Cannot Cure the Constitutional Failure..............................................................................................10

       A.    The Science Panel Is Not Neutral in Its Structure, Operation, or Effect....................................................................................................12

       B.    The Proposed Settlement Remains an Unfair and Unprecedented Displacement of Judge and Jury. .......................................17

CONCLUSION............................................................................................................................20

CERTIFICATE OF SERVICE ...................................................................................................21

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC

i

# TABLE OF AUTHORITIES

## CASES:

*Allen v. McCurry*,
   449 U.S. 90 (1980)................................................................................16

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)...................................................................1, 3, 4, 6

*Clark v. Cantrell*,
   529 S.E.2d 528 (S.C. 2000) ....................................................................8

*In re Diet Drugs*,
   No. 1203, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000)........................4

*In re E.I. du Pont de Nemours & Co. C8 Personal Injury Litig.*,
   2017 WL 237778 (S.D. Ohio 2017).....................................................18

*Georgine v. Amchem Products, Inc.*,
   83 F.3d (3d Cir. 1996).............................................................................6

*In re Hyundai & Kia Fuel Econ. Litig.*,
   881 F.3d 679  (9th Cir. 2018), *on reh'g en banc*, 926 F.3d 539 (9th Cir. 2019) .......................1

*In re Hyundai*,
   926 F.3d (9th Cir. 2019) ..........................................................................1

*In re Johns-Manville Corp.*,
   600 F.3d 135 (2d Cir. 2010)....................................................................3

*In re Joint E. & S. Districts Asbestos Litig.*,
   830 F. Supp. 686 (E.D.N.Y. 1993) .........................................................8

*Kane v. Johns-Manville Corp.*,
   843 F.2d 636 (2d Cir. 1988)..................................................................13

*Pitts v. Terrible Herbst, Inc.*,
   653 F.3d 1081 (9th Cir. 2011) ................................................................7

*Stephenson v. Down Chemical Co.*,
   273 F.3d 249 (2d Cir. 2001), *aff'd in relevant part by an equally divided court*, 539 U.S. 111 (2003) ...............................................................3

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                                    ii

**MISCELLANEOUS:**

Alexandra D. Lahav,
*The Knowledge Remedy*,
98 TEX. L. REV. 1361 (2020) .......................................................................8

6 Am. Jur. 2d Assignments § 47 ..................................................................8

C8 Class Action Settlement Agreement §§ 3.3,
10.2.2(a)(6), Dkt. 820-8, Case No. 2:13-md-02433-EAS-EPD
(S.D. Ohio filed Sept. 3, 2014) ...................................................................18

FEDERAL JUDICIAL CENTER,
NEUTRAL SCIENCE PANELS: TWO EXAMPLES OF PANELS OF COURT-APPOINTED
EXPERTS IN THE BREAST IMPLANTS PRODUCT LIABILITY LITIGATION 20-21, 51,
63-79 (2001), https://www.fjc.gov/content/neutral-science-panels-two-
examples-panels-court-appointed-experts-breast-implants-product-1 ...................17

Luoping Zhang et al.,
*Exposure to Glyphosate-Based Herbicides and Risk for Non-Hodgkin
Lymphoma: A Meta-Analysis and Supporting Evidence*,
781 MUTAT RES. 186 (2019),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6706269/ ...................................13

Report of the Judicial Conference Ad Hoc Committee on Asbestos Litigation 2-3
(Mar. 1991) ...................................................................................13

Robert N. Hoover,
*Adverse Health Outcomes in Women Exposed In Utero to Diethylstilbestrol*,
365 NEW ENGL. J. MED. 1304 (2011),
https://www.nejm.org/doi/full/10.1056/nejmoa1013961.....................................14

Sharon Milberger et al.,
*Tobacco Manufacturers' Defence Against Plaintiffs' Claims of Cancer
Causation: Throwing Mud at the Wall and Hoping Some of It Will Stick*,
15 TOB. CONTROL iv17, iv20 (2006),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2563590/ ...................................13

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                   iii

# INTRODUCTION

The proposed class settlement is now a sea of redlines, with dozens of tweaks made across virtually every one of its core components. The sheer number of changes, some coming even *after* putative Class Counsel filed their reply brief, puts the lie to their repeated assurances, beginning last summer, that each iteration of the proposed settlement was the product of intense, knock-down negotiations and so reflected the best deal possible.[1]   If the settlement was so good, why does it keep changing?

The many changes also powerfully underscore the concern that the *Amchem* Court, the Ninth Circuit, and leading commentators have all voiced:   Where (as here) a settlement-only class lacks any realistic prospect of certification as a litigation class, class counsel is disarmed in negotiations with the defendant. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621 (1997) ("Class counsel confined to settlement negotiations could not use the threat of litigation to press for a better offer. . . ."); *In re Hyundai & Kia Fuel Econ. Litig.*, 881 F.3d 679, 703 (9th Cir. 2018), *on reh'g en banc*, 926 F.3d 539 (9th Cir. 2019) (noting that the defendants "knew that there was little risk that they would face a nationwide litigation class action if they did not reach a settlement agreement," leaving class counsel "disarmed") (quoting *Amchem*, 521 U.S. at 621) (quotation marks omitted); Dkt. 12677-1 (Erichson Decl.) ¶ 9 (explaining the "inadequate-leverage problem"). For that reason, reviewing courts must give "undiluted, even heightened, attention" to a class settlement's terms. *Amchem*, 521 U.S. at 619; *In re Hyundai*, 926 F.3d at

---

[1] *See* Reply at 49, 50, 55 (filed Apr. 7, 2021) (noting that "no one is going to be able to get Monsanto to agree to pay $2 billion without it getting *something* in return" and asserting that the new version of the settlement was "negotiated carefully over many months," "obtains unprecedented benefits for the class," and is "a victory for the class"); Dkt. 12509 at 2, 41 (filed Feb. 3, 2021) (noting "intense" nature of "six months of difficult negotiations"); Dkt. 11042 at 16, 18, 50 (filed June 24, 2020) (describing "months of adversarial negotiation" and noting that "[n]egotiations were intense," "contentious," and "nearly collapsed").

David F. Engstrom

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                                    1

558 (9th Cir. 2019). The Constitution's and Rule 23's rigorous requirements—from notice to class cohesion to overall fairness—must be carefully scrutinized and scrupulously enforced.

At the same time, the many tweaks that have coalesced into Settlement 3.0 are just that: tweaks. They do nothing to address the core problems that afflicted Settlements 1.0 and 2.0. Notwithstanding the many recent revisions, the proposed settlement still cannot provide constitutionally adequate notice to the far-flung, unselfconscious, and amorphous legions of landscapers, agricultural workers, and suburban gardeners exposed to or injured by Roundup. These unlucky souls will be bound by the proposed settlement even though they are unlikely to learn of it until it's too late—and, even if they do, won't be able to parse its language or meaningfully weigh its terms.

That means that, to satisfy the minimum requirements of due process, there must be a fully unfettered back-end opportunity to opt out. But even with a fresh wave of amendments, the proposed settlement's back-end opt-out remains illusory because it is weighted down with unfair litigation impediments—a waiver of punitive damages, an inexplicable four-year litigation stay, and a juror-baffling and defense-slanted Science Panel—that make the choice whether to opt out no choice at all. And it remains the case that, for many class members, the proposed settlement will be pure downside:  Once the compensation scheme shutters after four years (plus a possible but to-be-negotiated extension), only the litigation impediments will remain. Settlement §§ 7.3(a), 7.13, 13.2, 13.4(b)-(e). For class members whose NHL diagnoses come after the end of the settlement period, *there will be nothing from which to opt out*. There is only a hobbled tort action.

In all of these ways, Settlement 3.0, like its prior iterations, remains an outlier:  a unique, and uniquely flawed, settlement plan with no analog in the annals of mass torts. No previous class settlement has released unmanifested personal injury claims of class members whose

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    2

exposures to a dangerous product are continuing to occur. And no other class settlement has released punitive damages claims relating to a dangerous product that is still on the market. For these two reasons alone, and even if it were otherwise fair, the proposed settlement cannot meet the threshold requirements for preliminary approval, for there is nothing putative Class Counsel or Monsanto could possibly say to salvage the deal. The motion should be denied.

## ARGUMENT

### I.      Due Process Prohibits Binding Absent, Exposure-Only Class Members to the Proposed Settlement.

The Supreme Court in *Amchem* long ago warned against what the parties are trying to do here:  bind a huge, sprawling, and hard-to-identify class, a large portion of whom are exposure-only plaintiffs who have not yet manifested any injuries. The *Amchem* Court, of course, had the luxury of deciding the case under Rule 23 based on that settlement's other severe defects, and so it only paused to note the "gravity" of the constitutional notice concerns. *Amchem*, 521 U.S. at 628. But lower courts hearing subsequent cases that more squarely tee up the issue have addressed these questions head-on, and those courts have rightly questioned whether binding future-injury plaintiffs to a class action settlement is *ever* appropriate. *See In re Johns-Manville Corp.*, 600 F.3d 135, 158 (2d Cir. 2010) (holding that plaintiff insurance company did not have "constitutionally sufficient notice" of a bankruptcy court's orders where its exposure-only insureds held claims that "were abstract, 'unimaginable,' and inchoate at the time"); *Stephenson v. Down Chemical Co.*, 273 F.3d 249, 261 & n.8 (2d Cir. 2001) (upholding a collateral attack on a class settlement because the plaintiffs were not adequately represented in the prior litigation, and then separately noting that the plaintiffs had "likely received inadequate notice" of the class

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                                                3

action in light of *Amchem*'s skepticism that notice "could ever be given to exposure-only class members"), *aff'd in relevant part by an equally divided court*, 539 U.S. 111 (2003) (per curiam).[2]

Running through these cases and a small handful since is a straightforward legal proposition, and it is the fairest accounting of the current doctrinal landscape unless and until the Supreme Court says otherwise:  Grave constitutional doubt hovers over *any* effort to bind absent, future-injury class members to a class settlement unless one of two special conditions exist that can ameliorate that doubt. First, the court might permit a settlement to bind absent, exposure-only class members if the class is especially discrete, identifiable, or otherwise cohesive—such that counsel can furnish some measure of individualized notice to absent class members. An example is *NFL Concussion*, with its finite, knowable, and tight-knit community of former professional athletes. Also illustrative but more of a stretch is *Diet Drugs*, on which Class Counsel so heavily rely for other purposes, in which a relatively homogenous class (*i.e.*, educated, middle-class women) consciously took a drug that required a prescription, leaving a record of those who had taken it and thus permitting individualized notice to nearly a million potential class members, another 750,000 physicians who had likely prescribed the drugs, and more than 100,000 pharmacists who had filled those scripts. *In re Diet Drugs*, No. 1203, 2000 WL 1222042, at *36–*39 (E.D. Pa. Aug. 28, 2000). *See generally* Opposition at 8-9 [Dkt. 12677] [hereinafter Opp.] (collecting other cases, each featuring significant individualized notice). Second, a special condition *might* exist if the class members are given a true back-end

---

[2] One of putative Class Counsel's supporting professor declarants attempts to reassure this Court that it will be in good company, invoking the *Agent Orange* case as evidence that other courts have approved notice programs in future-injury classes. Dkt. 12911-6 (Dodson Decl.) ¶ 26 (citing *In re Agent Orange Prod. Liability Litig. MDL No. 381*, 818 F.2d 145 (2d Cir. 1987)). The Second Circuit indeed let that one pass, but they have the wrong *Agent Orange*. Fourteen years later in *Stephenson*, the Second Circuit reached a very different result, permitting a collateral attack on the class where the compensation scheme had folded up by the time the plaintiffs' injuries were known. 273 F.3d at 260-61. As already noted herein, that perfectly describes this case, where a non-trivial proportion—and perhaps a quite large fraction—of class members will have their NHL diagnosed *after* the proposed settlement's compensation scheme has shuttered.

David F. Engstrom

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    4

opt-out right—that is, if class members are furnished an unfettered opportunity, once they fall sick, to decide that the settlement has secured for them something of value or, alternatively, to seek to vindicate their rights in court.

Unfortunately for Class Counsel, the settlement proposed here does not satisfy either condition.

The proposed settlement plainly flunks the first condition (*i.e.*, a particularly discrete, identifiable, and cohesive group), and the most recent round of revisions does not change matters. The addition of spoken-only indigenous languages to the proposed media blitz and the layering on of yet more verbiage, from yet another vendor declaration, about the advent of smartphones, how much poor Hispanic people use them, or the program's "state of the art" features, is not helpful. Indeed, this discussion merely exposes the glaring constitutional problem that is Subclass 2—surely the bigger of the two subclasses (likely in the hundreds of thousands) and composed in large measure of people who do not even know of their exposure to Roundup. It strains credulity, and it breaks the Constitution, to say that absent class members, many of whom are uneducated migrant and itinerant workers and cannot envision and, indeed, have never *heard* of a rare affliction they may or may not get, will attend to the sort of notice contemplated here, no matter how "state of the art" or flashy the media blitz.

But the notice problem gets worse, for meaningful notice also requires these same individuals to intelligently weigh, in the here and now and without any present injury, not two but *three* possible courses of action and related eventualities:  (i) opt-out now and, upon falling sick in the future, pursue a full and unfettered tort action; (ii) do nothing now and, upon falling sick, accept a compensation package keyed to where one ultimately, based on disease severity and other factors, falls on the grid; or (iii) do nothing now and, upon falling sick, opt-out—whether by choice or because NHL has presented too late and the settlement compensation

David F. Engstrom

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    5

scheme has shuttered—to pursue an impaired tort action. Even top-drawer lawyers backed by a stable of statisticians and epidemiologists could not put reasonable confidence bands around the expected result in each of these buckets. That sort of calculus was deemed too hard in *Amchem* even on the assumption that the class was composed of highly intelligent native English speakers who in fact received and read the class notice and understood its terms. *Amchem*, 521 U.S. at 591 ("Even if they fully appreciate the significance of class notice, those without current afflictions may not have the information or foresight needed to decide, intelligently, whether to stay in or opt out."); *see also Georgine v. Amchem Products, Inc.*, 83 F.3d at 610, 633-34 (3d Cir. 1996) (doubting the adequacy of the notice because it will not lead to a "reasoned decision"). It is folly to think that *this* class—and, to repeat what was already said, a class made up of a number of uneducated (and, in many instances, illiterate), non-English-speaking, and itinerant and migrant workers—can do so here.

Putative Class Counsel are, to their credit, candid about the gravity of the resulting notice problem, but none of their fancy footwork, including an eleventh-hour narrowing of the class definition, can salvage the notice program. Narrowing the class definition to "occupational" and "residential" exposures barely dents the constitutional problem of binding exposure-only class members. Settlement § 1.1.  Ousting comparatively well-heeled golfers from the class strips away only the class members *most* likely to receive notice and *best* equipped to weigh their rights when they do. It remains the case under Settlement 3.0's class definition that an absent class member can be swept into the class based on *someone else's* preparation and application of Roundup, leaving anyone who hears a radio ad to wonder whether it was Roundup, or some other product, that was used three farms or three lawns ago, but with no way to confirm which it was.

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC          6

No more convincing is Class Counsel's reprise of their up-is-down, black-is-white assertion that a primary benefit of the proposed settlement is informational. Reply at 1 [Dkt. 12911] [hereinafter Reply] (arguing that the proposed settlement "will deliver notice, outreach, and information"); *see also* Dkt. 12911-3 (Coffee Decl.) (extolling the proposed settlement's "health education" benefits). For starters, this gets the constitutional inquiry exactly backwards. The fact that such an absurdly broad notice program is necessary in the first place stems from Class Counsel's decision to seek to use the class device to resolve the claims of an absent class they chose to define so broadly.

Just as important, Class Counsel's suggestion that the settlement serves an informational role blows past the question, looming over the proceedings from the start, as to why the class device is needed—or "superior," in Rule 23 terms—in the first place. Putative Class Counsel, in yet another 100 pages of briefing explaining yet more revisions to the settlement's terms, have *still* not persuasively answered that question. Nor could they. The settlement will not bring "global peace," even were that a stated aim of Rule 23 (it is not). After all, Monsanto plans to continue to sell Roundup, and those exposed to it for the first time after February 3, 2021 will retain full litigation rights (though Monsanto will undoubtedly force them to prove to a court, likely this Court, that they were not exposed sooner). Nor will the settlement aggregate and resolve low-value claims that would not otherwise be marketable, as is often true in the consumer context.[3] *See Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1091 (9th Cir. 2011) (noting "the aggregation of similar, small, but otherwise doomed claims" is the "core concern" of Rule 23). To the contrary, the current exposure-only class members, so long as not hamstrung by the proposed settlement's run of litigation impediments (which we turn to shortly), will be well-

---

[3] As previously observed, low-value consumer claims is also an area where courts have— quite appropriately—tolerated less exacting and individualized forms of notice, including media-only programs like the one proposed here. *See* Opp. at 5 (collecting cases).

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    7

incentivized if and when they fall sick to retain counsel and prosecute their high-value claims based on wherever the science around glyphosate sits by then. Last, this case lacks the bankruptcy risk that eventually upended the asbestos cases. Serving none of these purposes, and so with "health education" as its linchpin, the proposed settlement, and its absurdly broad notice program, is a solution to a problem of its own making.

Finally, among the raft of recent changes to the proposed settlement is removal of the previous exclusion for compensatory damages increased because of the absence of medical monitoring for injuries. Settlement § 2.1(16). This edit was an obvious way in which the earlier iterations of the settlement left an amorphous and unselfconscious class of plaintiffs less than whole in the most obvious and formalistic of senses.

But Class Counsel persist in arguing one further. The proposed settlement's surrender of punitive damages is no matter, they say (Reply at 84-85), because punitives are not compensatory and protect only "societal interests," and so they can be readily traded away without raising constitutional concerns. As noted previously (Opp. at 38), this characterization of punitives does not get out of the gate—some states declare them compensatory,[4] and others permit their assignment, implying they are a property right that triggers due process.[5]  But, even if Class Counsel's crabbed conception of punitives *were* accurate, their effort to sideline them is also plainly an incomplete answer to the constitutional concern. The proposed class settlement no less impairs absent class members' rights when it systematically degrades class members' ability to be made whole in court via a gauntlet of litigation impediments than when it excludes entire categories of damages. Put another way, the Science Panel and the four-year litigation

---

[4] *See, e.g.*, *Clark v. Cantrell*, 529 S.E.2d 528, 533 (S.C. 2000) (noting that punitives "serve to vindicate a private right of the injured party by requiring the wrongdoer to pay money to the injured party").

[5] *See* 6 Am. Jur. 2d Assignments § 47 (noting states that permit assignment and others that do not).

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                8

standstill—both serving no other plausible purpose than to delay and cripple the trial prospects of class members, including those whose NHL is diagnosed too late for them to be eligible for any compensation at all—are just as much a part of the constitutional problem as the proposed settlement's categorical bar on punitives.

That insight leads naturally to the second of the two special conditions, and the other possible way around the otherwise fatal notice problems that plague this case:  a full-blown, unfettered, back-end opt-out opportunity. Here, however, the proposed settlement, with its gauntlet of litigation impediments, gets no closer than it does to getting meaningful notice to a huge, unselfconscious, and amorphous group of absent class members. This is not to say that the proposed settlement *couldn't* meet the second condition. Even where a court has doubts about how much benefit a given settlement confers on absent class members, it seems at least reasonable—and, indeed, would seem far more reasonable than the heroic assumptions at the core of the proposed settlement's notice program—that we should be less worried if those class members have a genuinely effective opportunity once they fall sick to consider and decide for themselves whether to accept the deal or go to court. But the proposed settlement's current structure, despite multiple waves of tweaks to the Science Panel, is still miles away from a "complete answer," as putative Class Counsel so dubiously put it (Reply at 29), to the constitutional concerns posed by such an amorphous and unselfconscious class. To see why requires a more in-depth reckoning with some of the recent changes to the proposed settlement, particularly the structure and operation of the Science Panel, and we turn to that task in a moment.

But before doing so, it is worth pausing to note where all of this leaves putative Class Counsel and the proposed settlement they urge upon this Court:  Once one sees in full the proposed settlement's many deficiencies—a huge, sprawling, and hard-to-identify class, and a

David F. Engstrom

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    9

gauntlet of litigation impediments for absent class members who find themselves unwittingly bound by the settlement—one can see why the deal being presented to this Court does not merely run afoul of Rule 23 but is also facially uncertifiable under the Due Process clause. Returning to the doctrinal landscape defined by *Amchem*, *Johns-Manville*, and *Stephenson*, this Court would have to approve the proposed settlement not *because of* special conditions that can ameliorate the grave notice problems, but *in spite* of conditions that run in precisely the opposite direction. That is a bridge too far—and would make the proposed class settlement, if approved by this Court, a lone and distant outlier in the history of mass torts.

## II.   Settlement 3.0's Opt-Out Right Remains Illusory and Cannot Cure the Constitutional Failure.

The foregoing established that the proposed settlement plainly flunks the constitutional requirement of meaningful notice. Compared to the rare exposure-only class settlements that other courts have approved, the class sought to be certified here is not cohesive; nor are its members discrete or identifiable. As a result, all eyes must turn to the sufficiency of the back-end opt-out. But whether viewed as a cure for the otherwise fatal constitutional defects in the proposed settlement's front-end notice program, or through the lens of Rule 23(e)'s requirement that a settlement be fair, reasonable, and adequate, the back-end opt-out provided here remains woefully insufficient.

Two pieces of the proposed settlement that bear on the sufficiency of the back-end opt-out have remained unchanged throughout:  Class members who reject a compensation package surrender their ability to seek punitive damages, and they are subject to a four-year litigation standstill.[6]  For the reasons objectors have previously noted at length (Opp. at 35-40), these

---

[6] Settlement 3.0 does make one small concession:  Certain class members may sue during the four-year litigation standstill upon a finding of "exceptional and unusual hardship" by the Settlement Administrator, Settlement § 18.2(b)(i), (iv), though the criteria to be used in making that finding are not provided.

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    10

litigation impediments render the proposed settlement's latest iteration unfair, unreasonable, and inadequate. Indeed, no court has *ever* approved a class settlement waiving punitive damages in a case involving a dangerous product that remained on the market—a fact that readily distinguishes *every case* cited by putative Class Counsel, including the *Diet Drugs* case on which they so heavily hang their hopes.

While the waiver of punitives and the litigation standstill have stayed the same, the proposed Science Panel has undeniably changed with each successive iteration. Science Panel 3.0 now features:   (i) court approval of panel members where the parties cannot agree, Settlement § 12.1(b)(iii); (ii) a larger (7-member) panel, *id*. § 12.1(b); (iii) a relaxation (but not elimination) of the bar on seating scientists with previously expressed views (and thus specific expertise) on glyphosate, *id*. § 12.1(c); (iv) a relaxation of the bar on review of new and even peer-reviewed evidence, but only if a panel super-majority (including at least one Monsanto-appointed member) agrees, *id*. § 12.2(e); (v) a slackening of the constraints on the methodology to be used (but no change to a mandatory "no causation" finding where the panel cannot agree on the precise threshold), *id*. § 12.3(b); (vi) short exit-interview-style depositions of panel members (though still not live cross-examination at trial), *id*. § 12.6(d); and (vii) a shortening of the time period, from three years to two years, after which a subsequent torts plaintiff can challenge the panel's finding on *Daubert* grounds, *id*. § 12.5(b).

Nothing in this menu of revisions, however, alters two basic facts, as explained in full below. First, the Science Panel is not neutral in its design or operation, despite putative Class Counsel's contrary claims (Reply at 71), and it is decidedly not neutral in its effect on class members' ability to vindicate their rights in court. Indeed, when combined with the proposed settlement's other litigation impediments, including the waiver of punitive damages and the litigation standstill, the Science Panel renders the right of class members to opt out and go to

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    11

court illusory. Second, and perhaps for this reason, the Science Panel and the broader set of litigation impediments of which it is a part would work a displacement of judge and jury that is without precedent in the history of mass torts class actions.

## A.    The Science Panel Is Not Neutral in Its Structure, Operation, or Effect.

Despite a raft of revisions, Science Panel 3.0 remains far from a neutral body. First, the assorted revisions to its structure and operation do nothing to change the stark fact that neither party, not Class Counsel and certainly not Monsanto, has any incentive to vigorously vet candidates in order to guard against pro-defense designations.[7]   Indeed, because Class Counsel won't litigate opt-out cases (and even the LSP lawyers they will supervise cannot represent opt-outs), they will not suffer the consequences of an adverse panel determination. Quite the contrary:  Class Counsel stand to earn rich reputational rewards if more, rather than fewer, class members accept compensation packages rather than go to court. The latest settlement version's effort to enlist this Court to approve panel members where the parties cannot agree on their own, see Settlement § 12.1(b)(iii), does not cure this basic structural defect.

Second, the proposed settlement continues to require that the Science Panel issue a "no causation" finding where its members cannot agree on a threshold internal dose for NHL. What

---

[7] *See* Dkt. 12677-1 (Erichson Decl.) ¶ 17 ("The other problem is that the parties proposing to create this science panel—that is, Monsanto and putative Class Counsel—share an interest in maximizing participation in the settlement and minimizing future litigation.").  As Professor Erichson, one of the world's experts on use of expert panels in mass torts, went on to note:

> A defendant such as Monsanto generally desires protection from future litigation. Those negotiating with a defendant such as Monsanto can maximize the size of the deal—with implications for the size of attorneys' fees—by negotiating terms that provide the defendant with the protection it desires. This can provide real benefits for claimants, but it also means that the negotiating parties have a strong incentive to make future litigation unappealing, rather than to increase plaintiffs' chance of success in future litigation. It is reasonable to expect that both Monsanto and putative class counsel would prefer that every person who becomes eligible to receive compensation accept the compensation offer and provide a release, rather than pursue future litigation against Monsanto.

*Id.*

David F. Engstrom

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    12

this means is that the panel's finding will be "Causation Not Shown" unless its members can agree not just that Roundup causes NHL, but also the *precise* level of exposure at which it does so. *See* Settlement § 12.3(b). This default rule places a heavy thumb on the scale in favor of a null finding. But it's still worse, for the Science Panel's tortured provisions also prohibit trial counsel from telling jurors "that the Science Panel reached a conclusion inconsistent with the Science Panel Determination," *id.* § 12.3(d)(ii), meaning the panel's disagreement about the precise level of exposure that meets the causal condition cannot even be placed in what any reasonable person would consider highly relevant context. None of Class Counsel's efforts to salvage the Science Panel does anything to fix these basic and obvious infirmities.

Third, none of the recent revisions removes the Science Panel's blinders that prevent it from considered new and even peer-reviewed evidence except by super-majority vote, Settlement § 12.2(e); nor do those changes subject panel members to any substantial adversarial testing apart from short, "exit interview" depositions, *id.* § 12.6(d). Both of these features stack the deck for defendant. Defendants in toxic torts cases typically benefit from an earlier state of science about a toxic harm. Early in the life of a mass tort, defendants often have privileged access to relevant data—not all of which will have been shared with regulators. To the extent data *are* or *become* available at that early stage, the datasets tend to be smaller (as it can take a long time for victims to emerge, particularly in cases like this one, with latent injuries[8]), the error bars around statistical estimates wider, and the inferences that can be drawn less confident. *See*, *e.g.*, Sharon Milberger et al., *Tobacco Manufacturers' Defence Against Plaintiffs' Claims of*

---

[8] *See*, *e.g.*, *Amchem*, 521 U.S. at 598 (noting latency of asbestos-related disease) (citing Report of the Judicial Conference Ad Hoc Committee on Asbestos Litigation 2-3 (Mar. 1991)); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 639 (2d Cir. 1988) (also noting latency problem in asbestos cases); Luoping Zhang et al., *Exposure to Glyphosate-Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence*, 781 MUTAT RES. 186 (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6706269/ (noting NHL latencies of 15 to 20 years for low-dose glyphosate exposure). *See also* Dkt. 12682 at 11 & n.10 (Sloviter Opp.) (discussing latency of tobacco, asbestos, and glyphosate).

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC          13

*Cancer Causation: Throwing Mud at the Wall and Hoping Some of It Will Stick*, 15 TOB. CONTROL iv17, iv20 (2006), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2563590/ (noting that the tobacco industry successfully argued general causation at trial for decades until definitive evidence mounted); Robert N. Hoover, *Adverse Health Outcomes in Women Exposed In Utero to Diethylstilbestrol*, 365 NEW ENGL. J. MED. 1304, 1305 (2011), https://www.nejm.org/doi/full/10.1056/nejmoa1013961 (recounting decades-long emergence of evidence of causal relationship between in utero DES exposure and vaginal and cervical cancer); Dkt. 12682 at 32-33 (Sloviter Opp.) (recounting evolution of science around Agent Orange). Early findings, in other words, will predictably slant toward the null hypothesis.

Here the design and operation of the Science Panel and the waiver of punitive damages work hand-in-glove to ensure that a null or conservative finding by the panel stays that way. With only compensatory damages on offer, only foolhardy plaintiffs' counsel will invest top-dollar in developing and litigating opt-out cases or retaining the sophisticated scientific experts necessary to do so well. Nor will plaintiffs' counsel invest in returning to this Court to mount the limited *Daubert* challenge to the Science Panel's determination permitted by the proposed settlement. Settlement § 12.5. This virtually assures that the Science Panel's blindered, frozen-in-time inquiry will go untested, *even if it's wrong or outmoded*. This should be concerning for anyone who cares about litigation integrity. But it is especially concerning here. Unlike cases like *Diet Drugs*, in which the offending product had already been pulled from store shelves, Monsanto will continue to market Roundup for years to come, generating new exposure to glyphosate and hence fresh sources of data to gauge its effects. By raising substantial barriers to the interrogation of that data, the proposed settlement gives enormous leverage to a panel determination that, slanted from the start, will diverge still further from scientific reality almost as soon as the ink is dry.

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC          14

Finally, the various tweaks to the Science Panel do nothing to fix the juror bafflement that will result from the proposed settlement's tortured provisions for handling panel findings at trial. Those provisions include an agreement that the parties will "not contradict any of the stipulated facts contained in the Science Panel Stipulation or assert that the Science Panel reached a conclusion inconsistent with the Science Panel Determination." Settlement § 12.3(d)(ii). They also include a purported prohibition on the right of the *court* to "instruct or otherwise tell the jury it is not bound by any of the stipulated facts in the Science Panel Stipulation." Settlement § 12.3(d)(iv).

As noted previously (Opp. at 41), there is a reason that muddying the evidence is a predominant defense-side tactic. Juror confusion tends to harm the party with the burden of proof. And the Science Panel's tortured design promises confusion in spades. The Science Panel's findings will alone carry the imprimatur of "Science," as against the mere "paid experts" made to testify in open court and subjected to tough cross-examination, leaving perplexed jurors to wonder why they should not privilege the panel's findings. Baffled jurors will also wonder why no one—not trial counsel and not the court—is willing to say anything in answer to the obvious question:  Is the Science Panel's finding binding, or is it not?  And even as trial counsel puts on experts casting the Science Panel's conclusions as unreliable, outdated, and entitled to less weight, confused jurors will read in the Science Panel Stipulation, once entered into evidence, that the parties previously agreed that the panel's determination would be given "*the same weight* given to the testimony of any other independent expert witness."[9]  *See* Science

---

[9] Class Counsel and one of their professor declarants assure this Court that the settlement goes no further than a stipulation as to admissibility. Reply at 73 (noting that the panel determination "will be admissible as a stipulated piece of evidence—not a stipulated fact"); Dkt. 12911-6 (Dodson Decl.) at ¶ 67 ("Further, a stipulation of admissibility is not a stipulation to the veracity, credibility, *or weight* of the conclusion itself.") (emphasis added). For starters, this is a distinction without a difference:  Lay jurors cannot distinguish stipulated evidence from stipulated facts, and it strains credulity to suggest that lay jurors will not merely give deference to the Science Panel's findings. Moreover, and as just noted, the proposed settlement does

David F. Engstrom

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    15

1
2
3
4
5
6
7

Panel Stipulation ¶ 11 (emphasis added). Given all of these deep and granular invasions into the trial process, the panel's determination, already slanted toward a null finding by the panel's member-selection process and its blindered, frozen-in-time inquiry, will carry something approaching de facto issue-preclusive effect, but without any of the usual adversarial safeguards. *See Allen v. McCurry*, 449 U.S. 90, 95 (1980) (noting rule that issue preclusion is available only where there has been a "full and fair opportunity to litigate"); *see also* Opp. at 43.

8
9
10
11
12
13
14
15
16
17
18
19
20

Once one understands the Science Panel's lopsided design and operation, one can see the proposed settlement for what it is. The Science Panel is not, contrary to Class Counsel's absurd claim (Reply at 70), a welcome informational boon to class members. That proposition does not, and never did, withstand even the slightest scrutiny. Instead, it is a high and unfair hurdle, and yet another poison pill in a settlement littered with them, designed to freeze the science around glyphosate even while that science is still emergent, and to press class members to accept anemic compensation payments rather than go to court so Monsanto can continue to market a dangerous product. Never before has a class settlement asked class members to give up so much in return for so little—and indeed, for many of them, precisely nothing at all. Even with the most recent round of revisions, the Science Panel, and the wider suite of litigation impediments of which it is a part, renders illusory the back-end opt-out on which putative counsel rely so heavily.

21
22
23
24
25
26
27
28

precisely what Class Counsel and the declarant say it doesn't, telling jurors that the panel's determination is to be given "*the same weight*" as trial experts and then forbidding trial counsel from suggesting otherwise. *See* Science Panel Stipulation ¶ 11 (requiring that the panel's determination be given "equal weight"); Settlement § 12.3(d)(ii) (mandating that the parties "not contradict any of the stipulated facts"). And, to the extent jurors might be thought to harbor confusion on the point, the settlement's tortured provisions prevent counsel or the court from clarifying the issue by specifically prohibiting either from telling the jury that the Science Panel's determination is not binding. Settlement § 12.3(d)(ii) (prohibiting parties from contradicting stipulated facts); *id*. § 12.3(d)(iv) (prohibiting court from telling jury it is not bound).

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    16

**B.    The Proposed Settlement Remains an Unfair and Unprecedented Displacement of Judge and Jury.**

The proposed settlement's various litigation impediments do not just render the back-end opt-out rights illusory. The proposed settlement's suite of litigation-killing provisions would also be unprecedented in the history of mass tort class actions.

Arguing otherwise, putative Class Counsel have now, with the latest revisions, taken to referring to the Science Panel as a "Rule 706-type" structure. Reply at 18; *see also id*. at 71 (asserting that the Science Panel "is similar to an expert panel under Federal Rule of Evidence 706"). This is risible. In all its various iterations to this point, the Science Panel has failed to meet Rule 706's most basic of requirements:  that a court-appointed expert can be called "by the court or any party" and "may be cross-examined" at trial. With only short, seven-hour "exit interview" depositions—meaning, apparently, as little as 3.5 hours of adverse questioning by a questioner other than trial counsel—and no live testimony at trial, Science Panel members remain insulated from virtually any adversarial testing at all and never in the context of the specific facts of a case or a particular type of NHL.

Given Rule 706's clear terms, it should not surprise that the proposed settlement's rules for handling the Science Panel's determination at trial contrasts sharply with the procedures applied to Rule 706 experts in the relatively few mass torts that have featured them. As noted previously (Opp. at 42-43), trial judges adjudicating mass torts have, on rare occasion, appointed Rule 706 experts and, even more rarely, multi-member panels of experts. In none of these past cases, however, have the findings of a Rule 706 expert or expert panel been admitted at trial without an opportunity for cross-examination in open court.  *See*, *e.g.*, FEDERAL JUDICIAL CENTER, NEUTRAL SCIENCE PANELS: TWO EXAMPLES OF PANELS OF COURT-APPOINTED EXPERTS IN THE BREAST IMPLANTS PRODUCT LIABILITY LITIGATION 20-21, 51, 63-79 (2001), https://www.fjc.gov/content/neutral-science-panels-two-examples-panels-court-appointed-

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC          17

experts-breast-implants-product-1 (describing extensive depositions and trial cross-examination of Rule 706 experts in breast implant cases); *In re Joint E. & S. Districts Asbestos Litig.*, 830 F. Supp. 686, 694 (E.D.N.Y. 1993) (noting process whereby Rule 706 panel would "present their report in the form of sworn testimony" and "be cross-examined").

Nor does Science Panel 3.0 in any way resemble what may be the sole example of a science panel created by a class action settlement: the Dupont C8 litigation.[10]  For starters, the C8 litigation science panel performed *actual science*, including blood draws and bench work costing some $20 million—a far different set of tasks than the restricted meta-analysis called for here. Moreover, while the C8 science panel's findings had binding preclusive effect, thus eliminating any role for trial testimony, the C8 settlement provided for open and unlimited written communication between the settling parties and the science panel's members as they worked. *See* C8 Class Action Settlement Agreement §§ 3.3, 10.2.2(a)(6), Dkt. 820-8, Case No. 2:13-md-02433-EAS-EPD (S.D. Ohio filed Sept. 3, 2014). Finally, unlike Science Panel 3.0, the C8 science panel could consider "all scientifically relevant data," *id.* § 12.2.3(a), and, as a localized mass tort—a single manufacturing facility discharging C8 into the water supply in a single West Virginia community—the case suffered from none of the grave constitutional notice concerns that afflict this one, with its far-flung legions of absent class members exposed to Roundup. Viewed in the light of past court use of Rule 706 experts and the C8 science panel, Science Panel 3.0 would be, despite the recent tweaks, a clear outlier among what is already a small and boundary-pressing set.

Putative Class Counsel make a final effort to manufacture commonality with *any* past mass-torts case by telling this Court (Reply at 21) that the many tweaks to the proposed

---

[10] *See* Alexandra D. Lahav, *The Knowledge Remedy*, 98 Tex. L. Rev. 1361 (2020) (detailing the C8 science panel's workings); *In re E.I. du Pont de Nemours & Co. C8 Personal Injury Litig.*, 2017 WL 237778, at *1-3 (S.D. Ohio 2017) (recounting the litigation and use of the science panel).

David F. Engstrom

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC          18

settlement somehow bring this case closer to *Diet Drugs*. That, too, is wrong. As already noted, no prior class settlement—not *Diet Drugs*, and not any other case in the annals of mass tort class actions—released unmanifested personal injury claims of class members whose exposures continued to occur. No prior class settlement waived punitive damages where the offending product remained on the market. And the *Diet Drugs* settlement did not feature an expert panel, much less the blindered, cloistered, and juror-baffling Science Panel called for here.

Instead, Class Counsel's effort to liken this case to *Diet Drugs* merely underscores both the stark differences and the high stakes. Amidst all the settlement revisions, and notwithstanding Class Counsel's eagerness to analogize this case to *Diet Drugs* or any other case, some simple facts remain: A woman who marries a longtime landscaper five years from today, then loses him to NHL five years after that, would be bound by the proposed settlement. But with the settlement's compensation scheme shuttered, she would be left with only a hobbled tort action. She could not seek punitive damages no matter how cavalier Monsanto's conduct is revealed to have been or how cavalier its conduct becomes. Her hands would be tied even if, sometime in the future, we all learn that Monsanto has, tobacco-like, suppressed information about Roundup's dangers. Indeed, Monsanto will enjoy something close to complete litigation immunity, with no one in the plaintiffs' bar willing to take this widow's case and contend with a defense-slanted, juror-baffling Science Panel Stipulation and without any prospect of recovery beyond compensatory damages and with Monsanto likely arguing that without punitive damages its reprehensible conduct is inadmissible.

No court has ever blessed a class action settlement in a mass tort case with anything even remotely similar to these features. To do so now would be an unwise and inappropriate use of this Court's power.

David F. Engstrom

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC          19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

The motion should be denied.

Respectfully submitted,

_____/s/ *David F. Engstrom*_____
David F. Engstrom (SBN 314688)
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: (650) 721-5859
Fax: (650) 725-0253
dfengstrom@stanford.edu

Russell Post
**Beck Redden LLP**
1221 McKinney Street, Suite 4500
Houston, TX 77010
Telephone: (713) 951-3700
rpost@beckredden.com

Dated:  May 3, 2021

*Counsel for Objectors Arnold & Itkin LLP and Kline & Specter, P.C.*

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC

20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that service of this document was accomplished pursuant to the Court's electronic filing procedures by filing this document through the ECF system.


_____/s/ *David F. Engstrom*_____
David F. Engstrom

Dated:  May 3, 2021

DAVID F. ENGSTROM

Arnold & Itkin & Kline & Specter Sur-Reply to Motion for Preliminary
Approval of Class Action Settlement,  Case No. 3:16-MD-02741-VC                    21