Gerson H. Smoger
**SMOGER & ASSOCIATES**
13250 Branch View Lane
Dallas, TX 75234
Telephone: (510) 531-4529
Facsimile: (510) 531-4377
gerson@texasinjurylaw.com

Steven M. Bronson, Esq. (SBN 246751)
**THE BRONSON FIRM APC**
7777 Fay Avenue, Suite
202La Jolla, CA 92037
Telephone: 619-374-4130
Facsimile: 619-568-3365
sbronson@thebronsonfirm.com

*Counsel for Objector Melinda Sloviter*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITYLITIGATION<br><br>This document relates to:<br><br>Ramirez, et al. v. Monsanto Co.<br><br>Case No. 3:19-cv-02224 | MDL No. 2741<br>Case No. 16-md-02741-VC<br><br>**OBJECTOR'S SUR-REPLY IN OPPOSITION TO PRELIMINARY APPROVAL OF PROPOSED CLASS SETTLEMENT, APPOINTMENT OF INTERIM CLASS AND SUBCLASS COUNSEL, DIRECTION OF NOTICE UNDER FED.  R. DIV. P. 23(e), SCHEDULING OF FAIRNESS HEARING, AND STAY OF THE FILING AND PROSECUTION OF ROUNDUP-RELATED ACTIONS BY SETTLEMENT CLASS MEMBERS**<br><br>Re: Dkt. No. 12911<br><br>Date: May 19, 2021<br>Time: 10:00 AM<br>Place: Courtroom 4, 17th Flr (Videoconference)<br>Judge: Honorable Vince Chhabria |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

I. THE ILLUSION OF RELIEF PROVIDED TO THE CLASS.............................. 4

   A. Class Proponents' Represented "Expedited Compensation System" ................ 4

   B. Research Funding Program .............................................................................. 9

   C. Diagnostic Accessibility Grant Program  ("DAGP") ...................................... 10

   D. Labeling Change .............................................................................................. 12

II. MONSANTO'S FUTURE GET OUT OF JAIL FREE CARDS ......................... 12

III. OTHER ASPECTS OF THE SETTLEMENT ..................................................... 18

CONCLUSION .............................................................................................................. 20

Objector Sloviter's Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Benoit v. Saint-Gobain Performance Plastics Corp.*,
    959 F.3d 491 (2d Cir. 2020)..................................................................14

*In re Diet Drugs*,
    Nos. 1203, 99-20593, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000)....................................7, 8

*In re Simon II Litig.*,
    407 F.3d 125 (2d Cir. 2005)..................................................................16

*Stephenson v. Dow Chemical Co.*,
    273 F.3d 249 (2nd Cir. 2001)..................................................................18

**Statutes & Rules**

California Civil Code Section 1542 ................................................................18

Fed. R. Civ. P. 23 ................................................................................2, 3

Objector Sloviter's Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

# INTRODUCTION

On June 24, 2020, Class Proponents filed a 59 page Approval Motion (Dkt. 11042) and a 209 page Settlement Agreement (Dkt. 11042-2), along with declarations from two class action administration experts (Shannon Wheatman and James Messina). On February 3, 2021, Class Proponents filed a 70 page Approval Motion (Dkt. 12509), a 263 page Settlement Agreement (Dkt. 12509-2), including 12 Exhibits totaling 137 pages and six declarations from class action administration experts (Shannon Wheatman, James Messina, Matthew Garretson, Mark Eveland, and Jessica Horewitz). On March 3, 2021, Class Proponents filed a third amended Settlement Agreement (Dkt. 12665-1) on the eve of the time set by this Court for Objectors to file briefs.  On April 7, 2021, Class Proponents filed a 92-page Reply (Dkt. 12911) (hereinafter "Reply" or "R"), a fourth amended Revised Settlement Agreement (hereinafter "RSA") (Dkt. 12911-1) with 90 pages of changes and declarations from five lawyers (Andrew Bradt, Scott Dodson, John Coffee, Arthur Miller, and Jeremy Wieck),[1] three plaintiffs, and later a third declaration, filed on April 21, by claims administration expert Shannon Wheatman along with the now third Revised Notice Plan. (Dkt. 12975).  On April 27, class proponents filed a revised Legal Services Plan. (Dkt. 13000). For the most part, each revision is being offered by Class Proponents to correct acknowledged prior settlement administration deficiencies, as well as providing declarative support for either the settlement's administration or alleged constitutionality.

However, despite serious questions raised by Objector Sloviter ("Objector" or "SO") about the medical, epidemiological, toxicological and general scientific underpinnings for the proposed settlement, virtually ignored in all of Class Proponents' submissions has been any underlying explanation, much less supporting evidence, for what they state settlement members will actually

---

[1] Objector Sloviter has moved to strike the first declaration of Dr. Mehta (Dkt. 12682 at pp. 13-14), as well as the declaration of John Coffee. (Dkt. 12958).

Objector Sloviter's Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

benefit from -- the Claims Program, the Research Funding Program ("RFP"), and the Diagnostic Accessibility Grant Program ("DAGP").  Nor has any evidentiary support been provided for the tasks given the science panel that no doubt Defendant Monsanto insisted upon.  These are not inconsequential details; they are at the heart of the bargain that Class Proponents have struck. After all, this is a settlement based on adverse medical sequelae caused by an environmental toxin.

The underlying methodology for allocation of what is purported to be more than a billion dollars in relief to putative class members is barely given a passing reference.  Class Proponents devote no pages in their initial motion explaining the basis for any criteria behind the Claims Program award payment levels ("grid") other than a conclusory four-page declaration from an oncologist with no research expertise in NHL or herbicides, toxicology, epidemiology or even a research interest in any of them.  As to the tasks given the science panel, they present no supporting expert declaration from relevant disciplines and they fail to mention, much less respond to, the critique regarding their methodology by Declarant George Rodgers, M.D., Ph.D., attached as Exhibit "C" to the declaration of Objector's counsel Gerson H. Smoger and specifically referred to in the Sloviter Objection.  Not a single public health, scientific, or medical expert discusses the RFP, which ostensibly will provide money to be used by those disciplines.  The same is true of the DAPG other than a bare bones declaration from the same Dr. Mehta.

In essence, Class Proponents spend hundreds of pages explaining why they believe they can take the money despite likely insurmountable due process and Rule 23 concerns, followed by more pages detailing how they will communicate with the class and administer the payment of the money received.  But the most important element of any class settlement's construction – how the sums were agreed to and how the money is properly being allocated to injured victims based upon their injuries – is ignored and treated almost as an afterthought.

This severe imbalance between the extensive explanations for the administration of the settlement and the paltry explanation for its medical and scientific components leads to the inescapable conclusion that Class Proponents were unable to secure reputable, much less distinguished, oncologists, toxicologists, or epidemiologists to support any of the science and medicine underlying their proposed deal with Monsanto.  As will be discussed below, the construction of the settlement's grid and the science panel's tasks, along with counsel's inability to articulate the underlying medical or scientific rationale for either, make that clear.

In Section I below a number of the gross deficiencies in the proposed Claims Program, the newly minted notice, and the RSA will be discussed.  As will be detailed, the science and medicine behind the Claims Program, the RFP, and the DAGP remain illusory.

Section II will address another area which is not provided with evidentiary support and as to which the RSA is woefully deficient.  There are no underlying declarations or other evidence from anyone with environmental or public health credentials to support the settlement's giveaways to Monsanto regarding the future of class members.  Here, beyond the very serious Constitutional and Rule 23 questions about the ability to settle future claims on behalf of currently undiagnosed victims, this settlement provides unique relief to the defendant never heretofore provided to a manufacturer of a toxic substance.  It asks the Court to condone continued manufacture of a cancer-causing product while giving the manufacturer legal protections so that the product might continue to be sold while hobbling actions even for future exposure by class members.  There is no case analogue for what the reply brief and the RSA make clear (but the revised notice does not) -- the settlement expressly allows Roundup to continue to be sold unabated while each class member's lifetime *future* exposure even to *future product* is bargained away and Monsanto is immunized from any reprehensible conduct.

Finally, Section III will discuss a number of other areas of the now fourth revised settlement agreement. To be sure, Class Proponents made several minor changes in response to Objector Sloviter's original objection, but they have mis-stated and failed to make other changes in their newly revised notice plan, their legal services plan, or their now fourth amended settlement agreement.  Taken as a whole, this constantly changing 'perfect settlement' is not worthy of any approval, preliminary or not.  Like the sumptuous meal served to Zeus by Prometheus, under the veneer there is nothing worth digesting.

## I.      THE ILLUSION OF RELIEF PROVIDED TO THE CLASS

At R87 Class Proponents detail what they argue to be the benefits of the settlement for the class: "the entire class (and society) gains benefits from the bargain: notice, diagnosis (with the improved health outcomes that come with it), dedicated research into diagnosis and treatment, free legal assistance, a label change, and an expedited compensation system without litigation."  In reviewing these, notice and the legal assistance are merely administrative functions and not intrinsic benefits.  Research into diagnosis, treatment and a label change provide nothing for Subclass 1 members who already have been diagnosed with NHL.  As to Subclass 2, the DAGP *at best* only benefits the subset who do not already have private or employment health insurance, Medicare, Obamacare,  or Medicaid, etc.

### A. Class Proponents' Represented "Expedited Compensation System"

Like a carnival barker hawking the "big prize," the settlement notice begins by boldly announcing an award of "up to $200,000." And just like the rigged games of a carnival, it is a sum that no one is likely to ever qualify for.  As detailed at SO 9-12, the extensive roadblocks erected to prevent anyone from getting more than $65,000 are close to fool-proof.

Class Proponents ignore this in their Reply other than to again point to the declarations of Amit Mehta and Monsanto's all-purpose oncologist Michael L. Grossbard (R56-57) as if Dr.

Grossbard had the interests of the class at heart.[2] For instance, Dr. Grossbard mimics the words Monsanto wants him to say about familial cancer: "There is also published literature establishing a link between first *and second* degree relatives with cancer and the development of NHL." (Dkt. 12511, Aff. Grossbard ¶ 18 (Emphasis supplied)  However, he references no such literature about "second degree relatives" (aunts, uncles, grandparents, grandchildren, nieces, nephews, or half-siblings).[3]  Certainly, Monsanto knows that it is impossible to cast such a wide net and not find someone in a family who has had cancer, particularly given the 39.5% prevalence of cancer for each individual.[4]  Indeed, for farmworkers and their extended families who Class Proponents assert will most benefit from their settlement, the most common cancer in the United States, skin cancer, is endemic.[5]  The bottom line is that any cancer in any family member will alone reduce the potential for recovery from a maximum of $200,000 to a maximum of $65,000. The odds that not even one person has ever had cancer in any extended family are quite small.

When one adds this to all of the other factors before a class member can receive more than $65,000 from the Claims Program, it is abundantly clear that Monsanto is either scamming class

---

[2] Objector has argued that this Court should disregard Dr. Grossbard's declaration. (SO 14-15).

[3] None of the citations Dr. Grossbard provides support a relationship to second degree relatives. (Dkt. 12511).  Article 16 in Dr. Grossbard's attached list is by Chiu and states: The conclusion of the study is that it "provide[s] little evidence that a family history of cancer modifies the association of agricultural exposures with NHL." As to McDuffie (49), Dr. Grossbard admits that any findings go only to first degree relatives. Aff. Grossbard ¶ 18. Zahm (75) is a very small pre-1992 study of women in which family history of cancer is not defined.  These are attached as Exhibit "D" to the Supplemental Declaration of Gerson H. Smoger.  *See also* the declaration of Ron D. Schiff, M.D., Ph.D. at ¶ 15, attached as Exhibit "E" to the Supplemental Declaration of Gerson H. Smoger as to why family history of cancer should not be considered at all.

[4] National Cancer Institute, *Cancer Statistics* (Sep. 25, 2020), *available at* https://www.cancer.gov/about-cancer/understanding/statistics

[5] Skin cancer is the most common cancer in the United States.  One in five people will get some form of skin cancer before the age of 70. Between 86% and 90% of these are caused by sun exposure.  https://www.skincancer.org/skin-cancer-information/skin-cancer-facts/

Objector Sloviter's Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

counsel, the class, or both. A review of all the roadblocks makes this clear.  Before anyone is eligible for more than $65,000 under the Class Program, a class member must have NHL **and** 1) be under 45 at the time of NHL diagnosis; 2) have active NHL or be in remission for less than 3 years; 3) have frequency and duration of exposure to Roundup for more than 60 months (or 20 years for a summer worker); 4) never at any time have worked in any cleaning service, as an electrician, in hairdressing, in handling fission products or jet propulsion, handling solvents, as a metal worker, as a painter, as a pest exterminator, in a petroleum refinery, in textiles, in woodworking or with x or gamma radiation; 5) have no prior history of cancer; 6) have no first or second degree relative with any history of cancer; 7) have not had more than a 1ppd/20 year history of smoking; 8) never had Hepatitis B, C or HIV; 9)  not have a body mass index greater than 30 (which alone knocks out almost half of the population);  10) not have diabetes; 11) never had an organ or stem cell transplant; 12) never have been diagnosed at any time in their life with polymyositis, dermomyositis, ulcerative colitis, polymyalgia rheumatica, chronic rheumatic heart disease, Sjogren's syndrome, systemic lupus erythematosus, polyarteritis nodosa, discoid lupus erythematosus, sarcoidosis, Crohn's disease, systemic sclerosis, rheumatoid arthritis, Hashimoto's disease, psoriasis, autoimmune hemolytic anemia, Behcet's disease, immune thrombocytopenic purpura, myasthenia gravis; or primary biliary cirrhosis; and 13) never at any time been given infliximab, adalimumab, etanercept, golimumab, certolizumab pegol, azathioprine, 6-mercaptopurine, or cyclosporin.

Class proponents ignore this in their Reply, but it is difficult to believe that they do not know that they are offering the big prize – $200,000 in their notice – while at the same time the game is rigged so that no one is likely to win it.  For someone considering whether to opt out, the most obvious of required information is "What am I going to get?"  But also missing from the

notice is the fact that treatment for NHL is expensive and generally subject to reimbursement liens. Class Proponents do not dispute the fact that mean-treatment costs are between $103,498 and $146,185, which will be far more than any amount the grid provides.  They respond to this by arguing that class members stand no differently in negotiating with lienholders than individually represented class members. (R54, fn. 15). However, this betrays a fundamental misunderstanding of tort practice.  Lienholders may often reduce their liens when faced with a prospect of an indeterminate settlement or a failure to settle.  Here, with the amount locked in in advance, there is no negotiating incentive.  For many, therefore, the settlement will offer little or no recovery.

All of these factors call for a comparison to *In re Diet Drugs*, Nos. 1203, 99-20593, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000), because Class Proponents cite to it 19 times in their Reply. Before venturing further into the details of the *Diet Drugs* settlement, it should preliminarily be noted that none of the explanations offered to counter the crucially important differences in notice here compared to *Diet Drugs* (where the offending substance was off the market, users had to get a doctor's prescription for it, and generally the pills were gotten from a pharmacy) stand up to even minimal scrutiny.[6] Significantly, for the purposes here the settlements are not comparable. Class Proponents cite to the Notice in *Diet Drugs*, (R61 n17) http://www.settlementdietdrugs.com/pdfs/notice_fja.pdf, ("Notice"), but any reading of that notice underscores this settlement's  lack of substantive details, particularly when compared to the carefully negotiated resolution of *Diet Drugs:* 1) the most deadly causally-related disease, primary pulmonary hypertension, was never settled as part of the class action settlement at all (Notice 14), and those with it *did not lose the*

---

[6] Class Proponents assert that "Roundup is a heavily-promoted branded product: the best-selling weedkiller. Those who buy and use it know what they are using. Those who work where it is used can readily find out." (R25).  Yet, they ignore their own extensive list of alternative names for glyphosate herbicides.  *See* RSA Exhibit 1, 1-21 where out of 516 names, 444 do not include the word Roundup; and in Exh. B p. 9 to Wheatman's declaration (Dkt. 12975-2), 103 products are listed but **only 1** has Roundup in its name.

7

*ability to  seek punitive damages* nor have their individual lawsuits encumbered, regardless of whether or not they opted out;  2)  rather than the anemic realistic settlement range of between $5,000 to $65,000 for the very deadly cancer of NHL, class members' recovery range for valvular heart disease, which is often treatable, was between $7,389 and $1,485,000 (Notice 11);  3) claims payments in *Diet Drugs* continued for thirteen years after the settlement with a 2% cost of living adjustment and an increased compensation in the event a class member's condition worsened (Notice 11);  and 4) while class proponents mock the amounts provided to derivative claimants in *Diet Drugs* which ranged from $500 to $15,000 (Notice 13) (R61), derivative claimants here get nothing at all but are still bound by the class settlement provisions.[7]

The comparison between the proposed grid here and the comprehensive and carefully explained grid in *Diet Drugs* is striking.  (*See.* http://www.settlementdietdrugs.com/pdfs/ green_form.pdf at pages 16-21 for the grid and 21-32 for a detailed explanation of its underlying science).[8] As oncologist Ron D. Schiff, M.D., Ph.D., declares: "There is no reliable scientific justification to claim that the Group A or Group B Medical Conditions are more causal or substantial in contributing to a person's NHL than the person's Roundup exposure."  (Declaration of Ron D. Schiff, M.D. Ph.D., attached as Exhibit "E" to the Supplemental Declaration of Gerson H. Smoger ¶ 13). "Group A Medical Conditions are simply too broad to scientifically justify"

---

[7] Regarding derivative claims, Class Proponents make the following statement: "To be blunt: if this settlement saves a class member's life or improves their quality of life, their spouse is unlikely to focus on the settlement's impact on loss-of-consortium damages." (R61). Ignored is the fact that if not for their exposure to Roundup to begin with, their spouse's life would not need to be saved.

[8] Only *Diet Drugs* will be addressed in this Sur-Reply.  However, Objector notes a demonstrably false statement made by class proponents: "Nor do the objectors meaningfully address the post-*Amchem* settlements that this settlement actually *does* parallel …*BP Medical* settlements that courts approved over similarly-misplaced objections." (R7). To the contrary, this was thoroughly addressed in an extensive 13-page Declaration by Stephen J. Herman, lead counsel in the *BP Medical* litigation, attached to the Declaration of Gerson H. Smoger and summarized at SO 47. This declaration was never mentioned in Class Proponents' Reply.

relying on each alone as being significant.  Likewise, choosing just a few examples, Dr. Schiff notes: 1) Group A condition of a family member with NHL ignores whether the family member also had Roundup exposure; and 2) as to the long list of drugs, it needs to be known when the "medications [were] taken, at what dose, and for how long?" (*Id*. ¶ 14) Dr. Schiff notes that the literature for the Group B condition of a BMI above 30 is "non-existent" for certain types of NHL and "inconsistent at best for others." (*Id*. ¶ 17) Yet, under the grid this alone disqualifies more than 40% of people from moving on to Tier 4. (*Id*.) Dr. Schiff concludes that "limiting claims for anyone who manifests any one Group A or Group B Medical Conditions is a blunt instrument not sufficiently based on the science of medical causation." (*Id*. ¶ 19).

## B. Research Funding Program

The Revised Settlement Agreement also presents the shiny object of $40,000,000 being set aside for research funding "for the diagnosis and treatment of NHL." (RSA 55). The Reply touts this 14 times.  Yet, even though this is a research medicine and public health proposal, no experts in public health or medicine are put forward to discuss or explain the basis for any underlying program, i.e exactly what research will be performed.  Even more important, and likely at Monsanto's insistence, the program is general for NHL and expressly will not be studying what is at the heart of this settlement -- the causal relationship between Roundup and NHL. RSA 10.2(a).

While the fourth amended agreement states that there will be some form of program, at minimum it should describe the interrelationship of this expenditure with the many other research endeavors already in existence. To put the Research Program in perspective, the National Cancer Institute spends approximately $120 million every year on NHL research, the Leukemia and Lymphoma Society has invested more than $52 million in researching chronic lymphocytic

Objector Sloviter's Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

leukemia alone  (and this is only one of the 54 listed NHLs on Exhibit 3, pages 1-5  of the RSA)[9] and the Lymphoma Research Foundation and the American Cancer Society have many decades of experience funding and researching lymphoma.  The Mayo clinic alone currently lists 166 different clinical studies on its website related to NHL.[10]  It is thus sheer hubris that a group of lawyers believe that they can set up a general program from scratch that will last just 4 years and produce immediate meaningful results that will benefit class members.

### C. Diagnostic Accessibility Grant Program ("DAGP")

Class proponents also tout a "program [that] educates class members about the NHL-related risk associated with Roundup exposure, the importance of early discovery and diagnosis, and how to conduct self-evaluation for NHL indicators, which can lead to life-saving early detection; these benefits are infinite." (RSA 45). For these benefits of the DAGP, class proponents primarily cite to the declaration of a lawyer, John Coffee, who has no expertise on this issue.[11]

In response to Objector's statements that there are no screening tests for NHL that improve survivability and that proper NHL screening is both invasive and expensive, (SO 41-42), Class Proponents agree with both statements.  R68. Their counter is a well-recognized maxim – early diagnosis of cancer can save lives.  This in essence summarizes the four-page Supplemental Declaration of Class Proponents' only medical, scientific, or public health expert Amit Mehta.  But what are the details?  Although he touts "self-examination" for NHL, neither he nor the settlement say how that will be conducted, particularly when the symptomatology of concern, even according

---

[9] *See*  https://www.cancer.gov/about-nci/budget/fact-book/data/research-funding; https://www.lls.org/research/lymphoma-research-funded-by-lls
[10] https://www.mayo.edu/research/clinical-trials/diseases-conditions/non-hodgkin%27s-lymphoma
[11] "As Professor Coffee explains, the DAGP can and will save or extend lives, given the importance of early diagnosis," R66, as if this statement has any evidentiary value. ( *see also* R8, R71).

to Dr. Mehta, is non-specific: "fever, lymph node swelling, loss of appetite and weight loss" and many early sufferers are "minimally symptomatic or asymptomatic." (Supp. Decl. of Mehta ¶ 6)

As to the very expensive biopsies and scans required for proper diagnosis, the Reply refers to the vague wording of Settlement § 8.1 ("evaluation of an individual for NHL using methodologies that are generally accepted as appropriate among the medical community for the individual in question in view of that individual's profile and characteristics"). (R68). These are expensive, and it must be presumed that their intended beneficiaries are those who do not have private or employee health insurance, Obamacare, Medicare, or Medicaid, all of which would pay for this as well as necessary treatment. After diagnosis, does the DAGP plan to pay for the mean $100,000 to $150,000 in treatment for these uninsured individuals? If so, the $210,000,000 set aside will be eaten up by fewer than 2,000 NHL sufferers. If not, what is the point of the diagnostics? The reality of the program is that it is little more than a tax on class members who will receive no benefits from the program.[12] Given latency, the average age of diagnosis for NHL is over 65, meaning that more than half of the victims qualify for Medicare and do not need these benefits.

---

[12] At R 3-4, Class Proponents argue that migrant workers and landscaping crews require substantial outreach, because "90% of the tens of thousands of Roundup claims for which plaintiffs provided information—are consumers who purchased Roundup for personal use, at Walmart, Home Depot, or garden stores, and whose exposure arose from use at home." Citing the Declaration of Jeremy J. Wieck. The only clear conclusion from this alone is that there is massive residential exposure throughout the U.S. If Class Proponents are worried particularly about migrant farmworkers, why not enter into a settlement for them without sacrificing the rights of the 90%? Moreover, there is no reason to believe there have not been attempts to contact the farmworker population. In the first nine months of 2019 alone, $60 million was spent on Roundup legal advertising, and a significant amount was spent in both the Southwestern part of the United State and on Spanish language broadcasts. https://legalnewsline.com/stories/514531817-seeing-all-those-roundup-commercials-that-s-because-lawyers-have-spent-60m-on-them-this-year

11

### D. Labeling Change

Class Proponents attempt to respond to Objector's arguments that no benefits whatsoever are offered by the supposed "labeling additions" (SO 42-43, R64, R85), but this Objector and this Court still has no idea what the changes will say.  (*See* Wheatman Dec. Exh. B, Revised Long Form Notice, p. 2).  Class Proponents argue that this unknown label change cannot use the word cancer, because it would not be approved by the EPA.  This is presumptive given the fact that EPA's administration has changed.  Nevertheless, benefits are touted on the sole basis that sometime up to 180 days after final approval (RSA54)[13] Monsanto will provide the EPA with some citation to the internet for Roundup's users, ignoring the fact that rural farmers and farmworkers often have at best attenuated access to the Internet.[14]   Class Proponents also ignore the fact that these class members are unlikely to understand the citation even if they make the equally unlikely effort to find it.

## II.      MONSANTO'S FUTURE GET OUT OF JAIL FREE CARDS

The supposed benefits described for the class, the Class Payment Program, the Research Program, and the DAGP all terminate in four to five years.  By contrast, the giveaways to Monsanto from this Settlement—the ability to continue to sell Roundup without risk of punitive damages, this court's implied imprimatur of the continued production of Roundup, the loss of medical monitoring for NHL, and the imposition of the science panel on future NHL litigation—are

---

[13] Professor Scott Dodson (Dkt. 12911-6 at 12) states that the labeling provisions will enhance notice.  However, there is little possibility that this will be so: 1) Monsanto has 180 days after the settlement to propose the changes (RSA 54), which is 30 days after the end of the opt-out period (RSA 18); 2) the EPA will need time for any approval; and 3) all labels on existing product are grandfathered in by the terms of the settlement.  (RSA 54-55).

[14] As noted in the now dismissed complaint by the Black Farmer's Association, "Indeed, the harms caused by Roundup® are felt acutely by NBFA's members: largely rural Black farmers who frequently have limited internet connectivity and/or literacy..." (Complaint at 2, *National Black Farmers Association v. Monsanto Co.*, 4:20-CV-01145 (Dkt. 1)).

permanent.  Indeed, the broad releases in the barely amended Section XVII of the settlement agreement extend to conduct that has not yet occurred, as to product that has not yet been made, for exposure that has not yet taken place, in exchange for benefits most class members will never get.  There is no case analogue for any of these aspects of the proposed settlement, and no effective notice is even attempted to be provided for this in the Revised Class Notice.

There is a single reference in the Reply admitting that future exposure is being bargained away: "The settlement covers only those who were exposed as of February 3, 2021 and does not include those *first exposed* in the future." (R86) (Emphasis supplied).  The italicized language restates a key, but little noticed, fact about this Settlement:  it encompasses all future exposures for any class member who has been exposed to any amount of Roundup prior to the settlement date. RSA Section 12.8. No class member would understand this from the text of the Notice.  But this provision will allow Monsanto to claim that this settlement binds the rights of plaintiffs in any future lawsuits filed by victims of Roundup, so long as Monsanto can plausibly argue that the plaintiff was exposed to any Roundup prior to the settlement date.

Notice expert Shannon Wheatman in her recent Declaration seems to misunderstand this giveaway to Monsanto: "In addition to the limited toxic longevity of Roundup products, the Class is composed of individuals *who were exposed* to the weed killer before February 3, 2021."  (Dkt. 12975 ¶ 10) (Emphasis supplied).  Consistent with this misunderstanding, Wheatman's notice never references future exposure and pointedly uses the past tense in stating, "Weed killer products *were* sold." (Dkt. 12975-1, Ex. A Publication Notice) (Emphasis supplied) This misunderstanding further undermines her entire declaration -- even if Wheatman were competent as a "notice expert" to opine on the "exposure profile" and "toxic longevity" of Roundup, which she is not. (Wheatman Dec. ¶¶ 9, 10).  While Wheatman's science is dubious, the limitations on "exposure profile" or

"toxic longevity" are irrelevant for a product that will continue to be sold to a population whose future is still legally controlled by Monsanto's deal.[15]   In fact, to complete this legal hog-tying of future rights, the Revised Notice's only reference to the future is when it makes sure that class members know that the release will extend to any possible business or business activity that may be involved with glyphosate *in the future*. (Wheatman Ex. B. p. 21).

As to medical monitoring, it is acknowledged that in response to Objector the medical monitoring release has now been limited to NHL in section 17.1(b) of the Revised Settlement. Nevertheless, Class Proponents inappropriately rely on the existence of the DAGP to justify the complete elimination of any future medical monitoring claims for NHL.  (R66). As the revised notice makes clear, the DAGP ends after four years, yet medical monitoring for NHL is lost forever for the class at the very time that class members are permitted to reenter the tort system. (Wheatman Dec. Ex. B p. 3) There is a reason that Monsanto wants this.   An increasing number of courts are permitting medical monitoring claims to be brought in toxic tort cases.  *See, e.g., Benoit v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 491 (2d Cir. 2020).

The gift to Monsanto of the Science Panel is something no toxic tort plaintiff lawyer would ever request, let alone agree to.  By being able to frame the questions that the Science Panel must answer and then present them to a jury, Monsanto is seeking to control the framing of the jury's entire general causation inquiry.  It evidently does not trust judges or juries to do this, knowing that no courts have required a finding on its preferred dose defense before allowing a jury to consider causation.

---

[15]  Note this Q & A: "9. What does exposure mean? Exposure means that you were exposed when Roundup Products were mixed or applied, whether or not you were the person doing the mixing or application. You could have been exposed while working in an area where weed killers were used. The settlement affects anyone who may have breathed in these weed killers or absorbed these products through their skin." (Wheatman Ex. B, p. 9). Besides the extraordinary breadth of this description, including "working in an area where weed killers were used," exposure is incorrectly defined in the Notice as being entirely in the past – "were exposed."

Objector Sloviter's Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

Having failed with judges and juries, Monsanto still seeks to find a way to require juries to resolve a question that scientists themselves would never even attempt to answer.  Indeed, this is the likely reason that Class Proponents' Reply remains silent on both Objector's critique at SO 23 and the declaration of medical toxicologist, George Rodgers, M.D., Ph.D., (Dkt. 12717-1), while offering *no* supporting testimony from any scientist. As Dr. Rodgers says of the toxicological data required to conclude the existence of a minimum internal dose for NHL: "extrapolating this data to a non-Hodgkin's endpoint or any specific cancer endpoint cannot be done given the difficulties of quantifying dose and the huge variability in human reactions."[16]  (Rodgers Decl. ¶ 11).  "Even if this were possible, it would still not be possible to then calculate an internal dose based on past exposure in a trial setting." (*Id*. ¶ 12). Dr. Rodgers testifies further that he has never "seen or heard of this methodology to determine whether a substance causes cancer." (*Id*. ¶ 14). Finally, he is not even aware "of any medical professionals who require a calculated dose of a substance before opining whether the substance can cause cancer." (*Id*. ¶ 15).  This is because any calculation for humans is quite complicated, and, as stated previously, made even more complicated if attempting to translate incomplete outdoor exposure information into an internal dose.  (*See* SO 25).

Finally, requiring that this finding be made is not even enough for Monsanto.[17] Knowing

---

[16] Class Proponents' insistence on California's Proposition 65 makes little sense. (*See* R 78) They fail to state that the target animal cancer used for Prop. 65 was hemangiosarcoma – not the required NHL endpoint here – or that it is based on a single 2005 study of groups of 50 CD-1 mice.  https://oehha.ca.gov/media/downloads/proposition-65/chemicals/glyphosate032917isor.pdf  Further, neither California nor any other regulatory body makes a calculation intended to determine whether a human got any specific cancer from a toxic substance.  Regulators are only deciding on whether there should be a warning.  Consider, in comparison to the single mouse study used by California regulators, the thousands of people required for a Phase III pharmaceutical trial just to attempt to determine adverse human results.
[17] Even an extremely unlikely positive determination will only minimally change what is necessary for a plaintiff to show to the jury in order to meet the burden of proof. (SO 24). A plaintiff would still need to prove specific causation, requiring a restatement of the underlying science and epidemiology, as well as dealing with all argued potential alternative causal factors.

the extreme unlikelihood that any science panel could agree on its scientifically impossible task, Monsanto's settlement requires that the Science Panel *must* find "Causation Not Shown" unless it can establish a "threshold internal dose level" for NHL (as if there was only one type of NHL). (RSA Section 12.3(b); *see also* Ex. 8 to Settlement Agreement, Science Panel Determination Form at 1-2). This provision, notably, has not been changed by the recent amendment to the settlement. Why should the extremely likely inability of the panel to conclude on a threshold internal dose for NHL result in a default to no general causation?   The only reason is that Monsanto wishes to stack the deck.

Yet, the biggest and most unique gift to Monsanto in this settlement is the release of punitive damages. Class Proponents' argument that punitive damages have been bargained away in cases before should be considered in terms of how very few cases they can cite where this has been done. Indeed, they cite to few Circuit Court holdings, while ignoring Objector's reference on *In re Simon II Litig.*, 407 F.3d 125 (2d Cir. 2005) (*see* SO 40). Moreover, they do not and cannot cite to a case where punitive damages were bargained away for a toxic product still on the market.

Moreover, the Reply does not explain why they provide Monsanto a wholesale release for any reprehensible conduct that is yet unknown or that Monsanto may commit in the future. Nowhere do they address Objector's concerns about unchanged section 17.1(a) in the settlement agreement. (SO 38) When combined with the fact that the settlement allows Monsanto to continue to sell Roundup and other glyphosate-containing products along with its future exposure component, the punitive damages giveaway amounts to an approved license to kill.

Nor is there any attempt to describe how this settlement may adversely affect future claimants. There are no doubt tens to hundreds of thousands of people who have had minimal exposure but by definition are still class members. These include children helping their parents

doing yard work, wives temporarily helping out at the farm, teenage children of migrant workers assisting in the fields after school, and anyone who might have been nearby while an application was occurring.   These relatively low-exposed individuals would have no reason to pay attention to a notice even if they saw it. But as time goes by and long after the settlement ceases making monetary payments, a number of these people will likely find themselves in situations where their exposure is greater: teenagers graduate high school and go to work on the family farm; others go into landscaping or work as groundskeepers; and children grow up to enter into their parents' occupations.   Some of these individuals will be diagnosed with NHL.  It is only then that they will seek to bring legal action -- perhaps twenty or thirty years from now.

It is then that they will discover their inclusion in a settlement, even though most of their exposure occurred after the settlement.   If their pre-February 3rd, 2021, exposure is readily apparent, they will be required without any prospects for compensation from the settlement to accede to the giveaways to Monsanto, including no punitive damages regardless of Monsanto's future conduct and the requirement that a science panel's findings will be presented to their jury.

 But even if it is not readily apparent, it is likely that Monsanto will take the position that they were exposed members of the class and attempt to assert that any action is limited by the terms of this settlement.  If it is argued otherwise, Monsanto will respond that it is a bad faith collateral attack on the settlement and move to remove the case as a tag-along action no matter how many years later the action is brought. Monsanto has experience in this area. Indeed, this is exactly what Monsanto did in *In Re: Agent Orange*.  *See Stephenson v. Dow Chemical Co.*, 273 F.3d 249 (2nd Cir. 2001).

Then the litigation nightmare will begin.   Extensive discovery will ensue against the individual claimant with Monsanto attempting to show class membership no matter how *de*

*minimus* the exposure might have been.  If the claimant is determined to be a member of the class and a trial takes place, Monsanto will argue that none of its conduct, no matter how reprehensible, may be discovered or presented to a jury.  In fact, Monsanto will argue that its conduct is irrelevant to a jury's consideration and trials should be limited to the predetermined questions posed to their Science Panel.  All of this is designed to let Monsanto calculate future risk, unencumbered by the unknowable amounts of punitive damages, on a table severely tilted in its favor.

### III.    OTHER ASPECTS OF THE SETTLEMENT

To be sure, a few of Objector's critiques of the settlement were remedied.  The Offer of Judgment which trailed plaintiffs who declined their settlement offers was eliminated. (SO 25-26). The non-disparagement clause required in every release was also eliminated.  (SO 17-18) While wrongful death cases are still stayed for four years, those dying during the pendency of the stay will at least not face the prospect of their heirs and estates losing rights that they had while alive. (SO 28) Under certain circumstances an individual *in extremis* can now petition to be allowed to go to court (SO 28), though the mechanics for this are never specified. Finally, the rather absurd precondition of the science panel that it must rule out "chance, bias, or confounding" has been corrected in response to Objector's lengthy submission.  (SO 19-22).

On the other hand, key elements of the settlement which Objector questioned were ignored. There is no explanation given for how the paltry $5,000 "Accelerated Payment Award" was arrived at or why it is beneficial to class members with NHL.  (SO 8) The extensive indemnification and release provisions for Monsanto remain unchanged. (SO 16). While Class Proponents claim to have tightened the individual release at Exhibit 6, (R12-13) the very broad nature of the release remains, including the waiver of California Civil Code Section 1542 and the release of any 17200 type claims in any state. (SO 17).  Monsanto's four year relief from suits still includes the absurd

Objector Sloviter's Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

overbreadth of everything in Section 2.1(70). (SO 30). The two paragraphs (17.2 and 17.3) waiving the future for the entirety of the class remain; and despite general representations by Class Proponents that the release is only for NHL (RSA 18), this limitation is not found in the text of the RSA nor is the purpose of either section ever explained -- leading to the inescapable conclusion that these releases mean exactly what they say. (SO 30-32)[18] Current and future multiple myeloma sufferers are still forced into the settlement without any compensation from the Claims Program while still being required to make all the same giveaways to Monsanto. (SO 37-38) And, finally, the bizarrely one-sided and one way ability to use the results of the science panel in outside proceedings remains. (SO 44)

On April 27, 2021, a new Legal Services Plan was announced by Class Proponents. (Dkt. 13000). This Plan is now set to begin immediately after this court grants preliminary approval. According to the Plan, Monsanto will be fronting the cost for lawyers selected by class counsel to represent putative class members. Despite the fact that at this time the most important activity for lawyers would be to advise putative class members about whether to opt out or object at the Fairness Hearing, the lawyers chosen by class counsel and paid for by Monsanto are not permitted to represent opt-outs or objectors. (*Id*. § 11.3(c); SO 18-19). Class proponents argue that otherwise there would be a "conflict of interest." (R65). Yet, they ignore even more significant conflicts of interest. On what basis can a Defendant pay lawyers to represent plaintiffs? On what basis can Class Proponents select and supervise lawyers when a settlement has never been approved by the

---

[18] Class Proponents represent that "[t]he objectors' claim that the settlement does apply to non-NHL claims … is simply wrong. *See* Settlement §§ 2.1(7), 17.1 (release tied to NHL only)." (R17-18) However, this is inconsistent with the text of the RSA. § 2.1(7) is about the Claims Administrator. Only §17.1(b) is limited to NHL. §§ 17.1(a), 17.2, and 17.3 contain no language limiting them to NHL.

Objector Sloviter's Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

court?   (*See* Notice Re: Preliminary Plan for Operation of Legal Services Program, Dkt. 13000, at 4-5)

Finally, after more than a year in development, much of this settlement is still incomplete. The April 27 filing by Class Proponents states that the Legal Services Plan will not be presented until one week before this Court's Preliminary Hearing, which is both after the submission of this Sur-reply is due and after this Court has stated that no more papers could be presented.  (Dkt. 13000 at 1).   The recently revised now third Notice Plan refers to the website www.RoundupClass.com 19 times. Yet, as of the date of this submission, the website does not exist so Objector cannot assess what it says.  This is significant because, among other things, the Notice relies on the website to explain the Claims Program.  The supposed labeling addition provides no label to review and one that likely will not even be provided until 180 days *after* this Court approves the settlement, and 30 days after the initial opt out period ends. (RSA 54).  Finally, as has been stated, there are no public health, medical or scientific explanations filling out the skeletons of the Claims Program, the DAGP, or the Research Program.

## CONCLUSION

This is not merely an unfair deal. It is a deal designed to allow Monsanto to poison future generations.  Monsanto knows it can only do this if it can put shackles on our system of justice.  After four attempts, it should be clear that this proposed settlement cannot be remedied. This Court should deny preliminary approval and end this exercise in allowing a corporation to buy its own justice system.

Dated: May 3, 2021                                     */s/ Gerson H. Smoger*
                                                       Gerson H. Smoger
                                                       **SMOGER &ASSOCIATES**
                                                       13250 Branch View Lane
                                                       Dallas, TX 75234
                                                       (510) 531-4529

Objector Sloviter's Sur-Reply to Plaintiffs' Reply Brief and Amended Settlement Agreement
Case No. 16-md-02741-VC

(510) 531-4377 (facsimile)
gerson@texasinjurylaw.com

Steven M. Bronson, Esq. (SBN 246751)
**THE BRONSON FIRM APC**
7777 Fay Avenue, Suite 202
La Jolla, CA 92037
Telephone: 619-374-4130
Facsimile: 619-568-3365
sbronson@thebronsonfirm.com

*Counsel for Objector Melinda Sloviter*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of May 2021, a copy of the foregoing was filed with the Clerk of the Court through the CM/ECF system which sent notice of the filing to all appearing parties of record.

*/s/ Gerson H. Smoger*
Gerson H. Smoger
**SMOGER &ASSOCIATES**
13250 Branch View Lane
Dallas, TX 75234
(510) 531-4529
(510) 531-4377 (facsimile)
gerson@texasinjurylaw.com