Pages 1 - 182

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

```
ROBERT RAMIREZ; et al.,        )
                               )
           Plaintiffs,         )
                               )
   VS.                         )    NO. C 19-02224 VC
                               )
MONSANTO COMPANY,              )
                               )
           Defendant.          )
_____)
IN RE ROUNDUP PRODUCTS         )
LIABILITY LITIGATION.          )
                               )    NO. 16-md-02741 VC
                               )
_____)
```

San Francisco, California
Wednesday, May 19, 2021

**TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**

**APPEARANCES BY ZOOM WEBINAR:**

For Plaintiffs:

                    LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
                    275 Battery Street - 29th Floor
                    San Francisco, California  94111
             BY:    **ELIZABETH J. CABRASER, ATTORNEY AT LAW**
                    **ROBERT L. LIEFF, ATTORNEY AT LAW**

                    NYU SCHOOL OF LAW
                    40 Washington Square South - Suite 411J
                    New York, New York  10012
             BY:    **SAMUEL ISSACHAROFF, REISS PROFESSOR OF**
                        **CONSTITUTIONAL LAW**

                **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

```
1   APPEARANCES BY ZOOM WEBINAR:  (CONTINUED)

2   For Plaintiffs:
                            FEGAN SCOTT LLC
3                           150 S. Wacker Drive - 24th Floor
                            Chicago, Illinois  60606
4                  BY:  ELIZABETH A. FEGAN, ATTORNEY AT LAW

5                           AUDET & PARTNERS LLP
                            711 Van Ness Avenue - Suite 500
6                           San Francisco, California  94102
                   BY:  WILLIAM M. AUDET, ATTORNEY AT LAW
7
                            THE DUGAN LAW FIRM, APLC
8                           365 Canal Street
                            One Canal Place - Suite 1000
9                           New Orleans, Louisiana  70130
                   BY:  JAMES R. DUGAN, II, ATTORNEY AT LAW
10
                            THE DUGAN LAW FIRM, APLC
11                          269 S. 3rd Street
                            Philadelphia, Pennsylvania  19106
12                 BY:  TERRIANNE BENEDETTO, ATTORNEY AT LAW

13                          WEITZ & LUXENBERG PC
                            700 Broadway
14                          New York, New York  10003
                   BY:  ROBIN L. GREENWALD, ATTORNEY AT LAW
15
                            ANDRUS WAGSTAFF PC
16                          7171 W. Alaska Drive
                            Lakewood, Colorado  80226
17                 BY:  AIMEE H. WAGSTAFF, ATTORNEY AT LAW

18                          THE MILLER FIRM LLC
                            108 Railroad Avenue
19                          Orange, Virginia  22960
                   BY:  MICHAEL J. MILLER, ATTORNEY AT LAW
20
    For Defendant:
21                          ARNOLD & PORTER KAYE SCHOLER LLP
                            601 Massachusetts Avenue, NW
22                          Washington, D.C.  20001
                   BY:  WILLIAM HOFFMAN, ATTORNEY AT LAW
23                      DAVID J. WEINER, ATTORNEY AT LAW

24

25
```

**APPEARANCES BY ZOOM WEBINAR:**   (CONTINUED)

For Defendant:
                        WACHTELL, LIPTON, ROSEN & KATZ
                        51 West 52nd Street
                        New York, New York 10019
                BY:  **JEFFREY M. WINTNER, ATTORNEY AT LAW**
                     **CARRIE M. REILLY, ATTORNEY AT LAW**

For Objector Melinda Sloviter:
                        SMOGER & ASSOCIATES, P.C.
                        3175 Monterey Boulevard
                        Oakland, California  94602
                BY:  **GERSON H. SMOGER, ATTORNEY AT LAW**

For Objector Adam Williams:
                        DALIMONTE RUEB STOLLER LLP
                        515 S. Figueroa Street - Suite 1550
                        Los Angeles, California  90071
                BY:  **BEHRAM V. PAREKH, ATTORNEY AT LAW**

For Gibbs Objectors:
                        COONEY & CONWAY
                        120 North La Salle Street - 30th Floor
                        Chicago, Illinois  60602
                BY:  **JOHN D. COONEY, ATTORNEY AT LAW**

For *Amicus Curiae* Public Citizen and Public Citizen Foundation:
                        PUBLIC CITIZEN LITIGATION GROUP
                        1600 20th Street, N.W.
                        Washington, D.C.  20009
                BY:  **MICHAEL T. KIRKPATRICK, ATTORNEY AT LAW**

For Objectors Howard Gee, Jr., et al.:
                        GEORGE WASHINGTON UNIVERSITY
                        2000 H Street, N.W.
                        Washington, D.C.  20052
                BY:  **ALAN B. MORRISON, DEAN FOR PUBLIC**
                        **INTEREST AND PUBLIC SERVICE LAW**

For Objectors Arnold & Itkin LLP and Kline & Specter, P.C.:
                        STANFORD LAW SCHOOL
                        559 Nathan Abbott Way
                        Stanford, California  94305
                BY:  **DAVID FREEMAN ENGSTROM, ATTORNEY AT LAW**

**APPEARANCES BY ZOOM WEBINAR:**   (CONTINUED)

For Objector Public Justice:
                         PUBLIC JUTICE
                         475 14th Street - Suite 610
                         Oakland, California  94612
                    BY:  **LESLIE A. BRUECKNER, ATTORNEY AT LAW**


Also Present:        **Shannon Wheatman**
                     **Mark Eveland**
                     **Matthew Garretson**
                     **Settlement Program Agents and**
                       **Administrators**

| | |
|---|---|
| 1 | **<u>Wednesday - May 19, 2021</u>**                    **<u>10:06 a.m.</u>** |
| 2 | **<u>P R O C E E D I N G S</u>** |
| 3 | **---oOo---** |
| 4 |         **THE CLERK:**  Calling Case Number 16-md-2741, In Re |
| 5 | Roundup Products Liability Litigation and Case |
| 6 | Number 19-cv-2224, Ramirez vs. Monsanto Company. |
| 7 |      Counsel for class plaintiffs, please state your appearance |
| 8 | for the record. |
| 9 |         **MS. CABRASER:**  Good morning, Your Honor.  Elizabeth |
| 10 | Cabraser for the Ramirez class plaintiffs.  With me on video |
| 11 | are co-counsel Samuel Issacharoff and Beth Fegan, also |
| 12 | co-counsel Robert Lieff, James Dugan, TerriAnne Benedetto, and |
| 13 | William Audet available on audio, as are our proposed notice |
| 14 | and settlement program agents and administrators Shannon |
| 15 | Wheatman, Mark Eveland, and Matthew Garretson. |
| 16 |         **THE COURT:**  Hello, everybody. |
| 17 |         **THE CLERK:**  For co-lead plaintiffs. |
| 18 |         **MS. WAGSTAFF:**  Good morning, Your Honor.  Aimee |
| 19 | Wagstaff on behalf of the MDL co-lead.  I'm here with my |
| 20 | co-lead counsel Robin Greenwald and Mike Miller. |
| 21 |         **THE COURT:**  Hello. |
| 22 |         **MS. GREENWALD:**  Good morning, Judge. |
| 23 |         **THE CLERK:**  For defendant. |
| 24 |         **MR. HOFFMAN:**  Good morning, Your Honor.  William |
| 25 | Hoffman on behalf of Monsanto along with Jeffrey Wintner, |

1    Carrie Reilly, and David Weiner.

2            **THE COURT:**  Hello.

3            **THE CLERK:**  And Mr. Smoger for objectors.

4            **MR. SMOGER:**  Good morning, Your Honor.  This is Gerson

5    Smoger, and I'm here on behalf of objector Sloviter.

6            **THE COURT:**  Hi.

7            **THE CLERK:**  And Mr. Parekh.

8            **MR. PAREKH:**  Good morning, Your Honor.  Behram Parekh

9    on behalf of objectors Mr. Williamson -- Williams.  I'm sorry.

10           **THE COURT:**  Hi.

11           **THE CLERK:**  Mr. Cooney.

12           **MR. COONEY:**  Good morning, Your Honor.  John Cooney on

13   behalf of the Gibbs objectors.

14           **THE COURT:**  Hello.

15           **THE CLERK:**  Mr. Kirkpatrick.

16           **MR. KIRKPATRICK:**  Good morning, Your Honor.  Michael

17   Kirkpatrick on behalf of *amici curiae* Public Citizen and Public

18   Citizen Foundation.

19           **THE COURT:**  Hello.

20           **THE CLERK:**  Mr. Morrison.

21                   (Pause in proceedings.)

22           **THE COURT:**  I think he may have disappeared.

23           **THE CLERK:**  Okay.  We'll skip to Mr. Engstrom.

24           **MR. ENGSTROM:**  Good morning, Your Honor.  I'm David

25   Freeman Engstrom on behalf of the Itkin and Klein inspector

1    objectors.

2              **THE COURT:**  Hello.

3        Is that it?

4              **THE CLERK:**  And that should be it.

5              **MR. SMOGER:**  Your Honor, Mr. Morrison was here and

6    disappeared, and he would be appearing on behalf of the Gee

7    objectors when he comes back.

8              **THE COURT:**  Okay.  Good.  Well, he should -- you

9    should tell him to raise his hand and we'll bring him back in

10   if and when he is able to get back into the virtual courtroom.

11       I guess one initial question for the objectors is:  Have

12   you-all coordinated amongst yourselves and identified somebody

13   who's going to be taking the lead, you know, on behalf of

14   objectors and/or *amicus*, or how is that going to work?

15                    (Pause in proceedings.)

16             **THE COURT:**  I guess the answer is no.

17             **MR. PAREKH:**  Your Honor, this is -- I apologize,

18   Your Honor.  This is Behram Parekh.

19       We've done some informal very loose coordination or

20   nothing formal that suggested that a person would take the

21   lead.

22             **THE COURT:**  Okay.  Well, and maybe -- you know, maybe

23   it just kind of depends on the topic that we're discussing so

24   we'll see how it goes.

25       Let me start by saying I was going back over the questions

1  that I put out yesterday, and I found myself regretting a

2  little bit that I didn't separate out the questions based on

3  class; right?  There are two you're calling them subclasses.

4  I've started calling them classes just because it's easier to

5  say.  But there are two classes and I think it's important to

6  remember that the answer to my questions that I put out

7  yesterday and the answer to many other questions will be -- you

8  know, it depends on which class you're talking about.

9      And so I think it's important for purposes of this

10  discussion to separate out the classes and to start by having a

11  discussion exclusively about one class and then later on move

12  to a discussion exclusively about the other class; right?

13      So, you know, one class is, you know, a class of people

14  who have been diagnosed with NHL and have been exposed to

15  Roundup and have not yet hired lawyers; right?  That's Class

16  Number 1.

17      And Class Number 2 consists of people who have been

18  exposed to Roundup but have not yet been diagnosed with NHL;

19  and there's a further limitation to that as I recall.  It's not

20  anybody who's been exposed to Roundup but people who have been

21  exposed to Roundup in particular occupations and through

22  residential use but they've not yet developed NHL.

23      And this proposed settlement covers both of those proposed

24  classes, but the interests of those class members, you know, in

25  a number of ways are quite distinct.  So I think it's very

```
 1   important -- I think one of the difficult things -- one of the

 2   many difficult things about slogging through the briefs was

 3   that, you know, they were, for the most part, not separated out

 4   into a discussion of whether this is a reasonable settlement

 5   for the first class and then whether this is a reasonable

 6   settlement for the second class, and a lot of points are made

 7   and, you know, it's hard to know sometimes which point applies

 8   to which class.

 9        So I think that's the most important thing, is that we

10   have -- we separate out the classes in our discussion

11   completely, and I think I'd like to start with Class Number 2.

12        Oh, one other thing I want to say is that as recently as

13   yesterday evening, I was sort of pounding the podium saying

14   there's no way that this deal can be reasonable for Class

15   Number 1, for the people who have already been diagnosed with

16   NHL and have been exposed to Roundup and haven't hired a lawyer

17   yet, but I'm actually starting -- I'm starting to have second

18   thoughts about that as I was reflecting on it further last

19   night and this morning.

20        I think a settlement -- I don't know if this exact

21   settlement is reasonable, but I think a settlement of this type

22   could potentially be reasonable for, you know, the first --

23   Class Number 1.

24        As for Class Number 2, I have -- my concerns are -- I have

25   concerns about both of them, but my concerns about Class
```

 1  Number 2 are even greater, and so I think that -- much greater

 2  I would say.  So I think we should start by exclusively

 3  focusing on Class Number 2, the futures, the people who have

 4  been exposed to Roundup but have not yet been diagnosed with

 5  NHL, and we'll do that this morning.

 6      And, by the way, we'll go until about 12:30 and then we'll

 7  have a lunch break and we'll resume at about 1:30.  I think the

 8  morning session we can -- we'll probably take up the entire

 9  morning session discussing the futures class, Class Number 2,

10  and then in the afternoon hopefully we'll have time to discuss

11  Class Number 1.

12      So regarding Class Number 2, I think the first and perhaps

13  the most important thing to discuss is litigation risk, and I

14  think that's another thing that was largely glossed over in all

15  of the briefs.  So, again, thinking about it from the

16  standpoint of the futures, the people who have not yet been

17  diagnosed with NHL, it seems to me that by far the greatest

18  litigation risk they have -- wait a minute.

19      I want to make sure -- Ms. Cabraser's box just moved on

20  the screen.  I want to make sure she's still there.  Oh, yeah.

21  There she is.

22          MS. CABRASER:  I'm still here.

23          THE COURT:  Gotcha.

24      So, you know, I think the judge's first job in considering

25  a proposed settlement like this is to assess the litigation

1   risk, the risk of not settling and, you know, plowing ahead;

2   and it seems to me that for the people who have not yet been

3   diagnosed with NHL, by far the biggest litigation risk is that

4   the Supreme Court would rule at some point that these state law

5   claims are preempted and that they would have no claim

6   whatsoever, you know, if they were unable to obtain a recovery

7   or a settlement before the Supreme Court does that.

8        So I guess for Ms. Cabraser, first, let me ask you.  Do

9   you agree by far that's the greatest litigation risk for those

10  people?

11       MS. CABRASER:  Yes, Your Honor.  That is the risk that

12  could wipe out at least some and perhaps, arguably, all of the

13  tort claims of people that have been exposed to Roundup, and --

14       THE COURT:  How would it wipe out only some?  What's

15  the scenario where the Supreme Court issues a preemption ruling

16  that only applies to some state law claims that Roundup caused

17  people's NHL?

18       MS. CABRASER:  Your Honor, it's an unlikely and narrow

19  path, but it is just possible, although I don't think the

20  Ninth Circuit *Hardeman* decision on the evidence supports it

21  thus far, it's just possible that a court could find

22  intentional fraud violation of the common law duty not to

23  deceive by Monsanto; and the Supreme Court at least twice in

24  tobacco-related decisions has held that claim not preempted,

25  but it's very narrow.  And these cases have sounded thus far

```
 1    and I think, you know, most clearly in failure to warn, and so

 2    that is where preemption is an ongoing risk.

 3         And though we were very pleased to see the Ninth Circuit

 4    affirm all this Court's factual findings in *Hardeman* and affirm

 5    the verdict for Mr. Hardeman, which was wonderful news, there

 6    was some language in the decision to give us pause.

 7         It was a victory for plaintiffs on preemption as well, no

 8    question, but we do note for the Court just in light of the

 9    ongoing controversy and risk of preemption, a brief filed oddly

10    by the Environmental Protection Agency yesterday in another

11    case, *Natural Resources Defense Council vs. EPA*,

12    Number 20-70787, vociferously arguing for preemption.

13         So that is an ongoing hurdle that --

14              THE COURT:  Wait.  But is that -- sorry -- is that a

15    case involving FIFRA?

16              MS. CABRASER:  It is a case involving FIFRA and

17    specifically glyphosate.

18              THE COURT:  Oh.  Is this a case where NRDC is trying

19    to get the Feds. to take the product -- to stop approving the

20    product or something like that?

21              MS. CABRASER:  Yes.  Yes, Your Honor.  That's my

22    understanding.  I'm not a party in that case, but reading the

23    EPA's brief, that is the EPA's position, that they're entitled

24    to absolute deference and that attempt is preempted.

25              MR. HOFFMAN:  Your Honor --
```

1          **THE COURT:**  But that's not an issue -- that's not an

2     issue of federal preemption of state law claims, is it?

3          **MS. CABRASER:**  Well --

4          **MR. HOFFMAN:**  Your Honor, with Ms. Cabraser's

5     permission, maybe I can jump in --

6          **MS. CABRASER:**  Please.

7          **MR. HOFFMAN:**  -- because we're more directly involved.

8        You're right, Your Honor, it's a challenge to the interim

9     registration decision and administrative law challenge.

10       At the point of the change of Administrations, the EPA

11    asked to stay proceedings so it could reassess its position on

12    the glyphosate preregistration; and yesterday they filed a

13    brief reiterating that, with respect to safety issues and in

14    particular with respect to the question of whether glyphosate

15    is capable of causing cancer, it was reaffirming yet again the

16    agency's position.

17         **THE COURT:**  Okay.  But that doesn't have anything to

18    do with federal preemption of state law claims nor, I think,

19    does it necessarily have anything to do with the position the

20    EPA will take in the future regarding federal preemption of

21    state law claims.

22       I mean, I know EPA has taken a position, you know, and I

23    believe took the position in the *Hardeman* case that these

24    claims are federally preempted -- right? -- but it's at least

25    possible that they could change their position on that.

1          **MR. HOFFMAN:**  You're correct, Your Honor.  That is not

2     an issue that was squarely presented in this case, though it is

3     a bit of evidence with respect to some of the scientific

4     issues --

5          **THE COURT:**  Right.

6          **MR. HOFFMAN:**  -- involved in the case.

7          **THE COURT:**  Right.

8          **MR. HOFFMAN:**  I just wanted to clarify that.

9          **THE COURT:**  Okay.  But it does seem to me that one of

10    the things that needs to be conducted that has not been

11    conducted in the papers is an assessment of the risk to the

12    plaintiffs that the Supreme Court will issue a preemption

13    ruling in *Hardeman* or in some future case; right?

14         And if we agree that that is by far the biggest litigation

15    risk facing, you know, the people in Class 2 -- I mean, it's

16    probably also the biggest litigation risk that the people in

17    Class 1 face, but we'll hold off on that -- you know, I need to

18    conduct an assessment of that litigation risk.  So what is your

19    assessment of that risk?

20         **MS. CABRASER:**  Your Honor, our qualitative assessment

21    of that risk is that it is an ongoing and material risk and one

22    that class members should be aware of and is reflected in the

23    notice papers.

24         **THE COURT:**  The risk of a Supreme Court preemption

25    ruling is reflected in the notice papers?

1          **MS. CABRASER:**  The risk of negative rulings on

2     preemption.  We haven't specified the specific risk of a

3     Supreme Court ruling.  That's something that can easily be

4     done.

5          For example, Your Honor, when we got the *Hardeman*

6     decision --

7          **THE COURT:**  But I didn't -- sorry to interrupt, but I

8     can't -- you know, I can't represent to you that I've been

9     through every word of the proposed notice, but I didn't see

10    anything in there about a risk of, you know, an adverse

11    preemption ruling notice.

12         **MS. CABRASER:**  It's presented as a disputed issue in

13    the case.

14         **THE COURT:**  Okay.

15         **MS. CABRASER:**  And I think it would -- I think it

16    would, Your Honor, be preferable and certainly doable to call

17    out specific litigation risks as we are adding to the notice to

18    call out the specific holdings of the Ninth Circuit in

19    *Hardeman*.

20         **THE COURT:**  But I'm not focusing so much on the notice

21    right now as just my own assessment that I am required to

22    conduct of the litigation risk; right?

23         And I think the only real risk -- I mean, I think if the

24    Supreme Court were to rule tomorrow, you know, "No, we're not

25    going to deviate from our reasoning in *Bates* and, you know,

 1    claims like this are not preempted," if the Supreme Court were

 2    to issue that ruling tomorrow, we would be sitting here saying

 3    essentially that the class members have no meaningful

 4    litigation risk.  I mean, there is --

 5         MS. CABRASER:  I'm not sure that's -- I'm not sure

 6    that's precisely true, Your Honor.  Certainly that is the legal

 7    risk, that is the risk of a preemptive -- you know, a binding

 8    preemptive holding that would bar state claims from even being

 9    brought, and I do think that's a risk that the Court must

10    assess.

11         There are also other more practical litigation risks for

12    class members to be aware of.

13         THE COURT:  But they're very, very low compared to

14    your typical case; right?  Very low.  I mean, you know, we've

15    seen from the three trials that have taken place, particularly

16    from the federal trial, which was structured in the most fair

17    way possible for Monsanto -- right? -- if Monsanto can't win a

18    trial with that sort of structure where we're keeping out the

19    most damning evidence until after the jury has decided

20    causation, I mean, you know, if Monsanto can't win a trial with

21    that structure, it's in big, big trouble; right?

22         MS. CABRASER:  Your Honor, *Hardeman* was a green light

23    for plaintiffs on those issues certainly; and although the

24    sample size of three trials is a small one, nonetheless, it is

25    significant that plaintiffs have won all three.

1      On the other hand, and this is a practical litigation risk

2  that is important for class members in evaluating the choices

3  of settling and litigating, *Hardeman* is a yellow light on

4  punitive damages.  It upheld this Court's calculation of the

5  3.8-to-1 ratio but cautioned the rest of the Roundup

6  litigation, specifically the 5,000 claims that the *Hardeman*

7  panel thinks are next in line, that that ratio would be reduced

8  and could vanish entirely if and as the outer limits of due

9  process are reached.  And of course in the arena of punitive

10  damages, due process belongs entirely to the defendant.

11      And so that's a concern we've always had, that our class

12  members, particularly the Class 2 members, those are the ones

13  we're talking about, are not even at the back of a very long

14  line for trial.  They're not even in that line yet, and so

15  while --

16      **THE COURT:**  Yeah.  I mean, I think we could -- we

17  could probably spend all day quibbling about those sorts of,

18  you know, risks, litigation risks.  I could respond by saying:

19  Well, Monsanto is not taking it off the shelf and Monsanto is

20  not even willing to put a warning on its label; and so maybe,

21  you know, somebody who gets NHL 15 years from now as a result

22  and they claim it's from Roundup will still be able to get

23  punitive damages.  Maybe not 4-to-1.  Maybe 1-to-1, something

24  like that.  I don't know.

25      But I'm not sure it's worth our quibbling on that because

```
 1   I think you would have to agree that, at a minimum, by far the
 2   biggest risk is the Supreme Court preemption -- adverse
 3   Supreme Court preemption ruling; and that if the Supreme Court
 4   were to rule tomorrow that there's no federal preemption, the
 5   risk for the class members would be dramatically reduced.  Do
 6   you agree with that?
 7            MS. CABRASER:  Yes, Your Honor, I agree with that.
 8            THE COURT:  Okay.  So what is the risk of the
 9   Supreme Court issuing an adverse preemption ruling for the
10   plaintiffs?
11            MS. FEGAN:  May I respond?
12            MS. CABRASER:  Please.
13            MS. FEGAN:  Thank you.
14            MS. CABRASER:  By the way, Your Honor, Beth Fegan
15   specifically represents what we call Subclass 2, what
16   Your Honor calls Class 2.
17            THE COURT:  Great.
18            MS. FEGAN:  Your Honor, thank you.
19        There's a significant risk.  There are only 14 states that
20   recognize medical monitoring either as an independent cause of
21   action or as a remedy.  So for 36 states, there would be no
22   remedy at all regardless of a preemption ruling.  So there's a
23   significant risk here that for residents and citizens in 36
24   states that there be absolutely no medical monitoring option at
25   all, no education, no opportunity to understand their exposure,
```

1    the symptoms that they've been exposed to, or --

2         THE COURT:  What does this have to do with my question

3    about preemption?

4         MS. FEGAN:  I'm sorry.  Your follow-up question,

5    Your Honor, was if preemption -- if the Supreme Court rejected

6    preemption, there would be no risk at all; and I'm pointing

7    out --

8         THE COURT:  So what I said is that the risk is -- the

9    litigation risk is dramatically reduced.  And then I said:  So

10   what is the litigation -- what is the risk of the Supreme Court

11   issuing a preemption ruling?

12       I think we've agreed that that's by far the greatest risk

13   for the plaintiffs; and if that risk were eliminated, you know,

14   the calculus would have to change dramatically in the

15   assessment of the reasonableness of a proposed settlement.

16       So given our apparent agreement about that, what is the

17   risk?  What is the nature of the -- what is your assessment of

18   the risk that the Supreme Court will issue an adverse

19   preemption ruling for the defendant -- for the plaintiffs?

20        MS. CABRASER:  Your Honor, would that we were all able

21   to infallibly predict what this Supreme Court will do on

22   preemption.  We have some past history with some still sitting

23   justices.  There are people on this Zoom panel who are

24   Supreme Court watchers and Supreme Court advocates and could

25   give you those views.  I don't know what the football pool

 1   would be on that.

 2        I would simply say that because preemption is so important

 3   and because it is a game changer, as Your Honor has mentioned,

 4   I think as responsible plaintiffs' lawyers, when we have a

 5   class settlement that provides a safe harbor from a negative

 6   preemption ruling for plaintiffs by the Supreme Court, we have

 7   to take that seriously.

 8        Can I give you a specific percentage as I sit here today?

 9   I cannot.  Perhaps Mr. Issacharoff could.  He's a Supreme Court

10   advocate and a court watcher, but I can't -- I can't put it in

11   precise percentage terms.

12        **THE COURT:**  Okay.  Well, that's fine.  And, you know,

13   if anybody else wants to weigh in on that, that's fine; but I

14   guess the next question would be -- I guess what I will say is

15   I agree with your general statement that you need to take it --

16   you need to take that risk very seriously.  I agree with that.

17        But I guess the question for -- you know, I'm putting

18   myself in the shoes of someone who's in Class 2.  Okay?  I've

19   been exposed to Roundup.  Let's say I've been using Roundup for

20   the last five years regularly in my yard to get rid of the

21   poison oak and I have not been diagnosed with NHL.  And, you

22   know, there's this -- let's say that I feel that, you know, if

23   the Supreme Court rules -- you know, rules in favor of Monsanto

24   on preemption, I know that I'm going to get nothing; and if the

25   Supreme Court rules against -- it doesn't take the case or

1  rules in favor of the plaintiffs on preemption, whenever I get

2  NHL, I'm going to have a very -- you know, a very valuable

3  lawsuit against Monsanto.  Why would I want to be part of this

4  deal?  Why would I want to be in this class?

5          **MS. CABRASER:**  Your Honor, you -- well, the

6  hypothetical class member that you have described would very

7  much want to be a part of this deal because of the safe harbor

8  that it offers as well as the diagnostic services and research.

9          You know, there are -- there are many things that are

10  valuable to us in our lives.  A good lawsuit is certainly one

11  of them.  We have a property right in our compensatory damages

12  if that happens; but I would say particularly in the past year

13  and a half under COVID, many of us realize there's something

14  more important and valuable than that, and that is our health.

15          And if I am made aware that there is a risk of NHL because

16  I've used that Roundup and that I should get that checked out

17  because if I find out early, I'll be able to manage my health

18  better and be less of a burden on my family and also if it

19  turns out I'm diagnosed with NHL, I'll get a sum certain in a

20  settlement without having to prove causation or liability,

21  without having to worry about preemption as long as the

22  settlement program lasts and I'm in the settlement, then that's

23  something very much worth considering because --

24          **THE COURT:**  Okay.  But as long as the settlement

25  program lasts.  I mean, we can talk about -- we can and should

1    talk about medical monitoring and diagnostic services and how

2    valuable or not valuable that is to somebody in my position.

3         I'm the hypothetical person who's been spraying for five

4    years in my yard -- okay? -- and let's just say hypothetically

5    that I'm 51 years old.  And, you know, I'm looking at the

6    settlement which contemplates medical monitoring for, like,

7    four years and which contemplates that there will be a

8    compensation fund for, like, four years at -- you know, four

9    years maybe -- right? -- if the money doesn't run out before

10   the four years is over.

11        And, you know, I know that NHL has a -- you know, has a

12   tensed-out long latency period and, as a matter of fact, the

13   plaintiffs' star witness, star expert witness, at the *Hardeman*

14   trial acknowledged that, you know, if you're talking about

15   getting NHL from exposure to Roundup, you're looking at a 10-

16   or a 15-year latency period so that you won't contract the

17   disease until, you know, 10 or 15 years after exposure.

18        And, you know, so the medical -- the four years of medical

19   monitoring and the possibility of getting some compensation if

20   I am diagnosed with NHL in the next two or three or four years

21   is not particularly enticing to me.  Why would I want to be a

22   part of a settlement like that?

23             **MS. CABRASER:**  Because, Your Honor, that settlement

24   does provide you with an insurance policy as well as benefits

25   and services during that period of time because the settlement

 1   is renewable with additional funding at the end of that four

 2   years.

 3            **THE COURT:**  I mean, if Monsanto decides to put in

 4   additional funding and if the plaintiffs decide to extend it

 5   and if the Court decides to extend it; right?  But there's --

 6   you know, there's no assurance -- there's not even any

 7   assurance that the money is going to be there in four years to

 8   pay to compensate me; and I certainly can't bank in any

 9   meaningful way at all on -- oh, there's Mr. Morrison.  I see

10   Mr. Morrison raising his hand.  So if we want to let him back

11   in.

12            **MS. CABRASER:**  Your Honor, the settlement --

13            **THE COURT:**  Why would I -- sorry.  Let me just finish

14   my thought.

15        Why would I -- you know, why would I possibly sign on to a

16   settlement agreement like that?  Why wouldn't I just say,

17   "Look, you know, there's no indication that there's going to be

18   any money for me when" -- oh, by the way, one other thing.

19        You know, more than 50 percent of people who get diagnosed

20   with NHL get diagnosed after the age of 65.  So, you know, here

21   I am, I'm 51.  I've been spraying Roundup in my yard for a few

22   years.  You know, I don't have NHL yet and if I get diagnosed

23   with NHL, it's probably going to be when I'm 65 or older.

24   There's no reason for me to believe that there's going to be

25   any compensation for me as a result of this settlement.

1          There's no reason to believe that there's going to be

2     medical monitoring for me at the time that I'm most likely to

3     contract the disease; and, yet, I'm, you know, giving up -- I'm

4     giving up the right to sue if I get it -- if I do get it in two

5     years and I'm giving up the right to seek punitive damages

6     despite being harmed by a product that Monsanto is unwilling to

7     put a warning label on.

8          I just can't understand why I would -- why it would be in

9     my interest or in, you know, the vast majority of the class

10    members' interest to not opt out of a settlement like that.

11          **MS. CABRASER:**  Your Honor, I'll give you three general

12    answers, and then I'll pass the baton to Ms. Fegan who

13    specifically represents Your Honor as a hypothetical Subclass 2

14    member for those benefits.

15          But, first, the experts, the experts that estimate claims

16    rates and damages rates for very long-term settlements,

17    including asbestos settlements, have filed declarations here

18    with respect to the estimation of the claims that will come in

19    and the sufficiency of the money to pay them.

20          If for some strange reason those experts are wrong -- and

21    they're not wrong, this is their living -- then pretty

22    obviously Monsanto would pay those individual claims because

23    otherwise people can pass into the tort system without

24    affirmatively opting out on the back end to pursue all their

25    compensatory claims.

 1          Number two, the incentives and disincentives are set up --

 2          **THE COURT:**  Well, then why haven't -- why not just do

 3     an estimate of the amount of claims that are actually going to

 4     be and establish a fund right off the bat that will be

 5     sufficient to pay my claim when I get diagnosed with NHL at

 6     age 67?

 7          **MS. CABRASER:**  Because, Your Honor, while that may be

 8     rational -- that's a rational alternative, it's not a realistic

 9     alternative.  The money would not be as good.  Defendants do

10     not enter into completely open-ended funds without some brakes

11     and guardrails and without ongoing court supervision.  That's

12     why the class action -- the settlement class action structure

13     is utilized in cases like this.

14          And as I was saying, the incentives and disincentives are

15     designed to promote the continuation of that fund past the four

16     years and, you know, effectively in perpetuity because, number

17     one, if Monsanto doesn't, it's got to pay a break-up fee to the

18     class of $200 million to be used to pay --

19          **THE COURT:**  A $200 million break-up fee does not sound

20     like a big break-up fee compared to, you know, the amount of

21     money Monsanto is spending to settle these cases and would have

22     to spend to settle future cases.  It sounds like peanuts.

23          **MS. CABRASER:**  Well, the alternative, Your Honor, if

24     Monsanto did not continue -- did not continue the fund at a

25     funding level that would be satisfactory at that time under

 1  those present circumstances to the Court, it would be paying

 2  claims outside the settlement because people that either have

 3  not made a claim during the term of the settlement or had

 4  rejected their settlement offers would have their compensatory

 5  claims intact, including, by the way, anything --

 6       THE COURT:  But their lawsuits, their claims would be

 7  a lot less valuable because it wouldn't be accompanied with a

 8  punitive damages claim.

 9       MS. CABRASER:  Your Honor, these would be claims that

10  would be based on past exposure to Roundup essentially during

11  the same terms of years that --

12       THE COURT:  Mr. Smoger, can I ask you?  You're just

13  sitting there below Ms. Cabraser, at least on my screen you're

14  directly below Ms. Cabraser, and all you're doing is shaking

15  your head and it's not really appropriate and it's distracting.

16    Sorry.

17       MS. CABRASER:  The problem that we're trying to solve,

18  Your Honor, is a very practical problem that is caused by the

19  fact that today in light of the three trial victories, there

20  are at least 20 additional cases set for trial by people that

21  were exposed to Roundup during the same general, you know, time

22  period as our class.  They will all get to trial before our

23  class as will the 4- to 5,000 other cases that have been

24  released from litigation holds and that are in the system.

25       So the queue is long.  We heed the *Hardeman* warning.  We

know that that punitive damages claim, not a right, but that

punitive damages claim as a valuable piece of not property,

because it doesn't belong to the plaintiff, is depreciating.

We don't know at what rate, we don't know to what extent; but

we do know that for cases like ours that are based on what

Monsanto knew or should have known in the past and what the

science, you know, was or should have been during that exposure

period, we are going to be faced with the most likely scenario.

       Can I give you a specific percentage?  No, I can't.

That's up to the Appellate Courts, but we are going to be faced

with a scenario where what we have left, Subclass 2, at that

time are what the settlement preserves and reserves for us are

full compensatory claims, including any individual medical

monitoring expenses we had to incur after the DAGP is gone or

if it doesn't reach us.

       Those are our claims, our property rights.  We keep them.

We can assert them.  We know those can't be taken away by the

settlement or by the Court.  We'll be facing whatever the

litigation landscape is at that time; but in the meantime we

have the safe harbor of a compensation program, a diagnostic

program, and research program, $40 million into the diagnosis

and treatment of NHL.

       In other words, if we're going to value our health in our

calculus as to whether we take the deal or walk, I think for a

class member concerned about health, longevity, quality of

1    life, you know, it's like the credit card commercial:   Some

2    things you can put a price on.   Some things are priceless like

3    health and safety.   For everything else there's Mastercard.

4        So because of the remedies that we are striving to deliver

5    to this particular class, we cannot look only at things that

6    are arguably reducible to dollars and cents.

7            **THE COURT:**   Okay.   And we'll get to the -- we'll

8    discuss the medical monitoring part of it more in a minute, but

9    can I just get confirmation from you?

10       So if I do become a member of this class, if I don't opt

11   out, I am -- and let's say two years from now the Supreme Court

12   issues a preemption ruling favorable to Monsanto, I can

13   still -- that doesn't prevent me in any way from getting

14   compensation from the fund; is that correct?

15           **MS. CABRASER:**   That is correct.

16           **THE COURT:**   Okay.

17           **MS. CABRASER:**   The fund is the safe harbor.

18           **THE COURT:**   But if I opt out and I sue for -- I can no

19   longer opt out and sue for compensatory damages; correct?   So

20   if the Supreme Court -- you have this -- and I don't know how

21   much it matters, but I just want to make sure I understand.

22           **MS. CABRASER:**   Yes.

23           **THE COURT:**   Let's say the Supreme Court issues a

24   preemption ruling in two years in favor of Monsanto and then

25   when I'm 67, I get diagnosed with NHL and I see that there's no

 1   money left in the fund -- there's no more fund or there's no
 2   money left in the fund for me, and I say, "Okay.  No big deal
 3   because I can sue for compensatory damages."  I assume the
 4   answer there is that I can't sue for compensatory damages
 5   because the Supreme Court has ruled that my claim is preempted
 6   by federal law; is that correct?

 7       MS. CABRASER:  That's correct, if the Supreme Court
 8   has made that ruling.  Would that our settlement could bind the
 9   Supreme Court, Your Honor, I would do it in a heartbeat, but
10   you are absolutely right.  The person at that time would take
11   the litigation landscape as it was.  We can't vaccinate someone
12   who is no longer in the class against preemption.

13       THE COURT:  But is there -- I was wondering -- you
14   know, I started thinking about this last night, and these are
15   not fully formed thoughts, but does that have to be the case?
16   I mean, could Monsanto waive a federal preemption defense?  Is
17   that the kind of thing you can waive?

18       MS. CABRASER:  That is a good question, Your Honor.  I
19   don't honestly have the answer to that.  I can tell you that
20   Monsanto has, indeed, waived certain defenses with respect to
21   class members even, even those who opt out.  For example,
22   during the pendency of the settlement period, statutes of
23   limitations are waived.  If you opt out at the end or you pass
24   through, you've had that statute of limitations tolled during
25   that time.

1          **THE COURT:**  Yeah.  It may be -- I mean, if you put a

2    gun to my head, without having researched the question, my

3    guess is that, you know, federal preemption is sort of

4    jurisdictional in nature and it means effectively that, you

5    know, there is no jurisdiction to, you know, adjudicate the

6    state law claim and, therefore, it's not a defense -- it's not

7    something that a defendant could waive, but I'm really not

8    sure.

9          **MS. CABRASER:**  I am not sure either, Your Honor.  That

10   sounds right to me.  For an example of a waivable defense,

11   Monsanto is waiving, you know, the defense that pain and

12   suffering doesn't survive the claimant, for example --

13         **THE COURT:**  Right.

14         **MS. CABRASER:**  -- in the settlement fund because

15   someone could die.  There's some states that bar those claims.

16   Notwithstanding that bar, Monsanto is waiving them.  Monsanto

17   is waiving statutes of limitations.

18       I think, though I am not -- I've filed *amicus* briefs in

19   the Supreme Court on preemption in *Wyeth vs. Levine*, but I'm

20   not the preemption expert; but I think you're right, it's

21   jurisdictional.

22         **THE COURT:**  But, anyway, the upshot is that what your

23   settlement -- what your proposed settlement contemplates is

24   that I would be protected from a Supreme Court preemption

25   ruling to the extent that I'm making a claim to the fund, but I

1  would not be protected from a Supreme Court preemption ruling

2  to the extent that I -- if the fund is exhausted or the fund no

3  longer exists or I don't like what is offered to me from the

4  fund, I then no longer have the option of opting out and suing

5  for compensatory damages because the Supreme Court has taken

6  that option away from me; correct?

7          MS. CABRASER:  That is correct.

8          THE COURT:  Okay.

9          MS. CABRASER:  You've got the safe harbors that are

10  built into the settlement agreement as long as you are in the

11  settlement.  And, frankly, Your Honor, in the highly, highly

12  unlikely event that the fund runs out before anybody that's in

13  the class in the queue to be paid, we, and I am virtually

14  certain Monsanto, would pay those claims.

15          THE COURT:  Well, I mean, you're saying the highly

16  unlikely.  So if I'm -- we'll stick with me as the hypothetical

17  class member, and I should be able -- I should assume that it

18  is highly unlikely that compensation would not be available for

19  me, you know, 16 years from now at age 67 when I'm diagnosed

20  with NHL?

21          MS. CABRASER:  Oh, I apologize, Your Honor.  You mean

22  compensation outside an existing settlement fund?

23          THE COURT:  No.  What I'm saying is that if I'm a

24  member of this class, are you saying -- I may have

25  misunderstood what you're saying.

1     But if I am a member of this class and I'm worried about

2   being diagnosed with NHL 15 years from now, should I be

3   assuming that I will be compensated from the fund?

4        **MS. CABRASER:**  I think while you're assessing risks,

5   you can make a reasonable assumption that given the incentives

6   to the renewal of the fund, there will be a court-supervised

7   settlement fund for you when you do because --

8        **THE COURT:**  But, I mean, there's nothing -- so what I

9   should be -- there's no guarantee -- there's no guarantee of

10  money for me.  And so you're saying that what I should do as a

11  class member is I should assume that even though this

12  settlement contemplates a fund of -- that will -- is designed

13  to last four years -- maybe it will last four years, maybe it

14  will last three years, maybe it will last two years, but it's

15  designed to last four years, but I can assume -- I can safely

16  assume as a class member that there will be a fund there for me

17  to make a claim to in 15 years?

18       **MS. CABRASER:**  Under the settlement, there is no

19  guarantee of such a fund; and so you would want to take that

20  into account; but you would also want to take into account the

21  fact that such funds, particularly court-supervised funds,

22  particularly funds that are successful as it is estimated by

23  the experts this one will be with respect to attracting and

24  paying claims will be continued, and it will be there for you.

25       And I think, frankly, Your Honor, if we are assessing

risks, that likelihood is higher than the likelihood that you
would be better off leaving the settlement, preserving the only
thing that is absolutely preserved for you outside the
settlement, which is a potential punitive damages claim, which
isn't your property right, which you may never get a chance to
exercise, particularly given the limited capacity of the trial
system; and that you would want to avail yourself of what is
available for you in the here and now as a Subclass 2 member,
which are diagnostic services and information which you can use
now to protect your health.  Even if your initial diagnosis is
negative, you'll know now through the settlement things you did
not know before about the risks, about the warnings, about
things that you can and should do to protect yourself from
ongoing exposure to Roundup.

      **THE COURT:**  Okay.  And we'll definitely talk about how
valuable or not valuable those services are as it relates to
NHL, but maybe -- I've been talking to you for a while now.
Maybe I should turn -- I see Mr. Freeman has his hand up, which
is actually a good idea to put your hand up if you want to say
something and you're an objector.

    I also see Ms. Brueckner from Public Justice just came in,
and I'm happy to hear from her too if she has anything to say;
but -- where did he go?

    Mr. Engstrom, do you want to say something?

      **MR. ENGSTROM:**  I had merely raised my hand to note

1   that Leslie Brueckner was in the virtual gallery, and that she

2   was on the briefs in the *Hardeman* case before the

3   Ninth Circuit.  So if you wanted some more focused expertise on

4   some of the preemption questions that you've been asking of us,

5   I think she might be an ideal person.

6            **THE COURT:**  Well, let me turn -- that's fine.

7        Let me turn to whoever wants to talk from the other side,

8   you know, about any of the issues that we've been discussing so

9   far, and then I'll turn back to Ms. Cabraser about the medical

10  monitoring diagnostic piece of it.

11       Ms. Brueckner, go ahead.

12           **MS. BRUECKNER:**  Thank you, Your Honor.

13       I wasn't expecting to speak today but since you've focused

14  so heavily on preemption, I thought I would respond to your

15  question about the risk of the U.S. Supreme Court finding these

16  claims preempted.

17       And of course, as Ms. Cabraser noted, that nobody has a

18  crystal ball here, but I would note that the *Hardeman* decision

19  was written by a very conservative judge.  It was a very

20  conservative panel.  And the panel --

21           **THE COURT:**  Yeah, but they're applying -- I don't --

22  that does not strike me as particularly relevant to the

23  analysis because they're applying existing Supreme Court case

24  law, and they said --

25           **MS. BRUECKNER:**  True.

1       **THE COURT:**  -- you know, they, in fact, said in their

2   opinion, you know, we recognize that, you know, regulatory

3   preemption has evolved in other -- you know, in other areas

4   over the years but, you know -- but the *Bates* decision is the

5   Supreme Court's most recent pronouncement on FIFRA preemption

6   and it controls here, which sort of begs the question what the

7   Supreme Court would do if it had decided to take the case.

8       So I don't think -- you know, the statement that, you

9   know, the judges who -- the lower court judges who ruled no

10  preemption are conservative or liberal, or however you want to

11  characterize them, I don't think that really matters.

12      **MS. BRUECKNER:**  Fair enough, Your Honor.

13      I would just say that in order for the Supreme Court to

14  issue an opinion contrary to *Hardeman*, they would basically

15  have to overrule *Bates*.

16      The Court's ruling first rejected express preemption on

17  the grounds that *Bates* clearly holds that tort claims

18  challenging the adequacy of the label are not preempted so long

19  as the substantive state law is functionally equivalent to

20  FIFRA's misbranding standards, and that's clearly true here.

21      **THE COURT:**  So are you trying to say that you don't

22  think there's -- you don't think that's a risk to be taken

23  seriously?  If I'm a member of the class, that's not a risk

24  that I should be taking seriously?

25      **MS. BRUECKNER:**  I think it's a risk, Your Honor, but I

don't think that it is a serious risk given -- given what we

know about FIFRA.  FIFRA is a unique federal statute that

preserves a large concurrent role for the states in enforcing

FIFRA's standards and it's very, very different from the

prescription drug laws and the laws governing medical devices.

And I think given the unique character of FIFRA and the

clarity with which the Supreme Court spoke in *Bates*, that if

there were ever a case that this Supreme Court is unlikely to

render a preemption ruling wiping tort claims, it would be this

one.

On implied preemption, Monsanto's main theory below in

*Hardeman* was that the EPA's August 2019 letter had preemptive

effect, and the Ninth Circuit squarely --

**THE COURT:**  That's obviously not a particularly

serious argument.

**MS. BRUECKNER:**  Exactly, Your Honor.

And then what Monsanto is left with is arguing that

EPA's -- the mere fact that EPA has to preapprove a label

change itself exerts preemptive effect, and we know that can't

be right because, first of all, it's contrary to what the

Supreme Court ruled in *Bates*; and, second, it's contrary to

FIFRA itself, which contains a provision that states that EPA's

approval of a pesticide label is merely *prima facie* evidence

that the pesticide complies with federal law.  And a

pesticide -- in other words, a pesticide can be misbranded even

1    though the EPA has approved it.

2         THE COURT:  Well, I don't think we need to argue the

3    preemption issue.  It's just a question of whether, you know,

4    there is a meaningful risk the Supreme Court will either, you

5    know, explicitly or implicitly, distance itself from *Bates* in a

6    ruling on Roundup.

7       But do you agree -- I mean, without getting into the

8    nitty-gritty of the preemption argument, do you agree that that

9    is by far the biggest risk for the class members?

10        MS. BRUECKNER:  Yes, Your Honor, but I --

11        THE COURT:  Okay.

12        MS. BRUECKNER:  -- don't think it's a risk that would

13   justify a settlement like this one that wipes away and purports

14   to resolve future unaccrued, unmanifested personal injury

15   claims.

16        THE COURT:  So what if -- so let's use my -- I don't

17   know if you were here for when I described me as a hypothetical

18   Roundup user, hypothetical class member, but, you know, let's

19   say I've used Roundup -- sprayed Roundup in my yard for a few

20   years regularly to get rid of the poison oak.  You know, I am

21   51 years old.  Most people don't get diagnosed with NHL until,

22   you know, after 65.  There's a long latency period for NHL.

23   You know, 10, 15 years is not uncommon unless it's something --

24   I mean, what I learned in the pretrial and the trial process is

25   if -- and this is one of the plaintiffs' experts testified

about this, Dr. Nabhan, I think it was -- that if you go

through chemo, you know, you're getting such a massive -- it's

such a massive intrusion into your body that, you know, the

latency period for getting NHL from chemo might be like one

year but for most, you know, causes, it's much, much longer

than that.

So, anyway, the upshot is, you know, I'm a class member or

a potential class member.  I don't have NHL.  I'm concerned

that I might be diagnosed with NHL, you know, 10, 15 years from

now.  What if Monsanto said to me, "Look, we'll give you 50,000

bucks right now if you agree to settle any future claim you

have against us.  And the reason you should take that deal

right now, we understand that if the Supreme Court rules

favorably to the plaintiffs, that you're going to be able to

get a lot more money -- you're likely to be able to get a lot

more money from Monsanto 10, 15 years from now if you are

diagnosed with NHL; but, you know, you also maybe get nothing

because the Supreme Court may rule in our favor on preemption

so we're offering you 50,000 bucks right now," don't you think

I should take that deal?

**MS. BRUECKNER:**  It's hard to say, Your Honor.  Maybe.

Maybe.  But, of course, the problem in this case, and I would

defer to the objectors to articulate this in greater detail, is

that it's very unlikely that many of the class members here

will ever -- first of all, of course, the settlement doesn't

1    offer $50,000.

2         THE COURT:  I know.  But I'm asking a hypothetical

3    question, and I'm saying -- and the question is designed to get

4    at --

5         MS. BRUECKNER:  Yes.

6         THE COURT:  -- whether a settlement for these class

7    members, these futures who have not yet been diagnosed with

8    NHL, is it -- are you all -- those of you who oppose the

9    settlement, are you saying it's categorically impossible to

10   have a settlement involving these people; or are you saying

11   that the deal that's on the table is just simply not the right

12   deal?

13        Because it seems to me that if I'm a member of Class

14   Number 2 or potential member of Class Number 2 and Monsanto

15   offers me 50,000 bucks right now and gives me the opportunity

16   to take that now as opposed to waiting to see if I get

17   diagnosed with NHL and then waiting -- and then if the

18   Supreme Court hasn't issued a preemption ruling that's

19   favorable to Monsanto, I sue and I sue for compensatory damages

20   and I see if there are any punitive damages left to recover, if

21   those are my two options, I think I'd probably take the 50

22   grand, wouldn't you?

23        MS. BRUECKNER:  Our position is that it is

24   categorically impossible and the reason is, is that it's

25   impossible to exercise a meaningful --

 1                    (Screen frozen.)

 2          THE COURT:  Ms. Brueckner, you're freezing for me.

 3          MS. BRUECKNER:  I'm sorry.

 4          THE COURT:  I can't -- is it -- are other people able

 5   to hear her?  No?

 6      Okay.  Yeah, you're --

 7          THE COURT REPORTER:  She's frozen for me also.

 8          MS. BRUECKNER:  I'm saying -- let me try again.  How's

 9   this?

10          THE COURT:  So far so good.

11          MS. BRUECKNER:  I was saying that it is categorically

12   impossible in our view to settle unmanifested future personal

13   injury claims because it is impossible to exercise a meaningful

14   choice upfront about whether or not to accept a monetary deal,

15   and that the only way that this settlement could possibly pass

16   constitutional muster is if it had a full and unfettered back

17   end to opt out, which this deal does not.  That is the position

18   of my organization Public Justice --

19          THE COURT:  Okay.

20          MS. BRUECKNER:  -- that even if this settlement were

21   fair, adequate, and reasonable, that it is constitutionally --

22                    (Screen frozen.)

23          THE COURT:  Okay.

24          MS. BRUECKNER:  -- to do what is being proposed here.

25          THE COURT:  Okay.  Does anybody on the objectors side

```
 1   want to jump in and address anything that I've discussed with
 2   Ms. Cabraser or Ms. Brueckner?
 3           MR. SMOGER:  Yes, Your Honor.
 4           THE COURT:  Who said that?
 5           MR. SMOGER:  Gerson Smoger.
 6           THE COURT:  Okay.  Go ahead.
 7           MR. SMOGER:  I want to go through and start with the
 8   preemption question.  We can't know what the Supreme Court
 9   would do if they took it.  We can get a pretty good idea of the
10   likelihood that they accept *cert* in any case, which is
11   extremely rare.  We can get a likelihood that they accept *cert*
12   on a case where they've already decided and the Supreme Court
13   has already issued a decision in order to reverse a decision.
14   That's somewhat rare; but with what you're -- what you're
15   saying is let's assume that they did and we have to go through
16   this process.
17           THE COURT:  Okay.  Well, that's one of my questions,
18   is let's assume that they did.  Okay.
19           MR. SMOGER:  So then we get to a matter that concerns
20   me greatly is that the preemption decision only deals with the
21   statute as written and it's the Supreme Court reviewing of
22   legislative enactment.  That is not immutable.  That can change
23   and the nature of the law that's been passed can change over
24   time.
25           THE COURT:  Is this kind of a long way of saying that
```

1    if the Supreme Court issues a preemption ruling, Congress could

2    amend FIFRA?

3              **MR. SMOGER:**  Yes.

4              **THE COURT:**  Okay.

5              **MR. SMOGER:**  And I want to then go on to something

6    that I think is not clearly stated about this settlement, and

7    that is -- and your statement about the five years that you

8    were exposed.  And let's just -- I'm going to take that down to

9    five days.

10        The settlement under Section XII.8 includes your exposure

11   for the rest of your life after February 3rd.  That's what

12   XII.8 says.  So that single date is not determinative because

13   your exposure continues throughout all of this time.

14             **THE COURT:**  By the way, that sort of concept of, you

15   know, you get a recover -- you know, you're covered, you know,

16   if you're exposed prior to a certain date and not covered if

17   you're exposed after a certain date, I mean, usually that sort

18   of concept is used when the company has decided to take its

19   product off the market or slap a warning on the label; right?

20   And so the idea is if you were exposed before that date, you're

21   covered and if you were exposed after that date, you're not

22   covered.

23             **MR. SMOGER:**  I don't know a comparator that exists

24   that allows the elimination of punitive damages based on future

25   exposure to product that had not yet been made.  So now we're

1    talking about product that Monsanto can make in the future,

2    we're talking about exposure that can occur to you in the

3    future, and the implication of that is XVII.1a where the

4    release occurs for punitive damages and that release is known

5    or unknown, which means the release extends to product not yet

6    made, exposure that has not yet occurred, and that --

7              THE COURT:  I assume that what they will say

8    immediately is, "No, you're wrong.  It's only about Roundup

9    exposure."

10             MR. SMOGER:  Excuse me?  I didn't hear you.

11             THE COURT:  Oh, I'm sorry.  I said I assume their

12   response to that is, "No, you're wrong.  It's only about

13   Roundup exposure; and if there's anything that needs to be --

14   any language that needs to be added to the settlement agreement

15   to make that even more clear, we're happy to do that, but this

16   is only about Roundup."

17             MR. SMOGER:  Well, it's any product that has

18   glyphosate in it.  So it's somewhat broader than that.  And

19   what they say is the punitive exposure, which is something that

20   Ms. Cabraser had said, was intentional acts.

21        Well, if -- their intentional acts become irrelevant to

22   get around preemption if you cannot sue on the basis of any

23   intentional acts because they've been released for the rest of

24   your life.  Whatever Monsanto does to these people in the

25   future has been released because there's release of unknown

1  claims for future exposure and future products.  That's what

2  XVII.1a says when read together with XII.8.

3      **THE COURT:**  Okay.  That's probably like a -- I would

4  probably put that in the category of the detail that could be

5  addressed if we get past the bigger picture issues.

6      Anything else?

7      **MR. SMOGER:**  In terms of your $50,000, I think you

8  were posing that as an individual choice and I think

9  Ms. Brueckner was saying "Is that an unfettered choice?"  And I

10  don't disagree that for some people it's a reasonable choice to

11  make if it's just a choice.  That's what happens in every

12  settlement -- individual settlement:  Do you want to take this

13  amount of money at this time for this condition and will you

14  release the future?  Yes, we do that all the time, but the --

15  but here you have the implied release of future rights before

16  the offer is made and that becomes a very different question.

17      **THE COURT:**  Understood, and particularly when there's

18  no reason to -- we have to take it on faith that there will be

19  a compensation fund for me to make a claim to 12 years from now

20  or whenever I get diagnosed.  I understand.

21      Mr. Morrison has his hand raised.

22      **MR. MORRISON:**  Thank you, Your Honor.

23      I just want to point out one fact about the hypothetical

24  you raised, which is that Monsanto was not offering to pay

25  anybody anything, let alone $50,000, unless they currently have

 1    NHL or will have NHL at sometime in the future.

 2         Second is, the $50,000 would put you at the high end of

 3    the tiers here; and so Your Honor might be right on an

 4    individual basis that you would buy the $50,000 as kind of a

 5    life insurance policy, but that has nothing to do with the

 6    class action that we have before us.

 7         Thank you, Your Honor.

 8         **THE COURT:**  Okay.  Anybody else on the objecting side

 9    want to jump in and say anything?

10         **MR. PAREKH:**  Your Honor, Behram Parekh.

11         **THE COURT:**  Hi.

12         **MR. PAREKH:**  Hi.

13         Just to address Your Honor's question about the adequacy

14    of the fund, and I don't know if you want to treat that

15    separately or whether you want to deal with that now as well.

16         **THE COURT:**  Go ahead.

17         **MR. PAREKH:**  So, I mean, one of the issues that

18    Your Honor raises is specifically the adequacy of the fund, and

19    in my brief I go through the numbers and I won't go back

20    through them here, but it's very clear that this fund will at

21    most last four years and that's even assuming everything that

22    the class administrators have written is correct in terms of

23    who gets what, how many people, and who doesn't.

24         One of the issues --

25         **THE COURT:**  Well, yeah.  It's only -- the fund is only

1    designed to last four years; right?

2         MR. PAREKH:  Right.  And the class administrator says

3    over 90 percent of the fund will get -- will be used in that

4    four-year time frame.

5         And specifically as to Class 2, the question -- it sort of

6    the begs the question:  Well, how many of these people in

7    Class 2 are going to be diagnosed with NHL over the next four

8    years?

9         And then why does the class continue to expend after those

10   four years when there are no funds available except if Monsanto

11   chooses on their own to do so?

12        And I think that's really one of the fundamental issues

13   here, is if the class terminated at the end of the exhaustion

14   of funds, then this would be a very different situation that

15   we'd be talking about.  I'm not saying that we wouldn't object

16   to other aspects of it, but in this particular instance why --

17   there's no --

18        THE COURT:  You're saying if the class terminated upon

19   the exhaustion of funds, you're saying that that -- when you

20   say the class terminates, what you mean is there's no more

21   waiver -- there's no more waiver that class members are subject

22   to, they're free to file a lawsuit and seek everything that

23   they would have been able to seek if they were not members of

24   the class?

25        MR. PAREKH:  Right.  None of the restrictive

 1    provisions of the settlement applies.  There's no punitive

 2    damages.  There's no enforceability of the Science Panel, which

 3    we can, you know, obviously go into in much more detail.  But

 4    all of the things that are restrictive about the settlement,

 5    once there are no more funds left and these people have no

 6    choice but to go through the tort system, there's no reason why

 7    those people should be bound by those restrictions.  There's

 8    just -- I mean, there's no consideration for that at all.

 9         THE COURT:  Other than the medical monitoring, which,

10    you know, we can talk about.

11         MR. PAREKH:  Yeah.  And we can address the medical

12    monitoring in more detail as well.

13         But in sort of a more fundamental level of what do they

14    get in terms of a concrete number, a concrete, you know,

15    numerical settlement for their claim, it's nothing at that

16    point.

17         THE COURT:  Right, unless the parties and the Court

18    collectively decide to add money to the fund.

19         MR. PAREKH:  Correct, because Monsanto out of the

20    goodness of their heart wishes to pay more.

21         THE COURT:  Well, I mean, I don't think that's being

22    fair to Ms. Cabraser's position.

23         MR. PAREKH:  No, no.  I don't mean to make light of

24    that.  What I mean is what is Monsanto's incentive at that

25    point; right?  They already have the restrictions that they

 1  want in place and it binds those people.  What are -- you know,

 2  assuming preemption happens, obviously Monsanto now has zero

 3  risk and, therefore, it never would have to pay anyone so why

 4  would it, you know, want to contribute more money?

 5          THE COURT:  Right.

 6          MR. PAREKH:  I mean, there's no benefit to Monsanto at

 7  that point putting more money in.

 8          THE COURT:  Yeah, that's a very basic point, but one

 9  that somehow I didn't focus on until you just said what you

10  said; but obviously if there's a preemption ruling from the

11  Supreme Court, not another dime will go into that fund.

12          MR. PAREKH:  Right.

13          THE COURT:  So people who have claims that they can

14  make over the next four years will still get paid their claims

15  and that fund will be exhausted presumably, but it's game over

16  after that.

17          MR. PAREKH:  Absolutely.

18          THE COURT:  On the other hand, it's still game over.

19  I mean, if the Supreme Court issues a preemption ruling, you

20  know, in two years from now, then in my hypothetical situation,

21  it's game over for me; right?

22          MR. PAREKH:  Right.  It is, but my point is that the

23  threat of a preemption ruling doesn't really help anyone in

24  terms of a cost-benefit analysis once the funds are exhausted.

25          THE COURT:  That makes sense.

```
 1          Okay.  Anybody else on the objecting side want to jump in
 2    and address anything that we've discussed so far?
 3                MR. ENGSTROM:  There's nothing more, Your Honor.
 4            THE COURT:  All right.  Mr. Smoger, you still have
 5    your hand up, but I don't know if that's left over from the
 6    last time.  And you're on mute.  Now your hand is down, but
 7    you're on mute.
 8                MR. SMOGER:  My apologies.  It was left over from last
 9    time --
10                THE COURT:  Okay.
11                MR. SMOGER:  -- and I didn't remember to get it off.
12                THE COURT:  Okay.  Ms. Cabraser.
13                MS. CABRASER:  Thank you, Your Honor.
14          And, by the way, while we're handicapping the odds of
15    preemption, I think I've got to say that I like Ms. Brueckner's
16    take on that.  We don't agree on everything in this case, but I
17    think that both sides have to consider the ongoing battle over
18    preemption as a risk, but I think it's one that is going to
19    motivate Monsanto in the future to replenish the fund and renew
20    the settlement, and I think that that is the most likely thing
21    we can say.
22          The settlement structure is --
23                THE COURT:  Well, but if what you are saying by
24    that -- I mean, Ms. Brueckner would seem to be trying to argue
25    that the risk of an adverse Supreme Court ruling is quite low;
```

and to the extent you're agreeing with that, then isn't the
response that the settlement doesn't make any sense for
anybody?

      **MS. CABRASER:**  No, Your Honor.

      **THE COURT:**  Why would I -- my hypothetical scenario,
why would I enter into a settlement agreement where, you know,
there's no reason to -- there's no fund -- no compensation fund
to bank on when I'm diagnosed with NHL in 15 years and there's
not going to be a preemption ruling; and so I'll just wait and
I'll, you know, sue Monsanto or Bayer, or whoever it is, at
that time and get full compensation for my harm?

      **MS. CABRASER:**  As you certainly will under the
settlement.  So the choice to stay in the settlement is the
most rational choice under those circumstances.

      **THE COURT:**  Not unless I have reasonable assurance
that there's going to be money in the fund for me 15 years from
now.

      **MS. CABRASER:**  If there's no money in the fund for
you, Your Honor, you have your own compensatory damages rights.
You have all the rights that you have under the law to seek
compensatory damages.

      **THE COURT:**  So basically what you're saying is that
somebody in my situation, in my hypothetical situation, should
want to be in this class; and even though there's no -- I can't
reasonably bank on any money from a compensation fund in

1  15 years and even though I'll be giving up a punitive damages

2  claim 15 years from now, I want to be in this class because of

3  medical monitoring.  That's basically what you're saying.

4        **MS. CABRASER:**  You do want to be in this class because

5  of medical monitoring and the research fund and you want to be

6  in this class because of the compensation fund.

7        **THE COURT:**  The research fund is going to exist

8  whether I join the class or not; right?

9        **MS. CABRASER:**  That is true, but it's only going to

10  extend to the settlement.  So no settlement, no fund.

11        **THE COURT:**  Right.

12        **MS. CABRASER:**  It's part of the consideration that

13  flows to the benefit of the class as well as everyone else.

14        **THE COURT:**  So what -- so we keep getting to

15  medical -- we keep sort of steering ourselves towards medical

16  monitoring so why don't we talk about that.

17     Why does it benefit me to have four years of medical

18  monitoring through this program?

19        **MS. CABRASER:**  Because if you've been exposed to

20  Roundup, you should get yourself diagnosed because the earlier

21  you catch the diagnosis, the better your health outcome can be;

22  and if you have -- if you were not --

23        **THE COURT:**  How is the medical monitoring going to

24  diagnose me?  How is the medical monitoring going to increase

25  my chances of getting diagnosed early?

1          **MS. CABRASER:**  Because of the outreach program,

2     Your Honor, and because --

3          **THE COURT:**  No, no.  That's not what I'm asking.  What

4     I'm asking is:  Medically speaking, what are they going to do

5     to diagnose me?

6          **MS. CABRASER:**  They are going to do the best-available

7     screenings.  Ms. Fegan talked about that.

8          **THE COURT:**  What are those?  What are the

9     best-available screening?

10          **MS. CABRASER:**  I'm going to pass it to Beth,

11     Ms. Fegan.

12          **THE COURT:**  Oh, okay.

13          **MS. FEGAN:**  Your Honor, I think the unique piece about

14     the program here is that it doesn't require a physician to do a

15     particular test or bind everyone to a particular test.

16          So, you know, part of what we've tried to create in the

17     medical monitoring programs is to ensure, one, that the

18     physicians that are doing the testing aren't limited --

19     right? -- that they can use state of the art, whatever that may

20     be.  So if the research that would be done shows that next year

21     there's a particular or better way or a specific test, even if

22     it's --

23          **THE COURT:**  Okay.  Let's get a little more concrete

24     about it.

25          **MS. FEGAN:**  Sure.

1          **THE COURT:**  You know, I've been spraying Roundup in my

2     yard for five years.  I'm concerned that maybe I gave myself

3     NHL.  I go to the doctor.  What is the doctor going to say to

4     me?  What is the doctor -- what tests will the doctor perform

5     on me today?

6          **MS. FEGAN:**  Your Honor --

7          **THE COURT:**  What is the current state of the art in

8     the medical world about how a patient like that will be

9     treated?

10         **MS. FEGAN:**  Your Honor, I think that patient is going

11    to be treated holistically based on what that physician thinks

12    the right thing to do is.  So whether it starts with blood

13    tests, whether it goes to imaging, that is the purpose of this

14    program, is to build in that flexibility so that if a --

15         **THE COURT:**  So if I go in, will they be able to detect

16    my NHL?  If I'm not showing any symptoms -- right? -- I'm not

17    experiencing -- there's no lump in my neck, I'm not having

18    night sweats, I'm not having any symptoms but I'm worried about

19    it, is there some blood test that they can perform that will

20    detect NHL?

21         **MS. FEGAN:**  No, Your Honor, and I think --

22         **THE COURT:**  Okay.

23         **MS. FEGAN:**  -- in that context part of what that

24    physician is doing is working with you and probably actually in

25    that instance in the telehealth context, which we built in to

1    make sure that we don't spend all that money on people who are

2    just worried -- right? -- but can do that assessment exposure

3    to talk about whether you are symptomatic -- right? -- to talk

4    about are you somebody who's only been exposed for a year

5    versus 15 years --

6            **THE COURT:**  Okay.  But until I'm symptomatic.  Until

7    I'm symptomatic.

8            **MS. FEGAN:**  Yes.

9            **THE COURT:**  And I understand that medical monitoring

10   could -- you know, if there's regular medical monitoring and if

11   I'm really educated about it, I might link the symptoms I'm

12   experiencing to NHL more quickly.  I understand that.  But

13   before I am experiencing any symptoms, is there any way for

14   them to tell if I have NHL?

15           **MS. FEGAN:**  Your Honor, as I sit here today, not that

16   I'm aware of.

17           **THE COURT:**  Okay.

18           **MS. FEGAN:**  But I will tell you that --

19           **THE COURT:**  Well, isn't this case -- I mean, you

20   spend, you know, pages and pages in your briefs talking about

21   how this case is just like *Diet Drugs*; right?  But in

22   *Diet Drugs*, whether somebody was experiencing symptoms or not,

23   they could go in and get an echocardiogram to determine whether

24   they were sick from the diet drugs; and there was no latency,

25   as I understand it, in that case.

1          To the contrary, you start getting sick right when you

2     start taking those drugs -- right? -- or in the immediate

3     aftermath of taking those drugs.  So the medical monitoring

4     makes a lot of sense in the *Diet Drugs* context where you go and

5     you can get an echocardiogram -- I think that's what it's

6     called -- and they can tell you right now whether you're sick

7     or not from the drugs that you took.

8          There's nothing remotely comparable to that in this case,

9     and so it seems to me that you are greatly exaggerating the

10    benefit of medical monitoring in this settlement.

11         I'm not saying there's no benefit.  It just seems like by

12    comparing it to *Diet Drugs* all the time, it seems like you're

13    greatly exaggerating that.

14         **MS. FEGAN:**  Your Honor, I think your point at the

15    beginning outside of the hearing was a good one, that we should

16    have split the briefing on this issue.  Because when we're

17    specifically talking about medical monitoring, I think that the

18    case that this is more akin to are the concussion cases with

19    NCAA and NFL.

20         And the reason for that, Your Honor -- and I was in the

21    *NCAA* case -- the reason for that is because there CTE or

22    chronic traumatic encephalopathy, which a lot of times is

23    mistaken for dementia and Alzheimer's and those types of

24    things, there is no current, I think the right words are, *in*

25    *vivo* test to identify CTE.  In fact, it cannot be diagnosed

1   until after you're dead and then by a brain whatever they do at

2   that point.

3       But the point there is Judge Lee in the Northern District

4   of Illinois in the *NCAA* case thought that the education of NCAA

5   student athletes, frankly whether they were in contact sports

6   or not, but that where there was even a minute risk, and he

7   used I think the example of somebody who shot a rifle was

8   probably unlikely to have a concussion or have experienced

9   subconcussive hits; but the education so that once those

10  symptoms occur, even if it's 15 years from now, that they had

11  the opportunity to raise the issue, to be knowledgeable about

12  it and, frankly, to get the support that the person who has CTE

13  versus somebody who has Alzheimer's or early other type --

14  early onset dementia would have because otherwise you get stuck

15  in this system of not being educated and somebody not

16  understanding, frankly, and here, that they should --

17       **THE COURT:**  Sorry.  Hold on.  My alarm went off.  I

18  set my alarm to make sure that we gave the court reporter a

19  break about an hour and a half in.  So why don't we take a

20  two-minute break and everybody can just stay on the screen and

21  do whatever.  I'll come back in about two minutes and we'll

22  resume, and we'll go until -- why don't we say five minutes,

23  until 11:35 -- and we'll resume at 11:35, we'll go to about

24  12:30, and then we'll break for lunch.

25       **MS. FEGAN:**  Thank you.

1              (Recess taken at 11:30 a.m.)

2          (Proceedings resumed at 11:38 a.m.)

3          **THE COURT:**  Ms. Fegan, I interrupted you I think.

4          **MS. FEGAN:**  Thank you, Your Honor.

5      I think I was analogizing the situation to those NCAA

6  student athletes that in the future with a long latency period

7  may develop CTE; and in that context what the court found

8  valuable was the idea that we would educate actually all

9  current and former NCAA student athletes now about the risks of

10  concussions, the risks of subconcussive hits, and the symptoms,

11  frankly, that they should be watching for so that --

12          **THE COURT:**  So, wait.  Is there going to be an

13  education program for people suggesting that they not use

14  Roundup -- not expose themselves to Roundup?

15          **MS. FEGAN:**  No, Your Honor.  The education program

16  there was not to not play football or not to not play lacrosse.

17  The education program there was to be mindful of if you have

18  suffered a concussion or been exposed, you know, to the

19  accumulation of these hits, that you may develop these symptoms

20  in the future; and if and when you do, you need to seek a

21  particular type of help and support because you're going to be

22  better off if you have a whole bunch of different things but

23  not have it treated as Alzheimer's and other things.  No, we

24  can't cure CTE or we can't cure early onset dementia, but we

25  can give you a better life outcome than if you don't realize

 1    what it is.

 2         And, you know, we hear the stories about the football

 3    players that end up in a car and homeless and that type of

 4    thing; but had somebody interceded earlier or recognized the

 5    symptoms and that it was related to their career in football,

 6    they could have had a better life outcome and not ended up, you

 7    know, where people thought that they were, you know, domestic

 8    violence and all those other things.

 9         So the idea --

10         **THE COURT:**  Yeah, but the thing is -- the thing is,

11    and I want to make sure that you don't -- you're not

12    misinterpreting anything I'm saying.  I'm not suggesting that

13    this medical monitoring program is, you know, complete hogwash

14    or anything; but, you know, what you just described with the

15    NFL players or the NCAA players is very different from the

16    experience of somebody who comes down with NHL.

17         I mean, NHL is one of the most common cancers, you know,

18    that exists and it's not commonly -- you know, when you have a

19    lump in your neck and you're having night sweats and the other

20    symptoms associated with NHL and you go to the doctor and you

21    describe those symptoms, the doctors don't typically confuse

22    that with, you know, something else.

23         And so, you know, I start experiencing symptoms, I go to

24    the doctor, you know, and it's not like I'm going to go through

25    five years of them trying to figure out what is wrong with me.

1  And so I think a marginal benefit of, you know, a medical

2  monitoring and diagnostic program that you've described is

3  much, much lower than how you're portraying it and much, much

4  lower than for the NFL players and much, much lower than, you

5  know, in the *Diet Drugs* case.

6      **MS. FEGAN:**  Your Honor, I think that you and I would

7  have that experience because we come from a very privileged

8  place, and I think here we're talking about 90 percent of our

9  Subclass 2 members do not live in the same place that you and I

10  do.  They are in rural areas, they don't have access to

11  healthcare like we do, and they certainly -- everything just

12  shifted so I lost you.  There you are.

13      They don't have the ability to walk in and go -- they

14  don't have a primary doctor and they can't go in and say, "I've

15  been experiencing night sweats."  It doesn't come up in a

16  normal conversation because they don't have the money to go.

17      Now, I realize not all Subclass 2 members fall within this

18  so, you know, we are also taking care of those people like you

19  and I who are more privileged, but that is why we spent a lot

20  of money and a lot of time working with our claims

21  administrators, working with research groups to identify what

22  does -- who is this class composed of and making sure that our

23  benefit is geared for everyone.

24      But, in particular, for 90 percent of them we'll provide

25  them services that they don't have otherwise, provide them

 1    education that they don't have otherwise.  And, frankly, some

 2    people get lumps, they have night sweats, and if they don't

 3    have the money to go to the doctor or don't realize that

 4    there's capacity for them, you know, it's not as easy, you

 5    know, as it would be for you and me walking around.

 6            **THE COURT:**  That's a fair point.  Let me ask you about

 7    that since you brought up the *NFL* case.  Do you think that that

 8    settlement would have been approved if it had the medical

 9    monitoring component but no way for an NFL player or retired

10    NFL player to reasonably believe that they would get

11    compensation from a fund at the end of the day once they -- you

12    know, because if I recall the *NFL* settlement correctly, you

13    know, the main thing was that they were -- you know, in

14    exchange for being part of this class, they were going to get a

15    payout based on -- I think there was some sort of, you know,

16    tiering program depending on the type of injury they got, but

17    they were going to get paid; right?

18            Whereas, in this one you're offering medical monitoring

19    that because of the nature of the disease -- your point is very

20    well taken about low-income folks and people who don't have

21    health insurance -- but because of the nature of the disease

22    NHL, it's inherently less valuable than in the *Diet Drugs* case

23    where you're looking for heart disease or in the *NFL* case where

24    you're looking for, you know, CTE or other brain injuries, it's

25    inherently less valuable, and you are not -- you know, there's

 1   no pot of gold at the end of the rainbow, if you will.   And so

 2   it just seems -- you know, it seems very different from

 3   *Diet Drugs* and the *NFL* case and those other cases.

 4          **MS. FEGAN:**   Your Honor, what you have just described

 5   was our *NCAA* settlement.   So our *NCAA* settlement creates a

 6   medical monitoring program.   There was no compensatory damages

 7   program, and there's a lot of reasons why that in negotiations

 8   we didn't accomplish that; but the Court, nonetheless, found

 9   that the identification of the symptoms, the education, and the

10   access to healthcare when talking about medical monitoring

11   alone was a valuable right and one that he was willing to

12   approve.

13          **THE COURT:**   And what did the NCAA players give up for

14   that?

15          **MS. FEGAN:**   The NCAA players gave up medical

16   monitoring claims.   They also gave up class-wide personal

17   injury claims outside of a very small piece, and that was a

18   highly litigated, highly contested issue.   So they were allowed

19   to bring individual personal injury claims upon diagnosis but

20   gave up class-wide rights.

21          **THE COURT:**   So there's no interference with their

22   ability to sue and recover compensatory or punitive damages?

23          **MS. FEGAN:**   There was not, Your Honor.

24          **THE COURT:**   Okay.

25          **MR. ISSACHAROFF:**   Your Honor, if I may, on the *NFL*, I

1   was counsel on all the appeals in *NFL*, that's a settlement that

2   was intended to last the lifetime of the players as Your Honor

3   indicated.

4       What this one does, what's the big difference here is that

5   there is a capacity to seek tort damages after the exhaustion

6   of the settlement period whether it's four years or whether

7   it's extended.

8       In *NFL* there was no capacity, as Ms. Fegan said, to

9   diagnose the most critical or potentially most critical injury,

10  which is CTE exposure, and so we used proxies for that.  And

11  one of the proxies that we used was a baseline assessment, get

12  people into the medical screening process so that their

13  deterioration and cognitive functions or neuromotor capacities

14  could be measured, and we are trying to do the same thing here.

15      The big difference between this and *NFL*, and I think

16  Your Honor alluded to it, is that *NFL* was a one-time

17  compensatory offer so that the players could opt out or not;

18  but if they did not opt out, they continued in place in the

19  settlement and whatever they got, it could be zero, but

20  whatever they got in future years through the settlement would

21  be the entirety of their compensation.  They could never return

22  to the tort system, and that was affirmed all the way through

23  the U.S. Supreme Court.

24          **THE COURT:**  Okay.  Anybody else on the pro side want

25  to say anything about the medical monitoring and the other

1    issues we've discussed, the *NFL* case and all that?

2         **MS. CABRASER:**  Yes, Your Honor, if I may.  Elizabeth

3    Cabraser.

4         And this is really an assortment of statements.  First of

5    all, in *Diet Drugs*, most of the valvular heart damage that was

6    the so-called signature disease of the diet drugs combination

7    was asymptomatic.  That was the problem.

8         **THE COURT:**  Right.  But you could go get an

9    echocardiogram to see if you'd been harmed by the diet drugs

10   right away.

11        **MS. CABRASER:**  You could, and that's one of the

12   reasons why it was important to get the notice out; but, but as

13   a trade-off for that, my point is that these -- all of the

14   cases that we're talking about -- *Diet Drugs*, *NCAA*, *NFL* -- they

15   all have similarities.  They're like intersecting sets in a

16   way, but none of them is exactly like the other; and in each

17   case the settlement was designed to work under the particular

18   circumstances of the case, the reality of the state of the law

19   on causation, the nature of the disease, and importantly the

20   nature of the class members.

21        And so here what was most important to us from all of

22   these other cases was to do something as a safeguard in a more

23   expansive way than any of these other cases had done, and that

24   is to absolutely preserve compensatory damages rights,

25   including individual medical monitoring, without the necessity

of any affirmative step, without the necessity of a so-called
opt-out, and without any limitation on the court or the place
or the time after the cessation of the settlement program that
someone can sue.  We don't make someone go through the
compensatory program.  They don't need to even show up.
Whether they're diagnosed or not, they can simply pursue their
claim.

The one thing they don't have is something they don't have
anyway.  And I'm sorry about this because the proudest moments
in my professional life are when I win a punitive damages
verdict or it's affirmed on appeal.  It's the best feeling ever
but it is for the few, it takes years, and there's neither the
capacity nor the avenue for that for most tort claimants
because, as I said before, unfortunately, defendants get all
the due process in punitive damages thanks to our
Supreme Court.

And for our class, for the people that haven't shown up in
the tort system yet because they can't, for the people that
have been exposed the most but have been included the least in
this tort system, they weren't reached in the inventory
settlements.  They won't be reached without a class settlement.
They are the ones that most need the information that the
notice program and the diagnostic assistance program can give
them.  And the infrastructure that the DAGP will build out,
it's not a traditional medical monitoring fund or a program.

 1   It's building out a health outreach infrastructure.

 2           **THE COURT:**  Well, hold on a second.  Let me respond to

 3   a couple things that you've said so far.

 4           **MS. CABRASER:**  Yes, Your Honor.

 5           **THE COURT:**  You're acting as if there will be no more,

 6   quote/unquote, "inventory settlements."  You're operating on

 7   the assumption that those are not going to be available for

 8   future people, people who get diagnosed with NHL in the future;

 9   and, you know -- and then you say that punitive damages are not

10   going to be available for them.

11       I understand your point that, yes, you know, if I get NHL

12   12 years from now and I file a lawsuit, you know, the

13   likelihood of my getting into court and being able to seek

14   punitive -- you know, get in front of a jury and seek punitive

15   damages may be low, but that's not really the point.  The point

16   is, you know, the existence of the ability to seek punitive

17   damages affects my settlement value.

18       And, you know, you make these allusions to the possibility

19   that -- the likelihood that nobody's going to be able to hang

20   punitive damages over Bayer's head 12 years from now.  Well, it

21   seems to me that that depends in part on whether they keep the

22   product on the market and whether they have a proper warning on

23   the label.

24       So, you know, I think it's reasonable to assume that

25   12 years from now I will have a claim for punitive damages that

```
 1   I can hang over Bayer's head, and that will affect the
 2   settlement value of my case.  And there's no -- this is not
 3   the -- you know, this is not, you know, the asbestos cases.
 4   You know, there's no indication that Bayer is on the verge of
 5   bankruptcy.  Bayer has been playing ball with, you know, the
 6   plaintiffs.
 7        And, you know, the way you're talking about it, the
 8   picture you're painting is that there's going to be nothing
 9   left for me 12 years from now if I don't participate in this
10   settlement, and I just don't -- I don't think -- on this
11   record, there's just no reason to assume that.
12        MS. CABRASER:  Your Honor, not quite.  I think that
13   may be overstating my overstatement if I made one.
14        The class settlement doesn't replace inventory
15   settlements.  There are people that are not within the
16   settlement class definition that may be in the process of
17   bargaining for those now.  There's certainly people who can opt
18   out on the front end if they would prefer to prosecute and
19   settle their personal injury claims individually.
20        The point is --
21        THE COURT:  Not if I -- no.  We're talking about --
22   we're talking about Class 2; right?
23        MS. CABRASER:  Okay.
24        THE COURT:  So I can't sue now.  I can't opt out and
25   sue now.  You know, it's about the possibility of suing later
```

1   if I get NHL.

2          **MS. CABRASER:**  It is, Your Honor.  It's about

3   assessing the possibility of suing later; and under this

4   settlement, you can.  All of your compensatory rights are

5   preserved.  Those are substantial.  We see that in the verdict.

6   That's very meaningful regardless of what happens to punitive

7   damages.

8          But in the meantime, there's an insurance policy.  There

9   is a compensation program.  It's transparent.  You know what it

10  is.  There is a diagnostic infrastructure that helps.

11         And, by the way, yes, NHL can be diagnosed at an

12  asymptomatic stage.  There are a number of tests to do that.

13  We would be happy to augment the record in that regard so that

14  you have more facts about how the diagnostic program will work.

15         But the point is they're opportunities and the purpose of

16  this settlement, which is a complement to, a complementary

17  structure to the inventory settlements thus far, is we saw the

18  need to address the rights and interests and claims and

19  realities of people that had been largely left out of the

20  process because they don't have access to lawyers, because they

21  don't have access to --

22         **THE COURT:**  Well, wait a minute.  Hold on a second.

23  We're talking about people who haven't gotten NHL yet.

24         **MS. CABRASER:**  Yes.

25         **THE COURT:**  And the comments you're making right now I

think speak to Class 1, the people who have already gotten NHL and don't have lawyers yet.

       **MS. CABRASER:**  They also speak to Class 2, to people that don't have the information that they need to be aware that their exposure to Roundup, which is the heaviest exposure, 84 percent of the exposure, the continuous exposure, is in the agricultural and other occupational settings.  They are the ones that need the outreach, the information, the notice, and, by the way, the warnings.  Yes, this settlement does provide a label addition that links people to all of the information on the controversy over whether or not Roundup can cause NHL.

      Look, Monsanto has been punished for hiding the ball on this, not for knowing whether or not it does -- as Your Honor said, the metaphorical jury is still out on that -- but for not wanting to know.  That's the problem.  That's the failure to warn problem.  It's a failure to know, find out, and educate problem.  And the settlement profoundly attempts, and I think succeeds, to rectify that problem by getting the information out there because if you were exposed to Roundup at work, that is something of immense value to you.

      Information is valuable.  We would like everyone to know and understand how to protect themselves.  We would like them to know there's a diagnostic problem -- program -- I'm sorry -- for them.  If they are concerned, as they should -- they may or should be about NHL, there is a compensation program for the

1    next four years, which is their insurance policy if -- and this

2    is Subclass 2 -- if they're diagnosed in the near term; and if

3    they are not, they're passing through the system with more than

4    they had before.

5           They had the outreach.  They have the information.  They

6    have the ability of a diagnostic program that has now become a

7    healthcare access infrastructure for them; and if they are

8    diagnosed in the far future, they will have their compensatory

9    claims and they can participate in whatever system exists at

10   that time, whether it's a new inventory settlement, whether

11   it's a continuation of the class settlement fund, or whether it

12   is something else, but we have preserved those claims for them.

13   That's what due process requires us to do for this subclass.

14   That's all that due process requires us to do for this

15   subclass.

16          And while no case is exactly like any other, the same

17   decisions, the same trade-offs have been seen as fair and

18   constitutional in other -- by other courts in other post-*Amchem*

19   cases, including *Diet Drugs*.

20          **THE COURT:**  Why -- since you -- since we were talking

21   a little bit about the label, I've been wondering this question

22   for years.  I mean, since I got this case; right?  Why don't

23   you negotiate a settlement with them -- which if you're sort of

24   focused on representing the interests of the class members, why

25   don't you negotiate a settlement with them which includes a

1    label which says:

2         The International Agency on the Research of Cancer

3         has included glyphosate, the active ingredient in Roundup,

4         is a probable carcinogen; specifically, it has identified

5         a link between glyphosate and NHL.  The U.S. Environmental

6         Protection Agency disagrees and has concluded that there

7         is no link between NHL and glyphosate.  For more

8         information, please consult with EPA, look at the EPA's

9         website or look at IARC's website.

10   I know that's probably a little wordier than it needs to

11   be, but wouldn't a label like that inoculate Monsanto from

12   lawsuits by people who used Roundup if it contained that label?

13        MS. CABRASER:  Your Honor, I was trying to write that

14   down when you said it, and we have been considering such a

15   label.  We are obviously consulting with human factors and

16   warnings experts.

17        The wording on this would come back to Your Honor in

18   connection with final approval.  We have been going back and

19   forth with this.  No one knows today what exactly it would or

20   could say.

21        I think the *Hardeman* case gives impetus to a clear,

22   succinct warning label with a link to all the information.  We

23   always conceived of this as a link on every label of every

24   Roundup container of every Roundup product.

25        THE COURT:  But the label that you have in your

settlement, I mean, that presumably would not inoculate

Monsanto from a claim by somebody who --

**MS. CABRASER:**  Our goal on the plaintiffs' side is not

to inoculate Monsanto from future claims.  It's going to be

accountable for its future conduct with respect to future

claims, and we don't have any interest on our side in that sort

of inoculation.

Our interest is in getting the word out now to the users

of the product so that they can be aware and educate

themselves, and that is a great benefit.  Whatever the --

**THE COURT:**  And I hear -- I certainly hear what you're

saying about you don't have any particular or any narrow

interest in inoculating Monsanto, but you have a broader

interest in getting a good deal for the class.

And why wouldn't it -- why wouldn't -- if Monsanto had a

label like that -- I mean, this may be more of a question for

Mr. Hoffman -- but if Monsanto had a label like that that

inoculated themselves from future claims, wouldn't that free up

a lot more money to pay -- you know, to pay -- to offer to

people who were exposed to Roundup prior to the adoption of

that label, thereby benefiting the people who you're trying to

represent?

**MS. CABRASER:**  That would benefit the people that we

are trying to represent as does the label as currently

conceived.  It's a great question for Monsanto, Your Honor.

1     **THE COURT:**  No, but it's a question for you too

2   because your job is to put together the best deal for the

3   people you're trying to represent.  And, you know, the people

4   you've been trying to represent, that class has shifted over

5   time a little bit; but it's basically people who -- you know,

6   when we're talking about Class 2, we're talking about people

7   who have been exposed to Roundup prior to February of '21 who

8   have not gotten NHL yet; right?

9     And what I'm saying is that if you negotiate a deal that

10   allows Monsanto to stop worrying about having to pay people who

11   are exposed afterwards, then doesn't that free up more money

12   for your clients?  So why wouldn't you try to negotiate

13   something like that with Monsanto?

14     **MS. CABRASER:**  Your Honor, we're certainly trying to

15   negotiate the most informative, enforceable and accurate and

16   meaningful label change, warning on the label, that we

17   absolutely can.

18     **THE COURT:**  And, by the way, it can include all -- it

19   could include all of this medical monitoring stuff that you're

20   talking about still; right?  But I just -- like I said -- maybe

21   I'll turn to Mr. Hoffman and ask him because for years I've

22   been wondering why Monsanto, frankly, didn't do that

23   voluntarily to, you know, protect itself against future claims.

24     **MS. CABRASER:**  I can't answer that question,

25   Your Honor, but I can tell you that the link on the label is

1    designed to link to all of the available information, which

2    will be updated so it will be state of knowledge, as well as

3    linking to the settlement website, which will also contain all

4    of the *Hardeman* and other trial materials, all of everything

5    that's occurred in this litigation.  And, frankly, that puts

6    some teeth into prospective tort claims of people that either

7    reject settlement offers or pass through the system without

8    making claims.

9        We're improving the landscape, as it were, for all of the

10   class members, including the Subclass 2 members, by giving them

11   access to things they don't currently have, no one has, and

12   also making it easier for the people with the least access to

13   the tort system to have meaningful and valuable alternatives.

14       And there's a reason -- there's a lot of reasons,

15   Your Honor, why -- and these are -- you know, why our

16   Subclass 2 members are unlikely to find their way into the tort

17   system to exercise their compensatory rights absent the

18   guidance and structure of this settlement.

19       There's a gap and we need to bridge it, otherwise whatever

20   settlement, inventory settlements, or future funds are set up

21   under the auspices of this court or otherwise, it's going to be

22   the same people showing up -- the 90 percent residential users,

23   the privileged few -- and the vast majority of the users are

24   going to continue to be left out.

25       Class actions, the rule is an equitable rule.  That's what

 1  we're trying to accomplish, is to bridge that gap and to give

 2  those people what the current litigants and the more privileged

 3  potential claimants already have, access to our system.

 4      THE COURT:  Mr. Hoffman, let me ask you about this

 5  label business.  I mean, why not have as part of your

 6  settlement -- I mean, I'm assuming that the label that's part

 7  of this settlement is not something that would inoculate your

 8  client from lawsuits in the future, and I wonder why -- if that

 9  assumption is correct, I'm wondering why you aren't striving to

10  create a label that would.

11      MR. HOFFMAN:  I'll take inoculation up at the end.

12  Let me start with a few points before that.

13      First, what you sketched out, as Ms. Cabraser said, is

14  half of what's in the agreement already.  There will be a link

15  that provides all of the information, including the information

16  that was entered into evidence in the *Hardeman* case, for

17  anybody to look at.

18      The verbiage that you started with, and I don't mean

19  verbiage to be pejorative in any way --

20      THE COURT:  Well, it was kind of -- it was more

21  verbose than it needed to be for sure.

22      MR. HOFFMAN:  I would never criticize Your Honor in

23  that regard; but, in fact, what you did say is exactly language

24  that is at issue in yet another glyphosate-related litigation

25  between some associations and the State of California over

```
 1   Proposition 65.
 2           THE COURT:  That's false.  What I -- the language I
 3   recited is far different from the Prop. 65 warning.  Do you
 4   want me to give you my language again?
 5           MR. HOFFMAN:  No.  I think, Your Honor, and I could be
 6   wrong, I could be wrong, but having read the briefs, I think --
 7           THE COURT:  You're wrong.  The Prop. 65 warning is
 8   that this product is known to the State of California to cause
 9   cancer.
10           MR. HOFFMAN:  Well, what I was going to say,
11   Your Honor, and, again, I could be wrong --
12           THE COURT:  That's a very different label and not one
13   that -- and it's not factually accurate; right?
14           MR. HOFFMAN:  I think --
15           THE COURT:  There's a reason that it was enjoined.
16           MR. HOFFMAN:  I think, though, in briefing, the State
17   of California suggested something maybe not exactly like what
18   you said but close to it, that there would be a statement about
19   the IARC conclusion and that the company would add in that EPA
20   disagreed.
21       I could be wrong, but I think the main point is that we
22   have rights not to articulate support for what IARC did.  I
23   think that's part of what's at issue.
24           THE COURT:  We're not talking now about whether the
25   State of California is allowed to force you to put anything on
```

your label.  We're talking about whether it makes sense for
everybody who's implicated by this discussion that we're having
today, including your clients, to put the kind of label on the
product that I've just described, which I assume would
inoculate your client from future lawsuits.

**MR. HOFFMAN:**  Again, I'll get to inoculation in a
moment, but to some degree this issue is bound up in what's
going on in the Prop. 65 litigation.

**THE COURT:**  No.  It's not.  I mean, the Prop. 65
label, there's a particular label that's required by the
statute, as I recall, and that label is "This product is known
by the State of California to cause cancer," and that is
triggered by, among many other things, the conclusion by the
IARC that something is a probable carcinogen.  I think actually
even if the IARC concludes that something is a possible
carcinogen, that requires -- in California that triggers the
Prop. 65 requirement that you say on your product "This is
known by the State of California to cause cancer."  And so
there's a reason why the Prop. 65 labeling requirement is
misleading in a number of contexts.

That's just not what I'm -- you know, I'm not talking
about that label and I'm not talking about anybody forcing you
against your will to put that label on.  I'm talking about
including it as part of a settlement.

**MR. HOFFMAN:**  I understand that, Your Honor; and if

1   I'm wrong about the Proposition 65 litigation, I apologize.

2       But, second, from my client's perspective, we don't

3   believe that we have unilateral authority to put a label like

4   that on; that, with all due respect to the Ninth Circuit, that

5   that is the purview of the agency.

6       **THE COURT:**  Right.  But why would the EPA reject -- if

7   you went to the EPA and said, "We want to put this label on our

8   product," why would EPA reject that?

9       **MR. HOFFMAN:**  Well --

10      **THE COURT:**  I mean, you're not saying "This product

11  causes cancer," but you're warning people about the state of

12  affairs out there and you're making clear that the EPA doesn't

13  buy it.

14      **MR. HOFFMAN:**  Well, I think implicitly by putting the

15  IARC statement first, it could be read as accepting --

16      **THE COURT:**  Okay.  Let's rewrite it:

17          Although the U.S. Environmental Protection Agency has

18      concluded that there's no link between this product and

19      cancer, the International Agency on Cancer Research has

20      concluded otherwise.  Please wear the protective gear that

21      we tell you to wear elsewhere on this label and that we

22      already tell you to wear; and if you're concerned about

23      this issue, go to the EPA's website or IARC's website.

24      **MR. HOFFMAN:**  So, again, we cannot do that

25  unilaterally.  It's --

1          THE COURT:  Why would the EPA have any problem with

2     that?

3          MR. HOFFMAN:  They may view that as undermining their

4     repeated conclusion about the safety of glyphosate.

5          THE COURT:  They may.  You're speculating that they

6     may.  I mean, it seems rather unlikely to me that the EPA would

7     decline to approve that sort of factual -- you know, purely

8     factual label.

9          MR. HOFFMAN:  Well, I don't know, Your Honor, because

10    I think the unbroken conclusion of the EPA for decades now

11    suggests that they might be somewhat protective of what they've

12    done in this area.

13       Let me get to inoculation --

14          THE COURT:  Shall we ask the EPA?  Maybe I should

15    invite the EPA to file a brief commenting on my proposed label.

16          MR. HOFFMAN:  I don't know that I've ever seen that

17    done, Your Honor, in a case where it's a proposal in a

18    settlement.

19          THE COURT:  There's never been a settlement proposed

20    like this.

21          MR. HOFFMAN:  That's a fair point, Your Honor.  I

22    don't know -- I don't know what the agency's reaction to being

23    asked that question would be.  I can see reasons why they

24    may --

25          THE COURT:  Okay.  From your perspective -- okay.

1      So let's assume for the sake of argument that the EPA

2  would approve that label if you asked them to put it on your

3  product.  Why not have a deal where you have a label that

4  hopefully would inoculate you from future claims freeing up

5  more money to pay the people who Ms. Cabraser purports to

6  represent?

7          MR. HOFFMAN:  So the inoculation point I think may be

8  the challenge here because my friends on the other side, and

9  this is based on years of experience in other cases, are very,

10  very capable lawyers and can find flaws or issues in almost any

11  form of label.  And I suspect that many of them would say,

12  "That's not good enough.  That doesn't give a user enough

13  information."  We would, of course, disagree on that.

14          THE COURT:  I mean, that's sort of a nonanswer; right?

15  Because they can -- you know, I mean, people can argue that the

16  election was stolen, but that doesn't -- you know, that

17  doesn't --

18          MR. HOFFMAN:  Oh, I would not equate the two here,

19  Your Honor, because I think lawyers representing individuals

20  zealously advocate for positions that are not equivalent to

21  saying the election was stolen.

22      I think that there would be a fight in many courts.  You

23  know, going back to where we started, certainly we have a track

24  record in Northern California of trial verdicts, and I think

25  they're very challenging cases for us given the venue.  Plenty

1    of people in this country are dubious about decisions that

2    company's make, and my friends on the other side would have an

3    obligation to fight very hard to say that that label was

4    insufficient.

5         THE COURT:  I was sort of assuming that they wouldn't

6    be able to get to a jury if that label exists.  I mean, you

7    know, maybe that's not a correct assumption.

8         MR. HOFFMAN:  Perhaps in your court, Your Honor,

9    perhaps; but, I mean, even Your Honor can have an initial

10   reaction to a legal issue and then after briefing and oral

11   argument come to a different conclusion.

12        I have been in cases over the years, for example a case in

13   the pharmaceutical context, where the product that I was

14   working on defending had a black box warning and we got to

15   trial and at trial my adversary put up an amended edited black

16   box.

17        So there's no guarantee, far from guarantee, that it

18   inoculates, which is why, circling back to what we did in the

19   deal here, I think we accomplished a significant amount of what

20   Your Honor is talking about without commentary on IARC or EPA

21   in terms of providing information.

22        As Ms. Cabraser said, we've agreed that we'll consult with

23   and work with them and human factors experts to figure out

24   exactly the right way consistent with the regulations to

25   display that.

1          **THE COURT:**  Okay.  Let's see, Mr. Parekh, you've been

2     raising your hand for quite a while.

3          **MR. PAREKH:**  Your Honor, to address the label issue

4     and then go backwards to the plan and the medical monitoring

5     issue, just on the label issue itself, Ms. Cabraser, you know,

6     is trying to make the point that, you know, this label is going

7     to inform the 88 or 89 percent of people who wouldn't otherwise

8     know about this.

9          But let's take a look at what the actual settlement

10    provides for the label.  It's supposed to provide a link to

11    information on a website that is scientific in nature and talks

12    about -- you know, and essentially just provides factual

13    scientific documents.  That's what the settlement provides.

14         Those 88, 89 percent of farm workers who are told that

15    they have to spray Roundup in the field are getting huge

16    containers of Roundup.  None of that labeling on retail

17    containers is going to go to them.  None of that labeling even

18    on the large containers that, you know, come and fill up those

19    things are going to go to them.  That labeling issue is really

20    kind of a sideshow in terms of, you know, those people that

21    Ms. Cabraser claims that they're really trying to protect.

22         The same thing goes for the medical monitoring issue.  The

23    medical monitoring doesn't say, "Hey, you can go to your doctor

24    and ask -- and say 'I've been exposed to Roundup and, you know

25    what, I need to figure out whether or not I have NHL and can

1   you help me?'"  That's not covered.  If I do that, I don't have

2   any ability to get that paid for by the settlement.

3        What the settlement says is "We're going to establish a

4   group of doctors or medical providers, and those people will

5   have the ability to offer some services, limited services, to

6   help people who may be afraid that they contracted NHL."

7        In order to qualify for that, you have to, first off,

8   apply using the settlement website.  You have to go through

9   this process, be approved, be assigned to someone, and then go

10  to that person who may be near you, who may not, who only

11  approximately, I believe the settlement says, 10 percent can be

12  done through telehealth.

13       So, again, you know, we're talking about a group of people

14  which Ms. Cabraser says that "This is the group of people we're

15  trying to protect," but the structural impediments put in place

16  really belie that because the structural impediments are the

17  exact same structural impediments, if not worse, that those

18  people would suffer from trying to get a lawyer once they

19  contract NHL.

20       And I can tell you from having advertised for individual

21  cases as my firm and others who have, people put up billboards

22  in farming towns, lawyers put up billboards in farming towns in

23  Spanish specifically targeting farm workers.  They put adds on

24  Spanish language radio.  They put adds on Spanish language TV.

25       The fact that these people are not being solicited by

1   lawyers and the only way that they're going to find out that

2   Roundup may possibly cause cancer is through this notice

3   program I think, again, sort of belies what lawyers -- mass

4   tort lawyers do as part of their business practice.  I mean, we

5   just do.  That's how we get clients.

6           **THE COURT:**  I think Mr. Smoger has his hand up.  Oh,

7   sorry.  Was there somebody else?

8           **MR. SMOGER:**  Let me --

9           **THE COURT:**  Okay.  Go ahead.

10          **MR. SMOGER:**  Let me talk about what Mr. Parekh said

11  and go, I guess, in the other direction.

12      And these are just pieces that I don't necessarily follow

13  that have been argued.  There's an argument that this --

14  90 percent that is unavailable, I don't know where that comes

15  from.  There's a declaration that said that 90 percent of the

16  claimants were residential.

17      We do know that in Your Honor's example you said --

18  Your Honor said that it was 15 years later that NHL was going

19  to occur after 51, which puts you over 65, which means you and

20  the majority of the class are going to be eligible for

21  Medicare.  So the program doesn't benefit those people at all.

22  It doesn't benefit people that have employment insurance.  It

23  doesn't benefit people that have their Obamacare.

24      So we're talking about a segment of people there but not

25  anywhere near the numbers that we're talking about for the

1    class, and essentially what we're doing is taxing those people

2    with the settlement saying "You're not going to get benefits

3    from the one thing that's being offered because we need to give

4    a certain small subset those benefits because they don't have

5    access to it."

6         And I said in my brief:  Well, why not have a separate

7    class for those people?  Why are we bringing everybody else and

8    getting rid of their rights?

9         The second question goes into I think what also is

10   mentioned in terms of advertising.  On the first nine months of

11   2019, $60 million was spent on legal advertising.  Now, I don't

12   have advertising and I don't represent anybody in this

13   litigation.  I'm only representing except for this objector,

14   and that's by my decision.

15        But $60 million to spend over nine months, a lot of that

16   went into the Southwest and into advertising in farm worker

17   communities for clients.

18        **THE COURT:**  Are you talking about advertising on

19   Roundup specifically?

20        **MR. SMOGER:**  Yes.  Advertising on Roundup

21   specifically, the estimate is over a nine-month period

22   $60 million was spent.

23        **THE COURT:**  Where does that -- sorry.  Where does that

24   come from?

25        **MR. SMOGER:**  It's in my brief.  I have a citation in

1    my brief.  It's in a footnote in my surreply.

2              **THE COURT:**  Okay.

3              **MR. SMOGER:**  The second thing is then we go to -- you

4    know, and I want to -- since a lot was talked about, the

5    research program and we're saying there's a benefit for NHL.

6    The research program specifically says that the relationship of

7    Roundup and NHL cannot be researched.  So the one thing that's

8    at issue in this entire case is off limits to the research

9    program.  Why would that be?

10         Then, finally, we get to the -- we get to the question of

11   the labeling.  I don't know what that label is.  We've been

12   told what that label is.  We're told that Monsanto will come

13   out with that label 180 days after the -- after fairness -- 180

14   days from fairness, which was 30 days after the opt-out ends.

15   So the opt-out will not be able to consider whatever is in the

16   labeling.

17         And I'll say to Your Honor, I included in my first brief

18   "Why not just say cancer?", the same thing that this Court has

19   asked, and I got -- and I received this same answer.

20         But I can say that regardless of whatever the labeling is,

21   it will be argued to other courts that whatever label is given

22   here has the imprimatur of the MDL court, and there will be

23   motions on that basis to say the claims are preempted

24   regardless of the label because the argument will be that this

25   Court is the one that has authorized the label.

1      So I take that very seriously in what a label is, but we

2   don't know what that label is going to be.  We've never --

3          **THE COURT:**  Okay.  Anybody else from the opponents,

4   objectors, have anything they want to say before we break for

5   lunch?

6          **MR. COONEY:**  Yeah, Judge.  This is John Cooney.

7      I've tried not to be cumulative, but I think since we're

8   breaking for lunch, I don't want to be lengthy, just that I

9   think Your Honor got it right from the very beginning and your

10  point -- the point you made that "What do I get" -- if I were a

11  potential client here, a 51-year-old hypothetical person:  What

12  do I get from this deal?  I think it needs to be said out loud

13  the disparity of what you give up versus what you would ever

14  get.

15     Obviously the whole idea of giving up your punitive damage

16  rights that now are being -- were described that they're

17  diminishing over time, I think Your Honor correctly pointed out

18  if Monsanto continues not to warn, it doesn't take a great

19  trial lawyer to make the case that even after thousands of

20  claims and time passes and they never warned and still aren't

21  warning, I don't know that those punitive rights -- those

22  punitive damage rights are not increasing.

23     So I think legally and morally Your Honor's suggestion is

24  brilliant and one that they should do and put a warning on the

25  thing.

1          But, nevertheless, you also pointed out that it's all

2     really come down to what do they get.  Well, very little.  But

3     if they get a medical monitoring program in the form that this

4     is, as small as that might be in comparison to the huge give-up

5     on the other side, even that, Your Honor seized on the fact

6     that this is not a disease like, you know, prostate cancer

7     where you have PSA tests taken by a bunch of people and

8     actually identify early some disease.  This is like trying to

9     monitor for getting pancreatic cancer.  You can take the test

10    over and over again but if you don't have it, you don't have it

11    yet.  So I don't think that that's a fair trade.

12         **THE COURT:**  Okay.  I get your point.

13         **MR. COONEY:**  Okay.  Thanks, Judge.

14         **THE COURT:**  Anybody else on the objector side?

15    Ms. Brueckner?

16         **MS. BRUECKNER:**  One additional point on preemption,

17    Your Honor.

18         I neglected to mention that under any reading of *Bates* or

19    FIFRA, design defect claims are not preempted because FIFRA's

20    express preemption clause merely covers legal requirements.

21    And although in California it may be the case that design

22    defect claims are essentially duplicative of failure to warn

23    claims, my understanding is that design defect claims may be

24    viable as a separate matter in other states.

25         And so even if the Supreme Court were to find failure to

 1    warn claims preempted, there would still be design defect

 2    claims that may very well survive as viable claims in other

 3    states.

 4          **THE COURT:**  Well, but wouldn't that -- you're

 5    challenging me now to reach back into the recesses of my memory

 6    of grappling with this design defect issue like three years ago

 7    or something, but I guess -- so I think this may be an issue

 8    that's worthy of further exploration; but my gut is -- my gut

 9    reaction and my vague memory is that if you have a design

10    defect claim that is truly a design -- truly what we normally

11    think of as a design defect claim, that is, you know, the way

12    they design -- you know, they messed up in the manufacture of

13    the product -- right? -- if they deviated from how it was

14    supposed to be manufactured, then that would be a separate

15    design defect claim that wouldn't be preempted by federal law

16    and would be truly distinct from a failure to warn claim.

17          But any design defect claim in these Roundup cases would

18    be basically the product is inherently defective; right?  And a

19    state law claim based on the assertion that the product is

20    inherently defective seems like it would probably be just as

21    contrary to, you know, federal law as the claim that they

22    failed to warn that the product caused cancer.

23          I mean, that's just sort of a gut reaction based on vague

24    memory of having to think about these issues a few years ago,

25    and I -- you know, but the point that you've made, at an

1   absolute minimum, highlights the larger point that I was trying

2   to make at the beginning of this hearing, which is that the

3   judge's primary job is to evaluate litigation risk for the

4   class members and what's the risk of not entering into a

5   settlement.

6       And it seems to me that the -- it seems like everybody

7   agrees that the primary risk is you get the rug pulled out from

8   under you by the Supreme Court, and we can have a debate about

9   how likely or unlikely that is; but your comment highlights the

10   fact that we need to do sort of a more careful -- I would need

11   to do and I would need to receive from both sides a much -- an

12   actual analysis how much of a risk it is that the Supreme Court

13   would pull the rug out from everyone.

14       So with that, I will say that the one thing -- keeping it

15   on the Class Number 2, the people who, you know, have been

16   exposed to Roundup but have not yet been diagnosed with NHL,

17   there's one more issue that we need to discuss after lunch and

18   it may be an issue that is more important than any of the

19   issues we've discussed -- right? -- and that is the discussion

20   of notice, whether somebody receiving notice, a member of this

21   class, you know, somebody like me who's used Roundup in his

22   backyard -- hypothetical me who's used Roundup in his backyard

23   for a few years, hasn't developed NHL, you know, might be

24   concerned about developing NHL 12 years from now, like when

25   they receive -- when that person receives this notice, are they

1    going to -- assuming they read it, are they going to be able to

2    understand it and are they going to be able to make a

3    meaningful decision about their options?

4         And that relates to some of the issues we've discussed

5    already but, you know, it's a distinct issue, and so I think we

6    should focus on that after lunch for Class Number 2.

7         And then, yeah, so why don't we -- we'll plan on seeing

8    everyone back here at 1:30.

9              MS. BRUECKNER:  Thank you, Your Honor.

10             THE COURT:  Thank you.

11             MS. CABRASER:  Thank you, Your Honor.

12             (Luncheon recess taken at 12:32 p.m.)

13   **Afternoon Session**                                    **1:30 p.m.**

14             THE COURT:  You know, one thing I was reflecting on at

15   lunch, Ms. Cabraser, is the way you describe the punitive

16   damages claim that is being given up by the people who, you

17   know, don't yet have NHL and might get it in the future, and it

18   struck me that the way you were describing it was as if people

19   are really not giving up anything at all by relinquishing a

20   punitive damages claim.

21        It seemed like your characterization of the claim was that

22   it's almost meaningless; and it made me wonder:  If that's

23   true, why does it need to be relinquished?  Why don't -- why

24   wouldn't Monsanto be perfectly comfortable just keeping the

25   punitive damages claims in for the people who opt out at the

1    back end?

2        Ms. Cabraser, you're on mute.

3        **MS. CABRASER:**  There we go.  Thank you.

4        I think there are two answers to that question.  I don't

5    think anyone would derogate the importance of punitive damages

6    to society.  We know what purposes they're intended to serve

7    and we know that the agency to pursue those claims is delegated

8    to private plaintiffs.

9        The point that I was trying to make was really a practical

10   point when Your Honor was asking about risk factors, and we

11   talked about the pure legal risk of a wipeout on preemption;

12   right?  Nobody knows, we'll all never agree, how likely that is

13   to occur but it's a factor because if it does occur, it's a

14   wipeout.

15       And so the point that I was making was that while the

16   period of damages verdicts for the three plaintiffs that won

17   them were very good news and the lawyers are to be

18   congratulated and punitive damages are serving their purpose,

19   we took the warning symbol, the only -- the only math we have,

20   and maybe I'm making too much of it, but the only math we have

21   in terms of actually calculating what will happen in the future

22   to a damages claim or a legal claim is the math from the

23   *Hardeman* Ninth Circuit decision.

24       Now, maybe that won't hold.  Maybe that's too conservative

25   a ratio prediction going down from 1-to-1 and lower than that.

1   And maybe if *Hardeman* had come out before we negotiated our

2   settlement, the calculus would be different; but the fact is we

3   have that fact now and we've taken into account the more

4   important thing in the settlement I think for due process in

5   all sorts of ways is something that plaintiffs and counsel

6   representing the subclasses and the class have been adamant

7   about from day one in terms of any settlement that has a

8   compensation structure, two things absolutely important:  The

9   ability to retain the right to go to court on compensatory

10  claims either through a back-end opt out as were affirmed or

11  pass-through.

12          **THE COURT:**  Let me ask you to stop there.

13          **MS. CABRASER:**  Yes.

14          **THE COURT:**  Putting aside due process, I mean, I

15  understand, but I am just trying to measure the value of the

16  punitive damages claim to the people who would be giving up

17  those claims; right?

18          **MS. CABRASER:**  Understood.

19          **THE COURT:**  And so if -- and I completely understand

20  your point about how hard it would be to get into line and

21  actually get into court and present a punitive damages claim to

22  the jury; but my sort of take-away from your discussion of

23  future punitive damages claims was that they're not really

24  worth anything to people because, you know, Monsanto -- by the

25  time I sue 12 years from now and I ask for punitive damages, I

1  mean, Monsanto will have been hit with so many punitive damages

2  awards that it will be hard to justify, you know, further

3  awards; or if there are punitive damages, it would be very

4  small punitive damages awards.

5      If that is, in fact, true, what's the point of giving them

6  away and what's the point -- why does Monsanto need you to give

7  them away on behalf of the class?

8      **MS. CABRASER:**  Right.  The point of giving them away

9  is to get something for the class that's more valuable and more

10  usable to more members.  I'm not talking about Monsanto's

11  perspective.  I'm talking about our perspective because, as

12  Your Honor noted, we're looking at that risk factor -- you

13  know, that risk-benefit factor along two axes.  And with the

14  punitive damages there, how much could I get?  We got a signal

15  on that.  And, number two, how likely am I going to get into

16  court and have the chance to do that?  And we know that that

17  chance is --

18      **THE COURT:**  How valuable is -- I don't think that's

19  the right question.  I think the question is:  How valuable is

20  my punitive damages claim in settlement negotiations?  How much

21  does it affect settlement value that I have a punitive damages

22  claim that could eventually get to trial?

23      **MS. CABRASER:**  I think, Your Honor, the answer is that

24  in the context of the negotiations as they actually occurred in

25  the sequence of events, that the class got benefits and

 1   compensatory rights and options that were very valuable and

 2   worth giving up something in return for those that was far less

 3   likely to be valuable to the class.

 4        The Monsanto calculus is the Monsanto calculus.  Each side

 5   tries its best to bargain hardest for the things it believes

 6   its clients most need, want, and can use; and so that's why we

 7   have the suite of benefits and the compensatory program in the

 8   class that we have giving away no compensatory claims, no

 9   compensatory tort system rights at all to get those things.

10        **THE COURT:**  Okay.  I just -- and I understand, you

11   know, you may have been in a particular place during

12   negotiations, but my job is to sit here today and assess the

13   reasonableness of the settlement; and, you know, part of me is

14   thinking, "Well, if Ms. Cabraser is right that, you know,

15   you're not really giving anything away when you give away your

16   punitive damages claims, then why should I approve a settlement

17   that gives away the punitive damages claims?"  I mean, it

18   shouldn't change things that much if those claims are in there,

19   you know; and in the event that she's wrong, why should I

20   approve a settlement which relinquishes the punitive damages

21   claims?

22        **MS. FEGAN:**  Your Honor, Beth Fegan.

23        I think that this is analogous to *NCAA* where we bargained

24   away and agreed in exchange for the medical monitoring program

25   the right to pursue a class action for personal injury claims.

1    In our calculus, we didn't think that anybody probably had that

2    right in the litigation context and, yet, that was very

3    important to the NCAA.  They didn't want to have to face

4    continued litigation from a barrage of people in the future who

5    would bring class actions regarding lacrosse or football or

6    whatever.

7         So there was a calculus there on both sides that we felt

8    was more important to get the medical monitoring program in

9    place than to give to future lawyers the right to bring a class

10   action because we didn't think many of those would be very

11   successful.

12        So I think that it is possible to take a right in your

13   role as class counsel that you think perhaps, you know, your

14   class members would be unlikely to get but where it's important

15   to the defendants to give them that in exchange for here what

16   we see as real value.

17        So I understand Your Honor's point but I do think, you

18   know, it comes down to are there things that are important to

19   the defendant that we could get in exchange for $2 billion, and

20   there has to be some give.

21             **THE COURT:**  Okay.

22             **MS. CABRASER:**  And, Your Honor, I think that's exactly

23   why when one reads the *Diet Drugs* decision of the

24   Third Circuit, that's what the punitive damages waiver is

25   forthrightly called.  It's a trade-off and it was a trade-off

 1    that both the district court and Court of Appeals found was

 2    fair under the totality of the circumstances of the settlement.

 3         And so in any settlement, whether it's an inventory

 4    settlement or a class settlement, there are trade-offs that are

 5    made to get to a deal.  The difference, as you pointed out,

 6    Your Honor, is that in a class settlement, other than an --

 7    rather than an inventory settlement, there's a transparency

 8    there and there's a scrutiny by the Court to see if, in fact,

 9    under all the circumstances of the settlement, as is known to

10    the Court presiding over the case, it is a fair set of

11    trade-offs and it is overall a fair deal to both sides and an

12    adequate and reasonable one for the class.

13         **MR. HOFFMAN:**  Your Honor, maybe I should just

14    interject briefly since you mentioned our perspective.

15         **THE COURT:**  Yes.

16         **MR. HOFFMAN:**  It's somewhere in between; right?

17    Because Ms. Cabraser laid out an argument based on the

18    Ninth Circuit opinion and what the judges -- the two opinions

19    said that suggests that there may be fewer punitive damages

20    awards going forward, and Your Honor laid out an argument

21    suggesting that that might not be true.  So we're sort of

22    impartial equipoise from our position -- from our perspective

23    on that.

24         What we do know is that very few cases go to trial,

25    therefore, very few individuals are going to get the benefit of

1  punitive damage awards; and of course punitive damage awards

2  are not, from the perspective of the individual, the same as

3  compensatory awards.

4      So it's not --

5      **THE COURT:**  Yeah, you-all keep saying that but the

6  answer to that, which I feel like a broken record in repeating,

7  is that it's about the settlement value; right?  If somebody

8  possesses a punitive damages claims, it affects settlement

9  value.

10     **MR. HOFFMAN:**  It does but, you know, the three trials

11 so far, which of course are just three data points, I think

12 have shown that there are significant compensatory awards that

13 are possible in these cases that create an incentive to settle

14 and that the punitive damage award on top of that is only

15 partial incentive.  So it's not nothing but it's not

16 everything.

17     **THE COURT:**  Okay.

18     **MS. CABRASER:**  That was important to us, Your Honor,

19 in valuing what the class kept because everyone has

20 compensatory rights, everyone can prosecute them or settle

21 them.  You can have multiple-plaintiff trials.  There are many

22 ways to pursue and to package the substantial compensatory

23 damages in this case, and that was the one thing that we could

24 not, would not ever, ever compromise.

25     We need all of the class members in both classes, in both

subclasses, to retain those rights without the restrictions and limitations and gotchas and guardrails that some other courts have accepted as okay, including *Diet Drugs* and *BP*.  We wanted a retained right, not an affirmative opt out, and we're very proud that we were able to get that and to keep it.

        **MR. ISSACHAROFF:**  Your Honor, if I could add one thing because I participated in the negotiation of this feature of it, and the way I would -- I thought about it was that for any individual who gets to trial, punitive damages is a big amount and it's a club, and as Your Honor has indicated, it helps drive the settlement value.  But the chance of any particular class member being that one has to be discounted quite substantially.

        So the way we thought about it in negotiations was some folks would get punitive damages -- the numbers may go down over time, but that doesn't really matter -- some folks may get them, and did we get an appropriate trade-off for the class for giving away the discounted possibility of any class member being actually the one to get punitive damages in exchange for the guarantees of the compensation without all the rigors of trial, specific causation, and all that.  That's how we thought about it, and --

        **THE COURT:**  Right.  So it sounds to me like what you're saying is "We thought about it wrong" because it sounds like what you're saying is "The way we thought about it is only

1    a few people would get punitive damages and we can give away

2    the possibility of a few people getting punitive damages in

3    exchange for what Monsanto is going to give us."

4         But as I keep saying, it's not just the possibility of a

5    few people getting punitive damages.  It's possessing the

6    punitive damages -- everybody possessing the punitive damages

7    claim and that affecting their settlement value.

8              MR. ISSACHAROFF:  Right, and that has to be discounted

9    by -- and so if everybody had a $1 million punitive damages

10   claim, just to pick a number, that doesn't mean that there's a

11   trillion dollars of punitive damages out there.  What that

12   means is that some number of people are going to get that.

13   Whatever the number is, it's always got to be discounted and

14   that gets traded in exchange for the guaranteed benefits.

15   That's what the *Diet Drugs* court accepted in the arguments

16   there.

17        And I think that the question before Your Honor is whether

18   we got appropriate value for that, not for the fact that the

19   class-wide access to these benefits is something that can be

20   negotiated in exchange for a better compensatory and other

21   features for the class as a whole.

22             THE COURT:  Well, I'm not saying you can never have a

23   futures class that gives away punitive damages; but in this

24   case, of course, there's no -- you know, going back to my

25   hypothetical person who doesn't have a claim for 12 years, I

1   mean, there's nothing in the -- you know, there's no reason to

2   believe there's going to be anything in the fund for that

3   person so why would I give up my punitive damages claim and,

4   therefore, reduce my settlement value of the claim I will have

5   in 12 years when there's no reason to think that there's going

6   to be anything in the fund for me in exchange?

7          MR. ISSACHAROFF:  Because, Your Honor, in our view

8   you've got four years of a guarantee if you happen to have the

9   misfortune of getting NHL in that period.  You got access to

10  diagnostic services, which would not have been available to you

11  particularly given the composition of the class.  You got other

12  benefits within the class and you retained all your

13  compensatory.  So it's a cost-benefit trade-off of how much are

14  you giving up in exchange for how much are you getting on the

15  other end.

16         We think --

17         THE COURT:  I think if I -- I think -- you know, I'm

18  thinking out loud here so, you know, take what I say with a

19  grain of salt, but if -- you know, it could -- this whole

20  discussion could have been very different if there was a way to

21  assure, you know, class members that they will get money from a

22  litigation -- from an alternative to litigation; right?

23         If there's an alternative to litigation that I know is

24  going to be out there that's going to get me money if I am

25  diagnosed in 12 years with NHL as a result of exposure to

1  Roundup, I know that there's going to be money there for me,

2  you know, then it becomes a different deal potentially.  You

3  know, I mean at a minimum it's a very different discussion

4  perhaps than the one we've had today.

5      Let's talk about the issue of notice, and the issue of

6  notice, of course, relates to all of these things that we've

7  been discussing.  But, you know, there is this -- and, you

8  know, there's a lot of discussion in the briefs about how "This

9  is not *Amchem*," "This is not *Amchem*," and the objectors say

10 "This is *Amchem*."  I fully understand that this is not *Amchem*.

11     You know, this is very different, but you have to -- the

12 question is not whether this is *Amchem*.  The question is

13 whether, you know, this settlement is reasonable; and part of

14 assessing whether this settlement is reasonable is assessing

15 whether, you know, people are going to -- the notice is going

16 to reach people.  If it reaches people, are they going to read

17 it?  If they read it, are they going to understand it?  And

18 even if they understand it, are they going to be in a position

19 to make a meaningful choice about what to do?

20     And, you know, we're talking about people who have not yet

21 been diagnosed with a disease.  They may not be -- they may

22 never be diagnosed with the disease.  They may -- there's no --

23 there's likely no way to currently detect whether they have the

24 disease.  You know, it's a very -- you know, it's a murky

25 concept that's floating way out there in the future.

1          I mean, how -- and this settlement is very complicated.

2     The notices are very complicated.  And you think about how long

3     it's taken me to understand the settlement, and I still don't

4     understand aspects of the settlement.  I mean, how is anybody,

5     you know, receiving this notice going to be able to understand

6     and make an informed decision about what to do?

7          Particularly when they don't have a problem on their hands

8     immediately that they need to deal with, and it's some sort of

9     vague future problem that may exist sometime down the line, you

10    know, why is notice appropriate in a situation like this?

11         **MS. CABRASER:**  Your Honor, I'll try to march through

12    all your various inquiries.  I may not get them in exactly the

13    right order.

14         **THE COURT:**  Sorry.

15         **MS. CABRASER:**  But these are the questions and we knew

16    going into this process that these would be the questions, and

17    this is a challenging case in which to give effective notice.

18    It may or may not be the most challenging case.  I think our

19    notice agents, Kinsella Media and Dr. Wheatman, have mentioned

20    to me three or four other settlements that were more complex

21    and challenging and difficult both in terms of notice reach and

22    communication, and I'll talk about those in a minute.

23         But the point is, is that our notice agents built on that

24    experience the challenging class notice program, the

25    multilingual class notice program, the hard-to-reach class

1    members in designing this notice program, and they certainly

2    didn't take it off the shelf and say, "This worked great in

3    case X.  We'll tweak it a little bit and we'll use it here."

4        As Jim Messina's declaration goes into in excruciating

5    detail, hundreds and hundreds of hours of research were done by

6    research and survey experts and firms and teams to find out,

7    without assumptions, to find out:  Where are the class members?

8    How do we reach them?  What do they care about?  What's on

9    their minds?  What matters to them?  What media do they most

10   watch or listen to?  What media do they most trust?  And does

11   that vary by message?  And those are all aspects of giving an

12   effective notice.

13       You have to take your class as it is, where it is, who it

14   is, not assume it's like any other class, do the work, do the

15   research, design, and then test the message and the notice,

16   which was done through phone surveys, in-person surveys,

17   interviews.

18       And, as Your Honor sees in the notice materials -- and we

19   apologize for their length and detail, but this is a complex

20   program -- it uses all the forms of notice and outreach known

21   to the litigation system and to communications experts.  Jim

22   Messina himself is a campaign strategist, a get-out-the-vote

23   person.  How do you motivate people to do something they might

24   not be fully aware they want or need to do?

25       So all of that is built into this notice program.  Leave

aside all of the different media, the different languages, all
of that.

    We also knew we would have to use grassroots
organizations, community organizations that are trusted by
these class members, to be --

        **THE COURT:**  Does that include, by the way, the
National Black Farmers Association?

        **MS. CABRASER:**  Yes, it does.  It includes the National
Black Farmers Association and other organizations and, in
fact --

        **THE COURT:**  Are they being paid to do outreach?

        **MS. CABRASER:**  Not necessarily, Your Honor.  Many of
these organizations will do it without pay.  Some of them may
need to be subsidized because they're not-for-profit
organizations.

        **THE COURT:**  What about the National Black Farmers
Association?

        **MS. CABRASER:**  Yeah, not that I'm aware of.  It's
something that they have volunteered to do.  And, by the way,
the National Black Farmers Association case waged its own very
challenging and very difficult notice program.  I believe
Dr. Wheatman was involved in that notice program as well.

    So long story short, Your Honor, the notice folks are
building on the experience that they have had to reach classes
in other challenging cases.

1        And I will say this:  This is not simply or only a Rule 23

2   class action notice.  If you look at the notice materials, if

3   you look at the short form notices, if you look at the Spanish

4   language version notices, if you look at the graphics, these

5   notices aren't about a legal case only.  These notices function

6   as alerts.  They function as warnings, if you will:

7            Pay attention.  If you're using Roundup, if you're

8        applying Roundup, if you're working where it's applied,

9        pay attention.  If you work around weed killers, pay

10       attention.  This is important.  And this is important not

11       only because you might get some money in a lawsuit.  It's

12       important because exposure to Roundup is associated with

13       NHL and there are things you can do about it, some of them

14       through this lawsuit.

15       That's a very important function of the notice.  And not

16   to belabor this is not *Amchem*, that's really a function of

17   notice that couldn't as practically be done there because here

18   we're dealing with a ubiquitous weed killer, the most widely

19   used weed killer in the U.S., something people are aware that

20   they are using or that is being used around them, something

21   that is visible and palpable.  It's not a hidden asbestos fiber

22   somewhere you might never know and couldn't know you had

23   encountered.  And so in terms of the awareness of the class,

24   this was designed to meet that challenge.

25       The transient nature of the class, same thing.  The notice

 1    follows them in a multimedia way.  The notice is repeated.

 2    There is a five-month period for the notice.  There are

 3    supplemental notices.  All of the notice materials and the case

 4    materials and Your Honor's orders live on a settlement website.

 5         And, by the way, that might sound like a problem given

 6    what we know is a digital divide in this country, and we were

 7    very aware of that.  So one of the things we made sure to find

 8    out in your surveys were:  Would the class members -- the

 9    transients, the migrant workers, the people that may be in

10    Mexico part time, the people that might not speak English --

11    how and where could they access this notice in a way that was

12    meaningful to them?  And, for example, it turns out 90 percent

13    of migrant farm workers have smartphones and that's their major

14    device.  That's how they listen to music.  That's how they

15    listen to the radio.  That's how they communicate with family

16    and friends, and so having a smartphone-friendly notice matters

17    a lot.

18         All of these things were taken into account.  Everything

19    that we possibly could take into account, we have.  And, by the

20    way, when objectors pointed out there were things we might have

21    missed or should have said but didn't say, we took that to

22    heart and we have been revising the notice because that's what

23    we care about, actually communicating with the class members.

24         So we're dealing with a large class.  We're dealing with a

25    disparate and transient class, and --

1          **THE COURT:**  So let's say -- I mean, I'm willing to

2    take it on faith -- one thing I'm willing to take on faith is

3    that you've done a very good job of figuring out how to reach

4    as many people as you can reach -- right? -- as many people as

5    one is capable of reaching, but what if it still doesn't reach

6    a significant portion of the population?

7          **MS. CABRASER:**  Well, first, Your Honor, as we know, it

8    is not the rule or standard in any type of class action or

9    class action settlement that the notice needs to reach

10   everyone.  It is the standard that we do have to do our best to

11   give the practical -- the best practicable notice that is

12   appropriate under the circumstances of the case.

13        So here we're weighing the balance.  We're doing

14   risk-benefit.  We're doing cost-benefit.  We're trying to

15   balance how good the notice has to be best practicable but it's

16   a relativistic standard, it's not an absolute one; and we are

17   doing everything we can in incorporating all constructive

18   suggestions to do that.

19        And we know from the experience of our experts with past

20   notice programs, including international notice programs with

21   the notice in 27 different languages, that the notice does

22   reach those it is intended to reach and it does everything it

23   can, not only with the medium but with the message, to alert

24   and engage those class members to pay attention and to take

25   action and to know that there is a risk and to know that there

1   are things that they can do about that risk.

2        We have said, and I think it's true without exaggeration,

3   that this particular notice program itself under the

4   circumstances of this case is actually a positive benefit of

5   the settlement.

6        And I know Your Honor heard about the $60 million in

7   lawyer advertising.  That's a lot of money in lawyer

8   advertising, but let me say this:  The class notice program is

9   not lawyer advertising.  It is from the court.  It is about

10  rights and options.  It is far more thorough in content, as it

11  has to be, than lawyer advertising.  It is not calling on

12  people to undertake the cost of hiring a lawyer.  It is not

13  requiring them to do that.  And, frankly, it is addressing the

14  very concern and fear and distrust that class members may have

15  about lawyers and the courts.

16       Remember, this is a settlement that includes undocumented

17  workers.  They are not disqualified from participating in the

18  settlement simply because they can't file their own case in

19  court without risk of deportation.  I think that's important in

20  terms of due process because they have due process rights

21  notwithstanding the fact that they can't easily access the

22  traditional court system without creating risks for themselves.

23           **THE COURT:**  What about the complexity, though?  I

24  mean, you know, again for somebody who is not sick, you know --

25  I mean, it would be one thing to send a notice to people in

Class 1 -- right? -- people who have been not lawyered-up,

they've -- I shouldn't say "send a notice to" but direct a

notice to people who, you know, have not lawyered-up but

they've contracted NHL and they've been Roundup users.  You

know, you can say to them, "Look, you know, there's a

compensation fund here; and, you know, if you don't opt out,

you'll have the right to make a claim to this compensation

fund.  And, you know, if you don't like what you get, you can

opt out at the back end and you can sue for compensatory

damages," you know, as these things go, relatively

straightforward.

     And somebody who does stop to look at that notice is going

to take note -- right? -- because they've got NHL.  And maybe

they'll say, "I don't believe in the tort system.  I don't want

to participate."  And maybe they'll say -- you know, or maybe

they'll be too busy or overwhelmed with stuff that's going on

in their life or maybe they're too sick or whatever and they

won't focus on it; but it's something that, you know, you can

imagine somebody spending some time focusing on and making an

informed decision about.

     Here, you know, the problem that is being addressed is so

abstract distant because the person isn't sick and the content

of these notices is so complicated and difficult to understand.

You know, why should we assume that people are going to be able

to -- you know, are not going to spend 30 seconds looking at it

1    and then toss it aside, or, you know, simply not be able to

2    understand it?

3           MS. CABRASER:  Here's why, Your Honor.  First, let's

4    take complexity.  And, again, while no two settlements are

5    exactly alike, let's look at an analogous settlement.  The *BP*

6    medical settlement for transient cleanup workers.  That

7    settlement agreement was nearly 500 pages long, over twice as

8    long as this one.  The long form class action notice lived up

9    to its name.  It was 33 pages long, at least as complex as

10   ours.

11          And our notice program isn't just sending out or linking

12   to a long form notice.  That notice has got all the detail and

13   all the questions and answers.  There's a channel that takes

14   place where what you see is a short form notice with graphics

15   with a very simple message in your language on your smartphone,

16   through Facebook, YouTube, all of these media, to get you

17   alert, and then you can choose to look at as much additional

18   information as you want.  And that is what due process

19   requires.  That is what due process would require in a

20   settlement in which the class members were giving up all their

21   claims and rights.

22          That is not this settlement.  We have a reservation of

23   rights regardless of whether one takes any affirmative opt-out

24   action.

25          And --

1          **THE COURT:**  You know, I'm looking at some of these

2    notices and on the Wheatman declaration, Exhibit C -- Wheatman

3    declaration, Exhibit A, Publication Notice, Official

4    Court-Approved Legal Notice (reading):

5               "Exposed to weed killers?  You could benefit from a

6          $2 billion settlement.  People diagnosed with

7          non-Hodgkin's lymphoma could receive up to 200,000."

8          I mean, at that point if I'm not diagnosed with

9    non-Hodgkin's lymphoma, I just put it aside.  I mean, why would

10   I keep reading after I've read those three sentences?  Like,

11   "Okay.  They're offering money to people, you know, who have

12   been diagnosed with non-Hodgkin's lymphoma.  I don't have

13   that."

14         **MS. CABRASER:**  There are a series of different short

15   form notice formats, Your Honor, that --

16         **THE COURT:**  Okay.  I'm looking at the next one.  The

17   next one says (reading):

18              "Exposed to weed killers?  You could benefit from a

19         $2 billion settlement.  People diagnosed with

20         non-Hodgkin's lymphoma could receive up to $200,000.

21         Others could receive free medical evaluations to diagnose

22         the disease early."

23         Now, maybe, maybe there's a chance that that sentence

24   catches my eye; but, I mean, aren't most people who see that --

25   and then you look -- you know, you keep reading and it says

 1    benefits include, you know, money, 5,000 to $200,000 for

 2    eligible class members diagnosed with NHL.  You know, I don't

 3    know.  When I look at that, I think if I'm somebody who sprays

 4    Roundup in my yard or for my job, or whatever, you know, I

 5    don't need to read any further.  This is for people with NHL.

 6         I mean, it gets -- this sort of raises an interesting

 7    question about whether it makes sense to have these two

 8    settlements noticed together.  You know, I mean, it makes it a

 9    lot more complicated to notice these two -- these are basically

10    two different settlements and, you know, it makes it a lot more

11    complicated and more difficult to understand when, you know,

12    you notice them together.

13         **MS. CABRASER:**  I think, Your Honor, the long form

14    notice, for example, provides full information on all the

15    benefits to everyone.

16         With respect to your point about the notice campaign,

17    should it be two campaigns or one campaign and what strikes the

18    balance between clarity and confusion, that is why we have

19    notice experts who have been doing this for years and years and

20    years and that is what they think about and consider.

21         And we do have Dr. Wheatman available by phone listening

22    to you.

23         **THE COURT:**  Well, yeah, I understand.  I'm just

24    saying, is it inherently confusing to be announcing these two

25    settlements at the same time and providing notice on these two

settlements at the same time?  Doesn't that make it way, way

harder for the recipient of the notice to understand it and to

understand whether it applies to them?

          **MS. CABRASER:**  Not necessarily, Your Honor.  And what

I'm thinking of now is another example from *BP*.  And in that

case we had two very complicated settlements that were launched

simultaneously with notice programs; one was the medical

settlement, one was the economic settlement.  They shared the

same settlement website, the deepwaterhorizonsettlement.com.

You go to the website, you look at either one.

     The notice plans were intersecting and similar.  There was

some differentiation because in one case we were dealing

with -- and Robin Greenwald was a key, key figure in

negotiating that *BP* medical settlement, including the notice

program.

     But in that case it was an intersecting set.  People could

be in both classes but not necessarily in both classes.  The

economic settlement was for economic losses for businesses,

individuals, and wage earners; and, of course, the medical

settlement was for two groups basically, those exposed to

surfactants in cleaning up the beach area and then residents of

what was called Zone B.

     So, yes, it was complicated, it was complex, it was

necessarily so; and every effort was made to clearly

communicate some very complex deals to, again, very disparate

1    groups of people, people that were Vietnamese fishermen,

2    transient cleanup workers, local businesses.

3        What we were required to do was the best we could; and, by

4    the way, the economic settlements had waivers law rights if

5    people didn't make claims in the program.  There was no

6    retention of compensatory damages.

7        And so have we gotten it perfect?  Can we do better?

8    Your Honor, that's why we're listening, that's why we have

9    Dr. Wheatman on the line, that's why we've taken suggestions

10   from objectors, to make this notice campaign the best

11   practicable notice.  And if to do so we should differentiate

12   between our subclasses or classes, of course that's what we'll

13   do because the standard we're held to is communicating

14   information in the way, manner, and form that we would if we

15   were desirous of actually communicating it to the absentee.

16       There's no court case that requires a perfect notice.  We

17   are required to give the best practicable notice.  The concern

18   that I have, Your Honor, is that I seem to be hearing, not from

19   the Court necessarily but from others, that if we don't have a

20   perfect notice, we can't have any at all and there is no rule

21   that says the perfect notice is the enemy of the best

22   practicable.

23           THE COURT:  Right, but the question is whether this is

24   too confusing and whether it's speaking of a problem that is

25   too distant to meaningfully, you know, educate a significant

1    portion of the class --

2           **MS. CABRASER:**  Yeah.

3           **THE COURT:**  -- and such that we can justify, you know,

4    relinquishing their right to sue at the front end for a few

5    years and relinquishing their right to claim punitive damages

6    at the back end.

7           **MS. CABRASER:**  I think, Your Honor, with respect to

8    whether the risk is too small or distant, other courts have

9    grappled with those risks.  Again, no two cases are identical.

10   You've heard a lot about how obvious things were in *Diet Drugs*,

11   but I represented classes in *Diet Drugs* and I was involved in

12   the notice program in *Diet Drugs* and I know there were over

13   18 million prescriptions of that combination and many people

14   didn't know that's what they had gotten, which is why the

15   notice was a multimedia notice.

16      They also -- it was also a chore to inform people and

17   reach people and say, "Look, what you don't know could be

18   hurting you now or it could hurt you in the future" because it

19   wasn't known how long it would take for the valve disease to

20   manifest in secret, much less manifest symptomatically.  That's

21   why we had medical monitoring there.  And here, there were

22   unknowns.

23          **THE COURT:**  At least the court opinion -- the district

24   court's opinion said, you know, it can be detected right away.

25          **MS. CABRASER:**  I would take some respectful issue with

1    that, Your Honor.   In many cases it was detected immediately

2    upon the EEG.

3              THE COURT:  Yeah, that's what I'm saying.

4              MS. CABRASER:  But, but first you've got to get

5    someone to know and care that they want to do that.

6              THE COURT:  Right.

7              MS. CABRASER:  And then you have to tell people there

8    are other problems and there are things that you need to do.

9    It's a matter of degree I think, Your Honor, not of kind; and

10   here, we know that there is an elevated risk.

11        Look, in *Diet Drugs* causation was off the board; right?

12   Everybody knew the side drugs combination could cause this

13   particular disease, and pretty much specific causation was off

14   the board though not in all cases.

15        Here, we're in a different litigation environment.

16   Causation is still contested; but, meanwhile, we don't want

17   people to be at a risk that they can mitigate or avoid even if

18   it may be a small risk and even if the disease they are at risk

19   for manifests itself in the future.   We want to head it off at

20   the pass.

21              THE COURT:  Okay.  Does anybody on the other side want

22   to say anything about notice?  Mr. Kirkpatrick?

23              MR. KIRKPATRICK:  Yes.  Thank you, Your Honor.

24        I think we've heard a lot about how these efforts to reach

25   the class may be the best practicable, but I think the issue

 1   really is whether the notice is going to be effective and those

 2   are two different questions.

 3        So you can have a very robust notice program that reaches

 4   a lot of people but, as you say, they might start reading and

 5   say "I don't have NHL" and put it aside; or even if they do

 6   read it and they're in the futures subclass, again, they don't

 7   have the information they need to make an informed choice about

 8   whether to opt out at the front end in order to maintain their

 9   ability perhaps down the road if they develop the disease to

10   seek punitive damages and not be subject to the stay of four

11   years and not, you know, be stipulating to the admissibility,

12   the Science Panel conclusions, and all of that.

13        **THE COURT:**  The four-year stay isn't that big of a

14   deal; right?  I mean, from a -- you know, for Class Number 2,

15   for the people that haven't been diagnosed yet, either from a

16   notice standpoint or from a substantive weighing of the costs

17   and benefits standpoint.

18        I mean, you haven't been diagnosed yet.  It's a long

19   latency period.  People usually don't get diagnosed until over

20   65.  If you do get diagnosed, there's going to be money in the

21   pot; right?  Or there's likely to be money in the pot during

22   those first four years.

23        And so, you know, giving up the right to sue for four

24   years for somebody who's not yet been diagnosed with NHL

25   probably isn't that big of a deal; right?

1          **MR. KIRKPATRICK:**  Well, I think it could be a big deal

2    depending on how soon, you know, they get sick, if they do, but

3    I think it's just the unknown aspect of it that makes it very

4    hard for somebody to make an intelligent choice.

5          And they are giving up some valuable rights.  Even with

6    the back-end opt out and return to the short system for

7    compensatory damages, there still are some rights that are

8    being sacrificed; and it's very hard for somebody who doesn't

9    know if they're going to get sick --

10          **THE COURT:**  I mean, we've talked a lot about punitive

11    damages.  We understand the right to claim punitive damages is

12    being given up.  But other than that, what -- and then we've

13    talked just now about, you know, the right to sue in the first

14    four years, which probably isn't that big of a deal if you

15    don't have NHL yet.  So what other rights are they giving up?

16          **MR. KIRKPATRICK:**  Well, they're stipulating to the

17    admissibility of the Science Panel conclusions, which we

18    haven't talked about; but we have -- I don't want to plow the

19    same ground.

20          **THE COURT:**  I had forgot about that.  I totally forgot

21    about the Science Panel discussion.

22          **MR. KIRKPATRICK:**  I don't want to plow the same ground

23    again with respect to punitive damages, but just to point out

24    that it is a product that is going to remain in use; and

25    somebody who had their first exposure before February of this

year but then continues to use it for 10, 12, 15 years and then

gets sick, then goes to a lawyer, then goes into the tort

system, and they find out you don't have the same bargaining

power because there was a class action settlement, you know,

15 years ago that stripped you of your ability to ever seek

punitive damages.  So that's one of the big issues.

But I think my main point is just that the efforts to

reach are admirable, but they may not be effective just because

of all of the unknowns and the inability of people to make an

intelligent choice.

Just with respect --

**THE COURT:**  So are you saying -- but in terms of your

concerns, justifiable concerns, about, you know, the ability to

reach people in a meaningful way --

**MR. KIRKPATRICK:**  Right.

**THE COURT:**  -- are you saying that as a result, there

can never be a settlement for this class that binds them to

anything?

**MR. KIRKPATRICK:**  With respect to the futures subclass

given the size of it and the fact that they're unrecognizable,

yes, that is what I'm saying.

**THE COURT:**  What about a settlement that says, you

know, "If you're a Roundup user and you haven't been diagnosed

with NHL yet, if you want to guarantee yourself some money in

the event that you are diagnosed with NHL sometime in the

future, here's $10,000.  So you can participate -- you know,

here's a settlement where if you're a Roundup user, we'll give

you $10,000 right now in exchange for waiving any claims you

have about NHL in the future"?

     Are you saying that a notice describing -- that that

settlement could never -- that that class action settlement

could never happen and there could never be adequate notice for

that settlement?

          **MR. KIRKPATRICK:**  Yes, and here's why.  In order to

evaluate whether it's a reasonable settlement, we have to look

at the value of the settlement, which in your hypothetical we

know is $10,000, relative to the value of the claim, which we

don't know at this point whether it's going to be no claim at

all because you never get sick or a claim that, you know, could

potentially get punitive damages and large compensatory

damages; and then we have to discount that for risk, and we

talked a lot about risk before lunch.

     So we have these sort of three elements of the formula,

and with just knowing the value of the settlement, how do you

make an intelligent choice if nobody's telling you what is the

value of your claim?  And they can't tell you because if you

never get sick, your claim is zero.

          **THE COURT:**  Don't people reach -- under the

circumstances that you just described, don't people reach

settlements like that all the time in our system?

1          **MR. KIRKPATRICK:**  Well, they do when they have a

2     lawyer who can evaluate for them, you know, this is what the

3     range of possible recovery would be, from getting zeroed out to

4     a very large award; and this is the risk, the risk of

5     preemption, the risk of delay, the risk of all of the things;

6     and then people make a decision personally as to whether that's

7     good for them or not.

8          **THE COURT:**  Don't people make those kinds of

9     decisions -- don't class members make -- or putative class

10    members make those kinds of decisions all the time in our

11    system without the advice of a lawyer beyond what is sent

12    included in the notice?  I mean, a bird in the hand versus some

13    unknown outcome ranging from zero to a million.

14         **MR. KIRKPATRICK:**  Right.

15         **THE COURT:**  I'll take 10,000 now instead of, you know,

16    ranging from zero to 5 million later.

17         **MR. KIRKPATRICK:**  But I think the piece of information

18    that's missing, which may be available in a typical case, is:

19    What's the value of the claim that you're giving up?  Because

20    the claim might be worth nothing but it might be worth a whole

21    lot, and you have no way of knowing whether you're ever going

22    to be in that group.  And so how do you make the decision

23    intelligently when there's such a large unknowable part of the

24    formula?  And that's what I think makes this different.

25         **THE COURT:**  You know, if they -- if I'm -- you know,

```
 1    I'm thinking about my gardener.  You know, if my gardener got a
 2    notice like that and he said, "Look, I can take 10,000" -- I
 3    mean, obviously I'm making up the numbers.  There's no magic to
 4    the numbers that I'm making up.  The purpose of these questions
 5    is to assess whether it's really true that there can never be a
 6    satisfactory notice to a class like this or whether it's just
 7    the nature of this settlement that makes the notice potentially
 8    unsatisfactory; right?
 9              MR. KIRKPATRICK:  I think it's --
10          THE COURT:  And it seems to me that it's more the
11    nature of this settlement combined with the nature of the --
12    you know, the composition of the class that makes it
13    problematic, but it doesn't follow for me that there could
14    never be a notice -- there can never be a settlement for this
15    class where notice would be inherently inadequate.
16         If you had something simpler and more tangible and, you
17    know, you got enough benefit now rather than the ability to
18    participate in a fund which probably isn't going to exist
19    12 years from now -- right? -- if you're offered cash in
20    exchange for, you know, waiving future claims, I just don't
21    understand why that can't be adequately explained to people.
22         I mean, is everybody going to read it?  No, but, you
23    know -- but why doesn't that -- why isn't that much more like
24    the typical, you know, class action notice that we have these
25    days?
```

1          **MR. KIRKPATRICK:**  Well, I think the difference is what

2   you explained, that it's both the nature of the class members

3   and the nature of this settlement that makes it different from,

4   for example, *NFL* where all the class members knew whether they

5   played in the NFL, or even *Diet Drugs* where people have medical

6   records that they can get from their pharmacy and from their

7   primary care physician.  There was just more knowable in those

8   instances as to whether, you know, you're a part of this and,

9   you know, is this a good deal for you or a bad deal for you,

10  should you opt out or not.

11         I just think here, where it's really hard to know whether

12  you've been exposed and whether you're going to develop any

13  sort of disease, it's just you don't have the information

14  necessary to make the decision.

15         **THE COURT:**  So your position is there can be no

16  settlement for this class?

17         **MR. KIRKPATRICK:**  For this class.  Well, for the

18  futures subclass, yes.

19         **THE COURT:**  Right.  There can be no settlement period

20  for people who have not been diagnosed with NHL?

21         **MR. KIRKPATRICK:**  I think that's right because I don't

22  think they can be given effective notice in the sense of having

23  all the pieces of information they need to make an intelligent

24  choice, and that's what I think is different.

25         With regard to the derivatives, it's even worse because

1   they're even -- you know, they're one step removed and some of

2   them are going to be future derivatives.  Somebody who gets

3   married down the road to somebody who was exposed before, you

4   know, they have no reason to think that their rights are being

5   affected at all but, in fact, their rights are being

6   extinguished.

7        I would like to mention something about --

8        **THE COURT:**  I'm glad you reminded me of that.  I mean,

9   I assume, though, that if you excluded derivative claimants

10  from the class, that would largely defeat the purpose of the

11  settlement agreement from Monsanto's standpoint; right?  I

12  mean, because then Monsanto would probably come back around and

13  say, "Okay.  Well, you know, you, Roundup user, you're getting

14  the right to, you know, make a claim to this fund if it exists

15  12 years from now and, in any event, you have the right to opt

16  out and sue for compensatory damages.  Fine, but now your

17  spouse, you know, has the right to sue for everything,

18  including punitive damages."  And those two cases would

19  probably be joined -- right? -- and tried together as happened

20  with those folks in Oakland -- in the Oakland trial.

21       **MR. KIRKPATRICK:**  Right.  But to the extent the

22  derivative is releasing potentially valuable claims for

23  nothing, then, you know, they're giving up a cause of action

24  and they need to get adequate notice, which means effective

25  notice, and I don't think they can be given effective notice

 1    under these circumstances.

 2         **THE COURT:**  I assume that what you could do, though,

 3    is say, "If you, Roundup user, make a claim against the fund,

 4    in exchange for getting paid there needs to be a waiver from

 5    you and from any of your derivative plaintiffs, otherwise we're

 6    not paying you."  That would be okay.

 7         **MR. KIRKPATRICK:**  Well, and, in fact, the release does

 8    contain that sort of language and, in fact, the derivatives

 9    have to indemnify Monsanto.  So, you know, if somebody accepts

10    the payment from the compensation fund and they release their

11    claims and a derivative later comes forward and sues, that

12    claim will be dismissed and that derivative may actually owe,

13    you know, the attorneys' fees for Monsanto's defense because

14    those claims are being released and there's an indemnification

15    provision.  That is in the release.

16         I would like to raise one other point, if I could, while I

17    have you about the currents --

18         **THE COURT:**  Okay.

19         **MR. KIRKPATRICK:**  -- the Subclass 1, and that is --

20         **THE COURT:**  Well, I really want -- I'm sorry.  I

21    apologize, but I really want this to focus -- I think it's very

22    important -- I think by focusing exclusively on Class 2 right

23    now, it's helping shine a light on some of the problems with

24    the settlement for Class 2; and for Class 1, you know, it will

25    be equally helpful to focus exclusively on that later.  So I'm

1   happy to hear from you later about Class 1.

2            MR. KIRKPATRICK:  Okay.  That's fine.  It's just a

3   notice issue that I can hold until we talk about the other

4   class.

5            THE COURT:  Yeah.  Great.

6        Mr. Parekh?  Is it Parekh or Parekh?

7            MR. PAREKH:  Parekh.

8            THE COURT:  Sorry?

9            MR. PAREKH:  Parekh.

10           THE COURT:  Parekh.  I apologize.

11           MR. PAREKH:  That's all right.  I'm sure your name

12   gets butchered all the time as well.

13           THE COURT:  Never.

14           MR. PAREKH:  Just three points that I'd like to point

15   out.  One is, you know -- and Ms. Cabraser makes a good point,

16   look, this is the best notice practicable that, you know, they

17   and their class administrators and everyone could come up with

18   and they and Monsanto are incredibly, you know, confident that

19   they're going to reach these people and be able to reach these

20   people and things.  I think Your Honor is right, that the

21   notice and the classes need to be split in terms of how the

22   notice occurs.

23        But one of the things that, and using Your Honor's sort of

24   example of "If I offered to give you $10,000 now to release

25   your claims going forward," that works if it's an opt-in class;

right?  If it's an opt-in class and everybody gets sent out
that notice and it says, "If you want $10,000 to release your
claims going forward, sign this form, send it in, and we'll
give you an opt-in class and now you waive your claims going
forward," but it has to be a knowing waiver.

An opt-out class doesn't provide that.  An opt-out class
says, "If you do nothing, you know, your claims are waived,
period, and you don't get the $10,000 and you don't get
anything else"; right?

So it's a very different scenario between what's being
proposed by the plaintiffs here and what, you know,
Your Honor's example is.

In terms of giving up the rights, one of the issues with
the notice that's provided is it -- and I don't want to talk
about the notice in too much detail, but when it talks about
who's in the class and who's not -- right? -- it says you have
to have used Roundup and it talks about -- and Your Honor made
the point that "Once, you know, I read, well, if I don't have
NHL and I don't get $200,000, why am I going to keep reading
it?"  The next line down if you notice, and you read that too,
says "and you could get medical -- you know, medical early
diagnosis."

It's not until you get to the very, very bottom of the
notice in much smaller print that says, "Hey, even if you don't
have NHL, you might be giving up some rights and maybe this is

1    important to you."  And that, again, you know, sort of goes

2    back to the idea that people who don't have NHL are not really

3    going to pay attention to this.  I think you're absolutely

4    right.

5         And, again, if you wanted to do this and you think that

6    you're going to reach all these people, make it an opt-in class

7    and say, "Look" --

8              **THE COURT:**  Make what?  Make an opt-in class?

9              **MR. PAREKH:**  Make it an opt-in class, not the way it's

10   structured but the way Your Honor structured it, which is a

11   knowing release saying "I can get X amount now in order to give

12   up my claims, or I can choose not to and take the risk of

13   whatever happens in the future."  But it has to be a knowing

14   release.  It can't simply be I get opted into it.

15             **THE COURT:**  What if a notice said "Attention:  If

16   you've used Roundup but have not yet gotten sick, read this

17   because it's about your rights"?  I mean, wouldn't that be more

18   likely to grab somebody's attention who fits the description of

19   a Class 2 class member than this stuff we're looking at now?

20             **MR. PAREKH:**  I think it certainly would be more

21   likely.  See, but you also have to look at this in the context

22   of what they're giving up.

23        A typical class action you're talking about $20, $30, did

24   you buy a drink and, you know, did that drink not have

25   5 milliliters in it that it didn't or you're talking about some

1   other thing.  I mean, we're talking about negligible amounts of

2   money.  No one is going to really care one way or another about

3   going out and suing on those things, and they pay as much

4   attention to those notices as they do to a notice about

5   Roundup.

6        That's what -- you know, the typical response rate, as

7   Your Honor I'm sure is aware, is like 5 percent, 7 percent to a

8   class notice.  That's what you get back.  And the problem here

9   is a 5 percent or 7 percent response rate, assuming that that's

10  what happens in terms of people who --

11       **THE COURT:**  But in the typical -- but the problem is

12  in the typical class notice, you know, somebody's being offered

13  20 bucks -- right? -- as you just noted.

14       **MR. PAREKH:**  Right.  But here you're not being offered

15  anything.  You're being told, "Hey, maybe, you know, if you

16  have -- if you don't have NHL and you use Roundup, maybe you'll

17  be offered something in the future."

18       In Your Honor's hypothetical, it's a little bit different.

19  You are being offered $10,000 or $50,000.  That might get

20  somebody's attention.  But in this -- the class that's being

21  proposed now, all you're saying is "If you don't opt out now,

22  you may lose the opportunity to sue Monsanto for punitive

23  damages in the future"; right?  You're not being given anything

24  at this point.  All you're being told is you must affirmatively

25  opt out or you lose your rights, and that's not really going to

1   trigger people because they don't have NHL.  Most people don't

2   even know what NHL is.

3           **THE COURT:**  Well, what if the notice said, "Hey, if

4   you use Roundup and you have not been diagnosed with cancer,

5   this settlement affects your rights.  Please read on.  If you

6   don't opt out, what's going to happen to you is you're going to

7   get four years' worth of medical monitoring and you're going to

8   potentially have the ability to make a claim from a

9   compensation fund; but, in any event, you're still going to

10  have the right to sue at the end of the day if you don't get

11  money from the compensation fund and if you get NHL and if you

12  want to sue"?  The only thing you're giving up is punitive

13  damages and then we have this Science Panel thing we'll talk

14  about later.

15      That's something that somebody could potentially

16  understand -- right? -- I mean, if it was articulated clearly

17  to them.

18          **MR. PAREKH:**  It's possible they could understand, but

19  look at the audience which Ms. Cabraser said we're sending this

20  notice to.  84 percent of this audience is supposed to be

21  migrant farm workers or people who work in the fields.  I would

22  have difficulty, honestly, as a lawyer looking at that and if I

23  didn't do litigation understanding what exactly I was giving up

24  because you're talking about punitive damages.  I mean, who

25  understands what punitive damages are unless you happen to have

gone to law school or, you know, various --

         **THE COURT:**  Or read a John Grisham novel.

         **MR. PAREKH:**  Right, read a John Grisham novel maybe.

    You know, who understands what the Science Panel is?  It took our side hours and hours of trying to figure out what the Science Panel did and what the thresholds were and what that actually meant and that it actually changes the legal standard for what you have to prove in court.  I mean, that took an expert on our end to help teach me what that meant.  That's not something that an average farm worker can knowingly decide and go, "You know what?  Maybe that makes sense.  Maybe it doesn't. Maybe I need to opt out."

    And the thing is you're asking them to do something affirmative in order to not give up their rights for what is effectively medical monitoring and nothing else, and that's part of the problem with Class 2.

    And I appreciate that Ms. Cabraser has probably negotiated one of the best settlements that she could, but what Ms. Fegan said about the *NCAA* settlement really, really sort of I think underlines where the problems with this settlement are.  She said, "We gave up the class PI claims because they had little value in reality."

    And, unfortunately, I think that's the issue that Ms. Cabraser and her side are facing here, is class PI claims, as we all know who have litigated class cases, have little

1   value in litigation because the chances of you actually

2   certifying a PI class are slim and none.

3        And so, yes, they're trying to negotiate a settlement but

4   they have very little leverage from which to negotiate that

5   settlement from, just as Ms. Fegan said, because those claims,

6   just as in *NCAA*, had very little practical value.

7        And I think that underlines a lot of the issues with this

8   settlement at a basic level, is that the individual claims have

9   enormous value in comparison; and what Monsanto is trying to do

10  is wiggle away at the value of those individual claims.

11       And it goes back to the whole idea of:  Why are we giving

12  up punitive damages in this?  Why is giving up punitive damages

13  so important to Monsanto that it's part of this deal?  It's

14  because that is what holds leverage, it holds a hammer above

15  Monsanto for individual plaintiff lawyers like myself to

16  negotiate deals, not just on behalf of the case going to trial

17  but on behalf of the entire group of cases that I have and that

18  I represent.  Because if I threaten to take that case to trial

19  and get 10 million or a billion dollars in punitive damages,

20  that makes a difference to Monsanto's bottom line; whereas, the

21  individual claims, it's a cost of doing business.

22       And that's the other issue with this, is -- and I

23  apologize, I'm going on long -- but the other issue with this

24  is that one of the things that makes this so egregious in terms

25  of giving up punitive damages is that Monsanto has not changed

1   its behavior.  It is continuing to sell Roundup and it's

2   continuing to sell Roundup without notice, without warnings.

3        And the problem with that is, that by giving up punitive

4   damages, now Monsanto's saying, "Hey, I don't even have to

5   worry about that.  I can keep selling Roundup for as long as I

6   want"; whereas --

7            **THE COURT:**  You know, I'm not saying this would

8   happen, but theoretically, you know, Monsanto could come into

9   possession of evidence in the future which sort of definitively

10  shows that glyphosate causes NHL, hide it, and then, you know,

11  at some later point it's revealed that they hid that

12  information and then the people in this class would not be able

13  to seek punitive damages even if they, you know, continued to

14  use Roundup over the years while Monsanto was concealing this

15  information; right?

16       Now, people who are not in the class, people who began

17  using Roundup after February of '21, they could still sue for

18  punitive damages --

19           **MR. PAREKH:**  Right.

20           **THE COURT:**  -- but the people in the class would not

21  be able to.

22           **MR. PAREKH:**  Right.  And going back to -- I mean,

23  Your Honor presided over *Hardeman* so you're very familiar with

24  it.  The evidence introduced into *Hardeman* for the punitive

25  damages phase was limited by the dates that Mr. Hardeman's

1    claim arose.  There was much more evidence after that point

2    which Your Honor excluded, and I'm not going to argue about

3    whether or not --

4         THE COURT:  Not the kind of evidence that I was just

5    talking about, though.

6         MR. PAREKH:  No.  No.

7         THE COURT:  There was evidence of very sort of crass

8    conduct by Monsanto, no question --

9         MR. PAREKH:  Right.

10        THE COURT:  -- but there wasn't evidence that they

11   actually knew that the stuff causes cancer.

12        MR. HOFFMAN:  Your Honor, Your Honor, if I may, you're

13   right about that and the hypothetical that you described --

14        THE COURT:  Who's talking?  Wait.

15        MR. HOFFMAN:  I apologize.  It's Mr. Hoffman.

16        THE COURT:  Oh, okay.

17        MR. HOFFMAN:  You're right, Your Honor, and the

18   hypothetical you described would never happen.

19        And I would just note that the brief that was filed

20   yesterday by the EPA goes through all of this, including the

21   allegations in these underlying lawsuits, and concludes that

22   they have no impact on the decision of the scientists at the

23   EPA.

24        So I just didn't want to let the nonsense that a lawyer

25   representing hundreds of claimants is throwing into this

1    proceeding go on.

2         **THE COURT:**  No, I don't think that he's throwing

3    nonsense into the proceeding.  First of all, it's my

4    hypothetical so if it's anybody's nonsense, it's my nonsense.

5         And, number two, I think what Mr. Parekh is saying is --

6    you know, he's making a different point than the one I was

7    making.  He's saying, you know, there was -- and he's correctly

8    saying -- that there was a lot of evidence of very crass

9    conduct by Monsanto post-2012 and that didn't come in in the

10   *Hardeman* case, and that may come in in the next case.

11        And you know what?  Monsanto hasn't been punished for that

12   yet.  I don't know, maybe they were punished for it in one of

13   the other trials, but at least in federal court Monsanto hasn't

14   been punished for that comment.

15        Right, Mr. Parekh?  Is that correct?  Is that --

16        **MR. PAREKH:**  Exactly.

17        **THE COURT:**  -- what you were saying?

18        **MR. PAREKH:**  Exactly, Your Honor.

19        **MS. FEGAN:**  Your Honor, this is Beth Fegan.

20        I just would like to add a point.  There's a very real

21   harm of not providing notice.  And while I understand from a

22   mass tort or personal injury lawyer perspective keeping these

23   claims so that someday if these people get cancer because they

24   continue to use Roundup is important to them, what's important

25   to Subclass 2 members today is to be warned, is to get the

information so that they know that they are at risk so that
they can make affirmative choices about whether to continue,
frankly, to be exposed at all.  And that is part of notice and
that's part of the purpose of a medical monitoring program.

And I'll just give the example of one of our clients,
Aaron Sheller, who's one of the Subclass 2 representatives, and
for the last 15 to 20 years he has sprayed between 500 and a
thousand gallons a year himself of Roundup on his own farm and
on other farmland that he contracts for in Indiana.  And when
he learned -- before this, he just did it without any
protective cover.  So he is at risk.  When he learned of these
risks, he bought, you know, masks.  He bought gloves.  He has a
charcoal filter.  He's completely changed the way that he
works.

And that is significant and why we would put Subclass 2
members in a place of not educating them, of not providing them
this information and waiting until that in 15 years they answer
a billboard from a lawyer is really concerning.

So I understand and I think we need to decouple the idea
that maybe this notice doesn't have the right headlines and
maybe we need to do additional short form notices that are
decoupled and separate out the two subclasses.

But the idea that we would throw out the baby with the
bathwater and not provide education now and provide warning now
so that people can make meaningful changes even just in the way

1   that they work in the fields would be a really critical failure

2   through this process.

3        **THE COURT:**  I understand what you're saying to a

4   degree but, you know, the educational value in a class notice

5   surely cannot justify a bad settlement.

6        **MS. FEGAN:**  I agree.

7        **THE COURT:**  It doesn't mean you would approve as

8   reasonable an otherwise bad settlement.

9        **MS. FEGAN:**  I agree with you, Your Honor, and we will

10   differ on whether we think this is a bad settlement, but I do

11   think there is a way to provide meaningful notice and to do it

12   in a way for people to make meaningful choices.

13       And I think part of what's built in here is the idea,

14   going back to your original issues, of, you know, will it reach

15   them, will they read it, and will they understand it.  And

16   understanding a meaningful choice is the part that makes this

17   notice program so different because we have worked in these

18   groups and the community groups that will work and speak with

19   people in the way that they -- you know, where they're located,

20   in the way that they normally communicate, whether it's in

21   Spanish, whether it's not.

22       But the idea that you could never have a class action that

23   provided benefits to people just because they are migrant

24   workers or just because they speak Spanish or just because they

25   are not, you know, privileged in the way that we are, it would

 1   be a death knell for --

 2           **THE COURT:**  Yeah, I don't think you're --

 3           **MS. FEGAN:**  -- meaningful change.

 4           **THE COURT:**  I think that's a little bit of a straw man

 5   you're creating.  I don't think anybody's saying they can't get

 6   notice because they're underprivileged or speak Spanish.

 7       But, Mr. Parekh, we interrupted you.  Did you have

 8   anything else you wanted to say?

 9           **MR. PAREKH:**  If I may just briefly respond to

10   Ms. Fegan.

11           **THE COURT:**  Sure.  Go ahead.

12           **MR. PAREKH:**  So I think Ms. Fegan is correct in a lot

13   of ways, but the issue here is:  What are you giving up?

14   Right?  And if this was a medical monitoring class for Class 2,

15   medical monitoring only, and what you're giving up is what they

16   gave up in *NCAA*, medical monitoring claims and no class-wide PI

17   relief, I'd happily go, "Great.  You know what?  Let's give the

18   best notice possible.  Let's inform these people.  Let's get

19   this notice out."  I'd be right there cheering them on, but

20   that's not what this is, and so let's focus on the settlement

21   that is rather than on the straw man settlement.

22           **THE COURT:**  Okay.  Mr. Morrison.

23           **MR. MORRISON:**  Thank you, Your Honor.

24       I want to assume for the moment that almost all the class

25   members, Class 2, actually receive the short form notice; and,

1  second, I'll make the assumption that they actually go out and

2  either go to the website or ask for and have a copy of the

3  24-page long form notice sent to them.

4       **THE COURT:**  Okay.

5       **MR. MORRISON:**  What I want to focus on is whether they

6  are in a position to make a meaningful choice about whether to

7  opt out or not because that seems to me to be the biggest

8  problem in the notice aspect.

9       Of course, the class members are not people like

10  Your Honor.  They're not lawyers.  84 percent are farm workers.

11  And it's difficult I think for all of us to understand what the

12  compensation scheme is and what the trade-offs are.

13       For example, the class member won't know if they're going

14  to get NHL and, if so, when and how bad their case will be.

15  It's very hard to understand the grid that's been proposed.

16  They can't know about most disqualifying conditions, the

17  medical conditions, for them and their family and, indeed, in

18  the future because that's when the conditions actually kick in.

19       It's very hard to know what exposure level they would have

20  of Monsanto's Roundup as it goes forward in the future, and

21  they can't reasonably estimate the problems of proof that

22  they're going to have to be able to make a claim in

23  compensation.  So that's on the plus side for them to try to

24  evaluate what they're going to get on the settlement.

25       On the other side they have a very difficult time

determining the benefits from these detriments, the

restrictions.  These are not, as class counsel calls them in

their brief, modest restrictions.  They're very significant.

How much is the possibility of punitive damages worth?  We

don't have to answer that question.  All we have to do is to

recognize that for class members, it's going to be very

difficult to evaluate even if they have a lawyer, which most of

them, of course, don't have.  Punitive damages, of course, are

tied to actual damages as we know and, therefore, they can't

know what their actual damages are and can't know what their

punitive damages are.

How bad is the four-year delay?  Well, as Your Honor

pointed out, that depends on when they get sick and where

they're going to be suing; but whatever we know it is, it's

not, as the plaintiffs call it, a temporary litigation stay.

How much will the Science Panel hurt?  I don't know.

There's very wide-ranging difference of opinion about it.  The

one thing I know, Your Honor, is clear is that on page 1 of the

short form notice where class counsel has approved this saying

it will not affect the class members' rights, that's plainly

not correct.  We know the Science Panel is going to be

significant.  We can't possibly know how significant but it's

going to be significant.

And then there's, of course, the issue of preemption where

it's entirely possible that the Biden EPA may be more friendly

1    to Roundup victims than the prior administration has been.

2        As I said, this is almost an impossible choice without a

3    lawyer.  Class counsel says, "Don't worry.  We have the Legal

4    Services Program.  The Legal Services Program will come to the

5    rescue."  And my first reaction is, that's in effect a

6    concession that without a lawyer, these class members cannot

7    make meaningful choices.  They are not equipped to do so.  They

8    don't have the information.  They can't make the kind of

9    trade-offs that you or I would be able to make in advising a

10   client about it.

11       And of course the Legal Services Program now provides that

12   these programs are available at the front end if, of course,

13   they can make the connection with the class member.  Remember,

14   that to get access to these Legal Services attorneys, the class

15   member has to know enough about it, meaning that they have to

16   read through this 24-page summary and read the questions and

17   understand them, and then they have to take the affirmative

18   step of trying to get in touch with the program and then they

19   have to get a lawyer, and we have to assume that there are

20   going to be enough lawyers who are going to be able to handle

21   this situation.

22           **THE COURT:**  And who are these lawyers?  I mean, I've

23   seen a lot of really bad advice dispensed over the years by

24   lawyers.

25           **MR. MORRISON:**  We don't know.  That's not part of the

1    plan yet.  We do know a couple things about them; but on the

2    front end, even think of the lawyer's responsibility.  The

3    lawyer is going to have to go with each client one by one and

4    say, "Well, the first thing I need to do is I need to know

5    about your work history so I can get some sense of what the

6    exposure level is going to be.  I also need to know about your

7    family medical history and your medical history because those

8    loom very large on the grid; and then I'm going to have to try

9    to explain to you punitive damages, what the risks are, how the

10   delay is, and how the Science Panel comes in."

11        And all that has to happen in a truncated period within

12   the 150 days that the class members have to opt out.  And,

13   meanwhile, the clock is running from the time that the notice

14   first goes out.  If they find somebody, we don't know how many

15   lawyers there are going to be, where they're going to be

16   located, how they're going to be able to do all of this.

17        And the last thing I want to say about this is there's a

18   problem with these lawyers.  They are being paid by Monsanto

19   out of the $170 million that Monsanto is putting in.  They are

20   also being appointed, supervised --

21        THE COURT:  I don't know.  I mean, if it's under court

22   supervision and under the supervision of the plaintiffs, I

23   don't know the fact that the check is being written by

24   Monsanto -- I'm not sure how big -- that seems like more of a

25   rhetorical point in a sense.

1              **MR. MORRISON:**  No, Your Honor, let me explain why.

2      The key question here is opting out.  That's the question these

3      lawyers are being asked to help about.  If they are not able to

4      give candid advice about opting out, then it doesn't matter.

5      And are they going to give candid advice to the person who's

6      paying them, Monsanto; the person who's supervising them,

7      approving them, and deciding how much they're going to get paid

8      on an hourly basis, class counsel?  All of them have an

9      interest of them staying in the class.

10             And so Rule 1.8(f) of the model Rules of Professional

11     Conduct requires that when somebody else is paying for your

12     legal services, there must be informed consent, and I would ask

13     Your Honor to ask whether these class members on a mass basis

14     are going to be in a position to give informed consent to the

15     lawyers who are providing services for them as well.

16             So even then, in the long run, they are in a very, very

17     difficult position to try to make these kind of decisions.  As

18     Your Honor pointed out in the order rejecting the last year's

19     settlement, are they going to be able to have a meaningful

20     choice?  And that means to be informed, to be able to balance

21     the trade-offs versus the benefits.  And I don't think that's

22     possible to people who don't even necessarily know that they've

23     been exposed, don't have the disease now; and no matter how

24     loud you shout the warnings, they are not going to be in a

25     position to do it.

1        The final thing I want to say is:  Even if they decide to

2   opt out, it's not a very easy thing to do and there's serious

3   risks for people who are not lawfully in the United States.

4   So, for example, each person who wishes to opt out must submit

5   their name, their address, their telephone number, and their

6   date of birth and a copy of a government-issued or other

7   genuine identification, such as Social Security or drivers'

8   licenses.  I am very worried that anybody who gets that far may

9   say, "Huh-uh.  I don't have the disease now.  Why should I run

10  the risk of being potentially deported by providing somebody,

11  it looks like the government because it's coming from the

12  court, the government has somehow got this information and I do

13  not want to be in a position to do that."

14       The bottom line is that even assuming that the maximum

15  legal services participation is followed, that there is no

16  chance that most of the class will be able to make the kind of

17  meaningful choice that the due process clause of the

18  Constitution requires.

19       Thank you, Your Honor.

20       **THE COURT:**  Okay.  Thank you.

21       Let's take a break and give the court reporter a break.

22  We'll resume at 3:05.

23                  (Recess taken at 2:59 p.m.)

24             (Proceedings resumed at 3:07 p.m.)

25       **THE COURT:**  Okay.  Ms. Cabraser, do you want to

briefly have the last word on the notice issue?

        **MS. CABRASER:**  Yes, and thank you, Your Honor.

        Let me start backwards because I was about to mention the Legal Services Program, in fact, and Mr. Morrison beat me to it.

        Without belaboring the point -- and, yes, Your Honor needs and will get additional detail on that program because it would be subject to court supervision -- but the whole point of it and the whole point of starting it during the notice and opt-out period and continuing it during all of the settlement programs is because we recognize that this is not a $20 consumer class action.

        The class members have important rights.  They have important options.  We don't believe they're incapable of understanding them, but we do understand that some of them may need help.  And some of the conversations we had this morning about preemption, those are lawyerly conversations and that is why the Legal Services Program which, frankly, is a unique one. To my knowledge it hasn't been done before.

        Yes, class counsel always have been and always would be available in a class action to answer basic questions from class members and there are, you know, other call centers and service providers; but we recognize that the questions that class members may ask and the options they are considering, including the option to opt out on the front end, are questions

that they may feel more confident, and the Court may feel more
confident, are answered by independent lawyers.

Class counsel, it's true, always have the obligation to
keep the best interests of the class and subclass they
represent as a whole in mind; but we are also proponents of a
settlement, and we recognize that tension and that is exactly
why the Legal Services Program will utilize independent
lawyers.  Yes, lawyers with mass tort, complex litigation, and
Roundup litigation experience, not just any lawyers.

It's important to have quality legal representation
available for people to answer their questions and to consider
with them their options.  This would be the most informed class
ever at the time of opt-out even though it's an important and
complex decision.

So the provisions of the settlement and the organizational
programs of the settlement and the infrastructure of the
settlement are rising to meet the particular circumstances of
the action.  And I'm sure it's always possible to critique and
flyspeck and even nit-pick any given program, but we are
proposing this to meet a challenge, to solve a problem, to be
faithful to the independence of the class members and to
respect their rights to make their own decisions.

I don't think that such decisions are being beyond any
client.  They may be difficult.  I also don't think that the
only alternative is for everyone to wait until they get sick

and, indeed, until they get the sickest they're going to get and then have a tort system claim.

This settlement makes a value judgment, quite frankly, that a diagnostic program of the very sort we've designed to meet class members where they are and to deal with their needs based on who they are is a valuable service to them and promotes a valuable objective with respect to their own health and safety.

And I would hate to see all settlements, class and nonclass, devolve to the point where it's only money after the damage is done.

**THE COURT:**  Ms. Cabraser, could I ask you --

**MS. CABRASER:**  Yes, Your Honor.

**THE COURT:**  -- a question?  I was thinking about a comment that Mr. Parekh made earlier.  He was describing the difference between an opt-out settlement and an opt-in settlement --

**MS. CABRASER:**  Uh-huh.  Yes.

**THE COURT:**  -- and offering people in Class 2, you know, money in exchange for a release; and he said, well, that's an opt-in settlement that he was describing.

What if, though, instead -- you know, I was trying to think of something else that would be responsive to my comments that -- you know, the discussion would be very different if, you know, people in Class 2 were being offered money --

1   right? -- rather than, you know, just this sort of being told

2   about the settlement compensation fund that's not going to be

3   there when they get -- or may not be there when they get NHL,

4   if they get NHL.

5       And I was thinking -- I'm sort of thinking out loud here

6   so please take what I'm saying with a very large grain of

7   salt -- but what about a compensation fund for members of

8   Class 2 that they can make claims to right away?  And obviously

9   the payments they would get from that compensation fund would

10  be, you know, lower than the payments that members of Class 1

11  would get from the compensation fund because the people from

12  Class 2 don't have NHL; right?

13      But, you know, they could be given the opportunity to, you

14  know, be paid -- receive a payment from the compensation fund

15  now sort of in exchange for releasing, you know, their punitive

16  damages claims down the line or, you know, in exchange for

17  releasing something down the line, maybe more than their

18  punitive damages claims.

19      I'm wondering if that would be something that would be

20  kind of tangible and understandable and immediate for members

21  of Class 2, like if somebody from the class saw something like

22  that, that you can get paid money now because you used Roundup,

23  you know, in exchange for waiving certain rights later.  Might

24  that be more tangible, immediate, understandable to class

25  members, members of Class 2?  I don't know if I articulated

1  that very well, but --

2          **MS. CABRASER:**  Your Honor, it is an intriguing notion.

3  It is an intriguing idea.  It is certainly tangible and

4  knowable.  We actually have a feature like that in the

5  settlement for diagnosed class members.  It's the accelerated

6  payment option and it's --

7          **THE COURT:**  Yeah, I'm not participating in the

8  provision of a lowball offer to people who have been diagnosed

9  with NHL so that's not in.  We can talk about that later.

10          **MS. CABRASER:**  Okay.  I think my point is that, of

11  course, when Your Honor raises it as an option or a structure,

12  it is intriguing and interesting.  If that is something that we

13  had proposed, you know, under the rule of every feature becomes

14  a bug, I'm sure there would be criticism of it just as there is

15  criticism of an LSP whose very function is to provide the best

16  that lawyers can provide.

17          **THE COURT:**  Yeah.  I wasn't musing so much about

18  whether such a settlement would be reasonable or doable.  Maybe

19  it would be.  But I was thinking about -- I mean, what prompted

20  my question was really thinking about it from a notice

21  standpoint.  You know, thinking about it from the standpoint

22  of:  Is this something that is more likely to grab people's

23  attention?  Is it something that they're better -- somebody who

24  doesn't have the disease, they would be better able to

25  understand?  And would it be more meaningful to participate in

1    than, you know, a settlement structure which involves a

2    compensation fund that only is there for four years or that we

3    can only count on being there for four years?

4         In other words, you know, if the people in Class 2 can get

5    paid immediately, it seems like at least from a notice

6    standpoint -- and I haven't thought about it conceptually, you

7    know, from these other standpoints that we've been discussing

8    today -- but at least conceptually from a notice standpoint,

9    you know, it seems like it might be easier for people to wrap

10   their brains around.

11        Okay.  Anyway, Ms. Cabraser, did you have anything else

12   you wanted to say on the notice issue before we turn to

13   Class 1?

14        **MS. CABRASER:**  I'm checking quickly, Your Honor.  I

15   think that only I think the point that was actually made by

16   Ms. Fegan in reaction to the "let's just make everything an

17   opt-in nonclass settlement," I think at the extreme at least

18   that would negate the viability and existence of medical

19   monitoring classes and class settlements; and in light of *BP*

20   and *Diet Drugs*, I don't think that that's anything we want to

21   do.  That said -- or that should be done because this is a

22   valuable benefit for the class.

23        If the challenge is communicating to class members in a

24   way to optimize their attention and action in the making of

25   choices, which are much like the choices we all have to make

1    every day when we think about buying insurance or not, we make

2    that choice, I don't think that due process requires the

3    choices in litigation or settlement to be more as simple or

4    primitive than the choices that we're all required to make in

5    everyday life.

6        I do think it is an obligation to make notices clear and

7    as communicative as possible, to make the claims process and

8    registration and participation processes as easy and user

9    friendly as practicable.  That's where all the details are.

10   That's what we've tried to do.  That's what we continue to try

11   to do.

12       And just a miscellaneous point to note, the settlement

13   doesn't close off a registration process.  That registration

14   process for compensation is ongoing throughout the term of the

15   settlement and, indeed, would be ongoing again throughout

16   renewed terms of the settlement; and that in itself is a way to

17   make sure that class members continue to pay attention because

18   the settlement website and everything else will tell them, you

19   know, "If you get a diagnosis, if you become sick, there is a

20   fund for you.  Remember.  Pay attention.  You're not going to

21   be left out of that process."

22       So we've certainly attended to the channeling and the flow

23   so that class members have an interest in participating in the

24   settlement program and seeing that it has benefits for them,

25   including a safe harbor and insurance, by keeping alive that

1    process of engagement, registration, and outreach.

2              **THE COURT:**   Okay.   Class 1.   Let me tell you what I

3    was saying about this yesterday and kind of how my thinking has

4    evolved on it a little bit.

5         And, by the way, I know that this is one settlement;

6    right?   I know that I can't approve as to Class 1 and reject as

7    to Class 2; but I still think, you know, from the standpoint

8    of -- or I assume that I can't do that.   If somebody wants to

9    correct me on that, go ahead, but I'm assuming that I can't do

10   that, but I still think it's very useful to separate out the

11   discussions to see whether it's reasonable for Class 2 and

12   reasonable for Class 1.

13        What I was saying yesterday now as to Class 1 -- I'm going

14   to focus in large part on, you know, this preemption issue --

15   is that for anybody who's in Class 1, for anybody who's been

16   diagnosed with NHL and they've been exposed to Roundup, it is

17   in their interest to rush to court and to try to get on the

18   inventory train in the settlements that Monsanto is currently,

19   you know, reaching with law firms -- right? -- and to do that

20   before any, you know, potential Supreme Court action on the

21   preemption issue.   And so it's absolutely not in their

22   interests to participate in this settlement.   That's what I was

23   thinking yesterday.

24        And then I was reflecting on it and thinking, look it,

25   these are people who have NHL, have been Roundup users, and

have not yet sued.  Why haven't those people yet sued?  And

maybe those are the -- you know, there could be any number of

reasons; right?  It could be people who just are opposed to the

tort system.  I mean, we get that during jury selection; right?

We get prospective jurors who just say, "I don't believe in

this tort, you know, suing for damages when you get hurt by

someone."  Maybe it's some of those people.

     But maybe it's largely the people that, you know, we've

been focusing on in this discussion today.  Maybe it's migrant

farm workers and people who are sort of too unsophisticated to

have filed a lawsuit or don't have the means or don't have the

combination of the means and the sophistication and the time to

get to the point of filing a lawsuit or even getting to the

point of hiring a lawyer to, you know, negotiate a claim for

them.

     Those are assumptions I'm making obviously, you know, and

it may be that they are not good assumptions and we can talk

about that.  But if the bulk of the people who would want to

sue but haven't sued are people like that, then perhaps it is

reasonable to put them in a program like this because, number

one, they'll start -- they'll get -- there will be this robust

notification program and, you know, they'll be educated on the

topic.  Because they already have NHL, they will have an

opportunity to make a claim, you know, for compensation from

the fund that's being created.  And, you know, they'll have an

1  opportunity to opt out at the back end and seek compensatory

2  damages in the event that they don't like what is offered to

3  them from the compensation fund and in the event that the

4  Supreme Court doesn't pull the rug out from under them.

5      If I'm right about the people who are in this class, some

6  of them, just as they've not been able to get to the point of

7  hiring a lawyer yet, filing a lawsuit yet, they may never get

8  to the point of filing a claim for compensation, you know,

9  through this program.  But maybe we're really increasing the

10  chances of those people getting some form of compensation by,

11  you know, subjecting them to this robust notice program and,

12  you know, giving them an opportunity -- and it's with legal

13  assistance by the way -- and giving them an opportunity to --

14  you know, we still don't know the details of the legal

15  assistance but some form of legal assistance -- and, you know,

16  they have an opportunity to make a claim to the fund and no

17  percentage of that will be taken out for lawyers I guess other

18  than the percentage that will be taken out for class counsel at

19  the front end, which is not nothing.

20      So maybe conceptually, anyway, you know, a settlement

21  along these lines for people who have been exposed to Roundup,

22  diagnosed with NHL and haven't hired a lawyer yet could be

23  reasonable.

24      So I guess I'll put it out to the opponents of the

25  settlement to ask what's wrong with that new way of thinking

 1   that I've adopted tentatively over the last roughly 18 hours.

 2          **MR. AUDET:**  Your Honor, may I just introduce myself?

 3   I'm Subclass 1 counsel --

 4          **THE COURT:**  Hello, Subclass 1.

 5          **MR. AUDET:**  -- Bill Audet.  Sorry.  I wanted to

 6   introduce myself.  I wasn't there earlier today.

 7          **MS. CABRASER:**  And, Your Honor, Elizabeth Cabraser

 8   here.

 9      You know, Your Honor described exactly an experience that

10   those of us who were involved in the PG&E bankruptcy

11   proceedings had just last year, and this was the situation.

12          **THE COURT:**  Is there anything you're not involved in?

13          **MS. CABRASER:**  I hope so.

14      I represented one of the tort claimants committee members,

15   the fire's victims, and there was a dichotomy between the

16   North Bay fire's victims and the Camp fire victims.  And my

17   house was in the North Bay fire zone.  It wasn't destroyed, but

18   I got a stack of lawyer solicitation letters almost a foot

19   high.  Everybody wanted to represent me in the bankruptcy.

20          **THE COURT:**  Did you get one from yourself?

21          **MS. CABRASER:**  No, because we don't do that.

22      But, on the other hand, Your Honor, the people that had

23   fled for their lives from Paradise, from the Camp fire, as the

24   bar date deadline was approaching -- and a bar date is a bar

25   date.  It's worse than preemption.  I mean, you're toast if you

don't file that claim on time -- we realized there was a huge
gap and the Camp fire claimants hadn't shown up, and we
hurriedly asked the bankruptcy court, Judge Montali, to extend
the bar date, which he did.

It turned out there had been great conventional notice of
bar dates, but a lot of those mailed notices had gone to homes
that had been destroyed and the people were gone.  They were
displaced.  They were refugees.  They were living in their
cars.  They were in parking lots.  They were out of state.
They didn't have anything except the clothes on their backs,
and so we had a challenge to reach them so they would have a
chance to file a claim.

And we did two things.  We asked Judge Montali to appoint
a notice trustee, which he did.  He hired the Kinsella firm and
basically for two months every way, shape, or form notice beat
the bushes through church groups, communities, laundromats, to
find the missing claimants so their rights wouldn't be
extinguished and so they could participate and also to provide
kind of the equivalent of the Legal Services Program in a less
sophisticated way to make sure the claims got on file, and they
did.  The missing 10,000 claims were reached.

And so when we look at Subclass 1, these are the people
we're seeing.  They are similarly situated to the people that
have been in the litigation and able to participate in some of
the inventory settlements, but there is a gap.  They don't come

into the system.  I'm not derogating the effectiveness of
lawyer advertising, but they're either not being marketed for
or not being reached.  They have other reasons to be reluctant
to come into a suit.

And so in our view the Subclass 1 settlement is
tailor-made to bring these people into the system, get them
into a claims compensation program, get compensation to them
starting shortly after final approval, it won't be delayed
during any appeals, and enable them to catch up.

They also, of course, can opt out on the front end.  If
they prefer an individual claim and an individual lawyer,
that's great.  But through the notice one way or another
they're going to be able to get in the system and have an
opportunity for compensation for diseases they already have.
And we think that is not only important but just and fair and,
of course, this is more in the nature of I don't want to say
the everyday class action, but the class action that most of us
are familiar with.

And, you know, it's funny, this is one settlement.  You
talk about two settlements.  It's one settlement but, of
course, the claims processes and programs and infrastructure of
the settlement are really geared toward these two groups.  And
for the diagnosed group it's to get them their compensation as
soon as possible, reduce the transaction costs, and give them a
meaningful choice.

1          **THE COURT:**  Pretend for a minute we didn't have

2     Class 2 and we were just here to talk about Class 1.  Why would

3     it need to be limited to people who don't have lawyers?  I

4     mean, why couldn't it be, you know, everybody who has been

5     exposed to Roundup and has NHL; and, you know, the people who

6     have lawyers, whose lawyers advise them to opt out, can opt

7     out?

8          **MS. CABRASER:**  Your Honor, that is not something that,

9     hypothetically at least, we would object to.  That is a class

10    structure that works for everyone.

11         We were very conscious at the outset of not interfering

12    with existing attorney-client relationships.  We knew that

13    there were people who had lawyers that might --

14         **THE COURT:**  How does it interfere with an existing

15    attorney-client relationship?  I mean, we have cases all the

16    time where-- there's a bunch of individual cases and a bunch of

17    individual lawsuits filed by a bunch of different lawyers, and

18    we eventually decide there needs to be a class action and we

19    decide who's going to be the lead plaintiff and who's lead

20    counsel.  Why would something like this interfere with an

21    existing attorney-client relationship any more than what I

22    described?

23         **MS. CABRASER:**  Technically it wouldn't and ethically

24    it wouldn't.  I'm simply explaining to Your Honor why in the

25    deal, as it has been presented to Your Honor, we carved those

people out of the class.  And, frankly, it was an impression's

question.  We didn't want to be accused of client poaching.  We

didn't want to interfere with might or might not be going on in

the inventory settlements, which are confidential.  We don't

have a window into those.  We didn't want to confuse class

members who saw a notice, who suddenly thought, "Oh, I can go

shopping.  You know, I can shop for lawyers."  I mean, that's

their right, but we didn't want to create any confusion or any

interference.

But, of course, what Your Honor is describing is something

that certainly happens in class action settlements.  Some class

members have their own lawyers.  Rule 23 allows class members

to appear by their own lawyer in a case.

**THE COURT:**  I mean, I'm looking at the short form

notices.  I mean, does it say anywhere, you know, "If you are

exposed to Roundup and you have NHL and you don't yet have a

lawyer, you qualify for this settlement"?

**MS. CABRASER:**  Your Honor, that is in the long form

notice.

**THE COURT:**  So these short form notices are going to

confuse people anyway; right?  I mean, if you're worried about

people with lawyers getting confused, this is going to do the

job; right?

**MS. CABRASER:**  I disagree respectfully, Your Honor.

If we could put everything in a short form notice that we put

in a long form notice and have it still be a short form notice

with headlines, we would.  I think the notice professionals are

getting better at doing just that, but we --

    **THE COURT:**  I'm just saying, you know, avoidance of

confusion does not seem like a reason to exclude people who

already have lawyers.  I mean, those people are going to be

confused by this short form notice because it doesn't say

anything about, you know, "If you have NHL and you haven't

hired a lawyer yet, you could get benefits through this class

action settlement."

    I mean, everybody who has NHL and was exposed to Roundup

who sees these short form notices are going to think they're

part of it and they need to do something about it; right?

    **MS. CABRASER:**  And they're advised to go to the

website.  They're advised to get more information on the

website.  There's a lot of additional information on the

website.  The class definition is on the website.  That's part

of the class definition.

    I'm not, you know, dying in a ditch over this aspect of

the settlement.  I'm explaining why we did it.  And, again,

it's the general rule.  You know, every feature turns out to be

a bug so we wanted to respect what was going on in the MDL with

inventory settlements.  We wanted to create a demarcating line

here, and that's how we did it.

    **THE COURT:**  Yeah.  I guess I'm scratching my head at

that demarcation other than, you know, lawyers fighting over

money or something.  I mean, from the standpoint of people who

were exposed to Roundup and have NHL and believe that, you

know, their NHL was caused by the Roundup, I'm not sure if that

demarcation makes sense.

But putting that aside, and I'm very much -- by the way,

we're very much now in the territory -- I mean, the stuff we

talked about regarding Class 2, you know, I've given a lot more

consideration to.  The stuff we're talking about with respect

to Class 1 is very much more in the category of thinking out

loud so you really do have to take everything I say from here

on out with a grain of salt.

But, you know, thinking about it from a preemption

standpoint, you know, for the people who already have NHL and

don't have lawyers -- right? -- the thing that they would need

to worry about most if they were focused on this, other than I

guess statute of limitations, is whether the Supreme Court is

going to pull the rug out from under them before they can get

some money; right?  That is also true of people who have

already filed lawsuits, so people who have already hired

lawyers; right?  That's the biggest concern for them.

Why not give them an opportunity to sign on for a class

that gives them, you know, access to a compensation fund that

they would have access to even if the Supreme Court pulled the

rug out from under them?  I mean, it obviously depends on how

1    much of a risk there is that the Supreme Court is going to pull

2    the rug out from under them and, as we already discussed, we

3    have not carefully analyzed that question yet.

4         But, anyway, you don't need to answer that right now.  I

5    think I want -- we don't have that much time left --

6              **MS. CABRASER:**  Okay.

7              **THE COURT:**  -- and I want to hear from any objectors

8    who might disagree with the way I'm sort of starting to think

9    about Class 1.

10        So, Mr. Kirkpatrick.

11             **MR. KIRKPATRICK:**  Yes.  Thank you, Your Honor.

12        I just wanted to bring up one point, which you made a

13   comment about you were not going to participate in making a

14   lowball offer.  I think you were referring to the Accelerated

15   Awards Program.

16             **THE COURT:**  Correct.

17             **MR. KIRKPATRICK:**  And I just wanted to bring up one

18   aspect of that problem which we did not put in our opening

19   brief but we did put in our supplemental brief, and that is

20   that the Court cannot direct notice to the class in the current

21   form without violating Rule 23(e) because that accelerated

22   payment program --

23             **THE COURT:**  It's okay.  I'm not going to do it.

24             **MR. KIRKPATRICK:**  Okay.  I just --

25             **THE COURT:**  I'm not going to approve anything that

1   includes a lowball offer going out to class members, you know,

2   along with a notice of preliminary approval.

3       **MR. KIRKPATRICK:**  Yeah.  I just wanted to make sure

4   that we were on the same page there because I don't think they

5   can do it before final approval; but for whatever reason, we

6   agreed that that should not be part of the notice and should

7   not be part of the settlement.

8       **THE COURT:**  Okay.  Anything else, Mr. Kirkpatrick, on

9   the way I'm thinking about Class 1?

10      **MR. KIRKPATRICK:**  No.  With regard to the currents,

11  that was our major concern, was the accelerated payment awards.

12      **THE COURT:**  Okay.  Any other objectors have any

13  comments about my thinking about Class 1?

14      **MR. SMOGER:**  I do, Your Honor.

15      **THE COURT:**  Hold on.  I was looking to see if there

16  was anybody else who maybe hasn't had a chance to talk as much.

17      No, I'm not seeing anybody else raise their hand.

18      Okay.  Briefly, Mr. Smoger.

19      **MR. SMOGER:**  You asked me a question before I get to

20  that.  The footnote is Footnote 12, which is you asked me where

21  the 60 million was.  So I found that.

22      **THE COURT:**  Thank you.

23      **MR. SMOGER:**  I also wanted to say in *BP* there's an

24  attached declaration of Steve Herman, who is the lead counsel

25  of *BP*, saying why this is not *BP*.  So that is attached to my

1    first -- to declarations of my first submission.  I wanted to

2    make the Court aware of that.

3        In terms of the Legal Services Plan, there's something

4    that's important that nobody in the Legal Services Plan can

5    represent opt outs.  So there's a truncated ability of

6    representation which leads them to keep people within the terms

7    of the settlement because they're restricted in how they can

8    represent people.  So it's not full representation.

9        If I could have one minute on the notice, I did argue

10   *Stephenson* in the Second Circuit and before the U.S.

11   Supreme Court, and the Agent Orange veterans did not opt out.

12   They did not as a future notice and almost nobody exercised it.

13   In fact, there was less than .01 percent of people opt out.

14   They know that and here it's not meaningful because nobody

15   looks to their long-term future.

16       Now getting to your question is that there's a

17   reasonableness in the underlying framework I think of that

18   question:  Can you give some kind of settlement for presently

19   injured people?  And the answer is yes, and I think that that's

20   been done.

21       The problem that I see, and I don't know if the Court

22   wants to get into it, is the details here because what's not

23   reasonable is the fact that it's almost impossible for anybody

24   within those levels to get more than $65,000.  It's just never

25   going to happen, if you look at all the restrictions, to go

above that.  Even the fact that any first or second degree
relative has cancer knocks you out of anything above $65,000,
which is 40 percent prevalence for one person and now you're
talking about aunts, uncles, cousins.

And I list those on there.  You have to be under 45 years
of age.  You have to be exposed for the equivalent of 20 years
if you're only a three-month seasonal worker.  Nobody is going
to get above 65,000 under the settlement.

So if you get to the question of fairness, which I didn't
know if the Court wants to address it now because you have that
question, the underlying settlement does not provide a
reasonable amount for those people that could go into it.

Then the other part of it is that the gun to everybody's
head to take that settlement when they're in is the gun of what
happens coming out of the settlement.  And we have not
discussed the Science Panel yet, but the Science Panel is so
weighted that it's going to be very difficult to win a
compensatory case even after the punitive damage case is lost,
and I can go into that if the Court wants me to.

The other part of the punitive damages, which I agree with
the Court totally, the punitive damages drive settlement.  It's
not a question of just the verdict.  It puts prospect of
punitive damages which always when they exist drive settlement.
So everybody knows that.

We also know that Monsanto doesn't want them because they

1    can't predict the value of punitive damages and they want to be

2    able to predict losses, and punitive damages are not

3    predictable so it's harder to judge what the payout is.

4         So it's the restrictions -- the actual settlement could be

5    done if the compensations were appropriate, and I agree with

6    you there.  I don't think they are, but I also think that the

7    gun coming out of the settlement on the back end opt-out is too

8    strong; that in terms of the way the Science Panel is

9    structured and the questions you'll ask, and I'll only say one

10   thing about it, I don't think it's possible to have the

11   minimum -- to have a threshold dose determined for 54 different

12   NHLs.  They only talk about one NHL.

13        They refer to the California proposition, which is

14   actually looking at a hemangiosarcoma and not non-Hodgkin's

15   lymphoma at all.  I don't think you can find that threshold

16   dose; and the problem is once you can't find the threshold

17   dose, it defaults to no causation in their settlement.

18        Now, these are details but the way it's structured, the

19   settlement can't work.  So in the big picture, I agree with the

20   Court.  In the detailed picture, this is a very unfair

21   settlement for those people -- for those that are going to try

22   to participate in it.

23             THE COURT:  Okay.  Anybody else?

24                  (No response.)

25             THE COURT:  Mr. Parekh.

1          **MR. PAREKH:**  Your Honor, I know I've talked a lot and

2     I will keep this very brief.

3          **THE COURT:**  That's all right.

4          **MR. PAREKH:**  I just wanted to comment on one thing,

5     which is Your Honor noted in one of the questions that was in

6     your order how can the Court evaluate the settlement without

7     understanding what the individual settlements and inventory

8     settlements are like.  I think that goes directly to whether or

9     not Class 1 is approvable in some form or another, in that

10    there has to be information provided to the Court on what the

11    alternative is in order to determine whether or not the amounts

12    being offered are fair.

13         And so to the extent that the -- and I agree with the

14    Court.  I think there is a theoretical Class 1 that could be

15    approved, but I don't think that that can be approved without

16    enough information being provided to the Court as to the value

17    of what the alternative is if someone went and got a lawyer and

18    participated in the settlements that are currently happening.

19         **THE COURT:**  Well, but these are people who could have

20    gotten a lawyer by now and haven't; right?  And so, you know, I

21    guess the hope or part of the hope behind, you know, a

22    settlement with respect to this class is the notice program

23    jars them into some form of activity, and maybe the form of

24    activity that it jars them into is opting out and hiring Aimee

25    Wagstaff and negotiating a good settlement with Monsanto.  I

don't see Aimee Wagstaff anymore.  Robin Greenwald.  Or maybe

it jars them into, you know, maybe they say "I don't want to

hire a lawyer, but I want to make a compensation claim."

But, you know, either way, even without regard to what,

you know, people are getting in settlements currently, it seems

like it could be a good thing for the class members to have

this happen.

**MR. PAREKH:**  I think that it could.  I would be

concerned about the fact that, again, it's an opt-out class

rather than an opt-in class.  And so, you know, to the extent

that these people want to participate in the settlement, that's

a great way of doing it.  Let's get as many people as possible

through the program.

You could even design a settlement where if you chose to

register yourself and get an offer from the program, you were

then bound by some degree of restrictions, your ability to

decline that offer and go forward with litigation in the

future.

But if the issue is there's a huge group of people out

there that are unknown and can't be reached or may not be

reached, maybe this notice will jar them into action and reach

them and maybe this notice won't reach them at all; and it's

hard to know which group -- you know, where you actually fall

within the does it reach you and you don't do anything or does

it not reach you.

1           **THE COURT:**  On the Science Panel, maybe we can talk a

2      little bit about that.  I was planning on wrapping up at about

3      4:00.

4           Ms. Cabraser, did you have something you wanted to say

5      first?

6           **MS. CABRASER:**  Yes, Your Honor.  Just with respect to

7      the comparison inside and outside the settlement, I think that

8      that's a bit of apples and oranges.  The settlement amounts are

9      net amounts.  The inventory settlements would not be.

10          That said, it's our understanding -- we don't have a

11     window into all of the confidential inventory settlements but

12     to the extent we do, through the mediator we're aware that the

13     gross/net awards in the compensation class structure, which is

14     where what you get is what you keep, no lawyers' fees, are

15     comparable to those in the current pilot program and most

16     recent nonclass settlements.

17          So that's something that Your Honor, of course, could

18     confirm confidentially if you needed more information on that,

19     but our understanding is that we are generally on par.  We're

20     using the same sorts of criteria.  We're using the same sorts

21     of tiers.  These inventory settlements are complicated of

22     necessity.  There are tiers.  There are allocations.  They have

23     special masters trying to replicate some sort of a neutral and

24     objective claim system.

25          The difference with our class is that it's transparent and

1     everyone sees it so it's open to critique, of course; but in

2     terms of comparable levels, we think it's a comparable choice

3     for class members.

4          And then, of course, we're not deducting contingent fees

5     from that because those are in a separate pot, as Your Honor

6     noted, entirely under the Court's control with respect to yes,

7     no, or anything in between.

8               **MR. AUDET:**  Your Honor --

9               **THE COURT:**  On the Science Panel, you know, on the one

10    hand, I think that the plaintiffs agreeing to the Science Panel

11    is a big concession -- is a major concession.  I don't think

12    there's really any disputing that, you know, because what we

13    know based on the cases that have happened so far is that when

14    you have a battle between Monsanto's experts and plaintiffs'

15    experts, you know, plaintiffs' experts win.

16         I know that it's only three cases and I know that that's a

17    small sample size but, you know, I sat through that trial.

18    And, again, my trial was structured in the most fair way

19    imaginable to Monsanto, and it was -- you know, I'll say now

20    that part of why it was structured that way was precisely so

21    that we would have the information about how a trial like that

22    would go.

23         And, you know, so it's a major concession.  Science Panel

24    is giving up something big for these plaintiffs.  On the other

25    hand, I will say that I seem to recall at the beginning of the

MDL I raised the possibility of using a court-appointed expert
and having a court-appointed expert I think it was just to
advise me on the science.  I don't think the idea at the time
was to testify to the jury on the science.  It was just to
advise me and help me figure out whether these expert opinions,
you know, should be admitted.  And, if I recall correctly, both
sides, particularly the plaintiffs, but both sides I think had
a strong reaction against that.  And I see Mr. Miller is here.
I remember him having a particularly strong reaction against
that.

        And, you know, I will tell you that if I -- you know, as I
do more of these trials, and I think we have now some more
cases in the MDL that I could try myself, I would seriously
consider having a court-appointed expert or a court-appointed
panel of experts to present an opinion to the jury because I
think that that would give the jury a much better chance of
meaningfully assessing the evidence than without a
court-appointed expert or a court-appointed panel of experts.

        So, you know, at least for the cases in the federal MDL
that I would be trying in the future, I would very, very
seriously consider doing something along the lines of what is
being contemplated by the settlement.  And, you know, it may
need to be tweaked around the edges and maybe it can't be seven
people and, you know, whatever, and there may be issues with
the threshold level of exposure and all that; but I guess

1    knowing what I just said, does that make the Science Panel less

2    of a major concession for plaintiffs from class members?   I

3    guess that's a question for the objectors.

4            MR. ENGSTROM:   Your Honor, I think I can speak to

5    that.

6        I think the Science Panel is actually far worse than

7    Your Honor is suggesting.   It's far worse than just a concern

8    that plaintiffs' experts seem to be doing quite well as against

9    Monsanto's experts, at least in the three bellwethers thus far.

10       I think our concern and the best way for this Court we

11   believe to think about that Science Panel is that the

12   Science Panel is slanted from the start, and then you can think

13   about all of its other provisions and many of them are quite

14   tortured:   The panel's inability to consider new science, the

15   lack of adversarial testing, and then the truly tortured

16   provisions for handling its findings at trial.   They're all

17   designed to ensure that that initial determination, that that

18   initial determination that's already biased towards --

19           THE COURT:   Wait a minute.   Let's go through that.

20   Inability to consider new science.   I want to make sure I

21   understand what you're talking about.

22           MR. ENGSTROM:   Well, for instance, Your Honor, there

23   is a provision that says that the panel can consider new

24   evidence, even peer-reviewed evidence -- may not consider that

25   evidence unless a super majority, five out of seven members of

1    the Science Panel, agree that it should be considered.

2          **THE COURT:**  Yeah, but some of these peer-reviewed

3    papers are just garbage.  I mean, I read all the papers and

4    there are some really trash peer-reviewed papers out there in

5    epidemiology.

6          **MR. ENGSTROM:**  That might be true, Your Honor, but

7    even a high-quality peer-reviewed study cannot come within the

8    cognizance of the Science Panel if at least one

9    Monsanto-appointed Science Panel member says he or she doesn't

10   want to see it.  And so that's I think one --

11         **THE COURT:**  I thought you said five out of seven

12   needed to approve it.

13         **MR. ENGSTROM:**  Correct, although it's that the

14   Monsanto appointees would include three Science Panel members,

15   Your Honor.

16         **THE COURT:**  Okay.

17         **MR. ENGSTROM:**  And in terms of slanting from the

18   start, you know, in our papers --

19         **THE COURT:**  But that's a detail; right?  I mean, you

20   could say that they could consider any peer-reviewed paper and

21   they're even more capable than I am of identifying the trash in

22   the peer-reviewed literature.

23         **MR. ENGSTROM:**  That might be right, although, again,

24   these are Monsanto-appointed members and so these are members

25   who have been handpicked by Monsanto to staff this

1   Science Panel.

2        Your Honor, in terms of slanting from the start --

3        **THE COURT:**  I'm allowed to approve or reject a panel

4   member; right?

5        **MR. ENGSTROM:**  That's true, and you could serially

6   reject endless panel appointees.  That is correct, Your Honor,

7   I will concede that.

8        **THE COURT:**  That sounds fun.

9        **MR. ENGSTROM:**  Yeah.  I think it's important to note

10  just how slanted the Science Panel's determination will be from

11  the start.  It is simply not the case that class counsel is

12  going to have a strong incentive to vet candidates closely or

13  avoid pro-defendant designations.  Indeed, as we noted in our

14  papers, there are actually quite rich rewards, like

15  reputational rewards, for class counsel if the take-up of

16  compensation packages within this proposed settlement is high.

17       More importantly, and this is something that Mr. Gerson I

18  think articulated quite well, which is that the Science Panel,

19  this is an important fact, must default to a finding of no

20  causation in the absence of agreement about the precise

21  threshold.  That's in Section XII.3(b) of the settlement.  And

22  what that means is if there is a --

23       **THE COURT:**  I thought it was that a majority has to --

24  if a minority -- if that threshold X only three of the seven

25  agree that there's causation, then for that threshold there's

1  no causation.  It's only if, you know, four out of the seven

2  agree at threshold X, then there's causation.  What's wrong

3  with that?

4       **MR. ENGSTROM:**  It's yet another way in which the

5  Science Panel defaults towards a null or conservative finding.

6  If there are enough --

7       **THE COURT:**  I don't understand.  I mean, I don't

8  understand that.  I mean, the point is we're trying to figure

9  out whether, you know, NHL causes cancer at exposure levels

10  that humans are experiencing; right?  And if only two members

11  of the Science Panel believe that it causes cancer at exposure

12  levels that humans are experiencing, then it's a no causation

13  finding; whereas, if five of the panel members conclude that,

14  then it's a yes causation finding.  That doesn't sound slanted

15  to me.  I guess I'm not understanding -- I may not be

16  understanding how the panel works exactly.

17       **MR. ENGSTROM:**  Maybe I'm misreading it, Your Honor.

18  Perhaps that is the case.  My understanding of the

19  Science Panel's construction and its various provisions is that

20  if there is disagreement about the precise threshold, that the

21  Science Panel's determination would default to a no causation

22  finding.

23       **THE COURT:**  I don't think that's correct.  I mean, it

24  may -- it's possible that's one of the many significant changes

25  that was made between the original settlement proposal -- not

 1  the original one from last year but the one from this year, and

 2  then they made a bunch of changes on reply and that may have

 3  been one of the changes.  I don't know.  But as I understand

 4  the settlement that's before me, it's just people have to --

 5  there has to be a majority vote as to the threshold.

 6        **MR. ENGSTROM:**  Your Honor, I apologize if I've missed

 7  that then.

 8        **THE COURT:**  Well, it's very hard because, you know, so

 9  many significant changes were made between the settlement

10  agreement that was originally proposed in this motion and the

11  revised settlement agreement.  I mean, it makes it very hard to

12  understand what's in the agreement, frankly.

13        You know, I have been toying with just denying the motion,

14  saying re-tee it up based on what you have right now because so

15  many changes were made.  But, anyway, I thought it would be a

16  little more productive to have this all-day discussion about

17  it.

18        What else on the Science Panel?

19        **MR. ENGSTROM:**  Well, Your Honor, it's not subject to

20  cross-examination at trial and that means that the

21  Science Panel determination, which, by the way, enjoys the

22  imprimatur of science, is not subject to any live

23  cross-examination.  All there are are what we refer to in our

24  papers are exit interview depositions.  That is to say, once

25  the Science Panel has rendered its determination, its members

1   must sit for I believe a single-day deposition, and that time

2   is to be allocated as between the settling parties, would be my

3   guess, and that means as little as three and a half hours of

4   deposition time.

5        And I think it's important to note here that that will be

6   a deposition that is not taken by trial counsel, not taken by

7   trial counsel in the context of a particular case, but will

8   rather be a general --

9             **THE COURT:**  It's just on general causation.

10            **MR. ENGSTROM:**  Correct.  But it will also just be a

11  general inquiry on deposition, then, as to how the

12  Science Panel went about rendering its view.

13            **MR. HOFFMAN:**  Your Honor, may I on the Science Panel

14  for two minutes?

15            **THE COURT:**  Sure.

16            **MR. HOFFMAN:**  So Your Honor is right, that you will

17  have involvement in selection of members.  There will be a

18  report.  There will be a deposition.  Though the professor's

19  turn of phrase was quite good in his brief I must admit, but I

20  think there will be real depositions.

21       There is no limit at trial on what evidence can be

22  presented by a plaintiff.  The determination of the

23  Science Panel can be attacked at trial.  I think Your Honor is

24  right in your reading on the threshold dose question; but if

25  there's any ambiguity, we can clarify that.

1        And also on the new science, if there's a concern about

2    the super majority, we can address that.  We've already talked

3    to class counsel about including clarifying language that any

4    material entered into evidence in any of the three trials that

5    have taken place or in the future, any scientific evidence that

6    bears on general causation, that the Science Panel should look

7    at it.

8        We're not trying to put a thumb on the scale.  We want a

9    fair assessment of this because, as you suggested when you

10   introduced this topic, we want another voice in this process.

11   So that's the objective here.  I don't think it compromises the

12   ability of plaintiffs to win verdicts.  They're very good at

13   attacking expert testimony.

14       **THE COURT:**  Well, but it really -- I mean, the way you

15   view it is that it levels the playing field a little bit for

16   you in these cases; but, you know, the way the plaintiffs

17   should view it is, you know, "I've got a playing field that is

18   extremely favorable to me right now when I go to trial and why

19   should I agree to level it?"

20       That's why I said I do think it is a major concession,

21   it's a major thing that plaintiffs are giving up if they agree

22   to the Science Panel.  I don't think there's any -- I don't

23   think that's disputable.  It's a major concession compared to,

24   you know, sort of how these trials have been going now.

25       **MR. HOFFMAN:**  It could be, though, we shouldn't

 1   prejudge what could happen with the Science Panel and it could

 2   be even more powerful evidence.

 3        And I would just harken back to Your Honor's *Hardeman*

 4   trial where you bifurcated the case and while the result was

 5   the result, the jury deliberated for a considerable period of

 6   time on the causation question.  So depending on the Court and

 7   the jury and how the evidence is presented, it's not

 8   necessarily a lay down.

 9            THE COURT:  Let's say the Science Panel renders its

10   opinion and then, you know, a year later somebody goes to trial

11   in state court and the state court judge says, "Excuse me.

12   Like, I'm not -- we're not -- you know, this science -- these

13   scientists are not in court.  They're not subject to

14   cross-examination.  It's not appropriate to admit this at

15   trial."

16            MR. HOFFMAN:  So we, of course, would have remedies to

17   try to enforce the agreement and we likely would try to pursue

18   those in state court.

19            THE COURT:  Well, what would the remedy be?  I mean,

20   you force the judge?  You have a remedy -- this settlement

21   agreement is binding on the state court judge?

22            MR. HOFFMAN:  Well, it's binding on the parties.

23            THE COURT:  Yeah, but, I mean, the judge is

24   ultimately -- you know, it's ultimately up to the judge whether

25   they believe that it's appropriate to admit, you know, certain

 1    evidence at trial; right?

 2         MR. HOFFMAN:  Well, this was a provision in the *Diet*

 3    *Drug* litigation and there was post-settlement litigation over

 4    this also in the Third Circuit's *Prudential* case.  Certainly in

 5    these settings you can try to enforce that.

 6         THE COURT:  What if I said that I would be very

 7    reluctant to -- you know, I mean, this is assuming we ever get

 8    to a point of preliminary approval -- what if I said -- and

 9    assuming that we ever get to a point of preliminary approval

10    that includes a Science Panel -- but if I said that, you know,

11    I wouldn't approve anything that didn't leave it up to an

12    individual trial judge to decide whether it's appropriate to --

13    I mean, you can say that the plaintiff won't oppose its

14    admission, but that it's up to the trial judge ultimately to

15    decide whether it's appropriate to admit the opinion, would

16    that kill the Science Panel for you?

17         MR. HOFFMAN:  I think it would be very challenging in

18    that instance, Your Honor.  You mention doing a 706 panel in

19    your court, and that would be an interesting prospect in your

20    court but it doesn't address the great mass of the rest of the

21    litigations that we could face.

22         THE COURT:  Yeah.  I mean, you know, I will say for

23    now that even assuming -- I mean, again, the first question is:

24    Is it appropriate for the plaintiffs to give up that much in

25    exchange for what they're getting?  But, you know, even aside

1   from that, you know, I have very serious reservations about

2   approving an agreement that effectively forces state court

3   trial judges, or other federal trial judges for that matter,

4   to, you know, admit an opinion where the author of the opinion

5   is not subject to cross-examination.  You know, I would have

6   pretty serious reservations about signing off on something like

7   that, I can just tell you that right now.

8         **MR. HOFFMAN:**  I understand, Your Honor.  We may be

9   making a supplemental submission on some of the issues that

10  arose today and we can include a little bit on this too to

11  allay your concerns.

12        **THE COURT:**  Okay.  Does anybody else have any burning

13  comments?

14        **MR. SMOGER:**  Just one second.  I didn't go to the

15  Science Panel, but the biggest thing is that it's going to

16  frame the issue for the jury.  They want the jury front and

17  center.

18        **THE COURT:**  I understand.  I understand that.

19        **MR. SMOGER:**  Okay.

20        **THE COURT:**  Mr. Smoger, thanks.  I understand that.

21     Anything else?

22                        (No response.)

23        **THE COURT:**  Okay.  Thank you very much.  I will be --

24  you know, I will be -- I guess maybe let me just say one more

25  thing.  I mean, I will be pondering this on my end.  I don't

1    think that -- you know, assuming that the parties don't come

2    back to me and say that they're withdrawing this, I think it

3    will be still awhile before I issue a ruling on it.  I am a

4    little behind.  I still have a holdback ruling that I need to

5    put out; and after this hearing, I'm going to turn back to a

6    holdback ruling and then I'm going to turn back to this if it

7    hasn't been -- you know, if the parties decide they don't want

8    to withdraw it and take another shot later on.  So you have a

9    little time.

10        But what I would urge you to do is communicate with me on

11   what you want and what you're thinking, and those

12   communications will need to happen on the docket or in open

13   court.  I'm not interested in any sort of back-channel

14   communications.  Okay?

15        All right.  Thank you.

16              **ALL:**  Thank you, Your Honor.

17                   (Proceedings adjourned at 4:12 p.m.)

18                        ---oOo---

19

20

21

22

23

24

25

1

2

3                    __CERTIFICATE OF REPORTER__

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Saturday, May 22, 2021

8

9

10

11    _____

12         Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25