UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br><br>Case No. 16-md-02741-VC |
| This document relates to:<br><br>*Ramirez, et al. v. Monsanto Co.*<br>Case No. 3:19-cv-02224 | **PRETRIAL ORDER NO. 235: DENYING THE MOTION FOR PRELIMINARY APPROVAL**<br><br>Re: Dkt. No. 12531 |

      Attorneys for certain individual plaintiffs in the MDL have negotiated a class action settlement with Monsanto that would cover potential future lawsuits. Those attorneys now seek preliminary approval of the proposed settlement. This ruling assumes that the reader has reviewed a transcript of the hearing on the motion for preliminary approval and is familiar with the briefs and the legal standard for preliminary approval of class action settlements.

      The people covered by the agreement are divided into two groups. The first group consists of Roundup users who have been diagnosed with NHL but who have not yet sued and have not yet hired a lawyer to sue. The second group consists of people who used Roundup before February 2021 but who have not been diagnosed with NHL. The settlement is a package deal; the Court has not been asked to approve the deal for one group if the deal is deemed unreasonable for the other.

      It is unnecessary to evaluate whether the settlement is reasonable for the first group because it is clearly unreasonable for the second group—the Roundup users who have not been diagnosed with NHL. This ruling merely discusses some of the most glaring flaws with the proposed settlement and the plaintiffs' presentation in support of it.

If Roundup users who have not been diagnosed with NHL do not opt out of the class after notice is disseminated, the settlement purports to offer them two primary benefits. First, a medical monitoring program would be available for roughly four years. The program is ostensibly designed to increase the chances that class members' NHL (if they get it at all) will be diagnosed early. Second, the settlement provides for a compensation fund, which is designed to last roughly four years. If a class member is diagnosed with NHL during that four-year period, they can make a claim to the fund, with a likelihood of receiving somewhere between $10,000 and $60,000 (and in rare cases, up to $200,000).

The benefits of the medical monitoring program are far less meaningful than the attorneys suggest. In this MDL, both sides' experts have testified that NHL has a long latency period, particularly when caused by something like an herbicide (as opposed to a more jarring intrusion on the body, such as chemotherapy). According to this testimony, people can reasonably expect to wait 10 or 15 years after exposure before developing the disease. Moreover, the Court's understanding is that NHL is primarily contracted by older people—more than half the people with the disease are diagnosed after age 65. Finally, the Court's understanding from the litigation is that doctors generally cannot perform tests on patients to detect NHL before patients start experiencing symptoms. This is in contrast, for example, to the *Diet Drugs* case, where medical monitoring involved an echocardiogram that would immediately detect a heart disease that typically has no latency period. *In re Diet Drugs*, 2000 WL 1222042, at *46-47, *57 (E.D. Pa. Aug. 28, 2000). The attorneys filing this motion have provided no information that contradicts the Court's understanding on these points. The motion thus appears to greatly exaggerate the potential benefits of four front-end years' worth of vaguely described medical monitoring for those without NHL.[1]

The benefits of the compensation fund are also vastly overstated for the second group.

---

[1] This is not to say that the proposed medical monitoring program is worthless. As the motion notes, the program would serve the benefit of educating people about how to recognize symptoms of NHL early, thereby increasing their chances of catching the disease before it progresses.

The fund is designed to last only four years. It may even be exhausted earlier by claims from people already diagnosed with NHL. Since many people in the second group will likely receive their diagnosis more than four years down the line (with or without medical monitoring), they will not be able to request compensation from the fund. Monsanto has the option to add to the fund and extend its duration with the approval of class counsel and the Court, but there is no requirement to do so, and Monsanto would merely incur a relatively minor "exit fee" if it decided to end the program. Accordingly, the Court cannot assume (and a class member certainly could not assume) that money will be available for longer than four years.

In exchange for these tenuous benefits, the proposed agreement calls upon class members to make two major sacrifices. First, although class members retain the ability to sue Monsanto upon diagnosis if they choose to forego compensation from the fund or if the fund has expired, they lose the right to seek punitive damages. Second, in any trial where class members seek compensatory damages, they must stipulate to the admission of the opinion of a seven-member science panel about whether Roundup can cause NHL.

It may well be true, as the attorneys pushing this deal asserted at the hearing, that a punitive damages award for a Roundup plaintiff who sues Monsanto 15 years from now is not likely to exceed a 1:1 ratio compared to compensatory damages. But punitive damages would presumably still be available because Monsanto continues to sell Roundup, and it insists on doing so without any real warning label.[2] Moreover, compensatory damage awards in these trials

---

[2] Rather than working proactively to craft a warning label that the EPA would likely approve, Monsanto repeatedly points to the fact that the "Proposition 65" warning label California attempted to require for Roundup has been enjoined by a federal court and criticized by the EPA. As discussed more fully at the hearing, it's true that the Proposition 65 warning label is misleading, and it's clear that the EPA would not currently approve such a label. But it is equally misleading for Monsanto to invoke Proposition 65 to assert that Monsanto could never get a meaningful label approved by the EPA. A label that alerts users to the contrasting positions taken by the EPA and IARC on the safety of glyphosate, points users to the literature produced by these two agencies, and reminds users to employ protective gear and take other appropriate precautions when spraying Roundup, would be a meaningful one—and one that is not misleading like the Proposition 65 warning. There's no apparent reason for the EPA to reject a label like that, and it's hard to imagine why a federal agency that believes a product is not dangerous would be unwilling to allow the producer of the product to include a purely factual label that might help limit liability in the future.

have been quite high. For example, Hardeman's was roughly $5 million, even though he had made a full recovery from NHL by the time of trial. Thus, even if punitive damages awards consistently fall to levels below compensatory damages in future lawsuits, that's still a lot of money to be giving up.[3]

The attorneys pushing this deal repeatedly intone that it will be difficult for Roundup users who are diagnosed with NHL in the future to get a trial, given the limited capacity of courts and given that many plaintiffs will be "in line" ahead of them. This means, the attorneys imply, that relinquishing the ability to seek punitive damages at trial is no big deal. Surely counsel must know that this misses the most important issue, which is that class members, by waiving punitive damages, would be greatly diminishing the future *settlement value* of their claims. This is not a situation where the defendant is at risk of going bankrupt, such that only the first set of plaintiffs will be able to recover. Bayer (which recently acquired Monsanto) is a massive, wealthy company, and it continues to make money specifically from Roundup sales. Nor is there any indication that the company will cease its efforts to settle cases. As recently as last week, Bayer stated publicly that it remains committed to settling Monsanto's Roundup litigation. This is not surprising because the alternative to settling—continuing to lose trials left and right—is not attractive.[4]

As for the science panel, on the surface this concession does not seem so great, at least so long as the Court can ensure that the panel's inquiry is fair and unbiased. But the reason Monsanto wants a science panel so badly is that the company has lost the "battle of the experts" in three trials. At present, the playing field on the issue of expert testimony related to causation is

---

[3]It's worth noting that class members—who may continue to be exposed to Roundup—would be relinquishing their punitive damages claims without knowing how egregious Monsanto's conduct will be with respect to Roundup in the future.

[4] More generally, absent from the voluminous presentation in support of this motion for preliminary approval is any meaningful analysis of the various litigation risks that class members would face absent a settlement. The motion could have been denied on this basis alone. *See, e.g.*, *Hunt v. VEP Healthcare, Inc.*, 2017 WL 3608297, at *1 (N.D. Cal. Aug. 22, 2017); *Eddings v. DS Services of America, Inc.*, 2016 WL 3390477, at *1 (N.D. Cal. May 20, 2016); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

slanted heavily in favor of plaintiffs. Thus, agreeing in advance to admit the opinion of a court-blessed panel that might undercut the opinions of the plaintiffs' experts is a significant concession for the class members—one that could greatly reduce their chances of winning. And again, it would reduce settlement value.

In sum, the settlement proposed by these attorneys would accomplish a lot for Monsanto. It would substantially diminish the company's settlement exposure and litigation exposure at the back end, eliminating punitive damages and potentially increasing its chances of winning trials on compensatory damages. It would accomplish far less for the Roundup users who have not been diagnosed with NHL—and not nearly as much as the attorneys pushing this deal contend.

These deficiencies are bad enough on their own. But they are exacerbated by the difficulties with effectively notifying people of the right to opt out of the class at the front end. Let's assume, for argument's sake, that an opt-out class notice could ever be adequate in a situation like this—that is, class notice that is mostly by advertisement for a massive, diffuse, and largely transient population of people who have not gotten sick and may not even know of their exposure, and therefore have no immediate interest in putting considerable effort into educating themselves on an exceedingly complex settlement agreement. If notice in this situation could ever be adequate, it would need to communicate the settlement's message very clearly and offer something sufficiently valuable and tangible to make it worth the potential class members' attention.

This settlement, and the proposed program for publicizing it, do not come close to accomplishing that. Indeed, for people who have not been diagnosed with NHL, the notice's message is so garbled that they are likely to ignore it. Consider the first three sentences of the proposed "short form" publication notice: "Exposed to weed killers? You could benefit from a $2 billion settlement. People diagnosed with Non-Hodgkin's Lymphoma could receive up to $200,000." This might catch the eye of the people in the first group—those who have already been diagnosed. But if you're trying to grab the attention of someone who has *not* been diagnosed with NHL, this is not the way to do it.

Counsel's response at the hearing was simply that they hired experts and trusted them to craft an appropriate notice. That is not an adequate response. It should be obvious to any expert or layperson that the proposed notice does a disservice to the group that has not been diagnosed with NHL, potentially misleading them into disregarding a message about a settlement that could substantially diminish their rights if they eventually get sick.

One final note. At the hearing, the Court signaled that a fair amount of time might pass before it issued a ruling on this motion. This was based partly on the assumption that the parties might decide to submit revisions to the agreement in light of the discussion that took place. On reflection, from the standpoint of transparency and procedural fairness, this would not be a good approach. The parties already made significant changes to the agreement between the time when the motion for preliminary approval was filed in February 2021 and the time when the reply was filed in April 2021.[5] It was difficult enough to wade through the briefs and determine which arguments still applied to the revised agreement. To entertain further revisions in the context of this motion would be unfair to objectors and interested members of the public who are attempting to follow developments and potentially weigh in on this consequential matter. Especially since mere tweaks cannot salvage the agreement. If a settlement that reasonably protects the interests of Roundup users who have not been diagnosed with NHL can be reached, that agreement must be presented on a new motion for preliminary approval. This motion, however, is denied.

**IT IS SO ORDERED.**

Dated: May 26, 2021

VINCE CHHABRIA
United States District Judge

---

[5] As bad as the current version of the agreement is from the class members' standpoint, the version submitted with the original motion in February 2021 was quite a bit worse. For example, in their original motion, the attorneys proposed to force class members to relinquish a potentially large percentage of compensatory damages as well. *See* Opposition Brief for the National Black Farmers Association at 28-29, *In re Roundup Products Liability Litigation*, No. 16-md-2741 (N.D. Cal. Mar. 4, 2021), ECF No. 12678.