# EXHIBIT 1

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | FOR COURT USE ONLY |
|---|---|
| | *(SOLO PARA USO DE LA CORTE)* |

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
MONSANTO COMPANY, a corporation; (See Attachment)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Donald Miller

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: | CASE NUMBER: *(Número del Caso):* |
|---|---|
| *(El nombre y dirección de la corte es):* San Francisco Superior Court | **CGC-20-587445** |

Civic Center Courthouse
400 McAllister Street, San Francisco, CA 94102

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Karen Barth Menzies, GIBBS LAW GROUP LLP, 505 14th Street, Suite 1110, Oakland, CA  94612 Tel: (510) 350-9700

| DATE: | | Clerk, by | | , Deputy |
|---|---|---|---|---|
| *(Fecha)* NOV 0 2 2020 | **Clerk of the Court** | *(Secretario)* | ANGELICA SUNGA | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010).)*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date)*

Page 1 of 1

| Form Adopted for Mandatory Use | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 |
|---|---|---|
| Judicial Council of California | | www.courts.ca.gov |
| SUM-100 [Rev. July 1, 2009] | | |

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Donald Miller  v. MONSANTO CO., et al. | |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff    ☒ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

WILBUR-ELLIS COMPANY, LLC, a limited liability company; WILBUR-ELLIS NUTRITION, LLC (formerly WILBUR-ELLIS FEED, LLC), a limited liability company; VAN'S ACE HARDWARE; and DOES 1 through 100 inclusive,

Page  2  of  2

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

CM-010

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Karen Barth Menzies (CA SBN 180234)<br>GIBBS LAW GROUP LLP<br>505 14th Street, Suite 1110, Oakland CA 94612<br><br>TELEPHONE NO : (510) 350-9700     FAX NO. *(Optional):* (510) 350-9701<br>ATTORNEY FOR *(Name):* Plaintiff, Donald Miller | **FOR COURT USE ONLY**<br><br>**ENDORSED FILED**<br>**SUPERIOR COURT**<br>**COUNTY OF SAN FRANCISCO**<br><br>NOV 0 2 2020<br><br>**CLERK OF THE COURT**<br>ANGELICA SUNGA<br>BY: _____ **Deputy Clerk** |

| |
|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO<br>STREET ADDRESS: 400 McAllister Street<br>MAILING ADDRESS: same<br>CITY AND ZIP CODE: San Francisco, CA 94102<br>BRANCH NAME: Civic Center Courthouse |

| |
|---|
| CASE NAME:<br>Donald Miller v. MONSANTO COMPANY, et al. |

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER:<br>CGC-20-587445 |
|---|---|---|---|
| [x] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000) | [ ] Counter   [ ] Joinder<br><br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br><br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [x] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [ ] is  [x] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more counts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [x] punitive
4. Number of causes of action *(specify):* 7 (Seven)
5. This case [ ] is  [x] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: October 30, 2020

Karen Barth Menzies

(TYPE OR PRINT NAME)                                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.
Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courts.ca.gov |

CASE NUMBER: CGC-20-587445  DONALD MILLER VS. MONSANTO COMPANY, A CORPORA

# NOTICE TO PLAINTIFF

A Case Management Conference is set for:

> DATE: **APR-07-2021**
>
> TIME: **10:30AM**
>
> PLACE: **Department 610**
> **400 McAllister Street**
> **San Francisco, CA 94102-3680**

All parties must appear and comply with Local Rule 3.

---

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference. However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed and served twenty-five days before the case management conference.

---

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state. **This case is eligible for electronic filing and service per Local Rule 2.11. For more information, please visit the Court's website at www.sfsuperiorcourt.org under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

## ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

---

IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION, AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.

(SEE LOCAL RULE 4)

---

Plaintiff **must** serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint. (CRC 3.221.) The ADR package may be accessed at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution or you may request a paper copy from the filing clerk. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

Superior Court Alternative Dispute Resolution Administrator
400 McAllister Street, Room 103-A
San Francisco, CA 94102
(415) 551-3869

See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.

1  Karen Barth Menzies (CA SBN 180234)
   GIBBS LAW GROUP LLP
2  505 14th Street, Suite 1110
   Oakland, CA 94612
3  Tel: (510) 350-9700
   Fax: (510) 350-9701
4  kbm@classlawgroup.com

5  Fletcher V. Trammell, Esq.
   Melissa Binstock Ephron, Esq.
6  TRAMMELL, PC
   3262 Westheimer Rd., Ste. 423
7  Houston, TX 77098
   Tel: (800) 405-1740
8  Fax: (800) 532-0992
   fletch@trammellpc.com
9  melissa@trammellpc.com

10
   Alexander G. Dwyer
11 Andrew F. Kirkendall
   Erin M. Wood
12 KIRKENDALL DWYER LLP
   4343 Sigma Rd, Suite 200
13 Dallas, TX 75244
   Tel: 214-271-4027
14 Fax: 214-253-0629
   ad@kirkendalldwyer.com
15 ak@kirkendalldwyer.com
   ewood@kirkendalldwyer.com
16 *Attorneys for Plaintiff*

17

**ENDORSED FILED**
**SUPERIOR COURT**
**COUNTY OF SAN FRANCISCO**

NOV 02 2020

CLERK OF THE COURT
ANGELICA SUNGA
BY: _____ Deputy Clerk

18 **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

19 **FOR THE COUNTY OF SAN FRANCISCO**
   **(UNLIMITED JURISDICTION)** CGC-20-587445

20 DONALD MILLER,                              Case No.

21         Plaintiff,                          **ORIGINAL COMPLAINT FOR**
                                               **DAMAGES AND DEMAND FOR JURY**
       v.                                      **TRIAL**
22
   MONSANTO COMPANY, a corporation;
23 WILBUR-ELLIS COMPANY, LLC, a limited        1.   **Strict Liability – Design Defect**
   liability company; WILBUR-ELLIS NUTRITION, 2.   **Strict Liability – Failure to Warn**
24 LLC (formerly WILBUR-ELLIS FEED, LLC), a    3.   **Negligence**
   limited liability company; VAN'S ACE        4.   **Fraud**
25 HARDWARE; and DOES 1 through 100 inclusive, 5.   **Breach of Express Warranties**
                                               6.   **Breach of Implied Warranties**
26         Defendants.                         7.   **Exemplary Damages**

27                                             **JURY TRIAL DEMANDED**

28

1

COMPLAINT

FILED BY FAX

Plaintiff Donald Miller, by and through his attorneys, alleges upon information and belief:

**STATEMENT OF THE CASE**

1.      In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007.  As of 2013, glyphosate was the world's most widely used herbicide.

2.      Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

3.      Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

4.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

COMPLAINT

5.      On July 29, 2015, the IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.      The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

7.      The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans. Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

8.      Upon information and belief, Wilbur-Ellis Company, LLC and Wilbur-Ellis Nutrition, LLC were responsible for marketing Roundup® and related Monsanto products during the time period in question.

9.      Upon information and belief, Van's Ace Hardware was responsible for marketing and selling Roundup® to Plaintiff during some of the time period in question.

## JURISDICTION AND VENUE

10.     The California Superior Court has jurisdiction over this action pursuant to California Constitution Article VI, Section 10, which grants the Superior Court "original jurisdiction in all causes except those given by statute to other trial courts." The Statutes under which this action is brought do not specify any other basis for jurisdiction.

11.     The California Superior Court has jurisdiction over the Defendants because, based on information and belief, each is a California resident, a corporation, and/or entity organized

3
COMPLAINT

under the laws of the State of California, a foreign corporation or association authorized to do business in California and registered with the California Secretary of State or that has sufficient minimum contacts in California, or principle places of business in California or otherwise intentionally avails itself of the California market so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court pursuant to California Code of Civil Procedure Section 395(a) because some of the Defendants – Wilbur-Ellis Company, LLC and Wilbur-Ellis Feed, LLC – are residents of San Francisco County.

13.     Furthermore, the Defendants have purposefully availed themselves of the benefits and the protections of the laws within the State of California.  Monsanto has had sufficient contact such that the exercise of jurisdiction would be consistent with the traditional notions of fair play and substantial justice.

14.     Plaintiff seeks relief that is within the jurisdictional limits of this Court.

**PARTIES**

15.     Plaintiff Donald Miller is a citizen of the State of California. Plaintiff was born on March 21, 1940, and resides in Lockeford, County of San Joaquin. Plaintiff submits to the jurisdiction of this court and alleges venue in this Court is proper.

16.     Plaintiff was exposed to Roundup® in Lockeford, California and Tracy, California when he applied Roundup® to his home and to his 7-acre cattle farm. Plaintiff used Roundup® up to twice a week in the spring, summer, and fall months from 1980 until August of 2017.

17.     On November 1, 2017 Plaintiff  was diagnosed with non-Hodgkin lymphoma ("NHL") in Lodi, California at Adventist Health Lodi Memorial Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendants' wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

18.     Plaintiff is informed and believe and based thereon allege that as a direct and proximate result of Plaintiff's exposure to Roundup® and/or other Monsanto and/or Monsanto glyphosate-containing products ("Roundup"), supplied, marketed, and/or distributed by Defendants herein, Plaintiff suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to non-Hodgkin lymphoma and other cancers, other permanent physical deficits, permanent bodily impairment and other injury sequelae. Plaintiff's injuries required medical intervention to address the adverse physical effects and damage caused by Plaintiff's exposure to Roundup® and/or other Monsanto glyphosate-containing products ("Roundup").

19.     As a direct and proximate result of the wrongful conduct, acts, omissions, fraudulent concealments, fraudulent misrepresentations, and fraudulent business practices by Defendants and DOES 1 through 100, inclusive, Plaintiff used and/or was exposed to Roundup® and was diagnosed with serious health injuries including non-Hodgkin lymphoma.

20.     As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiff suffered severe mental and physical pain and has and will sustain permanent injuries and emotional distress, along with economic loss due to medical expenses and living-related expenses as a result of lifestyle changes.

21.     As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendants, Plaintiff required medical intervention in efforts to maintain and/or save Plaintiff.

22.     Plaintiff is an individual who suffered damages as a result of injuries resulting from Plaintiff's use and/or exposure to Roundup® and is authorized to bring an action for the causes of actions alleged herein including, but not limited to, injuries and damages sustained by Plaintiff resulting from Plaintiff's use of and exposure to Roundup®. Said injuries and damages sustained by Plaintiff were caused or substantially contributed to by the wrongful conduct of Defendants and

DOES 1 through 100, inclusive.

23.     The product warnings for Roundup® in effect during the time period Plaintiff used and/or was exposed to Roundup® were vague, incomplete, or otherwise inadequate, both substantively and graphically, to alert consumers to the severe health risks associated with Roundup® use and/or exposure.

24.     The Defendants and DOES 1 through 100, and each of them, inclusive, did not provide adequate warnings to consumers including Plaintiff and the general public about the increased risk of the serious adverse events described herein.

25.     Had Plaintiff been adequately warned by the Defendants and DOES 1 through 100, and each of them, inclusive, of the potential life-threatening side effects of Roundup®, Plaintiff would not have purchased, used, or been exposed to Roundup®.

26.     By reason of the foregoing, Plaintiff developed serious and dangerous side effects including non-Hodgkin lymphoma, related injury sequelae, physical pain and suffering, mental anguish, and loss of enjoyment of life. By reason of the foregoing, Plaintiff suffered economic losses and special damages including, but not limited to, loss of earning and medical expenses. Plaintiff's general and special damages exceed the jurisdictional limits of this Court.

27.     Plaintiff has reviewed potential legal claims and causes of action against the Defendants and has intentionally chosen only to pursue claims based on state law. Any reference to any federal agency, regulation or rule is stated solely as background information, and Plaintiff is not making any claims which raise federal questions. Thus, California state jurisdiction and venue is proper.

### Defendants

28.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters in St. Louis, Missouri, and multiple principal places of business throughout the world, including in St. Louis, Missouri, Oxnard, California, Woodland, California, and, at all relevant times to this complaint, San Ramon, California. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and manufactured Roundup®. Monsanto has regularly transacted and conducted business within the State of

California and has derived substantial revenue from goods and products, including Roundup®, used in the State of California and employs sales representatives in the State of California. Specifically, Monsanto operated a residential products division known as the Solaris Group of Monsanto Company (hereinafter "Solaris Group"), headquartered in San Ramon, California. Moreover, upon information and belief, Solaris Group manufactured, registered, distributed, marketed, advertised, and sold Roundup® products to California consumers. At all relevant times, Monsanto has conducted testing, research, and analyses on its Roundup® and other glyphosate-based formulations within California and manufactured said products in California, utilizing principal laboratories and manufacturing sites throughout the State of California in locations such as San Ramon, Oxnard, and Woodland. Monsanto expected or should have expected its acts to have consequences within the State of California because it derived substantial revenue from interstate commerce and invoked the benefits and protection of the State of California's laws.

29.     Defendant Wilbur-Ellis Company LLC is a California limited liability company with its headquarters and principal place of business in San Francisco, California. At all times relevant to this complaint, Wilbur-Ellis Company, LLC sold and distributed Monsanto products, including Roundup®, within the State of California.

30.     Defendant Wilbur-Ellis Nutrition LLC (with Wilbur-Ellis Company LLC, hereinafter "Wilbur-Ellis") is a California limited liability company with its headquarters and principal place of business in San Francisco, California. At all times relevant to this complaint, Wilbur-Ellis Nutrition LLC sold and distributed Monsanto products, including Roundup®, within the State of California. Wilbur-Ellis is a main distributor of Roundup®, and, upon information and belief, distributed Roundup® used by Plaintiff and to which Plaintiff was exposed.

31.     Defendant Van's Ace Hardware is a California corporation with its principal place of business in Tracy, California. At relevant times to this complaint, Van's Ace Hardware sold Roundup® to Plaintiff from its storefront in Tracy, California, and this constituted some of the Roundup® to which Plaintiff was exposed.

32.    Plaintiff is informed and believes, and based thereon alleges, that in committing the acts alleged herein, each and every managing agent, agent, representative, and/or employee of the Defendants was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendants and their directors, officers, and/or managing agents.

33.    At all relevant times alleged herein, one or more of the corporate Defendants was, and now is, a corporation with its principal place of business in the State of California and, therefore, is a citizen of the State of California.

34.    The true names and/or capacities, whether individual, corporate, partnership, associate, governmental, or otherwise, of Defendant DOES 1 through 100, inclusive, and each of them, are unknown to Plaintiff at this time, who therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes, and thereon alleges, that each Defendant designated herein as a DOE caused injuries and damages proximately thereby to Plaintiff as hereinafter alleged; and that each DOE Defendant is liable to the Plaintiff for the acts and omissions alleged herein below, and the resulting injuries to Plaintiff, and damages sustained by the Plaintiff. Plaintiff will amend this Complaint to allege the true names and capacities of said DOE Defendants when the same are ascertained.

35.    Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, each of the named Defendants and each of the DOE Defendants was the agent, servant, employee, and/or joint venturer of the other co-Defendants and other DOE Defendants, and each of them, and at all said times, each named Defendant and each DOE Defendant was acting in the full course, scope and authority of said agency, service, employment, and/or joint venture.

36.    Plaintiff is informed and believes and alleges that at all times mentioned herein, Defendants and DOES 1 through 100, inclusive, and each of them, were also known as, formerly known as and/or were the successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, a parent, a subsidiary (wholly or partially owned by, or the whole or partial owner), affiliate, partner, co-venturer, merged company, alter egos, agents, equitable trustees, and/or fiduciaries of and/or were members in an entity or entities engaged in the funding,

researching, studying, manufacturing, fabricating, designing, developing, labeling, assembling, distributing, supplying, leasing, buying, offering for sale, selling, inspecting, servicing, contracting others for marketing, warranting, rebranding, manufacturing for others, packaging, and advertising of Roundup® and/or other Monsanto glyphosate-containing products. Defendants and DOES 1 through 100, inclusive, and each of them, are liable for the acts, omissions and tortious conduct of their successors and/or predecessors in interest/business/product line/or a portion thereof, assigns, parents, subsidiaries, affiliates, partners, co-venturers, merged companies, alter egos, agents, equitable trustees, fiduciaries, and/or their alternate entities in that Defendants and DOES 1 through 100, inclusive, and each of them, enjoy the goodwill originally attached to each such alternate entity, acquired the assets or product line (or portion thereof), and in that there has been a virtual destruction of Plaintiff's remedy against each such alternate entity, and that each such Defendant has the ability to assume the risk spreading role of each such alternate entity.

37.    Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, Defendants and DOES 1 through 100, inclusive, and each of them, were and are corporations organized and existing under the laws of the State of California or the laws of some state or foreign jurisdiction; that each of the said Defendants and DOE Defendants were and are authorized to do and are doing business in the State of California and regularly conducted business in California, including in San Francisco County.

38.    Upon information and belief, at all relevant times, Defendants and DOES 1 through 100, and each of them, inclusive, were engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce and into the State of California, including in San Francisco County, either directly or indirectly through third parties or related entities, Roundup® and/or other Monsanto glyphosate-containing products.

39.    At all relevant times, Defendants and DOES 1 through 100, inclusive, and each of them, conducted regular and sustained business and engaged in substantial commerce and business activity in the State of California, which included but was not limited to selling, marketing and

COMPLAINT

distributing Roundup® and/or other Monsanto glyphosate-containing products in the State of California, including in San Francisco County.

40.     At all relevant times, Defendants and DOES 1 through 100, inclusive, and each of them, expected or should have expected that their acts would have consequences within the United States of America including the State of California, including San Francisco County, and said Defendants derived and derive substantial revenue therefrom.

## EQUITABLE TOLLING

41.     Plaintiff has suffered an illness that has a latency period and does not arise until years after exposure. Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until made aware that Plaintiff's illness, including non-Hodgkin lymphoma could be caused by use and/or exposure to Roundup®. The discovery rule applies, and the statute of limitations was tolled until the day Plaintiff knew or had reason to know that Plaintiff's illnesses, including non-Hodgkin lymphoma, were linked to Plaintiff's use and/or exposure to Roundup®.

42.     Within the time period of any applicable statute of limitations, Plaintiff could not have discovered through the exercise of reasonable diligence that exposure to Roundup® and glyphosate is injurious to human health.

43.     Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of and/or exposure to Roundup® and glyphosate nor would a reasonable and diligent investigation by Plaintiff have disclosed that Roundup® and glyphosate would cause Plaintiff's illnesses.

44.     The expiration of any applicable statute of limitations has been equitably tolled by reason of Monsanto's fraudulent misrepresentations and fraudulent concealment and fraudulent conduct. Through affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the true risks associated with use of and/or exposure to Roundup®.

45.     As a result of Defendants' actions, Plaintiff could not reasonably have known or learned through reasonable diligence that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

10
COMPLAINT

46.     Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Roundup®. Defendants had a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which Defendants continue to have exclusive control. Defendants knew that this information was not available to Plaintiff, Plaintiff's medical providers and/or health facilities, yet Defendants failed to disclose the information to the public, including Plaintiff.

47.     Defendants had the ability to and did spend enormous amounts of money in furtherance of the purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiff and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks and were forced to rely on Defendants' representations.

## FACTS

48.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

49.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

50.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses.

51.     That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In

order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

52.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use.  Monsanto still markets Roundup® as safe today.

### Registration of Herbicides under Federal Law

53.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all herbicides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a (a).

54.     Because herbicides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to herbicides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c) (5) (D).

55.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration of a product should be granted or allowed so that the product may continue to be sold in commerce.

56.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States including the State of California.  However, the EPA's decision to register Roundup was based on studies on the active chemical, glyphosate, and not the formulated Roundup product which contains a cocktail of other ingredients such as surfactants, adjuvants, and inert compounds, all of which, as discussed in greater detail below, contribute to the health risks associated with Roundup exposure.[1]

57.     FIFRA generally requires the registrant, Monsanto in the case of Roundup®, to conduct health and safety testing of herbicide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

58.     The evaluation of each herbicide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of an herbicide has changed over time. The EPA is now in the process of re-evaluating all herbicide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these herbicides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

59.     The EPA completed its review of glyphosate in early 2015 but delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.  On September 12, 2016, the EPA's office of Pesticide Programs released an interim report, titled "Glyphosate Issue Paper: Evaluation of Carcinogenic Potential," ("2016 Issue Paper") detailing the agency's review of a small portion of the existing literature on Roundup.  The 2016 Issue Paper contains a review of studies submitted to the agency by Monsanto, as well as the general independent scientific literature on glyphosate carcinogenicity.

[1] Surfactants are compounds which contribute to the even and effective spread of glyphosate across the surface of a leaf and increase the rate of penetration through the plant.  It has been shown that surfactants also greatly increase the amount and rate of Roundup® absorbed by human skin.

60.     Immediately following the publication of the 2016 Issue Paper, the FIFRA Scientific Advisory Panel ("SAP") issued a report which reviewed the EPA's 2016 Issue Paper, and the conclusions therein.  The SAP strongly criticized the EPA's conclusions and questioned the scientific approach of the agency, noting that that agency had failed to follow its own guidelines.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®

61.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, in 1991 the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E). In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

62.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

63.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate herbicide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

64.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

65.     Three top executives of IBT were convicted of fraud in 1983.

66.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

67.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

68.     Multiple studies have been ghostwritten in part and/or published by Monsanto through companies such as Intertek, from 2000 through the present which minimize any safety concerns about the use of glyphosate. The studies are used to convince regulators to allow the sale of Roundup® and customers to use Roundup®. Such studies include, but are not limited to, Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts. All of these studies have been submitted to and relied upon by the public and the EPA in assessing the safety of glyphosate.  Through these means, Monsanto has fraudulently represented that independent scientists have concluded that Glyphosate is safe. In fact, Monsanto paid these so-called "independent experts," and Monsanto failed to disclose the significant role Monsanto had in creating the manuscripts produced by the "independent" experts. Further, Monsanto has ghostwritten editorials to advocate for the safety of glyphosate in newspapers and magazines for scientists such as Robert Tarone and Henry Miller. Monsanto has also ghostwritten letters by supposedly independent scientists which have been submitted to regulatory agencies who are reviewing the safety of glyphosate.

69.     Monsanto has also violated federal regulations in holding secret ex parte meetings and conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry. Monsanto's close connection with the EPA arises in part from its offering of lucrative consulting gigs to retiring EPA officials. In March 2015, The Joint Glyphosate Task Force, at Monsanto's behest, issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC

did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

70.     Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force, Defendants were able to co-opt this study, becoming the sole providers of data and ultimately writing the report, which was rubber-stamped by the BfR. The Glyphosate Task Force was solely responsible for preparing and submitting a summary of studies relied upon by the BfR. Defendants have used this self-serving report (which they, in fact, wrote) to falsely proclaim the safety of glyphosate. In October 2015, the Defendants, as members of the Joint Glyphosate Task Force, wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate, arguing that the IARC classification was mistaken. In January of 2016, Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

71.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

72.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide, and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured

Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

73.     Through a three-pronged strategy of increased production, decreased prices, and by coupling Roundup Ready® seeds with Roundup® herbicide, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Monsanto has known for decades that it falsely advertises the safety of Roundup®.*

74.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

(a)     Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences . . . .

(b)     And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem.

(c)     Roundup® biodegrades into naturally occurring elements.

(d)     Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

(e)     This non-residual herbicide will not wash or leach in the soil. It . . . stays where you apply it.

(f)     You can apply Accord (glyphosate-containing herbicide) with "confidence because it will stay where you put it;" it bonds tightly to soil particles, preventing leaching.

Then, soon after application, soil microorganisms biodegrade Accord into natural products.

(g)    Glyphosate is less toxic to rats than table salt following acute oral ingestion.

(h)    Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture or use it.

(i)    You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

(j)    "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

75.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

(a)    its glyphosate-containing herbicide products or any component thereof are safe, non-toxic, harmless or free from risk. * * *

(b)    its glyphosate-containing herbicide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable * * *

(c)    its glyphosate-containing herbicide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

* * *

(d)    its glyphosate-containing herbicide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

(e)    glyphosate-containing herbicide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

(f)    its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

18

COMPLAINT

76.     Monsanto did not alter its advertising in the same manner in any state other than New York, and, on information and belief, still has not done so today.

77.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### *Classifications and Assessments of Glyphosate*

78.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

79.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

80.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed, and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

81.     In assessing a chemical agent, the IARC Working Group reviews the following information:

(a)     human, experimental, and mechanistic data;

(b)     all pertinent epidemiological studies and cancer bioassays; and

(c)      representative mechanistic data.

The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

82.    In March of 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent, that is, glyphosate is probably carcinogenic in humans.

83.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

84.    The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

85.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

86.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

87.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

COMPLAINT

88.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

89.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

90.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

91.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

92.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA, oxidative stress, and chromosomal damage in mammals and in human and animal cells in utero.

93.     In addition to DNA damage and oxidative stress, scientists have suggested that Roundup®'s association with various serious health conditions is linked to the effect Roundup® has on the digestive system. Specifically, scientists believe the same mechanism that makes Roundup® toxic to weeds also makes it toxic to the microbes within the human gut and mucous membranes. When humans are exposed to Roundup®, this exposure leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer. Monsanto has deliberately refused to conduct tests on this aspect of Roundup®'s mechanism of action.

94.     Many Roundup® products bear a label which either reads: "glyphosate targets an enzyme found in plants but not in people or pets" or "this Roundup formula targets an enzyme in plants but not in people or pets." These statements are false because it has been established that the

human body is host to microorganisms which contain the enzyme Monsanto asserts is not found in humans.  Thus, glyphosate targets microbes within the human body which have the enzyme, leading to a variety of adverse health effects.

95.     Thus, glyphosate targets microbes within the human body which contain the enzyme affected by glyphosate, leading to a variety of adverse health effects. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

96.     The IARC Working Group also reviewed an Agricultural Health Study consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings about Glyphosate's Dangers to Human Health

97.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### Release Patterns

98.     Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped, and non-cropped sites. These sites may be around water and in wetlands.

99.     It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

100.     Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.

101.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

102.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of this assessment as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

103.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

104.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

105.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

COMPLAINT

106.    The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

107.    The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

108.    On information and belief, Wilbur-Ellis was, at all relevant times, engaged in the distribution of Roundup®, Roundup-ready® crops and other glyphosate-containing products from Monsanto to retailers and commercial/agricultural users in California.

109.    Wilbur-Ellis had superior knowledge compared to Roundup® users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its sales and or marketing of Roundup® with any warnings or precautions for that grave danger. On information and belief, Wilbur-Ellis was one of the distributors providing Roundup® and other glyphosate-containing products used by the Plaintiff and to which Plaintiff was exposed.

110.    On information and belief, Van's Ace Hardware was, at relevant times, engaged in the marketing and retailing of Roundup®, Roundup-ready® crops and other glyphosate-containing products from Monsanto to customers in California, including Plaintiff.

111.    Van's Ace Hardware had superior knowledge compared to Roundup® users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its sales and or marketing of Roundup® with any warnings or precautions for that grave danger. On information and belief, Van's Ace Hardware was a retailer providing Roundup® and other glyphosate-containing products to Plaintiff, resulting in the exposure of Plaintiff.

**LIMITATION ON ALLEGATIONS**

112.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

113.    The allegations in this pleading are made pursuant to California law. To the extent California law imposes a duty or obligation on Defendants that exceeds those required by federal law, Plaintiff does not assert such claims. All claims asserted herein run parallel to federal law,

*i.e.*, the Defendants' violations of California law were also violations of federal law. Had Defendants honestly complied with California law, they would also have complied with federal law.

114.    Additionally, Plaintiff's claims do not seek to enforce federal law. These claims are brought under California law, notwithstanding that such claims run parallel to federal law.

115.    As alleged herein, Defendants violated U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5) by distributing Roundup®, which was misbranded pursuant to 7 U.S.C. § 136(g). Federal law specifically prohibits the distribution of a misbranded herbicide.

## COUNT I:  STRICT LIABILITY (DESIGN DEFECT)

116.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

117.    Plaintiff brings this strict liability claim against Defendants for defective design.

118.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants. At all relevant times, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiff, as described herein.

119.     At all relevant times, Defendants' Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, including Plaintiff.

120.    At all relevant times, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.  At all relevant times, Defendants registered, researched, manufactured, distributed, marketed, and sold Roundup® and other glyphosate-based formulations within California and aimed at a

California consumer and industrial market. The Wilbur-Ellis Defendants were at all relevant times involved in the marketing, distribution, and sale of Roundup® and glyphosate-based formulations marketed and sold in California. Van's Ace Hardware was at relevant times involved in the marketing and sale of Roundup® and glyphosate-based formulations marketed and sold in California to Plaintiff.

121.    Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they left the control of Defendants' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

122.    Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

123.    At all relevant times, Defendants knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

124.    Therefore, at all relevant times, Defendants' Roundup® products, as researched, tested, developed, designed, registered, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

    a.    When placed in the stream of commerce, Defendants' Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

    b.    When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c. When placed in the stream of commerce, Defendants' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d. Defendants did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate;

e. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

f. Defendants knew or should have known at the time of marketing Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries;

g. Defendants did not conduct adequate post-marketing surveillance of its Roundup® products; and

h. Defendants could have employed safer alternative designs and formulations.

125.    Plaintiff was exposed to Defendants' Roundup® products without knowledge of Roundup®'s dangerous characteristics.

126.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendants' Roundup® products in an intended or reasonably foreseeable manner without knowledge of Roundup®'s dangerous characteristics.

127.    Plaintiff could not reasonably have discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure due to the Defendants' suppression of scientific information linking glyphosate to cancer.

128.    The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering Defendants' product dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Roundup® products were and are more dangerous than alternative products, and Defendants could have designed Roundup® products to make them less dangerous. Indeed, at the time Defendants designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

129.    At the time Roundup® products left Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' herbicides.

130.    Defendants' defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Plaintiff.

131.    Therefore, as a result of the unreasonably dangerous condition of their Roundup® products, Defendants are strictly liable to Plaintiff.

132.    The defects in Defendants' Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained injuries.

133.    Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

134.    As a direct and proximate result of Defendants placing its defective Roundup® products into the stream of commerce, and the resulting injuries, Plaintiff has sustained pecuniary loss including general damages in a sum which exceeds the jurisdictional minimum of this Court.

135.    As a proximate result of Defendants placing its defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiff has suffered great mental anguish and other personal injury and damages.

136.    As a proximate result of the Defendants placing its defective Roundup® products into the stream of commerce, as alleged herein, Plaintiff sustained loss of income, loss of earning capacity and/or property damage.

137.    WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT II:  STRICT LIABILITY (FAILURE TO WARN)

138.     Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

139.     Plaintiff brings this strict liability claim against Defendants for failure to warn.

140.     At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendants.  At all relevant times, Defendants registered, researched, manufactured, distributed, marketed and sold Roundup® and other glyphosate-based formulations within California and aimed at a California consumer and industrial market. The Wilbur-Ellis Defendants were at all relevant times involved in the marketing, distribution, and sale of Roundup® and glyphosate-based formulations marketed and sold in California. Van's Ace Hardware was at relevant times involved in the marketing and sale of Roundup® and glyphosate-based formulations marketed and sold in California to Plaintiff.

141.     Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

142.     At all relevant times, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Plaintiff of dangers associated with Roundup use and exposure. Defendants, as manufacturer, seller, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

143.     At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

144.     At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their product and to those who would foreseeably use or be harmed by Defendants' herbicides, including Plaintiff.

145.     Despite the fact that Defendants knew or should have known that Roundup® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of their products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, and were not known to end users and consumers, such as Plaintiff.

146.     Defendants knew or should have known that their products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers, *i.e.*, the reasonably foreseeable users, of the risks of exposure to its products. Defendants have wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate and, further, have made false and/or misleading statements concerning the safety of Roundup® products and glyphosate.

147.     At all relevant times, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

148.     Plaintiff was exposed to Defendants' Roundup® products without knowledge of their dangerous characteristics.

149.     At all relevant times, Plaintiff used and/or was exposed to the use of Defendants'

Roundup® products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

150.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

151.     Defendants knew or should have known that the minimal warnings disseminated with their Roundup® products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

152.     The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

153.     This alleged failure to warn is not limited to the information contained on Roundup®'s labeling. The Defendants were able, in accord with federal law, to comply with California law by disclosing the known risks associated with Roundup® through other non-labeling mediums, *i.e.*, promotion, advertisements, public service announcements, and/or public information sources. But the Defendants did not disclose these known risks through any medium.

154.     To this day, Defendants have failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup® and its active ingredient

glyphosate.

155.     As a result of their inadequate warnings, Defendants' Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by Plaintiff.

156.     Defendants are liable to Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup® and glyphosate.

157.     Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Roundup® products, Plaintiff could have avoided the risk of developing injuries and could have obtained or used alternative herbicides.

158.     As a direct and proximate result of Defendants placing defective Roundup® products into the stream of commerce, Plaintiff was injured and has sustained pecuniary loss resulting and general damages in a sum exceeding the jurisdictional minimum of this Court.

159.     As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

160.     As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, Plaintiff sustained loss of income, loss of earning capacity and property damage.

161.     WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT III:  NEGLIGENCE

162.     Plaintiff incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

163.     Defendants, directly or indirectly, caused Roundup® products to be sold,

distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.  At all relevant times, Defendants registered, researched, manufactured, distributed, marketed, and sold Roundup® and other glyphosate-based formulations within California and aimed at a California consumer and industrial market. The Wilbur-Ellis Defendants were at all relevant times involved in the marketing, distribution, and sale of Roundup® and glyphosate-based formulations marketed and sold in California. Van's Ace Hardware was at relevant times involved in the marketing and sale of Roundup® and glyphosate-based formulations marketed and sold in California to Plaintiff.

164.    At all relevant times, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

165.    At all relevant times, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

166.    At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and, specifically, the carcinogenic properties of the chemical glyphosate.

167.    Accordingly, at all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause or be associated with Plaintiff's injuries, and thus, create a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

168.    Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

COMPLAINT

169.    As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Roundup® products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate; knew or had reason to know of the defects inherent in its products; knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries. Indeed, Defendants deliberately refused to test Roundup® products because they knew that the chemical posed serious health risks to humans.

170.    Defendants were negligent in their promotion of Roundup®, outside of the labeling context, by failing to disclose material risk information as part of their promotion and marketing of Roundup®, including the Internet, television, print advertisements, etc. Nothing prevented Defendants from being honest in their promotional activities, and, in fact, Defendants had a duty to disclose the truth about the risks associated with Roundup in their promotional efforts, outside of the context of labeling.

171.    Despite their ability and means to investigate, study, and test the products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

172.    Defendants' negligence included:

a.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

b.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c.   Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.   Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

e.   Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.   Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendants could reasonably foresee would use and be exposed to Roundup® products;

g.   Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h.   Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i.   Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j.   Representing that their Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose;

k.   Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup® and glyphosate;

l.   Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known (by

Defendants) to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.  Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n.  Continuing the manufacture and sale of their products with the knowledge that the products were unreasonably unsafe and dangerous.

169.  Defendants knew and/or should have known that it was foreseeable consumers such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

170.  Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

171.  Defendants' negligence was the proximate cause of Plaintiff's injuries, *i.e.*, absent Defendants' negligence, Plaintiff would not have developed cancer.

172.  Defendants' conduct, as described above, was reckless. Defendants regularly risked the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendants' reckless conduct therefore warrants an award of punitive damages.

173.  As a direct and proximate result of Defendants placing defective Roundup® products into the stream of commerce, Plaintiff was injured and have sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

174.  As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

175.  As a proximate result of Defendants placing defective Roundup® products into the stream of commerce, as alleged herein, Plaintiff sustained a loss of income, loss of earning capacity and property damage.

176.    WHEREFORE, Plaintiff respectfully request this Court to enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT IV:  FRAUD
## (MONSANTO)

177.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

178.    Defendant Monsanto has defrauded the agricultural community in general and Plaintiff in particular by misrepresenting the true safety of its Roundup® and by failing to disclose known risks of cancer.

179.    Defendant Monsanto misrepresented and/or failed to disclose, *inter alia*, that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with non-Hodgkin lymphoma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

180.    Due to these misrepresentations and omissions, at all times relevant to this litigation, Defendant's Roundup® was misbranded under 7 U.S.C. § 136(g) and its distribution within California and around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5).

181.    Plaintiff relied on the Defendant's misrepresentations and/or material omissions regarding the safety of Roundup® and its active ingredient glyphosate in deciding whether to purchase and/or use the product. Plaintiff did not know nor could Plaintiff have reasonably known of the misrepresentations and/or material omissions by Defendant concerning Roundup® and its active ingredient glyphosate.

182.    The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup® labeling, as defined under federal law, but also involve Defendant Monsanto's representations and omissions made as part of its promotion and marketing of Roundup®, including on the Internet, television, in print advertisements, etc. Nothing prevented Defendant Monsanto from disclosing the truth about the risks associated with Roundup® in its promotional efforts outside of the labeling context, using the forms of media and promotion Defendant Monsanto traditionally used to promote the product's efficacy and benefits.

183.    When Defendant Monsanto made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and the agricultural community and with the intent of inducing the public and agricultural community to purchase and use Roundup®.

184.    Defendant Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward Plaintiff and the public generally. Defendant's conduct was willful, wanton, and/or reckless. Defendant deliberately recommended, manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public, and by reason thereof, Defendant is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiff and others which proximately caused the injuries as set forth herein.

185.    As a proximate result of Defendant Monsanto's fraudulent and deceitful conduct and representations, Plaintiff has sustained damages and other losses in an amount to be proven at trial.

186.    As a proximate result of Defendant Monsanto's fraud, as alleged herein, Plaintiff sustained a loss of income, loss of earning capacity, and property damage, including lost income.

187.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein

incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT V:  BREACH OF EXPRESS WARRANTIES

## (MONSANTO)

188.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

189.    At all relevant times, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto.

190.    Defendant Monsanto had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of Roundup® products, including a duty to:

      a.   ensure that its products did not cause the user unreasonably dangerous side effects;

      b.   warn of dangerous and potentially fatal side effects; and

      c.   disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiff.

191.    As alleged throughout this pleading, the ability of Defendant Monsanto to properly disclose those risks associated with Roundup® is not limited to representations made on the labeling.

192.    At all relevant times, Defendant Monsanto expressly represented and warranted to the purchasers of its products, by and through statements made by Defendant Monsanto in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant Monsanto advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to

induce their purchase or use, thereby making an express warranty that Roundup® products would conform to the representations.

193.     These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Defendant Monsanto knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant Monsanto expressly represented that Roundup® products were safe and effective, that they were safe and effective for use by individuals such as the Plaintiff, and/or that they were safe and effective as agricultural herbicides.

194.     The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

195.     Defendant Monsanto placed Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

196.     Defendant Monsanto breached these warranties because, among other things, Roundup® products were defective, dangerous, and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant Monsanto breached the warranties in the following ways:

a.     Defendant Monsanto represented through its labeling, advertising, and marketing materials that Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b.    Defendant Monsanto represented that Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that Roundup® products, therefore, were not safer than alternatives available on the market.

197.    Plaintiff detrimentally relied on the express warranties and representations of Defendant Monsanto concerning the safety and/or risk profile of Roundup® in making a decision to purchase the product. Plaintiff reasonably relied upon Defendant Monsanto to disclose known defects, risks, dangers, and side effects of Roundup® and glyphosate. Plaintiff would not have purchased or used Roundup® had Defendant Monsanto properly disclosed the risks associated with the product, either through advertising, labeling, or any other form of disclosure.

198.    Defendant Monsanto had sole access to material facts concerning the nature of the risks associated with its Roundup® products, as expressly stated within their warnings and labels, and knew that consumers and users such as Plaintiff could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

199.    Plaintiff had no knowledge of the falsity or incompleteness of Defendant Monsanto's statements and representations concerning Roundup.

200.    Plaintiff used and/or was exposed to Roundup® as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant Monsanto.

201.    Had the warnings, labels, advertisements, or promotional material for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff could have avoided the injuries complained of herein.

202.    As a direct and proximate result of Defendant Monsanto's breach of express warranty, Plaintiff has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

203.    As a proximate result of Defendant Monsanto's breach of express warranty, as

alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

204.    As a proximate result of Defendant Monsanto's breach of express warranty, as alleged herein, Plaintiff sustained a loss of income, loss of earning capacity, and property damage.

205.    WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT VI:  BREACH OF IMPLIED WARRANTIES
## (MONSANTO)

206.    Plaintiff incorporates by reference every allegation set forth in preceding paragraphs as if fully stated herein.

207.    At all relevant times, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which were and are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce.

208.    Before the time Plaintiff was exposed to the aforementioned Roundup® products, Defendant Monsanto impliedly warranted to its consumers, including Plaintiff, that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural herbicides.

209.    But Defendant Monsanto failed to disclose that Roundup® has dangerous propensities when used as intended and that use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

210.    Plaintiff was an intended beneficiary of the implied warranties made by Defendant Monsanto to purchasers of its herbicides.

211.    The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant Monsanto.

COMPLAINT

212.    At all relevant times, Defendant Monsanto was aware that consumers and users of its products, including Plaintiff, would use Roundup® products as marketed by Defendant Monsanto, which is to say that Plaintiff was a foreseeable user of Roundup®.

213.    Defendant Monsanto intended that Roundup® products be used in the manner in which Plaintiff, in fact, used them and which Defendant Monsanto impliedly warranted to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

214.    In reliance upon Defendant Monsanto's implied warranty, Plaintiff used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendant Monsanto.

215.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

216.    Defendant Monsanto breached its implied warranty to Plaintiff in that Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

217.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

218.    As a direct and proximate result of Defendant's breach of implied warranty, Plaintiff has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

219.    As a proximate result of the Defendant's breach of implied warranty, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

220.    As a proximate result of Defendant's breach of implied warranty, as alleged herein, Plaintiff sustained a loss of income, loss of earning capacity, and property damage.

221.    WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in

Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## EXEMPLARY DAMAGES ALLEGATIONS

222.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

223.    Defendants' conduct as alleged herein was done with oppression, fraud, and malice. Defendants were fully aware of the safety risks of Roundup®. Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead farmers and consumers.

224.    This was not done by accident or through some justifiable negligence. Rather, Defendants knew that it could turn a profit by convincing the agricultural industry that Roundup was harmless to humans, and that full disclosure of the true risks of Roundup® would limit the amount of money Defendants would make selling Roundup® in California. Defendants' objection was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiff was denied the right to make an informed decision about whether to purchase, use, or be exposed to an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiff's rights.

225.    There is no indication that Defendants will stop their deceptive and unlawful marketing practices unless they are punished and deterred. Accordingly, Plaintiff requests punitive damages against the Defendants for the harms caused to Plaintiff.

## JURY TRIAL DEMAND

226.    Plaintiff demands a trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

227.    WHEREFORE, Plaintiff requests the Court to enter judgment in Plaintiff's favor and against the Defendants for:

a.    actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

b.    exemplary and punitive damages sufficient to punish and deter the Defendants and

1  others from future fraudulent practices;

2      c.    pre-judgment and post-judgment interest;

3      d.    costs including reasonable attorneys' fees, court costs, and other litigation

4  expenses; and

5      e.    any other relief the Court may deem just and proper.

6

7  Dated:  October 30, 2020            **GIBBS LAW GROUP LLP**

8

9

10  By: _____

11  Karen Barth Menzies
GIBBS LAW GROUP LLP

12  505 14th Street, Suite 1110
Oakland, CA  94612

13  Tel: (510) 350-9700
Fax: (510) 350-9701

14  kbm@classlawgroup.com

15  Fletcher V. Trammell
Melissa Binstock Ephron

16  TRAMMELL, PC
3262 Westheimer Rd., Ste. 423

17  Houston, TX 77098
Tel: (800) 405-1740

18  Fax: (800) 532-0992
fletch@trammellpc.com

19  melissa@trammellpc.com

20

21  Alexander G. Dwyer
Andrew F. Kirkendall

22  Erin M. Wood
KIRKENDALL DWYER LLP

23  4343 Sigma Rd, Suite 200
Dallas, TX  75244

24  Tel: 214-271-4027
Fax: 214-253-0629

25  ad@kirkendalldwyer.com
ak@kirkendalldwyer.com

26  ewood@kirkendalldwyer.com

27

28  *Attorneys for Plaintiff*

45

COMPLAINT



**Superior Court of California, County of San Francisco
Alternative Dispute Resolution
Information Package**



> The plaintiff must serve a copy of the ADR Information Package on each defendant along with the complaint. Cross-complainants must serve a copy of the ADR Information Package on any new parties to the action together with the cross-complaint. (CRC 3.221(c).)

**WHAT IS ADR?**
Alternative Dispute Resolution (ADR) is the term used to describe the various options available for settling a dispute without a trial. There are many different ADR processes, the most common forms of which are mediation, arbitration and settlement conferences. In ADR, trained, impartial people decide disputes or help parties decide disputes themselves. They can help parties resolve disputes without having to go to trial.

**WHY CHOOSE ADR?**
It is the policy of the Superior Court that every long cause, non-criminal, non-juvenile case should participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to trial. (Local Rule 4.)

ADR can have a number of advantages over traditional litigation:

- **ADR can save time.** A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.
- **ADR can save money,** including court costs, attorney fees, and expert fees.
- **ADR encourages participation.** The parties may have more opportunities to tell their story than in court and may have more control over the outcome of the case.
- **ADR is more satisfying.** For all the above reasons, many people participating in ADR have reported a high degree of satisfaction.

**\*\*Electing to participate in an ADR process does not stop the time period to
respond to a complaint or cross-complaint\*\***

**WHAT ARE THE ADR OPTIONS?**
The San Francisco Superior Court offers different types of ADR processes for general civil matters. The programs are described below:

**1) MANDATORY SETTLEMENT CONFERENCES**
Settlement conferences are appropriate in any case where settlement is an option. The goal of settlement conferences is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of a dispute. Mandatory settlement conferences are ordered by the court and are often held near the date a case is set for trial, although they may be held earlier if appropriate. A party may elect to apply to the Presiding Judge for a specially set mandatory settlement conference by filing an ex parte application. See Local Rule 5.0 for further instructions. Upon approval by the Presiding Judge, the court will schedule the conference and assign a settlement conference officer.

**2) MEDIATION**

Mediation is a voluntary, flexible, and confidential process in which a neutral third party facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of a dispute after exploring the interests, needs, and priorities of the parties in light of relevant evidence and the law.

**(A) MEDIATION SERVICES OF THE BAR ASSOCIATION OF SAN FRANCISCO (BASF),** in cooperation with the Superior Court, is designed to help civil litigants resolve disputes before they incur substantial costs in litigation. While it is best to utilize the program at the outset of litigation, parties may use the program at any time while a case is pending. Experienced professional mediators work with parties to arrive at a mutually agreeable solution. The mediators provide one hour of preparation time and the first two hours of mediation time. Mediation time beyond that is charged at the mediator's hourly rate. BASF pre-screens all mediators based upon strict educational and experience requirements. Parties can select their mediator from the panels at www.sfbar.org/mediation or BASF can assist with mediator selection. BASF staff handles conflict checks and full case management. The success rate for the program is 67% and the satisfaction rate is 99%. BASF charges an administrative fee of $295 per party. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waivers of the fee are available to those who qualify. For more information, call 415-982-1600 or email adr@sfbar.org.

**(B) JUDICIAL MEDIATION PROGRAM** provides mediation with a San Francisco Superior Court judge for civil cases, which include but are not limited to, personal injury, construction defect, employment, professional malpractice, insurance coverage, toxic torts and industrial accidents. Parties may utilize this program at any time throughout the litigation process. Parties interested in judicial mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court will coordinate assignment of cases for the program. There is no charge. Information about the Judicial Mediation Program may be found by visiting the ADR page on the court's website: www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

**(C) PRIVATE MEDIATION:** Although not currently a part of the court's ADR program, parties may select any private mediator of their choice. The selection and coordination of private mediation is the responsibility of the parties. Parties may find mediators and organizations on the Internet. The cost of private mediation will vary depending on the mediator selected.

**(D) COMMUNITY BOARDS MEDIATION SERVICES:** Mediation services are offered by Community Boards (CB), a nonprofit resolution center, under the Dispute Resolution Programs Act. CB utilizes a three-person panel mediation process in which mediators work as a team to assist the parties in reaching a shared solution. To the extent possible, mediators are selected to reflect the demographics of the disputants. CB has a success rate of 85% for parties reaching a resolution and a consumer satisfaction rate of 99%. The fee is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available. For more information, call 415-920-3820 or visit communityboards.org.

**3)  ARBITRATION**

An arbitrator is a neutral attorney who presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case.

**(A)  JUDICIAL ARBITRATION**

When the court orders a case to arbitration it is called "judicial arbitration". The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial. Pursuant to CCP 1141.11, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration.  (Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.) An arbitrator is chosen from the court's arbitration panel. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a trial within 60 days after the arbitrator's award has been filed. Local Rule  4.1 allows  for mediation  in lieu of judicial arbitration,  so long  as the parties  file a stipulation  to mediate after being assigned to judicial arbitration. There is no cost to the parties for judicial arbitration.

**(B)  PRIVATE ARBITRATION**

Although not currently a part of the court's ADR program, civil disputes may also be  resolved  through private   arbitration. Here, the parties voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

**HOW DO I PARTICIPATE IN ADR?**

Litigants may elect to participate in ADR at any point in a case. General civil cases may voluntarily enter into the court's or court-affiliated ADR programs by any of the following means:

- Filing a Stipulation to ADR: Complete and file the Stipulation form (attached to this packet and available on the court's website); or
- Indicating your ADR preferences on the Case Management Statement (available on the court's website); or
- Contacting the court's ADR Department (see below), the Bar Association of San Francisco's ADR Services, or Community Boards.

**For more information about ADR programs or dispute resolution alternatives, contact:**

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103-A, San Francisco, CA 94102
415-551-3869
Or, visit the court's ADR page at www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

TO PARTICIPATE IN ANY OF THE COURT'S ADR PROGRAMS, PLEASE COMPLETE AND FILE THE ATTACHED STIPULATION TO ADR AND SUBMIT IT TO THE COURT.  YOU MUST ALSO CONTACT BASF OR COMMUNITY BOARDS TO ENROLL IN THEIR LISTED PROGRAMS.  THE COURT DOES NOT FORWARD COPIES OF STIPULATIONS TO BASF OR COMMUNITY BOARDS.

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name *and address*)<br><br><br>TELEPHONE NO.:<br><br>ATTORNEY FOR *(Name):* | *FOR COURT USE ONLY* |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO**
400 McAllister Street
San Francisco, CA 94102-4514

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| | |
|---|---|
| **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION (ADR)** | CASE NUMBER: _____<br><br>**DEPARTMENT 610** |

1) **The parties hereby stipulate that this action shall be submitted to the following ADR process:**

☐ **Mediation Services of the Bar Association of San Francisco (BASF)** - Experienced professional mediators, screened and approved, provide one hour of preparation and the first two hours of mediation time for a BASF administrative fee of $295 per party. Mediation time beyond that is charged at the mediator's hourly rate. Waivers of the administrative fee are available to those who qualify. BASF assists parties with mediator selection, conflicts checks and full case management. www.sfbar.org/mediation

☐ **Mediation Services of Community Boards (CB)** – Service in conjunction with DRPA, CB provides case development and one three-hour mediation session. Additional sessions may be scheduled. The cost is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available to those who qualify. communityboards.org

☐ **Private Mediation** - Mediators and ADR provider organizations charge by the hour or by the day, current market rates. ADR organizations may also charge an administrative fee. Parties may find experienced mediators and organizations on the Internet.

☐ **Judicial Arbitration** - Non-binding arbitration is available to cases in which the amount in controversy is $50,000 or less and no equitable relief is sought. The court appoints a pre-screened arbitrator who will issue an award. There is no fee for this program. www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

☐ **Judicial Mediation** - The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. There is no fee for this program. www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

Judge Requested (see list of Judges currently participating in the program): _____

Date range requested for Judicial Mediation (from the filing of stipulation to Judicial Mediation):

☐ 30-90 days   ☐ 90-120 days   ☐ Other (please specify) _____

☐ **Other ADR process** (describe) _____

2) **The parties agree that the ADR Process shall be completed by (date):** _____
3) **Plaintiff(s) and Defendant(s) further agree as follows:**

_____

_____
Name of Party Stipulating

_____
Name of Party or Attorney Executing Stipulation

_____
Signature of Party or Attorney

☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Dated: _____

_____
Name of Party Stipulating

_____
Name of Party or Attorney Executing Stipulation

_____
Signature of Party or Attorney

☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Dated: _____

☐ *Additional signature(s) attached*

ADR-2   10/18       **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION**




# Superior Court of California
## County of San Francisco

**HON. GARRETT L. WONG**
PRESIDING JUDGE

## Judicial Mediation Program

**ELIZABETH M. KELBER**
ADR ADMINISTRATOR

The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. Cases that will be considered for participation in the program include, but are not limited to, personal injury, professional malpractice, construction, employment, insurance coverage disputes, mass torts and complex commercial litigation. Judicial Mediation offers civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint in an effort to resolve the matter before substantial funds are expended. This program may also be utilized at anytime throughout the litigation process. The panel of judges currently participating in the program includes:

The Honorable Suzanne R. Bolanos
The Honorable Angela Bradstreet
The Honorable Andrew Y.S. Cheng
The Honorable Teri L. Jackson
The Honorable Harold Kahn
The Honorable Curtis E.A. Karnow
The Honorable Kathleen A. Kelly

The Honorable Charlene P. Kiesselbach
The Honorable Joseph M. Quinn
The Honorable Jeffrey S. Ross
The Honorable John K. Stewart
The Honorable Richard B. Ulmer, Jr.
The Honorable Mary E. Wiss

Parties interested in Judicial Mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program and deliver a courtesy copy to Department 610. A preference for a specific judge may be indicated on the request, and although not guaranteed due to the judge's availability, every effort will be made to fulfill the parties' choice for a particular judge. Please allow at least 30 days from the filing of the form to receive the notice of assignment. The court's Alternative Dispute Resolution Administrator will facilitate assignment of cases that qualify for the program.

Note: Space and availability is limited. Submission of a stipulation to Judicial Mediation does *not* guarantee inclusion in the program. You will receive written notification from the court as to the outcome of your application.

Alternative Dispute Resolution
400 McAllister Street, Room 103-A, San Francisco, CA 94102
(415) 551-3869

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name *and address*)

*FOR COURT USE ONLY*

TELEPHONE NO.:

ATTORNEY FOR *(Name):*

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO**
400 McAllister Street
San Francisco, CA 94102-4514

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

**STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION (ADR)**

CASE NUMBER: _____

**DEPARTMENT 610**

1) **The parties hereby stipulate that this action shall be submitted to the following ADR process:**

☐ **Mediation Services of the Bar Association of San Francisco (BASF)** - Experienced professional mediators, screened and approved, provide one hour of preparation and the first two hours of mediation time for a BASF administrative fee of $295 per party. Mediation time beyond that is charged at the mediator's hourly rate. Waivers of the administrative fee are available to those who qualify. BASF assists parties with mediator selection, conflicts checks and full case management. www.sfbar.org/mediation

☐ **Mediation Services of Community Boards (CB)** – Service in conjunction with DRPA, CB provides case development and one three-hour mediation session. Additional sessions may be scheduled. The cost is $45-$100 to open a case, and an hourly rate of $180 for complex cases. Reduction and waiver of the fee are available to those who qualify. communityboards.org

☐ **Private Mediation** - Mediators and ADR provider organizations charge by the hour or by the day, current market rates. ADR organizations may also charge an administrative fee. Parties may find experienced mediators and organizations on the Internet.

☐ **Judicial Arbitration** - Non-binding arbitration is available to cases in which the amount in controversy is $50,000 or less and no equitable relief is sought. The court appoints a pre-screened arbitrator who will issue an award. There is no fee for this program. www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

☐ **Judicial Mediation** - The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. There is no fee for this program. www.sfsuperiorcourt.org/divisions/civil/dispute-resolution

Judge Requested (see list of Judges currently participating in the program): _____

Date range requested for Judicial Mediation (from the filing of stipulation to Judicial Mediation):

☐ 30-90 days   ☐ 90-120 days   ☐ Other (please specify) _____

☐ **Other ADR process** (describe) _____

2) **The parties agree that the ADR Process shall be completed by (date):** _____

3) **Plaintiff(s) and Defendant(s) further agree as follows:**

_____

_____

_____
Name of Party Stipulating

_____
Name of Party Stipulating

_____
Name of Party or Attorney Executing Stipulation

_____
Name of Party or Attorney Executing Stipulation

_____
Signature of Party or Attorney

_____
Signature of Party or Attorney

☐ Plaintiff ☐ Defendant ☐ Cross-defendant

☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Dated: _____

Dated: _____

☐ *Additional signature(s) attached*

ADR-2  10/18

**STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION**

**CM-110**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | *FOR COURT USE ONLY* |
|---|---|
| TELEPHONE NO.:                    FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):*<br>ATTORNEY FOR *(Name):* | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF |
|---|
| STREET ADDRESS: |
| MAILING ADDRESS: |
| CITY AND ZIP CODE: |
| BRANCH NAME: |

| PLAINTIFF/PETITIONER: |
|---|
| DEFENDANT/RESPONDENT: |

| CASE MANAGEMENT STATEMENT | CASE NUMBER: |
|---|---|
| *(Check one):*  ☐ **UNLIMITED CASE**<br>(Amount demanded<br>exceeds $25,000)   ☐ **LIMITED CASE**<br>(Amount demanded is $25,000<br>or less) | |

A **CASE MANAGEMENT CONFERENCE** is scheduled as follows:

Date:                    Time:                    Dept.:                    Div.:                    Room:

Address of court *(if different from the address above):*

☐ **Notice of Intent to Appear by Telephone,  by** *(name):*

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one):*
   a. ☐  This statement is submitted by party *(name):*
   b. ☐  This statement is submitted **jointly** by parties *(names):*

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a.  The complaint was filed on *(date):*
   b. ☐  The cross-complaint, if any, was filed on *(date):*

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐  All parties named in the complaint and cross-complaint have been served, have appeared, or have been dismissed.
   b. ☐  The following parties named in the complaint or cross-complaint
       (1) ☐  have not been served *(specify names and explain why not):*
       (2) ☐  have been served but have not appeared and have not been dismissed *(specify names):*
       (3) ☐  have had a default entered against them *(specify names):*
   c. ☐  The following additional parties may be added *(specify names, nature of involvement in case, and date by which they may be served):*

4. **Description of case**
   a.  Type of case in  ☐  complaint  ☐  cross-complaint  *(Describe, including causes of action):*

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-110 [Rev. July 1, 2011] | **CASE MANAGEMENT STATEMENT** | Cal. Rules of Court,<br>rules 3.720–3.730<br>*www.courts.ca.gov* |

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4. b. Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐ *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5. **Jury or nonjury trial**
The party or parties request ☐ a jury trial. ☐ a nonjury trial. *(If more than one party, provide the name of each party requesting a jury trial):*

6. **Trial date**
a. ☐ The trial has been set for *(date):*
b. ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c. Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7. **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a. ☐ days *(specify number):*
b. ☐ hours (short causes) *(specify):*

8. **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
a. Attorney:
b. Firm:
c. Address:
d. Telephone number:                          f. Fax number:
e. E-mail address:                              g. Party represented:
☐ Additional representation is described in Attachment 8.

9. **Preference**
☐ This case is entitled to preference *(specify code section):*

10. **Alternative dispute resolution (ADR)**
a. **ADR information package.** Please note that different ADR processes are available in different courts and communities; read the ADR information package provided by the court under rule 3.221 for information about the processes available through the court and community programs in this case.

(1) For parties represented by counsel: Counsel ☐ has ☐ has not provided the ADR information package identified in rule 3.221 to the client and reviewed ADR options with the client.

(2) For self-represented parties: Party ☐ has ☐ has not reviewed the ADR information package identified in rule 3.221.

b. **Referral to judicial arbitration or civil action mediation** (if available).

(1) ☐ This matter is subject to mandatory judicial arbitration under Code of Civil Procedure section 1141.11 or to civil action mediation under Code of Civil Procedure section 1775.3 because the amount in controversy does not exceed the statutory limit.

(2) ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

(3) ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court or from civil action mediation under Code of Civil Procedure section 1775 et seq. *(specify exemption):*

**CM-110**

| PLAINTIFF/PETITIONER:<br><br>DEFENDANT/RESPONDENT: | CASE NUMBER: |
|---|---|

10.  c.  Indicate the ADR process or processes that the party or parties are willing to participate in, have agreed to participate in, or have already participated in *(check all that apply and provide the specified information)*:

| | The party or parties completing this form **are willing** to participate in the following ADR processes *(check all that apply)*: | If the party or parties completing this form in the case **have agreed** to participate in or have already completed an ADR process or processes, indicate the status of the processes *(attach a copy of the parties' ADR stipulation)*: |
|---|---|---|
| (1) Mediation | ☐ | ☐ Mediation session not yet scheduled<br>☐ Mediation session scheduled for *(date)*:<br>☐ Agreed to complete mediation by *(date)*:<br>☐ Mediation completed on *(date)*: |
| (2) Settlement conference | ☐ | ☐ Settlement conference not yet scheduled<br>☐ Settlement conference scheduled for *(date)*:<br>☐ Agreed to complete settlement conference by *(date)*:<br>☐ Settlement conference completed on *(date)*: |
| (3) Neutral evaluation | ☐ | ☐ Neutral evaluation not yet scheduled<br>☐ Neutral evaluation scheduled for *(date)*:<br>☐ Agreed to complete neutral evaluation by *(date)*:<br>☐ Neutral evaluation completed on *(date)*: |
| (4) Nonbinding judicial arbitration | ☐ | ☐ Judicial arbitration not yet scheduled<br>☐ Judicial arbitration scheduled for *(date)*:<br>☐ Agreed to complete judicial arbitration by *(date)*:<br>☐ Judicial arbitration completed on *(date)*: |
| (5) Binding private arbitration | ☐ | ☐ Private arbitration not yet scheduled<br>☐ Private arbitration scheduled for *(date)*:<br>☐ Agreed to complete private arbitration by *(date)*:<br>☐ Private arbitration completed on *(date)*: |
| (6) Other *(specify)*: | ☐ | ☐ ADR session not yet scheduled<br>☐ ADR session scheduled for *(date)*:<br>☐ Agreed to complete ADR session by *(date)*:<br>☐ ADR completed on *(date)*: |

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

11. **Insurance**
   a. ☐ Insurance carrier, if any, for party filing this statement *(name):*
   b. Reservation of rights: ☐ Yes ☐ No
   c. ☐ Coverage issues will significantly affect resolution of this case *(explain):*


12. **Jurisdiction**
   Indicate any matters that may affect the court's jurisdiction or processing of this case and describe the status.
   ☐ Bankruptcy ☐ Other *(specify):*

   Status:

13. **Related cases, consolidation, and coordination**
   a. ☐ There are companion, underlying, or related cases.
      (1) Name of case:
      (2) Name of court:
      (3) Case number:
      (4) Status:
      ☐ Additional cases are described in Attachment 13a.
   b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party):*

14. **Bifurcation**
   ☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*


15. **Other motions**
   ☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*


16. **Discovery**
   a. ☐ The party or parties have completed all discovery.
   b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery):*

   | Party | Description | Date |
   |---|---|---|




   c. ☐ The following discovery issues, including issues regarding the discovery of electronically stored information, are anticipated *(specify):*

**CASE MANAGEMENT STATEMENT**

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Economic litigation**

a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90-98 will apply to this case.

b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

**18. Other issues**

☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

**19. Meet and confer**

a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*

b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

**20. Total number of pages attached** *(if any):* _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and alternative dispute resolution, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____          ► _____
(TYPE OR PRINT NAME)                                      (SIGNATURE OF PARTY OR ATTORNEY)

_____          ► _____
(TYPE OR PRINT NAME)                                      (SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached.



# MEDIATION SERVICES

THE BAR ASSOCIATION OF SAN FRANCISCO

FOR OUTSTANDING ADR SERVICES
Voted into the Hall of Fame In The Recorder's "Best of" Poll

## TESTIMONIALS

"This was the third attempt to mediate this case, and the BASF mediator was far and away the best mediator. I dare say that we would not have settled today but for his efforts."

*George Yuhas, Esq.*
*Orrick, Herrington & Sutcliffe LLP*

"We had an excellent experience and, after 8 1/2 hours of mediation, [the BASF mediator] settled a very difficult case involving claims against four clients of ours by a wealthy investor who claimed inadequate disclosure was made."

*Robert Charles Friese, Esq.*
*Shartsis Friese LLP*

"When the other side made their offer, I thought there was no way we would reach an agreement – we were too far apart, but the mediator brought us together. He saved me a lot of time and aggravation by facilitating a settlement. Thanks!"

*Leslie Caplan*
*Global Warming Campaign Manager*
*Bluewater Network*

"BASF staff was very helpful – stayed on the task and kept after a hard to reach party. The mediator was great!"

*Mark Abelson, Esq.*
*Campagnoli, Abelson & Campagnoli*

"The [BASF] mediator was excellent! He was effective with some strong, forceful personalities."

*Denise A. Leadbetter, Esq.*
*Zacks, Utrecht & Leadbetter*

PROCEDURES, PODCASTS, FORMS, MEDIATOR BIOGRAPHIES AND PHOTOGRAPHS:
**www.sfbar.org/mediation**

**adr@sfbar.org or 415-982-1600**



## Experienced mediators are available in the following areas

- Business
- Civil Rights
- Commercial
- Construction
- Contracts
- Disability
- Discrimination
- Education
- Employment/Workplace
- Environmental
- Family
- Family-Certified Specialists
- Fee Disputes
- Financial
- Government
- Insurance
- Intellectual Property
- Intra-Organizational
- Labor
- Landlord/Tenant
- Land Use
- LGBT Issues
- Malpractice: Legal-Medical-Professional
- Partnership Dissolutions
- Personal Injury
- Probate/Trust
- Products Liability
- Real Estate
- Securities
- Taxation
- Uninsured Motorist
- And more...

## QUALITY        EXPERIENCE        TRUST

### WHAT IS BASF'S MEDIATION SERVICE?

The Bar Association of San Francisco's Mediation Services is a private mediation service which will assist you with almost any type of dispute, from simple contract disputes to complex commercial matters.

### WHO ARE THE MEDIATORS?

They are established mediators who have private mediation practices and have met our extensive experience requirements. By going through BASF you receive the services of these highly qualified mediators at a great value.

### HOW DO I LEARN MORE ABOUT THE MEDIATORS?

BASF's website at www.sfbar.org/mediation provides bios, photos and hourly rates of mediators. You can search by name or by area of law needed for your case. BASF staff is always available to assist you with selection or to answer questions.

### HOW MUCH DOES THE SERVICE COST?

A $295 per party administrative fee is paid to BASF at the time the Consent to Mediate form is filed. This fee covers the first hour of mediator preparation time and the first two hours of session time. Time beyond that is paid at the mediator's normal hourly rate.

### HOW IS THE MEDIATOR CHOSEN?

You may request a specific mediator from our website (www.sfbar.org/mediation) and indicate your choice on the BASF Consent to Mediate form, or you may indicate on the form that you would like BASF staff to assist with the selection.

### WHY SHOULD I GO THROUGH BASF? CAN'T I JUST CALL THE MEDIATOR DIRECTLY?

BASF mediators have agreed to provide three free hours as a service to BASF. If you go directly to one of our mediators, you do not qualify for the free hours unless you notify us. Once you have filed with us, you will talk directly to the mediator to ask questions and to set a convenient mediation date and time.

### HOW LONG IS THE MEDIATION SESSION?

The time spent in mediation will vary depending on your dispute. BASF mediators are dedicated to reaching a settlement, whether you need a few hours or several days.

### WHO CAN USE THE SERVICE?

BASF mediation can be utilized by anyone and is NOT limited to San Francisco residents or issues. Also, the service may be used before a court action is filed or at any time during a court action.

### OUR CASE IS FILED IN COURT. HOW DO WE USE BASF'S MEDIATION SERVICES?

When you file the San Francisco Superior Court's Stipulation to ADR form, check the box indicating "Mediation Services of BASF." Then complete BASF's Consent to Mediate form found on our website and file it with us. (If the matter was filed in a different county, please check with that court for the appropriate process.)

### WE ARE ON A DEADLINE; HOW QUICKLY CAN WE MEDIATE?

Once all parties have filed all the paperwork, BASF can normally have you in touch with the mediator within a day or two. If there is a deadline, BASF staff will give the matter top priority.

### WHAT TYPES OF DISPUTES CAN I MEDIATE?

BASF mediators are trained in 30+ areas of law. If you don't see the area you need on our website or in this brochure, contact us; it is very likely we can match your need with one of our panelists.

### MORE INFORMATION

Visit our website at www.sfbar.org/mediation where you can search by name or by area of law. For personal assistance, please call 415-982-1600.

## WWW.SFBAR.ORG/MEDIATION • ADR@SFBAR.ORG • 415.982.1600