Pages 1 - 32

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

IN RE: ROUNDUP PRODUCTS        )
LIABILITY LITIGATION           )  **NO. MD 16-02741-VC**
                               )
_____)

San Francisco, California
Wednesday, August 18, 2021

**TRANSCRIPT OF REMOTE VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**: (Appearances via Zoom videoconference.)

For Plaintiffs:

WEITZ & LUXENBERG PC
700 Broadway
New York, New York  10003
BY:  **ROBIN L. GREENWALD, ATTORNEY AT LAW**

ANDRUS WAGSTAFF PC
7171 W. Alaska Drive
Lakewood, Colorado  80226
BY:  **AIMEE H. WAGSTAFF, ATTORNEY AT LAW**

ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA 94104
BY:  **LORI E. ANDERSON, ATTORNEY AT LAW**

THE MILLER FIRM LLC
108 Railroad Avenue
Orange, Virginia 22960
BY:  **BRIAN K. BRAKE, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

```
 1    APPEARANCES:   (CONTINUED)

 2    For Defendants:
                               WILKINSON STEKLOFF LLP
 3                             2001 M Street NW - 10th Floor,
                               Washington, D.C. 20036
 4                      BY:    BRIAN L. STEKLOFF, ATTORNEY AT LAW
                               RAKESH KILARU, ATTORNEY AT LAW
 5
                               SHOOK, HARDY & BACON LLP
 6                             2555 Grand Boulevard
                               Kansas City, Missouri 64108
 7                      BY:    ANTHONY R. MARTINEZ, ATTORNEY AT LAW

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   **Wednesday - August 18, 2021**                          **11:05 a.m.**

2                      **P R O C E E D I N G S**

3                            ---o0o---

4       **THE CLERK:**  Now calling 16-md-2741, In Re: Roundup

5   Products Liability Litigation.

6       Will counsel for the plaintiffs, please, state your

7   appearances.

8       **MS. GREENWALD:**  Good afternoon, Your Honor.  Robin

9   Greenwald for the plaintiffs.

10       **THE COURT:**  Good afternoon.

11       **MS. GREENWALD:**  Good afternoon.

12       **MS. WAGSTAFF:**  Good afternoon, Your Honor.  Aimee

13   Wagstaff for the plaintiffs.

14       **THE COURT:**  Hi.

15       **MS. WAGSTAFF:**  Hi.

16       **MR. BRAKE:**  Hi.  This is Brian Brake for the

17   plaintiffs, Your Honor.

18       **THE COURT:**  Hello.

19       **MS. ANDRUS:**  And Lori Andrus for the plaintiffs,

20   Your Honor.  Good afternoon.

21       **THE COURT:**  Good afternoon.

22       **THE CLERK:**  For the defendants?

23       **MR. STEKLOFF:**  Good afternoon, Your Honor.  Brian

24   Stekloff, Rakesh Kilaru, and Anthony Martinez for Monsanto.

25       **THE COURT:**  Hi.

**PROCEEDINGS**

 1        And I see there is somebody named Charles Housier

 2   (phonetic), raising their hand.  Do we -- does anybody know who

 3   that is?

 4             **MS. GREENWALD:**  I don't.

 5             **THE COURT:**  Okay.  And I assume that, Bhavna, this is

 6   not somebody who's -- who registered to participate?

 7             **THE CLERK:**  Uh-uh.

 8             **THE COURT:**  Okay.  So we won't be allowing that person

 9   in then.

10        Okay.  So this is a status conference.  And the primary

11   purpose of it is to move -- start moving -- set a schedule to

12   start moving a bunch more of these cases forward towards trial.

13        And I read the case management statement that you all

14   submitted, and there is kind of a difference of opinion on how

15   to do it.  It looks like Monsanto proposes kind of going at the

16   same pace that we've been going.  And the plaintiffs are

17   proposing to accelerate things.  I don't see why we should not

18   accelerate things.

19        I don't see why we should not make the groups of cases in

20   each wave, the number of cases, in each wave larger.  We can

21   have a discussion about how to do that, about, you know, which

22   cases to pick or which states to pick.

23        But I really -- given sort of where we are in the MDL, as

24   I've made clear, you know, we've -- we have this settlement

25   process that's been set up with Ken Feinberg, but none of that

**PROCEEDINGS**

1   is going to cause delay in terms of plaintiffs' ability to take

2   their case to trial if that's what they want to do.

3        So -- and given that what's been happening is that,

4   you know, these cases have all been settling as they get close

5   to trial, I don't see why we shouldn't, you know, increase the

6   number of cases that we're getting closer to trial, and do it

7   faster.

8        So I think that we'll do that.  The plaintiffs proposed --

9   if I recall correctly, you all proposed just including every

10  case in the Ninth Circuit as part of the next wave; is that

11  right?

12           **MS. GREENWALD:**  That's correct, Your Honor.

13           **THE COURT:**  You know, I could imagine there being

14  fairness issues with that.  For example, the -- most of the

15  Ninth Circuit cases, I assume, in are in California; is that

16  right?

17           **MS. GREENWALD:**  That's right.

18           **THE COURT:**  And although there is something attractive

19  about moving the California cases forward, it's sort of easier

20  from a judicial economy standpoint -- because I have already

21  looked at California law of causation, and we have this

22  Ninth Circuit opinion and all that stuff -- you know, I think

23  that what we should be doing is thinking about it from the

24  standpoint of the plaintiffs who have filed their lawsuits.

25  And, you know, the people -- the cases that are left in

**PROCEEDINGS**

1   California are from people who filed their lawsuits, I think,

2   much later than some of the people from other states.

3      Is that correct?

4      **MS. GREENWALD:**  There might be some of those.  We

5   thought about first-in/first-out concept as well, was one of

6   things we were thinking of.

7      I don't know that we have that data as simply at our

8   fingertips as we did the number of cases per state.

9      **THE COURT:**  Well, I'm not sure -- I'm not sure it's

10  necessary to be so exacting in that regard.  But I know that,

11  you know, California cases were part of the first wave.  And so

12  the case -- the oldest California cases have been disposed of

13  for the most part; right?

14     **MS. GREENWALD:**  That is correct.  Or they are awaiting

15  remand.  I mean, for example, we have a case that has not

16  settled, so it's -- it would be awaiting remand, but it was

17  California Wave 1.  And I'm sure there is other plaintiffs in

18  that position.

19     **THE COURT:**  Well, wait a minute.  What do you mean you

20  have a California Wave 1 case that's awaiting remand?

21     **MS. GREENWALD:**  Yes.

22     **THE COURT:**  I thought all the Wave 1 cases settled.

23     **MS. GREENWALD:**  No.

24     **THE COURT:**  I've been told repeatedly that all the

25  Wave 1 and all the Wave 2 cases have settled.  So which case

1    are you talking about that didn't settle?

2              MS. GREENWALD:  So, Yolanda Mendoza --

3              THE COURT:  I would have sent that to trial a year ago

4    if you would have told me that.

5              MS. GREENWALD:  She's not -- she is in the Eastern

6    District of California.  And so you --

7              THE COURT:  So?

8              MS. GREENWALD:  So -- but, yes, she is ready for

9    remand.

10             THE COURT:  But, wait a minute.  I was told -- I have

11   been informed multiple times by the special master and by the

12   parties that all of the Wave 1 cases settled.

13        So now you're telling me that there has been a Wave 1 case

14   that's been sitting out there ready for trial for, like, a year

15   and we haven't sent it to -- back to its home district for

16   trial?

17             MS. GREENWALD:  I believe there is more than just

18   mine, absolutely.  And I did not -- I did not understand that

19   we have ever informed the Court that all of the Wave 1 cases

20   were settled.  I believe that what happened was --

21             THE COURT:  Absolutely.  I mean, you all have told me

22   that many times.  And I've been told that all the Wave 2 cases

23   settled as well.

24             MS. GREENWALD:  I don't know.  I mean, I could ask

25   Aimee and Brian.  I think they even have cases as well -- I

1  could be wrong -- in Wave -- in California and potentially

2  Illinois.  I know I also have an Illinois --

3        THE COURT:  Why didn't you tell me that?  I would have

4  sent them for trial a year ago.

5        MS. GREENWALD:  You know, Your Honor, I didn't know

6  that we ever actually had an opportunity to ask for the remand.

7     I mean, I apologize, to the extent we should have been

8  doing that.  I think some of it's a little complicated

9  because -- and I guess, I'll be a little careful in how I

10  describe this on the phone call.

11     Every firm probably has a slightly different settlement

12  agreement.  And so to the extent firms have opt-out programs,

13  and if they are not resolved in the opt-out process, then

14  they -- they go back to trial.

15     And so perhaps at the time you first asked that, maybe it

16  was a year ago, we didn't know that those cases who -- at least

17  in our firm's context -- that were in the opt-out group would

18  not resolve in the opt-out process.

19        THE COURT:  Okay.  So what you're saying is there were

20  settlement agreements with law firms --

21        MS. GREENWALD:  Correct.

22        THE COURT:  -- to settle their, quote/unquote,

23  inventory; and some of the individual plaintiffs represented by

24  particular law firms may have, in the meantime, opted out of

25  their settlements?

1          **MS. GREENWALD:**  Correct.

2          **THE COURT:**  Okay.  So we should be sending those cases

3    to their home districts for trial immediately.  That should be

4    the first order of business.

5          **MS. GREENWALD:**  We will take it upon ourselves to work

6    with defendants to get a full list of all the plaintiffs who

7    are in all of first three waves, regardless of whether it was a

8    plaintiff or defendant pick, and we can get that list to you, I

9    would say --

10        What do you think, Brian?  Can we do it in a week or less

11   than a week?

12        I mean, I guess, on our side, we would have to write an

13   e-mail to the group.  Maybe even a few days.

14        What do you think?  Brian Stekloff, I was asking you

15   because I'll need your help on this one a little bit because we

16   don't know every single plaintiff firm.

17        **MR. STEKLOFF:**  Yeah.  I mean, as you know, I will have

18   to loop in others who have been handling these cases.  But I

19   think easily within a week we can get -- I wasn't aware of this

20   issue, but I have no doubt that we can get a list of any

21   opt-outs that were part of Wave 1 or Wave 2 that should be

22   remanded.

23        **THE COURT:**  All right.  So, yeah.

24        **MR. STEKLOFF:**  I think wave 3 is --

25        **THE COURT:**  Wave 3 is still in the middle of being

1    worked up.

2              MR. STEKLOFF:  Right.

3              THE COURT:  So within seven days of today, I'll order

4    the parties to submit a joint list of cases that are ready to

5    be remanded for trial.

6              MS. GREENWALD:  Thank you.

7              THE COURT:  Or, to put it another way, a list of all

8    ways cases from Wave 1 and Wave 2 that have not yet settled.

9              MS. GREENWALD:  We will do that.

10             MR. STEKLOFF:  The other thing we'll flag, Your Honor,

11   in the submission, I think, whether there are pending motions

12   that still apply to the cases.

13        Because I -- I don't know which cases they are, but there

14   may be, for example, Ms. Greenwald mentioned an Illinois case.

15   And we still have, I believe, summary judgment issues relating

16   to Illinois law, and we may have *Daubert* challenges relating to

17   the experts that were disclosed in those cases that are

18   pending.

19        I do not -- again this is the first I'm hearing of this,

20   so I do not know; but we'll include that in the submission that

21   we file next week.

22             THE COURT:  Okay.

23        All right.  And so that -- and I think we'll have a

24   further status conference in roughly two or three weeks to set

25   a schedule -- to sort of set a schedule for those cases, to the

 1   extent there is anything I need to do further in any of those

 2   cases before sending them back to their home districts for

 3   trial, we'll set a schedule for that at the next status

 4   conference.

 5        So -- let's see, what is it -- where are we now?

 6        **MS. GREENWALD:**  Can I make -- oh, sorry.  I'll wait

 7   until you finish.  I'm sorry.

 8        **THE COURT:**  No.  Go ahead.

 9        **MS. GREENWALD:**  The one other thought I had on

10   California, just to raise this -- I'm not saying this is what

11   you want to do, but a thought.

12        I think, some of the later California cases may be in the

13   Northern District of California, and they would be cases that,

14   if they were worked up, you would be able to try.  So we wanted

15   to raise that with you.  But I'm -- I know there are some for

16   sure.

17        **MS. ANDRUS:**  Sorry to interrupt, Robin.

18        Your Honor, sorry, I do have something relevant on this as

19   well.  This is Lori Andrus.

20        I do have a Northern California -- Northern District of

21   California case that came -- that was filed shortly after the

22   Wave 1 orders.  It's -- so it's not a new case.  It's been on

23   file for more than two years.  So some of the cases on file in

24   California are getting old, even though they were filed after

25   Wave 1.

PROCEEDINGS

1          **THE COURT:**  Okay.  So -- yeah, but there are a lot of

2    old -- a lot of cases that are older than that --

3          **MS. GREENWALD:**  Correct.

4          **THE COURT:**  -- that are waiting to -- you know,

5    waiting to get worked up for trial.

6          So why don't we have a status conference two or

7    three weeks from now to figure out what to do with these cases,

8    these opt-outs or other cases from Wave 1 or 2 that haven't

9    settled?

10         **MS. GREENWALD:**  Okay.

11         **THE COURT:**  Bhavna, what do you think?

12         **THE CLERK:**  Do you want it at 11:00, Your Honor?

13         **THE COURT:**  Yeah, that's probably good.

14         **THE CLERK:**  Okay.

15         **THE COURT:**  Or actually, you know what?  Why don't we

16   do it -- actually, I think 1:00 is probably a little bit

17   better.

18         **THE CLERK:**  1:00.  We can do it on September 29th, or

19   is that too far?

20         **THE COURT:**  I think we should do it sooner than that

21   if possible.

22         **THE CLERK:**  Okay.

23         **THE COURT:**  I'm pulling up my calendar.

24         **THE CLERK:**  We kind of have a heavy calendar next

25   month.

**PROCEEDINGS**

1          **THE COURT:**  Yeah.

2          **THE CLERK:**  Do you want it on the 1st of September?

3          **THE COURT:**  The 8th should be fine.

4          **THE CLERK:**  The 8th?

5          **THE COURT:**  Let's do the 8th.

6          **THE CLERK:**  Okay.

7          **THE COURT:**  The U.S.A. versus Neal trial is probably

8   not going to go because of, you know, the surge in COVID cases

9   and all that.

10          **THE CLERK:**  Okay.  September 8th at 1:00.

11          **THE COURT:**  Yeah.  All right.

12       So that's the next status conference.

13       And then what I -- in terms of, you know, scheduling the

14   next waves, my proposal -- I'll see what Monsanto has to say

15   about this, but, you know, I sort of understood -- I

16   understand, you know, the concern with just including all of

17   the cases in the Ninth Circuit as part of the next wave.

18       I don't -- I'm not concerned about the number of cases,

19   but in terms of, you know, fairness, and, you know, I'm -- as I

20   said, I'm primarily concerned with fairness for the individuals

21   who filed their cases; right?  There are a lot of people in

22   other states who have been waiting around longer than the

23   people who filed their, you know, lawsuits after Wave 1 in

24   California.

25       And so what I was going to propose is, all of the states

1  that you all have identified in waves -- in your proposed

2  Wave 4, 5, and 6, put them all together and make that the next

3  wave.

4       So would Monsanto rather do it that way or just do -- go

5  with plaintiffs' proposal of taking all cases from the

6  Ninth Circuit and moving those forward?

7            **MR. KILARU:**  Your Honor, this is Rakesh Kilaru.

8       I mean, as between those options, we would certainly

9  prefer an approach that has a representative selection from

10 both sides in terms of states.

11           **THE COURT:**  Okay.

12           **MR. KILARU:**  If you'll allow me to just take a moment,

13 I would say, we do have a concern that I would note for the

14 record -- and also for the lawyers who are going to spend a lot

15 of time working up these cases -- with the volume, which is, I

16 think, we have been -- both sides, it's fair to say, have been

17 stretched with the volume that we have, which has involved 22

18 to 98 cases per wave.

19      And the stretch has largely been because of expert

20 discovery.  I think the fact discovery is very practical and

21 easy to do, but the expert discovery is pretty burdensome.  I

22 think it is a burden that falls somewhat disproportionately on

23 our side of the ledger because a firm may have three or four

24 cases on the plaintiffs' side, but if the wave includes 200 to

25 300 hundred cases, that's an immense amount of work-up to do in

 1   terms of identifying experts, having them sit for depositions,

 2   the schedule crunch can be pretty significant.

 3        And I would also just note that with the Feinberg process

 4   in place, it strikes us as maybe not advisable to have the

 5   first wave out of the gate, have so many cases before we know

 6   how that's going to impact things, as opposed to having a

 7   smaller wave of what would still be a lot -- 100 to 150 cases

 8   would be more than any we've done before, and I think you can

 9   still have the representatives in the sample there.  So that

10   would be our preference --

11        **THE COURT:**  I understand what you're saying, but I

12   don't agree.

13        I mean, first of all, with respect to the Feinberg

14   process, as I've tried to make clear, the Feinberg process,

15   the -- you know, the administrative settlement process is not

16   going to result in delay of litigation.  It's not going to

17   cause litigation delay.

18        This is not going to be one of those MDLs where

19   plaintiffs' lawyers get the impression that if they don't

20   settle their case, their case is going to be sitting around for

21   15 years with no litigation.

22        That's not going to happen in this MDL.

23        So we're -- now is the time -- now that we've set up the

24   Feinberg process, the premium is on moving the cases forward

25   faster in litigation, not slowing them down.

1    With respect to the burden that it places on Monsanto and

2   its lawyers, I understand that.  And I understand that the

3   expert discovery is quite burdensome.  But the reality is,

4   you know, we establish these phases; the cases get worked up;

5   they are on the verge of getting sent out for trial; and then

6   they settle.

7        And I realize that some of the cases -- you know, some of

8   the plaintiffs later opt out of those settlements, as we

9   discussed earlier, but, for the most part, these cases are

10  settling.  It's just that they are not settling until after

11  they get worked up for trial.

12       And so, it seems to me, that if Monsanto prefers not to

13  undergo the expense and burden of working the cases up for

14  trial, Monsanto can settle the cases earlier.  And if Monsanto

15  doesn't want to settle the cases earlier, it can hire more

16  lawyers and we can get them worked up for trial.

17       So what I'm going to do is -- I do think, you know, that

18  some of fairness concerns that you raise support not --

19  you know, not making the Wave 4 just Ninth Circuit cases.  I

20  think that what we'll do is we'll take all of these cases, all

21  of these states that you've identified, and we'll put them in

22  Wave 4.

23       So Wave 4 will be Michigan -- cases from Michigan, cases

24  from Massachusetts, cases from Ohio, cases from Florida, cases

25  from Iowa, and cases from South Carolina.  And that will be

**PROCEEDINGS**

1    Wave 4.

2         And I notice you didn't propose any dates for Wave -- a

3    schedule for Wave 4.

4         And by the way, it's not going to be a more elongated

5    schedule because of the fact that there are more cases.  It's

6    going to be a similar schedule for the one -- the ones that

7    we've set for the prior waves.

8         So I noticed you all didn't -- or at least I don't think

9    you proposed dates for Wave 4.

10        Did you propose something and I just missed it?

11             **MS. GREENWALD:**  No, we didn't, Your Honor.

12        Can I just add -- we should add to that, Arizona.  We had

13   said if you don't go with the catch-up order or Ninth Circuit,

14   we would pick Arizona.

15        I think Monsanto missed that when it wrote its summary at

16   the end, because South Carolina and -- I'm sorry -- South

17   Carolina and Iowa are Monsanto choices.  They picked two states

18   for the last wave.

19             **THE COURT:**  That's fine.

20             **MS. GREENWALD:**  So Arizona is the only one missing.

21   It doesn't add very many cases, by the way; it's just a few.

22             **THE COURT:**  That's fine.  You can add Arizona.

23             **MS. GREENWALD:**  Okay.  Thank you.

24        We did not do a schedule.  I'm sorry.  We did not.

25             **THE COURT:**  Okay.  So that will be Wave 4.  And I'm

1  going to ask you to submit -- within seven days, I'm going to

2  ask you to submit a proposed Wave 4 schedule.  And -- or if you

3  can't agree, you can submit competing schedules.  And do

4  those -- submit those within seven days, and I will, you know,

5  likely adopt the more -- the more aggressive schedule; but

6  we'll see.

7       I mean, I'm not going to adopt something that's totally

8  unreasonable, but it should be similar to the schedules that

9  you all had for the previous waves.

10      And then we're going to -- we're also going to schedule a

11 Wave 5 and a Wave 6, and we'll do that at the next status

12 conference.  And I want you to pick -- I want you to propose

13 sort of similar numbers, similar number of states, or similar

14 number of cases for Waves 5 and 6.

15      I think probably -- you know, maybe it would make sense to

16 include California in Wave 5, since there are so many.  But

17 I'll, you know, sort of keep an open mind on that, and you all

18 can make proposals for what's going to be part of Wave 5 and

19 Wave 6 at the next status conference.

20      Okay.  And now, this -- the concept of the catch-up order,

21 can we talk a little more about that?  Can you explain to me

22 what you're proposing about that?

23           MS. GREENWALD:  So we were just proposing that for all

24 six states that were Wave 1 through 3, the cases that were

25 filed in those states after the wave was picked, would be part

1   of one of these waves, so they would be caught up.  Because,

2   otherwise, they won't be picked again, so they would be just

3   left out there.

4        And I understand that because there is -- I understand

5   your point that there are some states that haven't even been

6   picked yet, and I understand the fairness of that.  But our

7   thought was those people just didn't have their cases filed yet

8   because perhaps they weren't diagnosed yet.  And so -- and we

9   don't know how to get them back into the fold if we don't have

10  some process at some point in time to catch them up.

11       Again, it doesn't have to be this wave.  It won't be,

12  obviously, Wave 5, but if at some point in time we can put that

13  on the calendar to make sure we focus on catching them up at

14  some point so they don't get left in the wind.

15       **THE COURT:**  Yeah.  I mean, I don't know how many

16  states have cases.  I don't know how many states there will be

17  left after Wave 4.  But, you know, I wonder if it's possible to

18  cover the rest of the states in Wave 5 and then start doing

19  catch-up.

20       **MS. GREENWALD:**  Right.  I think what you will see --

21  we've actually -- Brian and Rakesh were kind enough to give us

22  a list of the states, and I could pull it up, but maybe they

23  have it.  It's in an e-mail from them.

24       But, as you get to some of the other states, there are

25  very few cases in there, like, one or two, three.  And so, even

1    if we put five or six states in a wave, you wouldn't even have

2    20 cases, potentially, when we get closer to the bottom of the

3    list.

4         So maybe we can work with Monsanto in integrating some

5    catch-up states, as we look to adding other states.

6         I don't know what you guys think, if that's something we

7    can try to negotiate and talk about.  But that's how I would

8    propose doing it.  And, maybe, in light of Your Honor not

9    wanting to put them in quite get, that we can integrate them as

10   we get to the states that are many smaller groups of plaintiffs

11   for each state.

12        **THE COURT:**  Yeah.  I mean, like I said, I'll let you

13   all work on it and think about it and talk about it.  But if,

14   you know, it strikes me that, you know, in Wave 5 or Wave 6,

15   that, you know, those cases can start coming in.

16        **MS. GREENWALD:**  Okay.

17        **THE COURT:**  That would be my guess.

18        **MR. KILARU:**  Your Honor, we're happy to work with

19   plaintiffs on this.

20        I think, probably, the overriding point from our side

21   would just be some proportionality among sort of which cases

22   get chosen by which sides; but I don't know that that

23   necessarily needs to dictate new states versus old states.

24        **THE COURT:**  Yeah.  I mean, I'm mostly worried about

25   not -- you know, I'm concerned about people who filed lawsuits

1   towards the beginning who are just having their cases sit

2   around.  Right?  That's my primary concern.

3       And so as you're sort of figuring out the best way to do

4   this, please keep that in mind.

5           **MR. KILARU:**  Yes, Your Honor.

6           **THE COURT:**  Okay.  Is there anything else that we need

7   to talk about today?

8           **MR. MARTINEZ:**  Your Honor, this is Anthony Martinez.

9       I just had a comment on, I think it was PTO 247, the one

10  where you required Monsanto to e-mail PTO 50 to plaintiffs'

11  counsel once it's -- once their cases --

12          **THE COURT:**  Oh, yeah.

13          **MR. MARTINEZ:**  We just wanted to bring up, that brings

14  up some issues with us on service and waiver of service.

15  Because oftentimes, when the case is transferred to the MDL, we

16  sometimes haven't even been served, and most of the times have

17  not answered.

18      So we're wondering if that -- that could trigger off of

19  when we answer, we e-mail PTO 50, versus when it's transferred

20  to the MDL?

21          **THE COURT:**  I think that sounds fair.

22      Does anybody have any objection to that?

23          **MS. GREENWALD:**  We don't.

24          **THE COURT:**  Okay.  And then the plaintiff fact

25  sheets -- so there are a bunch of -- it sounds like you've

1  filed a bunch of motions to dismiss for failure to submit a

2  plaintiff fact sheet.  And, I gather, some of plaintiffs'

3  lawyers are scrambling to comply with the requirement of

4  submitting a fact sheet in response to your motions to dismiss.

5      Have you calendared those motions for hearing?

6          MR. MARTINEZ:  We have not calendared those,

7  Your Honor.  I can give you some numbers.

8          THE COURT:  Okay.

9          MR. MARTINEZ:  So we filed one motion to dismiss that

10  encompassed just one plaintiffs' counsel, Charles Johnson,

11  I believe.  And that was based on deficient PFSs.  So he had

12  submitted PFSs, but they were basically blank in our minds.

13  There were 65 of those plaintiffs.

14          THE COURT:  Okay.

15          MR. MARTINEZ:  We also submitted another motion to

16  dismiss for various other plaintiffs' counsel that just did not

17  submit a PFS.  That was originally for 35 plaintiffs, and that

18  has been whittled down to 18 now, based on they notified us

19  that they were either going to dismiss the case or that they

20  have submitted a PFS.

21      So we've at least cut that number in half.  But the 65

22  plaintiffs for the deficient PFSs for Charles Johnson, still

23  outstanding -- is still outstanding.

24          THE COURT:  Okay.  When, like, is there a deadline for

25  him to correct it?  Or -- I can't remember what the rules are.

1      **MR. MARTINEZ:**  I don't remember what your order said

2  at this time, Your Honor.  I have to bring it back up.  But I

3  imagine it would be less than seven days, and we submitted that

4  motion to dismiss on August 13th.

5      **THE COURT:**  Okay.  So it seems like we should, at the

6  next status conference, you know, for any cases where the PFS

7  problems have not been worked out, it seems like we should

8  calendar a hearing for your motions to dismiss those cases.

9      But you should also let us know in the status conference,

10  the status report, which cases -- let us know the cases where

11  the motion to dismiss has been worked out, so we can terminate

12  those motions.

13      **MR. MARTINEZ:**  Okay.  You want us to set a hearing for

14  September 1st as well then?

15      **THE COURT:**  Set a hearing?

16      **MR. MARTINEZ:**  For the motions --

17      **THE COURT:**  No.

18      **MR. MARTINEZ:**  -- on the same day as the status

19  conference?

20      **THE COURT:**  No.  At the status conference, you can

21  update us on the status of the motions to dismiss.

22      **MR. MARTINEZ:**  Okay.

23      **THE COURT:**  And we can talk at the status conference

24  about when we will schedule a hearing on them, on the motions

25  to dismiss.

 1          MR. MARTINEZ:  That sounds good.

 2          THE COURT:  Or if some of them have gone unopposed, I

 3    can just probably grant them without a hearing.  So that's a

 4    possibility too, obviously.

 5          MR. MARTINEZ:  Okay.

 6          MR. KILARU:  Your Honor, could I just raise one quick

 7    housekeeping question?

 8          THE COURT:  Let me say one other quick thing before I

 9    forget it.

10          You know, I assume that some of these cases where a

11    plaintiffs' lawyer has failed to submit a fact sheet on behalf

12    of a client is just a negligent plaintiffs' lawyer.  So just I

13    want to make sure -- I mean, I wonder if lead counsel should be

14    doing anything to reach out to these lawyers to say:  Hey,

15    you're about to -- your case is about to be dismissed if you

16    don't get your act together.

17          Does that make sense from anybody's standpoint?

18          MS. GREENWALD:  Yes.  We'll do that.  Again, we'll

19    work with Rakesh to get the list.  I mean -- I'm sorry,

20    Anthony -- either one can send them out.  I know Anthony well.

21    I'll work with him to get the list; although it's on the docket

22    anyway, so I can find them.

23          And we'll reach out to those lawyers, and tell them that

24    this is going to be up on the conference on the --

25    September 8th, and they need to get it in this before.

1          **THE COURT:**  Tell them they are on the verge of

2    committing malpractice.   It may be that some of the plaintiffs

3    are not cooperating with them and that --

4          **MS. GREENWALD:**  Correct.

5          **MS. WAGSTAFF:**  Your Honor, one thing that I would add,

6    just because I am familiar with the Charles Johnson group of

7    cases, is that some of these cases are about to be subject to a

8    settlement agreement.   And so I think that we had e-mailed -- I

9    think Brian Stekloff had e-mailed you about a process for cases

10   that are subject to an MSA, but have not yet settled or opted

11   out.

12         **THE COURT:**  Yeah.   I was going to ask about that.

13   Yeah.

14         **MS. WAGSTAFF:**  And I think we will -- based on your

15   desire to remand cases that are ready for trial, I would ask

16   that you let us push that to the September 8th CMC, and we'll

17   have a more finalized proposal.

18        But I know that the Charles Johnson cases are very, very,

19   if not already, subject to an MSA.   Very close, if not already

20   subject.   So there is that wrinkle too, that those should --

21   probably, I should talk with Anthony about that offline a

22   little bit that those motions should probably come down if the

23   case has become subject to a settlement agreement.

24         **THE COURT:**  Okay.   And then I do want to hear more

25   now, and we can talk about it further when we meet on

1    September 8th or whatever the date was.  But I do want to talk

2    more now about your proposal for how I can better manage the

3    docket with respect to these cases that have settled, but can't

4    yet -- apparently can't yet be dismissed.

5          You know, obviously, the MDL docket is very hard to manage

6    and it's very hard to keep track of which motions, you know,

7    can be terminated and which can't; and which cases can be

8    terminated and which need to stay on the docket, even if they

9    have reached a settlement in principle, or whatever.

10         And I understand there was talk about creating some sort

11   of shadow docket, and I really didn't understand that and

12   wasn't sure if it would work.  But, mainly, I didn't understand

13   it.

14         So can somebody explain to me what they are contemplating

15   there?

16         **MS. GREENWALD:**  So, Your Honor, we've actually had

17   conversations with defense counsel about this.  And we're in

18   agreement on this.  We just haven't ironed out the final

19   wrinkles of it.

20         But we were really talking about an inactive docket, so

21   that they would be cases that are still on file, still part of

22   the MDL, but they would be in inactive status, which I believe

23   has happened in MDLs before.

24         And then you could have a sunset provision on it, if it's

25   not within 60 days or six months -- whatever you decide -- then

 1    it comes out of inactive status.  There are multiple ways we

 2    could do that.

 3        And I think we were discussing that -- actually in the

 4    context, as Aimee just said, in those few cases, like the one I

 5    mentioned at the beginning of conference today, that shouldn't

 6    go in that inactive status because, even though it would have

 7    been initially -- if we had done this six months ago, I would

 8    have put her in that inactive status, now she shouldn't be.

 9        And then we even talked about mechanisms for either party

10    coming to you and requesting, even before the sunset provision,

11    that you would take someone out of inactive and put them back

12    in active because of changed circumstances.

13        And so we can, again, present that on September 8th.  I

14    don't know if anyone wants to add to what I just said, or if

15    you have further questions, Judge.  But I think that the

16    inactive status process would really clarify for you what's

17    actually still likely to be on your docket versus what's very

18    likely to go away in the very near future.

19        **MS. WAGSTAFF:**  And one thing I would add is that it's

20    really important for plaintiffs' counsel that cases only be

21    moved to the inactive docket by agreement of both counsel.

22        For example, it takes six to nine months, maybe longer, to

23    administer a settlement agreement.  So if Your Honor enters

24    Wave 4 -- I've forgotten what states you said, but I think

25    Florida was one of them -- and a law firm just signed a

1   settlement agreement, and they have 10 Florida cases, pursuant

2   to court order, they need to work up those cases; right?

3       And they need to spend all that money on expert discovery,

4   and they need to do all that work, but both counsel are

5   actually trying to resolve those cases.  And so those cases are

6   actually subject to a settlement agreement that's going to take

7   time to do allocations, and to do distributions and to,

8   you know, get released is six to nine months.

9       So we would propose that by agreement of both parties,

10  cases subject to settlement agreements go on to an inactive

11  docket.  And then, when the cases -- if the cases ever opt out

12  of the agreement, that there is a trigger that they can go back

13  to the active docket.

14      And that's just sort of what we're working on right now is

15  what's that trigger back?  Is it automatic?  Is it Your Honor

16  saying they can sit only sit on the inactive docket for

17  six months?  Or is it one counsel filing a motion?

18      That's what we're working on right now.

19          **THE COURT:**  Okay.  And I would say -- I mean,

20  obviously, we can talk about it further at the next status

21  conference.

22      I do -- the idea of a case going to inactive status and

23  staying there until I do something affirmatively makes me

24  nervous; right?  Because how am I supposed to know, unless the

25  lawyers tell, me that the case needs to be reactivated?  And

```
 1    how, you know -- and, you know, should I be relying -- I mean,
 2    if it's your client or -- you know, if it's your client, then I
 3    could be pretty confident that you will come and say this case
 4    needs to be reactivated.  But if it's somebody -- some random,
 5    you know, lawyer's client, how do I know that that's going to
 6    happen?
 7         So -- and then these cases might be just stuck in inactive
 8    status when they shouldn't be.  So that's definitely a concern
 9    for me.
10         The other concern for me is mechanically, you know, how
11    does that, you know, how do we implement that?
12         So do you have examples of MDLs where something like this
13    has been done in the past so we can talk to the judge and the
14    courtroom deputy who managed it to sort of get a sense of how
15    it worked?
16         MS. WAGSTAFF:  Yes, Your Honor.  Judge Goodwin in the
17    Southern District of West Virginia did this with the
18    transvaginal mesh litigation.  His clerk did it.  It's -- name
19    is Kate Fife.  And I can put Kristen in touch with Kate or,
20    obviously, you can reach out to Judge Goodwin.
21         THE COURT:  Okay.
22         MS. WAGSTAFF:  That's one example that comes to mind.
23         MR. STEKLOFF:  Your Honor, I think we can probably
24    find other examples.
25         I will add, I think we agree with everything that
```

1   Ms. Greenwald and Ms. Wagstaff said.  I think what we would

2   propose, which, hopefully, will give you some comfort is that

3   we, jointly, the parties give you -- I think, the burden will

4   fall more on Monsanto, but that we give you a regular update

5   about cases that are ready to be dismissed because either they

6   are part of a -- you know, some of the smaller settlements

7   where lawyers have fewer cases are not subject to some big

8   master settlement agreement with complicated opt-out provisions

9   and participation rates.

10      And then those cases would be ready to be dismissed from

11  the MDL docket.  We would have this inactive list which we

12  could update you on.  And when we gave you regular updates, we

13  would also be updating you on whether cases have moved from the

14  inactive list to the dismissed list, like, sort of everything

15  is final, or need to be reactivated because of some opt-out

16  situation, like Ms. Greenwald mentioned.

17      And then, third, I think we would also update you on which

18  motions are subject -- are on the docket, but are subject to

19  either category.  So either dismissal, the motions are now

20  moot, or inactive, in other words the motions need to stay on

21  the docket in the small chance a case becomes active, but none

22  of the parties expect you to have to deal with those motions --

23          THE COURT:  Well, right.  I mean, those motions would

24  be terminated and then they would be -- you know, if the case

25  went to inactive status, those motions would be terminated or

**PROCEEDINGS**

1   denied without prejudice, or whatever, and they would need to

2   be teed up again in the unlikely event that the case became

3   active.

4        **MR. STEKLOFF:**  And that would be fine too.  And I

5   think what we would propose -- and we can come -- I,

6   unfortunately, can't make it on the 8th, but everyone else, I'm

7   sure, can raise this more on the 8th with more detail.

8        But, I mean, I think we were thinking that, sometimes not

9   much happens in, you know, month-long periods.  So I think we

10  were thinking, you know, every 45 to 60 days we would submit

11  these updates to this process for the Court; which, again, I

12  think Monsanto would have more information, given the number of

13  plaintiffs' lawyers, we would take the lead on this.

14       But when we have done these in the past, we've always

15  shared them with the plaintiffs' leadership committee before

16  anything was submitted to you.  So I think if we -- what I am

17  suggesting is, if we add some normal process to this, where

18  it's a regular reporting, it will hopefully lead to more

19  efficiency for the Court.

20       **THE COURT:**  Okay.  So why don't you lay all of that

21  out in your next case management statement which will be due

22  seven days before the next status conference.

23       And include, if you could, you know, some examples of

24  where this has been done with the name of the judge; and it

25  would be helpful also to get the name of the clerk so we can

**PROCEEDINGS**

1   get in touch with them and ask for guidance.

2       But all of that, at least on the surface, to me, sounds

3   good.

4       All right.  Anything else?

5       Mr. Kilaru, you were starting to say something else and I

6   interrupted you.  Was it going to be about this issue?

7           **MR. KILARU:**  You've already addressed it by saying the

8   status report is due on the 1st.  So I'm all set, Your Honor.

9           **THE COURT:**  Okay.  Anything else for today?

10          **MS. GREENWALD:**  I don't think so.

11          **THE COURT:**  All right.  Right.  We'll see you soon

12   then.

13          **MS. GREENWALD:**  Thank you very much, Your Honor.

14          **MR. BRAKE:**  Thank you, Your Honor.

15          **MR. STEKLOFF:**  Thanks.

16          **THE CLERK:**  Court is adjourned.

17              (Proceedings adjourned at 11:43 a.m.)

18                      ---o0o---

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

      I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Tuesday, August 24, 2021



_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court