# Exhibit 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | ) <br> ) MDL No. 2741 <br> ) <br> ) Case No. 3:16-md-02741-VC |
| This document relates to: <br><br> *Powell v. Monsanto Co., 3:20-cv-05623* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

# EXPERT REPORT OF CHARLES M. BENBROOK, PhD

## On Behalf of Plaintiff Donnie Powell

Table of Contents

1. INTRODUCTION ..................................................................................................................... 5

2. EXPERT BACKGROUND AND QUALIFICATIONS .................................................................. 6

3. REGULATORY COMPLIANCE .............................................................................................. 12

4. BIG CHANGES IN SPRAY METHODS, APPLICATOR EXPOSURES, AND THE VOLUME OF ROUNDUP APPLIED . 26

    A. IMPACTS OF HANDHELD SPRAY EQUIPMENT ON APPLICATOR EXPOSURE LEVELS .................. 26
        2. Big Impact of Wind and Spray Pattern on Exposures ........................................................ 28
        3. EPA Estimates of the Impact of Application Equipment and PPE on Applicator Exposures are Generally Consistent with the UK Findings .......................................................... 29
    B. NEW REASONS AND WAYS TO APPLY ROUNDUP ON OVERALL USE ........................................ 30
        1. Monsanto Brings Pre-harvest, Crop Desiccation Uses of Roundup to America ................ 30
        2. Changes in Roundup Uses Required EPA Approval of Much Higher Tolerances ............... 31
    C. TRENDS IN THE VOLUME OF GLYPHOSATE USE IN THE U.S. ................................................. 32
        1. Published Trends in Glyphosate Use in the U.S. ............................................................... 32
        2. EPA Rankings of the Most Heavily Applied Pesticides ...................................................... 36
    D. MONSANTO SHARE OF THE MARKET FOR GLYPHOSATE-BASED HERBICIDES ......................... 37
        1. What Allowed Other Manufacturers to Label and Sell GBHs? .......................................... 37

5. EPA'S EVALUATION OF GLYPHOSATE/ROUNDUP ONCOGENICITY/ CARCINOGENICITY ............................... 39

    A. IMPACTS WHEN EPA CLASSIFIES A PESTICIDE AS A POSSIBLE OR PROBABLE ONCOGEN ........ 39
        1. Possible Oncogens may be Labeled for "Restricted Use" Only ......................................... 40
        2. Triggering a Special Review and Possible Cancellation Action ......................................... 40
    B. IMPACT OF THE DELANEY CLAUSE ON PESTICIDE TOLERANCE SETTING ................................ 41
        1. Sections 408 and 409 of the Food, Drug, and Cosmetic Act ............................................ 41
    C. TWO-YEAR FEEDING STUDIES SUBMITTED TO EPA IN SUPPORT OF GLYPHOSATE TOLERANCES ........... 43

6. BIO/DYNAMICS MOUSE ONCOGENICITY STUDY TRIGGERS A NEAR DECADE-LONG CONFLICT BETWEEN EPA AND MONSANTO ......................................................................................... 45

    A. RESULTS OF BIO/DYNAMICS MOUSE ONCOGENICITY STUDY ............................................... 45
    B. REVIEW OF THE BIO/DYNAMICS MOUSE STUDY .................................................................. 46
        1. Swift and Aggressive Response by Monsanto Challenges Classification of Glyphosate as a "Possible Oncogen" ................................................................................ 47
        2. EPA's Response to Monsanto's Criticisms of the "Possible Oncogen" Classification ...... 48
        3. Monsanto Takes Its Appeal to the Tox Branch Chief ........................................................ 49
        4. OPP Dismisses Monsanto's Historical Control Data Argument ........................................ 49
        5. Monsanto Takes Its Case to the Director of the OPP Registration Division ..................... 50
        6. Monsanto Hires Another Pathologist to Re-read the Kidney Slides ................................. 51
    C. RE-SECTIONING OF THE BIO/DYNAMIC MOUSE KIDNEY SLIDES ............................................ 52
        1. EPA Response to the Newly Identified Tumor in Control Mouse #1028 ............................ 53
    D. THE 1986 SAP REVIEW OF THE MOUSE ONCOGENICITY STUDY ........................................... 54
        1. Monsanto Increases the "Votes" for Its Interpretation of Mouse Kidney Tumors ............ 55
        2. SAP Report Recommends a Repeat Mouse Study to Resolve the Dispute ....................... 57
    E. EPA CALLS FOR A REPLACEMENT MOUSE STUDY IN 1986 GLYPHOSATE REGISTRATION STANDARD DOCUMENT ............ 58
        1. Monsanto Challenges the EPA RS Requirement for a Repeat Mouse Study ..................... 58
        2. EPA Calls for a Specially Designed Study in Response to Monsanto's Refusal to Conduct a Repeat Mouse Study ................................................................................ 59
        3. Monsanto Persistence Pays Off .................................................................................... 61
        4. Conclusions Regarding Monsanto's Sparse and Inadequate Oncogenicity Testing ......... 61

7. MONSANTO, EPA, AND IARC ASSESSMENTS OF GLYPHOSATE AND ROUNDUP GENOTOXICITY ................. 63

    A. Monsanto Seeks Outside Guidance on Glyphosate/Roundup Genotoxicity ...............................................64
       1. *Parry Report #1* ...............................................................................................................65
       2. *Monsanto Response to Dr. Parry's First Report* .............................................................65
       3. *Dr. Parry's Second Report* ...............................................................................................65
       4. *Dr. Parry's Third Report* ..................................................................................................65
       5. *Monsanto's Response to Dr. Parry's Reports* ................................................................66
       6. *Monsanto's Response to Dr. Parry's Research Recommendations* ................................68
    B. EPA's and IARC's Evaluation of Glyphosate Genotoxicity.....................................................................71
       1. *Studies Relied Upon by EPA and IARC* ............................................................................72
       2. *Results of Registrant-Commissioned Versus Peer-Reviewed Genotoxicity Studies Considered by IARC and EPA* 74
       3. *Significant Impact Evident of the Year When Studies were Completed* .........................75
    C.   Conclusions Regarding Monsanto Efforts to Understand and Address the Genotoxicity of Roundup .............76

**8.   ROUNDUP SURFACTANTS, DIFFERENTIAL TOXICITY AND MONSANTO INITIATIVES TO REDUCE APPLICATOR EXPOSURES AND RISK.................................................................................................................... 77**

    A.   Heightened Toxicity Caused by the Surfactants in Formulated Roundup .........................................78
    B.   European Regulators Press Monsanto to Better Characterize and Reduce Risks Arising from the Surfactants in Roundup..........................................................................................................................................79
       1. *Monsanto Agrees to Phase Out POEA Surfactants in All Roundup Brands Sold in Europe* .......................80
       2. *Evidence of Endocrine Disruption Adds New Pressure on Monsanto-Europe to Phase out High-Risk Surfactants*..........................................................................................................................82

**9.   MONSANTO FAILURES TO ADEQUATELY ESTIMATE APPLICATOR EXPOSURES AND RISK AND REFUSAL TO AUGMENT WORKER-PROTECTION PROVISIONS AS CALLED FOR IN THE 1986 EPA REGISTRATION STANDARD ... 84**

    A.   Monsanto Terminates TNO Study, Which Showed Elevated Rates of Dermal Absorption .................85
    B.   Worker-Safety Provisions Required in the 1986 Glyphosate RS .......................................................88
       1. *Monsanto's Response to the New RS Worker-Safety Provisions*..................................89
       2. *The Blondell Study Raises Concerns* ...............................................................................89
       3. *EPA Responds "Yes and No" to Monsanto's Request* .....................................................90
       4. *Monsanto Digs In, Refuses to Add New Worker-Safety Provisions* ...............................91
       5. *PPE Requirements on Roundup Labels* ...........................................................................91
    C.   Concerns Grow Over Applicator Exposures When Using Handheld and Backpack Applicators.....................92
       1. *European Regulators Raise Worker-Safety Concerns* ....................................................92
    A.   Monsanto's Third Party Network of Experts .....................................................................................96
       1. *The "Glyphosate Scientific Outreach Plan"* ....................................................................97
       2. *Cherry Picking Science* ....................................................................................................98
    B.   Monsanto's Relationships with "Friendly" Scientists and Officials in EPA .....................................98
    *Jess Rowland* ....................................................................................................................................98
       1. *EPA's Office of Research and Development Asked to Review -- and Undermines -- OPP's Glyphosate Oncogenicity Report* ...............................................................................................100
    *Jack Housenger* ..............................................................................................................................100
    C.   Corporate Ghost-Authorship/Writing ............................................................................................102
       1. *Gary Williams et al 2000 Paper*....................................................................................103
       2. *Williams et al 2012*......................................................................................................106
       3. *Kier and Kirkland 2013 Paper*......................................................................................108
    D.   *Critical Reviews of Toxicology* Special Issue on Glyphosate Risks .................................................109
       1. *Other Forms of Ghost-Writing* ......................................................................................111
    E.   Responses to Scientists Raising Concerns over Glyphosate Safety .................................................112
       1. *Monsanto Response to the IARC Working Group Report* ...............................................113
       2. *Seralini Team*................................................................................................................113

**11.     THE IARC CLASSIFICATION ..................................................................................................... 118**

A.    IARC's Justification for Its "Probable Human Carcinogen" Classification ......................118
B.    Monsanto Braces for Unwelcomed News from IARC ........................................................119
    1.    *Monsanto's IARC "Talking Points" Drafted Before the IARC Decision is Released* ..................120
    2.    *Monsanto Enlists Its Third Party Network to Criticize the Basis of the IARC Classification* ...................121
    3.    *Monsanto Receives Advance Warning of the IARC Classification from EPA* .........................123
    4.    *Post-IARC Plans Put Into Motion* ......................................................................................125
    5.    *Heydens Drives the Intertek Project* ..................................................................................128
    6.    *Ethical Lapses Catch Up with Monsanto and Intertek*........................................................129
C.    Political and Other Activities Post-IARC .........................................................................130
    1.    *Blocking the ATSDR Review of Glyphosate* .......................................................................131

**D.    DOWNPLAYING GLYPHOSATE RISKS** .............................................................................. **132**

E.    Understating Risks...........................................................................................................132
    1.    *The IARC Review Process*...................................................................................................133
    2.    *Advertising* .......................................................................................................................136
F.    Freedom to Operate (FTO) ...............................................................................................137
    1.    *Responding to FQPA Challenges* .......................................................................................138
    2.    *Misleading Statements Regarding Relative Risks* ..............................................................139
    3.    *Section 6(a)(2) of FIFRA* ...................................................................................................139

**APPENDIX A. RESUME**...................................................................................................... **141**

**RESEARCH AND ANALYTICAL ACTIVITIES**........................................................................ **143**

# 1. Introduction

I have been asked by Plaintiffs' attorneys to address a series of questions relating to the composition, use, testing, stewardship, risk assessment, and regulation of glyphosate, Roundup®-brand herbicides (Roundup), and other glyphosate-based herbicides (GBHs).

As the litigation has progressed, I have been asked additional questions by plaintiff and defense attorneys in multiple depositions and trial testimony. My answers and opinions expressed are based on review of public documents on glyphosate and Roundup over the last 40 years; my independent research and peer-reviewed publications on glyphosate and Roundup; and, the discovery record, depositions, exhibits, and trial testimony in this litigation.

My work on this body of litigation began in September 2016.

I have produced four expert reports in this litigation: Dewayne Johnson v. Monsanto Company, December 21, 2017; IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION MDL No. 2741, November 10, 2018; Edmund Richard Giglio v. Monsanto Co. Case No. 3:16-cv-05658, MDL No. 2741, U.S. District Court Northern District of California; and, this report.

I have been deposed  9 times in this litigation, spanning 8 days and approximately 70 hours of videotaped  testimony: 1) Johnson case, Orange, Virginia February 8-9, 2018; 2) Peterson and Hall v. Monsanto, Clarkston, Washington, May 23, 2018; 3) Continuation of Hall v. Monsanto deposition, Seattle, Washington, August 14, 2018; 4) Adams v. Monsanto, Longmont, Colorado, September 13, 2018; 5) San Francisco MDL cases, December 27, 2018, Clarkston, Washington; 6) Lamb/Winston joint deposition, May 26, 2019, Seattle, Washington; 7) Giglio case, MDL, November 8, 2019, Longmont, Colorado, and 8) "All MDL Wave 2 Cases," CASE NO. 3:16-md-02741-VC, March 9, 2021 via Zoom. 9) Clark Case, August 17, 2021.

I have testified at trial three times: the Johnson, Pilliod, Stephens cases.

Throughout this report, my conclusions and opinions are expressed following my review of specific issues and milestones in the testing, use, and regulation of Roundup. My conclusions and opinions have been reached to a reasonable degree of scientific certainty, and have evolved over the course of my work on this litigation. I reserve the right to update and add to my conclusions and opinions since my work on this litigation is ongoing.

## 2. Expert Background and Qualifications

I received a B.A. in Economics from Harvard University in 1971, and a Ph.D. in Agricultural Economics from the University of Wisconsin in 1980. I have worked on the impact of agricultural technology on pesticide use, efficacy, and risks, as well as on public health and farmer costs for nearly 40 years.

My work has encompassed the impacts of regulatory policies, requirements, actions, and laws on pesticide use, dietary exposure, worker risks, pest management systems, and food quality and safety.

I was the Staff Director of the Subcommittee on Department Operations, Research, and Foreign Agriculture ("DORFA") of the House Committee on Agriculture for three years (1981 to 1983). This Subcommittee had jurisdiction over the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), the primary federal statute governing pesticide regulation. During this period, I organized several DORFA hearings on pesticide issues, and worked with Members of Congress in drafting potential changes in federal laws impacting the Environmental Protection Agency's ("EPA") Office of Pesticide Programs ("OPP"). During my tenure as the DORFA Staff Director, around one-half of the time and focus of the Subcommittee was devoted to pesticide regulatory issues.

I made dozens of visits to OPP headquarters during this time-period, collecting information and speaking with OPP management, staff, and scientists on issues that had been brought to the attention of the Subcommittee, as well as issues of concern to OPP. These visits resulted in the flow of substantial information from OPP to the Subcommittee. Information provided by OPP helped the Subcommittee prioritize the issues addressed in forthcoming Subcommittee hearings, and/or in need of legislative intervention.

On behalf of the Subcommittee, I organized several hearings on pesticide regulatory activities, issues, and controversies. This entailed drafting a hearing charter (purpose, focus, goals), identifying and securing the participation of witnesses, managing the flow of information submitted as part of delivered testimony, and preparing the hearing report issued by the House Committee on Agriculture.

The Subcommittee carried out a two-year investigation of pesticide regulatory policy and issues, with a principle focus on OPP/EPA activities. Several controversial areas of EPA action, or inaction, arose during the investigation. These included the OPP and industry response to the Industrial BioTest ("IBT") laboratories scandal, the role of state versus federal government agencies in pesticide regulation, the way known or possible carcinogenic pesticides were regulated, the timeliness of OPP decision-making, the burden of proof governing OPP suspension and cancellation actions, the cost of program activities and possible need for user fees, state versus federal roles, among other issues.

During the DORFA investigation of OPP activities, I visited OPP in Crystal City, Virginia multiple times. I met with managers in the various divisions of OPP, as well as with staff scientists in the residue chemistry, toxicology, and registration divisions. I interacted with

most of the senior OPP administrators and staff who were responsible at the time for OPP's assessment and regulation of glyphosate herbicides.

The DORFA Subcommittee investigation culminated in the publication of a Subcommittee report (Volume I), and three supporting volumes of information (Volumes II-IV).
The IBT toxicological data scandal was among the issues explored in the Subcommittee's investigative report and supporting volumes. At the request of the Subcommittee, OPP provided a detailed accounting of the pesticide-company studies submitted to OPP from IBT. The list included several studies commissioned by Monsanto on glyphosate. In fact, most of the initial data supporting the first regulatory decisions on glyphosate in the 1973-1980 period was from IBT, and was subsequently deemed invalid and/or fraudulent. All such studies had to be replicated, and were replicated during the mid-1980s and 1990s.

An official accounting of the validity of pesticide industry toxicological studies done my IBT, by pesticide active ingredient, was compiled by EPA in 1981-1982 in response to a request from our Subcommittee for such an accounting, and was made public through a DORFA Subcommittee hearing. This document was Exhibit 1364 in the Pilliod trial.

While serving as the DORFA Subcommittee Staff Director, I met multiple times with Mr. Chester Dickerson. Mr. Dickerson worked for Monsanto and was based in the corporation's Washington, D.C. office. Mr. Dickerson attended nearly all pesticide-related hearings conducted by the Subcommittee in the time period I worked as Staff Director.
Mr. Dickerson advanced his, and Monsanto's views regarding the way the OPP was implementing federal pesticide law. We discussed many times the OPP response to the IBT scandal, and the subsequent steps Monsanto took to replace fraudulent data. Other common topics of discussion included the need for legislative reforms, pesticide risk-assessment issues, and how known or possible oncogenic pesticides were being regulated.

From 1984-1990 I served as the Executive Director of the Board on Agriculture, a major unit of the National Academy of Sciences/National Research Council ("NAS/NRC").
In February 1985, the EPA "asked the Board on Agriculture of the National Research Council to study the EPA's methods for setting tolerances for pesticide residues in food.

Specifically, the EPA asked the board to examine "the current and likely future impacts of the Delaney Clause on the tolerance-setting process" (quote from preface, *Regulating Pesticides in Food: The Delaney Paradox*, NAS, 1987).

My job was to support the work of the Board of Agriculture ("BA")  in recruiting the study committee, collecting necessary information and records from the OPP, commissioning and overseeing analytical work in support of the Committee's deliberations, and helping the Committee draft its report, which was entitled *Regulating Pesticides in Food: The Delaney Paradox.*

The report was released in 1987. It estimated the level and distribution of potential cancer risk across foods, stemming from the about 2,500 tolerances covering the residues in food of

53 oncogenic pesticides. It also discussed the impact of the Delaney Clause's paradoxical impact on pesticide tolerance setting.

In 1988, the Congress directed the EPA to request the BA to conduct a study on the unique vulnerability of pregnant women, infants, and children following pesticide exposures. This new study was commissioned as a follow-up to the Delaney Paradox report. As Executive Director of the BA, I developed the scope of work, helped the Board identify and recruit the study committee, and supported the initial 2.5 years of the Committee's work. I left my position as the Executive Director of the Board on Agriculture in late 1990.

The report written by the new NAS/NRC Committee was entitled *Pesticides in the Diets of Infants and Children*. It was released in June, 1993. Hearings on the report were held in both the House and Senate on the day of release. The recommendations were widely embraced by the pesticide industry and environmental/consumer advocates, and provided the basic framework for an historic piece of legislation that was passed and signed into law in the summer of 1996, the Food Quality Protection Act ("FQPA").

I started Benbrook Consulting Services ("BCS") in late 1990. Since that time BCS has carried out dozens of projects involving pesticide use, risks, and regulation for federal and State government agencies, companies, private institutions, and non-governmental organizations.

In the 1990s, several BCS projects involved analytical work on risks stemming from residues of cancer-causing pesticides in food. The impact of the Delaney Clause, and possible legislative changes to it, was the primary focus of these projects.

BCS's major client in the 1993-2002 period was Consumers Union ("CU"), publisher of *Consumer Reports*. I was hired initially to work with senior CU scientific staff in writing a book on pest management, and pesticide use and regulatory issues in the U.S. *Pest Management at the Crossroads* ("*PMAC*") came out in October 1996 and was widely disseminated in pesticide policy circles.

Chapter 3 in *PMAC* addressed human-health risks stemming from pesticide use and exposure, and notes that "More than 70 active ingredients cause cancer in animal tests, and cancer has been the most common reason cited by the EPA in pesticide cancellation and suspension actions."

Chapter 4 in *PMAC* focuses on pesticide regulation and includes a detailed explanation of the purpose, provisions, and impact of the 1996 Food Quality Protection Act, with multiple references to both the 1987 and 1993 NAS/NRC reports. The FQPA changed the basic standard and risk-assessment process governing the setting of tolerances in the case of possibly cancer-causing pesticides that are known to concentrate in processed foods.

The FQPA's core reforms were effective upon enactment, and required the EPA to revisit the 8,066 tolerances covering residues of pesticides then on the market. These included 130 tolerances covering all forms of glyphosate and its metabolites, as well as 14 additional

tolerances covering residues of the isopropylamine salt form of glyphosate (the primary form of glyphosate sold by Monsanto).

From late-1996 through about 2002 I continued work with CU on the implementation of the FQPA. I carried out multiple analytical projects for CU, the results of which were typically included in CU's comments to the EPA on various aspects of FQPA implementation. BCS also worked on FQPA implementation issues for other clients.

From late 1990 through 2006, all my work was via contracts with BCS. From 2006 through mid-2012, I worked as the Chief Scientist of The Organic Center, a small non-profit responsible for tracking new science on the environmental and consumer health impacts of organic food and farming. The impact of organic farming on pesticide use and risks was an ongoing focus during my tenure as TOC Chief Scientist.

I received a non-tenure track, Research Professor appointment at Washington State University in June 2012, a position I held for three years. During this time, I ran the "Measure to Manage" program. Our focus was development and application of analytical tools useful in quantifying the impact of agricultural technology and farm production systems on agriculture's environmental footprint and public health outcomes.

As a result of research collaborations with Newcastle University scientists, I was appointed as a Visiting Professor in the School of Agriculture, Food and Rural Development, Newcastle University in the United Kingdom (2016-2019).

In March 2017, I became a Visiting Scholar in the Department of Environmental Health and Engineering in the Bloomberg School of Public Health, Johns Hopkins University (ended June 30, 2018).

As part of my ongoing analytical work since the early 1990s, I download the pesticide use data collected and released annually by the U.S. Department of Agriculture. Each year I track and publish on changes in herbicide use, as well as overall pesticide use in the three major GE crops – soybeans, corn, and cotton.

It was clear to me by the early 2000s that both herbicide and overall pesticide use was rising on acres planted to genetically engineered, herbicide-tolerant (GE-HR) soybeans, corn, and cotton. This was inconsistent with Monsanto's oft-repeated  claim that it's new, "Roundup Ready" GE-HR crops were reducing pesticide use. My analyses of USDA pesticide use data showed otherwise.

In 2003, I released the first of several reports I have written on the impacts of GE crops on pesticide use. Ag BioTech InfoNet Technical Paper #6 was issued in 2003. It documented the increase in overall pesticide use on GE soybeans, corn, and cotton from 1996 through 2002. In 2004, Ag BioTech InfoNet released Technical Paper # 7, quantifying the impact of GE crops on pesticide use over the first nine years of use.

During my tenure as Chief Scientist of The Organic Center ("TOC"), I wrote and issued a November 2009 "Critical Issue Report" covering the impact of GE crops on pesticide use over the first 13 years of use.

In October 2012, I published a peer-reviewed paper entitled "Impacts of genetically engineered crops on pesticide use in the U.S. – the first 16 years" in the peer-reviewed journal *Environmental Sciences Europe* (Vol 24),  Open Access. https://enveurope.springeropen.com/articles/10.1186/2190-4715-24-24).

I accessed the metrics for this paper on January 14, 2021 from the journal's website. It has been accessed 302,000 times. The paper's Altmetric score is ranked 30th out of 138,000 papers of similar age in all journals. It has been the most heavily accessed paper in the 20+ year history of *Environmental Sciences Europe*.

Each of the reports I wrote on the impact of GE crops on overall pesticide use highlighted the role of rapidly-rising use of glyphosate-based herbicides in pushing upward the overall pounds of pesticides applied by U.S. soybean, corn, and cotton farmers.

In 2016, I published the first complete accounting of the use of glyphosate-based herbicides in the U.S. and globally, based on publicly available pesticide use data. The open-access paper was entitled "Trends in glyphosate herbicide use in the United States and Globally" and was published in *Environmental Sciences Europe* (Vol 28:3; DOI 10.1186/s12302-016-0070-0). My "Trends" paper has been cited 467 times, accessed 89,000 times, and has an Altmetric score of 1,386 (ranked 76th out of 347,334 papers of similar age in all journals; accessed 1-14-2021).

Also in 2016, I was the senior author of a paper entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement" that was published in the peer-reviewed journal *Environmental Health* (Volume 15:19; DOI 10.1186/s12940-016-0117-0). This paper is open access, and has been accessed 77,000 times, cited 264 times, and has an Altmetric Score of 887 as of 1-12-2021.

### Other Publications Relevant to Glyphosate-NHL Litigation

Landrigan P, and Benbrook C. GMOs, Herbicides, and Public Health. *New England J. Medicine*, August 20, 2015. https://www.nejm.org/doi/full/10.1056/nejmp1505660

Benbrook, C. Enhancements Needed in GE Crop and Food Regulation in the U.S., *Frontiers in Public Health*, March 31, 2016. Open access. https://www.frontiersin.org/articles/10.3389/fpubh.2016.00059/full

Benbrook, C. Why Regulators Lost Track and Control of Pesticide Risks: Lessons From the Case of Glyphosate-Based Herbicides and Genetically Engineered-Crop Technology, *Current Environ Health Reports*, July 12, 2018. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6132568/

Benbrook, C. How did the US EPA and IARC reach diametrically opposed conclusions on the genotoxicity of glyphosate-based herbicides?, *Environ Sciences Europe*, 2019 31:2. Open access. https://enveurope.springeropen.com/articles/10.1186/s12302-018-0184-7

Benbrook, C. Comments to the U.S. Environmental Protection Agency re: Proposed Re-Registration of Glyphosate-Based Herbicides, submitted to EPA glyphosate reregistration docket September 3, 2019

Benbrook, C. Shining a Light on GBH Hazard, Exposures and Risk: Role of Non Hodgkin Lymphoma Litigation in the USA, *Eur. J. Risk and Regulation.* 2020. Open access. https://www.cambridge.org/core/journals/european-journal-of-risk-regulation/article/shining-a-light-on-glyphosatebased-herbicide-hazard-exposures-and-risk-role-of-nonhodgkin-lymphoma-litigation-in-the-usa/DAB656565EFD8F07DE241C33EFCCDBD1

Benbrook, C and Davis D. The dietary risk index system: a tool to track pesticide dietary risks, *Environ Health*, 2020. Open access. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7557078/

Litigation experience the last four years:

1. Dewayne Johnson, et al. vs. Monsanto Company, et al. Case No. CGC-16-550128, Superior Court of California County of San Francisco.
2. Roundup Products Liability Litigation. MDL No. 2741, Case  No. 16-md-02741-VC, U.S. District Court Northern District of California.
3. Alva and Alberta Pilliod vs. Monsanto Company; Wilbur-Ellis Company, LLC, and Wilbur-Ellis Feed, LLC. Case No. RG17-862702, Superior Court of California In and for the Country of Alameda.
4. Multiple other Roundup-non Hodgkin lymphoma cases at various stages of evolution.
5. Hoffman et al. vs. Syngenta Crop Protection, LLC, Syngenta AG, Chevron U.S.A., Inc., and Growmark, Inc. Case No. 17-L-517, Circuit Court 20th Judicial Circuit, St. Clair County, Illinois.

I charge $300.00 per hour for expert witness work. My resume appears in Appendix A.

# 3. Regulatory Compliance

In the case of an application for a food crop use, or uses, of a new pesticide active ingredient, the EPA requires registrants to submit a number of studies that are then evaluated by OPP for adherence to study protocols and Good Laboratory Practices ("GLP"s). Data requirements are set forth in Section 408 of the Code of Federal Regulations, and are discussed below.

Any required "tolerances" must be approved and in place prior to final OPP action in response to a registration application. Tolerances are set by EPA and establish the maximum concentration of a pesticide that can be in or on a food crop as it leaves the farmgate (typically measured as milligrams of pesticide per kilogram of crop, or ppm). Tolerances are legally enforceable. Foods found to contain residues above the applicable tolerance level are deemed adulterated, and cannot be legally sold.

Tolerances play a critical role in assuring that human exposures to pesticide via the diet is kept below the safety threshold EPA sets called the chronic Reference Dose, or cRfD. This important exposure threshold is typically expressed as milligrams of pesticide active ingredient ingested per kilogram of a person's bodyweight per day, or mg/kg/day.

Companies generate studies and collect data to submit to the OPP in support of requested actions, including the setting of tolerances.
Upon submission, a new study is subjected to an initial screen to see if it was carried out in accord with Good Laboratory Practices (GLPs), is deemed acceptable, and whether it satisfies an OPP-imposed data requirement. Studies that pass this initial screen are then distributed to OPP science-branch managers for review and use in risk assessments. EPA's next task is to determine whether submitted studies "support" the actions requested by applicants, such as setting a tolerance, registering a new use of a pesticide, or altering rates of application.

## A.  Statutory Obligations of Pesticide Manufacturers

There are four core elements of the pesticide regulatory scheme set forth in FIFRA.

### 1.  Initial Approvals

Prior to widespread commercial sales, pesticide manufacturers seek approval of time-limited tolerances and a series of Experimental Use Permits (EUPs) that sanction applications of a limited volume of product on a few dozen to a few thousand acres. A portion of the toxicological data package required to support full registration is reviewed prior to approval of EUPs and time-limited tolerances.

The first EPA approval of a Roundup label came on April 5, 1974, for "Industrial and Non-Agricultural Uses" and "Home and Farmstead Uses." (MONGLY00245013)  A little over a month later, the first Experimental Use Permit (EUP) was granted for limited Roundup applications on corn, soybeans, wheat, and cotton.

Additional non-farm uses were added to the first label in October 1974.

The first major farm label was approved by EPA on December 23, 1975, and sanctioned use on corn, wheat, soybeans, and small grains (oats, barley, rye).

Key first actions by EPA also included approval of temporary tolerances for the combined residues of glyphosate and its major metabolite aminomethylphosphonic acid ("AMPA") in the crops harvested from 9,715 acres of experimental crop applications.

These temporary tolerances, along with similar tolerances on several other crops, were approved and eventually became permanent tolerances, in response to tolerance petitions 4G1444, 5G1523, 5G1561, and 5F1560.

On March 5, 1976 Monsanto requested EPA to establish temporary tolerances on cottonseed and cotton forage, and soybean grain, hay, and forage, in order to allow harvest and use of crops grown under an Experimental Use Permit. (MONGLY03579293).

In a letter dated September 7, 1976, EPA approved Monsanto's request for temporary cotton and soybean tolerances covering residues resulting from recirculating sprayer applications on acres treated under an EUP. The tolerances would be in effect for one year. The letter goes on to alert Monsanto that: "A food additive tolerance is being established for residues of glyphosate and its metabolite in soybean hulls at 20 ppm."

So, from September 1976, Monsanto was aware that it would have to request, and EPA would need to approve, food additive tolerances for most new glyphosate food crop uses. These tolerances are governed by Section 409 of the Food, Drug, and Cosmetic Act ("FDCA") that includes the anti-cancer Delaney Clause. This clause states, in effect, it is unlawful to knowingly add a chemical to the food supply that is known to pose a risk of cancer. Residues of pesticides in processed foods that concentrate above the levels in raw agricultural commodities are considered food additives, and hence are subject to the anti-cancer Delaney Clause.

So, EPA might establish a tolerance allowing a low level of an oncogenic pesticide in a grape at 0.1 part per million (ppm) under the risk-benefit balancing standard in FIFRA, but would be prevented by the Delaney Clause in Section 409 of the FDCA from establishing a higher tolerance in raisins. Such a higher tolerance would be needed because whenever a fresh fruit or vegetable is dried, the concentration of any pesticide in or on it rises. This occurs because the removal of water lowers the weight of the food, but may not alter the amount of pesticide in or on it.

***The impact of the Delaney Clause on glyphosate's regulatory history is substantial and addressed in detail in this report.*** By the early 1980s, Monsanto knew it would have to secure dozens of Section 409 tolerances to expand the crop uses of Roundup (soybean and corn oil, wheat germ, vegetable processing wastes), and it also knew it would likely not be able to do so if glyphosate was found to be a possible oncogen.

13

Over the next 10+ years, several other applications for EUPs were submitted and most were granted by EPA, sometimes in a modified form. In addition, most of the requests for temporary tolerances accompanying EUPs were approved. But most of these approval letters from EPA to Monsanto contained a paragraph explaining that the agency might also need to establish Section 409 food additive tolerances.

Both the number and scope of pending temporary and permanent tolerance petitions expanded steadily during the late 1970s, as did the number of tolerances that were granted.

### 2. Establishing Tolerances

FIFRA directs the EPA to not approve the registration of a food-crop use of a pesticide prior to the establishment of necessary tolerances covering the pesticide residues expected to remain in or on the harvested crop as it leaves the farm.

The tolerance process begins with submission by a pesticide manufacturer of a petition requesting approval of a specific set of tolerances, e.g. 0.1 ppm of glyphosate in wheat grain. Such petitions are accompanied by a large data package including residue chemistry, metabolism, and toxicology studies. These studies are used by EPA to carry out a detailed set of analyses, following prescribed procedures and science policies, to determine whether the submitted studies "support" approval of the requested tolerances.

EPA's in-depth assessment of human health risks from pesticide dietary exposures is carried out within the tolerance-setting process. This includes assessment of whether a pesticide poses oncogenic risk. ***It is also why EPA judgements regarding whether a pesticide poses cancer risk are based on typical levels of exposure to the general public via food, and not the other routes of exposure that place mixer-loaders and applicators at markedly heightened risk***.

### 3. Approval of Labels

It is widely understood by pesticide manufacturers that "the label is the law." Put simply, applications of a pesticide made in accord with all label requirements, directions, and restrictions are legal, and any others are not.

A newly proposed pesticide-product label can authorize applications for:
   1. A new pesticide,
   2. A new use, or uses of an already-registered pesticide,
   3. A revised set of label directions, or a new formulation or brand name, within an existing registration, and
   4. Combinations of 2) and 3).

There are two Roundup labeling issues at the heart of this litigation: (1) the degree to which Monsanto provided adequate warnings to users relative to potential risks, and (2) whether Roundup labels included sufficient instructions and adequate, use-specific requirements to

minimize exposures and risk to mixer-loaders, applicators, farmworkers, and others subject to occupational exposures.

Pesticide labels can be judged as complete and effective, or deficient, to the degree that they adhere to, and help assure attainment of FIFRA's basic goal -- "avoiding unreasonable adverse effects on man or the environment."

***Labels that do not prevent or avoid "unreasonable adverse effects on man and the environment" following lawful applications render the pesticide product containing such labeling misbranded.*** The fact that EPA had reviewed and approved a label written by a registrant does not absolve the registrant of this fundamental obligation under FIFRA. Accordingly, EPA approval is not an acceptable defense when a label is found to be deficient in rising to this ultimate FIFRA goal and responsibility.

Labels that disclose possible human health or environmental risks, ***and then also*** set forth use directions and effective steps to mitigate exposures and potential risks, are most likely to attain FIFRA's basic goal of avoiding adverse impacts. Such labels are also likely to adhere to core industry stewardship standards and responsibilities.

Labels that fail to disclose potential risks, or fall short in requiring measures to mitigate such risks, fall short of meeting FIFRA requirements. They may well also not be fully in accord with generally applicable industry product-stewardship and safety standards as set forth in company-specific policy statements and pledges, the Food and Agricultural Organization's pesticide Code of Conduct (to which Monsanto and most major manufacturers were signatories), and other industry stewardship and product safety commitments and codes of conduct.

Labels that fail to warn about known risks and ***also*** fail to mitigate such risks are the most likely to trigger adverse impacts, and hence may possibly render a product misbranded.

Pesticide manufacturers -- ***not the EPA*** -- draft pesticide product labels. The critical components of a pesticide product label are: (a) its use directions (what pests the product is registered to control, allowed application rates, and directions regarding when and how the product can be applied), and (b) the safety precautions and warnings linked to specific uses or methods of applications (broadcast on a field, sprayed by an airplane, applied using a handheld or backpack sprayer), or certain higher-risk conditions and circumstances of use (e.g. applications made on a windy day, spraying pesticides in areas with sandy soil subject to leaching, or near schools or a body of water).

Manufacturers are responsible for the contents of their product labels, ***and*** the adequacy of a label's use directions, precautionary statements, exposure-reduction requirements, warnings, and other provisions relative to adhering to the performance standards and safety thresholds set by EPA via regulation.

EPA's review and approval of a requested, new pesticide label is driven by the answers to three questions:

1. Has the manufacturer submitted valid studies fulfilling all applicable data requirements?
2. Do the science assessments carried out by the relevant branches in OPP support approval of the label as proposed?
3. Does the label conform to the detailed specifications set forth by EPA in its regulations governing what must appear on labels, where, and in what font?

In some cases, especially with applications for new labels, EPA scientists will identify the need for new or more sophisticated studies and data to fully "support" a judgement that the available data adequately justify, i.e. **support** approval of a proposed label. In such cases, the EPA will often grant a time-limited "conditional registration" that specifies additional data or analytical requirements that the registrants must agree to fulfill by a stated date.

Human health risks facing the general public are assessed largely within the tolerance-setting process. All other types of risks to the environment, applicators, people living near treated areas, non-target organisms, and damage to property are addressed within the label review and approval process.

### 4. Confidential Statements of Formula Not Disclosed on Labels, Impairing Scientific Progress

Requests to EPA to approve a new pesticide product must include the product's **Statement of Formula**, i.e. what is actually in the formulated, "end-use" product. (An "end use" pesticide product is formulated and ready for sale to pest managers). FIFRA directs the EPA to treat Statements of Formula as Confidential Business Information ("CBI").

Statements of Formula included in an application for a registration will specify: (a) the active ingredient(s) responsible for controlling target pests as a percentage of the product by weight (i.e. 43% glyphosate in a given Roundup formulation); and, (b) the identity and concentrations of adjuvants, surfactants, and other "inert ingredient" added to the formulation. "Inert" ingredients are so labeled because they typically are not, themselves, toxic to target pests.

Inert ingredients can markedly alter the physical and chemical properties of a formulated, pesticide product, and inerts can also enhance the human-health risks arising from exposures to formulated pesticides. This is surely the case with Roundup, as will be made clear in this report. It is also why the inert ingredients in Roundup play a major role in explaining how Monsanto and the EPA so seriously underestimated applicator exposures and risk.

Once a registration and label are approved by EPA, pesticide product labels are affixed to cans, bags, barrels, or jugs of pesticide. They must disclose the active ingredient and its concentration, and the total concentration of "Inert Ingredients," without identifying what the inert ingredient are, nor the relative amounts of each of them.

Masking full Statements of Formula on pesticide products leads to uncertainty when independent scientists conduct tests of the toxicity, human health impacts, or environmental fate of formulated, glyphosate-based herbicides. The reasons why are explained in "Insight into the confusion over surfactant co-formulants in glyphosate-based herbicides." (Antoniou, Benbrook, Mesnage, 2019. *Food and Chemical Toxicology* Vol. 128; 137-145. https://www.sciencedirect.com/science/article/pii/S0278691519301814).

### 5.   Periodic Re-registration of Previously Approved Products

FIFRA requires EPA to take a fresh look, and update pesticide studies and risk assessments every 15 years. In the re-registration process, the EPA is bound by FIFRA to balance the risks and benefits associated with ongoing, or altered uses of a pesticide. The EPA's judgement must take account of how, and how widely, the pesticide has been used, and the availability, cost, and risk profile of other, registered pesticide alternatives.

As stated in *Pest Management at the Crossroads*, the 1996 Consumers Union book:
> ***"…new pesticides are guilty until proven innocent, with applicants bearing the burden of proof.  Old pesticides are innocent until proven guilty, with EPA bearing the burden of proof."*** (page 93)

Before restricting the use of a previously registered pesticide, EPA's Office of Pesticide Programs (OPP) must first show that: 1) exposure levels to one or more non-target organisms (and especially people), exceed the EPA's "level of concern", and 2) the risks stemming from the ongoing use of the pesticide exceed the benefits flowing from such uses.

To make judgements regarding pesticide risks versus benefits, the OPP must carry out detailed assessments of how a given pesticide is used on each crop it is registered for. This assessment must consider pesticide efficacy, the number and severity of pests controlled, how well are they controlled, and for how long. OPP must also assess:
- How use of the pesticide varies across the country,
- The cost of the pesticide plus its application compared to "next best" alternatives, and
- What combination of factors can lead to exposures above EPA's level of concern.

Use-specific information is used by the EPA to identify relatively high-risk uses, as well as options to reduce exposure levels. At the end of its assessment of pesticide uses, benefits, and risks, the OPP must decide whether restricting or cancelling the use, or uses of a pesticide will cause unacceptable crop losses or damage, and/or force farmers to increase reliance on another pesticide that might pose even more serious risks.

It can take years for the EPA to complete a re-registration review for a pesticide like Roundup that is the product-of-choice in a diverse array of circumstances. The ongoing glyphosate re-registration process started in 2009, and is yet to be finalized.

Re-registration reviews tend to take many years to complete when:
- Recent studies raise questions with past EPA toxicological determinations, or point to possible new risks;

- There is inadequate data for EPA to accurately calculate levels of exposure to people or other non-target organisms (hence requiring delay while field studies are carried out, and/or residues are measured in food); and
- Registrants are determined to retain all existing uses, defend all tolerances, and avoid any requirements or restrictions that might pose a competitive disadvantage, or curtail approval of new uses in the future, as has been the case in spades with Roundup.

Each of the above three circumstances have triggered delays in the ongoing reregistration review of Roundup and other glyphosate-based herbicides.

## B. EPA Testing Requirements

Currently applicable EPA toxicology data requirements are set forth in Part 158 of the Code of Federal Regulations. The modern set of pesticide data requirements was promulgated as a Final Rule in the Federal Register on October 24,1984 (Vol. 49, No. 207). The Toxicology Data Requirements table appears on page 42882. A more recent summary of the slightly modified Part 158 pesticide toxicology data requirements was published in the Federal Register (Vol. 72, No. 207, Friday October 26, 2007). These toxicology data requirements include:

- Eight acute (short-term) studies;
- Four required and three conditionally required sub-chronic studies;
- Three chronic feeding studies (carcinogenicity tests in two species, typically the mouse and rat; and, a non-cancer chronic feeding study);
- Three required and one conditionally required developmental toxicity and reproduction studies;
- Three genotoxicity studies; and
- Two required (metabolism and immunotoxicity) and two conditionally required "Special Studies" (dermal penetration and companion animal safety).

Accordingly, prior to registering a new food-use pesticide, the EPA requires a minimum of 28 toxicology studies, assuming it imposes all conditionally required toxicology study requirements.

Monsanto has frequently stated that Roundup is the most heavily tested pesticide ever, and that glyphosate registrants have generated and submitted to EPA over 800 studies proving the safety of Roundup. Claims of this sort are repeated frequently in media reports, agricultural publications, grower meetings, at conferences, and before regulatory agencies (for example, see the August 8, 2019 AgPro piece "Glyphosate Overview: Where are We Now?" at https://www.agprofessional.com/article/glyphosate-overview-where-are-we-now).

The first claim is not true, as clear in Table 3.1. It shows the number of scientific studies captured in the PubMed database across several areas of pesticide toxicology. Two herbicides and two insecticides have been tested more intensively than glyphosate.

**Table 3.1 The Number of Studies Conducted on Glyphosate and Several Other Pesticides by Category: 1970-March 2019  [PubMed searches]**

| Type of Study | Herbicides | | | | Insecticides | | |
|---|---|---|---|---|---|---|---|
| | Glyphosate or GBHs | 2,4-D | Atrazine | Alachlor | Chlorpyrifos | DDT | Permethrin |
| Cancer | 98 | 231 | 159 | 70 | 220 | 893 | 104 |
| Genotoxicity/Mutations | 261 | 302 | 230 | 51 | 173 | 571 | 278 |
| Epidemiology Studies | 67 | 115 | 103 | 15 | 145 | 752 | 370 |
| Chemistry, Metabolites, and Environmental Fate | 568 | 466 | 1,251 | 239 | 1,005 | 2,453 | 379 |
| Exposure and Biomontioring | 702 | 1,003 | 1,312 | 226 | 2,318 | 3,765 | 896 |
| Reproductive and Developmental Impacts | 210 | 334 | 454 | 35 | 501 | 1,225 | 180 |
| General Health Effects and Risks Assessments | 951 | 834 | 1,276 | 184 | 2,112 | 3,174 | 932 |
| TOTAL | 2,857 | 3,285 | 4,785 | 820 | 6,474 | 12,833 | 3,139 |

A slide in a February 16, 2009 Powerpoint by Monsanto senior toxicologist David Saltmiras summarizes "Glyphosate Mammalian Tox Data Submitted -- 2004 WHO Review." The slide notes that the listed studies had been submitted to WHO by 11 companies, reflecting the fact that several companies held their own GBH registrations by 2004.

Across all categories of mammalian toxicology data, Saltmiras identifies 101 submitted studies including 7 chronic feeding studies, four multigenerational studies, and six rat and rabbit developmental studies. Perhaps as many as 100 additional mammalian toxicity studies have been conducted by various registrants since 2004, the majority of which are short-term Bacterial reverse mutation (BRM, or Ames tests) genotoxicity studies.

So, about 200 of the 800+ studies claimed by Monsanto to support the human safety of Roundup are foundational in EPA's evaluation of glyphosate and GBH mammalian toxicity. About 100 of these 200 are Ames genotoxicity tests done in test tubes that are quick and inexpensive. The EPA requires just one. The additional ~99 add little new information, but do inflate the number of studies that Monsanto can cite as reporting no evidence of toxicity. Plus, it is not surprising that nearly all Ames tests involving glyphosate or GBHs are negative, because the bacterial cells used in BRM assays lack mitochondria, a primary target of oxidative-stress triggered by glyphosate in mammalian cells.

Around 600 out of the 800 safety studies conducted by Monsanto on GBHs include field studies on pesticide residues in food, environmental fate studies, and hundreds of acute toxicity and irritation studies (the so-called Six Pack studies done on specific formulations).

The record also shows that Monsanto has refused to carry out studies required or requested by EPA. Examples central to this case include studies needed in order to: (a) evaluate oncogenic potential, (b) accurately estimate dermal exposures and risks for applicators, and

19

(c) determine the efficacy of exposure- and risk-mitigation provisions on, or absent from, Roundup labels. Required studies that were not carried out by Monsanto, or carried out but not submitted to the agency, are discussed in subsequent sections of this report.

### 1. Did Monsanto Submit Valid Studies in Fulfillment of EPA Testing Requirements?

Not always, especially in the 1970s when Monsanto relied heavily on the Industrial BioTest (IBT) laboratory in carrying out dozens of EPA-required toxicology studies.

IBT was a contract laboratory doing toxicological studies destined for submission to OPP/EPA for many pesticide manufacturers in the 1970s and 1980s.

A routine FDA audit of an IBT test facility in 1976 uncovered problems with the conduct of some studies, leading to a thorough EPA assessment of all studies done by IBT that supported regulatory actions by OPP (for a history of the IBT case, see Eliot Marshall, "The Murky World of Toxicity Testing," *Science Magazine*, Vol.226, June 10, 1983; Pilliod v. Monsanto Exhibit 1363).

Most of the initial toxicological database supporting the early tolerance petitions and registrations of glyphosate were done by IBT. The "IBT Tracking System Report" released in 1983 notes 30 studies done by IBT on glyphosate, of which 17 were invalid and 2 were pending final judgements ("Summary of the IBT Review Program," OPP, July 1983; Pilliod v. Monsanto Exhibit 1364).  The invalid studies included long-term carcinogenicity mouse and rat studies fed glyphosate.

On July 1, 1977, OPP generated a one-page summary of the eight toxicology studies used to support establishment of all then-existing glyphosate tolerances. These eight studies were submitted between 1972 and 1974, and all were done by IBT.

An August 21, 1978 memo from William Dykstra of the OPP Toxicology Branch to Robert Taylor in the Registration Branch discusses the EPA's assessment of the validity of a 2-year chronic feeding study done in Albino rats by IBT. For a variety of reasons, the EPA judged the study to be invalid, yet it served as the basis of the then-current chronic Reference Dose of 0.1 mg/kg/day (called an ADI, or Acceptable Daily Intake in 1978).

A July 27, 1982 memo from the Toxicology Division to the Registration Division reported EPA's judgement that the 2-year dog study (No. 651-00565) done by IBT for Monsanto and completed in 1973 was invalid because of missing data, failure to record diet preparation records, and other deficiencies.

Accordingly, it took about a decade for EPA to determine that most of the toxicological database submitted to the agency by Monsanto in the mid-1970s, and used by EPA to support all early glyphosate EUP, tolerance, and registration actions, was invalid and possibly fraudulent.

Problems also arose with some of the replacement studies that Monsanto commissioned to replace invalid IBT studies. In July 1979, Monsanto decided to terminate a 2-year mouse study on NNG (a glyphosate breakdown product) because of excessive mortality in treated groups of animals. (MONGLY04272266)

Via an agreement with OPP, Monsanto repeated all the invalid IBT studies at different laboratories, mostly during the 1980s. In the interim, EPA allowed existing registrations and tolerances to remain in place, and no effort was made by Monsanto via label alerts or other communications to convey to users of Roundup herbicides that the existing EPA approvals and label directions were not supported by valid toxicology, particularly oncogenicity, studies.

## C.  Regulatory Consequences When Monsanto Submitted Invalid Studies or Refused to Carry Out New Studies Requested by EPA

Monsanto was required by EPA to repeat the invalid and fraudulent IBT studies, and it eventually did so. But in many other instances, Monsanto refused to carry out replacement studies, or more sophisticated studies required by EPA. In other instances, it deviated from EPA instructions regarding responses to requests for additional, or clarifying information.

The record shows that Monsanto refused to repeat the 1983 Bio/dynamics mouse study despite repeated, formal, EPA requests for it to do so (the 1983 Bio/dynamic study replaced an invalid IBT study, and also triggered considerable controversy as described below).

In the face of Monsanto's refusal to repeat the 1983 Bio/dynamic 2-year mouse oncogenicity study to resolve disagreements between Monsanto and EPA scientists over mouse kidney tumors, EPA had two basic options. It could pursue cancellation or suspension of Roundup products, or accept Monsanto's arguments explaining why, in its view, a repeat study was not necessary. EPA chose the latter course.

The cancellation process under FIFRA is extremely resource intensive, with EPA bearing the burden of proof in showing that the risks stemming from currently labeled Roundup uses exceed the benefits to farmers and society from those uses.

In addition to EPA bearing the burden of proof, registrants have multiple opportunities to intercede in the process to challenge:
- The validity of the EPA's risk assessments, or the data such assessments rely upon;
- The EPA's quantification of the benefits arising from uses of Roundup; and
- Whether there are registered alternative herbicides that offer farmers and weed managers equal or superior efficacy and cost-effectiveness, while imposing lesser risks.

From past cancellation processes, EPA knew that it would have to show that glyphosate risks exceeded its associated benefits. But in the case of glyphosate and Roundup in the mid-1980s, EPA lacked adequate data to resolve questions over glyphosate's oncogenicity. Hence, EPA would have been unable to present a strong case that exposures to Roundup

might pose an oncogenic risk, rendering the Agency vulnerable if challenged, as it almost certainly would have been.

In my opinion, EPA decided not to pursue cancellation of glyphosate-based herbicides in the mid-1980s, because Monsanto had made clear that it would contest the action vigorously. The most likely outcome from a protracted, resource-intensive cancellation process would have been a court order enforcing EPA's request that Monsanto conduct another mouse 2-year feeding study. Monsanto would likely agree to do so, and this process would take at least three more years, during which Roundup would remain on the market.

## D.  Monsanto Adherence to FIFRA's Adverse Effects Reporting Requirement

In crafting the provisions of the modern FIFRA in the early 1970s, Congress was persuaded that even a robust, rigorous, pre-approval pesticide risk-assessment process might miss some scenarios or circumstances in which a given pesticide use leads to "unreasonable adverse effects on man or the environment." Plus, Congress knew that progress in the toxicological and risk-assessment sciences might uncover risks not previously recognized or understood.

Accordingly, FIFRA Section 6(a)(2) was added to the statute. It spells out what has come to be known as the "adverse health effects reporting requirement." EPA describes the new information that must be submitted to the EPA by registrants in its implementing regulations (40 CFR § 159.158):

(a) General. Information which is reportable under this part must be submitted if the registrant possesses or receives the information, and the information is relevant to the assessment of the risks or benefits of one or more specific pesticide registrations currently or formerly held by the registrant. Information relevant to the assessment of the risks or benefits also includes conclusion(s) or opinion(s) rendered by a person who meets any of the following:

(1) Who was employed or retained (directly or indirectly) by the registrant, and was likely to receive such information.
(2) From whom the registrant requested the opinion(s) or conclusion(s) in question.
(3) Who is a qualified expert as described in § 159.153(b).

In September, 1997, EPA published a Final Rule in the Federal Register "codifying EPA's interpretation and enforcement policy regarding section 6(a)(2)" of FIFRA, focusing on what information must be submitted under 6(a)(2), when, and how often. The Final Rule became effective as of June 16, 1998.

EPA issued on April 3, 1998 Pesticide Registration (PR) Notice 98-3, "NOTICE TO MANUFACTURERS, FORMULATORS, PRODUCVERS, DISTRIBUTORS AND REGISTRANTS OF PESTICIDE PRODUCTS." An attachment provides detailed 6(a)(2) guidance and requirements.

Section VII in the 1998 6(a)(2) guidance document addresses "Expert Opinion Information." It addresses legal responsibilities Monsanto faced in its ongoing exchange of information with EPA relative to the possible risks stemming from exposures to Roundup-brand herbicides.

Section VII begins by stating:

> "Conclusions or opinions of experts must be submitted under FIFRA 6(a)(2) if the registrant possesses the information and either 1) the information is otherwise reportable under one of the substantive provisions of the rule; or 2) the registrant knows, or should reasonably know, that the information, alone or in conjunction with other information, might raise concerns about the continued registration of a pesticide or about the appropriate terms and conditions of registration of a pesticide. As a general matter, the Agency frequently relies on the 'weight of evidence' in making pesticide regulatory decisions, and it considers expert opinion that tends to confirm or validate otherwise reportable information. In this context, expert opinions can play an important role in Agency decision-making."

The PR Notice goes on in Section VII to offer examples of such information reportable under 6(a)(2). These include "scientific opinions that test data demonstrate that a pesticide causes a particular adverse effect".

Two of many examples are discussed in this report of new information obtained by Monsanto from its consultants, inhouse research, and contract labs that would have also been new to the EPA -- Dr. Parry's 1999 genotoxicity reports, and the TNO dermal absorption rate study reports.

The new scientific information in the Parry and TNO reports was directly relevant to the EPA's evaluation of glyphosate and Roundup risks. The core findings and conclusions in these important reports, taken together, were profoundly inconsistent with the information EPA was currently relying on in estimating Roundup applicator exposure levels and associated risks. Monsanto was fully aware that the information in the Parry and TNO reports would substantially raise EPA concerns over the genotoxicity of Roundup and applicator exposure levels. The failure of Monsanto to provide the Parry and TNO reports to EPA almost certainly perpetuated applicator exposure levels several-fold higher than they would have been had EPA been provided the information.

Requiring that this sort of information be made available to EPA promptly is precisely why Congress including the 6(a)(2) provision in FIFRA.

## E.  EPA Action Targeting California's Mandatory Proposition 65 Warning

Several EPA-approved labels on glyphosate-based herbicides have included the California Proposition 65 cancer warning required by the State's Safe Drinking Water and Enforcement Act of 1986 (Proposition 65). For example, the EPA-approved label for the Ragan and

Massey, Inc. registration of Quick Acting Weed Killer Concentrate containing 18% glyphosate and 0.73% diquat dibromide includes these two statements:

>   For California:
>   **WARNING:** Cancer - www.P65Warnings.ca.gov

>   For California:
>   **WARNING:** This product can expose you to chemicals including glyphosate, which is known to the State of California to case cancer. For information go to www.P65Warnings.ca.cov

The purpose of Proposition 65 is to alert California residents of ***significant exposures*** to chemicals believed to pose risk of cancer, birth defects, or reproductive problems.
In a letter dated August 7, 2019 to registrants, the Director of the Registration Division in EPA's Office of Pesticide Programs (OPP) advised that the EPA will no longer approve GBH labels containing a Proposition 65 cancer warning label, as required in California State law.

The critical passage in the letter states:
>   "Given EPA's determination that glyphosate is 'not likely to be carcinogenic to humans,' EPA considers the Proposition 65 warning language based on the chemical glyphosate to constitute a false and misleading statement."

This OPP action is unprecedented, inappropriate, and factual misleading. Among other things, EPA fails to acknowledge that its judgement regarding glyphosate oncogenicity was driven by "typical" dietary exposures to just the pure, parent chemical glyphosate, while the California Proposition 65 listing on formulated Roundup and other GBH containers is based on concerns over applicator exposures to formulated GBHs.

By acquiescing to Monsanto pressure to undermine the California Proposition 65 process via changes in federal pesticide labeling, EPA created little more than new venues in which the debate and litigation will continue over differences in the EPA's and IARC's evaluations of the potential of glyphosate and GBHs to cause cancer.

Nothing has changed since 1991 in the EPA's evaluation of glyphosate carcinogenicity, yet the EPA felt compelled for the first time to challenge adding the Proposition 65 cancer warning on OPP-approved GBH labels in 2019.

The EPA's glyphosate carcinogenicity judgement, and the scientific analysis produced by OPP ***does not address nor encompass*** the potential of Roundup and other GBHs to enhance risk of NHL following the relatively high levels of applicator and occupational exposures that periodically occur to formulated Roundup and GBHs.

In multiple places in the discovery record -- several of which are cited in this report -- Monsanto scientists and senior executives acknowledge in internal emails that formulated

Roundup products containing POEA surfactants are markedly more toxic than pure, technical glyphosate alone.

This OPP letter to registrants asserts that EPA's penultimate glyphosate carcinogenicity report and glyphosate risk assessment concludes that Roundup and GBHs are safe at the relatively high levels of exposure experienced by farm workers and applicators. ***EPA's final glyphosate oncogenicity review does not seriously address applicator exposures, and it certainly does not state that relatively high, but expected applicator exposures pose no oncogenic risk***. (Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential," December 12, 2017)

In an August 12, 2019 response to the EPA letter, the California Office of Environmental Health Hazard Assessment ("OEHHA") announced that:

"OEHHA's listing of glyphosate as a carcinogen was unanimously upheld by the California's Fifth District Court of Appeal following legal challenges by Monsanto Company and others who opposed the listing (see Monsanto v. Office of Environmental Health Hazard Assessment (2018) 22 Cal.App.5th 534).

"OEHHA objects to US EPA's characterization of any warning concerning glyphosate's carcinogenicity as 'a false claim'. US EPA's assertion is based on its view that glyphosate is not likely to cause cancer in humans. That position conflicts with the determination made by IARC and its scientific panel, which included experts from the US National Cancer Institute, US EPA and the U.S. National Institute of Environmental Health, who carefully evaluated the extensive scientific evidence on glyphosate's carcinogenicity. It is disrespectful of the scientific process for US EPA to categorically dismiss any warnings based on IARC's determinations as false.

"Through Proposition 65, California has reduced or eliminated exposures to toxic chemicals…[Proposition 65] warnings coupled with advice on how to reduce exposures, including information posted on OEHHA's warnings website (www.p65warnings.ca.gov), contribute to lower risks of chemical exposures and greater public health protections for Californians."

# 4. Big Changes in Spray Methods, Applicator Exposures, and the Volume of Roundup Applied

When first registered, Roundup was approved for weed control on fallow land and in and around homes, businesses, roadways, pipelines, and other open spaces. Soon thereafter, registrations sanctioning applications to fields growing cotton, soybeans, corn, wheat and other small grains, and many other crops were approved.

From the late 1970s through mid-1980s, new ways to apply Roundup were approved including via aircraft, truck and ATV-mounted sprayers, and backpack and handheld sprayers. Farmers were allowed to apply Roundup via rope-wick applicators. This type of applicator works by soaking a rope with Roundup. The rope is mounted on a tool bar on the front of a tractor, and placed above the height of a growing crop, but low enough to come in contact with weeds that rise above the crop canopy.

Different methods and equipment are used to apply Roundup in and around homes, gardens, roadways and rights-of-way, industrial facilities, and other non-agricultural uses than on large-scale commercial farms. These applications are typically done using a handheld wand from which the spray solution is directed by the applicator at target weeds. Such wands could be attached via a short hose to a handheld or backpack sprayer, or to an ATV or truck-mounted sprayer.

Application methods that entail directing the spray solution from a handheld wand result in much higher exposures per unit area treated and per pound of glyphosate applied, as evident in Monsanto-commissioned studies of applicator exposures (see especially MONGLY06509236-06509257). This widely known fact is also clearly driven home in the EPA's detailed assessment of expected exposures to pesticides as a function of application method and PPE utilized. These differences are set forth in the agency's "Occupational Pesticide Handler Unit Exposure Surrogate Reference Table" (November 2016; https://www.epa.gov/sites/production/files/2016-11/documents/handler-exposure-table-2016.pdf), and highlighted in the balance of this chapter.

## A. Impacts of Handheld Spray Equipment on Applicator Exposure Levels

Sometime in 2001 or early in 2002, Monsanto commissioned a UK consulting firm to conduct a detailed study measuring applicator exposures to glyphosate under major UK-Roundup application conditions.

The results of this sophisticated field-research project are discussed in a November 7, 2002, email from Chantal Van Bellinghen, a Monsanto-Europe employee, to Richard Garnett and two other Monsanto officials responsible for Roundup-related risk assessments and regulatory affairs in Europe. The email subject line states "Glyphosate field studies summary doc; glyphosate worker exposure (field study) UK case." (MONGLY06509235; Pilliod v. Monsanto Exhibit 0026)

### 1.  UK Field Study Raises Alarm over Applicator Exposure Rates

The study focused on a number of different MON 2139 (Roundup) application methods and scenarios. These methods included tractor mounted sprayers with and without a cab, and a variety of handheld wand application methods and scenarios, with and without various combinations of PPE.

In a section setting forth UK application recommendations, the document states that applicators should "wear suitable protective gloves and face protection (face shield) when handling or applying the concentrate" and other Personal Protective Equipment (PPE) when spraying Roundup through ultra-low volume application equipment or mistblowers.

Exposures were estimated in all scenarios:
- During mixing and loading operations,
- As a result of applications, and
- Via inhalation of spray solution.

Moreover, exposure estimates were reported by application volumes and duration of spraying and exposures (typically a work day, or 6 hours of spraying).

Exposures were estimated on the applicator's hands with and without gloves, and on their trunk and legs, with and without impermeable clothing. In the case of a tractor mounted, low-volume spray application, the report estimated dermal exposure at 1,122 mg/day without gloves, and 174 mg/day with gloves -- ***a reduction greater than six-fold just from wearing gloves.***

At the bottom of the results for this application scenario, in section "E. Predicted Exposure," the report states that the "no gloves" scenario results in applicator exposures of 0.7 mg/kg/day (i.e. 0.7 milligrams of glyphosate per kilogram of the applicator's bodyweight), a level that is ***347% of the daily exposure level regarded as acceptable (0.2 mg/kg/day)***. But when gloves are worn during mixing and loading and application, estimated exposures drop to 0.12 mg/kg/day, or a level that is 60% of the allowable exposure level. The report highlights this finding "***60% AOEL ← OK!***". (MONGLY06509238; Pilliod v. Monsanto Exhibit 0026)

Scenario 4.2 models a handheld application at a low level of application and low-spray volume, assuming "Gloves at all time + waterproof jacket and trousers + rubber boots" (a high level of PPE far beyond what has ever been required on US GBH labels). Under predicted exposure ***with gloves and the other PPE listed above, exposure is still estimated to be 0.585 mg/kg/day, or 293% of the allowable level.***

Estimated applicator exposures under the above UK-application scenario would be far higher in the US, given that comparable US Roundup labels contain ***NO PPE requirements.*** While many US GBH labels require applicators to wear long pants and a long-sleeve shirt, these are clothing items, not added PPE.

The PPE-driven reduction factors in the UK-application scenario discussed above are sizable and include:

- Gloves reduce mixing and loading exposures on the hands to 5% of what they would be without gloves (i.e. a 20-fold reduction), and to 10% of what they would be during application (i.e. 10-fold); and
- Impermeable cloths on trunk and legs reduce mixing and loading exposures to 5% of what they would be without such PPE, and 5% during application (20-fold in  both cases).

## 2. Big Impact of Wind and Spray Pattern on Exposures

The UK field study also analyzed the impact of spraying with a handheld or backpack sprayer in a pattern parallel to the direction of the wind, versus perpendicular to the wind. When an applicator follows an up-and-back spray pattern that is first generally in the direction the wind is blowing and then opposite the wind, the wind blows spray solution onto the back of the applicator when walking with the wind, and onto the applicator's front when walking against the wind.

Conversely, when spraying in a pattern that is predominantly perpendicular to the prevailing wind direction, the wind tends to move the spray solution away from the applicator, as opposed to onto his or her front or back.

Tables 3 and 4 in the UK report cover backpack spray applications and reports exposure to glyphosate per hour of spraying under a variety of scenarios, including with the wind and perpendicular to the wind (speed 1.95 km/hour). Table 3 reports that spraying perpendicular to the wind reduces estimated exposures per hour by about ***35-fold*** on windy days, and by about 10-fold in the case of an RDA sprayer (a sprayer nozzle that increases droplet size to reduce drift of spray solution).

The document's section 6 "General conclusions and proposed actions" states in part: "All studies…except one… showed that contamination of legs represents the major part of exposure." In response, the authors write "Mitigation measures should be proposed to reduce this contamination (???)" And "Field studies…show[n] that the highest contamination of legs occurred when spraying parallel to the wind. ***A mitigation measure could be to recommend spraying perpendicular to the wind***." (Emphasis added) (MONGLY06509257)

A requirement that applicators spraying with handheld or backpack equipment follow a pattern perpendicular to the wind does not appear on any Roundup label I have seen, nor does even a ***suggestion*** to spray in a pattern perpendicular to the wind appear on any US Roundup labels.

In addition, the document reports significant uncertainty in the default values for the penetration of glyphosate through clothing in conjunction with PPE, compared to no PPE. Specifically, they authors state that the assumed reduction of glyphosate exposures from impermeable clothing are likely overestimated. Many field studies have shown that once

28

soaked with pesticide spray solution, multiple layers of clothing do relatively little to reduce the amount of spray solution reaching the skin.

This means that UK-regulators, and/or other regulators relying on such models to estimate worker exposures, are underestimating actual exposures stemming from mixing and loading and applying Roundup under a variety of scenarios.

### 3. EPA Estimates of the Impact of Application Equipment and PPE on Applicator Exposures are Generally Consistent with the UK Findings

The EPA has carried out and refined over several years detailed estimates of the impacts of different application equipment, with and without various combinations of PPE, on typical, expected applicator exposures. The results of EPA's simulations are reported in "Occupational Pesticide Handler Unit Exposure Surrogate Reference Table" (November 2016; https://www.epa.gov/sites/production/files/2016-11/documents/handler-exposure-table-2016.pdf).

The values are used by registrants and the EPA exposure branch to estimate the need for, and efficacy of worker-safety provisions on pesticide labels to reduce mixer-loader, applicator, and worker-exposure levels. The surrogate values are used to estimate the percent reduction in exposures expected as a result of various new label requirements for PPE, or other changes in when and how a pesticide is applied.

In the case of mixer-loader operations with liquids, dermal absorption is estimated as 37.6 ug/lb a.i. applied with gloves, and 220 ug/lb a.i. without gloves, or a 5.9-fold reduction.

When a pesticide is applied by a backpack or handheld sprayer, dermal absorption is estimated as 29,000 ug/lb a.i. without gloves, and 8,600 ug/lb a.i. with single-layer gloves, a 3.4-fold reduction. (Recall the UK analysis was based on an estimated 10-fold reduction, thought by the authors to be high).

Mixer-loader and applicator exposures with a mechanized, pressurized sprayer are estimated by EPA to be 6,050 ug/lb a.i. without gloves, 2,050 with single-layer gloves, and 1,360 with double-layer gloves.

Based on the UK-field study results, coupled with EPA's surrogate table reporting the impacts of gloves versus no gloves, I conclude that requiring gloves on home, lawn and garden, and industrial, non-agricultural Roundup labels can be expected to reduce hand exposures at least three-fold, and five-fold with some gloves. Wearing gloves and spraying perpendicular to the wind (on windy days) would reduce applicator exposures by well over 30-fold. Wearing proper gloves, impermeable clothing on legs and chemical-resistant shoes, like rubber boots, and spraying perpendicular to the wind would reduce overall exposures by 50-fold or more.

29

Labels on Roundup products sold in the U.S. since 1974 have not included a requirement to wear gloves, nor impermeable clothing and shoes during applications, nor has a requirement or guidance been added to labels to spray in a pattern perpendicular to the wind on windy days.

## B.   New Reasons and Ways to Apply Roundup on Overall Use

In 1996, Monsanto gained approval of genetically engineered soybean and cotton seed varieties resistant to Roundup -- so-called "Roundup Ready" crops. Similar approvals came for corn, sugarbeets, and alfalfa in subsequent years.

Roundup is a broad-spectrum herbicide that kills almost any plant, tree, or shrub that is actively growing. For this reason, the farm uses of Roundup were restricted to before a crop had germinated, or after the harvest of a crop. But Roundup Ready crops could be sprayed later in the season, after crop germination, controlling weeds while leaving the crop unharmed.

As a result, Roundup Ready technology triggered rapid growth in the acres treated with Roundup, and the volume applied year to year in the U.S. and globally. But Roundup Ready technology was not the only decision by Monsanto in the late 1990s and the 2000s that led to consequential changes in how Roundup could be used by farmers.

### 1.   Monsanto Brings Pre-harvest, Crop Desiccation Uses of Roundup to America

Beginning in the early 1980s in the northern U.K., Monsanto-Europe conducted research on, and won approval of labels allowing Roundup to be applied as a pre-harvest desiccant to speed up harvests of mostly small grain crops.

Farmers trying to complete their harvests of wheat, oats, and barley in the U.K., before the onset of inclement weather in the fall, began spraying their grain fields with Roundup, killing the mother plants to accelerate the drying of the grain kernels, so harvest operations could begin earlier than otherwise possible.

Such pre-harvest, "green burn down" uses of Roundup became commonplace across northern Europe beginning in the mid-1980s, and moved to the U.S. in the late 1990s. (I conducted extensive research on the history of crop-desiccation uses of Roundup while serving as an expert witness in a case involving adverse impacts caused by such uses in Idaho).

Prior to EPA approval of new labels sanctioning pre-harvest Roundup uses, Monsanto had to petition the EPA to set markedly higher glyphosate tolerances on the crops included on labels allowing pre-harvest, desiccation applications. This is because the glyphosate residues expected on the harvested foodstuffs from a crop sprayed within two weeks of harvest exceed by 20-fold or more the level of residues typically found on a crop from a field sprayed before crop germination.

## 2.   Changes in Roundup Uses Required EPA Approval of Much Higher Tolerances

In order to obtain EPA approval of Roundup Ready crops, and Roundup labels authorizing late-season, desiccation uses, Monsanto had to petition for, and EPA had to approve, much-higher tolerances in certain crops. This is why wheat, other small grain, soybean, and corn tolerances were increased 10- to 2,000-fold between 1993 and 2015, as shown in Table 4.1.

| Table 4.1. Changes in Selected U.S. EPA Glyphosate Tolerance Levels (ppm) | 1993 | 1999 | 2012 | 2015 |
|---|---|---|---|---|
| **Soybeans** | | | | |
| Grain | 20 | 20 | 20 | 40 |
| Hay | 15 | 200 | 200 | 100 |
| Forage | 15 | 100 | 100 | 100 |
| | | | | |
| **Maize** | | | | |
| Corn grain | 0.1 | 0.1 | 5 | 5 |
| Corn stover | NT | NT | 6 | 100 |
| Sweetcorn | 0.2 | 0.2 | 3.5 | 3.5 |
| | | | | |
| **Oats** | | | | |
| Grain | 0.1 | 0.1 | 0.1 | 30 |
| | | | | |
| **Wheat** | | | | |
| Grain | 0.1 | 5 | 5 | 30 |
| Straw | 0.1 | 85 | 85 | 100 |
| | | | | |
| **Edible Beans** | 0.2 | 0.2 | 5 | 5 |
| | | | | |
| **Alfalfa** | | | | |
| Dry hay | 0.2 | 200 | 200 | 400 |
| Silage | 0.2 | 75 | 75 | 400 |

Sources: 2012 and 2015 tolerances -- 40 CFR Part 180.364, "Glyphosate; tolerances for residues." 1993 tolerances --"Glyphosate Reregistration Eligibility Docment (RED)," (7508W), Office of Pesticide Programs, U.S. EPA, September 1993. 1999 tolerances -- EPA Tolerance Reassessment document for Reassessed Group 3 tolerances, August 4, 1999.

Note the 300-fold increase in the glyphosate tolerance in wheat and oat grains (0.1 ppm to 30 ppm). The increase was not nearly so large in the case of soybeans, because on February 21, 1986, Monsanto had submitted an application to OPP seeking registration of preharvest, desiccation use of glyphosate on soybeans (MONGLY03692349). The application noted a list of also-proposed changes in soybean tolerances required to cover residues in soybean

grain and hay. In addition, Monsanto acknowledged that a Section 409 food-additive tolerance in soybean hulls would be required, and proposed that it be set at 100 ppm.

But as long as EPA considered glyphosate a possible oncogen, approval of the Section 409 tolerance in soybean hulls would likely not occur. For example, in an April 18, 1985 memo to the Registration Division and Toxicology Branch from the Residue Chemistry Branch, R.W. Cook reviews a pending tolerance petition that requests increases in glyphosate plus AMPA tolerances in wheat grain and wheat straw. The memo states: "4b. TOX has concluded (W. Dykstra, 3/19/85) that food additive tolerances for glyphosate are not appropriate due to the Delaney rule." (page 4) (MONGLY00221717).

## C. Trends in the Volume of Glyphosate Use in the U.S.

Several methods and data sources are useful in tracking trends in glyphosate use. The detailed tables from my 2016 peer-reviewed paper "Trends in glyphosate herbicide use in the United States and Globally" provide the best-available data on changes in glyphosate use over time. (*ESE* Vol 28:3; DOI 10.1186/s12302-016-0070-0). The EPA has issued periodic rankings of the most heavily applied pesticides in the U.S. agricultural sector that clearly capture the explosive growth in the use of glyphosate starting in the late 1990s. Annual pesticide use data on major crops is collected and released by the U.S. Department of Agriculture. I draw on these three sources of glyphosate use data in this section.

### 1. Published Trends in Glyphosate Use in the U.S.

Table 1 from my 2016 "Trends" paper reports trends in agricultural and non-agricultural use of glyphosate-based herbicides from 1974 through 2014 (reprinted below). Of the estimated 1.4 million pounds of active ingredient applied in 1974, 800,000 pounds were applied on farms and ranches, and 600,000 for weed control outside agriculture, for a 57% to 43% ag versus non-ag split in total pounds applied.

| Table 1. Glyphosate Active Ingredient Use in the United States: 1974-2014 | 1974 | 1982 | 1990 | 1995 | 2000 | 2005 | 2010 | 2012 | 2014 |
|---|---|---|---|---|---|---|---|---|---|
| **Glyphosate Use (1,000 kg)** | 635 | 3,538 | 5,761 | 18,144 | 44,679 | 81,506 | 118,298 | 118,753 | 125,384 |
| **Agricultural** | 363 | 2,268 | 3,357 | 12,474 | 35,720 | 71,441 | 106,963 | 107,192 | 113,356 |
| **Non-Agricultural** | 272 | 1,270 | 2,404 | 5,670 | 8,958 | 10,065 | 11,335 | 11,562 | 12,029 |
| **Glyphosate Use (1,000 lb)** | 1,400 | 7,800 | 12,700 | 40,000 | 98,500 | 179,690 | 260,804 | 261,807 | 276,425 |
| **Agricultural** | 800 | 5,000 | 7,400 | 27,500 | 78,750 | 157,500 | 235,814 | 236,318 | 249,906 |
| **Non-Agricultural** | 600 | 2,800 | 5,300 | 12,500 | 19,750 | 22,190 | 24,989 | 25,489 | 26,519 |
| **Share Agricultural** | 57.1% | 64.1% | 58.3% | 68.8% | 79.9% | 87.7% | 90.4% | 90.3% | 90.4% |
| **Share Non-Agricultural** | 42.9% | 35.9% | 41.7% | 31.3% | 20.1% | 12.3% | 9.6% | 9.7% | 9.6% |

Notes: Data in thousands of kilograms or pounds of glyphosate active ingredient. From the National Agriculture Statistical Service pesticide use data and the Environmental Protection Agency pesticide industry and use reports (1995, 1997, 1999, 2001, 2007). See Supplemental Table S18 for details.

From 1974 to 2001, Monsanto's Roundup-brand herbicides were the only GBHs sold in the U.S. By1982, the total volume of glyphosate in Roundup applied had risen to 7.8 million pounds, 5.6-fold higher in 1982 than in 1974. The share accounted for by agricultural uses rose to 64% in 1982 and non-farm use fell to 36%.

Growth in the sales and volume applied continued at a slower, but still significant pace through 1990, a year when total volume applied reached 12.7 million pounds, or 1.6-fold higher than the volume applied eight years earlier in 1982. In this time period, ***non-agricultural sales and volume applied grew faster than agricultural sales and volume***, shifting the relative agricultural to non-agricultural shares to 58% and 42%.

From 1990 to 1995, agricultural sales and volume applied more than tripled and non-agricultural volume applied more than doubled. Total pounds applied of glyphosate rose to 40 million pounds, jumping 3.1-fold in just five years.

Beginning in the 1996-2000 period, the volume of Roundup applied in agricultural began its decade-long run of spectacular, unprecedented growth, as farmers rapidly adopted the Roundup Ready seed and herbicide system. As a result, overall reliance on herbicides rose, as did the total pounds of herbicides applied. The impact of Roundup Ready technology was most dramatic in the case of soybeans, the nation's number two crop by acreage planted. The dynamic data visualization (DDV) below shows how rapidly glyphosate took over the soybean herbicide market in the 12 Midwest Census Bureau states plus Arkansas.

Click anywhere on the image below to access the DDV. The horizontal axis on top is millions of pounds of herbicide active ingredient applied. The top row reports total soybean herbicide use pounds applied; the top six market leaders each year then appear, ranked by pounds applied. Note than Roundup is not among the top-six soybean herbicides at baseline in 1990, but watch what happens.

Glyphosate's share of total soybean herbicide pounds applied by year is shown in the static graph below the DDV. (DDV also accessible at: https://my.visme.co/view/rx0dxzv0-lbs-applied-1991-2020#s1).



The reason why the adoption of Roundup Ready technology increased herbicide use is clear and not in dispute – farmers who planted Roundup Ready crops switched away from many herbicides generally applied at a rate of 1.0 to 0.01 pound of active ingredient per acre. Interactive herbicide use tables done by Benbrook Consulting Services for the Heartland Health Research Alliance report the average rate of soybean herbicide applications from 1991 through 2018 (https://hh-ra.org/herbicide-use-tables/#/metrics8-12). Metric 12 reports the average rate of herbicide applications on soybeans, weighted by the share of total soybean acres sprayed with each herbicide.

In the early 1990s before RR soybean seeds hit the market, the average rate of application of soybean herbicides ranged from 0.4 pound per acre to 0.5 pound.

Peak use of glyphosate occurred in 2006 (see chart in DDV graphic above). The average soybean rate of application also peaked that year at 0.69 pound -- just below the average rate of glyphosate applications. By 2018, the average rate of soybean herbicide applications had fallen to 0.53, as farmers were forced to apply additional, but mostly lower-dose herbicides in their effort to control glyphosate-resistant weeds.

Glyphosate-based herbicides, on the other hand, were typically applied at an average rate between 0.7 to 1.5 pounds of glyphosate per acre per year. Replacing two herbicides applied at 0.4 pounds per acre, with one application of glyphosate at 1.0 pound per acre increases herbicide use, when "use" is measured by average pounds of active ingredient applied per acre (the most common metric used by EPA and the USDA).

In 2000, farmers and ranchers applied 78.8 million pounds of Roundup, an absolute increase of 51.3 million pounds, and a 2.9-fold increase from 1995. The rate of growth in non-ag sales and volume applied was much lower, rising only by about 50% over five years. The agricultural to non-agricultural split moved to 80% to 20%.

It is worth noting that *just the increase* in the volume of Roundup applied by farmers and ranchers in the five year period 1996 to 2000 -- up 51 million pounds -- exceeded the total growth in Roundup use over the 25+ years the herbicide had been on the market.

While growth in the early years of adoption of Roundup Ready seeds was unprecedented by any measure, it pales in comparison to the magnitude of growth in absolute agricultural sales and glyphosate volume applied in 2001-2005 and 2006-2010.

The last patents which prevented other pesticide companies from entering the market for GBHs lapsed in 2000, so since around 2001, it is necessary to focus on total use of GBHs, not just Roundup.

From 2001-2005, agricultural and ranch uses of GBHs doubled from 78.75 million pounds to 157.5 million pounds -- *for a five-year increase of nearly 79 million pounds*. Accordingly, the absolute growth in the volume of GBHs applied almost doubled in 2001-2005 time period, compared to previous five-year period.

The rate of growth in non-agricultural sales and volume applied stalled in the 2001-2005 period, growing only 12% from 2001 to 2005. As a result, there was another sizable shift of the agricultural/non-agricultural shares to 88% and 12%.

Rapid growth in GBH sales and volume applied persisted for five more years, through 2010. Agricultural sales and volume rose to 235.8 million pounds in 2010, an absolute increase of 78.3 million pounds, or by 50%.  The agricultural to non-agricultural shares were 90.4% to 9.6%, a split that has not changed much to this day.

Monsanto had successfully petitioned EPA to approve tolerances and labels covering most agricultural crops and uses, and most non-agricultural uses by 1982, a year when the total volume of glyphosate applied was 7.8 million. By 2014, the total volume of glyphosate applied had risen to 276 million pounds, *a 35-fold increase in 22 years*. No pesticide in history comes close to matching the sustained, upward trajectory in glyphosate sales and volume applied in the U.S. The same is true globally.

### 2. EPA Rankings of the Most Heavily Applied Pesticides

A series of reports issued by the EPA on the volume and sales of pesticides used in the U.S. provides a second data series and perspective on growth in glyphosate sales and volume applied. These EPA reports list by year and rank order (1-25) the most heavily applied pesticide active ingredients on U.S. farms and ranches (i.e. agricultural sector use), along with the EPA's best estimate of total ag volumes applied by year.

These EPA reports draw heavily on the USDA's periodic surveys of agricultural pesticide use, as I did in my 2016 "Trends" paper and in the interactive herbicide metric lookup tables on the HHRA website. Hence, it is no surprise that the EPA estimates of typical volumes of glyphosate applied by year are close to the estimates in my "Trends" paper.

The rankings were calculated by EPA every two years from 1993 through 2009, as well as in 1987 and 2012. Tables 4.2 below records the rapid rise in glyphosate-volumes applied in the agricultural sector relative to the other, widely used pesticides, and are from the EPA pesticide use reports.

Table 4.2 EPA Rankings of the Top 25 Pesticides Based on Pounds Applied

**Glyphosate's Rise to the Top – EPA Rankings of the Top Pesticides by Year in the U.S. Agricultural Sector, 1987-2001 ("Range" is in million pounds active ingredient applied) (see "Notes")**

| Active Ingredient | Type | 1987 | | 1993 | | 1995 | | 1997 | | 1999 | | 2001 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Rank | Range | Rank | Range | Rank | Range | Rank | Range | Rank | Range | Rank | Range |
| Glyphosate | H | 17 | 6-8 | 11 | 15–20 | 7 | 25–30 | 5 | 34-38 | 2 | 67-73 | 1 | 85-90 |
| Atrazine | H | 1 | 71–76 | 1 | 70–75 | 1 | 68–73 | 1 | 75-82 | 1 | 74-80 | 2 | 74-80 |
| Metam Sodium | Fum | 15 | 5-8 | 8 | 25–30 | 3 | 49–54 | 3 | 53-58 | 3 | 60-64 | 3 | 57-62 |
| Metolachlor-S | H | | | | | | | | | 12 | 16-19 | 9 | 20-24 |
| Acetochlor | H | | | | | 11 | 22–27 | 7 | 31-36 | 4 | 30-35 | 4 | 30-35 |
| Dichloropropene | Fum | 4 | 30-35 | 6 | 30–35 | 5 | 38–43 | 6 | 32-37 | 11 | 17-20 | 8 | 20-25 |
| 2,4-D | H | 5 | 29-33 | 7 | 25–30 | 6 | 31–36 | 8 | 29-33 | 6 | 28-33 | 5 | 28-33 |
| Trifluralin | H | 6 | 25-30 | 9 | 20–25 | 10 | 23–28 | 10 | 21-25 | 9 | 18-23 | 12 | 12-16 |
| Propanil | H | 13 | 7-10 | 15 | 7–12 | 15 | 7–10 | 22 | 6-8 | 18 | 7-10 | 17 | 6-9 |
| Dicamba | H | 23 | 4-6 | 16 | 6–10 | 18 | 6–10 | 16 | 7-10 | 22 | 6-8 | 24 | 5-7 |

Notes: " H" is herbicide; and, "Fum" is fumigant.  (—) indicates that the pesticide was not one of the 25 most commonly used pesticides in the given year. Data does not include sulfur and petroleum oil.

Source: Data from U.S. Environmental Protection Agency Pesticide Industry Sales and Usage Reports, accessible at https://www.epa.gov/pesticides/pesticides-industry-sales-and-usage-2006-and-2007-market-estimates

**Glyphosate Stays at the Top – EPA Rankings of the Top Pesticides by Year in the U.S. Agricultural Sector, 2001-2012**

| Active Ingredient | Type | 2001 | | 2003 | | 2005 | | 2007 | | 2009 | | 2012 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Rank | Range | Rank | Range | Rank | Range | Rank | Range | Rank | Range | Rank | Range |
| Glyphosate | H | 1 | 85-90 | 1 | 128-133 | 1 | 147-167 | 1 | 170-190 | 1 | 209-229 | 1 | 270-290 |
| Atrazine | H | 2 | 74-80 | 2 | 75-80 | 2 | 66-76 | 2 | 70-80 | 2 | 29-69 | 2 | 64-74 |
| Metam Sodium | Fum | 3 | 57-62 | 3 | 45-50 | 3 | 36-46 | 3 | 48-58 | 3 | 30-40 | 6 | 30-40 |
| Metolachlor-S | H | 9 | 20-24 | 8 | 28-33 | 5 | 25-35 | 4 | 27-37 | 6 | 24-34 | 3 | 34-44 |
| Acetochlor | H | 4 | 30-35 | 5 | 30-35 | 6 | 24-34 | 5 | 25-35 | 7 | 23-33 | 7 | 28-38 |
| Dichloropropene | Fum | 8 | 20-25 | 7 | 20-24 | 4 | 28-38 | 6 | 24-34 | 4 | 27-37 | 4 | 32-42 |
| 2,4-D | H | 5 | 28-33 | 4 | 30-35 | 7 | 21-31 | 7 | 22-32 | 5 | 24-34 | 5 | 30-40 |
| Trifluralin | H | 12 | 12-16 | 11 | 8-10 | 14 | 6-10 | 17 | 4-8 | 18 | 3-7 | 19 | 3-7 |
| Propanil | H | 17 | 6-9 | 18 | 5-7 | 18 | 3-7 | 18 | 3-7 | 17 | 3-7 | 17 | 3-7 |
| Dicamba | H | 24 | 5-7 | | | 22 | 1-5 | — | 1-5 | 25 | 1-5 | 18 | 3-7 |

Notes: " H" is herbicide; and, "Fum" is fumigant.  (—) indicates that the pesticide did not make the 25 most commonly used pesticides ranking in the given year. Data does not include sulfur and petroleum oil.

Source: Data from U.S. Environmental Protection Agency Pesticide Industry Sales and Usage Reports, accessible at https://www.epa.gov/pesticides/pesticides-industry-sales-and-usage-2006-and-2007-market-estimates

In 1987, the first year EPA issued its 1-25 most-used pesticide rankings, glyphosate ranked 17th, with an estimated 6-8 million pounds applied. The #1 pesticide was the corn herbicide atrazine, with 71-76 million ponds applied. Accordingly, there were about 10 pounds of atrazine applied in 1987 for every pound of glyphosate.

Six years later in 1993, glyphosate had risen six places in the ranking, to #11, with an estimated 15-20 million pounds applied. Atrazine remained #1, with 70-75 million pounds applied.

Glyphosate volume applied entered its rapid growth phase in the late 1990s, rising steadily to #1 by 2001, a year during which EPA estimated glyphosate's total ag volume applied at 85-90 million pounds. Atrazine fell to #2 at 74-80 million pounds.

In the next 11 years, from 2001 through 2012, glyphosate volume applied almost tripled, while atrazine's volume applied declined modestly to 64-74 million pounds.
The four-year growth in glyphosate volume applied from 2001 to 2005 was, according to EPA's accounting, about 70 million pounds. Hence, just the *growth* in glyphosate volume applied over four years roughly equaled *total* atrazine use in 2005.

In 2018, the total volume applied of glyphosate exceeded 300 million pounds. As noted above, there were about 10 pounds of atrazine applied in 1987 for every pound of glyphosate. In 2018, farmers and ranchers applied nearly five pounds of glyphosate for every pound of atrazine.

## D. Monsanto Share of the Market for Glyphosate-Based Herbicides

Monsanto was the sole U.S. and global manufacturer and source of Roundup and glyphosate-based herbicides (GBHs) from 1974 through about 2000, the year the last glyphosate patent expired (https://www.icis.com/explore/resources/news/2000/12/11/128125/us-patent-expiry-of-roundup-creates-uncertainty-in-glyphosates/).

Accordingly, I conclude that Roundup-brand sales accounted for 100% of the GBH applied over the 18 year period 1974-2000.

Monsanto was the sole company responsible for: (a) all testing of glyphosate and GBHs, (b) petitioning and obtaining nearly all glyphosate tolerances (a USDA program [IR-4] petitioned for glyphosate tolerances for some minor-acreage crops), and (c) the contents of all labels sanctioning agricultural and non-agricultural uses of Roundup.

### 1.  What Allowed Other Manufacturers to Label and Sell GBHs?

Given the rapid growth in Roundup sales from 1995-2000, several other pesticide manufacturers were eager to enter the market when the last glyphosate patent expired. They had two avenues to do so.

Competitors in the industry were free in 2001 to develop their own GBH manufacturing base and obtain their own EPA registrations. This path to the market would require a company to:

- Conduct the necessary field research needed to fine-tune formulations and determine adequate rates of application and use directions;
- Carry out all required EPA studies needed to obtain approval of a label;
- Submit the required registration applications and supporting studies to the EPA, and work with the agency through the 2-3 year process usually required to gain final EPA approval of new product labels; and
- Commence sales and building distribution and technical support capacity.

The above steps require several years to complete, and are costly. This is why pesticide manufacturers rarely choose this option as their preferred method to enter a market quickly when a widely used pesticide comes off patent.

Companies striving to enter the GBH market pursued a second, common option -- entering a licensing agreement with Monsanto. The terms of such agreements are similar across the industry, and the general structure of such agreements are set forth in provisions in FIFRA. Via such licensing agreements, Monsanto agrees to sell technical grade glyphosate at a set price per gallon or pound, along with permission to cite all of Monsanto's data submitted to EPA and use all, or most of Monsanto's already-approved label language.

Each company entering into such an agreement with Monsanto would then, in general, be responsible for developing its own formulation, and conducting the limited, Six-Pack set of short-term toxicology studies EPA requires prior to approval of any new formulation. According to the ICS report cited above, Monsanto entered into such long-term supply agreements with several major pesticide manufacturers including Cheminova, Dow Chemical, Microflo/BASF, Nufarm, and Syngenta. Several others followed in subsequent years.

In the 2000s, about seven companies went through the process of producing their own toxicological data packages, and applying to EPA for their own labels. Once completed, this process allowed them to no longer rely on Monsanto for technical grade glyphosate, nor on Monsanto's studies, testing data, and label language.

The availability of abundant supplies of technical glyphosate from China at prices markedly lower than what Monsanto was charging its licensees in the early 2000s no doubt played a role in the decision by several pesticide companies to "go it alone" by obtaining their own glyphosate registrations.

The entry into the GBH market of around six additional companies is why 14 valid two-year rat and mouse oncogenicity studies on glyphosate have been submitted to the EPA: two by Monsanto, and two more by each of six additional companies. Precise accounting of the number of companies is complicated, because of rapid industry consolidation beginning around 2001.

# 5. EPA's Evaluation of Glyphosate/Roundup Oncogenicity/ Carcinogenicity

Various terms are used to refer to the potential of a chemical to cause cancer. The term "carcinogenic risk" used in the Monograph series issued by IARC means that "an agent is capable of causing cancer."

An "oncogen" is a chemical thought to possibly increase the risk of triggering growth of benign and/or malignant tumors. A "carcinogen" is a substance thought to trigger the growth of malignant tumors. Oncogenicity is the capacity to cause or amplify growth of benign or malignant tumors, while carcinogenicity is the capacity to trigger or amplify growth of malignant tumors.

The EPA was formed in 1970 and took over pesticide regulation authority from the USDA in 1972. According to a 1994 EPA document, cancer risk to the general public from residues in food had been, at that point in the Agency's history, the most commonly cited reason for EPA to suspend or cancel the use of pesticide registrations (*Status of Pesticides in Reregistration and Special Review*, 738-R-94-008).

As of the mid-1980s, the NAS/NRC report *Regulating Pesticides in Food – The Delaney Paradox* identified about 2,500 tolerances covering residues of 53 food-use pesticides thought by EPA to pose some level of cancer risk (NAS/NRC, 1987).

As of June 1986, there were 8,477 pesticide-food tolerances in the Code of Federal regulations, so about 30% of all tolerances covered uses of possibly oncogenic pesticides (data on number of tolerances from Table 2-1, p. 35, NAS/NRC, 1987).

Congressional hearings conducted by the DORFA Subcommittee in 1981-1983 (the period I served as DORFA Staff Director) included testimony from OPP officials, the pesticide industry, other government agencies, and consumer health advocates on OPP methods and policies governing the regulation of pesticides thought to pose some risk of cancer.

## A. Impacts When EPA Classifies a Pesticide as a Possible or Probable Oncogen

In the 1980s-1990s, EPA classification of a pesticide active ingredient as a possible oncogen had three substantial consequences under FIFRA:

1. Pesticide products containing the active ingredient would have to be labeled for "restricted use" only (i.e. use only by and sale only to licensed applicators);
2. The EPA could institute cancellation proceedings and would be precluded from granting a conditional registration, thereby slowing approval of federal labels; and
3. Approval of any Section 409 tolerances required would be blocked by the Delaney Clause, also blocking approval of new labels.

### 1.   Possible Oncogens may be Labeled for "Restricted Use" Only

FIFRA sets forth a number of criteria EPA must take into account in deciding whether a pesticide label should include the requirement that only "certified applicators" can use and purchase the product. Pesticides known by EPA to pose possibly significant risks are classified as "Restricted Use" to help assure adherence to label provisions designed to reduce risks and exposure.

"Certified applicators" go through required training, periodic testing, and re-certification. They can lose their license to apply restricted use pesticide products if they are subject to an enforcement action for misapplying a restricted use product -- an obviously serious consequence for people earning their living as a pesticide applicator.
The rules governing possibly oncogenic pesticides and restricted use classification evolved through three Federal Register notices published on September 26, 1984, October 3, 1985 , and as a Final Rule on May 3, 1988.

Section 152.170 of the Code of Federal Regulations sets the final rules governing classification criteria for restricted use pesticides including in 152.170 (b)(vi):
> "When used in accordance with label directions, or widespread and commonly recognized practice, the pesticide may cause significant subchronic, chronic or delayed toxic effects on man as a result of single or multiple exposures to the product ingredients or residues."

### 2.   Triggering a Special Review and Possible Cancellation Action

FIFRA sets forth the terms, conditions, and process for a pesticide to gain new registrations, as well as the criteria, reasons and process for EPA to restrict or cancel a use or uses of an already-registered pesticides.

In the 1980s when Monsanto and EPA were intensely focused on and debating the proper cancer-risk classification of glyphosate, Section 162.11 of the Code of Federal Regulations set forth the "Criteria for Determination of Unreasonable Adverse Effects." Any pesticide active ingredient that triggered one or more such risk criteria would be subject to a "rebuttal presumption against registration."

When a risk criterion is exceeded, the EPA issues a report and notice to this effect and explains the basis for its decision. The company is then given a chance to "rebut" the basis for EPA's action. Then, in most cases, the EPA and the registrant proceed to work through and agree on label changes to curtail excessive exposures from future uses of the pesticide.

The risk criterion in Section 162.11(a)(3) states:
> "(ii) *Chronic Toxicity*. Induces oncogenic effects in experimental mammalian species or in man as a result of oral, inhalation, or dermal exposure; or induces mutagenic effects as determined by multitest evidence."

Accordingly, the 1984 determination of the OPP Toxicology Branch that glyphosate was a "possible oncogen," if sustained, would have compelled EPA to more deeply assess

glyphosate uses, exposures, and risk. It would also threaten attainment of new Roundup labels, and possibly the cancellation of some existing labels. At a minimum, it would almost certainly trigger more restrictive use provisions, coupled with combinations of mandatory PPE more effective in reducing exposures.

## B. Impact of the Delaney Clause on Pesticide Tolerance Setting

Special focus throughout the 1980s, and until passage of the Food Quality Protection Act in 1996, was directed to the conundrum faced by EPA in working through sometimes conflicting statutory standards applicable in the tolerance-setting process in the case of oncogenic pesticides. The "Delaney Paradox" arises from the then-conflicting mandates in the two statutes governing tolerance-setting.

FIFRA directs the EPA to apply a risk/benefit balancing standard in deciding whether to approve a pesticide registration, reregister an already-approved pesticide use, or cancel or suspend an existing registration.
According to the OPP –

"Before EPA may register a pesticide under FIFRA, the applicant must show, among other things, that using the pesticide according to specifications 'will not generally cause unreasonable adverse effects on the environment.' FIFRA defines the term 'unreasonable adverse effects on the environment' to mean: '(1) any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide, or (2) *a human dietary risk from residues that result from a use of a pesticide in or on any food inconsistent with the standard under section 408 of the Federal Food, Drug, and Cosmetic Act*.'" [Emphasis added]
Quote from: Summary of the Federal Insecticide, Fungicide, and Rodenticide Act, https://www.epa.gov/laws-regulations/summary-federal-insecticide-fungicide-and-rodenticide-act)

### 1. Sections 408 and 409 of the Food, Drug, and Cosmetic Act

A second federal statute establishes the authority for EPA to set tolerances -- the FDCA. Section 408 was added to the FDCA in 1954 to provide a mechanism for the Food and Drug Administration ("FDA") to control pesticide-residue levels in food.

Section 408 authorizes the establishment of tolerances in raw agricultural products at the point they would typically leave the farm gate.  Section 408 requires such tolerances be set at levels deemed necessary to: (a) cover the residues that can be expected to occur when a pesticide is used at its maximum label rate under conditions conducive to residues remaining on the harvested crop; and (b) protect public health.

Residues in excess of the applicable tolerance renders food adulterated and, hence, unlawful for sale. Responsibility for establishing tolerances under Section 408 was granted to the EPA upon formation of the agency in 1970.

Section 409 of the FDCA provides the FDA general authority to regulate food additives – "any substance the intended use of which results or may reasonably be expected to result…in its becoming a component of the food." 21 USC § 321(s) [1984].

Section 409 goes on to exempt from its provisions pesticide residues in food up to the level authorized by a Section 408 tolerance applicable to a given food-pesticide combination, recognizing that such levels are subject to control via the Section 408-governed tolerance-setting process.

However, in some cases, pesticide residues in raw agricultural commodities concentrate in processed agricultural products, or in the food ingredients derived from raw agricultural commodities. Common examples include residues in raisins, in contrast to the grapes the raisins come from (and indeed any dried food); milling wheat to produce wheat germ, bran, and flour; making tomato paste or ketchup from raw tomatoes; or, extracting oils from crops like canola, soybeans, or olives.

As in the case with Section 408, Congress granted EPA the responsibility of setting tolerances under the authority embedded in Section 409 of the FDCA. Thereafter, EPA had to determine how to comply with the provisions set forth in the FDCA's Section 409 when setting so-called "food additive" tolerances.

In 1958, Congress amended Section 409 of the FDCA to include the so-called Delaney Clause (named after its author, New York Congressman James Delaney).  The clause states that "the Secretary of the Food and Drug Administration shall not approve for use in food any chemical additive found to induce cancer in man, or, after tests, found to induce cancer in animals."

The purpose and intent of the Delaney Clause was to prevent FDA approval of ***food additives*** known, or thought to pose cancer risk. The impact on pesticide regulation was not considered as Congress crafted, debated, and passed the Delaney Clause.

In the 1970s, the EPA determined that pesticide residues in processed foods that concentrate above the level in the corresponding raw agricultural commodity must be regulated as "food additives," and hence are subject to the Delaney Clause.

In the 1980s and 1990s, EPA denied the registration of several new pesticides and/or new uses of already-registered pesticides, because OPP had classified the active ingredient as a possible or probable oncogen. The Delaney Clause in Section 409 of the FDCFA was the reason cited.

***Glyphosate was among the pesticide active ingredients that was directly impacted by the Delaney Clause from the late 1970s into the 1990s.***

The Toxicology Branch within the OPP decided that glyphosate should be classified as a possible human oncogen in 1984. This decision posed a significant economic threat to

Monsanto, as stated by Frank Serdy, Monsanto's Manager of Federal and State Regulatory Affairs in a March 13, 1985 letter to the OPP Registration Division Director, Doug Campt.

Once glyphosate was classified as a potential oncogen, most future extensions in the range of food crop uses of Roundup would likely require the establishment of food-additive tolerances to cover glyphosate residues that would be present at concentrated levels in certain fractions of grains, oilseed, and other crops. Such tolerances would have to comply with the Delaney Clause in Section 409 of the FDCA.

There were several glyphosate Section 409 tolerance petitions in the EPA pipeline throughout the 1980s, and several more would be needed to accommodate final approval of the glyphosate tolerances and Roundup labels necessary for Monsanto to commercialize its Roundup Ready seed and herbicide "technology packages."

It is important to stress at this point that the primary years of conflict between Monsanto and EPA over the oncogenic classification of glyphosate, and by far the most consequential EPA actions relative to glyphosate oncogenicity, occurred between 1984 and the end of 1991. Throughout this period, Monsanto was the sole registrant of GBHs and only company that had conducted long-term feeding and genotoxicity studies on glyphosate.

## C. Two-Year Feeding Studies Submitted to EPA in Support of Glyphosate Tolerances

From the first glyphosate-related toxicology submissions by Monsanto to EPA in 1972, through the early 2000s, the EPA had received from Monsanto:

- An invalid 2-year mouse feeding study, and an invalid 2-year rat feeding study conducted by IBT for Monsanto in the 1970s;
- The Bio/dynamic mouse replacement study, submitted to EPA in 1983 (Knezevich and Hogan);
- A 2-year rat feeding study submitted to EPA in 1981 (Lankas) that the Agency required Monsanto to repeat because the "…highest dose tested of approximately 31 mg/kg/day was not considered a maximum tolerated dose to assess the carcinogenic effects of glyphosate" (page 74, "Glyphosate Issue Paper: Evaluation of Carcinogenic potential," December 12, 2017 and June 1986 Reregistration Guidance); and
- A repeat, 2-year rat feeding study submitted to EPA nine years later, in 1990 (Stout and Ruecker).

From the first Roundup approvals in 1974 through the early 2000s, only two valid 2-year chronic feeding oncogenicity studies had been submitted to EPA (Sout and Ruecker; Knezevich and Hogan). From its initial approval in 1974 through 1990, therefore, ***Monsanto had not completed the full battery of required, valid long-tern carcinogenicity to support its dozens of Roundup uses and hundreds of glyphosate tolerances.***

As new competitors entered the market for GBH herbicides after the last glyphosate patent expired in 2000, some companies decided to sever dependence on Monsanto for their GBH products. Each company that decided to attain its own glyphosate-based herbicide

registrations, without citing and paying for use of Monsanto data, had to carry out all required toxicology studies.

Accordingly, companies other than Monsanto were responsible for the growth since 1990 in the number of 2-year feeding oncogenicity studies on glyphosate.

# 6. Bio/dynamics Mouse Oncogenicity Study Triggers a Near Decade-Long Conflict Between EPA and Monsanto

A new mouse oncogenicity study on glyphosate was among the IBT replacement studies submitted by Monsanto to OPP (EPA Accession #: 251007-014; Bio/dynamics Project No. 77-2061). It was conducted by the contract laboratory Bio/dynamics, and was submitted to EPA on July 29, 1983, five years after the EPA had informed Monsanto that such a test was required.

## A. Results of Bio/dynamics Mouse Oncogenicity Study

The study followed routine design protocols for a chronic feeding study. There were four groups of Charles River CD-1 mice: control, 1,000 ppm glyphosate technical in the animals' diet, 5,000 ppm, and 30,000 ppm. There were 50 male mice and 50 female mice in each group. Animals were observed twice daily, and mortality during the study was reported as "normal for this age and strain of mice." (MONGLY04275682)

In the section "Results" in its summary report to Monsanto, Bio/dynamics states: "No treatment-related effects were demonstrated."  In other words, the study was "negative" for oncogenicity.

But the Bio/dynamics summary report does address a number of statistically significant increases in tumors observed in the study. Table 1 in the report lists four "microscopic changes" that were elevated in the treatment groups in a statistically significant way: central lobular hepatocyte hypertrophy (elevated in male mice), central lobular hepatocyte necrosis (elevated in males), chronic interstitial nephritis (elevated in males), and proximal tubule epithelial basophilia and hypertrophy (elevated in females).

Bio/dynamics dismisses all four types of lesions noted in their Table 1 by saying "All these findings, however, were of the type and severity common to long-term mouse studies."

The report also stated:
> "The incidence of renal tubule adenomas was 0/49, 0/49, 1/50, and 3/50, in control through high-dose males, respectively. This lesion, however, was not observed in any of the female treatment groups, and, as mentioned previously, this data was not statistically different from control. ***While not observed in control animals in this study***, renal tubule adenomas have previously been observed in control male CD-1 mice of comparable age. The slightly increased incidence of adenomas in the high-dose males was considered spurious and unrelated to glyphosate administration."
> (Emphasis added; MONGLY04275683)

In the male mice, the incidence of renal tubule adenomas reported by Bio/dynamics clearly follows a statistically significant, upward trend. They would become over the next decade the most intensely studied and economically consequential four adenomas in history. They also possessed seemingly magical powers as explained below.

## B. Review of the Bio/dynamics Mouse Study

The importance of OPP's evaluation of the Bio/dynamics mouse oncogenicity study on glyphosate was widely recognized inside EPA and Monsanto, and throughout the pesticide regulatory community, especially if deemed "positive" by the agency.

Such a judgement would change the status-quo classification of glyphosate from "not classifiable as to oncogenicity" to either a "possible" or "probable" oncogen. It would have significantly altered the outcome of a number of pending and forthcoming tolerance petitions and registration applications in the U.S., and placed in jeopardy Monsanto's ability to bring Roundup Ready seed to market.

Two memoranda dated January 31, 1984 were sent from Monsanto toxicologist Lyle Gingerich to four colleagues (MONGLY04269118; MONGLY04269119-20). The first memorandum reports on a recent conservation Gingerich had with Robert Taylor, the senior official in herbicides section of the OPP Registration Division.

Taylor was responsible for managing the flow through OPP of glyphosate-Roundup herbicide tolerance petitions and registration applications. He also managed interactions between Monsanto and OPP on the fulfillment of data requirements, label changes, data compensation, and other issues that arise regarding the regulatory status of Roundup.

In the first January 31, 1984 memo, Gingerich reports on separate, face-to-face meetings on January 31, 1984 at OPP with Robert Taylor of the Registration Division and W.L. Burnam, Deputy Director of the Hazard Evaluation Division.

The Gingerich memorandum reports that Taylor told him that W.G. Dykstra of the OPP toxicology division had reviewed the new Bio/dynamics mouse oncogenicity study. The memo states: "R.J. Taylor said that he saw something in writing to indicate that when the review is sent to him it will state that Roundup is an oncogen."

The memo goes on to report that according to OPP's Taylor, various pending tolerance petitions will be denied, as a result of this change in OPP's characterization of glyphosate's oncogenic potential.

In the January 31, 1984 memorandum Gingerich reported that he intends to speak later the same day, again, with Taylor and Burnam of the toxicology branch, in order to request "W.G. Dykstra's review and [discuss] what would be an appropriate forum for Monsanto inputs."

Gingerich ends this memo to colleagues with this question: "Do you think it would be appropriate for our legal department to caution EPA on possible premature leaks of this review's conclusions prior to Dr. Kasza's [senior OPP pathologist] re-review and final disposition of the matter?"

Later in the day (January 31, 1984), Dr. Gingerich either met with, or spoke on the phone again with Burnam of the OPP toxicology branch, according to the second of two memos he sent to Monsanto colleagues. It passes along what Burnam had told him:

"A 'complete' review of the glyphosate mouse study has not been done. There has been no section or branch sign-off of W.G. Dykstra's review. The question of kidney tumors was pointed out by W.G. Dykstra and is being evaluated by either C. Chaisson or Dr. L. Kasza. W.L. Burnam asked that we send in historical control data to document the claims made in our summary. He cautioned that these be from the same laboratory and time period. He said to be sure to report the [historical control] numbers study by study, rather than as an overall average."

This second January 31, 1984 memorandum goes on to say that "R.J. Taylor continues to be concerned that Roundup actions will be held up for a few months until this is resolved." By "this," Gingerich is referring to the classification of glyphosate as a possible oncogen.

### 1. Swift and Aggressive Response by Monsanto Challenges Classification of Glyphosate as a "Possible Oncogen"

The above series of events on January 31, 1984 are remarkable. On the same day during which Monsanto first learned that OPP's evaluation of the Bio/dynamics mouse study was likely to lead to a "possible oncogen" classification, a representative of Monsanto stationed in the company's Washington D.C. office (Gingerich) had:

- At least two face-to-face meetings with senior representatives of the OPP Registration and Toxicology Divisions;
- At least two follow-up calls or meetings with these same individuals; and
- Received a substantive request from Dr. Burnam for more data on historical control rates of the tumors in question.

A little over one month later, on February 10, 1984, Hoyt Jamerson of the OPP Registration Division received a memo from William Dykstra of the Toxicology Branch ("TB") addressing the results of the recently submitted Bio/dynamics mouse study. Under "Recommendations," it states:

"Review of the mouse oncogenicity study indicates that glyphosate is oncogenic, producing renal tubule adenomas, a rare tumor, in a dose-related manor. Therefore, Toxicology Branch considers that the PP#3E2845 [a pending tolerance petition] is not toxicologically supported."

The conclusion set forth in the February 10, 1984 memo is the first written confirmation that I know of stating that OPP's TB now regarded glyphosate as a possible oncogen.

On March 20, 1984, Monsanto submitted to OPP historical control data on the incidence of renal tubule adenomas in the control groups of CD-1 mice from past studies. OPP's Burnam had instructed Monsanto to submit historical control data from the same laboratory, and roughly from the same time period study by study.

Monsanto submitted such historical control data from Bio/dynamics, as well as from two other "major" contract laboratories. (MONGLY04276057) This is one of several examples in which Monsanto did not follow instructions from EPA regarding submission of supplemental data.

The final memo codifying Dykstra's review of the mouse oncogenicity study was sent to Taylor in the Registration Division on September 4, 1984. In its "Recommendations" section, the Toxicology Division states that "1. Glyphosate was oncogenic in male mice causing renal tubule adenomas, a rare tumor, in a dose-related manner. The study is acceptable as core-minimum data. 2. A [cancer] risk assessment by Toxicology Branch is required."

On February 5, 1985 Monsanto sent the Director of the OPP Registration Division a letter advancing several arguments in support of the company's conclusion that the renal tubule adenomas in the male mice were not treatment related, nor statistically significant.

This February 5, 1985  Monsanto letter set forth six arguments in support of the company's assertion that the observed renal tubule adenomas were not treatment related:
- Tumors were only observed in male mice,
- Renal tubule adenomas were only present at the end of the study, suggesting they were caused by the age of the male mice, rather than exposure to glyphosate in the animal's feed, and only benign tumors were observed,
- Another Bio/dynamics, 2-year chronic feeding study in the same strain of mice with N-nitrosoglyphosate (NNG) produced no renal tubule adenomas in any control or treatment group,
- Glyphosate was not mutagenic in a number of genotoxicity assays, and
- A statistical argument suggesting that the dose-related increase in renal tubule adenomas in the male mice was not statistically significant.

## 2. EPA's Response to Monsanto's Criticisms of the "Possible Oncogen" Classification

Toxicology Branch (TB) scientists assessed the data and arguments in this Monsanto letter. The review was conducted by Herbert Lacayo. After his statistical analysis of the data, he concluded that "a prudent person would reject the Monsanto assumption that Glyphosate dosing has no effect on kidney tumor production" (February 26, 1984 memorandum,  Lacayo to Reto Engler).

The OPP held a cancer-assessment peer-review group meeting on February 11, 1985 attended by eight senior scientists in the TB to "evaluate and discuss the data base on Glyphosate, and in particular the potential oncogenic response of Glyphosate." The attendees reviewed the OPP assessment of the new mouse study, as well as the arguments and data submitted by Monsanto in its February 5, 1985 letter.

The attendees concurred unanimously that: "In accord with EPA proposed guidelines (FR of Nov. 23, 1984) the panel has classified Glyphosate as a Category C [possible] oncogen."

### 3.   Monsanto Takes Its Appeal to the Tox Branch Chief

On February 21, 1985, a Monsanto-requested meeting was held with the OPP tox branch attended by the TB Chief Dr. Ted Farber and then-Assistant Chief Burnam.  Gingerich, Frank Serdy, and Fred Johannsen represented of Monsanto.

A February 22, 1985 memorandum from Gingerich to Monsanto colleagues characterized the meeting mood as "relaxed, informal, and open." The memo states that Farber called the February 11, 1985 decision by OPP to classify glyphosate as a possible oncogen "an extremely close call and that EPA remains open to any new information that would make their decision easier." (MONGLY04269072)

The memo sets forth Monsanto's goals for the meeting, including:
> "(1) see if we could respond to their concerns [the renal tubule adenomas] before any unnecessary comments became a part of the Roundup permanent file. (2) determine exactly what their concerns are. (3) gauge the level of their concern."

Under the heading "Concerns of Toxicology Branch" in Gingerich's February 22, 1985 memorandum, he reports that Farber opened the meeting by describing the conclusions of the OPP toxicology branch review of the mouse oncogenicity study. Specific points noted were:
> "Oncogenic in mouse, IARC ranking 'c' [possible human carcinogen]; Company's letter [Monsanto's February 5th letter] was too weak to be convincing; Biologically significant rare tumors; Historical controls [data] not helpful; Will ask to re-section tissues, consider crystal formation, etc."

The meeting memo then states that "Dr. Farber indicated that a substantial re-look at tissues may cause the EPA pathologist [Dr. Kasza] to change his position. If no carcinomas are found the second time, our arguments about 'only benign' tumors would be stronger. *I [Gingerich] read this to mean that the EPA pathologist (Kasza) is open to persuasion.*"

Next, the memo reports on several questions raised during the meeting, and their answers. Monsanto representative FJ (Frank Johannsen) then asked OPP's Dr. Farber "…what the EPA would be likely to do if we [Monsanto] re-sectioned the slides and found no carcinomas. Dr. Farber said that it would force them to get the internal peer review group together again."

### 4.   OPP Dismisses Monsanto's Historical Control Data Argument

On February 5, 1985, Monsanto sent the Director of the OPP Registration Division a four-page letter transmitting additional information related to the Bio/dynamics chronic mouse study.

On February 26, 1985, an EPA memorandum was sent to OPP statistician Reto Engler, a senior scientist involved in the TB's review of glyphosate's oncogenicity. The memo was written by OPP statistician Herbert Lacayo, and sent through and signed off by Bertram Litt,

OPP's Statistics Team Leader. During my years working for the DORFA Subcommittee, I met several times with Dr. Engler, Bert Litt, and Bob Taylor.

The memo focused on whether the additional, mouse historical control data for kidney tumors submitted by Monsanto should alter the OPP assessment of the significance of the reported renal tubular adenomas in the Bio/dynamics study. The summary of the Lacayo statistical review of the historical control data states that "…we can conclude that Glyphosate dosing has a statistically significant effect (at the p = .006 level) in the production of kidney tumors in male mice" (i.e., highly statistically significant, since the usual cut-off for significance is p = 0.05).

A March 4, 1985 OPP memorandum on the subject "Consensus Review of Glyphosate" codified the conclusion reached by the eight Toxicology Branch, peer-review scientists, each of whom signed the consensus review document. (MONGLY04269067).  The signatories included the Chief of the TB Farber, OPP's senior pathologist Dr. Karza, who read the Bio/dynamics mouse study slides, Bertram Litt, OPP's senior statistician, and William Dykstra, author of the original OPP review of the mouse study.

The memorandum was sent to Robert Taylor in the Registration Division, and marked the end of the beginning of a protracted debate between OPP and Monsanto over the results of the Bio/dynamics mouse study.

### 5.   Monsanto Takes Its Case to the Director of the OPP Registration Division

Only two days passed before Monsanto again wrote to OPP, this time to Douglas Campt, then Director of the OPP Registration Division. The five-page March 13, 1985 letter was sent by Frank Serdy, Monsanto's Manager, Federal and State Registration Affairs.

The letter recounts the recent history of OPP's evaluation of the Bio/dynamics mouse oncogenicity study, the numerous meetings and back-and-forth involving OPP and Monsanto scientists, and asserts that the renal tubule adenomas observed in the male mice in the study are not treatment related nor statistically significant. It also restates the many Monsanto arguments advanced in support of the company's position over the past six weeks.
In closing his letter to Campt,  Serdy states that:
"As you know, glyphosate is an extremely important herbicide to agriculture in the U.S. and around the world. Monsanto is concerned that even the initiation of formal regulatory action would have serious negative economic repercussions which we believe are not justified by the scientific evidence."

In an April 3, 1985 memorandum from Dykstra to the Registration Division's Taylor, the TB's judgement regarding glyphosate's oncogenicity was stated as it had been previously: "Glyphosate was oncogenic in male mice causing renal tubule adenomas, a rare tumor, in a dose-related manner."

### 6.   Monsanto Hires Another Pathologist to Re-read the Kidney Slides

Also, on April 3, 1985, Dr. George Levinskas, a scientist in the Monsanto Department of Medicine and Environmental Health, circulated a brief update inside the company stating that:

> "Senior management at EPA is reviewing a proposal to classify glyphosate as a class 'C possible human carcinogen' because of kidney adenomas in male mice. [Private, consulting pathologist] Dr. Marvin Kuschner will review kidney sections and present his evaluation of them to EPA in an effort to persuade the agency that the observed tumors are not related to glyphosate." (MONGLY04277789)

Dr. Kuschner had not been involved with the design, conduct, or evaluation of the Bio/dynamics mouse study and had not previously reviewed the study's kidney slides.

Also, on April 3, 1985, a letter was sent by Dr. Aleksanday Knezevich, Senior V-P, Pathology at Bio/dynamics to Dr. Marvin Kuschner, the consulting pathologist hired by Monsanto (MONGLY04269049). The letter informs Dr. Kuschner:

> "The enclosed shipment is being sent to you at the request of Dr. Tim Long of Monsanto. It contains slides of kidney sections from all animals on the reference study [mouse oncogenicity study]."

In mid-May 1985, Kuschner submitted his report to Bio/dynamics and Monsanto. The company reviewed the report, and submitted it to OPP.  The report was, as predicted before Dr. Kuschner even received the slides, supportive of Monsanto's "effort to persuade the agency that the observed tumors are not related to glyphosate."

In a June 14, 1985 memo from OPP's senior statistician Rito Engler to Robert Taylor of the Registration Division,  Engler reports that after a TB peer-review process:

> "We have determined that the incidence of renal adenomas in male mice (a rare tumor) is inconsistent with the historical control incidence of this tumor. The registrant, in several letters, has refuted our statistical analysis of the data. Basically, the registrant contends that the <u>highest incidence ever observed</u> in historical controls should be used to judge the incidence in the Glyphosate study. The use of <u>any</u> historical control data in this manner is biologically as well as statistically inappropriate and misleading." (Underlining in original).

Then, Engler goes on to report that the registrant has now submitted a report "which shows that a re-reading of the kidney slides has revealed one (1) kidney tumor in the mouse control group, but no additional tumors in the treatment groups." In light of this new information, Engler writes that:

> "Given the overall uncertainty concerning the significance of the observed tumor incidence we believe a systematic reevaluation of this kidney lesion has become necessary in order to fully evaluate Glyphosate."

OPP's decision to re-section the slides created the possibility that new information would emerge supporting Dr. Kuschner's assessment of the slides. It might also change the number

of tumors in the three treatment groups in a way that eliminates the dose-related response in the frequency of renal tubule adenomas. (MONGLY00235097 at 5412)

## C. Re-sectioning of the Bio/dynamic Mouse Kidney Slides

"If the results of the kidney re-sectioning do not resolve the glyphosate issue within OPP, we will be faced with an adverse OPP decision," Gingerich to Monsanto colleagues in an August 20, 1985 memorandum. (MONGLY04268982)

Gingerich also discusses the prospect that OPP might decide to place unresolved science issues before the agency's Scientific Advisory Panel ("SAP"), especially if a deadlock emerges between the conclusions of Monsanto's and OPP's pathologists.

Gingerich goes on to ask:
> "Can we change the focus of the question to the S.A.P. to: 'Is 30,000 ppm too high [a dose] to be used in a meaningful risk assessment?'…If we assembled 10 respected toxicologists, would all ten agree that the feeding level is too high to be meaningful?"

He then suggests that the 10 toxicologists agreeing with Monsanto's position should be brought to the SAP meeting and asked to speak in support of the company's assessment of the mouse study, given "…the importance of this issue to Monsanto."

Gingerich then explains why he has suggested that all 10 toxicologists should be brought to the SAP meeting:
> "There is a tendency to *'count the votes'* at S.A.P. meetings. We can make a difference by lining up a large number of experts on our side." [Emphasis added]

Note that "our side" refers to Monsanto's stated interpretation of the kidney tumor data, and not an effort to gain deeper scientific understanding of the impact of glyphosate on kidney tumors, nor the mechanisms through which glyphosate exposures might lead to such tumors.

Eight days later, on August 28th, Serdy, the Director of Federal and State Regulatory Affairs for Monsanto, wrote a memo to his colleague Tim Long, another official working on the effort to change EPA's mind on the mouse oncogenicity study. Serdy wrote on the topic of "Additional Steps" in the effort to change EPA's assessment. (MONGLY04268980)

Serdy voices confidence that glyphosate will ultimately be shown to be not oncogenic but lays out some "additional steps" if the results of the re-sectioning of the kidneys does not change EPA's mind. First, Serdy writes:
> "We continue to feel it is important to identify and contact those outside 'experts' who we feel would testify on our behalf both to EPA and SAP that, based on the results, glyphosate is not oncogenic."

Serdy's second "additional step" is prefaced by acknowledging that "We do not have a lot of faith, presented with the same evidence, Ted Farber [senior OPP scientist in the Toxicology Branch] will want to back off and change his mind." Serdy then writes:

"Hence we feel that it is equally as important to identify and contact 'experts' in the area of statistics who would be willing to testify both to the EPA and SAP that [a tumor incidence of] 1-0-1-3 cannot be considered statistically significant."

Note that in Serdy's second point he is assuming that EPA has, or will accept Dr. Kushner's conclusion that one mouse in the male control group had a renal tubule adenoma that was not detected or reported in the original Bio/dynamics report on the study. In the absence of that one, additional adenoma in the male mice control group, the tumor incidence would have remained as originally reported, 0-0-1-3, and reflect a trend which is unambiguously dose-related and highly statistically significant, as Lacayo's February 26, 1985 memo had concluded.

Driving home the importance of these "additional steps," Serdy writes that:
"It seems imperative that we continue to do all that is possible in order to have the Agency reverse its decision. Hopefully, the testimony of several respected 'experts' will be enough to cause EPA to change their minds." [It is unclear why, but intriguing that Serdy wrote 'experts' in this memo]

The re-sectioning of the male mice kidneys, and the re-evaluation of the slides, was done by Bio/dynamics, at the request of Monsanto. The OPP pathologist Dr. Kasza had been consulted in the process of developing the procedures. R.F. McConnell, a pathologist consulting with Bio/dynamics, read both the original slides, and the slides from the re-sectioned kidneys.

The Bio/dynamics report covering the re-sectioned kidney tumors was dated September 26, 1985 and was submitted to the EPA a few days later.

The significant result in the Bio/dynamics report on the re-sectioned kidney tissues is finding one renal tubule adenoma in the control group of male mice (mouse # 1028). The report states:
"Confirmation of the diagnosis of the original renal tubular adenomas was made, including concurrence with Dr. Marvin Kushner on the presence of a lesion in the control group which represented a developing tumor. No new tumors were found in any of the [other] control or treated groups."

The report concluded: "The renal tumors observed were considered to be incidental and not toxicologically significant."

## 1. EPA Response to the Newly Identified Tumor in Control Mouse #1028

The technical response from the Tox Branch to the September 26, 1985 Bio/dynamics report was done by Dr. Kasza, OPP's senior pathologist. Dr. Kasza was the scientist who had been consulted by Bio/dynamics on the procedures to be followed in the re-sectioning of the kidneys. Kasza's December 4, 1985 memo with his findings was sent to Dykstra, the lead reviewer of the mouse study in OPP's Toxicology Branch.

The single, critical question was whether Kasza agreed with Dr. Kuschner and the Bio/dynamics pathologist Dr. McConnell that control male mouse #1028 had a renal tubule adenoma. Kasza requested and re-read the original slides for all male mice, as well as the newly re-sectioned kidney slides. He found no differences in the number of renal tubule adenomas in the treatment groups.

In reference to the tumor in control group mouse # 1028 reported by Kuschner and McConnell, Kasza wrote:

> "It is my opinion that the presence of a tumor cannot be definitely be established. My interpretation is similar to the conclusion of Bio/dynamics' pathology staff and Dr. McConnell, that the lesion 'may be' a proliferative change having the potential to lead to the development of a frank tumor. But as the tissue can be seen under the microscope as a small well-demarcated focal cell aggregate morphologically different from the healthy looking surrounding kidney tissue, this morphological alteration does not represent a pathophysiologically significant change."

Kasza's reading of the newly sectioned kidney of animal #1028 was that there was a group of cells that looked different and that might become a lesion of some sort, but the cell mass had not reached the stage justifying identification as a renal tubule adenoma, or indeed any type of tumor.

All of the EPA pathologists that had reviewed the Bio/dynamics mouse kidney slides could not see, and did not agree that there was a renal tubular adenoma in the kidney of control mouse #1028.

Each of the pathologists paid by Monsanto to assess the kidney slides concurred that there was a renal tubular adenoma in control mouse #1028, *except* for Dr. McConnell, the pathologist working for Bio/dynamics when the kidney slides from the study were fresh and initially read.

Years later, after re-reading the kidney slides, Dr. McConnell changed his mind and agreed with the other Monsanto-hired pathologists, who did see a renal tubular adenoma in control mouse #1028.

## D. The 1986 SAP Review of the Mouse Oncogenicity Study

Kasza's interpretation was accepted within EPA. As a result, the EPA and Monsanto were again dead-locked, and so OPP decided to seek assistance from its Scientific Advisory Panel (SAP) in resolving the conflict.

A January 17, 1986 Federal Register notice announced a two-day SAP meeting on February 11-12, 1986 during which the Bio/dynamics mouse study would be evaluated. Agenda item 1 read:

> "Review of a set of scientific issues related to apparent oncogenicity being considered by the Agency in connection with the preparation of a Registration Standard for glyphosate."

Monsanto sent a January 23, 1986 letter to Steven Johnson, a senior EPA official who managed the SAP. After noting that the Federal Register notice said the SAP would assess glyphosate's "apparent oncogenicity," the letter stated that:

"Monsanto firmly believes that glyphosate is not an oncogen, and we therefore do not agree with this position taken by the Agency. The Agency is in error in reaching this conclusion…"

The letter argues that the OPP determination does not follow EPA's Proposed Guidelines for Carcinogen Risk Assessment, and then adds:

"In addition to Monsanto's own evaluation, this matter has been reviewed by five independent experts. The unanimous conclusion reached by these scientists is that there is no treatment-related oncogenic effect of glyphosate in the chronic mouse study…"

Recall the August 20, 1985 Gingerich memorandum discussed above. It suggested that Monsanto recruit 10 experts to testify before the SAP, and that **"[t]here is a tendency to 'count the votes' at S.A.P. meetings**." (MONGLY04268982).

The focus of the glyphosate oncogenicity discussion during the February 11, 1986 SAP meeting was on the histopathology of the kidney slides, and in particular:

- The number of tumors in the male mouse control group;
- The appropriate statistical analysis to use, and whether the renal tubule adenoma incidence reached statistical significance; and
- The proper use of historical control data.

The two questions presented to the SAP by the EPA were:

"(1) Based on the Agency's weight of the evidence assessment with emphasis on the mouse kidney tumors, the Agency has classified Glyphosate as a class C (possible human) carcinogen. The Agency specifically requests any comment the Panel may wish to present with regard to its assessment of the weight of the evidence and subsequent determination of carcinogenicity according to the Agency's Cancer Guidelines."

"(2) The Agency requests also that the Panel consider what weight should be given to this marginal increase in kidney tumors, the importance of this type of tumor in the assessment of the carcinogenicity of Glyphosate, and the weight placed on historical and concurrent controls for this type of evaluation."

The primary presentation by EPA was done by Farber, and Monsanto's presentation was made largely by Robert Harness, Director of Environmental and Government Affairs, Long, in the company's Medical Department, and Wayne Withers.

### 1.  Monsanto Increases the "Votes" for Its Interpretation of Mouse Kidney Tumors

Monsanto brought to the SAP meeting three experts who had been involved with the study and/or the reading of the controversial kidney slides:

- Kuschner, the consulting pathologist who re-read the original mouse study kidney slides;
- McConnell, the consultant to Bio/dynamics that read the original slides, as well as the re-sectioned slides; and
- Dr. Ira Daly, the Bio/dynamics laboratory director.

Each of these individuals were given opportunities to make short presentations and participate in the Q & A with SAP members.

In addition, Monsanto announced to the SAP that they had submitted the data in question to a panel of four consulting experts (Squires, Olsen, Stemmer, Goodman), all of whom agreed with Monsanto's interpretation of the mouse oncogenicity study results. These experts were also in attendance at Monsanto's expense and participated in the Q&A.

One of the invited experts – Dr. Don Goodman – was also asked by Monsanto to represent the conclusions of a second review panel convened at the request of Monsanto by Pathco Inc, a pathology consulting group. The Pathco panel reviewing the same mouse oncogenicity data included five scientists, each also paid by Monsanto (Sourer, Anver, Stranberg, Ward, Goodman).

In his opening statement to the SAP, Harness summarizes the key conclusions reached by each of the Monsanto-invited experts, as well as the expert panel convened at Monsanto's request by Pathco Inc.

Dr. Marvin Kuschner, found an additional tumor in the male mouse #1028 in the control group, no additional tumors in the treatment group, switching the study from clearly positive to purportedly negative for renal tubule adenomas. His concluding statement, quoted by Harness, is that "I see no reason to assign carcinogenic potential to glyphosate."

Robert Squires, "In summary, I feel the weight of the evidence strongly suggests the renal adenomas in male mice were naturally occurring and not treatment related." Robert Olsen, "In summary, it is my view that these findings do not support the view that [text cut off]."

Dr. Robert McConnell, "It is and has been the opinion of this pathologist that the tumors were incidental and were not toxicologically significant." Dr. Klaus Stemmer, "The incidence of renal tubule adenomas is in all probability biologically by chance."

Pathco Inc panel (Drs. Sourer, Anver, Stranberg, Ward, and Goodman, who represented the panel at the SAP meeting), "The incidence of renal tubule cell neoplasms in this study are not compound related."

Monsanto's Dr. Timothy Long provided an overview of the back and forth over the mouse study pathology results, and then summarized Monsanto's position by stating:
> "The overall incidence [of renal tubular adenomas], therefore, remained at 1-0-1-3. These [kidney section] slides and/or supporting data have now been reviewed by a total of 10 pathologists and toxicologists and the unanimous conclusion of all the experts is that

there is no evidence of any treatment related oncogenicity."

Accordingly, the Monsanto team offering conclusions and presenting data before the SAP included 14 people (i.e. 'votes'): three from Monsanto, three individuals involved with the study, four consulting experts, and four additional experts who joined Dr. Goodman (in attendance) on the Pathco Inc panel.

A person attending this important SAP meeting might conclude, after three days of intense focus on the kidneys of control mouse #1028, that this animal had almost magical powers resulting in:

- Fooling the original pathologist that viewed the slides, Dr. McConnell, the first time he read the slides, and
- Revealing its renal tumor adenoma only to the EPA pathologists, but not to any of the pathologists working for or paid by Monsanto.

### 2.  SAP Report Recommends a Repeat Mouse Study to Resolve the Dispute

The report providing the SAP panel's answers to the two questions EPA asked the panel to address on February 11, 1986 was transmitted to the Director of OPP on February 24, 1986, and was released publicly soon thereafter. The section "Panel Response" begins by saying: "In the instance of Glyphosate, the Panel concurs that the data on renal tumors in male mice are equivocal."

The SAP report goes on to state:
> "The vast majority of the pathologists, who examined the proliferative lesion in the male control animal, agreed that the lesion represented a renal adenoma. Therefore, statistical analysis of the data should utilize this datum."

This conclusion that the "vast majority" of pathologists agreed with the Monsanto interpretation stands in contrast to a statement made by the EPA in its assessment of the differing views on whether control animal #1028 had a renal tubule adenoma.

In Dr. Faber's presentation to the SAP, he states: "we [EPA] do see an increased incidence statistically…" On the critical issue of whether there was a renal tubule adenoma in control mouse #1028, Dr. Farber's offered his accounting of the differing views: "…perhaps three pathologists saying no [tumor], perhaps four or more pathologists saying yes."

The lead person representing Monsanto at the SAP meeting was Robert Harness, Director of Environmental and Government Affairs. In his opening comments to the SAP, Harness said: "Because glyphosate is the largest selling herbicide in the world, with many registered uses, we consulted a group of scientists to advise us on the questions raised by the EPA and presented to you by Dr. Farber."

Taking into account the uncertainty and disagreement over the number of renal tubule adenomas, the use of historical controls, and the statistical methods used to judge whether the observed tumors were treatment related, the SAP's final judgement was equivocal:
> "…the Panel does not believe that it is possible to categorize Glyphosate clearly

into Group C (possible human carcinogen) or Group E (no evidence of
carcinogenicity in humans). The Panel proposes that Glyphosate be categorized as
Group D (not classified) and that there be a data call-in for further studies in rats
and/or mice to clarify unresolved questions."

## E. EPA Calls for a Replacement Mouse Study in 1986 Glyphosate Registration Standard Document

On August 11, 1986, OPP issued the glyphosate Registration Standard (RS) document setting
forth guidance to companies (i.e. Monsanto, then the sole registrant) seeking to register new
or retain existing pesticide product labels for herbicides containing glyphosate (the date on
the RS document is June 1986; it was released on August 11, 1986 ). (MONGLY00223577)

***The RS is a key historical milestone in the EPA's assessment of glyphosate uses, testing,
exposures, risks, and benefits.***

Key functions of the 1986 RS review and document were to specify required labelling
changes, warnings, and precautions that must appear on product labels; and, alert Monsanto
about the studies the company must agree to commission and submit to the agency in a
timely way in order to retain existing registrations/product labels, or win approval of new
uses/labels.

The 1986 glyphosate RS document states on page 2:
"Failure to comply with these requirements [e.g. filling data gaps, adding new worker
safety rules] may result in the issuance of a Notice of Intent to Cancel or a Notice of
Intent to Suspend (in the case of failure to submit data)."

Under the heading "Chronic Feeding/Oncogenicity Data," the glyphosate RS notes that
available studies included a 2-year mouse and rat chronic feeding studies and a 1-year dog
study. But because of limitations in study design and/or questions over the interpretation of
equivocal results, none of these studies satisfied core, OPP chronic feeding study data
requirements. Thus, 12 years after the first approval and sales of Roundup, Monsanto had
still not submitted the complete, required set of long-term oncogenicity/carcinogenicity tests.

Hence, the "Summary Science Statement" in the RS states that "Repeat oncogenic studies are
required in mice and rats." (Page 5). EPA required the company to repeat the Lankas rat
oncogenicity study (which was a repeat of the initial invalid IBT rat study) that failed to
reach the Maximum Tolerated Dose ("MTD").

### 1.   Monsanto Challenges the EPA RS Requirement for a Repeat Mouse Study

About three weeks after the public release of the glyphosate RS,  Serdy, the head of product
registrations at Monsanto, sent a memorandum to Monsanto colleagues involved in the
ongoing debate over glyphosate oncogenicity. In this August 28, 1986 memorandum, Serdy
outlines "suggestions" for Monsanto's response to the RS's data call-in for repeat mouse and
rat oncogenicity studies. (MONGLY04278162)

After describing possible Monsanto arguments to EPA challenging the need for repeat studies, Serdy writes:

> "If successful [EPA drops the requirement], this approach has the following downside: EPA's response may be: 'Fine, don't repeat either study. We will just put you into class C [a possible oncogene under EPA's classification system][.]'"

Soon after the release of the glyphosate RS document in August 1986, Monsanto communicated to EPA via several channels its disagreement with some of the actions required by EPA in the RS document.

Serdy asserts in a RS-response letter to OPP that:

> "The results of the mouse bioassay do not provide positive, or even suggestive, evidence of carcinogenicity. The most that can be said is that the results were equivocal as, in fact, the Scientific Advisory Panel stated."

In this letter, Serdy notes that the company had asked several consulting experts to testify at the SAP meeting, with their time and expenses paid for by Monsanto. The Serdy letter states that the experts "were asked to evaluate the need for a repeat study. All experts agreed that additional testing is not justified…" (page 2).

I carefully reviewed the verbatim transcript of the testimony of all the Monsanto experts brought to the SAP meeting by Monsanto. ***None of them spoke to the issue, or expressed an opinion about whether the mouse study should be repeated, as Serdy had claimed in his letter to OPP.***

### 2. EPA Calls for a Specially Designed Study in Response to Monsanto's Refusal to Conduct a Repeat Mouse Study

In accord with routine OPP procedures, Monsanto's scientific arguments and requests for waivers of RS data requirements, including a repeat mouse study, were reviewed by the relevant branches of OPP.

Monsanto had formally requested waivers for two study requirements in the RS document: (1) an LC-50 inhalation study, and (2) a repeat mouse chronic feeding/oncogenicity study.

Dykstra in the Toxicology Branch reviewed the request and Monsanto's supporting data. He prepared the TB memorandum regarding "Glyphosate – Monsanto Comments to Glyphosate Guidance Document." (MONGLY00223052). Dykstra concurred/approved waiver request (1). On request (2), he wrote:

> "TB does not concur with Monsanto regarding the waiver of the repeat mouse oncogenicity study (see discussion in review section [pages 3-6 of the memo])."

In his review of Monsanto's arguments in support of a waiver for the mouse study, Dykstra wrote:

"Regarding the need to repeat the mouse oncogenicity study with glyphosate, TB fully concurs with the conclusion and recommendation of the Scientific Advisory Panel (SAP)."

The SAP had concluded that glyphosate be classified as Group D (not classifiable as to oncogenicity) and recommended that replacement studies in mice and/or rats be carried out. He then writes:

"TB believes the oncogenic potential of glyphosate in mice still remains unresolved and that a repeat mouse study is necessary to fully and adequately assess this potential." (MONGLY00223052)

Dykstra's memorandum goes on to say that the new mouse oncogenicity study should be "specially designed" to clarify "certain unresolved questions relating to the potential oncogenicity of glyphosate."

Dykstra sets forth several specific study requirements. First, he recommended retaining the 30,000 ppm high-dose treatment rate, since survival in that group of male mice exceeded survival in the control group, and hence did not exceed the MTD. Second, he recommended that two additional treatment groups should be added to more definitively delineate whether there is a dose-response – 7,500 ppm, and 15,000 ppm. Third, there should be 200 male mice per group, to enhance statistical power.

Dykstra proposed other changes to reduce the cost of the repeat study. He stated that the study should focus only on unresolved questions from the first study, and only on male mice (cutting the number of animals in half). He also proposed a "tier approach" in the pathology examination phase of the study, focusing first on kidney and liver sections in all groups of male mice. If the "first tier" examination produces no evidence of an oncogenic response, "then additional histopathological examination will not be necessary."

Monsanto continued to resist EPA's call for a new mouse oncogenicity study and has still not redone the Bio/dynamic study nor carried out the special study requested by EPA.

In my opinion Monsanto should have conducted the special study requested by EPA. Doing so would have provided the EPA with the information it felt it needed, and would have also been a constructive, substantive step in accord with the company's stated commitment to product safety. Surely, Monsanto did not want to continue marketing a herbicide to millions of people worldwide capable of producing blood and/or kidney tumors.

I also conclude that, beginning in 1985 and running until a repeat or new mouse study was submitted, reviewed by EPA, and found to be negative, Monsanto should have added to Roundup labels an alert regarding the status of glyphosate/Roundup oncogenicity testing (e.g., "…exposures to this product may increase the risk of certain cancers…" or, at a minimum, "…the potential of this product to cause cancer has not been fully evaluated…"). Similar information should have also been conveyed in glyphosate/Roundup chemical safety data sheets and other information developed for physicians and poison control centers, as

well as other means of communication Monsanto utilized to reach customers, i.e. brochures, leaflets, advertisements.

If a new mouse oncogenicity study had reported a positive response for renal tubular adenomas, and/or other tumors, the EPA's "possible oncogen" classification would have remained in place, or might have been upgraded to "probable." Either of these two classifications would have markedly restricted the range of new Roundup Ready crop and other agricultural and non-ag weed control uses. It also would have led to the addition of new warnings, worker-safety provisions, and restrictions on many, if not most Roundup labels.

### 3.   Monsanto Persistence Pays Off

Eight years of Monsanto-EPA debate ensued over this 1983 mouse study and whether it needed to be repeated. At multiple points, Monsanto found ways to raise new scientific issues in need of exploration with OPP scientists, delaying a final OPP decision on whether the 1983 Bio/dynamics study was positive or negative for cancer.

Monsanto demonstrated both its ability and willingness to direct political pressure on the Agency. The company's influence in Congress, at senior levels in Executive Branch agencies, and in the White House made it possible for Monsanto to incrementally raise the stakes facing the OPP on one issued followed by the next. Monsanto made it clear to those closely following OPP actions on major pesticides that this cycle would go on until OPP brought its evaluation of the Bio/dynamics study into alignment with Monsanto's.

### 4.   Conclusions Regarding Monsanto's Sparse and Inadequate Oncogenicity Testing

EPA changed its interpretation of the 1983 Bio/dynamics mouse oncogenicity study in 1991, largely on account of the one additional tumor in male control mouse #1028. I conclude that the seemingly magic tumor accomplished the goal it was invented to accomplish.

Monsanto should have conducted the specially designed, repeat mouse chronic feeding study, as requested by EPA. Such a study was specially designed to resolve the issues over the renal tubular adenoma in control mouse #1028.

Had that study been conducted, and if it reported a statistically significant increase in renal tumors, the regulatory history of Roundup would have been altered.

Monsanto has never conducted a long-term oncogenicity study utilizing formulated GBHs. The absence of a single, well-designed chronic feeding oncogenicity study in mice or rats exposed to *formulated glyphosate-based herbicides*, rather than pure glyphosate technical, is the most important single gap in the existing scientific appraisal of the human-health risks stemming from use of, and exposure to Roundup and other glyphosate-based herbicides.

I conclude that Monsanto should have, and could have conducted such a study on formulated Roundup in the 1990s.

Throughout the 1990s, the scientific justification for an oncogenicity study on formulated Roundup grew markedly stronger in step with:

- Mounting internal and published evidence of glyphosate and GBH genotoxicity, and
- Epidemiological studies reporting a link between GBH use and exposures, and non-Hodgkin lymphoma.

Such a study should have been done using the original Roundup formulation, or the biggest seller in the mid-1990s.

The failure of EPA to enforce its 1986 requirement that Monsanto carry out a repeat mouse oncogenicity study, or to request an oncogenicity study using a formulated GBH, do not obviate the scientific importance and regulatory relevance of such studies.

It also does not relieve Monsanto of its obligation, as the dominant manufacturer of GHBs, to carry out such studies in the interest of assuring its formulated products are as safe as the company had been claiming since the late 1970s, and as safe as they could be. This obligation arises from Monsanto's corporate product-safety and worker-safety pledges, and commitments arising from Monsanto's agreements to abide by the FAO International Code of Conduct on Pesticide Management (formerly the International Code of Conduct on the Distribution and Use of Pesticides) and various voluntary pesticide-industry safety standards.

# 7.  Monsanto, EPA, and IARC Assessments of Glyphosate and Roundup Genotoxicity

Three primary bodies of evidence are available to determine the contribution of glyphosate and Roundup use and exposures to human cancer: two-year animal bioassays; genotoxicity studies assessing the possible mechanisms through which exposure to Roundup might trigger or promote damage to DNA and cancerous growths; and, epidemiological studies in exposed versus not-exposed (or lesser-exposed) human populations.

The first round of mutagenicity and genotoxicity studies on glyphosate were commissioned by Monsanto in the 1970s, conducted by IBT, and were found to be invalid and/or fraudulent. The second round was done in the late 1970s and 1980s, and fulfilled the then-existing OPP genotoxicity data requirements (two studies).

Evidence addressing, and conclusions reached regarding a pesticide's genotoxicity are functionally equivalent to evidence on and conclusions reached regarding a pesticide's mutagenicity.

The laboratories conducting Monsanto-sponsored, cell-assay genotoxicity studies on pure glyphosate in the 1970s through 1990s reported no evidence of mutagenic or genotoxic effects. EPA scientists generally accepted and concurred with their conclusions.

Since the early approvals of Roundup herbicides in the 1970s and through multiple re-assessments over the last 40 years, the EPA has stuck with its original determination that glyphosate technical (i.e. nearly pure, 100% glyphosate) is not genotoxic in humans via oral ingestion, at least not at levels of exposure typically expected by EPA in the food supply.

***EPA's initial absence-of-genotoxicity determination played a central role in the successful effort by Monsanto to change OPP's mind on the results of the disputed, 1983 Bio/dynamics mouse oncogenicity study.***

On multiple occasions since the 1980s, the absence of evidence of glyphosate genotoxicity had been cited by Monsanto as an important reason to discount other evidence of Roundup toxicity, including the risk of cancer. Most regulators came to accept this view.

In March 2015, the International Agency for Research on Cancer ("IARC") classified glyphosate and glyphosate-based herbicides ("GBHs") as "probable human carcinogens." In EPA's September 2015 draft assessment of glyphosate oncogenicity, the EPA classified glyphosate as "not likely to pose cancer risks."

The most striking differences in IARC's and EPA's assessment of the oncogenic potential of glyphosate and GBHs were in the area of mechanisms and genotoxic potential. The reasons I hold this opinion are described in detail in my 2019, peer-reviewed *ESE* paper "How did the US EPA and IARC reach diametrically opposed conclusions on the genotoxicity of glyphosate-based herbicides." (https://enveurope.springeropen.com/articles/10.1186/s12302-018-0184-7)

To fully elucidate the reasons why genotoxicity plays such an important role in this litigation, I compare Monsanto's internal views and understanding of glyphosate and Roundup genotoxicity to the information and positions the company communicated to the EPA and other regulators via its submissions of data, and many interventions in the regulatory process (e.g. meetings, phone calls, letters, participation in advisory groups).

Last, I review the genotoxicity-related information shared by Monsanto with the scientific community via commissioned and published papers, and with Roundup users and the general public via multiple channels.

## A. Monsanto Seeks Outside Guidance on Glyphosate/Roundup Genotoxicity

In 1999, Monsanto hired Dr. James Parry, a leading expert in genotoxicity and genotoxicity testing methods, to advise the company regarding the validity of recently published scientific papers reporting positive evidence of genotoxicity. Dr. James Parry was a professor in the School of Biological Sciences, University of Wales Swansea, in the UK.

Several published genotoxicity studies done by scientists with no connection to Monsanto had reported one or more positive assays. These included:
- Lioi et al., (1998), Genotoxicity and oxidative stress induced by pesticide exposure in bovine lymphocyte cultures in vitro, *Mutation Research* 403: 13-20);
- Lioi et al., (1998), Cytogenic damage and induction of pro-oxidant state in human lymphocytes exposed in vitro to glyphosate, vinclozolin, atrazine, and DPX-E9636, *Environ. Mol. Mutagenesis* 32: 39-46);
- Bolognesi et al (1997), Genotoxic activity of glyphosate and its technical formulation Roundup, *J. Agric Food Chem* 45: 1957-1962); and
- Clements C, Ralph S, Petras M (1997), Genotoxicity of selected herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay. *Environ Mol Mutagen* 29:277–288.

To gauge how helpful Dr. Parry might be as a "Third-Party Network" member, Monsanto gave him a short-term assignment that entailed reviewing the above recently published genotoxicity papers.

The phrase "Third-Part Network" is frequently used by Monsanto in internal communications to refer to a group of "glyphosate-friendly" consulting scientists. These individuals were typically available on short notice and could be called upon, and trusted to lend support to Monsanto's positions on scientific and regulatory matters.

Third-Party Network members were typically academic scientists with no public affiliation with Monsanto. They were hired as consultants to carry out specific tasks and deliver specific messages on Monsanto's behalf to regulatory bodies, people attending scientific meetings, journalists and editorial boards, and allied industry organizations.

1.  **Parry Report #1**

Dr. Parry's first report was sent to Mark Martens, Toxicology Director, Monsanto Europe, and dated February 11, 1999. It contained 19 conclusions based on Dr. Parry's review of published genotoxicity provided to him by Monsanto:

- Six conclusions stated that certain types of assays showed no evidence of genotoxicity;
- Another 6.5 conclusions addressed studies and/or types of assays that were positive for evidence of genotoxicity; and
- Another 6.5 were equivocal, and would need to be refined and/or repeated.

In addition to his written report, Dr. Parry provided Monsanto with a one page set of recommended, follow-up research activities to address lingering genotoxicity questions. They focused both on the genotoxicity of glyphosate and formulated Roundup. Parry addressed work needed to elucidate the mechanisms giving rise to glyphosate and GBH genotoxicity, with focus on the mechanisms possibly elevating glyphosate's oncogenic risk. (MONGLY01314264)

These initial research recommendations were expanded upon in each of Dr. Parry's subsequent two reports.

2.  **Monsanto Response to Dr. Parry's First Report**

Two Monsanto scientists shared their reviews of the Parry report with colleagues. Stephen Wratten wrote an email entitled "Comments on Parry write-up" to Mark Martens and Donna Farmer. Wratten starts by saying:
> "I was somewhat disappointed…The style and rather casual lack of completeness and preciseness would make it hard to circulate this around to anyone as supporting information."

In  early July 1999, Monsanto officials discussed internally whether to:

- Commission the new genotoxicity research studies that Parry had recommended;
- Ask someone else to interface with Parry to rough out the edges of his conclusions; or
- End the effort to cultivate Parry as a member of the Third Party Network of glyphosate friendly scientists.

3.  **Dr. Parry's Second Report**

On August 18, 1999, Dr. Parry transmitted a second, requested report to Mark Martens. It encompassed and addressed an additional set of genotoxicity studies provided to Dr. Parry by Monsanto, including multiple, confidential Monsanto regulatory studies.

Again, at the end of his report, he offered research recommendations "to clarify the remaining problem..." noted in his analysis.

4.  **Dr. Parry's Third Report**

The third and most comprehensive report by Dr. Parry was entitled "Evaluation of the potential genotoxicity of Glyphosate, Glyphosate mixtures [i.e. formulations] and component surfactants." (MONGLY01314233-01314267)

Parry's third report includes 14 tables. It was based on his review of a few dozen genotoxicity studies provided by Monsanto, both published and proprietary/unpublished.

The report was accompanied by a second document by Parry entitled "Key Issues concerning the potential genotoxicity of glyphosate, glyphosate formulations and surfactants: recommendations for future work." In this four-page document, Parry poses eight "Key Questions"; describes four "Deficiencies in the Data Set"; and, under "Actions Recommended," lists nine areas in need of further research.

Some of Dr. Parry's research recommendations addressed the need for further testing on both technical glyphosate and formulated GBHs, while others were specific to glyphosate technical, formulated GBHs, or the surfactants in GBHs.

In this third report, Parry states: "I conclude that glyphosate is a potential clastogenic in vitro." A clastogen is a mutagenic agent which induces disruption or breakage of chromosomes, leading to chromosome deletion, addition, or rearrangement. In short, clastogens damage DNA.

He was unable to draw a conclusion on the clastogenicity of formulated glyphosate-based herbicides because of a lack of studies. He also states that "glyphosate mixtures [i.e. GBHs] may be capable of inducing oxidative damage in vivo [in live animals]."

In his summary statement in the document setting forth research recommendations, Parry writes:

> "My overall view is that if the reported genotoxicity of glyphosate and glyphosate formulations can be shown to be due to the production of oxidative damage then a case could be made that any genetic damage would be thresholded. Such genetic damage would only be biologically relevant under conditions of compromised antioxidant status."

### 5.  Monsanto's Response to Dr. Parry's Reports

For many months, Monsanto continued to discuss internally Parry's recommendations for more refined genotoxicity testing.

There was a February 15, 2001 phone meeting in which Dr. Parry and two Monsanto scientists participated (Mark Martens and Richard Garnett). A Monsanto email dated 2/16/2001 (MONGLY02626548) reports that the meeting "started off in a tense atmosphere because Parry was irritated by the language used in the mutagenicity section of the Williams et al. paper." (2000 genotoxicity review paper commissioned and largely ghost-written by Monsanto). (MONGLY02626553)

The email asserts that Dr. Parry "had begun to comprehend the complexity and range of glyphosate formulations." In a section of the email entitled "Results," Monsanto states that

Parry accepted that "glyphosate is not genotoxic"; the surfactants in Roundup are causing genotoxic responses via an oxidative stress mechanism of action (as IARC concluded 14 years later), but NOT via DNA damage (the second mechanism of genotox action highlighted in Parry's three reports and by IARC); and, that "Dr. Parry no longer requested any studies on the final formulation."

It is unclear to me what Monsanto is referring to in its use of the term "final formulation." However, in my opinion, it is highly unlikely that Parry communicated to Monsanto in this February 15, 2001 call that he had changed his mind so completely, and now saw no need for further genotoxic testing of Roundup formulations, given his repeated and emphatic call for *ALL* Roundup formulations to be tested in multiple ways for genotoxic potential.

Monsanto has asserted in this litigation that the company carried out all of Dr. Parry's research recommendations, and that Parry had changed his position regarding the need for further testing of Roundup and GBH genotoxicity. Both assertions are highly suspect and incompatible with clear evidence in the record, as explained below.

In a February 12, 2001 email from Mark Martens, a Monsanto toxicologist, to his colleagues Larry Kier, Donna Farmer, and William Heydens, Martens addresses Parry's recommendation to do additional *in vitro* micronucleus assays on Roundup surfactants. First, Martens says "let's include talk about laundry detergents, hand soap, dishwashing detergents…" that contain similar surfactant chemicals.

On the prospect of another company asking Monsanto for permission to test the genotoxicity of Roundup formulations, Martens says: "I know how I would react – with serious concern."

In explaining why he would be concerned, Martens lists five arguments that could be advanced to scientists or regulators in downplaying or obscuring Roundup's genotoxicity. First, the surfactants in home cleaning products pose greater risk than the surfactants in agricultural products, including Roundup. Second, a positive study on a Roundup formulation might trigger the notion that glyphosate might also be genotoxic. Third, pure glyphosate is not genotoxic, based on data generated mostly by Monsanto. Fourth, some tests on certain formulations and surfactants have been negative (with no mention of the several assays leading to positive results).

His fifth reason is identified as a "fallback position":
> "…we can agree with some testing on either surfactant solutions (would suppliers agree with us?) or with ***glyphosate formulations which don't exist anymore on the market*** (e.g. MON 35050) [Roundup "classic"]." [Emphasis added].

Martens' acquiescence to the testing of a Roundup formulation no longer on the market is obviously defensive, and predicated on Monsanto's desire to not produce any incriminating data on a Roundup product still on the market. Martens and his colleagues were well aware of concern among European regulators over the impact of Roundup surfactants on applicator exposure and risks. The company was working systematically to downplay such risks, and did not want to pay for a study likely to elevate them.

This approach, and apparent decision criteria, governing the new science that Monsanto should carry out or support is inconsistent with the company's professed commitment to invest in science needed to understand and mitigate risks arising from use of its products.

### 6.   Monsanto's Response to Dr. Parry's Research Recommendations

Dr. Parry's final report provided 10 specific recommendations for further research to Monsanto, following his review of several published and Monsanto-commissioned genotoxicity studies.

Table 7.1 below provides an accounting of Dr. Parry's genotoxicity research recommendations. Some applied to both glyphosate technical and formulated GBHs.

The numbers of assays conducted by Monsanto in each area of research recommended by Dr. Parry are taken from Exhibit 68 ("Surfactants: Genotoxicity Studies Conducted by Monsanto") and Exhibit 82 ("Dr. Parry's Recommendations (8/19/99)") that were part of the September 27-28, 2018 deposition of Dr. Donna Farmer, a Monsanto scientist designated to address glyphosate and Roundup genotoxicity and oncogenicity issues.

**Table 7.1 Response to Genotoxicity Research Recommendations Transmitted to Monsanto by Dr. James Parry on Glyphosate Technical and Formulated Glyphosate Herbicides (see notes)**

| | Assay | Minimum Number Assays Needed for Full Response | Number Assays Conducted by Monsanto | Source of Parry Recommendation | Monsanto Studies Responsive to Parry Recommendations from Farmer "Dr. Parry's |
|---|---|---|---|---|---|
| **Tests on Glyphosate Technical** | | | | | |
| 1. Evaluate *in vitro* GLY clastogenic activity in presence/absence of antioxidants (2 forms GLY, 2 assays per [1 presence, 1 absence antioxidants]) | MN human lymphocytes | 4 | 0 | MONGLY01314265; recommendation b) | |
| 2. *In vivo* induction of oxidative damage, role of antioxidant status, level of GLY that overwhelms ability of cells to overcome oxidative stress (2 forms of GLY, 2 assays per [1 presence, 1 absence of antioxidants])* | COMET assay; MN; others? | 4 | 1 | MONGLY01314265; recommendation c) | Hotz Vol 2 MON 35050 [Farmer "Dr. Parry's Recommendations (8/18/99)"]***** |
| 3. *In vivo* bone marrow micronucleus, multiple dosing (confirm/refute Bolognesi et al (1997)] (4 forms of GLY) | Mouse liver/kidney 8-OHdG; MN freq mice, SCE human lymphocytes | 4 | 0 | MONGLY01314265; recommendation f) | |
| 4. *In vivo* mouse in liver and kidney** | COMET assay | 2 | 0 | MONGLY01314265; recommendation f) | Hotz Vol 2 MON 35050 did not include a Comet assay; it measured markers of cytotoxicity and oxidative stress. ***** |
| Subtotals | | 14 | 1 | | |
| **Tests on Formulated Herbicide and Surfactants** | | | | | |
| 5. Comprehensive *in vitro* cytogenetic data (10 formulated products)*** | MN human lymphocytes | 10 | 7 | MONGLY01314265; recommendation a) | Roy 2016(a)-(f); Dutta 2017 [from Farmer "Dr. Parry's Recommendations (8/18/99)"] |
| 6. Evaluate *in vitro* GSH clastogenic activity in presence/absence of antioxidants*** | Not specified | 10 | 0 | MONGLY01314265; recommendation b) | |
| 7. *In vivo* induction of oxidative damage, role of antioxidant status, level of GSHs that overwhelms ability of cells to overcome oxidative stress* | Not specified | 10 | 1 | MONGLY01314265; recommendation c) | Hotz Vol 2 MON 35050 [Farmer "Dr. Parry's Recommendations (8/18/99)"]***** |
| 8. *In vivo* GSH bone marrow micronucleus, multiple dosing (confirm/refute Bolognesi et al (1997)] | Mouse liver/kidney 8-OHdG; MN freq mice, SCE human lymphocytes | 10 | 17 | MONGLY01314265; recommendation d) | In "Dr. Parry's Recommendations 8/18/99," Farmer cites no MON studies conducted in response to Parry #8. However, Farmer lists 17 mouse bone marrow/reticulocyte assays under the MON response to Parry #1 and #2 which are more directly responsive to Parry #8, and hence are listed here: Marquez 1999(b),(d),(f),(g),(h),(d); Ereeson 2003 (a-h); Ereeson & Xu 2010; Xu 2008(a-b); Xu 2009(a-c); Claro 2011; Kulkarni 2014; Kulkarni 2015(b). Excludes 3 assays with glyphosate plus dicamba. |
| 9. *In vivo* mouse liver and kidney (2 assays, 10 formulations)*** | COMET assay | 20 | 0 | MONGLY01314265; recommendation f) | |
| 10. Comprehensive *in vitro* data on surfactants (5 surfactants, 2 assays per)****** | E.g. MN; SCE human lymphocytes | 10 | 1 | MONGLY01314265; recommendation i) | Marli 2000, MON 59117, chrom aberration human lymphocytes [Farmer "Dr. Parry's Recommendations (8/18/99)"] |
| Subtotals | | 70 | 26 | | |
| **Glyphosate Technical and Formulated GBHs** | Totals | 84 | 27 | | |
| | | | | | |
| **Tests Not Needed/Low Priority** | | | | | |
| 11. Sister chromatid exchange studies | | 0 | 0 | MONGLY01314265; recommendation e) | |
| 12. Transgenic point mutation | | 0 | 0 | MONGLY01314265; recommendation g) | |
| 13. DNA adduct induction | | 0 | 0 | MONGLY01314265; recommendation h) | |
| 14. Bacterial reverse mutation studies on glyphosate | | 0 | 0 | MONGLY01314242 point 1) | Exhibit #69, Farmer deposition 1/24/2019 |
| 15. Bacterial reverse mutation studies on formulations | | 0 | 37****** | | Multiple authors, Exhibit #69, Farmer deposition 1/24/2019 |
| 16. Bacterial reverse mutation studies on GBH surfactants | | 0 | 3 | | Lawlor 2000; Mecchi 2000; Farabaugh 2009, Farmer response to Parry recommendations, table re-surfactants |
| Subtotals | | 0 | 40 | | |

Notes:

* It is assumed that Parry wanted this done for both technical GLY and formulated GBHs. Monsanto (Hotz, IX) performed an *in vivo* 24-hour exposure to MON 35050 formulation in the absence of glyphosate. Mice were injected intraperitoneally. Liver enzymes and kidney function molecules were assessed. It was concluded that the mixture caused damage to the liver and kidneys, but not a genotoxic response

** One of the 6 COMET assays was done *in vivo*; one of the six COMET assays was done using a GBH. All COMET assays were positive.

*** Parry called for cytogenetic data on glyphosate formulations (plural), and for all formulations in his 8/19/1999 report, so for this and other recommendations addressing formulations, it is assumed that at least 5 formulations would be tested.

**** The degree to which these assays took into account the presence or absence of antioxidants is unknown.

***** Hotz Volume 1 was started 6/16/1999 [MONGLY00204849], before Dr. Parry transmitted his recommendations to Monsanto in late fall 1999 [transmittal date uncertain]. The assay reported in Volume 2 was begun 1/20/7000 upon signing of the protocol for the study done for [MONGLY00890213], after receipt of Parry's recommendations.

****** A few of the bacterial reverse mutation studies counted as done on a GBH may have been done on a technical glyphosate. The total number conducted is accurate.

****** In addition to one *in vitro* assay on a surfactant, Monsanto conducted two *in vivo* assays with surfactants (not addressed directly by Parry).

My overall conclusions regarding Monsanto's response to Dr. Parry's recommendations appear in the Table 7.2, and are based on the my accounting of Parry's recommendations and Monsanto's stated response to them in Table 7.1.

| Table 7.2 Number of Dr. Parry's 10 Specific Recommendations for Additional Genotoxicty Assays that were Acted Upon, Partially Acted Upo, and Not Acted Upon (see notes) | | |
|---|---|---|
| **Fully Acted Upon** | **Partially Acted Upon** | **Not Acted Upon** |
| #8** | #2** | #1 |
| | #5 | #3 |
| | #7* | #4 |
| | #10 | #6 |
| | | #9 |
| Total = 1 | Total = 4 | Total = 5 |
| **Notes:** | | |

\* Partial because Hotz Volume 1 and 2 studies did not assess impact of the presence/absence of antioxidants, and Hotz Volume 1 was started 6/16/1999 [MONGLY00204849], before Dr. Parry transmitted his recomemndations to Monsanto in late fall 1999 [transmittal date uncertain]. The assay reported in Volume 2 was begun 1/20/2000 upon signing of the protocol by the study director [MONGLY00890213], after receipt of Parry's recommendations.

\*\* Monsanto did 19 mouse bone marrow/erythrocyte MN assays on formulated products; two of the 19 tested glyphosate plus dicamba, and hence are not counted here. These 17 assays were reported by Farmer as in fulfillment of Parry recommendations a) and b); herein the 17 assays are listed as responsive to Parry recommendation #8. The difference in classification does not impact the total numbers acted upon, partially acted upon, and not acted upon.

Accordingly, in response to Parry's recommendations for additional genotoxicity testing of glyphosate technical:

- 14 assays were recommended in 4 areas (Parry recommendations 1-4),
- Monsanto conducted 1 assay in one area (Parry recommendation #2), and

- An adequate number of new assays were conducted in 0 of 4.

In response to Parry's recommendations for additional assays on formulated GBHs and GBH surfactants:

- 70 assays were needed in 6 areas (Parry recommendations 5-10), based on an average of 2 assays on 5 formulations for a given test, and 2 tests in recommendation #4 (mouse liver and mouse kidney);
- Monsanto conducted 26 of the 70 needed assays (37%), including 17 in Parry recommendation #8; and
- Zero or 1 assay was carried out in 4 of the 6 areas.

***Overall, in response to Dr. Parry's research recommendations, Monsanto carried out 27 of 84 recommended assays (32%), and 0 or 1 assay in 8 of the 10 areas of recommendations.***

In addition, Dr. Parry identified six areas of study that were not needed or low-priority. Despite Parry's recommendation, Monsanto carried out 40 assays in these low-priority areas -- considerably more assays than the company conducted in response to Parry's high-priority recommendations (27 assays).

Of the 40 assays done in low-priority areas, 37 were Bacterial reverse mutation assays. In light of the more than two-dozen negative Bacterial reverse mutation regulatory studies that had already been conducted, it is hard to explain why Monsanto did so many Bacterial reverse mutation studies. The record shows that some were requested by regulatory authorities outside the U.S., but not 37.

I conclude that Monsanto's failure to test formulated Roundup herbicides for genotoxicity, as recommended by Dr. Parry, is a primary reason why the EPA and other regulatory authorities have failed for decades to recognize the potential for glyphosate-based herbicides to increase the risk of cancer, including risk of NHL, via genotoxic mechanisms of action.

In my opinion Dr. Parry's reports contained the type of information that pesticide registrants are required to submit to the EPA under FIFRA Section 6(a)(2). This was note done in the case of ***any*** of Dr. Parry's reports.

I also conclude that upon receipt of Dr. Parry's third report, Monsanto should have updated all Roundup labels to warn applicators of Roundup's potential to damage DNA.

Last, Monsanto should have conducted the additional genotox assays recommended by Dr. Parry, not just 32% of them.

## B. EPA's and IARC's Evaluation of Glyphosate Genotoxicity

EPA's post-IARC risk assessment of glyphosate was entitled "Glyphosate Issue Paper: Evaluation of Carcinogenic Potential." The second version is dated September 12, 2016. The slightly modified final version is dated December 12, 2017. The 200-page plus report

contains the EPA's assessment of genotoxicity studies conducted on glyphosate technical, and restates the Agency's  position -- "The overall weight of evidence indicates there is no convincing evidence that glyphosate induces mutations *in vivo* via the oral route" based on current, labeled uses and typical, expected exposures.

Note that the EPA's conclusion regarding glyphosate's genotoxicity is based on the general public's typical glyphosate exposures via food, and **does not apply nor encompass** occupational, dermal, or inhalation exposures to Roundup or other GBHs.

This distinction is critical in understanding why EPA and IARC disagree regarding genotoxic risk. It also largely explains their differing classifications of glyphosate and GBH oncogenic potential.

EPA's conclusion is clearly limited to the general public, and is based on average and expected dietary exposures to glyphosate (absent surfactants). IARC's conclusion encompasses all routes of exposure, with heavy weight on studies and data reflecting the relatively high human exposures experienced by applicators of GBHs, or people living in or near areas with heavy GBH use (and hence, people exposed simultaneously to glyphosate and GBH surfactants and co-formulants).

In the September 2016 draft and its 2017 final report, the EPA explains why it's detailed assessment is **limited to genotoxicity studies on glyphosate technical** -- the Agency states it is waiting for the completion of ongoing work by the National Toxicology Program ("NTP") on formulated GBH genotoxicity prior to reaching a judgement on differences in the genotoxicity of pure, technical glyphosate, in contrast to GBHs.

### 1.  Studies Relied Upon by EPA and IARC

The IARC glyphosate Working Group highlighted "strong evidence" of genotoxicity as an important factor supporting its "probable human carcinogen" classification. This unexpected decision by IARC was announced in a March 2015 announcement. The full basis for IARC's glyphosate classification, and the genotoxicity studies reviewed by the Working Group, are described in detail in the IARC Monograph 112 volume that was initially released on July 29, 2015.

The mechanistic and genotoxicity studies and assays cited and relied upon by the EPA and IARC differ significantly, as evident in my analysis of the genotoxicity-related tables in the EPA and IARC risk-assessment documents. The data sources and methods used in my analysis are described in my published paper "How did the US EPA and IARC reach diametrically opposed conclusions on the genotoxicity of glyphosate-based herbicides." This peer-reviewed paper appeared in *Environmental Sciences Europe* (Vol. 31, January 14, 2019; https://enveurope.springeropen.com/articles/10.1186/s12302-018-0184-7).

The following discussion focuses on the genotoxicity tables in the September 2016 draft EPA report, because that is the version of EPA's glyphosate oncogenicity report that I used in my detailed EPA vs. IARC comparison, and as the basis for the tables in my published paper in *ESE*. The genotoxicity-related differences between the September, 2016 and final EPA

glyphosate oncogenicity report issued in December 2017 are minor, and do not alter any of my empirical findings or opinions.

Pages 99-125 of the 2016 EPA assessment of glyphosate's oncogenic potential discuss studies on "Gene Mutations" involving technical glyphosate. Seven tables in this section identify the specific, mostly regulatory studies on glyphosate technical that were considered by EPA, and reports whether the study presented data positive for one or more genotoxic responses, or were negative for genotoxicity.

The IARC Monograph report has a similar set of tables assessing roughly the same categories of genotoxicity studies addressed in the EPA report, plus four types of studies not considered by EPA: (1) exposed humans, (2) human cells *in vitro* - AMPA, (3) non-human mammals *in vivo* - AMPA, and (4) non-mammalian systems *in vivo* - AMPA. (AMPA is the principle metabolite of glyphosate.

Like the EPA report, the IARC Working Group identifies whether a given study or assay was positive or negative for evidence of genotoxicity. ***But unlike EPA, the IARC Working Group reviewed mostly studies in peer-reviewed journals on both glyphosate technical and formulated GBHs.***

The data in the remainder of this section are taken from tables in my "EPA vs IARC Genotox" paper or the supplemental tables posted online at the *ESE* website. IARC cited 118 genotoxicity studies (Table 2). Of these, EPA cited only 51 in its 2016 report, or about 43% of those considered by IARC. Accordingly, IARC considered 67 studies not reviewed by EPA.

The studies cited by IARC, but not EPA included several of the most important studies done in the wake of human exposures to Roundup. These are the type of studies that most scientists, the EPA, and Monsanto regard as most relevant in the evaluation of any chemical's potential to trigger DNA damage in humans.

Of the 118 studies reviewed by IARC, 54 fell in mammalian test categories, and are regarded as more relevant to assessment of glyphosate's potential to trigger human cancer through a genotoxic mechanism of action than studies in non-mammalian organisms. EPA considered 40 of these mammalian studies/assays, or 74% of the number reviewed by IARC.

Of the five studies on "Exposed Humans" reviewed by the IARC Working Group, three were regarded as positive. These studies were given little or no weight by EPA because they entailed exposures to formulated GBHs, not technical glyphosate (the focus of EPA's review).

IARC reviewed five studies classified as "Oxidative Stress Human Cells *in vitro* - Glyphosate," of which four were positive. EPA considered one of these studies (the positive Mladinic et al [2009b] study).

## 2. Results of Registrant-Commissioned Versus Peer-Reviewed Genotoxicity Studies Considered by IARC and EPA

I conducted a detailed analysis of the outcome of the glyphosate and GBH genotoxicity studies and assays conducted or commissioned by Monsanto or other registrants ("Registrant Studies"), in contrast to studies and assays carried out by scientists not working on behalf of a GBH registrant, and who published study results in peer-reviewed journals. In the tables in my paper and in this report, the number of assay results generally exceeds the number of studies, because some studies report the results of more than one assay.

All regulatory studies cited in the September 2016 EPA report, or in a Monsanto-commissioned genotoxicity review articles, were analyzed relative to "positive" or "negative" results. Likewise, all studies published in peer-reviewed journals that were cited by EPA and/or the IARC Working Group were identified and analyzed, along with whether they reported "positive" or "negative" genotoxicity results.

Genotoxicity studies/assays in the 2019 *ESE* paper were listed in the seven categories the EPA used to organize the glyphosate-technical genotoxicity studies the agency reviewed. The results of Registrant Studies in each category were compared to the results of studies published in peer-reviewed journals (public literature).

A total of 104 studies on glyphosate technical were identified. Of these, 52 were Registrant Studies and 52 were published in science journals (Table 1).

Of the 52 Registrant Studies assessing the genotoxicity of glyphosate technical, only one reported a positive result (an *in vivo* bone marrow micronucleus study), while 35 of the public-literature studies reported positive evidence of genotoxicity (67%).

In studies assessing the genotoxicity of formulated GBHs, registrants conducted 43 studies cited by the EPA and/or in a Monsanto-commissioned review article, and another 65 were published in science journals, for a total of 108.

Across the total 108 genotoxicity studies on formulated GBHs, none of the Registrant Studies reported evidence of a genotoxic response, compared to 49 (75%) of the public-literature studies.

Of the 95 assays conducted by registrants on glyphosate technical and formulated GBHs, 51 were bacterial reverse mutation studies (54%), only one of which was positive.

The EPA's pesticide testing requirements call for only one bacterial reverse mutation study on technical glyphosate (see "Table -- Toxicological Data Requirements," page 60976, Federal register, Vol. 72, No. 207, October 26, 2007), raising questions about why registrants (mostly Monsanto) conducted so many repeat studies that added little or nothing to existing scientific knowledge.

Supplemental Table 11 in the *ESE* paper reports the number of assays considered by IARC, but not by EPA, and number considered by EPA, but not IARC.
Across all categories of genotoxicity assays, IARC considered 67 assays not considered by EPA, of which 55 reported one or positive result (82%).

EPA considered 109 mostly Registrant Studies that IARC did not, of which seven reported a positive genotoxic response (6%).

### 3.   Significant Impact Evident of the Year When Studies were Completed

A review of the date when Registrant Studies were conducted, compared to when public literature studies using the same, or similar assay systems, is revealing.

In terms of *in vivo* chromosomal aberration studies on glyphosate technical, the most recent registrant study cited in EPA's September 2016 report was completed in 1994, while two of three public literature studies were done in 2012. In the case of the same type of study on formulated GBHs reported in public literature, seven of eight assays were completed in the 2005-2011 (five positive), while no such study/assays on GBHs have been carried out by registrants.

The 15 *in vivo* micronuclei assays carried out by registrants on GBHs were done during or before 2011, all negative. Five of 16 public literature studies were done from 2011 through 2013 (all positive).

In terms of glyphosate technical assays exploring DNA damage in humans, only two registrant studies were completed, one in 1978 and the other in 1982, both of which were reported as negative. The public literature contains studies reporting the results of 20 assays conducted since 2004, 18 of which reported one or more positive result.

Table 4 in my "EPA vs IARC Genotox" paper reports the results of 27 genotoxicity studies published in scientific journals since completion of IARC's glyphosate monograph and the writing of the EPA glyphosate oncogenicity report.

All 11 newer studies on glyphosate technical reported positive evidence of a genotoxic response, while 18 out of 19 studies on formulated GBHs recorded one or more positive assay result.

In my opinion, genotoxicity assays designed to detect direct damage to DNA in humans following exposure to a ***formulated GBH*** are the most important in evaluating glyphosate and GBH genotoxicity, and oncogenic potential.

In 2001, Monsanto conducted one direct DNA damage study on a GBH formulation, MON 35050. It reported no evidence of oxidative stress in liver or kidney cells. The public literature includes the results of 32 direct DNA damage assays since 2005, of which 27 report one or more positive responses.

Based on the above analysis, I conclude that the dramatic differences in the results of genotoxicity assays reported in Registrant Studies, in contrast to assays appearing in peer-reviewed journals, arise from the state-of-science when various studies were conducted, coupled with the generally more sensitive and/or relevant assay systems used by the scientists publishing their results in peer-reviewed journals. For example, independent scientists published far fewer Bacterial reverse mutation assays.

I also conclude that EPA's limited assessment of genotoxicity data on formulated GBHs, coupled with the agency's dependence on older, less sophisticated and less relevant assays explains why IARC identified "strong evidence" of genotoxicity and EPA expressed no concern over the mutagenicity of glyphosate technical following typical levels of dietary exposure.

## C. Conclusions Regarding Monsanto Efforts to Understand and Address the Genotoxicity of Roundup

In my opinion, based on the composition of formulated, glyphosate-based herbicides (GBHs) sold by Monsanto since the early 1980s, Roundup has almost certainly always been genotoxic. In 2015, the International Agency for Research on Cancer (IARC) concluded that there is "strong evidence" that GBHs are genotoxic through at least two genotoxic mechanisms known to be associated with cancer in humans.

In my opinion, the fundamental flaw in EPA's assessment of Roundup genotoxicity has been, and remains, the Agency's near-sole focus on old and outdated genotoxicity assays testing pure, glyphosate, coupled with the absence of serious EPA consideration of dozens of published and positive assay results on formulated GBHs, the herbicide products to which people are exposed.

EPA justified its approach to genotoxicity testing on the basis of a flawed assumption -- that the "inert" ingredients used in the formulation of Roundup herbicides were, indeed, inert biologically, and therefor posed no genotoxic risk in formulated GBHs. As discussed below, such assumption is flawed.

## 8. Roundup Surfactants, Differential Toxicity and Monsanto Initiatives to Reduce Applicator Exposures and Risk

Human health and environmental risks from pesticide applications can arise from three general categories of ingredients, or components, which are combined in a commercial pesticide product:

- The active ingredient itself,
- The so-called "inert ingredients" added to certain end-use products (e.g., surfactants and adjuvants), and
- Any impurities in the active or inert ingredients that are formed during manufacturing processes, or as a result of a chemical reaction that occurs between the time the pesticide is made and/or mixed at a chemical plant and applied by a user.

"Inert ingredients" are added to liquid, end-use pesticide products like Roundup to assure that the active ingredient (glyphosate):

- Remains thoroughly mixed and stable,
- Is compatible with other pesticides or liquid fertilizers that might be combined in a tank-mix and applied via a single pass through a field or over a treated area, and
- Adheres to, and penetrates into whatever weeds or unwanted vegetation the herbicide is sprayed on.

Herbicide adjuvants and surfactants are regarded as "inert ingredients" by EPA because, in general, they do not contribute directly to the capacity of the herbicide to kill or control weeds. But several inert ingredients, by themselves, pose toxicological and/or environmental risks, and hence are not "inert."

In addition, several herbicide surfactants, including most of those used in formulating Roundup-brand herbicides since the 1970s, alter the environmental fate and toxicological risk profile of GBHs, compared to glyphosate technical. They do so by ***altering in significant ways each component of the ADME of glyphosate*** (**A**bsorption, **D**istribution, **M**etabolism, and **E**xcretion).

In the case of formulated Roundup, surfactants increase herbicide efficacy by enhancing the movement of the glyphosate in formulated Roundup through the plant epidermis, and into the plant where the glyphosate molecule is protected from rainfall and sunlight.

There are two major categories of inert ingredients. Surfactants are added to formulated herbicides to "interfere with proper membrane function" (MONGLY01700591), such as keeping foreign chemicals, viruses, and bacteria out of cells.

Such differences can be important to regulators, applicators, and public health in cases where the inert ingredients in a pesticide alter the toxicity profile of the formulated pesticide product. This can happen in several different ways.

77

The primary surfactants used for years in Roundup formulations fall within the family of polyoxyethylene-alkylamines (POEA). According to Monsanto, a POEA surfactant was generally present in a 3:1 ratio of glyphosate to POEA in the early years of commercial use in the U.S., with the concentration of POEA falling to ratios around 7:1 in many Roundup brands since ~2000. (MONGLY01700591)

Roundup original (MON 2139) contained 41% of the IPA salt of glyphosate and 15.4% of MON 0818, a tallowamine POEA surfactant, for a ratio of 2.7:1. Roundup Weathermax contained 49% of the potassium salt of glyphosate and 10% of MON 56151 surfactant (tallowamine/cocoamine blend), for a ratio of 4.9:1 (Terry Kaempfe Powerpont , February 16, 2009). However, some Roundup brands have nearly equal concentrations of glyphosate technical and surfactants, and a few more surfactant than glyphosate (e.g. Roundup Weed & Grass Killer RTU Plus: 2% IPA glyphosate, 4% surfactants) .

A Monsanto Powerpoint includes a slide "Tallowamine (POEA) Containing Products." After noting other uses of the surfactants in many Roundup brands, the slide states: ***"Surfactants are not biologically 'inert', they can be toxic and this must be addressed."*** (MONGLY06521465)

Another slide in the same presentation is entitled "Roundup is safe" states that "Surfactants in Roundup herbicides are unlikely to produce significant adverse effects to humans or animals ***under normal conditions of exposure***" (emphasis added). (MONGLY06521467)

The presentation does not further explain what "normal conditions of exposure" are, but the implication is that unusual exposure episodes might produce "significant adverse effects to humans."

## A. Heightened Toxicity Caused by the Surfactants in Formulated Roundup

The distinction between the risks associated with 100% pure active ingredients (i.e., glyphosate), in contrast to formulated products, is critical from the perspective of the accuracy of pesticide mixer-loader and applicator risk assessments.

Almost all of the testing required by the EPA has been on technical glyphosate, including all of the long-term animal oncogenicity tests.  Hence, most EPA and Monsanto judgements and claims relative to the oncogenicity of Roundup, are based on tests conducted with pure glyphosate, an herbicide which no one has ever applied for terrestrial weed control. (A few Roundup brands are restricted to aquatic weed control and contain no surfactant).

In the case of pure glyphosate versus formulated Roundup, the risks posed by the latter are greater than the former for three primary reasons:
- The inert ingredients in Roundup (including their impurities) are generally more acutely toxic than glyphosate itself,
- Roundup inert ingredients increase the amount of glyphosate moving through the skin when applicators are exposed, and

- The POEA surfactants in Roundup increase the amount of glyphosate reaching and penetrating cell walls in exposed mammals, and hence increase the risk of DNA-damage in exposed human populations.

A paper in *The Lancet* appeared in 1988 (Sawada, et al., Probable toxicity of surface-active agent in commercial herbicide containing glyphosate, *The Lancet*, 1(8580): 299) in which the authors attributed acute, glyphosate-herbicide poisoning symptoms among several Japanese patients to the "inert ingredient" surfactant POEA in formulated Roundup, and not the active ingredient (glyphosate). The Japanese team reported that the acute lethal dose (i.e., LD-50) of POEA in animal studies is one-third that of glyphosate, which explains why the LD-50 of glyphosate active ingredient is higher (less toxic) than the LD-50 of Roundup herbicides formulated with POEA.

This article in *The Lancet* triggered attention by independent scientists to the possible human health impacts of the inert ingredients in Roundup herbicides.  Damage to red blood cells was among the adverse mammalian impacts of POEA noted by the Japanese scientists.
Inert ingredients in formulated pesticide products can also, themselves, contain toxic impurities and contaminants. While pure glyphosate contains the nitrosamine-impurity NNG, the POEA surfactant in formulated Roundup products contains 1,4-dioxane.

A U.S. National Cancer Institute bioassay of 1,4-dioxane found that the chemical causes hepatocellular adenomas and carcinomas in the kidneys of rats (https://ntp.niehs.nih.gov/ntp/htdocs/lt_rpts/tr080.pdf).  In 1982, the International Agency for Research on Cancer classified 1,4-dioxane as a possible human carcinogen (IARC, IARC monographs on the evaluation of the carcinogenic risk of chemicals in humans. Supplement 4, WHO, 1982).  An EPA report from 1986 listed 1,4-dioxane as a probable human carcinogen.

## B. European Regulators Press Monsanto to Better Characterize and Reduce Risks Arising from the Surfactants in Roundup

The Italian Pesticide Committee, a European regulatory body, held a meeting in July 1999, on the regulation of Roundup. It decided that new genotoxicity studies on both glyphosate and formulated Roundup would be required to assess genotoxicity and DNA repair , following OECD Guideline 486 (1998).

Monsanto employee Gabrielle Fontana forwarded the news regarding this new genotoxicity study requirement to senior Monsanto scientists including Mark Martens, William Heydens, Donna Farmer, Larry Kier, and William Graham in a July 29, 1999 email. (MONGLY00877684)

In response, Martens said that the OECD 486 test "is not an unreasonable request but suggest some liver toxicity along with it to explain bumpy responses at the high dose. This test has also been requested by the French for MON 4660 and there ***the risk is greater because of extreme liver toxicity***." (MONGLY0877684) It would be interesting to know how Martens

knew this, why it was true, and whether Monsanto had informed regulators of this difference (very unlikely).

A few hours later, William Heydens adds to the email chain:

"I don't think an in vivo UDS [the OECD 486 test] is reasonable for glyphosate…Now, formulations are obviously another issue…liver toxicity with formulations could be a confounding factor, and we would have to design and conduct the study very carefully (using our alachlor & acetochlor experience) if we are ultimately forced to do it." (MONGLY00877684)

Two days later, Donna Farmer adds to this email chain, and writes:

"Sorry I am weighing in on this late…It is too premature to discuss conducting any studies. I will not support any studies on glyphosate formulations or other surfactants at this time…" (MONGLY00877684)

Despite numerous studies published in peer-reviewed journals beginning in the late 1980s pointing to the heightened toxicity of Roundup formulations compared to pure glyphosate, Monsanto has never conducted the studies needed to assess these concerns.

Moreover, Monsanto has never conducted a long-term animal carcinogenicity study on a GBH formulation, or a POEA surfactant used in formulated Roundup brands sold in the U.S.

## 1. Monsanto Agrees to Phase Out POEA Surfactants in All Roundup Brands Sold in Europe

European regulators pushed Monsanto to conduct new and better studies on the differences in glyphosate versus Roundup genotoxicity, and did so with increasing determination from 2000 through Monsanto's decision around 2012 to phase out all POEAs in Roundup-brand herbicides sold in Europe.

Importantly, in this period as part of the European reregistration of GBHs, EU regulators were also asking Monsanto for better data to assess how the POEA surfactants in Roundup were impacting the rate at which the glyphosate in formulated Roundup moves through the skin of applicators, especially those people using handheld or backpack sprayers.

Most of the Monsanto-commissioned studies on dermal absorption rates available to regulators in Europe and the U.S. were done in the 1980s, and tested only pure glyphosate technical. By the mid-2000s, several papers had been published in peer-reviewed journals reporting that the POEA surfactants in Roundup likely accounted for the greater genotoxicity of Roundup versus technical glyphosate, and likely because POEA surfactants increase passage of glyphosate through the cell membranes.

So, the concern of EU regulators was well grounded. Afterall, the surfactants in Roundup are added to accelerate movement through the epidermis of plant leaves. Might they do the same when formulated Roundup falls on human skin?

In a January 30, 2010 email, William Heydens stated that Monsanto continues to defend POEA surfactants because of concern over a "domino effect" on the closely related etheramine surfactants, which Monsanto-Europe was beginning to use in place of POEAs in the hope of appeasing the concerns raised by European regulators. (MONGLY02062439)

Heydens was responding to a January 25, 2010 email from his Europe-based colleague Richard Garnett on the question of whether to phase out known, high-risk POEA surfactants. After discussing some new studies underway on an alternative surfactant, Garnett wrote:

> "***Anyway, there are non-hazardous formulations so why sell a hazardous one***?" (emphasis added; MONGLY02062440)

Other documents point to possible explanations. First, the global supply of the safer surfactant that Monsanto-Europe was switching to was inadequate to meet Monsanto's needs if the company switched to it in all U.S. formulations. Second, it was about 25% more expensive.

In a June 8, 2010 email regarding Roundup formulations containing POEA surfactants in Argentina, William Heydens wrote to Monsanto colleagues in Argentina:

> "So I would think that a backup plan of reducing POEA content is not sufficient, but rather a POEA-free formulation (or formulations) would be necessary to totally protect your business in Argentina." (MONGLY02013061)

A slide addresses the business impact of the loss of POEA surfactants in a Powerpoint prepared for "Regulatory Leadership Meetings" in November 2010. "Germany is major concern" noting that "restrictions on POEA uses pre-harvest had significant negative impact on sales in 2010." (MONGLY02721133)

The "Strategy in Germany" included three core elements:
- Defend POEAs;
- Register non-POEA formulations; and
- "Managed exit from POEA" to "Avoid a ban"; "Focus: voluntary non-renewal of registrations (e.g. MON 14420 and 2012)", resulting in "***No sales [in Europe] of any POEA products after 2012***" [Emphasis added]. (MONGLY02721133)

The discovery record shows that Monsanto-Europe did phase out all POEA surfactants in Roundup-brand herbicides sold on the continent -- both for non-agricultural and agricultural uses -- between 2012 and 2014. As noted above, Garnett characterized this shift as from hazardous formulations to non-hazardous alternatives.

A comparable shift away from high-risk POEA surfactants has still not been undertaken in the Roundup brand herbicides sold in the U.S.

### 2. Evidence of Endocrine Disruption Adds New Pressure on Monsanto-Europe to Phase out High-Risk Surfactants

Around year 2000, the European Commission put in place a new set of testing guidelines to assess the degree to which formulated pesticides have the potential to disrupt the functioning of the endocrine system. Such chemicals are generally referred to as "endocrine disruptors," and have been linked to a number of developmental problems, impaired immune responses, and chronic diseases.

The U.S. Congress directed the EPA to assess the potential of pesticides to disrupt the endocrine system in a provision included in the 1996 Food Quality Protection Act. Monsanto employees in Europe reported to headquarters in April 2002 that European regulators were working on development of a list of possible endocrine disrupting pesticides, and that some new assays might be required on glyphosate and/or formulated Roundup herbicides.

In response to this news, William Heydens sends an email at 7:20 a.m. on April 25, 2002 to Donna Farmer. In it, he suggests a call to "…to see if there is anything more we should be doing besides the usual 'pay no attention to the man behind the curtain'." He ends this email by saying "…this damn endocrine crap just doesn't go away, does it."

Farmer replies to Heydens at 8:19 a.m. and writes that the "interest[ing] point is that published tests of glyphosate-related endocrine disruption show that pure glyphosate has no effect, but **formulated product (i.e. Roundup) does**" [Emphasis added]. (MONGLY00885551)

In response to Farmer, Heydens responds at 10:47 a.m. the same day. He reports that after discussions with other Monsanto experts, they "…concluded, not surprisingly, that we are in pretty good shape with glyphosate but **vulnerable with surfactants**" (Emphasis added).

In my opinion, Monsanto should have conducted the new genotoxicity studies on formulated GBHs that were recommended by Parry in 1999, and later sought by European regulators in 2002.

Monsanto's failure to probe the differences in the genotoxicity of pure glyphosate versus formulated Roundup perpetuated two myths: (1) Roundup and other glyphosate-based herbicides are not genotoxic, and (2) there is no need for more accurate data on applicator and worker exposure levels, nor are any additional worker-safety requirements warranted, like wear gloves when applying Roundup.

Monsanto replaced its high-risk POEA surfactants in Europe predominately with propoxylated quaternary ammonium surfactants (Dodigen 4022). Multiple genotoxicity studies have been conducted and published in recent years comparing the genotoxicity of POEA-based Roundup versus quaternary ammine-Roundup.

With co-authors Michael Antonio and Robin Mesnage, I published a paper entitled "Insight into the confusion over surfactant co-formulants in glyphosate-based herbicides" in the peer-reviewed journal *Food and Chemical Toxicology* (Vol 128, June 2019, pages 137-145).

The paper cites studies reporting that POEA-based Roundup is 10 to 1,000 times  more genotoxic than quaternary ammine-Roundup in a variety of human and animal cell assays (e.g. "Tests on human cells found that MON 52276 [Roundup with a quaternary ammine surfactant] was 50-times less cytotoxic than the etheramine-based formulation Roundup GT plus.")

In my opinion, Monsanto's decision to reformulate its Roundup-brand herbicides in Europe to make them safer, but not in the U.S., is inconsistent with the company's pledge to always put product safety first, especially in the case of non-agricultural Roundup products applied with a hand wand.

I also conclude this decision is inconsistent with Monsanto's pledges and obligations to pursue all feasible steps to reduce exposures to its pesticide products. Both obligations are articulated in the FAO International Code of Conduct on Pesticide Management, and would seem operational imperatives in light of Monsanto's pledge that product safety is "job #1."

### 9. Monsanto Failures to Adequately Estimate Applicator Exposures and Risk and Refusal to Augment Worker-Protection Provisions as Called for in the 1986 EPA Registration Standard

Applicator and worker exposures receive scant attention in the 216 page final report on glyphosate oncogenicity issued by EPA on December 12, 2017. (https://www.regulations.gov/document?D=EPA-HQ-OPP-2009-0361-0073)

One-half of one paragraph appears on page 15 addressing, in general, applicator and worker exposures. The EPA than states "The agency considers all of the anticipated exposure pathways as part of their evaluation for human health."

Yet there are no sections in the report devoted to worker and applicator exposures "pathways," nor analysis of the generally far-higher levels of exposure experienced by applicators via dermal absorption, as compared to typical, everyday exposures for most Americans via the food supply.

***This is why the EPA's final judgement regarding Roundup carcinogenicity applies only to the carcinogenicity of glyphosate, and furthermore, only in the case of "typical" dietary exposures to the general public.***

The EPA's final conclusion relative to the genotoxicity of glyphosate is clear and explicit in excluding worker and applicator exposures to Roundup. The EPA states:
> "The overall weight of evidence indicates there is no convincing evidence that glyphosate induces mutations *in vivo* via the oral route."

The inability of EPA to accurately estimate worker and applicator exposures to Roundup arose in the 1980s and has been sustained to this day by Monsanto's failure to provide credible data to EPA on the rate of dermal (skin) penetration of formulated Roundup.

In a 2009 internal Powerpoint, David Saltmiras, a senior Monsanto toxicologist, includes a slide entitled "Dermal Absorption -- Operator Systemic Exposure and Risk Assessment." In it, Saltmiras writes that:
- "Exposure assessment will impact politically (and scientifically) driven use restrictions in the EU";
- "Operator Exposure is dependent on dermal absorption";
- "Syngenta [registrant of a competing GBH called Touchdown]: 0.1 - 0.3% dermal absorption based on *in vitro* human skin study"; and
- "Monsanto: 3% dermal absorption based on older non-GLP data".

Saltmiras then goes on to state that the multi-company glyphosate Toxicology Working Group (Monsanto, Syngenta, Cheminova) will undertake the same dermal absorption studies conducted by Syngenta, at the same lab (DTL) used by Syngenta.

The private contract lab DTL was started by a scientist who had previously conducted dermal absorption studies in-house for Syngenta. The accuracy of the DTL in vitro human skin

dermal absorption methodology has been addressed in detail in the expert reports and testimony of plaintiff's toxicology expert Dr. William Sawyer. In short, Dr. Sawyer regards the DTL methodology as seriously flawed in ways that markedly underestimate the true rate of dermal absorption.

In the course of the in-depth regulatory review of Roundup uses and risks undertaken by European pesticide regulators in the 2000s, Monsanto was required to update and refine the studies supporting the then current glyphosate dermal absorption rate of 3%. This "default" 3% value has been the basis of both U.S. EPA and European worker-exposure estimates for about four decades.

Monsanto recognized new studies would be required on glyphosate and Roundup dermal absorption rates in order to satisfy European regulators that the true glyphosate dermal absorption rate in the case of Roundup was comparable to the 0.1% to 0.3% rate Syngenta had secured for its Touchdown formulation of glyphosate (i.e. a rate 10-fold to 30-fold *lower* than the current, default vale, 3%). The events triggered by this recognition are notable and highly relevant in the context of this litigation.

## A. Monsanto Terminates TNO Study, Which Showed Elevated Rates of Dermal Absorption

The rate of dermal absorption is a key variable in estimating applicator exposure and risk. Low dermal-absorption rates, other things being equal, will result in less worrisome warning symbols on labels, less strict limits on use, and/or fewer requirements for personal protective equipment for those mixing, loading, or applying Roundup.

EPA had incorporated a default 3% dermal penetration rate (also called an "absorption rate") for glyphosate in its estimates of applicator exposures and risk in both the Agency's 1986 glyphosate Registration Standard and its 1993 EPA Re-registration Eligibility Document (RED) for glyphosate.

An email exchange in April 2002 between Monsanto employees in Europe working on the new data required by German regulators and senior Monsanto personnel in St. Louis (Heydens, Healy, Farmer, Martens, Wratten, among others) reported that Monsanto-Europe had agreed to conduct a new *in vitro* dermal penetration study with rat and human skin.

Monsanto commissioned TNO to conduct these new studies using the same methods the Dutch company had used in earlier, Monsanto-supported dermal penetration studies. The results of the rat skin portion of TNO study were initially reported to a Monsanto scientist stationed in Belgium (Fabrice Broeckaert) via a phone call from TNO, and were later transmitted in a 22-page "unaudited draft report" dated June 14, 2002. (MONGLY00888353-0088388)

The "Draft report" stated that the dermal absorption rate for the glyphosate in the concentrate of the formulated Roundup herbicide (MON 35012) through rat skin is 10.3%, plus or minus 4.2%, resulting in a range of 6.1% to 14.5% after 48 hours of recovery.

TNO also tested the same MON 35012 formulation at a field-concentration rate that delivered a glyphosate dose of 0.08 mg/cm$^2$ during the experiment, as opposed to the 6.25 mg/cm$^2$ in the case of the concentrate (i.e., a 78-fold dilution rate). In the case of the field-diluted rate of MON 35012, the unaudited draft report reported that 2.6% +/- 1.4% of the glyphosate applied to the rat skin penetrated through it (range 1.2% to 4%).

TNO also measured rat skin penetration of pure glyphosate in a MON 0139 70% solution (70% glyphosate, 30% water), both as a concentrate and diluted 79-fold. For the pure glyphosate concentrate, 1.3% +/- 1.9% penetrated the skin, and 1.4% +/- 2.2% in the case of the diluted, pure glyphosate test substance.

Based on these initial TNO study results, the percent of glyphosate penetrating the rat skin was 7.9-times higher in the case of the formulated product out of the bottle, compared to the concentrate of pure active ingredient.

According to Garnett, the large difference between the dermal absorption rate of formulated Roundup (mid-range estimate, 10.3%) compared to pure glyphosate (mid-range estimate, 1.3%), "**confirm our expectation that surfactant concentration affects dermal absorption**." (Emphasis added)

In an April 2, 2002 email from William Heydens to his colleague Charles Healy about the "new issues and topics for the conf call of Tuesday, 2 April," Heydens wrote:
   "My primary concern is with glyphosate in terms of the potential for this [TNO] work **to blow Roundup risk evaluations** (getting a much higher dermal penetration than we've ever seen before." (emphasis added; MONGLY03738295)

Heydens concern that the TNO study might "blow Roundup risk evaluations" arose from the fact that an increase in the Roundup dermal absorption rate incorporated in mixer-loader risk assessments from 3% to 10%, as seemingly called for in this TNO study, would dramatically increase estimated exposures and risks.

Broeckaert reports to the group in an April 4, 2002 email that, as a result of the TNO results, "we came to the conclusion that the penetration of glyphosate would have been [probably] greater than the 3% already imposed by the German authorities. We decided thus to STOP the study (effective today)." (Emphasis in original; MONGLY03737015)

Donna Farmer replied to this email later the same day, asking for clarification, leading to an email the next day from Richard Garnett, the Monsanto scientist directly involved with the scope and focus of TNO's ongoing work on dermal absorption.

Garnett wrote in his April 5, 2002 email to Farmer, and all others on the April 2 email chain, "We dropped the programme for glyphosate **because a further study was not likely to help us meet the project objective**...", which was to make the case for reducing glyphosate's dermal absorption rate below the 3% rate used by the EPA and other regulators.

In other words, they stopped the TNO study because they did not like the data it had already generated.

But even after deciding to terminate the TNO study, Monsanto faced another quandary -- whether to submit the TNO report to the EPA under FIFRA Sec. 6(a)(2). As noted above, this provision in FIFRA requires registrants to submit factual information concerning possible unreasonable adverse effects of a pesticide at any time that it becomes aware of such information, including interim or preliminary results of studies. This obligation also includes discontinued studies as spelled out in 40 CFR 159.167.

Monsanto decided that it would not submit the TNO draft report to the EPA, but realized it might be called upon at some point in the future to justify this decision, given that it is seemingly inconsistent with EPAs clear requirement that even preliminary data and draft reports be submitted when meeting the other criteria laid out in Section 6(a)(2).

A series of calls and in-person meetings with TNO unfolded over the next two years. Some irregularities and unexpected data were discovered in certain aspects of the TNO study that TNO addressed in a revised study report. In this second report provided to Monsanto, the core and most important findings addressed above were repeated, with one small mathematical correction.

Receipt of this second TNO report triggered more calls, emails, and meetings in which Monsanto pressed its contention with senor TNO personnel and the lab director that the TNO study was so flawed that it was not reliable for regulatory purposes.

TNO submitted a third and final report to Monsanto that included a signed declaration by the TNO lab director that the study was not appropriate for regulatory purposes because of deficiencies in some aspects of the study. Yet, this third version of the TNO report repeated unchanged the core, empirical findings in the first two reports. I conclude that in the judgement of TNO, these core findings were not called into question by the deficiencies that had been identified in other aspects of the study.

In my opinion, Monsanto prematurely terminated the TNO study because the company recognized it would not "help us meet the project objective [reducing estimates of applicator exposure]." In fact, the results would likely have led to higher estimates of dermal absorption and more restrictions on applicator exposures.

I conclude from the detailed accounting of the TNO episode in the discovery record that Monsanto strong-armed TNO to label its work as so seriously flawed as to be inappropriate for regulatory purposes. If that was truly the case, TNO would not have repeated its core finding in its third report unchanged from the second report.

I also conclude that the way Monsanto "managed" the TNO study is a stark indicator of the company's willingness to manipulate science to achieve its regulatory goals. It is also a chilling example of Monsanto's apparent lack of concern over the health and safety of those applying Roundup.

## B. Worker-Safety Provisions Required in the 1986 Glyphosate RS

The EPA Glyphosate Registration Standard (RS) issued in 1986 was the agency's first updated and thorough review of the uses, toxicology data, data gaps, risks, benefits, and labeling of Roundup-brand herbicides (the only glyphosate-based herbicide brand on the market at the time).

The RS specified several new worker-safety provisions that must appear on all Roundup product labels in channels of commerce as of June 30, 1988, except for dilute lawn and garden products (i.e. products with less than 10% glyphosate; most had around 2%).

Section D, Part 4 of the glyphosate RS states that "Worker Safety Rules must appear on end-use products containing glyphosate except for those labeled for homeowner use only." (page 28). The EPA required several highly effective worker-safety provisions on glyphosate products including:

> "HANDLE THE CONCENTRATE ONLY WHEN WEARING THE FOLLOWING PROTECTIVE CLOTHING AND EQUIPMENT."

> "Wear goggles or a face shield, chemical resistant gloves, chemical resistant apron, chemical resistant shoes, shoe coverings, or boots."

> "WEAR THE FOLLOWING PROTECTIVE CLOTHING DURING APPLICATION, EQUIPMENT REPAIR, CLEANING, DISPOSAL OF THE SPRAY SOLUTION, AND DURING REENTRY TO TREATED AREAS BEFORE THE SPRAY HAS DRIED."

> "Wear goggles or a face shield, chemical-resistant gloves and chemical-resistant shoes, or boots. A helmet with visor may be worn during open cockpit aerial application."

> "IMPORTANT! Before removing gloves, wash them with soap and water. Always wash hands, face and arms with soap and water before smoking, eating, drinking, or toileting."

> "AFTER WORK, wash protective clothing and equipment with soap and water after each use. Personal clothing worn during use should be laundered separately from household articles. Clothing or protective equipment heavily contaminated or drenched with glyphosate must be disposed of in accordance with State and local regulations."

> "HEAVILY CONTAMINATED OR DRENCHED CLOTHING CANNOT BE ADEQUATELY DECONTAMINATED." (Page 29, glyphosate RS)

### 1.  Monsanto's Response to the New RS Worker-Safety Provisions

A series of Monsanto objections to the worker-safety provisions in the RS on glyphosate were sent to EPA in a letter dated November 7, 1986.

A February 9, 1987 letter to the Director of the OPP Registration Division amplified the reasons why Monsanto felt the new worker-protection provisions in the 1986 RS were unjustified. The February 9, 1987 letter also transmitted to OPP a new contact-dermatitis study done by a University of California scientist.

OPP's review of the February 1987 letter, the actions it requested, and the newly-submitted dermatitis study was conducted by Curt Kunchick, a scientist in OPP's Exposure Assessment Branch. His June 18, 1987 review notes that the focus of Monsanto's arguments is contact dermatitis and the newly submitted dermatitis study, while OPP's principal concerns were eye and skin irritation (MONGLY00241308)

There are three attachments included with Kunchick's June 18, 1987  review:
- A report on glyphosate poisoning episodes in California;
- "Worker Safety Rules for Glyphosate Products Containing the Signal Word 'Warning' for Skin or Eye Irritation"; and
- "Worker Safety Rules for All Glyphosate Products Intended for Agricultural Uses and Containing the Signal Word 'Caution'".

The required worker-safety provisions in Attachment 2 to Kunchick's memo were taken verbatim from the 1986 RS section setting forth "Required Labelling" (page 28-29, quoted above).

### 2.  The Blondell Study Raises Concerns

Attachment 1 was the primary basis for OPP concern over eye and skin irritation. It included data submitted to EPA by the California Department of Food and Agriculture in a June 6, 1988 report entitled "Glyphosate Poisoning Statistics Summary." The author was Jerome Blondell.

Data were recorded by Blondell for three categories of glyphosate applicators: ground application using a tractor or spray rig (42 out of 143 total cases); hand application with a backpack sprayer or hand-pump device (100 out of 142 cases); and, other types of application (1 of 142 cases).

Blondell's data covered 64 applicator and 24 mixer/loader cases of eye irritation between 1981 and 1985, and 52 applicator and 7 mixer/loader skin injury cases. In addition, there were a total of 24 "Systemic" illnesses reported, 6 cases among spray rig applicators and 18 among hand applicators. Hand applicators had suffered the majority of total-applicator injury cases for the eye (44 out of 64) and for 35 of 52 skin irritation cases.

A section of Blondell's report addresses the relationship between the number of physician-treated occupational illnesses in California and the total pounds of glyphosate applied. The Blondell report contains the following statement :

> "The number of California physician-treated occupational illnesses (average per year, 1981-1985) per million pounds of glyphosate reported sold in California in 1984 was 17.0. On average, for all pesticides, we find 1.3 poisonings per million pounds sold, per year in California."

This unexpected finding in Blondell's report had to have gotten the attention of EPA, given the low acute toxicity of Roundup and the fact that almost all Roundup labels bear the least-worrisome signal word, "Caution."

In 1986-1987, OPP was working on a policy document setting forth new worker-safety requirements for product labeling that would apply to all registered pesticides. OPP planned on issuing the new worker-safety labeling requirements via what is called a Pesticide Regulatory ("PR") Notice.

The worker-safety protections for applicators called for in the 1986 RS were supposed to appear on all Roundup-product labels in commerce as of June 30, 1988. However, in a November 2, 1987 letter to Robert Taylor, OPP's registration manager for glyphosate, Monsanto requested a postponement of certain additional protective clothing requirements on Roundup labels, pending finalization of the expected worker-safety PR Notice.

### 3.   EPA Responds "Yes and No" to Monsanto's Request

EPA assigned the task of reviewing and responding to this Monsanto request for deferral of the RS worker-safety provisions to Alan Nielsen in OPP's Exposure Assessment Branch. He received the assignment on November 11, 1987 and a memo setting forth his recommended action is dated January 28, 1988.

Nielsen agreed to Monsanto's request to postpone additional requirements for personal protective equipment (PPE) on Roundup labels subject to two conditions. The first was that the new worker-protection PR notice would be issued "…in a reasonable time frame…", and lead to changes in Roundup worker-safety language comparable to those required in the RS. And second, "…the submitter [Monsanto] begin investigating the high number of eye and/or skin injuries associated with glyphosate use in California."

Reinforcing his concern, Nielsen added in his memo to the Registration Division that:

> "Myself and other members of the Exposure Assessment Branch would like to meet with appropriate representatives of the Monsanto Company to discuss their response to this concern [the adverse impacts data from California] within six months. Please arrange with the submitter."

### 4.   Monsanto Digs In, Refuses to Add New Worker-Safety Provisions

Monsanto continued to challenge EPA's requirements for stricter worker-safety provisions through multiple communications over several years. Some arguments were procedural (e.g., defer changes in labeling until the new, generic worker-safety labeling PR notice was issued), while others were based on Monsanto-commissioned exposure studies and risk calculations.

Ultimately, Monsanto never added the new worker-safety provisions required by EPA in the 1986 RS, including the common-sense requirements for use of basic PPE like gloves.  The labels for Roundup products with concentrations of glyphosate above 10% generally state: "Personal Protective Equipment (PPE) Applicators and other handlers must wear: long-sleeved shirt and long pants, shoes plus socks…[no other PPE is required]."

The phrase "other handlers" encompasses those mixing and loading, shipping, storing, or handling the herbicide.

### 5.   PPE Requirements on Roundup Labels

The labels on most Roundup-brand herbicides over the last 30+ years state that an applicator's clothing, and any PPE, must be washed separately from other laundry, and then provides this important instruction to applicators and other handlers (sometimes with minor word changes):
> "Discard clothing and other absorbent materials that have been drenched or heavily contaminated with ***this product's concentrate***. Do not reuse them." (Emphasis added).

Accordingly, "clothing and other absorbent materials" drenched with ready-to-apply, diluted Roundup spray solution need not be discarded, despite EPA stating in the 1986 RS that heavily contaminated clothing cannot be fully decontaminated and should therefore be discarded, whether the clothing was contaminated with concentrated Roundup out of the bottle, ***or with diluted spray solution***.

Individuals like many of the plaintiffs in this litigation whose clothing was soaked with Roundup spray solution were never provided this important safety measure. Under the heading "User Safety Recommendations," most Roundup labels still state that users should:
> "Wash hands before eating, drinking, chewing gum, using tobacco or using the toilet. Remove clothing immediately if pesticide gets inside. Then wash thoroughly and put on clean clothing."

There is also a "Non-Agricultural Use Requirement" on each label: "Keep people and pets off treated areas until spray solution has dried."

There are no other sections or provisions on Roundup labels that address the need, or ways to reduce worker exposures and risks.

To this day, Monsanto has not added to Roundup labels the worker-safety precautions and requirements as set forth in the 1986 RS. In my opinion, a reasonable and prudent pesticide manufacturer committed to the safety of its customers, as Monsanto professes to be, would have added to all Roundup herbicide labels the commonsense mixer-loader and applicator safety language called for by EPA in 1986.

## C. Concerns Grow Over Applicator Exposures When Using Handheld and Backpack Applicators

Throughout the 1990s and 2000s, there was a steady flow of new information regarding worker risks from: (a) Monsanto's ongoing inhouse research and testing around the world that pointed to the need to address high-exposure scenarios and eliminate high-risk surfactants, and (b) exposure and illness episodes reported to the 1-800 phone numbers on Roundup labels by callers seeking guidance regarding the need for emergency medical assistance.

Regulators in the UK required Monsanto to add a requirement for respiratory protection on certain Roundup labels, as a result of high-exposures around the face when Roundup is applied to trees via a backpack sprayer. (MONGLY06454420)

The EU had been pushing for years for the removal of POEA surfactants from Roundup formulations, a task that Monsanto pledged to complete by 2012, and did so by or about 2014.

But in the U.S., Monsanto blocked or curtailed more restrictive worker-safety language on most formulated product labels, and has retained POEA surfactants in essentially all products. These actions were part of Monsanto's company-wide effort to guard against any regulator-imposed limitation on their "Freedom to Operate" (FTO) their Roundup business. Maximizing Roundup's FTO operationally translates into dogged defense of all existing labels, acquiescence to no label changes that might cost the company market share, and aggressive pursuit of new uses and markets. As a practical matter, FTO is synonymous with PMSP (pursue maximum sales and profit). FTO is a primary focus in the next chapter.

### 1. European Regulators Raise Worker-Safety Concerns

A peer-reviewed genotoxicity paper published in 2007 was among the papers triggering concerns in Europe over formulated Roundup products. It was entitled "Cytotoxicty of the herbicide glyphosate in human peripheral blood mononuclear cells" (Martinez A, Reyes I, Reyes N. (2007), *Biomedica* 27(4):594-604). The results and conclusions sections from the abstract of the paper follow:

"RESULTS:
Both technical grade glyphosate and Roundup formulation were toxic to human peripheral blood mononuclear cells. Cytotoxicity of Roundup was higher than cytotoxicity of glyphosate, since the LC50 (50% lethal concentration) determined by the trypan blue exclusion method at 24 h was the equivalent of 56.4 microg/ml

of glyphosate in the form of Roundup and 1,640 microg/ml (1.64 mg/ml) for technical grade glyphosate.

*CONCLUSIONS:*

This *in vitro* study confirmed the toxic effects on human cells by glyphosate and its commercial preparations. Commercial formulations were more cytotoxic than the active component alone, supporting the concept that additives in commercial formulations play a role in the toxicity attributed to glyphosate-based herbicides."

The 2007 Martinez et al study reported data suggesting that in this assay, formulated Roundup was ***29-times more cytotoxic than pure glyphosate***, obviously a substantial difference.

Plans and initiatives inside Monsanto to deal with European regulatory concerns were a focus of a "Glyphosate Toxicology Peer Review" meeting held in London on June 22, 2007. Three senior Monsanto scientists were present (Donna Farmer, Richard Garnett, Bill Graham), and a fourth participated via the phone (Christophe Gustin). The Third-Party Network experts in attendance were Professor K. Chipman, Dr. C. Harris, and Dr. G. Portal. (MONGLY0118777)

One section of the meeting overview document is entitled "NOTES TAKEN DURING THE PRESENTATIONS." It includes four sections addressing the issues facing Monsanto in preserving its glyphosate-related Freedom to Operate in Europe: carcinogenicity, endocrine disruption, co-formulants, and operator exposure.

Under "4. Operator exposure," a section describes "Proposals for Action." The first bulleted item reads: "Label recommendations for hand held spraying should include recommendation for using [face] shields and not walking through the spray or sprayed area. ACTION: RG." "RG" stands for Richard Garnett, who was head of Regulatory Affairs for Monsanto in Europe. Garnett was the individual responsible for submitting new or revised glyphosate-based herbicide label directions, including worker-safety requirements, to regulatory authorities. (MONGLY0118777)

As discussed above, the 1986 EPA glyphosate RS included a requirement for goggles or a face shield, a requirement Monsanto refused to include on U.S. Roundup labels.

Richard Garnett sent a November 10, 2008 email to his Monsanto colleagues Saltmiras, Gustin, Farmer, and Kronenberg. In it, Garnett shares his view that Monsanto needed to conduct additional studies to obtain better data to address worker-exposure concerns across Europe. (MONGLY02155826)

The new data and analyses that Garnett was advocating would be included in an Annex to the dossier Monsanto was developing for submission to the German regulatory authority, as part of the reregistration of glyphosate in the EU.

In his email, Garnett writes: "Dermal exposure is the greatest risk of exposure to operators. ***Therefor we need to be secure on the ADME of such exposure***." (MONGLY02155827)

ADME stands for **A**bsorption, **D**istribution, **M**etabolism, and **E**xcretion. This admission by a top Monsanto scientist underscores the importance of accurately assessing dermal exposures.

A few days earlier (November 7, 2008), Garnett had sent an email to Monsanto colleagues, including Holger Ophoff, a Monsanto employee based in Germany who was interacting with the BfR (the German regulatory authority) on glyphosate re-registration issues. Garnett's November 7, 2008 email outlines the topics of discussion on a call addressing adverse worker-exposure episodes the BfR was aware of. Four areas of "preparation" for future interactions with BfR were outlined, including: "3. Toxicology: counter the allegation on synergistic effects of tallow amine [POEA surfactants] with glyphosate." (MONGLY010122033) By "synergistic effects," Garnett was referring to the sort of effects clearly documented in the TNO dermal absorption study and the genotoxicity studies comparing the impact of comparable doses of glyphosate alone and glyphosate in a GBH.

Regulators in Italy and Germany were, in particular, concerned over genotoxicity data published in peer-reviewed journals showing that Roundup products formulated with POEA surfactants pose greater risks than glyphosate alone. As discussed above, Monsanto had asked Dr. Parry to review several of these studies and as Heydens' acknowledged, "***we are in pretty good shape with glyphosate [re genotoxic risks] but vulnerable with surfactants***."

Regulators in Europe and the U.S. EPA have based their glyphosate worker-risk assessments on data provided predominantly by Monsanto. If the data from Monsanto is not current or is inaccurate, then applicator exposure risk assessments done by regulators will also be inaccurate. Such estimates may poorly reflect actual exposures in the field, and hence subject applicators to excessive risks.

In my opinion, the generally old data submitted by Monsanto mostly in the 1980s and 1990s on worker exposure levels and dermal absorption rates underestimate actual exposures and applicator risks.

Glyphosate human exposure and illness incident reports collected by EPA, and the testimony of plaintiffs in this litigation, demonstrate that on-label uses of Roundup can lead to much higher exposures than the hypothetical, best-case assumptions and scenarios that Monsanto virtually always incorporated in its worker exposure and risk estimates. I also conclude that Monsanto knew this was the case, yet failed to point out the discrepancy to EPA or Roundup users.

In my 2019 paper in *ESE* ("How did the US EPA and IARC reach diametrically opposed conclusions on the genotoxicity of glyphosate-based herbicides"), I write:

> "The EPA's September 2016 evaluation of glyphosate carcinogenicity is largely focused on typical, expected dietary exposures facing the general public. The EPA's analysis does not encompass occupational and unusual exposure scenarios, nor circumstances where some problem, error, mistake, land use factor, or quirk of nature leads to an unusually high GBH-exposure episode.

"Periodically, the EPA issues a report covering glyphosate exposure and health-impact incident reports. For example, between 2002 and 2008, a total of 271 incident reports were compiled by EPA, 36% of which involved neurological symptoms, 29.5% dermal irritation, rash, or hives, and 14% respiratory duress [15]. Common causes of such incidents include a slow leak in a hose or fitting on a backpack sprayer, leading to the drenching over several hours of the applicator's neck, back, and/or legs; repair of an equipment breakdown that inadvertently leads to significant exposure to spray solution; and, routine maintenance and service of spraying equipment and tank cleanup procedures. In the case of large-scale spray equipment used to apply a GBH in farm fields or large areas, a person repairing a leaky fitting or valve, or dealing with clogged nozzles or a blown hose, can be heavily exposed in a matter of seconds.

"There is a vast array of unusual circumstances leading to elevated- to very-high exposure episodes, compared to typical, 'general population' exposures, that do not involve equipment malfunction. Some examples include:

- A child playing with a dog that has recently spent time in an area sprayed with a GBH;
- Sugar cane harvesters in Central America working in a recently burnt field that had been sprayed 7-10 days earlier with a GBH, creating a toxic mix of smoke and GBH residues;
- An applicator on an ATV or driving a truck-mounted sprayer that covers an area via a concentric-circle spray pattern on a windy day; and
- Workers in a rice field adjacent to an irrigation ditch recently treated with a GBH for weed control."

[Citation #15 above is: Hawkins M, Cordova J. (2009). Updated Review of Glyphosate (103601) Incident Reports, Office of Pesticide Programs, Environmental Protection Agency. Access at:  https://hygeia-analytics.com/wp-content/uploads/2019/01/RUP-EPA-archives-2009-2-26-review-of-incident-reports-lots-of-DERMAL.pdf]

I am further convinced that most applicators spraying Roundup multiple times per week, and dozens of times annually, with handheld, backpack, ATV, or truck-mounted sprayers are likely to experience a few to several high-exposure episodes every year as a result of spills, unusually tall or thick weeds, windy conditions, a leaky hose or fitting, a hand wand that leaks (often the case), equipment malfunctions, or when cleaning and repairing equipment.

Such episodes result in exposures vastly higher than the exposure scenarios in Monsanto's and EPA's applicator and worker-exposure assessments. Cancer risks are greatest for those applicators who spray Roundup multiple times in a year, and especially those people spraying Roundup for several hours a day on average over many years.

The failure of Monsanto to generate and submit to the EPA updated, more accurate worker-exposure and worker-risk data perpetuated EPA's reliance on out-of-date, worker-risk assessments that almost certainly underestimated actual worker exposures and risks.

# 10.    Freedom to Operate and Efforts to Convince Scientists and Regulators that Roundup is Safe

The primary goal driving Monsanto's herbicide business has been for years opening up new markets for Roundup-brand products (i.e., gaining new registrations), and minimizing any possible restrictions on the potential sale of Monsanto products already on the market.

Actions aimed at achieving these goals are often referred to inside Monsanto as preserving glyphosate's "Freedom to Operate" ("FTO"). Monsanto reached out to, and systematically used a "Third Party Network" of independent scientists in conducting a variety of actions and efforts to protect glyphosate's FTO.

The goal of Monsanto's engagement with independent scientists was succinctly stated in an internal, May 26, 1999 email. ***The goal is to encourage "… people to get up and shout Glyphosate is Non-toxic***." (MONGLY00904009)

"Non-toxic" is not an accurate description of glyphosate or Roundup herbicides. Yet through advertising, promotional material, and messaging advanced by sales staff, Monsanto invested significant effort and resources in a sustained effort to convince the general public that Roundup is "safe" because it is "non-toxic."

## A. Monsanto's Third Party Network of Experts

Monsanto made heavy use of supposedly independent scientists in its "Scientific Outreach" ("SO") and PR campaigns. In some instances, such individuals were appointed to an ad hoc, or standing advisory committee or panel. In other cases, they simply worked on a fee-for-service basis on a task defined, and often micro-managed by Monsanto.

Many of these glyphosate-friendly, consulting experts had once worked for Monsanto. Many have authored or co-authored one to several papers commissioned and paid for by Monsanto. Most of these papers contain passages ghost-written by Monsanto scientists, and some were largely ghost-written.

"Ghost-writing" refers to contributions to a written document by a person not listed as the author, or among the co-authors of the document.

In addition, Monsanto frequently asked and/or sponsored glyphosate-friendly experts to:
- Present oral and/or written comments to regulatory agencies, or their advisory groups;
- Make presentations to allied industry groups, academics, or professional society meetings; and
- Assist in gaining positive media coverage on glyphosate efficacy and health issues.

Several examples of the roles, activities, and contributions of glyphosate-friendly scientists are described in the body of this report. There are, however, far too many active, Third Party

Network individuals in the discovery record to provide a comprehensive accounting of the scope of Third Party Network activities.

Monsanto was systematic and strategic in its efforts to utilize supposedly independent scientists to:

- Restate company positions and scientific conclusions;
- Influence and contribute to the literature in peer-reviewed, science journals,
- Shape the information accessible to regulators; and
- Reinforce and/or amplify Scientific Outreach and PR messages targeting the farm community, allied organizations, the general public, and political leaders.

Engaging independent scientists in research, outreach, and PR activities is routine across the pesticide industry. But in my opinion, the degree to which Monsanto shaped and controlled the activities and communications of the "independent" scientists in its Third Party Network is unprecedented.

My review of the discovery record leads me to conclude that the actions and activities of Monsanto's Third Party Network was not focused on deepening scientific understanding of Roundup risks, nor on finding the best ways to avoid possibly high-risk applications. The Network was managed and deployed to reinforce Monsanto talking points and science judgements, and to challenge the relevance or reliability of any studies reporting evidence linking Roundup use to adverse human health outcomes.

## 1. The "Glyphosate Scientific Outreach Plan"

A formal statement of the "Overall purpose" of Monsanto's "Glyphosate Scientific Outreach Plan" ("SO Plan") appears at the beginning of a June 1999 document:

"Ensure that Monsanto's glyphosate-containing herbicides are widely viewed throughout the scientific community as posing no threat to human health or the environment. This support [from Third Party Network experts] will be used to favorably influence current and future possible challenges in the regulatory and public arena." (MONGLY00904774)

Note in particular the unconditional statement in the above-quoted paragraph -- that Roundup poses "…no threat to human health of the environment." This statement stands in sharp contrast to more nuanced statements by scientists commissioned by Monsanto to review the genotoxicity and oncogenicity literature. For example, the abstract of Kier and Kirkland's 2013 review of glyphosate genotoxicity ends with this statement:

"Glyphosate and typical GBFs [GBHs] do not appear to present significant genotoxic risk under normal conditions of human or environmental exposures."

I conclude that in this 2013 review paper, Kier and Kirkland do not rule out the possibility of *some* genotoxic risk from exposures to GBHs under normal conditions, nor the possibility of *significant* genotoxic risk in the event of unusually high GBH exposure episodes. Both possibilities are generally consistent with the results of the IARC review of glyphosate genotoxicity oncogenicity.

### 2. Cherry Picking Science

The record in this case shows that Monsanto does not, in general, use science in the organized pursuit of knowledge and deeper understanding of the potential human and environmental risks stemming from Roundup, but rather to gain new product registrations, and defend existing registrations. In short, Monsanto uses science to defend Roundup's FTO, and sometimes this requires heavy "management" of the scientific process.

In many instances, Monsanto has selectively drawn upon the results of studies, cherry-picking the findings most favorable to its position and desired outcome, while ignoring, or criticizing those findings that caste a less favorable light on the safety of glyphosate and/or Roundup herbicides.

Based on my review of the record, Monsanto's systematically biased and selective use of science is driven predominately by the unmistakable fealty among Monsanto's employees to the corporate goal of protecting glyphosate's FTO.

I further conclude that Monsanto rarely uses science as a structured path to deeper insights on the properties and toxicity of its products, so that better ways can be identified to manufacture inherently safer Roundup-brand herbicides and assure they are applied as safely as possible.

## B. Monsanto's Relationships with "Friendly" Scientists and Officials in EPA

**Jess Rowland**

Jess Rowland was the Deputy Director of the OPP Health Effects Division. He was directly involved in managing the EPA's internal assessment of glyphosate's oncogenicity, as well as the EPA's interactions with, and response to IARC's review of glyphosate. He also served as a point of contact between EPA and other federal agencies, and managed the Cancer Assessment Review Committee ("CARC"), a key, internal OPP committee that rendered judgement of whether a given pesticide poses cancer risk.

William Heydens wrote an email to Dan Jenkins, his Monsanto colleague that worked most closely with EPA on registration issues at the time. This February 20, 20/15 email discussed the "EPA Folks going to IARC," referring to the final IARC glyphosate Working Group meeting in Lyons, France scheduled for March 10-14, 2015.

Heydens reports on the two EPA scientists that "will actually participate in the meeting," and two other EPA representatives that will be attending as observers. He identifies the two observers as "Catherine [Eiden] is a Special Assistant in the Pesticide Re-evaluation Division, and we all know Jess." (MONGLY00986901)

In an April 27, 2015 Heydens-Jenkins email exchange, Heydens asks Jenkins about approaching EPA and asking them directly "about what area they see as most problematic [in

the IARC monograph] or just ask if there is anything that would help them [EPA] defend the situation?" By "defend the situation," Heydens is asking if there is anything Monsanto can do to buttress EPA in defending the Agency's position regarding glyphosate oncogenicity in this penultimate meeting of the IARC Working Group.

Jenkins responds:

> "I think you and I could get on the phone w Jess Rowland and discuss this openly. He'll give us straight talk." (MONGLY03929023)

The next day, April 28, 2015 , Jess Rowland called Dan Jenkins "out of the blue" and told Jenkins:

> "We have enough to sustain our conclusions [that glyphosate is not oncogenic]. Don't need gene tox or epi. The only thing is the cheminova [another registrant of glyphosate herbicides] study with the sarcoma in mice – we have that study now and its conclusions are irrelevant…I am chair of the CARC and my folks are running this process for glyphosate in reg review." (MONGLY00987756)

But Rowland had another message to pass on to Jenkins that day. The Agency for Toxic Substances and Disease Registry ("ATSDR"), another U.S. government agency responsible for assessing the toxicity of chemicals, was planning to undertake a review of glyphosate. According to one Monsanto scientist, ATSDR historically reached conclusions similar to IARC.

In this email, Rowland asks Jenkins for a contact name at ATSDR, and reports that there is no coordination underway between EPA and ATSDR in terms of ATSDR's pending assessment of glyphosate. Then, according to Jenkins's email, Rowland said: ***"If I can kill this [the ATSDR review] I should get a medal."***

In a September 3, 2015 email to a large group of colleagues, Dan Jenkins wrote that:

> "No questions but Jess Rowland at EPA is quite proud of their recent endocrine conclusions and is also on point regarding their IARC response. Jess will be retiring from EPA in ~5-6 mos and could be useful as we move forward with ongoing glyphosate defense." (MONGLY03351980)

Rowland was responsible for the October 2015 EPA evaluation of glyphosate as head of the CARC.  In conducting this review Rowland and his colleagues violated EPA's own cancer assessment guidelines in concluding that glyphosate was "Not Likely to be Carcinogenic to Humans."

In a May 2, 2016 email, Jim Jones, an Assistant Administrator at the EPA, informed Gina McCarthy, the Administrator of the EPA that the CARC glyphosate oncogenicity "assessment was not consistent with Agency's guidelines." (EELI_0000037)

The CARC Assessment was "inadvertently" released to the public, and "Monsanto saw it and put out a release saying EPA had confirmed glyphosate is not carcinogenic." (EELI_0000037)

The CARC assessment formed the basis of the OPP's September 2016 draft report on glyphosate oncogenicity.  Considering Rowland's relationship with Monsanto, it raises, in my opinion, questions about the objectivity of that report and the scientific basis of EPA's determination that glyphosate is "not likely" to pose cancer risk.

1. **EPA's Office of Research and Development Asked to Review -- and Undermines -- OPP's Glyphosate Oncogenicity Report**

Individual scientists working for EPA programs outside of the Office of Pesticide Programs had expressed skepticism about the conclusion reached by the OPP and CARC in the wake of the March 2015 IARC Working Group's "probable carcinogen" classification decision. The Office of the Administrator in EPA was aware of the conflicting EPA and IARC assessments, and asked the Agency's Office of Research and Development to share its views on OPP's glyphosate cancer risk assessment.

ORD prepared summary comments on OPP's classification in light of IARC's "probably carcinogenic to humans" determination. (EPA-HQ-2016-0140431_00000037-39) In point number 5, ORD addresses the importance of studies on the mutagenic (i.e., genotoxic) potential of glyphosate and GBHs. It notes that the EPA review of studies on glyphosate's mutagenic potential was not thorough. ORD then writes:

> "…if there is evidence of mutagenic potential or if a mutagenic potential has not been adequately ruled out, then the characterization of glyphosate as 'not likely to be carcinogenic' could be problematic for this reason alone, given the lack of a high-quality negative epidemiological study."

The IARC conclusion that there is "strong evidence" of GBH genotoxicity through at least two mechanisms known to be associated with human cancers more than satisfies the "evidence of mutagenic potential" referred to in the ORD memo. This statement by ORD comes closer to openly criticizing the science and judgment of another EPA program -- the Office of Pesticide Programs -- as any EPA document I have ever seen.

**Jack Housenger**

As events unfolded in 2015 after the release of the IARC classification, the OPP stood by its classification of glyphosate as not likely to pose a human cancer risk. Moreover, EPA had been working for years on its own reregistration review of glyphosate. A key question was whether and how the IARC classification would alter EPA's judgement regarding glyphosate herbicide cancer risk.

At the time, Jack Housenger was the Director of OPP and had been a senior OPP manager for many years.

The record (including text message exchanges) shows a close, deferential, and supportive relationship in communications between Housenger and Monsanto officials. One example of Housenger taking the initiative to help Monsanto occurred in May, 2015, about two months after the release of the IARC report. Monsanto, Jess Rowland of EPA, and apparently

Housenger raised concerns that a review of glyphosate toxicity by ATSDR might align with IARC's, and undermine OPP's view.

After asking Monsanto for help identifying contacts at ATSDR, and calling the ATSDR staff member assigned to carry out the review, Housenger sent a May 20, 2015 email to Patrick Breysse, head of the ATSDR program. Housenger introduced himself as the Director of the OPP, and updated him on the near-complete, comprehensive OPP review. Then he wrote:

> "However, given that our reviews [OPP's and ATSDR's] would be basically done very close in time to one another, there is a question of whether this is a good use of government resources. I'd like to talk to you about this and can be reached at the number below." (Public document).

Breysse responds nine minutes later: "Can we discuss today or tomorrow". Housenger's email and call with Breysse, the ATSDR Director, was not the only contact he made with ATSDR. In an email sent June 24, 2015 to Dan Jenkins, Monsanto's senior D.C.-based registration official, Housenger writes:

> "Dan, here is everyone I talked to Henry [Abadin] was the one who ended up saying that they [ATSDR] would put glyphosate on hold holding the OPP risk assessment release [he actually meant "pending" rather than "holding" the OPP risk assessment release] Hope this helps Breysse, Patrick N…he's the Director of HCEH/ATSDR. Stephan, James W (aka Jimmy) he's the acting director of the Division of Community Health Investigation Henry Abadin…..he's the branch chief Hannah Pohl…..is the person doing the work on glyphosate." (MONGLY04028722)

Another example involved Monsanto efforts to influence the outcome of a key meeting of the Scientistic Advisory Panel on glyphosate oncogenicity. On October 13, 2016 at the behest of Monsanto, Jay Vroom, the CEO of CropLife America (pesticide industry lobbying organization), called and emailed Jack Housenger to discuss removing epidemiologist Dr. Peter Infante from the glyphosate SAP panel. Monsanto was extremely concerned about Infante's impact on the SAP's deliberations. Vroom also took this opportunity to invite Housenger to a retreat with Monsanto and other industry executives at a West Virginia casino and resort. (EPA-HQ-2017-000442-0000205)

On October 14, 2016, the OPP announced that it was postponing the SAP hearing on glyphosate scheduled for October 18, 2016.  On October 19, 2016, the OPP announced that Peter Infante would no longer be on the SAP panel evaluating glyphosate.

Jack Housenger attended a CropLife retreat at the Greenbrier Casino and Resort with executives of Monsanto and other pesticide companies in November of 2016, one month before a key SAP meeting on glyphosate oncogenicity.  These executives noted that, "[w]e had some quality time with EPA OPP Office Director Jack Housenger to dig into key issues and operational matters at that vital department of EPA." (MONGLY07063555)

Like Rowland, Housenger's relationship with Monsanto and chemical industry raises questions about the objectivity and reliability of the OPP's recent assessment of glyphosate. Indeed, the SAP meeting convened to review the OPP's report agreed unanimously that the

OPP did not follow EPA cancer risk assessment guidelines in its review of the carcinogenicity of glyphosate. In my decades of experience reviewing OPP activities, I cannot think of a clearer example of regulatory capture.

## C. Corporate Ghost-Authorship/Writing

As used in this report, the term "ghost-authorship" and "ghost-writing" refer to three types of contributions to a written document by a person not listed as the author, or among the co-authors of a document:

- Producing the first and original draft of a document, or section(s) of a document;
- Revising a document, or its section(s), in a way that adds to or alters the substantive content of the document; and
- Providing information and text that is used by a listed author or co-author, or document editor, to alter the content of a document and/or respond to comments made during peer review.

Each of the above three types of ghost-writing are unethical and unacceptable in the scientific and regulatory communities.

As part of Monsanto's campaign to discredit the Seralini paper on the oncogenicity of genetically engineered  corn and Roundup (described below) and force its retraction, Monsanto and its network of third-party experts, referenced the Committee on Publication Ethics ("COPE") "Ethical Guidelines for Peer Reviewers (Irene Hames on behalf of COPE Council, March 2013, v.1, www.publicationethics.org), and shared it with Wally Hayes, editor of *Food and Chemical Toxicology*, the journal that published the Seralini study.

The COPE guidelines include that authors and/or reviewers must "declare all potential conflicts of interest" and "recognize that impersonation of another individual during the review process is considered serious misconduct."

In multiple instances, Monsanto authors and reviewers failed to disclose obvious conflicts of interest in their interactions with journal editors. Multiple reviews of papers were submitted by one Monsanto scientist that were ghost-written, in whole or part, by others "impersonating" the reviewer-of-record.

A 2005 editorial entitled "Ghost Writing Initiated by Commercial Interests" appeared in the *Journal of General Internal Medicine* (Vol. 20:549). It begins by saying:
> "The integrity of the published record of scientific research depends not only on the validity of the science but also on honesty in authorship…The scientific record is distorted if the primary purpose of an article is to persuade readers in favor a special interest, rather than to inform and educate, and this purpose is concealed."

## 1. Gary Williams et al 2000 Paper

The peer-reviewed journal *Regulatory Toxicology and Pharmacology* published in 2000 a paper entitled "Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its Active Ingredient Glyphosate, for Humans" (Williams, GM, Kroes, R, Munroe, AC, Volume 3, pages 117-165).

This Williams et al (2000) paper was called "an invaluable asset" for "Monsanto responses to agencies…Scientific affairs rebuttals…Regulatory reviews" in a Powerpoint presentation dated  December 10, 2010 by David Saltmiras, a Monsanto toxicologist. In the same slide, Saltmiras states that "More current external expert publications are now needed to support our FTO and Registration Reviews." He poses a question that had come up before in Gingerich's speculation about an EPA Scientific Advisory Panel meeting: "Will weight of evidence be measured by number of publications or quality of the science??" (MONGLY02067858)

The Williams et al (2000) paper emerged from a Monsanto commissioned and paid for project undertaken by the consulting firm then known as Intertek Cantox. (http://www.intertek.com/scientific-regulatory-consultancy/)

With funding from Monsanto, Cantox commissioned and paid for Dr. Williams and Dr. Kroes to write a review of the human safety of glyphosate and Roundup herbicides, and a Cantox employee Dr. Ian Monroe was a third, listed co-author.

Dr. Gary Williams was a professor in the Department of Pathology, New York Medical Center, Valhalla, New York. He had been a consultant to Monsanto in the past.
Dr. Robert Kroes worked for ROTOX, University of Utrecht, The Netherlands, and had worked with several Monsanto scientists stationed in Europe.

Dr. Ian Munro was an employee of Cantox Health Sciences International, the consulting firm hired by Monsanto to produce several peer-reviewed journal articles on glyphosate-based herbicides, in addition to Williams et al. (2000).

The Williams et al. (2000) paper is unusual in its scope and detail. It covers 48 pages in the journal and strives to accomplish two goals. First, it provides a summary of a significant portion of the toxicology test results from Monsanto-commissioned studies done to fulfill regulatory data requirements. In short, it restates Monsanto's findings and conclusions from company-commissioned regulatory studies, and introduces them to the broader scientific community as if they were peer-reviewed studies.

Second, the paper discusses scientific findings relevant to the risk characterization and risk assessment of exposures to glyphosate and glyphosate-based herbicides. It directs special focus on papers in the peer-reviewed literature that the company regarded as inconsistent with its conclusions with respect to glyphosate oncogenicity and/or the genotoxicity.

The paper's "Purpose and Scope" section states:
> "Certain sectors of the scientific and nonscientific communities have commented on the safety and benefits of pesticide use. With this in mind, parts of this assessment address specific concerns that have been raised by special interest groups. This review will focus on technical glyphosate acid; its major breakdown product aminomethylphisphonic acid (AMPA); its Roundup formulations; and the polyethoxylated tallow amine surfactant (POEA)."

There is no financial disclosure statement in the paper.

To determine if a financial disclosure statement had been added, the journal's website was visited November 25, 2017, and a search was conducted for the Williams et al paper. The search results were to this link:
http://www.sciencedirect.com/science/article/pii/S0273230099913715

The paper is now available for online purchase. The abstract is available for no charge, and lists the three authors and their affiliations, but no information is offered on who paid for the study, or the substantial role of Monsanto in writing the paper.

The paper's Acknowledgement statement reads in full:
> "The authors acknowledge the assistance of individuals who participated in the preparation of this document. First, we are grateful to those who gathered and made available the large amount of information used to write the manuscript for this document. Second, we thank the toxicologists and other scientists at Monsanto who made significant contributions to the development of exposure assessments and through many other discussions. The authors were given complete access to toxicological information contained in the great number of laboratory studies and archival material at Monsanto in St. Louis, Missouri, and elsewhere. Key personnel at Monsanto who provided scientific support were William F. Heydens, Donna R. Farmer, Marian S. Bleeke, Stephen J. Wratten, and Katherine H. Carr. We also acknowledge the participation and assistance of Douglass W. Bryant and Cantox Health Sciences International for scientific and logistical support in the preparation of the final manuscript."

The second point in the Acknowledgment statement credits "toxicologists and other scientists at Monsanto who made significant contributions to the development of exposure assessments and through many other discussions."

"Significant contributions to the development of exposure assessments" refers to methodological work and data done by Monsanto on exposure assessment, but does not encompass ghost-writing of the sections of the paper on exposure assessment.
The acknowledgement that Monsanto toxicologists and other scientists "made significant contributions through…many other discussions" does not disclose, nor even hint at ghost-writing.

On the role of five "key personnel" at Monsanto, the authors state that their participation and assistance entailed "scientific support," a phrase that typically means Monsanto provided

access to data, analytical tools or models, or other scientific information generated by Monsanto.

In my opinion, this Acknowledgement statement is false, incomplete, and misleading.

William Heydens states in a 2015 email that "we", i.e., Monsanto, ghostwrote Williams et al (2000). In discussing plans to ghostwrite another publication in 2015, Heydens states in reference to the new paper:
> "...we ghost-write the Exposure Tox & Genetox sections...we would be keeping the cost down by us doing the writing and they would just edit & sign their names so to speak. Recall that is how we handled Williams Kroes & Munro, 2000." (MONGLY00977264)

In addition to Dr. Heydens admitting that he and other Monsanto scientists ghostwrote the Williams et al paper, a Monsanto document-tracking system includes a statement asserting that Heydens was largely responsible for drafting the Williams et al manuscript. (MONGLY02598454)

Heydens' efforts were extensive, as he noted "I have sprouted several new gray hairs during the writing of this thing..." (MONGLY0186926)

On June 18, 1999, Douglas Bryant, a Cantox employee, sent a "progress report" on "Roundup documents [papers in preparation by Cantox]" in an email to his principle Monsanto contact, Lisa Drake. He copied two people: (1) William Heydens, the senior Monsanto corporate official overseeing the Cantox project and similar "science outreach" efforts, and (2) Cantox colleague and paper co-author Ian Munro.

On the subject of the Williams et al. (2000) paper on glyphosate health effects, Bryant reports on the status of various reviews, including one by co-authors Kroes and Dick Peterson. He writes:
> "Bill Heydens, Donna Farmer, Kathy Carr and all those at Monsanto have been helping get the document through QA."

If doing so simply entailed catching and fixing errors, such input would be consistent with the acknowledged role played by Monsanto scientists and toxicologists.

Bryant then outlines the final steps in the process prior to submission of the paper to the journal: Bill Heydens completes the QA changes; sends edited and corrected version back to Cantox to incorporate final comments by the internal-to-Monsanto and Cantox reviewers (e.g. Peterson), and then the paper will be sent to the journal.

Twenty-seven minutes after the Bryant email was sent, Heydens sent this reply to Bryant and the other recipients of the original email. It was addressed to "All," and states:
> "A clarification – there is one step missing – I will review the final manuscript with the reviewers comments incorporated (in revision mode so I can find them easily) before it is sent to the publisher. I will commit to conducting this review very quickly. Assuming the reviewers don't throw any surprises (I'm especially

thinking of Peterson), I can turn this back around with a very minimal investment of time."

Three days later, on June 21, 1999, Heydens sends a two-line email to his colleague Donna Farmer, where he states "And Dougie [referring to Bryant] thinks I would actually leave the final editing to him unsupervised…"  This degree of control over the final submission of the publication to the journal was not disclosed in the acknowledgment statement accompanying the manuscript submitted to the journal.

By September 15th, nearly-three months after the June 18, 1999 Bryant email exchange, there had been multiple calls, exchanges of written material, and meetings between Bryant and Cantox, and Monsanto regarding the content and finalization of the Williams et al (2000) paper (MONGLY00905085)

The September 15th email from Bryant to Heydens copies Lisa Drake and Katherine Carr of Monsanto, but not any of the co-authors. It states that:
- Bryant is sending a revised draft of the paper to the three co-authors Williams, Kroes, and Munro today;
- The draft manuscript includes "all the changes that were discussed today and during calls last week. Please check it over to be sure that I have been thorough";
- Each co-author is asked "to complete his review and respond so journal submission (*Food and Chemical Toxicology*) can be finalized for September 30, 1999"; and
- Thanks everyone "for all your effort (undoubtedly there will be more)…"

Later that same day, September 15, 1999, Heydens sends another short, cryptic email to Donna Farmer and Stephen Wratten. This time he writes (exactly as in email): "FYI – in case you want to see how it ended up (hopefully, that is! – I'll strangle Kroes or Williams if they ask for any re-writes!!)  Bill."  By "it," Heydens is referring to the pre-submission draft of the Williams et al paper.

A submission of this paper to a peer-reviewed journal consistent with COPE guidelines would have listed some additional, senior Monsanto scientists as the co-authors, including Heydens and Farmer.

It is not clear in the record whether Munro made any substantive contributions to the paper. In a July 30, 1999 email from Heydens to Munro, Heydens writes: "Everyone at Monsanto has agreed with adding you as an author – please do so." (MONGLY01869261)

## 2.  Williams et al 2012

Monsanto commissioned another team to produce an updated review of recent studies assessing the differential cellular toxicity of glyphosate and formulated Roundup herbicides in 2012. This paper appeared in the *Journal of Toxicology and Environmental Health, Part B Critical Reviews* (15(1): pages 39-96). The lead author was AL Williams (not Gary Williams), and RE Watson and JM DeSesso were listed as co-authors.

Monsanto employee Donna Farmer made significant contributions to the manuscript, but was not listed as a co-author.  In an email sending one round of her work on the manuscript to DeSesso, Farmer states, "[a]ttached is the first 46 pages. I added a section in genotox from the Gasnier study ...see attached a critique we did that I took that from. Am working on a section for Gasnier in the mechanistic section. Also we cut and pasted in summaries of the POEA surfactant studies. Attached are more detailed summaries - see Knapp." (MONGLY00919381)

Donna Farmer's name is edited out as a co-author in the draft manuscript attached to the email (MONGLY00919400)

**Developmental and Reproductive Outcomes in Humans and Animals after Glyphosate Exposure: A Critical Analysis** of the Available Literature

Amy Lavin Williams[1, 2]
Rebecca E. Watson[1, 3]
Donna R. Farmer[4]
John M. DeSesso[1, 2, 84]

The co-authors conducted a detailed review of dozens of studies, and concluded:
"An evaluation of this database found no consistent effects of glyphosate exposure on reproductive health or the developing offspring. Furthermore, no plausible mechanisms of action for such effects were elucidated. Although toxicity was observed in studies that used glyphosate-based formulations, the data strongly suggest that such effects were due to surfactants present in the formulations and not the direct result of glyphosate exposure."

The 2012 review was critical of a set of five genotoxicity studies carried out by a team of French scientist led by Dr. R. Belle.

In an effort to explain the substantial difference in the conclusions expressed by Williams et al. (2012), in contrast to several published studies, a Letter to the Editor by Belle et al. (2012), "Toxicity of Roundup and Glyphosate," Vol 15: pages 233-237) states:
"The authors [of Williams et al (2012)] do not take into account in their interpretation of our results the ***very poor cell membrane permeability of pure glyphosate***." (Emphasis added).

In concluding their letter, Belle et al. write:
"Although we notice that Monsanto, the manufacturer of Roundup, financed their work, we would have expected strong scientific arguments against our results or alternative findings that would evidence the contrary. This is not the case, and, to our knowledge, our experiments, first published in 2002 and brought to Monsanto's knowledge as early as 1999, have not been demonstrated to be incorrect or biased."

### 3. Kier and Kirkland 2013 Paper

In 2013, the journal *Critical Reviews in Toxicology* published a peer-reviewed paper entitled "Review of genotoxicity studies of glyphosate and glyphosate-based formulations" (Vol 43(4)). Two authors were listed -- Monsanto consultant and former employee, Larry Kier, and Dr. David Kirkland, a professor and Monsanto consultant.

The abstract of the 2013 paper reports that it updates an earlier review of studies on the genotoxicity of glyphosate and formulated glyphosate-based herbicides. This earlier review was the previously discussed, Monsanto commissioned and ghost-written paper Williams et al. (2000).

The "Monsanto Manuscript Clearance Form" for the 2013 Kier-Kirkland publication is dated February 29, 2012, and lists two authors: "David Saltmiras, Larry Kier (consultant)." Under "Lead Author's Comments," Saltmiras writes: "This work falls under the scope of the EU Glyphosate Task Force and will be a valuable resource in future product defense against claims that glyphosate is mutagenic or genotoxic." (MONGLY02117600)

When published, the authors are listed as Kier and Kirkland. Saltmiras' name is deleted. Accordingly, the 2013 genotoxicity review paper is a ghost-written update of a ghost-written 2000 review.

In the published version of the Kier-Kirkland 2013 paper, the "Declaration of Interest" states:
> "Larry Kier and David Kirkland were paid consultants of the Glyphosate Task Force for the preparation of this review. The Glyphosate Task Force is a consortium of 25 European glyphosate registrants, listed on http://www.glyphosatetask-force.org/. Larry Kier is also a past employee of Monsanto Company. Monsanto Company was the original producer and marketer of glyphosate formulations. The authors had sole responsibility for the writing and content of the paper and the interpretations and opinions expressed in the paper are those of the authors and may not necessarily be those of the member companies of the Glyphosate Task Force."

This "Declaration of Interest" is only partially truthful. Kier and Kirkland did not write the paper alone; a third author, David Saltmiras, had contributed substantially to the paper, but is not listed as a co-author (his help is noted in the Acknowledgements).

But in internal emails, Saltmiras specifically requests his inclusion as a named author. Kirkland rejects this request, explaining "As much as I agree with recognizing the effort David S has put in, I do not think you can start adding an author at this stage. Apart from anything else, it means the authors would no longer be 'independent'." (MONGLY04086537) Saltmiras was not listed as a co-author. According to Kier, "David S. was a co-author on the unpublished literature review manuscript which was the first phase of this project which I think qualifies him as a valid contributor to the manuscript."

In my opinion, the authors did not have sole responsibility for the content, and Monsanto, through its consultants Kier and Kirkland, and employee Saltmiras, was largely responsible for

the content, not the Glyphosate Task Force. (MONGLY02145924-30)  In my opinion, Saltmiras' contributions qualified for co-authorship and the failure to disclose his involvement is contrary to academic and scientific standards.

## D. *Critical Reviews of Toxicology* Special Issue on Glyphosate Risks

One of the clearest examples of ghost-writing in this case is the special, IARC-focused issue put out by *Critical Reviews of Toxicology* (*CRT*). This special issue was conceived and commissioned by Monsanto when the company learned that IARC would soon issue a monograph discussing the potential of glyphosate-based herbicides to cause cancer.

In an email with the subject "IARC [Response] Planning," Heydens discusses options for producing the papers that will make up the content of the special issue of *CRT*:

"If we went full-bore, involving experts from all the major areas (Epi, Tox, Genetox, MOA, Exposure - not sure who we'd get), we could be pushing $250K or maybe even more. A less expensive/more palatable approach might be to involve experts only for the areas of contention, epidemiology and possibly MOA (depending on what comes out of the IARC meeting), and *we ghost-write the Exposure Tox & Genetox sections*. An option would be to add Greim and Kier or Kirkland to have their names on the publication, but we would be keeping the cost down by us doing the writing and they would just edit & sign their names so to speak."  (Emphasis added, MONGLY02078590)

In another planning document titled "Proposal for Post-IARC Meeting Scientific Projects," the creation of a "Publication on Animal Carcinogenicity Data" is discussed. The document states, "Majority of writing can be done by Monsanto, keeping OS$ down."  (MONGLY01228576)

In another email, dated May 11, 2015, Michael Koch (Dr. Farmer's boss and head of product safety), notes that Monsanto will attempt to get a "Publication on Animal Data Cited by IARC," and that the "Manuscript to be initiated by MON as ghost writers."  (MONGLY01023968)

The contents of the special issue of *CRT* was a Monsanto-controlled, and largely Monsanto-written rebuttal of the evidence cited by IARC in support of its "probably carcinogenic to humans" classification. Each paper had a mix of consultants and "independent" scientists listed as co-authors, but failed to disclose various Monsanto scientists who had made substantive contributions to the papers, including drafting full sections, if not full first drafts.

There are dozens of emails and other documents in the record memorializing the role Monsanto played in the conceptualization, writing, revisions, and publication of the papers in the special issue of CRT.  For example: MONGLY00978170, MONGLY00992949, MONGLY00994301, MONGLY00998682, MONGLY00999487, MONGLY01000676, MONGLY01023968, MONGLY011300799, MONGLY01183933, MONGLY01228589, MONGLY02085862, MONGLY02133654, MONGLY00998684 and MONGLY02359008.  Many of the communications are between Monsanto scientists and individuals working for the Canadian consulting firm Intertek. This firm was hired by Monsanto to manage the process of producing the papers that would appear in the special issue of *CRT*.

The consulting firm Intertek is basically the same company that Monsanto hired in 1998 to manage the process of putting together the also-ghost-written Williams et al (2000) review of glyphosate toxicity. Back then, the consulting firm's name was CanTox Intertek.

Intertek served as the primary mechanism through which ghost-written material from Monsanto was incorporated in the drafts of the papers that were subsequently reviewed, revised, edited, and approved for submission by Monsanto.

In addition, Intertek also served as the primary point of contact with the editor of the journal *CRT*. This arrangement shielded the journal's editor from evidence of Monsanto's direct role, not just as a ghost-writer of parts of some of the papers, but as the primary author of several of them, and an important contributor to all of them.

In MONGLY00998682, William Heydens' edits on the "Summary Report" paper for the *CRT* special issue are transmitted back to Ashley Roberts, Senior VP of the Food and Nutrition Group at Intertek. Roberts served as the principle point of contact between Monsanto and Intertek, between Intertek and paper co-authors, and between Intertek and the journal.

William Heydens organized a group of Monsanto's Third-Party Network experts and consultants for an "Expert Panel Review of the Carcinogenic Potential of the Herbicide Glyphosate," to be held at the 2015 Society for Risk Assessment (SRA) Annual Meeting. (MONGLY01030787)

Heydens circulated the panel makeup to John Acquavella and Larry Kier, individuals who had been involved in writing, and/or ghost-writing the papers published in the special glyphosate issue of *CRT* published in 2016 in a November 3, 2015 email.

John Acquavella replied about an hour later that his name should be in the co-author list, to which Heydens replies: "I thought we discussed previously that…we would not be able to use you or Larry as Panelists/authors because of your prior employment at Monsanto."

Just over an hour later, Acquavella responds to Heydens: "I didn't realize that Bill. Also, I don't think that will be okay with my panelists. We call that ghost writing and it is unethical." (MONGLY01030787)

Heydens replied to Acquavella, writing: "We will have to pick this up tomorrow." The next day at 9:25 a.m., Heydens emails Acquavella, copying Donna Farmer, the Monsanto scientist managing Acquavella's consulting work. Heydens proposed a call later in the day. Acquavella responds and sets the time for the call. And then he adds:

"You guys know me. I can't be a part of deceptive authorship on a presentation or publication. Please note the ICME guidelines below [which he attached to his email] that everyone goes by to determine what is honest/ethical regarding authorship." (MONGLY01030787)

On September 26, 2018, the *CRT* issued an Expression of Concern regarding the papers in the special issue critical of IARC. In it, the publisher expressed "concerns over the completeness of

acknowledged contributions to the above supplement" and explained "[w]e have not received an adequate explanation as to why the necessary level of transparency was not met on first submission. We thank those who brought this matter to our attention. When reading the articles, we recommend that readers take this context into account.  We will continue to work to update these articles and ensure full disclosure of all contributions to them."

Similarly, on the same day, three of the named authors on the manuscripts issued Corrigendums, correcting their disclosures and revealing Monsanto's involvement more clearly.   Each of these Corrigendums specifically apologizes for their "errors."

Clearly, the Monsanto-driven *CRT* papers did not properly disclose Monsanto's involvement in producing the papers and they were not "independent" reviews.

### 1.  Other Forms of Ghost-Writing

The above cited examples of ghost-writing involve unattributed contributions to papers in peer-reviewed scientific journals that have explicit conflict of interest and disclosure rules prohibiting ghost-writing.

There are other examples of ghost-writing as well.

On August 19, 2008, Dr. Charles Healy, a senior Monsanto scientist, received an email request from the Editor of the journal *Cell Biology and Toxicology* to review a glyphosate genotoxicity paper entitled "Cytotoxicity of herbicide Roundup and its active ingredient, glyphosate in rats." (MONGLY02286842)

He accepted the assignment and contacted his Monsanto colleagues David Saltmiras and Donna Farmer later the same day. He asked them to conduct the review, explaining:
"You two would be the reviewers in fact and I would then collate your comments and be the reviewer of record."

In this circumstance, it would have been entirely routine for Healy to write back to the Editor and ask for permission to conduct the review with assistance from two Monsanto colleagues. The editor would have then had the opportunity to decide whether such participation by Monsanto was proper or not, and what public disclosure of such review was appropriate.

The ghost-written Healy et al. review of the paper is nearly five pages, single-spaced. It is about the same length as the paper when it was published about a year later. The Healy et al. review is brutal, rating the paper a 5 on a scale of 1 to 100 (100 top rating) and "unacceptable" for publication.

On September 9, 2008, an email from the journal is sent to Healy stating: "I have had completely opposite reviews on this paper. I would be very grateful for your comments before giving the authors a decision." Later the same day, Healy forwarded this message to Saltmiras and Farmer, and adds: "Looks like ours will be the deciding vote as to whether the glyphosate paper is published."

A little over a year later, a revised version of the paper reviewed by Healy et al. appeared in the journal *Environmental Toxicology and Pharmacology* (Vol 28:379-385). The author is Nahla S. El-Shenawy.

Rising concerns over Roundup's human health effects in Latin America led to a Monsanto-organized Toxicology Expert Panel meeting in October 2012. David Saltmiras was charged with putting together an invited, expert panel for the meeting. A seminar on the history and activities of the EU Glyphosate Expert Advisory Panel was among the presentations Saltmiras was organizing.

In an August 13, 2012 email, Saltmiras shares with colleagues that he will invite Sir Colin Berry or Jack Mandel to present talks during the seminar and adds that "I will likely prepare the presentation and send to him to change/adapt as he sees fit."

David Saltmiras engaged in an email discussion on January 26, 2013 with Monsanto-consultant and former employee Larry Kier over whether Saltmiras should be added as a co-author of Kier and Kirkland (2013), since Saltmiras wrote a significant portion of the paper. Saltmiras tells Kier that he had been strongly encouraged by "Senior Monsanto management" to author peer-reviewed publications, and that this Kier and Kirkland paper "is the *fifth such Glyphosate related manuscript I have been involved with over the past few years without co-authorship*." (Emphasis added, MONGLY04086532)

In his 2012 performance evaluation, Saltmiras wrote "Successfully facilitated numerous third party expert letters to the editor which were subsequently published..." on the Seralini study. He also "accepted an invitation to be a peer-reviewer for a 'high profile' toxicology journal…peer reviewed several manuscript submissions, wherein my recommendations to reject those manuscripts were accepted/adopted by the Editor." (MONGLY101045300)

As part of his 2015 performance evaluation, Saltmiras summarized his glyphosate-related activities, which included "ghost wrote cancer review paper Greim et al. (2015), coord Kier (2015) update to K&K, pushed for Sorahan (2015)." (MONGLY017223742)

These numerous examples, in my opinion, reflect instances of conduct which run counter to the basic precepts of scientific integrity and transparency, and are examples of the lengths to which Monsanto would go to protect Roundup's FTO.

## E. Responses to Scientists Raising Concerns over Glyphosate Safety

The discovery record contains many examples of Monsanto efforts to:
- Discredit the research findings of scientists whose work is not aligned with Monsanto's judgements regarding glyphosate and Roundup risks;
- Block studies from being published that raise new, or reinforce old concerns over Roundup by submitting highly critical reviews to journal editors;
- Look for ways to cut or divert the funding available to scientists deemed as glyphosate-unfriendly; and

- Provide encouragement and financial support to glyphosate-friendly scientists, often through circuitous mechanisms designed to hide Monsanto's fiscal sponsorship.

### 1. Monsanto Response to the IARC Working Group Report

Dr. Consolato Maria Segi, a professor at the University of Alberta, Canada, was a member of the IARC Working Group that carried out the assessment of the oncogenicity of glyphosate. After the release of IARC Monograph 112 and announcement of the 2A "probably carcinogenic to humans" classification, Dr. Sergi received a letter dated October 31, 2016 from a U.S. based law firm, Hollingsworth LLP. The firm had been hired by Monsanto to carry out various activities in response to the IARC decision. Apparently, several other IARC Working Group members received a similar letter.

According to Dr. Sergi's response dated November 4, 2016, the law firm's letter requested "disclosure of files used in connection with the preparation of the IARC Monograph Volume 112." Prior to responding, she consulted with colleagues on the Working Group and at IARC. She replied that the files belonged to IARC, and that the result of their deliberations were explained in detail in the monograph. She then wrote:
> "I found your letter ***intimidating*** and ***noxious*** even though transparency is important…It is impolitic to mention possible consequences without identifying the correct background. I find your approach reprehensive and lacking of common courtesy even by today's standards. As a graduate of a British educational system, I consider your letter ***pernicious***, because it maliciously seeks to instill some anxiety and apprehension in an independent group of experts…Please avoid contacting me or any of my colleagues in the future regarding this issue."
>    (Emphasis in original; Heydens Exhibit 3-54)

### 2. Seralini Team

A team of French scientists led by Gilles-Eric Seralini published a paper entitled "Long term toxicity of a Roundup herbicide and a Roundup-tolerant genetically modified maize" on September 19, 2012, in the journal *Food and Chemical Toxicology* (Vol 50: 4221-4231).

The paper reported the results of a two-year rat study. Both formulated Roundup herbicide and  genetically engineered-corn, fed separately and together, were found to trigger a variety of pathologies including cancer, damage to the pituitary gland, liver, and kidneys, and premature death. To my knowledge, this is the only chronic feeding study ever conducted in which animals were exposed to a formulated GBH.

The kidney emerged as a particularly vulnerable organ, given that 76% of the impacted parameters were associated with kidney deficiencies.

The abstract ends with this statement:
> "These results can be explained by the non-linear endocrine-disrupting effects of Roundup, but also by the overexpression of the transgene in the GMO and its metabolic consequences."

The Seralini study was designed to sort out the individual and combined impacts of long-term exposure to a GE corn (NK603) and formulated Roundup herbicide. Previously, Seralini and colleagues had conducted several genotoxicity experiments comparing the toxicity of glyphosate and formulated Roundup in cell assay systems.

The paper's findings received extensive media coverage in the U.S. and Europe, and posed a threat to Monsanto's commercial interests. It also posed tough, new questions for regulators worldwide who had previously approved Roundup and GE, "Roundup Ready" corn.

The next day, September 20, 2012, David Saltmiras sent an email to Sir Colin Barry and Andrew Cockburn, a consultant working for Monsanto. It marks the beginning of a campaign that would last years, with the goal of discrediting the Seralini paper and his team.
In the email, Saltmiras calls the paper "junk science." He questions what happened with the journal's peer review process, and states:
   "I also suspect this paper may be in our own best interests – the last rites for Seralini's few remaining shreds of scientific credibility." (MONGLY01096620)

The rapidity and scope of Monsanto-invoked negative commentary, beginning on the day the paper was released, was unprecedented. It arose from Monsanto's focus and determination to protect Roundup's FTO, as well as its enormous investment in Roundup Ready corn seed technology.

Within days, Monsanto's Third Party Network was activated. Just one week after the Seralini paper was published, Dr. Bruce Chassy, a retired U.S. academic and Third Party Network member, emailed the journal editor Wallace Hayes calling for the paper to be retracted, in order to save the reputation of the journal. (MONGLY00900629)

After Hayes responds and says he will process Chassy's email as a letter to the editor, and give the Seralini team an opportunity to reply in accord with standard journal policy, Chassy quickly replies and writes that his initial email "was a heartfelt expression by a caring colleague who is deeply concerned…My intent was to urge you to roll back the clock, retract the paper, and restart the review process." Then, Chassy alleges that "The paper in question has not been peer reviewed," a claim which he knew was false.

In the coming weeks and months, Monsanto encouraged and orchestrated a series of critical commentaries worldwide that included allegations of scientific fraud by the Seralini team.

An exchange of emails between senior Monsanto officials and scientists occurs on September 26, 2012, six-days after the paper came out. Saltmiras starts the email chain at 11:50 a.m., which is sent to seven colleagues, including Eric Sachs, Bill Heydens, Bruce Hammond, and Daniel Goldstein.

He reports on a call he had earlier that morning with the journal editor, Wallace (Wally) Hayes. Saltmiras writes:
   "He [Hayes] expressed concern that to date he has only received links to blogs,

web postings, media releases, etc. and no formal letters to the Editor…Therefore, he urgently needs rational, objective and authoritative formal letters to the Editor….I believe he would like such letters <u>TODAY</u>!"
(Emphasis in original, MONGLY02063095-96)

Among "Actions" Saltmiras lists in his email, he reports that he has emailed the EU Glyphosate Task Force (GTF) Toxicology Working Group, suggesting that the GTF submit a letter; that Eric Sachs (Monsanto's head of Regulatory Policy & Scientific Affairs) will follow-up with "his third party scientific experts…and request they consider formal letters to the Editor." Last, Saltmiras asks for his colleague's "thoughts on promptly moving forward."

Eric Sachs, head of Monsanto PR and media efforts when a threat to Roundup's FTO arises, responded 13 minutes later, reporting that Bruce Chassy will soon submit his letter to the journal, and "notify other scientists that have sent letters [to media outlets or Monsanto] to do the same. He understands the urgency."

Fifteen minutes later, Heydens replies to the group: "And I very strongly believe we must go ahead and put together a Monsanto letter to the editor…"

Four minutes after receipt of Heydens' email, Eric Sachs writes to the group: "I remain adamant that Monsanto must not be put in the position of providing the critical analysis that leads the editors to retract the paper." (MONGLY02063096)

Heydens replies privately to just Sachs a few minutes later:
"This [Sachs' recommended role for Monsanto] makes no sense to me at all. We have defended our science every step of the way since our 1st encounter with him [Seralini]. That fact remains that the external sector has not given us what we need, and the editor is telling us it is the 11th hour…"

Sachs then replies just to Heydens:
"I am not challenging that Monsanto should defend our science – we absolutely should and have. There is a difference between defending science and participating in a formal process to retract a publication that challenges the safety of our products. ***We should not provide ammunition for Seralini, GM critics and the media to charge that Monsanto used its might to get this paper retracted.*** The information we provided [to Third Party Network members writing critical letters] clearly establishes the deficiencies in the study as reported and makes a strong case that the paper should not have passed peer review. We have done our part. It is time now for the public sector and ***especially our network of experts*** to do theirs." (emphasis added; MONGLY02063095-96)

In this candid exchange, Sachs argues that Monsanto must not be perceived as orchestrating and supporting a campaign that is designed to force the journal to retract the Seralini paper, but that is exactly what they did, beginning with the sharing of Monsanto-written criticisms of the Seralini study, beginning even before its public release, to a number of its Third-Party Network

experts, many of whom were quoted in various media stories, blogs, commentaries, and letters to the editor harshly attacking the Seralini paper.

Two days later, in an email from Daniel Goldstein to Sachs on the effort to encourage letters to the editor, Goldstein writes to Sachs: "We are being asked to keep internal correspondence down on this subject." (MONGLY00936725) As obvious in the dozens of emails in the discovery record memorializing Monsanto's all-hands-on-deck response to the Seralini study, this request from the legal department either came too late or was overcome by the passion brought to the task.

In early October 2012, Goldstein shared notes from conference calls with Monsanto scientists and registration specialists in multiple countries regarding the fallout from the Seralini study. It includes "A list of pending actions in St. Louis is provided below." (MONGLY00978885-90)

These actions and "Key Points" cover Monsanto efforts to support the retraction campaign; studies that Monsanto should consider undertaking to have a basis to challenge the findings in the Seralini paper; and, rebuttal arguments and related talking points to share with regulators, in the hope they too will join the effort encouraging the journal to retract the Seralini paper.

Then Goldstein writes:
> "c. And finally – the one [new study that Monsanto should consider doing] you have all been waiting for: *2 year rat/chronic studies of pesticide formulations on crop*."
>> (Emphasis added).

The Monsanto letter to the Editor of *Food and Chemical Toxicology* appeared in March 2013 (Hammond et al Vol 53: 459-464). It spanned six pages of text in the journal; the original Seralini paper was 11 pages, of which about 4.5 pages were tables, figures, and photos. The Monsanto letter to the editor was signed by three Monsanto scientists: Bruce Hammond, Daniel Goldstein, and David Saltmiras.

Remarkably, the authors of the letter write *"The authors declare that there are no conflicts of interest"* in the section of the letter labeled "Conflict of Interest," when in fact it is hard to imagine how three co-authors could be more fully conflicted.

On November 19, 2013, *Food and Chemical Toxicology* Editor Wallace Hayes wrote Seralini a letter informing him that his paper would be retracted. The letter included the retraction statement that Hayes was going to publish. It recounts the controversy, the letters to the editor, "and even allegations of fraud."

At the time that Wallace Hayes decided to retract the paper, he had been hired by Monsanto as a consultant at $400 per hour to take on certain tasks. (MONGLY02185742)  This information was never disclosed by Hayes, the journal, or the journal's publisher.

Then, Hayes writes:
> "Unequivocally, the Editor-in-Chief found no evidence of fraud or intentional misrepresentation of the data…Ultimately, the results presented (while not incorrect) are

> inconclusive, and therefore do not reach the threshold of publication in *Food and Chemical Toxicology*."

The retraction of a scientific paper for reporting inconclusive results is virtually never done. If scientific journals only published "conclusive results," the number of published papers would drop substantially and the pace of scientific advance would slow, since one of the key tasks for science is to determine whether inconclusive or suggestive results are real.

Clearly, Monsanto's financial relationship with Hayes created a serious conflict of interest in light of the company's role in the retraction of the Seralini paper. It never should have happened and surely needed to be disclosed.

The response of Monsanto to the 1983 Bio/dynamic mouse cancer study, early papers reporting the genotoxic potential of glyphosate and Roundup, the Seralini paper, and the IARC classification of glyphosate and GBHs as "probably carcinogenic" are examples of the lengths Monsanto is prepared to go in protecting Roundup's Freedom to Operate.

In each of these episodes, there are two important things missing in Monsanto's response -- first, any evidence of interest in actually pursuing and resolving underlying scientific issues and uncertainties, and second, any concern over the health and welfare of those handling, mixing and loading, and applying Roundup.

My review of the above episodes, among others, is why I conclude that Monsanto has repeatedly violated its corporate pledges and commitments under the FAO Code of Conduct and other voluntary commitments. Monsanto has pledged that "in all we do" the safety of people using Roundup is the most important factor governing the company's "stewardship" of Roundup. I conclude that is demonstrably untrue.

# 11.      The IARC Classification

The International Agency for Research on Cancer (IARC) released a summary of its Working Group report on glyphosate and glyphosate-based herbicides via a short report published in the May 2015 issue of *The Lancet Oncology*, a highly regarded medical journal. The full Working Group monograph was initially published on July 29, 2015, and a slightly revised version was released January 26, 2017 in which some references and typos were corrected (http://monographs.iarc.fr/ENG/Monographs/vol112/mono112.pdf).

## A. IARC's Justification for Its "Probable Human Carcinogen" Classification

The concluding section of the full monograph discussing the basis for the Working Group's classification decision states:

**"6.3 Overall evaluation**

Glyphosate is *probably carcinogenic to humans (Group 2A)*.

**6.4 Rationale**

In making this overall evaluation, the Working Group noted that the mechanistic and other relevant data support the classification of glyphosate in Group 2A.

In addition to limited evidence for the carcinogenicity of glyphosate in humans and sufficient evidence for the carcinogenicity of glyphosate in experimental animals, there is strong evidence that glyphosate can operate through two key characteristics of known human carcinogens, and that these can be operative in humans. Specifically:

• There is strong evidence that exposure to glyphosate or glyphosate-based formulations is genotoxic based on studies in humans in vitro and studies in experimental animals.

One study in several communities in individuals exposed to glyphosate-based formulations also found chromosomal damage in blood cells; in this study, markers of chromosomal damage (micronucleus formation) were significantly greater after exposure than before exposure in the same individuals.

• There is strong evidence that glyphosate, glyphosate-based formulations, and aminomethylphosphonic acid can act to induce oxidative stress based on studies in experimental animals, and in studies in humans in vitro. This mechanism has been challenged experimentally by administering antioxidants, which abrogated the effects of glyphosate on oxidative stress. Studies in aquatic species provide additional evidence for glyphosate-induced oxidative stress."

Because a member of Monsanto's Third Party Network of scientists, Dr. Tom Sorahan, had been designated as an invited, industry observer at the public meetings of the Working Group, Monsanto was aware of the Working Group's likely judgements in the three key areas that

drive IARC determinations – animal testing, human epidemiology, and genotoxicity/possible mechanism(s) of action, and Monsanto recognized that IARC might classify glyphosate as a "possible human carcinogen."

The IARC classification system is clearly explained and driven by the strength of published evidence in the above three areas. An internal Monsanto memo states:
> "[w]e should assume and prepare for the outcome of a 2B rating (possible human carcinogen); a 2A rating (probable human carcinogen) is possible but less likely." (MONGLY02913526)          .

To better understand the thinking of the Working Group, I called Dr. Blair, who I have known since the early 1980s, and had a phone conversation with him on or about March 22, 2015. He outlined the factors leading to the Working Group's decision.

Dr. Blair told me that as the Working Group approached a final decision, the most extended debate was not between a 2A ("probably carcinogenic") or 2B ("possibly carcinogenic") classification, but actually between Group 1 ("The agent is carcinogenic to humans") and Group 2A ("The agent is probably carcinogenic to humans").

The fact that the Working Group almost classified glyphosate as a Group 1 carcinogen became public knowledge as a result of an Andrew Cockburn story in the September 2015 issue of *Harpers Magazine*. The story was entitled "Weed Whackers – Monsanto, glyphosate, and the war on invasive species" (https://harpers.org/archive/2015/09/weed-whackers/).

Cockburn's story describes the IARC classification as "a massive speed bump" undercutting Monsanto's 'mantra…all labeled uses of glyphosate are safe for human health'…"
To gain perspective on the IARC Working Group's assessment of the science, Cockburn interviewed Aaron Blair. The germane passage in Cockburn's story reads:
> "According to Blair, there were good grounds to declare that glyphosate definitely causes cancer [i.e., to classify it as a Group 1, *proven* human carcinogen]. This did not happen, he said, because 'the epidemiologic data was a little noisy.' In other words, while several studies suggested a link, another study of farmers in Iowa and North Carolina, did not. Blair pointed out that there had been a similar inconsistency in human studies of benzene, now universally acknowledged as a carcinogen. In any case, this solitary glitch in the data caused the group to list glyphosate as a probable (instead of a definite) cause of cancer."

## B. Monsanto Braces for Unwelcomed News from IARC

Donna Farmer, a senior Monsanto toxicologist, learned in mid-September 2014 of the forthcoming IARC review of the oncogenicity of glyphosate and glyphosate-based herbicides, and began developing a plan to respond to the forthcoming report. (MONGLY01207339)

A month later, William Heydens sent an email to Monsanto colleagues including Garnett, Farmer, Gustin, Koch, and Saltmiras, in which he asked: "…wouldn't an adverse IARC

evaluation have the real potential to impact the results of the Annex 1 renewal [reregistration of glyphosate in the EU]." Then, he also notes:

> "And while we have vulnerability in the area of epidemiology, we also have potential vulnerabilities in the other areas that IARC will consider, namely, exposure, genotox, and mode of action." (MONGLY00989918)

Among the many actions taken by Monsanto to buttress its response to a negative decision by IARC, a consulting agreement was put in place in November 2014 between former and retired Monsanto epidemiologist John Acquavella and Monsanto at $400 per hour. Donna Farmer was named as the principle point of contact. (MONGLY01224009)

A December 17, 2014 email from Kimberley Link in Monsanto's communications division to Daniel Goldstein discusses the need to identify Third-Party Network members to engage in the response to the IARC decision when it is made public. It reports that Monsanto had hired Potomac Communications to place favorable, ghost-written op-eds, targeting the Washington Post and USA Today, and a potential plan to approach officials in the American Academy of Pediatrics to find someone to serve as "high profile author." (MONGLY01021656)

A document dated February 15, 2015 describes "Glyphosate Key Points Following IARC Decision," and was developed by a Heydens-Farmer-Saltmiras led team preparing for release of the IARC decision. In the event that IARC assigns glyphosate-based herbicides "an unfavorable [possible carcinogen] 2B classification," the company set forth a plan that would hopefully generate an "***orchestrated outcry***" after the final classification decision is announced.

Triggering an "***orchestrated outcry***" is an accurate description of what Monsanto accomplished in the weeks and months following the March 2015 announcement of IARC's classification decision.

### 1. Monsanto's IARC "Talking Points" Drafted Before the IARC Decision is Released

The Monsanto-crafted IARC response plan set forth seven "Key Industry Points" critical of the feared, 2B classification. (MONGLY01021709-11) Seven more talking points for "Academics" are outlined, and include:

- "IARC has done a disservice by creating baseless fears with a cancer rating for glyphosate, and the confusing classification is certainly open to distortion by alarmists";
- The IARC decision "was predictable and political"; and
- "Government regulators remain reassuring about the potential risks."

About one month before the IARC decision was released, William Heydens sent an email to Donna Farmer, copied to Koch, Saltmiras, and Hodge-Bell, on the subject "RE: IARC Planning." The email describes "the next two most important things that we need to do…" These were a meta-analysis of epidemiology studies, and a re-assessment of Agricultural Health Study data that established a weak link between use of a glyphosate-based herbicide and multiple myeloma. (MONGLY00977267)

Heydens goes on to describe possible approaches to generate peer-reviewed journal articles undercutting the IARC classification (the genesis of these papers was described previously in the discussion of ghost-writing).

In a detailed, internal document dated February 23, 2015, Monsanto describes its multi-faceted plan for responding to the IARC decision due to be announced in about two weeks. It provides background on IARC, and states, for example:

> "IARC has a history of questionable and politically charged rulings on the carcinogenic properties of products such as cell phones, coffee and caffeine. We should assume and prepare for the outcome of a 2B rating (*possible* human carcinogen); a 2A rating (*probable* human carcinogen) is possible but less likely." (MONGLY02913526)

Attachment A to the February 23, 2015 document sets forth the "Objectives for Preparedness & Engagement" in Monsanto's response to the IARC decision. The two-bulleted items read:

- "***Protect the reputation and FTO of Roundup by communicating the safety of glyphosate***"; and
- "Provide cover for regulatory agencies to continue making reregistration decisions based on science."

Under "Strategies/Tactics" to achieve the above stated objectives, Attachment A states "Orchestrate Outcry with IARC Decision ~ March 10, 2015." (MONGLY02913530) The introductory section of the full document states that: "Regulatory is not aware of a situation where a regulatory body took a different position than IARC." (MONGLY02913526)

The "Key Deliverables" section outlines ***24 items and actions***, organized by milestone date (pre-IARC decision; week of Feb. 23-27; Post-Decision/Posting, etc). These include:

- Engage Henry Miller, "Inoculate/establish public perspective on IARC reviews" (Miller produced a hard-hitting *Forbes* piece the day of the release of the IARC decision);
- Blog posts;
- Outreach to EPA/IARC participants;
- Contact journals to inquire about press releases, for "amplification of scientific studies (a Saltmiras task, which went badly awry, see below);
- "Inform/Engage Industry Associations", with the objective "Lead voice in 'who is IARC' plus 2B outrage"; and
- Post-release of decision, "Outreach to key stakeholders," including grower groups, in order to "Neutralize impact of decision/gain support."

## 2. Monsanto Enlists Its Third Party Network to Criticize the Basis of the IARC Classification

A March 17, 2015 email was sent from Eric Sachs, head of Monsanto's public affairs and outreach efforts, to Henry Miller, a long-term, glyphosate-friendly member of Monsanto's

Third Party Network. In it, Sachs forwards to Miller a ghost-written draft of Miller's op-ed for Forbes that was written by Monsanto and Potomac Communications.

Five days earlier, Sachs had emailed Miller to ask him if he would be willing to write more on the IARC decision, to which Miller replied: "I would be if I could start from a high-quality draft." (MONGLY02063615)

On February 25, 2015, Donna Farmer received an email from Kimberley Link informing her that "you have been selected as one of the primary spokespersons for the company to defend glyphosate." (MONGLY01210309)

Michael Koch, a senior official and part of Monsanto's communications team, emails Farmer seven minutes later to "discuss" this new role for Farmer in the IARC response, and writes that "In the short term I think you are the right 'fix'."

A flurry of emails then addresses how to rapidly gear up the Third Party Network response, in support of Monsanto's critical reaction to the expected IARC 2B classification of glyphosate. (MONGLY01021648)

The communications team asks Dan Goldstein several times to identify experts that are vetted and prepared to say and write messages aligned with Monsanto's position. Such Third-Party Network experts would work with Farmer, and are needed so that the Monsanto communications team and Potomac Communications can move ahead with writing and placement of favorable, largely ghost-written op-eds.

Goldstein replies in a remarkable email dated September 23, 2015:
> "I realize that a non-paid individual would be preferred – but I do not know anyone who has kept up with this in their 'spare time' as a toxicologist and *one needs to be mighty prepared if one wishes to feel comfortable arguing with IARC*." (Emphasis added)

Goldstein estimates that a new expert would need "a good 10 hours of work in this, at $200 per hour" to accomplish the task (likely an underestimate of time required).

Kelly Clauss, another person working on Monsanto's IARC outreach and media response, emails Goldstein on February 23, 2015 with a list of experts to engage in the response effort, and for work with Potomac Communications. Five epidemiologists are identified and were listed in the email in order of "most to least familiar with published studies and data." The scientists identified in her list are:

- Tom Sorahan, University of Birmingham (an invited observer at the IARC meeting);
- Pam Mink, Emory University (did one review on glyphosate-cancer studies, one on non-cancer issues, both paid for by Monsanto);
- John Acquavella, former Monsanto employee, now retired and consulting with Monsanto;
- Elizabeth Delzell, University of Alabama-Birmingham; and

- Nalini Sathiakumar, University of Alabama-Birmingham (works with Delzell).

Richard Garnett replies to the list and writes that "Sir Colin Berry knows glyphosate but his contract, FCPA etc have expired so that would take 6 weeks to sort out."

Three days later on February 26, 2015, Donna Farmer responds to a now lengthy email chain on the subject "RE: URGENT: Draft email for experts to help with IARC." She begins her response to Goldstein and the communications team (Carla Lord, Kelly Clauss and Kimberley Link) with this sentence: "Help me understand why these folks were selected and who is Potomac?"

The next day, about two weeks before the release of the IARC decision, Carla Lord responds to Farmer and others on the email chain, with an explanation of the plan outlined earlier in the IARC response document:

"Donna,

Thanks and I'm sorry. I didn't realize until now that you were not on the original email string (included below). Potomac is a media house that is writing op-eds and letters to editors in response to negative press surrounding glyphosate. These would be 'authored' by those on the list then placed by Potomac in media where needed. Potomac writers would do the heavy lift with the expert authors as final editor. ***We know these items in the media need to be from those outside the industry***." (MONGLY01021648)

### 3.  Monsanto Receives Advance Warning of the IARC Classification from EPA

Four says after the end of the Working Group meeting and six days before the March 20, 2015 release of the embargo on the publication of the results of the IARC review in *The Lancet Oncology*, Donna Farmer reported in a March 14th email that a Monsanto colleague was on a CropLife Americas (CLA) call (pesticide industry trade association). An EPA representative, Jess Rowland, announced during the call the IARC decision to classify glyphosate as a Group 2A carcinogen. (MONGLY00977253)

Farmer's March 14, 2015 email was sent to Tom Sorahan, Monsanto's invited observer at the meeting, and other Monsanto colleagues including Christina Strupp, Jensen Mette, and William Heydens. These individuals were most directly involved with the IARC meeting. In the email, Farmer restates several of the plans and talking points in the IARC response plan document. She closes it by writing:

"We know it must have been a challenging week for all of you to try to keep the assessments based on sound science…"

Sorahan, the invited Monsano observer at IARC Working Group meetings, replies to Farmer and others on the email chain:

"I do know of instances where observers at IARC felt they had been treated rudely or brusquely at Monograph meetings. That was not the case for me at Vol.

122 [the one containing the glyphosate review and classification]. I found the Chair, sub-chairs and invited experts to be very friendly and prepared to respond to all comments I made…In my opinion the meeting followed the IARC guidelines. Dr. Kurt Straif, the Director of the Monographs programme, has an intimate knowledge of the IARC rules and insists they were followed."

The nature and scope of Monsanto's "response" activities expanded in the weeks and months after the release of the unexpected and highly consequential IARC decision.

Another Monsanto internal document circulated in April 2015 with the title "IARC Follow Up." Unlike all pre-decision planning documents, Monsanto is now dealing with the serious Group 2A "probably carcinogenic to humans" classification.  The goals, activities, and work products in this document include:

- "Invalidate relevance of IARC";
- "Protect regulatory FTO [Freedom to Operate]";
- "Litigation prevention/defense";
- "Protect Sales Globally"; and
- "Compilation of 3rd Party Statements in defense of glyphosate."
    (MONGLY03316369-71)

About the same time, John Acquavella sends an email to Donna Farmer. In it, he discusses IARC's assessment and final judgements on the epidemiology data. He writes:
    "IARC's classification of the epidemiology evidence follows directly from their definition of 'limited' [evidence]. ***There is not really much to quarrel about with respect to the epidemiology classification***."
    (Emphasis added; AcquavellaPROD00010215)

A draft Powerpoint entitled "Proposal for Post-IARC Meeting Scientific Projects" dated May 11, 2015, is circulated internally in preparation for a meeting. It begins by asking "Why do more?" in large letters, and then lists these reasons:

- "Severe stigma attached to Group 2A Classification";
- "Aaron Blair continues to defend work & exaggerate number of studies w/association while ignoring AHS";
- "In response to our critique, can expect IARC to beef-up monograph as much as possible";
- Likelihood that the impending ATSDR glyphosate review will support, and possibly concur with IARC's classification decision;
- Prop 65 [California State law requiring labeling of oncogenic products]; and
- Litigation support.  (MONGLY01228577)

Several new projects and scientific papers are outlined, nearly all to be authored by Third-Party Network experts. But in order to increase credibility and lower costs, ***"Majority of writing can be done by Monsanto" (i.e. ghost-written).***

Most of the internal documents and emails setting forth possible post-IARC actions include discussion of the need for new, Monsanto-commissioned and controlled peer-reviewed

papers providing Monsanto's critique of the basis of IARC's decision, and/or critical reviews of the findings and conclusions advanced by other scientists not adequately aligned with Monsanto's positions and messaging.

### 4. Post-IARC Plans Put Into Motion

From the fall of 2014, about six-months before the release of the IARC decision, to mid-2015 (about 4 months after the release of the decision), these discussions led to a plan to convene a "Glyphosate Expert Panel Review" of the scientific basis for IARC's classification of glyphosate as a "probably carcinogenic to humans."

The "Expert Panel" idea was eventually adopted, funds were committed, and the plan implemented, starting in late-June 2015. The panel would meet, discuss the issues, and produce a set of papers suitable for publication.

A detailed proposal describing several options for moving forward was presented to the "Glyphosate Strategy Team Meeting" on June 18, 2015. (Acquavella Exhibit 10-27; MONGLY03500777)

"Approach A" would entail an Expert Panel that "consists primarily of people we have worked with already…they have some/much knowledge…[and this approach would have] Lowest cost (est. $200-250k), but also lowest credibility/impact."

"Approach B" would be to add "a few 'big name' scientists & possibly some who have not worked for Monsanto before (more credibility)… hire a firm (Intertek, formerly CanTox) to manage the meeting…Cost estimate - $350-400k."

"Approach C" takes another step toward "credibility/impact" and would include hiring a well-respected risk assessment firm (presumably Intertek did not fall in this category based on Monsanto's assessment), in order to:
> "set up a totally independent review: they choose scientists, conduct meeting, write the report…Most credibility/impact but we have virtually no control…Cost estimate - $375-450k."

Approach B was the recommended path forward advanced during the meeting, and the one adopted and implemented. In fleshing out the plan, the document states: "Monsanto provides draft report which Experts edit & then publish…Use journal with quick review time…***Negotiate for expedited review with journal editor***."

A "Backup Slide" provides an even more detailed "Summary of Overall Process" and individual actions/steps include:
- "Review IARC Monograph to identify all areas that need to be addressed";
- "Prepare initial draft document";
- "Edit draft manuscript to capture meeting discussion/conclusions";
- "Send draft manuscript to Experts for their review";
- "Send manuscript to journal for review";

- "Revise manuscript per comments from journal"; and
- "Re-submit [papers] & get final approval from journal."

In other words, in Approach B, Monsanto would control the process, from producing an initial draft of the report/papers, to managing the revision of the drafts in response to the meeting of the experts, and making and/or approving responses to reviewer comments and final edits prior to submission.

This "Backup" slide failed to include two other key responsibilities Monsanto clearly reserved to itself – (1) deciding which names would appear on each published paper, and (2) deciding on the internal Monsanto information that would be provided to the expert panel and teams of co-authors.

A February 8, 2016 exchange between Monsanto consultant and *CRT* paper co-author John Acquavella, and Intertek's Ashley Roberts focuses on the difficulty Intertek, Monsanto, and the third-party expert co-authors were having in reaching a consensus on who would be listed as co-authors of the summary paper in the *CRT* special issue.

Both Acquavella and Roberts wanted the entire expert panel to sign the summary. But Acquavella tells Roberts that:

"I've had some initial correspondence from the panelists about the summary article and the consensus is that they will not be authors on an article that has inflammatory comments about IARC. Assuming those inflammatory comments were carried over from the animal carcinogenicity and genotoxicity articles, I'm sure the epi panelists would not want to be associated with those articles either. To achieve the complete authorship goal, an extensive revision of the summary article is necessary."

Roberts forwards Acquavella's email to Heydens, and writes:

"Hi Bill, Please take a look at the latest from the [Acquavella led] epi group!!!!  Can you call me once you have digested this."

Heydens replies the next day:

"Ashley,
OK, I have gone through the entire document and indicated what I think should stay, what can go, and in a couple of spots did a little editing."
(Heydens Exhibit 3-20)

The second responsibility generally reserved to Monsanto, and specifically claimed in the case of the Intertek/*CRT* paper-preparation process, was deciding what scientific materials to provide to the experts and co-authors. While Monsanto could not control access to published studies by its expert panel members, it had total control over the parts of its proprietary testing results that would be supplied to expert panel members.

This is evident in an August 6, 2015 email from Ashley Roberts to Donna Farmer in which she asks:

> "Please could you let me know in a sentence what we will be providing to the Animal Bioassay Expert group" (MONGLY01183933).

By the "we" in the phrase "what we will be providing," she really means what information Donna Farmer/Monsanto will provide to her/Intertek, so she/Intertek can then provide the information to the expert panel.

The 2015-2016 Intertek expert panel review of the IARC decision and monograph resulted in the publication of five papers, and a Foreword by the journal editor, Roger McClellan (all open access at http://www.tandfonline.com/toc/itxc20/46/sup1?nav=tocList). The papers included:

- Gary Williams et al., overview paper on the carcinogenic potential of glyphosate and the IARC assessment;
- Keith Solomon, assessment of exposure studies;
- Acquavella et al. on epidemiological studies;
- Gary Williams et al. on rodent bioassays; and
- Brusick et al. on weight of evidence evaluation of glyphosate, formulated glyphosate herbicides, and AMPA (major glyphosate metabolite).

Roger McClellan was aware of the intense scrutiny his journal's special issue on glyphosate safety would receive. Ashley Roberts was the employee of Intertek that managed the process of developing the papers and interacting with the journal as the papers moved through peer review and the publication process. On multiple occasions, the Editor McClellan stressed to Roberts the importance of clarity and full transparency in the Acknowledgements and Declaration of Interest sections of the papers.

McClellan's June 19, 2016 email to Roberts states:

> "I am still concerned about the tone in some places. Why antagonize the reader? I am still not clear as to the process used by all of the Panels. These reports are essentially a rebuttal of the IARC process and conclusions. There appears to be a reluctance to be absolutely clear in presenting exactly what IARC concluded, the panels conclusions and how they differ. Am I missing something?" (MONGLY02360733-34)

Six days later, Roberts replies from vacation. She states that "I am getting a lot of pressure to publish the papers for a lot of reasons as you can imagine." She then asks for the specific changes McClellan wants in the Acknowledgements and Declaration of Interest ("DOI") statements.

Just 90 minutes later, McClellan responds to Roberts. He spells out the changes he wants in the Acknowledgements (thank the reviewers for extensive comments received). He also says that "The Acknowledgements section should also identify any other reviewers of the paper and any editorial assistance." (MONGLY02360732)

In reference to the DOI statements, McClellan writes that it should:

"…make clear how individuals were engaged, i.e. by Intertek. If you can say without consultation with Monsanto that would be great. ***If there was any review of the reports by Monsanto or their legal representatives that needs to be disclosed.***"

Each of the papers has a similar "Declaration of Interest" statement. The DOI statement in the Brusick et al paper is quoted below:

"The employment affiliation of the authors is as shown on the cover page. However, it should be recognized that each individual participated in the review process and preparation of this paper as an independent professional and not as a representative of their employer….[Past and current relationship of each co-author to Monsanto is then listed]"

"The Expert Panel Members recruitment and evaluation of the data were organized and conducted by Intertek Scientific & Regulatory Consultancy…"

"Funding for this evaluation was provided by Monsanto Company which is a primary producer of glyphosate and products containing this active ingredient. Neither any Monsanto Company employees nor any attorney reviewed any of the Expert Panel's manuscripts prior to submission to the journal."

Based on my review of the detailed correspondence between Intertek and Monsanto, and the clear and direct involvement of Heydens and other Monsanto employees in ***ALL*** aspects of the process leading to the publication of these papers, I conclude that the first paragraph in the above quoted DOI is presumably truthful, the second paragraph is not truthful, and the second sentence in the third paragraph is not truthful.

Via direct interactions with Roberts of Intertek, it is clear that Monsanto reviewed, wrote much of, and approved the content of the papers prior to submission, and again as and after the papers were revised in response to peer review comments.

The composition of the expert panels was also controlled by Monsanto. Indeed, a July 1, 2015 email from William Heydens to Ashley Roberts tells her "we" (Monsanto) are adding two additional scientists, and that: "We just learned this morning that we can't have you send out 'invitations' until the names have been approved by our legal group." (MONGLY00992949-51)

### 5. Heydens Drives the Intertek Project

Monsanto was heavily involved in all stages of paper preparation. Heydens, in particular, played a direct, hands-on role.

In an August 28, 2015 email to Donna Farmer and other Monsanto colleagues, Heydens circulates for comment his first draft of the Intertek Expert Panel report on the carcinogenic potential of glyphosate. (Acquavella Exhibit 10-30; MONGLY02844211)

In the draft Heydens circulated, "William Heydens" does not appear as a co-author, nor does his name appear on any of the papers as published. In failing to truthfully acknowledge authorship, and declaring in the conflict of interest disclosures that Monsanto employees played no role in the review of the papers, I conclude that Monsanto violated ethical norms governing scientific publishing, including the policies of the journal *Critical Reviews in Toxicology*.

Heydens was influential, if not responsible for many critical decisions about how strongly to make reassuring, positive statements regarding the safety of glyphosate and Roundup herbicides. He controlled how sharply the papers criticize both the IARC report, and the studies in the peer-reviewed scientific literature that the IARC working group relied upon most heavily in reaching its "probably carcinogenic to humans" classification.

For example, Heydens sharply disagreed with some panel-members and ex-employee Acquavella over how strongly to state criticisms of the IARC classification decision. Examples of such disagreements are evident throughout Heydens' track-changes comments and editing of Acquavella's edits to the draft of the summary panel report. (MONGLY01000680-01000709)

Aquavella's paper on the epidemiological data is an outlier in two ways. The list of co-authors appears to accurately represent the contributions of different people to the paper. The Acquavella et al. paper also contains a different, and more truthfull version of the statement regarding Monsanto's role in the review of the papers; the Acquavella et al. DOI states:
> "The authors had sole responsibility for the content of the paper, and the interpretations and opinions expressed in the paper are those of the authors."

## 6. Ethical Lapses Catch Up with Monsanto and Intertek

On September 28, 2018, the Editor of *Critical Reviews in Toxicology* ("CRT") and the publisher of the journal (Taylor and Francis) issued an "Expression of Concern" via its website that was subsequently published in the journal. (https://doi.org/10.1080/10408444.208.1522786)

The "Expression of Concern" states in large part:
> "We…have been informed of concerns over the completeness of acknowledged contributions [to the special glyphosate issue]…and in declarations of interest provided by the named contributors, for the following articles: [the five core papers in the issue are then listed]."

> "We have requested corrigenda from the authors to provide additional disclosure as to the contributions to the articles. To date, we have only received corrigenda for three of the five articles that have been agreed to by all the authors. We have not received an adequate explanation as to why the necessary level of transparency was not met on first submission. We thank those who brought this to our attention."

In my opinion, the Declaration of Interest statements accompanying the papers in the *CRT* special issue on glyphosate were not just incomplete, they were blatantly untruthful, as evident in the email traffic discussed above.

It is also my opinion that if the Editor of *CRT* and the publisher, Taylor and Francis, understood the full degree to which Monsanto controlled the production of these five papers, the publisher would retract all the papers, except Acquavella et al, and issue an apology to its readers.

## C. Political and Other Activities Post-IARC

The breadth of Monsanto's activities in response to the IARC classification of glyphosate is striking.  A June 5, 2015 update on "US Government Outreach – WHO IARC Classification on Glyphosate" outlines dozens of ongoing and proposed actions and goals. Under "THE STRATEGY", the document states:

> "One strategy for addressing widespread confusion in the wake of the IARC classification has been to seek clarification from the World Health Organization (WHO [IARC's parent body]) which would provide the proper context of the classification for governments and regulators around the world to have greater confidence defending their science based regulatory decisions."
> (MONGLY02953363)

The document reports on multiple briefings given to U.S. government agencies, including a Donna Farmer briefing of Dr. Mitchell Wolfe, the Deputy Assistant Secretary for Global Heath in the Department of Health and Human Services ("HHS"). According to Farmer, "we came prepared with a robust set of technical materials for the Secretary's background…".

In the briefing for HHS Deputy Secretary Dr. Wolfe, he was told about ATSDR, an agency under HHS of which he was reportedly unaware. Monsanto told Wolfe about the ongoing ATSDR review of glyphosate, and made the case that such a review was unnecessary, and that the EPA bears the primary responsibility for "determination of pesticide safety."

Monsanto went on to brief Wolfe on "A common element between IARC and ATSDR…Christopher Portier Ph.D…[who] was [formerly] Director of ATSDR and co-chair of the IARC Advisory Group."

Dr. Portier's views on glyphosate oncogenicity were discussed, as was the fact that Dr. Portier "was an invited specialist representing the Environmental Defense Fund." According to Monsanto's recounting of the meeting:

> "Dr. Wolfe said he would follow up on what was going on with ATSDR and he was encouraged to have discussions with the EPA staff, as well."

Last, Monsanto asked for Wolfe's and HHS's "assistance in securing a WHO clarification. We emphasized that we were not seeking changes to IARC, the classification or the IARC process."

In fact, Monsanto had already initiated, and is still carrying out campaigns to punish IARC for its classification through, among other things (details below):

- Lobbying members of Congress to challenge U.S. government funding for IARC, via U.S. government support for IARCs governing body, the WHO;
- Calling for Congress to hold hearings;
- Mounting a campaign to force IARC to release drafts of its glyphosate review document and notes from Working Group deliberations;
- Working with a Washington Post reporter purportedly doing a hit piece; and
- Mounting multi-faceted outreach and Third-Party Network criticisms of the IARC process, the people who participated in it, the conclusion it reached, and of IARC's accountability.

Accordingly, the statement in Monsanto's account of the Wolfe-HHS briefing that "…we were not seeking changes to IARC, the classification or the IARC process" was not truthful.

### 1. Blocking the ATSDR Review of Glyphosate

Another important Monsanto post-IARC action-item was its efforts to stop an ongoing ATSRD review of glyphosate safety. The company had concluded that an ATSDR review that supported IARC's conclusions and classification decision would be damaging and should be avoided. (MONGLY03342947)

To stop or influence the outcome of the ATSDR review, Monsanto:

- Sought and carried out meetings, briefings, and webinars with ATSDR to communicate its assessment of the issues, explain why it felt the ATSDR review was unneeded, and to highlight what Monsanto asserted were scientific flaws in the IARC review;
- Received significant help from two senior OPP/EPA officials – Jess Rowland and the OPP Director, Jack Housenger;
- Sought assistance and support from the Deputy Assistant Secretary for Global Health in HHS (the agency home of ATSDR);
- Asked Monsanto's home-state Senators to contact HHS and reinforce the urgency of quick HHS action to intercede with ATSDR;
- Lobbied Congresswoman Lynn Jenkins to submit questions regarding the ATSDR glyphosate review to the Secretary of HHS at the conclusion of a hearing before the House Ways and Means Committee on health care reform (MONGLY03064699); and
- Recruited individuals to write letters to Congressmen complaining that the ATSDR review was duplicative and a waste of taxpayer money, so that the letters could be used to trigger media coverage of the Monsanto-orchestrated campaign to stop the ATSDR study. (MONGLY03342947)

A reasonable and prudent pesticide manufacturer committed to product safety would not respond to any serious effort like ATSDR's to better understand the toxicity of one of its products, nor devise and carry out a secret plan to obscure scientific discourse intended to better mitigate excessive risks.

## D. Downplaying Glyphosate Risks

Pesticide companies bear responsibilities and obligations vested in various laws and regulations to assure that the products they bring to market are safe, and will reliably produce the benefits for which they are registered, i.e., control of weeds in the case of glyphosate-based herbicides. Such responsibilities and obligations are codified in voluntary pesticide industry standards of care such as the FAO International Code of Conduct on Pesticide Management (formerly the International Code of Conduct on the Distribution and Use of Pesticides), and the many pledges made over the years on the Monsanto website, and before the internet, Monsanto documents.

The term "product stewardship" is used within the industry and regulatory agencies to describe and encompass the actions pesticide manufacturers should take on an ongoing basis in the interest of promoting the safe and sustainable use of a pesticide, before and after a new use of a pesticide is approved.

In the pesticide arena, the sciences supporting both human-health risk assessments and environmental-impact assessments are dynamic and imperfect. They depend heavily on location- and even application-specific data, which are almost never available on a large scale. So, in both companies and regulatory agencies, many assumptions and a considerable degree of judgement is essential in deciding upon the science that must be conducted prior to seeking and approving a new use of a pesticide, or when considering the terms on which a pesticide should be re-registered.

Where to draw the line between presumably safe and possibly risky pesticide uses is fraught with scientific, social, and political challenges. These challenges give rise to uncertainty, tension, and controversy. The same is true after approval of a pesticide, as companies and regulators strive first to refine and agree on the nature and magnitude of risks, given how a pesticide is actually used in the real world, and second, as regulators and registrants respond to how widely and frequently a pesticide is used.

***These last two, post-approval considerations are unknowable the day a new pesticide is approved.***

Monsanto claims that the company bases its product development, testing, commercialization, and engagement with regulators on the best available science, and pledges the safety of its customers is "job #1." I conclude neither claim is consistent with Monsanto's actions and behavior.

## E. Understating Risks

There are dozens of examples in the discovery record in which Monsanto employees, consultants, Third Party Network scientists, and PR firms prepare and share written materials

that overstate what is known and settled science (e.g., "get up and shout glyphosate is non-toxic"). Likewise, the significance of other known facts are repeatedly downplayed (e.g., glyphosate-based herbicides are genotoxic in some tests, but…).

In an episode described in detail earlier, Monsanto's senior official in the Washington D.C. office, Dan Jenkins, misrepresented statements made by Monsanto consultants brought by he company to an EPA Scientific Advisory Panel (SAP) meeting. The inaccurate statements were contained in a post-SAP-meeting letter from Jenkins to the EPA. The letter asserted that Monsanto's invited guests testified at the SAP meeting that a repeat mouse study, in light of the magic tumor controversy, was not warranted. None of the Monsanto-invited experts made such a statement.

Other examples of overstating benefits or understating risks are discussed below.

### 1. The IARC Review Process

In 2014, Monsanto initiated a number of activities to potentially influence the decision reached by the IARC Working Group assessing glyphosate carcinogenicity, and to deal with fallout from an expected, negative decision by IARC (classification of glyphosate as a "possible human carcinogen"). These activities have been addressed previously.

A paper on genotoxicity was among the papers Monsanto commissioned and guided through the publication process in the hope of influencing the deliberations of the IARC Working Group. But time was of the essence, because the purpose of this paper was to influence the outcome of the IARC review, not to respond to it.

Larry Kier, then a consultant to Monsanto and a former employee, was listed as the author of the Kier paper, which had been submitted to Roger McClellan, Editor of the journal *CRT*. The 2015 *CRT* paper by Kier was entitled "Review of genotoxicity biomonitoring studies of glyphosate-based formulations" (Vol 45(3): pages 209-218; accessed 12/10/17 at http://www.tandfonline.com/doi/pdf/10.3109/10408444.2015.1010194?needAccess=true).

The paper's "History" declaration states that the initial paper was submitted to *CRT* on January 7, 2015 and was revised by the author and submitted back to *CRT* on January 17, 2015. It was accepted for publication by the journal the next day, January 18th, and published online February 16, 2015, or about one month before the March 3-10, 2015 final meeting of the IARC Working Group conducting the glyphosate assessment.

Only 11 days transpired from the date of the original submission to the acceptance of the Kier paper. This meant that the peer review process, the editor's assessment of the reviewer comments, the author's revisions in response to peer-review comments, submission back to the journal, the editor's consideration of the author's response to reviewer comments, and the decision to accept and publish all occurred in 11 days—a staggering pace.

I have published about four-dozen peer-reviewed papers. Between several months to about one year transpired between initial submission and acceptance of each of them, a time-frame that is typical of most papers in most peer-reviewed science journals.

There had to have been an extraordinary set of circumstances driving the pace of the publication process for this Kier paper.

On February 19, 2015, a few days after the Kier (2015) *CRT* paper was published online, an email exchange occurred between the journal editor Roger McClellan and Monsanto's David Saltmiras.

The email chain starts on February 19, 2017 with an email from Saltmiras to *CRT* editor McClellan that begins "Roger – FYI on press releases." This email was not cc'd to the author, Larry Kier.

The email focused on the content of promotion material that Saltmiras had drafted and sent to the journal editor, for use by the journal and its publisher in promoting the paper. Saltmiras included a request that McClellan and the publisher take steps to raise the visibility of the Kier paper. (MONGLY01087311-17)

The Saltmiras email to McClellan advances "Sound bytes for social media."

A few hours later in response to the suggestions from Saltmiras, McClellan sent an email to Charles Whalley, a senior manager at the publishing company Taylor and Francis (T and F) that puts out CRT. The email begins:
> "I spoke with David Saltmiras today concerning the two Glyphosate papers that will be the lead papers in the next issue of Critical Reviews in Toxicology with regard to F and F [referring to T and F, the first "F" in the original text is a typo] putting out any publicity on these two papers. The email below includes complete citations for the papers, abstracts and some information developed by Monsanto Company on the papers."

The McClellan email to Whalley goes on to state the relevance of the Kier (2015) paper to the ongoing IARC glyphosate review, and then writes:
> "As a bottom line the two papers [Greim et al. and Kier] published on line in *CRT* are likely to attract some attention in the scientific and regulatory community and, possibly, by lay media."

McClellan then asks about Taylor and Francis policies regarding the publisher's promotion of just-released papers and asserts that the two papers "would be excellent candidates" for such a promotional effort by the publisher.

As a courtesy, McClellan also sent a copy of his February 19, 2017 email to David Saltmiras and Larry Kier. Just under a half-hour later, Kier responded by email to *CRT* Editor McClellan. He begins:

"I'm a little cautious about high levels of publicity for the biomonitoring review [that I am listed as the author of] and have concerns about some of the suggested publicity material." (MONGLY01087312)

Kier then writes:
"I don't know who wrote the 'Summary' for my paper and certainly don't want to offend them but it is not the way I would have worded it and I would personally not want this used to characterize my paper."

The differences between the "Summary" of Kier's paper sent to McClellan by Saltmiras, and the revised "Summary" Kier wrote and included in his email to McClellan are significant. The key passages from the Saltmiras-submitted "Summary" of Kier's paper read:
"The author concluded that there are no direct risks to human DNA under normal exposure conditions" and "these results confirm previous conclusions that glyphosate-based herbicides do not damage DNA in humans following real world exposures."

The comparable passages that Kier wrote for a revised "Summary" of his paper read:
- "The author concluded that these studies [on genotoxicity] do not indicate significant genotoxic risks to humans from glyphosate-based herbicides under normal exposure conditions"; and
- "These findings are consistent with an earlier review of an extensive number of laboratory studies that indicated little likelihood of significant genotoxic risk or reaction with DNA under normal exposure conditions."

The Saltmiras version of the first sentence quoted above is unequivocal – "there are no direct risks to human DNA." Kier's rewrite includes an important change. Instead of "no risk," Kier writes that there is an absence of "significant genotoxic risks", but only in the event of "normal exposure conditions."

In the second key passage quoted above, the Saltmiras version states that glyphosate-based herbicides "do not damage DNA in humans." Kier's rewrite says that there is "little likelihood of significant genotoxic risk or reaction with DNA under normal exposure conditions."

This version contains three caveats. First, there is "little likelihood," but hence some chance of "significant genotoxic risk or reaction" under normal conditions.

Second, Kier leaves the door open for less than "significant" genotoxic risk or reaction under normal conditions. Third, under not "normal," and presumably high-exposure scenarios, there would be heightened likelihood of modest to significant genotoxic risk.

In the same email to McClellan, Kier then turns his attention to the "Sound bytes for social media" in the Saltmiras email from earlier the same day. The sound bites state that glyphosate-based herbicides "do not damage cellular DNA…" and are "not associated with DNA damage in human cells." About these statements, Kier writes:
"I also don't think the 'Sound bytes for social media' are accurately worded. They

are way too absolute for my taste and place undue emphasis on the strength of the
biomonitoring data. Unfortunately, I can't readily suggest alternatives that fit
nicely into the 'sound byte' format."

Nine minutes later at 5:12 p.m., after receiving the above described email from Kier, CRT
Editor McClellan responds to Kier, sending a copy to Saltmiras. He writes:
"Larry:

What I forwarded to T and F (Charles Whalley) is what I received from David
Saltmiras. I assumed you were in the loop on what had been developed at
Monsanto. I suggest you get in touch ASAP with David."

Around noon the next day, Larry Kier does email David Saltmiras. His message is terse and
to the point, and quoted in full below:
"David,

I think I might have misunderstood something in our earlier conversation today
but apparently the Summary and Sound bytes were from Monsanto.

Please consider the bcc: comments I sent earlier to Roger. While I definitely
support glyphosate and GBF's [glyphosate-based formulations] I really don't
want to have ***inappropriate absolutes*** representing this [Kier, 2015] review."
(Emphasis added; MONGLY01087311).

## 2. Advertising

In June 1988, a member of the medical school faculty at the University of Iowa saw an
advertisement for Roundup herbicide on TV depicting an application of the herbicide. The
person in the advertisement was wearing gym shoes, a short sleeve shirt, and long pants. He
called the EPA to raise concern over the safety of such a method of application under the
conditions depicted in the advertisement.

Edwin Tinsworth, then Director of the OPP Registration Division, wrote a July 26, 1988
letter to Dr. Timothy Long, then Roundup's Registration Manager, stating that: "We are
concerned that advertisements for Roundup (running through July in Iowa and perhaps other
soybean growing areas) show the product being applied in a manner inconsistent with
protective clothing requirements…and we request that you cease running these spots."

In a certified letter dated April 7, 1992 to Monsanto, Leo Alderman of the Toxics and
Pesticides Branch in EPA Region VII challenges misleading claims made in Monsanto
advertising literature promoting Roundup sales. These statements included:
"Roundup doesn't stay in the soil, won't leach to nearby plants and breaks down into
natural substances…Nothing kills weeds better, or easier, than
Roundup…Biodegradable."

He instructs Monsanto that "such statements should be removed from all literature advertising the product…" Alderman directs Monsanto to cease distributing all advertising material with such claims and that Monsanto send him/EPA copies of the revised advertising material within 30 days.

In 1996, the Consumer Frauds and Protection Bureau of the Attorney General of the State of New York brought an action against Monsanto over assertions and safety claims in multiple print ads appearing in publications distributed in the State. (MONGLY02510516-544)

The Attorney General found that Monsanto advertising claims that Roundup-brand herbicides:
- "…are safe and will not cause harmful effects to people…";
- Are safe "because they quickly break down into natural substances"; and
- Are "good for the environment".

The AG also states that Monsanto advertising asserts or implies that "The characteristics of Monsanto's glyphosate-containing pesticide products can be adequately described by the characteristics of glyphosate alone." (MONGLY 02510519)

The AG found "that the representations set forth in paragraphs E and F above [encompassing the above quoted claims] constitute false and misleading advertising." After presenting why Monsanto's advertising claims were false and misleading, the AG reports agreement from Monsanto to cease and desist making all such claims in advertising associated with the marketing of Roundup in New York.

In my opinion, the New York AG was correct to challenge the basis of multiple claims in Roundup advertising.

In addition, Monsanto has failed to dissuade false and dangerous assertions and statements regarding the risks associated with exposures to Roundup. One of the common, and most dangerous assertions often encountered is that "Roundup is safe enough to drink."  This is not true.

## F. Freedom to Operate (FTO)

Tensions often arise between the commercial interests of a pesticide manufacturer and what the latest and best science suggests is the most responsible way to manufacture, label, communicate with the public, and sell a given pesticide.

In Monsanto, protecting its FTO in the manufacture and sale of glyphosate-brand herbicide was a clearly expressed objective across the company. Investing in new science to assure and enhance the safety of Roundup was not a Monsanto priority.

Monsanto's John Acquavella made the case for one such investment in better science as part of a proposal for a new, industry-funded, multi-pesticide non-Hodgkin lymphoma epidemiology study.

137

The goal of the study, among other things, would be to respond to the positive glyphosate-NHL results in the Hardell-Eriksson papers, and the forthcoming epidemiological study results from the National Cancer Institute's "Agricultural Health Study":

"There are a number of reasons why industry should consider this proposal seriously. First, allegations that pesticides cause cancer are important to the business and regulatory climate for pesticide manufacturers and, indeed, companies have *a product stewardship obligation* to ensure that their products can be used safely." (Emphasis added, MONGLY00894005)

Monsanto did not follow Acquavella's advice. It has never conducted an epidemiological study to evaluate the relationship between NHL and Roundup formulations, nor has the company conducted an epidemiological study on its own employees involved in the manufacture of glyphosate and Roundup.

## 1. Responding to FQPA Challenges

Passage of the Food Quality Protection Act ("FQPA") in 1996 changed the basic standard and rules governing the setting of food-additive tolerances for pesticide known to be oncogenic, including glyphosate beginning in 1983. Implementation of the FQPA required EPA to deal with dozens of science and risk-assessment policy issues, a process that took several years. Roundup was among the Monsanto products likely to be impacted by the FQPA.

Monsanto established an "FQPA Core Team to engage with EPA as it developed FQPA policies and procedures, and to alert colleagues of possible implications for the labels and tolerances sanctioning use of specific Monsanto pesticide products". (MONGLY03750989) Abby Li [FND/1735] was a member of this FQPA Core Team. She sent a November 20, 1999 email to several Monsanto management team and senior officials regarding the activities of the FQPA Core Team. After listing the six members of the FQPA Core Team, the email stated:

"This [membership] is a good mix of people that allows us to have external influence as well as ensure that we have practical understanding of the full impact to our products. I'd like to make sure we push hardest on those issues that are threatening our business." (MONGLY03750989)

Two days earlier, on November 18, 1999, Abby Li sent an email to 10 Monsanto colleagues regarding a scoping session on the evolving OPP policies governing aggregate pesticide risk assessments under the FQPA. (The FQPA directed the EPA to take account of exposures to a given pesticide from water, food, occupational, atmospheric, and any other routes of exposure; such total estimates of exposure from all routes are called "aggregate exposure" in the context of FQPA implementation).

The email begins: "Dear people who might be interested in the FQPA…" The last paragraph addresses the membership of the FQPA Core Team and key areas of expertise that need to be represented. Then, Abby Li writes: "A key goal is to understand how our products are

impacted so we know what issues Monsanto should fight the hardest on".
(MONGLY03750990)

## 2.  Misleading Statements Regarding Relative Risks

In multiple Monsanto public presentations, Powerpoints, media interviews, and promotional material used since the 1980s, Monsanto claims that glyphosate and some formulated Roundup products are less acutely toxic than nicotine, caffeine, aspirin, and salt (e.g. see slide #8 in an internal February 16, 2009 Powerpoint by David Saltmiras, a senior Monsanto toxicologist.

Slide #8 in this Saltmiras presentation includes the following admonition to his colleagues below the graphic showing glyphosate and Roundup-brand acute toxicity compared to other pesticides and common food ingredients and drugs: "FAO Code of Conduct -- we would not publicly compare these products."

Saltmiras's warning, however, has not prevented such comparisons to be a common feature in glyphosate and Roundup FTO PR campaigns, talking points, and media coverage.

The stated goal of FTO runs counter to Monsanto's Roundup stewardship responsibilities. A reasonable and prudent pesticide manufacturer would not sacrifice its stewardship obligations to achieve FTO objectives, as Monsanto has done repeatedly over the last 30-plus years.

## 3.  Section 6(a)(2) of FIFRA

Section 6(a)(2) of FIFRA, discussed earlier, is a provision in federal law intended to vest responsibility on pesticide registrants to report to EPA any new information, data, or insights regarding pesticide risks that are gained by the registrant, regardless of the source of the information.

The June 1986 Registration Standard for glyphosate contains this passage:
"Registrants [at this time for glyphosate, only Monsanto] are reminded that FIFRA sec. 6(a)(2) requires them to submit factual information concerning possible unreasonable adverse effects of a pesticide at any time that they become aware of such information…*including interim or preliminary results of studies, if those results suggest a possible adverse effect on man or the environment*. This requirement continues as long as your products are registered by the Agency." (page 3; emphasis added).

In my opinion, there are multiple instances in the record where Monsanto did not disclose information that might suggest to EPA a new or heightened risk to applicators from use of glyphosate-based herbicide. Some information not properly disclosed under Section 6(a)(2) arose from the company's inhouse research or commissioned studies (e.g,. the TNO rat skin penetration study; Dr. Parry's three reports), while other information was learned by Monsanto from the experience of users of the company's products.

The failure of Monsanto to provide such information to EPA was particularly serious in the context of this litigation, because such information, individually and collectively, would have dramatically altered EPA's assessment of mixer-loader, applicator, and occupational exposures to Roundup.

Moreover, I have reviewed multiple depositions of plaintiffs in this litigation to learn more about how they were exposed to Roundup. ***In every case, the vast bulk of the exposure episodes recounted by plaintiffs occurred during the mixing-loading and application of Roundup, or when fixing or maintaining application equipment used to spray Roundup***.

I am unaware of a single plaintiff who alleges that their exposure to glyphosate via the diet caused their non-Hodgkin lymphoma. Dietary exposure to glyphosate was, and remains the primary focus of the EPA's evaluation of glyphosate oncogenicity.

These are my conclusions and opinions, which I hold to a reasonable degree of scientific certainty.

_____  _____
Charles M. Benbrook, PhD.
August 31, 2021

# Appendix A. Resume

# CHARLES M. BENBROOK

**BUSINESS/HOME ADDRESS**: 10526 SE Vashon Vista Drive, Port Orchard, WA 98367
**PHONE**: (208) 290-8707 (Cell and work)
**E-MAIL**: charlesbenbrook@gmail.com
**WEBSITE**: www.hygeia-analytics.com

## PERSONAL INFORMATION

Birth Place:     Los Angeles, California
Children:        Stephen, Rachel, Michael, Seth and Zachary
Wife:            Karen Lutz Benbrook
Hobbies:         Fishing, Music

## EDUCATION

B.A. Degree - Economics, Harvard University (1971)
M.A. Degree - Agricultural Economics, University of Wisconsin (1979)
Ph.D. - Agricultural Economics, University of Wisconsin (1980)

## EMPLOYMENT HISTORY

Heartland Health Research Alliance, LTD (HHRA), Executive Director. October 1, 2020 to present.

> Founded in 2020, this 501 (c) 3 non-profit conducts cutting-edge science and policy analysis focused on how food and food systems impact public and environmental health. Responsibilities include providing scientific guidance, raising funding and budget tracking, and managing staff. The HHRA's flagship project is the Heartland Study, a multi-center birth-cohort study on the impacts of pre-natal and early life herbicide exposures on pregnancy, childbirth, birth defects, and children's development. Responsibilities include overseeing an elite, multi-disciplinary team of scientists and communicators conducting research, in order to support farming system changes, identify policy innovations, and guide regulatory actions to incrementally reduce pesticide risks.

Benbrook Consultant Services (BCS), President. December 1, 1990 to present.

> Analytical services for domestic and international clients in the public and private sectors. Areas of focus include biotechnology; pesticide use, risks, and regulation; adoption and costs-benefits of Integrated Pest Management; impacts of federal environmental and food laws, especially the Food Quality Protection Act of 1996. BCS specializes in the development of novel methodologies to assess environmental and public health risks, policy issues, and research needs. Services also include litigation-related evaluations and testimony. Litigations to date have involved herbicides (e.g. Oust, Roundup, Poast), the insecticide chlorpyrifos, and the labeling of genetically engineered foods.

<u>Washington State University, Center for Sustaining Agriculture and Natural Resources,</u> Research Professor. August 16, 2012 to May 15, 2015.
Adjunct Faculty, Department of Crop and Soil Sciences, Washington State University, October 31, 2007 to August 26, 2015

Research scientist and program leader for the "Measure to Manage Program – Farm and Food Diagnostics for Sustainability and Health."

<u>The Organic Center</u>, Chief Scientist. January 1, 2006 to May 31, 2012.

Developed and managed a program of research on the environmental and consumer health benefits of organic foods and farming.

<u>National Research Council/National Academy of Sciences</u>, Washington, D.C. Executive Director, Board on Agriculture.  January 16, 1984 to November 30, 1990.

Responsible for overseeing and managing activities of the Board. Major BA/NAS reports published during this period addressed the methods and applications of agricultural biotechnology; unique risks faced by infants and children from pesticide exposure; resistance to pesticides; options to improve the nutritional composition of animal products; and, agricultural research and education.

<u>Subcommittee on Department Operations, Research, and Foreign Agriculture, Committee on Agriculture, U.S. House of Representatives</u>.  Subcommittee chaired by Congressman George E. Brown, Jr., Staff Director.  April 1981 - January 13, 1984.

Responsibilities included:  (i) preparing and analyzing legislation within the jurisdiction of the subcommittee; (ii) organizing subcommittee hearings and business meetings; and, (iii) briefing members and staff on legislation and oversight activities.

 <u>Council on Environmental Quality, Executive Office of the President</u>, Agricultural Policy Analyst. December 1979 - March 1981.

Represented CEQ on various Executive Branch committees; analyzed natural resource data and policy options; and (iii) conducted research and contributed to multiple Executive Branch reports.

## AWARDS and HONORS

Visiting Scholar, Bloomberg School of Public Health, Johns Hopkins University, March 31, 2017- June 30, 2018

Visiting Professor, Newcastle University, Newcastle, U.K. 2016 - 2019

Excellence in Science Award, OTA/TOC Dinner, March 2014.

Appointed as member, USDA's AC 21 agricultural biotechnology advisory committee, 2010, and reappointed in 2013.

Appointed to AGree Advisory Committee, 2010.

Appointed as Adjunct Faculty Member, Department of Crop and Soil Sciences, Washington State University, Pullman, Washington, 2007.

Graduated cum laude from Harvard University, 1971.
Received $1,000 cash award from the Council on Environmental Quality for contributions to the completion of the National Agricultural Lands Study.

## RESEARCH and ANALYTICAL ACTIVITIES

1979-1983:  Basic analytical work on the extent and distribution of soil erosion, findings used in development of the conservation provisions in the 1985 farm bill.

1981- 1983: Congressional oversight investigation of the pesticide regulatory activities of the Environmental Protection Agency, wrote a three-volume subcommittee report: "EPA Pesticide Regulatory Study." The report's findings and recommendations set in motion activities that led to the 1984-1987 NAS report *Regulating Pesticides in Food: The Delaney Paradox* (1987), the seminal 1993 NAS report *Pesticides in the Diets of Infants and Children,* and passage of the "Food Quality Protection Act" in 1996.

1988-1989: Compiled data and conducted analysis of private sector research investments in the food and agricultural industries, leading to Appendix B, "Private Sector Research Activities and Prospects", in *Investing in Research: A Proposal to Strengthen the Agricultural, Food, and Environmental System*, NAS Press, 1989.

1995-2000: Developed the first system in the U.S. that quantifies the level of adoption of Integrated Pest Management along the "IPM continuum." This early model of IPM adoption has been refined and augmented through several iterations and applications in multiple projects, some of which are ongoing.

1999-2004: Developed a method to estimate the usage of subtherapeutic antimicrobials in livestock production for growth promotion and disease prevention.  Did the analytical work and was principle author of the Union of Concerned Scientists' report *Hoggin It! Estimates of Antimicrobial Abuse in Livestock* (2001).

2004-June 2012: Developed the "Nutritional Quality Index" (NQI), a food nutritional profiling system encompassing 26 essential nutrients.  For the first time ever, applied the system to all foods consumed in a day by an individual.  Utilized model in assessment of the fatty acid profile of organic versus conventional whole milk.

2013-2014: Posted on the M2M website at Washington State University interactive systems allowing access to: (i) USDA pesticide use data by crop, state, and over time in the U.S., and (ii) detailed information on pesticide residues and risk levels in food, for organic and conventional food, and imported foods and domestic production.

## PEER-REVIEWED PUBLICATIONS, REPORTS, PRESENTATIONS and ARTICLES

Published over 40 articles in peer reviewed journals, spanning multiple disciplines including agricultural biotechnology, pesticide use and residues in food, soil and water conservation, pesticide risk assessment methods, Integrated Pest Management, nutrition, germplasm conservation, scientific basis for evaluating agricultural technologies, antibiotic use and resistance, food safety, international agricultural development, sustainable agriculture, and agricultural policy. See https://hygeia-analytics.com/about/who-we-are/#publications for a list of publications with links to full text where available.

## Partial List of Peer Reviewed Papers

Benbrook, Charles M., & Davis, Donald R.; "The dietary risk index system: a tool to track pesticide dietary risks;" Environmental Health, 2020, 19(1); DOI: 10.1186/s12940-020-00657-z.

Mesnage, R, Benbrook, C, Antoniou M.N. "Insight into the confusion over surfactant co-formulants in glyphosate-based herbicides," *Food and Chemical Toxicology*, 2019, 128:137-145. https://doi.org/10.1016/j.fct.2019.03.053

Benbrook, Charles "How did the US EPA and IARC reach diametrically opposed conclusions on the genotoxicity of glyphosate-based herbicides?," *Environmental Sciences Europe*, 2019, 31(1). DOI: 10.1186/s12302-018-0184-7. https://enveurope.springeropen.com/articles/10.1186/s12302-018-0184-7.

Benbrook, Charles, "Why Regulators Lost Track and Control of Pesticide Risks: Lessons From the Case of Glyphosate-Based Herbicides and Genetically Engineered-Crop Technology," *Current Environmental Health Reports*, 2018, 5(3), 387-395. DOI: 10.1007/s40572-018-0207-y. https://www.ncbi.nlm.nih.gov/pubmed/30003510.

Benbrook, Charles, Davis, D. R., Heins, B. J., Latif, M. A., Leifert, C., Peterman, L., Butler, G., Faergeman, O., Abel-Caines, S., & Baranski, M., "Enhancing the fatty acid profile of milk through forage-based rations, with nutrition modeling of diet outcomes," *Food Science & Nutrition*, 2018, (3), 681-700. DOI: 10.1002/fsn3.610. https://www.ncbi.nlm.nih.gov/pubmed/29876120.

Vandenberg, L. N., Blumberg, B., Antoniou, M. N., Benbrook, C. M., Carroll, L., Colborn, T., Everett, L. G., Hansen, M., Landrigan, P. J., Lanphear, B. P., Mesnage, R., Vom Saal, F. S., Welshons, W. V., & Myers, J. P., "Is it time to reassess current safety standards for glyphosate-based herbicides," *Journal of Epidemiology and Community Health*, 2017, 71(6), 613-618. DOI: 10.1136/jech-2016-208463. https://jech.bmj.com/content/jech/71/6/613.full.pdf.

Benbrook, Charles, "Enhancements Needed in GE Crop and Food Regulation in the U.S," *Frontiers in Public Health*, 2016, 4, 59. DOI: 10.3389/fpubh.2016.00059. https://www.ncbi.nlm.nih.gov/pubmed/27066473.

Benbrook, Charles, "Trends in glyphosate herbicide use in the United States and globally," *Environmental Sciences Europe*, 2016, 28(1), 3. DOI: 10.1186/s12302-016-0070-0. https://www.ncbi.nlm.nih.gov/pubmed/27752438.

Myers, John Peterson, Antoniou, Michael N, Blumberg, Bruce, Carroll, Lynn, Colborn, Theo, Everett, Lorne G, Hansen, Michael, Landrigan, Philip J, Lanphear, Bruce P, Mesnage, Robin, Vandenberg, Laura N, Vom Saal, Frederick S, Welshons, Wade V, & Benbrook, Charles M, "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," *Environmental Health*, 2016, 15, 19. DOI: 10.1186/s12940-016-0117-0. https://www.ncbi.nlm.nih.gov/pubmed/26883814.

Srednicka-Tober, D., Baranski, M., Seal, C., Sanderson, R., Benbrook, C., Steinshamn, H., Gromadzka-Ostrowska, J., Rembialkowska, E., Skwarlo-Sonta, K., Eyre, M., Cozzi, G., Krogh Larsen, M., Jordon, T., Niggli, U., Sakowski, T., Calder, P. C., Burdge, G. C., Sotiraki, S., Stefanakis, A., Yolcu, H., Stergiadis, S., Chatzidimitriou, E., Butler, G., Stewart, G., & Leifert, C., "Composition differences between organic and conventional meat: a systematic literature review and meta-analysis," *British Journal of Nutrition*, 2016, 115(6), 994-1011. DOI: 10.1017/S0007114515005073. https://www.ncbi.nlm.nih.gov/pubmed/26878675.

Srednicka-Tober, D., Baranski, M., Seal, C. J., Sanderson, R., Benbrook, C., Steinshamn, H., Gromadzka-Ostrowska, J., Rembialkowska, E., Skwarlo-Sonta, K., Eyre, M., Cozzi, G., Larsen, M. K., Jordon, T., Niggli, U., Sakowski, T., Calder, P. C., Burdge, G. C., Sotiraki, S., Stefanakis, A., Stergiadis, S., Yolcu, H., Chatzidimitriou, E., Butler, G., Stewart, G., & Leifert, C., "Higher PUFA and n-3 PUFA, conjugated linoleic acid, alpha-tocopherol and iron, but lower iodine and selenium concentrations in organic milk: a systematic literature review and meta- and redundancy analyses," *British Journal of Nutrition*, 2016, 115(6), 1043-1060. DOI: 10.1017/S0007114516000349. https://www.ncbi.nlm.nih.gov/pubmed/26878105

Landrigan, Philip J, & Benbrook, Charles, "GMOs, Herbicides, and Public Health," *New England Journal of Medicine*, 2015, 373(8), 693-695.

Baranski, Marcin, Srednicka-Tober, Dominika, Volakakis, Nikolaos, Seal, Chris, Sanderson, Roy, Stewart, Gavin B, Benbrook, Charles, Biavati, Bruno, Markellou, Emilia, Giotis, Charilaos, Gromadzka-Ostrowska, Joanna, Rembialkowska, Ewa, Skwarlo-Sonta, Krystyna, Tahvonen, Raija, Janovska, Dagmar, Niggli, Urs, Nicot, Philippe, & Leifert, Carlo, "Higher antioxidant and lower cadmium concentrations and lower incidence of pesticide residues in organically grown crops: a systematic literature review and meta-analyses," *British Journal of Nutrition*, 2014, 112(5), 794-811. DOI: 10.1017/S0007114514001366. https://www.ncbi.nlm.nih.gov/pubmed/24968103.

Benbrook, Charles, & Baker, Brian P., "Perspective on Dietary Risk Assessment of Pesticide Residues in Organic Food," *Sustainability*, 2014, 6, 3552-3570. DOI: 10.3390/su6063552. https://res.mdpi.com/sustainability/sustainability-06-03552/article_deploy/sustainability-06-03552.pdf?filename=&attachment=1.

Benbrook, Charles, "Are organic foods safer or healthier?," *Annals of Internal Medicine*, 2013, 158(4), 296-297. DOI: 10.7326/0003-4819-158-4-201302190-00017. https://www.ncbi.nlm.nih.gov/pubmed/23420244.

Benbrook, Charles, "Impacts of Changing Pest Management Systems and Organic Production on Tree Fruit Pesticide Residues and Risk," *Acta Horticulturae*, 2013.

Benbrook, Charles, Butler, Gillian, Latif, Maged A., Leifert, Carlo, & Davis, Donald R., "Organic production enhances milk nutritional quality by shifting fatty acid composition: A United States-wide, 18-month study," *Plos One*, 2013, 8, 1-13. DOI: 10.1371/journal.pone.0082429.

Benbrook, Charles "Impacts of genetically engineered crops on pesticide use in the U.S. -- the first sixteen years," *Environmental Sciences Europe*, 2012, 24. DOI: 10.1186/2190-4715-24-24.

Benbrook, Charles, "Genetically engineered crops increase pesticide use in United States.," *Pesticides News*, 2010, 12-14.

Benbrook, Charles, & Davis, Donald R, "Letter: Methodologic flaws in selecting studies and comparing nutrient concentrations led Dangour et al to miss the emerging forest amid the trees," *American Journal of Clinical Nutrition*, 2009, 90(6), 1700-1701; author reply 1701. https://www.ncbi.nlm.nih.gov/pubmed/19846543.

Benbrook, Charles, & McCullum-Gomez, C., "Organic vs conventional farming," *Journal of the American Dietetic Association*, 2009, 109(5), 809,811. DOI: 10.1016/j.jada.2009.03.019. https://www.ncbi.nlm.nih.gov/pubmed/19394464.

Benbrook, Charles, "Prevention, not profit, should drive pest management," *Pesticides News*, 2008, 82, 12-17.

Zhao, Xin, Carey, Edward, & Benbrook, Charles, "The influence of organic production on nutritional quality of fruit and vegetables: A meta-analysis," *HortScience*, 2007, 42(4), 885-886.

Benbrook, Charles, "Toward a "Reduced Risk" Pesticide Policy Worthy of the Name," *Outlooks on Pest Management*, 2006, 17(4), 181-184. DOI: 10.1564/17aug11. https://www.ingentaconnect.com/content/resinf/opm/2006/00000017/00000004/art00011.

Benbrook, Charles, Mellinger, Charles, Frantz, Galen, Sexson, Deana, Stevenson, Walt, & Wyman, Jeffrey, "Use of "resistance risk profiles" to guide resistance management planning," *Pesticide Outlook*, 2003, 14(3), 107-110. DOI: 10.1039/B305507H. http://dx.doi.org/10.1039/B305507H.

McCullum, Christine, Benbrook, Charles, Knowles, Lori, Roberts, Susan, & Schryver, Tamara, "Application of modern biotechnology to food and agriculture: food systems perspective," *Journal of Nutrition Education and Behavior*, 2003, 35, 319-332.

Baker, B P, Benbrook, C M, Groth, E, & Lutz Benbrook, K, "Pesticide residues in conventional, integrated pest management (IPM)-grown and organic foods: insights from three US data sets.," *Food Additives and Contaminants*, 2002, 19, 427-446. DOI: 10.1080/02652030110113799.

Benbrook, Charles, "Organochlorine residues pose surprisingly high dietary risks," *Journal of Epidemiology and Community Health*, 2002, 56(11), 822-823. https://www.ncbi.nlm.nih.gov/pubmed/12388569.

Benbrook, Charles M., Sexson, Deana L., Wyman, Jeffrey A., Stevenson, Walter R., Lynch, Sarah, Wallendal, John, Diercks, Steve, Van Haren, Randy, & Granadino, Carlos A., "Developing a pesticide risk assessment tool to monitor progress in reducing reliance on high-risk pesticides," *American Journal of Potato Research*, 2002,  79(3), 183-199. DOI: 10.1007/BF02871934.

Benbrook, Charles, "Do GM crops mean less pesticide use?," *Pesticide Outlook*, 2001,  12, 204-207. DOI: 10.1039/b108609j.

Benbrook, Charles, "Apples, kids and core science," *Choices. The Magazine of Food, Farm, and Resources Issues*, 2000, (No. 3), 21-24.

Lynch, Sarah, Sexson, Deana, Benbrook, Charles, Carter, Mike, Wyman, Jeff , Nowak, Pete, Barzen, Jeb, Diercks, Steve, & Wallendal, John, "Working Out the Bugs," *Choices*, 2000,  Third Quarter 2000, 28-32.

Nigh, R., Benbrook, C., Brush, S., Garcia-Barrios, L., Ortega-Paczka, R., & Perales, H. R., "Transgenic crops: a cautionary tale," *Science*, 2000, 287(5460), 1927.
https://www.ncbi.nlm.nih.gov/pubmed/10755939.

Benbrook, Charles, Groth III, E., Halloran, Jean, Hansen, Michael, & Marquardt, Sandra, "Pest Management at the Crossroads," *American Journal of Alternative Agriculture*, 1997, 12(1), 45-46. DOI: 10.1017/S0889189300007190.

Benbrook, Charles, "The Den Bosch Declaration: Grappling with the challenges of sustainability," *Journal of Soil and Water Conservation*, 1991, 46(5), 349-352.
http://www.jswconline.org/content/46/5/349.extract#.

Benbrook, Charles, "Protecting Iowa's common wealth: Challenges for the Leopold Center for Sustainable Agriculture," *Journal of Soil and Water Conservation*, 1991, 46(2), 89-95.
http://www.jswconline.org/content/46/2/89.extract.

Benbrook, Charles, "Sustainable agriculture: Policy options and prospects," *American Journal of Alternative Agriculture*, 1989, 4(3-4), 153-159. DOI: 10.1017/S088918930000299X.
https://www.cambridge.org/core/article/sustainable-agriculture-policy-options-and-prospects/9BDD34D80698781F21BBF5A8793BCC61.

Benbrook, Charles, "The environment and the 1990 farm bill," *Journal of Soil and Water Conservation*, 1988, 43(6), 440-443. http://www.jswconline.org/content/41/5/285.extract.

Benbrook, Charles, "First principles: The definition of highly erodible land and tolerable soil loss," *Journal of Soil and Water Conservation*, 1988, 43(1), 35-38.
http://www.jswconline.org/content/43/1/35.extract.

Benbrook, Charles, "Is American environmental policy ready for de minimis risks in water?," *Regulatory Toxicology and Pharmacology*, 1988, 8(3), 300-307.
https://www.ncbi.nlm.nih.gov/pubmed/3238061.

Benbrook, Charles, "The science and art of conservation policy," *Journal of Soil and Water Conservation*, 1986, 41(5), 285-291. http://www.jswconline.org/content/41/5/285.extract.

Benbrook, Charles, & Moses, Phyllis B., "Engineering Crops to Resist Herbicides," *Technology Review*, 1986, 89(8), 55-79.

Benbrook, Charles, "Funding Agricultural Economics Research: Discussion," *American Journal of Agricultural Economics*, 1985, 67(5), 1262-1263. DOI: 10.2307/1241413. http://dx.doi.org/10.2307/1241413.

Benbrook, Charles, "Carcinogen policy at EPA," *Science*, 1983, 219(4586), 798. DOI: 10.1126/science.219.4586.798. https://www.ncbi.nlm.nih.gov/pubmed/17780189.

Benbrook, Charles, "An Examination of the Fledgling Alliance of Soil Conservation and Commodity Price Support Programs," *North Central Journal of Agricultural Economics*, 1980, 2(1), 1-16. DOI: 10.2307/1349265. http://www.jstor.org/stable/1349265.

## Reports, Papers, and Book Chapters (partial list)

Benbrook, Charles (2017). The Dollars and Cents of Soil Health. In D. J. Field, C. L. S. Morgan, & A. B. McBratney (Eds.), *Global Soil Security* (pp. 219-226): Springer.

Benbrook, Charles, "*A Commentary on "Comparing the Yields of Organic and Conventional Agriculture" – A Study Published April 25, 2012 in Nature*," 2012, The Organic Center.

Benbrook, Charles, "*A Deeper Shade of Green: Lessons from Grass-based Organic Dairy Farms*," 2012, The Organic Center.

Benbrook, Charles, "*Glyphosate Tolerant Crops in the EU: A Forecast of Impacts on Herbicide Use*," 2012, Greenpeace International.

Benbrook, Charles, "*Initial Reflections on the Annals of Internal Medicine Paper "Are Organic Foods Safer and Healthier Than Conventional Alternatives? A Systematic Review"*," 2012, Washington State University.

Benbrook, Charles, "*The Organic Center's "Dietary Risk Index": Tracking Relative Pesticide Risks in Foods and Beverages*," 2011, The Organic Center.

Benbrook, Charles, "*Transforming Jane Doe's Diet*," 2011, The Organic Center, https://organic-center.org/reportfiles/Transforming_Jane_Does_Diet_FINAL.pdf.

Benbrook, Charles, "Comments re: National Organic Program's proposed rule on Periodic Residue Testing [Document Number AMS–NOP–10–0102; NOP–10–10, 76 Federal Register 23914---23920 dated April 29, 2011; Regulatory Information Number (RIN) 0581–AD11]." Agency, Year, Available at: URL.

Benbrook, Charles, & Davis, Donald R, "*Identifying Smart Food Choices on the Path to Healthier Diets*,"

2011, The Organic Center, Documentation and Applications of TOC-NQI, Version 1.1.

Benbrook, Charles, "*Primer on the Fatty Acids in Milk*," 2010.

Benbrook, Charles, "*What Does Sustainable Agriculture Have to Offer? Conclusions and Recommendations in Two NAS / NRC Reports by Charles Benbrook*," 2010, The Organic Center.

Benbrook, Charles, Carman, Cory, Clark, E Ann, Daley, Cindy, Fulwider, Wendy, Hansen, Michael, Leifert, Carlo, Martens, Klaas, Paine, Laura, Petkewitz, Lisa, Jodarski, Guy, Thicke, Francis, Velez, Juan, & Wegner, Gary, "*A Dairy Farm's Footprint: Evaluating the Impacts of Conventional and Organic Farming Systems*," 2010, The Organic Center.

Benbrook, Charles, "*Impacts of Genetically Engineered Crops on Pesticide Use: The First Thirteen Years*," 2009, The Organic Center.

Benbrook, Charles, "*The magnitude and impacts of the biotech and organic seed price premium*," 2009, The Organic Center.

McCullum-Gomez, Christine, Benbrook, Charles, & Theuer, Richard, "*That First Step: Organic Food and a Healthier Future*," 2009, The Organic Center, Critical Issue Report: That First Step.

Benbrook, Charles, "*Simplifying the Pesticide Risk Equation: The Organic Option*," 2008, The Organic Center, State of Science Review: The Organic Option.

Benbrook, Charles, Zhao, Xin, Yáñez, Jaime, Davies, Neal, & Andrews, Preston, "*Executive Summary: New evidence confirms the nutritional superiority of plant-based organic foods*," 2008, The Organic Center.

Benbrook, Charles, Zhao, Xin, Yáñez, Jaime, Davies, Neal, & Andrews, Preston, "*New Evidence Confirms the Nutritional Superiority of Plant-Based Organic Foods*," 2008, The Organic Center.

Benbrook, Charles, Zhao, Xin, Yáñez, Jaime, Davies, Neal, & Andrews, Preston, "*Nueva Evidencia Con rma la Superioridad Nutricional de Alimentos Orgánicos de Origen Vegetal*," 2008, The Organic Center.

Benbrook, Charles, "*Unfinished Business: Preventing E. Coli O157 Outbreaks in Leafy Greens*," 2007, The Organic Center.

Benbrook, Charles. (2007). Principles Governing the Long-Run Risks, Benefits, and Costs of Agricultural Biotechnology. In C. McManis (Ed.), *Biodiversity and the Law: Intellectual Property, Biotechnology, and Traditional Knowledge*: Earthscan.

Benbrook, Charles, "*Successes and Lost Opportunities to Reduce Children's Exposure to Pesticides Since the Mid-1990s*," 2006, The Organic Center, Critical Issue Report: Reducing Pesticide Dietary Exposure.

Benbrook, Charles, "*Unfinished Business: Preventing Future E.coli 0157 Outbreaks*," 2006, The Target Group.

Benbrook, Charles, "*Breaking the Mold: Impacts of Organic and Conventional Farming Systems on Mycotoxins in Food and Livestock Feed*," 2005, The Organic Center.

Benbrook, Charles, "*Elevating Antioxidant Levels in Food Through Organic Farming and Food Processing*," 2005, The Organic Center, State of Science Review, Number 2.

Benbrook, Charles, "*Rust, resistance, run down soils, and rising costs–Problems facing soybean producers in Argentina*," 2005, AgBioTech InfoNet, Technical Paper Number 8.

Benbrook, Charles "*Executive Summary: Minimizing Pesticide Dietary Exposure Through Consumption of Organic Foods*," 2004, The Organic Center.

Benbrook, Charles, "*Genetically engineered crops and pesticide use in the United States: the first nine years*," 2004, AgBioTech InfoNet, Technical Paper #7.

Benbrook, Charles, "*Impacts of Genetically Engineered Crops on Pesticide Use in the United States: The First Eight Years*," 2004, Ag Biotech InfoNet, Technical Paper #6.

Benbrook, Charles, "*Minimizing Pesticide Dietary Exposure Through the Consumption of Organic Food*," 2004, The Organic Center, State of Science Review.

Benbrook, Charles "*Premium Paid for Bt Corn Seed Improves Corporate Finances While Eroding Grower Profits*," 2002, Benbrook Consulting Services.

Mellon, Margaret, Benbrook, Charles, & Lutz Benbrook, Karen, "*Hogging It!: Estimates of Antimicrobial Abuse in Livestock*," 2001, Union of Concerned Scientists, https://www.ucsusa.org/food_and_agriculture/our-failing-food-system/industrial-agriculture/hogging-it-estimates-of.html#.XAHEhmhKhPY.

Benbrook, Charles et al., "*Update: Pesticides in Children's Foods, An analysis of 1998 USDA PDP Data on Pesticide Residues*," 2000, Consumers Union of the U.S., Inc.

Benbrook, Charles, "*Do You Know What You Are Eating?*," 1999, Technical Division, Consumers Union of the U.S., Inc.

Benbrook, Charles, "*Evidence of the Magnitude and Consequences of the Roundup Ready Soybean Yield Drag from University-Based Varietal Trials in 1998*," 1999, Ag Biotech InfoNet, Technical Paper Number 1.

Benbrook, Charles, Groth, Edward, & Marquardt, Sandra. (1996). *Pesticide Management at the Crossroads*, Consumers Union.

Benbrook, Charles, "*U.S. Foreign Aid: What Counts for Sustainable Development?*," 1995, Coalition of NGO/PVO groups led by Bread for the World.

Benbrook, Charles, "*The Road from Rio:  An International Policy and Action Framework for Sustainable Agriculture and Rural Development*," 1994, FAO/UN.

Benbrook, Charles, & Marquardt, D, "*Challenge and Change: A Progressive Approach to Pesticide Regulation in California*," 1993, Cal-EPA, Department of Pesticide Regulation.

Benbrook, Charles, "*Sustainable Agriculture in the 21st Century:  Will the Grass Be Greener?*," 1992, Humane Society of the United States.

Benbrook, Charles, "*Unraveling Delaney's paradox: challenges for the 102nd Congress*," 1991, Institute for Science in Society.

Benbrook, Charles. (1991). Natural Resources Assessment and Policy. In R. Lal & F. J. Pierce (Eds.), *Soil Management for Sustainability* (Proceedings of a Special Symposium held in Edmonton, Alberta, August, 1987 honoring the work and accomplishments of Dr. William E. Larson. ed.). Ankeny, IA: Soil and Water Conservation Society.

Benbrook, Charles. (1991). What We Know, Don't Know, and Need to Know About Pesticide Residues in Food. In B. G. Tweedy (Ed.), *Pesticide Residues and Food Safety: A Harvest of Viewpoints* (Vol. Symposium Series #446): American Chemical Society.

Benbrook, Charles, "*Investing in Research: A Proposal to Strengthen the Agricultural, Food, and Environmental System, Appendix B: Private Sector Research Activities and Prospects*," 1989, NAS Press.

Benbrook, Charles. (1985). Public Policies and Institutions to Enhance Crop Productivity. In *Crop Productivity Research Imperatives Revisited: Proceedings of the Crop Productivity Revisited Conference* (pp. 239-257).

## Partial List of Presentations, Congressional Testimony, and Opinion Pieces

(See https://hygeia-analytics.com/about/who-we-are/#participation for details on Dr. Benbrook's Congressional Testimony, including full text links where available.)

Benbrook, C. "Healthy Outdoor Public Spaces Bill" (# 200425)," testimony delivered before the Health and Human Services Committee, Philadelphia City Council, October 30, 2020, Philadelphia, Pennsylvania.

Benbrook, C. "Private Sector Initiatives to Reduce Children's Pesticide Exposures," AAAS annual meeting symposium on reducing children's pesticide risks, February 19, 2006, St. Louis, Missouri.

Landrigan, P., and Benbrook, C.  "Impacts of the Food Quality Protection Act on Children's Exposures to Pesticides," AAAS annual meeting symposium on reducing children's pesticide risks, February 19, 2006, St. Louis, Missouri.

Benbrook, C. "Sowing the Seeds of Destruction," Op-Ed in the New York Times, July 11, 2003. Accessible at http://www.biotech-info.net/sowing_seeds_NYT.html

Benbrook, C.M., "Why pesticide risks matter and pose tough challenges for ecolabel programs", In Proceedings of a Conference on Ecolabels and the Greening of the Food Market, Tufts University, Boston MA, November 7-9, 2003.

Benbrook, C., and E. Groth. "Who Controls and Who Benefits from Plant Genomics?," AAAS Genomics Seminar Paper, February 19, 2000.

Benbrook, C. M.." Performance criteria for IPM: measuring IPM results," Henk, M. Kogan M. IPM in Oregon: Achievements and Future Directions, Special Report 1020 , 19-27. 2000. Corvallis: Integrated Plant Protection Center, Oregon State University Extension Service.

1998-2002 comments to the EPA and reports on the implementation of the Food Quality Protection Act are accessible through the Consumers Union FQPA website at http://www.ecologic-ipm.net.

Benbrook, C. and J. Cook.. "Striving Toward Sustainability: A Framework to Guide On-Farm Innovation, Research, and Policy Analysis," March 2, 1990. Paper presented at the 1990 Pacific Northwest Symposium on Sustainable Agriculture, Vancouver, Washington.

Benbrook, C. "Conflict or Cooperation: The Path to a 1990 Farm Bill," March 22, 1990. Speech presented before the "Who's Writing the Farm Bill?" Conference, sponsored by Governor George Mickelson and the South Dakota Department of Agriculture, Sioux Falls.

Pesticide Regulatory Policy: Creating a Positive Climate for Innovation. Presented before the Conference on Technology and Agricultural Policy on December 12, 1986. Published in Technology and Agricultural Policy: Proceedings of a Symposium, 1990, pp. 122-140.

Agriculture and Groundwater Quality: Policy Implications and Choices. January 17, 1989. Paper presented as part of the "Technical Session on Agriculture and Groundwater Quality," 1989 Annual Meeting of the American Association for the Advancement of Science, San Francisco, California.

Practical Realities and Political Options in Overcoming World Hunger. February 28, 1989. Invited testimony before the Subcommittee on Natural Resources, Agriculture Research, and the Environment, House Committee on Science and Technology.

Sustainable Agriculture: Policy Options and Prospects. February 28, 1989. Speech before the Institute for Alternative Agriculture Symposium on Sustainable Agriculture, Washington, DC. Published in the American Journal of Alternative Agriculture 4:3-4, pp. 153-159.

Coping With Delaney's Paradox. May 15, 1989. Invited testimony before the Subcommittee on Toxic Substances, Environmental Oversight, Research and Development of the Senate Committee on Environment and Public Works.

Will S. 7222 Unravel Delaney's Paradox? June 6, 1989. Invited testimony before the Senate Labor and Human Resources Committee's Food Safety Hearing.

Priority Setting Mechanisms Utilized by the U.S. Department of Agriculture. June 20, 1989. Testimony before the Senate Agriculture Committee's Agricultural Research and General Legislation Subcommittee.

The United States' Progress Toward Sustainable Resource Development. July 31, 1989. Paper presented at the Forty-fourth Annual Meeting of the Soil and Water Conservation Society, Edmonton, Alberta, Canada.

Balancing Agricultural Production and Resource Conservation Goals Through Commodity Program Reform: Recommendations from the NAS Report Alternative Agriculture. September 21, 1989. Invited testimony before the Senate Committee on Agriculture, Nutrition, and Forestry's Subcommittee on Agriculture Production and Stabilization.

Alternatives to Pesticides: Findings and Recommendations from the NAS Report Alternative Agriculture. September 22, 1989. Invited testimony by Dr. Charles M. Benbrook and Dr. Robert M. Goodman before

the Senate Committee on Environment and Public Works' Subcommittee on Toxic Substances, environmental Oversight, Research and Development Hearing on Pesticides.

Agriculture's Contribution to Water Quality Protection:  Lessons from the NRC Report Alternative Agriculture.  October 3, 1989.Invited testimony before a joint hearing of the House Committee on Agriculture's Subcommittee on Department Operations, Research, and Foreign Agriculture, and the House Committee on Science and Technology's Subcommittee on Natural Resources, Agricultural Research, and the Environment.

Unraveling Delaney's Paradox:  Unfinished Business.  October 19, 1989.  Invited testimony before the House Committee on Agriculture's Subcommittee on Department Operations, Research, and Foreign Agriculture.

Opportunities to Protect Water Quality:  Lessons from the NRC Report Alternative Agriculture.  October 24, 1989.  Invited testimony before a hearing of the Senate Committee on Agriculture, Nutrition, and Forestry's Subcommittee on Conservation and Forestry.

Quality in the American Food Industry:  Lessons from the NRC Alternative Agriculture Report.  November 3, 1989.  Paper presented at the Seventh International Conference on Gastronomy; "Tradition and Innovation in American Food and Wine--A View From the Midwest," Chicago, Illinois.

Beware the Future:  Pesticides, Public Policy, and Pest Management.  Presented before the 14th Illinois Crop Protection Workshop sponsored by the Illinois Cooperative Extension Service, March 9-11, 1988.

Pesticide Food Safety Act of 1988.  September 7, 1988.  Invited testimony before the Subcommittee on Department Operations, Research, and Foreign Agriculture, Committee on Agriculture, U.S. House of Representatives.

Florida's Food Safety Challenges.  September 27, 1988.  Speech presented at the 45th Annual Convention of the Florida Fruit and Vegetable Association in Naples, Florida.

Federal-State Cooperation in the Regulation of Pesticides, chapter in the Primer Agricultural Chemicals and the Midwestern States.  Proceedings of a conference held March 27-28, 1987.

Benbrook, C., and Moses, P.  "Herbicide Resistance:  Environmental and Economic Issues," Proceedings, BioExpo 1986.

## Major Board on Agriculture NAS/NRC Reports

Soil Conservation:  An Assessment of the National Resources Inventory, Volumes 1 and II (1986)

Pesticide and Groundwater Quality:  Issues and Problems in Four States (1986)

Pesticide Resistance:  Strategies and Tactics for Management (1986)

Agricultural Biotechnology:  Strategies for National Competitiveness (1987)

Educating the Next Generation of Food and Agricultural Professionals (1987)

Regulating Pesticides in Food:  The Delaney Paradox (1987)

Designing Foods:  Animal Product Options in the Marketplace (1988)

Understanding Agriculture:  Education in the Secondary Schools (1988)

Alternative Farming (1989)

Investing in Research: A Proposal to Strengthen the Agricultural, Food, and Environmental System (1990)

Pesticides in the Diets of Infants and Children (1993, started in 1989)

Soil and Water Quality: An Agenda for Agriculture (1993, started in 1988)

# REFERENCES

Dr. Fred Kirschenmann

Distinguished Fellow, Leopold Center for Sustainable Agriculture

Iowa State University

515-294-5588 (work, ISU)

515-450-2330

Dr. Margaret Mellon

Retired, former Director Agriculture Programs

Union of Concerned Scientists

Washington, D.C.

202-262-2802 (cell)

mardimellon@mac.com

Dr. Kathleen Merrigan

Executive Director, Swette Center for Sustainable Food Systems

Arizona State University

Phoenix, Arizona

kat.merrigan@gmail.com

301-395-1311

Dr. Melissa Perry

Chair, Dept. of Environmental and Occupational Health

George Washington University

Washington, D.C.

mperry@gwu.edu

617-461-3293