## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION** | ) ) ) ) ) | **MDL No. 2741**<br><br>**Master Docket Case No. 1 16-md-02741-VC** |
| **THIS DOCUMENT RELATES TO:** | ) ) | **Honorable Vince Chhabria** |
| *Elaine T. Aden, Individually, and as Representative of the Estate of Aubrey R. Aden, deceased* | ) ) ) ) | **Case No: 19-cv-1849-VC** |
| Case No. 19:-cv-1849-VC | ) ) | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY DEMAND

    **COMES NOW** Plaintiff, Elaine T. Aden ("Plaintiff" or "Mrs. Aden" or "Elaine T. Aden"), Individually and as representative of the Estate of Aubrey R. Aden, deceased, ("Decedent") (collectively, "Plaintiffs") by and through her attorneys, LAW OFFICES OF DAVID ADEN, LLC, and respectfully submits the following Amended Complaint and Jury Demand against Monsanto Company ("Defendant"), and alleges the following:

### NATURE OF THE ACTION

1.    This action seeks to recover damages for the injuries sustained by Plaintiff as the direct and proximate result of the wrongful conduct and negligence of the Defendant in connection with the design, development, manufacture, testing, packaging, promoting, marketing,

advertising, distributing, labeling, and selling of the herbicide Roundup®, containing the active ingredient glyphosate.

2.      Plaintiffs maintain that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3. Plaintiffs' injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction on Defendant pursuant to *28 U.S.C § 1332* because there is complete diversity of citizenship between Plaintiff and Defendants. Defendant is either incorporated and/or has their principal place of business outside of the state in whichPlaintiffs re side.

5.      The amount in controversy exceeds $75,000.00 exclusive of interest and costs.

6.      There is complete diversity of citizenship between Plaintiffs and Defendant. Plaintiffs are residents and citizens of and is and was domiciled in the State of Mississippi.  As set forth more fully below, Defendant is an entity organized in states other than the State of Mississippi, Defendant's principal place of business in a state other than the State of Mississippi, and Defendant is not a citizen or resident of the State of Mississippi.

7.      Venue is proper in this District pursuant to *28 U.S.C. § 1391(a),* because Defendant marketed, advertised, and distributed the dangerous product in this District; Plaintiffs resided in this District; Plaintiffs' harms, losses, and damages occurred in this District; Defendant do substantial business in the State of Mississippi and within this District; and at all times relevant

hereto, Defendant developed, manufactured, promoted, marketed, distributed, warranted, and sold Roundup® in interstate commerce.

**PARTIES**

8.     Plaintiff, Elaine T. Aden, is a citizen of Mississippi and resides in Carriere, Mississippi.

9.     Decedent, Aubrey Aden, was at all times relevant hereto a citizen of Mississippi and resided in Carriere, Mississippi.

10.    Plaintiffs bring this action for personal injuries sustained by Plaintiffs' exposure to Roundup® ("Roundup") containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup, Decedent developed Non-Hodgkin's Lymphoma.

11.    Pursuant to  *MS Code § 11-7-13*, Decedent's claims survive his death and are brought on his behalf by his wife, Plaintiff, Elaine T. Aden.

12.    Pursuant to *Mississippi Code § 11-7-13,*  Mr. Aden's Estate asserts its claims against the Defendant for Mr. Aden's wrongful death, and those claims are brought on behalf of Decedent's Estate by Mr. Aden's wife, Elaine T. Aden, and that Elaine T. Aden's family asserts a claim for pain and suffering and just compensation for their damages.

13.    "Roundup" refers to all formulations of Defendant's Roundup products that contain the active ingredient glyphosate.

14.    Defendant MONSANTO COMPANY is a Delaware corporation, in "active" status, with a principal place of business in St. Louis, Missouri.

15.    Defendant advertises and sells goods, specifically Roundup, in Hancock County and Pearl River County, Mississippi and in and around the surrounding counties where the Decedent

worked and lived.

16.     Defendant derived substantial revenue from goods and products used in the State of Mississippi.

17.     Defendant expected or should have expected their acts to have consequences within the State of Mississippi, and derived substantial revenue from interstate commerce.

18.     Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup. Defendant is authorized to do business in Mississippi  and derives substantial income from doing business in this state.

19.     Upon information and belief, Defendant purposefully availed themselves of the privilege of conducting activities with the State of Mississippi thus invoking the benefits and protections of its laws.

20.     Upon information and belief, Defendant did design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

## FACTUAL ALLEGATIONS

21.     At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and is responsible for Defendant who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.

22.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

23.     Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based

4

"Roundup" as a broad spectrum herbicide.

24.     Glyphosate is the active ingredient in Roundup.

25.      Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

26.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3- phosphate synthase, known as EPSP synthase.

27.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

28.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

29.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

30.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.,* "Roundup Ready®." As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

31.     The original Roundup, containing the active ingredient glyphosate, was introduced in

1974. Today, glyphosate products are among the world's most widely used herbicides.[1]

32.     For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

33.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), *7. U.S.C. § 136 et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA *7 U.S.C. 136a(a)*.

34.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." *7 U.S.C. § 136(a)(c)(5)(D)*.

35.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." *7 U.S.C. § 136(bb)*. FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

36.     The EPA and the State of Illinois registered Roundup for distribution, sale, and manufacture in the United States and the State of Mississippi.

37.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

38.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." *7 U.S.C. § 136a*- 1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

39.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

### MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP®

40.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit againstMonsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds

and fish. Among the representations the NYAG found deceptive and misleading about the human

and environmental safety of Roundup are the following:

> a) Remember that environmentally friendly Roundup herbicide is biodegradable. It Won't build up in the soil so you can use Roundup with confidence along customers driveways, sidewalks and fences.

> b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

> c) Roundup biodegrades into naturally occurring elements.

> d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

> e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

> f) You can apply Accord with " confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

> g) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700- fold safety margin for workers who manufacture it or use it.

> h) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non- toxic' as it pertains to mammals, birds and fish.

> i) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996.

41.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

> a) its glyphosate-containing pesticide products or any component thereof are safe, nontoxic, harmless or free from risk;
>
> b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.
>
> c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.
>
> d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."
>
> e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.
>
> f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

42.    Monsanto did not alter its advertising in the same manner in any state other than  New York,

and on information and belief has not done so today.

43.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup.  The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it left the soil clean."[3]

---

3 Monsanto Guilty in 'False  Ad' Row, BBC Oct. 15, 2009  available  at http://news.bbc.co.uk/2/hi/europe/8308903.stm.

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

44.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

45.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

46.      In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87- 103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

47.     In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

48.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendants' Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

49.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

50.     The study found that Defendant's Roundup caused delays in the cell cycles of sea

---

[4] Consensus Review of Glyphosate, Casewell No. 661A, March 4, 1985. United States Environmental Protection Agency.
[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf

urchins, while the same concentrations of glyphosate alone[6] proved ineffective and did not alter cell cycles.

51.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

52.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[7]

53.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

54.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

55.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

56.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that

---

6 Martinez et al. 2007; Benachour 2009; Gaspier et al; Peixoto 2005; Marc 2004

7 (Molinari, 2000;  Stewart, et  al.  2003)

amplifying the toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

57.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

58.     Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Decedent from Roundup.

59.     Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate was insufficient to prove the safety of Roundup.

60.     Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Decedent from Roundup.

61.     Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Decedent and the consuming public.

62.     Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

### IARC CLASSIFICATION OF GLYPHOSATE

63.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency of the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

64.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

65.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on pubic health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer- reviewed data.

66.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendants' possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence  of carcinogenicity in animals.

67.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

68.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for otheR pesticides.

69.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

70.     Despite the new classification by the IARC, Defendant had ample evidence of glyphosateand Roundup's genotoxic properties for decades.

71.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

72.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

73.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

74.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

75.     Oxidative stress and associated chronic inflammation are believed to be involved  in carcinogenesis.

76.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

77.     In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

78.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

79.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

80.     Despite a mountain of knowledge to the contrary, Defendant maintains that there is no that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

81.     In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

82.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

83.     Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

84.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubular adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

85.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

86.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

87.     In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

88.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

89.     In 2008, Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

90.     This strengthened previous associations between glyphosate and NHL.

91.     In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

92.     Upon information and belief, these statements and representations have been made with the intent of inducing Decedent, the agricultural community, and the public at large to purchase and increase the use of Defendant's Roundup for Defendant's pecuniary gain, and in fact, did induce Decedent to use Roundup.

93.     Defendant made these statements with complete disregard and reckless indifference to the safety of Decedent and the general public.

94.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

95.    Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

96.    Defendant failed to appropriately and adequately inform and warn Decedent of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

97.    Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

98.    Defendant has claimed and continues to claim that Roundup is safe, non- carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of their products, the safety of the public at large, and the safety of Decedent.

## SCIENTIFIC FRAUD UNDERLYING THE SAFETY DETERMINATION OF GLYPHOSATE

99.    After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

100.    This culminated in the EPA's reclassification of glyphosate to Group E, which was based

upon evidence of non-carcinogenicity in humans.

101.    In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

102.    On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

103.    In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

104.    In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

105.    Three top executives of IBT were convicted of fraud in 1983.

106.    In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

107.    In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

108.    The investigation led to the indictments of the laboratory owner and a handful of employees.

## MONSANTO'S CONTINUING DISREGARD
## FOR THE SAFETY OF DECEDENT AND THE PUBLIC

109.    Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[8]

110.    Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

111.    Glyphosate, and Defendant's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

112.    Defendant's statements proclaiming the safety of Roundup and disregarding its Dangers misled Decedent.

113.    Despite D efendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

114.    Defendant's failure to adequately warn Decedent resulted in (1) Decedent using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct

---

[8] Backgrounder – Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015).

consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

115.    Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

116.    The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

117.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

118.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

119.    By reason of the foregoing acts and omissions, Plaintiffs seek compensatory damages as a result of Decedent's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Decedent to suffer from cancer, specifically Non-Hodgkin's Lymphoma, and Plaintiffs suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

120.    Because of the foregoing, Plaintiffs were severely and permanently injured.

121.    By reason of the foregoing acts and omissions, Plaintiffs endured and, in some categories continued to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendant.

**DECEDENT'S EXPOSURE TO ROUNDUP®:**
**COMMERCIAL APPLICATION OF ROUNDUP® from  1994 to 2005  AUBREY ADEN**
**HORTICULTURAL SERVICES**

122.    In 1994, Mr. Aubrey R. Aden applied for and sat for his Commercial Applicator License

that allowed for a Commercial Pesticide Application License. In order to successfully qualify and be awarded a Commercial Applicator License, Mr. Aubrey R. Aden was required to sit for and pass a written examination which set forth standards of practice of laws on proper application of the pesticides in a commercial setting that allowed him to solicit business upon successful completion of the examination.

123.   The Commercial Applicator License consisted to two parts:

> *1.) The application of pesticides of Commercial Pesticides; and*
> *2.) A second examination allowed Mr. Aden for a certificate in a particular area of specialty of horticulture.*

124.   Mr. Aubrey R. Aden was certified on safety techniques for the application of Roundup® for commercial use techniques set forth in the Material Safety Data Sheet which always deferred to the Roundup® label for proper use and application of Roundup® on commercial accounts.

125.   In 1994, Mr. Aubrey R. Aden acquired this Application Certificate Holder that allowed him to purchase broadleaf  herbicides primarily used to kill woody brush and small trees.

126.   Mr. Aubrey Aden was licensed as a Bureau of Plant Industry in 1994, Bureau of Plant Industry bearing certificate for certified Commercial Pesticide Application Certificate.

127.   Mr. Aubrey Aden obtained a commercial license with the Mississippi Department of Agriculture and Commerce Bureau of Plant Industry for Certified Commercial Pesticide Applicator Certificate.

128.   While employed with Aubrey Aden Horticulture Services it was not uncommon for Mr. Aden to be exposed to Roundup® by such methods such as clothing exposure, hand to mouth exposure, skin absorption, and respiratory exposure.

129.   At all times during the course and scope of his employment with Aubrey Aden

Horticulture Services Mr. Aden maintained his active license with the Mississippi Department of Agriculture and Commerce Bureau of Plant Industry for Certified Commercial Pesticide Applicator Certificate adhering to commercial standards of care for appropriate storage and handling of the Commercial Concentrate Herbicide Roundup® product.

130.    At all times during the course and scope of his employment with Aubrey Aden Horticulture Services Mr. Aden maintained his active license with the Mississippi Department of Agriculture and Commerce Bureau of Plant Industry for Certified Commercial Pesticide Applicator Certificate adhering to commercial standards of care for appropriate exposure control/personal protection of the Commercial Concentrate Herbicide Roundup® product.

131.    At all times during the course and scope of his employment with Aubrey Aden Horticulture Services Mr. Aden maintained his active license with the Mississippi Department of Agriculture and Commerce Bureau of Plant Industry for Certified Commercial Pesticide Applicator Certificate adhering to commercial standards of care for appropriate knowledge of the physical and chemical properties of the Commercial Concentrate Herbicide Roundup® product.

132.    At all times during the course and scope of his employment with Aubrey Aden Horticulture Services Mr. Aden maintained his active license with the Mississippi Department of Agriculture and Commerce Bureau of Plant Industry for Certified Commercial Pesticide Applicator Certificate adhering to commercial standards of care for appropriate of knowledge of the toxicological information of the Commercial Concentrate Herbicide Roundup® product.

133.    At all times during the course and scope of his employment with Aubrey Aden Horticulture Services Mr. Aden maintained his active license with the Mississippi Department of Agriculture and Commerce Bureau of Plant Industry for Certified Commercial Pesticide

Applicator Certificate adhering to commercial standards of care for appropriate ecological information of the Commercial Concentrate Herbicide Roundup® product.

134.    At all times during the course and scope of his employment with Aubrey Aden Horticulture Services Mr. Aden maintained his active license with the Mississippi Department of Agriculture and Commerce Bureau of Plant Industry for Certified Commercial Pesticide Applicator Certificate adhering to commercial standards of care for appropriate disposal considerations of the Commercial Concentrate Herbicide Roundup® product.

135.    At all times during the course and scope of his employment with Aubrey Aden Horticulture Services Mr. Aden maintained his active license with the Mississippi Department of Agriculture and Commerce Bureau of Plant Industry for Certified Commercial Pesticide Applicator Certificate adhering to commercial standards of care for appropriate transport information of the Commercial Concentrate Herbicide Roundup® product.

136.    At all times during the course and scope of his employment with Aubrey Aden Horticulture Services Mr. Aden followed the Material Safety Data Sheet Commercial Product guidelines for application of the Commercial Concentrate Herbicide Roundup® product.

137.    At all times during the course and scope of his employment with Aubrey Aden Horticulture Services Mr. Aden maintained his active license with the Mississippi Department of Agriculture and Commerce Bureau of Plant Industry for Certified Commercial Pesticide Applicator Certificate adhering to commercial standards of care for appropriate application and handling of the Commercial Concentrate Herbicide Roundup® product.

## DECEDENT'S EXPOSURE TO  ROUNDUP® THROUGH FARM APPLICATION OF ROUNDUP®  FROM 1970 to 2015 ADEN RANCH/FARM

138.    In 1970, Mr. Aubrey Aden bought a farm and implemented agricultural non-solicitation services for his Roundup®.

139.    Mr. Aden  was exposed to Roundup® regularly by routine and regular use of Roundup® on his farm where he would use the product to kill the weeds located under farm fences and other locations on his farm for weed control.

140.    Mr. Aden kept bottles of Roundup® at all times in a secure cabinet and  maintained these bottles in locations to where he would have easy access to the regular use of Roundup® at any occasion. Basically, there was almost never a time when Mr. Aden was not in close proximity to Roundup® and or using Roundup® since the early 1970's.

141.    At all times, Mr. Aubrey R. Aden maintained the same commercial standards for transportation, ecological considerations, disposal, first aid measures, firefighting measures, accidental release measures, handling and storage considerations, exposure controls/personal protection considerations, stability and reactivity considerations, toxicological information considerations, ecological considerations, disposal considerations, transport considerations, and regulatory consideration for farm related application of the Roundup® product, despite potential variances for the farm application Roundup®.

142.    At or around 2013, Mr. Aden was diagnosed with Non-Hodgkin's Follicular Lymphoma. From 2013 until 2017, Mr. Aden had approximately 20 treatments, to which he suffered discomfort from the treatments.  The treatments were long in duration and would often exhaust Mr. Aden rendering him close to homebound status to the point of extreme exhaustion.

143.     After the diagnosis of Non-Hodgkin's Lymphoma Mr. Aden suffered from  depression, giving up all his hobbies.

144.    As a result of Decedent's injuries, the Plaintiffs  incurred significant economic and non-economic damages.

145.    As a result of Decedent's injuries and untimely death, all of Decedent's next of kin have suffered injuries, including grief, sorrow, mental anguish, companionship, and society.

**EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS**

146.    Plaintiffs incorporate by reference all prior paragraphs of this Amended Complaint as if fully set forth herein.

147.    The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through their affirmative misrepresentations and omissions,actively concealed from Plaintiffs the true risks associated with Roundup and glyphosate.

148.    At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, And non-carcinogenic.

149.    Indeed, even as of December 2020, Defendant continues to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and *agree* that there is *no evidence* that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).[9]

150.    As a result of Defendant's actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact,

---

[9] Backgrounder – Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015).

exposed Decedent to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

151.    Furthermore, Defendant is estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiffs or to distributors of Roundup. In addition, Defendant is estopped from relying on any statute of limitations because of their intentional concealment of these facts.

152.    Plaintiffs had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiffs could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiffs and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## **FIRST CAUSE OF ACTION (NEGLIGENCE)**

153.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Amended Complaint contained in each of the foregoing paragraphs inclusive, with the same force and

effect as if more fully set forth herein.

154.     Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution ofRoundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

155.     Defendant failed to exercise ordinary care in the designing, researching, testing,manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendant knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

156.     The negligence by the Defendant, their agents, servants, and/or employees, included but was not limited to the following acts and/or omission:

> a) Manufacturing, producing, promoting, formulating, creating,
> and/or designing Roundup without thoroughly testing it;
>
> b) Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;
>
> c) Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendant herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;
>
> d) Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after

Defendant had knowledge that Roundup is, was, or could be carcinogenic;

e) Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f) Negligently failing to adequately and correctly warn the Plaintiffs, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g) Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h) Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i) Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j) Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k) Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l) Negligently designing Roundup in a manner, which was dangerous to its users;

m) Negligently manufacturing, producing, and formulating Roundup in a manner, which was dangerous to its users;

n) Concealing information from the Plaintiffs while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

o)   Improperly concealing and/or misrepresenting information from the Plaintiffs, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

p) Negligently selling Roundup with a false and misleading label.

157.   Defendant under-reported, underestimated and downplayed the serious dangers of Roundup.

158.   Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

159.   Defendant was negligent and/or violated Illinois law in the designing, researching,supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

a)   Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b) Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c) Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d)   Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e) Failed to warn Plaintiffs of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of

NHL;

f) Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g) Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h) Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and

i) Were otherwise careless and/or negligent.

160.     Despite the fact that Defendant knew or should have known that Roundup caused or could cause, unreasonably dangerous side effects, Defendant continued to market, manufacture, distribute, and/or sell Roundup to consumers, including Decedent.

161.     Defendant knew or should have known that consumers such as the Decedent would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

162.     Defendant's violations of law and/or negligence were the direct and proximate cause of Plaintiffs' injuries, harm and economic loss, which Plaintiffs suffered and/or will continue to suffer.

163.     As a direct and proximate result of the foregoing acts and omissions, the Decedent suffered from serious and dangerous side effects including, but not limited to, Non- Hodgkin's Lymphoma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Decedent suffered life-threatening Non- Hodgkin's

Lymphoma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

164.    As a direct and proximate result of the foregoing acts and omissions, Decedentsuffered an untimely death and all of Decedent's next of kin have suffered injuries, including grief, sorrow, mental anguish, companionship, and society.

## SECOND CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY – DESIGN DEFECT)

165.    Plaintiffs repeat, reiterate and, re-allege each and every allegation of this Amended Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

166.    At all times herein mentioned, the Defendant designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or have acquired the Defendant who have designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as hereinabove described that was used by the Decedent.

167.    Defendant's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant.

168.    At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Decedent herein.

169.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the

benefits associated with the design or formulation of Roundup.

170.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design and/or formulation, in that, when it left the hands of the Defendant manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

171.    At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendant. In particular, Defendant's Roundup was defective in the following ways:

> a) When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate;
>
> b) When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;
>
> c) When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner;
>
> d) Defendant did not sufficiently test, investigate, or study its Roundup products;
>
> e) Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;
>
> f) Defendant knew or should have known at the time of

marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries; and

g) Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

172.    Defendant knew, or should have known that at all times herein mentioned its Roundup was in a defective condition and was and is inherently dangerous and unsafe.

173.    Decedent was exposed to Defendant's Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

174.    At the time of the Decedent's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

175.    Defendant, with this knowledge, voluntarily designed its Roundup with a dangerous condition for use by the public and, in particular , the Decedent.

176.    Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

177.    Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

178.    Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

179.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

180.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant reached their intended users in the same defective and unreasonably dangerous condition in which the Defendant's Roundup was manufactured.

181.    Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Decedent in particular, and Defendant is therefore strictly liable for the injuries sustained by the Plaintiffs.

182.    The Decedent could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

183.    By reason of the foregoing, the Defendant has become strictly liable to the Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

184.    Defendant's defective design, of Roundup amounts to willful, wanton, and/or reckless conduct byDefendant.

185.    Defects in Defendant's Roundup were the cause or a substantial factor in causing Plaintiffs' injuries.

186.    As a direct and proximate result of the foregoing acts and omission, the Decedent developed Non-Hodgkin's Lymphoma, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

187.    As a direct and proximate result of the foregoing acts and omissions, Decedent suffered an untimely death and all of Decedent's next of kin have suffered injuries, including grief,

sorrow, mental anguish, companionship, and society.

## THIRD CAUSE OF ACTION
### (STRICT PRODUCTS LIABILITY – FAILURE TO WARN)

188.    Plaintiffs repeat, reiterate and re-allege each and every allegation of this Amended Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

189.    Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Decedent who are exposed to it through ordinary and reasonably foreseeable uses.

190.    Defendant did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Decedent. Additionally, Defendant expected the Roundup that they were selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including Decedent, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

191.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

192.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the time Decedent was exposed to and/or ingested the product.

The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing Non-Hodgkin's Lymphoma as a result of exposure and use.

193.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of *7 U.S.C. § 136j(a)(1)(E)* as well as the laws of the State of Illinois.

194.    Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated *7 U.S.C. § 136j(a)(1)(E)* as well as the laws of the State of Illinois.

195.    Defendant could have amended the label of Roundup to provide additional Warnings.

196.    This defect caused serious injury to Decedent, who used Roundup in its intended and foreseeable manner.

197.    At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

198.    Defendant labeled, distributed, and promoted the aforesaid product so that it was dangerous and unsafe for the use and purpose for which it was intended.

199.    Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a  substantial contributing factor in the development of Non-Hodgkin's Lymphoma.

200.    Defendant was aware of the probable consequences of the aforesaid conduct. Despite the

fact that Defendant knew or should have known that Roundup caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing Non-Hodgkin's Lymphoma from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Decedent.

201.    At the time of exposure, the Decedent could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

202.    Defendant, as the manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

203.    Decedent reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

204.    Had Defendant properly disclosed the risks associated with Roundup products, Decedent would have avoided the risk of Non-Hodgkin's Lymphoma by not using Roundup products.

205.    The information that the Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Decedent, and similarly

situated individuals, to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable

risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

206.    To this day, Defendant has failed to adequately warn of the true risks of Decedent's injuries associated with the use of and exposure to Roundup.

207.    As a result of its inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Decedent.

208.    As a direct and proximate result of Defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiffs to sustain injuries as herein alleged.

209.    As a direct and proximate result of the foregoing acts and omissions, Decedent suffered an untimely death and all of Decedent's next of kin have suffered injuries, including grief, sorrow, mental anguish, companionship, and society.

## FOURTH CAUSE OF ACTION
## (BREACH OF IMPLIED WARRANTIES)

210.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Amended Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

211.    At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandised, advertised, promoted, and sold Roundup and/or have recently acquired the Defendant who have manufactured, compound portrayed, distributed, recommended, merchandised, advertised, promoted, and sold Roundup, as a broad spectrum

herbicide. The actions were under the ultimate control and supervision of Defendant.

212.   At the time Defendant marketed, sold, and distributed Roundup for use by Decedent, Defendant knew of Roundup's intended use and impliedly warranted the product to be of merchantable quality and safe and fit for this use.

213.   The Defendant impliedly represented and warranted to Decedent and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

214.   These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

215.   Decedent and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

216.   Decedent reasonably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

217.   Roundup was injected into the stream of commerce by the Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

218.   The Defendant breached the aforesaid implied warranties, as their herbicide Roundup was not fit for its intended purposes and uses.

219.   As a direct and proximate result of the foregoing acts and omissions, Decedent suffered from Non-Hodgkin's Lymphoma and Plaintiffs suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished

enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

220.    As a direct and proximate result of the foregoing acts and omissions, Decedent suffered an untimely death and all of Decedent's next of kin have suffered injuries, including grief, sorrow, mental anguish, companionship, and society.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs demand judgment against the Defendant on each of the above- referenced claims and causes of action as follows:

> 1. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action

> 2. Awarding compensatory damages to Plaintiffs for past and future damages,  including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs and economic loss;

> 3. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of this action;

> 4. Awarding damages to compensate Decedent's Estate for Decedent's wrongful death, including but not limited to damages for grief, sorrow, mental anguish, companionship, and society.

> 5. Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendant who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowed by applicable law; and

> 6. Pre-judgment interest;

> 7. Post-judgment interest;

8. Awarding Plaintiffs reasonable attorneys' fees;

9. Awarding Plaintiffs the costs of these proceedings; and

10. Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury as to all issues.

Dated: December 22, 2020

Respectfully submitted,


*/S/ David Aden*

_____

**DAVID R. ADEN  (LA BAR NO. 30373)**
**(TEXAS BAR NO: 24105005)**
**LAW OFFICES OF DAVID ADEN**
201 St. Charles Ave., Suite 2500
New Orleans, Louisiana 70170
T: (504) 452-3778
F: (504) 684-1377
*Attorney for Elaine T. Aden, Individually and on behalf of*
*The Estate of Aubrey R. Aden*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 1, 2021,  I electronically filed the foregoing document

with the Clerk of the Court using the CM/ECF system which will send notification of such filing

to the CM/ECF participants registered to receive service in this MDL.



_____ ____/s/ David Aden_____
**DAVID ADEN**