**KLEIN & FRANK, P.C.**
BETH KLEIN, ESQ.  [SBN 181456]
beth@kleinfrank.com
2505 Walnut Street, Suite 100
Boulder, Colorado 80302
Voice: (303) 448-8884
Facsimile: (303) 861-2449
Attorneys for Plaintiffs,
BRUCE J. DINNER
Individually and the
ESTATE OF MARIE BERNICE DINNER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION _____ | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

MDL: 2741

Case Number:  3:20-cv-03360-VC

**AMENDED COMPLAINT**

This document relates to:

BRUCE DINNER Individually and as the PERSONAL REPRESENTATIVE of the ESTATE OF MARIE BERNICE DINNER, v. MONSANTO CO.,
Case No.: 3:20-cv- 03360-VC

_____

Bruce Dinner, individually as the surviving spouse of Marie Bernice Dinner and as the duly appointed personal representative of the Estate of Marie Bernice Dinner, by and through their undersigned attorney, hereby brings this Complaint for damages against Defendant Monsanto Company and DOES 1-50, and alleges the following:

## NATURE OF THE CASE

1.   This is a wrongful death and survival action arising from the death of Marie Bernice Dinner, caused by the design, development, manufacture, testing, packing, promoting,

EXHIBIT B

marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2.   Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3.   Marie Bernice Dinner's damages and death, like those striking thousands of similarly situated victims across the country, were foreseeable and avoidable and proximately caused by the actions of the Defendant.

## JURISDICTION AND VENUE

4.   This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendant.

5.   Defendant is a citizen of the State of Missouri whose principle place of business is in St. Louis.

6.   Plaintiff Bruce Dinner is a citizen of the State of Colorado, residing in Denver, Colorado.

7.   The Estate of Marie Bernice Dinner is properly pending in the Denver County District Court, Probate Division, Case No.: 2020PR30811.

8.   The amount in controversy between Plaintiffs and Defendant exceeds $75,000, exclusive of interest and cost.

9.   The Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

10. Venue is proper within this district pursuant to 28 U.S.C. § 1391 in the Defendant conduct business here and are subject to personal jurisdiction in Colorado.  Furthermore, Defendant sells, markets, and/or distributes Roundup® within the District of Colorado.  Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within Colorado.

## PARTIES

11. The Personal Representative, Bruce Dinner, is legally authorized to bring this action on behalf of the Plaintiff, the Estate of Marie Bernice Dinner pursuant to C.R.S. section 13-20-101.

12. On June 25, 2020, Bruce Dinner was duly appointed as Personal Representative of the Estate of Marie Bernice Dinner by the Denver County District Court, Probate Division, Case No.: 2020PR30811.

13. Plaintiff, Bruce Dinner also is the surviving spouse husband of Marie Bernice Dinner who has the right under Colorado law to pursue a wrongful death action.  C.R.C. section 13-21-201.

14. Bruce Dinner brings this wrongful death and survival action, individually and as personal representative of the Estate of Marie Bernice Dinner arising from Marie Bernice Dinner's exposure to and death caused by Roundup® (hereinafter "Roundup") containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA").  As a direct and proximate result of being exposed to Roundup, Marie Bernice Dinner developed non-Hodgkin's Lymphoma.

15. Roundup refers to all formulations of Defendant's Roundup products, including but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate,  Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed and Grass Killer, Round Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed and Grass Killer, Roundup Ready-to-Use Extended Control  Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

16. Defendant Monsanto Company is a Delaware corporation, Colorado Secretary of State Entity No. 20001183279, in "active" status, with a principle place of business in St. Louis Missouri.

17. Upon best information and belief, Defendant Does 1-50 are subsidiaries, partners, or other entities that were involved in the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate. The identities of Does 1-50 are unknown to the Plaintiffs as this time. Plaintiffs will move the Court to specifically name Does 1-50 as their identities become known to Plaintiffs through discovery.

18. Defendant Monsanto Company and Does 1-50 are collectively referred to as "Defendant."

19. Defendant advertises and sells goods, specifically Roundup, in Colorado.

20. Defendant transacted and conducted business within the State of Colorado that relates to the allegations in this Complaint.

21. Defendant derived substantial revenue from goods and products used in the State of Colorado.

22. Defendant expected or should have expected their acts to have consequences within the State of Colorado, and derived substantial revenue from interstate commerce.

23. Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

24. Defendant is authorized to do business in Colorado and derive substantial income from doing business in this state.

25. Upon information and belief, Defendant purposefully availed itself of the privilege of conducting activities with the State of Colorado, thus invoking the benefits and protections of its laws.

26. Upon information and belief, Defendant designed, sold, advertised, manufactured and/or distributed Roundup, with full knowledge of its dangerous and defective nature.

## **FACTUAL ALLEGATIONS**

27.  At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible for Defendant who have designed, research, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.

28. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri.  It is the world's leading producer of glyphosate.

29. Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad spectrum herbicide.

30. Glyphosate is the active ingredient in Roundup.

31. Glyphosate is a broad-spectrum herbicide used to kill weeds and grassed known to compete with commercial crops grown around the globe.

32. Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

33. Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosophate synthase that interferes with the shikimic pathways in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

34. Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

35. Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks and golf courses.   This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

36. Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.* "Roundup Ready®."  As of 2009, Defendant was the world's

leading producer of seeds designed to be Roundup Ready®.  In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained  Roundup Ready® seeds.

37. The original Roundup, containing the active ingredient glyphosate, was introduced in 1974.  Today, glyphosate products are among the world's most widely used herbicides. Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops.  No other herbicide active ingredient compares in terms of number of approved uses.[1]

38. For nearly 40 years, farmers across the globe have used Roundup, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

39. The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.*  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described in FIFRA 7 U.S.C. § 136a(a).

40. The EPA requires as part of its registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination of EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."  7 U.S.C. § 136(a)(c)(5)(D).

41. FIFRA defines "unreasonable adverse effect on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social and environmental costs and benefits of the use of any pesticide."  7 U.S.C. § 136(bb).  FIFRA thus

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

42. The EPA and the State of Colorado registered Roundup for distribution, sale and manufacture in the United States and the State of Colorado.

43. FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products.   The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

44. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered.  The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. §136a-1.  In order to re-evaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

45. In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015.  The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP®

46. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit challenged Monsanto's general representation that its spray-on glyphosate-based herbicides, including Roundup were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds and fish.  Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a. Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customer's driveways, sidewalks and fences…

b. And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c. Roundup biodegrades into naturally occurring elements.

d. Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e. This non-residual herbicide will not wash or leach in the soil. It … stays where you apply it.

f. You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil micro-organisms biodegrade Accord into natural products.

g. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h. Glyphosate's safety margin is much greater than required.  It has over 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of "practically non-toxic" as it pertains to mammals, birds and fish.

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in the area which has been treated with Roundup.[2]

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

Amended Complaint - 16-CV-02741-VC                                        Page **8** of **32**

47. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisement [in New York] that represent, directly or by implication" that:

    a. Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

    b. Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed, or sold by Monsanto are bio-degradable.

    c. Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

    d. Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

    e. Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

    f. Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

48. Monsanto did not alter is advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

49. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

50. As early as the 1980's, Monsanto was aware of glyphosate's carcinogenic properties.

---

[3] *Monsanto Guilty in "False Ad" Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

51. On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogene are possible human carcinogens with limited evidence of carcinogenicity.

52. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies.  All of the data required was submitted and reviewed and/or waived.[5]

53. In October 1992 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate."  The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans).  Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

54. In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone.[7]   As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

55. In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CKD1/Cyclin B Activation."

56. The study found that Defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone provided ineffective and did not alter cell cycles.

57. In 2004, Julie Marc published a study entitled 'Glyphosate-based pesticides affect cell cycle regulation."  The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

---

[4] Consensus Review of Glyphosate, Caswell No. 661A.  March 4, 1985.  United States Environmental Protection Agency.
[5] Http://www.epa.gov/oppsrrd1/rereistration/REDs/factsheets/0178fact.pdf
[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6.  October 30, 1881.  United States Environmental Protection Agency.
[7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004
[8] Martinez et al. 1991.

58. The study noted that "cell-cycle dysregulation is a hallmark for tumor cells and human cancer.  Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell.  "Further, '[s]ince cell cycle disorders such as cancer results from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

///

59. In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

60. The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

61. In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic and placental cells.

62. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food.  The study concluded that supposed "inert" ingredients, and possibly POEA, changed human cell permeability and amplify toxicity of glyphosate alone.  The study further suggested that determinations of glyphosate toxicity should take into account the presents of adjuvants, or those chemicals used in the formulation of the complete pesticide.  The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

63. The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

---

[9] (Molinari, 2000; Stewart et al. 2003)

Amended Complaint - 16-CV-02741-VC                                    Page **11** of **32**

64. Defendant know or should have known that roundup is more toxic that glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert' ingredients, and/or the surfactant POEA were necessary to protect Marie Bernice Dinner from Roundup.

65. Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to provide the safety of Roundup.

66. Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Marie Bernice Dinner from Roundup.

67. Rather than performing the appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Plaintiffs and the consuming public.

68. Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continues to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

69. The International Agency of Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

70. An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014.  Though nominations for review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

71. IARC set glyphosate for review in 2015-2016.  IARC uses five criteria for determining priority in reviewing chemicals.  The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above-considerations.  Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

72. On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

73. The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

74. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

75. The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

76. Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

77. Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

78.  In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

79. The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

80. Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

81. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

82. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

83. In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate

84. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

85. The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

86. Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

87. In addition to glyphosate and Roundup's genotoxic proper ties, Defendant has long been aware of glyphosate's carcinogenic properties.

88. Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

89. Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

90. In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

91. In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

92. The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11

93. In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

94. The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate

95. In 2008 Mikael Eriksson published a study a population based case-control study of exposure to various pesticides as a risk factor for NHL

96. This strengthened previous associations between glyphosate and NHL.

97. In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

98. Upon information and belief, these statements and representations have been made with the intent of inducing Marie Bernice Dinner and the public at large to purchase, and increase the use of, Defendant's Roundup for Defendant's pecuniary gain, and in fact did induce Marie Bernice Dinner to use Roundup.

99. Defendant made these statements with complete disregard and reckless indifference to the safety of Marie Bernice Dinner and the general public.

100.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

101.     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

102.     Defendant failed to appropriately and adequately inform and warn Marie Bernice Dinner of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant

physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

103.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen,   Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup

104.     Defendant has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.  These misrepresentations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Marie Bernice Dinner.

## SCIENTIFIC FRAUD UNDERLYING THE SAFETY DETERMINATIONS OF GLYPHOSATE

105.     After the EPA's 1985 classification of glyphosate as possible carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classifications.

106.     This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

107.     In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

108.     On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup product for registration purposes committed scientific fraud.

109.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies related to Roundup.   IBT performed approximately 30 tests of glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

110.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate.  The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid.  An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

111.     Three top executives of IBT were convicted of fraud in 1983.

112.     In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

113.     In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

114.     The investigation lead to the indictments of the laboratory owner and a handful of employees.

## MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY OF PLAINTIFFS AND THE PUBLIC

115.     Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic"[10]

116.     Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

117.     Glyphosate, and Defendant's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

---

[10] Backgrounder – Glyphosate:  No Evidence of Carcinogenicity.  Updated November 24, 2014.  (downloaded October 9, 2015)

118.     Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled Marie Bernice Dinner.

119.     Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

120.     Defendant's failure to adequately warn Marie Bernice Dinner resulted in (1) Marie Bernice Dinner using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

121.     Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

122.     The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

123.     The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

124.     The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

125.     By reason of the foregoing acts and omissions, Plaintiff, individually and on behalf of decedent, Bruce Dinner seeks wrongful death and survival action damages as a result of Marie Bernice Dinner's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Marie Bernice Dinner to suffer and die on June 3, 2020 from NHL

## PLAINTIFF MARIE BERNICE DINNER EXPOSURE TO ROUNDUP

126.     Marie Bernice Dinner used Roundup beginning in 1970 to control weeds on their property.

127.     For many years, Plaintiff Bruce Dinner sprayed Roundup on a regular basis on the Plaintiffs' personal property after which Marie Bernice Dinner would garden.

128.     Marie Bernice Dinner followed all safety and precautionary warnings during the course of use.

129.     Marie Bernice Dinner was diagnosed with T Cell Chronic Lymphocytic Leukemia, a subtype of Non-Hodgkin Lymphoma on December 23, 2013.  The development of Marie Bernice Dinner's Non-Hodgkin Lymphoma and her death were proximately and actually caused by exposure to Defendant's Roundup products.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

130.     The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through their affirmative misrepresentations and omissions, actively concealed from Marie Bernice Dinner the true risks associated with Roundup and glyphosate.  Indeed, even as of October 2015, Defendant continue to represent to the public that "Scientists are in agreement that there is no evidence glyphosate causes cancer." (emphasis added)[11]

131.     As a result of Defendant's actions, Marie Bernice Dinner  was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Marie Bernice Dinner to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions

132.     Furthermore, Defendant are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continue to have exclusive control, and because Defendant knew that this information was not available to Marie Bernice Dinner or to distributors of Roundup. In addition, Defendant are estopped from relying on any statute of limitations because of their intentional concealment of these facts.

133.     Marie Bernice Dinner had no knowledge that Defendant were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by

---

[11] Backgrounder – Glyphosate:  No Evidence of Carcinogenicity.  Updated November 2014. (downloaded October 9, 2015)

Defendant, Marie Bernice Dinner could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Marie Bernice Dinner and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations.  Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## FIRST CAUSE OF ACTION
### (NEGLIGENCE)

134.     Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

135.     Defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendant knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are  permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

136.     The negligence by the Defendant, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

> a.   Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b. Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

c. Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendant herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d. Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendant had knowledge that Roundup is, was, or could be carcinogenic;

e. Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f. Negligently failing to adequately and correctly warn Marie Bernice Dinner, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g. Negligently failing to petition the EPA to strength the warnings associated with Roundup;

h. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i. Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j. Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k. Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l. Negligently designing Roundup in a manner, which was dangerous to its users;

m. Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n. Negligently producing Roundup in a manner, which was dangerous to its users;

o. Negligently formulating Roundup in a manner, which was dangerous to its users;

p. Concealing information from Marie Bernice Dinner while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations; and

q. Improperly concealing and/or misrepresenting information from Marie Bernice Dinner, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides.

r. Negligently selling Roundup with a false and misleading label.

137.    Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

138.    Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

139.    Defendant was negligent and/or violated Colorado law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

a. Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b. Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c. Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d. Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e. Failed to warn Marie Bernice Dinner of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f. Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g. Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h. Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity;

i. Were otherwise careless and/or negligent.

140. Despite the fact that Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, and/or sell Roundup to consumers, including Marie Bernice Dinner.

141. Defendant knew or should have known that consumers such as Marie Bernice Dinner would foreseeably suffer injury or death as a result of Defendant's failure to exercise ordinary care, as set forth above.

142. Defendant's violations of law and/or negligence were the proximate cause of Marie Bernice Dinner's death from Non-Hodgkin's Lymphoma.

143. As a result of the aforementioned negligence, the Decedent's Estate suffered damages for medical, funeral and burial expenses.

144. As a result of the aforementioned negligence, the Decedent's husband, Bruce Dinner, has been deprived of the care, affection, and companionship of his wife for the duration of his life.

**SECOND CAUSE OF ACTION**

1

**(STRICT PRODUCTS LIABILITY – DESIGN DEFECT)**

2     145.      At all times herein mentioned, the Defendant designed, researched, manufactured,

3 tested, advertised, promoted, sold, distributed, and/or have acquired the Defendant who have

4 designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as

5 hereinabove described that was used by Marie Bernice Dinner.

6     146.      Defendant's Roundup was expected to and did reach the usual consumers,

7 handlers, and persons coming into contact with said product without substantial change in the

8 condition in which it was produced, manufactured, sold, distributed, and marketed by the

9 Defendant.

10     147.      At those times, Roundup was in an unsafe, defective, and inherently dangerous

11 condition, which was dangerous to users, and in particular, Marie Bernice Dinner.

12     148.      The Roundup designed, researched, manufactured, tested, advertised, promoted,

13 marketed, sold, and distributed by Defendant was defective in design or formulation in that,

14 when it left the hands of the manufacturer and/or supplier, the foreseeable risks exceeded the

15 benefits associated with the design and formulation of Roundup.

16     149.      The Roundup designed, researched, manufactured, tested, advertised, promoted,

17 marketed, sold, and distributed by Defendant was defective in design and/or formulation, in that,

18 when it left the hands of the Defendant manufacturers and/or suppliers, it was unreasonably

19 dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary

20 consumer would expect.

21     150.      At all times herein mentioned, Roundup was in a defective condition and unsafe,

22 and Defendant knew or had reason to know that said product was defective and unsafe,

23 especially when used in the form and manner as provided by the Defendant. In particular,

24 Defendant's Roundup was defective in the following ways:

25              a.    When placed in the stream of commerce, Defendant's Roundup Products were

26                   defective in design and formulation and, consequently, dangerous to an extent

27                   beyond that which an ordinary consumer would anticipate.

28

b.  When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.  When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d.  Defendant did not sufficiently test, investigate, or study its Roundup products.

e.  Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f.  Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries.

g.  Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

151.    Defendant knew, or should have known that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently deadly, dangerous and unsafe.

152.    Marie Bernice Dinner was exposed to Defendant's Roundup in the course of gardening throughout her life, as described above, without knowledge of Roundup's dangerous characteristics.

153.    At the time of Marie Bernice Dinner's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

154.    Defendant with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular Marie Bernice Dinner.

155.    Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

156.    Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

Amended Complaint - 16-CV-02741-VC                          Page **25** of **32**

157.     Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

158.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

159.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant reached their intended users in the same defective and unreasonably dangerous condition in which the Defendant's Roundup was manufactured.

160.     Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to Marie Bernice Dinner in particular, and Defendant is therefore strictly liable for the injuries sustained by and death of Marie Bernice Dinner.

161.     Marie Bernice Dinner could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

162.     By reason of the foregoing, the Defendant has become strictly liable to Marie Bernice Dinner for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

163.     Defendant's defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendant.

164.     Defects in Defendant's Roundup were the cause or a substantial factor in causing Marie Bernice Dinner's injuries and death.

165.     As a result of the foregoing acts and omission, Marie Bernice Dinner developed NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and   mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care and ultimately her death.

166.      As a result of the aforementioned acts and omissions, the Decedent's Estate incurred medical, funeral and burial expenses.

167.      As a result of the aforementioned acts and omissions, the Decedent's husband, Bruce Dinner, has been deprived of care, affection and companionship of his wife for the duration of his life.

### THIRD CAUSE OF ACTION

### (STRICT PRODUCTS LIABILITY – FAILURE TO WARN)

168.      Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Marie Bernice Dinner who are exposed to it through ordinary and reasonably foreseeable uses.

169.      Defendant did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Marie Bernice Dinner. Additionally, Defendant expected the Roundup that it was selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including Marie Bernice Dinner, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

170.      At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

171.      At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the time Marie Bernice Dinner was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

172.     Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

173.     Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of Colorado.

174.     Defendant could have amended the label of Roundup to provide additional warnings.

175.     This defect caused serious injury and ultimately death to Marie Bernice Dinner, who used Roundup in its intended and foreseeable manner.

176.     At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

177.     Defendant labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

178.     Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

179.     Defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendant knew or should have known that Roundup caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Marie Bernice Dinner.

180.     At the time of exposure, Marie Bernice Dinner could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

181.     Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

182.     Marie Bernice Dinner reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

183.     Had Defendant properly disclosed the risks associated with Roundup, Marie Bernice Dinner would have avoided the risk of NHL by not using Roundup.

184.     The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Marie Bernice Dinner, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

185.     To this day, Defendant has failed to adequately warn of the true risks of Marie Bernice Dinner's injuries and death associated with the use of and exposure to Roundup.

186.     As a result of their inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Marie Bernice Dinner.

187.     As a direct and proximate result of Defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused Marie Bernice Dinner, to sustain injuries and death as herein alleged.

188.     As a result of Defendant's actions as alleged herein, the Decedent's Estate incurred medical, funeral and burial expenses.

189.     As a result of Defendant's actions as alleged herein, the Decedent's husband, Bruce Dinner, has been deprived of care, affection and companionship of his wife for the duration of his life.

### FOURTH CAUSE OF ACTION
### (BREACH OF IMPLIED WARRANTIES)

190.     At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandised, advertised, promoted, and sold Roundup and/or have recently acquired the Defendant who have manufactured, compound portrayed, distributed, recommended, merchandised, advertised, promoted, and sold Roundup, as a broad spectrum herbicide.  These actions were under the ultimate control and supervision of Defendant.

191.     At the time Defendant marketed, sold, and distributed Roundup for use by Marie Bernice Dinner, Defendant knew of Roundup's intended use and impliedly warranted the product to be or merchantable quality and safe and fit for this use.

192.     The Defendant impliedly represented and warranted to Marie Bernice Dinner and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

193.     These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

194.     Marie Bernice Dinner inner and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

195.     Marie Bernice Dinner reasonably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use

196.     Roundup was injected into the stream of commerce by the Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

197.     The Defendant breached the aforesaid implied warranties, as their herbicide Roundup was not fit for its intended purposes and uses.

198.    As a result of the foregoing acts and omissions, Marie Bernice Dinner suffered from NHL and Marie Bernice Dinner suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life and death, as well as financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

199.    As a result of the foregoing acts and omissions, the Decedent's Estate medical, funeral and burial expenses.

200.    As a result of the foregoing acts and omissions, the Decedent's husband, Bruce Dinner, has been deprived of the care, affection and companionship of his wife for the duration of his life.

201.    Plaintiffs incorporate all allegations throughout this complaint into each section, claim, and prayer for relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment against the Defendant on each of the above-referenced claims and causes of action and as follows:

1.  Awarding compensatory damages in excess of the jurisdictional amount, for the wrongful death of Marie Bernice Dinner.

2.  Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

3.  Awarding economic damages to Plaintiff, Bruce Dinner, for the loss of care, affection and companionship for the wrongful death of his wife;

4.  Awarding punitive damages for the Defendant's willful and wanton conduct;

5.  Pre-judgment interest;

6.  Post-judgment interest;

7.  Awarding Plaintiffs' reasonable attorneys' fees;

8.  Awarding Plaintiffs the cost of these proceedings; and

9.  Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands trial by jury as to all issues.

Dated:  September 9, 2020                          KLEIN & FRANK, P.C.
                                                  *A duly signed original is on file at*
                                                  *Klein & Frank, P.C.*

                                                  s/ *Beth Klein*
                                                  Beth Klein
                                                  Attorneys for Plaintiffs